Keely E. Duke
ISB 6044;ked@dukescanlan.com
Kevin J. Scanlan
ISB 5521; kjs@dukesanlan.com
Duke Scanlan & Hall, PLLC
1087 W. River Street, Suite 300
Boise, ID 83707
Telephone: (208) 342-3310
Facsimile:(208) 342-3299

David Ettinger *(pro hac application pending)*
Peter E. Boivin *(pro hac application pending)*
dettinger@honigman.com;
pboivin@honigman.com
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone (313) 465-7368
Facsimile (313) 465-7397

*Attorneys for Saint Alphonsus Medical Center-Nampa, Inc., Saint Alphonsus Health System, Inc., and Saint Alphonsus Regional Medical Center, Inc.*

Jason S. Risch
ISB 6655; jrisch@rischpisca.com
Risch Pisca, PLLC
407 W. Jefferson
Boise, ID 83702
Telephone (208) 345-9929
Facsimile (208) 345-9928
*Attorneys for Treasure Valley Hospital*

UNITED STATES DISTRICT COURT

IN THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER - NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.<br><br>              Plaintiffs,<br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD.<br><br>              Defendant. | Case No. _____<br><br>**COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES** |

## INTRODUCTION

1.      This case is being filed to preliminarily and permanently enjoin the latest, and most significant, in an unprecedented wave of acquisitions by St. Luke's Health System, Ltd. ("St. Luke's").  St. Luke's actions threaten to monopolize a broad series of markets in Idaho, further increase health care costs and reduce health care quality.

2.      St. Luke's has acquired more than 20 physician practices, 5 hospitals and 4 outpatient surgery centers in the last several years, gaining a dominant position in a series of health care markets.  St. Luke's is now poised to acquire Saltzer Medical Group ("Saltzer"), the largest and oldest physician practice in Idaho.  If St. Luke's is permitted to successfully acquire Saltzer, the public, Plaintiffs Saint Alphonsus Medical Center - Nampa, Inc. ("Saint Alphonsus Nampa"), Treasure Valley Hospital Limited Partnership ("Treasure Valley Hospital"), Saint Alphonsus Health System, Inc. and Saint Alphonsus Regional Medical Center, Inc., (together "Saint Alphonsus") (together "Plaintiffs"), and health care competition in Idaho and eastern Oregon, will be seriously and irreparably injured, in, among others, the following ways:

a.      St. Luke's will gain a near monopoly share in the Nampa, Idaho market for adult primary care physician services market.   It will continue its practice of foreclosing virtually all competition for the hospital admissions of the physician practices it acquires.

b.      St. Luke's will possess an irreplaceable network of hospitals and physicians, that will allow it to raise prices beyond competitive levels.

c.      Most urgently and irreparably, St. Luke's acquisition of Saltzer will deal a crippling financial blow to Saint Alphonsus Nampa hospital, which depends on

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-2

the admissions from the Saltzer physicians.  The acquisition will likely cause the loss of more than 140 jobs and the reduction or termination of key services.  Since Saint Alphonsus Nampa is a critical "safety net" hospital for the poor, uninsured and underserved of Nampa, such actions will create devastating consequences for the Nampa community.

d.      The acquisition will also irreparably harm Treasure Valley Hospital, which provides high quality, low cost care to the Boise area community.  More than 40% of Treasure Valley Hospital's inpatient and outpatient cases are performed by Saltzer physicians.  If St. Luke's acquires Saltzer, Treasure Valley Hospital would likely need to lay off 10% of its staff and cancel, or delay, planned capital improvements.  These planned improvements include an increase in the number of operating rooms, a new CT scanner, and improvements in its electronic medical records system.  These layoffs, delays and cancellations would have serious negative consequences on the quality of health care in the area.

e.      The transaction will irreparably harm all the Plaintiffs, because it will provide St. Luke's with a greater ability to obtain exclusive or preferential treatment from payors and employers, disrupt Plaintiffs' provider networks offered to managed care and employers, and thereby interfere with the relationships between Plaintiffs on the one hand and payors and employers on the other.  This anticompetitive interference will obstruct the ability of consumers and patients to benefit from competition for the highest quality product at the best price.

3.      St. Luke's actions, including the pending Saltzer acquisition, are the subject of a pending antitrust investigation by the Federal Trade Commission and Idaho Attorney General.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-3

The Idaho Attorney General has repeatedly requested that St. Luke's hold its transaction in abeyance so that the investigation can continue. In a letter dated November 8, 2012, Deputy Attorney General of Idaho stated to St. Luke's counsel that St. Luke's actions are "counter-productive" and "would appear designed to invite litigation":

> "As you know, the Attorney General earlier wrote St. Luke's and asked that it hold off on closing its purchase of Saltzer pending his review of this acquisition. He later sent a similar letter to Saltzer. In August, our office served your client and Saltzer with CIDs to obtain relevant information regarding the transaction. The present incomplete status of the production greatly hampers our ability to review this transaction and determine whether it complies with the Idaho Competition Act. To proceed to close under such circumstances is not constructive and counter-productive. Indeed, such a strategy would appear designed to invite litigation."

See Ex. A.

On November 6, 2012, an attorney for the Federal Trade Commission who has been investigating St. Luke's activities stated that the FTC is "focusing on the Saltzer investigation," because "there has been some indication … in the press, that the parties intend to close this transaction soon; and therefore the FTC is accelerating its investigation of that particular transaction." Nevertheless, St. Luke's is preparing to defy antitrust authorities and to imminently complete the transaction before the FTC or Attorney General act. Plaintiffs are forced to proceed in order to prevent immediate and irreparable injury.

4.    This injury can only be avoided by the issuance of an injunction temporarily prohibiting this transaction pending a trial on the merits.

## THE PARTIES

5.    Plaintiff Saint Alphonsus Medical Center – Nampa, Inc. ("Saint Alphonsus Nampa") is a not-for-profit corporation organized under and by virtue of the laws of Idaho.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-4

Saint Alphonsus Nampa is headquartered in Nampa, Idaho.  Saint Alphonsus Nampa is part of the Saint Alphonsus Health System.

6.      Saint Alphonsus Nampa has operated in Nampa (under this and other names) since 1917.  It is a critical "safety net" hospital for the Nampa community.  Twenty-five percent of its emergency room patients are uninsured.  Half of Saint Alphonsus Nampa births are delivered by physicians at the Terry Reilly Clinic, which is devoted to serving the poor and uninsured.  The hospital's percentage of bad debt and charity care is twice the national average and twice as high as any other hospital in the Treasure Valley.

7.      Saint Alphonsus Nampa (formerly Mercy Medical Center) was acquired by Saint Alphonsus Health System in 2010.  Saint Alphonsus has invested many millions of dollars to improve the Nampa hospital's services and facilities.  This effort has been very successful, and Saint Alphonsus Nampa has continually improved its quality and efficiency.  For example, Saint Alphonsus Nampa has won many recent awards for its quality.  It has been ranked number one in Idaho for coronary interventional procedures, gastrointestinal services and medical treatment.  It has also been ranked among the top five hospitals in Idaho for critical care and joint replacement.  The hospital has received five-star ratings for coronary interventional procedures, treatment of heart attack, total hip replacement, treatment of gastrointestinal bleeding, sepsis and pulmonary embolisms.  In 2012, it won a HealthGrades patient safety excellence award.  Saint Alphonsus Nampa has also improved its service to patients and physicians by substantially reducing waiting time in the emergency room, by reducing operating room turnaround time, and by improving information systems.

