UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MED. CTR., et al.,<br><br>             Plaintiffs,<br><br>       v.<br><br>ST. LUKE'S HEALTH SYSTEM,<br><br>             Defendant. | Case No. 1:12-cv-00560-BLW-REB<br><br>**ORDER** |

## INTRODUCTION

The Case Management Order required the parties to finalize and submit a proposed protective order by January 7, 2013. Counsel notified the Court that they have three issues in dispute in their proposed protective order and the Court held a telephone hearing on January 9, 2013 to consider those issues. In short, Plaintiffs (referred to collectively as "St. Al's") seek greater restrictions on disclosure of confidential and trade secret information than does Defendant St. Luke's Health System Ltd. ("St. Luke's"). Because the parties and counsel are familiar with the factual and procedural background of this litigation, the Court has included only the facts necessary to explain its decision. In this ruling, the Court has considered information in the written record, as well as the additional information provided by counsel during the hearing.

**ORDER - 1**

## DISCUSSION

A. **Legal Standards**

Federal Rule of Civil Procedure 26(c) allows the court to protect parties from "undue burden or expense" in discovery by ordering "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470-71 (9th Cir. 1992). *See also* Fed. R. Civ. P. 26(c). The parties agree that the Court must balance the risk of inadvertent disclosure of competitive information to a competitor against the risk that protection of such information prevents fair prosecution or defense of a claim. *See id.*; Pls.' Br., pp. 3-5 (Dkt. 53); Def.'s Br., pp. 2-4 (Dkt. 52).

The nature of the dispute presumes that certain information which has or is to be produced during the discovery process is confidential or otherwise proprietary in nature and which the producing party, in good faith, contends should be limited in how such information is handled or disseminated. The protective order permits a producing party to designate documents containing such information, in whatever format as "Confidential" (and within that designation, a subset of "Attorney's Eyes Only") which in turn triggers certain limits upon how such information may be used.

B. **Number of Individuals With Access to Confidential Information.**

The first dispute concerns those persons who will have unlimited access to documents marked "Confidential." St. Luke's seeks such access for four St. Luke's

employees, two Saltzer Medical Group ("Saltzer") employees, and Brian Julian, Saltzer's outside counsel.

The parties had made an initial agreement upon the number of persons who would have such unlimited access prior to Chief Judge Winmill's decision denying St. Al's motion for preliminary injunctive relief, which sought to restrain the acquisition by St. Luke's of the Saltzer Medical Group ("Saltzer"). The details of that effort are set out in the relevant pleadings and supporting documents filed by the parties.

St. Al's assumes, for purposes of the instant dispute over the protective order, that the transaction went forward in the absence of any restraining order, but also says in its briefing that no precise answer to that question has been given to St. Al's by St. Luke's. Assuming that the St. Luke's/Saltzer transaction was completed, St. Al's contends that any persons previously designated as Saltzer representatives are now St. Luke's employees. Therefore, St. Al's argues that to allow St. Luke's to have its already designated four representatives, plus the previously agreed upon number of Saltzer representatives, amounts to a stacking of the deck.

Because there is a distinction that can be drawn in the event that Saltzer is now part of St. Luke's, the Court inquired of St. Luke's outside counsel during the hearing about "what had happened." The answer was not entirely clear, but the Court understands from the statements of Mr. Bierig that a deal of some sort was, in fact, struck. That deal brought Saltzer into St. Luke's bigger tent, but in some form that would allow the parties to return to their former tents if the result of this lawsuit were to yank the tent poles out of

ORDER - 3

the larger tent.  Mr. Bierig said, among other things, that St. Luke's purchased Saltzer's assets and its former physicians now provide medical services for St. Luke's under a professional services agreement, but that Saltzer "continues to exist," that the Saltzer nameplate will still appear on the doorways, and that one of the designated Saltzer representatives from the prior agreement was still employed by Saltzer.

The Court discerns from the statements of Mr. Bierig that a purchase has, in fact, taken place by St. Luke's of the business of Saltzer, the details of which are largely similar to the nature in which other medical practices in the area have come under the St. Luke's umbrella, but with special attention paid to the possibility that things might come undone, depending upon the result of this lawsuit.  The most significant piece of that scenario, for purposes of the dispute presently before the Court, is that–notwithstanding whatever name may appear on the doorframe–the daily moving parts of the former Saltzer Medical Group are now part of the daily moving parts of the St. Luke's Health System. Hence, Saltzer's present interest in this dispute is either completely intertwined, or very nearly so, with that of St. Luke's.

