J. Walter Sinclair, ISB #2243
Email: jwsinclair@stoel.com
Sara M. Berry, ISB #7723
Email: smberry@stoel.com
STOEL RIVES, LLP
101 S. Capitol Blvd, Ste 1900
Boise, ID 83702
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendant St. Luke's Health System, Ltd.

Jack R. Bierig *(admitted pro hac vice)*
Email: *jbierig@sidley.com*
Ben Keith *(admitted pro hac vice)*
Email: *bkeith@sidley.com*
Scott D. Stein *(admitted pro hac vice)*
Email: *sstein@sidley.com*
Tacy F. Flint *(admitted pro hac vice)*
Email: *tflint@sidley.com*
Charles K. Schafer *(admitted pro hac vice)*
Email: *cschafer@sidley.com*
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER, NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.,<br><br>          Plaintiffs,<br><br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD., and ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.,<br><br>          Defendants | Case No. 1:12-cv-00560-BLW (Lead Case)<br><br>**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION** |
| FEDERAL TRADE COMMISSION; STATE OF IDAHO<br><br>          Plaintiffs,<br><br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD.; SALTZER MEDICAL GROUP, P.A.<br><br>          Defendants | Case No. 1:13-cv-00116-BLW |

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -1**

Defendant St. Luke's Health System, Ltd.  ("St. Luke's") hereby answers the Complaint of the Federal Trade Commission and the State of Idaho.  Any allegation not explicitly admitted is denied.  Moreover, the headings contained within the Complaint are not substantive allegations to which an answer is required.  To the extent those headings are substantive allegations to which an answer is required, St. Luke's denies the allegations.  In answer to the Complaint, St. Luke's states as follows:

# I.

## NATURE OF THE CASE

1.      St. Luke's acquisition of Saltzer (the "Acquisition") will substantially lessen competition for healthcare services in and around Nampa, Idaho.  The Acquisition gives St. Luke's a dominant market share of adult primary care physician services ("Adult PCP Services") sold to commercial health plans and provided to Nampa-area residents.  The high level of concentration in this market resulting from the Acquisition creates a strong presumption of anticompetitive harm under the *U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines* ("*Merger Guidelines*").  Beyond that presumption, quantitative evidence, statements and documents from commercial health plans and local employers, and St. Luke's own documents all confirm that the Acquisition likely will lead to higher healthcare costs and loss of valuable non-price competition.  According to St. Luke's own documents, health plans already pay "higher fee schedules in Idaho than in other states and metropolitan markets throughout the country."  The Acquisition will only increase that burden.

**ANSWER**:    St. Luke's admits that a document from a consultant assessing the factors affecting physician compensation states that commercial payers "utilize higher fee schedules in Idaho than in other states and metropolitan markets throughout the country."  St. Luke's denies the remaining allegations of Paragraph 1.

2.      St. Luke's has steadily built a formidable healthcare system that includes a large number of formerly competing physicians, adding in the last two years alone more than 16 previously independent physician groups across Treasure Valley, Idaho.  In so doing, St. Luke's has progressively gained ever increasing bargaining leverage and the ability to extract higher rates through its negotiations with health plans.  Those health plans have thus far been able to resist some of St. Luke's rate demands in part because they still have a credible "outside option" – *i.e.*, a network that does not include St. Luke's physicians but includes physicians from Saltzer and St. Alphonsus ("St. Al's").  That option gives health plans at least a credible threat that they can walk away from the negotiating table if St. Luke's demands rates that are too high.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION** -2

**ANSWER**:      St. Luke's admits that health plans have the option to form networks that do not include St. Luke's physicians and that health plans have not raised payments to St. Luke's as a result of some exercise of purported market power of St. Luke's.  St. Luke's denies the remaining allegations of Paragraph 2.

3.      The Acquisition, however, unites St. Luke's with Saltzer, eliminating that option as a credible threat, and creating a single dominant provider of Adult PCP Services in Nampa. With the combined entity commanding a nearly 60 percent share of that market, an alternative network that does not include St. Luke's/Saltzer becomes far less attractive for local employers whose employees reside in the Nampa area.  Indeed, the next largest providers of these services in Nampa will be a small fraction of the combined entity's size.  As a result, St. Luke's will have even greater bargaining leverage, which it has shown that it is more than willing to exploit to obtain higher rates from health plans.

**ANSWER**:      St. Luke's admits that after its affiliation with Saltzer, St. Luke's is the largest provider of Adult PCP Services in Nampa.  St. Luke's denies that Nampa is a relevant geographic market and further denies the remaining allegations of Paragraph 3.

4.      St. Luke's recognizes that a dominant market share in Adult PCP Services is critical to both increasing volume and extracting the highest possible payments for other components of its health system, including services provided by other physician specialties, surgeries, and ancillary services such as X-rays and laboratory tests.  PCPs generally determine what additional care and services their patients need, and refer them to other physicians, labs, or testing facilities accordingly.  As St. Luke's own documents show, St. Luke's reaps the benefits of its physician acquisitions in part by relying on those physicians to shift patients to its own facilities.  Those facilities almost invariably charge substantially higher fees (often more than double those of independent facilities), even when the patient is receiving the *same* service in the *same* location she did before her PCP was acquired by St. Luke's.  Health plans have had limited success resisting these price increases in the past, and in light of St. Luke's newly expanded market power, they believe their ability to do so will further diminish if the Acquisition is allowed to stand.

**ANSWER**:      St. Luke's admits that, subject to various constraints, PCPs generally determine what care and services their patients need.  St. Luke's also admits that PCPs refer their patients to physicians, labs, and testing facilities based on their judgment regarding the best interest of the patient.  St. Luke's admits that when physician practices become provider-based departments of a hospital, some services are reimbursed at a higher rate by some payers.  St.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -3**

Luke's denies that the reimbursement increase associated with provider-basing is the result of the

exercise of market power and further denies the remaining allegations of Paragraph 4.

　　　5.　　The competition eliminated by the Acquisition will not be replaced by other
providers.  New entry or expansion is unlikely to be sufficient or timely enough to offset the
Acquisition's likely competitive harm, as recruitment of PCPs into Nampa is difficult and
requires extended ramp-up periods to reach competitive significance.

　　　**ANSWER**:　　St. Luke's denies the allegations of Paragraph 5.

　　　6.　　Defendants' speculative efficiency and quality-of-care claims are insufficient to
offset the significant anticompetitive harm likely to result from the Acquisition.  Indeed,
St. Luke's own leadership admits as much.  As one St. Luke's board member described it in an
e- mail to St. Luke's Chief Financial Officer, "let's be realistic.  Employing physicians is not
achieving better cost, it's achieving better profit."

　　　**ANSWER**:　　St. Luke's admits that an individual member of the St. Luke's

Boise/Meridian Board of Directors, made the statements quoted in Paragraph 6, but denies that

clinical integration will "achiev[e] better profit" but not "better cost."  St. Luke's denies the

remaining allegations of Paragraph 6.

