| | |
|---|---|
| Keely E. Duke | David Ettinger |
| ISB 6044; ked@dukescanlan.com | dettinger@honigman.com |
| Kevin J. Scanlan | Lara Fetsco Phillip |
| ISB 5521; kjs@dukescanlan.com | lara.phillip@honigman.com |
| Duke Scanlan & Hall, PLLC | Honigman Miller Schwartz and Cohn LLP |
| 1087 W. River Street, Suite 300 | 2290 First National Building |
| Boise, ID 83707 | 660 Woodward Avenue |
| Telephone: (208) 342-3310 | Detroit, MI 48226 |
| Facsimile:(208) 342-3299 | Telephone (313) 465-7368 |
| | Facsimile (313) 465-7397 |

*Attorneys for Saint Alphonsus Medical Center-Nampa, Inc., Saint Alphonsus Health System, Inc., and Saint Alphonsus Regional Medical Center, Inc.*

## UNITED STATES DISTRICT COURT

### IN THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER - NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC. | Case No. 1:12-CV-00560-REB |
| | **DECLARATION OF DAVID A. ETTINGER** |
|        Plaintiffs, | |
| v. | |
| ST. LUKE'S HEALTH SYSTEM, LTD. | |
|        Defendant. | |

| | |
|---|---|
| STATE OF IDAHO | ) |
| | ) ss. |
| County of Ada | ) |

## <u>DECLARATION OF DAVID ETTINGER</u>

David Ettinger states as follows:

1.      I am lead counsel for Saint Alphonsus Health System and its wholly owned subsidiaries, Saint Alphonsus Medical Center-Nampa, Inc. and Saint Alphonsus Regional

**DECLARATION OF DAVID A. ETTINGER - 1**

Medical Center, Inc. ("Saint Alphonsus") in the captioned matter, and head the Antitrust and Trade Regulation Practice Group at Honigman Miller Schwartz & Cohn LLP.  I have knowledge of the facts set forth in this declaration from my personal experience and work at Honigman. This declaration is filed in support of Saint Alphonsus' Motion for Attorneys' Fees and Costs.

2.     This declaration is intended to address (a) the overall work performed by counsel on behalf of Saint Alphonsus, and (b) the specific efforts of my law firm, Honigman, and the document review lawyers we engaged.  Keely Duke of Duke Scanlan LLC, who also represents Saint Alphonsus, is submitting a declaration relating to the specific efforts of her firm.

**Background and Experience**

3.     I and my firm have extensive experience in health care antitrust matters.  I have been litigating health care antitrust cases for my entire legal career, more than 35 years.  My work has included more than 20 litigated health care antitrust cases, including two prior cases involving health care mergers.  I have also been extensively involved in the defense of government investigations of health care transactions and advice to clients on the antitrust implications of contemplated transactions.  I've worked on health care antitrust matters in more than 25 states.  I've also spoken on health care antitrust matters at programs of the American Health Lawyers Association, National Health Lawyers Association, American Bar Association, Texas Bar Association, Indiana Bar Association, Michigan Bar Association, New Jersey Bar Association, and numerous private groups.  I've written numerous articles and monographs on health antitrust issues.  I have been recognized by the National Law Journal as one of the top 40 health care lawyers in the United States.  Materials describing my and Honigman's relevant experience are attached hereto as Exhibit 1.

4.     The lawyers from Honigman supporting me in this case are also very experienced antitrust lawyers:

**DECLARATION OF DAVID A. ETTINGER - 2**

a.      Lara Phillip has worked with me on antitrust matters for seven years and previously was a litigator who worked on numerous major antitrust cases at Clifford Chance, and its predecessor firm Rogers & Wells, in New York since 1995.  A copy of Ms. Phillip's bio is attached hereto as Exhibit 2.

b.      Peter Boivin has spent his entire 13 year career working on antitrust issues.  He began at Cleary Gottlieb in Washington, DC and Brussels.  He focused on health antitrust matters while working with me from 2006 to 2013.  Recently Pete left Honigman and is now in-house antitrust counsel at General Motors.

c.      Brock Swartzle and Paul Fabien have each worked with me on antitrust matters for at least 8 years.

5.      Honigman (under my leadership) also has substantial prior experience in the specific issues that have arisen in this case:

a.      We've litigated relevant market issues in health care matters on at least eight occasions.

b.      Honigman has successfully defended government antitrust investigations of physician mergers and acquisitions in Pennsylvania and Indiana, and we have advised clients on such acquisitions and mergers in a variety of states.  Additionally, we've litigated at least five antitrust cases brought by physicians which involved relevant physician markets, including primary care physician markets.

c.      We've litigated two antitrust cases involving hospital mergers and have defended numerous FTC and Department of Justice investigations of hospital mergers.

d.      Honigman has analyzed and developed efficiencies defenses in a number of merger cases and investigations, both in health care and in other industries.

