1

1                    **UNITED STATES DISTRICT COURT**

2                       **IN THE DISTRICT OF IDAHO**

3    - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
     SAINT ALPHONSUS MEDICAL CENTER -    :
4    NAMPA, INC., TREASURE VALLEY        : **Bench Trial**
     HOSPITAL LIMITED PARTNERSHIP, SAINT :
5    ALPHONSUS HEALTH SYSTEM, INC., AND  : **Opening Statements**
     SAINT ALPHONSUS REGIONAL MEDICAL    : **Witnesses:**
6    CENTER, INC.,                       :   **Jeff Thomas Crouch**
                        Plaintiffs,      :
7            vs.                         :
                                         :
8    ST. LUKE'S HEALTH SYSTEM, LTD., and :
     ST. LUKE'S REGIONAL MEDICAL CENTER, :
9    LTD.,                               :
                        Defendants.      :
10   - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
     FEDERAL TRADE COMMISSION; STATE OF  :
11   IDAHO,                              :
                        Plaintiffs,      :
12           vs.                         :
                                         :
13   ST. LUKE'S HEALTH SYSTEM, LTD.;     :
     SALTZER MEDICAL GROUP, P.A.,        :
14                                       :
                        Defendants.      :
15   - - - - - - - - - - - - - - - - - x

16
                       * * * SEALED * * *
17

18   REPORTER'S TRANSCRIPT OF PROCEEDINGS

19     before B. Lynn Winmill, Chief District Judge

20     Held on September 23, 2013

21     Volume 1, Pages 1 to 212

22
                    **Tamara I. Hohenleitner**
23          Idaho Certified Shorthand Reporter No. 619
                 Registered Professional Reporter
24               Certified Realtime Reporter
             Federal Certified Realtime Reporter
25
              United States Courts, District of Idaho
       550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 2 of 57

2

```
 1                              A P P E A R A N C E S

 2
       FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
 3     SAINT ALPHONSUS HEALTH SYSTEM, INC.,
       AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.
 4

 5             Keely E. Duke
               DUKE SCANLAN & HALL, PLLC
 6             1087 W. River Street, Suite 300
               Boise, ID 83707
 7
               David A. Ettinger
 8             HONIGMAN MILLER SCHWARTZ AND COHN LLP
               2290 First National Building
 9             660 Woodward Avenue
               Detroit, MI 48226
10

11

12
       FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION
13

14             Peter C. Herrick
               U.S. FEDERAL TRADE COMMISSION
15             500 Pennsylvania Ave., N.W.
               Washington, DC 20580
16
               J. Thomas Greene
17             U.S. FEDERAL TRADE COMMISSION
               600 Pennsylvania Ave N.W.
18             Washington, DC 20580

19             Henry Chao-Lon Su
               U.S. FEDERAL TRADE COMMISSION
20             601 New Jersey Ave., N.W.
               Washington, DC 20001
21

22

23

24

25
```

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 540   Filed 11/04/14   Page 3 of 57

3

```
 1                          A P P E A R A N C E S (Continued)

 2
          FOR PLAINTIFF STATE OF IDAHO
 3
                  Eric J. Wilson
 4                GODFREY & KAHN, S.C.
                  One East Main Street
 5                Suite 500
                  PO Box 2719
 6                Madison, WI 53701

 7                Brett T. DeLange
                  OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
 8                954 W. Jefferson, 2nd Floor
                  Boise, ID 83720-0010
 9
          FOR PLAINTIFF TREASURE VALLEY HOSPITAL
10
                  Raymond D. Powers
11                POWERS TOLMAN FARLEY, PLLC
                  PO Box 9756
12                Boise, ID 83707

13        FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
          AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.
14
                  Jack R. Bierig
15                Ben J. Keith
                  Scott Stein
16                Charles Schafer
                  SIDLEY AUSTIN
17                One South Dearborn
                  Chicago, IL 60603
18
                  J. Walter Sinclair
19                STOEL RIVES
                  101 S. Capitol Boulevard, Suite 1900
20                Boise, ID 83702

21        FOR DEFENDANT SALTZER MEDICAL GROUP

22                Brian Kenneth Julian
                  ANDERSON JULIAN & HULL, LLP
23                PO Box 7426
                  Boise, ID 83707
24

25
```

4

1                                                     I N D E X

2

| DATE OF PROCEEDING | | PAGE: |
|---|---|---|
| September 23, 2013 | ..................................... | |
| | Opening statement by Mr. DeLange...... | 7 |
| | Opening statement by Mr. Greene....... | 11 |
| | **Courtroom closed to the public........** | 55 |
| | Opening statement by Mr. Ettinger..... | 56 |
| | **Courtroom reopened to the public......** | 105 |
| | Opening statement by Mr. Bierig....... | 118 |
| | Opening statement by Mr. Julian....... | 169 |
| | **Courtroom closed to the public........** | 177 |

9

10

11                                  PLAINTIFF FEDERAL TRADE COMMISSION

12                                                 W I T N E S S E S

13

| | | PAGE: |
|---|---|---|
| **CROUCH, Jeff Thomas** | | |
| | Direct Examination By Mr. Greene.............. | **179** |

16

17

18

19

20                                               * * * * *

21

22

23

24

25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 540   Filed 11/04/14   Page 5 of 57

5

```
 1                    P R O C E E D I N G S
 2                      September 23, 2013
 3              THE CLERK:  The court will now hear civil Case
 4    12-560-S-BLW, Saint Alphonsus Medical Center-Nampa, Inc.,
 5    versus St. Luke's Health System, Ltd., for day one of bench
 6    trial.
 7              THE COURT:  Good morning, Counsel.
 8         Before we start, I thought I would mention this is a
 9    bit unusual.  Because -- this is really for those in the
10    audience more than the attorneys.  Because of the nature of
11    these proceedings, there is a lot of very sensitive
12    information that the parties are going to use during this
13    process.
14         We have, through a -- I won't say "arduous" -- but kind
15    of a long-term process, determined how those -- that
16    information will be handled.  It involved some agreements
17    among counsel during what we call the discovery phase of
18    this case.  And now that we're entering into the trial
19    phase, it still becomes very important for the court to have
20    access to all information, including that information which
21    may be deemed very confidential and privileged by the
22    parties.  It may impact their competitive posture in the
23    marketplace.
24         And for that reason, the court has agreed to allow the
25    parties to designate even for trial some materials that will
```

6

```
 1    only be available to the court and will not be shown to the
 2    public or made part of the record that is accessible to the
 3    public.
 4         I have always been very committed to the idea of an
 5    open court.  And, in fact, we will -- we're going to be
 6    discussing with the attorneys the idea of allowing even live
 7    blogging during the process of the trial.  I have no
 8    philosophical problem with that.  But, of course, that has
 9    to give way when there are serious financial interests of
10    the parties that could be jeopardized or injured if certain
11    information does become public.
12         So, to achieve that balance of maintaining an open
13    courtroom but, yet, also preserving the privacy or the
14    information which might be deemed to be trade secrets, there
15    will be occasions during the trial -- and, in fact, even
16    this morning -- when I will have to, in essence, clear the
17    courtroom and excuse everyone from the audience to remain
18    outside the courtroom while certain evidence is presented to
19    the court.
20         It is an awkward process, but we could come up with no
21    better process.  So you have my apologies in advance for
22    this inconvenience.  But it is, in the court's view,
23    absolutely essential to allow this matter to be fully
24    presented to the court in a manner which will allow me to
25    hopefully, at the end of the day, issue a reasoned decision
```

7

```
 1    and a fully informed decision after considering all of the
 2    evidence at issue in this proceeding.
 3         So, just so you have kind of a heads-up.  We'll
 4    start this morning -- Counsel, just for your information,
 5    I'll tell you exactly when, but we'll take a break roughly
 6    around 10:10 or so.  I'll try not to interrupt your opening
 7    statement.  I'll try to find a time -- we'll either start a
 8    little bit -- take the break a little late or a little
 9    early, if need be, so as not to interrupt your statements.
10         We'll start off with the plaintiffs.  Mr. DeLange, I
11    think you're going to start us off with your opening
12    statement.
13              MR. DeLANGE:  Thank you, Your Honor.
14         Counsel, my name is Brett DeLange.  I'm a deputy
15    attorney general.  I'm chief of the Consumer Protection
16    Division in the Office of the Idaho Attorney General,
17    assigned the responsibility of enforcing Idaho's Competition
18    Act, as well as the applicable federal antitrust laws.
19         I represent the State of Idaho in this matter, and I'm
20    here on behalf of Attorney General Lawrence Wasden.  And
21    with me, Your Honor, is Special Deputy Attorney General
22    Eric Wilson.
23         My office has worked very closely and in conjunction
24    with my colleagues from the Federal Trade Commission, and I
25    would like to introduce them to you, as well.  Some of them
```

8

```
 1    have already appeared before Your Honor.  With me for the
 2    Federal Trade Commission are attorneys Tom Greene.
 3              MR. GREENE:  Good morning, Your Honor.
 4              MR. DeLANGE:  Peter Herrick.
 5              MR. HERRICK:  Good morning, Your Honor.
 6              MR. DeLANGE:  Another attorney who will be
 7    appearing before you is Henry Su.  He is working on trial
 8    matters outside the courtroom this morning.
 9         The Federal Trade Commission and the Office of the
10    Attorney General have been working on this matter intensely
11    for quite some time.  Indeed, our investigation of the
12    St. Luke's then planned acquisition of Saltzer Medical Group
13    started well over a year ago.
14         We, the government plaintiffs, interviewed numerous
15    parties.  We reviewed voluminous data.  We researched a
16    variety of issues.  We even met multiple times with
17    representatives of St. Luke's and the Saltzer Medical Group
18    to understand their side of the story.
19         When all was said and done, the government plaintiffs
20    were left with the abiding conclusion that the St. Luke's
21    acquisition of the Saltzer Medical Group violates the law.
22    We sought informally and amicably to have the transaction
23    not close.  We were not successful, and St. Luke's and
24    Saltzer closed on that transaction last December.
25         The private plaintiffs filed their suit in November.
```

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 6 of 57

9

1  The government plaintiffs, receiving assurances from
2  St. Luke's that the transaction could be unwound should we
3  prevail in any action that we might bring, completed our
4  investigation.  And having concluded that the now-closed
5  transaction does violate the law and that this matter is a
6  case of great import to the State of Idaho, we filed our
7  lawsuit in March of this year.  So here we are today.
8       Discovery has been very intense.  And as Your Honor
9  actually has noted, the parties have worked cooperatively to
10 gather the evidence and the expert opinions that Your Honor
11 will hear and receive.
12      So what is this case all about?  Let's start with what
13 this case is not about.  This case is not about the
14 Affordable Care Act.  This case is not a debate about how
15 healthcare can or should be improved.  This case is also not
16 about what someone hopes to do in improving healthcare as a
17 result of that debate.  Rather, what this case is about is
18 the proper application of laws enacted both by the Congress
19 and the Idaho legislature which uphold competition in part
20 by prohibiting acquisitions in any market that may
21 substantially lessen competition.
22      It is these laws, Your Honor, that provide the lens by
23 which we're to hear the evidence and consider the arguments;
24 laws which express the policy of this nation and this state,
25 namely, the competitions to be upheld, competitions to be

10

1  protected, competitions to be defended; and threats to it,
2  such as acquisitions that may substantially lessen that
3  competition are to be barred.
4       These laws also provide the principles and foundation
5  by which the evidence is to be judged and evaluated and
6  weighed.  Our antitrust laws rest, as the United States
7  Supreme Court has stated, on the premise that the
8  unrestrained interaction of competitive forces will yield
9  the best allocation of our economic resources, the lowest
10 prices, the highest quality, and the greatest material
11 progress, while at the same time providing an environment
12 conducive to the preservation of our demographic, political,
13 and social institutions.
14      So those are the laws that we're operating under today.
15 Those are the laws that provide the context by which we are
16 to consider the evidence that will come in, and their
17 application here is the issue to be decided in this case.
18      Thus, the government plaintiffs will discuss now, the
19 facts of this case, the expert opinions expressed, the
20 relevant documents and the data connected, all related to
21 this fundamental question:  Does or -- well, actually, may
22 St. Luke's acquisition of the Saltzer Medical Group
23 substantially lessen competition in certain lines of
24 physician services in the Nampa area?  That's the issue,
25 Your Honor.

11

1       We think, of course, they do.  That's why we're here.
2  And, hence, further, the government plaintiffs will also
3  show that allowing this acquisition to stand would harm
4  Idaho consumers; it will harm Idaho businesses; it will harm
5  Idaho employers who would ultimately see higher costs and
6  potentially less innovation and poorer services.
7       My colleague Tom Greene will now proceed to discuss the
8  facts and opinions which the government plaintiffs will
9  provide the court in this case.
10      Mr. Greene.
11      THE COURT:  Thank you, Mr. DeLange.
12      Mr. Greene.
13      MR. GREENE:  Thank you, Your Honor.
14      Apropos of our common problem of protecting the
15 confidential nature of some business documents, I will be
16 asking Your Honor to shut off the public screens
17 occasionally.  Not yet.
18      THE COURT:  All right.
19      MR. GREENE:  I will certainly let you know, but I
20 did want to indicate for the audience there will be these
21 little moments of awkwardness in which I will be broadly
22 speaking, discussing what you are seeing, but it won't be
23 being shown to the audience.
24      Let me start at the beginning.  Let me set the stage
25 just a bit, if I may, Your Honor, just in terms of who the

12

1  parties may be in this proceeding.
2       The defendant, the principal defendant in this case, of
3  course, is St. Luke's.  This is the largest healthcare
4  system in the state of Idaho.  It has facilities and
5  physician groups all across the state.  It literally employs
6  hundreds of doctors and other professionals.
7       Particularly apropos of St. Luke's acquisitions is the
8  bullet point at the bottom of the slide, which indicates
9  that circa 2011, in one of its many acquisitions, St. Luke's
10 acquired the Mercy Physician Group.  The Mercy doctors, now
11 St. Luke's doctors, are located specifically in Nampa, which
12 is ground zero for this litigation.  So, conceptually, from
13 an antitrust perspective, this is a horizontal merger as the
14 Federal Trade Commission and the State of Idaho view it.
15      But the premise for that is the fact that St. Luke's
16 actually feels primary care physicians in the Nampa market,
17 those physicians compete directly with Saltzer physicians
18 who are being purchased.
19      St. Luke's also -- although we have not alleged
20 it -- competes with respect to ancillary services like
21 laboratory services and things of that nature before the
22 acquisition.  The Saltzer physicians charged very little or
23 relatively less than St. Luke's, and we'll be talking about
24 those numbers in this opening statement.
25      But the principal point of contention and focus of this

13

1    particular antitrust analysis is that these physicians, the
2    Mercy Physician Group, compete with the Saltzer Group, and
3    that Saltzer Group is going to be acquired by St. Luke's.
4          According to Dr. Randell Page, this was the lead
5    negotiator for the Saltzer Group.  One of the major reasons
6    from their perspective for doing this deal is that they
7    perceive St. Luke's to be the dominant healthcare provider
8    in the Idaho markets.
9          Basically, what -- this next one by the way,
10   Your Honor, is going on an AEO slide.  So, essentially, they
11   wanted to hook up with the big guys, and they were able to
12   do so by way of this transaction.
13         The next slide, Your Honor, basically just gives a
14   brief indication.  This was drawn from some analysis and
15   testimony done by the chief financial officer of St. Luke's,
16   and it indicates generally the dramatically upward-sweeping
17   revenue curve that has been enjoyed by St. Luke's.  So
18   roughly at about the same time it begins a wave of
19   acquisitions, its revenue stream begins to increase
20   dramatically.
21         And you will note, Your Honor, that in the next three
22   years, that revenue stream is expected to increase even
23   further.  And I won't call out the particular numbers
24   because it's been designated by St. Luke's as
25   attorneys'-eyes-only material.

14

1          Saltzer is perceived by St. Luke's executives -- I'm
2    looking at a slide replicating testimony from
3    Mr. Castledine, who is director of business development.
4    His job was to go out and basically speak to independent
5    physicians groups and discuss the possibility of joining
6    with St. Luke's.  He did a very careful analysis looking at
7    the numbers of physicians.  And he concluded that one of the
8    advantages to St. Luke's of the deal was that it would give
9    them a dominant share in the Nampa market.
10         The next slide, also designated AEO by our colleagues
11   at St. Luke's, this is the results of an analysis done by
12   KPMG, a national -- actually, an international consulting
13   firm.  KPMG, as part of an analysis of financing, structured
14   financing deal for St. Luke's, concludes that St. Luke's is
15   dominant -- I mean, that's fairly obvious -- but it also
16   indicated that --
17              THE COURT:  Mr. Greene, there may be a technical
18   issue.
19              MR. GREENE:  I'm sorry.  -- that Saltzer -- I'm
20   sorry.
21              THE COURT:  There may be a technical issue.  You
22   have referred to multiple slides, and I think we are still
23   seeing the first slide.  Perhaps you could check with --
24              MR. GREENE:  You're absolutely right, Your Honor.
25   The KPMG analysis indicates that Saltzer within the

15

1    Nampa community is the dominant healthcare plan, the
2    dominant provider of primary care services, and that it has
3    already developed at least some amounts of leverage in
4    that -- in its dealings with the payors, like insurers Blue
5    Cross of Idaho, Regence, Blue Shield.
6          We're now going to switch to the acquisition.  I'm
7    going to ask you to keep the screens dark.
8          Before you is a slide which basically lays out the
9    terms of the deal.  I think I'm just going to call out just
10   a couple of them.  There are monetary figures in this slide.
11   I think there are just a handful of things I want to
12   underscore.
13         Firstly, as a result of this transaction, St. Luke's
14   will represent Saltzer in its negotiations with payors.  So
15   it will be a St. Luke's negotiator that will represent
16   whatever market power Saltzer has at the bargaining table
17   with payors.
18         The deal is structured as a contractual arrangement
19   that doctors have signed up for what's called a
20   "Professional Service Agreement."  These things are called
21   "PSAs."  The testimony will make clear that this is every
22   bit an employment relationship.  These are essentially
23   employed docs.  Sometimes in the trade they are referred to
24   as "owned docs"; although, that seems a little pejorative to
25   me.

16

1          The bottom bullet I think is an important one,
2    potentially, since the other side has suggested that remedy
3    may be an issue from their perspective.
4          I will only note that there is a form of payment in the
5    deal involving several millions of dollars of income to
6    Saltzer that would actually stay with Saltzer in the event
7    of an unwinding, which I think gives the court a little more
8    flexibility when and if you want to consider what we think
9    is the appropriate remedy here.
10         The deal points are, I think, pretty straightforward
11   here.  They have been sort of masked, I think, by
12   significant discussions about the Triple Aim and things of
13   that nature.  But the basic money parts of the deal are
14   fairly straightforward.
15         The slide you are looking at basically captures what
16   Saltzer gets out of the deal.  And what you're seeing is a
17   significant increase in the payday for the doctors.  This is
18   a substantial double-digit boost in their pay.  That's the
19   money side of what they get.
20         The next slide captures what I think is the essence of
21   the transaction from the perspectives of St. Luke's.  I
22   won't read the numbers here, but I think I can fairly
23   characterize the basic deal terms is they are going to pay
24   more for Saltzer, and they are going to charge more for
25   Saltzer.  So this is a pay-more/charge-more deal,

17

1  notwithstanding what we have heard from many in the public
2  press.
3      I think you can now go back to the public screens,
4  Your Honor.
5      The applicable law I have called out, since I'm the
6  federal guy here, Clayton Act, Section 7. There is an
7  analogous provision in the Idaho law, but the basic analytic
8  structure is the same under federal and state law.
9      Section 7 of the Clayton Act calls out a couple of
10 things which I think are important here. Firstly, it
11 applies -- though it is a very important federal statute, it
12 applies to any line of commerce anywhere in the country. So
13 Nampa is a perfectly appropriate market for purposes of
14 Section 7. Submarkets within Nampa could also be perfectly
15 appropriate markets within the compass of this statute.
16     And what is to be done here is to determine whether or
17 not this transaction may substantially lessen competition.
18 There is no requirement imposed upon the plaintiffs that
19 they be able to show that it does absolutely. This is a
20 forward-looking legal structure which is designed to protect
21 the economy in a forward-looking sort of way from incipient
22 anticompetitive problems.
23     The structure of analysis is relatively unique. I
24 mean, it's not different from some other kinds of law, but
25 the most important aspect of this is a very important

18

1  presumption. And that presumption was first articulated in
2  this case, Philadelphia National Bank, which you can tell,
3  from the typography of the opinion, is somewhat old.
4      But basically, the -- this case says that you can
5  presume anticompetitive effects based on concentration.
6  This is an essential element of this jurisprudence. If
7  there is concentration, there is a strong presumption that
8  it will have anticompetitive effects.
9      That is a rebuttable presumption that also flows from
10 Philadelphia National Bank. But if we start with a
11 presumption, then the burden shifts to the other side, and
12 there will be very specific evidentiary requirements for how
13 they prove up, you know, things that might offset this
14 anticompetitive effect.
15     This presumption of illegality runs through the whole
16 DNA of merger law. I have cited to you Rockford Memorial.
17 This is an opinion I quite like. Plaintiffs won, for among
18 other reasons is why I like this case, but it's also a very
19 nicely thought-through decision by Judge Posner of the
20 Second Circuit. And he, too, basically says the defendants'
21 immense shares in a regionally defined market create a
22 presumption of illegality.
23     So once the plaintiffs show the concentration, the
24 burden shifts dramatically. And at that point, we could
25 actually stop. We will not stop our presentation, but we

19

1  could certainly based on the law.
2      The structure of this case law is that in order to
3  provide a counterpoise, if you will, to the presumption that
4  a highly -- an acquisition resulting in a concentrated
5  market will have anticompetitive effects requires certain
6  showings. So entry -- entry -- the idea here is basically
7  is a quite simple one, which is: If there could be entry
8  into a market, then that would offset concentrations. So a
9  very straightforward idea.
10     But both the case law and the horizontal merger
11 guidelines that would guide the prosecutorial discretion of
12 both the Federal Trade Commission and our colleagues at the
13 U.S. Department of Justice is that entry must be timely,
14 that is typically within two years, it must be likely; you
15 can't speculate; there has to be very clear evidence that
16 there will be entry; and, finally, it must be sufficient.
17     So if we create a St. Luke's Saltzer which has an
18 enormous share of the market in Nampa, Your Honor would have
19 to find that the new entrant or entrants would be as
20 substantial or have as substantial effect --
21     That would be good.
22     -- substantial effect on competition as the newly
23 remuscled Saltzer-St. Luke's.
24     The next point is that -- and this actually is the case
25 law itself. I mean, this could be a rhetorical flourish on

20

1  the part of plaintiffs, but the defendants actually have to
2  show that their efficiencies are, quote, extraordinary,
3  close quote. This is not maybe some of them, maybe a little
4  bit; they have to be extraordinary.
5      And this is not a rhetorical flourish on my part. This
6  is the case authority. This is the standard that both the
7  Supreme Court and district courts across the United States
8  have embraced as necessary, so they need to make a showing
9  that is extraordinary.
10     THE COURT: Mr. Greene, has there been any
11 argument made that in terms of considering whether those
12 extraordinary efficiencies have been achieved, that they
13 kind of expand beyond the more historic model of healthcare,
14 the fee-for-service, that -- and into more integrated
15 healthcare and whether or not that can be the kind of
16 extraordinary procompetitive effect? Or is that just simply
17 inherently anticompetitive, and so that's not even part of
18 the discussion?
19     MR. GREENE: I think, fundamentally, Your Honor,
20 there is a falseness in that in the sense that what you're
21 mimic -- speaking to is something that I think our
22 colleagues on the other side have argued in
23 multiple -- about on multiple occasions. There is no
24 fundamental necessary dichotomy or tension between antitrust
25 and competition on the one hand and clinical integration on

**21**

1 the other side. I'll have a slide later in the deck which
2 speaks to directly the statutory structure of the
3 Accountable Care Act.
4     The Accountable Care Act and its implementing
5 regulations make it absolutely clear that there is no
6 question that antitrust and competition are regarded as
7 enormously important forces that need to be protected and
8 advanced in order for, as in any other sort of market, costs
9 can be kept down, innovations will flow.
10     There is no notion anywhere, other than in some
11 quarters in this courtroom, that you need to create a
12 monopoly or have this enormous market share in order to
13 integrate. There -- this is going on in every part of the
14 United States. St. Luke's, bless them, they are doing lots
15 of good things, but those good things are being replicated
16 in healthcare settings all across the United States. So
17 there is no tension between competition and healthcare.
18 Indeed, as I'll point out --
19     THE COURT:  What strikes me as really a pretty
20 critical issue in this case because simply merging for
21 merging or for a -- to simply take up a bigger market share
22 obviously poses the very risks which you have addressed, but
23 to do so if, indeed, it is necessary to perhaps change the
24 dynamic of healthcare services, that may be a different
25 matter.  And I think sorting through that is going to be a

**22**

1 major part of what this -- I think, at least from reviewing
2 the briefs and what I have heard so far -- as being much
3 about that.  But go ahead.  I didn't mean to interrupt.
4     MR. GREENE:  I think the next point may be useful
5 particularly to Your Honor on that point.  Because one of
6 the aspects of the case authority here is the notion that
7 efficiencies, to count -- I mean, to even just throw them in
8 the balance pan -- they have to be merger-specific.
9     So the idea here is kind of a less restrictive
10 competitive harm sort of test, less restrictive alternative
11 means.  So if it is the case that those efficiencies can be
12 obtained in a different way, a less competitively harmful
13 way, then they don't count.  So they are not
14 merger-specific.
15     Amongst others, our expert, Dr. Kizer, who was the --
16 now teaching at the University of California Davis, formerly
17 the person that reformed the Veterans Administration
18 hospitals all across the United States, ran hundreds of
19 healthcare facilities -- he will basically say, quite
20 clearly and crisply, you don't have to employ physicians in
21 order to get quality-of-care improvements.  But I think that
22 will be down the road during the trial.
23     THE COURT:  Okay.
24     MR. GREENE:  But I think, given your thinking,
25 Your Honor, this is a specific piece of analysis that you

**23**

1 might want to focus on particularly.
2     THE COURT:  Okay.
3     MR. GREENE:  The relevant markets, there is a kind
4 of standard way of looking at markets.  These are
5 conceptualized as two-dimensional.  One dimension is the
6 product market; what is being sold is the product market.
7 And then there the geographic market; where is it being
8 sold.  Plaintiffs tend to want to make these narrow.
9 Defendants tend to want to make them as broad as possible.
10     In this particular case, there seems to be -- there may
11 be a bit of kvetching about this, but the government
12 plaintiffs have alleged an adult primary care physician
13 market.  This is the kind of doctor you would go to for your
14 checkup.  If your baby has a fever, if you have a fever,
15 that's where you go.  And then a general pediatrics
16 physician market has been alleged in addition to the primary
17 care market by our private practice colleagues.
18     In both instances, Dr. David Argue, defendants' expert,
19 has indicated some sympathy to those being appropriate
20 markets.  So I think we may have a little bit of chatter
21 about that.  But I think, fundamentally, this will not be a
22 major issue in this litigation.
23     Geographic market, however, is something that we think
24 we have the better of, but that will be an issue.  How wide
25 is this?  Does this include Boise and beyond?  How do we

**24**

1 actually sort of sort that out?
2     The basic idea here, Your Honor, is that if you can
3 throw in more places, then that may change the concentration
4 ratios to some degree.  It turns out they don't change that
5 dramatically, as I will show you.
6     But from our perspective, the appropriate market is
7 Nampa.  This is, of course, the second largest city in
8 Idaho.  It is a city which is some distance from Boise.
9 There is obviously a very large rural area between the two
10 cities.  There is a significant driving distance between the
11 two cities.
12     But when you actually look at the testimony which you
13 will be hearing and which I'm briefly summarizing today, a
14 wide range of market participants indicate that patients
15 strongly prefer local physicians, the primary care
16 physician.  All plans -- that is, the payors, the Blue
17 Crosses, the Blue Shields -- all agree that PCPs -- local
18 PCPs are necessary to them being able to sell networks and
19 plans.
20     And, finally, we have done a fair amount of analytic
21 work, econometric work, which confirms that Nampa patients
22 strongly demand local PCPs.
23     Just tagging up on some of the evidence, this is
24 Patricia Richards.  She is the CEO of something called
25 SelectHealth.  Ms. Richards is an executive with Select.

