Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 1 of 65

213

1

2                    **UNITED STATES DISTRICT COURT**

3                       **IN THE DISTRICT OF IDAHO**

4   - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
    SAINT ALPHONSUS MEDICAL CENTER -    :
5   NAMPA, INC., TREASURE VALLEY        : Bench Trial
    HOSPITAL LIMITED PARTNERSHIP, SAINT :
6   ALPHONSUS HEALTH SYSTEM, INC., AND  :
    SAINT ALPHONSUS REGIONAL MEDICAL    : **Witnesses:**
7   CENTER, INC.,                       :   **Jeff Thomas Crouch**
                        Plaintiffs,     :   **Scott Clement (Video)**
8            vs.                        :
                                        :
9   ST. LUKE'S HEALTH SYSTEM, LTD., and :
    ST. LUKE'S REGIONAL MEDICAL CENTER, :
10  LTD.,                               :
                        Defendants.     :
11  - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
    FEDERAL TRADE COMMISSION; STATE OF  :
12  IDAHO,                              :
                        Plaintiffs,     :
13           vs.                        :
                                        :
14  ST. LUKE'S HEALTH SYSTEM, LTD.;     :
    SALTZER MEDICAL GROUP, P.A.,        :
15                                      :
                        Defendants.     :
16  - - - - - - - - - - - - - - - - - x

17

                         * * * SEALED * * *
18

    REPORTER'S TRANSCRIPT OF PROCEEDINGS
19

    before B. Lynn Winmill, Chief District Judge
20

    Held on September 24, 2013
21

    Volume 2, Pages 213 to 445
22

23                        **Lisa K. Yant**
          Idaho Certified Shorthand Reporter No. 279
24                  Registered Professional Reporter
                 Federal Certified Realtime Reporter
25

             United States Courts, District of Idaho
      550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 2 of 65

214

1                                    A P P E A R A N C E S

2

3    FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
     SAINT ALPHONSUS HEALTH SYSTEM, INC.,
4    AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.

5

         Keely E. Duke
6        DUKE SCANLAN & HALL, PLLC
         1087 W. River Street, Suite 300
7        Boise, ID 83707

8        David A. Ettinger
         HONIGMAN MILLER SCHWARTZ AND COHN LLP
9        2290 First National Building
         660 Woodward Avenue
10       Detroit, MI 48226

11

12

13   FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION

14

         Peter C. Herrick
15       U.S. FEDERAL TRADE COMMISSION
         500 Pennsylvania Ave., N.W.
16       Washington, DC 20580

17       J. Thomas Greene
         U.S. FEDERAL TRADE COMMISSION
18       600 Pennsylvania Ave N.W.
         Washington, DC 20580
19
         Henry Chao-Lon Su
20       U.S. FEDERAL TRADE COMMISSION
         601 New Jersey Ave., N.W.
21       Washington, DC 20001

22

23

24

25

**United States Courts, District of Idaho**

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 3 of 65

215

1                         A P P E A R A N C E S (Continued)

2
        FOR PLAINTIFF STATE OF IDAHO
3
              Eric J. Wilson
4             GODFREY & KAHN, S.C.
              One East Main Street
5             Suite 500
              PO Box 2719
6             Madison, WI 53701

7             Brett T. DeLange
              OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
8             954 W. Jefferson, 2nd Floor
              Boise, ID 83720-0010
9
        FOR PLAINTIFF TREASURE VALLEY HOSPITAL
10
              Raymond D. Powers
11            POWERS TOLMAN FARLEY, PLLC
              PO Box 9756
12            Boise, ID 83707

13      FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
        AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.
14
              Jack R. Bierig
15            Ben J. Keith
              Scott Stein
16            Charles Schafer
              SIDLEY AUSTIN
17            One South Dearborn
              Chicago, IL 60603
18
              J. Walter Sinclair
19            STOEL RIVES
              101 S. Capitol Boulevard, Suite 1900
20            Boise, ID 83702

21      FOR DEFENDANT SALTZER MEDICAL GROUP

22            Brian Kenneth Julian
              ANDERSON JULIAN & HULL, LLP
23            PO Box 7426
              Boise, ID 83707
24

25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.            Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 4 of 65

216

1                                                    I N D E X

2

| | | : |
|---|---|---|
| September 24, 2013 | ........................................ | |
| | Courtroom closed to the public.......... | 221 |
| | Courtroom opened to the public.......... | 443 |

6

7                                              PLAINTIFFS'

8                                        W I T N E S S E S

| | | PAGE: |
|---|---|---|
| CLEMENT, Scott (By video) | | 443 |
| CROUCH, Jeff Thomas | | |
| | Continued Direct Examination Questions By Mr. Greene................................... | 223 |
| | Cross-Examination Questions By Mr. Stein...... | 324 |
| | Redirect Examination Questions By Mr. Greene.. | 424 |
| | Cross-Examination Questions Bymr. Powers...... | 434 |
| | Recross-Examination Questions By Mr. Stein.... | 441 |

14

15                                             PLAINTIFFS'

16                                        E X H I B I T S

| | | | ADMITTED |
|---|---|---|---|
| | 1296 | St. Luke's Outpatient Surgery Center Purchase .. Meeting (PLTs' Dep. Ex. 368; BCI124948--BCI124948) | 320 |
| | 1297 | Confidential Settlement Agreement - BCI and .... SLHS (PLTs' Dep. Ex. 369; BCI115201--BCI115204) | 320 |
| | 1298 | Summary of Physician Reimbursement Trends, ..... 2007-2012 (PLTs' Dep. Ex. 370; BCI372803--BCI372803) | 320 |
| | 1299 | BCI Presentation: BCI - SLHS 2013 Kick-off ..... Meeting (PLTs' Dep. Ex. 371; BCI116586--BCI116586) | 320 |
| | 1300 | 2012 First Half Hospital Inpatient and ......... Outpatient Conversion Factor Report (PLTs' Dep. Ex. 372; BCI368370--BCI368373) | 423 |

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 5 of 65

217

| | | | |
|---|---|---|---|
| 1 | 1301 | BCI & SLHS: Memo of Understanding and .......... Agreement: Summary of Certain Terms for 2013 and 2014 Commercial and Medicare Advantage Contracts (PLTs' Dep. Ex. 373; BC1368366--BC1368369) | 320 |
| 4 | 1302 | Quick Estimate of change in allowed amounts if . SLHS purchase Saltzer Medical Group Based on Medicare Advantage claims billed by Saltzer physicians, no COB, no FEP, Sep 2011 through August 2012 (PLTs' Dep. Ex. 374) | 320 |

J O I N T

E X H I B I T S

| | | | ADMITTED |
|---|---|---|---|
| | 1 | Minutes of the Excecutive Committee Meeting ... February 10, 2012, dictated by B. Savage SMG000297767 Defendants' Exhibit 20; Plaintiffs' Exhibit 499 | 345 |
| | 2 | Letter from T. York to R. Billings BCI116580 .. Defendants' Exhibit 198 | 345 |
| | 3 | Email and attachment from G. Orr to T. Miles .. et al. Re Summary for Distribution - Confidential_2.xls SLHS000372237 Plaintiffs' Exhibit 010 | 345 |
| | 4 | Email exchange between R. Billings, K. Moore .. et al. Re Micron and St. Al's - Boise Surgical Group SLHS000580608 Plaintiffs' Exhibit 017 | 345 |
| | 5 | Email and attachment from N. Bowlby to R. ..... Stark cc: M. Chasin re Marc Chasin MD - CV and Bio SLHS000201751 Plaintiffs' Exhibit 024 | 345 |
| | 6 | Letter from Grant Thornton to J. Stright re ... Fair Market Value Analysis of Proposed Compensation Arrangements (May 8, 2012) SLHS0000001243 Plaintiffs' Exhibit 054 | 345 |
| | 7 | Email exchange between C. Roth, B. Wilson re .. Legal analysis on Saltzer SLHS000785623 Plaintiffs' Exhibit 110 | 345 |
| | 8 | List of Risks of Saying "No" / "Yes" .......... COKER0004606 Plaintiffs' Exhibit 199 | 345 |
| | 9 | Email exchange re Blue Cross - partnership .... discussions, attaching 11-17-2011 BC Discussions - Insurer Relations Critetia.docx SLHS000152882 Plaintiffs' Exhibit 277 | 345 |
| | 10 | Blue Cross 2013 Renewal materials ............. SLHS000804539 Plaintiffs' Exhibit 287 | 345 |

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 6 of 65

218

| | | | |
|---|---|---|---|
| 1 | 11 | Email from T. York to S. Drake and R. Billings re Saltzer Acquisition, attaching SLHS Saltzer Acquisition.pdf SLHS000657279 Plaintiffs' Exhibit 290 | 345 |
| 2 | | | |
| 3 | 12 | Email exchange re Micron benefit plans w/St. Luke's addition MT001298 Plaintiffs' Exhibit 299 | 345 |
| 4 | | | |
| 5 | 13 | Letter from Grant Thornton to J. Stright re Analysis of Proposed Compensation Arrangement - Saltzer Medical Group, Family Practice Physicians (May 8, 2012) SLHS0000003782 Plaintiffs' Exhibit 331 | 345 |
| 6 | | | |
| 7 | 14 | Letter from Grant Thornton to J. Stright re Fair Market Value Analysis of Proposed Compensation Arrangements (May 7, 2012) SLHS0000001257 Plaintiffs' Exhibit 335 | 345 |
| 8 | | | |
| 9 | 15 | Saltzer Medical Group, P.A. / St. Luke's Health System Executive Summary Integration Proposal (Aug. 27, 2012) SLHS0000001206 Plaintiffs' Exhibit 340 | 345 |
| 10 | | | |
| 11 | 16 | Letter from M. Reiboldt to E. Castledine, attaching draft term sheet prepared by Saltzer SLHS000044885 Plaintiffs' Exhibit 346 | 345 |
| 12 | | | |
| 13 | 17 | Letter of Intent between Saltzer Medical Group, P.A. and St. Luke's Health System, LTD SLHS0000001065 Plaintiffs' Exhibit 350 | 345 |
| 14 | 18 | Email exchange between R. Hofman, R. Lundquist, J. Waltz, D. McFadyen, M. Cronin, K. Moore, E. Castledine, and J. Kee re ICO Outside Referral Log SLHS000184885 Plaintiffs' Exhibit 352 | 345 |
| 15 | | | |
| 16 | | | |
| 17 | 19 | Contract Rate Sign-Off Sheet for St. Luke's Health Systems hospitals -Boise/Meridian, Wood River, Magic Valley BCI115094 Plaintiffs' Exhibit 367 | 345 |
| 18 | | | |
| 19 | 20 | SLHS RAMI and ECRI data SLHS001391008 Plaintiffs' Exhibit 377 | 345 |
| 20 | 21 | Email from B. Hill to SLHS System Leadership re RAMI & ECRI Results 2011-2012 Data Year, attaching 2012 RAMI ECRI results(2).doc SLHS000994386 Plaintiffs' Exhibit 387 | 345 |
| 21 | | | |
| 22 | 22 | St. Luke's YTD 2012-2013 Quality Performance Summary - Reporting on July 2012-August 2012 SLHS000890880 Plaintiffs' Exhibit 389 | 345 |
| 23 | 23 | St. Luke's Saltzer Operations Council Meeting Minutes, Jan. 22, 2013 SLHS001172716 Plaintiffs' Exhibit 403 | 345 |
| 24 | | | |
| 25 | 24 | Professional Services Agreement between St. Luke's and Saltzer, effective Dec. 31, 2012 SLHS000787871 Plaintiffs' Exhibit 404 | 345 |

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW  Document 550  Filed 11/04/14  Page 7 of 65

219

| 1 | 25 | Idaho Statesman article, Primary Health to .... open a new clinic in Nampa Plaintiffs' Exhibit 421 | 345 |
| 2 | | | |
| 3 | 26 | First Amendment to Physician Employment ....... Agreement between St. Luke's and Mark Johnson SLHS000464392 Plaintiffs' Exhibit 440 | 345 |
| 4 | 27 | Professional Employment Agreement between St. . Luke's and Mark Johnson SLHS000755470 Plaintiffs' Exhibit 441 | 345 |
| 5 | | | |
| 6 | 28 | Physician Employment Agreement between St. .... Luke's and Mark Johnson SLHS000755499 Plaintiffs' Exhibit 443 | 345 |
| 7 | 29 | Email from G. Mulder to S. Stevenson, copying . M. Johnson, M. Maier, E. Maier, and R. Kocemba re QI project, attaching Report of Mountain View Clinic Physicians Quality Improvement Project 2011.doc v.3.doc SLHS001098469 Plaintiffs' Exhibit 445 | 345 |
| 8 | | | |
| 9 | | | |
| 10 | 30 | St. Luke's / S. Scott Huerd Physician ......... Employment Agreement SLHS0000021126 Plaintiffs' Exhibit 451 | 345 |
| 11 | | | |
| 12 | 31 | SLRMC Letter of Intent to James Souza ......... SLHS000477033 Plaintiffs' Exhibit 459 | 345 |
| | 32 | Email exchange re WISE network contract ....... SMG000300733 Plaintiffs' Exhibit 475 | 345 |
| 13 | 33 | Email exchange re contingency plan ........... SALTZER506702 Plaintiffs' Exhibit 506 | 345 |
| 14 | 34 | SLHS / Boise Surgical Group, P.A. Proposed .... Integration Terms SLHS0000021546 Plaintiffs' Exhibit 513 | 345 |
| 15 | | | |
| 16 | 35 | St. Luke's Physician Employment Agreement with . Roberto Barresi, M.D. SLHS0000021805 Plaintiffs' Exhibit 515 | 345 |
| 17 | | | |
| 18 | 36 | St. Luke's Operations Council Meeting Minutes . (redacted)SALTZER203254 Plaintiffs' Exhibit 528 | 345 |
| 19 | 37 | Professional Goodwill Acquisition Agreement ... between St. Luke's and Harold V. Kunz, M.D. SLHS000786718 Plaintiffs' Exhibit 532 | 345 |
| 20 | | | |
| 21 | 38 | Asset Acquisition Agreement between St. Luke's . and Saltzer SLHS000787844 Plaintiffs' Exhibit 533 | 345 |
| 22 | 39 | Agreement for Physician Services between St. .. Luke's and Marshall F. Priest, MD, FACC SLHS000509601 Plaintiffs' Exhibit 557 | 345 |
| 23 | | | |
| 24 | 40 | St. Luke's Clinic Magic Valley Leadership ..... Council - Overview slides SLHS000970065 Plaintiffs' Exhibit 400 | 345 |
| 25 | | | |

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                                    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 8 of 65

220

| 1 | 41 | Strategic Affiliation Agreement between SLHS .. and SelectHealth, effective Aug. 1, 2012 SELH0001995 Plaintiffs' Exhibit 621 | 345 |
| 2 | | | |
| 3 | 42 | Saltzer Medical Group, P.A. / St. Luke's ...... Health System Executive Summary Integration Proposal CON0016856 Plaintiffs' Exhibit 651 | 345 |
| 4 | 43 | Email exchange re Blue Cross - single ........ conversion factor assessment, attaching BC PPO Single CF Analysis12711(revRB).xlsx SLHS000579330 Plaintiffs' Exhibit 692 | 345 |
| 5 | | | |
| 6 | 44 | Pate, David, Hospital - Physician Relations in . a Post-Health Care Reform Environment SLHS000075064 Plaintiffs' Exhibit 704 | 345 |
| 7 | | | |
| 8 | 45 | Pate, David.  Hospital-Physician Relations in . a Post-Health Care Reform Environment, The Journal of Legal Medicine 33:7-20, pp. 7-20 (2012) Plaintiffs' Exhibit 720 | 345 |
| 9 | | | |
| 10 | 46 | Email exchange re Micron - BrithPath admin .... fees SLHS000808330 Plaintiffs' Exhibit 722 | 345 |
| 11 | 47 | Email from D. Pate to J. Cilek, G. Fletcher, .. J. Taylor, and R. Billings re Governor's Cup SLHS000069552 Plaintiffs' Exhibit 723 | 345 |
| 12 | 48 | Professional Services Agreement between St. ... Luke's and Idaho Family Physicians SLHS0000020610 Plaintiffs' Exhibit 736 | 345 |
| 13 | | | |
| 14 | 49 | Asset Acquisition Agreement between St. Luke's . and Idaho Family Physicians SLHS000747768 Plaintiffs' Exhibit 737 | 345 |
| 15 | 50 | Lease Agreement between IFP Building .......... Association, LLP and St. Luke's Regional Medical Center, LTD SLHS000747789 Plaintiffs' Exhibit 738 | 345 |
| 16 | | | |
| 17 | 51 | Professional Goodwill Acquisition Agreement ... between St. Luke's and Mark A. Rutherford, MD SLHS000747812 Plaintiffs' Exhibit 739 | 345 |
| 18 | | | |
| 19 | 52 | Noncompetition Agreement between St. Luke's ... and Mark A. Rutherford, MD SLHS000747872 Plaintiffs' Exhibit 740 | 345 |
| 20 | 53 | St. Luke's Providers - Provider Report Card, .. Group G BCI373752 Plaintiffs' Exhibit 745 | 345 |

21

22

23                                    * * * * *

24

25

221

```
1                  P R O C E E D I N G S
2                   September 24, 2013
3      ****** COURTROOM CLOSED TO THE PUBLIC ******
4           THE CLERK:  The Court will now hear Civil Case
5    12-560-S-BLW Saint Alphonsus Medical Center, Nampa, Inc.,
6    versus St. Luke's Health System for Day 2 of bench trial.
7           THE COURT:  Good morning, Counsel.  A couple of
8    housekeeping matters before we resume the testimony.  We
9    must have bored the audience away, I guess.  But I was going
10   to indicate that, as I suggested yesterday, that I would
11   allow live blogging, and if there was no objection from
12   counsel.  There, apparently, is no objection.  Of course,
13   anyone who chooses to live-blog will be subject to the same
14   restraints that otherwise would apply in the courtroom, with
15   no recordings, and no still or video photography, of course,
16   would be allowed.  I think that would cover the primary
17   areas of concern.
18          Another area that came up, apparently, Mr. Stein was
19   provided three of the four items that Mr. Crouch either has
20   reviewed or has testified that he's reviewed or intends to
21   testify today, but he was not provided the fourth.  In
22   fairness, I think the plaintiffs, then, are a choice:
23   either the testimony of Mr. Crouch either will be stricken
24   or not allowed with regard to that fourth study.  We will
25   have to make him available later in the trial for
```

222

```
1    cross-examination by Mr. Stein after he's had a proper
2    chance to review that.
3           So plaintiffs, it's your option.  You can proceed in
4    either fashion, either agree to have it stricken, or I'll
5    provide it to Mr. Stein and make Mr. Crouch available for
6    cross-examination later in the proceedings.
7           MR. GREENE:  Your Honor, we are -- Blue Cross of
8    Idaho is, actually, couriering that over as we speak.  It
9    took some time to find the fourth study.  My recollection of
10   the testimony yesterday was that Mr. Crouch was answering my
11   question about how do physician costs compare in Idaho to
12   other parts of the United States.
13          He mentioned various figures, and he provided the Court
14   and counsel with the bases that he recollected was the
15   source of information, and he mentioned Milliman studies, he
16   mentioned various things, one of which was this fourth
17   article.  I am going to clean this up, momentarily.  It
18   turned out that, from our perspective, it was the Milliman
19   study, which they have, right now, and which was produced to
20   them in discovery months ago.
21          So if the Court does want to strike something, it seems
22   to me it may be just the reference to that one article,
23   which, I believe, is actually not particularly on point to
24   the statement he was making to me yesterday.
25          THE COURT:  Mr. Stein, you will have a daily, so
```

223

```
1    you can review it and determine what, if any, portion you
2    feel needs to be stricken, and discuss that with Mr. Greene
3    and work it out, and if you can't, I'll resolve it.
4           MR. STEIN:  I can tell you right now, Your Honor,
5    that the article from Dykeman, that I'm a little confused,
6    because I think Mr. Greene said that's being couriered over,
7    so it's something that wasn't produced, we don't have, and
8    move that the reference to the Dykeman study be stricken.
9    It doesn't really do me any good to --
10          THE COURT:  No, and that's why I am suggesting
11   that you will have the option to either review the
12   transcript, request for portions of Mr. Crouch's testimony
13   be stricken or cross-examine him.  After that's been
14   provided and you've had a chance to digest it.
15          MR. STEIN:  Thank you.
16          THE COURT:  Mr. Crouch, I will remind you are
17   still under oath.
18          And with that, Mr. Greene, you may resume your direct
19   examination of the witness.
20          MR. GREENE:  Thank you, Your Honor.  And good
21   morning, Mr. Crouch.
22             CONTINUED DIRECT EXAMINATION
23   QUESTIONS BY MR. GREENE:
24       Q.  As previewed in this previous discussion, I do
25   want to ask just a few questions that relate to your
```

224

```
1    testimony yesterday.  Specifically, overnight, did you have
2    the opportunity to review some of the materials that you
3    relied upon when you told us yesterday your estimates of the
4    difference in prices for physician services in Idaho versus
5    the rest of the United States?
6        A.  No, I didn't do any preparation last evening.
7        Q.  Can you now tell me what the basis was for your
8    estimate that physician service prices in Idaho were,
9    roughly, 140 to 150 percent of Medicare?
10       A.  The percentage of Medicare were higher than that,
11   generally.  But there was an article that came out talking
12   about the *Health Affairs* article that came out this month.
13   So it was an article focused solely on office visits and it
14   listed maybe a dozen or a dozen and a half office visit
15   codes.  Compared those codes a number of ways that showed
16   the deviation from the mean, showed the mean, and then I
17   compared our own allowances to each of those codes.
18       Q.  And at a high level, roughly, what was the
19   comparison?
20       A.  For the -- if you are looking at the table, I am
21   just trying to recall it now -- two codes account for about
22   60 percent of all office visits.  And for those two codes we
23   are above the 95th percentile.  We would be 135 to
24   140 percent of Medicare.
25       Q.  So 95th percentile would be among the highest in
```

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW    Document 550    Filed 11/04/14    Page 10 of 65

225

1  the United States?
2      A.  Correct.  5 percent or fewer of health plans would
3  pay an amount greater than that.
4          MR. GREENE:  And just for the record, I'm not
5  planning on introducing this document, Your Honor, but if we
6  can put it in the record.
7  BY MR. GREENE:
8      Q.  This is an article by Baker, Bundorf, and Royalty
9  entitled, "Private Insurers' Payments For Routine Physician
10  Office Visits Vary Substantially Across The United States,"
11  and that's in the September 2013 issue of *Health Affairs* at
12  1583; is that correct?
13     A.  Correct.
14     Q.  You also mentioned yesterday, Mr. Crouch, that
15  there was a risk-sharing contract which you had sought to
16  enter into with St. Luke's, which they decided not to join.
17  Do you recall that testimony?
18     A.  Correct, yeah.
19     Q.  And you mentioned, I believe, that they told you
20  that that's because they didn't want to be in price
21  competition with Saint Alphonsus.  Do you recall that
22  testimony?
23     A.  Yes.
24     Q.  I assume -- was there a conversation in which that
25  statement was made to you?

226

1      A.  Yes.  That would have been 2012 as we were
2  preparing our ConnectedCare product to be filed with the
3  Department of Insurance.
4      Q.  Approximately when in 2012 was it?
5      A.  I'm not recalling exactly.  It would have been
6  about the spring of 2012, I believe, and it was with Randy
7  Billings.
8      Q.  And who is Mr. Billings?
9      A.  He is the director of payor contracting for
10  St. Luke's.
11     Q.  And was anybody else present at this conversation?
12     A.  That conversation was a phone call I had with
13  Randy as I was trying to press him to make a commitment on
14  the ConnectedCare product.  And I think I pressed him to a
15  point of exhaustion, and he finally made that comment.
16     Q.  Okay.  And since you recollect, what specifically
17  was his comment to you?
18     A.  His comment was that "We do not want to compete
19  with Saint Alphonsus on this product over price."
20     Q.  Did he use words that he didn't want to get into a
21  bidding war with Saint Alphonsus or words to --
22         MR. STEIN:  Objection; leading.
23         THE COURT:  Sustained.
24  BY MR. GREENE:
25     Q.  Do you have any recollections of any of the exact

227

1  terms he used?
2      A.  Well, the exact term of they didn't want to
3  compete with Saint Alphonsus over price is the most specific
4  that he used.  It came up in a less specific way on several
5  other occasions.  That was the most specific comment that I
6  recall.
7      Q.  Okay.  Thank you.
8          Let me turn to, generally, how your business works,
9  Mr. Crouch.  Who are BCI's customers in the first instance?
10     A.  Blue Cross of Idaho is a mutual insurance company,
11  so our owners are our policyholders, and in that case our
12  owners and our customers are the same.
13     Q.  What is the role of employers in your business?
14     A.  Employers in U.S. healthcare, generally, are
15  the -- well, they are the predominant supplier of benefits,
16  healthcare benefits, to residents of the U.S.  So in that
17  reference the employer would be the direct customer, and the
18  membership within the employer would be an indirect
19  customer.  So the employer is paying the premium in that
20  regard.
21     Q.  And do you also have a business of administration
22  of healthcare plans as distinct from being an insurer of
23  healthcare?
24     A.  Correct.  We have a little over 400,000 members in
25  our -- on the medical side, not -- I am excluding the dental

228

1  side at this point.  And something just less than half of
2  that membership is to actually administered business, where
3  the employer is not purchasing an insurance product from us,
4  they're having us administer their benefit.
5      Q.  And is there a significant difference between the
6  two kinds of businesses in terms of the kind of healthcare
7  services that you provide?
8      A.  No.  To the marketplace and to the physician
9  community and the hospital community, they would not know
10  whether a member that was being treated, that they were
11  treating was a self-funded member or an insured member.
12     Q.  What is a network, Mr. Crouch?
13     A.  Network, I am assuming that's a reference to a
14  provider network?
15     Q.  Yes.
16     A.  So in Idaho we have, for each product, take a PPO
17  as an example, a PPO has a network of providers.  That is
18  the group of providers who, again, would contract with us to
19  be in that network.  So we would execute a contract with
20  them; we would establish what the payment allowances would
21  be; we had arrived at other agreements in terms of policies
22  and procedures that we each would follow.
23     Q.  What does it mean to be "in network"?
24     A.  In network means that you have a contract and you
25  are a contracted provider.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   v. Document 550   Filed 11/04/14   Page 11 of 65

229

1    **Q.**  What does it mean to employees that something is
2    either in network or not in network?
3        **A.**  The importance for the employee is that the
4    benefit designed, typically, has a higher out-of-pocket cost
5    for a person who uses a noncontracted provider.  And there
6    will be two elements to that higher cost.  One element is
7    that the benefit design is such there is a 20 percent lower
8    allowance for non -- well, the allowance is the same, but
9    there is a 20 percent increase cost share for the member.
10   In addition the member can be billed anything between our
11   payment allowance and what the provider chooses to charge.
12       **Q.**  And what do employers, typically, want from BCI in
13   terms of the network?
14       **A.**  Our network activities would be focused around, I
15   guess, several items.  One of them is we need to have a
16   complete network.  And in the case of primary care and
17   hospital services, that would mean that we would have
18   contracting providers in our network in that member's
19   community.  So that's the first requirement, is broad
20   network access.
21           And the second -- a series of other requirements
22   would be providers that we believe are of high quality.  In
23   some of our products we credential providers to attempt to
24   test that quality issue.  We want providers to be
25   cost-efficient.  So we want them to be good stewards of

230

1    healthcare resources.
2        **Q.**  And you mentioned that employers want physicians
3    in community.  Can you give more perspectives on that?
4        **A.**  Correct.  For primary care services, it's a
5    threshold that a health plan would have to offer would be to
6    have primary care services in the direct community that the
7    member resides.  For hospital services the same would apply,
8    to the extent there is a hospital in that community.
9    Specialty services become a little less specific.
10           Most members when they buy an insurance product or
11   enroll in a product, they don't, necessarily, anticipate if
12   they're going to need aggressive surgery, so it doesn't
13   always occur to them to check to see if the specialists are
14   in network.  An informed consumer would; some folks would
15   not.  But everybody is concerned about primary care access
16   in their community.
17       **Q.**  So would it be the case that for the provision of
18   specialty services versus primary care services, people
19   might be willing to drive further or take more time to get
20   to those services?
21       **A.**  Yes, to some limit, but there is higher
22   willingness of members to drive for specialized services.
23       **Q.**  And when you begin a negotiation with an employer,
24   do they, typically, indicate to BCI in the form of a request
25   for proposal, or some other document, what they want from

