446

1                UNITED STATES DISTRICT COURT

2                 IN THE DISTRICT OF IDAHO

3    - - - - - - - - - - - - - - - - - x  Case No. 1:12-cv-00560-BLW
4    SAINT ALPHONSUS MEDICAL CENTER -   :
     NAMPA, INC., TREASURE VALLEY       : Bench Trial
5    HOSPITAL LIMITED PARTNERSHIP, SAINT : **Witnesses:**
     ALPHONSUS HEALTH SYSTEM, INC., AND : **Scott Clement (Video)**
6    SAINT ALPHONSUS REGIONAL MEDICAL   : **Linda Lee Duer**
     CENTER, INC.,                      : **Max Reiboldt (Video)**
7                       Plaintiffs,     : **Randall Page (Video)**
             vs.                        : **Michael Djernes (Video)**
8                                       : **William Savage (Video)**
     ST. LUKE'S HEALTH SYSTEM, LTD., and : **John Kaiser (Video)**
9    ST. LUKE'S REGIONAL MEDICAL CENTER, : **Jackie Butterbaugh (Video)**
     LTD.,                              :
10                     Defendants.      :
     - - - - - - - - - - - - - - - - - :  Case No. 1:13-cv-00116-BLW
11   FEDERAL TRADE COMMISSION; STATE OF :
     IDAHO,                             :
12                     Plaintiffs,      :
             vs.                        :
13                                      :
     ST. LUKE'S HEALTH SYSTEM, LTD.;    :
14   SALTZER MEDICAL GROUP, P.A.,       :
                                        :
15                     Defendants.      :
     - - - - - - - - - - - - - - - - - x

16                 * * * SEALED * * *

17

18   REPORTER'S TRANSCRIPT OF PROCEEDINGS

19      before B. Lynn Winmill, Chief District Judge

20      Held on September 25, 2013

21      Volume 3, Pages 446 to 525

22

23                Tamara I. Hohenleitner
            Idaho Certified Shorthand Reporter No. 619
24               Registered Professional Reporter
                  Certified Realtime Reporter
25            Federal Certified Realtime Reporter

             United States Courts, District of Idaho
        550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 2 of 26

447

1                                    A P P E A R A N C E S

2

    FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
3   SAINT ALPHONSUS HEALTH SYSTEM, INC.,
    AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.

4

5           Keely E. Duke
            DUKE SCANLAN & HALL, PLLC
6           1087 W. River Street, Suite 300
            Boise, ID 83707

7

            David A. Ettinger
8           HONIGMAN MILLER SCHWARTZ AND COHN LLP
            2290 First National Building
9           660 Woodward Avenue
            Detroit, MI 48226

10

11

12
    FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION
13

14          Peter C. Herrick
            U.S. FEDERAL TRADE COMMISSION
15          500 Pennsylvania Ave., N.W.
            Washington, DC 20580

16

            J. Thomas Greene
17          U.S. FEDERAL TRADE COMMISSION
            600 Pennsylvania Ave N.W.
18          Washington, DC 20580

19          Henry Chao-Lon Su
            U.S. FEDERAL TRADE COMMISSION
20          601 New Jersey Ave., N.W.
            Washington, DC 20001

21

22

23

24

25

**United States Courts, District of Idaho**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 3 of 26

448

```
 1                      A P P E A R A N C E S (Continued)

 2
        FOR PLAINTIFF STATE OF IDAHO
 3
             Eric J. Wilson
 4           GODFREY & KAHN, S.C.
             One East Main Street
 5           Suite 500
             PO Box 2719
 6           Madison, WI 53701

 7           Brett T. DeLange
             OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
 8           954 W. Jefferson, 2nd Floor
             Boise, ID 83720-0010
 9
        FOR PLAINTIFF TREASURE VALLEY HOSPITAL
10
             Raymond D. Powers
11           POWERS TOLMAN FARLEY, PLLC
             PO Box 9756
12           Boise, ID 83707

13      FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
        AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.
14
             Jack R. Bierig
15           Ben J. Keith
             Scott Stein
16           Charles Schafer
             SIDLEY AUSTIN
17           One South Dearborn
             Chicago, IL 60603
18
             J. Walter Sinclair
19           STOEL RIVES
             101 S. Capitol Boulevard, Suite 1900
20           Boise, ID 83702

21      FOR DEFENDANT SALTZER MEDICAL GROUP

22           Brian Kenneth Julian
             ANDERSON JULIAN & HULL, LLP
23           PO Box 7426
             Boise, ID 83707
24

25
```

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 4 of 26

449

1                                              I N D E X

2

3
|   |   |   | PAGE: |
|---|---|---|-------|
4
|   | Courtroom open to the public..................... |   | 453 |
|   | Courtroom closed to the public.................... |   | 458 |
5
|   | Courtroom remains closed to the public.......... |   | 506 |
|   | Courtroom remains closed to the public.......... |   | 517 |
6
|   | Courtroom open to the public..................... |   | 523 |
|   | Courtroom remains open to the public............. |   | 524 |

7

8

9                                              PLAINTIFFS

10                                              W I T N E S S E S

11

12
|   |   |   | PAGE: |
|---|---|---|-------|
| BUTTERBAUGH, Jackie (By video) |   |   |   |
|   | .................................................. |   | 524 |
| CLEMENT, Scott (By video) |   |   |   |
|   | .................................................. |   | 457 |
| DJERNES, Michael (By video) |   |   |   |
|   | .................................................. |   | 518 |
| DUER, Linda Lee |   |   |   |
|   | Direct Examination by Mr. Wilson.............. |   | 459 |
|   | Cross-Examination by Mr. Stein................ |   | 478 |
|   | Cross-Examination by Mr. Julian............... |   | 496 |
|   | Redirect Examination by Mr. Wilson............ |   | 499 |
|   | Recross-Examination by Mr. Stein.............. |   | 502 |
|   | Further Redirect Examination by Mr. Wilson.... |   | 504 |
| KAISER, John (By video) |   |   |   |
|   | .................................................. |   | 521 |
| PAGE, Randell (By video) |   |   |   |
|   | .................................................. |   | 516 |
| REIBOLDT, Max (By video) |   |   |   |
|   | .................................................. |   | 507 |
| SAVAGE, William (By video) |   |   |   |
|   | .................................................. |   | 521 |

23

24

25                                    * * * * *

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.   Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 5 of 26

450

1

PLAINTIFFS'

2                                    E X H I B I T S

3

| 4 | | | ADMITTED |
|---|---|---|---|
| 5 | 1083 | WIPFLi Presentation: St. Luke's Operations ... Council Meeting (PLTs' Dep. Ex. 102; SLHS000892207--SLHS000892267) | 522 |
| 6 | 1142 | Max Reiboldt Bio (PLTs' Dep. Ex. 190)......... | 512 |
| 7 | 1143 | Letter from Allen Alda to John Kaiser, Bill .. Savage, and Nancy Powell re: [Coker Initial Consultative Review Process] (PLTs' Dep. Ex. 191; SMG000033850--SMG000033894) | 512 |
| 8 | | | |
| 9 | 1149 | E-mail from Nancy Powell to Max Reiboldt re: . Continuing (PLTs' Dep. Ex. 197; COKER0004698--COKER0004699) | 512 |
| 10 | 1150 | E-mail from Bill Savage to Max Reiboldt re: .. St Luke's/St Al's proposal (PLTs' Dep. Ex. 198; COKER0006233--COKER0006234) | 512 |
| 11 | | | |
| 12 | 1153 | E-mail from Max Reiboldt to Bill Savage re: .. TVH By-Laws (PLTs' Dep. Ex. 201; SMG000278640--SMG000278641) | 512 |
| 13 | 1154 | Max Reiboldt Handwritten Notes: Saltzer ...... Medical Group, P.A. Meetings (PLTs' Dep. Ex. 202; COKER-P-0000062--COKER-P-0000067) | 512 |
| 14 | | | |
| 15 | 1155 | E-mail from Michael Djernes to Andrew Curran . and Patricia Buersmeyer re: [Negotiations with SLHS) (PLTs' Dep. Ex. 203; COKER0006581--COKER0006584) | 520 |
| 16 | | | |
| 17 | 1156 | Coker Presentation: Saltzer Medical Group .... Physician Pod Meetings (PLTs' Dep. Ex. 204; COKER0011256--COKER0011268) | 512 |
| 18 | 1157 | Max Reiboldt Handwritten Notes: Saltzer ...... (PLTs' Dep. Ex. 205; COKER-P-0000052--COKER-P-0000061) | 512 |
| 19 | | | |
| 20 | 1159 | Letter from Max Reiboldt to Gary Fletcher re: . [Update of SMG's Current Alignment Perspective] (PLTs' Dep. Ex. 207; COKER0004259--COKER0004261) | 522 |
| 21 | | | |
| 22 | 1160 | Letter from Max Reiboldt to John Kee and ..... Peter LaFleur re: [Post-alignment Compensation Structure] (PLTs' Dep. Ex. 208; COKER0009500--COKER0009509) | 512 |
| 23 | | | |
| 24 | 1361 | E-mail from Randell Page to Nancy Powell, .... Mark Rasmus, and Michael Djernes re: RE: Blue Cross consultations (PLTs' Dep. Ex. 476, PLTs' Dep. Ex. 729; SMG000315458--SMG000315459) | 517 |
| 25 | | | |

451

| | | | |
|---|---|---|---|
| 1 | **1362** | E-mail from Randell Page to John Kaiser re: .. RE: Andy's sca guy (PLTs' Dep. Ex. 477; | **517** |
| 2 | | SMG000306637--SMG000306638) | |
| 3 | **1363** | E-mail from Randell Page to Andrew Curran, ... Bill Savage, John Kaiser, Nancy Powell, and | **517** |
| 4 | | Patricia Buersmeyer re: Psa's (PLTs' Dep. Ex. 478; SMG000278243--SMG000278243) | |
| 5 | **1366** | Letter from Randell Page to Saltzer ......... Physicians re: Opposition to Proposal from | **517** |
| 6 | | St. Al's (PLTs' Dep. Ex. 481; SMG000033688--SMG000033690) | |
| 7 | **1374** | E-mail from Ryan McCinnon to Harold Kunz, et . al. Re: RE: Contingency plan (PLTs' Dep. Ex. 489; SALTZER047702--SALTZER047703) | **517** |
| 8 | **1386** | E-mail from John Kaiser to Saltzer Medical ... Group Everyone re: St. Luke's Alignment | **522** |
| 9 | | (PLTs' Dep. Ex. 504; SMG000286177--SMG000286177) | |
| 10 | **1409** | E-mail from Heather Gilmore to Bill Savage, .. John Kaiser and David R. Orchard re: Newest | **521** |
| 11 | | numbers on patient hospital of choice (PLTs' Dep. Ex. 529; SALTZER239891--SALTZER239891) | |
| 12 | **1411** | E-mail from Warren Miller to Bill Savage re: . RE: St. Luke's medical staff (PLTs' Dep. Ex. | **521** |
| 13 | | 531; SALTZER523325--SALTZER523325) | |
| 14 | **1538** | E-mail from Michael Djernes to Randell Page .. re: Contingency plan (PLTs' Dep. Ex. 733; SALTZER177706--SALTZER177707) | **520** |

