Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 1 of 56

632

1                    UNITED STATES DISTRICT COURT

2                    IN THE DISTRICT OF IDAHO

3    - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
4    SAINT ALPHONSUS MEDICAL CENTER -   :
     NAMPA, INC., TREASURE VALLEY       : Bench Trial
5    HOSPITAL LIMITED PARTNERSHIP, SAINT: **Witnesses:**
     ALPHONSUS HEALTH SYSTEM, INC., AND : **Randall Billings (Video)**
6    SAINT ALPHONSUS REGIONAL MEDICAL   : **Joni S. Stright (Video)**
     CENTER, INC.,                      : **Geoffrey N. Swanson (Video)**
7                       Plaintiffs,     : **Robert Walker (Video)**
              vs.                       : **Nancy D. Powell**
8                                       : **Ed Castledine (Video)**
     ST. LUKE'S HEALTH SYSTEM, LTD., and: **Mark Johnson (Video)**
9    ST. LUKE'S REGIONAL MEDICAL CENTER,:
     LTD.,                              :
10                      Defendants.     :
     - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
11   FEDERAL TRADE COMMISSION; STATE OF :
     IDAHO,                             :
12                      Plaintiffs,     :
              vs.                       :
13                                      :
     ST. LUKE'S HEALTH SYSTEM, LTD.;    :
14   SALTZER MEDICAL GROUP, P.A.,       :
                                        :
15                      Defendants.     :
     - - - - - - - - - - - - - - - - - x

16

17                    * * * SEALED * * *

18

19   REPORTER'S TRANSCRIPT OF PROCEEDINGS

20       before B. Lynn Winmill, Chief District Judge

21       Held on September 27, 2013

22       Volume 5, Pages 632 to 840

23              **Tamara I. Hohenleitner**
         Idaho Certified Shorthand Reporter No. 619
24             Registered Professional Reporter
               Certified Realtime Reporter
25          Federal Certified Realtime Reporter

              United States Courts, District of Idaho
     550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 2 of 56

633

```
  1                          A P P E A R A N C E S

  2

  3

  4

  5
          FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
  6       SAINT ALPHONSUS HEALTH SYSTEM, INC.,
          AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.
  7

  8            Keely E. Duke
               DUKE SCANLAN & HALL, PLLC
  9            1087 W. River Street, Suite 300
               Boise, ID 83707
 10
               David A. Ettinger
 11            HONIGMAN MILLER SCHWARTZ AND COHN LLP
               2290 First National Building
 12            660 Woodward Avenue
               Detroit, MI 48226
 13

 14

 15
          FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION
 16

 17            Peter C. Herrick
               U.S. FEDERAL TRADE COMMISSION
 18            500 Pennsylvania Ave., N.W.
               Washington, DC 20580
 19
               J. Thomas Greene
 20            U.S. FEDERAL TRADE COMMISSION
               600 Pennsylvania Ave N.W.
 21            Washington, DC 20580

 22            Henry Chao-Lon Su
               U.S. FEDERAL TRADE COMMISSION
 23            601 New Jersey Ave., N.W.
               Washington, DC 20001
 24

 25
```

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 3 of 56

634

```
 1                          A P P E A R A N C E S (Continued)

 2

 3        FOR PLAINTIFF STATE OF IDAHO

 4             Eric J. Wilson
               GODFREY & KAHN, S.C.
 5             One East Main Street
               Suite 500
 6             PO Box 2719
               Madison, WI 53701
 7
               Brett T. DeLange
 8             OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
               954 W. Jefferson, 2nd Floor
 9             Boise, ID 83720-0010

10

          FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
               Raymond D. Powers
12             POWERS TOLMAN FARLEY, PLLC
               PO Box 9756
13             Boise, ID 83707

14

          FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15        AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16             Jack R. Bierig
               Ben J. Keith
17             Scott Stein
               Charles Schafer
18             SIDLEY AUSTIN
               One South Dearborn
19             Chicago, IL 60603

20             J. Walter Sinclair
               STOEL RIVES
21             101 S. Capitol Boulevard, Suite 1900
               Boise, ID 83702
22
          FOR DEFENDANT SALTZER MEDICAL GROUP
23
               Brian Kenneth Julian
24             ANDERSON JULIAN & HULL, LLP
               PO Box 7426
25             Boise, ID 83707
```

635

1                               I N D E X

2

3

| | | PAGE: |
|---|---|---|
| | Courtroom closed to the public................... | 680 |
| | Courtroom open to the public.................... | 687 |
| | Courtroom remains open to the public............ | 697 |
| | Courtroom closed to the public................... | 733 |
| | Courtroom open to the public.................... | 741 |
| | Courtroom closed to the public................... | 759 |
| | Courtroom remains closed to the public.......... | 775 |
| | Courtroom open to the public.................... | 786 |
| | Courtroom closed to the public................... | 822 |
| | Courtroom open to the public.................... | 827 |
| | Courtroom closed to the public................... | 833 |
| | Courtroom open to the public.................... | 834 |

11

12                                      PLAINTIFFS

13                               W I T N E S S E S

14

| | | PAGE: |
|---|---|---|
| BILLINGS, Randall (By video continued) | | |
| | ............................................. | 683 |
| CASTLEDINE, Ed (By video) | | |
| | ............................................. | 833 |
| JOHNSON, Mark (By video) | | |
| | ............................................. | 834 |
| POWELL, Nancy | | |
| | Direct Examination by Mr. Ettinger........... | 698 |
| | Cross-Examination by Mr. Schafer............. | 762 |
| | Redirect Examination by Mr. Ettinger......... | 828 |
| STRIGHT, Joni (By video) | | |
| | ............................................. | 687 |
| SWANSON, Geoffrey (By video) | | |
| | ............................................. | 693 |
| WALKER, Robert | | |
| | ............................................. | 697 |

24                         * * * * *

25

### 636

**PLAINTIFFS**

**EXHIBITS**

**ADMITTED**

**1008** E-mail from Greg Orr to Julie Eng re: Boise .....681 Podiatry (PLTs' Dep. Ex. 011; SLHS000112844--SLHS000112844)

**1009** System Clinical Leadership Council Clinical .....681 Integration Sub-Committee (PLTs' Dep. Ex. 013; SLHS000730791--SLHS000730792)

**1010** E-mail from Brenda Sinclair to Randy Billings, ..681 Natalie Bowlby, Brian Fortuin et al. Re: SCLC Agenda and Minutes w/Attach: 4:30.11 SCLC Agenda.pdf (PLTs' Dep. Ex. 014; SLHS000582423--SLHS000582426)

**1011** E-mail from Greg Orr to weinrobe@cableone.net ..681 re: Epic Question, (PLTs' Dep. Ex. 015; SLHS000193386--SLHS000193386)

**1012** E-mail from Steve Drake to David Bishop, Greg ...681 Orr, Sandy Stevenson et al. Re: Wise Contract Termination (PLTs' Dep. Ex. 016; SLHS000312527--SLHS000312528)

**1014** E-mail from Greg Orr to John Kee, Edward ........681 Castledine, Joni Stright et al. Re: Orthopedics practices (PLTs' Dep. Ex. 018, PLTs' Dep. Ex. 354; SLHS0000004621--SLHS0000004622)

**1015** 11/21/11 SLCIO-JOC Meeting Agenda (PLTs' Dep. ...681 Ex. 019; SLHS000467562--SLHS000467579)

**1016** St. Luke's Clinic Stewardship Financial Review ..681 and Planning (PLTs' Dep. Ex. 020; SLHS000723897--SLHS000724033)

**1017** St. Luke's Sign: "If you need emergency care..." .681 (PLTs' Dep. Ex. 021)

**1019** E-mail from Kathy Moore to Chris Roth and Jeff ..681 Taylor re: MR Referrals from IO (PLTs' Dep. Ex. 023; SLHS000092287--SLHS000092288)

**1021** E-mail from Marc Chasin to Murali re: West ........681 Valley and IHDE (PLTs' Dep. Ex. 025; SLHS000342628--SLHS000342629)

**1022** E-mail from Marc Chasin to John Kee and Linda ...681 House re: Allscripts ED Results to IHDA - Status update (PLTs' Dep. Ex. 026; PLTs' Dep. Ex. 214; SLHS000052800--SLHS000052800)

**1023** Idaho Health Data Exchange Website (PLTs' Dep. ...681 Ex. 027)

### 637

**1024** E-mail from Kendra Fiscelli to Jeff Taylor re: ....681 Deloitte Engagement Letter for Advisory Services w/attach: 2012-05-07 Deloitte Engagement - fully executed.pdf (PLTs' Dep. Ex. 028; SLHS000878323--SLHS000878347)

**1025** mySt.Lukes' Program Guiding Principles: St. .....681 Luke's Health System - Affiliate EMR Strategy (PLTs' Dep. Ex. 029; SLHS000597883--SLHS000597903)

**1026** E-mail from Marc Chasin to Marc Chasin re: SLHS .681 Affiliate Strategy Agenda and Questions_06-25012_v7.pptx w/Attach: SLHS Affiliate Strategy Agenda and Questions_06-25012_v7.pptx (PLTs' Dep. Ex. 030; SLHS000203279)

**1027** E-mail from Deidre Dillehunt to Marc Chasin and .681 Adrienne Edens re Updated Affiliate EMR Straw Model w/attach: SLHS Affiliate EMR Strategy Session_06-25-12_vUpdated.pptx (PLTs' Dep. Ex. 031; SLHS000598110--SLHS000598122)

**1031** E-mail from Brenda Sinclair to Courtney .........681 Kirchner re: Meeting inventory w/attach: Capital Planning Charter-draft.docx; SLHS Ops Council Charter-FINAL-12.9.11.pdf; SCLC Brief Charter 4-3-12.pdf; SLHS Resource Optimization and Coordination Steering Committee - Charter042512.docx; Meeting Inventory.2012 Kee.Fletcher.xls (PLTs' Dep. Ex. 036; SLHS000912360--SLHS000912374)

**1032** E-mail from Gary Fletcher to David .............681 Fleckenstein, John Kee, and Marc Chasin re: EPIC provider listing (PLTs' Dep. Ex. 037; SLHS000050879--SLHS000050879)

**1034** E-mail from Chris Roth to Ben Godfrey re .........681 Message Sent on Behalf of St Luke's TV CEO Chris Roth re Epic (PLTs' Dep. Ex. 039; PLTs' Dep. Ex. 095; SLHS000044475--SLHS000044479)

**1035** E-mail from Chris Roth to Kurt Seppi re: "Epic ...681 questions" (PLTs' Dep. Ex. 040; SLHS000044742--SLHS000044743)

**1036** E-mail from Marc Chasin to Adrienne Edens re: ...681 Confidential - Do Not Forward (PLTs' Dep. Ex. 041; SLHS000824352--SLHS000824361)

**1037** E-mail from Brad Beauvais to Marc Chasin re: .....681 Written version of my StLukes patient story (PLTs' Dep. Ex. 042;

**1039** E-mail from Marc Chasin to John Kee re: OB/GYN .681 Concerns (PLTs' Dep. Ex. 044; SLHS000343172--SLHS000343176)

### 638

**1040** St. Luke's Presentation: President's Cabinet ....681 Discussion, MSL Implementation (PLTs' Dep. Ex. 045, PLTs' Dep. Ex. 416; SLHS000036576--SLHS000036581)

**1041** Revised MYSTLUKE'S PHASE 1 APPROACH AND .........681 SCHEDULE Frequently Asked Questions (PLTs' Dep. Ex. 046; SLHS000058609--SLHS000058611)

**1043** E-mail from Marc Chasin to Brad Beauvais re: ....681 Productivity benchmarks post go live (PLTs' Dep. Ex. 048, PLTs' Dep. Ex. 444; SLHS000204315--SLHS000204316)

**1045** Spreadsheet: WRVU/Visit (PLTs' Dep. Ex. 050; ....681 SLHS000206889--SLHS000206889)

**1047** E-mail from Sarah Curtin to Marc Chasin re: ....681 Wave 4 EPIC implementation in McCall (PLTs' Dep. Ex. 052; SLHS000599127--SLHS000599130)

**1048** St. Luke's Health System - White Paper .........681 (SLHS000482843--SLHS000482843)

**1050** St. Luke's Treasure Valley/MSTI Board of ........681 Directors Meeting (PLTs' Dep. Ex. 055; SLHS000012925--SLHS000013101)

**1051** St. Luke's & Saltzer Medical Group Relationship .681 Summary 2006 - Present (PLTs' Dep. Ex. 056; SLHS0000004238--SLHS0000004240)

**1055** St. Luke's Presentation: Service Cost ...........681 Considerations of Physician Integration SLHS Board Meeting (PLTs' Dep. Ex. 060; SLHS000804984--SLHS000804984)

**1057** President's Cabinet Meeting (PLTs' Dep. Ex. ......681 062; PLTs' Dep. Ex. 123;

**1058** E-mail from Peter DiDio to Dana Tiegs re: .......681 UPDATES - For Board Book w/attach: SLHS FY2013 Budget Presentation.pdf; SLHS BOD Service Line Report - Sep 2012.pptx; SLHS Board - Hospital Based Billing Sep 2012.pptx; 2013 Budget - BOD Executive Summary.docx; 2012CD Board Issuance - BOD Executive Summary.docx (PLTs' Dep. Ex. 063; SLHS000130163--SLHS000130189)

**1059** Treasure Valley Joint Audit & Finance Planning ..681 & Strategy Committee Meeting (PLTs' Dep. Ex. 064; SLHS0000015306--SLHS0000015354)

**1060** System Capital Committee Agenda (PLTs' Dep. Ex. .681 065; SLHS000032427--SLHS000032651)

**1061** Letter from Jeff Taylor to Zelda Greyer-Sylvia .681 (PLTs' Dep. Ex. 067; SLHS000253087--SLHS000253089)

### 639

**1062** SLHS Contracting Committee Agenda (PLTs' Dep. ...681 Ex. 068; SLHS000592030--SLHS000592032)

**1063** SLHS Payor Contracting Committee Agenda (PLTs' .681 Dep. Ex. 069; SLHS000895970--SLHS000895979)

**1065** E-mail from Barbara Sinclair to Natalie Bowlby ..681 re: 10.25.12 SCLC Minutes.docx w/attach: 10.25.12 SCLC Minutes.docx (PLTs' Dep. Ex. 072; SLHS000915599--SLHS000915601)

**1066** E-mail from John Barnes to Gary Fletcher, Jeff ..681 Taylor, Gregory Janos et al. Re: TV Operations Plan - July w/attach: TV Operations Plan July 2012.docx (PLTs' Dep. Ex. 073; SLHS0000008201--SLHS0000008206)

**1067** St. Luke's Presentation: Payer Market and .......681 Strategy Discussion (PLTs' Dep. Ex. 074; SLHS000134816--SLHS000134816)

**1068** Vitals.com: Thomas Huntington credentials ........681 (PLTs' Dep. Ex. 075)

**1069** Minutes of the Meeting of the Board of ..........681 Directors of St. Luke's Treasure Valley Mountain States Tumor Institute (PLTs' Dep. Ex. 076; SLHS000012774--SLHS000012778)

**1071** Minutes of the Meeting of the Board of ..........681 Directors of St. Luke's Boise/Meridian Medical Centers Mountain States Tumor Institute (PLTs' Dep. Ex. 080; SLHS000012798--SLHS0000012805)

**1072** St. Luke's Presentation: St. Luke's Treasure ....681 Valley (PLTs' Dep. Ex. 081; SLHS0000012118--SLHS0000012126)

**1073** E-mail from Chris Roth to Cynthia Gearhard re: ..681 St. Als Garrity (PLTs' Dep. Ex. 090; SLHS000104361--SLHS000104361)

**1074** E-mail from Chris Roth to Kathy Moore re: WVMV .681 (PLTs' Dep. Ex. 091; SLHS000106012--SLHS000106012)

**1075** E-mail from David Peterman to Chris Roth re: ....681 [No subject] (PLTs' Dep. Ex. 093; SLHS000086350--SLHS000086351)

**1076** Planning & Strategy Committee of the St. Luke's .681 Boise/Meridian Medical Centers Mountain States Tumor Institute Board of Directors (PLTs' Dep. Ex. 094; SLHS000574379--SLHS000574382)

**1077** E-mail from Chris Roth to Gary Fletcher, John ...681 Kee and Jeff Taylor re: Interview with jason Robison- PERSONAL and CONFIDENTIAL (PLTs' Dep. Ex. 096; SLHS000123197--SLHS000123198)

**1078** Executive Committee Meeting Minutes (PLTs' Dep. .681 Ex. 097; SMG000282944--SMG000282944)

Case 1:12-cv-00560-BLW Document 553 Filed 11/04/14 Page 6 of 56

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 09/27/2013

**640**

| | |
|---|---|
| 1 | 1079 E-mail from Mark Murray to Chris Roth re: ......681 |
| 2 | Wipfli data w/attach: St. Luke's - Nampa Area |
| 3 | Demand v3 - 5-26.pdf; St. Luke's - Fruitland |
| | Area Demand v4 - 6-23.pdf; Executive Team |
| 4 | Presentation.pdf; Executive Team Meeting #3 |
| | 6-27.pptx; Baker County Physician Demand.pptx |
| 5 | (PLTs' Dep. Ex. 098; |
| | SLHS00078306--SLHS000783007) |
| 6 | 1080 E-mail from Gary Fletcher to Chris Roth re: ......681 |
| | Finance Committee Packet and Other Attachment |
| 7 | w/attach: Oct10.2011FinancePacket.pdf; |
| | img-X07141052-0001.pdf (PLTs' Dep. Ex. 099; |
| 8 | SLHS0000006501--SLHS0000005398) |
| 9 | 1081 St. Luke's Presentation: West Treasure Valley ...681 |
| | Planning: Fruitland Area, Canyon County |
| 10 | (Nampa/Caldwell) (PLTs' Dep. Ex. 100; |
| | SLHS0000005398--SLHS0000005398) |
| 11 | 1082 E-mail from Jeff Taylor to Christine Neuhoff, ...681 |
| | David C. Pate, Gary Fletcher et al. Re: Final |
| 12 | for Investor Call w/attach: St. Luke's Investor |
| | Presentation - June 14 2012.pdf; St. Luke's |
| 13 | Investor Presentation - June 14 2012.pptx |
| | (PLTs' Dep. Ex. 101; |
| 14 | SLHS00681386--SLHS00681413-026) |
| 15 | 1084 St. Luke's Presentation: How the West Was Won ...681 |
| | West Treasure Valley/Oregon Marketing Plan |
| 16 | (PLTs' Dep. Ex. 103; |
| | SLHS0000005043--SLHS0000005043) |
| 17 | 1085 E-mail from Kathy Moore to Chris Roth, Ann .....681 |
| | Sargent, Judy Edwards et al. Re: Action |
| 18 | Required: 1st Quarter Financial Results - Due |
| | Wednesday January 11 w/attach: ProFee Expense |
| 19 | Drilldown TV.xlsx; Contract Expense Drilldown |
| | TV.xlsx; Other Expense Drilldown TV.xlsx (PLTs' |
| 20 | Dep. Ex. 104; SLHS00686679--SLHS00686685) |
| 21 | 1086 St. Luke's Health System Board of Directors - ...681 |
| | Executive Session (PLTs' Dep. Ex. 105; |
| 22 | SLHS000037600--SLHS000037676) |
| 23 | 1087 E-mail from Raquel Hartman to Chris Roth re: ...681 |
| | Physician Liason Team (PLTs' Dep. Ex. 106; |
| 24 | SLHS000101819--SLHS000101820) |
| | 1088 Letter from Max Reiboldt to Gary Fletcher ......681 |
| 25 | (PLTs' Dep. Ex. 108; |
| | SLHS0000003076--SLHS0000003078) |
| | 1089 St. Luke's Boise Planning & Strategy Committee ..681 |
| | Meeting (PLTs' Dep. Ex. 109; |
| | SLHS0000015389--SLHS0000015415) |
| | 1091 SLHS Project Leadership Team Meeting Summary ....681 |
| | (PLTs' Dep. Ex. 111; HCF0001116--HCF0001122) |

**641**

| | |
|---|---|
| 1 | 1092 E-mail from Joni Stright to Chris Roth and Jeff ..681 |
| 2 | Taylor re: BSG summary PL 11 4 2011 w/attach: |
| | Boise Surgical Group Board Executive Summary 11 |
| 3 | 4 11.docx; BSG summary PL 11 4 2011.docx (PLTs' |
| | Dep. Ex. 112; SLHS000091832--SLHS000091836) |
| 4 | 1093 E-mail from Chris Roth to Jeff Taylor and Gary ..681 |
| | Fletcher re: 2012 Financial Issue.docx |
| 5 | w/attach: 2012 Financial Issue.docx (PLTs' Dep. |
| | Ex. 113; SLHS000006603--SLHS000006605) |
| 6 | 1094 E-mail from Chris Roth to John Kee, Greg Orr, ...681 |
| | Gary Fletcher and Kathy Moore re: MR Referrals |
| 7 | from IO (PLTs' Dep. Ex. 114; |
| | SLHS000104683--SLHS000104684) |
| 8 | 1095 E-mail from Chris Roth to Kathy Moore re: ......681 |
| | MFM Strategy.pptx w/A ttach: MFM Strategy.pptx |
| 9 | (PLTs' Dep. Ex. 115; |
| | SLHS000088181--SLHS000088182) |
| 10 | 1096 St. Luke's Organizational Chart (PLTs' Dep. Ex. ..681 |
| | 120; SLHS000000260--SLHS000000260) |
| 11 | 1097 A Strategy to Develop The St. Luke's Health .....681 |
| | Care Delivery System To Bring Better Care, |
| 12 | Better Health and Lower Cost to the Population |
| | it Serves (PLTs' Dep. Ex. 121; |
| 13 | SLHS000921032--SLHS000921036) |
| | 1099 E-mail from Geoffrey Swanson to Mike Reno re: ...681 |
| 14 | Your Thoughts (PLTs' Dep. Ex. 124; |
| | SLHS000776012--SLHS000776013) |
| 15 | 1100 E-mail from Geoffrey Swanson to Mike Reno re: ...681 |
| | PLEASE REVIEW: Transformation to Accountable |
| 16 | Care Score (PLTs' Dep. Ex. 125; |
| | SLHS000540959) |
| 17 | 1101 E-mail from Geoffrey Swanson to Jim Souza and ..681 |
| | Kurt Seppi re: Treasure Valley PLC. (PLTs' |
| 18 | Dep. Ex. 126; SLHS001093740--SLHS001093740) |
| | 1102 E-mail from Geoffrey Swanson to Jim Souza and ..681 |
| 19 | Brian Fortuin re: [No Subject] (PLTs' Dep. Ex. |
| | 127; SLHS001093741--SLHS001093743) |
| 20 | 1103 E-mail from Geoffrey Swanson, Jeff Taylor, .....681 |
| | David C. Pate and Gary Fletcher re: No Subject |
| 21 | (PLTs' Dep. Ex. 128; |
| | SLHS000892029--SLHS000892033) |
| 22 | 1104 E-mail from Geoffrey Swanson to John Kee, Gary ..681 |
| | Fletcher, Kurt Seppi, et al. Re: Defining |
| 23 | Clinical Integration (PLTs' Dep. Ex. 129; |
| | SLHS000581520--SLHS000581521) |
| 24 | 1105 E-mail from Geoffrey Swanson to Randy Billings ..681 |
| | re: End Game.docx w/Attach: End Game.docx |
| 25 | (PLTs' Dep. Ex. 130; PLTs' Dep. Ex. 284; |
| | SLHS000581968--SLHS000581969) |

**642**

| | |
|---|---|
| 1 | 1107 E-mail from Geoffrey Swanson to Kurt Seppi, .....681 |
| 2 | Gary Fletcher, John Kee, et al. Re: MSSP |
| | Application decision (PLTs' Dep. Ex. 132; |
| 3 | SLHS000585310--SLHS000585312) |
| | 1109 E-mail from Geoffrey Swanson to Gary Fletcher, ..681 |
| 4 | John Kee, Kurt Seppi et al. Re: [No subject] |
| | (PLTs' Dep. Ex. 134; |
| 5 | SLHS000034557--SLHS000034557) |
| | 1110 Spreadsheet: Graph of Referrals (PLTs' Dep. Ex. ..681 |
| 6 | 151; SLHS001171979--SLHS001171979) |
| | 1111 E-mail from Kathy Moore to Chris Roth re: [No ...681 |
| 7 | subject] (PLTs' Dep. Ex. 153; |
| | SLHS000098210--SLHS000098211) |
| 8 | 1113 E-mail from Jim Souza to Karl Watt and Nathan ..681 |
| | Andrew re: UCLAIMED CALL -NAMPA FW: MEETING |
| 9 | NOTICE - DEPARTMENT OF FAMILY MEDICINE - |
| | THURSDAY, 10-18-12, 0700 - St. Alphonsus |
| 10 | Regional Medical Center, Inc. - McCLEARY NORTH |
| | 2-3 (PLTs' Dep. Ex. 155; |
| 11 | SLHS001181408--SLHS001181409) |
| | 1114 Wipfli Presentation: St. Luke's Health System ...681 |
| 12 | System -Wide Physician Demand Assessment (PLTs' |
| | Dep. Ex. 156; Wipfli00000085--Wipfli00000129) |
| 13 | 1115 St. Luke's Presentation: Saltzer Medical Group ..681 |
| | Transaction Update (PLTs' Dep. Ex. 638) |
| 14 | 1116 E-mail from Kathy Moore to Joni Stright re: .....681 |
| | Boise Surgical Group Board Executive Summary 11 |
| 15 | 4 11 w/Attach: Boise Surgical Group Board |
| | Executive Summary 11 4 11.docx (PLTs' Dep. Ex. |
| 16 | 159; SLHS000091783--SLHS000091786) |
| | 1117 E-mail from Kathy Moore to Dave McFadyen re: ...681 |
| 17 | Network Optimization Steering Committee - |
| | Charter031412.docx w/Attach: Network |
| 18 | Optimization Steering Committee - |
| | Charter031412.docx (PLTs' Dep. Ex. 160; |
| 19 | SLHS000097531--SLHS000097539) |
| | 1118 Financial Recovery Plan- High Level Bullets for .681 |
| 20 | Board, Updated Quarterly (PLTs' Dep. Ex. 161; |
| | SLHS001069773--SLHS001069785) |
| 21 | 1119 E-mail from Kathy Moore to Edward Castledine ...681 |
| | re: Select Network (PLTs' Dep. Ex. 162; |
| 22 | SLHS000170307--SLHS000170308) |
| | 1120 E-mail from Kathy Moore to Angela Christensen ..681 |
| 23 | re: [No subject] (PLTs' Dep. Ex. 163; |
| | SLHS001182816--SLHS001182816) |
| 24 | 1121 Minutes of the Meeting of St. Luke's Heart ......681 |
| | Board of Directors (PLTs' Dep. Ex. 164; |
| 25 | SLHS001104748--SLHS001104751) |

**643**

| | |
|---|---|
| 1 | 1122 E-mail from Kathy Moore to Jeff Taylor, Chris ...681 |
| 2 | Roth, Peter DiDio et al. Re: Meridian |
| | Ambulatory Surgery Center (ASC) - Notes (PLTs' |
| 3 | Dep. Ex. 165; SLHS001183724--SLHS001183726) |
| | 1123 E-mail from Kathy Moore to Angela Christensen ...681 |
| 4 | re: Meridian ASC write up for the Board meeting |
| | - Need asap, but no later than Jan 1st |
| 5 | w/attach: Meridian Ambulatory Surgery |
| | Center.doc (PLTs' Dep. Ex. 166; |
| 6 | SLHS001183810--SLHS001183813) |
| | 1124 E-mail from Jeremy Ward to Kathy Moore and .....681 |
| 7 | Peter DiDio re: Meridian ASC Analysis (PLTs' |
| | Dep. Ex. 167; SLHS001182095--SLHS001182098) |
| 8 | 1125 E-mail from Matthew Wolff to Kathy Moore re: ...681 |
| | Meridian ASC Analysis w/attach: Meridian ASC |
| 9 | Proforma - draft.pdf; Meridian ASC Presentation |
| | - DRAFT.pdf (PLTs' Dep. Ex. 168; |
| 10 | SLHS001182009--SLHS001182087) |
| | 1126 St. Luke's Regional Medical Center Board of ......681 |
| 11 | Directors Meeting (PLTs' Dep. Ex. 169; |
| | SLHS001192620--SLHS001192703) |
| 12 | 1127 Letter from John Dao to Kathy Moore re: .........681 |
| | Facility Renovation and Expansion (PLTs' Dep. |
| 13 | Ex. 170; Wipfli00001587--Wipfli00001594) |
| | 1128 Letter from John Dao to Kathy Moore re: Amended .681 |
| 14 | Letter of Agreement (PLTs' Dep. Ex. 171; |
| | SLHS001175261--SLHS001175260) |
| 15 | 1130 Minutes of the Planning & Strategy Committee of .681 |
| | the St. Luke's Regional Medical Center, LTD |
| 16 | Board of Directors (PLTs' Dep. Ex. 173; |
| | SLHS001192005--SLHS001192113) |
| 17 | 1131 E-mail from Kathy Moore to Dave McFadyen re: ...681 |
| | Julie Jeff Taylor (PLTs' Dep. Ex. 174; |
| 18 | SLHS001182760--SLHS001182760) |
| | 1132 St. Luke's Talking Points: Karcher Project ......681 |
| 19 | (PLTs' Dep. Ex. 175; |
| | SLHS001190756--SLHS001190757) |
| 20 | 1133 E-mail from Gary Fletcher to Geoffrey Swanson, ..681 |
| | Barton Hill, Kurt Seppi et al. Re: Diabetes |
| 21 | Project (PLTs' Dep. Ex. 180; |
| | SLHS000050428--SLHS000050428) |
| 22 | 1134 SLHS Payor Contracting Committee Minutes (PLTs' .681 |
| | Dep. Ex. 181; SLHS000622532--SLHS000622534) |
| 23 | 1135 SLHS Payor Contracting Committee Minutes (PLTs' .681 |
| | Dep. Ex. 182; PLTs' Dep. Ex. 283; |
| 24 | SLHS000031227--SLHS000031236) |
| | 1137 SLHS Payor Contracting Committee Minutes (PLTs' .681 |
| 25 | Dep. Ex. 184; SLHS000622530--SLHS000622531) |

Case 1:13-cv-00560-BLW Document 553 Filed 11/04/14 Page 7 of 56

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.   Bench trial, 09/27/2013

644

1    1138 St. Luke's Boise Executive / Board Development ....681 Committee Meeting (PLTs' Dep. Ex. 185; SLHS000030342–SLHS000030354)

3    1139 Minutes of the Audit and Finance Committee of ....681 the St. Luke's Health System, Ltd. (PLTs' Dep. Ex. 186; SLHS000025963–SLHS000025966)

4    1141 Letter from Max Reiboldt to Gary Fletcher .......681 (PLTs' Dep. Ex. 188, PLTs' Dep. Ex. 497; SMG000383895–SMG000383897)

6    1147 Letter from Max Reiboldt to Bill Savage Nancy ....681 Powell and John Kaiser Re: Saltzer Medical Group, P.A. and St. Luke's Health System, LTD. Letter of Intent (PLTs' Dep. Ex. 195; COKER0007707–COKER0007713)

8    1158 E-mail from Aimee Greeter to Blaine Petersen ....681 and Max Reiboldt re: Max, Aimee, (PLTs' Dep. Ex. 206; COKER0006564–COKER0006564)

10   1161 Coker Presentation: Saltzer Medical Group ........681 Physician Pod Meetings (PLTs' Dep. Ex. 209; COKER0008247–COKER0008261)

11   1167 E-mail from Richard Rant to Linda House re: ....681 Fwd: Micron w/Attach: Micron.txt.msg (PLTs' Dep. Ex. 217; SLHS001045878–SLHS001045880)

13   1168 SLHS Contracting Committee Conference Call ....681 (PLTs' Dep. Ex. 218; SLHS000031711–SLHS000031713)

14   1170 E-mail from Linda House to Jeff Taylor, Gary ....681 Fletcher, et al. Re: Micron Letter of Agreement w/Attach: Micron Proposal draft 071610.doc; Micron SELECT CI AGREEMENT draft1.docm (PLTs' Dep. Ex. 220; SLHS001052652–SLHS001052688)

16   1171 E-mail from Linda House to Steve Drake re: RE: ..681 Micron Proposal (PLTs' Dep. Ex. 221; SLHS001052708–SLHS001052709)

18   1173 E-mail from Linda House to Steve Drake re: PCP ..681 visits (PLTs' Dep. Ex. 223; SLHS011146840–SLHS011146840)

19   1175 E-mail from Linda House to Joni Stright re: .....681 Micron/Eloise Walker, MD (PLTs' Dep. Ex. 225; SLHS00109699–SLHS001097702)

21   1178 E-mail from Linda House to Brad Erickson, et ....681 al. Re: Resource Optimization w/Attach: Referral Provider070512FF review.xls (PLTs' Dep. Ex. 231; SLHS001141251–SLHS001141252)

23   1179 E-mail from Linda House to Alyson Powell Erwin, ..681 et al. Re: Referral Meeting (PLTs' Dep. Ex. 232; SLHS000054954–SLHS000054954)

645

1    1180 E-mail from Linda House to Randy Billings re: ....681 PHO w/Attach: Memorandum on SELECT021611.doc (PLTs' Dep. Ex. 233; SLHS000581450–SLHS000581453)

3    1184 E-mail from Steve Drake to Chuck Pomeroy and Ed .681 Dahlberg re: Contracting (PLTs' Dep. Ex. 238; SLHS000031762–SLHS000031792)

4    1185 SLHS Contracting Committee Agenda w/ ...........681 Handwritten Notes (PLTs' Dep. Ex. 239; SLHS000662506–SLHS000662508)

6    1186 SLHS Payer Contract Status - Draft w/ ..........681 Handwritten Notes (PLTs' Dep. Ex. 240; SLHS000662520–SLHS000662543)

8    1187 SLHS Calendar 2009 Contract Negotiation Results .681 (PLTs' Dep. Ex. 241; SLHS000662423–SLHS000662434)

9    1188 SLHS Physician Reimbursement Payer Fee Schedule .681 Comparison (PLTs' Dep. Ex. 246; SLHS000313129–SLHS000313384)

11   1189 St. Luke's Discussion Points Regarding ..........681 Ambulatory Surgery Centers (PLTs' Dep. Ex. 247; SLHS000845699–SLHS000845701)

13   1190 E-mail from Steve Drake to Hank Clark and Jeff ..681 Taylor re: Re: OSCI Fee Schedule Comparison (PLTs' Dep. Ex. 248; SLHS000028868–SLHS000028869)

15   1191 Presentation: Preferred Blue PPO Participation ..681 (PLTs' Dep. Ex. 250; SLHS000251676–SLHS000251676)

16   1193 Outlook Scheduler from Steve Drake to Randy .....681 Billings, Jeff Crouch, and Todd York re: Blue Cross/SLHS Meeting w/ Handwritten Notes (PLTs' Dep. Ex. 252; SLHS000662715–SLHS000662726)

18   1194 E-mail from Kelly Green to Steve Drake re: .....681 071213 SLHS PCC Minutes Draft.docx w/Attach: 071312 SLHS PCC Minutes Draft.docx (PLTs' Dep. Ex. 253; SLHS000656632–SLHS000656635)

20   1199 E-mail from Steve Drake to Robyn Dumas, et al. .681 Re: Documents for Today's Discussion w/Attach: 102908 Agenda Documents.xls; SLRMC BCI contracting strategy 10 29 08.ppt (PLTs' Dep. Ex. 254; SLHS000928666–SLHS000928669)

22   1199 Document re: [Changes to Micron's Employee ......681 Benefit Plan] (PLTs' Dep. Ex. 259; SLHS000259990–SLHS000259991)

23   1201 Proposal for the Delivery of Health Care ........681 Services: Micron, SLHS, and SELECT (PLTs' Dep. Ex. 261; MT000042–MT000042)

646

1    1203 Outlook Scheduler from Randy Billings to Gary ..681 Fletcher, et al. Re: SLHS Payor Contracting Committee w/Attach: Agenda and materials (PLTs' Dep. Ex. 263; SLHS000653597–SLHS000653609)

3    1206 E-mail from Steve Drake to Carol Kurtz, et al. ..681 Re: RE: FLIGHT DETOUR - won't make meeting w/Attach: Micron Relationship Bullet Points 071312.docx (PLTs' Dep. Ex. 266; SLHS003314280–SLHS003314281)

5    1209 Memo from Jeff Taylor to SLHS Leadership and ....681 Managment re: [Randy Billings Introduction] (PLTs' Dep. Ex. 271; SLHS001157694–SLHS001157694)

7    1212 Dr. Pate's Prescription for Change Blog Post by .681 Randy Billings: The Value in Clinical Integration (PLTs' Dep. Ex. 274)

9    1213 St. Luke's Presentation: Network Scope and Key .681 Priorities, SELECT PHO BOARD Presentation (PLTs' Dep. Ex. 275; SLHS000155201–SLHS000155201)

11   1214 St. Luke's Presentation: CLINCIAL INTEGRATION ...681 STRATEGY, SELECT PHO BOARD Presentation (PLTs' Dep. Ex. 276; SLHS000159808–SLHS000159808)

13   1216 E-mail from Randy Billings to Hank Clark and ...681 Steve Drake re: Initial Parameters for FY 2013 Modeling - Price Increases (PLTs' Dep. Ex. 279; SLHS000153663–SLHS000153664)

15   1218 E-mail from Randy Billings to Jeff Taylor and ..681 Geoffrey Swanson re: Payor Subcommittee presentation materials w/Attach: Payor Strategy (BOARD SubCmte-Payor Relationships 10-28-2011).pptx (PLTs' Dep. Ex. 283; SLHS000809058–SLHS000809060)

17   1219 E-mail from Geoffrey Swanson to Randy Billings .685 re: End Game.docx w/attach: End Game.docx (PLTs' Dep. Ex. 285; SLHS000581527–SLHS000581528)

19   1221 SLHS Payor Contracting Committee Agenda (PLTs' ..681 Dep. Ex. 288; SLHS000728408–SLHS000728416)

21   1222 E-mail from Randy Billings to Steve Drake re: ..681 Saltzer Acquistion - Blue Cross impact (PLTs' Dep. Ex. 289; SLHS000308686–SLHS000308687)

23   1224 E-mail from Randy Billings to Bill Savage re: ...681 ACN - Saltzer participation w/Attach: 2012-12-28 Assignment_ACN_fully executed.pdf (PLTs' Dep. Ex. 291; SLHS001222471–SLHS001222475)

25   1225 E-mail from Chris Roth to Randy Billings re: ....681 First Choice Health (PLTs' Dep. Ex. 292; SLHS000892455–SLHS000892456)

