Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 1 of 68

841

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                    IN THE DISTRICT OF IDAHO

 3   - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
 4   SAINT ALPHONSUS MEDICAL CENTER -   :
     NAMPA, INC., TREASURE VALLEY       : Bench Trial
 5   HOSPITAL LIMITED PARTNERSHIP, SAINT: Witnesses:
     ALPHONSUS HEALTH SYSTEM, INC., AND : Karl F. Keeler
 6   SAINT ALPHONSUS REGIONAL MEDICAL   : Brian L. Checketts
     CENTER, INC.,                      : Nicholas J. Genna
 7                    Plaintiffs,       :
                 vs.                    :
 8                                      :
     ST. LUKE'S HEALTH SYSTEM, LTD., and :
 9   ST. LUKE'S REGIONAL MEDICAL CENTER, :
     LTD.,                              :
10                   Defendants.        :
     - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
11   FEDERAL TRADE COMMISSION; STATE OF :
     IDAHO,                             :
12                    Plaintiffs,       :
                 vs.                    :
13                                      :
     ST. LUKE'S HEALTH SYSTEM, LTD.;    :
14   SALTZER MEDICAL GROUP, P.A.,       :
                                        :
15                   Defendants.        :
     - - - - - - - - - - - - - - - - - x

16

17                    * * * SEALED * * *

18

19   REPORTER'S TRANSCRIPT OF PROCEEDINGS

     before B. Lynn Winmill, Chief District Judge
20
     Held on September 30, 2013
21
     Volume 6, Pages 841 to 1095
22
                    Tamara I. Hohenleitner
23       Idaho Certified Shorthand Reporter No. 619
              Registered Professional Reporter
24                Certified Realtime Reporter
             Federal Certified Realtime Reporter
25
             United States Courts, District of Idaho
        550 West Fort Street, Boise, Idaho  83724  (208) 334-1500
</pre>

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 2 of 68

842

1                                    A P P E A R A N C E S

2

3

FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
4    SAINT ALPHONSUS HEALTH SYSTEM, INC.,
     AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.

5

6           Keely E. Duke
            DUKE SCANLAN & HALL, PLLC
7           1087 W. River Street, Suite 300
            Boise, ID 83707
8
            David A. Ettinger
9           HONIGMAN MILLER SCHWARTZ AND COHN LLP
            2290 First National Building
10          660 Woodward Avenue
            Detroit, MI 48226
11

12

13   FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION

14

15          Peter C. Herrick
            U.S. FEDERAL TRADE COMMISSION
16          500 Pennsylvania Ave., N.W.
            Washington, DC 20580
17
            J. Thomas Greene
18          U.S. FEDERAL TRADE COMMISSION
            600 Pennsylvania Ave N.W.
19          Washington, DC 20580

20          Henry Chao-Lon Su
            U.S. FEDERAL TRADE COMMISSION
21          601 New Jersey Ave., N.W.
            Washington, DC 20001

22

23

24

25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 3 of 68

843

```
 1                          A P P E A R A N C E S (Continued)

 2

 3      FOR PLAINTIFF STATE OF IDAHO

 4              Eric J. Wilson
                GODFREY & KAHN, S.C.
 5              One East Main Street
                Suite 500
 6              PO Box 2719
                Madison, WI 53701

 7
                Brett T. DeLange
 8              OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
                954 W. Jefferson, 2nd Floor
 9              Boise, ID 83720-0010

10

        FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
                Raymond D. Powers
12              POWERS TOLMAN FARLEY, PLLC
                PO Box 9756
13              Boise, ID 83707

14

        FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15      AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16              Jack R. Bierig
                Ben J. Keith
17              Scott Stein
                Charles Schafer
18              SIDLEY AUSTIN
                One South Dearborn
19              Chicago, IL 60603

20              J. Walter Sinclair
                STOEL RIVES
21              101 S. Capitol Boulevard, Suite 1900
                Boise, ID 83702
22

        FOR DEFENDANT SALTZER MEDICAL GROUP
23
                Brian Kenneth Julian
24              ANDERSON JULIAN & HULL, LLP
                PO Box 7426
25              Boise, ID 83707
```

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 4 of 68

844

1                                              <u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

2

3
|  |  | PAGE: |
|---|---|---|
|  | Courtroom open to the public................... | 846 |
|  | Courtroom closed to the public................. | 878 |
|  | Courtroom open to the public................... | 912 |
|  | Courtroom remains open to the public........... | 927 |
|  | Courtroom closed to the public................. | 948 |
|  | Courtroom open to the public................... | 974 |
|  | Courtroom closed to the public................. | 979 |
|  | Courtroom open to the public................... | 986 |
|  | Courtroom remains open to the public........... | 1014 |
|  | Courtroom closed to the public................. | 1044 |

11                                             **PLAINTIFFS**

12                                       <u>W</u> <u>I</u> <u>T</u> <u>N</u> <u>E</u> <u>S</u> <u>S</u> <u>E</u> <u>S</u>

13

|  |  | PAGE: |
|---|---|---|
| **CHECKETTS, Brian L.** |  |  |
|  | Direct Examination by Mr. Ettinger............ | **913** |
|  | Cross-Examination by Mr. Stein................ | **965** |
|  | Redirect Examination by Mr. Ettinger.......... | **981** |
|  | Recross-Examination by Mr. Stein.............. | **984** |
| **GENNA, Nicholas J.** |  |  |
|  | Direct Examination by Mr. Powers.............. | **987** |
|  | Cross-Examination by Mr. Stein................ | **1065** |
| **KEELER, Karl F.** |  |  |
|  | Direct Examination by Mr. Ettinger............ | **850** |
|  | Cross-Examination by Mr. Stein................ | **887** |
|  | Redirect Examination by Mr. Ettinger.......... | **908** |
|  | Recross-Examination by Mr. Stein.............. | **910** |
|  | Further Redirect Examination by Mr. Ettinger.. | **911** |

21

22

23                                       * * * * *

24

25

845

 1                                    DEPOSITIONS

 2                                 P U B L I S H E D

 3

 4

| | | PAGE: |
|---|---|---|
| CASTLEDINE, Ed | ................................. | 986 |
| JOHNSON, Mark | ................................. | 986 |
| STRIGHT, Joni | ................................. | 986 |
| SWANSON, Geoff | ................................. | 986 |
| WALKER, Robert | ................................. | 986 |

 5

 6

 7

 8

 9                                    PLAINTIFFS

10                                 E X H I B I T S

11

12

| | | ADMITTED |
|---|---|---|
| 1649 | Top 50 Hospitals with Best Patient Ratings ..... (TVH 20--TVH 21) | 1040 |
| 1652 | CMS/Medicare Hospital Value-Based Purchasing ... Total Performance Score Spreadsheet ranking TVH first in nation (TVH 60386--TVH 60386) | 1043 |

13

14

15

16

17                                    DEFENDANTS

18                                 E X H I B I T S

19

20

| | | ADMITTED |
|---|---|---|
| 2118 | Email exchange between G. Dragolovic, N. Genna, J. Strauss, and B. Alismail re sample letter to Saltzer Docs (Def. Dep. Exh. 164; TVH20684-85) | 1076 |

21

22

23                          *  *  *  *  *

24

25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 6 of 68

846

1    P R O C E E D I N G S
2              September 30, 2013
3    ****** COURTROOM OPEN TO THE PUBLIC ******
4         THE CLERK:  The court will now hear Civil Case
5    12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,
6    versus St. Luke's Health System for Day 6 of a bench trial.
7         THE COURT:  Good morning, Counsel.
8         A couple of items I understand we needed to perhaps
9    address.  One had to do with the use or calling witnesses
10   out of order in order to accommodate scheduling, and perhaps
11   more importantly, to avoid having to call back witnesses for
12   very short, direct cross-examination.  As I indicated, my
13   practice has been that as long as there is sort of
14   proportionality and the direct is not -- is going to be less
15   than -- or the direct during cross-examination will not be
16   longer than the actual direct of the opposing party, that we
17   would allow that so we don't have to inconvenience witnesses
18   and would not have to have them come back towards the end of
19   the trial.
20        A problem, apparently, has arisen about not receiving
21   notice of that.  The pretrial order, I think, called for
22   actually four days' prior notice of the order of witnesses.
23   What would make sense in this instance would be once you
24   have the order of witnesses lined up -- and I'll use
25   St. Luke's since they're the ones in this posture -- that

847

1    perhaps they would need to give two court days' prior notice
2    that they're going to try to conduct direct during
3    cross-examination of some of the plaintiffs' witnesses.
4         Of course, the problem is that we haven't, I guess,
5    anticipated this as an issue, and we're down to where
6    presumably the government -- I mean, excuse me -- the
7    plaintiffs may try to rest by the end of the week.  That may
8    put St. Luke's in a bit of a -- have a bit of a problem in
9    terms of giving that notice.  I was thinking that, at least
10   for today, I would allow less notice the two days' but going
11   forward we would require the two days' notice.
12        So with that, Ms. Duke, I understand you raised an
13   issue -- or Mr. Ettinger, I don't know -- does that sound
14   agreeable, that as long as there was notice given so that
15   you're not completely flat-footed today, that St. Luke's
16   would have to give immediate notice of which of your
17   witnesses lined up for tomorrow they may want to conduct
18   direct examination of and also any of those on Wednesday so
19   you can be prepared?
20        Now, I know both sides have opposed any breaking up --
21   I think, Mr. Powers has a witness, a surgeon, he wants to
22   call next week during the St. Luke's case.  I'm going to
23   allow that.
24        I know, Mr. Bierig, you're opposed, and your objection
25   is noted.  But I do this consistently for both sides.  We're

848

1    in a court trial, and I think I'm, hopefully, smart enough
2    that I can figure out when we're switching from one case to
3    the other without getting too discombobulated.
4         So is that agreeable?  Can we proceed this morning?  Do
5    you have enough notice to deal with the direct examination
6    by St. Luke's of any of the witnesses that you're going to
7    call today or --
8         MR. ETTINGER:  Your Honor -- I think we'll be
9    fine, Your Honor.
10        THE COURT:  All right.  Thank you.
11        We also gave you a written decision dealing with the
12   Saint Alphonsus' offer for the acquisition of the Saltzer
13   Medical Group.  I think, hopefully, that's self-explanatory
14   as to certain areas that's simply not going to be allowed.
15   It will not be allowed in any way to put forward some kind
16   of an in pari delicto, or unclean hands argument, since that
17   isn't a recognizable defense in an antitrust case.
18        However, where it has other independent relevance
19   establishing whether or not an improper premium was paid for
20   the acquisition of the medical group so that -- because
21   valuation would be at issue, and for other reasons, then, of
22   course, the -- then I will allow the evidence in for that
23   purpose.  So I'll have to make the decision document by
24   document and witness by witness.
25        Are there any other issues we need to take up before we

849

1    call or resume with witnesses?
2         MR. STEIN:  Not from our perspective, Your Honor.
3         MR. ETTINGER:  No, Your Honor.
4         THE COURT:  All right.  Plaintiffs may -- I
5    believe we're ready to call the next witness?
6         MR. ETTINGER:  Yes, Your Honor.  We call
7    Karl Keeler.
8         THE COURT:  Mr. Keeler, please step before the
9    clerk, be sworn as a witness and then follow Ms. Gearhart's
10   direction from there.
11             KARL FAIRBANKS KEELER,
12   having been first duly sworn to tell the whole truth,
13   testified as follows:
14        THE CLERK:  Please take a seat in the witness
15   stand.
16        MR. ETTINGER:  Your Honor, having said there was
17   nothing else, there are two very small things, I guess.
18   One, because my opening was in a closed courtroom, my
19   clients weren't able to attend, and so I would just like to
20   introduce to the court Sally Jeffcoat, the CEO of Saint
21   Alphonsus Health System; and Stephanie Westermeier, the
22   general counsel of Saint Alphonsus Health System.
23        THE COURT:  Thank you.
24        MR. ETTINGER:  And then secondly, on the AEO
25   issue, Your Honor, I just wanted to flag it -- Mr. Stein and

850

1 I have talked -- something like the last 20 percent or so of
2 Mr. Keeler's direct examination will be matters that I think
3 we're going to need to close the courtroom for, and Mr.
4 Stein knows it, and, hopefully, we can work it out so it's
5 just one period for direct and cross. Most of the exam, I
6 think, can be in an open courtroom.
7        THE COURT: Very good.
8        All right. Ms. Gearhart.
9        THE CLERK: Please state your complete name and
10 spell your name for the record.
11        THE WITNESS: Karl Fairbanks Keeler, K-A-R-L
12 F-A-I-R-B-A-N-K-S K-E-E-L-E-R.
13        THE COURT: You may inquire, Mr. Ettinger.
14        MR. ETTINGER: Thank you, Your Honor.
15              DIRECT EXAMINATION
16 BY MR. ETTINGER:
17        Q. Mr. Keeler, what's your current position?
18        A. I'm currently the president and CEO of Saint
19 Alphonsus Medical Center, Nampa.
20        Q. How long have you had that position?
21        A. Almost three years.
22        Q. What's your educational background?
23        A. I have a bachelor's from Brigham Young University
24 in health promotion and a master's degree from the
25 University of Michigan in health services administration.

851

1        MR. ETTINGER: Your Honor, can I get a "go blue"
2 once in this trial? I'll go on.
3 BY MR. ETTINGER:
4        Q. How long have you worked in healthcare,
5 Mr. Keeler?
6        A. Over 15 years.
7        Q. Can you just, briefly, describe for the court the
8 positions that you've had in healthcare?
9        A. I started out at a -- about 130-, 140-physician
10 practice in southeastern Michigan. From there went to BJC
11 Health system, a large, integrated delivery system with an
12 insurance plan physician group and multiple hospitals. Then
13 was at Denver Children's as the director of strategic
14 planning business development, was there for five years;
15 then was at Mercy Medical Center in Cedar Rapids as service
16 line administrator and then chief operating officer, for six
17 years; and then currently at Saint Alphonsus.
18        Q. So could you just tell the court what Saint
19 Alphonsus Nampa is?
20        A. Saint Alphonsus Nampa is a not-for-profit
21 community hospital in Nampa.
22        Q. And what services, generally, does the hospital
23 offer?
24        A. General inpatient services, outpatient services,
25 ER.

852

1        Q. How long has that hospital existed?
2        A. Almost a hundred years.
3        Q. And that hospital is in Nampa, obviously. Could
4 you just generally, for background, for the record, compare
5 Nampa to Boise in terms of income levels, generally?
6        A. On a per capita basis, Nampa has a significantly
7 less per capita income than does Ada County.
8        Q. And how about the same comparison with regard to
9 people with and without health insurance?
10        A. That's similar. Nampa has less than -- the
11 population of Nampa has less than Meridian and Boise.
12        Q. And by "less," do you mean less insurance?
13        A. Less insurance, so there is more uninsured or
14 people on Medicaid.
15        Q. How -- what does the term "bad debt" mean in the
16 hospital world?
17        A. Bad debt is a -- essentially is the people don't
18 have the ability to pay for their care.
19        Q. What does "charity care" mean in the hospital
20 world?
21        A. In the hospital world, charity care is if --
22 essentially if a person is under -- or under our guidelines,
23 a certain level of the federally poverty level, we write off
24 that care.
25        Q. And what, approximately, is Saint Alphonsus

853

1 Nampa's percentage of its revenues that are bad debt or
2 charity care?
3        A. It's around 10 to 12 percent.
4        Q. And how does that compare to, for example, the
5 hospitals in Ada County?
6        A. They're around 5 to 6 percent.
7        Q. How does that compare to the average nationally?
8        A. Average nationally is around 6 percent.
9        Q. Does Saint Alphonsus Nampa have programs
10 specifically addressing the needs of the poor and the
11 uninsured?
12        A. Yes. We have -- specifically, we run Meals on
13 Wheels from our hospital for the community of Nampa. We
14 have a van service that takes people that don't have
15 vehicles to and from their healthcare appointments, not just
16 at the hospital, but outside other agencies. We also have a
17 number of free screenings for mammograms and other cancer
18 initiatives, as well as heart and stroke screenings.
19        Q. Mr. Keeler, the court reporter has commented on my
20 fast pace, and I bet she's thinking about yours right now,
21 so you might want to slow down just a little bit.
22        A. All right. No problem.
23        Q. As one fast talker to another.
24        When you started at Saint Alphonsus Nampa, what was
25 your evaluation of the hospital?

854

1   A.   It had some issues.

2   Q.   Any issues relating to the physical facility?

3   A.   Yes.

4   Q.   And what were those issues, generally?

5   A.   Just in general disrepair.  The other organization
6   that owned it prior to Saint Alphonsus had not made
7   investments in it.

8   Q.   And who was that other organization?

9   A.   Catholic Health Initiatives.

10   Q.   And I guess I should back up.  When was the
11   hospital acquired by Saint Alphonsus?

12   A.   It was acquired in April of 2010.

13   Q.   And who owned it before -- and what was it called
14   before then?

15   A.   It was called Mercy Medical Center.

16   Q.   Okay.  So, again, going back to your evaluation,
17   when you took over, were there issues relating to IT,
18   information technology, at the hospital?

19   A.   Yes.

20   Q.   And what were those issues?

21   A.   It had -- the computers were old; it had not much
22   memory, from the server standpoint; it had an old electronic
23   medical record.

24   Q.   Were there issues relating to medical technology
25   and equipment at that time, when you took over?

855

1   A.   Yes.

2   Q.   What were those issues?

3   A.   Again, same old technologies, 10 and 20 years old,
4   and a number that needed to be repaired.

5   Q.   Were there quality issues that you found when you
6   took over?

7   A.   Yes.

8   Q.   And what were some of the quality issues?

9   A.   Well, I think it just had just a number of poor
10   quality on the national indicators.

11   Q.   Did the hospital have standardized protocols for
12   treating patients at that time?

13   A.   Some, but not many, no.

14   Q.   Was there -- what was the evaluation of that
15   hospital within the Trinity system when you took over?

16   A.   Trinity Health has what's called our GPA or our
17   scorecard, and it takes around 50 indicators of quality,
18   both core measures from a CMS perspective, what they measure
19   quality, as well as other things, from patient satisfaction
20   to other initiatives with regard to quality.  And we ranked
21   very poorly.  We actually -- second to last within Trinity.

22   Q.   That's among how many hospitals?

23   A.   Around 50.

24   Q.   Second to last among 50 at that time?

25   A.   Yes.

856

1   Q.   Were there issues with regard to the emergency
2   room when you took over?

3   A.   Yes.

4   Q.   And what were those issues?

5   A.   Well, again, we didn't have any protocols there.
6   We had extremely long wait times.  We had a high "left
7   without being seen," so people would leave without being
8   seen, you know.

9   Q.   Did you know about these issues before you took
10   the job to come to Nampa?

11   A.   Not all, but, yes, I did.

12   Q.   And did those -- these issues affect your decision
13   to take the job?

14   A.   No.  I believed they were opportunities for
15   improvement, and with Saint Alphonsus purchasing the
16   hospital, I thought there was lots of opportunities that we
17   could improve those.

18   Q.   Did you know about Saltzer Medical Group before
19   you took the job?

20   A.   I knew that Saltzer was in the community, was the
21   largest medical group within Idaho and had been there for --
22   I think then it was under 50 years, but it had been there
23   for a very long time.

24   Q.   If you may have known at the time that Saltzer
25   would be acquired by St. Luke's, would that have affected

857

1   your decision to take the job?

2       MR. STEIN:  Objection.  Relevance.

3       MR. ETTINGER:  Your Honor, you know, one of the
4   issues that we're addressing directly with Mr. Keeler is the
5   impact on the hospitals of the acquisition of Saltzer, and
6   certainly, you know, his view of the hospital's prospects is
7   quite relevant.

8       THE COURT:  Mr. Stein.

9       MR. STEIN:  Well, that may be true, but I'm not
10   sure how speculating about what Mr. Keeler would have done
11   in terms of taking this job, unless we want to get into all
12   the other factors that Mr. Keeler considered in moving here.

13       THE COURT:  I'm not sure it's the most significant
14   thing, but I think the ability to hire administrative staff
15   would bear upon, I guess, one anticompetitive factor.

16       So I'll overrule the objection and allow the witness to
17   answer.

18       THE WITNESS:  Yes, it would have.

19   BY MR. ETTINGER:

20   Q.   And why is that?

21   A.   When you have your largest medical group, not only
22   in the state but also in your city, that's in your parking
23   lot, go with your competitor, that's -- that's where
24   referrals start is through the -- through physicians.  That
25   would have been extremely difficult to be successful.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench trial, 09/30/2013

858

1    Q.   I want to talk about the issues that you've been
2  through in terms of the issues with the hospital when you
3  came and they asked you what, if anything, has been done to
4  address those issues. Let's start with the physical plant.
5    A.   So the physical plant, we've put new flooring
6  throughout the facility, painted the whole facility. We've
7  improved all the heating and cooling systems throughout the
8  facility. We've actually upgraded some rooms. So increased
9  the size on our orthopedic floor of a number of rooms. Our
10 lab, we -- the lab hadn't been renovated since 1967 when the
11 building was built and had severe, major issues with regard
12 to the lab; totally renovated the lab. So we made
13 significant improvements.
14   Q.   Have you solved all the problems with the
15 facility?
16   A.   It's an old building, so we haven't solved all the
17 problems, but we're working on those.
18   Q.   Since you've done this work to improve the
19 facility, have you had any complaints from any Saltzer
20 physicians regarding the facility?
21   A.   No.
22   Q.   Why don't you talk a little bit about the IT
23 issues and what, if anything, you've done to address those.
24   A.   Well, we've implemented a 100 percent electronic
25 health record. That was completed in June. We've made

859

1  improvements to our wireless; we have wireless throughout
2  the facility. All of our cabling, 100 percent of our
3  computers have been upgraded. We've also -- what's called a
4  telemetry. We've put telemetry, as opposed to just in our
5  ICU -- that monitors heart rate and other things with regard
6  to patients -- we've put that throughout the facility. So
7  we've made major improvements.
8    Q.   And what about the medical equipment and
9  technology issues you've mentioned. What have you done, if
10 anything, to address them?
11   A.   We've done a number of issues. We've replaced our
12 endoscopy equipment. We've added an updated CT which has
13 less radiation for the patient. We've put all digital
14 mammograms throughout, also being able to look at smaller
15 tumors. We have upgraded almost every piece of equipment in
16 our radiology department, from nuclear cameras to other
17 pieces of equipment. So we've done many improvements.
18   Q.   We mentioned the ER. What have you done to
19 address issues in the ER, if anything?
20   A.   Well, we've -- we implemented what's called Lean
21 Six Sigma. So we've gone through and looked at all our
22 processes within the emergency department without wait
23 times. Also our lab, radiology, pharmacy, all the areas
24 with regard to that, to take out all the waste, decrease
25 costs in that -- in the emergency department.

860

1            With those processes, we put in protocols,
2  specific protocols: When patients come in, we start the
3  care immediately and have been able to decrease our wait
4  times down to, now, minutes and -- under 10 minutes -- and
5  have a door-to-physician time of around 20 minutes.
6    Q.   What have you done to address the quality issues?
7    A.   Well, we've done a number of things on our
8  quality. We've -- we've done basic things, like upgraded
9  all of our pharmacy equipment, so make sure patient
10 safety -- patients get the right dose at the right time.
11 Spent about a million dollars on our pharmacy. We've also
12 done a number of just major initiatives, like our perinatal
13 risk assessment.
14   Q.   What was your perinatal risk assessment?
15   A.   Essentially, there was a group from Trinity that
16 came to our organization, goes around all the organizations,
17 does an assessment on the hospital and how everything is
18 working, from an OB perspective and a well-baby issue, and
19 then comes back, gives us a report. And so we got a report
20 that said where we had gaps, where we were following
21 evidence-based protocol. We got a group of physicians
22 together, led by Dr. Hughes, an independent obstetrician in
23 the community, and then worked on those issues and came up
24 with how we're going to practice at our facility in Nampa.
25   Q.   And were any Saltzer physicians involved in that

861

1  initiative?
2    A.   Yes.
3    Q.   What was their role?
4    A.   Well, they were -- the Saltzer physicians, as well
5  as other independents and employed physicians, came together
6  to work on looking at the evidence-based care, looking at
7  the protocols we wanted to put in place and then put
8  together what our -- our plan or what our policies would be
9  moving forward.
10   Q.   And did these perinatal safety initiatives have
11 any impact on outcomes?
12   A.   Yes.
13   Q.   And could you describe them, generally?
14       MR. STEIN:  Your Honor, I'm sorry. Objection.
15 Foundation. I would just like to make sure we understand
16 what this data is based on because I'm not sure that I have
17 seen it before.
18       We -- I should say "we" -- St. Luke's is held to quite
19 a high standard by the plaintiffs, in terms of the quality
20 evidence and producing, so if we're going to have a bunch
21 of --
22       THE COURT:  Well, I agree, Mr. Ettinger, that if
23 we're going to get into issues of the quality of care
24 provided at Saint Al's Nampa, then I think we need to know
25 the basis for those assessments.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW  Document 554  Filed 11/04/14  Page 10 of 68

862

1  But, perhaps equally important -- I'm not sure the
2  direct relevance of what this -- well, I assume you may have
3  some indication why you think it is relevant, but it seems
4  to me to be of marginal relevance. But I think if we're
5  going to get into this, you're going to have to provide
6  testimony and explanation as to what the basis for these
7  conclusions were about the improvements, in terms of
8  studies, surveys, assessments, and what have you.
9        MR. ETTINGER: Well, Your Honor, a couple things.
10  On relevance, I think this information is relevant in a
11  couple of ways:
12        Number one, it shows the efforts that have been made
13  successfully at this hospital to provide good care in the
14  community and improve the hospital and that that's
15  jeopardized by this transaction, we're going to go on to
16  show.
17        Secondly, of course, St. Luke's has a defense that you
18  need to employ physicians to achieve certain quality
19  results. And Mr. Keeler's testimony is -- will provide one
20  example of a hospital that can do some of these things
21  working with independent physicians.
22        As to the foundation for the quality, I think what
23  you're going to hear is he is going to give a couple very
24  specific numbers, and the foundation for those numbers will
25  be apparent. It's not simply a broad conclusion. I did not

863

1  ask him, you know, generically, "Has quality across the
2  board increased?"
3        THE COURT: Mr. Stein, briefly.
4        MR. STEIN: It's perhaps in part, because all
5  we're going to get is a couple of numbers that I have issues
6  with the foundation. I mean, on what basis do I
7  cross-examine Mr. Keeler about those figures without --
8        THE COURT: Well, the problem is it's the cart
9  before the horse. I don't know, either. And I think we
10  need to hear exactly how Mr. Ettinger is going to present
11  the evidence.
12        At this point, I'll overrule the objection and give you
13  some leeway, but I think it would be important to make sure
14  that whatever the basis is for the witness' testimony that,
15  presumably, it's from a source that Mr. Stein can use to
16  cross-examine, potentially, the witness, but let's see where
17  we go.
18        Proceed.
19  BY MR. ETTINGER:
20     Q.  Mr. Keeler, are there any specific measured
21  outcome changes that you've identified with regard to the
22  perinatal safety initiative?
23     A.  Yes. One is elective deliveries before 39 weeks,
24  and prior -- prior to this, we were at around 39 percent of
25  elective deliveries were prior to 39 weeks, and now we're

864

1  less than 1 percent.
2     Q.  And why is that of significance?
3     A.  So, the earlier a baby is delivered, the more
4  opportunity it has for negative outcomes.
5     Q.  And did you engage in quality efforts with regard
6  to the surgery area?
7     A.  Yes. For -- one of the areas was our urinary
8  catheter infection we were looking at -- from our orthopedic
9  cases, so we got a group of physicians together. We had a
10  high rate, so we looked -- brought some physicians together,
11  looked at what we could do, came up with new protocols based
12  on evidence-based care, and we've only had one in the last
13  two years since -- since we actually have -- have moved
14  forward with the new protocols.
15     Q.  When you say you've "had one in the last two
16  years," one what?
17     A.  One infection.
18     Q.  And the physicians who were involved in
19  the -- this postsurgery-infection issue, were they
20  independent or employed surgeons?
21     A.  They were -- there was -- they were independent.
22     Q.  Have -- you mentioned earlier the Trinity ranking
23  that -- and quality that Saint Alphonsus Nampa had before
24  you arrived. What is that -- what rankings does Saint
25  Alphonsus Nampa get within the Trinity system today?

865

1     A.  We're now in the top 25 percent.
2     Q.  And have there been any national recognized
3  entities that have evaluated the quality at Saint Alphonsus
4  Nampa?
5        MR. STEIN: Your Honor, I'm sorry to raise this
6  objection again. What a third-party national organization
7  said is not particularly relevant, unless it's being offered
8  for the truth of the award. And I'm quite certain we've not
9  been provided with any of the underlying information for
10  third-party national awards.
11        And I raise this, Your Honor, subsequent to the
12  foundation issue, relevance issues. But it's also going to
13  be a time issue, because if we have to, then, have people
14  from St. Luke's come in and talk about all the awards that
15  we've won, I don't think it's going to be particularly
16  helpful.
17        THE COURT: Well, at this point, I'm going to
18  sustain the objection. I think we've established,
19  anecdotally. The problem is we could get diverted into a
20  side issue here about the award and what it means. I'm
21  going to sustain the objection.
22        Let's move on, Mr. Ettinger.
23  BY MR. ETTINGER:
24     Q.  Have you made any --
25        THE COURT: Having said that, Mr. Stein, of

866

1  course, again, the goose-and-gander problem. I'm quite
2  certain that I am not going to allow any similar evidence to
3  be coming in from St. Luke's in terms of the quality of care
4  provided or improvements. Anticipate that it's going to
5  have to be much more specific, so just so we're clear on
6  that point.
7       Mr. Ettinger, proceed.
8       MR. ETTINGER: Thank you, Your Honor.
9  BY MR. ETTINGER:
10      **Q.** Mr. Keeler, since you have been at Saint Alphonsus
11  Nampa, have you made efforts to improve hospital-physician
12  relationships?
13      **A. Yes.**
14      **Q.** And what have you done in that regard?
15      **A. So when I first got the -- at Saint Alphonsus**
16  **Nampa, I went around to all the physicians that were on the**
17  **medical staff and -- or tried to meet with all the groups to**
18  **talk about what the care was in the facility and what are**
19  **the things we could do to make improvements.**
20      **Q.** And have you -- did you do that one time or has
21  that been an ongoing process?
22      **A. I try to do that annually. You know, we have a --**
23  **do have a large medical staff, but actually I like to go**
24  **around annually and meet with all the different groups.**
25      **Q.** Did that include Saltzer?

867

1       **A. Yes, it did.**
2       **Q.** You mentioned the medical staff. Just for the
3  record, what is the medical staff?
4       **A. The medical staff are physicians that have**
5  **privileges to practice at the hospital.**
6       **Q.** And is that limited to employed physicians?
7       **A. No, it's not.**
8       **Q.** Okay. Were there -- we talked about surgery a
9  little bit. Were there any specific actions taken to make
10  the hospital more physician-friendly in the surgery area?
11      **A. So we did have some long turnover times, which in**
12  **your ORs when you turn over an OR and it's clean and you get**
13  **it prepped for the next patient, we had some long turnover**
14  **times, so we worked on that.**
15      **And additionally, with our orthopedic surgeons, we**
16  **allowed them to hop rooms so we could have two ORs ready so**
17  **when one was done, the surgeon would go directly into the**
18  **other and start the case, as opposed to having a long**
19  **turnover time. They didn't have to wait until that same OR**
20  **was ready for them to do another surgery.**
21      **Q.** Were there any steps that you had taken to improve
22  the information flow between the hospital and physicians?
23      **A. Actually, that was one of the things that Saltzer**
24  **had a complaint with, was information coming back from our**
25  **emergency department with regard to patients, that their**

868

1  patients that came into the emergency department,
2  information that they were able to understand what happened
3  while the patient was in the hospital and what that next
4  course of treatment was. So we actually went and changed
5  that. Due to that, now they actually -- everything was
6  transcribed, and they get exactly what happened in the
7  emergency department and in a timely fashion.
8       **Q.** Did you receive any comments by any Saltzer
9  physicians about these efforts to make the hospital more
10  physician-friendly?
11      **A. Yes.**
12      **Q.** And in terms of either Saltzer physicians or
13  Saltzer management, who commented?
14      **A. Bill Savage had made a number of comments, as well**
15  **as Dr. Patterson specifically came to my office and thanked**
16  **me for making -- Trinity Saint Al's making improvements to**
17  **the facility.**
18      **Q.** What was -- prior to this acquisition being
19  announced, how would you characterize the relationship
20  between Saint Alphonsus Nampa and Saltzer?
21      **A. I think we had a good relationship.**
22      **Q.** Let me take a step back and ask you kind of a
23  broad question. How important are primary care physicians
24  to a hospital, in your experience?
25      **A. Primary care physicians are where all the care**

869

1  starts, so it's critically important to hospitals, because
2  that's where the referral starts if there is a need for
3  specialty care or any care that is done within a hospital.
4  So it's vital.
5       **Q.** What is the importance, in your experience, of the
6  Saltzer primary care physicians to Saint Alphonsus Nampa?
7       **A. Being as that they're the largest group and they**
8  **actively participate in the hospital, from medical exec**
9  **committee and other committees, they are critical to the**
10  **hospital's success.**
11      **Q.** Do all the family practice -- let me start that
12  over.
13      Do the primary care physicians in the community all
14  provide inpatient care directly at Saint Alphonsus Nampa?
15      **A. No, they do not. We have hospitalists that help.**
16  **From an inpatient standpoint, that really frees them up so**
17  **they can just practice in their office.**
18      **Q.** Okay. And for those primary care physicians who
19  have the hospitalists treat their patients in the hospital,
20  rather than doing it themselves, are those doctors
21  irrelevant to the -- to the success of the hospital or not?
22      **A. No. Like I said before, the care starts in the**
23  **primary care office. And so if they need any higher level**
24  **service that can't be done in an outpatient setting or in an**
25  **office setting, it's -- they're critical to the hospital's**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 12 of 68

870

1  success.
2      Q.  Does the hospitalist have any role in referring a
3  patient to the hospital?
4      A.  The hospitalist?
5      Q.  Right.
6      A.  No, they do not.
7      Q.  Okay.  What's the importance, if any, of the
8  Saltzer pediatricians to Saint Alphonsus Nampa?
9      A.  Well, they, the Saltzer pediatricians, are the
10  only pediatricians in the market, and they provide the
11  inpatient care at the hospital, as well as well-baby checks
12  and come in on all of our C-sections.
13      Q.  Do -- what is the importance, if any, of the
14  Saltzer internal medicine physicians to Saint Alphonsus
15  Nampa?
16      A.  Well, they are the only internal medicine in
17  Nampa.  And internal medicine physicians take care of older
18  adults, which have more necessity to receive specialty care,
19  and so they're -- they're also critical for the hospital.
20      Q.  What role, if any, have Saltzer physicians had in
21  terms of your medical staff leadership?
22      A.  Well, we have -- currently, the head of our
23  credentialing committee is a Saltzer physician.  They also
24  lead our family practice section, as well as our pediatric
25  section, so they're -- and they are on our medical executive

871

1  committee, so they provide an important role in how the
2  hospital runs.
3      Q.  Based on your experience, are there any physician
4  groups in Nampa as important to your hospital as Saltzer?
5      A.  Maybe SAMG, but other than those two, they are
6  the -- Saltzer is the largest group, so --
7      Q.  Anybody else who is close to Saltzer or SAMG in
8  terms of its importance to the -- to the hospital?
9      A.  No.
10      Q.  I want to ask you some questions about your
11  experience with physicians working for St. Luke's.  Now, let
12  me start with the so-called -- what used to be the "Mercy
13  Physicians Group."  Are you familiar with those physicians?
14      A.  Yes, I am.
15      Q.  Can you just indicate who those doctors are and a
16  little bit of their history for background?
17      A.  There is Dr. Crownson, Dr. Cothern, Keefe,
18  Dr. Graham, Dr. Hansen, Dr. Ashaye, and Dr. Johnson.
19      Q.  And who -- were those doctors -- who do those
20  doctors work for today?
21      A.  They work for St. Luke's.
22      Q.  And who did they work for before they worked for
23  St. Luke's?
24      A.  Saint Alphonsus.
25      Q.  Saint Alphonsus Medical Group?

