1597

1

**UNITED STATES DISTRICT COURT**

2

**IN THE DISTRICT OF IDAHO**

3

- - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
4  SAINT ALPHONSUS MEDICAL CENTER -    :
   NAMPA, INC., TREASURE VALLEY        : Bench Trial
5  HOSPITAL LIMITED PARTNERSHIP, SAINT : **Witnesses:**
   ALPHONSUS HEALTH SYSTEM, INC., AND  : **David C. Pate**
6  SAINT ALPHONSUS REGIONAL MEDICAL    : **Patricia R. Richards**
   CENTER, INC.,                       : **William W. Deal**
7                       Plaintiffs,    : **Marshall F. Priest, III**
          vs.                          :
8                                      :
   ST. LUKE'S HEALTH SYSTEM, LTD., and :
9  ST. LUKE'S REGIONAL MEDICAL CENTER, :
   LTD.,                               :
10                      Defendants.    :
   - - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
11 FEDERAL TRADE COMMISSION; STATE OF  :
   IDAHO,                              :
12                      Plaintiffs,    :
          vs.                          :
13                                     :
   ST. LUKE'S HEALTH SYSTEM, LTD.;     :
14 SALTZER MEDICAL GROUP, P.A.,        :
                                       :
15                      Defendants.    :
   - - - - - - - - - - - - - - - - - - x

16

17                    * * * SEALED * * *

18

19    REPORTER'S TRANSCRIPT OF PROCEEDINGS

      before B. Lynn Winmill, Chief District Judge
20
      Held on October 8, 2013
21
      Volume 10, Pages 1597 to 1837
22
                    **Lisa K. Yant**
23         Idaho Certified Shorthand Reporter No. 279
                Registered Professional Reporter
24             Federal Certified Realtime Reporter

25

              United States Courts, District of Idaho
       550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

1598

1    A P P E A R A N C E S

2

3

**FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,**
4    **SAINT ALPHONSUS HEALTH SYSTEM, INC.,**
     **AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.**
5

6          Keely E. Duke
           DUKE SCANLAN & HALL, PLLC
7          1087 W. River Street, Suite 300
            Boise, ID 83707
8
           David A. Ettinger
9          HONIGMAN MILLER SCHWARTZ AND COHN LLP
           2290 First National Building
10         660 Woodward Avenue
           Detroit, MI 48226
11

12

13
     **FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION**
14

15         Peter C. Herrick
           U.S. FEDERAL TRADE COMMISSION
16         500 Pennsylvania Ave., N.W.
           Washington, DC 20580
17
           J. Thomas Greene
18         U.S. FEDERAL TRADE COMMISSION
           600 Pennsylvania Ave N.W.
19         Washington, DC 20580

20         Henry Chao-Lon Su
           U.S. FEDERAL TRADE COMMISSION
21         601 New Jersey Ave., N.W.
           Washington, DC 20001
22

23

24

25

1                    A P P E A R A N C E S (Continued)

2

3       FOR PLAINTIFF STATE OF IDAHO

4            Eric J. Wilson
             GODFREY & KAHN, S.C.
5            One East Main Street
             Suite 500
6            PO Box 2719
             Madison, WI 53701

7
             Brett T. DeLange
8            OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
             954 W. Jefferson, 2nd Floor
9            Boise, ID 83720-0010

10
        FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
             Raymond D. Powers
12           POWERS TOLMAN FARLEY, PLLC
             PO Box 9756
13           Boise, ID 83707

14
        FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15      AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16           Jack R. Bierig
             Ben J. Keith
17           Scott Stein
             SIDLEY AUSTIN
18           One South Dearborn
             Chicago, IL 60603
19
             J. Walter Sinclair
20           Charles Schafer
             STOEL RIVES
21           101 S. Capitol Boulevard, Suite 1900
             Boise, ID 83702
22
        FOR DEFENDANT SALTZER MEDICAL GROUP
23
             Brian Kenneth Julian
24           ANDERSON JULIAN & HULL, LLP
             PO Box 7426
25           Boise, ID 83707

1600

1    I N D E X

2

3

| | | PAGE: |
|---|---|---|
| | Courtroom open to the public.................... | 1602 |
| | Courtroom closed to the public................ | 1661 |
| | Courtroom remains open to the public.......... | 1684 |
| | Courtroom closed to the public................ | 1758 |
| | Courtroom open to the public.................... | 1762 |

4

5

6

7

8

DEFENSE ST. LUKE'S HEALTH SYSTEM

9    W I T N E S S E S

10

11

| | | PAGE: |
|---|---|---|
| DEAL, William W. | | |
| | Direct Examination by Mr. Bierig............. | **1796** |
| | Cross-Examination by Mr. Wilson.............. | **1818** |
| PATE, David C. | | |
| | Direct Examination by Mr. Bierig............. | **1603** |
| | Cross-Examination by Mr. Greene | **1656** |
| | Cross-Examination by Mr. Ettinger............ | **1685** |
| | Redirect Examination by Mr. Bierig........... | **1704** |
| | Recross-Examination by Mr. Ettinger.......... | **1712** |
| PRIEST, Marshall F., III | | |
| | Direct Examination by Mr. Stein............ | **1823** |
| RICHARDS, Patricia R. | | |
| | Direct Examination by Mr. Sinclair........... | **1719** |
| | Cross-Examination by Mr. Su.................. | **1763** |
| | Cross-Examination by Mr. Ettinger............ | **1777** |
| | Examination by the Court..................... | **1781** |
| | Redirect Examination by Mr. Sinclair......... | **1786** |

12

13

14

15

16

17

18

19

20

21

22

23

24                    * * * * *

25

1601

1  **DEPOSITIONS**

2  **P U B L I S H E D**

3

4
| | | PAGE: |
|---|---|---|
| PATE, David C. | ................................. | **1685** |

5

6

7  **PLAINTIFFS**

8  **E X H I B I T S**

9

10
| | | ADMITTED |
|---|---|---|
| **1985** | David Pate Article: Hospital-Physician .......... Relations In a Post-Health Care Reform Environment (PLTs' Dep. Ex. 704; SLHS000075064-SLHS000075074) | **1704** |
| **3040** | Demonstrative.................................... | **1790** |

11

12

13

14

15

16  **DEFENDANTS**

17  **E X H I B I T S**

18
| | | ADMITTED |
|---|---|---|
| **2640** | Saint Alphonsus Health System, Health & ......... Healing, Vol. 3, Winter 2012 | **1652** |

19

20

21

22

23  * * * * *

24

25

1602

1  P R O C E E D I N G S
2  October 8, 2013
3  ***** COURTROOM OPEN TO THE PUBLIC *****
4  THE CLERK:  The Court will now hear Civil Case
5  12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,
6  versus St. Luke's Health System for Day 10 of a bench trial.
7  THE COURT:  Good morning, Counsel.  I want to --
8  first of all, it is very nice to have the world not
9  spinning, but I did want to thank counsel for their
10  accommodation of my situation yesterday.  And my apologies.
11  It was, obviously, beyond my control, but I know it was
12  terribly inconvenient for everyone, and we will do
13  everything we can to make up for that over the coming days,
14  moving the case along.
15  My understanding is St. Luke's is ready to call its
16  first witness; is that right?  Mr. Bierig?
17  MR. BIERIG:  That is correct, Your Honor.  As our
18  first witness, Your Honor, we would call Dr. David Pate.
19  While Dr. Pate is coming, I think I speak for all counsel,
20  both plaintiffs and defendants, in saying that we're very
21  pleased that you're feeling better, and that we're very
22  happy to see you.
23  THE COURT:  I had a bad joke in mind to suggest
24  that one of you sent flowers and candy to my home but not
25  the other.

1603

1  (Laughter.)
2  THE COURT:  Dr. Pate, could you please step before
3  the clerk and be sworn.
4  DAVID CHARLES PATE,
5  having been first duly sworn to tell the whole truth,
6  testified as follows:
7  THE CLERK:  Please take a seat in the witness
8  stand.
9  Please state your complete name and spell your name for
10  the record.
11  THE WITNESS:  David Charles Pate, D-A-V-I-D,
12  C-H-A-R-L-E-S, P as in Paul, A-T-E.
13  THE COURT:  You may inquire, Mr. Bierig.
14  MR. BIERIG:  Thank you, Your Honor.
15  DIRECT EXAMINATION
16  BY MR. BIERIG:
17  **Q.**  Dr. Pate, by whom are you employed?
18  **A.**  St. Luke's Health System.
19  **Q.**  What is your position there?
20  **A.**  President and chief executive officer.
21  **Q.**  How long have you held that position?
22  **A.**  Four years as of August 31st.
23  **Q.**  So that would mean you started August 31, 2009?
24  **A.**  That is correct.
25  **Q.**  Can you describe your education starting with

1604

1  college?
2  **A.**  I graduated from Rice University in Houston in
3  **1979 with a bachelor's degree, and my major was**
4  **biochemistry.  I then went on to medical school, to Baylor**
5  **College Of Medicine, and I received my medical degree in**
6  **1982.  I then did my residency training in internal**
7  **medicine.  I then served as a chief medical resident at**
8  **St. Luke's Episcopal Hospital in Houston and entered private**
9  **practice when I finished my training.  And then subsequently**
10  **in 1992 I started law school at the University of Houston**
11  **Law Center, and I graduated in 1996.**
12  **Q.**  And then what did you do after 1996?
13  **A.**  I had -- I was employed by St. Luke's Episcopal
14  **Health System in Houston Texas; no relation to this health**
15  **system.**
16  **Q.**  And can you describe the nature of your job at
17  St. Luke's Episcopal in Houston?
18  **A.**  I had numerous positions of progressive and
19  **increasing responsibilities.  Most recently, before I came**
20  **here, I was the chief executive officer at St. Luke's**
21  **Episcopal Hospital, which was the flagship hospital for the**
22  **system in the Texas Medical Center.**
23  **Q.**  I would like to talk to you about that in a
24  minute.  But first of all, I'm going to ask you:  While you
25  were doing that, did you have time to write a book on health

1605

1  law?
2  **A.**  I did.  After I graduated from law school my focus
3  **was on health law.  And I began teaching at the University**
4  **of Houston Law Center.  I taught a course called "Regulation**
5  **of Healthcare Professionals."  And there was not a textbook**
6  **available, so I took my materials and wrote a textbook of**
7  **the same name.  And that was published in 2002, and then I**
8  **wrote a supplement to that textbook in 2005.**
9  **Q.**  When you were at St. Luke's Episcopal, what kind
10  of work did you do in your capacities there at St. Luke's
11  Episcopal in Houston?
12  **A.**  My responsibilities over the range of that time I
13  **was there was to develop primary care, work with the**
14  **independent medical staff.  We had about 2,000 independent**
15  **physicians on the medical staff of that hospital.  Worked**
16  **with them on developing clinical integration, and then**
17  **ultimately my responsibility was to do that as well as**
18  **running the hospital.**
19  **Q.**  What sort of steps did you take to try to
20  integrate those 2,000 independent physicians, clinically?
21  **A.**  We developed an independent practice association
22  **or IPA.  And over the course of a little more than ten**
23  **years, worked to try to achieve clinical integration with**
24  **those physicians.**
25  **Q.**  How successful were your efforts to achieve

1606

1  clinical integration with the independent physicians over
2  those ten years?
3      **A.  Well, I would say, you know, I am certainly**
4  **disappointed.  I think that we were not able to really**
5  **achieve the objectives I would have for care coordination,**
6  **for management of care transitions, for improving health,**
7  **and we certainly were not able to lower costs.**
8      **Q.**  And why, in your judgment, were your efforts to
9  integrate clinically and achieve the kind of things you just
10  talked about not as successful as you would have liked?
11     **A.  Well, unfortunately we had the realities of the**
12  **reimbursement system, which was purely fee-for-service**
13  **and -- meaning that it rewarded physicians for everything**
14  **they did.**
15     **The physicians in Texas were very heavily involved**
16  **in other activities.  Many of them had investments in**
17  **hospitals, surgery centers, imaging centers, laboratories,**
18  **and unfortunately, the physician's income was based on**
19  **trying to maximize revenue.  And so it became difficult for**
20  **us to actually control the costs, even while we were able to**
21  **make some marginal improvements in quality.**
22     THE COURT:  Mr. Ettinger.
23     MR. ETTINGER:  Your Honor, I object.  Dr. Pate, I
24  think, can talk about his experience, but he's now ascribing
25  motives to a thousand physicians based on the incentives

1607

1  they faced, and seems to be a little beyond personal
2  knowledge, Your Honor.
3      THE COURT:  Mr. Bierig.
4      MR. BIERIG:  He was describing, Your Honor, why he
5  feels he was unsuccessful in fully integrating physicians in
6  Houston, clinically.  I think it is important to understand
7  later, in terms of his testimony, as to what is trying to be
8  achieved at St. Luke's here in Boise.
9      THE COURT:  I am going to sustain the objection to
10  the extent that the doctor is talking about what specific
11  motivations were.  But I think the fee-for-services issue,
12  clearly, is front and center in this case.  I think the
13  witness's experience in that regard -- and, again, I think
14  it is probably just an economic reality that the
15  fee-for-services is at least one of the issues that many
16  commentators have been concerned about.  And I think all the
17  witness is expressing is that concern, not necessarily
18  trying to ascribe particular motivations to doctors.
19     So to the extent that it does, I will strike the
20  testimony.  But to the extent it's simply a comment about
21  the impact of fee-for-services upon the ability to control
22  costs and coordinate care, I will overrule the objection.
23     Proceed.
24     MR. BIERIG:  Thank you, Your Honor.  I will move
25  on from Houston to Boise.

1608

1  BY MR. BIERIG:
2      **Q.**  Dr. Pate, how did you happen to come to St. Luke's
3  Health System in Boise?
4      **A.  I was contacted by a recruiter who suggested that**
5  **this was the perfect job for me.  I had never thought about**
6  **coming to Idaho, but agreed to come here.  And when I came**
7  **here I saw the incredible opportunity to actually transform**
8  **healthcare, and that is part of what attracted me here.**
9      **Q.**  When you say you saw an incredible opportunity to
10  transform healthcare, what sort of transformation were you
11  seeking to achieve?
12     **A.  Well, what I think, and frankly most all of the**
13  **experts that I read were in agreement that the current**
14  **fee-for-service reimbursement system rewards the volume of**
15  **services provided regardless of outcomes to those who are**
16  **insured.  And I think that's causing our problems, not**
17  **solving our problems.  And I think that we need to transform**
18  **to a system where all healthcare providers are rewarded**
19  **based on value, not the volume of services we provide.**
20     **Q.**  How did you become interested in transforming
21  healthcare in the manner that you have just described?
22     **A.  The very first time that I really gave this much**
23  **thought was when President Clinton was in office, and, of**
24  **course, the national discussion was healthcare reform.**
25     **At that time I was a primary care physician -- and**

1609

1  **I might mention, I was a member of the independent practice**
2  **association I talked about at that time.  I was a practicing**
3  **physician in that organization.**
4      **I subsequently took on a position of**
5  **administration, and so I got to see healthcare from the**
6  **angle of being a primary care physician and being a hospital**
7  **administrator.  And both of those opportunities gave me the**
8  **opportunities to see the tremendous opportunity that lied**
9  **ahead to truly reform healthcare and transform it.**
10     **But that was nothing like what happened**
11  **subsequently when, in 2001, I was diagnosed with cancer and**
12  **I became a patient, and I got my treatment in the system.**
13  **And I could see, as a physician, hospital administrator, and**
14  **patient, how fragmented the healthcare system was; how**
15  **nobody had all of my information, I had to keep on giving**
16  **it; how there was no assurance, other than my own kind of**
17  **checking up on things to make sure that I was getting the**
18  **evidence-based treatment, the best possible treatment.  And**
19  **it just really fired my interest that we've got to fix this.**
20  **And frankly, not just for me, but my family all gets care at**
21  **all the places I work, and I've got to do this for them and**
22  **my grandchildren and everybody else's grandchildren.**
23     **Q.**  So what did you do to learn about approaches to
24  transforming the delivery of healthcare in the manner that
25  you are speaking about?

1610

1  **A.** Well, first of all, I read everything I can get my
2  hands on. I go to meetings. And at a lot of these meetings
3  I go and network with my colleagues and talk and try to
4  learn from them what's working in different places.
5  But I have studied looking for what are called
6  "bright spots." Even though there are very disparate health
7  systems across this world, where are the bright spots?
8  Where is something that seems to be working? And then, what
9  can I learn from that?
10  So obviously we've all heard about the developed
11  economic countries, the European nations. I have looked to
12  see what is the common thread. Why are they getting better
13  outcomes at a lower cost? I have looked at the health
14  systems that I know, from being in healthcare
15  administration, are recognized by my peers as being leading
16  health systems. I've looked at the health systems that
17  President Obama cited at the time of this renewed effort of
18  healthcare reform, organizations like Mayo Clinic, Cleveland
19  Clinic, Geisinger Health System, Kaiser Permanente, the
20  Intermountain Healthcare. I've looked at those
21  organizations and looked for those common themes.
22  **Q.** And what was attractive to you about the position
23  at St. Luke's?
24  **A.** Well, first of all, the mission, which is to
25  improve the health of people. I really think that the

1611

1  long-term answer to the growing healthcare costs is to
2  improve health. And so I really like that.
3  Second is, when I met with the board, I saw that
4  this board was very knowledgeable, very committed to our
5  communities, and they were passionate about trying to do
6  things that would improve healthcare in Idaho, including our
7  rural areas, and that was attractive to have an opportunity
8  to try to help improve rural healthcare.
9  And then, finally, all the physicians I met, I was
10  just really very impressed with the quality of physicians in
11  Idaho, as well as their commitment to this. And I thought,
12  boy, with all these ingredients, with an aligned board, with
13  physician leaders, we can do something important here.
14  **Q.** How would you describe St. Luke's Health System?
15  **A.** You know, I think that early on we were a
16  collection of hospitals. I think now how I would describe
17  us is we are an integrated delivery system.
18  **Q.** And what do you mean by that?
19  **A.** I mean that it's just not hospitals, it's
20  hospitals and physicians and then all the pieces that are
21  necessary to assemble that care coming together and working
22  together in an integrated fashion to be able to deliver
23  higher quality, more effective care to patients.
24  **Q.** And what is the mission of St. Luke's?
25  **A.** The mission of St. Luke's Health System is to

1612

1  improve the health of the people in the regions we serve.
2  **Q.** What is St. Luke's vision of how to achieve that
3  mission?
4  **A.** Our vision, to summarize -- and I will tell the
5  vision statement -- but really our vision is accountable
6  care. And by accountable care for St. Luke's we talk about
7  the Triple Aim. And our vision statement is that St. Luke's
8  Health System will transform -- and we picked our words very
9  carefully because we were making this vision statement right
10  before the time that Congress was passing the Affordable
11  Care Act. And we thought it was going to take more than
12  just reform. So we said St. Luke's Health System will
13  transform healthcare by aligning with physicians and other
14  providers to deliver integrated, seamless, patient-centered
15  quality care across all St. Luke's settings.
16  **Q.** Was that the vision of St. Luke's when you arrived
17  in August of 2009?
18  **A.** It was not. The vision at that time was to be the
19  indispensable provider for the regions we served.
20  **Q.** And why did St. Luke's adopt the new vision
21  statement that you talked about?
22  **A.** A new CEO would typically look at the mission,
23  vision, and values and make sure those are the right ones to
24  guide an organization forward. I understood how this vision
25  statement had come to be, but I thought it was problematic

1613

1  in two regards: One is I didn't think that was really a
2  vision. What does that look like, to be indispensable?
3  Second of all, I didn't think that was a good -- that
4  message would be received by the very people that it is
5  intended for.
6  I certainly don't want anyone who provides
7  services to me to be indispensable, and I don't think the
8  people of Idaho want St. Luke's to be indispensable. They
9  want us to earn their business every day.
10  **Q.** Now, I think you mentioned the Triple Aim. What
11  is the Triple Aim?
12  **A.** The Triple Aim for St. Luke's -- there is a number
13  of different versions; this is something that is being
14  increasingly adopted across the country -- but for
15  St. Luke's the Triple Aim is better health, and what we mean
16  is improving the health of people who are not yet patients;
17  better care, improving and coordinating the care for people
18  who are patients; and lower costs, and we mean that the way
19  people would know that is to see that in reduced insurance
20  premiums.
21  **Q.** When was the Triple Aim adopted by St. Luke's?
22  **A.** I don't remember exactly, but I believe it was in
23  2011.
24  **Q.** What is St. Luke's strategy to achieve the three
25  pillars of the Triple Aim?

1614

1     **A.**  You know, I guess I would say four different
2 things:
3     One is community outreach in order to improve
4 health.
5     Two is we have to have a system that will provide
6 care to everyone regardless of their ability to pay. And
7 that includes improving access to people who are
8 underserved, who are on Medicaid, who are uninsured; we've
9 got to do those things.
10     Three, we have to have at a foundation a
11 clinically integrated delivery system that can deliver
12 better care at a lower cost.
13     And then I think the fourth critical factor is we
14 must have a business model that provides value-based
15 reimbursement to support physicians and hospitals in their
16 efforts to decrease low-value and no-value services that
17 currently are revenue.
18     **Q.**  I believe, if I heard you correctly, you mentioned
19 four specific strategies. Let's take them one by one. I
20 think the first you mentioned was community outreach. What
21 do you mean by community outreach?
22     **A.**  So what I am talking about is particularly with
23 respect to how we are going to improve health. And that is
24 something that just has not been addressed by the American
25 healthcare system because we're not paid to improve people's

1615

1 health. We're paid to take care of people when they are
2 sick or injured.
3     If we want to improve the health of people who
4 aren't patients, then you don't look in hospitals and
5 physician offices because that's where patients are. You
6 have to get out in the communities, and that means we've got
7 to get to where those people are, and that's their homes,
8 their schools, and their businesses.
9     **Q.**  And why is community outreach important, in your
10 view?
11     **A.**  This is something I talk and write about quite
12 frequently. I don't want to minimize the fact that we have
13 a healthcare crisis today; we do. But frankly I am much
14 more concerned about the healthcare crisis coming, because I
15 think it's of a much greater magnitude. And that is, in
16 large part, related to the epidemic of childhood obesity.
17 And when I was in practice as a general internist, I would
18 see obesity in the 40s and 50s, and then I would see
19 hypertension, high cholesterol, diabetes, heart attacks, and
20 strokes in the 50s and 60s and 70s. What we're seeing now
21 is 15 percent of toddlers, I'm talking about children 2 to
22 4 years old, that are obese. And this should be shocking
23 news to people. And by the time these children are getting
24 to third grade, 30 percent are obese in Idaho.
25     And what my concern is -- and it's already

1616

1 materializing; I've talked to pediatricians about this, and
2 the American Academy of Pediatrics has already had to
3 respond to this -- what my concern is now we are going to
4 see hypertension, diabetes, heart attacks, and strokes in
5 the teens and 20s and 30s, decades before we saw this
6 before. This has tremendous impacts to the cost of
7 healthcare. These are very expensive conditions, as well as
8 imagine the impact to employers when the workforce is much
9 less healthy. So this is one of my passions.
10     Now, there's other things that --
11     **Q.**  Before you go on to other things, what is
12 St. Luke's doing by way of community outreach to address
13 childhood obesity?
14     **A.**  Not enough because we don't get paid for this.
15 But one of the programs that I'm really proud of that we
16 created together with one of our employed pediatricians who
17 is passionate about this is a program called the "YEAH!
18 program," Y-E-A-H exclamation point. This stands for Youth
19 Engaged in Activities for Health.
20     And what we're doing is targeting children, 5 to
21 16, I think it is, that are at the 95th percentile or more
22 of their expected body weight, and we are bringing them,
23 together with their families, into a program where we are
24 teaching them about how to have healthier lifestyles. We
25 have a nutritionist who takes them to the grocery store and

1617

1 shows them how to read labels and make healthy choices. We
2 get them together with our social workers and nurses and
3 others, and we get them moving and doing activities.
4     And what we've seen -- although this is something
5 that we've just piloted and gotten started -- what we've
6 seen is not only are we changing these children's lives, but
7 we're actually impacting their parents, and they are losing
8 weight. Because if you look at these children that are
9 obese, they typically, almost always, have one parent that
10 is also obese, and oftentimes two. So now we can impact a
11 whole family.
12     And I had the opportunity -- we just -- one of the
13 things we have done to continue to add to our YEAH! program,
14 just this summer we had a YEAH! summer camp. Most of these
15 children had never been to camp; their parents couldn't
16 afford it. And I don't think any of them had ever been to
17 Bogus Basin. But we partnered with Bogus Basin, Walmart,
18 the City of Houston. We took these kids up to camp, and I
19 went up there to see them, and let me tell you, we are
20 changing lives. And these kids who didn't have
21 self-respect, who didn't have self-confidence are now
22 starting to feel better and more confident about themselves.
23     **Q.**  Does St. Luke's make money on the YEAH! program?
24     **A.**  No, no. There are some of our community outreach
25 programs that we do get some fees for, and we have partnered

1618

1 with the community and gotten some grants, but our
2 investments in community outreach are not made up by these
3 fees. So no, it's an investment we make in our communities.
4     **Q.**   Well, can you give one or two other examples, very
5 briefly, of other community outreach programs that
6 St. Luke's is doing?
7     **A.**   A big thing that I am very worried about is
8 smoking, tobacco use. And we were, as a country, making
9 some initial progress in decreasing the smoking rates in
10 young people. And the critical thing at this point seems to
11 be can you prevent a kid from starting to smoke until at
12 least they're 18. The longer you can prevent, the less
13 likely they're going to smoke, and the less likely they're
14 going to have problems. Now we've got these e-cigarettes,
15 and I am very, very worried about what that's going to do.
16     **Q.**   Does St. Luke's have an outreach program on
17 e-cigarettes?
18     **A.**   So we have put together programs; we're trying
19 to -- now this is not as advanced as YEAH! yet, but we're
20 going to be getting out there and trying to address tobacco
21 cessation.
22         Another program that we're very proud of is
23 there's recent evidence showing the harms that are caused to
24 youth and young people engaging in sports who are getting
25 concussions. And so we have made a significant investment

1619

1 into a concussion program. And this is an example where we
2 are getting out to schools, and we're helping train athletic
3 trainers and others about how to prevent and manage
4 concussions. And I am very proud of that.
5     **Q.**   Does St. Luke's make money on the concussion
6 program or the tobacco cessation program?
7     **A.**   We do not.
8     **Q.**   Let's turn to the second thing that you mentioned:
9 Why does St. Luke's provide care to all patients regardless
10 of ability to pay?
11     **A.**   This is a deep commitment we have. We are Idaho's
12 only locally owned, locally governed health system. We are
13 committed to this community, and that means everyone. When
14 I told you about our mission statement and our vision and
15 the Triple Aim, I didn't say that those are just for the
16 people who can afford to pay for them or who are insured.
17 That is the fundamental problem with the traditional
18 fee-for-service system. And these people do not get access
19 to care or they get access only at a very advanced stage in
20 costly settings. So it is very important that we make our
21 programs available to everyone.
22     **Q.**   Is the commitment of St. Luke's to provide care to
23 all regardless of their ability to pay shared by physician
24 practices that are integrated into St. Luke's?
25     **A.**   Absolutely, or they don't get integrated into

1620

1 St. Luke's.
2     **Q.**   Now, you said as the third strategy you mentioned
3 clinically integrating the delivery of care. What do you
4 mean by that?
5     **A.**   What I mean and what we envision at St. Luke's is
6 getting all of the pieces of the health system to come
7 together and work together. And that means, in getting back
8 to the vision statement, we talk about how it's got to be
9 integrated. What we're talking about is having an
10 underlying unified electronic health store where every
11 person who is involved in your care has all the data.
12         We are talking about making it seamless for
13 patients, meaning that you go one place in the system, you
14 don't have to -- like back in Texas if you went from one
15 provider to another, you actually had to buy your medical
16 records and get them transferred. Now everybody has access
17 to those records; you don't have to reregister. It's
18 bringing all these things together, including how we're
19 going to have to get physicians working a new care model.
20         We don't have enough physicians in Idaho. And
21 we're adding nurse practitioners and PAs and other people to
22 work together as teams. And let me tell you, I can tell you
23 from my experience, this does not happen naturally. In
24 fact, it doesn't even happen until you put in an awful lot
25 of time and hard work.

1621

1         But what we've developed is physician leadership
2 that is amazing. And I never had anything like this in
3 Houston. And physicians who -- we believe are the best
4 people to lead this, to lead this cared redesign and what
5 we're trying to do. We've got that, the unified electronic
6 health record, the investment into analytics to support
7 this, and data help to help guide decisions, and the
8 clinical decision support systems which will be our next
9 step, where we can actually make sure that the physicians
10 have data at their fingertips about what are the best
11 treatments.
12         And, in fact, this will help address another IOM
13 report that just came out recently talking about the
14 problems in cancer care across this country because it's so
15 fragmented people don't have information, and they are not
16 using best practices.
17     **Q.**   Well, how does integration, the clinical
18 integration that you just spoke of, how does that allow
19 St. Luke's to offer better care at a lower cost?
20     **A.**   Several things. First of all, we think there's --
21 and so do policy-makers -- there's a lot of opportunity just
22 to reduce duplication of things in the healthcare system.
23         One of the things that happens when this care is
24 so fragmented, you go one place to get your care and that --
25 and you may have had a test, you go to another physician,

1622

1 they don't have the test, they just redo it.  And I'll tell
2 you what, one of the things that happens, you get a patient,
3 for example, that comes in to see a doctor like me with
4 abdominal pain, gets a CAT scan, gets exposed to radiation
5 and perhaps contrast, that test result is not ready, I leave
6 for the weekend, that patient gets worse, ends up in our
7 emergency room.  If we don't have access to that information
8 and that emergency room has to evaluate, they are going to
9 do another CAT scan.  It is very expensive.  Now you're
10 subjecting the patient to more radiation, maybe more
11 contrast, which can hurt their kidneys.  I mean, that is
12 definitely not better care.
13         So it allows us to avoid duplication.  It allows
14 us to reduce unnecessary services, and with the financial
15 alignment that we're trying to get and get the incentives
16 aligned to what we say we want, instead of rewarding volumes
17 of services, now we can look at what's the best treatment
18 that is the least intensive, and therefore least costly,
19 that will still get the same or better results.
20     **Q.**  Moving on to the fourth strategy, you mentioned
21 payment based on value rather than on volume.
22     **A.**  Yes.
23     **Q.**  What did you mean by that?
24     **A.**  So -- and I will give you an example, but what I'm
25 talking about is a payment system that does not reward

1623

1 people to just do things, that I'm going to get paid for
2 everything I do, every service I provided, and totally
3 regardless of whether it's the best treatment, the least
4 costly treatment or what the outcome is.  So we're talking
5 about a system that pays and rewards value.
6         Now, why that is so critical is an example that I
7 have from Houston with a neurosurgeon that I referred my
8 patients to.  When I couldn't handle their back or neck
9 pain, I would refer my patients to this surgeon because I
10 knew he was very conservative.  He agreed with the
11 philosophies that I have espoused.  However, he was in the
12 fee-for-service system.  And so what happened is when there
13 was an option not to operate, which he gets paid very well
14 for and the hospital does, he would choose physical therapy
15 or other less costly measures to see if those would work,
16 and they often did.
17         When he needed to operate, he would operate.  But
18 then he came to my office one day and said, "David, I'm
19 retiring."
20         And I was shocked, and I said, "Why?"
21         And he says, "I can't make it.  My colleagues are
22 in the operating room, operating all day, getting paid much
23 more.  I'm in the office, getting paid like a primary care
24 doctor, and yet I have the same overhead, malpractice
25 insurance and everything that other neurosurgeons have."

