1

**UNITED STATES DISTRICT COURT**

2

**IN THE DISTRICT OF IDAHO**

3
- - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
4  SAINT ALPHONSUS MEDICAL CENTER -    :
   NAMPA, INC., TREASURE VALLEY        : Bench Trial
5  HOSPITAL LIMITED PARTNERSHIP, SAINT : **Witnesses:**
   ALPHONSUS HEALTH SYSTEM, INC., AND  : **Marshall F. Priest, III**
6  SAINT ALPHONSUS REGIONAL MEDICAL    : **Mark C. Johnson**
   CENTER, INC.,                       : **John L. Kee**
7                      Plaintiffs,     : **James Souza**
            vs.                        :
8                                      :
   ST. LUKE'S HEALTH SYSTEM, LTD., and :
9  ST. LUKE'S REGIONAL MEDICAL CENTER, :
   LTD.,                               :
10                     Defendants.     :
   - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
11 FEDERAL TRADE COMMISSION; STATE OF  :
   IDAHO,                              :
12                     Plaintiffs,     :
            vs.                        :
13                                     :
   ST. LUKE'S HEALTH SYSTEM, LTD.;     :
14 SALTZER MEDICAL GROUP, P.A.,        :
                                       :
15                     Defendants.     :
   - - - - - - - - - - - - - - - - - x

16

17                    * * * SEALED * * *

18

   <u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>
19
      before B. Lynn Winmill, Chief District Judge
20
      Held on October 9, 2013
21
      Volume 11, Pages 1838 to 2070
22
                  **Tamara I. Hohenleitner**
23           Idaho Certified Shorthand Reporter No. 619
                 Registered Professional Reporter
24                  Certified Realtime Reporter
               Federal Certified Realtime Reporter
25
           United States Courts, District of Idaho
       550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

1                                    A P P E A R A N C E S

2


3

    **FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,**
4   **SAINT ALPHONSUS HEALTH SYSTEM, INC.,**
    **AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.**
5

6              Keely E. Duke
               DUKE SCANLAN & HALL, PLLC
7              1087 W. River Street, Suite 300
               Boise, ID 83707
8
               David A. Ettinger
9              HONIGMAN MILLER SCHWARTZ AND COHN LLP
               2290 First National Building
10             660 Woodward Avenue
               Detroit, MI 48226
11


12


13

    **FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION**
14

15             Peter C. Herrick
               U.S. FEDERAL TRADE COMMISSION
16             500 Pennsylvania Ave., N.W.
               Washington, DC 20580
17
               J. Thomas Greene
18             U.S. FEDERAL TRADE COMMISSION
               600 Pennsylvania Ave N.W.
19             Washington, DC 20580

20             Henry Chao-Lon Su
               U.S. FEDERAL TRADE COMMISSION
21             601 New Jersey Ave., N.W.
               Washington, DC 20001
22


23


24


25

1840

1                           A P P E A R A N C E S (Continued)

2

3          FOR PLAINTIFF STATE OF IDAHO

4                  Eric J. Wilson
                   GODFREY & KAHN, S.C.
5                  One East Main Street
                   Suite 500
6                  PO Box 2719
                   Madison, WI 53701
7
                   Brett T. DeLange
8                  OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
                   954 W. Jefferson, 2nd Floor
9                  Boise, ID 83720-0010

10
           FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
                   Raymond D. Powers
12                 POWERS TOLMAN FARLEY, PLLC
                   PO Box 9756
13                 Boise, ID 83707

14
           FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15         AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16                 Jack R. Bierig
                   Ben J. Keith
17                 Scott Stein
                   SIDLEY AUSTIN
18                 One South Dearborn
                   Chicago, IL 60603
19
                   J. Walter Sinclair
20                 Charles Schafer
                   STOEL RIVES
21                 101 S. Capitol Boulevard, Suite 1900
                   Boise, ID 83702
22
           FOR DEFENDANT SALTZER MEDICAL GROUP
23
                   Brian Kenneth Julian
24                 ANDERSON JULIAN & HULL, LLP
                   PO Box 7426
25                 Boise, ID 83707

1841

1  <u>I N D E X</u>

2

|  |  | PAGE: |
|---|---|---|
|  | Courtroom open to the public...................... | 1842 |
|  | Courtroom closed to the public.................. | 1978 |
|  | Courtroom remains closed to the public........... | 1986 |
|  | Courtroom open to the public...................... | 2003 |

3

4

5

6

7

8

DEFENSE ST. LUKE'S HEALTH SYSTEM

9                      <u>W I T N E S S E S</u>

10

11
|  |  | PAGE: |
|---|---|---|
| **JOHNSON, Mark C.** |  |  |
|  | Direct Examination by Mr. Stein............... | **1859** |
|  | Cross-Examination by Ms. Duke................. | **1871** |
|  | Redirect Examination by Mr. Stein............ | **1877** |
| **KEE, John L.** |  |  |
|  | Direct Examination by Mr. Keith.............. | **1879** |
|  | Cross-Examination by Mr. Herrick............. | **1970** |
|  | Cross-Examination by Mr. Ettinger:........... | **2017** |
|  | Redirect Examination by Mr. Keith............ | **2027** |
|  | Recross-Examination by Mr. Herrick........... | **2035** |
|  | Further Redirect Examination by Mr. Ettinger. | **2038** |
|  | Examination | **2039** |
|  | By the Court................................. |  |
| **PRIEST, Marshall F., III** |  |  |
|  | Cross-Examination by Mr. Ettinger............ | **1842** |
|  | Redirect Examination by Mr. Stein............ | **1854** |
|  | Recross-Examination by Mr. Ettinger.......... | **1857** |
| **SOUZA, James** |  |  |
|  | Direct Examination by Mr. Sinclair........... | **2041** |

12

13

14

15

16

17

18

19

20

21

22

23                      * * * * *

24

25

1842

1    P R O C E E D I N G S
2    October 9, 2013
3    ***** COURTROOM OPEN TO THE PUBLIC *****
4    THE CLERK:  The court will now hear Civil Case
5    12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,
6    versus St. Luke's Health System, for Day 11 of a bench
7    trial.
8    THE COURT:  Good morning, Counsel.
9    Dr. Priest, I'll just remind you, you are still under
10   oath.
11   Mr. Ettinger, you may resume your cross-examination of
12   Dr. Priest.
13   MR. ETTINGER:  Thank you, Your Honor.
14   MARSHALL FRANKLIN PRIEST, III,
15   having been previously duly sworn to tell the whole truth,
16   testified as follows:
17   CROSS-EXAMINATION
18   BY MR. ETTINGER:
19   Q.   Good morning, Dr. Priest.
20   A.   Good morning, sir.
21   Q.   Yesterday in response to Mr. Stein's questions,
22   you talked about the payment out of a bucket of incentive
23   money.  Do you remember that?
24   A.   Yes, sir.
25   Q.   And I don't believe you testified to the size of

1843

1    the bucket.  So why don't we start with that.  Until
2    recently, the bucket was 10 percent of total compensation;
3    isn't that right?
4    A.   The -- the quality incentive that you're referring
5    to has evolved over time so that it is different right now
6    than it was --
7    Q.   But, Doctor, I'd like you to -- if you wouldn't
8    mind, isn't it true that the bucket until recently for
9    incentives was 10 percent of total compensation?
10   A.   Up until last year; yes, sir.
11   Q.   Up until sometime after your deposition in this
12   case, wasn't it?
13   A.   The --
14   Q.   Isn't that correct, Doctor?
15   A.   You're correct.  But I made an error in my
16   deposition about that compensation that I can correct for
17   you if you'd like for me to, sir.
18   Q.   Is the current bucket 30 percent of total
19   compensation?
20   A.   The current bucket is 23 percent of a compensation
21   cap.
22   Q.   Okay.  So and 70 percent of that 23 percent is
23   related to quality incentive?
24   A.   That's correct.
25   Q.   So doing some quick math -- I did it on 30 easily,

1844

1    but 23 is a little tougher.  Doing some quick math, about 85
2    percent of total compensation then is unrelated to quality
3    incentives; right?
4    A.   That's correct.
5    Q.   Now, before the ICA doctors, the 12 ICA doctors
6    were acquired by St. Luke's, St. Luke's had a comanagement
7    agreement with independent cardiologists, including the ICA
8    doctors; correct?
9    A.   That's correct.
10   Q.   And that was called "St. Luke's Center for Heart
11   and Vascular Health"; correct?
12   A.   Correct.
13   Q.   And that comanagement agreement with independent
14   doctors paid the doctors out of a pot of money based on
15   quality metrics and patient satisfaction metrics; isn't that
16   right?
17   A.   That's correct.
18   Q.   And there were more than 20 such metrics that were
19   applied with those independent doctors; isn't that right?
20   A.   That's correct.
21   Q.   And the quality indicators that are used today by
22   St. Luke's to compensate cardiologists and cardiac surgeons
23   and vascular surgeons are, generally speaking, the same
24   kinds of metrics that are being used at hospitals all across
25   the United States; isn't that right?

1845

1    A.   We have about 54 metrics right now.
2    Q.   And those metrics are door-to-balloon time, use of
3    aspirin, those are standard metrics used across the
4    United States by hundreds of hospitals; correct?
5    A.   The core measures are used by hundreds of
6    hospitals, and then we select other metrics that we think
7    are important for our healthcare delivery system.  Whether
8    or not the latter ones are used across the country, I don't
9    know.
10   Q.   Well, the core measures, at least, are used by
11   scores of hospitals with independent doctors, too, aren't
12   they?
13   A.   That's correct.
14   Q.   And they're also used by health plans who make
15   payments to either the networks of independent doctors or
16   directly to independent doctors to reward them for quality
17   performance; correct?
18   A.   It's a requirement; correct.
19   Q.   We talked about Dr. Chai -- am I pronouncing it
20   right?
21   A.   Dr. Chai.
22   Q.   Dr. Chai, sorry -- at the congestive heart failure
23   clinic?
24   A.   Correct.
25   Q.   Do I understand correctly he gave up his practice

1846

1   to direct that clinic?
2       **A.   He gave up a noninvasive, traditional cardiology**
3   **practice to direct that congestive heart failure clinic.**
4       Q.   So he's not engaged in direct patient care today?
5       **A.   He is not.  He is involved in direct patient care**
6   **as an outpatient.  He doesn't have a hospital rotation as he**
7   **did in a traditional cardiology practice.**
8       Q.   So does he still see patients by appointment or
9   not?
10      **A.   He does, in an outpatient setting.**
11      Q.   Okay.  So how much of his time is devoted to
12  directing the clinic versus seeing patients in an outpatient
13  setting?
14      **A.   They're combined.  It's what he does every day.**
15  **So he's directing these five midlevel providers in addition**
16  **to providing direct patient care during the day.**
17      Q.   And there is nothing that would stop St. Luke's,
18  for example, from hiring an independent doctor part-time to
19  run that congestive heart failure clinic, whatever portion
20  of his time was necessary, and then allow him to
21  independently practice and see patients in the rest of his
22  time; correct?
23      **A.   I'm not sure that I understand your question, sir.**
24      Q.   Suppose St. Luke's -- you know what a service line
25  director is, don't you, Doctor?

1847

1       **A.   I do.**
2       Q.   And hospitals all across the country use service
3   line directors; correct?
4       **A.   Correct.**
5       Q.   And sometimes they're full-time employees, and
6   sometimes they are doctors with independent practices who
7   are paid by the hospital to spend part of their time running
8   a clinic or supervising a service line or engaged in quality
9   efforts of the hospital; correct?
10      **A.   Correct.**
11      Q.   There was nothing to stop St. Luke's, if it so
12  chose and Dr. Chai so chose, to have him part-time remain as
13  an independent provider of patient care and part-time
14  running that congestive heart failure clinic; correct?
15      **A.   I think if that independent physician was aligned**
16  **with St. Luke's goals, mission, and vision, that could**
17  **happen.**
18      Q.   By the way, there are hundreds of congestive heart
19  failure clinics across the United States, aren't there?
20      **A.   I don't know.**
21      Q.   Do you have any idea of how many there are?
22      **A.   I do not.**
23      Q.   So I gather you have no idea of how many work with
24  independent doctors?
25      **A.   I do not.**

1848

1       Q.   Let's talk a little bit about the ICA purchase.
2   When your 12 doctors went to St. Luke's, part of the deal
3   involved the purchase of a cath lab; isn't that right?
4       **A.   I think it did; that's correct.**
5       Q.   Do you recall what was paid by St. Luke's for that
6   cath lab?
7       **A.   You know, I don't really know the details of that**
8   **transaction because I was not in ICA leadership at the time**
9   **of that transaction.**
10      Q.   Isn't it true that after St. Luke's bought that
11  cath lab it never used it?
12          MR. STEIN:  Objection, beyond the scope.
13          MR. ETTINGER:  Your Honor, the direct talked about
14  the circumstances under which the purchase was made, and I
15  think the anticompetitive aspects of that are certainly
16  relevant here.
17          MR. STEIN:  I'm not sure I understand what that
18  means, but we didn't discuss any purchase of a cath lab.  We
19  discussed why the doctors affiliated with St. Luke's.
20          THE COURT:  Counsel, unless the question of the
21  purchase of the cath lab is tied in in some way to an issue
22  raised on direct, it's not a question of it being relevant;
23  it's a question of whether it's within the scope of the
24  direct examination.
25          MR. ETTINGER:  No, I understand, Your Honor.  And

1849

1   Mr. Stein did get into it, as he just admitted, the purpose
2   for which the transaction was undertaken, and part of it was
3   for extra compensation for assets that were never used, and
4   I think that's relevant to that purpose.
5           MR. STEIN:  Well, that may be Mr. Ettinger's
6   testimony, but I believe the scope of the direct was what
7   were the reasons that the Idaho cardiologists decided to
8   seek affiliation with St. Luke's.
9           THE COURT:  I'll sustain the objection.
10  BY MR. ETTINGER:
11      Q.   Now, Dr. Priest, you said that you gave up -- do I
12  have this right -- you gave up your privileges at Saint Al's
13  after your ER cases declined at Saint Al's?
14      **A.   And I said that in error, Mr. Ettinger, because I**
15  **did not have the data when I answered that question for**
16  **Mrs. Phillip in my deposition.**
17      Q.   You said in your declaration in December, a sworn
18  declaration, that you gave up your privileges when your ER
19  cases dropped; isn't that right?
20      **A.   I did because I thought that was true.  But I did**
21  **not have data, and I have seen data since then that**
22  **indicates, with the exception of the last month that we had**
23  **privileges, we had a fairly steady emergency department**
24  **presence at Saint Alphonsus.  So I was in error.**
25      Q.   And my colleague, Ms. Phillip, pointed that out to

1850

1 you in your deposition, didn't she?
2 **A.   She did.  But I didn't have the information then,**
3 **either.**
4 **Q.**   But the question is, Doctor, why did you give up
5 your privileges?  And doesn't that depend on what was in
6 your head, not having to call after the fact and look at the
7 data?
8 **A.   No.  I can tell you exactly why we didn't -- I'm**
9 **sorry.**
10 MR. STEIN:  Your Honor, I'm sorry.  I just object
11 to form.  Is that the question, why he gave up his
12 privileges?
13 THE COURT:  Rephrase.
14 BY MR. ETTINGER:
15 **Q.**   Now, the testimony you gave on direct was
16 purported to be a reason why you gave up your privileges;
17 correct, Dr. Priest?
18 **A.   Yes.**
19 **Q.**   And can you tell me what reason was in your head
20 when you chose to give up your privileges at the time, not
21 what data you looked at later?
22 **A.   Mm-hmm.  So are you asking me why our group gave**
23 **up our privileges at Saint Alphonsus?  Is that the question?**
24 **Q.**   Right.  Is it for the reason you stated in your
25 declaration back in December, that your perception was, at

1851

1 least, that your ER cases dropped?
2 **A.   Well, the plan was, all along, after we became**
3 **employed at St. Luke's, that we would eventually relinquish**
4 **our privileges at Saint Alphonsus.  We maintained those**
5 **privileges to support the four physicians who were in ICA**
6 **who moved to Saint Alphonsus and became employed until they**
7 **could begin to increase the numbers in their group.**
8 **By the spring of 2008, we were hospitalizing fewer**
9 **patients there.  We were seeing fewer consultations.  Our ER**
10 **numbers were fluctuating, slowly declining in the last**
11 **month, and we felt then it was time to withdraw from Saint**
12 **Alphonsus.  Similarly, the physicians who had gone to Saint**
13 **Alphonsus withdrew their privileges from St. Luke's.**
14 **Q.**   Now, your elective cases at Saint Alphonsus
15 dropped in half in the first month after you did the
16 St. Luke's deal while you still had privileges at Saint
17 Al's; correct?
18 **A.   Correct.**
19 **Q.**   And after you dropped -- and looking at your
20 pattern after you got acquired by St. Luke's, you moved all
21 your SAMG referral cases to St. Luke's, as well, didn't you?
22 **A.   I don't know the answer to that, sir.**
23 **Q.**   And prior to your employment by St. Luke's, you
24 referred 50 percent of your patients that needed pacemakers
25 or defibrillators to Dr. Seale; isn't that right?

1852

1 **A.   I did.**
2 **Q.**   And he was a partner of yours at the time?
3 **A.   He was.  I recruited him to Idaho.**
4 **Q.**   And you thought he did a very good job, didn't
5 you?
6 **A.   I did.  That's correct.**
7 **Q.**   And after your group was acquired by St. Luke's
8 you no longer refer any patients to Dr. Seale; correct?
9 **A.   Dr. Seale continued to follow every patient but**
10 **one, in whom he had implanted a pacemaker for me after we**
11 **were employed by St. Luke's.**
12 **Q.**   And you no longer refer any patients to Dr. Seale
13 for new implementation of pacemakers and defibrillators;
14 correct?
15 **A.   That is true.**
16 **Q.**   And that's true even though you believe that there
17 are no benefits from keeping referrals to specialists in the
18 St. Luke's system; correct?
19 **A.   I had three electrophysiology partners, and they**
20 **did the implants on patients who required a pacemaker or a**
21 **defibrillator.**
22 **Q.**   Doctor, here's my question again:  In fact, your
23 pattern that you described with Dr. Seale is the case even
24 though you believe that there are no benefits from keeping
25 referrals to specialists in the St. Luke's system; correct?

1853

1 **A.   Ask me one more time, please.**
2 **Q.**   You believe that there are no benefits from
3 keeping referrals to specialists in St. Luke's system;
4 correct?
5 **A.   I refer and I think our group refers to**
6 **specialists, sir, depending on how we value the care that**
7 **they provide for our patients, whether or not they're at**
8 **St. Luke's.**
9 **Q.**   Nevertheless, you dropped using Dr. Seale even
10 though you thought he was your go-to guy who did a good job
11 on pacemakers and defibrillators; correct?
12 **A.   That's correct.**
13 **Q.**   And without privileges at Saint Al's, you could
14 still send outpatient cases to Saint Al's.  You could still
15 have ancillary services performed at Saint Al's if you so
16 chose; correct?
17 **A.   I could.**
18 **Q.**   And, in fact, in 2010 and 2011 when you were still
19 practicing, more than 98 percent of the outpatient and
20 ancillary referrals you made were to St. Luke's; isn't that
21 right?
22 **A.   I don't know for certain, but -- I don't know the**
23 **answer.  I don't know the percentage, no.**
24 **Q.**   Is it correct that the overwhelming percentage
25 were referred to St. Luke's?

1854

1  **A.**   That would be correct.
2         MR. ETTINGER:  Nothing further.  Thank you.
3         THE COURT:  I forgot -- the FTC's -- I, frankly,
4  forgot.  There was no cross from --
5         MR. HERRICK:  We have no questions, Your Honor.
6         THE COURT:  Mr. Stein.
7                    REDIRECT EXAMINATION
8  BY MR. STEIN:
9         **Q.**   Dr. Priest, just a couple of points of
10  clarification.  With regard to the movement to quality-based
11  compensation, I believe you testified that currently 70
12  percent of that 23 percent bucket is quality-based; is that
13  right?
14        **A.**   That's correct.
15        **Q.**   Is that -- is the 70 percent moving to a different
16  percentage?
17        **A.**   It is.  Over the next three years, it will become
18  100 percent.
19        **Q.**   With regard to the comanagement agreement that
20  Mr. -- I'm sorry -- that plaintiffs' counsel referred to,
21  can you describe generally how that's different than the
22  type of structure, the integrated structure that you have
23  today in the St. Luke's heart line?
24        **A.**   I can't speak in detail about the comanagement
25  agreement because I was not part of the team that put that

1855

1  together.  Our leadership team put that together with
2  St. Luke's.  And accordingly, because I don't know the
3  details of the arrangement, other than it involved all of
4  the cardiovascular service line at that time, I can't speak
5  to the details.
6         **Q.**   But you do in the current St. Luke's heart line
7  have some experience in trying to bring independents along
8  with some of the same goals that you have been working with
9  on the -- with employed physicians; is that right?
10        MR. ETTINGER:  Your Honor, leading.
11        THE COURT:  Sustained.
12  BY MR. STEIN:
13        **Q.**   Do you have experience in your role at St. Luke's
14  heart in attempting to integrate independent physicians into
15  the St. Luke's heart line?
16        **A.**   I do.  And we attempted to do that, and it didn't
17  work, and that independent group left St. Luke's and went to
18  Saint Alphonsus.
19        **Q.**   And why didn't that work?  Can you just briefly
20  describe the issue that came up?
21        **A.**   The issue was related to alignment -- well, it
22  related to teamwork, it related to supporting the goals that
23  we had for our cardiovascular service line.
24        For an example, the most important metric to be
25  measured in caring for a patient who presents to the

1856

1  hospital with a heart attack is how fast you can get that
2  patient from his time of presentation to the emergency
3  department into the catheterization laboratory to open a
4  blocked artery, what we call PCI, percutaneous coronary
5  intervention, which is placing a balloon in the artery,
6  opening the blocked artery, then placing a stent to keep the
7  artery open.
8         We call that time door-to-balloon time, and the
9  national standard for that is 90 minutes.  We put together a
10  protocol at St. Luke's to have the interventional
11  cardiologist, who is the cardiologist that performs that
12  procedure, to take first call for all patients presenting to
13  the hospital emergency department with a heart attack.  The
14  reason for doing that is that there is no handoff.  That
15  particular physician is the one who performs the procedure.
16        We were unable to get the independent group to
17  adopt that guideline, such that when they were on primary
18  call, if one of their noninterventionalists was the
19  cardiologist responsible, he would take the patient to the
20  cath lab, perform the diagnostic procedure, then call the
21  interventional cardiologist at home to come in and do the
22  balloon stent procedure.  That extended that time sometimes
23  20 minutes, sometimes 40 minutes.  What we know is critical
24  is time is muscle.  The longer the delay, the more heart
25  damage, the poorer the outcome.

1857

1         So we could not get that group to adopt that
2  guideline, and for that reason and others, it was apparent
3  that they were not going to be able to be successful in what
4  we were trying to do, and they subsequently left and went
5  across time -- across town, I'm sorry.
6         In the interval, we have been able to reduce that
7  door-to-balloon time to an average of approximately 48
8  minutes, using the guidelines that we set up where the
9  interventional cardiologist is the primary physician on call
10  for heart attack patients.
11        **Q.**   And physicians who agree to follow that protocol
12  at St. Luke's, are those all employed cardiologists?
13        **A.**   They are.
14        MR. STEIN:  No further questions, Your Honor.
15        MR. ETTINGER:  Your Honor, just a couple.
16        THE COURT:  Mr. Ettinger.
17                   RECROSS-EXAMINATION
18  BY MR. ETTINGER:
19        **Q.**   So, Dr. Priest, just to be clear on the math, so
20  the 70 percent that's going to 100 percent, that's of the 23
21  percent; correct?
22        **A.**   That's correct.
23        **Q.**   So today 85 percent of the compensation is
24  unrelated to quality, and in the future it's 77 percent of
25  the compensation will be unrelated to quality; correct?

1858

1    **A.**   That's correct.

2    **Q.**   Okay.  The independent doctors whom you've just

3    said weren't willing to cooperate included Dr. Rasmussen;

4    isn't that right?

5    **A.**   I wasn't specifically speaking of him, but I was

6    **talking about that group of four cardiologists, yes.**

7    **Q.**   So all those four did not have this problem; is

8    that right?

9    **A.**   There were only two of those four who are

10   **interventional cardiologists.**

11   **Q.**   Dr. Rasmussen was the head of the St. Luke's

12   center for heart and vascular health, wasn't he?

13   **A.**   I don't know the answer to that, sir.

14   **Q.**   Okay.  And by the way, there are independent

15   cardiologists around the country who accomplished

16   door-to-balloon times of 30 minutes, aren't there?

17   **A.**   I don't know the answer to that either.

18        MR. ETTINGER:  No further questions.  Thank you.

19        THE COURT:  Mr. Stein, anything else?

20        MR. STEIN:  Nothing, Your Honor.

21        THE COURT:  Dr. Priest, thank you.  You are

22   excused.

23        St. Luke's may call its next witness.

24        MR. STEIN:  Thank you, Your Honor.  We'll be

25   calling Dr. Mark Johnson.

1859

1         THE COURT:  Dr. Johnson, please step before the

2    clerk, be sworn as a witness, and then follow her directions

3    from there.

4              MARK CHRISTOPHER JOHNSON,

5    having been first duly sworn to tell the whole truth,

6    testified as follows:

7         THE CLERK:  Please state your complete name and

8    spell your name for the record.

9         THE WITNESS:  Mark Christopher Johnson, last name

10   J-O-H-N-S-O-N.

11        THE COURT:  You may inquire, Mr. Stein.

12             DIRECT EXAMINATION

13   BY MR. STEIN:

14   **Q.**   Good morning, Dr. Johnson.

15   **A.**   Good morning.

16   **Q.**   What's your area of medical specialty?

17   **A.**   Family medicine.

18   **Q.**   Are you currently employed by St. Luke's?

19   **A.**   Yes, I am.

20   **Q.**   Could you tell the court what position you hold

21   within the St. Luke's Health System?

22   **A.**   I'm a family medicine practitioner.  I practice

23   **half-time, and half-time I'm an administrator, division**

24   **medical director for family medicine.**

25   **Q.**   Is that in the Treasure Valley?

1860

1    **A.**   In the Treasure Valley.

2    **Q.**   Could you briefly describe for the court your

3    educational background?

4    **A.**   I did my undergraduate work at the University of

5    **Washington, got a bachelor's of science.  I then went to**

6    **St. Louis University for medical school, graduated in 1986,**

7    **came to Boise for my family medicine residency training,**

8    **University of Washington-affiliated program, graduated three**

9    **years later and went on to teach at the residency for**

10   **another two-and-a-half years and did a fellowship in faculty**

11   **development.**

12   **Q.**   And after you did the faculty fellowship, what did

13   you do next?

14   **A.**   After the two-and-a-half years of teaching, I

15   **joined a couple of folks that I had trained with at the**

16   **residency in private practice.**

17   **Q.**   What's the name of that private practice?

18   **A.**   It's the Mountain View Medical Center.

19   **Q.**   So you've been a practicing primary care doctor in

20   Boise since 1996?

21   **A.**   1986.

22   **Q.**   '86.  And how many doctors are affiliated with

23   Mountain View Medical?

24   **A.**   Currently, we have eight.

25   **Q.**   What are their medical specialties?

1861

1    **A.**   They're all family medicine.

2    **Q.**   The Mountain View Medical practice was acquired by

3    St. Luke's in October of 2008?

4    **A.**   That is correct.

5    **Q.**   And since that time, have you and the other

6    physicians affiliated with Mountain View been employees of

7    St. Luke's?

8    **A.**   That's correct.

9    **Q.**   Were you personally involved in the process of

10   deciding whether to affiliate with St. Luke's back in 2007,

11   2008?

12   **A.**   Yes, I was.  At the time there were five of us in

13   **the group, and we made -- we made basically all of our**

14   **decisions by consensus, so we all participated in that**

15   **decision.**

16   **Q.**   Roughly, over what period of time did that

17   decision-making process and negotiation occur?

18   **A.**   It was probably close to a year, from start to

19   **finish.**

20   **Q.**   And what were the benefits that you anticipated

21   that Mountain View Medical might be able to obtain as a

22   result of moving from an independent practice to becoming

23   affiliated with St. Luke's?

