2071

1

**UNITED STATES DISTRICT COURT**

2

**IN THE DISTRICT OF IDAHO**

3

- - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW

4 SAINT ALPHONSUS MEDICAL CENTER -                  :
NAMPA, INC., TREASURE VALLEY                        : Bench Trial

5 HOSPITAL LIMITED PARTNERSHIP, SAINT                : **Witnesses:**
ALPHONSUS HEALTH SYSTEM, INC., AND                  : **James Souza**

6 SAINT ALPHONSUS REGIONAL MEDICAL                   : **Brian Fortuin**
CENTER, INC.,                                       : **Adebayo Crownson**

7                            Plaintiffs,             : **Christopher W. Roth**

                  vs.                               : **Richard M. Armstrong**

8                                                    : **Michael Roach (Video)**
ST. LUKE'S HEALTH SYSTEM, LTD., and                 :

9 ST. LUKE'S REGIONAL MEDICAL CENTER,                :
LTD.,                                               :

10                           Defendants.             : Case No. 1:13-cv-00116-BLW
- - - - - - - - - - - - - - - - - - :

11 FEDERAL TRADE COMMISSION; STATE OF                 :
IDAHO,                                              :

12                            Plaintiffs,            :

                  vs.                               :

13                                                    :
ST. LUKE'S HEALTH SYSTEM, LTD.;                     :

14 SALTZER MEDICAL GROUP, P.A.,                       :

                                                    :

15                           Defendants.             :
- - - - - - - - - - - - - - - - - - x

16                      **\* \* \* SEALED \* \* \***

17

18     <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19      **before B. Lynn Winmill, Chief District Judge**

20      **Held on October 10, 2013**

21      **Volume 12, Pages 2071 to 2300**

22

23

24

25

2072

1                               A P P E A R A N C E S

2

3

    FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
4   SAINT ALPHONSUS HEALTH SYSTEM, INC.,
    AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.

5

6           Keely E. Duke
            DUKE SCANLAN & HALL, PLLC
7           1087 W. River Street, Suite 300
             Boise, ID 83707
8
            David A. Ettinger
9           HONIGMAN MILLER SCHWARTZ AND COHN LLP
            2290 First National Building
10          660 Woodward Avenue
            Detroit, MI 48226
11

12

13
    FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION
14

15          Peter C. Herrick
            U.S. FEDERAL TRADE COMMISSION
16          500 Pennsylvania Ave., N.W.
            Washington, DC 20580
17
            J. Thomas Greene
18          U.S. FEDERAL TRADE COMMISSION
            600 Pennsylvania Ave N.W.
19          Washington, DC 20580

20          Henry Chao-Lon Su
            U.S. FEDERAL TRADE COMMISSION
21          601 New Jersey Ave., N.W.
            Washington, DC 20001
22

23

24

25

```
1                    A P P E A R A N C E S (Continued)

2

3       FOR PLAINTIFF STATE OF IDAHO

4            Eric J. Wilson
             GODFREY & KAHN, S.C.
5            One East Main Street
             Suite 500
6            PO Box 2719
             Madison, WI 53701
7
             Brett T. DeLange
8            OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
             954 W. Jefferson, 2nd Floor
9            Boise, ID 83720-0010

10
        FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
             Raymond D. Powers
12           POWERS TOLMAN FARLEY, PLLC
             PO Box 9756
13           Boise, ID 83707

14
        FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15      AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16           Jack R. Bierig
             Ben J. Keith
17           Scott Stein
             SIDLEY AUSTIN
18           One South Dearborn
             Chicago, IL 60603
19
             J. Walter Sinclair
20           Charles Schafer
             STOEL RIVES
21           101 S. Capitol Boulevard, Suite 1900
             Boise, ID 83702
22
        FOR DEFENDANT SALTZER MEDICAL GROUP
23
             Brian Kenneth Julian
24           ANDERSON JULIAN & HULL, LLP
             PO Box 7426
25           Boise, ID 83707
```

2074

1                                    I N D E X

2

3

| | | PAGE: |
|---|---|---|
| | Courtroom open to public........................ | 2076 |
| | Courtroom remains open to the public............ | 2154 |
| | Courtroom remains open to the public............ | 2236 |
| | Courtroom closed to the public.................. | 2297 |

4

5

6

7

8                    DEFENSE ST. LUKE'S HEALTH SYSTEM

9                         W I T N E S S E S

10

| | | PAGE: |
|---|---|---|
| **ARMSTRONG, Richard M.** | | |
| | Direct Examination by Mr. Bierig.............. | **2258** |
| | Cross-Examination by Mr. Wilson............... | **2287** |
| | Redirect Examination by Mr. Bierig........... | **2295** |
| **CROWNSON, Adebayo** | | |
| | Direct Examination by Mr. Stein.............. | **2190** |
| | Cross-Examination by Mr. Ettinger............ | **2211** |
| | Redirect Examination by Mr. Stein............ | **2221** |
| **FORTUIN, Brian W.** | | |
| | Direct Examination by Mr. Keith.............. | **2122** |
| | Cross-Examination by Mr. Su.................. | **2158** |
| | Redirect Examination by Mr. Keith........... | **2175** |
| | Recross-Examination by Mr. Su............... | **2186** |
| | Further Redirect Examination by Mr. Keith..... | **2189** |
| **ROACH, Michael (By video)** | | |
| | .............................................. | **2298** |
| **ROTH, Christopher W.** | | |
| | Direct Examination by Mr. Schafer............ | **2223** |
| **SOUZA, James** | | |
| | Continued Direct Examination by Mr. Sinclair.. | **2076** |
| | Cross-Examination by Mr. Ettinger............ | **2084** |
| | Redirect Examination by Mr. Sinclair......... | **2108** |

11

12

13

14

15

16

17

18

19

20

21

22

23

24                         * * * * *

25

2075

1                                              **DEPOSITIONS**

2                                        P U B L I S H E D

3

4 |                          |   |   | PAGE: |
|---|---|---|---|
| **ARMSTRONG, Richard** | ................................... | | **2297** |
| **KEE, John** | ................................... | | **2122** |
| **PRIEST, Marshall** | ................................... | | **2122** |
| **ROACH, Michael** | ................................... | | **2298** |

5
6

7

8

9                                             **DEFENDANTS**

10                                        E X H I B I T S

11

12 | **2236** | Saunders, Emilie Ritter.  Idaho's Health And ... Welfare Director Sets Different Tone for Budget Process, StateImpact Idaho (Jan. 15, 2013) (Def. Dep. Exh. 365) | **ADMITTED** **2272** |
|---|---|---|
| **2237** | Idaho Department of Health & Welfare FY2013 - ... FY2017 Strategic Plan (Def. Dep. Exh. 366) | **2295** |

13
14
15

16

17

18

19

20                          *  *  *  *  *

21

22

23

24

25

2076

1      P R O C E E D I N G S
2      October 10, 2013
3      *****COURTROOM OPEN TO PUBLIC*****
4      THE CLERK:  The court will now hear the continued
5   bench trial in the matter of Saint Alphonsus Medical Center,
6   Nampa, et al., versus St. Luke's Health System, LTD, Case
7   No. 12-CV-00560-BLW-REB.
8      THE COURT:  Good morning, Counsel.
9      Dr. Souza, I'll remind you you are still under oath.
10      I think, Mr. Wilson, you had an issue concerning --
11   that may arise later in the morning, about the use of
12   leading questions.  We'll discuss that later so we can get
13   Dr. Souza on his way back to his work.
14      Mr. Sinclair, you may resume your examination of the
15   witness.
16      MR. SINCLAIR:  Thank you, Your Honor.
17                    JAMES SOUZA,
18   having been previously duly sworn to tell the whole truth,
19   testified as follows:
20           CONTINUED DIRECT EXAMINATION
21   BY MR. SINCLAIR:
22      Q.   Dr. Souza, yesterday when you were going through
23   your background I meant to ask you, and I failed to, so I
24   want to back up just a little bit in our presentation.  You
25   indicated you were the CEO's designee to the medical staff.

2077

1   What does that entail?  What is that?
2      A.   You know, I am the CEO's representative to the
3   organized structure of the medical staff.  And basically
4   what that -- what that is is all the doctors who hold
5   privileges at the hospital organize themselves into a
6   governing structure that has at its top a medical executive
7   committee which is made up of all the department and section
8   representatives.  So the medical staff divides itself into
9   departments and sections, such as, you know, the department
10   of medicine, the department of orthopedics, things like
11   that.
12      Q.   Okay.  Thank you.
13      So when we ended yesterday you had just discussed the
14   EICU as one example of where you had seen quality
15   improvement since affiliating with St. Luke's.  Could you
16   give the court a couple other examples of areas where there
17   has been improvement in quality since you affiliated with
18   St. Luke's?
19      A.   Yes.  I have several.  I'll begin with the example
20   of group C sepsis.  And sepsis is the body's response to a
21   severe infection.  It's a highly lethal condition.  Group C
22   sepsis refers to those patients who have either a low blood
23   pressure or a high level in their blood of an enzyme called
24   "lactic acid."  The mortality rate of that condition is as
25   high as 45 percent.  It's one of the most lethal conditions

2078

1   we deal with in the intensive care unit.
2      There is a protocol, an evidenced-based protocol,
3   that when applied to patients saves lives.  This protocol
4   involves the rapid insertion of a catheter into the jugular
5   vein of the neck, IV fluids to target the central venous
6   pressure, adjustment of blood-pressure-supporting drugs,
7   adjustment of blood products, rapid cultures, and rapid
8   administration of antibiotics.
9      And the data on that is that if you do that to
10   eight people, you will save one life.  It's relatively
11   low-tech, inexpensive, but team-based care innovation that
12   requires, you know, a team to work together to achieve all
13   these things in a rapid fashion and saves lives.
14      So, again, when we integrated with St. Luke's and
15   were told we had income at risk for quality and were set
16   free to go develop these targets, the group C sepsis perfect
17   care rates, that was one of our targets.  And, basically,
18   year after year we have improved those perfect care rates,
19   which, you know, evidence-based medicine would tell us is
20   saving lives and improving sepsis mortality.  So that was
21   one of our better care.  You know, I went back to the group,
22   and I said, "Whatever our quality measures are, they have to
23   meet some or multiple parts of the Triple Aim."  That was
24   one of our better care initiatives.
25      More powerful initiatives to potentially discuss

2079

1   in terms of initiatives that met multiple aspects of the
2   Triple Aim would include our lung nodule program, our lung
3   nodule clinic, and our -- the work we've done in sleep
4   medicine.  So perhaps I'll start with the lung nodule.
5      Q.   Okay.
6      A.   A lung nodule, in plain English, is a spot in your
7   lung seen on a CAT scan.  A large number of adults who
8   present to an emergency department with the complaint of
9   shortness of breath or chest pain will end up having a CAT
10   scan performed.  And, you know, a lot of those folks are
11   going to have spots on their lungs.  A lot of people in this
12   courtroom have spots in your lungs.  We don't know it.  They
13   are incidental findings.
14      The issue with these spots is most of them are
15   benign, but a few of them are malignant, and so the entire
16   workup is around making that distinction.
17      If I think back to five years ago in my
18   independent practice, most such cases were referred to our
19   group for a pulmonary consult.  I should make a couple of
20   points about that.
21      First is that that was an important revenue stream to
22   our practice.  Commercial payors would reimburse us, you
23   know, around $300 for such a service.  And yet, it was a
24   low-value service to the patient.  And I say that because in
25   order to make a decision about what's the best care for the

2080

1   patient, you really only need a limited amount of
2   information.  What you need to know is the age of the
3   patient, the smoking status of the patient, the size of the
4   nodule, the shape of the nodule, and then it's useful if you
5   have any previous films.  So we -- in my old practice we
6   would see these patients and apply those standards and, you
7   know, come up with the right plan for the patient.
8          Now, unfortunately, some of those patients in
9   the -- five years ago they were sent to their primary care
10  doctors, mostly got good care, but sometimes were sent for
11  unnecessary biopsies of the lung, you know, because this was
12  being guided by a primary care physician and not a
13  specialist.  Some of those biopsies of what were benign
14  lesions led to complications like a pneumothorax; that's a
15  collapsed lung.  When that occurs you have to put in a chest
16  tube.
17         When that occurs you have to admit the patient to
18  the hospital; that generates fee-for-service revenue fee for
19  the hospital.  A few of those patients were sent to
20  oncologists or thoracic surgeons, and, sadly, a few of those
21  patients had no follow-up.  And, you know, I don't know what
22  the numbers would be, but, you know, very sad when you would
23  see a patient return with metastatic cancer that's no longer
24  curable.
25     Q.  So what's different now than then?

2081

1      A.  So St. Luke's said go create quality measures.
2   And this was one of our long-term quality targets, was the
3   creation of a lung nodule clinic.  We're very proud of that
4   work.  We were national leaders in that work.  We beat
5   National Jewish Medical Center, one of the -- probably the
6   world's preeminent respiratory hospital in Denver, Colorado,
7   by a year in creating this.  So what we did is we created
8   essentially a virtual clinic.  We said, this seems like an
9   area where we could improve care, get access for all the
10  patients to a pulmonologist, and lower cost.
11         So the way it works is we have a team of docs: a
12  St. Luke's pulmonologist, a St. Luke's thoracic surgeon, and
13  a St. Luke's radiologist.  And each week, the nodules that
14  come out of the emergency department or, you know, ordered
15  from an individual doctor's clinic can be referred to the
16  lung nodule clinic.  This team of doctors applied those same
17  standards:  What's the age of the patient?  What's the
18  smoking status?  They can review the medical record.  They
19  can review the images, current and past, and make an
20  evidence-based recommendation.  75 percent of those patients
21  no longer need to see a pulmonologist.
22         So we're getting access for all patients to
23  experts, not requiring them to be in a clinic room
24  generating a fee-for-service charge.  So there is clinical
25  benefit to the patient, and the financial benefit is

2082

1   accruing to the payor.  We are doing the good work in the
2   middle.
3      Q.  Why couldn't you do that as an independent?
4      A.  That would -- you know, back-of-the-napkin math,
5   in terms of lost fee-for-service revenue -- would lose us a
6   number that approaches six figures in charges.
7      Q.  So there would be an economic disincentive to do
8   that?
9      A.  Absolutely.
10     Q.  Any other examples for the court?
11     A.  Yeah.  The work we've done in sleep.  So for the
12  court -- I think probably most people know what sleep apnea
13  is.  I think we have a lot of education to do yet.  Most
14  people don't know that it's a very powerful -- when
15  undiagnosed and untreated, it's a very powerful risk factor
16  for stroke, heart attack, and cardiac death, so it's more
17  than just treating snoring.
18         Sleep apnea is also a very important revenue
19  stream for an outpatient pulmonary clinic because it is
20  reimbursed very well.  The way sleep apnea is diagnosed is
21  usually with a visit with a doctor, then a baseline
22  polysomnogram, sleep study, then a CPAP titration study.
23  These things, just so you've got ballpark numbers, Medicare
24  reimburses for a baseline or a CPAP $750, commercial payors
25  usually reimburse around $1200.  So, again, we're developing

2083

1   our quality measures, and this was another one where we
2   thought we could meet better care and lower costs.
3          So there is a subset of the sleep apnea population
4   where current evidence suggests you can make the diagnosis
5   and initiate the treatment for a much -- with a much
6   lower-cost procedure called an out-of-center sleep test.
7   That procedure reimburses at -- it's around $150 for
8   Medicare, around $350 for commercial.
9          In the same way there is also evidence that shows
10  that for, you know, a subset of the sleep apnea population,
11  you don't need to do a baseline study and a CPAP titration,
12  that you can combine those studies and only get paid for
13  one, and that's called a split study.  So you spend the
14  first part of the night diagnosing the disorder and the
15  second part of the night applying the treatment, which is
16  the positive pressure mask.
17     Q.  That cuts the reimbursement in half?
18     A.  That would cut the reimbursement in half, and, of
19  course, an out-of-center sleep test, by the math, cuts the
20  reimbursement to, you know, what, 15 or 20 percent.
21         So what we did is we created pathways that
22  encouraged patients moving toward split studies, such that
23  in three years we've gone from 4 percent split studies to I
24  think it's 34 percent split studies.  And we've done 74
25  out-of-center sleep tests in the last year.  Again, the

2084

1   back-of-the-napkin math on that is about a $650,000 loss in
2   potential revenue.
3           So, once again, the patient is deriving a clinical
4   benefit. The payor is deriving the financial benefit, and
5   because our doctors are immune to the financial impact of
6   that and set free to find the waste in the system -- I mean,
7   this all gives me so much hope for the chances to actually
8   save healthcare -- that the doctors write the orders that
9   spend the money; the doctors know where the waste is. If
10  you set us free to find it, we can do it. Examples like
11  this give me hope that -- that clinical innovations like
12  this can avoid the financial catastrophe that's coming.
13          MR. SINCLAIR: Thank you. No other questions,
14  Your Honor.
15          THE COURT: Mr. Ettinger, cross.
16          MR. ETTINGER: Yes, Your Honor.
17                  CROSS-EXAMINATION
18  BY MR. ETTINGER:
19      Q.  Good morning, Dr. Souza.
20      A.  Good morning.
21      Q.  We were fortunate enough to get a transcript of
22  what you said yesterday, and I'm going to ask you about some
23  of your exact words which we're going to put up on the
24  screen.
25      A.  Okay.

2085

1       Q.  We'll start with those as soon as it's up.
2           So let me begin by going to recruitment. At page 207
3   of your transcript yesterday -- Keely, if you could pull it
4   up -- you said -- it would be about line --
5       A.  Can I make mine any bigger?
6               THE COURT: They're going to blow it up for you, I
7   believe.
8               MR. ETTINGER: We're going to blow it up.
9               THE WITNESS: Thanks.
10              THE COURT: If not, I'll ask them to.
11              THE WITNESS: Middle age is hitting hard.
12              MR. ETTINGER: Sure. I'd be the same way.
13  BY MR. ETTINGER:
14      Q.  At lines 12 through 16, why don't we blow those
15  up.
16          You see there you said, quote, You couldn't recruit,
17  close quote. Do you see that?
18      A.  Yep.
19      Q.  And you were referring to when IPA was an
20  independent group?
21      A.  Yep.
22      Q.  And are those words literally true, yes or no?
23      A.  We did recruit.
24      Q.  You recruited nine pulmonologists in nine years,
25  didn't you, Doctor?

2086

1       A.  We needed many more.
2       Q.  You recruited at the same rate, basically, that
3   you have recruited since you were acquired by St. Luke's;
4   isn't that right?
5       A.  Not true.
6       Q.  First of all, let's be clear. You did, in fact,
7   recruit nine in nine years; correct?
8       A.  I did recruit nine in nine years.
9       Q.  And your group in total was only 14; correct?
10      A.  Yes.
11      Q.  And how many pulmonologists did St. Luke's have in
12  the Treasure Valley when your group was acquired?
13      A.  Ten.
14      Q.  And how many does it have today in the Treasure
15  Valley?
16      A.  I believe 17. It may be 16.
17      Q.  Okay. And that was --
18      A.  And Saint Alphonsus has also successfully
19  recruited.
20      Q.  Doctor, my question is about St. Luke's. Thank
21  you.
22      A.  Got it.
23      Q.  Now, you said just a minute ago that what
24  St. Luke's does is set the doctors free. Is that -- is that
25  fair?

2087

1       A.  Those were my words, yes.
2       Q.  Okay. Why don't we take a look at Exhibit 1357.
3   And do you recall this -- and we have -- should we -- do we
4   have the book for Dr. Souza if he has trouble reading?
5   We've got hard copies for you.
6       A.  I can read it, sir.
7       Q.  Okay. Well, if you need one on any of these,
8   we'll be happy to do it.
9           So this is -- the middle email is from Dr. Bathina to
10  Gary Fletcher, Re: Saltzer. Do you recall seeing this in
11  your deposition?
12      A.  I do.
13      Q.  And Dr. Bathina is the vice president of St.
14  Luke's Idaho Cardiology Associates; is that right?
15      A.  He is the site medical manager.
16      Q.  And he's a physician --
17      A.  Yes.
18      Q.  -- like you, who works for St. Luke's?
19      A.  Yes.
20      Q.  And he says in that email to Gary Fletcher, who is
21  the -- by the way, Gary Fletcher is the COO of the
22  St. Luke's Health System?
23      A.  Yes.
24      Q.  And he says, quote, Just had a conversation with
25  Jim Souza. I am sure you know that he is very disappointed

2088

1  with the way things have happened.
2       Do you see that language?
3       **A.  Yep.**
4       **Q.**  And in the next paragraph he says, quote, He and I
5  and likely some other physicians are feeling like this whole
6  physician-led mantra is a bunch of propaganda without real
7  meaning.  Why are we working on standards and expectations
8  for the system when the system is making decisions based on
9  dollars and strategy regardless of quality, question mark.
10      Did I read that correctly?
11      **A.  You did.**
12      **Q.**  And did you also testify that St. Luke's does not
13  in any way push you to keep referrals within the system; is
14  that correct?
15      **A.  That is correct.**
16      **Q.**  And in the fourth paragraph, Dr. Bathina says,
17  referring to Saltzer, "It will be very disappointing to us
18  doctors who work on the west side to have to refer to these
19  guys, because they are now part of Luke's, when we are fully
20  aware that they offer a far inferior product to what our
21  colleagues at IPA can provide, close quote.
22      Did I read that correctly?
23      **A.  Yep.**
24      **Q.**  Now, it's your view -- actually, I'm sorry.  Let
25  me -- I was going to do one other thing.  In fact, the

2089

1  agreement with Saltzer was contingent on the Saltzer
2  physicians obtaining privileges at St. Luke's; isn't that
3  right?
4       **A.  No.**
5       MR. ETTINGER:  Why don't we play the cross clip
6  No. 19.  Your Honor, that's 156, line -- I think it's page
7  157, line 1 through 23.
8       THE COURT:  All right.  Thank you.
9       (Video clip played as follows:)
10      **Q.**  "Why was the agreement with the Saltzer
11          physicians contingent on them obtaining
12          privileges?
13      **A.**  "I think that's part of all of St. Luke's
14          employment agreements, that if you're going to
15          be employed by the hospital, you have to have
16          privileges.
17      **Q.**  "In order for the Saltzer physicians to
18          admit patients to St. Luke's, they would have
19          to have privileges; right?
20      **A.**  "For them to admit patients, absolutely.
21      **Q.**  "So it was complicated -- it was
22          contemplated in the Saltzer agreement that the
23          Saltzer physicians would be admitting patients
24          to St. Luke's; right?
25      **A.**  "Yes."

2090

1       (Video clip concluded.)
2  BY MR. ETTINGER:
3       **Q.**  Doctor, was that your testimony?
4       **A.  Yes, but it's wrong.**
5       **Q.**  Doctor, in fact, you went to St. Luke's, you chose
6  to affiliate with St. Luke's in significant part because in
7  your view St. Luke's is better positioned to become the
8  dominant player in the market for the foreseeable future;
9  isn't that right?
10      **A.  I find it ironic that we're talking about --**
11      **Q.**  Doctor, I'd like you to please answer my question
12  "yes" or "no."
13      THE COURT:  Let me just explain.  Dr. Souza,
14  Mr. Sinclair is going to give you a chance to explain all of
15  this.
16      THE WITNESS:  Sorry, Your Honor.
17      THE COURT:  That's fine.
18      Go ahead, Mr. Ettinger.
19  BY MR. ETTINGER:
20      **Q.**  Would you like me to repeat the question?
21      **A.  I would love that.**
22      **Q.**  Isn't it true -- I'm more than happy to -- isn't
23  it true that you chose to affiliate with St. Luke's in
24  significant part because in your view St. Luke's is better
25  positioned to be the dominant player in the market for the

2091

1  foreseeable future?
2       **A.  Those were my words that I wrote to myself, yep.**
3       **Q.**  Thank you.  Now, you said yesterday that the
4  situation you were in before you were acquired by St. Luke's
5  was a sad state of affairs in terms of medical quality.  Is
6  that your view?
7       **A.  It is my view.**
8       **Q.**  In fact, isn't it true that before your group was
9  acquired by St. Luke's, under your group's contract with
10  Saint Alphonsus, there were substantial lengthy quality
11  metrics for which the group could be compensated up to
12  $250,000 per year; isn't that right?
13      **A.  I'd have to see the actual -- yeah, we had quality**
14  **metrics as part of our critical care contract, which took 18**
15  **months to negotiate.**
16      **Q.**  How long did it take to develop the quality
17  metrics at St. Luke's?  Can you tell me the time period?
18      **A.  About a month.**
19      **Q.**  From start to finish?  When were the quality
20  metrics first adopted after you were acquired by St. Luke's?
21      **A.  I don't recall.**
22      **Q.**  Okay.  Now, you said some things about call, and I
23  wanted to ask you about call, Doctor.  Before your group,
24  your physicians were acquired by St. Luke's, you provided
25  call at four different hospitals; is that correct?

2092

1     **A.**  That's correct.

2     **Q.**  And that was 14 doctors sharing call at four

3 hospitals?

4     **A.**  That's correct.

5     **Q.**  And then ten of the doctors went to St. Luke's;

6 right?

7     **A.**  Yes.

8     **Q.**  And the ten doctors still share call at three

9 hospitals; correct?

10     **A.**  Yes.

11     **Q.**  Let's talk about eClinicalWorks.  Doctor, you,

12 yesterday -- I'd be happy to show you the language if you

13 like -- but you called it, quote, a horse-and-buggy system,

14 close quote --

15     **A.**  I did.

16     **Q.**  -- do you recall that?

17     **A.**  Yeah.

18     **Q.**  Is that fair, do you think?

19     **A.**  In my experience, it is fair when compared with

20 **Epic.**

21     **Q.**  Now, you're aware that a number of significant

22 groups in this community use eClinicalWorks; correct?

23     **A.**  I am.

24     **Q.**  Primary Health does; correct?

25     **A.**  I am.

2093

1     **Q.**  Idaho PM&R does, for example?

2     **A.**  I didn't know that.

3     **Q.**  You know Saltzer did before this acquisition?

4     **A.**  Yes.

5     **Q.**  Do you know even approximately how many physicians

6 around the United States use eClinicalWorks?

7     **A.**  I don't know that.

8     **Q.**  Would it surprise you if 80,000 physicians seem to

9 find eClinicalWorks useful?

10     MR. SINCLAIR:  Your Honor, I would object.  He

11 just testified he does not know.

12     THE COURT:  Well, I think the question is would

13 you be surprised.

14     THE WITNESS:  No, I wouldn't be surprised.  We got

15 here by this kind of work.

16 BY MR. ETTINGER:

17     **Q.**  Now, what was -- what was the last time you used

18 eClinicalWorks, Doctor?

19     **A.**  June of 2012.

20     **Q.**  Your group was on eClinicalWorks until June of

21 2012?

22     **A.**  Yes.

23     **Q.**  What version of eClinicalWorks was your group on

24 in June of 2012?

25     **A.**  I do not know, sir.

2094

1     **Q.**  Are you aware that the current versions of

2 eClinicalWorks -- strike that.

3     Now, you made some comments yesterday about how when

4 you used eClinicalWorks, for example, you had to remember to

5 send a note to the primary care physician if you wanted her

6 to see what you had found; is that right?

7     **A.**  Yes.

8     MR. SINCLAIR:  Your Honor, may we approach?

9     THE COURT:  Yes.

10     (Sidebar commences as follows:)

11     MR. SINCLAIR:  I'm anticipating that they're going

12 to attempt to call up that same document that we objected to

13 yesterday, which I was able to find on the internet last

14 night.  It's a news release from approximately a month ago

15 about revisions to the systems of Epic and eClinicalWorks.

16     MR. ETTINGER:  Actually, I'm not.

17     MR. SINCLAIR:  Okay.

18     THE COURT:  Well, that makes it easy.  All right.

19 Very good.

20     (Sidebar concluded.)

21     THE COURT:  Proceed, Mr. Ettinger.

22     MR. ETTINGER:  Thank you, Your Honor.

23 BY MR. ETTINGER:

24     **Q.**  And you said part of the problem was that you

25 could forget to send the note; isn't that right?

2095

1     **A.**  Yes.

2     **Q.**  Are you aware that under the current versions of

3 eClinicalWorks, there could be an automated process that

4 automatically sends information to the primary care

5 physician?

6     **A.**  No.

7     **Q.**  And you mentioned that the physician might not

8 find the test results that you performed; is that right?

9     **A.**  Depended on their detective skills, yes.

10     **Q.**  And are you aware that under the current version

11 of eClinicalWorks, there is an automated feature that can

12 send those test results to the primary care physician?

13     MR. SINCLAIR:  Your Honor, I'm going to object to

14 this unless they're planning on calling a witness to put in

15 the foundation of what they're trying to question this

16 witness about.

17     MR. ETTINGER:  Your Honor, the witness offered

18 opinions about eClinicalWorks that suggests that it is

19 inefficient to use it, and the question is what does he know

20 about it.

