1

**UNITED STATES DISTRICT COURT**

2

**IN THE DISTRICT OF IDAHO**

3

- - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
4   SAINT ALPHONSUS MEDICAL CENTER -     :
NAMPA, INC., TREASURE VALLEY     : Bench Trial
5   HOSPITAL LIMITED PARTNERSHIP, SAINT  : **Witnesses:**
ALPHONSUS HEALTH SYSTEM, INC., AND : **Christopher W. Roth**
6   SAINT ALPHONSUS REGIONAL MEDICAL     : **Scott Huerd**
CENTER, INC.,                    : **John R. Kaiser**
7                     Plaintiffs,     : **Steven W. Williams**
vs.                  :
8                                         :
ST. LUKE'S HEALTH SYSTEM, LTD., and :
9   ST. LUKE'S REGIONAL MEDICAL CENTER,  :
LTD.,                                :
10                   Defendants.     :
- - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
11  FEDERAL TRADE COMMISSION; STATE OF   :
IDAHO,                               :
12                     Plaintiffs,     :
vs.                  :
13                                         :
ST. LUKE'S HEALTH SYSTEM, LTD.;      :
14  SALTZER MEDICAL GROUP, P.A.,         :
:
15                   Defendants.     :
- - - - - - - - - - - - - - - - - x

16

17                    * * * SEALED * * *

18

REPORTER'S TRANSCRIPT OF PROCEEDINGS
19

before B. Lynn Winmill, Chief District Judge
20

Held on October 11, 2013
21

Volume 13, Pages 2301 to 2539
22

**Tamara I. Hohenleitner**
23          Idaho Certified Shorthand Reporter No. 619
Registered Professional Reporter
24                  Certified Realtime Reporter
Federal Certified Realtime Reporter
25

United States Courts, District of Idaho
550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

2302

1                        A P P E A R A N C E S

2

3

4

5

    FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
6   SAINT ALPHONSUS HEALTH SYSTEM, INC.,
    AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.

7

8        Keely E. Duke
         DUKE SCANLAN & HALL, PLLC
9        1087 W. River Street, Suite 300
            Boise, ID 83707
10
         David A. Ettinger
11       HONIGMAN MILLER SCHWARTZ AND COHN LLP
         2290 First National Building
12       660 Woodward Avenue
         Detroit, MI 48226
13

14

15
    FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION
16

17       Peter C. Herrick
         U.S. FEDERAL TRADE COMMISSION
18       500 Pennsylvania Ave., N.W.
         Washington, DC 20580
19
         J. Thomas Greene
20       U.S. FEDERAL TRADE COMMISSION
         600 Pennsylvania Ave N.W.
21       Washington, DC 20580

22       Henry Chao-Lon Su
         U.S. FEDERAL TRADE COMMISSION
23       601 New Jersey Ave., N.W.
         Washington, DC 20001

24

25

2303

```
 1                    A P P E A R A N C E S (Continued)

 2

 3       FOR PLAINTIFF STATE OF IDAHO

 4            Eric J. Wilson
              GODFREY & KAHN, S.C.
 5            One East Main Street
              Suite 500
 6            PO Box 2719
              Madison, WI 53701
 7
              Brett T. DeLange
 8            OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
              954 W. Jefferson, 2nd Floor
 9            Boise, ID 83720-0010

10

         FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
              Raymond D. Powers
12            POWERS TOLMAN FARLEY, PLLC
              PO Box 9756
13            Boise, ID 83707

14
         FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15       AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16            Jack R. Bierig
              Ben J. Keith
17            Scott Stein
              SIDLEY AUSTIN
18            One South Dearborn
              Chicago, IL 60603
19
               J. Walter Sinclair
20            Charles Schafer
              STOEL RIVES
21            101 S. Capitol Boulevard, Suite 1900
              Boise, ID 83702
22
         FOR DEFENDANT SALTZER MEDICAL GROUP
23
              Brian Kenneth Julian
24            ANDERSON JULIAN & HULL, LLP
              PO Box 7426
25            Boise, ID 83707
```

2304

1                                    **I N D E X**

2

| | | PAGE: |
|---|---|---|
| | Courtroom open to the public....................... | 2306 |

5

6                                    **PLAINTIFFS**

7                              **W I T N E S S E S**

8

| | | PAGE: |
|---|---|---|
| **WILLIAMS, Steven W.** | | |
| | Direct Examination by Mr. Powers.............. | **2471** |
| | Cross-Examination by Mr. Schafer.............. | **2498** |
| | Redirect Examination by Mr. Powers............ | **2536** |

11

12

13                    **DEFENSE ST. LUKE'S HEALTH SYSTEM**

14                              **W I T N E S S E S**

15

| | | PAGE: |
|---|---|---|
| **HUERD, Steven S.** | | |
| | Direct Examination by Mr. Sinclair........... | **2349** |
| | Cross-Examination by Ms. Duke................ | **2362** |
| **KAISER, John Rhyan** | | |
| | Direct Examination by Mr. Keith.............. | **2366** |
| | Cross-Examination by Mr. Wilson.............. | **2410** |
| | Cross-Examination by Mr. Ettinger........... | **2444** |
| | Redirect Examination by Mr. Keith........... | **2454** |
| | Recross Examination by Mr. Ettinger.......... | **2469** |
| **ROTH, Christopher W.** | | |
| | Cross-Examination by Mr. Ettinger............ | **2306** |
| | Redirect Examination by Mr. Schafer.......... | **2337** |
| | Recross-Examination by Mr. Ettinger.......... | **2344** |
| | Recross-Examination by Mr. Ettinger.......... | **2344** |
| | Further Redirect Examination by Mr. Schafer... | **2347** |

24
                              * * * * *
25

2305

1                                                    **PLAINTIFFS**

2                                            **E X H I B I T S**

3

| 4 | | | ADMITTED |
|---|------|------------------------------------------------|----------|
| | **1972** | Letter from Eric Gonzaga and Bill Hopkins .. | **2326** |
| 5 | | to Joni Stright re: Fair Market Value | |
| | | Analysis of Proposed Compensation | |
| 6 | | Arrangements (PLTs' Dep. Ex. 054; | |
| | | SLHS0000001243-SLHS0000001256) | |
| 7 | **1977** | Letter from Eric Gonzaga and Bill Hopkins .. | **2325** |
| | | to Joni Stright re: Analysis of Proposed | |
| 8 | | Compensation Arrangement-Saltzer Medical | |
| | | Group Family Practice Physician (PLTs' Dep. | |
| 9 | | Ex. 331--SLHS0000003782--SLHS0000003808) | |

10

11

12                                                   **DEFENDANTS**

13                                          **E X H I B I T S**

14

| 15 | | | ADMITTED |
|----|------|------------------------------------------------|----------|
| | **2016** | Email exchange between S. Jeffcoat and A. . | **2527** |
| 16 | | Reimers re Dr. Beasley, Dr. Williams, and | |
| | | Dr. Curran (Def. Dep. Exh. 22; | |
| | | ALPH00015364) | |
| 17 | **2020** | Curran texts with Williams (Def. Dep. ..... | **2533** |
| | | Exh. 26; ARC 00335-42) | |
| 18 | **2558** | Email exchange re WISE network contract ... | **2529** |
| | | (SMG000297851-53) | |
| 19 | **2639** | Letter from M. Roach to Black Canyon ...... | **2349** |
| | | Family Medicine re request for proposal | |
| 20 | | (Def. Dep. Exh. 73, ALPH00696750) | |

21

22

23                                          * * * * *

24

25

2306

1    P R O C E E D I N G S
2    October 11, 2013
3    *****COURTROOM OPEN TO THE PUBLIC*****
4    THE CLERK:  The court will now hear Civil Case
5    12-560-S-BLW, Saint Alphonsus Medical Center Nampa, Inc.,
6    versus St. Luke's Health System for Day 13 of a bench trial.
7    THE COURT:  Good morning, Counsel.  My apologies
8    for a late start.  I had literally an emergency that had to
9    be attended to before we started.
10   Mr. Roth, I'll remind you you are still under oath.
11   Mr. Ettinger, you may cross-examine the witness.
12   MR. ETTINGER:  Thank you, Your Honor.
13   THE COURT:  And let me thank you, sir, for
14   agreeing to defer cross-examination for scheduling purposes.
15   MR. ETTINGER:  Thank you, Your Honor.  I can't
16   claim it was exactly a hardship, but I appreciate it.
17   CHRISTOPHER WILLIAM ROTH,
18   having been previously duly sworn to tell the whole truth,
19   testified as follows:
20   CROSS-EXAMINATION
21   BY MR. ETTINGER:
22   **Q.**  Good morning, Mr. Roth.
23   **A.**  Good morning.
24   **Q.**  Do you recall yesterday that you said that the
25   Saltzer transaction was not undertaken in order to gain

2307

1    market power?
2    **A.**  Yes.
3    **Q.**  Isn't it the case that the Saltzer transaction was
4    undertaken, at least in part, in order to gain market share?
5    **A.**  How would you define "market share"?
6    **Q.**  You don't know what market share means, Mr. Roth?
7    **A.**  Well, I do.  There are different definitions of
8    market share.
9    **Q.**  In order to have a greater share of primary care
10   providers in the Nampa area.
11   **A.**  No.  That wasn't an intent of the integration with
12   Saltzer.  Market share -- my point about market share is
13   there is Medicare market share.  There is commercial market
14   share.  There is clinic market share.  There is inpatient
15   market share.
16   **Q.**  Well, I'm kind of intrigued by your answer.  Is
17   there some definition of market share that was a purpose of
18   the transaction?
19   **A.**  No.  There was no purpose of the transaction to
20   gain market share.
21   **Q.**  Let's go to -- Keely, if we could call up 1473.
22   Your Honor, this is AEO, but I think I can do this without
23   any --
24   THE COURT:  Can we turn off the --
25   MR. ETTINGER:  Well, the initial slides just

2308

1    identify what the document is, so I think we can leave
2    those, and then we'll see about the third slide.
3    BY MR. ETTINGER:
4    **Q.**  1473, Mr. Roth, can you see that okay?
5    **A.**  Yes.
6    **Q.**  Actually, Keely, could you go to the cover page of
7    the document.
8    Is this a memo from Mr. Taylor, the CFO of St. Luke's,
9    to you and others attaching revised slides?
10   **A.**  Yes.
11   **Q.**  And it says, "Saltzer PowerPoint"; is that right?
12   **A.**  Yes.
13   **Q.**  And now going to the second slide, Keely, if you
14   could.
15   And were these revised slides a transaction update for
16   the St. Luke's Treasure Valley board on the Saltzer
17   transaction?
18   **A.**  It says, "transaction update."  I don't know if it
19   was for the board.
20   **Q.**  Who else would you have been updating with these
21   slides?
22   **A.**  I don't know.  It just says, "transaction update."
23   MR. ETTINGER:  Why don't we -- Keely, turn to
24   page 6.
25   And, Your Honor, why don't we -- it's a little too

2309

1    fast.  Maybe we need to screen this unless the St. Luke's
2    people say that there's not a need.  I'm not sure it's all
3    that sensitive, but it's their call.
4    MR. BIERIG:  I think we better screen it.  I'm not
5    sure.
6    THE COURT:  All right.  Just to be safe, I'll
7    leave it off.  But, again, Counsel, as we discussed, you are
8    reviewing these exhibits and will make a proffer to the
9    court, and then I'll make a separate determination and make
10   them publicly available if we determine any of these are
11   truly not trade secret information.
12   BY MR. ETTINGER:
13   **Q.**  Now, Mr. Roth, when presentations were made to the
14   St. Luke's Treasure Valley board about the Saltzer
15   transaction, like all your presentations, you tried to
16   provide the most relevant information to the board; right?
17   **A.**  Correct.
18   **Q.**  And the slide that's on the screen, page 6 of
19   Exhibit 1473, has figures for Nampa physician market share
20   for, among others, Saltzer and the Mercy Group, and then
21   Saltzer and the Mercy Group put together; correct?
22   **A.**  The slide that's up now?  It has -- it has the
23   percentage of affiliated physicians by group and specialty.
24   **Q.**  And those percentages involve a combination of the
25   Saltzer numbers and the Mercy Group numbers; correct?

2310

1  **A.  Yes.  Yes.**
2  **Q.**  And the Mercy Group, of course, is the seven
3  physicians who are now St. Luke's Family Medicine; correct?
4  **A.  Correct.**
5  **Q.**  And this document highlights, at the bottom, that
6  Saltzer and Mercy Group physicians represent the majority of
7  primary care and surgical providers in Nampa; correct?
8  **A.  Correct.**
9  **Q.**  This was certainly relevant information in the
10  view of management in deciding whether to do the Saltzer
11  transaction; correct?
12  **A.  It was relevant information.  I can't say whether**
13  **it was a -- a major factor in deciding whether to do the**
14  **transaction.  The reason we did the transaction was to**
15  **accomplish our respective visions.**
16  **Q.**  Well, if this was in a PowerPoint presentation on
17  the Saltzer transaction that Mr. Taylor and you were
18  involved in, you thought it was relevant information to the
19  decision; correct?
20  **A.  It is relevant information, yes.**
21  **Q.**  Okay.  Now, isn't it true that you told Dr. Steve
22  Williams -- let me back up.
23  You talked about your conversations with Dr. Williams
24  on direct yesterday, did you not?
25  **A.  I did.**

2311

1  **Q.**  And I'm going to ask you about that a few times.
2  But first of all, you told Dr. Williams, did you not, that
3  St. Luke's needed Saltzer to expand its market share in
4  Nampa?
5  **A.  I don't recall saying that.**
6  **Q.**  You deny saying that?
7  **A.  I don't deny saying it.  I don't recall saying it.**
8  **Q.**  Okay.  And you also intended, you and your
9  colleagues, that the Saltzer -- that acquiring Saltzer would
10  help you to pressure payors; isn't that right?
11  **A.  Are you saying -- can you repeat?  Can you repeat**
12  **that?**
13  **Q.**  You and your colleagues and St. Luke's top
14  management also intended that the Saltzer transaction would
15  aid you to pressure payors, health plans; correct?
16  **A.  No, that's not correct.**
17  **Q.**  Why don't we put up Exhibit 1093, first the cover
18  sheet, Keely.
19  The cover sheet I think we can show, Your Honor.  After
20  that, we may need to turn the screen off.
21  So is Exhibit 1093, Mr. Roth, notes that you prepared
22  and sent to Mr. Taylor and Mr. Fletcher?
23  **A.  Well, what's on the screen is an email that**
24  **says -- just a summary of the notes I had.**
25  **Q.**  Right.  And that went from you to the CFO of the

2312

1  St. Luke's Health System and the COO of the St. Luke's
2  Health System; correct?
3  **A.  It went from me, as the chief operating officer,**
4  **to our CFO and our chief executive officer at the time,**
5  **Gary Fletcher.**
6  **Q.**  I'm sorry.  At that point, Mr. Fletcher was CEO of
7  Treasure Valley --
8  **A.  Correct.**
9  **Q.**  -- and later became CEO of the whole system;
10  correct?
11  **A.  Correct.  Actually, I need to correct that.  It**
12  **looks like it was December 29th, so I was the CEO at that**
13  **time.  So you're right.**
14  **Q.**  Okay.  I don't claim to have the dates perfect,
15  but that never hurts.
16  MR. ETTINGER:  Why don't we go to the third page,
17  Keely.
18  And, Your Honor, we better blank the screen on this.
19  THE COURT:  Thank you.
20  BY MR. ETTINGER:
21  **Q.**  And you see under No. 4, the second bullet you
22  wrote, Mr. Roth?
23  **A.  Yes.**
24  MR. STEIN:  Do you have the whole document for the
25  witness to look at?

2313

1  MR. ETTINGER:  Yeah, we do have a binder.  I'm
2  sorry.  Your Honor, may we approach and give the witness the
3  bind?
4  THE COURT:  Yes.
5  THE WITNESS:  There is another binder up here,
6  too.  I don't know if this is for me.
7  MR. ETTINGER:  I don't think that's ours.
8  Your Honor, to avoid the AEO and clearing the court
9  issues, I'm not going to read him the second bullet.  I have
10  asked him to look at it.  I think the court has had a chance
11  to look at it.  I'm just going to move on.
12  THE COURT:  Yes.
13  THE WITNESS:  This didn't reference Saltzer,
14  though.
15  BY MR. ETTINGER:
16  **Q.**  But this was -- that second bullet was, indeed, a
17  strategy that you were suggesting, as CEO of St. Luke's
18  Treasure Valley, to the COO of the system and the CFO of the
19  system; correct?
20  **A.  It was a strategy to partner with payors so that**
21  **we could have more directed focus in the care and services**
22  **that we provide.**
23  MR. ETTINGER:  Well, Your Honor, I need to now get
24  into the words.  If no one has objection, I'll just do it in
25  the open courtroom.

2314

1    THE COURT:  Counsel?

2    MR. SCHAFER:  I'm fine with that.

3    THE COURT:  Go ahead and proceed.

4    MR. BIERIG:  You can put this up.

5    MR. ETTINGER:  Okay.  Why don't we put it up.

6    BY MR. ETTINGER:

7    **Q.**  So those words, "pressure payors for new directed

8    agreements."  Your interpretation of the word "pressure"

9    when you use it, Mr. Roth, is partner?

10   **A.**  Well, I wrote this, so I can interpret what I was

11   thinking.  Above that it says, "strategic increases on

12   specific services," then "pressure payors for new and

13   directed agreements."  And we've had a long history of

14   successes in children's and oncology and in spine center

15   outcomes and improvements, and when I'm talking about this,

16   I mean let's engage with the payors and, basically,

17   demonstrate that we're providing superior outcomes and ask

18   them, work with them, to direct patients to St. Luke's

19   because we're providing a better service.

20   **Q.**  So your --

21   **A.**  That's what I meant.

22   **Q.**  So your interpretation of the word "pressure," the

23   ordinary, simple English word "pressure," is it means work

24   with, persuade, convince; is that correct?

25   **A.**  It can.  Pressure can mean a lot of different

2315

1    things.

2    **Q.**  Ever look it up in the dictionary?

3    **A.**  Can't say I have.

4    **Q.**  Okay.

5    **A.**  But if our patient satisfaction scores --

6    **Q.**  You've answered my question.  Thank you.

7    **A.**  If our patient satisfaction scores --

8    MR. ETTINGER:  Your Honor.

9    THE COURT:  Just a moment.  Let's put a question

10   before the witness.

11   And, again, try to answer the question directly as best

12   you can, and we'll rely upon counsel to give you a chance to

13   explain.

14   Go ahead.

15   BY MR. ETTINGER:

16   **Q.**  Now, you and your colleagues -- let's just stick

17   to you.  You told Saltzer, in substance, that St. Luke's

18   would like to acquire Saltzer and then staff the new

19   hospital, the new St. Luke's hospital in Nampa, with Saltzer

20   doctors; correct?  Yes or no, please.

21   **A.**  Correct.

22   **Q.**  Now, you described the progress of the Saltzer

23   transaction on direct.  In fact, isn't it the case that

24   Saltzer rejected St. Luke's initial offer?

25   **A.**  Initial offer?  Do you have a date or a -- any

2316

1    specifics?

2    **Q.**  Sure.  Why don't we put up Plaintiffs' Exhibit

3    1088 -- which I believe is not AEO, Your Honor.

4    1088 is a letter to you from Max Reiboldt of the Coker

5    Group.  Do you recall this letter?

6    **A.**  Yes, I do.

7    **Q.**  Mr. Reiboldt was the consultant working on behalf

8    of Saltzer?

9    **A.**  Yes.

10   **Q.**  And he informed you that the Saltzer Group had

11   taken a ballot and rejected the St. Luke's offer; isn't that

12   right?

13   **A.**  I believe that's correct.  I -- I can't read the

14   letter if that's supposed to be in here.

15   **Q.**  You've got it in your binder if you want to take a

16   look at it, if that helps?

17   **A.**  Which exhibit is it again?

18   THE COURT:  It's 1088, it looks like.

19   BY MR. ETTINGER:

20   **Q.**  1088.

21   THE COURT:  It's now blown up, or at least the top

22   of it is.

23   THE WITNESS:  Yes, that's correct.

24   BY MR. ETTINGER:

25   **Q.**  Going to the second page of the document, the

2317

1    little box on top.

2    **A.**  Yes.

3    **Q.**  And that indicates that there were three reasons

4    given by Saltzer doctors as to why they rejected the deal;

5    isn't that right?

6    **A.**  That's correct.

7    **Q.**  And one of them was the economic terms of the

8    current St. Luke's proposal are not sufficient; correct?

9    **A.**  Correct.

10   **Q.**  Why don't we go on to another topic, but still on

11   Saltzer.

12   Now, you talked about the exclusivity provision of the

13   professional services agreement with Saltzer on direct, did

14   you not?

15   **A.**  I did.

16   **Q.**  Keely could we bring that up?  It's Joint Exhibit

17   24, page 5.  Actually Section 2.2(a) is on the bottom of

18   page 5, top of page 6.  We can start with bottom of page 5.

19   Do you recall this exclusivity provision as something

20   that you addressed; correct?

21   **A.**  Correct.

22   **Q.**  And you said on direct -- and I looked at the

23   transcript overnight -- that "exclusivity means dedication

24   toward the group and St. Luke's."  Is that your definition

25   of exclusivity?

2318

1      **A.  Well, the definition of exclusivity is what's**
2   **written here in 2.2, but I was using my words.**
3      **Q.**  Okay.  Your words were "dedication toward the
4   group and St. Luke's"; correct?
5      **A.  I believe that's what I said; correct.**
6      **Q.**  Okay.  Why don't we go to 2. -- the second page,
7   the rest of 2.2(a).  And that refers to nonexclusive
8   providers; isn't that right?  In part?  Do you see that bold
9   language, "Non-Exclusive Providers"?
10     **A.  Yes.**
11     **Q.**  So my question is if exclusive providers are
12  dedicated toward the group and St. Luke's, are nonexclusive
13  providers not dedicated toward the group and St. Luke's?
14     **A.  They may not be 100 percent dedicated.**
15     **Q.**  So by "exclusive" you meant 100 percent dedicated;
16  correct?
17     **A.  Relative to administrative leadership**
18  **responsibilities, medical direction, as I referenced**
19  **yesterday.**
20     **Q.**  Now, there's -- you said several things yesterday,
21  but you also said "dedication toward the group and
22  St. Luke's."  Are you saying that it only applies to
23  administrative responsibilities?
24     **A.  Well, the definition is written here in 2.2, so I**
25  **think it speaks for itself.  We define "exclusivity."**

2319

1      **Q.**  The definition says -- let's look at 2.2(a).  The
2   second line -- first and second line, "Saltzer and Saltzer
3   Physicians shall only provide Services and related
4   administrative activities on behalf of St. Luke's"; correct?
5      **A.  Correct.**
6      **Q.**  And the requirement is that for services and
7   related administrative activities, to use your words, the
8   doctors have to be 100 percent dedicated to St. Luke's;
9   correct?  Those were your words a minute ago.
10     **A.  That's -- that's what I said, yes.  The definition**
11  **is here.**
12     **Q.**  Now, you talked about -- let's talk some more
13  about your discussions with Dr. Williams.  You said
14  yesterday that you told Dr. Williams that you needed the
15  surgeons to cover the new Nampa hospital; correct?
16     **A.  Correct.**
17     **Q.**  And by "cover" you mean do the surgeries that are
18  needed at the new Nampa hospital; correct?
19     **A.  I mean beyond the medical staff of the new**
20  **hospital.**
21     **Q.**  Now, wait a minute.  Let's take a look at this
22  testimony.  Page -- I think we can put it up on the ELMO,
23  page 2248.
24           THE COURT:  This is Mr. Roth's testimony from
25  yesterday?

2320

1           MR. ETTINGER:  Yes, Your Honor.
2           MS. DUKE:  Your Honor, can we switch over to
3   the --
4           THE COURT:  Yes.  Ms. Gearhart.
5   BY MR. ETTINGER:
6      **Q.**  You said, "In the event that they couldn't cover
7   it, we needed to be able to have the option to recruit
8   physicians that could cover it."
9      **A.  Yes.**
10     **Q.**  Are you saying that you thought they would resign
11  from the medical staff?  That was your concern?
12     **A.  No.  What I mean is we need a medical staff to**
13  **support a hospital.  Surgeons need to meet beyond the**
14  **medical staff to support the hospital, and they have to work**
15  **in the hospital in order to be on the medical staff.  We**
16  **anticipate having a separate medical staff in that facility.**
17     **Q.**  And so by "support the hospital," by "cover the
18  hospital," you meant perform the surgeries needed at the
19  hospital; correct?
20     **A.  Any physician on a medical staff needs to -- needs**
21  **to --**
22     **Q.**  Please answer my question "yes" or "no."
23     **A.  Correct.  Correct.  Thank you.**
24     **Q.**  And you told Dr. Williams, did you not -- I think
25  that covers it -- you told Dr. Williams, did you not, that

2321

1   St. Luke's expected that the surgeons commit to the new
2   Nampa facility; correct?
3      **A.  Yes.**
4      **Q.**  And you told him, in fact, that you needed a
5   commitment of full volume to that facility; isn't that
6   right?
7      **A.  I don't recall saying that.**
8      **Q.**  You don't deny saying that, do you?
9      **A.  It wouldn't make sense for me to make a comment**
10  **like that.  He practiced at Treasure Valley Hospital in**
11  **Meridian at the time.**
12     **Q.**  So you do deny it?  You deny saying that you
13  needed a full-volume commitment out of the surgeons at the
14  new facility?
15     **A.  I can't deny it, but it makes no sense that I**
16  **would ever make a comment like that.**
17     **Q.**  In fact, in your deposition you said you do not
18  deny it; correct?
19     **A.  I -- I don't know what -- I'd need to see my**
20  **deposition.**
21           MR. ETTINGER:  Keely, let's play Roth cross 28.
22  Your Honor, this is page 193, lines 4 through 25, from
23  Mr. Roth's deposition.
24           THE COURT:  I don't recall if we published the
25  deposition previously.

2322

1    MS. DUKE:  We did.

2    THE COURT:  If not, please provide the original at

3  the conclusion, and we'll publish it at that time.

4    Go ahead and proceed.

5    (Video clip played as follows:)

6      **Q.**  "Do you recall saying that, you know, you

7        would need full-volume commitment out of the

8        surgeons at the new facility?

9      **A.**  "No, I don't recall talking about

10       full-volume commitment.

11     **Q.**  "Do you deny saying that?

12     **A.**  "I don't deny saying it.  I don't recall

13       saying that we would need full-volume

14       commitment.  I was very clear to Steve Williams

15       and consistently with other surgeons if they

16       want to continue to remain invested in Treasure

17       Valley Hospital, they have every right to do

18       that.

19        "And -- but at the same time, we have

20       plans and we intend to build services in Nampa,

21       inpatient services, surgical services.  And as

22       time passes, I predicted that it would be more

23       difficult for them to commit and serve a

24       growing facility and also Treasure Valley

25       Hospital.

2323

1      "Now, Dr. Williams disagreed with me.  We

2        had a philosophical disagreement on how that

3        future may play out.  But that was -- we had a

4        very -- very lengthy discussion around that."

5    (Video clip concluded.)

6  BY MR. ETTINGER:

7      **Q.**  Was that your testimony, Mr. Roth?

8      **A.**  Yes.

9      **Q.**  Now, you also discussed yesterday on direct

10  compensation for the Saltzer physicians.  Isn't it true that

11  the family practice, internal medicine, and pediatric

12  physicians received 30 to 40 percent increases in

13  compensation?

14     **A.**  I don't know if that was the exact percentage, but

15  **it was an increase.**

16     **Q.**  Was that the approximate percentage, 30 to 40

17  percent?

18     **A.**  I don't know for sure, but it -- it sounds

19  **reasonable.**

20     **Q.**  And you had consultants from Grant Thornton who

21  evaluated these proposals for fair market value; correct?

22     **A.**  We -- we had consultants.  I don't know if it was

23  **Grant Thornton or --**

24     **Q.**  They found that these proposals for the primary

25  care physicians were above market norms; correct?

2324

1      **A.**  I don't recall that.

2      **Q.**  Did you receive the -- the fair market valuations

3  by Grant Thornton, yourself?

4      **A.**  I -- I don't remember if they were from Grant

5  **Thornton.  We had a valuation performed for the group that I**

6  **know I've seen.**

7      **Q.**  Well, why don't we go through them, then.

8  I don't believe they're AEO.  Why don't we put up 1977.

9    MR. SCHAFER:  I think they're probably --

10   MR. ETTINGER:  You think they are?  Okay.

11   MR. SCHAFER:  I mean, identify the document so we

12  can -- yeah, they are.

13   THE COURT:  They are?

14   MR. SCHAFER:  Yes.

15   THE COURT:  I'll turn off the monitor to start

16  with and then see.  If we need to clear the courtroom, we'll

17  do so.

18  BY MR. ETTINGER:

19     **Q.**  So why don't we -- the first page -- I'm just

20  going to do the first page first, Your Honor.  It's just the

21  cover page.  I don't think that's a problem, but however you

22  want to do it.

23    So this is the Grant Thornton evaluation of fair market

24  value for the Saltzer family practice physicians; is that

25  correct?

2325

1    THE COURT:  This is just the cover page that you

2  think is not AEO?

3    MR. ETTINGER:  Right.  I'm just using this to

4  identify it, Your Honor.

5    THE COURT:  And the exhibit number is 1977?

6    MR. ETTINGER:  1977.

7    THE COURT:  Counsel, there was an objection that

8  it was untimely.  Is that withdrawn?

9    MR. SCHAFER:  Yes, Your Honor.

10   THE COURT:  All right.  So the exhibit will be

11  admitted.

12   (Plaintiffs' Exhibit No. 1977 admitted.)

13   THE COURT:  Proceed.

14  BY MR. ETTINGER:

15     **Q.**  So Mr. Roth, have you seen this evaluation by

16  Grant Thornton of the compensation for offers for the family

17  practice physicians?

18     **A.**  I don't remember seeing this.  I was confused

19  **because I think we had KPMG do the valuation on the whole**

20  **group.  I don't recall seeing a specific valuation for just**

21  **this group of physicians.  I may have.  I just don't recall.**

22     **Q.**  Since you talked about compensation today, why

23  don't we look at one more page.

