1

**UNITED STATES DISTRICT COURT**

2

**IN THE DISTRICT OF IDAHO**

3

- - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW

4  SAINT ALPHONSUS MEDICAL CENTER -    :
NAMPA, INC., TREASURE VALLEY        : Bench Trial

5  HOSPITAL LIMITED PARTNERSHIP, SAINT : **Witnesses:**
ALPHONSUS HEALTH SYSTEM, INC., AND  : **Alain Charles Enthoven**

6  SAINT ALPHONSUS REGIONAL MEDICAL    :
CENTER, INC.,                       :

7                    Plaintiffs,     :
         vs.                        :

8                                    :
ST. LUKE'S HEALTH SYSTEM, LTD., and :

9  ST. LUKE'S REGIONAL MEDICAL CENTER, :
LTD.,                               :

10                   Defendants.      :
- - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW

11 FEDERAL TRADE COMMISSION; STATE OF  :
IDAHO,                              :

12                   Plaintiffs,     :
         vs.                        :

13                                    :
ST. LUKE'S HEALTH SYSTEM, LTD.;     :

14 SALTZER MEDICAL GROUP, P.A.,        :
                                     :

15                   Defendants.      :
- - - - - - - - - - - - - - - - - - x

16

17                    * * * SEALED * * *

18

    REPORTER'S TRANSCRIPT OF PROCEEDINGS

19

    before B. Lynn Winmill, Chief District Judge

20

    Held on October 15, 2013

21

    Volume 14, Pages 2540 to 2746

22

                **Tamara I. Hohenleitner**

23          Idaho Certified Shorthand Reporter No. 619
                Registered Professional Reporter

24                Certified Realtime Reporter
              Federal Certified Realtime Reporter

25

            United States Courts, District of Idaho
      550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

2541

1                        <u>A P P E A R A N C E S</u>

2

**FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,**
3       **SAINT ALPHONSUS HEALTH SYSTEM, INC.,**
        **AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.**
4

5            Keely E. Duke
             DUKE SCANLAN & HALL, PLLC
6            1087 W. River Street, Suite 300
             Boise, ID 83707
7
             David A. Ettinger
8            Lara Festco Phillip
             HONIGMAN MILLER SCHWARTZ AND COHN LLP
9            2290 First National Building
             660 Woodward Avenue
10           Detroit, MI 48226

11

12

13     **FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION**

14
             Peter C. Herrick
15           U.S. FEDERAL TRADE COMMISSION
             500 Pennsylvania Ave., N.W.
16           Washington, DC 20580

17           J. Thomas Greene
             U.S. FEDERAL TRADE COMMISSION
18           600 Pennsylvania Ave N.W.
             Washington, DC 20580
19
             Henry Chao-Lon Su
20           U.S. FEDERAL TRADE COMMISSION
             601 New Jersey Ave., N.W.
21           Washington, DC 20001

22

23

24

25

2542

1                       A P P E A R A N C E S (Continued)

2

     FOR PLAINTIFF STATE OF IDAHO
3
             Eric J. Wilson
4            GODFREY & KAHN, S.C.
             One East Main Street
5            Suite 500
             PO Box 2719
6            Madison, WI 53701

7            Carl J. Withroe
             Brett T. DeLange
8            Colleen Zahn
             Wendy Arends
9            OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
             954 W. Jefferson, 2nd Floor
10           Boise, ID 83720-0010

11   FOR PLAINTIFF TREASURE VALLEY HOSPITAL

12           Raymond D. Powers
             POWERS TOLMAN FARLEY, PLLC
13           PO Box 9756
             Boise, ID 83707
14
     FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15   AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16           Jack R. Bierig
             Tracy F. Flint
17           Ben J. Keith
             Scott Stein
18           Chad Schafer
             SIDLEY AUSTIN
19           One South Dearborn
             Chicago, IL 60603
20
             J. Walter Sinclair
21           Sara M. Berry
             STOEL RIVES
22           101 S. Capitol Boulevard, Suite 1900
             Boise, ID 83702
23
     FOR DEFENDANT SALTZER MEDICAL GROUP
24           Brian Kenneth Julian
             ANDERSON JULIAN & HULL, LLP
25           PO Box 7426
             Boise, ID 83707

2543

1          **I N D E X**

2

| | | PAGE: |
|---|---|---|
| | Courtroom open to the public......................... | 2544 |

8

9        **DEFENSE ST. LUKE'S HEALTH SYSTEM**

         **W I T N E S S E S**

| | | PAGE: |
|---|---|---|
| **ENTHOVEN, Alain C.** | | |
| | Direct Examination by Mr. Keith............... | **2545** |
| | Cross-Examination by Mr. Ettinger............ | **2652** |
| | Cross-Examination by Mr. Greene.............. | **2694** |
| | Examination by the Court..................... | **2710** |
| | Redirect Examination by Mr. Keith............ | **2718** |
| | Recross-Examination by Mr. Ettinger.......... | **2735** |

19         * * * * *

2544

1     P R O C E E D I N G S
2          October 15, 2013
3     ***** COURTROOM OPEN TO THE PUBLIC *****
4          THE CLERK:  The court will now hear Civil Case
5     12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,
6     versus St. Luke's Health System for Day 14 of a bench trial.
7          THE COURT:  Good morning, Counsel.
8     Mr. Keith, I see you're ready to call your next
9     witness.
10          MR. KEITH:  We are, Your Honor.  Defendants call
11    Dr. Alain Enthoven.
12          THE COURT:  Dr. Enthoven, if you would step
13    forward, take the -- or step before the clerk and be sworn
14    as a witness and then follow Ms. Gearhart's directions from
15    there.
16               ALAIN CHARLES ENTHOVEN,
17    having been first duly sworn to tell the whole truth,
18    testified as follows:
19          THE CLERK:  Please take a seat in the witness
20    stand.
21          Please state your complete name and spell your name for
22    the record.
23          THE WITNESS:  My complete name is Alain Charles
24    Enthoven.
25          THE COURT:  You may inquire of the witness.

2545

1     Mr. Keith.
2               DIRECT EXAMINATION
3     BY MR. KEITH:
4          Q.  And I'll just ask, can you spell your first name,
5     as well?
6          A.  It's the French spelling, A-L-A-I-N.
7          Q.  Thank you, Dr. Enthoven.
8          MR. KEITH:  Your Honor, we have a set of exhibits,
9     demonstratives that I would like to hand up to the witness
10    now.  A copy has been provided to plaintiffs.  And just for
11    the record, these include the expert report that Dr.
12    Enthoven provided in discovery, as well as some articles
13    that he cited.
14    BY MR. KEITH:
15         Q.  Dr. Enthoven, can you please explain your current
16    employment.
17         A.  I'm a retired professor in the Graduate School of
18    Business at Stanford University.
19         Q.  And we'll get into your background in more detail,
20    but it would be -- would it be fair to say that you spent
21    decades studying the healthcare industry?
22         A.  Four decades.
23         Q.  Would you explain to the court the scope of your
24    engagement in this case?
25         A.  My engagement is to testify and opine, first, on

2546

1     the benefits of integrated delivery systems in general and
2     specifically the benefits that would accrue to residents of
3     Idaho if St. Luke's were to be able to complete its plan to
4     create an integrated delivery system, and then to offer
5     opinions on the significance of the Saltzer integrated
6     merger for this process.
7          Q.  And how have you been compensated or are you
8     compensated for your work?
9          A.  Yes.  I'm being paid $600 an hour, and the pay is
10    not contingent on the consequences of this trial.
11         Q.  And in preparing for your testimony, have you put
12    together a set of slides to aid the court in understanding
13    your direct?
14         A.  Yes, I have.
15         Q.  Could we put that up on the screen, please.
16         Do you recognize at least the title slide here as this
17    set that you put together?
18         A.  I recognize it, yes.
19         THE COURT:  Counsel, this exhibit has been marked
20    for identification purposes only as Exhibit 5108, and it is
21    a demonstrative only; correct?
22         MR. KEITH:  That's correct, Your Honor.
23         THE COURT:  All right.
24    BY MR. KEITH:
25         Q.  I'd like to first turn and have you explain your

2547

1     educational background.
2          A.  I hold a bachelor of arts in economics from
3     Stanford University.  Then I went to Oxford and earned an
4     M.Phil. master's degree in economics.  And then I came to
5     MIT in Cambridge, Massachusetts, and earned a Ph.D. in
6     economics.
7          Q.  And what has been the nature and scope of your
8     academic work?
9          A.  Well, I have been the Marriner Eccles professor of
10    public and private management in the Graduate School of
11    Business and also professor of health economics and research
12    in the medical school at Stanford.  I founded and taught
13    three courses at Stanford:  analysis of costs, risks, and
14    benefits of medical technology; the political economy of
15    healthcare in the United States; and quality management in
16    medical care.
17         And over those years I have written about 85
18    articles published in leading journals like *The New English
19    Journal of Medicine, The Journal of the American Medical
20    Association Health Affairs,* about 85 articles and/or
21    chapters in books.
22         Q.  And there are a set of articles that are
23    highlighted here on this slide.  Could you just briefly
24    explain to the court the nature of those articles.
25         A.  Sure.  The first on the list is "Competition in

2548

1    Health Care: It Takes Systems to Pursue Quality and
2    Efficiency." And my main point there was quality and
3    efficiency in healthcare are achieved at the system level,
4    because there are so many things that the system can do that
5    the individual doctor can't do. Quality, efficiency is not
6    a matter of the single doctor working faster. Efficiency
7    comes from a well-designed system.
8         "'Redefining Health Care': Medical Homes or
9    Archipelagos to Navigate," that was a debate I was having
10   with Professor Michael Porter of the Harvard Business
11   School, who had a vision of competing individual practice
12   units, so if you were suffering a spine problem, you sought
13   out the best spine-ologist, and if you had a liver problem,
14   you went to the best liver-ologist, and he didn't think that
15   an integrated comprehensive care system was the best way to
16   go, for his own reasons, and so I was rebutting that by
17   saying people need integrated delivery systems. You don't
18   arrive in the world with a diagnosis marked on your
19   forehead. You walk in the door and talk to your primary
20   care physician who then, if necessary, refers you to a
21   specialist and interacts with the specialist. And you
22   eventually find your way to the appropriate integrated
23   practice unit, but you need a system to get you there.
24        "Curing Fragmentation with Integrated Delivery
25   Systems: What They Do, What Has Blocked Them, Why We Need

2549

1    Them, and How We Get There From Here." Professor Einer
2    Elhauge -- I don't know if I pronounced it correctly --
3    Elhauge, of the Harvard Law School organized a conference on
4    fragmentation in medical care and invited me, and actually I
5    was invited to give the first presentation. And what I
6    explained in the article was just what the title says: Why
7    is the system fragmented now, explained that, and why we
8    have such a bad system, what integrated care is and what it
9    could do for us. And then how to get there from here.
10        Let's see. Finally, oh, that's the same as the
11   first one, "Competition in Healthcare: It Takes Systems to
12   Pursue Quality and Efficiency."
13        Q.  Now, I would like you to turn not to your academic
14   work but some of your experiences relative to your testimony
15   in this case. Can you explain what government work you've
16   done in that regard?
17        A.  Sure. I spent the 1960s in the Department of
18   Defense, and I -- at the direction of the secretary, this
19   is -- I served through all of the Kennedy and Johnson years.
20   At the direction of the secretary of defense I created an
21   office that we called "the office of systems analysis." And
22   I had a few people to begin with, and McNamara kept on --
23   Secretary McNamara kept on saying, you know, expand, get
24   more, we want more of this. And so I ended up with about a
25   200-person organization. Sometimes I described my job as

2550

1    chief analytical think-man for Robert McNamara, other times
2    to say den mother for McNamara's whiz kids.
3         Essentially, we analyzed all kinds of issues, from
4    antimissile-missile to NATO strategy to the best fighter
5    plane for the Air Force, and so forth.
6         By the way, during those years, I received the
7    President's Award for Distinguished Federal Civilian Service
8    from President Kennedy.
9         Q.  Can you explain your role with regard to the
10   Institute of Medicine?
11        A.  Yes. I was elected to the Institute of Medicine
12   in about 1972. The Institute of Medicine and the National
13   Academy of Sciences was an expansion of the National Academy
14   of Sciences to deal specifically with problems of
15   healthcare, health policy was to -- what the National
16   Academy of Sciences does is advises the president and the
17   Congress on important issues of healthcare.
18        And I guess they'd noticed the work I had done at
19   Georgetown University prior to that, which was that I was on
20   the board of directors and on the medical center committee,
21   and some of the doctors there wanted to study what did they
22   think would be the future of medicine so they could properly
23   direct their students. And they concluded it would be with
24   what's known as prepaid group practice, multispecialty group
25   practice paid for on per capita prepayment.

2551

1         And so we created Georgetown University community
2    health plan, which was a prepaid group practice. And I was
3    active and involved in that, and that's when I first learned
4    about integrated delivery systems. I was attracted to the
5    idea because it included rational economic incentives,
6    teamwork. So that was my Georgetown work.
7         And then the Institute of Medicine -- well, I
8    participated in discussions and in various committees. At
9    the time they were interested in evaluating prepaid group
10   practices, and so I was interested in influencing their
11   thinking about that. And I served as a -- on the committee
12   of the Institute of Medicine, advising the federal
13   government on the national quality report card.
14        That led to -- now I'm up to the early '70s. And
15   in 1976 Jimmy Carter was elected president, and he picked
16   Joe Califano to be his secretary for health and human
17   services, and Califano right away contacted me and asked me
18   to come back and be one of his assistant secretaries. I
19   said, "I just don't want to give up my beautiful,
20   comfortable home in California for that." I said to our
21   dean, "I took that course before and got an A in it."
22        And the dean said, "Yeah, you might get a C this
23   time."
24        I mean, the office of the assistant secretary was
25   based on the office I created in the defense department, the

2552

1  same idea, planning and evaluation.
2          Anyway, so then Jimmy Carter, in his campaign, had
3  promised, I'll give you all universal, mandatory,
4  compulsory, comprehensive health insurance, and my
5  assignment with Califano -- and I said, "I'll do that as a
6  consultant; I'll commute back here" -- is I'll work out a
7  plan for how you could do that.
8          The result was pair -- well, it was a report to
9  them and then a pair of articles based on that in *The New*
10 *England Journal of Medicine* called, "Consumer Choice Health
11 Plan." And the idea was we would transform the system, get
12 our costs under control, improve quality, and so forth, by
13 the competition among integrated delivery systems.
14         That article had a big impact. Important people
15 came to talk to me about it. Bills were introduced in the
16 Congress. Al Ullman, the chairman of the House Ways and
17 Means committee, Dave Durenberger in the Senate Finance
18 Committee, and on and on. So that really got me involved in
19 government testifying before Congressional committees and
20 the like.
21         At the same time back -- scroll back to 1973, when
22 I came to Stanford, based on my experience with Georgetown
23 University community health plan, I thought, well, who are
24 the local prepaid group practices around here. Well, it was
25 obvious that it's Kaiser Permanente. So accompanied by my

2553

1  dean, I went over to meet with the CEO of Kaiser Permanente.
2  Kaiser Permanente is the largest integrated delivery system
3  in the USA.
4          And so I met with their CEO, explained what I had
5  done in the defense department, which included a lot of
6  policy analysis, cost effectiveness analysis, et cetera.
7  And what I would like to do is establish a consulting
8  relationship with them, which I did, or they agreed to, and
9  that's -- I'm still a consultant to Kaiser Permanente. I
10 worked with them on a rich variety of problems over the
11 years, and in the process learned much more than I taught
12 them about integrated delivery systems.
13         What really impressed me about them was just
14 problem after problem they had faced -- these are smart
15 people, and they'd come up with a rational, reasonable
16 solution to that problem. So I still have the relationship
17 with Kaiser Permanente.
18         Meanwhile, after the Carter Administration, later
19 on when Clinton was elected president, they asked for my
20 advice on -- on -- what the Clinton health plan should be
21 like. I remember meeting with Hillary Clinton and Ira
22 Magaziner and those people. And their plan adopted a lot of
23 my ideas. Unfortunately, it adopted some other ideas that I
24 really didn't like, like federal price controls on health
25 plans, which I felt wouldn't work. But so I was involved

2554

1  with the Clinton health plan.
2          Then in the 1990s, what was called "managed
3  care" -- which wasn't always prepaid group practice; it was
4  sometimes insurance companies contracting with
5  fee-for-service solo practice doctors and calling it an HMO.
6  I didn't think it was. And I think the terrible mistake was
7  these were imposed on people; that is, the Blue Cross HMO,
8  let's say, would make a sale to some company, and the
9  company would foolishly say, okay, all of our employees are
10 going to be in that plan. Well, the next day some of the
11 employees found they couldn't see their favorite doctor, and
12 they were furious. So in the '90s we experienced the
13 managed-care backlash.
14         And so the government pulled payment for my sins
15 but appointed me to head of a commission called "The Managed
16 Care Improvement Task Force" made up of doctors, insurance
17 companies, hospitals, health plan members -- I guess I was
18 one of those -- and to make recommendations for how to deal
19 with the backlash.
20         Well, our research showed that the backlash was
21 concentrated in people who were there without a choice. And
22 I remember my letter to the governor after it said, "The
23 most satisfied people in California are the members of
24 Kaiser Permanente and their doctors, and I think the reason
25 for that is because they were there by choice." So I had

2555

1  become a big advocate of consumer choice and competition.
2          So along about the same time, Stanford University
3  has a committee called the -- we then called it "the
4  benefits committee" to oversee the health insurance programs
5  for the -- for the employees. And I was appointed chairman
6  of that committee. And at the time we were experiencing
7  very undesirable cost increases, and so I designed and we
8  implemented a managed competition model. "Managed
9  competition" is a term that I coined for the rules to make
10 competition work because you can't have just a plain old
11 free market in health insurance; too many bad things would
12 happen. And health insurance, in fact, is a very regulated
13 industry.
14         So we installed managed competition in the -- in
15 the health insurance for our employees, and I am still
16 chairman of this committee because they won't let me go,
17 because, you know, they say, "Oh, Alain, this healthcare --
18 health insurance is so complicated; you're the one who
19 understands it." So I have been following it through the
20 years at a practical down-to-earth level.
21     Q. Can you just explain what you mean by "managed
22 competition"?
23     A. Yes. It's not a free market. You have to have
24 rules. For example, if you had competing insurance plans,
25 the first best way to succeed would be to make yourself

2556

1  attractive to good risks and unattractive to bad risks.  You
2  know, like we just don't sign up any nephrologists.  So
3  anybody with kidney problems wouldn't choose that plan.
4       And, in fact, we had some examples of that where
5  one of our HMOs said we cover insulin as an outpatient drug,
6  but we don't cover the delivery system for it.  We
7  discovered that, and we said to them, "If you want to go on
8  doing business with us, you're going to fix that."  A lot of
9  tricks like that.  So one of the answers to that is to
10  standardize the coverage contracts so you're all bidding for
11  the same coverage.
12       And the other thing is a process called "risk
13  adjustment."  Essentially, you're doing econometric analysis
14  of the diagnostic history of each patient, and you translate
15  that into predicted medical costs, and you add that up, and
16  that's a score that the health plan gets for how sick is its
17  population, what is the expected cost to care for such a
18  population.  So we -- in our managed competition model, we
19  essentially tax the pre -- or add a supplement to the
20  premium of those plans that got the good risks, and we used
21  that to subsidize the plans that got the bad risks -- I
22  think the French call that *compensation des risques;* it was
23  compensation of risks, or some call it "risk
24  equalization" -- to make it work.
25       Another problem would be the insurance companies,

2557

1  if left to their own devices, love to come up with all kinds
2  of complicated bells and whistles; nobody can read and
3  understand their health insurance contract.  So the answer
4  to that would be to standardize the coverage contracts.
5       By the way, along about the same time I was -- in
6  the early '90s -- I was chairman of the Health Benefits
7  Advisory Council for CalPERS, the California Public
8  Employees Retirement System, which covered 1.3 million
9  people.  And that was one of my first recommendations which
10  he really adopted, which was standardize the coverage
11  contract.
12       And -- oh, in fact, great stories of the fine
13  print.  One contract said, "yes, we cover organ
14  transplants," but in the fine print, "we do not cover the
15  harvesting and transporting of the organ," you know.  So
16  here I am anesthetized, lying on the operating table, and
17  they say first, "write a check to pay for that."  So that's
18  ridiculous.  Again, the management of CalPERS said, "If you
19  want to go on doing business with us you strike that
20  clause."
21       So that was another example of managed
22  competition.  You've got to have rules that are enforced to
23  make them compete on the same product, take care of risk
24  selection, et cetera.
25   Q.  And to what extent do you believe that the

2558

1  principles you've articulated as managed competition are in
2  place or at least coming into place in the U.S. healthcare
3  system?
4    A.  Well, it's a work in progress, and I think we
5  still have a long way to go, but I have, for years, been
6  advocating that we -- more people should have an informed
7  cost-conscious choice, and -- which not enough people do
8  now, but there's -- step by step there is progress.
9       First of all, I got into this when -- with Kaiser
10  Permanente I went to them and said, "Where does your
11  business come from?"  I had just been president of Litton
12  Medical.  I'd just been in business, so I was thinking
13  business.
14       And they said, "Well, most of our customers come
15  from federal employees and public employees in California.
16  And somebody said, "Must be something about us that
17  bureaucrats like."
18       And I said, "No, you know, what it is is the
19  federal employees' health benefits program is a
20  cost-conscious, multiple-choice program and so is the state
21  employees'.  So naturally if people are given a choice, they
22  will choose you.  And when we installed managed competition
23  at Stanford, the Kaiser's market share soared.  And that was
24  part of what I was thinking about with consumer choice
25  health plan, is what I am trying to do is make the world

2559

1  safe for high-quality, cost-effective, integrated delivery
2  systems that satisfy and please their employees.
3       But we're not there yet.  But I think in the
4  Affordable Care Act, the Congress took a very important step
5  in creating the exchanges.  And I think whoever you are,
6  you've got to think the exchanges are a great idea because
7  health plans can be presented to the citizens in a
8  cost-conscious mode.
9       And also, in recent times, Aon Hewitt and Towers
10  Perrin consulting firms have created private sector
11  exchanges.  I've been involved in other -- in fact, one of
12  the companies that Towers acquired to do this, I was one of
13  the advisors on that one.  So they can go to employers and
14  say, "Well, here is -- we've contracted with all these
15  health plans, and they all meet the conditions of managed
16  competition."
17       One of the conditions of managed competition, by
18  the way, is a guaranteed issue, that is -- so, let's say, at
19  Stanford if an employee walks in and says, "I choose Plan
20  B," well, then we say, "The deal is you're in Plan B."  You
21  can't -- Plan B can't say, oh, you know, we don't want
22  Professor Enthoven and all his children, you know, et
23  cetera.  The rules are guaranteed issue.  That's another
24  thing you have to have.  The health plan doesn't have the
25  right to inspect you or discriminate against you and so

2560

1   forth.
2           Let's see, so where did that get me?
3       Q.   Well, is guaranteed issue one of the provisions of
4   the Affordable Care Act that you think helps --
5       A.   Yeah, right.
6       Q.   -- further the purposes of managed competition?
7       A.   That's right.  You can't have a competitive market
8   in which -- in health insurance in which the insurer says,
9   well, wait a minute, I get to inspect you and see whether I
10  like you or not and not take you if you're sick.  I mean,
11  you get to an absurd situation where the whole health
12  insurance industry is trying to avoid insuring sick people,
13  yet that's why we have insurance.  So if you want people to
14  have health insurance, then you have to have a rule like
15  that.
16      Q.   Before we move on, I just wanted to ask you about
17  the Integrated Healthcare Association.
18      A.   Right.
19      Q.   I'm not sure you touched on that.
20      A.   Well, Integrated Healthcare Association -- I've
21  been on their board for 10 or 12 years now -- is a
22  nonprofit, nonpartisan, multisector leadership group.
23  It's -- the board is made up of seven medical groups, the
24  leaders of medical groups, seven from hospitals, seven from
25  insurance companies, and then a few other people

2561

1   like -- like three professors like me that are there, I say
2   to keep them honest and to make sure that we could testify
3   to the Federal Trade Commission, if necessary, this is not
4   an anticompetitive scheme, in fact, this is a procompetitive
5   scheme and is trying to make the market work better.
6           And so we have done a lot of projects that I feel
7   proud of, like -- called "pay for performance."  It used to
8   be that different insurance companies would require the
9   different medical groups to report product -- report quality
10  based on their own particular list of quality indicators.
11  And so then the medical groups said you're driving us crazy;
12  we have seven different insurance companies, and we have
13  seven different quality measure sets, and so couldn't we all
14  get together on one.  And so the Integrated Healthcare
15  Association, that's the kind of thing we did.  We were
16  trying to figure out how to -- to make the market work
17  better because we were confident that if the market was
18  working well, more and more people would choose integrated
19  healthcare.
20          So pay for performance, the idea was first public
21  measurement, public accountability for quality measures so
22  they're out there for people to see, and then the insurance
23  companies would direct financial rewards to the groups that
24  excelled in quality.
25      Q.   I would like to turn now to the substance of your

2562

1   work in this case.  And you articulated in response to my
2   question that you had been asked to look at three things:
3   the benefits of integrated delivery systems, the benefits
4   that would accrue if St. Luke's was able to create an
5   integrated delivery system here in Southern Idaho, and the
6   benefits that would accrue from the Saltzer transaction.
7           So let's take the first of those topics.  Can you just
8   give us a very high-level overview of the benefits of
9   integrated delivery systems?
10      A.   Yes.  Okay.  It starts with the fact that
11  healthcare comes in systems.  You know, something of an
12  irony that back in 1973 the Federal Trade Commission put on
13  a conference on competition in healthcare, and somehow they
14  invited me.  And part of the conference was structured as
15  competition among doctors, competition among hospitals,
16  competition among insurance companies.  And my paper was to
17  say, no, competition really comes -- healthcare is -- comes
18  in systems.  If you're sick, you benefit from the services
19  of all three of those.  And it will be better if they work
20  together, if we define it as a system and start doing
21  process improvement to make it work together to raise
22  quality and cut costs.
23          So especially with complex and chronic care, those
24  are beyond the capabilities of individual doctors, and yet
25  they account for most of healthcare spending.  Most of

2563

1   healthcare spending is not, you know, on mom taking kid to
2   the pediatrician.  Most healthcare spending is in complex
3   care for people with multiple chronic conditions.
4           So that's the first insight in recognition.
5           Secondly, that system can be more or less
6   fragmented or more or less integrated, and greater
7   integration and less fragmentation promotes higher-value
8   care.
9       Q.   When you use the word "integration," what exactly
10  do you mean by that?
11      A.   Well, that the parts are coordinated, work
12  together, don't work at cross-purposes, particularly that
13  their incentives are aligned.  So in an integrated delivery
14  system what's best for the patient is also best for the
15  doctors and the hospitals and the insurers.  They don't work
16  at cross-purposes.  They share information.  And the culture
17  and ethic is one of teamwork, not -- there's a problem with
18  traditional medicine, what I call "20th century medicine."
19  Part of the ethics of organized medicine was autonomy, that
20  is, each doctor is responsible for the whole thing and does
21  it on his own and doesn't share information.  You know, it's
22  kind of "it's my patient, not somebody else's patient, and
23  the records are my records."  That's the fragmented system.
24          In the integrated system, the care is given by a
25  team.  We completely share information, so, you know, if

2564

1  he -- if a patient is being seen by doctors A, B, C, and D,
2  all those doctors have a comprehensive record, kind of in
3  real-time as to what has happened to facilitate their
4  working together. That's a brief sketch of integrated care.
5      Q.  I think I got ahead of my ability to collect. So
6  I think you've already touched on a number of these items,
7  but let me ask you about a few in particular.
8      First off, you said that fragmentation you describe as
9  20th century medicine. Does that mean that it's a system of
10 medicine that's -- it's behind us, we're beyond that
11 fragmentation now?
12     A.  Well, unfortunately, it's still with us. And in
13 America, across America, we are engaged in struggle, and in
14 this courtroom, also, I think it's a struggle for what I
15 call "21st Century medicine," which is -- has the virtues
16 and characteristics that I described. To replace 20th
17 century medicine, that is to replace fragmentation, autonomy
18 of physicians, et cetera, et cetera, lack of sharing
19 information, with a system that has these attributes,
20 sharing information, financial alignment of incentives,
21 what's best for the doctors is best for the patients, et
22 cetera, agreement on practice guidelines.
23     Q.  What about the use of health information
24 technology? How would you describe that in terms of 20th
25 century medicine?