8.     Saint Alphonsus Nampa currently has plans to expand the hospital at a new location on the I-84 freeway, with a new emergency department, heart care center and obstetrics unit.  It is also planning significant renovation and facility enhancement to its main campus.

9.     Plaintiff Treasure Valley Hospital Limited Partnership, doing business as Treasure Valley Hospital, ("TVH") is a 9-bed physician-owned, short–term care, non-emergency hospital in Boise, Idaho.  TVH offers both inpatient and outpatient services.  It also offers a full-service laboratory and imaging services, including high field MRI, Multi-Slice CT scanning, Ultrasound, and X-Ray services.

10.     TVH provides high quality, low cost health care.  By nationally recognized measures of quality gathered by the federal government at www.hospitalcompare.hhs.gov, TVH has the best quality measures of all of the hospitals in the Treasure Valley.  TVH is first among the local hospitals in each of the 10 categories listed by the government on that site.  TVH's percentage score in each of these 10 categories is 15 or more percentage points higher than that of the next closest hospital.

11.     Plaintiff Saint Alphonsus Regional Medical Center, Inc. ("Saint Alphonsus Boise") is a not-for-profit corporation, organized under and by virtue of the laws of Idaho, and headquartered in Boise, Idaho.  It operates a licensed medical-surgical/acute care 381-bed facility that serves as the center for advanced medicine in its community.

12.     Saint Alphonsus Boise is Idaho's only nationally-ranked Trauma, Chest Pain and Primary Stroke Center, and is a 4-time HealthGrades Distinguished Hospital for Clinical Excellence recipient, ranking it among the top 5% of hospitals nationwide.

13.     Plaintiff Saint Alphonsus Health System, Inc. ("Saint Alphonsus") is a not-for-profit corporation organized under and by virtue of the laws of Idaho.  Saint Alphonsus is

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-6

headquartered in Boise, Idaho.  Saint Alphonsus owns and operates medical centers serving the full range of the health and wellness needs of the people in southwestern Idaho, eastern Oregon and northern Nevada.  Saint Alphonsus owns four hospitals located in Idaho and Oregon: Saint Alphonsus Regional Medical Center – Boise; Saint Alphonsus Medical Center – Nampa; Saint Alphonsus Medical Center – Ontario; and Saint Alphonsus Medical Center – Baker City.

14.     Defendant St. Luke's Health System, Ltd. ("St. Luke's") is a not-for-profit health system organized under and by virtue of the laws of Idaho.  St. Luke's, which is headquartered in Boise, Idaho, owns and operates six hospitals: St. Luke's Boise, a 399-bed hospital in Boise; St. Luke's Meridian, a 167-bed hospital in Meridian; St. Luke's Magic Valley, a 228-bed hospital in Twin Falls; St. Luke's Wood River, a 25-bed hospital in Ketchum; St. Luke's Jerome, a 25 bed hospital in Jerome; St. Luke's McCall, a 15 bed hospital in McCall, and more than 100 outpatient centers and clinics throughout central and southwest Idaho and eastern Oregon.  St. Luke's also has a "joint partnership" with North Canyon Medical Center in Gooding, Idaho.

15.     The Boise metropolitan area or "Treasure Valley" consists of two counties, Ada (containing the city of Boise, and the towns of Meridian, Kuna, Star, and Eagle) and Canyon (containing the towns of Nampa, Middleton, and Caldwell).  There are three hospitals in Ada County, SARMC and TVH in Boise, and St. Luke's with campuses in Boise and Meridian. There are also two hospitals in Canyon County, Saint Alphonsus Nampa and West Valley Medical Center ("West Valley") in Caldwell.  St. Luke's share of hospital inpatient hospital services in Ada and Canyon counties combined is approximately 58%.  Saint Alphonsus and TVH have an approximate 34.7% share and 0.5% share, respectively.  West Valley's share is approximately 6.8%.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-7

## SALTZER MEDICAL GROUP

16.     Saltzer is a physician-owned multispecialty group with its principal place of business located in Nampa, Idaho.  Saltzer is the largest, physician-owned, multispecialty group in Idaho with physicians in at least 12 specialties.  Saltzer employs all of the internists in Nampa, all but one of the pediatricians, and all of the rheumatologists.  Most of these physicians are primarily based at Saltzer's main facility in Nampa, Idaho.  Saltzer provides outstanding medical care, and has a leading reputation in the Nampa community.  Saltzer prides itself on the loyalty of its patients, many of whom are in the third generation of families treated by Saltzer.  Past studies commissioned by Saltzer indicate that it is at the 90th percentile or higher among physicians in terms of patient satisfaction.

17.     Saltzer faces very little competition in the Nampa area, where it is based, and where most of its physicians practice.  More than three-quarters of Saltzer's patients come from the city of Nampa.

18.     Saltzer's dominance in Nampa is even greater than its number of physicians would suggest.  Its physicians tend to see significantly more patients than the typical physician per doctor in the area.

19.     Patients in the Nampa area have always demanded Saltzer in their payor network. For example, when Saint Alphonsus acquired what was then Mercy Hospital in Nampa, its employees became self-insured under the Saint Alphonsus network.  That network did not include Saltzer because Saint Alphonsus did not previously have employees in the Nampa area. The employees immediately demanded that Saltzer physicians be added to their network.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-8

20.     Similarly, when the St. Luke's network sought to provide coverage for JR Simplot, which has a significant number of employees in the Nampa area, Simplot demanded that the network include Saltzer.

21.     The Saltzer primary care physicians refer almost all of their specialty cases to Saltzer specialists, where Saltzer has a specialist in the relevant field.  The Saltzer specialists receive the vast majority of their cases from Saltzer primary care physicians.

22.     Saltzer's main office is located across the street from the Saint Alphonsus Nampa campus.  Saint Alphonsus Nampa has always depended very heavily on admissions from Saltzer physicians and from the Saltzer patients not technically admitted by Saltzer physicians, but referred to hospitalists at Saint Alphonsus Nampa.  Saltzer patients are critical to the financial viability of Saint Alphonsus Nampa, both because of their volume and the fact that they are more heavily weighted to (more lucrative) commercially insured patients than the hospital's overall patient base.  Saint Alphonsus Nampa is able to afford to treat the poor, uninsured and Medicaid population (on whom it loses money) because of more profitable commercially insured admissions through physicians such as Saltzer.

23.     TVH also relies heavily on Saltzer for its cases.  More than 40% of its inpatient and outpatient cases have been performed historically by Saltzer physicians.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

25.     St. Luke's transacts business in the District of Idaho and is subject to personal jurisdiction therein.  The actions complained of herein took place in this district.  Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391.

## TRADE AND COMMERCE

26.     St. Luke's is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Hundreds of millions of dollars (and close to a majority) of St. Luke's, Saint Alphonsus' and TVH's revenues come from sources located outside of Idaho, including payments from the federal government through such programs as Medicare and payments from out of state commercial payors such as Coventry, Aetna and United Healthcare. This includes payments for both hospital and physicians' services.  St. Luke's and Saint Alphonsus borrow at least tens of millions of dollars from lenders in interstate commerce, through their bond offerings.   Moreover, St. Luke's sells medical services in interstate commerce, and its conduct has an effect on the citizens of several states.  St. Luke's activities at issue include activities in Oregon, where it owns and operates medical facilities.  Both St. Luke's and Saint Alphonsus treat a substantial number of patients from other states, including in particular eastern Oregon.  The parties hereto expend millions of dollars on the purchase of supplies in interstate commerce.