At first blush, then, the argument of St. Al's seems the most sensible.  That is, the justification for allowing separate representatives of both St. Luke's and Saltzer to have complete access to confidential documents in this lawsuit no longer exists, and to continue that framework is not necessary and potentially even prejudicial to St. Al's. St. Luke's, however, points out that this particular lawsuit has wider implications than just the immediate controversy over the transaction involving St. Luke's and Saltzer.  Mr.

ORDER - 4

Bierig read into the record of the hearing a recent e-mail he just had received from Mr. Ettinger (outside counsel for St. Al's), in which Mr. Ettinger had stated that the lawsuit was clearly an antitrust case, and that the lawsuit implicated more "markets" than just the Treasure Valley.  The Court takes judicial notice of the fact that both St. Luke's and St. Al's have acquired, or built, new medical facilities in other geographic regions of Southern Idaho and Eastern Oregon, and that the Saltzer transaction has appeared on the radar of antitrust enforcement agencies.

In that context, there is legitimate argument for review of the "confidential' documents by someone with a Saltzer knowledge base.  Those persons had previously been identified by St. Luke's as John Kaiser, M.D., the President of Saltzer (who remains an employee of Saltzer, which now has a five-year Professional Services agreement with St. Luke's); Bill Savage, former CEO of Saltzer (now employed by St. Luke's); and Saltzer's outside counsel Brian Julian, of the firm of Anderson, Julian & Hull LLP.

Of those three individuals, either Dr. Kaiser or Mr. Savage should be able to adequately provide answers to questions about the "pre-transaction decisions and conduct of Saltzer" that might be raised from the documents originating from Saltzer's pre-transaction records.  However, to allow both Dr. Kaiser and Mr. Savage, who managed Saltzer, to be involved in that process given the changed landscape of the lawsuit created by the completion of the transaction between St. Luke's and Saltzer, raises the potential for potential prejudice to St. Al's.  Accordingly, the Court will resolve this dispute by ordering that the protective order allow for Mr. Savage, who is currently employed by St.

**ORDER - 5**

Luke's, and Brian Julian, to review the "Confidential" documents that originate from Saltzer's pre-transaction records, but not other "Confidential" documents. The Court understands from the record that Mr. Julian's role included the type of legal advice and legal work that might otherwise be handled by an in-house attorney, if Saltzer had an in-house attorney. Because St. Luke's has represented that Saltzer continues to exist as a separate entity, continues to have physicians employed by Saltzer and not St. Luke's, and where the deal between the two entities apparently has been structured to allow it be unwound if needed, there remain competitive sensitivities for St. Al's that outweigh any usefulness for St. Luke's that might otherwise derive from a review by Mr. Julian of non-Saltzer "Confidential" documents.

Additionally, so as to eliminate any potential ambiguity, the Court orders that Mr. Savage's role shall be limited solely to a review of the pre-transaction Saltzer "Confidential" documents. He cannot be designated additionally, or alternatively, as one of the four St. Luke's representatives. He comes to this dispute having been Saltzer's chief executive, which means that his knowledge and experience are similar to those of someone involved in the "competitive decision making" discussed in *Brown Bag Software*. If he is now employed by St. Luke's, a reasonable inference can be drawn that St. Luke's would seek to drawn upon that knowledge and experience going forward.

**C.     Should In-House Counsel Have Access to "Attorney's Eyes Only" Materials?**

As described earlier, the parties have agreed to two levels of confidentiality: "Confidential" and "Attorney's Eyes Only" ("AEO"). They disagree about whether in-

house counsel should have access to documents marked AEO.  St. Al's seeks to limit AEO material access to experts and the parties' outside counsel.  St. Luke's proposes that AEO material be available to two attorneys in the four attorney St. Luke's in-house counsel's office, and represents that the two particular lawyers so-identified are not "substantially involved" in competitive decision-making.  St. Al's concern is the potential for in-house counsel's "inadvertent disclosure."  St. Al's argues that it and third parties "could very likely suffer severe financial harm and competitive disadvantage if their main competitor is granted access" to information about strategies, managed care rates and negotiations, and physician contracting.