　　　7.　　Idahoans and Idaho employers will pay for that "better profit" – directly or
indirectly – through higher premiums, co-pays, and other out-of-pocket costs, as commercial
health plans will be forced to accede to St. Luke's rate demands.  As healthcare costs increase,
employers reduce or eliminate benefits or pass along those higher costs to their employees.
Faced with higher costs, some employees will drop their health insurance coverage, while others
will delay or forgo healthcare services that they can no longer afford.

　　　**ANSWER**:　　St. Luke's denies the allegations in the first sentence of this Paragraph.  It

has insufficient knowledge to admit or deny the remaining allegations of Paragraph 7 and

therefore denies these allegations.

　　　8.　　Under Section 7 of the Clayton Act, Plaintiffs need only demonstrate by a
preponderance of the evidence that the Acquisition's effect "may be substantially to lessen
competition, or to tend to create a monopoly."  Congress chose the words "*may be*" because the
Act was designed to "arrest restraints of trade in their incipiency and before they develop into
full-fledged restraints."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 & n.39 (1962).
Permanent injunctive relief is needed to prevent likely immediate and long-term harm to
competition and consumers in the Nampa area and across Treasure Valley.  Accordingly,
Plaintiffs respectfully ask this Court to permanently enjoin the Acquisition as a violation of

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -4**

Section 7 of the Clayton Act and Section 48-106 of the Idaho Competition Act, Idaho's
counterpart to Section 7 of the Clayton Act.

**ANSWER**:    St. Luke's states that the first two sentences of Paragraph 8 state a legal

conclusion as to which no answer is necessary.  To the extent that an answer is necessary, St.

Luke's states Section 7 requires a balancing of the likely procompetitive effects of a transaction

against the likely anticompetitive effects.  St. Luke's denies that the Saltzer transaction violates

Section 7 and further denies the remaining allegations of Paragraph 8.

## II.

## BACKGROUND

### A.

### Jurisdiction and Venue

9.      This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.
§ 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337, and
1345.  This is a civil action arising under Acts of Congress protecting trade and commerce
against restraints and monopolies and is brought by an agency of the United States authorized by
an Act of Congress to bring this type of action.

**ANSWER:**    The allegations of Paragraph 9 purport to state a legal conclusion to which

an answer is not required.  To the extent an answer is required, St. Luke's admits that plaintiffs

purport to bring this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and

Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337, and 1345.  St.

Luke's denies that the FTC has been authorized by Congress to bring this action in this Court.

10.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe –

(1)    that any person, partnership, or corporation is violating, or is about to
violate, any provision of law enforced by the Federal Trade Commission,
and

(2)    that the enjoining thereof pending the issuance of a complaint by the
Commission and until such complaint is dismissed by the Commission or
set aside by the court on review, or until the order of the Commission
made thereon has become final, would be in the interest of the public – the

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -5**

Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. . . . Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.

**ANSWER:**   St. Luke's admits that Paragraph 10 correctly restates Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), but denies that it is a "person, partnership, or corporation" within the meaning of this statute.

11.     Defendants are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

**ANSWER:**   St. Luke's admits the allegations of Paragraph 11.

12.     Defendants all transact business in the District of Idaho and are subject to personal jurisdiction therein.  Venue therefore is proper in this District under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

**ANSWER:**   St. Luke's admits that all defendants conduct activities in the State of Idaho and are subject to the personal jurisdiction of this Court.  St. Luke's denies, however, that this case is brought by the FTC in accordance with law.  St. Luke's denies the remaining allegations of this paragraph.

13.     The Court has supplemental jurisdiction over the State of Idaho's claim under Idaho Code Section 48-101 *et seq.*  under 28 U.S.C. § 1367.

**ANSWER:**   The allegations of Paragraph 13 state a legal conclusion to which an answer is not required.  To the extent an answer is required, St. Luke's denies the allegations of this paragraph.

## B.

## The Parties

14.     The Commission is an administrative agency of the United States, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, which prohibits acquisitions that may substantially lessen competition or tend to create a monopoly.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION** -6

**ANSWER:**      St. Luke's denies that the FTC is vested with authority to enforce Section

7 of the Clayton Act in this proceeding.  St. Luke's therefore denies the allegations of the last

sentence of this paragraph.  St. Luke's admits the allegations of the first sentence of

Paragraph 14.

15.      The State of Idaho is a sovereign state within the United States.  This action is
brought by and through its Attorney General – Lawrence G. Wasden – who is the chief law
enforcement officer of the state, with the authority to bring this action on behalf of the state
pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Idaho Code § 48-108 of the Idaho
Competition Act.  The State of Idaho brings this action in its sovereign capacity and as *parens
patriae* on behalf of the citizens, general welfare, and economy of the State of Idaho.  The Office
of the Attorney General for the State of Idaho is headquartered at 700 W. Jefferson Street, Boise,
Idaho 83720.

**ANSWER:**      St. Luke's admits the allegations of Paragraph 15 except that it is without

knowledge as to whether the State brings this action as "parens patriae" and therefore denies that

specific allegation.

16.      Defendant St. Luke's is a not-for-profit health system organized under and by
virtue of the laws of Idaho.  St. Luke's is headquartered at 190 W. Bannock Street, Boise, Idaho
83702.  St. Luke's owns and operates six hospitals:  St. Luke's Boise Medical Center, a 399-bed
hospital in Boise; St. Luke's Meridian Medical Center, a 167-bed hospital in Meridian;
St. Luke's Magic Valley Medical Center, a 228-bed hospital in Twin Falls; St. Luke's Wood
River Medical Center, a 25-bed hospital in Ketchum; St. Luke's Jerome Medical Center, a
25-bed hospital in Jerome; and St. Luke's McCall, a 15-bed hospital in McCall.  St. Luke's also
owns and operates an emergency room facility in Nampa, as well as a children's hospital, a
cancer referral center, and more than 100 clinics throughout central and southwest Idaho and
eastern Oregon.  During fiscal year 2012, St. Luke's generated $1.44 billion in revenue,
$182.6 million in operating cash flow as measured by EBITDA, and $72.3 million in income.
St. Luke's current assets include $116.5 million in cash and an additional $269.5 million in
board-designated funds.

**ANSWER:**      St. Luke's notes that it operates Mountain States Tumor Institute (which

plaintiffs refer to as "a cancer referral center").  St. Luke's further states that in fiscal year 2012,

it generated $182.6 million in *total* cash flow, not operating cash flow, but otherwise admits the

allegations of the second to last sentence.  St. Luke's admits that its audited financial statements

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -7**

for fiscal year 2012 state current assets of $116.5 million in cash and at least $269.5 million in

board-designated funds.  St. Luke's admits the remaining allegations of Paragraph 16.