**DECLARATION OF DAVID A. ETTINGER - 3**

e.      We've also brought a number of plaintiff's antitrust cases both in and outside of the health care area, against such defendants as a number of Blue Cross Blue Shield plans and IBM.

f.      We also have specific experience in cases involving preliminary injunctions on antitrust matters, including the defense of two cases (one private and one brought by the government) which sought preliminary injunctions against health care mergers.

6.      This case was highly complex, and involved a number of novel issues.  It was only the second litigated antitrust case of which I'm aware involving acquisition of physician practices.  It's the only litigated antitrust case of which I'm aware addressing a hospital acquisition of a physician practice or the impact of such an acquisition on physician referrals of patients.  It was also the first case of which I'm aware of in which a defendant argued that the needs of health care reform justify hospital acquisition of physician practices.

7.      I believe that our extensive health care antitrust experience has equipped us to effectively represent Saint Alphonsus in this novel case.  The effective conduct of this case required a detailed knowledge of antitrust economics, of the complex markets in health care and the manner in which health care markets are currently changing.  I don't believe that a firm without deep experience in health care antitrust could have litigated this case effectively, given its numerous complex issues and the rapid pace with which it has been conducted.

8.      I've also had significant prior experience for Saint Alphonsus in Idaho.  In 2005, I analyzed the Treasure Valley and Magic Valley area markets and St. Luke's activity in those markets for Saint Alphonsus.  Additionally, in 2009, I performed an antitrust analysis of what became Saint Alphonsus' acquisition of Mercy Medical Center and two other Catholic Health

**DECLARATION OF DAVID A. ETTINGER - 4**

Initiative hospitals, and responded to FTC questions relating to the Hart Scott Rodino Act filing for that transaction.  Therefore, at the time that my efforts in this case began, I already had substantial knowledge of the area, its history and many of the major players.

9.     Because of this experience, we were able to proceed with this case without the need for the time and expense of substantial legal research or education in the relevant markets. This saved substantial expense for Saint Alphonsus, and significantly reduced the legal fees involved in the case.

10.     In my efforts over 30 years in practicing health antitrust law, I have become quite familiar with the identity and locations of other attorneys who specialize in this work across the United States.  I have worked with them on other merger matters and other litigation, and have encountered them at seminars and other educational programs.  In my experience, there are no lawyers who specialize in health antitrust matters (or antitrust matters generally) in the Boise area or in Idaho.  While there are certainly many fine litigators in this area (my co-counsel Keely Duke among them), none have the experience in health antitrust that would allow them to practice as an efficient and effective "first chair" in a major health antitrust case such as this one.

**Legal Work Involved in the Case – Rates And Hours**

11.     Saint Alphonsus has been represented by Honigman Miller Schwartz & Cohn LLP as lead counsel, Duke Scanlan as local counsel, and Gnoesis, providing attorneys engaged in review of the hundreds of thousands of documents produced in this case.

12.     Honigman's agreement with Saint Alphonsus is that Saint Alphonsus will pay our reasonably incurred legal fees on projects assigned by Saint Alphonsus at rates agreed upon by Saint Alphonsus, plus costs incurred, when properly documented.  All the attorneys' fees for which Saint Alphonsus is seeking reimbursement from Honigman were paid by Saint Alphonsus pursuant to this agreement.

**DECLARATION OF DAVID A. ETTINGER - 5**

13.     Total legal fees for which Saint Alphonsus requests recovery from Honigman and Gnoesis are as follows:

Honigman Miller Schwartz & Cohn LLP:                                    $5,314,593

Gnoesis:                                                                $1,171,608

14.     The average hourly rates for these firms are as follows:

Gnoesis:                                                                $35[1]

Honigman Miller Schwartz & Cohn LLP:                                    $377

Honigman's hourly rates ranged from  $ 150 to $ 770[2] (for my

work)

15.     The number of hours for which Saint Alphonsus seeks recovery for these firms are as follows:

Honigman Miller Schwartz & Cohn LLP:                                    14,109.00 hours

Gnoesis:                                                                33,129.85 hours

16.     The fees for which Saint Alphonsus seeks to be reimbursed only relate to this litigation, and do not relate to the FTC/Idaho Attorney General investigation which preceded it.

17.     Spreadsheets describing the efforts, hours and legal fees of Honigman and Gnoesis are attached hereto as Exhibits 3 and 4 respectively.   A small number of Honigman's time entries regarding communications with prospective third party witnesses and other privileged matters have been generalized so as not to reveal privileged information.   Other

---

[1] All Gnoesis attorneys were billed at $35 per hour, except for Jeffrey Roush, an attorney who managed the effort, who was billed at $45.

[2] My rate increased to $780 in January, 2014.   My time in January for which reimbursement is being sought is under 10 hours.

**DECLARATION OF DAVID A. ETTINGER - 6**

entries have been revised to provide context and more detail in order to assist the Court in assessing the reasonableness of the time expended.