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 10 of 57

## 25

1  And she -- Select is partnering with St. Luke's with an
2  insurance product. And she makes very clear you need local
3  primary care physicians and suggests that her metric is you
4  need physicians close to home, within a few miles, and
5  within a driving distance of five to ten miles -- five to
6  ten minutes. That basically means the market is Nampa.
7       This certainly is the common-sense perspective of how
8  the market should be done. If you are ill, you are not
9  going to get in your car and drive 25 miles to another city.
10  You want your physician to be close by, at least for the
11  primary care services that you use most often.
12      So this is one of the business partners of St. Luke's
13  telling you that this is a market which should be understood
14  to be quite small.
15      Excuse me, Your Honor. I need you to close this next
16  slide.
17      The next slide is from a business consultant. He does
18  most of the financial analysis for St. Luke's in terms of
19  its various deals, and he also indicates that patients
20  prefer local services.
21      I think at the end of the day, you will find that the
22  fact that people need services close to home is baked into
23  the business planning of St. Luke's with respect to this
24  deal, but this is yet another admission by someone who
25  speaks for, I think, and certainly analyzes these deals for

## 26

1  St. Luke's that you need physicians close to home.
2       I think the next one you can open, Your Honor.
3       Dr. Seppi. Dr. Seppi is now a quality-of-care chief
4  for St. Luke's. He also indicates that it is very important
5  to have access points for those patients close to home. So
6  the close-to-home aspect of this -- I mean, this gets
7  complicated with the econometrics and all that kind of
8  stuff. But at a very basic understanding of how things work
9  in a marketplace, people want their physicians to be close
10  to home.
11      Ms. Richards also says that, from a payer perspective,
12  she also needs PCPs close to the location of the patients
13  that will use them.
14      I'm sorry, Your Honor. You can open the screen at this
15  point.
16      Jeffrey Crouch with Blue Cross of Idaho. Mr. Crouch
17  represents the largest payor in the state of California.
18  They have, I believe, on the order of magnitude of 400,000
19  lives in this state. PCPs are necessary. Patients demand
20  them. In his experience, BCI cannot offer a competitive
21  network without local PCPs. And, finally, a network without
22  PCPs in Nampa would simply not be viable in the marketplace.
23      Within the -- interesting. We do have a document
24  which, interestingly, has not been designated as AEO. Nampa
25  physicians market, indicating that Saltzer and Mercy

## 27

1  physicians represent the majority of primary care and
2  surgical providers in Nampa.
3       A couple of things here. One is this is an admission
4  of the shares that will result from this deal. And on the
5  question of geographic market, they are analyzing the market
6  for business purposes as Nampa, which I think is not, at the
7  end of the day, absolutely dispositive, but I think it's
8  useful.
9       This chart, Your Honor, is worth I think spending just
10  a few moments on. This is referred to by our economists as
11  a "Pac-Man chart," just because it sort of looks like the
12  little dots on a Pac-Man slide.
13      So when you look at this, the purple area is the town
14  of Nampa. And you can see that there is a slight shading
15  difference between two areas. The shading area on one side
16  is Ada County on the right, and the shading on -- the white
17  space on the left is Canyon County.
18      And the Pac-Man pie charts that are sitting in or near
19  Nampa show various colors. And you see the purplish color
20  is provision of services in Nampa. So these shares are
21  actually very, very substantial. And then the red and the
22  yellow indicate that people have actually gone to other
23  places, either Meridian or some as far away as Boise, to get
24  care.
25      So that indicates that there is a strong need for local

## 28

1  doctors to serve local patients. Currently, the vast
2  majority of people in Nampa are seeking care locally, and a
3  handful are leaving.
4       When you look at the other -- in the other county, you
5  find that the pattern shifts actually quite dramatically.
6  The yellow and red become much more predominant, and the
7  treatment by patients that live in those areas going to
8  Nampa -- which, again, is the purplish area -- is tiny.
9       So there appears to be very little interplay. There is
10  some, and, you know, this will be an issue in how one should
11  address all of this. But you can see that there is almost
12  no departure from local markets by people when they have a
13  basic choice.
14      One of the things which has struck me about these --
15  this Pac-Man chart, particularly when you look at the folks
16  in Nampa who are getting their care locally, what St. Luke's
17  economists are saying is: Gee, since some people can leave
18  and obviously do, you should, too.
19      So, basically, I think of this as the -- you know, it's
20  the St. Luke's way or the highway, fundamentally, which is
21  what St. Luke's is telling this court, fundamentally, and
22  its economists will suggest in elaborate econometrics. But
23  basically this is the situation: the St. Luke's way or the
24  highway.
25      What St. Luke's proposes is, even if they get a

29

1  monopoly share or a very large share in Nampa, the folks who
2  seek treatment in Nampa either pay more or they go a long
3  distance, which they, at least at this point, don't want to
4  do.
5       There is a notion which sort of fits here.  There is an
6  idea called "critical loss."  This was used in a number of
7  cases involving hospital mergers 10 to 15 years ago.  It's
8  subsequently been criticized by economists, including the
9  economy -- economic expert being used by the Federal Trade
10 Commission.
11      So critical loss, the basic notion is that if an A-side
12 company in a merger, the acquiring company, raises prices,
13 would prices -- would people in some fashion leave to a
14 degree -- the idea here being critical loss -- to the point
15 where it would defeat their -- their proposal to increase
16 prices.
17      It kind of intuitively makes some sense, but it turns
18 out it's very difficult to do and, also, from a technical
19 perspective, dramatically widens the geographic markets.
20 And that has been found to be not very helpful and certainly
21 not very accurate.
22      But there are a number of problems with this analysis,
23 specifically in healthcare markets.  The first is that, as
24 Mr. Crouch and specifically Dr. Dranove will speak to in
25 some detail, pricing in these kinds of markets is set by

30

1  negotiations between payors and providers and has relatively
2  less to do with patient preferences.  So it is -- the real
3  analysis is focused at a different level from the level that
4  this analysis was initially designed to do.
5       Secondly, Dr. Argue fails to execute perhaps the most
6  basic aspect of the analysis, which is to determine the
7  elasticity or the willingness of patients to shift, do
8  something different if prices rise.  That is an essential
9  first element.  He just skips that part and suggests that he
10 thinks it's probably there.  But when you actually look at
11 what he has provided in his report, he doesn't.
12      And it turns out, finally, that Dr. Argue has had some
13 real problems doing the calculation.  He abandoned his first
14 version of this because he said it wasn't fully done.  And
15 then, from our perspective, the most recent one is not any
16 better.  But you will hear more about that when you hear
17 from Dr. Argue and Dr. Dranove.
18      Dr. Argue does not offer any specific geographic market
19 of his own.  He has not specified the exact parameters of
20 his geographic market.
21      Market concentration.  Based on our view -- again,
22 reminding Your Honor of the Philadelphia National Bank
23 presumption, this is yet another case in which excessive
24 post-merger market shares and concentration create a
25 presumption that the merger violates the Clayton Act.

31

1       HHI, this is the Herfindahl Index, which basically
2  involves the summing of the squares of the market shares.
3  We discussed that in our opening pretrial memorandum.
4       In this particular instance, typically, there are three
5  thresholds, if you will:  unconcentrated markets, moderately
6  concentrated markets, and highly concentrated markets.  We
7  are deeply into the highly concentrated market category.
8       THE COURT:  Counsel, does the HHI and the
9  Philadelphia National Bank standards take into account
10 radical differences in the market structure of different
11 sectors of the economy?
12      I mean, it seems to me that automobiles and perhaps
13 healthcare, that there is only a certain number of
14 competitors that can, for a number of reasons, really be
15 part of the market.  Whereas with other sectors of the
16 economy, the concentration is going to be far, far less
17 because it's much easier to enter the market and other
18 reasons like that.
19      Now, a bank, for example.  I'm assuming the
20 Philadelphia National Bank had to do with banking, and we
21 have seen --
22      MR. GREENE:  It did.  The law has some flexibility
23 in that regard because it takes into account, you know, the
24 ways in which businesses are done.  You know, there used to
25 be the idea of natural monopoly.  Certain things were so --

32

1  a local public utility, for example, was thought to be a
2  natural monopoly.
3       THE COURT:  Public utilities are regulated.
4  They're allowed --
5       MR. GREENE:  Right.  At some point, if it is a
6  natural monopoly, then there is regulation.  The rest of the
7  market, from the perspective to the antitrust laws, should
8  be -- there should be free and open competition.
9       Healthcare markets are somewhat different from other
10 markets.  Pricing signals are almost impossible to sort out
11 for ordinary consumers.  That's why the testimony I think
12 you will find from the payors is particularly important from
13 our perspective.
14      But I think you will have the opportunity under the
15 law -- ProMedica, and I have cited a number of healthcare
16 cases, and I will cite some more.  Those do take into
17 account the unique aspects of healthcare.  But, at the same
18 time, Your Honor, they also honor and follow the law with
19 respect to the importance of competition in those same
20 markets.
21      THE COURT:  Okay.  And I'm not suggesting that it
22 should not.  It's just that it does seem to me that a
23 unitary standard would not make sense because markets are so
24 radically different from -- as you go across the national
25 economy.  But, clearly, it's just a question of what factors

## 33

1  might change that and what the numbers should be, not that
2  we shouldn't apply the HHI standards or the Philadelphia
3  Bank standards. The question is what adjustments would need
4  to be made because of the nature of the market. And I'm
5  assuming other cases -- other courts have done so and
6  considered that question.
7         MR. GREENE: They have, Your Honor. And one of
8  the things -- I have the first witness for Your Honor later
9  today or tomorrow, and I'm going to spend some time with him
10  talking -- trying to sort out and help Your Honor understand
11  that one of the key aspects of this, unlike a market, say,
12  for example, for the sale of fruit or apples, okay -- I mean
13  that's -- there are daily, if not minute-by-minute
14  announcements of the price. It goes up, it goes down, that
15  sort of thing. That's conceptually the classic open market.
16         These, by contrast, are bargaining markets. Prices are
17  set in basically one-on-one, small-group-on-small-group
18  negotiations. So the way prices are set depend on people's
19  perceptions of their clout, if you will, their muscle, their
20  ability to negotiate. And from the payer's side of that,
21  typically, it's the availability of an outside option.
22         So, for example, if you have -- in this case,
23  actually -- an 80 percent share of the market in Nampa, the
24  payer with would want to know: What is my outside option?
25  What is my alternative?

## 34

1         And as the payers look at those kinds of facts, they
2  have to make some judgments about their negotiating power in
3  that negotiation. Though these kinds of negotiations, these
4  bargaining markets are interesting -- and you will certainly
5  be learning about them -- the effects of those negotiations
6  ripple throughout the Idaho economy.
7         Firstly, if clout is reduced, as we believe it will be
8  here, on the part of those that seek to buy services from
9  St. Luke's, now St. Luke's Saltzer, then prices will rise;
10  employers will have to pay more; employers, in turn, in
11  Idaho may face competitive disadvantages in the national
12  marketplace because they are paying more for their
13  healthcare. But at the end of the day, this market is
14  substantially unique because it is a bargaining market,
15  which you will hear a great deal about.
16         Turning Your Honor's attention back to the slide deck,
17  our complaint initially, the government complaint,
18  essentially alleged that the shares of the combined
19  Saltzer-St. Luke's entity would be order of magnitude in the
20  mid-60 percent range.
21         We have subsequently subpoenaed information from the
22  various payers, and we have now done a determination of the
23  numbers based on visits. So this is actually the shares of
24  these two firms based on visits; basically, this is billing
25  information. So, at the end of the day, St. Luke's Saltzer

## 35

1  will have a nearly 80 percent share -- 80 percent share of
2  PCP services, primary care services, in Nampa.
3         Even if we use a somewhat broader geographic market,
4  including Nampa, Caldwell, and Meridian, this pie chart
5  indicates that the combined firm will have a share of
6  approximately 60 percent. So this is well over the
7  presumptions that -- that are appropriate.
8         And then just let me put this in briefly in context,
9  Your Honor. Philadelphia National Bank, this was 30 percent
10  share. This was enjoined. Rockford, 60 percent share, HHIs
11  in the five thousands. If you actually look at the Rockford
12  opinion by Judge Posner, he basically said those shares were
13  enormous.
14         You've got University Health, 3200 was the postmerger
15  HHI; Cardinal Health, 3800 is the final HHI; H&R Block,
16  4600; ProMedica, 4300. And then finally, Your Honor, we
17  have St. Luke's Saltzer, and that number is 6219. So that
18  is the -- that is this case in the context of the broader
19  jurisprudence of antitrust.
20         Let me turn briefly to anticompetitive effects. We
21  don't need to prove this as plaintiffs, but we do think that
22  there is some very interesting testimony and evidence in the
23  record which indicates that there are anticompetitive
24  effects already existing in this market.
25         I mentioned this point to you earlier, Your Honor.

## 36

1  This is the idea that these are bargaining markets. So
2  basically payers on one side. Payers bring money and
3  customers, and then providers bring patients. And these
4  come together to generate prices and networks, which are
5  then sold to employers and subsequently provided to
6  employees.
7         So this -- this is the -- the existence of the outside
8  option, the ability to find an alternative that will serve a
9  market like Nampa, is -- is the most important aspect of
10  this. And then in specifically this instance, this
11  acquisition makes health plans' outside options much less
12  attractive. They just don't have the options they used to
13  have before this deal came down. And I think we will talk
14  at some length about what that may mean.
15         Our expert, Dr. Dranove -- who is actually one of the
16  most interesting experts, I think, actually in this space at
17  Northwestern University -- his basic conclusion is that this
18  deal will enhance St. Luke's market power and give it the
19  ability to increase price. That's the essence of the
20  problem before Your Honor and the essence of I think what
21  will be determinative here.
22         St. Luke's, itself, interestingly enough, understands
23  this concept as well. This document basically states,
24  "St. Luke's Treasure Valley recognizes that the market share
25  in primary care is a key success factor critical to

37

1  effective negotiations with payers."
2      So people in this market, and certainly St. Luke's
3  executives, understand what the deal here is in a
4  relationship between concentration and clout at that
5  bargaining table.
6      The next document, Your Honor, is AEO -- actually, the
7  next several documents.
8      Saltzer had its own consultant to help them through the
9  deal. This consultant basically says, "Opportunities for
10  improved managed care negotiations exist based on a higher
11  number of physicians." This is, yet again, indication of
12  clout.
13      The next one, Randell Page, the -- again, the lead
14  negotiator for Saltzer. Dr. Page basically says: We didn't
15  get this particular consulting -- this particular advantage.
16  We couldn't get that. But now that we're going to be part
17  of this network, we will be able to get it, so let's go try.
18      One aspect of this, Your Honor, is that -- and we have
19  suggested this in our complaint -- is that the Magic Valley
20  story may well be a past-is-prologue situation. Basically,
21  the game plan they developed there is a game plan they want
22  to execute in Nampa.
23      And you can see from this slide that they are basically
24  explicitly saying: We see this type of negotiation, the one
25  like they had in Magic Valley, as a precursor to what we may

38

1  be able to achieve across the region. So, having learned in
2  the Magic Valley what works and what doesn't, then that is
3  the plan here.
4      You can see, by the way -- this is a BCI document which
5  basically captures historic price increases -- the third
6  column over are the percentage increases for the Magic
7  Valley arena. So they go -- you can see these are very
8  significant increases, particularly when you compare them.
9  And the last column has the hospital rate of inflation. And
10  you can see that they are multiples of those numbers, and
11  they're rising very quickly.
12      We also have evidence that, from St. Luke's, itself, we
13  need critical mass to -- we need -- that relates critical
14  mass to the ability to negotiate with payors and their
15  understanding of that is quite clear.
16      It's also clear, interestingly, that St. Luke's would
17  strongly prefer not to compete on price. You will see a
18  number of documents indicating that, though pretty much
19  every competitor in the United States economy regards
20  competition on price as pretty much what competition is
21  about, St. Luke's executives apparently don't. They would
22  like to avoid this -- this -- this tiresome price
23  competition in the Idaho market.
24      We believe that that is not a good idea, that is not
25  appropriate, and it's not allowed under the antitrust laws.

39

1      Another AEO document. St. Luke's doing its own
2  internal analysis of one line item, the one important one,
3  that it will now charge more for in the Saltzer deal. So
4  this is from one line item, and it's for one year. And
5  those numbers are going to ripple out to payers and then
6  employers.
7      The next slide is from their internal analyses of the
8  advantage they will get -- you know, the higher costs,
9  higher charges they will make -- now that they control
10  Saltzer. And you can see at the lower right, for commercial
11  payers, we are talking millions of dollars of increased
12  charges. This is their analysis, not ours. This is not our
13  economists. This is their person.
14      Idaho's largest insurance plan, Blue Cross, will
15  indicate that -- that St. Luke's has used its market power
16  previously, and they expect it to use its market power in
17  the future specifically in the Saltzer transaction.
18      We have a Regence Blue Shield executive indicating just
19  how important the Saltzer Group is in Nampa. I mean, when
20  you think about the bargaining nature of these markets, if
21  it's necessary to have Saltzer-St. Luke's in your network,
22  that means that you don't have that outside option which
23  keeps prices down.
24      We will hear -- you will hear from Linda Duer, who is
25  the executive director of Idaho Physicians Network. This is

40

1  the network that is basically purchased or rented by some of
2  the largest national health insurance companies in the
3  country in order to compete in the Idaho marketplace.
4      She will indicate that she had huge problems with Magic
5  Valley price increases; price negotiations have essentially
6  stopped with her; and that substitutes in the Nampa region
7  simply are not there.
8      I think, Your Honor, we can turn to "Entry," and you
9  can turn the screens back on.
10      Again, recollect, Your Honor, that entry must be
11  timely, likely, and sufficient. And in this case, that is
12  simply not the case.
13      Two quick hits. Dr. David Peterman. He's the
14  president of Primary Health. This is a group that practices
15  specifically in the Nampa area. He has had great
16  difficulty, great difficulty recruiting physicians into
17  Nampa.
18      Nancy Powell, who was formerly the CFO of Saltzer, also
19  indicates that even that firm, with its great reputation,
20  was unable to recruit.
21      Randell Page indicates that -- again, Mr. Page is
22  the -- Dr. Page is the chief negotiator for Saltzer. And a
23  new entrant would be basically -- wouldn't have any patients
24  and would have to build a practice from scratch. Obviously,
25  huge difficulties in meeting the standards of entry.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW    Document 549    Filed 11/04/14    Page 14 of 57

Bench trial, 09/23/2013

41

1   Entry will not offset St. Luke's additional market
2   power. Dr. Dranove looks at this very carefully. It's a
3   classic piece of antitrust analysis. His firm conclusion is
4   that both the theory and the evidence indicate that entry
5   will not work.
6       THE COURT:  Mr. Greene, in a bargaining market, as
7   you have described it, the entry into the market would not
8   presumably be individual PCPs but PCP groups or groups
9   coordinating with, say, Saint Al's or others to create a
10  competitor that could then be engaged in bargaining for
11  healthcare?
12      MR. GREENE:  Yes. It would probably come in two
13  potential ways. One would be the expansion of groups
14  independent from St. Luke's Saltzer in that marketplace. It
15  could also come in as new entrants. It's probably going to
16  be a combination of both.
17      But when you actually look at the success rate of folks
18  who are already in this market recruiting primary care
19  physicians in particular, it's essentially terrible. They
20  all complain about it. St. Luke's complains about it.
21  Saint Alphonsus complains about it. It's just hard to get
22  these physicians into these kinds of markets.
23      THE COURT:  All right.
24      MR. GREENE:  So, apropos of that, David Argue, the
25  defense expert, was asked: Can you identify one likely

42

1   entrant? And his relatively crisp -- and we appreciated
2   it -- answer was:  No. It's just not obvious that anyone
3   would be coming into this market after the
4   Saltzer-St. Luke's transaction occurs, and certainly not
5   sufficiently so, from our perspective, that it would offset
6   the obvious problems created by this deal.
7       There are a number of problems with the efficiencies
8   claim. The first is conceptual but nonetheless important.
9   It goes fundamentally to this question of merger
10  specificity.
11      There is no link -- there is no necessary link between
12  these acquisitions and quality improvements; there just
13  isn't. Their numbers don't indicate that. They would like
14  it to be. They have a post hoc ergo propter hoc analysis:
15  Well, we hired some doctors, and we say we improved our
16  care, but it's not at all clear that the one was necessary
17  to get the second.
18      The second point here is that they have made, at least
19  to us, some really quite extraordinary claims about improved
20  morbidity and mortality. None of those claims have stood up
21  to scrutiny. And at this point in time, there are no
22  measurable benefits from St. Luke's use of its health
23  information technology and certainly no evidence that
24  this -- any benefits associated with St. Luke's is not the
25  equivalent of or about the same as the kinds of improvements

43

1   that are being seen at Primary Health, for example, that
2   uses eClinicalWorks, which is the technology that Saltzer is
3   using.
4       And, finally, there is no evidence that St. Luke's
5   prior acquisitions or primary care physicians lowered the
6   cost of healthcare. We looked at this closely.
7       Okay. Finally, there is a notion that we have had a
8   nucleus theory idea offered by the defense, which is that:
9   Well, we may not need to own or employ all of the doctors,
10  but we do need a nucleus of employed physicians in order to
11  improve quality of care.
12      So this actually has been a bit of a moving target.
13  Dr. Seppi, in his deposition, basically said they needed 300
14  or 400. Since they already had 500, presumably they don't
15  need Saltzer to do this.
16      Then Dr. David Pate, the CEO, indicated that he is
17  currently doing this -- improving care from his
18  perspective -- with two to three dozen physicians.
19      And then, most interestingly, Dr. Alain Enthoven of
20  Stanford University suggested that: Well, I'm thinking
21  something like four to six per specialty. So when you have
22  got already 500 doctors in your stable, there is no
23  indication here that you need to have this many doctors for
24  your nucleus or your core to be employed in order to gain
25  efficiencies.

44

1       That's AEO, Your Honor. Let me have you close the
2   screen.
3       St. Luke's head of clinical integration, he is not even
4   sure if they're going to reach clinical integration by the
5   end of this decade. This is not a -- a statement that is
6   consistent with the burden that the defense has to carry in
7   this case.
8       The expert -- you can turn it on again -- this again is
9   Dr. Enthoven in his deposition. "Do you have a view of how
10  long it takes to fully change the incentives?"
11      "I would have to say I think maybe a decade or more."
12      And then he goes on to say, talking about this
13  integrated care program that St. Luke's aspires to, "This is
14  a complex and perilous route, and others trying to take this
15  route have tripped and fallen."
16      These are not good words to hear when you're being
17  asked to offset this speculative enterprise when you know
18  that they're going to get an 80 percent market share in an
19  important market in the state of Idaho.
20      The St. Luke's strategy, according to one of their own
21  doctors -- this is a statement by one of their medical
22  directors, surgeon Dr. Huntington. I deposed
23  Dr. Huntington. This is one of his emails. "But let's be
24  realistic. Employing physicians is not achieving better
25  cost. It is achieving better profit."

45

1    So, from our perspective, Your Honor, this is really
2    what this is about.
3    And then, finally, there is no evidence that prior PCP
4    acquisitions actually lowered costs.  Our experts spent a
5    fair amount of time and a lot of computer time looking at
6    this.  And he saw two patterns:  either no significant
7    spending changes or increased total spending.  There was no
8    indication that, at the end of the day after all these
9    various acquisitions, that costs -- costs for consumers had
10   gone down in any way.  And in some of his scenarios, costs
11   had actually increased.
12   And he suggests that there is some possibility --
13   actually, some substantial possibility that this may result
14   in cost increasing inefficiencies.
15   The efficiencies are not merger specific.  They didn't
16   consider viable alternatives.  The executives have
17   acknowledged that there were alternatives that they could
18   have followed but did not.  Plaintiffs' expert, Dr. Kizer,
19   will indicate that all of the purported benefits could be
20   achieved using less competitively problematic alternate
21   means.
22   And it turns out that various executives from
23   St. Luke's agree that that's true.
24   And if you would darken the screens, Your Honor, for
25   the next couple of slides.

46

1    So you have the VP of physician services indicating
2    that even if the deal is undone, there would be a
3    relationship -- presumably a productive one -- between
4    St. Luke's and Saltzer.
5    One of the things that we have heard that -- and you
6    have also got this language, and then let me go to this.
7    One of the things that has been suggested is you need to
8    employ docs in order to provide -- doctors in order to
9    provide them a financial incentive to pursue quality.
10   It turns out that the vice president of payer relations
11   at St. Luke's has indicated quite clearly, based on his
12   experience at Advocate Health, which is a Chicago-based
13   healthcare area, that it's very -- that at least when he
14   worked there, they provided significant financial benefits
15   to independent physicians if they met quality metrics.
16   That is something that has been allegedly not possible
17   here in Idaho.  But at least in Chicago, where one of their
18   major executives sort of cut his teeth, that was certainly
19   appropriate and possible.
20   If you could light the screens again, Your Honor.
21   One of the statements made in the pretrial memorandum
22   is that one of the major benefits of this deal is a robust
23   electronic medical record.  Well, it turns out that EMRs is
24   a good thing.  The United States government and its
25   taxpayers have been spending billions of dollars in support

47

1    of seeding of EMR systems across the United States,
2    including money provided to St. Luke's.
3    And it turns out that the EMR system that St. Luke's is
4    considering, they are going to extend that system to
5    independent physicians.  It's called the Affiliate EMR
6    Program.  This is one of the planning documents.  They
7    already have some people who are using this.
8    Dr. Kizer will testify, by the way, that you don't have
9    to be on the same system.  There are a couple of
10   alternatives.  One is there are interfaces; you can have one
11   system talk to another.  This is a classic EMR problem.
12   Virtually every EMR provider in the country has specialists
13   that sort out how to make one system talk to another.
14   The Idaho Health Data Exchange exists.  This is a
15   program that's partly funded by a federal grant.  The design
16   of that program is to facilitate -- its goal is to
17   facilitate interaction of electronic medical records all
18   across the state of Idaho, and it uses technologies that
19   allow different systems to talk to each other.
20   And here is -- actually, I found this interesting.
21   This is essentially a demonstrative we pulled from the
22   website of Primary Health.  This is a provider that provides
23   some services in the Nampa area.  And it turns out that
24   Primary Health, like Saltzer, uses the eClinicalWorks EMR.
25   And we actually look at what the EMR does, and you compare

48

1    that with the claims and the things that St. Luke's says are
2    the crucially important aspects of an EMR.  All of those
3    elements are already being provided by the eClinicalWorks
4    program, and they are interacting with St. Luke's already.
5    And I think you need to darken the next slide,
6    Your Honor.
7    There are a number of other defenses which we have not
8    seen before, but we wanted to just tag up on them.  The
9    first one -- unfortunately, this is an AEO slide.  This is a
10   statement from the report of Dr. Alain Enthoven.  Basically,
11   I think of this as the give-monopoly-a-chance defense.
12   So the idea here is that Dr. Enthoven is very
13   comfortable with the idea of a payer as long as it has what
14   he thinks of as a good clinical integration program.  They
15   can be a monopoly from his perspective as far as we can
16   tell.  It may take some time, as he suggested; it may be 20
17   years; it's speculative; it's hard.  But it's the give
18   monopoly a chance.
19   I don't think Your Honor should give monopoly a chance
20   under this circumstance, but you will certainly hear from
21   Dr. Enthoven that that's something you can consider.
22   The next slide --
23   THE COURT:  One of the arguments that St. Luke's
24   makes is that in order to have -- I think the term is
25   "risk-based contracting," that there does not to be, in

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 16 of 57
Bench trial, 09/23/2013

49

1  fact -- they don't use the term "monopoly," but there has to
2  be a sufficiently large volume of patients and doctors and
3  people who buy into that concept in order to make it work,
4  so that they can actually contract to provide healthcare on
5  that basis rather than fee-for-services.
6       Are you suggesting that, in fact, that's not true?
7  That you don't want that large --
8            MR. GREENE: Yes. Exactly. I mean, the -- there
9  is -- I mean, just based on your ordinary experience, you
10 would think there would be a minimum number. It's kind of
11 an insurance product. But it turns out that when you
12 actually look at what's happening in the rest of the
13 United States, risk-based contracting actually is not a new
14 thing.
15      The State of California, for example, over a third of
16 patients in the state of California are served under
17 risk-based contracts. This is a brand-new deal here in
18 Idaho, but some of those contracts are being provided by
19 relatively small providers.
20      And I think one of the questions that we'll probably
21 ask Mr. Crouch when we get to this is: Is there some
22 something -- is there some minimum -- what would he think,
23 since he is an expert on insurance.
24      I think what he will suggest, Your Honor, is it's much
25 smaller than 500 doctors and one-plus billion dollars in

50

1  revenues. It just is not required.
2       Then we have the -- and you can open the screens again,
3  Your Honor.
4       So now we have -- now we have the healthcare reform
5  defense. This was in the pretrial brief. This is a very
6  elegant and artful piece of work. Basically, the
7  implication here is that there is some collision, there is
8  some necessary conflict between the interests of the
9  Accountable Care Act, which, of course, vouches for and
10 supports the idea of clinical integration and antitrust.
11      Essentially, what Dr. Pate and his lawyers have told us
12 is that: Gee, I can't integrate if these antitrust laws get
13 in the way. I mean, I think it's fundamentally what
14 Your Honor is going to hear. But at least from a federal
15 government perspective, that's hokum.
16      When you actually look at the Federal Register, these
17 are the guidelines, these are the regulations implementing
18 the Accountable Care Act with respect to accountable care
19 organizations. And it makes crystal clear that competition
20 among ACOs can accelerate advancements in quality and
21 efficiency.
22      The federal government -- at least CMS in charge of the
23 Medicare program -- does not believe that it should
24 incentivize the creation of ACOs where their formation would
25 create market power. Amongst other provisions in these

51

1  regulations is a specific notification provision that lets
2  the federal antitrust agency, the Federal Trade Commission,
3  and the U.S. Department of Justice know about every one of
4  these ACO formations so that we can take a look at it.
5       There is no war between competition and accountable
6  care. It is a figment of the imagination of several, but it
7  is not a figment in the -- it is not real; it is not the law
8  of the United States.
9       Finally, the pretrial memorandum cited Professor
10 Herzlinger. Professor Herzlinger writes and speaks
11 frequently on healthcare issues. And the implication in the
12 pretrial memorandum is that somehow she supports what
13 St. Luke's is doing here.
14      I must admit we were a little bit flattered that the
15 defense suggested that the government plaintiffs had their
16 muscles rippling. We were sort of excited we had muscles
17 that might ripple. But it turns out that, when you actually
18 read Professor Herzlinger's work -- this is her most recent
19 book, Who killed healthcare? -- she warns us -- and it's
20 probably worth sharing with Your Honor -- that in
21 prior -- in a prior wave of hospital mergers -- this relates
22 to the hospital merger wave of the 1980s and 1990s -- that
23 hospitals suggested and argued and were allowed to merge
24 based on those arguments that healthcare costs would fall,
25 quality would increase. This is a trope which you'll hear

52

1  in this courtroom for the next month. It turns out that
2  that turned out to be not true. Costs went up and,
3  arguably, quality declined.
4       She also specifically suggests that when hospitals buy
5  doctor groups, that, itself, creates competitive problems.
6  She specifically notes that when they buy a doctor group,
7  they basically are buying the referral system that the
8  doctor controlled.
9       So where work used to go to the most efficient provider
10 that the doctor felt was appropriate, the usual result of
11 these kinds of transactions is a referral shift to typically
12 the more expensive hospital services. And she notes that
13 these things -- though this is an aspect of vertical
14 integration, she says specifically that, "Although vertical
15 integration is an old strategy, it is not a good one. For
16 one, it may work against the public interest by restraining
17 competition." Exactly our situation here.
18      I think at the end of the day, Your Honor, a remedy is
19 appropriate. And the antitrust laws indicate that the
20 remedy that is the default remedy is divestiture. This is
21 not out of the ordinary. This is the ordinary remedy that
22 is provided in these kinds of deals.
23      So you have got the Dupont case. This is the seminal
24 case in this space. Congress expressed its view that
25 divestiture was the most suitable remedy in a suit for

53

1    relief from Section 7.
2        California versus American Stores, which is a case I
3    had a role in, divestiture is the most important of the
4    antitrust remedies and should be in the forefront of a
5    court's mind when a violation of Section 7 has been found.
6        You heard in this court -- actually, in this courtroom
7    at the time of the preliminary injunction, a quite clear
8    statement from the defense that it would be quite possible
9    to unscramble this egg. We will not oppose divestiture on
10   grounds that divestiture cannot be accomplished.
11       You are hearing a very different story in the pretrial
12   memorandum. We will certainly mount evidence with respect
13   to this kind of thing. I think, in particular, one of the
14   first slides I showed you indicated that there actually is a
15   source of funding for a transition when and if Your Honor
16   decides that this is the appropriate remedy.
17       But we did want to conclude with the fact that we think
18   we will be asking for this remedy at the end of -- at the
19   end of this trial. I think, once all is said and done, this
20   acquisition should be and will be properly found unlawful.
21       The premerger HHIs of 6219 create a strong legal
22   presumption that this deal will have anticompetitive
23   consequences. Testimony, documents, and empirical evidence
24   all come together to confirm that the acquisition will have
25   likely anticompetitive effects. There are no verifiable,

54

1    merger-specific efficiencies that justify taking this risk.
2    And, finally, the evidence warrants divestiture and a
3    permanent injunction.
4        That concludes my opening statement, Your Honor.
5        THE COURT: Thank you.
6        MR. GREENE: Thank you.
7        THE COURT: Mr. Ettinger, we would normally take a
8    break in about 25 minutes, but we could take a short break
9    now. I'm going to assume you're going to take a little more
10   than 25 minutes, but I don't know. I'll give you the
11   option.
12       MR. ETTINGER: Your Honor, if we take a short
13   break now, it might be a convenient way to try to clear the
14   courtroom.
15       THE COURT: I'll avoid that. But, Mr. Powers,
16   I'll probably go directly into your argument, though, after
17   Mr. Ettinger, so if you could be ready to go. Then we'll
18   take another short break and hear from, I guess, Mr. Bierig.
19   And, I guess, Mr. Julian will be the cleanup hitter or
20   whatever.
21       All right. We'll take a recess. We'll try to limit
22   this to about ten minutes.
23       MR. ETTINGER: Your Honor, should we identify who
24   ought to not come back after the break, given that I'm going
25   to be very heavily AEO?