231

1    BCI in terms of the network?
2            MR. STEIN:  Objection, Your Honor.  I don't
3    believe that he has established that Mr. Crouch is involved
4    in negotiations with employers.
5            THE COURT:  Let's lay that foundation.
6    BY MR. GREENE:
7        **Q.**  Do you have knowledge of the negotiations that BCI
8    carries out with employers?
9        **A.**  Yes.  For large employers my area is always
10   involved.
11       **Q.**  So you are directly involved in those negotiations
12   with employers?
13           THE COURT:  Counsel, I forgot.  Mr. Crouch, you
14   did testify about that yesterday as to the largest eight or
15   nine hospitals that you were directly involved and oversaw
16   the negotiations; is that correct?
17           THE WITNESS:  That is correct.  I think the
18   question is around our clients, not our providers.
19           THE COURT:  Okay.  All right.  I see now the
20   distinction.
21           Go ahead, Mr. Greene.
22   BY MR. GREENE:
23       **Q.**  You may proceed --
24           MR. STEIN:  I apologize, Your Honor.  I'm sorry.
25   Did we establish, my objection was to Mr. Crouch's

232

1    involvement in negotiations with employers, not with
2    hospitals.  That was the basis.
3            THE COURT:  Mr. Crouch has corrected me on that
4    score, and now I am allowing Mr. Greene to go back to lay a
5    further foundation with regard to negotiations with
6    employers.
7    BY MR. GREENE:
8        **Q.**  So as I understand your testimony, Mr. Crouch, you
9    actually do engage in negotiations with the ten or so
10   largest employers in Idaho?
11       **A.**  I'm not sure I put a number to the largest
12   employers.  I will give you a recent example:  Three weeks
13   ago I was scheduled to attend a meeting with Melaleuca,
14   which is a large employer in Eastern Idaho.  And anytime
15   there's a large employer, State of Idaho, Melaleuca, Micron,
16   Boise, Inc., there is always involvement from my area.  It
17   might not be me, personally, but my area is involved.
18       **Q.**  Okay.  And in the context of that involvement, do
19   you see the documents that reflect what employers want from
20   BCI in terms of the network?
21       **A.**  Yes.  When we have a lead that we are actively
22   working, if it's a large enough lead, every major functional
23   area in the company becomes involved in responding to a
24   request for proposal.  And the questions on that RFP, then,
25   would be delegated out to each the departments, membership,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW    Document 550    Filed 11/04/14    Page 12 of 65

233

1    claims, customer service, provider services, correct.
2        Q.   And as part of that process, do you occasionally
3    do analyses of the proximity of physicians to the employees
4    of that particular potential customer?
5        A.   We do.  It varies.  If the employer is being
6    consulted by a local broker, then the broker usually has a
7    great deal of knowledge about our network, and the RFP will
8    be somewhat streamlined.  If the employer is out of state
9    and they are unaware of the capabilities we have around
10   provider contracting or medical management or other issues,
11   then they would have a more complex set of questions.
12       Q.   To what extent are you asked to provide
13   information to the employer or potential customer of the
14   proximity of primary care physicians to where the employees
15   live?
16       A.   For large employers out of state -- now there's a
17   secondary category here, as well.  In the Blue Cross/Blue
18   Shield Association the Home Plan is the plan where the
19   corporation's headquarters is located.  And very often the
20   Home Plan -- so let's say that it's Target, and Target is
21   located in Minnesota, the Blue Cross plan in Minnesota would
22   be the lead plan in that case, but there are Target stores
23   across the country.  So the Minnesota plan would then send
24   out RFP questions to each of the plans that has a Target
25   store in their location.  And we'd be expected to complete

234

1    that RFP.
2            And it's very typically going to show -- ask
3    questions around:  Here are the cities our Target stores are
4    located; compare that to your provider network.  And very
5    often they would say compare that to the provider network
6    they are currently administering in their plan, United,
7    CIGNA.
8        Q.   Is that sometimes known as "a disruption study"?
9        A.   Yes, that's what that's called.
10       Q.   Do you do these all the time?
11       A.   We do them regularly.
12           THE COURT:  Could I ask why it's called "a
13   disruption study."
14           THE WITNESS:  It is trying to identify the extent
15   to which Target's employees will be disrupted in their
16   medical network.  More typically, that is not a disruption
17   study of specialists, again.  That's to say the employees of
18   Target on Eagle Road in Meridian are currently being
19   administered -- so I am going to make this up as an
20   example -- by CIGNA, and here are all the primary care
21   physicians in the CIGNA plan.  Now go compare that against
22   the Blue Cross of Idaho primary care physicians and identify
23   any areas where there would be a disruption in network.
24   BY MR. GREENE:
25       Q.   And is it the case that sometimes you don't have

235

1    to do these kind of studies?
2        A.   Correct.  If it's an in-state employer and they
3    are being consulted by an in-state broker, they're already
4    aware of our network.  And in that case, the broker would be
5    communicating the disruption to the employer without our
6    involvement.
7        Q.   And this may be the obvious question:  Obviously,
8    you have knowledge of your own network; correct?
9        A.   Correct, yes.
10       Q.   So you wouldn't need to do such a study in order
11   to make a judgment with regard to the proximity of primary
12   care physicians to potential customers in a particular city?
13       A.   We do it -- we do it out of form just to
14   communicate the results, but we are already aware of what
15   our disruption is.
16       Q.   And how important is it to have primary care
17   physicians close to potential employees?
18       A.   It's a hurdle if you don't -- if you don't meet
19   that one hurdle, then you are not considered an eligible
20   vendor for the employer.
21       Q.   So would it be the case that you would be,
22   essentially, knocked out of the competition if you didn't
23   have that?
24       A.   Yes, that's correct.
25           MR. STEIN:  Objection; leading.

236

1            THE COURT:  Overruled.
2            THE WITNESS:  So we have a few examples of that at
3    Blue Cross of Idaho because our provider network is so
4    broad.  The most recent example of that would be in Twin
5    Falls, in around 2004 to 2009, when we had 65 percent of the
6    providers in Twin Falls under contract, but did not have the
7    Physician Center, which is the local dominant primary care
8    practice in Twin Falls, and we sold very little business in
9    that market during that period.
10   BY MR. GREENE:
11       Q.   So that put you at a competitive disadvantage; is
12   that what you are telling me?
13       A.   Yes.  It puts us at a competitive disadvantage,
14   and that raises the cost of healthcare in that market.
15       Q.   Would be at a similar disadvantage if you did
16   not have access to -- or have in-network pediatricians?
17       A.   Yeah, you would not attract any families with
18   children.
19       Q.   Let me turn to your negotiations with the
20   providers.  We talked about your customers that you sell
21   insurance to, but let's talk about providers.  What is the
22   ideal mix of providers from BCI's perspective?
23       A.   Are you referring to like a percentage of
24   providers under contract or a category of provider in the
25   network?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 13 of 65

237

1    Q.   No.  More what -- in terms of hospitals and their
2    efficiencies, et cetera.
3    A.   Well, if I were to describe our preferred network,
4    it would be a network we would include all of the highly
5    efficient providers in the market, for one.  And we would
6    have broad access for primary care services as a secondary
7    measure.
8         One of the measures of efficiency is if a primary
9    care physician, as an example, needs to perform a diagnostic
10   workup on a member, that they would refer that diagnostic
11   work to a nonhospital provider, which is commonly far less
12   expensive than the hospital for laboratory tests, imaging
13   studies, that sort of thing.
14   Q.   Now, how are rates, reimbursement charges,
15   determined between BCI and providers?
16   A.   It varies.  So I will start with the simplest
17   method, which is for professional services.  We establish
18   fee schedules that we believe are appropriate in the market.
19   We have a -- recognize that we need to have most of the
20   professionals in the market under contract.  So we have --
21   had a policy in the past that we realize we are going to
22   need to pay above national allowances to attract those
23   providers, but we want to hold it to a range that is still
24   affordable for our policyholders.
25        So in that case we will establish fee schedules

238

1    that we think are appropriate for physician services,
2    physical therapy, audiology, optometry, just go down the
3    list of professional providers and attempt to do research to
4    make sure that we're establishing the correct allowances.
5         Then, annually, we would call select providers in;
6    we'd go around the state, and we would hold meetings around
7    the state.  It's called our physician payment advisory
8    council.  And we ask those providers, we give them a preview
9    of what we're planning to do over the next year.  We ask for
10   their input and, very often, receive good suggestions that
11   influence our decisions.
12   Q.   And to what extent does this process involve
13   negotiations?
14   A.   For hospitals, that is the common method for
15   establishing a payment allowance is that there is a
16   negotiated contract that exists, then, between Blue Cross
17   and the hospital.
18   Q.   And how about do you occasionally negotiate with
19   physician groups in terms of their fee schedules?
20   A.   We don't negotiate with them in the manner that
21   I'm talking about for hospitals.  We do include physicians
22   in our planning process, so they influence the process.
23   There are times when a physician group will drop out of our
24   network, and at that point we would enter into somewhat of a
25   negotiation around the elements that they find unacceptable,

239

1    try to reach a reasonable compromise.  And whatever
2    compromise we arrive at then becomes -- it's rolled into our
3    standardized fee schedule for the next year for all
4    providers.
5    Q.   So when you enter into these conversations with a
6    physician group that may be dropping out of your network,
7    what is the -- to what extent are options or alternatives to
8    you to provide those services as part of that process?
9    A.   Well, in the contracting world there is a term
10   called a "BATNA," which is your best alternative to a
11   negotiated agreement.  And that's a primary function that
12   anybody performs when they're performing contracting, is
13   that they identify if this doesn't happen -- so let's say
14   that we're negotiating with the gastroenterology group.  If
15   I'm unable to resolve this contract, what is my best
16   alternative?
17        And the challenge I represented yesterday is that
18   in Idaho it's composed of seven or so smaller markets around
19   the state.  Many of those markets have monopolies for
20   certain services:  orthopedic services, gastroenterology
21   services, some markets even have tight limitations on
22   primary care services.  Almost every one of those markets
23   has a single hospital in it.
24        And so when we look at the negotiation with the
25   hospital, as an example, we try to identify if this doesn't

240

1    happen, what is my best alternative?  And in that case,
2    there is not a reasonable alternative to have the hospital
3    not in contract.
4    Q.   And how does -- if you do not have an adequate
5    BATNA, best alternative, what is the potential effect on the
6    prices or the reimbursement levels that you would be willing
7    to pay?
8    A.   If we don't end up with an agreement with that
9    provider, our payment allowances then, and we've had this
10   happen, very seldom, but it happened in Idaho Falls in the
11   early 2000s when Eastern Idaho Regional Medical Center
12   dropped out of our PPO network.
13        We then calculate what is a standardized payment
14   for a hospital, averaging the payments we make to all
15   hospitals.  That becomes the payment allowance we allow in
16   that market.  If a member utilizes that hospital, which is
17   now noncontracting, we would pay the member our average
18   allowance for all hospitals, the member then would be left
19   to negotiate any difference between that amount and what the
20   hospital is charging.
21   Q.   And as part of your BATNA analysis, would you look
22   at the possibility of being able to serve customers or
23   employees in a particular location with physicians that
24   might be located some distance away?
25   A.   We, certainly, attempt to make that a point of our

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW    Document 550    Filed 11/04/14    Page 14 of 65

Bench Trial, 09/24/2013

241

1  conversation with the employers, but they are almost always
2  going to find that unsatisfactory.
3      Q.  Did you run into a BATNA problem in the Magic
4  Valley?
5      A.  We did.  Between, it would have been about 2002 or
6  so, and 2009, the Physician Center in Twin Falls was not
7  contracted with Blue Cross of Idaho for a PPO.  The
8  Physician Center is the only provider of primary care
9  services for children, pediatrics.  I believe there was only
10  one other internal medicine physician in that marketplace,
11  and they were the dominant provider of family practice
12  services.
13          So what ended up happening for Blue Cross is that
14  we sold very little business in that market between those
15  years.  We ended up selling the State of Idaho account,
16  which is our largest account by a very large margin; they
17  are more than 10 percent of our total membership.
18      The State of Idaho, as we sold the account,
19  recognized that we had a physician network limitation in
20  Twin Falls, and they instructed us to close out that gap.
21  So that would have been around 2004 or 2005.
22          So we then were left with we had been in that
23  market and had been willing to be a small niche player in
24  Twin Falls because of concern that if we conceded to the
25  aggressive pricing demands of the provider community, we

242

1  would have to roll that out to the rest of the state.  And
2  there are reasons for that if you want to get into it.
3      But now we had the -- the issue dialed up because
4  our largest employer account is now a statewide account, and
5  they were instructing us that we needed to resolve that
6  problem in Twin Falls.
7      Q.  And was your customer, the State of Idaho or its
8  representatives, pushing you in the direction of making sure
9  you had services in Twin Falls?
10      A.  Yes, they were.  They were pushing us to enter
11  into a contract with the physicians.
12      Q.  I would like to show you a map; this is one of the
13  demonstratives.  It will take us just a moment.
14      THE COURT:  While you are bringing that up, what's
15  the acronym that you used?
16      THE WITNESS:  BATNA.
17      THE COURT:  BATNA?
18      THE WITNESS:  Best alternative to a negotiated
19  agreement.  If you were to pull out any of the, sort of,
20  standardized contracting, and this is not in reference to
21  medical contracting, it's a strategy that says before you go
22  into a contract negotiation, you should understand what your
23  BATNA is that informs you as to how willing you need
24  to be to make concessions.
25      THE COURT:  Thank you.

243

1  BY MR. GREENE:
2      Q.  Before you, Mr. Crouch, is a map of the Twin Falls
3  area.  I believe we got this from Google.  Would you give
4  that a quick look and tell me if that looks like an accurate
5  reflection of the geography in that area?
6      A.  Yep, correct, I agree with it.
7      Q.  And Twin Falls is the purple thing in the
8  lower-left.  Is that the city you've been talking about?
9      A.  Yes.
10      Q.  Now, there are -- what did you have in your
11  network in Twin Falls, itself, when you got this state
12  contract?
13      A.  So we had 64 percent of the providers in Twin
14  Falls in network.  And the Twin Falls area would have about
15  200 providers if you counted all categories of providers.
16  That would be composed of -- in this case the real problem
17  was the primary care services would be about 50 to 60
18  primary care providers in Twin Falls.
19      Q.  So as a percentage of the available primary care
20  providers in Twin Falls, how many were represented by the
21  group you mentioned earlier?
22      A.  So I'm going to give you a general answer.  I have
23  not looked at that number recently, so my memory is going to
24  fail me a little bit.  But of the 54 primary care providers,
25  we might have had 10 percent in network and the remainder

244

1  would have been out of network.
2      Q.  And from your perspective, was that adequate or
3  inadequate?
4      A.  That was inadequate, and we knew that because we
5  had no sales success in Twin Falls.
6      Q.  Now, I notice that there are various cities that
7  seem to be reasonably close.  Did you have physicians under
8  contracts in any of those nearby cities and towns?
9      A.  Yes, we had a very strong presence in Jerome, in
10  Burley, in Rupert.  I'm not sure there are physicians in
11  Buhl, Filer, or Kimberly.  If there are there is maybe one
12  in each market.
13      Q.  Roughly, what is the distance from Twin Falls to
14  Jerome?
15      A.  Looking at the little chart at the bottom, it
16  looks like it's maybe 15 miles between Twin Falls and
17  Jerome.
18      Q.  Now, in building your network, could you offer
19  this large employer the alternative of sending their
20  employees to Jerome?  Would that have been adequate?
21      A.  We attempted to do that.  And so that would have
22  been our normal sales process for -- what is that? -- a
23  six-year period, is to say there are 50-ish primary care
24  providers in Twin Falls.  There are more primary care
25  providers out of Twin Falls when you look at Jerome and

245

1  Burley and Rupert.  And Jerome and Rupert probably had 20
2  providers, and Burley had maybe 25 to 30 providers.
3      So we had more providers in this 30-mile region
4  that were contracting than were noncontracting, but the
5  employers in Twin Falls don't want to drive to Burley for
6  primary care and neither would the patients of Twin Falls.
7      Q.  So this proved to be not an adequate solution for
8  you?
9      A.  It was not an adequate solution.
10      This is recalling -- the map is triggering a
11  memory for me.  I worked in Seattle, as I mentioned earlier,
12  and we were a very niched player in the Washington market.
13  PacifiCare Health Systems, which is the dominant -- what was
14  in Southern California the dominant capitated health plan.
15  But in Seattle --
16      MR. STEIN:  Your Honor, I'm sorry.  This is
17  nonresponsive to the question.
18      THE COURT:  Sustained.  It is not.  The question
19  is simply whether this proved not to be an adequate
20  solution, I think.
21      MR. GREENE:  An adequate solution here.  I think
22  he is providing an additional anecdote.
23      THE COURT:  Mr. Greene, go ahead.
24      MR. GREENE:  Okay.  Thank you.
25  BY MR. GREENE:

246

1      Q.  Let's take -- momentarily here I'm going to ask
2  you about your additional experience.  So just to make sure
3  I'm clear on this, so individuals who were covered under the
4  State of Idaho contract just were not going to drive that
5  10, 15 miles from Twin Falls to Jerome?
6      A.  Correct.  They will use the Twin Falls provider,
7  and they will pay the out-of-pocket, additional
8  out-of-pocket costs that leads to.
9      Q.  And if you could not have solved that problem for
10  the State of Idaho employer group, would you be risking the
11  contract itself?
12      A.  Yes.  We feel like that our contract would have
13  been in jeopardy with the state.
14      Q.  And why is that?
15      A.  It's too much of a problem for a local marketplace
16  for the State.  So as they look at their -- they were
17  willing to come to Blue Cross of Idaho because the savings
18  we could offer in healthcare costs was so great.  I'm not
19  recalling the exact number, but it would have exceeded 10
20  percent savings.
21      So if you're the State of Idaho, and you're the
22  largest employer, and you're physically constrained to 10
23  percent reduction in total healthcare costs, it's a big
24  number.  But there comes a point at which they get so much
25  noise from their employees and the dependents of their

247

1  employees that they're not willing to -- that offset is not
2  satisfactory, so they would look for another option.
3      Q.  And what steps did you value to fix this problem,
4  close this network hole, if you will?
5      A.  Well, in addition to the State being concerned,
6  Senator Coiner, which was a local legislator in Twin Falls,
7  became very active with our senior leadership, representing
8  his constituents.  We had the brokers in Twin Falls dialing
9  up their efforts to get Blue Cross of Idaho and the Twin
10  Falls physicians to reach an agreement.
11      And at that point Ray Flachbart, who was the
12  president and CEO of the company, became personally involved
13  in it.  So we dialed up our efforts to a great extent around
14  2007, 2008.
15      Q.  Did that have a financial consequence to BCI?
16      A.  Yes.  We ended up having to concede to pricing --
17  their pricing proposal, which was an 8 percent increase in
18  fees.
19      Q.  And what were you planning on providing before you
20  were pushed into the 8 percent increase?
21      A.  Previous to that agreement, we were hoping they
22  would accept our physician fee schedule, our statewide
23  physician fee schedule.
24      Q.  And did that have any --
25      THE COURT:  Excuse me.  If I understood you

248

1  correctly in your prior testimony, this, in turn, would have
2  resulted in an 8 percent increase to all the other primary
3  care physicians around the state; in other words, moving up
4  that schedule for primary care physicians.
5      THE WITNESS:  Correct.  Over time that is how that
6  would happen.
7      THE COURT:  So you never have outliers, but you'd
8  allow one community that has, say, reimbursement rates
9  substantially out of sync with the rest of the state because
10  of pressures from those local physicians?
11      THE WITNESS:  Well, one of the limitations we've
12  lived with in Idaho is the Any Willing Provider Law, which
13  states -- and this was passed when managed care was sort of
14  going across the country.  And it states that a health plan
15  has to offer the same contract terms to any willing provider
16  in Idaho.  So if we arrive at a payment level for a primary
17  care doctor in Pocatello, and at higher than what we offer
18  elsewhere, any other provider can demand the same rate.
19      THE COURT:  Then regional, is there any factor
20  built in for cost-of-living differences between Pocatello,
21  Coeur d'Alene, Boise?
22      A.  No, we do not have any.
23      THE COURT:  I'm sorry.  Go ahead, Mr. Greene.
24  BY MR. GREENE:
25      Q.  Just to follow up on His Honor's question, did the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 16 of 65

249

1  increases you gave the physicians in the Twin Falls area
2  affect rates in other parts of the State of Idaho?
3      **A.  They didn't immediately.  There is no case law**
4  **around Any Willing Provider Law and how it needs to be**
5  **implemented over time.  Our interpretation has been that if**
6  **we arrive at a negotiated increase with an outlier in some**
7  **marketplace, that we would then incorporate that into our**
8  **standardized contract in the future contracting cycle.  And**
9  **that's what we did in this case.**
10     **Q.**  So let me make sure I understand your answer.  So,
11  in fact, the 8 percent increase you gave to the physicians
12  in Twin Falls wound up being an increase for physicians all
13  across the state of Idaho?
14     **A.  Correct.  We implemented that particularly large**
15  **increase over a two-year period.**
16     **Q.**  And is there a practical business reason why BCI
17  would roll those higher physician rates out to other
18  physicians?
19     **A.  We had the requirement from the Any Willing**
20  **Provider Law, which we feel like we'd need to commit to.**
21  **The more practical reason is that if we offer higher rates**
22  **for a health system, a hospital system for primary care**
23  **services than we offer for an independent primary care**
24  **practice, that creates arbitrage in the market that would**
25  **cause independent practices to join the health system just**

250

1  to obtain the higher payment.
2      **Q.**  So that would create an incentive for physician
3  groups to be acquired by hospitals?
4          MR. STEIN:  Objection; leading.
5          THE COURT:  I'm going to give counsel some leeway.
6  It's a court trial.
7          Proceed.
8          Unless I think counsel is putting words in the
9  witness's mouth, which I didn't perceive to be the case.
10         Proceed.
11         THE WITNESS:  So let's take the example of a
12  routine office visit, which is in the study I referenced
13  yesterday.  The predominant code is an 87; let's call it a
14  $90 payment allowance.  If we are paying St. Luke's Magic
15  Valley owned physician $100, and we're paying an independent
16  physician in the Magic Valley $90, that independent
17  physician now has an incentive, a financial incentive, to be
18  purchased by the hospital because there is a payment
19  increase that would be an immediate result.
20  BY MR. GREENE:
21     **Q.**  And who were you -- was there a principal
22  negotiator on behalf of the physician group you mentioned in
23  Twin Falls?
24     **A.  The principal negotiator would be Chuck Pomeroy,**
25  **who is the chief financial officer for St. Luke's Health**

251

1  System, at the time.
2      **Q.**  And was there a physician as well?
3      **A.  Kurt Seppi is -- was -- I think he may -- well, at**
4  **that point Kurt Seppi was the lead physician for Physician**
5  **Center.**
6      **Q.**  And Physician Center was the group that wanted the
7  higher prices; is that correct?
8      **A.  Correct.  They had not changed their name to**
9  **St. Luke's at that point.**
10     **Q.**  And what is Dr. Seppi's role currently?
11     **A.  The leadership at St. Luke's is still a little**
12  **unclear to us, but if I read a recent article, he is in**
13  **charge of clinical affairs for owned physician practices, I**
14  **believe.  So chief medical officer for clinical activities,**
15  **not hospital activities.**
16     **Q.**  So do you have any further knowledge of his
17  specific role at St. Luke's?
18     **A.  Well, when St. Luke's purchased Physician Center**
19  **in Twin Falls, he was the lead physician in Twin Falls.**
20  **They, then, subsequently, promoted him to have that lead**
21  **role for their entire corporate structure across Idaho.  I**
22  **don't know the details of his involvement outside of that.**
23     **Q.**  Do you have any concerns, Mr. Crouch, about the
24  proposed St. Luke's Saltzer transaction?
25     **A.  Our concern with the Saltzer acquisition is that**

252

1  it appears to be a repeat of the Magic Valley acquisition,
2  **which is the accumulation of market power and the ability to**
3  **then negotiate what we would consider to be unreasonable**
4  **payment levels.**
5      **Q.**  And what -- in your parlance, what do you think of
6  market power?  What does that mean to you?
7      **A.  I don't know if this is like a purely economic**
8  **definition, but I would say market power, in this context,**
9  **is acquiring sufficient power that they can arrive at**
10  **concessions from Blue Cross or other payors above what the**
11  **market would otherwise sustain.**
12     **Q.**  Has Blue Cross done any calculations with respect
13  to what it expects in higher charges from the St. Luke's
14  Saltzer transaction?
15     **A.  There are two events that follow the acquisition**
16  **of a physician practice by a hospital.  One of them is that**
17  **we see -- of course, we see the hospital would be getting**
18  **the bill for those professional services.  On the Medicare**
19  **side, that will result in an immediate doubling of the**
20  **office fee.  So our fee for our Medicare Advantage product**
21  **would double overnight.**
22         **While that's a big number, the more relevant**
23  **number on the commercial side is what happens to what we**
24  **call "ancillary services."  Ancillary services are those**
25  **services that are not professional services and not hospital**

253

1 services. So it's that whole category of other activities,
2 diagnostic testing, physical therapy, that sort of thing.
3 The Saltzer Medical Group had, prior to its
4 acquisition by St. Luke's -- and I think it may even be
5 continuing for some period now -- they have their own
6 laboratory, they have their own diagnostic imaging, they
7 provide therapy services, they provide specialized facility
8 services for colonoscopies and minor outpatient surgeries
9 such as that.
10 When we learned of the acquisition or the pending
11 acquisition, we calculated what would happen to the cost of
12 those ancillary services following the acquisition, and we
13 calculated that for commercial services it would go up
14 somewhere in the 30 to 35 percent range. And for Medicare
15 Advantage --
16 MR. STEIN: Your Honor, we object to this, first
17 of all, on foundation grounds, but also relevance. We are
18 talking about Medicare, which is not a commercial product,
19 which is -- this case involves commercial products. The
20 ancillary services, which Mr. Crouch just testified, are
21 neither professional services nor hospital services, which
22 is the only two types of services that are at issue in this
23 case.
24 MR. GREENE: Well, actually, that's not correct,
25 Your Honor.

254

1 THE COURT: Mr. Stein, you are suggesting that an
2 increase -- so ancillary services, I guess Mr. Crouch did
3 say those were nonhospital services; correct?
4 THE WITNESS: Before an acquisition they're not;
5 after an acquisition, they become hospital services.
6 THE COURT: I'll overrule the objection.
7 Go ahead and proceed.
8 MR. GREENE: Thank you, Your Honor.
9 THE COURT: Just so I'm clear on this, in other
10 words, they are ancillary services before the acquisition
11 because the doctor, at that point, would then direct that
12 the labs, diagnostic imaging, and whatnot, could be
13 performed anywhere; after the acquisition it would be
14 directed more within the hospital structure.
15 THE WITNESS: Correct.
16 THE COURT: Is that what you meant?
17 THE WITNESS: Yes.
18 THE COURT: All right. Go ahead and proceed.
19 MR. GREENE: Thank you, Your Honor.
20 BY MR. GREENE:
21 Q. Before you, Mr. Crouch, is a binder of materials.
22 I would like to have you look at the first document, which
23 is Plaintiffs' Exhibit 1302, if you would glance at that,
24 and I will ask you some questions.
25 A. I have got it, yep.

255

1 Q. If you would bring up 32.
2 So, Mr. Crouch, what is this document?
3 A. This is the source of the statistic I was giving
4 earlier. This identifies the increase to policyholders
5 following the acquisition of Saltzer by St. Luke's.
6 Q. Does this calculate that for both your Medicare
7 Advantage program and your commercial programs?
8 A. The first page shows the Medicare Advantage
9 program, and the second page shows the commercial program.
10 Q. And was this -- what is the data that was used to
11 prepare this document?
12 A. We took a set of all the claims that Saltzer had
13 billed us for in that category of ancillary services, and
14 you can see they are listed on that first column. DME is
15 durable medical equipment.
16 Q. We're just going to lay a foundation for the
17 document. So what sort of -- this was based on claims data
18 from Saltzer itself; is that correct?
19 A. Yes. It's the Saltzer claims, yes.
20 Q. And, roughly, how much data were you -- how far
21 back did you go to create this?
22 A. September 2011 through August 2012, one-year
23 period.
24 Q. Now, was this prepared in the ordinary course of
25 BCI's business?

256

1 A. Yes, as soon as we -- it's not a report we would
2 produce monthly, but upon announcement of an acquisition it
3 would be a common report.
4 Q. Now, I would like to turn your attention to what I
5 believe is the third page, and my colleague will bring up
6 the third page.
7 A. I have it.
8 Q. What is this showing us in terms of ancillary
9 services?
10 A. The first two pages show the result. We had to
11 make some assumptions about how many of the ancillary
12 services that had been billed by Saltzer would begin to be
13 billed by the hospital. This page -- and so to make that
14 assumption, we had to figure out, well, in past
15 acquisitions, do they tend to leave some of the services at
16 the physician's office and move some of the services over to
17 the hospital or what percentage of that movement occurs.
18 This document gave us that data.
19 Q. And I notice in the first column there is
20 something for Ada County. What is that describing in terms
21 of shifts in service?
22 A. The first row of data is July of 2011; that's what
23 the 2011/07 represents. And in Ada County the physicians --
24 THE COURT: Just so I'm sure, this is just Saltzer
25 Group-generated patients who require these ancillary

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW    Document 550    Filed 11/04/14    Page 18 of 65

257

1   services; correct?
2       THE WITNESS:  And this is not.  In this case,
3   these are the physicians that had been acquired by
4   St. Luke's before Saltzer.
5       THE COURT:  Okay.
6       THE WITNESS:  So we wanted to identify when
7   St. Luke's acquires a physician office, how aggressive are
8   they at transitioning those services into the hospital.
9       THE COURT:  I'm sorry, I lost -- I knew there was
10  something I was missing and now I see.  So these were
11  physician groups acquired prior to the Saltzer transaction?
12      THE WITNESS:  Correct.  On the first row it was
13  105 physicians.
14      THE COURT:  And what you're tracking is,
15  essentially, their transition using nonhospital sources for
16  these ancillary services and converting and going over to
17  hospital-provided services.
18      THE WITNESS:  Yes.
19      THE COURT:  Go ahead.
20  BY MR. GREENE:
21      Q.  So what does this column show us for Ada County?
22      A.  It shows us that following acquisition,
23  essentially, all of the physician-billed services
24  transitioned to the hospital.
25      Q.  And was that also true for Canyon County?