15

16

17

18

19

20                              * * * * *

21

22

23

24

25

452

1                                          DEFENDANTS'

2                                    E X H I B I T S

3

| | | | ADMITTED |
|---|---|---|---|
| 2145 | Blue Cross of Idaho Business Plan and Budget ... for Years 2012-2014, for Finance Committee Review (Def. Dep. Exh. 194; BCI372350-419) | | 454 |
| 2148 | Email from L. Rowell to S. Proctor re SLHS ..... Acquisitions, attaching Updated St_Lukes_Acquisitions as of Mar 27 2012.xlsx (Def. Dep. Exh. 197; BCI216968-69) | | 455 |
| 2235 | SAHS Idaho Statesman Questions (Def. Dep. Exh. . 358; ALPH00016033-35) | | 455 |
| 2583 | St. Luke's Health System 2010 Contract ......... Negotiation History (BCI365155-56) | | 455 |
| 2584 | 1/13/11 email from Jeff Crouch to Zelda ........ Sylvia-Geyer re Large Hospital Contract Rate Strategy (BCI275294-96) | | 455 |
| 2585 | 4/20/11 email from David Slonaker to Todd York . re SLHS Surgery Center Dispute (BCI266105-107) | | 455 |
| 2587 | 1/20/12 email from Jeff Crouch to Zelda ........ Geyer-Sylvia re St. Luke's Payer/Provider Partnership (BCI250653-54) | | 456 |
| 2588 | 4/12/12 Letter from Milliman to Jeff Crouch re . Physician Unit Cost Benchmarking Analysis (BCI173612-25) | | 456 |
| 2589 | 8/30/12 Memo from Zelda Geyer-Sylvia to ........ Independent Public Directors Committee re Select Health/St. Luke's Health System Issue (BCI222252-53) | | 456 |
| 2632 | 2/3/10 Risk Universe Definitions (BCI372420-47). | | 456 |
| 2634 | Summary of Proposals for 2013 Contract ......... (BCI368088) | | 456 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21                          * * * * *
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW  Document 551  Filed 11/04/14  Page 8 of 26

Bench trial, 09/25/2013

453

PROCEEDINGS

September 25, 2013

******COURTROOM OPEN TO THE PUBLIC******

1  THE CLERK:  The court will now hear Civil Case

2  12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,

3  versus St. Luke's Health System for Day 3 of a bench trial.

4  THE COURT:  Good morning, Counsel.

5  MR. GREENE:  Good morning, Your Honor.

6  THE COURT:  As a housekeeping matter, when we play

7  the deposition, we need to publish that as part of the

8  record.

9  So at this time, I'm assuming, Ms. Duke, you would

10  request to publish Mr. Clement's deposition?

11  MS. DUKE:  Yes, Your Honor.

12  THE COURT:  I will direct Ms. Gearhart to do so

13  since we are playing it through a video.  You'll provide the

14  original, however, the original deposition to Ms. Gearhart?

15  MS. DUKE:  Correct.  We'll have the original, and

16  then we'll also have a transcript that has all the excerpts

17  so that you can directly go to those, as well.

18  THE COURT:  All right.  Including the objections?

19  MS. DUKE:  Correct.

20  THE COURT:  All right.

21  MS. DUKE:  That are written in.  And then the AEO

22  designations, as well.

454

1  THE COURT:  Very good.  All right.  I think, then,

2  we'll go ahead, and as soon as you provide that, the

3  original, I'll direct Ms. Gearhart to publish the deposition

4  for the record.

5  MS. DUKE:  Thank you, Your Honor.

6  THE COURT:  I think we'll just go ahead and

7  proceed with the playing.  As I understand, this is open to

8  the public; however, there may be portions of depositions

9  played today where we will need to turn off the sound and

10  the projector; correct?

11  MS. DUKE:  Correct.

12  MR. STEIN:  Your Honor, as our one other

13  housekeeping matter, we would like to move into evidence the

14  exhibits from Mr. Crouch's testimony yesterday.  I

15  apologize.

16  THE COURT:  Thank you.  Give me one moment to get

17  to that.  All right.  Could you indicate the numbers?

18  MR. STEIN:  2145.

19  THE COURT:  Okay.  Appears to be no objection.

20  MR. GREENE:  No objections, Your Honor.

21  THE COURT:  That will be admitted.

22  (Defendants' Exhibit 2145 admitted.)

23  THE COURT:  Likewise 2148.

24  MR. STEIN:  Correct.

25  THE COURT:  Any objection, Mr. Greene?

455

1  MR. GREENE:  A moment, Your Honor.

2  No objection, Your Honor.

3  THE COURT:  2148 will be admitted.

4  (Defendants' Exhibit 2148 admitted.)

5  MR. STEIN:  2235.

6  MR. GREENE:  No objection, Your Honor.

7  THE COURT:  2235 will be admitted.

8  (Defendants' Exhibit 2235 admitted.)

9  MR. STEIN:  2583.

10  MR. GREENE:  No objection, Your Honor.

11  THE COURT:  Was it -"83"?

12  MR. STEIN:  Yes, Your Honor.

13  THE COURT:  I must have missed that in my notes,

14  but I do recall it being discussed, so 2583 will be

15  admitted.

16  (Defendants' Exhibit No. 2583 admitted.)

17  MR. STEIN:  2584.

18  THE COURT:  And -85?

19  MR. STEIN:  Yes.

20  THE COURT:  Any objection to either?

21  MR. GREENE:  No objection.

22  THE COURT:  2584 and -85 will be admitted.

23  (Defendants' Exhibit Nos. 2584 and 2585 admitted.)

24  MR. STEIN:  And then 2587, -88, and -89.

25  THE COURT:  Any objection?

456

1  MR. GREENE:  No objection, Your Honor.

2  THE COURT:  All right.  2587, -88, and -89 will be

3  admitted.

4  (Defendants' Exhibit Nos. 2587, 2588, and 2589

5  admitted.)

6  MR. STEIN:  2632.

7  THE COURT:  Any objection?

8  Mr. Stein, could you remind me what that was?  That was

9  not on the exhibit list.

10  MR. STEIN:  This was a -- this was a document on a

11  risk-universe definitions.

12  THE COURT:  All right.

13  Any objection?

14  MR. GREENE:  No objection, Your Honor.

15  THE COURT:  2632 will be admitted.

16  (Defendants' Exhibit No. 2632 admitted.)

17  MR. STEIN:  And 2634 is the last exhibit.

18  THE COURT:  Any objection?

19  MR. GREENE:  No objection, Your Honor.

20  THE COURT:  Those exhibits all will be admitted.

21  (Defendants' Exhibit No. 2634 admitted.)

22  THE COURT:  Now I think we're ready to resume.

23  MS. DUKE:  Do you want me to start one click back

24  or just start right where we left off?

25  THE COURT:  Why don't you back up a couple of

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 581   Filed 11/04/14   Page 9 of 26

457

1  minutes, if you would, just so I can put that back into
2  context.
3      (Testimony of Scott Clement via video deposition
4          resumed.)
5          THE COURT:  Counsel, just a moment.  We had agreed
6  before we are going to waive the reporting; correct?
7          MS. DUKE:  Correct.
8      (Video deposition of Scott Clement resumed.)
9          MS. DUKE:  Your Honor, this is an AEO document, so
10  maybe we can just flip to your screen.
11         THE COURT:  The problem, though, is I can't see
12  the entire text with the screen.
13         MS. DUKE:  Correct.
14         THE COURT:  Is there a way we could -- if what you
15  want me to do is just read, or are we going to be able to
16  play it?  Because I don't know how much the AEO --
17         MS. DUKE:  The transcript has not been designated
18  AEO, just the document itself.
19         THE COURT:  Is that Exhibit 1997?
20         MS. DUKE:  1997.
21     (Video deposition of Scott Clement resumed.)
22         MS. DUKE:  Your Honor, we can flip back on to the
23  main screen now.
24         THE COURT:  I'm sorry?
25         MS. DUKE:  We can flip back on to the main screen.

458

1          (Video deposition of Scott Clement resumed.)
2          MS. DUKE:  That's the conclusion, Your Honor.
3          THE COURT:  All right.  The next witness will also be
4  by video?
5          MR. WILSON:  No, Your Honor.  Good morning.
6  Eric Wilson on behalf of the State of Idaho.  I don't think
7  I've ever formally introduced myself to you.
8          THE COURT:  Yes.  Thank you.
9          MR. WILSON:  At this point the plaintiffs call
10  Linda Duer, who is a live witness.
11         THE COURT:  Ms. Duer, if you'll summon her.
12         MR. WILSON:  Your Honor, Ms. Duer represents a
13  payor, IPN, and she is in exactly the same situation as
14  Mr. Crouch was, and so we would respectfully request that
15  this portion of the trial be handled the exact same way as
16  Mr. Crouch's testimony was.
17         THE COURT:  I assume counsel is all in agreement?
18         MR. JULIAN:  No objection.
19         THE COURT:  All right.  Then I will have to clear
20  the courtroom.  We will direct anyone who has not been
21  identified that they are allowed to stay in the courtroom,
22  but will need to leave during Ms. Duer's testimony.
23     ******COURTROOM CLOSED TO THE PUBLIC******
24         THE COURT:  Ms. Duer, please step before the
25  clerk, be sworn as a witness, and then follow Ms. Gearhart's

459

1  directions from there.
2                  LINDA LEE DUER,
3  having been first duly sworn to tell the whole truth,
4  testified as follows:
5          THE CLERK:  Please state your complete name and
6  spell your name for the record.
7          THE WITNESS:  My name is Linda Lee Duer, L-I-N-D-A
8  L-E-E D-U-E-R.
9          THE COURT:  You may inquire.
10         MR. WILSON:  Thank you, Your Honor.
11             DIRECT EXAMINATION
12  BY MR. WILSON:
13     Q.  Good morning, Ms. Duer.  What do you do for a
14  living?
15     A.  I'm the executive director of Idaho Physicians
16  Network.
17     Q.  And is Idaho Physicians Network commonly referred
18  to as "IPN"?
19     A.  It is.
20     Q.  You said -- you mentioned you're the executive
21  director at IPN?
22     A.  Correct.
23     Q.  How long have you been doing that?
24     A.  Since April of 2000, about 13 years.
25     Q.  Generally speaking, what is IPN?

460

1      A.  IPN was originally started as an independent
2  practice association made up of physicians in the Treasure
3  Valley.  They have since formed what is called a "network"
4  because we have grown to be statewide, and they now lease
5  their statewide network to payors.
6      Q.  So how is IPN the same and how is it different
7  from a company, say, like Blue Cross of Idaho?
8      A.  IPN brings different payors together with
9  physicians, hospitals, and ancillary providers.  Blue Cross
10  of Idaho is an insurance company and contracts directly with
11  hospitals or physicians or ancillary providers for their own
12  network, where I lease -- I am just the opposite.  I lease
13  my network, what I have developed, to all kinds of different
14  payors.
15     Q.  How big is that network of providers that you have
16  in Idaho?
17     A.  Provider-wise, I have about 13,000.
18     Q.  What sorts of payors does IPN serve?
19     A.  We serve national payors, such as Aetna, Cigna,
20  United.  We serve regional payors, such as PacificSource
21  Health Plans.  We serve third-party administrators, such as
22  AmeriBen, CBSA, Meritain.  And then we also lease our
23  network to self-funded employers, and we let them choose
24  between having a PPO product, having an HMO product, or
25  having a point-of-service product.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                Bench Trial, 09/25/2013

461

1    Q.  When you pool all of those together, approximately
2    how many members are served by those various plans would you
3    say?
4        A.  We have approximately 236,000 lives.
5        Q.  In terms of number of covered lives, how does that
6    compare to other third-party payors in the state of Idaho?
7        A.  Could you do a clarification on "third party."
8        Q.  Sure.  I'm just trying to get a sense of how big
9    IPN's service is compared to, say, Blue Cross of Idaho or
10   other payors here in the state.
11       A.  The data that we have done in our analysis is we
12   are second in the market.  The first would be Blue Cross of
13   Idaho.
14       Q.  And you mentioned that you also serve self-funded
15   employers; is that correct?
16       A.  Correct.
17       Q.  When these employers come to IPN, how is it that
18   they let you know what they want in a network?
19       A.  An employer will sometimes contact us through a
20   broker or directly, and they will often submit what's called
21   a "request for information" or a "request for proposal."
22       Q.  An RFP?
23       A.  Correct.
24       Q.  You say "often."  Just ballpark, how many of these
25   do you get in a given month from an employer?