647

1    1226 E-mail from Gary Fletcher to Randy Billings, ....681 Jeff Taylor and Steve Drake re: Micron contract (PLTs' Dep. Ex. 293; SLHS000291534–SLHS000291534)

3    1227 E-mail from Randy Billings to Linda House re: ...681 Micron update (PLTs' Dep. Ex. 294; SLHS000154481–SLHS000154482)

5    1228 E-mail from Randy Billings to Richard Rant, .....681 Randy Stevenson, and John Kee re: Micron-Update-December 2011 (PLTs' Dep. Ex. 295; SLHS000153569–SLHS000153572)

7    1229 E-mail from Randy Billings to David C. Pate re: .681 Micron possibilities (PLTs' Dep. Ex. 296; SLHS000152677–SLHS000152677)

9    1230 E-mail from Gary Fletcher to Randy Billings and .681 David C. Pate re: Micron possibilities (PLTs' Dep. Ex. 297; SLHS000934477–SLHS000934479)

11   1231 E-mail from Randy Billings to David C. Pate and .681 Gary Fletcher re: Micron possibilities (PLTs' Dep. Ex. 298; SLHS000543157–SLHS000543160)

13   1233 E-mail from Randy Billings to Richard Rant re: .681 Micron (PLTs' Dep. Ex. 300; SLHS000307918–SLHS000307918)

15   1234 E-mail from Randy Billings to Margo Nicholson ..681 re: Hospital Proposal - Micron (PLTs' Dep. Ex. 301; MT001261–MT001261)

17   1237 St. Luke's Presentation: St. Luke's Clinic .....681 Budget Review Fiscal Year 2012 (PLTs' Dep. Ex. 304; SLHS000033045–SLHS000033073)

19   1240 Letter from Adam J. Klein to Joni Stright re: ...692 Fair market value and commercial reasonability (PLTs' Dep. Ex. 307; SLHS000705757–SLHS000705760)

21   1245 E-mail from Joni Stright to John Kee cc: Laura ..681 Busch, Subject: Capital Budget - Practice Acquisitions - CONFIDENTIAL FY13.xls, Attachment: Capital Budget - Practice Acquisitions - CONFIDENTIAL FY13.xls (PLTs' Dep. Ex. 314; SLHS0000007822–SLHS0000007831)

23   1247 E-mail from Joni Stright to Gustav Neve, Laura ..681 Busch, and Ken Dey cc: Jeffrey Stevens and Geoffrey Swanson, Subject: RE: Medicaid Medicare Request (PLTs' Dep. Ex. 316; SLHS000795673–SLHS000795675)

24   1249 E-mail from Peter LaFleur to Kira Jasper and ...681 Bill Hopkins cc: Joni Stright, Subject: Boise physician market, Attachment: SLHSmarketwhitepaper090408 vs 2 07-09final.doc (PLTs' Dep. Ex. 318; GT001984–GT001996)

**United States Courts, District of Idaho**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/27/2013

**648**

| | |
|---|---|
| 1 | 1255 SLHS Presentation: Developing the Vision and ....693 |
| 2 | Strategy for Physician Alignment and Clinical |
| 3 | Integration for St. Luke's Health System – |
| | Discussion with SLHS Project Leadership Team |
| 4 | (PLTs' Dep. Ex. 323; HCF0001235--HCF0001235) |
| | 1256 E-mail from Belinda Mcgiverly to Douglas Croft, .681 |
| 5 | et al. Re: Sleep lab referral (PLTs' Dep. Ex. |
| | 324; SLHS0000007644--SLHS0000007645) |
| 6 | 1257 E-mail from Douglas Croft to Joni Stright re: ....681 |
| | RE: Sleep lab referral (PLTs' Dep. Ex. 325; |
| 7 | SLHS0000007583--SLHS0000007583) |
| | 1261 E-mail from Chris Roth to Jeff Taylor re: KPMG ..681 |
| 8 | Summary Updated Valuation w/Attach: Seltzer |
| | Valuation Draft Report - Revised 09.15.10.pdf; |
| 9 | 0 - Saltzer Medical Reports - Market Value – |
| | REV - slz.pdf; Saltzer Medical Group Valuation |
| 10 | 9 28 2012.xlsx (PLTs' Dep. Ex. 329; |
| | SLHS0000005407--SLHS0000005473) |
| 11 | 1262 E-mail from Peter LaFleur to Joni Stright re: ...681 |
| | Saltzer TV Board 6 29 2011.pptx w/Attach: |
| 12 | Saltzer TV Board 6 29 2011.pptx (PLTs' Dep. Ex. |
| | 330; SLHS0000007573--SLHS0000007574) |
| 13 | 1264 OB/GYN Strategies in Nampa Meeting Minutes ......681 |
| | (PLTs' Dep. Ex. 332; |
| 14 | SLHS00882486--SLHS000882487) |
| | 1265 E-mail from Eric Gonzaga to Bill Hopkins, Joni ..681 |
| 15 | Stright, and Peter LaFleur re: RE: Saltzer - |
| | FMV Opinion (Family Practice) (PLTs' Dep. Ex. |
| 16 | 333; SLHS0000007361--SLHS0000007361) |
| | 1266 E-mail from Bill Hopkins to Joe Davio, Eric .....681 |
| 17 | Gonzaga and Joni Stright re: Pioneer Family |
| | Medicine (PLTs' Dep. Ex. 334, PLTs' Dep. Ex. |
| 18 | 695; SLHS0000007425--SLHS0000007427) |
| | 1268 E-mail from David C. Pate to Joni Stright re: ...681 |
| 19 | RE: Saltzer and Adrienne (PLTs' Dep. Ex. 336; |
| | SLHS000894429--SLHS000894430) |
| 20 | 1269 Letter from Eric Gonzaga to Joni Stright re: ....681 |
| | RE: Analysis of Proposed Compensation |
| 21 | Arrangement - Saltzer Medical Group, Orthopedic |
| | Surgeons (PLTs' Dep. Ex. 337; |
| 22 | SLHS0000007084--SLHS0000007117) |
| | 1270 E-mail from Kathy Moore to Joni Stright and ....681 |
| 23 | Chris Roth RE: Physician communication (PLTs' |
| | Dep. Ex. 338; SMG000025071--SMG000285071) |
| | 1271 E-mail from Kirsten Grunzke to Jon Getz, Joni ..681 |
| 24 | Stright, et al. Re: Saltzer (PLTs' Dep. Ex. |
| | 339; SLHS000881562--SLHS000881563) |
| 25 | 1274 St. Luke's Presentation: Intermountain ..........681 |
| 25 | Orthopaedics Integration (PLTs' Dep. Ex. 342; |
| | SLHS001117224--SLHS001117224) |

**649**

| | |
|---|---|
| 1 | 1275 St. Luke's Presentation: West Treasure Valley ..681 |
| 2 | Strategic Planning (PLTs' Dep. Ex. 343; |
| | SLHS0000003072--SLHS0000003072) |
| 3 | 1276 E-mail from Joni Stright to Peter Lyster, Peter .681 |
| | LaFleur and Edward Castledine re: Saltzer |
| 4 | Medical Group (PLTs' Dep. Ex. 344; |
| | KPMG0001027--KPMG0001028) |
| 5 | 277 St. Luke's Presentation: Saltzer Integration ....681 |
| | Analysis Update (PLTs' Dep. Ex. 345; |
| 6 | SLHS000820291--SLHS000820309) |
| 7 | 1279 Memo from David R. Melloh and Meaghan A. .......681 |
| | Moriarty to Saltzer Medical Group, P.A. re: |
| 8 | Employment Requirements Under the |
| | Provider-Based Entity Rules (PLTs' Dep. Ex. |
| 9 | 347; SLHS000819743--SLHS000819745) |
| | 1280 E-mail from Edward Castledine to Peter LaFleur .681 |
| 10 | and Chris Roth re:SMG_ (PLTs' Dep. Ex. 348; |
| | CON 0006030--CON 0006032) |
| 11 | 1281 E-mail from Edward Castledine to Jeff Taylor ....681 |
| | and Chris Roth re:stats w/Attach: Nampa |
| 12 | Physicians.xlsx (PLTs' Dep. Ex. 349; |
| | CON 0007045--CON 0007046) |
| 13 | 1283 E-mail from Jan Miller to Edward Castledine and .681 |
| | Linda House re: Physician Referral List |
| 14 | w/Attach: Physician Referral List.txt.msg |
| | (PLTs' Dep. Ex. 351; |
| 15 | SLHS001129618--SLHS001129620) |
| | 1285 E-mail from Kathy Moore to Joni Stright, John ...681 |
| 16 | Kee, Dave McFadyen et al. Re: SLIM Referrals |
| | (PLTs' Dep. Ex. 353; |
| 17 | SLHS000108839--SLHS000108839) |
| | 1286 E-mail from Edward Castledine to Bill Savage ....681 |
| 18 | re: Vote (PLTs' Dep. Ex. 355; |
| | SMG000280883--SMG000280883) |
| 19 | 1287 E-mail from Edward Castledine to Joni Stright, .681 |
| | Chris Roth, Kathy Moore et al. Re: SWIENT |
| 20 | (PLTs' Dep. Ex. 356; |
| | SLHS000184332--SLHS000184332) |
| 21 | 1288 E-mail from John Kee to Chris Roth, Edward ......681 |
| | Castledine, Gary Fletcher et al. Re: Saltzer |
| 22 | (PLTs' Dep. Ex. 357; |
| | SLHS000034495--SLHS000034495) |
| 23 | 1289 E-mail from Chris Roth to Edward Castledine, ....681 |
| | Angela Christensen, Kathy Moore et al. Re: |
| 24 | Neuro volumes (PLTs' Dep. Ex. 358; |
| | SLHS000104153--SLHS000104153) |
| | 1291 E-mail from Edward Castledine to Patrick Gray, .681 |
| 25 | Marc Chasin and Greg Orr re: Epic Functionality |
| 25 | Questions (PLTs' Dep. Ex. 360; |
| | SLHS000183724--SLHS000183725) |

**650**

| | |
|---|---|
| 1 | 1292 E-mail from Greg Orr to Edward Castledine re: ...681 |
| 2 | Robison (PLTs' Dep. Ex. 361; |
| | SLHS000175804--SLHS000175804) |
| 3 | 1293 Presentation: Orthopedic Surgery Center of ......681 |
| | Idaho (PLTs' Dep. Ex. 362; |
| 4 | SLHS000168979--SLHS000168979) |
| | 1304 Quality Dashboard July through Nov-10 (PLTs' ...681 |
| 5 | Dep. Ex. 378; SLHS000025709--SLHS000025710) |
| | 1305 St. Luke's Quality Dashboard, Quality .........681 |
| 6 | Indicators for current Quality Reporting Year |
| | (PLTs' Dep. Ex. 380; |
| 7 | SLHS000024241--SLHS000024242) |
| | 1306 St. Luke's Quality Dashboard, Quality ..........681 |
| 8 | Indicators for current Quality Reporting Year |
| | (PLTs' Dep. Ex. 381; |
| 9 | SLHS001070905--SLHS001070907) |
| | 1307 St. Luke's Quality, Safety & Service Excellence .681 |
| 10 | Committee (PLTs' Dep. Ex. 382; |
| | SLHS000355832--SLHS000355876) |
| 11 | 1308 St. Luke's Quality Dashboard, Quality ..........681 |
| | Indicators for current Quality Reporting Year |
| 12 | (PLTs' Dep. Ex. 383; |
| | SLHS001070918--SLHS001070920) |
| 13 | 1309 E-mail from Sarah Nyberg to Ana Alsa, Dawn .....681 |
| | Berheim, Edward Castledine et al. Re :[secure] |
| 14 | Quality and Patient Safety Council August 2012 |
| | w/Attach: Tumbleweed.pdf, 2012-06Jun SL with |
| 15 | Nrsing Units Report.xls, August 2012 CM Missed |
| | Opportunities Report for June 2012.xls, |
| 16 | Aug12-8-13 TVDASHBOARD_2012.xlsm (PLTs' Dep. |
| | Ex. 384; SLHS000862881--SLHS000862891) |
| 17 | 1310 White Paper: POSITION OF ST. LUKE'S HEALTH .....681 |
| | SYSTEM ON WHY ITS AFFILIATION WITH THE SALTZER |
| 18 | MEDICAL GROUP SHOULD BE PERMITTED TO PROCEED |
| | WITHOUT CHALLENGE (PLTs' Dep. Ex. 386) |
| 19 | 1312 E-mail from Bart Hill to Mary Cronin re: Master .681 |
| | w/Attach: System Quality Performance Update Jan |
| 20 | 2012MASTER2.docx (PLTs' Dep. Ex. 388; |
| | SLHS000373842--SLHS000373849) |
| 21 | 1314 St. Luke's Presentation: Quality & Patient .....681 |
| | Safety Update (PLTs' Dep. Ex. 390; |
| 22 | SLHS000978369--SLHS000978419) |
| | 1316 St. Luke's Boise/Meridian Medical Centers .......681 |
| 23 | Quality Scorecard (PLTs' Dep. Ex. 392; |
| | SLHS001359573--SLHS001359585) |
| 24 | 1317 E-mail from Bart Hill to Chris Roth and Kathy ...681 |
| | Moore cc Jim Souza re: Joint Commission |
| 25 | article is out (PLTs' Dep. Ex. 394; |
| | SLHS000088949--SLHS000088951) |

**651**

| | |
|---|---|
| 1 | 1318 E-mail from Bart Hill to Alice Hennessey and ....681 |
| 2 | David C. Pate cc: Dana Tiegs re: QSSEC meeting |
| | feedback w/Attach: QSSEC Mtg 7-23-12 |
| 3 | Feedback.pdf (PLTs' Dep. Ex. 394; |
| | SLHS000069613--SLHS000069619) |
| 4 | 1320 List of Efforts Undertaken/Planned With .........681 |
| | Affiliate Physicians to Improve Quality |
| 5 | Prepared by Kurt Seppi for Deposition (PLTs' |
| | Dep. Ex. 397) |
| 6 | 1321 St. Luke's Presentation: Physician IT Steering ..681 |
| | Committee "Vision 2015" (PLTs' Dep. Ex. 399; |
| 7 | SLHS000516598--SLHS000516598) |
| | 1323 St. Luke's and Elmore Medical Center joint ......681 |
| 8 | Integration Steering Committee (PLTs' Dep. Ex. |
| | 401; SLHS000688796--SLHS000688800) |
| 9 | 1328 St. Luke's Presentation: Current Scope of St. ..681 |
| | Luke's Physical Integration Activities (PLTs' |
| 10 | Dep. Ex. 406; SLHS000003069--SLHS000003088) |
| | 1330 E-mail from Gary Fletcher to Geoffrey Swanson, ..681 |
| 11 | John Kee, Kurt Seppi, et al. Re: CLINICAL |
| | INTEGRATION GOAL setting across the proposed |
| 12 | network (PLTs' Dep. Ex. 409; |
| | SLHS000091995--SLHS000091996) |
| 13 | 1336 Primary Health Group Website (PLTs' Dep. Ex. ....681 |
| | 420) |
| 14 | 1338 Primary Health group Website: NEW Downtown ......681 |
| | Clinic Now Open!! (PLTs' Dep. Ex. 422) |
| 15 | 1339 Operating Agreement of Alliance Medical Group, ..681 |
| | LLC (PLTs' Dep. Ex. 423; |
| 16 | SLHS001389400--SLHS001389445) |
| | 1340 E-mail from David Peterman to Chris Roth re: ....681 |
| 17 | [Meeting and meeting agenda] (PLTs' Dep. Ex. |
| | 424; SLHS000086349--SLHS000086349) |
| 18 | 1343 Noncompetition Agreement, Mark Johnson (PLTs' ...681 |
| | Dep. Ex. 442; SLHS000792603--SLHS000792610) |
| 19 | 1346 E-mail from Sandy Stevenson to Jon Schott re: ...681 |
| | E-mailing; Executed, Jonathan Schott, MD Med. |
| 20 | Dir. Agr 10.1.11.pdf w/Attach: Employment |
| | Agreement - Jonathan Schott MD.pdf; Executed, |
| 21 | Jonathan Schott, MD Med. Dir. Agr 10.1.11.pdf; |
| | Medical Site Manager JD - Final.docx (PLTs' |
| 22 | Dep. Ex. 446; SLHS000980797--SLHS000980836) |
| | 1347 Cardiovascular and Chest Surgical Associates, ...681 |
| 23 | PA -SLHS Integration Proposal Executive Summary |
| | (PLTs' Dep. Ex. 450; |
| 24 | SLHS000474024--SLHS000474026) |
| | 1349 Noncompetition Agreement, Scott Huerd (PLTs' ....681 |
| 25 | Dep. Ex. 452; SLHS0000020992--SLHS0000020999) |

Case 1:12-cv-00560-BLW Document 553 Filed 11/04/14 Page 9 of 56

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Bench trial, 09/27/2013

652

```
1   1352 St. Luke's Clinic Leadership Council Meeting ....681
        Minutes (PLTs' Dep. Ex. 456;
        SLHS000675167--SLHS000675172)
3   1353 Comparison between terms of employment of St. ...681
        Al's and St. Luke's (PLTs' Dep. Ex. 458;
        SLHS001090000--SLHS001090001)
5   1358 E-mail from James Souza to Bart Hill re: RE: ....681
        Saltzer does and credentials (PLTs' Dep. Ex.
        463; SLHS001094008--SLHS001094009)
7   1359 E-mail from James Souza to Gary Fletcher and ....681
        Chris Roth re: RE: GIs/Page (PLTs' Dep. Ex.
        464; SLHS001094361--SLHS001094362)
9   1364 Contract's Committee Meeting Agenda (PLTs' Dep. .681
        Ex. 479; SMG000000308--SMG000000309)
11  1365 E-mail from Randell Page to Nancy Powell, Bill ..681
        Savage, John Kaiser, et al. Re: Saltzer: TVH
        Non-Compete Memo (PLTs' Dep. Ex. 480;
        SMG000279055--SMG000279056)
13  1367 E-mail from Randell Page to Bill Savage and .....681
        John Kaiser re: St Luke's/st Al's proposal
        (PLTs' Dep. Ex. 482;
        SMG000281910--SMG000281911)
15  1369 St. Luke's Strategic Planning Document (PLTs' ...681
        Dep. Ex. 484; SMG000039297--SMG000039369)
17  1370 E-mail from Randell Page to Andrew Curran, Bill .681
        Savage, John Kaiser, Nancy Powell, and Patricia
        Buersmeyer re: Draft letter of intent (PLTs'
        Dep. Ex. 485; SMG000279202--SMG000279203)
19  1371 E-mail from Randell Page to Bill Savage, et al. .681
        Re: ER referral St Luke's nampa (PLTs' Dep. Ex.
        486)
21  1372 E-mail from Randell Page to John Kee, Bill .......681
        Savage, and John Kaiser re: St luke's/saltzer
        alignment (PLTs' Dep. Ex. 487;
        SLHS0000006618--SLHS0000006618)
23  1373 E-mail from Michael Djernes to Randell Page re: .681
        RE: Contingency plan (PLTs' Dep. Ex. 488;
        SALTZER047704--SALTZER047705)
25  1375 John Kaiser Handwritten Notes (PLTs' Dep. Ex. ...681
        490; SMG000037708--SMG000037708)
    1376 E-mail from John Kaiser to Randell Page re: RE: .681
        Psa's (PLTs' Dep. Ex. 492;
        SMG000305149--SMG000305149)
    1378 St. Luke's - Saltzer PSA DRAFT (PLTs' Dep. Ex. .681
        494)
    1379 Saltzer Negotiating Committee Memo to Executive .681
        Committee Re: PSA Term Sheet (PLTs' Dep. Ex.
        495; SMG000039016--SMG000039031)
```

653

```
1   1380 E-mail from Nancy Powell to John Kaiser, ........681
        Randell Page, Patricia Buersmeyer, and Andrew
        Curran re: Comp Proposal (PLTs' Dep. Ex. 496;
        SMG000279023--SMG000279023)
3   1383 E-mail from Gary Fletcher to John Kee and Chris .681
        Roth re: Additional items for PSA agreement
        (PLTs' Dep. Ex. 500;
        SLHS000000299--SLHS000000299)
5   1384 E-mail from Nancy Powell to John Kaiser et al. ..681
        Re: Tonight's meeting (PLTs' Dep. Ex. 501;
        COKER0007737--COKER0007737)
7   1385 Executive Committee Meeting Scheduler from Bill .681
        Savage w/ John Kaiser Meeting Notes (PLTs'
        Dep. Ex. 502; SMG000037709--SMG000037709)
9   1387 E-mail from John Kaiser to Brandy Welch re: RE: .681
        Could you send an E-mail regarding the news
        last night (PLTs' Dep. Ex. 509;
        SMG000301370--SMG000301370)
11  1389 Letter from John Kaiser to Patient re: .........681
        [Surgeons leaving Saltzer] (PLTs' Dep. Ex. 507)
13  1390 E-mail from John Kaiser to All Physicians CC: ...681
        Bill Savage and Kathy Maggard re: Letter [sic]
        of Intent Vote (PLTs' Dep. Ex. 508;
        SMG000283574--SMG000283574)
15  1391 E-mail from John Kaiser to John C. Freeman re: ..681
        RE: Vote (PLTs' Dep. Ex. 509;
        SMG000300922--SMG000300923)
17  1392 E-mail from John Kaiser to Michael Djernes re: ..681
        Re: Contract (PLTs' Dep. Ex. 510;
        SMG000301148--SMG000301149)
19  1393 E-mail from John Kaiser to Bill Savage re: St. ..681
        Luke's negotiations no (PLTs' Dep. Ex. 511;
        SALTZER088297--SALTZER088299)
21  1394 E-mail from Max Reiboldt to Aimee Greeter and ...681
        Nancy Nancy Powell re: RE: SL PCP in Canyon
        County (PLTs' Dep. Ex. 512;
        SMG000293141--SMG000293143)
23  1397 E-mail from Heather LaBour to Roberto Barresi ..681
        re: Saturday (PLTs' Dep. Ex. 516;
        SLHS001093867--SLHS001093867)
25  1398 E-mail from Annette Larsen-Leavitt to Krishna ..681
        Alluri, Thomas Beck, Sarah Bolender et. Al. Re:
        Larsen-Leavitt w/Attach:
        Physicianetreatminutes2012.doc (PLTs' Dep. Ex.
        517; SLHS0000009078--SLHS0000009090)
    1399 Executive Committee Meeting Minutes (PLTs' Dep. .681
        Ex. 518; SMG000000888--SMG000000888)
```

654

```
1   1400 Memo from Negotiating Committee to Executive ...681
        Committee re: PSA Term Sheet w/Enclosure PSA
        Term Sheet (PLTs' Dep. Ex. 519;
        SMG000039016--SMG000039031)
3   1401 Executive Committee Meeting Minutes (PLTs' Dep. .681
        Ex. 520; SMG000000921--SMG000000924)
5   1402 Executive Committee Meeting Minutes (PLTs' Dep. .681
        Ex. 521; SMG000000937--SMG000000938)
7   1403 E-mail from Randell Page to Bill Savage and .....681
        John Kaiser re:St Luke's/st Al's proposal
        (PLTs' Dep. Ex. 523;
        SMG000281910--SMG000281911)
9   1404 E-mail from Ryan McKinnon to Harold Kunz re: ...681
        RE: Contingency plan (PLTs' Dep. Ex. 524;
        SALTZER047702--SALTZER047703)
11  1405 E-mail from John Kee to Bill Savage re: RE: .....681
        Saltzer (PLTs' Dep. Ex. 525;
        SALTZER214252--SALTZER214253)
13  1406 E-mail from David R. Orchard to Bill Savage re: .681
        SWOT Surgery Center w/ Attach SWOT analysis
        Outpatient Surgery Center.docx (PLTs' Dep. Ex.
        526; SALTZER214522--SALTZER214571)
15  1407 E-mail from Tawna Miles to Stephani Bothen, ....681
        Hedrick Gay, Alena Hope et. Al. Re: Saltzer
        Providers pdate (PLTs' Dep. Ex. 527;
        SMG000302643--SMG000302644)
17  1410 Saltzer Medical Group, P.A. Annual Shareholders .681
        Meeting Minutes (PLTs' Dep. Ex. 530;
        SMG000287308--SMG000287308)
19  1415 Form Letter from St. Luke's Boise Orthopedic ....681
        Clinic to Micron Employees re: Loss of Tier 1
        status (PLTs' Dep. Ex. 555;
        SLHS000879568--SLHS000879568)
21  1416 Letter from Steve Drake to Allison Robbins re: ..681
        Termination Notices for Patients (PLTs' Dep.
        Ex. 556; SLHS000258340--SLHS000258340)
23  1418 Second Amendment to Agreement Between St. ......681
        Luke's Regional Medical Center and Marshall F.
        Priest, M.D (PLTs' Dep. Ex. 558;
        SLHS000464293--SLHS000000194977)
25  1419 Letter Charles E. Eiriksson and Robert Duerr to .681
        Sandra Bruce re: First Right of Refusal
        w/Enclosure: St. Luke's Offer to Purchase
        Curtisian Office Units (PLTs' Dep. Ex. 559;
        SLHS000378723--SLHS000738742)
    1420 E-mail from Murali Bathina to Marshall Priest ...681
        re: Vascular surgeons (PLTs' Dep. Ex. 561;
        SLHS001411428--SLHS001411428)
```

655

```
1   1421 St. Luke's System Physician IT Steering .........681
        Committee (SPITSC) Meeting Agenda (PLTs' Dep.
        Ex. 562; SLHS000209490--SLHS000209496)
3   1422 St. Luke's Clinic Physician Leadership Council ..681
        Meeting Agenda (PLTs' Dep. Ex. 563;
        SLHS001202611--SLHS001202641)
5   1423 Southern Idaho Healthcare Cooperative, St. ......681
        Luke's Magic Valley Regional Medical Center and
        Magic Health Delivery (PLTs' Dep. Ex. 564;
        SLHS000073465--SLHS000073504)
7   1424 Clinical Integration Committee Meeting Minutes ..681
        (PLTs' Dep. Ex. 565;
        SLHS000475285--SLHS000475291)
9   1425 St. Luke's Presentation: St. Luke's Clinic ......681
        Magic Valley Leadership Council - Overview
        (PLTs' Dep. Ex. 566;
        SLHS000969626--SLHS000969626)
11  1426 Real Estate Purchase and Sale Agreement, St. ...681
        Luke's and B.O.C. Real Property, LLP (PLTs'
        Dep. Ex. 570; SLHS0000017964--SLHS0000017971)
13  1427 Asset Acquisition Agreement: St. Luke's and .....681
        B.O.C. Equipment, LLP (PLTs' Dep. Ex. 571;
        SLHS0000018002--SLHS0000018009)
15  1428 Professional Goodwill Agreement, St. Luke's and .681
        Robert Walker (PLTs' Dep. Ex. 572;
        SLHS0000018078--SLHS0000018085)
17  1429 Noncompetition Agreement, Robert Walker (PLTs' ..681
        Dep. Ex. 573; SLHS0000018086--SLHS0000018091)
19  1430 E-mail from Robert Walker to James Johnson, et ..681
        al. Re: Saltzer Ortho clinics (PLTs' Dep. Ex.
        574; SLHS1418117--SLHS1418117)
21  1431 BOC Foundation of Sports Medicine Practice .....681
        (PLTs' Dep. Ex. 575;
        SLHS000168911--SLHS000168917)
23  1432 E-mail from Connie Kniefel to Robert Walker re: .681
        JMJ (PLTs' Dep. Ex. 576;
        SLHS1417498--SLHS1417499)
25  1433 Physician Employment Agreement, St. Luke's and .681
        Erik Heggland (PLTs' Dep. Ex. 577;
        SLHS000001979--SLHS000001997)
    1434 Noncompetition Agreement, Erik Heggland (PLTs' .681
        Dep. Ex. 579; SLHS0000019818--SLHS0000019826)
    1435 Memo from John Kee to Jim Souza, Robert Walker, .681
        Chris Roth, Joni Stright, and Erik Heggland re:
        Hand Program Developments (PLTs' Dep. Ex. 580;
        SLHS1416387--SLHS1416391)
```

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 10 of 56

Bench trial, 09/27/2013

## 656

1. 1436 E-mail from Debbie Kytle to Laura Stewart, ......681 James Angle, John Kee et. Al. Re: Re: New Independent Physician Group in Magic Valley - media request (PLTs' Dep. Ex. 601; SLHS000421354--SLHS000421356)
2. 
3. 1437 E-mail from Brian Fortuin to Geoffrey Swanson ...681 re: PLC (PLTs' Dep. Ex. 603; SLHS000544665--SLHS000544666)
4. 1438 Adebayo O. Crownson, M.D.'s Resume (PLTs' Dep. ...681 Ex. 604; SLHS000496055--SLHS000496058)
5. 
6. 1439 Physician Employment Agreement between St. ......681 Luke's Regional Medical Center Ltd. And Ababayo O. Crowson (PLTs' Dep. Ex. 605; SLHS000019141--SLHS0000019162)
7. 
8. 1440 First Amendment to Physician Employment .........681 Agreement between St. Luke's Regional Medical Center Ltd. And Ababayo O. Crownson (PLTs' Dep. Ex. 606; SLHS000496017--SLHS000496019)
9. 
10. 1441 E-mail from Brenda Sinclair to Bill Savage, ....681 Bayo Crownson, Joni Joni Stright, et. Al. Re: Lunch Meeting - Saltzer Medical Group / SL FM - (Agenda Below) (PLTs' Dep. Ex. 607; SLHS000001570--SLHS0000001570)
11. 
12. 1442 E-mail from Sandy Stevenson to Bayo Crownson ....681 re: Meetings with Bill Savage (PLTs' Dep. Ex. 608; SLHS001404779--SLHS001404779)
13. 1443 E-mail from Bayo Crownson to Joni Stright re: ...681 RE: Rich Ballantyne (PLTs' Dep. Ex. 609; SLHS001404862--SLHS001404862)
14. 
15. 1445 Physician Services One-on-One Engagement (PLTs' .681 Dep. Ex. 611; SLHS001146556--SLHS001146557)
16. 1446 E-mail from Harold Kunz to Steven Williams re: ...681 Farewell (PLTs' Dep. Ex. 613; SALTZER178308--SALTZER178309)
17. 
18. 1447 E-mail from Tom Patterson to Perry Brown re: ....681 Re: Saint Alphonsus Health System Strategic Update (PLTs' Dep. Ex. 614; SALTZER055685--SALTZER055686)
19. 
20. 1448 E-mail from Tom Patterson to Bill Savage re: ...681 Fwd: Message from Sally Jeffcoat: Saint Alphonsus Health System Strategic Update w/Attach: SJ_SAHS Strategic Update_11-12-12_FPO.pdf (PLTs' Dep. Ex. 615; SALTZER419502--SALTZER419504)
21. 
22. 
23. 1449 E-mail from Ryan McKinnon to Tom Patterson re: ..681 Direct Mail Letter (PLTs' Dep. Ex. 616; SALTZER520116--SALTZER520117)
24. 
25. 

## 657

1. 1450 E-mail from Tom Patterson to Nora Davis, Brandy .681 Welch, Byron Knowles et al. Re: SironaHealth (PLTs' Dep. Ex. 617; SALTZER049103--SALTZER049103)
2. 
3. 1451 Joint Finance/Planning Committee Meeting (PLTs' .681 Dep. Ex. 618; SLHS0000015208--SLHS0000015210)
4. 1452 E-mail from Joni Stright to John Kee, Gary ......681 Fletcher, Chris Roth et al. Re:Saltzer Board Executive Summary 08 24 12.doc w/Attach: Saltzer Board Executive Summary 08 24 12.doc (PLTs' Dep. Ex. 619;
5. 
6. 
7. SLHS0007898--SLHS0000007902)
8. 1453 Integration with Saltzer Medical Group (PLTs' ..681 Dep. Ex. 620; SLHS0000010099--SLHS0000010103)
9. 1457 Patricia Richards's Notes from Call with David ..681 C. Pate (PLTs' Dep. Ex. 626; SELH0001838--SELH0001846)
10. 
11. 1459 St. Luke's Audit and Finance Committee Meeting ..681 (PLTs' Dep. Ex. 636; SLHS0000007637--SLHS0000007671)
12. 
13. 1460 St. Luke's Board of Directors Meeting (PLTs' ....681 Dep. Ex. 637; SLHS0000011978--SLHS0000012133)
14. 1461 St. Luke's Presentation: Developing the Vision ..681 and Strategy for Physician Alignment and Clinical Integration for St. Luke's Health System (PLTs' Dep. Ex. 639; SLHS000039794--SLHS000039823)
15. 
16. 
17. 1464 Letter from Peter LaFleur to Jeff Taylor re: ...681 [Update of terms for engagements] (PLTs' Dep. Ex. 641; SLHS000257640--SLHS000257644)
18. 1466 E-mail from Peter LaFleur to Jeffrey Lubeck re: .681 Saltzer update 4 9 2010 provided to Saltzer.ppt w/Attach: Saltzer update 4 9 2010 provided to Saltzer.ppt (PLTs' Dep. Ex. 652; CON000850--CON0000851)
19. 
20. 
21. 1467 Peter LaFleur Investigational Hearing ...........681 Transcript (PLTs' Dep. Ex. 653)
22. 1469 E-mail from Edward Castledine to John Kee and ...681 Peter LaFleur re: FW: Friday w/Attachment:Imaging Cases by Zip Code.xlsx; Surgical Cases by Zip Code.xlsx (PLTs' Dep. Ex. 655; CON0007053--CON0007055)
23. 
24. 1470 E-mail from Edward Castledine to Peter LaFleur .681 re: Saltzer Medical Group Hurdles.xlsx w/Attach: Saltzer Medical Group Hurdles.xlsx (PLTs' Dep. Ex. 656; CON 0006028--CON 0006029)
25. 1471 E-mail from Edward Castledine to Peter LaFleur .681 re: Saltzer board presentation (PLTs' Dep. Ex. 657; CON0007047--CON0007048)

## 658

1. 1472 E-mail from Peter LaFleur to Jefferey Lubeck, ..681 Gary Fletcher, John Kee et al. Re: Draft Slides for Saltzer w/Attachment: Saltzer TV Board 06 29 2011.pptx (PLTs' Dep. Ex. 658)
2. 
3. 1473 E-mail Jeff Taylor to Chris Roth Gary ........681 Fletcher and Carol Wilmes re: Revised Slides w/Attachment: Saltzer.pptx (PLTs' Dep. Ex. 659; CON0007059--CON0007060)
4. 
5. 1474 E-mail from Edward Castledine to Peter LaFleur .681 re: Saltzer Board presentation (PLTs' Dep. Ex. 660; CON0007051--CON0007052)
6. 
7. 1475 E-mail from Scott Fallis tto Peter LaFleur re: ..681 RE: LOI (PLTs' Dep. Ex. 663; CON010956--CON0010960)
8. 1478 E-mail from Chris Roth to Peter LaFleur and ....681 Jeff Taylor re: RE: Saltzer LOI (PLTs' Dep. Ex. 664; CON0005213--CON00005214)
9. 
10. 1479 E-mail from Peter LaFleur to Bill Savage re: ....681 FW: Compensation model (PLTs' Dep. Ex. 665; CON0012726--CON0012729)
11. 1480 E-mail from Peter LaFleur to Jeffrey Lubeck and .681 Kyle Lubeck re: Saltzer Update 5 7 2010 w/Attachment Saltzer Update 5 7 2010.ppt (PLTs' Dep. Ex. 666; CON0000983--CON0000984)
12. 
13. 1481 E-mail from Peter LaFleur to John Kee re: RE: ...681 FW [2] : Saltzer Acquisition (PLTs' Dep. Ex. 667; SLHS000048646--SLHS000048647)
14. 1482 E-mail from Jeff Taylor to Peter LaFleur re: ....681 Fwd: Saltzer Acquisition - Blue Cross notice w/Attachment:SLHS Saltzer Acquisition.pdf; ATT00001.htm (PLTs' Dep. Ex. 668; CON0009111--CON0009113)
15. 
16. 
17. 1483 Various Finance-Related Notes by Scott Clement ..681 (PLTs' Dep. Ex. 669; REGENCE 002988--REGENCE 002990)
18. 
19. 1484 Chargemaster Business Proposition Timeline by ..681 Scott Clement (PLTs' Dep. Ex. 670; REGENCE 003026--REGENCE 003026)
20. 1485 Notes from Meeting with Steve Drake (PLTs' Dep. .681 Ex. 671; REGENCE 003014--REGENCE 003016)
21. 1488 St. Luke's Presentation: Nampa/Caldwell Area ...681 Demand Assessment (PLTs' Dep. Ex. 674; SLHS000783007--SLHS000783042)
22. 
23. 1503 Amended Notice of 30(B)(6) Video Deposition of .681 Grant Thornton (PLTs' Dep. Ex. 693)
24. 1504 Grant Thornton Statement of Work for .........681 Compensation and Benefits Consulting Services (PLTs' Dep. Ex. 694; GT003254--GT003261)
25. 1505 St. Luke's Analysis of Reimbursement Rates ......681 (PLTs' Dep. Ex. 696; GT003051--GT003051)

## 659

1. 1508 St. Luke's Health System Form 990: Return of ...681 Organization Exempt From Income Tax (PLTs' Dep. Ex. 699)
2. 
3. 1510 E-mail from David C. Pate to Gary Fletcher re: ..681 My draft thought about ACO and physician leadership evolution (PLTs' Dep. Ex. 701; SLHS000086168--SLHS000086170)
4. 
5. 1528 E-mail from David C. Pate to Randy Billings, ...681 Gary Fletcher, Jeff Taylor et al. Re:RE[4]: Micron possibilities (PLTs' Dep. Ex. 721; SLHS000076828--SLHS000076831)
6. 
7. 1537 E-mail from Michael Djernes to Patricia .......681 Buersmeyer re: Another Thought (PLTs' Dep. Ex. 732; SALTZER193370--SALTZER193370)
8. 1539 E-mail from Michael Djernes to John Kaiser ......681 re:Offer (PLTs' Dep. Ex. 734; SALTZER266009--SALTZER266070)
9. 
10. 1548 Letter from Lance Coleman, M.D. to Blue Cross ..681 of Idaho (PLTs' Dep. Ex. 744; BCI266332--BCI266333)
11. 1550 St. Alphonsus Medical Group - Provider Report ..681 Card (PLTs' Dep. Ex. 746; BCI373636--BCI373864)
12. 1551 Saltzer Medical Group - Provider Report Card ...681 (PLTs' Dep. Ex. 747; BCI373781--BCI373793)
13. 1552 Letter from Lance Coleman, M.D, to Terry G. ....681 Ribbens (PLTs' Dep. Ex. 748; SLHS1408746--SLHS1408746)
14. 1553 Physician Advisory Panel - draft minutes (PLTs' .681 Dep. Ex. 749; BCI218353--BCI218356)
15. 1554 Physician Advisory Panel - draft minutes (PLTs' .681 Dep. Ex. 750; BCI239498--BCI239502)
16. 1555 Blue Cross of Idaho Quality Program Evaluation .681 1/1/2010 to 12/31/2010 (PLTs' Dep. Ex. 751; BCI372933--BCI372982)
17. 
18. 1556 Blue Cross of Idaho Quality Program Evaluation .681 1/1/2011 to 12/31/2011 (PLTs' Dep. Ex. 752; BCI372983--BCI372024)
19. 
20. 1557 Blue Cross of Idaho Quality Program Evaluation .681 1/1/2012 to 12/31/2012 (PLTs' Dep. Ex. 753; BCI373025--BCI373074)
21. 1558 2011 Quality Program Evaluation; 2012 Quality ..681 Program Description and Work Plan (PLTs' Dep. Ex. 754; BCI245700.pptx--BCI245700.pptx)
22. 
23. 1559 Medical Policy - Blue Cross of Idaho Spine ......681 (PLTs' Dep. Ex. 755; BCI104651--BCI104651)
24. 1560 Provider Alert - Lumbar Fusion Surgery (PLTs' ..681 Dep. Ex. 756; SLHS306209--SLHS306209)
25. 1564 Saltzer Medical Group - Provider Report Card ...681 (PLTs' Dep. Ex. 762; BCI373794--BCI373822)