872

1      A.  Correct.
2      Q.  And then they are sometimes, colloquially,
3  referred to as "Mercy Physicians Group doctors."  At one
4  time when Mercy Medical Center owned it and CHI owned it,
5  were they part of the Mercy Physicians Group?
6      A.  That's correct, they were.
7      Q.  So taking that group of doctors, do any of them
8  have staff privileges, active staff privileges at Saint
9  Alphonsus Nampa today?
10      A.  No, they don't.
11      Q.  And how many of them did before they went to work
12  for St. Luke's?
13      A.  All seven.
14      Q.  And what happened to their staff privileges?
15      A.  They relinquished their privileges.
16      Q.  Was that at their initiative or the hospital's?
17      A.  That was theirs.
18      Q.  And by the way, what are active staff privileges?
19      A.  Essentially, active staff means you
20  provide -- well, at our hospital it's over 12 patient
21  accounts or patient activities at the hospital.  So you're
22  actively practicing at the hospital.
23      Q.  And so if they resign their active staff
24  privileges, can they freely admit patients to the hospital
25  or not?

873

1      A.  They can through the -- through the hospitalists.
2      Q.  Before they were part of St. Luke's, they had
3  privileges to admit patients directly, as well; correct?
4      A.  That's correct.
5      Q.  Before these doctors went to work for St. Luke's,
6  were any of them on boards or committees at the hospital?
7      A.  Yes.  Dr. Crownson was on the board of our
8  hospital.  He was a board member.  And then Dr. Cothern was
9  the chair of our quality committee.
10      Q.  Do either of those physicians have that position
11  today?
12      A.  They do not.
13      Q.  And why not?
14      A.  They relinquished their -- their positions.
15      Q.  Was that at their initiative or the hospital's
16  initiative?
17      A.  That was at their initiative, not the hospital's.
18      Q.  Is there a group of St. Luke's oncologists located
19  near the Saint Alphonsus Nampa?
20      A.  Yes.  Mountain States Tumor Institute is across
21  the street.
22      Q.  And was there a point at which those physicians
23  changed their status with regard to the Saint Alphonsus
24  Nampa medical staff?
25      A.  Yes.

874

1    Q.   And when did that happen?
2    A.   That happened in 2010.
3    Q.   Okay.  And in 2010, was that the year that Saint
4  Alphonsus Nampa bought that hospital?
5    A.   That's correct.
6    Q.   And do any of those oncologists who were across
7  the street have staff privileges at Saint Alphonsus Nampa
8  today?
9    A.   They do not.
10   Q.   Did they prior to Saint Alphonsus Nampa buying
11 that hospital?
12   A.   They all did, yes.
13   Q.   And why did -- at whose initiative did that
14 change?
15   A.   They initiated the change.
16   Q.   Prior to the Saltzer acquisitions, were there any
17 St. Luke's-employed specialists in addition to the
18 oncologists who were very near -- who were located very
19 nearby your hospital?
20   A.   Yes, the cardiologists, St. Luke's cardiology.
21   Q.   Where have they been located?
22   A.   They are in the Saltzer building in their clinics,
23 the -- essentially tens of feet away from our hospital.
24   Q.   So "tens of feet"?
25   A.   Yeah.  So maybe 50 feet.  It's a -- it's in our

875

1  parking lot, essentially.
2    Q.   Okay.  And do any of those cardiologists have any
3  staff privileges at Saint Alphonsus Nampa?
4    A.   No, they do not.
5    Q.   Are you aware of any of them ever having requested
6  such privileges?
7    A.   I am not aware of that.
8    Q.   If they did, would you be open to granting them
9  privileges at the hospital?
10   A.   Yes, definitely.
11   Q.   Does Saint Alphonsus Nampa have a cath lab?
12   A.   Yes, we do.
13   Q.   What is a cath lab?
14   A.   So a cath lab is where a cardiologist or an
15 interventional cardiologist goes to perform heart
16 procedures.
17   Q.   How far away is that cath lab from where the
18 St. Luke's cardiologists have their offices?
19   A.   It's, again, tens of feet, maybe 100 feet or less.
20   Q.   Okay.  And have any of these St. Luke's
21 cardiologists sought to use that cath lab?
22   A.   No, they have not.
23   Q.   Would you be open to their using that cath lab?
24   A.   Yes, I would.
25   Q.   Now, since the acquisition of Saltzer by St.

876

1  Luke's, are there any additional St. Luke's doctors that
2  you've observed practicing at the -- in the Saltzer offices
3  in your parking lot?
4    A.   Yes.
5    Q.   And what specialties?
6    A.   Urology, general surgery, ENT, orthopedics.
7    Q.   And have any of those physicians sought privileges
8  to practice at Saint Alphonsus Nampa?
9    A.   None of them.
10   Q.   Are any of them doing any work at Saint Alphonsus
11 Nampa?
12   A.   None of them.
13   Q.   Taking these examples we've just gone through as a
14 whole, can you think of any explanation for why none of
15 these doctors have privileges or are practicing at Saint
16 Alphonsus Nampa other than their affiliation with
17 St. Luke's?
18   A.   I cannot.
19   Q.   So how do you think, if the St. Luke's acquisition
20 of Saltzer is not unwound, how do you think that will affect
21 Saint Alphonsus Nampa?
22   A.   I think it will have a crippling effect.
23   Q.   Why do you think that?
24   A.   Well, again, as I said, you know, care starts in
25 the primary care office, so not having any of those

877

1  referrals to the organization will have, I think, a
2  devastating effect on the hospital.
3    Q.   What was the reaction of your employees when the
4  St. Luke's acquisition of Saltzer was announced?
5    A.   It was, I think, a little panic -- well,
6  definitely panic, I think a little hysteria, definitely
7  caused significant issues with the staff.
8    Q.   You've offered a general view as to the effect on
9  the hospital.  What would be the specific consequences on
10 your hospital of a Saltzer acquisition?
11   MR. STEIN:  Object to the foundation, Your Honor.
12 I would at least like to have some understanding for what
13 assumptions are being made about the mere impact of the
14 acquisition before we talk about consequences.  Certainly,
15 it can't be just the signing of legal documents between St.
16 Luke's and Saltzer.
17   THE COURT:  The objection is overruled.  You can
18 restate the objection once we get into details.  But I think
19 this was just, I guess, an introduction to get into some
20 specifics.  So the objection is overruled.
21   You may go ahead and answer it.
22   THE WITNESS:  Will you restate the question?
23 BY MR. ETTINGER:
24   Q.   The question is what are the -- you know, what do
25 you think the hospital will have to do, generally, in

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 14 of 68

878

1    response to a -- this acquisition if it is not unwound?
2        **A.**  Well, I believe we'll see a decrease in referrals,
3    **and we'll have to -- we'll have a -- have to decrease our**
4    **services that we provide.**
5            MR. ETTINGER:  Your Honor, I think we're now into
6    the "attorneys' eyes only" period.
7            THE COURT:  I'm going to have to ask everyone in
8    the courtroom who has not been otherwise advised that you
9    will need to leave.  I'm assuming Saint Al's employees --
10           MR. ETTINGER:  Yes, Your Honor.
11           THE COURT:  -- would be able to stay.
12           MR. ETTINGER:  Yes.
13           THE COURT:  But that would be the only exception.
14           MR. ETTINGER:  Yes, Your Honor.
15   ****** COURTROOM CLOSED TO THE PUBLIC ******
16           THE COURT:  Go ahead and proceed.
17           MR. ETTINGER:  Thank you, Your Honor.
18   BY MR. ETTINGER:
19       **Q.**  Will there be -- do you foresee any impact on
20   jobs?
21       **A.  Yes.**
22       **Q.**  And generally, what would those be?
23       **A.  Well, as we have done the analysis, we were**
24   **estimating around 140 jobs in different areas within the**
25   **facility.**

879

1            MR. STEIN:  Objection, Your Honor.  "Analysis"?
2            MR. ETTINGER:  Your Honor, the next witness,
3    Mr. Checketts, the CFO, will provide specific projections,
4    and I'm trying to ask Mr. Keeler to provide an overview and
5    his reasons, and the numbers will come from Mr. Checketts.
6            THE COURT:  Subject to that being tied in, I'll
7    overrule the objection.
8            Proceed.
9    BY MR. ETTINGER:
10       **Q.**  And do you think that the hospital's bottom line
11   will be significantly affected if the transaction goes
12   forward without being unwound?
13       **A.  Severely.**
14       **Q.**  What would be -- in your view, what will be the
15   effect on that portion of your staff that is not laid off?
16       **A.  Well, if you -- if you have major layoffs at your**
17   **facility there is just an anxiety throughout the facility,**
18   **and, you know, your other employees will think the ship is**
19   **going down, so they will look for other jobs.  So I think**
20   **there is just an overall net effect on morale within the**
21   **organization.**
22       **Q.**  And what will be, in your view, the effect on the
23   volume of the hospital's not -- patients who do not
24   originate with a Saltzer physician?
25       **A.  Well, if you're, you know, having major layoffs,**

880

1    **and the community hears you are having major layoffs, and**
2    **the people that are coming to your facility don't know, you**
3    **know, what's going on -- do you have enough staff?  Do you**
4    **have what you need to make sure you are providing good**
5    **quality care?  And so I think it will have a halo effect for**
6    **other patients.**
7        **Q.**  When you say "a halo effect," what do you mean?
8        **A.  That other patients will also look to say, hey,**
9    **maybe I need to seek care elsewhere because of what's going**
10   **on at the facility, because they've had to make such cuts in**
11   **the departments, as well as clinical services.**
12       **Q.**  Have you looked at what services might need to be
13   cut in the event of -- that this transaction proceeds
14   without being unwound?
15       **A.  We've -- we've done an analysis on a number of**
16   **different departments.  We haven't made any decisions,**
17   **obviously, but we've -- we've done the analysis.**
18       **Q.**  So what are some of the areas that you've taken a
19   close look at as possible service cuts?
20       **A.  Well, I think, as I mentioned earlier, some of the**
21   **services like the Meals on Wheels, like our van service.**
22   **We'd have to get into some services that we've implemented,**
23   **like our senior strategy for seniors in our OR, where we've**
24   **added pharmacists, where we've added social workers, where**
25   **we've added additional nurses with specific elder-care**

881

1    **training.  I think our pulmonologist intensivist in our ICU,**
2    **we've subsidized those significantly.  I think we'd have to**
3    **look at that.  Our pediatrics department, and then there is**
4    **other kind of low-margin clinical errors we would have to**
5    **look at.**
6        **Q.**  You said the seniors in the OR?
7        **A.  Oh, ER.  Excuse me.  Excuse me.  In our emergency**
8    **room.  Sorry.**
9        **Q.**  Do you foresee a possible impact on your quality
10   staff?
11       **A.  Yeah.  You know, we would -- we would look at**
12   **every department that is not a direct patient care**
13   **department.  And our quality staff is that; they are not**
14   **direct patient care.**
15       **Q.**  Now, you're aware, of course, that some of the
16   former Saltzer surgeons now work for SAMG?
17       **A.  Yes, I am.**
18       **Q.**  Do you believe that that will offset the harm that
19   you've been talking about if the Saltzer transaction goes
20   forward?
21       **A.  No, I don't.  They still rely on referrals from**
22   **primary care for those physicians.**
23       **Q.**  Could Saint Alphonsus simply recruit new primary
24   care physicians to replace the Saltzer primary care
25   physicians?

882

1     **A.  You can recruit physicians, but it is extremely**
2     **difficult.  You have a premier group in Saltzer that's been**
3     **there for 50 years.  And to -- it's difficult to recruit**
4     **docs, it takes a long time, as well as just getting**
5     **physicians up into a full practice takes time.  And we've**
6     **recruited a couple to date and they're not at that level.**
7     **They're not busy.**
8     **Q.**  Have you tried to recruit pediatricians?
9     **A.  We have.**
10    **Q.**  Any success at all?
11    **A.  We have not been able to recruit any.**
12    **Q.**  Have you tried to recruit general internal
13    medicine physicians?
14    **A.  We have.**
15    **Q.**  Any success at all?
16    **A.  Zero.**
17    **Q.**  Do you see any prospect that you could recruit
18    enough primary care physicians to provide a contribution to
19    the hospital comparable at all to what Saltzer has provided?
20    **A.  Nearly impossible.  I don't think it's possible.**
21    **Q.**  Okay.  Could you buy up other physician groups to
22    replace the impact of Saltzer?
23    **A.  There are none, so that -- that's not an option.**
24    **Q.**  And when you say "there are none," there are none
25    where?

883

1     **A.  So, essentially, in Nampa, the only other groups**
2     **there are from a -- there is a -- Primary Health has a**
3     **couple clinics in Nampa, but other than that, from a primary**
4     **care standpoint, there really isn't any other primary care,**
5     **inclusive of internal medicine and pediatrics.**
6     **Q.**  Is Saint Alphonsus Nampa in the process of
7     relocating any services from its current campus?
8     **A.  Yes.**
9     **Q.**  And what services are those?
10    **A.  Our obstetric department, as well as our cardiac**
11    center.
12
13
14
15
16
17                        REDACTED
18
19
20
21
22
23
24
25

884

1     relocation of other parts of the hospital services?
2     **A.  We're doing investigation on relocating the campus**
3     **on 12th to that location.**
4     **Q.**  And have any decisions been made by -- with regard
5     to that?
6     **A.  No, they have not.**
7     **Q.**  And who would make that final decision?
8     **A.  That's the board of Trinity Health.**
9     **Q.**  Okay.  At what stage is that process at?
10    **A.  That's in the investigation stage, so we're doing**
11    **all the analysis right now on the cost and the market and**
12    **everything like that.**
13    **Q.**  Okay.  Has there been any approval to do any
14    architectural work on that?
15    **A.  We've got preliminary approval.  So part of**
16    **Trinity's process, you need to have architecture on at least**
17    **part of the schematic design complete so they understand**
18    **what the cost, total cost, of the project is, as well as all**
19    **the market analysis.  So we have approval to actually do**
20    **that work so we can submit a full project with total costs.**
21    **Q.**  Has there been an approval to buy any land,
22    potentially to be used for that project?
23    **A.  Yes.**
24    **Q.**  But does that constitute a commitment to go
25    forward with the relocation of the hospital?

885

1     **A.  No.  You can -- you can lease the land.**
2     **Q.**  When would that decision be made?
3     **A.  Well, the final decision would be the summer of**
4     **next year.  June is when the board of directors for Trinity**
5     **Health makes the decision.**
6     **Q.**  Has the final presentation from Saint Alphonsus to
7     Trinity relating to this possibility been made yet?
8     **A.  No.  The normal process is that that's in January,**
9     **so it would be in January '14 when we would submit capital.**
10    **So as every other hospital within Trinity.**
11    **Q.**  I want to show you, just briefly, the Exhibit
12    2172, which we're going to put on the screen.  And what is
13    this document, generally, Mr. Keeler?  I just want to ask
14    about it generally.
15    **A.  This is a document where we ask to get dollars to**
16    **do design for the relocation hospital.**
17    **Q.**  Does it include possible projections?
18    **A.  Yes, it does.**
19    **Q.**  And what do those projections assume about the
20    acquisition of Saltzer?
21    **A.  We -- we assume that the -- there would not be an**
22    **acquisition of Saltzer.  They would remain independent.**
23    **Q.**  Okay.  And where is that assumption spelled out in
24    this document?
25    **A.  It's on the front page.  It's on this page right**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 16 of 68

886

1   here.
2       Q.  Okay.  So, do you think -- if a replacement
3   facility were built, do you think that would provide
4   benefits to Saint Alphonsus Nampa?
5       A.  Sorry.  Would you repeat the question?
6       Q.  If a replacement facility were built, do you think
7   that could provide benefits to Saint Alphonsus Nampa?
8       A.  Yes, I do.
9       Q.  And if the Saltzer transaction goes forward, is
10  not unwound, how do you think that will affect the ultimate
11  decision as to whether or not to build this facility?
12      A.  Well, I think we would have to go back and
13  reproject.  It would totally change the business plan.  We'd
14  have to go reproject all of the -- all of the information we
15  put in.  As part of this, it's put in as a potential threat,
16  but we'd have to actually go recalibrate all the numbers.
17      Q.  And would you expect the same level of success
18  that you would hope for if Saltzer were not unwound?
19      A.  Definitely not.  If you don't have the largest
20  referring group in Nampa as an independent, that
21  would -- that would definitely change the outcome.
22      Q.  Okay.  Now, if Saint Alphonsus were to relocate
23  the facility, would that provide any aid in recruiting
24  primary care physicians?
25      A.  I don't believe it would help in recruiting

887

1   primary care.  I think it would help a specialist, but not
2   primary care.
3       Q.  Okay.  And why not?
4       A.  Well, primary care, they don't provide care in the
5   hospital like they used to, so it's -- they're not -- they
6   spend time in their office, not in the hospital, so I don't
7   think it would affect the recruitment of primary care.
8       Q.  So if Saltzer were unwound by the court, what
9   actions would you take?
10      A.  We would continue to try to work with them and do
11  everything possible so they could be a viable, vibrant
12  independent group.
13          MR. ETTINGER:  Nothing further, Your Honor.
14          THE COURT:  Cross.  Mr. Stein.
15          MR. STEIN:  Your Honor, I will try to order my
16  cross so that we cover attorneys' eyes only now.
17          THE COURT:  Thank you.  I appreciate that.
18                  CROSS-EXAMINATION
19  BY MR. STEIN:
20      Q.  Mr. Keeler, Saint Alphonsus Nampa currently has a
21  monopoly on hospital services in Nampa; right?
22      A.  We are currently the only inpatient facility in
23  Nampa.
24      Q.  And you're aware that St. Luke's is considering
25  building a facility in Nampa to compete against Saint Al's

888

1   Nampa; right?
2       A.  I have heard that, yes.
3       Q.  And, in fact, Saint Al's believes that if
4   St. Luke's -- the St. Luke's hospital is in Nampa, it would
5   be devastating to Saint Al's Nampa, don't you?
6       A.  The hospital will be devastating?
7       Q.  Yes.  Just the competition from St. Luke's
8   hospital, Saint Al's believes that would be devastating.
9       A.  I think we -- I think it's something we would
10  compete on, so --
11      Q.  All right.  Why don't we pull up a capital
12  submission you made to Trinity for some of that work you
13  were just talking about with Mr. Ettinger, trial Exhibit
14  2086.
15          Now, we talked about this a little bit at your
16  deposition, Mr. Keeler.  This is the capital request that
17  Saint Al's submitted to Trinity Health requesting capital to
18  build the Nampa Health Plaza that was the moving --
19      A.  Do you have a copy of this?  I can barely read it.
20          MR. STEIN:  Yes.  Carol.
21          THE WITNESS:  Thank you.
22  BY MR. STEIN:
23      Q.  Mr. Keeler, can you confirm that this is a request
24  that was submitted to Trinity for capital to do some of the
25  work to move services up to the new site off the Garrett

889

1   exit off 84?
2       A.  This is -- this is to do precon for that.
3       Q.  That's right.  And this was prepared by Mr.
4   Checketts, your CFO, and then reviewed by you?
5       A.  That's correct.
6       Q.  And now can we call up the last paragraph on the
7   first page.
8           Mr. Keeler, you see there at the end of this document
9   that you approved, at the end of the third line, it says,
10  quote, Additionally, St. Luke's has announced in several
11  settings that they will break ground on a 100-bed hospital
12  in Nampa in the near future.  The negative impact on
13  inpatient and outpatient volume from this new hospital would
14  be devastating due to the newer facility that would be
15  offered and from the more favorable location."
16          Do you see that, Mr. Keeler?
17      A.  I see that.
18      Q.  That's Saint Al's assessment regardless of whether
19  the Saltzer transaction goes forward; right?
20      A.  This is the -- this is -- at that time, yes.
21      Q.  Right.  And you believe that if St. Luke's can
22  proceed with the Saltzer transaction, that that's going to
23  allow St. Luke's to move forward more quickly with building
24  this new hospital in Nampa; right?
25      A.  If the transaction happens, again, yes, I believe

890

1  that will accelerate it.
2      Q.  And so therefore, if in this court you can slow
3  down or unwind that transaction, you believe you could slow
4  down the building of a competing hospital in Nampa; right?
5      A.  No.  I don't think they are tied together, but I
6  think if St. Luke's is going to build, that's their
7  decision.  I don't think one is exactly tied to the other.
8      Q.  Well, actually you do think that, Mr. Keeler,
9  don't you?  You do think that if the Saltzer transaction
10  goes forward, St. Luke's will be able to move forward more
11  quickly with building a hospital than they would if the
12  transaction doesn't go forward?
13      A.  I don't think that will change them building the
14  hospital.
15      MR. STEIN:  Could we pull up clip 2.
16      (Clip of video deposition played.)
17  BY MR. STEIN:
18      Q.  You were asked that question, and you gave that
19  answer at your deposition, Mr. Keeler; correct?
20      A.  Yeah.
21      Q.  Now, you talked with Mr. Ettinger about some of
22  the improvements you've been able to achieve with
23  independent physicians, but the fact is that Saint Al's has
24  been increasing its employment of physicians every year for
25  at least the last decade; right?

891

1      A.  Saint Alphonsus, yes.
2      Q.  Yes.  And, in fact --
3  Can we pull up Exhibit 2082, George?
4  This is a presentation that was put together for Saint
5  Al's board of directors in July of 2012; is that right?
6      A.  That's what it looks like, yes.
7      Q.  And that's your name on the cover?
8      A.  It is.
9      Q.  Slide 13.
10  This is a slide in your presentation titled, "Market
11  Assessment, Physician Employment Increasing."  And am I
12  correct that the red lines there are Saint Alphonsus
13  employment of physicians over the years?
14      A.  That's correct.
15      Q.  And the bottom of the slide states, in the orange
16  box, "Rapid alignment of physicians is accelerating the
17  development of SAHS and St. Luke's into two integrated
18  health systems."
19  And "SAHS" there refers to Saint Alphonsus Health
20  System?
21      A.  That's correct.
22      Q.  And what that statement in the box means is that
23  through the employment of physicians, both St. Luke's and
24  Saint Al's are becoming more integrated systems; correct?
25      A.  Our model is both independent and employed, yes.

892

1  As our clinically integrated network, that's correct.
2      Q.  But what that statement means is that employment
3  of physicians -- because of the employment -- the two
4  systems are becoming more integrated; right?
5      A.  That we -- it says that we're acquiring more
6  physicians; correct, yeah.
7      Q.  And as a developing integrated regional health
8  system, the Saint Alphonsus Health System will have a
9  greater capacity to extend its reach and compete with the
10  integrated St. Luke's system; right?
11      A.  Sorry.  Repeat that question.
12      Q.  Sure.  As a developing integrated health system,
13  the Saint Alphonsus Health System will have a greater
14  capacity to compete with the St. Luke's integrated system;
15  right?
16      A.  Well, I think we -- as a hospital and -- we try to
17  compete, yes, in markets that we're -- that we're at.
18      Q.  Now, with regard to this work that's been going
19  on, this planning work, you talked about the fact that
20  services -- some services, like OB and cardiac, have been
21  moved to this new facility; is that right?
22      A.  That's correct.
23      Q.  And the new facility, that's what's known within
24  Saint Al's as Phase 1?
25      A.  That's correct.  It hasn't opened yet, but, yes.

893

1      Q.  And Phase 2 involves moving the rest of the
2  hospital up to the Garrity facility, which is right off 84;
3  right?
4      A.  That's correct.
5      Q.  One of the factors underlying Phase 2 is the
6  recognition by Saint Al's that the current facility is
7  inconveniently located vis-à-vis the hospital; right?
8  Vis-à-vis the highway.  Sorry.
9      A.  Yeah, we're not next to the highway; that's
10  correct.
11      Q.  Right.  So for a lot of Nampa residents, it's
12  actually quicker for them to hop on 84 to get to Meridian or
13  even Boise than it is to get to Saint Al's Nampa?
14      A.  For inpatient care, that's correct.
15      Q.  And that's going to continue to be the case
16  whether or not the Saltzer transaction goes forward?
17      A.  For some inpatient services, yes.  For some of
18  Nampa.
19      Q.  Now, you were asked some questions by Mr. Ettinger
20  about St. Luke's doctors and their status of their
21  privileges with respect to Saint Al's.  I think there may
22  have been some important facts left out that I want to
23  explore.
24  So with respect to the oncologists, the St. Luke's
25  oncologists, am I correct that for many years there was a

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 18 of 68

894

1   joint venture between Saint Al's and St. Luke's involving
2   the oncologists?
3       **A.   For radiation.**
4       **Q.**   For radiation?
5       **A.   Not medical oncologists.**
6       **Q.**   Right.  I'm talking about the oncologists who you
7   were referring to in your testimony?
8       **A.   Yeah.  I was referring to both medical and**
9   **radiation oncologists.**
10      **Q.**   And when I say "Saint Al's," it was actually a
11  partnership between physicians --
12      **A.   Mercy.**
13      **Q.**   -- between Mercy, before it was acquired by Saint
14  Al's, and St. Luke's; right?
15      **A.   Yes.**
16      **Q.**   And then after Saint Al's acquired Mercy, Saint
17  Alphonsus terminated that partnership; isn't that right?
18      **A.   The merger was unwound --**
19      **Q.**   It was unwound because Saint Alphonsus desired it
20  to be unwound; right?
21      **A.   Actually, I don't know about that.**
22      **Q.**   You don't know?
23      **A.   Actually, yeah, that I don't know.**
24      **Q.**   Okay.
25      **A.   That was --**

895

1       **Q.**   But it was after the unwinding of that
2   relationship that the St. Luke's physicians -- the
3   St. Luke's oncologists no longer practiced at Saint Al's;
4   correct?
5       **A.   That's not correct.  So the deal was unwound and**
6   **ended in the end of 2010.  The doctors -- the doctors**
7   **relinquished their privileges in 2010, and I think September**
8   **or October through the first of 2011.**
9       **Q.**   Right.
10      **A.   So they relinquished their privilege before the**
11  **unwinding.**
12      **Q.**   But when was it known that the transaction was
13  going to be unwinding?
14      **A.   And I don't know the exact timing of that.**
15      **Q.**   And the cardiologists you referred to, that are
16  affiliated with St. Luke's, they have never had privileges
17  at Saint Al's; right?
18      **A.   They have not.**
19      **Q.**   Nor have the urologists or the orthopedic surgeons
20  or the other individuals that work out of the Saltzer
21  building that you mentioned; right?
22      **A.   They have not had, in Saint Al's Nampa.**
23      **Q.**   So I knew you were struggling to think of reasons
24  why they might not want to practice at Saint Al's Nampa.  If
25  they did take privileges at Saint Al's Nampa, could they do

896

1   so without taking call?
2       **A.   Could they --**
3       **Q.**   Right, could they become active members of the
4   medical staff and not take call at Saint Al's Nampa?
5       **A.   All members of the medical staff take call.**
6       **Q.**   Right.  So maybe one reason they have decided not
7   to start practicing at Saint Al's Nampa is because they
8   don't want to take call at another hospital.  Could that be
9   a legitimate reason?
10      **A.   Well, it depends on the -- it depends on the**
11  **service.**
12      **Q.**   Well, that's certainly something you've heard from
13  physicians, right, that they don't like to take call?
14      **A.   I think any physician you talk to doesn't like to**
15  **take call.**
16      **Q.**   And with regard to your testimony about the likely
17  result of the Saltzer transaction, I want to make sure that
18  we understand what assumptions you've got in your head.  The
19  analysis that you referred to regarding what types of cuts
20  you might have to make, that's based on the analysis that
21  was done by Mr. Checketts that he's going to be talking
22  about in a little bit?
23      **A.   That's correct.**
24      **Q.**   Is that right?  And would you say that that
25  analysis, that -- you reviewed that analysis; right?

897

1       **A.   Yes.**
2       **Q.**   And was that analysis intended to be conservative
3   in terms of its assumptions and the impact of the
4   transaction on Saint Al's?
5       **A.   Oh, I think we tried to be realistic with what we**
6   **felt, based upon patterns that we've seen in other**
7   **acquisitions.**
8       **Q.**   And the assumption that you made and that
9   underlies your opinions today is that the pediatricians
10  affiliated with Saltzer are going to cease 100 percent of
11  their inpatient activity at Saint Al's Nampa; right?
12      **A.   In that analysis, yes.**
13      **Q.**   And you also assumed that the Saltzer family
14  practitioners, they are also going to immediately cease any
15  and all inpatient admissions to Saint Al's Nampa; right?
16      **A.   I think that was in the analysis.**
17      **Q.**   By the way, which Saltzer physicians told you that
18  they're going to completely cease 100 percent of their
19  admissions at Saint Al's Nampa?
20      **A.   Well, they had, a couple of times actually, met as**
21  **a group to decide are they or aren't they going to, so --**
22      **Q.**   Can you answer my question?  Did any Saltzer
23  doctors tell you, "We are going to completely cease
24  inpatient admissions at Saint Al's Nampa because of the
25  St. Luke's transaction"?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 19 of 68

898

1    A.    No, but according to the pattern that --
2    Q.    Thank you, Your Honor -- thank you, Mr. Keeler.
3    And the other -- the other assumption that you've made
4    is that the Saint Al's -- strike that.
5    The other assumption you've made is that the Saltzer
6    family practitioners are going to completely cease 100
7    percent of their use of Saint Al's Nampa through the
8    hospitalist program; right?
9    A.    That's correct.
10   Q.    And so if we can maybe reframe this, the
11   assumption you're making is that the Saltzer doctors, who
12   have been practicing in the Nampa community for years, are
13   going to just walk away from and abandon Mercy Medical
14   Center; right?
15   A.    Based on the patterns we've seen in other
16   acquisitions, yes.
17   Q.    Right.  And that's why Ms. Jeffcoat and you and
18   others are going out in the community telling people that
19   this transaction that the Saltzer doctors are entering into,
20   after many years of diligence, is something that's going to
21   harm the healthcare in Nampa; right?
22   A.    I guess I don't understand what going out and
23   telling the community --
24   Q.    Well, isn't that what Saint Al's is telling the
25   community, that this transaction is going to harm healthcare

899

1    in Nampa by harming Saint Alphonsus?
2    A.    I believe that based upon the pattern we've seen
3    from other acquisitions, that it will -- yes, it will
4    produce harm to the hospital.
5    Q.    And as somebody whose responsibilities include
6    physician relations, how do you think the Saltzer doctors
7    feel about Saint Al's going out and telling the state of
8    Idaho that this transaction they want to enter into is going
9    to harm the healthcare in the community in which they have
10   been based for over 50 years?  Do you think that's going to
11   help relations with Saint Al's?
12   A.    I think, temporarily, probably not.
13   Q.    Now, you also testified about the Mercy Medical
14   Group?
15   A.    Yes.
16   Q.    You, personally, have not analyzed any data
17   concerning referrals by the Mercy Group at Saint Al's;
18   correct?
19   A.    Lannie Checketts has done the analysis.
20   Q.    And of the seven doctors affiliated with Mercy,
21   isn't it true that only two of them ever had active
22   admitting privileges at Saint Al's?
23   A.    No, that's not correct.
24   Q.    Two of them, Drs. Cothern and Crownson, were
25   hospitalists?

900

1    A.    Yes, they were hospitalists, but all of them had
2    active privileges.
3    Q.    But the other physicians didn't admit patients
4    under their own name, typically, right; they used the
5    hospitalist program?
6    A.    No.  They were there before the hospitalist
7    program.
8    Q.    I understand they were there before the
9    hospitalist --
10   A.    And admitted patients before we had hospitalists.
11   Q.    Let's put it this way:  Would you agree that it's
12   -- between your memory of the data and Saint Alphonsus'
13   actual data, that the data would be a more accurate
14   reflection of the activity of the Mercy Group doctors?
15   A.    Repeat the question.
16   Q.    Would you agree that as between the actual Saint
17   Alphonsus admitting data and your memory of that data, that
18   the data would be the more accurate place to go in order to
19   evaluate the activity of the Mercy Group physicians?
20   A.    For admission of patients?
21   Q.    Yes.
22   A.    So if they admitted a patient, it would be under
23   their name, yes.
24   Q.    And the Saint Al's data tracks the name of the
25   admitting physician.  That's one of the fields; right?

901

1    A.    That's correct.
2    Q.    And if a Mercy Group doctor sends a patient to be
3    admitted to the hospitalist program, the hospitalist is the
4    one that's going to be identified as the admitting
5    physician; right?
6    A.    Well, we have multiple fields, so we have a field
7    of who the primary care doctor is, as well as who is the
8    referring and who is the admitting.
9    Q.    Okay.  So if you wanted to -- if you wanted to get
10   the most accurate picture from Saint Al's data as to who the
11   primary care doctor was that admitted a patient to Saint
12   Al's Nampa, which field would you go look at, the admitting
13   field or the primary care field?
14   A.    Well, if it was -- whoever admitted, we would look
15   at the admitted field.  Sorry.
16   Q.    Sure.  Let's walk this out.  If a Mercy Group
17   doctor uses the hospitalist program exclusively, then that
18   Mercy Group doctor is not going to be identified as the
19   admitting physician in the Saint Al's data; right?
20   A.    It would be in the referring.  They would not be
21   in the admitting; that's correct.
22   Q.    Right.  So you couldn't look at the admitting
23   physician data and reach a conclusion about the extent to
24   which primary care doctors are referring patients to
25   hospitalists?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 20 of 68

902

1    **A.**  No.  You would have to look at the -- you would
2    have to look at who the primary care doc was, not the
3    admitting.  The admitting is the one who is actually taking
4    care of the patients in the hospital.
5    **Q.**  And those Mercy Medical Group doctors there were
6    seven of those doctors in Nampa?
7    **A.**  That is correct.
8    **Q.**  And were those -- was that an important group to
9    Saint Al's Nampa?
10   **A.**  Well, as part of Mercy, they were, yes; as they
11   moved over to Saint Alphonsus, yes.
12

13                     REDACTED
14
15
16
17
18         MR. ETTINGER:  Objection, Your Honor.  The
19   question calls for hearsay, and we just got some hearsay.
20         THE COURT:  Sustained.
21   BY MR. STEIN:
22                     REDACTED
23
24
25         MR. ETTINGER:  Your Honor --

903

1         MR. STEIN:  Your Honor, this isn't hearsay.  This
2    gets to why Saint -- to the claim by Saint Al's about the
3    importance of these Mercy Group doctors, and if they were so
4    important, why Saint Al's allowed them to leave.
5
6                     REDACTED
7
8
9         MR. ETTINGER:  Mr. Stein is asking what these
10   doctors said to try to prove the truth of what they said.
11        MR. STEIN:  I'm not -- I'm not trying -- I'm
12   trying to prove --
13        THE COURT:  Counsel, just a moment.  Just a
14   moment.  All right.
15        Mr. Stein, one more time.  Why is it relevant as to
16   what the witness thought the Mercy Group doctors' motivation
17   was or was not?
18        MR. STEIN:  It goes to the claim by the plaintiffs
19   that Nampa is the right market.       REDACTED
20
21                     REDACTED                    And I think it
22   allows us to argue, Your Honor, that if this group, if this
23   group of seven primary care doctors in Nampa was so
24   important, why did they let them walk away and go to
25   St. Luke's when it was in their control to not have that

904

1    happen?
2         And Your Honor is going to be hearing about this group,
3    this Mercy Medical Group, from other Saint Al's witnesses
4    and from their experts.  This won't take -- this really
5    won't take that long.
6         THE COURT:  It's not a question of time.  It's
7    either hearsay or it's not, so --
8         MR. STEIN:  I'm not offering it for the truth.
9         THE COURT:  Well, I'm not sure what relevance it
10   has if not for the truth, so I'll sustain the objection.
11        MR. STEIN:  Your Honor, that's fine.  I'll move
12   on.
13   BY MR. STEIN:
14   **Q.**  Now, Mr. Keeler, you testified in your direct
15   about concerns that Saint Al's has about the Saltzer
16   transaction, but notwithstanding those concerns, you hired a
17   number of former Saltzer surgeons in the fall of 2012;
18   right?
19   **A.**  The medical group did; correct.
20   **Q.**  And when those former Saltzer surgeons were
21   employed by Saltzer, a large part of their referrals came
22   from Saltzer primary care doctors?
23   **A.**  That's correct.
24   **Q.**  And when you made the decision to hire the Saltzer
25   surgeons it was your belief that the rest of the Saltzer

905

1    group, including the primary care docs, was going to be
2    affiliating with St. Luke's; right?
3    **A.**  So at the time that they joined, I knew that there
4    was the investigation going on with the attorney general,
5    FTC, and us, so didn't know if it was actually going to
6    happen, but I knew that it was -- at least St. Luke's was
7    moving down the path, yes.
8    **Q.**  Right.  And what you're saying is that you hired
9    all of the surgeons, believing that a large portion of their
10   referral base was going to evaporate as a result of the
11   St. Luke's transaction?
12   **A.**  Well, the hospital, the medical group hired them.
13   The hospital is -- we depend on them more for just doing
14   general cases.  Our emergency department depends on
15   orthopedic surgeons to just have a general emergency
16   department to run.
17   **Q.**  You knew at the time that you hired the Saltzer
18   surgeons that a large portion of their referral base was
19   likely to evaporate?
20   **A.**  Correct.
21   **Q.**  At the time that Saint Al's opened the Nampa
22   Health Plaza last year, you knew that Saltzer was going to
23   be proceeding with the affiliation with St. Luke's; right?
24   **A.**  Okay.  I don't know what you're referring to.
25   **Q.**  Do you know what the Nampa Health Plaza is?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 21 of 68

906

1     **A.**   Yeah.  The Nampa Health Plaza has been open since
2     2002, so you're going to have to be specific what you're
3     talking about.
4          **Q.**   I'm talking about the services that you moved up
5     there last year.  You don't -- you don't have any clue what
6     I'm talking about?
7          **A.**   Well, we've opened up an emergency department this
8     year, and we're opening up other things this year.  We
9     opened up a wound care department last year.  So I guess I'm
10    trying to get specifically what you're --
11         **Q.**   Right.
12         **A.**   -- talking about of services.
13         **Q.**   Right.  And all that -- all that activity that you
14    have undertaken has been done knowing that St. Luke's is
15    proceeding with the Saltzer transaction; right?
16         **A.**   No.  We've been working on that facility actually
17    since I got here in 2010.
18         **Q.**   Right.  And you're still moving forward with it,
19    still moving the services up there, still --
20         **A.**   Yeah, but that had nothing to do with whether
21    Saltzer was -- so, no.
22         **Q.**   And in January of this year, two months after
23    Saint Al's filed this lawsuit, Saint Al's asked Trinity to
24    allocate about $20 million for planning work for Phase 2 of
25    that development; right?