1624

1         And so trying to do the right thing in the wrong
2 business model actually drove this physician out of
3 practice.  And we can't have that.
4     **Q.**  Dr. Pate, as part of your study, have you looked
5 at what HMOs were doing in the 1980s and 1990s?
6     **A.**  I have, because I often get the question, "What's
7 the difference between the HMOs of the '80s and '90s and
8 accountable care that we're talking about now?"  And I
9 emphasize that they're very different.
10         When the HMO movement -- unfortunately that was
11 not provider driven, that was insurance company driven.  And
12 what I've said St. Luke's philosophy is, we've got to have
13 our physicians driving this change.  So that's one
14 difference.
15         The other difference was the whole focus was just
16 on reducing cost.  And they were willing to do so for
17 short-term gains; that is, try to deny or make access to
18 more costly services just very difficult even if people
19 needed it.
20         That's not what accountable care is.  Accountable
21 care is about delivering value.  It's the quality and
22 outcomes as well as how you can make the cost the most cost
23 efficient.
24         Now, the other thing is we're much better prepared
25 to do this today than back then.  Physicians didn't have the

1625

1 tools that we have today.  We've got electronic health
2 records -- and, sure, some of those have been around, but in
3 their infancy, and they were not particularly effective;
4 they're much more robust today -- so electronic health
5 records to be able to share data, clinical decision support
6 systems to be able to help physicians.  There's just no way
7 to keep up with all the evidence that's coming out.  No
8 matter how good you are, you cannot keep up with all of it.
9         And so by having clinical decision supports, where
10 physicians are deciding what is the current best evidence
11 and sharing that with everybody and having it embedded, now
12 you equip the physician with the information he or she needs
13 to make the right decision, and analytics to allow us to
14 compare, how are we doing, are we making a difference.
15         So I think it's very different.
16     **Q.**  So you've been with St. Luke's for a little more
17 than four years now.  Has St. Luke's succeeded in
18 implementing the strategies that you've just outlined?
19     **A.**  Well, I am very proud of what we've accomplished,
20 but I also realize this is a journey, and we've got a long
21 way to go.  However, I think, as I think about just the
22 things that we have accomplished in such a short time, I'm
23 really amazed, and I'm confident that we will be successful
24 in implementing our strategy.
25         I think of -- for example, you know, as I

1626

1  mentioned before, that the -- we thought reform was good,
2  but not enough.  We've got to transform healthcare.  And, in
3  fact, in my discussions with Dr. Don Berwick, the
4  administrator for CMS, he said Washington can't fix these
5  problems.
6          MR. GREENE:  Objection, hearsay, Your Honor.
7          MR. BIERIG:  I don't think it's being offered for
8  the truth; it's just the witness is stating what has
9  impacted him.
10         THE COURT:  I'll sustain -- well, if it's being
11 offered only for the effect upon the witness, whether true
12 or not true, and the witness's decision making, so I'll
13 overrule the objection, but with the understanding that it's
14 not being offered for the truth of what was said by the
15 person with whom Dr. Pate spoke.
16         Go ahead and proceed.
17         The objection is overruled.
18         THE WITNESS:  And that providers are going to have
19 to lead this effort.  And so what we decided to do is to
20 participate in the Medicare Shared Savings Program, a
21 voluntary program that was made possible through the
22 Affordable Care Act.  And we became the first and only
23 federally designated accountable care organization in Idaho.
24         So this past January we started our participation in
25 the Medicare Shared Savings Program.  I think when you look

1627

1  at what we've already accomplished with data analytics,
2  through our partnership with White Cloud, and we've showed
3  what we've got to some of these advanced systems like
4  Intermountain Healthcare, and they don't have anything like
5  this, and so now we've got -- we've already developed that.
6          And I think the physician leadership is critical.  In
7  fact, as I talk to my colleagues from around the country,
8  that's the biggest problem that is challenging them, besides
9  the business model, of how they're going to transform.
10         And so we've got all those ingredients, and because
11 we've got all those things and with the progress we've made
12 in such a short time, I've challenged my leadership team to
13 have St. Luke's Health System ready to enter into
14 value-based contracts for the majority of our business by
15 2015.
16 BY MR. BIERIG:
17    Q.  Why has the transformation to a value-based
18 contracting not been fully implemented at this time, in
19 2013?
20    A.  First of all, you have to understand that what
21 we're talking about is disruptive innovation.  We're not
22 talking about making tweaks to the current healthcare
23 system.  We're not talking about what has been referred to
24 as sustaining innovations that just advances.  We're talking
25 about really transforming this whole model.  This means you

1628

1  have to now think about healthcare in a completely different
2  way.  Whereas, today, in a fee-for-service model, I am
3  always thrilled when my hospitals are full, in a pay for
4  value, we will not want that.  We've got to keep people out
5  of hospitals.
6          So, you know, what the challenge is, first of all,
7  to get my whole leadership team aligned, many of whom have
8  spent decades working in the fee-for-service model.  And
9  they've got to -- you know, can you get your hands around
10 this?  You think in a new way.
11         Then getting the boards aligned, which we have
12 tremendous board alignment across the health system.
13         And then you go and you have to have these
14 physicians.  And the problem is that when everything is
15 working well for them they are not going to change unless
16 they come to the same conclusion we did, that healthcare is
17 unsustainable.  And you've got to get them out of the
18 mindset of that they're going to maximize revenue through
19 all these investments and hospitals and ambulatory surgery
20 centers, and imaging centers, and that kind of stuff, to be
21 focused on what we're going to do is improve value.
22         The other part of it is that -- as I've said --
23 that is, the big challenge is aligning the business model.
24 And we have -- and, you know, I understand, I am not
25 faulting them, but the insurance companies have done

1629

1  extremely well under fee-for-service.  They know how to
2  manage that.  And so they're a little bit resistant to
3  completely change their model.  And so without doing that,
4  it just means you can't go as fast.
5     Q.  So what has St. Luke's done with respect to
6  Idaho's major insurance companies to try to promote
7  healthcare transformation?
8     A.  We have talked with all of the local payors.  We
9  have explained where we're trying to go, we've been seeking
10 opportunities to partner with them.  Would they help us?
11 And I've explained to the insurance companies.  We're not
12 ready today to take risk.  We don't have the balance sheet
13 to do that, we can't take the total financial risk.
14         But I believe part of getting to the ultimate
15 accountable care is providers have to be accountable for the
16 outcomes and the cost of care.  That means we're going to
17 have to take financial risk.  I've told them that we're
18 getting geared up to do that; In fact, shared my goal that
19 we need to be ready by 2015.  So we have tried.
20 Unfortunately they are very -- you know, we still don't have
21 that relationship of partnering, and things are going very
22 slow.  And I have a real sense of urgency.  I don't think we
23 have the time to continue doing things like we are.  We've
24 got to change this.  And I hear it from employers and people
25 who can't afford healthcare all the time.

1630

1    Q.  So apart from talking to the traditional Idaho
2  insurance companies about transitioning to risk-based
3  contracting, what has St. Luke's done with insurance
4  companies?
5    A.  Well, realizing we were not going to have our --
6  our strategy facilitated by local partners -- local payors,
7  we've looked for a partner.  And one of the obvious places
8  for us to look was Intermountain Healthcare.  They are
9  recognized by our own industry as one of the leading health
10 systems, they were recognized by President Obama as the
11 leading health system, they've done great things, and they
12 have a subsidiary insurance company called SelectHealth.
13 And that company has been working with providers since the
14 '80s at least, maybe before then.
15         And what we know is that they have a different
16 philosophy about partnering with providers.  So we've talked
17 with them.  We found tremendous alignment in vision and
18 strategy.  They were very excited about what we were doing,
19 and so we have asked to partner with them.
20    Q.  And when you say you've "asked to partner with
21 them," what form has that partnership taken?
22    A.  First of all, they are in the Idaho market, they
23 are offering insurance plans, both on and off the insurance
24 exchange, and our partnership is to now look at how they can
25 help us prepare to take the risk, the financial risk, and

1631

1  that what will happen is instead of the traditional model,
2  where the insurance company has the premiums and gives a
3  smaller piece to the providers and keeps about 20 cents on
4  the dollar for their profits, investments, and reserves,
5  that SelectHealth agreed that they would only keep half of
6  that.  They run very lean; they would keep 10 percent for
7  them, and we would have access to the 90 percent, which now
8  gives us the financial model that allows us to invest in
9  health and allows us to invest in making physicians whole so
10 they are not penalized for not doing the expensive care and
11 things when there is a less costly option that will get a
12 good outcome.
13         THE COURT:  Mr. Bierig, because of the problem I
14 had yesterday, I have medication that requires I take just a
15 very short break.  So I'm going to take a five-minute break,
16 if that's alright.  And we'll still take a break in about an
17 hour, like we normally would.  So this will literally be
18 five minutes.  So if you need to leave the courtroom, make
19 sure you are back in five minutes because we will start.
20         MR. BIERIG:  I will stand right here, Your Honor.
21         THE COURT:  We will be in recess for five minutes.
22 (Recess.)
23         THE COURT:  I will remind Dr. Pate, you are still
24 under oath.
25         Mr. Bierig, you may resume your examination.

1632

1         MR. BIERIG:  Glad to see the court is practicing
2  the first pillar, better health.
3         THE COURT:  Well, I could have a discussion about
4  that, but perhaps we shouldn't.
5  BY MR. BIERIG:
6    Q.  Dr. Pate, what is your view on whether close
7  financial and personal alignment with physicians is
8  important in St. Luke's movement to value-based delivery of
9  care?
10   A.  Well, I think it's critical because, first of all,
11 I base it on my own personal experience in Houston.  I base
12 it on my experience here in Boise and in Idaho.  We have to
13 align the incentives to get the things that the American
14 people say they want, and that is better quality care at a
15 lower cost.  The incentives are not aligned that way now.
16         It's not surprising that the healthcare system is
17 broken, because we're paying for things we say is not what
18 we want.  We've got to have a model that allows physicians
19 to make the best possible decisions with the best evidence
20 and to select those options that will get the best outcomes
21 at the lowest cost.
22         Additionally, we've got to be able to give
23 physicians the time and not be penalized, from a financial
24 standpoint, because if you think about fee-for-service,
25 which is what I practiced in, time was money.  I had to keep

1633

1  my office clicking and patients going in order to make
2  payroll and pay the expenses.
3         We need physicians to devote time to quality
4  initiatives, to putting all this stuff together, the best
5  practices, all that.  And a great example that comes to my
6  mind is Dr. Kevin Shea, S-H-E-A.  Dr. Shea was on our
7  medical staff for many years and then subsequently became an
8  employee; he's an orthopedist.  And he looked at our
9  postoperative infection rates in people that have joints.
10 And we were doing very well compared to the rest of the
11 country, but try telling that to the patient who gets an
12 artificial joint infection.  You are talking about prolonged
13 disability, prolonged time away from work and a cost that
14 could be as much as a couple hundred thousand dollars
15 additional.  Healthcare did not have an answer for that,
16 because we were already doing really well compared to the
17 rest of the country.
18         Dr. Shea, because he had protected time, went to
19 outside the healthcare industry.  He went to Micron, to
20 their engineers, because when they're making a chip or
21 whatever the stuff is that they make, they can't have any
22 contaminants in it, or it's defective.  So they've figured
23 out air systems and how to handle that.  We went to Boise
24 State University to get air engineers to work for us.
25         And we've been implementing those lessons from

1634

1 other industries in our ORs, and now our infection rate,
2 which previously was very good, is half -- is already
3 dropped in half.  But we call it "project zero," because
4 when I congratulated Dr. Shea, Dr. Shea said, "Don't
5 congratulate me yet, we're only halfway there; we're going
6 for zero."  That's the kind of thing we can do with aligned
7 physicians.
8      Q.  Well, to what extent is your view on the
9 importance of closely aligned physicians based on your study
10 of other healthcare delivery systems?
11      A.  Well, it is.  As I have looked at others, I read
12 the book that Mayo has put out about their successes, and
13 they attribute it to Dr. William Mayo who said back in -- I
14 think it was in the '20s -- he said he wanted physicians to
15 be salaried so that they didn't have to worry about which
16 patients they were seeing, they didn't have to cherry-pick,
17 they didn't have to worry about how much time they spent
18 with the patients, and they didn't have to be pressured to
19 order tests.
20      THE COURT:  Mr. Ettinger.
21      MR. ETTINGER:  I think we're pretty far beyond the
22 witness's experience, reciting what other people said in
23 books.
24      THE COURT:  I think the objection will have to be
25 sustained on that.  I think the witness can certainly

1635

1 testify as to his own belief, but if we're going to bring in
2 other documents, we --
3      MR. BIERIG:  I think the witness is explaining the
4 basis for his belief.  He's telling you how he formed his
5 belief, what went into his experience that causes him to
6 have these views.  So it's hard to believe that he can't
7 mention that he read a book that informed his view.
8      THE COURT:  Well, I suppose similar to the last
9 objection made, it is being offered only to show the impact
10 upon Dr. Pate and his commitment to value-based healthcare.
11      I'll overrule the objection, but will not consider the,
12 I guess, Dr. Mayo's statement for the truth, but only for
13 the impact it had upon the witness in formulating his own
14 view and opinion about the need for integrating clinical
15 services into healthcare organizations.
16      Proceed.
17      MR. BIERIG:  I'll ask a different question that
18 perhaps will alleviate some of Mr. Ettinger's concern.
19 BY MR. BIERIG:
20      Q.  To what extent have you looked at current systems
21 in formulating your view about the importance of close
22 personal and financial alignment?
23      A.  Well, I've done several things:  First of all, the
24 Cleveland Clinic, Dr. Toby Cosgrove, who is the CEO of
25 Cleveland Clinic, has been quite outspoken -- it's all over

1636

1 in documents and videos -- that he attributes the Cleveland
2 Clinic's success to that salaried model.
3      Additionally, I've looked at the Pioneer
4 Accountable Care Organization Pilot that just finished its
5 first year.  32 organizations were in that, and there were 9
6 organizations that actually saved money for the Medicare
7 program, enough that they could share in the savings.  I
8 looked at those 9 organizations, and what is common to them
9 is all of them have at least a significant core of employed
10 physicians, and most of them, in fact, had faculty practice
11 plans where all the physicians were employed, and then
12 wrapped around that independent physicians.  Also when I
13 looked at -- there were 2 organizations that were reported
14 to have actually had increased costs, so they didn't get to
15 share, and, in fact, it crossed the threshold that they had
16 to refund money to the government.  I couldn't find
17 information publicly about both, but the one I did find
18 was -- it was an affiliation of independent physician
19 practices.
20      So based on everything that I've seen, what I've
21 heard, what I've gone to other meetings, consultants, what
22 seems to be the common theme in Kaufman Hall -- I mean, I'm
23 not the only person that noted this -- they put out a
24 publication where Ken Kaufman states it -- the common theme
25 in the organizations that President Obama cited and the ones

1637

1 that I've just talked about is at least a core of employed
2 physicians if not all of them employed.
3      Now, St. Luke's model is not to employ every
4 physician, but all these policy leaders are agreeing it's at
5 least a core of employed physicians.
6      Q.  Let me move now to the Saltzer transaction.
7 You're aware, are you not, Dr. Pate, that the focus of this
8 litigation is the affiliation of the Saltzer Medical Group
9 with St. Luke's?
10      A.  I am.
11      Q.  What has been your involvement in the Saltzer
12 transaction?
13      A.  Two things:
14      One, knowing the significance to St. Luke's, I
15 have met, on several occasions, with the leaders and the
16 executive committee to ensure that we have alignment on
17 vision and strategy and to ensure that they understand what
18 St. Luke's is trying to do and that I understand what their
19 aspirations are, to make sure we're aligned.
20      The second thing was I was involved in the system
21 board that gave final approval for the transaction.
22      Q.  And when you say you were "involved," were you
23 present when the system board discussed the Saltzer
24 transaction?
25      A.  I was.

1638

1  Q.  In considering whether to enter into the
2  relationship with Saltzer, what were the factors that the
3  system board considered?
4  A.  Well, first of all, the system board wanted
5  representations from me that those physicians were aligned,
6  at least the leadership.  And then we had a short-term
7  problem to address, and that short-term problem was that we
8  were running out of capacity at our St. Luke's Meridian
9  Medical Center.  And the question that we are facing is were
10  we going to do an addition to that facility.  In looking at
11  the patients coming to that facility, nearly 30 percent were
12  coming from further west in the Treasure Valley.  And so we
13  considered should we add to the facility at Meridian or
14  should we build a facility further out west in the Treasure
15  Valley further.
16       And we concluded that it would be -- given that
17  these patients were coming all this way and bypassing Saint
18  Al's to come to St. Luke's, that we would be best served if
19  we could build a facility in Nampa, and it would be less
20  costly actually than adding on to the Meridian facility.
21       The longer-term problem was that -- back to what I
22  talked about with community outreach, is the concept of
23  population health management.  This is a new concept,
24  relatively speaking, in healthcare.  And it's really the
25  kinds of things I was talking about, about how do we manage

1639

1  the health of an entire population, some of which are
2  patients, but many of which are not.  How do you take
3  accountability for managing that whole population?
4       And given that the population of Canyon County is
5  growing, and given that we are a sought-after provider in
6  those communities, the opportunity to have Saltzer Medical
7  Group aligned and willing to help us provide population
8  health management was a critical factor.
9  Q.  To what extent did the board consider how the
10  transaction would increase St. Luke's market share?
11  A.  We didn't consider that at all.  Our consideration
12  was how was this going to advance accountable care and the
13  Triple Aim.
14  Q.  And how did you see that happening?
15  A.  The biggest thing is, first of all, when you think
16  about that Triple Aim, better health, better health of
17  people who aren't patients and that it has no supporting
18  business model, I think that's the most challenging piece to
19  achieve.  The alignment of Saltzer Medical Group and willing
20  to commit to that Triple Aim and willing to help us with
21  improving health in those communities, which they know best
22  because they live and work in those communities, was
23  tremendously impactful.
24       Better care is the -- the opportunity with the
25  Saltzer Medical Group was to work with them to make more

1640

1  specialty services available to people locally and to
2  coordinate that care better to get better outcomes at lower
3  costs.
4  Q.  What role, if any, did the desire to increase
5  price to commercial payors play in the board's decision to
6  approve the affiliation with Saltzer?
7  A.  None whatsoever.
8  Q.  To what extent did a desire to implement the
9  Triple Aim in Canyon County influence the board's decision
10  to approve the affiliation with Saltzer?
11  A.  It was virtually the total basis for approving
12  that.
13  Q.  Did the board of the St. Luke's system consider
14  the competitive effects of the Saltzer affiliation?
15  A.  You know, the board's approach to this is, first
16  and foremost, what's in the best interest of the community.
17  Second, what will help advance our vision and our strategy
18  and serve the people better.  And third, will this be
19  procompetitive, which we saw it, from our view, as extremely
20  procompetitive, especially given that the Saint Al's Nampa
21  hospital was the only hospital choice there.
22       And we had created a small urgent care/emergent
23  care center in Nampa, and what we saw was an amazing turnout
24  of people supporting it and thanking us for giving them
25  choice.  And so we thought this was going to be very, very

1641

1  procompetitive.
2  Q.  Did the board consider a request by the State of
3  Idaho not to close the Saltzer transaction until the State
4  had completed its investigation?
5  A.  Yes.  We considered that very seriously and very
6  carefully.  There were several factors that prompted us to
7  move ahead.  First of all, we had made an agreement with
8  Saltzer that we would close by the end of the year, so we
9  had that commitment.  That wasn't overriding.
10       Second is that by the time of the board's
11  decision, Saint Alphonsus had hired away the seven highest
12  revenue-producing surgeons for the Saltzer Medical Group,
13  and we were aware that that was going to have a tremendous
14  financial hardship on the medical group because those seven
15  physicians accounted for $2 million worth of additional
16  overhead.  So we knew that the physician group was going to
17  be strapped, and, in fact, we believed that their very
18  survival was going to be threatened.
19       Saltzer was very important to us in being able to
20  carry out our vision in the western Treasure Valley.  It was
21  critical to our ability to offer a new product out to those
22  people.  It was something that we felt was very important
23  and very important for the community.  It was very important
24  to Saltzer.  Saltzer had decided, after considering both
25  St. Al's and St. Luke's, that they were most aligned with

1642

1   St. Luke's.

2          And then, frankly, looking at the course of the

3   investigation, from the time the investigation started to

4   the time we even just got our first subpoena was seven

5   months.  And I thought -- and we turned over I don't know

6   how many -- voluminous amounts of documents.  So I had no

7   idea.  And the government was not telling us a date certain

8   that they would finish their investigation.  We thought this

9   could go on for years and, in fact, the survival of Saltzer

10  would be threatened and all of this would become moot, and

11  it would hurt the community.

12         MR. GREENE:  Your Honor, objection.  We move to

13  strike the discussion of the alleged weakness -- financial

14  weaknesses of Saltzer.  There has been no foundation laid

15  for that answer.

16         THE COURT:  Mr. Bierig.

17         MR. BIERIG:  Your Honor, the question was did the

18  board consider the letter from the State of Idaho, and why

19  did it act as it did.

20         THE COURT:  Well, I think it gets to be a bit

21  nonresponsive.  Let's get the question back before the

22  witness.

23         Let's go ahead and proceed.

24  BY MR. BIERIG:

25      Q.  Well, the question was:  Why did the board

1643

1   determine to go forward?  What were the factors -- let me

2   rephrase it.

3          What were the factors that the board considered in

4   making its decision to go forward with the Saltzer

5   transaction in the face of a request by the State of Idaho

6   that it hold off on the transaction?

7          THE COURT:  Just so we're clear, I think the

8   concern from Mr. Greene was that we were having the witness

9   testify about the financial circumstances of the Saltzer

10  Medical Group without a foundation for the witness's

11  understanding of that.  I suspect, again, the witness is

12  only testifying about what his understanding was and the

13  motivation.  And I think motivation for the merger is in

14  fact an issue in the case.  So on further reflection, I'm

15  going to overrule the objection and allow the answer to

16  stand.

17         I see, Mr. Bierig, as you were struggling to rephrase

18  the question, I put you in an untenable position, because it

19  probably was a properly phrased question and a proper

20  answer.  So I'll overrule the objection.

21         MR. BIERIG:  Thank you, Your Honor.

22         THE COURT:  Go ahead and proceed.

23         MR. BIERIG:  In that case, I'll move on because I

24  think the witness has answered.

25  BY MR. BIERIG:

1644

1      Q.  Dr. Pate, did the board consider whether

2   St. Luke's could achieve the Triple Aim in Canyon County

3   through a looser affiliation with Saltzer?

4      A.  It did not.  I didn't bring that option to the

5   board because, first of all, I wouldn't take a

6   recommendation to the board that I couldn't support.  My own

7   experience in Houston taught me it wouldn't work.  It was

8   inconsistent with what we were trying to achieve, and in

9   fact, Saltzer had asked us for the tighter affiliation.  So

10  a looser affiliation was really not on the table.

11     Q.  And when you say you couldn't recommend a looser

12  affiliation, what was the basis for that belief on your

13  part?

14     A.  Because in my discussions with the Saltzer

15  leadership, they wanted -- they shared our vision and our

16  strategy.  They realized that the only way that could

17  succeed was to get away from the total fee-for-service

18  drivers of this and that we had to work together.  And they

19  were willing to do so and willing to commit to that.  And so

20  given the importance of us achieving our vision and the

21  strategy and being able to offer a new product in this

22  market, we felt like it only made sense to go forward in the

23  manner that Saltzer had requested.

24     Q.  Now, plaintiffs in this case allege that

25  St. Luke's will use the Saltzer transaction to drive up

1645

1   prices for healthcare services.  As president and CEO of

2   St. Luke's, what is your reaction to that allegation?

3      A.  Well, I think that given that, as I said before,

4   we are Idaho's only locally owned, locally governed health

5   system.  Our board of directors are all people who are part

6   of this community and have been part of this community for a

7   long time.  They are well connected in this.  They want us

8   to fix what's wrong with healthcare.  Our board of directors

9   wouldn't stand for this.

10         Further, our board of directors, a lot of them,

11  run businesses in these areas that would be impacted if we

12  tried to charge excessive or unreasonable prices.  And even

13  if their business wasn't impacted, they are so closely

14  networked in the community that they would hear from others

15  that they know.  And believe me, that board would be coming

16  back to me and feeling that this was unacceptable from

17  management.

18     Q.  Prices are determined by St. Luke's management

19  rather than the board; is that not correct?

20     A.  That is correct.

21     Q.  So how can you be confident, given that management

22  sets price, that prices will not be set above competitive

23  levels?

24     A.  Well, I think it's back to my previous answer.

25  Our board members are -- a lot of them are business owners;

1646

1 they run businesses here. They would be negatively
2 impacted, and they would let us know about it. In fact, I
3 hear about the challenges they have. And they're very
4 excited that we're designing a program to address these
5 issues. But they're so -- I mean, this is a very small
6 community, relatively speaking.
7        I mean, the entire state of Idaho is less
8 population than I had back in Houston in this city. So you
9 hear about these things, and they would know if we made any
10 effort to charge unreasonable or excessive prices, and they
11 just wouldn't tolerate it. And I can guarantee you I'd hear
12 from the board.
13    Q.  What constraints, if any, apart from the board's
14 view, are there on the ability of St. Luke's to raise prices
15 above competitive levels?
16    A.  Well, there is tremendous restraints here. This
17 market, unlike the market that I came from in Texas, has an
18 unbelievable dominant payor in the market. And Blue Cross
19 is so dominant that they are a must-have for us. We
20 couldn't just walk away from their business. And even
21 Regence, we have been in negotiations with them for the last
22 year on a contract asking for a change. After a year we
23 just gave in. We couldn't even get anything that we asked.
24 But this is a process of negotiation, and the -- we just
25 can't get what we want.

1647

1        And then there is two other things.
2    THE COURT:  Which you'll get to in a moment.
3    THE WITNESS:  Yes.
4    THE COURT:  Mr. Ettinger.
5    MR. ETTINGER:  Your Honor, I'd like to object on
6 foundation grounds. Dr. Pate is certainly the CEO of the
7 system. I believe, based on the record, that he's had
8 virtually no involvement in managed care negotiations, and
9 he doesn't even talk to some of the people directly involved
10 very much. And so I think a foundation ought to be laid
11 before he offers opinions as to the impact of various
12 managed care payors and what their negotiations have been.
13 Like many CEOs, you know, he has a lot of people below him
14 who do a lot of these things.
15    THE COURT:  I'm going to overrule the objection
16 and allow the witness to testify. Again, since Dr. Pate is
17 obviously a driving force behind this decision, his
18 motivation and his reasoning for it, whether his assumptions
19 are correct or incorrect. I'm not going to consider his
20 testimony for the accuracy of whether or not Regence or Blue
21 Cross were or were not in active negotiations with
22 St. Luke's or vice versa, but only that this witness has
23 testified that was his understanding in forming his
24 conclusions as to the way forward for St. Luke's.
25        But counsel will just have to trust me that I'm not

1648

1 concerned for the truth of that. Other witnesses can
2 testify to that. And if they don't, then I'll assume there
3 is no basis for it other than just Dr. Pate's assumptions.
4        So go ahead, Mr. Bierig.
5    MR. BIERIG:  Thank you, Your Honor. Well, the
6 witness said that he had two other reasons, so I would like
7 to ask him what the two other reasons are.
8    THE COURT:  I assume we're now going to tick off
9 items two and three. So go ahead.
10    MR. BIERIG:  That's my assumption, as well. I'm
11 looking forward to hearing what they are.
12    THE WITNESS:  Thank you, Your Honor.
13 Well the two other things, one was, I mean, I think
14 St. Luke's learned from the loss of the Micron business that
15 we have to be able to compete on price or we're going to be
16 subject to loss of business. That hurt us.
17        And then, finally, something that happened shortly
18 after I got here, I got contacted by an employer in Wood
19 River who told me that -- this was prior to alignment of our
20 prices there, so they were a little out of whack in Wood
21 River -- and he told me that they were sending employees to
22 Salt Lake City for services because prices for some our
23 imaging and procedures were too high, so we reduced our
24 prices. We are subject to pressures from even relatively
25 small- or medium-sized employers.

1649

1 BY MR. BIERIG:
2    Q.  Dr. Pate, the hospital plaintiffs in this case
3 have alleged that the Saltzer transaction will cripple them
4 competitively by drying up referrals. As the president and
5 CEO of St. Luke's, what is your response to that allegation?
6    A.  Well, I feel that there is no basis for that. One
7 of the things that has -- was clear to me when I got here is
8 that St. Luke's never had a practice of directing patients.
9 That's up to physicians. And even if that weren't the
10 practice, as a physician, I would find it completely
11 objectionable for us to direct where our physicians are
12 supposed to refer business.
13        For heaven's sakes, I took my wife to a St. Luke's
14 physician, and that physician referred my wife to a Saint
15 Al's physician, so I know that they're not directing them
16 all within St. Luke's. So I wouldn't tolerate it. I would
17 find it highly objectionable.
18        I knew from the discussions that I had with
19 Saltzer leadership that this was a very important issue to
20 them, that they be free to refer wherever they want to. And
21 I immediately said, of course. I couldn't imagine anything
22 else. They should. And, in fact, their specific concern
23 was the ability to refer to the Saint Al's Nampa hospital,
24 and I told them that I couldn't imagine not using the only
25 hospital that's there in Nampa. And I knew that Saltzer

1650

1  cared for many Saint Al's employees. I mean of course,
2  they're going to want their care at that hospital, and I
3  don't think we would have had the capacity to take their
4  business even if we wanted to direct it.
5      So no, we do not direct referrals, and as long as
6  I am CEO we will not direct referrals.
7      Q.  What is your view on the strength of Saint
8  Alphonsus as a competitor of St. Luke's?
9      A.  Well, my view is, and has always been since I got
10  here, that Saint Alphonsus is a very strong competitor. And
11  I like that because, frankly, they push us to be better and
12  I think we push them to be better. So I think that's a very
13  good thing. You know, in Houston, my next two competitors,
14  one of them was closer than the parking lot here to this
15  courthouse. I am used to having competition, and it only
16  drove us to be better, so that's a good thing.
17      Second, more recently, you know, they're part of
18  the Trinity system. Through the mergers and acquisitions of
19  Trinity, they are now the third largest nonprofit health
20  system in this country. And to put that in perspective,
21  they are about ten times bigger than the size of St. Luke's.
22  So I just, I see them as a very strong competitor.
23      Q.  Has Saint Alphonsus done or said anything that
24  confirms your belief in the strength of their competitive
25  position?

1651

1      A.  Oh, absolutely. I was, frankly, amazed that after
2  I heard about the allegations that they were somehow going
3  to -- their very existence was going to be threatened by our
4  transaction with Saltzer, and after Saltzer had already made
5  the decision to come with St. Luke's, I read in the
6  *Statesman* and received at my home a brochure stating that
7  Saint Alphonsus was investing $33 and a half million in the
8  Nampa area to expand their hospital services. And, to me, I
9  mean, I just don't think they even believe what they're
10  saying.
11      A competent healthcare leader would not make the
12  decision to put $33 and a half million at risk if they
13  sincerely believed they were going out of business there.
14  And I think that would be a flagrant foundation of the
15  fiduciary responsibilities of the Saint Alphonsus board if
16  they believed that they were going to be threatened to spend
17  that kind of money that should be going to the community.
18      Q.  You say "a flagrant foundation." Did you --
19      A.  Sorry. A flagrant violation of their fiduciary
20  responsibility.
21      Q.  I am going to ask the Court to put up Defendants'
22  Exhibit 2640, if you wouldn't mind.
23      MR. ETTINGER:  Your Honor, this is something we
24  just received the other day. We don't have an objection as
25  long as this is -- as long as Mr. Bierig is using the entire

1652

1  document. What he provided us was three cherry-picked
2  pages.
3      THE COURT:  I assume you're going to offer the
4  entire document, Mr. Bierig?
5      MR. BIERIG:  I can easily offer the entire
6  document. I'm only going to inquire about one page. I have
7  given Mr. Ettinger the entire document so he will be free to
8  cross-examine.
9      THE COURT:  Mr. Ettinger, I assume that is
10  satisfactory?
11      MR. ETTINGER:  Yes, Your Honor.
12      THE COURT:  Now, Mr. Greene -- we've got two
13  attorneys objecting. I'm assuming both of you may
14  cross-examine.
15      MR. GREENE:  Yes, Your Honor. I'll go first and
16  then Mr. Ettinger.
17      THE COURT:  Do you have any objection to 2640?
18      MR. GREENE:  No objection.
19      THE COURT:  All right. 2640 will be admitted.
20      (Defendants' Exhibit No. 2640 admitted.)
21  BY MR. BIERIG:
22      Q.  Can you identify for the record the date of this
23  document?
24      A.  It says winter -- winter of 2012.
25      Q.  And so that would be the November, December of

1653

1  2012?
2      A.  I don't remember which month I received it, but I
3  remember this was in my mailbox, and I remember looking at
4  the article I'm sure you are going to and thinking they know
5  that Saltzer has chosen to come with St. Luke's; why are
6  they investing this 33 and a half million if they really
7  believe that they're going to be devastated by this.
8      MR. BIERIG:  Well, I would ask the court to put up
9  page 2 of the exhibit as it currently stands.
10  BY MR. BIERIG:
11      Q.  You'll see a picture of a hospital there, or what
12  appears to be a hospital?
13      A.  I do.
14      Q.  Could you read the line that is underneath the
15  picture of the hospital?
16      A.  It says a $33.5 million expansion of services,
17  quality, access to care."
18      Q.  And what did you understand that sentence to mean?
19      A.  That Saint Alphonsus Health System was devoting
20  $33 and a half million to expand their current hospital
21  services in the Nampa market.
22      Q.  Is it your testimony that that statement was
23  published after Saint Alphonsus knew about the affiliation
24  between Saltzer and St. Luke's?
25      A.  It was.

1654

1    **Q.** Dr. Pate, what is your view on the strengths of
2    Treasure Valley Hospital as a competitor?
3    **A.  Well, the advantage that Treasure Valley Hospital**
4    **has is quite the opposite of what I was talking about**
5    **earlier; they have a perfectly aligned financial model which**
6    **incentivizes the physicians to use that facility and to do**
7    **these high-revenue services.  So I think they have a very**
8    **strong business model.  And as long as it continues to be**
9    **legal for physicians to self-refer, I think they are in**
10   **great shape.**
11   **Q.** I just have one small series of questions,
12   Dr. Pate.  You wrote an article that has been referred to
13   previously in this case in the *Journal of Legal Medicine*
14   entitled, "Hospital-Physician Relations in a Post-Health
15   Care Reform Environment"; is that correct?
16   **A.  That is correct.**
17   **Q.** When was that article published?
18   **A.  That was published in the beginning of 2012, is my**
19   **recollection.**
20   **Q.** I'm going to quote a statement that you made in
21   the article.  Specifically you stated as follows, quote:
22   When a specialist experiences a number of his or her
23   referring physicians being hired by a hospital, this creates
24   pressure for the specialist to consider employment with the
25   hospital to preserve the referral base, end of quote.

1655

1    Do you recall making that statement?
2    **A.  I do.**
3    **Q.** Does that statement continue to reflect your
4    views?
5    **A.  It does, but it's very important to understand**
6    **what that statement says.  What it says, that it does create**
7    **pressure for them to consider.  Now, I will tell you, in my**
8    **experience, I have never actually had that happen, where a**
9    **specialist sought employment from us because of the referral**
10   **sources being employed by us.  Frankly, most of these**
11   **physicians have diverse sources of referrals, and so that**
12   **doesn't tip it.**
13   **And, in fact, as I testified before, we don't**
14   **direct referrals, and so we find that it is quite typical**
15   **for our physicians to continue to refer to those physicians.**
16   **And, finally, I would say the Saltzer Medical**
17   **Group is a glaring example of how it is only consider, but**
18   **they in fact decided not to go with the organization where**
19   **the primary care physicians were going.**
20   **Q.** And where did they go?
21   **A.  They were employed by Saint Alphonsus Medical**
22   **Group.**
23   **Q.** I have no further questions, Your Honor.
24   THE COURT:  Mr. Ettinger, you're going first or
25   Mr. Greene?