24   **A.**   There were -- there were several that were

25   **important to us.  A big important one was that we really**

1862

1 wanted to get out of the business of running a medical
2 practice, and so that was -- that was a big appeal to let
3 some professionals do that for us.
4       We also, at the time, we were on a paper medical
5 record. We knew that we needed to move to an electronic
6 health record, and we had seen plenty of our cohorts in the
7 community spend a lot of money and not get such a good
8 product, and we felt that we would be better positioned to
9 get a great product if we did that.
10      There were some succession issues within our
11 practice that we were considering that played a role, but
12 probably the biggest factor was we, through conversations
13 with John Kee, were aware that St. Luke's was interested in
14 developing a physician-led multispecialty group of the
15 highest quality, and here was an opportunity before us to
16 participate in that at the ground level, and that
17 was -- that was very appealing and intriguing.
18      Q.  Does that clinic today have a name?
19      A.  The greater clinic?
20      Q.  Yes.
21      A.  It's part of the St. Luke's Health System. It's
22 the St. Luke's Clinic.
23      Q.  So I want to ask you some questions about your
24 position as St. Luke's division medical director of family
25 medicine in the Treasure Valley. Could you describe for the

1863

1 court generally what your responsibilities are as division
2 medical director of family medicine in the Treasure Valley?
3      A.  So I lead 15 clinics and approximately 70
4 providers in Treasure Valley, family medicine providers, and
5 sit on a body called the System Clinical Leadership
6 Committee. And the work of that body -- well, I should say
7 there is probably close to 15 other division medical
8 directors that represent other geographic regions and other
9 subspecialties. And the business of that body is to do the
10 work of the greater St. Luke's Clinic, basically to -- from
11 a real high level, to execute the vision of the health
12 system.
13      Q.  So this body, the clinic leadership committee that
14 you sit on, is that also known sometimes as the Clinic
15 Leadership Council or the CLC?
16      A.  That's correct.
17      Q.  So you sit on the CLC as a representative of
18 family medicine in the Treasure Valley. What other
19 specialties or groups are represented on that CLC, if you
20 can just give some examples?
21      A.  It's pretty much the full spectrum. There is a
22 representative for surgical subspecialties. There's a
23 representative for OBGYN, gynecology, urology, pediatrics,
24 internal medicine, and subspecialties, et cetera.
25      Q.  And when we talk about the organization that is

1864

1 the St. Luke's Clinic, are all of the -- is that the
2 organization for physicians who are employees of St. Luke's?
3      A.  Employees and some of them have -- are independent
4 contractors that are --
5      Q.  People under like a professional services
6 arrangement?
7      A.  That's correct.
8      Q.  But the clinic, am I correct, it's limited to
9 physicians who are employed or in that kind of PSA
10 arrangement with St. Luke's?
11      A.  That's correct.
12      Q.  And so there is a group of you that sit on the CLC
13 from different specialties. Is there an information flow
14 that goes from the committee either, you know, further up in
15 the chain, so to speak, or down to the clinics?
16      A.  Yes. So a big part of my responsibility is to
17 disseminate what goes on, disseminate the business of the
18 CLC down to my clinics. So communication is a huge part of
19 my role. I routinely, once a month, sit down with leaders
20 from each of those clinics -- we call them "site medical
21 managers" -- and we discuss what goes on at the higher
22 level. We talk about big clinical issues that are coming
23 down, things like the operations, rolling out the electronic
24 health record, et cetera, cultural things.
25      Q.  Is St. Luke's Family Medicine in Nampa one of the

1865

1 clinics that's under the purview of the Family Medicine
2 Division?
3      A.  Yes, it is.
4      Q.  Would they have a site manager that would be one
5 of the people you interact with regularly?
6      A.  Yes, they do.
7      Q.  Who is that?
8      A.  Dr. Abedayo Crownson.
9      Q.  Is the Saltzer Medical Group, do they also fall
10 within the family practice division?
11      A.  Yes, they do.
12      Q.  Do they have a medical site manager?
13      A.  Dr. Harold Kunz.
14      Q.  So with these different -- these different family
15 practice groups within the St. Luke's Clinic, the Family
16 Medicine Division, can you talk generally about what steps
17 are being taken to further integrate the practices of those
18 family medicine doctors across the St. Luke's system?
19      A.  Well, a huge part of what we've done over the last
20 two years is implement and role out a uniform electronic
21 health record. That's required a tremendous amount of time
22 and energy, but it's sort of foundational to anything and
23 everything else we do with respect to clinical integration.
24 So that's been a big, big piece of our work.
25      Following on the heel steps of that was the -- our

1866

1 clinical integration scorecard or the WhiteCloud scorecard,
2 also, foundational to clinical integration and quality
3 improvements, et cetera.
4      Q.   The electronic medical record that you're talking
5 about, is that Epic?
6      A.   Correct.
7      Q.   And the court has heard a little bit about a tool
8 called "WhiteCloud."  Does that have a relationship to the
9 scorecard that you mentioned?
10      A.   One and the same.
11      Q.   Okay.  The court is going to hear from Dr. Fortuin
12 tomorrow and get a chance to see the scorecard, but can you
13 just generally describe, from the family practice
14 perspective, what is the scorecard?  What does it show?
15 What does it allow you to do?
16      A.   Yeah.  It's an unbelievable tool, a tool that I
17 never would have imagined having in independent private
18 practice.  Basically, what it is is it let's me know how
19 well I'm doing on a whole host of clinical parameters,
20 everything from how well I'm doing with respect to the care
21 I'm giving my diabetics, my patients with hypertension.  It
22 talks -- there is a number of parameters that address health
23 maintenance, cancer screening, immunization rates.  There is
24 a section devoted to patient centeredness that transmits
25 data that we collect directly from our patients regarding

1867

1 the care that they're getting.
2          Then there is another section on there that
3 addresses cost, and right now it's largely -- relates to use
4 of generic drugs.
5      Q.   And so when you go and get this scorecard, is the
6 data -- the only data that you see how is Dr. Mark Johnson
7 doing?
8      A.   No.  Well, as division director, I can pretty much
9 see anybody in the whole system.  But all of our providers
10 can see exactly how they stack up compared to the rest of
11 our family medicine docs in the system.
12      Q.   And so does that mean for a family medicine doctor
13 they just see themselves against an aggregated benchmark, or
14 can they actually compare themselves against colleagues that
15 can be identified by name?
16      A.   Both.  We have benchmarks, and so they see how
17 they stack up relative to that.  They see how they have
18 progressed over the course of time, and they can see exactly
19 if, for instance, they're in the middle of the pack with
20 respect to taking care of their diabetic patients, they can
21 pull a list and look to see who is in that top 10 percent
22 and ask them, "Well, what are you doing to get the results
23 that you're getting?"
24      Q.   And are those kinds of discrepancies that may
25 exist among providers in different practice areas or family

1868

1 practice clinics, are those the kinds of things that you
2 might ever discuss in those site manager meetings?
3      A.   That's -- that's -- that's the key to why -- you
4 know, one of the big keys to why we put this whole thing
5 together, this foundation, is that we can start to develop
6 standards of care so that we can deliver a consistent
7 quality outcome to our patients.
8      Q.   And all of the different sites within the family
9 practice division, are they part of that discussion?
10      A.   Absolutely.
11      Q.   So are you aware of -- well, let me back up for a
12 second.
13          Generally, do you have an understanding for the primary
14 way that family practice doctors within the St. Luke's
15 Clinic are compensated?
16      A.   Yes.
17      Q.   And what is that?
18      A.   It's mostly based on work units, most
19 physicians -- excuse me -- have a base pay that's based on
20 the assumption that they will produce a certain amount of
21 work.
22      Q.   And in the course of your work at the St. Luke's
23 Clinic, are you aware of other medical specialties within
24 the clinic that have been able to successfully move their
25 compensation from one that is virtually entirely

1869

1 productivity based to one that has a larger quality
2 component?
3      A.   Yes.  I'm aware of three groups that have done
4 that.
5      Q.   And what are those?
6      A.   The St. Luke's cardiology group has done that, our
7 pulmonology group has done that, and our St. Luke's internal
8 medicine group has done that.
9      Q.   And are there any efforts underway to transform
10 the way that family practice medicine doctors within the
11 clinics are compensated to move from a -- from a virtually
12 entirely productivity-based compensation to one that's got a
13 larger quality component?
14      A.   Yes.  That's our goal, and we have actually
15 started down that path with discussions of how that's going
16 to look and shape up.
17      Q.   So if there are other groups within St. Luke's
18 that have already managed to do that, why isn't family
19 medicine there yet?  What has to happen?
20      A.   Well, our group is a little more complex, perhaps,
21 than the other groups.  The other groups came in as sort of
22 single units, very cohesive, came in under similar --
23 already existing, were very similar contracts.
24          My group, with the 15 clinics and 70 docs, I think
25 there is close to eight variations on that compensation

1870

1   theme, so it's going to be a little more complex to bring us
2   all together and come up with what we think is a standard
3   way to reimburse all of us and everybody feel good about it.
4       Q.   And is there some relationship between moving to
5   the quality-based compensation and that scorecard that you
6   were talking about a few minutes ago?
7       A.   Yeah.  Absolutely.  It's the scorecard,
8   undoubtedly, will be an important tool that we use to help
9   us -- well, let me back up.
10      Part of what we're going to -- a big part of what
11  will go towards compensation in the future will be quality.
12  There will be quality metrics that we'll follow, and those
13  will be things that we'll take directly off of the scorecard
14  and be able to monitor and follow with the scorecard.
15      Q.   And so is there already -- has everybody already
16  agreed on, you know, these are the specific benchmarks on
17  the scorecard that will determine what our compensation is
18  based on, and these are the metrics we should be shooting
19  for?
20      A.   In family medicine, no.  I know they've done that
21  with the other groups, and it's -- it's a fairly long,
22  drawn-out process to discuss what's going to work best for
23  all of our groups.  And by "all of our groups," I mean all
24  of our family medicine groups.  So I'm sure there will be
25  considerable discussion and debate about what's -- what

1871

1   benchmarks really are the ones we want to hold ourselves to,
2   what's really going to be most important to delivering
3   quality care for our patients that we want to hang our hats
4   on, what are the benchmarks we're going to hold ourselves
5   to.
6       Q.   And as a -- currently, as a member of the
7   St. Luke's Clinic within the Family Medicine Division, does
8   Saltzer have a seat at the table in those discussions?
9       A.   Yes.
10      Q.   And provided they continue to be a part of the
11  St. Luke's Clinic, would the plan be that they would also
12  then participate in this move from a primarily
13  productivity-based compensation to one with a more
14  substantial quality component?
15      A.   Yes.
16          MR. STEIN:  I have no further questions,
17  Your Honor.
18          THE COURT:  Cross-examination.
19          MS. DUKE:  Yes, Your Honor.
20          THE COURT:  Ms. Duke.
21          CROSS-EXAMINATION
22  BY MS. DUKE:
23      Q.   Bear with me, Dr. Johnson.  I just need to switch
24  the electronics over real quick.  All right?
25      A.   Great.

1872

1       Q.   How are you this morning?
2       A.   Just fine.  Thanks.
3       Q.   Very good.  So as I understand it, you're the
4   division director of family medicine in the Treasure Valley;
5   correct?
6       A.   That's correct.
7       Q.   And in that position, you serve as the
8   representative for all of the family medicine clinics
9   throughout the entire Treasure Valley?
10      A.   That's correct.
11      Q.   And that management role is to serve on the System
12  Clinical Leadership Council that you've just been discussing
13  with defense counsel; correct?
14      A.   Yes.
15      Q.   And that System Clinical Leadership Council is a
16  group of approximately a dozen physicians and administrative
17  leaders, as you were just going through in your direct
18  examination?
19      A.   That's correct.
20      Q.   And the prime duty of that council is to help in
21  the running and operations of the greater St. Luke's Clinic;
22  correct?
23      A.   That's correct.
24      Q.   And as part of this you discuss, advise, and make
25  decisions for all things pertaining to the greater

1873

1   St. Luke's Clinic, including clinical integration?
2       A.   That's correct.
3       Q.   Now, with respect to Saltzer, prior to being
4   acquired by St. Luke's -- prior to being acquired by
6       Prior to being acquired by St. Luke's, Mountain View
7   did not really regard Saltzer as a competitor; correct?
8       A.   No.
9       Q.   That's correct?
10      A.   That's correct.
11      Q.   And that's because of the geographic location of
12  Saltzer; right?
13      A.   There is a lot of family medicine clinics
14  scattered throughout the Treasure Valley between them and
15  us, so, yeah, I would not have seen them as a direct
16  competitor.
17      Q.   And again, that's because of their geographic
18  location; correct?
19      A.   Correct.
20      Q.   And the location of your clinic is at -- it's in
21  west Boise across from Delsa's Ice Cream?
22      A.   Across from Delsa's Ice Cream.
23      Q.   A favorite spot for my kids.
24      And that's at 3301 North Sawgrass Way in Boise;
25  correct?

1874

1    A.  That's correct.

2    Q.  Cross streets there are Ustick and Milwaukee?

3    A.  Yes.

4    Q.  Now, let me talk to you about the use of

5  independents with respect to St. Luke's plan going forward

6  related to family medicine.  All right?  You agree that one

7  of the things that St. Luke's is very interested in, you

8  know, one of their main missions is being able to deliver

9  accountable care to patients; correct?

10    A.  That's correct.

11    Q.  And to do that, you agree that it is crucial that

12  St. Luke's works with independent physicians; right?

13    A.  I do believe we'll need to work with independent

14  physicians.

15    Q.  And to also accomplish that mission, it's also

16  crucial that St. Luke's network with those independent

17  physicians and clinically integrate those independent

18  physicians; right?

19    A.  That's correct.

20    Q.  Yet, to date, your responsibilities have not, to

21  any great extent, included any efforts to include the

22  independent family practice physicians in St. Luke's efforts

23  regarding clinical integration; correct?

24    A.  At the present time, we don't -- we don't -- we're

25  not integrated with any independent family medicine clinics.

1875

1    Q.  Now, with respect to those independents, I know

2  that you had testified earlier on your direct that the

3  medical health record was a very big deal to your group and

4  was a big part of why you all ended up being acquired by

5  St. Luke's and going in that direction.  Fair?

6    A.  That's fair.

7    Q.  And it's your understanding that St. Luke's

8  intends to make the electronic health record available to

9  independent physicians; correct?

10    A.  I believe that's correct.

11    Q.  Which means that independent physicians then could

12  take advantage of the electronic health record systems being

13  implemented by St. Luke's without becoming employed by

14  St. Luke's; correct?

15    A.  That's correct.

16    Q.  Now, turning to quality measures at Mountain View.

17  As of the time of your deposition, you were not able to

18  demonstrate any improvements in quality since the

19  acquisition by St. Luke's; correct?

20    A.  We had just begun to roll out the clinical

21  scorecard, so in terms of meaningful data, that's correct.

22    Q.  Nor had, at the time of your deposition, Mountain

23  View taken any actions to control the misuse or overuse of

24  services; correct?

25    A.  I wouldn't characterize it that way.

1876

1    Q.  You weren't able to measure those -- those --

2  whether or not there was a misuse or overuse of services at

3  the time of your deposition; correct?

4    A.  We weren't able to measure it, but that doesn't

5  mean that we didn't take any efforts to do those things.

6    Q.  But you weren't able to measure whether there were

7  improvements in that regard or not?

8    A.  That's correct.

9    Q.  Now, your practice is to refer -- with respect to

10  referrals, your practice is to refer, in any instance, to a

11  St. Luke's provider unless the patient states a specific

12  preference; correct?

13          MR. STEIN:  Objection, beyond the scope.  I don't

14  think we discussed referrals at all.

15          THE COURT:  Counsel, I think that's correct.

16  Ms. Duke, I don't recall there being any testimony

17  about referral patterns or -- so I'll sustain the objection.

18  BY MS. DUKE:

19    Q.  As I understand it, a big part of the decision for

20  Mountain View to be acquired by St. Luke's was to get out of

21  the management role in managing a medical practice.  Is that

22  correct?

23    A.  That played a role.

24    Q.  And -- but at the time of your negotiations with

25  St. Luke's, you would agree that Mountain View was in good

1877

1  financial condition?

2    A.  Yes, it was.

3    Q.  That it was well run?

4    A.  Yes, it was.

5    Q.  Efficient?

6    A.  I would like to think so.

7    Q.  And a productive clinic?

8    A.  Yes.

9    Q.  That provided high-quality care?

10    A.  I would like to think that it did.

11    Q.  Well, do you believe that it did?

12    A.  I do believe that it did, but we had no means to

13  measure that at that time.

14    Q.  Dr. Johnson, thank you very much for your time

15  today.

16    A.  Thank you.

17          THE COURT:  Redirect, Mr. Stein.

18          MR. STEIN:  Just briefly.

19               REDIRECT EXAMINATION

20  BY MR. STEIN:

21    Q.  Dr. Johnson, with regard to a plan to make the

22  electronic health record that St. Luke's uses, Epic,

23  available to independent physicians, is that something

24  that's within the scope of your responsibilities?

25    A.  No.

1878

1  **Q.** And as between yourself and Dr. Marc Chasin at
2  St. Luke's, who would be, in your view, more knowledgeable
3  about the status of those efforts and what would be involved
4  in making the Epic record available to independents?
5  **A.** Dr. Chasin, without question.
6  MR. STEIN: No further questions, Your Honor.
7  THE COURT: Anything else?
8  MS. DUKE: No, Your Honor. Thank you.
9  THE COURT: You may step down.
10  Thank you, Dr. Johnson.
11  Counsel, I am assuming all witnesses will be released
12  from any subpoena unless counsel indicates otherwise.
13  So, Dr. Johnson, you are excused. Thank you.
14  Call your next witness.
15  MR. BIERIG: Your Honor, our next witness be
16  Mr. John Kee. We're just going to get him.
17  THE COURT: Dr. Kee, would you step before the
18  clerk and be sworn.
19  JOHN LYONS KEE,
20  having been first duly sworn to tell the whole truth,
21  testified as follows:
22  THE CLERK: Please take a seat in the witness
23  stand.
24  Please state your complete name and spell your name for
25  the record.

1879

1  THE WITNESS: John Lyons Kee, last name -- the
2  first name J-O-H-N, L-Y-O-N-S K-E-E.
3  THE COURT: You may inquire of the witness.
4  MR. KEITH: Thank you, Your Honor.
5  DIRECT EXAMINATION
6  BY MR. KEITH:
7  **Q.** Mr. Kee, what is your current employer?
8  **A.** St. Luke's Health System.
9  **Q.** What's your title?
10  **A.** Vice president for network operations.
11  **Q.** What's the network to which your title refers?
12  **A.** The Select Medical Network.
13  **Q.** Please describe for the court what the Select
14  Medical Network is.
15  **A.** Select Medical Network is an individual physician
16  association that is comprised of St. Luke's employed and PSA
17  physicians, hospital-based physicians and other independent
18  physicians in the community.
19  **Q.** Is there a term that you use to describe
20  physicians who are either employed by St. Luke's or under a
21  professional services agreement with St. Luke's?
22  **A.** Yes. We refer to that as the St. Luke's Clinic.
23  **Q.** What's the current relationship between St. Luke's
24  and the Select Medical Network?
25  **A.** The St. Luke's Medical -- or the Select Medical

1880

1  Network is wholly owned by St. Luke's.
2  **Q.** What are your responsibilities as vice president
3  of network operations?
4  **A.** My goals are to -- generally to develop a network
5  that integrates clinically between the St. Luke's Clinic and
6  the independent medical community using tools such as shared
7  analytics, developing standardized ways of practicing
8  medicine, emphasizing best practice tactics in the
9  marketplace to develop care coordination, and to make best
10  effort to establish value-based insurance contracting
11  relations with the payor community.
12  **Q.** And how long have you been in your current role?
13  **A.** About two months.
14  **Q.** So August, September of 2013?
15  **A.** I started in August 2013.
16  **Q.** And prior to that time, what position did you
17  hold?
18  **A.** Vice president for physician services for the
19  St. Luke's Health System.
20  **Q.** And how long were you in that position?
21  **A.** About six years.
22  **Q.** So roughly August 2007 to August 2013?
23  **A.** I started in June 2007 to August 2013.
24  **Q.** And what were your responsibilities as vice
25  president of physician services for St. Luke's Health

1881

1  System?
2  **A.** I think the -- probably the most -- the
3  overarching goal was to develop a culture of interdependency
4  between the physicians that were currently employed with
5  St. Luke's. It was to develop recruitment plans, retention
6  plans, to make sure that St. Luke's was able to serve the
7  community. It was to look at methodologies by which to
8  share information and generally develop a transparent
9  medical record, to ensure that we operated in an
10  administrative efficient -- administratively efficient
11  fashion, and also to develop physician leadership so that we
12  could move forward with the goals and objectives of the
13  St. Luke's Health System.
14  **Q.** So I would like to have you take us back to the
15  period before we've talked about, before August 2007. How
16  long have you worked in the healthcare field in Idaho?
17  **A.** I have worked in Idaho healthcare over a span of
18  approximately just over 37 years.
19  **Q.** And at a high level, could you explain your work
20  history and, if possible, if you could focus on the work
21  you've done with respect to physician practices.
22  **A.** Yes. I -- I actually started at the McCall
23  Memorial Hospital in 1976 after graduating from the
24  University of Idaho, and I was stationed in McCall, but did
25  accounting work for initially two other small hospitals. I

1882

1    left for a brief period of time to get my wife through
2    college in Spokane, and when I returned I served a variety
3    of roles.  I've worked for Saint Alphonsus.  I've worked for
4    St. Luke's, a number of the small critical-access hospitals
5    in the state.
6            I've served in a variety of roles.  I've been CEO
7    at small hospitals, at large hospitals, typically, been able
8    to establish good working relationships with physicians.  So
9    that led to a wide variety of work, everything from medical
10   directorships for service lines to practice startup to
11   practice management.  So I have a broad variety of
12   experience from the very small critical access to medium and
13   larger hospitals.
14       Q.   And I would like you to focus on your time when
15   you were employed with Saint Alphonsus.  Can you tell us
16   what your work involved there with respect to physician
17   practices?
18       A.   Yeah.  I have actually worked for Saint Alphonsus
19   twice.  We sold our company.  We had a small, self-employed
20   company we sold to Holy Cross.  I actually left that job
21   after just getting burned out on travel, and I came back to
22   Saint Al's in 1994, and I worked as the director of their
23   Management Services Bureau with the intention of working
24   with the strategic direction of Saint Al's to pursue a
25   vision of an integrated delivery system.  And while I was at

1883

1    Saint Alphonsus, I probably worked in three primary areas,
2    one was pure management services, offering billing, coding,
3    staff leasing, accounts receivable services.
4            We also entered into the employment market.  I was
5    integral to Saint Alphonsus's acquisition of two large
6    groups, one in Boise and one in Caldwell, Family Practice
7    Associates and Caldwell Family Medicine in Caldwell.  I also
8    started their employed internal medicine group and was also
9    involved with a joint venture down in Twin Falls that
10   involved Magic Valley and the Physician Center in Twin
11   Falls.  So that was the scope of my services at Saint
12   Alphonsus.
13       Q.   And when you described your work with management
14   services, were those management services provided to
15   independent physician practices?
16       A.   Yes.
17       Q.   And which practices were those?
18       A.   The two that I recall were Mountain View Medical
19   Center and Idaho Family Physicians.
20       Q.   During the time that you've just described in
21   working with independent and employed physician practices,
22   what were the nature of the contracts that those practices
23   had with insurance companies?
24       A.   The physicians -- well, in the contracted offices?
25       Q.   Well, let's start with independent physicians.

1884

1        A.   Oh, the independent physicians were responsible
2    for signing their own agreements.
3        Q.   Were those risk-based or fee-for-service or
4    something else?
5        A.   Fee-for-service.
6        Q.   And what was your approach with respect to
7    providing management services to the independent practices
8    who operated under fee-for-service contracts?
9        A.   In the independent practice world, the goal is to
10   optimize revenues, work within the guidelines of the payor
11   fee schedules, but optimize that, make sure you were
12   consistent with the basic allowable charge structures in the
13   community, was to minimize costs, avoid any investments in
14   what I would call forward-thinking services, because those
15   are typically services unreimbursed in fee-for-service
16   medicine, and to the extent possible, limit access for
17   uninsured, underinsured, Medicaid, and typically limitations
18   even on Medicare patients.
19       Q.   And what was your approach in providing management
20   services to the independent practices under fee-for-service
21   contracts with respect to ancillary services?
22       A.   To the extent possible, in primary care you would
23   typically offer in-office imaging and a client-brokered
24   laboratory.
25       Q.   And why is that?

1885

1        A.   Because they were profitable to offer within the
2    clinic, and it was consistent with optimizing the revenue
3    streams.
4        Q.   When did you leave employment with Saint Alphonsus
5    the second time?
6        A.   1994, I believe I started with Saint Alphonsus the
7    second time.
8        Q.   You started in 1994.  When did you finish your
9    employment?
10       A.   Oh, I'm sorry.  Oh, 1999 I left.
11       Q.   And where did you go from there?
12       A.   I actually became self-employed, and in that -- I
13   started a small company and offered consulting services to a
14   variety of primarily small hospitals and small practices.
15   And I did that for about a year, a little over a year, year
16   and a half.
17       Q.   And where did you go next?
18       A.   I was offered the position of chief operating
19   officer at the Magic Valley Regional Medical Center in
20   October of 2000.
21       Q.   I take it you accepted the offer?
22       A.   Oh, I'm sorry.  Yeah, I accepted that offer.
23       Q.   And at the time that you joined the Magic Valley
24   Regional Medical Center, was it affiliated with St. Luke's
25   or any other hospital or system?

1886

1      **A.**   Magic Valley Regional Medical Center was owned by
2    the citizens of Twin Falls County, so it was a county
3    hospital wholly owned by the Twin Falls County.
4      **Q.**   And does the Magic Valley Regional Medical Center
5    go by an acronym that we can use to shorten our examination
6    today?
7      **A.**   MVRMC.
8      **Q.**   Thank you.
9      **A.**   That's about as short as I can get.
10     **Q.**   When you started work at MVRMC in 2000, what was
11   the nature of the healthcare provider market in that area?
12     **A.**   Well, it was a little bit messy.  The county
13   hospital is fairly well depreciated with limited capital
14   reserves to reinvest.  The Twin Falls Clinic and Hospital
15   was starting to show signs of wear and tear and needed
16   reinvestment.  The physician community was very divisive
17   between each other, I think to a great extent created by
18   the -- sort of the physician specialty hospital and the
19   county hospital, and Magic Valley or MVRMC had some disputes
20   going on with the private physician community, as well.
21          So I would generally say two hospitals pretty run
22   down and a very divisive hospital-to-physician and
23   physician-to-physician environment.
24     **Q.**   And you indicated that MVRMC was county owned.
25   Did you have in your new role as COO any direction from the

1887

1    county or hospital board on the goals that you were meant to
2    pursue?
3      **A.**   Yeah.  Actually, there was pretty significant
4    direction, and it's -- that direction actually came as a
5    result of an inquiry by Saint Alphonsus Regional Medical
6    Center to the Twin Falls County Commission in an inquiry to
7    actually purchase Magic Valley Regional Medical Center, and
8    I think that was roughly in February of 1998.  The result of
9    that inquiry were the county commissioners actually passed a
10   resolution to appoint a committee of citizens to study
11   options or recommendations spurred by that inquiry.
12     **Q.**   And what were the results of the committee's work?
13     **A.**   The results of the Hospital Alliance
14   Committee -- let me think for a moment here -- first of all,
15   was remain independent, that was their initial -- and then
16   it was to pursue leases, affiliations, or other
17   relationships that would lead to three potential outcomes:
18   an integrated healthcare delivery system was one of those
19   objectives; a second one was to secure and protect the
20   primary care physician base in Twin Falls; and a third is
21   maximize local control in the community.
22     **Q.**   And what did you do to implement the
23   recommendations of the Hospital Alliance Committee?
24     **A.**   Well, at the time I was actually still employed
25   with Saint Alphonsus, and based on primarily the

1888

1    recommendation on secure and protect the primary care base,
2    we entered into discussions with the leadership at Magic
3    Valley and the leadership of the Physician Center, and as I
4    was with Saint Alphonsus, obviously Saint Alphonsus.  And we
5    began discussion with Physician Center, which was at the
6    time, the largest group in Twin Falls, and it was a
7    multispecialty group that had recently come together between
8    family physicians and pediatricians.
9          It was an important group to the community, and it
10   was experiencing a significant amount of administrative and
11   financial difficulties.  And it was important to the
12   community.  A couple reasons:  one is they were a
13   significant provider for the Medicaid population in the
14   community, but they were also foundationally the largest
15   group.
16          So, again, consistent with the -- with the
17   direction from the Alliance Committee, we worked with Magic
18   Valley and the Physician Center to create a joint venture to
19   get that group back up on its feet.  And that joint venture,
20   which became known as Magic Health Partners, LLC, was
21   one-third owned by Saint Alphonsus, one-third owned by Magic
22   Valley Regional Medical Center, and one-third owned by the
23   Physician Center.
24     **Q.**   And after -- I realize now that I've gotten this
25   out of order, the first thing that you did to implement the

1889

1    committee's recommendation was something you actually
2    started at Saint Alphonsus; is that right?
3      **A.**   While I was at Saint Al's, that's when the
4    resolution was passed.
5      **Q.**   Okay.  So after you joined MVRMC, what was the
6    first step you took to implement the Hospital Alliance
7    Committee's recommendations?
8      **A.**   Well, pretty coincidental, when I started with
9    Magic Valley the Twin Falls Clinic and Hospital, which was a
10   hospital that was owned by the -- by a group of physicians,
11   predominantly primary care but some specialists, and that
12   hospital, as I said earlier, was getting pretty well
13   depreciated and run down.  And they had reached a point
14   where not only were they experiencing administrative
15   difficulties in managing it and running it, they also were
16   faced with a significant capital investment.
17          And the second thing they were faced with was a
18   significant capital investment in information technology,
19   which they simply did not have the -- either the wherewithal
20   or the desire to fund on their own.  So as a result of that,
21   they put out a request for proposal to divest themselves of
22   the hospital.
23     **Q.**   And to whom did the Twin Falls Clinic and Hospital
24   send RFPs, to your knowledge?
25     **A.**   They sent an RFP to Saint Alphonsus Regional

1890

1 Medical Center, to Magic Valley Regional Medical Center, and
2 they also contacted St. Luke's.
3     Q.   And which of those entities responded?
4     A.   Saint Alphonsus responded, Magic Valley Regional
5 Medical Center responded, St. Luke's -- actually when Ed
6 Dahlberg was the CEO, actually went down and talked to the
7 Twin Falls Clinic physicians but declined to participate,
8 sort of waiting for how the local community might sort
9 through it. So St. Luke's did not respond to the proposal.
10     Q.   And which option did the Twin Falls Clinic and
11 Hospital accept?
12     A.   The Twin Falls physicians actually selected the
13 Saint Alphonsus proposal.
14     Q.   And did that transaction end up closing?
15     A.   Well, actually what happened there was that Saint
16 Al's had offered to joint venture and construct a new
17 facility so that the physicians would have an ownership
18 position in that hospital in Twin Falls. That was appealing
19 to the physicians at the time, so they pursued that option,
20 but after several months -- I think six, seven months of
21 negotiation -- it turned out that actually Trinity would not
22 support a joint venture for a for-profit hospital in -- in
23 that environment.
24          THE COURT:  Mr. Ettinger?
25          MR. ETTINGER:  Your Honor, the witness is offering

1891

1 a lot of history, including motivations of third parties,
2 decisions by third parties, you know, entities that he was
3 not at that time associated with. And maybe we could try to
4 confine it to what he has personal knowledge of. You know,
5 what Trinity did and why, what the doctors or third party
6 thought of somebody else's proposal, and so on.
7          THE COURT:  Well, at this point, I think,
8 Mr. Keith, probably all that Mr. Kee can testify to is that,
9 to his knowledge, Trinity would not support the joint
10 venture, for whatever reason. I think that would be
11 hearsay. So let's go ahead and proceed.
12          I'll sustain the objection, but limited only to the
13 question of why it was that Trinity apparently would not
14 support the proposed joint venture, since that would be
15 beyond the witness's understanding or knowledge.
16          Go ahead and proceed.
17          MR. KEITH:  Thank you, Your Honor.
18 BY MR. KEITH:
19     Q.   In the end, the potential deal between the Twin
20 Falls Clinic and Hospital and Saint Alphonsus did not close;
21 correct?
22     A.   That's correct.
23     Q.   And what happened next?
24     A.   Magic Valley Regional Medical Center, having
25 completed all of our due diligence, actually was able to

1892

1 close the transaction, and we acquired the hospital, merged
2 those business operations, and the physicians worked with
3 Magic Valley under a professional services agreement to
4 manage the practices.
5     Q.   Now, you mentioned earlier, you know, an approach
6 you had taken to managing physician practices under
7 fee-for-service reimbursement. Was there or did there come
8 a time when your approach to structuring the delivery of
9 healthcare changed?
10     A.   Yeah. Actually, that -- that happened when Sharon
11 Fisher, who was our director of quality at Magic Valley,
12 actually introduced me to a publication that was
13 commissioned by the Institute of Medicine, the Committee on
14 Quality Health Care in the United States, and that
15 publication was Crossing the Quality Chasm.
16     Q.   And at a high level, could you summarize your
17 understanding of the Committee on Quality of Health Care in
18 America's recommendations?
19     A.   Yeah. I thought the thing that was really
20 illuminating about that publication, and going back to the
21 Alliance Committee's recommendation on pursuing a strategy
22 towards integrated care is it gave a framework and some
23 guiding principles for how you might put such an integrated
24 system together.
25          And I -- I would refer to those as "STEEEP," with

1893

1 three Es, and that stands for the creation of a healthcare
2 system that would prioritize safe care, timely care,
3 effective care, efficient care, equitable care, and
4 patient-centered care. And those became principles that we
5 began to actively use with our board and with our physicians
6 as we tried to create a framework for moving forward with
7 creating the local delivery system.
8     Q.   And how did -- what's your understanding of the
9 difference between care provided under the STEEEP principles
10 and what the committee regarded as the then-current
11 healthcare system?
12     A.   A couple things that I think are pretty
13 significant. First of all, it becomes a -- an equation to
14 balance both quality against volume and value against
15 volume. I think it spoke to the true principles of the
16 Magic Valley Center, which was to provide care to all. So
17 if I were to take one of those principles, like equitable
18 care, it was really an opportunity to begin dialogue around
19 providing access to those that needed care rather than those
20 who could just afford to pay for care.
21          It -- one of the most significant principles was
22 in the area of patient centeredness, which is asking
23 hospitals, physicians to look at care through the lens of
24 the patient rather than through the lens of the provider.
25 It began to look at things like effective care, so trying to

1894

1    pursue principles around evidence-based medicine rather than
2    what just sort of met the needs of the provider community.
3    It spoke to things like efficiency, trying to reduce
4    redundancy, overtesting, effectively the underuse, overuse,
5    misuse of resources.  And most importantly, I think it
6    speaks to, you know, safety; first, do no harm.  And in the
7    area of timely care, try to emphasize the right care, right
8    time, right place.
9         Q.    And you mentioned that the -- the committee on
10   quality and healthcare in America had articulated some
11   redesign principles that you found compelling.  Can you
12   describe those for us?
13        A.    Yeah.  There were what they called "redesign
14   imperatives," which I think also became a blueprint for not
15   only Magic Valley, but what we are trying to do with St.
16   Luke's today.  And one of those design imperatives was the
17   more effective use of information technology, essentially
18   trying to get technology to be more of a tool to improve
19   transparency, sharing of data.
20             Secondly, it was to materially alter the
21   coordination of care across the delivery system.  And I
22   speak to that in the context the incredible burden of
23   chronic diseases on the healthcare spent in the
24   United States today, where you have, typically, small
25   numbers of patients consuming a disproportionate share of

1895

1    the resources.  By working in a different manner and
2    coordinating care, it's an opportunity to begin to address
3    those costs.
4             Thirdly, it was to improve the effectiveness of
5    performance improvement and continuous quality improvement
6    through the use of outcomes and metrics.  So those were
7    three of the redesign imperatives.
8         Q.    Did the committee make any recommendations that
9    you found compelling with respect to relationships with
10   insurance companies and other payors?
11        A.    Yeah.  I think one of the key recommendations
12   and -- that were fundamental to the change process was
13   realigning payor relationships with a more reasonable
14   balance between clinical outcomes, quality of care, as well
15   as the volume and efficiency metrics that we typically have
16   used in healthcare.  And it specifically -- it specifically
17   talked to the history of fee-for-service medicine, where you
18   typically perfectly align utilization with -- with -- with
19   the reimbursement system.  You align paying for errors,
20   paying for redoes with the reimbursement system, and then
21   balancing that on the other end of the spectrum with the old
22   era of capitation HMOs, where it was all focused on reducing
23   the medical loss ratio but not really looking at the
24   clinical outcomes.
25             So what I took from the publication was how do we

1896

1    get a fair balance between fee-for-service alignment for
2    doing things versus capitation to not do anything to getting
3    to, I guess, lack of a better word, the sweet spot in the
4    middle that appropriately rewards people for doing the right
5    thing, but also asking for some performance outcomes, such
6    as clinical metrics that hold people accountable.
7             And to be honest, I think that's -- that principle
8    is -- really resonates with the whole notion of creating
9    accountable care organizations, which is the world we live
10   in today.
11        Q.    How does -- how do the -- the court has heard a
12   fair amount about the Triple Aim during this case.  In your
13   mind, how does the -- how do the principles of STEEEP, safe,
14   timely, effective, efficient, equitable, patient-centered
15   care, relate to the Triple Aim?
16        A.    Yeah.  I think the -- just speak a minute to the
17   Triple Aim, which I think probably more clearly illustrates
18   the three essential domains, which are better health, you
19   know, prevention, you know, just providing a better
20   environment for better health.  The STEEEP principles are
21   still embodied within the better care, so better care really
22   focused on safe, timely, effective, efficient,
23   patient-centered.  Those still resonate through the Triple
24   Aim for the better care.  And then the third, around lower
25   cost, I think appropriately describes the spectrum that

1897

1    we're trying to address through accountable care.
2         Q.    Did you do anything to attempt to implement the
3    principles you've articulated learning in *Crossing the*
4    *Quality Chasm* during your time in the Magic Valley?
5         A.    Yeah.  I think the -- and I think this resonates
6    throughout the publication, as well, that change in culture
7    and change in thinking and redirecting your thoughts around
8    the guiding principles of the -- the STEEEP equation really
9    started with a lot of discussion and a lot of education
10   around what it meant, so we typically started using those
11   principles in our -- in our board meetings.  I think you
12   would find those frequently talked with in our physician
13   meetings.  As we began to organize our physicians, we
14   started to use those themes consistently in the forums that
15   we would have with -- with the board, with the community and
16   with our physicians.  So first thing was -- really was
17   around culture change.
18             We also began a physician hospital organization,
19   became known as Magic Health Delivery which was a
20   partnership between an individual physician association and
21   St. Luke's.  And the goal of that was to try to find common
22   ground with the payors around the blend between the current
23   fee-for-service system and how we could build quality
24   incentives into our contractual relationships to begin to
25   rebalance that equation.  And the third key initiative was

1898

1 really around development of a community health information
2 system, which started with our electronic medical record
3 initiative.
4     Q.   I think you may have said that the Magic Health
5 Delivery PHO involved St. Luke's.  Is that true or was it
6 with Magic Valley Regional?
7     A.   Excuse me.  Magic Valley.  I apologize.
8          THE COURT:  Counsel, just so I'm clear, I want to
9 make sure I didn't lose something here.  I think the initial
10 discussions and interactions with Saint Al's, the doctors
11 group, and what ultimately became -- I'll call MVRMC.  Is
12 that what -- was that the title of the hospital?
13         THE WITNESS:  Yeah.  Magic Valley Regional Medical
14 Center.
15         THE COURT:  And you were acting as CEO at that
16 time of that facility?
17         THE WITNESS:  I started as COO, and the
18 then-administrator suffered some health problems, so I
19 transitioned into the CEO role.
20         THE COURT:  But at the outset of those discussions
21 you were actually working for Saint Al's.
22         THE WITNESS:  No.  At the outset of the
23 discussions on the Twin Falls Clinic I was working for Magic
24 Valley Regional Medical Center.
25         THE COURT:  Okay.  But at some point you had

1899

1 worked with Saint Al's, and I was of -- something in your
2 testimony suggested to me that you were actually working for
3 Saint Al's when some of these discussions were taking place.
4 Was that mistaken?
5         THE WITNESS:  With the Twin Falls Clinic; that's
6 mistaken.
7         THE COURT:  Okay.  So you were always with the
8 Twin Falls Clinic, and then when they acquired MVRMC after
9 this --
10        THE WITNESS:  MVRMC acquired Twin Falls Clinic,
11 and I was working for Magic Valley at the time.
12        THE COURT:  Okay.
13        MR. KEITH:  I think I may be able to help.  I
14 apologize for the confusion, Your Honor.
15        THE COURT:  I just want to make sure I understood
16 what role Mr. Kee was playing.
17        MR. KEITH:  Sure.
18 BY MR. KEITH:
19    Q.   I believe you testified about a group called the
20 Physician Center.  Do you recall that?
21    A.   That's correct.
22    Q.   Was that the group that had some financial
23 difficulties that were rectified by a joint venture
24 involving Saint Alphonsus?
25    A.   That's correct.