21     THE COURT:  I'm assuming -- but, again, the

22 question assumes facts not in evidence.  I think that's

23 really the basis of the objection.  I'm going to allow it,

24 but if it's not tied in with some evidence about, in fact,

25 that eClinicalWorks does that, then I think the questioning

2096

1    really has no relevance.
2        I'm going to allow you to proceed, but if you don't tie
3    it in on rebuttal or through cross-examination or through
4    some exhibit to demonstrate that, then I think the
5    questioning then has no purpose with this witness because it
6    does assume facts not in evidence.  Proceed.
7        MR. ETTINGER:  I understand, Your Honor, and
8    that's our plan.
9        THE COURT:  All right.
10   BY MR. ETTINGER:
11       **Q.**  Are you aware that eClinicalWorks has an automated
12   feature that can send test results automatically to the
13   primary care physician?
14       **A.**  No.
15       **Q.**  By the way, you mentioned yesterday that you send
16   notes in Epic, don't you?
17       **A.  Notes in Epic -- I know you want a yes/no, but**
18   **I've got to clarify -- notes in Epic are automatically in**
19   **the chart.  What I can do is attach a note to a note and**
20   **then send that.**
21       **Q.**  And that's what you were referring to yesterday?
22       **A.  Yes.**
23       **Q.**  And you've got to remember to send that note,
24   don't you, Doctor?
25       **A.  It's usually front of my mind that I'm needing to**

2097

1    **communicate an urgent issue to someone when I send such a**
2    **communication, yes.**
3        **Q.**  So you don't have a -- you've never had a big
4    problem remembering to send notes to primary care
5    physicians, have you?
6        **A.  Routine notes, yes, I have.**
7        **Q.**  Oh, but the Epic notes are not routine notes; is
8    that what you're saying?
9        **A.  No.  What I'm saying, sir, is when I have an**
10   **urgent issue that demands clinical integration with a**
11   **primary care doctor and other specialists, that Epic gives**
12   **me the power to do that without calling an office, sitting**
13   **on hold, waiting for the -- oh, that doctor is not in this**
14   **office today.  You understand, I hope, the efficiencies that**
15   **would gain you.**
16       **Q.**  Are you aware whether you could --
17       THE COURT:  Let me just inquire to make sure I
18   understand.  I think what you're saying is that Epic has
19   built into it kind of an integrated note feature -- or not
20   even really a note feature, but whatever action you take is
21   automatically communicated or available to the primary care
22   physician; but if there is something that requires immediate
23   attention, that is -- you have the ability to add a separate
24   note which creates kind of an alert.
25       THE WITNESS:  That's right.  That's not part of

2098

1    the progress note, but it's physician-to-phys-- or
2    physician-to-provider, I should say, communication, yes.
3        THE COURT:  Mr. Ettinger, I just wanted to clarify
4    in my mind.  I thought that's what the witness was saying.
5    Go ahead.
6        MR. ETTINGER:  Your Honor, and that's helpful to
7    me.  I'm going to ask a follow-up question on that.
8    BY MR. ETTINGER:
9        **Q.**  And isn't it true that under the current version
10   of eClinicalWorks, eClinicalWorks can send jelly beans that
11   light up and tell the primary care physician, "This is
12   something you really want to look at right away"?
13       **A.  You know, sir, I'm going to tell you that I have**
14   **no idea what eClinicalWorks does today because I haven't**
15   **worked in it since June of 2012.**
16       **Q.**  Thank you.
17       **A.  You're welcome.**
18       **Q.**  Why don't we go to page 206 of yesterday's
19   transcript, Doctor.  I want to ask you about one other
20   thing, and I don't want to fracture it by just reading it.
21       **A.  Okay.**
22       **Q.**  The major paragraph -- Keely, second first
23   paragraph, "The last thing I would say."
24       Doctor, you say here, "The last thing I would say is
25   that in eClinicalWorks, I could not" -- I gather -- "find

2099

1    out how many 50-year-old female patients in my practice with
2    a body mass index less than 25 have" -- and the court
3    reporter wasn't quite there on the rough transcript, as I
4    certainly wouldn't be -- "had a hemoglobin A1c greater than
5    8.5."  Did I fracture that too badly?
6        **A.  No.  It's perfect except for "metformin" is the**
7    **word.**
8        **Q.**  I skipped it over; I didn't know what to say
9    there.
10       THE COURT:  Why don't you spell that just to make
11   it easier on the court reporter.
12       THE WITNESS:  M-E-T-F-O-R-M-I-N.
13       THE COURT:  All right.  Thank you.
14       THE WITNESS:  You're welcome.
15   BY MR. ETTINGER:
16       **Q.**  Now, if you had this information, am I correct
17   that what you contemplate is doing some kind of -- making
18   some kind of judgment about correlation between these
19   variables?
20       **A.  What this information would be used for would be**
21   **to target my interventions on that group of patients.  If**
22   **I'm not meeting my targets, the question for the clinician**
23   **is why, what about my practice is not providing the care**
24   **that these people need.**
25       **Q.**  And by focusing on some particular group like

2100

1  this, you would be inferring something about the
2  relationship between, say, body mass index and these test
3  results for this group of patients; correct?
4      **A.** **These would be thin patients who I'm still not**
5  **meeting their goal, yes.**
6      **Q.** Are you an epidemiologist, Doctor?
7      **A.** No.
8      **Q.** Are you a statistician?
9      **A.** No.
10     **Q.** And people who do medical studies gather vast
11 amounts of data, do careful statistical work to try to
12 gather conclusions about correlations; correct?
13     **A.** Yes.
14     **Q.** And you wouldn't try to do that with some subset
15 of your patients just using Epic, would you?
16     **A.** **I would always try to improve my clinical practice**
17 **based on evidence base, using whatever tools I have.  That's**
18 **my job.  That's what I do.**
19     **Q.** Would you agree that a physician, not trained in
20 epidemiology or statistics, drawing conclusions from
21 statistical -- small samples of statistical evidence from
22 his patients might be a little more dangerous for those
23 patients than somebody who relies on national studies?
24     **A.** **I don't agree with the premise of your question.**
25 **You're suggesting that individual physicians can't improve**

2101

1  **the care of their patients, and I disagree with that so**
2  **fundamentally that -- no.**
3      **Q.** I'm not -- I don't want to engage in a debate
4  here, though at some other time we might, but let me just
5  ask you this:  Isn't the whole premise of evidence-based
6  medicine that individual physicians should not be making
7  their own judgments and should be relying on scientific
8  results that have been tested in peer-reviewed journals.  Is
9  that correct?
10     **A.** **No.  What about this is not following**
11 **evidence-based medicine?**
12     **Q.** So you disagree with my question; is that right?
13     **A.** **I really don't understand your question as it**
14 **pertains to the paragraph that's in front of me.  I would**
15 **want my diabetics to have a hemoglobin A1c less than that**
16 **number.  And if I don't measure that number and I don't know**
17 **about it, I can't possibly address it.**
18     **Q.** Well, you measured -- that number is measured by
19 tests on individual patients, is it not, Doctor?
20     **A.** **It is, but the question is:  Are there subsets of**
21 **my patients that I take good care of and some that I've got**
22 **a miss on and other things that I can do to meet these**
23 **patients' needs?  More education, more -- you know, whatever**
24 **it might be.  You can't fix a -- what gets measured gets**
25 **managed, and what gets managed gets done.**

2102

1      **Q.** Doctor, you said yesterday you would cut -- you
2  would have cut your own throat if you had gone along with an
3  EICU system --
4      **A.** **That was colorful.**
5      **Q.** -- and you were under contract.
6  Excuse me?
7      **A.** **That was too colorful of language.  Sorry.**
8      **Q.** Well, I wasn't suggesting that you meant it
9  literally, Doctor.  But I gather you did -- your point was
10 that you would lose a tremendous amount of money, and
11 therefore you never would have done it; is that right?
12     **A.** **It would take 2.4 FTE physicians generating no**
13 **fee-for-service revenue and losing subsequent**
14 **fee-for-service volume so, yes, that would be financial**
15 **suicide for my practice and the people I employed.**
16     **Q.** Now, those dollars -- if St. Luke's employs your
17 group and St. Luke's is not getting reimbursed, just like
18 the doctors wouldn't for that --
19     **A.** **Right.**
20     **Q.** -- under a fee-for-service system, St. Luke's is
21 losing those very same dollars; correct?
22     **A.** **But we believe -- yes, but --**
23     **Q.** Would you please answer my question.  Is that
24 correct?
25     **A.** **Yes.**

2103

1      **Q.** And in every single example you have given where
2  you say as an independent group you would have lost money,
3  today St. Luke's is losing that very same money; correct?
4      **A.** **Clinical benefit to the patient, financial benefit**
5  **to the payor; correct.**
6      **Q.** One thing about this EICU example, you were not
7  saying, were you, that if the patient is not extubated
8  during the night that that creates complications and more
9  work; that wasn't your point, was it?
10     **A.** **I don't understand your question.**
11     **Q.** I think that wasn't your point.  Okay.
12 You mentioned that the out-of-center sleep testing and
13 the EICU and the lung nodule clinic are innovations.  None
14 of those are at all unique to St. Luke's, are they?
15     **A.** **Nobody has put them all together, but each as**
16 **individual innovations, no, they're not.**
17     **Q.** In fact, hundreds of hospitals around the country
18 are doing all these things, aren't they?
19     **A.** **I don't know.**
20     **Q.** The EICU comes from a company that is offering it
21 that has already set it up in 350 hospitals in America;
22 correct?
23         MR. SINCLAIR:  Object.
24         THE WITNESS:  Correct.  The first in Idaho,
25 though -- second in Idaho, first successful in Idaho.

2104

1  BY MR. ETTINGER:
2      **Q.**  And do you know how many of those hospitals
3  involve independents in their work?
4      THE COURT:  Just a moment.  Mr. Sinclair, I think
5  you were trying to make an objection, but I'm not sure if
6  you withdrew it --
7      MR. SINCLAIR:  My mic was off.  I'll withdraw it.
8      THE COURT:  All right.  Thank you.
9  Proceed.
10     MR. SINCLAIR:  I turned my mic on, though.
11 BY MR. ETTINGER:
12     **Q.**  Do you know, even approximately, how many of those
13 hospitals are working with independent physicians in
14 establishing an EICU?
15     **A.**  I don't.
16     **Q.**  And lung nodule screening -- let me ask you about
17 that.  First of all, you have no evidence that your efforts
18 in that area have reduced utilization at all; correct?
19     **A.**  What do you mean by "evidence"?
20     **Q.**  Why don't you play clip 15, Keely, please.
21     (Video clip played as follows:)
22     **Q.**  "How does SLIPA measure utilization
23         control to do this lung nodule screening?
24     **A.**  So I asked about that some months ago,
25         you know:  Do we have any evidence that this is

2105

1          actually decreasing utilization?  And the
2          answer is I don't have that evidence.
3      (Video clip concluded.)
4      THE WITNESS:  That was May 30th, sir.
5      THE COURT:  Counsel, we need a page and line
6  number.
7      MR. ETTINGER:  I'm sorry, Your Honor.  That is
8  page 138 of Dr. Souza's deposition, lines 18 to 23.
9  BY MR. ETTINGER:
10     **Q.**  Was that your testimony when your deposition was
11 taken?
12     **A.**  On May 30th.
13     **Q.**  Now, isn't it true that many hospitals have
14 interdisciplinary committees to screen for lung nodules
15 before any biopsy is done?
16     **A.**  I don't know.
17     **Q.**  Now, you talked about sepsis.  There are
18 nationwide guidelines for sepsis from the Society of
19 Critical Medicine, aren't there?
20     **A.**  There are.
21     **Q.**  And you don't know how many hospitals around the
22 country are following those guidelines, do you?
23     **A.**  I don't.
24     **Q.**  And St. Luke's is not in the top 5 percent of
25 hospitals nationwide in avoiding sepsis mortality, is it?

2106

1      **A.**  I don't know.
2      **Q.**  Do you know whether Saint Al's has accomplished
3  more than St. Luke's in this area?
4      **A.**  I don't know.
5      **Q.**  In fact, St. Luke's did not hit its targets for
6  sepsis; correct?
7      **A.**  What targets are you referring to?
8      MR. ETTINGER:  Why don't you play clip 21, please,
9  Keely.
10     THE COURT:  Page and line.
11     MR. SINCLAIR:  Your Honor, I would object.  He
12 simply asked for clarification as to what targets.  I don't
13 know how you can impeach him asking what targets he is
14 referring to.
15     MR. ETTINGER:  Your Honor, because he uses the
16 word "target" in the clip and says they're not meeting it.
17 So it seems to me that if the witness used it, it's
18 impeaching his suggestion that it's somehow ambiguous.  Just
19 like in the last clip, where he didn't know what I meant by
20 "evidence," and he used --
21     MR. SINCLAIR:  Your Honor, I'd object to this
22 commentary, as well.
23     THE COURT:  Well, counsel needs to, I think,
24 explain his position.  I'm going to overrule the objection
25 and allow it to be played.

2107

1          Go ahead.  But I need a page and line number; I'm not
2  sure you've provided that.
3      MR. ETTINGER:  I'm sorry, Your Honor.  It's page
4  115, lines 3 through 22.
5      (Video clip played as follows:)
6      **Q.**  "How frequently do you receive reports on
7          your score for the group C sepsis perfect care?
8      **A.**  "So those now come fairly frequently.  I
9          want to say the group gets a monthly update on
10         that.  Moreover, we've baked into the program
11         now that if I have a miss on a group C sepsis
12         patient, so I have a patient where I didn't get
13         the follow-up lactate, I am pinged with an
14         e-mail by the sepsis coordinator that says,
15         "You missed."  Also, if I achieve perfect care
16         on a sepsis group C patient, I get an e-mail
17         that says, "Thank you.  You achieved perfect
18         care."
19             "So there's an immediate feedback loop,
20         and then there's a slightly more drawn-out
21         feedback loop, and then there's an annual
22         report.  And I know that by late in the year we
23         were not hitting our target, and I think we did
24         not achieve the target on that measure for last
25         year.

2108

1    **Q.**  "For 2012?

2    **A.**  "Yeah."

3    (Video clip concluded.)

4    BY MR. ETTINGER:

5    **Q.**  Dr. Souza, was that your testimony?

6    **A.  On May 30th.**

7    **Q.**  Do you believe you were practicing poor quality

8    medicine before your group was acquired by St. Luke's?

9    **A.  No.  But I didn't measure it.**

10   **Q.**  The metrics that were included in your contract

11   with Saint Al's were, in fact, measured in making decisions

12   as to whether to make the payments; correct?  Is that right?

13   **A.  There would have been -- yes.**

14   MR. ETTINGER:  No further questions.  Thank you.

15   THE COURT:  Mr. Sinclair, is there any -- I am

16   assuming --

17   MR. SU:  No, Your Honor.

18   THE COURT:  Thank you, Mr. Su.

19   Mr. Sinclair.

20   REDIRECT EXAMINATION

21   BY MR. SINCLAIR:

22   **Q.**  Dr. Souza, when Mr. Ettinger referred to your

23   trial testimony last year where you said, "We need to

24   recruit, but you couldn't recruit.  The doctors coming out

25   of training knew that the old model was unsustainable, and

2109

1    they wanted to be employed with the health system, so we

2    were struggling with recruitment."

3    At what point in time were you indicating that you were

4    having difficulties recruiting?

5    **A.  We had difficulties recruiting throughout all of**

6    **that time.  If you look at what's happened in this valley**

7    **since our group unanimously decided to seek employment,**

8    **we've, at St. Luke's, added six physicians, and Saint**

9    **Alphonsus has added four.**

10   MR. ETTINGER:  Your Honor, the question was about,

11   and my question was about, the independent group's

12   difficulty recruiting.  I think the witness is going beyond

13   the question and the scope of the redirect.

14   THE COURT:  The witness also -- during the

15   cross-examination, whether it was asked or not, a comment

16   was made about the number that had been added before and

17   after, and I think it's fair redirect.  I'll allow it.

18   THE WITNESS:  So the community, that's what we all

19   should be talking about here, what does the community need.

20   The community needed ten more doctors.  We could not meet

21   that need as an independent group.  The model was

22   unsustainable.  We recruited in a trickle when we needed to

23   just open the faucet more widely.

24   BY MR. SINCLAIR:

25   **Q.**  So since joining St. Luke's your ability to

2110

1    recruit the necessary doctors has improved?

2    **A.  Most definitely.**

3    **Q.**  And Saint Al's as an organization has recruited

4    doctors that are pulmonologists, as well?

5    **A.  Absolutely.**

6    **Q.**  How many independent pulmonologist groups have

7    recruited in the Treasure Valley in the last five years, if

8    you know?

9    **A.  There are no more independent pulmonary groups in**

10   **the Treasure Valley.**

11   **Q.**  So all the pulmonologists in the Treasure Valley

12   have opted to be part of a system?

13   **A.  That's correct.**

14   MR. ETTINGER:  Objection; leading, Your Honor.

15   THE COURT:  Sustained.

16   MR. SINCLAIR:  I was simply restating what he just

17   testified to, I thought, Your Honor, just summarizing.

18   MR. ETTINGER:  There was a little more to it, Your

19   Honor.

20   THE COURT:  I agree, and I sustained.  But the

21   answer will stand.  You know, the issue of leading and

22   questions, to me, is generally -- I won't say much ado about

23   nothing, but much ado about something that's not that

24   significant.  As long as counsel is not putting words in the

25   witness's mouth, I'm going to give leeway.

2111

1    But I think we went a little bit over the edge on that,

2    Mr. Sinclair, but let's go ahead and proceed.

3    MR. SINCLAIR:  Fair enough.

4    BY MR. SINCLAIR:

5    **Q.**  You referred to the email that you had with

6    -- actually you weren't part of the email.  Dr. Bathina was

7    discussing matters in an email that you weren't part of;

8    correct?

9    **A.  That's right.**

10   **Q.**  And he referenced -- and we actually went over

11   this in your video presentation, that you weren't here

12   during that -- plaintiffs --

13   **A.  Yeah.**

14   **Q.**  -- played during the first part of the trial.  But

15   in order to bring it back into context -- because you

16   explained it in the deposition.  Could you explain what your

17   recollection of this comment about "physician-led mantra"

18   was about?

19   **A.  So that -- that's a painful chapter in my history.**

20   **So the email that Dr. Bathina sent followed a conversation**

21   **in which I was very emotional.  It involved a physician that**

22   **we had previously had a relationship with, and, you know,**

23   **truth be told, it wasn't my brightest moment as a physician**

24   **leader.  It was a self-centered comment, and it was not**

25   **focused on the needs of the organization or the people we**

2112

1  serve.
2          This organization has far exceeded my expectations
3  in terms of physician leadership.  It has created physician
4  leadership bodies.  It has invested in physician leadership
5  in terms of education.  You can't take doctors and just say,
6  "Go be leaders."  And I guess I'm an example of that culture
7  of physician leadership.  I hope I'm a good example.  I
8  don't know.
9      Q.  Also in that email there was a reference to
10  recruiting.  Do you recall that?
11      A.  I don't.
12      Q.  I'm just looking for it in my --
13      A.  I don't recall that.
14      Q.  I believe it was Exhibit 1357 in the fourth
15  paragraph.  That's not the right paragraph.
16      A.  The one above?
17      Q.  "Physician-led mantras" and then -- I can't find
18  it, unless you see it.  Then we'll move on.
19      A.  Sorry.  I don't.
20      Q.  No problem.
21  Mr. Ettinger asked you about your use of the word
22  "dominant."  We went over this previously, as well, but
23  could you address what you meant by "dominant."
24      A.  Yes.  You know, it's really ironic to me that
25  we're talking about the meaning of the word "dominant" when

2113

1  in my -- in a trial in which, I guess, I/we are accused of
2  being anticompetitive, when it's actually competition that
3  creates dominance, of course.  You know, I believe that the
4  clinical innovations we are trying to introduce are exactly
5  the competitive innovations that this market and healthcare
6  in general need.
7          Everybody has seen my CV.  I'm a -- I'm a
8  biologist and a physician by training.  I am not an
9  epidemiologist.  You can look up the word.  Competition
10  creates selective pressures that create dominance.  And
11  dominance is defined -- dominance is surviving.  It's being
12  here tomorrow so that as an organization you can fulfill
13  your mission and vision, or as a population you can continue
14  to grow, or as an individual you can put your genes into the
15  next generation's pool.  Dominance is not conquering the
16  world.  That's the way I used the word.  That's how I meant
17  it.  I wanted to be in an organization that was still here
18  tomorrow.
19      Q.  And since you've joined St. Luke's, has your call
20  schedule been lighter than it was when you were covering
21  four?
22      A.  It has.
23      Q.  So that did address that concern?
24      A.  It did.
25      Q.  Now, there were all these questions about what

2114

1  eClinicalWorks does today and whatnot.  At the time that you
2  were deciding on which electronic medical records system to
3  purchase, did you talk to any other physician groups in the
4  Treasure Valley to see what they were using?
5      A.  Sure.
6      Q.  And was one of them Primary Health?
7      A.  Yes.
8      Q.  And what was your experience with interfacing with
9  Primary Health's eClinical system at that point in time?
10          MR. ETTINGER:  Your Honor, I think the question is
11  calling for hearsay unless the witness actually sat down on
12  Primary Health screens.  I don't think that's what the
13  question is seeking.
14          THE COURT:  Well, I took it to be a question about
15  his actual experience in interfacing with Primary Health's
16  clinical system.
17          MR. SINCLAIR:  That's correct.  If you don't have
18  any experience, then just tell us that.
19          MR. ETTINGER:  Then I'm incorrect, Your Honor.
20  I'm sorry.
21          THE WITNESS:  Sorry, sir.  Would you repeat the
22  question?
23  BY MR. SINCLAIR:
24      Q.  Do you have any experience in regards to how the
25  information from eClinical's -- from Primary Health's

2115

1  eClinical system would populate with your eClinicalWorks
2  system?
3      A.  Sure.
4      Q.  What was your experience at the time you were
5  using eClinicalWorks?
6      A.  At the time I was using eClinicalWorks, it was
7  basically an electronic paper chart.  So my note would be
8  scanned in essentially like a PDF into their record, and
9  then my individual note could be looked for and, you know,
10  called up and viewed.
11      Q.  Just like you described yesterday when you were
12  describing your experience with eClinicalWorks?
13      A.  Yes.  And, you know, when we -- one of the things
14  we, you know, at the time liked about eClinicalWorks is it's
15  hard to change, and we went from paper charts to an
16  electronic chart, and what was nice is that it was basically
17  an electronic paper chart, so we didn't have to change very
18  much.
19          THE COURT:  Just so I'm clear, when you refer to
20  an electronic paper chart, it's like a PDF; in other words,
21  it's a -- I mean, I review briefs electronically as a PDF --
22  basically a snapshot of a written page.  That's what you're
23  referring to?
24          THE WITNESS:  That's what I'm referring to, yes.
25          THE COURT:  Proceed, Mr. Sinclair.

2116

1    MR. SINCLAIR:  Thank you, Your Honor.
2    BY MR. SINCLAIR:
3    **Q.**  Now, there were some questions about
4    epidemiologists and statisticians.  Do you -- what is your
5    belief in regards to whether it would be a good way to
6    improve practice to wait and hear what an epidemiologist or
7    a statistician said about the condition of your patient?
8    **A.  Well, I'll just -- I'll come back to the example**
9    **that was shown to me.  Evidence-based medicine says it's not**
10   **okay to have your diabetics running around with hemoglobin**
11   **A1c's of 8.5.  Epidemiologists and statisticians don't tell**
12   **us about how to fix that; they tell us what are the effects**
13   **of that, what's the evidence that says that that's a bad**
14   **number.  I think it's up to teams of providers and**
15   **individuals to -- you know, and especially in an individual**
16   **clinic patient population -- find the best way to engage**
17   **that patient, meet their needs and then help them achieve**
18   **that target.  I don't know if I answered your question.**
19   **Q.**  You did.  Now, you testified as to the lung nodule
20   screening and the benefits it had, and then Mr. Ettinger
21   showed page 130, lines 18 through 23, which was back in May
22   of 2013 and your testimony at that time.  Has your knowledge
23   base changed since May of 2013?
24   MR. ETTINGER:  Your Honor, objection.  I think
25   we've been through this with other efforts on my part to

2117

1    introduce evidence postdeposition, and obviously we didn't
2    have a way to test that or find out about it, and so -- so I
3    think it's inappropriate to raise it now.
4    MR. SINCLAIR:  Well, the distinction here is he
5    testified as to that.  They let it in.  They didn't object
6    upon it as was done earlier when people were trying to
7    testify to something that was post when a deposition was
8    taken.  He testified to it.  And then he tries to impeach
9    him based upon a set of information that was earlier.
10   MR. ETTINGER:  That's not at all what happened,
11   Your Honor.
12   THE COURT:  Well, if the witness -- it's a
13   difficult situation if a witness in their normal work
14   acquired additional information, not preparation for trial
15   or not trying to acquire additional information.  I don't
16   think it's terribly significant in any event, because what
17   the witness understood at the time of his deposition,
18   apparently in May, is what it is, and if there is some
19   additional information that suggests that he was mistaken or
20   misunderstood, then I think that's fair game.  But what I
21   will not allow is for the witness to offer his testimony and
22   then essentially to run a new test or a new study or inject
23   something new into the case.
24   MR. SINCLAIR:  Fair enough.
25   THE COURT:  So with that understanding, I'll allow

2118

1    you to go ahead and proceed, but I'm assuming this is simply
2    a witness being asked something at a deposition, making
3    a statement, realizing later, based upon things that either
4    occurred in his practice or just out of curiosity he checked
5    into it, and found out he was wrong.  He can correct those
6    kinds of mistake.
7    So go ahead and proceed.
8    BY MR. SINCLAIR:
9    **Q.**  First of all, at the time of your deposition you
10   indicated that you did not know the information that they
11   were asking for; correct?
12   **A.**  Yes.
13   **Q.**  And in your practice, not in preparing for this
14   trial or anything I asked you but just in your practice,
15   have you become more aware of more current information in
16   regard to that?
17   **A.  As a routine part of reporting in the practice,**
18   **yes.**
19   **Q.**  And that's what you testified to yesterday or this
20   morning?
21   **A.**  Yes.
22   **Q.**  And that's true with regards to sepsis, as well?
23   I have asked Dr. Souza not to testify if somebody
24   stands up.
25   THE WITNESS:  If somebody stands up.

2119

1    MR. SINCLAIR:  Mr. Ettinger stood up.
2    THE COURT:  Mr. Ettinger.
3    MR. ETTINGER:  I'm sorry, Your Honor.  As I
4    understand what I am hearing, he's talking about new
5    evidence that was accumulated after the deposition, though
6    it's a little unclear, I've got to admit, from the questions
7    and answers.
8    THE COURT:  Again, it's a difficult problem
9    because we don't live in a world that just freezes as of a
10   moment in time.  But what I think is unfair, as I have
11   noted, is for a party to, in essence, change their answer or
12   a witness to change their answer by undertaking some
13   additional evaluations.  But if the witness has acquired in
14   his -- the normal course of his clinical work -- and I think
15   that's what he just indicated -- some additional
16   information, I'll allow it, particularly if he is clarifying
17   a statement that he made mistakenly during his deposition.
18   MR. SINCLAIR:  Thank you.
19   THE COURT:  Proceed.
20   BY MR. SINCLAIR:
21   **Q.**  Finally, Dr. Souza, Mr. Ettinger asked you whether
22   you had hit your targets on sepsis, and then he played a
23   clip from your deposition.  In your deposition, did you
24   describe the types of things that you were being rated on
25   and whether or not you had reached those?

2120

1    **A.  I mean, I don't recall specifically, but the**
2    **reason we haven't hit our -- we hadn't hit our targets --**
3    **and actually I was being honest, I don't think we're going**
4    **to hit the target this year -- is because they are very**
5    **aggressive.  And I started on this, I think yesterday,**
6    **perhaps it was today.  It's all blending together.**
7    **But when you are administering these boluses of**
8    **intravenous fluids to a patient with septic shock, one of**
9    **our measures is that we must achieve a certain central**
10   **venous pressure goal.  There is a group of us human beings**
11   **that you can't raise the pressure on.  You can squeeze in 1**
12   **liter, 2 liters, 5 liters, 10 liters, and their kidney turns**
13   **on, and they just evacuate the fluid that you're dumping in.**
14   **So we -- we -- by intent, because we're trying to**
15   **be physician leaders, we do not choose to set targets that**
16   **are meatballs.  We want targets that are difficult to**
17   **achieve.  We've constructed the quality incentive as a**
18   **takeaway, not an add-on.  And that's really important in**
19   **terms of human behavior.  We're a lot -- we're a lot more**
20   **upset when a hundred-dollar bill falls out of our pocket and**
21   **blows away as if we find one on the sidewalk.  So we've**
22   **constructed it as a takeaway.  We've made the target**
23   **meaningful and real because if -- we want to continuously**
24   **improve.**
25   **Q.  Okay.  And after the judge's last ruling I**

2121

1    actually didn't go back and let you answer the question that
2    was on -- that was pending in front of you, and that is in
3    regards to the improvements in sepsis.  Was the information
4    that you testified to this morning more current than what
5    you knew at the time of your deposition?
6    **A.  Yes.**
7    MR. SINCLAIR:  Thank you, Your Honor.  That's all
8    I have.
9    THE COURT:  Mr. Ettinger?
10   MR. ETTINGER:  No questions, Your Honor.
11   THE COURT:  You may step down, Dr. Souza.  Thank
12   you.
13   THE WITNESS:  Thank you.
14   THE COURT:  Call your next witness.
15   MR. STEIN:  Your Honor, we'll be calling Dr. Brian
16   Fortuin.
17   MS. DUKE:  Your Honor, while Dr. Fortuin is
18   coming, may I just publish the depositions of John Kee and
19   Dr. Priest?
20   THE COURT:  If you would hand that to --
21   MS. DUKE:  I will do so.  Thank you.
22   THE COURT:  Mr. Metcalf, could you help us with --
23   just hand that to Ms. O'Larey.
24   Dr. Fortuin, if you'll step forward.  Watch the cord
25   there.  I can't believe we're allowing that in a court of

2122

1    law, but --
2    MR. POWERS:  I'm trying, Judge.
3    THE COURT:  Ms. O'Larey will administer the oath
4    to you.
5    BRIAN WALLACE FORTUIN,
6    having been first duly sworn to tell the whole truth,
7    testified as follows:
8    THE CLERK:  If you'll please state your full name
9    for the record and spell your name.
10   THE WITNESS:  Brian Wallace Fortuin F-O-R-T-U-I-N.
11   THE COURT:  All right.  Before we actually begin
12   the examination, Ms. O'Larey, why don't you announce the
13   publication of those depositions so we have that cleared up
14   for the record.
15   THE CLERK:  The deposition of John Kee, dated
16   May 15th, is now published.  And the deposition of Marshall
17   Priest, dated 6-05-2013, is now published.
18   (Depositions of John Kee and Marshall Priest
19        published.)
20   THE COURT:  All right.  Thank you.
21   You may proceed.
22   DIRECT EXAMINATION
23   BY MR. KEITH:
24   **Q.  Good morning, Dr. Fortuin.  By whom are you**
25   employed?

2123

1    **A.  I am in a partnership that is a group of**
2    **internists in Twin Falls, Idaho, that has a contractual**
3    **relationship with St. Luke's Medical Center.**
4    **Q.  And what's the nature of your medical practice?**
5    **A.  So I'm a practicing internist.  I spend most of my**
6    **time in a clinic.  I spend six to eight, maybe ten weeks of**
7    **the year doing hospitalist work.**
8    **Q.  And how long have you practiced in Twin Falls?**
9    **A.  Since 1997.**
10   **Q.  Why don't you step back and give us your**
11   **educational history post high school.**
12   **A.  After high school I got a bachelor's in English at**
13   **University of California Santa Barbara; from there I went to**
14   **Duke University Medical School, I got my medical degree**
15   **there; and went to the University of Washington in Seattle,**
16   **where I did my internal medicine internship and residency.**
17   **Q.  And where did you go after your residency?**
18   **A.  I came to Twin Falls, Idaho, directly after**
19   **residency in 1997.**
20   **Q.  And did you join a group at that time?**
21   **A.  Yeah.  The name of the group was the Twin Falls**
22   **Clinic and Hospital, which was a multispecialty group.**
23   **Q.  And did that group also own a hospital?**
24   **A.  That's correct.  It had a clinic and hospital.  It**
25   **was a full-service, like a community hospital.**

2124

1    **Q.** And at that time, was the Twin Falls Clinic and
2    Hospital independent of any other hospital system?
3    **A.** That's correct.
4    **Q.** Did there come a time when that changed, when Twin
5    Falls Clinic and Hospital joined with another hospital
6    system?
7    **A.** Yes. In 2001 and finally in 2002, the Magic
8    **Valley Regional Medical Center purchased the Twin Falls**
9    **Clinic and Hospital.**
10   **Q.** And could you just describe the circumstances
11   around Twin Falls Clinic and Hospital joining Magic Valley
12   Regional Medical Center?
13   **A.** Yeah. At the time, the Twin Falls Clinic and
14   **Hospital was having financial troubles, really. There were**
15   **a variety of factors contributing to that, and we were**
16   **looking to sell the operation because the physicians and the**
17   **leadership were tentative about the future, and our**
18   **financial situation at the time was not very good. So we**
19   **joined conversations with what was Magic Valley Regional**
20   **Medical Center at the time, who then purchased the Twin**
21   **Falls Clinic and Hospital.**
22   **Q.** And was Magic Valley Regional Medical Center the
23   only hospital that expressed an interest in acquiring Twin
24   Falls Clinic and Hospital?
25   **A.** So prior to that, there was conversations with

2125

1    Saint Alphonsus about acquiring the Twin Falls Clinic and
2    Hospital.
3    **Q.** Do you use an electronic health record in your
4    practice?
5    **A.** Yes.
6    **Q.** And what system or what electronic health record
7    is it?
8    **A.** So it's called "Centricity."
9    **Q.** Can you explain for the court the ways in which
10   you use Centricity and how that relates to achieving
11   St. Luke's goal of the Triple Aim?
12   **A.** So traditionally in my practice, I would use a
13   **paper chart where I would document by dictating or writing**
14   **notes on my patient encounters, and in that chart would be**
15   **lab and X-ray and other notes, what have you. The**
16   **electronic record is -- it can be just a repository for that**
17   **information, but what we've done with the analytics teams is**
18   **use the Centricity medical record in a way to capture**
19   **discrete data elements so that we can then -- we call it**
20   **"mine," we can get those data elements later to show whether**
21   **or not a patient has had a test or a procedure.**
22       **So in daily practice, I put data into the record**
23   **with the patient, and then I use the record, as well, to get**
24   **information about the patient, whether it be lab or X-ray or**
25   **other reports from other physicians, et cetera, but at the**

2126

1    same time I'm putting it into the record in a way that
2    **allows me to get that data later. So for example, if I see**
3    **you in six months, then I would be able to look back and see**
4    **what I've done over the past year for your blood pressure or**
5    **your diabetes or whatever it might be.**
6    **Q.** And does use of the Centricity tool facilitate
7    communications among physicians who are also on that same
8    record?
9    **A.** Yes. Physicians on the same record, yes.
10   **Q.** And can you give us an example of how that ability
11   to communicate through Centricity addresses St. Luke's goals
12   of the Triple Aim?
13   **A.** So there are many examples in my practice of how
14   **that happens. Some are more, I guess, more illustrative**
15   **than others. The one that comes to mind is a patient of**
16   **mine who came from Elko, a 50-year-old gentleman who**
17   **was -- had been a smoker, had heart disease, but he came**
18   **in -- he drove up from Elko to see me and had blood in his**
19   **urine.**
20       **And so using the electronic record, I, you know,**
21   **can access information. There's a program called UpToDate**
22   **that it can link to. And in UpToDate it can tell me what**
23   **optimal tests are for a 50-year-old with blood in his urine.**
24   **So by using UpToDate, I was able to determine that there**
25   **were a handful of tests that were appropriate. But what's**

2127

1    nice about the Centricity record, I was able to send what's
2    **called a "flag," which is like an email within the record**
3    **itself, so it includes the patient health information that's**
4    **protected.**
5        **So I can send that to the urologist. And I asked**
6    **Dr. Bates in this example, who is the urologist, you know,**
7    **"What do you recommend as the best test? I see there is a**
8    **few different possible options."**
9        **And he said to do a CT urogram, which is a CAT**
10   **scan protocol that specifically looks at the kidney, the**
11   **ureters, the bladder, and the urethra, which he then did,**
12   **and which I then was able to do that very same day. And the**
13   **CT urogram came back, and there was a subtle abnormality in**
14   **the bladder, and the radiologist wasn't sure what to make of**
15   **it, and I didn't know what to make it.**
16       **So I sent another note to Dr. Bates, who then,**
17   **later in that same day, say in midday, looked at the CT scan**
18   **himself, and we talked about it, and he said, "Well, that**
19   **shows an abnormality, and he needs a cystoscopy," which is a**
20   **procedure where he takes a scope through the urethra and can**
21   **look at the bladder and actually take a sample of whatever**
22   **the abnormality was. Which that very same day the patient**
23   **underwent and was found to have a very early bladder cancer**
24   **that was then, you know, subsequently treated with excision**
25   **and treatments.**

2128

1    The point of the story is that the patient who
2  showed up that morning saw me, got expert advice from a
3  urologist through the record, got a CAT scan that the
4  urologist was able to review through the record, and then a
5  procedure that made the definitive diagnosis and started the
6  treatment without having to drive back and forth to Elko,
7  without having to travel to different clinics or make other
8  appointments or any of that.
9    So I think that points up the efficiency of a
10 shared medical record in an integrated environment.
11    Q.  And the urologist you're referring to, is that
12 person a St. Luke's clinic physician?
13    A.  That's correct.
14    Q.  And was St. Luke's able to bill for the
15 consultations that the urologist did?
16    A.  So when I called the urologist on the flag, using
17 the flag through the record -- and I use that with urology,
18 pulmonary, cardiology -- there's no billing that's
19 associated with that; that's all not -- in the current
20 payment environment, there is no way to be reimbursed for
21 those services.  But it's something we do as being in part
22 of the group.
23    Q.  Do you hold any leadership positions within
24 St. Luke's?
25    A.  Yes.