24    And this one I guess we better cover the screen on,

25  Your Honor.  And that's page 10 of the document.

2326

1    Are you there, Mr. Roth?
2    **A. Yes, page 10.**
3        **Q.** Do you see in the third paragraph the reference to
4    the average increase in compensation?
5    **A. Yes.**
6        **Q.** And you see that Grant Thornton said this is above
7    the typical market norms?
8    **A. Yes. It says, "but is warranted in this case."**
9        **Q.** So let's go on to Exhibit 1269.  Actually, I'm
10   sorry.  Let's go on to Exhibit 1972.
11       Again, I think we can put the first page, Your Honor,
12   on the screen, and then we'll go to the page in question.
13       So it was 1972.  Tell me when you're there, Mr. Roth.
14   **A. Is that one supposed to be in my book?**
15       **Q.** I certainly hope so.  It's not?
16       THE COURT:  Let me also, again, there was an
17   untimely objection.  Is that withdrawn?
18       MR. SCHAFER:  Yes, Your Honor.
19       THE COURT:  1972 will be admitted.
20   (Plaintiffs' Exhibit No. 1972 admitted.)
21       THE WITNESS:  I don't see it tabbed here in the
22   book.  There's a --
23   BY MR. ETTINGER:
24       **Q.** If you could look at the screen, and if you have a
25   problem, we'll try to get you one quickly.  Does this appear

2327

1    to be the Grant Thornton evaluation for the Saltzer internal
2    medicine physicians compensation offer?
3    **A. This is a cover letter that's on the screen --**
4        **Q.** Right.
5    **A. -- that's blown up.**
6        **Q.** With regard to the internal medicine physicians?
7    **A. Yes.**
8        **Q.** And why don't we go to page 7, and we ought to
9    keep this one off the screen, Your Honor.
10       And you see there that the increase is in the -- the
11   proposed increase is in the range that we discussed earlier?
12   The 30 to 40 percent?
13   **A. Yes. And it says it's justified.**
14       **Q.** We'll get to that.  And it says it's above typical
15   market norms; correct?
16   **A. Yes.**
17       MS. DUKE:  Your Honor, we have a full copy if the
18   witness would like that.
19       THE COURT:  Are you comfortable using this or
20   would you prefer the full copy?
21       THE WITNESS:  If we're almost done, I don't need
22   it.
23       MR. ETTINGER:  We're almost done.
24       THE COURT:  All right.
25   BY MR. ETTINGER:

2328

1        **Q.** It says it's justified, and then it lists some
2    reasons why it's justified; isn't that right?
3    **A. I have three bullet points. If there are more, I**
4    **do need the document.**
5        **Q.** I'm just going to ask you about the first one.  I
6    think the next page is not bullet points, but, you know, if
7    you want to see it, of course, we can show it to you.
8        The first bullet point, the first justification is that
9    rates are going to go up after the deal; correct?
10   **A. It says "physician charge rates," yes. It says**
11   **"being adjusted." It doesn't say "going up."**
12       **Q.** Well, if this is -- if this is a justification for
13   raising the physician compensation, simple math would
14   suggest that the rates have to go up in order to justify
15   paying out more money; isn't that right?
16   **A. That's not what it says here.**
17       **Q.** It says "adjusted"; right?
18   **A. It says "adjusted"; it doesn't say "up."**
19       **Q.** Well, Mr. Roth, as a matter of simple math, isn't
20   it true that if you want to pay out more and you think that
21   the money coming in is going to justify it, logic suggests
22   you're going to get more in in order to justify paying more
23   out; correct?
24   **A. It may, but we're relying on the -- this is a**
25   **Grant Thornton work. They just say "adjusted."**

2329

1        **Q.** It does say, "results in a corresponding increase
2    in the rates collected," doesn't it?
3    **A. It does.**
4        **Q.** So it's pretty clear we're talking about an
5    increase; right?
6    **A. It would seem that way. It just says "adjusted,"**
7    **though.**
8        **Q.** And the rest of the sentence says "increased,"
9    doesn't it?
10   **A. Yes.**
11       **Q.** Okay.  Let's go to one more of these documents.
12   Why don't we put up 1269?
13       And, again, the cover page I think can be on the
14   screen, Your Honor.
15       And this is the Grant Thornton offer with regard to the
16   orthopedic surgeons, is it not?
17   **A. That's correct. Cover letter.**
18       **Q.** I'm sorry.  This is the Grant Thornton evaluation
19   with regard to the offer to the orthopedic surgeons;
20   correct?
21   **A. Yeah. It's analysis of their proposed**
22   **compensation.**
23       **Q.** Okay.  And why don't we go to page 9, which I
24   think we probably want to blank out, Your Honor.
25       And the second bullet point on page 9 says that "the

2330

1  proposed increases for the surgeons are below market norms";
2  correct?
3      **A.   Correct.**
4      **Q.** That's all I've got on that.
5      Now, do you recall a conversation about the specialists
6  at Saltzer with Dr. Buersmeyer?
7      **A.   Do I recall a specific conversation.**
8      **Q.** Yeah, that you had with Dr. Buersmeyer.
9      **A.   Individually or?**
10     **Q.** Right, right.
11     **A.   I don't recall meeting with Dr. Buersmeyer**
12  **individually.**
13     **Q.** Actually, I'm sorry.  Do you recall a conference
14  call with the negotiating team members that included
15  Dr. Buersmeyer, at least one?
16     **A.   I don't recall a conference call.  We had a lot of**
17  **meetings.  I don't remember any being over the phone, but**
18  **they may have.**
19     **Q.** Okay.  Do you recall Dr. Buersmeyer saying, "We
20  could lose all of our specialists over this deal if we're
21  not careful"?
22     **A.   I don't recall her saying that.**
23     **Q.** Do you recall words to that effect?
24     **A.   No.**
25     **Q.** Do you recall telling her in response, "That would

2331

1  be just fine with us"?
2      **A.   I don't recall saying that, but it's not**
3  **inconsistent with what I've said regarding physicians that**
4  **don't want to stay with the group or work with us.**
5      **Q.** Now, you were asked questions about referrals
6  policy generally as relating to Saltzer, and I want to show
7  you one document that I believe is not AEO.  It's 1094.  I'm
8  raising it in case anyone in the St. Luke's group wants to
9  tell me I got this one wrong before we put it up.
10         THE COURT:  I can darken the screen if you want.
11         MR. SCHAFER:  That's fine.  It's not AEO.
12         MR. ETTINGER:  Great.  So let's put up 1094.
13  BY MR. ETTINGER:
14     **Q.** And this is some emails, an email from you to
15  John Kee and Greg Orr responding ultimately to an email from
16  Greg Orr; isn't that right?
17     **A.   That's right.**
18     **Q.** And Greg Orr worked in physician services at that
19  time, did he not?
20     **A.   He did.**
21     **Q.** And Greg Orr was talking about how to handle
22  referrals for imaging cases from the employed Ortho Joint
23  Orthopedic Committee group; correct?
24     **A.   "How to handle"?**
25     **Q.** This was the Intermountain Orthopaedics group

2332

1  employed by St. Luke's; correct?
2      **A.   Correct.**
3      **Q.** Well, let's just go to the last bullet, and we
4  don't need to worry about my characterization.  Mr. Orr said
5  there, did he not, that the group "approved changes to their
6  imaging order screens that eliminates the ability to easily
7  choose from several imaging centers."
8      Do you see that?
9      **A.   Yes.  This was the result of our work to improve**
10  **service for those physicians.**
11     **Q.** And he says, "The only options will be
12  'St. Luke's' and 'Others.'"  Did I read that correctly?
13     **A.   Yes.**
14     **Q.** And he says, "The 'other' category requires manual
15  entry and a stated reason for the outside referral."  Did I
16  read that correctly?
17     **A.   That's correct.**
18     **Q.** And you said Mr. Kee said "great work," didn't he?
19     **A.   He did.**
20     **Q.** And you were slightly more reserved.  You said,
21  "Thanks.  Good work," didn't you?
22     **A.   Yes.  It was a culmination of a lot of work to get**
23  **to the point to improve our services.**
24     **Q.** Thank you.  You answered my question.
25     Let's move on to just a couple quick topics.  You

2333

1  mentioned West Valley on direct.  You've used the phrase
2  "coopetition" to describe the relationship between
3  St. Luke's and West Valley; isn't that right?
4      **A.   I believed I used the phrase coopetition in my**
5  **deposition.**
6      **Q.** You used the term in your deposition; correct?
7      **A.   Yes.  Yes, I used it.**
8      **Q.** Combination of half cooperation half competition;
9  correct?
10     **A.   I didn't say half and half.**
11     **Q.** Now, you're not aware of any initiatives
12  St. Luke's has undertaken to take business away from
13  West Valley, are you?
14     **A.   I'm not aware of any initiatives we have that**
15  **specifically designed to take business away from anybody.**
16  **We don't -- we don't measure -- we don't measure that as an**
17  **outcome.  But we compete and we cooperate.**
18     **Q.** Now, we talked about clinical alignment on direct?
19     **A.   Yes.**
20     **Q.** Do you recall that?
21     **A.   Yes.**
22     **Q.** And there is a group called Women's Health
23  Associates, an independent group?
24     **A.   Yes.**
25     **Q.** Another one called -- I think you called it "OGA"

2334

1  in your deposition?
2      **A.  That's another OB group, yes.**
3      **Q.**  And these are independent groups that, in your
4  view, are as clinically aligned with St. Luke's as its
5  employed groups except for the fact that as of now they're
6  not participating in Epic; correct?
7      **A.  Yes.  They're not as clinically aligned now.**
8      **Q.**  And the only way in which they're not as
9  clinically aligned now is participation in Epic; correct?
10     **A.  I think that's fair, yes.**
11     **Q.**  And when the affiliate EMR program is up and
12  running, they will be as clinically aligned as St. Luke's
13  employed groups; correct?
14     **A.  They could be.  They may not be as strategically**
15  **or financially aligned, but clinically, yes, they will be**
16  **getting closer.**
17     **Q.**  Well, they will be as clinically aligned as the
18  employed groups; correct?
19     **A.  Yeah, they should be.**
20     **Q.**  And has Women's Health already indicated they want
21  to participate in the affiliate EMR program?
22     **A.  Yes.**
23     **Q.**  And by the way, the Epic -- Epic today is not up
24  on the inpatient side for St. Luke's, is it?
25     **A.  It's not yet.**

2335

1      **Q.**  Is there a date set for when it will be up on the
2  inpatient side?
3      **A.  We're targeting one year to start the**
4  **implementation, and it's -- I don't recall the specific**
5  **date, if it's 2015 time frame.  I just don't recall the date**
6  **when we will go live, but we're actively working on it**
7  **today.**
8      **Q.**  So is it the case that today, on the inpatient
9  side, St. Luke's is still using paper records?
10     **A.  No.  We have a combination of records throughout**
11  **the health system that's somewhat fragmented, which is why**
12  **we need to get on a consistent system.  It's not all paper.**
13     **Q.**  How much of it is paper, would you say, on the
14  inpatient side?
15     **A.  The critical -- a couple of the critical care**
16  **units are on paper.  Everything else is on electronics, some**
17  **form of electronic documentation system.**
18     **Q.**  What are the systems?
19     **A.  We have Centricity -- and I'm talking Treasure**
20  **Valley right now -- we have Centricity system for OB.  We**
21  **have Soarian system for most other areas.  We've got**
22  **electronic medication management.  We've got electronic**
23  **radiology systems.  We've got electronic laboratory systems.**
24  **We've got electronic health record in the emergency**
25  **department and in the cancer program.  We have paper in some**

2336

1  **of our critical care units -- I think I may have mentioned**
2  **that.  They are all kind of different systems that need to**
3  **try to communicate with one another, which is why we are**
4  **moving to a single common system that can integrate with the**
5  **physician practices.**
6      **Q.**  Now, critical care, you said, is a paper record?
7      **A.  Yes.**
8      **Q.**  That's where Dr. Souza, who was here the other
9  day, practices?
10     **A.  Yes.  He practices on electronic health record in**
11  **his clinic, and he practices --**
12     **Q.**  On the inpatient side, which was my question,
13  where Dr. Souza practices, it's a paper record?
14     **A.  Yes.**
15     **Q.**  Would you call that a "horse-and-buggy system"?
16     **A.  No, I wouldn't call it that.**
17     **Q.**  Okay.  Let me ask you a little bit about
18  compensation.  Isn't it true that more than 80 percent of
19  the physicians in St. Luke's clinics are today compensated
20  based on wRVUs, productivity?
21     **A.  I don't know the exact percentage, but I think**
22  **it's fair to say it would be more than 80 percent.**
23     **Q.**  And under that system, the more patients the
24  doctor sees, the more work the doctor performs, the more the
25  doctor gets paid?

2337

1      **A.  Yes.  That's the world of healthcare reimbursement**
2  **in this country.**
3      **Q.**  And you mentioned on direct that in Saltzer's
4  case, it's 100 percent based on wRVUs as of today; correct?
5      **A.  It is today, as it has been in the past.**
6      **Q.**  And as of today, there is no -- while there is an
7  aspiration to try to work out some quality measures, there
8  is nothing specific that's been agreed to with Saltzer;
9  correct?
10     **A.  Correct.  We have been kind of standing still for**
11  **the last many months, so correct.**
12     **Q.**  Now -- and you don't know of any contracts with
13  physicians at St. Luke's that are either in place or even
14  being developed that compensates physicians primarily based
15  on quality outcomes or utilization; correct?
16     **A.  "Primarily" meaning more than 50 percent?**
17     **Q.**  Right.
18     **A.  No, I'm not aware of any.**
19              MR. ETTINGER:  Thank you very much.
20              THE COURT:  Mr. Schafer, redirect.
21              MR. SCHAFER:  Thank you, Your Honor.
22                      REDIRECT EXAMINATION
23  BY MR. SCHAFER:
24     **Q.**  Mr. Roth, plaintiffs' counsel asked you some
25  questions regarding market share and whether the purpose of

2338

1  the Saltzer transaction was to increase market share.  Do
2  you remember those questions?
3      **A.   Yes.**
4      **Q.**   And I think you testified yesterday that one of
5  the goals of St. Luke's transaction with Saltzer was to
6  increase St. Luke's presence in Canyon County; is that
7  right?
8      **A.   That's right.**
9      **Q.**   And would increasing St. Luke's presence in
10  Canyon County result in what Mr. Ettinger termed a "market
11  share increase" there?
12      **A.   It could.**
13      **Q.**   But was that St. Luke's goal in entering the
14  transaction with Saltzer to increase market share for market
15  share's sake?
16      **A.   No, it wasn't.  And I'll just elaborate that in**
17  **the state of Idaho when we talk about market share, we have**
18  **publicly available data for market share for Medicare**
19  **inpatient discharges.  That's a sliver of healthcare.  We**
20  **have no meaningful market share for all the other services**
21  **provided.**
22      **Q.**   Mr. Ettinger also asked you some questions about a
23  comment in a document where there was a phrase "pressure
24  payors."  Do you remember that document?
25      **A.   I do.**

2339

1      **Q.**   I think plaintiffs' counsel's original question to
2  you said -- implied that that had something to do with the
3  Saltzer transaction.  And I think you were trying to answer,
4  but can you elaborate on whether or not that document had
5  anything to do with the Saltzer transaction?
6      **A.   It had nothing to do with the Saltzer transaction.**
7  **I was talking about what was -- what we were seeing**
8  **globally.  And I was trying to elaborate relative to**
9  **pressure; for example, if our patient satisfaction scores go**
10  **down, I feel pressure to improve them.  That's not a bad**
11  **thing.  But pressure comes in many forms.**
12      **Q.**   And the statement that was shown to you, I believe
13  it said, "pressure payors to enter new directed contracts";
14  correct?
15      **A.   Correct.**
16      **Q.**   What did that mean, "new" and "directed
17  contracts"?
18      **A.   Well, I'll use our spine center as an example.  If**
19  **we can demonstrate that we have lower costs, better**
20  **outcomes, then the payors, employers, others should want to**
21  **partner with us and work with us to essentially direct**
22  **patients to that service that's delivering lowering costs**
23  **and better outcomes.**
24      **Q.**   And that document didn't say anything about
25  pressuring payors to increase reimbursement rates, did it?

2340

1      **A.   No.**
2      **Q.**   Plaintiffs' counsel also asked you some questions
3  regarding whether or not St. Luke's goal with respect to the
4  Saltzer transaction and a proposed hospital at some point in
5  the future in Nampa would be to have the Saltzer physicians
6  staff that facility; is that correct?
7      **A.   That's correct.**
8      **Q.**   By staffing that facility, was it your expectation
9  that St. Luke's -- or that Saltzer physicians wouldn't be
10  able to be on staff at any other facility, like Saint
11  Alphonsus Nampa?
12      **A.   Not at all, and I think it's demonstrated in the**
13  **fact that we said you can continue to have an investment in**
14  **Treasure Valley Hospital, work in Treasure Valley Hospital,**
15  **work at the Meridian facility, work wherever, but we needed**
16  **physicians that would be on staff and that would cover that**
17  **facility.**
18      **Q.**   You were also asked some questions about two
19  documents that I would like to pull back up, if possible.
20      The first document you were asked about -- and, Judge,
21  I think we might need to blank the screen for this one.
22  This is one of the AEO documents.
23      I believe it was page 10 of this document,
24  Exhibit 1977.
25      **A.   Okay.**

2341

1      **Q.**   You were asked about the phrase, in the third
2  paragraph on this page, "this is above typical market
3  norms."  Tellingly, the question stopped with that portion
4  of the sentence.  Would you read the rest of that paragraph?
5      **A.   "This is above the typical market norms, but is**
6  **warranted in this case as the compensation model results in**
7  **reasonable compensation, and is in line with the**
8  **compensation model offered to other St. Luke's Health System**
9  **family practice physicians."**
10      **Q.**   And with respect to that issue, isn't that -- did
11  you discuss that issue yesterday with respect to the equity
12  of physician salaries across the Treasure Valley?
13      **A.   Yes, that's what I was referencing.**
14      **Q.**   If you could pull up Exhibit 1972.
15      It's another document you were asked about.
16      And page 7 of this document.
17      Down at the bottom of the page you were asked about a
18  sentence here:  "Saltzer physician charge rates are being
19  adjusted to the SLHS rate which results in corresponding
20  increase in the rates collected."  Do you remember looking
21  at that sentence?
22      **A.   Yes.**
23      **Q.**   Mr. Roth, are you aware that as part of the
24  proposed transaction with Saltzer part of the plan would be
25  to provider-base bill Saltzer's services for Medicare

2342

1  purposes?
2       **A.  Yes.**
3       **Q.**  And would provider-based billing those services
4  result in increased collection from Medicare?
5       **A.  Increased collection, but not necessarily any**
6  **change in charges.**
7       **Q.**  You were also asked some questions regarding an
8  email that referenced an Intermountain Imaging issue.
9       **A.  Yes.**
10      **Q.**  And I believe you were starting to say, and you
11 were cut off, that -- that that email and what's reflected
12 in that email was the result of a lot of hard work.  Could
13 you elaborate on what you meant by that?
14      **A.  Yeah.  I remember a physician, Dr. Howard King,**
15 **coming to me on at least one occasion, it may have been in a**
16 **larger meeting, and said that -- he expressed**
17 **dissatisfaction with our imaging service and his ability or**
18 **inability to get paid --**
19      MR. ETTINGER:  Your Honor, hearsay.
20      THE COURT:  Sustained.
21 BY MR. SCHAFER:
22      **Q.**  Mr. Roth, did you have an understanding from
23 Intermountain that Intermountain was sending its imaging
24 studies to some other facility?
25      MR. ETTINGER:  Your Honor, this is asking for the

2343

1  same hearsay with the word "understanding" grafted in the
2  front of it.
3       MR. SCHAFER:  Your Honor, if I may, Mr. Ettinger
4  was asking what Mr. Roth's view in this document, as far as
5  what he meant by "good work" in response to a series of
6  emails.
7       THE COURT:  I'll allow the witness to indicate the
8  meaning -- how -- where he derived that from.  Just
9  referring to the source of the information, limited in that
10 fashion.  Although it's probably still hearsay, it's
11 probably necessary to allow the witness to explain a subject
12 matter that was covered on cross.
13      You may answer.
14      THE WITNESS:  A physician told me directly that he
15 was not satisfied with our service.  I asked our teams to
16 work with the physicians to figure out how to improve our
17 service.  Over a course of time, we improved our service,
18 and the outcome was that the physicians felt comfortable
19 enough sending their studies to St. Luke's imaging because
20 we were successful in improving that.
21 BY MR. SCHAFER:
22      **Q.**  Did you or, to your knowledge, anybody else at
23 St. Luke's ever tell Intermountain that they couldn't send
24 their imaging studies anywhere other than St. Luke's
25 facility?

2344

1       **A.  No.**
2       MR. SCHAFER:  No further questions.
3       THE COURT:  Redirect -- I mean, recross.
4       MR. ETTINGER:  Yes, Your Honor, briefly.
5            RECROSS-EXAMINATION
6  BY MR. ETTINGER:
7       **Q.**  So, first of all, very briefly, Mr. Roth, on
8  Exhibit 1473, the market share figures on page 9 -- I'm not
9  sure we need to put them up, and, of course, we blanked the
10 screen for this anyhow.
11      These are not Medicare numbers.  Somebody had to go out
12 and count physicians to come up with share figures; correct?
13 Isn't that correct?
14      **A.  I think that would be -- that would be correct,**
15 **percentage of affiliated physicians.**
16      **Q.**  Okay.  Now, Mr. Schafer asked you about the
17 "pressure payors" phrase.  Let me just -- yes or no, I want
18 to understand your definition of pressure is demonstrate
19 lower costs and better outcomes; is that correct?  Yes or
20 no?
21      **A.  That's not my full definition of pressure.**
22      **Q.**  Is that what you meant by pressure in this
23 document?
24      **A.  That's what I meant when I wrote that in this**
25 **document, yes.**

2345

1       **Q.**  Okay.  And did you testify a minute ago that that
2  phrase had nothing to do with price increases?  That's what
3  I thought I heard you say in response to Mr. Schafer's
4  question; is that right?
5       **A.  That the phrase had nothing to do with price**
6  **increases?**
7       **Q.**  Right.
8       **A.  I think his question was:  Is the intent of that**
9  **to pressure payors to increase prices?  I don't recall his**
10 **specific question.**
11      **Q.**  And your answer was "no"?
12      **A.  Yeah.  I said no to his question.  I don't recall**
13 **exactly what his question was.**
14      **Q.**  Let's go back to the document and see if we can
15 help you.
16      1093, the third page, which I think we need to keep the
17 screen blank on.  You see the heading under which the phrase
18 "pressure payors" is placed?
19      **A.  Yes.**
20      **Q.**  And the heading says "price increase," does it
21 not?
22      **A.  Yes.**
23      **Q.**  Okay.  Now, two other quick things.  Do you know
24 whether St. Luke's other family practice physicians outside
25 of Saltzer are also paid above market norms?

2346

1    **A.**  I don't know.

2    **Q.**  Okay.  Why don't we go real quickly to Plaintiffs'

3   Exhibit 1977 again, page 10.  I think this needs to be

4   blanked.

5        Do you see that same paragraph that Mr. Schafer and I

6   have asked you about?  Let's go back to that, the third

7   paragraph on page 10.  And you see the last sentence

8   provides a further reason why Grant Thornton thought that

9   the competition increases were justified; correct?

10   **A.**  Do you want me to read it or -- what's your

11  question?

12   **Q.**  Well, I just -- given the page is blank, I'm

13  trying to avoid an improper disclosure.  But is it fair to

14  say -- we can all read it, those of us who have it -- that

15  one of the reasons why Grant Thornton thought that the

16  compensation was reasonable though above market norms was

17  its characterization of the substantial business case for

18  acquiring Saltzer that it provides in that last sentence?

19   **A.**  It says that we have a substantial business case,

20  yes.

21   **Q.**  For the reasons in that sentence; correct?

22   **A.**  The sentence speaks for itself.  I don't know if

23  it -- it says "also has."

24   **Q.**  Now, finally, Mr. Schafer asked you about imaging,

25  and I want to call up that document again very quickly.

2347

1        We'll see if Keely is better than me, because I'm

2   forgetting the exhibit number.  The reference to the imaging

3   screens.

4        Let me just ask you:  If it were the case that

5   St. Luke's -- that what Mr. Orr really did was improve

6   service in imaging so that the physicians were satisfied,

7   isn't it true that there would have been no need to

8   eliminate the ability to easily choose other people on the

9   electronic system?

10   **A.**  I can't say that or not.

11   **Q.**  Why would there have been a need to eliminate that

12  choice?

13   **A.**  I don't know.

14        MR. ETTINGER:  No further questions.  Thank you.

15        THE COURT:  Anything else, Mr. Schafer?

16        MR. SCHAFER:  Just one question.

17        THE COURT:  One question.

18             FURTHER REDIRECT EXAMINATION

19  BY MR. SCHAFER:

20   **Q.**  If you can blow up that same paragraph, that would

21  be great.

22        I just want to clarify one thing from plaintiff

23  counsel's questions, Mr. Roth.  Plaintiffs' counsel asked

24  you questions seemingly stating that -- that this opinion

25  states that compensation was above market norms.  Could you

2348

1   read the first two sentences?

2    **A.**  First two sentences of the blocked?  Starting

3   with --

4    **Q.**  Does this -- do these sentences relate to

5   compensation being above market norms or do these sentences

6   relate to the increase being above market norms?

7    **A.**  It starts out "the increases," so it references

8   the increase.

9        MR. SCHAFER:  Thank you.  No further questions.

10        THE COURT:  Anything else, Counsel?  Mr. Ettinger?

11        MR. ETTINGER:  No, Your Honor.  We can save it for

12  findings later.

13        THE COURT:  All right.  Mr. Roth, you may step

14  down.  Thank you, sir.

15        Call your next witness, Mr. Sinclair.

16        MR. SINCLAIR:  Call Dr. Huerd.

17        THE COURT:  Dr. Huerd, would you please step

18  before the clerk here -- you will have to step over that

19  cord -- I think this is the fall test that we were --

20             STEVEN SCOTT HUERD,

21  having been first duly sworn to tell the whole truth,

22  testified as follows:

23        THE CLERK:  Please take a seat in the witness

24  stand.

25        MR. SINCLAIR:  Your Honor, while he is approaching

2349

1   the witness stand, yesterday we used Exhibit 2639, and we

2   played the Roach video clip, and I cleared with plaintiffs'

3   counsel, they have no objection, so we would move its

4   admission at this point in time.  2639.

5        THE COURT:  Is that correct, Counsel?  No

6   objection?

7        MS. DUKE:  Yes, Your Honor.

8        THE COURT:  All right.  2639 will be admitted.

9   (Defendants' Exhibit No. 2639 admitted.)

10        THE CLERK:  Please state your complete name and

11  spell your name for the record.

12        THE WITNESS:  Steven Scott Huerd, S-T-E-V-E-N

13  S-C-O-T-T H-U-E-R-D.

14        THE COURT:  You may inquire, Mr. Sinclair.

15        MR. SINCLAIR:  Thank you, Your Honor.

16             DIRECT EXAMINATION

17  BY MR. SINCLAIR:

18   **Q.**  Good morning, Dr. Huerd.

19   **A.**  Good morning.

20   **Q.**  Where you currently employed?

21   **A.**  St. Luke's.

22   **Q.**  What is your area of medical specialty?

23   **A.**  Cardiothoracic surgery.

24   **Q.**  Would you explain your educational background?

25   **A.**  I finished medical school at the University of

2350

1  Washington in Seattle in '95.  I then went to the University
2  of Colorado in Denver from '95 to 2000 and completed my
3  general surgical training and then went on for fellowship to
4  specialize in cardiothoracic surgery at the University of
5  Minnesota from 2000 to 2003, and my wife and I came in July
6  of '03 to Boise.
7      Q.   From the time you came to Boise, what have you
8  been doing?
9      A.   I've been in practice with Cardiothoracic &
10 Vascular Associates since July of 2003 and then in 2010
11 became employed with St. Luke's.
12     Q.   And how many doctors were in -- is it commonly
13 referred to as "CVA"?
14     A.   CVA.  We didn't intentionally make it sound like a
15 stroke, but that's how it landed when we named our practice.
16 But there were eight physicians when I arrived, one has
17 retired, Dr. Olson, and there are eight physicians
18 currently.
19     Q.   Okay.  How did the discussions regarding a
20 potential affiliation between your group and St. Luke's
21 originate?
22     A.   Well, it took many months of group-based
23 discussions to make the decision, but --
24     Q.   What caused you to even discuss it, though?  How
25 did it come about?

2351

1      A.   Well, approximately 12 to 15 months prior to our
2  discussion with the hospital or our transition to the
3  hospital, we came across an advertisement for a vascular
4  surgeon at Saint Al's in the *Journal of Vascular Surgery*,
5  which is a common place for vascular surgeons to submit
6  recruitment ads.  It was discovered by one of our PAs in our
7  practice, delivered to my vascular partners, who then during
8  one of our Monday night group practice meetings showed us
9  the ad, which began a discussion about what that impact
10 would have upon our practice over time.
11     Q.   At that point in time, you were an independent
12 medical group; correct?
13     A.   Yes.  We all had privileges equally at both Saint
14 Alphonsus and St. Luke's and practiced at both facilities
15 regularly.  I would say that I covered 30 percent of my
16 practice at Saint Al's and approximately 70 percent at
17 St. Luke's.  We all had slightly different ratios of that
18 practice, based upon our direct referrals.
19     Q.   Okay.  When this -- when this ad came to your
20 attention, why did that cause you concern?
21     A.   Well, it didn't cause me personally a tremendous
22 concern because I'm a cardiac surgeon and it didn't have a
23 direct impact, but I have partners who are vascular
24 surgeons.  This was their competition.  We were upset, as a
25 group, because we were unaware it was happening.  We did not

2352

1  like the idea that vascular surgeons were being recruited,
2  and we didn't really know about it.  We didn't find that to
3  be professionally appropriate for us.
4      Q.   So Saint Al's had not come to you and told you in
5  advance that they intended to do this?
6      A.   No.  One of my partners, Dr. Masser, called
7  our -- one of his associates, Dr. Simmons, and asked about
8  it.  And Dr. Simmons then notified us shortly after we
9  noticed the ad that he had become employed in the last two
10 to three months, unbeknownst to us, and that ad was to seek
11 his future partner.
12     Q.   How did the discussions within CVA develop after
13 you became aware of that?
14     A.   Well, that was the time when my vascular partners
15 began to challenge all of us regarding the future of our
16 practice, the future of recruitment at Saint Al's, and the
17 impact of that recruitment upon our practice.  They were
18 making the point that they felt that their call dynamic and
19 coverage dynamic and practice dynamic was changing abruptly
20 with recruitment.  They challenged us that that could happen
21 for us at any moment, unbeknownst to us, and it was
22 upsetting because they had a call relationship with both
23 hospitals, and they felt that it would be more appropriate
24 to have discussed it.
25     Q.   So in the discussions that ensued, were there

2353

1  other actors that you considered in deciding whether or not
2  to affiliate with one of the hospitals?
3      A.   Well, I think there were multiple factors.  I
4  think that as a group and running a practice for the last
5  eight or nine years and doing all the details of running it,
6  we constantly commented on many things, the nature of our
7  reimbursement, our patient profiles, the impact of
8  healthcare changes as we could forecast it in the future,
9  the costs and inconveniences, at times, of running a
10 practice.  It was challenging having 25 to 30 employees and
11 satisfying their needs.  We also thought of the politics of
12 hospitals that are recruiting our competition, the effect of
13 our practice value, per se, if our competition arrives with
14 or without our knowledge.
15         There was also a lot of the discussion in the
16 personal.  As a surgeon doing cardiac surgery, I was on call
17 every third night.  I was covering two health systems, two
18 emergency rooms, and working hundred-hour weeks, which was
19 very similar to my residency training, eight years -- seven,
20 eight years out.  And there was a lot of personal reasons
21 for -- it wasn't just about economics.  It wasn't just about
22 politics.  What played a role -- we were all in a similar
23 age group.  We all -- some of us had young children.  We had
24 lifestyles we weren't that happy with.  And so all of that
25 played a role in our discussions as a practice.

2354

1    Q.  So what was -- what happened after you had these
2    discussions?
3    A.  Well, after -- after probably, I would
4    guesstimate, two to four months of internal debate, formal
5    debates at our meetings, informal debates in our locker
6    room, hallways, you name it, eventually, after everybody had
7    a chance to debate and say their piece -- we are a
8    one-man/one-vote practice, and we put it to a vote, and
9    there were four vascular surgeons, three cardiac surgeons,
10   and we had a majority vote to enter a discussion with
11   St. Luke's.
12   Q.  So who approached whom in regards to an official
13   affiliation?
14   A.  We approached St. Luke's.  Our group tasked two of
15   us, one vascular surgeon and one cardiac surgeon, myself,
16   asked us to go over and start the conversation.
17   Q.  So once you had made that decision, did you advise
18   Saint Al's?
19   A.  I didn't formally, but I know that my -- one of my
20   vascular partners, one of my cardiac surgical partners
21   discussed it with one of their vice presidents and let her
22   know that we were starting the conversation.  And then I
23   think it very rapidly got out that the conversation had
24   started.  I know that the cardiologists were well aware of
25   the situation probably within two weeks of the time we

2355

1    formally approached the hospital.
2    Q.  Did you sit down with the hospital and discuss
3    call coverage while you were going through this process and
4    later affiliating?
5    A.  Absolutely.  I mean, during our initial experience
6    with Gary Fletcher, who we approached personally about the
7    conversation, we made it very clear that our practice
8    dynamic would be unchanged and our call coverage would, for
9    the time being, stay as it was.  And our policy within our
10   group at all times was to operate on patients where they
11   preferred to be operated on, number one, and number two
12   where their workup occurred.  So we did not ever stray from
13   that, and we planned to cover the hospital, callwise, for
14   professional reasons, as long as needed, until they had
15   surgeons that were credentialed and on staff ready to fill
16   in.
17   Q.  Did you offer to assist in recruiting surgeons for
18   Saint Al's?
19   A.  We did.  We did.  It was an informal discussion,
20   but at the same time, we -- we as a group have recruited
21   surgeons in the past.  We know what it's like to have to
22   sift through CVs of many, many applicants and trying to
23   figure out, you know, the best quality applicants we could
24   find, and so we did, informally, offer to review anybody
25   they recruited, make calls to other colleagues to make sure

2356

1    that their recruits were, you know, high quality and make
2    sure that whoever joined was outstanding.
3    Q.  What was Saint Al's response to your offer?
4    A.  That they -- I wasn't present for the
5    conversation, but I was told that they're happy to recruit
6    on their own.
7    Q.  Okay.  And what occurred in regards to your call
8    coverage?
9    A.  Well, my group continued to take call as we always
10   had.  The call schedule didn't change.  We reassured the
11   cardiologists that the cardiac surgeons would be there every
12   third night, 24/7, to cover their cases for the foreseeable
13   future.  I don't think we left it open-ended forever, but we
14   did imply we would be there.
15   Q.  Was the transition more abrupt than you had
16   expected?
17   A.  A little bit, yes.  As months went on, they had
18   decided to recruit a surgeon from Alaska, and the surgeon,
19   we were told, had committed, and they had committed to him.
20   We had met with him locally and talked with him briefly once
21   he got to Boise.  He was not yet credentialed.  And we met
22   with him right at 6th and Idaho at Java to have coffee.  And
23   we talked with him about what his plans were when he finally
24   reached his credentials, and he planned on taking call by
25   himself.