2565

1      A.  Well, 20th century medicine, for the most part,
2  took place before we had modern electronic information
3  technology. Although, for example, Dr. Colin at the Kaiser
4  Permanente, way back in the '60s believed that we needed to
5  use computers in medicine and was experimenting and testing
6  and creating applications. Computers weren't very good
7  then, of course. I'm going to -- next week going to
8  Dr. Colin's 100th birthday party. So in living memory of
9  this -- this development has happened.
10     With 21st century medicine, though, we have
11 powerful electronic information technology which confers
12 enormous benefits. In fact, my friends at Kaiser Permanente
13 say, with Epic, it has completely transformed medical care
14 and the way they practice medicine. For example, two or
15 three different doctors want to be seeing -- who are
16 treating a given patient want to be seeing what's going on,
17 and they can share information in real time. They can all
18 be looking at the same record.
19     Q.  I'd like you to identify to the court what you see
20 as the problems resulting from fragmentation in healthcare.
21     A.  Right. Well, first of all is errors. Around 1999
22 the Institute of Medicine of the National Academy of
23 Sciences published a report called, "To Err is Human." And
24 it was really a shock -- it wasn't meant to be a shocker,
25 but, boy, it had a big impact, because it documented that

2566

1  there are credible studies on the basis of which you could
2  estimate that somewhere between 44,000 and 98,000 -- maybe
3  it's 95- -- Americans die every year in hospitals from
4  errors that could have been prevented. And errors come
5  because providers won't have key information that they need
6  to for treating their patients. That's huge. That's a very
7  big problem. There is both undertreatment and
8  overtreatment.
9      Again, the National Academy of Sciences did a
10 report more recently saying -- estimating that 30 to 40
11 percent of all healthcare spending is waste, that is, it
12 does nothing to benefit the patient. That's huge, 30 to 40
13 percent of this multitrillion-dollar -- and that results
14 from overtreatment, from undertreatment. That is -- some is
15 unnecessary surgery, in that, surgery that there is no
16 evidence that it benefits the patient. Undertreatment,
17 there are things the patient should have had but didn't.
18     A few years ago, my friend from RAND, Beth
19 McGlynn, published a big study in *The New England Journal of*
20 *Medicine,* said, "First we, you know, examined all the
21 medical literature, and we found that -- we codified a lot
22 of rules," you know, if this, then that. If a heart attack,
23 then a beta blocker. If a palpable breast mass, then a
24 mammogram, et cetera, et cetera; all these rules. Then go
25 through thousands of medical records of Americans and find

2567

1  they got about 50 percent of recommended care, just all
2  kinds of errors of omission. And usually the things omitted
3  were on the prevention side and wouldn't cost a lot to
4  implement.
5      So there's overuse, underuse, misuse. You know, I
6  could give you lots of examples of misuse. One that I was
7  most interested in that some complex procedure like
8  open-heart surgery, the result is a lot better if it's done
9  by a high-proficiency provider versus a low-proficiency
10 provider.
11     In fact, I published an article in one of the
12 medical journals about that. It was the first article to
13 document and quantify the effect of the learning curve. I
14 believed in the learning curve, because in the defense
15 department that's the way we bought airplanes. So we
16 documented the learning curve. It was an econometric study,
17 and it actually became a famous article.
18     Some years later I was in London studying the
19 National Health Service at their invitation, and I wanted to
20 talk to a particular heart surgeon, and when he learned that
21 I was the author of that article he said he was happy to see
22 me. So that had a big impact.
23     But that's an example of misuse. In California we
24 had more than 50 hospitals doing dangerously low volumes of
25 open-heart surgery. So overuse, misuse, et cetera. And

2568

1   that's part of the fragmented system.
2        Then under the fragmented system, resources
3   inefficiently allocated; higher-cost providers used when
4   lower-cost providers could provide high-value care.  Just
5   as -- an example that comes to my mind, and that is once I
6   was visiting the Kaiser Permanente Medical Center in San
7   Francisco, and they were kind of giving me a tour of the
8   whole place and telling me what they were doing, and we
9   walked by an area, and they said, "These are the spaces for
10  our home nurses."
11       And I said, "Oh, what's that all about?"
12       They said, "Well, we have -- we take care of about
13  300 people who are in their homes, who otherwise would need
14  to be in a hospital, because we have a nurse visiting them
15  every day and making sure everything is okay and they've got
16  their IVs," or whatever it was.  And usually that's a lot
17  more acceptable for patients.  I mean, the hospital is a
18  miserable place to be.  It's a lot nicer to be at home in
19  your own bed where you're -- the bugs in the bed are what
20  you're immune to and your body is used to it, and so forth.
21  Anyway, it's a lot cheaper, and it's a lot more satisfying
22  for patients.  So that would be an example of -- but on the
23  other hand, if the insurance pays for it all, why go to the
24  trouble of caring for people at home?  So I think there is a
25  lot of that.

2569

1        And then, generally, I think in the fragmented
2   system, it inflates the cost by perverse incentives and
3   lowers the quality of care.
4        Q.   And within the fragmented system, I wanted to ask
5   you about the effect or the impact that price has on some of
6   the issues that you just described as problems of the
7   system.
8        A.   Well, pricing is -- well, I guess first, looking
9   at my slide here, "Payers can, to some extent, control the
10  prices paid."  You know, Blue Cross can say negotiate the
11  price or Medicare just decrease the price.  But an
12  interesting thing about it is payors are completely
13  ineffective when it comes to trying to control the volume
14  and intensity of services.
15       So in the Medicare organization, they have an
16  office of volume intensity response.  And what they find is
17  if the Congress decides to cut doctor fees by -- to raise --
18  let's see, the equivalent of $100, to take a convenient
19  round number, then the doctors take back 30 to 40 percent of
20  it by increasing the volume of services -- you know, come
21  back and see me tomorrow if you don't feel better -- and the
22  intensity of services -- well, we're going to give you some,
23  you know, intense high-cost procedure when a low-cost
24  procedure or no procedure would have done just as well.
25       So here I'm going to be talking about physicians

2570

1   responding to incentives.  Let me emphasize I have the
2   greatest respect for physicians.  I have learned in the
3   classroom that people who went to medical school did it
4   because they wanted to take care of patients, not because
5   they wanted to get rich.  So I had in the classroom in front
6   of me a whole lot of young doctors and MBA students, and the
7   MBA students were in there for two years, and then they'd go
8   out to Wall Street or something and make piles of money;
9   whereas, the doctors had been in medical school for years.
10  They're going through residency programs and taking
11  postgraduate programs.  Like the students in medical
12  information sciences took my course on cost-benefit
13  analysis; we struggled with the cost effectiveness of
14  information technology.  And I just thought, here are these
15  guys who had all this schooling, they're going to merge with
16  debt and -- whereas, if they'd just come over and got an MBA
17  quicker and cheaper they could make more money.  So I
18  learned vividly then people go to medical school because
19  they want to take care of patients.  It's not because they
20  want to pay -- make more money.
21       But once they're there, they face powerful
22  incentives to do things in more costly ways and
23  disincentives to do things in less -- less costly and
24  complex ways.
25       Q.   Well, let's talk about that for a moment.

2571

1   The -- can you explain to the court the -- how the
2   fee-for-service system works at a general level and the
3   impact you think that has on the delivery of healthcare.
4        A.   Right.  Fee-for-service is a centrifugal force.
5   That is, imagine you are trying to put together a medical
6   group.  If it's all on fee-for-service, some of the doctors
7   can get very high fees, and so they're -- they don't have a
8   strong incentive to cooperate with the rest of the medical
9   group, maybe not even to belong to it if they can't get
10  their full revenue.  Other doctors, let's say primary care
11  doctors, fee-for-service pays very poorly for primary care,
12  so it just -- it pulls apart -- the doctor's financial
13  rewards come from his patients; they don't come from the
14  system.
15       Whereas, in an integrated delivery system, the
16  system takes in the revenues, can determine its goals, some
17  version of what we call "the Triple Aim."  This is
18  Dr. Berwick of the Medicare program manager saying that the
19  aim is a Triple Aim:  one, it's better care; two, it's
20  better health; and, three, it's lower costs.  And one way or
21  another, that's what an integrated delivery system is.
22       So, anyway, physicians' incomes come from
23  individual patients, not from serving the Triple Aim.
24  Providers are not rewarded for teamwork.  Physicians acting
25  autonomously are compensated strictly based on the number of

2572

1  patients they treat and the number and complexities of the
2  procedures that they perform, not on doing the right thing
3  at the right time, not for value produced.  But,
4  unfortunately, fee-for-service payment is still the
5  predominant form of payment throughout the U.S. healthcare
6  system today.  And I think the great struggle is to get
7  beyond that, beyond that to pay for value rather than paying
8  for volume.
9        Q.  And what are the problems you see resulting from
10  fee-for-service payment?
11        A.  Well, I see payment for volume, not value, or
12  quality doesn't align a physician's financial rewards with
13  successful outcomes for the patient at efficient costs.
14  What we want is a system that rewards the doctor for acting
15  in such a way as to produce high-quality care, excellent
16  results at an affordable price for the patients.  That's
17  what the patients want.  And we have to align those
18  incentives.  And fee-for-service is perverse in that
19  respect.  Fee-for-service incentivizes costly, often
20  wasteful services that are unsupported by evidence as the
21  best course of treatment.
22        I mean, what happens a lot is just -- well, a
23  patient is sick, and we don't know exactly what to do.  Here
24  is something we don't really have any great evidence that
25  it's going to help them, but let's try it anyway because the

2573

1  insurance company will pay for it, so -- and it doesn't
2  reward physicians for working in lower-cost settings.
3        It makes teamwork more difficult because
4  physicians are incentivized to hoard patients, and there is
5  a disincentive to coordinate care with other providers.
6  When I say "hoarding patients," I have to give you a
7  homily -- forgive me for these homily examples.  But anyway,
8  I was giving a talk about integrated delivery systems to the
9  board of trustees of Stanford University.  One of the
10  members of the board was Bill McColl, a classmate of mine
11  and an all-American football player, then he had gone on to
12  become an orthopedic surgeon.  And he broke out laughing,
13  and he said, "Alain, I know just what you're talking about.
14  You know, right now we orthopods are in a struggle with the
15  podiatrists as to which specialty owns the foot, and now
16  we're battling for the ankle," or something like that.
17        And I've experienced that.  My mother was cared
18  for by a specialist and a generalist, and her primary care
19  doc had to call up the cardiologist and say, "Now, wait a
20  minute, she needs a lot of things that I can do, you know,
21  as a primary care doctor.  Please, you know, don't poach on
22  my territory."  I don't know what words he used, but to that
23  effect.
24        So I think the main thing is summarized in the
25  National Academy of Sciences report that 30 to 40 percent of

2574

1  health spending is waste because it's not -- by the powerful
2  incentives, it's not focused on value for money.
3        Q.  Do you have any -- a particular example of an
4  organization that had identified a way to provide care in a
5  lower-cost setting, but it just didn't work under the
6  fee-for-service system?
7        A.  Well, the example that comes to mind is Dr. Ralph
8  Snyderman, who is chancellor of the medical center at Duke
9  University, held an annual meeting at which, you know, some
10  people like me were invited.  And I remember he was
11  complaining, he said, "We went to a lot of trouble to find
12  and design a better way for caring for a certain category of
13  heart patients.  And it would cost a whole lot less money,
14  but we thought that was the right thing to do, so we
15  converted to that.  But under the fee-for-service system, we
16  pretty soon found that we were getting a lot less revenue."
17        And that's my main complaint with -- about
18  fee-for-service is it punishes well-intentioned providers
19  doing the right thing with less revenue if they find a less
20  costly way of doing the job.
21        Q.  Well, let's talk now about what you see as an
22  improvement over the fee-for-service system, integrated care
23  or 21st century care.  Can you just give us a -- give the
24  court a high-level perspective on what an integrated care
25  delivery system would look like?

2575

1        A.  Well, the first thing is that the system accepts
2  responsibility or accepts the risk for cost of care and
3  accountability for quality of care, so they have incentives
4  to provide better care at lower cost.  They will do better
5  if they can do those things.
6        In the fragmented fee-for-service, providers are
7  rewarded for doing more whether or not more leads to better
8  outcomes.  Providers don't suffer financially for errors,
9  infections, misdiagnoses.  So picture the scene under
10  fee-for-service:  Patient comes in, and the doctor can't
11  quite make the diagnosis and fumbles around for days and
12  days, orders more tests.  He's going to get a lot more
13  revenue than the doctor who figures it out right away, makes
14  the correct diagnosis promptly and treats the patient
15  appropriately.
16        But integrated care exists as a spectrum.  It's
17  not black or white, you know; it's kind of in shades of
18  gray.  But I think the more integrated and less fragmented
19  that healthcare is, the better.
20        Q.  Now, you mentioned risk in one of the -- that
21  taking on risk is one of the attributes of an integrated
22  delivery system.  Can you explain what you mean by risk and
23  what types of risk-taking systems can take on?
24        A.  Well, the costs of care for different patients
25  will vary widely, and under the fee-for-service system, the

2576

1   insurance company is bearing the risk.  And, of course, what
2   the insurance company does is passes the higher costs in
3   terms of a higher premium for consumers or for employers.
4   The reason that it's important for the provider system to
5   bear the risk is that the doctors are the people who make
6   the decisions.  There is a saying that the most expensive
7   piece of medical technology is the doctor's ordering pen.
8           So it's just necessary that the decisionmakers who
9   decide how costly it's going to be aren't rewarded for
10  making it more costly.  So they have an incentive to make it
11  less costly.
12      Q.  What is a full-risk arrangement?
13      A.  Well, I think the -- the ideal is like the end
14  point of -- of integration would be a system like Group
15  Health Cooperative of Puget Sound or Kaiser Permanente, in
16  which the patients or the employer of the patients pays a
17  fixed dollar per person per month, and for that they get
18  comprehensive care, that is they will be cared for whatever
19  their problem is.  And the delivery system, like Group
20  Health Cooperative of Puget Sound, bears the risk.  So if a
21  patient has a more expensive condition, they treat it.  And
22  as I say, the important thing about the providers being at
23  risk is then they are not punished; they are, rather,
24  rewarded for finding less costly ways to do the job or --
25  and they're the ones who make the big decisions.

2577

1           I have another example, in fact.  A former student
2   of mine is an orthopedic surgeon at Kaiser Permanente.  He
3   was a good example of why I think it's important for the
4   providers to bear risk.  So what -- I kind of worked with
5   him on this.  What Kaiser Permanente did was to create a
6   registry for joint replacement patients, a detailed registry
7   where they have all the information on the patient, the
8   hospital, the doctor, and the prosthesis that was used.
9   Then they track that through their electronic records, and
10  if some problem shows up, then they quickly feed that
11  information back to the providers and they analyze the
12  information and try to figure out what the cause of the
13  problem is.
14          Now, some people have a joint replacement that
15  just doesn't work.  And in the fully prepaid Kaiser-like
16  system, Kaiser knows that their obligation is to fix that at
17  their own expense.  So they want to do it right the first
18  time because if it's not right, they're going to have to fix
19  it, and nobody is going to pay them more money for fixing
20  it.
21          Now contrast that with the fee-for-service sector,
22  where the patient gets their hip replacement, and it turns
23  out after a few months it comes loose, doesn't work, pain,
24  misery, and so forth; has to be redone.  Well, then they
25  come back and say my hip replacement has to be revised.

2578

1   Dreadful thing to happen to a patient, by the way.
2           So if the patient stays -- stays with the same
3   doctors.  The doctors say, okay, we will operate on you and
4   we'll revise your -- your hip replacement, and we'll get
5   paid a lot of money.  Or maybe the patient, you know,
6   doesn't like those doctors anymore because they messed them
7   up, so they go to some other doctors and get the revision.
8   But, still, that's paid for by the insurance company.
9           So providers -- providers bearing risk means it's
10  very important to them to do it right the first time.  And
11  they are really punished by the system, by the workings of
12  the system they are punished for making mistakes; whereas,
13  in the fee-for-service system -- I don't want to say or
14  suggest ever that there is a doctor who is, you know, going
15  to say, "Well, let's do it wrong just so we get more money,"
16  nothing like that.  But it's just that the intensity and the
17  effort that is made to prevent errors is motivated to be
18  much greater intensity in error prevention in the prepaid
19  system than in the fee-for-service system where errors don't
20  have a negative financial consequence.
21      Q.  Are there methods of taking risk or sharing risk
22  that fall short of the full risk or capitated model you're
23  describing?
24      A.  Oh, yes.  There is the wide spectrum of risk
25  sharing.  Some risks, not other risks, corridors, you know,

2579

1   we take a risk up to this amount, but no more, et cetera.
2           So an example would be the Congress of the
3   United States in preparing the Affordable Care Act
4   decided -- they reached the conclusion that I've been --
5   reached 40 years ago, that we've got to get doctors and
6   hospitals to work together in teamwork and share
7   responsibility for costs and quality; that is, just be able
8   to report quality, which in many cases they couldn't do.
9           So the Congress offered doctors in the Medicare
10  program and hospitals a deal.  We want you to create an
11  accountable care organization, otherwise known as an ACO.
12          I ask the court to forgive me if I use too many
13  jargons, or stop me if I -- so I'll talk about ACOs.
14          So here is an ACO:  Some doctors and a hospital,
15  or sometimes a medical group even without a hospital, will
16  get together and sign an ACO contract in which Medicare
17  estimates which are the patients that these doctors take
18  care of, identified a group of patients, and then they add
19  up the costs for caring for those patients in the base year.
20  Then they project forward how those costs are likely to grow
21  over the coming years if they don't have an ACO, just in the
22  normal course of events.  Then, if the doctors and the
23  hospitals in the ACO, if they can care for the patients at a
24  lower cost, then they get half the savings.  Now, at the
25  same time, they have to report on quality indicators, so

2580

1 they don't get the savings if they did this cost saving at
2 the expense of quality. That's an ACO.
3         But it's capped. There are corridors; that is,
4 they may not take risk, like if they exceed the target,
5 there are different arrangements here; some have one-sided
6 or some have two-sided risk-taking. So some more aggressive
7 medical groups will say, okay, we'll take upside and
8 downside risk; that is, if we cost more than the target, we
9 will pay half of it up to some limit, and if we cost less,
10 we'll get half of it. You see what I mean by a corridor.
11 It's like -- you know, half the cost up to 5 percent or
12 below 5 percent.
13         We're -- at Stanford, where I chair the benefits
14 committee, one of the things we're doing right now is
15 negotiating an ACO with Stanford Hospital & Clinics. And
16 it's -- I would like to see them take a lot higher risk. I
17 guess the buyers are pressing for greater risk, but it's a
18 very constrained risk. In the first year or two we split
19 the gains or the losses 50-50 until they reach 5 percent of
20 the target. Beyond that, if our hospital and clinics exceed
21 the target by more than 5 percent, then we have to pay for
22 the care after that. So that's a -- that's a -- you know,
23 that's risk-taking light. From there to full risk-taking,
24 like Kaiser Permanente or Group Health Cooperative of Puget
25 Sound, there is a spectrum. You can imagine with all these

2581

1 variables the percent that you share or not, the limits at
2 which you're at risk or not.
3         So there's a lot of variations on that theme.
4     Q. And in terms of providing incentives to physicians
5 and hospitals to provide the lowest cost, best care, do you
6 have a view as to whether full risk or some risk-taking
7 short of full risk is most effective?
8     A. Well, I think that full risk is most effective.
9 It just, you know, makes it very important to the providers
10 to do it right the first time. And I think of the ACO kind
11 of situation as simply the Congress recognizing that most
12 doctors are not into risk-bearing. It's a way of sucking
13 them in, inducing them or saying, look, guys, you really can
14 do it. Then we're going to come back with a contract with
15 sharper teeth and try to draw you into full risk-taking.
16         However, it's important to understand that
17 Medicare, although it's predominantly a fee-for-service
18 model, just completely the wrong model. It's like a 1965
19 model; it did fee-for-service then because of the political
20 influence in the medical profession.
21         But in more recent years, we advocates of
22 integrated care have gotten the Congress to offer something
23 called "Medicare Advantage." And in a Medicare Advantage
24 plan, that's like an HMO; that is, the beneficiary chooses
25 it because they think they can get better care at less cost,

2582

1 and the provider organization accepts full risk. I am
2 personally covered under a Medicare Advantage plan with an
3 integrated delivery system.
4         And so that's a way that -- of bringing more
5 providers taking risk into the Medicare program. More than
6 one-quarter of Medicare beneficiaries now have chosen
7 Medicare Advantage plans. That's one of the things I liked
8 about what St. Luke's has done is, both, they were the first
9 ACO in the state, one; two, they participated in a couple of
10 Medicare Advantage plans.
11     MR. KEITH: Let me just stop for a second.
12 Your Honor, Dr. Enthoven has asked if he might be able
13 to take somewhat more frequent breaks. And we've been going
14 for about an hour.
15     THE COURT: If you would like, we could do it now.
16 I might have had a similar situation. I'm doing fine, but
17 if the doctor wants to take a short break now, we can do it.
18 Would that be good?
19     THE WITNESS: Thank you.
20     THE COURT: Let's try to hold this to about a
21 ten-minute recess, and we'll take another ten-minute recess
22 in about another hour or so.
23     MR. KEITH: Thank you, Your Honor.
24     THE COURT: We'll be in recess.
25     (Recess.)

2583

1         THE COURT: Dr. Enthoven, I'll remind you you are
2 still under oath.
3         Dr. Enthoven, you made a comment regarding the use of
4 acronyms, and I think you've done a really good job of
5 telling me what the acronyms are. But you did use a French
6 phrase that I'm sure is going to make the court reporter's
7 job really hard. Do you recall what it is? And if so,
8 could you give us a stab at spelling it?
9         MR. KEITH: It had something to do with equalizing
10 risk.
11         THE WITNESS: Oh, *compensation des risques*.
12         THE COURT: I'm not sure that's going to help a
13 lot.
14         MR. KEITH: Oh, that helps. Thanks.
15         THE WITNESS: It's compensation of risks.
16         THE COURT: All right.
17 All right. Maybe counsel can agree upon a spelling and
18 provide it to the court reporter.
19         MR. KEITH: We would be happy to if someone can
20 tell me what it is.
21         THE WITNESS: That was the first time I heard that
22 expression, you know, how do the French say that, and that's
23 what they said.
24         THE COURT: All right. I know how the court
25 reporter sometimes struggles trying to figure those things

2584

1    out.
2            THE WITNESS:  I apologize.  No more French.
3            THE COURT:  All right.
4            MR. KEITH:  May I proceed, Your Honor?
5            THE COURT:  You may.
6    BY MR. KEITH:
7        Q.  Before the break, Dr. Enthoven, you were
8    explaining some of the hallmarks of what you regarded to be
9    integrated or integrated delivery systems.  And I would like
10   to expand a little bit on some of the points that you
11   brought up.  The first has to do with how information is
12   shared in an integrated delivery system.  Can you explain to
13   the court the value and the use of shared information within
14   an integrated delivery system?
15       A.  Yes.  It's fundamental.  It's really important.
16   Even at the outset, before computers were significant,
17   Kaiser Permanente had records, and Mayo Clinic also pride
18   themselves on keeping comprehensive longitudinal -- that is,
19   over time -- records of each patient so that they've got the
20   history.  And now it's a wonderful transformation to be able
21   to have that in electronic form.
22           So electronic records, just as an example, a
23   patient is being cared for by several providers or maybe one
24   other doctor and three nurses.  With the electronic record,
25   all of them can see at the same time what is going on with

2585

1    this patient, what medications they're on, indicators of
2    their medical progress and so forth.  So -- and also, what's
3    very important is that the doctor or the providers enter
4    into the record, currently, the test results that they have
5    observed and procedures that they have done.
6        Q.  So if I understand that correctly, it's not simply
7    having a common electronic record; it's using it in a
8    consistent manner that is meaningful for an integrated
9    delivery system?
10       A.  That's right.  It's using it as -- well, another
11   example would be the primary care doctor has a patient and
12   would like advice from a specialist, because in an
13   integrated delivery system the specialists act as
14   consultants to the primary care doctors.  Well, the primary
15   care doctor can just email the message to the specialist,
16   and the specialist, in turn, can open up the record for that
17   patient and right away, you know, have a complete picture of
18   the medical progress of that patient.  And the specialist
19   can decide what advice to give to the primary care doctor.
20   It might be, "You can take care of this patient, and here is
21   my advice for how to do it," or it may be, "I need to see
22   this patient," et cetera.  So that avoids errors in
23   communication, the message gets through and minimizes
24   duplication of diagnostic tests.
25       Q.  And I think that relates to another point you made

2586

1    earlier about the culture of teamwork in an integrated
2    delivery system.  Can you talk to us about the way that the
3    system works to create teams of providers, particularly as
4    between primary care and specialist providers?
5        A.  Sure.  Well, if patients have complex conditions,
6    you know, some patient has diabetes and depression and
7    coronary artery disease, or something like that, then the
8    patient needs to be under the care of the diabetologist or
9    endocrinologist and the cardiologist and maybe the
10   psychiatrist.  So a big problem in medicine has been lack of
11   coordination; one doctor may prescribe drugs that conflict
12   with what another doctor prescribes, or overlaps, you know,
13   unnecessary to have both of those drugs.
14           And so with the shared electronic record,
15   the -- all of the doctors can see what's going on, and the
16   primary care physician who acts as the coordinator and team
17   leader, if you like, could review the whole thing, make sure
18   that what's needed is done and nothing falls between the
19   cracks.
20       Q.  And does the method of payment involved in an
21   integrated delivery system impact the ability of physicians
22   to work together as teams?
23       A.  Yes.  The great thing about it is these doctors
24   are all on salary, plus usually bonuses for indicators of
25   quality and patient satisfaction and so forth.  And

2587

1    the -- so personal finances don't enter in.  It's not like
2    if we do this, I'm going to make more money; if we do that,
3    I'll get less money, so that the -- all the doctors on the
4    team are partners.  They're not economic rivals, which they
5    are in the fragmented fee-for-service system.  They are
6    partners.  They're working together.  They are focused on
7    what's best for this patient without any distraction of
8    their personal finances.
9        Q.  And how does that impact the ability of an
10   integrated delivery system to provide care in the most
11   cost-effective manner?
12       A.  Well, the goals of the system include better care,
13   better health at a lower cost, so everybody on the team
14   knows that's our shared goal to do this in an economical
15   way.  And there may be personal financial -- there may be
16   bonuses for, you know, if you do a great job on this patient
17   or if your quality record is strong.
18       Q.  And what about the role of primary care physicians
19   within an integrated delivery system?  Does that change in
20   any way from the fee-for-service system?
21       A.  Yes.  Definitely.  I personally experienced this
22   recently, because I told you about the ACO being formed at
23   Stanford Medical Center.  And so I called a meeting because
24   I wanted to talk to the doctors in charge and say, "You've
25   got to understand that primary care in a quality,

2588

1    cost-effective, integrated system is very different from
2    primary care in the fee-for-service system. I fear that
3    your primary care docs have been working in the
4    fee-for-service system and -- where their job is just to
5    hand off the patient to one or another specialist.
6         In primary care, the primary care physician -- in
7    integrated care, a primary care physician has a greatly
8    expanded role as much as reasonably possible and consistent
9    with the best outcome for the patient. The primary care
10   physician should be doing the job with the specialists
11   acting as consultants to the primary care physician. And
12   that has important advantages, such as the patient doesn't
13   have to go running around make appointments with different
14   doctors, go see different doctors.
15        And the primary care physician is supposed to have
16   this all in his or her -- in her head and kind of
17   integrated. That costs less and usually is more satisfying
18   to the patient; that is, the patient then feels great, you
19   know, with advice from the specialist, my doctor now knows
20   what to do, and I'm getting it from my doctor who knows me
21   and is familiar with me.
22        Q.  And how does an integrated delivery system allow
23   for physicians to develop evidence-based practices?
24        A.  Well, that's a very important thing. What
25   integrated delivery systems can do is analyze their own

2589

1    experience in a kind of continuous learning process. They
2    track, you know, completely what's happening to their
3    patients and what treatments are working and what treatments
4    are not working and then feed that back into the -- the
5    practice guidelines that the doctor can access on the
6    economic -- on the electronic health record system.
7         Q.  Does the information technology system of an
8    integrated delivery system help implement best practices?
9         A.  Oh, definitely. Because when the doctor enters
10   information on the patient, they will be supplied with
11   advice from the system as to these are our guidelines for
12   what's the best way to treat this symptom. One of the
13   problems there, you think, oh, doesn't the doctor know?
14   Well, the problem is doctors are overwhelmed by the flow of
15   information. There is something like 25,000 randomized
16   controlled trials are published each year and included in
17   the National Institutes of Health Library. 25,000. And so
18   it's just huge amounts of information.
19        So you have to have a knowledge management system.
20   You can't just expect the doctor to know -- and, you know,
21   they say that half of what you learn in medical school is
22   out of date in five years, and you don't know which half
23   that is. So there has to be some systematic process for
24   gathering, digesting, transmitting that information. As I
25   understand it, that's done through -- let's say at Kaiser,

2590

1    it's done through Epic.
2         Q.  Are you aware of any examples in which that sort
3    of hardwired, best practice in integrated delivery systems,
4    electronic health record has actually led to better patient
5    care?
6         A.  Well, I'm pretty confident it does. I'm not
7    having a good example come to mind.
8         Q.  What about mammography care, is the standard for
9    providing mammography something that gets --
10        A.  Oh, yeah. Okay. That's a great example, in fact.
11   The CEO of a Kaiser Permanente got a thank-you letter from a
12   patient one day. And her story was -- the practice
13   guidelines in Kaiser Permanente, if you're a woman between
14   50 and 75 years old, you will have a mammogram -- I think
15   it's every two years. Well, and if this lady has not had
16   her mammogram, the system reminds.
17        So the thank-you letter came because this lady had
18   not had a mammogram. She went in to get her prescription
19   refilled, and the pharmacist -- the pharmacists have an
20   expanded role in these systems also. They are employed to
21   the full extent of their abilities, not just counting pills.
22   It's also making sure that the pharmacological aspect of the
23   treatment is rational.
24        So she comes in, and the pharmacist says, "Madam,
25   this says that you have not had your mammogram."