27.     As a result of the fact that much of St. Luke's, Saint Alphonsus' and TVH's revenues come from sources located outside of Idaho, including payments from out of state commercial payors, the increases in the market power of St. Luke's, and weakening of Saint Alphonsus and TVH, described herein, will substantially affect the prices and rates negotiated with the commercial payors and, therefore, substantially affect the parties' revenues in interstate

commerce.  Such actions will also substantially affect the flow of patients across state lines and purchase of supplies in interstate commerce, substantially increasing St. Luke's volume of patients and interstate purchases and decreasing the volumes of the plaintiffs.

## FACTUAL ALLEGATIONS

### St. Luke's Acquisition of Physician Practices in the Boise Area

28.    Over the course of the last four years, St. Luke's has engaged in a series of acquisitions in the Boise, Idaho area that are unprecedented in their magnitude, scope and rapidity.  St. Luke's has acquired 22 physician practices, adding more than 200 employed physicians.  These acquisitions have occurred across 11 different specialties and include, most significantly, acquisitions of 11 separate groups of primary care physicians.

29.    The physician practices that St. Luke's has acquired include some of the most prominent and popular physician groups in the Treasure Valley area, including Capital City Family Medicine, Idaho Family Physicians, Mountain View Medical, Boise Surgical, Intermountain Orthopedics and Boise Orthopedics.  The first three groups were among the leading primary care groups in the Boise area.  Boise Surgical and Boise Orthopedics were, respectively, the most prominent general surgery group and most prominent orthopedic surgery group in the area before they were acquired.

30.    St. Luke's acquisitions over the last two years have given it a dominant position in primary care services and several physician specialty markets, including general surgery, cardiology, pulmonology and orthopedic surgery in the Boise area.

## St. Luke's Acquisition of Surgery Facilities

31.     St. Luke's has also acquired a number of independent competitive facilities that provided (or would have provided) surgery and/or cardiac catheterizations.  In some cases, St. Luke's paid substantial sums simply to eliminate the competition provided by these facilities, without even operating them.  This has further reduced competition and increased St. Luke's dominance.

32.     When St. Luke's acquired the Intermountain Orthopedic group, it also acquired plans, and the land that was purchased, to build an independent neurosurgical-orthopedic hospital.  The planned hospital was abandoned by St. Luke's.  St. Luke's also acquired another surgery center (previously owned by Intermountain) when it acquired Intermountain.

33.     St. Luke's also acquired Orthopedic Surgery Center on River Street.  After the acquisition, many prices at the facility doubled or tripled.

34.     When St. Luke's acquired Idaho Cardiology Associates, the major cardiology group in Boise in late 2007, it also acquired an outpatient catheterization lab (performing diagnostic heart catheterizations) that the doctors operated.  Prior to the acquisition, the cardiologists were located on the Saint Alphonsus Boise campus.  After the acquisition, the group (except for a few physicians who left the group) moved to the St. Luke's campus.  St. Luke's, however, shut down the cath lab, and never operated it.

35.     These acquisitions have resulted in the possession by St. Luke's of a dominant share of surgery rooms in the Treasure Valley.

**St. Luke's has Exploited its Monopoly Power in the Magic Valley**

36.    Since the late 1990's St. Luke's has been systematically acquiring virtually all of

the hospitals and physician practices in the Magic Valley.  For example:

- In the late 1990s, St. Luke's acquired the hospitals in Ketchum, Idaho and in 2000, St. Luke's replaced them with St. Luke's Wood River.  St. Luke's now employs virtually all the primary care physicians in Hailey and Ketchum.

- In 2006, St. Luke's acquired the Magic Valley Regional Medical Center located in Twin Falls, Idaho.  St. Luke's has acquired and now employs the vast majority of the physician practices in the Twin Falls area.

- In 2008, St. Luke's entered into a management agreement with Gooding County Memorial Hospital ("Gooding Memorial") in Gooding, Idaho.  In 2010, the 40-year old Gooding Memorial was replaced by the North Canyon Medical Center ("North Canyon"), which is owned by a "joint partnership" including St. Luke's.

- In 2011, St. Luke's acquired St. Benedict's in Jerome, Idaho.

- St. Luke's managed Elmore Medical Center ("EMC") located in Mountain Home, Idaho for ten years, and in May 2012 St. Luke's acquired EMC.

37.    As a result of these acquisitions, St. Luke's currently controls (through

employment or professional services agreements) upwards of 70% of all physicians and over

80% of the primary care physicians in the Twin Falls-Jerome area.  St. Luke's also controls

100% of the specialists in pediatrics, urology and neurology in that area.  In Wood River, St.

Luke's controls 80% of the primary care physicians, 67% of OB/GYNs and 47% of all

physicians.

38.    A September 2011 editorial in the Twin Falls Times-News characterized St.

Luke's as a "near monopoly" and added that "St. Luke's is the only health care option for most

Magic Valley residents.  While a small number of physicians – and even fewer hospitals – remain unaffiliated, most have signed on with St. Luke's."

39.     As a result of St. Luke's consolidation of power in the Magic Valley, it has been able to charge prices far above competitive levels.  The cost for services doubled the first year St. Luke's Wood River Medical Center opened and the price increases in the Magic Valley have only continued to increase from there.  For example, the price for colonoscopies at St. Luke's Magic Valley Regional Medical Center has quadrupled over the last few years.  St. Luke's charges approximately two to three times more than local independent surgical centers for endoscopies.  St. Luke's charges approximately three times as much for laboratory work than the independent labs in the Magic Valley.  The prices for CT Scans at St. Luke's are approximately 60% higher and X-Rays are twice as expensive as they are elsewhere in the Magic Valley.  As a result of these supracompetitive prices, physicians in Twin Falls often send patients to medical centers in Burley (40 miles away) or Rupert (48 miles away) for CT Scans and X-Rays because they can save their patients anywhere from $400-$500.  St. Luke's has also successfully succeeded in demanding higher reimbursement rates from one or more health plans.

40.     St. Luke's gradually increasing control over the Magic Valley has also resulted over time in an almost 50% decline in admissions from the Magic Valley to Saint Alphonsus.

**The Proposed Acquisition of the Saltzer Medical Group**

41.     St. Luke's and Saltzer began discussing a possible acquisition in 2009.  At that time, Ed Castledine of St. Luke's told Saltzer that if Saltzer did not join with St. Luke's, St. Luke's would bring physicians into the Nampa area to compete with Saltzer.

42.     St. Luke's personnel described their motivations in undertaking the Saltzer transaction as arising from two factors.  First, St. Luke's wanted to secure Saltzer's primary care

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-14

referrals.  Second, St. Luke's wanted additional market share.  Both these points were made by St. Luke's personnel, including, in particular, John Kee, St. Luke's Vice President of Physician Services.

43.      St. Luke's personnel also described their overall goals with respect to the market. St. Luke's wanted control over the patient from beginning to end.  St. Luke's desired a system in which patients saw St. Luke's primary care physicians, had their surgeries performed by St. Luke's specialists at St. Luke's facilities and received all of their ancillary services at St. Luke's facilities.

44.      John Kee also told Saltzer personnel that Saltzer had more negotiating power with managed care than it realized.  He said that St. Luke's received better rates than Saltzer in the Twin Falls area because of the strength of its network.

45.      After St. Luke's made its bid to acquire Saltzer, Saltzer requested that Saint Alphonsus offer a competing bid.  While Saint Alphonsus complied with Saltzer's request and placed a bid that was ultimately unsuccessful, it was always Saint Alphonsus' desire that Saltzer remain as an independent entity within Nampa.