The Court must weigh the potential harm of any inadvertent disclosure against prejudice to the other party from denial of access.  *Brown Bag Software*, 960 F.2d at 1470.  In doing so, the Court should avoid making "arbitrary distinctions based on type of counsel employed," because "the risk of inadvertent disclosure of trade secrets obtains equally for both kinds of counsel." *Id.* (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed.Cir. 1984)).  Rather, the Court "should examine the factual circumstances of any counsel's relationship to the party demanding access and consider whether in-house counsel was involved in 'competitive decision making'". *Id.* (quoting *U.S. Steel*, 730 F.2d at 1468 n. 3).

Here, St. Al's represents that information designated as AEO under the protective order will relate, in part or substantial whole, to the heart of the competition between St. Al's and St. Luke's.  St. Al's contends that AEO documents in this case will contain

**ORDER - 7**

information about the ingredients used to make competitive business decisions and run a competitive business (*e.g.*, financial, marketing, and advertising data; strategic and long-range plans; internal cost and provider charges, rates, and data) in a market or markets where St. Al's and St. Luke's are the two major competitors.  *See* Proposed Prot. Ord. ¶ 3. The risks of inadvertent disclosure in this setting are evident.  Even if such in-house attorneys assure that they will comply with restrictions upon the use of information gained from a review of their main competitor's proprietary information, the office in which they work is small (only four lawyers, and support staff), and the duties they perform are myriad.  The closeness of the physical setting and the nature of the work performed in a small, in-house counsel's office in the current competitive environment, create a legitimate concern over inadvertent disclosure, or internal institutional pressures to make use of such information.  Additionally, the personnel and work assignments of any in-house counsel's office are subject to change, and the two attorneys who are identified as not being "substantially involved" in competitive decision making today, may well be called upon to be so involved in the future.  Further, as highlighted in the *Brown Bag Software* decision, the very nature of competitive information makes it difficult to compartmentalize:

> "Knowledge of [the competitor's] trade secrets would place in-house counsel in the 'untenable position' of having to refuse his employer legal advice on a host of contract, employment, and competitive marketing decisions lest he improperly or indirectly reveal . . . trade secrets."

*Brown Bag Software*, 960 F.2d at 1471.

ORDER - 8

In such circumstances, it would be an impossible task for an in-house lawyer to try to separate his or her business judgment or legal advice into two compartments of "With St. Al's Lawsuit knowledge" and "Without St. Al's Lawsuit knowledge." Additionally, although St. Luke's states that only Christine Neuhoff, its general counsel, is substantially involved in competitive decision-making, the distinction between "substantial" involvement is not an adequate point of demarcation (nor is it the precise test described in *Brown Bag Software*) to avoid the risk of inadvertent disclosure. St. Luke's argues that the two associate in-house attorneys simply work on deals that have already been made, and do not provide advice about whether those deals should be made. However, St. Luke's proffered reason for involving those attorneys is so that outside counsel can talk to in-house counsel who are "knowledgeable" and "in the best position to analyze and explain to outside counsel the significance of particular documents." The argument loses its focus at that point, as to have such knowledge and "be in the best position to analyze and explain", the attorneys must necessarily have knowledge already acquired about competitive decision-making. In the small world of St. Luke's in-house counsel department, particularly given the extremely competitive hospital marketplace, such attorneys will likely continue to be involved in that work in the future, heightening the risk of inadvertent disclosure. These factual circumstances are of particular importance under the test described in *Brown Bag Software*, where the court gave particular emphasis to the concern over whether the in-house counsel realistically "could lock up trade secrets

**ORDER - 9**

in his mind, safe from inadvertent disclosure to his employer once he had read the documents." *Brown Bag Software*, 960 F.2d at 1471.

The Court acknowledges that some prejudice to St. Luke's will flow from any restriction upon the ability of in-house counsel to assist in the defense of this lawsuit. However, St. Luke's has experienced outside counsel at the helm of this case and that counsel is well versed in antitrust litigation and representing medical entities.[1] It is difficult to envision a circumstance where a document containing competitive information about the business of running a medical center cannot be understood by outside counsel specializing in such matters, even if such counsel is not intimately familiar with the community or communities in which St. Luke's and St. Al's compete with each other. Moreover, it is only a subset of documents that will be subject to this restriction, *i.e.* those marked as "Attorneys' Eyes Only" because they contain "highly sensitive trade secrets, the disclosure of which would result in demonstrable harm". Proposed Prot. Ord. ¶ 3. Such a designation requires a good faith basis at the outset. If the opposing party believes that such an AEO designation is unjustified, the protective order allows that designation