17.     Before the Acquisition, Defendant Saltzer – organized as a professional
association under the laws of Idaho – was a for-profit, physician-owned multispecialty group
located at 215 E. Hawaii Avenue, Nampa, Idaho 83686.  With approximately 44 physicians,
Saltzer was the largest and oldest independent multispecialty group in Idaho.  Saltzer physicians'
specialties include family practice, internal medicine, and pediatrics.  During fiscal year 2012,
Saltzer generated $40.6 million in revenue and net income of $14.7 million before paying
physician salaries, expenses, and benefits.

ANSWER:     St. Luke's admits the third sentence of Paragraph 17.  St. Luke's admits

that both prior to and after Saltzer's affiliation with St. Luke's, Saltzer was and is a professional

association under the laws of Idaho.  Beyond denying that the transaction with Saltzer is properly

characterized as an "Acquisition", St. Luke's admits the remainder of the first sentence of this

paragraph.  St. Luke's further admits that at certain times there have been approximately 44

physicians with Saltzer.  St. Luke's lacks sufficient information to admit or deny the remaining

allegations in Paragraph 17 and therefore denies those allegations.

## C.

### The Acquisition

18.     Section 7 of the Clayton Act provides, in pertinent part, that "no person subject to
the jurisdiction of the [FTC] shall acquire the whole or any part of the assets of another person. .
. , where . . . the effect of such acquisition may be substantially to lessen competition, or to tend
to create a monopoly."  Here, effective December 31, 2012, St. Luke's acquired the assets of
Saltzer for an amount not to exceed REDACTED.  Pursuant to the Acquisition, St. Luke's
received Saltzer's intangible assets, personal property, and equipment.  The Acquisition also
transferred many, if not all, of Saltzer's legal rights to St. Luke's, including, among other things,
the power to manage day-to-day operations, negotiate health plan contracts on Saltzer's behalf,
establish rates and charges for services provided by Saltzer physicians, manage Saltzer
employees, and control purchasing, billings, collections, payables, accounting, and other
financial matters relating to Saltzer's operations.  In addition, Saltzer, on behalf of its physicians,
entered into a five-year professional services agreement with St. Luke's.

ANSWER:     St. Luke's admits that the first sentence of Paragraph 18 correctly recites

Section 7 of the Clayton Act, but denies that it is a "person subject to the jurisdiction of the

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -8**

[FTC]" or that the Saltzer transaction violates Section 7.  St. Luke's admits the second and third sentences of Paragraph 18, except that St. Luke's denies that the Saltzer transaction was an "acquisition" of Saltzer by St. Luke's.  St. Luke's denies that the Professional Services Agreement entered into between St. Luke's and Saltzer transfers all of the legal rights enumerated in the fourth sentence of Paragraph 18.  St. Luke's admits the last sentence of Paragraph 18.

19.     On November 12, 2012, St. Al's filed suit in this Court alleging – as Plaintiffs do here – that the Acquisition violates Section 7 of the Clayton Act ("*St. Al's v. St. Luke's*").  That case, No. :12-cv-00560-BLW-REB, is assigned to the Honorable B. Lynn Winmill of this Court and currently scheduled for trial on July 29, 2013.

**ANSWER:**     St. Luke's admits the allegations of Paragraph 19, but denies that the Saltzer transaction violates any law.

20.     The Commission has reason to believe that the Acquisition violates Section 7 of the Clayton Act by substantially reducing competition in a line of commerce and has authorized Staff to initiate this proceeding.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 20.

## D.

### Competition Between Healthcare Providers

21.     Competition between healthcare providers occurs in two "stages."  In the first stage, providers compete to be selected as in-network providers by health plans.  To gain in-network status, a provider engages in bilateral negotiations with the health plan.  Providers benefit from in-network status by gaining access to the health plan's members as patients. Health plans seek to create provider networks with geographic coverage and a scope of services sufficient to attract and satisfy employers and their employees, as well as independent purchasers of "non-group" insurance.  One of the critical terms that a provider and a health plan agree upon during a negotiation is the reimbursement rates that the health plan will pay to the provider when the health plan's members obtain care at the provider's facilities or from its employed physicians.

**ANSWER:**     St. Luke's admits that providers compete to be selected as in-network providers by health care payers, that providers negotiate with some payers, and that providers benefit from in-network status by gaining potential access to the health plan's members as

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -9**

patients.  St. Luke's admits the last two sentences of this paragraph.  St. Luke's denies the

remaining allegations of Paragraph 21.

22.     Employers generally have two alternative funding mechanisms for purchasing health insurance for their employees.  Fully insured employers and their employees pay premiums, co-pays, and deductibles in exchange for access to a health plan's provider network and for insurance against the cost of future care.  The costs to employers and health plan members are inextricably linked to the reimbursement rates that health plans negotiate with each healthcare provider in their provider network.  Self-insured employers also have access to their health plan's network and negotiated reimbursement rates but assume the risk for the costs of care provided to their employees.  Self-insured employers must pay the entirety of their employees' healthcare claims (aside from member cost-sharing, such as deductibles and co-payments) and, as a result, they immediately incur any provider rate increases.  Therefore, regardless of the funding mechanism, health plans act as employers' agents in seeking to create provider networks that offer convenience, high quality of care, and negotiated reimbursement rates.

**ANSWER:**     St. Luke's states that this paragraph oversimplifies the issues which it

purports to describe and therefore denies the allegations of this paragraph.

23.     In the second stage of competition, providers compete with other in-network providers to attract patients.  Health plans typically offer multiple in-network providers with similar out-of-pocket costs, and those providers compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer.

**ANSWER:**     St. Luke's admits that providers in a network compete with other in-

network providers to attract patients, that health plans typically offer multiple in-network

providers, and that such providers compete, *inter alia*, on non-price bases.  St. Luke's denies the

remaining allegations of this paragraph.

### III.

### THE RELEVANT SERVICE MARKET

24.     The Acquisition threatens substantial competitive harm in the market for adult primary care physician services sold to commercial health plans ("Adult PCP Services").  This market encompasses general physician services provided to commercially insured patients aged 18 and over by physicians practicing internal medicine, family practice, and general practice.

**ANSWER:**     St. Luke's denies the allegations of this paragraph.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -10**

25.     The Adult PCP Services market excludes obstetricians and gynecologists ("OB/GYN") because for many health plan enrollees, including all males, services offered by OB/GYN physicians are not viable substitutes for Adult PCP Services. Those services generally complement, rather than substitute for, general PCP services, and are offered under different competitive conditions. The market also excludes services provided by pediatricians because they typically treat only patients under 18 years of age.

**ANSWER:**     St. Luke's admits that for some health plan enrollees, including adult

males, the services provided by OB/GYN physicians do not substitute for adult primary care

physician services. St. Luke's also admits that pediatricians typically treat patients under the age

of 18. St. Luke's denies the remaining allegations of Paragraph 25.