18.     I believe that the fees involved have been reasonable, both as to the rates, and the number of hours.  We have worked hard to represent our clients as economically as possible, given the extraordinary demands of this case.  We have avoided duplication whenever possible and used the professionals with the lowest rates available who could effectively perform the work.  Our rates on this matter have been discounted from our standard rate levels.

19.     My annual responsibilities as head of the Antitrust Practice Group at Honigman include recommendations for my hourly rate and the hourly rates of other Honigman personnel practicing in the antitrust area.  In order to perform these responsibilities, I annually study extensive data provided to us relating to attorney rates around the United States in a variety of practice areas.  This information comes from public surveys such as those performed by the National Law Journal, described further below, and bankruptcy court filings that list hourly rates in connection with fee applications.

20.     I regularly set my personal standard rate at a level slightly below the rates charged by the most senior partners at Chicago-area firms.   These rates are significantly below the top rates charged by senior partners in New York and Washington, D.C.  These are the cities whose data I examine because most leading antitrust lawyers (especially health antitrust lawyers) are located in these venues.  This approach was taken for each of at least the last several years, including each year in which work was done for this case.

21.     The National Law Journal's 2012 survey of hourly billing rates at AmLaw 250 firms confirms that the hourly billing rates of the most senior partners at AmLaw 250 firms in Chicago, New York, and Washington D.C. are significantly higher than my hourly billing rate.

**DECLARATION OF DAVID A. ETTINGER - 7**

(Ex. 5 hereto).  The National Law Journal 2012 AmLaw 250 Annual Billing Survey reported hourly rates of $835 for senior partners at two of the three participating Chicago firms (Brinks Hofer and Vedder Price); hourly senior partner rates ranging from $960 - $1,200 at Washington DC firms; and hourly senior partner rates as high as $1,200 per hour at New York firms.

22.     A review of fee applications and orders approving fees of antitrust lawyers in a number of recent bankruptcy cases supports the conclusion that Honigman's hourly rates are indeed below that of leading antitrust lawyers in markets like Chicago, New York and Washington DC.  Indeed, my hourly rates are well below those of senior antitrust attorneys at Sidley Austin, St. Luke's counsel.  *See e.g.* Order Approving Final Fee Applications and corresponding Fee Applications in *In re Dynegy Holdings, LLC*, Case No. 11-38111 (S.D.N.Y) (approving attorney fees for Sidley Austin, including fees for John Lavelle, an antitrust lawyer with approximately 18 years experience, at an hourly rate of $850) (Ex. 6 hereto); *In re Tribune Company*, Case No. 08-131141 (U.S. Bank Ct. D. Del) (approving attorney fees for debtor's counsel, Sidley Austin, including fees for John Treece, a Chicago-based antitrust lawyer, at an hourly rate of $850) (Ex. 7 hereto).

23.     A review of fee applications and orders from additional bankruptcy matters demonstrate that my hourly rate is significantly below antitrust lawyers in New York and Washington D.C. *In re AMR Corporation*, Case No. 11-15463 (approving attorney fees for Skadden Arps, including fees for James Keyte, a New York based antitrust lawyer at an hourly rate of $1,135) (U.S. Bank. Ct. S.D.N.Y.) (Ex. 8 hereto); and *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (approving attorney fees for Weil Gotshal & Manges LLP, including fees for Ralph Miller, a Washington based antitrust lawyer at a rate of $1,000 per hour) (U.S. Bank. Ct. S.D.N.Y.) (Ex. 9 hereto);  *In re Tribune Company,* Case No. 08-13141 (U.S. Bank Ct.

**DECLARATION OF DAVID A. ETTINGER - 8**

D. Del) (approving attorney fees for Jones Day, including fees for Phillip Proger, a Washington based antitrust lawyer with whom I have participated as co-defense counsel in a number of matters, at a rate of $900 per hour) (Ex. 10 hereto).  My hourly rate is comparable to the $750 (2010) hourly rate of Phillip Proger's partner, Thomas Demitrack, who is based in Jones Day's Cleveland office and with whom I have also worked as co-defense counsel. See Omnibus Order Awarding Interim Allowance of Compensation for Services Rendered (Dkt. 1759) *In re Qimonda Richmond, LLC,* Case No. 09-10589 (U.S. Bank Ct. D. Del) at Exhibit B.  Ex. 11 hereto.  Of course, this rate is likely higher today.

**Work Performed**

24.     We commenced our direct work on this litigation in August of 2012, at a point at which it appeared that St. Luke's and Saltzer could well go forward with their transaction before the Federal Trade Commission and Idaho Attorney General had finished their investigation.  We have not requested fees for work done prior to that time.  In August, we were authorized by the Saint Alphonsus Health System Board to begin preparing for possible litigation, under the supervision of Saint Alphonsus' General Counsel, Stephanie Westermeier.  We were instructed to take these steps though the decision to litigate had not yet been made.  The work commencing in August included selection of an expert economist and supporting firm, the beginning of drafting of the initial pleadings seeking a preliminary injunction, and the accumulation and evaluation of evidence to support that request.  We continued to work on these pleadings, including our complaint, preliminary injunction brief and declarations in support, until the case was filed in mid-November.