55

1        THE COURT: Yes. It was my understanding, though,
2    Mr. Ettinger, that you were only going to ask that people
3    leave when you reach that point, or were you really
4    requesting that it --
5        MR. ETTINGER: Your Honor, my first ten slides
6    are -- even that's not true anymore. I think the better way
7    to do it, unfortunately, because so many of the slides are
8    designated AEO by St. Luke's, that we simply do it for the
9    entire argument otherwise I will get a little bit into it
10   and we'll have to --
11       THE COURT: What I will do then is exclude
12   everyone from the courtroom except St. Luke's employees
13   because it's -- and the term "AEO" is attorneys' eyes only.
14   That's the designation given for privileged and sensitive
15   materials.
16       So when we reconvene, everyone except St. Luke's
17   employees -- who may remain in because they are -- they have
18   been designated as sensitive documents by St. Luke's -- but
19   everyone else will have to remain out. We won't start until
20   that's been kind of clarified and perhaps the attorneys can
21   review the audience and make sure we have proper mix here
22   when we begin. All right. We'll be in recess for ten
23   minutes.
24       (Recess.)
25   ****** COURTROOM CLOSED TO THE PUBLIC ******

56

1    THE COURT: Mr. Ettinger.
2        MR. ETTINGER: Thank you, Your Honor. By the way,
3    I'm going to have one slide that is AEO Saint Al's, and I'll
4    simply ask you to blank the screen when we get there, but
5    only one.
6        THE COURT: All right.
7        MR. ETTINGER: Your Honor, I'm going to address
8    the issues from the point of view of the private plaintiffs,
9    both Saint Al's and Treasure Valley, generally, and then
10   Mr. Powers will have some specific comments related to
11   Treasure Valley.
12       I also wanted to start by saying while there is a large
13   overlap between our case and the government's case, for the
14   most part, we're not going to say anything about those
15   overlapping issues because Mr. Greene has certainly
16   addressed them. The only exception -- I'm going to begin
17   with this, Your Honor -- is I thought I would add a couple
18   quick comments in response to some of your questions to
19   Mr. Greene and then jump into what I prepared.
20       Your Honor asked Mr. Greene, in terms of market share
21   thresholds and HHIs, whether healthcare is any different,
22   and I would simply add that Mr. Greene's chart where he
23   showed you the market share is less than the shares here in
24   cases that were enjoined, four of those seven cases with
25   lower market shares were healthcare cases. So I think that

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 18 of 57

57

1  provides a lot of insight on that issue.
2      Your Honor, on the question of the Luke's --
3          THE COURT: Just a moment.  What were the time
4  frames of those cases?  I mean, were they in the last ten
5  years?
6          MR. ETTINGER: Yes, Your Honor.  Not all of them.
7  Some of them.  They range from 1988 for Rockford to two
8  years ago for ProMedica.
9          THE COURT: Very good.
10         MR. ETTINGER: Your Honor, on the quality, slash,
11 integrated care defense, I just wanted to add a couple of
12 things, some of which are particularly responsive to your
13 questions.
14     I think we're going to have a lot of evidence that none
15 of what St. Luke's claims that it would like to be able to
16 do is merger-specific, that St. Luke's, itself, first of
17 all, has taken many avenues, and many of the quality gains
18 it claims occurred for reasons having nothing to do with
19 acquisition of physician groups.
20     For example, St. Luke's has management services
21 organizations that existed with the orthopedic and
22 cardiology groups well before they were acquired, and the
23 achievements in those areas are attributed by St. Luke's
24 personnel to those MSOs, not to acquisition.  That's one
25 alternate way they can do it.

58

1          Number two, they are proceeding with clinical
2  integration with their own network, Select Medical, which
3  includes lots of independent physicians.  And Dr. Pate has
4  said publicly, and has affirmed in his deposition, that he
5  expects to achieve clinical integration with that group,
6  including the independents, by the end of 2013.
7          Third, St. Luke's, like every hospital in America,
8  employs part-time service line directors who assist on
9  quality, planning, and related issues, and those service
10 line directors can be employed or independent.  There is no
11 reason why they can't be independent.  They are sometimes
12 for St. Luke's.  They are frequently around the country.
13 And that's a way to incentivize a doctor to help you on
14 things where he is not doing direct patient care but still
15 allow him to remain independent.
16         Fourth, as Mr. Greene mentioned, there is the
17 affiliated EMR program, where St. Luke's plans to bring its
18 electronic medical record to the independents.  So once they
19 do that, it will be crystal clear you don't need to acquire
20 the group in order to have that shared medical record.
21         And fifth, the evidence will show that St. Luke's is
22 working with independent groups, like Primary Health, like
23 OB/GYN Associates, and has achieved quality gains by doing
24 that.  Another reason why you don't need to buy them in
25 order for these things to happen.

59

1          Despite all those available options, many of which
2  St. Luke's is pursuing, Your Honor, St. Luke's also
3  admitted -- Dr. Pate, St. Luke's CEO, admitted that until
4  this year, St. Luke's has not devoted sufficient resources
5  to clinical integration with independent physicians.  I
6  asked him, specifically, at page 165 and 6 of his
7  deposition, quote, When did sufficient resources start
8  getting devoted to clinical integration with independent
9  physicians at St. Luke's?
10         Dr. Pate said, "I believe it was at the beginning of
11 this calendar year."
12         So if they haven't devoted adequate resources to the
13 alternative until this year, after this case was filed, how
14 can they say, as they have said since December, that we have
15 got to acquire the physicians to achieve these results.
16         Dr. Pate, also, I think, reaffirmed the speculative
17 nature of this defense.  We had some discussion in his
18 deposition about: Can you do the very same thing in every
19 respect with independent physicians through contract?  He
20 offered a contrary view.
21         And then I asked him, "These are open-ended questions;
22 aren't they?" at page 162.
23         And he said, "Yes."
24         So St. Luke's is requesting to be allowed to do
25 something that is otherwise clearly anticompetitive, based

60

1  on one theory of how to answer open-ended questions.
2          Finally, Your Honor, you asked Mr. Greene about: Do
3  you need a certain minimum number of doctors or shares in
4  order to do risk contracting?  Well, I asked Dr. Pate,
5  essentially, that same question at page 190.  I said, quote,
6  Have you made any effort or has anyone at St. Luke's made
7  any effort to try to determine whether the scale necessary
8  to manage population health in the Treasure Valley, what
9  that means in terms of any particular market share levels?
10         And Dr. Pate said, "We have not."
11         So, you know, if this defense were to work, Your Honor,
12 among all the requirements that Mr. Greene mentioned, it's
13 got to be a numbers defense.  It's got to somehow say: We
14 need to have a market share at least as big as what we're
15 going to acquire here in order to get these gains.  Because
16 otherwise, if you could do it without that kind of
17 acquisition, without that kind of market share, it doesn't
18 justify the deal.  But St. Luke's has never connected the
19 dots.  They have never said, quantitatively, in any way,
20 that we need a market share of X in order to achieve these
21 gains and here is why.  Dr. Pate's statement admits it.
22 What Mr. Greene showed you about the core and the nucleus
23 and the shifting numbers establishes it.
24         So with that, Your Honor, let me go on and talk about
25 the issues where we do not overlap with the government, and

61

1  get into my slides.
2      So, Your Honor, the part of the case that is unique to
3  the private plaintiffs really concerns ways in which the
4  Saltzer acquisition will result in other anticompetitive
5  conduct, conduct that will be enabled, conduct that will be
6  forwarded by the acquisition of -- and that will include two
7  major categories, harm to network competition in the
8  Treasure Valley and the steering off patients to St. Luke's
9  and the resulting foreclosure of competition.  And this, we
10  believe, will harm consumers and harm competition, and
11  that's what we're going to show.  These are activities
12  that are already being undertaken and already being planned.
13  And Saltzer will provide critical ammunition to allow
14  St. Luke's to effectuate these activities.
15      Our case concerns the markets -- the primary care
16  markets, as does the government's case, but it also concerns
17  the hospital and outpatient surgical facilities markets
18  because these events will affect all those markets, both
19  inpatient hospital care and outpatient surgical facilities.
20  So that's another way in which we go beyond the government's
21  case.
22      So Your Honor, what I'm going to do is talk about
23  network competition and then talk about foreclosure and
24  steering and then talk about how those activities are going
25  to harm competition, in the next few minutes.  And to start

62

1  with, though, before that, to set the stage, talk a little
2  bit about primary care and its significance.
3      Your Honor, Mr. Greene talked about primary care as a
4  separate market, but it's also important to note, as again
5  Dr. Page from Saltzer said, primary care is effectively the
6  gateway, the gatekeeper for all those other services.
7  Primary care providers control the input to outpatient
8  services, diagnostics, referral to proceduralists, meaning
9  specialists, who then use the hospital.  So the primary care
10  doctor is the guy who starts the process in motion to decide
11  all those things and, therefore, is critical to all the
12  relevant markets, including the hospital and surgery
13  facility markets.
14      Your Honor, this is just a simple schematic that shows
15  the ways in which patients can get to the hospital or
16  outpatient surgery facility from the primary care physician,
17  either directly or indirectly through other vehicles, and
18  we'll spell all this out as we go further in trial.
19      But in most cases, not all, but in most cases the
20  primary cary physician is what starts it all off, and that's
21  why the primary care physician is critical to networks, and
22  that's why the primary care physician is critical to
23  competition in all of these markets.
24      The other thing, just to set the stage, Your Honor, is
25  that this case is, of course, focused on the Saltzer

63

1  acquisition, but it is not only about the Saltzer
2  acquisition.  It has to be assessed in the context of what's
3  been going on, that St. Luke's has made more than 20
4  acquisitions of physician practices over the last several
5  years.  And the case law that we have cited in the trial
6  brief makes clear, under Section 7, Your Honor, is to look
7  at all the transactions, look at the full context, the cases
8  recognized, Congress recognized as far back as 1890 when
9  they adopted the Sherman Act that you can't sue on every
10  last transaction, so you have got to be flexible and allow
11  the court to consider a series of transactions.
12      It may be too late to undo a lot of these, but,
13  certainly, the effects of them coupled with Saltzer are
14  important as long as Saltzer is a significant contributing
15  cause.  And we think it's far more than that.
16      So now, Your Honor, to get into network competition.
17  First, real basics, talk about what we're talking about.  A
18  network is, basically, an aggregation of providers,
19  Your Honor.  So a network can get together hospitals,
20  doctors, outpatient facilities, other providers, and offer
21  this to either a self-funded employer or a payer.  And the
22  self-funded --
23      THE COURT:  The payer is going to be an insurance
24  company, typically.
25      MR. ETTINGER:  Insurance company but also

64

1  employers.  We're going to talk about Micron, for example,
2  today --
3      THE COURT:  All right.
4      MR. ETTINGER:  -- which directly dealt with such a
5  network.
6      THE COURT:  You distinguish employers from payers.
7  I'm assuming, I guess, the private individual who has no
8  insurance and is independently wealthier can afford to pay
9  for it.
10      MR. ETTINGER:  I don't know if any of them have
11  called the networks lately, Your Honor.
12      THE COURT:  All right.
13      MR. ETTINGER:  But, basically, it's self-funded
14  employers or payers where this will arise.
15      And just to throw out a little bit of the jargon that I
16  may slip into, Your Honor -- and by the way, if I do beyond
17  this, please interrupt me -- there is talk in the record
18  about so-called "narrow networks" that include a limited
19  number of providers, PPO networks, which, typically, in
20  Idaho, include most of the providers.  There is also talk
21  about tiering, where you may have providers in a network but
22  the benefit design is such that certain providers are
23  preferred over others.  Employees get a better financial
24  break if they use certain providers over others.  So there
25  is a lot of ways these networks can develop that we'll be

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 20 of 57
Bench trial, 09/23/2013

65

1   talking about in this case, but it starts out with kind of
2   this basic concept.
3       So, Your Honor, there are a bunch of competing networks
4   in the Treasure Valley that we'll be talking about.  Select
5   Medical is the Treasure Valley Network that's anchored by
6   St. Luke's that includes St. Luke's physicians but also many
7   independent physicians.  BrightPath, which is not on the
8   slide, is the statewide network that hooks into the
9   St. Luke's Select Medical Network, and they will be
10  mentioned as well.  ACN is the former name of and Saint
11  Alphonsus Health Alliance is the current name of a network
12  of independent and employed physicians and hospitals that
13  include Saint Alphonsus.  Mr. Greene mentioned the Idaho
14  Physicians Network, IPN, which is a broad PPO network, lots
15  of hospitals and doctors, including St. Luke's and Saint
16  Al's.  And that's the network that hooks up with national
17  payers like Cigna, Aetna, United and provides their
18  healthcare in Idaho, so it fulfills a very important
19  function.  The Imagine or Wise Network is the network that
20  was developed to serve Micron and intended to serve a lot of
21  other employers, but that hasn't happened, we believe,
22  because of St. Luke's actions to scuttle it, and we will be
23  talking about that this morning.
24      So, Your Honor, the first step is -- and Mr. Greene
25  talked about this.  I'm going to talk about it a bit

66

1   more -- Saltzer is critical to having a broad enough
2   network.  Scott Clement from -- formerly of Regence Blue
3   Shield explained that.  He said it was critical that Saltzer
4   be part of the network.  And the testimony will show this
5   was not just an opinion.  He ended up paying -- he ended up
6   paying Saltzer more money than his standard rates because
7   they wouldn't join his PPO network without -- without
8   getting more money.  And he felt he had to have them.  So it
9   wasn't just an opinion, it was an opinion confirmed by his
10  business conduct.
11      But this doesn't just come from third parties,
12  Your Honor.  It comes from St. Luke's own executives.
13  Mr. Billings, the VP of payer relations, said in an email
14  that if Saint Al's kicked Saltzer out from ACN, it would,
15  quote, cripple their own network, close quote.  Those were
16  his words in his email.  And so when I asked him in his
17  deposition, "What do you mean by that?" he said, "If they
18  kick Saltzer out of their network, they're going to have a
19  revolt on their hands from employees."
20      So Mr. Billings put it as strongly as we could possibly
21  desire in making a case, Your Honor.  This will cripple the
22  network.  Saltzer is that important.  People who are using
23  Saltzer doctors will revolt if -- if they don't have
24  Saltzer.
25      By the way, Your Honor, this is interesting because you

67

1   will note in St. Luke's briefs, it says that what we have to
2   prove to show harm to competition is that Saint Alphonsus
3   would be crippled or that TVH would be crippled.  That is
4   wrong as a matter of law.  We don't have to show that at
5   all, but, in fact, it's pretty interesting that St. Luke's
6   own witnesses say that standard is met.  It's a higher
7   standard that we have to prove, and it's met according to
8   St. Luke's own witnesses.
9       So what is St. Luke's already planning to do,
10  Your Honor?  Select Medical and St. Luke's already resolved,
11  before this case got filed, that they will have all their
12  clinics exit the ACN agreement -- that's again the Saint
13  Al's Network -- by July 1, 2013.  Now that didn't happen
14  because this case intervened.  But I asked Steve Drake, the
15  director of payer contracting, "That approval has never been
16  rescinded; has it?"
17      And he said, "No, it has not."
18      Randy Billings again wrote another email, and he was
19  talking about a particular contract with Saltzer.  Then
20  he said that should be reviewed and put into the exit queue
21  just like we are contemplating with Wise, ACN, and even IPN,
22  eventually.
23      Your Honor, this is a critical document because what he
24  is saying is we're going to pull Saltzer and all our other
25  docs from all the competing networks, not just the Al's

68

1   network.  You will hear St. Luke's say that we're
2   complaining just about harm to competitors, just Al's, not
3   competition.  This is everybody.  This is the Wise Network.
4   This is IPN, the broad PPO independent network that serves
5   Aetna and Cigna and United.  They want to pull their doctors
6   from all of them.  That's their plan.  And if they have a
7   critical provider like Saltzer along with all the others,
8   you know, it's going to cripple those networks according to
9   Mr. Billings' own words.
10      Finally, there is a trio of these documents,
11  Your Honor, that we found.  This is Toni Newman who works
12  for Mr. Drake.  Mr. Billings, Mr. Drake under him,
13  Ms. Newman under him.  And she said, "Our intent is not to
14  participate in networks that compete with our own networks.
15  We do not intend to allow clinics we acquire to remain in
16  ACN.  Our direction is for us to eventually terminate all
17  ACN agreements."
18      So the plan is to pull the doctors out of the networks,
19  and, certainly, having Saltzer is going to make that even
20  more significant, even more competitively harmful.
21      Your Honor, a couple comments before I go on to the
22  next slide, and that is, you're going to hear from
23  St. Luke's about SelectHealth.  SelectHealth is a payer from
24  Utah that's come into Idaho working with St. Luke's,
25  competing with other payers.  St. Luke's says that's

69

1  procompetitive.  As far as it goes, that's right,
2  Your Honor.  But, in fact, the SelectHealth story indicates
3  why the Saltzer acquisition is anticompetitive.  Why is
4  that?  Well, SelectHealth is using the BrightPath network,
5  the St. Luke's-based network statewide that hooks into
6  Select Medical.  SelectHealth and Select Medical, Your
7  Honor, by the way, are different entities, just happen to
8  have that "Select" in their name.
9      Saltzer was already in that network before it was
10  acquired.  That network contains lots and lots of
11  independent physicians.  So St. Luke's is able to bring
12  SelectHealth in from Utah and compete to its utmost with
13  other payers without acquiring Saltzer.  It already had
14  Saltzer in the network.
15      So what changes if Saltzer is acquired?  They can then
16  pull Saltzer out of everybody else's network, and what would
17  otherwise be procompetitive behavior, a new payer, will turn
18  into anticompetitive behavior, a payer that is the only one
19  that has access to these key providers.
20      Your Honor, one other point on this network issue that
21  responds to what I think you may hear from St. Luke's.
22  Saint Al's -- there are documents of Saint Alphonsus that
23  discuss the issue of these providers.  And Saint Alphonsus
24  is in a very difficult situation, Your Honor, and that is
25  because if Saint Alphonsus allows all the St. Luke's

70

1  providers in its network, they get to see all its secrets,
2  all its strategies, all its plans.  Nevertheless, it needs
3  those providers.  And as of today, there are 90 St. Luke's
4  providers still in the Saint Alphonsus network.  And that
5  includes Saltzer.  I think what these charts, what these
6  slides show is that as of tomorrow, Your Honor, that's not
7  going to be true if this transaction is allowed to go
8  forward.
9      So, Your Honor, let's look at some of the networks,
10  because St. Luke's argument is in here it doesn't matter,
11  you don't need these providers in, the networks can create
12  financial incentives to get employees to shift away from
13  providers, and, therefore, it doesn't matter how big we get,
14  it's really the payers and employers who have the upper
15  hand.  That's an argument you're going to hear, Your Honor.
16      And I think the evidence shows that's not true.  Blue
17  Cross and Saint Al's has a network called ConnectedCare
18  without St. Luke's.  Still has some of those St. Luke's
19  doctors because they all have not yet been pulled out of
20  ACN, as Your Honor saw.  But, you know, how successful that
21  network has been, Your Honor?  It sold 220 lives.  Not
22  contracts with the employers.  People.  220 lives in Idaho
23  after a year, so -- and that's despite a 10 percent price
24  advantage.  Your Honor will hear about this, I think, from
25  Mr. Crouch, and the fact is that this narrow network is not

71

1  attractive without St. Luke's.
2      Boise schools and Idaho Power developed incentive plans
3  that would divert people from St. Luke's to Saint Al's
4  because Saint Al's offered a lower price.
5      THE COURT:  Just so I'm clear, BCI's
6  ConnectedCare, then, was an attempt to create kind of a
7  network of patients who would be directed to only the
8  participating physicians and care providers, and it did not
9  include St. Luke's.  And after a period of time, it simply
10  did not gain traction despite what you indicated was a
11  10 percent incentive?
12      MR. ETTINGER:  Yes, Your Honor.
13      THE COURT:  All right.
14      MR. ETTINGER:  Boise schools and Idaho Power
15  entered into programs where Saint Al's gave them a price
16  break, and they created incentives for their employees to
17  use Saint Al's, and they both ended the program.  There are
18  a few small employers who are now looking at similar things.
19  It's too early to tell what's going to happen there.  I
20  think there is evidence that they need more providers.
21      Finally, Micron.  I want to spend some time on Micron.
22  Micron is a case where, so far, they have been successful in
23  shifting business, but it's very much in doubt as to today.
24  St. Luke's and Saltzer have done their best to scuttle the
25  Micron network.  And Micron is an extremely unusual case.

72

1  Indeed, Mr. Clement of Regence was asked about Micron, and
2  he said, "I would not compare Micron to a commercial health
3  plan.  What happened with Micron was their industry wasn't
4  healthy, employment had declined precipitously, and the
5  company needed to save money, and employees needed to keep
6  their jobs."
7      So Micron was willing to say to their employees, you
8  know, you're going to pay a big financial penalty if you
9  don't use the providers who are giving us a deal.  Because
10  they were in such tough shape, they were willing to do
11  something that other employers in this area have not been
12  willing to do, to say to people if you want your doctor, if
13  you want your Saltzer doctor, you're going to have to pay
14  more.
15      So let me talk a little more about Micron, because
16  there is a lot to the Micron story, and, first, try to
17  quickly run through a timeline that you'll hear more about,
18  Your Honor.
19      So starting in 2008, Micron faces cuts in the chip
20  business -- which is a difficult, cut-throat, innovative
21  technology worldwide business -- faces price cuts of 50 to
22  65 percent.  This is right out of their 10-K.  They take a
23  $1.6 billion loss.  They announce plans to cut employment
24  worldwide by 15 percent.  They closed, by the way, their
25  Fab 1 plant in Boise, and they announce cost-cutting

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 22 of 57
Bench Trial, 09/23/2013

73

1 initiatives across the board.
2     What they do in healthcare is they hook up with
3 Imagine, a company that has what's called the Wise Network.
4 And the plan is we're going to pick a narrow number of
5 providers, we're going to ask them to give us really good
6 prices in exchange for a volume that will be incentivized
7 because the employees will face a financial penalty if they
8 don't use it. And they say we're going to do it in a tiered
9 fashion, as I mentioned earlier, Your Honor. We're going to
10 have the preferred high performance network, and actually on
11 top of that we're going to have the Micron clinic for people
12 who when they come to work want to go see a primary care
13 doctor on site. But they are going to have the preferred
14 network, the guys who give them the really low price for the
15 preferred position; then the PPO tier, they have financial
16 incentives but still within network; and then those people
17 who are out of network.
18     So Saint Al's and St. Luke's bid. Saint Al's bids once
19 and then sweetens its bid. St. Luke's does not. Saint Al's
20 was chosen.
21     Micron goes to Saltzer, and Saltzer refuses even to
22 bid. Micron still says they need St. Luke's in that
23 second-tier PPO network, and they need to develop a
24 second-tier PPO network for employees who don't like the
25 limited number of providers in the preferred network, and so

74

1 there is a national PPO network named "First Health" who is
2 prepared to do so.
3     St. Luke's on the eve of the program starting sends a
4 termination notice to First Health, and First Health
5 withdraws. And St. Luke's does this in order to cause First
6 Health to withdraw.
7     THE COURT: Now, wait. I'm not sure I understood
8 what First Health was.
9     MR. ETTINGER: First Health, Your Honor, is a
10 national company that has networks kind of like Select or
11 ACN or IPN.
12     THE COURT: And Micron was working with First
13 Health to develop this second-tier network, and St. Luke's
14 withdrew from First Health?
15     MR. ETTINGER: Yes. St. Luke's was already in the
16 general First Health network, which was offered by First
17 Health, a national company to national payers coming into
18 Idaho. St. Luke's had been a long-time participant.
19 St. Luke's sent them a notice of termination with this
20 pending, and First Health withdrew.
21     St. Luke's, internally, decided that if IPN
22 participated in the PPO network, it would terminate IPN.
23 And I am not saying that that's what caused IPN to decline,
24 but the fact is St. Luke's was ready to take the same
25 actions for another network if it did not participate, and

75

1 IPN ended up not participating. So at the last minute, the
2 ACN network was used, which was not Micron's choice, because
3 Micron already had Saint Al's as the preferred network.
4 They wanted somebody else in the PPO network to have more
5 choices. They weren't able to get them, so they went ahead
6 anyhow.
7     And by the way, they then went back to Saltzer, offered
8 Saltzer a better price, and it was better than the Blue
9 Cross price Saltzer was already getting and accepting.
10 Saltzer declined. Saltzer, ultimately, did come into the
11 PPO second tier after it joined the ACN network in 2011, and
12 that's another story I don't want to get into right now,
13 Your Honor, but they did come in. Just for completeness I
14 wanted to say that.
15     So nevertheless, the Micron network goes ahead, and it
16 is successful. It saves Micron $27 million a year,
17 according to Imagine, and it does cause patients to shift
18 away from St. Luke's. And we believe it's because of the
19 unique situation Micron was in. They really needed to cut
20 costs. Their employees really needed their jobs and
21 understood the circumstances. So Micron, uniquely, in this
22 area, has been able to shift patients with financial
23 incentives.
24     But nevertheless, Micron executives were not happy that
25 they didn't have St. Luke's in the network. And they had

76

1 continuing discussions with St. Luke's. Up to this day,
2 those discussions are continuing. And St. Luke's said,
3 however, we will not join your Imagine Wise Network. We
4 don't even want to talk to Imagine or Wise. We will not
5 communicate with them. If you want to throw that out, that
6 low-price, you know, high-volume approach and do something
7 different that doesn't require us to engage in a bidding
8 war, then we're interested. And because St. Luke's is so
9 important and has so many providers, Micron has stayed at
10 the table with them until this day.
11     In 2012, what happened then, Your Honor, is St. Luke's
12 by then had acquired a number of the groups that were
13 participating in the Micron network, and many of these were
14 in the preferred network. They had agreed to pay the very
15 low price to get the preferential treatment. St. Luke's
16 bought them and St. Luke's pulled them out.
17     St. Luke's didn't pull everybody out, and Steve Drake
18 admitted this, Your Honor, and it was because the FTC
19 investigation was pending.
20     Today Micron is seeking alternative bids to replace a
21 program in which they have saved $27 million a year. The
22 reason is they're not happy because they don't have
23 St. Luke's. And after five years, Your Honor, only one
24 other employer -- no Boise area employer has joined the
25 Micron network.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW    Document 548    Filed 11/04/14    Page 23 of 57

77

1    And this is something I need to explain. The whole
2    idea of what Imagine/Wise does is they go into a market,
3    they find a sponsoring employer, they get started, they
4    demonstrate how it works, and then the other employers join.
5    And it becomes even more attractive to providers then
6    because they have got more volume. And that's what they
7    tried to do here. That's worked in a lot of locations
8    around the country.
9    But here, after five years, after a program that saved
10   lots of money, they have been unable to get a single Boise
11   area employer to join. Why is that? Well, Steve Drake,
12   again, Your Honor, said in an email discussing about what
13   St. Luke's was going to do and why they, ultimately, did not
14   participate in the PPO tier, "A very strong response is
15   required to assure that Wise does not try to replicate this
16   effort in conjunction with First Health for other large
17   employers." St. Luke's was worried that price competition
18   was going to spread, and it was determined to stop it,
19   Your Honor.
20   Dr. Page made clear that Saltzer had the same concerns.
21   This was when the second offer was made to Saltzer, the
22   higher one, better than Blue Cross. So he said, "This is a
23   decent fee schedule, but the con is we legitimatize a
24   network and process that may end up setting a bad precedent
25   for this area if it's successful."

78

1    What's the bad precedent? Customers can use their
2    volume, the offer to incentivize employees to shift the
3    volume in order to get low prices. Well, that's
4    competition. And St. Luke's didn't want it, and Saltzer
5    didn't want it.
6    As I mentioned, Your Honor, Steve Drake terminated a
7    number of these groups from the network when they were
8    acquired by St. Luke's, but not all of them, because of the
9    pendency of the FTC investigation. And this is where
10   Mr. Drake admits that fact. So it would be even worse today
11   if we didn't have the FTC as the cop on the beat and
12   Your Honor overseeing it. And our concern is, obviously, if
13   this case ends allowing the acquisition, these things are
14   going to proceed apace.
15   Finally, Your Honor, I asked Mr. Billings about
16   his -- St. Luke's attitude on this, the vice president of
17   payer relations, and I said, "Isn't it true you took the
18   position, from the beginning, and still take the position,
19   that you don't want to engage in a bidding war with Saint
20   Al's?"
21   "That's correct."
22   "And you think that's the right decision even though
23   you don't have the Micron business as of today?"
24   "I don't want to get into a fee-for-service bidding
25   war; that's correct."

79

1    So after five years, after Micron being successful,
2    after the volume shifting, that's not enough to cause
3    St. Luke's to get into that bidding war and vigorously
4    compete.
5    Now, is that because, Your Honor, we think they're bad
6    people? We're not going to argue that. It's because of
7    their dominant market position. This is a St. Luke's
8    document where they talked about in this document, "Should
9    we get involved in what they call a directed traffic
10   environment?" And that's what Micron is. You know, where
11   employers or payers say, you give us a really low price and
12   we'll create incentives for our employees to use you.
13   St. Luke's says, look, we have already got a 65-35 split.
14   Right now we're dominant. We have two-thirds of the
15   business. If we already have two-thirds of the business and
16   we offer a -- and we give a discount to get business
17   directed to us, if all that does is get us two-thirds, we
18   are just breaking even and giving it up on the price. Their
19   logic is impeccable. When you're dominant like them, it
20   doesn't pay to compete on price, because you're already so
21   ahead when you're not competing on price. So that's why
22   St. Luke's wants to stymie these kinds of competitive
23   networks. And the more acquisitions they're allowed to
24   make, the more they're able to stymie them, and the more
25   power they get, the higher share they get, the more

80

1    incentive they have to stymie them. And that illustrates
2    the kinds of anticompetitive effects that are present here,
3    Your Honor.
4    So that's the kinds of things we're going to be showing
5    on network competition being interfered with, Your Honor.
6    Let me talk about steering of patients and foreclosure
7    of competition. And I want to begin here by talking a
8    little bit about Saint Alphonsus Medical Center in Nampa,
9    Your Honor. This is the hospital the evidence will show
10   that was acquired by Saint Al's from the CHI chain when it
11   was called Mercy Medical Center in 2010. The evidence is
12   going to show that hospital was in pretty rough shape at
13   that time. And Saint Al's has spent a lot of money and a
14   lot of effort to not only improve the hospital but to make
15   it more physician friendly, make the operating rooms have
16   quicker turnovers so the doctors could be more efficient and
17   so on. So that hospital has improved significantly, and
18   after dropping for several years, its volumes have increased
19   since Saint Al's acquired it.
20   That hospital has one critical vulnerability,
21   Your Honor. As this Google Earth map shows, Saltzer is
22   right next door on the same campus across kind of a narrow
23   boulevard, in fact in the same parking lot as the hospital
24   is. It has had a very, very close relationship with Saltzer
25   in terms of geography, and it critically depends on Saltzer.

**Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.**                Bench trial, 09/23/2013

---

81

1  So the issue is, for Saint Alphonsus Nampa, when
2  St. Luke's acquires Saltzer -- the evidence is overwhelming,
3  and I'm going to go through some of it, Your Honor -- that
4  Saltzer doctors will not be sending the cases they have been
5  sending to Saint Alphonsus Nampa, and that hospital will be
6  tremendously harmed by it.
7      And right now, our economists, Dr. Haas-Wilson, did an
8  analysis, and she found that 47 percent of the inpatient
9  admissions at Saint Alphonsus Nampa are of patients who have
10 a Saltzer primary care physician. 47 percent. And,
11 Your Honor, recognizing -- I'm sure that, you know, the
12 marginal case is always more important because you have got
13 to cover your fixed costs, and more of the business goes to
14 the bottom line -- and we'll spend more time on that in the
15 trial. You know, if half your business is in jeopardy or
16 even a decent fraction of that, that can be a terrible
17 financial body blow to any institution and a terrible blow
18 to competition, as I'll explain.
19     So on this issue of steering referrals of the business
20 shifting if Saltzer is acquired, Your Honor, we have what I
21 could call -- stretching the metaphor a bit -- what might be
22 a 12-legged stool. We have documents and testimony from
23 payers, from St. Luke's executives, from Saltzer personnel,
24 and our economist has done analyses of the data in about
25 eight different ways, looking at payer data, looking at

---

82

1  inpatient, outpatient, ancillary services, cases where the
2  patient was referred by the Saint Alphonsus Medical Group,
3  cases where they weren't, looking in Boise, looking in
4  Nampa, looking for primary care and for specialists.
5      Your Honor, this is what I, somewhat facetiously,
6  called "the dog ate my homework" defense the other day when
7  we were talking about the relevance of the acquisition of
8  other practices. St. Luke's has offered a series of
9  explanations for a variety of these pieces of evidence and a
10 whole bunch of different ones. In every case it all just
11 happens that these other alleged explanations happened at
12 the time of acquisition. And at the time of acquisition,
13 the business shifted. And our point is, well, maybe these
14 explanations might be valid in one case, maybe two cases.
15 But when you have got case after case under
16 different circumstances and a wide variety of sources of
17 evidence, it is impossible to explain in any other way
18 except that the business is going to shift and competition
19 for that business is going to be foreclosed.
20     So let me start with the evidence. First, Dr. Pate
21 says -- this is uncontroversial -- you know, patients are
22 very influenced by what the physician tells them. Not all
23 patients, but most patients are going to go where the
24 physician recommends. So if the physician's decision has
25 been changed, then the patient behavior is going to change.

---

83

1      The first evidence I want to go to is very specific on
2  the Saltzer transaction. Mr. Reiboldt, again, Saltzer's own
3  consultant -- and the context here, Your Honor, is that
4  St. Luke's has publicly said that it is planning a new
5  hospital in Nampa, though I don't believe it, as I
6  understand it, has made the final, final decision. I think
7  the testimony shows management has decided it will recommend
8  it. And that was a heavy discussion with Saltzer. And
9  St. Luke's said to Saltzer: Once the new hospital is up, we
10 expect your volume at the new hospital. And Mr. Reiboldt
11 said, yes, that's where you're going to be expected to work
12 if you're acquired.
13     Again, once they are aligned fully with St. Luke's,
14 there was the expectation that their business would largely
15 go to St. Luke's. Mr. Reiboldt was quite frank about that.
16     The St. Luke's executives, basically, said the same
17 thing. Mr. Taylor, the CFO agreed. That it is the
18 intention of St. Luke's management to build a hospital in
19 Nampa and staff it with Saltzer physicians.
20     Your Honor, I might add this is a little bit like the
21 SelectHealth example. Is there anything anticompetitive
22 about building a new hospital? In isolation, no. But if
23 the building of that hospital is premised on acquiring the
24 dominant physician group, controlling its referrals and
25 shifting them to the new hospital, that's another story, and

---

84

1  that's the concern here.
2      THE COURT: This is just kind of a, I guess,
3  fundamental question, but I'm assuming there is nothing in
4  the contract with Saltzer that would require referrals
5  to -- by the participating physicians, the members of the
6  practice, to St. Luke's facilities. Is it possible to
7  create a circumstance or situation where the acquisition
8  could go forward but there could be some limitations or
9  contractual agreements even to allocate referrals, or does
10 that interfere, then, with the doctor's role? And, in fact,
11 why is it the doctors automatically refer or would refer
12 within St. Luke's? There's a lot of questions in there, but
13 I'm trying to kind of understand the dynamic of that.
14     MR. ETTINGER: Let me address each of them,
15 Your Honor. First of all, I think there are lots of reasons
16 why this happens, though it is not expressly spelled out in
17 the contract.
18     THE COURT: Right.
19     MR. ETTINGER: Number one, you are going to see
20 evidence -- in just a minute I'm going to show you --
21     THE COURT: Let me ask one question: Is there
22 profitability? I mean, do the doctors participate in the
23 profitability? Of course, St. Luke's is a nonprofit. But
24 is there some financial incentive for a doctor to use the
25 St. Luke's facility that's more subtle than contractual

---

85

1  obligation to do so?
2         MR. ETTINGER: Yes, Your Honor. Subtle is an
3  important word here. The contract does not pay them
4  directly for any referrals. However, St. Luke's set their
5  compensation based on formulas that considered not just the
6  actual work they do, the professional fees, but the
7  ancillary services they bring to the hospital, lab and
8  imaging dollars, and so on. And they are under five-year
9  contracts.
10        So at the end of the contract -- there is testimony on
11 this -- if you're a doctor employed by St. Luke's or you're
12 under a professional services agreement with St. Luke's, you
13 know very well that if you're not going to be a team player
14 after five years, they may say we don't want you anymore or
15 we don't want to pay you the same amount anymore.
16        So while it is not expressly spelled out in the
17 contract that any dollar payment is contingent on doing
18 these things, the doctors understand the realities, and
19 that's why they behave the way we have seen them behave
20 again and again and again.
21        It's also true that the computer system, the electronic
22 medical record creates default options. I'm going to get to
23 those slides in a second. So unless you go to the trouble
24 of going elsewhere, you are going to go to St. Luke's.
25        Finally, Your Honor, when you're working with somebody

86

1  and you're there every day -- and by the way, when your
2  staff is directly employed by St. Luke's and the staff has a
3  lot of role in where referrals are going to, especially for
4  things like lab and imaging, you're going to be a team
5  player, and you're going to go along with what the team
6  wants. I don't think there is any doubt of that. That's
7  what the behavior shows.
8         So, Your Honor, I think there is no way that a court
9  order could regulate this. First of all, you know, the
10 doctors would say -- and I think this argument was made by
11 St. Luke's back in December -- well, we should have a right
12 to make decisions based on medical necessity. And in some
13 particular case, the doctor might argue that it's medically
14 necessary because one hospital is superior to the other.
15 But how do you decide whether it's necessary in this case or
16 that case? If suddenly in 80 percent of the cases they have
17 made that judgment, is Your Honor going to decide whether
18 that's a medical judgment or subterfuge? I don't think so.
19        The other problem, of course, is, Your Honor, that even
20 if there were a mechanism, it doesn't address any of the
21 horizontal issues that, of course, the government has raised
22 in its case, and it doesn't address any of the network
23 issues. You know, I think it's an inadequate solution to a
24 small part of the problem, frankly, Your Honor.
25        So let me just go on with this evidence. I don't want

87

1  to spend too much time on it. Mr. Roth, the CEO of
2  St. Luke's Treasure Valley, said the same thing. They need
3  the full support of Saltzer. Dr. Djernes of Saltzer in an
4  email said St. Luke's, quote, declined to allow us autonomy
5  in patient referral matters, close quote.
6         As I said, Your Honor, it's not in the contract, but
7  that was the understanding of this member of the Saltzer
8  executive committee. Declined to allow us autonomy in
9  patient referral matters. That's what he said.
10        Nancy Powell, as Mr. Greene mentioned, was CFO of
11 Saltzer. She is today, by the way, chief administrative
12 officer of the Saint Alphonsus Medical Group. She left
13 Saltzer on Halloween day, as I recall her telling me in
14 2011, but she was at Saltzer for much of the discussions
15 here and had been their CFO for 13 years. And this gets at
16 another aspect of this control.
17        The surgeons in Saltzer had part-time -- had an
18 ownership interest in Treasure Valley Hospital and did a lot
19 of cases there because they believed it provided better
20 quality, lower-priced care. And they wanted to keep doing
21 that. So first St. Luke's said, no, you can't do that. We
22 want you to divest and quit using that hospital because we
23 need your full support for the new hospital in Nampa. And
24 then, eventually, St. Luke's abandoned that, by the way,
25 after Saltzer, initially, voted not to do a deal with

88

1  St. Luke's.
2         And St. Luke's then started working, through their
3  consultant Peter LaFleur -- and this is what Ms. Powell
4  is referring to here -- on an account model that would provide
5  additional compensation for exclusivity. And she explained
6  exactly what was meant by that: working out of St. Luke's
7  facilities only. So they said to the surgeons: If you
8  agree -- we're not going to make you give up your interest
9  in Treasure Valley, but if you agree to work out of our
10 facilities only, we'll pay you more. That's what
11 Mr. LaFleur was working on.
12        Well, the surgeon said, no, we want to use Treasure
13 Valley, as well, not exclusively but as well. And
14 Mr. Reiboldt, the consultant, said St. Luke's refused to
15 provide them with as much compensation as the other doctors
16 got because they knew that these surgeons would continue to
17 do a significant portion of their surgeries at TVH. If
18 you're going to use a competitor, as well, we're not going
19 to pay you as much.
20        And the difference was stark. The evidence shows,
21 Your Honor, that the primary care docs in Saltzer got 30 to
22 40 percent increases, I think some greater than that. The
23 surgeons were offered 5 percent increases. And St. Luke's
24 own consultant said that was under market. And the
25 surgeons, not surprisingly, because of this and other

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 26 of 57

Bench trial, 09/23/2013

89

1 reasons, said we don't want to be part of this deal, and a
2 number of them are now working for Saint Alphonsus because
3 they didn't want to be forced to give up their interest in
4 TVH and give up using TVH.
5      So just some of the other evidence of this issue,
6 Mr. Orr, the former director of physician services, spoke of
7 St. Luke's historical willingness to preferentially direct
8 patients to St. Luke's affiliated practices.
9      Under the Epic system, Your Honor, all referrals auto
10 default to internal referral type, the point I was making.
11 The medical record system effectively directs the referrals.
12     Your Honor, one other form of evidence on this.  This
13 is an example Mr. Fletcher, the COO of St. Luke's, presented
14 to the board -- I think it was the Treasure Valley board in
15 this case -- the acquisition of three groups:  the
16 Cardiovascular and Chest Surgical Associates, Boise
17 Orthopedics, and Women's Clinic.  And in his write-up in
18 telling the board what it wanted to know as to whether or
19 not to approve the deal, he said it was expected these
20 groups would be exclusive to St. Luke's.  And I asked him,
21 "What does that mean?"
22     And he said, "It was expected," quote, they would end
23 up doing most of their work at St. Luke's, close quote.  So
24 when St. Luke's buys these groups, it expects to get their
25 business.

90

1      We have testimony from lots of doctors on this.  Just
2 one example:  Dr. Barresi testified he had done most of his
3 cases at Saint Al's until his group, Boise Surgical, was
4 acquired.  The group then gave up their privileges at
5 Saint Al's and stopped doing surgeries at Saint Al's.
6      Your Honor, at least in the perception of some
7 St. Luke's executives, Dr. Bathina, who is the president of
8 St. Luke's Idaho Cardiology Associates, this is so strong
9 that he felt that he would have to refer to a pulmonologist
10 from Saltzer after the acquisition, "when we are fully aware
11 that they offer a far inferior product," close quote.
12     So it was the perception of this president of one of
13 the St. Luke's groups that referrals were controlled tightly
14 enough that they had to refer to somebody they thought was
15 lower quality.  And if that happens, certainly, competition
16 is foreclosed.
17     Your Honor, this was enough of a concern to St. Luke's
18 that it tried to cover up the evidence.  Kathy Moore is the
19 COO of St. Luke's Treasure Valley.  The proposal for the
20 Boise Surgical Group, Dr. Barresi's group, said in the
21 proposal as written that surgical volume is currently
22 divided between St. Luke's and Saint Alphonsus.  It's
23 anticipated that the surgical volume will migrate to
24 St. Luke's over time.  Ms. Moore in an email crossed out
25 that language and said, "See deleted portion.  We can talk

91

1 to this, but I don't think we want it in the document."
2      Now, Ms. Moore in her deposition, said:  Well, I didn't
3 want it in the document because it wasn't true.  Well, then,
4 why is it okay to talk about it?  Clearly, her desire was
5 not to create a paper record of what they're doing.
6      So, Your Honor, there is also the data.  You saw what
7 Dr. Haas-Wilson came up with in December.  Since then she
8 has been able to look at far more data.  Payer data as well
9 as Saint Al's data, outpatient as well as inpatient.  The
10 pattern's very clear:  After the groups are acquired, there
11 is a big shift from Saint Al's to St. Luke's.  This shows
12 the same thing on the outpatient side.
13     Your Honor, you may remember a chart like this in
14 December.  This is updated with the new data, and it shows
15 after the acquisitions the amount of this business that goes
16 to -- that goes to Saint Al's drops precipitously and
17 quickly.  These are cross groups:  primary care and
18 specialty.
19     So, Your Honor, as I said, the 12-legged stool, there
20 is a huge amount of evidence supporting this conclusion
21 about referrals.  There can't be any serious doubt about it.
22     Finally, though, Your Honor --
23          THE COURT:  That last slide, I assume that will be
24 shown as part of the evidence, as well?
25          MR. ETTINGER:  Yes, Your Honor.

92

1          THE COURT:  Okay.  Go ahead.  I was going to try
2 to -- go ahead.
3          MR. ETTINGER:  Okay.  Your Honor, the final piece
4 of this is pretty intriguing.  So, Your Honor, of course,
5 said in deciding not to grant a preliminary injunction and
6 to allow this deal to go forward, that you assumed,
7 paraphrasing, that things weren't going to change until
8 trial.  And indeed Saltzer agreed to provide the attorney
9 general with survey results of what was happening.  But the
10 survey results show that even though, presumably, the
11 Saltzer doctors have been told, you know, we're supposed to
12 maintain the status quo, some of them, now that they are in
13 the new team, or their nurses, now they're employed by
14 St. Luke's, nevertheless started the shift.  Because what we
15 see here is that far fewer patients who prefer Saint Al's
16 are referred to Saint Al's, and significantly more patients
17 who are -- who are preferred -- who prefer St. Luke's are
18 referred to St. Luke's, that the referrals are tilted
19 towards St. Luke's as compared to their patient preferences.
20     And if they're doing it -- this is not the kind of
21 thing we have seen in the other charts when they actually
22 acquire the earlier groups where everything switches, but
23 this is while the cop on the beat is paying attention and
24 getting reports.  And nevertheless, the shifting is already
25 occurring, so what it says is:  How bad is it going to be if

93

1 this transaction is approved?
2     Your Honor, let me go on to harm to competition, but
3 one thing I want to say about what St. Luke's may talk about
4 here is St. Luke's may say:  Saint Al's doctors do the same
5 thing.  A couple of quick points on that.
6     Number one, I don't think it's true, but more
7 importantly I don't think it matters.  Shifting referrals is
8 not a, per se, violation of the antitrust laws.  The
9 question is:  Will it harm competition?  And Saint Al's
10 hasn't bought Saltzer.  Saint Al's hasn't bought 20 other
11 plus groups.  Saint Al's is not dominant in these markets.
12     And what Your Honor is required to do under the
13 antitrust laws is to look at the effect on competition.  And
14 all the vertical merger cases look at it that way.  They do
15 not simply say it's either always okay or always not.  And
16 here we think the harm to competition is compelling,
17 Your Honor.  Let me go through why.
18     First of all, as I said, St. Luke's has a dominant
19 share in these hospital and facility markets already.
20 59.4 percent in inpatient.  That is within shouting distance
21 of a monopoly, Your Honor.  And in inpatient it really only
22 has two rivals, Saint Al's and West Valley, but West Valley
23 is off in Caldwell, and, virtually, all of its business is
24 in Caldwell.  So for the bulk of the Ada/Canyon County
25 market, it has one rival.

94

1     The reason why that's important, Your Honor, is that,
2 typically, there is a significant distinction between harm
3 to a competitor and harm to competition.  Not true here.
4 Here where the only way to preserve choice, the only way to
5 preserve some competition is to make sure you have at least
6 some vigorous rivals, when those rivals are hurt badly,
7 competition is hurt badly.
8     Same thing, Your Honor, in the surgical facility
9 markets.  St. Luke's is dominant, and, essentially, its only
10 competitors here, outpatient surgery, are Saint Alphonsus
11 and Treasure Valley.  So St. Luke's is very strong, and if
12 it is allowed to make more acquisitions and get stronger
13 that way, it's going to create an even greater problem.
14     By the way, there is a reason -- another reason why
15 St. Luke's is so strong in the surgical facility markets,
16 Your Honor, and that is it already bought up others of the
17 competition.  In the same period when it was buying up all
18 these physician groups, it bought up two independent
19 surgical facilities, the so-called River Street practice and
20 another one, as well, Your Honor, where I think it was
21 called Orthopaedic Associates.  I may be remembering that
22 wrong.  They were groups associated with the orthopedic
23 surgery groups that St. Luke's bought, facilities.  So there
24 used to be more competition in outpatient surgery.  There is
25 only two rivals now because St. Luke's bought up the others

95

1 and thereby increased its share.  So it's achieved dominance
2 by other acquisitions.  And now this acquisition, by
3 changing primary care referrals to surgery facilities, will
4 increase that dominance further.
5     Your Honor, one other difference, and Mr. Powers is
6 going to address this, is that Treasure Valley is uniquely a
7 low-cost, high-quality facility.  It provides something
8 different in the market.  And so harm to it and even
9 restrictions on its ability to grow are anticompetitive
10 because they take away a key choice.
11     Your Honor, just to illustrate the importance of
12 Saltzer in all this, I mentioned the 47 percent that Saltzer
13 patients represent to Saint Al's Nampa.  But when you look
14 at the surgical facility markets, you see the same critical
15 factor in terms of the Saltzer patients.  The referrals from
16 Saltzer, going back to Dr. Page's explanation at the very
17 beginning of my presentation, starts with the primary care
18 doctor, ends up at the facility.  And so Saltzer has a
19 substantially important role and can substantially shift
20 this marketplace towards even more dominance by St. Luke's.
21     Here, looking at general outpatient surgical
22 facilities, same thing as the last slide, except here it's
23 really important, Saltzer is, to Treasure Valley, not as
24 important to Saint Alphonsus, but critical overall for those
25 very few rivals left in the market after St. Luke's has

96

1 already bought the rest of the competition.
2     Excuse me, Your Honor.  The next slide, I almost missed
3 it.  The next slide is the one I'm going to need you to
4 blank out.
5     THE COURT:  I'm sorry?
6     MR. ETTINGER:  The next slide is the one I'm going
7 to need you to blank out.  It's the Saint Al's --
8     THE COURT:  Okay.
9     MR. ETTINGER:  So, Your Honor, another piece of
10 evidence you're going to see is Saint Al's projections as to
11 what's going to happen to Saint Alphonsus Nampa if it loses
12 the Saltzer business.  And a large part of this will happen
13 even if it loses only part of the Saltzer business.  The
14 hospital is going to go into the red, and to maintain even a
15 minimal margin, there are going to be very substantial
16 effects on the hospital's operation.  That's going to hurt
17 overall competition.  It's going to hurt the people of
18 Nampa.  It's going to have a significant effect on the
19 public, Your Honor.
20     Your Honor, I'm going on to another slide, and the rest
21 of them can be seen by this audience.
22     So St. Luke's may argue, Your Honor, well, this is
23 about Nampa, the hospital market, the facilities markets are
24 Nampa, are Canyon and Ada, so why is that important?  Well,
25 it's important for all the reasons I have just shown,

97

1  St. Luke's dominance and TVH's low price and high quality.
2  But it's also important because everybody recognizes that
3  Saltzer, because of its size and its strength, is really
4  important market-wide. Dr. Page says, "St. Luke's is
5  offering a wonderful opportunity to control and codevelop
6  services in Canyon County, because of its importance."
7        John Kee of St. Luke's said that "It would be very
8  challenging to enter into risk contracting without a
9  foundational group like Saltzer," close quote.
10       Well, Your Honor, this is a very interesting statement
11 when you unpack it. Risk contracting is what all the
12 providers in the market are moving towards, not uniquely
13 St. Luke's. Saint Al's is doing the same thing, as
14 Mr. Greene mentioned. People all around the country are
15 doing this.
16       Now, if Saltzer were to be like Primary Health, another
17 large group, independent, Primary Health deals with
18 everybody's networks. They are like Switzerland. And it's
19 to their benefit and it's to the benefit of the public, if
20 you've got a Primary Health doctor, you can join any network
21 and you're going to have them. And if you're Primary
22 Health, if you're in all the networks, you get more
23 business. That allows the networks to freely compete. But
24 if Saltzer is acquired by St. Luke's and pulled out of
25 everybody else's network, how are they going to do risk

98

1  contracting? According to Mr. Kee, it would be very
2  challenging. According to Mr. Billings, as we saw, it would
3  be crippling. So the point is these networks are competing
4  across the market, and Saltzer is very important to them,
5  according to everybody's testimony.
6        Your Honor, before I go on to this, one other thing I
7  want to add and that is the harm to Saint Alphonsus Nampa
8  here cannot be remedied by entry. And you asked Mr. Greene
9  some questions about entry. And entry is often talked about
10 as entry or expansion of smaller competitors. So one
11 question certainly we're addressing is: Could Saint
12 Alphonsus Medical Group expand and become more of a
13 competitor through entry there? I think it would -- I think
14 even if the answer were yes, the FTC would say that's not
15 enough competition in that market; but, in fact, the answer
16 is no.
17       The testimony will show Saint Alphonsus Medical Group
18 has tried to recruit pediatricians in Nampa for some years.
19 It's gone zero, zero, zero. It's tried to recruit general
20 internists in Nampa for some years. It's gone zero, zero,
21 zero. Why are those two primary care specialties
22 particularly important, Your Honor? Because Saltzer has got
23 all but one pediatrician in Nampa and all but one general
24 internist. And there are a lot of people who want these
25 kinds of doctors.

99

1        In family practice, the third --
2        THE COURT: Let me ask a question. Was the reason
3  Saint Al's failed in trying to recruit primary physicians is
4  competition with Saltzer?
5        MR. ETTINGER: I think, Your Honor, there is a
6  number of reasons you will hear about. Let me summarize
7  them briefly. One is, you know, if doctors are interested
8  in coming to this part of the country, a lot of them prefer
9  Boise to Nampa. And it is more difficult to convince
10 doctors who may have a lot of opportunities to come to
11 Nampa.
12       Number two, there is kind of a chicken-and-egg problem,
13 and particularly with pediatrics. You can't just recruit
14 one guy, because then he is on call all the time. I don't
15 know if Your Honor is familiar with that. But, you know,
16 "call" among other things, means when the patient calls in
17 the middle of the night and needs somebody, you don't want
18 to be the only guy who gets called every night. So you need
19 partners. So you have got to recruit more than one, really
20 four, to make it attractive to what opportunities are
21 available else where.
22       Number three, in internal medicine, Your Honor,
23 everybody acknowledges it's very, very difficult today --
24 didn't used to be true -- very, very difficult today to
25 recruit general internists anywhere. And the reason is

100

1  because they have other things they do. Lots of them become
2  hospitalists, where they work full-time in the hospital.
3  Almost all hospitalists are general internists, and all
4  hospitals today, just about, have hospitalists, people who
5  guide your care in the hospital as a full-time job.
6        So most internists go towards that or they go on to
7  subspecialize in cardiology or pulmonary or some other
8  field. There is a very small number of graduates in
9  America -- I have heard the number 200, Your Honor -- who
10 graduate every year and go into general internal medicine in
11 an office-based practice. So it's very hard to find those
12 guys anywhere today.
13       But it's also true, Your Honor, that Saltzer is the
14 popular group, the group with the strong reputation, and so
15 it's harder to compete against that. And that in particular
16 affects the third category, Your Honor: family practice.
17 Saint Al's Medical Group has recruited a few family practice
18 doctors. They had to replace what Mr. Greene referred to as
19 the Mercy Physician Group, when those doctors went to
20 St. Luke's, seven doctors, and they replaced a few of them.
21 But the doctors they brought in are working at about half
22 speed. They can't get enough business.
23       The reason is the testimony will show, Nancy Powell
24 will testify, is that they are, you know, up against
25 Saltzer. And that's where people want to go. Saltzer has

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW    Document 549    Filed 11/04/14    Page 29 of 57

101

1  a -- doesn't have that problem, you know, because Saltzer
2  gets calls every day from new patients who have heard of
3  Saltzer, their friends use Saltzer, their families use
4  Saltzer, they want a Saltzer doctor, all the Saltzer doctors
5  are full, so they send them to the new guy they just
6  recruited.
7      So at Saltzer they can ramp up in a much shorter period
8  of time than at SAMG.  SAMG has a real problem getting these
9  people busy.  Of course, if you recruit them and you're not
10 busy, you're not competing.  So it doesn't solve the
11 problem.  So that's a quick nutshell on the entry expansion
12 issue, Your Honor.
13     So just to try to finish up, Your Honor, again, as I
14 said at the beginning, you have got to look at this in the
15 context of all these acquisitions and also, Your Honor, in
16 terms of the acquisitions to come.
17     Joni Stright is the, I believe, director of physician
18 services.  She reports to Mr. Kee at St. Luke's.  And she
19 explained that there were several transactions that were in
20 place, and they were put on hold pending the FTC
21 investigation and this litigation.  And I asked Ms. Stright,
22 "Are you pursuing other deals?"
23     "No."
24     "Because of the litigation?"
25     "Yes."

102

1      So, Your Honor, there haven't been any new deals since
2  this all happened.  And so it's about Saltzer, but it's
3  about more than Saltzer, because St. Luke's is ready to
4  continue on the acquisition trail if there is a conclusion
5  that they can lawfully do so.  And it's going to get worse
6  in these hospital and surgery facility markets.  And it's
7  going to get even worse because it's going to be a domino
8  effect, Your Honor.
9      The problem is, especially for primary care, is that if
10 St. Luke's keeps recruiting all the primary care doctors,
11 the specialists in this market understand that, Your Honor.
12 They say, if all my referral sources are owned by
13 St. Luke's, I better join the team or I'm not going to get
14 referrals.  So it creates a domino effect, and more and more
15 acquisitions occur.
16     And Dr. Barresi, for example, was asked -- you know,
17 his Boise Surgical Group was acquired -- "Was the group also
18 aware of St. Luke's recent acquisitions of other physician
19 practices:
20     "Yes."
21     "Was that a consideration?"
22     And he said, "Sure.  It stands to reason that if we're
23 part of a network, that would facilitate communication and
24 referrals."
25     So the specialists understand this, and it's going to

103

1  drive other specialists to be acquired and create more
2  problems in these hospital markets.
3      Dr. Pate wrote an article.  He said the same thing.
4  Dr. Pate said in this article, "When a specialist
5  experiences a number of his or her referring physicians
6  being hired by a hospital, this creates pressure for the
7  specialist to consider employment with the hospital to
8  preserve the referral base."
9      And so that's exactly what we're talking about, what
10 Dr. Barresi was talking about.  If St. Luke's can keep
11 acquiring the primary care doctors, Saltzer most notably,
12 that puts pressure on the specialists to be acquired and
13 creates even more dominance.  How far is it going to go?
14 Well, Your Honor, this is an intriguing document,
15 interesting question.
16     Dr. Swanson, the VP of clinical integration, wrote a
17 document which refers to scenario planning and talks about
18 the monopoly model.  He sent this document twice, because,
19 apparently, there was a some snafu, to Mr. Billings, the
20 vice president of payer and provider relations.  So he
21 apparently wrote it.  Mr. Billings apparently got it.  We
22 asked each of them in their depositions, "What is this?"
23     "I can't remember."
24     "Why did you send it?"
25     "I can't remember."