258

1       A.  Yes.  And you can see that that's, certainly,
2   smaller dollars for Canyon County; there hadn't been many
3   acquisitions.  But it, again, drops to almost zero.
4       Q.  And is this -- I believe you mentioned that 105
5   physicians were reflected in these referral pattern shifts;
6   is that correct?
7       A.  At the top of the chart it was 105.  By the time
8   we arrive at the bottom of the chart, it was 156.  So it
9   grew, the volume of physicians grew by over 50 percent.
10      Q.  Now, let's turn to the second page, which I think
11  you were about to give us more detail on.  What is this
12  chart showing us?
13      A.  This chart is showing us the repricing of the
14  claims that had been previously billed by Saltzer and what
15  the price would be if they were billed by St. Luke's Boise.
16      Q.  And what is -- why is there a difference between
17  services provided by a hospital-owned doctor group versus an
18  independent doctor group?
19      A.  So it is one of the challenges of the U.S.
20  healthcare system.  The foundation for the payment mechanics
21  that were established a couple of decades ago have still
22  been prevalent in the market, even though the market has
23  changed to a different practice of ownership.  So I will
24  give you an example.
25      In the '80s, '70s and '80s, certainly, hospitals

259

1   were, at that point, specific centers for acute care
2   activities.  And the hospital would approach the payor and
3   say:  We're open 24 hours a day, seven days a week.  We've
4   got people who are in inpatient beds who need acute care,
5   and they need their diagnostic testing performed.  We can't
6   perform a lab test in that environment with the same level
7   of efficiency as a freestanding lab can because the
8   freestanding lab is working 9:00 to 5:00, Monday through
9   Friday.  The same thing would apply for a free-standing
10  outpatient --
11      THE COURT:  Just so I'm clear, in terms of
12  efficiency, the argument is they have to be staffed 24/7
13  even though probably two-thirds of the time the actual
14  demand is fairly low because they're just waiting for an
15  emergency to happen.  Is that the concept?
16      THE WITNESS:  I'd say there's an additional
17  element, as well.  So, one, is they have to be staffed all
18  day long; and the second is the volumes are low.
19  Traditionally, a hospital might have -- let's say that it's
20  a hospital the size of a standard community hospital -- they
21  might have 20 to 50 patients in-house on any one day.  There
22  aren't that many lab tests you're going to do for 20 to 50
23  patients, but you still have to have the equipment and staff
24  to do it.  So it's a combination of having to work all the
25  time and having low volumes.

260

1   BY MR. GREENE:
2       Q.  Now, these rates, is there any legal requirement
3   that you pay higher rates for physician services and
4   associated lab services done in a hospital-owned physician
5   group?
6       A.  No, there is no legal requirement.
7       Q.  So this would be a matter of negotiation?
8       A.  That's correct.
9       Q.  Conversely, are there legal requirements in the
10  Medicare system that require you to pay more for services
11  provided by physicians in the ancillary services if they are
12  provided under the Medicare program?
13      A.  No, there are no requirements.  There are many
14  markets that pay less than Medicare for physician services.
15      Q.  Okay.  I would like to just get a sense of these
16  prices.  So we're going to call up a few of these.  Let's
17  start with drug --
18      THE COURT:  Can I just -- and I apologize.
19  Hopefully, I won't have to interrupt as often as I get a
20  little better feel for some of the background.  Can we use
21  the word -- is the word "ancillary services" kind of a
22  general term used within your business area which would
23  include diagnostics, x-rays, labs, essentially, all of the
24  services outside of a patient room for inpatient treatment
25  and the kind of services that would be ordered by a

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 19 of 65

261

1  physician on an outpatient basis?
2      THE WITNESS: I think that is a fair definition.
3      THE COURT: But not necessarily including
4  pharmaceuticals, drugs, which might be just done
5  separately, or is that also considered an ancillary service?
6      A.  It depends on the drug. There are drugs that can
7  be --
8      THE COURT: Prescribed.
9      THE WITNESS: Right. So if it's prescribed and
10  you use your pharmacy card, and you go to Walgreens, or
11  wherever, that would not be an ancillary service. But if
12  you're being injected with a drug as part of another
13  activity, then that would be considered part of an ancillary
14  service.
15      THE COURT: Go ahead, Mr. Greene.
16  BY MR. GREENE:
17      Q.  So briefly, why would drug prices go up by,
18  roughly, $78,000?
19      A.  In the example of drugs -- I just want to make
20  sure. We didn't show on this table what the new allowance
21  would be. You would have to add current allowance plus
22  increase in allowance. That would be the new allowance, so
23  we're not showing on this sheet the new total.
24      In this case, the cost of drugs would grow by
25  something like 130 or 140 percent.

262

1      When a physician bills a drug through their
2  office, it hits a standardized fee schedule for Blue Cross.
3  And that fee schedule we've been able to manage to be
4  representative of what we think is an appropriate price for
5  the drug. When that is billed by the hospital, that is the
6  result of whatever the negotiated agreement is with the
7  hospital. And in that case you can see that it's an
8  increased allowance.
9      THE COURT: And again, this would be a drug that
10  is actually administered at the clinic, at the Saltzer
11  clinic postacquisition?
12      THE WITNESS: Yes.
13      THE COURT: As opposed to a prescription which you
14  would fill at a pharmacy which would be under the normal --
15      THE WITNESS: That is correct.
16  BY MR. GREENE:
17      Q.  Just so I'm clear on this, Mr. Crouch, if this
18  drug were administered in the before/after world would this
19  be the same treatment, the same drug?
20      A.  Correct. We took the claims -- so let's say that
21  it's a tetanus shot or it's a hepatitis vaccine or something
22  along those lines, something that's very commonly
23  distributed through the physician's office. We took that
24  drug and simply repriced it. We didn't assume there was any
25  change in utilization, we didn't assume that there was a

263

1  change in the drug. We simply took the list of drugs that
2  Saltzer had billed us, repriced those drugs on the St.
3  Luke's fee schedule.
4      Q.  And then turning to the labs, which it's a
5  $606,000 increase. What is the basis for that increase?
6      A.  That would be another example of the fees at the
7  hospital being a -- that we would pay which are higher than
8  the fees we would pay to the physician in practice. So labs
9  would include a complete blood count, cholesterol
10  screenings, urinalysis, other blood work.
11      Q.  And then turning down to PT/OT, that shows
12  $165,000 increase. What is "PT/OT"?
13      A.  Physical therapy and occupational therapy.
14      Q.  And what is the basis for this price increase --
15  or this increase?
16      A.  It would be the same basis, which is we have
17  existing fee schedules that when the physician bills for the
18  service, it's going to hit our standardized fee schedule,
19  and when the hospital bills for the service, it's going to
20  hit whatever its negotiated fee schedule is.
21      Q.  One down from that is something called "RVU".
22  What does "RVU" stand for?
23      A.  Relative value unit. In this case it's a
24  catch-all for an item that has a relative value unit, so
25  it's a CPT code. It's a defined service, but it was just

264

1  not bundled into any of the other summaries.
2      Q.  I think you're going to need to uncap that for me.
3  So what is -- what for a layperson would be an RVU, and what
4  for a layperson would be a CPT code?
5      A.  So I have not looked at this in a long time, but
6  there are -- in the coding system there's what is called a
7  HCPCS code, Healthcare Common Procedure Coding System. It's
8  7,000 codes that are not considered professional services,
9  and in this case would also not be separately identified as
10  being a lab or being drugs or being durable medical
11  equipment. So it would be those items which are still
12  reimbursed on an RV, on a relative value scale, but don't
13  cleanly fit in one of the other categories.
14      Q.  And TC Imaging for $589,000, what's that?
15      A.  So this would be x-rays and MRIs and CT scans. TC
16  is a reference to the technical component. For most codes
17  there's going to be two components to the code, the amount
18  we are paying for professional services and the amount we
19  are paying for technical component, which would be the
20  facility, as an example.
21      So we have a CT scan that has a $600 payment
22  allowance. Some portion of that payment allowance is for
23  the professional read of the exam, some portion of that is
24  simply for the equipment, for the CT scanner, for the
25  technician's time and for the facility time. So the TC is

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 20 of 65

265

1 the nonprofessional component of imaging.
2     Q.  And then dropping down to the grand total, I
3 assume that reflects an addition of all of the estimated
4 increases?
5     A.  To some of the above numbers.
6     Q.  So you've got it in dollars and in percentages.
7 What are those dollars and percentages?
8     A.  $2,476,000 increase for one year of these services
9 that had been billed by Saltzer that we believe would be
10 billed by St. Luke's, and that would represent a 32 percent
11 increase in our costs.
12     Q.  Let's turn to the first page.
13         THE COURT:  Can I go back to this and ask one more
14 question.  The current charges is what the physician or the
15 service provider is going to charge; correct?
16         THE WITNESS:  Yes, that's correct.
17         THE COURT:  And current allowed is what Blue Cross
18 is going to pay?
19         THE WITNESS:  Yes.
20         THE COURT:  The rest of it could be subject to
21 negotiation between the patient and the provider or it would
22 be written off in some fashion; correct?
23         THE WITNESS:  It would be written off if it is the
24 contracting provider.
25         THE COURT:  Now, the estimated increased

266

1 allowance, what that suggests is that, for example, taking
2 the colonoscopy, there would be a fairly modest increase in
3 the allowance for that change, but the others would be -- so
4 the real relevant or the important factors to be looking at
5 are the last two columns; correct?
6         THE WITNESS:  Yes.
7         THE COURT:  All right.  Go ahead, Mr. Greene.  I
8 just wanted to make sure I understood that.
9 BY MR. GREENE:
10     Q.  Now, turning to the first page of this document,
11 which will also be appearing on your screen, Mr. Crouch,
12 what is this document reporting?
13     A.  This is the same study, but we've replaced
14 Medicare Advantage data for claims for commercial data.
15     Q.  And I want to go back to this question.  So this
16 is under the Medicare Advantage plan.  That's a Medicare
17 program; is that correct?
18     A.  Yes.  So in the Medicare world there are two broad
19 ways that a senior citizen in a community can obtain their
20 Medicare benefits.
21         MR. STEIN:  Your Honor, object.  The question was
22 answered.
23         THE COURT:  True.  But I am going to give a lot
24 more leeway.  This is a court trial, not a jury trial, and
25 I'm going to give counsel a lot of leeway; otherwise, we're

267

1 going to get bogged down pretty quickly here.  So I will
2 overrule the objection.
3     Go ahead.
4         THE WITNESS:  Medicare's had for -- since the '80s
5 has had the initiative to transition people out of the
6 Medicare fee-for-service world and into what is called the
7 Medicare Advantage, because the Medicare program can save
8 money when members move to a Medicare Advantage plan, and
9 they can obtain enhanced benefits.
10     So Blue Cross of Idaho is a contractor with the Federal
11 Government in Idaho to be a replacement for the Medicare
12 program.  It is voluntary, but any member who elects our
13 coverage, they get Medicare coverage through Blue Cross of
14 Idaho and drops their direct coverage through the Medicare
15 program.
16 BY MR. GREENE:
17     Q.  Dropping down in this chart to "RVU, E&M".
18     A.  Yes.
19     Q.  Is this showing a $1.16 million increase?
20     A.  Correct.  And you can see on that item it was a
21 raw assumption that the allowance for the professional
22 service will double.  Under our contract with St. Luke's, we
23 follow Medicare pricing rules for physician office visits,
24 and Medicare has had this nuance loophole in their program
25 for when a physician's practice becomes acquired by a

268

1 hospital, the hospital can then bill a supplemental charge
2 for that visit, and it essentially doubles the cost.
3     Q.  So would it be the case that the receptionist
4 stays the same, the magazines in the waiting room stay the
5 same, the doctor stays the same, the nurse stays the same,
6 but the price doubles; is that correct?
7     A.  That is correct.
8     Q.  And what is RVU, E&M?
9     A.  Evaluation and management that -- the industry
10 jargon for an office visit.
11     Q.  So is part of this something called a "facilities
12 fee" or something else?
13     A.  On that third column, where you saw the E&M fee
14 double, that is what we typically refer to as the facility
15 fee.  The professional fee is still in place, and the
16 hospital is now billing a facility component to that office
17 visit, and so that -- that is one of the uses for the term
18 "facility fee."
19     Q.  Thank you.  And then dropping down to the bottom
20 line, what is that?
21     A.  It shows that the cost for those services will
22 grow by 1.2 million, which is a 43 percent increase.
23     Q.  We do have a demonstrative.  I can represent to
24 you, Mr. Crouch, this was a demonstrative taken from a
25 MedPAC report on Medicare payment policies from April of

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 21 of 65

269

1    last year.  Are you familiar with this document?
2    **A.  Yes, I have seen this before.**
3         MR. STEIN:  Your Honor, I am wary of testing the
4    Court's patience, but we're talking now about Medicare
5    reimbursement, not commercial reimbursement, which is the
6    issue.  This case only involves commercial plans.
7         THE COURT:  Mr. Greene.
8         MR. GREENE:  This is just context, Your Honor.  I
9    am going to ask two questions, and we're done.
10        MR. STEIN:  With due respect, we -- well, first of
11   all, we've objected to this demonstrative and because this
12   is referring to a payment methodology that is a function of
13   Medicare policy, not commercial reimbursement, which
14   Mr. Crouch has testified is the subject of negotiations
15   between the parties.  This is the provider-based billing
16   issue, Your Honor, that we --
17        THE COURT:  All right.
18        Mr. Greene, the only possible relevance I could see to
19   this would be that if there is a reason for not approving
20   the acquisition, would be some overall increase in prices
21   totally apart from the question of concentration of market
22   power or competitive loss of competition.  So I'm not sure
23   why this is relevant.
24        MR. GREENE:  Our view of this, Your Honor, is that
25   we're trying to paint a picture of overall impact.  And what

270

1    this will show is that -- this, essentially, illustrates the
2    doubling in price that Mr. Crouch just spoke to.  This is a
3    direct consequence of the transaction.  It is a consequence
4    also of a regulatory scheme that the federal government has.
5         THE COURT:  It may be a consequence, but it is not
6    a competitive consequence.  I'm not sure it is a relevant
7    consequence.  So I think I will sustain the objection so we
8    stay focused on -- you know, I'm sure the consumer would be
9    very concerned, but that is not the concern of this
10   litigation.
11        MR. GREENE:  Thank you, Your Honor.
12   BY MR. GREENE:
13     **Q.**  Now, Mr. Crouch, your analysis or BCI's analysis
14   of the effect on commercial payments, is that based on --
15   what experience is that based on in terms of why you think
16   this chart is relevant to or appropriate to be considered
17   when considering the effects of the Saltzer/St. Luke's
18   transaction?
19     **A.  It measures the impact we had already observed**
20   **from the 150 previous acquisitions and applies that learning**
21   **to the Saltzer acquisition.**
22     **Q.**  Is one of those experiences the experience with
23   two orthopedic practices in Boise?
24     **A.  Certainly, the Intermountain Orthopaedics Group**
25   **was acquired and one of the other surgical practices --**

271

1    **well, more than one surgical practice were acquired, and we**
2    **saw similar results through those acquisitions.**
3
4
5
6
7
8
9
10
11
12                    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

272

1
2
3
4
5
6
7
8
9
10
11
12                    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 22 of 65

Bench Trial, 09/24/2013

273

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

274

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

275

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

276

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 23 of 65

277

REDACTED

.

8   Q.   I would like to bring up the next document in
9   order, Clinton, which is Plaintiffs' 1298.
10   What is this document, Mr. Crouch?
11   A.   This is showing the -- do you want me to talk
12   about the top half and the bottom half?
13   Q.   Well, just describe the document generally, and
14   then I may ask some questions about the bottom half of the
15   first real page.
16   A.   The top half is showing the changes in our -- we
17   have two standardized fee schedules in the marketplace.
18   Multiple conversion factor of fee schedules tend to benefit
19   specialists.  Single conversion factor tends to benefit
20   primary care.  There is a whole dialogue about that, if
21   there's interest in that in this trial.
22   Q.   Now, briefly, tell me what this shows.
23   A.   It shows that the payment changes have been over
24   time.  You can see the years represented and the changes in
25   the reimbursement.

278

1   Q.   This is a reflection of your ongoing payments at
2   the higher level; is that correct?
3   A.   Yes.
4   Q.   And looking at the lower block -- which I will ask
5   my colleague to highlight for us -- so are these annual
6   figures?  What period is covered by this?
7   A.   2008 through 2012.  And this is showing that for
8   ambulatory surgery centers -- we had mentioned earlier, in
9   my testimony, that our understanding is that within Idaho,
10   payment allowances are very high.  That applies to
11   professional services and hospital services.  In this case,
12   there would be another category included here, which would
13   be surgery center services.  During that period of time,
14   those four periods represented, there is only one period
15   when we made a payment increase.  For St. Luke's Boise there
16   were payment increases every period.
17   Q.   So what is the bottom-line figure for these
18   transactions, from your perspective, based on this chart?
19   A.   This is giving a little bit of history over the
20   increases.  The bottom line is the -- when a surgery center
21   is acquired by St. Luke's, our payment for all of those
22   surgeries increases 289 percent.
23   Q.   Thank you.  Briefly, in terms of foundation, how
24   was this prepared?
25   A.   Similar to the method we used previously.  We will

279

1   take a set of real-life claims, existing claims that were
2   paid, in this case it would have been through the surgery
3   center, and we'll reprice those claims under the hospital's
4   contract and calculate the difference.
5   Q.   So conceptually, is this similar or the same as
6   the calculation you did for the St. Luke's/Saltzer
7   transaction?
8   A.   Yes, same methodology.
9   Q.   I would like to turn to the next exhibit, which is
10   Plaintiffs' 1299.  What is this document, Mr. Crouch?
11   A.   Again, going back to the contracting process, at
12   the beginning of each major negotiation, both parties will
13   come together and try to identify what it is they're trying
14   to accomplish through the negotiation.  This set of slides
15   is background for the -- what Blue Cross is trying to
16   accomplish, which was really to communicate St. Luke's is
17   overpaid for their services and we don't feel like the large
18   increase is substantiated.
19   Q.   How were the numbers within this slide deck
20   calculated?
21   A.   Well, there might be different methods based on
22   the different slides.  Do you have one in mind?  Do you want
23   me to look at it?
24   Q.   Sure.  Why don't you take a look at Slide 3.
25   A.   Okay.  So this slide shows the historical

280

1   increases for their three largest hospitals for each year,
2   and you can see the increases there in front of you.  The
3   point we were attempting to make with this slide is that the
4   last column shows the hospital producer price index.  That
5   is a measure of inflation for the hospital industry.
6   Similar to CPI for consumers, this is a measure of inflation
7   for hospitals.
8   Q.   Directing your attention to the Magic Valley
9   column -- my colleague will highlight that portion --
10   starting in 2009, does this reflect the greater power in the
11   Magic Valley that we discussed earlier?
12   MR. STEIN:  Objection; leading.
13   THE COURT:  Overruled.
14   THE WITNESS:  Certainly.  It shows that in -- the
15   Magic Valley Hospital received an 8 percent increase in
16   2009; that was in an environment when inflation was
17   3.4 percent, nationally.  That is not an amount we would
18   have offered to any other hospital.
19   BY MR. GREENE:
20   Q.   And then the -- in the subsequent year what was
21   the figure?
22   A.   6 percent for the Magic Valley.
23   Q.   And how does that compare to medical inflation?
24   A.   In this case, you can see that this is the tail
25   end of the recession, that inflation was dropping that year,

281

1   went to 2.2 percent.

2      Q.  Now, I just want to understand how this works.  So

3   is the 6 percent in 2010 on top of the 8 percent in 2009?

4      A.  That is correct.  They are compounding numbers.

5      Q.  And that would be true for the 2011 figure of 6.5,

6   that is on top of the preceding 6 and the preceding 8?

7      A.  Yes, exactly.

8      Q.  Just very briefly, the St. Luke's facilities in

9   Boise and Meridian, not as dramatic, obviously, but how did

10  those compare, briefly, with medical inflation?

11     A.  I don't think there is an example anywhere on the

12  page where the increase is less than inflation, except for

13  the Wood River reduction, but that was a request St. Luke's

14  made of us; that was not our proposal.

15     Q.  Turning to Slide 5, what is the purpose of this

16  slide?

17     A.  We were trying to make several points during this

18  part of the negotiation.  One of the points is that we felt

19  they were attempting to resolve cost inefficiencies through

20  higher payment increases.  So the parlance we used is you're

21  trying to solve a cost problem with a revenue solution.

22          And in this slide we're showing SLWR, St. Luke's

23  Wood River, their average cost per inpatient day being

24  $1,900, and you can see the -- compare that to EIRMC, who we

25  typically hold out in Idaho as being a highly efficient

282

1   provider, their cost being $800 per inpatient day.

2      Q.  So more than double?

3      A.  More than double.

4      Q.  Do you regard St. Luke's as an efficient provider

5   of care?

6      A.  No, we do not.

7      Q.  And why is that?

8      A.  This is -- one indication is there their cost

9   structure is high.  The second indication is what we've been

10  talking about all morning, which is they redirect commodity

11  services from a low-cost setting to a high-cost setting, so

12  that is a substantial cost driver.

13     Q.  And that's a consequence of acquisitions?

14     A.  Yes.

15     Q.  And how do they do in terms of Medicare?

16     A.  I don't know if we have a slide here, but at that

17  same meeting we are, essentially, debating whether they were

18  efficient or inefficient for costs, Randy produced a slide

19  from the Idaho Hospital Association that showed that

20  St. Luke's was losing 20 to 25 percent on Medicare business,

21  so this would be not Medicare Advantage but the Medicare

22  system from the federal government.

23          And their own slide -- we brought it to his

24  attention -- there on their own slide it showed that

25  75 percent of hospitals in Idaho are near or break-even or

283

1   are making money on Medicare.  So his own slide, which he

2   intended to show "look how much of an increase we need from

3   you," demonstrated that their problem was cost, it was not

4   revenue.

5      Q.  I would like to have you turn to Slide 8.  What

6   was this slide designed to show?

7      A.  Two points.  The first point is that we have a

8   category of services that we call "commodity services,"

9   which are those services where there is no perceived or

10  measurable difference in quality.  The only difference is in

11  the payment allowance, and these are all examples of what we

12  would consider to be commodity services.  It is a scattering

13  of different categories; I don't know if there is any

14  particular thought put into what comes on this slide.  But

15  it was intended to show that despite the fee schedule

16  improvements we had over many years with St. Luke's on the

17  outpatient side, they were still an outlier in cost for most

18  categories of services.

19     Q.  And would these be the services that would be

20  called upon by formerly independent physicians?

21          MR. STEIN:  Object to the form.

22          THE WITNESS:  Yes, every one of these services.

23  You know, we were talking about drugs earlier, and there's

24  an example of a drug on the very bottom line there,

25  ondansetron hydrochloride.

284

1   BY MR. GREENE:

2      Q.  Let me turn to the next exhibit in order, which I

3   believe is Exhibit 1300.  What is this document showing us?

4      A.  We call this our conversion factor report, and it

5   is a method we use to compare the reimbursement between

6   hospitals in Idaho.

7          MR. GREENE:  I would ask my colleague to highlight

8   the St. -- one of the St. Luke's facilities.

9          MR. STEIN:  Your Honor, we object to the use of

10  this document.  The basis for the objection is we think it

11  is frankly evident from looking at it.  You can see, Your

12  Honor, that Blue Cross has selectively disclosed certain

13  portions of some analysis that they did.  You can see

14  there's whole columns blacked out here, there's whole rows

15  blacked out here.  This version has what they did blacked

16  out.  We didn't get the backup for this; we didn't get the

17  queries they ran for this.  We have had absolutely no way to

18  review the underlying analysis here.  It is being presented

19  as here is something we did, and here are our conclusions.

20          THE COURT:  Mr. Greene.

21          MR. GREENE:  I think, Your Honor, there are

22  probably two levels.  Firstly, they did discuss this with

23  BCI, did not take the opportunity to do a motion to compel.

24  We think that Mr. Crouch can certainly speak to the

25  underlying data analysis that was done to support this.