462

1        A.  On an average we can get anywhere from three to
2    five, maybe six.
3        Q.  In these RFPs, how important is the composition of
4    a provider network to the employer?
5        A.  In Idaho, that is probably the first question they
6    want to know, is:  Is my provider in the network?  If I
7    don't have the provider, especially key providers, then I
8    usually do not -- I'm not chosen as the network.
9        Q.  What about location?  Is that one of the factors
10   that employers are considering when they are choosing a
11   network, location of providers?
12       A.  Yes.
13       Q.  Why is that the case?
14       A.  Because the employer wants to make their employee
15   happy, and they want -- the employees want to have their
16   care close to either where they live, for the most part, or
17   sometimes where they work.  But they want to have either,
18   especially primary care or urgent care, close to them.  So
19   an example would be like Paul's Markets.  They would like to
20   do narrower networks, but because they have people in -- all
21   over Idaho, basically, that they have to -- they want as
22   large a network as possible.
23       Q.  You said that the location of the providers is
24   especially important for primary care physicians.  Why is
25   that?

463

1        A.  Because people don't want to drive forever to go
2    to a doctor when they're sick.  They want to be able to get
3    to a doctor fairly quickly.
4        Q.  Wouldn't the same be true of a specialist?
5        A.  Well, they don't see specialists, normally, on a
6    regular basis as they would -- so if they took their
7    children -- you know, so the school calls, says your kid is
8    sick, mom wants to take them -- pick them up at the school
9    and get them to the physician or an urgent care.
10       Q.  How is it that IPN transmits information to the
11   employer regarding locations of the providers in your
12   network?
13       A.  Could you repeat that?
14       Q.  Sure.  How is it that when employers, in their
15   RFPs, say to IPN, "Please let me know what providers are in
16   your network and where they are," how is it that IPN will
17   give that information to the employer?
18       A.  We usually get it through what's -- they asked us
19   to do what's called a "GeoAccess match."  And under the
20   GeoAccess match, they will give us all of the providers whom
21   the members have seen over a period of time, and then we do
22   a match based on geographic location and who that member has
23   seen.
24       Q.  Let's focus on one geographic area in particular,
25   which is Nampa.  In your capacity as executive director of

464

1    IPN, have you marketed networks of physicians to self-funded
2    employers in Nampa?
3        A.  Yes.
4        Q.  And did those networks include primary care
5    physicians in Nampa?
6        A.  Absolutely.
7        Q.  Is Saltzer Medical Group currently part of the IPN
8    network?
9        A.  Saltzer Medical Group is part of the IPN network
10   under the St. Luke's Health System.
11       Q.  Since the acquisition?
12       A.  Correct.
13       Q.  How long, approximately, have the Saltzer doctors
14   been a part of the IPN network?
15       A.  For as long as I can remember.  Over ten years.
16       Q.  Could you successfully market a network to
17   self-funded employers in Nampa that did not include Nampa
18   primary care physicians?
19       A.  No.
20       Q.  Why not?
21       A.  Because employers, again, want to have primary
22   care physicians where their employees go, and even though
23   they may drive to Boise for, say, a surgeon, to have a
24   surgery, they do not want to leave Nampa.  They want to stay
25   where their home is and where a lot of them work, like the

465

1  school district; people want to be close.
2      **Q.**  Could you successfully market a network to
3  self-funded employers in Nampa that did not include Saltzer
4  primary care physicians?
5      **A.**  No.
6      **Q.**  Why is that?
7      **A.**  Because Saltzer is the -- well, it was the largest
8  independent, multispecialty clinic in the state of Idaho.
9  They are not only the largest, but they're a very
10  prestigious group, going -- the history of Saltzer goes way
11  back to Dr. Saltzer, and it's just a clinic that everybody
12  goes to.  It is very convenient.  It has pharmacy.  It has
13  lab.  It has X-ray.  It has some specialties, and it's very
14  close to the hospital.
15      **Q.**  Are you familiar with a provider named Terry
16  Reilly Health Services?
17      **A.**  I am.
18      **Q.**  What are they?
19      **A.**  Terry Reilly is a federally qualified health
20  clinic who serves mostly indigent population.
21      **Q.**  If you could not offer Saltzer primary care
22  physicians in your network, would Terry Reilly primary care
23  doctors be a viable substitute?
24      **A.**  No.
25      **Q.**  Why is that?

466

1      **A.**  Again, they are a federally qualified health
2  clinic.  They do serve the indigent.  Most people in the
3  mainstream and commercial choose not to go to those types of
4  clinics.
5      **Q.**  Saint Al's Medical Group has some primary care
6  physicians in Nampa; correct?
7      **A.**  Correct.
8      **Q.**  What about the Saint Al's Medical Group primary
9  care physicians, would those doctors be a viable Saltzer
10  substitute for a self-funded employer in Nampa?
11      **A.**  No.
12      **Q.**  Why not?
13          MR. STEIN:  Object to foundation.
14          THE WITNESS:  Because --
15          THE COURT:  Just a moment.  Overruled.
16      You may answer.
17  BY MR. WILSON:
18      **Q.**  Why is it that the SAMG doctors wouldn't be a good
19  substitute for Saltzer in Nampa, for Nampa employers?
20      **A.**  Because there is very few of them, to start with,
21  and then also the convenience of Saltzer, again pharmacy,
22  labs, specialties, a huge primary care base.
23      **Q.**  How does their reputation compare to that of the
24  Saltzer doctors?
25      **A.**  There is no comparison.  They -- hardly anybody

467

1  even knows who they are.  They're --
2          MR. STEIN:  Objection, Your Honor.  Move to
3  strike.  Speculative.
4          THE COURT:  Well, the witness --
5          MR. WILSON:  May I respond, Your Honor?
6          THE COURT:  Yes.  I was going to allow the witness
7  to testify as to her perception, in terms of her marketing
8  her network.  I am going to assume she has not actually done
9  any studies with regard to product familiarity in the area,
10  which is really kind of what she is alluding to.
11      I think what I'll do, I'll strike the last comment.
12  You can rephrase the question though and probably get at it
13  in a somewhat different way.
14          MR. WILSON:  And, of course, the foundation is her
15  having offered networks in the Nampa area for the last 13
16  years and her general perceptions of the preferences.
17          THE COURT:  I think she can testify generally, but
18  in terms of no one knowing who they are, I think that
19  requires something more than just her marketing.  She can
20  certainly offer a comment that, in her perception, people
21  are generally not familiar with it.  That's probably as far
22  as she can go.
23  BY MR. WILSON:
24      **Q.**  Well, what about other providers?  Does Primary
25  Health, to your knowledge, have any primary care physicians

468

1  in Nampa?
2      **A.**  They do.  They are very small.  There is -- if you
3  were to look at -- so if you had a large employer, say, the
4  Nampa School District, that wouldn't -- there is not
5  enough -- they don't have enough providers in the clinic
6  full-time to cover a large employer in Nampa.
7      **Q.**  So would the Primary Health doctor or doctors be a
8  substitute for Saltzer, Saltzer primary care physicians?
9      **A.**  No.
10      **Q.**  And the West Valley Medical Group, do they have
11  primary care physicians in Nampa?
12      **A.**  I think they have one or two.
13      **Q.**  Would that doctor or those two doctors be a
14  substitute for Saltzer primary care physicians to a
15  self-funded employer in Nampa?
16      **A.**  No.
17      **Q.**  As you've built networks over the course of your
18  career as the executive director of IPN, have you had
19  personal experience negotiating contracts and contract
20  amendments with providers?
21      **A.**  Yes.
22      **Q.**  Has one of those providers been St. Luke's?
23      **A.**  Yes.
24      **Q.**  Over your tenure as the executive director of IPN,
25  about how many times would you say that you've negotiated

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 12 of 26

Bench Trial, 09/25/2013

469

1  against St. Luke's.

2      **A.** More times than I can count.

3      **Q.** Generally speaking, Ms. Duer, how would you

4  characterize the tenor of those negotiations?

5      **A.** Nonresponsive on the part of St. Luke's.

6      **Q.** Can you give the court some idea of what you mean

7  by that?

8      **A.** They make it very difficult to try and do business

9  with them.

10      **Q.** What do you mean?

11      **A.** Do you want an example?

12      **Q.** Just like you to explain what you mean by it being

13  very difficult to do business with St. Luke's.

14      **A.** So I'll give you a recent experience.

15  UnitedHealthcare received the TRICARE business under United

16  Military and Veterans Services. They contracted with IPN to

17  be the network for Idaho. They paid us to hire somebody to

18  do that, and they also paid us an access fee to

19  operationally take care of every piece of making sure that

20  there was a 95 percent match to the old network, which was

21  TriWest.

22          And we had to have that done in 90 days, and so I

23  went to all of the hospitals that were in TRICARE, and

24  everyone signed, with the exception of Luke's. Luke's

25  refused to sign with IPN. They went around IPN, went to

470

1  UnitedHealthcare and said they wanted to do a direct

2  contract with them. United told them that they would not do

3  that because they had leased IPN, and they were paying IPN

4  to do exactly that. They later said that they would not

5  participate and that -- if they had to work with IPN -- and

6  so United caved and went ahead and did the contract. United

7  said it was the -- United just had said that it was very

8  hard to --

9          MR. STEIN: Objection, Your Honor. Hearsay.

10          THE COURT: Just a moment. Just a moment.

11      Sustained.

12  BY MR. WILSON:

13      **Q.** When you said "they" refused to participate, who

14  was the "they" you were talking about?

15      **A.** St. Luke's.

16      **Q.** Okay. And ultimately, who were the people that

17  United was trying to get a contract for here? Who were

18  the -- who were the covered lives?

19      **A.** The covered lives were the Mountain Home Air Force

20  division members and their dependents, the retirees, and the

21  southern Idaho part of the Guard and the retirees and all of

22  their dependents.

23      **Q.** So members of the military and their --

24      **A.** Members of the military; correct. It was

25  St. Luke's saying that they would not contract with IPN for

471

1  the military services.

2      **Q.** Lately, who have been the folks at St. Luke's who

3  you've been dealing with?

4      **A.** Steve Drake, Toni Newman, Randy Billings.

5      **Q.** Focusing specifically on Mr. Drake, has he ever

6  told you anything about St. Luke's plans with respect to PPO

7  networks?

8      **A.** He has.

9      **Q.** Approximately when has he told you about those

10  plans?

11      **A.** It was after Randy Billings was employed,

12  probably -- and I'm not sure on this -- probably two years

13  ago.

14      **Q.** Did Mr. Drake communicate that to you in person or

15  over the phone?

16      **A.** In person.

17      **Q.** What did Mr. Drake tell you about St. Luke's plans

18  with respect to PPO networks?

19      **A.** He said St. Luke's plan was to look at each

20  individual insurer and, based on the number of lives and the

21  value that they brought to St. Luke's, they would determine

22  on whether they were going to continue that relationship,

23  and that their goal was to get rid of all PPO networks and

24  have no contracts with them.