Case 1:12-cv-00560-BLW v. Document 553 Filed 11/04/14 Page 11 of 56

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/27/2013

**660**

1  1565 Minutes of the Board of Directors General .......681 Meeting St. Luke's Health System, Ltd. (SLHS0000010784--SLHS0000010790)

3  1568 RSS Feed Posted by PateD re: The Value in .......681 Clinical Integration (SLHS000361373--SLHS000361375)

4  1569 Letter from Eric Gonzaga and Bill Hopkins to ..681 Joni Stright re: Analysis of Proposed Compensation Arrangement - Saltzer Medical Group, Family Practice Physicians (SLHS0000001320--SLHS0000001346)

6  1570 St. Luke's Presentation: West Treasure Valley ...681 Strategic Planning (SLHS0000003073--SLHS0000003073)

8  1573 Outlook Scheduler from Brenda Sinclair: System .681 Clinical Leadership Council - Executive (SLHS000679532--SLHS000679565)

9  1575 HIE Assessment: IHDE Value and Opportunity for ..681 SLHS (SLHS000193297--SLHS000193299)

11  1581 Spreadsheet: St. Luke's Employed and PSA .......681 physicians, PAs, & NPs (all of Idaho and Eastern Oregon). (SLHS0000000001--SLHS0000000001)

13  1582 St. Luke's and PHMG Presentation: Clinical ......681 Leadership Council (SLHS000084567--SLHS000463569)

14  1583 SLHS Payor Contracting Committee Agenda ........681 (SLHS000798589--SLHS000798598)

15  1584 SLHS Payor Contracting Committee Agenda ........681 (SLHS000910529--SLHS000910539)

16  1585 SLHS Payor Contracting Committee Agenda ........681 (SLHS000728358--SLHS000728366)

17  1586 St. Luke's Outline: SLHS Contracting Strategy ...681 Current Processes versus Opportunities (SLHS000591982--SLHS000591984)

18  1587 E-mail from Janice Fulkerson to Randy Billings ...681 and Geoffrey Swanson re: Network Sizing.xls (SLHS000585929--SLHS000585931)

20  1589 St. Luke's Presentation: Physician Integration ...681 (SLHS000005812--SLHS000005812)

21  1590 E-mail from Steve Drake to Randy Billings re: ...681 SLHS Payor Contracting Committee - SelectHealth Rate Proposal (SLHS000657656--SLHS000657658)

22  1592 Greater Treasure Valley Physician Demand and ....681 Recruitment (SLHS000040970--SLHS000040990)

23  1593 HealthCare Futures Presentation: Background ....681 Materials for July 28, 2009 Board of Directors Retreat (SLHS000747114--SLHS000747114)

**661**

1  1594 Professional Goodwill Acquisition Agreement ...681 between St. Luke's and Saltzer (SLHS000786654--SLHS000786861)

3  1602 Email from Mike Reno to Geoffrey Swanson ........681 regarding Transformation to Accountable Care Score (SLHS000551269--SLHS000551270)

4  1604 Letter from Randall Billings to Zelda ...........681 Geyer-Sylvia (BCI) regarding St. Luke's 2013 contract renewal options (SLHS000728363--SLHS000728366)

6  1606 Email from Chris Roth to Barbara Wilson ........681 regarding Saltzer (SLHS000785625--SLHS000785626)

7  1607 Email from Kurt Seppi to John Werdel regarding ..681 SLHS Referrals (SLHS000886074--SLHS000886077)

9  1615 Email regarding Greg Sonnenberg ................681 (SLHS000055859--SLHS000055860)

10  1617 Email regarding Greg Sonnenberg ................681 (SLHS000133759--SLHS000133759)

11  1618 Email regarding Greg Sonnenberg ................681 (SLHS000133760--SLHS000133761)

12  1621 Email and attachment regarding clinical .......681 integration (SLHS000580486--SLHS000580490)

13  1622 Letter from D. Pate to Zelda Geyer-Sylvia ......681 regarding Blue Cross rates (SLHS000586941--SLHS000586960)

14  1627 Email regarding Meridian ASC ....................681 (SLHS000883295--SLHS000883296)

15  1633 Email regarding Saltzer Enrollment - Non-St. ...681 Luke's Plans (SLHS001372035--SLHS001372037)

16  1635 St. Luke's Saltzer Operating Counsel ...........681 (SLHS001399304--SLHS001399306)

17  1636 Email regarding Saltzer physician recruitment ..681 (SLHS1416629--SLHS1416631)

18  1637 Email regarding Saltzer ..........................681 (SLHS1417061--SLHS1417063)

19  1655 TVH Physician case count report (TVH 59853--TVH .681 59853)

20  1656 Detail Income Statement for December 31, 2011 ..681 (TVH 53740--TVH 53740)

21  1657 Detail Income Statement for December 31, 2012 ..681 (TVH 56193--TVH 56193)

22  1658 Memo from David C. Pate to St. Luke's System ...681 Leadership, St. Luke's Site Leadership Teams, St. Luke's Clinic Divisional Medical Directors regarding organizational changes

24  1659 St. Luke's presentation entitled "Payer .........681 Discussion" (44 pages) (SLHS000153214)

25  1660 Email from R. Billings regarding lab billing ...681 (SLHS001368640--SLHS001368644)

**662**

1  1662 Saltzer charts entitled "From Patient .........681 Demographics", "From Referrals", and "Patient Records Sent to Former Saltzer Practitioiners" (SALTZER560918--SALTZER560919)

3  1663 Saltzer packet including charts entitled "From ..681 Patient Demographics", "From Referrals", and Saltzer Executive Committee and Nominating Committee minutes (SALTZER560607--SALTZER560914)

5  1664 Email to/from Crouch and Randy Billings ........681 regarding Patient Centered Medical Home. (BC1363626--BC1363626)

7  1840 Email re: Elmore and Saltzer integration ........681 (SLHS000718238--SLHS000718239)

8  1861 Balance Sheet & Consolidated Income Statement ...681 dated September 30, 2009 (SALTZER000001--SALTZER000373)

9  1863 Balance Sheet & Consolidated Income Statement ...681 dated September 30, 2011 (SALTZER000724--SALTZER001176)

11  1947 Printout from Saint Luke's website of a list of .681 St. Luke's Family Medicine Clinic Locations (www.stlukesonline.org/clinic/family_medicine)

12  1948 Printout from Saint Luke's website of a list of .681 St. Luke's Internal Medicine Clinic Locations (www.stlukesonline.org/clinic/internal_medicine)

14  1949 Printout from Saint Luke's website of a list of .681 St. Luke's Pediatric Clinic Loations (www.stlukesonline.org/clinic/pediatrics)

16  1950 Printout from Saint Alphonsus website ...........681 (www.saintalphonsus.org/saint-alphonsus-health-plazas)

18  1951 Printout from Saint Alphonsus website............681 (www.saintalphonsus.org/family-medicine-nampa-dallan-woods)

19  1952 Printout from Saint Alphonsus website............681 (www.saintalphonsus.org/garrity)

20  1953 Email from S. Jeffcoat to T. Reinhardt ..........681 regarding meeting with BSG (ALPH00008828-8829)

21  1954 Document entitled "Saint Alphonsus Health .......681 System Payer Partnership and Growth Strategy" (ALPH00848251)

23  1955 Document entitled "St. Luke's Health System An .681 Overview of Physician Alignment Strategy and Outcomes" (SLHS000476374-476382)

24  1956 Document entitled "St. Luke's Magic Valley ......681 Region" (SLHS000012709-12711)

25  1957 Document entitled "St. Luke's Clinic Treasure ...681 Valley" (SLHS000039819-39825)

**663**

1  1958 Document entitled "Stata Base Reference Manual ..681 - Release 13" (Plaintiff Dep. Ex. 779)

2  1998 Document entitled Randy Billings, Vice ..........685 President Payor and Provider Relations, St. Luke's Health System (PLTs' Dep. Ex. 270; SLHS000728341)

**DEFENDANTS**

**E X H I B I T S**

**ADMITTED**

8  2002 Email and attachment from J. Reilly to K. Fry ...681 attaching Micron Proposal from Saint Alphonsus (Def. Dep. Exh. 3; ALPH00147420-622)

10  2005 Exhibits to Saint Alphonsus Micron proposal .....681 (Def. Dep. Exh. 6; ALPH00147488-96)

11  2013 Email exchange and attachment re Letter from ....681 Dr. Page (Def. Dep. Exh. 16; SMG000005318-20)

13  2014 Email and attachment from S. Williams to D. .....681 Beasley re ECM Minutes for 12/09/2011 (Def. Dep. Exh. 17; SWW 00173-75)

15  2015 Offer letter from T. Reinhardt to S. Williams ..681 re Professional Services Agreement with St. Alphonsus Health System (Def. Dep. Exh. 21; SWW 00008-11)

16  2018 Offer letter from T. Reinhardt to S. Williams ..681 re Professional Services Agreement with St. Alphonsus Health System (executed) (Def. Dep. Exh. 24; ALPH00126143-47)

18  2019 Professional Services Agreement between Saint ...681 Alphonsus Regional Medical Center, Inc. And Victory Surgical Services, PLLC (Def. Dep. Exh. 25; ALPH00563079-102)

20  2021 Draft Professional Services Agreement between ...681 St. Luke's Regional Medical Center, Ltd. And Saltzer Medical Group, P.A. (Def. Dep. Exh. 31; SMG000000106-32)

22  2022 Email from S. Andrew to M. Chenore et al. Re ...681 Orthopedic Department Resignation (Def. Dep. Exh. 32; SMG000284567-68)

23  2023 Independent Contractor On-Call Clinical ........681 Services Agreement between Saint Alphonsus Medical Center - Nampa, Inc. And Keith G. Holley, MD (Def. Dep. Exh. 33; KGH 00009-19)

Case 1:12-cv-00560-BLW Document 553 Filed 11/04/14 Page 12 of 56

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/27/2013

## 664

1  2024 Offer letter from T. Reinhardt to K. Holley, MD .681 re Professional Services Agreement (executed 8/29) (Def. Dep. Exh. 35; ALPH00126158-61)

2  2025 St. Alphonsus Announcement re Holley  (Def. .......681 Dep. Exh. 38; ALPH00102982-83)

3  2026 Draft Amended and Restated Agreement of Limited .681 Partnership of Treasure Valley Surgery Center - Nampa, LP (Def. Dep. Exh. 40; KGH 00268-310)

4  2028 Saint Alphonsus Regional Medical Center FY2013 .681 Strategic Update (July 2012) (Def. Dep. Exh. 42)

6  2029 Saint Alphonsus Regional Medical Center FY2012 .681 Annual Report (Def. Dep. Exh. 43)

8  2030 Email from T. Seibert to T. Anderson et al. Re ......681 Draft West Valley Strategy Summary (Def. Dep. Exh. 46; ALPH00077483)

9  2031 West Valley Strategy (Def. Dep. Exh. 47; .........681 ALPH00077484-93)

10  2032 Boise-Integrated Operations Team Agenda/Minutes .681 (Def. Dep. Exh. 34; ALPH00001503-08)

11  2039 Email and attachment from S. Bundgard to S. ....681 Brown re Requested Information (Def. Dep. Exh. 60; ALPH00001794-95)

12  2047 Email and attachment from M. Roach to A. Romero .681 re 12-Step Practice Acquisition and Physician Employment Toolkit (Def. Dep. Exh. 69; ALPH00518492-93)

14  2048 Physician Contracting Committee Minutes (Def. ...681 Dep. Exh. 70; ALPH00622469-70)

15  2049 Email and attachment from M. Darr to S. Brown ...681 et al. Re Tomorrow's Phys Contracting Committee Meeting [Additional Meeting Materials] (Def. Dep. Exh. 71; ALPH00517350-51)

17  2050 Physician Contracting Committee Minutes (Def. ...681 Dep. Exh. 72; ALPH00622531-32)

18  2053 Email and attachment from T. Reinhardt to B. ....681 Vance-Wehrli et al. Re Narratives for Trinity 12-8-10 summary.ppt (Def. Dep. Exh. 76; ALPH00077301-02)

21  2054 Email and attachment from T. Reinhardt to B. ....681 Vance-Wehrli et al. Re Narratives for Trinity 12-8-10 summary.ppt (Def. Dep. Exh. 76; ALPH00077301-02)

22  2055 Email and attachment from D. Cox to B. Morgan ...681 et al. Re Internal Medicine & Hospitalist Recruitment Strategy (Def. Dep. Exh. 78; ALPH00455791-92)

24  2059 Email and attachment from A. Romero to T. .......681

25  Anderson et al. Re Fragmentation Examples at SAHS (Def. Dep. Exh. 82; ALPH00457401-02)

## 665

1  2062 Email and attachment from T. Seibert to T. ......681 Anderson et al. Re Draft West Valley Strategy Document (Def. Dep. Exh. 85; ALPH00077483-93)

3  2065 Saltzer/ACN Participation Agreement (Def. Dep. ..681 Exh. 91; SMG00000347-70)

4  2066 Assignment and Assumption Agreement by Saltzer .681 to STL for ACN Participation agreement (Def. Dep. Exh. 92; SLHS001222473-75)

5  2067 Email exchange between G. Sonnenberg, K. Gries, .681 D. Jones, E. Barker re Saltzer Update: Confidential: Connected Care Membership - Jan 2013 (Def. Dep. Exh. 93; ALPH000156233-34)

7  2068 Email from G. Sonnenberg to L. Checketts, S. .....681 Brown, B. Petersen, E. McEachern re acquisition of Saltzer (Def. Dep. Exh. 94; ALPH00027242)

9  2069 Email exhange and attachments from G. ..........681 Sonnenberg to J. Reilly et al. Re: Truman (Def. Dep. Exh. 95; ALPH00136911-23)

10  2070 Presentation re The Saint Alphonsus Health ......681 Alliance Payor Strategy - Idaho (Def. Dep. Exh. 96; ALPH00369291)

11  2071 Email and attachments from A. Sawyer to B. ......681 Fickes et al. Re ACO Steering Advance Materials for 8/15 Meeting (Def. Dep. Exh. 97; ALPH00500350; ALPH00503462-63)

13  2072 Email exchange between T. Richards, S. Brown ...681 et al. Re Criteria for Initial Invitation to Join the Alliance 8-2-12 draft TR.doc (Def. Dep. Exh. 98; ALPH00022364-66)

15  2073 Email and attachments from M. Helms to A. ......681 Sawyer et al. Re ACO Steering Committee Meeting - 9/27/2012 Materials Attached (Def. Dep. Exh. 99; BDC005067-89)

17  2074 Email and attachment from E. Barker to S. .......681 Drake, T. Newman re Termination of St. Luke's Boise Surgical Group Physicians (Def. Dep. Exh. 104; SLHS000660618-19)

19  2075 Saint Alphonsus Health System Strategic Plan ....681 Overview. Board Retreat (Def. Dep. Exh. 108)

20  2076 Saint Alphonsus Medical Center-Nampa .............681 Improvement Plan (Def. Dep. Exh. 109; ALPH00405799)

22  2077 Saint Alphonsus Finance/Planning Committee ......681 Presentation re Develop Nampa Heath Plaza; Proposal (Def. Dep. Exh. 110; ALPH00429773-85)

24  2078 Email and attachment from A. Hunt to S. Wang et .681 al. Re SAHS - ISFC Volume Template and Narrative Submission (Def. Dep. Exh. 111; ALPH00452531-44)

## 666

1  2079 Business Plan for the Nampa Health Plaza .......681 Expansion (Dep. Dep. Exh. 112; ALPH00430302-50)

2  2080 Saint Alphonsus Medical Center-Nampa FY13 ......681 Budget Presentation (Def. Dep. Exh. 113; ALPH00429207-15)

4  2081 Email from S. Jeffcoat to R. O'Connell et al. ...681 Re Nampa Health Plaza: Facility Plan acceleration (Def. Dep. Exh. 114; ALPH00015460-61)

6  2082 Saint Alphonsus Medical Center-Nampa FY2013 ....681 Strategic Update (Def. Dep. Exh. 115)

7  2083 Email and attachment from N. Raynor to L. .......681 Checketts, K. Keeler re Karl's presentation from 9-20 meeting (Def. Dep. Exh. 116; ALPH0005149)

9  2084 Saint Alphonsus Medical Center-Nampa: Nampa ....681 Health Plaza - Phase II (Def. Dep. Exh. 117)

11  2085 Saint Alphonsus Medical Center-Nampa FY13 Mid ..681 Year Analysis (Def. Dep. Exh. 118)

12  2086 Threshold Business Plan - Nampa-NHP Precon .....681 Phase II (Def. Dep. Exh. 119; ALPH00430535-42)

13  2087 SAMC-Nampa Relocation: Pre-Construction .........681 Business Plan (Def. Dep. Exh. 120; ALPH00430543-619)

15  2089 Draft Professional Services Agreement between ..681 St. Luke's Regional Medical Center, Ltd. And Saltzer Medical Group, P.A.(Def. Dep. Exh. 123; SMG000000106-32)

17  2090 Email exchange between A. Curran, J. Livingston .681 et al. Re development of the partnership (Def. Dep. Exh. 124; DJB 00017-21)

19  2091 Email exchange between W. England, J. Freeman, .681 B. Savage  et al. Re Modifications to LOI (Def. Dep. Exh. 125; SMG000280866-68)

21  2092 Email exchange between A. Curran, D. Martin et ..681 al. Re Letter from Dr. Page (Def. Dep. Exh. 126; SMG000325499-500)

23  2093 Email and attachment from J. Kaiser re Treasure ...681 Valley Owners (Def. Dep. Exh. 127; SMG000294109-10)

24  2095 Letter from J. Kaiser to Patient re ............681 notification of affiliation (Def. Dep. Exh. 129; ALPH00019558)

25  2096 Email from S. Jeffcoat to C. Perkins et al. Re ..681 Saltzer Surgeon mtg (Def. Dep. Exh. 130; ALPH00008883)

24  2097 Email and attachment from T. Reinhardt, A. Curran, .681 N. Powell re Professional Service Agreement

25  offer letter (Def. Dep. Exh. 131; ALPH00684872-73)

## 667

1  2098 Offer letter from T. Reinhardt to A. Curran re .681 Professional Services Agreement, with marginalia (Def. Dep. Exh. 132; ARC 00176-81)

3  2102 Email from J. Hessing to S. Williams et al. Re .681 Treasure Valley Hospital (Def. Dep. Exh. 137; SMG000300668)

4  2103 Treasure Valley Hospital Competitive Advantage, .681 Clinical Performance, and Financial Performance and Return on Investment slides (Def. Dep. Exh. 138)

6  2106 Treasure Valley Surgery Center - Nampa, LP ......681 Confidential Offering Memorandum (Def. Dep. Exh. 151; TVH 36359-87)

7  2107 Presentation re Treasure Valley Surgery Center .681 Potential Investor Meeting (Def. Dep. Exh. 152)

9  2111 Treasure Valley Hospital Payor Mix data (Def. ...681 Dep. Exh. 157)

10  2112 Treasure Valley Hospital Detailed Income ........681 Statement for Period Ending December 31, 2009 (Def. Dep. Exh. 158; TVH 58758)

11  2113 Treasure Valley Hospital Detailed Income ........681 Statement for Period Ending December 31, 2010 (Def. Dep. Exh. 159; TVH 58759)

13  2114 Treasure Valley Hospital Detail Income ..........681 Statement for Period Ending December 31, 2011 (Def. Dep. Exh. 160; TVH 58760)

14  2115 Treasure Valley Hospital Detail Income ..........681 Statement for Period Ending December 31, 2012 (Def. Dep. Exh. 161)

16  2119 Treasure Valley Balance Sheet for Period Ending .681 August 31, 2011 (Def. Dep. Exh. 165)

17  2122 Email from J. Strauss to L. Byrd, copying J. ....681 Jackson re 2011 Saltzer doc's as a percent of all Physicians case count, attaching 2011 Physician case count.xls (Def. Dep. Exh. 166; TVH 16387-88)

19  2123 Email from J. Strauss to N. Genna, copying C. ...681 Dragolovic re Treasure Valley Hospital - Internal DCF Model, attaching TVH DCG TTM July 2012 (rd 8.22.2012) M is.xls; TVH DCF Model Memo (rd 8.22.2012).doc (Def. Dep. Exh. 169; TVH 22496-98)

22  2124 Kraft Healthcare Consulting letter to the TVH ...681 Board of Directors, enclosing Medicare Cost Report, CMS Form 2552-10 for the year ended December 31, 2011 (Def. Dep. Exh. 170)

24  2125 Email exchange between J. Franz, J. Strauss, ....681 and N. Genna re TVH Email - First Draft (Def. Dep. Exh. 171; TVH 22122-24)

**668**

1. 2128 SARMC Chief Medical Officer Updates (Def. Dep. ..681 Exh. 176; BDC0004327-37)
2. 2129 Saint Alphonsus proposal to Trinity (Def. Dep. ..681 Exh. 177; ALPH00044791-97)
3. 2133 Email exchange between N. Powell and S. Brown ...681 re Zip code work on Pediatrics (Def. Dep. Exh. 181; ALPH00030737)
4. 2136 Email from N. Powell to L. Hess, copying S. ......681 Brown re SAMG clinical integration plan, attaching SAMG Clinical Integration Plan 2013.doc (Def. Dep. Exh. 185; ALPH00271910-13)
5. 2137 SAHS Clinical Integration Network Status Report .681 (Def. Dep. Exh. 186; BDC0013226-27)
6. 2138 2012 SAMG Report: Readiness for Clinical ........830 Integration (Def. Dep. Exh. 187; BDC0013235-72)
7. 2140 Email from S. Brown to T. Reinhardt, copying P. ..681 Floyd, A. Sawyer, G. Sonnenberg, B. Petersen, and T. Leach re Criteria for Initial Invitation to Join the Alliance 8-2-12 draft TR.doc (Def. Dep. Exh. 189; BDC0023651-52)
8. 2143 Email exchange re SLHS Update (Def. Dep. Exh. .681 192; BC1226866-67)
9. 2144 Blue Cross of Idaho Business Plan and Budget ....681 for Years 2013-2015 (Def. Dep. Exh. 193; BC1372253-349)
10. 2147 Contract Rate and Language Sign-Off Sheet, 2011 .681 Statewide Physician fee schedule (Def. Dep. Exh. 196; BC1365912-22)
11. 2149 Email from S. Gorman to L. Checketts, C. Child, .681 D. Hughes, K. Keeler, and P. Harrop, attaching general surgery referral list 2012-2013.xls (Def. Dep. Exh. 204; ALPH00020079-80)
12. 2150 Saint Alphonsus Medical Center - Nampa .........681 (Revenue/Expenditures in 1,000's) (Def. Dep. Exh. 206; ALPH00017900)
13. 2151 Saint Alphonsus Health System Strategic ..........681 Financial Plan Submission slides (Def. Dep. Exh. 207; ALPH00271906)
14. 2152 Email from L. Checketts to B. Green re Brain, ...681 attaching SAMC Nampa_FY14-FY16 SFP Volume Template Oct 11 2012.xls (Def. Dep. Exh. 208; ALPH00291093; ALPH00291091)
15. 2153 Trinity Health ISFC Volume Template FY12-FY16 ..681 (Def. Dep. Exh. 209; ALPH00452532)
16. 2154 Email from L. Checketts to K. Keeler, attaching .681 SAHS Mid Year Nampa Dec 2012.pptx (Def. Dep. Exh. 210; ALPH00019546-47)

**669**

1. 2155 Email from T. Albanese re Materials for the ......681 7/22 Nampa Health Plaza Threshold Capital Project Meeting, attaching Nampa Plaza Combined Project.doc; SBAR Nampa Health Plaza March 2010.doc (Def. Dep. Exh. 211; ALPH00010659-72)
2. 2156 Email from M. Prisby re Approval Memo - Nampa ..681 Health Plaza Expansion, attaching Project Team Evaluation Matrix_Final_1.xls; Nampa Health Plaza approval memo_11 19 11_Final.doc (Def. Dep. Exh. 212; ALPH00010047-54)
3. 2157 Saint Alphonsus Health System Threshold .........681 Business Plan (Def. Dep. Exh. 213; ALPH00291788-95)
4. 2161 Email from B. Petersen re Saltzer Physician ......681 Information for PTC, attaching Saltzer orthopedic surgeon SBAR 100812.doc (Def. Dep. Exh. 219; ALPH00020945-51)
5. 2162 SAHS Executive Committee Meeting Agenda, with ..681 Saltzer Ortho Surgeons PSA SBAR (Def. Dep. Exh. 220; ALPH00399558-64)
6. 2163 Email from L. Kidd to B. Petersen re Steve ......681 Williams PSA Pro Forma 4-10-12.xls, attaching Steve Williams PSA Pro Forma 4-10-12.xls; Don Beasley ENT PSA Pro Forma 4-11-12.xls; Ortho MDs PSA Pro Forma 4-11-12.xls (Def. Dep. Exh. 221)
7. 2165 Email exchange re DRAFTS - CIN Work Plan and ...681 Status Reports (Def. Dep. Exh. 226; ALPH00064001-02)
8. 2166 Email exchange re meeting just now ... just .........681 thinking out loud (Def. Dep. Exh. 227; ALPH00025100)
9. 2167 Email exchange re The SAHA Board Meeting Next ..681 Week (Def. Dep. Exh. 232; BDC0003371-74)
10. 2168 Saint Alphonsus Health System Business Plan, ....681 Surgery Care Affiliates Joint Venture, Phase 1 - Nampa Health Plaza Surgery Center (Def. Dep. Exh. 233; ALPH00120745-80)
11. 2172 SAMC-Nampa Relocation: Pre-Construction .........681 Business Plan (Def. Dep. Exh. 239; ALPH00009735-807)
12. 2173 Primary Health President's Board Report January .681 2009 (Def. Dep. Exh. 240; PH 000223-24)
13. 2174 Primary Health Medical Group President's Board ..681 Report April 2009 (Def. Dep. Exh. 241; PH 000134-35)
14. 2175 Primary Health Medical Group President's Yearly .681 Report 2012, David L Peterman MD (Def. Dep. Exh. 242; PH 000211-14)

**670**

1. 2177 Primary Health Medical Group President's Board .681 Report August 2009; Primary Health Medical Group President's Board Report September 2009 (Def. Dep. Exh. 244; PH 000186-88; PH 000176-77)
2. 2178 Screenshots from Primary Health Medical Group's .681 blog (Def. Dep. Exh. 245)
3. 2179 Alliance Medical Group, LLC dba Primary Health .681 Medical Group 2011 and 2010 Year End Information (Def. Dep. Exh. 246; SLHS000094127-49)
4. 2180 Drug code usage data by clinic location (Def. ...681 Dep. Exh. 247; PH 000001-03)
5. 2185 Email exchange re Criteria for Initial ..........681 Invitation to Join the Alliance 8-2-12 draft TR.doc (Def. Dep. Exh. 265; ALPH00022364-68)
6. 2186 Email from E. White to T. Reinhardt, attaching ..681 Referral History Data.xlsx (Def. Dep. Exh. 266; ALPH00772191-92)
7. 2187 Email exchange between E. White and T. ........681 Reinhardt re Referral History Data.xlsx (Def. Dep. Exh. 267; ALPH00690393)
8. 2190 Employed Administrative and Clinical Services ...681 Agreement between SARMC and Rory Ramsey, M.D. (Def. Dep. Exh. 270; ALPH00527968-8001)
9. 2191 Email exchange re FYA - New Statesman Story .....681 (time sensitive) (Def. Dep. Exh. 271; ALPH00049830-31)
10. 2192 Email exchange re financial concerns (Def. Dep. .681 Exh. 273; SMG000275190-92)
11. 2193 Email exchange re ACN Agreement & LOA Extension .681 (Def. Dep. Exh. 274; SALTZER161631-37)
12. 2194 Contracts, Managed Care Committee Meeting .......681 Minutes (Def. Dep. Exh. 275; SALTZER165513)
13. 2195 Dear Referring Colleagues letter, with ..........681 handwritten notes (Def. Dep. Exh. 276; SALTZER165514)
14. 2196 Memorandum of Understanding between St. Luke's .681 Regional Medical Center, Ltd and Saltzer Medical Group, P.A. (Def. Dep. Exh. 277; SLHS000883181-85)
15. 2197 Email from E. Castledine to B. Savage and N. ....681 Powell re thoughts (Def. Dep. Exh. 279; SMG000274619)
16. 2198 Shareholder Meeting Minutes, Dec. 9-10, 2010 ...681 (Def. Dep. Exh. 280; SMG000033674)
17. 2201 St. Luke's / Select Proposal for the Deliver of .681 Health Care Services (Def. Dep. Exh. 302; MT000042-43)

**671**

1. 2202 Email from J. Reilly to G. Sonnenberg re .......681 Network Analysis and Ped's Status, attaching Network analysis.doc; Pediatrics.doc (Def. Dep. Exh. 303; ALPH00718188-95)
2. 2203 Email exchange re Call with Steve Drake (Def. ..681 Dep. Exh. 305; IMAGIN E000591-95)
3. 2204 Email exchange re IM A February 1 IM Ages (Def. .681 Dep. Exh. 307; SALTZER380635-41)
4. 2205 Email from J. Kaiser to Physicians, copying B. .681 Savage and N. Powell re Alignment LOI with St. Luke's (Def. Dep. Exh. 308; SMG000280243-44)
5. 2211 Email from T. Reinhardt to K. Keeler and N. ....681 Powell re Follow up to PSA discussion (Def. Dep. Exh. 316; ALPH00684874-75)
6. 2212 Email exchange re President's Council 1/8 - Mtg .681 Summary (Def. Dep. Exh. 317; ALPH00074891-92)
7. 2213 Saint Alphonsus Medical Group FY 2013 - FY 2015 .681 Strategic Plan (Def. Dep. Exh. 318; ALPH00272291)
8. 2214 IPN Fee Schedule Update (Def. Dep. Exh. 326; ...681 SLHS000931936-55)
9. 2216 Email exchange re St. Als vs St. Lukes changes, .681 attaching St Lukes and St Als fee compare Apr 2011-M ar 2012 edit v1.xlsm (Def. Dep. Exh. 328; PS038800-02)
10. 2217 IPN Strategic Plan (Def. Dep. Exh. 329; ........681 PS045923-32)
11. 2218 Email exchange re Boise Schools Benefit Design, .681 attaching BSD Wellness option 9.2010.pdf; BSD Standard option 9.2010.pdf (Def. Dep. Exh. 331; SLHS001054337-50)
12. 2220 SLMC Health Insurance Plan Detailed Trend ......681 Report (Def. Dep. Exh. 335; REGENCE 002542)
13. 2232 Email exchange re Response to article in the ...681 New England Journal of Medicine (Def. Dep. Exh. 355; ALPH00006472-73)
14. 2233 Email from S. Jeffcoat to K. Keeler, L. Smith, .681 and B. Petersen re Preparation for Board Question (Def. Dep. Exh. 356; ALPH00016050)
15. 2234 Email from S. Jeffcoat to P. Harkaway, K. ......681 Johnson, K. Adkins, and K. Sears re Visit to Idaho this week, attaching SAHS CPMS v4.doc; Kedrick Adkins itinerary - Aug 2012.doc (Def. Dep. Exh. 357; ALPH00123050-57)
16. 2240 Micron Idaho Benefits Guide 2013, Making ......681 Choices that Fit (Def. Dep. Exh. 370)
17. 2242 Business Case Template re ACO Provider .........681 Reporting Tool (Def. Dep. Exh. 372; BCI017934-38)

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW Document 553 Filed 11/04/14 Page 14 of 56

Bench trial, 09/27/2013

## 672

1 | 2246 Email from J. Crouch to Z. Geyer-Sylvia, D. .....681 Jones, K. Nielsen, T. York re St. Luke's ACO Update (Def. Dep. Exh. 376; BCI344245)

3 | 2247 Agenda for St. Lukes Treasure Valley / MSTI .....681 Board of Directors Meeting with Executive Summary re Saltzer) (Pltf. Dep. Exh. 55; SLHS0000012925-3020)

5 | 2248 St. Luke's & Saltzer Medical Group Relationship .681 Summary, 2006 - Present (Pltf. Dep. Exh. 56; SLHS000049169-71)

6 | 2249 Email exchange and attachment between J. .........681 Taylor, D. Tiegs et al. Re SLHS Pricing Overview for Board Meeting (Pltf. Dep. Exh. 60; SLHS000804978-79)

8 | 2250 Email exchange and attachment between M. ........681 Murray, C. Roth cc C. Neuhoff re Wipfli data (Pltf. Dep. Exh. 98; SLHS000783006-42)

9 | 2251 Presentation re West Treasure Valley Planning: ..681 Fruitland Area, Canyon County (Nampa/Caldwell) (Pltf. Dep. Exh. 100; SLHS000000593)

11 | 2252 One St. Luke's Presentation (Pltf. Dep. Exh. .....681 115; SLH S000088182)

12 | 2253 Letter from DZA to S. Drake (Jan. 12, 2012) .....681 (Pltf. Dep. Exh. 242; SLHS000662746-47)

13 | 2254 St. Luke's Quality & Patient Safety Update .....681 (Pltf. Dep. Exh. 390; SLHS000978369)

14 | 2255 St. Luke's Quality Scorecard, Published Dates: .681 September 2007, 2008, and 2009; St. Luke's Treasure Valley Quality Dashboard, Updated on 9/19/2011, 9/27/2012, and 4/12/2013 (Pltf. Dep. Exh. 392; SLHS001359573)

16 | 2256 Why Luke's Will Be The Choice I Make (Pltf. ...681 Dep. Exh. 457; SLHS001090031-37)

17 | 2257 Email from K. Maggard to J. Kaiser and B. .......681 Savage re overhead reduction, attaching Overhead reduction.xlsx (Pltf. Dep. Exh. 535; SMG000285192-93)

19 | 2258 Facility and Indirect Cost data based on .........681 9/30/12 year end financials (Pltf. Dep. Exh. 536; SLHS001345105)

21 | 2259 Declaration of David Sass............................681

22 | 2260 Letter from R. Schmidt to L. House re Micron .681 Benchmarks - Initial Draft Results (SLHS001052614-24)

23 | 2261 Micron Employee Health Plan Utilization .........681 (SLHS001161527-28)

24 | 2262 Email exchange and attachments between C. .......681 Snider, J. Montz et al. Re Expansion at

25 | Treasure Valley Hospital (50057) - APPROVED (TVH12295-304)

## 673

1 | 2263 Presentation re Treasure Valley Hospital ........681 Partnership Meeting (TVH15614)

2 | 2264 Presentation re Treasure Valley Hospital ........681 Partnership Meeting (TVH16316)

3 | 2265 Answers to Defendants' First Set of ................681 Interrogatories to Plaintiffs Saint Alphonsus Health System, Nampa, Inc., Saint Alphonsus Health System, Inc., and Saint Alphonsus Regional Medical Center, Inc.