907

1          **A.**   Phase 2, yes, and a medical office building.
2          **Q.**   And that request was approved by Trinity; right?
3          **A.**   Yes.
4          **Q.**   You talked about one of the advantages of building
5     a new facility near the highway being the ability to recruit
6     specialists; is that right?
7          **A.**   Yes.
8          **Q.**   And is it -- am I correct that Saint Al's has had
9     difficulty recruiting specialists into Nampa?
10         **A.**   Not the same as primary care, but we have -- we've
11    been able to recruit a couple, so pulmonologists, general
12    surgeons.
13         **Q.**   Would you agree it would be extremely difficult to
14    recruit, at one time, a large number of specialists of one
15    type in to Nampa?
16         **A.**   Is it difficult to recruit a large number?
17         **Q.**   Yes.
18         **A.**   I would say yes, it's different to recruit a large
19    number.
20              MR. STEIN:  No further questions.
21              THE COURT:  Can we bring -- open the courtroom
22    again, or are we -- if you just have a few questions,
23    perhaps --
24              MR. STEIN:  I'm sorry, Your Honor.  I blew past
25    the --

908

1              THE COURT:  That's all right.  It's
2     understandable.
3              MR. ETTINGER:  Could we have a minute, Your Honor?
4              THE COURT:  Yes.
5              MR. STEIN:  We're okay, Your Honor.
6              THE COURT:  All right.
7     Mr. Ettinger, do you just have a few questions?
8              MR. ETTINGER:  Just a few, Your Honor.  It's
9     probably simpler to get them done, because they can touch on
10    the AEO, at least one or two of them do.
11              REDIRECT EXAMINATION
12    BY MR. ETTINGER:
13         **Q.**   Mr. Keeler, the approval that occurred in January,
14    what was that for, exactly?
15         **A.**   The approval was for some purchase of land.  It
16    was also for doing investigation work or doing the pro
17    forma, just to submit for a full approval the next year, as
18    well as to build a medical office building.  So the 20
19    million, 13 of it was for a medical office building.
20         **Q.**   So has there been any approval from Trinity in
21    terms of relocating the rest of the hospital?
22         **A.**   Definitely no.
23         **Q.**   If the hospital were relocated and Saltzer were
24    not acquired by St. Luke's, do you have concerns about your
25    ability to compete with a new St. Luke's hospital in Nampa?

909

1          **A.**   No.
2          **Q.**   If Saltzer is acquired by St. Luke's and that
3     acquisition goes forward and St. Luke's builds a new
4     hospital in Nampa, do you have concerns about your ability
5     to compete with that hospital?
6          **A.**   Hospitals depend on referrals from primary care
7     docs, and that would be very difficult to compete.
8          **Q.**   Why don't you turn to -- Mr. Stein asked you about
9     Exhibit 2082, page 13.  I just have one question about that
10    page.
11         Do you see the language, "when mid-levels are
12    considered" there?
13         **A.**   Yes, I do.
14         **Q.**   Is a mid-level the equivalent of a physician
15    in -- in your view?
16         **A.**   No, it is not.
17         **Q.**   And what is a mid-level?
18         **A.**   A mid-level is either a nurse practitioner or a
19    physician's assistant, a PA.
20         **Q.**   Okay.  And does Saint Alphonsus utilize mid-levels
21    to a substantial degree?
22         **A.**   We do.  We have a number of mid-levels.
23         **Q.**   Okay.
24              MR. ETTINGER:  Your Honor, I have no further
25    questions.  I don't know whether this is necessary or not,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW Document 554 Filed 11/04/14 Page 22 of 68

Bench Trial, 09/30/2013

910

1  but when I made that hearsay objection, Mr. Keeler had
2  gotten out about half a sentence on the topic, and I assume
3  that -- is that not in evidence, and we can move to strike
4  it?
5          THE COURT: The part that any response -- what
6  would be stricken would not be considered.
7          MR. ETTINGER: Okay. Thank you, Your Honor.
8          THE COURT: Mr. Stein.
9          MR. STEIN: Can we put Exhibit 2086 back up,
10 George, the second page.
11             RECROSS-EXAMINATION
12 BY MR. STEIN:
13     **Q.** Mr. Keeler, did I understand you to be walking
14 away from the statement that a St. Luke's facility in Nampa
15 would be devastating to Saint Al's regardless of whether the
16 Saltzer transaction goes forward?
17     **A.** I think we would be able to compete, yeah.
18     **Q.** Let's just pull up that last paragraph again. And
19 you've got the document there. Let me know if there is
20 something we're missing in the last paragraph, or elsewhere,
21 where it says in this document that the construction of a
22 new facility by St. Luke's in Nampa would be devastating
23 only if the Saltzer transaction proceeds.
24     **A.** It doesn't say that, but that's not what I
25 believe.

911

1          MR. STEIN: Thank you.
2          MR. ETTINGER: Your Honor, very briefly on the
3  same paragraph.
4          THE COURT: This will be last question.
5             FURTHER REDIRECT EXAMINATION
6  BY MR. ETTINGER:
7     **Q.** Does the sentence that Mr. Stein has referred to,
8  that was just up on the screen --
9          And would you leave it up, please, if you don't mind.
10 Thank you.
11         That sentence, does that assume that the hospital will
12 or will not be relocated?
13     **A.** Let's see. Well, this would -- in this, it would
14 say that the hospital was not relocated.
15         MR. ETTINGER: Thank you. No further questions.
16         THE COURT: All right. You may step down.
17 I assume the witness -- we did cover on some direct.
18 This witness will not be re-called; is that correct?
19         MR. STEIN: He will not be re-called. We may have
20 some testimony through deposition in our case in chief, but
21 he will not be re-called live.
22         THE COURT: All right. Thank you very much.
23 Call your next witness. And may we open it to the
24 public?
25         MR. ETTINGER: We may, Your Honor, though there

912

1  will be some periods for which we --
2          THE COURT: Can you cover it early on? Let's just
3  proceed. I don't want you to struggle too hard to try to
4  restructure --
5          MR. ETTINGER: Your Honor, we're going to be
6  taking the witness through these financial projections.
7  What I'm going to do is keep the courtroom open, but the
8  demonstratives are going to have to be shielded from the
9  screens because they're specific financial numbers, and then
10 there will be a point at which I think we just need to clear
11 the courtroom.
12         THE COURT: All right. Very good.
13         MR. ETTINGER: I'll do my best.
14         THE COURT: It's Mr. Checketts, as I understand
15 it.
16         MR. ETTINGER: Yes.
17         THE COURT: Sir, will you please step before the
18 clerk, be sworn as a witness and then follow Ms. Gearhart's
19 directions from there.
20         While that's going on, can we open the courtroom then,
21 for at least some period of time.
22         ****** COURTROOM OPEN TO THE PUBLIC ******
23             BRIAN LANNIE CHECKETTS,
24 having been first duly sworn to tell the whole truth,
25 testified as follows:

913

1          THE CLERK: Please take a seat in the witness
2  stand.
3          Please state your complete name and spell your name for
4  the record.
5          THE WITNESS: Brian Lannie Checketts, B-R-I-A-N
6  L-A-N-N-I-E C-H-E-C-K-E-T-T-S.
7          THE COURT: You may inquire. Mr. Ettinger.
8          MR. ETTINGER: Thank you, Your Honor.
9             DIRECT EXAMINATION
10 BY MR. ETTINGER:
11     **Q.** Mr. Checketts, what is your position?
12     **A.** I am vice president of finance and chief financial
13 officer at Saint Alphonsus Medical Center in Nampa.
14     **Q.** What are your responsibilities in that role?
15     **A.** I have oversight and responsibilities for the
16 financial operations of the hospital and some other
17 operations responsibilities, as well.
18     **Q.** And what other departments do you have
19 responsibilities for beyond finance, as such?
20     **A.** Medical records and facilities and construction.
21     **Q.** Do you have any role at the hospital with regard
22 to the medical executive committee?
23     **A.** In the past, I attended that committee meeting.
24     **Q.** And what is the medical executive committee?
25     **A.** It's comprised of physician leaders and chairs of

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench trial, 09/30/2013

914

1  departments and areas of the hospital that meet monthly to
2  discuss physician matters.
3       Q.  And do you have any responsibility for physician
4  contracts?
5       A.  Yes, I do.
6       Q.  And what is that responsibility?
7       A.  I'm involved in the negotiation for medical
8  directorships, employment agreements, and when the hospital
9  purchases services from physicians or physician groups.
10      Q.  And do you participate in senior leadership
11 meetings at Saint Alphonsus Nampa?
12      A.  Yes, I do.
13      Q.  And what happens at senior leadership meetings?
14      A.  So we discuss the operations of the hospital,
15 which includes discussions regarding employees, patients,
16 and physicians.
17      Q.  And have you had any responsibilities for imaging
18 and lab services at the hospital?
19      A.  I have in the past, yes.
20      Q.  And what have been those responsibilities?
21      A.  I had oversight of those departments -- oversight
22 responsibility for those departments.
23      Q.  Any other departments that you've had oversight
24 responsibilities at, at Saint Alphonsus Nampa?
25      A.  Also cardiology.

915

1       Q.  And do you have any role with regard to the
2  hospital strategic plan?
3       A.  Yes, I do.
4       Q.  And what role is that?
5       A.  I have a leadership role in that responsibility.
6       Q.  Do you -- when the hospital was Mercy Medical
7  Center, did you have any responsibility for managed care
8  negotiations?
9       A.  Yes, I did.
10      Q.  And did that include dealings with Advantage Care
11 Network?
12      A.  Yes.
13      Q.  ACN.  You're familiar with a group called MPG or
14 Mercy Physicians Group?
15      A.  Yes, I am.
16      Q.  What was that group?
17      A.  That was the hospital group prior to the
18 acquisition of Mercy Medical Center by the Trinity Health
19 system, and that was -- that was a hospital group that was
20 owned by the hospital.
21      Q.  And did that group -- when you were there at Mercy
22 Medical Center, did that group have contracts in network
23 with Advantage Care Network?
24      A.  Yes.
25      Q.  Did that group participate in Blue Cross

916

1  contracts?
2       A.  Yes.
3       Q.  Regence Blue Shield contracts?
4       A.  Yes.
5       Q.  IPN contracts?
6       A.  Yes.
7       Q.  And did those physicians -- when Saint Alphonsus
8  bought that hospital, who did those physicians become
9  employed by?
10      A.  They became employed by Saint Alphonsus Medical
11 Group.
12      Q.  So when they became employed by SAMG, did they
13 participate in contracts with ACN?
14      A.  Yes.
15      Q.  With Blue Cross?
16      A.  Yes.
17      Q.  With Regence Blue Shield?
18      A.  Yes.
19      Q.  With IPN?
20      A.  Yes.
21      Q.  Okay.  Were you ever interim CEO of the hospital
22 that's now called Saint Alphonsus Nampa?
23      A.  I was.
24      Q.  Do you have interactions with physicians as part
25 of your job?

917

1       A.  Yes, I do.
2       Q.  And what's the nature of those interactions?
3       A.  Contract negotiations.  I meet with them in
4  various meetings of the hospital, talk with them on the
5  phone, see them in the hallway.
6       Q.  And how long have you worked at the hospital
7  that's now called Saint Alphonsus Nampa?
8       A.  Since 1999.
9       Q.  And what position have you had during those years?
10      A.  Chief financial officer.
11      Q.  And that's been true since 1999?
12      A.  Other than the role for six months as interim CEO,
13 yes.
14      Q.  What's your educational background?
15      A.  I have a bachelor's degree in accounting and a
16 master's in business administration.
17      Q.  And how long have you worked in healthcare?
18      A.  Since 1985.
19      Q.  So in the course of your work as CFO, have you
20 been involved in the preparation of projections?
21      A.  Yes, I have.
22      Q.  Roughly how many times?
23      A.  At least a hundred.
24      Q.  Over what period of time have you been involved in
25 preparing hospital projections?

918

1      **A.**  Since 1985.

2      **Q.**  For what purposes have you been involved in

3  preparing hospital projections?

4      **A.  Prepared them for a variety of reasons, for**

5  **looking at feasibility studies, for looking at capital**

6  **projects, assessing business lines, things of that nature.**

7      **Q.**  Okay.  Have you had any opportunity after the fact

8  to assess the accuracy of your projections?

9      **A.  Yes, I have.**

10     **Q.**  And has your ability to prepare projections, do

11  you think that's improved or gotten worse or stayed about

12  the same over the years?

13     **A.  I think they have improved.**

14     **Q.**  And why do you think that?

15     **A.  Because I have an opportunity after the facts to**

16  **look at projections as they play out --**

17         MR. STEIN:  Objection, Your Honor.  If he's going

18  to testify about -- try to establish that he's an accurate

19  projector based on other projections, I think those have not

20  been produced.

21         MR. ETTINGER:  Your Honor, we --

22         MR. STEIN:  I don't think that's fair.

23         MR. ETTINGER:  We are not going to try to come up

24  with a batting average or any precise --

25         MR. STEIN:  Well, but that's --

919

1         MR. ETTINGER:  I would like to finish.  Mr. Stein,

2  I would like to finish if you wouldn't mind.

3      -- any precise measure of it.  We would like to point

4  out that he has substantial experience and he's attempted to

5  improve over time and doing so, and he's had lots of

6  opportunities for feedback; that's all.

7         THE COURT:  Well, he has testified to that, which

8  he can.  But if we're going to get into trying to quantify

9  his accuracy, in any way, then I think the underlying data

10  has to be provided; otherwise, we're probably just going to

11  have to be left with his own general assessment and, you

12  know, I suppose specific events in which he can show that,

13  but not some kind of a hypothetical batting average of

14  sorts.

15         MR. ETTINGER:  And I have no intention of

16  seeking --

17         THE COURT:  Let's see where we go, and then,

18  Mr. Stein, you can renew the objection.

19         Proceed, but with that direction.  If we're going to

20  get into some indication that he, in fact, has a particular

21  success rate, then obviously the underlying information

22  needs to have been made available.

23         MR. ETTINGER:  Your Honor, I'll just take that off

24  the table, but I was going to ask it.

25  BY MR. ETTINGER:

920

1      **Q.**  Mr. Checketts, yes or no, have you ever tried to

2  calculate a quantitative success rate or a batting average

3  for your projections?

4      **A.  No.**

5      **Q.**  Over the years, do you believe that your ability

6  to prepare good projections has improved, gotten worse, or

7  stayed about the same?

8      **A.  It's improved.**

9      **Q.**  Why do you think that?

10     **A.  Because of the opportunity I have had to do**

11  **look-backs and to assess performance and take that**

12  **information and improve future projections.**

13     **Q.**  What is -- just as a little more background, what

14  is the -- roughly the market area of the hospital, Saint

15  Alphonsus Nampa?

16     **A.  It includes Nampa city, the impact area**

17  **surrounding, and basically the drive time of about 15, 20**

18  **minutes from the hospital.**

19     **Q.**  And does that apply to the hospital or to primary

20  care physicians?

21     **A.  To the hospital.**

22     **Q.**  Okay.

23         MR. ETTINGER:  Your Honor, I want to put up

24  Exhibit 1661 but not show it on the public screens, if we

25  may.

921

1  BY MR. ETTINGER:

2      **Q.**  Just generally, what is Exhibit 1661, Mr.

3  Checketts?

4      **A.  These are the projections that I prepared to**

5  **measure the impacts of the Saltzer referral loss.**

6      **Q.**  Okay.  And why did you prepare these projections?

7      **A.  I prepared them at the request of Sally Jeffcoat.**

8      **Q.**  And to whom did you -- Sally Jeffcoat is who?

9      **A.  She is the CEO of the Saint Alphonsus Health**

10  **System.**

11     **Q.**  And to whom did you present your projections?

12     **A.  To Sally Jeffcoat, to Blaine Petersen, Karl**

13  **Keeler, and to the Nampa -- Saint Alphonsus Medical Center**

14  **Nampa community board.**

15     **Q.**  Who provided you with information related to the

16  projections?

17     **A.  Blaine Petersen, Karl Keeler, Nancy Powell, and**

18  **Dr. Dustan Hughes.**

19     **Q.**  By the way, who is Blaine Petersen?

20     **A.  Blaine Petersen is the CFO of the Saint Alphonsus**

21  **Health System.**

22     **Q.**  Are you aware of whether any particular decisions

23  were made with the aid of these projections?

24     **A.  Yes.**

25     **Q.**  And what decisions were those?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 25 of 68

922

1    A.  The decisions to -- whether or not to pursue legal
2  recourse for the Saltzer transaction.
3    Q.  How many different drafts did you prepare of the
4  projections?
5    A.  20.  At least 20.
6    Q.  Okay.  I would like to show you now some
7  demonstratives.  Start out with demonstrative No. 1, if we
8  could.  This could be on the public screen.
9    You know -- well, why don't we take it off the public
10 screen.  I'm sorry, Your Honor.  There is a number on it,
11 even though it's largely conceptual.
12   So what does demonstrative 1 depict, Mr. Checketts?
13   A.  This demonstrates the impact that different types
14 of costs have; in particular, fixed costs that a hospital
15 incurs.
16   Q.  And what are fixed costs?
17   A.  So fixed costs are those costs that do not vary
18 when hospital volume changes.
19   Q.  And you list here, as examples of fixed costs,
20 "minimum clinical staffing."  What is minimum clinical
21 staffing?
22   A.  So an example, that would be, for an emergency
23 room, where there is a minimal number of personnel that are
24 necessary to safely deliver care no matter how many patients
25 are seen or not seen that day in the ER.

923

1    Q.  And the other costs -- what are some other
2  examples of fixed costs in a hospital?
3    A.  Well, there is administrative expenses associated
4  with management, of course, utilities, depreciation,
5  contracts for maintenance, and things of that nature.
6    Q.  And are fixed costs a substantial or insubstantial
7  portion of the costs at a hospital like Saint Alphonsus
8  Nampa?
9    A.  They are substantial.
10   Q.  Okay.  Why don't we go to demonstrative 2.
11   MR. ETTINGER:  And since this is a wholly
12 illustrative calculation, Your Honor, I believe we can keep
13 this on the public screen.
14   THE COURT:  That can go on the public screen?
15   MR. ETTINGER:  Yes.
16 BY MR. ETTINGER:
17   Q.  Now, what does demonstrative 2 illustrate,
18 Mr. Checketts?
19   A.  This demonstrates the impacts of fixed costs to a
20 hospital when a change in volume occurs, and the fact that
21 that impact has a disproportionate impact to the operating
22 income.
23   Q.  Why does it have a disproportionate impact to the
24 operating income?
25   A.  Well, for example, in this example, you can see

924

1  that the fixed costs are the same under two scenarios.  One
2  is the original at 99 million, next is 89 million, which is
3  a 10 percent decrease.  And with those costs remaining the
4  same, under the original, the net income is 3 and a half
5  million and under the new scenario, it loses 350,000.  And
6  the reason being is that the fixed costs are at 35 percent,
7  approximately, under the first scenario.  Under the second
8  scenario, that changes to about 39 or 40 percent.
9    Q.  So when the revenue goes down, do the variable
10 costs drop commensurately?
11   A.  Variable costs do drop, yes.
12   Q.  Do the fixed costs drop at all?
13   A.  No, they do not.
14   Q.  And so here you've got a 10 percent reduction in
15 patient volume.  Is the reduction in operating income -- how
16 does that compare to the 10 percent?
17   A.  It's far worse than a 10 percent decrease in
18 operating income.
19   Q.  Okay.  So how does -- we haven't yet talked about
20 Saltzer.  If you have -- what does this -- this example tell
21 you about, if anything, about the impact on a hospital like
22 Saint Alphonsus Nampa if it were to lose a major source of
23 revenue?
24   A.  Well, if it were, then because of the fixed costs
25 structure, it would have a disproportionate impact on the

925

1  bottom line of the hospital.  It would be very detrimental.
2    Q.  Why don't we go --
3    MR. ETTINGER:  Your Honor, the rest of the
4  demonstratives, I think, all need to be on blank screens
5  because they are using actual numbers.
6    THE COURT:  Counsel, just so I'm clear, the
7  demonstratives, these were created by this witness for -- to
8  essentially allow him to explain his testimony; correct?
9    MR. ETTINGER:  Yes, Your Honor.
10   THE COURT:  Okay.
11   MR. ETTINGER:  Your Honor, demonstratives 1 and 2
12 were just hypothetical and illustrative.  The remaining
13 demonstratives are -- and I'll bring this out with the
14 witness -- are simply pulled from the projections.  But
15 because the projections are a pretty dense document, we
16 thought we would take certain lines in the projections and
17 highlight them in demonstratives.
18   THE COURT:  The projections were objected to with
19 1661; there was an objection as to foundation and hearsay.
20 Are those still --
21   MR. STEIN:  Well, I think we'll have to see how
22 the testimony comes in and whether the witness is -- lays
23 the foundation.  I have no objection to Mr. Ettinger using
24 the demonstratives during the exam.
25   THE COURT:  Where it's a court trial, I mean,

926

1   I -- I guess, early on, on the bench, I had become a real
2   advocate of using demonstratives in jury trials, but with
3   the understanding they do not go back to the jury room.
4   They simply allow a witness to explain, better explain their
5   testimony.
6        With a court trial, it's a little bit of a fuzzier line
7   between what's a demonstrative and what is a substantive
8   exhibit, since I will virtually guarantee you I will
9   probably want to see those demonstratives in the same way I
10  want to see my notes and whatnot.
11       But let's go ahead and proceed.  I'm just indicating I
12  will probably be a little bit more lenient in allowing
13  documents to come in, certainly as demonstratives, but with
14  the understanding I am going to review them as we prepare a
15  decision in this matter.
16            MR. ETTINGER:  Yes, Your Honor.  As I tried to
17  indicate, starting with the next one, these are literally
18  extracted from the underlying exhibit, so they are simply
19  more for convenience than --
20            THE COURT:  Well, true.  But the problem is the
21  underlying exhibit, so far, has been objected to.  We'll
22  have to sort that out.
23            MR. STEIN:  If I can actually try to help
24  Mr. Ettinger here.  I don't have an issue with the use of
25  the demonstratives.  Obviously, we understand to the extent

927

1   the exhibit doesn't come in, the demonstratives won't have
2   much value in and of themselves because they are just
3   summarizing.
4            THE COURT:  True.
5            MR. STEIN:  To the extent they just summarize the
6   numbers in the exhibit, we don't have any issue with it.
7            THE COURT:  Counsel, we're going to take a break
8   in about ten minutes, so I'll give you that advance notice
9   to sort out where you want to -- I mean you can take your
10  break anytime in the next ten minutes.
11       Go ahead and proceed.
12            MR. ETTINGER:  Well, Your Honor, since we're about
13  to head into the substance of the projections, maybe this is
14  a good time.
15            THE COURT:  All right, if that will help so you
16  don't have to disrupt your testimony.  We're a little bit
17  early, but -- that's probably better to just go ahead and
18  take the break.
19       We'll reconvene in 15 minutes.  We'll be in recess.
20       (Recess.)
21       ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
22            THE COURT:  Counsel, let's go ahead and proceed.
23  At the next break, I'm going to have Ms. Gearhart, for the
24  record, publish all of the depositions that we dealt with,
25  but I think let's wait until we have a witness being called,

928

1   and we can do that just to save time.
2        Go ahead.  You may examine the witness.
3        And Mr. Checketts, I'll remind you, you are still under
4   oath.
5   BY MR. ETTINGER:
6        Q.   So let's look at demonstrative No. 3 but not put
7   it up on the big screen, if we might.  What does
8   demonstrative No. 3 depict, Mr. Checketts?
9        A.   These are the original baseline projections in
10  the -- for the projections that I did that -- prior to any
11  impact of the Saltzer Medical Group changes being added to
12  them.
13       Q.   So what do you mean by "baseline projections"?
14       A.   So, again, this is -- this is budgets and
15  projections moving forward, sort of a status quo.
16       Q.   And were these baseline projections prepared and
17  ordered to analyze the impact of the Saltzer acquisition or
18  for some other purpose?
19       A.   For some other purpose.
20       Q.   And what purpose was that?
21       A.   That was for our annual strategic financial
22  planning process.
23       Q.   And do these baseline projections include the
24  impact of the relocation of OB and cardiac to a new
25  location, as has been discussed in the testimony?

929

1        A.   Yes, they do.
2        Q.   Now, these baseline projections include fiscal
3   year '13; is that right?
4        A.   Yes.
5        Q.   And when -- what is fiscal year '13 for Saint
6   Alphonsus?
7        A.   So that began on July 1st, 2012, and ended
8   June 30, 2013.
9        Q.   Okay.  And so we are now in fiscal year '14; is
10  that correct?
11       A.   Correct.
12            MR. ETTINGER:  Your Honor, I'm going to have some
13  questions about -- that relate further to this that are
14  attorneys' eyes only, so I'm going to try to skip over them
15  and come back to them.
16            THE COURT:  All right.  Thank you very much.  I'm
17  sure the public appreciates it, as well.
18  BY MR. ETTINGER:
19       Q.   Why don't we go on, Mr. Checketts, to
20  demonstrative No. 4.  And keep that, Your Honor, off the big
21  screen, as well.
22            THE COURT:  Yes.
23  BY MR. ETTINGER:
24       Q.   By the way, demonstrative No. 3, where do those
25  numbers come from, Mr. Checketts?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 27 of 68

930

1      **A.** From my projections and also from the financial
2 information of the hospital.
3      **Q.** Okay. And then going on to demonstrative No. 4,
4 what does this depict?
5      **A.** So this depicts the impact of the Saltzer referral
6 loss that would occur.
7      **Q.** And where do these numbers come from?
8      **A.** From the financial systems of the hospital as well
9 as from my projections.
10      **Q.** Okay. It says -- the note says, "Assumes Saltzer
11 transaction completed and fully implemented by January
12 2013."
13 Why do the projections assume that?
14      **A.** When these projections were prepared, it was prior
15 to the -- prior to the December court hearing, and so the
16 assumption was that that would occur on January 1st.
17      **Q.** So, looking at this today, what time period do you
18 think these projections would be relevant to?
19      **A.** In projected FY14, I think we could just move
20 these probably one column to the right.
21      **Q.** Okay. What does the "net revenue" line here refer
22 to?
23      **A.** These are the net revenues that would be
24 anticipated to be lost if the Saltzer referrals were to go
25 away.

931

1      **Q.** Okay. And let me take a step back and talk for a
2 while about what underlies these revenue numbers. Well,
3 first of all, just see if I can do this without using the
4 actual numbers. These minuses, I gather, reflect the
5 revenue loss; is that right?
6      **A.** Yes.
7      **Q.** And why don't we go through the three rows, and
8 then I will go back and ask you about more of the underlying
9 reasoning. "Total variable expenses," what does that row
10 refer to?
11      **A.** So those are the variable costs that -- associated
12 with those revenues that we would be able to decrease.
13      **Q.** So the idea is if the revenues were lost, there
14 would be certain costs that would be foregone as a result?
15      **A.** Correct.
16      **Q.** Those are the variable but not the fixed costs?
17      **A.** Correct.
18      **Q.** Okay. And then what does the "operating income"
19 line reflect?
20      **A.** So that would be the impact to the net operating
21 income of the hospital. The net of those two lines.
22      **Q.** Okay. So what -- when you looked at the net
23 revenue impact, what areas of --
24 THE COURT: Counsel, so I'm clear, these are
25 obviously in thousands of dollars. Maybe that was picked up

932

1 in an earlier slide.
2 THE WITNESS: Yes.
3 THE COURT: Thank you. I'm sorry. I'm sure it
4 was very obvious, but --
5 MR. ETTINGER: It's at the end of the note, and I
6 should have referred to it but didn't.
7 BY MR. ETTINGER:
8      **Q.** So what kinds of -- in working up towards these
9 revenue numbers, what kinds of records did you look at?
10      **A.** I looked at the financial records of the hospital
11 as well as our standard cost information.
12      **Q.** And what kinds of -- did you look at records
13 relating to admissions?
14      **A.** I did.
15      **Q.** And what categories of admissions did you look at?
16      **A.** So I looked at direct admissions by primary care
17 physicians as well as outpatient referrals to the hospital
18 and also referrals to the hospitalist program.
19      **Q.** And is it important to Saint Alphonsus Nampa and
20 important to you as its CFO where the hospital's cases
21 originate?
22      **A.** Yes.
23      **Q.** And why is that important?
24      **A.** We want to know -- we want to know who those
25 physicians are. They're our customers. We want to be sure

933

1 that we're doing the things that makes it easy for them to
2 care for their patients at the hospital.
3      **Q.** And aside from the actual data, what information
4 sources do you have in terms of being able to assess what
5 physician groups are important to the hospital?
6      **A.** By talking to physicians, by talking to the senior
7 leadership team.
8      **Q.** And are there particular physician groups that are
9 the primary sources of admissions and outpatient cases at
10 Saint Alphonsus Nampa?
11      **A.** Yes.
12      **Q.** And what are those physician groups?
13      **A.** So that would include Saltzer Medical Group; SAMG,
14 Saint Alphonsus Medical Group; Terry Reilly Health Services;
15 independent obstetricians; and some other independent
16 physicians in the community.
17      **Q.** So from a financial standpoint, which of those
18 groups are the most important to Saint Alphonsus Nampa?
19      **A.** The Saltzer Medical Group and the SAMG group.
20      **Q.** Why not Terry Reilly?
21      **A.** They're an important group, but financially, they
22 have a challenged payor mix, and they have very few
23 commercial payors among their patients.
24      **Q.** Why does that matter in terms of the hospital's
25 finances?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/30/2013

934

1     A.   Because it's -- it does not contribute as much
2  profit, of course, to the operations, financially, for the
3  hospital.
4         Q.   Okay.  Did you attempt to estimate the percentage
5  of Saint Alphonsus Nampa's revenues that are attributable to
6  Saltzer physicians?
7     A.   Yes.
8         Q.   And what -- what was your estimate?
9     A.   Upwards of 20 percent.
10        Q.   Okay.  Now, to the extent that there were direct
11 admissions by Saltzer physicians, did you look at those
12 direct admissions?
13    A.   Yes.
14        Q.   And to the extent of -- to the extent a Saltzer
15 physician admits a patient, is there a hospital record on
16 that?
17    A.   Yes.
18        Q.   For outpatient cases, what record do you have in
19 terms of -- in terms of whether an outpatient imaging
20 procedure or lab procedure or surgery procedure or other
21 outpatient procedure originates with a Saltzer doctor or
22 someone else?
23    A.   That's in the -- in the financial record, yes.
24        Q.   The court has heard a little bit about the
25 hospitalist program.  And let me just ask you:  When did

935

1  Saint Alphonsus Nampa institute a hospitalist program?  Or
2  did it precede Saint Alphonsus Nampa?
3     A.   It was instituted in about January, February of
4  2009.
5         Q.   Okay.  And do Saltzer physicians utilize the
6  hospitalist program?
7     A.   Yes.
8         Q.   And what have you heard as the general reaction of
9  the Saltzer physicians to the hospitalist program?
10    A.   Positive.  Actually, the Saltzer Medical Group
11 requested that a hospitalist program be implemented, and so
12 they were early adopters.
13        Q.   Are you aware of any Saltzer doctors who quit
14 sending patients to the hospital or reduced patients they
15 sent to the hospital because of the hospitalist program?
16    A.   I am not aware of any, no.
17        Q.   Okay.  So if a patient is treated in the hospital
18 by a hospitalist, what does the formal admission record
19 show?  Does it identify the referring physician or the
20 hospitalist?
21    A.   It shows the hospitalist.
22        Q.   Okay.  So is there any way from that data for an
23 individual patient who is treated by a hospitalist to tell
24 what the source of that patient's admission was originally,
25 whether it was a referring Saltzer physician or not?

936

1     A.   No.  That data is incomplete.
2         Q.   Okay.  So how did you in your analysis address the
3  issue of hospitalist cases?
4     A.   I looked at the period prior to the implementation
5  of the hospitalist program, which was the last half of 2008,
6  where I could look directly at the referring patterns of the
7  primary care physicians in the community.  And then I used
8  that to -- to use against the aggregate data for the
9  hospitalist program today.
10        Q.   And did you include -- in looking at the pre-
11 hospitalist data, did you include all -- all the doctors who
12 were then utilizing the hospital, all the primary care
13 doctors, or did you exclude some from your calculation?
14    A.   I excluded some.
15        Q.   And who did you exclude?
16    A.   So, for example, I excluded Terry Reilly Health
17 Services.
18        Q.   Why did you exclude them?
19    A.   Because they don't use the hospitalist program.
20        Q.   So did you come up with a ratio of the relative
21 use of the hospital- -- did you infer a ratio of the
22 relative use of the hospitalist program by various physician
23 groups?
24    A.   Yes, I did.
25        Q.   What was that ratio?  Do you recall the number?