1656

1    MR. GREENE:  I'm going first, Your Honor.  Thank
2    you.
3    THE COURT:  You just told me, and I'd forgotten
4    already.
5    MR. BIERIG:  This Exhibit 2640 has been admitted,
6    Your Honor?
7    THE COURT:  Yes, it has.
8    MR. BIERIG:  Thank you.
9    MR. ETTINGER:  Your Honor, I assume that's the
10   entire document, not the --
11   THE COURT:  No.  The entire document will be
12   admitted.
13   MR. BIERIG:  I will provide -- actually my only --
14   Mr. Ettinger has my only copy.
15   THE COURT:  Now, I'm assuming we're only talking
16   about the article in question, not the -- apparently it was
17   a magazine of some type or a publication.
18   MR. BIERIG:  A publication that Saint Alphonsus
19   distributed to the population in this area.
20   MR. ETTINGER:  It's an eight-page brochure.
21   THE COURT:  The entire document is admitted.
22   MR. GREENE:  Thank you, Your Honor.
23   CROSS-EXAMINATION
24   BY MR. GREENE:
25   **Q.** Good morning, Dr. Pate.

1657

1    **A.  Good morning.**
2    **Q.** Now, Dr. Pate, St. Luke's expects to achieve
3    clinical integration with independent physicians; correct?
4    **A.  That is correct.**
5    **Q.** And specifically, St. Luke's Select Network will
6    make a number of clinically integrated independent
7    physicians as part of the network; correct?
8    **A.  Yes.  But I'm not sure you said the name right.**
9    **Did you say, "Select Medical Network"?**
10   **Q.** I did.
11   **A.  Okay, good.  Yes, that's correct.**
12   **Q.** And you have discussed this on your blog, as I
13   understand it; correct?
14   **A.  Yes.**
15   MR. GREENE:  Mr. Oxford, if you'd bring up cross
16   Exhibit 3004, please.  And if you would highlight the first
17   two paragraphs when you get the opportunity.  Your Honor,
18   just a side note while we're doing this.  I will need to
19   close the courtroom in a few minutes just because we're
20   going to switch to AEO here?
21   THE COURT:  At this point?
22   MR. GREENE:  No, no.  This is public.  I'm going
23   to try and do two publics.
24   THE COURT:  We'll take a break about 20 minutes
25   after.  I don't know if that will help you in your timing.

1658

1  But if not, we'll just clear the courtroom.
2          MR. GREENE:  Much of my cross will actually
3  involve AEO.
4          THE COURT:  All right.
5  BY MR. GREENE:
6      Q.  Now, Doctor, let me read this portion of your
7  blog:  "One of St. Luke's strengths is in recognizing the
8  value of partnerships and being able to work collaboratively
9  to solve very challenging problems in healthcare.  We
10  recognize the importance of working with aligned physicians
11  and other providers, whether employed or independent.  We
12  know that we are not in a position to manage the total care
13  of a population in a way that can be accountable for when it
14  comes to outcomes and costs.  The delivery system necessary
15  to provide this population health management will include
16  St. Luke's, but includes many independent physicians and
17  facilities all working together around the state.  The
18  delivery system for our area of the state that St. Luke's
19  belongs to is Select Medical Network, and the statewide
20  delivery system of which Select Medical Network is a part is
21  BrightPath."
22          Did I read that correctly, sir?
23      A.  Yes, sir.
24      Q.  And that reflects your views, then?
25      A.  It does.

1659

1      Q.  And it currently reflects your views?
2      A.  It does.
3          MR. GREENE:  Now, Mr. Oxford, could you bring up
4  Plaintiffs' Exhibit 1658.
5          Your Honor, this is a memorandum from Dr. Pate.  It has
6  been admitted by stipulation and is not AEO.
7          THE COURT:  Yes.
8          MR. GREENE:  Mr. Oxford, could you bring up the
9  third paragraph so that we could see it a bit more clearly?
10  BY MR. GREENE:
11      Q.  And let me just read this to you, as well:  "In
12  order to prepare our organization to take not only the
13  accountability for clinical outcomes, but also for the cost
14  of that care, we must add aligned independent physicians to
15  the core physician group we have within the St. Luke's
16  clinic.  By developing relationships with independent
17  physicians who are willing to participate in evidence-based
18  medicine, agree to share quality data, and agree to hold
19  themselves accountable for the performance of the network,
20  we increase our ability to provide clinically integrated
21  accountable care to the patients we all serve.  We have
22  already established this network of St. Luke's clinic
23  physicians and independent physicians, and it is called
24  Select Medical Network."
25          Did I read that correctly, sir?

1660

1      A.  You did.
2      Q.  And the fourth paragraph, if you could highlight
3  that, Mr. Oxford.
4          And you are indicating here, let me just read:  "Select
5  Medical Network is critical to the success of our
6  transformation of healthcare.  For this reason, I have asked
7  John Kee, VP physician services, to transition to a new role
8  as Vice President, Network Operations."
9          Then continues with, "This move will allow John to
10  focus on fostering strong physician relationships and
11  supporting the alignment and clinical integration efforts
12  with independent physicians across the system.  Further
13  development of the network will position us well for the
14  future of population health management and accountable
15  care."
16          Did I read this portion of your memo correctly?
17      A.  You did.
18          MR. GREENE:  Now, this is the point where I have
19  an AEO document, Your Honor, and I apologize to our --
20          THE COURT:  Ladies and gentlemen, we will have to
21  clear the courtroom while the witness is being examined
22  concerning this document.
23          Are there any parties who can remain in the courtroom,
24  Mr. Greene?
25          MR. GREENE:  This is a St. Luke's document.  I

1661

1  leave it to my --
2          THE COURT:  All right.  So the St. Luke's
3  employees can remain in the courtroom?
4          THE WITNESS:  Our board chairman could remain,
5  couldn't he?
6          MR. BEIRIG:  Yeah.
7          MR. SINCLAIR:  Mr. Saldin.
8          MR. GREENE:  I think we're set, Your Honor.
9          ******COURTROOM CLOSED TO THE PUBLIC******
10          MR. GREENE:  Mr. Oxford, could you bring up
11  Plaintiffs' Exhibit 1510 -- which has been admitted by
12  stipulation, Your Honor.
13  BY MR. GREENE:
14      Q.  You can certainly take a look at this when it
15  comes up, Dr. Pate.  This is Exhibit 1510.  It's an email
16  chain between you and Mr. Fletcher dated October 6, 2012.
17          Mr. Fletcher is your chief operating officer for
18  St. Luke's Health System; isn't that correct?
19      A.  That is correct.
20      Q.  Turning to the third paragraph, four lines down,
21  of your portion of this email string, it reads, "Select
22  Medical Network will be responsible and accountable to me.
23  The purpose of SMN is to involve sufficient numbers of
24  independent physicians with our St. Luke's clinic through
25  clinical integration to permit our successful management of

1662

1 populations of patients throughout our health system's
2 geographic area (and through BrightPath for members
3 requiring care outside of our geographic service area, but
4 within the state)."
5 Did I read correctly, sir?
6 **A. There was a slight minor but not substantive --**
7 **yes, it's basically correct.**
8 **Q.** Thank you, Doctor.
9 Mr. Oxford, could you bring up Plaintiffs'
10 Exhibit 1212.
11 Now, Dr. Pate, this is one of your blog entries. And
12 your blog, as I understand it, is called Dr. Pate's
13 prescription for change; that is correct?
14 **A. It is. Except I can't read it. I'm not sure if**
15 **it's my entry or a guest blogger, but it is my blog.**
16 **Q.** We can pop the text. I can also give you a binder
17 with the actual document and paper if that would be helpful.
18 **A. I can actually tell now. This was a -- it wasn't**
19 **written by me, it's a guest blog, but, yes, it's my blog.**
20 **Q.** And many of the blog posts you write yourself; is
21 that correct?
22 **A. The majority.**
23 MR. STEIN: Could you give a binder to the
24 witness?
25 MR. GREENE: We haven't yet. My apologies. The

1663

1 small version.
2 THE COURT: That hanging cord is making me
3 nervous. I'm assuming --
4 MR. POWERS: It will catch anybody that goes this
5 way, Your Honor.
6 THE COURT: That's very reassuring.
7 All right. I assume we'll just be very careful and
8 perhaps try to unplug it on breaks or something.
9 Go ahead, Mr. Greene.
10 MR. GREENE: Thank you, Your Honor.
11 BY MR. GREENE:
12 **Q.** Dr. Pate, many of these blog posts you write
13 yourself; is that correct?
14 **A. That is correct.**
15 **Q.** And occasionally you ask others to do sort of
16 guest articles for you; is that correct?
17 **A. That's correct.**
18 **Q.** And in this particular instance you asked
19 Mr. Billings to do a guest appearance on your blog; is that
20 correct?
21 **A. I did.**
22 **Q.** Your intro, as I read this, is, quote, I've asked
23 Randy Billings, St. Luke's Health System vice president of
24 payor and provider relations, to share his perspective on
25 the difference clinical integration can make, closed quote.

1664

1 Did I read that correctly?
2 **A. You did. And those would be my words, that --**
3 **Q.** Right.
4 **A. Yes, correct.**
5 **Q.** And I was going to ask you.
6 So the rest of this is Mr. Billings with your obvious
7 sponsorship. And let me see if I understand what he writes.
8 Mr. Billings explains that prior to coming to St. Luke's he
9 led contracting efforts for advocate health care; correct?
10 **A. I don't see that here, but I know that to be the**
11 **truth, yes.**
12 **Q.** Let me turn to the second to the last paragraph,
13 where Mr. Billings writes: "The Triple Aim will be realized
14 only within and dependent upon such a clinically integrated
15 network. And while the financial incentives of
16 participating providers must be aligned, a clinically
17 integrated network is not necessarily a network of providers
18 under common financial ownership. The Patient Protection
19 and Affordable Act allows government-approved accountable
20 care organizations, ACOs, that can consist of otherwise
21 financially independent provider competitors that are
22 clinically integrated."
23 And then on the next page he continues --
24 THE COURT: Could you leave it there just for a
25 moment before you switch. I want to finish reading that.

1665

1 Although you were reading it, I wanted to look at it again.
2 Go ahead.
3 BY MR. GREENE:
4 **Q.** Continuing on to the next page, Mr. Oxford, if you
5 would switch us. The last partial bit of text: "Clinical
6 integration with independent providers is clearly the
7 essential building block of accountable care."
8 Did I read that correctly?
9 **A. You did.**
10 **Q.** Now, Dr. Pate, it is possible to design incentives
11 that improve quality without employment; isn't that correct?
12 **A. Yes, sir.**
13 **Q.** And, in fact, you told me this in an
14 investigational hearing, I believe.
15 Mr. Oxford, would you bring up page 156 of Dr. Pate's
16 investigational hearing?
17 THE COURT: Counsel, is this marked as an exhibit?
18 MR. GREENE: It is marked as -- excuse me, Your
19 Honor -- it's marked as Plaintiffs' Exhibit 3006. And this
20 was -- as part of our investigative process we do
21 essentially depositions before filing, so this was an
22 investigative deposition transcript.
23 BY MR. GREENE:
24 **Q.** And do you recall this process?
25 **A. The process of my investigational hearing?**

**1666**

Q. Yes.

A. Yes, I do.

MR. STEIN: Your Honor, I'm not sure what counsel is driving at. The witness has already agreed with the previous statement asked by Mr. Greene, so I don't know what he's seeking to impeach here because the witness has already agreed with the statement.

MR. GREENE: Well, Your Honor, I think, certainly -- I believe my colleague is referring to Federal Rules of Evidence 801(d)(1), which relates to statements that may be contrary to prior statements. 801(d)(2) speaks specifically in terms of statements by a party opponent, and it comes in that way.

THE COURT: I was going to equate that to a deposition of -- obviously a deposition of a party, although here you'd probably need a 30(b)(6) designee. But more importantly, I think counsel is correct; it is a statement by a party opponent or its representative and, therefore, nonhearsay.

MR. GREENE: Thank you, Your Honor.

THE COURT: So I will overrule the objection. My primary concern now is I'm having a hard time identifying for the record. This has been marked?

MR. GREENE: Yes, it has been marked as Plaintiffs' Exhibit 3006.

**1667**

THE COURT: And is that the plaintiffs' demonstratives?

MR. GREENE: That's in the demonstrative series, Your Honor. I mean, it is obviously evidence, but we -- there was no obvious place to put this.

THE COURT: You're not offering the entire transcript, only that portion which you just read?

MR. GREENE: Just the portion I'm reading.

THE COURT: All right. Proceed.

MR. GREENE: Okay. Thank you.

BY MR. GREENE:

Q. And you recall, Dr. Pate, you were under oath?

A. That's correct.

Q. And you promised to tell the truth; correct?

A. I did.

Q. And the question I posed to you and your answer: My question was, "Accountable care requires a different business model to support it. Instead of fee-for-service, it may be promoted through episode-based payments. Now, based on this are you suggesting that an employment relationship is not necessarily the only way to provide the incentives to for the integration of care."

And you answered, "I think it is possible to design incentives with quality and, in fact, I think -- without employment, and I think that's why we were so successful in

**1668**

Houston."

Did I read that correctly, sir?

A. You did.

Q. And Mr. --

MR. BIERIG: Your Honor, I would ask that if --

THE COURT: I was waiting. Yes, I'm going to direct counsel to read the entire response under the doctrine of completeness.

I assume that's what -- Mr. Bierig, I may have anticipated too much.

MR. GREENE: If I can have the rest of that transcript. I don't have it in my notes, Your Honor.

THE COURT: Well, the problem is that the answer is broken up into at least two pieces. And I think what -- Mr. Bierig, you're asking that the entire response be read into the record?

MR. BIERIG: I am. But I'm also asking that the entire question be shown, because the question that I see is, "Uh-huh."

MR. GREENE: Your Honor, if we may -- if we may move on, because they're finding it for me, and I will certainly --

THE COURT: If you'll come back, and let's read the entire question.

MR. GREENE: Of course.

**1669**

THE COURT: I think that's what I meant, Mr. Bierig, it was broken up by an affirmation by, I think, Mr. Greene during the questioning. So we will read the entire question and both pieces of the answer that were separated by the aforementioned comment.

MR. BIERIG: Thank you, Your Honor.

MR. GREENE: And, Your Honor, I would like to --

BY MR. GREENE:

Q. Now, Dr. Pate, conversely, employment doesn't guarantee alignment, correct?

A. That's correct.

Q. And I believe you responded to my question with respect to this in your deposition or responded to a question at your deposition.

Mr. Oxford, can you bring up pages 1029 to 1035 of Dr. Pate's deposition transcript. And if you can play that tape, that would be terrific.

(Video clip played as follows:)

Q. "What you were talking about earlier when you say that, you know, even within your population of employed physicians, you're not sure that everybody is aligned with the vision?

A. "Yeah. I think that we have great alignment, but I don't think that there is 100 percent alignment. And my point being that

1670

1    employment by itself doesn't guarantee
2    alignment.  You have to work at these
3    relationships to create alignment.  And so that
4    was the point of that."
5    (Video clip concluded.)
6    BY MR. GREENE:
7        **Q.**  Thank you.  Doctor, I do have the complete
8    transcript before me, but I don't have an obvious way to
9    show it to you.  If I read it to you, would that be
10   sufficient?  Did you have -- I do have it actually.
11       THE COURT:  All right.  Let's switch over to the
12   ELMO, and we can --
13       Face up is probably a good start.  And maybe
14   that's where we -- there we go.
15       MR. BIERIG:  I would just ask, Your Honor, as this
16   is going forward that the witness be given an opportunity to
17   see the entire context of the question before he's asked to
18   respond.
19       THE COURT:  Let's -- Mr. Greene, if you'll ask the
20   entire question and then read in the witness's response.
21       MR. GREENE:  Of course, Your Honor.
22   BY MR. GREENE:
23       **Q.**  This is the --
24       THE COURT:  It probably would start on -- looks
25   like page -- is it 155, line 7?

1671

1        MR. GREENE:  Yes, it starts at 155, line 15.
2        THE COURT:  I'm suggesting line 7 because -- to
3    put it into context, there's a reference to page 13 in your
4    question.
5    BY MR. GREENE:
6        **Q.**  "Okay.  I have placed before you an exhibit, which
7    is from the *Journal of Legal Medicine*, which you authored,
8    and it's called, quote, 'Hospital-Physician Relations in a
9    Post-Health Care Reform Environment,' dated March of 2012.
10       "I presume you're intimately aware of what's in this
11   document?
12       **A.**  "Very familiar.
13       "Okay.  I'm just kind of interested in this
14   whole" --
15       THE COURT:  Just a second.  The "Okay" is we start
16   with a new question?
17       MR. GREENE:  Yes.  The new question starts after
18   he says, "Okay."
19   BY MR. GREENE:
20       **Q.**  New Question:  "Okay.  Now, I'm just kind of
21   interested in this whole, you know, employment versus other
22   kinds of structures.  So on page 13, you're talking about
23   accountable care, and let me just read a portion of this.
24   Towards the bottom, it's the -- basically the second from
25   the bottom paragraph reads, quote, 'Accountable care

1672

1    requires a different business model to support it.  Instead
2    of fee-for-service, it may be promoted through episode-based
3    payments, shared savings, pay for performance, value-based
4    purchasing'" --
5        THE COURT:  Could you slide up so we can see.
6    There.  Thank you.
7    BY MR. GREENE:
8        **Q.**  -- "'partial capitation, global capitation, or
9    various other models that provide aligned incentives to
10   providers for providing value in healthcare services, as
11   opposed to payments for each service provided.  The business
12   model for accountable care may vary and will certainly
13   evolve with time.'
14       "Now, based on this, are you suggesting that an
15   employment relationship is not necessarily the only way to
16   provide incentives to -- for the integration of care?
17       **A.**  **"It depends, it depends.  It would limit certain**
18   **types of incentives, but it doesn't preclude all kinds of**
19   **incentives.**
20       **"So in other words, there are many things that**
21   **need to be aligned, and I mentioned two things in -- I think**
22   **it was in the provider -- the PSA agreement that you showed**
23   **me, that incentives were along two lines, quality and**
24   **lowering cost.**
25       **Q.**  "Uh-huh.

1673

1        **A.**  **"I think it is possible to design incentives with**
2    **quality and, in fact, I think without employment, and I**
3    **think that's why we were so successful in Houston.  I**
4    **mentioned what we had done with improving quality there.  I**
5    **think you can do that.**
6        **"We did not, in Houston, lower the total cost of**
7    **care, I am confident.  I don't know what it was, but I am**
8    **confident that we didn't lower it.  I think because there**
9    **was just very little alignment from a financial standpoint.**
10   **Without the financial alignment you are limited to what**
11   **incentives you can provide.  Many of those incentives would**
12   **be illegal.**
13       **"So back to the example where I am saying, you**
14   **know, I want to improve diabetes care that you -- you could**
15   **do.  I think you could actually do that, and that's not**
16   **really going to come out of somebody's pocket.  But if I**
17   **wanted to try to reduce spine surgery, I'm going to hit a**
18   **brick wall, because the way that you lower those costs, it**
19   **comes out of the surgeon's pocket, and they are just not**
20   **typically going to act against their own economic**
21   **self-interest to do that."**
22       That's the end of his answer.
23       THE COURT:  Thank you, Mr. Greene.
24       MR. GREENE:  Thank you, Your Honor.
25   BY MR. GREENE:

1674

1    **Q.**  Now, Dr. Pate, it's also the case that you would
2    expect some version of clinical alignment with Saltzer even
3    if the deal is unwound; isn't that correct?
4    **A.  Well, I don't know what the judge's orders would**
5    **entail if this had to be divested, so I don't know what we**
6    **would and would not be able to do.  But I can tell you that**
7    **we would want to work with Saltzer Medical Group, or**
8    **whatever part of it survives, even if it had to be divested,**
9    **as long as it was consistent with the judge's order.**
10   **Q.**  And you would be willing to consider a joint
11   venture with Saltzer; correct?
12   **A.  I would consider that.  Again, subject to the**
13   **judge's orders.**
14   **Q.**  Sure.  And I believe you told us that, or at least
15   a version of this, in your deposition.
16   Mr. Oxford, would you play from Dr. Pate's deposition
17   1676 through 1681.
18   (Video clip played as follows:)
19       **Q.**  "You see in your email to Ms. O'Keefe on
20       May 10 at 11:27 a.m., you say, 'My guess, just
21       between you and me, is that we do not proceed
22       with Saltzer in current scenario but look to
23       other ways to partner, work with the group'?
24   **A.**  "Yes.
25       **Q.**  "And who is Ms. O'Keefe?

1675

1    **A.**  "She is my system leader for human
2    resources.
3       **Q.**  "What other ways would you -- would you
4       partner or work with Saltzer if the current
5       transaction had not proceeded?
6    **A.**  "Um, we were willing to consider joint
7       ventures or, actually, whatever they would be
8       willing to.  We really hadn't spent any time
9       discussing it because we'd been looking at the
10      current model, but certainly we want to work
11      with physicians that want to work with us
12      however we can.  So it was meant to be very" --
13   (Video clip concluded.)
14   THE COURT:  Counsel, it just struck me, I think
15   we've not -- everyone in the courtroom is still just
16   St. Luke's employees or affiliated with St. Luke's.
17      MR. GREENE:  That's my understanding.
18      THE COURT:  Are you still involved in AEO?
19      MR. GREENE:  This I believe has been designated as
20   AEO.
21      THE COURT:  Okay.  All right.  We're going to take
22   the break anytime in the next five minutes, so you can pick
23   your spot, Mr. Greene.
24      MR. GREENE:  Okay.  Thank you, Your Honor.
25   BY MR. GREENE:

1676

1    **Q.**  Now, you mentioned in your conversation with my
2    colleague Jack Bierig that at the system board, or as I
3    understood what you told me, that the board did not consider
4    the costs and revenues associated with the transaction.  Is
5    that a correct understanding of your testimony?
6    **A.  No, that's not correct.**
7    **Q.**  So they did, in fact, consider the revenue stream
8    and the costs associated with this agreement?
9    **A.  Yes.  They fulfilled their fiduciary**
10   **responsibilities with respect to that.**
11   **Q.**  And as I understood your testimony, you indicated
12   that you did not tee up or provide to the board a looser
13   alignment option, it was only the employment option; is that
14   correct?
15   **A.  That's correct.**
16   **Q.**  Now, the system board was not the only board to
17   consider this transaction; isn't that correct?
18   **A.  That's correct.  The system board was the final**
19   **decisionmaker because this exceeded the thresholds authority**
20   **delegated to the Treasure Valley board, who had the primary**
21   **responsibility.**
22   **Q.**  So it's the case that the Treasure Valley board
23   also reviewed and approved this transaction; is that
24   correct?
25   **A.  That's what we were told.  I was not in attendance**

1677

1    there, and I certainly would believe that that would be the
2    case.
3       **Q.**  Did you get reports on that meeting?
4    **A.  I did not.**
5       **Q.**  You did not.
6    **A.  It wasn't presented as part of our system board**
7    **presentation that I can recall, other than this came up on**
8    **recommendation of the Treasure Valley board.**
9       **Q.**  And you presumably, then, have no knowledge of
10   whether that board was at all concerned about the potential
11   dominance that might result from this transaction?
12   **A.  I would find that very surprising, but, no, I have**
13   **no direct knowledge.**
14   **Q.**  You have no knowledge one way or the other?
15   **A.  No knowledge.**
16   **Q.**  And you've not had the opportunity to speak to
17   Director Jim Everett about his concerns and the concerns of
18   some of the other board members with respect to dominance in
19   market share?
20   **A.  I have not heard any concerns from him.  I've**
21   **certainly had opportunities to talk to him, but I've never**
22   **heard if --**
23   **Q.**  So you have no knowledge one way --
24   **A.  No.**
25   **Q.**  -- is what you're telling me?

1678

1    **A.**  Correct.
2        **Q.**  Generally, the board relies or the system board
3    relies on your good judgment, as I understand it, when they
4    make their decisions; is that correct, Doctor?
5        **A.**  Well, they certainly count on my good judgment.
6    And I don't think that's the whole basis for their
7    decisions.  I don't mean to suggest that.  But I do think
8    they rely on me to give them good advice and to present
9    issues to them.
10       **Q.**  And occasionally when you give that advice you
11   would rely, at least in part, on your law degree, I presume?
12       **A.**  Well, occasionally, yeah.
13       **Q.**  And you've spoken on this litigation on your blog;
14   correct?
15       **A.**  I have.
16       **Q.**  And you've spoken publicly otherwise on this
17   litigation; correct?
18       **A.**  I'm trying to remember.  You mean in some
19   particular public thing?  Like, I have talked to the
20   newspapers; they've interviewed me and so forth.  Is that
21   what you mean?
22       **Q.**  Yes.  I'm thinking specifically, Doctor, about
23   your presentation to the "young lawyers section" of the
24   Idaho State Bar, in May of this year, concerning healthcare
25   and the law.

1679

1    **A.**  Yes.  I talked to some law students.
2        **Q.**  And do you recall answering a question about
3    whether it was helpful to be both a doctor and a lawyer in
4    managing the processes at St. Luke's?
5        **A.**  I don't recall it, but it does sound familiar that
6    that came up.
7        **Q.**  Do you recall that you said words along the lines
8    of that your knowledge of the law has allowed you to counsel
9    the board to continue with this litigation, and it would not
10   otherwise have done so.  Is that correct?
11       **A.**  I don't recall making that statement.  I have the
12   advice of my own attorneys.
13       **Q.**  Okay.  But we did have the opportunity to record
14   this, at least parts of this answer that you gave at this
15   proceeding.
16       Mr. Oxford, would you play that for me.
17       (Video clip played as follows:)
18       **A.**  "That we're embroiled with Saint Al's, a
19           physician specialty hospital, the Idaho
20           Attorney General, and the Federal Trade
21           Commission.  You know, I have to tell you that
22           knowing what I know, and understanding the law
23           like I do, has really been, I think, key -- I
24           think we would have just given up on this a way
25           long time ago and decided not to fight it if I

1680

1            didn't have the understanding that I have and
2            can convey that to our board.  We have great
3            attorneys, but they're going to turn and look
4            to the CEO for the direction.  So it's been
5            very help" --
6        (Video clip concluded.)
7        **Q.**  That's your voice, obviously?
8        **A.**  Yeah, it is.
9        MR. BIERIG:  I am going to object to this one
10   statement out of context like this.  If they're going to use
11   it, I think they should have provided us with the entire
12   document.  They should certainly provide Dr. Pate with the
13   entire recording.
14       MR. GREENE:  This was turned over as an exhibit,
15   Your Honor, actually, some time ago.
16       THE COURT:  Is this, again, marked as
17   demonstrative, for impeachment -- in the demonstrative
18   series as an impeachment exhibit?
19       MR. GREENE:  We will mark it as next in order.
20   The exhibit actually has been marked as Exhibit 3007.  And
21   the recordings, there were two documents that were turned
22   over to the defense, IAG000417 to -418, which is Dr. Pate's
23   hard copy handout at that presentation, and then the voice
24   files, IAG000423 to -427.
25       THE COURT:  Mr. Bierig, I'll give you a chance to,

1681

1    if need be, play a larger portion of the excerpt just to
2    provide context, but not -- you can't offer the entire thing
3    itself.  But certainly you are entitled, I think, to provide
4    context for the witness's statement.
5        MR. BIERIG:  Well, the problem is I would ask
6    Mr. Greene, through the court, Your Honor, when this was
7    marked as a demonstrative.  I don't believe that we --
8        THE COURT:  Well, I am concerned.  I don't have a
9    list of the demonstratives, what's been marked.  I think
10   what -- a problem has arisen that we were referring to
11   demonstrative exhibits without any reference to them, so we
12   couldn't make a record.  And I've directed counsel to take
13   any demonstratives and make sure that a number is assigned
14   to them for the record.  And I think the plaintiffs are
15   using the 3,000 series, and perhaps the defense is using the
16   4,000 series.
17       MR. BEIRIG:  5,000.
18       THE COURT:  5,000.  And that also could include,
19   of course, any items that were marked for impeachment
20   purposes and not premarked as a trial exhibit; it can all go
21   into that grouping.  They will all need to be marked and
22   made part of the record.  I am assuming that has been done
23   with regard to both the transcript or at least the audio
24   file.
25       MR. GREENE:  The audio file, yes, Your Honor.  I

1682

1   misspoke, it's actually Cross Exhibit 3007 as opposed to
2   Exhibit 3007.
3       And now I just have a -- just a few more lines to ask
4   about.
5   BY MR. GREENE:
6       Q.   So, Dr. Pate, market power would still matter in a
7   world of value or risk-based contracting; correct?
8       A.   **I don't know the answer to that.  I'm not sure the**
9   **answer is known.**
10          MR. GREENE:  Mr. Oxford, can you play a clip from
11  Dr. Pate's deposition transcript, 19016 through 20.
12  (Video clip played as follows:)
13          Q.   "In a world of paying for performance or
14          paying for value, there's still going to be
15          negotiations between payors and providers as to
16          how much to pay; correct?
17          A.   "Yes."
18  (Video clip concluded.)
19  BY MR. GREENE:
20      Q.   And isn't it the case, Dr. Pate, that if you are
21  the only provider in town, you're going to be in a very good
22  negotiating position in a world of pay-per-value; isn't that
23  correct?
24      A.   **Well, you certainly could be.  It depends on how**
25  **you use your relative circumstances.**

1683

1       Q.   Okay.  Let's play another clip.
2   Mr. Oxford, would you play 191 --
3          THE COURT:  We're kind of past where we need to
4   take the break.  Are you almost --
5          MR. GREENE:  I'm there.
6          THE COURT:  All right.
7          MR. GREENE:  Play 19, 113 through 24, Mr. Oxford.
8   (Video clip played as follows:)
9          Q.   "If you're the only provider in town,
10         you're going to be in a very good negotiating
11         position in the world of pay for value to get a
12         higher rate than if you had competitors who
13         were good alternatives to you, correct?
14         A.   "And I -- I think that's theoretically
15         correct.  I think the question is would
16         somebody abuse that -- that position.  But,
17         yes, I think they could."
18  (Video clip concluded.)
19         MR. GREENE:  I believe that ends with "they
20  could."
21      Your Honor, I think we can take our break.  I do need
22  to lay the foundation apparently for a couple of documents
23  that we --
24         THE COURT:  All right.  We'll take the break,
25  then.

1684

1          MR. GREENE:  -- but I think that's after the
2   break.
3          THE COURT:  If we're past the AEO material, I
4   think we ought to bring the public back into the courtroom.
5   I'm also going to direct that Dr. Pate's deposition be
6   published -- if he'll provide the original to Ms. Gearhart;
7   I don't think that's been done yet -- since we've used it.
8   And then we'll publish that --
9          MR. GREENE:  We have the ability to publish that
10  right now, as a matter of fact.
11         THE COURT:  Well, if you have the original, then
12  we'll hand that to -- Ms. Gearhart will take care of that
13  now.  If you need to look for it, we'll take care of it
14  after the break.
15         MR. GREENE:  Very good.
16         THE COURT:  All right.  We'll take care of it
17  after the break.
18      And then, also, one last housekeeping matter.  If
19  counsel would work with Ms. Gearhart to make sure that we
20  have a list of the demonstratives, the 3,000 and 5,000
21  series documents, so that we can keep track and have a
22  record as well of what has been made part of the record.
23      We will be in recess for 15 minutes.
24         (Recess.)
25  ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******

1685

1          THE COURT:  We had a shift in the cast of
2   characters here.  First, I assume we have the original
3   deposition of Dr. Pate.  I will direct Ms. Gearhart to
4   publish.
5      Counsel, technically, I trust you all, but the
6   depositions are to be sealed and submitted to the court in a
7   sealed fashion.  I am not sure why that wasn't done, but I
8   will direct Ms. Gearhart to publish the deposition.
9          MS. GEARHART:  The deposition of David C. Pate is
10  published.
11         (Deposition of David C. Pate published.)
12         THE COURT:  Mr. Ettinger, I assume you're picking
13  up?
14      Mr. Greene, you're done?
15         MR. GREENE:  Yes, I am done, Your Honor.
16         THE COURT:  All right.  I've got you down for a
17  few clean-up matters.
18         MR. GREENE:  I did resolve those.
19         THE COURT:  Very good.
20  Mr. Ettinger.
21         MR. ETTINGER:  Thank you, Your Honor.
22                  CROSS-EXAMINATION
23  BY MR. ETTINGER:
24      Q.   Dr. Pate, St. Luke's approach to changing
25  healthcare is an experiment; correct?

1686

1    **A.**   It's an experiment based on things that we have
2    learned have worked with other systems.  But, yes, many
3    things are new that we are trying.
4        **Q.**   And you can't say whether, to date, St. Luke's has
5    achieved anything more in terms of quality improvements
6    than, say, Saint Alphonsus, can you?
7        **A.**   No, that's not a true statement.
8        **Q.**   Have you tried to measure St. Luke's against Saint
9    Alphonsus, Dr. Pate?
10       **A.**   I have relied on other organizations that do so.
11       **Q.**   And you know St. Luke's has won a number of
12   national awards and Saint Alphonsus has won a number of
13   national awards; correct?
14       **A.**   That is correct.
15       **Q.**   And -- and you made some comments on direct about
16   Saint Alphonsus' breach of fiduciary duty or something like
17   that.  I assume that you would agree that Saint Alphonsus
18   has a -- is a local board that is every bit as dedicated as
19   St. Luke's board to doing the right thing, wouldn't you?
20       **A.**   I have no knowledge.
21       **Q.**   You wouldn't dispute it, would you?
22       **A.**   I have no knowledge to dispute it with.
23       **Q.**   Now, you talked about spine infection rates.
24   Isn't it true that St. Luke's spine infection rates are
25   greater than the national average even today?