1900

1    Q.   And at the time that that joint venture was put
2 together, was that when you were employed by Saint
3 Alphonsus?
4    A.   That's correct.
5    Q.   And all of the other steps that we've talked about
6 in Twin Falls involving the Magic Valley Regional Medical
7 Center, those occurred at a time when you were employed by
8 MVRMC?
9    A.   That's correct.
10    Q.   And you mentioned a physician hospital
11 organization known as Magic Health Delivery.  Did that
12 organization include physicians who were employed by Magic
13 Valley Regional Medical Center, those who were independent
14 of MVRMC, or both?
15    A.   It was both.
16    Q.   Did you attempt while you were at Magic Valley to
17 implement the -- any of the principles you described with
18 respect to changing the relationship between providers and
19 insurance companies?
20    A.   Yeah.  We actually pretty actively pursued
21 different relationships with the payor community.  Those
22 discussions were primarily with Blue Cross of Idaho, with
23 Regence, and I think Altius as well, but to a large extent
24 primarily focused on the Blues in Idaho.  And our goal in
25 those was, again, to blend sort of the current

1901

1 fee-for-service with introducing some quality metrics into
2 the contractual relationship.
3    Q.   And what in particular was the nature of the
4 relationship with Blue Cross that Magic Health Delivery was
5 seeking?
6    A.   Well, again, we were -- we were trying to work
7 with Blue Cross to weave some quality metrics into our
8 contractual relationships.  And to be fair to both sides, I
9 think Blue Cross was less than interested in what we were
10 trying to pursue, and I think at the time we were probably
11 not totally prepared to bring forward all of the necessary
12 data analytics to support the position.  So I would
13 basically say they were generally not terribly productive
14 from the payor perspective.
15        However, from the building the relationship with
16 physicians and understanding what was going on in the payor
17 market, I think it was generally valuable to have gone
18 through the exercise, from an education and knowledge
19 standpoint.
20    Q.   And did the -- did the fact that the Magic Health
21 Delivery included independent physicians as well as employed
22 physicians present any obstacles in terms of delivering on
23 the promises of changed relationships with payors?
24        MR. ETTINGER:  Your Honor, just kind of a form
25 objection.  I mean, it might be nice to have some sense of

1902

1 the dates we're talking about here. I think we're --
2          THE COURT: I'm going to sustain the objection
3 because that's part of the reason I think I got lost before
4 is I didn't have a clear sense of the timing of these
5 things.
6 BY MR. KEITH:
7      Q.  With respect to the timing of the approaches of
8 the Magic Health Delivery PHO to payors, can you just give
9 us a rough sense of when that occurred?
10      A.  I think in the early 2000s, 2001, 2002.  I don't
11 remember the exact dates.  There was a lot going on during
12 that period of time.
13      Q.  And the -- going back to my prior question, did
14 the involvement of independent physicians in that PHO
15 present any obstacles in terms of achieving the aims you set
16 forth?
17      A.  Well, yeah, there is -- there is always obstacles
18 in dealing with multiple parties in a transaction.  You have
19 different data systems.  You have different philosophies,
20 and you have different sort of core values with running your
21 own business versus trying to operate as a common business
22 unit.  So I think the nature of the structure of a full
23 series of independent practices, trying to work collectively
24 was a challenge.  It was a challenge.
25      Q.  And you mentioned that there was a challenge

1903

1 around the diversity of data systems that different
2 practices were using.  Did you take any steps to try to
3 address those challenges?
4      A.  Well --
5          MR. ETTINGER: Your Honor, I'm sorry.  Foundation
6 objection.  I'm not clear that the witness had a role at the
7 Magic Valley PHO that would give him a basis for discussing
8 details of the PHO.
9          THE COURT: Mr. Stein, let's establish the
10 witness's knowledge.  I'm sorry.  Mr. Keith.
11          MR. KEITH:  I take pride in being confused for
12 Mr. Stein, but --
13          MR. STEIN:  Force of habit.
14 BY MR. KEITH:
15      Q.  What was your role with respect to the Magic
16 Health Delivery?
17          THE COURT:  There was another reason why I -- that
18 was a Freudian slip for a different reason that anyone
19 knows.
20          THE WITNESS:  Well, I was the -- at that time the
21 CEO of the hospital, and I sat on the board, so I think I
22 was integral to the formation of the PHO.
23 BY MR. KEITH:
24      Q.  Turning to the question I had about the difficulty
25 of having disparate data systems, did you take any steps to

1904

1 try to address that problem while you were in Magic Valley?
2      A.  I think the key initiative that we move forward
3 was beginning the work on developing a community-based
4 electronic health record, and to that end, we wrote a grant
5 to the AHRQ, which actually turned out to be a successful
6 grant, and actually that turned out to be one of the more
7 unifying experiences with the physician community in Twin
8 Falls.  That grant allowed us to invest in what we
9 ultimately chose was Centricity, and that actually has
10 resulted in a community-wide electronic health record in the
11 Magic Valley.
12      Q.  What is Centricity?
13      A.  Centricity is software that actually stores
14 patients' medical records in an electronic format.
15      Q.  There came a time, as the court is aware, that
16 Magic Valley Regional Medical Center and St. Luke's entered
17 into a transaction.  And I'd like you to tell us, from your
18 perspective, what -- what was the -- you know, what led up
19 to the decision to move forward with that transaction?
20      A.  I'm sorry.  Could you restate that question?
21      Q.  Sure.  I appreciate the opportunity.
22          The -- at some point St. Luke's and Magic Valley
23 Regional Medical Center entered into a transaction, and from
24 your perspective as the CEO of Magic Valley Regional Medical
25 Center, what was it that led you to look toward a

1905

1 transaction with St. Luke's?
2      A.  We'd had a longstanding relationship with St.
3 Luke's.  They'd been honorable around working with the local
4 community.  They were based in Idaho, and we felt they
5 offered the best opportunity to create a regionally
6 organized integrated health system.  We felt there was
7 enough patient interaction between the tertiary facility and
8 the secondary care facilities that St. Luke's could bring
9 great value.
10          And secondly, St. Luke's offered us the
11 opportunity to access capital funding to replace the
12 physical plant that we were really unable to take the risk
13 of that on our own.
14          And thirdly, we felt that truly offered us the
15 opportunity to begin to pursue a truly well-organized
16 regional health delivery system.
17      Q.  And you used terminology --
18          THE COURT:  I was just going to ask what
19 "tertiary" and "secondary care" -- I think I know, but could
20 you explain that for the record?
21          THE WITNESS:  Well, I would refer to a primary
22 care facility as a critical-access hospital, like a Saint
23 Benedict's in Jerome or a McCall Memorial Hospital.  A
24 secondary-level facility would have an additional layer of
25 services.  Tertiary tends to get into the more complex care,

1906

1 like pediatric subspecialties.  And then quaternary would
2 get into things like transplants.
3      So it's sort of a hierarchy of service delivery.
4           THE COURT:  All right.
5      Mr. Keith, maybe there was something else you wanted
6 the witness to explain, but I did --
7           MR. KEITH:  No.  That was it.
8 BY MR. KEITH:
9      Q.  And when did -- what ultimately was the --
10          THE COURT:  Just a moment.  Just so I'm clear, and
11 so Magic Valley probably then would be primarily secondary
12 care?
13          THE WITNESS:  Yes.
14          THE COURT:  And probably St. Luke's and Saint Al's
15 would be tertiary care?
16          THE WITNESS:  Tertiary, um-hmm.
17          THE COURT:  And a quaternary care you might be
18 looking at --
19          THE WITNESS:  U of U.
20          THE COURT:  All right.  I was going to say Salt
21 Lake City.
22          THE WITNESS:  Yeah.
23          THE COURT:  All right.  Go ahead.
24 BY MR. KEITH:
25      Q.  What transaction did Magic Valley and St. Luke's

1907

1 ultimately enter into?
2      **A.  Ultimately, after a vote was put to the public,**
3 **which passed with an 84 percent support by the -- by the**
4 **citizens, Magic Valley was acquired and became one of the**
5 **key pillars of the St. Luke's Health System.**
6      **Q.**  The court has heard testimony about the financial
7 integration of providers in Magic Valley under one economic
8 unit.  I'd like you to explain when those transactions
9 occurred relative to the St. Luke's transaction, either
10 before or after, or some of both.
11      **A.  Well, the development of the relationship with the**
12 **physicians was substantially complete before St. Luke's came**
13 **into the -- came into the picture.  The vast majority of the**
14 **business relationships with the -- with the Twin Falls**
15 **physicians had been worked on for several years by staff**
16 **that worked for me, under my direction, again, consistent**
17 **with that whole local vision that was outlined from the 1998**
18 **citizens alliance, that Hospital Alliance Committee.  There**
19 **were some transactions that occurred after St. Luke's came**
20 **in, and there certainly has been substantial recruitment.  I**
21 **think over the last six or seven years there has been**
22 **somewhere in the 70-plus physicians that have been brought**
23 **into the Magic Valley community.**
24      **Q.**  On the question of recruitment, in your view, does
25 the fact that the Magic Valley physician and hospital

1908

1 community is fully integrated play a part in the success of
2 recruitment efforts?
3      **A.  Yeah.  I think, in my opinion, it's absolutely**
4 **essential.  A lot of the newer physicians coming out of**
5 **training are looking for organized systems to go into.  They**
6 **are looking for either employment with a group or with the**
7 **health system, and I think that the competitive market is**
8 **going to be around the organized groups.  So I think it is**
9 **important to have an administrative structure to recruit to.**
10     **Q.**  So after the transaction with St. Luke's, what did
11 you do in terms of your role at Magic Valley?
12     **A.  I stayed on for a year to work through the**
13 **transition and had a fair amount of discussion with Ed**
14 **Dahlberg, who was the CEO at the time.  And I was trying to**
15 **make career choices, to be honest, what I was going to do,**
16 **and Ed offered me the opportunity to come to Boise and**
17 **continue the work with the system integration planning that**
18 **had been envisioned when Magic, Magic Valley governance, the**
19 **Twin Falls County governance worked with St. Luke's to**
20 **actually create the St. Luke's Health System.  So it was a**
21 **desirable opportunity, and that's what I did.**
22     **Q.**  And before we turn to talking about the work
23 you've done since joining St. Luke's in Boise, I just would
24 like you to provide the court a comparison, in your mind, of
25 the state of the healthcare delivery network in Magic Valley

1909

1 from when you arrived in 1999 to today.
2      **A.  Yeah.  It's just stunning.  It was stunningly**
3 **different.  We started with two run-down facilities, with**
4 **physicians really arguing, debating with each other.  When I**
5 **left we had plans to build a new facility, which has now**
6 **been recognized; it's as fine a facility as you'll find in**
7 **the country.  We had, I think at the time -- there's more**
8 **now, but roughly 100-plus physicians coming together to**
9 **develop a community health information record.**
10          **In my view, we had the medical community.  We had**
11 **the support of the patient community, I think as evidenced**
12 **by an 84 percent vote that I don't think would have happened**
13 **back in 1998 or '99 when the community was really in, more**
14 **or less, medical disarray.**
15          **So I mean, I think it's just like -- was totally**
16 **consistent with the Health Alliance Committee**
17 **recommendations.  I don't think we'd achieved all the goals**
18 **that we needed to, things that we're still working on today.**
19 **But if you go back from 1998 and then you look at what it**
20 **was, in that short period of time, it was not even a**
21 **comparable situation.  It was stunningly different.**
22     **Q.**  Let's start talking now about your work in Boise.
23 Can you tell me, just generally speaking, what your
24 responsibilities were when you joined -- well, let me take a
25 step back.

1910

1  Was this -- was the timing of your move to Boise when
2  you took on the position of director of physician services?
3  A.  Yeah.  The position that I took when I came to
4  Boise actually didn't exist, but I think the situation in
5  Boise was that we, St. Luke's, had started to employ
6  physicians.  They employed -- just recently concluded the
7  transaction to bring the cardiologists on board.  They had a
8  urology group on board.  They had had the longstanding
9  relationship with St. Luke's Internal Medicine that started
10  back in the mid to -- mid to late '80s.  There were a few
11  employed family physicians, and there needed to be some
12  structure put around that, so that was one body of work.
13          Secondly, my recollection, from talking with Gary
14  Fletcher and Ed Dahlberg, was that there was an increasing
15  interest in physicians who saw healthcare reform coming.
16  They saw a different environment for healthcare, and there
17  was increasing interest about what would that look like in a
18  relationship with Luke's, and there was no particular
19  infrastructure to address that.
20          We also had a joint venture that had been
21  successful with St. Luke's Family Health, but, again, that
22  joint venture was run under the context of more of a
23  traditional fee-for-service private practice, which, as I
24  talked earlier, had specific limitations on access for
25  Medicare, access for Medicaid, so it was not entirely

1911

1  consistent with the corporate vision of St. Luke's, although
2  it was a high-performing group.
3          And so those were -- that was sort of the
4  environment I came into.  So I would say, at the highest
5  level, if I were to rewind, I think the goal was to come in
6  and build a culture within the existing physicians and new
7  physicians that might come on board around how to work
8  cooperatively sort of consistent with what was outlined in
9  the publication I referred to earlier, how do you build a
10  spirit of cooperation, a culture of transparency,
11  willingness to share information, and sort of work in a
12  common way to improve care in the community.
13          So I'd say at the highest level, build culture,
14  make it administratively efficient, put in the
15  infrastructure to ensure that we had a high-performing group
16  of physicians that chose to work with St. Luke's if they so
17  desired.
18  Q.  And did your work also include responsibilities
19  with respect to the Select Medical Network at that time?
20  A.  Yes.  I was also asked to participate and ended
21  up -- I don't remember exactly when, but going on to the
22  board of Select Medical Network.  That organization was
23  intended to be a clinically integrated individual physician
24  association, and so I was asked to participate with that to
25  keep that process moving along.

1912

1  Q.  And what did you end up doing after you joined
2  St. Luke's in Boise in 2007 with respect to the Select
3  Medical Network?
4  A.  The Select Medical Network I would say was
5  floundering.  The independent physicians that had -- had
6  interest, ownership interest, within the IPA -- if I can
7  shorten that to IPA.  I really didn't want to make a lot of
8  financial investments into that organization, and absent
9  some serious financial investment to build infrastructure
10  around data gathering, data collection, it was very
11  difficult for these separate groups of docs to actually
12  organize themselves to move forward in a productive fashion.
13  So I'd say primarily I used it as a moment to dialogue
14  around where we could go with the necessary investments and
15  what alternatives might be around different alignment
16  strategies.
17  Q.  And if I understand correctly, then you would have
18  allocated more of your time to organizing the existing
19  St. Luke's physician practices and working with those
20  physicians who expressed interest in a tighter alignment
21  with St. Luke's?
22  A.  Yeah.  The demand on times actually tended to come
23  more from physician interest in economic alignment than
24  investing in the IPA.  I think I spent an appropriate amount
25  of time with the IPA, but there was just more time demands

1913

1  within the integrated network at St. Luke's.
2  Q.  If you had to do it over again, would you invest
3  more of your time, in the period in 2007 and close
4  thereafter, in developing the Select Medical Network?
5  A.  No, I don't think so.  I think I spent an
6  appropriate amount of time, in my view, based on my
7  experience in Twin Falls and sort of what I've seen
8  elsewhere since then in the state.  I would suggest that
9  without sort of figuring out the economic alignment with a
10  critical number of physicians, that I think the IPA
11  ultimately was going to stall.  So I think I spent an
12  appropriate amount of time and put my energy where I thought
13  there would be more productive work.
14  Q.  Productive to what end?
15  A.  To developing the integrated delivery system and
16  moving downstream towards achieving the goals that we've
17  talked about earlier around better health, better care,
18  lower cost.  So that was where my time got spent.
19  Q.  Mr. Kee, are you familiar with an organization
20  called the North Idaho Health Network?
21  A.  Yes.
22  Q.  And why have you become familiar with the North
23  Idaho Health Network?
24  A.  The North Idaho Health Network is connected to the
25  business of St. Luke's through an organization called Idaho

1914

1 Integrated Healthcare.  That's also under a dba called
2 "BrightPath."  And North Idaho Health Network was the
3 Region 1 -- we refer to it as Region 1 in the north -- in
4 the Idaho Panhandle, was the contracting entity for
5 BrightPath in North Idaho.  So NIHN was that structure under
6 which we did our contracting for the statewide network.
7       St. Luke's is a 75 percent owner of that statewide
8 network.  And in my changing role, I needed to understand
9 sort of what was the state of affairs in North Idaho, as
10 well in Region 3 over in the Portneuf area.  But that's my
11 relationship with NIHN.
12       Q.  And you used two words, I just want to make sure
13 we understand.  I think you used "dba."  Is that "doing
14 business as"?
15       A.  NIHN is --
16       Q.  Sorry, dba.
17       A.  Oh, I'm sorry.  I was referring to BrightPath was
18 the dba for Idaho Integrated Health.
19       Q.  And "NIHN," what's that?
20       A.  North Idaho Health Network.
21       Q.  NIHN?
22       A.  NIHN, uh-huh.
23       Q.  And what have you done to inform yourself
24 concerning the status today of NIHN?
25       A.  Well, I have been brought up to speed by Janice

1915

1 Fulkerson, who was the -- then the executive director for
2 BrightPath.  And so I've since assumed some of her
3 responsibilities as we worked through the ownership,
4 ultimate organizational structure of BrightPath.  And I've
5 also made a trip to North Idaho to meet with Jon Ness, at
6 Kootenai Medical Center, and with Richard Bell and Mike
7 Dixon, who are the lead physicians with the IPA.
8       Q.  What is your understanding of where NIHN stands
9 today?
10       A.  Well, I think NIHN was a very well-meaning
11 organization, but as of a week ago all of the hospitals have
12 withdrawn from North Idaho Health Network, so they really
13 have divested their interest between the hospital and the
14 physicians.  So that creates -- you know, that creates some
15 structural issues for sort of working in a collaborative
16 fashion going forward.
17       About a year ago and probably, as I understand
18 now, it's -- actually I found the documents out on the
19 website -- but Blue Cross and NIHN terminated their Blue
20 Cross commercial risk-sharing agreements.  And so there are
21 some structural issues within NIHN.
22       They are -- in my discussion with the physicians
23 and with Jon Ness, both entities are seeking data analytics
24 solutions so they actually can perform under their stated
25 objectives of being more clinically integrated.  But absent

1916

1 a common electronic health platform, absent any data
2 warehouse, absent any reporting systems, absent any care or
3 clinical coordination systems, they really find themselves
4 at sort of a turning point of what are the investments they
5 will need to make going forward.
6       Q.  I would like to turn to a different topic.
7       THE COURT:  Counsel, we're about where we would
8 take the break.  Is this a good breaking point?
9       MR. KEITH:  It is, yes.
10       THE COURT:  All right.  We'll take a 15-minute
11 recess.  Court will be in recess.
12       (Recess.)
13       THE COURT:  Mr. Kee, I'll remind you you are still
14 under oath.
15       Mr. Keith, you may resume your examination of the
16 witness.
17       MR. KEITH:  Thank you, Your Honor.
18 BY MR. KEITH:
19       Q.  Could you tick off just a --
20       THE COURT:  Counsel, could I ask just one
21 question?  I wanted to make sure I understood.  You know,
22 one of the things about this case that is frustrating is not
23 only the acronyms, but the kind of moving acronyms.  You
24 referred to, I think, the IPA was an acronym.
25       THE WITNESS:  Individual physician association.

1917

1       THE COURT:  Is the what now?
2       THE WITNESS:  Individual physician association.
3       THE COURT:  Is that just a generic term, not a
4 specific network of any kind?  Or is that --
5       THE WITNESS:  It's a generic term.
6       THE COURT:  Okay.
7       THE WITNESS:  I think described under the --
8       THE COURT:  Because there was reference to an IPN,
9 which I think was the Idaho Physicians Network.  And that's
10 a specific network, whereas IPA is just a generic term;
11 correct?
12       THE WITNESS:  That's correct.
13       THE COURT:  All right.  Thank you.  I was thinking
14 that maybe that was another acronym by which the Idaho
15 Physicians Network was known, but now I understand.
16 BY MR. KEITH:
17       Q.  And IPA is also sometimes used as an acronym for
18 independent practice association or independent physician
19 association.  Would that be different from your definition,
20 Mr. Kee?
21       A.  I think they are probably used interchangeably,
22 actually.
23       THE COURT:  All right.  Thank you.  And that's --
24 the problem is that the acronyms not only are -- they're not
25 only a lot of them, but sometimes they seem to morph.  All

1918

1 right.
2 BY MR. KEITH:
3     **Q.** Mr. Kee, can you tick off for the court at a high
4 level what you regard as the major initiatives that St.
5 Luke's has taken to implement the Triple Aim?
6     **A.** Yeah, sure. And I want to sort of tie this back
7 again to some of those redesign imperatives we talked about
8 earlier. But at the highest level, we have selected after
9 exhaustive review an integrated patient health record. We
10 have developed a clinical care coordination team. We have
11 invested heavily in a data source to manage the performance
12 improvement process through WhiteCloud. We have been, over
13 the last couple years, working towards a value-based
14 compensation system, and we have been exploring more
15 creative, more value-based payor relationships.
16     **Q.** And describe to the court the steps that
17 St. Luke's has taken with regard to implementing a unified
18 electronic health record.
19     **A.** That -- that process to actually select the
20 electronic health record was organized under the auspices
21 of, I think, roughly 15 physicians that spent almost a year
22 working through a selection process looking at a variety of
23 integrated health records. And they ultimately -- that
24 group ultimately recommended we go with Epic, which is
25 generally recognized at or near the top of the industry

1919

1 leaders and enterprise-wide patient health record systems.
2     **Q.** And where is Epic implemented within the
3 St. Luke's system today?
4     **A.** We have implemented the ambulatory portion of Epic
5 in Baker City, McCall, Fruitland, Nampa, Meridian, Boise,
6 and Wood River. So those are the primary installations. I
7 think at this point, we have roughly 500 providers on that
8 system, so it's widely used across the greater Treasure
9 Valley and into Baker City.
10     **Q.** And I noticed that Magic Valley was not on the
11 list of places where Epic has been implemented. Can you
12 tell the court why that is?
13     **A.** The reason Magic Valley was chosen last -- I think
14 we talked about that earlier -- was the physicians prior to
15 the St. Luke's merger had already put significant time and
16 energy into the Centricity product. So that had matured to
17 the point where we, I believe at this point, have 150 users
18 on that system, and it just made sense to let that system
19 that was more mature stand as the last one we converted.
20     **Q.** And prior to implementing Epic in the greater
21 Treasure Valley, what was the state of electronic health
22 records among the St. Luke's clinics?
23     **A.** Maybe the best way to describe it, it was sort of
24 a microcosm of the whole healthcare -- the whole healthcare
25 delivery system in the Treasure Valley. It was a potpourri

1920

1 of paper charts, a couple different electronic health
2 records.
3     So I describe it as a microcosm of the greater
4 physician community, and that was generally a result of when
5 the physicians came on board with -- with St. Luke's.
6 Rather than tear those systems out, we wanted to go through
7 an organized thoughtful process to actually come up with
8 a -- a good, solid replacement tool, which became Epic.
9     **Q.** I should have asked this with respect to the Magic
10 Valley before, but is there a plan to implement Epic in
11 Magic Valley St. Luke's?
12     **A.** Yeah. That plan will -- expected to roll out over
13 the next two to three years.
14     **Q.** And how much has St. Luke's spent so far in
15 implementing Epic?
16     **A.** The ambulatory portion of Epic is probably roughly
17 40 million, approximately.
18     **Q.** And why don't you tell the Court, in your view,
19 why implementing Epic is a step towards the Triple Aim.
20     **A.** I think if you go back to some of those redesign
21 imperatives, one of those is an information system that
22 allows patient information -- obviously, in a PHI-protected
23 health information format respecting HIPAA -- but that to be
24 shared across a broad number of physicians such that when
25 care is rendered, the ordering physicians, the treating

1921

1 physicians can see what's been going on with the patients'
2 -- patients' health records.
3     So I would sort of go through each of the
4 principles that would be impacted by having an integrated
5 healthcare. So when you think about safe care, a
6 sophisticated system like Epic across the provider base
7 would have embedded such tools as medication alerts.
8     So to the extent you have multiple people
9 interacting with the patient, contraindicated medication
10 alerts are provided within the tool. So it's a way to look
11 at safe care, timely care.
12     Just one example, if we have a common health
13 record across all of our provider base, when patients call
14 after hours into our call center, basically, the call center
15 would have access to those records, and to some extent, if
16 the patient doesn't require to see a physician at all,
17 sometimes the triage nurse can handle that. Absent having
18 records, you basically get "Go see your physician in the
19 morning." In this manner, we can actually provide a more
20 timely response.
21     As far as effective, tools like Epic can be
22 embedded with best practice protocols to sort of direct a
23 physician to the correct outcome. Some examples of that
24 were working with Healthwise now today to try to build
25 within the Epic tool best practices for preventive health

1922

1 and provide patient information.
2          In terms of efficiency, I think this is a
3 significant issue over time when treating physicians can
4 actually see the care that's already been rendered to a
5 patient.  In our -- in my opinion, there is less chance for
6 redundant testing.  Therefore, I think it ultimately becomes
7 more efficient because you actually have delivered to your
8 desktop the clinical services that have already been
9 rendered.
10          And then lastly, from a patient-centered approach,
11 Epic -- Epic has what they call MyChart, which is a patient
12 portal where a patient can actually go online; they can
13 actually see their healthcare records.  It allows them to be
14 a participant in medical decision-making, in sharing
15 information, in transparency of the record, and also
16 communicating with their provider online.
17          So I think it meets the core principles of
18 redesigning your IT platform to be more efficient, and it
19 also, in my view, provides a better patient experience.
20          And lastly, on a common platform, it also allows
21 us to very easily mine information and place that into a
22 format whereby we can actually see the results of the care.
23 And, again, I think that's an important concept because as
24 we move to more accountable care, it's not just the process
25 of giving care:  It's reporting back what are the outcomes

1923

1 of the care you've rendered.
2          Q.  You also mentioned at a high level that St. Luke's
3 has taken steps to move physician compensation from volume
4 to value.  Can you describe to the court what steps you're
5 talking about?
6          A.  The -- I think we talked about this a little bit
7 earlier, but the historical methodology of paying physicians
8 has been on productivity.  That's really been the one
9 quantifiable objective outcome of what's going on in a
10 practice.
11          As we have began to -- as we have begun to journey
12 towards developing tools, we actually can start blending
13 some of those clinical metrics into the compensation models
14 because we will have reliable replicable data that a
15 physician can look at and believe.
16          So to that end, we have moved three groups from a
17 volume-based into a value-based compensation system, that
18 being cardiology, pulmonary, and we have just completed the
19 work with our internal medicine group.  So we're moving
20 towards value when we can actually identify data elements
21 that would substantiate how we would pay those quality
22 incentives.
23          Q.  And across the groups you just mentioned,
24 cardiology, pulmonary, and internal medicine, what's the
25 range of total compensation for which those physicians are

1924

1 at risk based on their quality outcomes?
2          A.  It varies.  In internal medicine, it's 20 percent
3 of their compensation is based on variable comp based on
4 earned outcomes.  I believe that's the same ratio in
5 pulmonology, and cardiology is somewhat less.
6          Q.  And, you know, given what you've testified to in
7 terms of your views of the way the healthcare delivery
8 system should be designed, why were St. Luke's clinics
9 physicians paid based on productivity in the first place?
10          A.  I just don't think there -- at the time we started
11 working with physicians, I don't think we had credible,
12 replicable data sources by which to actually legitimately
13 assign quality incentives in a consistent fashion.  So we
14 have been on this evolution to creating data that we can
15 actually feed back to physicians, which is meaningful and
16 actually focused on outcomes.
17          Q.  And does St. Luke's have a goal of converting more
18 of its St. Luke's Clinic physicians to payment based on
19 value?
20          A.  We're in exploration with family medicine,
21 orthopedics, virtually all of our groups over -- it's going
22 to take time, but I would suggest over the next two to three
23 years, most of our physicians will be in a value-based
24 package.
25          (Ringing noise.)