2129

1    Q.  And what are those?
2    A.  So I'm a member of the St. Luke's Health System
3  Clinical Leadership Council, which is a physician leadership
4  group that partners with the system administration.  I'm
5  also a member of the Magic Valley Physician Leadership
6  Council.  I chair that committee.  And that committee
7  partners more so with the Magic Valley administration, and
8  that's, again, a physician leadership committee that has
9  that partnership.  I'm on a System Formulary Work Group,
10 which is actually a subcommittee of the System Clinical
11 Leadership Council, and that's looking at formulary
12 standardization across the health system.
13    Q.  Directing your attention to the Magic Valley
14 Physician Leadership Council, can you give me an example of
15 how that group has taken action that addresses St. Luke's
16 Triple Aim?
17    A.  So an example would be the Physician Leadership
18 Council has three subcommittees that do a lot of the work,
19 so there's a division medical director committee, and that
20 is more operational.  There's an IT steering committee that
21 is -- works with the electronic record and the proper use of
22 the electronic record.  And there's a clinical integration
23 committee.  And the clinical integration committee looks at
24 clinical processes and technologies and treatments and
25 evaluates those based on, really, the Triple Aim and whether

2130

1  or not those functions that we perform as physicians or as
2  an enterprise meet the Triple Aim are warranted.
3    So, you know, an example would be there was a
4  recent need for pulmonary rehab.  So the clinical
5  integration committee looked at the evidence behind
6  pulmonary rehab for pulmonary patients and found that the
7  evidence supported it.  The -- that that would result in
8  better treatment for our pulmonary patients of Magic Valley.
9  And working with the Treasure Valley pulmonary rehab that
10 committee then, through the PLC, I guess, you know, endorsed
11 to the administration to support, would be one example that
12 comes to mind of how we are trying to get better care in the
13 Magic Valley for our patients.
14    Q.  And does the clinical integration committee or
15 subcommittee of the Magic Valley PLC review requests for new
16 technology or equipment?
17    A.  Yes.  So that would -- yes.
18    Q.  And can you give us an example of how that work
19 has resulted in decisions that help achieve the Triple Aim?
20    A.  So an example of achieving the lower-cost portion
21 of the Triple Aim, the clinical integration committee has
22 reviewed certain spinal cord stimulators, certain
23 implantable devices.  And there are a variety of these
24 devices that are used to treat people with chronic back
25 pain.  And the device industry is continuing to make new or

2131

1  supposedly better devices; however, they have not been shown
2  to have an improved outcome, but they do result in a much
3  higher cost.
4    So that committee reviewed the medical evidence
5  for a new device that one of the proceduralists wanted to
6  implant in the patients and was able to sort of -- to look
7  at the evidence for it critically and recognize that there
8  was no clinical benefit to the procedure, but there was
9  substantially increased cost to the procedure.  Consequently
10 we are not providing that device to our patients at Magic
11 Valley because of the work of the various clinical
12 integration committees.
13    Q.  You mentioned that you serve on a subcommittee of
14 the System Clinical Leadership Council that is tasked with
15 identifying what pharmaceuticals ought to be used in the
16 St. Luke's Clinic.  Can you give us an example of decisions
17 that have been made by that subcommittee that help achieve
18 the Triple Aim?
19    A.  So one of the -- yes, I can.
20    One of the objectives of the System Formulary Work
21 Group is to standardize the pharmacologic treatments that we
22 use across our system.  And one of the very expensive things
23 that we do is use brand-name medications when there are
24 equally effective generic medications available.  So many of
25 the projects that we've done at the System Formulary Work

2132

1 Group have been targeting using the equally effective
2 generic medicines in place of the more expensive branded
3 medicines when the evidence supported that the effect was
4 the same.
5     So an example would be the cholesterol medicines,
6 the stomach acid reflux medicines, the blood pressure
7 medicines that are used throughout the system, we've
8 standardized those and narrowed the number of choices, if
9 you will, to the agents that we know work well but are very
10 inexpensive, you know, thereby providing as good or better
11 care to the patients at a significantly reduced cost.
12     Q.  Can you describe to the court how these various
13 physician leadership structures interrelate, how information
14 flows up and down?
15     A.  So that's actually critically important because if
16 the leadership structure is making decisions in a vacuum,
17 then none of the -- none of those things get to the bedside.
18 So there needs to be communication from the leadership,
19 which would be the Clinical Leadership Council down to the
20 physicians that are practicing in the exam room at the
21 bedside.
22     So the way that works is the Clinical Leadership
23 Council is comprised of divisional medical directors, which
24 are physicians over divisions or service lines; that might
25 be primary care or cardiology or other service lines.  And I

2133

1 was just thinking Dr. Souza might have gone over this,
2 because he's part of this whole leadership structure.  I
3 didn't want to be redundant.
4     But in any case, those divisional medical
5 directors talk to the site medical managers that work in the
6 individual clinics, and the site medical managers then talk
7 to the practicing physicians, so if there was something
8 going -- so an example would be -- and this is sort of
9 ongoing remiss this -- so an orthopedist in Magic
10 Valley -- or Treasure Valley recognized that a certain
11 injection we were using for knee arthritis was, you know,
12 did not have evidence to support its use.  It didn't benefit
13 patients.
14     And so what he did is he moved this information up
15 through the -- in this case, the Clinical Integration
16 Committee up to the Clinical Leadership Council that using
17 this certain injection was not optimal for patients and was
18 a procedure that may not be necessary and at a cost that was
19 not -- didn't bring forth benefit.  So the orthopedist
20 brought it up through the leadership structure, and then
21 from the leadership structure we're in the process of
22 disseminating that information down so that all the
23 physicians across the system are -- are using the same high
24 standard of care for their patients.
25     So the point I'm trying to make is that the

2134

1 information flows up and down from the bedside to the top
2 and then from the top down to the bedside so that we can be
3 sure that we're all executing on the same mission.
4     Q.  Turning to a different topic, is there a tool that
5 you use to analyze the quality of care you provide and the
6 cost effectiveness of the care you provide?
7     A.  Yes.  We use a WhiteCloud Analytics tool called
8 "the clinical integration scorecard," which takes the
9 information from the electronic health record and other data
10 repositories to present it back to the providers and the
11 physicians in a meaningful way.
12     Q.  Who developed the clinical integration scorecard?
13     A.  I don't know the exact individual, but WhiteCloud
14 Analytics is the company.
15     Q.  And when did the clinical integration scorecard
16 become available to you?
17     A.  I think the first time I saw it might have been in
18 November of last year or December of last year.
19     Q.  And was that the time at which the tool rolled out
20 to every St. Luke's clinic provider?
21     A.  Over the ensuing few months, yes, it did roll out
22 to everybody.
23     MR. KEITH:  Alyson, I'd ask you to publish the CI
24 scorecard on the screen.
25     Your Honor, we have a demonstrative with screen shots

2135

1 of the pages that we plan to show the witness that is
2 Exhibit 5105.
3     THE COURT:  All right.  Counsel, just so we're
4 clear, this again is a -- you've given screen shots, but
5 this is an actual online demonstration of the WhiteCloud
6 scorecard?
7     MR. KEITH:  Exactly, Your Honor.
8 BY MR. KEITH:
9     Q.  Dr. Fortuin, can you tell the court what we're
10 looking at here?
11     A.  So this is one of the opening pages of the
12 clinical integration scorecard, and you can see, I
13 think -- okay, so up here it -- this is all the system
14 groups throughout the St. Luke's Health System.  And over
15 here is the -- the percent of total possible points that can
16 be achieved based on the various metrics that we're using,
17 these items that we're measuring to determine
18 our performance, how well we're doing with the scorecard.
19     Q.  And how -- do you have an individual scorecard
20 within the system?
21     A.  Right.  So the tool has been developed so that we
22 can navigate to my scorecard.  So if we go here to Magic
23 Valley, within Magic Valley you can see that our percent is
24 73 percent of the total score of the Magic Valley possible.
25 And if we go to my peer group, we can see -- there it

2136

1    goes -- we can scroll down to internal medicine, which is my
2    group.  And we can go further still and show -- there is my
3    scorecard there.  And so now we're looking at just my
4    scorecard, not the entire system, so I can see my data.
5        Q.   And for the record, this is page 1 of Exhibit
6    5105, or at least there is actually two pages that it takes
7    to do the screen shots.  That's pages 1 and 2.  So why don't
8    you walk us through what we're looking at, or why don't you
9    walk the court through what we're looking at here on your
10   screen.
11       A.   So you can see that top bar has the number of
12   points available and how many points I'm getting.  Each of
13   the clinical measures that we're looking at -- and we'll go
14   over those a little bit -- have been attributed a point
15   score based on the, I guess, how important we feel they are
16   in terms of the care of the patient or the population.  So
17   you can see my score is 441 or 89 percent of the total
18   possible.  The blue line represents -- here, I'll see if I
19   can trace it -- the blue line represents my score compared
20   to the triangles, and each triangle represents the average
21   score for other doctors in my specialty.  So of the
22   internists, there's my blue line --
23       THE COURT:  Your specialty within your practice
24   group?
25       THE WITNESS:  So this represents, I believe,

2137

1    across the entire system.
2        THE COURT:  All of the St. Luke's?
3        THE WITNESS:  All of St. Luke's Internal Medicine.
4    So I can see as a comparator -- and you will see how that
5    becomes useful.
6        THE COURT:  Could I just ask, I notice scores by
7    category.  It appears better care, lower cost, and I'm
8    assuming there are some more categories, as well.  So the
9    metrics that are being used here do include -- I guess,
10   better care would be the care of whatever the current
11   condition is; lower cost would be a consideration of what
12   the relative value is of a particular treatment that's being
13   ordered; patient-centered I'm assuming has something to do
14   with being sort of an advocate for the patient in terms of
15   comfort, care, et cetera; better health would be long-term
16   health improvements?  So these are all factored in?
17       THE WITNESS:  So I can go through -- yes, you're
18   exactly right.  What we did is took the various measures and
19   put them in these four buckets so that -- so Alyson could
20   open "better care."
21       MR. KEITH:  Alyson, why don't you expand "better
22   care."
23       THE WITNESS:  Under "better care" we can scroll
24   down and you can see -- a good example would be the diabetes
25   care.  So these are measures of diabetic care in my

2138

1    patients.  And we feel that this goes under the better care
2    bucket.  So the hemoglobin A1c, which I can -- so hemoglobin
3    A1c is a measure of the average blood sugar that a diabetic
4    has over the preceding three months, and it's a
5    well-established marker of the severity as well as control.
6        So we know that diabetics whose hemoglobin A1c is less
7    than 8, and even closer to 7, have better long-term outcomes
8    than diabetics whose A1c, like in this case, are greater
9    than 9.  And so I can see at a glimpse that 72 percent of my
10   diabetics are currently treated to the kind of standard.  I
11   have 9 percent of my diabetics that are struggling with the
12   treatment.  And the top number here, this 42 percent, that
13   is an -- those 42 percent of the diabetics have each one of
14   these metrics are -- are to goal.  So at a single glance, I
15   can see -- see what -- how I'm performing or how my patients
16   are doing.  And each month I get the reupdate on this data.
17       MR. KEITH:  And just a quick point, Your Honor, I
18   want to make sure for the record that this is -- what we're
19   looking at now is more or less covered by page 5 of the
20   demonstrative 5105.  Unless Your Honor has another question.
21       THE COURT:  No.  Go ahead.
22   BY MR. KEITH:
23       Q.   Where does the data come from that underlies the
24   scores we're seeing here?
25       A.   So the tool's been developed so that if I hit that

2139

1    info button, I can determine where the data are from.  They
2    come from different places.
3        Can you hit this one, Alyson?  Okay, good.
4        They come from different places depending upon
5    what they are.  In this case, you can see right down here it
6    says -- where does it say it, Alyson?  Usually, it says down
7    here somewhere that it's -- the data are from Epic or
8    Centricity, which are the two main electronic health records
9    that we use in the system.
10       Q.   Why don't we -- Alyson, if you will, close the
11   "better care" category and open the next, "lower cost."
12       THE COURT:  Doctor -- I was going to say you seem
13   to know how to remove the markings or someone
14   else -- Mr. Keith, thank you.
15   BY MR. KEITH:
16       Q.   Why don't you explain to the court what appears
17   here under "lower cost"?
18       A.   So getting at the lower cost part of the equation
19   has been difficult, but one of the easy things to look at in
20   terms of lower cost is the generic prescription rates.  So
21   this -- these data come from claims data from one of our
22   local payors, and it shows what percent of my patients are
23   on these different medicines.  So statins are cholesterol
24   medicines, a PPI is a stomach medicine, steroids,
25   antidepressants, and these are categories of medicines where

2140

1  there are a huge number of inexpensive, very effective
2  generic medications that work as well as the very expensive
3  branded medicines.
4        So we've decided that a good way to lower cost for
5  the patients, for the payors, for the whole system is by
6  using generic medicines whenever possible.  So the amount of
7  money we save by doing that can be quite dramatic.
8        MR. KEITH:  For the record, this is page 13 of
9  Exhibit 5105.
10        THE COURT:  Has there been any effort to identify
11  specific tests -- and perhaps it would be impossible to do
12  that, but perhaps there are unnecessary tests being ordered,
13  and I -- I guess I'm trying to get my head around how you
14  could do it.  Maybe the answer is you can't do that.  It
15  would be very difficult to set up kind of a metric or
16  standard that would gage using certain types of tests that
17  are less expensive, but yet it would give you the necessary
18  information.  Does that become just too patient-specific to
19  actually kind of measure?
20        THE WITNESS:  So it can be, but I'll give you an
21  example.  There is a test called a CT pulmonary angiogram.
22  That's a CT scan that is a specific pulmonary test that
23  looks for blood clots in the lungs.  So that's a very
24  expensive test which also exposes patients to radiation and
25  contrast dye.  So it's very hard to determine whether those

2141

1  tests are being ordered too much or too little because there
2  are specific reasons why that test should be ordered.
3        So what we've done, and it's not in this tool, but it
4  would be in development, is looking at the -- so take an
5  emergency room physician who orders that test a lot, is you
6  can take the emergency room physicians and show who is
7  ordering what number of tests, because over a long period of
8  time, you would expect that they see a similar number of
9  patients.
10        THE COURT:  So you can track it, but you can't do
11  it in this particular --
12        THE WITNESS:  That has not been developed in this
13  tool yet, but it could be.
14        THE COURT:  There was a discussion -- perhaps in
15  this trial or something I read -- about ordering C-sections
16  or having more C-sections performed than perhaps would
17  normally be indicated.  You would compare that against kind
18  of a national -- and Mr. Ettinger got into this with
19  Dr. Souza -- more of a national -- I don't know if
20  epidemiological study, but at least a statistical analysis
21  of how often it should be used and under best practices so
22  you could compare that, as well, with your OBGYN and any
23  family doctors who are performing deliveries, as well?
24        THE WITNESS:  That's correct.  That would be
25  available, and WhiteCloud would be -- and this tool would be

2142

1  a means by which we could display that information to the
2  clinician in a meaningful way.  So as a nonobstetrician, I
3  would look at my hemoglobin A1c rate and compare that to the
4  national average.
5        THE COURT:  Mr. Keith, I have become curious, and
6  I'm not sure you're going to go there, and I'm not sure I
7  should worry about my curiosity and I should worry more
8  about the issues counsel wants to present, but it -- anyway,
9  go ahead.
10        THE WITNESS:  To be fair, it's -- for me it's very
11  exciting because in medicine, to date -- and we'll get into
12  this, I think, later -- we haven't had this kind of
13  information.  And without this information, we really have
14  no way of taking our own pulse and vital signs of how I'm
15  doing as a physician.  So this -- I mean, this is really, in
16  my mind, groundbreaking because I couldn't really compare
17  myself in terms of am I giving better care or not.  I mean,
18  I could say I'm a good doctor because I feel good about
19  myself, but in actual fact I really had no way of comparing
20  myself to how I ought to be.  So, I mean -- I guess I'm just
21  a little enthusiastic.  I apologize.
22  BY MR. KEITH:
23    Q.  Can you tell us, using the screen that we're
24  looking at now, what the triangles on each metric represent
25  and the dash lines represent?

2143

1    A.  If I could use another screen maybe.  I'll do
2  that.  So if you look at -- so take generic prescriber.  And
3  you can see I'm not quite getting an A in that class.  My 96
4  percent is right next to that triangle.  It's a little bit
5  more glaring right here.  But my performance is the bar, the
6  yellow bar.  My peer performance is the triangle right
7  there, so that little triangle.  And that's the -- so I can
8  see how I compare to other doctors in my same -- in my same
9  specialty.
10        And what's kind of nice about this is I'm
11  comparing apples to apples.  So I'm comparing other doctors
12  in Twin Falls, Idaho, using the same data draw, the same
13  claims data, as opposed to if I use this to compare myself
14  to national numbers, like in your C-section rate.  Then
15  there is always a lot of room for me to say, well, they used
16  a different measure, or they had a different denominator, a
17  different numerator, or that doctor operated at different
18  hospitals.  There is a lot of ways to wiggle around the
19  data.  But when I'm comparing myself to the guy next door to
20  me in my office and my triangle is below his bar or vice
21  versa, it's very hard for me to not accept the fact that
22  there is something about my practice right here that I need
23  to fix.
24    Q.  What about the dashed lines, the vertical dashed
25  lines that you see?

2144

1      A.   So those are predetermined that we've agreed as a
2  system, these are sort of the standard.  That's where we
3  hope to go, and that's where you get the points.  If I go
4  above the dashed line, I get 20 points.  If I'm below it
5  within a close range, like in this -- sorry, let's just
6  clear this.  Let's clear this.  So if I'm in a close range,
7  like in this one, I get 13 out of the 20 points.  But if you
8  can see, if there was a red bar that was very low, I would
9  get zero of the 20 points, and that rolls up into the
10  composite score that I have at the very top.
11      Q.   So, Alyson, can you close "lower cost" and expand
12  the category of "patient-centeredness," "patient-centered."
13      A.   So, Your Honor, this will get -- do I have to
14  answer a question?
15      Q.   That's a good question, Dr. Fortuin.  Let me give
16  you another one in response.  What are we looking at here,
17  Dr. Fortuin?
18      A.   So this is the patient centeredness more
19  granular -- that you'd sort of alluded to, Your Honor -- and
20  this is actually 15 questions that a patient -- we have a
21  patient survey that we've developed that patients in our
22  offices submit the survey or they are given the survey, and
23  then we submit the data here so that I can see how -- what
24  my patients really think of me.
25           And so, for example, am I communicating well?

2145

1  Well, 92 percent of my patients or 92 percent of the time
2  they say I communicate well.  And so you could say, well,
3  access to specialists, I'm 78 percent, and you can see my
4  peer is higher than that, so why is it that my patients
5  don't feel that they have the proper access to specialists
6  that they need?  So one of the things that allows me to
7  do -- maybe we can do this, if we can hit that triangle and
8  go to "performance" up here.
9           So if we hit these -- if we hit this field down
10  here, it allows me to see this guy, Jared Helms, 100 percent
11  of his patients feel that he has access to specialists.  And
12  I know Jared, he's across down from me, he's a good
13  internist.  And I can call Jared and say, "Jared, you know,
14  your patients really have access to specialists.  Can you
15  help me out here, because you can see I'm not really doing
16  very well."  And it gives us an opportunity to collaborate
17  and see what is his practice and how do I change my practice
18  so that my patients have the proper access that they need to
19  specialists when they need it.
20      Q.   So why don't we minimize "patient-centered" and
21  expand the category of "better health."  Dr. Fortuin, can
22  you explain to the court, generally speaking, what we're
23  looking at on this screen?
24      A.   So this is the better health category of the
25  scorecard.

2146

1           If you can scroll up just a little bit, Alyson, so
2  we can see the banner.
3           So this is under "population health."  And this to
4  me represents a deviation from traditional medicine as I
5  knew it.  And that is, I would consider myself a doctor who
6  when you get sick you come see me, and I'll try to help you
7  get through your illness.  That's the kind of doctor I would
8  say I used to be.  But I think the new era and the Triple
9  Aim era of healthcare is I'm really responsible for all of
10  your health.
11           So, you know, fall screening is one of the things
12  we're measuring.  Am I screening my patients for falls.  So
13  in other words, rather than waiting for the patient to fall
14  and me take care of them after they have their hip fracture,
15  or what have you, if I can take the initiative to try to
16  help them prevent a fall, or any one of these things, then I
17  actually am taking better care of their health in general.
18  Because obviously a patient who has never broken their hip
19  is a healthier patient than one that broke their hip.
20           So philosophically this is a deviation from the
21  traditional practice of medicine.  I'll be honest with you,
22  I -- I see myself as pretty adaptive, and I feel like I've
23  been pretty, you know, willing to change.  I've heard the
24  Triple Aim, I've wanted to do these things, but it wasn't
25  until I really had the data in front of me that I

2147

1  recognized, boy, you know, my patients -- and I can -- if
2  you hit "fall screening," Alyson, for example.
3           Nobody tell anyone else about this.  So if you
4  look at my trend line, if you can look back here, I was
5  doing a pretty bad job when I first got this.  In fact, I
6  was doing a terrible job.  But today I can be proud of the
7  fact that I'm doing a really good job of screening for
8  falls.  So if I can prevent one fall in my practice by
9  screening for falls better, it seems to me that's had a
10  dramatic improvement in the health of my patients in my
11  clinic.  So if that unfortunate elderly patient who fell and
12  broke their hip never fell, think of the cost implications,
13  the better care for that patient, the better health for
14  them.
15           And this is true of depression, as well, and
16  mammography, all of these things.  The better I do with
17  these sorts of things in the -- like immunizations,
18  et cetera, the healthier my patients are going to be, the
19  fewer illnesses I'm going to have to treat as a "fix me/I'll
20  fix you when you're sick" type of doctor, more of a "I want
21  to make sure you stay healthy" type of doctor.
22      Q.   So I think we've run through the categories now.
23  I want you to give the court a specific example, if you can,
24  of a way that you've used the clinical integration scorecard
25  to provide better or lower-cost care to a particular patient

2148

1  or set of patients.
2      A.  There is a bunch of examples.  If we go to "better
3  care," one I think that I just this -- just this week I've
4  been working on, if you go to "diabetes antiplatelet
5  therapy," you can see that 93 percent of my diabetics that
6  are high risk are on the proper antiplatelet therapy.  And
7  what that means is that's -- their medicine is -- aspirin is
8  the primary one, but there are several others, clopidogrel
9  and others that we use that reduce the risk of stroke and
10  heart attack in diabetic patients.
11      So if I hit that tab -- and this is where I --
12  this tool is so powerful it's amazing to me, but -- okay,
13  sorry, you hit that tab.  Hit the -- sorry, Alyson.  Oops,
14  you hit the detailed list.
15          And what this does is this calls up my patients
16  that are not on aspirin.  So if I were to hit that button,
17  these -- these three people here, these four people, their
18  names would come up, and I could tell you the names but I
19  think it's against the law because it's protected health
20  information.  But in any case, those four people -- and so
21  yesterday in my clinic I had Jessica, my nurse, call them
22  and say, "Hey, how come you're not on aspirin?"
23      So if you think about how this works, in the past,
24  if they were in front of me in my office, we would -- I
25  would ask, "Are you on aspirin?"  But if they have a lot of

2149

1  illnesses and a lot of problems, that may not be something
2  that's on the front burner, so it gets neglected.
3  Negligence isn't something I would admit to in front of
4  lawyers, but the point is it gets put on the back burner,
5  and so I don't necessarily recognize that they're not on
6  aspirin.
7      So they may show up -- say they show up in the
8  emergency room with a stroke.  My first thought is, "Oh, my
9  word, I hope that they're on aspirin, because if they're
10  not, you know, it's really not very good.  But what this
11  tool allows me to do -- and in two of these instances they
12  were on a separate antiplatelet medicine that worked as well
13  as aspirin but it didn't get captured in the tool, but two
14  of the patients were not on aspirin.  So my nurse yesterday
15  called both of them and said, you know, "Why aren't you on
16  aspirin?"
17          And the one had said he had had nosebleeds and had
18  some problems with it --
19          THE COURT REPORTER:  Would you slow down, please?
20          THE WITNESS:  I'm sorry.  I'll try.  Are you
21  ready?
22      So one of the patient's said he had nosebleeds, and so
23  that's why he stopped the aspirin on his own.  But after a
24  conversation about the risks and benefits and why stroke
25  reduction and the reduction in risk of heart attack was more

2150

1  important than -- than -- you know, accepting the risk of
2  the nosebleeds was worth it because of the benefit.
3      So to me, rather than waiting until this patient may
4  have had a stroke or heart attack, we can intervene before
5  that to be sure they're on all the right treatments.  Does
6  that make a little bit of sense?
7          THE COURT:  All right.  Thank you.  Go ahead.
8  BY MR. KEITH:
9      Q.  Can you give the court an example of the way
10  you've used the "better health" category of the tool --
11      A.  Yes.  Sorry.
12      Q.  -- to improve the care and health of your
13  patients?
14      A.  So if we open the "better health" tab, and we
15  go -- I'll take mammograms because it was -- it was a hard
16  lesson for me to learn.  If you look over here, you can see
17  that in October and January of last year, about half of the
18  time it was about 50 percent, half of the time my patients
19  had a mammogram that were supposed to get their mammogram.
20          And when I first got this, I had a lot of
21  reactions.  But my final reaction was I needed to do
22  something different because if the women in my practice are
23  not getting proper mammograms, then they're not getting
24  screened for, you know, a fatal illness, and I'm not doing
25  as well as I could.  So if I were to hit these, I could

2151

1  see -- if you look at the -- look at the sheet -- I can see
2  that other doctors in my same practice are having 90, 91, 93
3  percent of the time their patients are screened for a
4  mammogram, and so somehow I'm way below.  So if I go down
5  here, that blue circle represents me, and the triangle is
6  everybody else, and this is where I am now, but I was down
7  here with this guy, whoever that is, and I was having a very
8  low mammography rate.
9          So what we did is Jessica, who is my nurse, and I,
10  if you remember that list I had, we populated the list of
11  patients that had not had their mammogram that should.  And
12  we went about calling them, and some of the patients had had
13  a mammogram but we hadn't collected the data right, so we
14  put that in.  Other patients had just not gotten their
15  mammogram, so we went about ordering mammograms.
16          At the same time I called Lucy, who is one of the
17  other doctors, and asked her why is it that she has a 100
18  percent, 95 percent mammography rate, and I only have 50.
19  "What do you do differently?"
20          And she explained that in her workflow with her
21  patients, every patient she went through a risk factors tool
22  that was in the electronic record, which since that time
23  I've started to do.
24          And if you press the "done" here, Alyson.
25          You can see that over -- I mean, you can see this

2152

1  graph goes up nicely, and right now I'm at 69 percent of my
2  women -- and the women in my patient -- I shouldn't say
3  that -- the women in my clinic are getting mammograms
4  appropriately.
5           And what's really important about this is just
6  about two weeks ago, a patient of mine -- I can't say her
7  name -- but she came in, and the nurse had called her to get
8  a mammogram, and it was an abnormal mammogram and it ended
9  up being a breast cancer.  And my heart sort of sunk at
10 first because I thought here is this patient who now has
11 breast cancer, you know, and it was sort of -- in my mind, I
12 thought, is this -- was this somebody that we could have
13 helped earlier.  But I can say that had we not had this
14 tool, we would not have called her because we wouldn't have
15 known she hadn't had her mammogram, and we wouldn't have got
16 her in to get the mammogram, she wouldn't have had the
17 biopsy and she wouldn't have had it removed.
18          And so now she has a Stage I/Stage II breast
19 cancer that we, luckily, diagnosed early, and I think it's
20 because of this tool, because without the tool she wouldn't
21 have gotten the mammogram.  And now she has a 90 percent
22 chance of cure and she doesn't need chemotherapy and
23 radiation.
24          So when you think about that one case representing
25 such a dramatic impact on her personal life, but in general,

2153

1  I mean, that's sort of the Triple Aim personified.  She has
2  better health, she is getting better care, and it's a
3  dramatically lower cost because -- talking to oncologists,
4  it could be $100,000 for a treatment of breast cancer that
5  requires chemo and radiation.  So it's a dramatic cost
6  reduction to the patient and to the system.
7           MR. KEITH:  And just for the record, Your Honor,
8  the pages we've been viewing just now are 9, 10, and 14 of
9  Exhibit 5105.
10 BY MR. KEITH:
11     Q.  And I just want to clarify for later on the
12 record, Dr. Fortuin, that the trend line that you were
13 describing is that -- that's over at the right-hand side of
14 the screen, and it's labeled "trend" under "mammography
15 screening"; is that right?
16     A.  That -- yes, the trend line.
17          THE COURT:  Thank you, Mr. Keith.
18          Counsel, we're just about where we take the morning
19 break, and you seem to be pausing.  Would this be a good
20 breaking point or do you want to go for a couple more
21 minutes?
22          MR. KEITH:  I think so, Your Honor.
23          THE COURT:  All right.  Let's take -- try to hold
24 it to a 15-minute recess.  We'll be in recess for 15
25 minutes.