2357

1    Once he had his privileges, he felt he didn't need
2    any further assistance.
3    At that time, you know, informally, we just
4    thought that that was a little much with the abrupt
5    transfer.  We were willing to stay there and do cases, you
6    know, even if we were in the room adjacent, to make sure
7    that he had had time to do cases, even not taking call, just
8    doing some cases, getting his feet wet, getting used to the
9    cardiologists, the ICU, the ORs.  It's a huge adjustment in
10   an operating room to go from one surgeon to a completely new
11   style of operating, and we wanted some more lengthy
12   transition for him.
13   Q.  Did that --
14   A.  I just felt it was professionally appropriate to
15   give him that breathing room.
16   Q.  And did they take you up on the offer to assist?
17   A.  No.  No.  When -- when he reached his privileges
18   within -- I think it was within eight hours of him receiving
19   his privileges, I had a text that we were free to leave
20   Saint Al's and our services weren't needed.
21   Q.  Okay.  Doctor, was it important to you that you
22   were able to continue to refer patients wherever you thought
23   it was best for the patient?
24   A.  Absolutely.  We -- as we negotiated with the
25   hospital over the course of a few months, it was made very

2358

1 clear to us that the hospital had zero interest in getting
2 involved with clinical decision-making with our group.  You
3 know, we were very adamant that that not play a role in our
4 future.
5        Q.  And was St. Luke's agreeable that that would not
6 play a role, and you would have autonomy in making
7 referrals?
8        A.  Yeah.  The language that I agreed to in our
9 contract was very clear to me that we were free to do what
10 we think is appropriate clinically with any one of our
11 patients at any time.
12       Q.  So do you continue to make referrals outside of
13 the St. Luke's system?
14       A.  I wouldn't say -- I wouldn't say I do it often
15 because there's not often a need, but I would say that I
16 feel completely free to do so.  I refer patients to Salt
17 Lake City for minimally invasive procedures that cannot be
18 done locally that we are on the cusp of doing but they're
19 head of us in the technology.  They're a study center site,
20 so I refer patients to the cardiologists and cardiac
21 surgeons at Intermountain once in a while.  I have referred
22 patients to Stanford University, referred patients to the
23 Mayo Clinic, Vanderbilt, heart surgical patients that I'm
24 fully capable of operating on, but the patient might express
25 to me that they were reading about something that they

2359

1 really want done that I'm not particularly comfortable doing
2 or in agreement that might be the best for me to do, so I
3 refer them out.  But I think I've referred a couple of
4 patients in the last three, four months.
5        Q.  And would those referrals include Saint Al's?
6        A.  They would include Saint Al's if there was a -- a
7 particular -- if a patient requested it, absolutely.  There
8 is not a -- I don't have a clinical programmatical reason to
9 make that referral, in terms of what they do that we do not.
10 At the same time, that's really driven by my patients.
11       On a weekly basis when I see patients in clinic,
12 if they express to me that they -- based on their location
13 and where they live, based on where they want to have
14 their follow-up, it can be as insignificant as a family
15 member who works at Saint Al's.  I've had patients ask if
16 they could have their doctor there.  I'm great with that.  I
17 just don't have any problem with it.
18       Q.  Doctor, this court has heard testimony from the
19 plaintiffs' expert, the hospital plaintiffs' expert
20 Dr. Haas-Wilson regarding the decrease in admissions to
21 Saint Al's from CVA, from your group.  I would like to
22 explore that a little bit with you.  What has happened to
23 the referrals you used to get from Saint Al's in your
24 practice?
25       A.  Well, for many years after I relocated to Boise,

2360

1 my practice has developed where I did approximately 30
2 percent of my cardiac cases at Saint Al's.  That was just
3 the dynamic that developed, based upon direct referrals to
4 me from Saint Al's.  So I did approximately 240 to 250 heart
5 cases, cardiac cases per year, and I'd say 60 to 80 of those
6 per year were done at Saint Al's.
7        After -- after it came out that we were in
8 discussions with St. Luke's, based on the feedback I had
9 from the cardiologists at Saint Al's, I think they felt very
10 negatively that we were having the discussion, and I believe
11 just with the discussion with the cardiologists on a
12 person-to-person basis, they felt that somehow this was my
13 idea.  And because it was my idea that I think I saw a
14 marked drop in my referrals.  So my volumes went down from
15 maybe three, maybe four cases a week, to three to four cases
16 per month after the information was out.
17       And so for the last nine to ten months at Saint
18 Al's, I was doing basically call cases, you know,
19 emergencies, urgencies, people that couldn't go home, people
20 that were being flighted in that needed emergency surgery.
21 But my elective cases went away.
22       Q.  Now, what was your volume at St. Luke's before you
23 decided to affiliate?
24       A.  Roughly 150 cases a year.
25       Q.  And what's your volume at St. Luke's after you

2361

1 affiliated?
2        A.  The same, 150 cases a year.
3        Q.  So the Saint Al's cases dwindled down to the few
4 you mentioned.
5        A.  Yeah.  Yes.
6        Q.  Did you transition any of the Saint Al's work over
7 to St. Luke's?
8        A.  No.  The entity that lost volume in it was me.  I
9 believe that the cases at Saint Al's since -- in my absence
10 have gone up higher than their normal average.  During
11 our -- just prior to our transition, I think some of my
12 elective cases went to my colleagues.  They decided to refer
13 them away from me.  But since I we went to Saint Al's, the
14 only time I will see an Al's referral is a direct referral
15 from a patient who -- or a self-referral, I guess I would
16 put it.
17       Q.  So the only patient from Saint Al's you see now
18 would be a self-referral?
19       A.  Pretty much.  It's pretty rare to get a -- if I
20 have -- I have received a call from a cardiologist to see
21 one of their patients maybe once a year.  But it's -- the
22 conversation is driven by the patient.  The patient may say,
23 "I would like a second opinion.  Can I go see Dr. Huerd?"
24 And, graciously, they've allowed it.  And so the doctors I
25 have spoken with have been -- you know, we all try to stay

2362

1 above the fray there and just let the patient decide, and
2 that's what I try to do every day.
3      Q.   So it's your understanding that the volume you
4 were doing at Saint Al's before you affiliated with
5 St. Luke's is still there at Saint Al's?
6      A.   Right.  My understanding is they did 240 heart
7 cases the year we left and 240 the second year we left --
8           MS. DUKE:  I'll object to this.  I mean, I should
9 have objected probably two answers ago.  He has a lack of
10 foundation as to what Saint Alphonsus is doing with respect
11 to its surgical practices after he left.
12          MR. SINCLAIR:  Your Honor, we have some foundation
13 through other witnesses as to what the volumes are, so I
14 don't need to belabor this.
15          MS. DUKE:  Then, I would move to strike any of his
16 testimony related to that.
17          THE COURT:  I will sustain the objection and
18 strike the response, and we'll allow that to be presented
19 through a witness that would have firsthand information.
20          MR. SINCLAIR:  Sally Jeffcoat can provide that
21 information.  Thank you.
22      Thank you, Doctor.  No more questions.
23          THE COURT:  Ms. Duke, cross?
24                CROSS-EXAMINATION
25 BY MS. DUKE:

2363

1      Q.   Good morning, Dr. Huerd.
2      A.   Good morning.
3      Q.   My name is Keely Duke, and I am one of the
4 attorneys who represents Saint Alphonsus, the entities that
5 are the plaintiffs in this matter.
6      A.   Good morning.
7      Q.   You and I have not had a chance to meet yet.
8      So as I understand it, you have been brought here
9 today, obviously, to provide the testimony that you have;
10 correct?
11      A.   Correct.
12      Q.   And none of that testimony has involved anything
13 related to quality at St. Luke's; correct?
14      A.   Correct.
15      Q.   Or any change in quality at St. Luke's since you
16 became employed there; is that correct?
17      A.   Correct.
18      Q.   And you haven't been called here to testify
19 related to utilization at St. Luke's when you became
20 employed; correct?
21      A.   I'm not sure what you mean by "utilization."
22      Q.   Utilization of services.
23      A.   You mean like ancillary services?
24      Q.   Correct.
25      A.   No.

2364

1      Q.   What your testimony has been very narrowly limited
2 to is, really, why you left Saint Al's and went to
3 St. Luke's.  That's one aspect; correct?
4      A.   Correct.
5      Q.   And your patient volumes that you had at Saint
6 Al's and then at St. Luke's?
7      A.   Correct.
8      Q.   And then how those volumes have changed for you?
9      A.   Correct.
10      Q.   Now, as I understand it, your Saint Al's volume
11 prior to the time you left, you thought, was about one-third
12 Saint Al's and two-thirds St. Luke's; correct?
13      A.   Prior to our transition?
14      Q.   Prior to the transition.
15      A.   In the years leading to that, yes.
16      Q.   And the overall groups, as I understand it, volume
17 at Saint Al's versus St. Luke's was around 23 percent prior
18 to the transition?
19      A.   Yeah.  We would normally just say about two-
20 thirds, one-third.  But that's just the rough guess within
21 our practice.
22      Q.   And after the acquisition by St. Luke's, your
23 volume of inpatient admissions at Saint Alphonsus decreased
24 significantly; correct?
25      A.   I admitted all of my patients after the transition

2365

1 to St. Luke's.
2      Q.   And you are no longer performing any procedures at
3 Saint Al's; correct?
4      A.   Correct.
5      Q.   And you stopped doing procedures at Saint Al's
6 right around that time of the transition; correct?
7      A.   Yeah.  Roughly, the end of October of '010.
8      Q.   And that included call and referral work; correct?
9      A.   Call.
10          MS. DUKE:  Just one moment.
11      All right.  Given your very narrow testimony, I have no
12 further questions.  Thank you very much.
13          THE COURT:  Thank you.
14      Mr. Sinclair, anything else?
15          MR. SINCLAIR:  No, sir.  Thank you.
16          THE COURT:  All right.  Dr. -- is it Huerd?
17          THE WITNESS:  Huerd.
18          THE COURT:  Thank you very much for being here.
19          THE WITNESS:  You're welcome.
20          THE COURT:  Call your next witness.
21          MR. SCHAFER:  Call Dr. John Kaiser.
22          THE COURT:  Dr. -- is it Peck?
23          MR. SCHAFER:  Kaiser.
24          THE COURT:  Oh, Dr. Kaiser.  I'm sorry, I missed
25 that completely.

2366

1 Dr. Kaiser, please get through our mine field there,
2 and then we'll place you under oath.
3 JOHN RHYAN KAISER,
4 having been first duly sworn to tell the whole truth,
5 testified as follows:
6 THE CLERK:  Please take a seat in the witness
7 stand.
8 Please state your complete name and spell your name for
9 the record.
10 THE WITNESS:  John Rhyan Kaiser, John, J-O-H-N;
11 Rhyan, R-H-Y-A-N; Kaiser, K-A-I-S-E-R.
12 THE COURT:  You may inquire of the witness.
13 DIRECT EXAMINATION
14 BY MR. KEITH:
15 Q.  Dr. Kaiser, by whom are you currently employed?
16 A.  I'm currently employed by Saltzer Medical Group.
17 Q.  And do you hold a position with Saltzer Medical
18 Group?
19 A.  Yes.  I'm the president.
20 Q.  And how long have you been president?
21 A.  A little over five years.
22 Q.  Could you describe for the court the nature of
23 your medical practice?
24 A.  So I'm in obstetrics and gynecology.
25 Q.  And where do you practice -- hospitals, clinics,

2367

1 or both?
2 A.  So I have full privileges at St. Luke's Meridian,
3 and I have courtesy privileges at Saint Al's Nampa.
4 Q.  And why do you have the privileges that you do,
5 courtesy privileges, at Saint Al's Nampa and full privileges
6 at St. Luke's Meridian?
7 A.  So I used to have full privileges at both
8 hospitals.  Several years ago as my patient preference -- my
9 patient population expressed a preference for St. Luke's
10 Meridian, I switched my obstetrics practice primarily to
11 St. Luke's Meridian.
12 Second is the aspect of what's called "on-call."
13 With full privileges is the requirement to participate in
14 call for the hospitals.
15 And it is a somewhat onerous task to provide call
16 for two different hospitals and difficult to meet the time
17 requirements, depending on where you live and how much
18 activity you have at two hospitals.
19 Q.  So obviously a lot of the folks here are lawyers,
20 not doctors.  So can you describe on a personal level what
21 the -- what taking call means?
22 A.  Yeah.  So there is several levels of call.  You
23 take call for your own patients, which means -- I'm not
24 really referring to just the phone calls that you receive
25 outside of the normal business hours.  That's something that

2368

1 you can take.  There is a second aspect of call, which is
2 called "unclaimed call" or "call for the hospital."  So you
3 would take care of patients that presented there for
4 emergency, for patients who presented to the hospital who
5 did not have a care provider who had full privileges at that
6 hospital, and then you would be required to take care of
7 those patients.
8 Often that requires presenting to the hospital and
9 caring for them in person.
10 Q.  Let's step back for a moment.  Can you describe to
11 the court your educational background since high school?
12 A.  Yes.  I have a bachelor's of science in electrical
13 engineering; and then I have a master's of science in
14 industrial engineering, an MBA; and finally an M.D. degree.
15 Q.  Could you provide the court a high-level overview
16 of the Saltzer Medical Group, let's say the time early 2012,
17 before the surgeons who we've heard left the group, in fact,
18 left?
19 A.  Yes.  So we had a group of fluctuating between 40
20 and 50 physicians, a multispecialty group that provided care
21 in various areas, organized under what's called a
22 C-corporation and managed through an executive committee and
23 various other subcommittees.
24 Q.  And where did Saltzer Medical Group provide
25 services?

2369

1 A.  So we actually have nine locations.  The primary
2 locations currently are in Meridian at a location called
3 "Portico"; at our main campus, which is right next to the
4 Saint Al's Nampa facility; and then also another location
5 which has been opened in North Nampa at the location that
6 St. Luke's has the emergency room, called "Ventana."
7 Q.  What sort of services does Saltzer Medical Group
8 provide?
9 A.  So we are a multispecialty group.  We provide
10 physician care across a primary care base, pediatrics,
11 obstetrics.  We have surgical specialties, orthopedics,
12 general surgery, dermatology, pulmonology, rheumatology,
13 neurology.  Then we also have ancillary services, which
14 included labs, an imaging center, sleep, physical therapy,
15 and some others I'm sure I'm forgetting.
16 Q.  And at a high level, can you describe how the
17 Saltzer Medical Group physicians were compensated under the
18 model prior to the transaction with St. Luke's?
19 A.  So it was a somewhat complex model of payment.  At
20 least it seemed complex.  We received a revenue stream based
21 on all of those different generating sources, the ancillary,
22 et cetera.  The individual physicians were compensated based
23 on what their revenue was, subtracted out in overhead costs,
24 subtracted out of a direct department cost.  Then, they also
25 received a portion that was defined as an ancillary revenue

2370

1   stream after the cost for those different ancillary services
2   were taken out.  And there was some variation on how much
3   ancillary revenue was received by different departments
4   based on their portion of contribution.
5          THE COURT:  Dr. Kaiser, I might ask you to slow
6   down just a little bit.
7          THE WITNESS:  Sorry.
8          THE COURT:  You are probably pretty quick.  And
9   the court reporter, I'm sure, is struggling just a bit.
10         All right.  Mr. Keith.
11  BY MR. KEITH:
12     Q.  Did the -- did the compensation structure that
13  Saltzer had in place prior to this transaction lead the
14  group to manage the types of patients that its physicians
15  saw on a regular basis?
16     A.  Yes.
17     Q.  Can you describe how?
18     A.  So -- I'm sorry.  So the -- the methodology of
19  payment was based totally on fee-for-service.  So in order
20  to increase or maximize your compensation, what was
21  typically done was when a new partner would come into the
22  practice, it was a requirement by the group that they see
23  all patients who were presented to them.  As that practice
24  matured, it was common for the physicians to start to limit
25  their new patients who are in certain lower reimbursement

2371

1   rate insurances.  By that I mean Medicare, Medicaid,
2   TRICARE.
3      Q.  And what about patients who lacked insurance?
4      A.  We did not typically see those patients unless the
5   patient was referred to us from an emergency room when that
6   physician was on call for that emergency room, then they
7   would take care of those patients for a set period of time,
8   and after that they would typically not be cared for.
9      Q.  I would like to turn now to discuss the
10  transaction that's at the heart of this case, the
11  transaction, the entering into of the professional services
12  agreement between Saltzer and St. Luke's.  Can you provide
13  the court some background on how Saltzer -- how it came to
14  be that Saltzer became interested in affiliating with
15  St. Luke's?
16     A.  So it was actually a very long process.  And I'll
17  go back, so that the genesis of the thought for why we
18  should -- why we thought it was important to look at
19  alignment strategies with larger healthcare systems goes all
20  the way back into the 2000s.  You know, there was a lot of
21  medical literature, press that talked about how healthcare
22  had to change for the future, how there needed to be more
23  integrated services, how costs had be to taken into
24  consideration.  So it was a mindset that was present in many
25  of the individual partners.

2372

1          Even as far back as 2005, there was even an
2   instance that Saint Al's approached our group asking if they
3   wanted to -- if we wanted to join them in an employed
4   relationship, and then we continued -- we declined for
5   various reasons.  And then that mindset continued.  We
6   worked -- started working with some of the hospital systems
7   on what things we could do together.
8      Q.  And did any of those efforts to work together with
9   other systems bear fruit?
10     A.  So some of the early work that we did was
11  with -- tried to look at things we might be able to do with
12  what was then Mercy Medical Center.  None of the projects
13  that we had contemplated came to fruition.  We didn't
14  proceed down any of those.  With St. Luke's -- and we had no
15  other interactions with Saint Al's.
16         With St. Luke's, we had started meetings with them
17  that date back a long ways -- I'm not exactly sure when they
18  started -- where we would have meetings quarterly, something
19  to that effect, to kind of talk about what was Canyon County
20  like, what were the needs, what were we doing, what were
21  they doing, just as an information sharing.
22         Then, we actually advanced some of those, said we
23  probably should formalize some of these relations.  And they
24  did finally end up with a memorandum of understanding in the
25  2008 time frame.

2373

1      Q.  What were the projects that were envisioned to
2   take place under that memorandum of understanding?
3      A.  So there were several areas that we thought were
4   an opportunity for us to work together, that we had needs in
5   the community for.  And some of the areas that I recall that
6   we talked about were cardiovascular, urology, and a couple
7   others, occupational medicine.  I can't remember the others.
8      Q.  And were those efforts successful?
9      A.  So successful from the standpoint of, yes, we were
10  finally talking about it, and how we could work together.
11  No, from getting a whole lot of things accomplished.  We did
12  work on cardiovascular.  I think that was a success.  We had
13  cardiovascular services provided within our clinic, had
14  left, it was an area of need for our patients, and we were
15  able to work out an arrangement with St. Luke's to provide
16  those services within our clinic.
17     Q.  So ultimately, since we're here now,
18  Saltzer -- you know, it was determined that a tighter
19  affiliation should -- that the parties should enter into a
20  tighter affiliation than under the memorandum of
21  understanding.  Can you help the court understand how
22  Saltzer Medical Group came to the decision that a tighter
23  affiliation was necessary?
24     A.  Yes.  So the -- the rate of acceleration of the
25  information on what should be done for the future, what the

2374

1   potential changes in healthcare were going to be for the
2   future accelerated.  We saw that we didn't think we were in
3   a position to be able to participate in that arena without
4   combining with a larger healthcare entity, a more
5   comprehensive entity.  So we said, I think we need to take
6   some more formalized steps to actually -- to actually move
7   in that direction.
8           And so we requested -- we sat back, and we said,
9   who can we do this with?  One, we didn't think that going
10  outside of our group, going outside of our community would
11  be a feasible thing to do.  We had some experience with
12  Mercy Medical Center and its owner, which is CHI.  And
13  whenever we would try to go down the path of trying to do
14  something, it never worked.  It was always the answer of CHI
15  won't allow us to do that.  So we thought it had been to a
16  local partner that we were going to work with.
17          We had no working relationship with Saint Al's,
18  which was one of the two options.  The other was St. Luke's.
19  And we had had a working relationship with St. Luke's, so we
20  reached out to St. Luke's to say, What can we do?  What
21  opportunities do we have?
22      Q.   And you mentioned that one of the factors that led
23  Saltzer Medical Group to seek a tighter affiliation was the
24  belief that Saltzer was not in a position to really
25  effectively participate in -- the new healthcare model.  Can

2375

1   you speak to the -- provide more detail on that?
2       A.   Yeah.  So a lot of these models, at least from our
3   limited perspective, required additional resources that we
4   didn't have.  For example, looking at pay-for-performance,
5   looking at risk-based contracting, our group has no
6   reserves.  Our corporate structure is that we distribute all
7   funds by the end of the fiscal year.  We don't retain
8   reserves because they get taxed at a significant rate.
9           We didn't think we had the breadth of a group.
10  While we are a group of independent physicians together, a
11  group of multispecialty physicians who work together, it's
12  not really a very big group in the grand scheme of things,
13  and it certainly doesn't offer the full breadth of things
14  that we thought you would have to have to provide those kind
15  of contracts, those kind of arrangements to look forward to.
16          Those are some of the reasons.
17      Q.   And you mentioned that you and Saltzer Medical
18  Group approached St. Luke's about the possibility of a
19  tighter integration.  What happened next?
20      A.   So I can't remember exactly who placed a call to
21  St. Luke's administration -- it would be Gary Fletcher as
22  the contact point that I remember -- asking for us to set up
23  a meeting where we could simply kick this off, simply kick
24  off the aspect of let's try and look at what opportunities
25  we might have together, what things we can do, and -- and

2376

1   that -- that meeting was arranged subsequent to that initial
2   call.  As a part of that discussion, we had said, you know,
3   we would kind of like to know how this is working in other
4   areas.  And as an outcome of that, there was an invitation
5   to visit with the Twin Falls area.
6       Q.   And did you, in fact, visit Twin Falls?
7       A.   Yes, we did.  There was Bill Savage, Nancy Powell,
8   myself went to Twin Falls for a day to talk to some of their
9   physicians and leaders.
10      Q.   And what did you learn from those meetings?
11      A.   Actually, I'll say I went there very skeptical and
12  was actually quite impressed with the organization.  In
13  fact, the line of questioning from us, from myself, from a
14  physician was, so how does this work?  Do you really trust
15  each other?  Do you like the arrangement?  And the answer
16  was unequivocally yes.
17          And then we were very impressed with the -- the
18  information that was provided of continually talking about
19  how we have to move from silos of healthcare, which is, frankly,
20  what Saltzer is, to an integrated healthcare system.  And
21  the progress that they had made working in a team approach
22  was quite impressive.
23      Q.   I want to take a step back to something you said
24  earlier about risk-based contracts and Saltzer's size and
25  scope, capacity to take those types of contracts on.  There

2377

1   was some testimony earlier in this trial that Saltzer
2   actually already has or has entered into risk-based
3   contracts.  I'm wondering if you have any understanding of
4   what that might refer to.
5       A.   Well, the only contract that I'm familiar with
6   that Saltzer has had and has is really just a gain-sharing
7   contract, and I believe it's with Treasure Valley Health
8   Network, if I recall the name properly.  And that's the only
9   one that -- that we have.  It's not really a true risk
10  contract.  It's a gain-sharing contract.
11      Q.   What is the Treasure Valley Health Network?
12      A.   So it's a group of physicians, and there is only
13  three partners that I'm aware of.  It was originally Mercy
14  Medical Center physicians, Saltzer, and Terry Reilly Health
15  clinic.  When Saint Al's took over the Mercy Medical Center
16  physicians, it became Saint Al's physicians.
17      Q.   And so if I understand correctly, it's your
18  understanding that there is not significant downside risk in
19  the contract between Treasure Valley Health Network
20  and -- well, let me take a step back.  With whom is the
21  agreement with Treasure Valley Health Network that has the
22  gain-sharing aspect you had mentioned?
23      A.   It's Medicare Advantage program.  And so the way
24  the program works is there is a pool of money, and if there
25  is excess funds at the end of the year for where that

2378

1    contract runs, those funds are distributed back to those
2    three entities. And that's the extent of the gain-sharing.
3        Q.   And is it a Blue Cross Medicare Advantage plan?
4        A.   Yes, it is. I'm sorry. Blue Cross.
5        Q.   What efforts, if any, are there within the
6    Treasure Valley Health Network to address opportunities to
7    lower costs or better coordinate care?
8        A.   There is really not any sharing of data or
9    management protocols. There may have been some set up in
10   the early -- when it originally was set up. But as far as
11   practically, how it's managed by the physicians in the
12   primary care area, there really isn't any management of
13   patients. It's simply at the end of the year we never know
14   what we're going to get, if we're going to get anything or
15   not, and then when the funds come in, we distribute them.
16       Q.   And to the point you made about having the
17   infrastructure necessary to take on pay-for-performance or
18   risk-based contracts, can you tell the court what electronic
19   health record you're using and how that relates to your
20   ability to really achieve the goals of transforming the
21   healthcare model?
22       A.   So we use eClinicalWorks as our electronic health
23   record. And eClinicalWorks is a good system for -- for our
24   business. It is only -- it only encompasses, I'll say, the
25   walls of Saltzer. So the information provided within the

2379

1    system is what tests we request, what tests we order, what
2    visits we see for patients. So it's good for sharing
3    information across our partners. It doesn't -- it only has
4    access to a data outside of the system by way of those
5    records being either brought into the system by some
6    electronic method and being a document that you can look at
7    or simply by scanned documents that come into the system.
8        Q.   Are you familiar with the Idaho Health Data
9    Exchange?
10       A.   Limited.
11       Q.   And does Saltzer participate in IHDE?
12       A.   We do not.
13       Q.   How does the current functionality of the
14   eClinicalWorks system you used impact, say, Saltzer's
15   ability to identify best clinical practices?
16       A.   So --
17            MR. ETTINGER: Objection, Your Honor, I don't
18   think we've laid a foundation for this witness to -- that
19   this witness has knowledge in this particular area of
20   Saltzer's operations.
21            THE COURT: Well, he is the CEO of Saltzer.
22            THE WITNESS: The president.
23            THE COURT: The president.
24            MR. ETTINGER: He is the president and a
25   practicing physician, and we all know that CEOs don't know

2380

1    the details of lots of areas of their businesses.
2            THE COURT: Well, I'm assuming as a practicing
3    physician, he can certainly indicate how, as an
4    obstetrician, that affects his ability to use best clinic
5    practices.
6            But perhaps some further foundation that he actually
7    was involved in some of the discussions about the pros and
8    cons of the eClinicalWorks program within the Saltzer
9    structure, would be in order if we're going to go beyond
10   Dr. Kaiser's actual use and familiarity with the system,
11   limited to his own practice.
12           Counsel, we're probably should break in the next five
13   minutes, so you can pick your spot.
14           MR. KEITH: Great.
15   BY MR. KEITH:
16       Q.   Dr. Kaiser, are you personally involved in working
17   with the eClinicalWorks system and what functionalities
18   might be built into the system at Saltzer?
19       A.   Yes. So when we decided to select eClinicalWorks,
20   I was part of the committee that reviewed the options for us
21   of what system to select because we were moving from a
22   different electronic medical record. I also have
23   participated in one or two of the eClinicalWorks shops that
24   are presented for users, user group workshops, where they
25   try to identify what features the clinical has and what

2381

1    aspects. I also, as president, have responsibility for
2    upgrades, cost of those upgrades and what they can and can't
3    do. And then as a practicing physician, I use the system on
4    a daily basis.
5        Q.   In light of that background, what are -- in what
6    ways, if any, does the current functionality of the Saltzer
7    eClinicalWorks system impact the ability to identify best
8    practices within Saltzer?
9        A.   So the system allows us to track data, so we can
10   extract out of the system lab data or other things that
11   could be used to help identify where patients are at.
12           The system doesn't have a way of prompting
13   providers for what's the pathway to get to that best
14   practice, what's the way to get -- what's the protocol to
15   use to get to the point where you've managed the patient
16   properly, taking into consideration the best steps, lowest
17   cost, most efficacious steps to get to the point where you
18   want to get to for managing that patient.
19       Q.   So the court has heard some testimony that another
20   group that also uses eClinicalWorks has been able to analyze
21   the quality of care it provides and implement best
22   practices. Why can't Saltzer do the same?
23       A.   So I'm not familiar with exactly what aspects of
24   eClinical they're using to do that or the scope that they're
25   using to perform that task. I know that eClinical has

2382

1  multiple modules that you can purchase, and they do
2  different functions.  And perhaps -- and there are some
3  other functions that we could purchase that we haven't
4  purchased, but the level of the system that we have won't
5  allow us to go to the next step of managing patients outside
6  of our walls.
7       Q.  And does Saltzer's eClinicalWorks program platform
8  currently interoperate with any other electronic health
9  records?
10      A.  No.  We collect data from other sources, but we do
11  not, to the best of my knowledge, export our data on a
12  regular routine basis to any other systems.
13      MR. KEITH:  Your Honor, that's a pretty good
14  stopping point for me.
15      THE COURT:  Counsel, let's try to hold this,
16  again, to a 15-minute recess.
17      I'm just trying to recall if there were any depositions
18  we needed to publish.  I'll let Ms. Gearhart check on that,
19  and, if so, we'll take care of that after we return from the
20  15-minute recess.
21      We'll be in recess.
22      (Recess.)
23      ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
24      THE COURT:  Dr. Kaiser, I'll remind you you are
25  still under oath.

2383

1       Mr. Keith, you may resume your examination.
2  BY MR. KEITH:
3       Q.  Dr. Kaiser, before the break, you mentioned that
4  there may be opportunities to purchase upgrades to
5  eClinicalWorks.  Do you recall that testimony?
6       A.  I do.
7       Q.  And how does Saltzer go about determining whether
8  or not to invest in additional functionality for
9  eClinicalWorks or how -- how did it prior to the transaction
10  with St. Luke's?
11      A.  So whenever we look at -- whenever we did look at
12  upgrades or enhancements to the system, it was always an
13  evaluation of what's the cost for that enhancement, what's
14  the benefit, and what's the long-term implications of it.
15      Q.  And by "benefit," what do you mean?
16      A.  Financial benefit.
17      Q.  I'm sorry, say that again.
18      A.  Financial benefit.
19      Q.  And are you aware of any module or improvement to
20  eClinicalWorks that would allow full integration of ECW,
21  eClinicalWorks, into Epic, St. Luke's system?
22      A.  Not that I'm aware of.
23      Q.  And if you were in independent practice or if
24  Saltzer were back operating as it had been, if there were
25  such a module, do you think that Saltzer would invest in it?

2384

1       A.  So the problem with a -- from our -- from a
2  perspective of an independent group is, if you're looking to
3  manage the whole cost of the system, it could be a very
4  expensive and complex process.  So you would have to figure
5  out, are you going to collect data from payors from all the
6  hospital systems and try to manage that information and
7  integrate it into your information?  And the answer is most
8  likely not.  That's just too expensive of a proposition and
9  too big of a proposition for a group like ourselves ever to
10  pursue.
11      Q.  I would like to turn to a slightly different topic
12  and talk about what motivated Saltzer Medical Group to enter
13  into the transaction with St. Luke's.  Was the -- was an
14  interest in raising prices to commercial insurance payors a
15  factor in Saltzer's determination to enter into an agreement
16  with St. Luke's?
17      A.  So I think that I probably sat through as many, if
18  not more, conversations with St. Luke's, our partners, and
19  this discussion was never a topic that we ever pursued or
20  was ever addressed.
21      Q.  What about the desire to increase physician
22  compensation?  Was that a factor that drove Saltzer to seek
23  a tighter integration with St. Luke's?
24      A.  So compensation is a part of the evaluation when
25  you look at integration with another system.  It is not the

2385

1  prime driver.  It was never the prime driver.  The -- there
2  were many other aspects to the transaction that we kept
3  pointing out throughout the negotiations.  What was the
4  goals of Saltzer Medical Group in aligning with another
5  healthcare entity, St. Luke's, and our compensation was an
6  important part, but it wasn't the main driver of the
7  transaction.
8       Q.  The court has seen an email that I will
9  parathise -- paraphrase for you as coming from Nancy Powell
10  and asking, generally speaking, what it would take to get
11  the Saltzer physicians to give up their independence.  Would
12  it be a compensation increase of X, Y, or Z percentage
13  points?  Do you recall that -- that email?
14      A.  Actually, I do.  So -- and I recall my response to
15  it.  Nancy Powell sent out an email.  I don't remember if I
16  responded to her via email or talked to her, but I remember
17  discussing with her and the -- the response I gave her is,
18  Nancy, I have no idea.  I don't know if there is a number
19  that we need to get or want to get to make the transaction
20  move forward.
21      What I said is, I think we need to use benchmarks.
22  I think we need to use -- establish standards like MGMA,
23  which is Medical Group Management Association, has surveys
24  of physicians and what are their compensations.  St. Luke's
25  has within their system physicians who are in employed or

2386

1  PSA arrangements.  I said we should be included in that
2  market.  We should get fair compensation for our services.
3      Q.  There has also been testimony about whether the
4  Saltzer physicians truly wanted to remain independent and
5  had to be convinced to enter into a transaction with
6  St. Luke's.  And are you familiar with -- with those
7  discussions within Saltzer; that is, whether folks wanted to
8  stay independent or enter into an agreement with St. Luke's?
9      A.  I am.  So I remember a discussion that we had
10  with -- after a survey done by Coker.  And that survey
11  indicated one of the reasons -- actually, I don't think it
12  was the number one reason why physicians voted not to
13  proceed with the proposal that was on the table at that
14  point in time.  But it indicated independence was a concern.
15          And so I said in an executive committee meeting
16  that was well-attended by most of the partners that if this
17  is truly the sentiment of the group that we do not -- that
18  we want to stay independent and not align, then we should
19  stop.  We should stop wasting our money, our time, St.
20  Luke's money, St. Luke's time.  And I think that really
21  brought it to a point where the group said, let's talk about
22  this.
23          And the answer that came back is, no, we didn't
24  mean that we didn't want to align.  There were other reasons
25  that we put forward as why we didn't think this proposal was

2387

1  the best proposal that we were going to go forward with.
2  And they said -- and we voted and we said let's proceed on.
3  We want to continue an integration plan.
4      Q.  The plaintiffs have made a point of arguing that
5  there is an unspoken or unwritten quid pro quo within the --
6  the agreement -- in the agreement between Saltzer Medical
7  Group and St. Luke's that Saltzer Medical Group physicians
8  will refer or -- and admit all of their patients at
9  St. Luke's facilities.  Do you have a reaction to that
10  argument?
11      A.  Yeah.  This has been a topic that we brought up
12  and discussed with St. Luke's from the very earliest phases
13  of this -- this alignment strategy.  And it was well
14  understood we had providers who were currently taking care
15  of patients at Saint Al's Nampa who were going to continue
16  to provide care for patients at Saint Al's Nampa and would
17  refer patients to Saint Al's Nampa.  And that was totally
18  acceptable and understood by St. Luke's throughout the
19  transaction.
20      Q.  And was that understanding made part of the
21  written professional services agreement?
22      A.  We asked that.  We made sure that it was
23  incorporated into the PSA agreement that we can refer to
24  wherever we wish.
25      Q.  There has also been discussion at some length

2388

1  about what exclusivity meant within the context of the
2  negotiations leading up to the Saltzer/St. Luke's
3  transaction.  Can you provide the court your recollection,
4  your understanding of what exclusivity meant between the two
5  parties?
6      A.  Yeah.  I think it's -- it came up in a couple
7  different areas, and so you always have to know which part
8  of exclusivity you are talking about.  So I think the base
9  level was that as of -- with a PSA signed with St. Luke's,
10  that we would be -- I'll use the term "agent."  Maybe it's
11  not the correct term, but agent of St. Luke's when we
12  provide our professional services.  So that's one aspect of
13  exclusivity.
14          The second was the area of Canyon County.  We had
15  asked for the ability to influence working with St. Luke's,
16  the providing healthcare to Canyon County.  And by that I
17  mean, as services were expanded, as we offered more things,
18  we wanted to be at the table for that discussion and to use
19  Saltzer to the best of our ability to provide those services
20  and to agree where we couldn't provide those services and
21  agree on what mode would be taken.
22          The last was the area of ownership.  There was a
23  couple entities that we had or we had partners that were
24  invested in that were competing entities with St. Luke's,
25  and those were in the sleep lab business.  There is an ASC