2591

1         And she says, "Oh, I know. I'm just too busy. I
2    just -- I can't take the time."
3         And he says, "Well, wait a minute. I may be able
4    to work you in right now." And he goes to the mammography
5    department, "Oh, yeah, they could take you right now. Just
6    go down the hall and turn left, and go to that door, and you
7    can have your mammogram right now, convenient."
8         And so she did. And they found she had breast
9    cancer. And so right away they treated her, successfully,
10   and she wrote a thank-you note to the CEO of Kaiser
11   Permanente saying: Thank you. You saved my life.
12        It's one of the things that Epic does, is
13   reminders. Again, you think, well, isn't my doctor supposed
14   to know that and remember that? Honestly, what the doctor
15   is up against -- you just can't expect a human being to
16   remember everything. And they need checklists and prompts
17   and so forth to interact with to make sure the right things
18   get done.
19        Q.  The court has heard some testimony about
20   population health management and -- but I would like you to
21   explain your view of what that means and how an integrated
22   delivery system approaches population health management.
23        A.  Okay. The -- in traditional medicine, the
24   doctor's responsibility is to sit back and wait for patients
25   to come in. The patient walks in, displays their symptoms,

2592

1  they talk it over, the doctor listens to the story, makes a
2  decision, writes a prescription, prescribes it, and that's
3  sort of the end of it.
4       In population health management, the system, in
5  its own best interest, takes the initiative and reaches out,
6  as in the case of the lady and her mammogram.  So in a
7  population management system, the doctor can call up on Epic
8  and say to Epic, tell me who my diabetics are, and is their
9  blood sugar under control, and tell me which ones it's not.
10  Up comes the name, then we're going to contact those people.
11  One way or another, we're going to make sure they see the
12  nurse and get their blood sugar tested and that they get
13  back on track.
14       There is also a lot of health education work that
15  goes on, teaching people about -- about diet and exercise
16  and healthy lifestyle.  You hear an awful lot about that
17  around Kaiser Permanente now.  They have even gone so far as
18  to create farmers markets for fruits and vegetables in some
19  of their medical centers because they're trying to get their
20  people to be weaned from processed foods and eat healthily,
21  with fruits and vegetables.  So it's kind of the full-court
22  press on -- the system benefits if all the people are
23  healthy and don't need medical care.  And sometimes it's
24  said that something like 70 -- the need for 70 percent of
25  medical care is driven by unhealthy lifestyles.  And so this

2593

1  is a whole new dimension for medicine.
2       In fact, a friend of mine who used to be my
3  primary care doctor has written a book called *Next Medicine*.
4  And his vision is eventually medicine is going to become
5  more and more reaching out and figuring out what -- what
6  problems can be prevented.  I think of that in my own life
7  because some of the serious problems I've had could have
8  been prevented.
9       Once I was on a long plane flight and cramped up
10  and wasn't able to move, the plane was bouncing around, and
11  the next day I was feeling pains in my leg.  I went into the
12  clinic, and the doctor was examining my chest, and I said,
13  "Look, Doc, it's down there in my leg, and I want to go
14  mountain climbing next week.  What do we do to fix it?"
15       And she said, "Well, Alain, your story is you were
16  on a long plane flight, and you got blood clots in your leg,
17  and so you're going to spend the next week in the hospital
18  being anticoagulated," and so forth.  And I thought, gee,
19  you know, I wish that somebody had told me that ahead of
20  time.  I could have acted appropriately and avoided -- I do
21  notice now the airlines do put out recommendations about how
22  to get up and stretch and -- to avoid blood clots.
23       But I think a lot of -- when I read my friend's
24  book I thought there is a lot of need for medical care that
25  can be prevented if somebody, you know, gets the advice and

2594

1  takes the advice to prevent the need for disease.  So
2  that's -- the whole population management story is more and
3  more finding opportunities to prevent the need for medical
4  care.
5       Q.  And under a full-risk contract, I take it that
6  managing that patient health doesn't come at the expense
7  of -- or doesn't come out of the pocket of the system?
8       A.  Right.  I mean, the thing about the full-risk
9  financing, and I guess the reason you see so much of this at
10  Kaiser, is they've got the resources to pay for this.
11  Fee-for-service doesn't pay -- you know, Medicare doesn't
12  pay for a medical consultation with the dietician or
13  something like that.  They pay for doctor office visits.  So
14  per capita prepayment provides the resources needed to do
15  population medicine, as well as the incentive to do it.
16       Q.  Do you regard the role of physicians in management
17  as an important attribute of integrated delivery systems?
18       A.  Well, especially -- yes, for the primary care
19  physician.  In fact, I receive the internal publication for
20  the Permanente Medical Group, for their doctors, and I think
21  it was last year the headline on one of the articles was,
22  "Primary Care is the Soul of Kaiser Permanente."  A very
23  strong emphasis on primary care.  And this is not at all to
24  denigrate or deny people's access to specialists; when they
25  need a specialist they get right there, and -- but it's to

2595

1  say that the primary care physician is the coordinator and
2  manager and is expected to make sure that the patient gets
3  to the right specialist, that they -- that the actual care
4  is carried out.  The primary care physician is likely to be
5  interested in was the prescription filled.  And if it's in
6  their system, they will get a reminder about that:  This
7  patient has not been taking her medicine.  So there's all
8  kinds of things that you can do when you have a system like
9  that.
10       Q.  And you had indicated earlier that one of the
11  things that an integrated delivery system does, and must do
12  under a risk-based contract, is to identify best practices,
13  to ensure that folks are following those practices, and --
14  you know, is it meaningful or is it important that the folks
15  who are making those decisions and articulating them to the
16  physicians at the ground level are, themselves, physicians?
17       A.  Absolutely.
18       Q.  Why is that?
19       A.  Well, you want the doctors to be -- to believe
20  it -- in fact, there was a literature -- for a while there
21  was a lot of idea that we were going to have specialty
22  societies create guidelines and publish guidelines, and then
23  there would be research that showed the guidelines were not
24  effective.  And I think one of the problems was -- again,
25  just thinking of my intimate relationship with Kaiser

1   Permanente -- the problem was those were guidelines for
2   doctors not practicing in our kind of system.  So for it to
3   be credible, it needs to come from doctors who, themselves,
4   are in the system.
5          And so let's say it's cardiology, and there's some
6   particular problem.  Well, the guidelines, they will form a
7   committee of cardiologists, they will be supplied with the
8   research literature, kind of edited and annotated, you know,
9   do the health services researchers think this article is
10  valid or not, and so forth.  So then they get the distilled,
11  true medical research, and they talk it over, they go back
12  to their own medical center, talk it over with their
13  colleagues.
14         And it's -- you might say that's an expensive
15  process.  Well, in a sense it is, but it's an educational
16  process.  You kind of bring them along so all the
17  cardiologists in your department, by the time you've
18  discussed it with all of them, they are all up to speed.
19  And those guidelines are followed, and they're kind of
20  hardwired into the -- into the Epic system.  And they're
21  followed because it's credible.  It's doctors like me
22  practicing in a setting like mine that is -- that are doing
23  it.
24         Q.   Now, having walked through what you regard as the
25  hallmarks of an integrated delivery system from sort of the

1   system level, I wonder if we can turn and -- and if you can
2   articulate to the court what it feels like to be a patient
3   of the integrated delivery system?
4          A.   Well, my colleagues at Stanford say I never want
5   to go back to the fragmented system.  As a patient you feel
6   that your doctors all know each other, know about your case;
7   you know, a doctor doesn't walk in not knowing what your
8   background is, that they're all teammates, and they're
9   working together, supporting each other in the mission of
10  better care and less cost.
11         The -- I think one of the things that's really
12  terrific is secure email with your doctor, and that's just a
13  terrific benefit.  It's very popular with patients and
14  certainly with my fellow employees at Stanford University.
15  In the olden days, in the fragmented system and the
16  nonelectronically supported system -- I have a question to
17  ask my doctor.  So in the old system I make an appointment
18  two or three weeks later, maybe -- by then I might still
19  have that question -- and so I make the appointment.  And on
20  the appointed day, I go down to the parking lot, get in my
21  car, drive over to the doctor's office, lose my parking
22  place if somebody else takes that, find a parking place, get
23  in the doctor's building, take the elevator up to the third
24  floor and go to my doctor's office.  The nurse shows me in
25  to the examining room, and I take off my clothes, and the

1   doctor walks in, and I tell her my question.  So I have to
2   get dressed again and go back to my office.
3          Whereas, now I just email the -- my question, and
4   I get a pretty prompt answer.  In fact, Kaiser Permanente in
5   Hawaii rolled out their Epic there, and it was enormously
6   popular with patients because they could email their
7   questions and get them answered.  And they found that the
8   demand for doctor office visits fell by 25 percent because
9   the patient didn't really need to see the doctor; they just
10  wanted to ask the question.  And the doctors felt, again,
11  because it's per capita, the doctors felt this is great;
12  they didn't suffer a loss in income as they would in the
13  traditional system, because they're on salary and paid by
14  the per capita prepayment payments, and they felt this is
15  great, now I will have more time to work with the patients
16  who really need to see me.  And patients are happier.  It's
17  just a huge benefit and blessing.
18         Q.   Well, let's take, for example -- let's say I'm a
19  patient who has multiple diseases that require a great deal
20  of care.  How would it -- how would I feel in terms of the
21  interaction I have with my healthcare providers if I'm in an
22  integrated delivery system versus the current fragmented
23  system?
24         A.   Well, I have a family member who had a lump in her
25  breast, and she went and told somebody -- and is in

1   Kaiser -- went and told somebody.  Very quickly mammogram
2   and several other diagnostic modalities -- they figured out
3   it was cancer.  Then, quite promptly, they organized -- the
4   system organized a multispecialty conference where she was
5   sitting down with oncologists, a surgeon, a radiologist.
6          And I remember the dean of the Stanford medical
7   school explaining to me once, you know, "The surgeon is
8   going to want to cut, the oncologist wants to do
9   chemotherapy, and the radiologist is going to want to do
10  radiation."  So we need to kind of bring the patient in on
11  this and talk it over and consider the pros and cons and
12  balances and so forth.
13         And she chose surgery.  So, again, the team was
14  working for her.  And she chose surgery, and it was done
15  very well.  She, you know, just got a very satisfactory
16  result, and she looks great.
17         Q.   So what if I -- I'm the patient with multiple
18  disease states, and I don't present to, you know, any of
19  the -- my primary care physicians or someone who can
20  coordinate or manage my care.  Is an integrated delivery
21  system going to intervene on my behalf?
22         A.   Well, your primary care doc -- I mean if you
23  haven't touched the system -- well, I think under population
24  management, they might want, you know, even ask you to come
25  in and be tested for this, like the lady with her mammogram.

2600

1  But they are reaching out to bring you in and get you
2  diagnosed.
3          In fact, in the early days -- I mentioned a
4  Dr. Colin earlier -- in the early days of Kaiser they had
5  something called multiphasic screening, then eventually they
6  dropped it because it was too -- it was not cost-effective
7  enough.  You had to focus on patients who really needed
8  care.  But where patients could just walk in and have a
9  whole lot of blood tests and other diagnostic tests and then
10  get a report, you know, is their blood sugar within the
11  proper limits and so forth.
12          But then they -- but, you know, what we've
13  experienced is the patients quite quickly experience
14  well-coordinated care.  They're all on the same team.
15      Q.  Well, let's turn to talking about what you regard
16  as the requirements for building an integrated delivery
17  system, what it takes to get one going.  Why don't we talk,
18  first, about whether there is a scale or a scope necessary
19  to really be an effective integrated delivery system.
20      A.  Well, I think the effective integrated delivery
21  systems generally have hundreds of doctors, you know, in the
22  multiple hundreds, so that they can work together in teams,
23  and you got to have -- you know, in this example with my
24  family member, they've got to have plenty of oncologists
25  around so that one of them could come and join this meeting.

2601

1  So there's -- I think scale is necessary for that, and it's
2  to support the overhead, like the electronic health record
3  and like the guidelines, practice guidelines development.
4          They have to be fairly large, also, to accept risk
5  because some patients turn out to be extremely costly.  I
6  mean, one year Kaiser had a patient, a child with hemophilia
7  in their system, and the appropriate drug would cost more
8  than a million dollars a year.  So you have to be big enough
9  that you can take a hit like that and carry on.
10          So successful integrated delivery systems are
11  generally fairly large with multiple hundreds of doctors.
12      Q.  In terms of the physicians that are aligned with
13  the integrated delivery system, is there a mix of primary
14  care and specialists that you think is necessary to --
15      A.  Right.  In fact --
16      Q.  -- effectively operate?
17      A.  Yes.  Yes.  In fact, prepaid group practices, the
18  fully integrated system like Kaiser have proportionately
19  many more primary care physicians than are in our society,
20  generally.  I think generally, across the country, probably
21  now, like one-third of our physicians are in primary care, a
22  number which is declining because of the economic imbalances
23  of specialists overpaid by Medicare, primary care doctors
24  underpaid.  In Kaiser, roughly speaking, half the doctors
25  are -- and other integrated systems -- roughly, half the

2602

1  doctors are primary care physicians, and because of the role
2  that I described for them, you need to have them.  I think
3  in round numbers Kaiser needs 60 primary care physicians per
4  100,000 population.  So if they didn't have the primary care
5  physicians, they wouldn't be able to expand.
6          So they get the primary care physicians they need.
7  They will pay whatever they have to pay to get them.
8      Q.  And is there a -- beyond just having numbers of
9  primary care physicians, is it also important to have a
10  regional distribution or geographic distribution of primary
11  care providers to run an effective integrated delivery
12  system?
13      A.  Yeah, sure.  You have to deal with where their
14  patients are, and you have to make sure that primary care is
15  reasonably accessible to where they are.  And so depending
16  on the geography, people like to have convenient access.  So
17  depending on the geography, you deploy your doctors
18  appropriately.
19      Q.  Let's take a moment and go over what you regard as
20  the evidence that integrated delivery systems provide more
21  effective, lower-cost care.
22      A.  Well, the most famous piece of research on that
23  was done by the RAND Corporation.  There was a big argument
24  going on.  I remember I was arguing with Joe Newhouse, who
25  is the head of health services research for RAND at that

2603

1  time.  And I believed integrated care was better, and there
2  were studies before that that were not randomized trials.
3  But there is research the Mayo Clinic would publish and Palo
4  Alto Clinic would publish showing that hospital days per
5  thousand per year were like 40 percent less in the
6  integrated system than in the fee-for-service solo practice
7  sector outside.  A big difference.
8          And there was a study about federal employees
9  health benefits utilization.  And they could, in some of the
10  studies, adjust for the age of distribution, but still the
11  skeptics said, no, Group Health Cooperative Puget Sound
12  costs so much less because they got the good risks.  The
13  healthy people joined them, the unhealthy people went
14  someplace else.
15          So to answer that question, you need to have a
16  randomized, controlled trial, which is not easy to do in a
17  situation like this.  But they did organize a big project
18  called the Health Insurance Experiment.  And in Seattle
19  people were randomized either into traditional
20  fee-for-service or into a Group Health Cooperative, kind of
21  a flagship integrated -- famous integrated delivery system
22  there.
23          And what they found when they cared for them for
24  several years was that Group Health Cooperative produced
25  equal health results for 25 or 30 percent less cost, so a

2604

1  comparison uncontaminated by patient selection. It was very
2  thorough, careful research design.
3      Q.  What about the Weeks study that you cited there?
4      A.  Yeah. I think that's the one about the CAPP
5  groups. There is an organization in this country called
6  "Council on Accountable Physician Practices," and it
7  includes Kaiser Permanente, but also many of the Mayo
8  Clinic, Cleveland Clinic -- these large multispecialty
9  clinics. And the purpose of their organization was to
10  promote the idea they hold themselves accountable, and they
11  think everybody should have to report on quality measures.
12  Of course, it's hard to do quality measures if you don't
13  have the enrolled population.
14      So the study was for fee-for-service Medicare
15  beneficiaries. Some were cared for by these CAPP groups,
16  large multispecialty group practices, and others were not.
17  And so they compared them, and what they found was that the
18  CAPP group patients had better care at lower cost.
19      Q.  And that was lower cost for the care provided by
20  the large multispecialty groups?
21      A.  Yeah, lower cost to Medicare.
22      Q.  And one of the things we've heard in this case is
23  that Saltzer is a multispecialty practice. Can you explain
24  whether Saltzer fits the paradigm of the groups that were
25  studied in the Weeks' article?

2605

1      A.  No. I looked at the list of the doctors and what
2  they do and so forth. Overwhelmingly it was primary care
3  physicians. And I don't think you can be considered a
4  multispecialty group practice unless you have a solid
5  presence in the group, you know, four, five, or six in each
6  specialty. You need to have that many for OB/GYN for
7  coverage, for example.
8      You know, when we were having our babies,
9  Rosemary's, my wife's, OB/GYN said -- you're my doctor for
10  the scheduled visits -- "but I might not be there on the
11  night -- the night the baby comes, so I've got five
12  partners, and one of them will be there." And in other
13  specialties -- so, you know, for rheumatologists, for
14  urologists, and so forth, they have enough specialists so
15  they can support each other, discuss practices, literature,
16  and so forth, and be there for the patients.
17      And in the -- it looked to me in Saltzer like
18  they're almost all -- there are just a few scattered
19  specialists. So having one OB/GYN and one rheumatologist,
20  one or two, that doesn't make you a multispecialty group
21  practice. You cannot purport to be supplying comprehensive
22  care for patients the way these CAPP group, multispecialty
23  group practices are.
24      Q.  What about the Berkeley Forum, what did that
25  article or study conclude?

2606

1      A.  The Berkeley Forum was organized and led by Steve
2  Shortell, who at the time was the dean of the school of
3  public health at the University of California at Berkeley.
4  And he tried to convene a lot of the leaders of California
5  healthcare. So he had the heads of insurance companies,
6  hospitals, so forth, and to say let's talk this over and
7  study this together and say what should be the future of
8  healthcare in California.
9      And he noted that -- or they noted that healthcare
10  costs per person in California are substantially below, like
11  10 percent or more, below the national average. And this is
12  impressive because the cost of living in California, they
13  reported, is about 30 percent above the national average.
14  That, by the way, because real estate is so expensive. If
15  you're trying to recruit a doctor from out of state to come
16  into state, he or she is going to have to have more than a
17  million dollars to buy a house. You know, it's very
18  expensive to pay the mortgage. So that's why cost of living
19  matters.
20      So I would say California is markedly a very
21  economical state when it comes to healthcare. So why is
22  that? Well, mainly because of the strong presence of Kaiser
23  Permanente and because they have been so economical.
24      MR. GREENE: Objection, Your Honor, foundation.
25      THE COURT: Just a moment. I'm sorry, Counsel.

2607

1  Well, Counsel, I'm not sure I understand the objection.
2      MR. GREENE: Your Honor, if I may, what he has
3  suggested to the court is that there is a causal link and
4  only a causal link between the existence of Kaiser and the
5  lower cost of care in California. California is a much more
6  dynamic market than just Kaiser; and, indeed, a significant
7  number of patients in California came under capitated
8  contracts not provided -- not associated with Kaiser. So
9  there are a number of activities here. The notion that
10  Kaiser is the one and only cause of that, I think foundation
11  is required.
12      THE COURT: Well, I'm not sure he was saying it
13  was the only causal link. I think he was testifying it was
14  certainly a causal link.
15  I'm sorry. Mr. Keith.
16      MR. KEITH: Correct, Your Honor. And, in
17  addition, he is explaining the findings of the Berkeley
18  Forum on this very issue.
19      THE COURT: All right. The objection is
20  overruled. I'll just leave it at that.
21  You may continue with your answer.
22      THE WITNESS: Thank you, Your Honor.
23  Well, it is what they found in the Berkeley Forum. And
24  while Kaiser Permanente now has a remarkably large market
25  share, 40 percent of the non-Medicare, non-Medicaid --

2608

1   therefore, called "commercial" -- commercially insured
2   people in California, are now in Kaiser Permanente; that's
3   twice the market share of Blue Cross. And all the rest have
4   a 20 percent market share, sort of like Blue Cross. It's a
5   remarkable achievement.
6       But what that has done is put a lot of pressure on the
7   other doctors to form medical groups, to sign up for
8   capitation contracts with insurance companies, to try to
9   imitate Kaiser to some extent. Interestingly enough, just
10  to take a homing example, the reason that Stanford Hospital
11  & Clinics have come to us offering an ACO has got to be
12  because 45 percent of Stanford employees now chosen Kaiser
13  Permanente, so the competitive pressure -- I could give you
14  other examples where the presence of -- strong presence of
15  Kaiser. Anyway, so it's understandable that the Berkeley
16  Forum -- even leaders of Blue Cross and some of the others
17  would say the strong presence of Kaiser is a key factor.
18      So that's essentially -- then to go on with the
19  Berkeley Forum, what they recommend is a big increase in the
20  number of Californians whose care is paid for on a per
21  capita prepayment basis.
22  BY MR. KEITH:
23      Q.  What are the -- some other articles or studies
24  that you believe support the case that integrated delivery
25  systems provide higher value care?

2609

1       A.  Well, on this slide we refer to a number of
2   articles, Rittenhouse, et al., "Integrated delivery systems
3   are more likely to use electronic health records," not
4   surprising because then they have the resources and the
5   benefit. They're best positioned to benefit from electronic
6   health records.
7       Casalino, et al., which includes Shortell and some
8   of the Berkeley group, find "integrated delivery systems are
9   better able to monitor clinical performance and implement
10  clinical protocols." The system helps them to do that.
11      Shortell, who is the dean of the School of Public
12  Health at Berkeley, and also a fellow member of the board of
13  the Integrated Healthcare Association, found "integrated
14  delivery systems are more likely to use care management
15  processes," rules for how to manage care. You know, like
16  having a registry of diabetics. He wrote an article in a
17  book that I edited and enumerated six or eight care
18  management processes.
19      In light of that research, the Institute of
20  Medicine has strongly supported integrated delivery systems.
21  Following *To Err is Human*, they did another report called,
22  "Crossing the Quality Chasm." The reason for the title of
23  the book was they said, "as between the quality we have and
24  the quality we could have lies not just a gap but a chasm."
25  And so they're saying it takes a big change to get to the

2610

1   quality we should have.
2       And the Berkeley Forum advises more integration in
3   California. And the Congress of the United States has
4   established accountable care organizations all to foster
5   integration. I think also the -- in Medicare, the Medicare
6   Advantage program was instituted for that reason.
7       Q.  Now we've talked at some length about the Kaiser
8   Permanente system, Group Health Cooperative. Where is Group
9   Health Cooperative located?
10      A.  In Seattle.
11      Q.  Are you aware of integrated delivery systems that
12  operate in Minnesota and Wisconsin and other areas of the
13  country?
14      A.  Yeah. I visited a lot of them, and others I've
15  met their leaders at meetings in Jackson Hole and elsewhere.
16      Q.  Without trying to be exhaustive, can you just give
17  us a sense of what they are?
18      A.  Yeah. In Minnesota you've got the Gundersen
19  Lutheran. You've got the Marshfield Clinic. You've got the
20  Dean Clinic. You've got a group health cooperative there.
21  And in Madison, Wisconsin, they compete intensely to get
22  state employees to join them, who -- the state employees are
23  in a managed competition model.
24      Elsewhere in the country, down in Temple, Texas,
25  there is the Scott & White Clinic. There's Ochsner Clinic

2611

1   in New Orleans. There is the Lahey Clinic in Massachusetts.
2   So they do exist around the country. They are more
3   prominent in the upper Midwest probably because originally
4   organized medicine, say 19th century medicine, even going
5   into the 20th century, resisted and objected to
6   multispecialty group practice, for economic reasons -- I
7   could explain if anyone wanted it. And so it took the
8   success and strength of the Mayo Clinic, in effect, to
9   legitimize multispecialty group practice, and that's why you
10  have numerous multispecialty group practices in Minnesota
11  and Wisconsin.
12      Q.  Is it -- is the organizational structure of an
13  integrated delivery system important in determining its
14  efficacy?
15      A.  Well, I think so.
16      Q.  And specifically with regard to whether physicians
17  of the organization are tightly integrated or employed, do
18  you have a view on whether that tight relationship is
19  important to the efficacy of an IDS?
20      A.  Yeah. This is team-based medicine, and I think
21  for that to work all the players need to be on the same team
22  and on the same payroll and -- in particular, as opposed to
23  looser arrangements in which some of the doctors are
24  part-time or they're seeing other payors' patients also, I
25  think you get a problem then of divided loyalties and

2612

1  diffused messages from a point of view of the patient
2  guidelines.
3      If the group health cooperative has studied it and
4  they've come to the conclusion this is the way we treat this
5  kind of patient -- all their doctors are on staff, and so
6  it's not too hard to get the doctors to join in that;
7  whereas, if the doctors were practicing under a variety of
8  other arrangements -- for one thing, a variety of other
9  arrangements almost invariably would mean fee-for-service,
10  which, as I've explained, has got the bad incentives.
11      It's a -- it really comes down to what Saint Luke,
12  the evangelist, said, which is, "No man can serve two
13  masters."  And I feel and see that in our healthcare system.
14  You can't do fee-for-service and also do capitated
15  integrated medical care well.
16      There is some -- there is some institutions that
17  do that.  Many of the multispecialty group practices in
18  California are in a model that's called "the California
19  delegated model."  So let's say Blue Cross contracts with
20  the XYZ Clinic, and the clinic agrees to take the enrolled
21  patients for a per capita amount.  The trouble is these
22  doctors also have a fee-for-service practice, so they get
23  into a situation of kind of cognitive dissonance.  Well, do
24  we treat this patient in an integrated care way or do we
25  treat them in some other way?

2613

1      And, in fact, at Stanford with the -- we see this
2  problem with the ACO that the hospital and clinics want to
3  give us now, and I asked some of the top docs, "Does this
4  mean you will treat our employees differently because you're
5  at risk for them than other patients?"
6      Kind of embarrassed silence, struggle to -- and
7  doctors generally believe there is a right way to take care
8  of the patient, and so he said just that, that "We'll figure
9  out the right way, and we'll treat all our patients the
10  same."
11      Q.  And you don't believe that will effectively
12  incentivize the physicians to provide the most effective,
13  lowest-cost care?
14      A.  Well, I think it's going to be a problem that
15  they're going to have to overcome.  I think you have to
16  decide, are you going to be a quality, cost-effective,
17  integrated system and practice the way they do, or are you
18  going to be a fee-for-service system, chasing fees.
19      Q.  And how do the incentives in terms of investments
20  in one another, as between, say, a system and a physician
21  differ in an employment relationship and some looser
22  affiliation?
23      A.  Sure.  Well, I think that's -- that's huge.  As I
24  described in the integrated system, the specialists are
25  consultants to the generalists.  So the specialists have to

2614

1  devote a substantial amount of time and effort to educating
2  the primary care physicians.  And they -- it pays for them
3  to do that because the primary care physicians are on the
4  same team.  You know, they're fully committed to each other.
5      Also, on the question of investments, I mentioned
6  the California delegated model HMOs -- which I regard as
7  ineffective because too many of the doctors have too much
8  fee-for-service -- but they have not made very good progress
9  with respect to electronic health records because of the
10  problem of divided loyalties.  If Blue Cross was
11  considering -- or say one of the medical groups, if the
12  medical group said, "Blue Cross, we could do a better job if
13  you will help us with our electronic medical record."  The
14  problem is Blue Cross would think if we help you, that will
15  help several -- the benefits will be diffused among several
16  other insurance companies that are paying for your patients;
17  whereas, in Kaiser Permanente, it's very clearly focused.
18  Kaiser Foundation Health Plan is happy to pay for Epic for
19  Kaiser doctors because -- and hospitals -- happy to do that
20  because all of the benefit will be realized in our system.
21  It's not going to leak out and be diffused to others.
22      Q.  And how do the incentives work going the other
23  way, that is, a physician considering whether to spend
24  additional time assisting in developing evidence-based
25  practices, how do the incentives differ as between an

2615

1  integrated delivery system with a close financial
2  relationship and some looser organization?
3      A.  Well, the physicians do that nonrevenue-generating
4  work, if you like, as a matter of course, as part of their
5  job.  And so they get -- they can do that on company time or
6  they get credit for it or paid for it.  I noticed in
7  Geisinger that in determining the physicians' compensation
8  they ascribe points to education work and other things to
9  try to make sure they're paid for committee work.
10      Q.  Now a looser entity could pay the doctor for the
11  same work to develop evidence-based practices; right?
12      A.  I'm sorry.  Say that again.
13      Q.  A looser affiliation that didn't involve economic
14  integration, the system, you could say, could just pay the
15  independent doctor to compensate him for his time.  So if
16  that's true, why does the incentive for the physician differ
17  as between a fully integrated, financially integrated IDS
18  and some looser --
19      A.  Well, I just think the main thing is
20  fee-for-service.  The looser arrangements almost invariably
21  involve fee-for-service payment.  And as I've explained
22  today and in my writings, the fee-for-service just has too
23  many perverse incentives, including you're punished if you
24  find a way to solve the patient's problems for less, less
25  money.