46.      In early 2012, St. Luke's and Saltzer agreed in principle to an acquisition. Pursuant to the currently contemplated transaction, St. Luke's will acquire Saltzer's intangible assets, personal property and equipment, take over the lease on Saltzer's real estate, and employ all of Saltzer's non-physician employees.  Saltzer's physicians will then enter into professional services agreements with St. Luke's, and St. Luke's will conduct all managed care contracting and billing for the Saltzer physicians and their employees and services.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-15

**FTC and Attorney General Actions**

47.    In late 2011, both the Federal Trade Commission and the Idaho Attorney General began investigating St. Luke's actions under the federal antitrust laws and Idaho's Competition Act, respectively.  These investigations are ongoing.

48.    On February 24, 2012, shortly after being made aware of St. Luke's intention to acquire Saltzer, the Idaho Attorney General, Lawrence Wasden, wrote a letter to Christine Neuhoff, Vice President and General Counsel, informing St. Luke's that "if consummated," its acquisition of Saltzer "directly affects our current antitrust review."  The letter also stated that "[h]aving one more large acquisition in the mix complicates matters and would result in additional cost and expense for all parties involved."   Attorney General Wasden further noted that it was his "hope … that St. Luke's will delay closing on its acquisition of the Saltzer Medical Group, and any other medical practice group it is considering acquiring, until our investigation is complete."  See Ex. B.

49.    In an August 16, 2012, statement to the press, St. Luke's spokesperson Ken Dey confirmed St. Luke's intent to move forward with the acquisition of Saltzer.  Dey added that St. Luke's acquisition of Saltzer is "pretty much a 'when' and not an 'if.'"  St. Luke's stated that it would provide the antitrust authorities with 30 days notice of any closing on the Saltzer transaction.

50.    In response to St. Luke's statements in August that it intended to move forward with its acquisition of Saltzer, the Idaho Attorney General wrote a letter to Saltzer dated August 29, 2012, asking it to not merge with St. Luke's while the hospital system was under investigation for possible antitrust violations.  See Ex. C.  The Attorney General informed Saltzer that:

"The acquisition [of Saltzer], if consummated, directly affects our current antitrust review.  While there are various remedies available to address acquisitions that substantially lessen competition, including divestiture, I would hope that upon conclusion of our investigation … we could work to address [concerns] amicably and informally without the need for litigation and court participation. … My hope is that St. Luke's and the Saltzer Medical Group will delay closing on this acquisition until our investigation is complete."

51.     On or before October 23, 2012, in a "President's Update," St. Luke's president, David Pate, announced that "SLHS has provided notice to the FTC and state AG of our intent to proceed to closing with the Saltzer Medical Group."   Ex. D.   Thus, given the earlier announcement that any notice would provide 30 days, the transaction can be expected to close imminently.

52.     As described above, on November 8, 2012, Idaho's Deputy Attorney General, Brett T. DeLange wrote a letter to St. Luke's counsel reiterating the Attorney General's stance that St. Luke's not close this transaction, informing St. Luke's that the Attorney General's investigation was not complete and stating that proceeding to close the transaction was "counterproductive" and "appear[ed] designed to invite litigation."  See Ex. A.

### St. Luke's Activities In Nampa

53.     St. Luke's acquisition of Saltzer would be a further step in its attempt to gain dominance in the Nampa area.  St. Luke's consistent pattern in its physician practice acquisitions has been to acquire the physicians, and then cause them to shift all or virtually all their admissions and other business away from competing facilities, thereby foreclosing competition and securing referrals and admissions for St. Luke's.

54.     For example, in 2011, St. Luke's employed 7 physicians who had been employed by Saint Alphonsus Medical Group.  After their employment, these physicians virtually ceased admitting inpatients to Saint Alphonsus Nampa, and dramatically reduced their outpatient

utilization of Saint Alphonsus Nampa.  This is consistent with the pattern after St. Luke's acquisitions of physician practices in Boise, where the physicians whose practices were acquired reduced their admissions at Saint Alphonsus by more than 90% after the acquisitions.

55.     Another example relates to St. Luke's employed oncologists, who work in a facility across the street from Saint Alphonsus Nampa.  Before Saint Alphonsus acquired this hospital from Catholic Health Initiatives in 2009, those oncologists had been regularly practicing at the hospital.  Immediately after the acquisition, they ceased doing so and resigned from the Saint Alphonsus Nampa medical staff.

56.     When St. Luke's acquired the Boise Orthopedic Group, those physicians were partners in TVH and performed approximately 300 cases per year at the hospital.  After the group was acquired by St. Luke's, those surgeons did not perform any procedures at TVH.

57.     St. Luke's and Saltzer's statements make clear that the same pattern will follow a Saltzer acquisition by St. Luke's.  Saltzer's CEO, John Kaiser, has recently told Saltzer physicians that any patients taken to Saint Alphonsus or Treasure Valley would not be supportive of the group's overall goals.

## The Relevant Product Markets

### Primary Care Physician Services

58.     One relevant product market in this case is the market for adult primary care physician services sold to commercial third party payers ("primary care physician services").  This market encompasses services offered by physicians practicing internal medicine, family practice, and general practice.  Primary care physicians provide both the first contact for a person with an undiagnosed health concern as well as continuing care of varied medical conditions, not limited by cause, organ system, or diagnosis.

59.     Other physicians cannot and will not provide adult primary care services to most adult patients, because they are not trained to provide these services.  Some OB/GYN specialists provide primary care to adult female patients, but they do not do so for adult males.  Health plans would not be able to sell an insurance product without a broad selection of adult primary care physicians within that product's physician panel.  Likewise, patients generally would not, and do not, seek primary care services from physicians who are not primary care physicians.  If faced with a price increase by a hypothetical monopolist for adult primary care services, health plans would be forced to agree to the price increase because access to adult primary care physicians is essential to successfully market a health insurance product.  As a result, other types of physicians are not reasonably interchangeable or substitutes for adult primary care physicians.

60.     As a result of the nature of the practice, many patients establish strong loyalties to their primary care physicians.  One recent survey found that 87% of commercially-insured patients have a regular employed primary care physician, and 74% of these said that they are satisfied with their care.  The survey also found that fewer than 15% switch primary care physicians in a year.

61.     As the first point of entry into the health care system and the physician that is likely to have the most contact and most long-lasting relationship with a patient, primary care physicians can hold great influence over which hospital or specialist a patient will seek additional care with if necessary.  In a study published by the Center for Studying Health System Change, it was reported that almost 70 percent of patients chose a specialist because of their primary care physician's referral.

62.     The relevant market does not include adult primary care physician services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-19

not compete for these services.  A hospital, physician group or physician offering adult primary care physician services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

### General Acute-Care Inpatient Services Market

63.     Another relevant market is the market for general acute-care inpatient hospital services sold to commercial third party payers ("general acute-care services").  General acute-care services encompass a broad cluster of medical and surgical diagnostic and treatment services that include an overnight hospital stay, including, but not limited to, many emergency services, internal medicine services, and surgical procedures.

64.     The general acute-care services market does not include outpatient services (those not requiring an overnight hospital stay) because such services are offered by a different set of competitors under different competitive conditions.   Outpatient hospital services are not reasonably interchangeable with inpatient hospital services, and health plans and patients could not substitute outpatient services for inpatient services in response to a small but significant price increase.  The treatment that requires an inpatient hospital stay cannot be effectively treated on an outpatient basis.  Similarly, the most complex and specialized tertiary and quaternary services, such as certain major surgeries and organ transplants, also are not part of the relevant cluster of services because they generally are not available in the Boise area, are offered by a different set of suppliers under different competitive circumstances, and are not substitutes for general acute-care services.