---

[1] St. Luke's lead outside counsel is Jack R. Bierig, of Sidley Austin LLP.  Mr. Bierig has been a lawyer for 40 years and has "extensive experience in general representation of associations, antitrust matters, litigation challenging government action affecting health care providers, copyright, trademark and trade secret cases, and FDA matters." Sidley Austin LLP, Jack Bierig Partner Bio, available at http://www.sidley.com/bierig_jack/ (site last visited Jan. 9, 2013). He has represented numerous associations (including the American Medical Association) and health care providers in a variety of cases, including antitrust cases, and also advises clients "on a wide variety of antitrust, association law, and regulatory issues." *Id.*

**ORDER - 10**

to be challenged.  Accordingly, the protective order is intended to protect against gamesmanship in the first instance, and if an unjustified designation is made, the Court stands ready to intervene to protect the interests of the party prejudiced by such designation.  In other words, a party who seeks protections from the nature and use of the discovery process must keep its own clean hands in the use of such protections.

Accordingly, the Court orders that the protective order include the prohibition requested by St. Al's, prohibiting in-house counsel from access to information in documents designated by an opposing party as "Attorney's Eyes Only."  The balance of the competing interests in this particular case, on these particular facts, weighs in favor or restricting such access to in-house counsel.  The protections against misuse of such a designation, and the other means available to outside counsel experienced in such disputes to understand and handle such documents, sufficiently protect St. Luke's ability to fairly defend itself in this lawsuit.

**ORDER - 11**

**D.     Proposed Restrictions on Showing Confidential or AEO Material to Witnesses.**

St. Al's argues that to fully protect confidential information in this case, witness review of documents must be constrained as well, so as to only allow a witness to review that portion of the document for which the witness has knowledge.  St. Luke's objects, arguing that such a rule would prevent counsel from showing a confidential document to a witness to determine whether and to what extent the witness had access to some or all of the document.  Further, St. Luke's contends that such a rule will become inevitably cumbersome and contentious, leading to "on-the-fly redacting" during depositions, and arguments over whether a particular document "characterizes or discusses (but does not merely report on) a communication to which the deponent or witness was a party". Proposed Prot. Ord., ¶ 9.

The Court agrees that the language proposed by St. Al's will unnecessarily place boulders in the road during the discovery process, and the likelihood of the harm envisioned by St. Al's is so small that the solution becomes a potential impediment to the discovery process that outweighs the detriment of the purported harm.  This is particularly true under the expedited litigation schedule and trial date in this case.  St. Al's has not made a sufficient showing that this case involves documents that create a significant risk of this nature, and the Court is not inclined to include protection for such documents on supposition.

**ORDER - 12**

Accordingly, the Court orders that St. Luke's position on the nature of how and when documents may be disclosed to witnesses shall be incorporated into the protective order. Specifically, the Court adopts the language proposed by St. Luke's in paragraphs 6(f) and 7(d) of the protective order and excludes St. Al's proposed paragraph 9. This ruling does not, however, preclude a request by a party to make a specific ruling upon a particular document that raises compelling concerns of the sort anticipated by St. Al's. In such a circumstance, either party may seek agreement with the opposing party as to the specific use of that particular document, and if an agreement cannot be reached, may then ask the Court for a protective order that is more restrictive than the protective order generally, as to the use of that particular document.

## CONCLUSION

The Court finds good cause to issue an order protecting documents containing information that is proprietary and/or confidential in nature, as set forth specifically above. However, the parties shall comply with the Court's rules and procedures if they seek to seal any information to be placed in the Court record. *See* D. Idaho L. Civ. R. 5.3; *Pintos v. Pacific Creditors Ass'n*, 504 F.3d 792, 802 (9th Cir. 2007) (providing that "compelling reasons" are required to seal documents related to a dispositive motion); *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (explaining that a "good cause" standard must be met in order to seal documents attached to nondispositive motions). In the event any conflicts arise between the Protective

Order's terms and the Federal Rules and/or the Court's Local Rules, the court rules and applicable case law shall control and will be applied to determine the outcome.

St. Al's counsel shall revise the proposed protective order in accord with this decision and provide it to the Court for approval and filing.  In the meantime, the terms agreed to and those set forth in this order shall govern the parties' conduct going forward in the discovery process.

**IT IS SO ORDERED.**



DATED:  **January 10, 2013**.

_/s/ Ronald E. Bush_

Honorable Ronald E. Bush
U. S. Magistrate Judge