26.     St. Luke's has not disputed in *St. Al's v. St. Luke's* that Adult PCP Services is a relevant service market in which to analyze the competitive effects of the Acquisition.

**ANSWER:**     St. Luke's admits that it has not disputed in *Saint Alphonsus v. St. Luke's*

that adult primary care physician services is a relevant service market, but denies that that market

is limited to services provided to commercially insured patients and  limited to primary care

physicians.

# IV.

## THE RELEVANT GEOGRAPHIC MARKET

27.     The relevant geographic market in which to analyze the effects of the Acquisition in the relevant service market is no larger than the five zip codes that encompass Nampa and Caldwell, Idaho (the "Nampa area"). This is confirmed by both quantitative and qualitative evidence, including by Defendants' own executives and St. Luke's ordinary-course documents. In fact, in the ordinary course of business, St. Luke's analyzes the Adult PCP Services market shares for a "Nampa Physician Market."

**ANSWER:**     St. Luke's denies the allegations of Paragraph 27.

28.     An appropriate geographic market is "the area in which consumers can practically turn for alternative sources of the product [or service] and in which the antitrust defendants face competition." *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1076 (N.D. Ill. 2012) (citation omitted). Defining the geographic market is a "pragmatic undertaking," *FTC v. ProMedica Health Sys., Inc.,* No.  3:11 CV 47, 2011 U.S. Dist. LEXIS 33434, at *149 (N.D. Ohio Mar. 29, 2011) (citation omitted), and it should "correspond to the commercial realities of the industry," *OSF Healthcare*, 852 F. Supp. 2d at 1076-77 (citation omitted).

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -11**

**ANSWER:**     St. Luke's states that *FTC v. OSF Healthcare Sys.* and *FTC v. ProMedica Health Sys., Inc.* speak for themselves.  St. Luke's further states that most of this paragraph states conclusions of law as to which no answer is required.  To the extent that an answer is required, St. Luke's admits that defining the geographic market has been characterized in the two cases as the plaintiffs have quoted.  St. Luke's denies the remaining allegations of this paragraph.

29.     A relevant test to determine the boundaries of the geographic market is whether a hypothetical monopolist of the relevant services within the geographic area could profitably raise prices by a small but significant amount.  If so, the boundaries of the geographic area are an appropriate geographic market.  This is known as the "hypothetical monopolist" test.

**ANSWER:**     St. Luke's admits that the hypothetical monopolist test is a method used to determine a geographic market. St. Luke's denies the remaining allegations of Paragraph 29.

30.     In general, consumers of Adult PCP Services care about the distance they need to travel for those services.  Nampa-area residents are no different; they strongly prefer to stay close to home for Adult PCP Services.  Given patients' preferences, a hypothetical monopolist that controlled all such services in the Nampa area could profitably increase rates by at least a small but significant amount.

**ANSWER:**     St. Luke's admits that patients of adult PCPs care to different extents about the distance they need to travel for PCP services.  St. Luke's denies the remaining allegations of Paragraph 30.

31.     In fact, health plans must include a sufficient number of quality in-network Adult PCPs located in the Nampa area to create an attractive network for local employers whose employees reside in and around Nampa.  As Saltzer's former Chief Financial Officer testified, "any managed care plan or network that only offered primary care physicians in Meridian and Caldwell, and not in Nampa or only offered Nampa physicians upon payment of a financial penalty, would certainly not be acceptable to any employer with significant numbers of Nampa employees."

**ANSWER:**     St. Luke's admits that Nancy Powell—former Chief Financial Officer of Saltzer and current Chief Administrative Officer of Saint Alphonsus Medical Group—made the statement quoted in the second sentence of Paragraph 31.  St. Luke's denies the remaining allegations of this paragraph.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -12**

# V.

## MARKET STRUCTURE AND THE ACQUISITION'S
## PRESUMPTIVE ILLEGALITY

32.    Under Section 7, the Acquisition is presumed to substantially lessen competition if it will lead to "undue concentration" in at least one relevant market.  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  The *Merger Guidelines* measure market concentration using the Herfindahl-Hirschman Index ("HHI").  A merger or acquisition is presumed likely to create or enhance market power, and thus is presumed illegal, when the post-merger HHI exceeds 2,500 points and the merger or acquisition increases the HHI by more than 200 points.

**ANSWER:**    St. Luke's states that *United States v. Phila. Nat'l Bank* and the Merger

Guidelines speak for themselves.  St. Luke's further states that much of this paragraph states

conclusions of law as to which no answer is required.  St. Luke's denies any implication of this

paragraph that the Saltzer transaction was anticompetitive.  St. Luke's denies the remaining

allegations of this paragraph.

33.    Here, the Acquisition combines the two largest Adult PCP Services providers in Nampa.  St. Luke's post-Acquisition market share in the Adult PCP Services market will be nearly 60 percent (as measured by visits using data from several Idaho health plans), which surpasses levels held to be presumptively unlawful by the Supreme Court.  *Phila. Nat'l Bank*, 374 U.S. at 363.  Post-Acquisition, the two largest competitors, St. Luke's and St. Al's, control almost three-quarters of the Adult PCP Services market in the Nampa area, but St. Al's market share is less than one-third of St. Luke's share.  After the combined entity and St. Al's, the other providers in the Nampa area each account for a market share of less than five percent.

**ANSWER:**    St. Luke's denies that the Saltzer transaction was an acquisition and

further denies that Nampa is a relevant geographic market.  St. Luke's denies the remaining

allegations of Paragraph 33.

34.    In the Adult PCP Services market, the concentration levels far exceed the *Merger Guidelines* thresholds.  The post-Acquisition HHI in the Adult PCP Services market will be 3,552, an increase of 1,397 points, nearly *seven times* the required increase in concentration for a presumption of illegality.  The HHI figures for the Adult PCP Services market are summarized in the table below:[1]

---

[1]    In Table 1, market shares are calculated based on visits to physicians identified as practicing internal medicine, general practice, and family practice based on data provided by Idaho health plans.  The "75% Service Area" represents the minimum set of zip codes that accounts for at least 75% of "visits" to Nampa-area physicians.  Here, the 75% Service Area consists of five zip codes encompassing Nampa and

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -13**

Table 1

| Adult PCP Services Sold to Commercial Health Plans (75% Service Area of Nampa-Based Providers) | | |
|---|---|---|
| **Provider** | **Market Share (visits)** | **Post-Acquisition** |
| **Saltzer** | **38.85%** | **56.84%** |
| **St. Luke's** | **17.99%** | |
| St. Alphonsus | 15.87% | 15.87% |
| Primary Health | 4.97% | 4.97% |
| Terry Reilly | 0.97% | 0.97% |
| Family Med. Resid. | 0.28% | 0.28% |
| All Independent Facilities | 21.08% | 21.08% |
| **HHI** | **2,155** | **3,552** |
| **Delta** | **1,397** | |

  **ANSWER:** St. Luke's denies that Nampa is a relevant geographic market and denies

the allegations of Paragraph 34 and of Table 1.  St. Luke's further denies that the 75% Service

Area is the proper threshold for a geographic market analysis and denies the remaining

allegations of this paragraph and of Footnote 1.