25.     Our extensive work in providing information to the Federal Trade Commission and Idaho Attorney General in connection with their investigations provided a substantial factual, economic and legal foundation for the development of pleadings for this litigation.

**DECLARATION OF DAVID A. ETTINGER - 9**

Nevertheless, because that work was undertaken primarily for a different purpose, we have not sought to obtain reimbursement for the legal fees associated with that work.

26.     Honigman worked with a variety of law firms on this matter.  We took the lead on behalf of Saint Alphonsus, working with our local counsel, Duke Scanlan & Hall.  Until the Federal Trade Commission and Idaho Attorney General filed their case in March, 2013, the case brought by Saint Alphonsus and Treasure Valley Hospital (the "Private Plaintiffs") was the only antitrust case challenging the St. Luke's/Saltzer transaction, and Honigman took the lead in pursuing that case in these early stages.  This involved the gathering of evidence and preparation of pleadings in connection with our Complaint and Motion for Preliminary Injunction, attendance at court hearings, negotiations and argument regarding a case management order, development of deposition schedules, initial requests for production of documents, the review of documents produced by St. Luke's, and the review and production of documents by the Saint Alphonsus entities.  Our work also involved significant interaction with our expert economist Deborah Haas-Wilson and Analysis Group, supporting her, as well as our own extensive market and antitrust analysis of the relevant issues.

27.     Once the FTC and Idaho Attorney General filed their complaint, and their case was consolidated with the Private Plaintiffs' case, our role changed, but was still extensive. While the two cases contain very significant common elements, there are substantial claims in the Private Plaintiffs' cases that relate to markets not addressed in the government case, including the pediatric primary care, inpatient hospital services, and outpatient surgical facility services markets.  Our efforts involved substantial work on both the common claims as well as the claims that were pursued only by the Private Plaintiffs.

**DECLARATION OF DAVID A. ETTINGER - 10**

28.     We worked extensively with the government enforcement agencies in pursuing the common claims, and in responding to St. Luke's and Saltzer's defenses to those claims, while avoiding duplicative work:

a.      Our efforts included our presentation of the testimony of Saint Alphonsus personnel on the common issues. For example, Nancy Powell's testimony, as former CFO of Saltzer, almost entirely concerned the common elements of both cases.  Karl Keeler's testimony in part concerned entry barriers, also relevant to the common issues of both cases.  Blaine Petersen's testimony concerned provider negotiations with managed care, relevant to market definition as part of the common issues.  Dr. Robert Polk's testimony concerned quality issues and how they are treated at Saint Alphonsus without the need to employ physicians.  Of course, the "quality defense" was offered by St. Luke's in response to all the issues raised by all plaintiffs.

b.      On a number of issues, Honigman was especially able to contribute to the joint efforts of the Plaintiffs because of the fact that our lawsuit had started earlier, and we had already proceeded into beginning discovery at the point in which the Government Plaintiffs became involved.  For example, we deposed Patricia Butterbaugh of Imagine Health three days after the Government Plaintiffs filed their Complaint and before the two cases were consolidated.  That deposition related to the Micron-St. Luke's relationship, and St. Luke's activities with regard to pulling physicians from the Micron network.  We were therefore able to contribute our early thinking and work on this issue to the depositions and testimony going forward.

c.      Honigman learned a great deal about managed care competition in the Treasure Valley through our discussions with Saint Alphonsus personnel.  This provided

us with information that allowed us to contribute significantly to discovery on the managed care issue, and resulted in our taking the lead in some of the early managed care depositions of St. Luke's personnel, including Steve Drake and Randy Billings.

d.      Similarly, our discussions with Saint Alphonsus on the actions of its primary care physicians gave us insights into the primary care physician market that allowed us to contribute to the Plaintiffs' joint efforts in developing evidence to define the relevant product and geographic markets.

e.      Honigman's discussions with Saint Alphonsus regarding its relationship with Saltzer Medical Group gave us information concerning the operations of Saltzer, which also allowed us to contribute to Plaintiffs' discovery of Saltzer.

f.      I have extensive experience in deposing and cross examining experts, particularly economic experts, in part due to my graduate school training in economics and econometrics (statistical analysis as applied to economics). I utilized this experience in cross examining St. Luke's experts, Drs. Argue and Enthoven and Ms. Ahern, all of whom relied in significant part on statistical work and/or statistical academic studies. I also addressed both the common and unique issues in closing argument.

g.      At trial, I cross examined key defense trial witnesses on the "quality" defense (Enthoven, Pate, Priest, Kee and Souza), the claims regarding the alleged harm to Saltzer from divestiture (Ahern, Kaiser, Kunz and Savage) and the likely competitive harm from the acquisition (Page).