104

1      "Did you discuss it?"
2      "I can't remember."
3      Mysteriously, neither of these people have the
4  slightest recollection of why they were talking about a
5  monopoly scenario, but, Your Honor, we think we understand
6  why.  And we think the evidence shows that that's where
7  we're headed.  The antitrust laws don't require that we
8  prove anything like that.  But the facts show, Your Honor,
9  that's where we're, ultimately, headed in these hospital
10 markets and other markets if this transaction is not
11 stopped.
12     Thank you, Your Honor.
13     THE COURT:  Thank you.
14     Mr. Powers.
15     MR. DeLANGE:  Your Honor, should we open the
16 courtroom?
17     THE COURT:  Mr. Powers, I assume you don't have
18 anything.
19     MR. POWERS:  I don't have anything to --
20     THE COURT:  I mean, I shouldn't say that.  I
21 assume you have something.
22     MR. POWERS:  I don't have anything I believe
23 cannot be heard by the public.
24     THE COURT:  Thank you.  To avoid disruption, I
25 guess we can wait just a moment to allow whoever wants to

## 105

1  come back in to reenter the courtroom.
2  ****** COURTROOM REOPENED TO THE PUBLIC ******
3  THE COURT: Mr. Powers, go ahead and proceed.
4  MR. POWERS: Thank you, Your Honor.
5  Your Honor, as you know, I represent Treasure Valley
6  Hospital. And there is no competitor, in my view, that is
7  more vulnerable to St. Luke's market power, as you've heard
8  it expressed here today, and will in trial, than Treasure
9  Valley Hospital.
10  Treasure Valley Hospital is owned, in part, by
11  independent specialist physicians in the Treasure Valley.
12  They're physicians who have had privileges at St. Luke's,
13  Saint Al's, as well as Treasure Valley Hospital. Some of
14  them have privileges at other institutions in the valley.
15  They are physicians who are independent, value independence,
16  and have actually done well in the marketplace as
17  independent physicians.
18  Treasure Valley Hospital was founded in 1995. It's a
19  relatively small outpatient surgical facility that has four
20  operating suites. It has ten beds. It focuses on
21  outpatient surgery.
22  You'll find from the evidence, Your Honor, that
23  Saltzer's surgeons -- and we'll refer to them as "Saltzer
24  surgeons," and these are, essentially, surgeons who were
25  part of the Saltzer Medical Group for many years in many

## 106

1  cases -- Saltzer surgeons, who were used to practicing as a
2  group with Saltzer PCPs and other Saltzer specialists, also
3  had an ownership interest in Treasure Valley Hospital. They
4  were, in fact, key surgeons at Treasure Valley Hospital and
5  did a significant percentage of surgeries at Treasure Valley
6  Hospital.
7  Treasure Valley Hospital, the market for Treasure
8  Valley Hospital that we're examining here in this case is
9  the market for outpatient general and ortho/neurosurgery.
10  You will find that these Saltzer surgeons contributed to the
11  TVH production when it comes to general and orthopedic and
12  neurosurgery. Treasure Valley Hospital, as Mr. Ettinger
13  pointed out to the court in his presentation, is one of the
14  few independent surgery centers in the market and the only
15  one with a market share greater than 20 percent.
16  Interestingly, the evidence will show that at Treasure
17  Valley Hospital, there is both physician and a high level of
18  patient satisfaction. The patients like the convenience and
19  service that are provided, the patients like the level of
20  attention from the staff, and the patients like the quality
21  of care.
22  At the same time, you'll find from the evidence that
23  physicians prefer Treasure Valley for certain outpatient
24  surgical procedures. They prefer it because they have more
25  control over the quality of care and service that's provided

## 107

1  to their patients, they appreciate the experienced staff of
2  nursing and surgical assistants, and they perform surgery in
3  a more efficient setting. But most of all, what surgeons at
4  Treasure Valley Hospital like best about Treasure Valley
5  Hospital is they're able to offer lower-cost, high-quality
6  alternatives for care to their patients. That's what they
7  value the most.
8  Treasure Valley Hospital is known as a high-quality,
9  low-cost competitor. You have heard that a few times. You
10  heard that back in November. You will find from the
11  evidence that TVH is ranked first in the Treasure Valley in
12  many measures of quality and service, even on par with the
13  larger hospitals. Treasure Valley has been recognized
14  nationally for providing quality of care at a low cost.
15  Treasure Valley is a valuable alternative for consumers in
16  the market providing that low-cost, high-quality service.
17  You will hear evidence that when you compare the cost
18  or the average insurance payments, rather, for certain
19  services at Treasure Valley to St. Luke's, you see large
20  discrepancies in the costs involved. And you see on this
21  chart that we have outlined MRI costs, CT scan costs,
22  colonoscopies, and hernia repairs. The difference in cost
23  is real at Treasure Valley Hospital when it comes to a
24  comparison with St. Luke's.
25  But the best evidence you're going to hear, Your Honor,

## 108

1  of the low cost and the quality at Treasure Valley Hospital
2  is going to be evidence from Nancy Powell, who when she was
3  the administrator at Saltzer, before this acquisition, sent
4  a memo approved by administration at Saltzer that encouraged
5  all Saltzer employees who are contemplating any sort of
6  outpatient surgery that if it was possible to have their
7  surgery at Treasure Valley Hospital, Saltzer would prefer
8  that those employees of Saltzer choose Treasure Valley
9  Hospital for cost savings, cost savings through their
10  insurance program. To me, that's the most compelling
11  evidence about the value of Treasure Valley Hospital in this
12  marketplace for outpatient surgery.
13  Treasure Valley Hospital is a competitive constraint to
14  St. Luke's. It's, historically, been a competitive
15  constraint to St. Luke's. And there will be testimony that
16  St. Luke's recognizes that independent surgical facilities,
17  such as TVH, are substantially less expensive and that
18  St. Luke's realizes it needs to reduce its outpatient
19  surgical rates to meet that competition. So Treasure Valley
20  Hospital does affect the manner in which St. Luke's prices
21  its services.
22  St. Luke's -- as you've heard in both Mr. Ettinger's
23  presentation and in Mr. Greene's presentation -- St. Luke's
24  response to competition has been, rather than competing, to
25  do a number of things, to use a number of strategies. They

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

109

1 either acquire the competitor, and we have evidence of
2 acquiring of River Street Surgery Center and the acquiring
3 of Boise Orthopedic Clinic, and/or they offer employment to
4 high-producing, independent physicians, and/or they acquire
5 practices. That's been their strategy rather than to
6 compete.
7       And at Treasure Valley Hospital, Treasure Valley
8 Hospital experienced just that, just the downside of that
9 strategy with respect to St. Luke's purchase of Boise
10 Orthopedic Clinic back in June of 2010. Prior to that
11 acquisition, 2008, 2009, surgeons who were also part of
12 Boise Orthopedic Clinic had ownership interest in Treasure
13 Valley Hospital. They also -- they also provided surgical
14 services and took some of their patients to Treasure Valley
15 Hospital. In 2008, for instance, the Boise surgical cases
16 at Treasure Valley totaled 443. In 2009, 490. Lo and
17 behold, in 2010, on the eve of the acquisition of Boise
18 Orthopedic by St. Luke's, those numbers dropped to 60. And
19 once the acquisition was complete, there were no orthopedic
20 surgeons performing cases at Treasure Valley Hospital. That
21 was an experience, an example that Treasure Valley Hospital
22 had with respect to this acquisition.
23       And it's what I mean when I say they are the most
24 vulnerable competitor in this marketplace. They, literally,
25 had 10 percent of their surgical volume removed via as a

110

1 result of this acquisition. So Treasure Valley Hospital has
2 experienced this before, they have seen what happens to
3 their organization when these acquisitions occur, and that's
4 why they are parties to this litigation and the Saltzer
5 litigation.
6       So the strategies in play with respect to the Saltzer
7 deal, as Mr. Ettinger pointed out, were consistent with
8 other strategies that St. Luke's has used. They acquire,
9 they foreclose competition, they demand exclusivity, and
10 they steer referrals. And as Mr. Ettinger told you, the
11 negotiations with Saltzer involve, to some extent, direct
12 negotiations with Saltzer surgeons. And in negotiating with
13 the Saltzer surgeons at first, St. Luke's indicated that
14 they had to divest of their interest in Treasure Valley
15 Hospital, otherwise a deal would not be possible.
16 Interestingly, a vote of all of the physicians at Saltzer
17 rejected that idea, so St. Luke's circled back and suggested
18 to the Saltzer surgeons that if they held on to their TVH
19 interest, they would be penalized via reduced compensation,
20 but, more importantly to these surgeons, as you will hear
21 from the evidence, they would not be allowed to participate
22 in decision-making or participation in the leadership of the
23 organization if they held on to their interest at Treasure
24 Valley Hospital.
25       Now, these are the same surgeons who like to practice

111

1 at Treasure Valley Hospital because of the high level of
2 control that they have over the environment, over the
3 quality of care for their patients. And St. Luke's, in
4 offering a compromise to them where they would hold on to
5 their interest in Treasure Valley Hospital, wanted to take
6 that sort of control away from these surgeons if they
7 remained with Saltzer and if they continued to practice
8 within the St. Luke's system. That was unacceptable to
9 these Saltzer surgeons.
10       But the strategies in play were the same, the same that
11 you've heard from Mr. Ettinger. The power of referrals of
12 primary care physicians was in play. And these Saltzer
13 surgeons knew it was in play. They knew what would happen
14 if the primary care physicians were purchased and acquired
15 by St. Luke's. They knew what would happen if they weren't
16 part of that group.
17       The power of employed specialists to direct surgeries
18 to a facility was also in play. They knew that St. Luke's
19 has an abundance of specialists in orthopedic surgery, in
20 neurosurgery, in spine surgery, and in general surgery who
21 could then step in and direct surgeries to the facility that
22 they -- that they chose. The control of PCPs, the ability
23 to control surgeries was evident to the Saltzer surgeons
24 during these negotiations.
25       And then, finally, and I think the most important

112

1 point, and a point stressed by Mr. Ettinger at the end of
2 his presentation, is something that is well known to
3 Dr. Pate, something that is well known to Dr. Barresi, and
4 that's the fear of a surgeon losing employed PCP referrals.
5 The fear of a surgeon who sees the doctors who he has had
6 relationships with for years, who trust in the surgeon's
7 quality of care and who the surgeon trusts in their
8 referrals of their patients, they experience the fear of
9 their referrals going to a different organization, and they
10 knew what would happen. They knew and they know that with
11 the PCPs going with St. Luke's, they knew that their
12 referrals would dry up.
13       This is a slide that Mr. Ettinger already covered.
14 I'll skip over it, Your Honor.
15       And here is what the impact -- here is what the impact
16 has been on TVH or, rather, on these surgeons as a result of
17 this acquisition.
18       Dr. Curran in his deposition that was taken in the
19 middle of this year, when asked the question, "What's
20 happened with your referrals from Saltzer physicians?"
21 testified, "They have been reduced by 80 to 90 percent,
22 probably." Dr. Curran is a very robust surgeon, was the
23 primary orthopedic referral surgeon for general orthopedic
24 care at Saltzer.
25       Dr. Keith Holley, another younger surgeon at Saltzer,

---

113

1  was asked the same question, and his testimony was, "The
2  actual number of new referrals since leaving Saltzer is down
3  90 percent, I'd say."
4      Dr. Steve Williams, a general surgeon at Saltzer and a
5  very busy general surgeon at Saltzer, having received the
6  confidence of the primary care physicians who are part of
7  Saltzer to take care of their patients, was asked the same
8  question, and his response was, "Well, I don't really get
9  Saltzer referrals anymore."
10     All of this testimony has come in in the last several
11 months in the course of this case. And it shows exactly
12 what these surgeons knew when they were feeling that
13 negotiating power and that market power of St. Luke's when
14 the acquisition was being negotiated.
15     Now, there is a notion, Your Honor, about utilization
16 that you're going to hear in this case, and the notion is
17 that physician-owned hospitals or hospitals that are
18 partially owned by physicians are hospitals that are
19 overutilized. But, in fact, the testimony is that that's
20 not true with respect to Treasure Valley. Mr. Coleman, the
21 medical director of BCI, when posed that question, when
22 confronted with that issue, made a very appropriate response
23 when he said, "We preauthorize our members regardless of
24 where their surgery is being done the same way. So
25 hopefully we would be able to, you know, watch for those

---

114

1  things."
2      And that comes down to the question of: Is the surgery
3  necessary? Is it required? And I think Mr. Coleman
4  disposes of that notion quite well in his testimony.
5      So what's the -- what's the harm to TVH if the Saltzer
6  deal stands? Well, the threat of competitive harm is
7  imminent. TVH will be left to survive, to attempt to
8  survive in an unbalanced market where Luke's has a
9  disproportionate share of the market power that can be used
10 at any time to the detriment of TVH. TVH is vulnerable in
11 the marketplace. And really nobody understands that better
12 than St. Luke's.
13     In Dr. Williams' testimony in this case, he noted that
14 in negotiating with St. Luke's, the Saltzer surgeons heard
15 from Mr. John Kee and from Mr. Taylor, both senior
16 executives at St. Luke's, and in one of those meetings,
17 Mr. Kee said to Dr. Williams, "This is just my opinion, but
18 if I was you, I would sell out your shares while they are
19 still high and get as much as you can from them. And then
20 you can come with us, and you can -- you can be an exclusive
21 partner instead of being a nonexclusive partner."
22     And Dr. Williams interpreted that comment
23 that -- Dr. Williams said Mr. Kee said that his shares in
24 Treasure Valley would probably be worth half of what they
25 were, in five years.

---

115

1      So the Saltzer surgeons knew when the negotiations were
2  occurring. They knew what the market power of St. Luke's
3  was. They felt the market power of St. Luke's in this
4  negotiation. They valued independence enough. They did not
5  want to be told where to practice and how to practice. And
6  they wanted to maintain their practice at Treasure Valley
7  Hospital. They wanted to give their patients, have the
8  ability to give their patients the alternative and the
9  choice to go to a provider that was lower cost and high
10 quality.
11     So they rejected. They rejected St. Luke's offer, and
12 they decided to go ahead and maintain their interest in
13 Treasure Valley Hospital so they could provide that
14 alternative.
15     So TVH faces St. Luke's market power on several fronts
16 in this negotiation. They have had the threat of losing key
17 independent surgeons as shareholders at Treasure Valley
18 Hospital. And that threat was imminent during the
19 negotiations with Saltzer.
20     Essentially, St. Luke's was striving to convince the
21 Saltzer surgeons to give up their interest in Treasure
22 Valley. But they were able to overcome that. The Saltzer
23 surgeons decided that they weren't going to give in on that
24 issue.
25     But the market power still remains, and the next front

---

116

1  where they faced market power was on the loss of referrals
2  to those surgeons from Saltzer PCPs, resulting in the
3  reduction of spine surgeries at Treasure Valley Hospital.
4  That's occurred. And they felt the brunt of that, and
5  Treasure Valley Hospital has felt the brunt of that.
6  Treasure Valley Hospital has seen a drop in surgeries, a
7  significant drop in surgeries performed by Saltzer surgeons
8  over the past 12 months.
9      And on another front, Treasure Valley Hospital -- or on
10 another front, St. Luke's market power has forced the
11 independent surgeons to give up their independence and enter
12 into an agreement with Saint Al's. Now, they forced them to
13 do that, and Saltzer surgeons didn't, necessarily, want to
14 do that, but once they realized that the PCPs were going
15 with St. Luke's, they knew they had no choice but to try to
16 find a place where they could obtain referrals. Because
17 what they knew was going to happen with respect to referrals
18 has, in fact, happened.
19     And then the other front that TVH faces with respect to
20 St. Luke's market power is the increased concern -- and this
21 is probably the greatest concern, and again, it goes back to
22 Mr. Ettinger's closing remarks, and it goes back to what
23 Dr. Pate knows, and that is the increased concern and fear
24 of all independent physicians who practice at TVH. There
25 are over some 40 specialists that practice at TVH that if

---

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 33 of 57

**117**

1  St. Luke's can control the PCP market, if the Saltzer
2  acquisition is allowed to stand and they can control the PCP
3  market in Nampa, then they can control referrals and they
4  can control these physicians' practice. And all of the
5  present specialists at Treasure Valley Hospital know this,
6  are watching, are watching this litigation, and they have
7  that overriding concern that, in fact, their practices may
8  very well be highjacked in the future.
9      In the final analysis, Your Honor, the real key here is
10  not what these poor surgeons at Treasure Valley Hospital may
11  or may not be able to do in future years; it's really about
12  what harm there is to consumers. And the real harm to
13  consumers if this deal stands is that TVH will face the real
14  harm that -- I'm sorry, Your Honor -- the harm to consumers
15  is that they won't have the alternative. They won't have
16  the alternative that TVH offers. Their physicians won't
17  have the alternative that TVH offers so that they can go to
18  a -- an institution that provides high quality care at a
19  lower cost when it comes to this particular market.
20      So that's the real harm, and that's what we're here
21  for, and that's what this case is all about. We firmly
22  believe that TVH is facing the threat of harm, the threat of
23  harm based upon no competition in the marketplace. And we
24  believe that the remedies asked for by both the FTC and by
25  Saint Al's also should be applied as it respects Treasure

**118**

1  Valley Hospital.
2      Thank you.
3      THE COURT: Thank you, Mr. Powers.
4      Mr. Bierig, let's take a short break, and then we'll
5  proceed to your argument as well as Mr. Julian's. We will
6  try to hold this to about a ten-minute break. I think we
7  got a little longer than that last time. But you do not
8  have any AEO materials during your argument?
9      MR. BIERIG: That's correct, Your Honor.
10      THE COURT: Very well. We will be in recess then
11  for ten minutes.
12      (Recess.)
13      THE COURT: Mr. Bierig.
14      MR. BIERIG: Good morning, Your Honor.
15      Along with my colleagues from Sidley Austin and Walt
16  Sinclair from Stoel Rives, I will be defending St. Luke's at
17  this trial. It is our privilege to represent St. Luke's
18  because the conduct at issue, the affiliation of the Saltzer
19  Medical Group with the St. Luke's Health System, is intended
20  to promote and will promote both competition and the best
21  interests of the people of Idaho.
22      We believe that the evidence in this case will lead the
23  court to recognize that St. Luke's and Saltzer have entered
24  into this transaction in order to improve the care of
25  patients in this state and to lower the costs of that care,

**119**

1  and that, if allowed to go forward, the Saltzer transaction
2  will have precisely those effects.
3      As Your Honor will hear from Dr. David Pate, CEO of
4  St. Luke's, and from several other defense witnesses, the
5  Saltzer transaction is a critical component of St. Luke's
6  ongoing efforts to transform the delivery of healthcare in
7  Southern Idaho in accordance with the Triple Aim that
8  St. Luke's has adopted.
9      The Triple Aim consists of three pillars: better
10  health, better care, and lower cost. In the furtherance of
11  these three objectives, the transformation of healthcare,
12  which St. Luke's is in the process of achieving, is creating
13  four efficiencies, and I will discuss each of them.
14      First, community health outreach offering preventive
15  healthcare and education in the community to provide better
16  health, the first of the pillars, for the population so that
17  there will be less need for hospitalization and less need
18  for acute care.
19      Second, care for all patients, including Medicaid and
20  uninsured patients, regardless of their ability to pay in
21  the interest of both better health and better care.
22      Third, fully integrated care using the best available
23  electronic health record, evidence -based medicine protocols
24  developed and implemented by physicians, rigorous
25  utilization review and quality control metrics, and

**120**

1  information on patient outcomes that can come only from an
2  integrated system using very sophisticated measurement
3  tools.
4      St. Luke's is committed to the proposition that a fully
5  integrated delivery system, as opposed to the current, more
6  fragmented approach that plaintiffs favor, delivers better
7  care at a lower cost through avoiding duplicative tests and
8  diagnostic procedures, minimizing unnecessary or unduly
9  intensive treatment modalities, and generally coordinating
10  the care of the patient.
11      Fourth, providing better care at a lower cost by
12  transitioning from the current fee-for-service system that
13  pays based on the volume of procedures to an alternative
14  that pays based on the value of the services, a system in
15  which the provider is at economic risk for unnecessary
16  hospitalizations, unnecessary surgical procedures, and
17  unnecessary ancillary services, such as imaging and lab
18  tests.
19      Taken together, these four features are the result of a
20  new product, a fully integrated healthcare delivery system
21  in which the financial and personal interest of the system
22  is aligned with that of its physicians.
23      Now, the affiliation of Saltzer with St. Luke's is a
24  key element of St. Luke's efforts to create this new
25  product. At trial, several witnesses will explain why.

Case 1:12-cv-00560-BLW    Document 549    Filed 11/04/14    Page 34 of 57

121

1    As Your Honor listens to their testimony, I would urge
2  this court to consider whether this is the sort of conduct
3  that the law condemns or should be condemning, or whether
4  St. Luke's should be permitted to proceed in its efforts to
5  move forward to a fully integrated delivery system that is
6  designed to increase quality and lower costs and that will,
7  in fact, produce those results.
8    For now, however, let me summarize the relevant
9  testimony.  It's going to have four principal points.
10   First, the presence of a core group of physicians who
11 are financially aligned with St. Luke's gives St. Luke's the
12 ability to provide community health programs in
13 Canyon County.  Your Honor will hear from Dr. Harold Kunz
14 and other Saltzer physicians about the outreach programs
15 that Saltzer, prior to the affiliation, did not have the
16 time or the resources to undertake to the extent that they
17 are able to do now.
18   Second, the affiliation will help to fulfill St. Luke's
19 goal of seeing that all patients, including Medicare and
20 Medicaid patients and the uninsured, are cared for.  Again,
21 Your Honor will hear the testimony of Saltzer physicians and
22 other physicians that, prior to the affiliation, economic
23 constraints required these physicians to limit the number of
24 low-pay or no-pay patients that they could see.
25   Third, the affiliation of the Saltzer physicians brings

122

1  into the St. Luke's system a group of primary care
2  physicians who are committed to clinically integrated care
3  using the state-of-the-art electronic medical record known as
4  Epic that St. Luke's uses; physicians who are so financially
5  and personally aligned that they have time to develop and
6  will commit to practicing in accordance with evidence-based
7  medicine protocols; physicians who are committed to moving
8  away from the current fee-for-service system that
9  incentivizes overutilization.
10   Not all physicians are interested in that.  Indeed, as
11 you heard, some of the physicians who went over to Saltzer
12 from Treasure Valley didn't want to practice that way, but
13 the physicians that remain are very much in that mindset.
14   And as several physicians from Saltzer will testify, it
15 was a recognition that they could not provide to their
16 patients the benefits of fully integrated care without the
17 resources and the infrastructure that St. Luke's has to
18 offer that caused Saltzer to want to affiliate with
19 St. Luke's.
20   And fourth, the affiliation with Saltzer, Your Honor,
21 gives St. Luke's the presence in Canyon County and the scale
22 and the type of financial arrangements with physicians that
23 it needs in order to move to risk-based insurance contracts.
24   Your Honor will hear from Pat Richards, the CEO of
25 SelectHealth, the Utah-based insurance company with which

123

1  St. Luke's has formed a strategic alliance, how St. Luke's
2  and Saltzer, working together, are moving to provide
3  value-based insurance contracts as an alternative in this
4  market.
5    Now, you would think -- one would think, Your Honor,
6  that this sort of innovation, both in the market for
7  healthcare delivery and in the market for health insurance,
8  is precisely the sort of conduct that the antitrust laws
9  would seek to promote.  After all, as you see on the screen,
10 Your Honor, the antitrust laws are, in the words of the
11 Supreme Court, a consumer welfare prescription.  That is
12 what we are trying to achieve through the Saltzer
13 affiliation, consumer welfare.
14   But in a move that conjures up the title of the book
15 The Antitrust Paradox, the plaintiffs have ironically
16 invoked the antitrust laws in an attempt to undo the
17 extraordinarily procompetitive transaction that is the
18 Saltzer affiliation.
19   Notably, as we have heard this morning, the two sets of
20 plaintiffs have very different theories.  The government
21 plaintiffs allege that the affiliation of so many physicians
22 in the city of Nampa will give St. Luke's the power to raise
23 price above competitive levels.
24   The hospital plaintiffs say that the affiliation will
25 so dry up referrals to them and will so preclude their

124

1  participation and provider networks, that competition will
2  be suppressed because their ability to compete will be
3  crippled.
4    Your Honor, we know why Saint Alphonsus and TVH have
5  brought this case.  They talk about promoting competition,
6  but they actually fear competition.  They fear the
7  competition that St. Luke's is bringing to the market
8  through its transition to fully integrated care and
9  value-based payment.
10   And they especially fear -- as we heard from
11 Mr. Ettinger, they especially fear the increase in
12 competition that will occur as St. Luke's expands its
13 presence in Canyon County.  They particularly fear the
14 possibility of St. Luke's building a hospital in Nampa to
15 compete with Saint Alphonsus Nampa.
16   Mr. Ettinger's presentation comes down to this:
17 St. Luke's is providing better care in a better way, and
18 that is going to hurt Saint Alphonsus.  Well, that is called
19 competition, Your Honor.
20   We also know why Blue Cross of Idaho, which currently
21 dominates the commercial health insurance market in this
22 state, is supporting the claims of Saint Alphonsus and TVH.
23 Blue Cross will say all the right things about competition.
24 In reality, Blue Cross fears the competition that St. Luke's
25 in part, by virtue of the Saltzer transaction, is in the

125

1    process of bringing to the health insurance market through
2    its strategic alliance with SelectHealth that will offer
3    value-based contracts as opposed to the traditional
4    fee-for-service contracts which has made Blue Cross very,
5    very profitable.
6        The question that the defendants have been asking
7    themselves and the question that the court may be asking
8    itself is this: How can the Federal Trade Commission and
9    the Attorney General of Idaho take the position that a
10   transaction so procompetitive both in intent and in effect
11   violate the antitrust laws?
12       This morning, Your Honor, I'm going to try to answer
13   that question. And I will do so by identifying and
14   explaining ten mistakes made by the government plaintiffs
15   that have caused them to reach their erroneous conclusions.
16   I will then point out three additional mistakes that
17   underlie the self-serving arguments of the hospital
18   plaintiffs.
19       I would respectfully ask this court to keep those
20   mistakes in mind as the court hears the evidence that will
21   be brought forth over the next four weeks.
22       Preliminarily, however, I would like to address the
23   language of the governing statute. Section 7 of the Clayton
24   Act provides that a transaction is unlawful if its effect,
25   quote, may be -- may be substantially to lessen competition.

126

1        Plaintiffs would read the words, quote, may be as
2    meaning that they should prevail if there is some
3    possibility of anticompetitive effect from the challenged
4    transaction, no matter how tenuous or no matter how
5    speculative that possibility might be. That is what I
6    understood Mr. Greene to have said this morning.
7        But the statute requires a considerably greater
8    showing. It requires a plaintiff to prove that weighing the
9    anticipated procompetitive effects against the supposed
10   anticompetitive effects, the transaction is, on balance,
11   likely to cause substantial anticompetitive effects in a
12   properly defined market. Likely to cause substantial
13   anticompetitive effects in a properly defined market.
14       If the standard were any less demanding, the Eighth
15   Circuit could not have reversed the preliminary injunction
16   in FTC v. Tenet Healthcare Corporation where the district
17   court failed to consider evidence that the merger of two
18   hospitals would produce, quote, better medical care than
19   either of those hospitals could separately because the
20   merged entities could, quote, offer integrated delivery.
21       Now, Mr. DeLange got up here and said this case is
22   about competition, not about healthcare. But, in fact, as
23   the Tenet Healthcare case makes clear, the efficiencies that
24   come from a healthcare transaction are an integral part of
25   the antitrust analysis, and we believe that the healthcare

127

1    and the antitrust laws go hand in hand.
2        I would submit to Your Honor that the proper
3    methodology for analyzing this case is as follows: First,
4    plaintiffs must make a prima facie showing that the Saltzer
5    transaction will lead to undue concentration in a properly
6    defined market.
7        Second, if the plaintiffs make this prima facie
8    showing, the burden shifts to St. Luke's and Saltzer to show
9    that the market share statistics inaccurately depict the
10   likely competitive effects of the transaction.
11       Third, once defendants show the overall likely
12   procompetitive effects, the burden shifts back to the
13   plaintiffs to demonstrate that the procompetitive benefits
14   of the transaction can reasonably be achieved in a manner
15   less restrictive of competition.
16       I don't believe that the plaintiffs disagree with this
17   framework. However, in applying it, the plaintiffs have, as
18   I noted earlier, made at least ten mistakes. I will now
19   discuss each one of those mistakes.
20       First, mistake No. 1. Plaintiffs have defined the
21   geographic market far too narrowly. They argue that the
22   geographic market is the city of Nampa. This allegation is
23   hardly surprising because, after the affiliation, St. Luke's
24   will have a substantial percentage of the primary care
25   physicians in that city. But the evidence will show that

128

1    the market is broader than the city of Nampa.
2        Plaintiffs will spend a lot of time eliciting testimony
3    that, all else being equal, people prefer to obtain primary
4    medical care close to where they live or to where they work.
5    We heard Mr. Greene stress that point this morning.
6    Defendants don't dispute that proposition, but that doesn't
7    mean that Nampa is a relevant market. Rather, the relevant
8    market in this case is defined by where people would go for
9    primary medical care if, following the Saltzer affiliation,
10   St. Luke's were to raise prices for the services of Saltzer
11   physicians above competitive levels.
12       The evidence will show, Your Honor, and life experience
13   teaches that a significant number of people in Nampa, many
14   of whom work in Meridian, Boise, or elsewhere, already get
15   primary medical care outside of Nampa.
16       Moreover, our expert, David Argue, will explain that if
17   St. Luke's were to raise the prices of the services of the
18   Saltzer physicians above competitive levels, it could not
19   sustain the price increase because people would travel for
20   their care to Caldwell, Meridian, and Boise and would get
21   care from other physicians. Likewise, patients from outside
22   Nampa who currently travel there to get care from Saltzer
23   physicians would cease doing so.
24       Perhaps most tellingly on this point, we will present
25   evidence of the natural -- of the natural experiment that

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 36 of 57

Bench trial, 09/23/2013

### 129

1 took place when Micron excluded Saltzer from its network and
2 thereby required Micron employees to pay more money if they
3 wanted to be seen by Saltzer physicians than other
4 physicians.
5     As Your Honor will hear, both from witnesses from
6 Saltzer and from Pat Otte of Micron, the result was that
7 Nampa patients left Saltzer in substantial numbers and went
8 to physicians in Caldwell, Meridian, and Boise. This
9 evidence confirms empirically that Nampa is not a properly
10 defined market in which to measure concentration.
11 Plaintiffs' failure to show undue concentration in a
12 properly defined market without more should end this case.
13     THE COURT: Well, Counsel, even if we expand the
14 market to include all of Canyon County and perhaps even
15 western Ada County, isn't there still a concentration in the
16 order of 65 percent?
17     MR. BIERIG: I don't think it's quite 65 percent.
18     THE COURT: I think that's what the plaintiffs
19 suggested.
20     MR. BIERIG: That's what they suggested. I don't
21 think it's quite that high. Certainly, if we expand the
22 market, Your Honor, to go beyond Nampa to include Meridian
23 and Boise, there will still be a market concentration issue,
24 but it will be significantly less than if we were dealing
25 with Nampa.

### 130

1     But that actually brings me to my second point, so here
2 it comes. Plaintiffs place too much reliance on the
3 Herfindahl-Hirschman analysis, which measures market
4 concentration. As the D.C. circuit pointed out in the
5 Baker Hughes case, which we cite in our briefs, market
6 concentration statistics alone are insufficient to determine
7 the outcome of a Section 7 case.
8     In the words of that court, quote, evidence of market
9 concentration simply provides a convenient starting point
10 for a broader inquiry into future competitiveness.
11     I want to stress that, Your Honor. "Evidence of market
12 concentration simply provides a starting point for a broader
13 inquiry into future competitiveness."
14     I would note, by the way, that the panel that decided
15 the Baker Hughes case includes two current justices of the
16 U.S. Supreme Court.
17     Reliance on HHI figures is particularly inappropriate
18 in a relatively small market in which two strong competitors
19 are vigorously competing. Take, for example, a market in
20 which Home Depot and Lowe's are competing and one of them
21 acquires a smaller retailer. No matter what the HHI figures
22 might say, one can be sure that there will continue to be
23 intense competition as long as Home Depot and Lowe's remain
24 rivals.
25     The same is true here. The same is true of St. Luke's

### 131

1 and Saint Alphonsus. These systems are strong and vigorous
2 competitors. As long as St. Luke's and Saint Alphonsus are
3 competing, as surely they will, the court need not worry
4 about anticompetitive pricing.
5     Indeed, Your Honor will learn that Saint Alphonsus' own
6 internal documents and vision is that the market for
7 healthcare in the Treasure Valley will be characterized by
8 intense and vigorous competition between two large
9 integrated delivery systems: St. Luke's and Saint Alphonsus.
10     THE COURT: But if the merger substantially
11 weakens one of those two strong competitors, should that be
12 something that antitrust laws should be concerned with under
13 the Clayton Act?
14     MR. BIERIG: If the acquisition were to weaken the
15 other competitor to the point that it cannot be an effective
16 competitor, yes.
17     THE COURT: I guess that's the point, is --
18     MR. BIERIG: But it's not that if they just lose
19 some referrals or have some other issue, that's -- the
20 antitrust laws don't concern themselves about that. The
21 antitrust laws require that they have to demonstrate that
22 they are so weakened, that they can't effectively compete.
23     And I'll get to that in one of my other mistakes,
24 Your Honor -- hopefully not my mistakes, but one of the
25 mistakes that the plaintiffs make.