285

1   From my perspective, this suggests that, over time,
2   St. Luke's -- and I think this is the key point -- St.
3   Luke's facilities had apropos at the efficiency point, gone
4   up and over the efficiency point. Have gone from some with
5   basically, middling-level cost levels to the highest in the
6   state of Idaho in, roughly, a five-year period. So we think
7   it's useful evidence.
8           THE COURT: Why was some of it blacked out?
9           MR. GREENE: This is a very detailed slide,
10  what -- as I understand it -- BCI did not want St. Luke's to
11  see the prices and costs associated with other facilities as
12  part of the negotiation process. I think they could have
13  brought this to the Court's attention in a much more timely
14  way.
15          THE COURT: I am assuming the plaintiffs do not
16  have the underlying data?
17          MR. GREENE: We do not.
18          THE COURT: You have what we see here?
19          MR. GREENE: I just have this.
20          MR. STEIN: To be clear, Your Honor, this
21  redaction was a decision made by Blue Cross. This is a
22  document that is produced as part of the -- as part of the
23  discovery, and --
24          THE COURT: Well, at this point let me hear --
25  again, fortunately we don't have a jury here. I want to

286

1   hear how this was put together, why the matters were
2   deleted, and then, Mr. Stein, you can inquire, perhaps, in
3   aid of an objection as to why it makes a difference. At
4   this point It's hard for me to tell.
5           Go ahead and proceed.
6           Counsel, we're going to take our break in about
7   ten minutes.
8           MR. GREENE: Okay. We will make progress.
9   BY MR. GREENE:
10      **Q.** Mr. Crouch, why was this document created?
11      **A.   So this is the primary tool we use in-house to**
12  **compare payment allowances between hospitals. In Idaho**
13  **there are 40-ish hospitals; 9 or 10 of them are what we**
14  **would consider to be large hospitals. They are in the peer**
15  **group that is shown unredacted. And it is the method we use**
16  **to make sure that -- well, I guess there are two things:**
17  **This supports two policy positions or supporting material**
18  **for two policies. One is we have a written policy that it**
19  **is our intent to reimburse cost-efficient providers at a**
20  **market-appropriate profit so that we don't incentivize**
21  **inefficiency.**
22      **And a second policy is that we want to, for almost**
23  **every procedure that we can imagine, have a negotiated**
24  **payment allowance and not rely on a provider's billed charge**
25  **to determine what the payment should be, a whole series of**

287

1   **other policies that this supports.**
2           **So in the early 2000s we created this document as**
3   **a method to accomplish that. The methodology we follow is**
4   **we take every hospital's claims that were billed to us, and**
5   **we recalculate those claims on what Medicare would have paid**
6   **them. The reason we use Medicare is because it's a**
7   **standardized benchmark. And then we compare each hospital**
8   **against one another, so you can see the -- we could have**
9   **made a bigger version of this. This is a little small. So**
10  **the last column that is not redacted shows the simple**
11  **average for that hospital when compared to their peer group.**
12          **So this is what informs us during our contract**
13  **negotiation cycle as to whether hospitals are becoming**
14  **overly compensated and undercompensated.**
15          THE COURT: So the vertical column, are those
16  different treatments or care that is being provided?
17          THE WITNESS: No. So we separate -- if you'll
18  look at the -- I'll point -- if you look at the first pair
19  of columns that are unredacted --
20          THE COURT: They're showing -- what they've blown
21  up here is the last column.
22          THE WITNESS: So the -- did you want me to talk
23  about the last column?
24          THE COURT: If you can explain what the various
25  columns are. I can't see it well enough when we look at all

288

1   of them. Can you go column by column? Can you explain
2   that?
3           THE WITNESS: Sure.
4           THE COURT: Let's start with the first.
5           THE WITNESS: The first column is the hospital.
6   So it shows the hospital's name, "St. Luke's Magic Valley
7   Wood River." "BM" is Boise Meridian. You can see "Saint
8   Alphonsus" is highlighted.
9           THE COURT: So what you have included would be the
10  hospitals that you think would be relevant in the Treasure
11  Valley?
12          THE WITNESS: Correct. Did you want me to
13  describe why some of this material is redacted, why we
14  believe that was necessary?
15          THE COURT: Well, I am assuming because you treat
16  that somewhat as a trade secret, is this information given
17  to those individuals or those companies that you are
18  negotiating with?
19          THE WITNESS: No, we don't disclose it.
20          THE COURT: It's just an internal document.
21          THE WITNESS: Internal only. Our concern is that
22  if it were -- let's say we're published as part of the court
23  record and all the hospitals on the bottom end of it would
24  say, "I need a payment increase."
25  BY MR. GREENE:

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW Document 550 Filed 11/04/14 Page 26 of 65

Bench Trial, 09/24/2013

289

1  **Q.** In looking at St. Luke's Boise-Meridian, can you
2  compare -- can you compare where they were, say, in the
3  first period versus the last period?
4  **A. The first set of columns there are their out --**
5  **"OP" is outpatient. So this sheet is not measuring from one**
6  **period of time to another period of time. This is saying**
7  **for outpatient services, St. Luke's Magic Valley is 7**
8  **percent above their peer group; for inpatient services Magic**
9  **Valley is 40 percent above their peer group. When you do a**
10 **weighted average of those two numbers, they are 121 percent**
11 **above their peer group.**
12 **Q.** In absolute terms how do they compare with the
13 rest of their peer group?
14 **A. When I am using this I would look at the last**
15 **column, and that would show that they are 21 points above**
16 **average in their peer group.**
17 **Q.** How about St. Luke's Boise, Meridian?
18 **A. There again, I jumped to the last column. They're**
19 **17 percentage points above their peer group. And if I**
20 **wanted to identify the drivers, we would look at outpatient**
21 **and inpatient separately.**
22 **This is an example of why we provided that**
23 **outpatient data. It shows that even though relative to**
24 **their peer groups they are a little bit under, overall,**
25 **their peer group, they are still dramatically higher when**

290

1  compared to the open market for those commodity services.
2  THE COURT: I'm not sure I see the commodity
3  services. If I am reading this correctly, the first column
4  identifies the hospital, the second column is outpatient?
5  THE WITNESS: Yes.
6  THE COURT: The third column is inpatient?
7  THE WITNESS: Yes.
8  THE COURT: And the fourth column is an average of
9  the first two?
10 THE WITNESS: Yes.
11 THE COURT: Where is the commodity pricing?
12 That's not reflected here?
13 THE WITNESS: No, that's not. That would go back
14 to the other slide.
15 THE COURT: That's what threw me. All right.
16 BY MR. GREENE:
17 **Q.** Now, if you would look at the -- what I think of
18 as the first page of this, at the bottom of the last page on
19 your stack -- and I'll ask Clinton to bring that up.
20 So what I'm going to ask you to do is to --
21 THE COURT: Counsel, let me back up and ask a
22 question or two to make sure I understand.
23 Now, in arriving at these numbers, the methodology was
24 to take the average of all inpatient and outpatient
25 charges --

291

1  THE WITNESS: No, we take the --
2  THE COURT: Or reimbursement rates?
3  THE WITNESS: Yes.
4  THE COURT: Reimbursement rates.
5  THE WITNESS: Right. And it's not the average; we
6  recalculate the reimbursement for every claim and
7  recalculate it on Medicare --
8  THE COURT: So it is weighted in the sense that it
9  actually shows what was being charged so that if you have a
10 lot of one particular procedure, it's going to be
11 appropriately weighted and included more often because it
12 occurs more frequently?
13 THE WITNESS: Correct.
14 THE COURT: And that simply was taken from the
15 reimbursement history for these facilities. Is that an
16 annual?
17 THE WITNESS: Produce it annually.
18 THE COURT: And this was for what year?
19 THE WITNESS: This was for 2012, so it would be a
20 running 12 months, not a calendar 12 months.
21 THE COURT: All right.
22 Mr. Greene, go ahead. You have only three minutes.
23 And I apologize for wasting your time.
24 BY MR. GREENE:
25 **Q.** Mr. Crouch, has the relative position of the

292

1  St. Luke's hospitals changed over time, in terms of how they
2  compare to other hospitals in Idaho?
3  **A. In 2007, the Boise facility was an average paid**
4  **facility in the state, and they had one facility in the top**
5  **five in Idaho. The range in 2007 is the highest compensated**
6  **hospital was 9 percentage points above the average. In**
7  **2012, St. Luke's were the top three hospitals in Idaho, and**
8  **the range for the top hospital was 21 percent higher than**
9  **for the average hospital.**
10 **Q.** What explains that increase over that period of
11 time?
12 **A. It is purely market negotiations.**
13 THE COURT: So what is now up on the screen is for
14 the year 2007; is that correct?
15 THE WITNESS: The title is not showing on there.
16 Is that the last --
17 THE COURT: The numbers you gave correspond to,
18 roughly, what is shown on the chart, I think.
19 Counsel, can you tell?
20 THE WITNESS: Yes, I think that's correct. That
21 might be 2008. It looks like it's the January through
22 December 2009 even, so there would be earlier periods that
23 would show.
24 THE COURT: There was an earlier period?
25 THE WITNESS: Yes.

293

1     THE COURT: All right. Thank you.
2     MR. GREENE: Maybe move on to another document,
3  Your Honor. It may be a good moment to take our break.
4     THE COURT: We'll probably just take a break if
5  this is a good breaking point. Mr. Stein, if you have
6  questions in aid of an objection, you might want to use your
7  time afterwards or when we come back, if you want to object
8  at this time, or you can cover it on cross and move to
9  strike.
10    Although, actually, none of the exhibits have been
11 offered. I assume, Mr. Greene, when you conclude with
12 Mr. Crouch you're going to actually offer these exhibits.
13    MR. GREENE: Yes. I thought in conversation with
14 Mr. Metcalf that offering at the end of direct made the most
15 sense conceptually.
16    THE COURT: That's fine.
17    If there is going to be -- I think, Mr. Stein, if
18 there's going to be an objection in which you're going to
19 perhaps want to inquire of the witness, I think it might be
20 good to take it up while it's fresh in my mind rather than
21 try to wait until the end. My mind will then have to
22 reengage and that could take a while.
23    I think what we might do then is if you want to inquire
24 in aid of objections, Mr. Stein, you can do so after we come
25 back from the 15-minute break. Otherwise, we'll wait until

294

1  the end of the direct examination, Mr. Greene will offer the
2  exhibits, and those will be admitted without objection, but
3  we'll see.
4     We'll be in recess for 15 minutes.
5     (Whereupon, recess taken.)
6     THE COURT: I will note for the record that the
7  witness has retaken the stand. Mr. Crouch, I'll remind you
8  that you are still under oath.
9     Mr. Stein, did you want to examine now and waive an
10 objection or just go?
11    MR. STEIN: Whatever Your Honor would prefer. I
12 can do it during my cross-examination or --
13    THE COURT: That might be as well. I may reserve
14 ruling on the admission of that exhibit until after you have
15 done your cross, which might be a little more efficient.
16    With that, Mr. Greene.
17    MR. GREENE: Thank you, Your Honor.
18 BY MR. GREENE:
19    **Q.** Mr. Crouch, I think one of your last answers to me
20 was that you thought these increased charges at these
21 hospitals reflected the exercise of market power or words to
22 that effect. Can you remind me what your testimony was?
23    **A.** Our increased payment allowances. This isn't
24 measuring their charges. What is shown here is the payment
25 allowances. These are a result of their market position,

295

1  yes.
2     **Q.** Does that, in your mind, have -- is that caused by
3  their acquisition strategy in their acquisition of
4  additional practice groups?
5     **A.** It's a combination of practices and hospitals. So
6  by this point I think we are on the 2012 slide. St. Luke's
7  had become the sole supplier or the dominant supplier of
8  hospital and professional services in five markets. And
9  since that date it has expanded to two additional markets.
10 But it was that market position in those markets that led to
11 the increases.
12    **Q.** Thank you. Let me take the next exhibit in order.
13    THE COURT: Can I ask a question while you're
14 bringing that up. This chart, this Conversion Factor Chart,
15 was prepared by Blue Cross of Idaho and has been prepared
16 annually for seven or eight years at least.
17    THE WITNESS: More than that, a decade at least.
18    THE COURT: It is something you do routinely and
19 it is drawn from your other records and the compilation is
20 created in anticipation of negotiation with all of the
21 various healthcare providers that are listed there?
22    THE WITNESS: Correct. It is produced annually.
23 It is distributed internally to senior executives annually
24 who then begin conversations about our budget cycles and
25 other elements.

296

1     THE COURT: Obviously, you're dependent upon the
2  accuracy of those reports to ensure that you have accurate
3  information as you enter into these negotiations; correct?
4     THE WITNESS: Yes.
5     THE COURT: It was not prepared for this
6  litigation at all.
7     THE WITNESS: No, not at all.
8     THE COURT: No tweaking or changing of the data;
9  this is exactly the report you looked at in 2007 or 2008 and
10 then again in 2012 in the two versions we saw on the screen?
11    THE WITNESS: That is correct.
12    THE COURT: Proceed, Mr. Greene.
13    MR. GREENE: Thank you very much, Your Honor.
14 BY MR. GREENE:
15    **Q.** Turning your attention, Mr. Crouch, to what has
16 been marked as Plaintiffs' Exhibit 1301. What is that
17 document?
18
19
20
21              REDACTED
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 28 of 65
Bench Trial, 09/24/2013

297

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

298

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

299

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

300

1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

301

REDACTED

302

1    REDACTED
2    MR. STEIN:  Your Honor, I move to strike the
3    answer as nonresponsive.  We are getting again into Medicare
4    Advantage, and I thought the Court had indicated it was
5    outside the scope.
6         THE COURT:  Counsel, I do think we need to --
7         MR. STEIN:  Your Honor, I think this is speaking
8    to the private plaintiffs' case.
9         MR. GREENE:  If I may be heard on this, Your
10   Honor.
11        There are two levels of this, if I may speak to it.
12   The Medicare Advantage is a federal program at some level.
13   However, the precise internal pieces of it, the financial
14   pieces, are negotiated between, in this instance, Blue Cross
15   of Idaho and St. Luke's.  The next question will focus on
16   the sharing of costs and benefits associated with that.  And
17   if I may proffer to the Court, it is likely that this
18   witness will say that they were essentially squeezed down
19   substantially and that that squeeze down came from the
20   enhanced market power of St. Luke's Health System.
21        THE COURT:  Mr. Stein, the reason I hesitate is I
22   think what Mr. Greene is now pointing out, my sense is that
23   it is somewhat like supplemental insurance, there is a
24   negotiated component to the Medicare Advantage program, and
25   I was just kind of assuming that.  If that indeed is the

303

1    case, then I will overrule the objection.  But if rather
2    than that there is not a negotiated rate, it is simply a
3    federal regulation and a rate prescribed either by rule or
4    regulation, I will sustain the objection.
5         MR. STEIN:  Your Honor's understanding is correct.
6    But my point was:  This is a case about a commercial market.
7    Mr. Crouch has testified and plaintiffs' representatives
8    testified that Medicare Advantage is not a commercial
9    product; it is distinct from a commercial product.  If we
10   look at the plaintiffs' complaints, it is focused on
11   commercial products.
12        THE COURT:  Mr. Ettinger, I'm going to overrule
13   the objection.  So we'll save you a little energy there.
14        The objection is overruled.  Proceed.
15        MR. ETTINGER:  Thank you, You Honor.
16   BY MR. GREENE:

REDACTED

304

REDACTED

305

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | REDACTED |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

306

REDACTED

307

REDACTED

308

REDACTED

13    **Q.**  Let me turn back to the Nampa area and Saltzer.
So does Blue Cross of Idaho require primary care physicians
in the Nampa area to serve local residents?

16    **A.  We don't have a requirement they would serve any
particular resident.**

18    **Q.**  But in order to sell a viable network, do you need
primary care physicians in Nampa to serve patients in Nampa?

20    **A.  Yes.  There is a high correlation between
membership we have in a community and whether the primary
care providers in that community are under contract.**

23    **Q.**  Do you regard Nampa as its own separate community?

24    **A.  Yes.**

25    **Q.**  From your perspective, is this a separate market?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 31 of 65

309

1    **A.**   Yes.

2    **Q.**   Based on that, what do you think the likely

3    long-term effects of the St. Luke's-Saltzer transaction

4    might be?

5    **A.**   Our concern is that it would follow the same

6    pattern we observed in Magic Valley and other markets where

7    St. Luke's had, instead of being the dominant provider of

8    hospital and physician services in five markets, at this

9    point it is seven markets, it would add that other market.

10   **Q.**   Do you understand that some of BCI's Nampa members

11   travel to Boise for PCP services?

12   **A.**   Yes, we see that in the data.

13   **Q.**   And does that indicate to you that you could serve

14   the Nampa market with Boise-based physicians?

15   **A.**   Our understanding of where members receive their

16   primary care services is that they either receive it where

17   they live or where they work.  When you look at family

18   members who do not work or dependents, they are going to

19   receive their care in the community in which they reside.

20   Sometimes the working spouse will decide to pick the primary

21   care provider close to their work because he can avoid the

22   commute in that case.  That would explain, I think, most of

23   the difference.

24   **Q.**   Could BCI, in your judgment, offer a network with

25   other primary care physician groups in Nampa but not

310

1    St. Luke's-Saltzer that would be attractive to Nampa area

2    employers?

3    **A.**   Saltzer has 50-ish primary care providers.  They

4    are easily the largest primary care provider in Nampa.  In

5    fact, they are the largest non-hospital-based clinic in the

6    state of Idaho.  So we would be very challenged to -- we

7    would not expect people would go pick another provider; they

8    would stay with their Saltzer provider.

9    **Q.**   Could you provide a commercially viable network

10   with only non-St. Luke's, non-Saltzer primary care

11   physicians for Nampa area employers?

12           MR. STEIN:  Object to lack of foundation.

13           THE COURT:  I'm sorry?

14           MR. STEIN:  Lack of foundation.

15           THE COURT:  Overruled.

16           THE WITNESS:  We do not have a lot of experience

17   in Idaho at Blue Cross of Idaho in having physicians go

18   noncontracting and see what the results will be.  The one

19   level of experience we have is with the Magic Valley where

20   the docs in Magic Valley were not contracting.  We saw even

21   with 65 percent of the physicians in the marketplace under

22   contract, having those 35 percent that were the primary care

23   doctors leave the network meant we did not sell products in

24   that market.

25   BY MR. GREENE:

311

1    **Q.**   Apropos of that point, if a plan without

2    St. Luke's/Saltzer would not be marketable to local

3    employers in Nampa, what kind of impact would that have on

4    BCI's ability to negotiate with St. Luke's/Saltzer?

5    **A.**   Are you saying -- could you repeat the question.

6    **Q.**   Sure.

7        If a plan without St. Luke's/Saltzer would not be

8    marketable to local employers in Nampa, what impact would

9    that have on BCI's ability to negotiate with

10   St. Luke's/Saltzer?

11   **A.**   Now, are you assuming that in that case Saltzer is

12   with St. Luke's?

13   **Q.**   Yes.

14   **A.**   It weakens our ability to negotiate with

15   St. Luke's.

16   **Q.**   Would that result in higher prices or higher

17   reimbursement rates, from your perspective?

18           MR. STEIN:  Objection, speculation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Our PPO product is the most

21   competitively priced product in almost every market.  If you

22   go back to when I first came to the health plan in 2001, end

23   of 2001, Regence Blue Shield of Idaho and Blue Cross of

24   Idaho were essentially the same size.  We had the same

25   number of members, something on the order of 200,000

312

1    members.  Between 2001 and 2013, Regence had dropped to 120,

2    150, I don't recall the exact number of members.  Blue Cross

3    of Idaho has grown to over 400,000 members.  That is

4    entirely the result of premium improvements we have made in

5    the marketplace.  Every year we attempt to improve our

6    relative position by half a point or a point.

7        And that relative position has improved through

8    utilization management, through intelligent benefit design,

9    through collaborations with providers in attempt to control

10   costs, and through management of our provider payment fee

11   schedules.

12       If we are not able to sell in any particular community,

13   the next choice the members of that community have are going

14   to be higher insurance costs.

15   BY MR. GREENE:

16   **Q.**   Would those higher costs be passed on to local

17   employers and employees?

18   **A.**   Yes.

19   **Q.**   So could BCI defeat the market power of

20   St. Luke's/Saltzer using a directed product?

21           MR. STEIN:  Object to the form, Your Honor, just

22   the "market power."

23           THE COURT:  I am more concerned about "directed

24   product."

25           MR. GREENE:  Let me back up.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench Trial, 09/24/2013

313

1    THE COURT: And rephrase on both counts.
2  BY MR. GREENE:
3    Q. Mr. Crouch, what is a directed product?
4    A. A directed product is an insurance product which
5  is composed of a narrow network of providers. And that
6  narrow network of providers we have in the marketplace right
7  now is with the Saint Al's system. It's called our
8  ConnectedCare product.
9    Q. Does that provide either incentives or
10 disincentives to people to use the preferred provider?
11   A. The benefit design is such if a member goes to a
12 nonpreferred provider, noncontracting provider in that case,
13 the member is exposed to the full bill charges of the
14 noncontracting provider.
15   Q. So that creates both an incentive and a
16 disincentive?
17   A. It creates both, yes.
18   Q. How successful has ConnectedCare been?
19   A. We sold just over 220 members on that product in a
20 little over a year.
21   Q. That seems like a very small number. Is it from
22 the perspective of someone in your business?
23   A. Yes, that is a small number.
24   Q. To what do you attribute the small number of sales
25 with respect to this product?

314

1    A. St. Luke's is not in the network. If you live in
2  the Treasure Valley and this is a product for commercial age
3  members, so non-retirees, if you wanted network in the
4  Treasure Valley, you want St. Luke's to be in the network
5  because they have all of the pediatric specialties, they
6  have almost all of the OB/GYN docs in the region, they have
7  the largest number of primary care and specialty physicians.
8    Q. Focusing just on the Nampa area, if you did not
9  have St. Luke's/Saltzer available to you, could you
10 construct something like ConnectedCare that would
11 successfully shift patients to the remaining primary care
12 physicians?
13   A. That is what we have, in fact, but people aren't
14 buying that product.
15   Q. What is the current discount or percentage
16 difference?

17                    REDACTED
18

19   Q. If you increase that, do you think you could
20 successfully shift patients from St. Luke's/Saltzer to other
21 providers?
22   A. We went into that product assuming that with a
23                    REDACTED
24 the market; we'd have some attraction to the market. That,
25 in fact, did not happen. So we are now thinking a pricing

315

1                    REDACTED
2

3    Q. Are you aware, other than your ConnectedCare
4  product, are there any other directed products in the Idaho
5  market that have been successful?
6    A. In north Idaho there have been directed products
7  that go to the North Idaho Health Network. They have had
8  success over the years. Although I would say that managed
9  care policies fell out of favor across the country in the
10 '90s and 2000s. It is only recently they are starting to
11 come back because there is a recognition that premium levels
12 are so high that is an obvious method to attempt to bring
13 premium levels down.
14   Q. And to your knowledge, have there been any
15 successful programs other than the one you just identified
16 in Idaho?
17   A. No.
18   Q. You have mentioned SelectHealth a couple of times
19 during your testimony today. What is SelectHealth?
20   A. SelectHealth is an insurance carrier out of Utah.
21   Q. And to the extent you know, do they have some sort
22 of business relationship with St. Luke's?
23   A. Yes. To our knowledge, St. Luke's brought them
24 into the marketplace to be -- essentially to use the
25 St. Luke's insurance license or the SelectHealth insurance

316

1  license for St. Luke's to then develop a directed product
2  into the St. Luke's system.
3    Q. Do you regard them as competitors or competitive?
4    A. Yes.
5    Q. Do you perceive them as a significant competitive
6  threat to Blue Cross of Idaho?
7    A. They don't have a lot of membership currently, but
8  they are affiliated with Intermountain Healthcare in Utah,
9  which is a very formidable plan in Utah. So yes, they would
10 be a future threat.
11   Q. Are you familiar with the BrightPath network?
12   A. Yes.
13   Q. What is that?
14   A. It's a network that St. Luke's has managed over
15 time composed of St. Luke's employed physicians and
16 independent physicians in the community.
17   Q. And what is the connection between that network
18 and the SelectHealth product?
19   A. I believe the SelectHealth product is based on the
20 BrightPath network.
21   Q. Do you know whether Saltzer is in the BrightPath
22 network?
23   A. Yes, they are.
24   Q. If St. Luke's does not acquire Saltzer, would
25 SelectHealth still be able to market a product, including

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW v. Document 550 Filed 11/04/14    Page 33 of 65

**317**

1  Saltzer?

2  MR. STEIN: Object to lack of foundation. I

3  believe he's asking the witness to testify about whether

4  another different insurance company, how they could market.

5  THE COURT: The witness clearly understands

6  negotiating -- not only understands, but has experience with

7  Blue Cross in terms of its negotiations, both with employers

8  and with healthcare providers. But in terms of being able

9  to market a product, whether another entity could enter into

10  the market, I'm not sure his knowledge goes that far.

11  Perhaps it does. Perhaps we'll lay a little more foundation

12  not only in terms of Blue Cross's involvement in the market,

13  but also generally whether his background allows him to --

14  and perhaps that is part of his assignment at Blue Cross of

15  Idaho is also to anticipate possible competition in the

16  market which may be sufficient.

17  But at this point, I think we need further foundation.

18  MR. GREENE: Yes. Actually, let me do this with a

19  hypothetical, Your Honor. That point is very well taken.

20  BY MR. GREENE:

21  **Q.** Hypothetically speaking, Mr. Crouch, if

22  SelectHealth had Saltzer and Blue Cross of Idaho did not

23  have Saltzer in their respective networks, would that give

24  an advantage to St. Luke's?

25  **A. Yes, that is our understanding of one of the major**

**318**

1  **drivers for acquiring the Saltzer practice.**

2  **Q.** What would be the nature of that advantage?

3  MR. STEIN: Your Honor, I'm just going to object

4  to that answer for lack of foundation.

5  MR. GREENE: It was a hypothetical.

6  MR. STEIN: Not the answer, it was about his

7  understanding.

8  THE COURT: I am going to overrule the objection.

9  You may answer.

10  THE WITNESS: In Nampa part of the acquisition

11  Saltzer participated in both the BrightPath network, which

12  is the SelectHealth product, and with the ConnectedCare

13  network, which is the Blue Cross of Idaho product. So in

14  that respect, Nampa was a competitive marketplace because

15  you could obtain either of those insurance products and

16  still maintain your relationship with your Saltzer

17  physician.

18  BY MR. GREENE:

19  **Q.** And just to be clear, Saltzer was in the

20  BrightPath network before the acquisition, correct?

21  **A. I believe it had been in the BrightPath network**

22  **since its inception.**

23  MR. GREENE: Mr. Crouch, thank you for your

24  attention. I pass the witness.

25  THE COURT: Just so I am clear. Do the private

**319**

1  plaintiffs intend to examine? I don't know if there was an

2  understanding among counsel.

3  MR. GREENE: I need to bring in the evidence, Your

4  Honor.

5  THE COURT: I'm sorry?

6  MR. GREENE: I do need to move the evidence into

7  the record.

8  THE COURT: Maybe you can respond to my question

9  here in a moment.

10  I have Exhibits 1296 through 1302. You are moving to

11  admit all those exhibits?

12  MR. GREENE: Yes, Your Honor. We are proposing to

13  move into evidence, let me just tick them off, the ones we

14  used: Exhibit 1296 has been stipulated to; 1297 there are

15  relevance objections, which is the standing objection from

16  Mr. Stein; 1298, similar, 402, 403 objections, also

17  foundation, which I believe I have now laid; 1299, again,

18  principally a 403 objection; 1300, 403, foundation, we have

19  covered that; 1301 has been stipulated to; 1302 also has a

20  relevance objection. And I don't believe there are

21  significant objections to the demonstratives, at least the

22  map of Magic Valley there has been no objection that I am

23  aware of, and Your Honor has already struck the Medicare

24  payment policy demonstrative.

25  THE COURT: Mr. Stein, Counsel, I think probably

**320**

1  the most profitable way to go through this is I will

2  identify which exhibits have been -- well, Counsel can

3  indicate which exhibits are being offered. I have your

4  exhibit list, so I know what the objections were. However,

5  sometimes those objections go away once they are actually

6  presented through a live witness.

7  So Mr. Stein, as you indicate, I'm assuming you

8  stipulate to 1296 and 1301?

9  MR. STEIN: That's correct, Your Honor.

10  THE COURT: Are you maintaining the same

11  objections noted in the exhibit list?

12  MR. STEIN: That's correct, Your Honor.

13  THE COURT: I am going to admit Exhibits 1296,

14  1297, 1298, 1299, I'll reserve ruling on 1300 until Counsel

15  has had a chance to inquire during cross in aid of any

16  objection they may have. I'll admit Exhibits 1301 and 1302,

17  overruling any objections to those exhibits.

18  (Whereupon, Plaintiff's Exhibit Nos. 1296, 1297,

19  1298, 1299, 1301, and 1302 were admitted into

20  evidence.)

21  THE COURT: Now, Mr. Greene, anything else?

22  MR. GREENE: Well, just a question of sort of

23  appropriate process here. I believe my colleague Mr. Stein

24  does not recollect that his objections to the BCI exhibit

25  that Your Honor is holding back, 1300, was actually the

**Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.**    Bench Trial, 09/24/2013

---

321

1  subject of a motion to compel, which was actually decided
2  against St. Luke's by Judge Bush.  So I'm sure this is just
3  a matter of not recalling that.
4        But this may be law of the case or something
5  potentially, but there is, it is the case that there was
6  argument on this, this was before Judge Bush, and to my
7  knowledge it was not appealed to Your Honor in a timely way.
8  My sense of this is it is done.
9        THE COURT:  I don't know the motion to compel or
10  objection at that level would necessarily preclude counsel
11  from raising it during trial.  I don't know what exactly
12  Judge Bush decided, but of course the issues here may be
13  somewhat different.
14        The standard for relevance, for example, is much
15  broader in a discovery dispute than it would be at trial.
16  If there were other objections where Judge Bush has ruled
17  and somehow it does become law of the case, then I am
18  certainly going to hear argument.  But I have generally not
19  regarded the resolution of an issue during a discovery
20  dispute to either bind counsel or the Court from
21  readdressing the subject during trial.
22        MR. GREENE:  I have only quickly reread Judge
23  Bush's analysis and opinion.  I believe this is document
24  No. 130, so Your Honor can certainly take a look at it, and
25  starting at page 10 there is a discussion of the BCI -- I'm

---

322

1  sorry, the St. Luke's perspective on this.  They suggested,
2  as Mr. Stein did before the Court earlier today, that there
3  was an unfairness in them not being able to see the parts
4  that were redacted.  So this goes primarily to a redaction
5  set of issues.
6        My understanding is that Judge Bush was quite clear
7  that is not inappropriate.  The redactions were perfectly
8  proper in that context.  And it is the case, I understand,
9  that Mr. Stein was shown the underlying -- well, two things:
10  Mr. Stein was shown the full document in his office that was
11  taken over to him by a representative of Blue Cross of
12  Idaho.  So he got to see them in Sidley's offices in
13  Chicago, spent time with them, reviewed them.  And the
14  underlying data on which these things were built was
15  actually produced to St. Luke's over time.
16        So on the relevance point, we can certainly more fully
17  debate that, but at least in terms of any alleged
18  improprieties associated with this, that has not been
19  decided.
20        THE COURT:  Now, Mr. Ettinger or Mr. Powers, do
21  either of you intend or is there an understanding that you
22  will forgo any direct examination of Mr. Crouch or any other
23  witness?  I am just trying to get clear kind of the
24  understanding of counsel.  You have independent issues; you
25  are not joined at the hip with government plaintiffs,

---

323

1  probably at the elbow, but not the hip.
2        So I need to know how will you indicate if you intend
3  to ask any additional questions beyond those asked by the
4  government attorneys.  And I suppose it may go the other way
5  when there are witnesses that are being called by the
6  private plaintiffs.
7        MR. ETTINGER:  Your Honor, I have no questions of
8  Mr. Crouch at this time.
9        I think generally the plaintiffs are endeavoring to
10  have one questioner for all the plaintiffs per witness.
11  Without any particular case, it is conceivable some counsel
12  for some Plaintiff may want to ask a few of his own
13  questions.  We are trying not to make it a hard and fast
14  rule, but that is our goal.
15        THE COURT:  I will follow that.  That will also
16  inform my decision on the relevance rulings since I did
17  allow counsel, Mr. Greene, to have leeway then to cover
18  topics that would only be relevant as to the private
19  plaintiffs as well and vice versa.
20        MR. GREENE:  Thank you very much, Your Honor.
21        THE COURT:  Mr. Stein.
22        MR. STEIN:  Thank you, Your Honor.
23        I need the binder.  See how frequently we have to
24  reference it?  I would like to have it available to the
25  witness.