25      **Q.** Switching gears over to Saltzer, have you ever

472

1  negotiated with Saltzer Medical Group?

2      **A.** I have.

3      **Q.** Have you ever -- so you have negotiated charges,

4  rates with Saltzer?

5      **A.** I have negotiated fee schedules with them.

6      **Q.** On behalf of what payors?

7      **A.** All of my payors.

8      **Q.** And how did the fee schedule you negotiated on

9  behalf of your payors for the Saltzer Medical Group compare

10  to other providers?

11      **A.** It was higher than other providers.

12      **Q.** Why is that?

13      **A.** Because Saltzer had the clout in Nampa, and

14  if -- I pretty much had to do what they wanted me to do.

15      **Q.** Ms. Duer, as the executive director of IPN, does

16  the St. Luke's Saltzer deal concern you?

17      **A.** Yes.

18      **Q.** Why?

19      **A.** Because I have been dealing with St. Luke's in

20  Twin Falls over pricing, over networks, over employers, and

21  it has been difficult, at best, to deal with them. I had to

22  renegotiate a fee schedule that was lower. I had to bring

23  them up to a higher fee schedule, so I was reimbursing their

24  physicians, the physicians in their system, at a higher rate

25  than what they were previously on. And my fear is if it

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 13 of 26

473

1  happens in Twin and nothing got done with it in Twin, it's
2  going to happen again in Nampa. It's just a matter of time.
3      Q. Well, the next time you're negotiating with
4  St. Luke's, could you just walk away from the negotiating
5  table? Could IPN survive if it didn't have St. Luke's in
6  its network?
7      A. IPN could not survive, in its state, the way it
8  is, with 236,000 lives and be a viable alternative to Blue
9  Cross or Regence if I did not have St. Luke's.
10     Q. You mentioned that Saltzer has been part of the
11 network for quite some time; is that right?
12     A. Right.
13     Q. The IPN network?
14     A. Yes.
15     Q. Has anyone else from Saltzer ever occupied any
16 sort of leadership role within IPN?
17     A. Yes.
18     Q. What is that?
19     A. We have a board member that's represented from
20 Saltzer.
21     Q. How long has Saltzer had a representative on IPN's
22 board?
23     A. Probably eight to ten years.
24     Q. Does Saltzer still have a board position?
25     A. They do.

474

1      Q. Who is that Saltzer representative currently on
2  IPN's board?
3      A. Dr. Randell Page.
4      Q. About how long has Dr. Page been the board
5  representative from Saltzer?
6      A. As long as Saltzer has been on the board.
7      Q. So eight to ten years?
8      A. Mm-hmm; correct.
9      Q. Do you have a board position, Ms. Duer?
10     A. I do.
11     Q. How long have you been on the IPN board?
12     A. A little over 12 years.
13     Q. So for the entire time that Dr. Page has been on
14 the Saltzer board you have been on the board as well?
15     A. Yes.
16     Q. About how many board meetings does IPN, typically,
17 have in a year?
18     A. Currently, we hold board meetings every other
19 month.
20     Q. So you and Dr. Page know each other fairly well;
21 is that fair to say?
22     A. On a business basis, absolutely.
23     Q. Have you spoken to Dr. Page about the St. Luke's
24 Saltzer transaction?
25     A. I have.

475

1      Q. Do you recall any one conversation in particular?
2      A. I do.
3      Q. Approximately when did that conversation occur?
4      A. It was -- it was two -- around two years ago when
5  they -- when Saltzer was in negotiations around the
6  specialists and Treasure Valley Hospital and whether or not
7  they were going to stay together as a group and go with
8  Treasure Valley Hospital or whether they were going to split
9  up.
10     Q. So that was the time period when Saltzer was
11 contemplating a transaction with St. Luke's? Is that
12 accurate?
13     A. Yes.
14     Q. Okay. And where did this conversation occur that
15 you had with Dr. Page?
16     A. In the lobby of PacificSource Health Plans.
17     Q. In what context? Why were you there?
18     A. We had an evening board meeting, and we had taken
19 a break, and I met Randy out in the lobby. And he had given
20 a report in the board on the status of Saltzer, and he was
21 saying that there was probably a chance that they would not
22 go stay independent, that they would probably look at going
23 with St. Luke's.
24     Q. So you had a conversation out in the hall after
25 that with him?

476

1      A. Yes, I did.
2      Q. Was that a private conversation?
3      A. That was a private conversation.
4      Q. During that conversation, what did you say to each
5  other?
6      A. I basically asked him, "What the hell are you
7  doing, Randy?" And we had some discussion on that.
8          And he said, "Linda, I'm damned if I do, I'm
9  damned if I don't. If I do it, everyone will be mad,
10 everyone will be upset. If I don't, St. Luke's will build a
11 clinic wherever I go. They have more money, they have more
12 resources" --
13         MR. STEIN: Objection, Your Honor. Hearsay.
14         MR. WILSON: He's a party opponent, Your Honor.
15         MR. STEIN: Foundation as to what St. Luke's will
16 do.
17         THE COURT: Well, is the objection as to hearsay
18 or is it --
19         MR. STEIN: Well, I'm sorry, Your Honor. Fair
20 enough. It's foundation as to what St. Luke's will do.
21         THE COURT: All right. The objection is
22 overruled. The witness can testify as to what the witness
23 was told about the Saltzer representative's understanding,
24 but it obviously is limited only to his understanding, as
25 part of the negotiations. The objection will be overruled.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 581   Filed 11/04/14   Page 14 of 26

477

1    You may go ahead and answer.
2        THE WITNESS:  Thank you.
3        Randy continued to say, "They have -- they are already
4    building the specialist clinic out by Costco.  There is no
5    way that I can compete with that."
6    BY MR. WILSON:
7        Q.  During this conversation where Dr. Page explained
8    to you why Saltzer was joining St. Luke's, did he say that
9    it had anything to do with Saltzer's sharing St. Luke's
10   vision --
11       MR. STEIN:  Objection.  Leading.
12   BY MR. WILSON:
13       Q.  -- about the triple aim of healthcare?
14       MR. STEIN:  Objection.  Leading.
15       THE COURT:  Sustained.
16   BY MR. WILSON:
17       Q.  Did he mention anything else to you during this
18   conversation about why Saltzer was joining St. Luke's other
19   than he feared St. Luke's and its competitive effect on
20   Saltzer?
21       A.  No.
22       MR. WILSON:  May I have a moment, Your Honor?
23       THE COURT:  Yes.
24       MR. WILSON:  Nothing further, Your Honor.
25       THE COURT:  All right.  Cross.  Mr. Stein.

478

1        MR. STEIN:  Your Honor, I have a couple of topics
2    in my outline that I think could fall in the direct
3    category.  I don't think, again, it will be, I think,
4    overall very time-consuming, but Your Honor's protocol
5    called for us to raise that, so --
6        THE COURT:  Well, my -- what I expressed is to
7    avoid having to call a witness back on multiple occasions, I
8    will allow you to engage in a very limited direct
9    examination as part of your cross, but, of course, you will
10   not then re-call her.  So as long -- Mr. Wilson, is there
11   any concern?
12       MR. WILSON:  This falls into the "you know it when
13   you see it category," Your Honor.
14       THE COURT:  That's why I'm hedging my bets, as
15   well.
16       Could you -- well, let's see how it goes.  And if it
17   starts to get, you know -- Mr. Wilson, set your clock, and
18   if you sense that it's getting a little disproportionate to
19   the extent of your direct, then I'll -- unfortunately, I'll
20   have to call Ms. Duer back and have her testify later in the
21   proceeding, as well.
22       Go ahead and proceed, Mr. Stein.
23                    CROSS-EXAMINATION
24   BY MR. STEIN:
25       Q.  Ms. Duer, before you worked for IPN you were

479

1    employed by Blue Cross of Idaho; right?
2        A.  Before I worked for IPN, I was employed by
3    AmeriBen.
4        Q.  Before you were employed by AmeriBen, you were
5    employed by Blue Cross of Idaho?
6        A.  Correct.
7        Q.  Blue Cross of Idaho is the 800-pound gorilla in
8    this market, aren't they?
9        A.  Yes.
10       Q.  Now, another one of the board members for IPN is
11   Dr. Jeffrey Hessing; right?
12       A.  Correct.
13       Q.  Dr. Jeffrey Hessing is the medical director of
14   Plaintiff Treasure Valley Hospital?
15       A.  Okay.
16       Q.  Is that right?
17       A.  I don't know if he is or not.  If you say he is --
18       Q.  Do you know if Dr. Hessing is the medical director
19   of Treasure Valley Hospital?
20       A.  I do not know that.
21       Q.  Do you know if he is affiliated with Treasure
22   Valley Hospital?
23       A.  Yes, I know that.
24       Q.  And he is affiliated with Treasure Valley
25   Hospital; right?

480

1        A.  Correct.
2        Q.  Now, IPN is also owned 60 percent by
3    PacificSource; is that right?
4        A.  Correct.
5        Q.  PacificSource is an insurance company?
6        A.  Correct.
7        Q.  They compete against SelectHealth; is that right?
8        A.  I would not know that.  That -- I'm not
9    PacificSource.
10       Q.  Does SelectHealth compete against IPN?
11       A.  SelectHealth?  Correct.  SelectHealth are you
12   saying?
13       Q.  Yes.
14       A.  No.  They're an insurance company.
15       (Clip of video deposition played.)
16   BY MR. STEIN:
17       Q.  You were asked those questions, and you gave those
18   answers at your deposition in this case, Ms. Duer?
19       A.  Yes.
20       Q.  Correct?
21       A.  Yes.
22       Q.  And SelectHealth is aligned with St. Luke's;
23   right?
24       A.  Yes.
25       Q.  And IPN, itself, competes for business like the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW  Document 551  Filed 11/04/14  Page 15 of 26

481

1  UnitedHealthcare business against other networks in Idaho;
2  is that right?
3  **A.  Would you define "other networks"?**
4  **Q.**  Well, are there any other networks of providers
5  like IPN in the state of Idaho?
6  **A.  There is a smaller one, First Choice, there is**
7  **First Health, that are networks.**
8  **Q.**  Did you forget about BrightPath?
9  **A.  BrightPath, the alliance.**
10 **Q.**  BrightPath is a competitor of IPN; right?
11 **A.  Correct.**
12 **Q.**  BrightPath happens to be affiliated with
13 St. Luke's; is that right?
14 **A.  Correct.**
15 **Q.**  And St. Luke's is out there in the market
16 encouraging employers to switch from IPN to BrightPath;
17 right?
18 **A.  Yes.**
19 **Q.**  They're competing against you; correct?
20 **A.  Yes.**
21 **Q.**  Now, on the testimony Mr. -- I'm sorry -- in the
22 UnitedHealthcare contract you were talking about -- let me
23 make sure I understand this.  IPN has a contract with United
24 for TRICARE; is that right?
25 **A.  Correct.**

482

1  **Q.**  And St. Luke's didn't want to deal with IPN to get
2  to United, St. Luke's wanted to deal with United directly;
3  is that right?
4  **A.  Correct.**
5  **Q.**  And so they went around IPN and said, We,
6  St. Luke's, would like to contract with you, United, for
7  this TRICARE contract without going through IPN; right?
8  **A.  Yes.**
9  **Q.**  You don't have very good relationships with the
10 people at St. Luke's you negotiate with, do you?
11 **A.  I think I have very good relationships with them.**
12 **Q.**  With Steve Drake?
13 **A.  I consider him a friend.**
14 **Q.**  Haven't you described your relationship with him
15 as passive-aggressive?
16 **A.  On which side?**
17 **Q.**  On your side.
18 **A.  On my side?  Absolutely not.**
19 **Q.**  On his side?
20 **A.  Yes.**
21 **Q.**  And, in fact, you've gone from having a tenuous
22 relationship to Mr. Drake -- with Mr. Drake to no
23 relationship; isn't that right?
24 **A.  No.**
25          (Clip of video deposition played.)