6 | 2266 Defendant Treasure Valley Hospital Limited ......681 Partnership's Answers to Defendants' First Set of Interrogatories

8 | 2267 Defendant Treasure Valley Hospital Limited ......681 Partnership's Supplemental Answers to Defendants' First Set of Interrogatories

9 | 2268 Email exchange between R. Powers, S. Stein et ..681 al. Re TVH Damages Question

10 | 2269 TVH/TVSC Ownership (file name: 4Q2012 ........681 DISTRIBUTION CALC.xls) (TVH51291)

11 | 2270 Email exchange between L. House, J. Taylor et ..681 al. Re Boise Schools meeting tomorrow (SLHS001053223-24)

12 | 2271 Letter from R. Page, N. Powell to B. Wallace re .681 contract (BCI141760-65)

13 | 2272 Letter from R. Page, N. Powell to T. York re ....681 2009 provider contract amendment (BCI023508-09)

14 | 2273 Letter from N. Powell to B. Wallace re proposed .681 fee schedule amendments (unsigned) (SMG000035583-84)

16 | 2274 Letter from N. Powell to B. Wallace re proposed .681 fee schedule amendments (SMG000035668-69)

17 | 2275 Letter from B. Wallace to N. Powell re 2011 ....681 physician rates (BCI024247-48)

18 | 2276 Email from D. Beasley to N. Powell cc: J. .......681 Kaiser, B. Savage, M. Rasmus re referrals (SMG000273373)

19 | 2277 Minutes of Executive Committee Meeting ..........681 (SMG000001167-68)

20 | 2278 Email exchange between N. Powell, M. Reiboldt, .681 A. Greeter et al. Re Letter from Dr. Page (COKER000503-55)

21 | 2279 Email exchange between N. Powell, E. ...........681 Castledine, B. Savage, J. Kaiser re Confidentiality Agreement (SMG000276667)

23 | 2280 Email from P. Powell to M. Reiboldt, A. Greeter .681 cc: B. Savage re SL Comp Model Analysis (COKER0007477)

24 | 2281 Email and attachment from N. Powell to A. ......681

25 | Greeter, R. Langosch, M. Reiboldt re More (COKER0007924-30)

## 674

1 | 2283 Email exchange between S. Williams, A. Curran, .681 J. Kaiser et al. Re Request (SMG000279461)

2 | 2284 Email exchange between D. Taylor, N. Powell re .681 Scheduling Barriers (ALPH00030769-72)

3 | 2285 Email from N. Powell to M. Reiboldt, A. Greeter .681 re negotiations (COKER0007741)

4 | 2286 Email exchange between S. Jeffcoat, T. ..........681 Reinhardt et al. Re Saltzer Surgeon mtg (ALPH00014587)

5 | 2287 Email exchange between S. Jeffcoat, N. Powell ..681 re Dinner with Saltzer Surgeons (ALPH00014567)

6 | 2288 Email and attachments from T. Reinhardt to K. ...681 Keeler, S. Brown, S. Jeffcoat, C. Perkins, B. Petersen, N. Powell re Saltzer Surgeon Employment offers (ALPH00664115-47)

9 | 2289 Email exchange between N. Powell, S. Reimers re .681 Dr. Curran issue (ALPH00074424)

10 | 2291 Pros and Cons of PCP Physician Contract ........681 Non-Compete Issue (ALPH00274258)

11 | 2292 Presentation re SAHS Strategic Priorities - ....681 FY12 - FY15 (ALPH00922370-93)

12 | 2295 Email exchange between N. Powell, R. Hutchings .681 re recruitment, retention (ALPH00270254)

13 | 2296 Email exchange between N. Powell, S. Brown re ..681 Neurology rotation (ALPH00129721-22)

14 | 2297 Email exchange between N. Powell, S. Jeffcoat ..681 re Final - Saltzer Physician Ltr 11-12-12 revised draft 3.Doc (ALPH00017943)

15 | 2298 Email and attachment from S. Jeffcoat to N. ....681 Powell re Final Saltzer Physician Ltr 11-12-12 revised draft 3.Doc (ALPH00016069-71)

17 | 2299 Provider Network Council Agenda and Minutes ....681 (ALPH00480115-19)

18 | 2301 Email and attachment from S. Brown to J. Pilot .681 cc: N. Powell re SAMG recruitment process (ALPH00030775-76)

19 | 2302 Presentation re The Saint Alphonsus Health .....681 Alliance - Mission, Vision, Goals and Objectives (BDC0009612)

20 | 2303 Email exchange between S. Brown, J. Polk et al. .681 Re St. Lukes, SelectHealth form partnership (ALPH00016731)

23 | 2304 Email and attachment from M. Helms to W. .......681 Norsworthy et al. Re ACO Steering Committee Meeting - 11/3/2012 Materials Attached (BDC0025165; BDC0025177-78)

24 | 2305 Email exchange between D. Kirk, K. Keeler et ...681 al. Re Sombod (ALPH00022352-53)

## 675

1 | 2306 Offer letter from T. Reinhardt to A. Curran re ..681 Professional Services Agreement (executed 8/23/12) (ARC 00182-85)

2 | 2307 Email from J. Hessing to G. Dragolovic re May ..681 meeting (TVH12494)

3 | 2308 Email exchange between A. Curran, S. Gorman re .681 Meeting regarding regulatory compliance issues (ALPH00102861)

5 | 2309 Email exchange between M. Roach, T. Lumsden re .681 adding an Elm pod (ALPH00484025)

6 | 2311 Email exchange between M. Roach, N. Powell re ..681 Midlevel - Full Time Standard (ALPH00463599)

7 | 2313 Email and attachment from J. Reilly to J. East, .681 M. Roach, R. Hutchings re Clinical Integration Slides (ALPH0007805-06)

9 | 2314 Offer letter from T. Reinhardt to C. Robinson ..681 re Professional Services Agreement (TCR 00146-49)

10 | 2315 Offer letter from T. Reinhardt to C. Robinson ..681 re Professional Services Agreement (executed 9/6/12) (ALPH00126149-52)

11 | 2316 St. Alphonsus Announcement re Robinson ........681 (ALPH00102988-89)

12 | 2321 Email exchange between B. Croffy, Z. ...........681 Geyer-Sylvia et al. Re SARMC Spine Request (BCI227301-03)

14 | 2322 Email exchange between B. Croffy, J. Crouch et .681 al. Re St. Luke's Oncology Study (BCI224539-40)

16 | 2323 Letter from J. Crouch to R. Billings re ..........681 contract proposal (BCI217934-37)

17 | 2324 BCI-Saint Alphonsus Health System ConnectedCare .681 Accountable Care Organization Master Concept Document (BCI017945-57)

18 | 2325 SAMG Clinical Integration Plan .................681 (ALPH00271910-13)

19 | 2327 Alliance Mission Document (BDC0009612).........681

20 | 2380 Enthoven Report Appendix A ...................681

21 | 2381 Enthoven Report Appendix C ...................681

22 | 2382 Enthoven Report Exhibit B......................681

23 | 2501 Email RE Saltzer SBAR with attachment "Saltzer .681 Ortho Surgeons PSA SBARD DRAFT.doc" (ALPH00020011-14)

24 | 2502 Saint Alphonsus Medical Center Nampa, August ..681 31, 2012, CFO Discussion and Analysis (ALPH00022534-35)

25 | 2503 Saint Alphonsus Medical Center - Nampa, ........681 Financial Improvement Plan, January 13, 2013 (ALPH00024246)

25 | 2504 Saint Alphonsus Health System, CFO Narrative, ...681 December 2012 (ALPH00024268-72)

676

2505 Saltzer WRVU and Comp MGMA Compare 12 22 ...........681
 2011.xlsx (ALPH00054820)
2506 Professional Services Agreement between Saint ...681
 Alphonsus and Clark Robinson, DO
 (ALPH00108108-11)
2507 Professional Services Agreement between Saint ...681
 Alphonsus and Keith Holley, MD
 (ALPH00126158-61)
2508 Professional Services Agreement between Saint ...681
 Alphonsus and Miers Johnson, MD
 (ALPH00126162-65)
2509 Trinity Health, Integrated Strategic, Financial .681
 and Capital Plan, FY13-16 Guidelines,
 Assumptions and Timeline, February 6, 2012,
 Version FY12.2 (ALPH00135566-642)
2510 Physician Alignment Strategies, Nampa, Idaho ....681
 Market, March 1, 2010 (ALPH00329833-81)
2511 Estimated Loss from FP Exodus (ALPH00333407).....681
2512 Nampa Income Statement Analysis Dec 2012 .......681
 (ALPH00334019)
2513 Email from Blaine Petersen RE: Re: Fwd: Ortho ...681
 MDs PSA Pro Forma 10-2-12 w final capital.xls,
 10/8/2012 (ALPH00337804)
2514 Saint Alphonsus-Nampa Consolidated Balance .....681
 Sheets as of October 2012 (ALPH00395979)
2515 SAHS President's Council, 1/24/2013 ...........681
 (ALPH00498141-241)
2516 Professional Services Agreement between Saint ...681
 Alphonsus and Shane Andrew, DO
 (ALPH00761581-84)
2517 Professional Services Agreement between Saint ...681
 Alphonsus and Andrew Curran, DO (ARC 00182-85)
2519 Saint Alphonsus Health System, Strategic Plan, .681
 Kurt Salmon Associates, 3/23/2011
 (BDC0000953-1145)
2520 Professional Goodwill Acquisition Agreement ....681
 between St. Luke's Regional Medical Center,
 Ltd., and John R. Kaiser, M.D., 12/31/2012
 (SLHS000786766-73)
2521 Asset Acquisition Agreement between St. Luke's .681
 Regional Medical Center, Ltd., and Saltzer
 Medical Group, P.A., 12/31/2012, section 1.1
 (SLHS000787844-70)
2522 September spreadsheets 2012 (SLHS001409260).....681
2523 For example, Saltzer Medical Group, P.A. ........681
 Employment Agreement, Full-Time Salaried,
 Exhibit A (SMG000000023-24)
2526 Saint Alphonsus Health System Western Idaho / ...681

Eastern Oregon Regional Overview slides
 (ALPH00001795)

677

2527 Saint Alphonsus Health System Western Idaho / ...681
 Eastern Oregon Regional Overview slides
 (ALPH00005860)
2528 Saint Alphonsus Health System Oregon-Idaho FY13 .681
 Budget Presentation slides, presented by Blaine
 Petersen, Chief Financial Officer, SAHS (April
 2012) (ALPH00009120)
2529 Saint Alphonsus Health System Growth & .........681
 Alignment Strategy slides (ALPH00011855)
2530 Email exchange re Saltzer Physicians to Trinity .681
 PTC (Out of Office) (ALPH00015517-19)
2531 Saltzer Ortho Surgeons PSA SBAR DRAFT.doc ......681
 (ALPH00020012-14)
2532 Saint Alphonsus Health System FY2013 - FY 2015 .681
 Strategic Overview and Capital Planning slides,
 presented by Blaine Petersen (Sept. 20, 2012)
 (ALPH00021848)
2533 Primary Care SWAT Team slides (ALPH00049333).....681
2534 Contracting Mini-Summitt Notes (Dec. 16, 2010) .681
 (ALPH00137451-54)
2535 SARMC Planning & Finance Committee slides (June .681
 25, 2009) (ALPH00141303)
2537 Volume Acceleration Growth Teams Update (Dec. ...681
 8, 2011) (ALPH00394628-33)
2538 Trinity Health Memo re Idaho-Oregon Clinical ...681
 Integration Status Report for November (Nov.
 15, 2012) (ALPH00501972-73)
2539 Trinity Health slides, Market Strategy Update: ..681
 Saint Alphonsus Health System (May 22, 2012)
 (ALPH00635627)
2541 Saint Alphonsus Health System Payer Partnership .681
 and Growth Strategy slides (ALPH00947398)
2543 Blue Cross of Idaho Business Plan and Budgets ...681
 for Years 2013 - 2015 (BCI372253-349)
2544 Saint Alphonsus Accountable Care Readiness .....681
 Assessment (July 12-13, 2011) (BDC00067-115)
2545 Saint Alphonsus Health System Strategic Plan ...681
 slides, Final Report (BDC00020728-920)
2550 Rocky Mountain Real Estate Development slides, ..681
 Primary Health Group: 12th Avenue: Nampa, Idaho
 PH 000004-23)
2551 Primary Health Medical Group President's Yearly .681
 Report 2012, Regional Overview and Plan (PH
 000211-14)
2554 Email exchange re Boise Schools meeting ........681
 tomorrow (SLHS001053223-24)
2556 Email exchanges re Healthwise Project ..........681
 (SLHS001419625-32)
2561 Saint Alphonsus Contract and Amendments with ...681
 IPN (PS-IPN00275-93 (Contract);

678

PS-IPN0029770-73 (1st Amendment); ..............
 PS-IPN0029766-69 (2nd Amendment);
 PS-IPN0029762-65 (3rd Amendment);
 PS-IPN0029759-61 (4th Amendment [never
 executed]; PS-IPN0029755-58 (5th Amendment);
 PS-IPN0029751-54 (6th Amendment);
 PS-IPN0029747-50 (7th Amendment);
 PS-IPN0029743-46 (8th Amendment);
 PS-IPN0029738-42 (9th Amendment);
 ALPH00876378-96 (10th Amendment)
2562 Noncompetition Agreement between St. Luke's and .681
 John R. Kaiser, M.D. (SLHS000786462-69)
2573 Email from C. Roth to G. Fletcher, J. Kee, and ..681
 J. Taylor re Saltzer (SLHS0000006527)
2574 Service Cost Considerations of Physician ........681
 Integration, presented at SLHS Board Meeting on
 Sept. 25, 2012 (SLHS001371130)
2575 Letter from Grant Thornton to J. Stright re ....681
 Analysis of Proposed Compensation Arrangement -
 Saltzer Medical Group, Family Practice
 Physicians (May 8, 2012) (SLHS000042417-43)
2581 Letter from Grant Thornton to J. Stright re ....681
 Analysis of Proposed Compensation Arrangement -
 Saltzer Medical Group, Family Practice
 Physicians (April 11, 2012) (GT008051-76)
2582 7/16/10 Letter from Jeffrey S. Taylor to Zelda .681
 Geyer-Sylvia (BCI245863-65)
2586 11/17/10 email from Becki Wallace to Paula ......681
 Wigger re FW: Summary of Contract Terms
 (BCI277528-31)
2590 10/12/12 letter from Jeff Crouch to Randy .......681
 Billings (SLHS001615833-34)
2591 11/7/12 letter from Jeff Crouch to Randy ........681
 Billings (BCI226472-74)
2592 Blue Cross 2013 Renewal presentation ...........681
 (SLHS000728369)
2616 1/1/09 Agreement between St. Luke's Regional ...681
 Medical Center, Ltd. And Blue Cross of Idaho
 Health Services, Inc. (SLHS000728507-45)
2617 1/1/11 Facility Contract - Commercial between ..681
 St. Luke's Regional Medical Center and Blue
 Cross of Idaho Health Service, Inc.
 (BCI015438-80)
2618 Email exchange between P. Richards, D. Pate, K. .681
 Seppi et al. Re Blue Cross of Idaho -
 Connected Care (SLHS000570442-44)
2619 8/5/10 memo from S. Jeffcoat re System ..........681
 Strategic Plan - Board Overview Summary
 (ALPH00397701-08)

679

2621 2/3/11 memo from M. Murphy re Minimum ..........681
 Requirements for Physician Practice
 Acquisitions that do not include Full
 Professional Employment (ALPH00862346-48)
2624 First Amendment to Professional Services ........681
 Agreement between St. Luke's Regional Medical
 Center and Saltzer Medical Group, dated 8/29/13
2625 12/20/12 Letter from J. Bierig to B. DeLange ...681
 and S. Hirschfeld

* * * * *

680

1    P R O C E E D I N G S
2    September 27, 2013
3    ****** COURTROOM CLOSED TO THE PUBLIC ******
4    THE COURT: Counsel, just a couple -- oh,
5    Ms. Gearhart, sorry.
6    THE CLERK: The court will now hear Civil Case
7    12-560-S-BLW, Saint Alphonsus Medical Center Nampa, Inc.,
8    versus St. Luke's Health System for Day 5 of a bench trial.
9    THE COURT: Counsel, do we need to put on the
10   record the resolution of the minor dispute that arose this
11   morning or take is that sufficiently well resolved that we don't
12   need to take the time to put it on the record?
13   Mr. Wilson, I -- or Mr. Keith.
14   MR. KEITH: For our side, Your Honor, we've got it
15   resolved.
16   THE COURT: All right. Then let's not take any
17   time.
18   There are a couple housekeeping matters. My
19   understanding we are closing the courtroom because this
20   portion of Mr. Billings' testimony --
21   MS. DUKE: For the next 30 minutes, yes.
22   THE COURT: Two other issues very quickly. The
23   parties have filed -- and I think the plaintiffs have
24   docketed on CM/ECF a new copy of the exhibit list. The
25   defendants have submitted it to Ms. Gearhart but have not

681

1    docketed it on CM/ECF, and I would ask them to docket it so
2    that we can indicate the docket numbers to memorialize for
3    the record.
4    And I am now going to admit all of the exhibits on both
5    exhibit lists, which have been marked as stipulated to their
6    admission. We will do that in gross here, and that's why I
7    want it filed on CM/ECF so that we have a record of exactly
8    which exhibits were admitted. That should save a little bit
9    of time. So we won't have to go through and deal with any
10   stipulated exhibits, only those that were objected to.
11   (Plaintiffs' and Defendants' Exhibits admitted, as
12   listed in index.)
13   THE COURT: Then the second matter has to
14   do -- and this kind of relates, maybe, to the issue that you
15   had a little dustup on this morning. With regard to Rule
16   901, Rule 901 indicates that a very minimal threshold level
17   is established for foundation. It simply has to be
18   sufficient evidence from which the finder of fact can find
19   that the document is what its proponent says it is. In a
20   court trial that becomes a little awkward.
21   My view, generally, is that I will admit almost any
22   exhibit under that very minimal threshold showing of
23   foundational requirement. But then in writing a decision,
24   if there is an item which you think is disputed, you may
25   want to point that out in your posttrial submissions so that

682

1    I can actually make a determination as a matter of fact
2    whether the exhibit is or is not what its proponent claims
3    it to be. It's kind of an oddity, but it's actually cropped
4    up in a couple of cases in the past on court trials, so just
5    bear that in mind. Perhaps, we'll discuss this a little
6    later, as well, but I wanted counsel to have that in mind.
7    All right. Let's go ahead and resume playing
8    Mr. Billings' deposition.
9    MR. WILSON: Your Honor, if I may?
10   THE COURT: Yes.
11   MR. WILSON: We arrived at court this morning to
12   discover the exhibits that accompany this witness are no
13   longer on the computer. In a minute, I'm going to be
14   handing you a hard copy of each one of those exhibits and
15   then note down at the bottom of the screen. I will let you
16   know what trial exhibit number it is as it's playing so that
17   you have a record, because it just -- obviously, in the
18   deposition transcript it's the deposition exhibit number.
19   So I'll let defense counsel know what trial exhibit number.
20   THE COURT: If you have a list, if you wanted
21   to --
22   MR. WILSON: I do. And I will --
23   THE COURT: -- give it to Mr. Metcalf, we might be
24   able to copy it very quickly and then give it to counsel and
25   to the court, and that would, actually, avoid having to,

683

1    kind of, interrupt the playing of the deposition.
2    MS. DUKE: One of those middle-of-the-night
3    gremlins that somehow does those things on computers, so --
4    THE COURT: That's technology; can't live with it,
5    can't live without it.
6    I noted Mr. Sinclair is giving a presentation next
7    Friday on the use of the iPad in the courtroom. I kind of
8    assumed that's all we would have in here this week. We've
9    actually seen that more and more. I've had quite a number
10   of trials where both attorneys on both sides were using only
11   an iPad for their only computer, which is pretty remarkable
12   when you think about how far technology has gone.
13   Why don't we go ahead and get started.
14   MS. DUKE: All right. Thank you, Your Honor.
15   MR. WILSON: This is 1216.
16   (Testimony of Randall Billings via video deposition
17   resumed.)
18   MS. DUKE: These are 1105 and 1219, Your Honor.
19   MR. WILSON: Your Honor, I believe this is Joint
20   Exhibit 10, but, I apologize, I don't think you have a copy.
21   1224, Your Honor.
22   This is Joint Exhibit 11, Your Honor.
23   THE COURT: Thank you.
24   MR. WILSON: Exhibit 1224, Your Honor.
25   Exhibit 1225, Your Honor.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 17 of 56

684

1    This is Trial Exhibit 1226.
2         MS. DUKE: I'm not sure why the sound is not going
3    on, but at least it's controlling.
4         MR. WILSON: This is Exhibit 1229.
5    Also 1230.
6    Exhibit 1231.
7    The next exhibit is Joint Exhibit 12.
8    Trial Exhibit 1998.
9         MS. DUKE: All right. Your Honor, that concludes
10   the deposition of Randy Billings.
11        (Video deposition of Randall Billings concluded.)
12        THE COURT: All right. Are there any exhibits
13   that were -- I was not able to keep track because I was
14   trying to go back and forth.
15        MS. DUKE: Sure. I've got a list of them. Do you
16   want me to read the list off?
17        THE COURT: If they were stipulated to, they are
18   already admitted.
19        MS. DUKE: Okay. There were a number that were
20   stipulated to. A new one was 1998, which I talked to
21   Mr. Keith about, and he stipulated that that can be
22   admitted.
23        THE COURT: Is that correct?
24        MR. KEITH: That's correct, Your Honor. We have
25   no objection.

685

1         THE COURT: That's 1998?
2         MS. DUKE: 1998.
3         THE COURT: All right. 1998 will be admitted.
4    (Plaintiffs' Exhibit No. 1998 admitted.)
5         MS. DUKE: And then the only one that I saw an
6    objection to was 1219, which was a 402/403.
7         MR. KEITH: We withdraw that objection,
8    Your Honor.
9         THE COURT: 1219 will be admitted. The other
10   exhibits have been admitted by stipulation.
11        (Plaintiffs' Exhibit No. 1219 admitted.)
12        MS. DUKE: Thank you, Your Honor.
13        THE COURT: Counsel, we're going to take a break
14   in about 15 minutes, a short break. It will be a ten-minute
15   break. Can the technology problems be addressed maybe over
16   the lunch hour? We'll have a two-hour lunch hour.
17        MS. DUKE: Yeah. I think, unfortunately, some of
18   the videos they were all provided just have portions
19   where the videographer failed to sync the sound with the
20   lines and there's no way we can fix some of those.
21        THE COURT: All right. That's fine. As long
22   as -- primarily, you couldn't get the exhibits up so that I
23   can look at those.
24        MS. DUKE: That should be -- that should be
25   solved.

686

1         THE COURT: When the screen went dark for a
2    moment --
3         MS. DUKE: That was because my computer went to
4    sleep, even though it was still playing.
5         MR. WILSON: Just the computer.
6         MS. DUKE: Yeah. We have a love-hate relationship
7    right now.
8         THE COURT: Let's go ahead. Call your next
9    witness.
10        MS. DUKE: Joni Stright by video deposition, and
11   we can open the courtroom. There will be a couple of AEO
12   portions, and if it worked for Your Honor yesterday, we can
13   continue to handle those where I just mute it and have
14   you --
15        THE COURT: And are there exhibits?
16        MS. DUKE: There are a couple.
17        THE COURT: And are you providing the copies?
18        MS. DUKE: And I'll let you know when to blank the
19   screen.
20        THE COURT: All right. Well, we won't -- that
21   won't be an issue because we can't show the exhibits;
22   correct?
23        MS. DUKE: Correct.
24        THE COURT: So you will provide me with hard
25   copies?

687

1         MS. DUKE: Well, I can show you them. You will
2    see them on your screen, like we did yesterday. We just
3    won't project them.
4         THE COURT: And so it was only on the last witness
5    that we had the problem?
6         MS. DUKE: Correct.
7         THE COURT: All right.
8         MS. DUKE: We hope. There have been others that
9    we've seen them and some of them we've been able to work
10   with the videographer to get us new clips, and others there
11   just hasn't been time.
12        THE COURT: What I'm referring to now is the
13   exhibits.
14        MS. DUKE: Correct. We should be fine on the
15   exhibits.
16        THE COURT: All right.
17        MS. DUKE: The only thing I would note, I guess,
18   is the last five pages of her testimony are AEO, so we
19   may -- I don't know if the court will want to just read for
20   that five pages or clear the courtroom.
21        THE COURT: That would be fine.
22        MS. DUKE: Okay.
23   ****** COURTROOM OPEN TO THE PUBLIC ******
24        (Testimony of Joni Stright via video deposition.)
25        MS. DUKE: Your Honor, if we could blank the

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 18 of 56

688

1  screen for this one, we can blow things out.
2      (Video deposition of Joni Stright resumed.)
3      MS. DUKE: Your Honor, this next portion will be
4  AEO, so I'm going to blank out the sound.
5      THE COURT: All right. Thank you.
6      (Video deposition of Joni Stright resumed without
7      audio.)
8      MS. DUKE: We can now go on to the screen and also
9  the volume, Your Honor.
10     (Video deposition of Joni Stright resumed with audio.)
11     MR. WILSON: Page 10, Your Honor.
12     THE COURT: Thank you.
13     Is the system frozen closing as far as the exhibits?
14     MS. DUKE: It just isn't in there. So if you just
15  turn to page 10, the rest is --
16     THE COURT: All right.
17     (Video deposition of Joni Stright resumed.)
18     MR. SINCLAIR: Is this AEO?
19     THE COURT: Is this AEO?
20     MS. DUKE: Yes.
21     (Video deposition Joni Stright resumed with
22     redactions for public.)
23     MS. DUKE: So this is now AEO, so I'm going to
24  take the volume away.
25     THE COURT: Okay. So it is AEO?

689

1      MS. DUKE: It's AEO.
2      THE COURT: All right. Thank you.
3      (Video deposition of Joni Stright resumed without
4      audio.)
5      THE COURT: I hate to ask. Could you back up just
6  maybe 10 or 15 lines? I was making notes, and I think I
7  missed some of it.
8      (Video deposition of Joni Stright resumed without
9      audio.)
10     MS. DUKE: The screen can come back on,
11  Your Honor.
12     (Video deposition of Joni Stright resumed with audio.)
13     MS. DUKE: That's the conclusion of Joni Stright,
14  Your Honor.
15     (Video deposition of Joni Stright concluded.)
16     THE COURT: All right.
17     Counsel, I noted one exhibit -- I think 1255 is the
18  only one I noted that was not stipulated to, but there may
19  be others. There was a 402/403 objection.
20     MS. DUKE: We would be moving for the admission.
21     THE COURT: Is that the only exhibit that was not
22  stipulated to by your notes?
23     MS. DUKE: Yes.
24     THE COURT: Because I may have missed some. I was
25  trying to keep track.

690

1      MS. DUKE: 1240 also had an 802, 402, and 403.
2      THE COURT: Counsel, I don't see dates on either
3  of those exhibits. 1255, apparently, was a St. Luke's
4  internal presentation.
5      Well, let me just inquire. Does counsel withdraw the
6  objections?
7      MR. SINCLAIR: No, Your Honor.
8      THE COURT: How is Exhibit 1240 not hearsay,
9  Ms. Duke? It's a letter from --
10     MR. SINCLAIR: This is AEO, I think.
11     THE COURT: That's why I'm trying to -- thank you.
12     MS. DUKE: Well, it's certainly going into her
13  evaluation, even to the extent it were hearsay. It's going
14  into her state of mind and part of the process for which she
15  just testified to as her role at St. Luke's, and in
16  evaluating physician practices and practices that would be
17  purchased.
18     THE COURT: So being offered not for the truth of
19  what is asserted, but for the fact that Ms. Stright had had
20  this information conveyed to her?
21     MS. DUKE: Correct, Your Honor.
22     THE COURT: Could you blow it up just so I can
23  read the text, very quickly?
24     MS. DUKE: Mr. Greene may have additional --
25     MR. GREENE: Your Honor, if I may, in addition --

691

1      THE COURT: Yes.
2      MR. GREENE: I think this is classically a
3  business record. This was commissioned by St. Luke's; it
4  relied upon the analysis here in extending an offer they
5  thought would keep them within legal bounds, under the Stark
6  Act. So we think that this is fundamentally a business
7  record and should -- could, alternatively, come in in that
8  way, too.
9      THE COURT: Mr. Sinclair, do you dispute that this
10  was, indeed, prepared at St. Luke's request by a consultant
11  and then conveyed to them?
12     MR. SINCLAIR: It was prepared in our request, but
13  this isn't in the ordinary course of business. This was a
14  specific transaction. So if you are calling this a business
15  record, I guess anything that would be in our file would be
16  a business record.
17     THE COURT: Well, what sets this apart, I think,
18  as Mr. Greene is pointing out is that is, again, the reason
19  for the exception under 803(6) is that when there is a
20  process developed by which information is recorded and then
21  a party relies upon that information in making business
22  decisions, there is a presumption of reliability that allows
23  us to forego cross-examination. I think that's really
24  what -- it's not, perhaps, technically, an 803(6) document,
25  but the same principle would seem to apply.

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 19 of 56

692

1    But I think, certainly, it seems to me it may have
2    independent relevance because it was information requested
3    by St. Luke's. The information was then conveyed by a
4    consultant retained by them, and I think it has independent
5    relevance for that reason.
6        So I'll admit the exhibit as -- but only for whatever
7    probative value it may have as providing notice to
8    St. Luke's of the information conveyed therein.
9            MR. SINCLAIR: Okay. I would still assert this is
10   not under 803(6) because it's not a regularly conducted
11   activity.
12           THE COURT: And I'm admitting it not for the truth
13   of what's set forth in it, but only that it provides notice
14   of information that in fact was conveyed to St. Luke's by
15   one of its hired consultants. So it's not an 803(6), but
16   it's nonhearsay under Rule 801 and 802.
17       So Exhibit 1240 will be admitted.
18       (Plaintiffs' Exhibit No. 1240 admitted.)
19           MS. DUKE: And then 1255 was the other.
20           THE COURT: Could I look very briefly -- and I'm
21   sure that it's a lengthy -- well, perhaps not. Maybe it is
22   just a single page, but could I see 1255?
23           MR. WILSON: You have a hard copy of it.
24           MR. SINCLAIR: If you have it, I wouldn't mind you
25   calling it up. I don't have a copy in front of me.

693

1            Okay. Thank you.
2            THE COURT: I'll overrule the 402/403 objection to
3    Exhibit 1255, as well. That will be admitted.
4        (Plaintiffs' Exhibit No. 1255 admitted.)
5            THE COURT: Call your next witness.
6            MS. DUKE: All right. I was just pulling
7    something up for Mr. Sinclair. Let me get back to Swanson,
8    Geoffrey Swanson. Dr. Geoffrey Swanson.
9            THE COURT: By deposition again?
10           MS. DUKE: Yes, Your Honor.
11           MR. WILSON: Spelled G-E-O-F-F-R-E-Y.
12           MR. SINCLAIR: Is this AEO?
13           MS. DUKE: No. We can show it on the screen.
14       (Testimony of Geoffrey Swanson via video deposition.)
15           THE COURT: I'm sorry. Can you back up?
16           MS. DUKE: Yes, Your Honor.
17           THE COURT: Might as well start over.
18       (Video deposition of Geoffrey Swanson resumed.)
19       (Video deposition of Geoffrey Swanson paused.)
20           THE COURT: Counsel, do you have an exhibit?
21           MS. DUKE: What was that, Your Honor?
22           THE COURT: He is referring to bullet points on an
23   exhibit, but I don't have an exhibit. Is there an exhibit
24   that goes along with this? If not, that's fine, but I
25   just --

694

1            MS. DUKE: There is. Part of the problem with
2    those who are making cuts to try and cut time, occasionally
3    they're cutting some of the referenced material that
4    precedes the document.
5            THE COURT: All right. For the record, if he is
6    referring to a trial exhibit, we should at least identify
7    the exhibit number.
8            MS. DUKE: Sure. Just give us a moment,
9    Your Honor.
10           THE COURT: Yes.
11           MS. DUKE: Your Honor, I have the document up that
12   is being referred to.
13           THE COURT: And that exhibit number is 1097?
14           MS. DUKE: 1097.
15           THE COURT: Thank you.
16       Let's go ahead and proceed, then.
17           MS. DUKE: Just making sure it's not AEO. We're
18   clear.
19       (Video deposition of Geoffrey Swanson resumed.)
20       This is AEO, Your Honor, if we could blank out the
21   screen.
22       (Video deposition of Geoffrey Swanson resumed with
23   redaction.)
24           THE COURT: Counsel --
25           MS. DUKE: We're just skipping ahead. There were

695

1    a couple clips we needed to take out.
2        (Video deposition of Geoffrey Swanson resumed.)
3            MR. KEITH: I believe this is AEO.
4            MS. DUKE: Yes, this will be AEO.
5            THE COURT: Including the testimony, not just
6    the --
7            MS. DUKE: Including the testimony, so I'm going
8    to mute the volume.
9            THE COURT: Before you start, give me a moment to
10   finish making a note to myself.
11       All right. Go ahead.
12           MS. DUKE: Thank you, Your Honor.
13       (Video deposition of Geoffrey Swanson resumed without
14   audio.)
15           MS. DUKE: That concludes the portion of
16   Dr. Swanson, Your Honor.
17       (Video deposition of Geoffrey Swanson concluded.)
18           THE COURT: All right.
19           MS. DUKE: And the three exhibits that were
20   referenced, 1097, 1102, and 1105, it's my understanding they
21   were not objected to.
22           THE COURT: And, therefore, they have been
23   admitted by the court's order this morning.
24           MS. DUKE: Thanks.
25           MR. KEITH: I just wanted to ask that -- Exhibit

696

1 1097 that originally had not been designated as AEO, I
2 believe that was a mistake on our part. That should be
3 attorneys' eyes only. I don't think anything that was
4 presented live through the testimony was problematic, but
5 there were other parts of the document that clearly fall
6 within planning documents of recent vintage.
7           THE COURT: All right.
8           MS. DUKE: We have no objection.
9           THE COURT: All right. Then they will be so
10 designated.
11          MR. KEITH: Thank you, Your Honor.
12          THE COURT: All right. Call your next witness.
13          MS. DUKE: Thank you, Your Honor.
14          THE COURT: Now, is that the only --
15          MS. DUKE: So we'll break in about 15 minutes?
16          THE COURT: Just a moment, so we're clear, is that
17 the only testimony we're going to hear from Dr. Swanson? I
18 thought I understood that you were going to break this up in
19 some fashion. Did I misunderstand?
20          MS. DUKE: No. Dr. Swanson -- that was it from
21 the standpoint of our case.
22          THE COURT: Okay. Call your next witness.
23          MS. DUKE: Let's see. We have 15 minutes, so we
24 can -- Dr. Robert Walker.
25          Your Honor, we can put the screen up, too.

697

1           THE COURT: All right.
2           (Testimony of Robert Walker via video deposition.)
3           (Video deposition of Robert Walker concluded.)
4           MS. DUKE: That's the conclusion of the excerpts
5 for Dr. Walker, Your Honor.
6           THE COURT: Since it's 25 minutes after, why don't
7 we just take a break for lunch. Counsel, I do have a
8 meeting for two hours, so I won't be able to reconvene until
9 1:30. And then we'll go 1:30 to 5:00 until the balance of
10 the afternoon.
11          We'll be in recess, then, until 1:30 this afternoon.
12          (Recess.)
13          ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
14          THE COURT: Counsel, my apologies. I literally
15 walked up the stairs five minutes ago from my meeting or
16 I -- we would have started right on time.
17          Ready to begin with a live witness?
18          MR. ETTINGER: Yes, Your Honor.
19          THE COURT: All right. Call your next witness, if
20 you would, Mr. Ettinger.
21          MR. ETTINGER: We are calling Nancy Powell,
22 Your Honor. Hopefully, she is walking in right now.
23          THE COURT: Would you please step before
24 Ms. Gearhart, the clerk, be sworn as a witness, and then
25 follow her directions from there.

698

1              NANCY POWELL,
2 having been first duly sworn to tell the whole truth,
3 testified as follows:
4           THE CLERK: Please state your complete name and
5 spell your name for the record.
6           THE WITNESS: Nancy Diane Powell, N-A-N-C-Y --
7           THE REPORTER: Excuse me.
8           THE COURT: Could you pull the microphone up
9 there? That will make a big difference.
10          THE WITNESS: Thank you.
11          It's Nancy Diane Powell, N-A-N-C-Y, D-I-A-N-E,
12 P-O-W-E-L-L.
13          THE COURT: Mr. Ettinger, you may inquire of the
14 witness.
15          MR. ETTINGER: Thank you, Your Honor. We have a
16 small binder with some exhibits. May Ms. Duke approach the
17 witness, give her a copy?
18          THE COURT: Yes.
19              DIRECT EXAMINATION
20 BY MR. ETTINGER:
21     Q. Ms. Powell, you won't -- you won't need the
22 exhibits quite yet, so let me just start out, could you tell
23 the court what your position is, your occupation?
24     A.  I'm the chief administrative officer for Saint
25 Alphonsus Medical Group.

699

1     Q. Okay. And what is Saint Alphonsus Medical Group?
2     A.  It's a multispecialty group practice that's
3 employed by Saint Alphonsus Health System.
4     Q. And generally where are its offices? Is it -- is
5 it often called "SAMG," by the way?
6     A.  It is referred to as "SAMG," yes.
7     Q. Okay. I'll -- I'll slip into that, I know. So
8 where are SAMG's offices --
9           THE COURT: Counsel, just -- could we back up? I
10 may have missed the acronym. It's Saltzer Medical Group,
11 Saint Alphonsus Medical?
12          THE WITNESS: No. Sorry. Saint Alphonsus Medical
13 Group.
14          THE COURT: It's Saint Alphonsus Medical Group.
15          MR. ETTINGER: Yeah.
16          THE COURT: All right. Thank you.
17          THE WITNESS: We refer to it as "SAMG."
18          THE COURT: All right.
19          MR. ETTINGER: Your Honor, we'll get Saltzer in
20 there in just a second and it will get more -- more
21 confusing.
22          THE COURT: Yeah. I -- well, I -- I know what
23 happened. I'm looking at the transcript, and I think there
24 was a -- well, it -- it just confused me quite a bit.
25          But go ahead.

700

1    THE WITNESS: It's okay, Your Honor. I do the
2    same thing.
3    BY MR. ETTINGER:
4    Q.    So where, generally, are SAMG's offices and
5    clinics?
6    A.    From Boise to Baker City.
7    Q.    Okay. What's your educational background?
8    A.    I have a bachelor of science in accounting.
9    Q.    And how long have you been at SAMG?
10    A.    Almost two years.
11    Q.    Where were you before you were at SAMG?
12    A.    I was the chief financial officer for Saltzer
13    Medical Group for 13 years.
14    Q.    So what were your responsibilities as the CFO at
15    Saltzer?
16    A.    So I was responsible for all financial operations
17    of the organization, and I had various departments that
18    reported up to me: That would be information systems, human
19    resources, accounting, purchasing, medical records, the
20    business office. I was responsible for all contract
21    negotiations with payors, that type of thing.
22    Q.    And how long were you at Saltzer?
23    A.    Thirteen years.
24    Q.    And -- and how long have you been working in
25    healthcare?

701

1    A.    Directly in healthcare since 1995 and then in
2    public accounting for ten years prior to that, where
3    predominantly my clients were healthcare related.
4    Q.    Okay. Let me ask you a little bit more about what
5    you -- your involvement when you were at Saltzer as CFO.
6    Does Saltzer have an Executive Committee?
7    A.    We did.
8    Q.    And what -- what did the Executive Committee do,
9    generally?
10    A.    The Executive Committee is the governing board
11    for -- for the Medical Group, and so it acted like a board
12    of directors if you were publicly traded.
13    Q.    Okay. Did you attend meetings of the Executive
14    Committee?
15    A.    Yes, I did.
16    Q.    And did Saltzer have a Contracting Committee?
17    A.    Yes, they did.
18    Q.    And what did it do?
19    A.    The main purpose of the Contracting Committee was
20    to negotiate payor contracts, but we also did -- reviewed
21    lease agreements, any type of contract for the organization
22    that was substantial in nature, but predominantly it was the
23    payor contracts.
24    Q.    And did Saltzer have a Finance Committee?
25    A.    They did.

702

1    Q.    And what did it do?
2    A.    The Finance Committee was responsible for the
3    financial operations of the organization, so they reviewed
4    financial statements, made capital decisions, reviewed
5    capital budgets, those kind of things.
6    Q.    So -- so let me back up. In terms of the
7    Contracting Committee, what was your role?
8    A.    I was the administrative chair for the Contracting
9    Committee.
10    Q.    And in terms of the Finance Committee, what was
11    your role?
12    A.    I was the administrative chair for the Finance
13    Committee.
14    Q.    Did -- did Saltzer have an IT Committee?
15    A.    Yes, they did.
16    Q.    And what did the IT Committee do?
17    A.    The IT Committee did -- basically made the
18    decisions for the information systems for the organization.
19    Q.    And what was your role with regard to the IT
20    Committee?
21    A.    I was a member of the IT Committee; however, the
22    director of information systems was a direct report to me
23    and he was the administrative chair.
24    Q.    Okay. And who do you -- who did you regard as
25    your bosses when you were at Saltzer?