937

1     A.   Saltzer Medical Group was 57 percent.
2         Q.   How did you use that 57 percent number?
3     A.   So I applied that against the aggregate
4  hospitalist data in subsequent years to determine what that
5  would be.
6         Q.   And do you believe that's a reasonably accurate
7  way of estimating the Saltzer cases that come through the
8  hospitalist program today?
9     A.   Yes.
10        Q.   Do hospitalists play any role in outpatient cases
11 at the hospital?
12    A.   They don't.
13        Q.   What is a self-referral to a hospital?
14    A.   So that's a patient who typically does not have a
15 primary care physician, and they may come through the ER for
16 services.
17        Q.   Do you believe that the accuracy of your
18 projections is significantly affected by the possibility of
19 self-referrals?
20    A.   I don't because self-referrals, if a patient does
21 not have a primary care physician, typically they also do
22 not have a payor source in many instances.  And so, that
23 would not have had a -- because there is not much in the way
24 of net revenue associated with those patients, it would not
25 have impacted the analysis.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.      Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 29 of 68

938

1    Q. Okay.
2         THE COURT: Counsel, could I just inquire of the
3    witness and ask to back up again to the hospitalist. Did I
4    understand you to say, then, that you just simply took the
5    ratio of admissions between Saltzer and non-Saltzer
6    physicians, excluding some groups such as the Terry Reilly
7    Clinic physicians, what the ratio was that they were
8    admitting, what percentage were coming from those groups,
9    and then applied that to all patients that were admitted by
10   hospitalists after the program was implemented?
11        THE WITNESS: Yes.
12        THE COURT: Sorry, Counsel. I just wanted to make
13   sure I had that right before we moved on. Go ahead.
14        MR. ETTINGER: Thank you, Your Honor.
15   BY MR. ETTINGER:
16   Q. What --
17        THE COURT: And Mr. Ettinger, I know you have
18   moved on also to self-referrals after that. I didn't want
19   you to think I missed that completely; although, I was
20   thinking back, trying to make sure I understood what
21   Mr. Checketts had testified to earlier. Go ahead.
22        MR. ETTINGER: Okay. Thank you, Your Honor.
23   BY MR. ETTINGER:
24   Q. Mr. Checketts, to what degree did you -- what was
25   your assumption in terms of the loss of admissions

939

1    attributable to Saltzer physicians if the Saltzer
2    acquisition were not unwound in preparing your projections?
3    A. I assumed that a hundred percent of those
4    referrals would be lost.
5    Q. Okay. And what was the basis for you in making
6    that assumption?
7    A. I based it on the behavior I have observed of
8    physicians who are -- who affiliate with St. Luke's.
9    Q. Okay. Did you have any personal experience in
10   terms of the oncologists?
11   A. Yes.
12   Q. And what was that experience?
13   A. When the hospital was acquired by Trinity Health,
14   the oncologists who are St. Luke's physicians relinquished
15   their privileges at the hospital.
16   Q. Okay. And did you have any personal experience
17   with regard to the St. Luke's cardiologists?
18   A. Yes.
19   Q. And what was that experience?
20   A. The cardiologists -- they have a -- they are
21   located in the Saltzer building, and, so, the Saltzer
22   referrals that go to those cardiologists, if they require --
23   those patients require care, they are not referred to
24   the -- to the hospital, to Saint Alphonsus Nampa hospital,
25   nor do those physicians practice at the hospital.

940

1    Q. Was your assumption based entirely on your own
2    experience or did you discuss that issue with others?
3    A. I also discussed it with others.
4    Q. And who were those others?
5    A. Karl Keeler, Blaine Petersen.
6    Q. Okay. Did you look at any information or consider
7    the behavior of the seven physicians who are sometimes
8    called the MPG group?
9    A. Yes, I did.
10   Q. What did you do in that regard?
11        MR. STEIN: Your Honor, I'm going to object to
12   this. This is an issue I flagged for Mr. Metcalf before we
13   started today. At his deposition, Mr. Checketts testified
14   about this analysis he is about to testify to. The day
15   after the -- it had not been produced to us. The day after
16   the deposition, we wrote asking for it. We did get a
17   response to that last Friday night. That's when we first
18   saw the analysis. Last Friday night.
19        THE COURT: Mr. Ettinger.
20        MR. ETTINGER: Your Honor, let me just explain.
21   It is true that this is something we forgot. And when I
22   realized it, I produced it. Having said that, a number of
23   points. No. 1, the same data was produced and a very
24   similar analysis was done by Professor Haas-Wilson. It was
25   in her report. It was produced months ago.

941

1    No. 2, the information, frankly, can be reviewed very
2    quickly. It takes five minutes with the pivot table to
3    reproduce the data.
4         Having said that, Your Honor, we goofed, and I would be
5    more than happy to allow St. Luke's to recall Mr. Checketts
6    and ask him about this at a later point if they choose.
7    They have an expert, Ms. Ahern is in the courtroom, who has
8    critiqued Mr. Checketts' work. She is on in ten days or so,
9    and she would have a right to further address it. So I
10   don't think there is any prejudice from allowing this to
11   proceed. And we're happy to take whatever steps we need to
12   eliminate this prejudice.
13        MR. STEIN: Your Honor, I'm sorry, but that is,
14   frankly, absurd. They are dropping a new analysis on us.
15   Literally, they did it after court on Friday. And
16   Mr. Ettinger wants to say: Well, we don't mind if the
17   defendants now divert a bunch of their resources to
18   evaluating this. By the way, they still haven't produced
19   any other data we could use to evaluate it.
20        So if I could just explain. What Mr. Checketts
21   testified he did was compare certain data from 2011 to data
22   in 2013. Now, how Mr. Checketts is going to explain he
23   relied on that in doing an analysis dated 2012, I guess
24   we'll have to wait to hear that. But the plaintiffs did not
25   produce any data for the year 2013 in discovery. None. So

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/30/2013

942

1 the first 2013 data that we saw was what we got on Friday
2 night. Moreover, the 2011 data they produced actually
3 doesn't match the 2011 data we had.
4     So in order to dig in -- you know, it's, basically,
5 dropping a new expert analysis on us and saying: Sorry, we
6 goofed. And, frankly, it does not cure the prejudice to say
7 we should have to spend time now going into it. It will
8 take us time to understand it. We may need more data. And
9 all that time, we're trying to prepare for our case, which
10 starts Monday.
11     I just think based on the rules Your Honor set forth
12 before, it should have been produced. It wasn't produced.
13 It should be excluded.
14     THE COURT: Mr. Ettinger, was the 2013 data not
15 provided?
16     MR. ETTINGER: Your Honor, I'm not certain about
17 that, Your Honor.
18     THE COURT: Well, if the underlying data had been
19 provided and this is simply an oversight of a -- a
20 formulation or an analysis of that data, I would allow it.
21 But if the 2013 data was not provided so that counsel now
22 has to essentially start from scratch on short notice, then
23 I'm going to have to sustain the objection. So unless you
24 can perhaps dig into your records and find that you, in
25 fact, had provided that data, I'll sustain the objection.

943

1 If you did provide it, I will allow it but require the
2 plaintiffs to provide St. Luke's with the underlying data,
3 the analysis, and an opportunity to recall the witness.
4     It's the best I can do. Obviously, I was not privy to
5 the problem, but it sounds to me like a mistake was made.
6 If it was prejudicial to St. Luke's, then I think the
7 consequence is the exhibit cannot be admitted, or the
8 evidence cannot be received, rather. But if, on the other
9 hand, it was the kind of oversight that can be corrected
10 with a somewhat minimal amount of effort on the part of
11 St. Luke's, then I'll overrule the objection.
12     So it's up to you, Mr. Ettinger, if you want to
13 persuade me that you, in fact, provided the underlying data
14 or you can persuade me that it really is an extremely simple
15 task to allow them to remedy, then you can make that effort.
16 And if you persuade me, then I'll allow it.
17     MR. ETTINGER: Your Honor, given the logistics of
18 what you're suggesting, and I understand it completely, my
19 only thought is should I make an offer of proof with
20 Mr. Checketts right now. And then you can assess it later?
21     THE COURT: That may be appropriate. Again, it's
22 your time that's ticking, and you have to make a decision as
23 to whether it's worth the effort, whether the lemon is worth
24 the squeeze as we heard the other day. That's a new one.
25     MR. ETTINGER: Your Honor, I don't think it will

944

1 take very long, so that's what I'll do with the
2 understanding that this has not been admitted.
3     THE COURT: Yes. Go ahead.
4 BY MR. ETTINGER:
5     Q. Mr. Checketts, when you looked at this MPG group,
6 what have you seen in terms of their outpatient cases at the
7 hospital before and after their acquisition by St. Luke's?
8     A. I observed a 90 percent decline in referrals.
9     Q. You say 90 percent?
10    A. Yes.
11    Q. Now, are your conclusions in your projections
12 dependent upon literally losing one hundred percent of the
13 business attributable to Saltzer?
14    A. No.
15    Q. Would the problem go away if it was only 80
16 percent?
17    A. No.
18    Q. Would the problem go away if it was only 50
19 percent?
20    A. No.
21    Q. Why not?
22    A. Again, because of the nature of the fixed costs,
23 the impact of that level of business going away would be
24 very detrimental.
25    Q. Why don't we go to demonstrative 5.

945

1     Again, Your Honor, if we could blank the screen.
2     THE COURT: It is off. If the screen is blue, it
3 won't be going on.
4 BY MR. ETTINGER:
5     Q. What does -- what does demonstrative 5 reflect,
6 Mr. Checketts?
7     A. It shows other impacts of the Saltzer referral
8 loss to the hospital. It's particularly as it relates to
9 the surgery center in which the hospital is an investor as
10 well as additional expenses that would be incurred.
11    Q. Okay. Now, the first row you call "SCA Investment
12 Revenue Loss." What does that refer to?
13    A. That refers to a joint venture that the hospital
14 owns in Treasure Valley Surgery Center.
15    Q. Okay. And where is Treasure Valley Surgery
16 Center?
17    A. It's located at the Nampa Health Plaza.
18    Q. And why did you project a loss in -- from the
19 Treasure Valley Surgery Center in your projections?
20    A. Because the underlying assumptions of the original
21 pro forma for the surgery center assumed that there would be
22 ongoing referrals from the Saltzer Medical Group to the
23 surgeons who would practice at the surgery center.
24    Q. And the second row says "Pediatrix Service
25 Additional Expense." What does that refer to?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 31 of 68

946

1    A.   So with the moving of the OB services to the
2  Health Plaza, my initial thinking was that -- and with the
3  involvement of the Saltzer Medical Group with St. Luke's --
4  that the pediatricians from Saltzer would not support the
5  new center and that we would have to seek support from
6  another group to help us with C-sections and that sort of
7  thing.
8    Q.   Okay.  Now, Mr. Keeler testified that the Saltzer
9  doctors were willing to support well-baby checks at the new
10 location but not C-sections.  Is that your understanding?
11   A.   That's my understanding, yes.
12   Q.   And has that necessitated the hiring of the
13 pediatrics group?
14   A.   Yes.
15   Q.   So would that be necessary whether or not the
16 Saltzer transaction were unwound?
17   A.   Yes.
18   Q.   So do you think it was correct to include this as
19 a part of the Saltzer referral loss, this item?
20   A.   In hindsight, no.
21   Q.   Okay.  Now, if you did not include this item under
22 "Impact of Saltzer Referral Loss," would that change your
23 bottom line calculations here, which we haven't gotten to
24 yet, but would it change them in any way?
25   A.   No, it wouldn't.

947

1    Q.   And why is that?
2    A.   Because these additional expenses should have been
3  included in the original baseline projections.
4    Q.   Okay.  So your bottom line projections are the
5  baseline less the impact; is that right?
6    A.   Correct.
7    Q.   So if the bottom line -- if the baseline is less
8  by a certain amount or the impact is more by the same
9  amount, either way does that change your bottom line
10 projections?
11   A.   It's going to be the same either way.
12   Q.   Okay.  Why don't we go to those bottom line
13 projections.  Demonstrative 6.  By the way, just to make
14 sure the record is clear, so if we look at demonstratives 3
15 through 6, and we can flash them back for you if you want,
16 are all those -- are all the numbers on those demonstratives
17 extracted from your original projections?
18   A.   Yes.
19   Q.   Okay.  So what does demonstrative 6 illustrate?
20   A.   So it shows the net impact beginning with the
21 baseline operating income, the impact of the different
22 changes that we have discussed, and what that has on the
23 projected operating income of the hospital.
24   Q.   And is this any more than arithmetic based on the
25 demonstratives we have looked at earlier?

948

1    A.   No.
2         MR. ETTINGER:  Your Honor, I'm at the point where
3  I think we probably need the courtroom closed for a more
4  detailed discussion.
5         THE COURT:  Ladies and gentlemen, again, we'll
6  have to ask everyone except Saint Alphonsus employees to
7  leave the courtroom.
8         ****** COURTROOM CLOSED TO THE PUBLIC ******
9         THE COURT:  You may proceed, Counsel.
10        MR. ETTINGER:  Thank you, Your Honor.
11 BY MR. ETTINGER:
12   Q.   So let's go back to the baseline results for a
13 moment, Mr. Checketts.  We're doing this out of order so we
14 didn't have to close the courtroom earlier.  Demonstrative
15 No. 3.  And if, in fact, these baseline projections turned
16 out to have been or turned out to be overly optimistic so
17 that the hospital results were worse than the baseline
18 projections, how would that affect your bottom line
19 conclusions about the impact of the continuation of the
20 Saltzer transaction?
21   A.   They would be worse.
22   Q.   And why is that, just as a matter of simple
23 arithmetic?
24   A.   Because we are starting off with a less robust
25 operating income, and then when you layer in all the

949

1  impacts, we're going to end up with a worse bottom line.
2    Q.   For fiscal '13, were the results, in fact -- how
3  did the results, in fact, compare to your baseline
4  projections?
5    A.   They were worse.
6         MR. STEIN:  Objection.  Objection, again,
7  Your Honor, we have not been provided with any financial
8  data beyond the middle of fiscal year '13.
9         THE COURT:  I'll allow you to make the proffer,
10 but the court will not consider it unless the showing that I
11 indicated was made, that is, that the '13 -- 2013 data had
12 been provided, and this is simply a method of analysis and
13 evaluation of that data that can be simply duplicated and
14 reviewed by St. Luke's.  So I'll allow you to go ahead, just
15 for the record, to make the proffer.
16        MR. ETTINGER:  Your Honor, I can actually -- as of
17 the time of Mr. Checketts' deposition, which was April or
18 May, he was questioned about the results of fiscal '13 up to
19 that point, and, indeed, St. Luke's expert commented on the
20 significance of the results up to that point in her own
21 report.  So I will restrict the question to that part of
22 fiscal year '13.
23        THE COURT:  All right.
24 BY MR. ETTINGER:
25   Q.   So let me reask that, Mr. Checketts.  If you take

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 32 of 68

950

1  fiscal year '13 up to the time of your deposition, how did
2  those results compare to the baseline projections?
3      **A.  They were worse than budget.**
4      **Q.**  Okay.  Why don't we go to demonstrative 7,
5  Mr. Checketts.  And what does this depict?  7?
6      **A.  So this is an analysis that I used to depict what**
7  **would be necessary in order to mitigate the operating loss**
8  **that was on the previous demonstrative.**
9      **Q.**  Let's go back to 6.  And I tried to avoid using
10  numbers before the courtroom was closed.  So what is -- what
11  do your projections show here in terms of operating income
12  if the Saltzer transaction were to continue in fiscal '14,
13  '15, '16?
14      **A.  It would be -- in '14 it would be an operating**
15  **loss of about 4.3 million.**
16      **Q.**  Okay.  And then '15 about 2.5, '16 about 2.1?
17      **A.  Right.**
18      **Q.**  Okay.  Why don't we go back to demonstrative 7.
19  So, how did you calculate FTE cuts as shown -- first of all,
20  what is an FTE?
21      **A.  So, an FTE is a full-time equivalent, and,**
22  **basically, it means a person's job, a full-time employee's**
23  **job.**
24      **Q.**  So is an FTE cut a cut in jobs?
25      **A.  It is.**

951

1      **Q.  How did you calculate these cuts in jobs?**
2      **A.  I took the average labor and benefit costs per FTE**
3  **and then used that to determine how many FTEs would be**
4  **necessary to cut using that average cost per FTE for**
5  **variable costs and also for beyond that in order to get us**
6  **to a 2 percent operating margin.**
7      **Q.**  Okay.  Why did you talk about -- why did you
8  consider getting to a 2 percent operating margin?
9      **A.  Well, 2 percent just represents a point of where**
10  **we need to be in order to just, basically, provide cash for**
11  **purchasing the things we need to in order to be a hospital.**
12      **Q.**  So why does a hospital need to do more than just
13  break even, be at a zero operating percent margin?
14      **A.  Well, because there is change in technology.  New**
15  **things that we haven't even imagined, I guess, at this**
16  **point, in some cases.  All that costs money to purchase.**
17  **And so, we need -- we need an operating margin in order to**
18  **be able to do that and to replace parts of the hospital and**
19  **provide the services that are necessary.**
20      **Q.**  How does a 2 percent margin compare to the
21  standard that Trinity applies?
22      **A.  It's actually lower.  That would be -- kind of the**
23  **industry and the standard and what Trinity would expect**
24  **would be about 4 to 5 percent.**
25      **Q.**  Okay.  So is 2-percent margin over the long term

952

1  enough for a hospital to do well and to be able to continue
2  to reinvest and grow?
3      **A.  No.  It's not enough in the long term.**
4      **Q.**  Okay.  So what does "FTE Cuts Variable" refer to,
5  specifically?
6      **A.  So those are the FTEs that would be necessary to**
7  **cut in order to cover the costs that identified with the**
8  **variable costs associated with the loss of Saltzer business.**
9      **Q.**  So let's go back to demonstrative No. 4.  And it's
10  got -- do you see the line that says "Total Variable
11  Expenses," and in fiscal '13, it's minus 5.6 million; fiscal
12  '14 it's minus 11.8 million?
13      **A.  Yes.**
14      **Q.**  How does that relate to the FTE cuts variable on
15  slide 7?
16      **A.  So I identified that we would make those**
17  **expenses -- we would cut those expenses by -- for the labor**
18  **component of that by that amount per FTE and divide it into**
19  **that number.**
20      **Q.**  So you're saying in order to get those variable
21  expense reductions, you have got to cut these FTEs?
22      **A.  Yes.**
23      THE COURT:  Just a moment.  So the variable
24  expenses that you've shown here, these are calculations
25  based upon a reduction in FTE?  So the numbers would have

953

1  been higher, or is this before you make the reductions?
2      THE WITNESS:  So these are the costs that would be
3  variable associated with -- with that business.  A component
4  of that would be for labor.  It's not identified here, but
5  there is a component that is labor.  So it would be labor,
6  supplies, and other expenses.  And, so, the FTEs would be
7  the number necessary that would be attributable to the labor
8  component of the variable costs.
9      THE COURT:  Okay.  Maybe -- either I didn't make
10  myself clear or I didn't understand what you just said.  For
11  example, on FY15 you show variable expenses.  Is that a
12  reduction in variable expenses that you would need to make?
13      THE WITNESS:  Yes.
14      THE COURT:  Okay.  That I think explains it.  So
15  the 12,385,000 would be the reduction, all the variable
16  expenses, including the 150 or -60 reduction FTE for that
17  year?
18      THE WITNESS:  It doesn't include all of those
19  FTEs.  It includes some of those FTEs.
20      THE COURT:  All right.  Why only some?
21      THE WITNESS:  We can probably look at that next
22  demonstrative.  I can show that.
23      THE COURT:  Go ahead.  Apparently, you'll explain
24  it.
25      MR. ETTINGER:  I think I understand the question,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 33 of 68

954

1   Your Honor, and I'll try to address it.
2   BY MR. ETTINGER:
3        Q.   So if we take the example that Judge Winmill
4   looked at, I'm forgetting what year he looked at, but let's
5   take on demonstrative 4 the FY16 minus 13 million.  Is there
6   a number on demonstrative 7 that shows the FTE cuts that are
7   associated with that decline in variable expenses?
8        A.   Yes.  So it would be that second line.
9        Q.   The 90.9?
10       A.   Right.
11       Q.   So the second row on demonstrative 7 shows you the
12  FTE cuts that are associated with the reduction in variable
13  costs resulting from this reduction in Saltzer drive
14  revenues?
15       A.   Yes.
16            MR. ETTINGER:  Your Honor, does that answer your
17  question?
18            THE COURT:  Yes, I think so.
19  BY MR. ETTINGER:
20       Q.   So then what's the next row?
21       A.   The next row represents the additional FTEs.
22  Because of the fixed cost structure and so forth, by cutting
23  the variable cost, it doesn't get us to where we need to be.
24  So in order to achieve what the additional impact to get us
25  to 2 percent operating margin, then there would be

955

1   additional costs that we would have to cut, and that would
2   be -- that's represented by those additional FTEs.
3        Q.   So are these additional FTEs variable costs or
4   not?
5        A.   They are not variable costs, no.
6        Q.   So how do you achieve them?
7        A.   We would have to go through and examine department
8   by department and service by service and try to figure out
9   where we cut, essentially, from fixed costs.
10       Q.   Did you do some analysis along those lines?
11       A.   Yes.
12       Q.   Did you attempt to reach definite conclusions
13  about what services would be cut or scaled back in order to
14  get those additional FTE cuts?
15       A.   Nothing definite, no.
16            MR. ETTINGER:  Your Honor, is the relationship
17  between the FTEs and the costs clear now, or do we need
18  to --
19            THE COURT:  Let me just back up a little bit.  I
20  am trying to wrestle with why some FTEs costs are fixed and
21  some are variable.  Could you explain that just briefly.
22            THE WITNESS:  Sure.  So on a nursing floor, for
23  example, if there are patients on the floor, we can staff up
24  with nurses to take care of those patients.  When they are
25  discharged, if there are no other patients who come in, then

956

1   those nurses would be excused to go home.  So they would be
2   variable, and we wouldn't call them back unless new patients
3   came in.
4            So back to the example of an ER, we have to have a
5   certain level of staffing in the ER to be safe.
6            THE COURT:  So the fixed portion of the FTE is the
7   baseline staffing that you have to have to even be
8   functional.
9            THE WITNESS:  Right.
10            THE COURT:  Then the variable would be -- I mean,
11  I know there are nurses who contract and fill in from time
12  to time.
13            THE WITNESS:  Right.
14            THE COURT:  But in addition, there may be the
15  recent hires may know that they're being hired and may be
16  terminated if the census, hospital census drops below a
17  certain level, those are considered more variable?
18            THE WITNESS:  Correct.
19            THE COURT:  All right.  I think that explains it.
20  Thank you.
21  BY MR. ETTINGER:
22       Q.   So if you're cutting -- if the third row --
23            THE COURT:  Can I ask one more question.  I think
24  you covered this, and, again, I'm trying to multitask, make
25  notes and anticipate objections and a number of other

957

1   things.
2            The 2-percent margin, was that the margin you discussed
3   earlier when you indicated Trinity -- you tried to maintain
4   a margin just to make the hospital economically viable over
5   the long term?
6            THE WITNESS:  Actually, that would be about 4 to
7   5 percent.
8            THE COURT:  What's the 2 percent?
9            THE WITNESS:  2 percent is just my judgment of
10  saying if we can get partway there, we'll get there, we'll
11  assess --
12            THE COURT:  In other words, in a crisis?
13            THE WITNESS:  Yes.
14            THE COURT:  This is what we would still want to be
15  able to maintain.
16            THE WITNESS:  Correct.
17            THE COURT:  You never want to just break even
18  because it gives you no flexibility to deal with ups and
19  downs and crises, both major and minor.
20            THE WITNESS:  Right.
21            THE COURT:  I'm sorry.  Mr. Ettinger, go ahead.
22            MR. ETTINGER:  No.  Your Honor told me ways in
23  which I can make this clearer, and I'll take a shot at it.
24            THE COURT:  I think it's now much clearer.  Thank
25  you.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 34 of 68

958

1    MR. ETTINGER: Nevertheless, I'll throw in a
2  couple; see if it helps at all.
3    THE COURT: Go ahead.
4  BY MR. ETTINGER:
5    Q. If, in fact, Mr. Checketts, you were shooting for
6  a 4-percent margin; would that result in more or less FTE
7  cuts than you show here?
8    A. Further cuts.
9    Q. And the cuts, the additional cuts, the ones that
10 aren't under the variable line, do those have to come, then,
11 from cutting back programs and services?
12   A. Yes.
13   Q. Okay. Let's go back to demonstrative No. 3 again.
14 Your Honor, I apologize for bouncing around, but I
15 realize there's one more thing --
16   THE COURT: That's fine.
17   MR. ETTINGER: -- that I saved for the closed
18 courtroom that I'd forgotten about.
19 BY MR. ETTINGER:
20   Q. And that is: Do these baseline projections -- you
21 said they do include the relocation of OB and cardiac?
22   A. Yes, uh-huh.
23   Q. And that's -- is that called phase 1?
24   A. Phase 1, yes.
25   Q. You're aware that there is a process that's being

959

1  undertaken to decide whether to relocate the rest of the
2  hospital?
3    A. Yes.
4    Q. And is that referred to sometimes as phase 2?
5    A. Yes.
6    Q. And do these projections include phase 2?
7    A. They do not.
8    Q. I think Mr. Keeler has testified to that, but has
9  any decision been made as to phase 2?
10   A. No.
11   Q. Is phase 1 now underway?
12   A. It is.
13   Q. In preparing these projections -- well, actually,
14 let me ask you one other question, Mr. Keeler [sic].
15 Does -- if there is borrowing done on behalf of Saint
16 Alphonsus Nampa, is that done by the hospital locally or is
17 that done through the Trinity system?
18   A. We rely on Trinity Health to help us with that.
19   Q. If Trinity borrows for the benefit of Saint
20 Alphonsus Nampa, whose balance sheet does that borrowing
21 appear on?
22   A. On Saint Alphonsus Nampa.
23   Q. If Trinity borrows for the benefit of Saint
24 Alphonsus Nampa, who is responsible for making the interest
25 payments on that borrowing?

960

1    A. Saint Alphonsus Nampa.
2    Q. So whose income statement does that appear on?
3    A. That appears on the hospital's income statement.
4    Q. Okay. Did you, in doing these projections,
5  attempt to estimate the loss of revenue that might occur if
6  these layoffs and service cuts cause further erosion in the
7  hospital?
8    A. No, I did not.
9    Q. If you had tried to estimate that, would that have
10 resulted in more -- in more losses or fewer losses?
11   A. More losses.
12   Q. Would that have resulted in more FTE cuts or fewer
13 FTE cuts?
14   A. More FTE cuts.
15   Q. Are you aware that Saint Alphonsus' private
16 plaintiffs' economist Professor Haas-Wilson has estimated
17 that 47 percent of the cases in total at Saint Alphonsus
18 Nampa are associated with a Saltzer primary care physician?
19   A. Yes.
20   Q. Are you familiar with all the data sources she had
21 access to in making that calculation?
22   A. No, I'm not.
23   Q. I'm not going to ask you, of course, to evaluate
24 that one way or the other, but if that 47 percent were
25 correct and you applied it in your projections, how would

961

1  that change your projections directionally?
2    A. It would make them worse.
3    Q. Okay. Have you -- let's just take the period up
4  to your deposition. Have you seen any declines in business
5  since the St. Luke's acquisition of Saltzer at the end of
6  last year?
7    A. Yes.
8    Q. In what area?
9    A. Outpatient referrals.
10   Q. Okay. Has it been dramatic or not?
11   MR. STEIN: Objection, Your Honor, again, up to
12 the time of his deposition, it was in May of 2013 for which
13 we have been provided no data.
14   MR. ETTINGER: These questions were asked in his
15 deposition, and I'm just following up on that.
16   THE COURT: I'll allow it.
17   MR. STEIN: I'm sorry. Is that subject to the
18 same --
19   THE COURT: Subject to objection. Proceed.
20   Well, just a moment. This is not a -- the earlier
21 question had to do with a separate analysis based upon FY13
22 data. And now his question related to his actual experience
23 with regard to loss of referrals and impacts. And I'll
24 allow it up to the point of his deposition. But to the
25 extent we're going beyond that, there must have been some

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/30/2013

962

1  data provided that the witness actually has a concrete
2  separate conclusion based upon the post-deposition data.
3      Mr. Ettinger, go ahead.
4  BY MR. ETTINGER:
5      Q.  As of that time, had the impact yet been dramatic
6  or not?
7      A.  It's been measurable, yes.
8      MR. ETTINGER:  I have no further questions,
9  Your Honor.
10     I would move the admission of the projections,
11 Exhibit 1661.
12     THE COURT:  Is there any objection to the
13 projection?
14     MR. STEIN:  Not the demonstrative, Your Honor.
15 I'm sorry, you mean to the underlying projection?
16     THE COURT:  The underlying projection.
17     MR. STEIN:  I think we would maintain our
18 objection to foundation, Your Honor.
19     MR. ETTINGER:  Your Honor, the -- I think we have
20 laid a substantial foundation.  I would have a couple of
21 comments.  No. 1, a projection based on assumptions is
22 admissible as appropriate opinion with the court having the
23 ability to evaluate the assumptions based on the record.  I
24 think that, nevertheless, there is an adequate foundation
25 for those assumptions from Mr. Checketts and Mr. Keeler.  I

963

1  also think the court has already heard further confirmation
2  of those assumptions from, say, Mr. Reiboldt's testimony
3  about the expectation with regard to Saltzer referrals, some
4  of the documents, Ms. Powell's documents, about the
5  expectation with regard to exclusive use of the new
6  St. Luke's facility, and throughout this record we're going
7  to be putting in more evidence as to the basis for believing
8  that Saltzer's referrals are going to shift after this
9  acquisition.  And so I think there is more than an adequate
10 foundation, even if you cut it off as of right now, but
11 certainly this is an issue where it's appropriate to admit
12 it with the assumption, and the court, in weighing the
13 evidence, can evaluate the degree to which it thinks that
14 assumption is supported by all the evidence.
15     THE COURT:  Mr. Stein, my inclination is to
16 reserve ruling on it until I have had the benefit of the
17 entire record as to whether or not there is an adequate
18 foundation.  And I can rule on that -- if I find it
19 necessary to rely upon the projections in my final decision,
20 I can rule upon whether or not the foundation has been made
21 at that time.
22     Mr. Stein, do you wish to be heard further given that?
23     MR. STEIN:  No, Your Honor.  Before we switch --
24     THE COURT:  What is the exhibit number?  I thought
25 it was 1616, but I must have it wrong.

964

1      MR. ETTINGER:  1661.
2      THE COURT:  1661?
3      MR. ETTINGER:  Yeah.  Your Honor, in light of your
4  comments on the demonstratives, I understand it will be
5  under the same condition; I would move the admission of the
6  demonstratives as 1661A through G, if my math is right.
7      THE COURT:  There is no objection to those;
8  correct?
9      MR. STEIN:  I had no objection to the use of the
10 demonstratives.  You know, I think, actually, I don't
11 have -- I don't know that we have been provided with this
12 current set.
13     Your Honor, let us confer and then --
14     THE COURT:  Yes.
15     MR. STEIN:  Then we'll let you know.
16     THE COURT:  Well, I'm going to consider the
17 demonstratives regardless.  I'm not sure it makes a huge
18 amount of difference whether I admit them as a substantive
19 independent exhibit or not.  They, apparently, are all based
20 upon 1661 in any event.
21     MR. ETTINGER:  Except for the first two, which are
22 illustrative examples.
23     THE COURT:  Right.  They were just without any
24 actual tie, being tied to any data.  All right.  So let's go
25 ahead and proceed.  Can we open the courtroom?

965

1      MR. STEIN:  I have a question about one of the
2  attorneys' eyes only slides.
3      THE COURT:  As soon as we reach that point, if you
4  or someone from either side can point out we're going beyond
5  that, I can bring back into the courtroom any members of the
6  public who may want to listen.
7      MR. STEIN:  Could I ask plaintiffs' counsel to put
8  up demonstrative 7, the full-time employees.
9                    CROSS-EXAMINATION
10 BY MR. STEIN:
11     Q.  There are some figures at the bottom of this,
12 total FTEs cut.  Do you see that, Mr. Checketts?
13     A.  Yes.
14     Q.  Those are not cumulative across years, are they?
15     A.  No.
16     Q.  So, in other words, the way to look at this would
17 not to be to add -- to determine the effect of the cuts that
18 you have projected, it would not be the correct way to look
19 at this to add those three bottom numbers together; right?
20     A.  That is correct.
21     Q.  Okay.
22     THE COURT:  I had the same question when the --
23 just so we're clear, in order to balance, then, the budget,
24 you would have to reduce your FTEs from FY -- what they
25 currently are as of FY13 by the 163.9 shown in this

United States Courts, District of Idaho

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 36 of 68

---

966

1    projection; correct?
2        THE WITNESS:  Yes.
3        THE COURT:  And, then, does this indicate that you
4    perhaps would be able to staff at a somewhat higher level in
5    FY15 and FY16 in order to still maintain the -- I assume
6    it's a 2-percent margin?
7        THE WITNESS:  Yes.
8        THE COURT:  All right.  I think that's the point
9    you were making, as well, and I had the same question.  I
10   should have asked it earlier.
11       Go ahead, Mr. Stein.
12   BY MR. STEIN:
13       Q.  Mr. Checketts, were counsel involved in reviewing
14   or commenting on these projections?
15       A.  I prepared them.
16       Q.  I understand.  Were counsel involved in reviewing
17   and commenting on the projections?
18       A.  They reviewed them.
19       Q.  And, in fact, the version of the projections that
20   you have been discussing today, that was finalized after
21   Saint Al's filed this litigation, right, in November of
22   2012?
23       A.  No.
24       Q.  When was it finalized?
25       A.  I think it was November of 2012.

---

967

1        Q.  Right.  That's the month that Saint Al's sued
2    St. Luke's; right?
3        THE COURT:  If you know.
4        THE WITNESS:  It was done prior to.
5    BY MR. STEIN:
6        Q.  Now, the accuracy of the projections, of any
7    projections, hinges on the reliability of the assumptions
8    you make; right?
9        A.  Correct.
10       Q.  You're familiar with the phrase "garbage in,
11   garbage out"?
12       A.  Yes.
13       Q.  So in the sense of projections, that means if your
14   assumptions are faulty, the outcome you have, the output, is
15   going to be faulty, too; right?
16       A.  Depends upon the degree.
17       Q.  Now, let's make sure I understand.  You assumed in
18   conducting these projections that there would be a one
19   hundred percent loss of direct admissions by Saltzer
20   pediatricians to Saint Al's Nampa; right?
21       A.  That's what I assumed, yes.
22       Q.  And would you characterize that, as somebody who
23   does projections, as a conservative assumption?
24       A.  Based on -- based on the behavior that I saw and
25   what I believe, that that was -- I mean, that's the

---

968

1    assumption I made, that it would be a hundred percent.
2        Q.  Let me ask you this:  If you wanted to be even
3    more unfavorable to St. Luke's, to make the projections look
4    even worse, what percent would you use?
5        A.  I guess I could have done a hundred percent on
6    some of the referrals to the surgeons and things like that.
7        Q.  If you wanted to make the analysis look even worse
8    for direct admissions by Saltzer pediatricians, you couldn't
9    make it any worse looking than by choosing the percentage
10   that you did; right?
11       A.  I was trying to be fair by pulling out the new
12   baby checks in that analysis, so --
13       Q.  Mr. Checketts, you used the assumption of a
14   hundred percent loss of direct admissions by the Saltzer
15   pediatricians?
16       A.  Yes.
17       Q.  Right?
18       A.  Yes.
19       Q.  And you could not -- you could not have chosen a
20   more unfavorable assumption to use for that particular
21   assumption in your analysis; right?
22       A.  A hundred percent is -- that would be the maximum,
23   yes.
24       Q.  Right.  I'm not a chief financial officer, but you
25   understand that the highest percent you can get is a hundred

---

969

1    percent; right?
2        A.  Yes.
3        Q.  Okay.  And likewise, for the loss of direct
4    admissions by Saltzer family practice doctors, you chose the
5    worst possible assumption of a hundred percent loss; right?
6        A.  I assumed a hundred percent, yes.
7        Q.  And for loss of referrals from Saltzer to Saint
8    Al's hospitalists, again, you chose the worst possible
9    assumption, worst for St. Luke's and Saltzer, of a hundred
10   percent right?
11       A.  I did.
12       Q.  You also chose -- you also as part of your
13   analysis tried to estimate what the percentage loss would be
14   of referrals from Saltzer to orthopedic surgeons at Saint
15   Al's Nampa; right?
16       A.  Yes.
17       Q.  You assumed there a 60-percent loss of referrals;
18   right?
19       A.  Yes.
20       Q.  And you assumed that 60-percent loss would persist
21   over the entire period of your projections?
22       A.  Yes.
23       Q.  And, again, that 60-percent loss was what Saint
24   Al's internally estimated as a worst-case scenario loss of
25   referrals to orthopedic surgeons; right?