1687

1        **A.**   First of all, I actually didn't talk about spine
2    infection rates, but, second of all, to answer your
3    question, actually last year HealthGrades ranked St. Luke's
4    number one in Idaho for outcomes from spine surgery.
5        **Q.**   My question is:  Aren't St. Luke's spine infection
6    rates greater than the national average?  Yes or no or you
7    don't know.
8        **A.**   Given that -- I don't know given that as an
9    outcome of the surgery and we were ranked number one, I
10   would have to assume they are good, but I don't know what
11   they are.
12       **Q.**   Now, spine surgery is a kind of orthopedic
13   surgery; correct?
14       **A.**   Orthopedic or neurosurgery.
15       **Q.**   Isn't it true that virtually all of St. Luke's
16   quality achievements in orthopedics have come through an MSO
17   or management services organization?
18       **A.**   I -- I don't believe that to be the case because
19   we have received awards from HealthGrades that include our
20   Wood River and Magic Valley facilities, and I don't believe
21   those physicians are involved in the MSO.
22       **Q.**   Let me ask the question a little more precisely.
23   Isn't it true that virtually all of St. Luke's Treasure
24   Valley's quality achievements in orthopedics have come
25   through an MSO or a management services organization?

1688

1        **A.**   I -- I don't know whether that's true or not.
2        **Q.**   And the MSO is an organization that's partly owned
3    by St. Luke's and partly owned by orthopedic surgeons;
4    correct?
5        **A.**   That's correct.
6        **Q.**   And the MSO has been in existence since well
7    before any of the orthopedic surgeons were employed by
8    St. Luke's; correct?
9        **A.**   I don't know.  That -- the MSO was in place when I
10   got here and I don't know what membership of it was when I
11   first got here.
12       **Q.**   Now, Dr. Pate, you believe that it is not
13   necessary for a physician to be exclusively aligned with one
14   system in order to participate effectively in clinical
15   integration with that system; correct?
16       **A.**   That's correct.
17       **Q.**   And, in fact, you believe it's possible for
18   physicians who are aligned with one hospital in the Treasure
19   Valley to work closely on clinical issues with hospitals and
20   physicians in the other system; correct?
21       **A.**   That's correct.
22       **Q.**   And you believe also that it is not necessary for
23   a physician to make referrals exclusively within one system
24   in order to participate effectively in coordinated care and
25   clinical integration, correct?

1689

1        **A.**   I will -- I will grant it as to the latter; I'm
2    not sure of the former.
3        **Q.**   Why don't we play Pate Cross 15.
4        (Video clip played as follows:)
5            **Q.**   "Is it necessary for a physician to make
6        referrals exclusively within one system or
7        another in order to participate effectively in
8        coordinated care and clinical integration?
9            **A.**   "No.  And, in fact, I would expect that
10       we'd have almost no examples of that, except
11       perhaps in pediatrics."
12       (Video clip concluded.)
13       **Q.**   Was that your testimony, Dr. Pate?
14       **A.**   Yes.
15           THE COURT:  Counsel, because you're not reporting
16   it, I need to have the page and line number for that
17   excerpt.  You referred to it as Pate 15, which I assume is
18   your internal designation for a deposition expert.
19           MR. ETTINGER:  That's correct, Your Honor.  And
20   it's page 180 of Dr. Pate's deposition, lines 9 through 15.
21           THE COURT:  Thank you very much.
22   BY MR. ETTINGER:
23       **Q.**   Dr. Pate, you expect that St. Luke's will achieve
24   clinical integration with its independent physicians by the
25   end of this year; isn't that right?

1690

1    **A.** Not just with independent physicians but with our
2    **St. Luke's clinic and independent physicians by the end of**
3    **this year; that's correct.**
4        **Q.** And that's the case even though St. Luke's did not
5    devote sufficient resources to clinical integration with
6    independent physicians until the beginning of 2013; correct?
7        **A.** Roughly, give or take a month or two, yes.
8        **Q.** And St. Luke's has developed clinical integration
9    scorecards; correct?
10       **A.** That's correct.
11       **Q.** And you believe those scorecards will work not
12   only with employed physicians, but also with independent
13   physicians; correct?
14       **A.** I think they will.  Right now, it's a challenge
15   **with independent physicians because many of them are on**
16   **paper or different electronic health records, so it's very**
17   **hard to populate the CI scorecard, but we're certainly**
18   **making that work.**
19       **Q.** You believe it will work, in fact, clinical
20   integration and scorecards will work with the independent
21   doctors; correct?
22       **A.** Yes.
23       **Q.** Now, you mentioned a core group of employed
24   physicians to Mr. Greene and I want to ask you about that.
25   While you believe that you need to have a core group of

1691

1    employed physicians, you don't have any specific, targeted
2    number for that core group; correct?
3        **A.** That's correct.
4        **Q.** And, in fact, no one at St. Luke's has even
5    provided a quantitative range as to the number of physicians
6    that would need to be in that core group; correct?
7        **A.** Well, I don't know if somebody has; I haven't seen
8    **it.**
9        **Q.** And you've talked about managing population
10   health.  St. Luke's has made no effort to determine the
11   market share necessary to give it the skill it needs to
12   manage population health in the Treasure Valley; correct?
13       **A.** I think that's correct.
14       **Q.** And you had what you described as a core group of
15   physician leaders who helped you develop the clinical
16   integration scorecard; isn't that right?
17       **A.** Yes.
18       **Q.** And that number was about two to three dozen
19   doctors in total from the Treasure Valley and the
20   Magic Valley and Wood River; correct?
21       **A.** I think that's -- that's the right number.  I
22   **don't think they are the only ones that have been involved**
23   **in the clinical integration scorecard development, but, yes,**
24   **that is the correct number of the numbers of leaders.**
25       **Q.** And the number of leaders that you have stated

1692

1    were responsible for the scorecard developments as a core
2    group of employed physicians; correct?
3        **A.** Yes.  But I don't think I ever stated that they
4    **were the only ones involved, but, yes, they have been**
5    **critical to the development of it.**
6        **Q.** And are you aware that your retained expert,
7    Dr. Enthoven, said that what you need for this core group is
8    about four to six physicians per specialty?
9            MR. BIERIG:  Objection, Your Honor.  I'm not sure
10   that accurately states what Dr. Enthoven stated.
11           THE COURT:  Well, he can indicate whether he
12   agrees with it or not and then when the expert testifies, we
13   can obviously clarify that.
14   BY MR. ETTINGER:
15       **Q.** Are you aware of that testimony, Dr. Pate?
16       **A.** I am not.  My attorneys have not allowed me to
17   **view other experts or other people's -- witness's testimony.**
18       **Q.** So would you dispute the conclusion that the
19   core -- the necessary core group of employed physicians is
20   about four to six per specialty?
21       **A.** Yes, I would.
22           MR. BIERIG:  Object to the form of the question.
23           THE COURT:  Overruled.
24   BY MR. ETTINGER:
25       **Q.** Now, you're not aware of any physicians whose

1693

1    practices were acquired by St. Luke's who would not be
2    adequate to serve as part of your core group, are you?
3        **A.** No.
4        **Q.** And that would certainly include the seven primary
5    care physicians you have already got in Nampa in the
6    St. Luke's Family Medicine; correct?
7        **A.** They would be part of what we are trying to do, as
8    **well.**
9        **Q.** Now, Dr. Pate, you are not very knowledgeable
10   about Saltzer, are you?
11       **A.** Well, that's a pretty open question.  I don't know
12   **what that means.  There -- I'm sure there is many things**
13   **about Saltzer Medical Group that I don't know.  I feel like**
14   **I know the leaders pretty well, but, no, I'm sure there are**
15   **things I don't know.**
16       **Q.** Well, let's go through a couple of them.
17       **A.** Okay.
18       **Q.** You don't know whether Saltzer was in your select
19   medical network before the group was acquired; correct?
20       **A.** That's correct.
21       **Q.** And you don't know the degree to which Saltzer
22   cooperated with St. Luke's before the group was acquired;
23   correct?
24       **A.** No, I don't.
25       **Q.** You mentioned the seven surgeons who left Saltzer,

1694

1    went to Saint Alphonsus.  You were pleased they left Saltzer
2    and went to Saint Alphonsus; correct?
3         **A.   Well, I think what my -- I think what I told you**
4    **before and what I do feel today is, I feel bad for Saltzer**
5    **Medical Group that they lost those physicians, which puts**
6    **them at risk.  Am I glad that as things turned out seven**
7    **physicians who are not aligned with the vision and all have**
8    **left and prefer a completely different model?  I'm fine with**
9    **that.**
10        **Q.   You were, in fact, pleased --**
11        **A.   I am pleased.**
12        **Q.   And you never talked to any of these surgeons to**
13   find out if they were, in fact, aligned or not aligned with
14   your vision, did you?
15        **A.   That is not a correct statement.**
16        **Q.   Did you personally talk to any of the seven**
17   surgeons?
18        **A.   I have talked to one.**
19        **Q.   Which one is that?**
20        **A.   Dr. Steve Williams.**
21        **Q.   Did he tell you I don't believe in the St. Luke's**
22   vision for improving clinical quality?
23        **A.   No, he did not.**
24        **Q.   You mentioned Micron, so let me ask you a couple**
25   of questions about Micron.

1695

1         MR. ETTINGER:  Your Honor, this -- well, let's
2    see.  I'm going to try to -- maybe we won't need to go to
3    the AEO clips.  Let's see how the questions go.
4    BY MR. ETTINGER:
5         **Q.   St. Luke's was not interested in any proposal to**
6    Micron that would have involved a cost-per-unit proposal
7    that would have met Saint Al's prices; correct?
8         **A.   I think that's a true statement.**
9         **Q.   But St. Luke's did not offer a risk model to**
10   Micron; correct?
11        MR. BIERIG:  Objection.  No foundation laid for
12   this question.
13        THE COURT:  Well, the witness --
14        MR. BIERIG:  And there's also no specification for
15   the time period we're talking about.
16        THE COURT:  All right.  Let's specify a time
17   frame, although I guess -- I think we are basing it all upon
18   that period of time when Micron was setting up its own
19   employer system.
20        MR. ETTINGER:  Well, in fact, later, Your Honor.
21   BY MR. ETTINGER:
22        **Q.   In 2012, you had several discussions with**
23   Mark Durcan, the CEO of Micron, didn't you?
24        **A.   I did.**
25        **Q.   And you also consulted with Randy Billings, your**

1696

1    vice president, about his proposals or decisions not to make
2    proposals to Micron; correct?
3         **A.   I did.**
4         **Q.   Okay.  And during that period, St. Luke's did not**
5    offer a risk proposal to Micron; correct?
6         **A.   From my discussions with -- with Mark were about**
7    **us moving to a risk arrangement with them.  We didn't give**
8    **them a specific proposal for that, but I was talking with**
9    **Mr. Durcan and some of his team about kind of high-level**
10   **things, about how to transform healthcare for Micron and it**
11   **did involve moving to risk.**
12        **Q.   But you were not prepared to take risk -- take on**
13   risk with Micron at that time, were you?
14        **A.   That's correct.**
15        **Q.   And nevertheless, Mr. Durcan told you that Micron**
16   very much wanted St. Luke's in its network; correct?
17        **A.   He did.**
18        **Q.   And he -- in fact, he -- according to you, you**
19   reported to your staff that he committed to a relationship
20   with St. Luke's; isn't that right?
21        **A.   He did.**
22        **Q.   Now, you mentioned in your direct that the system**
23   board of St. Luke's didn't consider market share at all.
24   The -- the St. Luke's Treasure Valley board was presented
25   with market share figures, physician market share figures

1697

1    related to the Saltzer transaction, was it not?
2         **A.   I think I have already testified I wasn't present**
3    **at the Treasure Valley board meeting.  I don't -- I don't**
4    **know what they did or did not consider.**
5         **Q.   Let's -- Mr. Bierig asked you about your article,**
6    your 2012 article "Physician Relations in a Post-Health Care
7    Reform Environment."
8         **A.   He did.**
9         **Q.   I want to pick out a little bit more than that one**
10   sentence and ask you about it.
11        **A.   Okay.  Sure.**
12        MR. ETTINGER:  So why don't we call up
13   Exhibit 1985.
14   BY MR. ETTINGER:
15        **Q.   So first of all, is this, in fact, Exhibit 1985,**
16   is this, in fact, the article you wrote, Dr. Pate?
17        **A.   From the portion I can see, yes, that's my**
18   **article.**
19        **Q.   Okay.  And since this was a published article, I**
20   assume you wrote it with some care and considered your words
21   with some care?
22        **A.   Well, I was under some time pressures, but, yes, I**
23   **do think I typically exercise care in my choice of words.**
24        **Q.   And --**
25        **A.   I'm not always successful but I do try.**

1698

1    **Q.**  Well, you're aware of the fact that if you're
2    published, it's sort of there forever.  Right, Dr. Pate?
3    **A.  I am.  And you have made it painfully aware to me.**
4    **Q.**  Right.  And you tried, of course, to be as
5    accurate as possible in presenting your views; isn't that
6    right?
7    **A.  Yes, I think that's true.**
8    **Q.**  I have read all your blogs, by the way, I've kept
9    up on them.
10   **A.  And I appreciate that.  I -- I -- I think a number**
11   **of people at Saint Alphonsus are following the blog and I am**
12   **flattered.**
13   **Q.**  I can't speak to them and -- and I -- and I won't
14   give you a critique, but I have --
15   **A.  Well, thank you.**
16   **Q.**  So why don't we turn to page 3 of the article,
17   Dr. Pate, and let's look at the paragraph in question on
18   page 3.  And I want to -- I'm going to read you few a
19   sentences, not just the last one in the paragraph that
20   Mr. Bierig read you.
21   So starting with the third sentence from the end, it
22   says, "Further, the increase in hiring of physicians is
23   itself a driver of more physician employment.  If one
24   hospital in a market is offering physician employment, other
25   hospitals may feel the pressure to offer employment in order

1699

1    to preserve market share and access to patients.  Further,
2    when a specialist experiences a number of his or her
3    referring physicians being hired by a hospital, this creates
4    pressure for the specialist to consider employment with the
5    hospital to preserve the referral base," close quote.
6    Were those your words?
7    **A.  Those are.  I think maybe --**
8    **Q.**  Would you -- would you rewrite any of those words
9    sitting here today?
10   **A.  No.  But I think it's very important to consider**
11   **the context of what I was --**
12   **Q.**  You answered my question.
13   THE COURT:  Mr. Bierig will give you chance to
14   explain.
15   THE WITNESS:  Okay.  Thank you, Your Honor.
16   BY MR. ETTINGER:
17   **Q.**  Now, I heard you say, I want to make sure I got
18   this right on direct.  Quote, St. Luke's has never had a
19   practice to direct referrals, closed quote.
20   Was that -- was that your testimony?
21   **A.  That was based on my knowledge, that's correct.**
22   **Q.**  In fact, you don't know if St. Luke's
23   preferentially has directed referrals to its affiliated
24   practices; correct?
25   MR. BIERIG:  Object to the form of the question

1700

1    and the use of the word "preferentially."
2    MR. ETTINGER:  Your Honor, this word happens to
3    come from the St. Luke's document.
4    THE COURT:  All right.  Overruled.
5    THE WITNESS:  I -- I have testified and I believe
6    I have no knowledge of any directing of referrals.
7    BY MR. ETTINGER:
8    **Q.**  Let me ask you the question one more time before
9    we go to the tape, Doctor.
10   **A.  Okay.**
11   **Q.**  You don't know if St. Luke's has preferentially
12   directed referrals to its affiliated practices; correct?
13   **A.  I have been told we haven't, but I don't know that**
14   **for a fact.  I have not looked personally at all these**
15   **referrals.  I do not know.**
16   **Q.**  And are you aware that Saltzer physicians on its
17   executive committee reported that St. Luke's refused Saltzer
18   autonomy in referrals?
19   **A.  No.  That's -- is completely counter to my**
20   **conversations and experiences with the Saltzer leadership.**
21   MR. ETTINGER:  Your Honor, this -- we're going to
22   have to show him a document, then, that's AEO.
23   THE COURT:  Can we just turn off the projector or
24   do you need to --
25   MR. ETTINGER:  Yeah, we could do that.  Let's try

1701

1    it.
2    THE COURT:  Let's try it and see if we need to.
3    BY MR. ETTINGER:
4    **Q.**  I'm going to show you --
5    THE COURT:  Counsel, just a moment.  Did I just --
6    just while I am on this subject.  You showed the witness
7    Exhibit 1985, which is Mr. -- or Dr. Pate's article.  Was
8    that shown as a defense exhibit number?  Because 1985 was
9    not admitted, and there were objections to it.
10   MR. ETTINGER:  Your Honor, I intended at the end
11   of my examination to move its admission.  There was a
12   foundation objection.  I think we have laid the foundation
13   if there is any issue there.
14   THE COURT:  All right.  We will go ahead and
15   proceed then.  I -- I thought for some reason it may have
16   been shown by Dr. Pate by Mr. Bierig --
17   BY MR. ETTINGER:  Well, it was.
18   THE COURT: -- under a different exhibit number.
19   MR. BIERIG:  I hadn't shown it, I just quoted it,
20   Your Honor.
21   THE COURT:  All right.  Let's go ahead and
22   proceed.
23   BY MR. ETTINGER:
24   **Q.**  Well, why don't we -- we are going to take a look
25   at 1155, Dr. Pate.

1702

1    MR. ETTINGER:  Is there a way I can see it over
2    here?  If not, I'll --
3    I don't know if that monitor is on.
4    Your Honor, I don't have a hard copy handy because I
5    didn't anticipate using this; it came up on direct.  Oh,
6    great, there we go.
7    BY MR. ETTINGER:
8    Q.  So, Dr. Pate, you see this email from Dr. Djernes?
9    **A.  I can't read who it's from, but I see -- I see the**
10   **highlighted portion that you are talking about.**
11   Q.  Do you know who Michael Djernes is?
12   **A.  I -- I do not.**
13   Q.  Okay.  So don't know if he's a Saltzer executive
14   committee member or not?
15   **A.  I can -- no, I don't know.  I can infer he is with**
16   **Saltzer because of his email address, but I -- I don't think**
17   **who he is.  I may have met him, but I just -- I don't**
18   **remember all of the names.**
19   Q.  Okay.  And you see the highlighted third sentence
20   of Dr. Djernes' email?
21   **A.  I do.**
22   Q.  And are you able to say whether St. Luke's
23   executives, not you personally, but St. Luke's executives
24   declined to offer Saltzer autonomy in patient referral
25   patterns as part of the transaction?

1703

1    **A.  Well, I think this date is way before the**
2    **transaction.  The -- the discussions that we had around the**
3    **transaction and when Saltzer decided to come with**
4    **St. Luke's, I think everybody was clear, there is no --**
5    Q.  Doctor, my -- my question is:  Are you aware --
6    are you aware --
7    MR. BIERIG:  Your Honor, I object to the
8    interruption of the answer.
9    MR. ETTINGER:  Your Honor, it was not responsive
10   to my question.
11   THE COURT:  Counsel, let me just intervene.
12   Counsel, I -- I will instruct the witness to answer where
13   necessary to make sure we have a direct response.  It kind
14   of avoids some of that give and take.
15   Dr. Pate, let's listen to counsel's question one more
16   time.  Answer directly.  As I noted earlier, Mr. Bierig, I'm
17   sure will give you a chance to explain anything that you
18   feel needs to be placed into context.  But if you'll listen
19   carefully to the question as asked, it will allow us to move
20   forward.
21   Now restate -- restate the question, if you would,
22   Mr. Ettinger.
23   MR. ETTINGER:  Well -- and -- and I will rephrase
24   it a bit to make it as precise as I can.
25   BY MR. ETTINGER:

1704

1    Q.  Dr. Pate, are you aware whether or not at some
2    point during the discussions with Saltzer, St. Luke's
3    executives declined to offer Saltzer autonomy in patient
4    referral patterns?
5    **A.  No.**
6    MR. ETTINGER:  Your Honor, that is all I have.  I
7    would move the admission of Exhibit 1985, the article.
8    THE COURT:  Is there any objection to 1985?
9    MR. BIERIG:  No objection, Your Honor.
10   THE COURT:  All right.  1985 will be admitted.
11   (Plaintiffs' Exhibit No. 1985 admitted.)
12   MR. ETTINGER:  Nothing further.  Thank you.
13   THE COURT:  All right.
14   Redirect.
15   MR. BIERIG:  Can I have about two minutes, Your
16   Honor?
17   THE COURT:  Yes.
18   MR. BIERIG:  One minute, maybe.
19   May I proceed, Your Honor?
20   THE COURT:  Yes.
21              REDIRECT EXAMINATION
22   BY MR. BIERIG:
23   Q.  Dr. Pate, how does the fact that St. Luke's works
24   with independent physicians relate to your previously
25   expressed view that the close personal and financial

1705

1    alignment with physicians is critical to transforming the
2    delivery of healthcare?
3    **A.  It -- it is perfectly consistent.  I have always**
4    **believed that we need to work with independent physicians,**
5    **St. Luke's doesn't have a sufficient number of financially**
6    **aligned physicians to be able to manage risk and -- and**
7    **population health.  And I think my lessons from learning at**
8    **these other organizations, they all have at least a core of**
9    **employed physicians and they build on that with the**
10   **independent physicians.  So it's perfectly consistent.  It's**
11   **not -- St. Luke's approach isn't an "either/or," it's an**
12   **"and."  We want both the financially aligned and independent**
13   **physicians.**
14   Q.  Now, I believe in response -- excuse me -- I
15   believe in response to one of the questions asked by
16   plaintiffs' counsel, you acknowledged that employment is not
17   the only way to achieve accountable care.  How does that
18   view affect your position that a close personal and
19   financial alignment is the best way to achieve accountable
20   care?
21   **A.  Well, again, it's consistent.  I -- Geisinger**
22   **Health System has actually published their results in**
23   **"Health Affairs" and showed that they were able to drive**
24   **more improvements and faster with their employed physicians**
25   **than their independent physicians.**

1706

1    And in Mr. Greene's line of questioning, when he
2  was asking me about quality, the point that I kept trying to
3  make during the investigatory hearing is, I believe you can
4  drive quality through clinical integration in nontightly-
5  aligned financial roles.  You can do that because there is
6  no -- no loss of income to the physicians for that.
7    What I don't think you can do, is I don't think
8  you can improve the other two aims of the Triple Aim.
9    There is no financial model to support better
10 health and there would be significant legal hurdles to get
11 over for us to pay independent physicians to do that.  And
12 there is no way to be successful to the degree that we need
13 to lower healthcare costs unless we can eliminate the low-
14 value and no-value services that are performed by
15 physicians.  The problem is those services contribute to
16 their incomes and they are just not going to willingly give
17 this up.
18    Q.  In the -- the cross-examination, you were shown a
19 part of your deposition in which you indicated that
20 St. Luke's would consider a joint venture with Saltzer if
21 the court were to order the divestiture of Saltzer.  Do you
22 recall that?
23    A.  I do.
24    Q.  Would you be able to joint venture with Saltzer if
25 Saltzer ceased to exist as an entity?

1707

1    A.  Could not.
2    Q.  How, if at all, would proceeding through a joint
3  venture impact the -- let -- let me rephrase that.
4    How, if at all, would proceeding through a joint
5  venture with Saltzer, rather than the close affiliation in
6  the current structure, impact the ability of St. Luke's to
7  effectuate the Triple Aim in Canyon County?
8    A.  It would be huge.  I have a significant experience
9  with joint ventures -- joint ventures in Houston and they
10 were an abject failure.  It is a way, I think, we could try
11 to help the economic survival of Saltzer Medical Group, but
12 it will -- I have -- I am under no illusions that that is
13 going to help us achieve the Triple Aim or accountable care
14 or move to risk-based contracting.
15    Q.  And why would a joint venture relationship not be
16 as efficacious in moving the Triple Aim into Canyon County?
17    A.  Well, most of the -- most of the joint ventures
18 that are structured between hospitals and physicians are
19 around the use of the various -- the very kinds of services
20 we are trying to decrease the use of.  They are around
21 hospitals, surgery centers, imaging, those kinds of things.
22 And the problem is we have got to stop feeding the fire that
23 is leading to increased healthcare spending.  I -- I hear it
24 every day from employers and people who cannot afford their
25 healthcare, they are -- and -- and frankly, the problem is,

1708

1  yes, we can do a lot of things to improve quality, like
2  Mr. Greene questioned me about, not one of those people who
3  have come to me to express their concerns about healthcare
4  has said we have to have better quality, you have to do
5  something.
6    They -- that's not what they are telling me.
7  They're okay with the quality.  I think they should hope for
8  more, but they do not perceive there is quality problem,
9  they don't perceive they can afford it.  That's the problem
10 we have got to solve and a joint venture is not going to
11 solve that.
12    Q.  Okay.  Mr. -- well, plaintiffs' counsel asked you
13 questions about the MSO.
14    A.  Yes.
15    Q.  That's the Management Services Organization?
16    A.  It is.
17    Q.  And we are referring to the Ortho-Neuro Management
18 Services Organization?
19    A.  There was more than one, but I believe all the
20 questions were in reference to ortho-neuro.
21    Q.  Do you know what the makeup of the ortho-neuro MSO
22 is in terms of rough percentage of employed physicians
23 versus independent physicians?
24    A.  I am under the impression that it's mostly
25 employed physicians, but I do not know.

1709

1    Q.  Okay.  Counsel for Saint Alphonsus showed you
2  Plaintiffs' Exhibit 1985.  And I believe you were wanting to
3  give context to some of the statements that you made and you
4  were interrupted as you tried to give context.
5    MR. BIERIG:  So with plaintiffs' permission, I
6  would ask them to put that particular paragraph up for
7  Dr. Pate to look at.  Could -- could that be done?
8    You have got it?  Okay.  Then I would ask the
9  court to put up that one paragraph of 1985.
10    THE COURT:  This is not AEO?
11    MR. BIERIG:  No, this is not.  This was -- this
12 was his article, Your Honor.
13    THE COURT:  All right.
14    MR. BIERIG:  It was the -- the paragraph that
15 Mr. Ettinger quoted.  Could you give us some help,
16 Mr. Ettinger, what page that was on?
17    MR. ETTINGER:  Page 3.  Sorry.
18    MR. BIERIG:  Page 3.
19    MS. DUKE:  And it's the second paragraph.
20    MR. BIERIG:  Yeah.  Why don't you just highlight
21 that entire paragraph for Dr. Pate.
22    MS. DUKE:  It was the one up.
23    MR. BIERIG:  The one -- that one.
24    MS. DUKE:  There you go.
25 BY MR. BIERIG:

1710

1    **Q.** Yeah. That's the quotation. I believe you were
2    starting to say that you, in fact, did say that, but you
3    wanted to give context. So by this question, I am asking
4    you to give context.
5    **A. I did. Thank -- thank you, Mr. Bierig. It is**
6    **just important to realize who the audience was that I was**
7    **speaking to -- I -- and what I was speaking about. I was**
8    **speaking at a national law conference and this journal**
9    **article was to be the output from that conference.**
10   **And so I was commenting on the national scene of**
11   **healthcare, and I just wanted to be clear. My comments were**
12   **not describing the specifics of the Idaho market, but -- but**
13   **these are general statements that I do believe are true and**
14   **reflect activity across the country.**
15   **Q.** Thank you. And counsel for --
16   MR. BIERIG: You can take that down.
17   BY MR. BIERIG:
18   **Q.** Counsel for Saint Alphonsus also showed you a --
19   an interchange involving Dr. Djernes.
20   MR. BIERIG: I would ask the court to put that up,
21   if you would.
22   MR. KEITH: I'm going to object. That was AEO.
23   MR. BIERIG: Oh, that was AEO. Okay. Don't put
24   it up.
25   BY MR. BIERIG:

1711

1    **Q.** The -- the question there was --
2    MR. BIERIG: I tell you what, could you just put
3    it up but blank out everything but the date? Just -- just
4    put the date up.
5    THE COURT: Turn off the jury projector so we can.
6    MR. BIERIG: We're just talking about the date.
7    MR. KEITH: You can put it up now.
8    MR. BIERIG: Oh, we can put it up? Okay. Let's
9    put it up. You can put the whole thing up.
10   BY MR. BIERIG:
11   **Q.** Could you -- could you identify for the record
12   what the date of that document was?
13   **A. Yeah. It was June 28th of 2011.**
14   **Q.** And where in the course of the negotiation between
15   St. Luke's and Saltzer did that 2011 date fit?
16   **A. To my recollection, it preceded them. I mean,**
17   **there -- there had been discussions on and off, but the --**
18   **the present transaction was subsequent to this and this was**
19   **not the terms or the conversations that we had with the**
20   **Saltzer Medical Group around the present transaction.**
21   **Q.** So in terms of the questions that Mr. Ettinger
22   asked you about in terms of the directing of referrals, does
23   the statement that's in this document reflect what the
24   actual terms of the final transaction are?
25   **A. Absolutely not. It's in counter-distinction to**

1712

1    **our -- our agreement.**
2    MR. BIERIG: Thank you. I have no further
3    questions, Your Honor.
4    THE COURT: Any recross?
5    MR. ETTINGER: Just a bit, Your Honor.
6    RECROSS-EXAMINATION
7    BY MR. ETTINGER:
8    **Q.** Dr. Pate, isn't it true that the current Saltzer
9    transaction is a result of discussions that have gone on for
10   a couple of years?
11   **A. And evolved significantly, but true.**
12   **Q.** Okay. And they certainly began well before June
13   of 2011, didn't they?
14   **A. I think discussions about our relationship**
15   **preceded my arrival, which was more than four years ago**
16   **so --**
17   **Q.** I'm -- I'm talking about discussions about an
18   acquisition in some form or other.
19   **A. And -- and your question is what?**
20   **Q.** That began well before Dr. Djernes' email. In
21   fact, his email related to whether or not to accept -- let
22   me ask one question.
23   Isn't it true that Dr. Djernes' email related to
24   whether or not to accept St. Luke's original acquisition
25   proposal?

1713

1    **A. I don't know. I didn't get to see the whole --**
2    **whole document.**
3    **Q.** Okay.
4    **A. I just saw that one --**
5    **Q.** That original proposal was made in the spring of
6    2011, wasn't it?
7    **A. That could be and could be the original proposal.**
8    **It's not what the final was. I -- I don't remember ever**
9    **seeing the -- the original.**
10   **Q.** Now, you talked in response to Mr. Bierig's
11   questions about when people come to you, they are concerned
12   about cost. And I gather that the way you intend to address
13   that you have said is through controlling utilization; is
14   that right?
15   **A. Well, that's -- that's only a small part of it. I**
16   **have said much more than that, but that is an element of it.**
17   **Q.** Oh, there's only two ways to control cost. You
18   either cut the price -- we know your views on that -- or you
19   cut the quantity by controlling utilization; correct?
20   **A. No, I disagree with that statement.**
21   **Q.** There is a third way? What is it?
22   **A. Well, there's many ways. I think -- and one of**
23   **the things that I have said is foundational. If we want to**
24   **truly get a handle on healthcare costs, we have to improve**
25   **health. I mean, so it's not just controlling the**

1714

1    utilization of which services they get, I think that's
2    important and I think that it's clear from the "Dartmouth
3    Atlas" that people in this country are getting too much care
4    in some instances and we are hurting people.
5         Q.   Isn't it true that St. Luke's has concluded that
6    there is not much room for further reduction in utilization?
7         A.   St. Luke's me?  I have not concluded that at all.
8    Now, we have been told that by third parties and I do not
9    believe that to be the case.  I think there is tremendous
10   opportunity.
11             Idaho is a very low cost state and we have low --
12   low insurance premiums, but I'm not the least bit satisfied.
13   I think there is much more than we can do.  And I've heard
14   people that try to benchmark us to other areas, and, of
15   course, if you look at the current state of how healthcare
16   is done, Idaho is one of the best performing places in the
17   country.  So, yes, you wouldn't conclude there's
18   opportunity.  But if you now think about transformation and
19   completely changing the model, I think there is huge
20   opportunity.
21        Q.   Okay.  So number one, you disagree with the --
22   your consultants, Wipfli, who you've used on about a dozen
23   projects --
24             MR. BIERIG:  Your Honor, I'm going to object to
25   this as beyond scope of the redirect.  This sounds like

1715

1    entirely new material that I did not bring up on redirect.
2             MR. ETTINGER:  Your Honor, Dr. Pate said in
3    response to the question:  What could you and could you not
4    do in a joint venture with Saltzer?  And he said, Well, we
5    could address quality, but people come and complain to us
6    about cost.  And that's what I'm addressing here is the
7    ability to control cost.  St. Luke's own documents directly
8    contradict Dr. Pate's position.
9             THE COURT:  Mr. Bierig.
10            MR. BIERIG:  I don't believe this has anything to
11   do with the comparison of the joint ventures of the
12   employment model.  This is raising all sorts of new issues
13   that could have been covered in the -- in the
14   cross-examination.  I don't see this following from any
15   question of the four or five that I asked.  This is entirely
16   new.
17            THE COURT:  Well, Mr. Ettinger, I don't recall it
18   coming up on -- well, let me -- that's the danger with
19   recross is that it has to be tied to what was covered in
20   redirect.
21            MR. ETTINGER:  And -- and, Your Honor, if -- if I
22   didn't think it was, I wouldn't have raised it now --
23            THE COURT:  I understand.  Well, I'll -- I'll
24   allow to you procedure in a limited fashion.
25            Go ahead.