1925

1          I'm sorry.  Was that me?
2          Q.  Can you just repeat the time line you mentioned.
3          A.  I suspect it'll be at least two-plus years, two to
4 three years to get all the groups converted.
5          Q.  Now, at a high level, you've also mentioned
6 putting together a care coordination team.  Would you
7 describe to the Court what that -- who that team is and what
8 they do?
9          A.  Yeah.  This is actually a very critical element of
10 the work we began in the health system.  And when we
11 describe care coordination, we're particularly focused at
12 this point on the chronic disease population, which, again,
13 if you look at the data, tends to drive a disproportionate
14 share of the healthcare spend.  And we now have about 15
15 people in our care coordination team, and they provide an
16 umbrella of care across such areas as congestive heart
17 failure clinic, diabetes clinics, cardiac rehab.
18          We have a care of patient at-risk program,
19 generically called CoPar.  And at the heart of that team has
20 been a group of folks we recruited actually out of the Blue
21 Cross system, and it's led by a lady named Jackie Motta, who
22 has significant experience in looking at the continuum of
23 care and looking at where we can place patients into the
24 highest value situation.
25          So Jackie has assembled a team of four people that

1926

1 are at the core of that.  And, actually, I was thinking
2 about that yesterday, with probably a hundred-plus years of
3 experience in the area of care coordination and care
4 management across the continuum from inpatient care into
5 subacute settings such as long-term acute care hospitals,
6 acute rehab units, skilled nursing facilities, home health,
7 and the like.
8          So when you actually add up the experience of this
9 team, I think it's probably in the 200-plus years of
10 experience, and folks that are really committed to the
11 spectrum from health and wellness to post-acute care,
12 evaluating discharge points for patients that are high
13 value, with obviously the high-value focus being let's get
14 patients home when we can.  I mean, get people home.  That's
15 the most -- that's the most cost effective if, in fact, the
16 home is a place that can be prepared.
17          And, really, that's the passion and that's the
18 structure that we have developed our care coordination team
19 around.  It's a seriously, seriously talented group --
20 talented group of people, and we have made a significant
21 investment in human resources to move this process along.
22      Q.  You mentioned the CoPar program.  What does that
23 stand for?
24      A.  The CoPar program actually started with a concept.
25 I think it's sometimes been referred to as intensive

1927

1 outpatient care, as well.  But Regence Idaho actually
2 approached St. Luke's about a year ago, maybe a year-plus,
3 and said they would like to work with St. Luke's to develop
4 a program, care of patients at risk that actually begins to
5 predictively model patients with what they refer to as
6 "hierarchal care codes" that begin to define the risk
7 adjustments, that would begin to define whether a patient
8 potentially could move into a high-cost disease state.
9          And the theory around this program that Regence
10 research is based on is that patients managed in this
11 intensive outpatient environment have, by the -- by the
12 projected data, saved as much as 20 percent per year by
13 having very specific intensity, registered nurse attention
14 paid to these very specific cases.
15          So that program kicked off early this year.  We
16 really won't have data till the end of the year.  That's
17 really the Regence recommendation.  So we have taken that
18 core program, we have actually expanded that, and we are now
19 placing patients from the TrueBlue population, which is our
20 Medicare risk program with Blue Cross, our own employee
21 population, and other employers that have expressed
22 interest.  We are now starting to put patients into that
23 program.
24          So it's really focused on patients that are either
25 predictively to be at risk or have already been identified

1928

1 as very high-cost consumers in healthcare, and we're
2 actually applying very focused resource around those
3 patients.
4          And that, again, is under the direction of this
5 care coordination team that is actually -- the medical
6 director for that is Dr. Necochea, and Dr. Necochea is
7 actually a physician with a special interest in this and
8 also with a master's degree in public health.  So he has
9 training, focus, and passion around providing
10 well-coordinated clinical care, and I think this is going to
11 be -- this is foundational to the work we're doing as we
12 prepare for risk.
13      Q.  So I'm not going to --
14          THE COURT:  Let me just inquire very briefly.
15 Mr. Kee, is this intended to improve outcomes, reduce
16 cost, or both?  And if so, how does it reduce cost?
17          THE WITNESS:  Well, if you think of the CoPar
18 program, again, the theory -- and I think it's been proven
19 out in other intensive outpatient care programs -- is if you
20 have patients with serious chronic disease state, multiple
21 diseases like congestive heart failure, COPD, diabetes, they
22 tend to consume a lot of resources.  And that may be because
23 they don't have social -- they don't have a social network
24 to even get them to appointments.  They are not ambulatory,
25 so they can't get to the pharmacy and do refills.

1929

1          So these nurses that are assigned to these folks, which
2 is a very tight ratio of around 1 to 125 to 150 patients,
3 actually provide very specific coordination of their care
4 with the intent of keeping their quality of life as good as
5 it can be, given some of these folks have serious
6 disabilities, but also keeping them in a low-cost setting.
7 So it's both.
8          THE COURT:  So if -- my assumption is that people
9 who have these kind of chronic diseases often go from
10 chronic to critical constantly because of this, the
11 problems.  And I guess the idea is that you can manage the
12 care much more -- much less expensively if they can -- if
13 you can keep them just fighting the chronic problems without
14 going critical and requiring ER visits, hospitalization,
15 things of that sort.  Is that part of the concept?
16          THE WITNESS:  That's exactly the concept.
17          THE COURT:  All right.
18          THE WITNESS:  So if you have an out-of-control
19 diabetic, they are going into the ER frequently with DKA,
20 they are going to be a very high-cost patient in the system.
21 So what our care coordinators do is prospectively look to
22 find where do we have triggering events that are putting
23 patients in the very high-cost situations.
24          In the typical fee-for-service world, you just wouldn't
25 worry about this stuff because, actually, the more people

1930

1  that come to the emergency room under fee-for-service,
2  actually, it's revenue stream.  So what we're doing is
3  fundamentally targeting where do we have irrational variance
4  in utilization?
5      And it is a quality-of-life indicator.  Many of these
6  people have serious disability that with these nurses
7  working with theme, their quality of life, just their
8  general quality of life also improves.  So I do think it's a
9  balance scorecard between how do you best serve the patient,
10  but how do you do it in the lowest cost setting.
11      And the more we can keep a relationship with patients
12  that allow them to be at home as much as possible,
13  coordinate family support, whatever social networks are
14  necessary, you are going to end up with a lower cost outcome
15  to society as a whole.
16  BY MR. KEITH:
17      Q.  And just a little bit of cleanup.  You mentioned a
18  Dr. Necochea.  Can you just spell the last name for me.
19      (Laughter.)
20      MR. KEITH:  Sorry.  All right.  Your Honor, I
21  withdraw my question.
22      THE WITNESS:  N-E-C-O-C-H-E-A, I think.  I'm
23  sorry.  I don't -- I see it every day.  I just -- I always
24  get fouled up on it.  But Alejandro Necochea, so outstanding
25  young doctor.

1931

1  BY MR. KEITH:
2      Q.  And what's your estimate of the annual cost of the
3  care coordination program that St. Luke's has implemented?
4      A.  Well, I haven't run the exact numbers on it, but
5  it's roughly 15 people.  It's going to be running a
6  million-and-a-half to two million dollars a year in
7  training, education, salary, benefits, in that -- in that
8  range.
9      Q.  You mentioned that one of the roles of the care
10  coordinators is to ensure the patients are directed to
11  programs where the -- they can receive quality care at the
12  lowest cost.  And I'm wondering if you can identify some of
13  the alternative programs, sites of service to which the care
14  coordinators direct patients.
15      A.  Well, we just probably talked through the
16  CoPartner Program.  We also have a congestive heart failure
17  clinic, which I think others may talk about, but that's
18  a -- focused on a very complexed disease state, congestive
19  heart failure.  It's high cost, typically drives a lot of
20  readmissions, and it's a very serious quality-of-life
21  disease state.
22      We've also invested in mental health, which is a
23  -- which is a woeful weakness in the state of Idaho because
24  it's woefully under-reimbursed.  I mean, go out and look on
25  websites and see which psychiatrist is accepting patients in

1932

1  the city of Boise.  It'll be an eye-opening experience.
2      So we've invested in mental health, cardiac rehab,
3  and then we've made a serious investment in diabetes.  We
4  actually now wholly own the Humphreys Diabetes Center, and
5  we have been in the process of redesigning that, redeploying
6  our educators out of the central Humphreys Diabetes site
7  actually into clinics where they can get closer to the
8  physician and closer to the patients.  And we as well will
9  be kicking off with Dr. Christensen a specialty clinic
10  really focused around the more acutely ill diabetes
11  patients.
12      And for those of you who don't know it, diabetes
13  is a seriously debilitating disease left untreated.  And
14  unlike some diseases that can be cured, a lot of diabetes
15  cannot be cured.  It's -- it's a lifetime disease.  I mean,
16  it's always with people, and it is a very high-cost disease
17  state that, left untreated, actually drives significant cost
18  into the healthcare system.
19      So we took the structure of Humphreys Diabetes
20  Center, we have taken that and regionalized it to
21  Twin Falls.  We have diabetic educators now in the Nampa
22  area, we send them to Fruitland, we have a Humphreys
23  Diabetes at Wood River.  And we are expanding our network in
24  a synergistic, collaborative way with a group of -- I think
25  we have 16 diabetic educators now, and we just finished our

1933

1  survey by the ADA.
2      And what the ADA said -- Dr. Pate may not
3  appreciate this, but it's probably one of the highest
4  concentration for populations in CDEs they've seen in a lot
5  of their surveys.  So we are making serious investments into
6  this overarching care of coordination program.  Now these
7  people are in addition to this core group of 15 that are
8  just basically providing navigation and the higher-end care
9  coordination services.
10      So those are probably the key initiatives that
11  we're working on as well.  We are just getting ready to kick
12  off our child and adolescent psychiatric program under the
13  direction of John Hanks, and again a woefully underserved
14  area in the community and also woefully under-reimbursed,
15  but an area that has incredibly high impact on the pediatric
16  population.  So we brought in two child psychiatrists.
17      Again, these are not fee-for-service investments
18  that make sense, but they are investments in the community
19  that we think will pay significant rewards.  And that is
20  under the auspices of the pediatricians.  What we're trying
21  to do is drive care coordination back into the primary care
22  clinics with care coordinators that are closely aligned with
23  the two child psychiatrists.
24      So these are the kind of programmatic things that
25  we are investing in, again not consistent with

1934

1  fee-for-service medicine, but consistent with our mission to
2  improve health and ultimately, I think, will allow us to
3  achieve the Triple Aim, which isn't just lower cost, but
4  better health, better care, and lower cost.
5      So that -- that's the milieu of things under that
6  umbrella.
7      Q.  Is it your belief that investing in mental health
8  services could lower cost in addition to improving health?
9      A.  Yeah.  I think the goal in mental health left
10  uncontrolled, what you typically find out is that, first of
11  all, it creates tremendous social dysfunction in the family.
12  And, I mean, just -- I don't want to drift too much, but
13  like my wife is a CASA volunteer, so she sees all this
14  dysfunction out into the marketplace because it's
15  underserved.
16      When you actually apply resources to these
17  situations where you are actually helping people, this
18  actually confers value, in my view; less psychiatric
19  hospital admissions, less emergency room admissions; and
20  absolutely clearly higher quality of life for children with
21  serious psychiatric difficulties.
22      So it's a big deal.  What we are doing is a
23  serious big deal, and I would challenge that there is nobody
24  else in the state of Idaho doing what we're doing.  In fact,
25  I know nobody else is doing what we're doing.  This is

1935

1  seriously expensive work, and it has serious value to
2  society, quality of life, and, yes, I think will impact
3  cost.
4      Q.  I'm going to turn briefly to one of the high-level
5  steps you indicated that St. Luke's is taking is realigning
6  its relationships or attempting to realign relationships
7  with payors.  We've a had a lot of testimony on that point
8  by others, so I don't want to get into that much detail.
9      But one question I have for you is:  From a patient's
10  perspective, will they notice the difference between being
11  part of an insurance plan that is risk-based with providers
12  as opposed to pure fee-for-service?
13      A.  That's a complicated question.  I think that in a
14  well-run balanced program, what I would call maybe more of a
15  hybrid risk, what a patient would expect to see is a
16  reallocation or rebalancing of service from low value -- or
17  low value, high cost.  So unnecessary surgery, unnecessary
18  testing, rebalanced with the availability of front-end
19  preventive health services.
20      So I would think that would be something in our
21  vision that we would see some of our leadership and our care
22  coordination team that's led by Beth Gray, that that team is
23  focusing on how do we begin to interact with the patients.
24      We're in the process of developing a more
25  comprehensive health risk assessment that actually brings

1936

1  biometrics, more in-depth depression screening.  How does
2  that come forward into a value proposition that not only
3  identifies problems, but also identifies some solutions?  So
4  I think you would see that kind of functionality.
5      I think the second thing you might see is instead
6  of getting 15 bills from 15 different providers if you need
7  care, we could end up with sort of one patient, one bill.
8  That's been our mission and vision, so we're attempting to
9  reduce the administrative burden on the patient of actually
10  delivering care.
11      I would hope that patients -- again, I come back
12  to the STEEEP principle.  If you actually run a really
13  well-organized, hybrid-risk program, things like spine
14  surgery would not be conferred upon people who aren't ready
15  for it.
16      So, for instance, if you're a smoker, if you're 50
17  pounds overweight, if you're depressed, you probably
18  shouldn't be going to surgery.  In a well-managed health
19  plan, one would expect that we would put someone through a
20  more organized program -- which we're doing, we're working
21  on right now as we speak -- prior to the time that they
22  would be a candidate to surgery; that we wouldn't take a
23  patient immediately to surgery based on an unneeded lumbar
24  MRI that identifies a bulging disk that actually may be
25  asymptomatic and has nothing to do with what's going on with

1937

1  your body.
2      Those are the things, from a safe perspective, you
3  don't want to expose things -- you don't want to expose your
4  patients to unnecessary testing.  And with aligned
5  incentives, you begin to put the pieces of the puzzle
6  together where the patient actually is informed.  Right?
7  You actually are informing patients.
8      Another aspect of accountable care:  If, in fact,
9  a patient knows who the high-performing surgeons are and if
10  you have a way to identify it, don't you think patients
11  deserve to know?  It shouldn't be just based on a financial
12  interest in a revenue stream; right?  It ought to be based
13  on how many cases have you done, what have been your
14  outcomes.  So I think additional transparency would be a
15  part of a well-balanced, well-run, hybrid-type risk plan.  I
16  don't know if that addresses your question.
17      Q.  What do you mean by "hybrid-type risk plan"?
18      A.  Well, I don't think we want to go back to the '80s
19  where it's all about the medical loss ratio and it's not
20  about outcomes.
21      Q.  And what do you mean, "medical loss ratio"?
22      A.  Just controlling claims to the benefit of whoever
23  the payor is.  So if you can pay out 70 percent of claims in
24  the premium and claims instead of 80 percent, it goes to
25  somebody's bottom line.

1938

1    So the goal is balance outcomes against reasonable
2    cost.  That's the goal, in my view.
3        Q.  You mentioned a program that St. Luke's is
4    developing in the -- has developed with respect to spine
5    surgery.  Can you tell the Court in particular what you
6    meant by that?
7        A.  Well, actually I'll give you the history of that,
8    too.  Actually, several -- gosh, it's probably been seven or
9    eight years ago, I think Blue Cross tried to start a program
10   called Northwest Spine, and they tried to do this with
11   independent physicians with no organizational structure
12   behind it.  Actually, one of the key leaders in that was
13   Howard King, who is actually employed by us now.  And it
14   just sort of fell on its face.
15       Why did it fall on its face?  There's really no
16   sort of economic alignment to doing a Center for Spine
17   Wellness and providing conservative care if, in fact, your
18   main revenue stream is doing surgery; right?  There is,
19   like, inconsistent principles.
20       So anyway, it's been many years ago.
21   Geoff Swanson, who was the director of our Center for Spine
22   Wellness, actually reinstituted that plan, and we actually
23   now have put -- we've restructured that.  Blue Cross has
24   actually taken a lot of the principles of those centers and
25   started to embed that, as I understand, in some of their

1939

1    benefit plans.  And so we have retooled, relaunched that
2    program and actually have support of Howard King, Ken
3    Little, some of our more advanced surgeons who are working
4    more closely with Luke's, and we are actually going to
5    launch that out.  We are now seeing renewed interest of
6    people actually -- physicians actually referring patients
7    through the center.
8        Now, that being said, all we have today is small
9    sample groups.  We don't have definitive, statistically
10   significant data, but we have positive trends that this is
11   going to reduce the rate of spine surgery, which in this
12   community, is admittedly above what you would expect for
13   national averages.
14       Q.  And where does St. Luke's have spine wellness --
15   or centers for spine wellness?
16       A.  Twin Falls, Boise, Meridian, Nampa.
17       Q.  I'd like to turn to the final point you raised
18   when I asked you for the high-level steps St. Luke's has
19   taken to implement the Triple Aim, which was data analytics.
20   And I think you mentioned an organization called WhiteCloud.
21   Who is that?
22       A.  Well, WhiteCloud Analytics is actually a local
23   company, and it was founded by Bob Lokken, who was formerly
24   the -- I'm going to try to do it by recollection here, but
25   the former owner of ProClarity, and he sold that company to

1940

1    Microsoft.  And while he was with ProClarity, he did a
2    extensive amount of work with the VA Medical Center over a
3    number of years and developed an interest and an expertise
4    around the healthcare industry.
5        He has since launched a new company, which we
6    partnered with him on, to develop a data mining tool and a
7    reporting tool so that we can actually take the
8    information -- again, going back to effective use of a
9    electronic health record platform -- mining that
10   information, and putting it into a format that's actually
11   usable for a physician to begin to modify behavior based on
12   continuous feedback loops and actually seeing the results of
13   their work they are doing.
14       Now, that is the work of WhiteCloud Analytics.
15   There is three tools.  One of those we refer to as our
16   clinical integration tool, and that tool is designed
17   specifically for ambulatory practices at this point.  It
18   will evolve further to include our surgical specialists.  It
19   includes a population health tool, and it also includes what
20   we call acute foundations, which is more in-hospital,
21   acute-care-type work, but it's focused on reporting
22   outcomes.  It's not reported on process; it's on outcomes,
23   how do we make ourselves accountable for outcomes.
24       Q.  And how much has St. Luke's invested in the
25   WhiteCloud tools thus far?

1941

1        A.  The warehouse investment is around 10 million.
2    The applications, I'm saying 4 to 5 million, something in
3    that range.  It's been a serious investment.
4        And, actually, we're not the only ones investing
5    in these tools.  I mean, there's a variety of other tools on
6    the market.  We happen to think this one has some unique
7    characteristics around behavior modification, Web access.
8    But admittedly, many other health systems are doing this.
9        Q.  And we're going to have another witness walk us
10   through the clinical integration scorecard, but I have a
11   couple of questions for you on that tool.
12       What, if any, work has been done to try to extract
13   information from Saltzer's electronic medical records to
14   include in the data warehouse in WhiteCloud?
15       A.  We -- because Saltzer joined St. Luke's when they
16   did, we also are a participant in one of our payor
17   relationships called the Medicare Shared Savings Program.
18   We included Saltzer in that because we saw that as an
19   opportunity for developing better management tools in a more
20   aligned incentive program.
21       So Saltzer's ECW program, we were able to mine 30
22   of 40 -- or excuse me -- around 23 of the 33 metrics that
23   were required from MSSP.  That was with significant work, I
24   think some 240 hours of analyst time, and we still have to
25   mine manually ten different data elements.  So if we had

1942

1 been able to bring Saltzer into Epic immediately, we would
2 have had the full benefit, the full functionality of the
3 tool.
4     Q.   And on a going-forward basis, if Saltzer remained
5 on its eClinicalWorks system, would there be any costs
6 associated with maintaining the interaction of
7 eClinicalWorks and WhiteCloud?
8     A.   Yeah.  There will be -- there would be costs.  As
9 we begin to go get additional data elements over time, we
10 would have to invest both our analyst time, and it also
11 requires some amount of effort in investment on Saltzer's
12 time to work with eClinical to modify the database to
13 actually make the interfaces work efficiently.
14     Q.   And turning to the population health management
15 tool, can you just, at a high level, tell the court what
16 that is.
17     A.   So the population health management tool is
18 designed to take claims information -- at this point, claims
19 information -- and actually bring forward utilization data.
20 So around things like inpatient admissions for a thousand
21 member months, skilled nursing days per thousand member,
22 postacute -- the whole postacute and inpatient milieu of
23 utilization.
24         We will also use that to look at imaging
25 utilization, lab utilization.  One of the -- one of the

1943

1 things you would see in the tool is spine surgery
2 utilization, joint replacement.  So it's -- it's an effort
3 at a high level to look at utilization and identify areas of
4 variance as compared to national benchmarks.  And the
5 majority of this today is based on MedPAR.  We will still be
6 importing Milliman statistics into this, as well.
7     Q.   By that, do you mean the national standards you're
8 using at this point?
9     A.   The national standards for utilization.
10     Q.   And MedPAR is what?
11     A.   The Medicare database that then gets assembled by
12 the crew at Dartmouth Atlas.  They actually publish that
13 information, so it's a pretty sizeable amount of data.
14         MR. KEITH:  So, Alyson, would you bring up the
15 population health management tool.
16         THE COURT:  Counsel, what is the exhibit?  Is this
17 the demonstrative?
18         MR. KEITH:  This is a demonstrative.  It is 5104.
19         THE COURT:  All right.
20         THE WITNESS:  So could I comment on a couple other
21 things before we get started?
22 BY MR. KEITH:
23     Q.   Sure.
24     A.   The other things this will demonstrate for our
25 care coordination team is where we have high-cost, high-risk

1944

1 patients.  So this allows us an opportunity for those case
2 managers to actually look at this population, and based on
3 trigger events or hierarchal care codes, actually quickly
4 identify where we could make interventions in care.  And it
5 also organizes patients into registries.
6         And back to the question on, well, where -- you
7 know, what would we do with some of these patients if we
8 identified where their care was deficient?  Registries point
9 you in the direction of these places where you can make
10 meaningful interventions.
11         So I apologize.  I wanted to cover that.
12     Q.   Before we turn to the specific functionalities of
13 the tool, can you just explain what is the data underlying,
14 what we're looking at on this -- in the health
15 management -- population health management tool?
16     A.   This particular tool that we're looking at right
17 now -- and this would be the TrueBlue population under which
18 we have a risk-based contract with Medicare or with Blue
19 Cross for their Medicare Advantage plans.  So we accept
20 a claims file from Blue Cross, and then we -- Alyson's crew
21 does their magic and then presents this data in a
22 user-friendly format such that we can begin to identify
23 trends.
24         And I will have to be honest with the Court today.
25 We just recently received this data.  This isn't perfect

1945

1 data, so I can speak to functionality.  I'm not speaking to
2 the data being perfect today; I'm speaking to
3 functionality of the tool and how the tool might be used.
4         So thank you for --
5     Q.   And in the claims file that you get, are
6 those -- well, let me take a step back.
7         Who are the individuals for whom Blue Cross sends
8 St. Luke's claims records?
9     A.   These claim records are premised upon a patient to
10 primary care provider relationship.  So this would only be
11 claims data for those patients that are assigned to a
12 St. Luke's physician, but it would represent claims wherever
13 that patient experienced service.
14         So they could have gone to West Valley; they could
15 have gone to Saint Al's; they could have -- this is a data
16 set based on a relationship of a patient to a primary care
17 physician.  And at this point, this is only patients that
18 are under a St. Luke's tax identification number.
19         So that's the -- and then there is one other set
20 of data that's been interfaced in here for the case
21 managers.  And for selected disease states, we have started
22 to integrate lab information such that the case manager for
23 some of these disease states could actually quickly get to
24 the lab results, which typically identify our people
25 potentially on the tipping point of having other medical

1946

1  issues.
2       So -- but this is predominantly -- I'd say 98
3  percent of this is going to be claims data.
4       Q.  So could you show the court by touching the screen
5  in front of you where you might go on this page of the tool
6  if you wanted to assess utilization, say, of spine
7  surgeries?
8       A.  So that would be sort of where -- that would be
9  spine surgeries per thousand member months.
10      Q.  And can you tell the court what the statistics are
11  that are reflected there?
12      A.  So the first column is our year-to-date
13  statistics, so that would be .6 per thousand member months.
14  Again, the data sets are small today.  The national median
15  would be .4.  So assuming all this data was perfectly
16  cleansed, we would be above the national median.  And then
17  that would show the prior year, which would actually say
18  we've trended down from the prior year.
19      I'm not saying this is correct; I'm just saying
20  that's the methodology.  So it shows current year,
21  comparison to the average, and what was going on last year.
22      Q.  And if, after establishing that all the data were
23  correct and properly reflected, there was seemingly high
24  incidence of spine surgeries, how would you -- or how would
25  the care management team use this tool to investigate

1947

1  whether that was true and what they ought to do about it?
2       A.  Well, the first thing that would happen is they
3  would drill down into that population -- I think Alyson is
4  going to do.
5       Q.  Can you just tell the court what we're looking at
6  on this screen?  We've clicked through to the spine
7  surgeries page.
8       A.  So at the very top up here, that is, in addition
9  to the national median, also the national 90th, because I
10  think if you were to go through most of our tools, whether
11  it's acute foundations or our clinical integration tool,
12  we're not trying to shoot for the average; we're trying to
13  shoot for better -- we want to be better than average;
14  right?  So that's the first graph at the top.
15      Immediately below that, you will see the primary
16  care physician to whom that patient is attached by the Blue
17  Cross Medicare Advantage program.  There is a required
18  attachment to a primary care physician.
19      So, again, if there was a particular problem with
20  a primary care physician and referral partners, not saying
21  anything is wrong, but if that particular physician was
22  sending patients to a spine surgeon wherever -- when I say
23  referral, I mean to a spine surgeon -- that would be easily
24  identified by this -- by this chart.
25      So you could say, you know, Hey, Dr. Preucil, it

1948

1  looks like we've got some utilization that doesn't appear
2  consistent.  And from that point, we can drill down and
3  actually identify the patient.
4       Q.  And how would you do that?  Can you show the court
5  where you would click?
6       A.  Right there (indicating).
7       MR. KEITH:  And I should mention, Your Honor, that
8  the tool is being shown without protected health
9  information, so --
10      THE COURT:  Right.  I assumed as much.  Now, the
11  exhibit number you referred to, is that the entire program?
12      MR. KEITH:  The exhibit number, Your Honor, is
13  actually screen shots of all of the pages that we'll be
14  looking at.
15      THE COURT:  All right.
16      MR. KEITH:  So just --
17      THE COURT:  Just so I'm clear, is this a
18  live -- it appears to be an online demonstration, correct?
19      MR. KEITH:  It is, Your Honor.  And I'd just ask
20  Mr. Kee whether --
21  BY MR. KEITH:
22      Q.  Or the WhiteCloud tools, are those Web-based, or
23  are they available in other forms?
24      A.  This is actually designed to be Web-based
25  delivery.  The old way is you get a stack of paper reports

1949

1  from ten different insurance companies and try and sort
2  through them.  The new way we're trying to promote is online
3  so that the physician, case manager, whoever has need to see
4  information, only those that have need, can actually quickly
5  access the information.  So it's a little different than
6  some of the other tools that have been historically proposed
7  to the market.
8       Q.  Now, Mr. Kee, you indicated that if we clicked on
9  the radio button, which I believe we've done, that we would
10  be able to see who the patient is who received this spine
11  surgery.  I don't see a name here.  Why is that?
12      A.  Yeah, right (indicating) -- and it's all blanked
13  out for obvious reasons because -- so we could click on that
14  and actually go sort of see the -- who the patient would be.
15  And from that point, you could quickly drill down, access
16  medical records, look for efficacy of care, efficiency of
17  care, whatever.
18      Q.  I believe --
19      A.  So it's just a functional way to get quickly to
20  patient information.
21      Q.  And I believe that Alyson has clicked through to
22  the patient record.  Again, it's not identified by any
23  individual's name.  But can you tell the Court what we are
24  looking at on this screen?
25      A.  So, yeah, in this screen, it would identify -- if

1950

1 you could move across a little bit -- it would identify the
2 patient, the primary diagnosis, and again the primary
3 procedure. So, again, it allows you a progressively more
4 specific drill down on what's going on with that particular
5 patient.
6     Q. I'd like to turn to a different page on the tool,
7 if I can.
8     MR. KEITH: Alyson, if you could click on "Member
9 Demographics" for us.
10 BY MR. KEITH:
11    Q. Mr. Kee, can you explain to the Court what we're
12 looking at here?
13    A. Well, the first one is fairly self-explanatory.
14 It just basically looks -- it's the age distribution of the
15 population.
16        The second chart speaks to sort of where these
17 patients are populated, so you can see that in our internal
18 medicine groups, the vast majority of the geriatric
19 population tends to migrate to our internists in this
20 community.
21        So if we could scroll down a little bit, this is
22 probably one of the more important screens. This says
23 enrolled -- the enrolled patient risk scores for the -- for
24 the population.
25        And, in particular, if you look at this

1951

1 healthcare -- hierarchal care codes greater than or equal to
2 3, this starts to speak to that population and the relative
3 small number of patients relative to the cost of care. So
4 in this slide, what you'd see is that about 7 percent of the
5 patients consumed about 34 percent of the resources. And if
6 you keep adding down, by the time you get to roughly 14
7 percent of the patients, you're up around half the spend.
8        So, again, not saying this is perfect at this
9 moment, but as we begin to refine this, this is beginning to
10 reflect what are the national trends in healthcare spend.
11 So from that point, we can actually drill down further so we
12 could go look at the patients that are within this -- these
13 hierarchal care categories.
14    Q. And I believe Alyson has just clicked on that
15 category. And what are we looking at here, Mr. Kee?
16    A. So what a case manager, for example, or a clinical
17 care coordinator would be looking at here would be obviously
18 the blanked-out member ID, but the risk score, which is for
19 this patient a very, very, very high risk score. So this is
20 a patient that has a lot of -- a lot of disease state going
21 on and might be a patient that could potentially benefit
22 from more focused interventions, you know, both again from a
23 cost and a quality-of-life perspective.
24        This would also indicate, if you move across the
25 screen, the number of claims that this patient has

1952

1 experienced, the amount of premium received, and the total
2 amount of paid claims. So it sort of puts into balance, you
3 know, what is the premium flow, what's the paid flow.
4        And that, in and of itself, is not -- I mean, I'm
5 not saying that's the most clinically important because you
6 have to look at the population cost. But it begins to give
7 you a profile of a very high-cost patient relative to the
8 premium flow. So these are the kinds of tools that we would
9 utilize with our care coordination team to say, okay, when
10 we go look at these claims, where is this patient
11 experiencing care? Is it the emergency room? Is it
12 surgery? Is it -- how do we better arrange the care of this
13 patient so, again, it's cost effective? And absent having
14 access to the information, you're sort of flying blind a lot
15 with the patients.
16    Q. If a care manager wanted to drill down to a
17 patient level, as you say, and find out where care is being
18 provided, what would he or she do?
19    A. They would go to the member ID.
20    Q. And in this case, we're clicking on the top member
21 in the list?
22    A. Yeah.
23        So at the very top right, we could go across,
24 these would be a listing of all the disease states that have
25 been identified for this patient. If you keep going across,

1953

1 these are the weights that are assigned to that. So that's
2 sort of where that risk score comes from, is you look at all
3 the hierarchical care codes, and you come up to a total risk
4 score.
5        From that, you can actually drill down and see
6 where the services are being provided. So in this case,
7 this particular patient has been seen frequently at -- it
8 looks like Dr. Parent at Saint Al's saw them for cardiac
9 dysrhythmia. Let's see, Dr. Jackson and Gem State
10 Radiology.
11        So even though this patient is assigned to
12 St. Luke's, the patient, for whatever reason, has ended up
13 in a different delivery system. So this is -- this is the
14 data we'd see. If this was a St. Luke's patient seen within
15 the St. Luke's network, we could quickly get to the St.
16 Luke's electronic health record. But sometimes patients
17 move around in systems by their own choice, so...
18        MR. KEITH: And, Alyson, could you go back up in
19 the main page of the tool. I'd like to show the Court what
20 appears under "registries." And, for the record, this will
21 be Exhibit 5104-10, the screen shot of this page.
22 BY MR. KEITH:
23    Q. Mr. Kee, can you tell us what we're looking at?
24    A. So this first chart really looks at the
25 relationship of the number of patients in a registry. So if

1954

1 a patient has diabetes, they are going to fall into a
2 diabetes registry.  And it also looks at the average cost of
3 care over a 12-month -- over a 12-month run, what would be
4 the cost.  So you -- I mean, graphically, what it's just
5 saying is there is a high cost of care for a lower number of
6 patients.
7        If you look at the first one here, end-stage renal
8 disease, you can barely see the number of patients, but the
9 average cost is very high by the time a patient has moved
10 into end-stage renal disease and is in a dialysis center,
11 very, very high-cost patients.
12      Q.  And the chart you're referring to, that's titled
13 "Registry Patient Counts Versus 12-month Charges/Patient"?
14      A.  Correct.
15      Q.  Can you give us an example, looking at the chart,
16 what a care manager might do for some of the patients in a
17 particular disease state, for example?
18      A.  Well, and actually this is one of the aspects of
19 Epic that sort of outperforms some other systems is their
20 ability to actually create registries.  But in this
21 particular screen, you could -- you could go into
22 depression, AMI, asthma, any one of these disease states and
23 actually see the patients that are within that registry.  So
24 if you clicked on diabetes --
25      Q.  And you're looking at the registry patient counts

1955

1 chart?
2      A.  I'm sorry.  Yes.
3      Q.  And you're clicking on -- or Alyson is clicking on
4 diabetes?
5      I tell you what.  Why don't we go to a different
6 registry, Mr. Kee.  Why don't we go to the CHF registry,
7 which if we go back to registries or go back a page, we can
8 click on that.
9        MR. KEITH:  And, for the record, this will be
10 Exhibit 5104-11.
11 BY MR. KEITH:
12      Q.  Mr. Kee, what are we looking at here?
13      A.  So, again, a care manager could see member ID.
14 But probably more importantly, they could see what are the
15 disease registries that this patient is contained within.
16 So if you had a patient with CHF or with CHF, they
17 actually would have opportunities to say, well, would there
18 be benefit for this patient to be in the CHF clinic?
19        We also have options for patients that are
20 extremely obese; where can we place them into an appropriate
21 program?  And the goal of this would be, again, to say, if
22 we have a patient that has a need, how do we quickly get to
23 those patients and identify programmatically how do we
24 address their issues proactively.
25        Or in some cases, if you look at the cost, it's

1956

1 going to be retrospectively.  But we're trying to get a
2 rhythm and get out in front of the curve and get some of
3 these patients into the right programs to avoid the
4 expenditures.  So that's the goal of this registry.
5      Q.  And if a care coordinator decided, for example,
6 that the first patient on this exhibit, that there might be
7 an intervention that would be effective, what would the care
8 manager do?
9      A.  They would typically contact the physician and let
10 them know, Hey, look, I think there is an opportunity here.
11 And in a embedded clinical care coordination system, the
12 goal is to have the physician say, Oh, yeah, that looks like
13 an opportunity, and the clinical manager could reach out
14 directly to the patient sort of seamlessly as part of the
15 health system, instead of, like, from an insurance company
16 perspective where a third party is calling to say, Hey,
17 look, you've got a problem.
18        So the intent is to make this seamless for the
19 patient experience so it looks like it's just part of the
20 care delivery system.  That's the intent.
21      Q.  If a care manager wanted to find out who the care
22 provider was for, say, the top patient on the chart, what
23 would he or she do?
24      A.  I think you just click into "member."
25      Q.  I apologize.  I think I sent you to the wrong

1957

1 patient.  That one appears not to have data in it.  Why
2 don't we pick the second patient down the line.
3        MR. KEITH:  And, for the record, the screen shot
4 of this -- what's appearing before the court is 5104-12.
5 BY MR. KEITH:
6      Q.  Again, Mr. Kee, what are we seeing here?
7      A.  So we could identify the physician, which is
8 Dr. Gunther.  She's at Family Medicine Clinic on Parkcenter.
9 And then, basically, this is the array of places that this
10 patient has received services, so...
11      Q.  And is there any data on the -- you know, that's
12 incorporated from the her system at St. Luke's into this
13 particular chart?
14      A.  Yeah.  I believe in this one, we actually do have
15 access to lab information.  But the main functionality of
16 this is to identify high-risk patients; identify where they
17 are receiving services that are inefficient, ineffective, if
18 at all; and then to be able to place these people into a
19 program that would actually, again, improve quality and
20 improve financial outcomes.  So that's the goal of the tool.
21        And, actually, this has been tried for many years
22 with insurance carriers by sending you a paper report and
23 then hoping people will look at it.  The problem is there
24 is, you know, how many insurance companies with how many
25 reports, and it's a little difficult for people to sort

1958

1 through the paper.