2154

1           (Recess.)
2  ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
3           THE COURT:  Dr. Fortuin, I'll remind you that you
4  are still under oath.
5           Mr. Keith, you may resume your direct examination.
6           MR. KEITH:  Thank you, Your Honor.
7  BY MR. KEITH:
8      Q.  Just a few follow-up questions for you,
9  Dr. Fortuin.  In the past, have you had occasion to receive
10 quality statistics or scores from sources other than
11 WhiteCloud?
12     A.  Yes.
13     Q.  And can you just generally describe for the court
14 what you've received?
15     A.  Frequently, the payors, the health insurance
16 companies, will send information that compares my generic
17 prescription rate or when my diabetic patients had their
18 last A1c and this sort of thing.
19     Q.  And can you describe to the court the way in -- in
20 your view the WhiteCloud analytical tool differs from
21 the -- you know -- so the information in the WhiteCloud tool
22 differs from the information that you received, say, from
23 health insurance companies?
24     A.  So the health insurance company typically presents
25 claims data, meaning did a diabetic have a claim submitted

2155

1  for a hemoglobin A1c and then they -- suppose that means
2  they had it drawn.  But it wouldn't show the A1c value.
3           Or they might say did the patient submit a claim
4  for a certain prescription.  But -- but frequently -- so in
5  one case I'm thinking of, that prescription data comes six
6  and ten months after the prescription, not very close to
7  when the prescription was written.
8      Q.  And for that reason, do you find the WhiteCloud
9  tool more powerful as a means of modifying your practice
10 data?
11     A.  Well, absolutely, because the data are far more
12 meaningful because I get to see the actual value of the A1c
13 or -- or a good example would be the aspirin example.  There
14 is no claim submitted for aspirin.  There is no prescription
15 written for aspirin.  There is no lab value for aspirin.  It
16 has to be put in my record in a way that I can -- I can mine
17 it, if you will, and determine which of my patients are on
18 aspirin or not.  And then once I have that, as -- you
19 couldn't see it because I couldn't show that patient
20 information, but I see the exact patient names of my
21 patients who are not listed as taking aspirin.
22     Q.  And the tool that you described using to input the
23 data on aspirin use, is that Centricity?
24     A.  That's correct.
25     Q.  And are there any other ways in which using

2156

1  Centricity along with the WhiteCloud tool improves the power
2  of the WhiteCloud tool to modify your practice patterns?
3  **A.** Yeah. There are many -- there are many factors
4  that are very important about making the WhiteCloud data
5  meaningful. And the first probably is accuracy. And a lot
6  of the time we have spent so far has been to make sure that
7  the data that WhiteCloud is mining from our record is
8  accurate so that the interfaces are proper so that they
9  actually recognize when I have a patient on aspirin that
10 they are on aspirin so that -- using this example -- so that
11 I can see whether they're on aspirin or not.
12        So the accuracy of the interface -- the accuracy
13 of the tool is important because the way the electronic
14 records work is there are text panes where I can put free
15 text in, and if I just note the patient is on aspirin in the
16 free text pane, then it doesn't -- it's not accessible to
17 WhiteCloud whereas if I put aspirin on the medication list,
18 then WhiteCloud can get that information.
19 **Q.** Is the -- is the accuracy of the WhiteCloud
20 analytical tool important in your mind in driving your
21 practice patterns and those of others towards better health
22 and lower cost?
23 **A.** So it's absolutely critical and here is why: When
24 my mammogram data came back showing -- I spent a lot of my
25 time trying to disprove that to show that I really am a

2157

1  great doctor and this is malarkey because there has to be
2  some mistake. How is it possible that a highly trained
3  physician such as myself, you know, could do that? But I
4  did. And so if the data were inaccurate, I'll immediately
5  discredit the tool.
6        So back to what you asked before. When the payor
7  sends me information on my patients, I may glance at it, but
8  I don't spend much time on it because I know it's claims
9  data. And because it's claims data, it's nowhere near as
10 robust as the her data that I get from WhiteCloud.
11 **Q.** I want you to imagine if you were an independent
12 physician, your own practice in Magic Valley, do you think
13 that you would, in that circumstance, choose to participate
14 in the WhiteCloud analytical tool?
15 **A.** I think -- no. I don't think I would out of the
16 gates want to do that, and there are many reasons I can
17 think of. One is, I'm not sure how it would be paid for. I
18 don't know who would be -- who would be footing the bill.
19 Because now that I have seen it, I recognize the benefit.
20 But prior to that, I don't know that I would have put my
21 money into it.
22        The second thing is, who has the tool is a huge
23 factor for me because there is a tremendous amount of fear
24 that somebody is going to use that information against me.
25 So are they going to refer patients away from me? Are they

2158

1  going to, you know, reduce the fees that the insurer pays
2  me? Are they going to put that out in a public forum that's
3  embarrassing to me? So the fear associated with being very
4  transparent with my data to just anybody is pretty
5  overwhelming from my perspective.
6        MR. KEITH: Thank you, Your Honor. No further
7  questions.
8        THE COURT: Mr. Su.
9        MR. SU: Thank you, Your Honor.
10               CROSS-EXAMINATION
11 BY MR. SU:
12 **Q.** Good morning, Dr. Fortuin.
13 **A.** Good morning.
14 **Q.** Mr. Keith first asked you about your employment,
15 and you said you had a contract with St. Luke's.
16 **A.** That's correct.
17 **Q.** You're paid on a wRVU basis?
18 **A.** That's correct.
19 **Q.** Correct?
20    You've talked a lot about Centricity, and that's
21 your -- that's your EMR system; right?
22 **A.** That's correct.
23 **Q.** How many years have you used that?
24 **A.** We implemented in '06.
25 **Q.** And that was before your practice became part of

2159

1  St. Luke's clinic; correct?
2  **A.** That's correct.
3  **Q.** In fact, at that time your practice was called
4  Snake River Internal Medicine?
5  **A.** Correct.
6  **Q.** And it was a member of a -- of an individual
7  practice association or IPA called Southern Idaho Healthcare
8  Cooperative; right?
9  **A.** That's correct.
10 **Q.** And the cooperative had as its members many of the
11 other independent physician practices in Twin Falls?
12 **A.** Yes, sir.
13 **Q.** And the objective of the cooperative was to create
14 a clinically integrated network for physicians?
15 **A.** Yes.
16 **Q.** Let's look at Trial Exhibit 1423 --
17        MR. SU: Which has been preadmitted, Your Honor.
18 Could we pass up a notebook to the witness, please,
19 Mr. Beilein?
20        MR. KEITH: If you have a spare, I'll take one.
21 BY MR. SU:
22 **Q.** So, Doctor, you know, we could do it one of two
23 ways. You have the option of we can enhance something on
24 the screen, but if it's easier for you to read the text of
25 this exhibit in the notebook, you can do that as well, sir.

2160

1    So Trial Exhibit 1423, do you see that in front of you,
2  sir?
3        **A.  Yes, sir.**
4        **Q.**  And you saw this at your deposition; correct?
5        **A.  To my recollection, yes.**
6        **Q.**  And it's the Clinical Integration Plan for 2007
7  for the Southern Idaho Healthcare Cooperative?
8        **A.  Yes, sir.**
9        **Q.**  If we turn to page 4 of this document.
10            MR. SU:  And if you would, Mr. Oxford, highlight
11  the text immediately under the first heading, "Clinical
12  Integration Program Purpose."
13  BY MR. SU:
14        **Q.**  So the purpose of the cooperative was to create a
15  clinically integrated network of physicians; correct?
16        **A.  Yes, sir.**
17        **Q.**  And under the -- under the -- that heading, you
18  see a number of bullet points.  One of them is to "use
19  evidence-based medicine to reduce overuse, underuse, and
20  misuse"; correct?
21        **A.  Yes, sir.**
22        **Q.**  And -- and earlier today when Mr. Keith was asking
23  you about, you know, the -- the idea that you can -- you're
24  presented with information about how you're doing and how
25  you're doing compared to your peers, that -- that's what

2161

1  we're talking about, right, it's evidence-based care;
2  correct?
3        **A.  So the metrics we're using, we have applied**
4  **evidence-based medicine to determine what standard that we**
5  **would like to hold ourselves to.  The comparison to our**
6  **peers is not really -- I don't know that that's evidence**
7  **based, per se.  That's just part of how we present the data.**
8        **Q.**  Fair enough.  But the metrics that you're using
9  like the -- like the metrics that you -- that you
10  demonstrated to the judge --
11        **A.  That's correct.**
12        **Q.**  -- in your scorecard tool, that's evidence-based
13  care?
14        **A.  Sorry for interrupting, yes, that's correct.**
15        **Q.**  Thank you.  You see there is a second bullet point
16  that talks about one of the objectives of the cooperative
17  being to create an integrated care delivery network?
18        **A.  Yes, sir.**
19        **Q.**  And also create efficiencies in the area of
20  disease management; correct?
21        **A.  Yes, sir.**
22        **Q.**  Now, if we look at -- now that --
23            MR. SU:  Mr. Oxford, if you could go down to the
24  lower half of the page to the goals, I would like to
25  highlight -- let's go ahead and highlight the last bullet

2162

1  point, the very last bullet point of that page.  The very
2  last bullet point at the very bottom of the page, sir.
3  Thank you.
4  BY MR. SU:
5        **Q.**  One of the goals of the cooperative was to adopt
6  an ambulatory her system that would apply to all of the
7  physician practices that were members of the cooperative;
8  correct?
9        **A.  That's correct.**
10        **Q.**  And they would be integrated with the hospital in
11  the community?
12        **A.  Yes.  Each individual her would integrate with the**
13  **hospital system.**
14        **Q.**  And that's the Magic Valley Regional Medical
15  Center you're talking about?
16        **A.  At the time, yes.**
17        **Q.**  All right.  Let's now look at -- let's -- let's
18  turn to -- let's turn to page 13 of this exhibit, please.  I
19  would like to highlight the last -- the text under the last
20  heading, the only heading on that page, which reads,
21  "Implementation of EMR and data integration among
22  providers."
23        Do you see that the goal was -- was to get the -- all
24  of the physician practices in the cooperative to adopt the
25  common EMR?  Correct?

2163

1        **A.  I was just reading it.  Yes, that's correct.**
2        **Q.**  And that -- and it was -- the cooperative
3  recognized that "it's a critical enabler of data collection
4  capabilities to facilitate further quality improvement
5  initiatives."  Have I read that right?
6        **A.  That's correct.**
7        **Q.**  And then if you look at the second paragraph
8  there, the first sentence reads -- well, the only sentence
9  reads, "SLMVRMC will provide support of EMR implementation
10  in order to speed adoption and provide necessary clinical
11  and IT expertise to assist in implementation, thus reducing
12  common barriers to adoption by physician practices."
13        Have I read that right?
14        **A.  Yes, sir.**
15        **Q.**  And SLMVRMC, what was that?
16        **A.  That's St. Luke's Magic Valley Regional Medical**
17  **Center.**
18        **Q.**  So this effort, this -- this effort on the part of
19  the cooperative to adopt a common ambulatory EMR had the
20  support of the St. Luke's Magic Valley Regional Medical
21  Center?
22        **A.  Yes, sir.**
23        **Q.**  All right.  Now, if we turn to -- I would like to
24  direct your attention to the appendix, sir, which is at the
25  back.  It would be the 20th page of this document.  Do you

2164

1  see that, sir?
2      The pages that follow the appendix were the set of
3  clinical integration program initiatives that the
4  cooperative had outlined -- set forth in writing to pursue;
5  correct?
6      **A.** Yes.
7      **Q.** And if you look at the first initiative, which
8  is --
9          MR. SU: Let's turn the page, yeah, and highlight
10 that, please.
11 BY MR. SU:
12     **Q.** The first initiative is entitled "Electronic
13 Medical Record EMR Initiative"; correct?
14     **A.** Yes, sir.
15     **Q.** And so it says here under Project 1 what the
16 cooperative was pursuing was the adoption of the GE
17 Centricity EMR; correct?
18     **A.** Correct.
19     **Q.** And that's -- Centricity is the -- is the EMR
20 system that you're using now at the clinic?
21     **A.** Also correct.
22     **Q.** All right.  And do you see that under Project 2,
23 sir?
24     **A.** Yes, sir.
25     **Q.** The cooperative recognized that the EMR system

2165

1  would be able to develop alerts and prompts based on
2  evidence-based medicine protocols appropriate to each
3  medical or surgical specialty.  Do you see that?
4      **Q.** Yes, sir.
5      **Q.** Have I read that correctly?
6      **A.** That's correct.
7      **Q.** All right.  Now, it's correct, too, that the
8  cooperative was successful in getting some of the
9  member-physician practices to adopt Centricity, right?
10     **A.** Yes.  Although I don't know that the cooperative
11 adopted -- you know, was responsible for that.  If I could
12 clarify?
13     **Q.** Yes, sir.  Go ahead.
14     **A.** The practices were all managed by what's -- by an
15 MSO, a management services organization, that was a
16 department, if you will, or a company within the hospital,
17 initially Magic Valley Regional Medical Center and then it
18 was taken over by St. Luke's Magic Valley Regional Medical
19 Center after the merger.
20         And each of those individual practices in a
21 sequential fashion had Centricity implemented, partly
22 because St. Luke's Magic Valley Regional Medical Center and
23 the cooperative both had the same goal of implementing
24 Centricity.  But the -- one of the problems we found is that
25 the Centricity did not communicate from one practice to the

2166

1  other unless the practices themselves were integrated.  So
2  the clinical integration itself did not allow for the record
3  to be integrated to the degree that we had hoped.
4      **Q.** But -- but the -- but it's correct -- it's your
5  testimony that these managed practices had adopted
6  Centricity during the time that the cooperative was in
7  existence; correct?
8      **A.** Yes.  Many of them had -- although I don't know
9  which ones and I think some of them had not.
10     **Q.** And just so the record is clear, when you -- when
11 you talk about something being a managed practice, these
12 were physician practices that were managed by this
13 management services organization or MSO?
14     **A.** Yeah.  I guess to clarify for my life, I had a
15 practice -- there were four of us and we contracted with the
16 MSO to provide management and administrative services for
17 our practice.
18     **Q.** Right.  So the MSO would provide management or
19 administrative services like billing and coding and then
20 they would take a percentage off the top of the receipts as
21 the payment for those services; correct?
22     **A.** That's correct.
23     **Q.** And the -- and the balance would go to your
24 practice and be distributed among your partners under your
25 partnership agreement?

2167

1      **A.** That's exactly right.
2      **Q.** Now, you're happy with Centricity; right?
3      **A.** Yes, sir.
4      **Q.** In fact, you talked about -- you gave the judge an
5  example of the situation where you were able to ask a
6  urologist for a consult on a patient that came by with blood
7  in his urine; correct?
8      **A.** That's correct.
9      **Q.** And the -- you also mentioned when Mr. Keith asked
10 you about that, this is an up-to-date program?
11     **A.** Yes, sir.
12     **Q.** Is that an off-the-shelf program?
13     **A.** That's just a online medical textbook that we
14 access through our computer system.
15     **Q.** And -- and for Centricity to work with the
16 clinical integration scorecard tool that you've demonstrated
17 today, it -- it -- what it means is that the scorecard tool
18 is able to extract the discrete data -- data elements that
19 it needs to provide the -- the metrics; correct?
20     **A.** That's -- well, Centricity has to house discrete
21 data elements that the scorecard tool has to extract; that's
22 correct.
23     **Q.** And the same thing is being done, as you
24 understand it, with the extraction of data elements from the
25 Epic system in the Treasure Valley; correct?

2168

1  **A.   That's what I'm told, but I don't currently work**
2  **on Epic.**
3       **Q.**   Do you have an understanding that the scorecard
4  tool has been made to -- it's been -- it's been worked on
5  such that it can extract data elements from eClinicalWorks
6  used by Saltzer?
7       **A.   I have been told that, but I have been told that**
8  **they're working on extracting those -- those data.**
9       **Q.**   Okay.
10           MR. SU:   If we could, Mr. Oxford, turn back to
11  Trial Exhibit 1423.  I would like to go to page 15 of that
12  document now, please.  And if we would -- could, highlight
13  the text under "Performance, Measurement and Incentive
14  Program" in the middle of the page.
15  BY MR. SU:
16       **Q.**   So one of the initiatives that the cooperative was
17  working on was a way to provide the member-physicians with a
18  performance report; right?
19       **A.   Yes, sir.**
20       **Q.**   And if you see under the -- in the text there, the
21  last sentence of that first -- that paragraph, it reads,
22  "Reporting performance measures across peers is a strong
23  motivator for physicians to improve their scores, or in the
24  case of underperforming physicians, to self-select out of
25  programs."

2169

1  Do you see that?
2       **A.   Yes, sir.**
3       **Q.**   And that's really -- that's what you were
4  describing to the judge earlier, right, when you said that,
5  you know, if the guy down the hall, you know, has a better
6  score than you, that that's going to force you to figure out
7  what you're doing wrong; right?
8       **A.   No.  I think that is exactly -- I mean, my whole**
9  **description this morning is the fruition of this**
10  **conceptualization from 2007.**
11           MR. SU:   And if we could, let's just look down,
12  Mr. Oxford, at the 35th page of the exhibit.  It's not
13  really -- this is where it doesn't -- the numbering doesn't
14  work out so well, I think.  Do we have that?  No.  I'm
15  sorry.  That's not it.  I don't know where that one is.
16  We'll go past that.
17  BY MR. SU:
18       **Q.**   You were talking to the judge about the -- the
19  categories under better health, and you testified about, for
20  instance, "fall screening"?
21       **A.   Yes, sir.**
22       **Q.**   And if I recall correctly, the peer group was at,
23  like, 21 percent?
24       **A.   Yes, sir.  I -- I don't remember.  I -- I believe**
25  **you.**

2170

1           MR. SU:   Is it possible to pull that back up?  I'm
2  not trying to mislead, Dr. Fortuin, but that was my
3  recollection.  All right.
4       So let's look -- go under "better care" is what I
5  recall.  And then -- I'm sorry.  Not "better care."
6  "Population health."  That's right.  In the "fall
7  screening."
8  BY MR. SU:
9       **Q.**   And you told the court that the triangle is where
10  the peer is -- the peer group is; right?
11       **A.   That's -- yes.  That's correct.**
12       **Q.**   Okay.  So you may be at 92 percent or 91 percent,
13  but what explains the fact that the triangle is right there
14  where it is?
15       **A.   I would say there is probably a lot of reasons why**
16  **the triangle isn't farther to the right.  Perhaps other**
17  **physicians haven't adopted the fall screening tool that I**
18  **use.  I know -- I can't speak to the doctors who work within**
19  **the Epic environment, but in the Centricity environment, we**
20  **have rolled out the tool electronically, and I have also**
21  **implemented in my practice a sort of team-based approach**
22  **where my nurse does the fall screening before me, before I**
23  **even get into the room and when the fall screening comes out**
24  **as high, then I address it.**
25       **Q.**   So that -- so before you had the tool, were you

2171

1  doing fall screening?
2           THE WITNESS:   Well, Alyson, if you hit that
3  button.
4       So, yes, I was screening roughly for falls but not to
5  the same degree and not in a more -- not in a -- not using
6  an evidence-based tool that -- that we have now implemented.
7  It was more my clinical judgment, my guess as to whether
8  they would fall or not or they were -- you know, whether
9  they look like they're at risk for falling, so it was not
10  very evidence based.  It was not robust.
11  BY MR. SU:
12       **Q.**   Are you saying you weren't doing it for all
13  patients?  Is that what you're saying?
14       **A.   I was not doing it -- well, this -- this, by the**
15  **way, is not all patients.  This -- these are patients**
16  **greater than the age of 65.**
17       **Q.**   Yes, sir.
18       **A.   So I was doing it selectively on patients that**
19  **clinically would seem to be at high risk for falls.  If they**
20  **were on high-risk medications, if they were using a walker**
21  **or wheelchair or had a gait abnormality or the more glaring**
22  **things that put a person at increased risk of falling.**
23       **Q.**   And when you were doing that, did that -- that
24  make you a bad doctor, that you were focusing on those kinds
25  of characteristics?

2172

1    A.  I think I was as good a doctor as I could be with
2    the tools I had at my disposal.  But having this tool at my
3    disposal helps me be a better doctor.
4    Q.  But it all adds -- it all starts with your own
5    mindset, right, you want to do the best for your patients?
6    A.  Well, I think every physician does.
7    Q.  Right.  And in fact, since every physician does,
8    it would be great, right, in your -- in your opinion, if
9    this tool were made to all -- available to all the doctors
10   in the Twin Falls community; right?
11   A.  You're -- you're -- you're right.  The tool is
12   available.  You can Google it and download the tool and you
13   can implement it and you can use it.  That's absolutely
14   true.
15        The difference is how do you get that information
16   displayed in such a way that I can sort of get a report card
17   of how I'm actually doing.  So -- so, for me, it's nice to
18   look at this and say, well, I'm doing pretty well with fall
19   screening so I can focus my efforts on other -- other things
20   that maybe I need more work on, you know, like the aspirin
21   example or what have you.
22   Q.  But I guess what I'm saying is -- what I'm asking
23   you is, based on your testimony -- testimony today, I gather
24   that you're a convert to this -- to this clinical
25   integration scorecard tool; correct?

2173

1    A.  A convert, you said?
2    Q.  Yes, sir.
3    A.  Yeah.  Oh, absolutely, I mean I'm very fond of it.
4    Q.  You would tell your friends and colleagues in the
5    community about what a great tool this is; right?
6    A.  Yes.  I demonstrate it to them frequently.
7    Q.  And -- and I believe you have friends and
8    colleagues who are not part of St. Luke's clinic who are
9    also similarly culturally aligned; right?
10   A.  That's correct.
11   Q.  And these are people that, you know, if they had
12   the access to the tool and could share their data, they --
13   they want to be on it, too, right?
14   A.  They do.
15   Q.  And it's also your view that, in fact, that it
16   would be great if, you know, a network like the Select
17   Medical Network had independent physicians; right?
18   A.  Yeah.  Yes, I do.  I do believe that.  I mean, you
19   know, you're asking me a lot of questions.  I guess what I
20   would say is, that St. Luke's clinic patients, my -- my
21   patients get cared for by many different doctors, some of
22   whom are outside of the St. Luke's clinic.
23        So the better relationship I have with them and
24   the more I can make sure that patients are seeing physicians
25   who are, you know, trying to -- they're seeking the same

2174

1    mission, the same Triple Aim type of mission, the better
2    it's going to be for those patients and the network provides
3    an opportunity to have a relationship with physicians who
4    may be philosophically, you know, in line with kind of the
5    Triple Aim, say, but don't necessarily want to have a
6    contractual relationship with St. Luke's.
7        The -- the -- one of the barriers to this is that
8    these physicians that you've -- you've alluded to, these
9    friends of mine in Twin Falls, they either do not have a
10   medical record or their medical record, you know, has not
11   built an interface with, you know, the WhiteCloud tool and
12   so the time and effort and money associated with that hasn't
13   been spent.  And the physicians who don't have an electronic
14   record necessarily don't want to pay for that.  It's not
15   worth it for them to buy that.  So there is no way to
16   interface the WhiteCloud tool with a paper chart.
17   Q.  Right.  But when we talk about St. Luke's Triple
18   Aim and one of the -- you know, one of the aims is
19   population health; right?
20   A.  Yes, sir.
21   Q.  It would be great -- I mean, it would help fulfill
22   St. Luke's mission if everybody in the community, all the
23   physicians in the community could have access to the same
24   tool; right?
25   A.  I mean, I think anything we can do to improve the

2175

1    care delivered to patients is good for the population.
2    That's -- I mean, I -- maybe what you're getting at is how
3    do you define the population?  Is the population all of
4    Idaho?  All of Southern Idaho?  All of America?  You know,
5    it depends on how far you want to cast that net.  So, yeah,
6    I think the more we can work together to provide better care
7    for patients, the better the world is going to be.
8    Q.  Certainly, the population in the areas where the
9    St. Luke's Health System provides services; correct?
10   A.  Yeah.  I -- I think what's nice about St. Luke's
11   mission is that it doesn't confine itself to our patients or the
12   people that come to us.  It's the people in our region.
13   It's a pretty broad scope.
14        MR. SU:  Thank you, sir.  No more questions,
15   Your Honor.
16        THE COURT:  Redirect, Mr. Keith.
17        REDIRECT EXAMINATION
18   BY MR. KEITH:
19   Q.  Dr. Fortuin, just a few questions.  Counsel for
20   the government asked you a number of questions about the
21   plans and goals of an organization called the Southern Idaho
22   Health Cooperative.  And I noticed the conspicuous absence
23   of a question I'm going to ask you now.  How successful was
24   that organization?
25   A.  Not.

2176

1  Q.  And why not?

2  A.  I think there were a variety of factors.  I think

3  the obstacles I described where this -- the independent

4  physicians who were part of the cooperative but not part of

5  the MSO had fear of the -- of Magic Valley Regional Medical

6  Center.  And that goes back to the history in Twin Falls.

7  There was a lot of division and a lot of distrust among

8  physicians with each other, physicians within

9  administration.  So there was a lot of fear.

10      There were a lot of physicians that were not

11  philosophically in agreement with the whole cooperative

12  idea, the idea of being integrated and working together.

13  Many of the physicians simply didn't -- didn't want to share

14  their data, didn't want to be on the same record.  They

15  wanted to do their own thing.

16      And then also a part of that is that there -- at

17  the time where, you know, just culturally, there was -- it

18  was very hard to fund it and a lot of the payors were not

19  particularly interested in pursuing a robust cooperative

20  relationship with -- with the Southern Idaho Healthcare

21  Cooperative.

22  Q.  And why is that important?  Why is it important

23  that the payors cooperate with an entity like Southern Idaho

24  Health Cooperative to make it successful?

25  A.  So this will seem a little awkward, but take the

2177

1  patient I described who had the mammogram with the earlier

2  diagnosed breast cancer, right?  So suppose,

3  hypothetically -- and we don't know the outcome of her case

4  yet because she is still having her surgery -- but suppose

5  by implementing this tool I diagnosed breast cancer earlier

6  such that she needs very limited treatment, a surgery and

7  that's it.  And if I were to diagnosis it later, then she

8  would need a surgery, maybe chemotherapy and maybe

9  radiation.  Maybe it's a hundred thousand -- I'm going to

10  guess just a number, a hundred thousand dollars in

11  treatment.  Well, by reducing the need for that treatment,

12  it -- it's saving the patient a bunch of money.  It's saving

13  the insurance company a huge bucket of money, but it's

14  actually -- I am not making as much money because I'm not

15  giving chemo, I'm not giving radiation, I'm not seeing the

16  patient back.

17      And it's this very, if you will, perverted

18  incentives that the current healthcare system has where we

19  get paid more for people who are sicker.  So there is really

20  very little incentive for me financially, that is, there is

21  no financial incentive for me to try to keep people healthy

22  before they get sick.

23      So -- so there was sort of this disconnect

24  between, you know, the fee-for-service type of payment model

25  and what we are trying to accomplish.  And if the payors

2178

1  were not -- didn't want to partner, then we, basically -- we

2  use the phrase "gored our own ox," we would -- we would

3  damage our own business model by trying to do, you know, the

4  right thing, the Triple Aim.

5  Q.  Did the participants or the -- the folks who

6  anticipated -- are participating in the Southern Idaho

7  Healthcare Cooperative ultimately choose to take a different

8  tact towards achieving the Triple Aim?

9  A.  Yeah.  I think what -- what happened is that more

10  and more physician practices became more tightly aligned

11  with the Medical Center, and, in fact, the relationship sort

12  of changed where instead of me contracting -- me having a

13  contract with them to provide administrative services, they

14  basically owned the practice, Magic Valley Regional Medical

15  Center and eventually St. Luke's Regional Medical Center,

16  St. Luke's Magic Valley Regional Medical Center, sorry, they

17  own the practice and they contracted with me to provide

18  physician services to them.  So most all the physicians in

19  Twin Falls -- in fact, all the St. Luke's clinic physicians

20  in Twin Falls are now in that model.

21  Q.  In speaking for your own decision or your practice

22  group's own decision, why did you -- why did you decide to

23  more fully financially integrate with the Regional Medical

24  Center rather than pursue the option of trying to develop

25  the Southern Idaho Health Cooperative?

2179

1  A.  So there were several drivers of that.  One was

2  the cost of the care we were delivering became increasingly

3  expensive, so things like paying for the electronic medical

4  record and those sorts of expenses were getting higher and

5  the reimbursement wasn't going up, you know, along with

6  that, whereas being an owned practice, the hospital could

7  absorb that expense and could -- could pay for those sorts

8  of things.

9      The second driver was this integration.  Because

10  my electronic record couldn't communicate with other

11  practices that were not integrated, there was -- we were

12  still in our own silo, if you will, and we couldn't have

13  that cross-communication when a patient went from my office

14  to the gastroenterologist's office or the cardiologist's

15  office.  When we fully integrated, the record became the

16  patient's record and it went with them wherever they went.

17  Q.  Counsel for the plaintiffs asked you some

18  questions about the ability of WhiteCloud to interface with

19  different types of electronic health records.  I wanted to

20  ask you some details about that process.  So you are

21  familiar with the work that goes into extracting -- the work

22  that goes into making sure that WhiteCloud can extract data

23  from Centricity, is that right?

24  A.  Yes.  I'm not a computer programmer, but I

25  understand from the clinician's point of view how data has

2180

1  to be entered in and that there are often snafus, if you
2  will, in that process, and so that's when we reach out to
3  WhiteCloud and they help fix it and help to understand it,
4  so, yeah, that's how I understand it.
5      Q.  And so there is work involved in insuring in the
6  first instance that their -- that WhiteCloud has the ability
7  to extract data from Centricity?
8      A.  Correct.
9      Q.  And going -- on a -- so going-forward basis, are
10 there costs associated with maintaining WhiteCloud's ability
11 to extract data from Centricity?
12     A.  Absolutely.
13         MR. SU:  Foundation.
14         THE COURT:  I'm sorry?
15         MR. SU:  Foundation.
16         MR. KEITH:  Your Honor, I think the --
17         THE COURT:  Let's lay a foundation as to how the
18 witness knows.  I'm assuming that he is involved in some of
19 those decision-making, but we need a foundation.
20 BY MR. KEITH:
21     Q.  And, Dr. Fortuin, I believe you testified that you
22 were involved at least not necessarily on a programming
23 level but on a programmatic level with IT work in the Magic
24 Valley; is that correct?
25     A.  That's correct.