2389

1  that one of our physicians is an owner of that deals with
2  pain medication or pain treatment.
3          THE COURT:  What's an ASC?
4          THE WITNESS:  A surgical center.
5          And then the last one was we had investors in Treasure
6  Valley Hospital.  And so those are the three areas that we
7  got agreement that ownership could be maintained in those
8  entities.
9          And did I say the sleep -- there is a sleep lab.  Did I
10  say that.
11  BY MR. KEITH:
12      Q.  I believe you did, yeah.
13      A.  Thank you.
14      Q.  There has been suggestion that, in fact,
15  exclusivity as was used during the negotiations meant that
16  the Saltzer Medical Group physicians would use St. Luke's
17  facilities exclusively for their patients.  Is that your
18  recollection?
19      A.  Absolutely not.  Again, as I stated before, it was
20  known from the beginning.  It was part of our understanding
21  that we were going to provide patients care at whatever
22  hospital we wished, we could have privileges wherever we
23  wished, and that we would continue to have physicians who
24  worked out of Saint Al's Nampa.
25      Q.  And in the -- the final offer that St. Luke's made

2390

1  to the physicians who eventually departed Saltzer, is it
2  your understanding that exclusivity is that offer used the
3  term or concept meant -- well, let me just ask you what you
4  understand the exclusivity terms of the offers were to the
5  surgeons who departed.
6      **A.   That they could continue to have their ownership**
7  **interest at Treasure Valley Hospital and could continue to**
8  **perform cases.**
9      **Q.**   So there has been -- there has also been argument
10  that -- or assertion that deep within the -- and perhaps
11  unwritten in the professional services agreement, the deal
12  between Saltzer and St. Luke's is a quid pro quo whereby
13  Saltzer Medical Group physicians will agree to take all of
14  their patients to a St. Luke's Nampa hospital if and when
15  one is built.  What is your reaction to that assertion?
16     **A.   So the only discussions we had about any future**
17  **developments of facilities within Nampa was that we would**
18  **commit to providing support.  And by "support," we meant**
19  **when there is emergency room call requirements, that we**
20  **would provide support for those requirements or we would**
21  **agree to a plan for how that support would be provided for**
22  **Canyon County.**
23     **Q.**   Let's turn to talk about the benefits as you see
24  them of the transaction that -- or the professional services
25  agreement that St. Luke's and Saltzer Medical Group entered

2391

1  into, you know, understanding that it's -- it's only been
2  nine-plus months.  What, in your mind, have been the
3  advantages of that relationship?
4      **A.   So I think the one that first comes to my mind is**
5  **-- which I'm not sure we talked about before but was -- so**
6  **we are trying to recruit additional physicians into our**
7  **group, and without the support of St. Luke's and being in**
8  **the St. Luke's Health System, we would not be able to**
9  **recruit those professionals.**
10     **I have been involved in those discussions**
11  **with -- with physicians who we have tried to bring into our**
12  **group, and always the question comes up, so who are you**
13  **affiliated with?  Is it a part of a healthcare system?  We**
14  **can now say yes, and that's the understanding that we have**
15  **been providing those physicians with.**
16     **The second would be the area of since we have**
17  **aligned with St. Luke's, we have gone through the process of**
18  **looking at how our practice is run in multiple levels.  One**
19  **that I can think of that has -- I think is a benefit to our**
20  **patients is that we went through all of our nursing**
21  **protocols with St. Luke's, identified what we were doing,**
22  **what we should be doing to be best practices, made changes.**
23     **Examples of dispensing of or utilization of**
24  **medication that is used within the clinic practice,**
25  **expiration dates, how to monitor, how to inventory, how to**

2392

1  **track those.  We didn't have a good process for that.  We**
2  **have now implemented that.**
3      **Discussion on sampling of medication and what are**
4  **the real requirements that you should have in place for**
5  **patient safety in case there is a recall on those**
6  **medications and how that needs to be done.  We didn't have**
7  **that in place before.**
8      **Services to our patients.  We have a -- a lot -- a**
9  **lot of need for translation services within Saltzer.  We had**
10  **translation services that was a somewhat informal process.**
11  **All of our translation services now are certified**
12  **translators that provides a level of quality to our patients**
13  **that I think they appreciate.**
14     **We also have had patients who have come in,**
15  **personal experience we -- I have two -- had two deaf**
16  **patients that came in that I would not have ever been able**
17  **to afford to hire somebody to come in and do signing for**
18  **those patients through their care.  St. Luke's had a system**
19  **in place.  We made arrangements; they would come for every**
20  **visit throughout that pregnancy care for those patients and**
21  **provide that care for them.**
22     **Data analytics.  So we have started down the**
23  **process of looking at something called clinical integration**
24  **scorecard and what are the data measures and how can we see**
25  **where we're at.  How can we mine that data and what -- how**

2393

1  **can it be used in our management of our physicians and our**
2  **patients?**
3      **We have -- with the assistance of St. Luke's, we**
4  **have been able to extract a lot of those data elements.**
5  **Some of it requires manual extraction, going through**
6  **patients' charts.  With St. Luke's help, we figured out how**
7  **to do a registry of some disease states, which we had never**
8  **done before, so that we can look at our patient populations**
9  **that have certain diseases like diabetes and then look at**
10  **where we're at.  Then the next step needs to be trying to**
11  **develop protocols for how to manage those patients best, how**
12  **to change our protocols to get that data incorporated into**
13  **it.**
14     **I think the other area that I think has been a**
15  **significant advantage for our patients is in that diabetic**
16  **care.  There is a diabetic education and management program**
17  **that we have participated in at St. Luke's at their**
18  **assistance.  They have provided significant resources for**
19  **us.**
20     **Included in that is they have brought on diabetes**
21  **educators, which is a tremendous asset for a patient to**
22  **figure out what they are doing, what they should be doing**
23  **for management, where they're falling short, and what**
24  **changes they can make to their lifestyle.  We actually had a**
25  **diabetic educator in our practice years back.  We had to let**

2394

1   them go because it just wasn't a profitable business.

2      Q.  In terms of -- you had mentioned earlier in your

3   testimony that as an independent practice operating a

4   fee-for-service environment, Saltzer Medical Group

5   had -- had had to actively manage the mix of its patients by

6   who they were insured by or whether they were insured. And

7   can you describe to the court whether and how that has

8   changed since the integration of Saltzer and St. Luke's?

9      A.  Yeah. So the great thing about our arrangement

10  now is we are -- we call it payor blind. We open our

11  practices to patients that come to see us. We don't have to

12  worry about how many Medicare, how many Medicaid, how many

13  TRICARE patients, how many uninsured patients we see. We

14  can simply provide them with care. We are freed from the

15  constraints of worrying about what's the revenue stream

16  that's associated with this.

17     Q.  I forgot to ask you, but did -- did Saltzer

18  Medical Group accept Oregon Medicaid as an independent

19  practice?

20     A.  No, we did not.

21     Q.  And was -- do you have any reason to believe that

22  patients covered by Oregon Medicaid would have wanted to use

23  Saltzer?

24     A.  Actually, yeah. I had -- in obstetrics in my own

25  practice, I had patients that would come to Nampa and ask to

2395

1   be cared for at -- at a facility, and we would have to turn

2   them away because we didn't accept Oregon Medicaid.

3      Q.  And is that true today?

4      A.  No. We, again, are payor blind.

5      Q.  And since we're talking now about the compensation

6   being payor blind, why don't we talk a little bit just in

7   general about how compensation is set under the professional

8   services agreement. What is the metric? What's the -- the

9   design of the compensation structure?

10     A.  So it's a pretty simple structure at this point.

11  We simply have what are called work wRVUs that are assigned

12  to all visits and procedures based on a set standard, and

13  those values get rolled up and we get reimbursed at a fixed

14  rate for them. There may be tiers of rates that we receive,

15  but that's how our compensation is determined.

16     Q.  And so do I take it, then, that an uninsured

17  patient would generate the same number of wRVUs for the same

18  service as a Medicaid patient as a Blue Cross patient?

19     A.  There would be no difference. And the other thing

20  that that has allowed us to do is, because we now take those

21  patients who are uninsured, we also now have access to

22  St. Luke's Charity Care program, which we never, frankly,

23  were ever considering before, and now we can offer them that

24  opportunity and the avenue to pursue that for their own

25  assistance too.

2396

1      Q.  Does the compensation system that is part of the

2   professional services agreement provide for any payment to

3   Saltzer Medical Group for laboratory imaging or other

4   ancillary services that the Saltzer physicians order during

5   the term of the agreement?

6      A.  No. We have no -- there is no incentive plan.

7   There is no bonuses. There is nothing tied to any ancillary

8   services that might be provided.

9      Q.  And you -- you explained that the compensation

10  structure is a wRVU compensation structure. Can you explain

11  to us why it is, under that structure, the wRVU structure,

12  that there is no compensation to Saltzer for ordering tests,

13  labs, and ancillary services?

14     A.  So the only way that you generate work wRVU is if

15  it's something that you do. So when you order a test, order

16  an imaging study, there is no trigger to generate a work

17  wRVU for that ordering physician. So there is no

18  compensation driven back to the provider based on what they

19  order for ancillary services.

20     Q.  Prior to the transaction with St. Luke's, were

21  Saltzer physicians compensated in some form based on the

22  volume of laboratory imaging and ancillary services that ran

23  through the group's facilities?

24     A.  Yeah. As I was mentioning earlier, we had quite a

25  few ancillary services, and that was part of our revenue

2397

1   stream. The ancillary service revenue generated after

2   paying for the costs associated with that ancillary service

3   would then be distributed across the partners. One level

4   would be kind of a fixed base amount that those physicians

5   would receive or that all physicians would receive based on

6   that profit. And then there were some other carve out areas

7   for certain specialties for certain ancillary services that

8   they would get.

9      Q.  So if I understand correctly, the Saltzer Medical

10  Group physicians have gone from having a financial incentive

11  of some kind to generate volume in ancillary services to not

12  having an incentive to do so. Do you have any reason to

13  believe that the change in incentive structure may affect

14  the volume of services that are sent through into ancillary

15  services?

16     A.  I don't have data to know exactly if there have

17  been any changes. I will just simply talk to the human

18  nature of if you know an ancillary service is going to

19  generate more money for you, you may be more prone to order

20  that service. You may not; you may. But the whole program

21  was set up -- our reimbursement was fee-for-service. That's

22  what it was.

23     Q.  And was there any requirement or process in place

24  at Saltzer Medical Group when it was -- prior to the

25  transaction with St. Luke's that required physicians to

2398

1 balance the costs of the -- a test ordered versus the
2 benefit to the patient versus the revenue that was generated
3 to the group?
4 **A.   All we tracked was what was our revenue -- how**
5 **many imaging studies did we do, how much lab did we do, what**
6 **was the revenue generated by those and how did that get**
7 **distributed to the partners.  That's all we tracked.**
8 Q.   You mentioned that one benefit of the transaction
9 thus far has been to open up the Saltzer Medical Group to
10 new Medicaid, Medicare, TRICARE, and uninsured patients.  Do
11 you have any reason to believe that the volume of those
12 patients coming to Saltzer has, in fact, increased?
13 **A.   I'll tell you from my own practice, I used to**
14 **restrict the number of new obstetrics patients who were**
15 **insured under Medicaid.  I no longer do that.  And I know I**
16 **see more Medicaid patients, more obstetrics Medicaid**
17 **patients than I did before.**
18 **I also used to not see Medicare patients for**
19 **annual exams, et cetera, just because it was not very well-**
20 **reimbursed.  I now take all patients, so my practice has**
21 **changed.  Talking to my partners, their practice has**
22 **changed.  They now are open.**
23 Q.   I would like to talk a little bit about the
24 efforts that have been undertaken since the transaction
25 closed to extract data from eClinicalWorks to the WhiteCloud

2399

1 and the clinical integration scorecard.  Will you please
2 just describe the work that's been done to try to improve
3 the -- try to extract data from ECW to WhiteCloud.
4 **A.   Yes.  So when we started down this adventure,**
5 **St. Luke's came out and they had some significant resources**
6 **along with WhiteCloud that came to look at our data set,**
7 **look at eClinical, try to tell us what those measures were,**
8 **because we didn't actually know all the measures, and then**
9 **start to go through the process of, through eClinical, where**
10 **can that data be extracted.**
11 **When it couldn't be extracted electronically, they**
12 **assign resources to go mine the data through looking through**
13 **patients' charts and then worked with us on identifying what**
14 **kind of protocols might be done to try to increase the**
15 **number of data elements that they could get and track**
16 **automatically through eClinical.**
17 Q.   And if Saltzer had remained independent rather
18 than joining St. Luke's, would it have invested the time and
19 resources to provide data to WhiteCloud?
20 **A.   I do not believe we would have.  It's not an easy**
21 **process.  It takes resources, and we always kind of**
22 **prioritize our -- our resources on what we think we need to**
23 **do.**
24 Q.   And what about sharing the data from
25 eClinicalWorks with WhiteCloud?  If you had been an

2400

1 independent, would -- would that have made sense to you to
2 provide full disclosure on the -- from your electronic
3 health records?
4 **A.   I'll say that as an independent group, you're**
5 **always a bit skeptical about providing data and how much**
6 **data you provide and what it looks like.  So I do not**
7 **believe we would have been very -- we would have been all**
8 **gung ho about trying to provide all the data elements as**
9 **much as we could if we were staying independent.**
10 Q.   Since the time of the preliminary injunction
11 hearing, my understanding is Saltzer has been trying to do
12 what it can to track referral statistics and, you know,
13 monitor where referrals are going.  Are you familiar with
14 that process?
15 **A.   Yes.**
16 Q.   And has it -- has it -- as one part of that
17 process, are there a set of surveys that are done with
18 patients on their preferences for where they would like to
19 have hospital or specialty care provided?
20 **A.   Yeah.  We do two surveys.  We do a survey on new**
21 **patients that come to the clinic that are registered at the**
22 **clinic and ask them kind of a -- just a blanket question, so**
23 **do you have a hospital preference?  That's all it says.  And**
24 **then it lists several options.  And then that data is**
25 **recorded.**

2401

1 **Then there is a second survey that's done that is**
2 **when a patient, usually in a primary care, but it can be**
3 **others -- in primary care or another type of physician's**
4 **office, and is going to be referred for a procedure or**
5 **something that requires -- that will most likely require**
6 **them to be hospitalized and what is their preference for**
7 **where that care is provided.**
8 **So they are two different populations and two**
9 **different questions.**
10 Q.   If the court were to order Saltzer to be unwound
11 and Saltzer were to go back to being in independent
12 practice, what -- what do you think would happen?
13 **A.   Unfortunately, you know -- so if we're forced to**
14 **unwind, we're being put back to a model that we have made a**
15 **decision we don't think is the right model to move forward**
16 **with where we think healthcare is going.**
17 **As a result of that, through conversations with**
18 **partners, I believe that we would have partners, perhaps**
19 **even departments, that would simply say, I don't think this**
20 **is right, I don't wish to stay in this model, and I'm going**
21 **to leave.  And the group would be at a significant financial**
22 **harm.**
23 MR. WILSON:  Your Honor?
24 THE COURT:  Yes.
25 MR. WILSON:  May I interpose?  This past summer,

2402

1  there was a teleconference with the court where the
2  government plaintiffs raised the possibility of filing a
3  motion for summary judgment on a failing or flailing firm
4  defense, and defendants represented the court and to
5  plaintiffs that they would not be asserting any such
6  arguments here.  And we think that this is getting
7  dangerously close to asserting that defense which has no
8  legal or factual basis in this case.
9        Mr. -- Dr. Kaiser's testimony is talking about the
10  financial impact of Saltzer if it's divested.  And we think
11  that given the representations that the defendants have made
12  about they're not raising that defense, they are precluded
13  from doing so here.
14        THE COURT:  Mr. Keith.
15        MR. BIERIG:  Your Honor, I'll address this.
16        THE COURT:  All right.
17        MR. BIERIG:  What we said is that we would not say
18  that the reason that St. Luke's was affiliating with Saltzer
19  was that Saltzer was failing or flailing, but we made it
20  very clear that we would point out that there would be
21  significant problems for Saltzer in the event of a
22  divestiture.  And I think that's exactly what this witness
23  is talking to.  There is absolutely nothing inconsistent
24  with this testimony with what we represented to the
25  plaintiffs in this case.

2403

1        THE COURT:  Well, Counsel, that kind of raises
2  another problem which is that, you know, we agreed at the
3  time of the preliminary injunction hearing that problems
4  with divestiture as opposed to problems -- in other words,
5  things that happen from the date of the court's denial of
6  the motion for preliminary injunction through today's date
7  would not be raised as an issue.  The way you phrased that,
8  that there would be problems from divestiture, kind of
9  raises that issue, and I'm assuming you are not making that
10  argument either.
11        MR. BIERIG:  I am not making that argument.
12        THE COURT:  All right.  Now, as I understand it,
13  what you're really arguing is that there was some economic
14  reasons for -- from Saltzer's point of views, challenges
15  they were facing which encouraged them to enter into the
16  arrangement, not that they were going to fail or that they
17  were flailing, as perhaps use the term, nor are you arguing
18  that the situation has now become -- I guess, the
19  relationship has become so intertwined that now divestiture
20  or unwinding the arrangement is problematic.
21        MR. BIERIG:  That is correct.  We are talking
22  about problems that occurred -- that -- that were in
23  existence prior to the affiliation that would be exacerbated
24  by divestiture.  Now, we're not talking about anything
25  that's occurred in the last nine months, and we're talking

2404

1  about a remedy and why we think that remedy was, at the --
2  at the time of the preliminary injunction hearing and now,
3  totally inappropriate.
4        THE COURT:  Okay.
5        Mr. Wilson.
6        MR. WILSON:  Your Honor, we think that that's just
7  a flailing or failing firm defense wrapped up in remedy
8  clothing, and that is not the question that Mr. Keith posed
9  to the witness.  The question that Mr. Keith posed to the
10  witness was, quote, If the court were to order Saltzer to be
11  unwound and Saltzer were to go back to being in independent
12  practice, what do you think would happen?  And that's what
13  led to the testimony that we found objectionable.
14        THE COURT:  Well, all right.  But it's not
15  absolutely obvious to me that that question would have
16  resulted in a response that would have raised the failing or
17  flailing firm defense.
18        MR. KEITH:  If I may, Your Honor, my next
19  question -- sorry, my next question was going to be:  Were
20  those circumstances the same at the time of the preliminary
21  injunction hearing?
22        THE COURT:  The objection is noted.  I'm going to
23  give counsel the leeway here but with clearly the
24  understanding that is not a defense.  It was raised
25  pretrial, and it was agreed that it was not going to be

2405

1  asserted as a defense.  But I think an issue still in the
2  case is the potential procompetitive effects of the merger
3  and perhaps strengthening of Saltzer Medical Group, and its
4  position may be part of that.  So I think it may have some
5  relevance but not considered by the court as part of an
6  affirmative defense.
7        MR. WILSON:  Well, respectfully, Your Honor,
8  considering it as part of Saltzer's motivation or St. Luke's
9  motivation for doing the deal is sort of asserting the
10  flailing or failing firm defense --
11        THE COURT:  Well, Counsel --
12        MR. WILSON:  -- and that defense has very, very
13  strict legal requirements.
14        THE COURT:  Well -- well, I understand that.  But
15  let me -- let me put your mind at ease.  I have sat and
16  listened, you know, to the testimony now for, what, three
17  weeks, and that is not something that's been factored into
18  my mind at all.  I do have some very specific concerns, and
19  I may even ask Dr. Kaiser about a couple of those.  And I
20  think it is on the back end, the back door of the issue, and
21  that is the procompetitive effect.
22        I am intensely interested in that and the extent to
23  which the type of integration and the electronic health
24  records that have been discussed, whether those can be
25  achieved without this type of consolidation of medical

2406

1  practices.  But they're not concerned with the survivability
2  of Saltzer Medical Group.  That's just not an issue in my
3  mind, and it won't be.  I will just have to put your mind at
4  ease, and that's the best I can do.
5       Now, Counsel, Mr. Bierig, was there anything else you
6  wanted to offer?
7            MR. BIERIG:  No, except that we think the
8  propriety of the remedy is a very important issue.
9            THE COURT:  No.  I think that is the other huge
10  issue in my mind is -- is what -- assuming that we get to a
11  remedy, and I'm obviously -- the jury is still out on that
12  issue, but assuming we do, that's another issue that is very
13  much weighing on my mind as to what, if any, remedy would be
14  appropriate.  And so I'm -- I'm acutely aware of that as an
15  issue.  What I am not concerned about is that St. Luke's was
16  a knight in shining armor coming to rescue the damsel in
17  distress.
18            MR. BIERIG:  And that is --
19            MR. KEITH:  No offense.
20            MR. BIERIG:  -- we are not asserting a
21  knight-in-shining armor or damsel-in-distress defense.
22            THE COURT:  I don't see a shining armor here
23  and -- I guess, damsel in distress.
24            MR. BIERIG:  Right.  And we are not asserting
25  that.

2407

1            THE COURT:  And I hope that's not regarded as a
2  sexist comment; it's just simply something we say.  My
3  apologies.  I guess I could figure out a way to reverse
4  those roles, but somehow it wouldn't come out the same.
5       All right.  Mr. Keith, let's go ahead and proceed.
6  BY MR. KEITH:
7       **Q.**  And in -- in the circumstances in which Saltzer
8  **were unwound and independent, would Saltzer invest in**
9  **the -- in upgrading its electronic health record systems to**
10  **interoperate with St. Luke's?**
11       **A.**  I can tell you that the situation that we were in
12  **as of November of last year with high revenue producers**
13  **being gone, we will be looking at every penny that is spent,**
14  **and we will not invest -- we will not invest in anything**
15  **that we do not think increases our revenue stream.  And so**
16  **the answer is, no, we would most likely not invest in**
17  **anything.**
18       **Q.**  And just to be clear, the contracts that you had,
19  **that Saltzer Medical Group had prior to the St. Luke's**
20  **transactions, those were overwhelmingly fee-for-service**
21  **contracts.  Is that fair?**
22       **A.**  Yep.
23       **Q.**  And so when you say if Saltzer is unwound, it
24  **would be doing everything it could to increase**
25  **reimbursements, that's under a fee-for-service system?**

2408

1       **A.**  Yeah.  Our approach would have to be -- again,
2  **assuming that we had a nucleus of physicians that stayed**
3  **within the group, our focus would be cutting costs.  We**
4  **would have to do everything we could, probably releasing**
5  **employees.  We would have to emphasize fee-for-service.**
6  **That means we're not going to take -- we are good**
7  **physicians, and we are compassionate physicians.  We also**
8  **are realistic physicians.  And we will not focus on**
9  **Medicaid, Medicare, TRICARE patients.  We will focus on**
10  **fee-for-service, increasing that revenue stream, cutting**
11  **costs, cutting services that aren't profitable.  That would**
12  **be the strategy that we will have to take going forward.**
13       **Q.**  I want to take you back to the point where Saltzer
14  Medical Group was deciding how it wanted to move forward to
15  address what it saw on the horizon in terms of changes in
16  the healthcare system.  And, obviously, again, we're here
17  today because Saltzer took one particular path, tight
18  integration financially.
19       Why -- why was it that Saltzer Medical Group -- or
20  did -- did Saltzer consider whether a looser affiliation,
21  say, through something like the Select Medical Network could
22  achieve the same ends as the transaction that's now at
23  issue?
24       **A.**  Well, you know, there -- there is -- when you look
25  **at Select Medical Network or other types of networks, you**

2409

1  **have to put risk out there, risk for yourself as far as what**
2  **services you provide, what data you can share, and what**
3  **you're willing to accomplish.  And if those goals aren't**
4  **reflected in financial terms, revenue stream, then we're not**
5  **going to pursue those.  We would not want to pursue that**
6  **avenue.**
7            **The second is that when we looked at the alignment**
8  **strategy, we thought that we had to be very integrated**
9  **because you need to have trust with the partner that you're**
10  **intending on working with.  That partner has to have**
11  **strength, has to have the same goals that you have for where**
12  **you are moving forward to, and we saw all that within the**
13  **St. Luke's Health System.  I don't really see that in a**
14  **Select network or any other network that's out there to any**
15  **significant extent.**
16            MR. KEITH:  No further questions, Your Honor.
17            THE COURT:  Thank you.
18            MR. KEITH:  I'm sorry.  Now I'm being asked to
19  consult for one second.
20            THE COURT:  Yes.
21  BY MR. KEITH:
22       **Q.**  During the negotiations that Saltzer Medical Group
23  had with St. Luke's that led up to the agreement that's at
24  issue today, did there come a time when Saint Alphonsus
25  submitted its own bid to integrate with the group?

2410

1      **A.**   Yes.  After we had gone through negotiations,
2  there was a quest -- request from some of our partners to
3  open the negotiations to Saint Al's for them to provide an
4  offer to us, and they put together an offer and presented it
5  to us.
6      **Q.**   And were the financial terms of that offer the
7  same, different than the St. Luke's offer?
8      **A.**   The -- the financial terms were essentially the
9  same, very, very similar.  There were some other aspects of
10  the offer that were different, but the financial terms were
11  essentially the same.
12          MR. KEITH:  Thank you.
13          THE COURT:  Cross, Mr. Wilson.
14          MR. WILSON:  Thank you, Your Honor.
15                  CROSS-EXAMINATION
16  BY MR. WILSON:
17      **Q.**   Good morning, Dr. Kaiser.
18      **A.**   Good morning.
19      **Q.**   If I have understood your testimony correctly, you
20  just testified that Saltzer wanted to do the deal with
21  St. Luke's essentially because Saltzer required additional
22  resources to compete in this new arena of healthcare coming
23  on the horizon; correct?
24      **A.**   No.  I don't think that -- that wasn't the only
25  reason.  We thought that we could move forward the

2411

1  healthcare system with needing additional resources but
2  looking to the future for how we could change healthcare,
3  because that's what I was talking about the whole horizon
4  from the 2000s, the -- the system is broken.  We need to
5  figure out how to fix it.  We wanted to be part of that
6  solution.
7      **Q.**   And Saltzer thought that the additional resources
8  from St. Luke's would help accomplish that; correct?
9      **A.**   A healthcare system.  We didn't think we had the
10  resources within our walls to be able to do that and that we
11  needed another entity that was much more far-reaching than
12  us to do that.  And with the options presented to us, we
13  thought St. Luke's was the best.
14      **Q.**   So the answer is yes?
15      **A.**   Yes.
16      **Q.**   And I believe you also testified that in your
17  discussions with St. Luke's, you never talked about
18  increasing prices; is that right?  Is that your testimony?
19      **A.**   I -- as I -- as I said in my testimony, I do
20  not -- there was never a point of our discussions that we
21  were going to go out and try to increase costs, raise
22  premiums for third-party payors; correct.
23      **Q.**   Isn't it true, Dr. Kaiser, that Saltzer's
24  motivation, in part, for the deal with St. Luke's was to
25  control market share?

2412

1      **A.**   Not market share.  It was to control where the
2  future of healthcare was headed in Canyon County, not that
3  we were going to get more patients necessarily.  We may; we
4  may not.
5      **Q.**   But you wanted to control that?
6      **A.**   We wanted to control or be involved in the
7  services that were expanded in Canyon County.
8      **Q.**   But you weren't interested in controlling market
9  share per se --
10      **A.**   No.
11      **Q.**   -- is that your testimony?
12      **A.**   That's my testimony.
13      **Q.**   And isn't it true that one of the motivations for
14  Saltzer doing the deal with St. Luke's was being able to
15  reap the financial benefit of receiving St. Luke's hospital
16  facility fees for Medicare?
17      **A.**   So the discussion about Medicare payments and how
18  those payments are -- are distributed based on what your
19  organization is came up and were presented.  We made it
20  clear that if hospital-based billing went away, that should
21  have no impact on us either way.  Because there was just as
22  many discussions that that -- that method of payment may not
23  exist in the future.  And so we said it's off for us.  It
24  may be there; it may not.  That is not part of our concern.
25      **Q.**   But isn't it true that the financial benefit from

2413

1  those facility fees was how you expected that Saltzer would
2  pay for your increased compensation?
3      **A.**   That was, you know, so not in my -- not in our
4  mind.  That wasn't our responsibility, so, no.
5      **Q.**   And isn't it true, Dr. Kaiser, that part of the
6  motivation for Saltzer aligning with St. Luke's was that so
7  Saltzer would really only face one competitor in the
8  marketplace instead of two?
9      **A.**   No.  I don't think there was -- we never decided
10  that there was going to be multiple competitors that -- that
11  we were eliminating any competitors or adding any
12  competitors.
13      **Q.**   So your answer is, no, that wasn't a
14  consideration?
15      **A.**   That wasn't our goal.
16      **Q.**   Nancy Powell used to be the CFO of Saltzer;
17  correct?
18      **A.**   That's correct.
19      **Q.**   And she was heavily involved with the negotiations
20  with St. Luke's up until the time she left Saltzer in the
21  fall of 2011 -- or I'm -- right, fall of 2011?
22      **A.**   She was involved.
23      **Q.**   And, in fact, it's fair to say she was kind of the
24  scribe for a lot of the work that the Saltzer negotiating
25  committee did while she was at Saltzer; correct?

2414

1    **A.**  I don't know that to be a fact.

2          MR. WILSON:  Mr. Beilein, can you please play

3    clip 7, which is page 115, line 25 through page 116, line 3

4    of Ms. Powell's deposition.

5          MR. KEITH:  Your Honor, of Nancy Powell's

6    deposition?

7          MR. WILSON:  Nancy Powell's -- I mean -- I'm

8    sorry, of Dr. Kaiser's deposition.  I apologize.  Thank you,

9    Mr. Keith.

10         THE COURT:  Yes.  I was going to suggest that's an

11   odd impeachment, but I have seen odder forms of impeachment.

12         (Video clip played as follows.)

13    **Q.**  "So who -- who was with her, somebody who

14         intended to be the scribe for the negotiating

15         committee?

16    **A.**  "Nancy Powell did a lot of it."

17         (Video clip concluded.)

18   BY MR. WILSON:

19    **Q.**  It's a small point, but it's fair to say she was

20   the one who did a lot of the recording of what was going on

21   during discussions going on with St. Luke's prior to her

22   departure from Saltzer; correct?

23    **A.**  Yes.  But the negotiating committee dissolved

24   also, so it didn't remain as an entity.  And to be quite

25   honest, I'm not sure that I recall a whole lot of documents

2415

1    that she produced, but maybe I'm just forgetting.  I don't

2    know.

3     **Q.**  Okay.

4          MR. WILSON:  Mr. Beilein, if you could provide

5    Dr. Kaiser with -- and the court with a copy of the binders

6    we have prepared.  Appreciate it.

7          THE COURT:  Counsel, you might just provide one.

8    I tend not to use them, and they just start cluttering up my

9    desk.  And if I feel the need, I'll ask for it.  But

10   otherwise, I'll just look at the electronic version.

11         MR. KEITH:  Do you have an extra binder?

12         THE COURT:  If I have an extra one, give it to

13   St. Luke's.

14         MR. WILSON:  I would prefer, Your Honor, and I

15   will provide a copy to defense counsel of the document

16   before I produce it to the witness.

17         THE COURT:  All right.

18         MR. WILSON:  I -- I'd prefer, if the court would

19   allow me, not to preview the documents that are coming down

20   the road in cross-examination.

21         THE COURT:  Well, I'm not sure I suggested

22   otherwise.

23         MR. WILSON:  No.  It's just that if I gave them a

24   binder, there would be a preview of the documents.  And I --

25   I promise to provide him a copy prior to showing it --

2416

1          MR. KEITH:  He has been doing that in the past,

2    but if you want to change practice, that's fine.

3          THE COURT:  Let's go ahead and proceed.

4          MR. WILSON:  Sorry for being difficult.

5    BY MR. WILSON:

6     **Q.**  Dr. Kaiser, if you could please turn in your

7    binder to Exhibit 1369.  These are a series of handwritten

8    notes from Nancy Powell which have been admitted in

9    evidence.  Are you there?

10    **A.**  I am.

11    **Q.**  And if you see down at the lower right corner of

12   these documents, there is a number that bears a prefix "SMG"

13   and then some numbers.  If you could turn to page 393.

14         MR. SCHAFER:  This document is AEO.  I don't

15   know -- I mean, obviously, there is like a hundred pages, so

16   you may not be showing any AEO sections but --

17         MR. WILSON:  Your Honor, perhaps we can proceed

18   this way.  If you could blank the screen, please, and I'll

19   ask Mr. Beilein to highlight the portion that I intend to

20   ask the witness about.  But I do intend to ask about the

21   specific contents, so I'll leave it to St. Luke's counsel to

22   decide whether or not --

23         THE COURT:  Let -- let's do it question by

24   question.

25         MR. WILSON:  That's fine.

2417

1          THE COURT:  And then if we get to that point where

2    we need to clear the courtroom, we'll do so.

3    BY MR. WILSON:

4     **Q.**  Could you please turn, Dr. Kaiser, to page 39311.

5    Are you there?

6     **A.**  Not yet.

7          Okay.

8     **Q.**  These appear to be notes of a meeting related to

9    the St. Luke's integration; correct?  See that up there at

10   the top?

11    **A.**  Yeah.  I'm trying to figure out where the start of

12   this is.  Okay.  Yep.  Go ahead.

13    **Q.**  And the people attending that meeting appear to

14   all be people from Saltzer; correct?

15    **A.**  Yes.

16    **Q.**  And these notes, in fact, indicate that you were

17   at this meeting; correct?

18    **A.**  Correct.

19    **Q.**  So this appears to be an internal meeting within

20   Saltzer to talk about the St. Luke's deal; correct?

21    **A.**  Yes.

22    **Q.**  Okay.  If you could turn, sir, to the next page,

23   which is numbered 39312, and look at point 5.