2616

1    Q.  Are there articles or studies that support your
2  view that tighter financial integration with physicians
3  results in more effective, higher-quality, lower-cost care?
4    A.  Yes.  I think some of the studies I've referred
5  to, like in Mehrotra, et al.: "Patients treated by tightly
6  integrated medical groups consistently obtained
7  higher-quality primary care than patients treated by IPAs;
8  hybrid groups," and "achieve benefits that IPAs do not."
9         And Gillies, who is part of the Steve Shortell
10  team at Berkeley, et al., includes those people.  "Highly
11  organized systems relying mostly on staff or salaried
12  physicians were found to provide better care than did more
13  loosely organized models."
14         And Jonathan Weiner in his study of personnel,
15  physician personnel, of requirements finds, "organized,
16  prepaid group practices provide high-quality, cost-effective
17  care with considerably fewer physicians than in other
18  practice environments."
19    Q.  And going back to Mehrotra.  What is an "IPA"
20  within the meaning of that study?
21    A.  Well, an IPA is -- the initials are for an
22  independent practice association.  Now, they started in
23  California, then they grew to other states, too.  And the
24  joke was an IPA is a defensive alliance against Kaiser.  And
25  I know a lot of these guys, and they'll say that's right,

2617

1  you know, we wouldn't exist if we didn't have to pull
2  together to -- to keep our patients from going to Kaiser.
3  We have to offer them an equally good deal.
4    Q.  And I take it, then, the hybrid group within
5  Mehrotra would be somewhere between a tightly integrated
6  medical group and then looser or loose affiliation like an
7  IPA?
8    A.  Well, an IPA -- let's see -- well, I'll give you
9  an example of a hybrid.  Around 1970, there started Harvard
10  Community Health Plan, which it's a really excellent
11  multispecialty prepaid group practice.  I think excellent
12  because they hired two of my best students.  And they were
13  doing very well until they signed up as many people as they
14  could in the choice-offering employers.  And for them to be
15  offered, the employers have to -- the employees have to be
16  offered the choice so that they can choose them.  Well, then
17  their growth was stopped.  A lot of employers decided they
18  wanted to have what at the time was called a single plan
19  replacement.  We don't want to have to deal with multiple
20  insurance companies.  We want to have one plan.
21         So group -- so Harvard Community Health Plan
22  merged with a large IPA, and, in effect, then they could say
23  to the employer, "Your employees can all find a doctor they
24  like in this large IPA or in the medical group," and I think
25  that their efficiency and effectiveness declined after that.

2618

1         I talked to the chief of the group part of it.  I
2  said, "Do you get rewarded for your superior efficiency or
3  are you just diluted and spread over the independent docs?"
4  And it was the latter.
5    Q.  And this is another set of studies that -- some of
6  which involve multispecialty groups.  And again, there's the
7  question, "Well, isn't Saltzer a multispecialty group?"
8  Within the context of these articles, does Saltzer as it
9  existed as an independent practice fit the paradigm of what
10  these authors are saying, provide an effective low-cost,
11  high-quality care?
12    A.  Well, Saltzer is not a multispecialty group
13  practice.  It cannot, within itself, have this close a
14  relationship between specialists and generalists.  They
15  don't have the specialists in all of the different
16  disciplines to be able to support that and provide that.
17    Q.  What about the size of Saltzer compared to some of
18  the multispecialty groups that are analyzed in these
19  articles?  Are they different?
20    A.  Well, I would say they are very small.
21    Q.  That is Saltzer is very small?
22    A.  Saltzer is very small.  They have about 40
23  doctors.  And -- well, let's say Kaiser Permanente needs
24  approximately 60 primary care doctors per 100,000
25  population.  So if you wanted to go into Canyon County and

2619

1  sign up half the people at that kind of ratio, you would
2  need, you know, over 100 primary care doctors, so -- yeah.
3    Q.  So now you're familiar with some integrated
4  delivery systems that do work with substantial numbers of
5  independents; correct?
6    A.  Yes.
7    Q.  And is Geisinger Health System one of those
8  examples?
9    A.  Right.
10    Q.  Can you just explain to the court how Geisinger
11  works?
12    A.  Well, Geisinger has about 1,000 physicians on
13  staff.  So they've got a large number of fully committed,
14  salaried doctors on their staff.  Then, they do have their
15  own Geisinger health plan, their own insurance plan.  It
16  would do for Geisinger what, let's say, SelectHealth does
17  for Intermountain Healthcare and hopefully for St. Luke's.
18         So Geisinger, with their own health insurance
19  plan, has a problem of what if those doctors don't practice
20  the way we think they should?  Well, first, the doctors on
21  staff develop the care protocols and then advise the doctors
22  who are caring for their patients on their health plan.
23  And, you know, this all is -- needs to be seen as a
24  continuous flow of innovation.  This is not just we found
25  the best now and we stick with it forever.  This is a field

2620

1  that's changing all the time as new research comes out.

2          And so the Geisinger doctors on staff developed

3  new care models as new information comes, you know, how to

4  incorporate that in practice, and then they try to educate

5  the other doctors, the independent doctors:  This is the way

6  we now recommend caring for this kind of patient.

7          And I think what their experience shows is

8  probably because of diluted incentives, because these

9  doctors also have fee-for-service business, they are slower

10 to innovate and less effective in innovating.  It's back to

11 the same thing of "one man cannot serve two masters."

12     Q.  In the Geisinger system are --

13         THE COURT:  Counsel, we need to take another short

14 break, but you can pick your spot here in the next few

15 minutes.

16         MR. KEITH:  I just have one more question on this,

17 and I think it might be a good moment to stop.

18 BY MR. KEITH:

19     Q.  So within the Geisinger system, you mentioned

20 there are 1,000 or so employed staff physicians, but the

21 system also works with independents.  Does Geisinger -- or

22 are all those 1,000 employed physicians in one area or are

23 they dispersed geographically?

24     A.  I expect that they are -- their footprint is

25 fairly large in central northwestern -- I'm sorry --

2621

1  northern and central Pennsylvania.  I've seen their picture

2  of their footprint.

3      Q.  And why would it be important to have your

4  employed physicians as an integrated delivery system

5  allocated across your geographic footprint?

6      A.  Because you want them -- you want the patients to

7  have convenient access to your doctors so that they will

8  come to your doctors for care.

9          MR. KEITH:  I think that's a good stopping point,

10 Your Honor.

11         THE COURT:  All right.  Now I'm making a note.

12     All right.  Counsel, we'll try to hold this to a very

13 short break, certainly not more than ten minutes, maybe as

14 little as six or seven, just enough to stretch our legs

15 since the last break was quite a bit longer.

16     We'll be in recess.

17     (Recess.)

18         THE COURT:  Dr. Enthoven, I'll remind you you are

19 still under oath.

20     Mr. Keith, you may resume your examination.

21     Counsel, we're going to break right at noon for one

22 hour, and I will try to be back here promptly at 1:00.

23 BY MR. KEITH:

24     Q.  Dr. Enthoven, one of the things you said you did

25 within the scope of your work in this case was to analyze

2622

1  what St. Luke's has done to develop an integrated delivery

2  system and what benefits might arise if St. Luke's is able

3  to achieve that end.  Do you recall that?

4      A.  Yes.

5      Q.  And you did a number of things to investigate that

6  question.  I just want to walk you through them.

7          So you looked at the preliminary injunction pleadings

8  in this case; correct?

9      A.  I think so, yes.

10     Q.  And you also looked at the -- some of the

11 declarations that were submitted?

12     A.  Yeah, mm-hmm.

13     Q.  And you've obviously taken -- analyzed the expert

14 reports that were submitted to you?

15         MR. ETTINGER:  Your Honor, this is one or two I

16 didn't raise, but this is pretty leading to go through

17 everything he did in a leading way.

18         MR. KEITH:  I believe Your Honor said that, for

19 foundation, that's --

20         THE COURT:  I do allow leading questions on

21 foundation, so the objection is overruled.  It's not that I

22 allow it.  I think Rule 611 contemplates it rather

23 specifically that it is proper to ask leading questions on

24 foundational matters.

25     Proceed.

2623

1          MR. KEITH:  Thank you, Your Honor.

2  BY MR. KEITH:

3      Q.  And you obviously reviewed the report of

4  Dr. Kenneth Kizer that was submitted by the plaintiffs to

5  which you responded and then he filed a reply; correct?

6      A.  Right.

7      Q.  I'm sorry.  You have to say that --

8      A.  Yes.

9      Q.  Yes.  Okay.  And you also reviewed the testimony

10 of Dr. Dranove in this case; is that correct?

11     A.  Yes.

12     Q.  In addition, you looked at some various documents

13 that were relevant to the points that you found -- that you

14 needed to see in order to make it -- come to an opinion?

15     A.  Yes.

16     Q.  You also came to Idaho; is that right?

17     A.  Yes.

18     Q.  And you met with Dr. Marc Chasin, St. Luke's chief

19 medical information officer?

20     A.  Yes.

21     Q.  You met with Dr. Geoffrey Swanson, who is

22 St. Luke's vice president for clinical integration?

23     A.  I did.

24     Q.  You also met with John Kee, who, until very

25 recently, was vice president for physicians' services?

2624

1    **A.**  Yes.
2       **Q.**  And I think you also had a conversation with
3    Renee Watson, who is St. Luke's director of care
4    coordination.  Do you recall that?
5    **A.**  Yes, I do.
6       **Q.**  You also made a trip out to Saltzer; is that
7    right?
8    **A.**  Correct.
9       **Q.**  And you met with Dr. John Kaiser, who is the
10   president of Saltzer?
11   **A.**  Yes.
12      **Q.**  And you met with Dr. Randell Page, who is a
13   physician at Saltzer?
14   **A.**  Yes.
15      **Q.**  And with William L. Savage, the CEO of Saltzer?
16   **A.**  Yes.
17      **Q.**  You also reviewed a large number of depositions
18   that were given in the case; correct?
19   **A.**  Yes.
20      **Q.**  And then, finally, at your request, we set up a
21   webinar for you to be provided a tutorial on the WhiteCloud
22   analytical tools?
23   **A.**  That's correct.
24      **Q.**  And following that investigation, did you arrive
25   at an opinion on whether St. Luke's is taking steps to

2625

1    implement an integrated delivery system here in Idaho?
2    **A.**  I did.  I thought that they took several really
3    important meaningful steps in this direction.
4       **Q.**  Well, let's just go over those steps at a very
5    high level.  If you could just tick off the points that you
6    thought were important to you in reaching an opinion that
7    St. Luke's is going down the path to creating an integrated
8    delivery system.
9    **A.**  Yes, I will.  First of all, implementing Epic,
10   which is the system of choice for many integrated delivery
11   systems; then developing the WhiteCloud analytical tool,
12   which is an analytical software that sits on top of Epic and
13   produces very interesting reports.
14      Then I discussed with some of the physicians
15   physician-led management structure to drive improvement,
16   risk-based contracting, the CoPar initiative, transition to
17   value-based compensation, and use of evidence-based care.
18      **Q.**  And just briefly, let's touch on Epic for a
19   moment.  Why is that, in your mind, an important fact in
20   your opinion that St. Luke's is headed toward creating an
21   integrated delivery system?
22   **A.**  Well, what my friends at Kaiser who have done Epic
23   have told me and have written that I read, that Epic is
24   transformational, completely mod- -- completely changed
25   the -- the way they can practice medicine on a team basis

2626

1    because of all the members of the team.  And the Epic tool
2    also has quite a few members.  George Halvorson, the CEO of
3    Kaiser Permanente, wrote in the book that I edited about
4    caregiver-support tools, reminders, registries, things like
5    the lady with the mammogram.
6       MR. ETTINGER:  Your Honor, the witness here and
7    many times this morning has been recounting hearsay.  And,
8    of course, an expert can rely on hearsay, but I just
9    haven't found the distinction between relying on hearsay as
10   a basis for his opinions and the hearsay being independently
11   admissible.  And I assume when it's hearsay, it's only being
12   offered as a basis so we don't need to be jumping up and
13   down.
14      THE COURT:  No.  That's absolutely correct.  I
15   think Rule -- I want to say what 703 is explicit on that point
16   that it may be relied upon by a witness without being
17   admissible, but it does not provide -- will not be
18   considered by the court for its substance.  I think there is
19   a standard where it can be, but the burden -- it's a very
20   high burden.  It's kind of the reverse 403 standard where
21   its probative -- I'll have to -- well, perhaps, I have that
22   mistaken.
23      But, regardless, you're absolutely correct,
24   Mr. Ettinger.  I am not going to require counsel to state
25   their objection.  I'll just note that where Dr. Enthoven or

2627

1    any other expert has referred to out-of-court statements not
2    otherwise admitted into evidence, that will not mean that
3    that evidence will be considered by the court other than as
4    just a statement of what the witness relied upon.
5       Is that sufficient?
6       MR. ETTINGER:  Yes, Your Honor.
7       THE COURT:  All right.  Proceed.
8       MR. KEITH:  Thank you, Your Honor.
9    BY MR. KEITH:
10      **Q.**  Now, Dr. Enthoven, you actually are a patient
11   whose record is in the Epic system, aren't you?
12   **A.**  Yes, I am.
13      **Q.**  So you personally have used Epic?
14   **A.**  Yes.
15      **Q.**  You're able to access your records?
16   **A.**  Yes.
17      **Q.**  And you're able to see all of your records from
18   all your physicians; correct?
19   **A.**  Yes.
20      **Q.**  Is that a benefit to you as a patient?
21   **A.**  Yes, it's great.
22      **Q.**  And how so?
23   **A.**  Well, like I was worried about my cholesterol.
24   So, at my doctor's order, I went and had a test.  And then
25   later that day, there on my email was the code for me to

2628

1  enter into their system and call up my cholesterol.
2      Q.  And I think you have already mentioned that you
3  use the tool to communicate with your physicians rather than
4  going to the office; correct?
5      A.  Right.
6      Q.  And that you also perceive that as a benefit?
7      A.  Yes.
8      Q.  Let's talk a little bit about the -- the
9  WhiteCloud tool that you took a tutorial of.  Can you just,
10  at a very high level, indicate what you saw and why you
11  thought it was meaningful in making a determination that
12  St. Luke's really is trying to create an integrated delivery
13  system.
14      A.  Well, yes.  I mean, there is several things that
15  impressed me.  One was, with that tool, they could drill
16  down -- let us say we have orthopedic surgeons doing hip
17  replacements.  Well, the information is aggregated to
18  identify cost per case.  So then they can look at cost per
19  case for a hip replacement done by different orthopods,
20  orthopedic surgeons.
21          Then they can drill down and find out why does
22  this doctor cost so much than that doctor.  Well, it turns
23  out this doctor uses a particularly expensive prosthesis.
24          So this information is made available to all of
25  the orthopedic surgeons, and some of them that use an

2629

1  inexpensive prosthesis might be able to say, "Hey, Doc, you
2  know, we're doing the same result for a lot less money by
3  using this other product, and why don't you consider that."
4          So it's a way of encouraging physicians to kind of
5  get them on the side of working together and bringing down
6  the costs.
7          Also, something that got my attention that I
8  particularly liked was the Perfect Care Index.  A lot of
9  medical care and quality of medical care is doing all the
10  right things.
11          Atul Gawande had a famous article in *The*
12  *New Yorker* about checklists, and he explained the history of
13  checklists, why pilots use checklists because, previous to
14  that, their planes were crashing with negative consequences
15  for the pilots.
16          And so the idea of checklists has now been entered
17  into medical care.  So the doctors are reminded:  You are
18  supposed to have these various things done.  So they
19  compiled a Perfect Care Index, which is you did perfect care
20  on this case if you met all the criteria.
21          Now, some traditional doctors object to that as
22  cookbook medicine.  But, fortunately, integrated care
23  doctors don't see it that way.  They see:  I'm fallible.
24  I'm a human being.  I don't remember everything, and it's
25  good to have a reminder.

2630

1      Q.  Now, the court has heard testimony that St. Luke's
2  has expended considerable effort to mine certain data out of
3  the Saltzer electronic health record and -- in order to load
4  that data into the WhiteCloud tool.
5          Does that change your opinion on the importance of
6  WhiteCloud in terms of your decision, your opinion that
7  St. Luke's is headed down the path to creating an integrated
8  delivery system?
9      A.  Well, I think that WhiteCloud is something that
10  the medical director of an integrated system would want to
11  have, would want to have that information.  That's kind of
12  how they improve care.
13      Q.  And did you have an opportunity to discuss with
14  St. Luke's folks that you met with and also review documents
15  related to the way that St. Luke's had organized its
16  physician leaders to create a management structure?
17      A.  Yes.
18      Q.  And what did you conclude about that management
19  structure, and how does it relate to your opinion that
20  St. Luke's is headed down the path toward an integrated
21  delivery system?
22      A.  Well, the first thing that it led me to understand
23  much better than before:  St. Luke's is not just a hospital;
24  St. Luke's is a large, multispecialty group practice.
25          And the people that spoke to me were doctors,

2631

1  said -- these are talking the way doctors do.  And this is a
2  physician-led organization because the doctors are the
3  decisive decision-makers.  They're the ones that decide
4  whether a patient should be hospitalized or not, et cetera.
5          And a conclusion I had reached about Kaiser and
6  other systems was it's essential to win the loyalty,
7  commitment, and responsible participation of the doctors.
8  And I felt this kind of structure, the doctors would feel
9  they're being led by doctors, so these are doctors who
10  understand doctoring.  And that impressed me favorably.
11      Q.  And why is it, in your view, important in creating
12  an integrated delivery system that St. Luke's earn the
13  loyalty, commitment, and responsible participation of
14  physicians?
15      A.  Well, it's because physicians make all the key
16  decisions, and they're the natural leaders of the healthcare
17  delivery system.
18          You know, people have talked about or argued who
19  should be the leaders.  Well, to me, it's obvious that the
20  physicians should take responsibility for the results and be
21  leaders.
22      Q.  What did you learn about the -- about St. Luke's
23  efforts to shift away from fee-for-service medicine?
24      A.  Well, for one thing, they have engaged in several
25  kinds of risk-based contracting.  St. Luke's is the first

2632

1 accountable care organization in Idaho, so they're out in
2 front on that.
3       As well as that, they're in two different Medicare
4 Advantage contracts. I explained Medicare Advantage
5 earlier. It's like HMO for Medicare beneficiary, and it's
6 usually fully at risk.
7       Then I think they did a really important thing in
8 bringing in SelectHealth into Idaho. That's a very
9 important, procompetitive move, but --
10      Q. Why is that procompetitive, or why is that
11 important in your mind?
12      A. Okay. It's important because they -- they could
13 work with SelectHealth to develop -- and they did do
14 this -- a risk-based contract. SelectHealth, subsidiary of
15 Intermountain Healthcare, a nonprofit in Utah, had a
16 successful relationship with Intermountain Healthcare along
17 these lines.
18      And so they designed a contract in which they
19 would bear the risks -- the risks of the cost of care
20 initially, but over time, St. Luke's would be at risk for
21 the cost of care. And this would be a way for St. Luke's to
22 enter the employment market -- you know, the employment
23 group market and offer a risk-based contract.
24      And if they're successful in bringing down their
25 costs, then they will be able to offer a lower premium and

2633

1 be able to displace other insurers. And so it adds to the
2 competitiveness of the health insurance market in Idaho.
3      Q. And are you familiar with Intermountain
4 Healthcare, the Utah-based delivery system?
5      A. I am.
6      Q. Is it, in your mind, an integrated delivery
7 system?
8      A. It is.
9      Q. And do you think it's important that St. Luke's
10 relationship in this case that brings this type of product
11 is with SelectHealth because of its relationship with
12 Intermountain Healthcare?
13      A. Yes.
14      Q. And why is that?
15      A. Well, because SelectHealth has experience in
16 working with Intermountain Healthcare, and Intermountain
17 Healthcare would be one good model of what St. Luke's might
18 end up looking like.
19      So I expect it was probably much -- well, first,
20 that SelectHealth probably -- the leaders probably had the
21 vision: This is what we do in Utah, and this is what we'll
22 try to do in -- in Idaho.
23      So they kind of understood what this is all about.
24      Q. Now, you mentioned earlier in your testimony that
25 it's a fact of the American healthcare system that a small

2634

1 percentage of patients generate a considerable percentage of
2 the total costs of care.
3      A. That's right.
4      Q. And are there -- are there efforts that you're
5 aware of to try to address that problem nationally or
6 elsewhere, outside of Idaho?
7      A. Let me say elsewhere. It's still -- converting
8 this into a medical management process is still fairly new,
9 but this is what is St. Luke's CoPar, as I understand it,
10 is. CoPar, whatever that is -- I forget what the acronym
11 stands for.
12      But based on the recognition that 5 percent of the
13 patients cost more -- cost more than 50 percent of the total
14 costs, there are a few pilot projects around the country --
15 Boeing and Caterpillar in the East -- in which the
16 top 5 percent spenders would be identified and given
17 especially intensive care.
18      Just in the last year or two, we have -- we call
19 it -- call our ambulatory intensive care unit -- at
20 Stanford, we call it "Stanford Coordinated Care." And the
21 idea is that these patients are identified, and then
22 physicians and nurses form teams and work with them,
23 depending on what their problems are, and give them very
24 intense, special care to prevent them from needing hospital.
25      And our figures and our goals suggest the savings

2635

1 can be quite large. But from this point of view, the main
2 thing is this is a very anti-fee-for-service thing.
3      In the fee-for-service world, those 5 percent of
4 the patients that cost the most, they're the geese that lay
5 the golden eggs. In the risk-based world, on the contrary.
6 They are not a revenue center; they're a cost center.
7      And so we want to address that and -- and find
8 out -- really dig into what's causing their high costs and
9 what's the best thing to do to reduce their costs.
10      Q. So I take it, from that, that implementing the
11 CoPar program would be inconsistent in your mind with the
12 view that St. Luke's intended to stay primarily in
13 fee-for-service medicine?
14      A. No. This is a strong sign of commitment to
15 risk-based, per-capita-financed medicine as opposed
16 to -- it's the opposite of fee-for-service. As I was
17 saying, in fee-for-service, you want to have these expensive
18 people because that -- that's the geese that lay the golden
19 eggs.
20      Q. And did you discuss and investigate the nature of
21 compensation -- the manner in which St. Luke's compensates
22 the physicians who are either employed or under a
23 professional services agreement with the system?
24      A. Yeah. I haven't reviewed the whole picture in
25 detail, but what I have observed is that in three different

2636

1 specialties, they have converted the doctors from
2 fee-for-service or work- -- or wRVU, work-related relative
3 value units -- that is an indicator of fee-for-service
4 generation. And they have tried to work -- have worked out
5 an arrangement where the doctors are paid a salary plus
6 substantial bonuses based on quality.
7          It's not easy or obvious to do. You have to have
8 the information system up and running and in place and the
9 doctors persuaded that these are valid quality measures and
10 that they are willing to work toward those and then
11 implement the system. It just takes time, and it has to
12 follow the arrival of an effective information system.
13          Q. Is it your view that it's essential for a system
14 to be an integrated delivery system that physicians are
15 compensated purely on salary or quality, or are there some
16 systems you're aware of that their physicians are
17 compensated in part on productivity -- it's wRVUs -- or in
18 part on quality or some other metric?
19          A. Well, different -- this is kind of a work in
20 progress. And different systems are developing and
21 fine-tuning and modifying as they go. This is kind of a
22 learning process.
23          So Geisinger, as I learned from one of their
24 articles, now pays doctors in substantial part on relative
25 value units earned, like fee-for-service income, but a

2637

1 modified form of that. So if you do a huge amount, there
2 is, like, a tax on that.
3          And as I say, it's sort of empirical tuning. So
4 there is some fee-for-service in their model, but they are
5 trying to increase the component that is based on quality
6 indicators.
7          In other systems, like my understanding, the Palo
8 Alto Medical Foundation, the doctors are on salaries related
9 to their specialty, but the salaries are somewhat influenced
10 by their fee-for-service billings.
11          So the idea is to -- you know, you're trying to
12 solve multiple problems here. You are trying to get away
13 from the perversities of fee-for-service, but you do want to
14 reward productivity. You don't want to have the doctors
15 just sell their practice and then retire on the job.
16          So that's -- that's the reason for doing that.
17 And then the quality indicators, your Perfect Care Index for
18 your patients, and things like that.
19          And all I can say is there is variation as they
20 learn, and there is empirical tuning. You know, if they
21 think we have too much of this, then we'll tune that down
22 and add something else.
23          Q. I would like to wrap up here just by going back to
24 the list that we began with and asking you: You know, of
25 the facts that you became aware of that were important in

2638

1 your conclusion that St. Luke's really is developing an
2 integrated system and that are listed here, you know, which
3 of these makes sense in a fee-for-service world?
4          Or let me ask you differently: Which of these would
5 not make sense if you plan to stay primarily in
6 fee-for-service?
7          A. Well, I think use of evidence-based care. You
8 know, research shows that Idaho is a high user of spine
9 surgery, and critics have suggested that that's probably
10 beyond what the evidence has supported. So they have
11 created a spine surgery program.
12          And part of the idea of evidence-based is, in the
13 olden days in fee-for-service: Well, we don't know -- we
14 don't have good evidence, but we'll try it anyway. And in
15 the new days of integrated care, we're to look carefully for
16 the evidence that this is going to benefit this patient and
17 not do it if it doesn't because not all spine surgery is
18 beneficial to patients.
19          I think the transition to value-based compensation
20 also -- you know, if you're really running a fee-for-service
21 business, then you just put them straight on
22 fee-for-service.
23          With the CoPar initiative, that's an AICU as I
24 understand it, and you wouldn't do that. That's killing the
25 geese that lay your golden eggs.

2639

1          Q. Let me stop you there. AICU is the ambulatory
2 intensive care unit?
3          A. Yes, ambulatory intensive care unit. That's Idaho
4 talk for what elsewhere we call ambulatory intensive care
5 unit.
6          So this CoPar, there is risk-based contracting.
7 That's pretty fundamental. That's getting away from
8 fee-for-service. As I indicated, there is a transition
9 phase more or less and so forth, but the goal is to get to
10 fully capitated care. So then you can have, you know,
11 risk-based.
12          So then you can have a product with SelectHealth
13 that you can take to employers and say: Here is a less
14 costly way of caring for your patients, and we've got
15 quality indicators and cost indicators, and you can see this
16 would be a good deal.
17          Physician-led management structure to drive
18 improvement, well, you have that in fee-for-service, also.
19 Developing the WhiteCloud tool, you might well want to have
20 that.
21          And some -- like, say, at Stanford, they adopted
22 Epic before they had made much commitment to integrated care
23 just because they felt it was better care coordination,
24 better functioning of the system. And I think one of the
25 things Epic can do is improve your fee-for-service billing.