65.     The relevant market does not include general acute-care services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services.  A hospital offering general acute-care services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

**General Pediatric Physician Services**

66.     Another relevant market is the market for general pediatric physician services sold to commercial third party payers ("general pediatric physician services").  The medical specialty of general pediatrics focuses on the medical care of infants, children, and adolescents. The services provided by pediatricians require specific expertise about infants and children. Most adult primary care physicians lack this expertise.

67.     Many patients would not, and do not, seek general pediatric services from physicians who are not general pediatricians.  As a result, Treasure Valley area health plans would not be able to sell an insurance product without a broad selection of general pediatricians within that product's physician panel.  Each health plan operating in the Treasure Valley has general pediatricians on its panel of providers.  If faced with a price increase by a hypothetical monopolist for general pediatric services, health plans would be forced to agree to the price increase, because access to general pediatricians is essential to successfully market a health insurance product.   For these reasons, other types of physicians are not reasonably interchangeable or substitutes for general pediatricians.

68.     The relevant market does not include pediatric subspecialists, who treat specialty conditions such as pediatric cardiology, pediatric oncology or pediatric surgery.  Subspecialists do not provide the day to day routine care of children that is provided by general pediatricians, and are therefore not substitutes for general pediatricians.

69.     The relevant market also does not include general pediatric services paid for by Medicaid, because this government program fixes its fees and therefore does not compete for these services.  A hospital, physician group or physician offering general pediatric services could not increase its volume or revenue by persuading patients to sign up for Medicaid, because enrollment in these programs is limited to the disabled or underprivileged.  Medicaid typically pays significantly lower rates than do commercial insurers and, therefore, is not an alternative to them.  Of course, Medicare is not available to children.

### Outpatient Surgery Services

70.     St. Luke's acquisitions also threaten substantial competitive harm in the market for outpatient surgery services sold to commercial third party payers ("outpatient surgery services").  Outpatient surgery, also known as ambulatory surgery, is surgery that does not require an overnight hospital stay.  The outpatient surgery services market does not include general acute-care inpatient hospital services (those requiring an overnight hospital stay) because such services are offered by a different set of competitors under different competitive conditions. Patients receiving general acute care services, including inpatient surgery, rather than outpatient surgery, do so because either they are too sick to receive surgery on an outpatient basis or because the surgery they require is sufficiently serious that an inpatient stay is necessary after the surgery.  As a result, general acute-care inpatient hospital services are not reasonable substitutes for outpatient surgery services, and health plans and patients could not substitute outpatient

surgery services for inpatient surgery services in response to a small but significant price increase.

71.     The relevant market does not include outpatient surgery services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services.  A hospital or surgery center offering outpatient surgery services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

## The Relevant Geographic Markets

### Primary Care and General Pediatric Physician Services

72.     The relevant geographic market with respect to primary care and general pediatric physician services is no broader than Nampa, Idaho.  Nampa residents strongly prefer to obtain primary care and pediatric physician services in Nampa.  Because patients generally obtain primary care and pediatric services frequently and often require immediate treatment, such as when they, or their children, have a cold or the flu, they are unwilling to travel long distances to seek primary care or pediatric physician services, and their preference for access to local providers is strong.

73.     More than 75% of Saltzer's patients come from Nampa, where its main clinic is located.  About 80% of Saint Alphonsus Medical Group primary care patients seen in Nampa come from Nampa, and about 80% of the Nampa patients who see a Saint Alphonsus Medical Group physician do so in Nampa.  Most patients in Nampa utilizing the Saint Alphonsus Medical Group primary care physicians travel, on average, less than 10 miles for their care.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-23

74.     It is very important to Nampa patients that their primary care doctors are conveniently located (*e.g.*, "close to home") and readily accessible.  For example, Saint Alphonsus Medical Group advertises its clinics as being "close to home," being open on weekends and holidays and being committed to seeing patients the very same day they feel sick with its "Sick Today/Seen Today" program.  The tagline for its clinics is:  "Convenient Care. Close to Home."

75.     Because of the desire of patients to have easy access to a nearby primary care doctor, primary care providers develop a network of multiple small primary care offices in local communities very near their patients.  For example, Saint Alphonsus Medical Group has a series of small, local offices in Nampa, with separate clinics in Caldwell and Meridian.  Similarly, Primary Health has eleven different clinics in the Treasure Valley.  Saltzer has additional offices in Meridian and Caldwell.

76.     While Caldwell and Nampa are only about 12 miles apart, their medical communities are quite distinct.  Physicians in Caldwell predominantly focus their practices on Caldwell.  For example, the employed Saint Alphonsus primary care physicians at the Saint Alphonsus Medical Group clinic in Caldwell admit few or no inpatients at Saint Alphonsus Nampa.

77.     As a result, health plans must include primary care physicians and pediatricians from Nampa in order to meet their members' needs, and all area health plans do so.  Thus, a hypothetical monopolist that controlled all of the primary care physicians or pediatricians in Nampa could profitably increase rates by at least a small but significant price.

## General Acute-Care Inpatient Services

78.     The relevant geographic market in which to analyze the effects of the Saltzer acquisition on general acute-care services is no broader than Boise City-Nampa Metropolitan Statistical Area ("Boise Area").  (The Boise area includes hospitals owned by St. Luke's, Saint Alphonsus, TVH, West Valley Medical Center and Walter Knox Memorial Hospital, a small critical access hospital in Emmett, Idaho.)  Unlike for primary care or general pediatric services, patients seeking general-acute services tend to have more serious medical conditions and seek these services much less frequently.  As a result, they are willing to travel greater distances for care, but still not willing to travel substantial distances beyond Canyon or Ada counties.  In fact, there are no competitive alternatives for general-acute care services outsides of the Boise Area (other than those owned by St. Luke's or Saint Alphonsus Health System) within any reasonable distance from those counties.  The closest comparable hospitals to Saint Alphonsus and St. Luke's outside of the Boise Area are more than 200 miles away from the Treasure Valley.  As a result, hospitals outside of the relevant market do not meaningfully compete for general acute care services with the hospitals in the area.

## Outpatient Surgery Services

79.     The relevant geographic market in which to analyze the effects of the Saltzer acquisition on outpatient surgery services is no broader than the Boise Area.  There are no competitive alternatives for outpatient surgery services which are outside of the Boise Area within any reasonable distance from this area.  The closest comparable providers of outpatient surgery services are more than 100 miles from Boise.  Hospitals or surgery centers outside of Ada and Canyon counties do not meaningfully compete with outpatient surgery centers in this area.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-25

## ANTICOMPETITIVE EFFECTS

### Primary Care Physician Services

80.     If St. Luke's completes its acquisition of Saltzer, it will possess a near-monopoly position in the relevant Nampa area primary care physician services market.   The Saltzer acquisition will result in a concentrated primary care physician services market with only two significant competitors.   St. Luke's post-acquisition market share in the relevant primary care physician services market in Nampa will exceed 67%.

81.     Under the Merger Guidelines HHI test, a merger is presumed likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 2500 points and the merger or acquisition increases the HHI by more than 200 points.   The market concentration levels here exceed these thresholds by a wide margin.   The post-acquisition HHI in the primary care physician services market in Nampa will increase by over 1,800 points to approximately 4,800.