  35. While the above market shares are based on visits, other commonly used metrics

result in similarly high market concentrations and a strong presumption of anticompetitive harm.

For example, when measured by "allowed amount" – *i.e.*, reimbursement paid by a health plan –

---

surrounding areas:  83605, 83607, 83651, 83686, and 83687.  Once those zip codes were identified, market shares were calculated based on visits by patients residing in those zip codes, regardless of *where* those patients seek these services (*i.e.*, the analysis includes patients who traveled outside of Nampa for care).

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -14**

the post-Acquisition HHI increases 1,291 points to 3,265, and when measured by relative value units ("RVUs"), a measure of physician services rendered, it increases by 1,264 points to 3,039, well above the thresholds needed for a presumption of illegality.

**ANSWER:** St. Luke's denies the allegations of Paragraph 35.

36.    Moreover, these shares may *understate* the challenges a health plan would face in marketing a plan in Nampa without the merged entity.  For example, the combined entity will account for approximately 79 percent of visits by Nampa residents to Nampa-based physicians providing Adult PCP Services.[2]  If a health plan were to lose the combined St. Luke's/Saltzer from its network, it would face the very difficult task of directing all of those Nampa residents to the remaining Nampa Adult PCPs (who currently account for only 21 percent of the market) or to an Adult PCP outside of Nampa.

**ANSWER:** St. Luke's denies the allegations of Paragraph 36.

# VI.

# ANTICOMPETITIVE EFFECTS

## A.

### Elimination of Competition and Increased Bargaining Leverage of St. Luke's

37.    The Acquisition will eliminate significant head-to-head competition between the Defendants and therefore increase St. Luke's ability and incentive to demand higher reimbursement rates from commercial health plans.

**ANSWER:** St. Luke's denies the allegations of Paragraph 37.

38.    St. Luke's is already a dominant healthcare provider in Idaho by virtue of its large market share and ownership of numerous facilities across the state.  According to its own ordinary-course documents, "Idaho's health system market is relatively concentrated with St. Luke's and St. Alphonsus Health Systems making up a disproportionate share of the market." But as one of Saltzer's leading physicians put it, "we all know [St. Luke's is] and will likely remain the dominant provider" in the area.

**ANSWER:** St. Luke's admits that a Core Leadership Update given by its consultants

contained the statement quoted in the second sentence of Paragraph 38.  St. Luke's further

admits that a physician made the statement quoted in the last sentence of Paragraph 38. St.

Luke's denies the remaining allegations of Paragraph 38.

---

[2]    Note that this calculation differs from the 75% Service Area market share calculations above because it is based on Nampa residents seeking these services *only within Nampa* and does not include patients who traveled outside of Nampa for these services.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -15**

39.     St. Luke's has bolstered its dominance over the last decade, strengthening its grip on Idaho healthcare services through a steady stream of physician group acquisitions.  In total, St. Luke's has purchased more than 70 physician groups since 2004, with at least 16 in Treasure Valley in the last two years alone.  Notwithstanding its non-profit status, St. Luke's cannot credibly deny that its physician acquisitions are motivated by "better profit," as identified in an internal e-mail from its own board member.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 39.

40.     As a dominant provider, St. Luke's has significant bargaining leverage during contract negotiations with health plans, enabling it to extract high rates for its services.  Indeed, St. Luke's receives much higher rates for many of the same services offered by other providers, even for relatively routine procedures.  For example, St. Luke's charges as much as 160 percent more for a basic repair of a nasal septum, 124 percent more for a basic metabolic panel, and 274 percent more to repair a superficial wound than one major health plan's typical reimbursement rates in the community.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 40.

41.     St. Luke's understands that market share in primary care is vital to enhancing its bargaining leverage with health plans.  According to its own documents, "St. Luke's Treasure Valley recognizes that market share in primary care is a *key success factor*, critical to sustaining a *strong position relative to payer contracting* and supporting ancillary, procedural, inpatient, specialty and other services."  (emphasis added.)  As noted, the Acquisition gives the combined entity nearly 60 percent of the market for Adult PCP Services, further advancing St. Luke's stated goal of improving its bargaining position and ability to get the highest possible rates from health plans.

**ANSWER:**     St. Luke's admits that the second sentence of Paragraph 41 correctly

quotes a St. Luke's document, but denies that such a statement reflects a desire by St. Luke's to

enhance bargaining leverage with health plans in order to get the highest rates possible. St.

Luke's denies the remaining allegations of Paragraph 41.

42.     St. Luke's own consultant describes Saltzer as "the dominant medical group in Nampa" and "critical" to Nampa with the largest share of Adult PCPs. And, according to that consultant, Saltzer has maintained a "dominant market position in Nampa for decades" and "has also developed leverage with payors and other providers."  Consistent with that dominance, Nampa-area residents have a strong preference that Saltzer be included in their health plan networks.

**ANSWER:**     St. Luke's denies that its consultant describes Saltzer as "critical" to

Nampa,  but admits that a valuation report of Saltzer contains the language quoted in the first and

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -16**

second sentences of Paragraph 42.  St. Luke's lacks knowledge or information sufficient to admit

or deny the last sentence of the paragraph and therefore denies that allegation.

43.      By acquiring Saltzer, St. Luke's gained additional negotiating leverage with commercial payers, and, thus, the ability to extract higher rates.  Prior to the Acquisition, a health plan negotiating with St. Luke's could use Saltzer physicians as negotiating leverage.  Saltzer helped to give health plans a credible "outside option" if they could not reach acceptable contract terms with St. Luke's:  a network that does not include St. Luke's Adult PCPs but does include Saltzer and St. Al's Adult PCPs.  Accordingly, a health plan could substitute away from St. Luke's for Saltzer and St. Al's if St. Luke's rates became excessive, creating a constraint on St. Luke's ability to demand higher rates.  With the Acquisition, however, health plans lost that alternative to contracting with St. Luke's, as a St. Al's network that excludes Saltzer is not attractive to local employers whose employees live in the Nampa area.  As a result, St. Luke's will have even greater bargaining leverage with health plans, leverage it has shown that it is willing to exploit.