29.      This case involved very substantial deposition discovery, with 82 depositions being taken. (Saint Alphonsus requested an overall limit of 40 depositions, but the number expanded greatly because St. Luke's prevailed in its argument that the deposition limit should be

30 per side and then added substantial numbers of witnesses who plaintiffs needed to depose in order to be adequately prepared for trial.)  Counsel for all plaintiffs divided up lead responsibility for each deposition in order to avoid duplication.

30.     Honigman took the lead in either taking or defending more than 40 of these depositions.   Many of these concerned issues, such as referrals or the defense of Saint Alphonsus' witnesses, which were the exclusive issues of the Private Plaintiffs.   Honigman played a substantial role in taking or defending another 20 depositions.  In order to reduce costs, counsel for Saint Alphonsus did not attend six depositions.  We did not play a major role in the remaining depositions, but needed to attend them, given, among other things, the potential for an impact on the portion of the case applicable to the Private Plaintiffs.[3]

31.     The depositions we took played a very substantial role in the final trial.  At least 21 of the depositions where we took the lead were a source of significant testimony played into the record at trial.  In addition to the defense of depositions of the Saint Alphonsus witnesses, several of whose testimony played a direct role in the Court's Findings of Fact and Conclusions of Law, as described below, I contributed to the preparation of direct examination of other witnesses whose testimony was relied upon by the Court, including Jeff Crouch and Kenneth Kizer.

32.     Our depositions used at trial and our cross and direct examination at trial played a direct role in a wide variety of evidence utilized by the Court in its Memorandum Decision and Order and Findings of Fact and Conclusions of Law.  For example:

---

[3] 15 depositions were taken of Saint Alphonsus personnel.   At least 20 St. Luke's witnesses (who were deposed) were described by St. Luke's in its Revised Provisional Witness List (Dkt 238) dated  May 14, 2013, as offering testimony on Saint Alphonsus, referrals or the issues specifically raised by the Private Plaintiffs.

**DECLARATION OF DAVID A. ETTINGER - 13**

a.     Trial and deposition testimony from Steve Drake and Dr. Mark Johnson elicited by Honigman were used in the Court's findings on geographic market. *See* Findings of Fact and Conclusions of Law at ¶¶ 63, 68.

b.     Testimony by Chris Roth from my cross examination was utilized by the Court in its conclusions on the market strength of Saltzer and St. Luke's leverage as a result of the transaction. *Id.* at ¶ 112.

c.     My cross examination of Alain Enthoven regarding the findings of the Berkeley Forum and the Casalino study were utilized in the Court's conclusions on market leverage. *Id.* at ¶¶ 97, 115.

d.     My examination in the deposition of Peter LaFleur was utilized in the Court's findings on anticompetitive effects. *Id.* at ¶ 128.

e.     My presentation of testimony from Dr. Deborah Haas-Wilson was utilized in the Court's findings on referrals. *Id.* at ¶¶ 132, 136, 139. Saint Alphonsus' lawyers developed essentially all the evidence on the referral issue.

f.     The testimony of Nancy Powell I elicited was utilized in the Court's findings on recruitment and entry. *Id.* at ¶¶ 211-213.

g.     My cross examination of Dr. Kaiser supported the Court's conclusion that divestiture was appropriate here in light, among other things, of the $9 million payment that Saltzer would retain in the event of divestiture. Conclusions of Law at ¶ 58.

h.     The Court's references to St. Luke's efforts as experimental was supported by Dr. Pate's and Dr. Enthoven's admissions during my cross-examination. *Id.* at ¶¶ 69-70.

**DECLARATION OF DAVID A. ETTINGER - 14**

      i.     My cross examination of Dr. Argue was referenced by the Court in support of its Findings on referrals.  Findings of Fact at ¶ 132.

      j.     I examined Dr. Page on documents relied on by the Court related to Saltzer's expected "clout" after the acquisition.  *Id.* at ¶ 114.

33.     We undertook a number of steps to limit duplication.  We and the government attorneys divided up our work on the briefing, including the Trial Brief and the Proposed Findings of Fact and Conclusions of Law.  In those areas, the FTC and Idaho Attorney General took the lead on the common issues, while Honigman took the lead on the non-overlapping portions.

34.     We also avoided duplication because there was never more than one Saint Alphonsus lawyer present at any given deposition.  We limited Honigman's staffing of the depositions in total to two attorneys, myself and my partner Lara Phillip.  Lara focused on physician depositions, the defense of some of the Saint Alphonsus depositions, and most of the depositions that we needed to cover but in which we did not play a substantial role.  I staffed most of the others that Honigman covered.  A few physician depositions were covered by Keely Duke, who has substantial experience in representing physicians.