### 132

1     Mistake No. 3: Plaintiffs overlook the fact that the
2 Saltzer affiliation is largely a vertical transaction.
3 St. Luke's is a healthcare system while Saltzer is a group
4 of physicians that is one component of such a system. Thus,
5 this litigation is not like a case involving a horizontal
6 merger of two competing banks, like the Philadelphia
7 National Bank case that Mr. Greene cited, or even two
8 competing hospitals, which are the cases on which the
9 plaintiffs rely.
10     Notably, every one of the market power slides that
11 Mr. Greene put up this morning addresses a purely horizontal
12 merger, not an affiliation between an integrated delivery
13 system and a group of physicians.
14     The courts have been considerably more receptive to
15 vertical transactions because they realize that such
16 transactions are far more likely to produce efficiencies.
17 And at trial, we will demonstrate that the Saltzer
18 transaction will produce all of the four efficiencies that I
19 spoke about earlier.
20     Now, I don't want to overstate our case. I acknowledge
21 that there are some horizontal aspects to the Saltzer
22 transaction, and St. Luke's does, in fact, employ
23 physicians. But given that St. Luke's is an integrated
24 delivery system, the Saltzer transaction is properly viewed
25 as primarily vertical. And the integration of the Saltzer

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 37 of 57

## 133

1 physicians into the St. Luke's health system will produce
2 enormous benefits for better health, better care, and lower
3 costs.
4      By the way, Your Honor has referred to it as a merger.
5 I don't use the word "merger" because "merger" tends to
6 suggest horizontality.  This is much of an affiliation that
7 is vertical.
8      Mistake No. 4:  Plaintiffs give inadequate weight to
9 the fact that the purpose of the Saltzer transaction is to
10 promote access and quality and to reduce costs.
11      In this connection, I would invoke the words of Justice
12 Brandeis in Chicago Board of Trade v. United States that I
13 cited at the preliminary injunction hearing, words that are
14 as true today as when they were written nearly a century ago
15 and when I quoted them in this courtroom nearly a year ago.
16      "The history of the restraint, the evil believed to
17 exist, the reason for adopting the particular remedy, the
18 purpose or end sought to be attained are all relevant facts.
19 That is not because a good intention will save an otherwise
20 objectionable regulation or the reverse, but because
21 knowledge of intent may help the court to interpret facts
22 and to predict consequences."
23      Your Honor, I have been in a lot of antitrust cases,
24 and I can tell the court that when a transaction has
25 anticompetitive effects, the underlying documents are full

## 134

1 of references to anticompetitive purpose.
2      In this case, in the literally millions of pages of
3 documents that have been produced, there is not a single
4 St. Luke's document to the effect that the purpose of the
5 Saltzer transaction was to raise price above competitive
6 levels.
7      Plaintiffs will, of course, cherry-pick and distort
8 isolated statements from various documents, usually not
9 St. Luke's documents, to try to advance their case, as we
10 have already seen this morning.  But the court will see,
11 from numerous documents that we will present at trial, that
12 the fundamental purpose of the Saltzer transaction was to
13 achieve the goals of the Triple Aim.  This is a classic case
14 of the dog that did not bark.  We will not be seeing barking
15 about efforts to raise price or to dominate the market.
16      Beyond -- beyond the documents, Your Honor will hear
17 from several Saltzer physicians, including its president,
18 Dr. John Kaiser, that Saltzer's purpose in affiliating with
19 St. Luke's was:  One, to permit it to provide even better
20 care to its patients; two, to gain the benefits of a
21 sophisticated electronic health record and other systems
22 that Saltzer could not afford and could not gain access to
23 on its own; three, to enhance Saltzer's ability to reach out
24 to the community; and, four, to free itself from the
25 economic constraints that forced it to limit the number of

## 135

1 no-pay and low-pay patients that it could see.
2      Your Honor will also hear from St. Luke's witnesses,
3 such as Chris Roth, the CEO of St. Luke's Treasure Valley,
4 and John Kee, a senior St. Luke's executive with decades of
5 healthcare experience in Idaho.  They will testify as to the
6 intent of the Saltzer affiliation and what St. Luke's hopes
7 to achieve.
8      As the court listens to their testimony, I believe
9 Your Honor will have little doubt that, from St. Luke's
10 perspective, the Saltzer transaction had but one purpose:
11 to take care forward by producing the four efficiencies that
12 I mentioned earlier.
13      As Justice Brandeis foretold, knowledge of the
14 pro-patient, pro-consumer intent of the parties to the
15 Saltzer transaction should help this court in interpreting
16 the relevant facts and in appreciating the procompetitive
17 effects of the transaction.
18      That brings me to mistake No. 5:  Plaintiffs fail to
19 recognize the need for a substantial group of fully aligned
20 physicians in order to realize the benefits of a fully
21 integrated delivery system and to transition to value-based
22 payment.
23      The traditional antitrust model, Your Honor, was to
24 have a lot of atomistic providers competing against one
25 another.  But contemporary antitrust laws have recognized

## 136

1 that large groups of physicians must practice together and
2 must be financially aligned in order to achieve the
3 efficiencies of coordinated 21st-century care.
4      Thus, nearly 20 years ago, in Blue Cross v. Marshfield
5 Clinic, the Seventh Circuit rejected an effort under the
6 antitrust laws to break up the Marshfield Clinic, even
7 though that clinic employed all the physicians in
8 Marshfield, Wisconsin, and even though it employed all the
9 physicians in several other towns.
10      As Judge Posner wrote, "We live in the age of
11 technology and specialization in medical services.
12 Physicians practice in groups, in alliances, in networks,
13 utilizing expensive equipment and support.  Twelve
14 physicians competing in a county would be competing to
15 provide horse-and-buggy medicine.  Only as part of a large
16 and sophisticated medical enterprise such as the Marshfield
17 Clinic can they practice medicine in rural Wisconsin."
18      THE COURT:  Counsel, where do you draw the line,
19 however?  If that rationale were to apply to every case,
20 then that would mean that all mergers, all acquisitions are
21 good, and any failure to merge or any failure to acquire is
22 bad because it does not allow us to bring those -- I'll use
23 the word economies of scale -- to provide better healthcare.
24 Surely, that cannot be --
25      MR. BIERIG:  It clearly cannot be the case that

137

1   there will be only one system.  We need to have competition.
2   Where we draw the line is whether there is another system in
3   there competing forcefully against the system that is
4   putting together the networks.
5          THE COURT:  So your vision, then, would be that
6   if, indeed, you have a community in which there are at least
7   two vibrant, strong competitors, if one competitor needs to
8   reach a certain -- I'll use the word level of concentration
9   or -- what's the term you've used? -- a substantial group of
10  physicians in order to obtain a fully integrated system,
11  that acquisitions that may consolidate practice groups into
12  one unit should essentially be hands off from the antitrust
13  laws because it is necessary, in the words, I guess, of
14  Judge Posner, to take us out of the horse-and-buggy age of
15  medicine and to bring these kind of economies of scale to
16  bear upon the problem.
17         MR. BIERIG:  That would not exactly be my
18  position.  There is something to -- there is some aspects to
19  that.
20         THE COURT:  My point is as long as -- but as long
21  as there is a vibrant competitor using fee-for-services,
22  then we shouldn't be concerned about concentrations achieved
23  by its competitor if they are designed and intended to
24  obtain integrated healthcare.
25         MR. BIERIG:  That is correct.  But the way

138

1   Your Honor put it would take it out from the antitrust laws.
2   The antitrust laws would, of course, apply.  We're not out
3   from under the antitrust laws.
4          THE COURT:  What you're saying is --
5          MR. BIERIG:  But we believe the antitrust laws are
6   satisfied.
7          THE COURT:  The procompetitive benefits outweigh
8   whatever anti- --
9          MR. BIERIG:  That is exactly what we are saying,
10  and we believe that --
11         THE COURT:  All right.
12         MR. BIERIG:  -- Saint Alphonsus documents reflect
13  that.  They say that what the future holds for the Treasure
14  Valley is intense competition between these two systems.
15  They have their own system, which is a very effective, very
16  excellent system.  And we are competing with that.  We have
17  a different approach.
18       We believe more strongly than they do in the importance
19  of full and tight both financial and personal integration
20  and alignment, but there will be these two strong
21  competitive forces in this market.  And we believe that as
22  long as we have that, in addition to such third entities
23  like Treasure Valley Hospital and some of the other smaller
24  entities, we don't think that we have to fear
25  anticompetitive conduct.  And we think, as Your Honor put it

139

1   exactly correctly in our view, that the procompetitive
2   benefits of putting together this fully integrated system
3   vastly outweigh any threat to competition.  We don't think
4   there is going to be any anticompetitive conduct as long as
5   we have this very vigorous competition.
6          THE COURT:  Well, I think Mr. Greene -- I asked
7   him whether or not in his view -- and, of course, he
8   disagreed with that proposition -- that you could only
9   obtain integrated healthcare through consolidation of the
10  type that's involved here.  And he indicated that in many
11  instances, fairly small entities are able to obtain that
12  type of healthcare system and without running into the
13  problems that at least the government and the plaintiffs
14  here argue that you're running into with the Clayton Act.
15       You disagree, I assume, that, indeed, you have to have
16  these kind of consolidation or grouping of physicians?
17         MR. BIERIG:  These tightly aligned relationships?
18  Yes, we feel that way very strongly.  We believe the
19  evidence will show, Your Honor, that the systems that have
20  been most successful in controlling costs and improving
21  quality, if you look at the Mayo Clinic, Intermountain
22  Health in Utah, if you look at Geisinger Clinic, Kaiser, you
23  will see that all of them have very tightly aligned
24  physicians financially.
25       But, more than that, we don't think -- you will hear me

140

1   say this later, but we don't think that the court has to
2   make that judgment.  The market will make that judgment.  We
3   have a vision as to -- as to what the best way of competing
4   is.  It's through setting up this fully integrated system.
5          Saint Alphonsus has a somewhat different vision, and
6   that is competition.  The market will decide which of us is
7   right and who succeeds.  The court doesn't have to decide
8   today which is the right way, as Mr. Greene has invited this
9   court to do.  It's enough to say that our vision has a
10  substantial basis and we think is going to lead to all sorts
11  of benefits, just as Saint Alphonsus thinks that its
12  approach will lead to all sorts of benefits, and then the
13  market will decide who is right.
14        So, to continue, Your Honor, in the nearly 20 years
15  since Marshfield Clinic was decided, the need to practice
16  medicine in sophisticated enterprises that align, both
17  personally and financially, PCPs, medical specialists,
18  hospitals, and other caregivers to coordinate care and
19  thereby to provide better care at lower costs have only
20  increased.
21         Likewise, the cost and the complexity of the resources
22  and the infrastructure to achieve these goals have only
23  skyrocketed.  Indeed, the financial incentives offered in
24  the accountable care organization and the Medicare shared
25  savings program provisions of the Affordable Care Act

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 39 of 57

141

1 demonstrate that the United States Congress has recognized
2 this reality.
3    At trial, Your Honor, we will prove that the challenged
4 transaction is necessary to enable the Saltzer physicians to
5 practice medicine in Canyon County most effectively and to
6 position St. Luke's to most efficiently implement the
7 transformation of healthcare delivery in the Treasure Valley
8 from the current fee-for-service model to a value-based
9 model.
10    You will hear from Dr. Kaiser, the president of
11 Saltzer, and from other Saltzer witnesses that Saltzer
12 approached St. Luke's.  St. Luke's did not approach Saltzer.
13 Saltzer approached St. Luke's for what became the challenged
14 transaction only after Saltzer concluded, after much
15 deliberation, that as an independent clinic, it could not
16 afford the tools needed to practice 21st century medicine,
17 could not compete for risk-based contracts, and could not
18 effectively compete in other ways.
19    To paraphrase the Seventh Circuit, only as part of a
20 large and sophisticated integrated delivery system such as
21 St. Luke's can Saltzer physicians practice medicine most
22 effectively in Canyon County.
23    And, conversely, from St. Luke's witnesses, the court
24 will hear about St. Luke's vision for taking care forward in
25 Canyon County.

142

1    As I mentioned earlier, the Saltzer physicians bring to
2 St. Luke's a group of physicians who share St. Luke's own
3 vision.  Further, the scale that comes with a large group of
4 closely aligned physicians will facilitate St. Luke's
5 transition to value-based contracting.  And absent this sort
6 of group, contrary to what Mr. Greene may think, St. Luke's
7 cannot afford to take the risks inherent in value-based,
8 risk-based contracting.
9    This brings me to mistake No. 6:  Plaintiffs improperly
10 dismiss the procompetitive benefits of the Saltzer
11 transaction because it will take time for the full benefits
12 of that transaction to manifest.
13    According to plaintiffs, the defendants bear a, quote,
14 heavy burden, quote -- and continuing the quote, to verify
15 by reasonable means the likelihood and magnitude -- the
16 likelihood and magnitude of each asserted efficiency, how
17 and when each would be achieved and any costs of doing so,
18 how each would enhance the merged firm's ability and
19 incentive to compete, and why each would be merger-specific.
20    That statement is, of course, an impossible burden to
21 meet; and for that reason, it is not the law.
22    Rather, as the D.C. circuit held in the Baker Hughes
23 case, evidence on a variety of factors can rebut a prima
24 facie case.  And as we know from Tenet Healthcare
25 Corporation, that evidence includes proof that the

143

1 transaction will lead to integrated delivery of care and
2 ultimately to better care.
3    Significantly, contrary to what the government
4 plaintiffs say, that proof does not require a degree of
5 clairvoyance alien to Section 7 which deals with
6 probabilities, not certainties.  Those are not my words.
7 Those are the words of the D.C. circuit.
8    Section 7 does not require a degree of clairvoyance
9 alien to that section, which deals with probabilities, not
10 certainties.  And that is particularly true in a case like
11 this, Your Honor, where the full benefits of the transaction
12 will take time to manifest.
13    At trial, we will show that the first two objectives of
14 the Saltzer transaction -- community health outreach and
15 provision of care regardless of ability to pay -- are
16 already occurring.
17    But we will also show that the full benefits of
18 coordinated care will not be realized until the Saltzer
19 physicians are put on the Epic electronic health record,
20 which, as Your Honor will recall, we committed at the
21 preliminary injunction hearing not to do.  They will not
22 occur until the best medical practice protocols have been
23 developed and are implemented.  And they will not fully
24 occur until the outcomes of various alternative approaches
25 to diagnosis and treatment have been measured and studied

144

1 through the WhiteCloud system which the court will hear
2 about at trial.
3    Likewise, the transition from volume-based to
4 value-based payment will take time while the payment
5 structure of physicians is realigned and payers become more
6 comfortable with that approach.
7    Now, plaintiffs, we expect at trial, will make much of
8 the fact that the compensation of the Saltzer physicians is
9 tied to the amount of patient care they provide.  That line
10 of argument overlooks the fact that the -- that the
11 transition to value-based healthcare delivery takes time.
12    In this connection, Your Honor will hear testimony that
13 St. Luke's is in the process of changing the compensation of
14 cardiologists, pulmonologists, and internists, so that a
15 substantial portion of their pay is now based on quality
16 rather than on quantity considerations.  Your Honor will
17 also hear that the ability to implement that kind of change
18 and the journey from volume-based to value-based
19 compensation of physicians depends on the ability to capture
20 and track clinical data and outcome on a very tight -- and
21 on a very tight relationship between physicians and the
22 St. Luke's system.
23    Plans are underway to modify the compensation of
24 Saltzer physicians to base their compensation more on
25 quality considerations and less on volume considerations.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench trial, 09/23/2013

145

1     As I said, for the reasons that will be presented at
2     trial, those changes will not occur overnight.
3         Plaintiffs dismiss the efficiencies because they have
4     not yet materialized.  Mr. Greene this morning talked about
5     Epic and WhiteCloud but dismissed them because they have not
6     yet been proven quantitatively.  They cannot possibly have
7     been proven quantitatively at this point, but that fact does
8     not detract from the fact that these systems, the investment
9     that St. Luke's is making, will bring about advances in the
10    quality of care and reductions in the cost of that care.
11        The law does not require that all the benefits of a
12    transaction as complex as this one be proven with
13    specificity at the outset of the transaction.  The law does
14    not require that the procompetitive, propatient benefits of
15    the transaction be nipped in the bud because they have not
16    fully flowered at the time of trial and cannot be quantified
17    at the time of trial.  It is enough that those benefits are
18    likely.
19        Thus, the Ninth Circuit in Miller v. California Pacific
20    Medical Center cautioned against undoing a healthcare merger
21    where doing so might, quote, detract from the quality of
22    care for patients and might mean that, quote, innovative
23    procedures made possible by the merger would have to be
24    abandoned.
25        That is exactly what the government plaintiffs are

146

1     asking this court to do, is asking the court to order
2     abandonment of this affiliation with the effect that the
3     quality of care will be detracted from and that innovative
4     procedures will be nipped in the bud.
5         At trial we will show that there is more than enough
6     evidence to allow the Saltzer transaction to go forward so
7     that the people of Southern Idaho can reap its current
8     benefits and can look forward to the even greater benefits
9     to come.
10        This brings me to mistake No. 7:  Plaintiffs give
11    inadequate weight to the significant constraints on
12    anticompetitive price increases that they theorize from the
13    Saltzer transaction.
14        Plaintiffs simply ignore the fact that St. Luke's is an
15    Idaho-based charitable institution dedicated to enhancing
16    the welfare of the people of Southern Idaho.  We will show
17    through the testimony of several key St. Luke's executives
18    and through the testimony of board member Skip Oppenheimer
19    that St. Luke's is committed to keeping the price of
20    healthcare down.
21        Indeed, the third pillar of the Triple Aim, the aim
22    that animates St. Luke's, is lower cost.  And we will show
23    that the St. Luke's board includes several representatives
24    of employers who have a material interest in keeping their
25    employees' healthcare costs low.

147

1     In this connection, I would call Your Honor's attention
2     to the discussion in FTC v. Butterworth Healthcare
3     Corporation.  There, the court found that "The involvement
4     of prominent community and business leaders on the boards of
5     these hospitals can be expected to bring real accountability
6     to price structuring."
7         Now, needless to say, I'm not going to stand up here
8     and say that the board members control the pricing or set
9     the prices, but they do set a tone for management.  And if
10    the board learns that St. Luke's is pricing in a way that is
11    inconsistent with the Triple Aim or with the mission of
12    St. Luke's, it can and will take action.
13        But, quite apart from the Triple Aim, Your Honor, the
14    presence of strong purchasers such as Blue Cross of Idaho
15    constrains any ability to raise price above competitive
16    levels.
17        And here I want to go back to the analogy that I made
18    earlier to the market that includes Home Depot and Lowe's.
19    There is a critical difference between this case and the
20    cases that are relied upon by plaintiffs, and that's shown
21    by that analogy.  Those retailers sell to individual
22    shoppers who have absolutely no bargaining power.
23        St. Luke's, by contrast, negotiates with sophisticated
24    and powerful insurance companies that control a substantial
25    percentage of the covered lives in this area.  These

148

1     purchasers will strongly push back against almost any price
2     increase that St. Luke's might seek, let alone
3     anticompetitive price increases, which St. Luke's has no
4     intent to seek.
5         And that goes further to the question that Your Honor
6     asked when you said -- when the court said:  So what's the
7     limiting principle?  We would be more worried about having
8     competition among two systems if the payers were these
9     atomistic, sort of helpless groups that had no
10    countervailing power.  Here, by contrast, as long as we have
11    Blue Cross of Idaho and Regence and other very strong
12    payers, including strong payers like some of the employers,
13    I think we have even less to fear about anticompetitive
14    price increases.
15        Mistake No. 8:  Plaintiffs' evidence of past pricing
16    comes largely from the Magic Valley with different
17    demographics and facts and includes no analysis supporting
18    the conclusion that any price increases were above
19    competitive levels.
20        We expect, Your Honor, that plaintiffs will try to
21    prove a likelihood of anticompetitive price increases from
22    the Saltzer transaction by citing evidence from various past
23    transactions.  However, many of those transactions took
24    place in the Magic Valley, a market with demographics and
25    other facts very different from the Treasure Valley.  This

149

1 fact alone makes the relevance of that sort of evidence
2 highly questionable, at best.
3     In any event, proof of price increases without more
4 does not establish anticompetitive conduct.  As we discussed
5 in our motion for partial summary judgment, prices increase
6 for a variety of legitimate reasons.  It is, therefore,
7 quite telling that, despite presenting two different
8 economic experts, plaintiffs will offer no economic analysis
9 demonstrating that any prior transaction involving
10 St. Luke's has resulted in prices above competitive levels.
11     Mistake No. 9:  Plaintiffs wrongly discount the
12 procompetitive benefits of the Saltzer transaction.
13     Plaintiffs dismissed the asserted benefits of the
14 Saltzer transaction as speculative.  But we will prove,
15 through the testimony of Professor Enthoven, that these
16 benefits have actually occurred in systems such as Mayo
17 Clinic, Geisinger Clinic, and Kaiser, systems that
18 St. Luke's is seeking to emulate.
19     And, in fact, if Your Honor reads in the healthcare
20 journals, you will see that it's not only Mayo, Geisinger,
21 and Kaiser; but, as I said earlier, if one looks at the most
22 successful systems, they are precisely the kind of system
23 that St. Luke's is trying to achieve here in the Treasure
24 Valley.
25     Your Honor will also hear from a number of physicians

150

1 who have affiliated with St. Luke's in the past.  These
2 physicians will tell the court how their affiliation with
3 St. Luke's has improved the care that they provide to their
4 patients and how it has enabled them to offer more outreach
5 programs and how it has enabled them to treat all patients
6 regardless of the ability of those patients to pay.
7     These benefits may not be precisely quantifiable, as
8 Mr. Greene would like us to do, but they are hardly
9 speculative.  In this connection, I would note that
10 Your Honor will hear from Dr. Pate and Mr. Kee that
11 transforming the delivery of healthcare is a very difficult
12 process that takes time.  Yet, St. Luke's has made massive
13 strides in only a few short years.
14     It has invested tens of millions of dollars to convert
15 its clinics, which operated dozens of electronic medical
16 records that didn't communicate with one another, to one
17 common EHR, the gold-standard Epic program.  And the notion
18 that I heard from plaintiffs' counsel, well, Saltzer and
19 some of these other groups had eClinicalWorks, so they
20 already had an electronic health record, it's just nonsense.
21 Sure, there are other electronic health records, but they
22 don't do nearly what the Epic system does in terms of trying
23 to achieve the goals we're talking about of clinically
24 integrated care and helping to identify best practices and
25 reduce duplication.

151

1     St. Luke's has also invested millions more in the
2 WhiteCloud system, which will enable it to extract and
3 analyze data from medical records so that robust information
4 on the quality and cost of care provided by its clinics,
5 including Saltzer, can be harvested, analyzed, and used by
6 physicians to change practice patterns in interest of
7 patients.
8     Now, plaintiffs say St. Luke's will make Epic available
9 to independent practitioners through some pilot program.
10 Well, we have thought about that kind of program, but the
11 general consensus is that it will be very hard to do, and
12 most independent practices will not want to pay the cost
13 that it takes to be involved with that.
14     Once again, the value of these tools in improving the
15 quality of care and in transitioning to value-based
16 healthcare delivery cannot be quantified with precision.
17 But these benefits are not speculative in any way, and the
18 law does not require us to somehow quantify their benefits,
19 especially when those benefits have not yet been achieved.
20     Mistake No. 10.
21     THE COURT:  Counsel, let me ask you to step back
22 for a moment on that last point.  At what point -- I mean,
23 what is the burden, I guess, upon the defendant to show that
24 the projected benefits which have not yet been achieved are,
25 in fact, not just pie-in-the-sky hopes but, in fact, we know

152

1 it has occurred?
2     Now, you have mentioned the Mayo group, Intermountain
3 Healthcare, and some others that have, in fact, achieved
4 that.  But is it universal?  I mean, has there always been
5 procompetitive benefits from this?  Any downside?  And if it
6 is that clear-cut, why isn't the entire country moving that
7 direction with some speed?
8     MR. BIERIG:  Well, the entire country is moving in
9 that direction with different degrees of speed.  But if you
10 look at the Affordable Care Act, you will see that they're
11 trying to incentivize these accountable care organizations,
12 which are, in effect, on the Medicare level what we are
13 trying to achieve across the population of Southern Idaho.
14     The reason it hasn't been done more is these things are
15 tremendously costly.  They require a great deal of work.
16 You have to change all sorts of mindsets.  You have a lot of
17 physicians who don't want to be told how to practice
18 medicine, what kind of protocols to follow.  You have some
19 people who want to maximize their revenue by independent
20 practice, such as the physicians who went over to Saint
21 Alphonsus from Saltzer.
22     There is lots of impediments to this kind of thing, but
23 I think there is a general consensus that the way to
24 increase quality and reduce costs is to have these fully
25 integrated systems.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 42 of 57

Bench Trial, 09/23/2013

153

1    Now, that's not to say that there haven't been fully
2    integrated systems that have failed.  Sure, there is always
3    failure.  There are issues.  But, in general, the approach
4    that St. Luke's is taking is in line with all of the best
5    thinking in healthcare.
6        Are we going to succeed?  We feel quite strongly that
7    we will.  That doesn't make it a certainty.  But what we're
8    saying is that the antitrust laws should not nip our efforts
9    in the bud before we have a fair chance to show what we can
10   do.
11       THE COURT:  In any event, there is enough of a
12   track record that it is not just pie in the sky?
13       MR. BIERIG:  This is so not pie in the sky.  This
14   is -- this is not even pie.  This is reality right down here
15   on planet earth.
16       And you will hear from Professor Enthoven and you will
17   hear from physicians who have become part of the St. Luke's
18   system as to the benefits that will come and that are
19   coming.  And it's -- as I said, it's not only the benefits
20   of having the integrated delivery system.  It's also the
21   ability to provide care to Medicaid patients, to Medicare
22   patients, to the uninsured, none of which is happening.
23   I'll get to that in a minute.
24       But let me go to mistake No. 10, Your Honor.
25   Plaintiffs fail to appreciate that the benefits that

154

1    St. Luke's is seeking to achieve in the Saltzer transaction
2    cannot be achieved as effectively through a looser
3    affiliation with Saltzer.  We have talked already about
4    this, Your Honor, so I will try to be brief.
5        But our witnesses will explain why tight financial and
6    personal alignment of physicians is the best way to realize
7    the benefits of fully integrated care and to move to
8    value-based payment.
9        Of course, independent physicians play an important
10   role in St. Luke's strategy, as they do in all of these
11   other systems.  However, we will show that a substantial
12   nucleus of tightly-aligned physicians has been proven to be
13   necessary to achieve the kinds of objectives that St. Luke's
14   is trying to achieve.
15       Now, as Your Honor has heard already, the court is
16   going to hear a lot of argument from plaintiffs seeking to
17   persuade Your Honor that a looser affiliation with an
18   independent physician is better than the tighter affiliation
19   that St. Luke's believes to be essential.
20       Notably, other than the ipse dixit from plaintiffs'
21   counsel, plaintiffs are not going to have any in-depth
22   analysis to support this conclusion.  And, in fact, all the
23   empirical data is to the contrary.  But, more importantly,
24   this case is not about whether it is more effective to
25   employ physicians or to work with independent physicians or

155

1    how tightly to align them.
2        Both St. Luke's and Saint Alphonsus employ hundreds of
3    physicians.  The difference between the two systems is one
4    of degrees, as we have spoken about.
5        Saint Alphonsus and its co-plaintiffs are asking this
6    court to unwind the Saltzer transaction because they assert
7    that their model is less restrictive but likely to achieve
8    the same benefits that St. Luke's is seeking to achieve.  As
9    I just said, there is no proof of that in this case, and the
10   experience of institutions such as Mayo, Intermountain, and
11   many others is directly to the contrary.
12       But the more fundamental point, which I have already
13   stated to Your Honor, is that the court doesn't have to
14   determine which approach is better.  The market will sort
15   that out.  And if St. Luke's is wrong, it will lose in the
16   competitive process.
17       And here, I would like to invoke two very thoughtful
18   authority.  First, Judge Frank Easterbrook, a noted
19   antitrust scholar, pointed out in an article entitled "The
20   Limits of Antitrust" that "This is precisely the sort of
21   situation in which the court should stay its hand.  The
22   market will self-correct any anticompetitive effects,
23   whereas a judge erroneously prohibiting behavior with real
24   procompetitive potential could create significant and
25   long-term social costs," so says Judge Easterbrook.

156

1        But Judge Easterbrook's views are not binding on this
2    court, so let me turn to what the Ninth Circuit has to say.
3        The Ninth Circuit makes a very important point on the
4    importance of judicial restraint in a case such as this one.
5    In a case called United States v. Syufy Enterprises, the
6    court said that if market forces can potentially cure the
7    perceived problem, then a court, quote, ought to exercise
8    extreme caution because judicial intervention in a
9    competitive situation can, itself, upset the balance of
10   market forces, bringing about the very ills the antitrust
11   laws were meant to prevent.
12       We believe that if Your Honor were to enjoin this
13   affiliation, the court would in effect be doing exactly what
14   the Ninth Circuit has cautioned against, intervening in a
15   competitive situation, which will upset the balance of
16   market forces and bring about the very anticompetitive ills
17   that the antitrust laws were meant to prevent.
18       So, Your Honor, we would respectfully request that the
19   court consider these ten mistakes in plaintiffs' case as the
20   evidence is brought forward in the next four weeks.  We
21   submit that as the court hears that evidence in light of
22   these ten mistakes, Your Honor will conclude that judgment
23   should be entered against plaintiffs on their pricing
24   claims.
25       Now I would like to turn to the claims of the hospital

157

1  plaintiffs.  But at the outset, before getting into the
2  specifics, it's worth recalling the words of the Areeda and
3  Hovenkamp treatise.  Because a competitor opposes efficient
4  aggressive and legitimate competition by its rivals -- and
5  that is exactly what we're seeing here -- it has an
6  incentive to use an antitrust suit -- which is also what
7  we're seeing here -- to delay their operations or to induce
8  them to moderate their competition, which is, again, what
9  they have succeeded in doing because we haven't been able to
10  integrate Saltzer.
11      For that reason, the courts are properly skeptical of
12  many rivals' suits, particularly when the practices are not
13  obviously exclusionary, so say Professor Areeda and
14  Professor Hovenkamp.
15      Perhaps recognizing this lawsuit is nowhere near the
16  rare case in which a transaction can be successfully
17  challenged by a competitor, the hospital plaintiffs advance
18  a line of argument based on alleged exclusionary conduct,
19  which argument involves three additional mistakes.
20      It's noteworthy, in my view, that the government
21  plaintiffs explicitly state in their pretrial brief that
22  they, quote, do not join, end quote, the hospital plaintiffs
23  in the hospital plaintiffs' argument.
24      So mistake No. 11:  The hospital plaintiffs falsely
25  imply that some loss of referrals from the Saltzer

158

1  physicians amounts to a violation of the antitrust laws.
2      In fact, the antitrust laws do not concern themselves
3  with harm to competitors.  They prohibit harm to
4  competition.  Loss of referrals or exclusion from networks
5  can violate the antitrust laws only if they foreclose the
6  competitor plaintiffs from competing in the relevant market.
7      Here, this court will not hear a shred of evidence to
8  the effect that, by virtue of the Saltzer transaction, Saint
9  Alphonsus or TVH will cease to be effective competitors.
10  Sure, they would like to have more referrals from Saltzer
11  physicians; sure, they would like to, you know, be in every
12  network they can be.  But there is nothing in this record
13  that will show that Saint Alphonsus or Treasure Valley
14  Hospital will cease to be effective competitors.
15      Let me just say a couple words about each of those two
16  entities.  Saint Alphonsus is part of a huge national chain
17  that is highly capitalized and has tremendous resources to
18  bring into this market.  Treasure Valley Hospital is owned
19  by physicians who have every financial incentive to refer
20  patients to that hospital.  They make a tremendous profit.
21      I had to chuckle when I heard Mr. Powers talk about the
22  poor TVH physicians.  I think everyone in this courtroom
23  would like to have the balance sheet of those poor TVH
24  physicians.
25      But in terms -- also to note, Mr. Powers made a big

159

1  point about they are a lower cost provider.  Let's talk a
2  little bit about the reasons for the lower cost.  They take
3  the least risky procedures.  They do only outpatient work.
4  They take very little Medicaid, much less than either Saint
5  Alphonsus or St. Luke's.  And this is very important:  They
6  don't have an emergency room.  They don't operate an
7  emergency room.  They don't take any kind of care that comes
8  to an emergency room.  So no wonder their costs are so low.
9  So I think that's worth pointing out.
10      But in any event, the court will hear evidence -- I
11  should also say in that, that it's noteworthy that Congress
12  in the Affordable Care Act passed a law forbidding the
13  building of any more physician-owned specialty hospitals
14  along the lines of TVH.
15      To the contrary, Your Honor, the court will hear
16  evidence that Saint Alphonsus and TVH are investing heavily
17  in Canyon County.  They are both -- notwithstanding their
18  talk about they have lost some referrals from Saltzer
19  physicians or they are concerned about this or that, they
20  are both fully busy and active and strong competitors.
21  Their plans to invest heavily in Canyon County are not the
22  actions of competitors who believe that they will no longer
23  be able to compete.  What it does explain is why Saint
24  Alphonsus and TVH are trying so hard to have the Saltzer
25  transaction undone.