---

324

1        THE COURT:  Mr. Metcalf, do you want to provide
2  that to the witness?
3        MR. METCALF:  Yes.
4        MR. STEIN:  Just for reference if we need it.
5        THE COURT:  Yes.
6              CROSS-EXAMINATION
7  QUESTIONS BY MR. STEIN:
8        Q.  Mr. Crouch, every provider and payor has market
9  power, correct?
10        A.  Certainly to some degree.
11        Q.  So Saint Al's has market power, too?
12        A.  Sure, some degree.
13        Q.  In fact, you consider Saint Al's to be a must-have
14  provider in Nampa because they have the only hospital in
15  Nampa; right?
16        A.  We consider Saint Al's the hospital entity to be a
17  must-have provider.
18        Q.  Right.  So Nampa would be an example, wouldn't it,
19  of the monopoly markets where you only have one hospital;
20  right?
21        A.  Right.
22        Q.  Boise, of course, has two hospitals, two large
23  hospitals competing against each other, Saint Al's and
24  St. Luke's?
25        A.  There's a third hospital in Boise, it's the

---

325

1  Treasure Valley Hospital.
2      **Q.** And you testified earlier Blue Cross is the
3  largest commercial insurer in the state of Idaho?
4      **A. Yes.**
5      **Q.** You have the most covered lives?
6      **A. Yes.**
7      **Q.** You have the largest reserves?
8      **A. I don't know if we have the largest reserves.**
9  **That may be true.**
10     **Q.** And Blue Cross has market power, correct?
11     **A. I believe every payor and every provider has some**
12  **level of market power.**
13     **Q.** So Blue Cross has market power?
14     **A. Yes.**
15     **Q.** In fact, Blue Cross dominates the large group
16  market in Idaho; is that correct?
17     **A. We have the most large group -- have the largest**
18  **volume of large group business in Idaho.**
19     **Q.** You dominate the large group market in Idaho?
20     **A. How would you define "dominate"?**
21       MR. STEIN: Can we put up Trial Exhibit 2145.
22  BY MR. STEIN:
23     **Q.** Mr. Crouch, do you recognize this to be the
24  business plan and budget for the years 2012 to 2014 for Blue
25  Cross of Idaho?

326

1      **A. Yes.**
2
3
4              REDACTED
5
6
7      **Q.** One reason that Blue Cross dominates the large
8  group market in Idaho is its favorable provider contracts;
9  right?
10     **A. True.**
11     **Q.** Blue Cross is also the dominant insurer in
12  self-funded accounts, employer accounts?
13     **A. Isn't that what we just referenced?**
14     **Q.** Is that correct?
15     **A. Correct.**
16     **Q.** In fact, Blue Cross maintains a dominant market
17  share in all core product lines; correct?
18     **A. We do not have dominant position for the SNP plan,**
19  **which is a Medicare/Medicaid program. We once had a**
20  **dominant position for Medicare Advantage, and that position**
21  **was eroded this last January when premium levels were**
22  **reduced by our competition.**
23     **Q.** Competition, including SelectHealth?
24     **A. Yes. But in that case it was PacificSource.**
25     **Q.** One reason that Blue Cross is concerned about

327

1  St. Luke's acquisition is that acquisition of physician
2  practices opens opportunities for providers to become
3  significant competitors of Blue Cross; right?
4     **A. Our concern with physicians being acquired by**
5  **providers is not that those physicians will become**
6  **competitors of Blue Cross, but it eliminates competition in**
7  **their market for physician services.**
8       MR. STEIN: Let's put up Trial Exhibit 2632.
9  BY MR. STEIN:
10     **Q.** This is a document that was produced by Blue Cross
11  titled "Risk Universe Definitions" discussing a number of
12  risks. And you will see there at the top it says
13  Competitor. Do you see that, Mr. Crouch?
14     **A. Yes.**
15       MR. STEIN: And George, can we cull out the bottom
16  paragraph there.
17  BY MR. STEIN:
18     **Q.** The last sentence of this paragraph, which is a
19  document that was produced by Blue Cross, says, quote:
20  "Hospital consolidation and acquisition of physician
21  practices opens opportunities for providers to become
22  significant competitors"; correct?
23     **A. That is a reference to St. Luke's and its health**
24  **plan activities, not to providers becoming --**
25     **Q.** Did I read that document correctly, Mr. Crouch?

328

1      **A. I believe you interpreted it incorrectly.**
2     **Q.** In fact, St. Luke's is affiliated with
3  SelectHealth, the insurance company that is competing with
4  Blue Cross in this market now; is that right?
5     **A. That's correct.**
6     **Q.** And competition from SelectHealth in the market
7  for commercial insurance has already forced Blue Cross to
8  cut premiums to retain business; isn't that right?
9     **A. I would not say that.**
10     **Q.** You would dispute that?
11     **A. I'm not saying I dispute it or agree with it, but**
12  **I'm not familiar with what you are talking about.**
13     **Q.** In fact, in negotiations between St. Luke's and
14  Blue Cross over the current contract, the CEO, now CEO of
15  Blue Cross, Ms. Geyer-Sylvia, told Randy Billings of
16  St. Luke's that St. Luke's affiliation with SelectHealth was
17  going to make reaching an agreement with Blue Cross more
18  difficult; isn't that right?
19     **A. Correct.**
20     **Q.** And Blue Cross is concerned that the rates it pays
21  St. Luke's as a provider might help SelectHealth compete
22  more effectively against Blue Cross in the insurance market;
23  isn't that right?
24     **A. Our concern in that respect is that St. Luke's is**
25  **offering preferential rates to essentially what is its own**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW  Document 550  Filed 11/04/14  Page 36 of 65

329

1  insurance company and requiring high rates to Blue Cross and
2  other payors in the market so they can drive ownership to
3  SelectHealth.
4        MR. STEIN:  So let's put up Trial Exhibit 2589.
5  George, can we just cull out the top part, the memorandum,
6  to the first line.
7  BY MR. STEIN:
8        Q.   Mr. Crouch, this is a memo to the Independent
9  Public Directors Committee of Blue Cross dated August 30,
10  2012, from Ms. Geyer-Sylvia.  Ms. Geyer-Sylvia is your boss;
11  is that correct?
12       A.   Yes, that's correct.
13       Q.   The memo is regarding SelectHealth-St. Luke's
14  Health System issue.  Do you see that?
15       A.   As the title, yes.
16       Q.   Have you seen this memo before?
17       A.   I saw it just recently, yes.
18       Q.   What is the Independent Public Directors
19  Committee?
20       A.   It's our board of directors.
21       Q.   So in the first paragraph of this memorandum
22  Ms. Geyer-Sylvia states:  "I wanted to alert the Independent
23  Public Directors about a development in the market stemming
24  from a recent discussion held with Dr. David Pate.  When I
25  spoke to David, he indicated that his staff would be

330

1  contacting us next week to alert us about a press release
2  that St. Luke's planned to release on September 5, 2012.  He
3  stated that St. Luke's has entered into a strategic alliance
4  with SelectHealth, an insurance company owned by
5  Intermountain Healthcare in Salt Lake City, Utah."
6        Then in the next paragraph, Ms. Geyer-Sylvia continues:
7  "David went on to state that this new alliance plans to
8  offer insurance products in Idaho that would 'turn the
9  payor/provider relationship on its head.'"
10       And Ms. Geyer-Sylvia continues in the next paragraph,
11  in the middle of the paragraph she states:  "The commercial
12  individual product will compete directly with our Saint
13  Alphonsus ConnectedCare product."  Is that accurate?
14       A.   The competition -- David Pate's statements we
15  wouldn't agree with, but the competition statement is
16  accurate.
17       Q.   On page 2, Ms. Geyer-Sylvia goes on to say, the
18  fourth line down:  "As you know, we are currently in the
19  midst of contract negotiations with St. Luke's for our rates
20  of reimbursement for the next two years and we need to be
21  concerned that agreeing to higher provider rates would
22  essentially subsidize these new products and could adversely
23  impact BCI's competing products."  That is referring to the
24  most recent contract negotiations; is that right?
25       A.   Yes.  That would be the negotiations for the 2013

331

1  contract.
2        Q.   Mr. Crouch, you are not, you have not personally
3  had any discussions with any employers about Saltzer Medical
4  Group; is that right?
5        A.   Not in my recent memory.
6        Q.   You consider Saltzer to be a must-have provider
7  for Blue Cross in Nampa; is that right?
8        A.   Yes.
9        Q.   You felt that way about Saltzer for years?
10       A.   Yes.
11       Q.   And yet despite the fact that Blue Cross views
12  Saltzer as a must-have provider, Blue Cross has successfully
13  resisted all attempts by Saltzer to negotiate physician fee
14  amounts above the statewide fee schedule; isn't that right?
15       A.   We don't negotiate physician fees specifically
16  with individual providers.  They are a member of our
17  steering committee, so in that respect they influence our
18  fees.
19       Q.   Right.  But they get the same statewide fees as
20  every other provider in the state of Idaho; right?
21       A.   If they're able to convince us to a different
22  position, then every other provider will get that same
23  increase which Saltzer receives.
24       Q.   Mr. Crouch, Saltzer Medical Group receives the
25  same physician fee schedule amount as every other physician

332

1  on the statewide fee schedule; correct?
2        A.   That is correct.
3        Q.   And despite their attempts to negotiate
4  reimbursement higher than the statewide fee schedule, they
5  have been unable to do that; is that right?
6        A.   Let me see if I understand your question
7  correctly.  Are you asking if we would negotiate with
8  Saltzer only and violate the any-willing-provider law and
9  not allow those payments to go to other providers?
10       Q.   Well, it's interesting you mention that,
11  Mr. Crouch.  Do you have a law degree?
12       A.   No.
13       Q.   So you are not offering a legal interpretation of
14  the any-willing-provider law, are you?
15       A.   I'm offering my understanding.  I am the person at
16  Blue Cross of Idaho that has to live within the constraints
17  of that law.
18       Q.   What you are saying then is Blue Cross does not
19  have and has never had an agreement with any provider to pay
20  more than the statewide fee schedule?
21       A.   No, I'm not saying that.  We spoke about
22  exceptions to that earlier today.
23       Q.   Right.  One group that has never been able to
24  negotiate an exception is Saltzer Medical Group; correct?
25       A.   We have made compromises, breach compromises with

333

1 Saltzer around language in our contracts and anything that
2 they could convince us of in addition to our fee schedules
3 were then implemented for our entire fee schedule?
4       Q.   Mr. Crouch, I'm going to keep asking this
5 question, and please answer it directly:  Saltzer Medical
6 Group has never been able to negotiate an increase for
7 themselves above the statewide fee schedule?
8       A.   That is correct, yes.
9       Q.   Now, you have done no study of what distinguishes
10 those Nampa members who leave Nampa for primary care from
11 those who don't; correct?
12      A.   I have not done that study.
13      Q.   You don't know how many more members would travel
14 outside Nampa for primary care if Saltzer and St. Luke's
15 were not in the Blue Cross network; is that right?
16      A.   I would be left to my experience in other markets
17 to make that judgment.
18      Q.   You don't know how many members would switch to
19 Saint Al's or Primary Health providers in Nampa if Saltzer
20 and St. Luke's weren't in the Blue Cross network; correct?
21      A.   Have we literally counted the number of members
22 and attributed them to new providers?
23      Q.   No.  My question is simpler than that.  You don't
24 know how many members in Nampa would switch to Saint Al's or
25 Primary Health as opposed to staying with out-of-network

334

1 Saltzer and St. Luke's if Saltzer and St. Luke's weren't in
2 the network?
3       A.   So you are saying if St. Luke's leaves the network
4 and Saltzer leaves with them, how many would stay and how
5 many would go?
6       Q.   Right.
7       A.   No, we have not calculated that number.
8       Q.   If Saltzer and St. Luke's were not in the Blue
9 Cross network, Blue Cross members would still have access to
10 primary care providers in Nampa, in their community; right?
11      A.   As we look at the data we look at the volume of
12 services rendered within Saltzer and they are 80 percent of
13 the primary care services for Medicare Advantage and
14 60-something percentage of the services for commercial.
15      Q.   And if they were not in the network and St. Luke's
16 were not in the network, Blue Cross members would still have
17 access to Saint Al's primary care providers, Primary Health
18 providers, and other independent providers in Nampa;
19 correct?
20      A.   Well, let me see if I can clarify for you.  When
21 members pick a primary care provider, they are not picking
22 the insurance company they like and then going with that
23 primary care provider.  They are selecting the primary care
24 provider they like and looking for an insurance policy that
25 covers that provider.

335

1       Q.   Mr. Crouch, maybe my question wasn't clear, so
2 I'll ask it again.  If the Saltzer and St. Luke's physicians
3 were no longer in the Blue Cross network, Blue Cross members
4 in Nampa would still be able to see primary care physicians
5 in their communities?
6       A.   Yes, there would be a financial penalty for them
7 to do that if they retained their care with Saltzer.
8       Q.   But there would be no financial penalty for them
9 to stay in network and see Saint Al's primary care providers
10 or primary care providers related with Primary Health
11 Medical Group; correct?
12      A.   That is correct if they were willing to change
13 their primary care provider.
14      Q.   Now, I would like to go back for a second to one
15 of the slides that you talked about in connection with this
16 kickoff presentation that you talked about.
17          MR. STEIN:  George, can we pull up Trial
18 Exhibit 1299.  The next page.
19 BY MR. STEIN:
20      Q.   Now, Mr. Crouch, this is a presentation for this
21 kickoff meeting.  Would it be fair to say this was prepared
22 to tell Blue Cross's side of the story going into the
23 contract negotiations?
24      A.   Yes, that is the purpose.
25          MR. STEIN:  And can we go to slide 4.

336

1 BY MR. STEIN:
2       Q.   And this was one of the slides that you discussed,
3 presented to St. Luke's and discussed with them; is that
4 right?
5       A.   Yes.
6       Q.   And the purpose of this slide was to argue to
7 St. Luke's that they were overcompensated compared to peers;
8 is that right?
9       A.   Well, we had multiple purposes for this slide.
10 One was to show that regardless of what level of payment we
11 are making to them, outpatient services are tending to be
12 overpaid relative to inpatient services.  And that has been
13 a strategy of ours for many years.  So we're reinforcing
14 that position.
15          And then the second is that they are already, and
16 as we have seen later data that shows their relative
17 position has, in their opinion, improved, is that they are
18 already highly compensated.
19      Q.   Mr. Crouch, the information in this slide comes
20 from those conversion factor reports, those heavily redacted
21 documents we looked at earlier; is that right?
22      A.   That is correct.
23      Q.   And the information on this slide comes from the
24 2011 version of the conversion factor report?
25      A.   Yes, that's correct.

337

1      Q.   And in the bottom asterisk there at the very
2 bottom of the page it says: "Percentage of BCI based on all
3 negotiated hospitals." What does that mean?
4      A.   We calculate their -- I'm not recalling exactly
5 what we used as the benchmark -- in this case it is
6 referencing all negotiated hospitals, so I'll assume that
7 the footnote is correct. It would compare them against all,
8 every hospital where we have a negotiated payment amount.
9      Q.   This was information on this slide that you
10 thought was important to show to Blue Cross -- I'm sorry, to
11 St. Luke's as part of the negotiations?
12      A.   Yes, that is why we prepared this slide.
13      Q.   And there is a column there titled "Percent of BCI
14 in IP Average." Does that mean inpatient average; is that
15 right?
16      A.   Yes, that's correct.
17      Q.   Am I correct that the data here, if we go back to
18 the conversion factor report, this comes from the column in
19 the conversion factor report that shows the weighted average
20 percentage rather than that column for the simple percentage
21 we saw in that document; is that right?
22      A.   We would have to pull the document back up to be
23 sure.
24          MR. STEIN: George, can we do that?
25 BY MR. STEIN:

338

1      Q.   So we are going to put Exhibit 1299 side by side
2 with Exhibit 1300 for the 2011 report. So on the slide you
3 showed to St. Luke's, you have got rankings of 113, 113, 96,
4 115, and 99. Do you see that?
5      A.   On the slide we looked at earlier it was 2012.
6 I'm sorry, I cannot read on the screen very well.
7      Q.   Okay.
8      A.   Okay. Could you repeat that again.
9      Q.   Sure. I am just noting that in the
10 presentation --
11      A.   Oh, sure. Yes, I see the number you are looking
12 at.
13      Q.   Right. Do you see now the information that Blue
14 Cross decided to pull that Blue Cross thought was important
15 to show to St. Luke's came from the weighted average column,
16 not a simple averaged column in the conversion factor
17 report; is that right?
18      A.   I think it was to their benefit to show that
19 number. It would show as a greater outlier if they used the
20 other number.
21      Q.   The information that Blue Cross chose to show --
22          THE COURT: Just a moment. What was the weighting
23 again? Was it what we discussed earlier?
24          THE WITNESS: No, there are two different weights
25 that are used here. So in this case, when we are comparing

339

1 the peer group like, so we are saying St. Luke's Magic
2 Valley compared to the other hospitals.
3          THE COURT: Hospitals in the entire state in their
4 contract?
5          THE WITNESS: In their peer group that have that
6 negotiated. There are a bunch of hospitals. If they're
7 critical access hospitals we don't really negotiate with
8 them much.
9      So, in this case, we can calculate their percent of the
10 simple average, which means that if there are ten hospitals,
11 we don't take into account the size of the hospital. In
12 this case, we are doing a weighted average.
13          THE COURT: So the weighted average takes into
14 account the size of the hospital?
15          THE WITNESS: Well, I think more to the point, let
16 me see if I am looking at this data correctly. A weighted
17 average means that St. Luke's Boise, which is the largest
18 hospital in the state by far, drives the average because
19 they are so large.
20          THE COURT: But that is the point is that the
21 weighted average does include the size of the hospital.
22          THE WITNESS: Yes.
23          THE COURT: Go ahead. Mr. Stein, I apologize, but
24 when I have a question, I feel the need to ask it. So go
25 ahead.

340

1          MR. STEIN: We are here to educate you, Your
2 Honor. No need to apologize.
3          THE COURT: You have a lot of work to do.
4 Go ahead.
5 BY MR. STEIN:
6      Q.   Mr. Crouch, the information that Blue Cross shared
7 with St. Luke's came from the weighted average column in the
8 conversion factor report; is that right?
9      A.   Yes.
10          MR. STEIN: So, George, we can pull that down.
11 BY MR. STEIN:
12      Q.   Now let's go back to the most recent conversion
13 factor report, the one from 2012 that you talked about with
14 Mr. Greene. And let's pull up that last column, the one
15 that considers both inpatient and outpatient. As you did
16 with St. Luke's in the kickoff presentation last year, let's
17 focus on the weighted average.
18      Now, according to the weighted average for the 2012
19 report, St. Luke's Magic Valley, Wood River, and Boise-
20 Meridian were respectively 114 percent, 111 percent, and
21 109 percent; is that correct?
22      A.   Yes.
23      Q.   And now, the fourth and sixth hospitals on the
24 list you can't see because they have been redacted, they are
25 also at 109 percent; is that right?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW    Document 550    Filed 11/04/14    Page 39 of 65

341

1    **A.**  Yes.

2    **Q.**  Those are not St. Luke's hospitals; correct?

3    **A.**  Correct.

4    **Q.**  But they negotiated the same reimbursement as

5    St. Luke's Boise-Meridian?

6    **A.  The average, same average, yes.**

7    **Q.**  And the fifth hospital on that list, they are at

8    the 112th percentile; is that right?

9    **A.  That's correct.**

10   **Q.**  That is also not a St. Luke's hospital?

11   **A.  Correct.**

12   **Q.**  And they negotiate -- yet they're at a percentile

13   that's higher than both St. Luke's Boise-Meridian and Wood

14   River; is that right?

15   **A.  On the weighted average statistic, that is**

16   **correct.**

17   **Q.**  The purpose of these conversion factor reports is

18   to compare hospitals to one another across the state; is

19   that right?

20   **A.  So the column you are using here is a little**

21   **different from what we were describing earlier.  This is all**

22   **hospitals.  This includes those critical access hospitals,**

23   **the highest paid hospitals in the state are always going to**

24   **be critical access hospital because they're so small.**

25         THE COURT:  What is small?  What is an example of

---

342

1    critical access hospital?  Like Harms Memorial in American

2    Falls?

3         THE WITNESS:  Yes.

4         THE COURT:  Go ahead.

5    BY MR. STEIN:

6    **Q.**  St. Luke's Wood River is also a critical access

7    hospital; correct?

8    **A.  In Medicare's parlance, not in ours.**

9    **Q.**  Are you telling us today the hospitals whose names

10   we cannot see that are fourth, fifth, and sixth, they are

11   critical access hospitals?

12   **A.  No.  On the top part of that chart, they would not**

13   **be critical access.**

14   **Q.**  Right.  But we cannot see who they are because

15   that information has been blacked out; right?

16   **A.  I think you have seen who they are, but they're**

17   **not disclosed on this chart.**

18   **Q.**  We cannot show it to the Court; correct?

19   **A.  I am not familiar with the Rules of Evidence for**

20   **the Court.**

21   **Q.**  Can you tell us who they are?

22   **A.  They're redacted to me as well.  I cannot see any**

23   **names.**

24         MR. STEIN:  George, if we can just get rid of

25   those cull outs.

---

343

1    BY MR. STEIN:

2    **Q.**  There is a lot of other columns of information, at

3    least in this version of the document, that are redacted;

4    right?

5    **A.**  Yes.

6    **Q.**  And at the bottom of the page in that small print

7    there, is that describing the methodology that Blue Cross

8    uses to generate these reports?

9    **A.**  Yes, I believe it does.

10   **Q.**  And there is a series of judgments that Blue Cross

11   makes about certain claims to include and exclude?

12   **A.**  Correct.

13   **Q.**  And this is all run against a database that Blue

14   Cross maintains claims statewide; is that right?

15   **A.  It comes out of our claims warehouse.**

16   **Q.**  Right.

17   And Blue Cross did not provide the parties in this case

18   with all of the data statewide, did it?

19   **A.  I don't know what was provided for claims data.**

20   **Q.**  Without statewide data, the parties would have no

21   way to test the different assumptions and the outcomes that

22   might result if you changed those assumptions from this

23   analysis; is that right?

24   **A.  I'm not sure it was provided in claims data.  If**

25   **you didn't have claims data, could you recreate this?  You**

---

344

1    **could not recreate this chart if you did not have the data.**

2    **Q.**  And we couldn't do the analysis underlying the

3    chart; correct?

4    **A.  Without the claims data, that is correct.**

5    **Q.**  Now, would you agree that contract negotiations

6    between Blue Cross and St. Luke's involved give and take by

7    both sides?

8    **A.  With every negotiation there is give and take;**

9    **that is true.**

10   **Q.**  In each of the negotiations Blue Cross gets some

11   things, some things it wants, and St. Luke's get other

12   things that it wants; is that fair?

13   **A.  Correct.  Yes.**

14   **Q.**  The way the negotiations with Blue Cross and

15   St. Luke's have worked historically is when you sit down,

16   St. Luke's will typically propose a certain amount of rate

17   increase, Blue Cross will propose a lower increase, and then

18   over time the parties will reach agreement somewhere in the

19   middle?

20   **A.  Between those two points, yes.**

21         MR. STEIN:  George, can we pull up Trial

22   Exhibit 19.

23   BY MR. STEIN:

24   **Q.**  I'm not going to ask you about this first page,

25   but, Mr. Crouch, you recognize this document.  It is called

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 40 of 65

345

1  the contract rate signoff sheet?
2     **A.  I recognize it in a fuzzy way right now.**
3        THE COURT:  Counsel, what is this exhibit number?
4     MR. STEIN:  It is Joint Exhibit 19.
5        THE COURT:  Counsel, the Plaintiffs' exhibit, I
6  assume those are deposition exhibit numbers?
7        MR. STEIN:  Yes.  The trial exhibit number is at
8  the very bottom right-hand corner.
9        THE WITNESS:  I have it here in front of me.
10       THE COURT:  Counsel, again, I apologize.  I am
11  assuming that Exhibits 1 through 53 can be admitted since
12  they have been designated as joint exhibits; is that
13  correct?
14       MR. GREENE:  That's correct.  That is my
15  understanding, Your Honor.
16       MR. STEIN:  Yes.
17       THE COURT:  Exhibits 1 through 53 will be
18  admitted.
19       (Whereupon, Joint Exhibit Nos. 1 through 53 were
20       admitted into evidence.)
21       THE COURT:  Go ahead and proceed.
22  BY MR. STEIN:
23
24                  REDACTED
25

346

REDACTED

347

REDACTED

348

REDACTED

Case 1:12-cv-00560-BLW v. Document 550 Filed 11/04/14 Page 41 of 65

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

349

1
2
3
4
5
6
7
8
9
10
11                    REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24          THE COURT: Counsel, could I just -- this is 2634,
25   I believe, you referred to it. The notation at the top is

350

1   5070.
2          MR. STEIN: I'm sorry, Your Honor, that was an
3   internal number.
4          THE COURT: So is this 2634?
5          MR. STEIN: It is 2634.
6          THE COURT: Thank you.
7   BY MR. STEIN:
8      Q. Now, Mr. Crouch, I want to show you a statement
9   and get your reaction to it. Quote: "Hospitals need to
10  fully cover their costs and to earn a reasonable margin in
11  order to finance continuing investments in technology to
12  keep improving patient care and also to keep up with
13  healthcare cost inflation. Medicare and Medicaid do not
14  reimburse hospitals for all their costs and do not provide
15  this margin. In order to maintain a sufficient margin to
16  fulfill their mission, hospitals need to obtain these
17  revenues somewhere. Commercial insurers are the only
18  potential source of revenues to make up for this
19  governmental shortfall."
20        Does that sound like an argument you've heard from
21  St. Luke's during your contract negotiations?
22     A. I think I drafted this in the early 2000s.
23     Q. This actually comes, we can show where this comes
24  from, it comes from a document that Saint Alphonsus prepared
25  just the end of last year to respond to some questions from

351

1   the *Idaho Statesman*. But the argument that's being made
2   there is one you have heard from St. Luke's; is that right?
3      A. I think we have heard it from internally as well.
4   As I mentioned, it appeared like an argument I had been
5   making.
6      Q. Am I correct that the dynamic that is referred
7   there is something that is known as cost shifting?
8      A. Yes.
9      Q. And the idea behind cost shifting, the argument is
10  that because the government doesn't pay providers enough on
11  Medicare and Medicaid, that providers will seek to make up
12  that difference from commercial payors since Medicare and
13  Medicaid do not negotiate their rates. Is that the gist of
14  the argument?
15     A. That is the gist of the argument. I think there
16  is a different understanding in the industry now, but that
17  was at one point the Kool-Aid.
18        THE COURT: Counsel, this is Exhibit 2235 for the
19  record?
20        MR. STEIN: Yes. Thank you, Your Honor. 2235.
21        THE COURT: When we're referring to a document, I
22  think we need to make sure we've identified the exhibit
23  number so it's clear for the record.
24  BY MR. STEIN:
25     Q. I believe in your testimony when you were

352

1   answering questions from Mr. Greene, you had referenced a
2   couple of times a MedPAC report. What are MedPAC reports?
3      A. MedPAC is a consultant to Congress for issues
4   related to the Medicare system.
5      Q. Do you consult the MedPAC report in the ordinary
6   course of your business?
7      A. They publish reports twice a year and we I think
8   just about every year will pull the reports down and go
9   through the reports.
10     Q. This is not a document that is in evidence, but do
11  you recognize this as the March 2012 MedPAC report?
12     A. Sure. I guess so.
13     Q. Is it one you would have reviewed? This is one of
14  the biannual reports?
15     A. It is one of the -- I can't say I reviewed, I
16  would have to look at the contents of the report to know if
17  I have reviewed it.
18        MR. STEIN: Go to page 82.
19  BY MR. STEIN:
20     Q. Now, Table 3-4 of MedPAC report is titled "Overall
21  Medicare Margins By Hospital Group." At the top there, am I
22  correct this indicates that in every year that is reported
23  here, the last year being 2010, the MedPAC is reporting that
24  all hospitals on average are -- well, hospitals on average
25  are losing money on Medicare business. Is that how you

353

1  understand this chart?
2     **A.  The first line, is that what you are referring to?**
3     **Q.** Yes.
4     **A.  Yes.**
5     **Q.** About halfway down do you see there is a line for
6  nonprofit?
7     **A.  Yes.**
8     **Q.** For nonprofits like Saint Al's and St. Luke's,
9  MedPAC is reporting the average margin on Medicare business
10 in the most recent year for which there is a report is
11 negative 5.7 percent; correct?
12    **A.  Correct.**
13    **Q.** These are numbers nationwide?
14    **A.  I haven't read the footnotes, but I would suppose**
15 **so.**
16
17
18
19                      REDACTED
20
21
22
23
24
25

354

1
2
3
4
5
6
7
8
9
10
11                      REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

355

1
2
3
4
5
6
7
8
9
10
11                      REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

356

1
2
3
4
5
6
7
8
9
10
11                      REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 43 of 65
Bench trial, 09/24/2013

357

1
2
3
4
5
6
7
8
9
10
11     REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

358

1
2
3
4
5
6
7
8
9
10
11     REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

359

1
2
3
4
5
6
7
8
9
10
11     REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

360

1
2
3
4
5
6
7
8
9
10
11     REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Saint Alphonsus Medical Center, et al.; v. St. Luke's Health System, et al.                    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 44 of 65