483

1  BY MR. STEIN:
2  **Q.**  You were asked that question, and you gave that
3  answer at your deposition?
4  **A.  Yes.**
5  **Q.**  Now, in addition to the competitive threats that
6  IPN faces from St. Luke's and other networks, IPN is facing
7  competitive pressures in the market arising out of the
8  changes brought about by the Affordable Care Act; isn't that
9  right?
10 **A.  No, not currently.  There are some changes coming,**
11 **but, pretty much, you can see by the membership of 237,000**
12 **that it is still a very, very strong option in Idaho.**
13 **Q.**  But you have concerns about whether networks like
14 IPN can survive under healthcare reform?
15 **A.  Correct.**
16 **Q.**  One reason you feel that way is that healthcare is
17 moving from a traditional fee-for-service environment to
18 more accountable care; right?
19 **A.  Correct.**
20 **Q.**  The problem is IPN doesn't engage in any clinical
21 quality improvement activities; is that right?
22 **A.  Correct.**
23 **Q.**  IPN is not a clinically integrated network?
24 **A.  No.**
25 **Q.**  And IPN doesn't have any plans to become a

484

1  clinically integrated network; right?
2  **A.  Correct.**
3  **Q.**  And the reason for that is because it's hard to be
4  a clinically integrated network without owning hospitals or
5  physician practices; right?
6  **A.  Without having the direct relationship, correct.**
7  **Q.**  Right.  Because you have to have that direct
8  relationship with the providers in order to be able to
9  manage the care?
10 **A.  It has to be a direct relationship.  It doesn't**
11 **necessarily have to be an ownership position.**
12 **Q.**  But you need a closer relationship than what IPN
13 has with its network in order to be able to manage the care?
14 **A.  You have to bring the payor, who is assuming risk,**
15 **with the physician or the hospital, who is also assuming**
16 **risk.**
17 **Q.**  Now, there are networks in Idaho that don't have
18 St. Luke's in the network; right?
19 **A.  Yes.**
20 **Q.**  So Saint Al's doesn't have St. Luke's in the
21 network?
22 **A.  Correct.**
23 **Q.**  First Choice doesn't have St. Al's -- I'm
24 sorry -- First Choice doesn't have St. Luke's in the
25 network?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/25/2013

485

1   A.   Correct.

2   Q.   Micron doesn't have St. Luke's in the network?

3   A.   Correct.

4   Q.   And you have been having discussions with brokers
5   about tiered products, where Saint Al's would be at a
6   preferred tier and IPN would be at a secondary tier; is that
7   right?

8   A.   Correct.

9   Q.   And you mentioned Paul's Market. Paul's Markets
10  is an example of one employer where you've got this tiered
11  relationship; is that right?

12  A.   Yes.

13  Q.   And when we are talking about a tiered
14  relationship, what that means is if a Paul's Market employee
15  goes to a Saint Al's facility, there is a better benefit for
16  them than if they go to a St. Luke's facility; is that
17  right?

18  A.   Yes.

19  Q.   There is financial incentives to steer employees
20  from St. Luke's to Saint Al's; is that right?

21  A.   Yes.

22  Q.   Paul's Market has employees in Nampa; is that
23  right?

24  A.   Yes.

25       MR. WILSON: Your Honor, may I interpose here? I

486

1   would suggest that if there is any part of Mr. Stein's
2   examination that is direct and beyond the scope, that he
3   conduct it like direct examination without leading
4   questions.

5        THE COURT: It must. Counsel, unless you want to
6   suggest that the witness is hostile in some fashion, which I
7   don't think has been established at this point, so you will
8   need to proceed by nonleading questions.

9        MR. STEIN: I'm moving back to the cross,
10  Your Honor, but I will, of course, heed the court's
11  admonition.

12       THE COURT: Thank you.

13  BY MR. STEIN:

14  Q.   Ms. Duer, you've not had any IPN customers tell
15  you that they will not contract with IPN if Saltzer is not
16  included in IPN's network; correct?

17  A.   Well, yes, because we have them in the network.

18  Q.   I'm sorry. When you say "yes" you mean "yes, you
19  have had no such conversations"; right?

20  A.   Yes.

21  Q.   And you have not talked to any employers or payors
22  about whether they would be willing to contract with IPN if
23  IPN had only Saint Al's primary care providers and
24  independent primary care providers in Nampa; correct?

25  A.   Would you repeat that, please?

487

1   Q.   You have not talked to any employers or payors
2   about whether they would be willing to contract with IPN if
3   IPN in Nampa had only Saint Al's primary care providers and
4   independent primary care providers?

5   A.   No.

6   Q.   I'm correct, you've not had such conversations?

7   A.   Yes. Sorry. Yes.

8   Q.   You don't know what portion of Nampa residents
9   that are covered by IPN's customers see Saltzer physicians;
10  correct?

11  A.   Correct.

12  Q.   You don't know how many primary care physicians
13  your customers have determined they need in Nampa for their
14  networks to be considered adequate?

15  A.   Yes.

16  Q.   You have not studied the capacity of SAMG or
17  independent primary care providers in Nampa to be able to
18  accept patients from Saltzer if patients had to switch
19  providers; correct?

20  A.   We have done a study since my deposition.

21  Q.   At the time of your deposition you hadn't -- you'd
22  done no --

23  A.   No.

24  Q.   -- such study; correct?

25  A.   Correct.

488

1   Q.   When the Imagine Health Network was putting
2   together a plan for Micron, back in the 2007-2008 time
3   period, did you approach St. Luke's about how they intended
4   to proceed with regard to that network?

5   A.   I did.

6   Q.   Who did you talk to?

7   A.   Steve Drake.

8   Q.   What did he tell you?

9        MR. WILSON: Objection. Hearsay.

10       THE COURT: Sustained.

11  BY MR. STEIN:

12  Q.   Did IPN bid to participate in the Micron network?

13  A.   Imagine approached us and asked what it would take
14  to lease our network.

15  Q.   What did you tell them?

16  A.   I told them they could lease the network. They
17  chose not to.

18  Q.   Did you submit a bid?

19  A.   There was not a request for a proposal given to
20  IPN.

21  Q.   So Imagine did not seek IPN's participation? Is
22  that what you're saying?

23  A.   Imagine called us, and we had several
24  conversations.

25  Q.   But they never, ultimately, asked you to bid to

489

1  participate in the network?
2      A.   It isn't a bid.  It was negotiations.  We weren't
3  bidding on anything.  We were asked to see if we could do a
4  match based on their reimbursement, what they wanted to
5  offer, and then there were several other hoops that the
6  physicians would have to jump through in order to
7  participate in the Imagine network.
8      Q.   And you told Imagine you were not interested in
9  participating in the network?
10     A.   After several rounds of negotiations, yes.
11     Q.   Are United and Aetna customers of IPN?
12     A.   Yes.
13     Q.   Part of your job at IPN involves negotiating with
14 hospitals like Saint Al's and St. Luke's on behalf of payor
15 customers?
16     A.   Yes.
17     Q.   And that negotiation includes reimbursement rates
18 that you'll pay to the hospitals?
19     A.   Yes.
20     Q.   And the -- what's the primary methodology that IPN
21 uses to pay hospitals?
22     A.   It's what we're allowed to negotiate.  Currently,
23 with the exception of one payor, we are on a discount off of
24 charges, off of billed charges.
25     Q.   And so, just for background, a hospital will

490

1  typically have a chargemaster that's got a -- bill charges
2  or list prices for all of its services?
3      A.   Correct.
4      Q.   And then IPN will negotiate a discount off of
5  those charges?
6      A.   Yes.
7      Q.   So let's say hospital X you would negotiate an
8  agreement of, let's say, 12 percent off their charges, and
9  that would be the price that IPN's customers would pay for
10 hospital services?
11     A.   That would be the base of what they would pay
12 less -- then they would take a deductible and coinsurance,
13 and such, after that.
14     Q.   So if hospital A and hospital B have the same
15 exact charges, but hospital A gives you a higher discount,
16 then IPN members are going to pay less for services at
17 hospital A than they would at hospital B, holding everything
18 else equal; is that right?
19     A.   Would you repeat that?
20     Q.   Sure.  If hospital A and hospital B have the same
21 charges, they actually charge the same thing, but hospital A
22 gives IPN a higher discount, then holding copayments,
23 deductibles, all that other stuff equal, IPN customers who
24 go to hospital A are going to pay less for services than
25 they would if they went to hospital B?

491

1      A.   That is not black and white.  You could probably
2  do that off of a room-and-board charge, you could compare
3  that, but there are -- there so many other things that go
4  into coding and grouping and bundling charges that it would
5  be very hard to just say, based on this charge, and you have
6  a better discount at one hospital than the other, that it's
7  a better deal for the member.
8      Q.   Now, you negotiate hospital reimbursement on
9  behalf of Aetna; is that right?  Strike that.  Let me back
10 up for a second.
11     Aetna is a customer of IPN; is that right?
12     A.   For certain products, they are.
13     Q.   And you negotiate with hospitals like Saint Al's
14 and St. Luke's on Aetna's behalf?
15     A.   Yes.
16     Q.   And has Aetna talked to you about the prices
17 charged by Saint Al's?
18     A.   Yes.
19     Q.   And what have they told you?
20     A.   What period of time?
21     Q.   Well, were there ever any complaints about Saint
22 Al's charges?
23     A.   There were not complaints specific to Saint Al's.
24 The complaints were on the hospitals.  Aetna felt they had
25 done a study that was published, and they shared that

492

1  document with me and said they had dropped from being second
2  or third in the market to being fourth, and they were
3  looking at it as hospital charges.  And so they were very
4  concerned about the hospital charges, so they asked me if I
5  would be willing to do a directed product with the hospitals
6  that they felt were more in line with what they saw
7  nationally.
8      Q.   Didn't they tell you that Saint Al's charges were
9  higher than St. Luke's?
10     A.   Correct.
11     Q.   And that's -- and you took that information and as
12 part of your negotiations, you conveyed that to Saint Al's;
13 isn't that right?
14     A.   I did.
15     Q.   And with regard to the amount of discount that you
16 received, you get a better discount off of charges from
17 St. Luke's than you do from Saint Al's; isn't that right?
18     A.   If you are looking at just straight discounts,
19 yes, the discount at Luke's is more than the discount at
20 Al's.
21     Q.   Right.  So Saint Al's has higher charges and lower
22 discounts -- strike that.
23     Saint Al's has higher charges and less of a discount
24 than St. Luke's for IPN; correct?
25     A.   In the past, that would be correct.  Currently --

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                                    Bench trial, 09/25/2013