703

1    A.    I had 50, actually, all the physicians and Bill
2    Savage.
3    Q.    And -- and how often did you spend time talking to
4    one or more of the Saltzer physicians?
5    A.    Pretty much on a daily basis.
6    Q.    Was there a particular time of the day when --
7    when doctors would tend to drop by and talk to you about
8    issues?
9    A.    Yeah, around 5:30 every night.
10    Q.    Why did you leave Saltzer and go to Saint
11    Alphonsus?
12    A.    I was given an opportunity to be the administrator
13    for a much large -- larger organization, so it was
14    professional development for myself with a national company
15    that gave me opportunity to -- if I so choose to ever leave
16    Idaho, I would have the opportunities outside of Idaho as
17    well.
18    Q.    Well, was it an easy decision for you to leave
19    Saltzer for SAMG or a hard decision?
20    A.    No. It was very, very difficult.
21    Q.    How long did it take you to make up your mind?
22    A.    Approximately two months.
23    Q.    When you informed Saltzer management that you were
24    considering leaving, what response was there?
25    A.    There was a counteroffer.

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 22 of 56

704

1   Q.   At that time, did anyone else make you an offer of
2   employment?
3   A.   At the time, I met with Gary Fletcher and John Kee
4   and they had talked to me about a business development for
5   the west side of the Valley.
6   Q.   And who were Gary Fletcher and John Kee?
7   A.   Gary Fletcher is the -- I believe his role is the
8   chief operating officer for St. Luke's Health System.  And
9   John Kee, I'm not exactly sure of his exact title, but I
10  believe he is the vice president of physician services for
11  St. Luke's Health System, sorry.
12  Q.   What terms were you on with the physicians and
13  management of Saltzer when you left?  Were they good or bad?
14  A.   I think they were very good.
15  Q.   Okay.  So let's talk a little bit about Saltzer as
16  of the time when you were still at Saltzer up to the, I
17  guess, late fall of 2011.  Generally, what types of
18  physicians are part of Saltzer Medical Group?
19  A.   It's a multispecialty practice, so predominantly
20  primary care with pediatrics, family practice, and internal
21  medicine.  And then we have subspecialties like cardiology,
22  pulmonology, rheumatology, neurology, we have ophthalmology,
23  dermatology, orthopedics, general surgery.
24  Q.   And where --
25  A.   I'm probably missing somebody, but --

705

1   Q.   And where is Saltzer based?
2   A.   Predominantly in Nampa and then they have clinics
3   in -- small clinics in Boise, a clinic in Meridian and then
4   a clinic in Caldwell, a small clinic in Caldwell.
5   Q.   And how did Saltzer compare or does Saltzer
6   compare, if you know, in terms of numbers of primary care
7   physicians in Nampa as compared to other physician groups in
8   Nampa?
9   A.   They are predominantly -- they would have the most
10  number of primary care physicians in Nampa.
11  Q.   Was anybody a close second?
12  A.   Not a close second, no.
13  Q.   When -- when you were at Saltzer Medical Group,
14  was it a financially successful or unsuccessful practice?
15  A.   Well, as their financial officer, I would like to
16  say it was a successful practice, and I think that they
17  were.  If you look at the revenue cycle, their days in AR
18  were less than 30, their physician compensation relationship
19  to Medical Group Management Association national averages
20  were strong.  We had many in the 75th percentile or above,
21  most above median.  So I would say it was successful.
22  Q.   Okay.  As someone who was at Saltzer and is now at
23  SAMG, could you compare the reputation of SAMG and Saltzer
24  in Nampa?
25  A.   In Nampa?

706

1   Q.   Yeah.
2   A.   I would say that the reputation for Saltzer is
3   much stronger in Nampa than SAMG is.  They have been in the
4   community for 52 years.
5   Q.   About how many -- of the Saltzer doctors, about
6   how many who were in Nampa had been in the Nampa community
7   since you came to Saltzer in 1990s?
8   A.   Well, probably about half.
9   Q.   Okay.  And about how many SAMG doctors have been
10  in Nampa ten years or more?
11  A.   Two.
12  Q.   And by the way, exactly when did you leave Saltzer
13  for SAMG?
14  A.   Sorry.  Halloween -- my first day at SAMG was
15  Halloween of 2011.
16  Q.   Okay.  How many internal medicine physicians did
17  Saltzer have?
18  A.   Five.
19  Q.   How many --
20  A.   Well, six if you count Dr. Page.  So -- but he
21  does mainly GI procedures, but he is internal medicine
22  trained.
23  Q.   And what other internists -- general internists,
24  were there in Nampa?
25  A.   To my knowledge, there aren't any other general

707

1   internists.
2   Q.   Okay.  So how does -- if you take general
3   internists versus family practice doctors, how do they
4   compare in terms of the kinds of patient they treat?
5   A.   Generally, internal medicine sees older
6   population, so 50 or above, not always, but generally, 50 or
7   above.  They specialize in adult medicine.  So they don't
8   see any patients under the age of 18, and they deal with
9   probably what I would consider a sicker population, more
10  chronic disease.
11  Q.   As between general internists and family practice
12  doctors, which ones tend to have more patients who need
13  hospitalization?
14  A.   Internal medicine.
15  Q.   Okay.  How many pediatricians did Saltzer have in
16  Nampa?
17  A.   Six.
18  Q.   And what competition, if any, did Saltzer face in
19  terms of pediatricians in Nampa when you were at Saltzer?
20  A.   The only other pediatrician I'm aware of in Nampa
21  is Dr. Hammer and he has a small independent practice.
22  Q.   Okay.  So did family practice doctors in Nampa
23  also treat children?
24  A.   Sure, of course.
25  Q.   So how -- I would like you to compare this time

708

1 pediatricians and family practice doctors in terms of the
2 kinds of patients they treat?
3    **A.**  Okay.  Well, similar to internal medicine related,
4 **family practice, pediatricians is kind of the same thing**
5 **except for a younger population.  So from 0 to 18.  So they**
6 **tend to treat children with -- you know, developmentally**
7 **disabled children, children with chronic disease, as well as**
8 **well children, obviously, but -- but they're also trained**
9 **differently so they spend their entire residency dealing**
10 **with just childhood diseases versus a family practitioner,**
11 **who will have different rotations and different types of**
12 **areas so that they are a little -- have a more well-rounded**
13 **education and not so narrowly focused.**
14    **Q.**  You were saying "they" throughout that answer.  By
15 "they" were you referring to pediatricians?
16    **A.**  The pediatricians, I'm sorry.
17    **Q.**  Just so we're clear.
18    Why did Saltzer have both pediatricians and family
19 practice doctors in the group?
20    **A.**  Well, for just that reason.  So that they could
21 **care for the children and the community and, also too, to**
22 **support the hospitals so that they could care for the**
23 **children who were hospitalized.**
24    **Q.**  Was it Saltzer's perception that there were people
25 in the community who preferred to have pediatricians take

709

1 care of their children?
2    MR. SCHAFER:  Object to form and foundation
3 whether it was Saltzer's perception.
4    MR. ETTINGER:  Your Honor, she was, you know,
5 heavily involved in the management of Saltzer.
6    THE COURT:  I think the witness can testify as to
7 her own observations and if -- I'll overrule the objection.
8 I think the witness, based upon her position, and, of
9 course, we're talking only about the time frame prior to, I
10 guess, Halloween 2011 just in terms of a context, but I'll
11 allow -- I'll overrule the objection.
12    Go ahead and answer.
13    THE WITNESS:  Okay.
14    Could you repeat the question?
15 BY MR. ETTINGER:
16    **Q.**  Sure.  Was it Saltzer's perception that there were
17 people who preferred to have pediatricians take care of
18 their children?
19    **A.**  Mothers would prefer to see a pediatrician if
20 **given the option.**
21    **Q.**  Okay.  Let me ask you about some of the
22 competition or potential or possible competition in Nampa
23 for Saltzer primary care.  Was Primary Health viewed as a
24 significant competitor or not?
25    **A.**  Not in Nampa, no.

710

1    **Q.**  Why not?
2    **A.**  They just had one small clinic on the north end.
3 **At the time that I was there, they just had one small clinic**
4 **on the north end, and I think they only had two providers in**
5 **that facility.**
6    **Q.**  Okay.  Was Terry Reilly viewed as a significant
7 competitor for Saltzer or not?
8    **A.**  No, not at all.  They saw a much different
9 **population.  So they are a federally qualified health**
10 **clinic, so they see predominantly uninsured or Medicaid**
11 **patients, so they weren't a competitor for commercially**
12 **insured patients at all.**
13    **Q.**  And what about West Valley Medical Group?  Was
14 that a significant competitor to Saltzer in Nampa for
15 primary care?
16    **A.**  No.  They just had one small practice on the north**
17 **end of Nampa over by Costco, I think, and just one provider**
18 **that I'm aware of.**
19    **Q.**  Okay.  So today from your vantage point at SAMG,
20 how would you compare as competitors in primary care in
21 Nampa, SAMG on the one hand and Saltzer plus St. Luke's on
22 the other hand?
23    **A.**  It would be about nine -- we have nine physicians**
24 **in SAMG in Nampa and that would be approximately 27, 28**
25 **physicians for Saltzer and St. Luke's combined.**

711

1    **Q.**  Okay.  And how would you compare them in terms of
2 the longevity in the community of their doctors?
3    **A.**  Well, actually, even the St. Luke's physicians**
4 **have been predominantly in the Nampa market longer than the**
5 **SAMG physicians, so I would say it's on average much**
6 **greater.**
7    **Q.**  Okay.  Why don't we turn to an exhibit,
8 Ms. Powell, Exhibit 1952, and I think it's going to be on
9 your screen.  It's also the first tab in your book.
10    What is 1952, first of all?
11    **A.**  It appears to be a copy of the SAMG website for**
12 **the Nampa Garrity clinic.**
13    **Q.**  Okay.  At the top it says "Convenient Care Close
14 to Home."  Why is that on the website?
15    **A.**  That's the -- sort of our tag line, I guess you**
16 **could say.**
17    **Q.**  So why do you use that as a tag line on your
18 website?
19    **A.**  Well, because it's important to us as we -- when**
20 **we look at where to place clinics, we try to look between a**
21 **5 to 10, 15 at the maximum, drive time for our patients so**
22 **that it's really to be convenient for -- as we have**
23 **done -- as we know from studies that the female, the mother**
24 **makes the decisions for the care, of who is going to receive**
25 **care in the home and so it's really for the convenience of**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 24 of 56

712

1  the -- of the woman in the home.
2      Q.  Okay.  So -- so what does the mother making the
3  decision have to do with a close location, five to ten
4  minutes?
5      A.  Well, they generally -- you want your primary care
6  clinic so that it's convenient for your patients.  And for a
7  situation for a mother, for instance, or even a working
8  mother for that matter, if they have to take a child out of
9  school and take them to the doctor and then maybe take them
10  back to school or take them home or stay home with them
11  because they're sick, they don't want to spend their entire
12  day trying to get to a physician's office.  So
13  that's -- that's what we mean by "Convenient Care Close to
14  Home."  We try to make it convenient for the patient.
15      Q.  So how many different primary care clinics does
16  SAMG have in Nampa?
17      A.  In Nampa?
18      Q.  Yeah.
19      A.  Four.
20      Q.  And about how far apart from one another are they?
21      A.  The Iowa clinic and Dallan Woods are, I think,
22  about 2 miles apart maybe and then Garrity and Nampa Health
23  Plaza are about a mile, a mile and a half apart, and then
24  between Dallan Woods and Garrity, which is the greatest
25  distance, that's probably about 4 to 6 miles, I'm thinking.

713

1      Q.  How many primary care doctors does SAMG have at
2  each of those offices approximately?
3      A.  Approximately three to four at most of those
4  locations.  One at Dallan Woods -- one physician at Dallan
5  Woods, two physicians at Nampa Health Plaza, three at
6  Garrity, and actually three at Iowa.
7      Q.  Is it --
8      A.  Family practice.
9      Q.  Is it efficient to run that Dallan Woods clinic
10  with just one primary care doctor there?
11      A.  No, it's really not.
12      Q.  So why do you keep it open?
13      A.  Because of where it's located.
14      Q.  Okay.  And what do you mean by where it's located?
15      A.  It's located kind of in the heart of the
16  residential area, so we do hope to grow that practice but so
17  far, it's not grown.
18      Q.  That kind of leads into my next topic, which is
19  recruitment.  Since you have been at SAMG, have you been
20  involved with trying to recruit pediatricians to SAMG, to
21  Nampa?
22      A.  Yes, I have.
23      Q.  Any success?
24      A.  Not in Nampa, no.
25      Q.  So have you been unable to recruit any

714

1  pediatricians to Nampa?
2      A.  Not to Nampa, no.
3      Q.  And has SAMG been trying to recruit general
4  internists to Nampa?
5      A.  Yes, we have.
6      Q.  Any success in doing that?
7      A.  None at all.
8      Q.  So in terms of internal -- general internists,
9  what's the -- what's the reason why you think it's been
10  difficult to recruit?
11      A.  Well, for one reason, they don't make very many
12  general internal medicine physicians, so they have a
13  tendency when they get out of their residency to either go
14  into a hospitalist program, which is just inpatient
15  medicine, or they go on to various subspecialties, like
16  cardiology, pulmonary, rheumatology, those kind of things.
17  So it's a limited market that you can get internal medicine,
18  and then we don't have any internal medicine so there is no
19  peer support, so it's kind of hard to get the first guy in.
20      Q.  Okay.  And why has it been difficult to recruit
21  pediatricians to Nampa?
22      A.  Well, part of it, I think, is because we don't
23  have any pediatricians to support, so no peer support there.
24  But then, too, it's more difficult to recruit into Nampa for
25  SAMG than it has been into other areas for primary care

715

1  especially.
2      Q.  And why is that as compared to, say, Boise?
3      A.  Well, Boise is just a more attractive community to
4  most providers, so it's a little more difficult.
5      Q.  Okay.  Is SAMG -- has SAMG had any recent success
6  in recruiting family practice doctors to Nampa?
7      A.  Not this calendar year, no.
8      Q.  Before that -- prior to that, did SAMG have any
9  success?
10      A.  We had three providers that started with us in
11  2012.
12      Q.  And how successful has SAMG been in growing the
13  practices of those three providers?
14      A.  Not very.
15      Q.  Can you describe what you mean by "not very"?
16      A.  Well, currently, there are probably --
17  productivity-wise at about the 25th percentile compared to
18  national averages.
19      Q.  Are you making or losing money on those doctors?
20      A.  Currently losing money.
21      Q.  And why is it that you've had these problems
22  ramping up those doctors' practices?
23      A.  Well, part of it, I think we're competing against
24  a very strong group being Saltzer that has a very strong
25  reputation in the community.  So I think that's a big part

716

1  of it.  And there is quite a few family practitioners in the
2  Valley when you also consider we're also competing against
3  the St. Luke's Family Medicine Group as well who have been
4  in the community longer than SAMG, as well, so.
5      Q.  So how does that compare with when you were at
6  Saltzer in terms of Saltzer's ability to ramp up the
7  practice of a newly recruited doctor?
8      A.  Generally, it took about -- for family practice at
9  Saltzer, it took about six months to get a physician ramped
10  to where they were getting either close to their guarantee
11  or exceeding it.
12      Q.  So why was it quicker and easier at Saltzer than
13  it's been at SAMG?
14          MR. SCHAFER:  Object to foundation.
15          THE COURT:  Just --
16          MR. ETTINGER:  Your Honor, she has been at
17  both --
18          THE COURT:  Overruled.  Overruled.
19  BY MR. ETTINGER:
20      Q.  Go ahead.
21      A.  Okay.  So, well, I think a lot of it has to do
22  with the reputation of -- of Saltzer being in the community
23  for 52 years, so they have a very large clinic and their
24  main clinic is very large.  There's a lot of patients coming
25  in and out.  And so I think that as a physician -- as a

717

1  senior physician, the practice is full and because of the
2  reputation in the community, the way that you mark- -- the
3  best marketing for a medical group is really not marketing
4  at all, but it's more of a mouth to mouth, so it's -- it's
5  neighbor to neighbor.
6          And if your neighbor is going to Saltzer, they're
7  naturally going to recommend that you see a Saltzer
8  physician so there is those calls that come in and so it's
9  much easier -- rapid pace to get those schedules full.
10      Q.  And when you were at Saltzer, did you have an
11  easier time recruiting primary care doctors than you had at
12  SAMG?
13      A.  Much easier time.
14      Q.  And -- and why was that?
15      A.  Well, I think because we have the support of --
16  we're -- I mean, we're the -- it wasn't much easier, but I
17  think it was easier, especially in Nampa, because of the
18  support that they had within the group.
19      Q.  So if I'm a pediatrician and I'm going to SAMG,
20  what's my call situation?
21      A.  Well, you don't have anybody to cover your call
22  except for a family practice doctor, so if you get a really
23  sick patient, the chances are you're going to have to ship
24  that patient downtown.
25      Q.  Has -- I want to switch to another topic and that

718

1  is, Saltzer and its -- its dealings with various networks
2  and payors.
3          And let me start out by asking you:  Has -- did Saltzer
4  have an agreement at one time to provide medical care to
5  Saint Alphonsus' employees?
6      A.  Yes, we did.  We had a letter of understanding, I
7  think, is what it was called.
8      Q.  And how far back did that relationship go?
9      A.  Early 2000, I want to say.
10      Q.  Okay.  Did Saltzer have a contract with the ACN
11  Network when you were at Saltzer?
12      A.  We obtained a contract late -- I think we started
13  negotiating late 2010 and I think it was signed early 2011.
14      Q.  When did ACN start requesting that Saltzer join
15  ACN?
16      A.  In early 2000 when we had the letter of
17  understanding with Saint Alphonsus Health employees.
18      Q.  And -- and why didn't Saltzer join ACN at that
19  time?
20      A.  Well, there was a requirement that ACN had
21  that -- that you had to have medical staff privileges at a
22  Saint Alphonsus facility.  There wasn't a Saint Alphonsus
23  facility in Nampa.  So -- and the doctors weren't about to
24  go to Boise.  So that's one reason.  And so it was
25  just -- we didn't really feel the need.

719

1      Q.  Okay.  And did that situation change in the 2010
2  period?
3      A.  Well, it changed when Saint Alphonsus purchased
4  Mercy Medical Center.
5      Q.  And how did it change as a result of that?
6      A.  Well, one is we met the requirements now because
7  our physicians had medical staff privileges at the Saint
8  Alphonsus Nampa facility, and then also, too -- well, that
9  was mainly the biggest thing, actually.
10      Q.  Okay.  Did -- did ACN have a requirement that the
11  doctors be board certified?
12      A.  Yes, it did.
13      Q.  And what does that mean to be board certified?
14      A.  It's a -- I don't know exactly.  It's an exam that
15  the physicians take to basically receive their certification
16  that says that they're qualified to be in that specialty, I
17  guess.
18      Q.  Go ahead.  I'm sorry, I didn't mean to interrupt.
19      A.  No.  It's okay.  Go ahead.
20      Q.  Did all the Saltzer physicians meet the ACN board
21  certification requirement?
22      A.  No, they did not.
23      Q.  So what happened for those physicians who did not
24  meet that requirement?
25      A.  They made an exception.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 26 of 56
Bench trial, 09/27/2013

720

1    **Q.** By "they," you mean ACN?

2    **A.** I'm sorry, yes, ACN.

3    **Q.** Besides ACN, what other networks has Saltzer been

4    a part of when you were at Saltzer?

5    **A.** While I was at Saltzer?  So we were a part of the

6    Select contracting network.  We were part of IPN.

7    Obviously, Blue Cross and Blue Shield, First Choice Health

8    at one point in time, a couple of smaller networks, but

9    those were the main ones.

10   **Q.** Let me ask you a few questions about Regence Blue

11   Shield.  Did Saltzer have contracts with Regence Blue Shield

12   at one time?

13   **A.** Yes, they did.

14   **Q.** Initially, what was the Regence plan that Saltzer

15   participated in?

16   **A.** Well, initially, they only had just the one plan.

17   It was a traditional network, so -- so they had just the one

18   plan which is a traditional plan.

19   **Q.** And did Regence then adopt a PPO network?

20   **A.** Yes, they did.

21   **Q.** And was there any reason why Saltzer would have

22   wanted to be in the PPO network?

23   **A.** A reason?  Well, because we knew that they were

24   going to shift because historical perspectives told us, that

25   they were going to shift most -- most of their business from

721

1    the traditional network into the PPO network.  So, yes, in

2    order to see those patients that we were still seeing under

3    the traditional plan, we would need to participate in the

4    PPO plan because they would do a dramatic shift.

5    **Q.** So did Saltzer, therefore, accept Regence's

6    initial offer for the PPO network?

7    **A.** No.  Actually, we did not.

8    **Q.** And why not?

9    **A.** Because their rates were about 5 to 6 percent less

10   than what we were already getting in the traditional

11   product.  So we told them that we wouldn't participate

12   because we knew that they were just going to shift their

13   already existing business into the PPO plan, so we told them

14   we wouldn't participate at those rates.

15   **Q.** And what happened?

16   **A.** Well, initially, they walked away and then they

17   came back and said that we could contract with them in the

18   PPO plan under the traditional rates.

19   **Q.** So how did those rates compared to what they had

20   offered you initially?

21   **A.** So it was about a 5 to 6 percent decrease under

22   the PPO plan that we did not accept.

23   **Q.** So you got 5 to 6 percent more than their initial

24   offer; is that right?

25   **A.** Correct.

722

1    **Q.** Let's talk about Blue Cross a little bit.  Were

2    you able to negotiate as Saltzer with Blue Cross on

3    physician fee schedules?

4    **A.** Well, we -- well, yes, we attempted to on numerous

5    occasions.

6    **Q.** Did you succeed?

7    **A.** Well, they had a statewide fee schedule, so the

8    only way that we would know if we succeeded or not is if

9    they changed the statewide fee schedule as proposed.

10   **Q.** Did Blue -- were you on Blue Cross committees that

11   talked about their statewide fee schedule?

12   **A.** Actually, I did sit on the Physician Reimbursement

13   Advisory Council for Blue Cross, so that was a council that

14   met once a year usually in the winter -- November, December

15   time frame before they were getting ready to propose their

16   fee schedule and they would run it through the council to

17   kind of get our opinion as to what they were going to

18   propose as a statewide fee schedule.

19   **Q.** Did you offer your opinions?

20   **A.** Oh, numerous times, yes.

21   **Q.** And did they sometimes result in higher rates for

22   the statewide fee schedule?

23   **A.** Sometimes, yes.

24   **Q.** Did you feel the fact that you were there for

25   Saltzer paid any -- played any role in that or was it just

723

1    Nancy Powell being a brilliant advocate?

2            MR. SCHAFER:  Object to foundation.

3            MR. ETTINGER:  Your Honor, she was there in the

4    room judging what happened.

5            THE COURT:  Well, but the question, I think, calls

6    for her to delve into the mind of those who were involved.

7    I'm going to sustain the objection.

8            Proceed.

9    BY MR. ETTINGER:

10   **Q.** It -- were there -- did you negotiate with Blue

11   Cross regarding contract language for your contracts with

12   them?

13   **A.** Yes, we did.

14   **Q.** And did that contract language affect total

15   payment, in part?

16   **A.** In part, but it was mainly related to denials, so

17   medical necessity, that kind of thing.

18   **Q.** So what do you mean by "denials"?

19   **A.** Well, so that they -- it strengthened the language

20   of the medical necessity so that they couldn't just deny a

21   claim and claim medical necessity.  They had to

22   clearly -- we made them clearly define what that was.

23   **Q.** So if they deny a claim, does that mean they don't

24   pay it?

25   **A.** Correct.  Sorry.

724

1      **Q.** So did your language that you got, did you feel
2 that helped you get paid in circumstances where you might
3 otherwise not have been paid?
4      **A.** It tightened it, yes.
5      **Q.** Okay. When you were able to negotiate this
6 language, did that change the standard Blue Cross contract
7 or did they make a change some other way?
8      **A.** No. It didn't change the contract template, it
9 was just an amendment for Saltzer.
10      **Q.** Okay. Did -- were you able to negotiate any
11 incentives with Blue Cross?
12      **A.** We did have a quality improvement performance, I
13 think is what it was called, a -- a QIPS or something like
14 that incentive -- so where we had to meet different quality
15 metrics. So A1Cs, BMIs, I think, might have been one of
16 them, hypertension something like that. And then we also
17 had a generic prescribing program that we participated with
18 Blue Cross in, as well.
19      **Q.** So if you met the metrics you're talking about,
20 what would happen?
21      **A.** There was a monetary incentive.
22      **Q.** What's an A1C?
23      **A.** Sorry. An A1C is a blood test, and I'm not a
24 physician, so it has to do with diabetes. That's all I
25 know.

725

1      **Q.** Okay. Did Saltzer ever terminate its contract
2 with Blue Cross?
3      **A.** No. We threatened many times.
4      **Q.** Okay. So why did you never terminate Blue Cross?
5      **A.** It's kind of hard to walk away from 22 percent of
6 your business, so --
7      **Q.** Did you feel you had that same problem with any
8 other payors?
9      **A.** Oh, no, not at all.
10      **Q.** You mentioned John Kee earlier. Did you ever
11 discuss Saltzer's negotiations with Blue Cross with Mr. Kee?
12      **A.** Not -- not necessarily negotiations, but he made
13 the comment to me that he felt that we had more negotiating
14 power than we were utilizing when dealing with Blue Cross,
15 and he was just basically commenting to me on his experience
16 with Twin Valley -- with Twin Valley -- with Twin Falls.
17 Yeah. Twin Falls.
18      So the network that he had in Twin Falls, so he
19 felt that he was able to -- he thought that we had more
20 power with Blue Cross than I was utilizing.
21      **Q.** So how did he relate that to Twin Falls?
22      **A.** Well, he said the strength of the network in Twin
23 Falls --
24      MR. SCHAFER: Objection, Your Honor. Hearsay.
25      MR. ETTINGER: It's a party admission, Your Honor.

726

1 This is the vice president of St. Luke's.
2      THE COURT: Counsel, I would -- it sounds like an
3 801(d)(2)(c). I may be guessing on the subsection, but I'll
4 overrule the objection.
5      Proceed.
6 BY MR. ETTINGER:
7      **Q.** Go ahead.
8      **A.** Well, that was basically it.
9      **Q.** Well, you said something about the network. Could
10 you just finish the sentence?
11      **A.** Oh, sorry. The Twin Falls network, they -- he
12 just felt because of the strength of the network, it gave
13 them more negotiating power with Blue Cross than maybe they
14 had in other areas of the state.
15      **Q.** When you were at Saltzer, what was its practice
16 regarding referrals by its primary care physicians?
17      **A.** We were very good at keeping our referrals
18 internal.
19      **Q.** And did you do -- did you from time to time do
20 anything to check that?
21      **A.** Sure. Obviously, I would run reports and check
22 it.
23      **Q.** Did you ever look at up numbers on that with
24 regard to the Saltzer surgeons, specifically?
25      **A.** The orthopedic surgeons, specifically I did just a

727

1 spot check and at that time determined about 75 percent of
2 the referrals came from internal.
3      **Q.** Okay. And "from internal," you mean from
4 referrals by Saltzer primary care physician?
5      **A.** Right. Or their Saltzer primary care patients,
6 yes.
7      **Q.** Let me turn to another topic, the relationship or
8 some aspects of the relationship between Saltzer and Mercy
9 Medical Center before it became Saint Alphonsus Nampa. Did
10 Mercy Medical Center adopt a hospitalist program?
11      **A.** I believe in 2008 they did, yes.
12      **Q.** And what is a hospitalist program?
13      **A.** A hospitalist program is basically physicians that
14 work only in the hospitals. So they take care of all the
15 patients that once the patients -- well, actually, they do
16 the admissions. So when a patient is admitted, then they're
17 responsible for the care of that patient while they are in
18 the inpatient facility.
19      **Q.** So before the hospitalist program was started at
20 Mercy Medical Center, did the Saltzer primary care
21 physicians admit patients to a significant degree at Mercy
22 Medical Center?
23      **A.** Yes, they did.
24      **Q.** And what was the reaction of the Saltzer primary
25 care physicians to the hospitalist program?

A. **Predominantly, most of them were in favor of it pretty much from the beginning. It took a few of them, I think, a year or so before they realized that it was a much better lifestyle for the physician. They were obviously also more productive in their clinic on the outpatient setting. So it was overall favorable.**

Q. Are you aware of any Saltzer physicians who recommended their patients go to hospitals other than Mercy Medical Center because of the hospitalist program?

A. **Not to my knowledge.**

Q. And did Saint Alphonsus then buy Mercy Medical Center?

A. **They did.**

Q. And that was about 2010, I think you said; is that right?

A. **Correct. April 2010.**

Q. Are you aware of any Saltzer physicians who recommended their patients go to other hospitals because Saint Alphonsus bought Mercy Medical Center?

A. **Not to my knowledge.**

Q. When you were at Saltzer, did you make any communications to Saltzer employees about the use of any physician-owned hospitals?

A. **I believe I wrote a memo to our employees just letting them know that it was more cost effective for them**



**to utilize -- I think I maybe even addressed Treasure Valley Hospital directly because the -- it being a surgical specialty hospital, it was cheaper for the patient, generally, because they had a different fee schedule than a full -- than a full facility hospital, so it would be cheaper out-of-pocket costs for the employees, as well, obviously, because we were self-insured. It was also cheaper out-of-pocket costs for the employer, as well.**

Q. Was the management of Saltzer aware of your communication?

A. **Yes, they were.**

Q. Did anybody complain or disagree with it?

A. **Not that I recall, no.**

Q. Okay. Let me turn to another subject, the discussions with St. Luke's about an affiliation. What was your role in those discussions?

A. **I was on the Negotiating Committee.**

Q. And when did those discussions begin?

A. **I believe in 2009.**

Q. And -- and how did they begin?

A. **Well, initial discussions -- they began sort of with Ed Castledine just sort of making routine visits, and then I think we had a formal meeting with senior leadership of St. Luke's sometime in 2009. So -- and then at -- we were already working on some things together, so we had an**



**agreement to work on -- we leased space so they put their cardiologists into our main location in -- in Nampa. We were working together on, I believe, recruiting for urology. We were trying to -- to work on a joint affiliation with occupational medicine. And so it was after that that we were sitting in a meeting and Gary Fletcher made the comment that he would like to see us work in a more -- a broader affiliation. So that started in 2009.**

Q. And Gary Fletcher again is the -- was who?

A. **Well, at the time he may have been the CEO for the Boise hospital, but I think his title now is chief operating officer for the Health System.**

Q. And -- of St. Luke's?

A. **Of -- sorry, of St. Luke's Health System, yes.**

Q. Right. In the beginning of those discussions, what was the general attitude expressed by the Saltzer physicians about being acquired by St. Luke's versus remaining independent?

A. **They wanted to be independent.**

Q. Why don't we -- was Saltzer looking for possible buyers at that point?

A. **No, not at all.**

Q. When you were at Saltzer, was there ever any kind of systematic effort to go out and see who might be interested in buying us?



A. **No.**

Q. Why not?

A. **We liked our independence. We wanted to remain independent.**

Q. Okay. Why don't you turn -- we are going to put up Trial Exhibit 1380, which is also the next exhibit in the book.

A. **Okay.**

Q. And why don't you -- 1380 appears to be an email you wrote June 15 of 2011. Is that -- is that, in fact, an email you wrote, Ms. Powell?

A. **Yes, it is.**

Q. And you sent it -- who were the people you sent it to?

A. **That would have been Dr. Kaiser, Dr. Page, Dr. Buersmeyer, Dr. Curran, and Bill, and that was basically the Negotiating Committee.**

Q. For Saltzer?

A. **For Saltzer at the time, yes.**

Q. These are all Saltzer doctors and Mr. Savage, the CEO?

A. **Correct.**

Q. Okay. And you say in there --

MR. KEITH: Your Honor, just a moment. I believe that document is AEO.

Case 1:12-cv-00560-BLW v. Document 553 Filed 11/04/14 Page 29 of 56

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/27/2013

732

1    MR. ETTINGER:  I don't -- I don't believe it is.
2  We don't have a problem with proceeding however --
3    THE COURT:  Well, I turned off --
4    MR. ETTINGER:  -- Saltzer desires, Your Honor.
5    THE COURT:  I have turned off the projector.
6    MR. ETTINGER:  Okay.  Your Honor, the only problem
7  will be my questions are going to be fairly specific in
8  terms of the words of document.
9    THE COURT:  Well, let's determine if it is AEO or
10  not.  And if it is, we'll have to clear the courtroom.
11    MR. ETTINGER:  Yeah.
12    MS. DUKE:  It's not AEO on our list.
13    MR. ETTINGER:  Yeah.  We don't show it that way,
14  which is why we proceeded, Your Honor.
15    THE COURT:  Mr. Keith, can you confirm that?
16    MR. SINCLAIR:  Can we see the whole document?
17    MR. KEITH:  Your Honor, I confirmed that this is
18  designated as attorneys' eyes only on our exhibit list, and
19  I believe it does fall into the category --
20    THE COURT:  All right.
21    MR. KEITH:  -- related to physician --
22    THE COURT:  Ladies and gentlemen, we will have to
23  ask those who are not -- have not been advised that they can
24  remain in the courtroom to leave the courtroom while we
25  discuss this matter.

733

1  ****** COURTROOM CLOSED TO THE PUBLIC ******
2    THE COURT:  All right.  I'll turn the
3  jury -- jury -- the projector on and you may proceed.
4    MR. ETTINGER:  Thank you, Your Honor.  And if we
5  made a mistake, I apologize.  We did check all these in
6  advance.  I didn't see it on the list we looked at.
7  BY MR. ETTINGER:
8    Q.  Ms. Powell, going back to the document --
9    THE COURT:  Counsel, just so we're clear, Counsel,
10  I assume you're satisfied everyone in the courtroom can
11  remain in the courtroom because they are affiliated with
12  St. Luke's?
13    MR. SCHAFER:  Or our attorneys.
14    THE COURT:  Or your -- yeah.
15    MR. SCHAFER:  Yes, Your Honor.
16    THE COURT:  All right.  Go ahead and proceed.
17  BY MR. ETTINGER:
18
19
20
21              REDACTED
22
23
24
25

734

REDACTED

20    Q.  Okay.
21    A.  Well, while I was still there.
22    Q.  Sure.  Now, let me talk more generally a little
23  bit about the -- the acquisition discussions.  Who were the
24  people from St. Luke's -- you've mentioned Mr. Fletcher, I
25  think --

735

1    A.  Um-hmm.
2    Q.  -- and Mr. Castledine.  Who else from St. Luke's
3  were you involved in discussions with about the potential
4  transaction between St. Luke's and Saltzer?
5    A.  We met routinely with Gary Fletcher, John Kee,
6  Chris Roth, Jeff Taylor, and Ed Castledine.
7    Q.  Did any of the St. Luke's -- and, I guess, for
8  those we haven't gone through, who was Chris Roth?
9    A.  Chris Roth, at the time, I believe was the chief
10  operating officer for the Boise hospital, but then during
11  negotiations, he actually was promoted to the CEO of the
12  Boise hospital.  Jeff Taylor was the chief financial officer
13  for the St. Luke's Health System and who haven't I said?
14    Q.  I think we covered them.
15    A.  Okay.
16    Q.  Did any of the St. Luke's executives indicate in
17  your presence why St. Luke's wanted to acquire Saltzer?
18    A.  Well, they were predominantly interested in our
19  primary care base that we had in Nampa.
20    Q.  Who is Peter LaFleur?
21    A.  Peter LaFleur was the consultant that worked with
22  St. Luke's Health System.
23    Q.  And did you have any discussion with Mr. LaFleur
24  about ancillary services rates?
25    A.  Yes, we did.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/27/2013

736

1   Q.   And why don't you describe that discussion.

2   A.   Well, he was trying to come up with, you know,

3   enough money to pay the additional compensation and one

4   bucket of that money was the increase in ancillary rates

5   because that would become a department of the hospital so

6   there would be an increase to the fee schedule and that was

7   in the tune of about a million dollars.

8   Q.   And was he referring then to rates to government

9   payors or rates to commercial payors?

10  A.   I believe to all payors.

11  Q.   Why don't you -- let's go to Exhibit 1369.

12  A.   Well, I -- David, I think that actually could only

13  have been to commercial payors when I think about it because

14  Medicare has a standard fee schedule, so.

15  Q.   Okay, okay.  Why don't we go to Exhibit 1369.

16       And what is Exhibit 1369, Ms. Powell?  It looks like a

17  whole bunch of handwritten notes.

18  A.   These are copies from a notebook that I kept while

19  we were in negotiations with St. Luke's.

20  Q.   And -- and why did you keep this notebook while

21  you were in negotiations with St. Luke's?

22  A.   Just to keep a record of the meetings.

23  Q.   Okay.  And are these, in fact, your handwritten

24  notes?

25  A.   Yes, they are.

737

1   Q.   Okay.  Why don't -- we're going to turn to page

2   Bates-numbered 39311 of the document, which has got a little

3   number 15 at the bottom.  Can you tell what -- what this

4   group of notes concerned?

5   A.   This is a meeting that we had prior to, I believe,

6   a shareholder meeting, so these are notes that were -- I'm

7   taking during that meeting.

8   Q.   And --

9        MR. ETTINGER:  Your Honor, we may be well past

10  the -- it just occurs to me we may be well past the AEO

11  period.  We're into another exhibit.  I don't know if you

12  want to go back and forth, Your Honor, or what.  I don't

13  believe any of other others are AEO but --

14       MS. DUKE:  I just provided a list so we could

15  check real quick.

16       MR. KEITH:  The one on here is AEO.

17       MR. ETTINGER:  Oh, okay.

18       THE COURT:  You say it is AEO?

19       MR. KEITH:  It has been designated AEO.

20       THE COURT:  All right.  Well, then let's proceed.

21  But in fairness to the public, I think we need to open it as

22  soon as we can.  So as soon as we're at that point,

23  Mr. Keith, if you'll let me know and then we'll put it back

24  on the screen and let people back into the courtroom.

25       MR. KEITH:  I will, Your Honor.

738

1        THE COURT:  All right.  Thank you.

2   Proceed.

3   BY MR. ETTINGER:

4   Q.   So, Ms. Powell -- sorry to interrupt -- what --

5   what are -- meeting was -- did these particular notes

6   concern?

7   A.   Well, I don't know the date, but this is a meeting

8   that we had when we were discussing what we were going to

9   discuss at the shareholder meeting.  I'm pretty certain.