---

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 37 of 68

970

1    A.    That was based on my conversation with Nancy
2    Powell, yes.
3        Q.    Now, Mr. Ettinger asked you if the referral loss
4    was only 80 percent, would the problems go away.  You said
5    no.  Then, I think he asked you if it were 50 percent, would
6    the problems would go away.  You said no.  Do you recall,
7    generally, what I'm referring to?
8        A.    Yes.
9        Q.    What if the loss was 30 percent?
10       A.    They would be less than 50 percent, but we would
11   still have a problem.
12       Q.    Okay.  Well, when Mr. Ettinger asked you if the
13   problems would go away, am I correct that the problems would
14   not go away unless the loss of referrals was zero percent?
15       A.    Yes.  I mean, unless it gets so low that it's not
16   that noticeable.
17       Q.    What if there were a 30-percent reduction in
18   referrals, how would that affect Saint Al's ability to meet
19   its 2-percent margin?
20       A.    I would have to go back and do the calculations,
21   but, I mean, we would be in a better position to be able to
22   meet those.
23       Q.    You don't know how many full-time employees you
24   would have to lay off at a percentage less than the hundred
25   percent assumptions you made in your analysis; correct?

971

1    A.    I looked at a few data points.  I didn't look at
2    30 percent.
3        Q.    Now, the assumption you said you used for
4    surgeries, that was based on something Nancy Powell told
5    you?
6        A.    Are you talking about orthopedic surgeries?
7        Q.    Yes.
8        A.    Yes.
9        Q.    She gave you a range of 50 to 75 percent?
10       A.    Yes.
11       Q.    She didn't explain how she came up with that
12   range, did she?
13       A.    She just explained that that's what she -- from
14   her experience when she was at Saltzer Medical Group, that's
15   about what they experienced.
16       Q.    She didn't provide you with any underlying
17   analysis for that?
18       A.    No, she did not.
19       Q.    Okay.  And out of that range, you just picked the
20   60 percent number?
21       A.    Yes.
22       Q.    Now, you mentioned three bases for -- for what you
23   said your experience was with past St. Luke's physicians.
24   First was the cardiologists?
25       A.    Yes.

972

1    Q.    The cardiologists have never had privileges at
2    Saint Al's Nampa; right?
3        A.    Not as St. Luke's physicians, no.
4        Q.    Right.  So the cardiologists, that's not a
5    situation where St. Luke's acquired a practice and then they
6    dropped privileges; correct?
7        A.    That is correct.
8        Q.    And are you familiar with the joint venture that
9    existed between Mercy Medical Center and St. Luke's with
10   regard to M-S-T-I or MSTI?
11       A.    Yes.
12       Q.    That was a joint venture that involved the
13   oncologists from St. Luke's; is that right?
14       A.    Yes.
15       Q.    Then after Saint Alphonsus acquired Mercy Medical
16   Center, Saint Alphonsus terminated that joint venture?
17       A.    There was an agreement to terminate between --
18       Q.    Was that --
19       A.    -- the two parties.
20       Q.    I apologize.  Were you finished with your answer?
21       A.    I just said it was an agreement between the two
22   parties.
23       Q.    After the joint venture terminated was when the
24   St. Luke's oncologists dropped their privileges at Saint
25   Alphonsus?

973

1    A.    I don't believe that's the case.  I believe that
2    as soon as we were -- as soon as we were acquired, it was
3    soon after that that we were informed that the oncologists
4    were going to rescind their privileges.
5        Q.    Do you know whether St. Luke's had been informed
6    by Saint Alphonsus at the time that the joint venture was
7    going to be terminated?
8        A.    I don't know.
9        Q.    And with respect to Mercy Group, you did
10   not -- you did not attempt to do any analysis of change in
11   admissions or referrals for admissions on the inpatient
12   side?
13       A.    Correct.
14       Q.    Now, the Treasure Valley Surgery Center portion of
15   your analysis, that relates to the facility that opened in
16   August of 2012 at the Garrity site?
17       A.    Yes.
18       Q.    The Garrity site, that's also referred to as the
19   Nampa Health Plaza?
20       A.    Correct.
21       Q.    And the analysis -- the portion of your analysis
22   that relates to the Treasure Valley Surgery Center, that was
23   done based purely on forward-looking projections; right?
24       A.    Yes.
25       Q.    And at the time of your deposition in May of this

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW Document 554 Filed 11/04/14 Page 38 of 68

Bench trial, 09/30/2013

974

1 year, the surgery center was actually performing worse than
2 projection?
3    **A.** Yes.
4    **Q.** One reason for that was that surgeons were delayed
5 in getting credentials to operate at the surgery center?
6    **A.** Yes. There was a delay in the -- in the -- for
7 some of the payors.
8    **Q.** And another reason that the Treasure Valley
9 Surgery Center wasn't performing as well as projected is
10 because it was taking longer for Treasure Valley Hospital
11 shareholders to transition some of their cases to the
12 surgery center?
13    **A.** I'm not aware of that.
14    **Q.** When a hospitalist admits a patient who has been
15 referred by a primary care doctor, it's the hospitalist
16 that's identified as the admitting physician; right?
17    **A.** Yes.
18    **Q.** So one could not reliably determine whether a
19 primary care doctor referred a patient for admission by
20 looking at the admitting physician field; right?
21    **A.** That is correct.
22    THE COURT: Counsel, can we bring in the public?
23    MR. STEIN: Yes, Your Honor. I'm sorry.
24    THE COURT: Perhaps we could open the door.
25    ****** COURTROOM OPEN TO THE PUBLIC ******

975

1    THE COURT: Go ahead, Mr. Stein.
2 BY MR. STEIN:
3    **Q.** Mr. Checketts, you have not done any analysis
4 concerning changes in inpatient admissions resulting from
5 any prior practice acquisitions by St. Luke's; correct?
6    **A.** Correct.
7    **Q.** Now, in addition to the admitting physician field,
8 there is another field in Saint Alphonsus Hospital data for
9 primary care physicians; is that right?
10    **A.** Yes.
11    **Q.** And when patients come into the hospital, they are
12 asked if they have a primary care physician and who that
13 physician is; correct?
14    **A.** Sometimes. Not always.
15    **Q.** Do you know how frequently that field is
16 populated?
17    **A.** I don't. I know that it's incomplete as I've
18 requested information about that from the folks who are
19 close to that.
20    **Q.** But Saint Alphonsus relies on the information in
21 the primary care physician field in its operations, doesn't
22 it?
23    **A.** It's not required for admission, no.
24    **Q.** Well, if a -- if a patient refers -- strike that.
25 If a primary care doctor in the community refers a patient

976

1 in inpatient for admissions to the hospitalist program, the
2 way that's frequently done is for that patient to go through
3 the ER; right?
4    **A.** Yes.
5    **Q.** And Saint Al's wants to make sure that when
6 services are provided to that patient, that the records of
7 that treatment get back to the primary care providers so
8 there is continuity of care; right?
9    **A.** That's what we would like to have happen, yes, but
10 we have not done a great job focusing on that.
11    **Q.** I understand you may not be doing a great job with
12 the continuity of care.
13    **A.** No, no, no, no, no. No, that's not what I'm
14 saying. I'm saying that we have not done a great job of our
15 folks always asking for that bit of information, so it's
16 incomplete.
17    **Q.** But where there is a primary care physician
18 recorded there, do you have any reason to believe that the
19 information in that field is inaccurate?
20    **A.** No. We will send information to that primary care
21 physician if it's -- if it's identified that the patient has
22 been in the hospital.
23    **Q.** Right. So for those records where there is a
24 primary care doctor that's identified in the Saint Al's
25 data, Saint Al's will rely on that primary care doctor data

977

1 in sending medical records and related information to that
2 primary care doctor?
3    **A.** We would send record of that.
4    **Q.** Mr. Ettinger asked you some questions about an
5 expense that you included in your analysis related to
6 payment to a medical services provider known as Pediatrix
7 with an X; is that right?
8    **A.** Yes.
9    **Q.** If I understood your testimony, I think
10 essentially what you said was in your original analysis, you
11 attributed that as an impact of the Saltzer transaction, but
12 you now realize that's an expense that you would have had to
13 incur regardless of whether the transaction went forward?
14    **A.** Correct.
15    **Q.** So why did you assume in the first instance that
16 that was an expense that should be associated with the
17 Saltzer transaction?
18    **A.** Just thinking through, just early conversations
19 that -- that with the alliance of the Saltzer Medical Group,
20 that they would not be interested in doing any services at
21 the -- at the new location and, in fact -- but they -- you
22 know, they determined that they are interested.
23    **Q.** And that was conversations with who?
24    **A.** That would be with hospital management. I didn't
25 have those conversations personally with the pediatricians.

978

1  Q.  That assumption turned out to be incorrect?
2  A.  That the -- that indeed the pediatricians are not
3  interested in providing support for attending C-sections,
4  but they are interested in still following their own
5  patients for well-baby checks and that sort of thing.
6  Q.  The reason they are not providing support for
7  C-sections is because the new facility is a 15-minute drive
8  or so away from their current offices?
9  A.  That's my understanding.
10  Q.  Now, one of the other assumptions in your
11  projections that I don't think you testified about in your
12  direct is that you -- you increased the assumed revenue to
13  Saint Alphonsus by 5 percent each year; is that right?
14  A.  So what that represents is an increase of kind of
15  a split between volume of about 2 and a half
16  percent and then net revenue, another two and a half
17  percent, so just kind of sort of an estimation between the
18  two to kind of mirror what the growth of the community is
19  and assuming that they would continue having that kind of
20  growth and then what, you know, average revenue increase
21  would be.
22  Q.  I'm sorry.  By "they" you mean Saltzer?
23  A.  Yes.  That Saltzer Medical Group would continue to
24  grow.
25  Q.  At what annual rate has Saltzer grown in the past?

979

1  A.  I'm sorry?
2  Q.  At what annual rate has Saltzer grown in the past?
3  A.  I -- I have not measured specifically.  I don't
4  know what kind of past increases they have had as a group.
5  I don't have that information.
6  Q.  With regard to this 2-percent margin, isn't it
7  true that in three of the last five years -- Your Honor --
8  THE COURT:  I'm sorry.
9  MR. STEIN:  I apologize, but to ask this question,
10  I'm pretty sure Mr. Ettinger would not be happy if I asked
11  this question in open court.
12  MR. ETTINGER:  I'm not happy already, Your Honor.
13  THE COURT:  We'll need to clear the courtroom
14  again.  My apologies.
15  ****** COURTROOM CLOSED TO THE PUBLIC ******
16  THE COURT:  Go ahead and proceed, Mr. Stein.
17  BY MR. STEIN:
18  Q.  Isn't it true, Mr. Checketts, that in three of the
19  last five years Saint Alphonsus has operated not just with a
20  margin less than 2 percent but with a negative operating
21  margin?
22  A.  It is true that, yes, that is accurate.
23  Q.  And, for example, in 2010, when Saint Al's had a
24  negative operating margin, you didn't cut any full-time
25  employees; correct?

980

1  A.  Because we were being acquired by Trinity Health,
2  management made a decision specifically not to make cuts
3  because we weren't sure what that would mean in terms of the
4  hospital operations, so no cuts were made.
5  Q.  Trinity is one of the largest Catholic healthcare
6  systems in the United States?
7  A.  One of the largest, yes.
8  Q.  And in 2011, Trinity borrowed approximately $30
9  million for Saint Al's to fund the Nampa Health Plaza; is
10  that right?
11  A.  It wasn't that much, but it -- but they did borrow
12  funds.
13  Q.  And Mr. Ettinger asked you -- maybe I misheard the
14  question, but I think he asked you who is responsible for
15  paying the interest on that loan.  Who is responsible for
16  paying the principal on that loan?
17  A.  Also Saint Alphonsus Nampa.
18  Q.  Is Trinity also responsible for -- when you say
19  Trinity lends -- or obtains the money for Saint Al's, does
20  Trinity also guarantee that money?
21  A.  Trinity Health is a guarantor, yeah.
22  Q.  Am I correct that this year in 2013, Trinity
23  allocated another $20 million or so for planning regarding
24  phase 2 of the Nampa Health Plaza development?
25  A.  I'm not exactly sure how much it is, but -- would

981

1  you please restate your question?  I'm sorry.
2  Q.  This year, Trinity allocated another approximately
3  $20 million for planning on phase 2 of the Nampa Health
4  Plaza development?
5  A.  Yes.  Yes.
6  MR. STEIN:  I have no further questions,
7  Your Honor.
8  THE COURT:  Thank you.
9  Mr. Ettinger.
10  REDIRECT EXAMINATION
11  BY MR. ETTINGER:
12  Q.  Mr. Checketts, let's go backwards.  When Trinity,
13  quote, allocates money for Saint Alphonsus Nampa, is that
14  money coming from Trinity or are they giving permission to
15  Saint Alphonsus Nampa to allocate some of its money for that
16  purpose?
17  A.  It's actually -- for allocation, it's actually a
18  predecessor to when we actually receive approval, and at
19  that point, we're given permission to spend the money that
20  we have, the cash that we have.
21  Q.  Okay.  Now, when Trinity guarantees the loan,
22  who's responsible for that loan in the first instance,
23  Trinity or Saint Alphonsus Nampa?
24  A.  Saint Alphonsus Nampa.
25  Q.  And, so -- and does that principal and interest

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 40 of 68

982

1 payment appear on your income statements?
2    **A.**  Yes.
3    **Q.**  "Your" meaning Saint Alphonsus Nampa?
4    **A.**  Saint Alphonsus Nampa, yes.
5    **Q.**  Has Saint Alphonsus Nampa or Mercy Medical Center
6 in the last five years had occasion to make substantial FTE
7 cuts when it faced losses?
8    **A.**  Yes.
9    **Q.**  About how many?
10    **A.**  About 120 FTEs.  That was in 2009.
11    **Q.**  Now, the 5-percent growth rate that Mr. Stein
12 asked you about, is that a 5-percent growth rate for Saltzer
13 or a 5-percent growth rate with respect to the hospital
14 business that's attributable to Saltzer?
15    **A.**  So it's a -- actually a 5 percent -- so two and a
16 **half percent volume and two and a half percent revenue**
17 **increase for the business attributable to Saltzer Medical**
18 **Group at the hospital.**
19    **Q.**  Okay.  Mr. Stein asked you about a worst-case
20 scenario with regard to the surgeons.  Was that a projection
21 concerning hospital referrals or was that a projection
22 concerning the professional services provided by the
23 surgeons?  If you know.
24    **A.**  I don't -- I don't know on that.
25    **Q.**  Do you recall any pro formas done with regard to

983

1 the surgeons' own activities?
2    **A.**  Are we talking about the orthopedic surgeons?
3 Which surgeons?
4    **Q.**  Right.  The former Saltzer surgeons.  I'm sorry.
5    **A.**  So I did see a pro forma at one point, yes.
6    **Q.**  And do you recall whether that pro forma related
7 only to the surgeons' professional activities or to their
8 hospital referrals?
9    **A.**  As I understood it, it was their professional
10 **activities.**
11    **Q.**  Okay.  And do those surgeons devote their practice
12 currently exclusively to Nampa or not?
13    **A.**  No.  They also practice in Boise.
14    **Q.**  Okay.  To the extent they practice in Boise, does
15 that do any good to Saint Alphonsus Nampa?
16    **A.**  No.
17    **Q.**  Okay.  Mr. Stein also asked you about the surgery
18 center doing worse than projections.  Is the surgery
19 center's shortfall compared to projections in your view due
20 in part to fewer referrals or not?
21        MR. STEIN:  Objection.  Foundation.
22 BY MR. ETTINGER:
23    **Q.**  Have you had an opportunity to review information
24 on that subject that Mr. Stein already asked you about,
25 Mr. Checketts?

984

1    **A.**  So the -- I know that the physicians have received
2 **fewer referrals.**
3    **Q.**  And have the former Saltzer surgeons done fewer
4 cases at the surgery center than was anticipated?
5    **A.**  That is correct.
6        MR. ETTINGER:  Nothing further, Your Honor.
7        THE COURT:  Recross.
8                    RECROSS-EXAMINATION
9 BY MR. STEIN:
10    **Q.**  Mr. Checketts, how many full-time employees is
11 Saint Alphonsus Nampa already planning on cutting in
12 response to the negative margins that it experienced as of
13 the time of your deposition for fiscal year 2013?
14        MR. ETTINGER:  Your Honor, this is beyond the
15 scope of recross, certainly.
16        THE COURT:  I think it is, Counsel.
17        MR. STEIN:  Well, Mr. Ettinger asked on cross:
18 "Are there other instances where you've had -- where you've
19 experienced a negative margin where you have cut full-time
20 employees?"
21        THE COURT:  Well, tie it back correctly to -- it
22 was on redirect, not cross.  But you may inquire.  But it
23 needs to be tied specifically to a question that
24 Mr. Ettinger put to the witness on redirect.
25        MR. ETTINGER:  Your Honor, I was responding to

985

1 Mr. Stein's past five years, so --
2        THE COURT:  I -- that's why we need to tie it
3 specifically to a question asked by Mr. Ettinger.
4        Mr. Stein, proceed.
5 BY MR. STEIN:
6    **Q.**  Is fiscal year 2013 one of those years in which
7 Saint Al's experienced a negative margin and intends to cut
8 full-time employees?
9        MR. ETTINGER:  Your Honor, I have another
10 objection.  Mr. Stein kept me from asking questions about
11 fiscal year 2013.
12        THE COURT:  Mr. Stein, I'm going to have to
13 sustain the objection.  Anything else?
14        MR. STEIN:  Nothing else, Your Honor.
15        THE COURT:  You may step down.
16 Is Mr. Checketts subject to recall?
17        MR. STEIN:  No, Your Honor.
18        THE COURT:  All right.  Thank you, Mr. Checketts.
19 Call your next witness.
20        MR. POWERS:  Your Honor, we call Nick Genna.  Do
21 we want to bring the public back into the courtroom for
22 that?
23        THE COURT:  If you will permit it, certainly.
24        Counsel, while we're bringing them in, I'm going to
25 direct Ms. Gearhart to announce the exhibits that are going

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Page 41 of 68    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 41 of 68



986

1  to be published both based upon the court's directive on
2  September 26th and 27th.
3      ****** COURTROOM OPEN TO THE PUBLIC ******
4      THE COURT: Ms. Gearhart.
5      THE CLERK: The following depositions were
6  published on September 26th, 2013: Linda Duer, Jeff Crouch,
7  Scott Clement, Max Reiboldt, Randell Page, Michael Djernes,
8  William Savage, John Kaiser, Jackie Butterbaugh, Linda
9  House, Steven Drake, and Randall Billings.
10     The following depositions were published today,
11 September 30th, 2013: Joni Stright, Geoff Swanson, Robert
12 Walker, Mark Johnson, and Ed Castledine.
13     THE COURT: Castledine, I think.
14 Thank you, Ms. Gearhart.
15 Our witness, is it Mr. Genna?
16     MR. POWERS: Yes, Your Honor.
17     THE COURT: All right. Step before the clerk and
18 be sworn.
19             NICHOLAS JOHN GENNA,
20 having been first duly sworn to tell the whole truth,
21 testified as follows:
22     MR. POWERS: Your Honor, I think we can turn the
23 screen on.
24     THE CLERK: Please state your complete name and
25 spell your name for the record.

987

1      THE WITNESS: Nicholas John Genna, N-I-C-H-O-L-A-S
2  J-O-H-N G-E-N-N-A.
3      THE COURT: You may inquire, Mr. Powers.
4      MR. POWERS: Thank you, Your Honor.
5              DIRECT EXAMINATION
6  BY MR. POWERS:
7      Q. Mr. Genna, would you tell us your current
8  position, please.
9      A. I'm the CEO of Treasure Valley Hospital.
10     Q. How long have you held that position?
11     A. Just under six years.
12     Q. And what's your education level, sir?
13     A. I have a B.S. in business administration from
14 Cal State University, Sacramento.
15     Q. Why don't you give us -- has your entire career
16 been spent in the healthcare field?
17     A. It pretty much has, yes.
18     Q. Why don't you give us a short summary of the
19 institutions you've worked at and take us up to your present
20 position, please.
21     A. My first 17 years I worked for a company, a not-
22 for-profit community hospital system in Sacramento, based in
23 Sacramento, called Sutter Health Systems. They had
24 approximately -- from several to close to 20 hospitals.
25     And I left Sutter Health after 17 years and went

988

1  to work for a company called Horizon Health Services.
2      And then when I left Horizon Health Services, I
3  went to work as the CEO of Northwest Specialty Hospitals in
4  Post Falls, Idaho. I was there for approximately six years.
5      And then I moved to Boise, Idaho, and became the
6  CEO of Treasure Valley Hospital.
7      Q. The nature of your work at Sutter in general, if
8  you had to characterize it, was what?
9      A. Over 17 years, I got a lot of wonderful
10 experience. I started out as an accountant and worked
11 through planning and analysis, which was a very large area.
12 I got to do anything from projections, forecasting, budgets,
13 three-year, five-year projections to large presentations in
14 front of as big an audience as the board rating committees,
15 nationally and internationally, as well as a resource
16 planning committee of Sutter Health System.
17     Q. And the nature of your work at Horizon was what,
18 if you had to summarize it?
19     A. It was a start-up company, so at first I was a CFO
20 and then got into development, growth, administration,
21 regional role as managing several surgery centers and a
22 surgical hospital.
23     Q. And the nature of your work in North Idaho or
24 Post Falls was what?
25     A. I was the CEO of Northwest Specialty Hospital, so

989

1  that encompassed literally everything. Not in your
2  traditional sense of a CEO of a hospital. You wear very
3  many hats. So --
4      Q. So you arrived in Boise at Treasure Valley
5  Hospital in 2007; is that correct?
6      A. Yes, it is.
7      Q. And your position is CEO of the organization?
8      A. Yes, I am.
9      Q. Let's talk a little bit about Treasure Valley
10 Hospital in general. How big a facility is it from the size
11 of the -- from the number of beds and the number of
12 operating rooms?
13     A. We have ten licensed inpatient beds, we have four
14 operating rooms, and three procedure rooms.
15     Q. So even though you're primarily an outpatient
16 facility, you do have ten beds. Patients do stay in the
17 facility overnight for one, two, sometimes more days?
18     A. Absolutely.
19     Q. All right.
20     A. As long as they're needed to stay.
21     Q. Let's talk about the nature of the surgical
22 services provided at Treasure Valley Hospital. Why don't
23 you summarize that for us so that the court has an
24 understanding of the type of work that's done there.
25     A. We do ear, nose, and throat surgery. We do

990

1  general surgery.  We do colonoscopies as kind of in the
2  general surgery department.  We do GYN, orthopedics, which
3  includes spine in this case, a few other specialties.  Over
4  time, they have done some -- we do dental, oral surgery,
5  maybe urology, maybe a little bit of plastic surgery.
6      **Q.**  All right.  Now, you don't have a critical care
7  unit, do you?
8      **A.**  We do not.
9      **Q.**  You don't have an ICU; correct?
10     **A.**  Correct.
11     **Q.**  You don't have an emergency room?
12     **A.**  We do not.
13     **Q.**  Okay.  You really focus and specialize on
14  providing outpatient surgical care?
15     **A.**  Outpatient and some inpatient, yes.
16     **Q.**  Okay.  Let's talk a little bit about what you do
17  on a daily basis.
18     Before I get there, let me ask you a few questions
19  about the hospital staff.  Now, you have approximately a
20  hundred surgeons who have privileges at Treasure Valley
21  Hospital; correct?
22     **A.**  Yes.
23     **Q.**  And, then, you have some of those surgeons who
24  have privileges at Treasure Valley Hospital also have an
25  ownership interest; correct?

991

1      **A.**  Yes.
2      **Q.**  How many surgeons have an ownership interest?
3      **A.**  In the neighborhood of 30.
4      **Q.**  And help us understand what it means when you have
5  privileges at Treasure Valley Hospital for those one hundred
6  surgeons who have privileges, physicians.
7      **A.**  Just to clarify, those one hundred are not all
8  surgeons.  We have pulmonologists, critical care docs,
9  infectious control docs, cardiologists on staff, some of
10  them in a consulting manner.  We probably have a little bit
11  over 40 surgeons, currently of which 30 of those are owners
12  in Treasure Valley.
13     **Q.**  Okay.  So we have got 40 surgeons on staff who
14  have privileges and currently approximately 30 have an
15  ownership interest?
16     **A.**  Yes.
17     **Q.**  Let's talk a little bit about the ownership
18  structure at Treasure Valley Hospital.  How much of the
19  hospital is owned by these 30 surgeons, approximately?
20     **A.**  Sixty percent.
21     **Q.**  And who owns the rest of the hospital?
22     **A.**  A company called SCA, Surgical Care Affiliates.
23     **Q.**  All right.  Now, with respect to the surgeon
24  owners at the hospital, can you give us an idea of the
25  parameters of their ownership interest?  What does it range

992

1  from?
2      **A.**  As little as under a quarter of a percent or a
3  quarter of that hundred percent and as high as a little over
4  3 percent.  A little over 3 percent is the most.
5      **Q.**  And with respect to those owners, they have a
6  particular interest that they pay a sum of money for;
7  correct?
8      **A.**  Yes, they buy in, mm-hmm.
9      **Q.**  Okay.  And they own a percentage of the shares of
10  Treasure Valley Hospital.  Is that fair?
11     **A.**  Yeah, mm-hmm.
12     **Q.**  And then, every year, they're entitled -- if there
13  is a profit, every year they're entitled to a particular
14  distribution that's set in that given year; correct?
15     **A.**  Yes.
16     **Q.**  Now, let's talk about the day-to-day operations at
17  the hospital.  And I'm interested in how you interact with
18  physicians, staff, and patients on a daily basis at Treasure
19  Valley Hospital.  Help us understand if you would.
20     **A.**  Well, a typical day -- there is really no such
21  thing as a typical day.  But every day I carve out a large
22  portion of my day to interacting with our customers.  And I
23  would identify our customers as obviously the surgeons who
24  work at Treasure Valley Hospital as well as the patients and
25  the patient family members.

993

1      So every day -- my office is right next to the
2  doctors' lounge by design.  Not the biggest office.  No
3  window and all, but it's by design right next to the
4  doctors' lounge.  Every day, I spend time interacting with
5  the doctors first thing in the morning.  I get the surgical
6  schedule in advance a day or days before, and I interact
7  with them.  Get feedback.  They are very actively
8  participating in the operations of Treasure Valley.
9      I make time every single day to round on patients
10  in the inpatient unit, as well, and oftentimes interact with
11  their family members in the lobby and in the waiting rooms,
12  as well as in the room when they are recovering or in
13  the -- in the PACU, the recovery for the outpatients, as
14  well.
15     **Q.**  Okay.  Let me ask a few follow-up questions on
16  that.
17     **A.**  Sure.
18     **Q.**  With respect to the patients, you say you round on
19  them.  Help us understand what you mean by that and give us
20  an example of a typical interaction you might have with a
21  patient on a regular basis.
22     **A.**  Typically, on the inpatient side, we get our
23  patients up and moving around very quickly.  Feel -- the
24  doctors really demand that.  It feels like they recover
25  faster.  There are fewer complications from laying in a bed

Case 1:12-cv-00560-BLW v. Document 554 Filed 11/04/14 Page 43 of 68

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

994

1 after surgery.  Get them up and moving around.
2           I frequently make it a point of -- if I don't see
3 them walking up and down the hallways after surgery, I
4 connect with the nurses' station and see -- make sure I
5 don't go into a room when they are sound asleep or busy.  I
6 go into the rooms and introduce myself and talk to those
7 patients.  Oftentimes, their spouses are with them or family
8 members or friends, and I speak to them, as well, introduce
9 myself as the CEO, and ask for feedback, ask for ways we can
10 improve, ask for how they're doing, and let them know that
11 if they have any questions at all -- typically, I even give
12 them a business card -- if they have any questions, they can
13 contact me.
14      Q.  Okay.  Do you also gather information about
15 patient care at Treasure Valley Hospital through your own
16 surveys that you do with respect to patient satisfaction?
17      A.  We do.  We hand out patient satisfaction surveys
18 to every patient that comes through Treasure Valley.  And we
19 get information back.  We also have compiled a huge binder
20 of letters that we receive as well as patient satisfaction.
21 We regularly go through these with our leadership team at
22 quarterly teammate meetings with the entire staff at
23 Treasure Valley as well as with the physicians, MEC,
24 governing board, partnership meetings.  And we -- we
25 interact.  We respond to these requests for improvement, or

995

1 we recognize teammates that have been recognized by patients
2 in letters.
3      Q.  Do you work on a daily basis with physicians on
4 staff as well as physician owners in -- in checking and
5 improving and sustaining the quality of care at Treasure
6 Valley Hospital?
7      A.  Absolutely.  Every day.
8      Q.  You serve on committees, I take it, at the
9 hospital?
10      A.  I do.
11      Q.  Give us an idea of the top three committees that
12 you serve on at the hospital.
13      A.  Governing board.  Participate in all the
14 partnership meetings, typically present part of that agenda.
15 MEC, quality improvement, performance improvement.  Surveys
16 for joint commission, Medicare, Medicaid.  Quite a few.
17      Q.  It's true, isn't it, that, in effect, the surgeon
18 owners of Treasure Valley Hospital are, in part, individuals
19 you report to in your job; correct?
20      A.  Absolutely.  The entire team feels like they know
21 who the customer is as well as who the owners are.
22      Q.  In the course of your responsibilities, is it fair
23 to say that one of your primary jobs is to attract surgeons
24 to Treasure Valley Hospital, let them know what the hospital
25 does, let them know what it's all about, and attempt to

996

1 attract them to Treasure Valley Hospital and get a feel for
2 how the hospital operates?  Is that part of your
3 responsibility?
4      A.  Very much so.
5      Q.  Are you always interested in attracting surgeon
6 owners to the hospital, potential surgeon owners?
7      A.  Where that's an appropriate fit, absolutely.
8      Q.  Without those surgeon owners, Treasure Valley
9 Hospital would not exist; correct?
10      A.  Yes.
11      Q.  So in terms of your surgical staff, when you're
12 talking to physicians and trying to attract them to Treasure
13 Valley Hospital, what do you tell them about the quality of
14 care at Treasure Valley Hospital with respect, for instance,
15 to nursing care?
16      A.  We -- just respect to nursing care, we -- our
17 patient-to-nurse ratios are one to one, sometimes two nurses
18 to one patient, and probably at some point in time, they
19 could be as two -- two patients per nurse, so two to one.
20 One to one to two to one.
21      Q.  Is that a very favorable ratio when it comes to
22 patient care?
23      A.  It's absolutely favorable.  It's so not the norm
24 in healthcare, yes.
25      Q.  With respect to efficiencies at Treasure Valley

997

1 Hospital, from a surgeon standpoint, what do you stress to
2 those surgeons when you're attempting to attract them to
3 Treasure Valley Hospital?
4      A.  Because we specialize in what we do, not only do
5 we have extremely well-trained staff in the particular
6 specialties that they practice in, we really, really
7 streamline for efficiencies things like the turnover time
8 between cases.  On average, our turnover time is 10 minutes
9 to 12 minutes between cases.  We're able to do that because
10 of specializing and the setup and nature of our plant, the
11 way it was designed.
12           In my days at Sutter Health and most hospitals,
13 it's closer to an hour, hour and a half between cases.
14      Q.  And that's, obviously, attractive to surgeons
15 because they can perform more cases in a shorter period of
16 time?
17      A.  Yes.  They only have so much OR time available to
18 them.
19      Q.  Do you in any way discourage the referrals of
20 Medicare patients to Treasure Valley Hospital?
21      A.  Absolutely not.
22      Q.  Let's go through your general surgical mix at
23 Treasure Valley Hospital.  Approximately, how many -- what
24 percentage of your patients at Treasure Valley Hospital are
25 Blue Cross, third-party payor patients?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 44 of 68

Bench Trial, 09/30/2013

998

1  A.  Again, it varies throughout month to month and
2  year to year but in the nature of high 20s, I would say.
3  Q.  High 20 percent?
4  A.  High 20 percent.  Blue Shield and other, 7 or 8,
5  10 percent.
6  Q.  Okay.  You're anticipating my questions.
7  A.  I'm sorry.
8  Q.  Regence is another how many?
9  A.  Ten, 10 percent or so.
10  Q.  How about Medicare?
11  A.  Medicare in the 30 percent range.
12  Q.  Now, do you also talk to physicians about the
13  lower cost of care at Treasure Valley Hospital compared to
14  other hospitals?
15  A.  Absolutely.  That's -- that's something we work
16  with physicians day to day, and we couldn't -- we couldn't
17  provide the low cost that we're known for without
18  involvement of the -- of the physicians.
19  Q.  Okay.  With respect to investments, do you talk to
20  physicians about investments?
21  A.  Yes.  We do talk to them about investments.
22  Q.  What do you tell them about an investment in
23  Treasure Valley Hospital?
24  A.  Well, typically, they get credentialed, get on
25  staff at Treasure Valley Hospital.  It is a partnership with

999

1  the physicians.  We want to make sure they're engaged in the
2  day-to-day operations, they're involved in the care and the
3  improvement of care.  So, typically, they work at Treasure
4  Valley Hospital to see if it's a good fit for their practice
5  for some time.  Supply and demand of shares available,
6  sometimes that could be many years.  And then -- and
7  sometimes it can be a shorter period of time.
8       And if it is truly a good fit, they find value in
9  the care.  They find value in the productivity they're able
10  to get from their OR time at Treasure Valley Hospital.
11  There is a discussion about ownership.  And that discussion
12  includes the very large risk of investing in Treasure Valley
13  Hospital.  Have a lot of discussions with them.  There is
14  some concern about if they invest in Treasure Valley
15  Hospital how that will impact their referral sources, and
16  those kinds of discussions happen.
17       MR. STEIN:  Objection, Your Honor.  Hearsay.
18       THE COURT:  I'm sorry, Counsel.  I was not
19  tracking.
20       MR. STEIN:  The question was:  What do you tell
21  them about an investment in Treasure Valley Hospital?
22       THE COURT:  We're probably getting to where it's
23  nonresponsive to that original question.
24       Mr. Powers, let's get a question back before the
25  witness.

1000

1       MR. POWERS:  Certainly, Your Honor.  Certainly,
2  Your Honor.
3  BY MR. POWERS:
4  Q.  So with respect to the risk involved in investing
5  in Treasure Valley Hospital, what do you tell these
6  surgeons?
7  A.  I share financial information.  We do talk about
8  the risk.  They share the risk in their concerns with me at
9  that point.  But there are inherent risks with every
10  investment.  And they need to be a qualified investor to be
11  able to invest.  In other words, they need to know that
12  they're a risk.  We make sure that we pointed that out to
13  them.
14  Q.  Okay.  With respect to the rewards of Treasure
15  Valley Hospital, do you share your financial statements with
16  them?
17  A.  Absolutely.  With any investment you would have to
18  share the financials.
19  Q.  Do you share -- do you share the fact that there
20  have been dividends paid to other shareholders in previous
21  years?
22  A.  I do.  I give them as much history about the
23  operations that --
24  Q.  Do you share the rate of return for them?
25  A.  Yes.