1716

1             THE WITNESS:  Well, and my answer, Mr. Ettinger,
2    is --
3    BY MR. ETTINGER:
4         Q.   I'm not sure where we were in the question.  Let
5    me -- let me ask the question better.
6         A.   Well --
7             THE COURT:  Let's let -- again, even though I
8    normally would -- well, I will allow a re-redirect here to
9    cover this topic.  But let's get -- in order to streamline
10   it, let's get another question back before the witness.
11   BY MR. ETTINGER:
12        Q.   I want to ask you a very specific question,
13   Dr. Pate.  And that is:  Isn't it true that Wipfli, a
14   consultant used more than a dozen times by St. Luke's, has
15   said that there's not much room for further reduction in
16   utilization for St. Luke's?
17        A.   That's correct.  That's what they have said.  I
18   don't believe it's a correct statement --
19        Q.   Well --
20        A.   -- but that's what they've said.
21        Q.   -- let's -- let's go to that next.
22             What is the president's cabinet of St. Luke's, Doctor?
23             MR. BIERIG:  Your Honor, again, I must object.
24   This is well beyond the redirect.
25             MR. ETTINGER:  Your Honor, the witness has said

1717

1    it's not what he thinks, what St. Luke's thinks.  I have got
2    a document that says it's what his cabinet says.
3             THE COURT:  Go ahead, Mr. Ettinger.
4    BY MR. ETTINGER:
5         Q.   What is president's cabinet, Dr. Pate?
6         A.   The president's cabinet is senior leaders of the
7    health system who report to me or somebody that reports to
8    me.
9         Q.   Okay.  So let me show you Exhibit 1057, Dr. Pate,
10   if we can pull that up.  The first page first.
11             So let me represent to you, Dr. Pate, this is document
12   entitled "Treasure Valley Planning, President's Cabinet
13   March 12, 2012."  And you were president at that time,
14   correct?
15        A.   I'm sure I was.  I don't recall that, but I'm sure
16   I was.
17        Q.   Okay.  And this is a St. Luke's document and does
18   it say, quote, not much room for further reduction, closed
19   quote, referring to inpatient admissions?
20        A.   That's what the document says.
21             MR. ETTINGER:  Thank you.  Nothing further.
22             THE COURT:  Thank you.
23             Mr. Greene, I think you did not ask any further
24   recross --
25             MR. GREENE:  I passed, Your Honor, yes.

1718

1  THE COURT: Now, Mr. Bierig.
2  MR. BIERIG: No further questions.
3  THE COURT: All right. You may step down. Thank
4  you very much, Dr. Pate.
5  THE WITNESS: Thank you, Judge.
6  MR. BIERIG: Your Honor, at this point, may I
7  provide the full exhibit that has already been admitted? I
8  didn't have the full copies --
9  THE COURT: Yes. What was the exhibit number?
10  MR. BIERIG: It was 2640.
11  THE COURT: All right. If you would, provide that
12  to Ms. Gearhart on a break.
13  MR. BIERIG: Well, we are still in the process of
14  stamping the page numbers, so I'll do it during the break.
15  THE COURT: All right. Very good.
16  St. Luke's may call its next witness.
17  MR. SINCLAIR: Call Patricia Richards.
18  THE COURT: Ms. Richards, please before the clerk
19  here, be sworn as a witness and then Ms. Gearhart's
20  directions from there.
21  PATRICIA RAE RICHARDS,
22  having been first duly sworn to tell the truth, was examined
23  and testified as follows:
24  THE CLERK: Please state your complete name and
25  spell your name for the record.

1719

1  THE WITNESS: My name is Patricia Rae Richards.
2  And that's capital P-A-T-R-I-C-I-A; middle initial R-A-E;
3  last name Richards, R-I-C-H-A-R-D-S.
4  THE COURT: Thank you.
5  MR. SINCLAIR: Your Honor, this will not be AEO,
6  we can turn the screen on now.
7  DIRECT EXAMINATION
8  BY MR. SINCLAIR:
9  Q. Ms. Richards, for whom do you work?
10  A. I am employed by SelectHealth, which is a wholly
11  owned subsidiary of Intermountain Healthcare.
12  Q. And what is the mission of SelectHealth?
13  A. The --
14  Q. Before we go there, let me ask to call up
15  Exhibit 5100 and page 2.
16  A. Thank you.
17  Q. Is this the mission statement for SelectHealth?
18  A. Yes.
19  Q. Could you explain it?
20  A. Yes. The mission of SelectHealth is to
21  collaborate with our clinical partners to offer coverage and
22  access to high-quality healthcare services at the lowest
23  appropriate cost, to improve the health of our members, and
24  to provide superior service to our customers.
25  And with the -- that is the SelectHealth mission

1720

1  and to fully understand the importance of the SelectHealth
2  mission, it is also important to understand the origin of
3  our parent company, Intermountain Healthcare.
4  Q. Could you explain that to the court.
5  A. Yes. Intermountain Healthcare was established in
6  1975. And this was done through -- the LDS church was an
7  owner of 15 hospitals, 15 community hospitals. And at that
8  time in 1975, the LDS church made the decision to gift the
9  hospitals to the community. And a key caveat of the
10  leadership at that time was that these hospitals were to be
11  the basis of building a model healthcare system.
12  The founders really felt that healthcare was
13  something that was very important to the community. So they
14  wanted the hospitals and the leadership to work together to
15  build this model healthcare system that was based in the
16  community, a not-for-profit organization, with community
17  leadership. So that's an incredible origin and rich history
18  for the organization.
19  And then Intermountain went on about building that
20  model healthcare system, first by building the -- the -- it
21  was called IHC Health -- Health Plans at the time, and the
22  health plan was built in 1984, about ten years after the
23  gift of the hospitals.
24  They went on about ten years later and built the
25  Intermountain Medical Group, which was a group of employed

1721

1  physicians. The employed physician component of
2  Intermountain is now about 1,200 physicians and caregivers.
3  And then about ten years later building on the core of
4  Intermountain and the Intermountain Medical Group have
5  established clinical programs.
6  So with all parts of the system working together,
7  the hospitals, the health plan, the medical group and these
8  clinical programs, we are now in a position to really
9  deliver -- and it goes back to our mission, to really
10  deliver high-quality healthcare at the lowest appropriate
11  cost for the benefit of the community. So that is really
12  the origin of both Intermountain and the SelectHealth
13  mission.
14  MR. SINCLAIR: Mr. Chasin, could I have page 3 of
15  Exhibit 5100.
16  BY MR. SINCLAIR:
17  Q. What is the vision for SelectHealth?
18  A. Well, as you see on this screen, I am very proud
19  of the vision of SelectHealth. And this is something that
20  we -- we had our mission, we had our values, but in about
21  2010 and working into 2011, we felt it was very important to
22  articulate a clear and compelling vision for the future.
23  And so we worked with our leadership, our board, the
24  Intermountain leadership, and what you see here is our
25  vision. And we hope to achieve this vision over the next

1722

1  several years.
2       As you can see, we aspire to be a nationally
3  ranked, high-performing health plan. We didn't want to just
4  limit ourselves to being the best health plan in Utah, we
5  wanted to be nationally ranked and recognized. We
6  designated that we wanted to be a market leader in all
7  geographic areas in which we operate. We wanted to be, by
8  objective measure, the most preferred health plan by
9  members, providers, employers and agents, insurance brokers.
10      As I mentioned, this was done in 2010 and 2011, so
11  that was before our affiliation and expansion into Idaho.
12  If we had to revise this now, I would say the -- the most
13  preferred health plan in Utah and Idaho.
14      Those first three elements are fairly
15  standard and -- and might be seen by any health plan as part
16  of their vision, but I think the last two -- and this took a
17  long time, it's a few words, but it's -- it's a very
18  profound meaning.
19      The last two aspects of our vision statement are
20  to be recognized for leadership and commitment to community
21  service, improving health status, and serving all market
22  segments. So we have a -- a vision that goes outside of our
23  own walls to really help serve the community and improve
24  health community-wide.
25      And then the last aspect of our vision may be the

1723

1  most unique. And I have honestly not seen this with any
2  other health plan. And -- and our last part of our vision
3  is to be both a catalyst for and an active participant in
4  transforming healthcare delivery through collaboration and
5  shared accountability.
6       So this is no small goal. Not only do we want to
7  be the best health plan, we want to really be actively
8  involved in changing the way healthcare is delivered
9  locally, nationally, because I personally, and our board and
10  others within Intermountain, believe that healthcare as a
11  system is very broken right now and that it is not
12  sustainable and that it's really important to change the way
13  that healthcare is delivered and financed to create a system
14  that will meet the original vision of Intermountain
15  Healthcare, which was to build a model system for the
16  benefit of the community.
17      So we all recognize that change is necessary and
18  as we discuss our relationship with St. Luke's, what I am so
19  struck with is the alignment of the mission's vision and
20  values and the recognition that change is essential to make
21  our healthcare system sustainable.
22      Q.  In discussing transforming healthcare, Dr. Pate
23  just testified as to the Triple Aim. Are you familiar with
24  the Triple Aim?
25      A.  Yes, I am.

1724

1       MR. SINCLAIR: Mr. Chasin, could I have
2  Exhibit 1599, please.
3  BY MR. SINCLAIR:
4       Q.  Does this exhibit reflect the Triple Aim as
5  SelectHealth care addresses that term?
6       A.  Yes. And SelectHealth care understands that the
7  Triple Aim had its origins with the Institute for Healthcare
8  Improvement and we've adopted the three cornerstone
9  principles, which are really to improve health, better
10  health fundamentally; better care, how care is delivered and
11  organized; and the patients' experience of that care. And
12  what we are wanting to do is increase the value by
13  simultaneously achieving better health, better care, and
14  lower cost.
15      And this is -- we believe it's essential that all
16  three elements work together to, again, benefit individuals
17  and communities. So this is an outline of the Triple Aim.
18  What we also have added here are some specific examples.
19  But the fundamental Triple Aim that we -- that guides our
20  actions every day is better health, better care and lower
21  cost.
22      Q.  And again, why is the Triple Aim important to you
23  and SelectHealth?
24      A.  Well, this is very important to SelectHealth and
25  to me personally, but to SelectHealth because, as I

1725

1  mentioned, SelectHealth is a wholly owned subsidiary of
2  Intermountain Healthcare.
3       Intermountain Healthcare is organized as
4  not-for-profit 501(c)(3) organization, a charitable
5  organization. The health plan as a subsidiary is organized
6  as a 501(c)(4), so we are technically organized as a social
7  welfare organization. So this value of better health,
8  better care, lower cost for the benefit of the community, is
9  essentially the foundation of our mission and vision.
10      Q.  Does SelectHealth provide a full range of services
11  to your customers?
12      A.  Yes. We do provide a full range of services. And
13  it is through -- as -- as again referenced in the mission,
14  it is through working with our clinical partners.
15      SelectHealth is an insurance company, and we do
16  all of the traditional insurance work. We do not personally
17  provide healthcare, but we depend on the clinical partners
18  with whom we work to provide healthcare. So working
19  together, and that's -- that's the key of the collaboration
20  and working together, we are able to make arrangements for
21  people to receive, as you will note under better health,
22  receive appropriate preventive services, management of
23  chronic conditions, improving the health -- and this is key,
24  too, we are trying not only to improve the health of people
25  that come to the clinics or the hospitals that we work with,

1 we are dedicated to improving health of the entire

2 community. So we feel through our relationships with

3 providers, we are able to make arrangements for this access

4 to preventive care, chronic care, health improvement for the

5 community.

6    Q.  Does improving the health of the entire population

7 or community decrease costs within the health system?

8    A.  Yes. We believe it does. In fact, we believe

9 this in -- in two ways -- first of all, I often share with

10 people, it's a little known actuarial secret that healthy

11 people cost less than sick people.

12      And that is something that if we can keep people

13 healthy, that should help the entire community not be

14 subject to the rapidly rising costs in healthcare that we

15 have seen for the last 40 to 50 years. So we are

16 fundamentally about improving health.

17      And the other thing that that helps with, as part

18 of our goal, we want to serve the entire population. And

19 one of the things that we have recently launched in our Utah

20 operation, we've launched a managed Medicaid plan, which we

21 believe is really important to improve cost for low income

22 and somewhat disenfranchised populations because ultimately,

23 if we do not take care of the entire population, the cost

24 will just be shifted to the few that are paying the price.

25      And -- and I think many people have heard that

1 there is uncompensated care, undercompensated care,

2 uninsured individuals, and until we can find a way to

3 improve the health status of all of the individuals, those

4 costs for the care will just be shifted to the employers who

5 can barely afford to maintain their healthcare premiums now.

6 So it is an entire ecosystem that fits together. So all of

7 the pieces have to fit together.

8    Q.  Is having an integrated healthcare system of any

9 importance?

10   A.  Absolutely. To me it is -- it is one of the

11 foundations of being able to achieve the Triple Aim and to

12 achieve our mission and values. As I mentioned before,

13 the -- the integrated system allows all parties to work

14 together. It allows the hospitals, the physicians, the

15 health plan and the patients, and even others in the

16 community to work together to achieve these goals. So I

17 believe the key is having an integrated system. But it

18 takes even more than an integrated system.

19      It takes -- it takes leadership and it takes

20 vision to drive change. All of us, it's difficult to

21 change. And there is a lot of forces that want to keep the

22 status quo. But we fundamentally believe that for the

23 future and to have any sustainable cost for healthcare in

24 the future and to have methods that will actually improve

25 health, we need to fundamentally change the system and the

1 way it works. And we have to change that from the inside

2 out.

3      That starts, though, with -- with leadership and

4 will and an unrelenting vision to make the future better.

5 And I believe that that can best be accomplished -- first of

6 all, it takes very courageous leaders at a system level, but

7 then the advantage of having an integrated system is that

8 you can align and build a culture that is focused around

9 common objectives like the Triple Aim.

10      And -- and with that culture, I think it's -- it's

11 important, you have to start with a cadre -- first of all, I

12 believe it has to be physician led, clinician led. And you

13 have to start with a core group of physicians who share that

14 passion and who are willing to invest the time to create

15 change. So I believe it's all about change.

16      And what my experience has been with Intermountain

17 Healthcare is that a key foundational element -- you know, I

18 mentioned that Intermountain Healthcare was established in

19 1975, the health plan was built about ten years later,

20 then the medical group was built about ten years after that.

21 And once we had the group of employed physicians who could

22 help build what was called clinical programs, integrated

23 clinical programs, when we had that group of employed

24 physicians who were working towards this common goal, they

25 were able to build changes in the system and they had

1 aligned financial incentives to do so, that is the value of

2 an integrated system in driving change.

3      And I see that same courageous leadership and that

4 same vision and willingness to work in that same fashion

5 with our affiliation with St. Luke's Health System. And --

6      THE COURT: Mr. Ettinger, did you have --

7      MR. ETTINGER: Yeah, Your Honor, I would like to

8 object to foundation. The witness was just talking about

9 20-year-old history as a basis for her answer, and I think

10 she hasn't been at Utah much less working directly with

11 Intermountain for anything like that period of time. I

12 think she was back in Michigan with me fairly recently.

13 So -- so I think -- so I think she doesn't have personal

14 knowledge about the things she is talking about, Your Honor.

15      MR. SINCLAIR: She was talking about when they

16 were formed, when they added various segments. You do not

17 need to be there to know that information. As a CEO and

18 president of SelectHealth, that would be information she

19 would know.

20      THE COURT: Okay. Well, actually, I was -- I'm

21 not -- I shouldn't admit this, but I wasn't absolutely sure

22 what her status was. I'm not sure we heard --

23      MR. SINCLAIR: We haven't. I'm getting to that.

24 It's coming up.

25      THE COURT: So now -- now that I know that she's

1730

1  the CEO and president of SelectHealth, I think that will
2  affect my decision.  I will overrule the objection because
3  as the principal, as the head, if you will, of SelectHealth,
4  I think she certainly would be informed enough to know about
5  the history, at least broadly speaking, of both SelectHealth
6  and the parent corporation, Intermountain Health.  So I'll
7  overrule the objection.
8      MR. SINCLAIR:  And I will provide that foundation.
9  I wanted to get into some other issues first.  But I will
10  back up and cover that in a second.
11  BY MR. SINCLAIR:
12      Q.  So in your experience, Ms. Richards, what is the
13  result of attempting to reach your full potential without
14  affiliating with physicians?
15      A.  Without affiliating with physicians, it is very,
16  very difficult to drive the level of change necessary to
17  make systematic change.  And I -- I have learned that not
18  only from understanding the history of Intermountain and
19  SelectHealth, which is -- is actually well published and
20  documented, and there is books, these are case studies that
21  others look to to learn how to build modern -- model
22  healthcare systems.  So this is published information.
23          But my own personal experience, for instance, and
24  we will talk about that more, I most recently, before coming
25  to SelectHealth, worked at the Henry Ford Health System in

1731

1  Detroit, Michigan.  I was the executive vice president and
2  chief operating officer of the health plan, which was owned
3  by Henry Ford Health System.
4      Again, a very similar model with the Henry Ford
5  Health System having a health plan and employed physician
6  group and a hospital system.  And that experience there was
7  very similar to what I have both seen and read in Utah
8  because it takes this core of physicians, it takes all
9  parties working together, to make change.
10      So I have had both, I have learned history, but I
11  have also -- I am old enough now, I have this gray hair
12  because I have been in healthcare for 40 years.  So I have
13  lived history.  And I have seen so many failed attempts to
14  control cost that I believe through my own personal
15  experience and also reading that the only possible way that
16  we have for the future to both improve health, manage cost
17  is through these not-for-profit integrated delivery systems.
18      And it really goes back to having the -- the
19  agreed upon vision, the culture for change, and then having
20  systems that are willing to invest in the tools to make
21  change possible:  investing in systems, investing in
22  training, investing in time and effort to develop these
23  types of clinical protocols that can actually change care.
24      So I believe that, fundamentally, an integrated
25  system is required, because otherwise, you have fragmented

1732

1  efforts and you have independent parties who maybe don't
2  share that common mission.  And I believe it's really
3  foundational because once you have this kind of a system,
4  then other physicians can certainly join it, but it really
5  takes that core as the foundation to make it work.
6      Q.  So you can bring in independent physicians once
7  you have established your system?
8      A.  Yes.
9      Q.  Let's back up a little bit and address the
10  foundational questions that the court asked about.
11      Give your educational background, if you would.
12      A.  Oh, thank you.  I started out in nursing.  After
13  high school went to nursing school, earned a registered
14  nursing license.  And after that, my first professional work
15  was at the University of Michigan Medical Center in Ann
16  Arbor, Michigan.  Worked there for about five years in
17  clinical nursery and also in nurse recruitment.
18      After that, I took a couple of years off, had some
19  babies, went back to school, did kind of the usual, and when
20  I was ready to go back to work, I had an opportunity to work
21  at Blue Cross of Northwest Ohio.  And that was really a
22  great learning experience.  I learned all about the
23  insurance industry and the history of Blue Cross.
24      Following about six years at Blue Cross, I took
25  some time off again and then had an opportunity to work with

1733

1  a start-up operation called Paramount Health Care, which is
2  a wholly owned subsidiary of ProMedica health system, again
3  another not-for-profit integrated system.  And I spent about
4  12 years there.
5      Took a brief side trip to working for a publicly
6  traded Blue Cross plan.  I started at Blue Cross of Maine in
7  Portland, Maine, and they were subsequently acquired by
8  WellPoint.
9      I quickly realized that working in publicly traded
10  insurance environment was not a good fit with my core
11  beliefs.  And so then a position opened up at Henry Ford
12  Health System, so I moved back to Detroit, 50 miles from
13  where I started, spent five years working in Detroit with
14  Health Alliance plan and the Henry Ford Health System, and
15  then I was recruited to come to interview for the CEO job at
16  SelectHealth following that.
17      Q.  How long have you been with SelectHealth?
18      A.  I have been with SelectHealth almost four years.
19  I started in November of 2009.
20      Q.  So in follow-up to my prior questions about your
21  vision, your goal, and whether it's feasible, are there
22  others in the country that you know of --
23      MR. SINCLAIR:  And let me have Mr. Chasin call up
24  a blank sheet, if you would.  I am going to mark this as
25  Exhibit 5103.  And -- and if this works, as she mentions

1734

1 entities that she is aware of that are following the same
2 track, he will enter them on this sheet so that we can
3 memorialize that.
4        THE COURT:  All right.  Thank you.
5 BY MR. SINCLAIR:
6      **Q.**  So are there other entities in the country that
7 are trying to address medical care in the same fashion that
8 you are?
9      **A.**  Yes.  I participate in my role as the CEO --
10       MR. ETTINGER:  Your Honor --
11       THE COURT:  Just -- just a moment, there's an
12 objection --
13       THE WITNESS:  Sorry.
14       THE COURT:  -- before we go any further.
15       MR. ETTINGER:  I'm trying not to object too much.
16 But, you know, earlier in the case, three was an issue when
17 people tried to introduce data, has it been properly
18 assessed, do we know the background, do we know where it's
19 from, and now we're having witnesses who are going to talk
20 about other health systems with which they were not
21 personally involved and reaching conclusions about their
22 success based on certain characteristics of theirs.
23       And it seems to me in order to permit that, there ought
24 to be a pretty specific foundation laid that the witness
25 has, you know, really studied carefully the ins and outs of

1735

1 that system so the witness can offer a competent opinion
2 about what caused that system to do well or not do well more
3 than reading a few articles in the trade press recently.
4        THE COURT:  Mr. -- Mr. Sinclair, I -- I am very
5 interested in the extent to which integrated healthcare,
6 risk-based contracting has been tried, utilized, and
7 succeeded in other markets, but I am concerned,
8 Mr. Ettinger's point is well taken, that it's something to
9 have a witness offer observations about what's happened
10 around the country without either establishing expertise
11 under Rule 702 or some basis for her personal knowledge, I
12 think.  So I am going to direct you, I guess, to lay that
13 foundation or else limit the witness's response just to the
14 most general observations.
15       MR. SINCLAIR:  Okay.  That's fine, Your Honor.
16 Thank you.
17       For the record, we will indicate that these questions
18 come off the answers in her deposition on pages 87 and 88
19 where she identified these same types of entities in
20 response to questions from plaintiffs' counsel.
21 BY MR. SINCLAIR:
22      **Q.**  So as you identify any other entity that you
23 believe might be following the same path, would you explain
24 the basis of any of your knowledge so that Mr. Ettinger can
25 object if doesn't think you are adequately informed to have

1736

1 the opinions you are giving us?
2      **A.**  Uh-hmm, certainly.  First of all, throughout my
3 career, I have always wanted to study the best-in-class
4 organizations because I have felt that I am not smart enough
5 to do everything by myself.  So I have -- I have really made
6 it a study to -- to monitor and learn from other
7 organizations.
8       But having said that, in my present role, I serve
9 on the board of directors of an organization called the
10 Alliance of Community Health Plans.  And this organization
11 has 22 members and the common factor with all of the members
12 of the Alliance of Community Health Plans is, first of all,
13 that they are all not-for-profit organizations, they are all
14 delivery system aligned, they all share a belief in the
15 Triple Aim as the -- the core of changing for the better how
16 healthcare is delivered, and they all have a focus on
17 improving community health status.  So those are the -- the
18 requirements of the organizations who participate.
19       And so I'm -- I'm very familiar with these
20 organizations.  And I have spent time learning and reading
21 and interacting, we have very active committees, committee
22 structures that look at cost and quality and service.  We
23 meet as a group four times a year, and we have many calls,
24 conference calls in between, to look at what are the best
25 practices in health improvement and cost management.  So I

1737

1 work very closely with all of these organizations.
2       And in addition, I've -- I -- I do participate in
3 another organization as well, called the Health Plan
4 Alliance, and there are other similar organizations there,
5 and I have made it a point to actually go and visit several
6 of these organizations and have in-depth discussions with
7 their leadership team.
8       Part of the -- the other value of the Alliance of
9 Community Health Plans, we all believe in -- that one way to
10 improve is to be very transparent about performance.  And so
11 we are always sharing performance, we are always open about
12 performance, and we -- we routinely share about our
13 successes and when things don't work very well.  So I have a
14 lot of firsthand knowledge of these organizations from my
15 work as well as site visits in addition to -- to reading.
16       But a couple that I'm -- I can mention, for
17 instance, that I -- I work very closely with, there is
18 HealthPartners, based in Minneapolis, and HealthPartners is
19 a very similar model.  They have hospitals, employed
20 physicians, affiliated physicians, and a health plan.
21       Another one is Geisinger Health System out in
22 Danville, Pennsylvania.  Geisinger is, again, often
23 mentioned.  I think in the presidential debates, Geisinger
24 and Intermountain were both mentioned by both candidates.
25       Geisinger, same type of a model:  hospitals,

1738

1 employed physicians, affiliated physicians, and a health
2 plan.
3          Another one that I have firsthand knowledge of is
4 the -- it's called the Security Health plan. This is in
5 Marshfield, Wisconsin, where I went to nursing school, and
6 this is the Marshfield clinic, a group of physicians who
7 works with the hospital and owns a health plan, same type of
8 model. They were, in fact, one of the -- the very early
9 models of -- of integrated care delivery, and they really
10 serve much of the state of Wisconsin, especially the rural
11 area in Wisconsin.
12          So we've got HealthPartners, Geisinger, Security.
13 Another integrated system that's widely known that's part of
14 the ACHP is Kaiser, the Kaiser health plan, Kaiser
15 Permanente. The model with Kaiser is a little bit different
16 in that that's a fully employed model and they have both
17 employed physicians and hospitals and a health plan that
18 are -- are totally integrated.
19          Another member of ACHP is the Group Health
20 Cooperative of Puget -- well, it started out Group Health
21 Cooperative of Puget Sound, now it's just group Group Health
22 Cooperative in Seattle. Again, the same model: employed
23 physicians, affiliated physicians, hospitals, and health
24 plan working together.
25          One of the reasons that we can all share this

1739

1 information, we are in noncompeting markets and we have very
2 strict parameters. We don't ever discuss, for instance,
3 pricing strategies, but we focus our -- our discussions on
4 improving health, improving care, improving the health of
5 the community, and learning from each other.
6          Let me see, I could -- the list goes on.
7     Q.  That's okay. Let me ask this question. Let's --
8 the group that you have listed, and other than the Alliance,
9 which I understand is all these people coming together, but
10 of the groups that you listed, are you aware if they have an
11 employed-physician core as their program?
12     A.  Yes. The groups that I have listed,
13 HealthPartners, Geisinger, Security Health plan, and Group
14 Health have at the core an employed-physician group, and
15 then as they have developed, they have added other
16 affiliated physicians. The one that is the most unique,
17 though, that's -- that's virtually a fully employed model is
18 Kaiser. But everyone else on the list has a strong core of
19 employed physicians.
20     Q.  Now, earlier in this trial, there was a witness
21 who indicated to the court that there is no evidence that
22 this mission upon which you're endeavoring will work. What
23 is your belief in regards to that?
24     A.  Well, the belief is if you look at the history,
25 there is strong evidence that these types of systems work.

1740

1 And especially -- and as -- as now as reporting and
2 transparency and standardized reporting is more available,
3 and it's -- it's more well advanced in the quality and --
4 and satisfaction ratings, but these types of plans, when you
5 look at standardized metrics, do better than the fragmented
6 plans. They do better.
7          MR. ETTINGER: Your Honor, now -- now I think we
8 are getting into causation and that is where I have the
9 concern.
10          THE COURT: Do we have the -- the studies, the
11 metrics?
12          MR. SINCLAIR: Well, let me ask this question. It
13 may just raise another objection.
14 BY MR. SINCLAIR:
15     Q.  Are you aware, can you give the court any examples
16 which indicate that these efforts have been successful?
17 Specific examples.
18          MR. ETTINGER: Your Honor, I'm going to -- if she
19 doesn't have the studies, which we would need to look at, ad
20 hoc examples don't exactly provide us with greater assurance
21 or greater foundation, she is still making an interference
22 about causation from particular examples.
23          THE COURT: Well, causation in what -- causation
24 in the sense that integrated healthcare does, in fact, yield
25 better quality, I guess --

1741

1          MR. ETTINGER: Right. That -- that was the
2 question, as I understood it.
3          MR. SINCLAIR: It was.
4          THE COURT: When you use the word "causation" in a
5 courtroom, I think legal causation. We're talking medical
6 causation here; right?
7          MR. SINCLAIR: Sure.
8          THE COURT: Thank you. I just want to make sure I
9 understood the objection.
10          Mr. Sinclair, I am going to give you some leeway, but
11 if it's just anecdotal, in other words, her observations --
12 her, I apologize, the witness's, observations, then I think
13 that's -- that needs to be -- I believe we need to have
14 studies or -- or some reference of that sort.
15 BY MR. SINCLAIR:
16     Q.  Are there metrics or national standards that --
17 that you are referring to in trying to address whether or
18 not your vision and mission are working?
19     A.  Yes.
20     Q.  What would those be?
21     A.  And these are all publicly available. And it
22 would start with the NCQA accreditation, National Committee
23 for Quality Assurance accreditation. All their work is
24 published. And they build on two components: the HEDIS,
25 the Healthcare Effectiveness Data and Information Set, and

1742

1 the CAHPS survey, Consumer Assessment of Healthplan [sic]
2 Providers and Systems.  And these have been developed and
3 refined over the past 20-plus years.
4         And they use standardized measurements, validated
5 measurements, independent data collection, and public
6 reporting of metrics, especially the HEDIS would be called
7 the clinical metrics and HEDIS looks at preventive care,
8 management of chronic care, disease state, and helping
9 consumers improve their health.
10        And so there is a whole -- whole host -- and,
11 again, these are all published, validated, and publicly
12 available, how the methodology is established.  And if you
13 look at the top-performing plans and systems --
14        MR. ETTINGER:  Your Honor, objection.  Here we
15 are -- now the witness is referring to her conclusions from
16 a bunch of data without referencing a particular study and
17 trying to suggest that certain kinds of systems are higher
18 performing than others and that indicates causation.
19        THE COURT:  Has the witness been identified as an
20 expert witness as opposed to --
21        MR. SINCLAIR:  No, Your Honor.
22        THE COURT:  -- just a fact witness?
23        MR. SINCLAIR:  Yes, Your Honor.
24        THE COURT:  I will have to sustain the objection
25 then.

1743

1 BY MR. SINCLAIR:
2        Q.  Were you -- were you giving your personal opinions
3 as to how these entities related or what was it that you
4 were going to refer to?
5        A.  The publicly reported rankings of health plans.
6        Q.  And -- and what -- who publicly reports these
7 rankings?
8        A.  They are publicly reported by the National
9 Committee for Quality Assurance.
10        Q.  Is that a governmental entity?
11        A.  No, it's a private entity.
12        Q.  And it's -- and it evaluates all the various
13 systems across the country?
14        A.  Yes.
15        Q.  Based upon these national standards that you have
16 addressed?
17        A.  Yes.
18        Q.  So you're -- this isn't your personal opinion,
19 this is what you have seen published as publicly available
20 information?
21        A.  Yes.
22        Q.  And how do these entities rate in this context?
23        MR. ETTINGER:  Your Honor, back to the same point.
24        THE COURT:  Now -- now it's a question of hearsay.
25 If we had the reports and it falls within an exception of

1744

1 the hearsay rule, then we're in business.  If not, then I'm
2 going to have to sustain the objection.
3        MR. SINCLAIR:  Okay.
4        THE COURT:  And we are going to take a break in
5 about 15 or 20 minutes --
6        MR. SINCLAIR:  We'll look and see whether we want
7 to put them in.
8        THE COURT:  All right.  We can circle back to
9 that.
10        I did want to comment.  Ms. Richards, I did not -- I
11 hope you didn't take offense when I made the comment about
12 you not being an expert.
13        THE WITNESS:  Oh, no.
14        THE COURT:  My guess is you are an expert in a
15 number of different areas, but you've not been designated as
16 an expert for purposes of this trial.  So don't take offense
17 by my comments; they weren't intended in that fashion.
18        Mr. Sinclair.
19 BY MR. SINCLAIR:
20        Q.  Let me change topics a little bit.  You -- there
21 has been discussions of risk arrangements in this trial so
22 far.  Have you had risk-based arrangement discussions with
23 St. Luke's in your partnership with them?
24        A.  Yes.
25        Q.  And from your experience, does employment affect

1745

1 the ability to go to risk-based contracting?
2        A.  Yes.  And I have worked in several systems that
3 have had various contract or employment or shared financial
4 risk arrangements.  And it's -- it's critically important
5 when we talk about the change, when we talk about changing
6 healthcare, one of the things that's very important is to
7 align financial incentives.  Because in our current
8 healthcare system, which is largely fragmented and where
9 it's basically every man for himself, if you will, every
10 party is seeking to maximize their own personal benefit,
11 whereas if you have employed physicians or highly affiliated
12 physicians that are part of a larger system, then the entire
13 system can work together.
14        And it goes back to in a system approach, where
15 you have employed physicians with aligned financial
16 incentives, then all of a sudden the rather perverse
17 incentives that we have seen in today's fee-for-service
18 system that's fragmented, all of a sudden everybody comes
19 together in an integrated way and the value comes from
20 keeping people healthy and really lowering costs.  And that
21 can both -- in my personal experience and in the
22 literature -- be best accomplished through an integrated
23 system; a system with employed physicians, and most
24 importantly, the aligned financial incentives that tie right
25 back into the culture of the organization.

1746

1 **Q.** So have you been able to reach your vision yet?

2 **A.** In -- are you asking about Utah or Idaho?

3 **Q.** Utah.

4 **A.** In Utah, we have made -- working as part of

5 Intermountain Healthcare, have made tremendous strides. We

6 have improved quality, we've improved access to care, we've

7 managed to keep our health insurance premiums relatively

8 stable. They are still not to the level that we would like.