2     MR. KEITH: Unless the Court has particular

3 questions on the demonstrative, I think we can take it down.

4 BY MR. KEITH:

5     Q.  Mr. Kee, I'd like to ask you just a few questions

6 about the Saltzer transaction. Can you tell me what your

7 involvement was in the lead-up to the transaction?

8     A.  I was relatively uninvolved from the beginning. I

9 didn't really have the core relationships with the group.

10 In the midst of the transaction, I actually was deployed to

11 Wood River for about a year, year and a half, and I got more

12 actively involved when I came back in October,

13 October-November, somewhere in that time frame. So not too

14 involved for the first couple of years and heavily involved

15 in the last year.

16     Q.  Did you ever have an opportunity to speak with the

17 Saltzer physicians about whether the transaction would

18 impact their -- where they could send patients for specialty

19 care or inpatient admissions?

20     A.  No. We have always been clear that physicians can

21 send patients where they think they receive the best care.

22 So we have never -- is that the question? Am I --

23     Q.  Well, I maybe asked a bad question. Is the

24 answer, yes, you've had conversations with the Saltzer

25 physicians --

1959

1     A.  Absolutely.

2     Q.  -- that that's the policy?

3     A.  We have addressed that in specific contract

4 language that specifically addresses concerns with referral

5 partners because doctors typically have those concerns; am I

6 going to lose autonomy over how I treat my patients, so...

7     Q.  And why is it that St. Luke's approach is not to

8 direct their physicians to refer to any particular specialty

9 provider or hospital?

10     A.  Well, to be perfectly honest, we have always felt

11 that, first of all, if physicians decide they want to work

12 with St. Luke's, which is a decision, nothing that's forced

13 on them, they have chosen to work with St. Luke's for their

14 own personal reasons in support of the mission of Luke's.

15 And at the end of the day, if they have chosen to work with

16 us, then we feel like we ought to give them free choice on

17 where the patients want to go, and we feel like the market

18 will sort itself out. We feel like we provide good

19 services. We have been a solid, high-performing healthcare

20 system, and there just hasn't been any particular reason to

21 tell people what to do.

22     And then lastly, I've just never found it to be

23 terribly productive to tell physicians what to do, just to

24 be honest. I just -- I just don't find it real productive,

25 so I don't really do that. I feel like if you have to tell

1960

1 people what to do, whether it's physicians, staff, or

2 whomever, you probably have a bad relationship.

3     Q.  I want to turn to a question about the Saltzer

4 electronic health record system.

5     Do you have an understanding of what that system is?

6     A.  At a very high level, it's eClinicalWorks.

7     Q.  And at this point in time, is eClinicalWorks

8 interoperable with Epic so that, for example, you could see

9 patient records from eClinicalWorks in the Epic system?

10     A.  No. It wouldn't -- I wouldn't say that's an

11 interoperable system. You can send faxes and scans back and

12 forth, but it's certainly not interoperable in the sense of

13 sharing discrete data elements.

14     Q.  So the fact that St. Luke's has been able to mine

15 data for the WhiteCloud system, that doesn't make the two

16 EHRs interoperable?

17     A.  Well, yeah, just for clarification, there is two

18 separate tools we're talking about. The WhiteCloud tool we

19 just looked at is a performance improvement tool and an

20 ability-to-identify-high-risk-patient tool.

21     The interoperable health record is a day-to-day

22 practice management tool that really is a much deeper

23 relationship than a -- than the WhiteCloud tool. Really, to

24 some extent, separate purposes.

25     Q.  One of the questions -- the issues that has

1961

1 already been raised before the Court is what the Saltzer

2 physicians might do if they were unwound in terms of whether

3 they would acquire the Epic system under an affiliate

4 strategy with St. Luke's.

5     Can you tell me what the St. Luke's affiliate strategy

6 is?

7     A.  The St. Luke's affiliate strategy is really

8 designed to allow physicians that want to share a

9 common -- a common electronic health record platform, not

10 financial records, but the health record, that they would

11 share that along with every other physician in St. Luke's,

12 employed or otherwise.

13     That -- that requires that physician or the group

14 to adhere to very significantly rigid standards which really

15 takes a lot of customization away from a individual

16 physician because, basically, you're sharing in the same

17 record.

18     So to the extent a physician is interested in

19 that, then we are going to offer that opportunity to the

20 community. So that -- the affiliate strategy is an

21 opportunity for independent physicians to participate in a

22 community health information record, but they have to adhere

23 to the standards. The financial records are firewalled, and

24 they're unique to that physician group in the affiliate

25 strategy.

1962

1     **Q.** Is there a cost associated with installing Epic at
2 an independent affiliate?
3     **A.** **Absolutely, yes.  We are estimating the**
4 **cost -- initial cost per physician, 40- to 44,000 per**
5 **physician to install Epic in that environment.**
6     **Q.** And what portion, if any, of that total cost could
7 St. Luke's pay on Saltzer' behalf?
8     **A.** **It's our intent, under the Stark allowances, to**
9 **pay up to -- I would -- I'm estimating 18- to $20,000 but,**
10 **you know, roughly -- roughly half.**
11     **Q.** And that dollar figure that you're providing, is
12 that for the whole clinic, or is that per physician?
13     **A.** **Per physician.**
14     **Q.** So if my --
15     THE COURT:  Counsel, just a moment.  What is the
16 Stark allowance?
17     THE WITNESS:  Stark allows the hospitals to
18 subsidize the physician practice for 85 percent of what they
19 deem to be the allowable cost, which really are the
20 electronic health record software and other software that's
21 required to run the electronic health record.  But it
22 doesn't allow to pay for hardware or a fair amount of the
23 implementation cost.  So I --
24 BY MR. KEITH:
25     **Q.** So, Mr. Kee, is it the -- is it Stark that limits

1963

1 the amount that St. Luke's can contribute to installation of
2 Epic at Saltzer, or is it another provision of law?  Do you
3 know?
4     **A.** I'm sorry.  Today?  If Saltzer is part of us?
5     **Q.** No.  If Saltzer is unwound and independent.
6     **A.** Oh, if Saltzer is unwound, then --
7     **Q.** And my question is which -- is it Stark or is it
8 some other law or regulation that would limit the --
9     **A.** For the whole cost?
10     **Q.** -- paying for the -- right.
11     **A.** Yeah, we can't pay for the whole cost.  We're
12 limited to what we could do for an independent clinic, and
13 it's limited to the -- to that exemption.
14     **Q.** So if my math is correct, I believe the estimate
15 you've made is that, per physician, installation of Epic
16 through the affiliate strategy at Saltzer would cost
17 somewhere in the neighborhood of $20,000.  Is that about
18 right?
19     **A.** That's what -- that's what I would best guess
20 estimate today.
21     **Q.** And would that pay for all of the costs associated
22 with implementing Epic at Saltzer if it were an independent?
23     **A.** No.  The balance of the costs would have to be
24 absorbed by the group.
25     **Q.** And what about other consequences to implementing

1964

1 Epic at Saltzer as an independent?
2     **A.** Well, I think if Saltzer is unwound --
3     **Q.** Right.
4     **A.** -- what would be the consequences?
5     **Q.** Of installing Epic in terms of their revenues.
6     **A.** There would be undoubtedly sort of the sweat
7 equity cost of transition.  There would probably be for some
8 period of time a loss in their personal productivity.  Any
9 time you change these electronic health records, it has an
10 impact on personal productivity just to get through the
11 learning curve.  Those would be the impacts I would
12 immediately suggest.
13     **Q.** And has St. Luke's gone out and solicited interest
14 in the Epic Affiliate Strategy?
15     **A.** I don't -- we have -- we have received interest
16 from the community.  To be honest, we have just sort of
17 finalized our plan to roll the affiliate strategy out, and
18 we have had interest from about 15 groups.
19     **Q.** And of those 15 groups, how many have electronic
20 health records today?
21     **A.** I don't believe any of those -- well, I think one
22 of the 15 has ECW, which is certified, so I think 14 of the
23 15 have paper.
24     **Q.** And -- or the group that you mentioned that may
25 have eClinicalWorks, is it your understanding that that

1965

1 clinic already qualifies or does not qualify for meaningful
2 use payments?
3     **A.** My understanding is they already qualify.
4     **Q.** That is, they would not benefit from installing
5 Epic?
6     **A.** Well, they may benefit, but it's doubtful they are
7 going to invest in it.
8     **Q.** So the -- I'm sorry.  I may be a little confused.
9 These folks -- this group, you're saying, is not interested
10 in implementing Epic?
11     **A.** They are not going to be interested in Epic.
12     MR. ETTINGER:  Your Honor, the witness is now
13 opining as to the intentions of some other group after they
14 get more information that he is privy to.  It seems a little
15 broad.
16     THE COURT:  I'll sustain the objection.  The
17 witness can testify as to the factors that may dissuade
18 another group.  But I think on that basis, I'll sustain the
19 objection.
20 BY MR. KEITH:
21     **Q.** Do you have an understanding of why the vast
22 majority of groups that have expressed an interest in the
23 affiliate strategy, Epic Affiliate Strategy, are
24 using -- currently using paper records?
25     **A.** To some --

1966

1    MR. ETTINGER: Your Honor, I don't know if there
2  is a foundation. This sounds like more hearsay.
3    THE COURT: Sustained. The witness can testify,
4  if he knows.
5  BY MR. KEITH:
6    Q. Do you have an understanding of why --
7    THE COURT: Well, he can testify as to his
8  understanding of whether these groups interested in
9  affiliation are currently using paper records if he has
10 firsthand knowledge. But as to reasons why the affiliates
11 may want to switch, that would call for hearsay.
12   MR. KEITH: Well, I'm asking him as a person who
13 has managed physician practices for 30-some years.
14   THE COURT: Well, that's why I said that if he
15 identified the factors that would cause a physician without
16 actually testifying as to what the physicians thought, just
17 if that's clear.
18   MR. KEITH: Right.
19 BY MR. KEITH:
20   Q. So what are the factors in your mind that would
21 make it more attractive to adopt the Epic Affiliate Strategy
22 for a group that was currently on paper records?
23   A. I'm not sure what I'm allowed to say or not at
24 this point.
25   THE COURT: Just answer the question. Don't

1967

1  worry.
2    THE WITNESS: So, for example --
3    THE COURT: Mr. Ettinger will let us know if there
4  is a problem.
5    THE WITNESS: So, for example, a group like an
6  OB/GYN group that is heavily hospital-based and would like
7  to access easily records from both the hospital and the
8  clinic, and they're on paper today waiting for St. Luke's to
9  advance the strategy is a good decision for them. So I
10 would say that's an example of why someone would stay on
11 paper until the affiliate strategy is rolled out.
12 BY MR. KEITH:
13   Q. And what's your understanding of -- you've used a
14 term "meaningful use." Can you explain to the Court what
15 that is?
16   A. Meaningful use is an incentive program offered by
17 the federal government to encourage physicians to adopt
18 electronic health records as a platform by which to manage
19 their practice.
20   Q. And I take it from that explanation that a clinic
21 using paper records would not qualify for those financial
22 incentives?
23   A. That's correct.
24   Q. A clinic that adopted the affiliate strategy,
25 would that clinic qualify?

1968

1    A. As of this moment in time, yes.
2    Q. Assuming that Saltzer -- the Saltzer transaction
3  is unwound and Saltzer goes -- stays independent but doesn't
4  adopt the Epic Affiliate Strategy, what is your view of the
5  impact, or would -- well, what is your view of what the
6  impact would be on the provision of care in regards to the
7  STEEEP principles that you articulated earlier in your
8  testimony?
9    A. So I apologize. Could you repeat that? I
10 apologize.
11   Q. That's my fault. I apologize.
12   Let's assume that the Court finds the transaction is
13 unlawful, Saltzer goes back on its own and -- but it does
14 not adopt the Epic Affiliate Strategy, so it's not on Epic.
15 What, in your mind, would be the impact on the provision of
16 care, according to the STEEEP principles you articulated?
17   A. Well, I mean, there is sort of a question within
18 the question. I think, first of all, if Saltzer was back on
19 their own, if I was running the practice, which I wouldn't
20 be, but if I were running the practice, I would immediately,
21 as fast as I could, reaccelerate my focal point in
22 fee-for-service because that's sort of your survival
23 strategy.
24   So am I allowed to opine on that, or is that going
25 to be -- I don't know what I'm allowed to do anymore.

1969

1    THE COURT: I --
2    THE WITNESS: So my suspicion is that if they're
3  unwound, they're just going to go back to the best they can,
4  doing business as usual, try to replenish their medical
5  staff, and I don't think they're going to probably pursue --
6  my guess is they wouldn't pursue risk. They would invest in
7  the same old-school principles of how you run your practice
8  going forward. That's what I would do.
9  BY MR. KEITH:
10   Q. And what would the impact then be of the fact
11 that, in my hypothetical, Saltzer would remain on the
12 eClinicalWorks program?
13   A. Would they remain on eClinical?
14   Q. Well, that's my -- I'm asking you to assume that.
15   A. Yeah, absolutely. I wouldn't switch anything.
16 They are already getting meaningful use money for it, and
17 I'd stay the course.
18   Q. And if they stayed the course, what would that
19 mean for patient care, in your mind?
20   A. Well, I think in the -- in that particular
21 community, we would have more or less business as usual. It
22 would be fee-for-service, heavily -- I guess we'd be sort of
23 back to the inverse of what we just finished talking about,
24 which is how do you optimize revenues; how do you minimize
25 cost; how do you limit access to the uninsured/

1970

1 Medicaid/Medicare; and how do you drive as much, you know,
2 profitable investments as you can make. It's sort of the
3 way healthcare is delivered today, and I suspect that's what
4 they would go back to. I don't know what choice they'd
5 have, actually.
6         MR. KEITH: Thank you, Your Honor. No further
7 questions.
8         THE COURT: Cross-examination, Mr. Ettinger.
9         MR. ETTINGER: Your Honor, I think Mr. Herrick is
10 going to go first. I may follow.
11        THE COURT: All right. Mr. Herrick.
12        MR. HERRICK: We have some binders, Your Honor.
13               CROSS-EXAMINATION
14 BY MR. HERRICK:
15     Q. Good morning, Mr. Kee.
16        MR. HERRICK: Your Honor, may I proceed?
17        THE COURT: Yes.
18 BY MR. HERRICK:
19     Q. Mr. Kee, if you could please turn to the exhibit
20 marked 1980 in your binder.
21     A. (Witness complied.)
22     Q. And this is your declaration that was filed in
23 this case; is that correct?
24     A. Yes.
25     Q. If you could please turn to the last page of the

1971

1 declaration and look at the signature block. And you signed
2 this declaration on December 4th, 2012, under penalty of
3 perjury; is that correct?
4     A. Yes.
5     Q. And it was submitted to this court on that very
6 same day; correct?
7     A. Excuse me?
8     Q. It was submitted to this court on that very same
9 day; correct?
10     A. I would presume so.
11     Q. I'll represent to you that it was.
12        If you could turn to page 2 and take a look at the last
13 sentence of paragraph 2, please. You swore under penalty of
14 perjury that you were personally familiar with the facts in
15 this declaration; correct?
16     A. Yes.
17     Q. And when I asked you in May during your deposition
18 if you'd like to change anything if your declaration, you
19 said no; correct?
20     A. I actually -- I don't recall, but I could have. I
21 probably did if you say so. I don't know.
22        MR. HERRICK: Andy, if you could please bring up
23 clip 53.
24        THE COURT: If this is a videotape deposition,
25 could you identify page and line number.

1972

1         MR. HERRICK: Yes, Your Honor. This is page 141,
2 lines 17 to 20.
3         THE COURT: And you're requesting that Mr. Kee's
4 deposition be published?
5         MR. HERRICK: Yes.
6         THE COURT: And you will provide the original to
7 Ms. Gearhart?
8         MR. HERRICK: We will.
9         THE COURT: All right.
10 (Video clip played as follows:)
11     Q. "Before we get into the declaration, is
12         there anything about the declaration you would
13         like to change?
14     A. "No, I don't think so."
15 (Video clip concluded.)
16 BY MR. HERRICK:
17     Q. Was that your testimony, Mr. Kee?
18     A. Excuse me?
19     Q. Was that your testimony, Mr. Kee?
20     A. It looks like it.
21     Q. If you could turn to page 14 of your declaration,
22 please. And I'm going to focus your attention on paragraphs
23 38 through 40, which begin on --
24        THE COURT: Counsel, is this marked as a separate
25 exhibit?

1973

1         MR. HERRICK: It is, Your Honor. I believe it is
2 PX1980, but we are not currently offering it into evidence.
3         THE COURT: But it's being offered just for
4 impeachment purposes?
5         MR. HERRICK: Correct.
6         THE COURT: All right. I don't think we need to
7 offer it or have it admitted, but it will be marked so it's
8 clear for the record.
9 (Plaintiffs' Exhibit No. 1980 marked.)
10        THE COURT: Proceed.
11        MR. HERRICK: Thank you, Your Honor.
12 BY MR. HERRICK:
13     Q. During your deposition, you admitted that you did
14 not create the charts in paragraphs 38, 39, and 40 of your
15 declaration; is that right?
16        MR. KEITH: Objection, Your Honor. We did not
17 present any testimony in the direct on the charts that are
18 reflected here. These are quality statistics to which we
19 did not ask Mr. Kee to testify today.
20        MR. HERRICK: Your Honor, this goes to Mr. Kee's
21 credibility, which I believe is fair game on cross.
22        THE COURT: All right. Credibility is always
23 relevant, so I'll overrule the objection. The argument is
24 that the witness submitted an affidavit in December of last
25 year and then during the deposition conceded that he hadn't

1974

1 actually prepared that. Is that what you're saying?

2         MR. HERRICK: Portions of it. And --

3         THE COURT: I'll allow that, but you will be

4 allowed to rehabilitate the witness through explanation for

5 that, Mr. Keith. It's -- if there is a prior inconsistent

6 statement, I think it's fair game or a -- yeah. Proceed.

7         MR. HERRICK: Thank you.

8 BY MR. HERRICK:

9     **Q.** Again, Mr. Kee, during your deposition, you

10 admitted that you did not create the charts in paragraphs

11 38, 39, and 40 of your declaration; is that right?

12     **A. That's correct.**

13     **Q.** And Dr. Hill, Dr. Bart Hill, and Dr. Collier

14 created these charts; is that correct?

15     **A. That's what I understand.**

16     **Q.** And Dr. Hill's title is chief quality officer for

17 St. Luke's; is that right?

18     **A. I believe that's correct.**

19     **Q.** During your investigational hearing as part of the

20 FTC's investigation, you were unable to explain the data

21 underlying these charts; is that correct?

22     **A. That's correct.**

23     **Q.** Indeed, St. Luke's designated Dr. Hill as a

24 witness to testify on its behalf about these charts that

25 were in your sworn declaration; is that right?

1975

1     **A. That's correct.**

2     **Q.** So let's just pick one of these paragraphs. Take

3 a look at paragraph 39, please.

4     **A. Mm-hmm.**

5     **Q.** If you could turn to the top of page 15, the first

6 complete sentence.

7       There you told this court that: "St. Luke's witnessed

8 a 69 percent decrease of our risk-adjusted complication

9 index as of December 2011 compared to January 2010, as

10 reflected in the following chart."

11       Did I read that correctly?

12     **A. That's correct.**

13     **Q.** Now, first, risk adjusted in-hospital complication

14 index, that's the same as ECRI; is that right?

15         MR. KEITH: Your Honor, I would object. I think

16 if the point of the cross-exam -- of the impeachment is to

17 establish that he didn't write the text and didn't do the

18 analyses, I think we're well beyond the purpose of

19 impeachment at this point.

20         MR. HERRICK: Your Honor, I intend to show that

21 not only did he not prepare these, but they were actually

22 incorrect.

23         MR. KEITH: Well, that's the point. We're now

24 into the substance of whether they were correct, not

25 whether --

1976

1         THE COURT: Well, I think, Mr. Herrick, as

2 Mr. Keith has pointed out, if the point is that the witness,

3 I guess, suggested in a prior sworn declaration that he was

4 involved in preparing or was sponsoring these charts, but,

5 in fact, he was not, then it's kind of like you can't have

6 it both ways. If he didn't prepare it, then you can impeach

7 him on that. Or if they're inaccurate, you can impeach him

8 on that, but perhaps not both because he can't be held

9 accountable for something he didn't prepare, so --

10         MR. HERRICK: In a sworn --

11         THE COURT: Perhaps -- well, I suppose you could

12 inquire as to whether he checked his numbers before he

13 submitted his affidavit.

14       I'm going to give counsel some leeway, Mr. Keith. I

15 understand your point, and I'm going to give you some

16 leeway. You will have a chance on redirect to clarify all

17 of this, and I'm sure you will.

18       Go ahead, Mr. Herrick.

19 BY MR. HERRICK:

20     **Q.** Well, let me cut to the chase, Mr. Kee. To your

21 knowledge, was that statement that I just read to you

22 correct?

23     **A. I relied on the feedback from Dr. Hill and his**

24 **team's work that this was accurate and valid, so I relied on**

25 **that.**

1977

1     **Q.** And to your knowledge, did Mr. -- excuse me. Did

2 Dr. Hill testify that, in fact, that was incorrect?

3     **A. I have not seen Dr. Hill's testimony, so I can't**

4 **comment.**

5     **Q.** And did you take any steps to confirm that

6 Dr. Hill's feedback to you, as you put it, was accurate

7 before you submitted this sworn declaration to the Court?

8     **A. Did I -- did I try to validate this being correct?**

9     **Q.** Yes.

10     **A. Is that what the question is, on December 4th?**

11     **Q.** Did you attempt to validate it in any way?

12     **A. Yeah. I actually talked with -- I did talk with**

13 **Dr. Hill about this prior to this being submitted.**

14     **Q.** So if Dr. Hill testified that you cannot conclude

15 anything about declining complication rates from the data on

16 page 15 of your declaration, would you assume that Dr. Hill

17 was telling the truth?

18         MR. KEITH: Objection, Your Honor. We're now --

19         THE COURT: Sustained.

20         MR. KEITH: -- impeaching Mr. Hill.

21         THE COURT: Sustained.

22         MR. HERRICK: Your Honor, I think I'm going to

23 have to get into some AEO materials at this point.

24         THE COURT: All right. Ladies and gentlemen, I'll

25 have to unfortunately clear the courtroom. Are there any of

1978

1 the parties' employees that can stay, or is this going to
2 be...
3         MR. HERRICK:  I believe St. Luke's employees could
4 stay.
5         THE COURT:  All right.
6 ******COURTROOM CLOSED TO THE PUBLIC******
7         THE COURT:  Counsel, if you could, consistent with
8 our discussion yesterday, I think we had agreed that we
9 would, at least by category and perhaps discussion, explain
10 the basis for it so I can make a ruling going forward on
11 excluding -- again, it's something I hadn't thought through,
12 but I'm probably going to have to do that outside the --
13 with the audience cleared so I can hear the argument and
14 decide.  I may readmit the audience, depending on what is
15 admitted.
16         Actually, St. Luke's is the one that's asserting this
17 as AEO --
18         MR. HERRICK:  Correct.
19         THE COURT:  -- so I guess the burden is upon them.
20         And can you identify, perhaps for Mr. Keith's
21 benefit, the exhibit numbers you are now referring to so...
22         MR. HERRICK:  Well, it will be a combination of
23 exhibits and testimony, testimony that's potentially going
24 to come up for impeachment purposes that's been designated
25 AEO.  That's really the danger zone, if you will.

1979

1         THE COURT:  All right.  Perhaps the only way we
2 can deal with this is to go ahead, present the evidence, and
3 then in terms of what is redacted or not redacted and made
4 available to the public, that's where I'll probably have to
5 resolve that issue because I can't do it where it's so
6 intermixed.  I think that's probably going to be
7 unavoidable.
8         So let's go ahead and proceed, but then at the
9 conclusion of Mr. Kee's testimony, then I will need to have
10 probably a proffer made by St. Luke's as to why that matter
11 is AEO or not.  And it may be that counsel will conclude
12 that it's not, in which case we'll publish the deposition to
13 the public so that they'll have access to the testimony as
14 well.
15         Proceed, Mr. Herrick.
16         MR. HERRICK:  Thank you, Your Honor.
17 BY MR. HERRICK:
18    Q.  Mr. Kee, if you could please turn to JX41 in your
19 binder.  Now, during your direct exam, Mr. Kee, you
20 testified that one of the major initiatives of St. Luke's is
21 to move toward value-based payor relationships.  So I want
22 to explore that a little bit in your current role.
23         This document is the contract between St. Luke's and
24 SelectHealth; is that correct?
25    A.  Yes.  It looks like it.

1980

1    Q.  And this is the contract that governs St. Luke's
2 relationship with SelectHealth; is that right?
3    A.  That's correct.
4    Q.  Now, St. Luke's has pointed to its relationship
5 with SelectHealth as the means by which we'll move away from
6 a fee-for-service model to risk-based contracting; correct?
7    A.  That's the intent.
8    Q.  In fact --
9         MR. KEITH:  Your Honor, I would just raise an
10 objection here.  I specifically avoided having this witness
11 testify about the SelectHealth relationship or any of the
12 particulars of the risk relationships because we have others
13 who are testifying in that regard.  My objection is this is
14 beyond the scope.
15         THE COURT:  Mr. Herrick?
16         MR. HERRICK:  Your Honor, Mr. Kee outlined at
17 length the attempts by not only his former employer in the
18 Magic Valley, but St. Luke's to move from a fee-for-service
19 model to a risk-based model.
20         THE COURT:  The objection is overruled.
21 Mr. Keith, I think even though you may not have talked
22 directly about the St. Luke's SelectHealth contract or
23 arrangement, I think the issue of St. Luke's conversion from
24 fee-for-service to risk-based contracting is -- was clearly
25 covered.  And if counsel is limiting your questions just to

1981

1 that issue in conjunction with Joint Exhibit 41, I'll allow
2 it.
3         MR. STEIN:  Your Honor, I'm sorry for popping up
4 like this, but there is one other issue, I think, that came
5 up this morning.  Is the court permitting counsel for the --
6         THE COURT:  I'm sorry.  I thought we had --
7         MR. STEIN:  -- to be in the courtroom for this
8 type of testimony?
9         THE COURT:  My understanding was that the counsel
10 for Regence and Blue Cross had signed the -- my mind went
11 blank -- the agreement governing the use of trade secrets
12 and will be subject to the same restrictions given what
13 happened yesterday and their need to be able to, perhaps,
14 interpose an objection to the disclosure of their trade
15 secrets.
16         I thought counsel had discussed this morning the
17 agreement -- well, had discussed this morning and had
18 indicated no opposition to their remaining in the courtroom
19 subject to the restrictions of their having signed that
20 agreement.  And that would, of course, apply only to
21 retained counsel, not to in-house counsel.  Perhaps that was
22 not --
23         MR. BIERIG:  That was not clear, Your Honor.
24         THE COURT:  All right.
25         MR. SINCLAIR:  I was the only one in the courtroom

1982

1  at that time, and I indicated that I thought that was
2  probably the case.  When Mr. Stein came back in, he raised
3  the issue that he is raising now with me.  He mentioned it,
4  but we went ahead --
5        THE COURT:  All right.  Well, we have not got into
6  it.  Here is the concern:  Based upon the discussion we had
7  yesterday concerning the motion filed by the various press
8  and media entities and the issue raised concerning the
9  court's closing of the courtroom and also sealing certain
10  trial exhibits, it was understood that the court would have
11  to make, and would make, kind of a determination as to each
12  exhibit that was going to be discussed during the trial and
13  also any closure of the courtroom, and that counsel for the
14  affected entity would have an opportunity to be present and
15  participate.
16       The problem is that during cross-examination -- this is
17  exactly what's happening here -- it's very difficult to
18  anticipate what's going to happen.  And so I think the
19  request made this morning, I think by Mr. Diddle and I'm not
20  sure who else, was that since they had signed the -- help me
21  out.  What's the term?
22       MR. STEIN:  Protective order.
23       THE COURT:  -- protective order and were subject
24  to the same restrictions as counsel for the parties, that
25  they would be allowed to remain in the courtroom so they

1983

1  could assert their client's interest as the need may arise.
2        MR. STEIN:  And I think we don't have any problem
3  with that principle.  The only issue here is we're talking
4  here about St. Luke's relationship and its contractual terms
5  with SelectHealth, which I think, as the court heard from
6  Ms. Richards yesterday, is a competitor of Blue Cross and
7  Regence.  And while we have no doubt that counsel will
8  comply with their obligations under the protective order, I
9  think this would fall outside the scope of any reason that
10  those counsel would need to be in the courtroom for this
11  testimony.
12       THE COURT:  Mr. Herrick, do you intend to get into
13  anything other than this issue?  That is, the
14  SelectHealth/St. Luke's contract at this time.
15       MR. HERRICK:  Well, Your Honor, St. Luke's has
16  designated the -- certain aspects of the relationship with
17  SelectHealth as AEO; for instance, the nature of the fee
18  payment between SelectHealth and St. Luke's.  So I think
19  it's likely that I will touch on that.  I'm not aware of
20  whether any -- anyone from Regence or Blue Cross is actually
21  in the room, so I'm not sure what the issue is.
22       MR. McFEELEY:  I am, Your Honor.
23       THE COURT:  Yes?
24       MR. McFEELEY:  I'm Neil McFeeley, and I'm outside
25  counsel for Blue Cross.