2181

1      Q.  And so part of your work is, in fact, ensuring
2  that the Centricity tool is used in such a way that it can
3  interface with WhiteCloud?
4      A.  So there is two answers to that question.  One is
5  trying to educate the clinicians on how to enter the data
6  into Centricity so that it can be extracted from WhiteCloud,
7  and then the second piece of work is, the clinician -- the
8  clinicians -- we all provide feedback to WhiteCloud when the
9  extraction isn't exactly right so it improves the accuracy.
10         MR. KEITH:  Your Honor, I think that lays a
11 foundation for his testimony about the work that is required
12 to maintain the -- the interface between these two
13 electronic systems.
14         THE COURT:  I'll allow it.
15 BY MR. KEITH:
16     Q.  Dr. Fortuin, can you explain to us the work that's
17 involved on a continuous basis in making sure that their --
18 that WhiteCloud can interface with Centricity and back and
19 forth?
20     A.  So there is a large body of work that goes around
21 that.  Certainly, there is -- it's obvious that WhiteCloud
22 is doing a tremendous amount of work to do this, but on my
23 end, we have a one-hour meeting every week where we sit down
24 and talk about the interfaces, talk about Centricity, talk
25 about the tool.  In fairness, we also talk about the patient

2182

1  portal and other aspects of the electronic health record,
2  but there is a lot of human time, work time dedicated to the
3  processes you just described.
4      Q.  And is WhiteCloud a static tool?  And by that I
5  mean you sort of establish the metrics you're going to look
6  at, and the way it's going to look, you're done, wash your
7  hands of it, and the work is sort of over for now?
8      A.  No.  In fact, it's sometimes frustrating because a
9  month ago they added a couple of metrics that I wasn't doing
10 as well on, so now I had to figure those out and it was a
11 little bit frustrating.
12         And so -- so it continues to evolve in several
13 ways: One, the points attributed to each metric evolve as
14 we determine which metrics may or may not be more important,
15 the -- where the standard is, is moving based on new
16 evidence and new findings that we have, and then which
17 metrics.  We are adding metrics all the time to accommodate
18 requests of different physician groups that have different
19 focus within their practice.
20     Q.  And I take it that as the WhiteCloud tool changes
21 over time, adds elements, changes the way certain metrics
22 are acquired or displayed, that that requires work on the
23 back end in the electronic health record to make sure that
24 the two systems interface properly?
25     A.  Yes.  There is that work but there is also work --

2183

1  so take the fall -- we have talked about fall prevention,
2  and we had to develop the tool in Centricity in order to do
3  the fall screening so that it could be done electronically
4  and then captured by WhiteCloud because previously we had
5  used paper forms of the fall risk assessment.  So that takes
6  time to -- to build that into the electronic record.
7      Q.  And Mr. -- counsel for the plaintiffs asked you
8  about whether you had colleagues in the -- independent
9  colleagues in Twin Falls who were philosophically aligned
10 although not financially aligned, and whether they wouldn't
11 be eager to join in using the WhiteCloud tool.  And I wonder
12 if you can speak to the -- I wonder what -- he was sort of
13 putting you in the mind of your independent colleagues and
14 whether they wouldn't want to join in and use WhiteCloud.
15         And I guess now that we have discussed the costs
16 associated with maintaining the interoperability, I wondered
17 if you could speak to that question; that is, do you believe
18 that the independent colleagues that you are philosophically
19 aligned are likely to participate in the WhiteCloud tool?
20     A.  So the best answer I could give for that is, I
21 think the independent colleagues want access to their own
22 data.  I think they want control over which data and what
23 metrics and what standards.  I think they want to do it
24 their way.  I mean, their -- their name sort of says it.
25 They're independent.  They have their idea about doing

2184

1  things.
2       So if I were to go to them and say, Here is the
3  WhiteCloud tool, you can participate with it, but everyone
4  else in St. Luke's is going to be able to see your
5  performance and how you're doing.  And by the way, we have
6  already established what the measurements are and what the
7  standards are and what gives you a green, yellow, or red
8  mark, what gives you these many points.  I would say that
9  most -- most independents would just ask you to kindly
10 leave, especially when you said, And you've got to pay for
11 it.
12      Q.  And when you say we developed the metrics and what
13 counts as good or appropriate care, who is the "we"?
14      A.  Well, I -- I think that's been a collective effort
15 to some degree.  Many of the metrics are well established
16 and well accepted, you know, nationally among national
17 forums and groups.  Several of them were -- were adjudicated
18 by a what's called a measurement subcommittee that looked at
19 what measurements we're doing.  And quite honestly, the
20 chief of quality of the system and other thoughtful
21 clinicians sat down and sort of just put it together as a,
22 you know -- and it's -- it's sort of a work in progress, as
23 you alluded to earlier.
24      So the amazing thing is that the physicians have
25 accepted it within St. Luke's and are using it and they

2185

1  understand the -- the -- some of the conflicts within it.  I
2  mean, a brief example, the standard for mammography is not
3  the same.  Some expert groups say from 40 to 60 you should
4  have a mammogram every two years.  Others say from 50 to 75
5  you should have a mammogram every two years.  So there is
6  some discord in the professional communities as to -- or
7  expert communities as to what is the standard.  But in
8  St. Luke's, the physicians I have talked to have all
9  accepted the standards with minimal push back in that
10 regard.  I don't know if that answers your question at all
11 but --
12      Q.  If -- if your practice group decided to leave the
13 St. Luke's clinic and operate independently but you remained
14 philosophically aligned and interested in working together,
15 do you think that St. Luke's could achieve the Triple Aim as
16 efficiently and as effectively as having you closely
17 financially aligned with the system?
18      A.  No.
19      Q.  Why not?
20      A.  Well, efficiency is one thing.  Using the Southern
21 Idaho Healthcare Cooperative, we -- we have been -- in '07
22 we tried to do what St. Luke's has been doing for the last
23 couple years, and in that couple years, St. Luke's has
24 gotten us to a point where we have the data that Mr. Su, you
25 know, referred to or the -- the goals that we had set forth

2186

1  to do.  So it was very inefficient.
2       In trying to get physicians to philosophically
3  change their practice like I described my philosophical
4  change from being "I'll fix you when you get ill; if you get
5  sick come see me," to a more comprehensive, "I want to keep
6  you healthy," you know, type of physician, that
7  philosophical change is very difficult and without the tight
8  alignment with St. Luke's, I don't think I would have
9  necessarily gone there.  I'm not sure I would have come to
10 that recognition.
11      And I think the other thing is there is a lot of
12 fear out there with -- with disparate groups that have sort
13 of loose interact -- or loose ties, these clinical
14 integration ties being a part of St. Luke's, and that's why
15 I think you corrected me when I said "we," I sort of think
16 of me, we, us as St. Luke's.  We're all part of the -- we're
17 all part of the process.  We're all part of the mission that
18 we're trying to accomplish.
19      MR. KEITH:  Thank you, Your Honor.  No further
20 questions.
21      THE COURT:  Recross.
22      MR. SU:  May I have recross, Your Honor?
23      THE COURT:  Briefly.
24      MR. SU:  Thank you.
25              RECROSS-EXAMINATION

2187

1  BY MR. SU:
2       Q.  Dr. Fortuin, Mr. Keith asked you about the mindset
3  of the independent physicians in Twin Falls.  Isn't it true
4  that you have felt that it would be important to have an
5  independent physician member on the clinical integration
6  committee of your -- under your Physician Leadership Council
7  of Magic Valley?
8       A.  I think we have gone back and forth on that.  I
9  think -- I think it's -- in the interest of collegiality
10 because we're friends with these -- these other physicians
11 that we have been open and inclusive with them as much as we
12 can, there are certain -- I think there are certain business
13 and financial things we can't really be as transparent
14 about.  But in as much as we can, yeah, I've been -- I've
15 felt that way.
16      Q.  Mr. Keith also asked you about the importance of
17 financial alignment.  Isn't it true that in your view this
18 whole -- the role of compensation isn't as important as
19 changing the culture, the way that physicians practice and
20 deliver care?
21      A.  Well, I think compensation plays a very high role
22 in -- in motivating people.  We can't base -- I don't --
23 we -- I don't think that we could base what we're doing on
24 altruism or -- or just the good of the order alone.  I think
25 that having a sustainable clinical and business model is

2188

1  critical and a lot of -- I mean, everybody is motivated by
2  different things, and I think certainly if we -- if we make
3  our mission something that is damaging to a physician's
4  business model, that's going to be very counterproductive.
5      Q.  But isn't it true that you have expressed a view
6  that change in compensation is a very complicated thing to
7  do because a physician is going to be -- is not going to be
8  clear about what the cause-and-effect relationship is
9  between pay and performance. The example you gave me was do
10 I get paid more money if more of my diabetics are controlled
11 or do I get paid less money if my blood pressure patients
12 have high blood pressure; right?
13     A.  So I agree that culture and philosophical
14 perspective and my commitment to my patients is far and away
15 a much greater motivator than money ever could be. So I
16 agree with you.
17     Q.  Isn't it also true that you've -- you've expressed
18 a view that this can't be a top-down approach. I mean, your
19 rank and file within the St. Luke's clinic have to buy in to
20 what the leadership is doing. If that doesn't happen, then
21 this -- this effort to pursue the Triple Aim is a failure,
22 right?
23     A.  Absolutely.
24     Q.  Now, Mr. Keith asked you about what happened to
25 the Southern Idaho Healthcare Cooperative. Isn't it true

2189

1  that the financial alignment between individual practice
2  groups and the Medical Center was happening independently of
3  what the cooperative was trying to do at the time?
4      A.  Yeah. I don't know how independent -- I mean,
5  those were happening -- happening contemporaneously. I
6  don't know that they -- one was causing the other.
7          MR. SU:  Thank you. That's all the questions,
8  Your Honor.
9          THE COURT:  Anything else?
10         FURTHER REDIRECT EXAMINATION
11 BY MR. KEITH:
12     Q.  Dr. Fortuin, do you regard St. Luke's as a
13 top-down organization in terms of the way it's attempting to
14 achieve a Triple Aim?
15     A.  No, I don't.
16         MR. KEITH:  Thank you. No further questions.
17         THE COURT:  You may step down. Thank you,
18 Dr. Fortuin.
19         THE WITNESS:  Thank you.
20         THE COURT:  Call your next witness.
21         MR. BIERIG:  Call Dr. Adebayo Crownson,
22 Your Honor.
23         THE COURT:  Sir, please step before the clerk and
24 be sworn.
25             ADEBAYO CROWNSON,

2190

1  having been first duly sworn to tell the whole truth,
2  testified as follows:
3          THE CLERK:  Please state your complete name and
4  spell your name for the record.
5          THE WITNESS:  Adebayo, A-D-E-B-A-Y-O; Crownson,
6  C-R-O-W-N-S-O-N.
7          THE COURT:  You may inquire of the witness,
8  Mr. Stein.
9          MR. STEIN:  Thank you.
10         DIRECT EXAMINATION
11 BY MR. STEIN:
12     Q.  Good morning, Dr. Crownson.
13     A.  Good morning.
14     Q.  What is your area of medical specialty?
15     A.  Family medicine.
16     Q.  And are you board certified in family medicine?
17     A.  Yes, I am.
18     Q.  In what city do you practice?
19     A.  Nampa, Idaho.
20     Q.  How long have you been practicing medicine in
21 Nampa?
22     A.  Eleven years.
23     Q.  And currently you're employed by St. Luke's?
24     A.  Yes.
25     Q.  And is the -- is the name of the practice in

2191

1  Nampa, St. Luke's Nampa?
2      A.  It's St. Luke's Family Medicine Nampa.
3      Q.  Could you summarize for the court your educational
4  background starting with college?
5      A.  Yes. I went to undergraduate in New Jersey at
6  Rutgers University, where I received a bachelor's of science
7  in nursing BSN and a minor in premedical degree. I
8  subsequently then went to UMDNJ, that's the University of
9  Medicine and Dentistry of New Jersey in Newark, New Jersey,
10 where I received my M.D. degree.
11         And then did my internship and residency training
12 in family medicine at Oregon Health Sciences University in
13 Portland, Oregon.
14     Q.  And what year was that that you finished your
15 internship and residency?
16     A.  I finished that in '96. I take that back, sorry.
17 '99.
18     Q.  And what did you do next?
19     A.  I then went to I joined the United States Air
20 Force and was a flight surgeon for the 391st Fighter
21 Squadron at Mountain Home, Idaho.
22     Q.  And what was your rank?
23     A.  I was a major.
24     Q.  So how did it come to be that you began practicing
25 medicine in Nampa?

2192

1    A.   I was sent on a deployment after 9/11 to Kuwait
2    and Afghanistan and when I came back decided to separate
3    after I got married, and after I separated, my wife and I
4    both enjoyed Idaho, so we decided to stay in Idaho and work.
5    So I sought employment with a few organizations and wind up
6    with Saint Alphonsus Medical Group in Nampa.
7    Q.   And when you say you -- when you talked about
8    separating, you talked about separating from the Air Force?
9    A.   That's correct.
10   Q.   So what year did you join Saint Alphonsus Medical
11   Group?
12   A.   I joined Saint Alphonsus Medical Group in 2002.
13   Q.   And Saint Alphonsus Medical Group, you also know,
14   is referred to sometimes as SAMG?
15   A.   That is correct.
16   Q.   And at the time that you joined Saint Alphonsus
17   Medical Group in 2002, was the hospital in Nampa owned by
18   Saint Alphonsus?
19   A.   No.  It was owned by Catholic Health Initiative,
20   and it was at that time called Mercy Medical Center.
21   Q.   And Mercy Medical Center is the hospital that's
22   also known today as Saint Alphonsus Nampa?
23   A.   That's correct.
24   Q.   So when you first started working for SAMG in
25   Nampa in 2002, did you hold any leadership positions?

2193

1    A.   Yes.  They had two clinics, and I was the medical
2    director for the two Saint Alphonsus Medical Group clinics.
3    Q.   And those were both family medicine clinics?
4    A.   That is correct, yes.
5    Q.   So how long did you work for SAMG after you
6    started in 2002?
7    A.   I worked for SAMG until 2007 and left SAMG at that
8    time.
9    Q.   And can you describe the circumstances in which
10   you left SAMG the first time?
11   A.   I -- well, I was obviously not very happy with my
12   employment at that time because I didn't feel that physician
13   engagement was there.  And when you practice medicine, it's
14   important to have physicians as a partner with the
15   administration, and I didn't think that was there.  So
16   that's why I left.
17   Q.   And that was -- when you say "partner with the
18   administration," this would have been the administration of
19   Mercy Medical Center before it was acquired by Saint
20   Alphonsus?
21   A.   No, no.  The Saint Alphonsus Medical Group.
22   Q.   I'm sorry.  Saint Alphonsus Medical Group.
23   A.   Right.
24   Q.   So -- so 2007 you left Saint Alphonsus Medical
25   Group and did what?

2194

1    A.   The Mercy Physician Group -- sorry -- Mercy
2    Medical Center was interested in developing their own
3    medical group, and so I decided to start that effort by
4    being one of the physicians.
5    Q.   So this would have been -- you would have been,
6    then, on the staff of Mercy Medical Center?
7    A.   Yes.  So I was -- I became a -- an employed -- an
8    employed physician with Mercy Physician Group, and, yes, I
9    was on staff at the hospital at -- at Mercy Medical Center.
10   Q.   And were there other primary care doctors who were
11   members of Mercy Physicians Group?
12   A.   Yes.  When I left SAMG, two other physicians from
13   SAMG joined me and we subsequently employed other physicians
14   to a total of about seven family physicians.
15   Q.   So Saint Alphonsus then purchased the Mercy
16   Medical Center around 2009; is that right?
17   A.   That is correct.
18   Q.   And so how did that then affect your employment
19   status?
20   A.   So I essentially became -- because Mercy Medical
21   Center was -- was purchased by Trinity Saint Alphonsus, I
22   essentially became employed by SAMG again for the second
23   time.
24   Q.   And how did you view the prospect of working for
25   SAMG a second time?

2195

1    A.   I was not very happy about doing that, but the
2    leadership at Saint Alphonsus told my group to give them a
3    trial period of about a year to see -- for us to see that
4    the SAMG we left in the first place has changed and that
5    it's a better place to work now.  So we did that.  We gave a
6    trial period of a year.  And after that year, decided
7    to leave and join St. Luke's.
8    Q.   So you made the -- you made a decision to leave
9    SAMG in -- in what time period?
10   A.   It was about 2011 is when we decided.  I decided
11   to leave SAMG.
12   Q.   And what did you do next in order to pursue -- you
13   know, pursue additional work?
14   A.   I start -- I started looking around to see what my
15   options were and so I looked at Saltzer Medical Group.  I
16   looked at Primary Health and decided that St. Luke's would
17   be a better option for me.
18         I enjoyed -- well, I -- I have always worked for
19   hospital-employed physician groups, and I thought that would
20   be a better option for me, so I decided to join St. Luke's.
21   Q.   So did St. Luke's approach you and say, Hey, we
22   would like you to leave Saint Alphonsus and come work for us
23   in Nampa?
24   A.   No, they didn't.  I actually called the
25   administration center at Shoreline and found out that the

2196

1   director for family medicine is Sandy Stevenson.  So I
2   called her and engaged her and -- and she also told me to
3   get a letter of intent from my lawyer.  So I talked to my
4   lawyer, got a letter of intent to St. Luke's that I wanted
5   to seek employment with them.
6        Q.   And over what period of time did you then have
7   discussions with people from St. Luke's about becoming an
8   employed physician?
9        A.   It was probably about three months.  I engaged
10  with Sandy Stevenson, Joni Stright, and much later on with
11  Chris Roth.
12       Q.   So when you were practicing with SAMG before
13  coming over to St. Luke's, as a primary care doctor, would
14  you sometimes have occasion to have patients that would need
15  to be admitted to a hospital?
16       A.   Yes.
17       Q.   And can you tell the court generally where you
18  would send patients that you would see in your practice in
19  Nampa if they needed to be hospitalized?
20       A.   As a SAMG employee?
21       Q.   Yes.
22       A.   They would typically go to -- since that's the
23  only local hospital, they would typically go to Saint
24  Alphonsus Nampa.
25       Q.   And so did you have any concerns when you were

2197

1   considering about whether to affiliate with St. Luke's as to
2   whether that -- there might be some pressure on you to start
3   sending your patients to a St. Luke's facility, Meridian
4   or -- or Boise?
5        A.   Yes, I did.  And I -- you know, I actually
6   represented my group and had a meeting with some of
7   St. Luke's leadership, including Chris Roth, John Kee, and
8   some others, and I asked the question that you just asked,
9   well, so what -- what does this mean?  I am employed by
10  St. Luke's, but here I am in Nampa.  St. Luke's does not
11  have any facilities in Nampa, so is the expectation that I
12  will be sending my patients to Meridian because that's not
13  going to work very well.  And I was told emphatically
14  that -- by Chris Roth that, They are your patients, you are
15  the physicians, you take care of them the way you see best.
16        And if the local hospital -- they believed
17  strongly that care should be close to the patient.  And so
18  if the local hospital is where the patient is to go, that's
19  where they go.  And, therefore, there was absolutely no
20  pressure on me at all to send patients anywhere besides
21  keeping them close to home.
22       Q.   So when you were practicing as a primary care
23  doctor at SAMG, you were practicing primarily in an
24  office-based setting in Nampa; is that right?
25       A.   Primarily, yes, but I did do some hospitalist work

2198

1   for SAMG.
2        Q.   And can -- can you just tell the court briefly
3   what a hospitalist is?
4        A.   Well, a hospitalist is a physician that
5   essentially takes care of patients when they come in the
6   hospital because they are not able to get their care on an
7   outpatient basis any longer.  And so the hospitalist admits
8   the patient, follows the patient throughout the hospital
9   stay, and discharges the patient to the outpatient
10  physician.
11       Q.   So when you were working as a
12  hospitalist -- and -- and by the way, when you're talking
13  about working as a hospitalist, you were working as a
14  hospitalist at Saint Alphonsus Nampa or Mercy Medical
15  Center?
16       A.   Yes.
17       Q.   So when you would work as a hospitalist and see
18  patients, would these be your patients?  In other words, are
19  these -- would you only be admitting people who you
20  personally saw in your clinic practice?
21       A.   No.  The situation was that they were having
22  difficulty getting enough hospitalists to cover shifts and
23  so I -- one of my partners and I, Dr. Cothern and I,
24  essentially agreed to help out.  So we will help out and
25  work as a hospitalist, which meant that we admitted any

2199

1   patient that came into the hospital that requires inpatient
2   hospitalization.
3        Q.   So can you describe briefly how the population of
4   patients that you would tend to see when you were working as
5   a hospitalist was different in -- if they were different
6   from the population of patients you would tend to see in
7   your office in terms of how sick they were?
8        A.   Well, patients in the office tend to have a
9   fairly -- I wouldn't say benign, they are sick but they're
10  not sick enough to be in the hospital, so they tend to have
11  a short-term, short course of disease process.  And, you
12  know, you manage a lot of chronic diseases, hypertension,
13  diabetes, so you do that and in an outpatient setting.
14        In an inpatient setting, however, patients that
15  you admit are generally much sicker, they have a high acuity
16  of care.  And what that meant is that you are ordering a lot
17  more tests, a lot more labs, a lot more care for those
18  patients.
19       Q.   Now, you started working for St. Luke's in 2012;
20  is that correct?
21       A.   Yes.
22       Q.   I'm sorry.  2011 or 2012?
23       A.   2011.
24       Q.   2011.  So when you moved from Saint Alphonsus to
25  St. Luke's within Nampa, did all of your patients come with

2200

1   you?
2       A.   No.  The process for me leaving was that
3   the -- there was a letter sent out by Saint Alphonsus
4   Medical Group to my patients.  It -- it did tell them that I
5   was leaving but didn't tell them where I was going.  So I
6   only -- by word of mouth, I only had about maybe 60 percent
7   of patients that figured out where I was and followed me.
8       Q.   So the -- the court has already heard,
9   Dr. Crownson, from Saint Alphonsus's economic expert
10  regarding some data she put together concerning the use of
11  diagnostic imaging services and laboratory services by your
12  group at Saint Alphonsus Nampa before and after the --
13  before and after you affiliated with St. Luke's.  And so I
14  would just like to talk briefly about those two specific
15  services.
16          So with respect to laboratory services that you would
17  order, could you describe generally what your practice was
18  in terms of use of laboratory services when you were at
19  Mercy Physicians Group then Saint Al's then St. Luke's?
20      A.   So for laboratory services -- I -- I do have to
21  maybe give you a bit of a background, and that is the fact
22  that we were in two locations.  So one location was at South
23  Nampa and the other location was close to the freeway at --
24  north of Nampa.
25          And the South Nampa, before when Saint Alphonsus

2201

1   bought Mercy and they took over, before then, we had a lab
2   technician.  And so most of our blood -- most of our
3   laboratory work was done in house, meaning that if the
4   patient requires any type of laboratory order done, it would
5   be done in house by a phlebotomist.  And then --
6       Q.   I'm sorry, when you say "in house," does that mean
7   in the -- in the clinic?
8       A.   In the clinic, right.
9           And then it would be sent somewhere for
10  processing.  When Saint Alphonsus took over, we didn't --
11  they wanted to cut costs, so we lost that, that phlebotomy
12  service, and we were sending most of those patients to the
13  hospital to get their blood drawn.
14          We were located only about two miles from the
15  hospital, so the argument is, it makes sense to send most of
16  those patients to the hospital.  So we sent most of our
17  laboratory needs for patients to the hospital.
18          On the -- in the other location, they were on the
19  third floor.  And at the -- at the first floor was radiology
20  and laboratory services that was sort of part of the
21  hospital, and so they sent all their patients down to the
22  first floor for their lab work.
23      Q.   And when Mercy Physicians Group left Saint Al's,
24  did those physicians in that -- in that northernmost
25  location that used to have the laboratory on the first

2202

1   floor, did they move to a different building?
2       A.   Yes.
3       Q.   And did that other building have a hospital-based
4   laboratory in that -- in the new building?
5       A.   So the -- the new building had a -- they had
6   phlebotomy services, so somebody that actually drew the
7   blood and sent it -- and sent it for processing.
8       Q.   And with regard to the -- the phlebotomist that
9   you used to have in the southernmost office that you had in
10  Nampa, was the decision that was made to get rid of the
11  phlebotomist, was that a decision that was made by your
12  practice?
13      A.   No, it was not.
14      Q.   So when you came to work for St. Luke's, did that
15  change?
16      A.   Yes, it did.
17      Q.   How did it change?
18      A.   We hired a laboratory technician who did all our
19  lab -- lab work, once again, in the clinic, and this was for
20  patient convenience, so did all the lab work in house again,
21  in the clinic, and that was then sent by courier to -- for
22  processing.
23          And so does -- does that mean that when you
24  started working for St. Luke's, laboratory services that you
25  used to send to the hospital to be done can now be done in

2203

1   your office?
2       A.   That's correct.
3       Q.   So now I want to talk a little bit about
4   diagnostic imaging services.
5       A.   Okay.
6       Q.   Can you describe for the court generally what the
7   practice of the Mercy Physicians Group and later when you
8   were with SAMG was with respect to diagnostic imaging
9   services.
10      A.   So we have advanced imaging and there are plain
11  films that can be done in the office.  The plain films, we
12  had plain films in our offices, actually, the South Nampa
13  office.  And so those were done in the clinic.
14      Q.   I'm sorry.  What is a plain film?
15      A.   Plain film -- films that is not CT scan, MRI, so
16  it was not advanced imaging.  And so it was done in our
17  clinic.  At the northern clinic, it was done downstairs on
18  the first floor because they had radiology services there as
19  well.
20      Q.   And what about for advanced imaging?
21      A.   Advanced imaging, they were almost always sent to
22  Saint Alphonsus Nampa.
23      Q.   And has the -- has your practice for ordering
24  advanced imaging changed at all since the time you became
25  employed by St. Luke's?

2204

A. For the first year, it did not change very much and the reason being that there were no other options. The only option was Saint Alphonsus Nampa, so we sent most of our patients there for advanced imaging.

About a year after we started with St. Luke's, St. Luke's built an imaging center in North Nampa and we give patients the option. Most of the time, patients prefer to go to St. Luke's because of the interface between the imaging and the -- and our electronic medical record.

Q. Dr. Crownson, when you were most recently employed at SAMG, what medical record system did you use?

A. EClinicalWorks.

Q. And what medical record system do you use now that you're at St. Luke's?

A. The first year I was still on eClinicalWorks. The second year we started on Epic.

Q. And so now -- so you now have experience using both eClinicalWorks and Epic; is that right?

A. Yes, I have.

Q. Can you describe for the court the comparative benefits of Epic versus eClinicalWorks from the perspective of somebody who has used both systems?

THE COURT: Mr. Ettinger?

MR. ETTINGER: Your Honor, this is way beyond the scope of any witness description for this witness. I can

2205

provide the court with a copy of it.

THE COURT: Mr. Stein?

MR. STEIN: I would need to -- I would need to take another look at the description.

THE COURT: Well, was there anything listed concerning a comparison of the electronic medical record systems?

MR. STEIN: Not specifically relating to the electronic medical record system, but about his experiences working for the two systems.

THE COURT: The two healthcare systems?

MR. STEIN: Yes. I'm sorry, the two healthcare systems.

THE COURT: Well, the witness can only in a very broad sense describe it; otherwise, I think it would be unfair to raise that issue.

MR. ETTINGER: Your Honor, by the way, it doesn't even say his experience in working for St. Luke's. It only says his experiences working for Saint Al's in this description.

MR. STEIN: Well, it also talks about how his -- he talked about his use of laboratory and imaging and the relationship of having Epic available and the images available in Epic in terms of --

THE COURT: That's in the disclosure?

2206

MR. STEIN: Yes. That -- well, that the referrals of services are within the scope of the disclosure.

THE COURT: Well, I'm just going to -- I am going to confine counsel to what's disclosed. So if we have to, we'll take it up again.

MR. STEIN: Okay.

THE COURT: And I'll sustain the objection to this in the sense that I'll direct counsel to stay within the four corners of the witness disclosure.

BY MR. STEIN:

Q. Dr. Crownson, you previously testified when we were just talking about why it is that some patients prefer to have imaging done at St. Luke's. You mentioned something about the integration of the image with the record. Can you elaborate on what it is you're referring to specifically?

A. From my perspective as a physician?

Q. Yes.

A. So the -- what -- what I was referring to is the fact that when a patient is sitting in my office and I need an advanced imaging result, if that image was done at a facility where it's not interfaced with the electronic medical record, I have to have my staff call to have that image sent to me. That obviously takes time and sometimes I don't even get the result while the patient is still there in the office for me to interact with the patient based on

2207

the result.

When the imaging center is interfaced with my electronic medical record, all I have to do is just pull it up and I can then use that information to treat the patient. So obviously it did help a great deal in quality of care for the patient.

THE COURT: Just let me inquire. I think, Doctor, earlier you said that the patient preferred. How does the patient know or how does that impact the patient, himself, or herself as opposed to just making it more convenient for the doctor?

THE WITNESS: The patient a lot of times will inquire from us, well, so if I go to this particular imaging center, do you get the results much easier because it is St. Luke's? They would inquire that, they would ask that question when I give them the option.

And then I will tell them, yes, because I get the result right away.

BY MR. STEIN:

Q. Dr. Crownson, there -- there has also been a suggestion by the -- the plaintiffs' expert that it is your -- just the fact of your affiliation with St. Luke's has led you to preferentially -- or led Mercy Physicians Group to preferentially change referral patterns for Mercy Physicians Group and so I just want to explore, if I can,

2208

1  the -- the issue of your interaction with other St. Luke's
2  physicians since you have been employed by St. Luke's.
3       And -- and as a St. Luke's physician now, do you
4  have -- is your level of interaction with other St. Luke's
5  doctors different than it was when you were employed by
6  Saint Alphonsus?
7       **A.  Can you clarify that question?**
8       **Q.**  Yeah.  Do you have more -- for example, do you
9  have more frequent interactions with other St. Luke's
10 doctors now that you're an employee of St. Luke's than you
11 did when you were affiliated with Saint Alphonsus?
12      **A.  Yes.**
13      **Q.**  And in what context do those interactions occur?
14      **A.  In terms of referral?**
15      **Q.**  In -- in terms of interactions with St. Luke's
16 physicians.
17           MR. ETTINGER:  Your Honor, except in the referral
18 context, it's beyond the scope of this notice, which I can
19 provide the court if you'd like to see it.
20           THE COURT:  Well, I think, counsel did clarify
21 that it is in terms of referral, so I'm -- with that
22 limitation, I'll allow the witness to answer the question.
23           THE WITNESS:  Well, in terms of referral, what I
24 would say is the first -- well, since we have joined
25 St. Luke's, one, there has not been any pressure on us to

2209

1  change our referral patterns.  So my group has, for the most
2  part, kept our referral patterns intact.
3       What -- what has been frustrating to some -- some
4  of -- to me and some of my other group members is that
5  sometimes when we refer patients -- because really our
6  philosophy is that I would like to keep care close to home,
7  which is Nampa for us, and so if there is a specialist in
8  Nampa, that is what our first preference is for the patient.
9  And what has been frustrating at times is that when we have
10 referred these patients to some of the specialists that are
11 based locally in Nampa, those patients then are taken to
12 Treasure Valley to -- for their surgeries.  And so that has
13 been a frustration.
14      And in terms of other St. Luke's physicians,
15 specialists, if -- first of all, if the care can be provided
16 close to home, we use the services.  If it cannot, we will
17 send them to Meridian or Boise.
18      Epic makes it easy to use a physician who is in Epic
19 because the referral process is seamless and also the
20 getting the note back to the primary care provider is also
21 seamless because it's all in the same record.  And so from
22 that standpoint, if care has to be done in -- in Meridian or
23 Boise, it's -- it's been much easier for us to use
24 St. Luke's providers.
25 BY MR. STEIN:

2210

1       **Q.**  So you mentioned something about patients being
2  taken to Treasure Valley.  What -- what were you referring
3  to specifically?
4       **A.  Specifically, I was referring to the -- some
5  surgeons in Nampa that we will -- so a patient will ask me,
6  No, Doc, keep my care here, I don't want to travel, my
7  family is here.  And so we will do that, refer the patients
8  to a local surgeon in Nampa.  And then the patient comes
9  back and complain to us that, Well, our case was done in
10 Treasure Valley and how is that?  And so that became a
11 pattern for a while that became bothersome to my group.**
12      **Q.**  And when you say it was done in Treasure Valley,
13 are you referring to Treasure Valley Hospital or something
14 else?
15      **A.  No.  Treasure Valley Hospital.**
16      **Q.**  And so have you had discussions with others
17 at -- with St. Luke's administration about trying to bring
18 more specialists to Nampa?
19      **A.  Yes, I did.**
20      **Q.**  And the -- the court has heard a little bit about
21 the physician leadership structure within St. Luke's and the
22 family medicine division.  And with regard to St. Luke's
23 Family Medicine in Nampa, are you the site leader for -- for
24 that division?
25      **A.  I'm the site manager, yes.  Site medical director.**

2211

1       **Q.**  And so do you participate in meetings of the
2  family medicine division that are led by Dr. Johnson?
3       **A.  Yes, I do.**
4            MR. STEIN:  Your Honor, I don't have any further
5  questions at this time.
6            THE COURT:  Mr. Ettinger.
7            MR. ETTINGER:  Thank you, Your Honor.
8                 CROSS-EXAMINATION
9  BY MR. ETTINGER:
10      **Q.**  Dr. Crownson, isn't it, in fact, the case that
11 your group's approach is to first attempt to make a referral
12 to St. Luke's providers when you have a patient?
13      **A.  That is not true.**
14           MR. ETTINGER:  Keely, could you put up
15 Exhibit 1445, please.
16 BY MR. ETTINGER:
17      **Q.**  Dr. Crownson, do you remember seeing this document
18 in your deposition?
19      **A.  Yes, I do.**
20      **Q.**  And do you remember this is a report on a meeting
21 with you by other St. Luke's personnel, including Sandy
22 Stevenson, who you mentioned, and Linda House?
23      **A.  Yes, I do.**
24      **Q.**  And do you see under "notes" under "referrals"
25 that says -- that says, "Dr. Crownson voiced concern

2212

1  regarding their ability to refer to St. Luke's physicians
2  without people having to travel to Boise or Meridian.  The
3  physician's first attempt to make a referral to St. Luke's
4  providers, close quote.
5      Did I read that correctly?
6      **A.  Yes, you did.**
7      Q.  Thank you.
8      Now, you testified here today that --
9          THE COURT:  Counsel, could I -- could you blow up
10 that up again?  I -- I think the way you read it changed the
11 punctuation of that second sentence.
12     Okay.  Go ahead and proceed.
13         MR. ETTINGER:  Thank you, Your Honor.
14 BY MR. ETTINGER:
15     Q.  Today you said that -- if I understood you
16 correctly, that patients choose St. Luke's because of -- for
17 imaging because of the better interface with the medical
18 record.  Is that -- is that your testimony?
19     **A.  Well --**
20     Q.  Could you just answer yes or no; is that your
21 testimony?
22     **A.  Well, can you repeat that, then?**
23     Q.  Is it your testimony that patients have been
24 choosing St. Luke's for imaging because there is a better
25 interface with the electronic medical record.  Is that your

2213

1  testimony?
2      **A.  That is not entirely true.  I said that patients**
3  **were given the option for where they want to go for the**
4  **advanced imaging, and when patient ask us, would it be**
5  **easier for me as their physician to see their records if**
6  **they go to a facility that is interfaced with my medical**
7  **record, and the answer is yes.  And so sometimes patients**
8  **will still go to Saint Alphonsus Nampa for their imaging**
9  **because it's close to their house and sometimes they will**
10 **choose to go to St. Luke's over by North Nampa.**
11     Q.  Is it -- are there patients who out of the clear
12 blue sky say to you unprompted, Gee, if I go to one place or
13 another, will that -- how will that interface with your
14 medical record?
15     **A.  Absolutely.**
16     Q.  How many patients have done that, Dr. Crownson?
17     **A.  A lot of patients.**
18     Q.  Hundreds?  Dozens?  How many?
19     **A.  I -- I don't count.  But it's a lot -- a lot of my**
20 **patients that require advanced imaging ask that question.**
21     Q.  And is it your testimony to the court that you
22 don't tell the patients affirmatively, You know, if you go
23 to a St. Luke's facility, you're going to interface with
24 the -- with my medical record better?
25     **A.  Absolutely not.**

2214

1      Q.  You never say that?
2      **A.  No.**
3      Q.  Now, Doctor, you remember you -- you submitted a
4  declaration sworn under oath in this case.  Do you recall
5  that?
6      **A.  Yes.**
7      Q.  And in the declaration you never mention medical
8  records as a reason why patients are using St. Luke's, did
9  you?
10         MR. STEIN:  I'm sorry --
11         MR. ETTINGER:  I'm going to.
12         MR. STEIN:  I just would object if he is going to
13 ask a question about the declaration, if we could at least
14 offer the witness an opportunity to see the declaration.
15         MR. ETTINGER:  I'm perfectly happy -- I was about
16 to anyhow, Your Honor --
17         THE COURT:  Thank you --
18         MR. ETTINGER:  -- but we'll just give it to him
19 right now.
20         THE COURT:  -- Mr. Ettinger.
21 BY MR. ETTINGER:
22     Q.  Dr. Crownson, you have been handed a declaration.
23 You signed that under oath; is that right?
24     **A.  Yes.**
25     Q.  And you read it carefully before you signed it?