24         MR. WILSON:  If I can ask Mr. Beilein to bring

25   that up on the monitors, please.  And I would just indicate

2418

1  to defense counsel that I do intend to ask Dr. Kaiser about
2  specific points in this list on the record.
3         MR. SCHAFER:  I think it's fine to put this on the
4  screen.
5         THE COURT:  I'm sorry, I couldn't hear you.
6         MR. SCHAFER:  You can put this on the screen,
7  Your Honor.
8         THE COURT:  All right.
9  BY MR. WILSON:
10     **Q.**  Point No. 5 in the notes about this meeting
11  regarding the St. Luke's integration is "fundamental reasons
12  for why we should do this."  Do you see that?
13     **A.  I do.**
14         MR. KEITH:  Your Honor, if I may, I just have an
15  objection on form.  I would like a little time -- I don't
16  know what -- when these notes relate to.  If we can find a
17  date, that might be helpful.
18         THE COURT:  If -- if we could or if the witness
19  knows, he can lay the foundation for --
20  BY MR. WILSON:
21     **Q.**  Dr. -- Dr. Kaiser, can you turn to the next page
22  in the notebook, which is numbered 39313.  See that?
23     **A.  Yeah.**
24     **Q.**  And there is a notation of the date at the top of
25  that of December 16th, 2009.  And then if you turn to the

2419

1  page -- the pages before these notes, specifically page
2  39309, there's a date November 10th, 2009.  So is it fair to
3  say that these notes, presumably, are from sometime in late
4  2009?
5     **A.  Yes.**
6     **Q.**  Turning back to page 39312, and what's listed here
7  is the fundamental reasons for why we should do this.  The
8  first reason listed is, quote, Competition, control market
9  share; correct?
10     **A.  Yeah.  Can I --**
11     **Q.**  Is it -- yes or no, Dr. Kaiser?  Is that what's
12  listed?
13     **A.  Well, let me explain.**
14         THE COURT:  Dr. Kaiser, Mr. Keith is going to give
15  you a chance to explain this, so it's -- it's better to just
16  answer the questions yes or no if you can.  It will help us
17  move more quickly through the proceeding.
18         THE WITNESS:  I was going to ask a question about
19  I may need to change my answer on who was at this meeting,
20  because I'm not sure that the consultants weren't a part of
21  this meeting.  So I don't know the -- I may need to correct
22  that answer.
23         THE COURT:  I think that's fair.
24  BY MR. WILSON:
25     **Q.**  Regardless if the consultants were there or not,

2420

1  the third reason that Ms. Powell lists as one of the
2  fundamental reasons why Saltzer should do the deal with
3  St. Luke's is, quote, facility fee for Medicare; correct?
4     **A.  Correct.**
5     **Q.**  And the fourth reason listed is, quote, Align with
6  Luke's, one competition compared to two; correct?
7     **A.  Correct.**
8     **Q.**  And getting back to the first reason, it is true
9  that the reason listed there is, quote, Compensation,
10  control market share, end quote; correct?
11     **A.  Correct.**
12     **Q.**  And did I read all of those reasons accurately?
13     **A.  You did.  I don't know who said them, but you did.**
14     **Q.**  With respect to that facility fee issue that's
15  listed there, if you could turn in the exhibit you have in
16  front of you --
17         MR. WILSON:  And, Your Honor, if we could block
18  out the screen, please.
19         THE COURT:  Yes.
20  BY MR. WILSON:
21     **Q.**  -- to page 39338.  It's quite a ways back in the
22  document, Doctor.  Please tell me when you're there.  It's
23  notes from a meeting on July 27th, 2010.
24         Do you see that?
25     **A.  So what was that reference number?**

2421

1     **Q.**  Yeah.  The number is 39338.
2     **A.  Okay.**
3     **Q.**  These notes reflect what appear to be a meeting
4  between some folks from Saltzer and some people representing
5  St. Luke's; correct?
6     **A.  Appears to be.**
7     **Q.**  And, in fact, you mentioned consultants.  One of
8  the people at this meeting appears to be one of St. Luke's
9  consultants, Peter LaFleur; correct?
10     **A.  Yep -- yes.**
11         MR. SCHAFER:  This is not AEO, so if you want to
12  put this on the screen.
13         THE COURT:  Thank you, Mr. Schafer.
14  BY MR. WILSON:
15     **Q.**  And these notes reflect that you were at this
16  meeting; correct?
17     **A.  Yes.**
18     **Q.**  And at No. 3, Ms. Powell writes, quote,
19  Expectations of group in terms of comp, and the first point
20  listed is "Financial benefit facility fee share."
21         Did I read that accurately?
22     **A.  You did.**
23     **Q.**  And the second point she lists under No. 3 is,
24  quote, RVU basis, how is it done for other groups?
25         And the answer is "Same"; correct?

2422

1    **A.   Correct.  Well, I guess that's the answer.  I**
2  **don't know that.**
3        **Q.**   Well, that's what it says; correct?
4    **A.   It says "Same."  I don't know what "same" means.**
5        **Q.**   With regard to this notion of securing market
6  share being part of the internal discussions at Saltzer, are
7  you saying that was or was not a part of the discussions
8  within Saltzer internally about why to do the deal with
9  St. Luke's?
10    **A.   The discussions within -- within Saltzer were not**
11  **being excluded from the market.  That was our discussions.**
12        **Q.**   Okay.  It had nothing to do with securing market
13  share.  Is that your testimony?
14    **A.   So depending on how you define market share.  So**
15  **it can be simply preserving your market share or it can be**
16  **expanding it.  So our concern was always that we were going**
17  **to be excluded.**
18        **Q.**   You wanted to secure your market share; isn't that
19  accurate?
20    **A.   Yes.  Sure.**
21        **Q.**   For much of the time that Saltzer was negotiating
22  its deal with St. Luke's, Saltzer used -- you mentioned
23  consultants.  I think the consultant that Saltzer used was a
24  consultant named the Coker Group.  Is that right?
25    **A.   That was one of them, yes.**

2423

1        **Q.**   You used the Camden Group first, and they were
2  dismissed and then Coker came on; correct?
3    **A.   That's correct.**
4        **Q.**   And they were your primary consultant for the bulk
5  of the negotiations; correct?
6    **A.   That's correct.**
7        **Q.**   And Max Reiboldt was your primary contact at the
8  Coker Group?
9    **A.   He was the lead guy, yes.**
10        **Q.**   And in speaking with St. Luke's, Mr. Reiboldt was
11  speaking on behalf of Saltzer, was he not?
12    **A.   He was representing us.  Whether he was always**
13  **speaking for us, I would have to say I'm not sure we always**
14  **agreed.**
15        **Q.**   Well, you were generally pleased with the work
16  that the Coker Group did on behalf of Saltzer; correct?
17    **A.   Yes and no.**
18        **Q.**   Well, isn't it true that you were not at all
19  displeased with how Mr. Reiboldt represented Saltzer's
20  position?
21    **A.   At times I was.**
22        **Q.**   Isn't it true that you were not at all displeased
23  with how Mr. Reiboldt represented Saltzer's position, not at
24  all?
25    **A.   At times I was disappointed.**

2424

1        MR. WILSON:  Mr. Beilein, could you please play
2  dep video clip 3 from Dr. Kaiser's deposition.  Mr. Beilein,
3  what's the -- the page and line number of that?
4        I apologize, Your Honor, if you could just give me one
5  moment.
6        THE COURT:  As long as we have it for the record.
7        MR. WILSON:  Yeah.  This is from page 124 of
8  Dr. Kaiser's deposition, lines 7 through 20.
9        (Video clip played as follows.)
10        **Q.**   "When Mr. Reiboldt sent letters to
11        St. Luke's stating physician on behalf of
12        Saltzer, were those letters approved in advance
13        by -- by people at Saltzer before they went
14        out?
15    **A.   "By and large, yes.**
16        **Q.**   "And -- and whether the letter itself was
17        approved, was the position that Mr. Reiboldt
18        took always approved before the letter went
19        out?
20    **A.   "Yes.  I will add a caveat, perhaps not in**
21        finite detail to all of the points that
22        Mr. Reiboldt was making, but in general, yes.
23        **Q.**   "And were you displeased with how
24        Mr. Reiboldt was representing Saltzer's
25        position?

2425

1    **A.   "No.  No.  Not at all."**
2        (Video clip concluded.)
3        MR. KEITH:  Objection, Your Honor.  I think that
4  was a pretty narrow scope of testimony, not commensurate
5  with the question that -- that Mr. Wilson asked was, Were
6  you ever displeased with the --
7        THE COURT:  I'll allow you to cover that on
8  cross -- on redirect, excuse me.
9  BY MR. WILSON:
10        **Q.**   Was that your testimony, Dr. Kaiser?
11    **A.   Yes.**
12        **Q.**   He did a good job, didn't he?
13    **A.   He did some things very well for us.**
14        **Q.**   If you could please turn in your binder,
15  Dr. Kaiser, to Exhibit 1143 and let me know when you're
16  there.
17    **A.   I'm here.**
18        **Q.**   Okay.
19        MR. WILSON:  Your Honor, if we could black out the
20  screen, please?
21  BY MR. WILSON:
22        **Q.**   This is a letter from the Coker Group to you,
23  Bill Savage, and Nancy Powell dated December 17th, 2010;
24  correct?
25    **A.   That's correct.**

2426

1    Q.   So this is shortly after Saltzer engaged Coker as
2  its consultant to help with the St. Luke's deal; correct?
3    A.   That sounds about right.
4    Q.   And at the outset of that engagement, Coker
5  representatives met with the executive committee of Saltzer;
6  correct?
7    A.   Yes, they did.
8    Q.   And you were on the executive committee?
9    A.   Yes.
10   Q.   And so you personally met with Coker
11 representatives when they came out to interview people at
12 Saltzer?
13   A.   I met with Coker, yes.
14   Q.   At the outset of their engagement?
15   A.   Yes.
16   Q.   About how large was the executive committee at the
17 time?  This is December 2010.
18   A.   So I'm going to say somewhere around 10 to 12 is
19 the number I'm thinking.
20   Q.   So if Coker, when they came, met with the
21 executive committee to get their input, they would have met
22 with approximately 10 to 12 individuals?
23   A.   Well, not all members of the executive committee
24 are always present, so I don't know for sure how many they
25 met with.

2427

1    Q.   They met with the executive committee; correct?
2    A.   Yes.
3    Q.   And, in fact, this letter indicates that when
4  Coker came to speak with Saltzer doctors and employees, that
5  they also conducted several one-on-one interviews with
6  Saltzer doctors; correct?
7    A.   That's correct.
8    Q.   After those interviews, Coker compiled a summary
9  of what they had learned from the interviews; correct?
10   A.   Correct.
11   Q.   And is it fair to say that this letter essentially
12 contains that summary?
13   A.   For that point in time, yes.
14   Q.   Okay.  And in this summary, if you just page
15 through it, Dr. Kaiser, at various points, there is
16 numerous, what Coker has characterized as issues, concerns,
17 and comments that Saltzer doctors had about a
18 potential deal with the hospital system like St. Luke's;
19 correct?
20   A.   Yes.
21   Q.   And there are both positive and negative comments
22 here; correct?
23   A.   It appears so.
24   Q.   Isn't it true, Dr. Kaiser, that no one from
25 Saltzer mentioned to Coker that Saltzer's electronic health

2428

1  record system was a concern whatsoever?
2    A.   Throughout the discussion -- at this point in
3  time, I don't recall.  We did mention it later on in the
4  negotiations about electronic health record.
5    Q.   So your answer is you don't recall whether it was
6  mentioned when Coker first came to speak to Saltzer?
7    A.   No, I don't recall.
8    Q.   And isn't it true, sir, that when Coker first came
9  to gather input from Saltzer in late 2010 that no one from
10 Saltzer told Coker that gaining access to Epic was a reason
11 to do a deal with a large hospital system; correct?
12   A.   I don't know that we even knew the name of Epic at
13 that time.  We talked about infrastructure access, and so it
14 may not be mentioned in specific detail as far as Epic, but
15 as far as access to infrastructure would have implied an
16 electronic medical record or enhancement of electronic
17 medical record.
18   Q.   No one complained that Saltzer's EMR was
19 antiquated, did they?
20   A.   You mean to Coker or --
21   Q.   Correct.
22   A.   So I don't know.  I don't know if anyone did --
23   Q.   Your answer is you don't know?
24   A.   I don't know.
25   Q.   And isn't it true, sir, that in all these folks

2429

1  that spoke with Coker, not one of them told your consultants
2  that treating more Medicaid patients was a reason to do a
3  deal with a large hospital system?
4    A.   I don't know if anyone mentioned it or not.  I
5  don't -- I couldn't answer the question, I guess.
6    Q.   And isn't it true, Dr. Kaiser, that -- that no one
7  from Saltzer told your consultants that the quality at the
8  Saltzer Medical Group was a concern?
9    A.   I don't know.
10   Q.   You mentioned during your direct testimony that
11 you personally did not accept Medicare patients before being
12 acquired by St. Luke's?
13   A.   Not true.  I said I didn't take Medicare patients
14 for annual exams.
15   Q.   Oh, I'm sorry.  So you did not take Medicare
16 patients for annual exams, but you did accept them for other
17 parts of your practice?
18   A.   Yes.
19   Q.   And was there any legal impediment that prevented
20 you from accepting Medicare patients for annual exams?
21   A.   Not that I know of.
22   Q.   That was essentially a business decision you made;
23 correct?
24   A.   Correct.
25   Q.   And you also mentioned that Saltzer did not accept

2430

1  Oregon Medicaid patients; correct?
2      **A.  Correct.**
3      **Q.**  Or Oregon, I should say.  Sorry.
4      **A.  I don't know which --**
5      **Q.**  I'm from the Midwest.
6      And was there any legal impediment to Saltzer accepting
7  Oregon Medicaid patients?
8      **A.  I'm not an expert in the field, but I thought they**
9  **wouldn't get reimbursed -- that we wouldn't get paid for**
10  **them.**
11      **Q.**  So it was a business decision?
12      **A.  Business decision.**
13      **Q.**  And you also testified about the benefits of
14  sharing data that have come to Saltzer after its acquisition
15  by St. Luke's; correct?
16      **A.  Correct.**
17      **Q.**  And I believe you testified that you said you
18  wouldn't have shared this sort of electronic health data if
19  Saltzer had remained independent.  Is that your testimony?
20      **A.  I said I'm not sure of the extent of data that we**
21  **would share.**
22      **Q.**  Even though you just testified about all of the
23  benefits that it would inure to the patients at Saltzer;
24  correct?
25      **A.  Correct.**

2431

1      **Q.**  During your direct examination, you testified that
2  Saltzer did not want a looser affiliation with St. Luke's;
3  correct?
4      **A.  I think I said I didn't think it was going to**
5  **achieve our goals, a looser arrangement.**
6      **Q.**  Well, isn't it true that the proposal that Saltzer
7  put on the table initially to St. Luke's was a looser
8  affiliation; correct?
9      **A.  The proposal we put on the table initially was an**
10  **arrangement that we came to believe was not legal.**
11      **Q.**  Because it wouldn't allow St. Luke's to charge
12  provider-based billing; correct?
13      **A.  I'm not sure if that's the only reason.  We had**
14  **multiple attorneys that reviewed this and gave us**
15  **recommendations on what needed to be done in the transaction**
16  **to move forward into a alignment with a healthcare system.**
17      **Q.**  But one of the reasons for not pursuing a looser
18  affiliation was because it didn't allow St. Luke's to do
19  provider-based billing; correct?
20      **A.  I don't know that that was the only reason or**
21  **that --**
22      **Q.**  That wasn't my question, Doctor.  My question was:
23  Was it a reason?
24      **A.  Again, I'm going to have to say I don't know**
25  **because I don't know enough of the ramifications of CMS**

2432

1  **rules and what's required when you hold yourself out as**
2  **being part of a health system.**
3      **Q.**  Well, when you first proposed this looser
4  alignment that turned out not to be achievable for some
5  legal reason, apparently you thought that you could trust
6  St. Luke's under a looser arrangement; correct?
7      **A.  Yes.**
8      **Q.**  And you thought -- Saltzer thought that it could
9  achieve the same goals as St. Luke's with a looser
10  alignment; correct?
11      **A.  I'm not sure we had pursued all the goals, but we**
12  **thought we could achieve goals with St. Luke's.**
13      **Q.**  You thought you could clinically integrate with a
14  looser affiliation; correct?
15      **A.  Yes.**
16      **Q.**  And you mentioned in your direct testimony that
17  there was -- there is no incentive plan currently that
18  incentivizes Saltzer doctors to send -- to incur more
19  ancillary services; is that right?
20      **A.  That's correct.**
21      **Q.**  Okay.  Whether there is an incentive in place or
22  not, St. Luke's derives the revenue from those ancillary
23  services; correct?
24      **A.  As far as I know.**
25      **Q.**  And the agreed-upon compensation for the doctors

2433

1  with St. Luke's is based on RVUs; correct?
2      **A.  That's correct.**
3      **Q.**  And that, in fact, provides an incentive of some
4  sort, does it not?
5      **A.  No.  There is no -- we don't get a work RVU for**
6  **ordering a lab.**
7      **Q.**  The more doctors work, the more they get paid
8  under that system; correct?
9      **A.  Yes.**
10      **Q.**  It's the fee-for-service model?
11      **A.  It is.**
12      **Q.**  And it was important to Saltzer to negotiate a
13  guaranteed rate on an RVU basis for the entire five-year
14  term of its deal with St. Luke's; right?
15      **A.  Yes, it was.**
16      **Q.**  And that's still the compensation structure in
17  place today; correct?
18      **A.  Well --**
19      **Q.**  Is that correct, Your Honor --
20      **A.  No.**
21      **Q.**  -- Dr. Kaiser?  You have received a promotion,
22  Doctor.
23      THE COURT:  I'm going to take the Fifth Amendment
24  on that.
25  BY MR. WILSON:

2434

1   **Q.** That is the compensation structure in place today;
2   correct, Doctor?
3   **A.** Yes.
4   **Q.** Isn't it true, Dr. Kaiser, that one of the reasons
5   that Saltzer wanted to do the deal was that it wanted the
6   clout of combining with St. Luke's in negotiating contracts
7   with third-party payors?
8   **A.** I'm not sure how to answer that question. I don't
9   **know. It -- the -- the -- at what point in the transaction**
10  **are you talking about?**
11  **Q.** Are you denying that Saltzer -- one of the reasons
12  that Saltzer wanted to do this deal with St. Luke's is that
13  Saltzer wanted the clout of combining with St. Luke's in
14  negotiating contracts with third-party payors?
15  **A.** The desire of Saltzer was to not be excluded from
16  **contracts. If that's equated to clout, then the answer is**
17  **yes.**
18  **Q.** In fact, combined contracting was one of the
19  reasons that Saltzer did the deal; correct?
20  **A.** It was -- I don't know that it was a reason to do
21  **the deal. It was an outcome of the deal and how it was**
22  **structured.**
23  **Q.** If you could please turn, Dr. Kaiser, to
24  Exhibit 1375 in your binder. Are you there, Doctor?
25  **A.** I am.

2435

1   **Q.** These are your handwritten notes; correct?
2   **A.** They are.
3   **Q.** And in the lower part of the page under the word
4   "why," you list several reasons why doing the deal with
5   St. Luke's was a good idea; correct?
6   **A.** Correct.
7   **Q.** And if we could focus just on No. 6, it lists
8   "combined contracting"; correct?
9   **A.** Yeah.
10  **Q.** And so it's fair to say that this combined
11  contracting with a large hospital system was one of the
12  factors that led Saltzer to pursue an acquisition by
13  St. Luke's; correct?
14  **A.** Do you have a date on this?
15  **Q.** I have a question pending, Doctor.
16  **A.** I'm sorry, could you repeat the question?
17  THE COURT: If the witness wants to see the date
18  on the --
19  MR. WILSON: There is no date on the document,
20  Your Honor. And I believe you have answered the question
21  that was pending.
22  BY MR. WILSON:
23  **Q.** My question now is: So it's true that one of the
24  factors that led Saltzer to pursue a deal with a large
25  hospital system was the combined contracting clout it would

2436

1   get from combining with that hospital system; correct?
2   **A.** At this point in time, it was one of the issues
3   **that was brought forward as a reason to pursue.**
4   **Q.** By Saltzer?
5   **A.** By Saltzer.
6   **Q.** But to improve its posture in negotiations with
7   health insurers, Saltzer didn't want to align with just any
8   hospital system; correct?
9   **A.** I don't -- I don't think that -- I don't know how
10  **to answer that -- that that was a reason to -- did you ask**
11  **is that the reason we selected St. Luke's? Is that what**
12  **you're asking?**
13  **Q.** Well, Saltzer had a preference for one hospital
14  system over another; correct?
15  **A.** Correct.
16  **Q.** And isn't it true, Dr. Kaiser, that Saltzer
17  pursued a deal with St. Luke's because Saltzer believed that
18  St. Luke's was the dominant provider and would give Saltzer
19  an opportunity to control services in Canyon County?
20  **A.** The reason we -- I think I stated earlier the**
21  **reasons that we pursued working with St. Luke's, and they**
22  **are multifactorial and -- and again the term**
23  **"dominant" -- they were an important part of Canyon County**
24  **and patients, so, yes, we thought they were the right**
25  **partner to -- to work with.**

2437

1   **Q.** Do you have some discomfort with the term
2   "dominant"?
3   **A.** It seems to be thrown around the court and have**
4   **multiple meanings.**
5   **Q.** Could you please turn to Exhibit 1367 in your
6   binder, Dr. Kaiser.
7   **A.** Okay.
8   **Q.** This is an email from Dr. Randell Page to you and
9   Bill Savage; correct?
10  **A.** Correct.
11  **Q.** Dated January 3rd, 2012?
12  **A.** Yes.
13  **Q.** Dr. Page was and is the head of the contracting
14  committee at Saltzer?
15  **A.** That's correct.
16  **Q.** And Bill Savage was and is the CEO of Saltzer;
17  correct?
18  **A.** That's correct.
19  **Q.** This appears to be a draft of an email that
20  Dr. Page composed trying to convince his fellow physicians
21  to go with a deal with St. Luke's rather than Saint Al's;
22  correct?
23  **A.** Yes.
24  **Q.** And Dr. Page sent this to you and asked for your
25  thoughts, additions, and corrections before he distributed

2438

1    it; correct?
2        **A.  Correct.**
3        **Q.**  And if we could go down to the bottom, towards the
4    bottom of the page.  Dr. Page writes, "We have to be
5    concerned with aligning, if appropriate, with the strongest
6    partner.  No one would disagree that Saint Al's is not the
7    dominant provider in the Valley."
8        Did I read that correctly?
9        **A.  You did.**
10       **Q.**  Dr. Kaiser, you didn't correct that statement, did
11   you?
12       **A.  I had a conversation with him about multiple**
13   **aspects of this.**
14       **Q.**  Did you correct that statement?
15       **A.  I don't know.  I don't know what the final form of**
16   **it was.**
17       **Q.**  Well, we'll get to that.  Let's go on to the next
18   statement.  Right after that, Dr. Page writes, "We are
19   already linked in many ways to St. Luke's because we all
20   know that they are and will likely remain the dominant
21   provider."
22       Did I read that correctly?
23       **A.  You did.**
24       **Q.**  And did you correct that statement?
25       **A.  I don't recall.**

2439

1        **Q.**  If you could turn the page, Dr. Kaiser.  And here
2    Dr. Page writes, quote, They are offering a wonderful
3    opportunity to control and codevelop services in
4    Canyon County.
5        Did I read that correctly?  It's highlighted on your
6    screen, if that makes it easier, Doctor.
7        **A.  Yeah.  I was just trying to look at the context,**
8    **if that's okay.**
9        **Q.**  Sure.
10       **A.  Yes.**
11       **Q.**  And the "they" that Dr. Page refers to there is
12   St. Luke's; correct?
13       **A.  Yes.**
14       **Q.**  In fact, I believe in your direct examination
15   today, you mentioned that you wanted to influence services
16   in Canyon County; correct?
17       **A.  Yes.**
18       **Q.**  And, incidentally, on the page you're looking at
19   there, the second page of this exhibit, it states right
20   after the sentence we just highlighted:  "There is logic to
21   that.  Compensation for primary care and nonprocedural
22   specialties is based on the hospital system maintaining
23   access to patients.  Via these providers, they control the
24   input to outpatient services, diagnostics and referral to
25   proceduralists who then use the hospital."

2440

1    Do you see that?
2        **A.  I do.**
3        **Q.**  Did I read that accurately?
4        **A.  You did.**
5        **Q.**  Did you correct that statement?
6        **A.  I don't recall.**
7        **Q.**  Let's see if we can refresh your recollection.  If
8    you would turn to Exhibit 1366, please, sir.
9        Are you there?
10       **A.  Yes.**
11       **Q.**  This is, in fact, the final version of the letter
12   that Dr. Page ended up sending to the Saltzer doctors;
13   correct?
14       **A.  It appears to be.**
15       **Q.**  And isn't it true, sir, that none of the language
16   that I just read to you from his email was altered in any
17   way in the final version of this letter?
18       MR. KEITH:  Are you asking him to go through the
19   entire email?
20       MR. WILSON:  I asked him a question; he can answer
21   it.
22       THE WITNESS:  Let me read it.
23   BY MR. WILSON:
24       **Q.**  Sure.
25       **A.  Could you repeat your question?**

2441

1        **Q.**  Sure.
2        Isn't it true that none of the language I just read to
3    you from his email to you was altered in any way in the
4    final version of this letter?
5        **A.  That doesn't answer the question of whether I**
6    **asked him or recommended any changes, but the answer is yes.**
7        THE COURT:  Just a moment.  Well, rephrase the
8    question.  Listen carefully to counsel's question.  If you
9    can answer it directly, please do so.
10       Go ahead.  Mr. Wilson, would you rephrase.
11       MR. WILSON:  Sure.
12       THE COURT:  Or restate.
13       MR. WILSON:  I will restate to make it more
14   straightforward.
15   BY MR. WILSON:
16       **Q.**  If you look at this letter, Dr. Kaiser -- if you
17   look at the second bullet from the bottom, Dr. Kaiser, it
18   says, "We have to be concerned with aligning, if
19   appropriate, with the strongest partner.  No one would
20   disagree that Saint Al's is not the dominant provider in the
21   Valley."
22       Do you see that?
23       **A.  Yes.**
24       **Q.**  That's the exact same language from the email that
25   Dr. Page sent to you asking for your thoughts or

2442

1  corrections; correct?
2  **A.  I can go compare it to the other one.**
3  **Q.**  Is that true?
4  **A.  I need to look back at the other one to give you a**
5  **yes or no.**
6  **Q.**  Well, it's right there in your binder.
7  **A.  Yeah.  What was the number -- I don't know if you**
8  **could tell me your reference number.**
9  **Q.**  The number is 1367.  It's directly behind the
10  document you're looking at now.
11  **A.  It's the same.**
12  **Q.**  Okay.  And in the last bullet point at the bottom
13  of Exhibit 1366, it says, "We are already linked in many
14  ways to St. Luke's because we all know they are and will
15  likely remain the dominant provider."
16  And that's the exact same language that Dr. Page used
17  in his email to you asking for your input, comment, and
18  corrections; correct?
19  **A.  Correct.**
20  **Q.**  And if you turn to the second page of the letter
21  marked Exhibit 1366, in the middle of the page it states,
22  "They are offering a wonderful opportunity to control and
23  codevelop services in Canyon County."  Correct?
24  **A.  Yes.**
25  **Q.**  And that's the exact same language from his email

2443

1  that he sent to you asking for your input and corrections;
2  correct?
3  **A.  Correct.**
4  **Q.**  And, in fact, if you turn to the last page of
5  Exhibit 1366, Dr. Page's letter, you signed this letter;
6  correct?
7  **A.  That's correct.**
8  **Q.**  That's your signature there (indicating)?
9  **A.  Yes.  I said that's correct.**
10  **Q.**  And by signing the letter, you were indicating
11  that you agreed with Dr. Page; correct?
12  **A.  Correct.**
13  **Q.**  And, in fact, on the bottom of the second page,
14  Dr. Page ends his letter by saying, "Please sign if you
15  agree with me."
16  Isn't that right?
17  **A.  That's correct.**
18  **Q.**  And many other Saltzer doctors also signed the
19  letter, didn't they?
20  **A.  They did.**
21  **Q.**  And it would appear that Dr. Page did not change
22  the wording of the letter in any way after sending you that
23  email; correct?
24  **A.  That appears to be correct.**
25  MR. WILSON:  I have nothing further, Your Honor.

2444

1  MR. ETTINGER:  Your Honor, I have a few questions.
2  THE COURT:  Yes, Mr. Ettinger.
3  CROSS-EXAMINATION
4  BY MR. ETTINGER:
5  **Q.**  Dr. Kaiser, isn't it true that under Saltzer's
6  agreement with St. Luke's, if the court were to unwind this
7  transaction and Saltzer were to remain independent, Saltzer
8  and its physicians get to keep almost $9 million in
9  payments?
10  **A.  They get to keep the goodwill money, which I**
11  **believe is the $9 million category.**
12  **Q.**  Okay.  Let's talk a little bit about risk, which
13  you talked about on direct.  Saltzer is part of the
14  BrightPath Network; correct?
15  **A.  Correct.**
16  **Q.**  And it was before this acquisition; correct?
17  **A.  To the best of my knowledge.**
18  **Q.**  And the plan for the BrightPath Network with
19  SelectHealth is to ultimately have a risk arrangement; isn't
20  that right?
21  **A.  As far as I understand.**
22  **Q.**  And so if Saltzer were unwound and continued to
23  participate in the BrightPath Network, it could participate
24  in full risk as part of the larger BrightPath Network;
25  correct?

2445

1  **A.  If it decided to do that.**
2  **Q.**  Yeah.  And Saltzer today is part of the Saint
3  Alphonsus Health Alliance; correct?
4  **A.  We are.**
5  **Q.**  And the Saint Alphonsus Health Alliance plans to
6  enter into risk-based contracts; correct?
7  **A.  That I don't know.**
8  **Q.**  If Saint Alphonsus Health Alliance did enter into
9  risk-based contracts, Saltzer, even if it was separate from
10  St. Luke's, could be part of that; correct?
11  **A.  Could be, correct.**
12  **Q.**  So whether or not you think Saltzer can enter into
13  risk-based contracts on its own, there were things going on
14  in this marketplace that would give it the option to do so
15  as part of a larger network even if not acquired; correct?
16  **A.  That's correct.**
17  **Q.**  Now, you -- Mr. Keith asked you some questions
18  which referred to but did not identify Exhibit 1380.  So why
19  don't we go to 1380, which we have a notebook if it's not in
20  Mr. Wilson's.  I think it may be in Mr. Wilson's.
21  **A.  It is.**
22  THE COURT:  Thirteen - yeah.
23  BY MR. ETTINGER:
24  **Q.**  So this is the email --
25  MR. ETTINGER:  Is this AEO?

2446

1    MR. SCHAFER: Yes.
2    MR. ETTINGER: Okay.
3  BY MR. ETTINGER:
4    **Q.** This is the email from Ms. Powell asking --
5    MR. ETTINGER: And by the way, Your Honor, on
6  direct in open court, all the substance was revealed, but
7  I'll still observe the AEO distinction if St. Luke's wants
8  me to.
9    THE COURT: Do you want this, Counsel?
10   MR. KEITH: I purposely omitted the percentages.
11 I said X, Y, Z.
12   THE COURT: Well, I guess we will -- all right.
13 Let's go ahead and proceed.
14 BY MR. ETTINGER:
15   **Q.** So this is the email where Ms. Powell, your CFO,
16 said, "Should my target for compensation be X, Y, or Z
17 percent more, how much is enough to get the physicians to
18 say this deal might be worth it in substance"; correct?
19   **A.  That's correct.**
20   **Q.** Yeah. And I'm not going to go over your testimony
21 with Mr. Keith again, but why don't we go right away
22 to -- the date of that is June 15, 2011?
23   **A.  That's correct.**
24   **Q.** Now, isn't it true that the response Ms. Powell
25 got was that the middle number on this email is the number

2447

1  that St. Luke's ought to shoot for -- that Saltzer ought to
2  shoot for?
3    **A.  I don't know the answer to that.**
4    **Q.** Well, maybe we can help you. Why don't we go to
5  Exhibit 1384. And 1384 is another email from Ms. Powell to
6  you six days later; isn't that right?
7    **A.  That's correct.**
8    **Q.** And she's reporting on conversations with Peter
9  LaFleur, the St. Luke's consultant; isn't that right?
10   **A.  That's correct.**
11   **Q.** And in the third paragraph, she talks about --
12   MR. SCHAFER: Do you have the document --
13   MR. ETTINGER: I'm sorry?
14   MR. SCHAFER: We weren't given the binders. Do
15 you have this document?
16   MR. ETTINGER: Oh, sure. I'm sorry, you should
17 have it.
18   I think that was in -- oh, Eric didn't give it to you
19 because he was doing it individually. Sorry. You referred
20 to it, you must know about it, but we're happy to give it to
21 you.
22 BY MR. ETTINGER:
23   **Q.** So in paragraph 3, Ms. Powell reports that
24 Mr. LaFleur said that St. Luke's is building the Y percent
25 compensation model; correct?