2640

1    Q.  Let's turn to the third topic that you indicated
2  was part of your -- the scope of your work in this case, and
3  that is the -- the role of the Saltzer transaction in
4  St. Luke's development of an integrated delivery system and
5  the impact that that transaction might have on care for
6  Saltzer patients.
7       Can you just state, at a high level, what your
8  conclusion is in that regard.
9    A.  Well, my conclusion is that the merger with
10 Saltzer would be very helpful -- it would be very important
11 to St. Luke's to be able to move down the track toward
12 integrated care.
13      You can't really do integrated care, as I've
14 explained before, without strong primary care.  And Saltzer,
15 in my view, is overwhelmingly mainly a primary care group.
16 And that would help a lot.  You know, you need to have
17 something like 60 primary care doctors per 100,000
18 population, and so that would be an important contributor to
19 that.
20   Q.  And --
21   A.  If -- if St. Luke's wants to expand
22 population-based medicine in Canyon County, I don't see how
23 they could do it, you know, in a reasonably short period of
24 time without having such a primary care group.
25      I also concluded, as I've explained before, it

2641

1  just helps a lot to have these docs on your team fully
2  committed to your goals but not distracted by
3  fee-for-service elsewhere and trying to serve two masters.
4    Q.  You've -- you've said earlier in regard to
5  Geisinger that -- that it -- that it's important, even in an
6  integrated delivery system that works with independents, to
7  have a core or a nucleus of tightly, financially integrated
8  physicians.  Do you remember that testimony?
9    A.  Yeah.
10   Q.  And I would like you to relate that point to the
11 Saltzer transaction.  Just as a little bit of background,
12 St. Luke's does work with integrated -- with independent
13 physicians, as well.
14      So, in your mind, can you explain what is the core or
15 nucleus that St. Luke's needs that the Saltzer physicians
16 supply?
17   A.  Yeah.  I haven't been able to think of some
18 hard-and-fast numerical rule.  I just think you need a
19 substantial number of doctors that depends on the population
20 you're serving, on its geographic footprint.
21      But what you need to have, as -- as Geisinger has
22 written, is a substantial number of doctors so that you can
23 take on innovations, like CoPar or others, and develop them
24 and test them.
25      Such innovations are usually not spelled out in

2642

1  detail in the medical literature.  You know, you say this is
2  in general what we did.  And to turn that into specific
3  rules for what we do at St. Luke's requires some
4  experimental work.  You test it.  You use Epic to give you
5  results.  You feed back results, possibly into redesign of
6  the -- of the system.
7       So it just helps to have a substantial number of
8  doctors that --
9    Q.  And you're aware, aren't you, that St. Luke's has
10 seven primary care physicians currently under employment or
11 professional services agreement apart from Saltzer in
12 Canyon County; correct?
13   A.  Yes.
14   Q.  And is that a sufficient number in your mind to
15 form a core or nucleus for purposes of supporting an
16 integrated delivery system?
17   A.  Not -- not nearly.  I mean, if they want to serve
18 100,000 people, which would be a reasonable goal in Canyon
19 County, they would need roughly 60 or so primary care
20 physicians.  These are all approximate, you know.  I base
21 that on Jonathan Weiner's research.
22   Q.  And in your view, does the Saltzer transaction
23 facilitate St. Luke's ability to convert from a primarily
24 fee-for-service system to a risk-based system?
25   A.  Oh, very much so, because that gives them a solid

2643

1  base of primary care doctors who can fit into the model
2  they're trying to implement in Canyon County.  So it's a big
3  help.
4       I think, you know, St. Luke's wouldn't die without
5  them, but I think their progress to be an integrated
6  delivery system with risk-based contracts would be greatly
7  impeded.
8       You know, if you really want to see this
9  innovation happen in Idaho, then you have to be in favor of
10 their -- of their merging with Saltzer.
11   Q.  And do you think that the transaction at issue in
12 this case has benefits for not just St. Luke's in creating
13 an integrated delivery system but for Saltzer, as well, in
14 its pursuit of delivering higher-quality, lower-cost care?
15   A.  Oh, yes, definitely.  It's just a much better work
16 environment for a primary care doc if he or she has full
17 panels of specialists who are their partners and will work
18 with them on, you know, advising them and coaching them
19 on -- on their care of their patients, as well as having all
20 the resources to back them up from Epic.  That would enable
21 them to follow their patients into the hospital.
22   Q.  That is, implementing Epic would do that for the
23 Saltzer physicians?
24   A.  Yeah.  Whereas eClinicalWorks that they have now,
25 as I understand it, is a strictly outpatient system.

2644

1    Q.  And have you reached an opinion on whether the
2    transaction that's at issue in this case facilitates
3    Saltzer's ability to convert from a fee-for-service
4    physician group to taking on risk?
5    A.  I think it definitely does.  They would be part of
6    a larger team which is needed to take on risk.  And you
7    need -- as I testified earlier, you need a larger team with
8    the resources.
9         I think 40 primary care docs are not nearly enough
10   to take full risk for a population.  You need many more
11   people to spread the risks, as well as you need to have
12   management capabilities that they don't have on their own.
13   Q.  And that -- in terms of their ability to take on
14   risk -- that is, Saltzer's ability to take on risk as an
15   independent group, I take it you mean that their ability to
16   take on full-risk capitated payment --
17   A.  Yeah, right.
18   Q.  -- is limited by their size and scope?
19   A.  Right.
20   Q.  And that wouldn't necessarily mean they couldn't
21   take on some of the more limited forms of risk-sharing?
22   A.  Sure.  I'm sure that, you know, carriers could
23   devise plans like -- like ACOs with gain sharing, you know,
24   like the Medicare ACOs.
25        My problem with the Medicare ACO as a matter of

2645

1    incentives is you're coming into a situation where the
2    doctors are all in fee-for-service, and you're now asking
3    them to change.
4         And I kind of joked about Medicare ACOs at the
5    time of the Affordable Care Act by saying:  I picture the
6    doctors' board room when they're sitting around discussing
7    this.  And some doctor in the back of the room stands up and
8    says, "You mean to say they're telling us if we cut our
9    revenues by a million dollars, they will give us back a half
10   million?  Well, why don't we just keep the million?"
11        And so I'm afraid it's -- I like the ACO idea.  I
12   just think it would have been better if they had done it in
13   a full managed competition environment where they could be
14   losing a lot of their patients if they didn't really perform
15   well.
16   Q.  The plaintiffs in this case have articulated an
17   alternative for Saltzer in which it remains independent but
18   it participates in clinically integrated networks like
19   St. Luke's Select Medical Network or Saint Alphonsus Health
20   Alliance.
21        And I'm wondering whether you have an opinion on
22   whether that would be as effective in terms of delivering
23   high-value care as the integration that's at issue in this
24   case.
25   A.  Well, my opinion is if you have divided loyalties,

2646

1    then it's going to be much less effective.  You really have
2    to create a culture and incentives pointing in the right
3    direction, and I think that the doctors are pointed in
4    several directions.
5         So I came back to St. Luke's, but also
6    St. Matthews has reported the same thing; that is, one
7    man -- a man cannot serve two masters.  So I have even
8    stronger Biblical support for that -- for that insight.  I
9    just think if they're on fee-for-service, they are going to
10   be serving multiple masters and get confused.
11   Q.  The -- now, we have not asked you to render an
12   antitrust opinion in this case; is that correct?
13   A.  That's correct.
14   Q.  So we didn't have you calculate HHIs, for example?
15   A.  No.
16   Q.  And are you an antitrust expert --
17   A.  No.
18   Q.  -- generally?
19   A.  No.  I don't purport -- I would say my expertise
20   is not just in integrated care but in the creating the
21   competitive market environment in which integrated care
22   would succeed.
23        When I developed Consumer Choice Health Plan for
24   the Carter administration, what I had in mind was:  Let's
25   create an environment in which quality, cost-effective

2647

1    integrated systems that attract and please their patients
2    will be able to prosper, and the fee-for-service environment
3    is antithetical to that.
4         You know, when I read my student David Dranove's
5    testimony, as I did, I saw that he was doing
6    Hirschman-Herfindahl indices.  I have claimed no expertise
7    in that area.
8    Q.  But you do have views, don't you, on the
9    competitive impact of development of integrated delivery
10   systems?
11   A.  That's right.
12   Q.  And I think you've mentioned examples in Minnesota
13   with the Mayo Clinic.
14   A.  I'm a strong believer in competition.  And so I do
15   have views.  I do think if St. Luke's can carry out their
16   plan, that will have a very big competitive impact on the
17   rest of Idaho, just like Kaiser has had in California, that
18   is forcing the others -- in this case, may be forcing
19   Saint Al's or some others -- to form a defensive alliance
20   against Luke's and then to compete with them.
21   Q.  And you would regard that as positive for
22   consumers?
23   A.  Extremely positive because it's better quality and
24   lower cost.  We may have to do something to get the costs
25   under control.  This is the something that leaders in our

2648

1 country, including the Congress, are concluding.

2     **Q.**  And you've articulated to the court a number of

3 factors that you believe need to be in place for the type of

4 competition you have in mind to be effective -- for managed

5 competition to be effective.

6     **A.**  Yes.

7     **Q.**  I'm wondering whether there may be a

8 chicken-and-egg problem in your mind between the development

9 of integrated delivery systems and the conditions that would

10 be necessary for them to compete.

11     **A.**  Yeah.

12     **Q.**  So how do those two relate?

13     **A.**  Well, first of all, I have to say that -- when I

14 designed managed competition or in my first *New England*

15 *Journal* article, I called it "Regulated Competition in the

16 Private Sector." I said that because I wanted to counteract

17 the extreme free-market people that say: No, no. We don't

18 want any rules; we want an unregulated industry. And I'm

19 trying to say: No, there have to be rules.

20     So -- but, on the other hand, I could say if you

21 look at Utah, Wisconsin, Minnesota, for the most part, they

22 have had to create these integrated systems even in an

23 environment that is not rewarding to them.

24     So you don't have to have all of the aspects of

25 managed competition to make this work because these others

2649

1 have shown it, but it sure does help a lot.

2     And I think among elements of managed competition,

3 I see in the Affordable Care Act the exchanges. And I think

4 that's -- that's the kind of -- I have been writing about

5 the need for exchanges, and so I was very happy to see at

6 least that idea got into the Affordable Care Act.

7     My complaint was that instead of -- there were

8 just so few people in exchanges. I would like to have seen

9 a lot more people get into the competition model.

10     **Q.**  And do you think that in those areas where

11 integrated delivery systems have been created in contexts

12 that weren't necessarily ideal for managed competition, that

13 the creation of those systems has helped push forward and

14 put in place the elements of managed competition,

15 competition for employees, for employer health plans, and

16 the like?

17     **A.**  Right. I think both in Minnesota and the upper

18 Midwest and in California, there is kind of, as you say, a

19 chicken-and-egg problem.

20     The federal employees' health benefits program is

21 a famous -- it's not perfectly designed according to my

22 rules, but it's coming pretty close -- is a famous program

23 of multiple choice, cost-conscious, informed multiple

24 choice. And you know, how that became multiple choice was

25 back in 1960, the government -- federal government decided

2650

1 we really needed to have a health benefits program. And

2 Blue Cross, Blue Shield, and Aetna came in and said: Well,

3 we'll do it all for you.

4     But it turned out the postal employees had their

5 own plan; they didn't want to give it up. And Senator

6 Neuberger from Oregon, who was chairman of the Senate Postal

7 Civil Service Committee, was a Kaiser member. And he said

8 it's got to have room for Kaiser.

9     And so it's very hard to sell people on the idea

10 of -- of competition unless you have some plausible

11 competitors. And when I sold competition to the president

12 in Provo of Stanford University, it was because I could

13 point to Kaiser and say: They're there, and they do a good

14 job for a lower price. Why don't we just say that's what

15 we'll pay. Say to our employees: If you want fee for

16 service, God bless you, but you do that with your own money,

17 the extra cost.

18     And so, just in general, you know, you kind of

19 take a step here and then a step there. I think the reason

20 the Affordable Care Act did include exchanges, which is a

21 competition framework, is because there are some competitors

22 that could be pointed to.

23     **Q.**  So, if I understand it correctly, it's your

24 opinion that the Saltzer transaction will facilitate

25 St. Luke's development of an integrated delivery system?

2651

1     **A.**  It will.

2     **Q.**  And you believe that the development of an

3 integrated delivery system by St. Luke's will benefit

4 consumers in Idaho?

5     **A.**  I sure do.

6     **Q.**  And do you think that it will spur competition and

7 reaction by competitors to organize themselves and provide

8 similarly high-value care?

9     **A.**  That's what's happened in other areas, in other

10 states.

11     **Q.**  And you believe that the development of St. Luke's

12 integrated delivery system and perhaps the competitors who

13 react to it will facilitate the -- put in place the factors

14 that are necessary for managed competition to benefit

15 consumers?

16     **A.**  Well, it will take time, but if I were an officer

17 or director of St. Luke's and we were allowed to go forward

18 with the -- the Saltzer acquisition, then the next thing I

19 would recommend doing is go right up to the capitol -- or I

20 guess you've got the capitol right here -- and say: It's

21 time in Idaho that you do for public employees what they do

22 in California and Washington and Minnesota and Wisconsin and

23 Oregon. And that is you offer your employees choices and

24 cost-conscious choices of health insurance and make them

25 compete.

2652

1    MR. KEITH:  Thank you, Your Honor.  No further
2    questions.
3        THE COURT:  Counsel, we're right at the lunch
4    break.  So, with counsels' permission, let's just reconvene
5    at 1:00, and we'll start with the cross-examination of
6    Dr. Enthoven at that time.
7        Counsel, we'll be in recess.  I will try to be here
8    promptly at 1:00.  If I'm a few minutes late, please be
9    understanding, but that will be our plan.  We'll be in
10   recess.
11       (Recess.)
12       THE COURT:  Dr. Enthoven, I'll remind you that you
13   are still under oath.
14       Mr. Ettinger, you may cross-examine the witness.
15       MR. ETTINGER:  Thank you, Your Honor.
16           CROSS-EXAMINATION
17   BY MR. ETTINGER:
18   **Q.**  Good afternoon, Dr. Enthoven.
19   **A.**  Good afternoon, Mr. Ettinger.
20   **Q.**  Now, you would agree, Dr. Enthoven, would you not,
21   that healthcare has changed a lot over the four decades you
22   have been working in it?
23   **A.**  I would agree.
24   **Q.**  And in the last decade, it has changed a lot, has
25   it not?

2653

1    **A.**  Pardon me?
2    **Q.**  In the last decade, it's changed a lot; correct?
3    **A.**  Yes.
4    **Q.**  And you recall on direct you referred to the
5    Mehrotra, Gillies, and Weiner studies on tight integration?
6    **A.**  Yes.
7    **Q.**  Those studies relied on data from 2004 or earlier;
8    correct?
9    **A.**  Yes.
10   **Q.**  And as a result, none of those studies analyzed
11   the kinds of clinically integrated networks of independent
12   doctors and hospitals that have developed in the last five
13   to ten years; correct?  Just as a matter of timing, they
14   could not have because the data is older than that; correct?
15   **A.**  Correct.
16   **Q.**  And you don't know the extent to which networks of
17   independent doctors and hospitals today have specific
18   clinical protocols and standards relating to evidence-based
19   medicine; correct?
20   **A.**  That's correct.
21   **Q.**  And you don't know the extent to which clinically
22   integrated networks of independent physicians and hospitals
23   today manage clinical knowledge; correct?
24   **A.**  Well --
25   **Q.**  Is that correct or not, Doctor?

2654

1    **A.**  All right.  Correct.
2    **Q.**  And you don't know how clinically integrated
3    networks of independent physicians and hospitals today
4    measure adherence to their standards, do you?  Correct?
5    **A.**  Yeah.
6    **Q.**  Excuse me?  Is that correct?
7    **A.**  Yes.
8    **Q.**  And, in fact, this topic of what clinically
9    integrated networks of independent doctors and hospitals are
10   doing today is, in your words, a gray zone in your
11   knowledge; correct?
12   **A.**  Correct.
13   **Q.**  Now, isn't it true that -- strike that.  Let me
14   ask it somewhat differently.
15       You don't know whether clinically integrated networks
16   of independent doctors and hospitals today are generally led
17   by physicians and physician-run committees, do you?
18   **A.**  Repeat the question, please.
19   **Q.**  You don't know whether clinically integrated
20   networks of physicians and hospitals today are generally led
21   by physicians and physician-run committees?
22   **A.**  Generally, in what I have been able to observe,
23   they are.  But I don't have a census or a data or something.
24   **Q.**  Okay.  And do you recall on direct you talked
25   about pay for performance?

2655

1    **A.**  Yes.
2    **Q.**  Isn't it true that today commercial payers across
3    the United States are building pay for performance into
4    contracts with independent physician groups and clinically
5    integrated networks of independent physicians and hospitals?
6    **A.**  Yeah.  They are usually doing that in response to
7    the integrated systems that are succeeding --
8    **Q.**  Aren't they doing it today, Dr. Enthoven?
9    **A.**  Well, I don't really have research about today.
10   You know, there is a lag in publication and everything else,
11   as you've pointed out.
12   **Q.**  And you talked about registries on direct.  Do you
13   remember that?
14   **A.**  Yes.
15   **Q.**  And you have not studied the degree to which
16   clinically integrated networks of independent doctors and
17   hospitals today are utilizing registries, have you?
18   **A.**  I haven't seen much evidence that they are.
19   **Q.**  Have you seen evidence that they aren't?  Yes or
20   no, please.
21   **A.**  It's in the gray zone.
22   **Q.**  Okay.  Now -- your gray zone; correct?
23   **A.**  Yeah.  Yes.
24   **Q.**  Now, you talked a lot about Kaiser Permanente on
25   direct.  Isn't it true that there is no contractual

2656

1  ownership or other financial or legal relationship between
2  the Kaiser Permanente physician group and the Kaiser
3  hospitals?
4    **A.  Well, they share an ongoing contractual**
5  **relationship with health plan.**
6    **Q.**  Could you answer my question, please.  Isn't it
7  true that there is no contract ownership or other financial
8  or legal relationship between the Kaiser Permanente
9  physician group and the Kaiser hospitals?  Correct?
10   **A.  Well, there are financial relationships at least**
11  **over the years if -- if the physicians have been successful**
12  **in reducing the hospital's expenses, then -- then there is**
13  **some gain sharing there.**
14      MR. ETTINGER:  Keely, why don't you play cross
15  clip 20.
16      Your Honor, this is page 169.  It starts at line 21,
17  and there is a typo in my notes -- I apologize -- as to
18  ending line.  It should be -- it should be about line 29.
19      THE COURT:  We should be able to note that from
20  the scrolling transcript, I would think.
21      MR. ETTINGER:  Okay, great.  Sorry, Your Honor.
22  It says "170" here in my notes, and I know that can't be
23  right.
24      (Video clip played as follows:)
25      **Q.**  "Okay.  And the medical group has no

2657

1  formal relationship that you know of with the
2  hospital; is that correct?
3    **A.**  "They are the medical staff for the
4  hospital.
5    Q.  "I understand.  But do they have a
6  contract or ownership relationship, or other
7  financial or other legal relationship with the
8  hospital?
9    A.  "Not that I'm aware of.  I haven't heard
10  people talking about that.  And to the extent
11  that I've seen contracts, it's contracts
12  between the health plan and the medical group."
13  (Video clip concluded.)
14  BY MR. ETTINGER:
15   **Q.**  Was that your testimony?
16      THE COURT:  Just a moment.  That ends at page 170,
17  line 6 for the record.  Go ahead.
18      MR. ETTINGER:  Thank you, Your Honor.
19  BY MR. ETTINGER:
20   **Q.**  Was that your testimony, Dr. Enthoven?
21   **A.  That was my testimony, but let me say that --**
22      THE COURT:  Dr. Enthoven, Mr. Keith is going to
23  give you a chance to explain that in just a moment.  For
24  now, if we can just answer the questions yes or no, it will
25  allow us to proceed a little more efficiently.

2658

1  BY MR. ETTINGER:
2    **Q.**  And there is no legal or contractual requirement
3  for exclusivity as between the Kaiser Permanente physician
4  group and the Kaiser hospitals; correct?
5    **A.  Correct.**
6    **Q.**  Now, let's talk about some numbers.  You were
7  talking about primary care physicians in Canyon County,
8  Dr. Enthoven.  And you talked about the need for 60 to cover
9  half the people there.
10     Do you know how many primary care physicians even
11  approximately there are in Canyon County today?
12    **A.  Well, there is Saltzer with 40, and there is**
13  **with St. Luke's.  I think that's -- that's all I know about**
14  **that.**
15    **Q.**  You believe that Saltzer has 40 primary care
16  physicians in Canyon County?
17    **A.  Close to that.  I mean, they have a little more**
18  **than -- I looked at the list, and I think it was around 40.**
19    **Q.**  And is it -- you talked about -- you talked about
20  Saltzer, and you mentioned something about only one OB/GYN.
21  Is it your testimony that Saltzer has only one OB/GYN?
22    **A.  Could I see the document that I have -- I mean, I**
23  **did read a summary on that.  I think it was one family**
24  **practice doctor that does labor and deliveries and one**
25  **OB/GYN.  That's what I recall, anyway.**

2659

1    **Q.**  Okay.  Now, when you talk about OB -- when you
2  talk about primary care physicians in Canyon County, just so
3  we're clear, how are you defining "primary care"?  What
4  kinds of doctors?
5    **A.  Family practice, general internal medicine.  I**
6  **think there may be some DO, some doctors of osteopathy, that**
7  **are included in that.**
8    **Q.**  You had some questions you answered about the core
9  or nucleus idea.  I want to go back to that and unpack it a
10  little.
11     So it's your view, is it not, expressed in your report
12  that St. Luke's can work with independents in Canyon County,
13  but it's essential to have a core or nucleus of employed or
14  closely affiliated physicians; correct?
15    **A.  I think that the --**
16    **Q.**  Is that correct, Doctor?
17    **A.  Repeat that, please.**
18    **Q.**  It's your view that St. Luke's can certainly
19  utilize independent primary care physicians in
20  Canyon County, but you think it's essential to have a core
21  or nucleus of employed or closely affiliated physicians;
22  correct?
23    **A.  Correct.**
24    **Q.**  So, in simple English, isn't it true that, in your
25  view, they don't all have to be employed or closely

2660

1  affiliated -- of the 60; correct?

2      **A.** My view is it would be a lot more effective if
3  **they were employed.**

4      **Q.** Doctor, my question is: Isn't it your view that
5  they don't all have to be employed, that the 60 can include
6  independents as well as a core or nucleus of employed
7  physicians; correct?

8      **A.** Well, it's not so much have to be. It's more
9  **effective and less effective.**

10     **Q.** Doctor, I would like you to please answer my
11 question and not a different question.

12     THE COURT: Again, let's phrase the question one
13 more time.

14     Dr. Enthoven, answer the question as directly as you
15 can. As I noted, Mr. Keith is going to give you a chance to
16 fully explain your answer in a moment.

17     Let's, if we could, put the question to the witness
18 again, if you would, Mr. Ettinger.

19 BY MR. ETTINGER:

20     **Q.** Isn't it true, Dr. Enthoven, that it is your view
21 that even though St. Luke's can work with independent
22 primary care physicians in Canyon County, it needs to have a
23 core or nucleus of employed or closely affiliated
24 physicians? Yes or no?

25     **A.** Yes.

2661

1      **Q.** Thank you. And it's your view that the necessary
2  core or nucleus is four to six physicians per specialty;
3  correct?

4      **A.** No, that's incorrect. That's a misrepresentation
5  **of what I said.**

6      **Q.** Well, let's play it.

7      MR. ETTINGER: Keely, could you play clip 22.
8  Your Honor, it's Enthoven deposition, page 132,
9  line 13 --

10     MS. DUKE: -- to 133 line 1.

11     (Video clip played as follows:)

12         **Q.** "And then when you refer to 'core or
13     nucleus,' can you give me a quantitative
14     estimate of what the core or nucleus must
15     involve, either how many physicians or how many
16     physicians per specialty, or how many
17     physicians per area? I'd just like to get some
18     kind of quantitative measure of what you mean
19     by the essential core or nucleus.

20 MR. KEITH: "Object to form."

21     THE WITNESS: I was in --

22     THE COURT: Just a moment. We need to finish the
23 answer.

24         **A.** "I'm thinking of something like four to
25     six per specialty so that they would be able to

2662

1         do the heavy lifting on reviewing the
2     literature, consulting other organizations'
3     views on guidelines, and reach a consensus as
4     to what the practice guidelines would be in
5     their specialty."

6     (Video clip concluded.)

7 BY MR. ETTINGER:

8      **Q.** Was that your testimony, Dr. Enthoven? Yes or no?

9      **A.** I thought I was answering a different question.

10     **Q.** Was that your testimony? Yes or no?

11     **A.** I can't deny the tape.

12     **Q.** Thank you.

13     **A.** I just think I was discussing a different

14 **question.**

15     **Q.** Now, Dr. Enthoven, we have heard a lot about your
16 long and illustrious career, but you have not done any
17 original empirical research analyzing data on the subjects
18 you discussed in your direct testimony; correct?

19     **A.** As I mentioned in my testimony, I did --

20     **Q.** Yes or no, please, Doctor.

21     **A.** -- on the learning curve on and concentration
22 **of --**

23     **Q.** Yeah. Let me ask a slightly more precise
24 question, then, Doctor.

25     Isn't it true that you have never done any original

2663

1  empirical research analyzing data on integrated delivery
2  systems in healthcare? Yes or no?

3      **A.** No. The article that I did on the learning
4  **experience curve in heart surgery I saw as very relevant**
5  **because one of the things about Kaiser Permanente was that**
6  **they concentrated highly complex procedures in relatively**
7  **few hospitals. That is correct.**

8      **Q.** Doctor, were you the author of that study?

9      **A.** What?

10     **Q.** Were you the author of that study?

11     **A.** I was coauthor, yeah.

12     **Q.** With that exception, have you done any original
13 empirical research analyzing data on the subject of
14 integrated delivery systems?

15     **A.** No. I have --

16     **Q.** Yes or no?

17     **A.** -- relied on either research.

18     **Q.** And econometrics is the term for the field of
19 economic statistics; correct, Doctor?

20     **A.** Correct.

21     **Q.** And you have never had any published work
22 involving econometrics; correct?

23     **A.** Well, I did a lot of -- it's not quite correct.

24     **Q.** Correct?

25     **A.** I did a lot of -- I read a lot of econometric --

2664

1    Q.  Dr. Enthoven, could you please answer yes or no.
2         THE COURT:  Just a moment.  Now put the question
3    to the witness one more time.
4    BY MR. ETTINGER:
5    Q.  You have not done any published work involving
6    econometrics; correct?
7    A.  With the one exception that I mentioned.
8    Q.  And your econometrics training is 50 years old;
9    correct?
10   A.  Correct.
11   Q.  What does the term "statistical significance"
12   mean, Dr. Enthoven?  I would like a definition.
13   A.  Well, it means it's significant if it -- there
14   would be a very low probability that this result were
15   produced by chance.
16   Q.  And in economics and econometrics, statistical
17   significance provides the dividing line between reliable and
18   unreliable statistical work; correct?
19   A.  Well, it's one indicator.
20   Q.  There is no other recognized dividing line in
21   economics or econometrics, is there, besides the statistical
22   significance?
23   A.  No.  I think you would question the data
24   collection.  Did you think the data collection was correct
25   or not.  Did the people gathering the data understand the

2665

1    questioning they were answering and so forth.
2         So there are other issues you would want to
3    examine in fully establishing the validity of the data.
4    Q.  So what I'm hearing you say -- am I correct? -- is
5    that statistical significance is a minimum criterion for
6    finding statistical work reliable, but there may be other
7    things you need to look at, as well, including data
8    collection; correct?
9    A.  Yes; correct.
10   Q.  Okay.  Now, you're not aware of any studies with
11   statistically significant results relating to quality of
12   care or cost which compare hospital-owned physician groups
13   and nonhospital-owned physician groups; correct?
14   A.  I think that's correct.
15   Q.  And you're not aware of any studies with
16   statistically significant results relating to quality of
17   care or cost comparing group practices on the one hand and
18   IPAs or loosely affiliated networks on the other hand;
19   correct?
20   A.  No, that's not correct.
21   Q.  Can you name a study of that -- doing that
22   comparison for which there are statistically significant
23   results, Doctor?
24   A.  I would have to consult the literature.  I have
25   some of it here, but -- or you could bring me -- but I

2666

1    believe that there are -- are articles with statistically
2    significant results that report them.
3         MR. ETTINGER:  Keely, could you play --
4         THE WITNESS:  I would have to go through the list
5    to identify, but I'm quite sure there is --
6    BY MR. ETTINGER:
7    Q.  Do you recall that in your deposition, you said
8    you could not recall any such studies; is that correct?
9    A.  Well, let me say inability to recall, you know, I
10   was tired, it was toward the end of the day, and my mind is
11   not a tape recorder.  So the fact that I couldn't recall
12   it doesn't mean it didn't exist.  I might have studied it
13   and used it later.
14   Q.  So, just to be clear, in your deposition, you
15   couldn't recall any such studies; correct?
16   A.  That's correct, yeah.
17   Q.  And sitting here today right now, you can't recall
18   the name of any such studies; correct?
19   A.  No.  I can recall that there were some studies.
20   Q.  You can't tell us the author or the title sitting
21   here today?
22   A.  Well, may I look through these articles in my
23   notebook?
24   Q.  Doctor, I have limited time, and Mr. Keith may ask
25   you.

2667

1    Can you, sitting here today, recall the author or the
2    title of a study with statistically significant results
3    comparing quality or cost for group practices versus IPAs or
4    clinically -- or loosely affiliated networks?
5    A.  The articles that I submitted did include that
6    finding.
7    Q.  We'll go through them one by one right now, and
8    let's see what we find.  We'll do it with my question.
9         By the way, you also agree, don't you, that the studies
10   that you cited tend to use small samples with large standard
11   deviations?
12   A.  Not necessarily.  You have to look at each one.  I
13   mean, some of them do, but some of them don't.
14   Q.  And where that is -- a large standard deviation
15   means there is a lot of random variation in the data; isn't
16   that right?
17   A.  Correct.
18   Q.  And so it's harder to find a statistically
19   reliable result under those circumstances; correct?
20   A.  Correct; yes.
21   Q.  Okay.  Now, let's talk about the studies, and I
22   have a series of very specific questions for you.
23   A.  Okay.
24   Q.  First, the Gillies study, that was something you
25   talked about today; correct?