82.     With the addition of the Saltzer physicians to its physician network, St. Luke's will become a "must-have" system for health plans seeking to serve companies with employees in Nampa, because health plans will no longer be able to offer a commercially viable provider network to those companies without including St. Luke's.   Like the employees of Simplot and Mercy Medical Center, those employees will demand including the Saltzer physicians (as well as the St. Luke's physicians).   Health plans will no longer have the ability to drop St. Luke's from their networks, or even credibly threaten to do so.   Thus, health plans in the area now must either reach agreement with St. Luke's, likely at substantially higher rates, offer a commercially unattractive health care network to their members, or be forced to exit Nampa altogether.

83.     This significant change in the negotiating dynamic will give St. Luke's much-enhanced bargaining clout in contract negotiations and the ability to extract higher rates for inpatient services at all of its hospitals.

84.     Price increases resulting from the acquisition will be passed on to local employers and their employees.  Self-insured employers pay the full cost of their employees' health care claims and, as a result, they will immediately and directly bear the full burden of higher rates charged by hospitals or physicians.  Fully-insured employers will also inevitably be harmed by higher rates, because health plans will be forced to pass on at least a portion of hospital rate increases to these customers.

85.     Employers, in turn, will pass on their increased health care costs to their employees, in whole or in part.  Employees will bear these costs in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services.  Some Nampa area residents will forego or delay necessary health care services because of the higher costs, and others may drop their insurance coverage altogether.

86.     This enhancement of St. Luke's market power will also be used to exclude competition by rivals, including all of the Plaintiffs.  St. Luke's has already shown that it intends to use its market power resulting from the acquisition of numerous physician practices to demand that employers and payors take business from other providers and channel it, sometimes exclusively, to St. Luke's.  For example, St. Luke's recently demanded that Micron add St. Luke's to the Micron network where the St. Alphonsus hospitals and physicians have been the preferred choice for Micron employees because of the lower price and high quality Saint Alphonsus provides to Micron.  St. Luke's was able to do so because of its recent acquisition of many popular physician groups desired by Micron employees.  Micron was prepared to

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-27

acquiesce to St. Luke's demands, even at higher prices, in order to satisfy its employees' desire to utilize these popular doctors acquired by St. Luke's until it determined that those demands would likely require a 30% increase in Micron's overall health care costs.  Similarly, St. Luke's has demanded that other payors provide it with an exclusive or preferred status.

87.    Past actions by St. Luke's and recent statements by Saltzer, provide further evidence that these effects are highly likely.  Four years ago, when Saint Alphonsus was awarded the preferred position in the Micron network, the development of the network also required a "backup" PPO network of non-Saint Alphonsus providers.  St. Luke's attempted to sabotage that network by threatening two different PPOs that it would no longer participate with them if they provided a backup network for Micron.  As a result, both PPOs backed out of the Micron transaction and alternatives had to be sought.

88.    Recently, Saltzer has indicated that it no longer desires to participate with Saint Alphonsus Nampa in providing a network for the "True Blue" Medicaid Advantage product offered by Blue Cross.  This would substantially reduce the attractiveness of a Saint Alphonsus Nampa network to Medicare Advantage patients.  The decision by Saltzer was undoubtedly motivated by the pending St. Luke's transaction.

89.    If St. Luke's acquires Saltzer, its ability to demand that employers and payors set aside their procompetitive decisions to utilize lower price providers, and to require them to prefer St. Luke's, will be substantially enhanced.

### General Pediatric Physician Services

90.    If St. Luke's completes its acquisition of Saltzer, it will possess a near-monopoly position in the relevant Nampa area general pediatric services market.  Currently, Saltzer employs all but one of the general pediatricians in Nampa.  The acquisition of Saltzer by St.

Luke's would transfer this market share from Saltzer to St. Luke's and would further enhance St. Luke's market power by strengthening its "must-have" provider status, described above.  Since health plans seeking to serve companies with employees in Nampa need to offer general pediatricians who are convenient to those employees, the control of virtually all the pediatricians in Nampa by St. Luke's will further enhance its market power, and make it even more difficult for health plans to negotiate reasonable rates with St. Luke's.  Similarly, this additional power will give St. Luke's an even greater ability to demand a preferential position with employers and health plans, and to stymie procompetitive offers by competitors such as Saint Alphonsus and TVH.

### General Acute-Care Inpatient and Outpatient Surgery Services

91.    The Saltzer acquisition will also increase St. Luke's dominance in the general acute-care services and outpatient surgery services markets in the Boise Area.  St. Luke's market share (as measured by total discharges) is currently 58% in Ada and Canyon counties combined resulting in a similar HHI.  The pre-acquisition HHI for this market is upwards of 4,000, indicating a "highly concentrated" market for general acute care inpatient hospital services.  With respect to outpatient surgery services, St. Luke's market share (as measured by surgery rooms) is currently 54% in Ada and Canyon counties combined, resulting in a similar HHI.  St. Luke's acquisition of Saltzer will increase St. Luke's market share and lessen competition in the markets for acute-care inpatient hospital services and outpatient surgery.

92.    St. Luke's acquisition of Saltzer will result in the foreclosure of a critical source of patients (and admissions) — the Saltzer physicians.  Saltzer physicians currently provide a significant number of Saint Alphonsus Nampa's inpatients, a substantial amount of the hospital's

revenues, and an even higher percentage of their higher paying commercially insured patients. Saltzer is critical to the economic well-being of that hospital.

93.    The acquisition will also foreclose a significant source of volume for TVH.  More than 40% of its inpatient and outpatient cases are performed by Saltzer physicians.

94.    The evidence is overwhelming that the acquisition of Saltzer by St. Luke's will substantially foreclose competition for the admissions of the Saltzer physicians.  The behavior of St. Luke's leaves no doubt that these admissions will cease – almost as quickly as a spigot can be turned off – after the acquisition.  For example:

- When St. Luke's has acquired physician groups in the past, their inpatient admissions at Saint Alphonsus Boise have declined by more than **90%**, in several cases by **100%**.

- When St. Luke's acquired seven physicians employed by SAMG in Nampa, their admissions at Saint Alphonsus Nampa declined to virtually **zero**.

- When Saint Alphonsus acquired Mercy Medical Center, the St. Luke's oncologist located *across the street* from Saint Alphonsus Nampa nevertheless ceased practicing at that hospital.

- Since St. Luke's acquired the Boise Orthopedic Group, those surgeons went from performing 10-15% of all surgeries at TVH, to not performing any procedures at all at TVH.

- In internal conversations, Saltzer's leadership has confirmed that this pattern will follow this acquisition.  Indeed, Saltzer's president recently said that "any patients taken to Saint Al's or Treasure Valley is not supportive of [Saltzer's] overall goals."

95.    As a result, this foreclosure of competition will very likely increase St. Luke's dominance in the general acute-care services and outpatient surgery services markets.  The foreclosure of competition for the referrals and admissions of Saltzer physicians will shift even

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-30

more market share from Saint Alphonsus and TVH to St. Luke's, strengthening St. Luke's while weakening its competitors.

96.     St. Luke's will not acquire the orthopedic surgeons, general surgeon and ear, nose and throat specialists employed by Saltzer; those physicians have decided to obtain employment with Saint Alphonsus.   Those physicians chose not to go to St. Luke's both because they received less attractive offers than the Saltzer primary care physicians and because St. Luke's conditioned significant payments on their agreement to no longer send patients to TVH, but to exclusively admit to St. Luke's.   Such agreements would have harmed TVH, which provides surgical care at prices 40% less than St. Luke's.