        **ANSWER:**      St. Luke's denies the allegations of Paragraph 43.

44.      Moreover, even if Saltzer were to negotiate with health plans separately from St. Luke's, the merged entity's unilateral incentive and ability to raise rates remains.  Among other things, St. Luke's and Saltzer would retain all profits from each other's contracts and are each other's closest substitutes for Adult PCP Services in the Nampa area.  So, they risk relatively little if either is unable to reach an agreement with a particular health plan.  For example, St. Luke's could demand a significant rate increase from a health plan, knowing full well that if it fails to reach an agreement, the health plan would have no choice but to contract with Saltzer if it hopes to offer an attractive network for Nampa-area employers.  Of course, the reverse is true as well – if Saltzer fails to reach an agreement with a particular health plan, the health plan will need to contract with St. Luke's if it hopes to offer an attractive network in the Nampa area.  Either way, the merged entity reaps the benefits of its increased market power, giving St. Luke's and Saltzer each the motivation and means to demand higher rates in their negotiations with health plans.

        **ANSWER:**      St. Luke's denies the allegations of Paragraph 44.

45.      Significantly, in this case, past is prologue.  St. Luke's has used its strategy of purchasing physician groups and raising healthcare costs in another region of Idaho known as Magic Valley.  According to St. Luke's, Magic Valley was "extremely fragmented and physician centric."  Beginning in 2004, St. Luke's acquired hospitals and 30 physician practice groups in Magic Valley and then used its newfound leverage to extract higher payments from health plans. Following those acquisitions, health plans had no choice but to agree to St. Luke's rate demands if they hoped to offer attractive networks there.  St. Luke's facilities in the Magic Valley are now among the most expensive in the entire state, with rates rising much faster than the national average.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO**
**GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -17**

**ANSWER:**     St. Luke's admits that a document contains the language quoted in the third sentence of Paragraph 45.  St. Luke's further admits that it has acquired two hospitals in the Magic Valley since 2004.  St. Luke's denies the remaining allegations of Paragraph 45.

46.     Here, St. Luke's seeks to replicate its Magic Valley experience in Treasure Valley.  In St. Luke's own ordinary-course documents, it looks back on its Magic Valley "success," describing it as a "precursor to what we may be able to achieve across the region if we can attain the critical mass of physicians committed to partnering in the St. Luke's Health System."  And St. Luke's has attempted to do just that.  Since 2008, St. Luke's has acquired more than 40 physician practice groups in Treasure Valley – *not* including Saltzer – with the goal of changing the "extremely fragmented, competitive atmosphere" there, as it did in Magic Valley.

**ANSWER:**     St. Luke's admits that materials from the January 27, 2009 St. Luke's Health System Board of Directors meeting use the language quoted in the second sentence of Paragraph 46 in reference to St. Luke's gains in "hospitals and physicians working together to achieve mutually beneficial outcomes."  St. Luke's further admits that, both in the Magic Valley and in the Treasure Valley, it hopes to offer an integrated system of coordinated medical care and thereby to promote competition in each area.  St. Luke's also admits that to the extent that its transactions in the Magic Valley are providing better care at a lower cost to patients, it is seeking to achieve the same result in the Treasure Valley.  St. Luke's denies the remaining allegations of Paragraph 46.

**B.**

**Higher Healthcare Costs Will Be Borne by Idaho Employers and Local Residents**

47.     As a result of increased bargaining leverage from the elimination of significant head-to-head competition, the Acquisition will likely increase the overall cost of health care, thereby harming Idaho employers and local residents.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 47.

48.     First, St. Luke's will be able to extract higher rates during its negotiations with health plans.  Because rate negotiations with health plans in Idaho involve the joint negotiation of reimbursement rates for all services, these rate increases may be distributed among services

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -18**

within the St. Luke's system, not only and not necessarily in the Adult PCP Services market in Nampa.

**ANSWER:**   St. Luke's denies the allegations of Paragraph 48.

49.   Second, and more immediately, health plans and local employers will likely pay significantly more for ancillary services – like labs and X-rays – because of the Acquisition. St. Luke's receives significantly higher rates for ancillary services than independent facilities providing the same services.  St. Luke's encourages its Adult PCPs to direct their patients to its facilities for ancillary services so that it can reap the financial benefits of its higher rates.  This strategy is confirmed by St. Luke's ordinary-course documents that urge its employees to "[t]ighten up 'In-network' referrals – Lab/Imaging; Review of volumes from all regions and St Luke's clinics to determine network leakage."  St. Luke's higher "facility" fee structure will apply to these services following the Acquisition, leaving Saltzer physicians without the option of choosing to have these services provided at their independent facilities (or in other independent facilities) at a lower cost.  Thus, patients will use more expensive (but not necessarily higher quality) St. Luke's facilities for ancillary services, thereby increasing the overall cost of health care.  Because of St. Luke's newly enhanced market power, health plans believe they will be unable to resist these cost increases.

**ANSWER:**   St. Luke's admits that a confidential discussion document contains the language quoted in the fourth sentence of Paragraph 49, but denies that such language constitutes a "strategy."  St. Luke's denies the remaining allegations of Paragraph 49.

50.   Tellingly, as part of the Acquisition's terms, St. Luke's offered to increase Saltzer Adult PCPs' income by almost double the amount that is typical when a hospital acquires a physician group.  A third-party consultant hired by St. Luke's to analyze the compensation it offered to Saltzer remarked that the compensation increases averaging about REDACTED percent were "above the typical market norms" of REDACTED percent raises for acquired physicians.  But St. Luke's own documents explain how it plans to make up for that extra cost – "[f]unding for compensation increase[s] [to Saltzer physicians] is provided through higher hospital based reimbursement (approximately REDACTED) and other downstream revenue sources."  In other words, St. Luke's higher rates and "downstream revenue" – *e.g.*, ancillary services and surgeries – will more than compensate for its well above-market compensation package for Saltzer's physicians.

**ANSWER:**   St. Luke's admits that a third party consultant made the statements quoted in this paragraph.  Further answering, St. Luke's notes that the same consultant concluded that the payments made to Saltzer were reasonable and within Fair Market Value.  St. Luke's denies the remaining allegations of this paragraph.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -19**

51.     The costs of payment increases resulting from the Acquisition will be borne directly by or passed on to local employers and their employees.  Self-insured employers rely on health plans to negotiate rates and provide administrative support; the employers themselves pay the full cost of their employees' health care.  As a result, self-insured employers immediately and directly bear the burden of higher rates.  Meanwhile, health plans pass on some or all provider rate increases to their fully insured customers through higher premiums.

**ANSWER:**     St. Luke's denies the first sentence of Paragraph 51.  St. Luke's lacks

knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 51

and therefore denies them.

52.     Employers, in turn, generally must pass on their increased healthcare costs to their employees, in whole or in part.  Employees will bear these increased costs in the form of higher premiums, higher co-payments or deductibles, reduced coverage, restricted services, or reductions in wages or other benefits (and, in the case of public employers, increased costs will be passed along to local taxpayers as well).  Some Nampa-area residents may therefore delay or even forgo necessary healthcare services because of higher costs, while others may drop their insurance coverage altogether.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 52.

## C.

### Loss of Vital Non-Price Competition

53.     In recent years, Nampa-area residents have received high quality Adult PCP Services.  Studies indicate that Saltzer physicians are rated at the 90th percentile or higher among physicians in terms of patient satisfaction.