35.     Our approach to depositions also reflected our efficient, lean approach to this case.  For example, because of my knowledge of the area and this case, I relied on our support staff to provide potentially relevant documents to me for use in depositions, but did not obtain any assistance in preparing deposition questions.  Nor did I ever draft (or have drafted for me), a full deposition outline.  In some cases, I drafted in advance some of the questions I would utilize.  In other cases, I relied entirely on handwritten notes and identification of the documents I would use.  Given my experience and my intensive involvement in this case, this was sufficient to

conduct what I believe were highly effective depositions, which elicited significant testimony, without the time and expense of writing deposition outlines.

36.     We also worked to avoid duplication at trial. Only two lawyers (Keely Duke and I) attended trial on behalf of Saint Alphonsus.  I was the only Honigman lawyer who came to Boise for the trial.  Only a single lawyer handled the direct examination of each witness.

37.     More generally, the lawyers on the Honigman team performed different, complementary tasks, and thereby avoided duplication.  For example, Peter Boivin (and later Brock Swartzle) focused on supervising the document review and production process.  Mr. Boivin was also involved in working with the experts.  Paul Fabien conducted searches for, and reviewed and analyzed, documents and supervised the end of the document review process (after Boivin and Swartzle each left the firm during the course of this case).  Paul also supervised two lawyers (Nick Weier and Robert Roberts) who reviewed documents and then prepared initial cross examination outlines and initial selections of deposition segments for presentation at trial.[4] In addition to her work in connection with taking and defending depositions, Lara Phillip also did substantial work on the pretrial order, including deposition designations, counter-designations and objections to exhibits and Defendants' deposition designations; worked on revisions to deposition designations, counter-designations and objections to defendants' deposition designations as the designations changed over the course of the trial; prepared draft cross-examination outlines for the witnesses that she deposed; and was responsible for making recommendations regarding confidentiality determinations at trial and in response to the Court's order dated October 18, 2013 (Dkt 499).  Numerous lawyers worked on major pleadings (such as the complaint and preliminary injunction brief), but each undertook different tasks, involving

---

[4] Paul, Pete and/or Brock worked together on some document review issues, but in every case reviewed different documents, so that their work did not overlap.

**DECLARATION OF DAVID A. ETTINGER - 16**

different issues addressed in those documents such as relevant market, applicable law, remedy, and antitrust injury.

38.     St. Luke's, Saltzer and third parties produced more than 600,000 documents in the case, which we needed to review.  In order to reduce the expense of this review, we retained an outside document review firm, Gnoesis, which utilizes attorneys at very low rates ($35 per hour) to review documents and has experience in addressing complex antitrust cases.  Gnoesis is highly qualified for this work. The Gnoesis Group has extensive experience in conducting large scale document reviews and have conducted more than 100 document reviews in the past two years alone.  The Gnoesis Group has significant experience with conducting document review project in antitrust cases specifically, having conducted document reviews in more than 20 antitrust matters.

39.     The document review process was undertaken in a way so as to minimize duplication, while delegating as much of the work as possible to the attorneys with the lowest hourly rates:

    a.     Saint Alphonsus' documents were reviewed for responsiveness by Gnoesis reviewers, with a partial (quality control) review and feedback by Honigman lawyers.

    b.     Gnoesis attorneys also identified potentially privileged documents, with the final decisions being made by Honigman lawyers.

    c.     Documents were identified by Gnoesis lawyers initially as "hot" (i.e. of substantive interest).  Because this yielded a very large number of documents, the documents in this category were further reviewed, and winnowed down, by the (more experienced) Honigman lawyers.  The "winnowed down" group of documents was then provided to the person taking or defending the deposition to which the documents related.

**DECLARATION OF DAVID A. ETTINGER - 17**

Potentially significant documents that did not relate to any deposition, but were of potential relevance for trial, were subject to a final review by me.

40.    Because Honigman supervised a comprehensive team of Gnoesis document review attorneys, we were able to significantly help in the document review for witnesses and depositions even where the Government Plaintiffs took the lead.  Our additional staffing on the document review effort contributed significantly to the joint effort of the plaintiffs with regard to a number of such depositions.

41.    Saint Alphonsus produced more than 230,000 documents in response to St. Luke's discovery requests.  This production required an extensive review of the documents of to determine which of their documents were responsive to St. Luke's requests, which might be relevant to the issues in the case and which were privileged.  Again, we used Gnoesis outside document review lawyers (supervised and trained by Honigman lawyers) to undertake the bulk of this document review work.

42.    In order to assure that the document review lawyers did a careful and cost effective job, Honigman lawyers engaged in significant training and quality control efforts to prepare these attorneys to address the issues in this case, and to assure that the work they performed was of the requisite quality and efficiency.

43.    Our supervision of the document review attorneys encompassed both the quality of their work and their efficiency.  The Gnoesis document review attorneys each performed a single function at a given point in time.  We kept track of metrics such as documents reviewed per hour in order to assure that the document reviewers were proceeding at a reasonable and efficient pace.  Based on our experience in utilizing document review attorneys in the past, we were able to determine that the Gnoesis reviewers were proceeding at efficient rates of speed.