160

1      That brings me to mistake No. 12.  The hospital
2  plaintiffs erroneously suggest that they will lose so many
3  referrals and other opportunities, that their ability to
4  compete, that their ability to be effective competitors in
5  the market will be comprised.
6      Quite to the contrary, the defendants will demonstrate
7  at trial:  One, there is absolutely no policy against
8  referrals to Saint Al's or TVH; two, St. Luke's does not
9  incentivize physicians not to refer to these institutions.
10      And, by the way, Mr. Ettinger could not be more wrong
11  when he says that the contract with Saltzer incentivizes the
12  physicians to refer away from Saint Al's or from TVH.  There
13  is nothing of that in the contract.  And contrary to what he
14  says, they do not get paid for sending ancillary services to
15  St. Luke's or anyone affiliated with St. Luke's.  I don't
16  know where he got that, but he is just dead wrong about
17  that.
18      Three, it was a key consideration for the Saltzer
19  physicians that they be free to refer in the best interests
20  of their patients; and, four, Saltzer physicians have
21  continuing and are continuing to make referrals, substantial
22  numbers of referrals, to physicians affiliated with Saint
23  Alphonsus and TVH.
24      So let me talk a little bit about the network issue.  I
25  really, again, kind of was interested in Mr. Ettinger's

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 44 of 57

Bench trial, 09/23/2013

161

1  slide about referrals.  The slide he put up there was:  What
2  if Saint Al's kicks Saltzer out of its network?  I don't
3  know if the court noticed that.  But the slide was not
4  talking about St. Luke's; the slide was talking about Saint
5  Alphonsus kicking Saltzer out of its networks.
6       As to networks, the evidence will show that there is
7  intense competition.  And Mr. Ettinger's parade of
8  situations in which St. Luke's determined not to bid all
9  arose in the context of fee-for-service contracts where, as
10 we have already said, what St. Luke's is interested in is
11 trying to develop these risk-based, value-based contracts,
12 and he overlooks the fact that that is a fundamental part of
13 St. Luke's strategy.
14      The fact is, as I said, there is intense competition.
15 There will continue to be intense competition.  St. Luke's
16 has its own network.  Saint Alphonsus has its own network.
17 There are broad networks that consist of many providers, and
18 I don't think we need to worry about that kind of
19 competition.
20      And finally, the third -- the 13th mistake, the third
21 one that is exclusive to the hospital plaintiffs, is that
22 they rely on evidence from past transactions that have
23 absolutely no probative value on the referral issue.
24      The hospital plaintiffs will seek to introduce evidence
25 based on purported changes in hospital admissions by

162

1  surgical practices that have been acquired by St. Luke's.
2  In fact, the evidence will show that, to the extent that
3  admissions went down, it was often because primary care
4  physicians at Saint Alphonsus stopped referring patients to
5  the acquired practices or for other reasons, such as actions
6  by TVH that were unrelated to the conduct of St. Luke's.
7       In any event, the evidence will show that as far as
8  Saint Alphonsus' lost admissions from the surgeons whose
9  practices were acquired by St. Luke's, Saint Alphonsus made
10 up for that loss by having other surgeons affiliated with
11 Saint Alphonsus do the work.
12      Saint Alphonsus and TVH are not in any way threatened
13 as competitors.  Sure, they don't like the competition, but
14 they are not in any way threatened as competitors.
15      Now, the hospital plaintiffs will also rely on a study
16 by one of its experts that purports to show a drop-off in
17 admissions to Saint Alphonsus by primary care physicians who
18 became associated with St. Luke's.
19      In fact, the evidence will demonstrate that those
20 physicians continued to send patients for admission to Saint
21 Alphonsus.  However, because the admitting physician was
22 formally listed on the document reviewed by the expert as a
23 Saint Alphonsus hospitalist, it appeared to her that
24 admissions had dropped off significantly.  In fact,
25 admissions did not significantly drop off, as the physicians

163

1  in question will testify.
2       The artifact caused by the fact that the admitting
3  physician is listed as a Saint Alphonsus hospitalist
4  completely undercuts reliance by the hospital plaintiffs on
5  the study.
6            THE COURT:  What about the anecdotal evidence, the
7  documents put up by either Mr. Greene or Mr. Ettinger or
8  Mr. Powers, which suggested that there was an understanding
9  prior to some of these prior acquisitions that, in fact, the
10 referrals pattern would change and that the referrals would
11 come, if not exclusively, largely to St. Luke's?
12      Again, I don't have them in front of me, but was that
13 just a misunderstanding about what --
14           MR. BIERIG:  I think that's a misunderstanding.
15 But, more importantly -- I think that's wrong.  But, more
16 importantly, what we're dealing with here is not these past
17 transactions in the Magic Valley.  We are dealing with the
18 Saltzer transaction.
19           THE COURT:  I thought some of those had to do
20 with, like, with the Boise Orthopedic Group.
21           MR. BIERIG:  Yes.  You will hear from the Boise
22 Orthopedic Group, and you will find out, Your Honor, that
23 there was no understanding along those lines whatsoever.
24           THE COURT:  Okay.
25           MR. BIERIG:  But, more importantly, in the Saltzer

164

1  transaction, there was an understanding.  And the
2  understanding is the exact opposite of what plaintiffs would
3  have the court believe.  The understanding would be that the
4  Saltzer physicians would be free to refer and to admit
5  wherever -- to refer to whatever physician and to admit to
6  whatever facility they deem to be in the best interests of
7  their patients.
8       That was an article of faith with the -- with the
9  Saltzer physicians, and it was one that St. Luke's readily
10 agreed to because St. Luke's is interested in, to go back to
11 the Triple Aim, better care.  If the Saltzer physicians
12 believe that their patients are best served at Saint
13 Alphonsus Nampa or by having a surgeon from TVH or a surgeon
14 from Saint Alphonsus do surgery or some specialist do the
15 work, it was critical for -- for Saltzer that they be able
16 to do that, and St. Luke's was in full agreement with that
17 approach.
18      So, whatever the case may have been with Boise
19 Orthopedic -- and Your Honor will hear from a representative
20 of that group -- the fact could not be more clear that
21 Saltzer has retained the ability and will retain the ability
22 to refer wherever it deems to be in the best interest of the
23 patients.  St. Luke's supports that, and the facts support
24 it.  The facts support it.  If you look at the actual
25 referral patterns, you will see that St. Luke's is

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW v. Document 549    Filed 11/04/14    Page 45 of 57

165

1    continuing to make substantial referrals to Saint
2    Alphonsus-Nampa and to physicians who are associated with
3    the hospital plaintiffs.
4        So, in short, Your Honor, the evidence will show that,
5    when judged against the very high standard that the hospital
6    plaintiffs must meet, the claim of unlawful exclusionary
7    conduct by virtue of the Saltzer transaction is not even
8    close to one of the cases described by Professor Areeda and
9    Hovenkamp.  What it is is an attempt to forestall and
10   foreclose the competition that St. Luke's is bringing to
11   Canyon County.  Accordingly, we would respectfully ask this
12   court to enter judgment against the hospital plaintiffs on
13   their claims.
14       Now, finally, even though we believe strongly that
15   there has been absolutely no violation of law, I feel
16   compelled to say a few words about the remedy proposed by
17   plaintiffs.  And I would like to start out by citing not a
18   1960 case, you know, over 50 years old -- although I,
19   myself, have cited one that's a hundred years old.  But I
20   would like to start out with another -- a decision by
21   another district court in this circuit.
22       As the Central District of California put it,
23   "Divestiture should not be entered into without substantial
24   evidence that the benefit outweighs the harm."
25       Here, the evidence will demonstrate that quite the

166

1    opposite is true.  Any benefit of divestiture -- and we see
2    none -- will be far outweighed by the harm that that remedy
3    would cause.
4        To begin, far from injecting competition into the
5    market, the most likely result of divestiture is dissolution
6    of Saltzer.  Certainly, Saltzer will not be an effective
7    competitive force.
8        Your Honor will hear testimony from Bill Savage, CEO of
9    Saltzer, and from Saltzer physicians about the loss of seven
10   surgeons who left Saltzer to join Saint Alphonsus.  These
11   surgeons were Saltzer's greatest revenue producers.  Their
12   departure has so crippled Saltzer financially, that, if
13   divested, Saltzer is unlikely to survive very long and will
14   certainly not be a strong competitive force.
15       The plaintiffs, you know, they seem to think they know
16   what's going to happen, but I would submit that Mr. Savage,
17   the CEO of Saltzer, knows better than they do.  But
18   beyond -- beyond Mr. Savage, his testimony will be
19   corroborated and enhanced by the analysis performed by
20   defendants' expert Lisa Ahern.
21       Ms. Ahern will show that, as a result of the departure
22   of the surgeons and the loss of other physicians, if Saltzer
23   is divested, the Saltzer physicians will be at income levels
24   at approximately of only two-thirds of where they were prior
25   to the affiliation.  In the circumstances, it seems quite

167

1    fair to conclude that the most likely outcome of divestiture
2    would be the breakup of Saltzer and possibly the departure
3    of some of the Saltzer physicians from the Nampa area.  You
4    will hear a lot of testimony on that, Your Honor.
5        On the other hand, Saltzer physicians will testify that
6    divestiture will eliminate their access to the
7    infrastructure that they need to offer their patients the
8    fully integrated 21st century medicine that those patients
9    deserve and that affiliation with St. Luke's permits them to
10   have.
11       The Saltzer physicians will explain how they will not
12   be able to implement community health outreach programs
13   nearly as effectively as they would as part of St. Luke's.
14   They will further explain how they will not be able to treat
15   all Medicaid and low-paying patients.  Thus not only
16   frustrating their own view of what they, as physicians,
17   would like to do, but frustrating the objective of the
18   Department of Health and Welfare of this state to see that
19   quality care be provided to all such patients.
20       And we will provide evidence that divestiture will
21   dramatically slow the efforts of St. Luke's to move to
22   value-based payment, efforts which are also very much
23   supported by the Department of Health and Welfare of the
24   State of Idaho.
25       Third, divestiture is entirely unnecessary even if the

168

1    court were somehow to find that the Saltzer transaction is
2    unlawful.  Any concern about higher prices through the
3    exercise of a market power can be remedied by an order
4    requiring that fee-for-service contracts be negotiated by
5    Saltzer, which remains a distinct entity independent of
6    St. Luke's.
7        Indeed, St. Luke's offered this approach, both to the
8    Federal Trade Commission and to the State of Idaho, even
9    before the government plaintiffs filed suit.  And the
10   Federal Trade Commission, itself, has imposed a similar
11   remedy in the Northwest Hospital case and recently accepted
12   a similar remedy in the Phoebe Putney case.
13       Your Honor, at the end of the day, this case raises the
14   question of whether a midsize market such as the Treasure
15   Valley can realize the benefits of the clinically integrated
16   care that Congress in the Affordable Care Act sought to
17   incentivize and that the best thinkers in health policy
18   believe to be our society's greatest hope for reducing cost
19   while increasing quality.
20       The inescapable fact, as demonstrated by these numerous
21   systems that we have talked about and that is beginning to
22   be demonstrated by St. Luke's, itself, is that creation of a
23   fully integrated delivery system on a scale necessary to
24   permit transformation from volume-based to value-based
25   payment requires close financial and personal alignment with

169

1    a large number of primary care physicians.
2         On the facts of this case, if the court were to find
3    the Saltzer transaction unlawful, Your Honor would be
4    sending a signal across America that wooden application of
5    HHI numbers and recitation of speculative competitive harm
6    will relegate the people in such smaller markets to what the
7    Seventh Circuit has termed "horse-and-buggy medicine."
8         That, Your Honor, we submit, would be absolutely the
9    wrong signal to send.  Preempting innovation in healthcare
10   in this way is not consistent with, much less required by,
11   the antitrust laws.  This court should not erect a judicial
12   barrier to innovation in healthcare here in Southern Idaho
13   and as a precedent throughout this nation.  We would
14   respectfully submit, Your Honor, that after all the evidence
15   is in, this court should enter judgment for defendants on
16   all claims.
17        Thank you.
18        THE COURT:  Thank you.
19        Mr. Julian.
20        MR. JULIAN:  May it please the court and counsel.
21   I wish to offer just a few brief comments as my opening
22   statement.  I am Brian Julian.  I represent Saltzer Medical
23   Group.  With me is Dr. John Kaiser.  At various times, we
24   may see Bill Savage.  Dr. Kaiser is the president of the
25   group; Bill is the CEO.

170

1         I realize this case is important to all parties.  I
2    think, as my friend Ray Powers stated the other day, there
3    are still obviously primary and secondary parties.  Saltzer
4    finds itself aligned with St. Luke's Health System with a
5    common defense and a shared need to present this case in an
6    efficient manner under the clock.
7         I can represent to the court that we have discussed
8    major and significant issues with St. Luke's counsel.  We
9    have reached consensus.  Thus, if it appears Saltzer is not
10   asking as many questions or not calling as many witnesses,
11   we are doing that out of the economics and efficiency
12   required to present this in a timely fashion.
13        I am very much aware of the characteristics of the
14   physicians of Saltzer Medical Group.  I have represented
15   them for probably 20 years.  Simply put, Saltzer Medical
16   Group opposes the claims made by the government that somehow
17   Saltzer is reducing competition and impairing medical care,
18   when the short of the matter is to be nothing could be
19   further from the truth.
20        Further, the remedy sought by the government plaintiffs
21   against Saltzer would cause great harm to this clinic and
22   the respective medical care provided.
23        Effectively, I represent a doctor's office.  This
24   doctor's office has changed over the last couple years.  It
25   has lost about a dozen doctors.  The top producers have

171

1    quit, gone to work for Saint Al's, which now maintains a
2    significant presence for orthopedic surgery in Nampa.
3         Our point in the defense is that the government, when
4    administering a utilitarian law, and the court, in applying
5    the law, should do what a good physician does every day of
6    his or her life.  First, do no harm.  Do no harm to the
7    ultimate consumer.  Do no harm to the good quality of
8    medical practice in the community.  And do no harm to
9    physicians who have chosen to make integration of medical
10   services a valued tool for properly serving their patients
11   with their chosen partner, St. Luke's Health System.
12        You will hear from a number of the Saltzer doctors.
13   Dr. John Kaiser, who is here, is the president of the group
14   and presents an interesting perspective and background.  He
15   holds a bachelor's degree in electrical engineering, has a
16   master's degree in industrial engineering, was in a career
17   with IBM for many years.  He also acquired his master's in
18   business administration before going on to medical school
19   and becoming a board-certified obstetrician/gynecologist.
20   He was also a shareholder for Treasure Valley Hospital.
21        So his perspective on business survival and business
22   plans is of a distinctive quality.  He, along with other
23   physicians, will testify that, due to market conditions, it
24   became obvious that a standalone medical clinic that charges
25   fees for services could no longer survive in the current

172

1    medical climate.
2         Affiliation with another group was absolutely
3    essential.  It was essential for economic survival as well
4    as simply recruitment for replacement of retiring or
5    terminating physicians.  Such affiliation is not only a
6    trend, but it appears to be highly encouraged under the
7    Affordable Care Act and under Medicare regulations, which
8    strongly promote consolidation and the efficiencies that go
9    with such a business model.
10        Of course, St. Luke's was receptive to the idea when
11   approached by Saltzer.  You will hear that the concept of
12   affiliation was first considered as much as seven or eight
13   years ago.  It is interesting that Saint Al's, one of the
14   plaintiffs in this matter, also made an offer to affiliate
15   the services with Saltzer.
16        After approximately three years of deliberation,
17   consideration, and negotiations, Saltzer selected St. Luke's
18   Health System and rejected Saint Al's.  Prior history with
19   Saint Al's was a significant factor in coming to this
20   decision.
21        Of course, if the group would have gone with Saint
22   Al's, that entity would have had a larger market share than
23   the current affiliation with St. Luke's under the
24   plaintiffs' definition of market.
25        What you will also hear transcending even the

173

1 economic -- economics of consolidation was the physicians'
2 desire to improve medical care. You will hear that
3 physicians are excited about advanced electronic medical
4 record system. And while Saltzer did have its own
5 electronic medical record system, the Epic system offered by
6 St. Luke's is of a considerable higher quality with much
7 greater capability. It is the gold standard.
8     In fact, the evidence will show that Saltzer actually
9 tried to purchase the Epic system but was told by Epic it
10 could not purchase it because they weren't big enough to
11 have it.
12     In addition, St. Luke's Health System integrates Epic
13 with WhiteCloud, and it's an additional software tool.
14 WhiteCloud now provides Saltzer physicians with quality
15 control, statistical guidelines in the treatment of their
16 individual patients. For example, Dr. Kunz and Dr. Kaiser
17 will testify how this program has served as a remarkable
18 advance in improving medical care.
19     Testimony will also show that Saltzer physicians are
20 enthusiastic about access to these tools and increasing the
21 level of care for their patients that would simply not have
22 been available without this affiliation. They want to have
23 the highest medical care. They believe their patients
24 deserve the kind of care that they experience at Mayo
25 Clinic, at the Cleveland Clinic. And this gives them that

174

1 opportunity.
2     Another great benefit which the physicians support is
3 the ability to treat any patient regardless of their ability
4 to pay or with whom they are insured. All of the
5 government-insured patients, whether it be Medicare,
6 Medicaid, TRICARE, even the uninsured, will be accepted.
7 And a physician is going to be paid regardless of insurance
8 status.
9     It should be remembered the purpose of antitrust law is
10 to enhance consumer welfare. In Canyon County, there is a
11 growing Medicaid population. A significant benefit has
12 happened to those consumers. No longer are they waiting in
13 a public medical clinic for services. They are allowed to
14 go to the best clinic in the county, maybe the best clinic
15 in Idaho, for medical care. Physicians no longer have to
16 screen their patients on ability to pay. They are able to
17 render medical treatment to all patients regardless of their
18 insurance status.
19     How can this significant and growing population just be
20 ignored when we speak of enhancing consumer welfare?
21 Physicians will testify that to limit the geographical area
22 only to Nampa is unrealistic. Many patients travel to
23 Meridian or where they work in Boise for medical care and
24 vice versa.
25     The Saltzer integration with St. Luke's Health System

175

1 will have no negative effect on the availability of or costs
2 of medical services for the Nampa/Canyon County residents.
3 There is no threat of any inappropriate leverage from
4 St. Luke's and Saltzer negotiating with payers. Such
5 projections are based upon pure speculation.
6     Lastly, the evidence will show that if this transaction
7 were to be unwound, the survival of Saltzer Medical Group is
8 in question. For example, the testimony will show that the
9 doctors would have to assume massive amounts of overhead due
10 to the leaving, the absence of other producing physicians.
11 Working the same hours, same patient loads, they can expect
12 approximately a one-third decrease in their pretransaction
13 pay due to the increased overhead. Medicare, Medicaid
14 patients would have to be restricted.
15     At the time, Saltzer would have to -- at that same
16 time, they would have to try to recruit new physicians
17 without any hospital assistance, no economic incentives.
18 And it simply would be an act of futility.
19     With Saint Al's taking the top-producing physicians,
20 Saltzer can't sustain itself. The resources of Saltzer will
21 be so depleted and the prospect of rehabilitation so remote,
22 that Saltzer will face the grave probability of business
23 failure. It's likely this will lead to doctors finding more
24 lucrative deals, other cities in Idaho, perhaps in other
25 states. How can that be said to better the consumer welfare

176

1 in Nampa?
2     Based on this, we believe plaintiffs' claims must fail.
3 Saltzer stands uniformly with St. Luke's in support of this
4 transaction. Thank you.
5     THE COURT: Thank you, Mr. Julian.
6     Counsel, we only have one hour before the end of the
7 day. Let's take one more ten-minute break, and we'll try to
8 hold this to ten minutes. Let's try to reconvene at 20
9 minutes to. We will then have 50 minutes for our first
10 witness, which I assume the plaintiff will have teed up and
11 ready to call. We'll be in recess for ten minutes.
12     MR. GREENE: Your Honor, if I may.
13     THE COURT: Mr. Greene.
14     MR. GREENE: I'm so sorry. The first witness
15 plaintiffs will call is Mr. Crouch. We believe this is
16 one of the witnesses for which the courtroom may need to be
17 closed. So you may want to --
18     THE COURT: If counsel is in agreement -- I should
19 have checked the order. If that's the case, we'll have to
20 clear the courtroom while Mr. Crouch is testifying again.
21 And then as soon as -- well, will that take the balance of
22 the morning -- of the day?
23     MR. GREENE: Yes, and carry over until tomorrow I
24 think, Your Honor.
25     THE COURT: So, with that understanding, then,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 48 of 57

Bench trial, 09/23/2013

177

1 just to make it easier on the audience, then we won't allow
2 anyone else back into the courtroom for the balance of the
3 hearing today.
4      We'll be in recess.
5      (Recess.)
6      ****** COURTROOM CLOSED TO THE PUBLIC ******
7      THE COURT:  The plaintiffs may call their first
8 witness.
9      MR. STEIN:  Your Honor?
10      THE COURT:  Yes.
11      MR. STEIN:  I'm sorry.  Scott Stein.  Before we
12 begin, I just wanted to flag one issue.  We anticipate that
13 Mr. Crouch's testimony is going to cover a number of the
14 subjects that have been the subject of some of the pending
15 motions in limine and even the briefing that was done last
16 week concerning the Magic Valley and the surgery center
17 issue.  And I'm sensitive to the fact that we don't want to
18 keep popping up every time these issues come up.  Your Honor
19 may want to hear some testimony on it before ruling on it.
20 We would just look for some direction from the court as to
21 how to handle that so we preserve our objections.
22      THE COURT:  Well, I think one way we've, normally,
23 or that I have often addressed that is just allow one party
24 to have a continuing objection based upon a previously filed
25 motion in limine.  I think, by and large, the court, as I

178

1 most commonly do, feel that it's very difficult to resolve
2 those kinds of issues without hearing the evidence in
3 context.
4      With regard to the Magic Valley issue, in particular, I
5 thought it would be necessary to really have the context and
6 understand what the differences are and what the parties'
7 arguments are.  I think if it's adequate for your purposes,
8 I could simply note that you have a continuing objection to
9 any question regarding the Magic Valley transaction, of
10 course subject to the court's final ruling, perhaps as part
11 of its final decision or during the course of the trial that
12 it either is or is not admissible.  Is that adequate?
13      MR. STEIN:  I think so, Your Honor.  Thank you.
14      THE COURT:  All right.  Then you have a continuing
15 objection to any testimony concerning the Magic Valley
16 transaction.
17      All right.  Mr. Greene.
18      MR. GREENE:  Thank you, Your Honor.  Plaintiffs
19 call Jeffrey Crouch.
20      THE COURT:  Mr. Crouch.
21      Mr. Crouch, would you please step before the clerk, be
22 sworn as a witness, and then follow Ms. Gearhart's
23 directions from there.
24      JEFF THOMAS CROUCH,
25 having been first duly sworn to tell the whole truth,

179

1 testified as follows:
2      THE CLERK:  Please take a seat in the witness
3 stand.
4      MR. GREENE:  Your Honor, I do have a small binder
5 of documents I would like Mr. Crouch to have with him at the
6 witness stand.
7      THE COURT:  Yes.  Mr. Metcalf, could you help us
8 out.
9      THE CLERK:  Please state your complete name and
10 spell your name for the record.
11      THE WITNESS:  Jeff Thomas Crouch, C-R-O-U-C-H.
12      THE COURT:  You may inquire.
13      DIRECT EXAMINATION
14 BY MR. GREENE:
15      Q.  Good afternoon, Mr. Crouch.  Let's start with just
16 a few moments about who you are.  Could you please describe
17 your education after high school.
18      A.  Undergraduate work at Brigham Young University
19 with a major in finance.  Then right after that graduation,
20 that would have been 1985, went to the University of
21 California at Los Angeles in their school of public health.
22 Earned a master's degree in public health.  That degree is
23 the -- in that school that's their focus on hospital and
24 health services management.
25      Q.  So this would be closer to a program that would be

180

1 equivalent of a master's in business administration?
2      A.  Yes, but with a specific focus on the healthcare
3 industry.
4      Q.  Okay.  And Mr. Crouch, can you briefly describe
5 your work history since you graduated from UCLA.
6      A.  Right after UCLA worked for Ernst & Whinney, which
7 at that time was a large consulting firm.  I think they're
8 one of the big -- at the time big four accounting firms.
9 That was in downtown Los Angeles.  My activities were in
10 revenue management for hospitals, bonds for hospitals to
11 raise money, and process re engineering for business offices
12 within hospitals.
13      After Ernst & Whinney, I was there a couple of
14 years.  I joined up with Humana, which at that time was a
15 hospital company.  They owned hospitals across the country.
16 And I worked in two of their facilities in Orange County for
17 the next three or four years.
18      I, at that point, decided to leave the hospital
19 side of the industry and enter into the health plan side and
20 took a position with PacifiCare Health Systems.  That would
21 have been around 1992 in their corporate office in Cypress,
22 California.  I was there for a couple of years, was asked to
23 take on the director of finance role for a new acquisition
24 that they just concluded, which was California Dental Health
25 Plan.  That was the largest capitated dental plan in

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   v. Document 549   Filed 11/04/14   Page 49 of 57

181

1  California. I was there. That was a turnaround period. I
2  was there for a couple of years and was asked to go do the
3  same sort of turnaround sort of activity in Seattle, where I
4  took on responsibility for the third-party administrator
5  office in Seattle and was in Seattle with PacifiCare until
6  about 2001. And I could see that Humana was or, rather,
7  United Healthcare was about ready to acquire PacifiCare, so
8  I left there and joined Blue Cross of Idaho here in Boise.
9       Q.  And what was your position with Blue Cross?
10      A.  I joined as a director of provider contracting,
11  ended up becoming the vice president of provider contracting
12  as a promotion about three or four years later and have been
13  in that vice president role since around 2006.
14      Q.  What, in general terms, is that role, Mr. Crouch?
15      A.  My area manages all of the relationships with all
16  of the providers in Idaho. There are about 9,000 providers
17  in Idaho. We develop all the contract terms. We handle all
18  of the recruitment and contract activity for those
19  providers. We service their needs after the contract has
20  been signed. Any need that can't be managed through our
21  regular customer service line comes to my team.
22      Q.  And what is a provider for purposes of this
23  discussion?
24      A.  Anyone who is delivering healthcare services, so
25  that would range from physical therapy, pharmacy, to

182

1  hospitals and physician services.
2       Q.  And do you personally get involved in at least
3  some negotiations?
4       A.  Yes. I'm personally involved with any of the very
5  high-dollar negotiations.
6       Q.  And can you give some examples of those sorts of
7  high-dollar negotiations?
8       A.  The seven or eight largest hospitals in the state
9  we would consider to be high-dollar. They are all hospitals
10  that would be $10 million or more annually per contract, so
11  I would be involved in those. Most of those activities,
12  that would be back office involvement with review and policy
13  establishment for the very highest hospitals -- which would
14  be St. Luke's, Saint Al's, Eastern Idaho Regional Medical
15  Center, Portneuf, and Kootenai -- I would be personally
16  involved during the negotiation.
17      Q.  And, approximately, how large are those contracts?
18      A.  Those contracts are in the $30 million range on
19  the low end to REDACTED for St. Luke's.
20      Q.  And do you have a staff that assists you in this
21  work?
22      A.  I have a staff of 72: 10 of them are provider
23  contracting folks; 10 or 12 are data analyst folks; provider
24  relations; fraud, waste, and abuse; and some other
25  activities, as well.

183

1       Q.  What do your data analysts do for you?
2       A.  They prepare all the material as part of the
3  contract negotiations. Some of the staff manage the fee
4  schedules that we use to compensate providers for services
5  rendered, ad hoc reporting, provider directory activities,
6  things along those lines.
7       Q.  Okay. I would like to take you back, briefly, to
8  your prior experience, because earlier in the day in a
9  portion of this proceeding in which you were not present, we
10  were talking a bit about risk-based contracting and,
11  specifically, risk-based contracting in California. Do you
12  have any experience with risk-based contracting in
13  California?
14      A.  Yes. As I mentioned, I was the director of
15  finance for California Dental Health Plan, which was the
16  largest capitated medical -- or dental plan in California.
17      Q.  And what is a capitated plan?
18      A.  Literally, per head, so under a capitation
19  arrangement, an insurance company will compensate a provider
20  organization a fixed amount per person, and that's a
21  capitated fee. That amount varies based on the level of
22  risk that the provider is taking on and based upon the
23  acuity of the membership in that risk. And so the
24  capitation amount is a transfer of risk from the health plan
25  to the provider.