361

1
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

362

1
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

363

1
2
3
4
5
6
7
8
9          REDACTED
10
11
12
13
14
15
16
17
18
19      Mr. Ettinger.
20          MR. ETTINGER:  Response to what you raised.  Would
21  it work for the Court if we at some point soon move the
22  admission of all the joint and unobjected to exhibits and
23  just got them out of the way?
24          THE COURT:  I have already admitted all of the
25  Joint Exhibits 1 through 53, I believe.  As to anything that

364

1  is not marked with an exhibit -- excuse me, an objection,
2  apparently is stipulated to then; is that --
3          MR. STEIN:  Your Honor, as a general matter, that
4  is right.  There has been some late exhibits exchanged by
5  both sides, so I think we probably have to exchange some
6  updated lists, but I think conceptually we are fine with
7  that.
8          THE COURT:  Why don't you at some point put
9  together another exhibit list and designate stipulation or
10  admission under the column for stipulation, and I will just
11  refer to that and perhaps even docket that to indicate that
12  those exhibits are all admitted without taking time here and
13  my breath.  For some reason, my voice seems to be getting
14  weaker and weaker.  Too many weeks of consecutive trial, I
15  think.
16      Just to save that, I would prefer maybe just to admit
17  them in that fashion, if counsel can put their heads
18  together and do that.
19      Proceed.
20      We're going to take a break in about ten minutes,
21  Mr. Stein, but I will let you kind of pick your breaking
22  point in the cross-examination.
23          MR. STEIN:  Thank you.
24  BY MR. STEIN:
25      Q.  Mr. Crouch, we were talking a little bit before

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 45 of 65

365

1 about the give and take that takes place between St. Luke's
2 and Blue Cross.  Am I correct that one of the points on
3 which that give and take, which there has been discussion,
4 is what has been referred to as provider-based billing?
5         A.  Yes.
6         Q.  And Blue Cross does not accept provider-based
7 billing on the commercial side?
8         A.  That is correct.
9         Q.  That is a position you stuck to with success in
10 negotiations with St. Luke's?
11         A.  Yes.
12         Q.  Primary care doctors are frequently the ones who
13 are ordering the ancillary services like lab tests and
14 imaging?
15         A.  Correct.
16         Q.  And Blue Cross members will typically pay the same
17 amount for a physician visit, regardless of which in-network
18 physician they receive; is that right?
19         A.  With the PPO product, that is true.
20         Q.  But even though members will pay the same for a
21 physician visit for in-network providers, they may face
22 price differences for services that are ordered by their
23 primary care doctors like ancillary services; is that
24 correct?
25         A.  Yes.  They would be subject to those price

366

1 differences.  It is not typically disclosed to them, though,
2 when the referral is made.
3         Q.  But in your experience, members will often become
4 aware of the differences, the price implications of a
5 physician's pattern of referral of services once the
6 ancillary services are obtained?
7         A.  There is a segment of the membership that would.
8 We segment, like I think many organizations, we segment our
9 clientele into different market segments.  There is a
10 portion of the market that is highly sensitive to pricing
11 and that will research prices online, they will research
12 diagnoses and whatnot.  That is a -- this is sort of a foggy
13 memory -- but that might represent 10 percent of our total
14 membership.  So that would be what I deemed the informed
15 consumer, they have become aware of that difference over
16 time.
17         Q.  St. Luke's has cooperated with Blue Cross to help
18 narrow the gap between hospitals and other providers for
19 outpatient services; correct?
20         A.  Are you referring to our outpatient fee schedules?
21         Q.  I am referring to what you referred to as the
22 difference between hospital reimbursement and community-
23 based reimbursement for what you called commodity services.
24         A.  The nuance here is they've not been willing to
25 forgo payment; they demanded that payment in other parts of

367

1 the contract.
2         So I gave you the case of a CT exam earlier.  We
3 might pay $600 on the open market for a CT exam, St. Luke's
4 might have an $1,800 payment allowance.  If we persuade them
5 to a lower payment allowance, say, we persuade them down to
6 $1,200, they are not forgoing that money; they are putting
7 it in some other code.
8         Q.  St. Luke's has been cooperative with Blue Cross in
9 trying to reduce allowances for outpatient services;
10 correct?
11         A.  I guess I am sensitive to the way you phrase that
12 because it represents that they have reduced allowances when
13 in effect they've just redistributed amounts.
14         Q.  St. Luke's has been working with Blue Cross to
15 help narrow the gap between hospital reimbursement and
16 ancillary services in community; correct?
17         A.  Taken specific -- you couldn't make that specific
18 statement, we'd need follow-up.
19         Q.  Do you disagree with that statement?
20         A.  No, I agree with that part of it.
21         Q.  Blue Cross has also been taking steps in recent
22 years to incentivize members to utilize lower cost providers
23 of services; correct?
24         A.  That's true of the industry in total and of Blue
25 Cross.

368

1         Q.  You send communications to members through
2 newsletters?
3         A.  We do.
4         Q.  You recently implemented a website that allows
5 members to research online what the cost differentials are
6 between providers for different kinds of services?
7         A.  For a small set of services.
8         Q.  Things like colonoscopies and knee arthroscopies?
9         A.  Correct.
10         Q.  Blue Cross also publishes online the out-of-pocket
11 expenditures that members will pay for ancillary services
12 for various items; is that right?
13         A.  I'm not sure we have an online site where members
14 can calculate out-of-pocket costs.
15         Q.  Isn't it true that St. Luke's recently agreed to
16 facilitate the disclosure of that type of information
17 through modifying its contract?
18         A.  That was not an agreement to facilitate
19 disclosure.  They agreed to different contract terms, but I
20 think they have resisted any disclosure to the public.
21         Q.  Didn't you testify, Mr. Crouch, is it your
22 testimony that Blue Cross does not make that information
23 available online?
24         A.  So you've talked about several categories, one
25 being price allowances, the other being out-of-pocket

369

1 payment allowances. We do make price allowances available
2 for about 500, might even be less than that.
3     **Q.** That is the out-of-pocket expenditures; correct?
4     **A.** No, price allowance. To calculate the
5 out-of-pocket expenditure, you would need to know where the
6 person is in meeting their deductible and what that person's
7 benefit design would be, and we do not have that information
8 available to them on the web.
9     MR. STEIN: Your Honor, I have going to move to a
10 different topic that will take longer than when we break. I
11 won't be done in a few minutes so if you would like to take
12 a break now or I can just start.
13     THE COURT: We will take a break now. It is a few
14 minutes early. That is fine. I think it is probably better
15 not to break up the testimony if we can avoid it. Let's
16 just go ahead and take a 15-minute recess.
17     We will be in recess for 15 minutes.
18     (Whereupon, recess taken.)
19     THE COURT: You have my apologies.
20     I will remind the witness you are still under oath.
21     Mr. Stein, you may resume your cross-examination.
22 Counsel, was there a technical problem with the equipment?
23 Is that why --
24     MR. STEIN: Yes, but I believe it is resolved.
25     THE COURT: All right. Very good. Proceed.

370

1 BY MR. STEIN:
2     **Q.** Mr. Crouch, before we broke, I was asking you a
3 question about reserves, and you indicated that you thought
4 Blue Cross had something like 3 to 4 months' reserves. What
5 are the monthly reserves?
6     **A.** You are asking a dollar amount?
7     **Q.** Yes.
8     **A.** I'm not sure of the dollar amount.
9     **Q.** Do you have a rough estimate?
10     **A.** I am recalling that conversation from our planning
11 meeting about a year ago when we were talking about risk-
12 based capital, capital adequacy as an example. Health plans
13 have to have a risk-based capital equal to 200 percent or
14 else they are considered technically insolvent and the state
15 takes them over. So as we were talking internally, we were
16 trying to identify are our reserve levels too high, and one
17 of the statistics that came out was -- not necessarily a
18 calculation I performed. If you divide all of our member
19 reserves by our monthly claims expense, the total value of
20 our reserves is between 90 and 120 days of claims expense.
21     **Q.** And do you have a dollar figure that you can put
22 on that?
23     **A.** I don't. Not off the top of my head.
24     **Q.** In your testimony this morning you made reference
25 several times to I think seven markets. Does that sound

371

1 familiar?
2     **A.** Five markets that they've been dominant and now
3 seven.
4     **Q.** Who is they?
5     **A.** St. Luke's.
6     **Q.** What are those markets?
7     **A.** McCall, Gooding, Jerome, Twin Falls. With the
8 Saltzer acquisition they would be the dominant provider for
9 primary care in Nampa. And they purchased the Mountain Home
10 hospital and all the Mountain Home providers.
11     **Q.** The population of Twin Falls, it is about half
12 that of Nampa; is that right?
13     **A.** I'm not sure of the population. Nampa is the
14 second largest city, but I don't know the ratio.
15     **Q.** You don't know what percentage of Blue Cross
16 members from Twin Falls leave Twin Falls for primary care;
17 correct?
18     **A.** I have not calculated that percentage.
19     **Q.** But you do know that about 40 percent of Blue
20 Cross's commercially-insured members in Nampa already leave
21 Nampa for primary care; right?
22     **A.** Yes.
23     **Q.** And, in fact, over 60 percent of Blue Cross's own
24 employees in Nampa leave Nampa for primary care; isn't that
25 right?

372

1     **A.** That would explain the reasoning why is that they
2 work in Meridian.
3     **Q.** And if I understand your testimony from this
4 morning regarding Twin Falls, you basically said employees
5 in the larger community of Twin Falls were not willing to
6 drive to the much smaller community of Jerome to get primary
7 care; is that right?
8     **A.** That's correct.
9     **Q.** What year did the State of Idaho sign up for Blue
10 Cross's PPO product?
11     **A.** I believe it was 2004, but I'm not clear on that
12 date.
13     **Q.** And the doctors who were out of network, they were
14 with a practice you said called the Physician Center?
15     **A.** Yes.
16     **Q.** So if I refer to the Physician Center, you will
17 understand that we are talking about out-of-network doctors
18 in the Magic Valley?
19     **A.** Yes.
20     **Q.** And at the same time that the Physician Center
21 doctors were out of network for Blue Cross in the Magic
22 Valley, they were in network in the Magic Valley for
23 Regence, your competitor; is that right?
24     **A.** I assume so.
25     **Q.** Do you know whether that's the case?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 47 of 65

373

1    **A.**  I can't say that I know that to be a fact.
2    **Q.**  Well, when Blue Cross signed up to the State of
3    Idaho account in around 2004, they essentially, Blue Cross,
4    took that account away from Regence?
5    **A.**  Correct.
6    **Q.**  And at the time that the State of Idaho made the
7    decision to move from Regence to the Blue Cross network, the
8    physicians that are physicians were out of network; right?
9    **A.**  I think that's what I just agreed to.  They were
10   out of network for our PPO product.
11   **Q.**  So as a result, the Blue Cross PPO product in Twin
12   Falls had I think you said only ten percent of the primary
13   care doctors?
14   **A.**  That would be a rough number.  That is not an
15   exact number.
16   **Q.**  So in other words, at the time the State of Idaho
17   signed up for the Blue Cross PPO in Twin Falls, it did so
18   knowing that the product in Twin Falls had only ten percent
19   of the primary care doctors?
20   **A.**  Yeah, I think -- can I add a little bit of detail
21   to that?  The State of Idaho had two product offerings: a
22   traditional product offering and a PPO.  The Physician
23   Center was in network for the traditional product.  But what
24   they found over the intervening years is that the
25   membership, the employees of the State of Idaho did not want

374

1    a traditional product.  They wanted a PPO product.
2    **Q.**  And did I understand your testimony this morning
3    you consider the PPO product to be not commercially viable
4    because of the absence of the Physician Center?
5    **A.**  Well, it is not an on-off switch like that.  There
6    is a degree of viability.  So we would not consider it to be
7    a successful product in that market without the Physician
8    Center.
9    **Q.**  Even though you have the largest employer in the
10   state and your largest account to sign up for that product
11   without the Twin Falls primary care doctors?
12   **A.**  They did not sign up because of Twin Falls.  They
13   signed up for the cost savings across the state.  They
14   recognized it was a problem in Twin Falls and then
15   instructed us to correct it.
16   **Q.**  So notwithstanding the fact that you had only ten
17   percent of the primary care doctors in Twin Falls, you were
18   able to sign up the State of Idaho account; correct?
19   **A.**  Correct.
20   **Q.**  And, in fact, you maintained the State of Idaho
21   account for five years without having the Physician Center
22   doctors in the PPO product; correct?
23   **A.**  Well, it was a long-term contract so they didn't
24   have the option of dropping out of that contract during that
25   five-year period.

375

1    **Q.**  Now, the Physician Center doctors, while they
2    weren't in your PPO product, they were in the Blue Cross
3    traditional plan; is that correct?
4    **A.**  Correct.
5    **Q.**  And am I correct that the reimbursement for the
6    PPO product, the amount that Blue Cross offers to doctors
7    for the PPO is less than the reimbursement that they would
8    get for being in the traditional product?
9    **A.**  Not currently.  It was at that time.
10   **Q.**  And at the time the reimbursement from Blue Cross
11   to providers in the PPO network was about 7 to 10 percent
12   less than for the traditional product?
13   **A.**  That sounds approximately correct.
14   **Q.**  And the idea behind offering a lower amount for
15   physicians to participate in that PPO product is that you
16   would have a smaller network, and so those doctors could
17   expect to have more doctors steered to them.  Is that fair?
18   **A.**  Generically that would be a benefit design that is
19   true across the nation.  As I mentioned earlier, many
20   markets in Idaho and rural states really are markets that
21   have small monopolies, so that element of direction has a
22   smaller component.
23   **Q.**  Right, because in Twin Falls the scope of the PPO
24   product was basically with the Physician Center going to be
25   as broad as the traditional product?

376

1    **A.**  That is true, yes.
2    **Q.**  And what that meant was that the Twin Falls
3    physicians were being asked to take a 7 to 10 percent
4    discount for participating in a network that had the same
5    scope as the traditional network?
6    **A.**  There were other advantages though, the cost of
7    membership that caused the employees to want to pick the PPO
8    and then give a benefit to the physician for being a PPO.
9    **Q.**  But in terms of the scope of the network, the PPO
10   had about 90 to 95 percent of the providers in that area?
11   **A.**  The 95 percent is our participation statewide.
12   **Q.**  Was that -- that was -- that is what the
13   participation was after the Physician Center doctors
14   joined --
15   **A.**  I haven't looked at it, but that's probably close.
16   **Q.**  And that was roughly the same participation
17   percentage as the traditional product?
18   **A.**  Yes.
19   **Q.**  Now, despite that fact, the Magic Valley
20   physicians with Physician Center ultimately did agree to
21   accept a rate lower than the traditional rate in order to
22   participate in the PPO; correct?
23   **A.**  They accepted a rate lower, plus cash.
24   **Q.**  And the Physician Center physicians who Blue Cross
25   had been trying for years unsuccessfully to join the PPO did

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 48 of 65
Bench Trial, 09/24/2013

377

1  so only after St. Luke's acquired their practice; correct?
2      **A.  Well, the timing occurred because of that.  I'm**
3  **not sure that was the cause.  I would say the St. Luke's,**
4  **the Physician Center physicians joined Blue Cross when we**
5  **conceded to their payment demand.**
6      Q.  Right.  So you had made an offer to those
7  physicians that for years they had found unacceptable.  And
8  when you raised your offer, they ultimately agreed to a
9  raised offer and joined the network?
10     **A.  Yes, that's true.**
11     Q.  And nobody from St. Luke's told Blue Cross that it
12  had to extend the rates that it was paying to the Physician
13  Center statewide; right?
14     **A.  No.  I think their preference would be that we**
15  **don't do that because then they would recognize that**
16  **arbitrage benefit.**
17     Q.  Right.  The decision to extend that increase
18  statewide was a business decision by Blue Cross; correct?
19     **A.  Combination of a business decision and our**
20  **understanding of the law.**
21     Q.  And since Blue Cross increased the statewide fee
22  schedule to match that of the Magic Valley physicians, the
23  Magic Valley physicians have been at the same statewide fee
24  schedule level as other providers in this state; correct?
25     **A.  I think are you talking generally or there are**

378

1  some errors in St. Luke's billing physicians under the
2  incorrect fee schedule; is that what you're talking about?
3      Q.  No.
4      **A.  Or just generally?**
5      Q.  Let's back up for a second.  Timing-wise, you
6  indicated that at some point the Physician Center physicians
7  joined the PPO product at a rate that was hire than the
8  statewide fee schedule; right?  And then Blue Cross for
9  business reasons raised the fee schedule amount to match
10  that of the Magic Valley physicians?
11     **A.  You keep referring to business reasons.  We do**
12  **have to live within the "any willing provider" law in Idaho.**
13     Q.  Fair enough.  But you raised the statewide fee
14  schedule to match the amounts that you were paying in the
15  Magic Valley?
16     **A.  Yes.**
17     Q.  And since that time, there have been increases in
18  the statewide fee schedule; right?
19     **A.  Some.  We have split that fee schedule into**
20  **different levels based on performance but some increase.**
21     Q.  The Magic Valley physicians today are not getting
22  any more than the statewide fee schedule?
23     **A.  That's correct.**
24     Q.  Mr. Crouch, do you understand that St. Luke's
25  could not bill for services at a facility it acquired like a

379

1  surgery center under the main hospital's tax ID number
2  unless the acquired facility is actually deemed an
3  outpatient department of the hospital?
4      **A.  That is a Medicare rule I think you are referring**
5  **to.  That is not a rule within our contracts.**
6      Q.  And when we talked earlier about the way that
7  contracts are negotiated, we established first there is an
8  overall rate increase, a number that applies systemwide;
9  correct?
10     **A.  That's correct.**
11     Q.  And then that increase is allocated across the
12  different hospitals; right?
13     **A.  Correct.**
14     Q.  And then it is further allocated among inpatient
15  and outpatient services; right?
16     **A.  Yes.**
17     Q.  And then within the thousands of inpatient and
18  different outpatient services, there will be adjustments to
19  the different codes.  Some will see an increase.  Some may
20  see a decrease.  But the idea is that ultimately the net of
21  all those increases and decreases will roll up into that 5.6
22  percent -- or, for example, the five percent number if that
23  is the overall number?
24     **A.  Yes, that is true.**
25     Q.  And when you sit down, when Blue Cross sits down

380

1  to model the impact of a proposed increase, let's say you're
2  asking yourself that should we agree to a five-percent
3  increase, you model that based on the prior year's volume of
4  claims; is that right?
5      **A.  That's correct.**
6      Q.  Of course, there is always a risk that the actual
7  volume of claims is different in the following year than it
8  was in the past, then the actual increase you experience
9  could be more or less than you modeled?
10     **A.  That's correct.**
11     Q.  Now, once St. Luke's converted the acquired
12  surgery centers to St. Luke's tax ID, the amount that Blue
13  Cross began paying for services at those surgery centers was
14  the amount that Blue Cross had already agreed in its
15  contract to pay St. Luke's for those services; correct?
16     **A.  That is not correct.**
17     Q.  To pay St. Luke's for those services at the
18  hospital?
19     **A.  Let me phrase it and make sure I have it**
20  **correctly.  So you are saying the increased fees that they**
21  **received by billing through the hospital were in fact the**
22  **hospitals fees, that's correct.**
23     Q.  And the reason that Blue Cross was upset was
24  because the acquisition of the surgery centers resulted in
25  additional volumes of surgeries being billed under the

381

1  St. Luke's contract that hadn't been accounted for by Blue
2  Cross when it was modeling the proposed reimbursement in the
3  contract with St. Luke's:
4      **A.  No.  I would say that that was an element.  We**
5  **used the -- what we considered to be bad faith because we**
6  **had been in active negotiations and had asked St. Luke's to**
7  **represent are there any changes in volume that we should**
8  **anticipate that haven't been disclosed.  They said there**
9  **were no changes, and come to find out that in fact they were**
10 **in the midst of negotiating that facility that had a $4**
11 **million impact to us.  So we used the bad faith negotiation**
12 **as a way to bring it to their attention when otherwise the**
13 **would not have paid attention to our argument.**
14     **Q.**  But when you talk about a $4 million difference,
15 what you are referring to is the fact that you experienced
16 $4 million or you estimated $4 million in increased claims
17 that you had not accounted for when you modeled the increase
18 in reimbursement in the negotiations; correct?
19     **A.  I mean, that was an element.  But the ultimate**
20 **concern was that we increase costs by $4 million.**
21     **Q.**  Over what you had thought have agreed to?
22     **A.  No, over what we should have been paying in the**
23 **market.  So the example is, we're probably all familiar, at**
24 **least those who live in Boise, there's the surgery center on**
25 **River Street.  And that surgery center performs ENT**

382

1  services, orthopedic services, gallbladder removal, just all
2  sort of categorized as outpatient services.  We had entered
3  into an agreement with River Street surgery center as to the
4  payment allowances.  When St. Luke's bought the facility,
5  they billed those services as though they had occurred on
6  Bannock Street at the Boise hospital, misrepresented the
7  location of the service.  Surely it would increase their
8  payment.
9      So there were several levels of concerns we had.
10 One of them is after reading all the blogs and the stated
11 comments from St. Luke's about their intentions in the
12 market, why is it that all we see is payment increases?  Why
13 aren't we seeing the cost control that they're trying to
14 talk about?  And here is yet another example of not only do
15 they drive costs in the market, but they misrepresent the
16 billing in such a way that it is probably fraud.
17     **Q.**  Had Blue Cross known during contract negotiations
18 that St. Luke's was acquiring surgery centers, the way that
19 Blue Cross would have accounted for that was by taking
20 account of the increased reimbursement for surgeries by
21 decreasing reimbursement elsewhere; right?
22     **A.  Well, no.  That is one element.  Another element**
23 **is there was just --**
24     **Q.**  I'm sorry.  Is the answer yes or no?
25     **A.  Could you repeat the question.**

383

1      **Q.**  Had Blue Cross known during contract negotiations
2  that St. Luke's was acquiring the surgery centers, you would
3  have accounted for that increase reimbursement by decreasing
4  reimbursement for other procedures in that contract?
5      **A.  I think by answering yes or no you are making me**
6  **commit to an item that I don't want to commit to.  Because**
7  **the way the --**
8      **Q.**  Well, Mr. Crouch, do you recall you gave a
9  deposition in this case in May?
10     **A.  Yes, I recall that.**
11     **Q.**  And let me know -- we are going to play this clip,
12 and tell me if you recall being asked this question and
13 giving that answer.
14     (Video played.)
15 BY MR. STEIN:
16     **Q.**  You were asked that question and you gave that
17 answer in your deposition?
18     **A.  That is consistent with the answer I was just**
19 **providing, which is I think your question is we simply would**
20 **have changed the modeling.  And my deposition answer was no,**
21 **we would have said you've already achieved three and a half**
22 **million dollars.  We don't need to increase the allowance**
23 **any further.**
24     **Q.**  Now, nothing in the contract between St. Luke's
25 and Blue Cross prohibited St. Luke's from billing the

384

1  acquired surgery centers under the hospital's tax ID;
2  correct?
3      **A.  Could you rephrase that again.**
4      **Q.**  Nothing in the contract between St. Luke's and
5  Blue Cross prohibited St. Luke's from billing the acquired
6  surgery centers under the hospital's tax ID?
7      **A.  No, that was the point of our dispute.  We believe**
8  **that when we state this is a contract for St. Luke's Boise**
9  **hospital, we even put the street address of the hospital and**
10 **put the tax ID number in, that is a contract for that**
11 **physical facility.  And that is the nature of our dispute:**
12 **You cannot bill other locations through that facility purely**
13 **for an increase in payment.**
14     **Q.**  There wasn't anything in St. Luke's contracts that
15 prohibited St. Luke's once it acquired those centers from
16 billing them under its tax ID number; is that correct?
17     **A.  We didn't have a specific contract provision that**
18 **addressed that.**
19     **Q.**  You were asked that question and gave that answer
20 in your deposition, Mr. Crouch?
21     **A.  Yeah.  I think I just gave the same answer which**
22 **is they were billing it under a new tax ID.  The tax ID for**
23 **River Street would have been a separate tax ID.**
24     **Q.**  Now Blue Cross initially estimated the amount in
25 dispute at $4 million?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW    Document 550    Filed 11/04/14    Page 50 of 65

385

1    A.    That's correct.
2    Q.    You later recalculated the estimated amount in
3    dispute at around $3.2 million?
4    A.    No, I wouldn't say that.  We had --
5    Q.    Thank you.  St Luke's told Blue Cross that
6    St. Luke's didn't owe anything as a result of the surgery
7    center acquisition; is that right?
8    A.    St. Luke's told Blue Cross that it didn't owe
9    anything?
10    Q.    Right.
11    A.    Sure, that was their position.
12    Q.    Now, I think you told Mr. Greene something to the
13    effect that one of the reasons you didn't press the issue of
14    the lawsuit was because of concern about St. Luke's and the
15    size of it as a customer.  But that didn't stop Blue Cross
16    from unilaterally holding around $3 million of moneys that
17    were owed St. Luke's for other services; right?
18    A.    We feel we would have prevailed in that lawsuit,
19    so that was an appropriate action to take.
20    Q.    In fact, it was then St. Luke's that accused Blue
21    Cross of breaching their contract for unilaterally
22    withholding those funds; right?
23    A.    I'm sure that's a claim they made.
24    Q.    And Blue Cross was concerned about the time and
25    expense that would be involved if the parties had to fight

386

1    this matter in court; right?
2    A.    Yeah.  At that point it really was just the math
3    of are we going to obtain more through a settlement in court
4    or is it better to just take the amount we can earn through
5    the negotiation.
6    Q.    And of that three point -- roughly -- strike that.
7    Of the amount in dispute, you ultimately recommended
8    that Blue Cross agree to split the difference with
9    St. Luke's; right?
10    A.    That was in agreement as to what we thought we
11    could obtain, not whether I thought it was the appropriate
12    amount.
13    Q.    Let's put up trial Exhibit 2585.  Mr. Crouch, this
14    is a series of e-mails, internal e-mails from Blue Cross in
15    which you're involved.  I want to focus on an e-mail that
16    you sent.  It's on page 2.  And let's blow it up at the
17    bottom of the page there.  And can you tell me whether you
18    in fact recognize this as an e-mail that you sent on
19    March 17th, 2011.
20    A.    That appears to be correct.
21    Q.    And this is the regarding the surgery center
22    dispute with St. Luke's?
23    A.    Yes.
24    Q.    And you write, "St. Luke's has completed their
25    review of the disputed surgery center claims for 2010.  They

387

1    show 1,093 surgery center claims were billed by the hospital
2    for a total difference in allowances of $3,194,231.  As you
3    may recall, BCI estimated a $2.9 million difference in
4    allowances and withheld that full amount in 2010."
5    That was accurate as far as you know at the time;
6    correct?
7    A.    Yes.
8    Q.    And St. Luke's proposed that of that $3.194
9    million, the parties split that amount, meaning that Blue
10    Cross's net recovery would be $1.597 million; right?
11    A.    Correct.
12    Q.    That is in fact the amount that the parties agreed
13    to?
14    A.    Yes, that's correct.
15    Q.    And you recommended that Blue Cross agree to that
16    compromise?
17    A.    Yes.
18    Q.    And the reason that you recommended to agree to
19    the comprise -- let's look at that.  "Item No. 1, negotiate
20    the final settlement percentage.  Steve Drake stated that
21    SLHS is very firm" -- and Steve Drake works for St. Luke's?
22    A.    Yes.
23    Q.    "Steve Drake stated that SLHS is very firm in
24    holding to a 50-percent settlement.  FYI, we were able to
25    obtain contract language concessions to prevent this

388

1    situation from occurring in the future, so I support a
2    50-percent settlement."
3    That's what you told your peers at Blue Cross; correct?
4    A.    Correct.  And that is in the context of what we
5    thought we could achieve.
6    Q.    And the settlement resulted in Blue Cross
7    effectively paying the rates for surgeries at the surgery
8    centers or the surgery center locations at the rates they
9    were when they were independent for some period of time;
10    correct?
11    A.    I'm not sure.  Say that again.
12    Q.    When you received the -- I will withdraw.
13    A.    Is that the $800,000?
14    Q.    No.  I am talking about the 1.5 million,
15    1.6 million.
16    A.    Okay.
17    Q.    After this dispute was resolved, in all future
18    contract negotiations you were able to model the volume of
19    surgeries that were done at those surgery centers when you
20    were considering what rates to agree to with St. Luke's;
21    correct?
22    A.    They would have been included in the modeling, but
23    there wouldn't have been a reduction of payment as a result
24    of that inclusion.
25    Q.    Right.  But those volumes would have been included

389

1  in the modeling.  And when you increased -- whatever payment
2  amount you determined would be allocated, some might be
3  allocated at the surgery centers, might be allocated to
4  other services, but you knew in future negotiations that
5  these volumes were going to be occurring and billed under
6  the St. Luke's contract?
7       **A.**  So we lost that for 2012 and 2011, and then in
8  2013 that would have been part of the denominator.
9       **Q.**  We can take that down and let's pull up
10  Exhibit 2617.  Mr. Crouch, this is a 40-plus-page document,
11  but can you tell me whether you recognize this as a copy of
12  the contract between St. Luke's and Blue Cross for the years
13  2011 and 2012?
14       **A.**  Yes, that appears to be the case.
15
16
17
18
19
20            REDACTED
21
22
23
24
25

390

1
2
3
4
5            REDACTED
6
7
8
9
10       **A.**  That was one of the elements that led us strictly
11  to it.
12       **Q.**  By the way, this isn't a term that St. Luke's
13  wanted added to the contract; is it?
14       **A.**  No.  I'm sure they did not want it to be added.
15       **Q.**  And Blue Cross not only succeeded in negotiating
16  this provision in the 2011-2012 contract, also you were able
17  to maintain it in the most current contract with St. Luke's;
18  correct?
19       **A.**  Correct.
20       **Q.**  Now, when you were involved last year in
21  negotiating the most recent contract with St. Luke's, at the
22  time of those negotiations you knew that St. Luke's was
23  preceding with the acquisition of the Saltzer practice;
24  correct?
25       **A.**  Yes.