493

1   Q. That was -- that was correct as of last year,
2   2012, when you had these conversations?
3       A. The conversations I had were in '11 and part of
4   '12. And you would have to look at charge by charge to make
5   that determination. What might be cheaper at Al's, say, an
6   orthopedic procedure, might be higher at St. Luke's, but
7   then a neurology procedure done at Al's may be more
8   expensive than what is done at Luke's.
9       Q. Right. But the analysis that you -- that Aetna
10  provided you and that you discussed with Saint Al's showed
11  that, overall, Saint Al's was more expensive for Aetna in
12  terms of its charges and discounts than St. Luke's?
13      A. Based on 2010 and 2011 data, yes.
14      Q. Well, that was the most recent data you had;
15  right?
16      A. At the time of the deposition, yes.
17      Q. You talked a little bit about Twin Falls, and I
18  found interesting your characterization of the fee schedule
19  issue. Let's unpack that a little bit.
20      IPN has a fee schedule that applies called the
21  "Southwest Idaho Fee Schedule"; is that right?
22      A. That applies to?
23      Q. That applies to a region of Idaho that IPN
24  characterizes as "Southwest Idaho? Is that right?
25      A. It is a fee schedule that we have developed not so

494

1   much for the region. We called it that because when we
2   first negotiated that fee schedule, most of the physicians
3   were in Southwest Idaho.
4       Q. But that's a fee schedule that's uniform for all
5   the providers that are on it; right? That's the standard
6   fee schedule in that part of Idaho for IPN?
7       A. It's the standard fee schedule for physicians that
8   are on that fee schedule, yes.
9       Q. Right. And so when you were testifying that you
10  had to raise the amounts you were paying to the Twin
11  physicians, what that means is you raised the amounts from
12  amounts below the standardized fee schedule, and now they're
13  getting the same statewide fee schedule or the SWID fee
14  schedule as everyone else; right?
15      A. No. SWID is a fee schedule that was negotiated
16  for certain specialties. It has grown, and there are many
17  physicians on that, but we have multiple fee schedules
18  around the state, EI103, EI105, rural -- oh, let's see, we
19  have another one.
20      Q. Ms. Duer?
21      A. Yes.
22      Q. The amount of the money that you are paying, the
23  fee schedule for the Twin Falls physician, is an amount that
24  you brought them up to the standardized fee schedule that's
25  used by IPN for other physicians in Idaho; correct?

495

1       A. It is not a standardized fee schedule, but, yes,
2   we brought them up to be the same as the SWID fee schedule.
3
4
5
6
7
8
9
10
11
12
13                        REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

496

1
2                         REDACTED
3       MR. STEIN: No further questions.
4       THE COURT: Redirect -- oh, yes.
5       MR. JULIAN: Your Honor, if I can just ask a
6   couple questions.
7       THE COURT: You may, Mr. Julian.
8                   CROSS-EXAMINATION
9   BY MR. JULIAN:
10      Q. Good morning, Ms. Duer.
11      A. Good morning.
12      Q. My name is Brian Julian. I represent Saltzer. I
13  just want to ask you a couple questions. You mentioned a
14  conversation that you had with Dr. Randell Page. Do you
15  recall that?
16      A. Yes.
17      Q. When was that conversation?
18      A. I can't be specific. It was after a board
19  meeting. It was around the time when Saltzer was talking to
20  Treasure Valley over the specialists, and it was --
21      Q. You said maybe a couple years ago, 2010?
22      A. I don't think it was '10. I mean, I would have to
23  go back. I could find the board meeting minutes, and I
24  could tell you which one it was, but --
25      Q. Do you know if Saltzer had even taken a vote to

497

1  align itself with St. Luke's at the time of that
2  conversation?
3  **A.  I was privy to some conversations that said that**
4  **they had -- they felt they had X percent of physicians that**
5  **would put the vote over, and then there were other**
6  **conversations I had, depending on who the physician was,**
7  **saying, "There's no way we will block that no matter what."**
8  **Q.**  And going back to my question:  At the time of the
9  conversation, do you know if Saltzer had even taken a vote
10  then?
11  **A.  No, I don't.**
12  **Q.**  And did -- did Dr. Page say on behalf of Saltzer I
13  am giving you this statement, or was it more a friendly
14  conversation, "I'll be damned if I do and damned if I
15  don't"?
16  **A.  I think it was both.**
17  **Q.**  And what did he say that represented he was
18  speaking on behalf of Saltzer?
19  **A.  Because he represents Saltzer on our board.**
20  **Q.**  Okay.  But is he president of Saltzer?
21  **A.  He was president of Saltzer.**
22  **Q.**  At the time?
23  **A.  At the time of what?**
24  **Q.**  The conversation.
25  **A.  No, he was not.**

498

1  **Q.**  John Kaiser was the president?
2  **A.  Correct.**
3  **Q.**  You interpreted that he was speaking on behalf of
4  every shareholder at Saltzer when he said, "I'll be damned
5  if I do and damned if I don't"?
6  **A.  Whether Randy is president or not, Randy carries a**
7  **lot of clout in Saltzer.  And he has represented Saltzer and**
8  **he represents the shares of IPN.**
9      MR. JULIAN:  Thank you.
10     But for the record, Your Honor, because this is a court
11  trial, I'm going to move to strike the testimony of Randell
12  Page that was done as an individual shareholder.  There is
13  nothing to say that this was done on behalf of Saltzer.
14  Saltzer is a corporation.  Dr. Page is entitled to give
15  whatever he wants, but it's classic hearsay.  It does not
16  come under Rule 801 as a statement of a party opponent.
17  Party opponent is Saltzer.
18     MR. ETTINGER:  Your Honor, Dr. Page is chair of
19  the contracting committee of Saltzer, he's on the executive
20  committee of Saltzer.  The evidence shows he played a major
21  role in the negotiations of St. Luke's.  If that's not a
22  party admission, I don't know what is.  You don't have to
23  speak ex cathedra for it to be a party admission.
24     THE COURT:  Well, the rule also refers to an
25  individual, I think, speaking in a representative capacity.

499

1  He presumably was on the board in that capacity.  I'm going
2  to overrule the objection.  I understand the concern.
3  Certainly, Dr. Page -- is Dr. Page identified as a witness?
4      MR. JULIAN:  He is identified, but I believe only
5  his deposition is scheduled to be played at this point.
6      THE COURT:  All right.  Well, I'm going to
7  overrule the objection.  I think the rule is a little
8  broader than that.  You don't have to be specifically
9  designated as a spokesman.  For example, I think an employee
10  speaking within the scope of their -- of their authority or
11  their employment also falls within the provision of Rule
12  801(d).  And I think for that reason I will overrule the
13  objection.  Given the fact that he was at the meeting,
14  although this was an aside after the meeting, the discussion
15  clearly had to do with a decision being made by Saltzer.
16  And I think, therefore, the witness -- witnesses' out of
17  court declaration will not be deemed hearsay under Rule
18  801(d).
19     Redirect.
20     MR. WILSON:  Thank you, Your Honor.
21         REDIRECT EXAMINATION
22  BY MR. WILSON:
23
24      REDACTED
25

500

17     MR. STEIN:  Objection.  Foundation.
18     THE COURT:  Sustained.
19     MR. STEIN:  I would move to strike that testimony,
20  Your Honor.
21     THE COURT:  I will strike the testimony.  I'll
22  leave it at that.
23  BY MR. WILSON:
24  **Q.**  The work you have done since your deposition, what
25  sorts of materials have you relied upon to investigate

(REDACTED)

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 20 of 26

501

1  whether -- how the Saint Al's charges compare to the
2  St. Luke's charges?
3          MR. STEIN:  Your Honor, I'm going to object to
4  this.  This is their witness.  If they want to rely on new
5  things that they want to elicit since her deposition, I
6  don't really think that's fair.  This is somebody that
7  they're --
8          THE COURT:  Mr. Wilson, was there --
9          MR. STEIN:  In fact, Your Honor, two weeks ago, I
10 believe we got an email from Mr. Gourley's office providing
11 another document that was purporting to be a study, but it
12 was the same document I asked Ms. Duer about.  So if there
13 is some new analysis, it hasn't been provided to us.  And I
14 suspect that the email that we got from IPN's counsel was
15 not unsolicited, but, of course, I'm not privy to those
16 conversations.
17         THE COURT:  Mr. Wilson, do we have other evidence
18 that's going to come in on this issue?  I'm very reluctant
19 to have the witness testify during a deposition, then,
20 perhaps, when an issue arises, conduct additional inquiry,
21 produce a report which is never disclosed to counsel and
22 then come in and testify about that additional information.
23 That's one of the reasons we close discovery at some point,
24 so that we know that we have a nonmoving target to deal
25 with.

502

1          MR. WILSON:  Fair enough, Your Honor.  I would
2  just note that one of the unique aspects to this case is
3  that it's not a fixed moment in time.  These -- the harm
4  that's resulting is ongoing, and fixing someone's knowledge
5  as of the date of their deposition is problematic for that
6  reason.
7          That being said, I recognize the court's concerns.  And
8  I have no further questions.
9          THE COURT:  All right.  Anything else, Counsel?
10         MR. STEIN:  Just brief.
11         THE COURT:  Very briefly.
12              RECROSS-EXAMINATION
13 BY MR. STEIN:
14     **Q.**  Ms. Duer, did I understand you to suggest that the
15 reason you -- that the -- strike that.
16
17
18
19
20              REDACTED
21
22
23
24
25

503

1
2              REDACTED
3
4
5
6          MR. STEIN:  Your Honor, I would move to strike
7  that testimony and ask the witness be directed to answer the
8  question.
9          THE COURT:  Let's -- rephrase the question one
10 more time.
11         Ms. Duer, listen carefully to counsel's question.
12 Mr. Wilson will -- I'm going to give him a chance to come
13 back, and he will, perhaps, give you a chance to explain in
14 more detail.  But listen to Mr. Stein's question, answer it
15 directly, and then we can move along a little more
16 efficiently.
17         Mr. Stein, rephrase the question.
18 BY MR. STEIN:
19
20              REDACTED
21
22
23
24         THE COURT:  Mr. Wilson, I am assuming you have a
25 little more, I guess, we'll call that "re-redirect."

504

1          MR. WILSON:  Thank you, Your Honor.
2              FURTHER REDIRECT EXAMINATION
3  BY MR. WILSON:
4
5
6
7
8
9
10
11
12              REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 1:12-cv-00560-BLW v. Document 581 Filed 11/04/14 Page 21 of 26

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench trial, 09/25/2013

505

REDACTED

9   MR. WILSON: No further questions.
10   MR. STEIN: Nothing further, Your Honor.
11   THE COURT: All right. You may step -- I'm sorry.
12   Mr. Julian?
13   MR. JULIAN: No.
14   THE COURT: All right. You may step down.
15   I see we're actually, I guess, where we would take the
16   break. I kind of lost track of time. So the timing was
17   very good.
18   Counsel, we will take a 15-minute recess at this time.
19   When we reconvene will it be an AEO witness?
20   MS. DUKE: It's Max Reiboldt. And the great
21   majority of his has been marked "AEO," so I think we need to
22   close the courtroom for that.
23   THE COURT: Are we going to get to a point where
24   the court will be open? I mean, I wonder if we ought
25   to -- well, you know, if we have people who are actually

506

1   waiting, it would be helpful -- and, perhaps, you could even
2   share with -- I don't know who it is. We've had people ask
3   that we call them and let them know when the courtroom is
4   opened. But, perhaps, you could share the schedule with
5   them in advance so they are not inconvenienced by either
6   waiting around the courthouse or not. But I'll leave it up
7   to counsel to work that out.
8   All right. We'll be in recess for 15 minutes.
9   (Recess.)
10   ****** COURTROOM REMAINS CLOSED TO THE PUBLIC ******
11   THE COURT: Looks like our attendance is
12   diminishing even more.
13   I believe, Ms. Duke or Mr. Greene, someone is going to
14   announce the next witness.
15   MS. DUKE: Correct. It's Max Reiboldt.
16   THE COURT: And this is a substantial amount of
17   AEO testimony?
18   MS. DUKE: Yes, a substantial amount is.
19   THE COURT: Okay. All right.
20   MR. JULIAN: Your Honor, and this deals primarily
21   with Saltzer planning and in terms of the agreement, I have
22   invited Bill Savage to attend, and I have also invited
23   Christy Neuhoff of St. Luke's. We have no problem with
24   sharing this information.
25   THE COURT: All right. Very well. Again, you