10  Q.   And who were the people at this meeting?

11  A.   Dr. Patterson, Dr. Page, Dr. Djernes, Dr. Kunz,

12  Chenore, Bill Savage, Dr. Kaiser, myself, and

13  Dr. Buersmeyer.

14  Q.   So who -- who did these doctors represent?  Were

15  they a particular committee or group?

16  A.   At the time, I believe this was sort of the makeup

17  of the negotiating committee when we first started.

18  Q.   Okay.  So why don't we turn to the next page of

19  the notes and my first question is:  Is that a continuation

20  of the notes of the same meeting?

21  A.   Yes, it is.

22  Q.   I want to go to No. 5.  It says in No. 5,

23  "Fundamental reasons for why we should do this."  Did I --

24  did I read your handwriting correctly?

25  A.   You did.

739

1   Q.   Better than mine.

2        So who's -- by "do this," what were -- what were you

3   referring to there?

4   A.   Well, basically, I was just taking down a list as

5   we were talking about the reasons why we should do the

6   St. Luke's affiliation.

7   Q.   Okay.  And were these your thoughts or the

8   thoughts of the group that was -- that was having a

9   discussion?

10  A.   I think it was the thoughts of the group.

11  Q.   Why don't you go to Item D.  Would you read Item D

12  into the -- read what Item D says, and then I'll ask you

13  what it means.

14  A.   "Align with Luke's.  One competition compared to

15  two."

16  Q.   So what does that mean "one competition compared

17  to two"?

18  A.   It would mean that we were -- would only be

19  competing against Saint Alphonsus instead of Saint Alphonsus

20  and St. Luke's.

21  Q.   Okay.

22       MR. ETTINGER:  That's all I have got on that

23  exhibit, Your Honor.  I am now going to go to Exhibit 1384.

24  I don't know what -- what St. Luke's list shows as to that

25  one.

740

1    MR. KEITH:  Your Honor, I have just handed
2  Mr. Ettinger a list of the exhibits we were told were coming
3  up and the AEO designations.
4    MR. ETTINGER:  Okay.  Well, this -- this one
5  apparently is AEO, so I guess we'll have to --
6    THE COURT:  All right.  Let's proceed.
7  BY MR. ETTINGER:
8    Q.  So why don't you turn to -- why don't we put
9  Exhibit 1384 on the screen, Ms. Powell, and why don't you
10  turn to that.
11    And 1384 appears to be an email from you to Dr. Kaiser,
12  Mr. Savage, Max Reiboldt, Aimee Greeter.  Is this, in fact,
13  an email that you sent in 2011 when you were at Saltzer?
14    A.  Yes, it is.
15    Q.  And I want to focus in on paragraph 5 of the
16  email.  If you could take a look at that.
17    A.  Okay.
18
19
20                    REDACTED
21
22
23
24    Q.  So who is Peter?
25    A.  Peter LaFleur.

741

1    Q.  That's the St. Luke's consultant?
2    A.  Yes, it is.
3    Q.  And -- and did this refer to all of the Saltzer
4  physicians or some particular group?
5    A.  Well, mainly just the surgeons but sort of all of
6  them but predominantly the surgeons.
7
8
9                    REDACTED
10
11
12
13
14    MR. ETTINGER:  Your Honor, I'm done with that
15  document and going to some general topics for a while.
16    THE COURT:  And they're not AEO?
17    MR. ETTINGER:  I don't --
18    THE COURT:  The list you were just given.
19    MR. ETTINGER:  Yeah.  They're -- they're not
20  exhibits at all, so -- so they are not on that list,
21  Your Honor.
22    THE COURT:  Then perhaps we could open the door
23  and allow anyone from the public to come in.
24    ****** COURTROOM OPEN TO THE PUBLIC ******
25    THE COURT:  Go ahead and proceed.

742

1  BY MR. ETTINGER:
2    Q.  Ms. Powell, I want to talk to you a little bit
3  about efficiencies.  In connection with St. Luke's
4  affiliation discussions, did the subject ever come up in
5  your discussions with Peter LaFleur about whether any
6  efficiencies would be achieved if St. Luke's bought Saltzer?
7    A.  Actually, it was just the opposite.  Peter LaFleur
8  had made the comment to me that he was having a hard time
9  finding any efficiencies for Saltzer that we would gain so
10  that he could have a -- basically, a reason to pay the
11  additional compensation and have some wins.  So I think he
12  was a little frustrated by that, but, yeah.  He just -- he
13  told us that we were very lean and an efficient
14  organization.
15    Q.  What kind -- what electronic medical record system
16  did Saltzer have at the time you left the group?
17    A.  eClinicalWorks.
18    Q.  And did the physicians in the group generally
19  express satisfaction or dissatisfaction with eClinicalWorks?
20    A.  Mostly satisfaction.
21    Q.  Who else besides Saltzer in the Treasure Valley
22  had eClinicalWorks?
23    A.  Well, at the time?
24    Q.  Yeah.
25    A.  So we signed our contract and then St. Luke's

743

1  signed a contract with eClinicalWorks so St. Luke's
2  physicians' offices went on eClinicalWorks.  Primary Health
3  went on eClinicalWorks.  Those are the main larger
4  organizations.  Mercy Physician Group is another one that
5  went on eClinicalWorks.
6    Q.  Who had an electronic medical record first,
7  Saltzer or St. Luke's?
8    A.  Well, Saltzer's first electronic medical record
9  was back in 2003.  So -- and I know that St. Luke's went on
10  to eClinicalWorks, I believe, in either early 2007 or late
11  2006, so I would say Saltzer did.
12    Q.  In opening, Saltzer's counsel said that -- if I
13  got it right, that Saltzer wanted to buy the Epic system but
14  could not.  Is that accurate or not?
15    A.  No.  That's not an accurate statement.
16    Q.  Did Saltzer inquire about the Epic system?
17    A.  We did.  We tried to -- we actually tried to get a
18  demo of the Epic system, but Epic wouldn't talk to us
19  because we had less than a hundred physicians.
20    Q.  Did you ever learn enough to decide whether you
21  liked or disliked the Epic system?
22    A.  No.  We only could know based on literature.
23    Q.  Okay.  In the discussions with St. Luke's over a
24  possible acquisition, did the subject of Saltzer coming
25  under the Epic, the St. Luke's Epic system come up?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW  Document 553  Filed 11/04/14  Page 32 of 56

Bench Trial, 09/27/2013

744

1    A.   Yes, it did.
2    Q.   And what was the general reaction of the Saltzer
3    physicians to that idea?
4    A.   Well, they weren't very excited about it.
5    Q.   And -- and why not?
6    A.   Well, having to learn a whole new system, number
7    one, and -- and they were very comfortable and thought the
8    eClinicalWorks --
9         MR. SCHAFER:  I'm going to object to foundation
10   here, Your Honor.  She is talking about what sounds like
11   specific statements but attributing them to an entire group
12   of 50 physicians.
13        MR. ETTINGER:  Your Honor, Ms. -- Ms. Powell has
14   said that she had daily, you know, evening meetings with
15   physicians getting the pulse of the group and I think she
16   can certainly talk about -- about the reactions that she
17   heard.  She was on the negotiating committee and was heavily
18   involved.
19        THE COURT:  I think the witness can testify as to
20   the position taken by Saltzer with regard to specific topics
21   of negotiation with St. Luke's, but I think specific
22   conversations probably should not be discussed.  The witness
23   can testify as to her understanding since she was tasked
24   with the negotiation process.  So I'll allow you to go ahead
25   and answer the question but limit yourself only to your

745

1    understanding of the position you were taking in the
2    negotiations on these issues.  All right.
3         THE WITNESS:  Okay.
4         THE COURT:  Proceed.
5         MR. ETTINGER:  Thank you, Your Honor.
6    BY MR. ETTINGER:
7    Q.   Let me switch to another topic and that is Micron.
8    Was -- was Saltzer approached to become part of the Micron
9    network in the 2008 time period?
10   A.   Yes, we were.
11   Q.   And -- and who -- who approached Saltzer?
12   A.   I remember Jackie Butterbaugh, but I don't
13   honestly remember the other parties at the meeting.
14   Q.   Okay.  Do you remember who else was at the meeting
15   from Saltzer?
16   A.   Not completely.  Probably -- Dr. Page probably was
17   there.  Most likely Bill, but I'm not a hundred percent
18   certain.
19   Q.   Did Dr. Page have a role on the Contracting
20   Committee?
21   A.   He was our physician chair of the Contracting
22   Committee.
23   Q.   Okay.  What -- are you aware that the Micron
24   relationship that -- that started then had different tiers
25   to it?

746

1    A.   Yes.  They had, like, a couple of tiers, I
2    believe.
3    Q.   Do -- do you recall which tier Saltzer was asked
4    to participate in?
5    A.   Initially, it was the Tier 1, high performance
6    network, whatever they called it.
7    Q.   And when you were meeting with Ms. Butterbaugh and
8    perhaps others on this topic, did she suggest a price that
9    or -- or rates that Saltzer would be paid if you accepted
10   participating in the high performance tier?
11   A.   Yeah.  It was about a 20 percent discount to what
12   was pretty much the commercial market at the time.
13   Q.   And did she indicate why she thought a 20 percent
14   discount would be justified?
15   A.   I think she indicated directed volumes.
16   Q.   Okay.  And did she indicate whether this network
17   was intended to be limited to Micron or whether they had
18   hopes that it would involve others, as well?
19   A.   No.  They were hoping to expand it.
20   Q.   What was Saltzer's reaction to this proposal?
21   A.   It was not favorable.
22   Q.   Did Saltzer make a bid for the high performance
23   network?
24   A.   We did not.
25   Q.   What did you think of the price she wanted?

747

1    A.   There was no way.
2    Q.   What did you think about the idea of directed
3    volume as justifying a low price?
4    A.   Well, at the time, the Micron plant was either
5    closing or laying off, but -- so at the time we felt that
6    the Micron population was going to be diminishing, not
7    expanding, and so we didn't want to set a precedence of
8    accepting such a large discount for directed volumes because
9    if Blue Cross got wind of that, that would not be good.
10   Q.   Did you think that the expansion of the Micron
11   program, the other employers would benefit Saltzer or not?
12   A.   No.
13   Q.   Did you think it would benefit other providers in
14   the medical community or not?
15   A.   Not with the 20 percent discount, no.
16        MR. ETTINGER:  Your Honor, there is an exhibit
17   here that's apparently AEO and what I'm going to do is skip
18   over it and continue and come back to it at the end so we
19   don't need to ask the audience to go in and out, but it will
20   be slightly out of sequence that way.
21        THE COURT:  We're probably going to take a break
22   in about a half an hour if that helps in your planning.
23        MR. ETTINGER:  Actually, I'll be done with the
24   examination well before then.
25        THE COURT:  Okay.  Then when we get to that point,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW  v. Document 553  Filed 11/04/14  Page 33 of 56

**748**

1  we'll excuse the audience.  Go ahead.
2  MR. ETTINGER:  Okay.
3  BY MR. ETTINGER:
4  **Q.**  So after the -- so did the Micron program begin,
5  then, without Saltzer in the network?
6  **A.  Yes, it did.**
7  **Q.**  And did you see any impact in terms -- on
8  Saltzer's overall volume from your absence from the Micron
9  network?
10  **A.  No.  Not a significant impact, no.**
11  **Q.**  Did you see any impact on your overall
12  commercially insured volume from your absence from the
13  Micron network?
14  **A.  Not that I recall, no.**
15  **Q.**  Did Imagine or Wise make any further offers to
16  Saltzer to participate in the Micron network?
17  **A.  They came back to us with a Tier 2 proposal.**
18  **Q.**  And how -- how did those rates compare to the
19  initial rates?
20  **A.  They were about -- if I recall, they were**
21  **comparable to Blue Cross Blue Shield rates at the time, so**
22  **right -- right in market.**
23  **Q.**  Okay.  Did Saltzer accept those rates?
24  **A.  No, we did not.**
25  **Q.**  And was there discussion within Saltzer about

**749**

1  whether to accept those rates?
2  **A.  Sure, of course, we discussed it in contracting**
3  **committee.**
4  **Q.**  Was there any concern within Saltzer about
5  possible loss of Micron business?
6  **A.  Yes, at times.**
7  **Q.**  And did that cause Saltzer to accept the rates?
8  **A.  No, it did not.**
9  **Q.**  Okay.  And why not?
10  **A.  Well, it mainly had to do with the network itself.**
11  **We didn't -- we didn't want to give the network an**
12  **opportunity to really grow and to market to other employers**
13  **in the community.  So it had to do more with philosophy.**
14  **And -- and we knew if we participated, there was also the**
15  **chance that once they had you, that they would come back and**
16  **want the 20 percent discount on rates at some point in the**
17  **future.**
18  **Q.**  And whatever the impact that this had on Saltzer's
19  Micron business, did you ever see an appreciable decline in
20  Saltzer's overall commercially insured business as a result
21  of this program?
22  **A.  No.**
23  **Q.**  Did Saltzer ever become part of the Micron
24  second-tier network?
25  **A.  Actually, we did when we signed the ACN contract.**

**750**

1  Micron was part of that contract.
2  **Q.**  Okay.  Let me go on to another topic and then I'll
3  come back to the one -- one further document on Micron,
4  Ms. Powell.
5  There is one issue in this case is what would happen to
6  the Saltzer group if it were unwound.  Based on your
7  experience in recruiting at Saltzer, do you think that if
8  Saltzer were unwound, it would be able to recruit physicians
9  to replace the surgeons that have left the group?
10  MR. SCHAFER:  Object to foundation.
11  MR. ETTINGER:  Your Honor, she is heavily involved
12  in both jobs and recruiting.  She is certainly competent to
13  discuss this.
14  MR. SCHAFER:  I don't, I mean, I --
15  THE COURT:  Just a moment, Counsel.
16  MR. SCHAFER:  Sorry.
17  THE COURT:  Well, I'm not sure how -- I mean,
18  it's -- there has been a -- I -- I thought it was clear from
19  the outset that unwinding the practice was not going to be
20  an issue in the case -- I mean, the problems that Saltzer
21  and St. Luke's might face.
22  Now, can you rephrase the question or else indicate why
23  we're getting into this?
24  MR. ETTINGER:  Your Honor, that's certainly
25  plaintiffs' position.  Defendants have introduced a lot of

**751**

1  testimony and even have expert testimony to suggest that
2  unwinding is a problem.  If that is out of bounds, I'm more
3  than happy to not go into it.
4  THE COURT:  Well --
5  MR. SCHAFER:  Your Honor, if I may, I --
6  THE COURT:  Mr. Schafer.
7  MR. SCHAFER:  Yes.
8  THE COURT:  Yes, Mr. Schafer.
9  MR. SCHAFER:  Your Honor, I think the issue is
10  that what's out of bounds is the discussion about, you know,
11  that it would be more difficult because of what happened
12  since the preliminary-injunction hearing, but that doesn't
13  talk about why it would be more difficult for Saltzer in the
14  event of, say, losing seven surgeons that happened before
15  the preliminary-injunction hearing and other market factors
16  that will affect Saltzer in the event of an unwind that have
17  nothing to do with, you know, things that have been done
18  post the preliminary-injunction hearing as far as
19  affiliating with two groups.
20  THE COURT:  Well, I think we need to sort this
21  out.  Since it's apparently -- and since I didn't get a very
22  short answer that, yes, it is out of bounds and we agree,
23  I'm assuming there is at least some uncertainty there.  I'm
24  going to give counsel some leeway, and I think it is --
25  there is -- the witness does have an adequate foundation to

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/27/2013

752

1 indicate that based upon her experience as the --
2     Was it chief financial officer?
3         THE WITNESS: Yes, sir.
4         THE COURT: -- with Saltzer and now as kind of the
5 CEO of SAMG. Did I get --
6         THE WITNESS: Correct.
7         MR. SCHAFER: If I may, I don't mean to test that,
8 but I don't know if the foundation has been laid for her. I
9 think the premise of the question was based on her
10 experience in recruiting at Saltzer, and I don't think that
11 foundation has been laid, what -- what her experience in
12 recruiting at Saltzer was.
13         THE COURT: All right. Overruled. She testified
14 earlier that she compared the recruiting and indicated that
15 she was having much more difficult time at SAMG than she had
16 at Saltzer. So I think that has come in, so I'll overrule
17 the objection.
18     You may go ahead and answer.
19     Perhaps you ought to rephrase the question just to make
20 sure we have it properly before the witness.
21         MR. ETTINGER: I will, Your Honor.
22 BY MR. ETTINGER:
23     Q.  So you know, in fact, that a number of surgeons
24 have left Saltzer and indeed some of them work for SAMG
25 today; isn't that correct?

753

1     A.  That's correct.
2     Q.  So based on your experience at Saltzer and SAMG
3 and your experience in recruitment and your knowledge of
4 Saltzer, do you think if Saltzer were unwound, if it would
5 have any difficulty in recruiting surgeons to replace those
6 surgeons who left?
7     A.  No.  I don't believe that they would have
8 difficulty recruiting the physicians because they have a
9 strong primary care base to support the surgeons.
10     Q.  When -- when you -- and how does that relate to if
11 I'm an orthopedic surgeon and Saltzer is trying to recruit
12 me, why do I care if Saltzer has a strong primary care base?
13     A.  Well, that's -- because that's where your
14 referrals come from is from your primary care base.
15     Q.  When you started with Saltzer in the '90s,
16 Ms. Powell, about how many physicians did it have?
17     A.  Approximately 40.
18     Q.  And how many orthopedic surgeons did it have then?
19     A.  When I first started?
20     Q.  Right.
21     A.  Two.
22     Q.  Was the group, in your -- in your judgment,
23 financially successful at that time?
24     A.  Yes.
25     Q.  When you were at Saltzer, were there years when

754

1 the number of physicians at Saltzer declined from year to
2 year because people left and weren't immediately replaced?
3     A.  Yes, of course.
4     Q.  And what was the most that that number declined in
5 any given year when you were at Saltzer?
6     A.  I believe five, maybe six, but I think five.
7     Q.  Okay.  And when that happened, were there fewer
8 doctors to, in effect, absorb the overhead expenses of the
9 practice?
10     A.  Correct.
11     Q.  Did that mean the remaining doctors had more
12 overhead they had to -- they had to cover?
13     A.  Right.  Until we could get those physicians
14 replaced, yes.
15     Q.  Okay.  So what did Saltzer do in response to that
16 problem?
17     A.  They recruited.
18     Q.  Anything else?
19     A.  Well, you definitely have to cut your belt.  So,
20 you know, downsize.  You reduce your overhead, and, quite
21 honestly, you try to get the doctors to work a little harder
22 so you have more revenue.
23     Q.  Did any physicians leave the group because they
24 were upset at the additional overhead they would have to
25 absorb at least for a while?

755

1     A.  No.
2     Q.  If, in fact, Saltzer were unwound and it had to go
3 out -- and it decided it had to go out and recruit surgeons
4 to replace the surgeons who left, do you think the group
5 would -- would dissolve or regroup and deal with the
6 problems?
7         MR. SCHAFER: Object to foundation.
8         MR. ETTINGER: Your Honor, we're going to
9 hear -- if this issue is allowed, and again, we're perfectly
10 happy from the plaintiffs' side if it is not, we're going to
11 hear a lot of testimony on this issue from St. Luke's.  It's
12 a -- they purport to say it's a major defense.  It's an --
13 it's an appropriate question.
14         THE COURT: Would you rephrase the question.  If
15 we're getting into details as to how -- what may actually
16 happen in terms of groups dissolving or regrouping, that may
17 be going a little bit beyond what the witness has testified
18 to as to her background.
19     Rephrase the question.  I want to make sure I
20 understand the question and exactly how broad you're asking
21 the witness to -- well, the issue that you're asking the
22 witness to testify concerning.
23         MR. ETTINGER: And, Your Honor, let me just say
24 that I am virtually certain that you're going to hear the
25 defendants ask Saltzer witnesses essentially the same

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/27/2013

756

1  question. It's in their declarations, it's in their witness
2  statements, and Ms. Powell with these years of experience is
3  every bit as qualified as them.
4       THE COURT: I'm not questioning -- I'm not at all
5  concerned at this point about a 401, 402 relevance question.
6  It's just a question of foundation. Does this witness have
7  a background in her experience where she can testify
8  concerning this? I want to rehear the question, and so --
9  and I would suggest just stay within an area in which the
10  witness has already testified that she has a background
11  either with Saltzer or with SAMG.
12       MR. ETTINGER: Okay.
13       THE COURT: Proceed.
14  BY MR. ETTINGER:
15       Q.  So you were the CFO of Saltzer, Ms. Powell?
16       **A.  Correct.**
17       Q.  And so it was part of your job analyzing the
18  financial status of Saltzer?
19       **A.  Yes, of course.**
20       Q.  And did you understand how Saltzer's overhead
21  burden and how it was divided among physicians?
22       **A.  Absolutely.  I was the one that created the**
23  **formula.**
24       Q.  And did you get involved in the details of how
25  physicians were compensated?

757

1       **A.  I was the one that did the monthly calculations,**
2  **yes.**
3       Q.  So are you competent to say how, for example, a
4  reduction in the number of physicians at Saltzer -- Saltzer
5  would affect overhead, and, therefore, physician
6  compensation?
7       **A.  Yes, I think I'm qualified.**
8       Q.  And did you, over the course of your time at
9  Saltzer, have experience at looking at the ebb and flow of
10  number of physicians and how that affected the group?
11       **A.  Yes.**
12       MR. ETTINGER: So, Your Honor, I guess I'm going
13  to go back to the question.
14       THE COURT: Yes.
15  BY MR. ETTINGER:
16       Q.  So -- so if, in fact, Saltzer were unwound, do you
17  believe, despite the loss of the surgeons, that the group
18  would -- would be able to -- to address the problem and deal
19  with it successfully or that the group would dissolve?
20       **A.  Based on my experience and the management team**
21  **that they have, I think that they would be able to regroup,**
22  **replace, and remain.**
23       Q.  You think it would be an easy process?
24       **A.  No, of course not.  It would be difficult.**
25       Q.  Okay.  Ms. Powell, as the former CFO of Saltzer,

758

1  putting that old hat back on, do you think Saltzer would be
2  better off independent or owned by St. Luke's?
3       **A.  In my opinion --**
4       MR. SCHAFER: I guess I'll object to relevance of
5  her opinion on what would be better.
6       MR. ETTINGER: Well, Your Honor, if it's -- if
7  whether Saltzer is better off is irrelevant, that takes it
8  out of bounds for all of the witnesses, I'm okay with that.
9       THE COURT: Overruled.
10       THE WITNESS: Well, as I had stated to Bill Savage
11  before I left that I would prefer that we remain independent
12  because we had the opportunity to be Switzerland, so,
13  basically, we had the large clinic in Meridian next to
14  St. Luke's Meridian, we had our main facility on campus with
15  Nampa. So we had the best of both worlds, really. We could
16  be in the ACN network with Saint Alphonsus. We could be in
17  the Select network with St. Luke's. So it really was
18  Switzerland in kind of an ideal situation, in my opinion.
19       MR. ETTINGER: Your Honor, that's all I have for
20  this witness except for the one remaining AEO document which
21  I saved to the end.
22       THE COURT: Why don't we -- let's clear the
23  courtroom to consider that matter. We'll then go --
24  depending on how long it takes, but we'll then go into
25  cross-examination of the witness and try to focus only on

759

1  the AEO materials until we take the break.  And if we're
2  done with the AEO materials, we'll try to reopen the
3  courtroom after the break.
4       All right. So, again, I apologize, ladies and
5  gentlemen, but I'll have to ask anyone who is -- unless you
6  have been identified that you can remain in the courtroom,
7  you will have to leave at this time.
8       ****** COURTROOM CLOSED TO THE PUBLIC ******
9       THE COURT:  As soon as the door closes,
10  Mr. Ettinger, you may proceed.
11       MR. ETTINGER: Thank you, Your Honor.
12  BY MR. ETTINGER:
13       Q.  Ms. Powell, I want to go back to one document on
14  the Micron issue. We're going to call up Exhibit 2193.  And
15  the top email does not involve you, but if you turn to the
16  third page, there is an email from you to Randell Page and
17  Jeanie Cronwrath. Do you see that?
18       **A.  Yeah.  I have it.**
19       Q.  And you have identified Randell Page already.  Who
20  is Jeanie Cronwrath?
21       **A.  Jeanie was our director of the business office.**
22       Q.  And this is from 2008, is that when the Micron
23  network was getting started?
24       **A.  Yes.  It would have been that same time frame.**
25       Q.  In -- in the last sentence of that first

**Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.**                    Bench Trial, 09/27/2013

---

760

1  paragraph, you say, quote, I also spoke with Lannie at Mercy
2  and they are not going to sign a contract with Wise unless
3  we do, and he was willing to proceed going through TVHN but
4  he, like us, is really uncertain about giving this network
5  any teeth, close quote.  Do you see that?
6  **A.  I see that.**
7  **Q.**  And Mercy, is that Mercy Medical Center?
8  **A.  Yes, it is.**
9  **Q.**  So -- so what is this -- what did the phrase mean
10  to you when you were writing this email "uncertain about
11  giving this network any teeth"?
12  **A.  We didn't want to give the network any strength so**
13  **that they would be able to take the network beyond outside**
14  **of Micron.**
15  MR. ETTINGER:  Your Honor, that's all I have on
16  direct.  I would -- if this is the right time, I would move
17  the admission of the exhibits we went through.  I can
18  identify the numbers.
19  THE COURT:  I was trying to keep track, and I
20  thought they had all been previously admitted.  Were there
21  some that were objected to?  Because I admitted all this
22  morning, all of the stipulated exhibits.
23  MR. ETTINGER:  Well, then I guess they're all in,
24  Your Honor.
25  THE COURT:  Well, I think, they are unless -- if

---

761

1  you'll confer with your colleagues to make sure that there
2  weren't any.  I tried to keep track of them as they were
3  mentioned, but if I overlooked any, then they need to be
4  moved into admission.
5  MR. ETTINGER:  Your Honor, Ms. Duke told me
6  earlier that they had all -- they were not -- none of them
7  were objected to.
8  THE COURT:  All right.
9  MR. ETTINGER:  So I think we're fine.
10  THE COURT:  So they are admitted.  All right.
11  Mr. Schafer, is it?
12  MR. SCHAFER:  Yes.
13  THE COURT:  And we will take a break in 12 to 15
14  minutes.
15  MR. SCHAFER:  I think, Your Honor, in order to
16  start with some AEO materials, I think it's going to be
17  Saint Alphonsus AEO, so the St. Luke's representatives may
18  need to leave.
19  THE COURT:  All right.  Anyone affiliated --
20  MR. ETTINGER:  Your Honor, we're going to allow
21  Saint Alphonsus' general counsel back in the room consistent
22  with that.
23  THE COURT:  All right.  As long as you guys have
24  it all figured out, I'm fine, I just.  It's way beyond my
25  comprehension at this point.  I'm assuming, though, that you

---

762

1  will keep the cast of characteristics lined up properly and
2  if -- as you move, Mr. Schafer, from topic to topic, you'll
3  alert us so that we can ensure that the proper parties are
4  in the courtroom.
5  MR. SCHAFER:  I -- I will try my best, Your Honor.
6  THE COURT:  Thank you.
7  CROSS-EXAMINATION
8  BY MR. SCHAFER:
9  **Q.**  Good afternoon, Ms. Powell.
10  **A.  Hi, Chad.**
11  **Q.**  Just sticking with the document that you were just
12  talking about, we don't need to bring it up, but the
13  reference in the document to the conversation that you had
14  with Mr. Checketts about giving a network any teeth.  What
15  is Mr. Checketts' position today?
16  **A.  Today?**
17  **Q.**  Yes.
18  **A.  He is the chief financial officer for Saint**
19  **Alphonsus Nampa.**
20  **Q.**  And you talked some about the -- the offers that
21  St. Luke's made to both the Saltzer surgeons and to the
22  Group as a whole; correct?  You were part of that process,
23  the St. Luke's offers that it made to Saltzer?
24  **A.  Correct.**
25  **Q.**  And since you have been at SAMG, you were involved

---

763

1  in offers that Saint Alphonsus made both to the Saint
2  Alphonsus Group -- I mean, both to the Saltzer Group and
3  specifically to the surgeons, correct?
4  MR. ETTINGER:  Your Honor, objection on two
5  grounds.  Number one, it's certainly beyond the scope of
6  cross.  I did not ask questions about any Saint Alphonsus
7  offer.
8  Secondly, you know, we have a motion in limine on this.
9  We think it's irrelevant to this case whether Saint
10  Alphonsus made offers.
11  THE COURT:  Well, first of all, we -- consistent
12  with the court's pretrial order, I am allowing if we can
13  avoid recalling Ms. Powell as a witness to allow counsel to
14  spend a proportionate amount of time opening up a new topic.
15  So, Mr. Schafer, I'm going to have to rely upon you.  I
16  don't know how much you have planned for this witness.  I'll
17  give you some leeway to go beyond the scope as long as it's
18  proportional.
19  MR. ETTINGER:  The -- the -- Ms. -- Ms. Powell is
20  not on St. Luke's witness list, Your Honor.
21  THE COURT:  Well, then, it would not appear -- it
22  seems to me, then, we do need to stay within the scope.
23  MR. SCHAFER:  I think that's not actually true.  I
24  think we included on our witness list the fact that any
25  witness from Saint Al's that we were calling by deposition,

---

764

1 we reserved the right to call also live and that's -- that's
2 expressly noted on our witness list is that designation.
3 Ms. Powell was listed as a witness we would call by
4 deposition.
5          THE COURT:  All right.  At the lunch -- at the
6 break -- yes, Mr. Ettinger?
7          MR. ETTINGER:  Your Honor, so I don't recall that
8 in the list, but in any event, you know, our preference
9 would be for our witnesses, that we would prefer that they
10 be recalled if St. Luke's wants to recall them.
11          THE COURT:  Well, I have indicated previously if
12 it will allow us to avoid recalling Ms. Powell, but if you
13 engage in this further line of inquiry, you will not be
14 allowed to recall Ms. Powell as a live witness.
15          MR. SCHAFER:  Yes, Your Honor.
16          THE COURT:  Understood?
17          MR. SCHAFER:  Yes.  And per your previous comment,
18 our -- any portion that might go outside of what
19 Mr. Ettinger specifically discussed, will be well within the
20 proportional rules that Your Honor set out in pretrial.
21          THE COURT:  You just have a few questions, then?
22          MR. SCHAFER:  On this topic, you know, there
23 are -- again, I have many questions for Ms. Powell
24 proportionally far more that deal with what Mr. Ettinger
25 just talked about.

765

1          THE COURT:  All right.  I'll give you some leeway.
2 Now, as to the question of relevance, what is the
3 relevance of whether Saint Alphonsus made offers or -- or
4 approached them?
5          MR. SCHAFER:  Well, Your Honor, the relevance of
6 that is that Saint Alphonsus has raised in this case and in
7 the direct, the offers that St. Luke's made and suggested
8 that some increase in the amount of money that was offered
9 to primary care physicians is somehow suggestive of a
10 nefarious intent on the part of St. Luke's or a focus on --
11 a focus on primary care and not a focus on the surgeons.
12
13
14
15
16                    REDACTED
17
18
19
20
21
22
23          THE COURT:  Well, what I'm primarily
24 concerned -- it's a court trial.  So I mean, I think I can
25 sort out this without problem.  I'm more concerned with the

766

1 problem of wasting time and injecting an ancillary issue
2 into the case that's going to take us into another area.
3          I'm going to give counsel some leeway to just quickly
4 establish that there were offers and the parameters, but
5 we're not go to make that a focus of the inquiry of this
6 witness and certainly not a major in the case.
7          All right.  Proceed.
8          MR. SCHAFER:  Yes, Your Honor.
9          THE COURT:  And I'm -- and I'm serious about
10 making sure that the questions are proportional.  And I -- I
11 think we may have even suggested that it not be more than
12 the same length in time as direct examination.  It really
13 needs to be substantially less than that.  Just a few
14 questions or else we need to recall the witness as part of
15 your case in chief.
16          MR. SCHAFER:  Yes, Your Honor.
17          THE COURT:  All right.  If you're allowed to do so
18 because you've identified, I guess, indirectly, Ms. Powell
19 as a potential witness in the case and I think we'll sort
20 that out in about seven minutes when we take the break and
21 you can all confer and then I can decide if you can't reach
22 an agreement.
23          Proceed.
24          MR. SCHAFER:  Thank you, Your Honor.
25 BY MR. SCHAFER:

767

1     Q.  So, Ms. Powell, were you involved in the offers
2 that Saint Alphonsus made to the Saltzer Medical Group?
3     A.  To a small degree, yes.
4     Q.  And the offers that Saint Alphonsus made to
5 Saltzer, primary care physicians were very similar to the
6 offers that St. Luke's made, correct?
7          MR. ETTINGER:  Your Honor, this is not an area
8 where Schafer is allowed to lead, I don't believe.
9          THE COURT:  Sustained.  Counsel, you are not
10 allowed to lead if you're going to be asking questions
11 beyond the scope of direct examination.
12          MR. SCHAFER:  Even to an adverse witness, Your
13 Honor?  Do I need to establish hostility or -- she is -- she
14 is the CAO of one of the plaintiffs in this case here.
15          THE COURT:  Good point.  Mr. Ettinger.  Proceed.
16          MR. ETTINGER:  We won't contest it, Your Honor.
17          THE COURT:  Well, I had to figure out whether
18 SAMG -- what SAMG's role is, whether -- it's obviously
19 affiliated with Saint Al's.  Let's proceed.
20          So I'm going to give you that leeway.  Thank you,
21 Mr. Schafer, for pointing that out.
22          MR. SCHAFER:  Thank you, Your Honor.
23 BY MR. SCHAFER:
24     Q.  And is it true, Ms. Powell, that the offers that
25 Saint Al's made to the Saltzer primary care physicians were

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 09/27/2013

768

1 they similar to the offers that St. Luke's had made to those
2 physicians?
3     **A.   It's my understanding they were similar.**
4     **Q.**   And Saint Alphonsus in connection with making
5 those offers to the Saltzer physicians obtained an
6 independent fair market value analysis before they did so;
7 correct?
8     **A.   Correct.**
9     **Q.**   And the offers that were made were within what
10 Saint Alphonsus's consultants determined were a fair market
11 value offer to the Saltzer physicians; correct?
12     **A.   Correct.**
13     **Q.**   And the offers that Saint Alphonsus ultimately
14 made to the former Saltzer surgeons were also very similar
15 to the offers that St. Luke's made, weren't they?
16     **A.   Chad, can you talk a little slower?  I am having a**
17 **hard time following your questions.**
18     **Q.**   Absolutely.  The offers that Saint Alphonsus made
19 to the former Saltzer surgeons that are now with Saint
20 Alphonsus, those offers were also very similar to the offers
21 that St. Luke's made to those surgeons; correct?
22     **A.   If you take away the exclusivity offer, yes.**
23     **Q.**   And we'll get into that issue in a bit to -- to
24 discuss one of the issues that Mr. Ettinger talked to you
25 about.  Mr. Ettinger asked you some questions about some of

769

1 the prior history between the Salzer Group and both Saint
2 Alphonsus and the Mercy Group.  Do you remember those
3 questions?
4     **A.   I do.**
5     **Q.**   And when the Mercy Hospital was purchased by Saint
6 Alphonsus before that happened, there was a process whereby
7 various groups in the community expressed what their views
8 were as far as who the -- who the purchaser of the hospital
9 should be?
10     MR. ETTINGER:  Your Honor, this -- you know, I
11 didn't get into this and this is, again, beyond the
12 bounds of cross and I don't know how it's relevant to the
13 case, what the Saltzer doctors thought about who bought
14 Mercy Medical Center.
15     THE COURT:  Counsel, I'm struggling a little bit
16 with that myself.
17     MR. SCHAFER:  Your Honor, it gets to the, you
18 know, one of the issues in this case is the prior history
19 between Saltzer and both St. Luke's and Saint Alphonsus and
20 why the Salzer Group, having received offers from both
21 groups, decided to affiliate with St. Luke's as opposed to
22 Saint Alphonsus.  This is part of the background that
23 informs that.
24     MR. ETTINGER:  Your Honor, that's not an issue in
25 this case at all.  This is not a tortious interference case.