1001

1  Q.  Let's talk a little bit about what you can't do at
2  Treasure Valley Hospital in trying to attract physicians.
3  You can't -- you can't offer long-term employment contracts
4  to surgeons, can you?
5  A.  No.
6  Q.  And you can't buy up or buy out primary care
7  groups and move them into your system, can you?
8       MR. STEIN:  Your Honor, could I just ask, since
9  this is direct examination, that we not have such leading
10  questions.
11       MR. POWERS:  I'm trying to lay a foundation,
12  Your Honor.
13       THE COURT:  I think it is foundational.
14  Mr. Powers, obviously as we move away from foundational
15  matters, I will assume it will be less leading.  Go ahead
16  and proceed.
17       MR. POWERS:  Thank you, Your Honor.
18  BY MR. POWERS:
19  Q.  Let's talk a little bit about the pool of surgeons
20  that are available in the community for you to attempt to
21  attract to Treasure Valley Hospital.  Since 2008, has that
22  pool of surgeons become smaller?
23  A.  Extremely smaller.
24  Q.  Okay.  And as you're the CEO of this organization,
25  I take it that you're involved in long-range planning; is

1002

1 that right?
2    **A.**  Yes.
3    **Q.**  Am I correct in saying that one of the things you
4 do with respect to long-range planning is you look to the
5 future to see what the prospects are for attracting other
6 physicians?
7    **A.**  Yes.
8    **Q.**  In 2009 or so, did you come up with a plan for
9 attempting to attract a particular type of surgeon to
10 Treasure Valley Hospital?
11    **A.**  **In analyzing the data that kind of paramixes -- or**
12 **specialty mix we get, and the fact that we're able to keep**
13 **our costs down in spine, orthopedic, specifically spine, we**
14 **did set out to do -- to try to attract a little more spine**
15 **surgeons. We had some spine work that we were already**
16 **doing, but we tried to get more into that, yes.**
17    **Q.**  Why was spine work something that was attractive
18 to you with respect to future planning for Treasure Valley
19 Hospital?
20    **A.**  **Well, while the implant costs can be much higher,**
21 **the net revenue per case, as well, is higher.**
22    **Q.**  What's that a function of?
23    **A.**  **The amount of surgery, the larger amount, as well**
24 **as the reimbursement rates for those, the risks involved in**
25 **spine surgery, but for the most part, the type of surgery it**

1003

1 is.
2    **Q.**  All right.  Now, with respect to your plan and the
3 future, did you set out to attempt to attract particular
4 spine surgeons in the community to Treasure Valley Hospital?
5    **A.**  **We did.**
6    **Q.**  Now, in the 2008, 2009 time period, there were a
7 number of transactions that began to take place by
8 St. Luke's in the Treasure Valley healthcare marketplace; is
9 that correct?
10    **A.**  **Yes, it is.**
11    **Q.**  And those transactions included the Riverside, the
12 proposed Riverside Hospital that was a surgical hospital;
13 correct?
14       MR. STEIN:  Your Honor, I think we're starting to
15 move away from foundation to just Mr. Powers testifying
16 here.
17       THE COURT:  All right.  I'll -- Mr. Powers,
18 rephrase.
19       MR. POWERS:  Certainly, Your Honor.  I'm sorry.
20 BY MR. POWERS:
21    **Q.**  Let's talk about those transactions, if you would,
22 the significant transactions that occurred in the
23 marketplace that involved St. Luke's starting in 2009.
24       Can you recall for me in general and identify for me
25 those transactions that most greatly affected Treasure

1004

1 Valley Hospital, starting in 2009.  If you can do it in
2 chronological order.
3    **A.**  **Yes.  In 2009, there was -- the surgical hospital,**
4 **large surgical hospital that was in the plans, and I'm very**
5 **familiar with it because I interviewed for that job.  They**
6 **asked me to interview for that job in 2007.  So that -- that**
7 **project was purchased by St. Luke's.  That included a very**
8 **large orthopedic group, Intermountain Orthopaedics, as well**
9 **as a pretty large spine group and several other groups.  I**
10 **want to say there were more than or at least 20 surgeons**
11 **involved in that deal.**
12    **Q.**  All right.  Now, let me interrupt for a second.
13 Let's get some clarity here.  This was not a hospital that
14 was built; correct?
15    **A.**  **No.  It didn't quite get off the ground.  They**
16 **got --**
17    **Q.**  So this was a planned hospital; correct?
18    **A.**  **Yes.**
19    **Q.**  And was this a hospital that was planned to be put
20 together by a group of surgeons?
21    **A.**  **Yes, it was.**
22    **Q.**  All right.  And that -- that plan did not move
23 forward because a deal was struck with St. Luke's; is that
24 right?
25       MR. STEIN:  Objection.  Lack of foundation.

1005

1       MR. POWERS:  I'll lay the foundation.
2       THE COURT:  If you would.  Counsel, let me back
3 up.  Is this in Nampa we're talking?
4       MR. POWERS:  No, Your Honor.
5       THE COURT:  I assume not.
6       MR. POWERS:  No.  This is in Boise.
7       THE COURT:  All right.  Proceed.
8 BY MR. POWERS:
9    **Q.**  Let me ask you the question.  Was this Riverside
10 Surgical Hospital planned to be located in the city of
11 Boise?
12    **A.**  **It was, kind of downtown, midtown.**
13    **Q.**  Let's talk a little bit about what you know about
14 this project and talk foundation.  You interviewed for the
15 job as a CEO of this -- this organization?
16    **A.**  **While I was employed in north Idaho at Northwest**
17 **Specialty Hospital, I was contacted by the group of**
18 **physicians that were in charge of that project, and they**
19 **asked me to come down and interview.  I kind of said, you**
20 **know, I'm not really interested.  I'm happy where I am.  But**
21 **they needed some, if nothing else, consulting help.  So I**
22 **met with several of the docs.  I looked through the pro**
23 **forma.  I got very intimately involved with what they were**
24 **planning.**
25    **Q.**  And what were they planning?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.　　Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW　Document 554　Filed 11/04/14　Page 46 of 68

1006

1　　　**A.**　They were planning to build a very large surgical
2　hospital with -- they had a very large group of orthopedists
3　and spine surgeons, including pediatric orthopedists, and it
4　sounded like a very large all-physician-owned project that
5　they were planning on doing.
6　　　**Q.**　And then -- then the transaction that occurred
7　that you're aware of with St. Luke's, was that -- that group
8　of surgeons entered into a deal with St. Luke's and the
9　project was not moving forward.  Is that fair?
10　　　**A.**　Yes.  That project was purchased by St. Luke's,
11　including the ground that they had bought for the hospital
12　and is still on --
13　　　**Q.**　And one of the surgical groups in Boise that you
14　referenced is Intermountain Orthopaedic Surgery; right?
15　　　**A.**　Yes.
16　　　**Q.**　Describe that surgical group, its size and
17　preeminence in Boise for us, please.
18　　　**A.**　It was clearly the largest orthopedic group in
19　town.  At the time, 10 or 12, maybe, maybe more surgeons at
20　the time.  Covered all of the orthopedic specialties,
21　including pediatrics, as well as a spine group that was
22　involved with that, as well.
23　　　**Q.**　As a result of that transaction, did that diminish
24　the pool of surgeons available to you to attempt to attract
25　to Treasure Valley Hospital?

1007

1　　　**A.**　Part of that deal included an MSO, and the MSO had
2　a noncompete.
3　　　　　THE COURT:  Just a moment.  MSO?
4　　　　　THE WITNESS:  Yeah.
5　　　　　THE COURT:  What is the acronym?
6　　　　　THE WITNESS:  Medical service organization.
7　　　　　THE COURT:  Thank you.
8　BY MR. POWERS:
9　　　**Q.**　Am I correct in saying that certain orthopedic
10　surgeons that were involved in that group were then
11　precluded from investing in Treasure Valley Hospital?
12　　　　　MR. STEIN:  Objection.  Lack --
13　　　　　THE WITNESS:  Yes.
14　　　　　MR. STEIN:  Move to strike.  Lack of foundation.
15　　　　　THE COURT:  Sustained.
16　　　　　MR. STEIN:  Also relevance.  I mean, I'm not
17　sure -- I'm not sure what any of this has to do with the
18　Saltzer transaction.
19　　　　　MR. POWERS:  Let me try to lay a better
20　foundation.
21　　　　　THE COURT:  I'll overrule the objection on
22　relevance grounds, but as to foundation, I will sustain the
23　objection.
24　BY MR. POWERS:
25　　　**Q.**　With respect -- with respect to your knowledge of

1008

1　the preclusion of orthopedic surgeons from practicing or
2　being able to practice at Treasure Valley Hospital, did you
3　gain information from your discussions with your physician
4　owners at Treasure Valley regarding the terms of the
5　transaction and whether physicians would be precluded?
6　　　**A.**　I did.  I read the document.  I have seen the
7　document, and I saw the MSO.
8　　　　　THE COURT:  Which document are you talking about?
9　　　　　THE WITNESS:  The document with those surgeons and
10　St. Luke's for the River Street surgical hospital.
11　BY MR. POWERS:
12　　　**Q.**　Riverside?
13　　　**A.**　Riverside.  I'm sorry.
14　　　　　MR. STEIN:  Your Honor, I'll object, then, on best
15　evidence grounds.  I don't know what document he is talking
16　about.  The first question was prohibited from investing in
17　Treasure Valley Hospital.  The second question was very
18　different.  It was prohibited from practicing at Treasure
19　Valley Hospital.  If we're going to base this on some
20　document --
21　　　　　MR. POWERS:  If he has knowledge as a result of
22　his position as CEO of Treasure Valley Hospital, Your Honor,
23　about this transaction, in talking --
24　　　　　THE COURT:  The witness can testify as to his
25　understanding as to whether these physicians were subject to

1009

1　recruitment at Treasure Valley, and that's as far as he can
2　go.  And if he is wrong, then, of course, you can point that
3　out on cross.  But I think his understanding, whether he is
4　correct or not, has some bearing upon the competitive impact
5　of the acquisition and position of Treasure Valley.  So I'll
6　overrule the objection but allow the witness to answer only
7　based upon what he understands, and it's only admitted for
8　that purpose, not for the truth of what he is testifying to.
9　　　　　MR. POWERS:  Sure.
10　　　　　THE COURT:  Because it is either a best evidence
11　problem or a hearsay problem or both.
12　　　　　MR. POWERS:  Very good.
13　　　　　THE COURT:  Proceed.
14　　　　　MR. POWERS:  Thank you, Your Honor.
15　BY MR. POWERS:
16　　　**Q.**　Your understanding as the CEO of Treasure Valley
17　was as a result of the Riverside Surgical Hospital
18　transaction, there were certain key surgeons that were
19　precluded from involvement in Treasure Valley Hospital?
20　　　**A.**　An extremely large portion of the people involved.
21　　　**Q.**　Okay.  Whether that be involvement as having
22　privileges or whether it be involvement as being owners.  Is
23　that fair?
24　　　**A.**　Yes.
25　　　**Q.**　All right.  Now, let's move on to the other

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 47 of 68

1010

1 transactions. What was the next transaction that occurred
2 that involved St. Luke's that impacted Treasure Valley
3 Hospital?
4      **A.   The next one was the purchase of River**
5 **Street -- I'm sorry -- River Street Surgery Center, also**
6 **referred to as OSI Orthopedic Surgery Center.**
7      **Q.   So we have got -- a little confusing. We have got**
8 Riverside Surgical Hospital; correct?
9      **A.   Mm-hmm.**
10      **Q.   Which was a planned hospital that was never**
11 constructed. And then we have River Street Orthopedic
12 Surgical Center; correct?
13      **A.   Yes.**
14      **Q.   Okay. And that particular transaction occurred in**
15 what year?
16      **A.   I think it finalized in 2011.**
17      **Q.   You sure about that?**
18      **A.   It might have been earlier than that. 2010.**
19      **Q.   Do you have a memory of when it finalized?**
20      **A.   I think June of 2010 was when it finalized. I'm**
21 **not positive.**
22      **Q.   All right. Let's talk a little bit about the**
23 impact of the surgical center, the River Street Surgical
24 Center on Treasure Valley Hospital. Explain to us what
25 occurred in terms of the basics of the transaction. Did

1011

1 St. Luke's buy River Street Surgical Center?
2      **A.   They bought a hundred percent of it.**
3      **Q.   And who comprised -- what physicians comprised**
4 River Street Surgical Center, in general? How would you
5 describe that surgical mix?
6      **A.   There was a group of approximately 13 orthopedic**
7 **surgeons involved in that project.**
8      **Q.   And as a result of that particular transaction,**
9 were -- were certain surgeons precluded from being involved
10 in Treasure Valley Hospital?
11      MR. STEIN: Your Honor, same objections.
12      THE COURT: Same ruling.
13      MR. STEIN: If it's not being offered not for the
14 truth of the matter, then I'm fine.
15      THE COURT: Precisely. I'll allow the witness to
16 testify as to his understanding, but I won't -- but not for
17 the truth of -- you know, there may be other witnesses who
18 can so testify, but I think we either have a hearsay problem
19 or a best evidence problem.
20      Proceed.
21      MR. POWERS: Thank you, Your Honor.
22 BY MR. POWERS:
23      **Q.   You can answer the question, Mr. Genna.**
24      **A.   Of the physicians involved in that project, at the**
25 **point of the sale, the physicians that had an ownership in**

1012

1 **Treasure Valley Hospital could maintain that ownership. In**
2 **other words, they were grandfathered in. The ones that**
3 **didn't, couldn't -- could not invest in Treasure Valley**
4 **Hospital.**
5      **Q.   Okay. And did that transaction diminish the**
6 overall pool of available surgeons for you to attract to
7 Treasure Valley Hospital?
8      MR. STEIN: Same objection.
9      THE COURT: And same ruling.
10      THE WITNESS: Yes. By at least -- by several
11 additional orthopedic surgeons.
12 BY MR. POWERS:
13      **Q.   So what was the next transaction by St. Luke's in**
14 the healthcare marketplace that impacted Treasure Valley
15 Hospital?
16      **A.   There were a few single physician employments, but**
17 **I think the next biggest one was Boise Orthopedics --**
18      **Q.   Is Boise Orthopedic referred to as Boise**
19 Orthopedic Clinic properly?
20      **A.   BOC, yes.**
21      **Q.   And the acronym that everybody in this town throws**
22 around for them is BOC; correct?
23      **A.   Yes.**
24      **Q.   And with respect --**
25      THE COURT: Counsel, we're about where we take the

1013

1 break, but I'm going to allow you to go just for a few more
2 minutes. Pick a spot in the next five minutes where we can
3 break. Go ahead.
4      MR. POWERS: Thank you, Your Honor.
5 BY MR. POWERS:
6      **Q.   Describe BOC for the court, please. What type of**
7 orthopedic group was BOC?
8      **A.   It was a group of at least five orthopedic**
9 **surgeons, including spine, sports medicine, general**
10 **orthopedics, pediatric orthopedics. Five very busy**
11 **orthopedic surgeons.**
12      **Q.   And were some of Boise Orthopedics' surgeons on**
13 staff at Treasure Valley Hospital?
14      **A.   All of them were.**
15      **Q.   And did some Boise Orthopedics surgeons before**
16 this transaction perform surgery at Treasure Valley
17 Hospital?
18      **A.   Yes. They all did.**
19      **Q.   And did some Boise Orthopedic Clinic orthopedic**
20 surgeons have an ownership interest in Treasure Valley
21 Hospital?
22      **A.   At least three of them did, yes.**
23      MR. POWERS: Your Honor, this is probably as good
24 a place as any to stop.
25      THE COURT: Just a moment. I want to

**Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.**                    Bench Trial, 09/30/2013

---

1014

1 finish -- all right.  All right.  We will be in recess for
2 15 minutes.  Counsel, I will really try hard to hold this to
3 15 minutes.  We had problems with a copy machine on
4 something, which is why the last break got a little bit
5 long.  Please try to be in your seat in about 15 minutes.
6         We'll be in recess.
7         (Recess.)
8         ******COURTROOM REMAINS OPEN TO THE PUBLIC******
9         THE COURT:  Mr. Genna, I'll remind you you are
10 still under oath.
11         You may continue your examination of the witness.
12         MR. POWERS:  Thank you, Your Honor.
13 BY MR. POWERS:
14    **Q.**  Mr. Genna, when we took our second break, we were
15 talking about Boise Orthopedic Clinic, or BOC.
16         I would like to ask that the BOC -- St. Luke's
17 acquisition of Boise Orthopedic Clinic June 2010
18 demonstrative be put up, please.
19         Now, Mr. Genna, before we broke, you were pointing out
20 that there were several members of Boise Orthopedic Clinic
21 who had privileges at Treasure Valley Hospital before the
22 St. Luke's acquisition; correct?
23    **A.**  Yes.
24    **Q.**  Okay.  And you also mentioned that I think there
25 were three surgeons who were owners in Treasure Valley

---

1015

1 Hospital?
2    **A.**  Three of the five, yes.
3    **Q.**  Okay.  I want to review here with you the
4 performance by Boise Orthopedic Clinic at Treasure Valley
5 Hospital starting in 2008, and I want to follow along with
6 the demonstrative chart that's in front of you and in front
7 of the court.
8         It appears that Boise Orthopedic Clinic surgeons
9 performed surgery at Treasure Valley Hospital in 2008, and
10 the number appears to be 443 cases; is that correct?
11    **A.**  Yes.
12    **Q.**  Okay.  And the percentage of the total surgeries
13 performed at Treasure Valley Hospital compared to the BOC
14 surgeons in 2008 was 11 percent?
15    **A.**  Yes.
16    **Q.**  And in 2009, total number of BOC cases at Treasure
17 Valley Hospital were 490; correct?
18    **A.**  Yes.
19    **Q.**  And the percentage of total cases at Treasure
20 Valley was 10 percent; is that right?
21    **A.**  Yes, it is.
22    **Q.**  2010 -- and the transaction occurred on June 1st,
23 2010, with BOC and St. Luke's; is that right?
24    **A.**  It did.
25    **Q.**  Okay.  2010, the total number of surgeries at

---

1016

1 Treasure Valley Hospital Boise were 60 by BOC surgeons;
2 correct?
3    **A.**  Yes.
4    **Q.**  And that represented 1 percent of overall cases at
5 Treasure Valley in the year 2010?
6    **A.**  That's rounding up, yes.
7    **Q.**  All right.  And then in 2011, there were zero
8 cases before --
9         THE COURT:  Counsel, just a moment.  Ms. Gearhart
10 just pointed out to me that this is marked confidential,
11 attorneys' eyes only.  I'm assuming that is not the case, or
12 do we need to turn this off?
13         MR. POWERS:  No, we don't need to turn it off,
14 Your Honor.  It was marked in discovery.  I don't think it's
15 necessary here today in direct, but I appreciate -- I
16 appreciate that point, Ms. Gearhart's point.
17         THE COURT:  I will confess, I was asleep at the
18 switch, but Ms. Gearhart pointed it out in an instant
19 message out of a great deal of concern.
20         MR. POWERS:  It's my responsibility, Your Honor.
21 I should have explained it.  I'm sorry.  I appreciate
22 Ms. Gearhart's observation.
23         THE COURT:  Go ahead and proceed.
24 BY MR. POWERS:
25    **Q.**  So in 2011 there were no surgeries performed by

---

1017

1 BOC surgeons at Treasure Valley; correct?
2    **A.**  Correct.
3    **Q.**  Has that continued in 2012 and 2013?
4    **A.**  Yes, it has.
5    **Q.**  So, clearly, that acquisition had a direct impact
6 on Treasure Valley Hospital?
7    **A.**  Yes, it did.
8    **Q.**  And do you suspect that -- that you have any
9 opportunity to attract Boise Orthopedic Clinic surgeons to
10 Treasure Valley Hospital in the future?
11    **A.**  No.  I've met with them and talked to them, and I
12 don't expect to have any opportunity for them to work at
13 Treasure Valley.
14    **Q.**  And is it your understanding they are employed at
15 St. Luke's?
16    **A.**  They are.
17    **Q.**  So let's talk about chronologically the next
18 transaction that occurred here in the healthcare field in
19 Boise with respect -- that had an impact on Treasure Valley
20 Hospital.  What was the next transaction that occurred and
21 approximately when did it occur?
22    **A.**  Boise Surgical, I think, was the next project that
23 a large group of general surgeons -- I want to say at least
24 six -- six or seven.  They, too, became employed by St.
25 Luke's and don't expect them to -- to work at Treasure

---

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 49 of 68

1018

1 Valley.
2        Q.  I'm sorry.  I can't hear you, sir.
3        A.  I'm sorry.  I don't expect them to work at
4 Treasure Valley Hospital anymore based on meetings with some
5 of them.
6        Q.  That transaction occurred, I believe, at the -- I
7 believe in 2012; is that correct?
8        A.  Yes.
9        Q.  Now, none of those -- none of the surgeons at
10 Boise Surgical were on staff at Treasure Valley Hospital; is
11 that right?
12        A.  No.  There was one.  And we had talked
13 about -- talked with several others about privileges at
14 Treasure Valley Hospital.
15        Q.  So there was one surgeon who had privileges --
16        A.  Yes.
17        Q.  -- from Boise Surgical at Treasure Valley
18 Hospital?
19        A.  Yes.
20        Q.  Okay.  Does he still have privileges?
21        A.  No.
22        Q.  Did he relinquish his privileges at the time of
23 the transaction?
24        A.  It became time for recredentialing, and he -- he
25 didn't re-up.  We contacted him, and he said he had no plans

1019

1 of working at Treasure Valley Hospital.
2        Q.  Do you expect in the future you will have any
3 opportunity to recruit or attract Boise Surgical surgeons to
4 Treasure Valley Hospital?
5        A.  No.
6        Q.  Now, as part of your plan to promote and attract
7 spine surgeons to Treasure Valley Hospital, in 2012 -- in
8 2011, you were able to attract an independent spine surgeon
9 who happens to be a neurosurgeon to Treasure Valley
10 Hospital; correct?
11        A.  Yes, we were.
12        Q.  And that independent spine neurosurgeon is a very
13 busy spine surgeon, has a high volume; is that right?
14              MR. STEIN:  Your Honor, leading.
15              THE COURT:  It is leading.
16              MR. POWERS:  Sorry.  Sorry, Your Honor.  Just
17 thinking about time in the back of my mind.
18              THE COURT:  I understand.
19 BY MR. POWERS:
20        Q.  The independent spine surgeon that you hired, what
21 type of volume did he have?
22        A.  I'm sorry.  We didn't hire him.
23        Q.  I'm sorry.
24        A.  He --
25        Q.  That you -- that you attracted to Treasure Valley.

1020

1        A.  One of the more prominent independent spine
2 surgeons started working at Treasure Valley Hospital.  He
3 got credentialed through our efforts and started working at
4 Treasure Valley Hospital.  And we saw -- with his
5 satisfaction and his patients' satisfaction, we saw his
6 volume grow quite a bit.
7        Q.  And has that volume growth continued at Treasure
8 Valley Hospital with that surgeon?
9        A.  Yes, it has.
10        Q.  And have you been able to attract another
11 neurosurgeon to Treasure Valley Hospital in the last year?
12        A.  Yes.  We were able to attract another in that
13 independent but that group.
14        Q.  For those -- those high-margin, high-value cases?
15        A.  Yes.
16              MR. STEIN:  Object to form.  I don't think that's
17 been established.
18              MR. POWERS:  I think we have gone through the
19 value.
20              THE COURT:  Overruled.  Overruled.
21              MR. POWERS:  Okay.  Thank you.  Excuse me,
22 Your Honor.
23 BY MR. POWERS:
24        Q.  In 2012, did you have the opportunity to attempt
25 to attract another neurosurgeon in the community to Treasure

1021

1 Valley Hospital?
2        A.  Yes.  We have tried to attract as many in that
3 group.  So we had a third surgeon in that group apply for
4 privileges at Treasure Valley Hospital.
5        Q.  Now, when a surgeon applies for privileges, you
6 have to send out a request to the hospitals where he has
7 privileges to check on his or her credentials; correct?
8        A.  Yes.  There is a large process to get
9 credentialed, and that includes sending out where he is
10 currently working and getting feedback on peer review, as
11 well.
12        Q.  Okay.  And with respect to this particular surgeon
13 in late 2012, did you send those requests to St. Luke's and
14 Saint Al's?
15        A.  We did.
16        Q.  Shortly thereafter, was that surgeon's application
17 withdrawn from Treasure Valley?
18        A.  It was.
19        Q.  And shortly thereafter, did you come to find that
20 he had become employed at St. Luke's?
21        A.  Yes.
22        Q.  Do you suspect that you have the opportunity to
23 attract that particular neurosurgeon to Treasure Valley
24 anytime in the next several years?
25        A.  No.  Again, we followed up with him, and he

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 50 of 68

1022

1  said --
2          MR. STEIN:  Objection.  Hearsay.
3          THE COURT:  Sustained.
4          MR. POWERS:  Thank you, Your Honor.
5  BY MR. POWERS:
6      Q.  Now, the next transaction -- tell us what the next
7  transaction was here in the Treasure Valley that had an
8  impact on Treasure Valley Hospital with respect to
9  St. Luke's.
10     A.  It was the Saltzer transaction.
11     Q.  And when did you -- when did you first become
12  aware of the possibility of the Saltzer-St. Luke's
13  transaction occurring?  What year was it?
14     A.  It was probably 2009, late 2009.
15     Q.  That there was some discussion?
16     A.  There was quite a bit of discussion, yes.
17     Q.  And have you followed that discussion up to the
18  present?
19     A.  Yes, I have.
20     Q.  And in 2012 -- we know in November of 2012, the
21  acquisition was announced, Treasure Valley -- or St. Luke's
22  acquisition of the Saltzer group.
23          Let's talk a little bit about the participation of
24  Saltzer surgeons at Treasure Valley Hospital.  If you can
25  give the court an idea of -- well, let me ask a better

1023

1  question.
2          Why don't you tell us how you were able to attract
3  Saltzer surgeons to Treasure Valley Hospital.
4      A.  Prior to -- prior to me starting in Boise at
5  Treasure Valley, one Saltzer surgeon had been working at
6  Treasure Valley prior to me arriving, and we went out and
7  met with several other surgeons.  I met with the Saltzer
8  leadership, the CEO as well as the CFO, Bill Savage and
9  Ms. Powell, Nancy Powell.  We worked with the Saltzer
10  surgeons.  They showed interest.  Kind of a few at a time
11  started working at Treasure Valley.  They -- they liked the
12  service at Treasure Valley.  They liked the clinical
13  outcomes.  They liked the convenience as well as the
14  productivity.
15          So, over -- over a course of a couple years, we
16  had seven Saltzer surgeons working at Treasure Valley quite
17  a bit.
18     Q.  Okay.
19     A.  A large chunk.
20     Q.  Was there a payor mix similar to the average payor
21  mix that you described earlier at Treasure Valley?
22     A.  Yeah.
23     Q.  Okay.  Is it correct to say, then, that from 2008
24  to 2011, you were able to grow that Saltzer surgeon case
25  count to Treasure Valley Hospital?

1024

1      A.  They became a large percentage, in the 40s.  And
2  that kind of coincided with us thinking about spine work, as
3  well, to diverse a little bit.
4      Q.  We're going to get into those numbers in a bit,
5  but I want to -- I want to cover a few other issues before
6  we get into the Saltzer numbers specifically.
7          Why don't you -- why don't you tell us what your
8  thought was when you found out that St. Luke's had acquired
9  Saltzer.  What were the concerns that you had as a CEO of
10  Treasure Valley Hospital?
11     A.  Well, I had been working with -- with Saltzer,
12  specifically with John -- Dr. Kaiser, as the president of
13  Saltzer, throughout the process as well as the surgeons that
14  worked at Treasure Valley who were part of the board at
15  Saltzer: Dr. Williams, Dr. Curran, and others.
16          And the discussion varied in a lot of ways, but as
17  it grew over time, it clearly became an employment model.
18  So it got very concerning --
19     Q.  Okay.
20     A.  -- towards the end.
21     Q.  And Dr. Kaiser at one point in time was an owner
22  in Treasure Valley Hospital; correct?
23     A.  Yes, he was.
24     Q.  Dr. Kaiser is the leader of Saltzer; correct?
25     A.  He is the president, yes.

1025

1      Q.  And the Saltzer -- the Saltzer surgeons, as we're
2  referring to them, they were also owners in Treasure Valley
3  Hospital?
4      A.  Yes.
5      Q.  So you had discussions with them relative to the
6  discussions they were having as members of Saltzer with
7  St. Luke's; correct?
8      A.  Yes.
9      Q.  And did those discussions surround the issue of
10  maintaining their interest in Treasure Valley Hospital?
11     A.  They did.
12     Q.  And still becoming a part of St. Luke's?
13     A.  There were different variations to the mix.
14  Dr. Kaiser played a very active role in --
15     Q.  Let me ask some questions.  Let me ask some
16  questions.
17          The question was -- I've got to remember the question
18  now.  Were your discussions with the Saltzer surgeons, which
19  included Dr. Kaiser, were those discussions about the notion
20  of maintaining their interest in Treasure Valley Hospital
21  and still cutting a deal with St. Luke's?
22     A.  Yes.
23     Q.  All right.  And in the course of those
24  discussions, did you have occasion to talk with, amongst
25  other Saltzer surgeons, Dr. Kaiser?

1026

1    **A.**  Yes.

2    **Q.**  And tell us the nature of those discussions from a
3  chronological standpoint, when they first started and what
4  the focus of those discussions were with Dr. Kaiser about
5  maintaining his interest at Treasure Valley Hospital.

6    **A.**  He -- he was active at Treasure Valley Hospital,
7  **and he wanted to continue to be active at Treasure Valley**
8  **Hospital, and there was some discussion as to how they were**
9  **going to -- he, specifically, as well as the other**
10  **surgeons -- do that. There was discussion about the deal**
11  **and how it would work. He shared documents and even talked**
12  **to, I think, SCA legal at one point in time about it.**
13  **But up until I want to say 2010, he was very**
14  **engaged in seeing if the deal could be structured so that he**
15  **could still keep his shares at Treasure Valley Hospital. We**
16  **had a lot of conversations at that time. At some --**

17    **Q.**  Did you also converse with the other Saltzer
18  surgeons?

19    **A.**  **Yes. There were many meetings specifically with**
20  **them about it, a couple dinners but many, many meetings,**
21  **yes.**

22    **Q.**  Now, a couple other issues I want to talk about
23  before we get into these Saltzer numbers. Were you
24  concerned at all with the Saltzer-St. Luke's transaction
25  about primary care physicians at Saltzer?

1027

1    **A.**  **Clearly, yes. From --**

2    **Q.**  In what way?

3    **A.**  **From --**

4    **Q.**  You run a surgical hospital. In what way?

5    **A.**  **Right. The -- it's not only the surgeon getting**
6  **much, much smaller, but all of the surgeons in town get**
7  **their referrals from various sources that they developed**
8  **over years. And when a group the size of over 50 doctors**
9  **and they have been in the community for, I think, 54 years**
10  **at the time, when they're -- a group that big is looking at**
11  **going away, that's -- that's pretty much the biggest group**
12  **in town that is independent and had been referring to**
13  **surgeons that do work at Treasure Valley Hospital.**

14    **Q.**  As the CEO of a surgical hospital, what do you
15  know about the value of primary care physician referrals
16  with respect to surgical cases, the relationship?

17    **A.**  **Other than getting cases through the -- through**
18  **the emergency room, that is the primary way that they get**
19  **patients referred to them for surgery.**

20    **Q.**  A couple more questions. With respect to
21  utilization, "utilization" is a term that's used in various
22  ways in your business. Let's talk first about the notion of
23  overutilization. What is overutilization?

24    **A.**  **I'm not really familiar with that term. I could**
25  **guess, but I'm not really familiar.**

1028

1    **Q.**  Well, I don't want you to guess. I don't want you
2  to guess. Tell me this: Are you subject -- as a surgical
3  hospital, are you subject to questions from organizations --
4  such as Medicare, third-party payors such as Blue Cross --
5  to questions if they suspect there are too many surgeries or
6  unnecessary surgeries going on at your institution?

7    **A.**  **We -- we have never had that issue. No one has**
8  **ever said that. The process for getting surgeries approved**
9  **is standardized throughout all of healthcare: all**
10  **hospitals, all physician-owned facilities, all of them.**
11  **It's pretty much the same standard. Blue Cross, Blue**
12  **Shield, Medicare, Medicaid, they all need prior approval in**
13  **most cases, and there is a process for that.**
14  **So we have never been accused of unnecessary**
15  **surgery or overutilization.**

16    **Q.**  Okay. So with respect to the idea of utilization,
17  hospital utilization, utilization of facilities, help the
18  court understand what that -- that term means in that
19  context.

20    **A.**  **Well, it's basically utilizing the assets that you**
21  **have. So we have OR time, OR space, and we measure that**
22  **utilization by how much time is used versus how much time is**
23  **available.**

24    **Q.**  Do you track utilization?

25    **A.**  **We do.**

1029

1    **Q.**  In the 2011 time period, in the year 2011, what
2  percent of utilization of your facility were you running at,
3  approximately?

4    **A.**  **I think we were in the mid 80s -- mid 80s.**

5    **Q.**  Come the middle of 2012 and up until the present,
6  what's been your utilization rate?

7    **A.**  **It's dropped approximately 20 percent to the mid**
8  **60s.**

9    **Q.**  Now, let's talk a little bit about EMRs. Do you
10  have an EMR, an electronic medical record, at Treasure
11  Valley?

12    **A.**  **Yes, we do.**

13    **Q.**  And tell us about that EMR. How is it utilized
14  and how effective is it?

15    **A.**  **Well, EMRs were part of healthcare reform. Well,**
16  **they were around a lot longer than that. They're a**
17  **requirement of healthcare reform through CMS, Centers for**
18  **Medicare and Medicaid Services. We see Medicare and**
19  **Medicaid patients. So it was a requirement, as it is for**
20  **all, to participate in Medicare and Medicaid.**
21  **So we started the process, and we -- we got our**
22  **EMR up and running. There are various phases, and we met**
23  **the meaningful use for our EMR in 2012, early 2013 and we**
24  **just received a reimbursement for meeting meaningful use.**

25    **Q.**  What is meaningful use --

**Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.** Bench trial, 09/30/2013

---

1030

1  **A.** It's --

2  **Q.** -- in general?

3  **A.** It's kind of the timeline for when you have to

4  have a specific part of EMR.  First, you have to be doing

5  order entry and patient care and tracking, and then

6  eventually you have to have it completed, the entire EMR.

7  **Q.** Okay.  I want to talk a little bit about cost at

8  Treasure Valley Hospital.  Are you aware that imaging

9  services, such as MRI scans and CT scans, are -- the

10  insurance payments for those services are substantially less

11  at Treasure Valley than they are at St. Luke's?

12        MR. STEIN:  Objection.  Leading and foundation.

13        THE COURT:  Sustained.

14  BY MR. POWERS:

15  **Q.** Is there a difference between the cost of imaging

16  services at Treasure Valley and St. Luke's -- was there in

17  2012?

18        MR. STEIN:  Objection.  Foundation, potentially

19  hearsay.

20        THE COURT:  Let's lay a foundation as to how the

21  witness knows.

22        MR. POWERS:  Sure.

23  BY MR. POWERS:

24  **Q.** Mr. Genna, as the CEO of Treasure Valley Hospital,

25  do you have access to third-party payors' websites and the

---

1031

1  information regarding insurance payments for select

2  services?

3  **A.** Yes.  The Blue Cross website is -- is where

4  we -- we are able to go and look.  Providers can go and look

5  on the Blue Cross website, and it shows the difference

6  in -- it basically shares some contract information -- the

7  difference in prices by facility.  It's designed so that

8  providers, physicians, referral based, family practice, can

9  go to that website and look -- take that into account when

10  they're referring imaging -- MRs, CTs, ultrasounds, X-rays.

11        MR. POWERS:  Your Honor, let me ask the question

12  again, then.

13  BY MR. POWERS:

14  **Q.** Based on your access to the Blue Cross website,

15  are you aware of the differences in insurance payments in

16  2012 for MRI and CT scans between Treasure Valley and

17  St. Luke's?

18        MR. STEIN:  Your Honor, again, I object on the

19  grounds of hearsay to Mr. Genna testifying about what's on a

20  Blue Cross website.  We had a Blue Cross witness.  If the

21  plaintiffs wanted to introduce that testimony, they could

22  have done it through that person.  But I don't think

23  Mr. Genna's recollection of what's --

24        THE COURT:  I'm going to overrule the objection

25  and allow the witness to testify.  I think, again, this

---

1032

1  information informs his decision about the charges, the

2  competitive structure of the market, and the decision-making

3  that he has as a CEO of Treasure Valley.