9 In fact, we have an aspirational goal within Intermountain

10 Healthcare that we are on an active path to make sure that

11 health insurance premiums in the future are more in line

12 with the general consumer price index. Because we realize

13 that, again, this trajectory where healthcare costs are

14 three to four times the rate of the general inflation rate,

15 again, is not sustainable, nor is it fair.

16 So we have very specific plans in place to reach

17 CPI or CPI plus one goal. And the core -- the foundation of

18 that work is the joint effort with the health plan, the

19 hospitals, but relying very heavily on the employed medical

20 group.

21 So we have set the structure, we've set the plan,

22 we have a five-year plan. We are making progress, as I

23 mentioned, on the quality, access and service. We are

24 starting to make progress on the cost management to again

25 achieve that Triple Aim goal of controlling per-capita cost.

1747

1 So I think we are well on our way toward that.

2 And this is the same model that through all of our

3 discussions with St. Luke's Health System over the past

4 couple of years. We are aligned on that same model and

5 path.

6 And even though we are not owned by St. Luke's,

7 our goal is essentially to work with St. Luke's in the same

8 fashion that we work with Intermountain.

9 **Q.** So have you reached your mission in Idaho yet?

10 **A.** Well, in Idaho, again, I -- I think we are off to

11 a terrific start. And this took -- you know, it was a

12 yearlong process to build the foundation. We have now been

13 in operation for -- for almost a year. We essentially

14 started marketing products and services that became

15 effective in January. So now we have about eight -- eight

16 months' worth of data. And what we are seeing here --

17 THE COURT: Could I -- when you say you have been

18 in operation about a year, do you mean in Idaho --

19 THE WITNESS: Yes.

20 THE COURT: -- or in total? Just in Idaho?

21 THE WITNESS: Yes. In Idaho, yes. Thank you.

22 But at this point, we are -- we are on plan. We have

23 set out a five-year plan. We are on plan, we're on budget,

24 we're on track. We have built good systems for reporting

25 and monitoring our clinical, financial, operational and

1748

1 strategic objectives. So I'm -- I'm pleased with where we

2 are.

3 But it takes -- it takes years to build. And then it

4 takes at least another year to have sufficient reporting to

5 understand exactly where you are on these standardized

6 metrics. So we are in this building process and we have to

7 continue building, we have to have a critical mass of

8 membership and we have to develop sufficient time to report

9 our success on a valid number of members and claim data. So

10 it takes time to both build and then it takes time to

11 evaluate and report. But we are absolutely on track with

12 our five-year plan.

13 BY MR. SINCLAIR:

14 **Q.** Can you explain to the court how and why

15 SelectHealth decided to become aligned with St. Luke's?

16 **A.** Yes, I'd be happy to. It started out, as many

17 things do, really through a personal relationship. I have

18 mentioned I -- I am the CEO of SelectHealth. I report to

19 our board of directors and I also report to the executive

20 vice president of Intermountain Healthcare, and his name is

21 Burt Zimmerly. Burt had previously worked with Dr. Pate

22 when they were both working in Texas. So the two

23 individuals knew each other.

24 And before I was involved in the conversations, my

25 boss, Burt Zimmerly, had had conversations with Dr. David

1749

1 Pate about potential opportunities for Intermountain and St.

2 Luke's Health System to do some things together.

3 And as I mentioned, this started out with a

4 personal relationship, but it was also with the idea that

5 these are two leading not-for-profit health systems closely

6 adjacent in geography, and that in conversations they said

7 there must be some ways we could do some things together to

8 improve efficiency, to take advantage of certain functions.

9 And the original discussion actually started between Burt,

10 as I understand it, as Burt has relayed to me, between Burt

11 and Dr. Pate about perhaps working together on supply chain

12 purchasing because one of the major costs in healthcare is

13 supply chain and equipment, and they thought that perhaps

14 working together to improve purchasing and supply chain

15 management would be a way for both organizations to actually

16 help reduce the underlying cost of healthcare while

17 maintaining quality. So the first discussion started around

18 supply chain.

19 And then after that, there was this discussion

20 about the success of Intermountain and how was that achieved

21 and what role did the health plan play in that. And then

22 shortly thereafter, a meeting was arranged with -- with

23 Dr. Pate and others from his team, my boss, Burt Zimmerly,

24 and myself to say, well, maybe there are some ways that we

25 could work together in this integrated fashion, build on the

1750

1  skills that SelectHealth had, build on the infrastructure
2  that we had in place, maybe join forces and do what we do
3  best in collaboration with St. Luke's Health System.  And
4  what it brought would be a ready-made lower-cost
5  administrative infrastructure to combine with the clinical
6  structure that St. Luke's had built, again, for the purpose
7  of achieving the Triple Aim.  And it was really because Burt
8  knew -- knew Dr. Pate and knew the alignment of the vision
9  and thought it would be a good fit.  So we started having
10 those discussions.
11         And then over a period of time, really developed a
12 memorandum of understanding about our mutual objectives and
13 then that turned into a definitive agreement and then we
14 launched the products.  So it all started with that first
15 conversation.
16     Q.  And from SelectHealth's perspective, are there any
17 significant benefits from having Saltzer be directly
18 affiliated and highly integrated with St. Luke's in Canyon
19 County?
20     A.  I think there is two:  One, certainly from
21 SelectHealth's perspective, it's very important to us to
22 have a broad geographic coverage for a network because we
23 basically, when we sell products in the marketplace, we are
24 selling products and services and a network of physicians.
25 And it's very important to have good geographic coverage

1751

1  that is close to both where people work and where people
2  live, because people tend to want to receive healthcare
3  services close to their community.  So that's a SelectHealth
4  view per se.
5         The other view, and as I have really reflected on
6  this, my understanding of the Saltzer clinic, and this
7  comes, again, from my colleagues at St. Luke's, is that the
8  Saltzer clinic --
9         MR. ETTINGER:  Objection, Your Honor.  Hearsay.
10        THE COURT:  Sustained.
11 BY MR. SINCLAIR:
12     Q.  Were you explaining why -- why SelectHealth
13 believes there is a benefit of having the Saltzer physicians
14 highly aligned with this program?
15     A.  Yes.
16     Q.  Are you testifying as to whether it's accurate or
17 not as to your knowledge or whether this is the knowledge on
18 which you base your belief?
19     A.  This is my belief.
20        MR. ETTINGER:  Your Honor, I guess -- I mean, the
21 question is why is it relevant if only her belief?
22        THE COURT:  That was the thought that came to my
23 mind.  Why is the witness's belief relevant?  I think I
24 allowed a lot more leeway, I think, with Dr. Pate because he
25 was the decision-maker, and therefore, I thought his

1752

1  mindset, his attitude, his understanding was all relevant,
2  but I'm not sure Ms. Richards --
3  BY MR. SINCLAIR:
4      Q.  Would that alignment of Saltzer be relevant to
5  SelectHealth in attempting to reach its mission and vision
6  in Idaho?
7         MR. ETTINGER:  Your Honor, that gets back to the
8  substantive question.  That doesn't relate to whether her
9  belief is relevant apart from the truth of the belief which
10 is the only way this could be admissible.  Mr. Sinclair just
11 asked her, you know, how does it -- he just asked her the
12 factual question --
13        MR. SINCLAIR:  I just -- I am asking her what her
14 belief was in regards to the importance of Saltzer -- or
15 SelectHealth to reach its mission and vision in Idaho.
16        THE COURT:  I guess the predicate to that
17 argument, Mr. Sinclair, is that even though SelectHealth is
18 not a party, that any overall economic benefit that they
19 would reap in which they, through the integrated health care
20 model that they described, could bring to the community
21 would be a competitive -- an advantage that may justify what
22 would otherwise be --
23        MR. SINCLAIR:  Not only the financial aspect, but
24 also the ability to improve the healthcare of the entire
25 population.

1753

1         THE COURT:  Right.  That's what I was alluding to.
2  Maybe I didn't make myself clear.
3         I am going to overrule the objection and allow the
4  witness to indicate her belief as to what is necessary for
5  SelectHealth to bring their product into the market, both in
6  terms of, as Mr. Sinclair pointed out, the bottom line for
7  SelectHealth, but also for, I guess, the bottom line for
8  healthcare in Idaho.  You may go ahead.
9         THE WITNESS:  Thank you.
10        THE COURT:  And I guess you were just making --
11 identifying the second reason why you thought the full
12 integration of Saltzer into St. Luke's was important to
13 SelectHealth.
14        THE WITNESS:  Yes.  Thank you.  It is about
15 driving change.  And when you go back to our vision, that
16 last bullet point on our vision talks about being an active
17 participant, a catalyst and an active participant in driving
18 change.  And in order to drive significant change, there's
19 several elements required.
20        First, you have to have a common and aligned vision.
21 And then you have to have common tools and methods.  You
22 have to make a significant investment in changing processes.
23 And then you have to have the aligned financial incentives.
24 All of these elements are necessary to drive change.
25        And as we talked about in some of these other examples,

1754

1  the -- the core of that change comes from a core group of
2  physicians that share that same mission, that vision,
3  they're financially aligned, and they have time to be able
4  to change care processes.  And that's why I believe having
5  employed or affiliated physicians that are highly regarded
6  in the community as a core to that change.
7       So it's fundamental to driving change.  If you try to
8  do things just by contract or contractors or vendors, that
9  can be goods service, but it perpetuates a status quo.
10      To drive change, you need people that are fully
11 aligned, fully committed, and willing to take and make the
12 courageous types of changes that are necessary.  So it is
13 all about driving change.
14      And as I have seen that in my other work, change
15 requires -- it's easier to have that culture of change when
16 you have employed physicians with aligned incentives who can
17 drive the change and create the foundation.  So that's the
18 broad reason for having employed and highly aligned
19 physicians at the core.
20      And then, as I had mentioned previously, there is the
21 practical day-to-day reasons of having adequate physician
22 coverage to assure that you have access to a full range of
23 physicians that are easily accessibility to customers.
24 BY MR. SINCLAIR:
25      **Q.**  So those are the benefits to SelectHealth of

1755

1  having a highly aligned group like Saltzer in Canyon County?
2      **A.**  Yes.
3      **Q.**  Sort of a large global question:  Why was it
4  important to SelectHealth to become affiliated with
5  St. Luke's?
6      **A.**  The -- it was really interesting.  We -- and we
7  had a lot of internal discussions because it would be
8  possible for SelectHealth to just have a contract with
9  St. Luke's.  We could have had a provider contract.
10         But we felt, for a number of reasons, that when we
11 were coming into this market, we intended to be all in.  And
12 that means we intend to be here for the long term.  We
13 wanted to align ourselves with a highly regarded system.  It
14 was important that the system be not for profit.  It was
15 important that the hospital system also have alignment and
16 affiliation with physicians.
17         So for all of those reasons -- and it -- and it
18 really went back.  It was clearly the mission, vision, and
19 values, but it was also what St. Luke's brought to the table
20 with recognition and preference, the alignment that they had
21 built with physicians.  And then most importantly, we said
22 we want to build a strategic affiliation and that
23 affiliation, and when you look at our -- our principles of
24 that affiliation, it was to bring benefit to the communities
25 in Idaho.  And we shared that.  And it was to help stabilize

1756

1  cost for purchasers in Idaho.  And it was to improve the
2  health of the community and we felt through working with
3  this long-term strategic affiliation, there would be no
4  doubt about our long-term commitment.
5          And then we also do many things in the community
6  jointly.  And again, whether it's health promotion -- or I
7  think it was just about two weeks ago we jointly were
8  sponsors of the FitOne initiative in Boise.  And our team
9  was there helping people understand health reform and the
10 new exchanges and how that would affect them.  And we were
11 working side by side with the St. Luke's team who was there
12 doing health screenings, blood pressure checks, again,
13 really trying to promote health.  So part of our affiliation
14 is also the comarketing and cobranding and conjoined efforts
15 in the community to improve health.
16         So that's why we -- we knew we were all in, we
17 made the commitment for the long term, and it's not a
18 contract that we are willing to just walk away from if it
19 didn't work well in the first year or two.
20      MR. SINCLAIR:  Your Honor, my next area is
21 attorney's eyes only, looking at the time, I'm thinking it
22 might be good time for a break.
23      THE COURT:  You read my mind.
24      MR. SINCLAIR:  And I'm going to see if I can get
25 around the attorney's eyes only during the break and avoid

1757

1  that.
2      THE COURT:  All right.  Let's -- we will take the
3  break.
4      Counsel, one -- well, I'll wait.  I do have a couple of
5  questions I'm going to ask the witness.  I will wait until
6  direct and cross before I ask it and then you can follow up
7  on my questions.  The reason I do that, I don't want to jump
8  in with both feet only to find out you are going to cover it
9  with your direct or your cross but I do have some questions
10 here.
11      I just noted, I don't think this is clearly not an
12 issue in the case at all, but I do, you know, the
13 aforementioned health issue, my otolaryngologist, I have one
14 here with Southwest Idaho Ear, Nose and Throat, which is
15 near Saint Al's facility, I don't know if they're affiliated
16 or not, and I also go to a Dr. Scheulle at McKay-Dee and I
17 suspect -- I think that's an IHC facility, but I'm not sure
18 of that.  Would you know?
19      THE WITNESS:  McKay-Dee Hospital is an
20 Intermountain hospital.
21      THE COURT:  All right.  I -- I think it is
22 completely irrelevant, except that I thought I might as well
23 point it out.  If you think it's relevant or of concern, you
24 can file a motion to recuse me and get another judge and
25 start the trial over.  All right.

1758

1   We will be in recess.
2          (Recess.)
3   ****** COURTROOM CLOSED TO THE PUBLIC ******
4          THE COURT:  Thank you.  Please be seated.
5      For the record, I will remind the witness,
6   Ms. Richards, you are still under oath.
7      Mr. Sinclair, you may resume your direct examination.
8          MR. SINCLAIR:  Thank you, Your Honor.  I totally
9   failed avoiding the AEO.  So we will need anyone not
10  connected with SelectHealth or an attorney to leave the
11  courtroom.
12         THE COURT:  The only ones allowed to remain would
13  be those connected with SelectHealth; correct?
14         MR. SINCLAIR:  And trial counsel.
15         THE COURT:  And what?
16         MR. SINCLAIR:  And trial counsel.
17         THE COURT:  Obviously.  It would be kind of a
18  lonely trial.
19         MR. SINCLAIR:  Maybe we could have Mr. Ettinger
20  excluded.  (Laughter.)
21         THE COURT:  Go ahead.  Are we going to be showing
22  any exhibits?
23         MR. SINCLAIR:  No.
24         THE COURT:  Otherwise, we'd close the screen and
25  put it over the glass.  But if we're not showing exhibits,

1759

1   that shouldn't be a problem.
2          MR. SINCLAIR:  Ready?
3          THE COURT:  Yes.
4   BY MR. SINCLAIR:
5      Q.  Ms. Richards, there are allegations in this trial
6   so far that part of the motivation of St. Luke's in its
7   endeavors with Saltzer is to grow its market share in order
8   to increase pricing.  Were there any discussions between
9   SelectHealth and St. Luke's in regards to growing market
10  share?
11     A.  No.  The only discussions were how to have good
12  products and services in the marketplace and how to achieve
13  our joint goal of actually reducing the cost of healthcare
14  services.
15     Q.  From SelectHealth's perspective, you want as many
16  insureds as you can so you have viable product; correct?
17     A.  Correct.
18     Q.  Was there any discussion about increasing the
19  prices by the collaboration you were doing?
20     A.  No, not at all.
21     Q.  Has -- to your knowledge, has SelectHealth coming
22  into the Idaho market any effect upon pricing in Idaho for
23  insurance products?
24     A.  Yes.  You know, one of our goals was to bring
25  competitive pricing and have very predictable premium

1760

1   increases going forward.  And we thought we could bring a
2   meaningful competition to the marketplace.
3          And while we are on our plan in terms of growth,
4   one of the -- I guess it is an unanticipated side effect, if
5   you will -- we actually believe we were maybe more
6   successful in bringing more competition to the marketplace
7   because just our sheer presence in the marketplace has
8   basically caused other insurers in the market to sharpen
9   their pencil in terms of premiums for customers.
10         So even though we did not get some of the
11  customers, some of the customers where we offered
12  competitive insurance quotes actually benefitted
13  tremendously by having their current carriers come back and
14  reduce their prices -- premiums sometimes multiple times.
15         So it's kind of an odd way to achieve the goal of
16  making healthcare more affordable in the region, but just
17  our mere presence has actually helped certain purchasers
18  have more competitive premiums that were offered than
19  through other carriers in direct response to our offering a
20  competitive quote.
21     Q.  So you made a quote, and it was your understanding
22  your quote was lower than some of your competitors?
23     A.  Yes.  You know, in fact, I mentioned in the -- one
24  of our missions is to provide healthcare cost -- healthcare
25  at the lowest appropriate cost.

1761

1          And one of the things that we believe sets
2   SelectHealth apart, we try to be very open and transparent
3   about how we develop our premium pricing, and we try to not
4   play some games with the pricing.  We do not go in and offer
5   a high quote and then reduce it and things like that.  We
6   try to offer the right quote initially that is built on the
7   underlying cost that we anticipate for the services and
8   built around the population of the people -- age and sex and
9   health conditions -- that will be insured.
10         So we basically try to always hit the right
11  premium the first time, the right time.  So we offered in
12  many cases -- and I track -- I work with our general
13  manager, and I monitor sales reports, sales activity, and
14  the outcome of quotes.
15         As we would offer very competitive quotes that
16  typically the insurance broker or the customer would be very
17  pleased to receive -- they would say, "Wow, this is
18  great" -- but then their existing carrier would turn around
19  and come back, and they may have offered a 10- or 15- or
20  20-percent rate increase.  We offered a competitive quote,
21  and then the original carrier would come back and, quote,
22  knock off a few percentage points; they would come in with a
23  quote that was lower than ours, either by a few points or a
24  substantial margin, to keep the business.
25         So -- so the other carriers adjusted their quotes

1762

1  after employers received quotes from us.  The net impact was
2  that it really benefited the employer or the purchaser.  It
3  also allowed the incumbent carrier to keep the business.
4  And that wasn't in certainly every case, but we have many,
5  many examples where our -- what we thought was an accurate
6  quote was underbid.
7       So that is why I say it has sort of achieved the
8  results of making healthcare more affordable in the
9  community, but it was not necessarily the way we set out to
10 do it.
11      MR. SINCLAIR:  Your Honor, that's all I have.
12      THE COURT:  Mr. Ettinger or who is --
13      MR. SINCLAIR:  Can we open the courtroom again?
14      THE COURT:  Yes.
15      ****** COURTROOM OPEN TO THE PUBLIC ******
16      THE COURT:  Mr. Su, you are going to do the cross?
17      MR. ETTINGER:  Your Honor, we both may, but he can
18 start.
19      THE COURT:  All right.  Mr. Powers and Mr. Wilson,
20 I don't mean to exclude you.  I assume you have arranged a
21 cue, if there is one, to line up and cross-examine the
22 witness.
23      MR. POWERS:  We have, Your Honor.  We divided the
24 witnesses.
25      MR. SU:  May I proceed, Your Honor?

1763

1       THE COURT:  Yes, you may.
2               CROSS-EXAMINATION
3  BY MR. SU:
4       Q.  Ms. Richards, Mr. Sinclair asked you about the
5  relevance of having Saltzer to SelectHealth and its
6  affiliation with St. Luke's.  Isn't it true, in your
7  experience, when building a provider network, it is
8  important to have primary care physicians close to where the
9  members live?
10      A.  Yes.
11      Q.  And, in fact, if a health plan doesn't have
12 primary care physicians close to where its members live,
13 then that network would not be attractive to its members;
14 right?
15      A.  Yes.  It is important both where they live and
16 where they work.
17      Q.  And it is your position that, then, SelectHealth
18 needs Saltzer in its provider network because you want a
19 robust provider network that would be attractive in the
20 commercial market?
21      A.  Yes.
22      Q.  And from your experience with past plans, you know
23 that consumers like very much and they value having primary
24 care physicians close to home?
25      A.  Yes.  Again, close to both home and work, easily

1764

1  accessible.
2       Q.  Your testimony when you gave a deposition in this
3  case was that it was close to home, within a few miles, ten
4  to five minutes of home; right?
5       A.  Home and also accessible from work.
6       MR. SU:  May I have Mr. Beilein play clip 7.  And
7  this will be from the deposition of Ms. Richards, page 156,
8  line 5 -- line 25 to page 157, line 20.
9       THE COURT:  We have not yet published
10 Ms. Richards' deposition; correct?
11      MR. SU:  We have not, Your Honor.
12      THE COURT:  If you would provide the original, I
13 will have Ms. Gearhart publish the deposition at the
14 conclusion of the examination.
15      MR. SU:  Yes, we will do that.
16 (Video clip played as follows:)
17      Q.  "... time and distance requirements that
18      are in place for primary care physicians in
19      order for you to be awarded that contract?
20      A.  "The -- I honestly don't remember exactly
21      because I'm not that close to the work.  It is
22      usually -- my recollection is we're talking
23      30 minutes.  I believe that's the regulatory
24      requirement.  It might be 20 minutes.  It might
25      be a 20-minute, but it's very close.  And

1765

1       that's to meet the minimum regulatory
2       standards.
3            "And then also, in addition to meeting the
4       regulatory standards, you have to meet the
5       market acceptability standards; in other words,
6       what do consumers want.  And my experience with
7       past plans is that consumers would like very
8       much and they value having their primary care
9       physician close to home, within a few miles, 10
10      to 15 minutes.
11           "So there's a kind of a market
12      acceptability that we are trying to achieve,
13      and we also have to meet the minimum regulatory
14      standards."
15 (Video clip concluded.)
16 BY MR. SU:
17      Q.  Ms. Richards, that is your testimony that you gave
18 under oath in the deposition?
19      A.  Yes.
20      Q.  And your words were "having their primary
21 physician close to home, within a few miles, 10 to 5 [sic]
22 minutes"; correct?
23      A.  Yes, although it is not my complete testimony.
24      Q.  Yes or no, that is your testimony?
25      A.  That is my testimony, but there is additional

1766

1 testimony.
2        THE COURT:  Mr. Sinclair will give you a chance to
3 go into that, if need be.
4        THE WITNESS:  Okay.
5        THE COURT:  Go ahead, Mr. Su.
6 BY MR. SU:
7        Q.   You know that Saltzer Medical Group is in the
8 BrightPath Network, correct?
9        A.   That is my understanding, yes.
10       Q.   And the BrightPath Network is a provider network
11 that SelectHealth is using for the new products that it is
12 offering in the state; is that right?
13       A.   We are using the BrightPath Network, and then the
14 physicians have an opportunity to accept or reject to
15 participate and serve the SelectHealth plans.  So there is a
16 messenger model associated with it.
17           So we base it on the BrightPath Network, but it
18 doesn't include necessarily 100 percent of the BrightPath
19 providers.
20       Q.   But whatever the BrightPath Network provides in
21 terms of physicians is what you are getting for your
22 products?
23       A.   As long as the individual physician also signed an
24 addendum to participate in SelectHealth, yes.
25       Q.   Also, in response to Mr. Sinclair's questions, you

1767

1 talked about specific benefits, other benefits from the
2 St. Luke's affiliation with Saltzer; right?
3        A.   (No audible response.)
4        Q.   You recall, don't you, that when asked this very
5 question in your deposition, you said you do not have any
6 personal knowledge of those specific benefits; correct?
7        A.   That's correct.
8        Q.   And, in fact, you recall also that you submitted a
9 declaration to the Court back in December of 2012?
10       A.   Um-hmm.
11           THE COURT:  You need to answer yes or no.
12           THE WITNESS:  Oh.  Yes.
13           THE COURT:  Thank you.
14 BY MR. SU:
15       Q.   And when you were asked about that declaration
16 during your deposition, you said you had not a specific
17 discussion with St. Luke's about, quote, "any significant
18 benefits from having Saltzer be directly affiliated and
19 highly integrated with St. Luke's"; right?
20       A.   That's correct.
21       Q.   So all you were expressing was just your personal
22 belief that, in general, employment or highly affiliated
23 group practices can lead to significant value; right?
24       A.   Yes.
25       Q.   So you weren't talking specifically about any

1768

1 value that might flow specifically from St. Luke's
2 acquisition of Saltzer?
3        A.   Correct.
4        Q.   Also, during your deposition, you told my
5 colleague, Mr. Litvack, you had never had any conversations
6 with any Saltzer physician about the benefits of the
7 acquisition; correct?
8        A.   That's correct.
9        Q.   Now, you were also asked in your deposition
10 about --
11           MR. SINCLAIR:  Your Honor, I am going to object to
12 this line of questioning.  This is not a party.  Her
13 deposition can be used for impeachment, but it can't be used
14 for direct and redirect.
15           THE COURT:  I think that's correct.  Mr. Su, you
16 can ask the question of the witness.  If she gives the same
17 response she did in her deposition, we will accept that
18 here; if she didn't, you can use the deposition for
19 impeachment.
20           MR. SU:  I will do that.  Thank you, Your Honor.
21 BY MR. SU:
22       Q.   Now, when you use the term "directly affiliated,"
23 as you did in your December 2012 declaration, you don't mean
24 that a physician group necessarily has to be employed or
25 owned by a health system; correct?

1769

1        A.   Correct.
2        Q.   In fact, what you mean by "directly affiliated" is
3 that there just has to be a close working relationship
4 between the physician group and the health system; correct?
5        A.   What I mean is there has to be a highly aligned
6 relationship that shares those common commitments and values
7 and visions that I discussed earlier in my testimony today.
8        Q.   Right.  So what is important here, as you've
9 testified, is the culture, is the shared vision between the
10 physicians on the one hand and the health system?
11       A.   Yes.
12       Q.   And so that would include working together through
13 the physicians having privileges at the hospital; right?
14       A.   That would be a minimum requirement.  As I also
15 mentioned, it requires aligned financial incentives.  It
16 requires time and ability to spend time working on
17 developing clinical protocols and implementing those
18 clinical protocols.  It also involves assuming a leadership
19 role.
20           So there is a lot when you talk about -- or when I
21 talk about a highly aligned or affiliated relationship, it
22 is a significant relationship.
23       Q.   A close working relationship is what you said;
24 correct?
25       A.   Um-hmm.

1770

1    Q.  Is that correct?
2    A.  Yes.  I'm sorry.
3    Q.  And your point about financial alignment, that is
4 just to get -- to ensure that there is this common shared
5 vision; correct?
6    A.  It is one of the required elements, yes.
7    Q.  It is a means to an end?
8    A.  Um-hmm.  Yes.
9    Q.  And, in fact, SelectHealth in Utah has been able
10 to forge close working relationships with independent
11 physician groups; correct?
12   A.  That is correct.
13   Q.  Like the Central Utah Clinic, as an example?
14   A.  Yes.
15   Q.  And that was a multispecialty physician group?
16   A.  Yes.
17   Q.  Now --
18   A.  That was not an original -- that isn't where
19 things started, though.  Even within Utah, things started
20 with the core of the employed physicians, and that -- having
21 that core of employed physicians allowed for the development
22 of many of the clinical programs.  And that was the starting
23 point.
24       And after those had begun to mature, then we were
25 able to bring in other physicians who could also then

1771

1 participate on the work that -- the foundational work that
2 had already been done.
3       And when we pilot new programs to either improve
4 quality or align physician incentives, we often start with
5 our employed physician group because that is the most
6 closely aligned arrangement that we have.
7    Q.  Yes.  But my question was:  Central Utah Clinic
8 was not part of this core group?
9    A.  Correct.
10   Q.  It was an independent physician group?
11   A.  That was added at a later date, yes, after the
12 foundation had been built.
13   Q.  Right.  So if St. Luke's already has a core group,
14 it can work with Saltzer as an independent medical group;
15 correct?
16   A.  I don't know the extent.  I don't know how full
17 that core group is, in all honesty.
18   Q.  And you don't know whether St. Luke's acquisition
19 of Saltzer creates the proper aligned incentives between
20 that group and the health system, do you?
21   A.  I believe it sets the framework, it sets the
22 opportunity for those aligned incentives.
23   Q.  Now, Mr. Sinclair asked you some questions about
24 risk-based contracting.
25   A.  Yes.

1772

1    Q.  In Utah, SelectHealth currently doesn't have
2 risk-based contracting in any of its commercial plans;
3 correct?
4    A.  There is some risk-based contracting in a very
5 small network.
6       SelectHealth has three different networks.  We
7 have the Value Network, which is built primarily around the
8 employed medical group.  Then we have a larger network
9 called the Med Network.  And our largest network is called
10 the Care Network, which is a very broad network, essentially
11 an any-willing-provider network that includes, for instance,
12 the University of Utah.
13      So we have very small, medium, and large networks.
14 The smallest network, the Select Value Network that is built
15 around the Intermountain Medical Group, is a risk-based
16 network in our commercial product.
17   Q.  Now, you were asked about the -- to tell the
18 history of Intermountain Healthcare.
19   A.  Yes.
20   Q.  And you believe that the lessons that
21 Intermountain has learned from its own experience help
22 inform your views about what is achievable; correct?
23   A.  Yes.
24   Q.  And do you know who Dr. Brent James is?
25   A.  Yes.

1773

1    Q.  He's the chief quality officer at Intermountain?
2    A.  Yes.
3    Q.  You have talked to him?
4    A.  Yes.
5    Q.  You have talked to him about his views, about his
6 experiences with Intermountain?
7    A.  I've talked to him in that I have taken his
8 training program, the advanced training program for
9 professionals.  I don't know that -- and I have heard him
10 lecture many times.  I don't know that I have actually had a
11 personal conversation with him about his views about
12 Intermountain other than, as I said, I have taken his
13 course, and I meet with him periodically.
14   Q.  So you have taken his course.  You look to him as
15 a teacher?
16   A.  Yes.
17   Q.  You value his opinions?
18   A.  Yes.
19   Q.  All right.  Let me show you what we'll call Cross
20 Exhibit 3040.  If you will put that up.  If you will go to,
21 first of all, to the second page, Mr. Beilein.
22      Do you recognize this article, Ms. Richards?
23   A.  I recognize the title.  The text is not -- I can't
24 get a clear view on the screen.  It is a little too small
25 for me to read.

1774

1    Q.  Maybe we could just highlight the abstract --
2  actually, we have a hard copy as well.  With the Court's
3  leave, Mr. Oxford will provide it to Mr. Metcalf.
4         MR. SINCLAIR:  Do you have a copy for me?
5         MR. SU:  Yes, sir.  Right here.
6         THE WITNESS:  Thank you.
7  BY MR. SU:
8    Q.  Ms. Richards, is the paper copy better?
9    A.  Yes.  Thank you.
10   Q.  All right.  Great.  So you said you recognized the
11 title; is that what you said?
12   A.  Yes.
13   Q.  And you recognize the authors?
14   A.  Yes.
15   Q.  They are both employees of Intermountain, aren't
16 they?
17   A.  Yes.
18   Q.  And one of them is Dr. James?
19   A.  Yes.
20   Q.  Now, I would like to direct your attention to
21 page -- the article itself has its own numbering, and we are
22 looking at page 1189.  Do you see that?
23   A.  Yes.
24   Q.  Do you have that page?
25   A.  Yes.

1775

1    Q.  Specifically on the left-hand column on that page,
2  I wanted to direct your attention to the text that begins
3  with the subheading "Improving clinical care by reorganizing
4  its delivery."
5    A.  Yes.
6    Q.  And I will read the text.  It says, "The majority
7  of the physicians involved in executing Intermountain's key
8  clinical processes are independent, community-based
9  practitioners.  This protected Intermountain from a classic
10 blunder:  We didn't try to control physicians' practice
11 behavior by top-down command and control through an
12 employment relationship.  Instead, we relied on solid
13 process and outcome data, professional values that focused
14 on patients' needs, and a shared culture of high quality."
15      Do you see that?
16   A.  Yes.
17   Q.  Do you agree with what Dr. James has said -- has
18 written in that paragraph?
19   A.  I would agree that, at this point, a lot of the
20 execution is done by independent physicians; and yet, at the
21 same time, about 25 percent of the physicians who practice
22 at the Intermountain facilities are employed physicians.
23      And I believe that what Dr. James is speaking
24 about especially is that this is physician-led change as
25 opposed to administrator-led change.