1984

1        THE COURT:  I'm sorry.  We need to put it on the
2  record.  Sorry.  Yes, step forward, if you would.
3        MR. McFEELEY:  Your Honor, I'm Neil McFeeley at
4  Eberle Berlin, and I'm outside counsel for Blue Cross of
5  Idaho.  And my understanding from discussions with Mr.
6  Metcalf this morning was that we were allowed to stay during
7  the closed courtroom to see if there was anything that
8  affected Blue Cross AEO.
9        THE COURT:  But, Mr. McFeeley, you agree you're
10  subject to the same restrictions as counsel for the parties
11  under the protective order?
12       MR. McFEELEY:  Certainly, Your Honor.
13       MR. STEIN:  Your Honor, I guess we would also ask,
14  to the extent the Court is considering letting outside
15  counsel in, at a minimum, I would think we would need to
16  have something where they would verify that they are in no
17  way involved in negotiations with any of the parties.
18       THE COURT:  I think that's fair.
19       Mr. McFeeley, is that accurate that your involvement is
20  purely as outside counsel, and you are not engaged in any
21  way with negotiating with any of the, I guess, networks,
22  hospitals, physician groups, or any of the parties?
23       MR. McFEELEY:  That is correct, Your Honor.
24       THE COURT:  Okay.  All right.  Counsel, I don't
25  see any way around it.  It seems to me I can't sit here and

1985

1  safeguard and be confident in my ability to anticipate what
2  may be of great concern to Mr. McFeeley and his client.  So
3  I think the only option is to allow them to remain in the
4  courtroom.  They will be allowed to raise any issue that
5  they feel is of concern in terms of my resolution of the
6  trade secret issue and the attorneys' eyes only documents
7  and testimony.
8        So I'm going to allow Mr. McFeeley and the
9  representatives from, I think, Blue Cross, Regence, and
10  perhaps even Micron.  I think those are the three entities
11  that have entered appearances in the case.
12       MR. STEIN:  The only thing I would ask, Your
13  Honor, is that when those other counsel reappear in the
14  courtroom, that we have them make a similar affirmation.
15       THE COURT:  I think that's completely fair, and
16  we'll certainly do that.
17       MR. McFEELEY:  Thank you, Your Honor.
18       THE COURT:  All right.  Thank you, Mr. McFeeley.
19       All right.  Mr. Herrick, we are at about the breaking
20  point.  Since we're just going to launch into this -- these
21  questions, why don't we just go ahead and take the break,
22  unless you would -- unless you just have one or two
23  questions you want to ask.
24       MR. HERRICK:  I have more than one or two.
25       THE COURT:  I'm sorry?

1986

1     MR. HERRICK: I have more than one or two.
2        THE COURT: I assumed as much. So, Counsel, we'll
3   try to hold this to 15 minutes. I apologize; we have gone
4   just a little bit long. There is that temptation to stretch
5   those breaks out a little bit longer than we should, but
6   we'll try to reconvene in 15 minutes. We'll be in recess.
7        (Recess.)
8   ****** COURTROOM REMAINS CLOSED TO THE PUBLIC ******
9        THE COURT: Mr. Kee, I'll remind you you are still
10  under oath.
11       And, in fact, Mr. Herrick, you may resume your
12  examination.
13       Just so we're clear, at the conclusion of the AEO
14  session, I'll expect St. Luke's to make kind of a proffer as
15  to why both the testimony and any exhibits mentioned should
16  be considered to be AEO.
17       Yes?
18       MR. SINCLAIR: You made a comment that I picked up
19  on that I'm not sure I am clear just before we broke. And
20  that was that, you know, if we make our proffer and you
21  decide it's not AEO, that the deposition then becomes
22  public.
23       THE COURT: The transcript.
24       MR. SINCLAIR: Just the portion that we were
25  referring to; correct?

1987

1        THE COURT: Yes.
2        MR. SINCLAIR: Because there is a lot else in
3   these depositions.
4        THE COURT: No, no. Just that portion that I
5   determined was not AEO.
6        MR. SINCLAIR: Okay. Thank you.
7        THE COURT: Now, I think, Mr. Herrick, for that
8   reason, this may interrupt the flow of your cross. But if
9   you could focus just on the AEO portions and if you are
10  going to go into some nonAEO materials, save that so we can
11  bring the audience in and not --
12       You know, Counsel, you were not charged for the time,
13  and you are not being charged for this time against the time
14  that's been allotted, which means I don't know if we'll be
15  done on Monday. We will just have to see how it goes. If
16  we have to do this repeatedly for the next ten days, this
17  may extend the trial unavoidably.
18       MR. HERRICK: Thank you, Your Honor. Just to
19  clarify, the issue is -- with my cross-examination, it's
20  sort of peppered without --
21       THE COURT: That's why I'm asking you, to the best
22  of your ability, to focus it with AEO in one -- because --
23       MR. HERRICK: It's a headache.
24       THE COURT: It's a huge headache. There is
25  absolutely legitimate interests here. The private interests

1988

1   of St. Luke's, Saint Al's, Treasure Valley Hospital, Saltzer
2   Medical Group, Micron, Regence Blue Shield, Blue Cross of
3   Idaho, and on and on, and the public's right to access to a
4   court proceeding that obviously is of considerable interest.
5        And the First Amendment -- well, not just the First
6   Amendment, but just the general principle of open access to
7   the court dictates. So how we resolve that, we'll just do
8   the best we can.
9        Go ahead and proceed.
10       MR. HERRICK: Thank you, Your Honor.
11  BY MR. HERRICK:
12       Q.   Just to back up, Mr. Kee, you claimed in your
13  declaration that St. Luke's has recently begun a new
14  affiliation with SelectHealth, which will over time become a
15  risk-based arrangement; is that right?
16       A.   I'm sorry. Will become what?
17       Q.   A risk-based arrangement; is that right?
18       A.   That's correct.
19       Q.   But the SelectHealth contract pays St. Luke's on a
20  fee-for-service basis, not a capitation amount; correct?
21       A.   At the current time, the agreement is paid on
22  fee-for-service rates. That's correct.
23       Q.   Thank you. And there is nothing in the agreement
24  that does away with the fee-for-service component for the
25  SelectHealth relationship; correct?

1989

1        A.   Actually, I wouldn't agree with that.
2        MR. HERRICK: Okay. Mr. Beilein, can you play
3   clip 42, please.
4        THE COURT: Page and line number again, Counsel?
5        MR. HERRICK: Apologies, Your Honor. Page 117,
6   lines 4 through 8.
7        (Video clip played as follows:)
8        Q.   "And there's nothing in the agreement that
9            does away with this fee-for-service component
10           for the SelectHealth relationship?
11       A.   "Not that I'm aware of at this moment in
12           time."
13       (Video clip concluded.)
14  BY MR. HERRICK:
15       Q.   Was that your testimony, Mr. Kee?
16       A.   And I would like to clarify what my intent was in
17  that statement, because the inherent foundation of the
18  SelectHealth agreement is to focus on ultimately the medical
19  loss ratio, and the fee-for-service becomes an interim
20  payment methodology. So that would be my clarification.
21       Q.   You mentioned BrightPath during your direct
22  testimony. BrightPath is the provider network for
23  St. Luke's affiliation with SelectHealth; is that right?
24       A.   That's correct.
25       Q.   And Select Medical Network, which is under your

1990

1    supervision, is part of BrightPath?  Do I have that correct?
2    **A.   That's correct.**
3    **Q.**   Now, what percentage of the Select physicians are
4    in St. Luke's Clinic versus independent?
5    **A.   I don't know that ratio off the top of my head.**
6    **Q.**   Do you know if it's more than 30 percent that are
7    employed?
8    **A.   I would prefer not to guess.**
9    **Q.**   In any event, BrightPath includes independent
10   physicians; correct?
11   **A.   That's correct.**
12   **Q.**   And so does Select Medical Network?
13   **A.   That's correct.**
14   **Q.**   In fact, there is no limitation in the
15   SelectHealth agreement on the participation of independents
16   through the BrightPath Network; is that right?
17   **A.   Would you restate that, please?**
18   **Q.**   There is no limitation in St. Luke's agreement
19   with SelectHealth on the participation of independent
20   physicians in that agreement through the BrightPath Network;
21   is that right?
22   **A.   What do you mean by "limitation"?  None at all**
23   **or -- what -- define what you mean.**
24   **Q.**   Why don't we just go ahead and play the clip from
25   your deposition.

1991

1           MR. HERRICK:  Clip 36, please.  Page and line
2    number 107, 8 to 15.
3           (Video clip played as follows:)
4           **Q.**   "I guess what I'm trying to understand is
5                  whether there is any limitation on the
6                  participation of independent physicians through
7                  the BrightPath Network in this contract.
8           **A.**   "Any limitations on participation?
9           **Q.**   "Right.
10          **A.**   "No.  I don't think so.  I think if
11                 they're in the network, they can access
12                 patients."
13          (Video clip concluded.)
14   BY MR. HERRICK:
15          **Q.**   Was that your testimony, Mr. Kee?
16          **A.   I would agree with that statement, right.  If**
17   **they're in the network, they can access patients; that's**
18   **correct.**
19          **Q.**   Before St. Luke's acquired Saltzer, Saltzer was
20   part of the BrightPath Network, was it not?
21          **A.   That's correct.**
22          **Q.**   And Saltzer was also part of the Select Medical
23   Network?
24          **A.   That's correct.**
25          **Q.**   So Saltzer would have been subject to St. Luke's

1992

1    risk-based SelectHealth agreement even without the
2    acquisition; isn't that right?
3           **A.   They could have accessed patients through the**
4    **network.**
5           **Q.**   That was not my question.  I'll repeat it for you.
6    So Saltzer would have been subject to St. Luke's
7    risk-based SelectHealth agreement even without the
8    acquisition; isn't that right?
9           **A.   Yeah, I think that's correct.**
10          **Q.**   Now, you also talked about another major
11   initiative, the move to -- I believe the phrase you used was
12   "value-based payor relationships," which we have talked
13   about a little bit.
14          Independent physicians groups can engage in risk-based
15   contracting with commercial payors; correct?
16          **A.   You're asking me to opine on whether independent**
17   **physicians could enter into an insurance risk arrangement?**
18          **Q.**   Yes.
19          **A.   I assume they could, yes.**
20          **Q.**   And, of course, there is nothing in St. Luke's PSA
21   with Saltzer that provides for risk-based contracting; is
22   that right?
23          **A.   I don't believe that's specifically addressed in**
24   **the PSA, so I would say yes.**
25          **Q.**   You also mentioned MSSP.  That's the Medicare

1993

1    Shared Savings Program; is that right?
2           **A.   That's correct.**
3           **Q.**   And St. Luke's has been approved as a participant
4    in MSSP; right?
5           **A.   That's correct.**
6           **Q.**   And there is a risk-sharing component for MSSP;
7    correct?
8           **A.   Yeah.  There is an upside.  There is a cost --**
9    **yeah, it's a sharing in the cost savings, yes.**
10          **Q.**   And St. Luke's application to participate in MSSP
11   was not contingent on acquiring Saltzer; correct?
12          **A.   We could -- I believe we could have elected to**
13   **bring other people into the Medicare Shared Savings Program.**
14              **Could I correct a statement?  I would not say that**
15   **I believe Medicare Shared Savings is a risk-based agreement,**
16   **but --**
17          **Q.**   You agree that there a risk-sharing component of
18   MSSP?
19          **A.   There is a sharing in the cost savings.**
20              MR. HERRICK:  Mr. Beilein, can you play clip 68,
21   please, clip 68.  That's page 95, 8 to 15.
22          (Video clip played as follows:)
23          **Q.**   "There is a risk sharing component of
24                 MSSP; is that right?
25          **A.**   "Yeah.  I mean, Medicare Shared Savings is

1994

1    a little bit of a unique product because it
2    really takes risk between what Medicare
3    projects your savings should be versus your
4    actual performance. So, yeah, there is an
5    element of risk to that."
6        (Video clip concluded.)
7    BY MR. HERRICK:
8        **Q.** Was that your testimony, Mr. Kee?
9        **A.** No. That's true.
10       **Q.** I'll ask again. St. Luke's application to
11   participate in MSSP was not contingent on its acquisition of
12   Saltzer; is that right?
13       **A.** That's correct.
14       **Q.** And, in fact, full financial integration of
15   physicians with hospitals is not a requirement for
16   participation in MSSP; correct?
17       MR. KEITH: Objection, Your Honor, foundation. He
18   is asking him to opine on the legal requirements for
19   application to MSSP.
20       THE COURT: The witness, based upon his
21   background --
22       If you know. Do you know?
23       THE WITNESS: I don't believe it's a requirement.
24   I don't know that for certain -- a certain fact.
25       THE COURT: I think I'll sustain the objection,

1995

1    then. If the witness is only kind of speculating, then --
2        MR. HERRICK: Your Honor, he has testified
3    previously on this topic.
4        THE COURT: Well, even if he testified previously,
5    that doesn't mean that he had the foundation because you
6    wouldn't necessarily have made the objection during a
7    deposition that you would at trial. It only means that he
8    was willing to express an opinion. Many of us are willing
9    to do so whether we have the background or not. That's no
10   offense meant to Mr. Kee.
11   BY MR. HERRICK:
12       **Q.** Mr. Kee, what was your role in St. Luke's MSSP
13   application process?
14       **A.** I -- I sat on the -- I was ultimately appointed to
15   **the board, but I wouldn't say I was intimately involved in**
16   **the application.**
17       **Q.** And part of your role at St. Luke's is to oversee
18   risk-based contracting, whether it be with Medicare or
19   commercial payors; is that correct?
20       **A.** Over time, I will be involved in that, but I am
21   **not directly responsible or will have signature authority**
22   **for signing contracts.**
23       MR. HERRICK: Your Honor, I would submit that
24   that's sufficient foundation for him to at least offer his
25   perspective on whether full financial integration is

1996

1    required as part of the MSSP application process.
2        MR. KEITH: Your Honor, I believe he just said "I
3    will be more involved over time," not that he was -- you
4    know --
5        THE COURT: I think I'm still going to have to
6    sustain the objection. The witness has indicated just a
7    passing understanding based upon his somewhat limited
8    involvement with the board. So, based on that, I'm not sure
9    that's still adequate. The objection is sustained.
10   BY MR. HERRICK:
11       **Q.** You believe that Saltzer could participate in the
12   MSSP by itself if it remained independent; correct?
13       **A.** You want me to know -- you want me to say if
14   **Saltzer could do their open Medicare Shared Savings Plan?**
15       **Q.** Yes.
16       **A.** I'm not going to comment on that because I'm not
17   **sure I actually know that.**
18       MR. HERRICK: Mr. Beilein, can you play clip 31,
19   please.
20       MR. KEITH: Your Honor, I would first like to
21   establish a foundation that Mr. Kee would be in a position
22   to answer that question. Particularly, the question is
23   would they be legally entitled to apply if approved versus
24   would they likely apply and participate.
25       MR. HERRICK: Your Honor --

1997

1        THE COURT: Well, I'm going to overrule the
2    objection, but I do need a page and line number.
3        MR. KEITH: Yes. Deposition transcript page 98,
4    lines 6 through 13.
5        (Video clip played as follows:)
6        **Q.** "If Saltzer remained independent, it could
7        participate in MSSP by itself; correct?
8        **A.** "Well, I -- yeah, theoretically, I suppose
9        they could, as a small group, apply and see if
10       they could -- yeah. It could be a stretch to
11       make the investments and the -- plus, I don't
12       know why they would do it, but they
13       theoretically could do that."
14       (Video clip concluded.)
15   BY MR. HERRICK:
16       **Q.** One of the other -- actually, excuse me.
17   That was your testimony; correct?
18       **A.** It looks like it.
19       **Q.** One of the other major initiatives you mentioned
20   was St. Luke's attempt to move toward value-based
21   compensation for physicians. Under a wRVU compensation
22   system, a physician is compensated based on volume; is that
23   right?
24       **A.** I'm sorry. I didn't hear your question.
25       **Q.** Under a wRVU compensation system, a physician is

1998

1    compensated based on volume; correct?

2        **A.    That's correct.**

3        Q.    And wRVU stands for "work relative value unit"; is

4    that right?

5        **A.    That's correct.**

6        Q.    So under a wRVU compensation model, the higher a

7    physician's volume or utilization of services, the more he

8    or she gets paid; is that right?

9        **A.    That's correct.**

10       Q.    And physician compensation based on wRVUs --

11   excuse me -- is inconsistent with decreasing utilization of

12   services; is that correct?

13       **A.    I think if used as a long-term method, that would**

14   **be correct.**

15       Q.    And under the PSA between St. Luke's and Saltzer,

16   the Saltzer physicians are compensated based on wRVUs;

17   correct?

18       **A.    That's correct.**

19       Q.    And when Saltzer and St. Luke's signed the PSA,

20   there was no proposal on how to compensate the Saltzer

21   physicians based on quality; correct?

22       **A.    There was no specific proposal.**

23       Q.    And St. Luke's has not changed the compensation of

24   Saltzer physicians off of wRVUs; correct?

25       **A.    That's correct.**

1999

1        Q.    Indeed, St. Luke's and Saltzer amended the PSA a

2    few weeks before this trial started, did they not?

3        **A.    I don't know if it was a few weeks, but it has**

4    **been amended.**

5        Q.    And even that amendment does not change the

6    compensation of Saltzer physicians off of wRVUs; correct?

7        **A.    That's correct.**

8        Q.    You mentioned that St. Luke's has moved to a

9    partial quality-based payment system for a certain subset of

10   its physicians; is that right?

11       **A.    That's correct.**

12       Q.    How many of the physicians who have a quality

13   component to their compensation in the St. Luke's Clinic

14   system have failed to hit their target to get full

15   compensation?

16       **A.    I don't know off the top of my head.**

17       Q.    Have any?

18       **A.    I couldn't answer that.**

19       Q.    How many physicians are there in the St. Luke's

20   Clinic system, approximately?

21       **A.    Approximately 500.**

22       Q.    And you're not aware of any who have failed to

23   meet this quality component of their salary?  Am I

24   understanding your testimony correct?

25       **A.    That's correct.**

2000

1        Q.    St. Luke's has not implemented any quality-based

2    compensation protocol in Twin Falls; is that right?

3        **A.    That's correct.**

4        Q.    You also testified that another major initiative

5    was St. Luke's clinical care coordination team.  That's

6    aimed at, among other things, improving quality, is that

7    right?

8        **A.    I believe, if done effectively, it will improve**

9    **quality.**

10       Q.    Now, you mentioned CoPar.  Independents can

11   participate in CoPar; right?

12       **A.    Yeah.  If those patients fall under a network**

13   **agreement, we could -- we could provide care coordination**

14   **within the network.**

15       Q.    And that includes independents who participate in

16   St. Luke's CoPar program; right?

17       **A.    I would say that's correct.**

18       Q.    In fact, there is not a single quality initiative

19   at St. Luke's that doesn't involve at least some independent

20   physicians; is that right?

21       **A.    You say not a single one?**

22       Q.    Yes.

23       **A.    I would have to think further about that.**

24       Q.    Well, off the top of your head, you can't think of

25   any?

2001

1        **A.    Not right off the top of my head.**

2        Q.    And none of these quality initiative programs

3    require St. Luke's to employ over 70 percent of the PCPs in

4    Nampa; is that right?

5        **A.    Well, in my view, I think without economic**

6    **integration, I doubt that a lot of these quality initiatives**

7    **would actually move forward.  But, theoretically, it's not**

8    **that you couldn't offer those as opportunities.**

9        Q.    So I'll restate the question.  None of the

10   St. Luke's quality programs requires St. Luke's to employ

11   over 70 percent of the PCPs in Nampa; is that right?

12       **A.    I don't know that they require it.**

13       Q.    Thank you.  The Spine Wellness Center, you

14   mentioned that in your direct testimony, as well.  That

15   hasn't had a material difference on decreasing the number

16   of unnecessary spine surgeries; is that right?

17       **A.    That's correct.**

18       Q.    Now, before acquiring Saltzer, St. Luke's didn't

19   measure Saltzer's quality; correct?

20       **A.    That's correct.**

21       Q.    And Saltzer actually had a good reputation for

22   quality before St. Luke's acquired it, did it not?

23       **A.    I think they had a good reputation for quality,**

24   **yes.**

25       Q.    And on the whole --

2002

1  THE COURT:  Could we reopen the courtroom?
2  MR. HERRICK:  You know what?  There is one -- one
3  more question that may elicit AEO; and after that, we can --
4  we can reopen.
5  THE COURT:  All right.
6  BY MR. HERRICK:
7  **Q.**  On the whole, Saltzer provided high-quality care,
8  as far as St. Luke's could tell, before the acquisition;
9  correct?
10  **A.**  Based on reputation.
11  **Q.**  So St. Luke's can't tell whether Saltzer's quality
12  is better now than it was before the acquisition; right?
13  **A.**  **As of this moment in time, I believe we have**
14  **already explained that's the data we're in the process of**
15  **collecting.  So at this moment, I don't have -- other than**
16  **in diabetes, a few metrics, we would not overall be able to**
17  **say we could tell a difference in quality.**
18  **Q.**  Well, if you didn't have the information before --
19  strike that.
20  Actually, at this point, you don't know whether Saltzer
21  was overutilizing services before it was acquired, either;
22  correct?
23  **A.**  No.  We don't have those data sets.
24  **Q.**  For example, there is no evidence that Saltzer was
25  ordering more MRIs than necessary; right?

2003

1  **A.**  We don't have the data.
2  **Q.**  In fact, you can't say whether Saltzer is an
3  appropriate utilizer of healthcare services or not; right?
4  **A.**  No.  I wouldn't draw that conclusion that we can
5  tell, so --
6  MR. HERRICK:  Your Honor, I'm moving out of the
7  AEO portion of my exam.
8  THE COURT:  All right.  Perhaps we could
9  have -- open the courtroom then and allow the public back
10  in.
11  ******COURTROOM OPEN TO THE PUBLIC******
12  MR. HERRICK:  Your Honor, may I proceed?
13  THE COURT:  Oh, yes.  I'm sorry.
14  BY MR. HERRICK:
15  **Q.**  As part of St. Luke's quality initiatives,
16  St. Luke's is taking a patient-centered approach; is that
17  right?
18  **A.**  That's our goal, is to be patient-centered, yes.
19  **Q.**  And it's a patient-centered approach to provide
20  services close to patients' homes; is that correct?
21  **A.**  That would be, to me, as most desirable to get
22  patients home.
23  **Q.**  Mr. Kee, during your direct exam, you also
24  testified about the goal of altering coordination of care
25  and clinically integrating, among other things, the Select

2004

1  Medical Network.
2  From your perspective, integrating healthcare is about
3  the methodologies by which patients can have the information
4  to provide them safe, timely, effective care when they need
5  it at the right time; correct?
6  **A.**  That's correct.
7  **Q.**  And clinical integration can occur in multiple
8  ways; right?
9  **A.**  I assume there is multiple alternatives.  Is that
10  a rhetorical -- I guess, yes.
11  **Q.**  For example, integrating healthcare can occur with
12  employed physicians; right?
13  **A.**  Yes.
14  **Q.**  And integrating healthcare can also occur with
15  independent physicians; right?
16  **A.**  Yeah.  I think, to a limited extent, you could --
17  you can integrate care.
18  **Q.**  In fact, St. Luke's ability to be clinically
19  integrated doesn't depend on a certain threshold of employed
20  physicians; right?
21  **A.**  I don't think there is a specific threshold.
22  **Q.**  Indeed, St. Luke's would still go with its
23  clinical integration strategy if, for some reason, the
24  Saltzer transaction were not approved; right?
25  **A.**  Yeah.  I think we would put effort into working

2005

1  **with the independent physician community to move along some**
2  **quality- and performance-improvement initiatives.**
3  **Q.**  And specifically, if the Saltzer transaction were
4  not approved for some reason, St. Luke's would continue
5  working with Saltzer to the extent Saltzer was interested;
6  right?
7  **A.**  Yeah.  I believe I've said if this is unwound, we
8  would try to find opportunities to work with Saltzer.  They
9  have been a good community partner.
10  **Q.**  Now, you testified during your direct exam with
11  Mr. Keith about your experience at West Valley Regional
12  Medical Center.
13  West Valley Regional Medical Center implemented EMR
14  before St. Luke's acquired it; correct?
15  **A.**  I don't think I testified on West Valley Regional
16  Medical Center.
17  **Q.**  I'm sorry.  I misspoke.  I meant to say "Magic
18  Valley."
19  **A.**  Oh.
20  **Q.**  I misspoke.  Magic Valley Regional Medical Center.
21  I'll reask the question.
22  You testified during your direct exam about your
23  experience at Magic Valley Regional Medical Center.  And
24  just so I understand your testimony, Magic Valley Regional
25  Medical Center implemented EMR before St. Luke's acquired

**2006**

1  it; correct?

2  **A.**  Yeah.  We started the implementation.  It didn't

3  finish until after the acquisition, but we started it, and

4  we're way down the road.

5  **Q.**  And that was with the Centricity EMR system?

6  **A.**  That's correct.

7  **Q.**  And to this day, Magic Valley is still on

8  Centricity; is that right?

9  **A.**  That's correct.

10  **Q.**  And that's accessible through WhiteCloud?

11  **A.**  That's correct.

12  **Q.**  Now, you also mentioned during your direct

13  examination St. Luke's affiliate program.

14  St. Luke's is rolling out its affiliate strategy right

15  now; correct?

16  **A.**  We're in the planning stages of it.  We expect

17  that in April, we'll be ready to offer it to the community.

18  **Q.**  The affiliate strategy will allow independent

19  groups like Women's Health Associates, for example, to

20  actually share the same master patient index, firewalls,

21  financial data, and clinical data across the enterprise; is

22  that right?

23  **A.**  That's correct.

24  **Q.**  And St. Luke's intent with its strategy is to

25  provide independent physicians with full access to the full

**2007**

1  capability of St. Luke's her, Epic; correct?

2  **A.**  For the affiliate physicians?

3  **Q.**  Yes.

4  **A.**  Yes.  To the extent they participate and agree to

5  the appropriate standards and use, they could access the

6  complete patient record.

7  **Q.**  And as part of the affiliate strategy, St. Luke's

8  will pay for 85 percent of the allowable costs for EMR for

9  these independent groups?

10  **A.**  That's our intent.

11  **Q.**  One point of clarification, Mr. Kee:  When did

12  St. Luke's acquire Magic Valley Regional Medical Center?

13  **A.**  When did they acquire?

14  **Q.**  Yes.

15  **A.**  The vote occurred in June of 2006, I believe --

16  May or June.

17  **Q.**  Turning back to Women's Health Associates, that's

18  a financially independent OB physician group in the Treasure

19  Valley; correct?

20  **A.**  Which group?

21  **Q.**  OB obstetrican group.

22  **A.**  OB obstetrician?  I don't know what group you're

23  talking about.  There is two independent --

24  **Q.**  Women's Health Associates.

25  **A.**  Oh, Women's Health Associates.  Yes, that's an

**2008**

1  independent OB/GYN group.

2  **Q.**  And Women's Health Associates has actually decided

3  to enroll in St. Luke's affiliate program; is that right?

4  **A.**  That's their intent as --

5  **Q.**  And as an independent physician group, Women's

6  Health Associates will have the full capability of

7  St. Luke's Epic EMR system, just like a St. Luke's Clinic

8  doctor; is that right?

9  **A.**  That's -- that's correct.

10  **Q.**  And if the acquisition were to be unwound, the one

11  we're talking about here today, you would welcome Saltzer to

12  participate in the St. Luke's affiliate program; right?

13  **A.**  Oh, absolutely.

14  **Q.**  Now, you also mentioned that, if I understood your

15  testimony correctly -- excuse me -- that eClinicalWorks

16  which is Saltzer's system, cannot work interoperably with

17  St. Luke's Epic system.  Did I understand your testimony

18  correctly?

19  **A.**  I think it would be challenging to have ECW

20  actively interoperate with Epic, yes.

21  **Q.**  Now, are you aware that eClinicalWorks, in fact,

22  does work interoperably with Epic?

23  **A.**  No, not aware of that.

24  **Q.**  Mr. Beilein, can you put up Cross Exhibit 3005.

25  If you could highlight the first full paragraph.

**2009**

1  I'll read this into the record.  This is a press

2  release from September 24th of this year.  And it reads:

3  "EClinicalWorks today announces bidirectional

4  interoperability between" --

5  MR. KEITH:  Your Honor, I don't believe this is

6  proper cross.  He is reading something into the record that

7  Mr. Kee has already testified he doesn't know anything

8  about.

9  THE COURT:  Well, Counsel, what -- the witness has

10  simply indicated his understanding that it is not -- what's

11  the term?  "Interoperable," is that the term?

12  THE WITNESS:  I mean, my thought is realtime

13  interaction, you can actually see all the orders, all the

14  results.  I haven't seen this, and I don't know where it

15  really --

16  THE COURT:  I don't think it's proper impeachment

17  if it's simply something to show the witness is wrong about

18  something as opposed to having said something under oath

19  when it was not true.  I'm not sure I understand how that

20  can be proper impeachment.

21  MR. HERRICK:  Well, it also goes to his state of

22  mind, Your Honor.

23  THE COURT:  Unless he knew about this, how can

24  that affect his state of mind?

25  MR. HERRICK:  I'll move on.

2010

1        THE COURT:  The objection is sustained.

2    BY MR. HERRICK:

3        Q.   I believe during your testimony about WhiteCloud,

4    you mentioned Mr. Lokken.  Do you recall that testimony,

5    Mr. Kee?

6        A.   Yeah, Bob Lokken.

7        Q.   He is the founder and CEO of WhiteCloud; is that

8    right?

9        A.   That's correct.

10        Q.   Mr. Lokken is also a St. Luke's Health System

11    board member; is that right?

12        A.   Yeah.  He came on the board about a year ago, I

13    think.

14        Q.   Now, can you name any other health system that is

15    currently using the WhiteCloud tool for population

16    management besides St. Luke's?

17        A.   I can't, no.

18        Q.   So is it your understanding that the WhiteCloud

19    tool is sort of custom made for St. Luke's?

20        A.   Well, St. Luke's was a codeveloper with this

21    product, and WhiteCloud was actively marketing that.  And

22    I -- to be honest, I don't know the hospitals he is working

23    with specifically, but I understand he is working with 43

24    hospitals across the country.  I just can't name them.

25        Q.   I'm sorry.  I couldn't hear the last bit of your

2011

1    testimony.

2        A.   My understanding from Bob is he has relationships

3    with some 43 hospitals across the country.  I just don't

4    have the specific names.  I would be the wrong person to

5    ask.

6        Q.   Do you know whether any of those other hospitals

7    that Mr. Lokken mentioned to you are using the WhiteCloud

8    tool for population management?

9        A.   I do not.

10        Q.   As a St. Luke's executive, Mr. Kee, do you

11    consider how your words and actions will impact the

12    interests of a St. Luke's board member?

13        A.   I need a repeat on that question.

14        Q.   As a St. Luke's executive, Mr. Kee, do you

15    consider how your words and actions will impact the

16    interests of St. Luke's board members?

17        A.   I'm not clear I understand the question.  My

18    actions would affect those of the board members?  Is that

19    what you're asking me?

20        Q.   I'm asking you whether you have taken into

21    account -- when you, for example, give testimony or take any

22    action in your ordinary course of activities, whether you

23    consider how those words or actions will impact the

24    interests of St. Luke's board members.