2215

1      **A.  Yes.**
2      Q.  And you believed it to be as accurate as possible?
3      **A.  Yes.**
4      Q.  Why don't you turn to paragraph 8 of the
5  declaration.  And in paragraph 8, you said you let patients
6  choose where their imaging is conducted; correct?
7      **A.  Can I read it?**
8      Q.  Sure, go ahead.
9      **A.  Okay.**
10     Q.  You said you let patients choose, and you find
11 their choice often coincides with geographic preference, is
12 what you said in your declaration; correct?
13     **A.  That's correct.**
14     Q.  Is that true or not?
15     **A.  It is true.**
16     Q.  Is there a reason you didn't mention electronic
17 medical records in your declaration?
18     **A.  Because that is part of the preferences that**
19 **patients make based on the interface with my electronic**
20 **medical record.  But -- but I have to say that when this**
21 **came through when I did this declaration, it was fairly**
22 **early in the process when the facility was built.  So I can**
23 **now represent that patients have a preference based upon my**
24 **electronic medical record but back then I couldn't.  It was**
25 **fairly new at that time.**

2216

1    Q.   So in the fall of 2011, your group switched over
2    to St. Luke's; correct?
3    **A.   That's correct.**
4    Q.   And in the fall of 2011, the imaging cases that
5    your group sent to Saint Al's plummeted at that time.  Isn't
6    that right?
7    **A.   That's not -- I have to see what you mean.  I**
8    **don't -- that's not the case.  I can speak to my practice,**
9    **and my practice is that most patients that still required**
10   **advanced imaging were sent to Saint Alphonsus Nampa.**
11   Q.   Can you speak for the seven doctors in your group
12   or just yourself personally?
13   **A.   I -- I can speak for them because we talk amongst**
14   **ourselves.**
15   Q.   Have you seen the data that shows that those cases
16   went down in the fall of 2011, a year before the St. Luke's
17   facility opened?
18         MR. STEIN:  Objection, Your Honor.  I -- I believe
19   that assumes facts not in evidence.
20         THE COURT:  I -- subject to it being tied in, I'll
21   allow it but then strike the testimony unless it is, in
22   fact --
23         MR. ETTINGER:  And, Your Honor --
24   BY MR. ETTINGER:
25   Q.   Well, let me put this way, have you seen data one

2217

1    way or the other that describes the number of imaging cases
2    sent to Saint Alphonsus during the period after your group
3    was acquired and before the St. Luke's facility opened?
4    **A.   Who collected the data?**
5    Q.   I'm asking you, have you seen such data?
6    **A.   I have not seen the data.**
7    Q.   Thank you.  Now, is it your testimony today that
8    geography plays a role in where your patients go for imaging
9    or not?
10   **A.   Right now, after seeing the -- given a time with**
11   **patients since the imaging center was built, I would say,**
12   **sure, geography plays a role because if a patient that lives**
13   **in South Nampa, most of -- most of the time they will**
14   **probably prefer to go to Saint Alphonsus Nampa.  If they**
15   **live in North Nampa, they will probably prefer to go to**
16   **North Nampa.  However, there is still a preference for the**
17   **record being interfaced with my medical record where**
18   **patients in South Nampa might still prefer to go to the**
19   **St. Luke's facility because it interfaces with my medical**
20   **record.**
21   Q.   Now, your group of seven physicians, it gets about
22   half their patients from South Nampa; correct?
23   **A.   Repeat that.**
24   Q.   Your group of seven physicians gets about half
25   their patients from South Nampa; isn't that right?

2218

1    **A.   I haven't done the data analysis, so I cannot**
2    **answer that for sure.**
3    Q.   Okay.  And your offices are in South Nampa, aren't
4    they, even today?
5    **A.   That is correct.**
6    Q.   So Saint Alphonsus is closer to your facilities
7    than is the St. Luke's facility; correct?
8    **A.   Yes.**
9    Q.   And for patients who live in North Nampa, there is
10   a St. Luke's North Nampa imaging facility and there is also
11   a Saint Al's North Nampa imaging facility; isn't that right?
12   **A.   Yes.**
13   Q.   And so for your patients who live in North Nampa,
14   about half of them are likely to find Saint Al's more
15   geographically convenient than St. Luke's; correct?
16   **A.   It depends on where they live.**
17   Q.   Does it sound like about half and half of the
18   North Nampa people?
19   **A.   I don't know for sure.**
20   Q.   Okay.  And is it your testimony that neither you
21   nor any other member of your group makes any effort to
22   influence your patients as to where they get ancillary
23   services or imaging services performed?
24   **A.   That is my testimony.**
25   Q.   The St. Luke's imaging facility opened in June of

2219

1    2012; is that right?
2    **A.   I believe so.**
3    Q.   Okay.  So your comment about medical records
4    wouldn't apply to any data prior to June of 2012; correct?
5    **A.   Yes.**
6    Q.   Now, you mentioned you worked as a hospitalist.
7    Hospitalists don't do outpatient work in their role as
8    hospitalists; correct?
9    **A.   In my case, I did outpatient work.  I was just**
10   **helping the hospital by volunteering to be a hospitalist**
11   **sometimes.**
12   Q.   Let me -- let me be clear.  When you had your
13   hospitalist hat on, figuratively speaking, you were doing
14   inpatient work not outpatient work; correct?
15   **A.   That is correct.**
16   Q.   And you and Dr. Cothern acted as hospitalists for
17   approximately one week out of every six; is that right?
18   **A.   That's approximately about right.**
19   Q.   And during those seven days, typically you would
20   admit six to ten patients a day; is that right?
21   **A.   Yeah.  I think that's about -- that's reasonable.**
22   Q.   And you admitted those patients -- you were listed
23   as the admitting physician for those patients, your
24   testimony; correct?
25   **A.   Yes.**

2220

1    **Q.**  How many patients have complained to you about
2    being sent to Treasure Valley Hospital for surgery?
3    **A.**  I don't have the number, but I know that there
4    were quite a few patients that complained to me about that.
5    **Q.**  More than ten?
6    **A.**  Absolutely more than ten, yes.
7    **Q.**  Did you inquire -- did they have any complaints
8    about the quality of the care they received?
9    **A.**  The complaint wasn't about Treasure Valley.  It
10   was about the fact that their care wasn't provided locally
11   as was intended.
12   **Q.**  And you believe that it's very important to have
13   your office very close to your patients; correct?
14   **A.**  I believe that it's important to keep care close
15   to home, yes.
16   **Q.**  Yeah.  And you have an office in Nampa to be as
17   close as you can to your Nampa primary care patients;
18   correct?
19   **A.**  Yes.
20   MR. ETTINGER:  Nothing further.  Thank you.
21   THE COURT:  Mr. Stein, any recross -- redirect,
22   excuse me.
23   MR. STEIN:  Briefly.
24   If we could, could I -- could I indulge on plaintiffs'
25   counsel just to put Exhibit 1445 back up on the screen.

2221

1    MR. ETTINGER:  Sure.
2    REDIRECT EXAMINATION
3    BY MR. STEIN:
4    **Q.**  Dr. Crownson, we're showing you again Plaintiffs'
5    Exhibit 1445.  Did you write this document?
6    **A.**  No, I didn't.
7    **Q.**  Did you ever see this document before your
8    deposition?
9    **A.**  No.  I saw it first time at my deposition.
10   **Q.**  Okay.  And Mr. -- I'm sorry, plaintiffs' counsel
11   read you the second sentence there that says, "The
12   physician's first attempt to make a referral to SL
13   providers."
14   Is that something you said?
15   **A.**  No, I didn't say that.
16   **Q.**  And is that -- is it -- even if you didn't say it,
17   is it a true statement?
18   **A.**  No, it's not.
19   **Q.**  And what was -- what was the purpose of this
20   meeting that you had with Dr. Johnson and Sandy Stevenson
21   and Linda House?
22   **A.**  The -- the purpose was to look at specialty needs
23   in Nampa.  And I have always told them, told St. Luke's
24   leadership, that I really prefer to keep care close to home,
25   and so that was the -- that was what generated this meeting.

2222

1    So they -- we met and talked about what are the specialty
2    needs that are in Nampa.
3    The surgery, the reference to surgery was the fact
4    that was to demonstrate to them why my group is frustrated
5    because patients that are sent to local surgeons are having
6    their cases done in Treasure Valley Hospital, and they are
7    not happy about it.  And so that was to demonstrate that.
8    But the purpose of this meeting was to work with St. Luke's,
9    St. Luke's leadership in trying to get more specialists'
10   care in Nampa.
11   **Q.**  And when you talk about local surgeons, do you
12   mean local as in Nampa?
13   **A.**  That's correct.
14   **Q.**  And were those surgeons -- the surgeons that
15   you're talking about, were they formerly affiliated with a
16   medical group in Nampa?
17   **A.**  They were formerly affiliated with Saltzer Medical
18   Group.
19   MR. STEIN:  No further questions.
20   THE COURT:  Mr. Ettinger, anything else?
21   MR. ETTINGER:  No, Your Honor.
22   THE COURT:  All right.  You may step down,
23   Dr. Crownson.  Thank you very much.
24   Call your next witness.
25   MR. BIERIG:  We are calling Mr. Chris Roth,

2223

1    Your Honor.  We'll get him.
2    THE COURT:  Mr. Roth, would you step forward
3    before the clerk, Ms. Gearhart, be sworn as a witness, and
4    then follow her directions from there.
5    CHRISTOPHER WILLIAM ROTH,
6    having been first duly sworn to tell the whole truth,
7    testified as follows:
8    THE CLERK:  Please state your complete name and
9    spell your name for the record.
10   THE WITNESS:  My full name is Christopher William
11   Roth, C-R-I-S-T-O-P-H-E-R; William, W-I-L-L-I-A-M; last name
12   Roth, R-O-T-H.
13   THE COURT:  Mr. Schafer, you may inquire.
14   MR. STEIN:  Thank you, Your Honor.
15   DIRECT EXAMINATION
16   BY MR. SCHAFER:
17   **Q.**  Good afternoon, Mr. Roth.
18   **A.**  Good afternoon.
19   **Q.**  You currently work for St. Luke's; is that
20   correct?
21   **A.**  That is correct.
22   **Q.**  What is your position?
23   **A.**  I'm currently the chief executive officer of
24   St. Luke's Treasure Valley.
25   **Q.**  How long have you held that position?

2224

1    **A.** I have held that position since August of 2011.

2    **Q.** And prior to that, how long had you worked at

3    St. Luke's?

4    **A.** I joined St. Luke's in March of 2007.

5    **Q.** What was your position at St. Luke's from 2007

6    through 2011?

7    **A.** I was the chief operating officer of St. Luke's

8    Regional Medical Center.

9    **Q.** Can you describe your responsibilities as CEO of

10   St. Luke's Treasure Valley?

11   **A.** As the CEO, I'm responsible for implementation of

12   our strategic plan and fulfillment of our mission.

13   **Q.** And in your roles as COO and now CEO, do you have

14   occasion to interact with individual physicians?

15   **A.** Yes.

16   **Q.** And why do you do that as an executive of

17   St. Luke's?

18   **A.** Well, healthcare is a team sport, if you will, and

19   any successful administrator is going to need to partner

20   closely with physicians to work together, develop

21   relationships.  So it's -- it's essential to interact and

22   engage and work with physicians.

23   **Q.** Can you briefly describe for the court your

24   educational background.

25   **A.** I have a bachelor's degree in biology and a

2225

1    master's degree in healthcare administration.

2    **Q.** And, Mr. Roth, I assume you are familiar with the

3    Saltzer Medical Group?

4    **A.** Yes.

5    **Q.** When was the first time that you interacted with

6    anyone from Saltzer?

7    **A.** I believe the first interaction was in 2007, the

8    year I joined St. Luke's.

9    **Q.** And at the time that you first interacted with

10   Saltzer, what was the nature of the relationship between

11   Saltzer and St. Luke's?

12   **A.** Well, a number of the physicians at Saltzer were

13   on the medical staff at St. Luke's, so physicians across the

14   community were practicing with one another.  There were

15   individuals at St. Luke's that have had professional

16   relationships with those at Saltzer over the years predating

17   my tenure, so a number of interactions over the years.

18   **Q.** And after 2007, how, if at all, did the St. Luke's

19   relationship change with Saltzer?

20   **A.** Well, after 2007, we began to -- as I got to know

21   Saltzer a little bit better and we began to work together

22   further, we ended up formalizing a partnership actually in

23   2008 whereby we agreed, St. Luke's and Saltzer, to begin a

24   more deliberative focused effort around a series of --

25   series of initiatives.

2226

1            MR. SCHAFER:  And, Mr. Chase, could you pull up

2    Exhibit 2196?

3    BY MR. SCHAFER:

4    **Q.** And, Mr. Roth, do you recognize this document?

5    **A.** I do.

6    **Q.** And what is this document?

7    **A.** This is a memorandum of understanding between

8    St. Luke's Regional Medical Center and Saltzer Medical Group

9    that -- it's a nonbinding agreement but outlines the

10   parties' intent to focus on specific areas to where we would

11   begin to work together.

12   **Q.** And what's the date of this agreement?

13   **A.** December 19th, 2008.

14   **Q.** And did you play any specific role with respect to

15   this document?

16   **A.** I did.

17   **Q.** And what was that role?

18   **A.** I don't believe I signed it, but I was involved

19   in -- I certainly read it and involved in helping and

20   working with Saltzer to create the five areas that we would

21   focus on that are outlined in this document.

22   **Q.** And if you look at the third and fourth whereas

23   clauses on this page, could you read those for the court?

24   **A.** "Whereas Saltzer and St. Luke's have a mutual

25   interest in improving health care for the residents of Ada

2227

1    and Canyon Counties; and whereas Saltzer and St. Luke's

2    believe that together they can improve access to high

3    quality medical care, enhance coordination of medical

4    services, and streamline the healthcare service delivery

5    model."

6    **Q.** And did those statements accurately set forth

7    St. Luke's goals with respect to entering this MOU with

8    Saltzer?

9    **A.** Yes.

10   **Q.** And did they accurately set forth discussions that

11   you had with Saltzer regarding the purpose of entering into

12   this MOU?

13   **A.** Yes.

14   **Q.** If you could turn to the second page and look at

15   the second paragraph.  You see a discussion there regarding

16   a planning group?

17   **A.** Yes.

18   **Q.** What -- what was that planning group?

19   **A.** Well, the planning group was created where each

20   party, as it says here, would appoint four members -- four

21   from Saltzer, four from St. Luke's -- that would really

22   oversee, make recommendations related to the five areas

23   outlined in the MOU.

24   **Q.** And in working together, Saltzer and St. Luke's,

25   were -- were the entities able to meet the goals of this

2228

1  memorandum of understanding?
2      A.  We made some progress in the areas, the five areas
3  that are outlined.  I recall we had some immediate success
4  in the area of cardiovascular services.  Saltzer for years
5  had a difficult time recruiting cardiologists into the
6  practice, and St. Luke's was able to provide that service
7  and work with Saltzer in that regard.  So some immediate
8  success in that area.
9          In the area of urology, despite a lot of effort
10  over the years, we weren't successful helping that group
11  recruit a urologist to that community.
12          And in the other areas, we were able to have some
13  meaningful outcomes relative to our relationships and
14  program integration, but it took a number of years to do
15  that.
16      Q.  At a certain point, did there come to be a
17  discussion between Saltzer and St. Luke's about potentially
18  forming a more closer relationship?
19      A.  Yes.
20      Q.  And how did those discussions come about?
21      A.  Well, at first they -- they came about as a
22  natural evolution of the memorandum of understanding that we
23  just read.  We had developed planning groups.  We were
24  meeting to talk about these programs and these areas.  We
25  started to have success and things grew from there.

2229

1          I recall a meeting that I attended with Nancy
2  Powell and Bill Savage, and Ed Castledine, I know was there,
3  as well, at the Saltzer Medical Group where Bill and Nancy
4  indicated that the physicians at Saltzer were interested in
5  pursuing discussions beyond those areas outlined in the MOU
6  and wanted to sit down with St. Luke's to talk about what a
7  future relationship might look like.  During that meeting,
8  we essentially planned what that -- what the next meeting
9  would be where we would begin to explore those options.
10      Q.  So was that something that St. Luke's was
11  interested in exploring that closer relationship with
12  Saltzer?
13      A.  Yes.
14      Q.  And, Mr. Roth, can you tell the court why that
15  was, why St. Luke's was interested in pursuing a closer
16  relationship with Saltzer?
17      A.  Well, there are a number of reasons.  First, we
18  have had a relationship with Saltzer for many years.  As I
19  referenced earlier, physicians at Saltzer were on the
20  medical staff of St. Luke's.  Physicians throughout the area
21  are talking with one another, caring for the same patients.
22          In the MOU, we decided early on that we had some
23  shared goals to improve the health of people in our
24  community and streamline care, coordinate care.  Saltzer
25  wanted to work with us.  They were clear that they wanted to

2230

1  sit down with St. Luke's and only St. Luke's to discuss a
2  relationship.  They had decided they wanted to partner with
3  somebody.  They didn't know what it would look like in the
4  end, but willing to do that.
5          We, St. Luke's, were seeing 30 percent, if I
6  recall, the -- of inpatients in our Meridian facility were
7  residents of Canyon County, 20 percent of all of our
8  patients are inpatients from Boise and Meridian collectively
9  were from Canyon County.  We have wanted and had at the time
10  to establish a greater presence in Canyon County to care for
11  those patients.
12          Saltzer was and is an incredibly well-respected
13  group.  They are the preeminent group, if you will, in the
14  state of Idaho relative to multispecialty group practice.
15  They know Nampa.  They know Canyon County.  They have the
16  relationships.  They have the trust of the community.  They
17  had geographic dispersement in terms of their clinics, they
18  had locations in Meridian, Nampa, throughout Ada and
19  Canyon County.  So when a group like that says we're
20  interested in pursuing an additional further relationship,
21  absolutely we were interested.
22      Q.  And today, Mr. Roth, is Saltzer important to
23  St. Luke's plans in Canyon County?
24      A.  Yes.
25      Q.  And why is that?

2231

1      A.  I think for all the reasons I mentioned.
2      Q.  After that initial discussion that you had with
3  Bill Savage and Nancy Powell, what steps did St. Luke's take
4  in moving towards a closer affiliation with Saltzer?
5      A.  Well, that -- after that meeting, we -- we had, I
6  guess, our first integration meeting.  It was a group of
7  physician leaders from Saltzer and a group of administrators
8  from St. Luke's where we met at the Meridian hospital and
9  talked about shared visions and our interests, St. Luke's,
10  and Saltzer's interests and the discussions really began at
11  that point.
12      Q.  Do you know how many meetings you participated in
13  with Saltzer representatives with respect to the -- what
14  eventually became the PSA between the parties?
15      A.  No.  A lot.
16      Q.  And in one of the clips, I believe, that was
17  played from your deposition, you talked about three
18  different types of alignment.  Can you talk about, if that's
19  your opinion, what -- what the three different types
20  of alignment are, in your view?
21      A.  Sure.  We have a vision to transform healthcare,
22  which implies a fundamentally different way to deliver
23  healthcare than exists today.  Our vision states that we
24  will align with providers by delivering integrated, seamless
25  quality care across all of our settings.  And when we talk

2232

1  about aligning with providers, talk about strategic clinical
2  and financial alignment.
3       Q.  Can you describe, just in a nutshell, what each of
4  those types of alignment entails?
5       A.  So strategic alignment would be St. Luke's and
6  physicians working toward the same purpose, the same end
7  goal and pursuing the same types of strategies to effect our
8  vision.  Clinical alignment would be having the same type of
9  clinical information, being able to use that in a way to
10  provide seamless, integrated patient care, to get the
11  physicians and the other caregivers the information they
12  need to effectively care for patients.  And financial
13  alignment so that we are -- our financial interests are
14  aligned and we're not -- we're not competing against one
15  another in that regard.
16       Q.  And can St. Luke's align with independent
17  physicians?
18       A.  If I talk about clinical strategic financial
19  alignment, there are areas of those that, yes, we can have
20  some success in alignment in each of those categories or
21  progress in each of those categories.
22       Q.  Do you believe you can achieve the same level of
23  alignment with independent physicians as you can with a
24  group like Saltzer under a PSA?
25       A.  Not as I defined it, no.

2233

1       Q.  And you mentioned that under the MOU between
2  Saltzer and St. Luke's, the two entities were working
3  together.  Was there anything from your involvement with the
4  planning committee that you thought or Saltzer thought could
5  be enhanced by a closer relationship?
6       A.  Could you -- could you repeat that question?
7       Q.  Sure.  In connection with working with Saltzer
8  under the MOU that was signed that we looked at in -- from
9  2008, you referenced a -- planning committee that you
10  played some role in.  Was there anything in your experience
11  in working with that planning committee that you thought the
12  relationship between the parties could benefit from closer
13  affiliation than was permitted under that MOU?
14       A.  Yeah.  I -- I don't recall how long the planning
15  committee as envisioned in the MOU lasted.  It -- it, over
16  the course of -- or a period of time we began discussions of
17  integration.  So we -- we didn't have a separate planning
18  committee meeting to talk about those five things and a
19  separate committee meeting to talk about broader
20  integration.  That kind of came together.
21       Q.  And during your discussions with Saltzer, did the
22  subject of St. Luke's putting a hospital in Canyon County
23  ever come up?
24       A.  Yes.
25       Q.  And can you describe those conversations.

2234

1       A.  Well, it was, I think, public knowledge that some
2  years ago before I joined St. Luke's, St. Luke's purchased a
3  large piece of property in Caldwell, over a hundred acres,
4  for the purpose of putting healthcare facilities in the area
5  in the future at some undetermined point of time.
6            Saltzer Medical Group was very interested in the
7  St. Luke's plans because they told us of when and where we
8  would put a hospital in Canyon County.  They were
9  particularly concerned because during that period of time,
10  CHI -- it's a parent company of the -- of the hospital in
11  Nampa -- was selling that facility.  Saltzer told us --
12            MR. ETTINGER:  Your Honor, I think this is
13  hearsay.
14            THE COURT:  Well, is it -- Mr. Schafer?
15            MR. SCHAFER:  Your Honor, this is background as to
16  the -- the discussions in St. Luke's intent and motivation
17  with respect to the eventual decision that the facility
18  would be opened in Nampa.
19            THE COURT:  All right.  I'll allow it as not being
20  offered for the truth of the matter asserted but only as
21  providing a basis for some of the decisions that were
22  subsequently made by St. Luke's.
23            Proceed.  Counsel, we're probably at the breaking
24  point.  But I'll let you go.  You can just kind of pick a
25  spot in the next few minutes --

2235

1            MR. SCHAFER:  Okay.  Thank you, Your Honor.
2            THE COURT:  -- for a natural breaking point.
3  BY MR. SCHAFER:
4       Q.  So if you could continue your answer, Mr. Roth.
5       A.  Saltzer told us -- told me they were extremely
6  interested in having a St. Luke's hospital in that
7  community.  They were concerned that Saint Alphonsus may end
8  up acquiring the hospital in Nampa.  We indicated to
9  Saltzer -- I indicated to Saltzer that we did not have
10  immediate plans to put a hospital in Nampa or Canyon County.
11            They expressed to me that they felt the location
12  we selected in Canyon County, that land we purchased, was in
13  the wrong location, it needed to be in the Nampa city limits
14  and they wanted to know our specific plans to put inpatient
15  facilities in that market.  It was a topic of continued
16  conversation throughout our discussions.
17       Q.  And where do those plans stand today, Mr. Roth?
18       A.  Saltzer entered into a lease with a private
19  developer to establish a presence in a new location in
20  Nampa.  St. Luke's subsequently followed and established a
21  presence in that location.  Today, we have emergency
22  services and outpatient services and others in that
23  location.  We have acquired the property and we intend to
24  put additional facilities on that location as the demand is
25  there and the population supports.

2236

1  MR. SCHAFER:  Your Honor, this is probably a good
2  breaking point for the lunch break.
3  THE COURT:  All right.  Counsel, we'll take then a
4  15-minute recess.  We'll be in recess.
5  (Recess.)
6  ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
7  THE COURT:  Mr. Schafer, you may resume your
8  examination of Mr. Roth.
9  I'll remind you, sir, you are still under oath.
10  MR. SCHAFER:  Thank you, Your Honor.
11  BY MR. SCHAFER:
12  Q.  Mr. Roth, before we took a break, we talked a
13  little bit about the memorandum of understanding between
14  Saltzer and St. Luke's.  And you also talked about your
15  views of the three types of alignment with physicians.
16  I wanted to ask you:  Do you believe that working with
17  Saltzer under just the memorandum of understanding St.
18  Luke's would have been able to achieve the three types of
19  alignment you referenced?
20  A.  No.
21  Q.  And why not?
22  A.  Well, I -- I think we began to dabble in some of
23  those areas.  So if we talk about strategic alignment, at
24  the time, we're still separate organizations competing
25  against one another, trying to find areas that we can work

2237

1  together on and make sense.
2  Relative to financial alignment, there was no
3  financial relationship involved in those, outside of lease
4  agreements and things like that, so we -- we were completely
5  separate in that regard.
6  In the area of clinical alignment -- I'll take the
7  cardiology practice, for example -- that's an area where we
8  successfully partnered with Saltzer to provide cardiac
9  services in that clinic.  So that's a good start, but we're
10  still using separate medical records, we've got separate
11  registration processes, we've got separate billing
12  processes.  So it -- we began to dabble in those areas, but
13  certainly not full alignment in each of those three
14  categories.
15  Q.  After the -- you mentioned that after the
16  memorandum of understanding was entered, the relationship
17  sort of evolved in starting to talk more about a closer
18  affiliation.  How long did those discussions take place
19  before Saltzer and St. Luke's actually finalized the PSA?
20  A.  We finalized the PSA at the beginning of this
21  year, 2013, and we began the discussions that MOU started in
22  December of 2008, so the better part of three years.
23  Q.  And why did it take so long to reach an agreement?
24  A.  Well, they were complex.  St. Luke's and Saltzer
25  are large, complex organizations in their own right.  And

2238

1  this is a huge decision for both organizations to agree to
2  partner with -- with one another in -- in that regard.
3  The physicians at Saltzer had other -- there were
4  other complicating issues in that some of the physicians
5  owned real estate; some didn't; some had investments in
6  other businesses, surgery centers like Treasure Valley
7  Hospital; some didn't.
8  During the course of the discussions, Saltzer
9  engaged an independent consultant to help propose some ideas
10  towards integration and effectively represent Saltzer, and
11  it took us some time to process and discuss some of the new
12  ideas that he was proposing.
13  Near the end of our discussions in late 2011-2012,
14  Saltzer indicated that they wanted to engage with Saint
15  Alphonsus to entertain a potential relationship with Saint
16  Alphonsus, so that took some time to work out.
17  And then, you know, Saltzer being a 40-plus
18  physician, multispecialty group practice, just working out
19  compensation agreements with each of those physicians and
20  multiple specialties is incredibly complex.  So it took a
21  while.
22  Q.  Before St. Luke's and Saltzer entered into the
23  PSA, did they enter into a preliminary agreement or a letter
24  of intent?
25  A.  Yes, we had a letter of intent.

2239

1  Q.  And what was the purpose of that letter of intent?
2  A.  The purpose of that letter of intent is to outline
3  the parameters of the relationship that we were looking to
4  have.  It's a roadmap, high-level, that says this is what we
5  intend to do, Saltzer and St. Luke's, and once we complete
6  the relationship.
7  Q.  And in that letter of intent, was there a
8  provision that pertained to confidentiality or exclusivity
9  regarding negotiations?
10  A.  Yes.
11  Q.  And what, more specifically, did it provide?
12  A.  Well, we typically enter into these types of
13  agreements where both parties agree to keep the information,
14  sensitive information, confidential.  The exclusivity
15  provision would have said that during the course, we're
16  going to talk with one another and not others; that was a
17  discussion very early on.
18  We indicated to Saltzer that if -- if they were
19  looking to engage with St. Luke's and somebody else and have
20  integration discussions with more than one party at the same
21  time, we weren't interested, and they assured us that they
22  wanted to see this through with St. Luke's.  We memorialized
23  that in that agreement.
24  Q.  In one of your previous answers, you referenced
25  that there came a point in time when Saltzer came to

St. Luke's regarding potential -- a potential affiliation that had been offered by Saint Al's.
Was that something that the Saltzer physicians asked St. Luke's if they could do?
**A. Yes.**
Q. And did St. Luke's give its blessing?
**A. Yes. It was in the latter part of 2011, early 2012, where the physician leaders at Saltzer indicated that there was a desire by some in the group to engage with Saint Alphonsus in exploring what a relationship with Saint Alphonsus might look like.**
**It was frustrating in that we had been in these discussions for a number of years, but clearly remember the meeting where we, myself and others, attended with the Saltzer physicians, and Gary Fletcher stood up and said, "We're not here to twist arms. What's important is that we have a shared vision. If you don't have that shared vision and you want to explore that with Saint Alphonsus, then, by all means, go ahead. But let's not take forever to do it." And I think we agreed on a 90-day time period by which Saltzer would engage with Saint Alphonsus and determine their course.**
Q. And what was the result of those discussions, the discussions between Saltzer and Saint Alphonsus?
**A. Saltzer concluded after that that they wanted to**

**pursue an integrated relationship with St. Luke's. They proceeded to hold a vote with the partners. The vote was overwhelmingly in support of integrating with St. Luke's, and then we completed the agreement.**
Q. Mr. Roth, was any purpose of St. Luke's affiliation with Saltzer to affect the referral patterns of Saltzer physicians?
**A. No.**
Q. Was the subject of autonomy of referrals ever discussed in your meetings with Saltzer physicians?
**A. Yes.**
Q. And did anything in the PSA that was eventually entered between the parties address that issue?
**A. Yes.**
Q. And how did it address that issue?
**A. Well, very early on in the discussions with Saltzer, as it became apparent that we were -- both parties were looking toward a more financially, clinically, strategically integrated relationship, the concern was raised that, well, is St. Luke's going to require us to send our patients to St. Luke's facilities.**
**And we were consistently adamant, no, we don't do that with any of our physicians. They wanted -- Saltzer wanted that memorialized, and we were happy to do that. So in the agreement, it clearly says and states that physicians**

**at Saltzer can refer patients to wherever they would like.**
Q. Mr. Roth, I have put up on the screen Joint Exhibit 24. And can you identify this document?
**A. This is the Professional Services Agreement, yes.**
Q. And if you could look on page 5 of the exhibit, Section 2.2(a), what's the title of that section?
**A. "Exclusivity."**
Q. If you could turn to the next page, the last sentence of that provision, can you read that last sentence that's highlighted there.
**A. "All Saltzer physicians may have privileges at any hospital and may refer patients to any practitioner or facility regardless of its affiliation with St. Luke's."**
Q. So how is that statement consistent with the heading "Exclusivity"?
**A. Well, in regard to exclusivity, we want physicians and partners who are engaged with us to effect our mission of transforming healthcare. We need a -- we need partners who are dedicated administratively, dedicated relative to medical direction, not conflicted to those ends. So the exclusivity really references having dedication towards the group and St. Luke's to effect our mission.**
**That being said, physicians need to be able to have the, in our opinion, the flexibility to send patients where they deem appropriate based on whatever determinations**

**they make. If we wanted to, we could require physicians in these types of agreements to send patients to St. Luke's, and we don't.**
Q. And beyond being written in the contract itself, do you have any expectation regarding whether Saltzer physicians will actually exercise the right to refer patients to non-St. Luke's facilities or keep their privileges at other facilities?
**A. Yes, I have that expectation.**
Q. And why is that?
**A. Because they do today.**
Q. And is there any reason why you feel that Saltzer physicians are any more likely to do that than any other groups with which St. Luke's is affiliated?
**A. Can you repeat that?**
Q. Is there anything regarding the contractual process that leads you to believe that Saltzer might be more likely to exercise those rights than other groups with which St. Luke's is affiliated?
**A. No.**
Q. Mr. Roth, you referenced one of the impediments to moving more quickly towards an agreement with the Saltzer group being that some of the Saltzer physicians had an ownership interest in Treasure Valley Hospital. Do you remember that?