2448

1    **A.  That's correct.**
2    **Q.** And that was the middle number of the three that
3  she asked you about in her email six days earlier; isn't
4  that right?
5    **A.  That's correct.**
6    **Q.** So that -- doesn't that indicate to you -- doesn't
7  that refresh your recollection that Saltzer said that's the
8  number we want and St. Luke's was going to work with it?
9    **A.  No.**
10   **Q.** You don't remember?
11   **A.  I don't recall that.**
12   **Q.** Okay. Now, if we go to paragraph 5 of 13, Exhibit
13 1384, Ms. Powell reports that "Peter LaFleur is working on a
14 compensation model that would provide additional
15 compensation for exclusivity; i.e., working out of
16 St. Luke's facilities only"; correct?
17   **A.  That's what it says.**
18   **Q.** Yep. Now, why don't we go to Exhibit 1143, which
19 Mr. Wilson showed you, the Coker letter. And I'm going to
20 ask you about some different language on it on page 5 of the
21 letter.
22   MR. ETTINGER: Why don't we pull up the second
23 checkmarked paragraph under No. 8, "key need."
24   Your Honor, I'm going to refer to one sentence which
25 is -- you know, the subject was discussed in substance in

2449

1  open court on direct. Let me just ask St. Luke's; I want to
2  read the last sentence of that paragraph.
3    THE COURT: Any objection in terms of privilege
4  or --
5    MR. SCHAFER: No. That's fine.
6    MR. KEITH: No, Your Honor.
7    THE COURT: All right. Go ahead.
8  BY MR. ETTINGER:
9    **Q.** And -- and Mr. Reiboldt, in this letter after the
10 investigation that you described to Mr. Wilson, says, quote,
11 Saltzer cannot commit to leave Mercy until they have the
12 assurance of a new hospital-related facility in Nampa, close
13 quote.
14   Did I read that correctly?
15   **A.  You did.**
16   **Q.** By "Mercy," that refers to Mercy Medical Center?
17   **A.  I would assume so.**
18   **Q.** And today that's Saint Alphonsus Nampa?
19   **A.  That is correct.**
20   **Q.** And this is Mr. Coker -- Mr. Reiboldt reporting
21 after he met with the executive committee, met with other
22 doctors, reviewed data and documents from Saltzer; correct?
23   **A.  Correct.**
24   **Q.** Now, you, in response to Mr. Keith, said -- and I
25 want to be sure I've got it right -- he asked you what you

2450

1  meant when you said that Saltzer would support the new
2  St. Luke's Nampa hospital.
3       And, yes or no, did I hear correctly that you said when
4  the word "support" is used, it means only cover emergency
5  room call requirements?
6       **A.  In the context of the question, yes, it means that**
7  **we were talking about support for the hospital.**
8       **Q.**  Well, let's -- let's put it in the context of my
9  question.  I'll ask a different question just to be real
10 clear.
11      You have said, Saltzer has said in documents, other
12 people from Saltzer have said in testimony that Saltzer
13 agreed to support the new St. Luke's Nampa hospital;
14 correct?
15      Yes?
16      **A.  Correct.**
17      **Q.**  And by that, do you mean only that Saltzer agreed
18 to provide emergency room call requirements for that
19 hospital?
20      **A.  The major portion of our -- the answer is yes.**
21      **Q.**  Is there a single document anywhere that says
22 that --
23      **A.  I don't know.**
24      **Q.**  -- that you're aware of?
25      **A.  I don't know.**

2451

1       **Q.**  Now, you testified in response to Mr. Keith's
2  question about some survey data prepared in response to the
3  attorney general's request?
4       **A.  Yes.**
5       **Q.**  And the request was for data on the actual
6  referrals to hospitals by Saltzer; correct?
7       **A.  You know, I'm going to have to say I don't recall**
8  **the exact wording of the request from the FTC/AG.**
9       **Q.**  And, in fact, what you provided was:  Number one,
10 patient responses to questions about which hospitals they
11 referred; and, number two, data on the actual referral
12 patterns by Saltzer to those hospitals; correct?
13      **A.  No.**
14      **Q.**  Well, you -- you had no role with regard to that
15 survey, did you, Doctor?
16      **A.  Yes.**
17      **Q.**  What was your personal role with regard to that
18 survey?
19      **A.  So when we had made a decision, when we were**
20 **requested to provide that, we had to discuss how we were**
21 **going to do it, how the questions were going to be asked,**
22 **where the data was going to be collected.  And so that was**
23 **the discussion in the executive committee.**
24      **Q.**  Was Mr. Savage more directly involved with that
25 survey than you?

2452

1       **A.  Yes, he was.**
2       **Q.**  So we can rely on his testimony on that subject?
3       **A.  I don't know -- yes, you can rely on his**
4  **testimony.**
5       **Q.**  Thank you.  You -- you mentioned in response to
6  direct that the subject of raising prices to commercial
7  payors was never addressed by St. Luke's at any time during
8  the discussions; is that correct?
9       **A.  That I recall.**
10      **Q.**  That you recall.
11      Did you ever see any -- any of Mr. LaFleur's analyses
12 about raising reimbursement rates to commercial payors?
13      **A.  Not that I recall.**
14      **Q.**  He didn't share those with you?
15      **A.  Not that I recall seeing.**
16      **Q.**  Did Mr. LaFleur work more directly with Nancy
17 Powell, with Bill Savage than with you?
18      **A.  Yes, he did.**
19      MR. ETTINGER:  Nothing further.  Thank you.
20      THE COURT:  Redirect, Mr. Keith.
21      MR. KEITH:  Your Honor, I think it may be time for
22 our break.  I don't know if you --
23      THE COURT:  We're just a little bit early, but
24 is --
25      MR. KEITH:  I may have more than ten minutes.

2453

1       THE COURT:  All right.  We'll take a short --
2  well, we'll take a 15-minute break.  That's probably going
3  to be more like a 20-minute break so that the second -- our
4  last session of the day doesn't get to be too long.
5       Was there something else, Mr. Wilson?
6       MR. WILSON:  Just, of course, there be no
7  conferring with the witness during that time.
8       THE COURT:  No.
9       All right.  We'll be in recess, then, or until further
10 call.
11      Oh, just a moment.  Counsel, just a moment.  I
12 apologize.  Counsel, a scheduling matter just came to my
13 attention that next Tuesday I'm supposed to be at a luncheon
14 meeting, and I -- we just didn't factor it into it.  It's a
15 meeting we have twice a year with the state Supreme Court,
16 and I miss it more often than I make it because of my trial
17 calendar.  I was toying with the idea of going 8:30 to 3:30
18 with an hour break in the middle.  I would like you just to
19 see, would that be a problem?  If not, that may be what we
20 do.  I have a 3:30 calendar, but we'll -- I'll just go
21 directly from the trial into that calendar and just move my
22 hour break that I normally would take up through the lunch
23 hour.
24      MR. SINCLAIR:  We can discuss it by email with
25 Mr. Metcalf.

2454

1  THE COURT: Yes, if you would, and then we can
2  decide. The problem is Monday is a holiday, so we have to
3  decide today, and I want you to be aware of that.
4  MR. SINCLAIR: That's fine. That's fine from our
5  perspective.
6  THE COURT: All right. We'll be in recess.
7  (Recess.)
8  ****** COURTROOM REMAINS OPEN TO THE PUBLIC ******
9  THE COURT: Dr. Kaiser, I'll remind you that you
10  are still under oath.
11  Mr. Keith, you may conduct your redirect.
12  MR. KEITH: Thank you, Your Honor.
13  REDIRECT EXAMINATION
14  BY MR. KEITH:
15  Q. Dr. Kaiser, just a few follow-up questions from
16  cross-examination.
17  With respect to -- you talked about a survey that
18  Saltzer is conducting of patient preferences for hospitals
19  and specialty care. And I think you indicated that Bill
20  Savage is the most knowledgeable person about that survey as
21  a whole; is that right?
22  A. That's correct.
23  Q. And -- but you do participate in the survey in the
24  sense that if one of your patients needs a referral, you
25  would need to ask that person where they wanted to go?

2455

1  A. That's correct.
2  Q. And is it your understanding that that's the same
3  survey or the same point in the same population that you're
4  asking where they want to go as in the larger set, the folks
5  who come initially into the clinic?
6  A. No. There are two different populations. So the
7  first population is simply everyone that presents as a new
8  patient to Saltzer. That question is asked at the time that
9  they take their demographic information.
10  And then the second is when a patient is going to
11  need a referral for a procedure or something else, and then
12  the question is asked where would they like to go.
13  So there can be two very different populations.
14  Q. But I guess to put a fine point on it, one could
15  not conclude from comparing those two sets that Saltzer had
16  taken folks who expressed an interest in going to a
17  particular hospital and then sent them somewhere else?
18  A. No. The two populations are very different,
19  different set of circumstances where they're asked the
20  question.
21  Q. You were asked a question about the consequences
22  to Saltzer and the Saltzer physicians if the transaction at
23  issue here was unwound and, in particular, about goodwill
24  payments and whether those would need to be repaid under the
25  contract.

2456

1  Would you agree that Bill Savage is the person most
2  knowledgeable about what would a -- what would need to be
3  repaid or what could be kept following an unwind?
4  A. Absolutely.
5  Q. I would like to go back to a topic that I wasn't
6  sure I fully understood. Counsel for the state asked you
7  about a proposal that was initially floated during
8  discussions with St. Luke's and described that proposal as
9  a, quote/unquote, looser affiliation. But I'm not sure I
10  understand exactly what that proposal was. So can you
11  describe it to the court. What was the initial proposal?
12  A. Yeah. So the initial proposal that Coker came up
13  with was called a "global PSA." And I'm not sure it's
14  actually looser from an alignment standpoint compared to the
15  final one.
16  The parameters of the global PSA were paid at
17  a -- again, we never got to the final levels of detail of
18  what that would really be, but it was a reimbursement system
19  that was at kind of a top level with all the overhead still
20  being there and then us apportioning it down and getting
21  several other fees.
22  The problem with the plan is we started to pursue
23  that plan and tried to look for where that model had been
24  used and could not find any.
25  Q. And can you compare the initial proposal in the

2457

1  Saltzer-St. Luke's discussions that came from Coker with
2  what we have described elsewhere, you and I in your direct
3  testimony, as looser affiliation through, for example,
4  Select Medical Network?
5  A. Yeah. They are very different. So the global PSA
6  still was an alignment, an integration strategy, just where
7  different responsibilities were. When I typically talk
8  about looser affiliations, I'm talking about joint venture
9  activities, just participating in networks, or those type of
10  alignments.
11  Q. But in the -- in answering counsel for the state's
12  questions about whether Saltzer considered a looser
13  affiliation, whether there was the chance that that might be
14  successful in achieving the goals that Saltzer had, you were
15  speaking of the looser affiliation proposed by Coker; right?
16  A. That's correct. We were talking about the global
17  PSA, not the other types of affiliations of joint ventures
18  or anything else.
19  MR. KEITH: I would like -- if possible, if I
20  could ask that Exhibit 1369 be presented. And I believe the
21  screen is off. I'm not sure now where we ended up with,
22  what portions were shown, if they were AEO or not.
23  THE COURT: What portion --
24  MR. KEITH: The portions -- I'm just going to go
25  the same -- mainly the same portions.

2458

1    THE COURT: That's a St. Luke's decision, so you
2  all need to -- or Saltzer decision, I guess, actually.
3    MR. KEITH: Did we not show that?
4    MR. SCHAFER: I think we decided they're not AEO.
5    MR. KEITH: Okay. I just didn't want to do
6  anything differently. So these can be published.
7  BY MR. KEITH:
8    Q. Dr. Kaiser, a few questions on this document. I
9  think you said you recognized these as potentially notes
10 written by Nancy Powell. Is that fair?
11   A. That appears to be her handwriting.
12   Q. Okay. Other than this litigation, did you ever
13 review the set of notes that Nancy put together?
14   A. Never.
15   Q. Do you make it a habit to review her notes?
16   A. No.
17   Q. And so if she had something maybe wrong or she
18 misunderstood a point that someone was making and it got
19 into her notes, you wouldn't have had an opportunity to
20 correct her; right?
21   A. I would not.
22   Q. Now, if you look at the first page of the notes
23 that's 39297, you see a date that appears at the top.
24 What's that date?
25   A. 9/24 -- 9/24/2009.

2459

1    Q. And then if you -- if we could go to the
2  third-to-last page, 39367.
3    What's the -- can you tell us the date there?
4    THE COURT: It's on the screen.
5    THE WITNESS: Oh, sorry. 9/22/2011.
6  BY MR. KEITH:
7    Q. So these notes cover -- we can take that
8  down -- these notes cover a period of roughly two years?
9    A. Yes.
10   Q. And these were two years of fairly intensive
11 negotiation with St. Luke's?
12   A. That's correct.
13   Q. And plaintiffs' counsel pointed you to a couple of
14 portions of this document and the text within that document
15 suggesting what the purposes of the Saltzer transaction was.
16 So I have a couple of general questions, and then we'll go
17 look at the pages.
18   But, as a general matter, over the long course of these
19 intensive negotiations, did views and priorities change, get
20 articulated differently over time?
21   A. There was a significant change, both in
22 understanding of what -- where we were, what we needed, and
23 what could be done in the beginning versus where we ended at
24 the end.
25   So there was a lot of -- a significant amount of

2460

1  change that occurred through this long time frame.
2    Q. If you go to page 39312 of Exhibit 1369 -- and you
3  can put this up on the screen. I have got 39312 if I'm not
4  mistaken. And if we could highlight No. 5, the whole set
5  there, that would be great.
6    Do you remember seeing this when you were asked
7  questions by counsel for the state?
8    A. I do.
9    Q. And I notice that -- and I think this was pointed
10 out to you -- that under subpart C, there appears to read
11 "facility fee for Medicare."
12   A. That's correct.
13   Q. And what's your understanding of the meaning of
14 that phrase?
15   A. That there is a -- within the payment allowed for
16 Medicare, when you meet certain criteria under CMS rules,
17 that there is a facility that can also be paid for.
18   Q. And is that something that Saltzer or St. Luke's
19 would have to negotiate with CMS to achieve?
20   A. No. It's just part of the protocol that's
21 available.
22   Q. And are you familiar with the term "provider-based
23 billing"?
24   A. Yes, to some extent.
25   Q. And when you use that term, do you mean the change

2461

1  in reimbursement associated with the facility fee under
2  Medicare?
3    A. That's what it usually includes.
4    Q. So in your answers today, if you used those terms
5  or someone else used those terms, that's how you're using
6  the word?
7    A. Yes.
8    Q. Let's turn to 39338 in the same document. And if
9  we can just highlight or enlarge 3a -- I'm sorry. Not that
10 one. 3a. Maybe it was right. Okay.
11   So counsel for the state also showed you this page, and
12 I wanted to follow up because here you'll see "financial
13 benefit - facility fee share," doesn't indicate whether this
14 relates to Medicare or some other payor.
15   But to the best of your understanding, in the
16 discussions that you were involved in during negotiations
17 between St. Luke's and Saltzer, were the discussions, if
18 any, of the facility fee share related to Medicare, to
19 commercial payors, or both?
20   A. This topic came up periodically, and it always was
21 associated with Medicare and nothing else.
22   Q. I believe you testified during your direct
23 examination that, you know, one of the benefits that you've
24 seen through the transaction already is that you're able to
25 focus your attention on providing the highest quality care

2462

1 to any patient who wants to see you, and you no longer have
2 to focus on the sort of business side of the practice.  Do
3 you recall that?
4       **A.**  Yes.
5       **Q.**  And can you just expand on that somewhat?  What is
6 it that you feel is the advantage?
7             MR. ETTINGER:  Your Honor, asking the witness to
8 expand on his testimony on direct is a little beyond the
9 scope of redirect.
10            THE COURT:  I was kind of coming to that same
11 conclusion, Mr. Keith.  It's almost inherently -- you need
12 to focus specifically on something covered, I think, by
13 Mr. Wilson or Mr. Ettinger.
14            MR. KEITH:  Fair enough.
15       If we could bring up 1375, please.
16 BY MR. KEITH:
17       **Q.**  Counsel for the state asked you about this email
18 and pointed out that you had identified combined contracting
19 as one of the advantages of the transaction, and I wanted to
20 ask you what you meant by that.
21       What's the advantage to you or to Saltzer of the
22 combined contracting?
23       **A.  So this was taking down notes that was occurring**
24 **in a meeting.  The combined contracting, I don't know**
25 **exactly what was -- what was meant by that phrase.**

2463

1       **In my mind, it would be that contracting -- as the**
2 **PSA -- as the PSA rolled out as we got through all the**
3 **details, what happened with contracting is initially it was**
4 **thought to be something that we would participate in or that**
5 **we would do.  And then it became clear under the PSA that it**
6 **would be St. Luke's who would be providing the contracts for**
7 **us, for our services.**
8       **So I'm not real sure what we intended to mean by**
9 **this particular statement of combined contracting,**
10 **unfortunately, at this point in time.**
11      **Q.**  And do you recall, just generally speaking, the
12 idea of combining the contracting of Saltzer and St. Luke's
13 being a significant factor in the discussions because it
14 would allow the two to raise prices to payors?
15      **A.  There was no discussion about anything to do with**
16 **us being able to influence the contracting, raising prices,**
17 **or any other stipulation.  It was simply mostly a question**
18 **of how would contracting be done in the future, where were**
19 **we going to go with it, and not knowing exactly how it would**
20 **be done because it's going to be different than what we had**
21 **been doing all along.**
22      **Q.**  So I would like to turn your attention to the
23 email at Exhibit 1367, and this is -- this is the document
24 that you were shown in which Randy Page sends out a draft --
25 Dr. Page sends out a draft of a letter that he is planning

2464

1 to circulate and have signed.  And I wanted to ask you a
2 couple of questions about this document.
3       First of all, it sounded like you had -- although,
4 apparently, Dr. Page didn't change the language in the final
5 agreement or at least the language we have looked at.  Did
6 you have discussions -- it sounds like you had had
7 discussions with Dr. Page about what he meant by terms like
8 "dominant" in describing St. Luke's and "control" in terms
9 of controlling the Canyon County market.
10      So, first of all, is that correct?  Had you had those
11 discussions?
12      **A.**  Yes.
13      **Q.**  And what -- sorry.
14            THE COURT:  Is there an objection?
15            MR. WILSON:  To the next question.  We would
16 object that this calls for hearsay, Your Honor.
17            THE COURT:  Well, let's perhaps keep that in mind
18 as you formulate your next question, Mr. Keith.
19            MR. KEITH:  Sure.
20 BY MR. KEITH:
21      **Q.**  And in -- counsel for the state, I believe, or
22 counsel for the private plaintiffs asked you in particular
23 whether you would sign this letter; correct?
24      **A.  Correct.**
25      **Q.**  And in signing the letter, did you have in mind

2465

1 the understanding you gained from discussions with Dr. Page?
2      **A.  Yes.  So what -- what the intent of this letter**
3 **was was simply to express the view that Saint Al's was not**
4 **our preferred partner, mostly based on the relationship,**
5 **which it identifies here as the big problems that we had**
6 **with pursuing Saint Al's.**
7       **And this came at a time where there was some**
8 **partners, most who had interest in Treasure Valley Hospital**
9 **and in working in alignment with Saint Al's to bring**
10 **Saint Al's into the negotiation.  And this was a discussion**
11 **in the group about is that the right thing to do.**
12      **Q.**  And what was your understanding of the language --
13 maybe we can switch then here to the final letter,
14 Exhibit 1366.
15            MR. SCHAFER:  There are some AEO from Saltzer, so
16 we may want to blank the screen.
17            MR. KEITH:  Let's blank the screen until we can
18 talk to --
19      Mr. Julian, do we -- do we need to blank the screen?
20            MR. JULIAN:  No.  That's fine.
21            MR. KEITH:  Okay.  We can put that back up.  If we
22 can highlight the second bullet from the bottom of the first
23 page.
24 BY MR. KEITH:
25      **Q.**  You will see there is the language there that you

2466

1    were asked about in terms of what -- whether Saint Al's was
2    the dominant provider or whether that was St. Luke's.
3        What did you have in your mind when you signed this
4    letter as to the meaning of dominance as it's used here?
5        **A. What's our patient preference? I mean, who -- who**
6    **do we believe is the preferred provider based on patient**
7    **preference and working relationship with physicians.**
8        **Q.** And similarly, on the second page of that
9    document, if you'll turn there, the -- I guess the second
10   full paragraph, four lines down: "They are offering a
11   wonderful opportunity to control and codevelop services in
12   Canyon County."
13       In your mind, was -- did you understand this to mean
14   that St. Luke's was offering a wonderful opportunity to keep
15   all its competitors out of Canyon County?
16       **A. No. We had this discussion multiple times. We**
17   **understood that any competitor can come into any market and**
18   **provide any services they wish. This was simply talking**
19   **about what services can we help to enhance and to provide**
20   **with St. Luke's to the patients in Canyon County.**
21       **Q.** If we could pull up the letter from Coker -- the
22   number of which, unfortunately, is failing me -- that was
23   used on cross, the long letter.
24       **A. 1143.**
25       **Q.** 1143? You were asked a number of questions about

2467

1    this document, Dr. Kaiser, in terms of why certain things --
2    certain factors that you've articulated as important in
3    driving the St. Luke's-Saltzer transaction are not
4    represented here in this document.
5        **A. Right.**
6        **Q.** And I wanted to ask you, you know, did you -- or
7    had you asked Coker to put down in writing all of the, you
8    know, important or possible factors that could support a
9    transaction with St. Luke's?
10       **A. No. We didn't -- I did not ask that question, and**
11   **this was a work product from Coker.**
12       **Q.** And did you review this document at the time to
13   make sure that it included all of the very important
14   benefits that you thought could be achieved through the
15   transaction with St. Luke's?
16       **A. No.**
17       **Q.** And I believe you indicated in your
18   cross-examination testimony that you were not always pleased
19   with the work of the Coker Group. Did I get that correct?
20       **A. Yes. I think there were -- you know, there were**
21   **times in the negotiations that we were using Coker that I**
22   **think it was difficult for Coker to come in on just short**
23   **episodes. We were slotted with a bunch of other customers**
24   **that they had, and to understand what was our market, what**
25   **was our physicians' desires.**

2468

1        **So he did good things, and I think other times he**
2    **kind of missed the mark on certain aspects of what we should**
3    **be doing in looking at how this alignment might work out.**
4        **Q.** And if we could get that document back up. I just
5    wanted to clarify something. If we page down, there will be
6    some handwritten notes. I just wanted to ask whose they
7    are. So if we can stop up there and pull up the
8    handwriting.
9        Do you recognize that handwriting?
10       **A. Actually, I don't. I'm sorry.**
11       **Q.** Okay. Well, let's page down another page, another
12   one. Okay. Stop there and highlight the note.
13       Could you read that to the best of your ability.
14       **A. It says, "St. Luke's would pay to replace**
15   **eClinicalWorks."**
16       **Q.** And so -- and that reflects that, at the time that
17   discussions kicked off with St. Luke's, that there was
18   already thought to replacing ECW with something more
19   unified?
20       **A. Yes. When we originally made the decision to go**
21   **with eClinicalWorks, part of the decision was that**
22   **St. Luke's was using that system in some of their clinics.**
23       **As the change in strategy that the Epic would be**
24   **the product that would be used to best integrate across the**
25   **system, we realized that, well, we would need to do**

2469

1    something in that arena; otherwise, we're going to be not in
2    the best position to be able to participate in that data.
3        **So, yes, it was identified.**
4        **Q.** Let's go back to the very first page of this
5    document and highlight the date.
6        When was this letter sent, or when does it appear to
7    have been sent?
8        **A. December 17, 2010.**
9        **Q.** And do you know if, by this point, St. Luke's had
10   even decided on which system it wanted to use for unified
11   medical record?
12       **A. I do not recall. I was trying to recall when the**
13   **announcement was made, but I don't know.**
14       MR. KEITH: No further questions, Your Honor.
15       THE COURT: Any recross?
16       MR. ETTINGER: Just a couple, Your Honor.
17       THE COURT: Mr. Wilson, you have none?
18       MR. WILSON: No, thank you, Your Honor.
19       THE COURT: Mr. Ettinger?
20       MR. ETTINGER: We exchanged glances so we would
21   know. Your Honor, I was trying to jump the gun.
22                    RECROSS EXAMINATION
23   BY MR. ETTINGER:
24       **Q.** Dr. Kaiser, is it your view that the words, quote,
25   "control services," close quote, are synonymous with the

2470

1  words, quote, "enhanced services," close quote?

2  **A.  Provide and enhance.**

3  **Q.**  So "control" means the same thing as "provide and

4  enhance"; is that right?

5  **A.  I think in the context of what we were discussing,**

6  **yes.**

7  **Q.**  Now, Mr. Keith asked you -- and you said yes --

8  views changed over time as this transaction went forward.

9  And, in fact, the documents that plaintiffs' counsel have

10  showed you, myself included, have tended to be in the 2011

11  period; isn't that right?

12  **A.  They have extended from 2009 through 2011.**

13  **Q.**  And in early 2012, you became aware that the FTC

14  and attorney general were investigating your transaction,

15  didn't you?

16  **A.  We were informed by the FTC that they were looking**

17  **into the transaction.**

18  **Q.**  And that was in early 2012, was it not?

19  **A.  Yeah.  I believe it was January 2012.**

20  MR. ETTINGER:  Nothing further.  Thank you.

21  THE COURT:  Anything else?

22  MR. KEITH:  Nothing further.

23  THE COURT:  All right.  Dr. Kaiser, you may step

24  down.  Thank you.

25  Call your next witness.

2471

1  MR. ETTINGER:  Your Honor, I think Mr. Powers is

2  going to be calling Dr. Williams, and we will grab him.

3  Sorry.

4  THE COURT:  Dr. Williams, is it?

5  THE WITNESS:  Yes.

6  THE COURT:  Would you step before the clerk, be

7  sworn as a witness, and follow Ms. Gearhart's directions

8  from there.

9  STEVEN WAYNE WILLIAMS,

10  having been first duly sworn to tell the whole truth,

11  testified as follows:

12  THE CLERK:  Please state your complete name and

13  spell your name for the record.

14  THE WITNESS:  Steven Wayne Williams.  S-T-E-V-E-N,

15  W-A-Y-N-E, W-I-L-L-I-A-M-S.

16  THE COURT:  You may inquire, Mr. Powers.

17  MR. POWERS:  Thank you, Your Honor.

18  DIRECT EXAMINATION

19  BY MR. POWERS:

20  **Q.**  Would you state your profession, please, sir.

21  **A.  I'm a physician, general surgeon.**

22  **Q.**  All right.  Give us a brief outline of your

23  medical education, if you would.

24  **A.  I attended medical school at the University of**

25  **Texas Medical Branch in Galveston, Texas.  I did residency**

2472

1  **at the same institution from the years '97 to 2002.**

2  **Q.**  When did you arrive in the Treasure Valley?

3  **A.  2002.  I finished residency in June, got here in**

4  **late June, started work with Saltzer in August.**

5  **Q.**  Okay.  Now, when you joined Saltzer Medical Group,

6  did you eventually become a partner?

7  **A.  I did.**

8  **Q.**  What year?

9  **A.  2004.  It was a two-year partnership track.**

10  **Q.**  And as an owner, I take it you had the opportunity

11  to serve on various committees?

12  **A.  Yes.**

13  **Q.**  What committee were you a part of at Saltzer?

14  **A.  I was a part of the executive committee from**

15  **around 2005 until the time of my resignation in November of**

16  **last year.**

17  **Q.**  And help us understand the responsibilities of the

18  executive committee while you were part of it.

19  **A.  The main responsibility of the executive committee**

20  **was to serve the members by consolidating any data and**

21  **making decisions.  A lot of those -- a lot of the data would**

22  **come from the smaller committees, such as the finance**

23  **committee or the contracts committee or the quality**

24  **assurance committee.  And the executive committee would**

25  **assimilate all the data and make the large decisions for the**

2473

1  **group.**

2  **Q.**  In the course of practicing at Saltzer, give us an

3  idea, if you would, Dr. Williams, about how Saltzer surgeons

4  would communicate with Saltzer PCP surgeons -- PCP

5  physicians about the care of your patients.

6  **A.  We practice in one main location in Nampa.  We**

7  **had a large building in Nampa.  There were other outposts that**

8  **we had, other satellite clinics, but the main building is**

9  **where probably 85 percent of the physicians practice.  And**

10  **so you would see people in the hallways.  We had an intranet**

11  **phone system where we knew each others' extensions that was**

12  **posted.  We knew each others' nurses.**

13  **We also had eClinicalWorks as the EMR in the last**

14  **few years I was at Saltzer, and we could enter messages in**

15  **eClinicalWorks.  So that's probably the main way that I used**

16  **to communicate because you could -- you could tie the**

17  **message to the patient's chart.  And so if it was a specific**

18  **request or question that you had to the other doctor, you**

19  **could just send it in eClinicalWorks, and then they could**

20  **open up the chart when they got the message.**

21  **Q.**  Was eClinicalWorks, at the time you were with

22  Saltzer, an adequate system for EMR in caring for patients?

23  Excuse me.

24  **A.  Sure.**

25  **Q.**  Had you researched an EMR system before choosing

2474

1  eClinicalWorks?
2     **A.   Yes.  We had actually -- eClinicalWorks was our**
3  **second EMR.  Saltzer had adopted EMR early, and we had**
4  **chosen a product called Amicore.  And we had had Amicore for**
5  **at least a couple years and weren't completely happy with**
6  **everything that Amicore was able to do for us.  And so we**
7  **had shopped along with -- in fact, there was a specific**
8  **committee -- and along with the information technology**
9  **department at Saltzer, we shopped for quite a -- quite a**
10  **while before we found eClinicalWorks.  And we were very**
11  **happy with it.  It's a nationally recognized product.**
12     **Q.   In 2010-2011, was there any concern expressed by**
13  your partners at Saltzer over the ability of eClinicalWorks
14  to help you deliver good, quality care to your patients?
15     **A.   No.  There is -- there is problems with every EHR,**
16  **but we were very happy with it compared to what we had had**
17  **before.**
18     **Q.   Okay.  Now, I want to talk about the time period**
19  from 2008 through July of 2012, and I want to ask you a few
20  questions about where your cases originated from.
21     As a surgeon, is it correct that you receive referrals
22  of patients, and then you go ahead and perform surgery on
23  those patients?  Is that the way it works?
24     **A.   Correct.**
25     **Q.   All right.  So the time period 2008 through July**

2475

1  of 2012, what percentage of all of your surgical cases that
2  you perform -- no matter what location you performed them
3  in, what percentage of all of your cases originated with
4  Saltzer PCPs?
5     **A.   Eighty percent or greater.**
6     **Q.   And of those -- of those cases that you -- where**
7  you performed surgery, the hundred percent of cases where
8  you performed surgery, where did you perform them in 2010
9  and 2011?
10     **A.   St. Luke's Meridian was my main inpatient**
11  **hospital.  And so the bulk, the majority of the surgeries**
12  **were done there because I also took call there.  So I would**
13  **operate different days of the week.  I had a standing block**
14  **on Mondays.  So I would operate at St. Luke's Meridian every**
15  **Monday and then various other times throughout the week.**
16     **At that time, I had moved the location of my**
17  **office practice to our Portico building in Meridian.  And so**
18  **it was right across the parking lot from St. Luke's**
19  **Meridian.**
20     **I also did surgery at Treasure Valley Hospital in**
21  **Boise, on Emerald in Boise.  I also operated at a small**
22  **surgery center called Millennium Surgery Center in Meridian.**
23  **And I also still did a few cases at Saint Alphonsus in**
24  **Nampa.**
25     **Q.   Was it important to you to be able to perform**

2476

1  surgery for your patients at various locations?
2     **A.   You know, it's onerous to go to different**
3  **locations.  But the more options you can offer the patient,**
4  **the more referrals you get, the more options that you can**
5  **give those patients to where they can have surgery.**
6     **Q.   Okay.  What percentage of your surgeries did you**
7  perform at St. Luke's Meridian during this time period,
8  would you estimate?
9     **A.   Sixty percent.**
10     **Q.   And what percentage were you performing at**
11  Treasure Valley Hospital?
12     **A.   Thirty percent.**
13     **Q.   And the other 10 percent, I take it, were the**
14  other two facilities you mentioned?
15     **A.   Correct.**
16     **Q.   And you had -- obviously, to practice at all those**
17  facilities, you had privileges at those facilities; is that
18  correct?
19     **A.   Yes, sir.**
20     **Q.   And let's talk about your affiliation with**
21  Treasure Valley Hospital.  Why don't you explain to us, what
22  year and for what reason did you begin to practice at
23  Treasure Valley Hospital?
24     **A.   I started doing cases at Treasure Valley Hospital**
25  **around 2005 -- 2004-2005, and I found that it was a nice**

2477

1  **place to go and do cases, and they had very rapid turnovers.**
2  **They had good quality of care, and the patients all enjoyed**
3  **going there.  The patients, when they followed up, they**
4  **would talk about the good care they received.**
5     **Q.   Was -- were you aware at some point in time that**
6  the cost of care at Treasure Valley Hospital was lower than
7  at other places where you practiced?
8     **A.   You know, initially that wasn't -- initially I**
9  **started going there because they had fast turnovers, and it**
10  **was a fast place to do outpatient surgery.  But certainly**
11  **over time, I learned to realize -- and especially from**
12  **talking to patients, I found out how much -- how much of a**
13  **lower cost facility it was.**
14     **Q.   Okay.  Let's describe turnover times for the**
15  court, if we could.  Why is that an important issue
16  for -- for surgeons?
17     **A.   It's hugely important because it determines how**
18  **much work you can get done in a day.  And so the turnover**
19  **time is the amount of time that it takes the OR staff to**
20  **clean the room, clean the anesthesia machine, get everything**
21  **ready to go for a sterile environment for the next**
22  **procedure.**
23     **And so, to be specific, the main thing I remember,**
24  **what sticks in my head when you ask me the question, is one**
25  **of the first few months that I had been going to Treasure**

2478

1  Valley, I put seven cases on.  I got done at 2:00 p.m., and
2  I did seven cases.  And that had never happened to me
3  before.  So I found out that I could routinely put five, six
4  cases on there and be done early in the afternoon and get
5  home and see my family.
6      Q.  All right.  When did you decide to invest in
7  Treasure Valley Hospital?
8      A.  2007.
9      Q.  And your decision to invest was -- well, strike
10 that.
11     In 2007, were you offered shares in the -- in the
12 organization?
13     A.  I pursued shares.
14     Q.  Okay.
15     A.  I pursued a share.
16     Q.  And were you able to purchase a share?
17     A.  Yes.
18     Q.  And after that time, were you able to purchase an
19 additional share?
20     A.  Correct.  So one in 2007 and one in 2008.
21     Q.  And has that -- has that ownership in Treasure
22 Valley Hospital been -- been a successful investment for
23 you?
24     A.  Yes.
25     Q.  Let's talk a little bit about how your work at

2479

1  Treasure Valley Hospital has progressed from when you began
2  to practice there through the point in time that -- that you
3  became an investor.
4      Did you -- did you begin to do more surgeries at
5  Treasure Valley Hospital starting in 2008?
6      A.  I don't know.  I know I have turned in the numbers
7  for everything.
8      Q.  Okay.
9      A.  Sorry.  I don't know.
10     Q.  Let's help you out here a bit.
11     MR. POWERS:  Your Honor, if we could have TVH
12 demonstrative Exhibit 3001, No. 6, placed up on the board.
13 Counsel --
14     THE COURT:  Is this 3001?  Is that correct?
15     MR. POWERS:  3001, Your Honor.  It's the TVH
16 demonstrative exhibits.  We're extending it from the Genna
17 deposition to No. 6 now.
18 BY MR. POWERS:
19     Q.  Dr. Williams, we have -- we put on the screen here
20 an accounting of the cases that you performed at Treasure
21 Valley Hospital.  If you go to the bottom column, you will
22 see the totals for the years 2008 through 2013.  Do you see
23 that?
24     A.  I do.
25     Q.  Okay.  And it would appear, from reviewing those

2480

1  numbers, that you progressed from -- from 2008 from doing 32
2  cases at Treasure Valley Hospital in Boise to doing 205 in
3  2009, 208 in 2010, 189 in 2011, and 150 in 2012; correct?
4      A.  Yes.
5      Q.  And is that consistent with your -- with your
6  recall of your level of activity at Treasure Valley
7  Hospital?
8      A.  Yes.
9      Q.  Okay.  You can trust me on this.
10     A.  Okay.  Thank you.
11     Q.  We have already -- we have already established
12 these numbers.
13     A.  Looking at 2008, Ray, that's when I left the
14 hospital in Nampa and moved my inpatient practice from --
15 from the Nampa hospital -- which at that time was Mercy
16 Medical Center before it became Saint Alphonsus -- and moved
17 to Meridian.
18     And so that -- that also probably has something to
19 do with those numbers going from 32 to 205.
20     Q.  All right.  And so when we look at -- when we look
21 at 2010 and 2011, for instance, is it correct to say that of
22 those surgeries that you performed at Treasure Valley
23 Hospital, that 80-percent referral from Saltzer PCPs is
24 pretty consistent in those numbers?
25     A.  Yes.