2668

1    **A.** May I look in the actual article here?

2    **Q.** Why don't I ask you the question, and let's see

3    what you can do with my question first.

4         THE COURT: All right. Let's go ahead and

5    proceed.

6    BY MR. ETTINGER:

7    **Q.** Isn't it true that the Gillies study says that

8    studies in this area have not been conclusive or consistent

9    in determining whether one type of delivery system or care

10   delivery organization delivers higher quality or lower-cost

11   care than others?

12   **A.** That article might have said that, but there are

13   other articles --

14   **Q.** We'll get to the next ones.

15        And didn't the Gillies study also say that its

16   conclusions, at most, should be considered as, quote,

17   "exploratory," close quote?

18   **A.** I don't have the article in front of me, so

19   I -- as I said earlier, my mind is not a tape recorder.

20        MR. ETTINGER: Why don't we go to page 1194,

21   Keely, of that. Can you call that up?

22   BY MR. ETTINGER:

23   **Q.** Doctor, you see at the beginning of the last

24   paragraph --

25        Keely, if you could pull that up.

2669

1    -- do you see that the authors say, "These findings

2    should be considered as exploratory, providing information

3    for further research." Did I read that correctly?

4    **A.** Yes. That's what the article says.

5    **Q.** Okay. So now let's go on to the Mehrotra study.

6    The Mehrotra study looked at self-identified integrated

7    groups, did it not?

8    **A.** Again, if I don't see the article, I --

9         MR. ETTINGER: Why don't we go to page 832 of that

10   one, Keely. It starts out -- the title is "Do integrated

11   medical groups provide."

12        MS. DUKE: What's the title of the article?

13        MR. ETTINGER: The title is "Do integrated medical

14   groups provide higher quality medical care than individual

15   medical practice associations?" Go to page 832, the last

16   paragraph, in summary.

17        THE WITNESS: I would like to be able to look at

18   the abstract at the beginning of the article.

19        THE COURT: All right. Mr. Keith, I assume you

20   can provide that on redirect.

21        MR. KEITH: I'll do that.

22        THE COURT: You'll have a chance to do that.

23   BY MR. ETTINGER:

24   **Q.** Doctor, doesn't the Mehrotra study say in its last

25   paragraph "In summary, we found that physician organizations

2670

1    identified as IMGs by physician leaders delivered higher

2    quality on four of six primary care measures." Do you see

3    that?

4    **A.** I see that.

5    **Q.** And three of six would be random chance, the

6    result you would get from a coin flip; correct? Isn't that

7    right, Doctor?

8    I don't think my question depends on the other words in

9    the paragraph. Do you have it in mind?

10        THE COURT: Well -- let's let Dr. Enthoven finish

11   reviewing.

12        MR. ETTINGER: Sure.

13        THE WITNESS: I don't see any test of the

14   statistical significance.

15   BY MR. ETTINGER:

16   **Q.** But if one group was better than another group in

17   half of the measures, three of six, that means they would be

18   worse in half the measures, also three of six; correct?

19   **A.** Yes; correct.

20   **Q.** And three of six is the result you would get from

21   the typical coin flip; correct?

22   **A.** Correct.

23   **Q.** So four of six is just one better than that;

24   correct, Doctor?

25   **A.** That's correct.

2671

1    **Q.** Why don't we go on to the Casalino study,

2    "Benefits of and barriers to large medical group practice in

3    the United States."

4         Keely, if you could pull up the results paragraph on

5    the right side.

6         Now, this is another study that you cited on direct,

7    isn't it, Doctor?

8    **A.** Yes.

9    **Q.** And the Casalino study was a survey, was it not?

10   **A.** He talks about survey data, so I suppose that's

11   right.

12   **Q.** And he said that, quote, gaining negotiating

13   leverage with health insurance plans was the most frequently

14   cited benefit from being in a large medical group practice;

15   isn't that right?

16   **A.** That's what he says.

17   **Q.** And he said that that was cited eight times more than

18   improving quality; isn't that right?

19   **A.** That's correct.

20   **Q.** Now, let's go on to the Weeks study. The Weeks

21   study is the study that talks about the CAPP groups --

22   C-A-P-P -- that you discussed on direct; right?

23   **A.** Right.

24   **Q.** And the Weeks study compared physicians affiliated

25   with these large CAPP groups with all other physicians in

2672

1 the markets that were studied; correct?

2     **A.   Correct.**

3     **Q.**   And all other physicians included sole

4 practitioners and physicians in two- and three-person

5 groups, among others; correct?

6     **A.   Correct.**

7     **Q.**   And at the time of the Weeks study, that data in

8 the early part of the last decade, there were lots of such

9 physician groups, were there not -- small groups?

10     **A.   There were not lots of groups like the CAPP**

11 **groups.**

12     **Q.**   No, but there were lots of groups like -- there

13 were lots of onesies and twosies and threesies that he

14 compared to the CAPPs group; correct?

15     **A.   Correct.**

16     **Q.**   Now, the Rittenhouse study is another one you

17 cited; correct?

18     **A.   Yes.**

19     **Q.**   And the Rittenhouse studies studied only physician

20 groups from 1 doctor to 19 doctors; isn't that right?

21     **A.   I think that's right.  It talked about small**

22 **groups.**

23     **Q.**   Yeah.  So the Rittenhouse study tells us nothing

24 whatever about the relative benefits to Saltzer of staying

25 its size or getting to be part of a larger St. Luke's group;

2673

1 correct?

2     **A.   I'm not sure that's correct.  I would need to look**

3 **at the Rittenhouse study.**

4     **Q.**   If the Rittenhouse study compares the benefits and

5 attributes of physicians at the high end of 19 to those at

6 the low end of 1 to 19, that's not going to allow you to

7 compare a 40- or 50-person group to a 300-person group, is

8 it?

9     **A.   No.  Correct.**

10     **Q.**   And the Shortell study involved only groups

11 already associated with organized delivery systems; isn't

12 that correct?

13     **A.   I think that's right.**

14     **Q.**   And finally, the last study you cited, the Weiner

15 study, compared eight large groups with all other doctors in

16 America?

17     **A.   That's correct, yeah.**

18     **Q.**   And that includes lots of onesies and twosies

19 again, did it -- necessarily, didn't it?

20     **A.   Yes.**

21     **Q.**   I said "finally," but I forget one which I don't

22 want to forget, and that's the Berkeley Forum.

23     **A.   Yes.**

24     **Q.**   The Berkeley Forum was not a study of data.  It

25 was a conclusion by some people drawing conclusions about

2674

1 policy; correct?

2     **A.   Correct.**

3     **Q.**   And they also drew conclusions which you did --

4 strike that.  Let me start over.

5     And you talked about the Berkeley Forum again on direct

6 today; right?

7     **A.   Yes.**

8     **Q.**   And the Berkeley Forum looked at anticompetitive

9 concerns from these large group practices as well as the

10 items that you discussed on direct; correct?

11     **A.   Correct.**

12     **Q.**   Why don't we go to page 38, Keely, and looking at

13 the first column about halfway down.

14     You see about halfway down there, a sentence that

15 starts out "However," Dr. Enthoven?

16     **A.   Let me just read to get there.**

17     **Q.**   Sure.

18     **A.   Okay.  I have read that.  It says, "There is a**

19 **concern."**

20     **Q.**   "-- is a concern that provider consolidation and

21 integration may threaten the competitive market."

22     Do you see that?

23     **A.   I do see that.**

24     **Q.**   You see -- skipping over the next sentence just in

25 the interest of time -- they then say, "Even in a market

2675

1 with many providers, some providers may be able to set

2 higher prices depending on their reputation for quality and

3 their position within an insurer's contractual networks."

4     Do you see that?

5     **A.   I do see that.**

6     **Q.**   Why don't we go to the next column, Keely, if we

7 could.

8     And I'm going to ask you about the second paragraph,

9 the one that starts out "Recent research."  Do you want to

10 look at that before I ask you about it?

11     **A.   Yes.**

12     **Q.**   Go ahead.

13     **A.   Okay.  I have read it.**

14     **Q.**   And skipping over the first sentence, let me just

15 ask you about this.  Does it say, quote, "One study

16 examining the repeat trend towards more physician employment

17 by hospitals showed that although there may be improvement

18 in clinical integration and care coordination, the cost of

19 that care may increase."

20     See that?

21     **A.   They say that, yes.**

22     **Q.**   And then they say, "Among the possible reasons for

23 this finding are that physician reimbursement may be higher

24 for services rendered at hospitals than in physicians'

25 offices, and that at times physicians may be influenced by

2676

1  hospitals to order more expensive care or increase referrals
2  and admissions."
3      Do you see that?
4      **A.  Yes.  That can happen in the fee-for-service**
5  **context.**
6      **Q.**  Okay.  And it goes on to say, "Consolidation of
7  individual physician practices can also potentially lead to
8  higher prices as larger physician groups with added
9  bargaining power can negotiate for higher capitation rates."
10     Do you see that?
11     **A.  I do.**
12     **Q.**  And indeed, Dr. Enthoven, the problems of -- I
13  know you're not an expert in antitrust economics, but the
14  problems of too much market power and higher prices can
15  exist for capitation as well as fee-for-service; correct?
16     **A.  Depends on how the market is structured.**
17     **Q.**  Now, why don't you -- let's go to page 39, Keely.
18  I have one quick further sentence I want to show you.
19  The left column at the very top before sub B, the last
20  sentence.  It says, "Failure to respond to the regulatory
21  challenges posed by changing healthcare markets will likely
22  inhibit the implementation of the forum vision."
23     Did I read that correctly?
24     **A.  Yes, you read it correctly.**
25     **Q.**  Thank you.  That's all I've got on that.

2677

1      Dr. Enthoven, let's talk about incentives.  You agree,
2  do you not, that hospitals have the natural incentive to
3  ensure that their beds are filled?
4      **A.  They do have that incentive yes.**
5      **Q.**  Indeed, you call that "heads in beds," don't you?
6      **A.  Right.**
7      **Q.**  And I want to take a few of your slides from this
8  morning and ask you some questions about them on this topic.
9  Keely, could you pull up page 10, the one that starts
10  out "Integrated care."
11     Do you recall this slide from your direct,
12  Dr. Enthoven?
13     **A.  Correct, I do recall the slide.**
14     **Q.**  Now, the second bullet says, "In fragmented, FFS
15  care, providers are rewarded for doing more, whether or not
16  more leads to better health outcomes."
17     That -- you used the word "providers" there, and that
18  would be a true statement whether applied to doctors or to
19  hospitals; correct?
20     **A.  Correct.**
21     **Q.**  Why don't we go to two pages earlier in your
22  PowerPoint, under Fee-for-service Compensation.  And you say
23  here, "FFS payment contributes to fragmentation of care,"
24  and I want to ask you about a couple of the sub bullets.
25     The first one says, "Physicians' income comes from

2678

1  individual patients, not from serving the goals of the
2  system."
3      Again, if you replace that word "physicians" with
4  "hospitals," in the fee-for-service world, that would be a
5  true statement; correct?
6      **A.  Yes.**
7      **Q.**  And similarly, the third bullet, if you replace
8  the word "physicians" with "hospitals" and said "Hospitals
9  acting autonomously are compensated strictly based on the
10  number of patients they treat and the number and complexity
11  of procedures they perform," that would be a true statement
12  in the fee-for-service world; correct?
13     **A.  Correct.**
14     **Q.**  You said this morning -- and I think I'm quoting
15  you -- "You can't do fee-for-service and also capitated
16  integrated care well," close quote.  Do you remember that
17  statement?
18     **A.  They are conflicting, yes.**
19     **Q.**  And that's a true statement for hospitals as much
20  as for doctors, is it not?
21     **A.  Yes.**
22     **Q.**  Now, you believe that the healthcare system must
23  maintain productivity by continuing to use fee-for-service
24  compensation with physicians; correct?
25     **A.  No.**

2679

1      MR. ETTINGER:  Why don't we play clip 24, Keely.
2  Your Honor, this is page 67 of Dr. Enthoven's
3  deposition, line 6 to page 68, line 4.
4      (Video clip played as follows:)
5      **Q.**  "Moving off the hypothetical, is it fair
6      that in the 1990s, integrated systems were
7      created through purchasing physician groups,
8      and it's widely known that that model failed?
9      **A.**  "Yeah.  I think what happened then, in
10     fact, it's kind of an interesting story.  What
11     happened is a bunch of hospitals wanted to
12     acquire physician groups, which they did, and
13     they didn't do it well.  Not in a sophisticated
14     sort of way.  Because what they did is they
15     bought out the group, and then -- and they
16     didn't have anything in the agreement about
17     productivity or how they are going to support
18     themselves and so forth.  And the physicians
19     essentially retired on the job.  And so the
20     hospital found they were losing money on the
21     physicians.
22         "So it's one of the delicacies of this
23     complex issues, if you like, is that you have
24     to have a way of maintaining productivity.  And
25     unfortunately, the way of maintaining

2680

1    productivity is fee for service.  And it's one
2    of the kind of many contradictions,
3    difficulties in this field.  So I think what
4    they did, they failed to have a kind of -- they
5    failed to have a kind of maintenance of
6    productivity agreement with the doctors."
7         (Video clip concluded.)
8    BY MR. ETTINGER:
9         Q.  Was that your testimony, Dr. Enthoven?
10        A.  Yes, that was my testimony.
11        Q.  Thank you.
12             Let's talk about managed competition and, in
13   particular, your managed competition theory that you
14   described on direct.
15             You believe that there is no country in the world that
16   does managed competition right in your view; correct?
17        A.  Well, it's different shades of gray.  You know, I
18   think the Dutch have come a fairly long way, but they don't
19   have integrated delivery systems, so it hasn't worked as
20   well as they and I hoped.  I'm told --
21        Q.  Isn't it true --
22        A.  I'm told in Israel, they have competing systems,
23   but I don't know what the rules are.
24             MR. ETTINGER:  Keely, why don't you play clip 9.
25   Your Honor, it's Dr. Enthoven's deposition, page 184,

2681

1    lines 17 through 22.
2         (Video clip played as follows:)
3         Q.  "So I gather you're saying you're not
4         aware of any country that does managed -- that
5         you studied that does managed competition
6         right, according to your view; is that correct?
7         A.  "No.  If I were aware, I would go over
8         there and give them a congratulatory lecture."
9         (Video clip concluded.)
10   BY MR. ETTINGER:
11        Q.  Was that your testimony, Doctor?
12        A.  That was my testimony.
13        Q.  Thank you.  Now, it's your view, is it not, that
14   one of many necessary conditions for managed competition to
15   work is that employers would need to make a fixed-dollar
16   contribution to their employees' benefits, allowing
17   employees who choose health plans costing less than that to
18   keep the savings?
19        A.  That's right.
20        Q.  And those conditions are not present anywhere in
21   Idaho; correct?
22        A.  No.  At least those conditions are present now in
23   the exchange, and I believe if St. Luke's is successful in
24   this --
25        Q.  Doctor, in your view, the exchange is far too

2682

1    limited in its scope in order for it to allow managed
2    competition to work; correct?
3         A.  Well, we don't really know.
4         Q.  You have written that, haven't you, Doctor?
5         A.  I have criticized the Affordable Care Act for not
6    including more people in the exchanges.
7         Q.  Right.  And you have characterized them as far too
8    limited, have you not?
9         A.  Correct.
10        Q.  Okay.  And you also believe that in order for
11   managed competition to work, there must be sufficient
12   standardization of benefit packages to create price-elastic
13   demand; correct?
14        A.  Correct.
15        Q.  And with the partial exception of the exchange,
16   that's not present in Idaho, either, is it?
17        A.  You're saying with the exception of the exchange?
18        Q.  For a limited number of people, that's not present
19   in Idaho; either; correct?
20        A.  I don't know.
21        Q.  Okay.
22        A.  I know that now a couple of consulting firms have
23   gone into the business of offering employers an exchange
24   that is -- and I don't know whether they have sold any in
25   Idaho.  But, on the other hand, I was an advisor for a

2683

1    company called --
2         Q.  I think you have answered my question.  Thank you.
3         A.  What?
4         Q.  You answered my question.  Thank you.
5         A.  Okay.
6         Q.  Now -- and you have not investigated at all the
7    degree to which there is standardization in benefit packages
8    or enrollment processes in Idaho, have you?
9         A.  No.
10        Q.  And furthermore, for your managed competition
11   theory to work, Congress would need to override any willing
12   provider laws in the states; isn't that right?
13        A.  Yes, as they did in the HMO Act.
14        Q.  And you don't know whether there is any such
15   law -- any such any willing provider law today in Idaho, do
16   you?
17        A.  Well, I understand that in the creation of these
18   various networks, that they have been able to get around
19   that, the loophole.
20        Q.  You don't know whether there is an any willing
21   provider law in Idaho, do you?
22        A.  What?
23        Q.  You don't know whether there is an any willing
24   provider law in Idaho, do you?
25        A.  Well, I have been told that there is an any

2684

1  willing provider law, and I have also been told that people
2  find a way of getting around it.
3      Q.  And it's your view that unless these conditions
4  for managed competition to work are met, efficient
5  healthcare systems will continue to languish or disappear,
6  and the much more costly, unmanaged fee-for-services model
7  will win over; correct?
8      A.  I probably wrote that.
9      Q.  You did.  And so if the conditions to managed
10 competition don't occur, hospitals like St. Luke's will
11 continue to have an incentive to fill their beds, and so
12 will the doctors they employ; correct?
13     A.  Well, it's a matter of more or less a gray zone.
14 It's not all black and white.  And you're characterizing
15 this as black or white:  It's got to be all this way or not
16 at all.
17          And I would say integrated delivery systems have
18 grown up and done well in quite a few states without the
19 favorable circumstances that I am describing.
20          In fact, my articles are to do with the
21 theoretical ideal.  If you really want to use competition to
22 improve quality and cut cost, then these are the kind of
23 rules you need.  So it's recommendations to -- to the
24 policymakers.
25          But in -- in states like Minnesota and Wisconsin

2685

1  and in California, systems have been able to function pretty
2  well without that.  I don't -- I don't know whether they
3  have any willing provider in Utah or not, but we do have
4  Intermountain.
5      Q.  Doctor, you wrote, did you not, again,
6  efficient -- "that if these conditions are not met,
7  efficient healthcare systems will continue to languish or
8  disappear and a much more costly, unmanaged fee-for-services
9  model will win over," close quote.  Those were your words;
10 correct?
11     A.  Yes; correct.
12     Q.  Now, do you think if St. Luke's acquires Saltzer,
13 Doctor, that will cause Idaho payors to standardize their
14 benefits where they have not done so to date?  Yes or no,
15 please.
16     A.  I think that St. Luke's would then --
17     Q.  Answer yes or no if you can, please.
18     A.  No, I don't want to give a yes-or-no answer to
19 that.
20     Q.  You're unable to; is that right?
21     A.  Repeat the question.
22     Q.  Do you believe -- yes or no, or you don't know --
23 that if St. Luke's acquires Saltzer, that will cause Idaho
24 payors to standardize their benefits?
25     A.  It would be part of a movement in that direction.

2686

1      Q.  The question is:  Yes or no, will it cause it?
2      A.  It's -- it's not susceptible to a yes-or-no
3  answer.
4      Q.  Do you believe that if St. Luke's acquires
5  Saltzer, that will cause Idaho employers to switch to
6  fixed-dollar contributions to their employees' benefits; yes
7  or no?
8      A.  Well --
9      Q.  Yes or no, please.
10     A.  No -- yes, but.  And the "yes, but" is that the
11 delivery --
12     Q.  You think that --
13     A.  -- I mean, what will happen, as happened in
14 California and elsewhere, and that is that a --
15     Q.  Doctor, my question is --
16     A.  -- successful integrated system is a basis for
17 persuading policymakers to make that change.
18     Q.  Doctor, my question is:  Will the acquisition of
19 Saltzer cause employers to switch to fixed-dollar
20 contributions for their employees?
21     A.  Not in itself.  It takes more.  It takes a
22 successful integrated delivery system that you can point to
23 and say, employer, you can save money if you offer them.
24     Q.  Let's talk about that, then.  In your opinion,
25 St. Luke's has a long and complicated path before it can

2687

1  provide integrated care; correct?
2      A.  That's correct.
3      Q.  And in your view, St. Luke's is taking a perilous
4  route, your words; correct?
5      A.  Yes.
6      Q.  And in your view, many others who have tried to
7  take this route have tripped and fallen; correct?
8      A.  Correct.
9      Q.  And you think it will take ten years or more for
10 St. Luke's to achieve the result it seeks; correct?
11     A.  Correct.
12     Q.  Now, you don't have an opinion, do you, as to
13 whether St. Luke's past acquisitions have resulted in higher
14 quality or lower cost?
15     A.  I haven't studied that.
16     Q.  And you have not attempted to quantify even
17 approximately any quality or cost outcome improvements that
18 might be obtained by St. Luke's as a result of acquiring
19 Saltzer; correct?
20     A.  Correct.
21     Q.  And you're in no position to offer an opinion on
22 the degree to which there is any opportunity for St. Luke's
23 to reduce hospital utilization in Idaho; correct?
24     A.  Could you repeat the question, please?
25     Q.  You're in no position to offer an opinion on the

2688

1  degree to which there is any opportunity for St. Luke's to
2  reduce hospital utilization in Idaho; correct?
3      **A.  Correct.**
4      **Q.**  You talked about the "serving two masters" problem
5  on direct.  Do you recall that?
6      **A.  I recall that.**
7      **Q.**  And under your theories, that problem will exist
8  unless every doctor St. Luke's works with in a network is an
9  employed doctor; correct?
10     **A.  It's a matter of a gray, more or less, better or**
11 **worse.  It's not a black or white, as you're trying to**
12 **characterize it.**
13     **Q.**  It's your view that every single doctor,
14 independent doctor who works with St. Luke's in a network is
15 going to have to serve two masters and is going to be unable
16 to do so?
17     **A.  Well, he will have to try to serve two masters.  A**
18 **lot of doctors around the country are trying to do that,**
19 **juggling.  And what it produces is a less-effective result**
20 **than if the doctors served one master, that is, St. Luke's**
21 **and the Triple Aim of lower cost, better quality, better**
22 **care.**
23     **Q.**  Can you cite to a single study, sitting here
24 today, that looks at doctors serving two masters as you've
25 described it and assesses their performance as compared to

2689

1  some other group of doctors?
2      **A.  Well, I think that --**
3      **Q.**  A study.  I'm asking for a study with data.
4      **A.  I thought some of these studies dealt with IPAs**
5  **being less effective.**
6      **Q.**  And that was the IPAs of the 1990s and the
7  beginning of the last decade; correct?
8      **A.  That's usually when the studies -- you know, the**
9  **studies referred to.**
10     **Q.**  Doctor, you're not aware of what St. Luke's Clinic
11 is, are you?
12     **A.  Yes, I am.  It's a multispecialty group practice.**
13     **Q.**  Okay.  You didn't know that at the time of your
14 deposition, did you?
15     **A.  I was less clear on it than I subsequently**
16 **researched.**
17     **Q.**  Okay.  Do you recall Mr. Keith asked you some
18 questions of what would happen if Saltzer were in various
19 networks in the area on direct?
20     **A.  Yes.**
21     **Q.**  And you're not familiar with the identity of any
22 of the networks in the area, are you?
23     **A.  Well, since my deposition, I did learn about them.**
24 **There is BrightPath --**
25     **Q.**  Thank you.  Thank you.

2690

1      At the time of your deposition, you were not even aware
2  of who they were, were you?
3      **A.  That's correct.  I did not feel that it was**
4  **necessary for the analysis I was doing because I saw them as**
5  **all fee-for-service arrangements, not integrated care.**
6      **Q.**  So you have not investigated the degree to which
7  the networks in this market are working towards risk
8  arrangements, have you?  Yes or no?
9      **A.  No.**
10     **Q.**  And you mentioned the CoPar program on direct.  Do
11 you recall that?
12     **A.  I did, yes.**
13     **Q.**  And you cannot explain how the CoPar program
14 works, can you?
15     **A.  In general terms, I know how AICUs work, and I**
16 **have satisfied myself that -- that's that what they're doing**
17 **there, from their description.**
18     **Q.**  You cannot explain how St. Luke's CoPar program
19 works specifically, can you?
20     **A.  Not specifically.**
21     **Q.**  And you have not examined the degree to which
22 St. Luke's has improved quality by working with
23 independents, have you?
24     **A.  No.  I'm not aware that there is any such data.**
25     **Q.**  Did you ask for such data?

2691

1      **A.  No.  I asked for the WhiteCloud screens and -- but**
2  **I don't think that distinguishes between independent doctors**
3  **and St. Luke's employed doctors.**
4      **Q.**  Are you familiar with the MSOs that St. Luke's has
5  utilized to improve quality with physicians who were not
6  employed at the time?
7      **A.  No.**
8      **Q.**  Now, given what you said on direct about your lack
9  of expertise in antitrust economics, I just want to confirm
10 that you are not offering an opinion today on whether the
11 Saltzer transaction is, on balance, procompetitive and
12 anticompetitive when considering, among other things, the
13 antitrust considerations; is that correct?
14     **A.  Say that again, please.**
15     **Q.**  Okay.  It was kind of a long one.
16     **A.  Yeah.  Let me just -- I can -- I think --**
17     **Q.**  I would like to do it my way, if you don't mind.
18     **A.  Okay.**
19     **Q.**  That's how they taught me in cross-examination
20 school.  I have to keep it up.
21     Isn't it true that you have no opinion whether, on
22 balance, the Saltzer transaction is procompetitive or
23 anticompetitive when considering, among other things, the
24 antitrust implications of the transaction?
25     **A.  I do have an opinion, which is:  If this is part**

2692

1  of a successful transition by St. Luke's to an integrated
2  delivery system, then that will be definitely procompetitive
3  because it will do what happened in California, let's say,
4  or in Minnesota, where the success of a big integrated
5  delivery system put pressure on others to improve their
6  performance, and you got into a competition model.
7      In fact, I don't see any other way that -- that
8  you can get competition in Idaho than competing integrated
9  delivery systems where people have choices and the systems
10  are each trying to improve in competition with the other.
11  Because the traditional fee-for-service model is not
12  competition. It's not competition on value for money.
13  Organized medicine designed it that way.
14      You don't have doctors around here in the
15  fee-for-service model saying, "I can save you money if you
16  come to me because the patients don't care because they're
17  insured."
18      Q.  Doctor, have you ever heard -- read the statement
19  by the United States Supreme Court that Congress has
20  presumed that free competition is the best method of
21  allocating resources and keeping prices down?
22      A.  I can't recall the specific --
23      Q.  If Congress has made such a presumption, do you
24  think that's not correct for fee-for-service healthcare?
25  Yes or no?

2693

1      A.  I don't know.
2      Q.  Okay.  Now, you have not assessed the
3  anticompetitive effects that might arise from the Saltzer
4  transaction due to high market shares or effects on per-unit
5  prices, have you?
6      A.  No.
7      Q.  And you haven't tried to quantify those effects;
8  correct?
9      A.  Correct.
10      Q.  And you do agree that market share at some level
11  would be a concern here; correct?
12      A.  Could be at some level.
13      Q.  In fact, market share would be a concern to you at
14  some level less than 100 percent; correct?
15      A.  Well, if you're thinking about the Saltzer
16  situation --
17      Q.  I'm asking you a question. Yes or no:  Would
18  market share be a concern here at some level less than 100
19  percent, Doctor?
20      A.  The problem is I'm talking about 21st Century
21  medicine, a different product--
22      Q.  Doctor, I asked you a yes-or-no question. You can
23  give me a no if that's your view.
24      A.  Okay.  No.
25      Q.  Is it the case --

2694

1      A.  No.
2      Q.  Would you be concerned about any market share
3  here, any market share, if it were less than 100 percent?
4      A.  I don't know.
5      Q.  In fact, you haven't thought about what level of
6  market share would raise a concern for you; correct?
7      A.  Correct.
8      MR. ETTINGER:  I have no further questions right
9  now. Thank you.
10      THE COURT:  Mr. Greene.
11      MR. GREENE:  Yes, Your Honor.
12      MR. KEITH:  Your Honor, I apologize.  We have been
13  going about an hour. I don't know if the witness needs a
14  break.
15      THE COURT:  Would you like to take a break?
16      THE WITNESS:  Yes, please.
17      THE COURT:  Counsel, I have to recess at 3:30, so
18  this may be our last break of the day.  So let's take a
19  ten-minute recess. We'll be in recess.
20      (Recess.)
21      THE COURT:  Dr. Enthoven, I'll remind you you are
22  still under oath.
23      Mr. Greene, you may conduct your cross-examination.
24      MR. GREENE:  Thank you, Your Honor.
25      CROSS-EXAMINATION

2695

1  BY MR. GREENE:
2      Q.  Good afternoon, Dr. Enthoven.
3      A.  Good afternoon.
4      Q.  I wanted to turn your attention to relatively
5  recent legislative activity.  You're aware, are you, Doctor,
6  that the Federal Government has passed legislation
7  appropriating billions of dollars to support the use of
8  electronic health records in the United States?
9      A.  Yes, I am aware of that.
10      Q.  And that's generally referred to as the HITECH
11  Act?
12      A.  Right.
13      Q.  And at least preliminarily, 29-some-odd billion
14  dollars was appropriated for that purpose?
15      A.  I am aware of that, yes.
16      Q.  And under the HITECH Act, as it amends the Social
17  Security Act, there is such a thing as meaningful use as the
18  standard; is that correct?
19      A.  Yes.
20      Q.  And under the meaningful use standard, physician
21  groups and hospitals that install appropriate electronic
22  health records get payments for that installation and use;
23  isn't that correct?
24      A.  Yes.
25      Q.  And are you aware that St. Luke's has already

2696

1  received over $3 million in meaningful use payments?