97.     However, a Saltzer transaction will nevertheless seriously harm these physicians, TVH, and their patients.   These physicians depend critically on Saltzer primary care physician referrals for their patients.   After this transaction, those referrals will go to St. Luke's surgeons. On November 1, 2012, Saltzer sent a letter to its patients informing them of the departure of the five orthopedic surgeons, and told its patients that it was in the process of recruiting new orthopedic surgeons, that it was "currently working close[ly] with the St. Luke's orthopedic department" and that patients should call St. Luke's to schedule an appointment for surgery.   See Ex. E.

98.     The harm to Saint Alphonsus Nampa and TVH, will also result in substantial harm to competition.   The only hospital alternatives a payor has to St. Luke's in a Treasure Valley network are Saint Alphonsus, TVH and West Valley Medical Center (which focuses on the Caldwell area).

99.     The foreclosure of patients from Saltzer will significantly weaken Saint Alphonsus Nampa and TVH.   This will make it much more difficult for a health plan to rely on a

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-31

network that does not include St. Luke's if St. Luke's makes exorbitant price demands, as it has (successfully) in the Magic Valley.   This will further enhance St. Luke's dominant market power.

### Entry Barriers

### Primary Care and General Pediatric Physician Services

100.   Neither primary care or general pediatric physician entry or expansion by any existing physician practice group or hospital will be sufficient, timely or likely to offset the anticompetitive effects described above.   There is no prospect that such entry will materially reduce the harm to competition from St. Luke's primary care and pediatrician acquisitions.

101.   Recruitment of new primary care physicians or pediatricians into the Treasure Valley is difficult, because there is no medical school in Idaho that could provide a group of medical school graduates who are familiar with, and would like to stay in, the area.   There is a family practice residency program in Boise, but the program is focused on rural medicine, and very few residents from the program practice in the Treasure Valley.   Moreover, recruitment is especially difficult to a working class community such as Nampa.

102.   An additional problem exists relating to recruitment of general internal medicine physicians, desired by many patients.   Very few new general internists are beginning practice.   In the entire United States, only about 200 new internal medicine physicians complete their residency and go into general ambulatory/clinic internal medicine practice every year.   The vast majority of physicians participating in internal medicine residencies go on to specialize in a particular field.   As a result, it is extremely difficult to recruit any general internists.   Saltzer employs all general internists in Nampa.

103.    Another substantial barrier to entry is that any new primary care physicians or pediatricians will have great difficulty attracting patients in a market where the patients already have loyalties to existing primary care physicians and pediatricians.  Nationally 87% of insured consumers have a regular employed physician, and 74% of these say they are satisfied with their care.  Fewer than 15% switch doctors in a year.  Such loyalty is especially present with regard to patients of the very popular and successful Saltzer group.

104.    Even when Saint Alphonsus is successful in recruiting physicians, and they ultimately are able to attract a substantial patient load, this involves very substantial delays.  It typically takes a year or longer to recruit a primary care physician or pediatrician from the date recruitment begins to the date the primary care physician starts on the job.  It takes another two years or more for that physician to develop his or her practice, when even that is possible. Therefore, entry will not be sufficiently timely to offset the effect of St. Luke's anticompetitive practices.  In fact, there is no possibility that entry could occur in any period of time that would be sufficient to offset the competitive impact of the acquisition of the large Saltzer group by St. Luke's.

### General Acute-Care Inpatient Services

105.    Neither hospital entry nor expansion by any hospital will deter or counteract St. Luke's prior or proposed acquisitions' likely harm to competition in the relevant markets.

106.    New hospital entry or significant expansion in the Boise area would not be timely. Construction of a new general acute-care hospital would take more than two years from the initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk.  St. Luke's has stated that if it constructs a new hospital in Nampa construction alone will take 24-30 months.  No new hospital

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-33

facility has been constructed in the Treasure Valley since TVH in 1996 and St. Luke's Meridian in 2001.

107.    Construction and operation of an independent competitive hospital is likely to be especially difficult, given the large number of physicians employed by St. Luke's, since these physicians are unlikely to admit patients at a competitive hospital.  Such a hospital would have a very difficult time attracting admissions and operating successfully.

### Outpatient Surgery Services

108.    Neither outpatient surgery services entry nor expansion by any hospital or physician group will deter or counteract the likely harm to competition in the relevant markets due to St. Luke's price or proposed acquisitions.

109.    New outpatient entry or significant expansion in the Boise area would not be timely.  Construction of a new outpatient facility would take more than two years from the initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk, along with significant outpatient facility overcapacity in the Boise area.

110.    Construction and operation of an independent outpatient surgery facility is also likely to be very difficult given the large number of surgeons employed by St. Luke's, since these surgeons are unlikely to admit patients at a competitive hospital.  Such a hospital would have a very difficult time attracting admissions and operating successfully.  Certainly, facilities will not be constructed with sufficient capacity to offset the effect of St. Luke's anticompetitive activities.

## **Absence of Procompetitive Justifications**

111.  St. Luke's acquisition of Saltzer would not improve physician efficiency, productivity or quality.  Saltzer already operates very efficiently, has lean staffing and a very effective billing office.  There is no evidence in the economic literature that physician groups become more efficient at a size greater than the Saltzer group.  Moreover, Saltzer's financial model, in which the physicians share in overhead to the extent of the patient revenue they generate, has created a culture which strongly encourages hard work.  The same financial model will not apply when St. Luke's owns the practices.

112.  This conclusion is consistent with the statements of St. Luke's own personnel to Saltzer.  St. Luke's officials indicated that Saltzer's structure would remain the same after an acquisition and that "all that would change was the sign on the door."  St. Luke's representative Peter LaFleur told Saltzer that it was difficult to justify the high payments to Saltzer physicians as part of the transaction, because Saltzer was already very efficient, and there were not significant opportunities for additional efficiencies that would create more profits after an acquisition.

113.  St. Luke's will be unable to show that the acquisition will lead to any merger-specific efficiencies, i.e. efficiencies that are reasonably likely only after a merger or acquisition.  In fact, St. Luke's has effectively admitted that any efficiencies resulting from its acquisition would not be merger-specific.  For example, St. Luke's Health System Vice President of Payor and Provider Relations stated that "St. Luke's Health System is spending tens of millions of dollars and committing other valuable resources to implement an electronic medical record across *all our providers*" and that "a clinically integrated network is *not* necessarily a network of providers under common financial ownership..."  Thus, St. Luke's has effectively admitted that

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-35

the efficiencies that it hopes to obtain with its physicians can be obtained whether or not the physicians remain independent.

### Irreparable Injury As A Result of Saltzer Acquisition

#### Saint Alphonsus Nampa

114. St. Luke's acquisition of Saltzer would be virtually certain to cause substantial irreparable injury to St. Luke's most significant competitor in the general acute-care services market, Saint Alphonsus. If St. Luke's were to acquire Saltzer, the effect on Saint Alphonsus Nampa would be particularly devastating.

115. A significant number of all inpatient admissions at Saint Alphonsus Nampa come from Saltzer physicians. Saltzer physicians are even more important to Saint Alphonsus Nampa than their share of admissions would indicate. Saltzer physicians tend to treat commercially insured patients who provide more revenues to the hospital.

116. Like most institutions, Saint Alphonsus Nampa has very substantial fixed costs. The gain or loss of incremental patients can therefore have a significantly more than proportional impact on Saint Alphonsus Nampa's bottom line and margins. As a result of the loss of the patients at Saint Alphonsus Nampa attributable to Saltzer Medical Group, the hospital will face a multimillion dollar loss and will be several million dollars "in the red." Therefore, in order to cut its losses and to maintain a 2% net margin (the minimum necessary to fund future capital improvements), the hospital would need to reduce its staff by more than 140 full-time-equivalents ("FTEs").