**ANSWER:**     St. Luke's admits that Saltzer physicians provide high quality adult PCP

services.  Further answering, St. Luke's states that one of the reasons for the affiliation is that

Saltzer physicians concluded that they could better serve their patients as a result of the

affiliation with St. Luke's.  St. Luke's denies the remaining allegations of this paragraph.

54.     But the Acquisition will dampen the combined entity's incentive to improve or continue offering high quality services.  Because the merged entity will control the majority of Adult PCP Services in the Nampa area, it will face limited outside competition for patients seeking such services.  Thus, it will have reduced incentives to improve or continue offering high quality services because of the limited PCP competition remaining and its unduly high market share.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 54.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -20**

## VII.

## ENTRY BARRIERS

55.     De novo entry into the Adult PCP Services market is unlikely to occur in a timely or sufficient manner to deter or counteract the likely anticompetitive effects of the Acquisition. In addition, repositioning by competitors or expansion of their services is also unlikely to offset fully the harm to consumers from the Acquisition.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 55.

56.     First, new entry is unlikely because of the lack of available Adult PCPs. Most PCPs in Nampa are already employed by St. Luke's or St. Al's.  And according to St. Luke's ordinary-course documents, its physician contracts frequently contain non-compete provisions that REDACTED.  As a result, new competition from currently employed St. Luke's physicians who leave to open a private practice is unlikely to occur, and in any event would not be timely to deter or prevent the Acquisition's likely competitive harm.  Indeed, the number of independent physicians in Nampa is declining because hospitals offer stability and generous benefits, while self-managing a private physician practice can be challenging.

**ANSWER:**     St. Luke's admits that some of its physician contracts contain provisions

that require a physician who terminates his or her agreement prior to the initial term to pay back

all or a portion of the amount that St. Luke's paid to the physician in order to acquire his or her

professional goodwill.  St. Luke's denies that its physician contracts contain non-compete

provisions that prevent physicians from continuing to practice medicine in the community at

other facilities. St. Luke's lacks information or knowledge sufficient to admit or deny the

allegations of the last sentence of Paragraph 56 and therefore denies those allegations.  St.

Luke's admits that the number of unaligned physicians in Nampa has declined but denies the

remaining allegations of Paragraph 56.

57.     Second, recruiting new physicians to Nampa is especially difficult.  There is already a shortage of PCPs in Idaho and across the nation, and there is no medical school based in Idaho that could provide a group of medical school graduates who are familiar with, and would like to stay in, the area.  Indeed, there has been virtually no entry of independent PCPs into the Nampa area in the last several years.  And, as St. Luke's ordinary-course documents state, "there is a deficit of primary care physicians" across Treasure Valley.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -21**

**ANSWER:**     St. Luke's admits that one of its documents states that "there is a deficit of primary care physicians" across the Treasure Valley.  Further answering, St. Luke's states that that deficit should make recruiting of PCPs to the Treasure Valley easier.  St. Luke's denies the remaining allegations of this paragraph.

58.     And third, even if a new entrant or an existing competitor were successful in recruiting Adult PCPs, it would be challenging to attract a substantial number of patients in Nampa to offset St. Luke's market power in a timely manner.  Most adult patients are already treated by an Adult PCP.  Because most patients possess strong loyalties to their existing PCPs, a new physician is highly unlikely to attract patients who already have an Adult PCP.  Moreover, Saltzer has served the Nampa area for more than 50 years and enjoys a strong reputation and brand, assets a new physician would likely lack.  Without the ability to quickly build an adequate patient base, it is unlikely that a new Adult PCP will open a new practice or that existing physician practices will expand meaningfully into the Nampa area to offer such services.  For this reason, outlying physicians groups – that have virtually no patient base in Nampa – are unlikely to enter timely in significant numbers.

**ANSWER:**     St. Luke's admits that "Saltzer has served the Nampa area for more than 50 years and enjoys a strong reputation and brand."  St. Luke's denies the remaining allegations of Paragraph 58.

59.     Finally, the scope of entry needed to create a viable substitute for Saltzer is sizeable.  Saltzer currently accounts for about 39 percent of the Adult PCP Services in the Nampa area, while St. Luke's accounts for another 18 percent.  Thus, the removal of Saltzer as an independent firm does not merely necessitate recruitment of one or even several new physicians.  Even putting aside patient loyalty issues and Saltzer's strong brand and reputation, recruiting a significant physician complement to replicate the lost competition from the Acquisition would involve the entry of a substantial number of physicians to provide these services.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 59.

60.     Moreover, even when physicians do enter the Nampa market, they face substantial delays in becoming meaningful competitors.  It can take as long as a year to recruit a single PCP, from the date recruitment begins until the PCP starts.  Then, the PCP faces an extended ramp-up period before she achieves the patient volume of an established physician.  Indeed, it can require an additional one to three years before a new PCP develops a reasonably active practice.  Accordingly, physician entry is highly unlikely to be timely or sufficient to deter or counteract the substantial anticompetitive effects arising from the Acquisition.

**ANSWER:**     St. Luke's denies the allegations of Paragraph 60.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -22**

## VIII.

## EFFICIENCIES

61.     Defendants' alleged benefits of the Acquisition fall well short of the substantial, merger-specific, well-founded, and competition-enhancing efficiencies that would be necessary to outweigh the Acquisition's significant harm to competition.  No court ever has found, without being reversed, that efficiencies rescue an otherwise illegal transaction.  Relevant case law teaches that "extraordinary" efficiencies are required to justify an acquisition, such as this one, with vast potential harm to competition.

**ANSWER:**    St. Luke's lacks knowledge or information sufficient to admit or deny the

allegations of the second sentence.  St. Luke's further states that this paragraph states various

legal conclusions as to which no Answer is required.  St. Luke's denies the remaining allegations

of Paragraph 61.

62.     Defendants' alleged efficiencies in this case are unfounded and unreliable. Defendants claim that the Acquisition will improve quality and lower patients' cost-of-care.  But Defendants' claims are speculative, exaggerated, and lack the requisite evidentiary support.  The reality is that St. Luke's track record belies any claims Defendants make regarding post-acquisition cost savings being passed on to health plans or employers.

**ANSWER:**    St. Luke's admits that it believes that the Saltzer affiliation will  improve

quality and will lower patient's cost-of-care.  St. Luke's denies the remaining allegations of

Paragraph 62.