**DECLARATION OF DAVID A. ETTINGER - 18**

The hours and hourly rates of the document review attorneys, are attached hereto as Exhibit 4. Overall, Gnoesis incurred legal fees of $1,171,608 on 33,129.85 hours of work, at $35 per hour. The combined average hourly rate of Honigman and Gnoesis was $137.31 per hour.     The Gnoesis document reviewers reviewed at least 849,400 documents, which reviewed included a review for responsiveness, issue spotting and coding, and privilege.  Gnoesis' costs averaged out to less than $1.40 per document.

44.     We took a number of other steps in order to reduce total attorneys' fees in this complex and expensive case.  We did not bill for intra-firm communications of any kind, even where those were productive and necessary to the conduct of the case.  Our litigation plans, our fees, and our work in the litigation, were carefully reviewed by Saint Alphonsus' General Counsel, Stephanie Westermeier.  I frequently consulted with Stephanie regarding the resources to be applied to particular tasks, and she made decisions intended to keep our efforts as cost effective as possible.

45.     We have included in our request for attorneys' fees only fees relating to our efforts directly involved in prosecuting the case.  Thus, for example, any consultation with our client on press or public relations issues have not been included in our request.  Nor have we included in our petition the fees expended in preparing our fee request, though there is case law providing that such fees are recoverable.

**Non-Taxable Costs Incurred**

46.     In connection with this matter, Honigman incurred and charged to Saint Alphonsus the following non-taxable costs from the period August 1, 2012 through January 31, 2014:

**DECLARATION OF DAVID A. ETTINGER - 19**

| | |
|---|---|
| Airfare | $60,366.06 |
| Computer Research | $51,866.15 |
| Electronic Discovery | $571,178.54 |
| FedEx - Courier Service | $6,441.13 |
| Outside Document Production | $3,103.26 |
| Other Document Production | $16,048.10 |
| Public Access to Court Electronic Records | $410.76 |
| Secretary Overtime Charges | $28,502.73 |
| Telephone Charges | $1,385.12 |
| Other Travel Expenses | $50,133.09 |
| **Grand Total** | **$789,434.94** |

Additional non-taxable costs were incurred by Duke Scanlan, and are addressed in the Declaration of Keely Duke.

47.     Attached hereto as Exhibit 12 is a spreadsheet that provides, for each cost incurred by Saint Alphonsus and included in the amounts set forth above (with the exclusion of electronic discovery) the: (a) corresponding invoice number; (b) invoice date; (c) timekeeper; (d) timekeeper position; (d) date the cost was incurred; (e) the dollar amount of the expense; (f) Honigman's internal numerical cost code; (g) cost code category; and (h) a detailed description of the nature of the expense.

48.     Each of the foregoing costs listed in Paragraph 46 above and itemized in Exhibits 12 and 13 hereto were reasonably and necessarily incurred during the course of this action.

**DECLARATION OF DAVID A. ETTINGER - 20**

Honigman endeavored, wherever feasible, to keep Saint Alphonsus' costs to a minimum.  For example:

    a.    Only two Honigman attorneys travelled for depositions in this case, myself and my partner, Lara Phillip.  This reduced travel expenses. Because I was the only attorney from Honigman that attended the trial, Saint Alphonsus only incurred travel expenses for one person throughout the course of the trial.  I further minimized Saint Alphonsus' airfare expense by travelling outside of Idaho on only one instance throughout the pendency of the trial.  Honigman attorneys utilized hotels in Boise, Idaho with whom Saint Alphonsus has negotiated discounted rates, which further minimized travel expenses.

    b.    Computer research was performed when it was most efficient to do so, thereby cutting down on lawyer time.  Computer research was utilized to conduct fact research regarding prior testimony and writing of experts in preparation for their depositions.  It was also utilized to research very specific legal issues relevant to Saint Alphonsus' Motion for Preliminary Injunction, Saint Alphonsus' opposition to St. Luke's Motion for Summary Judgment; Motions in Limine; Daubert Motions; and various issues regarding admissibility of evidence that arose during the trial. However, because of Honigman's significant antitrust experience, it was able to avoid costly research on issues where it could quickly and easily identify the relevant case law, thus reducing what could have been significantly higher computer research expenses.

**DECLARATION OF DAVID A. ETTINGER - 21**

    c.    Secretarial overtime was only used where it was necessary, because of night and weekend work required to address short deadlines on this truncated schedule involving, e.g. almost daily depositions for several months.

    d.    Honigman charged Saint Alphonsus for copying costs at the reasonable and prevailing rate of ten cents per copy.

49.    Attached hereto as Exhibit 13 is a spreadsheet that itemizes Saint Alphonsus' electronic discovery costs that were charged to Saint Alphonsus by its electronic discovery vendor D-4.  Information included in this spreadsheet includes: (a) invoice date; (b) invoice number; (c) category of electronic discovery service; (d) service category; (e) quantity; (f) unit price and (g) invoice amount.