184

1       Q.  So can you describe in lay terms what is the risk
2  that the provider entering into such a contract takes?
3       A.  It can vary pretty widely. In the dental world,
4  as an example, there are very few catastrophic services, so
5  the capitation would transfer the risk for bite film X-rays,
6  for repair of cavities, for root canals, for replacement of
7  crowns, that sort of thing, all the way up to -- when I was
8  in the corporate office at PacifiCare and when I was in
9  Seattle, we would capitate provider organizations, so
10  commonly physician groups, for different levels of risk that
11  would be on the low side primary care services and on the
12  high side primary care specialty care and hospital services
13  in their town.
14      Q.  And do you have perspective on the -- this would
15  be for physician services and, preferably, primary care
16  physician services. Is there -- what's the smallest
17  contract you've seen that is risk-based that's with
18  physicians?
19      A.  So I'm going to define "risk" here, probably a
20  term that needs a little bit of definition.
21      Q.  Please.
22      A.  When I'm talking about risk, I'm talking about a
23  contract that will have the provider's payment level vary
24  based upon the outcome of the services that were delivered
25  that year or that month.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 50 of 57

185

1    So the providers at risk, their payment would be
2 higher or lower based upon the performance of the membership
3 in their group. We have a network or a risk arrangement in
4 Boise as small as two physicians. It's Initial Point
5 Medical Group. And from that two physicians on the low
6 side, it would go up to many hundreds of physicians for the
7 large systems.
8    THE COURT: Can I ask you to explain what you
9 meant by having the provider's payment level vary based upon
10 the outcome of the services? So could you just give me a
11 more concrete example of how that would work, either, I
12 guess, in the California dental or the two-physician-based,
13 risk-based plan you have identified here in Boise?
14    THE WITNESS: Yeah. So I can give you -- use some
15 real-world numbers. On a commercial health plan here in
16 Idaho, you and I and people in the room here would be in
17 what would be commercial. That's a non-Medicare and
18 non-Medicaid insurance product. The average premium for a
19 member in such a product is going to be about $300. So we
20 call that the total basket for services that could,
21 potentially, be transferred out through a capitation
22 arrangement to a medical group.
23    The portion of that that's primary care is going to be
24 about 30, 30 to 33 percent, so that would be 90-ish dollars
25 would be for primary care services -- or for physician

186

1 services. 50 percent of that amount is going to be for
2 hospital services. So that would be $150 or so. And then
3 the balance would be pharmacy and whatnot.
4    So when we're establishing a capitation arrangement,
5 one of the questions we're establishing is how much of that
6 $300 -- excuse me -- total budget is the provider group
7 going to be accountable for. And then we put corridors
8 around that because a group the size of, say, Initial Point,
9 which is two providers, they don't have the capital capacity
10 to go at risk for catastrophic services. So we would put a
11 corridor of risk around their performance.
12    THE COURT: Something akin to like a large
13 deductible?
14    THE WITNESS: Yeah, although it doesn't -- it
15 doesn't play out quite that way. So more likely what we
16 would do is we would go to -- so real-world example, another
17 one, a product that we're putting in the marketplace right
18 now is a product that takes that $300, and we would go to
19 the provider and say we need to get you to give us
20 a discount. Your risk is going to be to the degree of the
21 discount you're offering up front. So they might say we'll
22 give you a 5 percent discount. We build that discount into
23 our premium so that $300 now becomes a lower dollar amount.
24 They are not at risk for anything less than the 5 percent
25 discount they had before, and then they can participate in a

187

1 surplus if there is a surplus in the pool above the $300
2 level.
3    THE COURT: But they would participate in a risk
4 for the nonprimary care portion as well?
5    THE WITNESS: Yeah.
6    THE COURT: So that they have an incentive to
7 reduce unintended -- you can slide your chair up.
8    THE WITNESS: No, I was bumping the arm here so --
9    THE COURT: Is that more comfortable for you?
10    THE WITNESS: Good now, yeah.
11    THE COURT: All right. So that's what would
12 provide an incentive for the provider to sort out ways to
13 provide the same healthcare in a less expensive but still
14 effective fashion so that they can profit from that and
15 reduce the risk of actually requiring hospitalization for
16 more expensive types of care. Is that the concept?
17    THE WITNESS: Right. And as you mentioned, we
18 would like them to have as part of that incentive
19 arrangement the whole package of healthcare services so that
20 they are interested in hospital services and outpatient
21 surgeries in addition to just professional services.
22    THE COURT: All right. I'm sorry. Go ahead,
23 Mr. Greene.
24    MR. GREENE: That's fine.
25 BY MR. GREENE:

188

1    Q. I would like to get a sense of how Idaho compares
2 to other states with respect to risk-based contracting. How
3 prevalent or common is risk-based contracting in the Idaho
4 market?
5    A. It is -- it is not common. The three different
6 types of products which are commonly sold in a commercial
7 marketplace are traditional products. A traditional product
8 would be where the member has -- just shares a coinsurance.
9 So we would provide 80 percent coverage, and the member
10 would pay 20 percent of the bill. That would be a
11 traditional policy.
12    PPO policy, which has more elements of member
13 cost-sharing, some benefit to the member if they go to a
14 physician office visit, as an example.
15    Both traditional and PPO products are not
16 capitated products. They are not risk-sharing products.
17    And then HMO-style products would be managed care,
18 and Idaho has not been accepting of HMO-style products ever.
19 They really developed in the '80s, and there has never been
20 a strong market for HMO products in Idaho.
21    Q. What briefly defines an HMO product, from your
22 perspective?
23    A. At point of enrollment, the member pulls from a
24 provider directory the provider they want to associate with.
25 That provider -- so in my case then I would pick the name of

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.  Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 51 of 57

189

1  a provider, and I would -- say I picked Dr. Jones, that is
2  now my primary care provider.  And I need to go to
3  Dr. Jones' office in order to have access to any services
4  through the benefit.
5      Q.  And why is it that risk-based contracting is so
6  closely associated with HMO products as distinct from the
7  PPO and traditional products?
8      A.  Well, the assignment of members is necessary in
9  order to have these risk pools work.  So in a PPO, let's say
10  that you're in Boise, there is St. Luke's, Saint Al's,
11  Primary Health, a variety of other providers.  We can't
12  attribute the portion of a member's claim that would
13  be -- so we wouldn't be able to give St. Luke's, as an
14  example, here is the list of the members in your pool
15  because the members haven't selected anyone.  And quite
16  commonly, we'll see a member will go to a St. Luke's primary
17  care doc, they will go to a Primary Health urgent care
18  center, and they will deliver their baby at Saint Al's.  And
19  so they are getting services from many of the providers in
20  the community.
21      Q.  And is that an ordinary expectation of consumers
22  in the Idaho market?
23      A.  That is one of the defining elements of a PPO or a
24  traditional product is that they can go seek services from
25  any provider in the directory.

190

1      Q.  Now, how does the Idaho situation compare with,
2  say, the situation in California?
3      MR. STEIN:  Objection, Your Honor, lack of
4  foundation.  I believe Mr. Crouch testified he has been in
5  Idaho and not any other state for the last 12 years.
6      THE COURT:  Well, Mr. Greene, perhaps, we can lay
7  a foundation how the witness knows.  I'm going to assume
8  there is a number of different ways that --
9  BY MR. GREENE:
10      Q.  Mr. Crouch, how do you know about risk-based
11  contracting in other areas?
12      A.  Well, the Affordable Care Act in front of us,
13  there has been a large volume of publications around the
14  nature of markets across the country.  And California and
15  Minnesota, a number of markets are represented as being
16  still highly penetrated for managed care.
17      Q.  Okay.  And do you have any direct professional
18  experience with respect to those kinds of products in the
19  California market?
20      A.  Sure.  I was involved in those products when I was
21  working for PacifiCare and when I was working in the Humana
22  hospital systems.
23      Q.  And to the extent of your knowledge, roughly, what
24  is the percentage of risk-based contracting as a percentage
25  of providers in California?

191

1      MR. STEIN:  Your Honor, same objections.
2      MR. GREENE:  He has provided a basis on his
3  reading and research.  I think that's more than sufficient,
4  Your Honor.
5      THE COURT:  I'm going to allow it, Counsel.
6  Objection is overruled.
7      THE WITNESS:  As I recall -- so the HMO style,
8  people picking an HMO product in California, it's 20 to 30
9  percent of the market is managed care.
10  BY MR. GREENE:
11      Q.  Okay.  Do you have knowledge of this Washington
12  market, Washington state market?
13      A.  I have not read anything recently about Washington
14  State, so I don't have detailed knowledge.
15      Q.  Okay.  Now, what are the advantages of a
16  risk-based contract to a payer like yourself?
17      A.  A risk-based contract is a better alignment of
18  financial incentives within the system.  So if you look
19  at -- you look, look at the U.S. healthcare and compare it
20  to any other nation in the world, we're at least double the
21  next nation in terms of cost and triple and four times the
22  amount commonly for other nations in the world.
23      And one of the elements that's believed to be
24  driving that high cost is the mechanism that we use to
25  reimburse services, which is we pay fee-for-service for

192

1  services in the U.S. healthcare system.  So in very simple
2  terms, that incentivizes volume.  It does not incentivize
3  value.  So the volume of it -- so a physician in our network
4  then has an incentive to perform -- the more services they
5  perform, the more they can bill and the more they're
6  compensated.
7      Q.  And are there any disadvantages associated with
8  risk-based contracts either to the provider or to the payer?
9      A.  Well, there would be an inherent concern that
10  services would be underutilized, so there are mechanisms put
11  in place to make sure that that doesn't occur.  If you had a
12  provider physician or a provider system who was trying to
13  maximize their income, they could maximize that income at
14  the detriment of their patients.  Outside of those
15  detriments, these financial arrangements that align those
16  incentives I think are beneficial.
17      Q.  Okay.  And are there different types of risk-based
18  contracts?
19      A.  Sure.  That's a pretty broad category.  You could
20  have a risk-based contract which -- where the provider says
21  I'll take a discount up front, and let's get together and
22  measure the services performed during the year, and at the
23  end of the year, if there is a surplus or a deficit, we'll
24  each participate in that surplus or deficit.
25      So that would be an early stage of a risk-based

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW Document 549 Filed 11/04/14 Page 52 of 57
Bench trial, 09/23/2013

193

1 contract for a provider that's trying to transition into it,
2 all the way to capitation, full capitation, where the
3 provider system would take -- would say they would take
4 $250 per member per month for any member in our product, and
5 we transfer that risk and that premium to them, and then
6 they would be at full risk for those services.
7     Q.   Okay.  And what would -- from your perspective,
8 what would be a comfortable size in terms of number of
9 doctors in a group that might be able to reasonably provide
10 services under a risk-based contracting scheme?
11     A.   Well, as I mentioned a little bit earlier, we have
12 a risk-based arrangement, which is two physicians, and, in
13 fact, those two physicians commonly outperform the rest of
14 the network.  We don't know exactly why that's happening,
15 but we suspect part of the reason is because they are very
16 focused on they know it's just the two of them.  They know
17 all the membership in their network, and they are very
18 focused on making sure that they are managing appropriately
19 within the network.
20         But in that case we would not pass on catastrophic
21 risk to the group because they could have a very damaging
22 financial result if they had a large oncology case or some
23 traumatic experience happen to one of their members.  So the
24 protections need to be in place to prevent that.
25     Q.   And are you aware of the size of the Saltzer

194

1 Medical Group, approximately?
2     A.   Medical groups change.  People come and go.  I
3 think it's 45 to 50 physicians, as I recall.
4     Q.   Do you think, theoretically, Saltzer Medical Group
5 could enter into risk-based contracts?
6     A.   They have been in risk-based contracts with us for
7 as long as I have been in the plan.
8     Q.   What are the -- could you please describe the
9 risk-based contracts.
10     A.   We have the one area in Idaho that is accepting of
11 what we would call managed care risk-based services is
12 Medicare Advantage, and there's a bunch of reasons for that.
13 One of the reasons is because the member is making an
14 individual selection rather than an employer having to make
15 a selection for their employees.  So Saltzer has been in our
16 Medicare Advantage risk pool for back into the 1990s, I
17 believe.
18     Q.   And are you familiar with the size of St. Luke's
19 healthcare system?
20     A.   Something on the order of 500 to 600 physicians.
21 I have not pulled that number recently.
22     Q.   And is there any reason, from your perspective,
23 why St. Luke's healthcare system couldn't engage in
24 risk-based contracting today?
25     A.   They're a participant in risk-based contracting.

195

1 They have our most aggressive version of risk-based
2 contracting in Idaho.  They have a -- we signed a contract
3 with them just in January to transfer more risk to them.
4     Q.   From your perspective, do they need additional
5 physicians in order to engage in additional risk-based
6 contracting?
7         MR. STEIN:  Objection, lack of foundation.
8         THE COURT:  I'm going to overrule the objection.
9 You may answer.
10         THE WITNESS:  The scale of St. Luke's and Saint
11 Al's and Kootenai, all of our large hospitals, they have got
12 sufficient scale to engage in risk-based contracting when
13 it's small numbers.  You don't need to have a large number
14 of physicians to engage -- we manage the level of risk
15 proportionate to the level of the provider organization.
16     I think there is -- I think there is a dispute in the
17 marketplace about what you need to have risk-based
18 contracting.  One of the questions would be do you need to
19 own the practice or can -- is a clinical affiliation
20 appropriate?  I think we have seen both examples work fine.
21 BY MR. GREENE:
22     Q.   And both the independent physician model and the
23 employed physician model seem to work with respect to
24 risk-based contracting?
25     A.   Yes.  In North Idaho, the North Idaho Health

196

1 Network is a network of nonemployed physicians.  They have
2 been -- I think we consider them the most active in terms of
3 integrating their clinical activities, far more active than
4 what we see here in the Treasure Valley.  They are not
5 employees of each other.
6     Q.   And can you briefly describe the activities that
7 they have engaged in that you think is so special?
8     A.   They have a contract -- you know, part of it is
9 you need a -- you need a clinical organization that allows
10 the doctors to get together and establish what their
11 program's going to look like to create a dynamic and a
12 culture for what their organization is going to look like.
13 And then they need to actually spend the time talking about
14 what are our protocols, what are we going to support in
15 terms of efficient utilization of care, in terms of quality
16 improvement programs.  It's just the hard work of getting
17 together and making the program work I think is what
18 differentiates the systems.  The ownership is not what
19 differentiates success in the system.
20     Q.   Okay.  And can you briefly describe what successes
21 they have had in terms of clinical integration.
22     A.   So clinical integration can have a specific legal
23 meaning, and I'm not trying to represent that they have met
24 or haven't met whatever that legal --
25     Q.   I'm sorry.  In the lay sense, what positive

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW   Document 549   Filed 11/04/14   Page 53 of 57

197

1 outcomes has this group had?
2      A.   Well, that is the one area of Idaho that has been
3 accepting of some level of managed care programs.  And so in
4 North Idaho we have had commercial managed care products
5 that have been active in the market, still have them active
6 in the market even to this day, although to a smaller extent
7 than in other states.  But part of that is because the North
8 Idaho Health Network has developed a level of integration
9 within their community and their system so that the
10 employers and that marketplace are willing to buy their
11 product.
12      Q.   Okay.  Now, how does risk-based contracting
13 compare to value-based contracting?  Are those similar terms
14 or different terms?
15      A.   I guess I would define -- they are similar in some
16 way.  Value has got maybe a broader connotation.  I don't
17 know how you would -- maybe there is a question at play
18 there.  Probably wasn't -- that may have come up earlier,
19 I'm guessing.  I don't know how you define value other than
20 delivering a product that's either lower cost or higher
21 quality.  So when we talk about value as a health plan,
22 those are the two components we would identify as being the
23 variables within the value equation as the price goes lower
24 or the quality is improved.
25      Q.   Okay.  And have you ever sought to negotiate a

198

1 risk-based contract with BCI that they did not want to enter
2 into, ultimately?
3      A.   We're talking about NIHN or North Idaho Health
4 Network?
5      Q.   I'm so sorry.  St. Luke's.
6           THE COURT:  Would you rephrase the question?
7           MR. GREENE:  Sure.
8 BY MR. GREENE:
9      Q.   Are you aware of any risk-based contracts that
10 St. Luke's refused to enter into with BCI?
11      A.   If you look at the payment system on a scale, it's
12 not a yes or no, and it's not just one choice or a second
13 choice.  So if you look at it on a scale, the left side of
14 the scale is going to be fee-for-service payments.
15 Physician sees a patient, they bill us a code, we pay them
16 the fee for that code, and then that goes on as services
17 rendered.
18           There are a whole series of risk-based
19 arrangements that can occur prior to capitation for a
20 population of members.  One of them is bundled payments.
21 And we have been, as a health plan, interested in
22 implementing a bundled payment program for many, many years.
23 St. Luke's is the first organization that we approached for
24 a bundled payment program, and they declined to participate
25 and have continued to decline.

199

1           We have had a great deal of success with a bundled
2 payment with one of the other hospital systems, though, so
3 we continue to try to pursue that avenue, and that's not
4 been met with any success.
5      Q.   And what is a bundled payment program?  What does
6 that mean for us laypersons?
7      A.   If you take an episode of services.  I'll give you
8 an episode.  Well, I guess, episode would be maternity care,
9 so mom becomes pregnant, baby is coming.  A bundled payment
10 mechanism then would bundle all the services for the mother,
11 prenatal care for the mom and the baby, delivery at the
12 hospital.  If there is an epidural, it would cover an
13 epidural.  If there is a C-section, it would make a payment
14 for the C-section.  And it would cover some level of post --
15 postdelivery, follow-up care.  So we would bundle that
16 nine-month episode into a single-payment allowance.  Now the
17 provider has an incentive to perform within that bundle.
18
19
20
21
22                    REDACTED
23
24
25

200

REDACTED

201

1
2              REDACTED
3
4        **Q.**  Is ConnectedCare a risk-based care system?
5        **A.**  Yes.
6        **Q.**  And did you offer ConnectedCare to St. Luke's?
7        **A.**  Yes.  We offered it to St. Luke's before we
8    offered it to Saint Al's.
9        **Q.**  And did they participate?
10       **A.**  No.  We had a -- we attempted to get them
11   interested in it for many, many months.  We were running
12   into a filing deadline with the Department of Insurance,
13   just in 2012.  And, ultimately, St. Luke's said that they
14   did not want to compete with Saint Al's on price.  They had
15   heard that we were going to offer a program to Saint Al's as
16   well.  So they declined to participate.
17       **Q.**  Did they provide further insight into their
18   rationale for not wanting to compete on price with Saint
19   Alphonsus?
20       **A.**  No.  They didn't provide further rationale, but we
21   did -- of course, we learned that they brought their own
22   insurance company into the marketplace, and I think that
23   they were -- that had been part of their strategic plan, was
24   to pursue that avenue rather than an avenue with Blue Cross
25   of Idaho.

202

1        MR. GREENE:  Your Honor, I'm going to turn to a
2    different topic unless you have other questions on
3    risk-based contracting you would like me to --
4        THE COURT:  No.  That's fine.  Thank you.
5    BY MR. GREENE:
6        **Q.**  Mr. Crouch, I would just like to have you tell me
7    just a little bit more about the Idaho market.  All of us
8    are, essentially, laypersons in this audience, so we want to
9    get some better sense, just an overview of this market.
10       Just in general terms, how do the costs of physician
11   services compare to those in other states, to the extent you
12   have knowledge of that?
13       MR. STEIN:  Objection, lack of foundation.
14       MR. GREENE:  I think I would like him to answer,
15   and then I'll ask him the foundational question, Your Honor.
16   I can reverse it.
17       Mr. Crouch --
18       THE COURT:  The cart before the horse, but --
19       MR. GREENE:  Let me just reverse the order.
20   BY MR. GREENE:
21       **Q.**  Mr. Crouch, do you have any knowledge of how costs
22   for physician services in Idaho compare to costs in other
23   states?
24       **A.**  Yes.
25       **Q.**  And what is the basis for your knowledge?

203

1        **A.**  It's an area of high interest for us, so we keep
2    our ear to the ground for any -- any knowledge we can gain.
3    We hire consultants and over time have hired a variety of
4    consultants to pursue studies for us.  We have some
5    knowledge with our own claims data of claim payments for
6    members when they go to other states, what we're paying for
7    services of other states.  And follow the national
8    publications.  There has just been a lot of conversation
9    around payment allowances recently.
10       **Q.**  And how do payment allowances for physician
11   services compare in Idaho versus other parts of the
12   United States?
13       **A.**  I think the first strong indication -- we had
14   suspected for a long period of time -- well, as long as I
15   have been in the plan -- was that our payment allowances were
16   high.  We were not very sophisticated in the early 2000s
17   around trying to measure that or confirm that.  We began to
18   get a better understanding of that when we hired a firm
19   called Dykeman and Associates to perform pricing studies for
20   us.  So Blue plans and other plans would come together and
21   provide deidentified claims data and would deidentify the
22   plan.  And Dykeman would then calculate how your plans'
23   allowances compare to common allowances elsewhere.  I'm not
24   recalling the results of that study, but it was something
25   like we were 150 percent of the common plan.

204

1        Medicare published a -- not Medicare, rather,
2    MedPAC, which is a consultant to Congress around issues
3    related to the Medicare and Medicaid programs, they
4    published a statistic in 2008 that indicated that the
5    average commercial plan pays 120 percent of what Medicare
6    would pay.  So that gave us a very solid benchmark.  We
7    started to look at what we paid on our own and recognized
8    that we were anywhere from, commonly, 176 percent of
9    Medicare to well over 200 percent of Medicare.  It depends
10   on the professional service you are looking at.
11       We hired Milliman and Associates, which is an
12   actuarial firm.  We used their Seattle office to perform a
13   study for us in their Seattle office.  They
14   identified -- well, they did two studies for us.  One study
15   was we asked them to perform a benchmarking study where they
16   would compare our fees against what they would consider to
17   be appropriate benchmarks.  And in that benchmarking study,
18   I am a little foggy on all the details, but I think it
19   varied from 138 or -39 percent of other plans.  Well, it had
20   ranges I think to be maybe more specific.  There were ranges
21   of fee schedules.  But we were always high, and it was high
22   by double digits into the high double digits for some
23   markets.
24       We have had other -- well, I just saw an article
25   from *Health Affairs* just two days ago this month --

Case 1:12-cv-00560-BLW v. Document 549 Filed 11/04/14 Page 55 of 57

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/23/2013

205

1       MR. STEIN: Your Honor, I'm sorry. I let this go,
2 but I think we need to have some foundation here or there's
3 a best evidence issue. I mean, what studies are we talking
4 about? Where are these documents so we can at least --
5       THE COURT: I'm not sure we need to get into the
6 studies unless the studies themselves are presented. And I
7 think the witness answered the question.
8       MR. GREENE: Yeah. It's his business to focus on
9 prices here versus other places he is providing information,
10 and it's well grounded, it seems to me.
11       THE WITNESS: So --
12       THE COURT: Just a moment. Can you identify the
13 study? Is it important to your testimony to be able to
14 refer to it?
15       THE WITNESS: I was deposed on it. I know the
16 study is in the file somewhere. I can't say that I've
17 looked at it since May.
18       THE COURT: Well, if you're going to refer to it,
19 I think you need to provide counsel with a copy so that they
20 can, at least, examine you on it if you're going to offer
21 anything by way of that information. But this is something
22 you would and do rely upon in your current business?
23       THE WITNESS: Yes. Correct.
24       THE COURT: I'm going to allow it, but I think you
25 will need to provide the citation to counsel so that they

206

1 can cross-examine. We are going to be recessing in about
2 seven minutes, so that should be a pretty simple task.
3       MR. GREENE: Yes. We'll get that done by
4 tomorrow, Your Honor, for sure.
5 BY MR. GREENE:
6    Q. So can you just give me just a basic number for,
7 approximately, how costs for physician services compare? Is
8 it the 176 to 200-some-odd percent that is the correct
9 number, from your perspective?
10    A. Correct. The study I was mentioning just came out
11 in the *Health Affairs* journal just this week. It happens to
12 be their September issue. They were looking at fee schedule
13 payments across the country for commercial health plans, and
14 they gave a number then so we could look at that number, and
15 we are -- I just read this --
16       THE COURT: "We" being Blue Cross of Idaho?
17       THE WITNESS: I'm sorry, yes.
18       THE COURT: Of Idaho?
19       THE WITNESS: Blue Cross of Idaho. 140 percent of
20 the average for commercial plans in the United States.
21 BY MR. GREENE:
22    Q. Okay. And is that higher or lower than some urban
23 states?
24    A. Well, so the urban states would be 100 percent
25 then. So the reference I was giving about 140 percent is

207

1 that was comparing us to the common fee schedule in the
2 country for a commercial plan.
3    Q. Would you be higher than California?
4    A. Yeah, I would suppose California, Minnesota. Some
5 of those markets are driving much of the average. So we
6 would be quite a bit higher than California.
7    Q. Okay. And from your perspective, what explains
8 this higher reimbursement situation in Idaho?
9    A. I don't know that there is a single explanation.
10 It certainly has developed over time. Medical -- the
11 marketplaces across the country developed their own little
12 signature of utilization patterns and payment levels. It
13 wasn't until the 1990s that a standardized payment
14 methodology was even developed. It was very common prior to
15 that date that commercial payers would simply pay a discount
16 from billed charges or billed charges when they were
17 presented with a claim.
18       And the Medicare developed the RBRVS system, which
19 is a system that identifies a relative value for every
20 procedure that can be performed, and then that allows
21 payers, then, to establish fee schedules using those
22 relative values. Just need to come up with one conversion
23 factor, and say in our case it's $60. We'll take $60,
24 multiply it times any procedure that's going to be billed to
25 us. Because each procedure has that relative value, we know

208

1 what the payment allowance is going to be. When that system
2 was developed, it became very obvious that there were wide
3 variations in payment across the country.
4       And in Idaho I think one of the challenges has
5 always been that the markets composed of a series of very
6 small sort of monopoly markets where there is a single
7 hospital in a town, there would be one orthopedic group in a
8 town, there would be one ear, nose, and throat specialist.
9       And so what we saw when we converted over from
10 those discount-from-charges contracts to this more
11 standardized approach is that the physician in Pocatello was
12 charging a very different rate than the physician in
13 Coeur d'Alene, and that was even a different rate than what
14 a physician might charge in California. So the result of
15 that variation is, in some large degree, a result of there
16 wasn't a lot of competition in those markets, and physicians
17 could, essentially, pick their number when they were trying
18 to decide what they were going to bill.
19       So you compounded that with, I think, more and
20 more aggressive negotiations over what fees would be over
21 time, and we end up with the situation we're in currently.
22    Q. And with respect to those monopoly markets, do you
23 pay those higher rates?
24    A. We did back in the day. Now, that would have been
25 in the 1990s. We converted to the RBRVS system at Blue

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/23/2013

209

1  Cross of Idaho around the year 2000, so that was a couple of
2  years before I arrived. When that happened, when we
3  converted over, we couldn't convert over to a single -- when
4  the conversion factor -- let me know if I need to get into
5  more detail about the mechanics of the program, but
6  that -- if we were to adopt a single conversion factor that
7  was going to overpay some physicians relative to what they
8  had seen in the past, it was going to underpay other
9  physicians relative to what they had seen in the past, and
10 we knew we'd end up with a bunch of payment increases for
11 anybody under the average and a bunch of contract
12 terminations for anybody over the average.
13        So we implemented -- have over time implemented
14 contract terms that try to reduce the variation on that fee
15 schedule and have been quite successful, I think, so that
16 now, in 2013, every primary care doctor in the state is
17 based -- has fees that are based on a single conversion
18 factor. And specialists in the state are based -- have fees
19 that are based around a small range of conversion factors.
20     Q.  And this combined fee, does this take into account
21 the monopoly situation in some of these submarkets you have
22 described?
23     A.  Yeah. We have -- we have struggled over time.
24 There have been periods when the -- one year Medicare was
25 reducing the relative values for gastroenterology services,

210

1  as an example. We wanted to adopt that change straight from
2  Medicare since they administer the program, that we ended up
3  with contract terminations from a large number of
4  gastroenterology physicians, so we had to make some
5  accommodation that phased it in over time. Something
6  similar happened with orthopedic surgeons a number of years
7  ago.
8        So there have been periods when it's been more
9  challenging, but we have always been able to negotiate a
10 reasonable compromise and, I think, make appropriate
11 progress.
12     Q.  And do you have knowledge of how hospital service
13 rates or rates of reimbursement for hospital services in
14 Idaho compare to other states?
15     A.  We do. It's an area we have --
16     Q.  The question was do you have knowledge?
17     A.  Oh. We have some knowledge, yes.
18     Q.  Okay. And what's the basis for your knowledge?
19     A.  Again, we end up using the Medicare system as a
20 benchmark, not that Medicare payments are appropriate, but
21 there are published data around how those benchmarks
22 compare. So we use the comparison against what Medicare
23 pays and we can see what we would pay for the same service
24 and have an understanding of how much more we pay than
25 Medicare.

211

1      Q.  And how much more, in percentage terms, do you pay
2  than Medicare?
3      A.  On the inpatient side -- so we, roughly, break
4  hospital services into inpatient activities and outpatient
5  activities. If you're admitted to the hospital overnight,
6  then you would be considered an inpatient. And for those
7  inpatient services, our payments are something between 150
8  and 200 percent of Medicare. For outpatient services, our
9  payments are commonly 300 percent of Medicare. In some
10 cases they can be substantially higher.
11     Q.  And I'm very appreciative of the fact that the
12 cost of living appears to be quite low or relatively low in
13 Idaho. How does that get factored in to outpatient rates of
14 300 percent or more?
15     A.  When we do our internal comparisons, we adjust for
16 a typical Idaho Medicare fee schedule. Medicare does make
17 changes based on area indexes, including wages and the cost
18 of owning the land and building buildings and even all the
19 way down to energy, paying for utilities.
20        THE COURT: Could I just inquire. The numbers
21 that you just gave, and that you've given consistently,
22 about the relationship between what you're paying providers
23 and as a percentage of Medicare, that's after the
24 adjustment, kind of a locality adjustment has been made?
25        THE WITNESS: Correct, yes.

212

1        THE COURT: So it wouldn't be, for example, 300
2  percent of the outpatient services commonly paid on a
3  schedule in California; it would be 300 percent of the
4  schedule for the same service provided in California as
5  adjusted to an Idaho cost of living standard?
6        THE WITNESS: That's correct.
7        THE COURT: All right.
8        Counsel, we are at 2:30. Is this -- I'll let you go
9  for a minute or two more.
10        MR. GREENE: This is an appropriate breaking
11 point, Your Honor.
12        THE COURT: Is this a good breaking point?
13        MR. GREENE: Yes.
14        THE COURT: Counsel, let's reconvene at 8:30.
15 Unlike this morning, we'll try to start promptly at 8:30.
16 If you'll be in your seats and have Mr. Crouch available
17 and, perhaps, even on the witness stand, we will try to
18 start promptly at that time.
19        MR. GREENE: Very good. Thank you, Your Honor.
20        THE COURT: We'll be in recess, then, until 8:30
21 tomorrow morning.
22        (Court recessed for the evening at 2:31 p.m.)
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 09/23/2013

Case 1:12-cv-00560-BLW    Document 549    Filed 11/04/14    Page 57 of 57

1     R E P O R T E R'S   C E R T I F I C A T E

2

3

4

5         I, Tamara I. Hohenleitner, Official

6  Court Reporter, County of Ada, State of Idaho,

7  hereby certify:

8         That I am the reporter who transcribed

9  the proceedings had in the above-entitled action

10  in machine shorthand and thereafter the same was

11  reduced into typewriting under my direct

12  supervision; and

13         That the foregoing transcript contains a

14  full, true, and accurate record of the proceedings

15  had in the above and foregoing cause, which was

16  heard at Boise, Idaho.

17         IN WITNESS WHEREOF, I have hereunto set

18  my hand October 31, 2013.

19

20

21

22    _____-s-_____

     Tamara I. Hohenleitner

23  Official Court Reporter

     CSR No. 619

24

25

**United States Courts, District of Idaho**