391

1
2
3
4
5
6
7
8
9
10
11            REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

392

1
2
3
4
5
6
7
8
9
10
11            REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/24/2013

393

1
2
3
4
5
6
7
8
9
10
11
12                REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

394

1
2
3
4
5
6
7
8
9
10
11
12                REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

395

1
2
3
4
5
6
7
8
9
10
11                REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

396

1
2
3
4
5
6
7
8
9
10
11                REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

397

1  Q.  And that's what's known in the industry as a gain-
2  sharing arrangement?
3  A.  Yes.
4  Q.  And that's distinguished from a full risk
5  arrangement in which the provider not only stands to benefit
6  from upside gains but can lose money in certain
7  circumstances as well; right?
8  A.  That is true.
9  Q.  The arrangement that you described yesterday was
10  that two-person group, that was a gain-sharing arrangement;
11  is that right?
12  A.  That was a gain-sharing arrangement.
13  Q.  And likewise, the Medicare Advantage agreement
14  with Saltzer also involves only upside gain-sharing;
15  correct?
16  A.  That is correct.
17  Q.  Blue Cross has never had any risk-sharing
18  arrangements with Saltzer for commercial insurance products;
19  right?
20  A.  They haven't had an active commercial HMO product
21  for a number of years.  So I don't recall if they were in
22  that incentive program or not.
23  Q.  And a two-person group couldn't possibly bear the
24  financial risk of loss that would come with a full risk-
25  sharing contract; right?

398

1  A.  That's correct.
2  Q.  You have to have some scale in order to be able to
3  take downside risk as well as upside risk?
4  A.  Yes, that's true.
5  Q.  And even for that two-person group, for example,
6  while they have some upside potential, their primary form of
7  reimbursement from Blue Cross is on a fee-for-service basis;
8  right?
9  A.  I think the primary form of reimbursement for all
10  services in Idaho is fee for service.
11  Q.  Now, earlier this year, as you explained when you
12  were testifying in response to Mr. Greene's questions,
13  St. Luke's and Blue Cross entered into an arrangement that
14  provides for full risk sharing by St. Luke's, right, for
15  Medicare Advantage product?
16  A.  They in fact have purchased reinsurance from us,
17  so they are not at full risk.
18  Q.  So you would not call that a full risk product?
19  A.  Not because we are providing reinsurance with
20  them, no.
21  Q.  Now, the St. Luke's Medicare Advantage contract
22  does transition the financial risk from Blue Cross to
23  St. Luke's; right?
24  A.  With the exception of that reinsurance
25  arrangement.

399

1  Q.  Right.  You're not donating that reinsurance to
2  St. Luke's.  They have to pay for that; right?
3  A.  That is correct.  But that means they're not
4  accepting that risk at that point.  They're transferring it
5  back to us.
6  Q.  Well, they are insuring part of the risk.  That's
7  no different than obtaining coverage for catastrophic care.
8  A.  Yeah, I'm sorry.  You were using the term full
9  risk.  I was trying to clarify that it was partial.
10  Q.  Now, under the agreement with St. Luke's, did I
11  understand you to testify in response to Mr. Greene's
12  questions that Blue Cross has no profitability at all under
13  that contract?
14  A.  We don't know until the end of the year whether we
15  have had profitability, and it is still early.
16  Q.  Doesn't that contract provide for reimbursement to
17  Blue Cross for the cost of its administrative activities,
18  plus a profit of two percent?
19  A.  That was St. Luke's language that they believed it
20  was.  We have never agreed to.
21  Q.  So I'm sorry.  I don't understand.  You're saying
22  St. Luke's offered two-percent profit and you don't agree
23  with that?
24  A.  No.  I am saying that St. Luke's has described it
25  as they have provided us with our administrative costs plus

400

1  two-percent administrative profit.  We have not agreed with
2  them on that point.
3  Q.  If St. Luke's succeed in controlling costs as a
4  healthcare provider, St. Luke's is going to reap the
5  benefits of that under the Medicare Advantage product;
6  correct?
7  A.  If that were to occur, the curiosity is that Blue
8  Cross continues to perform all the medical management
9  functions under that contract.
10  Q.  You were not satisfied with the risk contract that
11  you signed with St. Luke's because it eliminated Blue
12  Cross's profitability under the medical component of the
13  contract; right?
14  A.  That was one element.  The second element is that
15  they left us to do what we call all the heavy lifting.  They
16  took the profit.
17  Q.  So can you just clarify that for the court,
18  Mr. Crouch.  Is it your testimony that St. Luke's isn't
19  really doing anything to address how services are utilized
20  under the Medicare Advantage product; they are really just
21  relying on the good work of Blue Cross?
22  A.  The standard methods for managing utilization are
23  prior authorizations for surgeries, prior authorizations for
24  imaging, current review of inpatient admissions, the
25  arrangement of contracted rates for care after discharge,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 54 of 65

**401**

1  making sure that people go home after a hip replacement
2  instead of going to a rehab facility.  Those are all
3  activities that we continue to perform.
4      **Q.**  And St. Luke's is performing no utilization-
5  reducing activities of its own?
6      **A.**  If they are performing those activities, I can't
7  speak to that.  I'm not aware of them.
8      **Q.**  Now, Mr. Greene asked you a question yesterday to
9  the effect of whether you were aware of any risk-based
10  contracts that St. Luke's refused to enter into with Blue
11  Cross.  I found that kind of interesting phasing.  And you
12  said St. Luke's rejected Blue Cross's request that it agree
13  to a ConnectedCare product; right?
14      **A.**  Yes.
15      **Q.**  Let's talk about the reasons St. Luke's rejected
16  that.  St. Luke's rejected the ConnectedCare product, which
17  would have been a new product; right?
18      **A.**  Yes, new to the market.
19      **Q.**  That would have sat side by side with the PPO
20  product and the Medicare Advantage product?
21      **A.**  No.  Would have sat side by side with the PPO
22  product.
23      **Q.**  Right.  And the reason St. Luke's rejected the
24  ConnectedCare product is because it wanted a broader risk-
25  sharing arrangement covering all products, commercial and

**402**

1  Medicare; right?
2      **A.**  It had proposed -- St. Luke's had stated the
3  reason they didn't contract for ConnectedCare was that they
4  did not want to compete over price with Saint Al's.
5      **Q.**  Let's pull up Trial Exhibit 2587, Mr. Crouch.  Do
6  you recognize this?  Let's pull it up.
7      **A.**  Can you zoom it a little.
8      **Q.**  This is an e-mail that you sent to Ms. Geyer-
9  Sylvia January 20th of 2012; correct?
10      **A.**  Yes, correct.
11      **Q.**  And in the second paragraph you say, quote, "As
12  you may recall, BCI previously proposed the ConnectedCare
13  concept to St. Luke's, but they rejected that approach in
14  favor of an all product arrangement."
15  That is what you wrote; right?
16      **A.**  Yes.
17      **Q.**  And an all product arrangement means an
18  arrangement covering all of the products that St. Luke's has
19  with Blue Cross commercial and Medicare?
20      **A.**  Correct.
21      **Q.**  In fact, St. Luke's proposed a broader
22  relationship under which a majority of St. Luke's
23  compensation would be risk-based by 2017; right?
24      **A.**  That is -- yes, that is what they were stating.
25      **Q.**  And that all products arrangement would have

**403**

1  involved a broader risk-sharing arrangement than just a
2  discrete ConnectedCare product or bundled payments; right?
3      **A.**  In the 2013 contract, they provided further
4  examples where they requested that Blue Cross of Idaho only
5  allow certain high profitable services to be directed into
6  St. Luke's under what we would consider the guise of a risk-
7  sharing product, which in fact was to eliminate the ability
8  for St. Al's or Treasure Valley or other providers to
9  perform sleep lab studies, surgical procedures, orthopedic
10  services, or spine fusions.  So they were using the correct
11  terminology, but when you looked at the details of their
12  proposal, it wasn't what we would consider to be an ACO.
13      **Q.**  Let's take a look at the proposal, page 2.
14      **A.**  Yes.
15      **Q.**  This is a document that Mr. Billings sent you
16  describing what St. Luke's was looking for in relationship
17  with a payor?
18      **A.**  Okay.  Yes, I have it.
19      **Q.**  And George, if we can pull up that section in the
20  middle of the page.
21  He told you -- Mr. Billings told you they wanted a
22  long-term relationship, a long-term commitment; is that
23  right?
24      **A.**  Yes.  I see it there stated.
25      **Q.**  He told you he wanted a commitment to a

**404**

1  traditional model of shared shavings for the population
2  management model; right?
3      **A.**  Should we define shared savings?
4      **Q.**  He told you he wanted complete data sharing
5  between the parties, more transparent data sharing; right?
6      **A.**  Yes.
7      **Q.**  And then in No. 6 there, we see the progression to
8  the majority risk-sharing model.  That's something else
9  Mr. Billings proposed?
10      **A.**  Yes.
11      **Q.**  And then No. 8, one of the things that
12  Mr. Billings insisted on was transition to control of the
13  premium value, meaning that the shared savings would not go
14  to Blue Cross's insurance reserve, but would go to lower
15  premiums; right?
16      **A.**  Let me read eight.  So, again, looking at the
17  document, they are phrasing in such a way to use jargon
18  which makes it sound like its appropriate, but what they
19  really requested here is that we distribute profits to
20  St. Luke's without them taking a risk until some
21  undetermined model would develop by 017.
22      **Q.**  Right.  So you're saying when he said majority
23  risk-sharing model, that really didn't mean majority risk-
24  sharing model?
25      **A.**  No.  I am saying that at that point they would

405

1  have had a share of whatever those profits would have been,
2  so they are asking us to commit distribution of profits
3  without them committing to the model of the risk
4  arrangement.
5       Q.  The statement that you have repeated over and over
6  that Mr. Billings told you that St. Luke's didn't want to
7  compete with Saint Al's on price, isn't it true what
8  Mr. Billings has explained to you on several occasions is
9  that what St. Luke's doesn't want to do is just perpetuate
10  the discounted fee-for-service paradigm but rather move to a
11  more population management-based, risk-based arrangement?
12      A.  They have said that, but they haven't agreed to
13  any of the proposals that would be a transition to a risk
14  arrangement.
15      Q.  Not with Blue Cross?
16      A.  Not with Blue Cross.
17      Q.  Now, regarding the analysis that you did of the
18  Saltzer volumes and the analysis of what those would look
19  like reimbursement under the St. Luke's contract, am I
20  correct that that analysis assumes no change in utilization
21  of services when Saltzer affiliates with St. Luke's?
22      A.  That is correct.
23      Q.  But you know the independent physicians who own
24  their own imaging devices utilize imaging at a higher rate
25  than physicians that don't own their own imaging devices;

406

1  right?
2       A.  In the context of that reference, though, a
3  hospital-owned provider is considered an owner of imaging
4  devices.
5       Q.  Independent physicians who own their own imaging
6  devices utilize imaging at a higher rate than physicians who
7  don't own their own imaging equipment?
8       A.  Than independent physicians who don't own imaging
9  devices.
10      Q.  And Blue Cross has provided claims data to a
11  researcher at Georgetown University to study the impact of
12  physician ownership on utilization; right?
13      A.  Yes, we did.
14      Q.  That is an issue that's important to Blue Cross.
15  Utilization affects the cost just as much as the unit price;
16  right?
17      A.  Yes.
18      Q.  And that researcher, is that Jean Mitchell?
19      A.  Yes, that sounds correct.
20      Q.  And her study demonstrated that independent
21  physicians who own their own imaging devices utilize imaging
22  at a higher rate than physicians who don't; is that right?
23      A.  That is correct.  And St. Luke's supported that
24  study as well.
25      Q.  They supported conducting that study?

407

1       A.  Yes.
2       Q.  And you believe those conclusions to be true both
3  nationally and in Idaho; is that right?
4       A.  With the caveat I was stating that independent
5  physicians -- we are talking only about independent
6  physicians.
7       Q.  Now the reason that utilization in physician-owned
8  centers is higher is because the physicians have a financial
9  interest in the utilization of those services; is that
10  right?
11      A.  That's true.
12      Q.  But yesterday and this morning you mentioned the
13  North Idaho Physicians Network, a network of providers in
14  north Idaho?
15      A.  Yes.
16      Q.  Isn't it true that the North Idaho Physicians
17  Network specifically excludes physician-owned hospitals from
18  the network?
19      A.  There is one physician-owned hospital network that
20  is excluded.
21      Q.  Are you familiar with Ms. Mitchell's study on the
22  effects of physician ownership of specialty hospitals and
23  ambulatory surgery centers and the frequency of use of
24  orthopedic surgeries?
25      A.  I have read it, it would have been many years ago.

408

1       Q.  This is a copy of that study that interestingly is
2  on North Idaho Health Network's website.  I believe you
3  testified you have read this, but it has been some time.
4       A.  And what was the publish date?
5       Q.  It was published in 2010 in the Archives of
6  Surgery.
7       A.  I'm not sure I even read this version of the
8  study.
9       Q.  You're not sure?
10      A.  Yeah, I don't recall if I have or not.
11      Q.  Okay.  So let me just ask you then -- George, if
12  we can go down to the section on results.
13          MR. ETTINGER:  Your Honor, if he hasn't read it
14  and it's some third-party study, this is hearsay.
15          MR. STEIN:  I'm trying to establish if he recalls.
16          THE COURT:  I will give you some leeway.  If
17  witness has not seen it, then he cannot very well be
18  cross-examined on it.
19          MR. STEIN:  Right.
20  BY MR. STEIN:
21      Q.  So, Mr. Crouch, if you can look at the results
22  here and let me know whether this refreshes your
23  recollection whether you have seen this study before.
24      A.  I am recalling the study that Jean Mitchell
25  performed in Idaho was independent physicians and their use

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 56 of 65

409

1 of imaging. This appears to be a different study.

2    **Q.** Okay.

3    **A. I am happy to comment on it if you are interested**

4 **in commentary, though.**

5    **Q.** Mr. Crouch, you testified that Blue Cross's

6 commercial rates are substantially higher than the Idaho

7 adjusted Medicare fee schedules; is that right?

8    **A. Are you talking about for physician services?**

9    **Q.** Yes.

10    **A. Yes.**

11    **Q.** Isn't it true that the rates that Medicare pays

12 physicians in Idaho are among the lowest in the nation?

13    **A. Medicare makes geographic price adjustments based**

14 **on the cost of running an office. And Idaho is a low cost**

15 **area, so those adjustments apply to Idaho.**

16    **Q.** So the rates that Medicare pays Idaho physicians

17 are among the lowest in the nation; correct?

18    **A. Let me state there are two components. The rate**

19 **Medicare pays for physicians for physician services are the**

20 **same. The rates they pay physicians for office overhead is**

21 **lower.**

22    **Q.** Now, you testified yesterday about an article that

23 you reviewed in this month's Health Affairs that you relied

24 on in your conclusion that Blue Cross's payments are higher

25 than national payments; is that right?

410

1    **A. I have had that opinion for many years, but this**

2 **month's Health Affairs confirmed that opinion.**

3    **Q.** But that article, that looked at payment rates in

4 the year 2007; right?

5    **A. Yes.**

6    **Q.** And the comparison that you described was in

7 national payment rates in 2007 versus Blue Cross's rates in

8 2007?

9    **A. Yes.**

10    **Q.** And you also reference Milliman studies that Blue

11 Cross commissioned as supporting your understanding of the

12 relationship between Blue Cross fees and Medicare; is that

13 right?

14    **A. Yes.**

15    **Q.** And one of those Milliman studies was from 2008;

16 is that right?

17    **A. Yes.**

18    **Q.** Like the Health Affairs article, that was using

19 data from the year 2007?

20    **A. Yes.**

21    **Q.** And the most recent Milliman study that Blue Cross

22 commissioned actually shows that Blue Cross's physician fees

23 are about a five percent less than the market rate in Idaho;

24 is that right?

25    **A. I need to provide a little bit of context.**

411

1    **Q.** Mr. Crouch, can you answer my question?

2    **A. I would say no.**

3    **Q.** So let's look at trial Exhibit 2588. And this is

4 a letter that Milliman sent to you on April 12, 2012; right?

5    **A. Yes.**

6    **Q.** And in the top paragraph there it says, "Dear

7 Jeff, at your request, Milliman has compared Blue Cross of

8 Idaho physician-allowed fees to benchmark data for calendar

9 year 2010." Correct?

10    **A. Yes.**

11    **Q.** That was something you asked Milliman to do?

12    **A. Yes, we did.**

13    **Q.** Then if we go to page 2 in the second paragraph,

14 Milliman reports back to you that, quote, "According to the

15 data, BCI fee levels were 4.7 percent less than the average

16 market scan of Idaho fee levels across all Idaho areas."

17 Correct?

18    **A. Correct. The way you phrased the question earlier**

19 **was market rates. I think you might be confusing market**

20 **scan which is a database for market rates.**

21    **Q.** And if we go down under the first table, Milliman

22 further explains that "Table 1B shows that BCI's physician

23 unit cost reimbursement rates are lower than market scan for

24 Idaho, Portland, Montana, Oregon, Utah, Washington, but

25 higher than market scan reimbursement levels for Spokane,

412

1 Seattle, and Salt Lake City." Correct?

2    **A. Correct.**

3    **Q.** Now, one of the things that your staff has done is

4 to prepare a document that tracks acquisitions of physician

5 practices by St. Luke's; is that right?

6    **A. Yes.**

7    **Q.** Around one of the things that you track in that

8 document is the effect of St. Luke's acquisition of the

9 physician practice on the amounts that Blue Cross pays to

10 that practice, doctors affiliated with that practice for

11 physician services; right?

12    **A. That is correct.**

13    **Q.** And that analysis by Blue Cross shows that every

14 single acquisition by St. Luke's of a physician practice in

15 the Treasure Valley has led to either no change in physician

16 service reimbursement or has decreased the rates that Blue

17 Cross pays for physician services to that practice; correct?

18    **A. That is incorrect. That is incorrect.**

19    **Q.** Let's take a look at Exhibit 2148. Mr. Crouch,

20 this is an e-mail from Laurie Rowell to Stina Proctor.

21 These are Blue Cross employees; is that right?

22    **A. Yes, that's correct.**

23    **Q.** And there is an attachment referenced here.

24 George, could you go to the first page of that attachment

25 and pull up the top few lines so we can see the headings of

Case 1:12-cv-00560-BLW v. Document 550 Filed 11/04/14 Page 57 of 65

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

413

1  the first few rows.
2      This is the analysis that we were just discussing of
3  the charts; is that right?
4      **A.**  Yes.
5      **Q.**  And.  In the left column it says "Acquisition
6  Date."  That is the date St. Luke's acquired the practice;
7  is that right?
8      **A.**  Yes.
9      **Q.**  Then the next column says "Clinic Name."  That is
10  the name of the practice that was acquired?
11      **A.**  Yes.
12      **Q.**  Next to that there is a "Provider Type or
13  Specialty"; is that right?
14      **A.**  Yes.
15      **Q.**  And then if we go over to the second-to-last
16  column, it says "Immediate Reimbursement Change Commercial";
17  right?
18      **A.**  Yes.
19      **Q.**  And that column shows what happens to the rate
20  that St. Luke's has to pay for services of the acquired
21  practice under commercial plans once St. Luke's acquires the
22  practice; is that correct?
23      **A.**  That's correct.
24      **Q.**  And there are basically three options:  Increase,
25  meaning the rates that Blue Cross pays for physician

414

1  services go up; none, meaning there's no change; or
2  decrease, meaning the rate Blue Cross pays for physician
3  services by those acquired practices goes down; right?
4      **A.**  Correct.
5      **Q.**  We can go through line by line, but every line in
6  this document for acquisition of a physician practice shows
7  that the immediate change in commercial reimbursement was
8  either none or a decrease; right?
9      **A.**  Incorrect.
10      **Q.**  Why don't you show me where I'm --
11      **A.**  You are missing the third-to-the-last column.
12      **Q.**  No.  I'm not asking about the third-to-last
13  column.  I am asking about the last column, which refers to
14  commercial.
15      **A.**  **Your question to me earlier was whether the**
16  **acquisition of a physician practice always results in a**
17  **decrease or no change, and that is incorrect.  For almost in**
18  **every example it results in an increase for Medicare.  This**
19  **document, if we've configured the physician correctly in our**
20  **system, there should be no change in compensation.  As you**
21  **talked about earlier, the fee schedule is the same across**
22  **the state.  So if we have identified there is an increase or**
23  **decrease in the second-to-the-last column, that indicates we**
24  **have either configured them incorrectly or St. Luke's is**
25  **billing them incorrectly.**

415

1      **Q.**  Mr. Crouch, this document shows that acquisition
2  of physician practices by St. Luke's have resulted in no
3  increase in physician fees paid by Blue Cross for commercial
4  plans?
5      **A.**  **I need to phrase that a little bit differently.**
6  **So we talked about earlier, St. Luke's has demanded through**
7  **hospital negotiations that we increase fees for professional**
8  **practices.**
9      **Q.**  Mr. Crouch, I am going to play another clip from
10  your deposition.  You seem to have trouble remembering your
11  prior testimony.  Exhibit 39.
12      **A.**  **I was apparently asleep during part of the**
13  **deposition.**
14          **(Video played.)**
15  BY MR. STEIN:
16      **Q.**  Mr. Crouch, you also gave this testimony.
17          (Video played.)
18  BY MR. STEIN:
19      **Q.**  Mr. Crouch, you also gave this testimony.
20          (Video played.)
21      **Q.**  You were asked that question and gave that answer,
22  Mr. Crouch?
23      **A.**  **Yes.  And the question was whether this document**
24  **shows an increase or decrease, not whether payments to**
25  **physicians increased or decreased as a result of St. Luke's.**

416

1          MR. STEIN:  Your Honor, at this time the only
2  things I think I have left outstanding are the issue with
3  the Dykeman report and Exhibit 1301?
4          THE COURT:  1300.
5          MR. STEIN:  Otherwise I have no further questions
6  at this time.
7          THE COURT:  Were you going to examine further with
8  regard to Exhibit 1300 in preparation?
9          MR. STEIN:  I'm sorry.
10          THE COURT:  Were you going to examine further with
11  regard to Exhibit 1300 and the method by which it was
12  created or otherwise seen?
13          MR. STEIN:  I don't think so, Your Honor.  I think
14  we established it was created using statewide data we do not
15  have access to, so really however it was calculated we do
16  not have any way of evaluating it.  That's really the issue.
17          THE COURT:  What you were provided as I understand
18  it was the St. Luke's data points, but none of the other
19  hospital facilities.
20          MR STEIN:  That is correct.  Again, we approached
21  this keeping in mind the point of this analysis is to
22  compare us to other hospitals statewide.  So without the
23  statewide data, it makes it a little difficult.  It is the
24  relative position of St. Luke's versus those other hospitals
25  for which the document's being introduced.  So without the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW Document 550 Filed 11/04/14 Page 58 of 65

Bench Trial, 09/24/2013

417

1 other data, I'm not really sure what it is that we could do.
2   We couldn't do an alternative analysis that would show
3 that if you made a different assumption, we might actually
4 be in a different position vis-à-vis those other hospitals.
5 We don't have that ability. We just have to take the
6 results of the study that they gave us, and we can look at
7 that and maybe take little things here and there. We
8 certainly don't have a full opportunity to do alternative
9 analysis. I would submit, if this were an expert report, my
10 hope would be that it wouldn't possibly come in. We don't
11 have the information needed to evaluate it.
12   THE COURT: This is my thought about this. In
13 fact, Mr. Metcalf and I were having a somewhat I don't want
14 to say heated but at the same time exchange here going back
15 and forth on that issue. And I asked questions to establish
16 that this was indeed a business record. And of course the
17 concept of a business record is a bit of a misnomer because
18 I think it has been misused so often it's really the record
19 of regularly conducted business activities or something like
20 that. The concept is when an entity records information,
21 and even I guess compiles that information in various
22 formats, in a way they actually rely upon it, that there is
23 a sufficient measure of credibility that we can forego
24 cross-examination for the admission of the exhibit itself.
25   Now the problem of course is that even when an exhibit

418

1 comes in under Rule 8036, the party opposing the admission
2 has the ability to call the person who actually prepared the
3 data, cross-examine that person about the accuracy and the
4 process by which they actually produced the report, the
5 rigors of being an 8036 document, and that is what is
6 missing here.
7   However, it is a problem that cuts both ways. This is
8 not a situation, for example, where it is a Saint Al's or a
9 Treasure Valley document so that it would be terribly unfair
10 to allow them to offer an exhibit without the ability to
11 cross-examine the preparer of the document and determine
12 what the methodology was that was used in creating it. But
13 here, Saint Al's and Treasure Valley and the FTC -- I
14 suppose I can say they are innocent bystanders. They want
15 to use the document. They are under the same impediment
16 St. Luke's is as far as not being able to actually bring in
17 the data that would then satisfy those concerns.
18   So then as I thought about it, perhaps it comes back to
19 a Rule 403 analysis. Typically when we think of the
20 prejudicial impact, we think of something that creates too
21 much sympathy or something of that sort, but it seems to me
22 it probably is applicable as well here. So you could say
23 that if the probative value is not substantially outweighed
24 by whatever prejudicial impediments there are to the
25 opposing party to examine the accuracy of the underlying

419

1 data, should the Court allow it in? And I think I need to
2 hear from Mr. Greene as to what the probative value is
3 because they are essentially the same position that
4 St. Luke's is, although they want to have the evidence in,
5 they think it is probative, and they are somewhat
6 handicapped because they cannot show that the numbers are
7 equally out of whack and then perhaps St. Luke's position is
8 even more out of the mainstream than what Blue Cross is
9 suggesting.
10  Mr. Greene, do you want --
11   MR. GREENE: Two levels of analysis, Your Honor.
12 First is the equities level as I mentioned earlier. When we
13 were not in trial, St. Luke's actually brought a motion to
14 compel production to resolve against them. They did not
15 decide to come to Your Honor to sort this out nor did they
16 at that time raise these issues. So I think there's that
17 problem.
18  The basic underlying --
19   THE COURT: Let me just address that. As we noted
20 earlier, a question of discovery is not the same as a
21 question of admissibility during a trial.
22   MR. GREENE: No, understood, Your Honor, but this
23 is the problem that puts us in the situation that we are in.
24 They didn't get this resolved at a point in time when we
25 could actually fix it. Now we are in trial. They have just

420

1 raised this matter. They could have raised this earlier in
2 a far more effective way. That is one level.
3   The second level is that all the parties, largely
4 because of the burden it imposed on Blue Cross of Idaho,
5 agreed to the fatal limitations which Mr. Stein is now
6 complaining about. So this again is a situation in which
7 St. Luke's participated in the process fully. They agreed
8 to this. There are certain e-mails and other conversations
9 that support that idea. So I think that is part of it
10 because we are in a balancing test situation.
11   With respect to its evidentiary value, what Mr. Crouch
12 and his document speak to is a dramatic upshift in the cost
13 of services at St. Luke's in its major facilities. One of
14 the major arguments that we have heard from the defense in
15 its advocacy throughout the case but certainly most recently
16 in its pretrial memorandum is that the offset what we regard
17 as the massive increase to Nampa is going to be
18 efficiencies. Mr. Crouch's document goes directly to the
19 heart of that matter by indicating the cost at those
20 facilities, without any change in case mix or anything else,
21 have gone up quite dramatically. Some of the most expensive
22 in the market.
23   I don't know that this decides the case, but it
24 certainly is directly contrary to the story line that
25 St. Luke's would have the Court believe. So we think it is

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 59 of 65

421

1  worthwhile.  It is useful.  It does have some inherent
2  limitations, but I think at the end of the day it is far
3  more beneficial to the Court to see and hear actual data
4  that indicates that St. Luke's puffery from our perspective
5  you will appreciate is simply not based on reality.  And
6  this does cover a pretty substantial period of time.  I mean
7  it goes from 2008 to 2012 and shows quite dramatically that
8  efficiencies they had they certainly haven't found them.
9        THE COURT:  Response?
10        MR. STEIN:  I actually think the document shows
11  the opposite.  What it shows as we demonstrated before, is
12  that there are other hospitals, of course, identities
13  unknown, that are getting the same reimbursement as
14  St. Luke's facility in particular.  I know the plaintiffs
15  like to focus on Magic Valley.  We are talking her about the
16  Treasure Valley.  We are talking about Boise and Meridian
17  and you saw three other hospitals that are getting the same
18  or higher reimbursement than St. Luke's in Boise.  So far
19  from supporting the plaintiffs' case on that point, I think
20  it actually supports our point that price increases occur
21  for a variety of reasons and that one cannot simply infer
22  from a price increase that there's been anti-competitive
23  conduct.
24        Again, the point is we are limited in our ability to
25  address this.  As far as the motion to compel goes, I am