507

1   move to publish the deposition of Mr. Reiboldt?
2   MS. DUKE: Yes, Your Honor.
3   THE COURT: I'll grant that motion. You don't
4   have the original currently?
5   MS. DUKE: I don't have that, but I can have
6   that --
7   THE COURT: If you have that at some point,
8   certainly no later than tomorrow, so that we can formally
9   publish that for the record.
10   All right. Proceed.
11   MS. DUKE: Your Honor, just to give you an
12   estimate, it's about 60 minutes long.
13   THE COURT: Sixty? Six zero?
14   MS. DUKE: Yes, six zero. Just so you have an
15   appreciation.
16   (Testimony of Max Reiboldt via video deposition.)
17   (Video deposition paused.)
18   MS. DUKE: Your Honor, would it be helpful for me
19   to identify the corresponding trial exhibit number? We
20   have that in the --
21   THE COURT: It would very much so. I was just
22   kind of left to guess in that regard.
23   MS. DUKE: Yeah. So this is Exhibit 1143.
24   THE COURT: Now, there was also his kind of CV
25   or --

508

1   MS. DUKE: Correct. And his CV was 1142.
2   THE COURT: Give me just a moment. All right.
3   MS. DUKE: Thank you, Your Honor.
4   THE COURT: And you will move their admission at
5   the conclusion?
6   MS. DUKE: Yes, Your Honor.
7   THE COURT: Go ahead and proceed.
8   (Video deposition of Max Reiboldt resumed.)
9   MS. DUKE: That will be Exhibit 1144, Your Honor.
10   (Video deposition paused.)
11   MS. DUKE: Sorry about that, Your Honor.
12   THE COURT: This is now Exhibit 1146?
13   MS. DUKE: Yes, Your Honor.
14   (Video deposition of Max Reiboldt resumed.)
15   MS. DUKE: These are 1148.
16   That would be 1149.
17   That's 1143 again.
18   1142.
19   THE COURT: Sorry. 11 what?
20   MS. DUKE: -42.
21   1153.
22   MS. DUKE: 1154.
23   That is 1154.
24   That's Exhibit 1156.
25   That's 1144.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 581   Filed 11/04/14   Page 22 of 26

509

1  This will be Exhibit 1157.
2  These are 1144 again.
3  1160.
4  That's 1150.
5  That's 1144 again.
6  (Video deposition of Max Reiboldt concluded.)
7  MS. DUKE: That's the end of that video,
8  Your Honor.
9  THE COURT: All right. The next witness?
10  MS. DUKE: Sure. But prior to that, just
11  housekeeping of admitting the exhibits. So we would be
12  moving to move for admission Exhibit 1996, 1997 --
13  THE COURT: Give me just one moment.
14  MS. DUKE: And 1996 and 1997 were from
15  Mr. Clement's yesterday, and they weren't objected to in the
16  exhibit list.
17  MR. SINCLAIR: I have noted that we objected as
18  untimely.
19  MS. DUKE: For 1996 and -97?
20  MR. SINCLAIR: Correct.
21  THE COURT: I don't have any notes here, so --
22  MS. DUKE: What's occurred by both parties is
23  there have been exhibits that have been exchanged -- put on
24  the exhibit list but have been exchanged in discovery all
25  the way up through this weekend for St. Luke's and this

510

1  weekend for the plaintiffs. Apparently they have made an
2  untimely objection to the 1996 and 1997.
3  MR. SINCLAIR: That's my understanding.
4  THE COURT: Well, what is the -- what is an
5  untimeliness objection? They were late disclosed?
6  MR. SINCLAIR: Correct.
7  MS. DUKE: On the exhibit list. They had been
8  disclosed in discovery but were placed on the exhibit list
9  sometime last week.
10  MR. SINCLAIR: I would have to verify that.
11  Were they disclosed in discovery?
12  MS. TIMOSCHIEK: Yes.
13  MR. SINCLAIR: They were simply late on the
14  exhibit list?
15  MS. TIMOSCHIEK: Yes.
16  MR. SINCLAIR: That's correct. They were
17  disclosed in discovery, but they were just on the exhibit
18  list in the last few days.
19  THE COURT: Well, what prejudice was there? I
20  mean, the problem is that's a hard objection for me to
21  sustain just without -- it's not like any rule of evidence.
22  So, if there is prejudice, then --
23  MR. SINCLAIR: Well, this is the challenge of
24  addressing it the next morning. I can't tell you because I
25  don't remember even what the exhibits are, much less --

511

1  THE COURT: Well, I'll reserve ruling on that.
2  Why don't you discuss among yourselves. I would strongly
3  suggest a goose-gander-type approach to this and perhaps
4  both be a bit understanding that that's going to happen. If
5  one side is much more guilty of that than the other, then
6  that may be an issue. But assuming that there have been
7  problems from both sides, my inclination would be to simply
8  let them all in except upon a showing of actual prejudice to
9  a party who simply could not be prepared to respond during
10  the examination.
11  So I'm going to reserve ruling on 1996, 1997, let
12  counsel review it and see if you can work it out.
13  MS. DUKE: Thank you, Your Honor.
14  So, then, with respect to this deposition, 1142 --
15  THE COURT: Okay. Just a moment. Let me -- okay.
16  MR. SINCLAIR: No objection.
17  THE COURT: I have 1142 and 1143 --
18  MR. SINCLAIR: No objection.
19  THE COURT: -- and 1149, those for which there
20  appears to be no objections.
21  MR. SINCLAIR: Right.
22  THE COURT: 1153, -54 -- I'm not sure if 1155 was
23  included, but 1157, 1156, and 1160 were all apparently
24  stipulated to?
25  MR. SINCLAIR: I don't have 1155 on here, either.

512

1  I am checking. The rest that you read are correct.
2  MS. DUKE: Your Honor, 1155 is not on there. So
3  the unobjected-to Reiboldt exhibits are 1142, 1143, 1149,
4  1150, 1153, 1154 --
5  THE COURT: Just a moment. 1150 was included?
6  MS. DUKE: Yes, Your Honor.
7  MR. SINCLAIR: Correct.
8  THE COURT: Then 11 what?
9  MS. DUKE: 1153, 1154, 1156.
10  THE COURT: I have 1157 and 1160.
11  MS. DUKE: And then 1157 and 1160. Those were all
12  unobjected to.
13  THE COURT: Right. So I'm admitting all of those
14  exhibits.
15  (Plaintiffs' Exhibit Nos. 1142, 1143, 1149, 1150, 1153,
16  1154, 1156, 1157, 1160 admitted.)
17  THE COURT: Now, with regard to those for which
18  there were objections would include 1144 --
19  MS. DUKE: -44.
20  THE COURT: 1144, 1146, and 1152.
21  MR. SINCLAIR: And 1148.
22  THE COURT: I don't have 1148 as having been
23  offered.
24  MS. DUKE: Yes. It's also being offered.
25  THE COURT: All right. I did not -- my notes are

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 23 of 26

513

1 a little behind. Okay. The problem is I didn't have a
2 chance to see this in context. There is a hearsay objection
3 and foundation objection, I think, as to all of these.
4         MR. SINCLAIR: Right.
5         THE COURT: How do we get around that problem?
6 Ms. Duke? Do you want me to go back and review where those
7 are referenced, and then I can make a determination?
8         MS. DUKE: I think you're going to have to because
9 you'll see throughout a lot of the clips, there was a great
10 deal of foundation laid with respect to Mr. Reiboldt relying
11 on Ms. Greeter and the notes that she would take, him
12 refreshing his recollection with respect to many of the
13 portions in the notes, some notes that were his that he took
14 as well.
15         So, I think, unfortunately, you are going to have to
16 look at that on a reference-by-reference basis.
17         THE COURT: Well, part of the problem with a
18 videotape deposition is that, once I rule, you don't have
19 any opportunity to kind of cure whatever the problem is that
20 I observed, but that is where we are. So, in order to save
21 time, rather than going back and reviewing where each of
22 those were referenced, I think what we will do is, since we
23 are going to be reviewing the depositions anyway to
24 determine and resolve objections, we will also resolve
25 objections to the exhibits at the same time.

514

1         Counsel, to be quite honest with you, what we may do is
2 write the decision, see if these exhibits or the objected-to
3 testimony really is even going to be considered by the
4 court, and if it's not, I'll probably not waste the time to
5 try to rule on it, since it won't bear upon the court's
6 decision anyway.
7         Unfortunately, this is going to be a rather difficult
8 task, although I'm sure Mr. Metcalf and I are up to it. We
9 will need the kind of cross-reference that you were
10 providing to what the trial exhibits were versus what the
11 deposition exhibits were so that as we go through that we
12 can sort out where that information is.
13         So what I will do, then, is reserve ruling on
14 exhibits -- the objections to Exhibits 1144, 1146, 1148, and
15 1152 with the understanding that we will resolve that in the
16 court's written decision.
17         MS. DUKE: Thank you, Your Honor.
18         THE COURT: Is that agreeable?
19         MS. DUKE: Yes.
20         THE COURT: Mr. Sinclair?
21         MR. SINCLAIR: Yes.
22         THE COURT: All right. Counsel, I just need to
23 make -- I try to keep notes, and I want to make sure I don't
24 forget what this note means. So give me just a moment
25 to --

515

1         Now, Ms. Duke, the plaintiffs have another witness to
2 call?
3         MR. WILSON: Your Honor, if I may?
4         THE COURT: Yes.
5         MR. WILSON: Just a point of clarification. In a
6 situation like that where we have moved for admission and
7 you have reserved ruling, how does that eight-to-ten-minute
8 interchange right there get counted against --
9 unfortunately, we're in a situation where minutes matter.
10 And just for planning purposes, it would be helpful to know
11 how the court is going to handle that.
12         THE COURT: Probably split the time equally.
13 Because there is objections which I have to resolve, and I
14 don't know how to address it otherwise. So I think we'll
15 find, at the end of the day, it's not that long because it
16 probably just took a couple of minutes, and so that's
17 probably how we will resolve it. All right?
18         MR. WILSON: Thank you.
19         THE COURT: Are plaintiffs ready to call their
20 next witness?
21         MS. DUKE: Yes. We are going to be calling
22 Dr. Page by video.
23         THE COURT: And that's AEO again?
24         MS. DUKE: It is.
25         THE COURT: Then, again, I'll direct the --

516

1 Ms. Messuri to publish the deposition of Dr. -- it's
2 Dr. Page; correct?
3         MS. DUKE: Randell Page.
4         THE COURT: Yes. And we'll do that formally once
5 you have provided us with the originals sometime tomorrow.
6         MS. DUKE: Yes.
7 (Testimony of Randell Page via video deposition.)
8 (Video deposition paused.)
9         MS. DUKE: That's Exhibit 1361, Your Honor.
10         THE COURT: I'm sorry. 13 --
11         MS. DUKE: -- 61.
12         THE COURT: Thank you.
13 (Video deposition of Randell Page resumed.)
14         MS. DUKE: This is 1362.
15 That's 1363.
16 And that's 1366.
17 That's 1361, Your Honor.
18         THE COURT: Sorry. What is it?
19         MS. DUKE: 1361.
20 (Video deposition paused.)
21         THE COURT: Counsel, how long -- we're about where
22 we would normally break, but if we only have ten minutes or
23 so, we could just finish it.
24         MS. DUKE: It's under ten minutes, Your Honor. I
25 think it's about -- I would say it's about five or so, would