770

1     THE COURT:  I'm going to sustain the objection.
2 It may be part of the background and, to that extent, I'll
3 allow some very limited inquiry, which I think we have
4 already had, but it's certainly not a, quote, issue in the
5 case.  It's -- it's at most, I think, just background.  So
6 let's proceed.
7     I'm sustaining the objection.
8 BY MR. SCHAFER:
9     **Q.**   Ms. Powell, Mr. Ettinger asked you some questions
10 about a recommendation that you made with respect to where
11 Saltzer employees get surgery.  Do you remember that
12 testimony?
13     **A.   I do.**
14     **Q.**   And you stated that you believed at a certain
15 point you made a recommendation that Saltzer employees get
16 their surgery done at Treasure Valley Hospital; correct?
17     **A.   Well, I didn't make a recommendation necessarily.**
18 **They get their surgeries wherever they want.  I let them**
19 **know that it would be less costly for them if they chose to**
20 **have their services done at Treasure Valley Hospital from an**
21 **out-of-pocket standpoint.**
22     **Q.**   And at the time that you made that
23 announcement --
24     THE COURT:  Just a moment.  I'm sorry, from an
25 out-of-pocket standpoint for Saltzer, the doctor, or the

771

1 patient?
2     THE WITNESS:  For the patient.
3     THE COURT:  Thank you.
4 BY MR. SCHAFER:
5     **Q.**   And at the time you made that -- if not a
6 suggestion -- that you made that proposal or communication
7 to the group, you were aware that the Saltzer surgeons were
8 owners in Treasure Valley Hospital; correct?
9     **A.   Correct.**
10     **Q.**   And you were aware that they had a financial
11 interest in the success of that facility; correct?
12     **A.   Correct.**
13     **Q.**   Now?
14     MR. SCHAFER:  George, if you could put up Exhibit
15 1384.
16 BY MR. SCHAFER:
17     **Q.**   This is a document that Mr. Ettinger asked you
18 about.
19     MR. SCHAFER:  And if you could blow up Section 5
20 of this email.
21 BY MR. SCHAFER:
22     **Q.**   I believe this is the section Mr. Ettinger asked
23 you about.  Before we get to talking about specifically
24 what's written here, you recall as you referenced a moment
25 ago that with respect to the offers that St. Luke's made to

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Page 39 of 56    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW    Document 553    Filed 11/04/14    Page 39 of 56

772

1  the surgeons, they made both an exclusive offer and a
2  nonexclusive offer; correct?
3      A.   Correct.
4      Q.   And the exclusive offer meant that the Saltzer
5  surgeons would be required to sell their interest in
6  Treasure Valley Hospital; isn't that right?
7      A.   That's correct.
8      Q.   And the nonexclusive offer meant that the Saltzer
9  surgeons would be permitted to retain their ownership in
10 Treasure Valley Hospital; right?
11     A.   Correct.
12     Q.   In order for those surgeons to qualify for the
13 exclusive offer, there was never any requirement that those
14 surgeons give up their privileges at any other facility, was
15 there?
16     A.   No.
17     Q.   And there was never any discussion about those
18 surgeons no longer their referring cases to or taking any
19 case to any other facility, was there?
20     A.   Well, sort of.  There was conversation of them
21 bringing their surgeries to the new facility that St. Luke's
22 was planning in Nampa.
23     Q.   Was that ever part of -- when you talk about the
24 exclusive and the nonexclusive offer, to qualify for the
25 exclusive offer, were they required to give up their

773

1  privileges at Saint Alphonsus, I think, were they?
2      A.   Not required, no.
3      Q.   And they -- were they required to somehow promise
4  that they wouldn't take any more cases to Saint Alphonsus?
5      A.   No.
6      Q.   And they -- were they required to somehow promise
7  that they weren't going to refer any cases to Saint
8  Alphonsus?
9      A.   No.
10     Q.   And that was true of the Saltzer primary care
11 physicians as well, correct?  With respect to the offer that
12 they accepted, there was never any language included with
13 respect to where those physicians could refer patients, was
14 there?
15     A.   No.
16     Q.   In fact, the opposite, there was express language
17 in part of the discussions that the Saltzer physicians would
18 have the ability to refer patients wherever they felt was
19 best for those patients; isn't that right?
20     A.   That's correct.
21
22
23              REDACTED
24
25

774

1
2              REDACTED
3
4      Q.   Was that -- was that part of any offer that was
5  ever made to the Saltzer surgeons?
6      A.   It was not in the written offer, no.
7           THE COURT:  Counsel, this is probably where we
8  need to take the break.  I have been weighing this issue in
9  my mind about whether or not what Saint Al's may or may not
10 have done in terms of soliciting a merger or acquisition of
11 the Saltzer Medical Group is relevant to these proceedings.
12           I'm concerned under Rule 403 with injecting an issue
13 into the case that's not directly relevant to the
14 proceedings.  The only way I can see that that would be
15 relevant would be if there is some kind of a clean-hands
16 requirement.  I know there is an injunctive relief request.
17 I simply don't know, but I would be very rather surprised.
18 Certainly, the FTC would not be subject to that in any event
19 or the State of Idaho.
20           But, you know, I'm willing to keep my mind open to the
21 issue, but I'm having a very hard time seeing how it's
22 directly relevant to the proceedings.  And you may want to
23 be prepared to very briefly indicate why that is relevant
24 other than just as background and we -- it's not enough just
25 to say it's an issue in the case.  The question is, is it

775

1  a -- an issue that needs to be resolved in the case.
2           But we can take that up later.  Let's take a 15-minute
3  recess.  We'll reconvene in 15 minutes.
4           (Recess.)
5       ******COURTROOM REMAINS CLOSED TO THE PUBLIC******
6           THE COURT:  Ms. Powell, is it?
7           THE WITNESS:  Yes.
8           THE COURT:  I'll remind you you are still under
9  oath.
10          You may resume your examination of the witness,
11 Mr. Schafer.
12          MR. SCHAFER:  Your Honor, I don't know if you
13 wanted to save for some other time the issue of whether or
14 not Saint Al's offer to the physician is fair game and
15 relevant to this case or whether you wanted to have that
16 discussion now.
17          THE COURT:  Let's move along with the witness.  I
18 was more or less just weighing out the issue.  And we may --
19 perhaps over the weekend, I'm sure you all have nothing
20 better to do but maybe submit something if need be.  But
21 let's move on so we can use the evidence time.
22          Mr. Ettinger?
23          MR. ETTINGER:  Your Honor, that is the subject of
24 a motion in limine we filed, so you have a brief on it.
25          THE COURT:  Thank you.  Has there been a response?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 40 of 56

Bench Trial, 09/27/2013

776

1       MR. SCHAFER:  Yes, Your Honor.
2       THE COURT:  I apologize.  I will look at it over
3  the weekend.  And if necessary, we'll -- I'll indicate my
4  ruling on Monday morning.
5       MR. SCHAFER:  Thank you, Your Honor.  I think this
6  is the last couple minutes that even addresses this topic.
7  BY MR. SCHAFER:
8       Q.  Ms. Powell, eventually, SAMG made offers to seven
9  of the former Saltzer surgeons; correct?
10      MR. ETTINGER:  Your Honor, I'm sorry.  I don't
11 know if this is worth taking the time or not.  I'll leave it
12 up to the court.  You asked us to look at the language in
13 the witness list, and we did.  We have a comment.  If it's
14 only a couple questions, I won't belabor the point for now,
15 though.
16      THE COURT:  Are you talking about whether or not
17 Ms. Powell was designated --
18      MR. ETTINGER:  Right.
19      THE COURT:  -- by St. Luke's?
20      MR. ETTINGER:  Right, Your Honor.  The comment,
21 very briefly, is St. Luke's listed 23 people by deposition
22 specifically.  And then at the bottom in one sentence says,
23 "Defendants reserve the right to call as live witnesses any
24 witness identified as being called by deposition."
25      So, while it's literally true, it kind of defeats the

777

1  whole purpose of the witness list to throw in that kind of
2  catchall.
3       THE COURT:  So Ms. Powell was listed as a witness
4  who may appear by deposition?
5       MR. ETTINGER:  By deposition, yes, Your Honor, not
6  live by name.
7       THE COURT:  Well, the problem is that if we do not
8  have -- it's a question of surprise to counsel so that they
9  know -- particularly now where you are conducting your
10 direct examination as part of the cross, so there is no
11 opportunity to kind of correct the list and give
12 Mr. Ettinger some advance notice that you are going to be
13 asking these questions of the witness so he can be prepared,
14 first, to object and, secondly, to be prepared to
15 cross-examine on the subjects that you're going to cover as
16 part of your direct.
17      I guess I will agree with Mr. Ettinger.  If it's very
18 narrow, very limited, you know, ten minutes or so, I'll
19 allow it.  Otherwise, I think either we're going to have to
20 recall Ms. Powell and have an extended discussion about
21 whether that was fair notice to the plaintiffs, or you're
22 going to have to recall the witness in any event.
23      So how much time do you need to cover these additional
24 topics?
25      MR. SCHAFER:  I don't think many more minutes,

778

1  Your Honor.  You know, part of the issue is we have
2  front-loaded the AEO materials in deference to not moving
3  people in and out of the courtroom.  So it's sort of
4  concentrated at the beginning session.
5       THE COURT:  All right.  I'll give you some leeway.
6  And as soon as we're beyond the AEO, please let us know so
7  we can open the courtroom.
8       MR. SCHAFER:  Yes, Your Honor.
9       THE COURT:  Proceed.
10 BY MR. SCHAFER:
11      Q.  Ms. Powell, SAMG eventually made an offer to the
12 seven former Saltzer surgeons; correct?
13      A.  Correct.
14      Q.  And at the time you made that offer, you had been
15 informed by at least some of those surgeons that their
16 referrals from within Saltzer were already beginning to
17 diminish; correct?
18      A.  I had no data to support that, but that's what
19 they were telling me.
20      Q.  And that was your understanding at the time that
21 the offer was made to those surgeons; correct?
22      MR. ETTINGER:  Objection, Your Honor.  I mean,
23 lack of foundation as to her understanding.  She just said
24 she was told something.
25      THE COURT:  Yeah, I think we need a foundation as

779

1  to how she has that understanding, Mr. Schafer.
2       MR. SCHAFER:  Just to respond, Your Honor, I think
3  she said she had that understanding because she was told
4  that by the surgeons.  And my point is not that this was
5  either true or false.  The point is that --
6       THE COURT:  There is no data.
7       MR. SCHAFER:  What's that?
8       THE COURT:  There was no --
9       MR. SCHAFER:  Yeah.  My point is just that the
10 offer was made with that understanding and no other data to
11 contradict it.
12      THE COURT:  Let's go ahead and proceed.  The
13 objection is overruled.
14 BY MR. SCHAFER:
15      Q.  And that's true -- Ms. Powell, I just want to
16 clarify.  You had no data that supported what the Saltzer
17 physicians were -- surgeons were telling you that their
18 referrals were drying up, but you didn't have any data that
19 showed that wasn't true; correct?
20      A.  That would be correct.
21      Q.  And you were part of meetings and copied on
22 communications at which the Saltzer surgeons were told that
23 Saint Al's belief was that there was plenty of market share
24 available for them to stay busy at Saint Alphonsus even
25 without referrals from Saltzer; correct?

780

1    A.    Well, SAMG in total, that would be correct.

2    Q.    I'm sorry.  Would you repeat that?  SAMG?

3    A.    So not necessarily just in Nampa, which is why we

4    put the surgeons in Meridian and in Nampa.  So SAMG in total

5    but not just Nampa.

6    Q.    Okay.  But the surgeons that we're talking about,

7    the seven former Saltzer surgeons, you believed that they

8    could stay busy without referrals from St. Luke's or

9    Saltzer; correct?

10   A.    We hoped that they could stay busy, yes.

11   Q.    Did you tell them -- were you part of

12   communications in which they were told that that was not

13   just a hope but the belief?

14         MR. ETTINGER:  Your Honor, I'm sorry.  But "did

15   you tell them or were you part of communications" -- I'm not

16   sure what he is asking.

17         THE COURT:  Rephrase the question.

18         MR. SCHAFER:  That's fair.  George, would you pull

19   up Exhibit 2097.  If you could blow up from the "from" line

20   through the end of that first paragraph.

21         THE WITNESS:  Is that not in my book?

22         THE COURT:  I'm sorry?  Look on the screen.  It

23   will be on the screen in front of you.

24         MR. SCHAFER:  For the record, this is Trial

25   Exhibit 2097.

781

1    BY MR. SCHAFER:

2    Q.    Ms. Powell, do you see this is an email from Tom

3    Reinhardt to Andy Curran, copying you?

4    A.    Yes, I do.

5    Q.    And the date of the email is March 8, 2012.  You

6    see it says, "Dear Andy - thanks for your questions.  Here

7    are the answers:"

8          If you look about halfway through this first paragraph,

9    it says, "I also understand the referral conundrum.  That is

10   an issue we both face and both are at risk for - although I

11   believe there is plenty of market and referral base

12   for you to be very busy without relying on Luke's."

13         Do you see that?

14   A.    I see that.

15   Q.    And you were copied on that email; correct?

16   A.    I was copied on it; correct.

17   Q.    And you never told the surgeons that you disagreed

18   with that assessment, did you?

19   A.    No, I never told them I disagreed.  I never told

20   them I agreed, but I never told them I disagreed.

21   Q.    And since Saint Al's has hired those surgeons from

22   Saltzer, you haven't seen that those surgeons are working

23   less than they did at Saltzer, have you?

24         MR. ETTINGER:  Object.  She hasn't seen -- I'm

25   sorry, Your Honor.  It seems like there is a double negative

782

1    in there.

2          THE COURT:  There probably is.  I understood the

3    question, but you may want to rephrase.

4    BY MR. SCHAFER:

5    Q.    Ms. Powell, have you seen that the surgeons are

6    working less hard now than they were at Saltzer?

7    A.    Are they less productive or working less hard?

8    There is a difference.  They always work hard.  They're

9    probably not significantly -- there has not been a

10   significant drop in their productivity.

11   Q.    And you believe they are working just as hard as

12   they were when they were at Saltzer?

13   A.    They always worked hard.

14   Q.    And do they still work hard?

15   A.    Yes, they work hard.  Yes.

16   Q.    Mr. Ettinger asked you some questions about

17   whether it would make a difference to the group or whether

18   the group would stay together in the event that the surgeons

19   left and this transaction was unwound.  Do you remember that

20   testimony?

21   A.    Yes.

22   Q.    During your time at Saltzer, you performed an

23   analysis of what that effect would be if the surgeons left

24   the group; isn't that right?

25   A.    Yes, I believe I did.

783

1    Q.    And given their impact on the group's overhead,

2    you told Bill Savage and Dr. Kaiser that it would be

3    difficult for the group to stay together if the surgeons

4    left, didn't you?

5    A.    Difficult, yes.

6    Q.    And, in fact, you said that it would be very

7    difficult for them to stay together if they couldn't be

8    replaced very quickly; isn't that right?

9    A.    I don't recall if I said "very difficult" or not,

10   but, yes, I did say it would be difficult.  I may have said

11   "very."

12   Q.    I just want to get at the one last Saint Al's AEO

13   document, I think.  On the issue of recruiting --

14         George, could you pull up Exhibit 2138.

15         Ms. Powell, if you look at this first page, you see

16   this is a document entitled "2012 SAMG Report:  Readiness

17   for Clinical Integration"?

18   A.    Mm-hmm.

19   Q.    Is that a yes?

20   A.    Yes.

21   Q.    Have you seen this document before?

22   A.    Yes, I believe so.

23   Q.    Did you play any role with respect to this

24   document?

25   A.    I don't know who authored this document, but it

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/27/2013

Case 1:12-cv-00560-BLW    Document 553    Filed 11/04/14    Page 42 of 56

784

1   was not me.
2       Q.  Okay.  Is this something that you have reviewed in
3   your time at SAMG?
4       A.  I have -- I believe I have seen the document.
5       Q.  George, if you could turn to slide 8 of the
6   document.
7       You see this is a document entitled "Recruitment
8   Strategic Plan," fiscal year '13 to '16.  Do you see that?
9       A.  Yes.
10      Q.  And, George, if you could -- if you could blow up
11  the SAHS goal for primary care and the actual for primary
12  care.
13              MR. ETTINGER:  Your Honor, could the witness have
14  an opportunity to see the hard-copy document?  I mean, this
15  is one where --
16              THE COURT:  Yes.  If you have a hard copy, let's
17  do that.  I think it's --
18              MR. ETTINGER:  This is one where there is
19  different information on different pages that may be
20  relevant to her.
21              MR. KEITH:  Your Honor, we have one for you if you
22  prefer.
23              THE COURT:  No.  That's fine.
24              MR. ETTINGER:  Do you have one for us, by any
25  chance?  That would be great.  Thank you.  Can't hurt to

785

1   ask.
2               THE WITNESS:  I'm sorry.  What number is this?
3               THE COURT:  2138.
4               THE WITNESS:  Thank you.
5   BY MR. SCHAFER:
6       Q.  Slide 8, Ms. Powell.
7       I'll just ask a background question, which is:  Saint
8   Alphonsus' fiscal year, can you tell me when that runs?
9       A.  July 1 to June 30.
10      Q.  Okay.  So this document was entitled "2012 SAMG
11  Report," and it's reporting on fiscal year 2013, which would
12  extend to June of this year; correct?
13      A.  Correct.
14      Q.  And if you see on this that in 2012, it reported
15  on the SAHS goal for recruitment of primary care being 11
16  primary care physicians.  Do you see that?
17      A.  Yes.
18      Q.  And it says that the actual for 2013 -- which,
19  again, most is halfway through the year if we're in 2012 --
20  is 10 primary care physicians that had been recruited at
21  that time; correct?
22      A.  Correct.
23              MR. SCHAFER:  Your Honor, I think we can bring the
24  public back in.  There may be one document I ask Your Honor
25  to turn the screen off for, but I won't discuss AEO.

786

1               THE COURT:  Okay.  Very good.
2   ****** COURTROOM OPEN TO THE PUBLIC ******
3   BY MR. SCHAFER:
4       Q.  Ms. Powell, Mr. Ettinger asked you some questions
5   about discussions that you had when you were at Saltzer with
6   St. Luke's about efficiencies and benefits of the
7   transaction.  Do you remember that?
8       A.  Yes.
9       Q.  And you talked about conversations with
10  Mr. LaFleur.  As part of the discussions about the benefits
11  of that transaction, do you remember discussions about the
12  recruiting assistance that St. Luke's would be able to offer
13  to Saltzer in the event of an affiliation?
14      A.  Yes.
15      Q.  And you believe that that would be -- that would
16  be a benefit to Saltzer to have the ability to grow the
17  group and extend the network on a larger scale than it had
18  been able to do in the past; correct?
19      A.  Correct.
20      Q.  And that was at least in part because St. Luke's
21  could offer guaranteed salaries to attract additional
22  qualified physicians to the market; right?
23      A.  Any hospital could do that if there was a
24  community need.  But, yes, correct.
25      Q.  But as an independent group, Saltzer would have to

787

1   absorb a lot more risk in guaranteeing salaries if those
2   physicians could not generate sufficient income; correct?
3       A.  If they weren't under a hospital guarantee;
4   correct.
5       Q.  And you -- you also discussed another benefit of
6   the transaction being the expansion of access to Medicare
7   and Medicaid patients, didn't you?
8       A.  Correct.
9       Q.  When you were at Saltzer, many of the Saltzer
10  physicians chose not to accept new Medicaid or Medicare
11  patients; isn't that right?
12              MR. ETTINGER:  Your Honor, this is beyond the
13  scope of cross, as well.
14              MR. SCHAFER:  Your Honor, Mr. Ettinger raised the
15  issue of discussions regarding efficiencies and benefits
16  of --
17              THE COURT:  I'll give you some leeway, but tie it
18  back in.  Because Medicaid and Medicare patients generally
19  was not discussed to my recollection.
20      Go ahead and proceed, Mr. Schafer.
21      I'm giving counsel a fair amount of leeway, thinking
22  that the time limits the court has imposed are going to be
23  somewhat a policing mechanism to how much time you spend on
24  subject matters that aren't directly relevant.
25      Go ahead and proceed.

788

BY MR. SCHAFER:
1
2    Q.   When you were at Saltzer, Ms. Powell, many of the
3    Saltzer physicians chose not to accept new Medicare and
4    Medicaid patients; correct?
5    A.   Correct.
6    Q.   And you believe the number of Saltzer physicians
7    who did not accept new Medicare and Medicaid patients was at
8    least 40 percent of the group at the time you left; isn't
9    that right?
10   A.   Yeah, I would say that was approximately right.
11   Q.   And under the terms of the Saltzer transaction
12   with St. Luke's, at least as of the time you left, Saltzer
13   was going to convert to a financial model where financially
14   it wouldn't matter whether a patient had commercial
15   insurance or government insurance; correct?
16   A.   It was a standard conversion factor.  So the
17   conversion factor was fixed regardless of the payor.
18   However, it could impact --
19   Q.   That's fine.  Thank you.
20   A.   Okay.
21       MR. ETTINGER:  Your Honor, she was in the middle
22   of a sentence.
23       THE COURT:  You will be allowed to get back into
24   that, Mr. Ettinger.
25       Go ahead, Mr. Schafer.

789

BY MR. SCHAFER:
1
2    Q.   Mr. Ettinger asked you some questions about the
3    Epic EMR and with respect to whether or not there is sort of
4    benefits generally from an EMR.  And I think you said that
5    when you -- you reached out to Epic.  Because of the size of
6    Saltzer, Epic wouldn't even talk to you about selling you
7    the Epic platform; correct?
8    A.   Correct.
9    Q.   And you've expressed the view at Saint Alphonsus
10   that getting all of SAMG on the same medical record was your
11   biggest concern in developing a clinically integrated
12   organization; isn't that right?
13   A.   For my medical group, yes.
14   Q.   And it would also help with clinical integrated
15   for SAMG to be on the same medical record as the rest of
16   Saint Alphonsus, wouldn't it?
17   A.   It would be beneficial, yes.
18   Q.   There was one more AEO document, so I'll skip over
19   this for now and do it at the end.
20       You testified in response to some questions from
21   Mr. Ettinger that before Saltzer affiliated with St. Luke's,
22   Saltzer was concerned about competition from the Mercy
23   physicians that St. Luke's had hired; correct?
24   A.   Not -- that was one of the competitors.  I didn't
25   say that we were concerned about them.

790

1    Q.   Okay.  Were you concerned about competition from
2    the Saltzer -- from the Mercy physicians that St. Luke's had
3    hired?
4    A.   No, not to a large degree, but -- not really.
5        MR. SCHAFER:  George, will you pull up P154.
6    BY MR. SCHAFER:
7    Q.   You took a deposition in this case; correct,
8    Ms. Powell?
9    A.   I'm sorry.  Excuse me?
10   Q.   You gave a deposition in this case?
11   A.   Yes.
12   Q.   I'm just going to play a question and answer and
13   ask you if you remember.
14       (Clip of video deposition played.)
15   BY MR. SCHAFER:
16   Q.   Do you remember I asked you that question and you
17   gave that answer?
18   A.   I do now.
19   Q.   And how many physicians were part of the Mercy
20   group at that time?
21   A.   I believe seven.
22   Q.   And you were concerned that St. Luke's would more
23   easily be able to recruit additional physicians in Nampa
24   given that it had seven physicians already in Nampa;
25   correct?

791

1    A.   It's always easier to recruit when you have, you
2    know, a good number to add to, yes.
3    Q.   And SAMG currently has nine primary care
4    physicians in Nampa; correct?
5    A.   Correct.
6    Q.   And one of those primary care physicians,
7    Dr. Hutchings, operates at roughly a median level of
8    productivity; is that accurate?
9    A.   He is above median, yes.
10   Q.   What's the level of productivity -- I think you
11   testified earlier.  What's the level of productivity of the
12   other eight primary care physicians in Nampa?
13   A.   Off the top of my head, I couldn't give you exact
14   numbers, but they're all around the 25th percentile.
15   Q.   And that's true of SAMG physicians not just in
16   Nampa but across the SAMG network; correct?
17       MR. ETTINGER:  Your Honor, we're way beyond the
18   scope again.
19       THE WITNESS:  Not -- no, actually.
20       THE COURT:  Just a moment.  Just a moment.
21       Again, Mr. Schafer, where --
22       MR. SCHAFER:  I can respond, Your Honor, just to
23   say that Mr. Ettinger specifically raised the issue of the
24   productivity of the Nampa primary care physicians of SAMG.
25   And I think it's relevant that when Ms. Powell talked about

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 44 of 56

792
1  their productivity being at the 25th percentile, that's not
2  limited to Nampa; that's across its entire network.
3          THE COURT:  All right.  The objection is
4  overruled.  Thank you for the clarification.
5          MR. SCHAFER:  Yes, Your Honor.
6  BY MR. SCHAFER:
7      Q.  So is that true, Ms. Powell, that the 25th
8  percentile number that you gave is not limited to primary
9  care physicians just in Nampa; that's across the SAMG
10 network generally for primary care physicians; right?
11     A.  It's split, but, yes.  For quite a few, yes.
12     Q.  So besides Dr. Hutchings within Nampa, the other
13 eight primary care physicians have significant capacity to
14 treat additional patients; correct?
15     A.  Yes.  I would think so.
16     Q.  You also testified in response to some of
17 Mr. Ettinger's questions that SAMG has had trouble
18 recruiting internists and pediatricians; correct?
19     A.  Correct.
20     Q.  But it has recruited other types of primary care
21 physicians to Nampa; correct?
22     A.  Family practice, yes.
23     Q.  And it recruited three in 2012 alone; right?
24     A.  That's correct.
25     Q.  Do any SAMG primary care physicians in Nampa see

793
1  pediatric patients?
2      A.  Yes.  Limited, but, yes.
3      Q.  And do any SAMG PCPs in Nampa treat elderly
4  patients?
5      A.  Yes.
6      Q.  Mr. Ettinger asked you some questions about your
7  role with respect to payor negotiations and specifically for
8  Blue Cross.  I want to start with Blue Cross.
9          When you negotiated with Blue Cross, Blue Cross had
10 more leverage in those negotiations than Saltzer did, didn't
11 they?
12     A.  Yes.
13     Q.  And I think that, as you told Mr. Ettinger, that's
14 because Blue Cross insured roughly 22 percent of Saltzer's
15 patients; right?
16     A.  Correct.
17     Q.  I think Mr. Ettinger may have covered this; I
18 don't know if he asked you this.  Saltzer never received
19 reimbursement above the statewide fee schedule at any point
20 from Blue Cross, did it?
21     A.  For commercially insured, no.
22     Q.  And in your negotiations with Blue Cross, you
23 repeatedly attempted to get Blue Cross to enter into
24 contracts that contained elements of gain-sharing, isn't
25 that true?

794
1      A.  We tried, yes.
2      Q.  And your efforts were unsuccessful on the
3  commercial side; isn't that right?
4      A.  On the commercial side, yes.
5      Q.  And you believed Blue Cross's refusal to enter
6  into more gain-sharing was based on its desire to keep the
7  profits for itself; isn't that right?
8      A.  Sounds like something I would say, yes.
9      Q.  And at one point you threatened Blue Cross that if
10 it didn't include gain-sharing in its contracts, Saltzer
11 might go out of network; right?
12     A.  Yeah, I probably did.
13     Q.  Did that threat cause Blue Cross to institute
14 broad gain-sharing in its contracts with Saltzer?
15     A.  No, but they did come back with the quality
16 incentive program.
17     Q.  But that's not what you were looking for in those
18 negotiations, was it?
19     A.  No, not close.
20     Q.  And, in fact, Saltzer threatened Blue Cross at
21 least twice while you were there that it would go out of
22 network if Blue Cross didn't change its position in
23 negotiations; right?
24     A.  I probably threatened more than twice.
25     Q.  But each time Saltzer determined not to go out of

795
1  network with Blue Cross; right?
2      A.  You cannot walk away from 22 percent of your
3  business.
4      Q.  And the reason that you thought going out of
5  network would mean walking away from 22 percent of your
6  business is because you had a concern that Blue Cross
7  patients who had previously sought services at Saltzer would
8  go elsewhere if Saltzer was out of network; right?
9      A.  That was the threat that that would happen, yes.
10     Q.  And that was your concern; right?  When you say
11 you don't walk away from 22 percent of your business, the
12 concern was that that 22 percent of your business, or at
13 least some portion of it, was going to go elsewhere; right?
14     A.  Correct, because it would have been more
15 out-of-pocket costs for the patient.
16     Q.  Now, you also tried to get Blue Cross to share
17 more data with Saltzer, didn't you?
18     A.  They did share data; it just wasn't timely.
19     Q.  And you believed that Blue Cross's refusal to
20 provide more data was both because Blue Cross wasn't willing
21 to share data and because it didn't have the sophistication
22 to share data; isn't that right?
23     A.  They did not have the sophistication to share it
24 timely, that's correct.
25     Q.  And don't -- didn't you attribute part of their

Case 1:12-cv-00560-BLW v. Document 553   Filed 11/04/14   Page 45 of 56

796

1  refusal to share more data with them not wanting to share
2  more data?
3      **A.  Well, I'm not Blue Cross, so I can't really answer**
4  **that.**
5      **Q.**  Was that your belief at the time?
6      **A.  Probably my belief, yes.**
7      **Q.**  And while you were at Saltzer, you also accused
8  Blue Cross of negotiating its contracts in bad faith, didn't
9  you?
10     **A.  Only once.**
11     **Q.**  You didn't make that claim on more than one
12  occasion?
13     **A.  Not the, quote, bad faith, no.  Just one time.**
14        MR. SCHAFER:  George, will you play P18.
15        (Clip of video deposition played. )
16  BY MR. SCHAFER:
17     **Q.**  And you were asked those questions and gave those
18  answers; is that correct?
19     **A.  One time in writing -- I put it in writing one**
20  **time to Blue Cross.**
21     **Q.**  Orally, did you make those assertions at other
22  times?
23     **A.  To myself, yes, but not to Blue Cross.**
24     **Q.**  You also raised issues with Blue Cross regarding
25  its PPO network and the fact that since everyone was in the

797

1  PPO network, there was not actually any directed traffic
2  that resulted from participation in that PPO; correct?
3      **A.  Correct.**
4      **Q.**  And that was true, wasn't it, that if nearly all
5  providers are in the PPO network, those providers don't
6  really get any benefit in exchange for the lower
7  reimbursement of a PPO plan?
8      **A.  Yeah, that's pretty true.**
9      **Q.**  And do you remember attempting to work on -- work
10  on numerous occasions with Blue Cross on areas that could
11  reduce costs to patients but being met with no response or
12  no commitment from Blue Cross?
13     **A.  Yes.**
14     **Q.**  Mr. Ettinger also asked you about a PPO product
15  that Regence Blue Shield offered.  Do you remember that
16  testimony?
17     **A.  Yes.**
18     **Q.**  And I believe what you said was that Saltzer
19  refused -- per the conversation we just had about the Blue
20  Cross PPO network, Saltzer refused to take a discount to be
21  part of the Regence PPO plan given your expectation that
22  Regence was going to move all of its business to that plan;
23  correct?
24     **A.  Correct.**
25     **Q.**  And so, at the end, what you -- the agreement that

798

1  you reached was that you accepted the traditional rates for
2  being part of the Regence PPO plan; correct?
3      **A.  Correct.**
4      **Q.**  And that was in part, as you discussed, from the
5  fact that you didn't believe you were going to get any
6  additional benefits from being part of that plan as opposed
7  to the traditional plan; right?
8      **A.  We knew from historical perspective that they**
9  **would just transfer the bulk of their business from their**
10  **traditional product to the PPO product.  And that's, in**
11  **fact, what did happen.**
12     **Q.**  And you believed that Scott Clement's decision to
13  pay Saltzer the traditional fee schedule rates was in part
14  due to his recognition that you were right and that they did
15  plan to move their traditional business to the PPO plan;
16  correct?
17     **A.  Right.**
18     **Q.**  Mr. Ettinger also asked you some questions about
19  the Micron network.  And you were involved on behalf of
20  Saltzer when Micron and Wise were first attempting to set up
21  the Micron high-performance network; correct?
22     **A.  Can you say that one more time?  You went really**
23  **fast.**
24     **Q.**  Sure.  You were involved on behalf of Saltzer in
25  discussions regarding potentially joining the Micron

799

1  high-performance network; correct?
2      **A.  Correct.**
3      **Q.**  Saltzer had a concern at the time of those
4  discussions that if it went out of network for Micron
5  patients, Saltzer would lose those Micron patients to other
6  practices; correct?
7      **A.  We knew that we would lose those patients, and we**
8  **still opted not to contract.**
9      **Q.**  And were you concerned about losing those
10  patients?
11     **A.  It wasn't a significant number, so not really.**
12  **Anytime you lose patients, it's a concern.  But it has to do**
13  **with materiality as to whether or not you're going to accept**
14  **a contract.**
15     **Q.**  But your understanding was that if Micron went out
16  of network for Saltzer, that you would lose those Micron
17  patients?
18     **A.  Could potentially lose those patients.  That was**
19  **up to the patient.  It was going to be more out-of-pocket**
20  **cost for the patient.  So it was the patient's choice, not**
21  **ours.**
22     **Q.**  In the end, Saltzer made a conscious decision not
23  to support the Wise Network because it believed that the
24  plan wouldn't provide a long-term benefit for its patients
25  or the medical community; isn't that right?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW Document 553 Filed 11/04/14 Page 46 of 56

Bench Trial, 09/27/2013

800

1    A.  That's what we put, yeah.  That's correct.
2    Q.  Didn't you believe at the time that in order for
3  the Wise Network to be successful in Nampa, it needed to
4  have the Salzer Group in network?
5    A.  For the network to be successful -- I believed,
6  absolutely, that it needed to have Saltzer in the network to
7  be successful in Nampa.
8    Q.  And the Wise Network launched without Saltzer in
9  the network; correct?
10   A.  It did.
11   Q.  And Micron still joined the Wise Network even
12  without Saltzer in network; right?
13   A.  Micron was the only employer that joined the Wise
14  Network.
15   Q.  And in 2008, you had concerns when you saw Micron
16  advertising to higher its own primary care physicians,
17  didn't you?
18   A.  Primary care, yes.
19   Q.  And your concern was that if Micron hired its own
20  primary care physicians, that Saltzer might lose patients,
21  who would go there for care rather than Saltzer; right?
22   A.  If those patients were getting care at work, yes,
23  then they would not be coming to Saltzer.
24   Q.  Wasn't that a concern of yours when you saw that
25  Micron was advertising for those positions?

801

1    A.  That and occupational medicine.
2        MR. SCHAFER:  George, if you could just put up
3  Exhibit 2204 and highlight just that first email.
4  BY MR. SCHAFER:
5    Q.  This is an email you sent to Bill Savage and
6  Harold Kunz on January 25th, 2008, in which you say, "I'm
7  sure you both get this, but I wanted to draw your attention
8  to the job advertisements for 'Micron Family Health Center.'
9  This could seriously impact primary care and occupational
10  medicine if Micron chooses to hire their own doctors."
11  Do you see that?
12   A.  Yes, I see that.
13   Q.  And you believed that was true, didn't you?
14   A.  I didn't want other employers to follow what
15  Micron was doing.  Yes, it's correct.
16   Q.  Mr. Ettinger also asked you some questions about
17  care close to home and where patients choose to seek primary
18  care services.
19        As part of Saltzer and St. Luke's discussions, the
20  parties entered into an exclusivity agreement.  Do you
21  remember that?
22   A.  Yes.
23   Q.  And Saltzer pushed to expand that agreement to
24  cover not just Nampa but all of Canyon County; right?
25   A.  It was predominantly Nampa, but we wanted our

802

1  complete market to be Canyon County.
2    Q.  Right.  So Saltzer pushed for that expansion
3  because you considered all of Canyon County to be Saltzer's
4  market; right?
5    A.  We wanted it to be, yes.
6    Q.  Did you consider it to be Saltzer's market?
7    A.  Outside of Nampa was not significant, but we
8  wanted it to be significant, yes.
9        MR. SCHAFER:  George, if you could play P46.
10  (Clip of video deposition played.)
11  BY MR. SCHAFER:
12   Q.  You were asked those questions and gave those
13  answers; correct?
14   A.  Yes.
15   Q.  At the time of your deposition, do you recall that
16  I asked you questions about Micron's Nampa plant, and you
17  believed at the time that the Micron plant in Nampa closed
18  down right around the time that the Wise Network started?
19   A.  I thought it had --
20        MR. ETTINGER:  Your Honor, he's asking the witness
21  questions about what she said in her deposition when I don't
22  think it's an accurate characterization.  I don't know that
23  that's an appropriate --
24        THE COURT:  Let's ask questions of the witness
25  now.  And if she provides an answer different from her

803

1  deposition, you can show that by way of impeachment.
2  BY MR. SCHAFER:
3    Q.  Well, let me ask it this way:  As of six months
4  ago, Ms. Powell, did you believe that the Micron plant
5  had -- or let me say three months ago -- did you believe
6  that the Micron plant in Nampa had closed down right around
7  the time that the Micron high-performance network launched?
8    A.  I thought it had closed.  I didn't know for sure,
9  but I thought it closed, yes.
10   Q.  Have you learned since that time that the Micron
11  plant in Nampa had not closed down?
12   A.  I learned they had substantial layoffs at that
13  time but that it hadn't officially closed down.
14        But the reason I thought that is because we had an
15  employee whose husband was laid off, and she had told me
16  that it was because the plant was closing.  So that's why I
17  thought that.
18   Q.  Well, do you remember a few months ago having the
19  belief that if the Micron plant had still been open, there
20  would have been -- at the time the Micron high-performance
21  network launched, that there would have been an uprising
22  from the employees if Saltzer had not been included in the
23  Micron high-performance network?
24   A.  Yeah.  I think that there probably would have been
25  more of that -- of a push of the Micron employees to have

804

1 the Saltzer physicians included in the network.
2    **Q.** But the Micron plant in Nampa was still open at
3 the time the high-performance network launched, wasn't it?
4    **A. I don't know that.**
5    **Q.** And --
6    **A. But you have told me that it was so, but I didn't**
7 **know that.**
8    **Q.** And there wasn't an uprising, was there?
9    **A. Not that I'm aware of.**
10    **Q.** You would remember an uprising?
11    **A. Well, I wasn't part of Micron, so I couldn't tell**
12 **you.**
13    **Q.** And you discussed seeking care that's convenient.
14 I think you may have covered this, but that includes seeking
15 care not only close to where a patient lives but where a
16 patient may work, as well; correct?
17    **A. Predominantly for the males, but yes.**
18    **Q.** You also answered questions about Saint Alphonsus
19 signing a deal with Saltzer to provide services to Saint
20 Al's employees in Nampa; correct?
21    **A. Correct.**
22    **Q.** And that agreement was stalled for some period of
23 time until Saint Al's bought the Mercy hospital; correct?
24 And after it signed -- after it bought the Mercy hospital,
25 it signed the agreement; right?