4        MR. POWERS:  Thank you, Your Honor.

5        THE COURT:  So I'll admit it for that limited

6  purpose.  If the assumptions are wrong, then, of course,

7  that may be pointed out on cross-examination, but I think

8  there is some independent relevance just to his

9  understanding.

10        Proceed.

11        MR. POWERS:  Thank you, Your Honor.

12        Let's put the average insurance payments for select

13  services demonstrative up, please.

14  BY MR. POWERS:

15  **Q.** Mr. Genna, this is a chart that I believe was

16  referred to in your declaration in this case.

17        With respect to MRI costs, comparing costs at

18  St. Luke's to Treasure Valley Hospital, what -- what was the

19  cost when you checked in 2012 for an MRI scan at TVH -- for

20  insurance payments, rather?

21  **A.** For a Blue Cross patient, the cost at Treasure

22  Valley Hospital was $622, and the cost at St. Luke's was

23  $1227.

24  **Q.** I'm sorry.  The cost was at St. Luke's?

25  **A.** $1,227.

---

1033

1  **Q.** All right.  And with respect to CT scans, what was

2  the difference between the two organizations?

3  **A.** It was even a higher margin.  It was 372 versus

4  904.

5  **Q.** And then there is also a difference in rates on

6  colonoscopy and hernia repair; correct?

7  **A.** Yes, there are.

8  **Q.** What were the differences there?

9  **A.** So this data came from EOBs that we collected in

10  the natural course of what we do.  An EOB is an Estimate of

11  Benefits.  And these showed the cost of a colonoscopy at

12  Treasure Valley, the reimburse cost of 675 versus 2,250.

13  **Q.** For a colonoscopy?

14  **A.** Yes.

15  **Q.** In 2012?

16  **A.** Yes.

17  **Q.** And with respect to hernia repair, what's the

18  difference in the cost of hernia repair comparing St. Luke's

19  to Treasure Valley Hospital?

20  **A.** $1900 versus 5400.

21  **Q.** $1900, for the record, for Treasure Valley

22  Hospital?

23  **A.** Yes.

24  **Q.** And 5400 for St. Luke's?

25  **A.** Yes.

---

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 09/30/2013

1034

1  **Q.** A couple questions for you about quality at
2  Treasure Valley Hospital.  There is an organization
3  called -- is it Health Compare?
4      **A. Hospital Compare.**
5      **Q.** Hospital Compare.  Help us understand what
6  Hospital Compare is.
7      **A. Again, part of healthcare reform requirements to**
8  **participate in Medicare and Medicaid, CMS Medicare, the**
9  **board collects data on clinical outcomes, complications of**
10 **surgery, infection rates, take-backs to surgery -- many,**
11 **many statistical outcomes that they set and -- as well as --**
12 **that CMS sets, as well as patient satisfaction.**
13     **So each quarter they put out a report of all**
14 **the -- all the hospitals participating in the country.**
15     **Q.** CMS is what?  I don't think it's been defined here
16 in this courtroom.
17     **A. It's the Center for Medicare and Medicaid**
18 **Services.**
19     **Q.** And by law, they're required to collect data with
20 respect to each hospital in the country that provides
21 services to Medicare patients; correct?
22     MR. STEIN:  Object to lack of foundation.
23 Your Honor, also, I thought this morning we were not going
24 to be getting into third-party quality data sources.
25     MR. POWERS:  Your Honor, I think I can lay a

1035

1  foundation for this, and I think I can do it through this
2  witness, and I think it's relevant to the question of the
3  quality of care.
4      MR. STEIN:  Only if --
5      MR. POWERS:  I am trying to lay a foundation.  If
6  Mr. -- you know, Counsel has an objection --
7      MR. STEIN:  Mr. Powers, lay the foundation, stop
8  and let Mr. Stein object, and then we'll rule on it.
9      MR. POWERS:  I will.
10 BY MR. POWERS:
11     **Q.** So CMS collects data from every hospital; correct?
12     **A.** Yes.
13     **Q.** And what data do they collect?
14     **A. Specifically, infection rates, take-backs to**
15 **surgery, complication rates, re -- having to take somebody**
16 **back for surgery, transfers, deaths.  And then there is a**
17 **whole section on patient satisfaction, as well.  And there**
18 **is a series of questions:  How well were you informed by**
19 **your nurse about your care, your medication; how well you**
20 **were informed by your physician about medication; did**
21 **somebody answer the call button -- those sorts of questions.**
22     **Q.** Okay.  That data all comes through -- through CMS
23 and data that CMS is obligated by law to provide; correct?
24     MR. STEIN:  Objection to leading and foundation.
25     THE COURT:  First of all, leading questions are

1036

1  permissible in laying a foundation, and I think that's what
2  Mr. Powers is trying to do.  But, obviously -- and I hope
3  it's clearly understood -- that before we get into what the
4  information actually was that was reported, that Mr. Stein
5  will have a chance to object and we can resolve it.
6      Proceed, Mr. Powers.
7      MR. POWERS:  Thank you, Your Honor.
8  BY MR. POWERS:
9      **Q.** Based on that data, how does that data get
10 transferred to Hospital Compare?
11     **A. There is a website.  It's Hospitalcompare.gov.**
12 **Anybody can go to that website.  You can compare hospital to**
13 **hospital.  It's planned to compare physician to physician,**
14 **see about outcomes, basically.  Part of healthcare reform is**
15 **you can shop around and see quality, clinical outcomes and**
16 **physicians and how they do.**
17     **Q.** So it's a website that's available to the public;
18 correct?
19     **A. Yes.**
20     **Q.** And it is a website that contains data, if I
21 understand your testimony, collected by CMS under federal
22 law from each hospital in the country; correct?
23     **A. And defined by CMS, yes.**
24     **Q.** Okay.  And any member of the public can access it?
25     **A. Yes.**

1037

1      MR. POWERS:  Your Honor, that's the foundation I
2  would like to lay for the next question, which is:  Where
3  did Treasure Valley Hospital rank in the listing of the top
4  50 hospitals in the country on the health compare -- or the
5  Hospital Compare website for patient satisfaction.
6      THE COURT:  Mr. Stein?
7      MR. STEIN:  Well, a relevance objection, which is
8  it's not really clear why -- how Treasure Valley Hospital
9  ranked on one website is that significant.  But, moreover,
10 this is one -- you're talking about one survey with a
11 complicated methodology to it that's done by the federal
12 government.  It's not simply, you know, pick a number and
13 assign it.
14     So, again, we have been held to an exacting standard in
15 terms of admitting quality evidence, and I just believe that
16 plaintiffs should be held to the same standard that if -- if
17 we're going to be getting into what some website says about
18 one's quality over another, U.S. News World Report, we could
19 bring all those things in.  I'm not really sure how they're
20 going to move the ball forward.
21     MR. POWERS:  We are --
22     THE COURT:  I'm sorry.  Mr. Ettinger?
23     MR. ETTINGER:  Could I weigh in on this,
24 Your Honor?  It does have implications for all plaintiffs.
25     THE COURT:  Well, obviously, my ruling here is

1038

1  probably not going to stop with Treasure Valley.  There
2  would be the issue raised about St. Luke's, Saint Al's, and
3  anybody else.  Mr. Ettinger, what is your --
4          MR. ETTINGER:  Your Honor, I think this example is
5  qualitatively different from the others.  This is the
6  federal government.  It's available to everybody.  It's
7  widely recognized.  I think it's 803(17) on recognized
8  market indices as an exception to the hearsay rule.  And if
9  anything qualifies, this does.
10      I would add that Dr. Enthoven, St. Luke's expert, is
11  relying on Medicare CMS studies in his testimony -- not this
12  precise data, certainly, but --
13         THE COURT:  Do we have the studies?  Why not admit
14  the studies rather than have the witness simply testify as
15  to his assessment?
16         MR. POWERS:  I have -- I have the ranking,
17  Your Honor, that I could admit, but it's a ranking from --
18  that you get on this public website with respect to Hospital
19  Compare.
20         MR. STEIN:  I'm just not sure if that's a trial
21  exhibit where it's -- where it's coming from.  I believe the
22  only evidence we got of this, Your Honor, came during
23  actually the exchange of pretrial materials.  So --
24         MR. POWERS:  Your Honor, it's been marked --
25  previously marked Exhibit -- Plaintiff's Exhibit 1649, I

1039

1  think.  Counsel.  It's a 2012 health compare -- Hospital
2  Compare data contained on the public website as Mr. Ettinger
3  has defined it.
4          THE COURT:  Give me just a moment.  I want to
5  review some -- some of the foundation that was laid.
6  Counsel, I need just a moment.  My apologies.
7      Well, Counsel it does sound to me like it's an 803(8)
8  publication.  I think, however, it should be limited to the
9  document itself.  The witness can only testify as to what is
10  in the document.  And I think the document, itself, would
11  constitute a public record setting forth the office's
12  activities and the matter observed while under a duty to
13  report, which is what the witness has testified to.
14      So, with that, I'll overrule the objection.  However, I
15  don't think we need to have the witness testify to it.  We
16  can simply admit Exhibit 1649 and leave it at that.
17         MR. POWERS:  I'll offer 1649, Your Honor.
18         THE COURT:  And I assume the same objection,
19  Mr. Stein?
20         MR. STEIN:  No.
21         THE COURT:  All right.  1649 will be admitted.
22         MR. POWERS:  Thank you, Your Honor.
23         MR. STEIN:  I'm sorry.  Admitted over our
24  objection?
25         THE COURT:  What's that?

1040

1          MR. STEIN:  Admitted over our objection?
2          THE COURT:  Yes.  Thank you for clarifying.  I
3  actually thought you were withdrawing your objection.
4          MR. STEIN:  That's how I saw it on the screen.
5          THE COURT:  The objection is overruled.  The
6  exhibit will be admitted.
7      (Plaintiffs' Exhibit No. 1649 admitted.)
8          MR. POWERS:  Your Honor, I would like to -- given
9  the court's ruling and not running through this -- the same
10  issue again, in the interest of time, I would like to also
11  offer Plaintiff's Exhibit 1652, I believe.  Same reasons,
12  Your Honor.  It's a -- it's a -- hospital --
13         THE COURT:  From the same agency?
14         MR. POWERS:  Hospital Compare agency.  You can
15  access it on Hospitalcompare.com.
16         THE COURT:  I'm not as concerned about how you can
17  access it.  I'm concerned about who prepared it and under
18  what circumstances.
19         MR. POWERS:  The same foundation, and I can run
20  through it if you would like me to.
21         THE COURT:  Is it disputed that it is essentially
22  a publication of the same entity?
23         MR. STEIN:  Your Honor, I don't know what this is.
24  It was produced to us as a spreadsheet.
25         THE COURT:  It's Exhibit 1652.  If you want to

1041

1  take a moment.
2          MR. STEIN:  The problem is we don't know what it
3  is.  This was just given to us in exchange of pretrial
4  materials.  It wasn't produced in discovery.  We didn't have
5  a chance to ask anyone about it.  It's literally a --
6          THE COURT:  Do you wish to inquire in aid of an
7  objection?
8          MR. STEIN:  Well --
9          THE COURT:  All right.  At this point, I will
10  admit the exhibit --
11         MR. STEIN:  If Mr. Powers could lay the foundation
12  with the witness for what this is --
13         THE COURT:  Mr. Powers.
14         MR. POWERS:  Certainly.
15  BY MR. POWERS:
16     Q.  Mr. Genna, we're referring to a document that is
17  found on Healthcompare.com that ranks hospitals in the
18  country, and Treasure Valley Hospital is ranked No. 1.
19  You're familiar with that document?
20     A.  I am.
21     Q.  Okay.  Explain what that document is, sir.
22     A.  Again, as part of healthcare reform, it's -- there
23  was a component of it that says value-based reimbursement.
24  So for Medicare and Medicaid patients, if your reimbursement
25  based on your amount of Medicare and Medicaid used to be

1042

1 kind of a -- if a line is going this direction, it used to
2 be right in the middle, or on a bell curve right down the
3 middle. That meant you got a hundred percent of what you
4 were entitled to reimbursed from Medicare.
5          Part of healthcare reform, they added a component
6 called "value-based reimbursement." And that was based on
7 clinical outcomes provided, as we had discussed earlier
8 through CMS questions, and patient satisfaction, again
9 provided through CMS questions, that every hospital
10 participating does.
11         **Treasure Valley Hospital --**
12   **Q.** Hold on a second. Hold on a second. You don't
13 need to get to the conclusion. Is this data -- is this data
14 published on Hospital Compare?
15   **A.** It is, as well as every hospital receives their
16 **ranking.**
17   **Q.** Okay. So every hospital in the country that
18 provides this data to CMS is ranked on this Hospital Compare
19 website?
20   **A.** Yes.
21   **Q.** And Treasure Valley Hospital's ranking on this
22 website was what?
23   **A.** It's very important because --
24   **Q.** Treasure Valley Hospital's ranking on this website
25 was what?

1043

1   **A.** Number one in the country.
2   **Q.** Okay. For?
3   **A.** For every hospital. Number one for every hospital
4 that participates -- number one ahead of Mayo Clinic, Johns
5 Hopkins, every hospital.
6   **Q.** For value?
7   **A.** It was -- it was termed under value-based
8 reimbursement, but it was for clinical outcomes, patient
9 satisfaction, all of those questions, all those --
10 complications to surgery, that type.
11         MR. POWERS: Thank you. Gentlemen, am I correct
12 that this is marked Plaintiff's Exhibit 1652?
13         Your Honor, I would offer Exhibit 1652.
14         THE COURT: The objection is noted. I'm going to
15 admit the exhibit. 1652 will be admitted.
16      (Plaintiffs' Exhibit No. 1652 admitted.)
17 BY MR. POWERS:
18   **Q.** And with respect to value-based reimbursement and
19 your ranking, what does that translate to with respect to
20 reimbursement from Medicare? What does it practically refer
21 to in terms of your bottom line in terms of Treasure Valley
22 Hospital?
23   **A.** So if you fall in that bell curve, you get the
24 **percentage you were going to get. Ranked number one at 99.7**
25 **percent, we got the highest allowable reimbursement for**

1044

1 **Medicare. So it was substantial. Of all our Medicare**
2 **volumes, we got a much higher percentage reimbursement, in**
3 **the neighborhood of 20 -- 20 points or so higher.**
4   **Q.** And it reflects -- it reflects a high level of
5 service in what areas?
6   **A.** Clinical outcomes and patient satisfaction.
7   **Q.** Okay. All right. Let's move on now to the
8 Saltzer cases and the impact on Treasure Valley Hospital.
9         Your Honor, unfortunately, at this point, I think we're
10 going to go to AEO information that --
11         THE COURT: I'll turn that off.
12         Counsel, I want to make clear the basis for my prior
13 ruling. There were -- I'm going to clear the courtroom.
14 And while people are walking out, I'll go ahead and indicate
15 my ruling since my ruling is not attorneys' eyes only. But
16 everyone not affiliated with, I guess, Treasure Valley would
17 need to leave the courtroom.
18         ****** COURTROOM CLOSED TO THE PUBLIC ******
19         THE COURT: Counsel, there were three objections:
20 relevance, and I guess 403, foundation, and hearsay. My
21 ruling is that foundation is laid by the fact the witness
22 has explained his understanding of how the document is
23 prepared, that it's available in a public website that they
24 access and use, and that he receives a copy of that from
25 this government or quasi government agency.

1045

1         The hearsay objection is satisfied by 803(8), and I
2 think the relevance is based upon at least an implicit, if
3 not directly stated, defense that there are indirect
4 benefits from the acquisition in terms of improvements in
5 quality care that -- that are being posited as a
6 justification for the acquisition.
7         So that will be the basis of my ruling.
8         Go ahead, Mr. Powers.
9         MR. POWERS: Thank you, Your Honor.
10         Gentlemen, let's put demonstrative entitled "Saltzer
11 Surgeon Case Counts, Treasure Valley Hospital, Boise, 2008
12 to 2013" up, please.
13         And, Your Honor, you can turn on the screen. I'm not
14 sure -- it helps me, actually.
15         THE COURT: All right.
16         MR. POWERS: Thank you.
17 BY MR. POWERS:
18   **Q.** All right. We talked about this data before we
19 cleared the courtroom, Mr. Genna, but I want to get into
20 specifics with respect to Saltzer surgeon case counts. And
21 let's make sure we have got a clear definition here.
22         Saltzer surgeon case counts in this particular chart
23 include case counts from 2008 through August 31st, 2013;
24 correct?
25   **A.** Yes.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 56 of 68
Bench Trial, 09/30/2013

1046

1    **Q.**  Okay.  And we know -- we know that it's not
2  necessarily accurate to describe Saltzer surgeons after
3  November 2012 -- the same Saltzer surgeons after November
4  2012 as "Saltzer surgeons"; right?
5    **A.**  Yes.
6    **Q.**  We know that -- that they left Saltzer at the time
7  of the acquisition with St. Luke's in November and they
8  joined Saint Alphonsus; correct?
9    **A.**  Yes.
10    **Q.**  Okay.  But for purposes of this chart, we have
11  tried to track those cases performed by the same group of
12  Saltzer surgeons or these Saltzer surgeons from 2008 to
13  2013; correct?
14    **A.**  Yes.
15    **Q.**  And you put -- you went through this chart, put it
16  together based on the data that you keep in the regular
17  course of your business at Treasure Valley Hospital;
18  correct?
19    **A.**  I did.
20    **Q.**  You keep track of how many surgeries are performed
21  and what surgeons perform those surgeries?
22    **A.**  Yes.
23    **Q.**  All right.  So as we look at these numbers --
24  let's look at the first column, Treasure Valley Boise
25  Surgeons from Saltzer only.  We see, don't we, that from --

1047

1  that in 2008, there were 981 cases performed by Saltzer
2  surgeons; correct?
3    **A.**  Yes.
4    **Q.**  In 2009, that number grew to 2,150; correct?
5    **A.**  Yes.
6    **Q.**  In 2010, that number grew to 2,230 cases; correct?
7    **A.**  Yes.
8    **Q.**  In 2011, that number grew to 2,068 cases -- it
9  didn't grow, but it actually diminished some to 2,068 cases?
10    **A.**  Yes.
11    **Q.**  And then in 2012, the number dropped to 1,415
12  cases; correct?
13    **A.**  Yes.
14    **Q.**  And as of August 31st, 2013, the number of cases
15  performed by the same group of surgeons, although they were
16  not Saltzer surgeons in 2013, is 563; correct?
17    **A.**  Correct.
18    **Q.**  Okay.  And as we compare it to the overall number
19  of surgeries at Treasure Valley Hospital during those years,
20  we know that the total of all surgeries at Treasure Valley
21  Hospital in 2008 were 3,731; in 2009, 5,017 cases; in 2010,
22  4,934 cases; in 2011, 4,830 cases; in 2012, 4,639 cases; and
23  the total number of cases performed at Treasure Valley
24  Hospital in Boise up through August 31st, 2013, is 2,904
25  cases; correct?

1048

1    **A.**  Through August 30th, yes.
2    **Q.**  Okay.  And below that, we have the percentage --
3  an estimated percentage of Saltzer surgeons' surgeries
4  performed at Treasure Valley Hospital Boise.  For 2008, we
5  have 26 percent; 2009, 43 percent; 2010, 45 percent of all
6  surgeries at Treasure Valley were performed by Saltzer
7  surgeons; 2011, 43 percent of all surgeries performed at
8  Treasure Valley were performed by Saltzer surgeons; 2012,
9  the number is 30 percent.  And, obviously, we don't have an
10  annualized number for 2013 yet.
11    Did I read those numbers correctly, sir?
12    **A.**  Yes, you did.
13    **Q.**  Do they accurately reflect what your actual case
14  counts -- the information that your actual case counts at
15  the hospital that you maintain on a regular basis contain?
16    **A.**  Yes.
17    MR. POWERS:  Your Honor, I would like --
18  gentlemen, I would like you to put up the Treasure Valley
19  Hospital Boise 2012 case count by physician.  If you
20  could -- yeah, let's put that up.
21  BY MR. POWERS:
22    **Q.**  All right.  And this particular demonstrative
23  actually identifies the Saltzer surgeons that are involved
24  and their -- their specialty; correct?
25    **A.**  Yes, it does.

1049

1    **Q.**  And the top portion of the demonstrative contains
2  a specific case count for those surgeons in 2012; correct?
3    **A.**  Yes.
4
5
6
7
8
9
10
11
12
13                      REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW  Document 554  Filed 11/04/14  Page 57 of 68

1050

REDACTED

1051

REDACTED

25    **Q.**  All right.  Now, you're aware from your work with

1052

1    these physicians -- and both Dr. Williams and Dr. Curran are
2    physician owners or surgery owners of Treasure Valley
3    Hospital; correct?
4    **A.  They are.**
5    **Q.**  Are you aware in your discussions with these
6    physicians what the referral patterns have been over the
7    years of their work at Treasure Valley Hospital?
8    **A.  Yeah.  Those are conversations, again, we have**
9    **every day.  They --**
10    **Q.**  Let me ask a question.  Let me ask a question.
11    And from -- from communicating with them, working with
12    these -- these surgeon owners, did you become aware of the
13    average percentage of case referrals that they received from
14    Saltzer primary care physicians?
15    **A.  Yes.  Dr. Williams --**
16    **Q.**  With respect to Dr. Williams before the
17    acquisition at -- before the acquisition between Saltzer and
18    St. Luke's, what was the percentage of PCP referrals he
19    received from Saltzer PCPs for his surgeries?
20    **A.  In the high 90s at least.**
21    **Q.**  Okay.  And with respect to Dr. Curran, same
22    question:  Before the acquisition between Luke's and
23    Saltzer, what was the percentage number of
24    referrals that he received for his surgeries at Treasure
25    Valley Hospital from Saltzer PCPs?

1053

1    **A.  In the high 80s to low 90s.**
2    **Q.**  Since -- since the acquisition, have you had the
3    opportunity as your job as CEO to discuss with Dr. Williams
4    and Dr. Curran the level of referrals they are receiving
5    from Saltzer PCPs since November of 2012?
6    **A.  Yes.**
7    **Q.**  And with respect to Dr. Williams, what -- what
8    have you -- what have you learned in those discussions?
9    MR. STEIN:  Your Honor, I'd just object on
10    hearsay.  I believe Dr. Curran and Dr. Williams are going to
11    be witnesses.  They can come in and testify --
12    THE COURT:  Counsel, I would tend to agree.
13    Unless there is some independent relevance that this
14    witness, knowing what was said --
15    MR. POWERS:  I do intend to call them, Your Honor.
16    If you would like me to ask them those questions, I can.
17    THE COURT:  Let's do that.
18    MR. POWERS:  All right.
19    BY MR. POWERS:
20    **Q.**  In your opinion -- I think I can ask this.  In
21    your opinion, based on your position as CEO of Treasure
22    Valley Hospital, has there been a distinct drop in the
23    number of cases performed by Saltzer surgeons since the
24    acquisition at Treasure -- since the acquisition between
25    Saltzer and Luke's?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 58 of 68

1054

1    **A.**  Yes.

2    **Q.**  And do you attribute that drop to a significant

3  reduction in Saltzer PCP referrals?

4        MR. STEIN: Objection. Foundation.

5        THE COURT: Well, I'll overrule the objection, in

6  large part because the numbers, I think, that have been

7  shown here show a trend and a time -- I guess a timeline of

8  sorts.

9        MR. STEIN: I'm sorry, Your Honor. Just to

10  clarify, I don't have an issue with the trend of the

11  numbers. I have an issue with the purported explanation for

12  the trend in the numbers, but I understand.

13        THE COURT: Right. I'll allow it.

14        MR. POWERS: Thank you, Your Honor.

15  BY MR. POWERS:

16    **Q.**  Did you answer that question? I can't remember.

17    **A.**  Could you read the question or restate the

18  **question.**

19    **Q.**  Sure. In your position as CEO of Treasure Valley

20  Hospital, do you have an opinion about the reason for the

21  drop in case counts by Saltzer surgeons, particularly

22  Dr. Curran and Dr. Williams, since the St. Luke's-Saltzer

23  transaction in November 2012?

24    **A.**  Through the information that we have gathered at

25  **Treasure Valley Hospital, not only are the referrals not**

1055

1  coming from the Saltzer PCPs anymore, they're coming from

2  **Saint Al's referral base, the SAMG docs.**

3        **And it's not just in this case. We have had other**

4  **Treasure Valley surgeons who have complained that their SAMG**

5  **referrals are now diluted by those Saltzer surgeons, so**

6  **their volumes dropped, as well.**

7    **Q.**  All right. What are your concerns, as the CEO of

8  Treasure Valley Hospital, with respect to this drop in cases

9  performed by Saltzer surgeons at Treasure Valley Hospital?

10    **A.**  Well, as you can tell, the high percentages of the

11  **cases that used to be performed by Saltzer docs in the mid**

12  **and high 40s are a large concern. As we saw this unfold in**

13  **meetings with Dr. Kaiser about the process, obviously, we --**

14  **we have tried to make some adjustments, spine and some other**

15  **orthopedic docs.**

16        **But the biggest concern is the pond of surgeons is**

17  **so much smaller than it was in 2008. And the number of**

18  **independent referral sources not within the St. Luke's**

19  **system is much, much smaller, as well.**

20        **So it is very concerning as to the challenge of**

21  **Treasure Valley in the future.**

22    **Q.**  As you look to the future and you're attempting to

23  plan for the viability of Treasure Valley Hospital in 2014

24  and 2015, do you have any similar plans in place of surgeon

25  groups that you feel you can target in the community to try

1056

1  to attract them to Treasure Valley Hospital that you did

2  back in 2009 with respect to spine surgeons?

3    **A.**  I can't think of any today other than what we're

4  **currently pursuing.**

5    **Q.**  Given -- given your quality scores and given the

6  lower cost that's already in evidence and given the issues

7  that you talked about that you use to attract surgeons to

8  Treasure Valley Hospital, why is it, based upon all this

9  information, that Treasure Valley Hospital simply doesn't

10  have the market cornered in -- in the valley for outpatient

11  surgical services?

12        MR. STEIN: Objection. Form and foundation.

13        THE COURT: Counsel, at this point, I don't

14  know -- the witness doesn't have an economics background.

15  I'm not sure what the question is asking. He is a

16  participant, obviously, as a CEO of Treasure Valley. But

17  offering an opinion as to why they haven't cornered the

18  market, so to speak, based upon this, it just seems to me to

19  be maybe beyond anything he can really testify to.

20        MR. POWERS: Let me ask a better question,

21  Your Honor.

22        THE COURT: All right.

23  BY MR. POWERS:

24    **Q.**  Given everything you have testified to in terms of

25  high quality, low cost, attractions of surgeons --

1057

1  attractiveness of surgeons to surgery at Treasure Valley,

2  why haven't you been more successful?

3        MR. STEIN: Objection. Form, foundation, "more

4  successful."

5        THE COURT: Well, I think we're getting away from

6  kind of a pure quantitative-based answer, and I think the

7  witness can offer general observations.

8        You may answer.

9        THE WITNESS: We feel that we have a good formula.

10  We certainly felt like that prior to the Saltzer

11  acquisition. We did have some plans for -- different plans

12  for growth that we have adjusted and changed, but that's a

13  good question. It can only be attributed to a nationwide

14  trend of physician employment and the lack of physicians'

15  ability to invest in Treasure Valley Hospital.

16  BY MR. POWERS:

17    **Q.**  Okay. A few more questions for you, Mr. Genna.

18        How has Treasure Valley Hospital done financially this

19  year?

20    **A.**  We have done okay. We have done pretty well.

21  **We've -- ahead of last year, but there have been two**

22  **specific things that have contributed to that -- probably**

23  **three in total.**

24    **Q.**  Let's go through those three. What's the first

25  thing that has contributed to Treasure Valley Hospital's

Case 1:12-cv-00560-BLW v. Document 554 Filed 11/04/14 Page 59 of 68

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

1058

1 doing well this year financially?

2     **A.** **So, as we discussed meaningful use, the electronic**
3 **medical records system, we met meaningful use in this year**
4 **and we got a 9 -- just under a million dollars one time for**
5 **meaningful use, I guess you would say, reimbursement.**
6 **Obviously, the cost of EMR is quite a bit, but just under a**
7 **million dollars. So that shows in our financials in other**
8 **revenue.**

9     **Q.** Who provided that million-dollar payment to you?

10     **A.** **That's part of healthcare reform. So CMS.**

11     **Q.** Okay. CMS made that payment?

12     **A.** **Yeah.**

13     **Q.** And it was just slightly less than a million
14 dollars?

15     **A.** **Yeah.**

16     **Q.** And what's the second factor?

17     **A.** **Again, the -- as we talk value-based**
18 **reimbursement, our reimbursement percentage in Medicare went**
19 **up quite a bit. So a good chunk of revenue based on**
20 **our -- our reimbursement from Medicare, an increase there.**

21     **Q.** And is that directly related to the number-one
22 ranking we talked about earlier?

23     **A.** **Yes, for this year.**

24     **Q.** And how much was that? How much was that
25 increased reimbursement?

1059

1     **A.** **I truly haven't done the math for 2013.**
2 **It's -- it's substantial.**

3     **Q.** Well, we need a little better than that. Is it
4 more than $500,000?

5     **A.** **We project it to be for the year, but we're only**
6 **through August from a financial standpoint.**

7     **Q.** What's your projection or estimate of the range of
8 that number?

9     **A.** **Mid 4- to 500,000.**

10     **Q.** All right. And what's the third factor that's
11 attributable to your success in 2013 financially?

12     **A.** **The increase in spine surgeons that we have been**
13 **able to attract. The net revenue per case of a spine case**
14 **is quite a bit higher than our prior mix of cases.**

15     **Q.** Okay. So -- so the net revenue for a spine case
16 has led to your enjoying an increased revenue stream this
17 year?

18     **A.** **Yes.**

19     **Q.** Okay. How vulnerable is Treasure Valley Hospital
20 at the moment in your opinion?

21     **A.** **Well, again, those three things we just discussed,**
22 **the value-based reimbursement, that's year to year; and**
23 **the -- the electronic medical record reimbursement, that,**
24 **again, is year to year.**

25     **We're very vulnerable. As we have seen the**

1060

1 **acquisitions in the valley, it would only take a physician**
2 **or two or three to -- to really -- to really have a huge**
3 **negative impact on Treasure Valley.**

4     **Q.** If St. Luke's were to employ that high-producing
5 spine surgeon that you attribute your increase in income to
6 in 2013 -- if St. Luke's were to employ that particular
7 surgeon, would Treasure Valley be immediately vulnerable
8 from a financial standpoint?

9     MR. STEIN: Objection, Your Honor. Relevance and
10 foundation. I don't know who the --

11     THE COURT: Sustained. Perhaps I missed
12 something. Is that part of the acquisition or what --

13     MR. POWERS: No. It's -- Your Honor, I think we
14 have established that St. Luke's has certain strategies, and
15 one strategy is employing independent surgeons. We went
16 through a case of St. Luke's employing an independent spine
17 surgeon recently.

18     So when it comes to how Treasure Valley is doing and
19 whether or not they are vulnerable and in jeopardy moving
20 forward -- which is one of the questions that Your Honor is
21 tasked with deciding, whether the threat in the future of
22 the anticompetitive behavior will harm Treasure Valley
23 Hospital.

24     THE COURT: But is there any connection that this
25 orthopedic surgeon will, in fact, leave Treasure Valley as a

1061

1 result of the acquisition?

2     MR. POWERS: No, but it's a question -- it's a
3 question that's posed: If St. Luke's entertains the same
4 strategies that they have in the past and if they were to
5 hire this particular surgeon, where would it put Treasure
6 Valley Hospital in terms of vulnerability moving forward?

7     THE COURT: All right. I'm going to sustain the
8 objection. I think it's just getting too speculative at
9 this point.

10     MR. POWERS: Thank you, Your Honor.

11 BY MR. POWERS:

12     **Q.** I want to ask you one more question, Mr. Genna.
13 Do you agree with the -- the proposition that when a
14 specialist in Boise experiences a number of his or her
15 referring physicians being hired by a hospital, that this
16 has created pressure in Boise for that specialist to
17 consider employment with the hospital to preserve that
18 referral base? Do you agree with that?

19     MR. STEIN: Objection. Leading and foundation.
20 Mr. Genna isn't a specialist.

21     THE COURT: Well, I think it is leading, the
22 beginning, but I'm not sure what the relevance is since
23 we're obviously in a different market.

24     MR. POWERS: Well, Your Honor --

25     THE COURT: Arguably.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 60 of 68

1062

1  MR. POWERS: Well, maybe I need to clear that up.
2  I'm glad to hear that question.
3  BY MR. POWERS:
4  **Q.** Mr. Genna, the surgical market as opposed to the
5  primary care physician market -- the surgical market in
6  Boise for outpatient surgical and ortho-neuro care includes
7  both Boise and Nampa; correct?
8  **A.** It does.
9  **Q.** And we know that in this marketplace, patients
10  seek surgical services from Nampa in Boise; correct?
11  **A.** Yes.
12  MR. POWERS: Your Honor, the question I posed is a
13  quote from a law review article by Dr. Pate regarding the
14  effect of referring physicians being employed on
15  specialists. I'm asking him simply the question -- and I
16  can rephrase it --
17  THE COURT: Well, I think you're leading, which
18  was the first objection. So if you rephrase it, that may or
19  may not solve the problem.
20  MR. POWERS: I'll ask a better question.
21  BY MR. POWERS:
22  **Q.** In your view as CEO of Treasure Valley Hospital,
23  have you -- have you observed that specialists in this
24  community are concerned about their referring PCP base being
25  employed by St. Luke's?

1063

1  MR. STEIN: Objection. Leading, hearsay.
2  THE COURT: It's going to have to be tied back to
3  the witness's experience. Otherwise, there needs to be a
4  foundation, and I think we'd probably run into hearsay
5  problems. But if the witness is testifying as to his
6  experience in trying to recruit physicians, if that's been
7  an issue, then he can indicate his experience. If it is
8  simply an observation, then we need to know what the basis
9  of that is, and I suspect we're going to run into hearsay
10  problems or possibly best evidence but more likely hearsay
11  problems.
12  So, with that guidance, Mr. Powers --
13  MR. POWERS: Thank you, Your Honor.
14  THE COURT: -- you can go forward as you wish and
15  see if you can solve the problem. If not --
16  MR. POWERS: Thank you, Your Honor.
17  BY MR. POWERS:
18  **Q.** Mr. Genna, in the past several months in 2013,
19  have you continued to try to attract surgeons to Treasure
20  Valley Hospital?
21  **A.** Yes, I have.
22  **Q.** And in your discussions with those surgeons to try
23  to attract them to Treasure Valley as the CEO, have -- has
24  it been expressed to you concern by the specialists about
25  the marketplace in Boise and the concern about PCP referrals

1064

1  being employed -- PCP physicians and their referrals being
2  employed by St. Luke's?
3  **A.** Yes. We talk about it regularly.
4  **Q.** And have those -- have those surgeons expressed to
5  you a reticence to become associated with Treasure Valley
6  Hospital in this particular atmosphere?
7  **A.** Yes.
8  MR. STEIN: Your Honor, again, for the record, I
9  will object to hearsay and also leading.
10  THE COURT: Well, I think you're absolutely right
11  if it's being offered for the truth of the matter asserted,
12  but --
13  MR. POWERS: Your Honor, I think it's part of his
14  job to attempt to recruit these surgeons and it -- I think
15  we have laid the foundation for what the marketplace is in
16  Boise at this time.
17  THE COURT: Well, but the problem is trying to
18  figure out whether it is relevant what the witness's
19  experience has been or not. And I suggested earlier that
20  that would solve the problem, and I'm wrestling with that
21  just a bit.
22  MR. STEIN: Your Honor, I think my issue is: If
23  it's not true, then it's not relevant, which means it's only
24  being offered for the truth.
25  THE COURT: Well, that's essentially another way

1065

1  of saying what I'm wrestling with, Mr. Stein, but thank you
2  for helping me crystallize that.
3  I think I'm going to sustain the objection, Counsel.
4  MR. POWERS: Very well, Your Honor.
5  THE COURT: We have heard testimony --
6  MR. POWERS: Very well, Your Honor.
7  THE COURT: All right. Proceed, Mr. Powers.
8  MR. POWERS: That's all right.
9  Your Honor, I don't believe I have any more questions
10  for this witness. Let me check with my colleagues here.
11  They say "nada." I think I'm done with my direct.
12  THE COURT: Can we reopen the courtroom,
13  Mr. Stein?
14  MR. STEIN: Well, probably not, Your Honor.
15  THE COURT: That's fine.
16  CROSS-EXAMINATION
17  BY MR. STEIN:
18  **Q.** Mr. Genna, you testified that Treasure Valley
19  Hospital is 60 percent owned by physician investors?
20  **A.** Yes.
21  **Q.** And the other 40 percent is owned by a company
22  called Surgical Care Affiliates?
23  **A.** Yes.
24  **Q.** And that's known as SCA?
25  **A.** Yes.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 61 of 68

1066

1    Q.   And technically, you're actually an employee of
2    SCA, not Treasure Valley Hospital; right?
3    A.   My paycheck comes from SCA, but my fiduciary
4    responsibility is to Treasure Valley Hospital.
5    Q.   But you also report up to executives at SCA;
6    correct?
7    A.   Yes.
8    Q.   And SCA operates, what, 180-some-odd surgical
9    facilities around the country?
10   A.   I don't have the exact number but more than 150.
11   Q.   And SCA has a contract with Treasure Valley
12   Hospital to essentially manage and provide all of its
13   administrative services; is that right?
14   A.   Yes.
15   Q.   And SCA also has a contract to manage the Treasure
16   Valley Surgery Center in Nampa --
17   A.   Yes.
18   Q.   -- is that right?
19        And SCA is also an owner in the Treasure Valley Surgery
20   Center in Nampa; is that correct?
21   A.   Yes.
22   Q.   And the Treasure Valley Hospital physician
23   shareholders as a group, they also are investors in the
24   Treasure Valley Surgery Center in Nampa; is that right?
25   A.   Many of them are.