1776

1         So he believes that the changes have to arise from
2  good clinical evidence, and they have to be championed by
3  respected colleagues.  And in conversations that I have had
4  with Dr. James, he doesn't believe that is possible for a
5  health plan by itself, for instance, to set protocols and
6  then impose them on physicians; nor does he believe that
7  hospital administrators should set the protocols and impose
8  them on physicians.
9         He believes -- and we've had these discussions --
10 that it should be based on the best clinical evidence, and
11 then that evidence should be turned into work processes that
12 support the physicians.  So it is really led by the
13 profession.
14        I can't comment and I have never had a discussion
15 with Dr. James about the command and control through an
16 employment relationship.  So I cannot make a comment about
17 that.
18   Q.  In your experience, physicians like autonomy,
19 don't they?
20   A.  Historically, yes, physicians have liked autonomy,
21 and it has been kind of a cottage industry.  But what we are
22 finding --
23   Q.  Yes or no?
24   A.  Yes.
25   Q.  Mr. Sinclair asked you some questions about the

1777

1  strategic affiliation agreement with St. Luke's.
2    A.  Yes.
3    Q.  That agreement provides that -- it has a potential
4  gain-sharing component; correct?
5    A.  Yes.
6    Q.  And that gain-sharing component, if you were to
7  realize a net surplus of dollars, that would go to both
8  St. Luke's providers and facilities and non-St. Luke's
9  independent providers and facilities; correct?
10   A.  Yes.
11        MR. SU:  That's all I have.  Mr. Ettinger may have
12 some other questions.
13        THE COURT:  Mr. Ettinger.
14              CROSS-EXAMINATION
15 BY MR. ETTINGER:
16   Q.  Ms. Richards, it is your view that the BrightPath
17 Network provides good access for physicians to SelectHealth;
18 is that correct?
19   A.  Yes.
20   Q.  And it is your view that the BrightPath Network
21 has demonstrated a commitment to evidence-based medicine
22 that is aligned with SelectHealth's goals; correct?
23   A.  Yes.  They have -- it's maybe not the complete
24 answer, but yes.
25   Q.  That was a -- and, in fact, the vast majority of

1778

1 physicians in the BrightPath Network, almost 90 percent, are
2 independent physicians; correct?
3 **A. I don't know the specific ratio.**
4 **Q.** Do you know the approximate ratio?
5 **A. No, I do not.**
6 **Q.** Now, in Utah, the broader networks you referred to
7 are Select Choice and Select Care; correct?
8 **A. I have referred to Select Care and Select Med.**
9 **Q.** And both of those are -- the vast majority of the
10 physicians in that network are independent; correct?
11 **A. In Utah --**
12 **Q.** Is that correct?
13 **A. It depends how you define "vast majority."**
14 **Q.** More than 75 percent.
15 **A. It is very close.  I would say we have a core of**
16 **about 30 percent employed and the remaining independent;**
17 **but, again, I don't know the exact percentage off the top of**
18 **my head.**
19 **Q.** Now, Mr. Su asked you some questions about direct
20 affiliation.  In fact, it is your view that an independent
21 physician group could be directly affiliated with a health
22 system within the meaning of "directly affiliated" as you
23 use that term, correct?
24 **A. They could be affiliated, yes.**
25 **Q.** And just to be clear, you have not been to

1779

1 Saltzer, you have never talked to anybody from Saltzer?
2 **A. I met the president of Saltzer today.**
3 **Q.** Not until today?
4 **A. Correct.**
5 **Q.** You are not -- with the one exception you
6 mentioned, you are not aware of when, if ever, SelectHealth
7 will implement risk-based contracts for commercial plans in
8 Utah; correct?
9 **A. No, that is not correct.**
10 MR. ETTINGER:  Could we play Richards Cross 3,
11 Your Honor?  This is Ms. Richards' deposition.
12 THE COURT:  Could you give me a page and line?
13 MR. ETTINGER:  Yes.  This is page 38, lines 22
14 through 25.
15 THE COURT:  Thank you.
16 (Video clip played as follows:)
17 **Q.** "Do you know when SelectHealth plans to
18 implement risk-based contracts for commercial
19 plans it offers?"
20 **A.** "No."
21 BY MR. ETTINGER:
22 **Q.** Was that your testimony?
23 **A. That was my testimony as of June.**
24 **Q.** Thank you.
25 **A. I am now aware --**

1780

1 THE COURT:  Mr. Sinclair will give you a chance to
2 explain that.
3 THE WITNESS:  All right.  Thank you.
4 BY MR. ETTINGER:
5 **Q.** And, in fact, it is your view that fee-for-service
6 payments will always be a component of the SelectHealth-
7 St. Luke's arrangement, and it's unrealistic to expect fee-
8 for-service will go away; is that right?
9 **A. Yes.**
10 **Q.** Are pediatricians in all of the networks offered
11 by SelectHealth?
12 **A. Yes, to the best of my knowledge.**
13 **Q.** You would not offer a network without
14 pediatricians, would you?
15 **A. I can't imagine that we would.**
16 **Q.** And as of now, there is no agreement as to how
17 St. Luke's will participate in trying to get quality
18 improvements in the SelectHealth relationship; correct?
19 **A. There is teams working on that.**
20 **Q.** There's no actual agreement today as to how that
21 will work; correct?
22 **A. The mechanics are not defined today; correct.**
23 **Q.** And any value-based payments between SelectHealth
24 and St. Luke's will not occur until at least year 3 of the
25 contract; isn't that right?

1781

1 **A. That's correct.**
2 **Q.** And St. Luke's doesn't have the capacity to handle
3 full risk today; correct?
4 **A. I don't believe that St. Luke's or BrightPath have**
5 **that capacity built yet.**
6 **Q.** And, in fact, isn't it the case that when you were
7 talking to St. Luke's, you originally started out talking
8 about a full-risk percent-of-premium approach, and
9 St. Luke's chose to move away from that because it began to
10 understand what that involved and concluded that it wasn't
11 ready for full risk; correct?
12 **A. Correct.**
13 **Q.** If Saltzer were not owned by St. Luke's and were
14 available to SelectHealth in the BrightPath Network and were
15 also available -- and was also available to competing payors
16 and competing networks, do you think that would be unfair
17 competition in any way?
18 **A. One, it is a hypothetical question; and, two, it**
19 **is a question that I'm not really qualified to answer.**
20 MR. ETTINGER:  Thank you very much.
21 THE COURT:  Mr. Sinclair, let me ask just a couple
22 of questions, and then you can follow up with my questions
23 in just a moment.
24 EXAMINATION
25 BY THE COURT:

1782

1    Q.   Ms. Richards, I think the primary question I had
2    was already asked by Mr. Su and Mr. Ettinger.  At this point
3    in time, SelectHealth, in terms of your insurance product it
4    is offering, is essentially a traditional fee-for-service
5    policy, or how does it vary from, say, what Blue Cross of
6    Idaho or Regence Blue Shield or any of the other insurance
7    companies -- how is it any different?
8    **A.   It is similar, of course, in terms of rates and**
9    **benefits in network and offering competitive pricing.  The**
10   **payment arrangement at this point is primarily fee-for-**
11   **service because we are in this very early stage of**
12   **development.  We have small numbers of members, and we don't**
13   **have sufficient experience or claim history or data to**
14   **really move into a risk-bearing arrangement.**
15   **So the reason that it is more traditional fee-for-**
16   **service is because it is so new.  We do have some level of**
17   **risk-bearing arrangement in our Medicare Advantage product.**
18   **But that's correct.**
19   Q.   How long has it been functioning in Utah,
20   SelectHealth?
21   **A.   It has been functioning in Utah since 1984.  So I**
22   **guess about 30 years almost.**
23   Q.   I guess the somewhat obvious question, then, is:
24   Despite that 30-year experience, that has not been
25   sufficient time to develop claim experience data and

1783

1    statistics that would allow you then to bring out a
2    risk-based product?  What is it that's keeping you from
3    doing that, say, in Utah?
4    **A.   Oh, in Utah.  What would be keeping us from doing**
5    **that has really been management and leadership decisions of**
6    **the Intermountain Healthcare system.  For many years, the**
7    **health plan, while it was a wholly-owned subsidiary, it was**
8    **really kind of off to the side as a more independent**
9    **organization that was not fully integrated with the delivery**
10   **system.  And so it was really just seen almost as an**
11   **independent enterprise.**
12   **Whereas now, and over the last three to**
13   **four years, there has been a concerted effort to integrate**
14   **and coordinate services between the health plan and the**
15   **delivery system.  And, in fact, we are on a path now to**
16   **create a fully integrated population health management**
17   **system, and we have --**
18   Q.   And that would be a risk-based product?
19   **A.   And that would be risk-based.**
20   **And, in fact, this year, one of the key points**
21   **where we started the risk-based financial arrangement with**
22   **Intermountain, the system is at full financial risk for the**
23   **Medicare Advantage product that we offered in January, the**
24   **full financial risk for the managed Medicaid product that we**
25   **offered in January.**

1784

1    **As I said, it has really been -- it was a**
2    **management leadership decision of Intermountain for a long**
3    **time to treat SelectHealth separately.  But now, with**
4    **recognizing the direction that is necessary to create**
5    **sustainable cost, we at Intermountain have moved towards**
6    **something we are calling "shared accountability."**
7    **So we have absolutely integrated and coordinated**
8    **our work efforts because of the entire system.  Our board,**
9    **the Intermountain board, has developed the belief that the**
10   **only way -- the only type of sustainable system for the**
11   **future is one that is highly aligned, highly integrated,**
12   **highly coordinated with those shared risks.**
13   Q.   So if I'm understanding you, then, you are saying
14   this was a decision made by IHC, say -- well, a decision
15   made quite some time ago but implemented in the last three
16   to four years, and that is the actual experience you have to
17   which you could kind of analyze what the premiums would look
18   like, what the structure would look like, and how you would
19   share the risk?
20   **A.   Yes.**
21   Q.   Now, is --
22   **A.   There is one point, if I could add.**
23   Q.   Go ahead.
24   **A.   Because SelectHealth is a wholly-owned subsidiary,**
25   **our financial results roll up, and they are consolidated**

1785

1    with the parent company.  So it is also logical to say that
2    the parent company has, in fact, been at risk for
3    SelectHealth performance since its inception.  So they have
4    been at financial risk, but it has only been the last few
5    years where we have really taken on the risk for population
6    health and with this emphasis on health improvement and
7    really expanding on these clinical programs.
8    Q.   It is a wholly-owned subsidiary of IHC, which is a
9    not-for-profit?
10   **A.   Correct.**
11   Q.   How -- so if a patient, or more likely an
12   employer, were to contract with SelectHealth, there would be
13   a flat-rate charge per capita --
14   **A.   Yes.**
15   Q.   -- for all people enrolled without variation -- of
16   course, under the Affordable Care Act, there's no
17   preexisting condition, presumably in any event.
18   And the consequence of that would be there would be --
19   would there still be deductibles?  I am assuming those would
20   be intended to maybe influence behavior by the patient to
21   encourage them towards healthy conduct, not towards
22   discouraging them from obtaining healthcare?
23   **A.   Correct, yes.**
24   THE COURT:  Well, Counsel, I think -- I guess I
25   would be helpful for me to have a better sense -- and maybe

1786

1 before the end of the next two weeks, I will have that -- as
2 to precisely what that risk-based system would look like
3 from a consumer's point of view.  And I think I am getting a
4 glimmering of it, but it may be helpful as we move on.
5        Mr. Sinclair, redirect.
6        MR. SINCLAIR:  Thank you, Your Honor.
7            REDIRECT EXAMINATION
8 BY MR. SINCLAIR:
9        Q.  Mr. Su asked you some questions about having
10 primary care physicians close to home.  Do you remember
11 that?
12       A.  Yes.
13       Q.  And you indicated there was more in your
14 deposition than what he had referenced; is that correct?
15       A.  Yes.
16       Q.  Looking at page 182 of your deposition, which is
17 on the screen, was this also your testimony that day?
18       A.  Yes.
19       Q.  So your answer was:  It could include where
20 someone works.  Typically, in the Medicare population, most
21 people are retired, and it's close to home for Medicare
22 Advantage enrollees.
23       But for the commercial population, many of whom are
24 employed, it's really both family and dependents.  It's
25 important both close to home, but where someone is working,

1787

1 it's very important that they also have access to care
2 that's very close to their workplace.  So it's really about
3 ease access -- easy and convenient access and availability."
4        That was your full answer; correct?
5        A.  Yes.
6        Q.  And that is what you were trying to explain to
7 Mr. Su?
8        A.  Yes.
9        Q.  Can we flip over to the document camera.
10       This is the page that Mr. Su used out of the exhibit.
11 I don't remember the number of it.  It is the article that
12 he referenced, Mr. James.
13       I guess now you can indicate, since they put this
14 before you, whether Intermountain has had any success in the
15 initiatives it has introduced since 1995.
16       **A.  Yes, I believe there has been many examples of**
17 **success.**
18       Q.  This says --
19       MR. SU:  Objection.  We just used this as an
20 impeachment exhibit.
21       MR. SINCLAIR:  I don't know how you impeach
22 somebody with a document written by someone else.
23       THE COURT:  Well, the witness had indicated that
24 the model for SelectHealth was based upon IHC's approach.
25 And I think the impeachment --

1788

1        MR. SU:  The impeachment, Your Honor, is that the
2 witness expressed a view that, you know, IHC has an
3 employment-based model, and the impeachment was Dr. James'
4 own opinion about the disadvantages of employment.
5        THE COURT:  I don't know that it is impeachment in
6 the sense of showing a prior inconsistent statement.  I
7 think it was offered, really, just as a cross-examination
8 document.
9        Are you offering the exhibit?
10       MR. SINCLAIR:  Sure.
11       THE COURT:  Is there any objection?  It apparently
12 is marked as a plaintiffs' exhibit.
13       MR. SU:  It was marked as a cross-examination
14 exhibit, which is why it had been assigned a 3000 number,
15 Your Honor.  We had not intended to offer it as a
16 substantive exhibit.
17       THE COURT:  Mr. Ettinger?
18       MR. ETTINGER:  I would object that it's hearsay,
19 Your Honor.  I would object to it as a substantive exhibit.
20       MR. SINCLAIR:  Then I would move to strike the
21 apparent attempt to impeach on a statement that is not this
22 witness's statement.
23       MR. ETTINGER:  It is somebody who she took courses
24 from, she learned from, she studied from, Your Honor.  He's
25 effectively her mentor.

1789

1        MR. SINCLAIR:  Well, that could make the Court's
2 statement impeachable against most of the bar in the state
3 of Idaho.
4        THE COURT:  Counsel, I think I either need to
5 consider the entire statement, what Dr. James was saying or
6 not saying, or not at all, because it is not this witness's
7 statement.
8        I think it is fair to raise it on cross-examination
9 because I understood the linkage between her testimony that
10 SelectHealth was based upon the fundamental underlying
11 principles adopted by IHC.  And then this statement included
12 by Dr. James indicated they, in fact, were opposed to the
13 kind of close vertical alignment that was being undertaken
14 here.
15       I understood the point, but I think I need to see the
16 entire statement by Dr. James so I can put it in context or
17 not at all, unlike what I would do if this were a statement
18 by Ms. Richards and she were impeached on that.
19       So you have your choice.  If I'm either going to strike
20 it, or I'm going to review the entire document.
21       MR. ETTINGER:  Can we have 30 seconds?
22       THE COURT:  You may.
23       MR. SINCLAIR:  On their time?
24       THE COURT:  I'll be magnanimous and not charge the
25 time to anyone.

1790

1       MR. ETTINGER: Your Honor, I will withdraw my
2 objection.
3       THE COURT: The exhibit will be considered and
4 admitted.
5       MS. DUKE: Yes, Your Honor.
6       THE COURT: All right. And that's Exhibit 3 --
7       MR. SU: 3050.
8       THE COURT: Now it's going to get really confusing
9 because now I'm admitting 3050.
10       MR. SU: I'm sorry. 3040.
11       THE COURT: 3040.
12       (Plaintiffs' Exhibit No. 3040 admitted.)
13 BY MR. SINCLAIR:
14     **Q.** The article also indicates that there has been a
15 $50 million cost reduction in one year in Utah as a result
16 of the labor induction protocol it interposed; correct?
17     **A.** Yes.
18     **Q.** These are the types of things that are fulfilling
19 the vision and the mission of SelectHealth and Intermountain
20 Health?
21     **A.** Yes. If I could add --
22     **Q.** Yes.
23     **A.** Kind of the rest of the story is a lot of the
24 **Intermountain work is built around these clinical programs**
25 **that I mentioned that have been in place for about the last**

1791

1 ten years. And the clinical programs work with physicians
2 to build the best clinical evidence and then build it into
3 the work processes and the work flows and the policies and
4 procedures of the organization.
5     This particular savings comes out of what is
6 called the maternal and fetal women's and newborns' clinical
7 program. And the lead physicians in the women's and
8 newborns' clinical program are, in fact, employed physicians
9 through the medical group.
10     So they do the leadership. They do the change
11 management. They develop the protocols. Then they get
12 input from other practicing physicians, and then they work
13 with Intermountain to set up the infrastructure to deploy
14 the programs.
15     So while the independent physicians are certainly
16 welcome to participate, it goes back to the leadership, and
17 the origin started with the physicians who are full-time
18 employees who have the time to develop new ways of
19 delivering care to achieve these results.
20     So it is absolutely true this particular protocol
21 is now widely accepted, but it really started with the work
22 of the employed physicians in the women's and newborns'
23 clinical program.
24     **Q.** Thank you. And you may have addressed this in
25 your discussions with Judge Winmill, but when Mr. Ettinger

1792

1 was asking you about risk-based and whether SelectHealth
2 will implement risk-based contracting in commercial plans in
3 Utah, you were cut off and you were going to say something
4 else. Did we cover that, or is there more?
5     **A.** Thank you. I would like to add: In June, at the
6 time of the deposition, we did not have a schedule planned
7 for when Intermountain would begin to assume more financial
8 risk in the commercial market.
9     As I said, they are accepting financial risk now
10 under a full-risk arrangement for Medicare and Medicaid, but
11 we are going through this planning and development and
12 refinement process.
13     And as of -- just in the past couple of weeks, we
14 have determined that we will be ready to move our commercial
15 products, our large employer commercial products -- it is
16 now in our work plan and schedule that we will be quoting
17 these premium rates at CPI plus one in 2015 for
18 implementation in 2016.
19     And what we are targeting right now is, at the
20 same time, we will be taking our large employer population,
21 and that will become a full-risk-sharing arrangement with
22 Intermountain beginning, we anticipate at this time in our
23 plans, mid 2015, more implementation in 2016, and then
24 probably full implementation by 2017.
25     And so while I did not have a timetable in June,

1793

1 we now have a timetable for a stepped approach to expand
2 risk sharing to our large employers.
3     **Q.** There was another question which I thought you
4 wanted to follow up on, and that was teams working on
5 quality improvement with St. Luke's.
6     **A.** Yes. I forget the exact question, but it was
7 about what have we implemented, I think, so far.
8     What we have, as part of our affiliation, we set
9 up a number of work teams. And one of the work teams is on
10 clinical alignment. And under that clinical alignment team,
11 we have physicians and leaders from SelectHealth working
12 with physicians and leaders from St. Luke's on a number of
13 clinical programs where we are trying to align our clinical
14 protocols around pharmacy, around quality, around
15 utilization and care management, and around incentives.
16     So we have that active work going on to, again,
17 build -- and it goes back to the triple aim. We are trying
18 to build protocols around preventative care, chronic care
19 management, maternal care management, pharmaceutical
20 management. And we are making very good progress.
21     We have joint work on pharmacy and therapeutics
22 teams. We have joint work on medical technology assessment
23 teams. We have joint work being done on the customer
24 satisfaction and the quality improvement teams.
25     And as these decisions are made by leaders, then

1794

1 they are shared with the rest of the clinical leadership
2 group and other affiliated physicians so that they can be
3 rolled out and deployed.
4      But each of these change mechanisms requires work,
5 a lot of work -- a lot of building trust, building
6 relationships, looking at data, then determining policies,
7 getting those policies ratified, then building the
8 infrastructure to support them.
9      So, once again, we are well on track because we
10 don't -- we really believe it is going to take at least --
11 it will be year three of our affiliation before we will
12 start to see some of the very specific metrics that I
13 referred to earlier with the CAHPS and HEDIS, because it
14 takes time to build; then you have to collect data; then you
15 have to evaluate data.
16      So we are on the right path, but it doesn't happen
17 overnight.
18      **Q.**  Thank you.
19      MR. SINCLAIR:  One correction for the record, Your
20 Honor.  When we were watching the clip on page 157 of her
21 deposition, at line 17, it said in the transcript "10 to
22 5 minutes."  And I believe, if you listen to the actual
23 transcript, it says "10 to 15 minutes."
24      THE COURT:  Counsel, do you disagree?
25      MS. DUKE:  We agree, Your Honor.

1795

1      THE COURT:  Then we will make that modification in
2 the transcript.
3      MR. SINCLAIR:  That's all I have, Your Honor.
4      THE COURT:  Any recross?
5      MR. SU:  No, Your Honor.
6      MR. ETTINGER:  No, Your Honor.
7      THE COURT:  You may step down, Ms. Richards.
8 Thank you.
9      THE WITNESS:  Thank you very much.
10      THE COURT:  Call your next witness.
11      MR. BIERIG:  Your Honor, we would call Director
12 William Deal of the Idaho Department of Insurance.
13      MR. SINCLAIR:  While Mr. Deal is coming in, I
14 would move the admission -- although I don't think you'd
15 move admission -- of the demonstrative exhibits I have used.
16      THE COURT:  No.  I think as long as we have noted
17 them for the record, and then I will direct counsel to
18 submit all of those to the Court so we have a record that
19 can go up on appeal, if need be.
20      Sir, would you please step before the clerk,
21 Ms. Gearhart, be sworn as a witness, and then follow her
22 directions from there.
23      WILLIAM WALLACE DEAL,
24 having been first duly sworn to tell the truth, was examined
25 and testified as follows:

1796

1      THE CLERK:  Please state your complete name and
2 spell your last name for the record.
3      THE WITNESS:  My complete name is William Wallace
4 Deal.  W-I-L-L-I-A-M, second name Wallace, W-A-L-L-A-C-E,
5 last name Deal, D-E-A-L.
6      THE COURT:  You may inquire of the witness.
7      MR. BIERIG:  Thank you, Your Honor.
8           DIRECT EXAMINATION
9 BY MR. BIERIG:
10      **Q.**  Good afternoon, Mr. Deal.  It is nice to see you
11 again.
12      **A.**  Good afternoon.
13      **Q.**  Are you employed by the State of Idaho?
14      **A.**  Yes, sir.
15      **Q.**  And what is your position with the State of Idaho?
16      **A.**  I am the director of the Department of Insurance
17 for Idaho.
18      **Q.**  For how long have you been the director of the
19 Department of Insurance?
20      **A.**  About six-and-two-thirds years.
21      **Q.**  In that position, you are the highest-ranking
22 official in the state of Idaho in the field of insurance?
23      **A.**  I am the director of insurance, yes.
24      **Q.**  And is there another agency that is higher than
25 yours in terms of directing -- in terms of regulating

1797

1 insurance in the state of Idaho?
2      **A.**  No.
3      **Q.**  Before you became director of the Idaho Department
4 of Insurance, what business were you in?
5      **A.**  I was in the insurance business.  I had my own
6 agency.
7      **Q.**  What was the name of that agency?
8      **A.**  W.W. Deal Insurance Agency.
9      **Q.**  And where was that agency located?
10      **A.**  In Nampa, Idaho.
11      **Q.**  Did the agency sell health insurance?
12      **A.**  Yes, it did.
13      **Q.**  Were you involved in the selling of that
14 insurance?
15      **A.**  Yes, I was.
16      **Q.**  And based on your experience running the W.W. Deal
17 Insurance Agency in Nampa for 41 years, would you say that
18 consumers in Nampa are very cost-conscious about the money
19 they spend on health insurance?
20      **A.**  Well, yes, they were.
21      **Q.**  And you have no reason to believe that has
22 changed, do you?
23      **A.**  No, I do not.
24      **Q.**  Mr. Deal, Idaho has recently established a
25 state-based health insurance exchange under the Affordable

1798

1 Care Act; is that correct?

2     **A.  Correct.**

3     **Q.**  And what state agency in Idaho is responsible for

4 implementation of that health insurance exchange?

5     **A.  Well, the legislation that was passed by the Idaho**

6 **legislature creates an independent board, an exchange board,**

7 **and it is responsible for the implementation of the**

8 **exchange.**

9     **Q.**  But isn't the Idaho Department of Insurance

10 involved in that effort?

11     **A.  The only effort that the Department of Insurance**

12 **is involved with is plan management.**

13     **Q.**  Are you aware of what the health insurance

14 exchange is?

15     **A.  I certainly am.**

16     **Q.**  When did the exchange become operational?

17     **A.  Well, the legislation was passed March 23rd of**

18 **this year.  And the exchange actually went live October 1st,**

19 **just a few days ago.**

20     **Q.**  Could you explain for the Court what the health

21 insurance exchange is here in Idaho?

22     **A.  In very simple terms, the exchange is a**

23 **marketplace where we have, in Idaho, an open exchange, which**

24 **means that companies who are authorized to do business in**

25 **Idaho and wish to participate in the exchange can.**

1799

1     **We ended up with four companies that are providing**

2 **policies or plans for the exchange.  And I call it a**

3 **one-stop shop from the standpoint that an Idaho citizen can**

4 **go onto the website and compare prices, learn what their**

5 **subsidy might be, choose a plan and buy the plan.**

6     **Q.**  And it's true, isn't it, that every plan on the

7 exchange has to offer each of ten specified essential health

8 benefits?

9     **A.  Yes.**

10     MR. WILSON:  Objection.  Leading.

11     MR. BIERIG:  I believe I'm entitled to lead, Your

12 Honor.  This is an employee of the plaintiff State of Idaho.

13     THE COURT:  I'd give counsel leeway regardless, so

14 the objection is overruled.

15     MR. WILSON:  And he is not a party, Your Honor.

16     THE COURT:  He is employed by the State of Idaho,

17 who is a party.

18     MR. WILSON:  Excuse me, Your Honor.  Which does

19 not mean that every employee of the State of Idaho is an

20 adverse witness.

21     THE COURT:  Well, I tend to view leading questions

22 somewhat differently as long as counsel is not putting words

23 in the witness's mouth.  Just to make the matter move more

24 smoothly, I give counsel a fair amount of leeway.  But, with

25 that, I will caution counsel not to be putting words in the

1800

1 witness's mouth, and then we will have no problem.

2 Go ahead.  The objection is overruled.

3     MR. BIERIG:  I don't think I could put words in

4 this witness's mouth if I wanted, Your Honor.  But I do want

5 to reiterate that he is an employee of the plaintiff.

6     THE COURT:  I understand that.  I overruled the

7 objection.

8 BY MR. BIERIG:

9     **Q.**  So let me repeat the question, Mr. Deal.

10 It is true, isn't it, that every plan on the exchange

11 must offer ten specified essential health benefits?

12     **A.  Yes.**

13     **Q.**  And is it also true that every plan on the

14 exchange must offer four different specified levels of

15 coverage?

16     **A.  Well, the answer to that is no.  They must provide**

17 **a silver and a bronze, which means the platinum, in fact, in**

18 **our exchange is not offered by all of the companies.  And**

19 **the gold is optional, one of the middle plans, too.**

20     **Q.**  So would it be fair to say that each plan that

21 makes an offering on the exchange has to offer these ten

22 essential health benefits and provide at least two levels of

23 coverage?

24     **A.  Correct.**

25     **Q.**  And isn't it true that the purpose of offering a

1801

1 standardized essential health benefits package is to promote

2 easy comparison of available health plan options based on

3 benefits, price, and quality?

4     **A.  Yes.**

5     MR. WILSON:  Objection.  Leading.

6     THE COURT:  I'm going to -- again, for the record,

7 but I am going to overrule the objection.

8 BY MR. BIERIG:

9     **Q.**  What was your answer, Mr. Deal?

10     **A.  Yes.**

11     **Q.**  Would you say, as someone who is familiar with the

12 insurance market, that the ability of purchasers of health

13 insurance to compare the prices charged by competing

14 insurance companies for the various levels of the essential

15 health benefits package encourages insurance companies to

16 compete on the basis of price?

17     **A.  Yes.**

18     **Q.**  And would you also think that it is fair to say

19 that insurance companies whose products are listed on the

20 exchange will have an incentive to price those products as

21 competitively as possible?

22     **A.  Yes.**

23     **Q.**  And in order to do so, won't these insurance

24 companies need to keep their costs as low as possible?

25     **A.  I would say so.**

1802

1 **Q.** And in order to keep their costs as low as
2 possible, won't insurance companies work hard to keep the
3 costs that they have to pay to providers as low as possible?
4 MR. WILSON: Objection. Foundation. And this is
5 a direct examination, Your Honor. At some point -- this is
6 a nonhostile witness -- leading questions, in our view, need
7 to stop.
8 THE COURT: Counsel, again, I tend to view this as
9 being -- it is getting to be a little more leading than what
10 I like. But, on the other hand, he is certainly affiliated
11 with the State of Idaho. He is the head of the Department
12 of Insurance, which is -- although not a party as an agency,
13 the State of Idaho is.
14 You have a continuing objection, but I am going to
15 allow it. Proceed.
16 MR. BIERIG: I don't believe we got an answer to
17 the question. Could we have the question read back.
18 (Question read by reporter.)
19 THE WITNESS: They have, yes.
20 BY MR. BIERIG:
21 **Q.** And those costs would include the cost of hospital
22 services?
23 **A.** Yes, but medical services, yes.
24 **Q.** It would also include the cost of physician
25 services?

1803

1 **A.** Yes.
2 **Q.** So would you agree that insurance companies will
3 be working very hard to drive down the costs of hospital
4 care in this state?
5 **A.** Would I agree? Yes, I would agree.
6 **Q.** And would you also agree that insurance companies
7 will be working very hard to drive down the cost of
8 physician services in this state?
9 **A.** I would.
10 **Q.** And this new exchange will be the first time that
11 consumers in Idaho will have access to a comprehensive
12 one-stop-shop marketplace of information in order to compare
13 the costs of the various plans; is that correct?
14 **A.** Correct.
15 **Q.** So that whatever incentive they may have had
16 before is even stronger now?
17 **A.** Well, clarify the question, please.
18 **Q.** So that the transparency of the Idaho Insurance
19 Exchange will provide an even greater incentive to drive
20 down cost; is that not right?
21 **A.** We are hoping so.
22 **Q.** Mr. Deal, would you agree that Idaho's small
23 population has historically dissuaded insurers from entering
24 the Idaho health insurance market?
25 **A.** Well, if you are meaning that some of the large

1804

1 carriers do not participate here, I would say yes. We have
2 a good marketplace, however.
3 **Q.** Would you agree that more strong entrance in the
4 health insurance marketplace in Idaho is something that you
5 are pleased about?
6 **A.** Well, I'm pleased that we have a competitive
7 market and we have insurance companies that want to be
8 competitive and provide a good price for our citizens, yes.
9 **Q.** And offering consumers more choice is the result
10 of having -- let me strike that.
11 And having more entrants into the Idaho health
12 insurance marketplace can offer consumers more choice; is
13 that correct?
14 **A.** Well, I would say that, at least my philosophy,
15 more participants should provide more competition.
16 **Q.** And that is a good thing for Idahoans?
17 **A.** I think so.
18 **Q.** Are you familiar, Mr. Deal, with the SelectHealth
19 insurance provider?
20 **A.** Yes.
21 **Q.** And it is true, isn't it, that SelectHealth only
22 recently began marketing its products in Idaho?
23 **A.** Yes.
24 **Q.** As the director of the Department of Insurance,
25 were you happy to see the entry of SelectHealth in a more

1805

1 active role in the insurance market?
2 **A.** Well, I am happy to see companies that want to
3 participate in our market, and certainly we were happy that
4 SelectHealth joined that group.
5 **Q.** Wouldn't it be fair to say that you were very
6 happy to see the SelectHealth entry into the market?
7 **A.** Well, I am not going to say "very happy," but it
8 was good that they did.
9 **Q.** Well, I think you did say you were very happy.
10 Let's just ask the court to put on No. 15.
11 MR. BIERIG: Can you switch screens, Your Honor?
12 THE COURT: Yes.
13 BY MR. BIERIG:
14 **Q.** So let's just show this. So let's read: "So were
15 you, as the director of the Department of Insurance, pleased
16 to see the entry of SelectHealth in a more active way to
17 promote competition?"
18 Answer: "As the director, I was happy to see that we
19 had SelectHealth and we had Altius and then we had this
20 company I can't think of the name of."
21 **A.** Altius.
22 **Q.** "So, yes" --
23 **A.** Yes.
24 **Q.** -- "we were very happy."
25 **A.** I am very happy.

1806

1     **Q.**  And I am very happy that you are very happy.

2     And if SelectHealth were to offer a premium that was

3 lower than other insurers, that would affect the pricing of

4 other insurance companies, would it not?

5     **A.**  **Well, the process that we went through when we**

6 **were pricing or approving plans for the exchange was that**

7 **none of the companies knew what the other company did until**

8 **after all the plans were in and approved by the Department.**

9 **And if they came back with a low cost, so much the better**

10 **for SelectHealth, or if some other company did.**

11     **So that's -- that's how I see the answer to your**

12 **question.**

13     **Q.**  Okay.

14     MR. BIERIG: Let me -- let me ask the Court to put

15 on No. 17, please.

16     THE COURT: We need page and line number.

17     MR. BIERIG: Excuse me?

18     THE COURT: We need a page and line number for the

19 record.

20     MR. BIERIG: It's page 47, line 18 through 24,

21 Your Honor.

22     THE COURT: I am afraid we may have missed the

23 last page and line number. Let's go ahead. And perhaps at

24 the end, you can state for the record what the excerpt was

25 that you played just a moment ago.

1807

1 BY MR. BIERIG:

2     **Q.**  So it says the question was: "And if SelectHealth

3 were to offer a premium that was lower than Blue Cross, that

4 certainly would affect the pricing of Blue Cross, could it

5 not?"

6     Answer: "Well, it could, yeah."

7     Question: "It could [sic] cause Blue Cross to lower

8 its premium to match the competition; correct?"

9     Answer: "Correct."

10     You did state that at your deposition, did you not?

11     MR. WILSON: I'm not sure that is impeaching of

12 his answer here in court today.

13     MR. BIERIG: I'm just asking whether he agrees

14 with it or does not.

15     THE COURT: Well, it is not a 30(b)(6) designee on

16 behalf of the State of Idaho, so I'm not sure you can just

17 offer the statement. Although I guess he is an agent and

18 certainly speaking within the area of his authority.

19     I will overrule the objection. I think it probably

20 could be admitted for substantive purposes beyond cross -- I

21 mean, beyond impeachment.

22     MR. ETTINGER: Your Honor, I had a slightly

23 different objection. Mr. Bierig, I'm sure inadvertently,

24 said "would" the first time instead of "could." And what's

25 on the screen says "could." It's kind of a substantive

1808

1 difference.

2     MR. BIERIG: That's fair enough. So I'll rephrase

3 my question.

4     THE COURT: If you would.

5 BY MR. BIERIG:

6     **Q.**  Would you agree that if SelectHealth were to offer

7 a premium -- keep that on, please -- would you agree that if

8 SelectHealth were to offer a premium that was lower than

9 Blue Cross, that could cause Blue Cross to lower its premium

10 to match the competition? You answered correct. Is that

11 still your view?