25        A.   Well, that's quite a question.  I -- I mean, my

2012

1    work with WhiteCloud is based on the strategic direction of

2    people way up above my pay grade.  So I'm trying to work

3    with a product that I think will bring benefit.

4        I guess I'm not feeling very qualified to comment

5    on my actions affecting a board member, but I don't know if

6    I fully understand how to answer your question.  That's

7    a -- I don't think my actions directly affect a board

8    member.  I guess the answer is no.  I --

9        Q.   You don't take that into account?

10        A.   What's that?

11        Q.   You don't take St. Luke's board members' interests

12    into account when you speak or take actions?

13        A.   Oh, you're asking me if I take my board members

14    in -- no.  Absolutely, I don't do that.

15        Q.   Now, WhiteCloud allows St. Luke's to interface

16    with independent physicians who were on different EMRs; is

17    that correct?

18        A.   WhiteCloud is working actively to figure out how

19    to gather whatever data it can from various EMRs.

20        Q.   And WhiteCloud, as you testified earlier, can pull

21    data from Saltzer's current EMR system, eClinicalWorks;

22    right?

23        A.   It can pull limited sets of data today from

24    eClinical.

25        Q.   In fact, WhiteCloud can bridge data from multiple

2013

1    EMRs to provide a comprehensive scorecard for physicians and

2    clinical leaders; correct?

3        A.   Depending on how much of an investment you chose

4    to make, you potentially -- and depending on the

5    infrastructure and bio mapping of the EMR and the

6    willingness of the group to make modifications, you could

7    potentially get to a -- you could get to a data set.

8        Q.   And WhiteCloud's TrueBlue population management

9    tool, that only looks at claims data from BCI's TrueBlue

10    plan; is that right?

11        A.   The data that you saw today is from the TrueBlue

12    population.  We have also imported the Medicare Shared

13    Savings Plan information, and we'll import other data sets

14    for those insurance plans with which we have a payor

15    relationship.

16        Q.   Let me ask the question again.

17        A.   Well, I didn't understand.

18        Q.   WhiteCloud's TrueBlue population management tool,

19    the one you showed to the court today, that only looks at

20    claims data from BCI's TrueBlue plan; correct?

21        A.   And laboratory data for populating the registry,

22    which came from the EMR.

23        Q.   BCI's TrueBlue plan is a Medicare Advantage plan

24    so it covers only Medicare patients who have chosen that

25    particular plan; is that right?

2014

1    **A.**  That's what's reflected in the scorecard.
2    **Q.**  The TrueBlue population management tool covers
3    about 4,000 patients at St. Luke's.  Does that sound about
4    right?
5    **A.  Somewhat more than that, but that's roughly**
6    **correct.**
7    **Q.**  Approximately how many patients does St. Luke's
8    treat annually?
9    **A.  I don't know.  Tens of thousands.  I don't know**
10   **off the top of my head.**
11   **Q.**  More than a hundred thousand?
12   **A.  Probably.**
13   **Q.**  More than 500,000?
14   **A.  I doubt that.**
15   **Q.**  Somewhere between 100,000 and 500,000?
16   **A.  Yeah.**
17   **Q.**  You mentioned that WhiteCloud's tool was a work in
18   progress.  I'm paraphrasing, but is that an accurate
19   assessment?
20   **A.  Yeah.  We're continuing to evolve it.**
21   **Q.**  And the data that were displayed during your
22   deposition, you don't know if that data is correct; correct?
23   Do I understand your testimony correctly?
24   **A.  We have just received the data, so we're**
25   **continuing to validate.**

2015

1    **Q.**  So you don't know if that data is correct?
2    **A.  I don't know that it's all perfectly correct.**
3    **Q.**  Now, you're aware that other population management
4    tools compare not only individual healthcare systems
5    patients but also healthcare system -- other healthcare
6    system patients, as well?
7    **A.  Yeah, that's correct.**
8    **Q.**  And, Mr. Kee, St. Luke's certainly isn't the only
9    healthcare system implementing data analytics tools; right?
10   **A.  No.  I think that I said that we -- this is one of**
11   **many systems working through this process.**
12   **Q.**  In fact, health systems and other providers all
13   around the country are implementing data analytics tools;
14   right?
15   **A.  That's correct.**
16   **Q.**  For example, a little bit closer to home,
17   Saint Al's uses a product known as Explorys.  Are you
18   familiar with Explorys?
19   **A.  I saw the press release announcing the release of**
20   **Explorys.**
21   **Q.**  Did St. Luke's consider Explorys when it was
22   deciding which data analytics tool to use?
23   **A.  I don't -- I didn't.  I don't know if others did,**
24   **but I did not.  I wasn't involved in that decision-making,**
25   **so --**

2016

1    **Q.**  Do you know if St. Luke's considered any other
2    data analytics tool besides WhiteCloud?
3         MR. KEITH:  Objection, Your Honor.  He just
4    testified he wasn't involved in the process of determining
5    which tool to use.
6         MR. HERRICK:  I'm asking whether he knows,
7    Your Honor.
8         THE COURT:  Just if you know, so indicate.
9         THE WITNESS:  I don't know.
10   BY MR. HERRICK:
11   **Q.**  In any event, St. Luke's did not select Explorys
12   as its data analytics tool; correct?
13   **A.  St. Luke's did not -- are you asking me if we**
14   **selected Explorys?**
15   **Q.**  Right.
16   **A.  No.  No.**
17   **Q.**  Now, are you aware that Explorys's tool covers
18   40 million patients, 200 hospitals, and over a 100,000
19   providers?
20        MR. KEITH:  Objection to form.
21        THE COURT:  I'll allow -- do you know that?
22        THE WITNESS:  No.  I have already indicated I
23   don't -- I haven't studied Explorys or Optums tools
24   or -- so --
25   BY MR. HERRICK:

2017

1    **Q.**  And you mentioned some of the challenges with
2    building interfaces between WhiteCloud and other EMR
3    systems, such as Saltzer's eClinicalWorks.
4         Do you know whether these difficulties are caused by
5    the fact that WhiteCloud may not have other healthcare
6    clients using its population management tool?
7    **A.  Do I know if it's caused by WhiteCloud's technical**
8    **skills?  Is that your question?**
9    **Q.**  You're paraphrasing, but that's fine.
10   **A.  Yeah.  No.  I'm not aware that it's WhiteCloud's**
11   **problem.**
12   **Q.**  Now, are you aware that other data analytics
13   tools, such as Explorys, are able to pull data from
14   different EMR systems?
15   **A.  I hear people say they can, but I don't know that**
16   **I understand the technology of it.**
17   **Q.**  And did you know that Explorys actually supports
18   EMR systems including Epic, eClinicalWorks, Cerner,
19   McKesson, Allscripts, GE, and Microsoft?
20   **A.  I think I have already testified I'm not an expert**
21   **on Explorys, so I don't know how to answer that.  I --**
22        MR. HERRICK:  I have no further questions,
23   Your Honor.
24        THE COURT:  Mr. Ettinger.
25                CROSS-EXAMINATION

2018

1  BY MR. ETTINGER:
2      Q.   Mr. Kee, I was very interested in one of your
3  early answers.  And Ms. Duke has put it up on her iPad and
4  told me not to touch it, so hopefully I can keep it there
5  long enough to read it to you, and then I'll ask you about
6  it.
7      Your current job, your new job, is vice president of
8  network operations; correct?
9      A.   That's correct.
10      Q.   And you said -- and I'm going to quote you not too
11  long -- "My goals are to generally develop a network that
12  integrates clinically between the St. Luke's Clinic and the
13  independent medical community using tools such as shared
14  analytics, developing standardized ways of practicing
15  medicine, emphasizing best-practice tactics in the
16  marketplace to develop care coordination and to make best
17  efforts to establish value-based insurance contracting
18  relations with the payor community."
19      Is that an accurate description of your goal and your
20  job in this new position?
21      A.   That's my goals and that's my new job.
22      Q.   So, generally speaking, your job is to integrate
23  the St. Luke's Clinic physicians with the independent
24  physicians; correct?
25      A.   That's correct.

2019

1      Q.   And that includes applying shared analytics, the
2  WhiteCloud tool, to the independent physicians and allowing
3  them to use that tool; correct?
4      A.   That would be our intent, to, where possible, be
5  able to mine information.
6      Q.   And that includes working with the independents so
7  that they adopt standardized ways of practicing medicine;
8  correct?
9      A.   Yes.
10      Q.   And working with the independents so that they
11  adopt best practices; correct?
12      A.   Yes.
13      Q.   And working with the independents to achieve care
14  coordination; correct?
15      A.   That would be our intent, yes.
16      Q.   And working with them so they could participate in
17  value-based contracting; correct?
18      A.   That would be our intent.
19      Q.   Is that a pretty good shorthand description of the
20  Triple Aim?
21      A.   Yeah.  I think that -- I think that the goals are
22  consistent with the intent of Triple Aim to perform those
23  activities.
24      Q.   And Dr. Pate appointed you to this new position as
25  part of his effort to devote adequate resources to clinical

2020

1  integration with independent doctors; correct?
2      A.   That's my understanding.
3      Q.   Let me ask you about a couple of the specific
4  innovations that you mentioned.  You talked about your CoPar
5  program and the use of care coordinators to go out and work
6  with patients.  Do you recall that?
7      A.   Mm-hmm.
8      Q.   That's a yes?
9      A.   Yes.  I'm sorry.
10      Q.   And hundreds of hospitals around the country and
11  independent practice associations are utilizing care
12  coordinators to do that sort of thing; isn't that right?
13      A.   I really can't -- I am aware it's going on, yes.
14      Q.   And you don't need an employed doctor to employ
15  nurse care coordinators to do this work, do you?
16      A.   No, I don't think you're required to have an
17  employed doctor.
18      Q.   And you talked about the diabetes clinic.
19  Saint Al's has a diabetes clinic; isn't that right?
20      A.   That's my understanding.
21      Q.   Do you know anything in detail about that
22  Saint Al's achievements in diabetes?
23      A.   No.  I don't know anything about Saint Al's
24  program.
25      Q.   And there are hundreds of hospitals around the

2021

1  country that have diabetes clinics, aren't there?
2      A.   I -- I'm sure people have diabetes programs, yes.
3      Q.   And you don't need employed doctors to operate a
4  successful diabetes clinic, do you?
5      A.   I don't -- I don't think it's an absolute
6  requirement.
7      Q.   Now, you talked about it being in -- if Saltzer
8  were unwound, about it being in Saltzer's economic interest
9  to practice fee-for-service medicine.  Do you recall that?
10      A.   Yes.
11      Q.   Isn't it -- if St. Luke's were only concerned with
12  its short-term narrow economic interests, wouldn't it be in
13  St. Luke's economic interest to practice fee-for-service
14  medicine today?
15      A.   In the very short-term, is it in their best
16  interest to practice fee-for-service medicine?  Is that the
17  question?
18      Q.   Yes.
19      A.   I think in the short-term, those are the way the
20  payor incentives are aligned.
21      Q.   Now, you were asked some questions about affiliate
22  EMR and how much St. Luke's is going to pay for the
23  independents to have -- to be on the Epic system.  And I'm
24  going to borrow from one of Mr. Stein's questions this
25  morning I liked it so much.

2022

1    Is Dr. Chasin the most knowledgeable about that subject
2  within St. Luke's?
3    **A.   I would say Dr. Chasin is the most knowledgeable**
4  **on the her.**
5    **Q.**   And the affiliate her, as well?
6    **A.   I would say Marc is the most knowledgeable on the**
7  **Epic platform.**
8    **Q.**   Including the affiliate EMR program?
9    **A.   Yes.**
10   **Q.**   You talked about Saltzer briefly, and I'm going to
11  ask you about Saltzer briefly.  One of the things you did
12  was meet individually with each Saltzer physician to discuss
13  their compensation if they were to go along with St. Luke's;
14  isn't that right?
15   **A.   I don't remember if I met with each doctor**
16  **individually.  I met with a number of Saltzer docs, but --**
17   **Q.**   And in those meetings, you were accompanied by
18  Joni Stright and Jeff Taylor from St. Luke's?
19   **A.   Yeah, Joni and I would always attend.**
20   **Q.**   And in direct, you talked about your philosophy
21  regarding physician referrals to St. Luke's.  Do you
22  remember that general subject?
23   **A.   Yes.**
24   **Q.**   Isn't it true that you believe that part of the
25  true economics of physician practices is that losses to

2023

1  St. Luke's from employing physicians are made up for in
2  increased hospital revenues and increased other downstream
3  revenues from those employed physicians?
4    **A.   You're asking me if that's what I believe is true?**
5    **Q.**   Yes.
6    **A.   I think that the --**
7    **Q.**   If you could answer yes or no, I would appreciate
8  it.
9    **A.   Well, I think --**
10   **Q.**   I can repeat it if you'd like.
11        THE COURT:  Let's put the question back before the
12  witness.
13        Mr. Keith will give you a chance to explain your answer
14  further.
15        Let's put the question back before the witness.
16  BY MR. ETTINGER:
17   **Q.**   Do you believe, Mr. Kee, that the true economics
18  of physician practices includes losses to St. Luke's from
19  employing physicians are made up for by increased hospital
20  revenues and other downstream revenues resulting from those
21  employed physicians?
22   **A.   Well, ultimately, the entire health system has to**
23  **balance.  And so when you pull revenues out of the clinics**
24  **and put it in the hospitals, in that context, the gains and**
25  **the losses are offset.**

2024

1    **Q.**   So is the answer yes?
2    **A.   Well, my view is that there needs to be more --**
3  **more explanation than yes or no, so I'll leave it at that.**
4    **Q.**   Why don't we go to Exhibit 1091.  And this is
5  Exhibit 1091 you may recall you saw in your deposition, it's
6  a St. Luke's Health System Project Leadership Team meeting
7  from June of 2009.
8    Do you recall seeing this document at least at that
9  time?
10        MS. DUKE:  Your Honor, can we blank the screen,
11  please?
12        THE COURT:  Yes.  Is this AEO?
13        MS. DUKE:  I'm not sure, so I think we need to be
14  safe.
15        MR. ETTINGER:  The document at least originally
16  was, Your Honor.  I'm going to ask about one general
17  statement.  I don't -- if St. Luke's view is that reading
18  that statement is AEO, we'll clear the courtroom.  That's as
19  far as I'm going to go with it.
20        THE COURT:  Well --
21        MR. ETTINGER:  Not hearing anything, I would like
22  to just proceed, Your Honor, if I may.
23        THE COURT:  Mr. Keith?
24        MR. KEITH:  Which is the portion you plan to read?
25        THE COURT:  It's on the screen.

2025

1        MR. ETTINGER:  Yeah.  It's highlighted on the
2  screen.
3        MR. KEITH:  No objection, Your Honor.
4        THE COURT:  All right.
5  BY MR. ETTINGER:
6    **Q.**   Mr. Kee, do you remember these minutes?
7    **A.   I absolutely have no recollection of this meeting**
8  **at all.**
9    **Q.**   Do you remember being shown these minutes in your
10  deposition?
11   **A.   Vaguely, but I don't --**
12   **Q.**   And, in fact, you worked with Health Care Futures
13  as a consultant on issues relating to physician compensation
14  in 2009, did you not?
15   **A.   I have absolutely worked with Health Care Futures,**
16  **yes.**
17   **Q.**   And the participants in this meeting include, in
18  addition to you, Chris Roth, Joni Stright, Jeff Taylor.
19  Ms. Stright worked directly for you; correct?
20   **A.   That's correct.**
21   **Q.**   Mr. Taylor, the CFO of St. Luke's?
22   **A.   That's correct.**
23   **Q.**   And Mr. Roth, at that time was I think, the COO of
24  St. Luke's Treasure Valley?
25   **A.   I believe so.**

2026

1    Q.   And today the CEO of St. Luke's Treasure Valley?
2    A.   That's correct.
3    Q.   And the guests are personnel of your consultants,
4  Health Care Futures; is that right?
5    A.   Yes.
6    Q.   And you see in the highlighted paragraph, it says
7  "John Kee and Chris Roth proposed" --
8    A.   I see that.
9    Q.   -- "that at least a trusted few board members are
10  shown the true economics of the physician division and
11  explain to them how the practice losses are made up in
12  hospital and other downstream revenues for the system."
13    Did I read that correctly?
14    A.   That's what it says.
15    MR. ETTINGER:  Nothing further.  Thank you.
16    THE COURT:  Redirect.
17    MR. KEITH:  Can we leave 1091 up but cover the
18  screen?
19    THE COURT:  You want the screen off?
20    MR. KEITH:  The screen off but so the witness can
21  see it.  This was the AEO document.  I just don't want
22  to --
23    THE COURT:  Well, I thought you agreed that at
24  least the portion read was not going to be AEO.  I did not
25  blank the screen.

2027

1    MR. KEITH:  Well, then we can put it on the
2  screen.  I am told now that it's not AEO, so I apologize.
3    REDIRECT EXAMINATION
4  BY MR. KEITH:
5    Q.   Now, Mr. Kee, do you recognize this document as
6  something that you wrote?
7    A.   No.  I -- I, to be honest, have no recollection of
8  this whatsoever.  I don't even know who -- I don't know who
9  took the minutes.  I don't know.
10    Q.   Now, there were a number of questions counsel for
11  the plaintiffs asked you about the potential for St. Luke's
12  to more closely work with independent physicians through the
13  Select Medical Network or BrightPath.  Do you recall that?
14    A.   Yes.
15    Q.   And do you have a view as to whether St. Luke's
16  will more quickly or effectively achieve the goals of the
17  Triple Aim with Saltzer tightly financially affiliated with
18  St. Luke's, as it is now, versus working with Saltzer as an
19  independent group through the Select Medical Network or
20  BrightPath?
21    A.   Yeah.  It's my opinion that to actually truly
22  achieve the benefits of integrating care and delivering a
23  high-quality competitively priced product, we're way further
24  advanced to move with economically integrated physicians.
25    We clearly need to work with the independent

2028

1  community.  I'm fully supportive of that, but I think the
2  momentum from change will come from doctors that are more
3  closely economically aligned.
4    Q.   And why is that?
5    A.   Because it's sort of like being on the same team
6  where you are rowing the boat in the same direction.  You
7  are setting strategic direction together, and I think it
8  just allows for more momentum.
9    I think one of the examples I would provide is in
10  The Spine Center.  That was actively promoted by a group of
11  independent physicians.  I think there were a few people
12  with good motivations; it just didn't get off the ground.  I
13  think we're getting that off the ground now; it will be
14  successful.
15    So it's my opinion that the economic alignment,
16  building a team, will provide faster and more -- and greater
17  progress to achieving the goals that we have discussed.
18    Q.   Counsel for the government plaintiffs asked you
19  about the nature of compensation of the Saltzer group under
20  the professional services agreement as it stands now.
21    And you explained that the current compensation is
22  based on wRVUs.  Do you recall that?
23    A.   Yes.
24    Q.   And under the current compensation scheme with the
25  Saltzer physicians, does the group receive any compensation

2029

1  for ancillary services that the physicians order?
2    A.   No.
3    Q.   And why is that?
4    A.   For the specific intent of not rewarding
5  physicians for ordering ancillary services and taking that
6  motivation off the table.
7    Q.   And how does that relate to the testimony you were
8  just giving about the opportunity to more effectively or
9  efficiently achieve the Triple Aim with Saltzer as a tightly
10  affiliated group?
11    MR. ETTINGER:  Your Honor, it seems to me to be
12  quite a bit beyond the scope.
13    THE COURT:  Counsel, I don't recall that that was
14  covered, the question of whether a tightly affiliated group
15  is necessary or not.  I'll sustain the objection.
16    MR. KEITH:  Your Honor, if I may.
17    THE COURT:  You may.
18    MR. KEITH:  There were a number of questions about
19  what one can do or what St. Luke's can do through
20  affiliations with independent physicians, through Select,
21  through BrightPath.  And I am endeavoring to get Mr. Kee to
22  give his opinion on whether that would be as effective or as
23  efficient as the current proposal or the current
24  relationship.
25    THE COURT:  With that explanation, I'll overrule

2030

1 the objection.  Proceed.

2 BY MR. KEITH:

3    Q.  So how does the way that Saltzer is now
4 compensated or not compensated for ancillary services under
5 the professional services agreement relate to the testimony
6 you gave that you think St. Luke's can achieve the Triple
7 Aim more quickly, more effectively with the current
8 transaction?

9    A.  Well, it's -- first of all, starting at the top, I
10 think cultural alignment and commitment to common goals --
11 and I think I have said this before, and I'll say it
12 again -- is hugely important.

13         When you actually join a team, you actually make
14 joint commitments.  I think it's a statement both in, you
15 know, your word and your actions that you're going to move
16 forward toward common goals.

17         Secondly, I think taking the incentive to consume
18 more off of the table is clearly to the benefit of being
19 more efficient in the marketplace and providing, you know,
20 motivation to work together on things like care
21 coordination, utilization management.  I think it's the
22 whole package built around culture and alignment.

23    Q.  Counsel for the government plaintiffs asked you a
24 number of questions about whether Saltzer, as an independent
25 group, could -- I emphasize the word "could" -- participate

2031

1 in certain risk contracts either with payors in the
2 commercial side or the government plaintiffs.

3         And my question to you is:  Let's assume that,
4 technically, Saltzer could, as an independent, apply or
5 request to participate in risk contracts.  As a person who
6 has managed physician practices for 37 years, do you believe
7 that Saltzer will endeavor to enter those types of
8 relationships?

9    A.  No, I don't believe they will.  And if I were
10 running Saltzer, personally I wouldn't do it, but I wouldn't
11 be running Saltzer.  But I think it would be inimical to
12 their interests to do it.

13         I don't see why a small group that would lack
14 administrative infrastructure, skills, expertise would
15 pursue that, but -- but that's my professional opinion.

16    Q.  There was a question from one of the counsel for
17 plaintiffs about whether the spine -- the Center for Spine
18 Wellness had to date achieved or resulted in material
19 differences in the incidents of spine surgery, and I believe
20 your answer was that it had not.

21         I wanted to follow up with you and ask:  For the
22 patients who have used the Center for Spine Wellness,
23 have -- has the incidents of spine surgery for those
24 patients been affected?

25    A.  Yes.

2032

1    Q.  And how so?

2    A.  It's been positively impacted.

3    Q.  Positively in the sense that there are --

4    A.  Well, reduced consumption of resource.

5    Q.  I believe you testified in -- during our direct
6 examination about the opportunity to eliminate low-value,
7 no-value services.  Do you recall that?

8    A.  Yes.

9    Q.  And counsel for the government plaintiffs asked
10 you whether you were -- you knew or had a -- had information
11 that demonstrated that Saltzer was an inefficient user of
12 healthcare services.  Do you recall that?

13    A.  Yes.

14    Q.  And my question is simple:  Do you know, one way
15 or the other, whether Saltzer was an efficient user of
16 healthcare resources?

17    A.  I think that the point that I made is this is
18 actually the process we're going through is actually to
19 gather information because I don't know where I would go to
20 get that information today without developing the systems
21 we're working on.  Whether it's WhiteCloud, Explorys, or
22 whatever, you have to have a way to pull that information
23 together and display it.

24         The -- I just don't know how you would get a
25 complete look at a physician practice in -- in our community

2033

1 today without the tools we're talking about.

2    Q.  Well, do you have any basis for believing that
3 there are opportunities working with Saltzer to make their
4 utilization of healthcare resources more efficient?

5    A.  Well, if I look at the HEDIS measures that were
6 reported in the Blue Cross scorecard, I would say there is
7 opportunities in many of the areas around preventive health
8 and disease state management.

9    Q.  Counsel for plaintiffs asked you whether MVRMC had
10 implemented an electronic health record, Centricity, prior
11 to St. Luke's acquisition of the hospital.  Do you recall
12 that?

13    A.  Yes.

14    Q.  What was the state of the integration, the
15 financial integration, of physician groups in Twin Falls
16 with MVRMC at the time that MVRMC implemented Centricity?

17    A.  The integration of the groups in Magic, in my
18 view, was substantially complete by the time the integration
19 with St. Luke's occurred.

20    Q.  And do you believe that facilitated implementation
21 of the electronic health record in Magic Valley?

22    A.  I think the --

23         THE COURT:  Counsel, what facilitated?  The merger
24 or the --

25         MR. KEITH:  I'm sorry, Your Honor.

2034

BY MR. KEITH:

Q. Do you think that the fact that the physician groups in Twin Falls were, I think you said, substantially all financially integrated with Magic Valley facilitated the implementation of a communitywide electronic health record?

**A. Yeah. I think it was a substantial driver. It was an opportunity for physicians to work together and come together with a common tool. It was actually a very positive experience, and I think it drove a lot of thought processes around working more collaboratively as a multispecialty group.**

Q. I would like to go back to the -- to your declaration and the charts that were included in that declaration, which counsel for the government plaintiffs asked you about, and I have a few questions about the declaration.

Did you review the declaration carefully before you signed it?

**A. I did review it. And I actually talked with Dr. Hill about those charts, and I called him. And to the best of my knowledge, I had reason to rely on Dr. Hill's work, and so I did. I made phone calls, and I did the best I could to validate it.**

Q. And did you anywhere in your declaration indicate that you had, yourself, run the numbers that were reflected

2035

in the chart?

**A. No. I absolutely have never said I ran the numbers.**

Q. And in the ordinary course of your business and your work at St. Luke's, do you typically rely on the efforts of folks who work with you, like Dr. Hill?

**A. Well, I would have to rely on the work of the -- of the physician and clinician team. That would be common in a company like St. Luke's.**

Q. And did you believe at the time that you submitted the declaration that everything in it was accurate?

**A. I did. And I validated as best I could with Dr. Hill and his team.**

MR. KEITH: Thank you, Your Honor. No further questions.

THE COURT: Any recross, briefly?

MR. HERRICK: Just two questions, Your Honor.

THE COURT: Mr. Herrick.

RECROSS-EXAMINATION

BY MR. HERRICK:

Q. Mr. Kee, Mr. Keith just asked you about revenue from ancillary services. Do you recall that testimony --

**A. Yes.**

Q. -- relating to the Saltzer transaction?

**A. Yes.**

2036

Q. St. Luke's modeled revenue from ancillary services as part of its decision-making process in deciding whether to acquire Saltzer; correct?

MR. KEITH: Objection, Your Honor. Beyond the scope. My question was as to the compensation to the Saltzer physicians.

MR. HERRICK: Your Honor --

THE COURT: Yes.

MR. HERRICK: -- Mr. Keith elicited testimony about ancillary services and whether that was affecting the incentives. I'm merely trying to point out that this was part of the thought process.

THE COURT: Mr. Keith?

MR. KEITH: So on cross-examination, counsel for the government sought to elicit testimony that the compensation scheme at the heart of the professional services agreement recapitulated the problem of volume-based compensation; that is, it's wRVU based. The more they do, the more they get paid -- that is, the Saltzer physicians.

My point was: Do they get paid for ancillary services as part of that contract? The answer was no.

The question that counsel for the government is asking now is whether St. Luke's took into account, not what the Saltzer physicians would get paid, but somehow the value of the stream to it.

2037

THE COURT: Mr. Herrick, it does seem to me you're getting into a different area than I think what counsel inquired of.

MR. HERRICK: Well, to borrow Mr. Keith's phrase, the more ancillary services Saltzer orders, the more St. Luke's gets paid. So I would --

THE COURT: Let me take look at the question as phrased. Give me just one moment.

Okay. Looking at the question, I'm going to overrule the objection.

MR. HERRICK: Shall I restate the question, Your Honor?

THE COURT: Yes.

BY MR. HERRICK:

Q. Mr. Kee, St. Luke's modeled revenue from ancillary services as part of its decision-making process in deciding whether to acquire Saltzer, did it not?

**A. Well, St. Luke's looked at the entire transaction.**

Q. And that included revenue from ancillary services?

**A. You have to look at the entire transaction to determine the financial stability of it in the short term, absolutely.**

Q. So the answer is yes?

**A. The answer is we looked at the entire business structure, including professional and ancillary fees; that's**

2038

1  correct.
2      Q.  Mr. Keith also asked you about risk-based
3  contracting.  Are you aware of whether any independent
4  physician groups currently engage in risk-based contracting
5  one way or the other?
6      A.  I'm sorry.  Repeat that question.
7      Q.  Are you aware, one way or the other, of whether
8  any independent physician groups currently engage in
9  risk-based contracting?
10     A.  I am not aware of any groups specifically
11 participating in full-risk contracting, no.
12     Q.  You have no knowledge one way or the other?
13     A.  No.
14         MR. HERRICK:  I have no further questions.
15         THE COURT:  Mr. Ettinger.
16         MR. ETTINGER:  Very briefly, Your Honor.
17             FURTHER REDIRECT EXAMINATION
18 BY MR. ETTINGER:
19     Q.  Mr. Kee, is Dr. Johans one of the leaders of the
20 efforts at Spine Wellness you've been describing?
21     A.  Yeah.  Dr. Johans has been actively involved with
22 that program.
23     Q.  He is an independent physician, is he not?
24     A.  He is with Neurological Associates.
25     Q.  And that's not a St. Luke's Clinic group; correct?

2039

1      A.  Correct.
2          MR. ETTINGER:  Nothing further.
3          THE COURT:  Mr. Keith, anything else?
4          MR. KEITH:  Nothing further, Your Honor.
5          THE COURT:  I'm trying to debate whether to ask
6  Mr. Kee this question or to defer.  I think I will ask a
7  question or two.
8                  EXAMINATION
9  BY THE COURT:
10     Q.  Mr. Kee, is the metrics that are used in
11 establishing the compensation rate for -- I guess, the
12 risk-based compensation rate for -- well, it's not risk
13 based.  It would really be more performance-based
14 compensation rate for, I think you said, the cardiologists,
15 pulmonologists, and internal medicine specialists with
16 St. Luke's were currently on a limited performance based.
17         Is that performance based tied not only to results but
18 also to kind of efficiencies; in other words, take into
19 account the cost of the services provided?  Or is it just
20 purely based upon -- again, I don't know exactly what goes
21 into those metrics.  I probably wouldn't understand it if
22 you told me.  But are they completely performance based in
23 terms of the outcome for the patient, or does it also take
24 into account the cost of services ordered versus various
25 alternatives?  Or does that even enter into the calculation?

2040

1      A.  At this point, the metrics for those groups
2  would -- if you define cost as revenue to the market, it
3  would take into account -- like, reduced costs of stints in
4  cardiology are inferred in their compensation model.  So the
5  use of stints and the number of stints that would be placed
6  are part of their compensation model.  That would be, you
7  know, less cost ultimately to the consumer.
8      Q.  So is there -- do the metrics somehow discourage
9  the use of stints?
10     A.  It's -- the metrics in the current cardiology
11 scorecard encourage the use of the American College of
12 Cardiology best practice, which actually encourages medical
13 interventions rather than surgical interventions.
14     Q.  I know that, what, three or four years ago, there
15 were some new studies developed suggesting that stints
16 perhaps weren't as effective as just using medicine; right?
17     A.  Right.  So now they are moving quickly into
18 medical intervention rather than --
19     Q.  So it's focused on, again, using best practices?
20     A.  That's the focus on the scorecard.
21         THE COURT:  Okay.  I think that's probably all
22 I -- it was more -- I'm not sure that really adds anything
23 to what's relevant to the case, but I was more curious than
24 anything else.
25         Is there any questions as follow-up to my inquiry?  I

2041

1  suspect not.
2          You may step down.  Thank you, Mr. Kee.
3          Call your next witness.
4          MR. SINCLAIR:  Call Dr. Souza.
5          THE COURT:  I'm sorry.  What was the last name?
6          MR. SINCLAIR:  James Souza, S-O-U-Z-A.
7          THE COURT:  Dr. Souza, would you please step
8  before the clerk and be sworn.
9                  JAMES SOUZA,
10 having been first duly sworn to tell the whole truth,
11 testified as follows:
12         THE CLERK:  Please state your complete name and
13 spell your name for the record.
14         THE WITNESS:  James Souza, M.D.  It's J-A-M-E-S,
15 S-O-U-Z-A.
16         THE COURT:  You may inquire.
17         MR. SINCLAIR:  Thank you, Your Honor.
18             DIRECT EXAMINATION
19 BY MR. SINCLAIR:
20     Q.  Good afternoon, Dr. Souza.  Where are you
21 currently employed?
22     A.  At St. Luke's.
23     Q.  And when did you become employed at St. Luke's?
24     A.  In January of 2010.
25     Q.  And when you were first employed by St. Luke's,

2042

1  what was -- what was your job?
2      **A.  I was a pulmonary and critical care physician,**
3  **still am, but I was full-time in that role at that point.**
4      **Q.**  Has that job changed?
5      **A.  It has.  I'm now a part-time pulmonary and**
6  **critical care physician and a part-time physician leader.**
7      **Q.**  Okay.  Could you give the court some background
8  about your educational --
9      **A.  Yes.  BA in cell biology in 1988 from the**
10  **University of Montana and then my medical doctorate in 1992**
11  **from the University of Washington.**
12      **Q.**  And what is your area of medical specialty?
13      **A.  Pulmonary disease and critical care medicine.**
14      **Q.**  Would you explain to the court what you did after
15  medical school in your medical career up to --
16      **A.  Yes.  Residency from '92 to '95 in internal**
17  **medicine, then a specialty fellowship from '95 to '98.**
18  **University of Washington and the Boise VA for that.  And**
19  **then faculty at the VA in 1998.  Private practice in 1999**
20  **when I joined Idaho Pulmonary Associates.**
21      **Q.**  And Idaho Pulmonary Associates was in Boise?
22      **A.  Yes.**
23      **Q.**  And just before you became employed with
24  St. Luke's in 2010, how many doctors were affiliated with
25  Idaho Pulmonary Associates?