2244

1    **A.**  Yes.

2    **Q.**  And was St. Luke's concerned with the fact that

3    some Saltzer surgeons had an ownership in that facility?

4    **A.**  No.

5    **Q.**  And why was that a concern?

6    **A.**  Well, it really goes back to the concept of

7    alignment, clinical strategic financial alignment.  And

8    physicians that are part of Saltzer and still invested in

9    Treasure Valley Hospital, it prevents alignment in those

10   areas.

11   **Q.**  Were you aware of any prior relationship that any

12   of the Saltzer surgeons had with an ambulatory surgery

13   center in Nampa?

14   **A.**  Yes.

15   **Q.**  And what was your understanding of what happened

16   with respect to that facility?

17   **A.**  My understanding is that the surgeons at Saltzer

18   did their outpatient surgery at a surgery center in Nampa.

19   They subsequently invested in Treasure Valley Hospital,

20   moved their cases to Treasure Valley Hospital, and that

21   surgery center in Nampa closed.

22   **Q.**  And did that history add at all to your concern

23   with respect to the Saltzer surgeons' ownership in Treasure

24   Valley Hospital?

25   **A.**  Yes.

2245

1    **Q.**  Did St. Luke's require that the Treasure Valley

2    Hospital owners sell their interests in Treasure Valley

3    Hospital in order to become part of the St. Luke's clinic?

4    **A.**  No.

5    **Q.**  Why not?

6    **A.**  They didn't want to.

7    **Q.**  Were there any conditions placed on the offers to

8    the Treasure Valley Hospital owners if they decided to

9    maintain their interest in Treasure Valley Hospital?

10   **A.**  Yes.

11   **Q.**  What conditions were those?

12   **A.**  Their salaries, their compensation agreements were

13   lower, and there were prohibitions in terms of leadership

14   positions they could hold in Saltzer.

15   **Q.**  And why were those two conditions put in place for

16   the surgeons if they decided to maintain their Treasure

17   Valley Hospital ownership?

18   **A.**  Well, it really goes back to -- to the alignment

19   question.  If we have surgeons who are personally invested

20   in a competing surgery center and we're asking them to

21   dedicate their time, their talents, their energies to

22   improving systems and care to -- in Saltzer and St. Luke's

23   essentially competing facilities, it's very difficult.  And

24   that was put in place to recognize that.

25   **Q.**  Did you or did anyone else from St. Luke's tell

2246

1    the Treasure Valley Hospital owners that in order to be part

2    of the exclusive agreement with St. Luke's, that they would

3    not only have to sell their interests in Treasure Valley

4    Hospital, but they could no longer take cases there?

5    **A.**  No.

6    **Q.**  Take patients there?

7    **A.**  No.

8    **Q.**  Did you ever meet individually with any of the

9    Saltzer surgeons to discuss issues regarding the PSA or the

10   Treasure Valley Hospital ownership?

11   **A.**  Yes.

12   **Q.**  And who did you meet with?

13   **A.**  Dr. Steve Williams.

14   **Q.**  And can you tell me what you discussed with

15   Dr. Williams?

16   **A.**  Yes.  I remember very well the meeting.  We met at

17   the Meridian Hospital late afternoon, early evening for

18   nearly two hours.  And we talked about the visions of our

19   respective organizations, and we talked about Treasure

20   Valley Hospital as it relates to that.

21   **Q.**  And what specifically did you discuss regarding

22   Treasure Valley Hospital?

23   **A.**  Well, Dr. Williams was at the time an investor in

24   Treasure Valley Hospital.  He was concerned about our

25   position that -- relative to exclusivity.  And what I mean

2247

1    by that is, as part of our relationship with Saltzer, we

2    agreed, both parties, that we would come together and design

3    the healthcare delivery system that the community needs.

4    And one of the elements of that would be what types of

5    physicians over the course of time and providers need to be

6    recruited into the area and that we would jointly make those

7    decisions and do that together.

8         We -- because the surgeons, Dr. Williams wanted to

9    retain that investment in Treasure Valley Hospital, we, St.

10   Luke's, indicated that we are not going to agree to sit down

11   at the table with the surgeons and plan when physicians need

12   to be recruited into that -- into the community.

13        In other words, we wanted the ability to recruit

14   physicians into the community at such time that we determine

15   that needed to happen.

16   **Q.**  And did you tell Dr. Williams that -- or any of

17   the Saltzer surgeons -- that St. Luke's would recruit more

18   surgeons into Nampa or Canyon County regardless of need?

19   **A.**  No.  I told them we wanted the option to recruit

20   if we needed to.

21   **Q.**  And what was Dr. Williams' response to that?

22   **A.**  We disagreed on -- on that point.  He felt

23   that -- and at the time, he was practicing primarily at the

24   Meridian Hospital and Treasure Valley Hospital.  Today it's

25   Treasure Valley Hospital and Saint Alphonsus.  But he felt

2248

1    that -- that he and other surgeons could support Treasure
2    Valley Hospital, the Meridian Hospital, and a future Nampa
3    hospital.
4            And while I conceded that's possible, that we, St.
5    Luke's, needed the flexibility.  In the event that they
6    couldn't cover it, we needed to be able to have the option
7    to recruit physicians that could cover it.
8        Q.   Did Dr. Williams tell you anything at that meeting
9    about what he thought the surgeons would do?
10       A.   He indicated that he thought a couple of surgeons
11   from Saltzer may end up leaving the group as a result of
12   this and -- position.  So that's -- he made me aware of
13   that.
14       Q.   And were you upset to hear that?
15       A.   No.
16       Q.   Why not?
17       A.   It really goes back to my reference Gary Fletcher
18   earlier talking about our vision.  To the extent that
19   physicians don't want to work with St. Luke's in that
20   regard, have no ill will, but we don't want to work with
21   them in this regard relative to the alignment we're talking
22   about.  So the sooner that decision is made, the better.
23       Q.   Mr. Roth, are you generally aware of the
24   compensation offers that St. Luke's made to the Saltzer
25   physicians?

2249

1        A.   I am, generally.
2        Q.   Do you know whether the compensation offered to
3    the primary care physicians would have increased by a larger
4    percentage than the compensation offered to the surgeons?
5        A.   I believe it did.
6        Q.   And why was that?
7        A.   Well, a couple of factors.  As we looked at
8    primary care compensation within the Saltzer Medical Group
9    before we integrated, it was certainly lower than the
10   specialists, which is typical, primary care physicians being
11   paid lower than specialists.  When we compared their
12   compensation to other primary care physicians in St. Luke's,
13   it was lower, so we wanted to increase that.
14           From a percentage basis, it's going to increase
15   more as a percentage basis because there -- the base for a
16   primary care physician is lower than that of a specialist.
17   So that would be why it increases at a larger percentage
18   rate.
19       Q.   And why -- why is having equitable salaries across
20   the physicians within St. Luke's a goal of St. Luke's?
21       A.   Having equity in compensation in any organization,
22   whether physicians or nurses or others, is important.  It's
23   important for the culture.  It is a representation of value,
24   how -- how is the organization valuing the services
25   that -- that I'm providing.

2250

1            One of the areas I'm very proud of is that
2    we -- we take away any -- our payment methodologies to
3    physicians are blind to the payors, if you will.  So a
4    physician, if they see a patient with no insurance or some
5    insurance, Medicare, Medicaid, Blue Cross, they get paid the
6    same regardless.  So the equity in our compensation systems
7    is -- is really important.
8        Q.   Did St. Luke's take any steps to ensure that the
9    compensation offers it was making to the Saltzer physicians
10   were within fair market value?
11       A.   Yes.
12       Q.   What steps did it take?
13       A.   We will always seek a third party, independent
14   third party group, to evaluate the compensation arrangements
15   we have with physicians to determine if they fall within the
16   limits of fair market compensation.
17       Q.   And, Mr. Roth, if one simply looks at the
18   compensation increase from what a Saltzer physician may have
19   made in 2012 at Saltzer to what he might have made, or might
20   make, in 2013 as part of St. Luke's, do you think that that
21   gives an accurate sense or a full sense of the compensation
22   structure of that agreement?
23       A.   I don't believe it does.
24       Q.   And why not?
25       A.   Well, the agreement that we entered in with

2251

1    Saltzer is a five-year agreement that sets the compensation
2    for a five-year period, so comparing one year to five is
3    kind of apples and oranges.
4        Q.   And how was the payment structure of those
5    agreements established?
6        A.   The way Saltzer physicians are reimbursed is a
7    traditional fee-for-service compensation system.
8        Q.   And, Mr. Roth, there has been discussion in this
9    case about a goal St. Luke's has about moving from volume to
10   value.  Are you familiar with that goal?
11       A.   Yes.
12       Q.   So why didn't St. Luke's immediately put Saltzer
13   on a quality- or value-based payment model?
14       A.   Moving from volume to value sounds easy.  But what
15   we're talking about is putting in a system that is
16   fundamentally different from how healthcare, the business of
17   healthcare, works.  Healthcare providers are paid based on
18   how much we do and how many patients we see, and it's been
19   like that for a long, long time.  And we're trying to change
20   that.
21           We're -- we, St. Luke's Health System hospitals,
22   providers, are a -- one cog in the system, if you will,
23   related to reimbursement.  So changes like this don't happen
24   overnight.  It requires a level of integration to start
25   moving reimbursement from volume to value that hasn't

2252

1  existed in our community, which is why I keep talking about
2  integration and alignment.
3        For Saltzer, day 1, a group that had not had
4  quality targets, to my knowledge, relative to compensation
5  prior to joining St. Luke's, frankly, I'm not aware of any
6  other independent groups that have joined St. Luke's that
7  had meaningful quality and value targets as part of their
8  clinic compensation. To change that on day 1 would be an
9  incredible challenge. We're not integrated. We're not
10 sharing information. We're not on the same medical record.
11 We don't have measurable outcomes, day 1, and it takes time
12 to do that.
13       So that being said, St. Luke's and Saltzer agreed
14 that that's the direction that we want to go, and both
15 organizations are prepared to go in that direction to move
16 physician compensation more towards the value side.
17    Q.  And has St. Luke's begun transitioning any of the
18 groups that have been part of the St. Luke's clinic for
19 longer than Saltzer in that direction?
20    A.  Yes.
21    Q.  And what groups?
22    A.  We have the Idaho Pulmonary group, the
23 cardiologists, St. Luke's Internal Medicine. We have a
24 pediatric gastroenterology group that's moved in that
25 direction, endocrinology group, and we've got another large

2253

1  group we're getting ready for at this time.
2    Q.  Mr. Roth, you would admit that those groups and
3  the move from volume to value, that's still a relatively
4  small percentage of those physicians' compensation, isn't
5  it?
6    A.  Yes.
7    Q.  And why is that? Why not more?
8    A.  We just -- St. Luke's Internal Medicine just went
9  through this transition. And the way it occurred is the
10 physicians established a compensation committee within that
11 group and determined their compensation going forward and
12 said: We're willing to put our compensation at risk for
13 meaningful quality and value measures.
14       Certainly a step in the right direction. Does it
15 represent the majority of their compensation? No, it
16 doesn't. But it's a start. And it's a start to change a
17 system that the rest of the region and the rest of the
18 country operates from.
19    Q.  Mr. Roth, what role, if any, did a desire to gain
20 market power play in the decision of St. Luke's to affiliate
21 with Saltzer?
22    A.  None.
23    Q.  And what role, if any, did a desire to increase
24 prices to commercial payors play in the decision to
25 affiliate with Saltzer?

2254

1    A.  None.
2    Q.  I want to switch gears and ask you a couple of
3  questions about the West Valley Medical Center. Are you
4  familiar with West Valley?
5    A.  Yes.
6    Q.  Where is that located?
7    A.  Caldwell.
8    Q.  Is West Valley a competitor of St. Luke's?
9    A.  Yeah. And they're -- they're part of, I believe,
10 the nation's largest for-profit hospital system.
11    Q.  In what ways does St. Luke's compete against West
12 Valley?
13    A.  We compete against West Valley like we would
14 compete against Saint Alphonsus or anybody else providing
15 services in the community.
16    Q.  Despite that --
17    A.  All the --
18    Q.  I'm sorry. Go ahead.
19    A.  All the services that we provide and they provide,
20 we are competing against one another in some regard.
21    Q.  Despite that competition, does St. Luke's work
22 together with West Valley on any programs or initiatives?
23    A.  Yes.
24    Q.  And what are those?
25    A.  We have an agreement in place where St. Luke's is

2255

1  -- and West Valley Medical Center are working together to
2  improve certain aspects of cardiac services. St. Luke's has
3  employed physicians in Caldwell, West Valley Medical Center,
4  cardiologists, urologists that practice at West Valley
5  Medical Center, and are involved in programs in that regard.
6  We do compete, but we also work together in areas that make
7  sense, and we agree to do so.
8    Q.  And why did St. Luke's decide to work with West
9  Valley on the cardiac program, for example?
10    A.  Well, West Valley was struggling with their echo
11 service. They were very interested in establishing a
12 certified chest pain clinic in their hospital, something
13 that St. Luke's had already established.
14       Two physicians -- namely, Dr. Bathina and
15 Dr. Fields, St. Luke's Clinic physicians, practiced
16 primarily in Caldwell and have for years -- were also
17 interested in helping that hospital achieve better results.
18 So we were willing to enter into an agreement with West
19 Valley to -- to make improvements in that regard.
20    Q.  With respect to those physicians you mentioned who
21 admit patients at West Valley Medical Center, why doesn't
22 St. Luke's just tell them to take all of those patients to a
23 St. Luke's facility?
24    A.  Well, for all the reasons I repeated earlier; we
25 don't do that. We -- we could, but we don't.

2256

1    MR. SCHAFER:  No further questions.
2    THE COURT:  Cross-examination.
3    MR. BIERIG:  Your Honor, excuse me for
4  interrupting.
5    THE COURT:  Oh, yes, Mr. Bierig.
6    MR. BIERIG:  We have a bit of a dilemma here.  As
7  the court knows, we have subpoenaed Dr. -- excuse me,
8  Director Armstrong of the Department of Health and Welfare
9  of the State of Idaho.  The only time that he could do it
10  this entire week was this afternoon, and I don't know how
11  long a cross-examination is going to take.
12    I can say that my direct examination of Mr. Armstrong
13  will be fairly substantial, so I think there is two or three
14  possible solutions.  One would be to delay the
15  cross-examination of Mr. Roth; the other is if the court is
16  willing to stay longer than 2:30 today.
17    But I'm concerned.  I'm told by Mr. DeLange that
18  Director Armstrong is not available tomorrow, and his
19  testimony really --
20    THE COURT:  Well, let me just -- Mr. Ettinger, are
21  you willing to defer your cross-examination?
22    MR. ETTINGER:  How much time, Your Honor?  I would
23  say 40 minutes, maybe.
24    THE COURT:  Well, I don't think that would give us
25  enough time.  Are you willing to delay it until tomorrow

2257

1  morning?
2    MR. ETTINGER:  Yes, Your Honor.
3    THE COURT:  All right.  I think that solves the
4  problem.  Let's have Mr. Roth step down and then call out of
5  your order your next witness.
6    Thank you, Mr. Ettinger.  That's very much appreciated.
7    You will be allowed to step down, Mr. Roth, but subject
8  to recall probably tomorrow morning.
9    THE WITNESS:  Okay.
10    THE COURT:  All right.  Thank you.
11    MR. BIERIG:  We call Dr. Richard Armstrong.
12    THE COURT:  All right.
13    MR. BIERIG:  Director Richard Armstrong, sorry.
14    THE COURT:  While Mr. Armstrong is taking the
15  stand, I think there was an issue raised -- well, I don't
16  see Mr. Wilson.
17    Mr. Wilson, a question was raised about counsel using
18  leading questions in examining the witness.  The Rule
19  611(b), I believe it is, provides that it is proper to use
20  cross -- to use leading questions in cross-examination and
21  while examining a hostile witness, a party, or someone
22  identified with a party.
23    I think that's broad enough, and I'm quite lenient on
24  leading questions as long as counsel is not putting words in
25  the witness's mouth.  So while you'll have a continuing

2258

1  objection, I am going to give counsel some leeway.
2    MR. WILSON:  Understood.  Thank you.
3    THE COURT:  All right.  Director, is it Director
4  Armstrong?  Would you step before the clerk and be sworn.
5    RICHARD MERLE ARMSTRONG,
6  having been first duly sworn to tell the whole truth,
7  testified as follows:
8    THE CLERK:  Please state your complete name and
9  spell your name for the record.
10    THE WITNESS:  It's Richard Merle Armstrong,
11  R-I-C-H-A-R-D M-E-R-L-E A-R-M-S-T-R-O-N-G.
12    THE COURT:  You may inquire of the witness.
13    MR. BIERIG:  Thank you Your Honor.
14    DIRECT EXAMINATION
15  BY MR. BIERIG:
16    Q.  Good afternoon, Mr. Armstrong.  It's nice to see
17  you again.
18    A.  Hello, sir.
19    Q.  You are currently the director of the Department
20  of Health and Welfare of the State of Idaho; is that
21  correct?
22    A.  Yes.
23    Q.  For how long have you held that position?
24    A.  Since June of 2006.
25    Q.  Is the department divided -- does the department

2259

1  divide the state of Idaho into different geographic regions?
2    A.  Yes.  We have a number of different designations,
3  depending on the kind of work that we're doing.  So where
4  there is a connection to the criminal justice system, we use
5  seven divisions.  But for other functions, we have three
6  divisions.  It depends on the kind of work that we do.
7    Q.  But there are basically seven different geographic
8  regions in the -- for the Department of Health and Welfare?
9    A.  Yes.
10    Q.  In what region is Nampa located?
11    A.  That would be Region 3.
12    Q.  And what does Region 3 cover?
13    A.  It covers a grouping of counties that's
14  predominantly along the Oregon border.  So it would go from
15  approximately Riggins down through Owyhee County.
16    THE COURT:  Counsel, let me just -- you mentioned
17  seven divisions.  I assume those coincide with the judicial
18  districts prescribed, or are they different?
19    THE WITNESS:  No.  They coincide with the judicial
20  districts.
21    THE COURT:  All right.  So that would be the same
22  as the Third Judicial District --
23    THE WITNESS:  Yes.
24    THE COURT:  -- which would be Canyon County,
25  Owyhee, and --

2260

1    THE WITNESS: Payette --

2    THE COURT: Payette.

3    THE WITNESS: -- and Washington and those

4    counties.

5    BY MR. BIERIG:

6    **Q.** So have you referred to this region as the "Boise

7    Valley region"?

8    **A. No, sir. I would -- I would -- I would not. The**

9    **Boise Valley region would include parts of 4 as well.**

10   **Q.** So would the region that Nampa -- that

11   the -- excuse me, that Nampa is located in include Boise,

12   Meridian, and Caldwell, as well?

13   **A. If we're referring to it as the "Boise region,"**

14   **yes. It would be the metro population center.**

15   **Q.** And have you characterized that region as pretty

16   much a single medical region?

17   **A. I don't know whether I have in the past, but if**

18   **you ask me today, I would say, yes, it's pretty much the**

19   **same medical region.**

20   **Q.** So that would be Meridian, Nampa, Caldwell, and

21   Boise would be a single medical region?

22   **A. Yes.**

23   **Q.** Would you regard Nampa as a single medical region?

24   **A. I don't see it as a -- as an isolated medical**

25   **region.**

2261

1    **Q.** Now, how many divisions are there within the

2    Department of Health and Welfare?

3    **A. There are ten.**

4    **Q.** And is one of those divisions the medically

5    indigent services division?

6    **A. It is not a separate division.**

7    **Q.** But there is a --

8    **A. It is connected to the director's department,**

9    **which is my cost center.**

10   **Q.** And one of the concerns of the Department of

11   Health and Welfare is dealing with the medically indigent in

12   the state of Idaho? Would that be accurate?

13   **A. That is one of our areas of responsibility.**

14   **Q.** Are you aware whether physicians who practice in a

15   medical office setting, whether they're required to treat

16   medically indigent patients?

17   **A. I'm not aware that they are required to treat**

18   **medically indigent patients.**

19   **Q.** In fact, as independent businesspersons, they are

20   not required to treat medically indigent patients; is that

21   correct?

22   **A. That's my understanding.**

23   **Q.** Now, another division in the department is the

24   Medicaid division?

25   **A. Yes, sir.**

2262

1    **Q.** How many Medicaid recipients are there currently

2    in the state of Idaho?

3    **A. I believe there is around 240,000.**

4    **Q.** How, if at all, do you expect that number to

5    change in the coming years?

6    **A. We would expect that with the advent of the**

7    **insurance exchange that there will be an increase of about**

8    **35,000 individuals who are currently eligible but not**

9    **enrolled that will become enrolled as individuals, seek**

10   **private insurance through the insurance exchange, and,**

11   **through that process, will be aware of their Medicaid**

12   **eligibility.**

13   **Q.** So is it your testimony that you expect an

14   increase of roughly 35,000 in the foreseeable future of the

15   Medicaid population?

16   **A. Over the next couple years.**

17   **Q.** Are physicians who practice in medical office

18   settings required to treat Medicaid patients?

19   **A. They are not.**

20   **Q.** And are you aware that a number of physicians in

21   Idaho limit the number of Medicaid patients they will

22   accept?

23   **A. Yes. I am aware some do.**

24   MR. BIERIG: Your Honor, I'd like to show a couple

25   of documents to the witness, and I would ask Ms. Timoschiek

2263

1    to provide a brochure to -- through Mr. Metcalf and to

2    counsel.

3    Your Honor, this is -- I'm asking the court to put up

4    Defendant's Exhibit 2236.

5    BY MR. BIERIG:

6    **Q.** I'd ask Mr. Armstrong to look at this document.

7    **A. Yes, sir.**

8    **Q.** You can identify the handsome individual whose

9    picture appears there?

10   **A. Vaguely familiar.**

11   **Q.** I'd call your attention to the fourth paragraph

12   that starts "Paying for value." Would you mind just reading

13   that.

14   **A. "Paying for value, Armstrong says, means his**

15   **agency's goal is to move away from fee-for-service medical**

16   **care. 'It becomes units of service that's important, as**

17   **opposed to what the outcome is. We're shifting toward a**

18   **more outcomes-oriented measure of success,' says Armstrong."**

19   **Q.** These are -- in this article, these are statements

20   that are said to have been made by you to the Idaho

21   legislature in January of 2013. Is that accurate?

22   **A. That's accurate.**

23   **Q.** And do the statements attributed to you in that

24   fourth paragraph of Exhibit 2236 reflect your current view

25   as director of the Department of Health and Welfare?

2264

1    **A.**  Yes.

2    **Q.**  So is it a goal of the Department of Health and

3    Welfare to move from the fee-for-service model to, quote,

4    paying for value?

5    **A.**  Yes, it is.

6    **Q.**  And when you use the term "pay for value," what do

7    you mean?

8    **A.**  **We believe that the healthcare system should focus**

9    **on the positive outcome of a medical event, as opposed to be**

10   **focusing on the number of services that can be provided**

11   **which are paid for independently of the outcome.**

12   **Q.**  So why is transitioning to pay-for-value a goal of

13   the department?

14   **A.**  **We have a budget that we have to manage, and it is**

15   **very difficult to manage that budget forward when -- under**

16   **the current environment.  And so we know that we need to**

17   **move to a different method of payment that can slow the rate**

18   **of inflation, healthcare inflation; at the same time, get a**

19   **better result from the dollars we spend.**

20   **Q.**  Would it be fair to say that one of the primary

21   reasons that the department wants to transition to

22   pay-for-value is that the fee-for-service system drives

23   utilization and frequency of services?

24   **A.**  **That would be our belief.**

25   **Q.**  And would it be fair to say that the department

2265

1    believes that moving toward more managed care will result in

2    better quality and lower prices in the long run?

3    **A.**  **That's our goal.**

4    **Q.**  And that's your belief, is it not?

5    **A.**  **That's my belief.**

6    **Q.**  How does the Department of Health and Welfare

7    intend to effectuate the transition from fee-for-service

8    Medicaid payments to a pay-for-value approach?

9    **A.**  **We have -- we began this process some years ago by**

10   **moving parts of our business to managed care concepts.  And**

11   **each of those pieces that have been moved have been**

12   **successful, which encourages us to move additional pieces of**

13   **business to that concept.**

14          **The next major goal will be to move physical**

15   **medicine to managed care, and we'll do that through a**

16   **request for proposal process.**

17   **Q.**  So does the desired transition to the

18   pay-for-value approach that you just articulated involve the

19   healthcare providers in the state of Idaho?

20   **A.**  **Oh, absolutely.**

21   **Q.**  In what way?

22   **A.**  **Well, they will -- they will be involved to -- in**

23   **the responses that would come in to a request for proposal,**

24   **and that would be either through accountable care**

25   **organizations or through connections to insurance entities**

2266

1    **or other companies that would respond to our proposal.**

2    **Q.**  So these providers have to be prepared to

3    undertake a pay-for-value approach to care for Medicaid

4    patients.  Would that be a fair statement?

5    **A.**  **Yeah, that would be logical.**

6    **Q.**  How long do you anticipate that the transition to

7    a pay-for-value approach will take to achieve?

8    **A.**  **It will take a -- it will take a period of time,**

9    **probably 18 to 24 months.  It's a culture shift away from**

10   **where we have been, and it will take some time for that to**

11   **really take hold.**

12   **Q.**  It doesn't happen overnight, does it?

13   **A.**  **Typically not.**

14   **Q.**  Now, would paying for value include shifting to a

15   more outcome-oriented measure of success?

16   **A.**  **Yes, it would.**

17   **Q.**  And a shift to a more outcomes-oriented measure of

18   success would require a shift by hospital systems, would it

19   not?

20   **A.**  **By?**

21   **Q.**  By hospital systems.  Excuse me, by health

22   systems.

23   **A.**  **Yes, I think it would.  Health systems today are**

24   **oriented around fee-for-service medicine, so, yes, it would**

25   **require a shift.**

2267

1    **Q.**  And they would have to shift more towards some

2    kind of capitated or value-based approach to delivery of

3    care; is that correct?

4    **A.**  **Yeah.  It would be to a different payment method.**

5    **Q.**  Would it include having a healthcare system moving

6    services from inpatient to outpatient settings?

7    **A.**  **That would be logical.  It would be a logical**

8    **outcome, yes.**

9    **Q.**  And would it also involve health systems moving

10   toward preventive care and community outreach?

11   **A.**  **That would be part of it as well.**

12   **Q.**  Would the shift you're describing involve having

13   physicians who are committed to developing best practice

14   protocols and following those protocols?

15   **A.**  **Yes, it would.**

16   **Q.**  In your view, as director of the Idaho Department

17   of Health and Welfare, are physicians more likely to agree

18   to and follow best practice standards if they are involved

19   in setting the standards?

20   **A.**  **That's my assumption.**

21   **Q.**  So would it advance the goals of the Department of

22   Health and Welfare if St. Luke's is incentivizing the

23   physicians that it employs to get involved in developing

24   best practice protocols?

25   **A.**  **Yes.  I think the more health systems encourage**

2268

1  physicians to move this direction, it would be very helpful.
2      Q.  And would the Medicaid program benefit from
3  physicians working together to develop evidence-based
4  practice protocols?
5      A.  Yes, it would.
6      Q.  And would the Medicaid program benefit from
7  physicians being incentivized to practice medicine in
8  accordance with the best -- excuse me -- in accordance with
9  best evidence practice protocols?
10      A.  Yes.
11      Q.  Does, in your judgment, shifting to a value-based
12  payment system involve physicians and hospitals forgoing
13  services on which they are currently making money in order
14  to emphasize outcome?
15      A.  I -- that's a difficult question, because
16  "forgoing" would imply that something is being delivered
17  that isn't appropriate or necessary.
18      Q.  Okay.  Well, let me ask you this, Mr. Armstrong:
19  Does the term "accountable care organization" mean anything
20  to you?
21      A.  Yes, it does.
22      Q.  Would it be fair to say that an accountable care
23  organization is a vehicle for a health system to assume risk
24  for the costs of delivering care to the patient population?
25      A.  That is the current definition.

2269

1      Q.  So would assumption of risk by a health system
2  advance the goals of the Department of Health and Welfare to
3  transition to pay-for-value?
4      A.  It's my assumption that that is a key ingredient.
5      Q.  Is assumption of risk by providers part of the
6  transition to pay-for-value that the department hopes to
7  achieve?
8      A.  Would you say that again, please?
9      Q.  Yes.  Is assumption of risk by providers part of
10  the transition to pay-for-value that the department hopes to
11  achieve, so that the providers will take on risk?
12      A.  Yes, it is.
13      Q.  In your judgment, would moving to an approach to
14  payment by which a health system takes the risk of excess
15  utilization require the healthcare system to have a viable
16  methodology for them to control their costs?
17      A.  Yes.  They'd have to have a viable method.
18      Q.  Would it involve having sufficient patients in the
19  system so that the risks of patients who require
20  significantly more services, or more intensive services than
21  most patients, could be spread across a large number of
22  patients?
23      A.  When we move into the changing payment
24  methodology, we will be stratifying our members into various
25  risk categories because we already know that there are

2270

1  certain Medicaid patients who use significant resources
2  today and others who do not.  So we would first be
3  stratifying them into various risk categories where there
4  would be a different payment attached to that category.
5          Now, within that category, we know that there will
6  be folks at each end of that class, and there would be then
7  a pooling within that class.
8      Q.  So a health system that's seeking to assume risk
9  would need to have a significant number of patients across
10  which to spread the risk of outliers.  Would that be true?
11      A.  That would be true.
12      Q.  Would the system toward which the department is
13  moving, would it benefit from having health systems having a
14  unified electronic health record across the system?
15      A.  Today, there are -- I'm part of the Idaho Health
16  Data Exchange; I'm a board member.  And, therefore, I have
17  observed that using that tool, that clinical data has been
18  able to move between electronic medical records that are
19  from different manufacturers.
20          So today there is a greater utility
21  of -- available than used to be available to the medical
22  community.  So clinical information can move between
23  dissimilar EMRs.
24      Q.  But do you regard a unified electronic health
25  record within a health system as being an advantage to the

2271

1  health system in terms of managing patients?
2      A.  Clearly, there needs to be clinical data in front
3  of the physician for the best decision-making to take place.
4      Q.  And do the plans of the department include having
5  each Medicaid patient be part of a medical home?
6      A.  Yes, sir.
7      Q.  What does the term "medical home" mean to you?
8      A.  Well, a medical home is a location that a patient
9  is connected to for the coordination of their care.
10      Q.  And it's -- when you say -- is that a single home,
11  or would that be just the patient going wherever the patient
12  feels like it for whatever the patient wants?
13      A.  That definition hasn't been totally concluded yet.
14  We are in the process of that evaluation.  The simplest
15  definition is that it is attached to a single physician.
16  However, we also know that people with significant medical
17  disability may very well be best placed in the care of a
18  specialist until such time as their crisis has been averted.
19      Q.  But would it be fair to say that having a medical
20  home involves providing coordinated care for each patient?
21      A.  Absolutely.
22      Q.  And would the process of coordination of care
23  benefit from having a unified health record and physicians
24  working closely together?
25      A.  Yes.  They have to have close coordination.