2481

1      Q.  All right.  So it's fair to say that the surgeries
2  you did at Treasure Valley Hospital, 80 percent of them came
3  from Saltzer PCPs prior to the fall of 2013?
4      A.  Yes.
5      Q.  All right.  Let's talk a little bit about the
6  conversations you would have with patients when -- at
7  Saltzer when a Saltzer primary care physician would refer a
8  patient who needed surgery to you.  Tell the court how you
9  would discuss with the patient options for the location of
10 their surgery.
11     A.  You know, it's a hard question to answer because I
12 think it varies every time.  I don't have a -- I don't have
13 a set way to do that.  A lot of patients come in, and
14 probably the biggest factor is going to be something that
15 you already know they can't go one place or the other.
16     For a long time -- we're talking about Treasure
17 Valley Hospital -- Treasure Valley Hospital didn't have a
18 contract with TrueBlue insurance.  And so we had a lot of
19 TrueBlue patients at Saltzer.  And when a TrueBlue patient
20 would come in, you knew that that wouldn't be an option, so
21 I couldn't do them on a Tuesday.  So we would look for
22 another day of the week I could do their surgery because I
23 was at Treasure Valley Hospital every Tuesday.
24     Otherwise, it may be a situation where a patient
25 is a -- one area or the other, has some preference.  It may

2482

1  be the type of case.  If they needed a bowel resection or
2  another high-acuity case where I knew that they were going
3  to be in the hospital for several days, they might need an
4  ICU, those cases would need to be done at the inpatient
5  hospital.
6      Q.  Okay.  So depending upon the patient's needs, it
7  sounds like one of the -- one of the first issues was
8  availability of a particular surgical location and the
9  ability of the patient to be there at that location.  Is
10 that fair?
11     A.  Right.  Availability is huge because a
12 lot -- sometimes, you know, I get -- the thing that pops in
13 my mind is you say, "Well, when do you want to do this?"
14 And the patient says, "Yesterday," sometimes.
15         And so they -- you know that that patient --
16 you're not going to be able to go out, look at your book,
17 and say come back and say, "Well, I've got a spot three
18 weeks down the road."  They want to get in.
19         Some people are hurting.  Some people have cancer.
20 Those are two -- people with cancer want to get a surgery
21 scheduled.  People that are hurting want to get a surgery
22 scheduled.
23         So availability is probably the biggest -- the
24 biggest issue.
25     Q.  Is convenience for the patient also an issue?

2483

1      A.  Well, sure.
2      Q.  Have you ever -- have you ever told a patient that
3  they could not have a particular surgery at a location they
4  desired?
5      A.  Sure.  If they -- if they desired to be done at a
6  small surgical center and they don't have the capacity to do
7  that type of case, then you wouldn't be able to do it there.
8      Q.  Have you ever told a patient that you have to have
9  a surgery performed at a particular location, say, Treasure
10 Valley Hospital?
11     A.  No.
12     Q.  If a patient tells you that they want to have
13 their surgery performed at a particular location, do you do
14 everything you can to accommodate them?
15     A.  Absolutely.  You're going to not make any friends
16 taking someone somewhere they don't want to go.
17     Q.  Now, with respect to the cost of surgery, is that
18 also a factor you discuss with patients?
19     A.  Sure, if it comes up and if it's -- if it's
20 something the patient is concerned about.
21     Q.  And some patients, cost is not a factor; correct?
22     A.  Correct.
23     Q.  Which patients are those?
24     A.  Medicaid, for one, cost isn't a factor to the
25 patient.  They have no copay.  They have no -- no payment

2484

1  that they're going to have to make.  Some Medicare Advantage
2  programs, such as TrueBlue, TrueBlue does have a copay now.
3      Q.  But with patients -- with patients who have
4  insurance or are paying for the surgery themselves or have a
5  deductible or a copay, is cost usually a factor?
6      A.  Yes.
7      Q.  And when you -- when cost becomes a factor,
8  explain to the court what you would explain to your patients
9  about the cost of surgery at various locations.
10     A.  You know, for that, I kind of do have a paradigm
11 now.  I don't stay and talk about that.  I -- I have them
12 call around, a lot of times, to find the facility fees.  But
13 if someone asks me, I explain to them that wherever I do
14 their surgery, the surgery fee is the same because they're
15 getting the same surgeon; I'm doing the same surgery, but
16 the facility fees differ.  And people -- sometimes they're
17 better educated, oftentimes not.  A lot of times they don't
18 understand what the facility fee is or that it does differ
19 from different facilities.
20     Q.  And do you ever describe to the patients that the
21 facility fee at Treasure Valley Hospital is lower than at
22 other institutions?
23     A.  Sure, I would do that.
24     Q.  Okay.  By the way, let me ask you a couple of
25 questions.  Have you ever refused to see a Medicare or

2485

1  Medicaid patient or provide surgical services to them?
2      A.  No.
3      Q.  Have you ever refused to care for an indigent
4  patient that was referred to you?
5      A.  No.  I have never limited my practice.
6      Q.  A couple of other questions on the side.  Have you
7  ever received a referral in the last 12 months from a
8  Dr. Crownson, a Nampa primary care physician?
9      A.  No.  I had a Crownson patient, and I called Bayo
10 and left him a voicemail.  And then I found out later that
11 he didn't refer the patient when the patient came.
12         THE COURT:  Excuse me.  What is "Bayo"?
13         THE WITNESS:  Sorry.  That's Dr. Crownson's first
14 name.  We have known each other for years.
15         THE COURT:  I understand.
16         THE WITNESS:  I got excited.  I thought he
17 referred the patient to me.  I left him this long voicemail
18 about how we should get together.  And then the patient came
19 in and told me that he had sent the patient to another
20 surgeon, but the patient had heard from his neighbor that he
21 should come to me, so he came and saw me.
22 BY MR. POWERS:
23     Q.  All right.  I think in an earlier question, I
24 referred -- and I need to correct this on the record -- I
25 referred to, in referring to your case counts, the fall of

2486

1  2013, and I meant to refer to up until the fall of 2012. So
2  I want to correct that on the record. It doesn't affect
3  your answer, though.
4      Now, let's talk a little bit about your negotiations
5  with Saltzer when you were on the executive committee.
6  First, what was your impression about who approached who
7  about a merger with St. Luke's based on your position on the
8  executive committee?
9      **A.   Well, I can tell you that, as a member of the**
10 **executive committee, there was never -- we never had a**
11 **meeting before these discussions commenced about going to a**
12 **hospital system to talk about a merger or another type of**
13 **affiliation.   There was no direction that we ever gave, took**
14 **a vote to say "let's go to St. Luke's" or any other**
15 **hospital.**
16     **Q.   What was your impression about who approached who,**
17 then?
18     **A.   Well, I know that Dr. Kaiser had --**
19         MR. SCHAFER:  I'll object to foundation. I don't
20 think a foundation has been laid for his impression on that
21 subject.
22         MR. POWERS:  He is on the executive committee,
23 Your Honor.
24         THE COURT:  I think we are now on to another
25 question, which is -- well, actually, I guess that was the

2487

1  question. But his response was he knows that Dr. Kaiser
2  had, and then he had not -- did not complete the response.
3      I will limit the witness, though, to testify not as to
4  his impression but only as to things he observed. Now, he
5  can -- I mean, there is probably going to be some
6  impressions necessarily involved in the response, but I
7  think it does have to be based upon something more than just
8  a general impression.
9      Let's back up, Mr. Powers. And with that direction,
10 approach it in a somewhat different manner.
11         MR. POWERS:  Certainly.
12 BY MR. POWERS:
13     **Q.   When did you -- when did you first hear that there**
14 was an interest in a merger between St. Luke's and Saltzer?
15     **A.   We --**
16     **Q.   How did you hear it?**
17     **A.   Well, we had been working -- we worked with both**
18 **hospital systems, being Mercy Medical Center didn't have**
19 **much interaction with Saint Alphonsus because, at the time,**
20 **Saint Alphonsus had just came in, was taking over.   And**
21 **actually, I think our negotiations with St. Luke's preceded**
22 **Saint Alphonsus buying the hospital in Nampa.**
23         **We were already working with St. Luke's on**
24 **recruiting a urologist to the area, and so I know that**
25 **that's how -- that's how the dialogue started.**

2488

1         **And I was just going to say, Your Honor, that I**
2  **know that Dr. Kaiser had some conversations, but I don't**
3  **think that answers your question of who approached who. I**
4  **just know there were conversations.**
5      **Q.   Okay.**
6      **A.   But we had been talking with St. Luke's about**
7  **jointly recruiting urology to the area.   And from that, at**
8  **some point, stemmed further conversations of what could be a**
9  **closer affiliation.**
10     **Q.   And as -- as the negotiations started out with**
11 St. Luke's, an initial offer was made that required that you
12 divest your interest in Treasure Valley Hospital; correct?
13     **A.   That came a little bit later, yes.   At first, we**
14 **were -- at first, we had a meeting, and we were told about**
15 **partnership possibilities, meaning joint venturing on some**
16 **different ancillary projects.   It was a three-pronged**
17 **presentation:  Joint venturing on some ancillary projects;**
18 **No. 2 was a PSA, a modelled PSA, which we had no**
19 **knowledge -- I, personally, certainly had no knowledge of**
20 **even what a PSA was at the time -- and then third, was**
21 **employment by the -- by the hospital system.**
22     **Q.   And the first -- the first offer that was made to**
23 you required that anybody who had investment in Treasure
24 Valley Hospital divest of that; correct?
25     **A.   Correct.**

2489

1      **Q.   All right.   And that was voted down; correct?**
2      **A.   Correct.**
3      **Q.   And then there was a second offer made that was**
4  proposed in September of 2011 --
5          MR. SCHAFER:  Your Honor, I think we are getting
6  very leading here in direct.
7          MR. POWERS:  Your Honor, we have been through this
8  with how many witnesses?
9          THE COURT:  We have.
10         MR. SCHAFER:  Not this witness who is testifying
11 now.
12         THE COURT:  I understand. But if we get into an
13 area where I think it's an issue truly in controversy, I am
14 going to be much more strict about the leading questions
15 with your own clients. But I think in laying this
16 background and areas we have already covered, I'm going to
17 give you a fair amount of leeway.
18         MR. POWERS:  Thank you, Your Honor.
19         THE COURT:  The court has that discretion under
20 Rule 611. Go ahead, Counsel.
21         MR. POWERS:  Thank you, Your Honor.
22 BY MR. POWERS:
23     **Q.   So there was a second round of negotiations.   And**
24 in September of 2011, another offer was made by St. Luke's
25 to the group as a whole; correct?

2490

1   A.   Correct.
2       Q.   And that particular offer did not require that you
3   divest of your investment in Treasure Valley Hospital; is
4   that right?
5       A.   Correct.  We could be nonexclusive providers.
6       Q.   All right.  I want to talk about your view of
7   being a nonexclusive provider.  What was your understanding
8   of being a nonexclusive provider?  What did it mean to you?
9       A.   It wasn't a great deal.
10      Q.   Why not?
11      A.   As a nonexclusive provider, you were going to be
12  paid at a lesser rate.  Many of us had -- had been shown
13  some RVU numbers, and those numbers went down when we were
14  going to be nonexclusive providers.
15           We would also be barred from the operating council
16  of the group.  We were told that, specifically, Dr. Curran
17  and I were, who were both on the executive committee, we
18  were told we could keep our position on the executive
19  committee; however, there would be a new committee formed
20  which would oversee and supersede the executive committee,
21  and we would not be able to be on that committee.  That
22  committee would be made up 50 percent of St. Luke's
23  representatives and 50 percent of Saltzer representatives.
24      Q.   What -- what was your understanding of the ability
25  of St. Luke's to compete with you, as a specialist, being a

2491

1   nonexclusive partner?
2       A.   It was very straightforward.  They said that they
3   would actively compete with us if we were a nonexclusive
4   provider.
5       Q.   By that, you understood what?
6       A.   That they were going to have their specialists
7   come to the area and get referrals from our partners.
8       Q.   Eventually there was a vote at Saltzer on this
9   particular proposal; correct?
10      A.   Yes.
11      Q.   And did the Saltzer surgeons vote a certain way?
12      A.   Yes.
13      Q.   How did you vote?
14      A.   We did not want to move forward with that
15  proposal.
16      Q.   And the majority of your group voted for the
17  proposal; is that right?
18      A.   Correct.
19           THE COURT:  Now, Counsel, when you say "your
20  group," you're talking about Saltzer Medical Group as a
21  whole?
22           MR. POWERS:  Saltzer, yes.  Thank you, Your Honor.
23  Saltzer Medical Group as a whole.
24  BY MR. POWERS:
25      Q.   During -- during your discussions with St. Luke's

2492

1   key representatives while you were -- before your vote on
2   the final offer, did you have discussions with Mr. John Kee
3   that involved the value of your Treasure Valley Hospital
4   stock?
5       A.   Yes.
6       Q.   Tell -- tell us what -- what occurred in those
7   conversations.  What was said?
8       A.   Mr. Kee told me that it was his opinion that I
9   should more strongly consider divesting, selling off my
10  Treasure Valley Hospital shares because they weren't going
11  to be worth 50 percent of what they were worth in the
12  future.
13      Q.   And what was your understanding of that comment?
14      A.   Well, it concerned me because I -- I didn't know
15  if he was bluffing or if he had information that I didn't
16  know.  But certainly the way he said it, I was concerned
17  that he had information that I didn't know, that he could be
18  correct, that the value of that investment would be less
19  than half of what it was currently.
20      Q.   During the negotiations, did you also have
21  conversations with Mr. Kee about whether you could provide
22  services for a proposed hospital to be built by St. Luke's?
23      A.   Yes.  St. Luke's planned on eventually building a
24  hospital in Nampa, but they were going to start out by first
25  creating areas of office space, a freestanding ER, some

2493

1   imaging facilities, and a surgery center.
2            And so we were excited about the surgery center.
3   It was going to open up a new place to do surgery in Nampa.
4   And myself and all the surgeons felt that we could commit a
5   certain amount of business and keep that surgery center
6   busy, but I was told that half interest, as it was -- as it
7   was put to me, wasn't good enough.
8       Q.   And who told you this?
9       A.   John Kee.
10      Q.   And what did he say specifically?
11      A.   He said specifically that St. Luke's was spending
12  a lot of money on this and that a half interest from us was
13  not going to be good enough and was not going to keep it
14  running.
15      Q.   What did he tell you he needed from you?
16      A.   He said he needed all my business.
17      Q.   What was your response to that?
18      A.   I thanked him for his information and told him I
19  would take it under advisement.
20      Q.   Now, in all of your discussions with St. Luke's
21  about negotiations on the purchase of Saltzer, was
22  there -- was there any discussion about the ability of the
23  deal to improve quality of care at Saltzer?
24      A.   No.
25      Q.   What was the focus of the discussions, the primary

2494

1  focus of the discussions with St. Luke's?

2  **A.  The primary focus of discussions was about revenue**

3  **and what the differences could be for -- for primary care to**

4  **increase the revenue and also what the future would be with**

5  **the new hospital in Nampa.**

6  Q.  Was the discussion of revenue focused on work

7  RVUs?

8  **A.  Correct.**

9  Q.  All right.  Was there any discussion about the

10  impact of providing indigent care on your work RVUs should a

11  deal be put together?

12  **A.  Well, we knew that it would be liberating in the**

13  **fact that if you saw a patient, it didn't matter if the**

14  **patient was Medicare, Medicaid, Blue Shield, you know, or**

15  **indigent, you were going to get paid the same amount.**

16  **But we -- we specifically asked the question about**

17  **the amount of indigent care, and we were told that it would**

18  **factor in when it came time to renegotiate the numbers,**

19  **which I believe the term was two years.  And we were told**

20  **that if there was a large amount of indigent care that we**

21  **had done, that the RVU numbers would have to -- to be -- to**

22  **reflect that, it would be lower.**

23  Q.  So your compensation would actually be lower if

24  you, in fact, cared for more indigent patients?

25  **A.  Correct.**

2495

1  Q.  You were aware of that based on your discussions

2  with St. Luke's?

3  **A.  Yes.**

4  Q.  Okay.  When it became apparent to you in -- in the

5  fall of 2012 that the group -- the Saltzer Group as a whole

6  had decided to move forward with a deal with Luke's, did you

7  have -- did you attend a meeting where a Dr. Kaiser made

8  certain representations to the group as a whole about

9  referrals and locations of surgeries?

10  **A.  Yes.  As I've testified in my deposition,**

11  **the -- the focus on the meeting, we had obviously came a**

12  **long way during these negotiations.  At the time of that**

13  **meeting, there was fracture in the group for the reasons**

14  **that we have talked about here.  And the -- the orthopedists**

15  **had been regularly attending the -- these meetings.  At**

16  **least -- at least two of them would usually be present**

17  **because they had a large stake in what happened.**

18  **And at this particular meeting, Dr. Kaiser had**

19  **asked that -- that the surgery department and orthopedics**

20  **department both come, and none of the orthopedists showed**

21  **up.  And so I know that he was very frustrated with the**

22  **outcome of the meeting.  The main reason is because we had**

23  **reached that point where, as you said, the majority of the**

24  **group had voted to go forward with the St. Luke's deal, but**

25  **there were -- in the bylaws, there was a -- there is two**

2496

1  **different rules within the Saltzer bylaws:  One that said**

2  **that you needed a 75 percent majority for large decisions of**

3  **the group and that you needed even greater supermajority of**

4  **90 percent for anything that changed the compensation to**

5  **physicians.**

6  **And so there was a novel interpretation of the**

7  **bylaws by Mr. Julian that said that if we merged with**

8  **St. Luke's, it really wouldn't change our compensation.  It**

9  **would just -- we would go to work with St. Luke's and then**

10  **later we would change the compensation.  So we didn't really**

11  **need a 90 percent vote, we only needed a 75 percent vote.**

12  **And so Dr. Kaiser knew that he had the 75 percent**

13  **but not the -- not necessarily the 90 percent, so he really**

14  **wanted the orthopedists there.  So he was frustrated, and he**

15  **made the statement to all the -- everyone there, 20, 25**

16  **people in the room that if the primary care doctors were**

17  **getting their operative reports sent back to them from**

18  **places such as Treasure Valley Hospital or Saint Alphonsus,**

19  **that they needed to think long and hard about that because**

20  **that was not the direction that the majority of the group**

21  **had decided that the group wanted to take.**

22  Q.  And what was your -- what was your understanding

23  of that comment?

24  **A.  My understanding of that comment was that I needed**

25  **to find a new job.  And so, that's why I remember it so**

2497

1  well.  I remember my walk from the meeting out to my car.  I

2  remember the morning very well.

3  Q.  All right.  And eventually you did take a position

4  with Saint Alphonsus; correct?

5  **A.  Correct.**

6  Q.  And that was, I think you signed that -- you

7  finalized that in the fall of 2012?

8  **A.  About a month after that meeting, yes.**

9  Q.  Okay.

10  MR. POWERS:  If we can -- if we can put Exhibit 6

11  up on the board again.  Treasure Valley Hospital

12  Demonstrative 3001, No. 6, Your Honor.  I'm sorry.  It's

13  properly stated.

14  BY MR. POWERS:

15  Q.  I want to look at your -- your case count at

16  Treasure Valley Hospital in 2012, and I want to focus on the

17  top bar line, Dr. Williams.  What -- what do you attribute

18  the steep drop in your cases at Treasure Valley Hospital

19  starting in September of 2012 through August of 2013?  What

20  do you attribute that to?

21  **A.  My Saltzer referrals became nonexistent.**

22  Q.  Okay.  Do you -- have your Saltzer referrals

23  increased at all since the month of September 2012?

24  **A.  No.**

25  Q.  Do you get any Saltzer referrals at all?

2498

1    A.  I get some patients that are Saltzer patients, but
2  it's usually the situation similar to what I've described,
3  either I have operated on the patient before or I have
4  operated on their neighbor.  So I don't -- that's not really
5  a referral.  It's not a group referral.
6    Q.  If Treasure Valley Hospital is not an alternative
7  you can offer for your patients for surgery, what -- what
8  options will your patients be left with from -- from a cost
9  standpoint?
10    A.  Well, they're going to go to facilities that
11  charge more.
12         MR. POWERS:  Thank you.  I have no further
13  questions.
14         THE COURT:  Mr. Schafer.
15              CROSS-EXAMINATION
16  BY MR. SCHAFER:
17    Q.  Good afternoon, Dr. Williams.
18    A.  Hi.
19    Q.  Following up on a question that Mr. Powers asked
20  you, and I just want to -- about conversations and the start
21  of the conversations between Saltzer and St. Luke's.  You
22  heard me make an objection that I didn't think you had a
23  foundation to answer that question.  I just want to sort of
24  establish that, which is:  At a certain point Dr. Kaiser
25  informed you that he had been talking to St. Luke's already

2499

1  about creating a stronger relationship between the two
2  organizations.  Right?
3    A.  Correct.
4    Q.  And you weren't a party to those initial
5  conversations between Dr. Kaiser and St. Luke's?
6    A.  No.
7    Q.  And you don't know who initiated those
8  conversations, do you?
9    A.  I do not.
10    Q.  You talked about some of the discussions and the
11  meetings that you had with St. Luke's representatives.  At
12  one of the early meetings between Saltzer and St. Luke's,
13  you attended a meeting at which Dr. David Pate spoke;
14  correct?
15    A.  Yes.
16    Q.  And Dr. Pate spoke about healthcare changes and
17  his thoughts on the future of healthcare; right?
18    A.  Yes.
19    Q.  And he talked about the formation of ACOs?
20    A.  Yes.
21    Q.  And that's accountable care organizations; right?
22    A.  Correct.
23    Q.  And the cost of healthcare was a large part of
24  what that first meeting was about, wasn't it?
25    A.  No.

2500

1         MR. SCHAFER:  If you could play W10, please.
2         THE COURT:  What are -- what are we playing,
3  Counsel?
4         MR. SCHAFER:  This is the deposition of
5  Dr. Williams, page 53, lines 1 through 3.
6         THE COURT:  Yeah.  Thank you.
7         (Video clip played as follows.)
8         A.  "And so the -- the cost of healthcare was
9         a -- was a large part of -- of what the first
10         meeting had been on -- about."
11         (Video clip concluded.)
12  BY MR. SCHAFER:
13    Q.  And that was your testimony; correct,
14  Dr. Williams?
15    A.  Correct.
16    Q.  And part of the discussion at that meeting was
17  that with the advent of ACOs, the most cost-effective care
18  that could be provided at good quality was going to be the
19  care preferred by ACOs; right?
20    A.  I -- that was -- I'm sorry.  Can you say that
21  again.
22    Q.  Sure.  Part of the discussion at that first
23  meeting was that with the advent of ACOs, the most
24  cost-effective care that could be provided at good quality
25  was going to be the care preferred by any ACO; right?

2501

1    A.  I'm sorry to -- part of the cost-effective care by
2  an ACO --
3    Q.  Well, let's do it this way.
4         MR. SCHAFER:  Will you play W11, please.
5         MR. SINCLAIR:  Page and line?
6         MR. SCHAFER:  Yeah.  This is Dr. Williams'
7  deposition, page 53, lines 4 through 12.
8         (Video clip played as follows.)
9         A.  "And, you know, like I said, ACOs and I
10         think this was probably the -- the largest part
11         of what we were all trying to do is to be
12         concerned with what our costs were going to be.
13         Because we knew that reimbursement was going
14         down and that also in the ACO model, the
15         cheapest care that you can provide with good
16         quality is going to be that which is preferred
17         by -- by the -- any accountable care
18         organization."
19         (Video clip concluded.)
20  BY MR. SCHAFER:
21    Q.  And was that your testimony, Dr. Williams?
22    A.  Yes.
23    Q.  And was that part of the discussion at that
24  meeting?
25    A.  Yes.  I believe it was part of the discussion at

2502

1  the meeting.

2  **Q.** And St. Luke's representatives expressed their

3  goal of reducing the costs of healthcare; correct?

4  **A. They expressed their goal, yes, of reducing the**

5  **cost of healthcare.**

6  **Q.** And you understood at the time of that meeting

7  that vertical integration was expected to lead to decreases

8  in the cost of healthcare; right?

9  **A. Vertical integration wasn't -- that didn't come up**

10  **until the second meeting with Mr. Fletcher.**

11  **Q.** Okay. In connection with the second meeting, did

12  you understand that vertical integration was expected to

13  lead to decreases in the cost of healthcare?

14  **A. Decreases in the cost of -- decreases in the**

15  **expenses of healthcare, yes.**

16  **Q.** And at that -- either the first or the second

17  meeting, you believed that decreasing the costs of the care

18  provided was something that Saltzer and St. Luke's shared

19  common ground on, didn't you?

20  **A. Oh, absolutely.**

21  **Q.** At the -- going back to the initial meeting, other

22  St. Luke's representatives at that meeting spoke in

23  additional detail about how Saltzer could help St. Luke's

24  vision for the Western Treasure Valley and what St. Luke's

25  wanted to accomplish; right?

2503

1  **A.** Yes.

2  **Q.** And among other things, those individuals

3  discussed the fact that roughly 20 percent of St. Luke's

4  patients already came from areas west of Meridian; right?

5  **A.** Yes, correct.

6  **Q.** And they also explained their desire to establish

7  a presence in Canyon County to better serve those patients;

8  correct?

9  **A. Sure, yes.**

10  **Q.** And then moving ahead to the second meeting that

11  we have already referenced briefly, that was the one at

12  which Mr. Fletcher spoke?

13  **A.** Correct.

14  **Q.** And Mr. Fletcher addressed some of the benefits of

15  integration between Saltzer and St. Luke's, didn't he?

16  **A.** Yes.

17  **Q.** And Mr. Fletcher told the group that there were

18  economies of scale that would result from a patient being

19  brought within a system and receiving his care within that

20  system; correct?

21  **A. Yes, he spoke to that.**

22  **Q.** And he told the group that care could be made

23  cheaper for patients if their care was kept within a system;

24  right?

25  **A. That expenses to be decreased.**

2504

1  **Q.** Did he -- do you remember him saying that care

2  could be made cheaper for patients if care was kept within a

3  single system?

4  **A. I don't recall that.**

5  MR. SCHAFER: Play 19. This is page 52, lines 18

6  through 25 of Dr. Williams' deposition.

7  (Video clip played as follows.)

8  **Q.** "And what is it that Mr. Fletcher said

9  about vertical integration?

10  **A.** "That there were efficiencies of scale

11  that could be brought to bear if -- if a

12  patient was brought within the system and

13  received their care within the system, that

14  there were economies of scale that could be

15  realized, that you could perform the care for

16  cheaper."

17  (Video clip concluded.)

18  BY MR. SCHAFER:

19  **Q.** Okay. Is it your testimony that you meant by that

20  that costs to Saltzer would be cheaper?

21  **A.** Yes.

22  **Q.** Okay. And Mr. Fletcher also stated that economies

23  of scale would result from group purchasing power, didn't

24  he?

25  **A. Correct. Same thing.**

2505

1  **Q.** And, in fact, at -- at that meeting, there were

2  even specific slides that were presented breaking out

3  savings in certain areas that could result from those

4  economies of scale; correct?

5  **A.** Yes.

6  **Q.** Mr. Fletcher also talked about the high quality of

7  care that St. Luke's offered; right?

8  **A. Yes. He is proud of his quality of care at**

9  **St. Luke's, absolutely.**

10  **Q.** And he also stated that he believed Saltzer also

11  offered quality care; right?

12  **A. Yes, he did.**

13  **Q.** And he told the group that if Saltzer and

14  St. Luke's could be brought together, they could provide

15  high quality care at a lower cost; right?

16  **A. Yes. I would agree with that.**

17  **Q.** With respect to negotiations with payors and third

18  parties, Saltzer's ability to negotiate with third parties

19  at the time that it was going through these discussions with

20  St. Luke's was something that had been a big concern at

21  Saltzer over the years prior to those discussions; correct?

22  **A. It had been a concern.**

23  **Q.** Would you say a big concern?

24  **A. I, you know, it's hard to put a qualifier on**

25  **everything. Sure. It's a big concern.**

2506

1    **Q.**  Did you say it would be a big concern?

2    **A.**  Sure.  It was one of the -- one of the many big

3    concerns, I guess.

4    **Q.**  Okay.  And that was because you felt that there

5    had been an erosion of the fees that Saltzer was able to get

6    in negotiations with payors; correct?

7    **A.**  We -- there had been some erosion of our fee base,

8    yes.

9    **Q.**  And you attributed that to Saltzer's lack of power

10   at the bargaining table with third party payors; right?

11   **A.**  Correct.

12   **Q.**  You talked about, I think, a statement that you

13   attributed to Mr. Kee regarding needing the full support of

14   the Saltzer physicians as part of an arrangement with

15   St. Luke's; right?

16   **A.**  The surgeons specifically, yes, full support of

17   all physicians.

18   **Q.**  And you understood where St. Luke's was coming

19   from in wanting to have the physicians that it partnered

20   with to have full buy-in with what St. Luke's was trying to

21   accomplish in Canyon County; right?

22   **A.**  Sure.

23   **Q.**  You were asked some questions about eClinicalWorks

24   during your time at Saltzer.  Do you remember those

25   questions from your counsel?

2507

1    **A.**  Yes.  Just a few minutes ago?

2    **Q.**  Yes.

3    **A.**  Yes.

4    **Q.**  And during the time that you were at Saltzer, it

5    was easier to get access to labs and other test results if

6    those results were performed at Saltzer rather than if they

7    were performed at a hospital; correct?

8    **A.**  On eClinicalWorks?

9    **Q.**  Correct.

10   **A.**  Correct.  The -- faxed pages would be scanned

11   in from the hospital so --

12   **Q.**  And that was a different functionality than if the

13   tests or labs had been performed within Saltzer --

14   **A.**  Correct.

15   **Q.**  -- correct?

16   **A.**  Because it -- it was prepopulated if it's

17   performed inhouse versus scanned in if it was outside.

18   **Q.**  And you mentioned that you were on staff at

19   St. Luke's Meridian hospital while you were employed by

20   Saltzer; correct?

21   **A.**  Yes.

22   **Q.**  Could you share medical records or was the data

23   interoperable between St. Luke's EMR system and the

24   Saltzer's eClinicalWorks?

25   **A.**  No.  You had to go online to a separate website

2508

1    called Dashboard.

2    **Q.**  So when you talked about attaching those notes to

3    patient charts and that you could communicate within Saltzer

4    using that method, that didn't work as far as communicating

5    outside of Saltzer; correct?

6    **A.**  Correct.

7    **Q.**  You talked about some of the discussions you had

8    or statements that were made by management in connection

9    with Saltzer's discussions with St. Luke's.  At the time you

10   left Saltzer, you believed that Saltzer's leadership and the

11   partners at Saltzer had put a lot of work into determining

12   the best course for Saltzer in the future as healthcare

13   continued to change, didn't you?

14   **A.**  I would say that's fair to say.  Everyone that was

15   working on it felt that it was the best direction for the

16   group.  Now, everyone didn't have the same --

17   **Q.**  That's fine, Dr. Williams.

18   **A.**  Yeah.

19   **Q.**  That -- that's fine.

20   **A.**  Each person thought that was the best direction.

21   **Q.**  While you were at Saltzer, the vast majority of

22   the group was opposed to working more closely with

23   Saint Al's; correct?

24   **A.**  The -- when you say "working more closely," you

25   mean the -- the deal that was offered?

2509

1    **Q.**  Correct.

2    **A.**  The PSA, correct.

3    **Q.**  And as part of the discussions as to why that was,

4    history between Saint Al's and Saltzer was often brought up

5    as one of the reasons; correct?

6    **A.**  Correct.

7    **Q.**  And that history related to the way that

8    Saint Al's had treated Saltzer prior to joining --

9    MR. ETTINGER:  Your Honor, now we're getting --

10   it's both irrelevant and outside of the scope of your ruling

11   on your motion in limine and beyond the scope of cross.

12   THE COURT:  Counsel, I -- I think we are getting

13   beyond the scope of cross, and I think we're getting into

14   some areas that I thought we had agreed.