2      **A.  I wasn't aware of that.**

3      **Q.**  Are you aware that Saltzer has been designated as

4  a meaningful use group?

5      **A.  I was not aware of that.**

6      **Q.**  Not aware?  Were you aware that Primary Health has

7  received meaningful -- meaningful use payments?

8      **A.  No.**

9      **Q.**  And Saint Alphonsus, to your knowledge, have they

10  achieved meaningful use?

11      **A.  I don't know.**

12      **Q.**  Are you aware, under the meaningful regulations,

13  that not only are there carrots -- that is, money that can

14  be received by users, appropriate users of electronic health

15  systems -- but there are also penalties?

16      **A.  Yes.**

17      **Q.**  And the penalties start at roughly 1 percent in

18  2015 and then rise to 3 percent of Medicare payments?

19      **A.  In Medicare, yes.**

20      **Q.**  Yes.  And that's your understanding?

21      **A.  Yes.**

22      **Q.**  And you're also aware, sir, that there are certain

23  standards for the functionalities to be contained in a

24  electronic health record system that receives certification

25  for meaningful use?

2697

1      **A.  Yes.**

2      **Q.**  And you mentioned earlier in the day various

3  functionalities that are available apparently through Epic,

4  and so I'm curious if you are aware, under the stage 2

5  eligible professional standards, whether or not meaningful

6  use requires the generation and transmission of permissible

7  prescriptions electronically.  Do you know if that's a

8  federal standard, sir?

9      **A.  I haven't followed this in that detail.**

10      **Q.**  Okay.  Do you know if meaningful use EHR must be

11  able to use clinical decision support to improve performance

12  on high priority health conditions?

13      **A.  I am aware that that functionality was somewhere**

14  **in the -- in the system.  I -- I'm not sure of just what**

15  **step it was, but all right.**

16      **Q.**  Okay.  That's a good answer.

17      And are you aware, sir, whether or not meaningful use

18  will require the provision that gives patients the

19  opportunity and ability to view online, download, and

20  transmit their health information?

21      **A.  I am aware that that's somewhere in the law.**

22      **Q.**  And do you also -- are you also aware that the

23  meaningful use standard includes generation of lists of

24  patients by specific condition to use for quality

25  improvement, reduction of disparities, research, or

2698

1  outreach?

2      **A.  Again, I'm just not sure of the details of the**

3  **law, but I do understand that that would be a part of**

4  **meaningful use, yes.**

5      **Q.**  Okay.  And does meaningful use also include the

6  use of clinically relevant information to identify patients

7  who should receive reminders for preventive follow-up care

8  and send these patients the reminders per patient

9  preference?

10      **A.  I'm not aware of the detail.  I do expect that**

11  **that would be part of meaningful use.**

12      **Q.**  And for an eligible professional who receives a

13  patient from another setting of care or provider of care or

14  believes an encounter is relevant, should perform a

15  medication reconciliation using this system?

16      **A.  I have to ask the question again.  Please repeat**

17  **the question.**

18      **Q.**  Oh, of course.  No problem.

19      Does meaningful use require that an eligible

20  professional who receives a patient from another setting of

21  care perform medication reconciliation, taking advantage of

22  this system?

23      MR. KEITH:  Object to form, Your Honor.  I think

24  the witness has already testified he did not follow the

25  statute or regulations in this kind of detail.

2699

1      MR. GREENE:  Well, he's -- Your Honor --

2      THE COURT:  The witness can indicate he doesn't

3  know if -- and then we'll just move on.

4  BY MR. GREENE:

5      **Q.**  And then also that the system must include secure

6  electronic messaging to communicate with patients on

7  relevant health information?

8      **A.  Yes.**

9      **Q.**  And that imaging results consisting of the image

10  itself and any explanation or other accompanying information

11  are accessible through the health record?

12      **A.  You're saying is that required?**

13      **Q.**  Is that required?

14      **A.  Is that part of meaningful use?  Again, I don't**

15  **know in detail where in the law, but I -- certainly, it**

16  **would make sense that that would be part of meaningful use.**

17      **Q.**  Okay.  And that it should have the capability to

18  identify and report specific cases to specialized

19  registries.

20      **A.  Again, I'm not aware of the specifics of that.**

21      **Q.**  But whatever the specific functionalities, it

22  would be the case that any -- any system, any electronic

23  health record system that would be certified for meaningful

24  use would have whatever functionalities were required under

25  the regulations; isn't that correct?

2700

1    **A.  Yes.**
2      **Q.**  And any independent physician association or
3    hospital that did not comply with those requirements would
4    either lose a potential benefit -- that is, the bonus -- or
5    would, in fact, be exposed to the penalty on their Medicare
6    billings; correct?
7    **A.  Correct.**
8      **Q.**  Okay.  Now, Dr. Enthoven, do you have any -- my
9    understanding -- are you aware that St. Luke's plans to
10   clinically integrate with independent physicians?
11   **A.  Not in any detail.  I understood that**
12   **they -- through BrightPath, they would establish some**
13   **relationship with the independent physicians.**
14     **Q.**  Okay.  And is it also your understanding that
15   St. Luke's was going to extend its Epic EMR system to
16   independent physicians through something called its
17   Affiliate EMR Program?
18   **A.  I'm not sure that actually exists yet or whether**
19   **it's just an idea.  There are barriers to doing that, the**
20   **Stark laws.  I don't think they can just go out and do it;**
21   **they have to --**
22     **Q.**  But would it be fair to say you just don't have
23   knowledge of what they are precisely going to do with
24   respect to --
25   **A.  That's correct.**

2701

1      **Q.**  -- extending EMR systems to independent
2    physicians?
3    **A.  Yeah.**
4      **Q.**  Was that a yes, sir?
5    **A.  Oh, yes.**
6      **Q.**  Okay.  And as I understand it, sir, with respect
7    to your discussions with respect to Epic, your experience
8    with Epic is limited to your experience as a patient; isn't
9    that correct?
10   **A.  To my experience as a patient?**
11     **Q.**  Yes.
12   **A.  No.  I have a lot of interactions with Stanford**
13   **Medical Center and with Palo Alto Clinic, as well as with**
14   **Kaiser.  And I read what Kaiser and others have written**
15   **about it and talk with them to establish some familiarity as**
16   **to what is going on.**
17          **So it's not only as a patient, but also as a**
18   **patient, but also as the overseer of -- of health insurance**
19   **programs for our employees and what's going on.  So I get**
20   **some indication from them also, so it's not limited to my**
21   **personal experience as a patient.**
22     **Q.**  So would it be fair to say, sir, that you have a
23   generalized understanding of the Epic --
24   **A.  Yes, right.**
25     **Q.**  -- functionality and capability?

2702

1    **A.  Yes.  Yes.**
2      **Q.**  And, conversely, you don't have much in the way of
3    specific knowledge about its specific functions and
4    capabilities?
5    **A.  Well, I read things like the writings of George**
6    **Halvorson that were in the book that I edited.  I've read**
7    **that chapter a few times over, and so I'm generally aware of**
8    **some of the functionalities that he talks about.**
9      **Q.**  And would it be the case, sir, that you do not
10   have knowledge of the functionalities of competing
11   electronic health records?
12   **A.  That's correct.**
13     **Q.**  Okay.  And you have no experience --
14   **A.  Well, excuse me.  I do know that I looked into**
15   **eClinicalWorks and that that's strictly an outpatient**
16   **clinic, an outpatient system; it does not follow patients in**
17   **and out of the hospital.  So I do know about that.  Mainly,**
18   **I learned about that from their website.**
19     **Q.**  And are you aware, sir, that, in large part at
20   least, the St. Luke's Hospital's facilities in the Treasure
21   Valley, as distinct from the Magic Valley, their systems are
22   still paper records?
23   **A.  Their systems are?**
24     **Q.**  Paper records.  Do you know that one way or the
25   other?

2703

1    **A.  Don't know that one way or another.**
2      **Q.**  But do you -- are you saying that eClinicalWorks
3    could not communicate with the hospital system?  Is that
4    your testimony?
5    **A.  As I understand it, it's not designed for**
6    **inpatient care, for tracking your patients into the hospital**
7    **and that that's one of the big advantages of Epic, is that**
8    **it can be configured both to track status of patients in the**
9    **hospital and also in the outpatient setting.**
10     **Q.**  So your testimony, your understanding of
11   eClinicalWorks' capacity is that it could not either send or
12   receive information to a hospital facility?
13   **A.  I don't know about sending or receiving any**
14   **information at all.  But I just don't believe, from my**
15   **understanding, that eClinicalWorks is going to keep your**
16   **outpatient doctor at Saltzer able to track what's going on**
17   **in the hospital.**
18     **Q.**  And have you -- have you done any independent
19   research into the interoperability capacities of
20   eClinicalWorks vis-à-vis Epic?
21   **A.  Not really, no.**
22     **Q.**  Have you, for example, reviewed the website for
23   either eClinicalWorks or Epic?
24   **A.  I have reviewed the websites for eClinicalWorks**
25   **and for Epic.**

2704

1    Q.   And when you visited the website for
2    eClinicalWorks, did you find the statement that Epic offers,
3    quote, hundreds of prebuilt interfaces to leading non-Epic
4    HIT systems?
5    **A.   I don't recall seeing that.**
6    Q.   Okay.  And do you recall seeing on the Epic site
7    language to the effect, quote, Participating in an Epic
8    shared record solves many of the challenges of community
9    groups have with meaningful use and interoperability and
10   that the hub can make use of prebuilt model system to extend
11   the best clinical content and work flows to their community,
12   close quote?
13   Do you recall seeing that, sir?
14   **A.   Could you repeat that.**
15   Q.   Sure.
16   **A.   This is now a quote from the Epic website?**
17   Q.   It is.
18   **A.   Okay.**
19   Q.   So "Participating in an Epic shared record solves
20   many of the challenges of community groups -- many of the
21   challenges many community groups have with meaningful use
22   and interoperability and that the hub can make use of a
23   prebuilt model system to extend the best clinical content
24   and work flows to their community."
25   **A.   I don't recall seeing that, but I did examine the**

2705

1    Epic website.
2    Q.   Okay.  And are you aware, sir, that Epic and
3    eClinical just recently announced -- this was on
4    the -- actually, both websites, but the one I'm thinking
5    about is the eClinical site.  Are you aware that they
6    announced, quote, bidirectional interoperability between
7    eClinicalWorks electronic health records (EHR system) and
8    Epic's EHR system and that this allows for real-time data
9    transfer between the two systems?
10   **A.   Is that a recent announcement?**
11   Q.   September 24th.
12   **A.   What?**
13   Q.   September 24th.
14   **A.   No, I wasn't aware of that.**
15   Q.   Not aware of that.
16   And, likewise, were you not aware that Epic's Peter
17   DeVault attributed the ability of Epic and eClinical to
18   achieve bidirectional interoperability to the fact that,
19   quote, both companies support the national interoperability
20   standards and were able to quickly and efficiently implement
21   this connection?
22   Are you aware of that?
23   **A.   No.**
24   Q.   Okay.
25   MR. KEITH:  Your Honor, if I might just interject,

2706

1    I am assuming that by reading all of these quotes into the
2    record and having our witness say he doesn't -- he hasn't
3    seen them, we are not creating evidence; we are simply
4    reading for the purpose of reading --
5    THE COURT:  If it's really --
6    MR. KEITH:  -- unless it's a question.
7    THE COURT:  -- tied in and presented on rebuttal
8    testimony, then it's simply asking the witness to agree or
9    disagree with an abstract statement.
10   All right.  Proceed.
11   MR. GREENE:  Right.  This just goes to the basis
12   of his opinion.
13   BY MR. GREENE:
14   Q.   Now, sir, one aspect of interoperability, of
15   course, is health data exchanges.  That's obviously a
16   phenomenon across the country, as you understand it;
17   correct?
18   **A.   Yes.**
19   Q.   Correct?
20   **A.   Yes.**
21   Q.   And there is one in Idaho; correct?
22   **A.   There is, as I understand, a Idaho Health Data**
23   **Exchange.  Dr. Chasin served on the board of that, I**
24   **believe.**
25   Q.   And you have, as I understand it, no knowledge of

2707

1    what the Idaho Data Health -- the Idaho Health Data Exchange
2    expects to be able to achieve in the next two to three
3    years?
4    **A.   All I understand is that it's a historical record.**
5    **It's not a real-time, decision-support tool.  Now, maybe**
6    **there is some plan to change that I don't know about.**
7    Q.   So I'm sorry, sir.  So as you sit there --
8    **A.   Yeah.**
9    Q.   -- you think that the Idaho Health Data Exchange
10   does not allow for real-time exchange of healthcare
11   information in Idaho?
12   **A.   That's my understanding.**
13   Q.   Okay.  And you're aware that a number of the
14   systems, Doctor, that you've mentioned -- Geisinger, for
15   example -- share data with independent physicians?  Do you
16   have any knowledge of that?
17   **A.   I don't have direct knowledge, but I presume**
18   **that -- that if they're independent physicians that are**
19   **serving patients in their health plan, that they have to**
20   **communicate that information for the sake of the care of**
21   **those patients.**
22   Q.   So would you be surprised if I suggested to you
23   that Geisinger interoperates with almost 700 non-Geisinger
24   users using something called EMR-Link?
25   **A.   I wouldn't be surprised.  I mean, I know that**

2708

1  they're trying to link with all the doctors that care for
2  their patients.
3      Q.   And are you aware, sir, that the Mayo Clinic
4  participates in something called the Southeast Minnesota
5  Beacon Community and shares information with independent
6  physicians through that vehicle?
7      A.   I'm not -- I'm not aware of just what the details
8  of that are or what the capabilities and limitations of that
9  are.
10     Q.   Okay.  And with respect to Kaiser in California,
11 are you aware that Kaiser shares information with non-Kaiser
12 physicians and facilities electronically?
13     A.   There mustn't be very much of that; I never hear
14 about that.  But I can't say for sure that it never happens.
15     Q.   Are you aware that the Kaiser facilities in
16 San Diego participate in something called the San Diego
17 Beacon Health Information Exchange and, thereby, exchange
18 information with --
19     A.   I don't know about that.
20     Q.   -- non-Kaiser -- you don't know.  Okay.
21          Now, you have little independent knowledge of health
22 data analysis products; correct?
23     A.   That's right.  I don't purport to be an expert on
24 any of the details of that.
25     Q.   Okay.  And, in fact, you'd never heard of

2709

1  WhiteCloud before this case; correct?
2      A.   Right.
3      Q.   Okay.  And you're not familiar with any other data
4  analytic tools; is that also correct?
5      A.   Other than what Kaiser and Palo Alto Clinic have
6  with Epic, no.
7      Q.   No.  That's fine.
8          So you -- it would then be the case, Doctor, that
9  you're not aware of whether other systems have better
10 functions or capacities than WhiteCloud?
11     A.   I don't know.
12     Q.   And, likewise, you would have no information about
13 whether those other technologies, those other products,
14 would have more robust interoperability capacities than the
15 WhiteCloud tool?
16     A.   I haven't studied that.
17     Q.   And then with respect to WhiteCloud, you don't
18 recall seeing any data showing that a physician group's
19 quality improved after implementing the WhiteCloud Analytics
20 tool; correct?
21     A.   No.  I think I have seen some of the screens that
22 show there is an improvement in the perfect care rate, for
23 example.
24     Q.   But you have not seen any quantifiable benefits
25 from the WhiteCloud tool being used by St. Luke's; correct?

2710

1      A.   Well, the quality improvement is quantifiable, and
2  they quantify it.
3      Q.   But at least at the time of your deposition,
4  Doctor, you said that you had not seen any, or did not
5  recall anyway, seeing any quantifiable benefits from the
6  WhiteCloud data analytics tool; correct?
7      A.   If that's what the record shows, it's what the
8  record shows.  I won't contest that.
9      Q.   If you have a recollection one way or the other,
10 Doctor, it would be helpful.
11     A.   Not really about the -- that aspect of the
12 deposition.
13     Q.   Isn't the trend in EMRs to improve
14 interoperability, Doctor?
15     A.   People are trying to do that, yes.
16     Q.   And isn't that part of federal law?
17     A.   Yes, it is.
18          MR. GREENE:  Thank you.  I have no further
19 questions at this time.
20          THE COURT:  Mr. Keith, let me just ask a couple of
21 questions.  Generally, when I have a question, I like to ask
22 before we start redirect so that you don't have to follow on
23 with anything that I have.  You can cover this on redirect
24 and then recross.
25                        EXAMINATION

2711

1  BY THE COURT:
2      Q.   Doctor, I'm going to ask you some questions, and
3  this may go beyond the area in which you have been retained
4  and may get into some of the antitrust economic issues.  And
5  if it does, you can just indicate that it's beyond anything
6  that you've been asked to think about in terms of the
7  problems here.
8          One of the things I have been wrestling with is that we
9  have this objective and the perception that integration of
10 healthcare systems is a -- is a -- not only a good, but
11 perhaps a necessary good, something that is really essential
12 to drive some of the changes in healthcare delivery that
13 seem -- that everyone seems to be in agreement is sorely
14 needed.
15          It seems that there is almost a necessary result of
16 that, though, is I'll use the term "concentration of
17 economic power."  In other words, bringing together, either
18 vertically or horizontally or both, groups of people
19 involved in delivering healthcare.  That is generally
20 frowned upon by our antitrust laws because of the potential
21 under kind of a normal free market system that --
22     A.   Yes.
23     Q.   -- economic power can be abused.
24          And this is kind of a long way to getting to a
25 question, but I'll make another observation that you have

2712

1  indicated that the movement to an integrated healthcare
2  system is a work in progress, and it's been such that we
3  have some examples of success, but no one has really, I
4  think, perhaps other than in your view, the Kaiser
5  Permanente has really embraced it at a level and to an
6  extent that we can say that it's kind of an unqualified
7  success.
8      A.  Yes.
9      Q.  Is that accurate?
10     A.  That's accurate.
11     Q.  All right.  Now, and then a third observation is,
12  if I'm understanding your testimony, you indicated
13  that -- and I have been a little concerned as well about if
14  Saltzer Medical Group wanted to become part of what they
15  perceive to be the kind of 21st century method of delivering
16  healthcare, they need to become part of a larger group in
17  order to have the benefits of integration and the size
18  necessary to do this.
19     And you suggested that that would then force everyone
20  to align either with Saint Al's or St. Luke's or perhaps a
21  third provider such that we really would have perhaps as few
22  as two players in the delivery of healthcare in the Treasure
23  Valley.
24     A.  Yes.
25     Q.  Is that --

2713

1      A.  That's correct.
2      Q.  -- a fair summary of some of your testimony?
3      A.  Yes, mm-hmm.
4      Q.  What I'm concerned about is, I guess, a couple of
5  concerns.  One is from an economist's point of view, is
6  having two -- as few, perhaps, as two -- and I'll use the
7  word "mega systems" or two -- only two healthcare providers
8  in the Treasure Valley -- is that a good thing from an
9  economics point of view?  Question No. 1.
10     And question No. 2 is:  Because it is a work in
11  progress and we have not perfect data about success, what
12  happens if it fails?  Do we revert back to a
13  fee-for-services system, a modified IH -- integrated
14  healthcare system -- or is there any experience that tells
15  us what might happen if, in fact, we're not able to pull
16  it -- or St. Luke's is not able to pull it off and we're
17  left then with, perhaps, two large players in a market,
18  perhaps not a managed competition system, but kind of an
19  open -- is that problematic from an economist's point of
20  view?
21     Now, this is maybe where you get into antitrust
22  analysis, and you may not want to go there, but I'm just
23  curious as to your thoughts on that.
24     A.  Well, I think it's problematic.  And part of the
25  success will be the extent to which the purchasers of

2714

1  healthcare, the employers and the state as the employer,
2  adjust the market to force them to compete.
3      That is, as Mr. Ettinger brought out, the
4  conditions for competition are not very well fulfilled in
5  Idaho, and I think employers and the state ought to promote
6  the idea that everyone would have a cost-conscious choice of
7  plan.  In other words, the demand side of this can -- can be
8  managed -- that's why I called it managed competition -- to
9  promote competition.
10     But as to is this necessary for this to happen, I
11  think that our society is now suffering from a terrible
12  excess of healthcare costs.  It's becoming an urgent
13  necessity because medical costs are crowding out important
14  public programs at every level of government, and also there
15  is a lot of bad quality that people are dying from.
16     So this is the most promising strategy, but I'll
17  grant you that it does -- the concentration aspect
18  does -- does lead to reasonable concerns.
19     Q.  My sense is what you're saying is, yes, there is
20  some concern, but the situation is critical enough that,
21  perhaps, risks need to be taken.
22     A.  Yes.
23     Q.  All right.  Now, you referred to managed care, and
24  I had a question about that.  Or not managed care, managed
25  competition.

2715

1      A.  Right.
2      Q.  Who is the manager?  Now, we know, under the
3  Affordable Care Act, that there are requirements that there
4  can be no preexisting conditions considered in insurance.  I
5  assume that's one example?
6      A.  Yes, mm-hmm.
7      Q.  But, you know, the Supreme Court issues a decision
8  suggesting that under the taxing power that the -- that
9  upholding certain portions of the Affordable Care Act and
10  not upholding others, my sense is that maybe in the
11  long-term, that the most that can be accomplished would be
12  some type of financial incentives or penalties but no direct
13  regulation on a federal level.
14     Does that mean that it's going to have to fall upon the
15  states, or in your view or model, does it matter whether
16  it's a national- or a state-managed competition?  Or does it
17  need to be a combination of both?
18     A.  I think it's got to be a combination of both.  It
19  would help enormously -- for example, one of the causes of
20  our inflation in healthcare now, or a contributing factor,
21  is the fact that employer contributions to employee
22  healthcare are tax-free without limits.  And that creates a
23  powerful incentive to -- for the employer to offer more and
24  more generous healthcare because it's not real dollars; it's
25  -- you know, it's tax -- pretax dollars.  And so the Federal

2716

1   Government could help a lot if they would just cap that and
2   say you can only have $300 per person per month tax-free,
3   and then it's taxable income.
4        It may be the Affordable Care Act is going to do
5   something very similar with the excise tax on excess costly
6   health plans. There are problems with that, but that may
7   create a powerful incentive to keep down your healthcare
8   costs.
9        But I think there is a role for federal and state
10   and -- governments and employers.
11    Q. And if the state lacks the political desire, or
12   perhaps the political will, to step into that arena, is that
13   problematic for your vision of managed competition?
14    A. I think it's problematic. I mean, for example,
15   Mr. Ettinger raised a question about any willing provider
16   laws. Any willing provider laws are an anticompetitive
17   enactment.
18        Now, the Congress overrode them in the case of the
19   HMO Act in 1973. So who is going to abolish that law? But
20   if people in Idaho want competition and economical care, it
21   would help if they would over -- you know, abolish the any
22   willing provider. You're aware -- you're acquainted with
23   the --
24    Q. I'm actually not, but I think it was mentioned
25   earlier, but I --

2717

1    A. Okay. Well, let me just explain. In answer to
2   managed care, organized medicine came back and said, well,
3   we want an any willing provider law. So that means if
4   Blue Cross comes in and negotiates -- tries to negotiate a
5   deal for low doctor fees --
6    Q. That actually did come up, I think, when the
7   Blue Cross -- in fact, I think I asked a question then
8   revealing my ignorance on the subject. But I think I did
9   get a little bit of a primer on --
10    A. So there is no incentive for a doctor to be the
11   low bidder because then any other doctor can come in and get
12   the same deal.
13        Or put another way, an important part of causing
14   an economical healthcare system is to match the numbers and
15   types of doctors to the needs of the population. So in
16   California, we had too many orthopedic surgeons, and the
17   managed care companies were trying to hire only the numbers
18   that they needed. But they couldn't do that and control
19   that if any other orthopedic surgeon in the state is allowed
20   to come along and say, well, I'll buy into the same
21   contract. So it meant that the health plans could not trade
22   volume for price, which is a promising way of bringing down
23   costs.
24    Q. All right.
25    A. So that would be a -- another thing the state

2718

1   could do would be to have a state employee plan for health
2   insurance and maybe for all public employees that looks like
3   Wisconsin or California, that looks like the federal
4   employees plan.
5    Q. Let me just -- because I want to let counsel have
6   at it. I do have one kind of -- well, a very related
7   question, and that is: You've treated Kaiser Permanente as
8   being, perhaps, the best model. That arose, of course, in
9   California, and I'm assuming that California adopted many of
10   the kind of management pieces that you're referring to and
11   made that possible for them to be successful?
12    A. That's right.
13        THE COURT: All right. Counsel, Mr. Keith.
14            REDIRECT EXAMINATION
15   BY MR. KEITH:
16    Q. Dr. Enthoven, just to follow up briefly on the
17   question you answered for the court, the -- in California,
18   part of the impetus for the rise of Kaiser was the change in
19   the state retirement system's --
20    A. Correct.
21    Q. -- allocation of insurance benefits?
22    A. Yes. That is CalPERS was an important factor in
23   the growth and success of Kaiser.
24    Q. And were there also important employers who
25   provided options to their employees that looked a lot like

2719

1   managed competition?
2    A. Well, yeah. I mean, the first most important was
3   the Federal Government, and early on, the Federal Government
4   and the Federal Employees Health Benefits Program, which was
5   a pretty good approximation to managed competition.
6        I mean, I have written -- you know, you could
7   tweak it and improve it, but it's pretty good. And that was
8   a big factor in Kaiser's success. And, in fact, in the
9   early days, the largest number of Kaiser members in any one
10   employment group were federal employees and then state
11   employees, so that was an important policy intervention.
12        And to correct a little bit Mr. Greene's comment,
13   is there any managed competition in existence in the state
14   of Idaho. There must be because there are federal employees
15   in the state of Idaho, and so they must be presented with a
16   range of choices.
17    Q. And that would also be true for the exchange now
18   in Idaho?
19    A. Yeah. So the exchange, you have the federal
20   employees. And I would be advocating with the state, you
21   can improve the healthcare economy if you would adopt a
22   similar model with fixed dollar contribution and choices of
23   plans.
24    Q. And are you aware of any reason as you sit here
25   today why an employer in Idaho couldn't provide that sort of

2720

1  option; that is, you have an option of two plans; I'll pay
2  for the cheaper one, and you can pay for the more expensive
3  one, if you wanted?
4      **A.  There is -- you know, there are industry factors**
5  **that make it a problem.  A lot of employers choose not to**
6  **because it's just simpler to have one fee-for-service plan,**
7  **which I think is a terrible problem.  But a fair number of**
8  **employers have converted to the model I am describing:  the**
9  **University of California with 180,000 employees, Stanford**
10 **University with 12,000 employees, we do it.  It's easier for**
11 **universities because you have a large concentration of**
12 **people nearby.**
13         **The Hewlett-Packard company did it; then**
14 **Wells Fargo adopted the same principles.  So -- and now some**
15 **companies have signed on with the -- the multiemployer**
16 **private sector exchanges.  "The Wall Street Journal"**
17 **recently had an article that -- projecting maybe 40 million**
18 **people would be covered under such arrangements within the**
19 **next -- I forget how many years, but in the foreseeable**
20 **future.  So this could happen.**
21     **Q.**  So it may be possible for an integrated delivery
22 system to gain traction in Idaho without any federal
23 statutory or regulatory changes?
24     **A.  I think so --**
25     **Q.**  And it may be possible for an integrated delivery

2721

1  system to gain traction --
2          MR. ETTINGER:  Your Honor, he is cutting off his
3  own witness and to lead him further.
4          THE COURT:  Counsel, I'll have to sustain the
5  objection.  I think we are now getting into very substantive
6  areas.  And even if they were triggered by my questions,
7  which may lead you to want to cross-examine, I think you
8  still need to lead by direct.
9       I did not mean to suggest that I was examining with a
10 point of view.  I was simply trying to tease out what I saw
11 to be sort of the consequences or ramifications of the
12 testimony, and I may have caused Dr. Enthoven to offer
13 opinions well beyond what he was retained to offer and
14 beyond and into the area of antitrust economics, which the
15 court has previously ruled he was not going to testify to.
16 And, therefore, in dealing with the motion in limine, I kind
17 of sidestepped the issue on the assurances that Dr. Enthoven
18 wouldn't be addressing those topics.
19      Go ahead, Mr. Keith.
20          MR. KEITH:  Understood, Your Honor.  Thank you.
21 BY MR. KEITH:
22     **Q.**  Counsel for the government asked you a number of
23 questions about meaningful use and what meaningful use
24 requires.  And do you consider yourself an expert on the
25 particular requirements of the meaningful use law?