117. The effect on Saint Alphonsus Nampa, its employees, its services and programs, and the Nampa community would be devastating;

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-36

- The job cuts would reduce Saint Alphonsus Nampa's staff by more than 25%.

- Such cuts would entail the substantial reduction or elimination of many programs and services.

- In particular, this could substantially affect Saint Alphonsus Nampa's ability to serve the poor and uninsured.

**Treasure Valley Hospital**

118.    The transaction will also irreparably harm TVH.   Cases performed by Saltzer Medical Group physicians are critical to the volume at, and success of, TVH.   More than 40% of TVH's inpatient and outpatient cases are performed by Saltzer physicians.

119.    If St. Luke's acquires Saltzer, and that results in a reduction of cases to be performed at TVH, this will have a dramatic negative effect on TVH, simply because of the great volume of business at TVH that is dependent on Saltzer.  If TVH were to lose all its cases from Saltzer, it would need to lay off 10% of its staff.  Even a loss of half these cases would have a very significant impact.

120.    TVH has planned significant capital improvements for its facility, including an increase in the number of operating rooms from four to six, a new CT scanner, and improvements to its electronic medical records system.  These improvements will benefit its patients and allow TVH to provide more low cost, high quality care to the community.

121.    If St. Luke's acquires Saltzer, and that causes a significant reduction in Saltzer cases performed at TVH (as is anticipated), TVH will be forced to cancel or delay its improvements.  This will be very harmful to both TVH and to the Nampa community.

122.    The transaction will also cause patients to lose the benefit of lower cost surgeries at TVH.  Those patients will be referred to St. Luke's surgeons who do their work at the higher cost St. Luke's facilities.

### All Plaintiffs

123.    The Saltzer transaction, if consummated, will also irreparably injure all the Plaintiffs, because it will increase the power of St. Luke's to (a) demand exclusivity and/or preferential treatment from payors and employers, (b) deny the Plaintiffs' competing networks access to the Saltzer physicians and thereby impede their effectiveness (as in the "True Blue" example described above), and (c) disrupt other arrangements which Plaintiffs have obtained through competitive pricing and quality care.  Such actions threaten to substantially harm the market position of all of the Plaintiffs on an ongoing basis into the indefinite future.

124.    Such actions will likely affect Plaintiffs' relationships with every significant payor and employer in the Treasure Valley.  Because of the scope of this potential harm, its likely recurring nature in the future, and the impossibility of predicting precisely the consequences of St. Luke's further anticompetitive actions, this harm cannot reasonably be fully compensated through money damages.  The only remedy that will prevent this significant and anticompetitive change in the market is a preliminary and then permanent injunction against the Saltzer transaction.

### <u>COUNT I</u>

### <u>THREATENED VIOLATION OF SECTION 7 OF THE CLAYTON ACT</u>

125.    Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 124 above hereof, as if fully restated herein.

126.     The effect of the proposed acquisition of Saltzer by St. Luke's would be to lessen competition substantially in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

127.     The transaction would likely have the following effects, among others:

      a.     Competition in the primary care physician services market in Nampa,  and the general acute-care services and outpatient surgery services markets in the Boise Area would be substantially lessened;

      b.     Prices in those markets would likely increase to levels above those that would prevail absent the merger;

      c.     Patient choice would be substantially reduced; and

      d.     Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus would suffer irreparable injury.

128.     This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## COUNT II

## THREATENED VIOLATION OF SECTION 1 OF THE SHERMAN ACT

129.     Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 128 above hereof, as if fully restated herein.

130.     St. Luke's intends to acquire Saltzer.

131.     This acquisition is to be effectuated by contracts, combinations and conspiracies that are unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1).

132.     This acquisition will cause substantial anticompetitive effects as described above.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-39

133.     This acquisition will unreasonably restrain trade in violation of Section 1 of the Sherman Act.

134.     As a direct and proximate result of St. Luke's violations of Section 1 of the Sherman Act, Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus will suffer irreparable harm.

135.     This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

<u>**COUNT III**</u>

<u>**THREATENED VIOLATION OF SECTION 48-106 OF THE IDAHO CODE**</u>

136.     Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 135 above hereof, as if fully restated herein.

137.     The effect of the proposed acquisition of Saltzer by St. Luke's would be to lessen competition substantially in Idaho in violation of Section 48-106 of the Idaho Code.

138.     The transaction would likely have the following effects, among others:

a.     Competition in the primary care physician services market in Nampa, and the general acute-care services and outpatient surgery services markets in the Boise Area would be substantially lessened;

b.     Prices in those markets would likely increase to levels above those that would prevail absent the merger;

c.     Patient choice would be substantially reduced; and

d.     Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus would suffer irreparable injury.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-40

139.   This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## COUNT IV

## THREATENED VIOLATION OF SECTION 48-104 OF THE IDAHO CODE

140.   Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 139 above hereof, as if fully restated herein.

141.   St. Luke's intends to acquire Saltzer.

142.   This acquisition is to be effectuated by contracts, combinations and conspiracies that are unlawful under Section 48-104 of the Idaho Code.

143.   This acquisition will cause substantial anticompetitive effects.

144.   This acquisition will unreasonably restrain trade in violation of Section 48-104 of the Idaho Code.

145.   As a direct and proximate result of St. Luke's violations of Section 48-104 of the Idaho Code, Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus will suffer irreparable harm.

146.   This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## RELIEF REQUESTED

147.   WHEREFORE, Saint Alphonsus Health System, Inc., Saint Alphonsus Regional Medical Center, Inc., Saint Alphonsus Medical Center - Nampa, Inc. and Treasure Valley Hospital Limited Partnership pray this Court to grant the following relief:

A.   Preliminarily and permanently enjoin St. Luke's from acquiring Saltzer;

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-41

      B.      Award Saint Alphonsus, TVH, Saint Alphonsus Boise and Saint Alphonsus three times their damages and their reasonable attorneys' fees against St. Luke's; and

      C.      Award such other relief as this Court finds just.

November 12, 2012.

              By:   /s/ Keely E. Duke
                    Keely E. Duke
                    Kevin J. Scanlan
                    Duke Scanlan Hall PLLC
                    1087 W. River Street, Suite 300
                    Boise, ID 83707
                    (208) 342-3310 (p)
                    (208) 342-3299 (f)
                    ked@dukescanlan.com
                    kjs@dukescanlan.com

                    AND

                    David A. Ettinger (P26537)
                    Peter E. Boivin (P62043)
                    Honigman Miller Schwartz & Cohn LLP
                    2290 First National Building
                    660 Woodward Avenue
                    Detroit, MI 48226
                    (313) 465-7368 (p)
                    (313) 465-7369 (f)
                    dettinger@honigman.com
                    pboivin@honigman.com

                    *Attorneys for Saint Alphonsus Health System, Inc., Saint Alphonsus Regional Medical Center, Inc., Saint Alphonsus Medical Center - Nampa, Inc.*

                    By:/s/Jason S. Risch
                    Jason S. Risch
                    Risch Pisca PLLC
                    407 W. Jefferson
                    Boise, Idaho 83702
                    (208) 345-9929 (p)
                    (208) 345-9928 (f)
                    jrisch@rischpisca.com

                    *Attorneys for Treasure Valley Hospital Limited Partnership*