63.     Moreover, by St. Luke's own admission, its financial incentives are not aligned with its asserted goal of lowering costs.  In *St. Al's v. St. Luke's* and elsewhere, St. Luke's claims, among other things, that independent physicians over-utilize services because of the incentive created by the fee-for-service payment model.  Yet St. Luke's fails to mention that post-Acquisition, for health plan contracts that continue to use fee-for-service as a reimbursement mechanism, St. Luke's incentives are unchanged.  Indeed, virtually all of St. Luke's contracts are currently reimbursed on a fee-for-service basis, and St. Luke's pays the acquired Saltzer physicians based on "work RVUs," a commonly used measure of the *volume*, not the quality or efficiency, of services provided by physicians.  If anything, after the Acquisition – and the likely post-Acquisition price hikes on services – the combined entity will have an even greater incentive to over-utilize because its profits on those services will increase.

**ANSWER**:    St. Luke's admits that it has claimed that independent physicians may

over-utilize services because of the incentives created by the fee-for-service payment model.  St.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -23**

Luke's further admits that it currently maintains fee-for-service contracts, and admits that the

acquired Saltzer physicians are presently compensated based on work RVUs.  St. Luke's denies

the remaining allegations of Paragraph 63.

63.    64.    Defendants' alleged efficiencies also are not merger-specific because they could
be accomplished without any merger or acquisition.  St. Luke's, by its own admission, has
already engaged in efforts to achieve some of these efficiencies independent of the Acquisition.
And St. Al's has achieved similar improvements by working with independent physicians.

**ANSWER:**    St. Luke's denies the allegations of Paragraph 64.

## IX.

## VIOLATIONS AND CONTEMPLATED RELIEF

65.    The allegations of Paragraphs 1 through 64 above are incorporated by reference as
though fully set forth herein.

**ANSWER:**    St. Luke's incorporates its answers to all preceding paragraphs as if fully

restated herein.

66.    The Acquisition will likely lessen competition in the relevant market in violation
of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and in violation of Idaho Code
Section 48-106 of the Idaho Competition Act.

**ANSWER:**    The allegations of Paragraph 66 state a legal conclusion to which an

answer is not required.  To the extent an answer is required, St. Luke's denies the allegations of

Paragraph 66.

67.    Accordingly, the equitable relief requested here is appropriate.

**ANSWER:**        St. Luke's denies that plaintiffs are entitled to any relief whatsoever.

WHEREFORE, Plaintiffs respectfully request that this Court, as authorized by 15 U.S.C.
§§ 26 and 53(b), and pursuant to the Court's inherent equitable powers:

      a.    Adjudge St. Luke's acquisition of Saltzer to violate Section 7 of the
Clayton Act, 15 U.S.C. § 18, and Idaho Code Section 48-106 of the Idaho
Competition Act;

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO
GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -24**

    b.       Order divestiture, rescission, and any further action needed to establish the competition that would have existed but for the unlawful acquisition of Saltzer;

    c.       Permanently enjoin St. Luke's, including any subsidiaries, joint ventures, and any persons acting on behalf of St. Luke's from acquiring or maintaining any simultaneous legal or beneficial interest in Saltzer;

    d.       Award reasonable costs and attorney's fees to the Office of the Idaho Attorney General; and

    e.       Order such other and further relief as the Court may determine is appropriate, just, and proper.

**ANSWER:**    St. Luke's admits that plaintiffs have made a prayer for relief, but denies that the Complaint states a claim and that plaintiffs are entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSE

The FTC lacks jurisdiction to bring this action in this Court.  It is basing jurisdiction in this Court on §13(b) of the Federal Trade Commission Act – which empowers the FTC to bring suit in a federal district court when the Commission has reason to believe that a "person, partnership, or corporation" is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission.  However, St. Luke's, as a non-profit organization exempt from payment of federal income tax pursuant to §501(c)(3) of the Internal Revenue Code, is not a "person, partnership, or corporation" within the meaning of the Federal Trade Commission Act.

Wherefore, St. Luke's prays that the Complaint of the Federal Trade Commission and the State of Idaho be dismissed both for lack of jurisdiction, for failure to state a claim, and on the merits – and that this Court award it such relief as is appropriate.

DATED:  April 5, 2013.

STOEL RIVES LLP


s/ J. Walter Sinclair
J. Walter Sinclair

SIDLEY AUSTIN, LLP
Jack R. Bierig *(admitted pro hac vice)*
Ben Keith *(admitted pro hac vice)*
Scott D. Stein *(admitted pro hac vice)*
Tacy F. Flint *(admitted pro hac vice)*
Charles K. Schafer *(admitted pro hac vice)*

Attorneys for St. Luke's Health System, Ltd.

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO**
**GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION -26**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2013, I filed the foregoing **ANSWER TO AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| Bely - FTC | bely@ftc.gov |
| Brett T. Delange - Atty General | brett.delange@ag.idaho.gov |
| Brian K. Julian - Saltzer | bjulian@ajhlaw.com |
| Brock Swartlze - St Al's | bswartzle@honigman.com |
| Bryan Nickels - St Al's | ban@dukescanlan.com |
| Carl Withroe - Atty General | Carl.Withroe@ag.idaho.gov |
| Chris Boisvert - TVH | crb@powerstolman.com |
| Colleen Funk - Atty General | colleen.funk@ag.idaho.gov |
| David Ettinger - St Al's | dettinger@honigman.com |
| Douglas E. Litvack - FTC | dlitvack@ftc.gov |
| Eric J. Wilson - SD Atty General | ewilson@gklaw.com |
| Henry C. Su | hsu@ftc.gov |
| J. Thomas Greene - FTC | tgreen2@ftc.gov |
| Jennifer Schwartz - TVH | jls@powerstolman.com |
| JSM - TVH | jsm@powerstolman.com |
| Kadye Bird - St. Al's | klb@dukescanlan.com |
| Kay Lynn Moorhouse | klm@dukescanlan.com |
| Keely Duke - St Al's | ked@dukescanlan.com |
| Kevin J. O'Connor - SD Atty General | koconnor@gklaw.com |
| Kevin Scanlan - St Al's | kjs@dukescanlan.com |
| Lara Phillip - St Al's | lara.phillip@honigman.com |
| N. Roberts - St Al's | nroberts@honigman.com |
| Paul Fabien - St Al's | pfabien@honigman.com |
| Peter Boivin - St Al's | pboivin@honigman.com |
| Peter C. Herrick - FTC | pherrick@ftc.gov |
| Portia L. Rauer - TVH | plr@powerstolman.com |
| Raymond Powers - TVH | rdp@powerstolman.com |
| S. Hakim - St. Al's | shakim@honigman.com |
| S.Sajewski - FTC | ssajewski@ftc.gov |
| Sandee Stogsdill - St Al's | sls@dukescanlan.com |
| Teresa Taylor - Atty General | teresa.taylor@ag.idaho.gov |
| Wendy K. Arends - SD Atty General | warends@gklaw.com |

By: /s/ J. Walter Sinclair
J. Walter Sinclair

**ANSWER OF DEFENDANT ST. LUKE'S HEALTH SYSTEM, LTD. TO GOVERNMENT PLAINTIFFS' COMPLAINT FOR PERMANENT INJUNCTION - 27**