50.    Electronic discovery was a necessary and reasonable expense in this case given the complexity of the matter, volume of the documents produced, and accelerated schedule for both discovery and trial.  In order for Saint Alphonsus to timely and efficiently produce documents under the accelerated schedule in this case, it was necessary to store the documents electronically in a searchable format where they could then be reviewed and coded for responsiveness, confidentiality and privilege.  Electronic discovery was also necessary to efficiently search and code (and later retrieve) documents provided by St. Luke's, Saltzer and third parties on the basis of such categories as responsiveness, importance, issue and witness. This significantly cut down on lawyer time in preparing for depositions and trial.

51.    Saint Alphonsus' electronic discovery vendor, D-4, provided several necessary services during the litigation.  First, they processed all of the electronic discovery collected by Saint Alphonsus.  This processing involved ingesting large volumes of electronic documents into

**DECLARATION OF DAVID A. ETTINGER - 22**

an ESI processing software tool that (1) removed redundant electronic data: (2) allowed paper documents to be scanned and converted to searchable electronic format based on keywords, date ranges, custodians, file types and other criteria; and (3) exported the final electronic evidence set in a format suitable for loading to a software review platform, Relativity.  D-4 also maintained the Relativity software and hosted the evidence on its computer servers during the document review and production phases.  Lastly, D4 provided project management services, including facilitating the processing, review and production process and managing access to the review platform.

52.     As the head of Honigman's Antitrust Practice Group and as the billing partner for a number of clients, I am familiar with Honigman's billing practices.  It is Honigman's standard practice as a firm to charge clients for airfare, computer research, courier and delivery service, copying, secretarial overtime, telephone, and travel expenses.

53.     I declare under penalty of perjury that the foregoing is true and correct.

This 14th day of March, 2014.

/s/ David A. Ettinger
David A. Ettinger

**DECLARATION OF DAVID A. ETTINGER - 23**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of March, 2014, I electronically filed the foregoing document with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System.

Ben J Keith      bkeith@sidley.com, krockwell@sidley.com
Brett T DeLange      brett.delange@ag.idaho.gov, teresa.taylor@ag.idaho.gov
Brian K Julian      bjulian@ajhlaw.com, lgrantham@ajhlaw.com, pgrossman@ajhlaw.com
Bryan A Nickels      ban@dukescanlan.com, klb@dukescanlan.com, klm@dukescanlan.com, sls@dukescanlan.com
Carl J Withroe      carl.withroe@ag.idaho.gov, colleen.funk@ag.idaho.gov
Charles K Schafer      cschafer@sidley.com
Colleen D Zahn      colleen.zahn@ag.idaho.gov, reta.massano@ag.idaho.gov
Danica Noble      dnoble@ftc.gov
David A Ettinger      dettinger@honigman.com, nroberts@honigman.com, shakim@honigman.com
Douglas Eugene Litvack      dlitvack@ftc.gov, abeilein@ftc.gov
Eric J Wilson      ewilson@gklaw.com
Henry Chao-Lon Su      hsu@ftc.gov, lrine@ftc.gov, ssajewski@ftc.gov
J Walter Sinclair      JWSinclair@hollandhart.com njhammond@hollandhart.com
Jack R Bierig      jbierig@sidley.com
Keely E. Duke      ked@dukescanlan.com, klb@dukescanlan.com, sls@dukescanlan.com
Kevin J O'Connor      koconnor@gklaw.com
Kevin J Scanlan      kjs@dukescanlan.com, klb@dukescanlan.com, klm@dukescanlan.com
Lara Fetsco Phillip      lara.phillip@honigman.com
Matthew Paul Accornero      maccornero@ftc.gov
Michael James Perry      mperry@ftc.gov
Peter C Herrick      pherrick@ftc.gov
Portia L Rauer      plr@powerstolman.com, jsm@powerstolman.com
Raymond D Powers      rdp@powerstolman.com, crb@powerstolman.com, jls@powerstolman.com
Robert J Schroeder      rschroeder@ftc.gov
Scott D Stein      sstein@sidley.com, efilingnotice@sidley.com, jfitzpat@sidley.com, jfitzpatrick@sidley.com
Syrena Case Hargrove      Syrena.Hargrove@usdoj.gov, angela.nyland@usdoj.gov, becky.early@usdoj.gov, pamela.bearg@usdoj.gov, USAID.ECFNOTICE@USDOJ.GOV
Tacy F Flint      tflint@sidley.com
Wendy K Arends      warends@gklaw.com, jschwartz@gklaw.com, swilson@gklaw.com
Thomas Greene      tgreene2@ftc.gov


/s/ Keely E. Duke
Keely E. Duke


**DECLARATION OF DAVID A. ETTINGER - 24**