422

1  certain we did not get any support when we asked the judge
2  to require us to produce this from the Federal Trade
3  Commercial.  But the bottom line is:  It wasn't our decision
4  to include the document on a trial exhibit list.  That
5  wasn't before Judge Bush and it wasn't something that we
6  addressed at the time.  It's true, we are now here at trial,
7  and that's why I think frankly the prejudice is all the more
8  manifest.
9        THE COURT:  I think Judge Bush's decision really
10  is not relevant.  I don't think anyone could have or should
11  have anticipated this issue during discovery that it would
12  require that in fact some appeal be taken or that somehow
13  they try to address the issue.  Discovery is one thing and
14  admission to trial is really quite another.
15        However, I am going to admit the exhibit.  I think it
16  does fall within Rule 8036.  I think it provides sufficient
17  guarantees of reliability because Blue Cross in fact
18  depended upon that information in making the most critical
19  business decisions.  I will concede that there is some
20  prejudice.  The prejudice really is to both parties.
21  Neither party has the ability to test it beyond the ability
22  which I would point out that they do have presumably to
23  compare reimbursements rates and percentages against at
24  least their own data.  I recall having three facilities on
25  that list, Saint Al's having a fourth.  Even though I think

423

1  it is a difficult problem, I just want you to know
2  Mr. Metcalf and I spent a fair amount of time exchanging
3  same time messages debating the issue.  But I am going to
4  admit the exhibit over objection of counsel.
5        (Whereupon, Plaintiffs' Exhibit No. 1300 was
6         admitted into evidence.)
7        I think that covers it.  Is there anything else,
8  Mr. Stein, that you want to --
9        MR. STEIN:  I think we just have the issue of the
10  reference to the Dykeman article.  I'm not sure whether
11  Mr. Green wanted to discuss that.
12        THE COURT:  We can discuss that if there is a
13  need.  You will have a chance to look at the daily
14  transcript.  If indeed there is some reference to testimony
15  that you want stricken because you have not had an
16  opportunity to examine on that, unless Mr. Crouch is
17  recalled, I guess that is the other option, but in any
18  event, let's move on to redirect then.
19        Whereupon,
20        Mr. Greene, redirect.
21        MR. STEIN:  Your Honor, some of these exhibits
22  used with Mr. Crouch, can we have leave to do that at the
23  end of the day?
24        THE COURT:  Yes, certainly.  I'm going to be very
25  flexible about those kind of housekeeping matters.  Make

424

1  sure we don't go into the second or third day.  My memory
2  will lag, although I'm trying to take fairly good notes as
3  exhibits are referenced.
4        Mr. Greene.
5              REDIRECT EXAMINATION
6  QUESTIONS BY MR. GREENE:
7        Q.  If I could have Exhibit 2148.  Showing you
8  Exhibit 2148, this is a document Mr. Stein was examining you
9  on a moment ago.  You seem to resist the notion that this
10  somehow indicated that the result of acquisitions by
11  St. Luke's of independent practice groups resulted in no
12  change in cost to BCI.  Why is that?
13        MR. STEIN:  Object to form.  I did not ask about
14  cost.  I asked about physician services for commercial.
15        THE COURT:  Counsel, would you rephrase the
16  question.  I wasn't sure we'd have an objection on the first
17  question.  Wasn't paying enough intention.  So could you
18  rephrase.  And bear in mind Mr. Stein's objection.
19        MR. GREENE:  Of course.
20  BY MR. GREENE:
21        Q.  With respect to Mr. Stein's questions with respect
22  to this document, when it says "None," what does that relate
23  to specifically?
24        A.  Well, the concern I had is a representation that
25  the acquisition of physician practices does not increase

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 60 of 65

Bench Trial, 09/24/2013

425

1   costs for Blue Cross of Idaho.  And that is an area that I
2   would disagree with.
3       Q.  And why is that?
4           MR. STEIN:  I would move to strike.  That's not
5   the question I asked.
6           THE REPORTER:  I can't hear.
7           THE COURT:  Let's go one at a time.  I am going to
8   overrule the objection.  Go ahead and proceed.
9   BY MR. GREENE:
10      Q.  Let's do this a different way.  Is it appropriate
11  to draw the conclusion from this document where it says
12  none, that there are no cost increases to BCI because of an
13  acquisition of a physician group?
14      A.  No.  That is not an appropriate result.
15      Q.  And why is that?
16      A.  Hospitals buy physician practices not to increase
17  physician reimbursement.  They buy physician practices to
18  increase hospital reimbursement.  So as a practice is
19  acquired, the fees paid to that physician are not going to
20  change.  We pay them on a standardized fee schedule.  What
21  will happen is that the referrals from that physician
22  practice will now be referred to specialists owned by
23  St. Luke's, and all of the ancillary services that were
24  previously referred out to community providers of what we
25  call commodity rates would be referred into the St. Luke's

426

1   hospital.
2           So the immediate impact for outpatient surgery is
3   our costs go up 289 percent in the study we looked at
4   earlier.  For ancillary services such as labs, PT, imaging,
5   they will go up 32 percent to over 40 percent depending on
6   the product you are looking at.
7       Q.  Now, during the course of the conversation with
8   Mr. Stein, you discuss something called provider-based
9   billing.  And I believe you also mentioned a notion called
10  hospital-based billing?  What is from your perspective
11  provider-based billing?
12      A.  In the Medicare world they changed their policy a
13  number of years ago.  It is now believed by MedPAC and
14  others to have been an ill-advised policy.  Nonetheless,
15  they changed the policy a number of years ago to state that
16  if a physician's practice is owned by a hospital, the
17  hospital can also bill a fee for office visits.  That is
18  what commonly would be referred to as facility-based
19  building or provider-based billing.
20      Q.  When you pay higher charges when an independent
21  physician group is acquired by a hospital, here at
22  St. Luke's, what would one call that pricing structure?  Is
23  that referred to as hospital-based billing or some other
24  phrase?
25      A.  I think it would create confusion to call that --

427

1   even though it's billing from the hospital, that would be a
2   transition of billing for services that previously had been
3   performed in the community by freestanding centers to
4   services performed by the hospital through their outpatient
5   department.  I'm not sure that there's a general reference
6   other than we normally refer to that as commodities going
7   from a low cost setting to a high cost setting to high.
8       Q.  So there's no ordinary term or phase that we can
9   use in this proceeding that describes the higher rate that
10  you pay?
11      A.  You could use hospital-based billings as long as
12  it is differentiated from that notion of provider-based
13  fees, which are a little bit of a nuance of the Medicare
14  system.
15      Q.  So if we wanted to keep this straight in our own
16  minds, provider-based billing would be associated with
17  Medicare changes, and hospital-based billing would be
18  associated with higher charges that might be associated with
19  payments from a commercial payor like yourself?
20      A.  I think that seems to be a fair use.
21      Q.  Back to this initial notion.  Is your primary
22  concern about the Saltzer deal that the physician component
23  of fees would go up dramatically or is it something else?
24      A.  The immediate impact is that physician fees or
25  fees that were billed from the physician would now be billed

428

1   by the hospital, those charges would go up.  The fee itself
2   as we identified through this audit document we had, the
3   payment for the physician service on a commercial product
4   should not change if everything was configured
5   correctly.  The concern in the mid-term is the cost will
6   increase.  The concern in the long-term for Saltzer is that
7   St. Luke's will drop Saltzer out of our ConnectedCare
8   network and out of the Saint Al's Alliance Network and
9   they'll only be available through the BrightPath Network and
10  through Select Health.
11      Q.  While we are sorting out nomenclature, how would
12  you distinguish the professional fee from an ancillary fee?
13      A.  So a professional fee is for a person service, a
14  physician, for example, has a professional fee.  An
15  ancillary, and this -- I might be taking a little bit of
16  liberty here just because that is the nomenclature I have
17  been using.  An ancillary service is a service that's
18  ancillary to the professional's activity or to the
19  hospital's activity.
20          THE COURT:  Counsel, I want to back up ask the
21  witness to explain something.  You were asked earlier I
22  think as I understood your testimony the acquisition of
23  doctor practices did not result in increasing the doctor's
24  rate of reimbursement, but that the cost increase came from
25  moving the reimbursement for ancillary services and I think

429

1  you referred to as commodity rates from community groups to
2  the hospital in which there were substantial increases in
3  those rates; is that correct?
4         THE WITNESS:  That is correct.
5         THE COURT:  Now are you saying the same thing
6  about your primary and initial concern about the Saltzer
7  acquisition?  I understood you to say that you were
8  concerned that actually the billings rates themselves for
9  the physicians would also increase when charged through the
10  hospitals.  Did I misunderstand that last part?
11        THE WITNESS:  The physician services won't be
12  billed through the hospital.
13        THE COURT: So it is the same issue.
14        THE WITNESS:  Yes.
15        THE COURT:  In essence, kind of the ancillary
16  services and the other services that are ancillary to the
17  primary physician care where the rates will substantially
18  change when they are build through a hospital, and we
19  discussed the reasons for that earlier when we talked about
20  maintaining the lab 24/7, maintaining diagnostic centers
21  24/7.  That is a primary concern, not a change in rates
22  themselves, for the physician?
23        THE WITNESS:  That is true for commercial.  For
24  Medicare there is in fact a change in the rate of physician
25  fees.  So there is that one difference.

430

1         THE COURT:  Medicare not at issue here.
2         THE WITNESS:  No.
3         THE COURT:  Thank you.  I just wanted to
4  understand that.  Go ahead.
5         MR. GREENE:  Thank you, Your Honor.
6  BY MR. GREENE:
7      **Q.**  Just a couple clarifications, Mr. Crouch.  With
8  respect to Twin Falls, did St. Luke's position in the Magic
9  Valley affect the ability to seek higher reimbursements from
10  BCI?
11     **A.**  **Higher reimbursements from physicians or from**
12  **hospitals or both?**
13     **Q.**  Both, but focus specifically on physicians.
14     **A.**  **So we do -- I would say the acquisition of**
15  **physician practices by St. Luke's has allowed St. Luke's to**
16  **demand higher fees for physicians in general.  So that is**
17  **not an immediate impact of an acquisition, but St. Luke's**
18  **now employs 500 or so physicians in the state.  So they have**
19  **been able to demand through their hospital contract that we**
20  **increase our physician fee schedules.**
21     **Q.**  That raises another question.  During the course
22  of the conversation with Mr. Stein, he described a structure
23  in which you and St. Luke's could put increased
24  reimbursement rates pretty much anywhere in the system; is
25  that correct?

431

1      **A.**  **Yes.**
2      **Q.**  And is that a typical practice?
3      **A.**  **No.  St. Luke's is the only provider that we have**
4  **been persuaded to negotiate to that level.**
5      **Q.**  So would it be the case that if there were greater
6  market power say in Nampa, instead of increasing rates for
7  physicians in Nampa, it could be taken in the price of, I
8  don't know, maternity care?
9      **A.**  **Yes.  The point I made earlier is that combining**
10 **whatever leverage they have with the hospital and whatever**
11 **leverage they have with the physicians leads to higher**
12 **payments for both because we are recognizing that we have**
13 **to -- I mean, in Chuck Pomeroy's comments in one of his**
14 **e-mails is when they changed their strategy to say we are**
15 **now contracting with Blue Cross for all products, for all**
16 **providers at the same time, they won't allow separate**
17 **negotiations for physicians or facilities.  It's bundled**
18 **into package of all or nothing for us.  That is when I think**
19 **we felt like we really had few options.**
20     **Q.**  Then turning briefly back to Twin Falls, this
21  ability to seek higher rates from BCI, was that a reflection
22  of the BATNA analysis?
23     **A.**  **Certainly that describes what we were thinking**
24 **when we were looking amongst ourselves and saying well, if**
25 **this doesn't come about, what are we going to be left with?**

432

1      **Q.**  And in effect, did that change the leverage, if
2  you will, of St. Luke's in the negotiations with BCI?
3         MR. STEIN:  Objection, leading.
4         THE COURT:  Overruled.
5         THE WITNESS:  Every time St. Luke's acquires
6  another hospital or another physician group they increase
7  market position so Magic Valley would be an example of that.
8  BY MR. GREENE:
9      **Q.**  Did the change in that negotiating leverage result
10 in higher reimbursements paid by BCI to St. Luke's?
11     **A.**  **Yes.  We believe that is exactly what it led to.**
12     **Q.**  Generally on this question of market power, how
13  would you compare St. Luke's market power with that of
14  Saint Al's?
15     **A.**  **That is an interesting question.  If I look at it**
16 **just purely from dollars, St. Luke's is more than three**
17 **times the size of Saint Al's.  So in that regard, if**
18 **dollars were of equal value, they would have three times the**
19 **value.  If you look at it by the markets they control,**
20 **Saint Al's does not control a single market other than say**
21 **for hospital services in Nampa.  Outside of that small niche**
22 **category, Saint Al's is in a competitive marketplace.**
23 **St. Luke's on the other hand is the only supplier or the**
24 **majority supplier of hospital and professional services in**
25 **many markets in Idaho.**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 62 of 65

433

1      **Q.**  At the end of the day, how does the Saltzer

2 transaction affects St. Luke's market power?

3      **A.**  **I think it adds to the list.  So St. Luke's is the**

4 **dominant provider or only provider in McCall, in the Wood**

5 **River, in Jerome, in Gooding, in Twin Falls, in Mountain**

6 **Home, and they are obviously the dominant provider in Boise.**

7 **That extends their reach to one more market, and that would**

8 **include the Nampa market.**

9      **Q.**  Then historically, Mr. Stein chatted with you

10 about the give and take of the negotiating process.  And I

11 believe you previously testified that you are paying more

12 because of some of these acquisitions.  What did you get

13 when you gave up those higher reimbursements for the surgery

14 centers in Magic Valley?  If there was a give and if there

15 was a take from St. Luke's, what did you get out of that

16 dealing?

17      **A.**  **Well, the consideration we obtained out of that**

18 **contract was their continued participation.  It would have**

19 **been modest concessions that might have had value to us that**

20 **might not have had value to St. Luke's, so we considered**

21 **that a gain to the negotiation.  They may not have**

22 **considered that to be a concession.  That often happens in**

23 **negotiations.**

24      **Q.**  Does St. Luke's acquisition of Saltzer affect

25 St. Luke's ability to obtain higher reimbursements?

434

1      **A.**  **Yes.**

2      **Q.**  Do you expect St. Luke's to be able to obtain

3 higher reimbursements from BCI as a result of this

4 acquisition?

5      **A.**  **Yes.**

6      **Q.**  Is that because BATNA is less attractive as a

7 result of this transaction?

8      **A.**  **In that case our BATNA, we have to walk away from**

9 **markets where St. Luke's is the only provider.**

10      **Q.**  Does this dynamic apply to negotiation of a risk-

11 based contract as well?

12      **A.**  **Yes.**

13      MR. GREENE:  I have no further questions, Your

14 Honor.

15      THE COURT:  Any recross?

16      MR. POWERS:  I have one question follow up on a

17 question Mr. Greene had.

18      THE COURT:  I will permit it.  Go ahead.

19              CROSS-EXAMINATION

20 QUESTIONS BY MR. POWERS:

21      **Q.**  My name is Ray Powers.  I represent Treasure

22 Valley Hospital.  Mr. Stein asked you some questions about

23 utilization, and the conversation generally or the

24 discussion generally had to do with utilization of imaging

25 studies at physician-owned facilities.  There was also

435

1 discussion about utilization at physician-owned surgical

2 hospitals.  And you seemed to want to interject in answering

3 those questions and make a distinction about independent

4 physicians.  Do you recall that give and take with

5 Mr. Stein?

6      **A.**  **Yes.**

7      **Q.**  Can you help the Court understand why it was

8 important for you to make that distinction about independent

9 physicians in that discussion.

10      **A.**  **The distinction I wanted to make is when a**

11 **physician becomes acquired by a hospital, they share the**

12 **characteristics of owning their own equipment because the**

13 **physician is compensated based on their referrals and what**

14 **they generate.**

15      **Q.**  Elaborate on that just a bit more, realizing that

16 we are all trying to get familiar with these issues.

17      **A.**  **So I am speaking in general terms.  I should not**

18 **represent that I know what the arrangements are with**

19 **Treasure Valley or Saint Al's or St. Luke's.  I am just**

20 **familiar with how the mechanics work generally.**

21      **But if a physician is an independent provider,**

22 **let's say an independent OB-GYN doc, and you are providing**

23 **primary care for moms who are pregnant, and you are**

24 **delivering babies, once you are acquired by a hospital,**

25 **there is an expectation, it probably is even in the**

436

1 **contract, but there is certainly an understanding that you**

2 **are going to deliver your babies at the hospital that**

3 **employs you.  That applies to all services the physician may**

4 **provide.  There is an expectation, whether it is in writing**

5 **or in fact it is just implied, that when you send your labs**

6 **out, you send it to the hospital.**

7      MR. STEIN:  Your Honor, I object on foundation.

8 This is just pure speculation of this witness.

9      THE COURT:  Counsel, I'm not sure he would be able

10 to, from his vantage point with BCI, how he would understand

11 that expectation.  So I would have to sustain the objection.

12      MR. POWERS:  Let me ask a follow-up question.

13 Maybe we can lay the proper foundation, Your Honor.

14 BY MR. POWERS:

15      **Q.**  As part of BCI's efforts, they track utilization;

16 correct?

17      **A.**  **Yes.**

18      **Q.**  Utilization is important to you; correct?

19      **A.**  **That's correct.**

20      **Q.**  And you track utilization in hospitals, and you

21 track utilization of independent physicians; correct?

22      **A.**  **That is correct.**

23      **Q.**  And in the course of tracking utilization, one of

24 the things that you are familiar with is the way independent

25 physicians -- one of the things you are familiar with is the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 63 of 65

437

1  practice of independent physicians when it comes to
2  utilizing services such as imaging studies and the practice
3  of those independent physicians once they are acquired by a
4  hospital in terms of how they use and rely upon imaging
5  studies; correct?
6      **A.  That's correct.**
7      **Q.**  Okay.  The testimony you have already given I take
8  it is based upon that knowledge of tracking utilization;
9  correct?
10     **A.  Yes.**
11         MR. POWERS:  Your Honor, I would like his answer
12 to stand, and I'd like him to be able to continue his answer
13 based on that foundation.
14         THE COURT:  The witness can testify as to what the
15 tracking utilization by BCI actually revealed, but in terms
16 of what the actual dynamic is or the expectation is, I don't
17 think he can testify as to that.  Can you still offer
18 anything limited only to information that BCI tracks in
19 terms of actual utilization?
20         THE WITNESS:  I will give an example.  We monitor
21 our emergency room usage across the state.  Bench market
22 would be how many emergency department visits per thousand
23 members per year in a region.  In the state of Idaho, the
24 average number of emergency department visits per thousand
25 members per year is 119.

438

1      When we look at the variation across the state though,
2  we see areas of high utilization and areas of low
3  utilization.  The area of highest utilization is the Magic
4  Valley, 147 ER visits per thousand members per year.  The
5  area of lowest utilization is Idaho Falls, which is 89
6  visits per thousand members per year.
7      ER utilization is thought to be an indicator of access
8  and availability to primary care.  One of the St. Luke's
9  competitors here in Boise attempted to open up an urgent
10 care center in Magic Valley, that urgent care center -- and
11 this is my understanding of conversations with that
12 provider.
13         MR. STEIN:  Objection, hearsay.  And I think we
14 are beyond the scope, Your Honor.  We are going to be
15 getting into this --
16         THE COURT:  How is this tied back in?
17         MR. POWERS:  It ties back into the concept of
18 utilization.  Mr. Stein introduced evidence suggesting that
19 there is over-utilization, not only of imaging studies, but
20 other facilities and other studies at hospitals that are
21 either owned by physicians or have a physician interest.
22 And I think the witness as he was being questioned was
23 trying to draw a distinction between over-utilization by
24 independent physicians versus physician-owned facilities.
25 And I think he is trying to elaborate on that and help the

439

1  Court understand the difference between the two and what BCI
2  sees with the issue of utilization once a physician becomes
3  affiliated with their own hospital.
4          THE COURT:  I will sustain the objection as
5  hearsay.  The witness can still offer whatever information
6  he can from information he observed at BCI that they
7  collected in order to make their business decisions.
8          Proceed.
9          THE WITNESS:  There is a bunch of questions here.
10 I am not sure I am addressing the specific question.  Maybe
11 you could phrase the question for me.
12 BY MR. POWERS:
13     **Q.**  Sure.  The BCI experience with utilization, once
14 an independent physician becomes affiliated with a hospital,
15 has been what with respect to utilization of imaging
16 studies, for instance?
17     **A.  We would treat the acquisition of a practice by a**
18 **hospital as being the same as the physician owning the**
19 **equipment because the economic incentive for them is the**
20 **same.**
21         MR. STEIN:  Objection, lack of foundation.
22         THE COURT:  The witness can testify as to how --
23 he said, "We would."  There may be a fallacy in that
24 economic analysis, but if that is what BCI perceives, I
25 think it has relevant, even if it is wrong.

440

1      Go ahead and answer.  Or continue with your answer, I
2  should say.
3          THE WITNESS:  When we have done our modeling as an
4  example, one of the exhibits that's come up a few times is
5  measuring the cost increase if the Nampa ancillary services
6  are billed, stopped being billed from the Nampa providers
7  and start being billed by the hospital.  We did not assume
8  those services would increase in utilization.  So we
9  eliminated whatever vagary that might have created and said
10 let's assume the same number of services happened, even
11 though we think there would be an increase, and that 32 and
12 40-whatever-percent increase is based on no change in
13 utilization.
14 BY MR. POWERS:
15     **Q.**  Are you familiar with BCI's utilization tracking
16 with respect to Treasure Valley Hospital?
17     **A.  I don't recall seeing, that I personally seen**
18 **anything recently specifically for Treasure Valley.**
19     **Q.**  Is that a subject that Dr. Coleman is familiar
20 with at Blue Cross?
21     **A.  He may be.**
22     **Q.**  Thank you.
23         THE COURT:  Now, Mr. Stein, is there anything you
24 want to ask as a follow up?
25         MR. STEIN:  Just briefly.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/24/2013

Case 1:12-cv-00560-BLW   Document 550   Filed 11/04/14   Page 64 of 65

441

RECROSS-EXAMINATION

1    QUESTIONS BY MR. STEIN:
2        Q.   Mr. Crouch, you don't know how the Saltzer
3    physicians were compensated, if at all, for ancillary
4    services that they ordered when they were in independent
5    practice; is that right?
6        A.   I don't know the specifics.
7        Q.   And you don't know the terms of their compensation
8    with St. Luke's, including how their compensation may or may
9    not be affected by the ordering of ancillary services now;
10   is that correct?
11       A.   That is correct.
12           THE COURT:  Anything else, Mr. Greene?
13           MR. GREENE:  Nothing more from us, Your Honor.  We
14   do have a few minutes if you want to start the video.
15           THE COURT:  We are going to have use the time.  I
16   assume the witness is excused and will not be recalled.  Is
17   that accurate, Counsel?  Do any of you intend to recall
18   Mr. Crouch?
19           MR. STEIN:  I don't believe so.
20           THE COURT:  Thank you, Mr. Crouch.
21           Call your next witness.
22           MS. MORAN:  Your Honor, what we'll be doing is
23   playing a portion of the video.
24           THE COURT:  Counsel, we will go just a few minutes

442

1    beyond.  I assume you will be willing to waive the reporting
2    of the playing of the videotaped deposition.  However, to do
3    so, we need to have a clear record as to what was played and
4    what the Court considered.  So either there has to be a
5    designation filed.  And I know there are objections, which I
6    suggest and I think Counsel has agreed, I will just reserve
7    ruling on those until I actually review and we determine --
8    we will include a decision on the objections in our final
9    decision on the matter.  But is there a designation that has
10   been filed as part of the record?
11           MS. MORAN:  It will be, and this actually includes
12   both the plaintiffs' designations plus the counter
13   designations by the defendants back and forth.  So we will
14   have a designation sheet for Mr. Metcalf as well so he knows
15   that.
16           THE COURT:  You will be willing to waive reporting
17   of the playing of the deposition?
18           MS. MORAN:  Yes, Your Honor.  We have a deposition
19   that was filed that is marked as well.
20           MR. STEIN:  To waive the reporting of the playing
21   of the deposition?
22           THE COURT:  Yes.
23           MR. STEIN:  Yes.
24           MR. GREENE:  Yes.
25           MR. POWERS:  Yes.

443

1            THE COURT:  Thank you.  Ms. Yant appreciates that
2    I'm sure.  Counsel, if you will just indicate.
3            (Video deposition of SCOTT CLEMENT published.)
4            THE COURT:  Why don't we take a break, pick back
5    up in about two minutes, and resume with the video in two
6    minutes.  No reason this cannot be played while -- the
7    courtroom can be open to the public or is this also --
8            MS. DUKE:  It can be open to the public.  The only
9    exhibit is 1997.
10           THE COURT:  We can note any media are free to come
11   into the courtroom.
12           ****** COURTROOM OPENED TO THE PUBLIC ******
13           MR. STEIN:  We have one deposition-related matter,
14   Your Honor.
15           THE COURT:  If it is not going to take long.  I
16   have a sentencing later this afternoon I need to get ready
17   for.  If it is something we can do in a brief period of
18   time, that would be fine.
19           MR. STEIN:  Only because it impacts depositions
20   that are going to be played.  There are a very limited
21   number, I think three depositions, where both sides have
22   made affirmative designations.  Most depositions of the
23   witnesses so counter-designations, overlap coming up
24   tomorrow or the rest of this week.  We would like to have
25   our affirmative designations and the plaintiffs' counters.

444

1    We would like to have all the testimony from that witness
2    played at the same time because we think without a live
3    witness, the dynamic of cross-examination is going to result
4    in duplication if we have one set of designations now and
5    then we have overlapping designations later.
6            We followed basically the principle that I think Your
7    Honor set forth in the pretrial order.  So as long as our
8    affirmative designations are roughly similar to our
9    counter-designations being a proxy for cross and direct,
10   that we would like to have those played all at the same time
11   and in the same order for the Court, especially given the
12   time pressures we are under.
13           MR. ETTINGER:  Your Honor, we have a different
14   view.  I guess I am a little foggy.  I remember we had a
15   detailed discussion I believe before Mr. Metcalf and maybe
16   it was not resolved.
17           My view is we are entitled to present our case as our
18   case and there is no convenience of the witness issue here.
19   It is all on videotape.  And that St. Luke's can then, if
20   they want to, present part of these depositions as part of
21   their case.  I don't think there is going to be significant
22   duplication involved.
23           THE COURT:  I thought we dealt with this in a
24   pretrial order.  Mr. Metcalf, do you recall?
25           We'll resolve this tomorrow morning.  I guess my

445

1  inclination is to, since there are no -- the primary reason
2  I require counsel to cooperate and allow a witness to cover
3  on cross-examination what counsel would otherwise have to
4  cover by recalling as part of their case in chief is
5  primarily convenience of the witness. Without that, then it
6  would seem to me, consistent with Mr. Ettinger's view, that
7  a party should be able to designate who they want and how to
8  present it in their case in chief.
9        The only exception I would think to that is substantial
10  overlap and to avoid having to play 25 minutes twice, then I
11  think that is something we ought to just indicate when it is
12  played the first time because it has been cross-designated.
13  Then it won't have to be replayed as part of the defense
14  case unless the defense wants to replay it for whatever
15  reason. I guess the beauty of that is it is self-policing
16  because you are using your own time. If it is worth it to
17  you, then more power to you, and if it is not, it won't be.
18        That is my general thoughts. We will take up tomorrow
19  morning and you probably ought to assume that will be my
20  ruling. I want to check the pretrial order, and if I
21  indicated something else, I probably erred because my intent
22  was only to do that with live witnesses and not on
23  deposition excerpts.
24        Recess until 8:30 tomorrow morning.
25            (Whereupon, evening recess taken.)

1            R E P O R T E R ' S   C E R T I F I C A T E
2
3
4
5
6        I, Lisa K. Yant, Official Court Reporter, County of
7  Ada, State of Idaho, hereby certify:
8        That I am the reporter who transcribed the proceedings
9  had in the above-entitled action in machine shorthand and
10  thereafter the same was reduced into typewriting under my
11  direct supervision; and
12        That the foregoing transcript, pages 213 to 445,
13  contains a full, true, and accurate record of the
14  proceedings had in the above and foregoing cause, which was
15  heard at Boise, Idaho.
16        IN WITNESS WHEREOF, I have hereunto set my hand
17  October 31, 2013.
18
19
20
21            _____
                    -s-
          Lisa K. Yant
22        Official Court Reporter
          CSR No. 279
23
24
25