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW   Document 551   Filed 11/04/14   Page 24 of 26

517

1  be my estimation.
2           THE COURT:  Let's go ahead and try to finish it
3  off, then, so we'll have a natural break.
4           (Video deposition of Randell Page resumed.)
5           MS. DUKE:  This is 1366.
6  This is Exhibit 1374.
7           (Video deposition of Randell Page concluded.)
8           MS. DUKE:  That's the end of his portion.
9           THE COURT:  Counsel, I have Exhibits 1361, -63,
10  -66, and -74.  Were there others that I missed?
11          MS. DUKE:  1362.
12          THE COURT:  And -62.  And those appear to not be
13  objected to; is that correct?
14          MR. SINCLAIR:  That's correct, Your Honor.
15          THE COURT:  Those exhibits, then, will be
16  admitted.
17          (Plaintiffs' Exhibit Nos. 1361, 1362, 1363, 1366, 1374
18  admitted.)
19          THE COURT:  All right.  Counsel, let's take a
20  15-minute recess.  And we will need to recess at 2:30.  I
21  have a matter at 3:00 or 3:30 on a detention hearing in a
22  criminal matter.  We'll leave it at that.
23  We'll be in recess for 15 minutes.
24          (Recess.)
25          ****** COURTROOM REMAINS CLOSED TO THE PUBLIC ******

518

1           THE COURT:  Plaintiffs may call their next witness.
2           MS. DUKE:  Your Honor, we have Dr. Michael Djernes
3  via video.
4           THE COURT:  And AEO?
5           MS. DUKE:  AEO.
6           THE COURT:  You guys are not going to be very
7  popular with the media, but that's, I guess, none of our
8  concern.
9           MS. DUKE:  And one thing that may make it easier
10  for you, too, to reference, when the exhibit is up there, if
11  it's easier -- I know we are far away apart -- you will see
12  it on the bottom right there where it says "Michael
13  Djernes."  When I put a document up, it will show that
14  document number, and it will be in the lower right-hand
15  corner.
16          THE COURT:  That will be helpful.  Thank you.
17  I'll just simply try to make note of that as it's being
18  played.
19          (Testimony of Dr. Michael Djernes via video
20           deposition.)
21          (Video deposition paused.)
22          THE COURT:  Counsel, could I stop?  I noted that
23  there was a -- I think maybe kind of a scrivener's error in
24  the transcript where I think the doctor actually referred to
25  "patient preference," and the word "patient" was

519

1  inadvertently dropped out.
2  I just noted that.  I don't know -- it seems to me
3  that's kind of a substantive difference.  Unless counsel
4  objects, I'm just going to make that notation for the
5  record.
6           MS. DUKE:  No objection, Your Honor.
7           MR. SINCLAIR:  No objection.
8           THE COURT:  All right.  Go ahead and proceed.
9           (Video deposition of Michael Djernes resumed.)
10          (Video deposition paused.)
11          THE COURT:  Counsel, the transcript referred to
12  "Medicare," but I think he actually said "Medicaid," which
13  is quite a substantial difference.  So I assume there is no
14  objection to the court making that notation as well?
15          MR. SINCLAIR:  Correct, Your Honor.
16          MS. DUKE:  No objection.
17          THE COURT:  All right.
18          MS. DUKE:  And I guess we'd better point out that
19  that's on page 81, lines 15 through 25, when "Medicare" is
20  referenced, it should instead be "Medicaid."
21          THE COURT:  All right.  Thank you.
22          (Video deposition of Dr. Michael Djernes resumed.)
23          (Video deposition of Dr. Michael Djernes concluded.)
24          MS. DUKE:  So that concludes that video,
25  Your Honor.  And the next video is Ed Castledine.

520

1           THE COURT:  Can we deal with the exhibits?
2           MS. DUKE:  Yes.
3           THE COURT:  I have 1155 and also 1538.  Were there
4  any others?
5           MS. DUKE:  1149.
6           THE COURT:  1149 was previously admitted.
7           MS. DUKE:  Okay.
8           THE COURT:  Is there any objection?
9           MR. SINCLAIR:  No, sir.
10          THE COURT:  1155 and 1538 will be admitted.
11          (Plaintiffs' Exhibit Nos. 1155 and 1538 admitted.)
12          THE COURT:  Counsel, I'm going to obviously
13  publish all of the depositions that are being played, but
14  we'll do it formally tomorrow morning when you bring the
15  originals.
16          MS. DUKE:  Correct.
17          THE COURT:  What is the name of the next --
18          MS. DUKE:  Ed Castledine.
19          THE COURT:  Go ahead and proceed.
20          MS. DUKE:  Your Honor, I'm having an issue with
21  that one, so let's move -- I'm not sure -- it's not playing
22  the clipped videos.  So we'll move to a different one and
23  come back to Mr. Castledine at a different time.
24          THE COURT:  All right.
25          MS. DUKE:  So we'll go to William Savage.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.   Bench trial, 09/25/2013

Case 1:12-cv-00560-BLW v. Document 551   Filed 11/04/14   Page 25 of 26

521

1    (Testimony of William Savage via video deposition.)
2         MS. DUKE:  All right.  That's the end of that one,
3    Your Honor.
4         THE COURT:  All right.
5         MS. DUKE:  We'll be moving to admit 1409 and 1411,
6    which I understand there is no objection to.
7         THE COURT:  Is that correct?
8         MR. SINCLAIR:  Correct, Your Honor.
9         THE COURT:  1409 and 1411 will be admitted.
10    (Plaintiffs' Exhibit Nos. 1409 and 1411 admitted.)
11        MS. DUKE:  All right.  We have excerpts from the
12    video deposition of John Kaiser next.
13        THE COURT:  All right.
14    (Testimony of John Kaiser via video deposition.)
15        MS. DUKE:  That's the conclusion of that one,
16    Your Honor.
17        So with respect to Dr. Kaiser, we'd move to admit 1083,
18    1159, and 1386.  And I know that 1160 has already been
19    admitted.
20        THE COURT:  Is there any objection?
21        MR. SINCLAIR:  No, sir.
22        THE COURT:  All right.  1083, 1159 -- what was the
23    third?
24        MS. DUKE:  Oh, 1386.
25        THE COURT:  -- 1386, those three exhibits will be

522

1    admitted.
2         (Plaintiffs' Exhibit Nos. 1083, 1159, 1386 admitted.)
3         MS. DUKE:  Let me just double check, Your Honor.
4    I think there may be one additional, 1143.
5         THE COURT:  1143 was previously admitted.
6         MS. DUKE:  Okay.  Thank you.
7         We're now going to play the Jackie Butterbaugh,
8    excerpts from her deposition.
9         MR. SINCLAIR:  Is this AEO?  Is this AEO?
10        THE COURT:  Counsel, is this AEO?
11        MS. DUKE:  I'm looking.  It's all of St. Luke's
12    AEO designations, so they would be in a better position --
13    you tell me.
14        MS. NEUHOFF:  Jackie Butterbaugh is not a
15    St. Luke's --
16        MS. DUKE:  Not you?
17        MR. SINCLAIR:  It may be a St. Luke's designation
18    of AEO, but she is not a St. Luke's witness.  So I'm just
19    wondering whether we need to exclude anyone.
20        MS. DUKE:  I have designated St. Luke's that
21    her exhibits, 1000, 1001, are AEO.
22        MR. SINCLAIR:  But they're all St. Luke's
23    exhibits?
24        MS. DUKE:  They're St. Luke's exhibits.
25        MR. SINCLAIR:  Okay.

523

1         MS. DUKE:  But I don't have any testimony that's
2    been noted to be AEO by Luke's, so I would think that this
3    could be open to the public, then.
4         THE COURT:  Any objection?
5         MR. SINCLAIR:  No.
6         THE COURT:  Again, I don't know how we alert
7    anyone to that except perhaps to open the doors.
8    ****** COURTROOM OPEN TO THE PUBLIC ******
9         MR. WILSON:  There's not a town crier?
10        THE COURT:  What's that?
11        MR. WILSON:  I asked if there was a town crier
12    that could go out.
13        THE COURT:  Great idea.  Have them walk up and
14    down the streets of downtown Boise.
15        MS. DUKE:  All right, Your Honor.  I'll start
16    that.  So this is Jackie Butterbaugh.
17        The audio is not working on this side, Your Honor,
18    so --
19        THE COURT:  Do you just need to change positions,
20    then?
21        MS. DUKE:  Yeah.  I just need to plug this
22    computer into this one, and sometimes the system doesn't
23    like the switching.
24        We need to take a five-minute break.  I apologize.  For
25    some reason, the audio is not picking up.

524

1         THE COURT:  We will take a very short break.  We
2    will need to take -- to recess at 2:30 because, as I said, I
3    do have another hearing I think at 3:00.
4         In any event, we'll be in recess.
5         (Recess.)
6    ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
7         THE COURT:  Do we have the technical problems
8    largely resolved?
9         MS. DUKE:  I have improvised and moved the
10    microphone right here, and we're good to go.
11        (Testimony of Jackie Butterbaugh via video
12            deposition.)
13        (Video deposition of Jackie Butterbaugh paused.)
14        MS. DUKE:  Your Honor, is this a point you would
15    like to stop?  I know you said 2:30.
16        THE COURT:  Thank you for noting that.  Let's go
17    ahead and take the recess.  Counsel, I apologize.  I'm
18    losing my voice.  I'm not sure why that is.  We'll reconvene
19    at 8:30 tomorrow morning.  The first order of business will
20    be to publish the depositions, and then we'll proceed with
21    Ms. Butterbaugh's video deposition.
22        Her deposition is open, is that correct?
23        MS. DUKE:  It is, with the exception of a couple
24    of the exhibits, which I think we can just blank out the
25    screen when we're showing you.

525

1    THE COURT: Tomorrow, generally, will it be open
2   or are there still going to be a number of witnesses in
3   which we will need to close the courtroom?
4        MS. DUKE: I still think, as I understand it,
5   there is a number of witnesses that will be closed.
6        THE COURT: All right. We'll be in recess, then,
7   until 8:30 tomorrow morning.
8        Counsel, if you could kind of clear the area and clean
9   up after yourselves just a bit because we have got attorneys
10  coming in very shortly here in about 25 minutes.
11       We'll be in recess.
12       (Court recessed for the evening at 2:32 p.m.)
13
14
15
16
17                    * * * * *
18
19
20
21
22
23
24
25

R E P O R T E R ' S   C E R T I F I C A T E

5        I, Tamara I. Hohenleitner, Official
6   Court Reporter, County of Ada, State of Idaho,
7   hereby certify:
8        That I am the reporter who transcribed
9   the proceedings had in the above-entitled action
10  in machine shorthand and thereafter the same was
11  reduced into typewriting under my direct
12  supervision; and
13       That the foregoing transcript contains a
14  full, true, and accurate record of the proceedings
15  had in the above and foregoing cause, which was
16  heard at Boise, Idaho.
17       IN WITNESS WHEREOF, I have hereunto set
18  my hand October 31, 2013.
19
20
21
22       _____-s-_____
23       Tamara I. Hohenleitner
         Official Court Reporter
         CSR No. 619
24
25