805

1    **A. We had the agreement from early 2000 on. It**
2 **was -- what was stalling is that we were negotiating a**
3 **contract, and then it's my understanding that they were**
4 **contemplating whether or not to continue the letter of**
5 **understanding. That's -- I believe that would be correct.**
6    **Q.** And after Saint Al's bought the Mercy Hospital, it
7 signed the letter of intent; correct?
8    **A. Say that one more time.**
9    **Q.** You said there was some discussion about the
10 letter of intent, and the issue was stalled. After Saint
11 Alphonsus bought the Mercy Hospital, it signed the letter of
12 intent with Saltzer; right?
13    **A. The letter of intent had been in place for many**
14 **years. So it was a renewal of -- it was an extension of**
15 **that letter of intent, I believe, while we were negotiating**
16 **the contract.**
17    **Q.** And did the financial terms of that contract --
18 the financial terms change after Saint Al's bought the Mercy
19 Hospital?
20    **A. No.**
21    **Q.** You were also asked some questions by Mr. Ettinger
22 about referrals. I think you said that Saltzer, during your
23 time there, always tried hard to keep referrals within the
24 group; correct?
25    **A. Correct.**

806

1    **Q.** And during your time at Saltzer, that was
2 something that you personally encouraged Saltzer physicians
3 to do; right?
4    **A. I did.**
5    **Q.** That was something you emphasized to the group on
6 a monthly basis, didn't you?
7    **A. In my memo, yes, correct.**
8    **Q.** And one of the reasons for doing so was that it
9 increased the financial strength of the group; right?
10    **A. Yes.**
11    **Q.** But another reason was that Saltzer physicians had
12 a shared medical record, which made the transition for the
13 patients seamless; right?
14    **A. It helped, yes.**
15    **Q.** Do you believe it made the transition for the
16 patients seamless?
17    **A. I think that there was more to it than that. But,**
18 **yes, there is an intimate relationship with the physician.**
19 **So a shared medical record obviously is part of it, yes.**
20    **Q.** Additionally, keeping referrals within the group
21 promoted continuity of care for those patients, didn't it?
22    **A. Yes, I believe so.**
23    **Q.** And from what you knew of the terms of the Saltzer
24 PSA with St. Luke's at the time you left Saltzer, the
25 Saltzer physicians have a much less significant economic

807

1 incentive today to keep referrals within the St. Luke's
2 network than they did when they were independent in keeping
3 referrals within the Saltzer network; right?
4    **A. I'm not sure that there would actually be less of**
5 **an incentive, but they're not paid the same way. So that**
6 **would be correct.**
7    **Q.** Are you -- with respect to the financial incentive
8 of keeping referrals in the group, the terms at the time of
9 the agreement you left, were you aware of --
10    **A. There is -- there is no shared overhead, so there**
11 **would not be that portion of an incentive. That would be**
12 **correct.**
13    **Q.** Saint Alphonsus also -- or SAMG also strongly
14 encourages keeping referrals within the group; correct?
15    **A. Any health system would strongly encourage to keep**
16 **referrals inside a health system, correct.**
17    **Q.** Saint Alphonsus, in order to encourage the network
18 referrals, you do a number of things, including introducing
19 specialists to primary care doctors and making sure that
20 those physicians have relationships; correct?
21    **A. Yes. You're more comfortable referring to someone**
22 **that you know.**
23    **Q.** And that's been very successful, hasn't it?
24    **A. I think it's been rather successful, yes.**
25    **Q.** I want to talk about some of the meetings that you

808

1    were involved with when you were at Saltzer with St. Luke's.
2        Before Saltzer ever started discussing a potential
3    closer affiliation with St. Luke's, Saltzer physicians had
4    expressed a concern about the future of the healthcare
5    system, hadn't they?
6        **A.  We always talked about the concern of**
7    **reimbursement, yes.**
8        **Q.**  Right.  And that was one of their concerns as to
9    what was going to happen with reimbursements in the future;
10   correct?
11       **A.  Because of Medicare threatening, yes.**
12       **Q.**  And you claim that Ed Castledine is the first
13   person to raise the issue of closer affiliation between
14   Saltzer and St. Luke's; right?
15       **A.  No.  Ed Castledine was the one that came --**
16   **continually called on us, but Gary Fletcher was the one that**
17   **first really said -- that I recall ever saying that they**
18   **wanted a much stronger, larger affiliation.**
19       **Q.**  And you don't know whether Bill Savage or John
20   Kaiser discussed that possibility with St. Luke's prior to
21   that meeting, do you?
22       **A.  Not in any meetings that I was in, but they could**
23   **have had separate meetings, yes.**
24       **Q.**  You mentioned that you had a discussion, I believe
25   you said, with John Kee where he mentioned that Saltzer may

809

1    not be fully using its power in the market.  Do you remember
2    that conversation?
3        **A.  I do.**
4        **Q.**  Do you remember, as part of those discussions,
5    Mr. Kee ever telling you that if St. Luke's affiliated with
6    Saltzer, that St. Luke's would be able to negotiate higher
7    rates with payors?
8        **A.  No, I don't recall that.**
9        **Q.**  Mr. Ettinger showed you some notes from some of
10   your meetings.  I would like to show you a different page of
11   your notes.
12       George, if you could go to Exhibit 1369.
13       If you look at the first page, you see these are notes
14   from September 24th, 2009.  And it lists a number of
15   participants at the meeting, both from St. Luke's and from
16   Saltzer; correct?
17       **A.  Correct.**
18       MR. SCHAFER:  And, George, if you could blow up
19   the bottom of the page, starting with "Gary."
20       And, Your Honor, just for the record, this document
21   contains AEO material.  I'm not going to be discussing or
22   showing any AEO portions, so I think you can leave the
23   screen on.
24       THE COURT:  All right.  Very good.
25       MR. SCHAFER:  We would keep our designation over

810

1    the document as a whole.
2        THE COURT:  All right.
3    BY MR. SCHAFER:
4        **Q.**  And it says here, "Gary."  And was that -- were
5    these comments attributed by you to Gary Fletcher?
6        **A.  No.  These were Gary's comments that I wrote down.**
7        **Q.**  Right.  And you see that, under A, it says
8    "partnerships with physicians"; right?
9        **A.  Correct.**
10       **Q.**  And Mr. Fletcher talked about the fact that one of
11   St. Luke's goals in Canyon County was to partner with
12   physicians.  Do you remember that?
13       **A.  It says right here, "partnerships with**
14   **physicians."**
15       **Q.**  Mr. Fletcher made those comments; correct?
16       **A.  Yes.**
17       **Q.**  The second goal that he talked about was access;
18   right?  And he talked about increasing access for patients
19   in Canyon County?
20       **A.  I don't remember, honestly, the specifics around**
21   **these.  I just see my notes here.**
22       **Q.**  Do you believe -- did you take your notes while
23   you were in that meeting?
24       **A.  I did.**
25       **Q.**  Did you believe that they were accurate at the

811

1    time you wrote them?
2        **A.  I would hope so, yes.**
3        **Q.**  And if you could turn to page 3 of these notes.
4    These are October 2nd, 2009, notes of a meeting between
5    Saltzer and St. Luke's.  And you see at the bottom of the
6    page, it lists Gary Fletcher's presentation on four points.
7        If you could blow up the bottom of the page, George,
8    from St. Luke's to Gary Fletcher.
9        Do you see that?
10       **A.  Yes.**
11       **Q.**  The third point on here was that St. Luke's wanted
12   to provide a level of continuity -- a level of continuity to
13   provide high-level and quality care; correct?
14       **A.  Correct.**
15       **Q.**  And the fourth point on here was that St. Luke's
16   wanted physician partners with long-term sustainable
17   relationships in order for an integrated delivery system to
18   be created that was aligned with physicians; right?
19       **A.  Yes.**
20       **Q.**  If you'd turn back to the second page, which I
21   believe is from your September 24th, 2009 notes, the second
22   page of that, you can look at the hard document to confirm
23   that.
24       Do you see that -- I don't think we need to blow it up,
25   but there is comments attributed to Bill.  And that would be

812

1    Bill Savage; correct?
2        **A.  I'm sorry.  Oh, Bill, yes.**
3        **Q.**  Yeah.  And you see under A, it says, "What is the
4    long-term goal - hospital?"
5        **A.  Yes.**
6        **Q.**  And then under Chris, would that be Chris Roth?
7        **A.  Yes.**
8        **Q.**  Chris says "hospital questionable."  Do you see
9    that?
10       **A.  Yes.**
11       **Q.**  And with respect to the issue of St. Luke's
12   potentially putting a facility in Canyon County, it was you
13   and others at Saltzer that proposed to St. Luke's that if
14   they were to put a facility in Canyon County, that you
15   wanted it to be in Nampa; correct?
16       **A.  That is correct.**
17       **Q.**  And now that you are at SAMG, or Saint Alphonsus,
18   is that something that is concerning for Saint Alphonsus,
19   the fact that St. Luke's may build a facility in Nampa?
20       **A.  Of course.**
21       **Q.**  And didn't St. Luke's, in connection with these
22   meetings about the goals of affiliation, tell you that it
23   was interested in Saltzer because Saltzer was strategically
24   aligned with St. Luke's views of the healthcare system?
25       **A.  I don't recall those words.**

813

1            MR. SCHAFER:  George, can you play P89.
2            (Clip of video deposition played.)
3    BY MR. SCHAFER:
4        **Q.**  Do you remember me asking you that question and
5    you giving that answer?
6        **A.  No, I don't remember you asking the question, and
7    I don't remember giving the answer.**
8        **Q.**  But you acknowledge that it happened?
9        **A.  Here I am.**
10       **Q.**  Okay.  You were also asked some questions about
11   discussions you had with Pete LaFleur about ancillary
12   services.  Do you remember that?
13       **A.  During my deposition?**
14       **Q.**  No.  Today by Mr. Ettinger.
15       **A.  Yes, I do remember that.**
16       **Q.**  And in the discussion between St. Luke's and
17   Saltzer, the Saltzer physicians understood that St. Luke's
18   planned to provider-base bill their services for Medicare;
19   correct?
20       **A.  Correct.**
21       **Q.**  You understood that if ancillary services were
22   provider-base billed, that the costs to Medicare would
23   increase; correct?
24       **A.  Ancillary I'm not sure was provider-based.
25   Ancillary I believe just fell under the hospital fee**

814

1    **schedule.  So -- because it would become a hospital
2    department.  I don't believe it was provider-based.**
3        **Q.**  If it was -- you understood that, as becoming part
4    of the hospital fee schedule, that the -- that the costs for
5    ancillary services would increase; correct?
6        **A.  Because the hospital fee schedules were higher for
7    ancillary services; correct.**
8        **Q.**  For Medicare; correct?
9        **A.  No, for everybody.**
10       **Q.**  Do you remember that one of the requirements for
11   provider-based billing was that Saltzer would have to become
12   Joint Commission certified?
13       **A.  Yes.**
14       **Q.**  And the physicians were concerned about having to
15   do that, weren't they?
16       **A.  Yes.**
17       **Q.**  And that's because it's cumbersome to go through
18   those evaluations and the other requirements of that;
19   correct?
20       **A.  That was our understanding, yes.**
21       **Q.**  And the physicians were also concerned that prices
22   to their customers might increase as a result of provider
23   basing; right?
24       **A.  They were concerned, yes.**
25       **Q.**  But you informed the Saltzer physicians that

815

1    prices to patients would not increase as a result of
2    provider-based billing to Medicare; correct?
3        **A.  For Medicare, that would be correct.  Because the
4    facility portion of provider-based billing is under Medicare
5    Part A, and that's a hundred percent paid for the patient.
6    So for Medicare Part B, their professional component would
7    go down.  And so the out-of-pocket costs just for the
8    patient actually would go down.**
9        **Q.**  And Saint Al's also provider-based bills a number
10   of its clinics, doesn't it?
11       **A.  We do.**
12       **Q.**  And some of its clinics in Nampa; right?
13       **A.  Yes, I believe we do have a couple in Nampa.**
14       **Q.**  Mr. Ettinger also asked you some questions about
15   recruiting during your time at Saltzer.  During your time at
16   Saltzer, you had almost no role in recruiting new
17   physicians, did you?
18       **A.  I met with the providers to go over the financial
19   aspect of the recruitment, but Bill Savage was predominantly
20   responsible for recruiting.**
21       **Q.**  With respect to recruiting family practice
22   physicians to Nampa, you believed that it takes roughly 12
23   months from the time that you decide to start recruiting
24   someone until they actually start?
25       **A.  From the time you start to the time that they**

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 50 of 56

816

1   start, especially if they're coming out of residency, yes,
2   it's usually 12 months.
3        Q.   You believe it takes roughly the same amount of
4   time, 12 months, to recruit an orthopedic surgeon; correct?
5        A.   I think it takes about 12 months to recruit just
6   about anybody.
7        Q.   And Mr. Ettinger asked you about prior experiences
8   you had with physicians leaving the Saltzer practice.  Do
9   you remember that testimony?
10       A.   Yes.
11       Q.   Did you ever have a case -- an occasion in your
12  time at Saltzer where 13 physicians left Saltzer in one
13  year?
14       A.   I don't remember 13 leaving.
15       Q.   In fact, that's way more than ever left in one
16  year before; right?
17       A.   That's more than I recall, yes.
18       Q.   I think you testified earlier that you remembered
19  five or six being the most that left in one year; correct?
20       A.   Right.
21       Q.   So this would be more than double?
22       A.   That would be correct.
23       Q.   And at the occasion when the five or six left,
24  were those the five or six highest producing physicians at
25  Saltzer?

817

1        A.   I'm trying to think of who left when.  So I -- I
2   don't know I can honestly answer that without seeing the
3   data.
4        Q.   But at least you can remember that there couldn't
5   have been the seven most -- most productive Saltzer
6   physicians leaving in one year; correct?
7        A.   That would be correct.
8        Q.   And Saltzer never had to recruit seven surgeons at
9   any one time, did it?
10       A.   Seven?  I'm trying to think.  We started a couple
11  orthopedic surgeons in one year.  And the year that I
12  started there were seven providers that started, but they
13  were not all surgeons, so that -- yeah, that would be a
14  correct statement.
15       Q.   In fact, in any two-year period during the point
16  in time when you were at Saltzer, the most surgeons that
17  Saltzer ever recruited was two in any two-year period; isn't
18  that correct?
19       A.   That would be a better question for Bill, but we
20  had Curran.  And Robinson I believe started the same year
21  Andrew started.
22            Yeah, that may be correct, but I don't know for
23  certain without looking at old records.
24       Q.   When you were at Saltzer, Saltzer had different
25  base salaries for different types of practices; correct?

818

1        A.   We only had base salaries for providers that were
2   being newly recruited.  Everybody else was on pure
3   production.
4        Q.   But with respect to newly recruited physicians,
5   you had different bases for different types of specialties;
6   correct?
7        A.   Correct.
8        Q.   And the primary care physicians had the lowest
9   based salaries at Saltzer, didn't they?
10       A.   Yes, they did.
11       Q.   With respect to surgeons, isn't it true that when
12  Saltzer complained about reimbursement from Blue Cross for
13  its specialists, Blue Cross told you on multiple occasions
14  that it believed Saltzer specialists were being paid 30
15  percent higher than the national average?
16       A.   Perhaps.  I don't know.
17            MR. SCHAFER:  Your Honor, I don't want to put this
18  whole document up on the screen because I think that there
19  are AEO portions of the document but not this.  So if the
20  witness -- you and the witness can see this if you turn off
21  the screen.
22            THE COURT:  Yes.
23            MR. SCHAFER:  Exhibit 2272, George.  If you could
24  blow up the third paragraph on the first page.
25            MR. ETTINGER:  Hold on one second.  I'm trying to

819

1   find that in the loose-leaf.
2            Your Honor, this --
3            THE COURT:  Just a moment.
4            MR. ETTINGER:  This looks like hearsay to me,
5   Your Honor.  It's not -- it's being offered by the
6   defendants.  It's a Saltzer document.
7            MR. SCHAFER:  This is a letter partially written
8   by Ms. Powell.
9            MR. ETTINGER:  She wrote it when she was at
10  Saltzer, Your Honor.  I don't think that --
11            THE COURT:  It appears, though, that it was not
12  listed -- that it was stipulated to.
13            MR. ETTINGER:  Was it?  I'm sorry, Your Honor.
14  Then I guess I'm out of luck.
15            THE COURT:  I could be mistaken.  I'm going by my
16  list here.  I suppose it may have been agreed because there
17  may be another witness who was prepared -- who was involved
18  in its preparation that's going to testify later.  But if
19  it's admitted, it is admitted.
20            Go ahead and proceed.
21  BY MR. SCHAFER:
22       Q.   Well, just to go back one step, you -- you were
23  one of the authors of this document; correct, Ms. Powell?
24       A.   Yes, I was.
25       Q.   And you reviewed this letter before it went out --

820

1    **A.   Yes, I did.**

2    **Q.**   -- under your signature?

3    And you see it says "PPO rates for specialty services

4    have remained flat for most services since 2005 except

5    urology and OB, which have remained flat since 2006.  Blue

6    Cross' argument has always been one to state that our

7    specialists are paid 30 percent higher than the national

8    average"; correct?

9    **A.   You left off the very last sentence.**

10    **Q.**   Right.  And you -- Saltzer's position in response

11    was that MGMA surveys you didn't think supported that;

12    right?

13    **A.   Correct.**

14    **Q.**   Right.  But you had a dispute with Blue Cross over

15    that issue; correct?

16    **A.   Correct.**

17    **Q.**   And Blue Cross repeatedly stated that it believed

18    your specialists were paid 30 percent higher than national

19    averages; right?

20    **A.   I don't know if you could say "repeatedly," but,**

21    **yes, they would state it.**

22    **Q.**   And in response to one of Mr. Ettinger's early

23    questions to you about why you moved from Saltzer to

24    Saint Alphonsus, one of the reasons you gave was that you

25    would be part of a national company in connection with SAMG;

821

1    correct?

2    **A.   Correct.**

3    **Q.**   Who is the national company you were referring to?

4    **A.   Trinity Health.  CHE Trinity Health now.  Sorry.**

5    **Q.**   And when you left Saltzer for SAMG, you said that

6    it was to work for a much larger organization; correct?

7    **A.   Correct.**

8    **Q.**   And you told individuals at Saltzer when you left

9    that you felt you could make a bigger difference working for

10    a larger organization; isn't that true?

11    **A.   I wanted the experience to work for a larger**

12    **organization, yes.**

13    **Q.**   You don't remember saying that you could make a

14    bigger difference working for a larger organization?

15    **A.   I don't remember those exact same words, but you**

16    **will probably show me my deposition video where I did, so --**

17    **Q.**   Not -- not -- not this time.

18    MR. SCHAFER:  Your Honor, I just have one more,

19    the one AEO document that I missed that I would like to

20    show.

21    THE COURT:  The projector is off.  Do you need to

22    clear the courtroom?

23    MR. SCHAFER:  Probably.

24    THE COURT:  We'll need to have everyone --

25    MR. SCHAFER:  It is Saint Al's AEO, so Saint Al's

822

1    witnesses.

2    THE COURT:  Saint Al's employees can stay, but

3    everyone else will have to leave the courtroom.

4    ******COURTROOM CLOSED TO THE PUBLIC******

5    BY MR. SCHAFER:

6    **Q.**   And I'll ask a question while the courtroom is

7    leaving that's not AEO, Ms. Powell.  During -- Mr. Ettinger

8    asked you some questions about your thoughts as to what

9    would happen in the event of an unwind or a divestiture in

10    this case.  Do you remember those questions?

11    **A.   Yes, I do.**

12    **Q.**   Since the time that you left Saltzer in 2011, have

13    you seen any Saltzer financial statements?

14    **A.   No, I have not.**

15    **Q.**   Now, George, if you could put Exhibit 2212 on the

16    screen and just to sort of --

17    **A.   Oh, sorry, Chad.  There was one point in time**

18    **after I left Saltzer -- because I did go back and help Kathy**

19    **Maggard with the year-end close for September 30th of 2011.**

20    **So I did see those financial statements, so --**

21    **Q.**   But not since that time?

22    **A.   But not since that time.**

23    **Q.**   Not since year close September 2011?

24    **A.   Correct.**

25    **Q.**   And Ms. Powell, just to recontextualize -- I'm

823

1    sorry to jump around.  This was something I started asking

2    you about earlier, but the document was AEO.  We were

3    talking about your -- that the biggest concern that you had

4    in developing a clinically organized -- a clinically

5    integrated organization was getting all of your medical

6    group on one medical record.

7    George, if you could expand all of that first email.

8    Ms. Powell, this is an email that you wrote to Mark

9    Donaldson on January 23rd, 2013; correct?

10    **A.   Correct.**

11    **Q.**   Who is Mark Donaldson?

12    **A.   Mark is the vice-president of strategic and**

13    **business development, or something to that effect, for Saint**

14    **Alphonsus Health System.**

15    **Q.**   If you could look at the paragraph that begins, "The

16    clinical quality targets." It says, "The clinical quality

17    targets are not defined.  We do have clinical quality

18    targets from our contracts that can be measured, but is

19    that -- but is it only that? I don't think so.  I would

20    like the Alliance to be involved in this development.  And

21    how are they going to report the outcomes?  We are going to

22    have to rely on the payers as we don't have the

23    infrastructure we need to gather this data, especially on

24    the outpatient side."

25    Was that an accurate statement at the time you wrote

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/27/2013

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 52 of 56

824

1    it?
2       **A.   Yes.**
3       **Q.**   If you go down to the next paragraph, you say,
4    "Our hands are tied with respect to the NextGen
5    implementation for our specialties, so that's concerning and
6    will delay our ability to truly have a clinically integrated
7    system. MedVentive will help, but we truly need to have one
8    medical record throughout the organization, and I'm hoping
9    we'll have that no later than June 30, 2014 for the entire
10   group." Just stopping there.
11          Was that an accurate statement at the time you wrote
12   it?
13      **A.   Why are you stopping there?**
14      **Q.**   I will continue.  I just want to ask you about
15   that portion of the paragraph for now.  Was that an accurate
16   statement at the time you wrote it?
17      **A.   Clinically integrated within my own medical group,**
18   **yes.**
19      **Q.**   And what's the timeline for having one medical
20   record for the entire organization?
21      **A.   Honestly, I haven't been given a timeline.**
22      **Q.**   Continuing from where we stopped, it says, "This
23   is my biggest concern in truly being able to develop a
24   clinically integrated organization.  We are a good five
25   years behind the eight ball.  It gives me deep concern on

825

1    how we successfully implement the strategic plan with such
2    disparaging data from too many sources.  This is a priority
3    for me to get Trinity to respond to our needs."
4           Do you see that?
5       **A.   I do.**
6       **Q.**   And was that an accurate statement at the time you
7    wrote it?
8       **A.   Accurate as to what, specifically?**
9       **Q.**   Well, was your biggest -- we already talked about
10   your biggest concern.
11      **A.   Right.**
12      **Q.**   Did you believe that you were a good five years
13   beyond the eight ball?
14      **A.   Five years behind the eight ball as far as**
15   **developing an electronic health record for my system, yes.**
16   **That's what I was referring to in my statement.**
17      **Q.**   Well, you also believed that SAMG was
18   substantially behind the curve in getting to the future of
19   healthcare, weren't you?
20      **A.   No.**
21          MR. SCHAFER:  George, if you could play P148.
22          (Clip of video deposition played.)
23   BY MR. SCHAFER:
24      **Q.**   You gave that answer at your deposition; correct,
25   Ms. Powell?

826

1       **A.   Yes, I did.**
2       **Q.**   With respect to the -- if you could put the
3    document back up, George.
4           With respect to your statement that "it gives me deep
5    concern on how we successfully implement the strategic plan
6    with such disparaging data from too many sources," by that,
7    you meant that SAMG has contracts with quality metrics in
8    them that SAMG can't really even track because of the lack
9    of data; correct?
10      **A.   Correct.**
11      **Q.**   And SAMG isn't actually doing anything to drive
12   those quality metrics without that data; right?
13      **A.   Well, that's not correct today, but that was**
14   **correct at the time that I had the statement, yes.**
15      **Q.**   At the time you wrote that, you said if SAMG hits
16   those quality metrics -- or your belief was if SAMG hit
17   those quality metrics, it was just the luck of the draw.  Is
18   that right?
19      **A.   At that time, it was, yes.**
20      **Q.**   When you were at Saltzer, Saltzer only had the
21   goal of entering contracts with gain-sharing as opposed to
22   any risk sharing; correct?
23      **A.   Correct.**
24      **Q.**   And the reason for that is that you believed it
25   was too risky for Saltzer, as an independent group of

827

1    Saltzer's size, to be able to take any downside risk; isn't
2    that true?
3       **A.   That would be true.**
4           MR. SCHAFER:  I have got no further questions at
5    this time.
6           THE COURT:  Redirect.
7           MR. ETTINGER:  Your Honor, I don't have any AEO
8    redirect.
9           THE COURT:  Perhaps we can bring -- open the
10   doors, then.
11   ****** COURTROOM OPEN TO THE PUBLIC ******
12          MR. ETTINGER:  Well, I'm sorry.  I just -- I had
13   forgotten for a moment that one of the documents I want to
14   go back to is St. Luke's AEO.  I'll do that one last as long
15   as we have people coming back in.
16          THE COURT:  All right.
17          MR. ETTINGER:  I don't have a whole lot of
18   redirect, anyway.  I'm sorry.  I guess we're not quite as
19   seamless on this as we purported to be.
20          THE COURT:  Well, we're trying.  We're trying.
21          MS. DUKE:  Your Honor, we can turn the monitor on.
22          MR. ETTINGER:  Well, actually, why don't we not.
23          THE COURT:  That's what I was thinking, that we
24   could at least put the document up.  And if you can be
25   careful about your questions, we might be able to avoid the

828

1    issue.
2         MR. ETTINGER: Sure. Why don't we do that for a
3    couple of documents, Your Honor.
4                   REDIRECT EXAMINATION
5    BY MR. ETTINGER:
6         Q.   Let's start looking at 1384 again, Ms. Powell. Do
7    you remember the paragraph I asked you about and Mr. Schafer
8    asked you about, paragraph 5?
9         A.   Yes.
10        Q.   You see the language that says there, quote, They
11   would not enforce the exclusivity until a facility in
12   Canyon County existed. So for a period of time, the
13   providers could be double dipping? I skipped a few words.
14   Do you see that language?
15        A.   Yes, I see it.
16        Q.   So does -- is that what Mr. LaFleur told you, that
17   any exclusivity would not be required or enforced for a
18   period of time?
19        A.   Yes, until there was a facility in Canyon County.
20        Q.   Why don't we go -- Mr. Schafer asked you some
21   questions about SAMG and recruiting, and I would like to go
22   to Exhibit 2138 and keep it off the screen, as well. Going
23   to slide 8.
24        Do you remember --
25             THE COURT: Counsel, I missed that. Are we now

829

1    where we can go beyond --
2         MR. ETTINGER: This is also an AEO document. So
3    if we keep it off the screen, Your Honor, we ought to be
4    fine.
5             THE COURT: All right.
6    BY MR. ETTINGER:
7         Q.   So looking at -- remember Mr. Schafer asked you
8    about slide 8 of Exhibit 2138?
9         A.   Yes.
10        Q.   Are we there? I can't tell, of course,
11   because --
12        A.   I'm not there yet. But, yes, I remember him
13   asking. Sorry.
14             THE COURT: Counsel, Ms. Gearhart pointed out --
15   and I had made note of this, as well, but it skipped over.
16   This is an exhibit that was objected to by -- I am assuming
17   by St. Luke's or the FTC or the State of Idaho on foundation
18   and hearsay grounds, but we got into it through Mr. Schafer.
19   Is it going to be offered, and is there any objection?
20   Or are you withdrawing the objection?
21             MR. ETTINGER: Your Honor, none from me. And I
22   don't believe my colleagues would have one, either.
23             MR. WILSON: Not from the government plaintiffs,
24   Your Honor.
25             MR. SCHAFER: We don't have an objection.

830

1             THE COURT: All right. Then 2138 will be
2    admitted.
3         Go ahead and proceed.
4         (Defendants' Exhibit No. 2138 admitted.)
5    BY MR. ETTINGER:
6         Q.   So the information on slide 8 about recruitment,
7    does that apply to Nampa specifically, or is that for all
8    the locations in which Saint Alphonsus is operating?
9         A.   No. That's for everyone.
10        Q.   So that would include Boise, for example?
11        A.   Boise to Baker City, yes.
12        Q.   That's all I have got on that.
13        Just -- you answered some questions Mr. Schafer asked
14   you about Blue Cross and negotiations with Blue Cross. And
15   as to certain questions, you answered by saying "on the
16   commercial side." Were you distinguishing between the
17   commercial side and something else?
18        A.   Medicare Advantage.
19        Q.   So how were things different with Medicare
20   Advantage?
21        A.   We did have gain-sharing with Medicare Advantage
22   with Blue Cross.
23        Q.   There were also some questions Mr. Schafer asked
24   you about Canyon County as a whole. Do you recall those?
25        A.   Yes.

831

1         Q.   What facilities did Saltzer have in Canyon County
2    outside of Nampa when -- at the end of the time that you
3    were at Saltzer?
4         A.   Outside of Nampa?
5         Q.   Outside of Nampa.
6         A.   We had just opened a small clinic in Caldwell
7    prior to my leaving.
8         Q.   And how many doctors were in that clinic?
9         A.   Two.
10        Q.   Did you have any other specialists in Caldwell?
11        A.   Oh, sorry. Yeah. We had -- the ophthalmologists
12   were in Caldwell.
13        Q.   So of the 50 or so Saltzer doctors, there were
14   four in Caldwell at that time; is that right?
15        A.   Yeah, I believe that's correct.
16        Q.   And those were the only Saltzer doctors in
17   Canyon County outside of Nampa?
18        A.   Correct.
19        Q.   Mr. Schafer asked you about the benefits of a
20   shared medical record, and you referred to an intimate
21   relationship between the physicians. Do you remember that?
22        A.   Yes, I do.
23        Q.   What did you mean by "an intimate relationship
24   between the physicians"?
25        A.   Well, because the physicians knew each other so

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.      Bench trial, 09/27/2013

832

1   well, there was a lot of, well, I guess what you refer to as
2   "hallway medicine." So they would walk down the hall, talk
3   to their partner about a particular patient and ask about,
4   you know, what to do, those kind of things.
5       So there was a lot of intercommunication between
6   the physicians related to their patients.
7   **Q.**   And comparing a group of Saltzer's size with a
8   group, say, the size of St. Luke's Clinic, which group is
9   better equipped to engage in those kinds of intimate
10  relationships that you have described?
11  **A.**   Well, I would say Saltzer would be.
12      MR. ETTINGER: I have nothing further, Your Honor.
13      THE COURT: Recross.
14      MR. SCHAFER: No, Your Honor.
15      THE COURT: All right. Ms. Powell, you may step
16  down.
17      THE WITNESS: Thank you.
18      THE COURT: I assume the witness is released and
19  will not be recalled.
20      MR. SCHAFER: That's correct, Your Honor.
21      THE COURT: Thank you, Ms. Powell. You are
22  released and excused from your subpoena. Thank you.
23      Call your next witness.
24      MS. DUKE: Your Honor, we have Ed Castledine by
25  video.

833

1       THE COURT: All right. I assume this is not AEO?
2       MS. DUKE: Part of it is, but the first part is
3   not.
4       THE COURT: All right.
5       MS. DUKE: We can turn the main --
6   (Testimony of Ed Castledine via video deposition.)
7       MS. DUKE: Your Honor, if we can just blank out
8   the screen. The document is AEO.
9   (Video deposition paused.)
10      MS. DUKE: We're to a point where I think we're an
11  AEO for the testimony itself.
12      THE COURT: Okay. Thank you.
13  ****** COURTROOM CLOSED TO THE PUBLIC ******
14  (Video deposition of Ed Castledine resumed.)
15      MS. DUKE: That's the end of those portions with
16  respect to Mr. Castledine, Your Honor.
17  (Video deposition of Ed Castledine concluded.)
18      THE COURT: That's all you're playing?
19      MS. DUKE: From him. I have got around six
20  minutes of Dr. Mark Johnson that we could use the rest of
21  the time for if you want.
22      THE COURT: That should take us right to the
23  recess.
24      MS. DUKE: Sure.
25      I should have said, Your Honor, I don't think there is

834

1   any AEO in this. If we want to open the courtroom back up,
2   we certainly can.
3   ****** COURTROOM OPEN TO THE PUBLIC ******
4       MR. SINCLAIR: While we're doing that, in
5   Mr. Castledine's transcript at page 122, at line 19, when
6   you listen to the testimony, he said, "yeah," but the word
7   was "you." He said "you," but on the transcript it said
8   "yeah." So I would ask the court to check that page and
9   line to see whether the transcript as written is accurate.
10      THE COURT: All right. We'll note that and
11  correct that as need be.
12      I should note we're all -- go ahead and proceed.
13      MS. DUKE: No. I'm sorry.
14      THE COURT: Go ahead.
15  (Testimony of Mark Johnson via video deposition.)
16      MS. DUKE: And that's the end of Dr. Johnson,
17  Your Honor.
18      THE COURT: Counsel, we'll then recess until
19  Monday morning at 8:30. There were depositions that we need
20  to publish. Could you announce those.
21      MS. DUKE: I was going to do that right now.
22      We will be publishing the depositions of Joni Stright,
23  Geoff Swanson, Robert Walker, Mark Johnson, and Ed
24  Castledine. And I'll provide those to Madam Clerk.
25      THE COURT: If you will. And I'll direct

835

1   Ms. Gearhart to publish those depositions. Perhaps Monday
2   morning we can have her announce those and that they have
3   been unsealed and made part of the record.
4       MR. BIERIG: Your Honor, before we adjourn -- I
5   didn't mean to interrupt the court.
6       THE COURT: Go ahead. There's something I do want
7   to take up with counsel, as well.
8       MR. BIERIG: Why don't you do that, and if you
9   don't mind giving me a few minutes --
10      THE COURT: Go ahead. Go ahead.
11      MR. BIERIG: I may have misunderstood what the
12  court said earlier this afternoon, but I thought that in one
13  of the colloquies, Your Honor may have said that the
14  question of divestiture of Saltzer was not being contested
15  by defendants as a remedy in this case.
16      THE COURT: No. No, no. I did not mean to say
17  that at all. What I meant to say -- and I probably did
18  state it too broadly, because essentially I think a -- well,
19  I almost call it a stipulation of counsel that you would not
20  assert that activity since the date of the injunction
21  through the date of trial would be raised as a grounds for
22  not divestiture -- in other words, it could not be
23  unwound -- because of commitment of resources and things of
24  that sort.
25      MR. BIERIG: Right. That is correct, and that is

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/27/2013

Case 1:12-cv-00560-BLW   Document 553   Filed 11/04/14   Page 55 of 56

836

1  what I wanted to clarify; that at the preliminary injunction
2  hearing, what we said was that we would not raise any steps
3  to integrate Saltzer between the time of the preliminary
4  injunction hearing and the time of the decision in this case
5  as a reason that the transaction could not physically be
6  unwound.
7      THE COURT:  That --
8      MR. BIERIG:  But we -- I just wanted to be very
9  clear that we strongly contest the propriety of divestiture
10  as a remedy in this case.
11      THE COURT:  Well, that's obviously the
12  primary -- well, the only remedy that I think is really
13  sought by the plaintiffs here.  So, clearly, that is at
14  issue.  If I said anything else, I misspoke.
15      MR. BIERIG:  Okay.  I'm sorry to take up the
16  court's time.  I just wanted to --
17      THE COURT:  No.  That's fine.
18      The only other issue I wanted to raise, I would like
19  counsel over the weekend to -- I don't know if this is a
20  problem going both ways or only a problem raised, I think,
21  with Mr. Schafer's examination of Ms. Powell, was it, but I
22  think that it is not going to be acceptable to have kind of
23  a generic placeholder for designation of witnesses.
24      Obviously, rebuttal witnesses or surrebuttal witnesses
25  may not be anticipated.  But I think at this point, I don't

837

1  want to get into some kind of a dispute with counsel about
2  who has or has not been designated.  I think we need to be
3  very clear.
4      And so, Counsel, I think -- and it could be a problem
5  going both ways.  But by Monday morning, I want that
6  resolved so that there is no question in anyone's mind as to
7  who is going to be called or who is not going to be called.
8      The designations have been made as to their
9  depositions.  And if you're tying it somehow to that, then
10  we need to get that off the table and just indicate which of
11  those individuals you intend to call as part of your case so
12  we don't get into any issues going forward.
13      Likewise, the one motion in limine that I addressed, I
14  will review that over the weekend.  I think there are four
15  or five others.  I will make sure I'm through those.  So if
16  we need to resolve those early next week, I don't want to
17  hold up the trial in any way because I'm fumbling around
18  trying to recall what the issue is.  That's, I think, my
19  obligation to counsel to make sure I'm ready to rule on that
20  and not hold up the proceeding.
21      All right.  Counsel, is there anything else we need to
22  take up at this time?
23      MR. BIERIG:  We did raise with Mr. Metcalf the
24  issue of the scheduling for next week and when the
25  plaintiffs would end their case so that we could start

838

1  scheduling our witnesses, but we can take that up Monday
2  morning.
3      THE COURT:  If you would.
4      Now, just again, so we're clear, we will go
5  unfortunately Monday, Tuesday, Wednesday will be the
6  8:30-to-2:30 schedule.  Thursday, unfortunately, I think
7  it's only 8:30 to 11:30.
8      MR. METCALF:  To noon.
9      THE COURT:  To noon.  All right.  You know, as
10  counsel knows, we have got serious budget problems, and
11  that's why these meetings -- I spent the lunch hour today
12  and I have got next Thursday in a similar meeting, and then
13  I will be having to go to Coeur d'Alene.  I think
14  Mr. Sinclair, as well, is participating in our district
15  conference there on Friday.
16      Then we will come back the following week, and is
17  it -- it's a full week, as I recall.  And I think it's a
18  full week.  Unfortunately, the 14th is Columbus Day, and
19  then we'll have four full days after that.
20      Counsel, I would like you to meet among yourselves, see
21  if we're on schedule.  I have tried very hard to give you
22  the full amount of time we thought we would get each day.
23  If we need to accelerate the process a little bit, I can
24  probably stay a little later than 2:30 to cover some
25  additional time.

839

1      I would sincerely hope we won't go past the 18th or
2  19th, as agreed upon.  If we have to, we'll need to discuss
3  that and see where the problem lies.  But, because of that,
4  I'm asking counsel to be very conscious of that and be very
5  focused in your questions.  So let's not get off into side
6  issues that are not truly central to the case so that we
7  don't waste your time, your clients' money, or the court's
8  time.
9      All right.  Anything else?
10      MR. WILSON:  Just briefly, Your Honor, just to
11  give the court and counsel as advance notice as possible, it
12  is our intent -- it's aspirational, but it is our intent to
13  rest at the conclusion of the day next Thursday.  That might
14  not happen, but that is our current plan.
15      MR. BIERIG:  And the reason that it's important
16  for us is several of our witnesses are surgeons who have
17  surgeries scheduled, and we need to know when we're going to
18  call them.
19      We have a representative of the State of Idaho that
20  we're trying to accommodate the schedule, the -- Director
21  Armstrong and Director Deal.
22      Our CEO, who is going to be our first witness,
23  Dr. Pate, we need to let him know when he is going to be
24  testifying because he is scheduled to go out of town.
25      THE COURT:  To accommodate that, we may need to

840

1    start taking witnesses out of order. If the plaintiffs'
2    case goes long, then there may need to be an adjustment
3    there to accommodate the schedule of whoever -- not just
4    physicians but anyone who has a scheduling conflict.
5        I think perhaps by Tuesday, we should start having a
6    pretty good feel for that. Tentatively, we'll probably
7    start with presumably St. Luke's case on Monday morning, a
8    week from Monday. If there is any delay in that, it may be
9    that whatever witnesses of the plaintiffs that we don't get
10   to by Thursday morning, they may need to be kind of
11   sandwiched in around any critical witnesses that St. Luke's
12   needs to call whose schedule cannot be adjusted.
13           MR. WILSON: Of course.
14           THE COURT: We'll be in recess, and see you all
15   Monday morning at 8:30.
16       (Evening recess at 5:05 p.m.)
17
18
19
20
21
22
23
24
25

R E P O R T E R ' S   C E R T I F I C A T E

1
2
3
4
5        I, Tamara I. Hohenleitner, Official
6    Court Reporter, County of Ada, State of Idaho,
7    hereby certify:
8           That I am the reporter who transcribed
9    the proceedings had in the above-entitled action
10   in machine shorthand and thereafter the same was
11   reduced into typewriting under my direct
12   supervision; and
13           That the foregoing transcript contains a
14   full, true, and accurate record of the proceedings
15   had in the above and foregoing cause, which was
16   heard at Boise, Idaho.
17           IN WITNESS WHEREOF, I have hereunto set
18   my hand October 31, 2013.
19
20
21
22       _____-s-_____
23       Tamara I. Hohenleitner
         Official Court Reporter
         CSR No. 619
24
25