1067

1    Q.   And so the court understands, I want to make clear
2    we're talking about two facilities.  Treasure Valley
3    Hospital in Boise is owned by Surgical Care Affiliates and
4    physician investors; right?
5    A.   Yes.
6    Q.   And then there is the Treasure Valley Surgery
7    Center in Nampa, which was opened last year; right?
8    A.   Mm-hmm.
9    Q.   I'm sorry.  You have to answer audibly.
10   A.   Sorry.  Yes.
11   Q.   And that is owned by Surgical Care Affiliates, a
12   group of Treasure Valley Hospital investors, and Saint
13   Alphonsus; is that right?
14   A.   Yes.
15   Q.   Now, you testified about some of the services that
16   TVH does or doesn't do.  TVH doesn't do, for example,
17   pediatric surgery; is that right?
18   A.   Could I correct my prior answer?
19   Q.   Sure.
20   A.   It's owned by Saint Alphonsus, SCA, a subset of
21   Treasure Valley Hospital surgeons, and 20 or so other
22   surgeons in the Caldwell/Nampa area.
23   Q.   Let me withdraw my last question and just ask
24   this, Mr. Genna:  You agree that hospitals like St. Luke's
25   have a much larger and more complex case mix than Treasure

1068

1    Valley Hospital?
2    A.   Yes.
3    Q.   And am I correct that roughly 80 percent of the
4    procedures at Treasure Valley Hospital are outpatient
5    procedures?
6    A.   Yes.
7    Q.   And roughly, what, 60 percent are orthopedic
8    surgeries?
9    A.   Pretty close.
10   Q.   And that Hospital Compare study that we had a lot
11   of discussion about, or at least a lot of objecting about
12   and some testimony about, does not control for the
13   difference in the mix of services provided by TVH versus
14   other hospitals; right?
15   A.   Actually, it does.
16   Q.   In what way?
17   A.   The questions are answered.  I mean, they are
18   based on the stay at the hospital.  So if you have an
19   orthopedic total shoulder, a total knee, the outcome should
20   be similar or the same at Saint Al's, St. Luke's, or
21   Treasure Valley Hospital.
22   Q.   Right.  Except that when St. Luke's is being
23   compared or the Mayo Clinic or Johns Hopkins, they are being
24   evaluated based on their total mix of surgeries; right?
25   A.   Yes.

1069

1    Q.   Right.  So when you say Treasure Valley Hospital
2    is number one and beat out the Mayo Clinic, what you mean is
3    as to the types of surgeries done at Treasure Valley
4    Hospital, they compared number one and beat out the Mayo
5    Clinic in the rankings it got on the whole universe of
6    surgeries that it performs; right?
7    A.   All hospitals specialize in a certain area, yes.
8    And all hospitals have different areas of cases, yes.
9    Q.   Right.  But the Mayo Clinic is not a hospital
10   that's primarily an outpatient orthopedic surgery hospital;
11   right?
12   A.   I -- I don't know that.
13   Q.   You talked about in one of your answers being
14   restricted or thinking about restrictions in terms of
15   growth.  And didn't the Affordable Care Act effectively
16   place a moratorium on the growth of physician-owned
17   hospitals?
18   A.   There was a section in the Affordable Care Act
19   that related to physician growth, hospitals' development and
20   growth, yes.
21   Q.   Right.  And you have described that in an article
22   that was written for the "American Medical News" as a
23   moratorium on growth for physician-owned hospitals; right?
24   A.   I think so, yes.
25   Q.   Now, when Treasure Valley Hospital filed its

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 62 of 68

1070

1 lawsuit against St. Luke's in November of 2012, you filed a
2 declaration in that case -- in the case; right?
3   **A.  I did.**
4     **Q.**  And am I correct that you were predicting in that
5 declaration the loss of a hundred percent of referrals to
6 the Saltzer doctors? --
7   **A.  The Saltzer --**
8     **Q.**  Surgeons.
9   **A.  -- referrals?**
10    **Q.**  Yes.
11  **A.  Mm-hmm.**
12    **Q.**  And Mr. Powers asked you some questions about
13 finding new investors for Treasure Valley Hospital.  Do you
14 recall that?
15  **A.  I do.**
16    **Q.**  And one thing Mr. Powers didn't elicit from you,
17 which I would like to talk about, is whether Treasure Valley
18 Hospital has had any success in eliciting new investors in,
19 let's say, the time period after Treasure Valley Hospital
20 filed this lawsuit.
21     So isn't it true that in December of 2012, Treasure
22 Valley Hospital succeeded in bringing seven new shareholders
23 in?
24  **A.  Six or seven, yes.**
25    **Q.**  And those included orthopedic surgeons?

1071

1   **A.  They did.**
2     **Q.**  And am I correct that in order to do that, you had
3 to first dilute the shares of the existing Treasure Valley
4 Hospital investors so that those could then be sold to the
5 new investors?
6   **A.  I'm not sure if that's the right term, but close**
7 **to that, yes, uh-huh.**
8     **Q.**  And those projections expressly accounted for --
9 the projections that you had to prepare in order to value
10 the shares included an assumption about what the loss of
11 volume would be for the Saltzer doctors; right -- for -- to
12 the Saltzer surgeons?
13  **A.  Yes.**
14    **Q.**  And the projection that was made was that volumes
15 to the Saltzer surgeons would drop about 50 percent in the
16 first year; is that right?
17  **A.  I'm trying to remember the timeline.  So my**
18 **declaration, there are documents prepared for that**
19 **additional recruitment.  So I don't recall exactly, but it**
20 **could be 50 percent, yes.**
21    **Q.**  And that's, in fact, what you said, I think,
22 earlier Treasure Valley Hospital is experiencing; right?
23 Roughly a 50-percent drop?
24  **A.  Yes.**
25    **Q.**  And then those projections also assumed that in

1072

1 the second year, there would be a recapture of lost volume
2 of about 33 percent?  In other words, that the volumes would
3 start going back up; is that right?
4   **A.  Yes.**
5     **Q.**  Now, ownership in a medical facility gives a
6 physician a financial incentive to do procedures at that
7 facility; right?
8   **A.  It's one of the reasons, yes.**
9     **Q.**  And it just so happens that the vast majority of
10 procedures done at Treasure Valley Hospital are done by
11 physicians who have an ownership stake in the hospital;
12 right?
13  **A.  Not always, but at this point in time, yes.**
14    **Q.**  Well, in 2011, isn't it true that roughly 86
15 percent of all the surgeries done at Treasure Valley
16 Hospital were done by those people on the medical staff who
17 have an ownership interest in the hospital?
18  **A.  I think in 2011, yes.**
19    **Q.**  And in 2012, it's roughly the same percent?
20  **A.  Yes.**
21    **Q.**  And the reason Treasure Valley Hospital has been
22 able to continue to bring in new investors as late as
23 December of last year is that it has provided unprecedented
24 returns on investment for those shareholders; right?
25  **A.  I -- we have done -- we have done pretty well.**

1073

1     **Q.**  Don't be modest, Mr. Genna.
2     Let's put up trial Exhibit 2118.  George, can we call
3 out the second email through the first paragraph.
4     Mr. Genna, this is a document you may not recall.  We
5 went over it at your deposition.  But there is an email from
6 Goran Dragolovic to you and several others dated February 2,
7 2012.
8     Mr. Goran Dragolovic is the person you report to at
9 Surgical Care Affiliates; is that right?
10  **A.  He is actually one level above that, but, yes.**
11    **Q.**  Okay.  You report to him, up to him indirectly; is
12 that right?
13  **A.  Yes.**
14    **Q.**  Okay.  And Mr. Dragolovic wrote to you:
15 "Gentlemen, this is the rough draft of the letter I plan on
16 sending to Saltzer Partners tonight.  Don't be bashful in
17 using red ink on this and recommend any changes you see
18 appropriate.  I am heading out to a meeting and plan on
19 incorporating your recommendations later tonight and sending
20 it out late."
21     Just by way of background, Mr. Genna, this relates to a
22 period of time in which Saint Alphonsus and Surgical Care
23 Affiliates were intending to make a proposal to the Saltzer
24 physicians, the group, as an alternative to the St. Luke's
25 proposal; is that right?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.   Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 63 of 68

1074

1   **A.  I think so.**

2   **Q.  Okay.  So now let's go to the second page of this**
3   document.  And if we can call out the return on investment.
4   Mr. Dragolovic wrote:  "In addition to providing great
5   care at a reduced cost, TVH has also provided its owners and
6   investors unprecedented returns on their investments.  By
7   way of illustration, if, at the beginning of 2007, a
8   physician invested $56,800 into TVH, they would have
9   received $275,000 in distributions to date, and the original
10  investment would have grown almost five-fold to the current
11  value of $274,000."

12  Then if we go back to the first page, Mr. Genna, you
13  responded to Mr. Dragolovic, right?

14  **A.  Yes, I did.**

15  **Q.  And you did not tell him that any of that**
16  information was incorrect, did you?

17  **A.  I read his verbiage and said, "You are the master.**
18  **This looks great."  Yes.**

19  **Q.  And when -- when that proposal was submitted to**
20  Saltzer, it specifically called out Treasure Valley
21  Hospital's financial returns as a reason for investing in
22  the hospital; is that right?

23  **A.  I wasn't at the presentation.  I'm not sure.**

24  **Q.  Well, let's call up --**

25  THE COURT:  Counsel, 2118 is not admitted.  Do you

1075

1   intend to offer that?

2   MR. STEIN:  I do, Your Honor.

3   THE COURT:  The objection is relevance, but I
4   think the issue of the ratio -- or the value and care under
5   the CMS study I think has been injected into the case, so
6   I'll hear any objection if you wish.

7   MR. POWERS:  Yes, Your Honor.  I think we need a
8   better foundation for -- for the document.  This witness did
9   not create that document.  We don't have Mr. Dragolovic
10  here.

11  THE COURT:  Well, the only objection noted is 402,
12  403 objection, no foundation.

13  MR. POWERS:  I would maintain the objection on
14  relevance, Your Honor.

15  THE COURT:  I'll overrule the objection.  Exhibit
16  2118 will be admitted.

17  MR. STEIN:  And Your Honor, just to be clear,
18  the -- because there is a few of these documents, and I want
19  to be clear in terms of relevance.  Part of this gets at the
20  claim that Treasure Valley Hospital is having trouble
21  recruiting investors and having trouble maintaining its case
22  volume.

23  THE COURT:  Well, there is that additional issue,
24  but I -- regardless, the court's ruling, obviously, will
25  stand.  It's perhaps just one additional reason why it is

1076

1   relevant.

2   MR. STEIN:  I should learn to take yes for an
3   answer.

4   THE COURT:  Well, actually, not, because that
5   argument might carry the day as to another exhibit --

6   MR. STEIN:  Okay.

7   THE COURT:  -- more so than this one.

8   (Defendants' Exhibit No. 2118 admitted.)

9   BY MR. STEIN:

10  **Q.  Mr. Genna, am I right that in 2012, the value of**
11  investor shares in Treasure Valley Hospital actually
12  increased?

13  **A.  It did.**

14  **Q.  Now, we talked a little bit at the beginning here**
15  about the Treasure Valley Surgery Center.  And am I correct
16  that you were personally involved in the process of
17  soliciting investors for that Treasure Valley Surgery Center
18  in Nampa?

19  **A.  I was involved.  I was not the lead, but I did**
20  **play a part.**

21  **Q.  But you and another SCA executive had over a dozen**
22  meetings with physician investors regarding the new surgery
23  center?

24  **A.  As well as several others, yes.**

25  **Q.  And during those meetings, you would provide**

1077

1   information about Treasure Valley Hospital and Surgical Care
2   Affiliates; is that right?

3   **A.  Yes.**

4   **Q.  And the Treasure Valley Surgery Center opened,**
5   roughly, when?

6   **A.  I don't recall the exact date.  I think they did a**
7   **couple cases, and then there was a period of time to get**
8   **surveyed.  So I -- I don't recall exactly when it opened.**
9   **Again, I had stepped completely out of it at that point.**
10  **They had an administrator in place.**

11  **Q.  Mr. Powers showed you a demonstrative exhibit**
12  where he called out the volume of surgeries done by
13  Dr. Curran and Dr. Williams.  Do you recall that?

14  **A.  Yes.**

15  **Q.  And I believe the point Mr. Powers was making was**
16  that there has been a significant drop in the number of
17  surgeries done by Dr. Williams and Dr. Curran at Treasure
18  Valley Hospital this year; is that right?

19  **A.  That's what he asked, yes.**

20  **Q.  Can you think of anything besides the Saltzer**
21  transaction that might account for a decrease in the number
22  of surgeries that Treasure Valley Hospital investors are
23  doing at Treasure Valley Hospital?

24  **A.  There could be several factors, but they're**
25  **getting their referrals from SAMG docs now.  And while there**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW  Document 554  Filed 11/04/14  Page 64 of 68

1078

1 is no problem with them still working at Treasure Valley
2 Hospital, they are probably seeing patients from a different
3 region, different area. So they might be doing some
4 downtown; they might be doing some at Treasure Valley
5 Hospital; they might be doing some at Nampa.
6     Q.  I see. So it's possible that, while they are
7 doing fewer surgeries at Treasure Valley Hospital, they are
8 doing an offsetting number of surgeries at the Treasure
9 Valley Surgery Center?
10     A.  Not an offsetting, but a smaller amount.
11     Q.  How do you know that?
12     A.  I occasionally see numbers from Treasure Valley
13 Surgery Center as an SCA employee.
14     Q.  And at the time the Treasure Valley Surgery Center
15 was opened, it was known that Saltzer was affiliating with
16 St. Luke's; right?
17     A.  I think so, yes.
18     Q.  In fact, it was expected that once the Treasure
19 Valley Surgery Center opened, physicians would transition
20 cases from the Treasure Valley Hospital to the Treasure
21 Valley Surgery Center; right?
22     A.  Some cases.
23     Q.  For example, it was -- it was understood that
24 higher-acuity and more complex cases would remain at
25 Treasure Valley Hospital, but many of the quicker and more

1079

1 basic outpatient procedures could be done at the surgery
2 center; right?
3     A.  That -- it includes patient preference as well as
4 physician preference and referral-based preference, but
5 that's part of it, as well.
6     Q.  And so if we wanted to understand what has
7 happened to the volume of surgeries that are done by
8 physicians affiliated with TVH, would it be fair to say that
9 in order to really paint an accurate picture of their
10 overall volumes, you should look at both the volume of
11 procedures they're doing at Treasure Valley Hospital and the
12 volume of procedures that are now being done at the new
13 surgery center that opened at the end of last year?
14     A.  That would give a part of the picture, yes.
15     Q.  Well, it would certainly give a more complete
16 picture of their volumes than just looking at Treasure
17 Valley Hospital; right?
18     A.  Yeah. Yes.
19     Q.  Now, Mr. Genna, did I understand that you were
20 involved in helping to pull together the data that was
21 recently produced regarding case counts for August --
22 through August of 2013?
23     A.  Yes.
24     Q.  Okay. And would it be a fair comparison if we
25 wanted to -- if we wanted to see how TVH is doing through

1080

1 August of 2013 to compare the period January through August
2 2013 with the period January through August of 2012?
3     A.  Sure.
4     Q.  Okay. And so if we can go to slide 4. So,
5 Mr. Genna, this is just a slide here showing Plaintiff's
6 Exhibit 1963, which is the Treasure Valley Hospital
7 physician case count for 2012. I realize you probably can't
8 read the numbers very well, but you're familiar with this
9 document?
10     A.  I am.
11     Q.  Okay. So what we have done here is to call out
12 the total hospital volume column for January through August.
13 And am I correct that -- that if we wanted to know what the
14 total volume was at Treasure Valley Hospital from January
15 through August of 2012, these are the numbers we would add
16 up?
17     A.  It looks like it, yes.
18     Q.  Okay. And we have done that, and we have got a
19 number of 3215.
20         MR. STEIN:  I should say, Your Honor, we have a
21 binder of exhibits, and I actually included a small
22 calculator in Mr. Genna's in case he wants to check any of
23 our math.
24         THE COURT:  Are you asking if I want to see it or
25 if the witness does?

1081

1         MR. STEIN:  I would ask that we provide a copy of
2 the binder to Mr. Genna just so that he can --
3         THE COURT:  All right. Mr. Metcalf, if you could
4 help us out. I assume, Counsel, you have --
5 BY MR. STEIN:
6     Q.  Mr. Genna, I'm going to walk through some of these
7 numbers. Of course, if at any time you want to check these
8 numbers yourself, you can just let me know.
9     A.  Thank you.
10     Q.  So if we go to the next slide, this is just
11 highlighting a different line on the case count, and that's
12 the line that says "Total Saltzer Surgeon Volume."
13         And am I correct that if we wanted to know the volume
14 of surgeries done at Treasure Valley Hospital by the
15 so-called Saltzer surgeons between January and August of
16 2012, these are the numbers we would add up?
17     A.  Yes.
18     Q.  And we have done that here, and it comes out to
19 1189. Do you want to check that? I won't be offended if
20 you do.
21     A.  I'm good. Thanks.
22     Q.  Okay. So now what we have done is we have put
23 those numbers against the figures that Treasure Valley
24 Hospital provided for 2013. Mr. Genna, this demonstrative
25 is showing --

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 65 of 68

1082

1    MR. STEIN: Again, Your Honor, this is information
2  that's in exhibits that have been presented by the
3  plaintiffs or -- that we'll be offering for admission.
4    THE COURT: All right. Counsel, this is a
5  demonstrative; correct?
6    MR. STEIN: This is a demonstrative.
7    THE COURT: All right.
8  BY MR. STEIN:
9    Q. And so, Mr. Genna, you had a decrease in the first
10  eight months of -- if you compare the first eight months of
11  2012 to the first eight months of 2013, Treasure Valley
12  Hospital is roughly 300 cases lower.
13    Were you aware that during that same time period, there
14  was an increase in cases done at the Treasure Valley Surgery
15  Center in Nampa from 24 to roughly 1,084?
16    A. Is that the total volume at the Surgery Center?
17    Q. According to the material produced by Treasure
18  Valley Hospital during those first eight months.
19    A. And my question to you was: Is that of all the
20  surgeries they did at the Surgery Center?
21    Q. Yes. These are totals.
22    A. So that includes an additional 20 or 30 surgeons
23  in that 1,000?
24    Q. Yes.
25    A. Okay. I don't have the Surgery Center numbers off

1083

1  the top of my head, but, okay.
2    Q. Okay. And if we were to actually look at the
3  total number of surgeries that were done by Treasure Valley
4  Hospital and the Treasure Valley Surgery Center in the first
5  eight months of 2012 to 2013, there is actually an increase
6  of about 600 surgeries; right?
7    A. I don't know that.
8    Q. You're not aware of these figures?
9    A. In the form you asked that question, I'm not sure
10  I understand it.
11    Q. The question is: If you look at the total volume
12  of procedures done at the Treasure Valley Surgery Center and
13  the Treasure Valley Hospital in the first eight months of
14  2012 versus the first eight months of 2013, isn't it correct
15  that there has actually been an increase in total procedures
16  of about 600 when you compare those two time periods?
17    A. So, again, if you're talking about all the
18  surgeons that are involved in that Surgery Center that
19  aren't involved in Treasure Valley Hospital, that could very
20  well be.
21    Q. Do you know to the extent to which the 1,084
22  procedures that were done at the Treasure Valley Surgery
23  Center in 2013 were done by Saltzer surgeon investors in
24  Treasure Valley Hospital?
25    A. I have seen the numbers. I don't know what

1084

1  percentage. But you're comparing apples to oranges here.
2    Q. Let's look at another slide, Mr. Genna, No. 17.
3  Here we have got the same totals, and we have just cut it a
4  little bit differently, Mr. Genna. Again, this is using the
5  information provided -- produced by Treasure Valley
6  Hospital. We have got here identified the number of cases
7  done by Saltzer surgeons in the first eight months of 2012
8  and the first eight months of 2013.
9    Were you aware, Mr. Genna, that the Saltzer surgeons --
10  the decrease in Saltzer surgeons' cases at these two
11  facilities is down by just about a hundred surgeries from
12  the first eight months of 2012 compared to the first eight
13  months of 2013?
14    A. That's what it looks like, yes.
15    Q. Is that consistent with your understanding of the
16  magnitude of the decrease in surgeries you said they were
17  telling you about?
18    A. That looks about right, yes.
19    Q. Now, in 2012, of the 1,211 cases that the Saltzer
20  surgeons did, they were done virtually almost entirely at
21  Treasure Valley Hospital; right?
22    A. Yes.
23    Q. And were you aware that in -- in the first eight
24  months of 2013, that while there was a decrease of about 500
25  cases at Treasure Valley Hospital, there was a corresponding

1085

1  increase in cases at the Treasure Valley Surgery Center by
2  the Saltzer surgeons? Were you aware of that?
3    A. Less a hundred cases, yes.
4    Q. And when you have talked to Dr. Curran about the
5  decrease in his volumes at Treasure Valley Hospital, have
6  you talked to him about the extent to which he is now doing
7  cases at the Surgery Center that he would have otherwise
8  done at Treasure Valley Hospital before the Surgery Center
9  opened?
10    A. I have had lots of conversations with Dr. Curran
11  as well as all of the surgeons, and the cases that he is
12  doing at Treasure Valley Surgery Center are a direct result
13  from his SAMG referrals. And, yes, he is doing some of
14  those in Nampa as well as at Treasure Valley Hospital.
15    Q. So Dr. Curran didn't tell you that he moved
16  roughly 45 percent of his cases from -- that he would have
17  otherwise done at Treasure Valley Hospital to the Treasure
18  Valley Surgery Center? Is that right?
19    A. Did he tell me or was I --
20    Q. Yes. Did he tell you that?
21    A. Yeah. I was aware of that, yes.
22    Q. Actually, before we go to that, I just had a
23  couple of questions about the demonstratives that Mr. Powers
24  showed you. As I said this morning with Mr. Checketts, my
25  math is not great, but I think I can do simple percentages

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 09/30/2013

Case 1:12-cv-00560-BLW   Document 554   Filed 11/04/14   Page 66 of 68

1086

1  here.
2      If we look at the 2009 column, there were 490 surgeries
3  at Boise Orthopedic Clinic; is that right?
4      **A.   Yes.**
5      **Q.**   And that would be 10 percent of the total
6  surgeries?  That's what's reflected here?
7      **A.   Again, those are rounding up and down, yes.**
8      **Q.**   Okay.  But then if we wanted to understand what
9  the total number of surgeries was in 2009, if 490 was 10
10 percent, then the total surgeries in 2009 would have been
11 about 4,900?
12     **A.   If it was exactly 10 percent, yes.**
13     **Q.**   Okay.  And so in 2010, when the Boise Orthopedic
14 Clinic's surgeries dropped to 1 percent and that 1 percent
15 was 60 surgeries, what would the total volume of surgeries
16 have been in 2010?
17     **A.   If it was exactly 1 percent, that would be 6,000.**
18     **Q.**   Okay.  So at the same time that Boise Orthopedic
19 Clinic volumes were going down, the actual total volume of
20 surgeries at Treasure Valley Hospital was going up according
21 to these numbers?
22     **A.   I think we're in the neighborhood of 5,000 in**
23 **2009, so, again --**
24     **Q.**   So yes?
25     **A.   They went up, and then they have gone slightly**

1087

1  down.
2      **Q.**   But between 2009 and 2010, according to these
3  figures, there was an increase of over a thousand total
4  surgeries at Treasure Valley Hospital at the same time the
5  number of surgeries done by the Orthopedic Clinic surgeons
6  was decreasing; right?
7      **A.   I don't think a thousand, no.  I don't think --**
8      **Q.**   Well, is my -- it's math, isn't it, Mr. Genna?
9  4900 versus 6,000?
10     **A.   Well, 1 percent could be deceiving.  It could be**
11 **6, so it wouldn't be 6,000; it would be 5,000.  I don't have**
12 **that in front of me.**
13         THE COURT:  Counsel, do we have raw numbers?  When
14 you're dealing with that small a percentage, a slight
15 variation can really make a pretty radical difference.
16         MR. STEIN:  I don't -- I only have -- I don't have
17 those.  We only have the information that was produced.
18         THE COURT:  All right.
19         MR. STEIN:  I think we'll look at some other --
20 we'll get some other numbers.
21 BY MR. STEIN:
22     **Q.**   Mr. Genna, would you agree as a general matter
23 that if the volume of surgeries done by a particular surgery
24 group stays constant, but Treasure Valley Hospital is going
25 gangbusters and the total number of surgeries they're doing

1088

1  is going higher, then the percentage of surgeries
2  represented by that group that's staying steady is going to
3  keep going down, down, down just because the total volume of
4  surgeries is going up; right?
5      **A.   So, under that example, yes, and we see them go**
6  **from 11 to 10 to 1.**
7      **Q.**   So I want to explore this issue -- because the
8  totals aren't reflected in these slides, I want to explore
9  the issue of the effect that these other acquisitions by
10 St. Luke's have had on Treasure Valley Hospital and the
11 cases done at Treasure Valley Hospital and the Treasure
12 Valley Surgery Center as a whole.
13         So we can go back to slide 18.
14         So here, Mr. Genna, you will see that we have got a --
15 this is just a graphic representation of those figures on
16 the previous slide for Boise Orthopedic Clinic:  443 in
17 2008, 490 in 2009, 60 in 2010, and then zero thereafter.
18 See that?
19     **A.   Yes.**
20     **Q.**   Okay.  And then -- what we'll do here is layer on
21 top of that the volumes done by the Saltzer surgeons at
22 Treasure Valley Hospital and -- in 2012 -- the Treasure
23 Valley Surgery Center for that same period.  And the pattern
24 here from 2011 to 2012, there is a decrease there.  Is that,
25 in your mind, attributable to the Saltzer transaction with

1089

1  St. Luke's?
2      **A.   The decrease in the Saltzer cases?**
3      **Q.**   Let me rephrase.  From 2011 to 2012, there is a
4  decrease here of 2,068 down to 1,621 procedures done by the
5  Saltzer doctors as between the Treasure Valley Hospital and
6  the Treasure Valley Surgery Center.
7          Is it your opinion that's something that's related
8  to the transaction between St. Luke's and Saltzer, or is
9  there some other explanation, or you just don't know?
10     **A.   It actually started in 2010.  It was a very heated**
11 **negotiation with Saltzer and St. Luke's, and so the**
12 **referrals of the Saltzer surgeons started to take a hit in**
13 **2010.  The Saltzer referral docs wanted to do the deal; the**
14 **Saltzer surgeons didn't necessarily want to, some of them.**
15 **And it was an evolution.  So the decline started sometime in**
16 **2010, but, yes.**
17     **Q.**   So now in the next slide, Mr. Genna, what we have
18 done is just put on here the total number of surgeries done
19 at Treasure Valley Hospital and Treasure Valley Surgery
20 Center, again, based on the information that was produced to
21 us by Treasure Valley Hospital.
22         So am I correct that during the time period that you
23 were seeing a decrease in surgeries from the Boise Surgical
24 Group, you were able to essentially maintain your volumes
25 around the 5,000 level?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 09/30/2013

Case 1:12-cv-00560-BLW    Document 554    Filed 11/04/14    Page 67 of 68

1090

1    A.   We were able to do that through --
2    Q.   Okay.
3    A.   -- new physicians.
4    Q.   And the same is true with respect to the decrease
5    in the Saltzer surgeons; that while you have seen a decrease
6    in procedures done by the Saltzer surgeons, you have been
7    able to make up for that with volume elsewhere; is that
8    right?
9    A.   Yes.
10   Q.   And then for 2013, as Mr. Powers pointed out,
11   we -- we don't have complete data, but as of August of 2013,
12   the total volumes for the Saltzer surgeons at Treasure
13   Valley Hospital and Treasure Valley Surgery Center were
14   1105; is that right?
15   A.   Yes.
16   Q.   And if we wanted to annualize that since that's
17   for the first eight months, would it be fair to multiply
18   that times 1.5, basically take half that volume and add it?
19   A.   You could do that.
20   Q.   Well, I'm asking you whether that would be an
21   appropriate way to do it.
22   A.   The ebb and flow of months sometimes aren't
23   consistent year to year, so annualizing it is just a general
24   way of looking at it.
25   Q.   Okay.  Do you ever do that?  Do you ever

1091

1    annualize?
2    A.   Sure.
3    Q.   In that way, like the way I described, just
4    multiply by 1.5 times if you're eight months in?
5    A.   Just to get a general look, not an accurate look.
6    Q.   So we have done that on the next slide, Mr. Genna.
7    And if we annualize the figures that TVH gave us, we're
8    about 1660 procedures.  Is that roughly what you're
9    anticipating from the Saltzer surgeons at the Treasure
10   Valley Hospital and the Treasure Valley Surgery Center for
11   this year?
12   A.   I -- I haven't done that analysis.
13   Q.   Okay.  Well, the data that Treasure Valley
14   Hospital and Treasure Valley Surgery Center produced also
15   shows that as of August of 2013, you're just under 4,000
16   procedures for the year; is that right?
17   A.   For the combined two?
18   A.   For the combined two.
19   A.   That, again, includes all those other physicians
20   from Canyon County?
21   Q.   Right.
22   Q.   Okay.
23   Q.   So if we annualize that, 4,000 times 1.5, on pace
24   for almost 6,000 total procedures at the two facilities this
25   year; is that right?

1092

1    A.   Again, apples -- not apples to apples, but, yes.
2    If you annualize --
3    Q.   Well, I understand there is some additional
4    investors, including Saint Alphonsus, in the Treasure Valley
5    Surgery Center, but there is also overlap in the investors
6    between Treasure Valley Hospital and the Treasure Valley
7    Surgery Center; right?
8    A.   There is some overlap, yeah.
9    Q.   Surgical Care Affiliates invests in both; is that
10   right?
11   A.   Mm-hmm, yes.
12   Q.   And the Saltzer surgeons are also investors in
13   both the Treasure Valley Surgery Center and Treasure Valley
14   Hospital; right?
15   A.   Yes.
16   Q.   Isn't it true, Mr. Genna, that if the current pace
17   of procedures at Treasure Valley Hospital and the Treasure
18   Valley Surgery Center holds for 2013, it's going to be their
19   combined entities' best year ever?
20   A.   No, that's not true.
21   Q.   Why not?
22   A.   The losses at Treasure Valley Surgery Center
23   combined with the income from Treasure Valley Hospital, it
24   will probably be the worst year we have had in -- since I
25   have been in town.

1093

1    Q.   The losses for who?
2    A.   The losses of income from the financials at
3    Treasure Valley Surgery Center, if you compared our -- our
4    bottom lines, our net income and their net income combined,
5    that would be a huge drop compared to the prior year.
6    Q.   All right.  It's a new surgery center.  They had
7    to get equipment.  I mean, it's always going to be a
8    lower -- it's always going to be a higher cost enterprise in
9    the first couple years, isn't it?
10   A.   Well, you capitalize equipment, so that's spread
11   out over many years, but --
12   Q.   So -- I'm sorry.
13   A.   But the actual income of the two would be down
14   substantially over prior years.
15   Q.   So how badly are the investors going to be off
16   this year?  What can they expect in terms of the value of
17   their shares?
18   A.   Again, I don't -- don't play a part in the
19   day-to-day operations of the Surgery Center.  I don't know
20   if they're going to have a cash call or any of those things.
21   But Treasure Valley Hospital, with the two-time hits, the
22   two-time windfalls, we're going to do a little better than
23   last year.
24   Q.   And let me make sure I understand those windfalls.
25        THE COURT:  Counsel, we're past where I was going



1094

1 to take the break. But I'll let you follow up on this line,
2 but we need to take a break in the next few minutes.
3            MR. STEIN: Your Honor, I have probably got about
4 ten more minutes, and I'm mindful of the time. So I can
5 either try to push through -- and of course, I don't know if
6 Mr. Powers has redirect.
7            THE COURT: I assume you have redirect,
8 Mr. Powers.
9            MR. POWERS: Some, Your Honor.
10            MR. STEIN: We could break now. I'm going to move
11 on to a different slide, if that works for Your Honor.
12            THE COURT: Let's take the break now. I
13 consciously went a little beyond 2:30, when we normally
14 break, to just make up for lost time we had earlier today.
15 But I think to stay for another 15 to 20 minutes I think
16 might be pushing things just a bit.
17            MR. POWERS: I only have five minutes of redirect,
18 Your Honor.
19            THE COURT: I'm sorry?
20            MR. POWERS: I only have five minutes of redirect,
21 or less.
22            THE COURT: How much do you have?
23            MR. STEIN: Ten minutes, tops.
24            THE COURT: I apologize for inconveniencing the
25 witness. But when we start at 8:30 and go until 2:30, it

1095

1 really gets to be a point where we just can't absorb a whole
2 lot more than that. So I think we'll just have to reconvene
3 tomorrow morning and pick up with the witness's -- the
4 balance of his testimony tomorrow.
5            Counsel, we'll start again at 8:30 tomorrow. And so
6 we're clear, the same schedule on Wednesday. Thursday,
7 we'll go 8:30 to 12:00, and then we're essentially done for
8 the week because of prior commitments that I have. All
9 right. We'll be in recess, then, until 8:30 tomorrow
10 morning.
11            (Evening recess at 2:37 p.m.)

1            R E P O R T E R ' S   C E R T I F I C A T E
2
3
4
5            I, Tamara I. Hohenleitner, Official
6 Court Reporter, County of Ada, State of Idaho,
7 hereby certify:
8            That I am the reporter who transcribed
9 the proceedings had in the above-entitled action
10 in machine shorthand and thereafter the same was
11 reduced into typewriting under my direct
12 supervision; and
13            That the foregoing transcript contains a
14 full, true, and accurate record of the proceedings
15 had in the above and foregoing cause, which was
16 heard at Boise, Idaho.
17            IN WITNESS WHEREOF, I have hereunto set
18 my hand October 31, 2013.
19
20
21
22            _____-s-_____
            Tamara I. Hohenleitner
23            Official Court Reporter
            CSR No. 619
24
25