12     **A.**  **Well, I would say hypothetically. But the way we**

13 **did it did not allow another company to lower their rates as**

14 **we move forward into the exchange.**

15     **Q.**  Right. But, of course, now Blue Cross -- now the

16 exchange figures are published, and certainly other

17 insurance companies will know what SelectHealth is offering;

18 correct?

19     **A.**  **They are published, yes.**

20     **Q.**  And so Blue Cross could certainly adjust its rates

21 going forward, could it not?

22     **A.**  **Yes, but --**

23     MR. WILSON: Objection, Your Honor. This whole

24 line of questioning calls for speculation.

25     THE COURT: Counsel, I think the witness can, I

1809

1 guess, speculate in the sense he can offer an opinion as to

2 how things occur within the area of his regulatory

3 responsibility, but I'm not sure these questions fall within

4 that. So I am inclined to agree that perhaps the objection

5 should be sustained.

6     Why don't we back up. I will allow you to inquire

7 specifically -- I mean, he can offer statements about his

8 understanding of the -- how the Department of Insurance

9 works and its regulatory function. But I think as to how

10 the marketplace works, I think we are either getting into an

11 area that calls for expertise, or it becomes speculation.

12     So, with that guidance, let's go ahead --

13     MR. BIERIG: I appreciate it, Your Honor. Except

14 I would note that he is the director of the agency which is

15 responsible for regulating the delivery of insurance in this

16 state. So to say that he doesn't know about these things, I

17 think -- as counsel for State of Idaho was suggesting, I

18 think may not be accurate.

19     THE COURT: All right. Let's go ahead and

20 proceed.

21 BY MR. BIERIG:

22     **Q.**  Mr. Deal, as the director of the Department of

23 Insurance for Idaho, is it your belief that Idaho healthcare

24 providers and insurance companies need to find mechanisms

25 for coordinating care better?

1810

1     **A.**  **I think that's a goal that we have, yes.**

2     **Q.**  In fact, it is your belief, is it not, that

3 insurers and health providers should move toward a system

4 where physicians and health systems are compensated based on

5 outcome as opposed to a fee-for-service model; is that not

6 correct?

7     **A.**  **Yes, I think that's an option, capitation,**

8 **fee-for-service, outcome-based compensation.  There are some**

9 **alternatives.**

10     **Q.**  Right, there are alternatives.  But, in fact, you

11 believe that insurers and health providers should move

12 towards a system where one alternative is to have physicians

13 and health systems compensated based on outcome as opposed

14 to fee-for-service?

15     **A.**  **Yes.**

16     **Q.**  So you would agree that moving toward a model

17 where there is at least an option of an outcome-based system

18 as opposed to a fee-for-service system is a desirable goal?

19     **A.**  **Yes.  That is a personal opinion, yes.**

20     **Q.**  Would you agree that if a physician hospital

21 network were trying to move towards a system whereby

22 compensation were based on outcome rather than on volume,

23 that is something that should at least be given an

24 opportunity to demonstrate whether it works or not?

25     MR. WILSON:  Objection.  Foundation.

1811

1     THE COURT:  I'm not sure I am tracking.

2     MR. WILSON:  The objection or the question?

3     THE COURT:  Well, the objection.  The objection is

4 that it lacks foundation.  It calls for the witness's

5 opinion as the regulator.  So what is the lack of

6 foundation?  What is missing?

7     MR. WILSON:  Mr. Bierig is asking his opinion

8 about what a hospital network might do and whether or not

9 that is consistent with the views he has expressed here

10 about movement towards risk-based contract.

11     THE COURT:  Let's rephrase it in terms of the

12 witness's role as the regulator, director of the Department

13 of Insurance, as opposed to -- I now understand.

14     Thank you, Mr. Wilson, for clarifying.

15     I will sustain the objection.

16 BY MR. BIERIG:

17     **Q.**  Mr. Deal, as director of the Department of

18 Insurance, which is charged with regulating insurance in the

19 State of Idaho --

20     THE COURT:  Well, but the question was not phrased

21 in terms of that regulatory function, as I understood it.

22 Now, perhaps I misunderstood; but, regardless, I think it

23 needs to be clarified.

24     MR. BIERIG:  Thank you, Your Honor.

25     THE COURT:  Well, just so we are clear.  I don't

1812

1 want to make it more difficult.  I am just trying -- I'm

2 suggesting that the question is phrased about what he, as

3 the director of the Department of Insurance, would promote

4 as a policy of the State of Idaho, that's fair game.  If the

5 comment is about what a hospital would or should do or what

6 an insurance company would or should do in the abstract,

7 then I think that is objectionable.

8     MR. BIERIG:  I completely agree with that, Your

9 Honor.  And I would ask the reporter to read back the

10 question because I think I asked it -- but rather than have

11 her read it back, why don't I ask another question.

12     THE COURT:  That's kind of what I was suggesting,

13 just to make it clear.

14     MR. BIERIG:  I was slow, but I ultimately got

15 there, Your Honor.

16     THE COURT:  All right.

17 BY MR. BIERIG:

18     **Q.**  As the director of the department charged with

19 regulating insurance in the state of Idaho, Mr. Deal, if a

20 physician hospital network were trying to move towards a

21 system whereby compensation would be based on outcome rather

22 than volume, is that something that you think should be at

23 least given the opportunity to prove itself?

24     MR. WILSON:  Your Honor, objection.  The witness's

25 regulatory responsibilities -- or, rather, those of his

1813

1 department -- do not involve the regulation of reimbursement

2 rates between providers and insurers, and that is what this

3 questioning goes to.

4     THE COURT:  Mr. Bierig.

5     MR. BIERIG:  This witness is the leading

6 government agent in the State of Idaho on the insurance

7 market.  And based on his experience, both as a -- someone

8 who sold insurance for 41 years and as a regulator of the

9 insurance market here in Idaho, I think it is fair to ask

10 him whether he thinks that having a physician hospital

11 network offering a product that is -- that has compensation

12 based on outcome rather than on volume is something that he

13 believes should at least be evaluated.

14     THE COURT:  All right.  I am going to allow the

15 witness to answer.

16     But, Mr. Deal, the question was couched in terms of

17 your role as the director of the Department of Insurance.

18 And if you feel, from your responsibilities, it is

19 irrelevant, you can so indicate.  If you think it is a good

20 thing or a bad thing within the context of your regulatory

21 responsibilities, you can answer it.

22     Do you understand?

23     THE WITNESS:  Yes, sir.

24     THE COURT:  The objection is overruled with that

25 clarification.

1814

1    THE WITNESS:  Thank you, Your Honor.
2    Well, Your Honor, what we do at the Department of
3    Insurance is regulate the insurance industry, which means
4    agents we license, companies we license.
5    The question that was asked me was totally an opinion,
6    and it would be my personal opinion.  So, to me, it is
7    outside of the authority that we have at the Department of
8    Insurance.
9    THE COURT:  Well, just so it is clear, the fact
10   that it may be your personal opinion, you -- I am not
11   concerned with.
12   So what I do want to know, though, is whether you have
13   an opinion whether it would have any impact or whether it
14   would be a positive or a negative thing in terms of the
15   areas of regulation for which you have responsibility.  And
16   if you don't have an opinion, you can so indicate.
17   THE WITNESS:  I don't have an opinion.
18   THE COURT:  All right.
19   MR. BIERIG:  In that case, I would ask the Court
20   to come up with --
21   THE COURT:  I'm sorry?
22   MR. BIERIG:  This is page 53, lines 2 to 17.
23   Since he says he has no opinion on the subject, I thought we
24   would see if this is accurate.  Page 53, lines 2 to 17 of
25   Mr. Deal's deposition.  Can you make that a little darker?

1815

1    BY MR. BIERIG:
2    Q.  So you were asked at your deposition, question:
3    "That if there were a physician hospital network that was
4    trying to offer an alternative whereby it would be
5    compensated based on outcome rather than on fee-for-service,
6    that would be desirable for the state of Idaho?"
7    Then Ms. Zahn, who is counsel for the State says:
8    "As his personal opinion as the director of the Department
9    of Insurance?"
10   And I said:  "However you want to answer."
11   And the answer then from Mr. Deal was:  "Well, I think
12   it would be better in my personal opinion, but I think it's
13   a direction that should be evaluated.  I think that, you
14   know, what we're into really and philosophically is that
15   we've got to find a way that we can help find a way to make
16   healthcare more affordable.  And if there are solutions that
17   are unthought of as being thought of now, I think that they
18   have to be evaluated."
19   Was that your statement in your deposition, Mr. Deal?
20   **A.  I did say that.**
21   Q.  And do you still agree with that statement?
22   **A.  Yes, I will.**
23   Q.  Would it be your opinion, in your capacity as
24   director of the Department of Insurance and your desire to
25   do what is best for the State of Idaho, that such a plan

1816

1    ought to be given a chance to succeed in the marketplace?
2    **A.  Yes.**
3    Q.  And would you agree that it will take a fair
4    amount of time to see whether a dramatic change in
5    compensation structure will work?
6    **A.  Yes.**
7    Q.  And why do you say that?  Why will it take a fair
8    amount of time?
9    **A.  Well, I can tell you that many people have been**
10   **working on different ways to compensate healthcare**
11   **providers; and so far, no solution has been found.  So I**
12   **don't think it is an immediate solution to this compensation**
13   **issue.**
14   Q.  So it would be fair to say that to see whether
15   such a plan works will take a fair amount of time?
16   **A.  Yes.**
17   Q.  Now, Mr. Deal, I think you testified earlier that
18   you are the highest-ranking official in the State of Idaho
19   when it comes to regulation of the insurance market; is that
20   correct?
21   **A.  I am the director of insurance.**
22   Q.  And in your position as director of the Department
23   of Insurance, you consult and are -- you are consulted by
24   other -- by directors of other departments in the State of
25   Idaho; is that correct?

1817

1    **A.  I think a little clarification to the question.  I**
2    **do -- I do consult with other department directors, so the**
3    **answer would be yes to that part of your question.**
4    Q.  Okay.  That was really my question.
5    **A.  Okay.**
6    Q.  And does Governor Otter from time to time seek
7    your advice on insurance-related issues?
8    **A.  Yes, he does.**
9    Q.  Before the State of Idaho decided to join this
10   litigation against St. Luke's, were you ever contacted by
11   anyone from the Attorney General's Office on your views as
12   to whether this litigation should be brought?
13   **A.  No.**
14   Q.  Were you contacted by anyone else from the
15   government of the State of Idaho as to whether this
16   litigation should be brought?
17   **A.  No.**
18   Q.  Were you ever contacted by anyone from the
19   Attorney General's Office about the advisability of the
20   remedy sought by the State of Idaho of divesting Saltzer
21   from St. Luke's?
22   **A.  No.**
23   MR. BIERIG:  I have no further questions, Your
24   Honor.
25   THE COURT:  Cross.

1818

CROSS-EXAMINATION

1  BY MR. WILSON:

2      **Q.**  Good afternoon, Director Deal.  Mr. Bierig asked

3  you some questions about the health exchange program here in

4  Idaho.  Do you remember those questions?

5      **A.**  Yes.

6      **Q.**  Through that exchange, various healthcare insurers

7  offer different metals -- M-E-T-A-L-S -- of plans under the

8  exchange; correct?

9      **A.**  Yes.

10      **Q.**  If a healthcare provider wanted to, could it

11  refuse to do business with one of those insurance companies

12  offering plans through the Idaho Health Insurance Exchange?

13      **A.**  Are we talking about providers?

14      **Q.**  Right, providers.

15      **A.**  Yes.  There's different networks with different

16  **insurance companies, if that is where we are going.**

17      **Q.**  I'm just trying to get -- just because a health

18  insurance company offers a plan through the exchange, that

19  does not mean a provider has to accept that insurance

20  company at its provider location; correct?

21      **A.**  Correct.

22      **Q.**  If a provider refused to do business with one of

23  the insurance companies on the exchange, could the

24  Department of Insurance prevent that from happening?

1819

1      **A.**  No, it can't.

2      **Q.**  Does the Idaho Department of Insurance have any

3  regulatory role with regard to the negotiation of

4  reimbursement rates between healthcare insurers and

5  healthcare providers?

6      **A.**  None whatsoever.

7      **Q.**  Have you ever negotiated a contract on behalf of

8  an insurer with a provider?

9      **A.**  No.

10      **Q.**  Would you say that you have any expertise to offer

11  the court today regarding what affects the negotiations

12  between healthcare insurers and providers?

13      **A.**  No, I don't.

14      **Q.**  So do you know whether the Idaho Health Insurance

15  Exchange will impact the rates that healthcare providers can

16  negotiate with insurance companies?

17      **A.**  I don't think so, no.

18      **Q.**  So are you giving any opinion today about how the

19  Idaho Health Insurance Exchange will impact the prices

20  charged by healthcare providers like St. Luke's?

21      **A.**  I would say no, but with just a little comment

22  **here, is that because the market has changed so drastically**

23  **because of the preexisting condition exclusion no longer**

24  **there, it could.**

25      **Q.**  Insurance companies in Idaho have an incentive to

1820

1  compete on price; correct?

2      **A.**  Yes.

3      **Q.**  And that incentive existed before the health

4  insurance exchange; correct?

5      **A.**  Yes, it did.

6      **Q.**  And it exists now after the health insurance

7  health exchange; is that correct?

8      **A.**  It does.

9      **Q.**  Is that correct?

10      **A.**  Yes, sir.

11      **Q.**  Director, do you believe that the insurance market

12  in Idaho is competitive?

13      **A.**  I do believe it.

14      **Q.**  Was it competitive before SelectHealth decided to

15  affiliate with St. Luke's?

16      **A.**  Yes.

17      **Q.**  Do you know whether adding one more insurer like

18  SelectHealth to the mix necessarily will have any

19  significant impact on the level of competitiveness of the

20  market here in Idaho?

21      **A.**  I don't know that at this time.

22      **Q.**  In fact, sitting here today, do you know what the

23  impact has been of SelectHealth on the market for health

24  insurance in Idaho?

25      **A.**  They have been in the market a short time, and

1821

1  there is no indication of what that effect is.

2      **Q.**  Director Deal, have you analyzed the provider

3  network that SelectHealth has offered?

4      **A.**  No.

5      **Q.**  Do you know whether Saltzer was in that network

6  before Saltzer was acquired by St. Luke's?

7      **A.**  I do not.

8      **Q.**  Do you have any knowledge as to whether the

9  acquisition of Saltzer by St. Luke's will impact the ability

10  of SelectHealth to compete in the market?

11      **A.**  I don't.

12      **Q.**  Finally, do you know what evidence the plaintiffs

13  are relying on here to prove their case?

14      MR. BIERIG:  Your Honor, this is way beyond the

15  scope of my direct.  I've tried not to object, but --

16      THE COURT:  Sustained.  That is such a broad

17  question, Counsel.  I mean, it is so broad, I don't know how

18  the witness can answer it, let alone --

19      MR. WILSON:  I am impeaching the witness, Your

20  Honor, that the scope of his knowledge is not relevant to

21  the issues here before the Court.

22      THE COURT:  All right.  Rephrase the question.  I

23  understand where you are going with that, but perhaps you

24  can rephrase it.

25      MR. WILSON:  Let me just ask one question --

1822

1    THE COURT: Actually, you probably don't need to
2 rephrase it now that I know what answer you anticipate you
3 are going to get. Let's go ahead and proceed.
4 BY MR. WILSON:
5    Q.  Do you have any opinion, Director Deal, about what
6 the competitive impact will be of the acquisition of Saltzer
7 by St. Luke's?
8    A.  I do not.
9    MR. BIERIG: Objection, Your Honor.
10    MR. WILSON: May I have one moment, Your Honor?
11    THE COURT: Yes. Well, I am going to overrule the
12 objection. The witness just indicated he has no opinion, so
13 I don't know what purpose there would be in sustaining the
14 objection.
15    MR. WILSON: Nothing, Your Honor. Nothing
16 further.
17    THE COURT: Mr. Bierig, redirect?
18    MR. BIERIG: No further questions, Your Honor.
19    THE COURT: Director Deal, you may step down.
20 Thank you very much for being here.
21    Call your next witness. Mr. Schafer, will you be --
22    MR. SCHAFER: No. Mr. Stein will be calling
23 Dr. Marshall Priest.
24    THE COURT: Doctor -- is it Priest? Sir, would you
25 come forward, step before Ms. Gearhart, be sworn as a

1823

1 witness, and then follow her directions from there.
2    MARSHALL FRANKLIN PRIEST, III,
3 having been first duly sworn to tell the truth, was examined
4 and testified as follows:
5    THE CLERK: Please state your complete name and
6 spell your name for the record.
7    THE WITNESS: Marshall Franklin Priest, III.
8 P-R-I-E-S-T.
9    THE COURT: You may inquire, Mr. Stein.
10    DIRECT EXAMINATION
11 BY MR. STEIN:
12    Q.  Good afternoon, Dr. Priest.
13    A.  Good afternoon.
14    Q.  Would you briefly describe for the court your
15 educational background.
16    A.  I have a bachelor's degree from the University of
17 Tennessee, a master's degree from the University of
18 Tennessee, and a doctor of medicine degree from the
19 University of Tennessee. I completed a medicine internship
20 and residency at the University of Tennessee hospitals in
21 Memphis, and I completed a cardiology fellowship and a
22 junior faculty year at University of Alabama in Birmingham.
23    Q.  Do you hold any board certifications?
24    A.  I do. I am board certified in internal medicine,
25 cardiovascular disease, and interventional cardiology.

1824

1    Q.  What is interventional cardiology?
2    A.  Interventional cardiology is a subspecialty of
3 cardiovascular disease. For an example, I would perform
4 cardiac catheterization, balloon angioplasty, and stent
5 placement in a patient that had a heart attack by opening
6 the blocked artery. That's one example of what an
7 interventional cardiologist would do.
8    Q.  And you are currently an employee of St. Luke's
9 Health System?
10    A.  I am.
11    Q.  What position do you hold within St. Luke's Health
12 System?
13    A.  I am the executive medical director of St. Luke's
14 Heart.
15    Q.  Can you explain to the Court what St. Luke's Heart
16 is.
17    A.  St. Luke's Heart encompasses the cardiovascular
18 service line, which includes cardiologists, vascular
19 surgeons, and cardiac surgeons.
20    Q.  What are your responsibilities as executive
21 medical director of the St. Luke's Heart line?
22    A.  My position is primarily one of leadership. I
23 work in a triad with two other employees: Cy Gearhard, who
24 is the administrator of St. Luke's Heart and currently
25 serving as the interim chief nursing officer; and David

1825

1 Bishop, who is our practice manager and director of clinics.
2    In addition, we have responsibility for the
3 pulmonary intensivist group of physicians and the
4 hospitalist group of physicians.
5    Q.  Are there any subcommittees within St. Luke's
6 Heart on which you actively participate?
7    A.  There are a number of subcommittees. I
8 participate as the chair of the quality committee, and I
9 attend meetings of a number of other subcommittees.
10    Q.  Dr. Priest, how long have you been practicing
11 medicine in the state of Idaho?
12    A.  I am in my 35th year of practicing in Idaho.
13    Q.  All of that in Boise?
14    A.  Correct.
15    Q.  And when you moved to Idaho, were you in private
16 practice?
17    A.  I was. I joined a practice then that was known as
18 Boise Cardiology Associates. There were three of us. Two
19 of us left after approximately 18 months and formed the
20 Boise Heart Clinic, which eventually grew to six physicians.
21    Q.  Did you eventually join a group called Idaho
22 Cardiology Associates?
23    A.  I did. I was a founding member of the group in
24 1994.
25    Q.  And how many doctors founded Idaho Cardiology

1826

1   Associates?
2       A.  There were six; four of us from Boise Heart Clinic
3   and two independently practicing cardiologists in Boise.
4       Q.  And were you able to grow that practice over time?
5       A.  We were.  We grew the practice over a number of
6   years to 16 cardiologists.
7       Q.  So when Idaho Cardiology Associates was an
8   independent practice, at what hospitals did members of the
9   group practice?
10      A.  We practiced both at Saint Alphonsus and at
11  St. Luke's.
12      Q.  So what percentage of the group's work would you
13  say was done at Saint Alphonsus versus St. Luke's when Idaho
14  Cardiology was an independent practice?
15      A.  It varied by individual members of the group.
16  Some members preferred to practice at Saint Alphonsus and
17  would have more work or more of their business at Saint
18  Alphonsus, while others in the group preferred St. Luke's
19  and would have more of their practice based at St. Luke's.
20      Q.  Idaho Cardiology Associates today is affiliated
21  with St. Luke's; is that right?
22      A.  That is correct.
23      Q.  When did that occur?
24      A.  October 1, 2007.
25      Q.  Can you describe generally for the court the

1827

1   process by which Idaho Cardiology Associates came to be
2   affiliated with St. Luke's.
3       A.  In the fall of 2006, the leadership of Idaho
4   Cardiology approached St. Luke's about developing a more
5   formal relationship, which evolved into an employment
6   agreement.  I was not part of that leadership group, but the
7   group in general knew that the leadership group was going to
8   approach St. Luke's about becoming employed.
9       Q.  And so at the time that Idaho Cardiology
10  Associates made the decision to affiliate St. Luke's, there
11  were 16 cardiologists?
12      A.  That's correct.
13      Q.  Did all 16 join St. Luke's?
14      A.  They did not.  Twelve joined St. Luke's, and four
15  joined Saint Alphonsus.
16      Q.  So for those of you that affiliated with
17  St. Luke's, when you joined St. Luke's in 2007, did you
18  immediately relinquish your privileges at Saint Alphonsus?
19      A.  We did not.  We maintained privileges at Saint
20  Alphonsus until about the first of May, as I recall, in 2008
21  so that we continued to take call, continued to see patients
22  in the hospital there and provide consultative services.
23      Q.  And why is it that you eventually relinquished
24  your privileges around May of 2008?
25      A.  Our business at Saint Alphonsus declined, not

1828

1   unexpectedly.  I think the physicians there supported the
2   members of the group who had decided to become employed by
3   Saint Alphonsus.
4           So over a period of time, we felt like we would be
5   more successful by focusing our efforts at St. Luke's.  So
6   at the first of May in 2008, we withdrew our privileges.
7   Similarly, the physicians who had become employed at Saint
8   Alphonsus withdrew their privileges from St. Luke's.
9       Q.  Now, at the time that the four Idaho Cardiology
10  Associates doctors left to work at Saint Alphonsus, were
11  there any other cardiologists in the community who practiced
12  primarily at Saint Alphonsus?
13      A.  As I recall, there were three independent
14  cardiologists in addition to those four who were practicing
15  primarily at Saint Alphonsus.
16      Q.  And has Saint Al's been able to grow its
17  cardiology practice since that time?
18      A.  It has.  I don't know the exact numbers, but I do,
19  indeed, know they have been successful in recruiting new
20  members to their group.  I would estimate the group probably
21  has 12 to 14 members now.
22      Q.  So when Idaho Cardiology Associates first
23  affiliated with St. Luke's back in the fall of 2007, can you
24  describe -- and without getting into the specific figures if
25  you don't need to -- what the general compensation structure

1829

1   was for the employed cardiologists?
2       A.  Our last -- well, when we were in private
3   practice, we were a fee-for-service organization.  When we
4   went to work at St. Luke's, our compensation was then based
5   on a RVU formula, a relative value unit formula.
6       Q.  Generally, what does it mean for the compensation
7   to be primarily RVU-based?
8       A.  It means primarily the more work that you do, the
9   more is your compensation based on the relative value unit
10  of the work.
11      Q.  And so, today, is that still primarily the way
12  that cardiologists employed by St. Luke's are compensated?
13      A.  It's the primary mode of compensation, which has
14  now been flattened.  And this has evolved over the period of
15  time that St. Luke's Idaho Cardiology has been at
16  St. Luke's, such that there is now a very large quality
17  component to that compensation package.
18      Q.  So can you describe today the general structure of
19  the way that cardiologists employed by St. Luke's are
20  compensated?
21      A.  Each of the cardiologists receives a flat-figure
22  salary.  In addition to that, there is a bucket of incentive
23  money that is based 30 percent on RVU work and 70 percent on
24  quality.  That has evolved over the period of time that the
25  cardiology group has been employed at St. Luke's.

1830

1    For instance, last year that RVU quality bucket
2    was 50/50.  This year it is 30 percent RVU, 70 percent
3    quality, with a plan over the next three years that that
4    bucket will be 100 percent quality.
5         Q.   And when did this new compensation structure that
6    has this substantial quality component go into place?
7         A.   2011, 2012.
8         Q.   The cardiologists with Idaho Cardiology had been
9    employed by that time for about four years.  Why did it take
10   so long to shift from a primarily RVU-based compensation
11   system to one that has a more substantial quality component?
12        A.   This started in the second year of employment when
13   I was still practicing with the group.
14             For clarification, I haven't been practicing for
15   the group in the two years that I have had my current
16   position as executive medical director.
17             In the second year of our employment, we developed
18   a St. Luke's Idaho Cardiology centric quality scorecard that
19   included six to eight metrics as sort of an introduction to
20   what a quality scorecard would look like.
21             Over time that evolved such that, in 2011 and
22   2012, it included not only metrics related to St. Luke's
23   Idaho Cardiology, but hospital centric metrics as well that
24   incorporated metrics for the vascular surgeons and the
25   cardiac surgeons, such that, today, all of that group -- or

1831

1    three groups, excuse me -- of physicians have the same
2    quality scorecard, and the metrics that are followed are
3    transparent across those three groups so that all of the
4    groups are responsible for the quality metrics, not just
5    those that would be centric to their particular group.
6         Q.   When you say "three groups," can you clarify what
7    groups you are talking about?
8         A.   Sure.  I meant by that the cardiology group, the
9    vascular surgical group, and the cardiac surgical group.
10        Q.   So does that mean that, for example, if the
11   vascular surgeons don't meet one of their quality criteria,
12   that actually affects the quality component of the
13   compensation for the cardiologists and the cardiac surgeons
14   as well?
15        A.   Correct.
16        Q.   And why is it -- I'm sorry.  Do you need to get
17   some water?
18        A.   Please.  Thank you.
19        Q.   And why is it that this quality-based compensation
20   is structured that way?
21        A.   The idea is that we are a team.  Our whole
22   focus -- excuse me.  Our whole focus here is team-based care
23   for cardiac patients, whether they be primarily on the
24   cardiology service, the vascular surgical service, or the
25   cardiac surgical service.

1832

1    So, as a team, we are transparent across our
2    subspecialty lines about the care that we are providing so
3    that I have an interest in the care that the cardiac
4    surgeons are providing as though they would have an interest
5    in what the cardiologists are doing.
6         Q.   In this compensation structure we have been
7    discussing, are all of the physicians to whom it applies
8    employees of St. Luke's?
9         A.   They are.
10        Q.   And what role, if any, does the fact that these
11   physicians are employed by St. Luke's play in the ability to
12   move from that primarily RVU-based compensation to the
13   current compensation structure?
14        A.   The group of physicians that I am speaking of
15   here -- and if you will allow me, I will use "group" to mean
16   cardiac surgeons, vascular surgeons, and cardiologists --
17   are aligned with St. Luke's goal of trying to transform
18   healthcare from a volume-based metric to a value-based
19   metric.
20             I think most of us recognize that healthcare as it
21   exists in the country right now is not sustainable over
22   time.  Accordingly, this group of physicians wanted to link
23   their incentives to the organizational strategies of
24   St. Luke's, which is bending this volume-to-value curve.
25        Q.   Do you think that you would have been able to have

1833

1    implemented this new compensation structure if the
2    physicians with the heart line were not employed by
3    St. Luke's?
4         A.   I think it would have been very difficult because
5    of an experience that we had a few years ago when we did
6    have a nonemployed group of cardiologists working at
7    St. Luke's who did not embrace the changes that I am
8    speaking of and subsequently elected to leave St. Luke's and
9    become employed at Saint Alphonsus.
10        Q.   Now, Dr. Priest, you are familiar with Triple Aim?
11        A.   Yes.
12        Q.   And one of the aims of Triple Aim is better
13   health?
14        A.   Yes.
15        Q.   What does that mean to you?
16        A.   Better health refers to population health.  You
17   know, conceptually, we are fantastic at rescue care, but we
18   are not very good at preventive/maintenance care, and we
19   never have been.
20             But in this new healthcare model that we are
21   heading into, the new healthcare environment, preventive
22   care and health maintenance is going to become very
23   important, and where we want to go is to risk
24   modeling so that we have the responsibility of taking care
25   of populations of patients who are at risk for

1834

1 hospitalizations. The idea is to keep them out of the
2 hospital.
3     So better health means population health, and that
4 is what we are trying to learn how to do right now.
5     Q. Can you provide the court with an example of
6 something that the St. Luke's Heart line is doing to promote
7 the aim of better health?
8     A. We have a congestive heart failure clinic that is
9 directed by Dr. Andrew Chai. To my knowledge, Dr. Chai is
10 the only cardiologist in the state who is board certified in
11 heart failure.
12     Dr. Chai gave up a very traditional, very busy
13 invasive cardiology practice to direct this congestive heart
14 failure clinic.
15     On his team are five mid-levels, physician
16 assistants, and nurse practitioners who are totally devoted
17 to the management of congestive heart failure patients.
18     In addition, we have two nurse navigators who are
19 part of that team and part of our transition of care team
20 who visit these very high-risk congestive heart failure
21 patients in their homes.
22     The goal of those recurring visits is to assess
23 their social situation; to learn if they have a way to get
24 to their appointments; to learn if they understand what
25 their medicines are, what they are taking them for, why they

1835

1 are taking them, time of day and evening that they are
2 taking them; and to look in their pantry, see what sort of
3 foods they have there. Do they have high-sodium foods that
4 would put them at risk for redevelopment of heart failure?
5     So the idea is to try and manage this high-risk
6 population of patients in our clinics and in their homes and
7 keep them out of the emergency department and out of the
8 hospital.
9     Q. And is this congestive heart failure clinic, is
10 this something that is a profitable endeavor for St. Luke's
11 financially?
12     A. It is not profitable. In fact, were we a private
13 practice group, there would have been no way we could have
14 afforded to do this.
15     For an example, every month the advanced heart
16 failure team from Intermountain Healthcare in Salt Lake City
17 flies to Boise and attends this clinic with our clinic team.
18 The purpose of that visit is to identify those very high-
19 risk patients who would be potential candidates for heart
20 transplantation or the implantation of a left ventricular
21 assist device. St. Luke's foots the bill for those folks to
22 come up every month and visit with our heart failure team.
23     Secondly, Dr. Chai's compensation based purely on
24 an RVU basis would have plummeted, giving up his very busy
25 hospital practice to run this clinic.

1836

1     Thirdly, there would have been no way as a private
2 practice group that we could have supported five mid-level
3 providers to be completely devoted to the management of
4 patients with congestive heart failure.
5     Q. And is Dr. Chai one of the physicians whose
6 compensation has gone now from primarily RVU-based to a
7 combination of a fixed salary and a quality component?
8     A. Correct.
9     MR. STEIN: Your Honor, I have no further
10 questions at this time.
11     THE COURT: Counsel, unless we have just very
12 limited questions, we are a little past where we take the
13 evening break.
14     MR. ETTINGER: Your Honor, it will be me, and I
15 have more than very limited questions.
16     THE COURT: All right. We will take it up
17 tomorrow morning.
18     Dr. Priest, I apologize for having to bring you back
19 tomorrow. Unfortunately, it is probably unavoidable. So
20 we'll take it up tomorrow morning at 8:30.
21     Counsel, we do have the hearing at 3:30. I assume we
22 will just have some representatives here to take that matter
23 up. Other than that, I don't think we have anything else.
24     MR. BIERIG: A few very quick items, Your Honor.
25 I believe I failed to state for the court the exact page and

1837

1 line numbers of the "very happy" comment by Mr. Deal. So I
2 would state that at page 43, line 21 through page 44,
3 line 2 of his deposition.
4     THE COURT: Thank you.
5     MR. BIERIG: Also, if I may approach Ms. Gearhart,
6 I would give full Exhibit 2460.
7     THE COURT: Perhaps, Mr. Metcalf, you can help us
8 out there.
9     And is there -- did we publish -- I think we were short
10 a deposition that needed to be published.
11     Ms. Gearhart, is that correct?
12     MS. GEARHART: Yes.
13     MR. BIERIG: I'll take whatever you don't need.
14     THE COURT: Counsel, could you provide the
15 original of Mr. Deal's and Ms. Richards' depositions, since
16 I think they were both used and we need to publish them. Do
17 so this evening so we can take care of that first thing
18 tomorrow morning.
19     Counsel, is there anything else?
20     MR. BIERIG: Nothing, Your Honor.
21     THE COURT: All right. We will be in recess until
22 8:30 tomorrow morning. We will see some of you back here at
23 3:30. Court will be in recess.
24     (Court recessed at 2:35 p.m.)
25

1    R E P O R T E R ' S   C E R T I F I C A T E

2

3

4

5

6          I, Lisa K. Yant, Official Court

7    Reporter, County of Ada, State of Idaho, hereby

8    certify:

9          That I am the reporter who transcribed

10   the proceedings had in the above-entitled action

11   in machine shorthand and thereafter the same was

12   reduced into typewriting under my direct

13   supervision; and

14         That the foregoing transcript contains a

15   full, true, and accurate record of the proceedings

16   had in the above and foregoing cause, which was

17   heard at Boise, Idaho.

18         IN WITNESS WHEREOF, I have hereunto set

19   my hand October 11, 2013.

20

21

22

23   _____-s-_____
     Lisa K. Yant

24   Official Court Reporter
     CSR No. 279

25

**United States Courts, District of Idaho**