2043

1      **A.  Fourteen.**
2      **Q.**  Now, at that time when you were with the Idaho
3  Pulmonary Associates, before affiliating, did you have a
4  electronic medical record system?
5      **A.  Yes.**
6      **Q.**  What system did IPA use?
7      **A.  EClinicalWorks.**
8      **Q.**  And can you explain to the court your familiarity
9  with eClinicalWorks.
10      **A.  We used it for about five years.**
11      **Q.**  And in using that -- well, are you currently
12  familiar with what we have been discussing as the system
13  called "Epic"?
14      **A.  Yes.  We have been using Epic since June of 2012.**
15      **Q.**  Now, back when you were with IPA, before
16  integrating, did you attempt to communicate with
17  eClinicalWorks and any other programs?
18      **A.  Can you rephrase the question?**
19          MR. ETTINGER:  Your Honor, I'm not clear on what
20  the question is.
21          MR. SINCLAIR:  Let me rephrase it.
22          THE COURT:  Rephrase, if you would.
23  BY MR. SINCLAIR:
24      **Q.**  How would you compare eClinicalWorks and Epic?
25      **A.  It's -- it's difficult to compare because they are**

2044

1  **so different.  EClinicalWorks is to electronic health**
2  **records what horses and buggies are to transportation.  It**
3  **had its day, and that day has passed.**
4          **EClinicalWorks is a great billing platform.**
5  **EClinicalWorks in terms of clinical information is really**
6  **little more than an electronic paper chart.  So it's an**
7  **electronic filing system.**
8          MR. ETTINGER:  Your Honor, I didn't object
9  initially because I thought the witness was going to
10  describe, you know, his experience with it.  But unless the
11  witness has been qualified as an expert on electronic
12  medical records, I think his testimony is getting a little
13  broad.
14          THE COURT:  Well, the witness I think can -- since
15  he used it with Idaho Pulmonary Associates, he can testify
16  as to his use, and I thought that's what he was doing.
17          MR. SINCLAIR:  I thought so, too.
18  BY MR. SINCLAIR:
19      **Q.**  Dr. Souza, limit your discussion with your
20  experience between the two systems.
21      **A.  Will do.**
22          **So in eClinicalWorks -- yeah, I'll use a clinical**
23  **example.  A common scenario for a pulmonologist thinking of**
24  **a complex patient where you've got to coordinate care with**
25  **others would be a patient with rheumatoid arthritis.  This**

2045

1  **is because such patients are typically older; they have**
2  **comorbidities; they have a primary care physician; they will**
3  **have a rheumatologist.  And because almost 100 percent of**
4  **rheumatoid arthritics develop complications during their**
5  **lifetime, they will typically have a pulmonologist to**
6  **treatment rheumatoid lung or other pulmonary complications.**
7  **So --**
8          THE COURT:  Counsel, let me just ask you to back
9  up.
10      You referred to "comorbidities."  I'm assuming that's
11  multiple medical problems?
12          THE WITNESS:  Yes, Your Honor.
13          THE COURT:  And "morbidity" suggests that they're
14  serious?
15          THE WITNESS:  Yes.
16          THE COURT:  Okay.  And then you referred to a
17  rheumatoid lung.
18          THE WITNESS:  Yes.
19          THE COURT:  Can you just tell me --
20          THE WITNESS:  It's scarring of the lung.  Scarring
21  of the lung induced by rheumatoid arthritis.
22          THE COURT:  All right.  Go ahead.
23  BY MR. SINCLAIR:
24      **Q.**  In that perspective, put as much as you can in
25  layman's terminology so all of us can understand what you're

2046

1   saying.
2        A.   Got it.  Thank you.  Yeah, different language.
3        So when I would be seeing such a patient, I would
4   keystroke my note into eClinicalWorks.  I would put in there
5   the pertinent information.  I may change medications.  I
6   would put in there information about important objective
7   things that we use to measure lung function, such as
8   pulmonary function tests.
9        When I was done with my note and finished my
10  encounter, I would move on.
11       Now, if that patient were seen by their primary
12  care doctor, she would see the patient, hear from the
13  patient, "Oh, I saw Dr. Souza.  He changed my medications."
14       Well, why did he do that?  Well, because she would
15  say I think my pulmonary function tests were different.
16       So this doctor inside eClinicalWorks -- because
17  St. Luke's Internal Medicine used to also be on
18  eClinicalWorks -- would go over to a tab that was labeled
19  "Consults," open the tab.  Inside that tab might be notes
20  from a gastroenterologist, a cardiologist, an oncologist,
21  here is a pulmonologist.  She would open that file, and
22  there she would find some notes from Dr. Souza.
23       She might open the most recent note, which is like
24  a pdf file.  So open it up, scan through it, try to find
25  what I did, what I changed and what I base -- oh, well, I

2047

1   guess he didn't do pulmonary function tests on that visit.
2   So she might go to an earlier note.
3        You can see sort of the inefficiency there.  And
4   even having that note would require that I remembered to
5   send it to her or, if I didn't, that she would query my
6   office and have it sent to her.
7        The same thing would play out for the
8   rheumatologist.
9        Fast-forward to Epic:  So same patient, same
10  situation.  Now, when I have entered my note, it's not my
11  record, it's not the primary care's record, it's not the
12  rheumatologist's record; it's the patient's record.
13       So when the primary care doctor opens her chart,
14  there is my note.  She didn't have to request it.  I didn't
15  need to remember to send it.
16       Moreover, she doesn't need to scan through my note
17  to find my pulmonary function tests -- which, by the way, in
18  eClinicalWorks wouldn't have come with an interpretation; it
19  just would have had the numbers that are important to me.
20  She can actually go to the labs tab in Epic, read the
21  pulmonary function tests, because she is probably not
22  familiar with how to interpret those, and have an
23  interpretation.  She can see the change in the medication
24  because the medication record has been updated.
25       Moreover, when I saw the patient and I changed the

2048

1   medications because her rheumatoid lung was flaring, I will
2   go to her problem list and modify that in the problem list.
3   All of this is accessible to the doctor.
4        In addition, if it's an unstable patient, like
5   happens frequently in patients with this burden of chronic
6   illness, I could -- I could actually send the primary care
7   doctor a note attached to the progress note that says, "I
8   saw so-and-so today with decompensated right heart -- with
9   lots of swelling in the legs and shortness of breath.  These
10  are the changes I made.  These are the labs I'm getting.
11  When can you see them?"
12       And I will typically get a response the same day
13  or the next day from the primary care physician.  So it's
14  that kind of care coordination.
15       The last thing I would say in comparing
16  eClinicalWorks to Epic is I could not, in eClinicalWorks,
17  say:  I want to know how many 50-year-old female patients in
18  my practice with a body mass index less than 25 who take
19  metformin have a hemoglobin A1c greater than 8.5.
20       I couldn't do that in eClinicalWorks.  You can do
21  that in Epic.
22       Q.   So Epic is a much more robust -- from your
23  experience, a much more robust platform?
24       A.   Absolutely.
25       Q.   Let's address the discussions that occurred

2049

1   between your group and St. Luke's about a potential
2   affiliation.  How did that come about?
3        A.   Dr. Bergquist approached St. Luke's.
4        Q.   And why did you even approach anybody?
5        A.   So the group felt that the old model was
6   unsustainable.  And, you know, you would have to go back
7   to -- I mean, this happened in about October of 2008.  Back
8   at that time, the 14 of us were rounding in 14 -- sorry --
9   in four hospitals.  We were on call every third weekend.  We
10  were doing two 12-day-in-a-row, back-to-back stretches
11  separated by a weekend off.  So 26 days with two days off.
12       We needed to recruit, and you couldn't recruit.
13  The doctors coming out of training knew that the old model
14  was unsustainable, and they wanted to be employed with a
15  health system.  So we were struggling with recruiting.
16       You know, financially, we were doing fine.  But we
17  thought our future was not bright.  You know, there was a
18  big problem with underinsured and uninsured patients in
19  Idaho that was getting worse, and we knew it would get worse
20  because at that time the economy was just starting to
21  free-fall in October of 2008.
22       And all of this was occurring about a year after
23  Michael Porter's book on revising healthcare along the lines
24  of value.  So that conversation was in the -- was out there.
25  And we decided it was not sustainable, and the group

2050

1 unanimously voted to seek employment.
2     Q. You said Dr. Bergquist approached St. Luke's. Who
3 is Dr. Bergquist?
4     A. He is one of my partners. And I became involved
5 shortly thereafter.
6     Q. And in those initial discussions with St. Luke's,
7 was there any discussion about the financial benefits that
8 that would bring to you as a physician?
9     A. No. The conversations were surprisingly devoid of
10 that. I mean, our group's goal was to basically try to stay
11 the same. So we weren't seeking a windfall.
12     Q. What was the basis of the discussions you were
13 having with St. Luke's?
14     A. You know, the conversations were all -- they were
15 pretty inspiring, frankly. They were focused on what we
16 could do together. It was not a -- it was not a discussion
17 that was like, "Well, we'll give you this, and you'll give
18 us that." It was more like, "What can we do together?"
19         There was, you know, talk of clinical integration.
20 There was a lot of talk about the culture at St. Luke's, the
21 values at St. Luke's, you know, built on relationships.
22 There was heavy focus on physician leadership at St. Luke's,
23 which was also compelling to me and others in the group.
24     Q. Did you -- did you solicit bids from anyone other
25 than St. Luke's or have discussions with anyone other than

2051

1 St. Luke's?
2     A. Yes. There was a small subset of the group of 14
3 that insisted that, for conversations to continue, that both
4 organizations needed to be approached.
5     Q. And when -- when you decided to do -- to join
6 St. Luke's, did everyone in your group join St. Luke's?
7     A. No. Four doctors chose to align with
8 Saint Alphonsus.
9     Q. And did they -- did they explain their rationale?
10     A. Yes. So shall I go through them individually?
11     Q. Sure.
12         MR. ETTINGER: Your Honor, this sounds like
13 hearsay to me.
14         THE COURT: Counsel, I wonder if it isn't. I
15 mean, we're getting now into reasons why --
16         MR. SINCLAIR: That's all right. I'll move on.
17 No reason to belabor it.
18 BY MR. SINCLAIR:
19     Q. Did you discuss alternate relationships other than
20 employment?
21     A. No, we didn't.
22     Q. Why not?
23     A. You know, we just felt that if we were going to
24 make a change from the old model to a different model, that
25 we were all in. We believed in the power of integration,

2052

1 the benefits that would be achieved by working together, and
2 we're not interested in anything short of the closest
3 possible relationship.
4     Q. Don't you think you could have accomplished those
5 same interests without becoming employed?
6     A. No.
7     Q. Why not?
8     A. Because most of the quality work that -- most of
9 the quality work we have taken on since then, we have taken
10 that on because we were incentivized to do that because our
11 payment structure was changed, causing us to actually
12 measure, you know, our performance.
13         If I go back in time to 2008 and I try to remember
14 how I measured myself, it's kind of a sad state of affairs,
15 actually. I mean, I measured that I was a good doctor based
16 upon the number of referrals I had and my reputation, and I
17 was great. On both of those counts, I was great.
18         But I'll tell you, it's -- it's surprising what
19 you find when you open up the hood and you look under the
20 hood and you actually start measuring quality, linking how
21 well you do to quality outcomes. It's just -- it's
22 completely different.
23         It's -- you know, I've got to say that -- and I'm
24 not -- I don't want to be snarky here, but to think that I
25 could do the same things as an independent doctor, the

2053

1 answer to that is self-evident to me. When I was
2 independent, I was running around town, working in four
3 hospitals that were part of three healthcare systems. To
4 think that my level of engagement, participation,
5 leadership, commitment when I was dating all of those
6 hospitals is the same as when I got married to St. Luke's is
7 naive.
8     Q. You were mentioning that before you joined
9 St. Luke's, you were serving four separate hospitals.
10     A. Yes.
11     Q. Which are?
12     A. Saint Alphonsus, St. Luke's Boise, St. Luke's
13 Meridian, and Complex Care Hospital, which is called
14 something different today. It's called Vibra.
15     Q. What was your level of privileges with those
16 hospitals?
17     A. Active staff.
18     Q. Have you relinquished those privileges since
19 affiliating with St. Luke's?
20     A. I relinquished my privileges at Saint Alphonsus.
21     Q. And why?
22     A. So, you know, the answer to that is the first
23 thing to know is that that was a mutual decision.
24         I already mentioned the lifestyle in 2008 and the
25 long stretches and, you know, few days off. I mean, both

2054

1  parts of the group that separated sought to simplify their
2  lifestyle.
3          Now, we ended up going from four hospitals to
4  three, and the Saint Alphonsus part of the group went from
5  four hospitals to one.  But we both achieved that, and we
6  both wanted that.  And so the -- all 14 members of the group
7  mutually agreed that from January 1st, 2010, through
8  May 1st, 2010, that we wouldn't change our schedule at all,
9  and we didn't.  My work inside the Saint Alphonsus Health
10  System was exactly the same in those five months -- four
11  months.  And we agreed that on May 1st, 2010, we would go
12  our separate ways.
13          So on May 1st, 2010, my volume at Saint Alphonsus
14  went to zero.  And on May 1st, 2010, Joe Crowley, Janat
15  O'Donnell, Kate Sutherland, and John East's volume at
16  St. Luke's went to zero.
17          MR. ETTINGER:  Objection, Your Honor.  We're
18  beyond his personal knowledge now, testifying as to the
19  other people in the group.
20          MR. SINCLAIR:  I don't believe it is, Your Honor.
21          MR. ETTINGER:  These are the people who left him,
22  not --
23          THE COURT:  It is, but I think the witness can
24  testify as to his understanding, since he continued to work
25  at St. Luke's in pulmonology, the extent to which other

2055

1  doctors were admitting patients in pulmonology at St.
2  Luke's.  And I think that's what the witness is testifying
3  to, so I'll overrule the objection.
4          THE WITNESS:  Their volume went to zero.
5  BY MR. SINCLAIR:
6      Q.  So how much of your work was at Saint Al's before
7  May of 2010?
8      A.  50 percent.
9      Q.  And following that, it went to what?
10      A.  To zero.
11      Q.  Now, what percentage of your outpatients are
12  referred to you by someone else?
13      A.  So 99 percent.
14      Q.  And since affiliating with Luke's, has there been
15  a change in the referrals to you?
16      A.  Yes.  I don't get referrals from Saint Al's
17  anymore.
18      Q.  How do you determine where you're going to refer a
19  patient?
20      A.  I ask the patient.
21      Q.  What if the patient does not have a preference?
22      A.  If they don't have a preference, I will keep them
23  inside the system because I fundamentally believe in the
24  power of clinical integration and that unified record which,
25  you know, I mentioned a bit ago.

2056

1      I believe it so powerfully that I have told my own
2  parents, who live in a -- not this community but a community
3  with two competitive healthcare systems -- and they have got
4  doctors in both systems, that they, too, need to pick.  They
5  need to unify their care for their own safety, for the
6  quality of their care, for their longevity.  That's what I
7  told my own parents.
8      Q.  Has St. Luke's ever said anything to you about how
9  you are to direct your referrals?
10      A.  No.  In fact, I have been told that I can direct
11  them wherever I would like.
12      Q.  Have they done anything to discourage you from
13  directing your referrals anywhere you wished?
14      A.  No.
15      Q.  Now, when you joined St. Luke's originally, you
16  indicated you were continuing to practice full-time medicine
17  at that point?
18      A.  Yes.
19      Q.  And then you took on an administrative role?
20      A.  I did.
21      Q.  Which is what?
22      A.  I'm the vice president of medical affairs for the
23  Treasure Valley region, which, you know, in plain English,
24  means I'm the chief executive officer's designee to the
25  medical staff, which means I'm the go-between between

2057

1  administration and the organized medical staff.
2      Q.  And as an independent physician, how is your
3  compensation determined?
4      A.  By revenue generated.
5      Q.  And when you say "revenue generated," that was on
6  a fee-for-service basis?
7      A.  Yes.
8      Q.  As an employee of St. Luke's, how is the Idaho
9  Pulmonary Associates group compensated?
10      A.  So now the group is compensated with a base salary
11  that's about two-thirds of their pay.  And that's based on
12  time served, taking care of patients in clinic and the
13  intensive care unit, in the EICU, wherever they are needed.
14  And then about a third is at risk for quality targets.
15      Q.  Does your compensation change in any way depending
16  upon your referrals?
17      A.  No.
18      Q.  There has been a question about whether the
19  quality metrics that you're paid on are set so low that
20  you're guaranteed to make them.  Is that the case?
21      A.  No.
22      Q.  What's your opinion about setting those quality
23  metrics?
24      A.  I mean, I -- you know, I can use as an example a
25  quality metric for Group C sepsis perfect care for this year

2058

1  is 97 percent, but we won't achieve that.  We won't get full
2  payment on that.
3      And part of the reason is one of the perfect care
4  measures is that you basically need to drive up a central
5  venous pressure in a patient with septic shock.  And there
6  is a subset of the population that you just cannot do that
7  in.  The more fluid you give them, the more they urinate,
8  and you can't raise the pressure.
9      Q.  So the quality portion that you're being paid
10  upon, there was a question just before you came in as to
11  what is that based on.  Is it based upon results and best
12  practices, or is it based upon the cost of services ordered?
13      A.  So our group has developed quality measures in
14  line with the Triple Aim.  Okay?
15      So, you know, Luke's gave us a fair bit of
16  latitude in developing these, which is in line with being
17  physician led.  They said:  Okay, we're going to -- you're
18  going to put some pay at risk; go develop measures and bring
19  them back.
20      I took to the group:  Since St. Luke's is pursuing
21  the Triple Aim, we need to pursue the Triple Aim.  So
22  whatever measures we pick have to either improve care for
23  the individual, improve population health, or lower cost or,
24  ideally, do more than one of those.
25      So did I answer your question?

2059

1      Q.  Yes.  And the metrics that you pick, are these
2  based upon national standards as well as your own
3  experiences?
4      A.  Yeah.  You know, I think the answer is yes.  I
5  mean, I could -- I think I can rattle off the ten quality
6  measures if you would like me to.
7      Q.  No need to.  I am just trying to see whether
8  you're looking at best practices when you set these
9  standards.
10      A.  Absolutely, yeah.  We are looking at best
11  practices, but we are also innovating.  You know, some of
12  our measures, like our long-term measures, the out-of-center
13  sleep testing measure, the EICU, the lung nodule clinic --
14  those were all internal innovations that met parts of the
15  Triple Aim.
16      Q.  So do you believe your affiliation with Luke's has
17  had any effect upon the quality of care provided by your
18  group?
19      A.  Without any question.
20      Q.  You just mentioned EICU.  What is EICU?
21      A.  So, to answer that, to give the court a little
22  background, first you need to know what an ICU is.  And
23  that's where we take care of our most sick adult patients.
24  Then you need to know what an intensivist is.  And I'm an
25  intensivist, and that's basically a doctor who has special

2060

1  training in critical care.
2      In about the 19 -- mid-1990s to late 1990s,
3  evidence started to accumulate that you were more likely to
4  leave the hospital alive if, during your critical-care stay,
5  you had your care managed by an intensivist.  Yet, in this
6  country, only one in three folks who are critically ill get
7  to see an intensivist while they are in the ICU.
8      So EICU was born out of that compilation of facts.
9  And the EICU, the idea behind it was to leverage technology
10  to extend intensivists into the care of patients that they
11  might not currently be seeing.
12      What it is, is actually -- that was your question,
13  right?  What is it?
14      Q.  Yes.  Explain to the court what that is.
15      A.  So it's three things:  It's hardware, software,
16  and people.  The hardware is two-way audiovisual screens,
17  highly powerful cameras -- I could, from a camera in that
18  corner, count your eyebrow hairs -- and a big panel of
19  monitors that I see sit in front of.  That's the hardware.
20      The software is a phenomenal innovation.  It is
21  constantly pulling data from the bedside from the patient:
22  their blood pressure, their heart rate, their respiratory
23  rate, their oxygen saturations, ventilator data, lab data,
24  radiographic data.
25      And unlike the old world, where a nurse would have

2061

1  to wait for a heart rate to exceed a threshold for an alarm
2  to go off, and then he or she would kind of troubleshoot
3  that, decide whether or not I needed to be called.  If I
4  did, what's my pager; kind of come up with information to
5  give me, page me, wait for a return call.  And then, you
6  know, when I call back, give me that little snippet of
7  information and that's all I have to act on.
8      With EICU, I'm sitting, you know, all night long
9  behind this bank of monitors.  It's like air traffic
10  control, and it's pushed to me, and I have to react.  All of
11  those steps are eliminated.
12      So if there is a 20 percent change in heart rate,
13  it didn't exceed any alarm limit because you set those kind
14  of wide.  But somebody's heart rate goes from 65 to 85,
15  there is an issue because they're asleep and they're in bed
16  and that shouldn't happen.  I have to react.
17      If there is an abnormal lab result, I have to
18  react.  I beat the nurses to 90 percent of the
19  interventions.  So that's the software.
20      And then the people.  There is, you know, two
21  critical care nurses 24/7/365, and then a guy like me, an
22  intensivist, 12 hours a day, 365 during daytime hours, we
23  are actually staffing the units physically.
24      Q.  So the physician sitting in this room, can they
25  bill for that time they put in that room?

2062

1   **A.**   No, not -- not anything.

2   **Q.**   And is this --

3   **A.**   But I'm up all night working.

4   **Q.**   Is this type of system something that you

5   considered when you were independents?

6   **A.**   We did, briefly.  It didn't take very long to

7   figure out that that couldn't be done in that model because

8   you can't bill for it.

9          Moreover, despite just -- I mean, you could say:

10  Well, yeah, but you could contract with the hospital and

11  have them pay you for it.  That would be like cutting our

12  own throats because what we're doing in the EICU now is

13  we're reducing our ability to generate critical care codes.

14         And I'm going to give you -- this is a real-life

15  example: So now when I'm in the EICU, if a patient is ready

16  to have their breathing tube removed at 10 p.m., out it

17  comes.  In the old world, I wasn't there.  You know, it

18  didn't feel safe, so we would just wait until morning.

19  Well, that's like ten more hours of mechanical ventilation

20  that's unnecessary, that is risky.

21         Now, since the EICU, the doc extubated the

22  patient, took out the breathing tube.  When I come by in the

23  morning, they're not on a ventilator anymore.  They don't

24  have respiratory anymore.  And the level of service that I

25  can bill for is significantly lower.

2063

1          So no way would that have been a sustainable model

2   for a private practice group.

3          **Q.**   And is this in any place other than Boise?  I

4   mean, where does this EICU operate?

5          THE COURT:  Counsel, the E -- I know what the

6   ICU --

7          MR. SINCLAIR:  It is like an electronic ICU.

8          THE COURT:  Thank you.

9          THE WITNESS:  Yes.  It was born on the East Coast.

10  It's kind of progressed across the --

11  BY MR. SINCLAIR:

12         **Q.**   Actually, let me limit my question.  Where within

13  the St. Luke's system does it exist?

14         **A.**   Oh, yeah.  First there were dinosaurs.

15  Sorry -- sorry about that.

16         So in the St. Luke's system, we went live in the

17  Treasure Valley in our 36 beds in the Boise hospital in

18  January and our 14 beds in Meridian in January.  We went

19  live with two critical care beds in Wood River in May.  We

20  went live with I think it's 14 beds in Magic Valley in

21  August.

22         We are going live now with mobile carts in the

23  critical access hospitals.  This will bring an intensivist,

24  for instance, to -- you know, if a person suffers a cardiac

25  arrest in McCall and they're in the McCall ED, they can turn

2064

1   on the mobile cart, and I can be there and start managing

2   the resuscitation.  That happens in the next two months.

3          Also in the next two months, two long-term acute

4   care hospitals are bringing up three to four beds each to

5   monitor their patients.  And after the first of the year, I

6   believe West Valley Medical Center, HCA for-profit in the

7   West Valley, is going to bring up a few of their beds.

8          MR. SINCLAIR:  We're about at the stopping time if

9   you want to stop at 2:30 today, but I just have a couple

10  real quick --

11         THE COURT:  I'll give you a little bit of leeway.

12  Just so I'm clear on this, if there is a cardiac arrest

13  in McCall, you're going to manage it remotely?

14         THE WITNESS:  Yeah.

15         THE COURT:  In other words, you will be there, you

16  will see the monitors.

17         THE WITNESS:  I can actually see the patient.  I

18  can direct the CPR.

19         THE COURT:  So there is a video camera involved,

20  as well?

21         THE WITNESS:  Yep.

22  BY MR. SINCLAIR:

23         **Q.**   And this is where you say that camera is so

24  powerful, you could count the number of eyelashes I have?

25         **A.**   Yes.  If you have nose hair, I can tell.  It's a

2065

1   military-grade camera.

2          THE COURT:  We all have nose hair.

3          THE WITNESS:  Me, too -- we do, some longer than

4   others.

5          THE COURT:  I think a pulmonologist probably or an

6   ENT could -- all right.

7   BY MR. SINCLAIR:

8          **Q.**   So how, if at all, are improvements in patient

9   outcome tracked as a result of this EICU?

10         **A.**   Two ways.  I mean, our first way is -- it's

11  anecdotal.  Because, really, within the first night, we

12  started to notice like little catches, like, oh, that

13  patient was reaching for their endotracheal tube, and I

14  alerted the bedside nurse and prevented an extubation.

15         So the EICU manager has created this multipage

16  document that she stopped adding to because it was getting

17  just ridiculously long.  You know, avoided errors, earlier

18  extubations than previous -- so anecdotes.

19         Then CMS is measuring our length of stay,

20  mortality.  And, you know, despite acuity of illness going

21  up, our length of stay and mortality are down.  So we're

22  moving the needle in the ICU.

23         MR. SINCLAIR:  Your Honor, this would probably be

24  a good time to take a break.

25         THE COURT:  All right.  Counsel, we'll take a

2066

1  recess then until 8:30 tomorrow morning.
2      My apologies, Doctor, for forcing you to come back
3  tomorrow, but we have been going since 8:30, and it makes
4  for a rather long day.
5      Counsel, I have thought a little bit more about the
6  issue of AEO. I think what I'm going to try to do is
7  monitor and, frankly, invite counsel -- and specifically, I
8  think Mr. Herrick, Mr. Greene, Mr. Wilson representing the
9  State of Idaho, since they don't typically have a dog in the
10  fight or at least as big a dog in the fight -- to assist as
11  well in trying to monitor and make sure that we're not
12  excluding the public except where it truly is absolutely
13  necessary.
14      Where we do have the public removed from the courtroom,
15  rather than actually taking up -- and, in fact, we failed to
16  do it following I think Mr. Kee's testimony, as I suggested
17  we would -- I think what is probably more profitable is to
18  wait until you've had a chance to review the daily
19  transcript. Review that, and then we can do it kind of a
20  more scalpel-like approach and can actually just excise out
21  certain questions and answers rather than large blocks,
22  which is all we can do here.
23      And that way -- then you can just simply submit your
24  affidavits as to why you think those portions should be
25  excluded, I'll rule on it, and then we'll include the --

2067

1  those portions which I have declined to grant AEO status to
2  in the portions of the transcript that will be made
3  available to the public.
4      I don't see another way to do it. I know it's not
5  perfect. I would much prefer to have the public physically
6  here in the courtroom. But in trying to balance these two
7  considerations, I see no other way to do it. But I think
8  the way I'm suggesting would be a little more efficient and
9  not take up much of your court time.
10      MR. SINCLAIR: It will, Your Honor. For example,
11  Pat Richards yesterday, which we had a short portion that's
12  AEO, we removed all of that today. So it will be part of
13  the transcript. Otherwise, we would have addressed
14  something that was not even an issue.
15      THE COURT: Very good. See, I think some of this
16  will kind of resolve itself as we actually look at -- we can
17  look at question and answer by question and answer rather
18  than -- but, again, that's going to require some
19  coordination with counsel.
20      Mr. McFeeley is here on behalf of Blue Cross. I think
21  they need to be able to review and make their pitch.
22      So, Mr. DeLange, did you have something?
23      MR. DeLANGE: Your Honor, there is -- not all
24  parties who claimed AEO are in the courtroom every day, and
25  so there may be -- a little more time may need to be built

2068

1  in to apprise them and allow them to communicate with
2  Your Honor.
3      THE COURT: That's the challenge. On the one
4  hand, I want to err on the side of protecting the AEO or
5  trade secret information of the parties who are not present
6  and want to lean that way, but I also want to lean towards
7  making sure the public has access to the courtroom. And
8  it's just going to be a very challenging process as we move
9  forward.
10      I think, again, as counsel -- if counsel will be alert
11  to this; when you designate AEO, make a note to make sure
12  that that party, whether they're here or not, is contacted
13  and is given an opportunity to review the transcript before
14  it is submitted.
15      MR. SINCLAIR: You know, from that perspective,
16  the only time that we couldn't give them advance notice of
17  AEO is when it's in your cross and you don't want -- now,
18  telling the third parties that "I'm going to bring this up
19  tomorrow" is not going to tip your hand. So people, if
20  they're going to do AEO in their cross -- that way, the
21  parties are here; there won't be a delay. They can sit
22  here, they can be right in the process.
23      THE COURT: I fully agree. And I would ask --
24  now, of course, that's easy for St. Luke's to now say
25  because they don't -- however, I am assuming there will be

2069

1  some rebuttal. And so what goes on in rebuttal, the
2  goose-gander dichotomy will rule there, as well.
3      MR. ETTINGER: Your Honor, we want to make the
4  process work as best we can. But as I think about the
5  evenings I am having for preparing for the next day's
6  cross-examination, if I have to also talk to some third
7  party at some late or extremely early hour and let them know
8  what I'm doing and get a reaction, I don't know how that
9  works.
10      THE COURT: I know. I'm mindful of that. I'm
11  just asking counsel to do the very best you can under the
12  circumstances, and it's not easy. That's why this trial, I
13  think, is such a challenge to kind of administer, just
14  because of dealing with these competing interests.
15      All right. Counsel, we'll be in recess, then, until
16  8:30 tomorrow morning. If there is anything you need to
17  take up before we start, make sure Mr. Metcalf knows.
18      And I think Ms. Duke may have something.
19      MS. DUKE: Two things. We need to publish the
20  depositions of Mr. Kee and of Dr. Priest.
21      THE COURT: We will do that first thing tomorrow
22  morning. Make sure the originals are given to Ms. Duke.
23  Counsel, they really should be submitted in a sealed format.
24  I think that's kind of the protocol. I'm sure you wouldn't
25  go in and change the text; that would be a rather difficult

2070

1  task to get away with that, if you were so inclined.  And
2  I'm very confident that you're not so inclined, so I won't
3  worry about it, but just try to keep it sealed.
4       Then we'll be in recess until 8:30 tomorrow morning.
5       (Court recessed at 4:38 p.m.)

R E P O R T E R ' S   C E R T I F I C A T E

5       I, Tamara I. Hohenleitner, Official
6  Court Reporter, County of Ada, State of Idaho,
7  hereby certify:
8       That I am the reporter who transcribed
9  the proceedings had in the above-entitled action
10 in machine shorthand and thereafter the same was
11 reduced into typewriting under my direct
12 supervision; and
13      That the foregoing transcript contains a
14 full, true, and accurate record of the proceedings
15 had in the above and foregoing cause, which was
16 heard at Boise, Idaho.
17      IN WITNESS WHEREOF, I have hereunto set
18 my hand October 11, 2013.

22      _____-s-_____
   Tamara I. Hohenleitner
23 Official Court Reporter
   CSR No. 619