2272

1    **Q.**  You may have answered this, but let me just ask
2  you again.  How long do you anticipate that the transition
3  from fee-for-service to more managed care for Medicaid
4  patients in Idaho will take to accomplish?
5    **A.  I don't know the exact answer to that.  There are**
6  **a lot of variables that have to play out.**
7    **Q.**  Would it be fair to say a number of years?
8    **A.  That would be fair.**
9    **Q.**  And would it be fair to say that it will require
10 lots of changes by health systems?
11   **A.  Some health systems more than others, but change**
12 **will be necessary.**
13   **Q.**  Okay.  I would ask you, Director, to take a look
14 at the other document in your -- in the material I gave you,
15 which is marked as Defendant's Exhibit 2237.
16        THE COURT:  Counsel, just a moment.  Before we
17 move on, 2236 was referenced but has not been admitted.
18        MR. BIERIG:  I was going to do that afterwards,
19 but I would move its admission now, Your Honor.
20        THE COURT:  Is there an objection, Mr. Wilson?
21        MR. WILSON:  No objection, Your Honor.
22        THE COURT:  All right.  2236 will be admitted.
23 (Defendants' Exhibit No. 2236 admitted.)
24        THE COURT:  And now we're moving on to which
25 exhibit?

2273

1        MR. BIERIG:  2237.
2        THE COURT:  All right.  Thank you.
3  BY MR. BIERIG:
4    **Q.**  Do you recognize this document?
5    **A.  I do.**
6    **Q.**  And what is it?
7    **A.  It is the strategic plan for the Department of**
8  **Health and Welfare.**
9    **Q.**  For what year?
10   **A.  2013-2017.**
11   **Q.**  If you wouldn't mind, could you take a look at
12 page 4 of the document, which says "Goals and Objectives."
13 And I would ask you to look at Goal No. 1, Objective No. 2,
14 if Cort could put that up.
15   **A.  Yes, sir.**
16   **Q.**  If you look at that goal -- well, why don't you
17 just read for the record Objective No. 2 under Goal No. 1.
18   **A.  "Increase the use of evidence-based clinical**
19 **preventive services to 70.3 percent by 2017."**
20   **Q.**  Is that, in fact, one of the department's goals?
21   **A.  Yes, it is.**
22   **Q.**  Why by 2017?
23   **A.  Well, if you're going to have a strategic plan,**
24 **you -- and you want to accomplish anything, you have to**
25 **measure it, and you have to test yourself against the**

2274

1  **measurement, and you have to have a destination.  And that's**
2  **the destination that our team came to.**
3    **Q.**  So you think that taking four years to have the
4  data to measure your success is a reasonable period?
5    **A.  Yes.  And this covers areas beyond Medicaid.  This**
6  **is part of public health as well.**
7    **Q.**  And in order to effectuate this goal of having
8  providers increase the use of evidence-based clinical
9  preventive services, would it be fair to say that the
10 department is going to have to rely on providers to make
11 that change?
12   **A.  Yes.**
13   **Q.**  Are you aware that the Saltzer Medical Group has
14 affiliated with St. Luke's?
15   **A.  I am aware of that.**
16   **Q.**  And are you aware that the affiliation -- that
17 that affiliation is being challenged by the State of Idaho
18 and the other plaintiffs in this case?
19   **A.  I am aware of that.**
20   **Q.**  Now, if the physicians from Saltzer who have
21 become affiliated with St. Luke's are incentivized to
22 increase the use of evidence-based clinical preventive
23 services, would that advance the objectives of the
24 department?
25   **A.  So the question is if they were?**

2275

1    **Q.**  Yes.
2    **A.  Well, if they were, well, then it would advance**
3  **the department's objectives.**
4    **Q.**  So you're saying if they were, it would?
5    **A.  Yes.**
6    **Q.**  Yes.  And if the physicians from the Saltzer
7  Medical Group who have become affiliated with St. Luke's
8  were incentivized to develop best medical practice
9  protocols, would that advance the goals of the department?
10   **A.  If they were incentivized, it would.**
11   **Q.**  And if the physicians of the Saltzer Medical Group
12 who are employed now by St. Luke's were incentivized to
13 engage in more coordinated care, would that also advance the
14 goals of the department?
15   **A.  If they were, it would.**
16   **Q.**  Is it fair to say that you believe that different
17 provider groups will attempt different methods of
18 incentivizing their physicians to meet the goals of the
19 department?
20   **A.  Yes.  As we look around the state, we see a wide**
21 **variation in the relationships between hospitals and**
22 **physicians.  We see a wide variation of the distribution of**
23 **certain specialties within those communities.  So it's**
24 **logical that there will be different techniques used by**
25 **various medical communities around the state of Idaho.**

2276

1    **Q.**  Okay.  And as the director of the Department of
2    Health and Welfare for the State of Idaho, you don't believe
3    that care should be delivered differently to Medicaid
4    patients than it is delivered to commercially insured
5    patients, do you?
6    **A.  No.  A community standard of care should be**
7    **applied equally to every member of the community.**
8    **Q.**  Right.  So that it would be fair to say that, in
9    your view, the benefits of outcome-based care should accrue
10   to all Idahoans, not just Medicaid patients.
11   **A.  That would be our hope.**
12   **Q.**  And you believe that high-quality care means the
13   right care at the right time.  Would that be a fair
14   statement?
15   **A.  Yeah, that's a fair statement.**
16   **Q.**  And you may have answered this, but you also
17   believe that the quality of care should be the same for all
18   patients, Medicaid, uninsured, commercially insured,
19   regardless of the source of payment?
20   **A.  Yes.  A good standard of care should be applied**
21   **equally.**
22   **Q.**  Are you aware that St. Luke's has a policy of
23   treating all patients regardless of their ability to pay?
24   **A.  I'm not fully aware of that policy, but it is one**
25   **that I believe exists, but I have never actually read it.**

2277

1    **Q.**  Well, assuming that St. Luke's has such a policy,
2    would that policy promote the goals of the Department of
3    Health and Welfare?
4    **A.  If we look at it from a public health perspective,**
5    **yes, it would.**
6    **Q.**  And if St. Luke's has a policy of requiring all
7    physicians whom it employs or with whom it has a
8    professional services agreement to treat all patients
9    regardless of their ability to pay, would that advance the
10   goals of the department?
11   **A.  For public health, I would believe it would.**
12   **Q.**  Right.  Are you aware, Director Armstrong, that a
13   hospital with an emergency room is required to make its
14   emergency department available to anyone who presents at the
15   hospital, regardless of ability to pay?
16   **A.  I'm aware of that.**
17   **Q.**  And are you aware that hospitals must provide
18   translation services for people who appear at the hospital
19   and who do not speak English?
20   **A.  I believe that's true.  I haven't read it**
21   **specifically.**
22   **Q.**  Okay.  And are you aware that hospitals are also
23   required to meet significant requirements in order to be
24   accredited for Medicare and Medicaid services?
25   **A.  Yes.**

2278

1    **Q.**  Do you know where the Saltzer Medical Group is
2    located?
3    **A.  Yes.**
4    **Q.**  And where is that?
5    **A.  It's in Nampa, Idaho.**
6    **Q.**  And Nampa is in Canyon County; correct?
7    **A.  Yes, sir.**
8    **Q.**  Is there a significant Medicaid population in
9    Canyon County?
10   **A.  Yes, there is.**
11   **Q.**  And would it be fair to say that taking care of
12   Medicaid recipients in Canyon County is a concern of the
13   department?
14   **A.  Yes.  It's important.**
15   **Q.**  If Saltzer's affiliation with St. Luke's enhanced
16   the ability of Saltzer physicians to serve Medicaid
17   patients, would you see that as a good thing for the
18   department?
19   **A.  If that affiliation resulted in treating more**
20   **Medicaid patients, it would be consistent with our**
21   **objectives.**
22   **Q.**  And if the affiliation of Saltzer with St. Luke's
23   helps St. Luke's to transition to value-based rather than
24   volume-based delivery of healthcare in the Treasure Valley,
25   would you see that as a positive development for the goals

2279

1    of the department?
2    **A.  If that happened, it would.**
3    **Q.**  If this court were to order St. Luke's to divest
4    Saltzer and the divestiture resulted in treatment of fewer
5    Medicaid patients in Canyon County, would that be a negative
6    result from a public health standpoint?
7    **A.  That's a difficult question to answer because it's**
8    **assuming that there would be -- that the physicians would no**
9    **longer treat Medicaid patients, and I don't know that to be**
10   **true.**
11   **Q.**  Well, I'm not -- I'm asking not if they stopped
12   altogether, but if they reduced the number of Medicaid
13   patients they saw as a result of a divestiture, would that
14   be a negative result from a public health standpoint, in
15   your view?
16   **A.  Today, we do not have an access issue.  If there**
17   **were a decline in the number of physicians that would see**
18   **Medicaid patients, it could create an access problem for us.**
19   **Q.**  I'm going to show you a statement that you made at
20   your deposition and see whether you still agree with it.  Is
21   that okay?
22   **A.  Sure.**
23        MR. BIERIG:  Could you put on 59.
24        Your Honor, this is the deposition of Director
25   Armstrong at page 40, line 13 to page 41, line 1.  I'll just

2280

1  read that.
2         THE COURT: Thank you.
3  BY MR. BIERIG:
4         Q. "If the court were to order St. Luke's to
5  divest the Saltzer Medical Group --
6         A. "Um-hmm.
7         Q. " -- and if, as a result of the
8  divestiture of Saltzer Medical Group, the
9  Saltzer physicians were unable to treat as many
10  Medicaid patients as they are treating in their
11  affiliation with St. Luke's, how would that
12  action comport with the policy of the
13  department?
14  "MR. WITHROE: Same objection.
15  "THE WITNESS: If they were unable to serve the number of
16  Medicaid people as they are today, it would be negative, in
17  my view, because we would have fewer physicians to treat
18  Medicaid patients."
19         Did you state that at your deposition?
20         MR. WILSON: Objection, Your Honor. It's not
21  impeaching.
22         THE WITNESS: I --
23         MR. WILSON: He essentially gave the same answer
24  today in court.
25         MR. BIERIG: Well, in that case, if he is willing

2281

1  to say he agrees with it, I don't --
2         THE COURT: Let's rephrase the question and let
3  the witness answer. If he agrees with the former statement,
4  then there is no reason to include that in the record here
5  today. But I'm not sure the question was precisely phrased
6  the same way, so --
7  BY MR. BIERIG:
8         Q. The question was: If --
9         MR. BIERIG: Could you just put that back on there
10  for a second?
11         THE COURT: This may make it just a little easier
12  for you to prepare your response since you will see the
13  question both in writing and orally.
14         Proceed, Mr. Bierig.
15  BY MR. BIERIG:
16         Q. So my question is: If the divestiture of the
17  Saltzer Medical Group -- if, as a result of the divestiture
18  of the Saltzer Medical Group, the Saltzer physicians were
19  unable to treat as many Medicaid patients as they are
20  treating through their affiliation with St. Luke's, would
21  that be a negative outcome from the point of view of the
22  department?
23         A. I would agree with my former statement.
24         Q. Your former -- when you say your former statement,
25  the statement in the deposition?

2282

1         A. Certainly.
2         Q. Okay. Thank you.
3         And if this court were to order St. Luke's to divest
4  Saltzer and that divestiture resulted in fewer physicians
5  treating medically indigent patients, would that be a
6  negative result from a public health standpoint?
7         A. I don't believe -- well, medically indigent care
8  typically is delivered through the hospital, and I think
9  they would still be obligated to deliver that care under
10  current law.
11         Q. The hospital. But what about the physicians?
12         A. Well, then the physician -- I don't know, as I'm
13  not sure how the physician gets tied to that case.
14         Q. Well, let me show you another statement that you
15  made, and let's see whether you agree with it or disagree
16  with it.
17         MR. BIERIG: So if you could put on 60.
18         Your Honor, this is page 42, lines 11 to 25.
19         Q. "If the court were to order St. Luke's to
20  divest the Saltzer Medical Group --
21         A. "Okay.
22         Q. -- "and if, as a result, the physicians at
23  the Saltzer Medical Group were unable to treat
24  the number of -- the same number of medically
25  indigent patients as they are able to treat by

2283

1  virtue of their affiliation with St. Luke's,
2  would -- how would that comport with the policy
3  of the department?
4  "MR. WITHROE: Same objection.
5  "THE WITNESS: From a public health standpoint, that would be
6  negative. That would be -- that would have fewer folks
7  receiving care, from a public health standpoint."
8  BY MR. BIERIG:
9         Q. Would you agree with that?
10         A. I would.
11         Q. Thank you. Are you aware, Director Armstrong,
12  that part of the reason for the affiliation between Saltzer
13  and St. Luke's is to help create through that affiliation a
14  clinically integrated health system network using
15  evidence-based medical protocols?
16         A. I can't say that I'm aware that was in the
17  agreement because I wasn't party to the agreement.
18         Q. I believe that you testified that you were aware
19  of it. I'll put on your testimony, and we'll see.
20         A. I'm aware of it because I read the newspaper.
21         Q. Okay. But -- right.
22         A. So that's the exposure that I would have to
23  whatever the agreement may have been.
24         Q. Right. And through reading the newspaper, have
25  you learned that part of the reason for the affiliation

2284

1  between Saltzer and St. Luke's is to help create through
2  that affiliation a clinically integrated health system using
3  evidence-based medical protocols?
4      **A.  Yes, sir, I'm aware of that.**
5      **Q.**  And if St. Luke's is successful in doing that,
6  will that promote the department's goal of providing
7  clinically coordinated care?
8      **A.  If they are successful, it would be.**
9      **Q.**  And it would be fair to say, would it not, that
10  clinical integration advances the goals of the department?
11     **A.  Yes, it does.**
12     **Q.**  And would it also be fair to say that adoption of
13  best practice protocols also advances the goals of the
14  department?
15     **A.  Yes.  We believe community best practice standards**
16  **will advance our goals.**
17     **Q.**  And would placing emphasis on preventive care also
18  advance the goals of the department?
19     **A.  Yes, sir.**
20     **Q.**  Is it fair to say that, as director of the
21  Department of Health and Welfare, you grapple with the
22  problem of trying to provide quality healthcare to Medicaid
23  patients at an affordable cost?
24     **A.  Yes, I do.**
25     **Q.**  And is an important element in addressing the

2285

1  problem of providing quality healthcare to Medicaid patients
2  at an affordable cost to have health delivery systems that
3  coordinate care among physicians, other healthcare
4  professionals, and using evidence-based medical practices
5  and electronic medical record and effective utilization
6  control?
7      **A.  That's our future view.  There isn't much of it**
8  **going on today, but it is our view of the future.**
9      **Q.**  And that is what you hope to see in the future?
10     **A.  That's right.**
11     **Q.**  And to the extent that a health system is moving
12  to that, you would view that as a good thing, would you not?
13     **A.  Yeah.  The more communities that move towards that**
14  **concept, the better it will be for the department.**
15     **Q.**  As the director of the Department of Health and
16  Welfare, do you have any concerns that the affiliation
17  between St. Luke's and Saltzer will result in the
18  Medicaid program -- will result in the Medicaid program
19  having to pay higher prices for care?
20     **A.  I'm not aware of that.**
21     **Q.**  Now, you are the highest-ranking government
22  official in the state of Idaho in the field of healthcare,
23  are you not?
24     **A.  That's a bit subjective, but possibly.**
25     **Q.**  Well, is there anyone you can think of that's a

2286

1  higher-ranking official?
2      **A.  Not at this moment.**
3      **Q.**  Okay.  Does the governor consult you from time to
4  time on healthcare policy issues?
5      **A.  Yes, he does.**
6      **Q.**  As the director of the Department of Health and
7  Welfare, were you ever consulted by the Attorney General
8  about the wisdom of bringing this lawsuit?
9      **A.  No.**
10     **Q.**  Were you ever -- were you consulted by any other
11  member of the Attorney General's Office about the wisdom of
12  bringing this suit before this lawsuit was brought?
13     **A.  No.**
14     **Q.**  Have you ever been consulted by the attorney
15  general about the wisdom of a remedy which would seek to
16  unwind the Saltzer/St. Luke's affiliation?
17     **A.  Nothing outside of what's happening in this trial.**
18     **Q.**  So before this suit was filed, no one asked your
19  opinion on whether the State of Idaho should seek to divest
20  the Saltzer Medical Group from St. Luke's; is that correct?
21     **A.  That's correct.**
22         MR. BIERIG:  I have no further questions,
23  Your Honor.
24         THE COURT:  Mr. Wilson.
25         MR. WILSON:  Thank you.

2287

1              CROSS-EXAMINATION
2  BY MR. WILSON:
3      **Q.**  Director Armstrong, does the Idaho Department of
4  Health and Welfare have any law enforcement responsibility
5  with regard to antitrust laws in the state of Idaho?
6      **A.  No.**
7      **Q.**  Your concern is public health; correct?
8      **A.  Yes, sir.**
9      **Q.**  Not antitrust; correct?
10     **A.  That's correct.**
11     **Q.**  Does your agency have any responsibility to
12  regulate competition between healthcare providers for
13  commercial business?
14     **A.  No.**
15     **Q.**  Does your agency have any responsibility to
16  regulate how healthcare providers interact with commercial
17  healthcare insurers?
18     **A.  No.**
19     **Q.**  Would you have expected that the Attorney
20  General's Office would have consulted you -- with you about
21  this lawsuit?
22     **A.  No.**
23     **Q.**  Are you upset that you weren't contacted?
24     **A.  Not at all.**
25     **Q.**  Does your department have any responsibility for

2288

1  regulating the commercial side of healthcare?  In other
2  words, you're focused on Medicaid; correct?
3      **A.  We're focused on Medicaid.  However, our license**
4  **and certification division licenses and certifies hospitals,**
5  **and that would be for all services that are delivered within**
6  **the hospital.  So it indirectly has a bearing on commercial**
7  **insurance.**
8      Q.  Right.  But you don't have any regulatory --
9  regulatory oversight regarding commercial insurers, for
10  example?
11      **A.  No.**
12      Q.  So the views and assumptions you expressed in your
13  testimony today were limited to the provision of Medicaid
14  services; is that correct?
15      **A.  That's my focus.**
16      Q.  Do you know what the competitive impact will be of
17  the acquisition of Saltzer by St. Luke's?
18      **A.  By "competitive impact" --**
19      Q.  Do you know how it will affect the competition for
20  healthcare in and around Nampa?
21      **A.  I really don't know.**
22      Q.  Director Armstrong, do you know whether the
23  acquisition of Saltzer by St. Luke's will, in fact, result
24  in the treatment of more Medicaid patients?
25      **A.  I don't know that for a fact.**

2289

1      Q.  Do you know anything about the incentives that may
2  or may not be in place for Saltzer physicians to do that?
3      **A.  I've not been party to those discussions.**
4      Q.  And do you know whether a divestiture of the
5  Saltzer physician group from St. Luke's would result in less
6  Medicaid patients being seen in the Nampa area?
7      **A.  I don't know that.**
8      Q.  In your view as the director of the Department of
9  Health and Welfare, can an independent physician group
10  provide services to Medicaid patients without losing money?
11      **A.  I am aware of some physician practices that have**
12  **reengineered their process, and I am told they don't lose**
13  **money on Medicaid patients.**
14      Q.  So in your view, does a physician group have to
15  get acquired by a hospital to treat Medicaid patients
16  without losing money?
17      MR. BIERIG:  Objection.  There is no foundation
18  for this question, Your Honor.
19      THE COURT:  I think we need to find out does the
20  witness know and what's the basis for knowing that.
21      MR. WILSON:  He is the director of the Department
22  of Health and Welfare.  He has regular interactions with
23  physician groups throughout the state.  And, in fact, I
24  think Mr. Bierig opened the door for this sort of
25  questioning through all of his questions directed towards

2290

1  the provision of Medicaid services and how the acquisition
2  would affect that.
3      THE COURT:  Well, my concern was the reference to
4  losing money.  I wasn't sure how that tied in and how this
5  witness would know what the financial inner workings of a
6  medical practice are.  If that's not a critical part of the
7  question, perhaps you could rephrase.
8      MR. WILSON:  Certainly, Your Honor.
9  BY MR. WILSON:
10      Q.  In your view, Director Armstrong, does a physician
11  group need to get acquired by a hospital to treat Medicaid
12  patients?
13      **A.  I'm not aware of any requirement.**
14      Q.  And there are many physician groups that treat
15  Medicaid patients in the Nampa area that aren't affiliated
16  with a hospital; correct?
17      **A.  Correct.**
18      Q.  You mentioned, I think when Mr. Bierig was asking
19  you questions, something about access by Medicaid patients
20  in Nampa.  At present, are there any access issues for
21  Medicaid patients in the Nampa area?
22      **A.  We are not aware of access problems in that area.**
23      Q.  Mr. Bierig also asked you several questions about
24  best evidence practice protocols.  Do you remember that?
25      **A.  Yes.**

2291

1      Q.  In your view, is there any one correct way to
2  achieve best evidence practice protocols?
3      **A.  We believe the community needs to establish what**
4  **those best practices are and that it would be then the**
5  **community responsibility to have a high level of performance**
6  **against those best practice standards.**
7      Q.  Well, is there any one way, in your view, to
8  achieve this concept of coordinated care that you spoke
9  about?
10      **A.  As we have traveled around the country and looked**
11  **at -- there are various models, and those models evolve**
12  **around the community in which they are practiced.  And it**
13  **seems that there are a number of different ways of**
14  **being -- ways of bringing about compliance with those**
15  **standards.**
16      Q.  In fact, I think you testified during your direct
17  examination that, even here in the state of Idaho, there is
18  a wide variation; correct?
19      **A.  Well, certainly, because every -- every community**
20  **has a different set of providers, a different mix of**
21  **specialties and services.  So just by that variability,**
22  **there would probably be different approaches used.**
23      Q.  In your view, Director, is it necessary for
24  hospitals to employ physicians for those hospitals to
25  coordinate care with the physicians?

2292

1    MR. BIERIG:  Objection.  There is no foundation
2  that Director Armstrong is familiar with how hospitals work
3  in terms of how they structure relationships with
4  physicians.
5    MR. WILSON:  In light of the questioning on direct
6  examination, Your Honor, I find the objection a bit bold.
7  All of Mr. Bierig's questioning was of the director
8  regarding whether his views about evidence-based protocols
9  were consistent with the objectives of the department and
10 what St. Luke's was doing was consistent with the objectives
11 of the department.  I am merely asking him, in his view --
12   THE COURT:  I'll overrule the objection.  The
13 question is asked in the context, even though there is a
14 reference to coordinating care.  I am assuming you're tying
15 it back to the witness's testimony about evidence-based
16 practices and coordinating care, perhaps, as being one part
17 of that.
18   MR. WILSON:  Let me rephrase, Your Honor, if I
19 may.
20   THE COURT:  Yes.
21 BY MR. WILSON:
22   Q.  In your view, Director Armstrong, is it necessary
23 for hospitals to employ physicians in order to achieve best
24 evidence practice protocols with physicians -- with
25 physicians?

2293

1    MR. BIERIG:  Objection, Your Honor.  I don't mean
2  to be bold as was suggested, but there was nothing in my --
3  in my examination about whether employment was necessary,
4  and I don't think a foundation has been laid for whether
5  Director Armstrong knows about how hospital physician
6  relationships work.
7    THE COURT:  Well, I'm going to overrule the
8  objection, but obviously, Director Armstrong, you can just
9  indicate you don't know.  But I'm going to allow the
10 question to be asked and answered, if you know.
11   Why don't you rephrase it one more time, Mr. Wilson.
12   MR. WILSON:  Thank you, Your Honor.
13 BY MR. WILSON:
14   Q.  Director Armstrong, in your view, is it necessary
15 for hospitals to employ physicians in order to achieve best
16 evidence practice protocols with those physicians?
17   A.  My experience at this point comes from our study
18 of various healthcare systems around the country as we have
19 tried to map our way forward around managed care and best
20 practice delivery.
21   And in those studies, we have seen both employed
22 circumstance and we have seen independent contracted
23 relationships deal with these circumstances.  I don't think
24 I would be able to say that one over the other is superior,
25 based on my experience, because I haven't had that

2294

1  experience yet with the Medicaid program.
2    Q.  And likewise, Director Armstrong, in your view, is
3  it necessary for physicians to be on the same electronic
4  medical record in order to achieve the goal of coordinated
5  care?
6    A.  Through the data exchange, we have seen cases and
7  we have had anecdotal evidence that coordination of
8  care -- effective coordination of care can occur between
9  providers using different EMRs, that the data was delivered
10 effectively to the treating physician for a good clinical
11 outcome.
12   MR. WILSON:  Your Honor, may I have one moment,
13 please?
14   THE COURT:  Yes.
15 BY MR. WILSON:
16   Q.  Director Armstrong, is St. Luke's the only
17 hospital in Idaho that provides medical care to all comers
18 regardless of economic circumstances?
19   A.  I don't believe so.  I believe all hospitals do.
20   MR. WILSON:  Thank you.  Nothing further,
21 Your Honor.
22   THE COURT:  Mr. Bierig, redirect.  And I assume
23 you would move for the admission of Exhibit 2237?
24   MR. BIERIG:  Yes, Your Honor, we would.
25   THE COURT:  Is there any objection, Mr. Wilson?

2295

1    MR. WILSON:  No, Your Honor.
2    THE COURT:  All right.  2237 is admitted.
3  (Defendants' Exhibit No. 2237 admitted.)
4        REDIRECT EXAMINATION
5  BY MR. BIERIG:
6    Q.  Director Armstrong, I believe that counsel for the
7  State asked you if your jurisdiction was limited to
8  Medicaid, and you gave an answer.  But I just want to make
9  sure I understand your previous testimony that it's your
10 belief that care should not be delivered differently to
11 Medicaid patients than it is delivered to any other patients
12 in the state of Idaho.  Is that correct?
13   A.  That's my belief, yes.
14   Q.  Right.  And counsel for the State asked you about
15 the electronic health record.  You haven't done any study of
16 the Epic electronic health record that's utilized in -- at
17 St. Luke's, have you?
18   A.  No.
19   Q.  And you haven't compared it in any way to the
20 Idaho Data Exchange; is that correct?
21   A.  No.
22   Q.  So you really -- would you say that you're really
23 in a position to make judgments about the relative benefits
24 of the Idaho Data Exchange -- excuse me, the Idaho Health
25 Data Exchange as compared with the functionality of the Epic

2296

1 system?

2     **A.**  **No. I have done no study of it.**

3     MR. BIERIG: Thank you, Director Armstrong.

4 No further questions.

5     THE COURT: Anything else, Mr. Wilson?

6     MR. WILSON: No, Your Honor. Thank you.

7     THE COURT: All right. Director Armstrong, you

8 may step down.

9     We only have ten more minutes. Counsel, I can't stay

10 much longer. I have a class coming at 3:30 that I am

11 involved in teaching, so I really can't stay longer. I

12 assume that we'll recall Mr. Roth and proceed with cross.

13     MR. SCHAFER: Mr. Roth left, Your Honor, thinking

14 that this would go -- run until the end of the day. We do

15 have a ten-minute clip that we can play of one of our video

16 depositions.

17     THE COURT: Why don't we do that. If it's ten

18 minutes, that would work rather well.

19     MR. STEIN: It's a ten-minute clip. It's a Saint

20 Alphonsus employee, and about five of the ten minutes

21 interspersed are attorneys' eyes only. And I hate to do

22 this, but given that it's the end of the day, I'm wondering

23 whether it makes sense to just clear the courtroom for this

24 last bit.

25     THE COURT: We will, but then we'll make a -- the

2297

1 non-attorneys' eyes only portions available --

2     MR. STEIN: Yes.

3     THE COURT: -- to the public by way of the

4 transcript; correct?

5     MR. STEIN: Yes. I think this is purely just in

6 terms of the logistics of getting the headphones on and off.

7     THE COURT: All right. Ladies and gentlemen, I

8 will have to clear the courtroom for the reasons indicated.

9 Having you come in and out would be counterproductive, I

10 think, at this point. And if you wish to see what was

11 testified to that's not privileged, you can review the

12 publicly available transcript.

13     ******COURTROOM CLOSED TO THE PUBLIC******

14     THE COURT: All right. Counsel, will you

15 indicate -- oh, we need to publish the deposition. Do you

16 have the original?

17     MR. SCHAFER: We do, Your Honor. I think

18 Ms. Timoschiek has it. This is Dr. Michael Roach, for the

19 record.

20     THE COURT: Ms. Gearhart, if you'll publish the

21 deposition. Is there -- okay. We'll publish both the

22 deposition of Mr. Armstrong and --

23     THE CLERK: The deposition of Richard Armstrong

24 and the deposition of Michael Roach are published.

25     (The depositions of Richard Armstrong and

2298

1     Michael Roach published.)

2     THE COURT: All right. You may go ahead and

3 proceed.

4     (Testimony of Michael Roach via video deposition.)

5     (Video deposition of Michael Roach concluded.)

6     MR. SCHAFER: Your Honor, that's the end of it,

7 Dr. Roach.

8     THE COURT: All right. Counsel, we'll be in

9 recess, then, until 8:30 tomorrow morning.

10     With regard to -- I think our understanding was that

11 with regard to yesterday's testimony and the portions

12 designated AEO, that counsel were going to submit some kind

13 of an affidavit or proffer as to which portions were to be

14 redacted from the public transcript and why, and then I will

15 rule on it. I assume that you got the daily transcript this

16 morning and that we can expect seeing something by tomorrow.

17     Is that the plan, Ms. Duke? Do you know or --

18     MS. DUKE: With respect to what we just played?

19     THE COURT: No. Yesterday.

20     MS. DUKE: Yesterday. Yes, we have a process in

21 place that all of the parties go through, and they --

22     THE COURT: All right. When --

23     MS. DUKE: -- put in their AEO. And then,

24 ultimately, it's filed. I'm not sure --

25     MR. DeLANGE: Your Honor, I think -- correct me if

2299

1 I'm wrong. I think yesterday's designation was a St. Luke's

2 AEO designation, so we have assumed St. Luke's is going to

3 provide you the -- the AEO justification, if you will,

4 to --

5     THE COURT: Yes. That's my -- that would be my

6 understanding, unless there are some third parties. And I

7 assume that's been relayed to them.

8     MR. DeLANGE: My understanding is it was just

9 St. Luke's designated AEO yesterday.

10     THE COURT: Well, whoever is making the

11 designation, obviously, would have to bear the burden.

12     MR. STEIN: We -- and we should be able to do that

13 tomorrow, Your Honor.

14     THE COURT: All right.

15     MR. STEIN: There is one issue with the

16 transcript. I think the version that we got yesterday, it

17 actually did not include Mr. Greene's cross-examination.

18     THE COURT: I'll let you work with

19 Ms. Hohenleitner on that and sort out what that is.

20     MR. DeLANGE: You are talking about the day

21 before, Dr. Pate.

22     MR. STEIN: Dr. Pate. Okay. Well, we'll work it

23 out.

24     THE COURT: All right. Very good.

25     All right. Counsel, we'll be in recess, then, until

2300

1   8:30 tomorrow morning.

2       (Court recessed at 2:33 p.m.)

<u>REPORTER'S CERTIFICATE</u>

I, Tamara I. Hohenleitner, Official
Court Reporter, County of Ada, State of Idaho,
hereby certify:

That I am the reporter who transcribed
the proceedings had in the above-entitled action
in machine shorthand and thereafter the same was
reduced into typewriting under my direct
supervision; and

That the foregoing transcript contains a
full, true, and accurate record of the proceedings
had in the above and foregoing cause, which was
heard at Boise, Idaho.

IN WITNESS WHEREOF, I have hereunto set
my hand October 11, 2013.


_____  -s-
Tamara I. Hohenleitner
Official Court Reporter
CSR No. 619