15   Well, I'm going to sustain the objection.

16   MR. SCHAFER:  Your Honor, if I may?

17   THE COURT:  Yes.

18   MR. SCHAFER:  We -- we did notice Dr. Williams

19   today, this is obviously in our case in chief, we did notice

20   him here as a direct witness as well, so some of my

21   questions may be on direct.

22   MR. ETTINGER:  It still violates the motion in

23   limine.  It's irrelevant.

24   MR. SCHAFER:  I -- and if I can -- if I can speak

25   to that point --

2510

1    THE COURT: Yes, yes.
2    MR. SCHAFER: Again, this -- this is not -- this
3  is not raising any sort of unclean hands defense. This is
4  relating to the motivation of the Saltzer physicians which
5  was -- which was also a part of Mr. Powers' direct
6  examination, which is to imply that the reason why
7  St. Luke's was chosen versus Saint Al's was for some factor
8  other than, you know, the group that they have decided to
9  align with. That -- that's the purpose of these questions.
10    THE COURT: Mr. Ettinger.
11    MR. ETTINGER: I have never heard a question
12  suggesting that. That's never been an issue in this case,
13  and there can't be an issue under the antitrust laws as to
14  whether they should have picked St. Luke's or Saint Al's.
15  That's not the issue here at all.
16    THE COURT: Well, the witness was providing --
17  witness clearly went through and explained why he opposed
18  the merger with St. Luke's and what the consequences were.
19  I'm going to give him some leeway, I think, to proceed with
20  the understanding that my prior ruling does not change.
21    Unclean hands is not a defense in the case, but since I
22  think the issue was broadly approached, if you will, by
23  Mr. Powers in the direct examination, I think counsel is
24  entitled to at least provide an alternative explanation.
25    So the objection is overruled. But it doesn't change

2511

1  the court's prior ruling.
2    Proceed.
3    MR. SCHAFER: Thank you, Your Honor.
4    THE COURT REPORTER: Mr. Schafer, would you please
5  try to slow down.
6    THE COURT: Yeah. And I was just going to
7  actually make that comment as well.
8    MR. SCHAFER: I apologize to both of you. I will
9  endeavor to do so.
10  BY MR. SCHAFER:
11    Q.   The discussion part -- part of that history that
12  was discussed as a reason why Saltzer or at least many at
13  Saltzer preferred St. Luke's over Saint Al's, part of that
14  related to a prior offer overture that Saint Al's had made
15  to purchase the Saltzer Group; correct?
16    A.   Years before, correct.
17    Q.   And that offer or that overture involved
18  Saint Al's CEO telling Saltzer that if Saltzer didn't join
19  with Saint Al's, Saint Al's was going to drive Saltzer out
20  of business. Isn't that what you -- part of the discussion?
21    A.   A previous Saint Al's CEO, correct.
22    Q.   And that history led many in the group to express
23  deep concerns about working with Saint Al's; correct?
24    A.   Correct. Part -- that was part of it. Yes.
25    Q.   And those conversations caused you to have a

2512

1  negative view of Saint Al's; right?
2    A.   Yes. I didn't know -- I didn't know Saint Al's at
3  all, so I would say that was correct.
4    Q.   During those discussions, do you ever remember
5  expressing the sentiment to others within the group that you
6  did not want to work for Saint Al's or even do a PSA with
7  Saint Al's?
8    MR. ETTINGER: Your Honor, may we approach? This
9  is way beyond the motion.
10    THE COURT: Well -- well, Counsel, I'm not sure.
11  Where are we going? I mean, the fact that they had some
12  concern about going with Saint Al's, didn't like Saint Al's.
13  I'm just not sure where that is going.
14    MR. SCHAFER: That's fine, Your Honor. I'll move
15  on.
16    THE COURT: All right. Thank you.
17    And I should note, it just -- it really does become a
18  question of relevance, even though I think the subject was
19  generally broached. I think we are getting a little too far
20  afield there.
21    Proceed.
22  BY MR. SCHAFER:
23    Q.   Dr. Williams, your counsel asked you some
24  questions regarding whether or not you had ever turned down
25  a Medicare, Medicaid, or indigent patient while you were at

2513

1  Saltzer. Do you remember those questions?
2    A.   I do.
3    Q.   Do you know how many Medicare, Medicaid, and
4  indigent patients you have taken to Treasure Valley
5  Hospital?
6    A.   I don't know the answer to that, no.
7    Q.   Many?
8    A.   Are you asking me for --
9    Q.   Ballpark.
10    A.   Many.
11    Q.   Do you take more of your Medicare, Medicaid, and
12  indigent patients, do you treat them at Treasure Valley
13  Hospital or at one of the other hospital facilities?
14    A.   I'm going to ask you to qualify that. Are these
15  patients that are in the ER from another hospital? I don't
16  ever take patients that are in a ER from another hospital to
17  Treasure Valley. So if it's an indigent patient that came
18  in the ER, they are going to be treated in the hospital
19  where I'm on call where I saw them in the ER. So if you
20  qualify with elective, you can re-ask the question. I'm
21  happy to answer it.
22    Q.   Well, let -- let me back up a step.
23    With respect to your clinic at St. Luke's, someone that
24  didn't come in --
25    A.   Saltzer.

2514

1    Q.  At -- at Saltzer, I guess you referred to it as an
2    elective patient.
3    A.  Right.  Elective surgery.
4    Q.  Elective surgery.  Do you know what percentage of
5    your patients while you were at Saltzer the elective
6    surgeries were accounted for by Medicare, Medicaid, and
7    indigent patients?
8    A.  So out of the total number of surgeries that I
9    would be doing, how many of them fall into that -- those
10   three categories?
11   Q.  Correct.
12   A.  Probably at least 30 percent, I would say more
13   than -- I would think just Medicare alone would be over 30
14   percent, so, you know, probably -- we're probably talking
15   closer to 40 percent.  Indigent was very probably few and
16   far between.  And by indigent, I'm assuming you don't mean
17   just patients that don't pay, you mean patients that don't
18   have insurance?
19   Q.  Correct.
20   A.  Okay.
21   Q.  And you're saying those were few and far between
22   that you would see those types of patients at Saltzer?
23   A.  Right.  Correct.  I mean, we had people -- you
24   know, indigent and that's why I wanted to -- to make sure I
25   understand what you mean by that.  Because we -- you know,

2515

1    we see a lot of patients that come in that don't have
2    insurance, but I don't know that those are necessarily
3    indigent.  They may own their own company.  They may have
4    made the conscious decision they weren't going to purchase
5    insurance, but they come in and want to pay cash for their
6    surgery.
7    Q.  During your -- your counsel's questions to you,
8    you indicated that at some point someone from St. Luke's
9    told you that if Saltzer treated a large number of indigent
10   care patients, your RVU rates would go down when the
11   compensation structure was renegotiated.
12   Do you remember that testimony?
13   A.  Correct.  When the term was over and it came time
14   to renegotiate the -- the numbers.
15   Q.  Who was it that made that comment?
16   A.  You know, I don't know a specific person.  I know
17   it's -- it's not a question that I had asked.  It's a
18   question someone else had asked, and so I took note.  I just
19   remember thinking, oh, wow, this is something we have to
20   think about.
21   Q.  But you can't remember who made that comment?
22   A.  It was during all the -- it was during all the
23   presentations.
24   Q.  Do you remember when that comment was made?
25   A.  It would have been when we were doing the

2516

1    negotiation sometime probably in 2011, probably in late
2    2011.  We were still feeling out -- we had lots of
3    questions, obviously.
4    Q.  Can you identify anybody else that was at the
5    meeting when that statement was made?
6    A.  You know, I would think that -- that was -- that
7    was a meeting that was down in the executive -- executive
8    conference room, and there would have been a lot of people
9    there, so I think anybody that you want to ask to testify
10   could probably testify to that.
11   Q.  Was Dr. Kaiser in that meeting?
12   A.  I'm sure he was, yes.
13   Q.  You also referenced -- I can't remember what it
14   was apropos of, but a -- a referral that you thought you had
15   gotten from Dr. Crownson and turned out had been a
16   self-referral; correct?
17   A.  Correct.
18   Q.  While you were at Saltzer, how many referrals did
19   you get from Dr. Crownson?
20   A.  Well, initially, Dr. Crownson and I had been
21   friends, and so that's -- like you say my comment, I -- I
22   thought, Wow, Bayo sent me a patient, this is great, because
23   I hadn't talked to him in so long.  Bayo has switched groups
24   several times.  Bayo had initially came to the area and had
25   worked for Saint Alphonsus Medical Group and then he

2517

1    had -- they had switched from there to Mercy Medical Group,
2    and then they switched from there to St. Luke's Medical
3    Group.  And so at various times he would refer to me more or
4    less but --
5    Q.  During the period --
6    A.  Sorry.  Go ahead.
7    Q.  During the period when Dr. Crownson was part of
8    the Mercy Medical Group as part of Saint Alphonsus, how
9    often would you receive referrals from Dr. Crownson?
10   A.  Well, when he was part of the Mercy group, I
11   received a lot of referrals from -- from Dr. Crownson.  Then
12   when he switched over to St. Luke's, I thought that with
13   Saltzer in there, you know, affiliation getting closer with
14   St. Luke's, I thought that the referrals would increase, but
15   they didn't with the switch for whatever reason.
16   Q.  With respect to Treasure Valley Hospital, your
17   professional fee was the same regardless of whether you
18   performed a surgery at Treasure Valley Hospital or if you
19   performed that surgery at St. Luke's or Saint Al's; correct?
20   A.  Correct.
21   Q.  But if you perform a surgery at Saint Al's or
22   St. Luke's, you don't receive any part of the facility fee;
23   correct?
24   A.  Correct.
25   Q.  But if you perform a surgery at Treasure Valley

2518

1  Hospital, that facility fee goes towards the profits of the
2  hospital; correct?
3      **A.   It goes towards the profits of the hospital,**
4  **correct.**
5      **Q.**   And you share in Treasure Valley Hospital's
6  profits?
7      **A.   Correct.**
8      **Q.**   And under your PSA with Saint Al's, you were also
9  permitted to retain your investment in Treasure Valley
10  Hospital; right?
11      **A.   As a nonexclusive provider, correct.**
12      **Q.**   This is with Saint Al's?
13      **A.   Oh, I'm sorry.  I -- I wasn't following you.**
14      **Q.**   Sure.  Under your current PSA with Saint Al's, you
15  were permitted to retain your ownership in Treasure Valley
16  Hospital?
17      **A.   Correct.**
18      **Q.**   And you also have an ownership interest in the
19  Treasure Valley Surgery Center?
20      **A.   All the Saint Al's or -- I'm sorry.  All of the**
21  **Treasure Valley Hospital partners bought in in aggregate**
22  **into the Treasure Valley Surgery Center.**
23      **Q.**   And that surgery center is a joint venture between
24  Treasure Valley Hospital and Saint Alphonsus; correct?
25      **A.   That's correct.**

2519

1      **Q.**   And if you perform surgery at Treasure Valley
2  Surgery Center, that facility fee also goes towards the
3  profits of the hospital; right?
4      **A.   If there were any profits.  There has never been a**
5  **profit, so.**
6      **Q.**   And at what point -- do you remember at what point
7  you -- your ownership or the Treasure Valley Hospital
8  invested in the Treasure Valley Surgery Center?
9      **A.   When it -- when it opened.  It was an initial**
10  **investment.**
11      **Q.**   And when did it open?
12      **A.   In August of -- I guess August of last year, 2012.**
13      MR. SCHAFER:  Ray, could you put up -- or whoever
14  is doing your demonstratives, put up that Treasure Valley
15  Hospital demonstrative, 3001.
16      MR. POWERS:  Which one?  Which number?  The one I
17  had up?
18      MR. SCHAFER:  Yes.
19      MR. POWERS:  Number 6?  Sure.  I won't do it, but
20  Andy will do it.
21      MR. SCHAFER:  That's probably better for all of
22  us.
23      MR. POWERS:  Yes.
24  BY MR. SCHAFER:
25      **Q.**   You mentioned that it opened in August of 2012,

2520

1  Dr. Williams, and if you look at your case counts here, it
2  seems to be pretty much exactly the point where your
3  surgeries drop from 22 to 4; correct?
4      **A.   August 2012, correct.  I'm following.**
5      **Q.**   What percentage of your outpatient surgeries do
6  you take to Treasure Valley Hospital?
7      **A.   Of my outpatient surgeries, probably 40 percent,**
8  **maybe, 30 percent.**
9      **Q.**   What percentage of your outpatient surgeries do
10  you take to Treasure Valley Surgery Center?
11      **A.   Probably 40 percent, 30 percent, 40 percent.**
12      **Q.**   And you said in answer to one of your counsel's
13  questions that the nonexclusive offer from St. Luke's was
14  not a great deal; correct?
15      **A.   Correct.**
16      **Q.**   But as part of that deal, you would have gotten to
17  keep your 2 percent interest in Treasure Valley Hospital;
18  correct?
19      **A.   It was 1.6 percent, but, yes.**
20      **Q.**   And I believe as you told Mr. Powers, that's been
21  a fairly lucrative investment for you; correct?
22      **A.   It turned out to be a good investment, yes.**
23      **Q.**   During early to mid 2012, you had a number of
24  conversations with representatives of Saint Al's regarding
25  the potential for you to affiliate with Saint Al's; correct?

2521

1      **A.   What was the time on it again?**
2      **Q.**   Early to mid 2012.
3      **A.   No.  That -- that part -- that was later that I**
4  **had -- I had one meeting that I attended with Saint Al's**
5  **after Saint Al's presented to Saltzer as individuals.  We**
6  **went -- we went to one meeting.  We were presented with a**
7  **letter of intent, and that was in -- it was right at the end**
8  **of February, start of March of 2012, and then I had --**
9  **didn't have further conversations with him until late 2012**
10  **until it became apparent that I was going to have to do**
11  **something different.**
12      **Q.**   So you don't remember having any conversations
13  with anyone from Saint Al's in the May 2012 time frame?
14      **A.   About?  I mean, you said conversations with Saint**
15  **Al's.  About my -- about me doing a deal with them?**
16      **Q.**   Right.  About a -- about a potential future
17  affiliation.
18      **A.   About a PSA, myself?  No.  Like I say, I had the**
19  **one meeting, and we were offered a letter of intent at the**
20  **meeting.  We left with folders in our hand.  And that**
21  **was -- I think it was March 1st.  I have turned the -- I**
22  **have turned the letter of intent in.  You guys have it.**
23      **Q.**   Well, do you remember in May of 2012 having a
24  conversation with Karl Keeler?
25      **A.   I don't recall that conversation, no.**

**Q.** Do you remember ever discussing anything about -- or do you know who April Reimers is? Or Reimers?
**A. Yes.**
**Q.** And who is she?
**A. She -- she doesn't work for Saint Alphonsus anymore, but at that time, she was a physician liaison for Canyon County.**
**Q.** Do you remember ever having a conversation with Mr. Keeler at which he mentioned that SAMG referrals, SAMG was going to start referring more patients to you?
**A. Possibly, but that didn't have anything to do with me being employed by Saint Al's. That was about referrals. I was working for Saltzer. That's -- you asked me about contractual negotiations or talks about a contract. So now you're talking about referrals -- patient referrals.**
**Q.** Do you remember having any conversations with Ms. --
Is it Reimers?
**A. Reimers.**
**Q.** Reimers.
-- with Ms. Reimers that when the Treasure Valley Surgery Center opened, which at that time, I guess, was slated to happen in June of 2012, that you would support that center?
**A. That -- that sounds correct, yes.**

**Q.** And do you remember having conversations with her that you would try to keep SAMG referrals within the system as much as possible?
**A. You know, I don't recall her specifically saying that, but I can certainly imagine that that was part of the conversations.**
**Q.** Do you remember Ms. Reimers telling you that SAMG expected you -- that if they sent you a patient, you would keep it within the Saint Al's system?
**A. Well, I think that the primary care base of any organization expects -- I already know that --**
**Q.** Could you just answer my question, yes or no. Sorry.
**A. State it again.**
THE COURT: Just a moment. Let's go one at a time. Now, rephrase the question. Listen carefully to counsel's question and try to answer it as directly as possible. Mr. Powers will have a chance to let you explain in more detail.
Go ahead and proceed, Mr. Schafer.
BY MR. SCHAFER:
**Q.** Did Ms. Reimers tell you during that conversation that SAMG expected that if its physicians sent you a patient, you would perform that surgery at a Saint Alphonsus facility?

**A. I can -- sure. Probably so.**
**Q.** And do you remember telling Ms. Reimers during that conversation that if the SAMG primary care providers could keep you busy with referrals, that you would sign a PSA with Saint Al's?
**A. No.**
MR. SCHAFER: And, Your Honor, this is AEO, but I think if we turn off the screen, we should be able to --
THE COURT: All right.
MR. SCHAFER: Put up Exhibit 2016.
THE WITNESS: I remember seeing this in my deposition, but I don't remember her saying that to me.
MR. SCHAFER: And if you could blow up that.
BY MR. SCHAFER:
**Q.** And you can see that -- I won't read the text of it, but at least Ms. Reimers said that she got the impression that --
MR. ETTINGER: Your Honor, you know, if something is AEO, not using the verbatim words but stating the substance doesn't really solve the problem.
THE COURT: Who -- whose AEO is it? Is it Treasure Valley's?
MR. ETTINGER: I think it's ours, Your Honor.
THE COURT: All right. Then I think, Counsel, we will need to clear the courtroom or figure out a way to do

it without relating --
MR. SCHAFER: Let me ask Mr. Ettinger if that second sentence is considered AEO by Saint Al's?
MR. ETTINGER: I think it is still -- I believe it is still AEO.
MR. SCHAFER: The question is whether you are actually deeming that second sentence to be AEO.
THE COURT: Well, Counsel, we can indicate that that is -- I can read it.
MR. SCHAFER: Okay. That -- that's fine, Your Honor. Can you read that second --
Sorry, Your Honor.
THE COURT: For the record, this is which paragraph of the exhibit? I can't see behind the -- the call-out.
MR. SCHAFER: The second paragraph.
THE COURT: The second sentence of the second paragraph of -- what's the exhibit number, again?
MR. SCHAFER: It is Exhibit --
THE COURT: 2016.
MR. SCHAFER: Yes, Your Honor.
THE COURT: All right.
BY MR. SCHAFER:
**Q.** And, Dr. Williams, I won't read this second sentence, but can you read that?

2526

1    **A.** The highlighted portion?

2    **Q.** Correct.

3    **A.** "If our primary care providers" --

4    **Q.** Don't read it out loud.

5    THE COURT: No. No. Just to yourself.

6    THE WITNESS: Oh, I'm sorry.

7    THE COURT: That's what we're trying to avoid.

8    THE WITNESS: Yeah. I've read it. I have seen

9    this document before.

10   BY MR. SCHAFER:

11   **Q.** Okay. And do you know how Ms. Reimers arrived at

12   the impression that she references in this email?

13   **A.** Well, let me ask you, she probably said -- did she

14   say on the day that she met with me or us or --

15   **Q.** The email is in front of you --

16   **A.** I would assume that she arrived at that conclusion

17   from our conversations.

18   **Q.** Thank you.

19   **A.** If that helps you.

20   THE COURT: Counsel, actually, 2016 has not been

21   admitted. Ms. Gearhart is on her toes and just alerted me

22   to that fact.

23   Do you intend to offer 2016 at this time?

24   MR. SCHAFER: Yes, Your Honor.

25   THE COURT: Is there any objection?

2527

1    MR. ETTINGER: No, Your Honor.

2    THE COURT: All right. 2016 is admitted.

3    (Defendants' Exhibit No. 2016 admitted.)

4    THE COURT: Go ahead and proceed.

5    BY MR. SCHAFER:

6    **Q.** Dr. Williams, during your time at Saltzer, you

7    recognized that patients often chose to receive care from

8    other providers instead of Saltzer if they could receive

9    care from those providers for less out-of-pocket costs;

10   correct?

11   **A.** I'm sorry. Patients chose to see other providers

12   other than Saltzer if it was cheaper for them to do so?

13   **Q.** If -- if they could receive that care for less

14   out-of-pocket costs.

15   MR. POWERS: Your Honor, could we have the

16   question either read back to the witness, or, Mr. Schafer,

17   ask the question a little slower.

18   MR. SCHAFER: I will restate the question.

19   THE COURT: All right. And let's slow down.

20   MR. SCHAFER: Yeah.

21   BY MR. SCHAFER:

22   **Q.** Dr. Williams, during your time at Saltzer --

23   **A.** Yes.

24   **Q.** -- you recognized that patients often chose to

25   receive care from other providers, nonSaltzer providers, if

2528

1    they could receive that care for less out-of-pocket costs

2    than they would have to pay to see a Saltzer physician?

3    **A.** Now, I -- I thought that's what you said, but

4    I -- are you asking me if I can imagine if that happened or

5    you're asking me if that was something that happened a lot?

6    I'm not sure how to answer. Now I understand the question,

7    but I still don't know how to answer.

8    **Q.** I'm asking if that is a -- something that you

9    recognized and communicated to your Saltzer partners while

10   you were at Saltzer?

11   **A.** So in other words, a different way to say it is,

12   did I think that our fees were too high and the patients

13   were going other places?

14   **Q.** Sure.

15   **A.** No. Not necessarily. I mean, I -- maybe. I

16   don't -- I don't remember that ever having thought of that

17   as a big problem, but --

18   **Q.** And if we could pull --

19   **A.** I assume you're going somewhere with this.

20   MR. SCHAFER: If you could put up Trial Exhibit

21   2558. Just pull up that whole middle email from

22   Dr. Williams.

23   THE WITNESS: 2008.

24   BY MR. SCHAFER:

25   **Q.** Dr. Williams, it says here, "The out-of-pocket

2529

1    expense considerations for patients contemplating elective

2    procedures is more important currently than it has ever been

3    in the past. We lose patients weekly when they find out

4    that another provider can provide the same service at less

5    out-of-pocket expense. The patient is already very aware of

6    their deductible, copayment responsibility, and et cetera,

7    and we look even worse when they find out later they could

8    have received their care somewhere else cheaper."

9    Do you see that?

10   **A.** Yeah. And I think we're talking about surgeries

11   here, so that -- that helps with the question, too.

12   **Q.** And was that your view at the time?

13   **A.** If I wrote it, yes.

14   THE COURT: Counsel, 2558 also has not been

15   admitted, but the only objection is hearsay.

16   Counsel, do you withdraw the objection?

17   MR. POWERS: Yes, Your Honor.

18   THE COURT: All right. Exhibit 2558 will be

19   admitted.

20   (Defendants' Exhibit No. 2558 admitted.)

21   THE WITNESS: And this was an answer to another

22   email.

23   BY MR. SCHAFER:

24   **Q.** That -- that's all I needed for my question.

25   Thank you.

2530

1       You mentioned that you believe your referrals -- notice

2  your referrals have dropped off some from your former

3  Saltzer colleagues; correct?

4    **A.**  Yes.

5    **Q.**  And you don't think it's surprising, do you, that

6  your former colleagues at Saltzer refer less cases to you

7  now?

8    **A.**  **It's not surprising.**

9    **Q.**  And the reasons that you think your former

10  colleagues at Saltzer are sending less cases to you now or

11  less referrals to you now include the fact that you're no

12  longer their partner; correct?

13    **A.**  Correct.

14    **Q.**  And because you no longer do any work at

15  St. Luke's Meridian?  Is that another reason?

16    **A.**  **That would be probably another less -- less**

17  **important reason, but yes.**

18    **Q.**  And because you are part of a group that has filed

19  a lawsuit against Saltzer; right?

20    **A.**  **I don't feel like I'm part of a group that's filed**

21  **a lawsuit against Saltzer.**

22    MR. SCHAFER:  Play W50.

23    MR. SINCLAIR:  Page and line?

24    THE WITNESS:  I had nothing to do with the filing

25  of the lawsuit for sure.

2531

1    MR. SCHAFER:  This is page 118, line 23 through

2  119-1 of Dr. Williams's deposition.

3    (Video clip played as follows.)

4    **Q.**  "Why do you think that physicians who you

5      were former partners with at Saltzer are not

6      sending you cases anymore?

7    **A.**  "Well, I'm not their partner anymore.  I

8      have resigned from the group.  I no longer work

9      out of St. Luke's in Meridian.  I had to give

10      that up because of the call difficulties.  I --

11      I now have call coverage at Saint Alphonsus,

12      and none of those doctors have St. Luke's

13      privileges.  And so more and more in the

14      Valley, there is no cross-pollination of the

15      hospitals anymore.  You're either on this

16      medical staff or you're on that medical staff.

17      And now I'm working with an organization that

18      is involved in a lawsuit against the

19      organization that has acquired that entity."

20    (Video clip concluded.)

21  BY MR. SCHAFER:

22    **Q.**  Was that your testimony, Dr. Williams?

23    **A.**  **That was.**

24    **Q.**  And, Dr. Williams, while you were still at

25  Saltzer, you expected even before you left that your

2532

1  referrals would begin to tank before even leaving the group;

2  correct?

3    **A.**  Yes.

4    **Q.**  And you also believed, did you not, that towards

5  the end of your and the other surgeons' presence or

6  employment with Saltzer that if all of the surgeons quit and

7  the FTC held up or unwound the Saltzer-St. Luke's

8  transaction, that Saltzer's overhead would go through the

9  roof?  Do you remember expressing that view?

10    **A.**  **I remember the text message that I received that**

11  **the defendant counsel gave in my deposition, yes.**

12    **Q.**  Okay.

13    MR. SCHAFER:  Well, let's put that up.  It's

14  Exhibit 2020.

15  BY MR. SCHAFER:

16    **Q.**  This is the fourth page, and I'll blow it up for

17  you, Dr. Williams, so you can see the text I'm talking about

18  because they're very small.

19  An August 13th, 2012, text at 9:45 a.m.

20    MR. SCHAFER:  If you could blow that up,

21  Mr. Chase.

22  BY MR. SCHAFER:

23    **Q.**  It says, "Beasley thinks" -- and I'm going to --

24  some -- some of these words are abbreviated in text message

25  style.  I'm going to read how -- what I think they mean.  If

2533

1  you think I have misconstrued any of it, please let me know.

2    It says, "Beasley thinks Kaiser is pushing for

3  resignation so that he can have a final 90 percent approval

4  and avoid any legal issues.  But if they do this prior to

5  December 31st anyway, does it matter?  We won't be supported

6  by our group anyway.  And honestly, if we all quit and then

7  FTC does hold up or unwind deal, Saltzer's overhead will be

8  through roof without us and Kaiser will finally get his

9  due."

10    Do you see that?

11    **A.**  **I do.**

12    THE COURT:  Counsel, we've got the same, 2020 was

13  not -- has not been admitted.

14    Is there any objection?

15    MR. POWERS:  No.  No, Your Honor.

16    THE COURT:  All right.  2020 now will be admitted.

17    (Defendants' Exhibit No. 2020 admitted.)

18  BY MR. SCHAFER:

19    **Q.**  Do you see that at the top of this page in -- in

20  text that was included by your counsel, this is identified

21  on a series of texts that are -- that are identified as

22  Curran text -- texts with Williams?

23    **A.**  **Correct.**

24    **Q.**  And do you believe you received this text message

25  rather than sending it?

2534

1  **A.  I received it, correct.  It's to my number.**
2  **That's my number.**
3  **Q.**  And with respect to the overhead going through the
4  roof, you understood that the Saltzer surgeons paid based on
5  their -- based on their volumes and the amount of money they
6  generated, they paid a large portion of Saltzer's overhead;
7  correct?
8  **A.  Correct.**
9  MR. SCHAFER:  No further questions.  Let me confer
10  with my colleagues.
11  THE COURT:  Yes.
12  BY MR. SCHAFER:
13  **Q.**  And when you received that text message,
14  Dr. Williams, what -- what was your understanding of the
15  phrase, "Kaiser will finally get his due"?
16  **A.  Well, I think there was a lot of frustration with**
17  **Dr. Kaiser, especially amongst the surgeons.  Dr. Kaiser was**
18  **the stopgap communication between St. Luke's and the**
19  **surgeons.  We had no direct communication.**
20  **Q.**  And I'm sorry to cut you off --
21  MR. POWERS:  He asked the question, and he is
22  entitled to answer it.
23  MR. SCHAFER:  But I -- I -- what he is giving me
24  is a background, what I --
25  MR. POWERS:  Well, he asked --

2535

1  THE COURT:  Just a moment.  Just a moment.  All
2  right.
3  Mr. Schafer, were you trying to suggest the witness
4  should not be allowed to complete his response?
5  MR. SCHAFER:  I was trying to suggest that I --
6  what I asked for was his interpretation of that phrase, not
7  the background that was entailed.
8  MR. POWERS:  The question -- I'm sorry.  The
9  question is what was your understanding of the reference to
10  Kaiser.  And that's an open-ended question, and the witness
11  should be entitled to answer it, and he was in the middle of
12  answering it.  Just because counsel doesn't like the answer,
13  doesn't mean --
14  THE COURT:  Counsel -- Counsel, I think I heard
15  enough, Mr. Powers.  Thank you.
16  I'm going to overrule -- well, I don't know if there is
17  even an objection, but I am certainly going to allow the
18  witness to complete his response.
19  THE WITNESS:  And I will be brief.  We were forced
20  out of our group.  I was forced out of the group that I had
21  been in ten years that I had helped build.  And so was there
22  frustration?  Yes.  You know, I didn't write the text, but
23  I -- I would agree with the sentiment that, you know, the --
24  we -- we felt that Dr. Kaiser was -- was mostly behind that.
25  BY MR. SCHAFER:

2536

1  **Q.**  And what did it mean -- what did that phrase mean
2  to you that "Dr. Kaiser would finally get his due"?
3  **A.  That I think the rest of the group would see**
4  **everything that he had done, that he had tried to hide from**
5  **the rest of the group.**
6  **Q.**  Didn't you interpret that phrase to mean that
7  Saltzer would not be able to survive in the event of an
8  unwind?
9  **A.  No.  It meant that he wouldn't get to be president**
10  **anymore.**
11  **Q.**  That's how you interpreted that?
12  **A.  Yes.**
13  MR. SCHAFER:  Okay.  No further questions.
14  THE COURT:  All right.  Mr. Powers, we're right at
15  the breaking time.  I don't know how much you have, but we
16  can't stay much beyond 2:30.
17  MR. POWERS:  Understood, Your Honor.
18  REDIRECT EXAMINATION
19  BY MR. POWERS:
20  **Q.**  A few questions for you, Dr. Williams.  Did -- did
21  you regularly, when you were a member of Saltzer, take
22  Medicare or Medicaid patients to Treasure Valley Hospital?
23  **A.  Absolutely, yes.**
24  **Q.**  Was there any reason not to take them to Treasure
25  Valley Hospital?

2537

1  **A.  No.  I was hoping you guys would have numbers.  I**
2  **think the numbers reflect out of my total Medicare,**
3  **Medicaid, there is a large portion that go to Treasure**
4  **Valley Hospital.  And by that I mean probably 50-50 between**
5  **insured and Medicare, Medicaid.**
6  **Q.**  Is the significant reduction in your case count at
7  Treasure Valley Hospital in Boise in September of 2012
8  attributed, in your opinion, to your performance of
9  surgeries at Treasure Valley Surgical Center in Nampa?
10  **A.  No.  They are two different patient populations.**
11  **Q.**  Thank you.
12  MR. POWERS:  No further questions, Your Honor.
13  THE COURT:  Anything else?
14  MR. SCHAFER:  Nothing, Your Honor.
15  THE COURT:  All right.
16  Dr. Williams, you may step down and are excused.  Thank
17  you, sir.
18  Counsel, we'll take the recess.  We're going to start
19  at 8:30 regardless on Tuesday, Monday being a holiday.
20  I'm -- I don't know if counsel has had a chance to confer.
21  MR. SINCLAIR:  Your proposed rescheduling is fine
22  with us.
23  THE COURT:  All right.  It is?  That's what we'll
24  do.  The meeting happens to be here in this building.  So we
25  will go 8:30 until noon and then 1:00 until 3:30.  So we're

2538

1     all -- all right.
2         We'll be in recess then until -- oh, Mr. --
3              MR. JULIAN:  Can I raise one issue?
4              THE COURT:  Yes.
5              MR. JULIAN:  Have the plaintiffs rested at this
6     point?
7              MR. ETTINGER:  Your Honor, we --
8              THE COURT:  I don't know.
9              MR. JULIAN:  They're three weeks into it.
10            MR. ETTINGER:  Your Honor, we still have to work
11    out these exhibits and these deposition designation issues,
12    and we intend to do so.
13            THE COURT:  Well, do we -- you anticipate a
14    Rule 50 motion, is that what --
15            MR. JULIAN:  A 52(c) actually, Your Honor.
16            THE COURT:  Oh, that's true.
17            MR. JULIAN:  Yes.
18            THE COURT:  I forget, we don't have a jury.
19         All right.  We'll wait until we have this all resolved.
20    I'm obviously allowing the case to proceed in a somewhat
21    unusual fashion because of the way the length of the trial,
22    the difficulty in trying to work around schedules, but I
23    think at some point, the plaintiffs are going to have to
24    rest before the defendants rest to keep the cart -- horse
25    before the cart, and then we'll have a chance to hear the

2539

1     appropriate motions at that time.
2            MR. JULIAN:  Thank you, Your Honor.
3            THE COURT:  All right.  We'll be in recess.
4     (Court recessed at 2:32 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       R E P O R T E R'S  C E R T I F I C A T E
2
3
4
5        I, Tamara I. Hohenleitner, Official
6    Court Reporter, County of Ada, State of Idaho,
7    hereby certify:
8        That I am the reporter who transcribed
9    the proceedings had in the above-entitled action
10    in machine shorthand and thereafter the same was
11    reduced into typewriting under my direct
12    supervision; and
13        That the foregoing transcript contains a
14    full, true, and accurate record of the proceedings
15    had in the above and foregoing cause, which was
16    heard at Boise, Idaho.
17        IN WITNESS WHEREOF, I have hereunto set
18    my hand October 14, 2013.
19
20
21
22       _____ -s-
         Tamara I. Hohenleitner
23    Official Court Reporter
         CSR No. 619
24
25