2722

1      **A.  I don't hold myself out to be an expert on the**
2  **details of something like that.**
3      **Q.**  But would -- if -- if there were in existence two
4  systems, two electronic health record systems in the same
5  community, both of which qualified for meaningful use
6  credits but didn't interoperate, would you consider that an
7  impediment to greater integration in healthcare?
8      **A.  Yes.**
9      **Q.**  You -- you were asked a question by the court
10 about whether there were integrated delivery systems you
11 regarded as successes, and Kaiser you identified as one of
12 them.
13      I'm wondering if you can list others.  For example,
14 Group Health Cooperative, do you consider that a success?
15     **A.  Definitely, yes.**
16     **Q.**  Any others?
17     **A.  Intermountain Healthcare, Geisinger, Dean Clinic,**
18 **Marshfield Clinic, Group Health Cooperative of**
19 **Minnesota -- I mean Wisconsin, the Gundersen Lutheran**
20 **Clinic, Park Nicollet Clinic in Minnesota, and three or four**
21 **other similar multispecialty group practices.**
22     **Q.**  And explain what you mean by "successes."  How are
23 those successful, in your mind?
24     **A.  They survive and grow.  They attract more members.**
25 **The quality reports show that the quality is good and**

2723

1  improving.
2      **Q.**  And what about impacts on premium levels or costs?
3          MR. ETTINGER:  Your Honor, some of the entities
4  that are listed were never addressed in Dr. Enthoven's
5  report, and so it's beyond the scope of what he has offered.
6          THE COURT:  All right.
7          MR. KEITH:  If you'd like to identify them, we
8  could eliminate them from my question.
9          MR. ETTINGER:  Well, Park Nicollet is one that I
10 have not heard before for sure.
11         THE COURT:  Well, again, I kind of opened it up
12 with my questions.  Let's --
13         THE WITNESS:  In my report, I mentioned most of
14 those.
15         THE COURT:  All right.  I'm going to allow you,
16 Mr. Ettinger, to go through that if you want to.  And I
17 obviously will not consider anything not included in
18 Dr. Enthoven's report.
19      Am I pronouncing correctly?  Is it Enthoven or --
20         THE WITNESS:  Enthoven, yes.
21         THE COURT:  Enthoven.
22         THE WITNESS:  Yeah.
23         THE COURT:  All right.
24 BY MR. KEITH:
25     **Q.**  So to get back to the question, there were a

2724

1  number of successes you identified.  We'll exclude
2  Park Nicollet for now, and maybe others, to the extent we
3  find we need to.  But you had indicated that those were
4  successes in your mind in that they had demonstrated an
5  ability to improve the quality of care.
6       Have any of them demonstrated as well the ability to
7  manage cost and provide high-value care?
8       **A.  Well, one of the studies that I referred to, the**
9  **one involving the CAPP groups, showed that they came in**
10 **costing less, as well as better quality.**
11      **Q.  And --**
12      **A.  But, you know, there are limits to how much cost**
13 **improvement you're going to get unless you make real**
14 **incentives.  And so a lot of the CAPP groups are not**
15 **operating in circumstances where there are powerful**
16 **incentives.**
17          **Although, on the other hand, let's say the Palo**
18 **Alto -- I remember a study some years ago, Palo Alto Clinic**
19 **vis-à-vis Stanford employees and Mayo Clinic vis-à-vis their**
20 **other -- the community in general, that they hospitalized**
21 **their -- their patients had 40 percent fewer hospital days**
22 **per thousand population than others, that there is something**
23 **inherent in multispecialty group practice that used hospital**
24 **much more sparingly, perhaps just that they have the CT**
25 **scanner on their own premises, so you don't have to go to**

2725

1  the hospital for it.
2       **Q.  And you had indicated that earlier in your direct**
3  testimony that you consider the St. Luke's Clinic a
4  multispecialty group practice; correct?
5       **A.  Correct, yes.**
6       **Q.  And so when Mr. Ettinger got up and asked you**
7  whether you had seen any evidence that would suggest that a
8  hospital acquiring a physician practice led to increased
9  quality or lower costs, in your mind, is that the
10 circumstance that you have been asked to opine on here?
11      **A.  Well, in my mind, St. Luke's Clinic is a**
12 **multispecialty group practice and a physician-run**
13 **organization and is in a position to overcome whatever heads**
14 **in beds hospital incentives there are.**
15      **Q.  In fact -- well, let's go to the heads in beds**
16 because I think that was an interesting question.
17      I think you said in your direct examination that -- it
18 stuck in my head because I thought it was funny -- that the
19 single most costly piece of medical technology is the
20 physician's ordering pen?
21      **A.  Yes.**
22      **Q.  And why is that?**
23      **A.  It's because there are varying estimates; between**
24 **70 and 90 of percent healthcare spending is the result of**
25 **physician decisions to hospitalize people to do this**

2726

1  operation or not do that operation, et cetera.  So physician
2  decisions are powerful drivers in the economics of
3  healthcare.
4       **Q.  And so when Mr. Ettinger was asking you whether,**
5  under a fee-for-service system, hospitals faced the same
6  incentives to drive utilization and waste services -- and I
7  understand you indicated that there were the incentives.
8       My question to you is:  Even with the incentives, is
9  there the ability on the part of hospitals separate from
10 physicians to react to fee-for-service incentives in the
11 same way that you believe is generated the system we have
12 now?
13      **A.  I'm sorry.**
14      **Q.  Yeah.  That was convoluted; I apologize.**
15      So the question is:  Are hospitals in a position,
16 independent of their physician practices, to drive
17 utilization in the same way that physicians do under the
18 fragmented fee-for-service system?
19      **A.  Not in the way that physicians do.**
20      **Q.  And further to those questions about what a**
21 hospital's incentive would be, do you, in your mind in the
22 way that you understand the development of the St. Luke's
23 Health System, do you see it as a -- a system driven by
24 hospital decision-makers maximizing hospital decisions, or
25 do you see it as a system making the best decisions for the

2727

1  system?
2       **A.  I -- I see it based on the people who came to talk**
3  **to me and what they had to say.  I see this as a**
4  **physician-led system responding to physician values.  And I**
5  **think a lot of the doctors have wanted to join St. Luke's**
6  **because they realize that the 20th century medicine was bad,**
7  **unethical, too costly, and they wanted to get with a system**
8  **in which their incentives were aligned with the best**
9  **interests of consumers for -- of having high-quality,**
10 **cost-conscious, affordable care.**
11          **There is not a lot the hospital can do to -- you**
12 **know, they can't go out and say, well, Doctor, don't you**
13 **think this patient needs a bypass graft?  I don't think that**
14 **happens.**
15      **Q.  You were asked a question about Kaiser Permanente**
16 that I think was meant to suggest that, in fact, Kaiser
17 Permanente is not a system, as you had indicated it, in
18 which all the piece parts are financially aligned.
19      **A.  Yeah.**
20      **Q.  The questions were with respect to who has a**
21 contract with whom.
22      **A.  Right.**
23      **Q.  I think you were trying to provide some context in**
24 response to that question, and I wanted to give you that
25 opportunity.

2728

1    A.   Okay.  Thank you.
2         The -- what I -- my objection or the but-if that I
3    wanted to throw in is, in Kaiser Permanente, the doctors and
4    the hospitals all get paid from the same premium flow, which
5    is the premiums of the Kaiser Foundation Health Plan.  And
6    there are aspects of the contracts between health plan and
7    medical group which do reward doctors for holding down
8    hospital costs.
9    Q.   And are the physicians and the Kaiser hospitals,
10   in your mind, pretty tightly interwoven, whether or not they
11   have a contract or directly with one another?
12   A.   Well, they are multispecialty medical groups, so
13   they are all on salary plus some form of incentive payments.
14   And, yeah, they have a culture that -- of teamwork.  They
15   work very closely together, and they are very conscious
16   about hospital costs.  They want the hospitals to be good so
17   they can do a good job.  But, also, they don't want to lay
18   on the hospitals a lot of expensive demands for equipment
19   that they don't think is -- is valuable.
20   Q.   You were also --
21   A.   They are drinking from the same hose of dollars,
22   and so they have got to interrelate pretty closely.  They
23   can't ignore each other, go off independently.
24        And the hospitals, by the way, are, in effect --
25   are budgeted based on the per capita amounts that are

2729

1    available.  And so the hospitals don't have the
2    heads-in-beds problem.  If the doctors or their nurses come
3    up with some great idea for how to reduce demand for
4    hospitalization, the hospital managers don't see that as a
5    loss of revenue.  They see that as a reduced cost.
6    Q.   You were asked a number of questions about
7    clinically integrated networks, and I believe you indicated
8    that that was sort of a gray area for you.  And so I want to
9    pose more of a hypothetical question for you.
10        To the extent that clinically integrated networks do
11   not -- do not end up entering into full-risk arrangements or
12   do not enter into them as quickly as an integrated delivery
13   system would, do you have a view on which is better for the
14   consumers of Idaho:  Clinically integrated networks of
15   loosely related physicians or an integrated delivery system?
16   A.   I think an integrated delivery system with the
17   doctors on the same team, because they can act as the driver
18   forcing others to compete with them.  That's what's happened
19   in California with Kaiser Permanente.  Kaiser didn't do it
20   with part-time doctors.
21   Q.   If I told you that in the state of Idaho, or I
22   asked you to assume in the state of Idaho that the two
23   competing clinically integrated networks were still in the
24   process of identifying the metrics they wanted to monitor
25   how to collect the data to do that with their independent

2730

1    physicians, how to incentivize their physicians to meet the
2    evidence-based standards, and were, generally speaking, some
3    time away from implementing any type of clinical
4    integration, would you view the opportunity Saltzer has
5    through the integrated delivery system to be advantageous to
6    the consumers of Idaho relative to waiting until clinical
7    integration gets in place?
8    A.   Yes, I do, because I think the integration between
9    the St. Luke's specialists and the Saltzer primary care
10   physicians would empower the primary care physicians to do a
11   much better job.  They would be informed by the specialists
12   so that the patient got most of his care from the primary
13   care docs supported by the -- the specialists and the
14   specialists coming in where needed.  Specialists coming in
15   means for kind of discontinuity in care.  I think patients
16   prefer to get their care from their doctor.
17   Q.   And, finally, counsel for the private plaintiffs
18   asked you a number of questions and read you a number of
19   quotations from the articles you had cited.  And I'm not,
20   frankly, going to take the time to go through and
21   demonstrate why each one may have been cherry-picked.
22        But my question for you is:  Are these articles the
23   only basis that you have for your conclusion that integrated
24   delivery systems with tightly financially integrated
25   physicians are the best option we have to deliver value in

2731

1    healthcare?
2    A.   Well, you know, I know that the studies in the
3    past were done in the past, and so anybody can say, well,
4    you have it last week, some -- or last month some great new
5    thing happened; did you know about that.
6         So I'd say my judgment is based on more than 40
7    years' association with working with delivery systems and
8    seeing -- at one time, the big study was the Federal
9    Employees Health Benefits Program utilization study.  And
10   they showed that the group practice HMOs used hospital 40
11   percent less.  That seemed to be a fixed number over the
12   years.
13        And, also, Mayo and Palo Alto Clinic, who are
14   partly fee-for-service, they just -- they -- but with their
15   own full-time doctors, they just used hospital less.
16        And then after a while came the RAND trial.  Well,
17   that -- RAND with Group Health Cooperative, that's a
18   completely integrated system.  I'm not aware that they do
19   use any outside doctors, except they may, like Kaiser
20   unwillingly uses a lot of part-time doctors because Kaiser
21   members go up and ski at Lake Tahoe and break their legs and
22   get taken to the local hospital, and Kaiser ends up paying
23   for that.  And then Kaiser doctors have to work how to get
24   the patient back into their own facilities and how to
25   continue the care and so forth.  So there is a certain

2732

1  amount of inadvertent spillover.

2      Q.  And, lastly, the -- you were asked, or you were

3  quoted in cross-examination, your view that the path that

4  St. Luke's is on right now is a precarious one and that some

5  systems have tried to go down this path and failed.

6      Do you regard that as a reason not to pursue the goals

7  of creating an integrated delivery system?

8      A.  No, because I think it's the best chance we got.

9  And I sympathize with the views of my friend Regina

10  Herzlinger that one of the perils is the government might

11  derail them, because government inevitably responds to the

12  dominant provider interests, and the dominant provider

13  interests don't want this kind of integrated system to come

14  along and threaten them.  So there is a whole set of perils

15  there.

16      Q.  And you were also asked in your cross-examination

17  about whether you -- some testimony you had given that

18  appeared to suggest that your view was the core or nucleus

19  of physicians of four to six per specialty would be

20  sufficient to manage population health.  And I believe you

21  indicated that wasn't the question you were answering.

22      A.  Right.

23      Q.  And I wanted to give you an opportunity to

24  explain --

25      A.  Thank you.

2733

1      MR. ETTINGER:  Your Honor, I don't know if it's

2  appropriate, but Mr. Keith just mischaracterized the

3  question that was asked before.

4      THE WITNESS:  Well, may I say --

5      THE COURT:  Just a moment.  Let's -- Mr. Keith, in

6  mind of -- with Mr. Ettinger's objection in mind, do you

7  want to rephrase?

8      MR. KEITH:  Well, it was actually a pretty long

9  and convoluted question.  I would be happy to have it read

10  out, but it was --

11  BY MR. KEITH:

12      Q.  The essence of it was:  So you say there needs to

13  be a core or a nucleus.  How many physicians -- how many

14  physicians per specialty?  What is it going to take to get a

15  core or nucleus?

16      A.  Oh.

17      Q.  And you had responded four to six per specialty.

18      A.  No.  No.  I thought I was responding to a

19  different question, which is:  What does it take to be a

20  multispecialty group practice?  I don't think Saltzer is a

21  multispecialty group practice.

22      Well, then, what do you want?  And I would say,

23  you need to have four to six docs in each specialty so they

24  can kind of cover the population and support each other and

25  share tasks and duties, and so forth.

2734

1      Q.  And we had been talking about that particular

2  issue in the deposition prior to your response.

3      A.  Yeah, that's right.  And so I -- maybe I was

4  confused as to what the question was.  I think when you need

5  a core, you've got to have enough so that you can -- can

6  deploy some part of them to develop a new care process like

7  CoPar and still have other doctors available to take care of

8  the patients.

9      Q.  And, in your mind, is four to six physicians in

10  primary care in Canyon County sufficient to --

11      A.  Not nearly.  I mean, if you want some innovation

12  in primary care in Canyon County, you've got to be able to

13  identify some team of doctors to say, now, there is some

14  imperfection in the processes we use for managing diabetics;

15  here is the literature and here is what we do and here is

16  our data.  Would you take on focusing on developing a better

17  care process for diabetics?  And so you'd have to have

18  enough other doctors to pick up the slack so that they could

19  be detached to focus on that until they do.

20      Then some other salaried doctors might take it up

21  and prove it, you know, see is this -- is this a proven

22  process.  And then they can take it to the outer circle of

23  affiliated doctors and say, well, this is our experience,

24  these are our studies.  So if you're going to work with us,

25  we expect you to comply with these care processes that we

2735

1  have developed.

2      MR. KEITH:  Thank you.  No further questions.

3      THE COURT:  Recross, Mr. Ettinger.

4      MR. ETTINGER:  Thank you, Your Honor.

5          RECROSS-EXAMINATION

6  BY MR. ETTINGER:

7      Q.  Dr. Enthoven, let's just talk about the core

8  nucleus for a moment more because I just want to be sure

9  we're all clear.

10      MR. ETTINGER:  Is the ELMO on?  Can we put the

11  ELMO on?

12  BY MR. ETTINGER:

13      Q.  I'm going to show you the paragraph that I read to

14  you from when I asked you this question a bit earlier.

15      THE COURT:  Counsel, do you want the ELMO on or

16  your computer?

17      MR. ETTINGER:  The ELMO, Your Honor.

18      THE COURT:  All right.  It's on now.

19  BY MR. ETTINGER:

20      Q.  See paragraph 208 of your report on the screen,

21  Dr. Enthoven?

22      A.  Mm-hmm.

23      Q.  See that?  Take a look at those first few

24  sentences of paragraph 208.

25      A.  Yeah.  Mm-hmm.

2736

1    Okay.  I have read it.
2        Q.  Now, you recall that's the paragraph that I
3    referenced when I asked you the question in your deposition?
4        A.  So the question was:  What does it take to have a
5    nucleus?
6        Q.  Within the meaning of that paragraph 208.  Do you
7    recall that?
8        A.  No, I don't.  I mean, if I said four to six, I
9    would have been confused as to what the question was.
10       Q.  Okay.  So, now, this says -- and this is very
11   similar to what I asked you about an hour ago -- even though
12   the health system can work with independents in
13   Canyon County, it's essential to have a core nucleus.
14       So my question to you right now -- you get a fresh
15   start, at least for the moment -- not saying we won't use
16   the old answer later; we will.  But right now sitting here,
17   how many independents and how many in the core or nucleus of
18   employed?  Give me numbers, please, for Canyon County, if
19   you can.  How many in one category, how many in the other?
20       A.  Okay.  I'm going to pull a number out of the care
21   [sic], and I won't be able to -- pull it out of the air, and
22   I won't have a good research base to establish it.  But --
23   and I think it does depend on the circumstances, et cetera,
24   et cetera, et cetera.  I think you need 30 or 40 -- say 30
25   primary care docs on the payroll, on the salary, to carry

2737

1    out the kinds of functions that I described.  And then they
2    can interact with part-time docs.
3        Q.  And how many independents, then?  So my question
4    is two-part:  How many independents, how many employed?
5        A.  Well, if you're trying to serve -- I mean, now
6    it's going to depend on the number of patients you're trying
7    to serve, but an equal number or more.
8        Q.  So you think -- you think for an integrated system
9    to work properly, it's got to be half independent, half
10   employed?  Is that your view?
11       A.  I just think the employed needs to be substantial,
12   and I just -- you know, then you're going to ask me, well,
13   what's the basis for it?  And all I can say is it's a
14   judgment out of unsupported opinion, but you've got to have
15   something like 30 or something to be able to interact and be
16   a force for innovation and improvement.
17       Q.  So the answer is it's substantial.  You don't have
18   a formula or a quantitative --
19       A.  Right.
20       Q.  -- way of estimating it; correct?
21       A.  Correct.  It depends on the circumstances.
22       Q.  Okay.  Now, you talked earlier in redirect about
23   Intermountain, Geisinger, Dean, Marshfield, Gundersen, among
24   others; correct?
25       A.  Yeah.

2738

1        Q.  Now, every one of those is what you consider to be
2    in the gray area because they do substantial fee-for-service
3    business; correct?
4        A.  Correct.
5        Q.  Okay.
6        A.  With -- with the --
7        Q.  Correct?
8        A.  With the Wisconsin ones, they do participate in
9    the Wisconsin public employees health insurance system,
10   which is a managed competition model.
11       Q.  But they also -- every single one of those, as you
12   testified, does substantial fee-for-service business and,
13   therefore, is in the gray area; correct?
14       A.  Yeah.  It would be more effective if they were all
15   competing on capitated basis.
16       Q.  Now, as to the large systems mentioned in your
17   report, Gundersen, Scott & White, Dean, Marshfield,
18   Intermountain, Geisinger, Everett, you are unaware of any
19   completed statistical studies of cost or quality improvement
20   with regard to those systems; correct?
21       A.  I think you could get --
22       Q.  The question is:  Are you aware of any completed
23   statistical studies with regards to cost or quality
24   improvements for any of those systems?  Yes or no.
25       A.  Yes.  There are the data that come out of the

2739

1    state employees health insurance plan in Wisconsin in which
2    several of those compete, and we do have information on
3    the -- on the costs that they charge state employees, and
4    they do compete.
5        Q.  Well, Doctor, we are going to do this the
6    old-fashioned way on the ELMO because I can't anticipate
7    this and have it in my clips.
8        But let's look at page 178, line 7 through line 14.
9        THE COURT:  Can you point to the line you're
10   referring to for the doctor.
11   By MR. ETTINGER:
12       Q.  Sure.  You see my question beginning "One more
13   along these lines"?
14       A.  Yeah.
15       Q.  And we can go back to the prior page, and it'll
16   trace us back.
17       A.  Okay.  All right.
18       Q.  I can represent to you those same groups
19   referenced in paragraph 54 of your report.
20       A.  All right.
21       Q.  I can do that if you like, but that's the fact.
22       So did I ask you:  "Are you aware of any statistical
23   analyses with regard to quality outcomes or cost
24   outcomes" -- I'm sorry; this is the wrong question.  Let's
25   go up --

2740

1    MR. ETTINGER: That one's St. Luke's, so I asked
2 the wrong question, Your Honor. Give me one second.
3    Keely, would you hand me 176. Well, I have lost it for
4 the moment.
5 BY MR. ETTINGER:
6    Q.  Let me ask you this, Doctor: With the exception
7 of any data that may have been reported by the state
8 employees, are you aware of any statistical studies with
9 regard to cost or quality outcomes for any of these seven
10 groups?
11    A.  The ones in Wisconsin, I do think we've got pretty
12 good information on cost outcomes because those are
13 publicly -- you know, they are published. And you can see
14 in that case -- in fact, it's a study that I am involved in
15 right now. You can see that in those counties, particularly
16 Dane County where Madison is, that you've got much more
17 intense competition and you've got much lower costs. Where
18 these groups compete in areas that are predominantly
19 fee-for-service, they are not as efficient as in the groups
20 where they -- in areas where they compete on price.
21    Also, the quality, I haven't examined that lately,
22 but I'm sure they have quality reports that go to the state
23 for how state employees are cared for.
24    Q.  And you don't know what those quality reports
25 show, do you, since you haven't looked at them?

2741

1    A.  Uh --
2    Q.  Yes or no. You haven't looked at them. You don't
3 know what they show; correct, Doctor?
4    A.  Well, you can be pretty sure they are going to be
5 HEDIS measures. It's fairly standard.
6    Q.  Doctor, I found the page and line number. I'm
7 sorry about the earlier confusion. So at page 188,
8 line 23 -- and I am referring to these groups --
9    MS. DUKE: 181.
10    THE WITNESS: 188, that's not on my screen here.
11    MS. DUKE: It's page 181.
12    MR. ETTINGER: 181. I'm sorry; I misspoke.
13    THE WITNESS: Could you scroll it down so --
14 BY MR. ETTINGER:
15    Q.  Page 181, line 23.
16    Q.  "So my question goes to statistical
17       studies of improvements and cost or quality
18       with regard to one or more of these provider
19       systems, and I gather you're not aware of any
20       such studies; correct?
21    A.  "No. I'm participating in one.
22    Q.  "Are you aware of any that are completed
23       that we have results for today?
24    A.  "No."
25 Was that your testimony?

2742

1    A.  Yeah.
2    Q.  Now, one last thing, Doctor. I want to be sure I
3 understand what you said to Mr. Keith correctly. Was it
4 your testimony that if St. Luke's puts -- wants to put heads
5 in beds and it owns the St. Luke's Clinic, that the
6 St. Luke's Clinic doctors will likely say, no, we're not
7 going to help you do it?
8    A.  I trust these doctors because I think that the
9 reason they have come there to form this kind of a system
10 that they would be doing what is best for the patients,
11 which would not be doing unnecessary surgery.
12    Q.  So is your question, then -- please answer yes or
13 no -- if St. Luke's wants to put heads in beds and it owns
14 the St. Luke's Clinic, is it your testimony that the doctors
15 of the St. Luke's Clinic will refuse to assist it in that
16 strategy? Yes or no.
17    A.  Yes.
18    Q.  And how many of these doctors have you met
19 personally in the St. Luke's clinics?
20    A.  I don't know. There's a list there, but 10 or 12
21 or something like that.
22    Q.  Several hundred?
23    A.  No. I didn't interview several hundred.
24    Q.  Right. There are several hundred in the clinic;
25 correct?

2743

1    A.  Yeah.
2    Q.  Okay.
3    A.  But I could get a pretty good feel for where the
4 leaders were, what their thinking was.
5    Q.  And, Of course, they understood what you're
6 arguing in this case when they met with you, did they not?
7    A.  Did they what?
8    Q.  Do you think they understood the point you were
9 trying to make in this case before they met with you?
10    A.  This particular issue about heads in beds versus
11 doctors did not come up. I just felt they impressed me as
12 being a physician-led system that was trying -- trying to
13 get to a position where the incentives would not -- would
14 not interfere with their doing the right thing for their
15 patients.
16    Q.  And is it your testimony that if these physicians
17 were not employees of St. Luke's Clinic or members of
18 St. Luke's Clinic, if they were independents, then they
19 would work on putting the heads in the beds if St. Luke's
20 wanted them to?
21    A.  I don't know. I just haven't thought about that.
22 This is getting to be a little hypothetical.
23    MR. ETTINGER: Nothing further. Thank you.
24    THE COURT: Mr. Greene.
25    MR. GREENE: Nothing further, Your Honor.

2744

1    THE COURT:  Any redirect?
2    MR. KEITH:  Nothing further.
3    THE COURT:  Or re-redirect, I should say.
4    All right.  Dr. Enthoven, there was one other question
5  I was going to ask, but -- I'm sure it will come to me as
6  you walk out the door, but I'll just have to defer that.
7    THE WITNESS:  I could give you my cell phone
8  number.
9    THE COURT:  No.  I don't think that would work.
10  Well, actually, it might.  No, I'm not sure counsel would
11  appreciate it.  But thank you very much, Dr. Enthoven.  You
12  will be excused.  Thank you.
13    THE WITNESS:  Oh, we're through?
14    THE COURT:  You're done.
15    THE WITNESS:  Oh, good.  Thank you.
16    THE COURT:  Counsel, we have about eight minutes.
17  I'm inclined -- I don't know what I'm inclined to do.
18    MR. STEIN:  Well, it's -- you know, Your Honor, we
19  have a video that's about nine minutes, but it's been
20  largely designated AEO, which means we'd first have to clear
21  the courtroom and then start playing it, so --
22    THE COURT:  Would counsel mind if I just review
23  that this afternoon at some point?  Is there any objection
24  to that?  It'll save some court time.
25    MS. DUKE:  Who is it?

2745

1    MR. STEIN:  It would be Rodney Reider.
2    MS. DUKE:  Reider?
3    MR. STEIN:  I don't know that we'd -- I don't know
4  that we would have the ability to --
5    THE COURT:  Provide the copy?
6    MR. STEIN:  -- this afternoon, but I think we have
7  more videos than this.  And if we want to talk more broadly
8  about how we deal with the issue of video going forward, we
9  can do that.
10    THE COURT:  All right.  I've suggested that I --
11  well, I'm anxious for a couple of reasons.  One is I have
12  actually a status conference in a very complex criminal
13  matter scheduled at 3:30, and I also have kind of an
14  emergency motion I need to attend to before the end of the
15  day.
16    MR. STEIN:  We'll we'd be fine -- I mean, we'd be
17  fine ending for the day if that would be more convenient for
18  you.
19    THE COURT:  Well, we may have to go a little long
20  tomorrow to catch up the time, but we'll just have to sort
21  that out.  Today is just one of those days when I've got a
22  lot of things on the plate that I have to resolve.
23    All right.  Counsel, we'll be in recess, then, until
24  8:30 tomorrow morning.  We'll do the regular 8:30 to 2:30
25  schedule tomorrow, perhaps holding over just a bit to make

2746

1  up for some lost time today.  All right.  We'll be in
2  recess.
3    (Court recessed at 3:23 p.m.)

R E P O R T E R ' S   C E R T I F I C A T E

5    I, Tamara I. Hohenleitner, Official
6  Court Reporter, County of Ada, State of Idaho,
7  hereby certify:
8    That I am the reporter who transcribed
9  the proceedings had in the above-entitled action
10  in machine shorthand and thereafter the same was
11  reduced into typewriting under my direct
12  supervision; and
13    That the foregoing transcript contains a
14  full, true, and accurate record of the proceedings
15  had in the above and foregoing cause, which was
16  heard at Boise, Idaho.
17    IN WITNESS WHEREOF, I have hereunto set
18  my hand October 16, 2013.

22    _____-s-_____
   Tamara I. Hohenleitner
23  Official Court Reporter
   CSR No. 619