2747

1
UNITED STATES DISTRICT COURT
2
IN THE DISTRICT OF IDAHO
3
- - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
4 SAINT ALPHONSUS MEDICAL CENTER -        :
NAMPA, INC., TREASURE VALLEY            : Bench Trial
5 HOSPITAL LIMITED PARTNERSHIP, SAINT    : Witnesses:
ALPHONSUS HEALTH SYSTEM, INC., AND      : Arthur F. Oppenheimer
6 SAINT ALPHONSUS REGIONAL MEDICAL       : Marc Chasin
CENTER, INC.,                           : Randell L. Page
7                      Plaintiffs,       : Steven D. Brown (Video)
            vs.                          : Rodney D. Reider (Video)
8                                        : Blaine Petersen (Video)
ST. LUKE'S HEALTH SYSTEM, LTD., and     : Thomas Reinhardt (Video)
9 ST. LUKE'S REGIONAL MEDICAL CENTER,    : David Arugue
LTD.,                                   :
10                      Defendants.      : Case No. 1:13-cv-00116-BLW
- - - - - - - - - - - - - - - - - :
11 FEDERAL TRADE COMMISSION; STATE OF    :
IDAHO,                                  :
12                      Plaintiffs,      :
            vs.                          :
13                                       :
ST. LUKE'S HEALTH SYSTEM, LTD.;         :
14 SALTZER MEDICAL GROUP, P.A.,          :
                                        :
15                      Defendants.      :
- - - - - - - - - - - - - - - - - x
16
* * * SEALED * * *
17

18      REPORTER'S TRANSCRIPT OF PROCEEDINGS

19      before B. Lynn Winmill, Chief District Judge

20      Held on October 16, 2013

21      Volume 15, Pages 2747 to 2927

22
                  Tamara I. Hohenleitner
23          Idaho Certified Shorthand Reporter No. 619
                Registered Professional Reporter
24                 Certified Realtime Reporter
               Federal Certified Realtime Reporter
25

            United States Courts, District of Idaho
       550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

2748

1                              A P P E A R A N C E S

2

3

    **FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,**
4   **SAINT ALPHONSUS HEALTH SYSTEM, INC.,**
    **AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.**
5

6            Keely E. Duke
             DUKE SCANLAN & HALL, PLLC
7            1087 W. River Street, Suite 300
              Boise, ID 83707
8
             David A. Ettinger
9            HONIGMAN MILLER SCHWARTZ AND COHN LLP
             2290 First National Building
10           660 Woodward Avenue
             Detroit, MI 48226
11

12

13
    **FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION**
14

15           Peter C. Herrick
             U.S. FEDERAL TRADE COMMISSION
16           500 Pennsylvania Ave., N.W.
             Washington, DC 20580
17
             J. Thomas Greene
18           U.S. FEDERAL TRADE COMMISSION
             600 Pennsylvania Ave N.W.
19           Washington, DC 20580

20           Henry Chao-Lon Su
             U.S. FEDERAL TRADE COMMISSION
21           601 New Jersey Ave., N.W.
             Washington, DC 20001
22

23

24

25

2749

```
 1                      A P P E A R A N C E S (Continued)

 2

 3        FOR PLAINTIFF STATE OF IDAHO

 4               Eric J. Wilson
                 GODFREY & KAHN, S.C.
 5               One East Main Street
                 Suite 500
 6               PO Box 2719
                 Madison, WI 53701

 7
                 Brett T. DeLange
 8               OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
                 954 W. Jefferson, 2nd Floor
 9               Boise, ID 83720-0010

10
         FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
                 Raymond D. Powers
12               POWERS TOLMAN FARLEY, PLLC
                 PO Box 9756
13               Boise, ID 83707

14
         FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15       AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16               Jack R. Bierig
                 Ben J. Keith
17               Scott Stein
                 SIDLEY AUSTIN
18               One South Dearborn
                 Chicago, IL 60603
19
                 J. Walter Sinclair
20               Charles Schafer
                 STOEL RIVES
21               101 S. Capitol Boulevard, Suite 1900
                 Boise, ID 83702
22
         FOR DEFENDANT SALTZER MEDICAL GROUP
23
                 Brian Kenneth Julian
24               ANDERSON JULIAN & HULL, LLP
                 PO Box 7426
25               Boise, ID 83707
```

2750

1                                          **I N D E X**

2

3

| | | PAGE: |
|---|---|---|
| | Courtroom open to the public..................... | 2754 |
| | Courtroom closed to the public.................. | 2873 |
| | Courtroom open to the public..................... | 2878 |
| | Courtroom closed to the public.................. | 2879 |
| | Courtroom open to the public..................... | 2879 |
| | Courtroom closed to the public.................. | 2892 |
| | Courtroom open to the public..................... | 2898 |
| | Courtroom closed to the public.................. | 2916 |

9

10                     **DEFENSE ST. LUKE'S HEALTH SYSTEM**

11                                    **W I T N E S S E S**

12

| | | PAGE: |
|---|---|---|
| **ARGUE, David** | | |
| | Direct Examination by Mr. Stein............... | **2881** |
| **CHASIN, Marc** | | |
| | Direct Examination by Mr. Stein............... | **2789** |
| | Cross-Examination by Mr. Perry................ | **2824** |
| | Redirect Examination by Mr. Stein............ | **2841** |
| **DUNNING, Steven (By video)** | | |
| | .................... | **2873** |
| **OPPENHEIMER, Arthur F.** | | |
| | Direct Examination by Mr. Bierig............. | **2755** |
| | Cross-Examination by Mr. Wilson.............. | **2778** |
| | Redirect Examination by Mr. Bierig........... | **2784** |
| | Recross-Examination by Mr. Wilson............ | **2787** |
| **PAGE, Randell** | | |
| | Direct Examination by Mr. Schafer............ | **2846** |
| | Cross-Examination by Mr. Wilson.............. | **2854** |
| | Cross-Examination by Mr. Ettinger............ | **2863** |
| | Redirect Examination by Mr. Schafer.......... | **2871** |
| **PETERSEN, Blaine** | | |
| | ................................. | **2875** |
| **REIDER, Rodney** | | |
| | ................................. | **2874** |
| **REINHARDT, Thomas A. (By video)** | | |
| | ................................. | **2878** |

* * * * *

2751

1                                                    DEPOSITIONS

2                                            P U B L I S H E D

3

4

| BARRESI, Roberto | | PAGE: |
|---|---|---|
| BARRESI, Roberto | ................................. | **2926** |
| BROWN, Steven | ................................. | **2926** |
| CHASIN, Marc | ................................. | **2926** |
| DEAL, William | ................................. | **2926** |
| ENTHOVEN, Alain | ................................. | **2926** |
| PETERSEN, Blaine | ................................. | **2927** |
| REIDER, Rodney | ................................. | **2927** |
| REINHARDT, Thomas | ................................. | **2927** |
| RICHARDS, Patricia | ................................. | **2926** |
| SEPPI, Kurt | ................................. | **2926** |

5

6

7

8

9

10

11                                                 PLAINTIFFS

12                                            E X H I B I T S

13

| | | ADMITTED |
|---|---|---|
| 1668 | Haas-Wilson August 18, 2013 Response to Aruge . Surrebuttal Exhibit 2 | **2880** |
| 1669 | Haas-Wilson August 18, 2013 Response to Aruge . Surrebuttal Exhibit 3 | **2880** |
| 1673 | Haas-Wilson July 29, 2013 Reply Report Exhibit 3 | **2880** |
| 1674 | Haas-Wilson July 29, 2013 Reply Report Exhibit 4 Haas-Wilson July 29, 2013 Reply Report Exhibit 4 | **2880** |
| 1675 | Haas-Wilson July 29, 2013 Reply Report Exhibit 5 | **2881** |
| 1682 | Haas-Wilson July 29, 2013 Reply Report Exhibit 12 | **2881** |
| 1683 | Haas-Wilson July 29, 2013 Reply Report ........ Appendix A | **2881** |
| 1686 | Haas-Wilson June 5, 2013  Corrected Report .... Exhibit 2 | **2881** |
| 1693 | Haas-Wilson June 5, 2013  CorrectedReport ..... Exhibit 7 | **2881** |
| 1694 | Haas-Wilson June 5, 2013  CorrectedReport ..... Exhibit 7a | **2881** |
| 1695 | Haas-Wilson June 5, 2013  CorrectedReport ..... Exhibit 8 | **2881** |
| 1696 | Haas-Wilson June 5, 2013  CorrectedReport ..... | **2881** |

14

15

16

17

18

19

20

21

22

23

24

25

2752

| | | | |
|---|---|---|---|
| | Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **1697** | Haas-Wilson June 5, 2013  CorrectedReport . . . . . | 2881 | |
| | Exhibit 10 | | |
| **1702** | Haas-Wilson June 5, 2013  Corrected Report . . . . | 2881 | |
| | Exhibit 13 | | |
| **1703** | Haas-Wilson June 5, 2013  Corrected Report . . . . | 2881 | |
| | Exhibit 14 | | |
| **1704** | Haas-Wilson June 5, 2013  Corrected Report . . . . | 2881 | |
| | Exhibit 15 | | |
| **1705** | Haas-Wilson June 5, 2013  Corrected Report . . . . | 2881 | |
| | Exhibit 16 | | |
| **1706** | Haas-Wilson June 5, 2013  Corrected Report . . . . | 2881 | |
| | Appendix A | | |
| **1741** | Haas-Wilson June 5, 2013 Corrected Report . . . . . | 2881 | |
| | Appendix D, Exhibit 8 | | |

**DEFENDANTS**

**E X H I B I T S**

| | | ADMITTED |
|---|---|---|
| **2131** | Email from S. Brown to K. Keeler, S. Jeffcoat, . . B. Petersen, and N. Powell re Saltzer Draft 9, attached Saltzer Proposal, Draft 8.pdf.pdf (Def. Dep. Exh. 179; ALPH00008474-503) | 2877 |
| **2135** | Email from S. Bundgard to S. Brown, L. Smith, . . and T. Reinhart re Incentive Bonus Plans - Update (Def. Dep. Exh. 183; ALPH00699539) | 2877 |
| **2141** | Email exchange between S. Brown, M. Potter, P. . . Floyd, S. Jeffcoat, and B. Petersen re The SAHA Board Meeting Next Week (Def. Dep. Exh. 190; BDC0003371-74) | 2877 |
| **2142** | Packet re Saint Alphonsus Health Alliance Board . Meeting (Def. Dep. Exh. 191; BDC0009840-62) | 2877 |
| **2164** | Email exchange re Question about cost position . . compared to St. Luke's (Def. Dep. Exh. 224; ALPH00749763) | 2877 |
| **2170** | Email exchange re Have you seen this? (Def. . . . . Dep. Exh. 235; ALPH00025405) | 2877 |
| **2188** | Email exchange re Referrals (Def. Dep. . . . . . . . . Exh. 268; ALPH00679277) | 2879 |
| **2189** | Email from T. Reinhardt to S. Brown, B. . . . . . . . . Petersen, R. Reider, and S. Jeffcoat re FYI - Treasure Valley Pediatrics (Def. Dep. Exh. 269; ALPH00679140) | 2880 |

2753

1                                              JOINT

2                                      E X H I B I T S

3

| | | ADMITTED |
|---|---|---|
| 54 | | 135 |

6

7

8

9

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2754

1    P R O C E E D I N G S
2    October 16, 2013
3    *****COURTROOM OPEN TO THE PUBLIC*****
4    THE CLERK:  The court will now hear Civil Case
5    12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,
6    versus St. Luke's Health System, for Day 15 of a bench
7    trial.
8    THE COURT:  Good morning, Counsel.  It looks like
9    we're ready to go.
10   Mr. Bierig, are you ready to call your next witness?
11   MR. BIERIG:  I am, Your Honor.  Good morning.
12   Defendants call Mr. Skip Oppenheimer.
13   THE COURT:  Mr. Oppenheimer, would you please step
14   before the clerk, be sworn as a witness, and then follow
15   Ms. Gearhart's directions from there.
16   ARTHUR FALK OPPENHEIMER,
17   having been first duly sworn to tell the whole truth,
18   testified as follows:
19   THE CLERK:  Please take a seat in the witness
20   stand.
21   Please state your complete name and spell your name for
22   the record.
23   THE WITNESS: Sure.  My name is Arthur Falk
24   Oppenheimer, and I usually go by Skip.  Did you want me to
25   spell the whole name, did you say?

2755

1    THE CLERK:  Please.
2    THE WITNESS:  A-R-T-H-U-R, middle name is F-A-L-K,
3    and last name is O-P-P-E-N-H-E-I-M-E-R.
4    THE COURT:  You may inquire.
5    MR. BIERIG:  Thank you, Your Honor.
6    DIRECT EXAMINATION
7    BY MR. BIERIG:
8    Q.   Mr. Oppenheimer, good morning.
9    A.   Good morning.
10   Q.   Are you currently a member of the board of
11   directors of St. Luke's Health System?
12   A.   I am.
13   Q.   Could you summarize your education starting with
14   high school?
15   A.   Well, I was -- I graduated from Boise High School
16   in 1964, went to the University of Idaho for two years in
17   Moscow, spent one year in France during that period and got
18   a degree for -- a one-year degree, and then came back
19   and graduated in 1968 from the University of Idaho.
20   Was then in the Army; I was drafted in 1968.  Took
21   courses in and around Indianapolis during that period at IU
22   and Butler and Purdue in business.  I graduated, had a BA in
23   history.  Ended up going, then, on to come back here
24   actually and taught at Boise State in the business
25   department.  And then went on to graduate school at Harvard

2756

1    Business School and graduated from there in 1972.
2    Q.   Where do you work?
3    A.   At Oppenheimer Companies, Inc.
4    Q.   What is Oppenheimer Companies?
5    A.   We're in the food business and in the commercial
6    real estate business.  The food business is national.  The
7    real estate business is pretty much around the Treasure
8    Valley.
9    Q.   What is your position there?
10   A.   I am the chairman and CEO.
11   Q.   How many employees does Oppenheimer Companies have
12   in Idaho?
13   A.   We have approximately 60 in Idaho and about 150
14   nationally.
15   Q.   Are you involved with obtaining health insurance
16   for those employees?
17   A.   I am.
18   Q.   And what is your role in that process?
19   A.   Well, the way we operate, we have a benefits
20   committee, and that benefits committee puts together
21   recommendations.  My role is basically to review and approve
22   or not those recommendations from the benefits committee.
23   Q.   Okay.  And you testified that you serve on the
24   board of St. Luke's Health System.  How long have you served
25   on that board?

2757

1    A.   I have been on the system board since it began in
2    2006.
3    Q.   What was your position on the board in 2006?
4    A.   I was the initial chair of the board.
5    Q.   How long did you serve in that capacity?
6    A.   It was a little over two years.  Our normal term
7    is two years, but there was an overlap because the formation
8    of the system began midyear.  I ended up being the initial
9    chair for about a little over two years, two and a half
10   years, roughly.
11   Q.   Could you describe the role of the board of
12   St. Luke's Health System?
13   A.   Well, the board of the St. Luke's Health System
14   has, in effect, final governance authority over the
15   institution.  There are subsidiary boards, but the final
16   authority for all governance matters is the St. Luke's
17   Health System board.
18   Q.   And how many people serve on the board of
19   St. Luke's Health System?
20   A.   The bylaws allow for up to 15.  We currently have
21   13.
22   Q.   Could you generally describe the composition of
23   the system board?
24   A.   Yes.  You know, we -- this is not totally
25   objective, but we like to think it's made up of a good

2758

1  representation of community leadership, largely from the
2  business community. We have an interesting range of people.
3  You know, most of the people on the board have been on the
4  board for -- have been on many boards, as I have. I would
5  say, though, that -- again, not totally objective, but I
6  think this board is one of the finest boards I have served
7  on.
8       Just some examples of the board members:
9  Bill Whitaker, who is the -- who is the CEO of J. R. Simplot
10 Company, which is a large employer; Bob Lokken, who is an
11 entrepreneur who built ProClarity and ultimately sold it to
12 Microsoft and has started a new venture; Larry Cope, who is
13 the CEO of Clear Springs, which is a large employer -- large
14 for the Magic Valley, about 330 employees -- in the trout
15 business in the Magic Valley; Tom Saladino, who is our
16 current chair, who was a long-time general counsel at
17 Albertsons and also at Idaho Power; Barbara Wilson, who was
18 the head of U.S. West and then Qwest in Idaho. We have an
19 adjudication, water adjudication judge from -- originally
20 Pocatello, now from the Magic Valley. We have the former
21 president of Boise Cascade, who is on the board and been a
22 long-time member.
23      So there's a, we think, a good mix and a good
24 representation of the community. All of -- all of the board
25 lives in Idaho.

2759

1       Q.  How often does the board meet?
2       A.  The board meets every other month.
3       Q.  About how much time per month do you spend on
4  St. Luke's matters in your capacity as a board member?
5       A.  I would say on the months that we have board
6  meetings, probably 10 to 15. I mean -- I'm sorry -- about
7  15 to 20. I would say on the months that we are off, the
8  nonboard-meeting months, probably 10 to 15 I would say, on
9  average.
10      Q.  Are you paid for your services to St. Luke's?
11      A.  No.
12      Q.  Are any board members paid for their services?
13      A.  No.
14      Q.  Then why are you willing to spend so much time in
15 service to St. Luke's?
16      A.  Well, you know, first of all, I think -- speaking
17 for myself, but my guess is other board members would
18 concur -- I think there's a feeling that, you know, there's
19 probably nothing much more important than healthcare today,
20 in terms of impact on all of us. As individuals, our
21 families, friends, we'll be in the healthcare system and are.
22 hospitals; we'll all be in the healthcare system and are.
23 So I think there's a -- just a strong feeling that this is
24 important, an important endeavor, and a good use of our
25 time.

2760

1       We also -- or I also feel that, personally, a
2  strong commitment to the direction of St. Luke's and
3  its -- its overall strategic idea of how we can continue to
4  affect, in a positive way, healthcare in this region. And
5  this movement that started some bunch of years ago towards
6  this transformational idea of how -- in this time of major
7  change in healthcare, how can we be a factor that is at the
8  leading, kind of, part of what's going on in healthcare is
9  compelling to me and, I think, probably to other board
10 members.
11      So we think it's -- or certainly I feel, speaking
12 for myself, it's -- I can't think of a better place to spend
13 my volunteer time than at around -- in and around healthcare
14 and at St. Luke's on that board.
15      Q.  And when you say transforming healthcare, what are
16 you referring to?
17      A.  Well, the institution has begun -- began some
18 years ago to look at how the delivery of healthcare was
19 changing, and we've made a very sort of fundamental
20 decision, strategically, to move towards what we think is a
21 transformational idea, which is to move towards outcomes
22 based -- an outcomes-based system, a value-based system and
23 away from where the world has been in healthcare, which is
24 basically pay-per-procedure, volume-based system.
25      And so I think, you know, if you're

2761

1  going to -- the other thing we talk a lot about, if we're
2  going to serve on a board in healthcare, this is probably
3  the time to do it, because there's an opportunity to maybe
4  be part of the significant positive change in healthcare
5  that's happening in many parts of the country and hopefully
6  in this valley, as well.
7       Q.  What role does the St. Luke's Health System board
8  play in St. Luke's acquisitions of physician practices?
9       A.  The St. Luke's Health System board basically
10 approves any acquisitions above a certain dollar amount.
11      Q.  And how does the approval process work?
12      A.  Well, it's an iterative process. The relationship
13 with the -- between the board and management is, in an
14 acquisition, typically -- and the board, when I said above a
15 certain level, for example, any acquisition above a $4
16 million level would be brought to the St. Luke's Health
17 System board. In the Treasure Valley, for example, 1 to 4
18 million would be handled by the Treasure Valley board, and
19 below 1 million would be handled by the management. But
20 above a $4 million level, typically there would be
21 discussion that has evolved from the early stages of the
22 idea of moving forward with an acquisition.
23      We would, at the committee levels, which is where
24 some of these discussions start, have discussions about the
25 advisability, how it might fit or might not fit with the

2762

1   strategic direction of the institution.  There is usually
2   some discussion at the board in the early stages to see
3   if -- and then to get input back from the board as to
4   whether this looks like a fit.  And then ultimately as
5   the -- assuming that the process does move forward -- and it
6   doesn't always move forward -- but in the cases where it
7   does move forward, there would ultimately be a formal
8   recommendation to the board and then a formal either vote
9   yes or no on that acquisition at the St. Luke's Health
10  System board.
11      Am I too close to this mic, or is this working?
12      Q.  I think you're fine.
13          THE COURT:  I think it's fine.
14          THE WITNESS:  Okay.  Thanks.
15  BY MR. BIERIG:
16      Q.  What factors does the board consider when deciding
17  whether or not to approve a transaction?
18      A.  Well, I would sort of categorize it in -- probably
19  in three different strategic categories.  One is does the
20  acquisition fit the strategic direction on sort of a
21  broad-brush level.  And in particular, as I have mentioned,
22  does it fit the idea of the -- of the integration of
23  healthcare that St. Luke's is trying to move toward and
24  achieve.  Does it fit what we call the Triple Aim, which is
25  better health, better care, and lower cost.  Does it match

2763

1   up well with all three of those, what I would call
2   fundamental categories of strategic direction of that
3   institution.  So that's kind of the first test under the,
4   I'd say, sort of strategic test.
5       Also under the more strategic kind of test, I'd
6   say, is it in alignment with the idea of, again, this
7   value-based, risk-based system as opposed to the older
8   school pay-for-performance that the world has experienced
9   and largely continues to.  In other words, do the --
10      Q.  You mean pay-for-procedure rather --
11      A.  "Pay-per-procedure" I meant to say.  And do the
12  physicians -- are they in alignment with that idea.  So
13  those would be a couple of the more strategic kinds of, I
14  think, screens that the board would look at.
15      Under what I would call the clinical side, the --
16  the whole idea of culture, I think -- I feel, I think the
17  whole board feels -- is really fundamental.  And so under
18  the clinical side, is there a fit with the physicians or
19  physician practice that's being acquired, in terms of are
20  they a fit for the culture?  Are they a -- is the quality of
21  care that those physicians represent -- is their reputation
22  one that would also be consistent with the kind of quality
23  that we try to achieve as a standard within St. Luke's.
24      And then, thirdly, under sort of clinical and
25  then -- and financial, I would say the whole question of

2764

1   whether it helps us gain certain efficiencies and whether it
2   fills certain geographic voids would be an important
3   consideration that we would make.
4       And then, lastly, there is just the fundamental
5   financials, is the price of the practice defendable, is it
6   reasonable?  We usually get -- of any size we always get
7   third-party reviews, appraisals of real property, tangible,
8   intangible properties, compensation, those kind of things;
9   is that financial construction one that is reasonable and --
10  from our fiduciary standpoint is it something that we feel
11  comfortable with.  So those are the kinds of considerations
12  I think the board would undertake.
13      Q.  So what role, if any, does having increased
14  leverage with payors play in the board's evaluation of an
15  acquisition?
16      A.  You know, honestly, I can't -- I don't think it
17  has any consideration.  I don't remember any discussion of
18  that at a board meeting or a committee meeting.
19      Q.  Has the board ever voted to reject an acquisition
20  or an affiliation?
21      A.  Well, as I say, we've -- through that iterative
22  process, we've ended up not going forward with certain kinds
23  of acquisitions.  I can't remember it ever coming to a vote
24  because there is too much discussion along the way before it
25  gets there, but -- I mean, I can think of two or three.

2765

1   One that pops into my mind that -- we signed a
2   confidentiality agreement, so I don't think I should
3   probably say the name of the institution, but it's in
4   another part of the state.  They approached us.  We
5   considered it.  We had a series of meetings with that board,
6   some of the board members, the board chair, the CEO, decided
7   it wasn't a fit for some of the reasons that I explained
8   before.  And there have been others.
9       Q.  Okay.  In evaluating a transaction, Mr.
10  Oppenheimer, does the board consider potential revenue gains
11  to St. Luke's from the transaction?
12      A.  Well, as part of the consideration certainly
13  revenue and the financial considerations, as I mentioned,
14  is -- would be a consideration.  I wouldn't say it's
15  primary, but it's a consideration, yes.
16      Q.  Why is that?
17      A.  Well, when we look at this institution, and you
18  know it's not -- this is different than a for-profit board
19  and a for-profit institution.  But when we look at some of
20  our strategic direction, there is a certain scale that the
21  institution needs to get to in order to be able to
22  effectively and, from a financial standpoint, probably from
23  a fiduciary standpoint, appropriately create risk-based and
24  value-based billing and system -- a system that is, in
25  effect, value-based.  And so there is a certain scale that

2766

1  we need to achieve.  But we have no desire just to grow to
2  grow.  I mean, there is no reason for that.  We don't have
3  any incentives.
4         Even our management, we made a decision -- again
5  this is sort of the culture, I think, but -- many years ago
6  not to have bonuses, for example, of our management based
7  on -- we don't have bonuses, period.  And part of the reason
8  and some of the discussion around that was, you know, you
9  sort of -- there are consequences for incentivizing, and we
10 couldn't come up with anything that got to the broader-brush
11 objective of this institution through bonuses.  And so
12 things like revenue increases, there is no incentive for
13 anybody just to grow.  What we're trying to do is create the
14 highest quality care in this region, but not necessarily
15 grow just to grow.
16     Q.  Turning to the Saltzer transaction, was that
17 affiliation reviewed by the St. Luke's board?
18     A.  It was.
19     Q.  And what considerations did the board take into
20 account in evaluating the transaction?
21     A.  Well, there were really, I'd say, two or three key
22 elements that I think would be a way to capture some of
23 that.  One is it gave us a presence in Canyon County.
24 St. Luke's had a relatively modest number of physicians --
25 I'm trying to remember, I think it was around seven -- in

2767

1  that market.  This gave us an ability to gain a more
2  significant presence in Canyon County, and we had a fair
3  percentage -- I think it's around 20, over 20 percent, I
4  think it's 22 percent -- of the patients of St. Luke's that
5  are traveling outside of Canyon County to get care at
6  St. Luke's.  So there was a convenience factor that we
7  thought had some value.
8         Secondly, in the discussions with Saltzer, there
9  was a strong feeling of alignment with where they wanted to
10 go, where they saw healthcare going, and where the
11 St. Luke's Health System saw healthcare going.  So we saw
12 that alignment as a fundamental piece that was of value.
13        And then I'd say, thirdly, as I mentioned, it
14 created a movement, again, to continue to increase that base
15 of patients and physicians that would allow us to continue
16 to have enough critical mass to move towards the risk-based
17 system, the value-based system that we're embarking on that
18 we think is pretty -- is basic to our strategy.  And we
19 think potentially -- trying not to overstate it -- but we do
20 think it's potentially transformational in terms of where
21 healthcare is going in this country and potentially where we
22 can go in this valley.
23     Q.  So what role, if any, did a desire to increase
24 leverage with payors play in the decision to approve the
25 Saltzer transaction?

2768

1     A.  I would say none.
2     Q.  And what discussion, if any, was there of
3  affiliating with Saltzer in order to be able to raise
4  prices?
5     A.  Again, I -- I can't think of one discussion on
6  pricing at the board or any committee level, anything I can
7  remember being involved in that had to do with pricing.
8     Q.  Are you aware that the plaintiffs in this case
9  claim that St. Luke's affiliation with Saltzer will result
10 in prices for the services of Saltzer physicians above
11 competitive levels?
12    A.  I'm sorry.  Say that again.
13    Q.  Are you aware that the plaintiffs in this case
14 claim that St. Luke's affiliation with Saltzer will result
15 in prices for the services of the Saltzer physicians that
16 are above competitive levels?
17    A.  Yes.  Yes, I do understand that to be the claim.
18    Q.  And how would you respond to that claim?
19    A.  Well, I would -- I would, first of all,
20 respectfully disagree.  First of all, the -- as I've said,
21 or tried to say, the mission of this institution is we're a
22 nonprofit, community-based, charitable institution.  We have
23 no interest in raising prices in terms of anything above
24 competitive levels.  We have no interest in doing that.
25 It's not part of our DNA.  There is no incentive for anybody

2769

1  to do that.  That's not our reason to be.
2         Secondly, you know, there is a lot of competition
3  in this valley, and we have strong competition with Saint
4  Al's, and if you go back many years, that competition wasn't
5  there.  And when the antitrust laws changed, it became much
6  more competitive.  For good or for bad, there is heavy,
7  serious competition between Saint Al's and St. Luke's, which
8  has an impact on the ability for anybody to raise prices,
9  Saint Al's or St. Luke's, beyond some level.
10        There is also competition, I think, among
11 insurers, you know, with Blue Cross, with Select that -- and
12 there is a negotiation that we all recognize takes place
13 between St. Luke's and the payors that has an impact on
14 competition -- I mean, on -- that would affect I think any
15 ability to raise pricing.
16        And then, I guess another point that I would make
17 is that the board, as I described, it's made up of a lot of
18 employers who pay premiums for their employees, and some of
19 them are large-scale employers.  So there is sort of a
20 built-in check, in one sense, and that is we would know
21 pretty quickly if there was any kind of pricing above
22 competition because our HR departments and people in this
23 community are not exactly bashful about letting board
24 members, when they know you're on a board, know if there's
25 an issue.  So I think if there was anything above

2770

1    competitive levels, we, as board members, would see it
2    firsthand, and it would affect us directly.
3        Q.   And so what would the board do about it?
4        A.   Well, the board would do what I think any good
5    board does, and that is they would make sure that that
6    became a significant discussion, and there would be a lot of
7    challenge to that at the board level, and I can't imagine
8    the board allowing for anything above competitive pricing
9    levels to happen.
10       Q.   But wouldn't trying to hold down prices be
11   inconsistent with a fiduciary duty of board members to
12   maximize revenue for St. Luke's?
13       A.   Well, first of all, as I said, I don't think the
14   board is trying to maximize revenue.  I don't think
15   that's -- that statement is exactly correct.
16            Secondly, and probably most importantly, you know
17   this board is really serious about what I mentioned as the
18   Triple Aim.  I mean, that's become sort of so foundational
19   to what this institution is all about.  And the third part
20   of that Triple Aim is lower cost.  And we feel that
21   healthcare in this country is moving towards potentially
22   lower reimbursement rates, an absolute requirement that we
23   as an institution and any healthcare institution that's
24   going to be able to deliver good quality and ultimately
25   survive is going to require a whole new way of looking at

2771

1    how the cost side of this equation, how efficiencies,
2    utilization, all those kinds of things are handled.  And
3    this board, I think, feels fundamentally that not only is it
4    not cont -- contradictory to our goals, it's fundamental to
5    our goals to get our costs down.
6            We, as a country, cannot sustain the kind of
7    increases in cost that we've had in healthcare in this
8    country.  And there is a need for transformational change,
9    and I think our board is 100 percent behind the idea that
10   we've got to try some new things to see if we can't make
11   change happen.  And our CEO, David Pate, is a great believer
12   in that.  He's been a great leader in that.
13            Frankly, this wasn't just started with David.  I
14   was the chair of the St. Luke's Regional Medical Center
15   board before David got here.  And Ed Dahlberg who -- and
16   we've only had -- David is our third CEO.  We've had two
17   CEOs before that in 40- -- roughly -- -3 years.  Gil
18   Gilbertson, who was very well known nationally was chairman
19   of the AHA from Boise, Idaho.  And then Ed Dahlberg was the
20   chair for over 20 years.  I worked very closely with him, as
21   did all of us on the board.
22            And I remember 15 years ago, roughly, being in
23   Philadelphia at a panel that talked about health systems and
24   where the world of healthcare might be going in this
25   country.  And at that point, even today, nobody really knows

2772

1    for sure, obviously.  But the whole idea that Ed had at that
2    point and the vision he had of -- and the St. Luke's Health
3    System was created under Ed -- was that we've got to create
4    a whole new method of delivery that, in effect, is going to
5    respond to the idea that reimbursement is going to start
6    coming about through quality outcomes, through outcomes and
7    quality measurements; it's not going to be based on volume,
8    and it's not going to be based on pay-per-procedure.
9            So this idea hasn't just evolved in the last few
10   years.  This was something that the institution began
11   embarking on as many as 15 years ago.
12       Q.   Okay.  Let me switch gears for a minute.  Are you
13   aware of the relationship between St. Luke's and
14   SelectHealth?
15       A.   I am.
16       Q.   What's the nature of that relationship?
17       A.   Well, SelectHealth, St. Luke's feels, has a lot of
18   the same kinds of, sort of, ideas about where healthcare is
19   going and a lot of the same kinds of goals that match with
20   where St. Luke's feels healthcare is going.  And so they're
21   an insurance company that's owned by Intermountain
22   Healthcare, which is a hospital system that we find is an
23   interesting model.  And because of the alignment of where
24   they see things going and where we see things going, we have
25   formed an alignment -- or an alliance with them to provide a

2773

1    new healthcare product to this region.
2        Q.   And what is the benefit to St. Luke's from having
3    this alignment with SelectHealth?
4        A.   Well, it's a key part, we think, because if we're
5    going to ultimately move to a risk-based system, then it's,
6    we think, pretty fundamental to have at least as one option
7    a -- an insurance company that has a similar set of
8    strategic goals and because of that allows St. Luke's, as an
9    institution, to pass back or to -- through Select, to gain
10   back some of the savings that might come about through a
11   value-based system.  And that would allow St. Luke's to, if
12   we are successful in achieving some of the savings that go
13   back to the lower cost, to get those savings recaptured and
14   to pass those back, either in the form of lower premiums,
15   lower cost of care or, potentially, some rewards for the
16   physicians and people that help make that -- that savings
17   happen.
18            And SelectHealth was aligned with that idea and
19   were willing to structure products that allowed that to
20   happen, which we think is a piece to the puzzle that's
21   pretty integrated to the idea, as we've looked around the
22   country, of what might be needed in order to have an
23   effective value-based healthcare system in this --
24       Q.   Do you know -- I'm sorry.  I didn't mean to
25   interrupt.

2774

1    **A.**  -- in this region.

2    **Q.**  Do you know whether SelectHealth has actually sold

3  any risk-based policies in Idaho?

4    **A.**  You know, I'm not sure that they -- I don't think

5  there has been a lot sold.  I don't have a clear sense for

6  what that number might be.  I know that in the strategic

7  plan we have specifically targeted the idea that we would

8  have the systems, the cost controls, and the

9  evidence-based medicine elements put together for 2015 as a

10  target date for where there would be a very strong marketing

11  effort by Select for that product.  And I think you're going

12  to see that happen more in 2015 than you are today.

13    **Q.**  Mr. Oppenheimer, in your judgment, what, if any,

14  is the relationship between the SelectHealth alliance and

15  St. Luke's affiliation with Saltzer?

16    **A.**  Well, I've given that, as I would suggest the rest

17  of the board, a lot of thought.  And we think -- we think

18  it's very integral.  Select, as I suggested, brings a

19  product that allows us to move towards a risk-based delivery

20  system.  And that's an important piece to the puzzle.

21    Select -- I mean Saltzer brings us a group of

22  physicians who are aligned with that idea and willing to

23  participate in that whole idea, and what we think is a big

24  idea.  And Saltzer brings us -- as I mentioned, it brings us

25  presence in Canyon County where we had a limited presence;

2775

1  it brings us, as I said, an alignment that allows us to put

2  together a risk-based system with Select and ultimately

3  helps us to get to the scale so that, from a financially

4  responsible standpoint, looking at our role as a board

5  fiduciarily, we have enough base to spread that risk out,

6  that that risk-base can go forward in a financially

7  responsible way.

8    So I would say that those -- they are very

9  connected and very important that they happen because you

10  need both.

11    **Q.**  Let me turn now to Oppenheimer Companies.  I

12  believe that you testified that Oppenheimer Companies

13  provides health insurance for its employees?

14    **A.**  We do.

15    **Q.**  What company actually provides the insurance for

16  employees of Oppenheimer Companies?

17    **A.**  Blue Cross.

18    **Q.**  When was your most recent contract with Blue Cross

19  signed?

20    **A.**  Oh, let's see.  It was April 1 of 2013.

21    **Q.**  Did you consider other health plans before

22  selecting Blue Cross?

23    **A.**  We did.

24    **Q.**  What other plans did you consider?

25    **A.**  Well, we looked at SelectHealth.  And, as I said,

2776

1  we have a benefits committee that's made up of four or five

2  of our associates, including our CFO and our HR director.

3  And they went through a process of evaluation.

4    **Q.**  Okay.  And so why did Oppenheimer Companies choose

5  Blue Cross over SelectHealth?

6    **A.**  Well, the process -- it was an interesting

7  process.  The committee went through a -- we use a

8  third-party broker, Western Benefits, and that broker went

9  out to the marketplace, and basically SelectHealth and Blue

10  Cross were the two that we focused on.

11    The initial meeting we had -- that I had with the

12  committee when they brought back their original

13  recommendation, SelectHealth care was lower, and Blue

14  Cross --

15    **Q.**  You said "lower"; you mean lower in price?

16    **A.**  Lower in price.

17    But they -- the committee was a little

18  uncomfortable with Select because they felt they were new to

19  the market.  They were a little worried about our associates

20  accepting a new entry without a little more seasoning.  They

21  had gotten sort of an indication from our broker that Blue

22  Cross had made some noises they might be willing to -- to

23  negotiate further or to bid again.  And so their

24  recommendation was to go with Select unless Blue Cross

25  significantly changed their pricing.

2777

1    I was a little torn because I -- you know, I have

2  a certain desire for SelectHealth to move forward, and I

3  tried to convince them that we were, you know, this wasn't

4  a -- this was going to be a long-term proposition with

5  Select.  But they felt that we ought to go back, and I --

6  and we've got the committee, and, you know, they felt

7  strongly that they go back, and I didn't veto that.  So,

8  anyway, long story short, we went back, Blue Cross came down

9  in pricing to a price very close, and the recommendation of

10  the committee and what we went forward with was Blue Cross.

11    **Q.**  So based on your experience, what effect has the

12  entry of SelectHealth had on competition in the market for

13  health insurance?

14    **A.**  Well, I think it's had a very healthy, competitive

15  impact, based on just using that one example and others that

16  I've heard of.

17    **Q.**  And what effect has entry of SelectHealth had on

18  the price paid by employers for healthcare?

19    **A.**  Oh, I think it's been very -- I think it's been a

20  very competitive, procompetitive kind of entry that's made a

21  difference.

22    MR. BIERIG:  Thank you, Mr. Oppenheimer.

23  I have no further questions, Your Honor.

24    THE COURT:  Cross.  Mr. Wilson.

25    MR. WILSON:  Thank you, Your Honor.

2778

CROSS-EXAMINATION

1    BY MR. WILSON:
2        **Q.**  Good morning, Mr. Oppenheimer.
3        **A.**  **Good morning.**
4        **Q.**  That acquisition that you mentioned in the other
5    part of the state that the board considered but did not
6    pursue, that was a hospital, not a physician practice;
7    correct?
8        **A.**  **Correct.**
9        **Q.**  And, in fact, you have never personally voted
10   against the acquisition of a physician practice; correct?
11       **A.**  **No, I have not.**
12       **Q.**  And during the time that you have been a
13   St. Luke's Health System board member, isn't it true that
14   you cannot think of a time where the board has ever voted
15   against the acquisition of a physician practice that's been
16   recommended by St. Luke's senior management?
17       **A.**  **Well, as I said, we --**
18       **Q.**  Yes or no, sir.
19       **A.**  **Well, I would like to answer yes or no, but I**
20   **would like to also explain how the process works.**
21           THE COURT:  Mr. Bierig is going to give you a
22   chance to do that on redirect.
23           THE WITNESS:  Okay.
24           THE COURT:  But if you can answer a question

2779

1    fairly yes or no, then go ahead and do so, and Mr. Bierig
2    will give you that chance.  If you think that it's just
3    completely misleading, then I'll give you a limited
4    opportunity to explain.
5            THE WITNESS:  Okay.
6            THE COURT:  Let's rephrase the question,
7    Mr. Wilson.
8            MR. WILSON:  Sure.
9    BY MR. WILSON:
10       **Q.**  Isn't it true, sir, that during your entire tenure
11   as a St. Luke's board member, you cannot think of a time
12   where the board has ever voted against the acquisition of a
13   physician practice recommended by St. Luke's senior
14   management?
15       **A.**  **Correct.**
16       **Q.**  And, in fact, all of those votes in favor of
17   acquiring physician practices have been unanimous votes by
18   the board; correct?
19       **A.**  **That's correct.**
20       **Q.**  I think you've said that you've been a member of
21   the St. Luke's Health System board since there was a
22   St. Luke's Health System board; correct?
23       **A.**  **Correct.**
24       **Q.**  And the St. Luke's Health System encompasses all
25   of the St. Luke's facilities, including the facilities in

2780

1    the Magic Valley; correct?
2        **A.**  **That's correct.**
3        **Q.**  Based on your testimony during direct examination
4    that the board has not had discussions regarding pricing, I
5    take it that St. Luke's -- the St. Luke's Health System
6    board hasn't taken any action with regard to pricing in the
7    Magic Valley by St. Luke's; correct?
8        **A.**  **Correct.**
9        **Q.**  It sounds, from your testimony, that you believe
10   that the board carefully considered the Saltzer transaction
11   before voting to approve it; correct?
12       **A.**  **That's correct.**
13       **Q.**  And are you aware, sir, that Saltzer was a part of
14   the BrightPath network before the acquisition?
15       **A.**  **Yes, generally.**
16       **Q.**  And are you also aware that SelectHealth is using
17   the BrightPath network?
18       **A.**  **Yes.  Generally, yes.**
19       **Q.**  But, nonetheless, the board thought it important
20   to acquire the Saltzer physician practice; correct?
21       **A.**  **Correct.**
22       **Q.**  So before voting to approve the Saltzer
23   transaction, the board must have considered whether a looser
24   affiliation with Saltzer was an option; correct?
25       **A.**  **We -- yes, we discussed different options.**

2781

1        **Q.**  Mr. Oppenheimer, there are competitors of Saltzer
2    for primary care in Nampa; isn't that right?
3        **A.**  **Yes.**
4        **Q.**  For example, Primary Health Medical Group has
5    primary care physicians in Nampa; correct?
6        **A.**  **Correct.**
7        **Q.**  And Saint Alphonsus Medical Group has primary care
8    physicians in Nampa; correct?
9        **A.**  **Correct.**
10       **Q.**  As a result of the Saltzer acquisition,
11   Mr. Oppenheimer, sitting here today, do you know what market
12   share of the primary care physicians St. Luke's now commands
13   in Nampa?
14       **A.**  **Again, we -- the board doesn't look at --**
15       **Q.**  Do you know?
16       **A.**  **-- Nampa as a discrete market.**
17       **Q.**  I'll ask the question again.  As a result of the
18   Saltzer acquisition, do you know what market share of the
19   primary care physicians St. Luke's now commands in Nampa?
20           MR. BIERIG:  Object to the form of the question.
21   It's implying that Nampa is a market, when this witness has
22   just testified that they don't regard Nampa as a market.
23           THE COURT:  Well, the witness -- all right.  I
24   think it's a valid objection, but the witness can simply
25   indicate that he doesn't know because it's not relevant to

2782

1  their -- Mr. Oppenheimer, am I reading your answer
2  correctly?
3      THE WITNESS:  Yes, that's correct.
4      THE COURT:  Go ahead and proceed.
5  BY MR. WILSON:
6      Q.  Of the primary care physicians who practice in
7  Nampa, Mr. Oppenheimer, do you know what percentage of those
8  primary care physicians are now employed or have a
9  physicians -- a professional services agreement with
10  St. Luke's?
11      A.  Again, this valley isn't -- Nampa, as I understand
12  it, something like a third of the patients who get treated
13  in Nampa come from outside of Nampa.  Two-thirds of the
14  patients in Nampa go elsewhere for treatment.  So this
15  valley has grown together -- I've lived here all my life --
16  it's not like Nampa is a discrete market.  And the board
17  didn't look at Nampa as a discrete market.  22 percent of
18  our patients come from Canyon County.  And as this valley
19  has grown together, it's hard to imagine Nampa being looked
20  at as a discrete market.
21      Q.  I'm not debating with you what is or is not the
22  market, Mr. Oppenheimer.  I have a very simple question,
23  which is:  In Nampa -- in Nampa, what percentage of the
24  primary care physicians are St. Luke's physicians?  Do you
25  know?

2783

1      A.  And I'm saying that isn't relevant because those
2  physicians don't just treat patients who live in Nampa nor
3  do Nampa patients only get treated in Nampa.
4      Q.  So you don't know; is that right?
5      A.  I don't think it's relevant, and I'm not sure I
6  know.  If you define the market as Nampa, I'm not totally
7  clear.
8      Q.  You don't know the answer to my question, do you?
9      A.  Can you rephrase the question?
10      Q.  What percentage of the primary care physicians in
11  Nampa are St. Luke's primary care physicians?
12      A.  Again, I don't see that as a relevant number,
13  so --
14      Q.  Do you know the answer to the question, sir?
15      THE COURT:  Let me just -- again, similar to what
16  we said before, I mean, I think I understand the point
17  you're making, but the question is, that Mr. Wilson is
18  putting to you, is do you know, and yes or no, and then, as
19  I've indicated, Mr. Bierig will give you a chance to explain
20  why you feel like that's not a relevant question.
21      THE WITNESS:  Yeah, I don't know exactly the
22  percentage.
23  BY MR. WILSON:
24      Q.  Can you hazard a guess?
25      A.  I would -- I mean, I've heard numbers in the range

2784

1  of 60 percent.
2      MR. WILSON:  Nothing further, Your Honor.
3      THE COURT:  Any redirect?
4      MR. BIERIG:  Very briefly, Your Honor.
5      THE COURT:  Yes.
6      REDIRECT EXAMINATION
7  BY MR. BIERIG:
8      Q.  Mr. Oppenheimer, you testified that the board had
9  never voted against an acquisition of a physician practice.
10  Can you explain the process in a way that explains why that
11  is?
12      A.  Well, the process, as I started to mention,
13  it's -- first of all, this is not exactly what I would call
14  a bashful or retiring group of people on this board.  It's a
15  group of very strong personalities who -- who I'm sort of
16  gratified when I see, have very strong beliefs in the
17  importance of healthcare, the quality of healthcare, and
18  where healthcare can go in this region.  But there is active
19  debate that goes on in every aspect of St. Luke's.  There is
20  no higher authority.  We don't have a board above our board.
21  We're it.  And we're all from Boise and Idaho.  We're all
22  from the -- not from Boise.  We're all from Idaho.  So, we
23  only have one allegiance, and that's:  How do we continue to
24  improve the quality of care in this valley and in this
25  region?

2785

1      When it comes to things like an acquisition of a
2  practice, there is a very strong discussion, starting at the
3  very beginning, of whether we should even look at the
4  practice, between the board committee or the board and
5  senior management.  And that's almost -- I can't think of
6  any sizable acquisitions that that hasn't happened.  And if
7  there is a fundamental disagreement about whether we should
8  proceed or not, it starts becoming very obvious early.
9      So there is no point in taking it to the final
10  kind of formal presentation and approval or disapproval at
11  the board.  We've had too many discussions along the way to
12  know whether or not the board is going to support it.  So
13  it's an iterative process that ultimately makes those kinds
14  of decisions before it gets to a final approval at the board
15  level, and that's just the way this board operates.
16      But, you know, I want to be sure it's clear,
17  this -- this board is a strong board.  They know they've got
18  final authority for making decisions.  There is no other
19  authority.  People take that responsibility very seriously.
20  And, you know, again, we have no incentive to do anything,
21  as a board member, that doesn't further the interests of
22  healthcare in this region.  That's the only reason we're on
23  that board.  And when it comes to acquisitions, that
24  discussion takes place, so it never gets to a final vote
25  before -- because we've made those decisions along the way.

2786

1   And there is no reason to waste the board's time if it's

2   clear that the board feels there is not a fit.

3       Q.   Let me ask you one last question. Mr. Wilson got

4   you to estimate that St. Luke's employs or has a PSA with

5   approximately 60 percent of the primary care physicians in

6   Nampa. Assuming that were the case, would that concern you,

7   from a competitive point of view?

8       A.   Well, as I was trying to say, I -- I feel that

9   the -- first of all, the -- we've got a highly competitive

10  environment here with -- I mean, Saint Al's and St. Luke's

11  do compete vigorously, and so I just don't see, you know,

12  where, first of all, you know, there is any lessened

13  competition. I mean, Saint Al's tried to acquire that same

14  practice and were not successful, so they must have, at that

15  point, thought it was okay to do.

16          But more importantly, this valley is a pretty

17  grown-together valley, and people in Nampa don't

18  get -- we've got, I think, pretty good facts that show

19  people in Nampa travel to other parts of the valley to get

20  healthcare. They don't just stay in Nampa.

21          So I wouldn't see that as a relevant percentage

22  because there is too much known travel for patients already

23  clearly established in this valley.

24          MR. BIERIG: I have no further questions,

25  Your Honor.

2787

1           THE COURT: Counsel, I did have one question I was

2   going to ask.

3           And you may have answered this question earlier, and I

4   perhaps just missed it. How is the board selected? I mean,

5   boards have to change over time. Is the -- well, let me

6   just have you describe that.

7           THE WITNESS: We have a nominating committee

8   that's made up of the board --

9           THE COURT: Okay.

10          THE WITNESS: -- of the board members who are

11  selected for the nominating committee.

12          THE COURT: So the board selects its own --

13          THE WITNESS: Members.

14          THE COURT: So it's not the CEO or --

15          THE WITNESS: No, no. It's the board itself who

16  form a nominating committee, and that's how the board is

17  selected; it's by the board.

18          THE COURT: All right.

19          Counsel, any further? Mr. Wilson.

20          MR. WILSON: Briefly.

21          RECROSS-EXAMINATION

22  BY MR. WILSON:

23      Q.   You mentioned, Mr. Oppenheimer, that people like

24  to travel for their care. Is that what you said?

25      A.   Yes.

2788

1       Q.   How far is your primary care physician from your

2   home?

3       A.   My primary care physician today is about, oh, a

4   half a mile from my home, but I live on Warm Springs, and

5   St. Luke's is about a half a mile away.

6           MR. WILSON: Nothing further, Your Honor.

7           THE COURT: Anything else?

8           MR. BIERIG: No, Your Honor.

9           THE COURT: Mr. Oppenheimer, thank you very much.

10          THE WITNESS: Thank you.

11          THE COURT: Counsel, I'm going to take another

12  short break. It's another one of those things I am coping

13  with because of the medicine I'm taking. It's not a huge

14  deal, but my apologies. We'll just take a very short

15  five-minute break and try to start very promptly in about

16  five minutes.

17          We'll be in recess.

18          (Recess.)

19          *****COURTROOM REMAINS OPEN TO THE PUBLIC*****

20          MR. STEIN: Your Honor, the defendants call

21  Dr. Marc Chasin.

22          THE COURT: Sir, please step there before the

23  clerk and be sworn.

24                  MARC CHASIN,

25  having been first duly sworn to tell the whole truth,

2789

1   testified as follows:

2           THE CLERK: Please take a seat in the witness

3   stand.

4           Please state your complete name and spell your name for

5   the record.

6           THE WITNESS: Sure. My name is Marc Chasin,

7   M-A-R-C, C, as in Charles, H-A, S as in Sam, I-N.

8           THE COURT: You may inquire of the witness.

9           DIRECT EXAMINATION

10  BY MR. STEIN:

11      Q.   Good morning, Dr. Chasin.

12      A.   Good morning.

13      Q.   What is your title at St. Luke's Health System?

14      A.   I currently hold the title of chief medical

15  information officer, as well as the interim chief

16  information officer.

17      Q.   And to whom do you report?

18      A.   I report to Dr. Pate.

19      Q.   What are your responsibilities as chief medical

20  information officer and interim chief information officer?

21      A.   My overall responsibilities are, firstly, to

22  ensure a robust, highly reliable IT infrastructure that is

23  available for our providers, as well as our patients, and as

24  well as my job is to partner with the end users to develop a

25  clinical information technology.

2790

1    Q.   And by "end users," who do you mean in that
2  context?
3    A.   I mean doctors, nurses, billing clerks.
4    Q.   You are also a licensed physician; is that
5  correct?
6    A.   I am.
7    Q.   What's your area of medical specialty?
8    A.   Family medicine.
9    Q.   Could you summarize for the court your educational
10  background, starting with college?
11    A.   Sure.  I graduated from the Ohio State University
12  with a bachelor's of science in human nutrition in 1994.  I
13  then matriculated to the American University of the
14  Caribbean School of Medicine, and I finished my medical
15  degree in 1997.  I subsequently completed a family medicine
16  residency from the University of Medicine and Dentistry of
17  New Jersey in 2001, and then I continued my education at
18  Carnegie Mellon University, where I received a master's of
19  medical management in 2009.
20    Q.   What is a master's of medical management?
21    A.   A master's of medical management is an MBA degree
22  for practicing physicians.
23    Q.   And is it a two-year program like a normal MBA?
24    A.   That is correct.  It's two years, full time.
25    Q.   Do you hold any other professional certifications?

2791

1    A.   Yes.  I hold a certified healthcare CIO, as well
2  as a certified physician executive.
3    Q.   Do you have any association with the American
4  Institute of Healthcare Quality?
5    A.   Yes.  I am a fellow of the American Institute of
6  Healthcare Quality.
7    Q.   And what is -- can you just describe briefly what
8  that organization is?
9    A.   Sure.  The American Institute of Healthcare
10  Quality is an organization that develops medical directors
11  on hospital throughput and hospital utilization to improve
12  the overall care of the patient while they are in the
13  hospital.
14    Q.   Dr. Chasin, when did you become employed by
15  St. Luke's?
16    A.   I became employed in fall of 2010.
17    Q.   And can you describe generally your work
18  experience before you came to St. Luke's, focusing on your
19  experience with electronic medical records or electronic
20  health records?
21    A.   Sure.  In residency, I was part of a pilot to
22  develop standardized technology for residents to improve
23  patient care.  Then as a physician in my own practice, I
24  developed my own electronic medical record.  I proceeded to
25  join Bon Secours Health System, based in Marriottsville,

2792

1  Maryland, and help them deploy and build an enterprisewide
2  electronic health record through 18 hospitals and 6,000
3  physicians, in both ambulatory and inpatient care.
4    Q.   So when you were hired by St. Luke's in 2010, you
5  were hired from Bon Secours?
6    A.   I was, yes.
7    Q.   And what is it that you were hired to do at
8  St. Luke's?
9    A.   What I was hired to do at St. Luke's in my arrival
10  here as the chief medical information officer was to partner
11  with St. Luke's providers and other end users to engage them
12  in developing a clinical information technology
13  infrastructure to transform the way we deliver care to the
14  patients, our patients and the community that we serve.
15    Q.   The court has heard reference in other testimony
16  to an organization called the "Idaho Health Data Exchange."
17  Are you familiar with that organization?
18    A.   I am.
19    Q.   And do you serve in any capacity in the Idaho
20  Health Data Exchange?
21    A.   Yes.  I'm on the board of that organization.
22    Q.   Do you participate in any other professional
23  organizations whose activities focus on health information
24  technology?
25    A.   Yes, I do.  I participate in the College of Health

2793

1  Information Management Executives.  I participate in the
2  Association for Medical Directors of Information Science.  I
3  also am the chair of the Epic Care Everywhere Network, and I
4  also serve on the governance committee for the National
5  Health Information Exchange.
6    Q.   What is the -- I'm sorry.
7    A.   No.
8    Q.   What is the Epic Care Everywhere Network?
9    A.   The Epic Care Everywhere Network is a network of
10  health systems that have successfully implemented the Epic
11  software, and we develop standards of security and data
12  transmission in order to successfully transmit data
13  throughout the network to improve patient care at the time
14  of service.
15    Q.   And does this organization consist of individuals
16  who are associated with systems that have adopted Epic
17  nationwide?
18    A.   Yes, sir.  Worldwide actually.
19    Q.   Worldwide.  How widespread generally is the
20  adoption of Epic?
21    A.   In the United States, as of now, 50 percent of the
22  U.S. population have a record in Epic.
23    Q.   How about in Idaho?
24    A.   In Idaho, we have roughly 200,000 Epic records.
25    Q.   And St. Luke's is on the Epic system; is that

2794

1 right?
2    **A.**  Yes.
3    **Q.**  Are there any other major systems in the Treasure
4 Valley that are on Epic, as far as you know?
5    **A.**  No.
6    **Q.**  Now, you also mentioned an organization that
7 you're associated with called the "National Health
8 Information Exchange." Is that a governmental body?
9    **A.**  It is a governmental body.
10    **Q.**  And what is that body responsible for doing?
11    **A.**  So the National Health Information Exchange is a
12 subset of the National eHealth Collaborative. And what that
13 organization does is that their job and their drive is to
14 accelerate the adoption of health information technology to
15 create a more patient- and family-centered health system to
16 drive value and improve outcomes.
17    **Q.**  And is this an executive agency organization?
18    **A.**  Yes. It reports right -- directly to Dr. Farzad
19 Mostashari of the office, a national coordinator who reports
20 to Kathleen Sebelius of the Health and Human Services.
21    **Q.**  And how is it you came to serve on the National
22 Health Information Exchange?
23    **A.**  By me being the chair member of the Care
24 Everywhere Network positions me well, as the Care Everywhere
25 Network is the largest health information exchange in the

2795

1 country. My expertise and the value that I bring to this
2 National Health Information Exchange provides me with that
3 expertise.
4    **Q.**  So in the course of your work in health
5 information technology, Dr. Chasin, can you just describe
6 some of the electronic medical records systems that you have
7 personally become familiar with?
8    **A.**  Sure. I am familiar with Epic. I am familiar
9 with eClinicalWorks. I am familiar with Soarian. I am
10 familiar with GE Centricity. I am familiar with Meditech.
11 I am familiar with NextGen. I am familiar with Practice
12 Made Perfect. I am familiar with Allscripts. I am familiar
13 with HMED. I am familiar with Cerner. And I am familiar
14 with Meditech. I could proceed if you would like.
15    **Q.**  I don't think we're going to go beyond those.
16 Thank you,
17 So, Dr. Chasin, what is -- what is "myStLukes"?
18    **A.**  MyStLukes is the name that we have branded our
19 Epic deployment. We've customized it to fit St. Luke's.
20    **Q.**  And that's the -- so is myStLukes essentially the
21 St. Luke's electronic health record?
22    **A.**  That's correct.
23    **Q.**  And what are your responsibilities with regard to
24 myStLukes?
25    **A.**  Sure. My responsibilities range from the -- the

2796

1 clinical -- the IT infrastructure, in that I have to
2 maintain a highly reliable infrastructure, make sure it's
3 available for our providers, as well as the other end users,
4 as well as the patients to access their data, make sure that
5 it's up 24/7.
6    Additionally, I have responsibility on engaging
7 the clinicians, as well as the end users, on workflow
8 design, making sure that their work is efficient as possible
9 and they could access the data at the right place and the
10 right time, as well as develop new workflows as they come
11 about to make sure that we are addressing clinical need in
12 the right environment.
13    **Q.**  Now, Doctor, when you and I have spoken in the
14 past in describing Epic, I have heard you use the phrase
15 "one record, one patient, multiple doctors."
16    **A.**  Yes.
17    **Q.**  Can you explain what that means?
18    **A.**  I sure can. In today's healthcare system, a
19 doctor A sees patient A, and they create a record of their
20 encounter and a relationship is built. When that patient
21 needs care from a specialist, that specialist creates
22 another record and builds a relationship with that patient.
23 And then further, if that patient needs services at a
24 hospital or at a lab, another medical record is created. As
25 you can see, none of these records talk to one another.

2797

1 There is limited amount of exchange of data. All in all,
2 it's very -- it's not ideal for the patient, as no one
3 clinician has the most up-to-date information on this
4 patient.
5    By creating a one patient/one record, we remove
6 the disparitness of the typical way that we practice
7 medicine, move the patient to the center, with one record,
8 one patient, multiple providers participating in the care of
9 that patient. That enables us to have the right care at the
10 right time with the right data, and overall that -- that
11 improves the overall healthcare outcomes of these -- of
12 these patients.
13    **Q.**  And Dr. Chasin, another phrase I've heard you use
14 when we talked about Epic is "single source of truth." Can
15 you explain what that means?
16    **A.**  Sure. As I said right before that, when you have
17 multiple instances of a patient record, there is no real --
18 we don't know who has the most up-to-date information. If
19 we're all collaborating around a single patient with a
20 single record, we have one single source, one source of
21 truth and one central repository where we can get the most
22 up-to-date, most accurate information to make the most and
23 the best medical decision-making at the right time.
24    **Q.**  And is that just a matter of inconvenience, for
25 example, of having to assemble multiple records, or is this

2798

1  something that has patient care or quality implications?

2      A.  This has both patient care, patient convenience,

3  and improves the overall quality of the experience that the

4  patient is receiving, as well as the confidence and the

5  medical decision-making rendered by the provider.

6      Q.  Now, does St. Luke's also have a website portal

7  where patients can go to access medical records and other

8  information?

9      A.  Yes.  It's called "MyChart."

10     Q.  And what benefits to patients does MyChart

11  provide?

12     A.  MyChart is an application that not only provides

13  lab access, secure email to your doctor, ability to see your

14  past appointments and your upcoming appointments, it allows

15  you to manage your medications, refill those medications.

16  It allows you, really, to treat and delegate access of the

17  elderly patient to improve coordination of care.  But what

18  it really does and what is the changing factor of patient

19  engagement of what we're trying to do is that it allows the

20  patient to become engaged in their care by participating in

21  their care.

22        In the past, patients did not have as much input

23  into their care.  Now, by using this patient portal and an

24  integrated electronic health record, patients could add

25  medications that they are on that they forgot to tell the

2799

1  doctor.  They could add problems that they -- that they came

2  to.  They can upload photos of dermatological disorders and

3  have a doctor take a look at them, and they have a larger

4  engagement in the care, and having patients engaged in their

5  care turns out to be -- have patients have better outcomes

6  and are more responsible for their care.

7      Q.  Now, is St. Luke's the only provider in the state

8  of Idaho with a patient portal?

9      A.  No.

10     Q.  So what is it that, in your view, makes MyChart

11  unique?

12     A.  What makes MyChart unique is the patient

13  engagement factor, allowing patients to actually engage and

14  participate in how care is rendered and their views and

15  their values and their -- and stuff that they forgot.  The

16  doctor becomes more of a partner as opposed to someone that

17  I just go and see.

18     Q.  How much time has St. Luke's spent developing the

19  MyChart patient portal?

20     A.  Over the past three years.  It's very difficult to

21  quantify just the specific MyChart portal, but overall we've

22  spent in employee time between 750,000 and a million hours'

23  worth of time developing this application.

24     Q.  Hours?

25     A.  Hours.

2800

1      Q.  And when a patient -- when a St. Luke's patient

2  goes onto the patient portal to review their medical

3  information, a patient in the Treasure Valley, what's the

4  source of that medical information they're looking at?

5      A.  The source of that medical information is the Epic

6  medical record.

7      Q.  And if a St. Luke's patient in the Treasure Valley

8  goes onto the St. Luke's portal, are they able to view data

9  from medical records other than what's contained in Epic?

10     A.  No.

11     Q.  And why not?

12     A.  The other electronic medical records don't

13  integrate with Epic.

14     Q.  So is there just one St. Luke's patient portal,

15  MyChart?

16     A.  No.  There are actually three.

17     Q.  And what are the three portals?

18     A.  Well, we have -- as we just spoke about, we have

19  the MyChart medical -- MyChart patient portal, which is

20  attached to Epic.  We have the Magic Valley patient portal,

21  which is tied to our Centricity platform.  And with Saltzer

22  we have the ECW patient portal, which is attached to Saltzer

23  and ECW.

24     Q.  So there are three different St. Luke's patient

25  portals?

2801

1      A.  Presently, yes.

2      Q.  So if a Saltzer patient wants to look at medical

3  records from Saltzer through the portal, they have to log

4  into the Saltzer portal?

5      A.  That's correct, yes.

6      Q.  And they won't see -- will they see in that portal

7  information that's contained in St. Luke's records on Epic?

8      A.  No.  If they saw patients in St. Luke's and in

9  Saltzer, they'd have two patient portals.

10     Q.  And so why doesn't St. Luke's just push all those

11  three portals together so that a patient who goes to Saltzer

12  or St. Luke's in the Treasure Valley or St. Luke's in the

13  Magic Valley can see all of their records from those three

14  systems in one place?

15     A.  Well, presently, the three systems don't

16  integrate, and the amount of technological development as

17  well as resources would be prohibitive to do that.

18     Q.  If Saltzer was on Epic, would a Saltzer patient be

19  able to access his or her Saltzer records and St. Luke's

20  records through the same portal?

21     A.  Yes.

22     Q.  Now, Doctor, in your mind, I think we -- the

23  lawyers have used the terms "electronic medical record" and

24  "electronic health record" interchangeably.  In your mind,

25  as somebody who works in this field, is there a difference

2802

1 between an electronic medical record and an electronic
2 health record?
3 **A.  Yes, there is.**
4 **Q.**  Can you explain what the difference is?
5 **A.  Sure.  An electronic medical record is exactly**
6 **analogous to what the term implies.  So it is typically**
7 **capturing an electronic or digital representation of a paper**
8 **chart.  It does mainly contain nursing and physician**
9 **information just based upon that encounter.  While an**
10 **electronic health record is focused on the overall health of**
11 **the patient, from outpatient to inpatient, to surgery, to**
12 **home health, to your case management, dieticians, and**
13 **nutritionists.  The scope and the breadth of an electronic**
14 **health record spans the life of the patient, as well as all**
15 **of the encounters that they will appear.  So an electronic**
16 **health record, when you see a patient, gives you a better**
17 **view of the patient's wishes, their desires, their medical**
18 **status, as well as their path through the health system.**
19 **Q.**  Which do you consider Epic to be?
20 **A.  Epic is an electronic health record.**
21 **Q.**  Now, are you familiar with the EMR system that
22 Saltzer is currently using?
23 **A.  I am.**
24 **Q.**  What system is that?
25 **A.  It's eClinicalWorks.**

2803

1 **Q.**  And how is it that you're familiar with
2 eClinicalWorks?
3 **A.  I've had to support eClinicalWorks from both an IT**
4 **infrastructure perspective, as well as from a partnering**
5 **with the clinicians on workflow perspective.**
6 **Q.**  Is eClinicalWorks what you would consider an
7 electronic medical record or an electronic health record
8 like Epic?
9 **A.  I would consider it an electronic medical record.**
10 **Q.**  Why?
11 **A.  eClinicalWorks --**
12 MS. DUKE:  Your Honor, at this point, we're going
13 to object to beyond the scope of this witness disclosure.
14 THE COURT:  I don't know -- obviously, I don't
15 have access to the report.  I assume we're talking about a
16 Rule 26 expert report?
17 MR. STEIN:  No.  It's a fact witness.
18 MS. DUKE:  No.  It's a fact witness disclosure.
19 THE COURT:  Okay.  I'm sorry.
20 Mr. Stein.
21 MR. STEIN:  Dr. Chasin is in charge of St. Luke's
22 medical records system.  He was disclosed for that purpose.
23 He was deposed about -- he was deposed for a full day by
24 plaintiffs' counsel regarding --
25 THE COURT:  Where are we going?  I mean, how far

2804

1 do you intend to get into the eClinicalWorks?
2 MR. STEIN:  I have just another page of questions
3 about the relationship between the integration of Saltzer
4 system and St. Luke's system.
5 THE COURT:  Ms. Duke, was that not disclosed
6 that he would discuss the --
7 MS. DUKE:  Here is what was disclosed related to
8 medical records:  "Dr. Chasin will be called to testify
9 about the benefits and costs of implementing a systemwide
10 common electronic health record," period.
11 So if it's anything about pros, cons of eClinicalWorks,
12 what it can or can't do, I -- that should have been
13 disclosed.
14 MR. STEIN:  It was disclosed.  A systemwide
15 medical record, by definition, means one record for everyone
16 in the system, the system here being Saltzer and St. Luke's.
17 And this is not a surprise.  Dr. Chasin was deposed by
18 plaintiffs' counsel.  He was asked about Saltzer's record.
19 He was asked about St. Luke's.
20 THE COURT:  Would you restate what is on that
21 disclosure again?
22 MS. DUKE:  Sure, Your Honor.  "Dr. Chasin will be
23 called to testify about the benefits and costs of
24 implementing a systemwide common electronic health record."
25 THE COURT:  Well, I guess my view is that to

2805

1 discuss the benefits of implementing a systemwide electronic
2 health record would necessarily require at least some
3 comparison of what it is replacing, so I'm going to give
4 counsel some leeway, but -- so I'll overrule the
5 objection -- but we're not going to go any further down that
6 road, except just simply to draw out how moving to the Epic
7 and the MyChart -- I think -- is it MyChart?
8 THE WITNESS:  Correct.
9 THE COURT:  -- MyChart provides benefits to the
10 patients.
11 MS. DUKE:  Great.  Thank you, Your Honor.
12 THE COURT:  Mr. Stein.
13 MR. STEIN:  I'm sorry.
14 BY MR. STEIN:
15 **Q.**  Dr. Chasin, have you personally been involved in
16 efforts to create some kind of interface between St. Luke's
17 Epic system and Saltzer's ECW system?
18 **A.  Over the past couple of months, we have**
19 **investigated the ability; however, at this time, there is no**
20 **ability to integrate or interface eClinicalWorks and Epic.**
21 **The best we are able to do is create a -- what is analogous**
22 **to a virtual type of handshake that would allow at one**
23 **specific time a doctor at each site to see minimal data**
24 **on -- on a specific patient.**
25 **Q.**  So does this handshake allow for an integrated,

2806

1  you know, fully integrated exchange of medical information
2  between Saltzer and St. Luke's?
3      **A.**  No.
4      **Q.**  So what capabilities does this handshake
5  arrangement between Saltzer and St. Luke's provide?
6      **A.**  What this provides is a basic framework of core
7  data that has basic demographic information, some
8  administrative information, minimal amount of clinical
9  information, such as allergies, some lab work, as well as
10  some patient problems.  But it's not of every visit.  It is
11  on a specific visit.
12      **Q.**  So if a -- let's say in the current environment a
13  patient goes to see her Saltzer primary care doctor, and
14  then a few months later that same patient goes to see a
15  St. Luke's doctor.  When the St. Luke's doctor pulls up that
16  patient's record in Epic, is there going to be any
17  information in there from the patient's visits to Saltzer?
18      **A.**  No.
19      **Q.**  And if the St. Luke's doctor doesn't know that the
20  patient previously saw a Saltzer physician, does this --
21  what you described as a handshake, is there any way that it
22  will notify the St. Luke's doctor, hey, there is information
23  that you need to go get from Saltzer?
24      **A.**  No.  There is no way of it automatically querying
25  the source record.  What would have to happen is an

2807

1  interaction would have to happen between the doctor and the
2  patient or the nurse of the patient and query them, have
3  they been seen somewhere.  And then the patient and that
4  office would have to call over to Saltzer and initiate that
5  handshake from that area.  It's not -- they can't query it
6  from the receiving.
7      **Q.**  So it's still a manual process?
8      **A.**  It is a manual process, yes.
9      **Q.**  How would this process that you just described be
10  different if Saltzer were on Epic?
11      **A.**  If Saltzer were on Epic, the information would be
12  completely integrated.  When you see that patient, the
13  entire health history of that patient would be present, all
14  the lab work that they had ever done, all the radiological
15  images they had done, all the contemporaneous notes that the
16  patient has been involved in, as well as all the health
17  maintenance information, as well as all of the pending tests
18  or preventive care measures that haven't been done.  You
19  would be able to see referrals that the patient has executed
20  against, as well as care and referrals that have not been
21  completed yet.
22      **Q.**  So can -- in the current environment can Saltzer
23  and St. Luke's physicians make notes in each other's charts
24  about the same patient?
25      **A.**  No.

2808

1      **Q.**  Would they be able to do that if they were on
2  Epic?
3      **A.**  Yes.  It would be one integrated record.
4      **Q.**  And let's say that in the current environment a
5  St. Luke's physician does find out that a patient previously
6  went to Saltzer, and they are able to call Saltzer, initiate
7  this handshake arrangement, what is it that the St. Luke's
8  physician gets in response?
9      **A.**  The St. Luke's physician gets, analogous to what I
10  had said before, a minimal amount of core data, and that
11  core data is administrative and demographic data in order to
12  carry out insurance and know where their coverage is.  They
13  get patient headers on where they've been -- what their
14  medical record number is and stuff like that, as well as
15  minimal clinical information, problems that they currently
16  have, some lab work on a per-visit basis.  It's not all the
17  lab work that they have had.  And they get some patient
18  allergies, some core information in order to try to have the
19  most up-to-date information to render care on that patient.
20      **Q.**  So what -- that sounds like -- you've ticked off a
21  few things.  What isn't St. Luke's getting even with this
22  handshake arrangement?
23      **A.**  Sure.  They're not getting the note on the
24  rationale on why the doctor chose the diagnosis, what
25  medications the patient is on, where their most preferred

2809

1  pharmacy would be, what lab tests they've had a year ago to
2  track and trend.  They don't have health maintenance.  They
3  don't have the same type of preventive care alerts that an
4  integrated record would provide.  And, again, you don't see
5  the full scope of the patient.  All you get is the data that
6  happened in the most recent -- the recent visit.
7      **Q.**  And so, but does not having those things that are
8  missing --I mean, does that have any impact on patient care?
9      **A.**  In my opinion, it has a tremendous amount of
10  impact on patient care.  In order to treat a patient
11  effectively and respectively, you need to have the most
12  up-to-date and most accurate information possible.
13      **Q.**  And so when St. Luke's calls up and is able to
14  initiate this handshake arrangement, at that point can't
15  St. Luke's just take that information and incorporate it
16  into the Epic record so it's there for future reference?
17      **A.**  No.  There is no way to integrate the two records.
18      **Q.**  Now, the court has heard or at least there has
19  been cross-examination questions about a recent announcement
20  by eClinicalWorks that they have purportedly developed some
21  kind of interoperability with Epic.  Are you familiar with
22  that?
23      **A.**  I am familiar with that.
24      **Q.**  And since we're talking here essentially about
25  Epic and eClinicalWorks, should we understand that that

2810

1  means that essentially the problems of communication between
2  Epic and ECW that you've described are basically -- have
3  been addressed or are shortly about to be addressed?
4      **A.** I can't see that the -- the ubiquitous
5  interoperability of these two records are going to be
6  completed in the foreseeable future.
7      **Q.** Well, the capabilities or the limitations that
8  you've described of communication between Epic and
9  eClinicalWorks, do the -- does this recent announcement by
10  eClinicalWorks indicate to you that those problems are
11  likely to be -- are being resolved?
12     **A.** No. In looking at that memo, there are two -- and
13  I have -- I have read it -- there are two types of
14  interoperability. And there is syntactic interoperability
15  and semantic interoperability. And what the difference is
16  is syntactic interoperability is just the ability of two
17  separate systems being able to communicate with one another.
18  And that means they have the same communication protocols, a
19  zero in one system will become a zero in another system, an
20  A and an A. And that's the bare bones of interoperability
21  which that memo is referencing, that ECW and Epic have
22  syntactic interoperability.
23         The next step, which is true interoperability,
24  which I do not see in the foreseeable future, is
25  interoperability that is called semantic interoperability,

2811

1  in which both systems can accurately interpret the data
2  that's coming up and act on it appropriately, so much so
3  that the end users of each system agree that the
4  interpretation is appropriate.
5      **Q.** And on the subject of creating a systemwide
6  record -- perhaps notwithstanding Epic and eClinicalWorks
7  and other systems -- there were some questions raised
8  yesterday about the government's meaningful use regulations.
9  And are you -- in the course of your work, are you generally
10  familiar with those?
11     **A.** Yes, I am.
12     **Q.** And you're -- is it your understanding that
13  St. Luke's and Saltzer and other groups have received what
14  are called "meaningful use dollars" in order to facilitate
15  the development of electronic medical records?
16     **A.** Yes. Meaningful use is a program that doctors and
17  organizations have gone through to address the adoption
18  of electronic health technology.
19     **Q.** And do the meaningful use requirements require
20  that systems that providers adopt meet with certain minimum
21  type of systems?
22     **A.** Meaningful use, one of the bullet points or the
23  goals that you have to achieve with meaningful use is the
24  certified electronic health technology that you're using has
25  to be able to communicate with other systems.

2812

1      **Q.** So doesn't that mean that when everyone is
2  compliant with meaningful use, the types of communication
3  and interoperability issues that you've just described are
4  not going to be an issue anymore?
5      **A.** No. It's left to the individual vendor or program
6  to determine and define what that communication means.
7  Again, so it suffices -- you -- you hit that meaningful use
8  acceptance or credit for it even if you have this
9  rudimentary interoperability.
10     **Q.** So let's switch to another alternative that has
11  been suggested to systemwide integration of St. Luke's and
12  Saltzer's medical records, which is the Idaho Health Data
13  Exchange.
14     **A.** Yes.
15     **Q.** This is the organization you're still on the board
16  of?
17     **A.** Yes, I am.
18     **Q.** What is the Idaho Health Data Exchange?
19     **A.** The Idaho Health Data Exchange is a repository
20  of health information for the state of Idaho.
21     **Q.** Is it an electronic medical record?
22     **A.** No.
23     **Q.** So what is the relationship between the Idaho
24  Health Data Exchange, this repository that exists, and
25  providers' electronic medical records?

2813

1      **A.** Well, the Idaho Health Data Exchange has bare
2  bones, very much scaled-down information from an -- a
3  completely electronic health record. It essentially will
4  have the same information that we spoke about earlier and
5  with this virtual handshake would be -- it constitutes the
6  same information.
7      **Q.** Now, apart from your serving on the board, does
8  St. Luke's support the Idaho Health Data Exchange?
9      **A.** Yes.
10     **Q.** Financially?
11     **A.** Financially, yes.
12     **Q.** Why?
13     **A.** Having the -- having some data to help with
14  medical decision-making of a patient is better than having
15  none. It's important as a clinician and as a health system
16  supporting our community to provide at least minimal data,
17  where available, to help clinicians render appropriate
18  clinical care.
19     **Q.** So is every provider in the state of Idaho a
20  participant in the Idaho Health Data Exchange?
21     **A.** No.
22     **Q.** And if a provider doesn't participate in the Idaho
23  Health Data Exchange, is there -- is information from their
24  records available to other providers through the exchange?
25     **A.** No.

2814

1    **Q.** Has Saltzer ever been a member of the Idaho Health
2  Data Exchange?
3        **A.** **No, they have not.**
4        **Q.** So even before St. Luke's acquired the Saltzer
5  practice, did St. Luke's have any ability to access any
6  records for services provided by Saltzer doctors at their
7  clinic?
8        **A.** **No.**
9        **Q.** And so if Saltzer is not a member of the Idaho
10  Health Data Exchange, does St. Luke's have any ability to
11  get information from Saltzer through the Idaho Health Data
12  Exchange?
13       **A.** **No.**
14       **Q.** And what type -- generally, again, what type of
15  information is and is not available to St. Luke's from other
16  providers through the Health Data Exchange?
17       **A.** **The information that's available is the same as**
18  **would be in this virtual handshake.  It would be some**
19  **demographic information, some administrative information,**
20  **limited clinical information, such as allergies, problems,**
21  **and some medications.**
22       **Q.** What about things like the doctor's notes and
23  things that they would keep in their chart?
24       **A.** **That would not be available, nor would any health**
25  **maintenance or long-term lab work, or radiological studies**

2815

1  are not housed in the Health Data Exchange.
2        **Q.** Okay.  So if I'm a doctor or a hospital and I
3  participate in the Health Data Exchange and a patient comes
4  to me, how do I know that there are other records for that
5  patient that I might be able to access through the Health
6  Data Exchange?
7        **A.** **You would have to ask the patient.**
8        **Q.** And then if the patient tells you, then what do
9  you have to do?
10       **A.** **Then you would have to query, query the database**
11  **on a -- through their -- through their portal.**
12       **Q.** When you say "query the database," you mean you
13  have to go and query the Health Data Exchange?
14       **A.** **You have to log into their -- their provider**
15  **portal and search for that patient.**
16       **Q.** Okay.  So let's say the provider does that and
17  then they get some information, they can pull that
18  information off the exchange and then integrate that into
19  their own medical record; right?
20       **A.** **No.**
21       **Q.** Why not?
22       **A.** **Right now, the way that -- the only way -- there**
23  **is no integration between the Health Data Exchange and Epic.**
24       **Q.** And so just -- can you explain to the court, just
25  generally, when we talk about querying the Health Data

2816

1  Exchange, what is it that the provider gets?  I mean, are
2  they getting a fax?  Is there a paper record?  Is it a
3  download?  What are they getting?
4        **A.** **It's a window in their browser that they are able**
5  **to see what was done by -- what is -- what was done by**
6  **another provider in care before they've received it.**
7        **Q.** So it just -- it's something they can view in
8  their Internet browser?
9        **A.** **Yes.**
10       **Q.** And can they make notes on the records and things
11  like that?
12       **A.** **No.**
13       **Q.** And what happens when they close their web
14  browser?
15       **A.** **Information goes away, and they are back to their**
16  **own record.**
17       **Q.** If Saltzer were to join the Idaho Health Data
18  Exchange, would that provide the same benefits to Saltzer
19  and St. Luke's as if Saltzer were on Epic?
20       **A.** **No.  The current virtual handshake created by the**
21  **interoperability between Saltzer and Epic is the same type**
22  **of information that you would get from a connection between**
23  **St. Luke's and the Idaho Health Data Exchange.**
24       **Q.** So on this subject of, again, an integrated
25  record, one of the things the court also heard from

2817

1  Dr. Peterman of Primary Health about some work that they've
2  done with St. Luke's.  And so are we to understand that
3  St. Luke's currently has an electronic health record
4  exchange with Primary Health?
5        **A.** **No.**
6        **Q.** So what exactly is the degree of integration, if
7  any, between St. Luke's medical records and Primary Health
8  medical records?
9        **A.** **The degree of any integration is not between our**
10  **electronic health record.  It is a sending of laboratory**
11  **data and limited radiological studies to his facility.**
12  **That's the extent the integration goes.**
13       **Q.** Lab and imaging?
14       **A.** **Lab and imaging.**
15       **Q.** And is that an exchange?  In other words, they get
16  St. Luke's lab and imaging data, and St. Luke's gets their
17  lab and imaging data?
18       **A.** **No, it's just a send.**
19       **Q.** Who sends who?
20       **A.** **We send it -- I'm sorry.  St. Luke's sends it to**
21  **Primary Health.**
22       **Q.** And does St. Luke's get back lab and imaging
23  information from Primary Health?
24       **A.** **No.**
25       **Q.** And do you consider the arrangement that St.

2818

1 Luke's and Primary Health have with respect to lab and
2 imaging to essentially be equivalent to having a fully
3 integrated medical record?
4     **A. No, it's not a fully integrated medical record.**
5     **Q.** So if a primary -- even with this interface that
6 Dr. Peterman described, if a Primary Health patient comes in
7 to St. Luke's and the St. Luke's doctor pulls up the patient
8 record in Epic, is there going to be any information in
9 there from any visits that the patient has had at Primary
10 Health?
11     **A. No.**
12     **Q.** Just before we move off of the issue of the Idaho
13 Health Data Exchange, is the data in there -- when a
14 participant goes to query the Idaho Health Data Exchange,
15 and there is information from another provider, is the one
16 who is doing the query, are they getting real-time data from
17 the other provider's medical record?
18     **A. No, they're not.**
19     **Q.** So why not? I mean, how -- how old or recent is
20 the data?
21     **A. It's very -- it's very difficult to determine.**
22 **Each organization has their own way that they've defined how**
23 **frequently they will set up. Some are weekly. Some are**
24 **biweekly. That's left up to the individual organization.**
25     **Q.** And what are the long-term plans for the Idaho

2819

1 Health Data Exchange?
2     **A. Well, right now, the federal grant for HITECH runs**
3 **out in March. The Idaho Health Data Exchange is working**
4 **towards a sustainability model, but that's yet -- that's yet**
5 **to be seen. So that is the fate or the -- what is to be the**
6 **Idaho Health Data Exchange we'll know after March.**
7     **Q.** When you say "sustainability" you mean financial
8 sustainability?
9     **A. Financial sustainability, yes.**
10     **Q.** Just one last thing I would like to touch on
11 that's been broached as, again, another alternative to
12 having St. Luke's and Saltzer affiliated is the affiliate
13 EMR program. And you're familiar with that?
14     **A. I am, yes.**
15     **Q.** Can you just describe briefly what the affiliate
16 EMR program is?
17     **A. Sure. I spoke earlier about the benefits of being**
18 **on an integrated electronic health record. And we feel that**
19 **encouraging other physicians to participate in the care of**
20 **the patient is not only going to improve their practice as a**
21 **physician, but it's also going to improve the care of the**
22 **patient receiving care because that patient and that**
23 **physician have the most up-to-date, most recent data**
24 **available.**
25     **Q.** And so what is the affiliate EMR -- how does the

2820

1 affiliate EMR program advance that?
2     **A. By providing services and our myStLukes record,**
3 **expanding that footprint improves that.**
4     **Q.** Expanding it to independent providers?
5     **A. Independent providers, yes.**
6     **Q.** And is it St. Luke's plan as part of the affiliate
7 EMR program to pay all of the costs that are involved for
8 having independent providers in the community adopt Epic?
9     **A. No.**
10     **Q.** And why not?
11     **A. The Stark and anti-kickback laws**
12 **prevent -- prohibit us from doing that.**
13     **Q.** And do they prevent -- is it your understanding
14 they prevent St. Luke's from providing any financial
15 assistance?
16     **A. No. We have agreed to provide assistance for the**
17 **startup licensure costs.**
18     **Q.** When you say "startup licensure costs," would that
19 be like the initial cost to purchase the Epic software?
20     **A. Yes.**
21     **Q.** What is the degree of subsidy that St. Luke's is
22 able to provide for that?
23     **A. We've agreed that 85 percent, the maximum that we**
24 **are allowed to subsidize, we would.**
25     **Q.** Now, if an independent provider were to adopt

2821

1 Epic, would there just be that one cost associated
2 with using the Epic system, in other words, just buying the
3 software?
4     **A. No.**
5     **Q.** Are there ongoing maintenance costs?
6     **A. Yes, there are.**
7     **Q.** And is St. Luke's affiliate EMR program going to
8 cover ongoing maintenance?
9     **A. No.**
10     **Q.** What about if a provider needs to update their
11 computer hardware in order to be able to run the Epic
12 platform, is St. Luke's going to be able to provide
13 financial assistance for that?
14     **A. No.**
15     **Q.** What about -- what about the time that providers
16 have to spend on training, you know, their staff and the
17 time they have to spend getting up to speed? Is St. Luke's
18 going to compensate independent providers for any time or
19 income that's lost from that?
20     **A. No.**
21     **Q.** So what is the status of the affiliate EMR
22 program?
23     **A. The affiliate EMR program has just been approved**
24 **within the last 60 days.**
25     **Q.** What does that mean? Does that mean that

2822

1  St. Luke's is getting ready to roll the Epic system out to
2  everybody?
3      **A. No. It means that we now can start building an**
4  **infrastructure, developing a plan, getting a team together,**
5  **as well as a group to pilot this in order to do a proof of**
6  **concept.**
7      **Q.** And is there a group that is going to be piloting
8  the Epic platform --
9      **A. Yes.**
10     **Q.** -- for the affiliate EMR program?
11     **A. Yes.**
12     **Q.** Who is that group?
13     **A. It is Women's Health Associates.**
14     **Q.** And how many providers are in that group?
15     **A. There are five physicians.**
16     **Q.** And have the costs to St. Luke's of subsidizing
17 Epic for that particular group of five providers been
18 estimated?
19     **A. Yes.**
20     **Q.** And what are the costs to St. Luke's just for that
21 five-provider group?
22     **A. The cost to build out and kick off the pilot**
23 **program equate to approximately $1.4 million.**
24     **Q.** And does that $1.4 million include the costs
25 that -- of the subsidy for the software that St. Luke's is

2823

1  providing?
2      **A. Yes.**
3      **Q.** So how much is the Women's Health group going to
4  have to pay to access Epic even after the St. Luke's
5  subsidy?
6      **A. Around $20,000 per provider.**
7      **Q.** So would that be meaning $20,000 times five?
8      **A. Yes.**
9      **Q.** Okay. So $100,000 for the group just for the
10 software?
11     **A. Yes.**
12     **Q.** And is that $20,000 cost, is that unique to
13 Women's Health, or is that -- is that a general estimate for
14 what it would cost on a per-provider basis for others who
15 would want to participate in the affiliate EMR program?
16     **A. It is a general estimate of what it would cost to**
17 **participate in a program like that.**
18     **Q.** So if a 40-person group like Saltzer wanted to
19 obtain Epic through the affiliate EMR program, they're
20 looking at about $800,000 just in software costs?
21     **A. Yes.**
22     **Q.** And on top of that, they'd have to pay ongoing
23 maintenance?
24     **A. Yes.**
25     **Q.** Computer hardware?

2824

1      **A. Yes.**
2      **Q.** Training and any loss of income or productivity
3  resulting from the switch to a new system?
4      **A. That's correct, yes.**
5      **Q.** And you mentioned this pilot program. When is it
6  that St. Luke's is currently anticipating, assuming that the
7  pilot were to work, that Epic would be made available to
8  purchase by other independent providers in the community?
9      **A. We anticipate the pilot program going live around**
10 **the fourth quarter of the calendar year of 2014, and if all**
11 **goes well and -- we would deploy and open it up for -- in**
12 **2015 for other independent providers.**
13     MR. STEIN: No further questions.
14     THE COURT: Cross.
15     MR. PERRY: Good morning, Your Honor. Michael
16 Perry for the Federal Trade Commission.
17     Defendants have designated portions of Dr. Chasin's
18 deposition as AEO, but I think my examination is largely
19 going to cover the same topics, and I think we can keep the
20 courtroom open and address any AEO issues as they arise.
21     THE COURT: Excellent. Thank you, Mr. Perry.
22             CROSS-EXAMINATION
23 BY MR. PERRY:
24     **Q.** Dr. Chasin, you recall that you were deposed in
25 this case?

2825

1      **A. Yes.**
2      **Q.** Are you aware that St. Luke's designated your
3  deposition as testimony on behalf of St. Luke's as an
4  organization for certain topics?
5      **A. No.**
6      MR. PERRY: I'll represent to the court and to
7  Dr. Chasin that St. Luke's designated Dr. Chasin's prior
8  deposition testimony as 30(b)(6) testimony on topics which
9  included -- and I'm paraphrasing -- St. Luke's
10 implementation and use of an electronic medical records
11 system.
12 BY MR. PERRY:
13     **Q.** Dr. Chasin, you mentioned when you were at the
14 Bon Secours system you developed what I believe you called
15 an "enterprisewide EHR system"; is that correct?
16     **A. That's correct.**
17     **Q.** St. Luke's has not yet fully implemented an
18 enterprisewide EHR system, has it?
19     **A. No.**
20     **Q.** St. Luke's is in the process of doing so; right?
21     **A. That's correct.**
22     **Q.** In the Treasure Valley specifically, St. Luke's
23 has implemented this Epic system for ambulatory settings; is
24 that right?
25     **A. No.**

2826

1  **Q.** St. Luke's has not implemented Epic for the
2  ambulatory settings?
3  **A.** **They have, but it goes beyond that.**
4  **Q.** Okay. And the ambulatory setting, that's --
5  speaking about that specifically, that's primarily physician
6  offices and clinics; is that right?
7  **A.** **The ambulatory aspect; that's correct.**
8  **Q.** St. Luke's has not yet implemented Epic even in
9  the Treasure Valley for its inpatient facilities; correct?
10 **A.** **That's correct.**
11 **Q.** St. Luke's has not yet implemented Epic for the
12 emergency department?
13 **A.** **That's correct.**
14 **Q.** St. Luke's has not yet implemented Epic for
15 nursing documentation; is that correct?
16 **A.** **Can you -- depending upon which nursing**
17 **documentation you're referring to. Is it ambulatory nursing**
18 **documentation or is it inpatient nursing documentation?**
19 **Q.** Inpatient.
20 **A.** **Then that is correct.**
21 **Q.** St. Luke's has not yet implemented the inpatient
22 Epic module for perioperative; is that correct?
23 **A.** **That's correct.**
24 **Q.** The obstetrical unit?
25 **A.** **That's correct.**

2827

1  **Q.** Anesthesia?
2  **A.** **Correct.**
3  **Q.** Home health?
4  **A.** **Correct.**
5  **Q.** Interventional cardiology?
6  **A.** **Correct.**
7  **Q.** And medical oncology?
8  **A.** **Correct.**
9  **Q.** At your deposition, you testified that you don't
10 anticipate these inpatient components of the Epic system
11 will be implemented until September or November of 2015; is
12 that right?
13 **A.** **That's correct.**
14 **Q.** And even that September or November of 2015 date
15 won't include some components of the Epic system, such as
16 interventional cardiology?
17 **A.** **Correct.**
18 **Q.** In fact, isn't it true that you aren't even sure
19 whether inpatient will be fully implemented by this 2015
20 target date?
21 **A.** **That's correct.**
22 **Q.** Let's talk about the Magic Valley. As of your
23 deposition, there was not even a target date for
24 implementing Epic in the Magic Valley; is that correct?
25 **A.** **That's correct.**

2828

1  **Q.** And that is because, at least in part, you first
2  need to see how the Treasure Valley implementation goes;
3  correct?
4  **A.** **That's correct.**
5  **Q.** In fact, you explained at your deposition that the
6  Magic Valley implementation hasn't even been budgeted yet;
7  is that correct?
8  **A.** **That's correct.**
9  **Q.** And regardless, you are confident that the Magic
10 Valley implementation will be sometime later than 2017;
11 correct?
12 **A.** **Correct.**
13 **Q.** St. Luke's Magic Valley is currently on an EMR
14 system called Centricity; is that right?
15 **A.** **Their ambulatory, yes.**
16 **Q.** That's a different system than the Epic system
17 that St. Luke's is implementing in the Treasure Valley
18 currently?
19 **A.** **And that is also different than the system on the**
20 **inpatient.**
21     THE COURT: Could you get a little closer to the
22 microphone?
23     THE WITNESS: Yes.
24 BY MR. PERRY:
25 **Q.** At some point in your direct examination you

2829

1  mentioned the phrase "foreseeable future" on a different
2  topic. Is it fair to say that you don't know whether
3  St. Luke's will be able to implement a systemwide electronic
4  health record for the foreseeable future?
5  **A.** **No, that's not correct.**
6  **Q.** You know it won't be until at least 2017 at the
7  earliest; correct?
8  **A.** **No, that's not correct.**
9  **Q.** Is it your testimony that St. Luke's will have a
10 systemwide electronic health record before 2017?
11 **A.** **We will start to build and develop our electronic**
12 **health system before 2017.**
13 **Q.** Is it your testimony that St. Luke's will have
14 implemented a systemwide electronic health record before
15 2017?
16 **A.** **No.**
17 **Q.** And when you're describing systems like the Idaho
18 Health Data Exchange and several other alternatives that you
19 were asked about on direct examination, you're describing
20 what's available today, not sometime in the 2017 or beyond
21 time frame; is that correct?
22 **A.** **That's correct.**
23 **Q.** You mentioned on direct that Saltzer uses an
24 electronic medical records system known as eClinicalWorks;
25 is that right?

2830

1    **A.**  Yes.

2    **Q.**  And there are a number of physician groups in the

3  Treasure Valley that use eClinicalWorks; is that correct?

4    **A.**  Yes.

5    **Q.**  And I believe you mentioned on direct that

6  eClinicalWorks is the system that Primary Health uses?

7    **A.**  Yes.

8    **Q.**  At your deposition, you testified that no work has

9  been done to get Saltzer -- the Saltzer physicians on Epic;

10  correct?

11    **A.  Correct.**

12    **Q.**  And you have not even looked at how long that

13  would take?

14    **A.  That's correct.**

15        MR. PERRY:  Mr. Oxford, will you display the

16  demonstrative Exhibit 3005.

17        MS. DUKE:  Your Honor, can we turn the main screen

18  on?

19        THE COURT:  Yes.

20        MS. DUKE:  Thank you.

21  BY MR. PERRY:

22    **Q.**  Dr. Chasin, you discussed on direct a recent

23  announcement that eClinicalWorks and Epic have worked

24  collaboratively to make their EHR systems interoperable?

25    **A.**  Yes.

2831

1    **Q.**  Is this the announcement that you'd mentioned on

2  direct?

3    **A.**  Yes.

4    **Q.**  And I think you used the term "syntactic

5  interoperability" on your direct?

6    **A.**  Yes.

7    **Q.**  Nothing in this announcement says anything about

8  "syntactic interoperability," does it?

9    **A.  No.**

10    **Q.**  That was just your assumption about how the system

11  worked?

12    **A.  Actually, referring to "XDR" and "XDS" is**

13  **referring to that type of interoperability.**

14    **Q.**  You are obviously not privy to what strategic

15  plans eClinicalWorks may have; correct?

16    **A.  (No audible answer.)**

17    **Q.**  Is that a no?

18    **A.  That's a no.**

19    **Q.**  Thank you.

20        On direct you discussed St. Luke's affiliate EHR

21  program; is that correct?

22    **A.**  Yes.

23    **Q.**  And St. Luke's wishes to make the Epic ambulatory

24  EMR available to independent physician practices as quickly

25  as possible; is that right?

2832

1    **A.**  Yes.

2    **Q.**  And an independent physician participating in the

3  affiliate EMR program would be utilizing the Epic system in

4  exactly the same way as an employed St. Luke's Clinic

5  physician would be; correct?

6    **A.  That's correct.**

7    **Q.**  You discussed some of the cost estimates regarding

8  the affiliate EMR program on direct.  I just want to make

9  sure I have some of the details correct.  At your deposition

10  you testified that the estimated cost for a physician in the

11  affiliate EMR program would be 30- to $35,000 for the

12  initial license; is that right?

13    **A.  That's correct, yes.**

14    **Q.**  And then you estimated an ongoing maintenance of

15  2500 to 3500 dollars per year; is that right?

16    **A.  That's right, yes.**

17    **Q.**  And for independent practices that participate in

18  the affiliate EMR program, St. Luke's has decided that it

19  will just defray 85 percent of that 30- to $35,000 upfront

20  cost?

21    **A.**  Yes.

22    **Q.**  And you mentioned some ongoing costs that an

23  independent group like Saltzer would have if it participated

24  in this program.  And you discussed maintenance costs.  I

25  think that was the 2500-to-3500-dollar estimate?

2833

1    **A.  Yes.**

2    **Q.**  If a physician group like Saltzer that currently

3  has an EMR system, if it switched to the affiliate program,

4  it would save whatever they're currently paying to

5  eClinicalWorks, or whoever their vendor is for similar

6  maintenance costs, to the extent that there are any;

7  correct?

8    **A.  That's correct.**

9    **Q.**  I think you also mentioned the cost of switching

10  computer systems or upgrading hardware.  Do you recall that?

11    **A.  I do, yes.**

12    **Q.**  And, again, if a group like Saltzer that already

13  has an existing EMR system, if it switched to the -- it

14  would incur costs, presumably, upgrading hardware, switching

15  computers, even if it stayed on its existing system; is that

16  correct?

17    **A.  I don't know if I understand your question.**

18    **Q.**  If an organization like Saltzer that has an

19  existing EMR system, they, presumably, if they needed to

20  update hardware or switch computers, they would incur those

21  costs under their existing system as well; correct?

22    **A.  Yes.**

23    **Q.**  You mentioned on direct the Idaho Health Data

24  Exchange.  Is that often abbreviated as "IHDE"?

25    **A.  Yes, it is.**

2834

1    Q.  The goal of the IHDE is to allow different
2  healthcare providers, including physicians and hospitals, to
3  allow their electronic medical records systems to interact
4  and exchange information; correct?
5    A.  That is their goal, yes.
6    Q.  St. Luke's is building an interface to the IHDE
7  which will facilitate data transfer and better coordination
8  of care as clinicians will have access to critical
9  information from other places care is rendered, such as
10  Saint Al's.  Is that accurate?
11    A.  That's accurate.
12    Q.  And, Dr. Chasin, you see the IHDE as an
13  institution that can help allow the facilitation and review
14  of patient care data across different providers; correct?
15    A.  Correct.
16    Q.  And IHDE can help facilitate the coordination of
17  care among providers not on the same EMR; right?
18    A.  Correct.
19    Q.  You mentioned St. Luke's MyChart portal and
20  several other portals that apparently are in place at
21  St. Luke's.  Through the IHDE, patients can get access to
22  their electronic health record through a portal even if they
23  receive care from a provider not within the St. Luke's
24  Health System; is that correct?
25    A.  That's incorrect.

2835

1    Q.  Mr. Oxford, can you display cross Exhibit 3016.
2  On the first page.
3    Dr. Chasin, Exhibit 3016 is an entry from Dr. Pate's
4  Prescription for Change blog, dated July 23rd, 2013.  Do you
5  recognize this exhibit?
6    A.  I do.
7    Q.  And other than the introductory paragraph that's
8  currently blown up on the screen, did you write what's
9  written in this exhibit?
10    A.  Yes.
11    Q.  And if you turn to the second page, the last four
12  paragraphs, please, Mr. Oxford.
13    You can see in the second paragraph that's displayed on
14  the screen that you're discussing in this blog post
15  St. Luke's MyChart tool.  Do you see that?
16    A.  Yes, yes.
17    Q.  And then the last two paragraphs on this page, you
18  write -- you ask a rhetorical question and then
19  answer -- I'll read that for you.  The question --
20    MR. STEIN:  I'm sorry.  It's disappeared from my
21  screen.
22    THE COURT:  There.  It should be back up.  Is it
23  on your screen now, Mr. Stein?
24    MR. STEIN:  It is, although I can't -- if we could
25  call it up again.  I just can't read what's there.

2836

1  Thank you.
2  BY MR. PERRY:
3    Q.  "Question:  What if you receive care from
4      a provider not within the St. Luke's Health
5      System, can you get access to your record?
6      "Answer:  The answer is yes.  St. Luke's has
7      partnered with the Idaho Health Data Exchange
8      to build a connection to our electronic health
9      record for clinicians not practicing on
10      myStLukes to ensure that providers can access
11      the most accurate medical information so the
12      most accurate diagnoses and treatments can be
13      rendered."
14    Did I read your blog post correctly?
15    A.  No.  You -- your question was referring to
16  patients --
17    Q.  My question is:  Just now, did I read your blog
18  post correctly?
19    A.  Yes.
20    Q.  Thank you.  To the best of your knowledge,
21  Dr. Chasin, the costs for a physician group that -- to join
22  the IHDE for an independent physician is less than $200 a
23  month; correct?
24    A.  I think so, yes.
25    Q.  And the interface through IHDE is easy to use;

2837

1  right?
2    A.  Relatively, yes.
3    Q.  I believe in your direct, you mentioned that
4  St. Luke's participates in the Idaho Health Data Exchange
5  because you believe -- and I'm paraphrasing your
6  testimony -- that it's important to have some data
7  available.  I believe you used -- maybe you used the term
8  "virtual handshake"; is that correct?
9    A.  Yes, that's correct.
10    Q.  But isn't it true, Dr. Chasin, that the same data
11  is available through the IHDE as through Epic?
12    A.  Can you clarify what "same data" means?
13    Q.  I'm asking you.  Isn't it true that the same data
14  is available through the IHDE as through Epic?
15    MR. STEIN:  Your Honor, I would just object to the
16  form.  I think the issue is -- is the question whether
17  everything in Epic is available on the Idaho Health Data
18  Exchange or whether for those common -- for those things
19  that are available in both it's the same data.  I think
20  those are two different questions.
21    THE COURT:  Mr. Perry, if you could clarify.
22    MR. PERRY:  Let me rephrase and ask a slightly
23  different question.
24    THE COURT:  I know we're probably past where we
25  take the break, but I'll let you pick a spot.

2838

1    MR. PERRY:  Okay.  I think it will be -- I should
2    be completed relatively shortly.
3    THE COURT:  All right.
4    BY MR. PERRY:
5    **Q.**  Dr. Chasin, you remember being deposed in this
6    case?
7    **A.**  Yes.
8    **Q.**  And do you recall that you were asked a question,
9    "Is the same data available through the IHDE as through
10   Epic?"  Do you recall that?
11   **A.**  Yes.
12   **Q.**  And do you recall providing the answer, "Yes"?
13   **A.**  **I don't recall that, no, but --**
14   **Q.**  Is the answer yes?
15   **A.**  **It's -- it's more complicated than that.  There is**
16   **the subset.  There is a subset of data available on the**
17   **Idaho Health Data Exchange that is from the Epic record,**
18   **yes.  Is it as comprehensive?  Absolutely not.**
19   MR. PERRY:  Mr. Oxford, can you play video clip
20   MC24.  For the record, this is Dr. Chasin's deposition,
21   page 35, lines 20 through 22.
22   (Video clip played as follows:)
23   **Q.**  "But is the same data available through
24   the IHDE as through Epic?
25   **A.**  "Yes."

2839

1    (Video clip concluded.)
2    MR. PERRY:  Nothing further, Your Honor.
3    THE COURT:  Mr. Stein, how much redirect do you
4    have?
5    MR. STEIN:  Maybe five minutes.
6    THE COURT:  Why don't we just take the break, and
7    then we'll come back.
8    Counsel, just so we're clear, I'm going to take just a
9    moment now since this may affect you in your planning.  The
10   issue arose concerning taking the -- or rather using the
11   deposition of Dr. Sonnenberg, who I understand was a former
12   director of Saint Al's at the time his deposition was taken,
13   but it was subsequently learned by Saint Al's that he was at
14   the same time actively negotiating with St. Luke's and
15   potentially moving to St. Luke's, which, ultimately, I guess
16   did not happen, and he is now independent.  St. Luke's has
17   indicated they want to take the deposition or to use the
18   deposition of Dr. Sonnenberg.
19   The rule itself provides, under Rule 32(a)(3), that an
20   adverse party may use for any purpose the deposition of a
21   party or anyone who when deposed was the party's director.
22   Technically, that would seem to be satisfied since at the
23   time of the deposition he was the -- a director of Saint
24   Al's.
25   The problem is, of course, that the rule I don't think

2840

1    envisioned a situation where the person, although a
2    director, was actually negotiating with the party opponent
3    in the same litigation; and, therefore, I'm not sure that
4    that really is at least pursuant to the spirit of the rule,
5    particularly given the Ninth Circuit's statement that there
6    is always a preference for live testimony.
7    I'm mindful of Rule 1, which directs the court to
8    administer and construe the rules in a way which will
9    effectuate the speedy, inexpensive, and just resolution of
10   all matters.  I think, to some extent, all three of those
11   are in play here.  I think in terms of what is just, I'm not
12   sure that Rule 32(a)(3) should be applied in a way so as to
13   preclude, for example, Saint Al's from being able to
14   cross-examine Dr. Sonnenberg in the same way they would if
15   he were called as a live witness.  On the other hand, there
16   is a question of expense.  The video deposition is
17   available.
18   I'm going to resolve the issue by allowing
19   Dr. Sonnenberg's deposition to be played, but on the
20   condition that he can be subpoenaed at any time between now
21   and close of business on Monday and subject to
22   cross-examination on the issues that I think could have been
23   covered if Saint Al's had known of the issue.  If he is not
24   available, then his -- I'm not going to allow his deposition
25   to be played.  But I am assuming that we can make him

2841

1    available.  Someone will have to subpoena him.  I'll allow
2    you all to work that out.
3    He will be -- if St. Luke's chooses to play the
4    deposition, that, in essence, will be the direct
5    examination, and then Saint Al's will have the opportunity
6    to cross-examine him as a live witness, immediately on the
7    heels of that, if possible, but that's going to require a
8    little, I suppose, juggling of the existing schedule.
9    That's the way I'm going to resolve the matter, which I
10   think tries to be consistent with the spirit of Rule 32(a)
11   and yet accomplish the aforestated goals of Rule 1.
12   All right, Counsel, I will allow you, then, to
13   effectuate that plan.  It will take a little bit of give and
14   take here.
15   MS. DUKE:  Thank you, Your Honor.
16   THE COURT:  We'll be in recess.
17   (Recess.)
18   *****COURTROOM REMAINS OPEN TO THE PUBLIC*****
19   THE COURT:  For the record, I'll advise Dr. Chasin
20   that you are still under oath, sir.
21   Mr. Stein, you may conduct your redirect.
22   MR. STEIN:  Thank you, Your Honor.
23   REDIRECT EXAMINATION
24   BY MR. STEIN:
25   **Q.**  Dr. Chasin, which is the most current and accurate

2842

1  per-provider estimate for the affiliate EMR?  Is it the 85
2  percent?
3          MR. PERRY:  Objection, Your Honor.  Dr. Chasin
4  provided his testimony -- deposition testimony in March.
5  After that point, plaintiffs served a notice for a
6  Rule 30(b)(6) deposition.
7      At that point, defendants took the opportunity to
8  review Dr. Chasin's testimony, and rather than make a
9  representative available on behalf of St. Luke's to provide
10  updated testimony, they elected to designate his prior
11  deposition testimony that had been -- you know, that was
12  earlier in this case.  So I think plaintiffs really haven't
13  had an opportunity to take any sort of new, updated
14  information since the time of his deposition.
15          THE COURT:  Mr. Stein.
16          MR. STEIN:  Well, Your Honor, Dr. Chasin has
17  already testified that the -- that the amount for the
18  affiliate program after subsidy is $20,000, and then they
19  played a clip from his deposition however long ago.  I'm
20  simply trying to clarify which of those is the accurate
21  figure.  One was an estimate a while ago, and one is the
22  current figure.  And that was -- that was from his direct.
23          THE COURT:  But if I understand Mr. Perry's
24  objections that he was -- well, not he -- that Saint Al's or
25  the FTC or the State of Idaho was not provided the

2843

1  opportunity to redepose or to depose Dr. Chasin.
2          MR. PERRY:  Let me clarify there.  We served a
3  Rule 30(b)(6) notice.  There were a number of topics.
4  Defendants designated three representatives to provide live
5  30(b)(6), testimony and those witnesses' depositions were
6  taken for the topic that relates to EMR systems that I
7  alluded to in my examination.  They first took the
8  opportunity to review the deposition testimony that
9  Dr. Chasin had already provided and then decided to
10  designate that retroactively as 30(b)(6) testimony on behalf
11  of the -- St. Luke's as an organization.
12          THE COURT:  But why does that exclude or limit
13  Dr. Chasin in responding to counsel's question?
14          MR. PERRY:  My understanding of the question was
15  that he is asking for updated information, you know, that's
16  happened since the time of his deposition.  His deposition
17  took place in March.  It was one of the earlier depositions
18  in this case, and to the extent it calls for information
19  that we could have had an opportunity to ask Dr. Chasin
20  about or another representative of St. Luke's, I think it's
21  improper in light of the decision-making with regard to the
22  30(b)(6) notice.
23          MR. STEIN:  Your Honor, the 30(b)(6) notice was
24  issued, I think, within a couple of weeks of Dr. Chasin's
25  deposition.  And, really, what we're talking about here is

2844

1  clarifying the record so we don't have a misleading
2  inference.  He was asked at his deposition:  What is the
3  estimated cost for X?  He testified today, based on his
4  knowledge, what the actual cost is to a provider.  And I'm
5  simply trying to avoid a situation where --
6          THE COURT:  Well, I'm going to allow it.  I'll
7  overrule the objection.  I understand the concern, but the
8  problem is there is a dynamic here.  If there is some
9  specific prejudice, then perhaps I'll give counsel some
10  leeway to explore the issue further.  But I think at this
11  point, I think it's -- particularly, where the witness is
12  simply clarifying his prior testimony, I'll allow it.
13      Go ahead and proceed, Mr. Stein.
14  BY MR. STEIN:
15      Q.  So, Dr. Chasin, can you clarify the relationship
16  between the estimate of -- that St. Luke's would be able to
17  subsidize 80 to 85 percent of a total 30- to $35,000 cost
18  and your testimony that the per-provider cost currently
19  after the subsidy is estimated to be $20,000?
20      A.  That's correct.
21      Q.  Which is the current estimate?
22      A.  It's $20,000.
23      Q.  And Mr. Perry asked you whether Saltzer has been
24  integrated on Epic yet, and I think you said the answer is
25  no; right?

2845

1      A.  That's correct, they haven't.
2      Q.  Does that have anything to do with the court's
3  order on the preliminary injunction that St. Luke's limit
4  the integration of Saltzer pending this trial?
5      A.  That's -- yes, sir.  That's correct.
6          MR. STEIN:  No further questions.
7          THE COURT:  Any recross?
8          MR. PERRY:  Nothing further, Your Honor.  Thank
9  you.
10          THE COURT:  All right.  Dr. Chasin, you may step
11  down.
12      Call your next witness.
13          MR. STEIN:  Your Honor, our next witness will be
14  Dr. Randell Page.
15          THE COURT:  All right.
16      Dr. Page, would you please step before the clerk, be
17  sworn as a witness, and then follow Ms. Gearhart's
18  directions from there.
19                  RANDELL PAGE,
20  having been first duly sworn to tell the whole truth,
21  testified as follows:
22          THE CLERK:  Please state your complete name and
23  spell your name for the record.
24          THE WITNESS:  Randell L. Page, P-A-G-E.
25          THE COURT:  You may inquire, Mr. Schafer.

2846

1    MR. SCHAFER:  Thank you, Your Honor.
2    DIRECT EXAMINATION
3    BY MR. SCHAFER:
4    **Q.**  Good morning, Dr. Page.
5    **A.**  **Good morning.**
6    **Q.**  What is your current profession?
7    **A.**  **I'm a physician at Saltzer Medical Group.**
8    **Q.**  And also how long have you worked with the Saltzer
9    Medical Group?
10   **A.**  **24 years.**
11   **Q.**  Do you serve on the executive committee at
12   Saltzer?
13   **A.**  **Yes, I do.**
14   **Q.**  And how long have you served on the executive
15   committee?
16   **A.**  **Close to 20 years.**
17   **Q.**  Have you held any other administrative positions
18   at Saltzer?
19   **A.**  **Yes, I have.  I was president of the group for**
20   **about four years, and I have been on the exec -- and I'm**
21   **also chairman of the contracts committee.**
22   **Q.**  What is your educational background?
23   **A.**  **I graduated from Princeton University,**
24   **undergraduate; medical school at Philadelphia College of**
25   **Osteopathic Medicine; internship and residency at Emanuel**

2847

1    **Hospital, now Legacy Health Systems in Portland, Oregon.**
2    **Q.**  Can you describe the nature of your practice
3    today?
4    **A.**  **I'm an internist, but my practice for the last ten**
5    **years or so has been limited to gastrointestinal problems.**
6    **Q.**  And at what locations do you see patients?
7    **A.**  **Primarily at Saltzer Medical Group clinic in**
8    **Nampa, and also at Saint Al's hospital in Nampa.**
9    **Q.**  And that is still true today after Saltzer's
10   affiliation with St. Luke's?
11   **A.**  **That's correct.**
12   **Q.**  And how long has that been the case?
13   **A.**  **I'm sorry?**
14   **Q.**  How long has it been the case that those are the
15   two locations where you see patients?
16   **A.**  **Oh, I'm sorry.  The whole time that I've been**
17   **here.**
18   **Q.**  Now, Dr. Page, I just have a very few number of
19   questions to ask you today, given the fact that plaintiffs
20   have already introduced a large portion of your deposition
21   testimony.  But the first thing I wanted to cover was some
22   statements made by Linda Duer of IPN.
23   And, Dr. Page, are you aware that during her testimony
24   in this case, Linda Duer testified that she had a
25   conversation with you roughly two years ago and that you

2848

1    discussed the potential St. Luke's transaction with her?
2    **A.**  **Yes.**
3    **Q.**  And are you aware that Ms. Duer testified that you
4    told her with respect to affiliating with St. Luke's that
5    you were damned if you did and damned if you didn't and that
6    you told her that if you didn't join St. Luke's, St. Luke's
7    would just build a clinic wherever you went because they had
8    more money and more resources than Saltzer?
9    **A.**  **Yes, I'm aware that that's what she said.**
10   **Q.**  Are you also aware that she testified that you
11   told her there was no way that you could compete against
12   St. Luke's?
13   **A.**  **Yes.**
14   **Q.**  How did you become aware that Ms. Duer had made
15   those statements?
16   **A.**  **I read it in the newspaper.**
17   **Q.**  What was your reaction to reading about that in
18   the newspaper?
19   **A.**  **Well, my first reaction was that I was very angry**
20   **that I had been misrepresented in that fashion by someone**
21   **that I had known for a long time and felt I had a good**
22   **relationship with.**
23   **Q.**  Do you recall having any conversations with
24   Ms. Duer regarding the potential St. Luke's deal roughly two
25   years ago?

2849

1    **A.**  **We actually had a number of conversations, casual,**
2    **candid, brief conversations at IPN board meetings.**
3    **Q.**  And, Dr. Page, did you ever make the statements to
4    Ms. Duer that she attributed to you in her testimony?
5    **A.**  **Absolutely not.**
6    **Q.**  And, you know, it was two -- two years ago, maybe
7    longer.  How can you be so sure that you didn't make those
8    statements?
9    **A.**  **Well, because those statements represented**
10   **thoughts that were not mine.  I never thought any of those**
11   **things, and, therefore, I wouldn't have said them.**
12   **Q.**  So, specifically, did you at any point believe
13   that, you know, if Saltzer didn't affiliate with St. Luke's,
14   St. Luke's would just put a clinic wherever you went?
15   **A.**  **I did not.**
16   **Q.**  And I assume because you didn't believe that, that
17   wasn't part of your consideration as far as supporting the
18   Saltzer affiliation with St. Luke's; is that right?
19   **A.**  **That's correct.**
20   **Q.**  And you were an advocate of the Saltzer
21   affiliation with St. Luke's.  True?
22   **A.**  **Yes.**
23   **Q.**  Was any part of your reason for advocating for
24   that affiliation with St. Luke's because you were afraid of
25   competing against St. Luke's?

2850

1    **A.**  **Absolutely not.**

2    **Q.**  Did you and others at Saltzer have some concerns

3    regarding Saltzer's competitiveness more generally going

4    forward?

5    **A.**  **I think we did.  We had had a consultant who had**

6    **advised us that with changes in the healthcare marketplace,**

7    **that as an independent group, there would be pressures on**

8    **us, and if we found the right partner, we'd probably be**

9    **better off going forward.**

10   **Q.**  And when you say pressures on you and you

11   reference sort of the changes in healthcare market, can you

12   be a little more specific about what it was in that respect?

13   **A.**  **Well, everybody recognizes that there are dramatic**

14   **changes occurring in the healthcare marketplace.  And in**

15   **order to be successful going forward; to be able to provide**

16   **the kind of care that we want to, that we have been**

17   **accustomed to; to be able to make changes that we might need**

18   **to make going forward in terms of recruiting new physicians,**

19   **developing new services, and, in particular, changes related**

20   **to the delivery of healthcare, healthcare reform with**

21   **respect to providing quality and being reimbursed on that**

22   **basis; we felt it was very necessary to be part of a larger**

23   **system than being independent.**

24   **Q.**  Thank you, Dr. Page.

25   I want to talk to you about an exhibit right now.

2851

1    MR. SCHAFER:  Your Honor, this has been marked

2    AEO, so if we could leave the screen off, I think there is

3    basically just one number in it that I'll avoid talking

4    about, so I think we don't need to clear the courtroom.

5    If you could put up 1361.  It's Trial Exhibit 361.

6    BY MR. SCHAFER:

7    **Q.**  And, Dr. Page, this is a -- Trial Exhibit 1361 is

8    a document that plaintiffs have referenced repeatedly during

9    this trial.  Do you recognize this document?

10   **A.**  Yes.

11   **Q.**  Can you tell the court, generally, what the issue

12   was that was being discussed in this email chain?

13   **A.**  **The issue was that Blue Cross had changed policy**

14   **and was no longer going to reimburse for consultation codes.**

15   **Q.**  And do you see in the last sentence of your email

16   at the top of the page, you state that:  Perhaps if the

17   Saltzer/St. Luke's affiliation came to fruition, this will

18   be something we could try to get back, i.e., consult codes,

19   as there would be the clout of the entire network.  Do you

20   see that?

21   **A.**  Yes.

22   **Q.**  What was the basis for your statement or belief

23   that that might happen?

24   **A.**  **I think it was primarily hope and speculation.**

25   **Q.**  Did anyone from St. Luke's ever tell you that they

2852

1    believed that Saltzer would be able to bill for those

2    consult codes again if Saltzer affiliated with St. Luke's?

3    **A.**  **No.**

4    **Q.**  And since Saltzer has joined with St. Luke's, has

5    Saltzer been able to start billing Blue Cross again for

6    those consult codes?

7    **A.**  **No.**

8    **Q.**  In fact, do you have an understanding as to

9    whether that change affected all providers in the area?

10   **A.**  **That was my understanding.**

11   **Q.**  And if you look at the second email on the page, I

12   want to avoid saying the specific number here, but you see

13   that Nancy Powell assigns a specific dollar amount to, you

14   know, what she attributed to that change.  Do you see that?

15   **A.**  Yes.

16   **Q.**  And is the number listed there consistent with

17   your understanding of sort of how big or small an issue it

18   was?

19   **A.**  Yes.

20   **Q.**  How much did your desire or hope to get -- to be

21   able to bill Blue Cross for consult codes again, how much

22   did that influence your advocating for the Saltzer

23   affiliation with St. Luke's?

24   **A.**  **Oh, it was tiny.  It was sort of a tip of the**

25   **iceberg, a burr under the saddle kind of a thing.  It was**

2853

1    **just another example of insurance companies making random**

2    **changes in reimbursement and then you just have to deal with**

3    **it.**

4    **Q.**  More generally speaking, did you ever hear anyone

5    from St. Luke's discuss that Saltzer would be gaining the

6    clout of St. Luke's network in payor negotiations if the

7    parties affiliated?

8    **A.**  **No.**

9    **Q.**  Did anyone from St. Luke's ever discuss Saltzer

10   being able to increase its reimbursement rates from

11   commercial payors as a result of the transaction?

12   **A.**  **No.**

13   **Q.**  When Saltzer was an independent group, did you and

14   others at Saltzer ever attempt to get commercial payors to

15   agree to quality incentives and shared savings plans?

16   **A.**  **We did.  We had been trying to get them to do that**

17   **for years and with -- never with any success.**

18   **Q.**  Did you have any expectation as to whether Saltzer

19   might have more success in getting those sorts of incentives

20   or shared savings plans in contracts with commercial payors

21   if Saltzer were part of St. Luke's?

22   **A.**  **That was the hope that by being part of a larger**

23   **system with a compelling strategy, a compelling capability,**

24   **a compelling commitment to dealing with healthcare reform**

25   **and being able to deliver the quality-not-quantity issue**

2854

1   that we'd be much more successful.

2       **Q.** And was that important to you personally as you

3   considered the potential affiliation with St. Luke's?

4       **A.   It was very important to me.  It was one of the**

5   **major reasons for being involved.**

6       **Q.** Thank you, Dr. Page.

7       MR. SCHAFER:  No further questions.

8       THE COURT:  Cross.

9       MR. WILSON:  Thank you, Your Honor.

10      THE COURT:  Mr. Wilson.

11                   CROSS-EXAMINATION

12  BY MR. WILSON:

13      **Q.** Dr. Page, Linda Duer is the executive director of

14  IPN, is she not?

15      **A.   Yes, she is.**

16      **Q.** And you are still a board member of IPN; correct?

17      **A.   That's correct.**

18      **Q.** It's fair to say that the board of IPN has quite a

19  bit of input as to whether Ms. Duer keeps her job; correct?

20      **A.   I actually don't know how that would work.**

21      **Q.** Well, let's be clear, Dr. Page, about what you're

22  testifying here today.  Is it your testimony that Ms. Duer

23  came into this courtroom and when she testified about that

24  conversation she had with you, she lied under oath?  Is that

25  your testimony?

2855

1       **A.   I would prefer not to accuse her of lying.  I**

2   **don't know if that's what she was doing or if she was**

3   **misrepresenting or misunderstanding or if she was -- I have**

4   **wondered if, as I have thought about why in the world would**

5   **she say those things, I didn't think it was just a**

6   **misrecollection because she was so precise in the wording.**

7   **But I wondered if she was perhaps projecting her own**

8   **concerns about what was happening onto that discussion and**

9   **it came out that way in the testimony.**

10      **Q.** She was precise with her wording, wasn't she?

11      **A.   It appeared as though she was recalling word for**

12  **word a conversation that we had.**

13      **Q.** And you've testified here today that, in fact, you

14  had several casual and brief conversations with Ms. Duer

15  about the deal between Saltzer and St. Luke's; correct?

16      **A.   That's correct.**

17      **Q.** So you admit that conversations occurred.  You're

18  just testifying today that you dispute that this particular

19  conversation occurred the way Ms. Duer characterized it;

20  correct?

21      **A.   That's correct.**

22      **Q.** And you don't have any alternative version of that

23  conversation; correct?

24      **A.   Again, there were --**

25      **Q.** Is that correct, sir?

2856

1       MR. SCHAFER:  I'll object to form.  The basis

2   being it he didn't have that conversation, I don't know how

3   he could have an alternative conversation of that

4   conversation as opposed to generally the conversations he

5   had.

6       THE COURT:  I'll sustain the objection.  I think

7   we need to establish that --

8   BY MR. WILSON:

9       **Q.** Are you dispute --

10      MR. WILSON:  I'm sorry, Your Honor.

11      THE COURT:  Just a moment.

12      MR. WILSON:  I apologize.

13      THE COURT:  Just so it's clear, the problem is

14  that the doctor has testified that there were some general

15  conversations but not one on this specific topic.  So I

16  think the question assumes a fact that, in fact, such a

17  conversation took place, and I'm not sure the witness is --

18  in fact, has agreed with that starting proposition.

19      So Mr. Wilson.

20  BY MR. WILSON:

21      **Q.** Sitting here today, Dr. Page, do you recall the

22  conversation Ms. Duer testified about that occurred

23  following an IPN board meeting out in the hallway?

24      **A.   Again, we had a number of conversations, and so I**

25  **don't recall that -- any specific conversation or this one**

2857

1   in particular.

2       **Q.** You said during your direct examination that when

3   you read about Ms. Duer's testimony in the newspaper, it

4   made you angry, is that right?

5       **A.   Yes, I did.**

6       **Q.** And you were angry when you heard about her

7   testimony because it made you look bad, isn't that right?

8       **A.   It was actually a concern of mine that it would**

9   **make me look as though I was saying things in that setting**

10  **that I didn't believe or that I wouldn't have said to my**

11  **friends and colleagues.**

12      **Q.** You thought it would hurt Saltzer's position in

13  this lawsuit, didn't you?

14      **A.   I don't think I considered that.  I was more**

15  **concerned about how it reflected on me and on my**

16  **relationship with my peers.**

17      **Q.** Well, you would agree, wouldn't you, that

18  Ms. Duer's testimony about what you said wasn't exactly

19  consistent with what Saltzer is telling this court about the

20  reasons it did its deal with St. Luke's?

21      **A.   It's entirely inconsistent.**

22      **Q.** And, in fact, when you saw that story in the

23  newspaper, you sent a statement to the "Idaho Statesman" to

24  complain about Ms. Duer's testimony, didn't you?

25      **A.   Yes, I did.**

2858

1    **Q.**  And I'm reading here from an article that appeared
2    the next day titled "Saltzer Doctor: Deal With St. Luke's
3    Not About Control."  And it says here, reading from your
4    statement: "At no time did we feel threatened by
5    St. Luke's."
6        Was that in your statement?
7    **A.**  Yes.
8    **Q.**  Is that the truth, Dr. Page?
9    **A.**  That's absolutely the truth.
10   **Q.**  How long have you been practicing in the Treasure
11   Valley?
12   **A.**  24 years.
13   **Q.**  You mentioned you've been on the executive
14   committee at Saltzer for almost 20 years?
15   **A.**  Correct.
16   **Q.**  Been chair of the contracting committee at Saltzer
17   for 18 years or so; is that fair?
18   **A.**  Correct.
19   **Q.**  And you've been a board member of the Idaho
20   Physicians Network for a number of years; correct?
21   **A.**  That's correct.
22   **Q.**  So you've been watching what St. Luke's has been
23   doing in the Treasure Valley over the last several years,
24   haven't you?
25   **A.**  Yes, I have.

2859

1    **Q.**  They've been acquiring practice after practice;
2    correct?
3        MR. SCHAFER:  Object to form.
4    BY MR. WILSON:
5    **Q.**  Isn't that right?
6        THE COURT:  Well, I'll overrule the objection.
7        THE WITNESS:  I'm aware that they've been
8    acquiring practices.
9    BY MR. WILSON:
10   **Q.**  And they've been acquiring clinic after clinic;
11   correct?
12   **A.**  I am aware that they've been acquiring clinics.
13   **Q.**  Well, they've been acquiring clinics right in your
14   backyard in Nampa, haven't they?
15   **A.**  I don't know that acquiring a clinic in Nampa is
16   the right -- I don't think that's what happened.
17   **Q.**  Well, you mentioned Ms. Duer says that you
18   complained to her about the specialty clinic out near
19   Costco; correct?
20   **A.**  She was mistaken.  There isn't a specialty clinic
21   out near Costco except in the building where Saltzer has a
22   number of physicians.
23   **Q.**  And despite the acquisition activity that
24   St. Luke's has been pursuing in the last several years, it's
25   your testimony that you did not feel threatened by

2860

1    St. Luke's.
2    **A.**  That's correct.
3    **Q.**  You read that newspaper article the following day
4    that quoted you; correct?
5    **A.**  Yes, I did.
6        MR. WILSON:  Mr. Beilein, if you could please put
7    up on the screen Exhibit 3033.
8        And, Your Honor, this is not AEO if you --
9        THE COURT:  Well, I need to know what it is
10   because I'm not sure that's in our exhibit list.
11       MR. WILSON:  It is not.  It's an exhibit we
12   prepared for purposes of cross-examination.
13       THE COURT:  All right.  Well, until it's admitted,
14   let's see where we are.
15       MR. WILSON:  Okay.
16   BY MR. WILSON:
17   **Q.**  This is the statement you sent to the newspaper;
18   correct?
19   **A.**  It looks like it.
20   **Q.**  I notice here, though, that you didn't personally
21   send this statement; correct?
22   **A.**  That's correct.
23   **Q.**  A St. Luke's spokesperson sent this statement to
24   the newspaper on your behalf; isn't that right?
25   **A.**  That's correct.

2861

1    **Q.**  Who wrote this statement, Dr. Page?
2    **A.**  I did.
3    **Q.**  You didn't get any help?
4    **A.**  That's correct.
5    **Q.**  You wrote every single word?
6    **A.**  I wrote every single word.
7    **Q.**  So you agree with everything in the statement;
8    correct?
9    **A.**  Yes.
10   **Q.**  And in this statement, in the second paragraph,
11   you wrote, "In fact, it was made clear" --
12       THE COURT:  Let me inquire.  Is there going to be
13   any objection to the exhibit, Mr. Schafer?
14       MR. SCHAFER:  Just on AEO grounds or --
15       THE COURT:  No.
16       MR. SCHAFER:  No, there's no objection, Judge.
17       THE COURT:  All right.  Exhibit 3003 [sic] will be
18   admitted and now published -- well, put on the public
19   screen.  I want to publish it to the jury, but we have no
20   jury.
21       Counsel, what is the exhibit number?
22       MR. WILSON:  3033, Your Honor.
23       THE COURT:  3033 will be admitted.
24       MR. WILSON:  Thank you.
25   (Plaintiffs' Exhibit No. 3033 admitted.)

2862

1 BY MR. WILSON:

2 **Q.** In the second paragraph of the statement that was

3 sent to the "Statesman" on your behalf, you write: "In

4 fact, it was made clear to us on many occasions that if no

5 merger occurred, they would still want to work with us in

6 whatever ways could be beneficial."

7 You mean that St. Luke's indicated to Saltzer that even

8 if the transaction didn't work out, St. Luke's was still

9 committed to working with Saltzer in whatever ways could be

10 beneficial; correct?

11 **A. Yes.**

12 **Q.** And you still believe that to be the case;

13 correct?

14 **A. Yes.**

15 **Q.** This conversation that Ms. Duer alleges to have

16 occurred, that occurred, according to her, prior to the

17 filing of this lawsuit; correct?

18 **A. I don't recall the exact date the lawsuit was**

19 **filed, but if it was 2011, I suppose it would have been.**

20 **Q.** That's right. And similarly, it would have

21 occurred prior to your knowledge of any government

22 investigation; correct?

23 **A. I -- I don't know.**

24 **Q.** Well, if it occurred in 2011, Dr. Page, you didn't

25 know about the government investigation then, did you?

2863

1 **A. I'm saying I don't recall when I first became**

2 **aware of the government investigation.**

3 **Q.** This statement you sent to the newspaper, though,

4 that was wrote -- written not only after the litigation

5 commenced, but during this trial; correct?

6 **A. Correct.**

7 **Q.** And it's your testimony, as you wrote in this

8 statement that you sent to the newspaper during the trial,

9 that Saltzer joined St. Luke's because Saltzer and

10 St. Luke's shared the same goals and values; is that right?

11 **A. Yes.**

12 **Q.** That's your testimony today?

13 **A. Yes.**

14 MR. WILSON: I have nothing further, Your Honor.

15 My colleague, Mr. Ettinger, has some questions.

16 THE COURT: Mr. Ettinger.

17 MR. ETTINGER: Thank you, Your Honor.

18 CROSS-EXAMINATION

19 BY MR. ETTINGER:

20 **Q.** Dr. Page, I think I heard you say that Ms. Duer's

21 comments expressed thoughts that were not yours. Did I get

22 that correctly?

23 **A. Yes.**

24 **Q.** In fact, your position in your deposition on

25 numerous occasions was that your own documents written by

2864

1 you expressed thoughts that were not yours; correct?

2 **A. I don't recall ever saying that.**

3 **Q.** Well, not in those words, but for example, why

4 don't we look at Exhibit 1366.

5 MR. ETTINGER: Your Honor, I think this is AEO. I

6 think Mr. Schafer knows the words I'm going to refer to. I

7 assume that these can be used in open court.

8 BY MR. ETTINGER:

9 **Q.** Okay. So you recall Exhibit 1366, an email you

10 wrote, Dr. Page? Actually, a letter you wrote to your

11 colleagues.

12 **A. Yes.**

13 **Q.** And you remember this is a letter that got signed

14 by the majority of the Saltzer physicians?

15 **A. Yes.**

16 **Q.** And you showed it to Mr. Savage and Dr. Kaiser

17 before you sent it around?

18 **A. Yes.**

19 **Q.** And in the last bullet on the first page, you

20 called St. Luke's the "dominant provider," didn't you?

21 **A. Yes, I did.**

22 **Q.** And in your deposition, you said, well, by

23 "dominant," I didn't mean they dominate the market; correct?

24 **A. I don't know if those were my exact words. I said**

25 **that there were probably other words that served the purpose**

2865

1 besides "dominant."

2 **Q.** Well, let's look at what you said.

3 MR. ETTINGER: Your Honor, if we could go --

4 THE WITNESS: I think I chose "preeminent" --

5 BY MR. ETTINGER:

6 **Q.** All right. Well, you said that --

7 **A. -- or "preferred."**

8 **Q.** You said the word "dominant" did not -- was not

9 really your thought even though it was your word in your

10 document; correct?

11 **A. I didn't say it wasn't my thought. I said that if**

12 **I had known I was going to be testifying in court years**

13 **later, I might have chosen a different word.**

14 **Q.** And you said that you were not trying to imply

15 that St. Luke's dominates the market by your use of the word

16 "dominant"; correct?

17 **A. Yes.**

18 **Q.** Okay. And in the same document, you talked on a

19 later page, the second page, about how this provided a

20 wonderful opportunity to control services in Canyon County;

21 correct?

22 **A. Yes.**

23 **Q.** And your testimony in your deposition was, well,

24 when you used the word "control," that didn't really reflect

25 your thoughts. You didn't mean control in the ordinary

2866

1  English sense; correct?

2  **A.  I didn't mean "control" in the sense that you**
3  **might have been trying to put on it.  "Control" in my mind,**
4  **when I made that statement, was that Saltzer would be in a**
5  **position to have input into our own future in the**
6  **decision-making process.  I never thought for a second I**
7  **could actually control anything because in the insurance**
8  **marketplace, physicians don't control anything.**

9  **Q.**  Oh, but your word in your letter signed by the
10  majority of the Saltzer physicians, reviewed by the CEO and
11  president of Saltzer was, quote, control, close quote,
12  right?

13  **A.  That was the word.**

14  **Q.**  Yeah.  But that was not your thought; correct?

15  **A.  I didn't say it wasn't my thought.  I said that in**
16  **retrospect, I could have used a different word.**

17  **Q.**  Okay.  And -- okay.  And then Mr. Schafer showed
18  you the document where you used the word "clout" referring
19  to St. Luke's; correct?

20  **A.  Yes.**

21  **Q.**  And was that another poor choice of words?

22  **A.  I don't think it's necessarily a poor choice of**
23  **words.  I think clout, if you want to put a negative**
24  **connotation on it, you can.  Clout, if it's used for the**
25  **right things, is a good thing.  You know, the United States**

2867

1  **of America has lots of clout; it uses it to accomplish good**
2  **things all around the world.  So that doesn't make clout a**
3  **bad thing or a bad word.**

4  **Q.**  Well, you said in multiple documents that
5  St. Luke's [sic] would have clout with payors if you did a
6  transaction with St. Luke's; isn't that right?

7  **A.  In multiple documents?**

8  **Q.**  Right.  You said it in Exhibit 1361, and you said
9  it in a piece you wrote called "FTC Filing:  A Saltzer
10  Physician's Perspective," didn't you?

11  **A.  I don't know if I used that word in that -- in**
12  **that document or not.**

13  **Q.**  Okay.  Well, let's refresh your recollection.

14  MR. ETTINGER:  Can we -- I think this is also AEO.
15  It's not an exhibit.  Your Honor, it's for impeachment.

16  THE COURT:  What's the exhibit number?

17  MR. JULIAN:  It's been claimed as privileged.

18  MR. ETTINGER:  This document has been claimed as
19  privileged?

20  MR. JULIAN:  Yes.

21  MR. ETTINGER:  Your Honor, I don't have a
22  recollection one way or the other, so I guess I can't
23  dispute that.  I don't believe it's privileged.

24  THE COURT:  Well, what's the exhibit, 1368?

25  MR. ETTINGER:  Your Honor, this is a deposition

2868

1  exhibit; it is not a trial exhibit.  We're going to use it
2  for impeachment.

3  MR. JULIAN:  It was stated in the deposition that
4  it was privileged and was intended to be clawed back.  There
5  was an inadvertent disclosure and was prepared at my
6  insistence.

7  MR. ETTINGER:  Your Honor, I don't believe it's
8  privileged, but I don't want to take up the court's time now
9  to argue about it.  We'll move on.

10  THE COURT:  Thank you, Mr. Ettinger.  If there is
11  a need to resolve it, we'll do it.  But it would take you,
12  you know, a in-camera review of the statement.  But,
13  Mr. Ettinger, it's your -- your choice.

14  MR. ETTINGER:  Yeah, I'll just proceed for now,
15  Your Honor.

16  THE COURT:  Thank you.

17  BY MR. ETTINGER:

18  **Q.**  Dr. Page, you do believe that St. Luke's has the
19  clout, combined with Saltzer, to get better reimbursement
20  from payors, don't you?

21  **A.  This is -- no, I don't.  This has never been about**
22  **better reimbursement.**

23  **Q.**  Well, in Exhibit 1361 when you were talking about
24  the clout of the entire network, you were talking about the
25  clout to get more money, weren't you?

2869

1  **A.  No, I wasn't.**

2  **Q.**  If you got the consult codes, as Mr. Schafer
3  showed you, there'd be more money involved; isn't that
4  right?

5  **A.  No.**

6  **Q.**  No?

7  **A.  The change in the consult codes was taking away**
8  **money.  It was --**

9  **Q.**  They changed the codes and took away the money;
10  you wanted it back; correct?

11  **A.  Yeah.  What's wrong with that?**

12  **Q.**  The issue is not at the moment what's wrong, but
13  the issue is did you believe that St. Luke's and Saltzer
14  together would have the clout to do so?  And when you wrote
15  that email, the answer to that question was yes; correct?

16  **A.  I said earlier that I think it was hope and**
17  **speculation.**

18  **Q.**  Well, in your deposition, you had a different
19  explanation, didn't you?  You said that you were naive when
20  you wrote it; correct?

21  **A.  Yes.**

22  **Q.**  And at the time you wrote it, you had been chair
23  of the contracting committee at Saltzer for 18 years; isn't
24  that right?

25  **A.  That's right.**

2870

1    **Q.**  And you were not naive about managed care
2  contracting after 18 years, were you, Doctor?
3    **A.  I wasn't naive about contracting, but I think the**
4  **statement I made was naive.**
5    **Q.**  The statement you made was about contracting,
6  wasn't it, Doctor?
7    **A.  Yes.**
8    **Q.**  And, finally, Mr. Schafer asked you about shared
9  savings, and the hope that with St. Luke's you could engage
10  in shared savings programs, that you had tried and the
11  payors were not interested.  Was that your testimony?
12    **A.  Yes.  We tried for years to institute some**
13  **programs of shared savings.  We finally did get one, what I**
14  **considered to be a minor program with Blue Cross regarding**
15  **generic prescribing.  But considering the number of years**
16  **that we had been requesting it, the number of suggestions**
17  **that we had made for ways to try to do that, that was very,**
18  **very minor.**
19    **Q.**  Doctor, isn't it true that Saltzer never made a
20  specific proposal to any health plan or payor relating to
21  risk sharing, a specific proposal where you used specific
22  numbers?  Isn't that true?
23    **A.  That's true.  Saltzer was never in a position to**
24  **make a proposal of that nature.**
25    MR. ETTINGER:  Nothing further.  Thank you.

2871

1    THE COURT:  Redirect, Mr. Schafer.
2    MR. SCHAFER:  Just briefly, Your Honor.
3    REDIRECT EXAMINATION
4  BY MR. SCHAFER:
5    **Q.**  Dr. Page, plaintiffs' counsel just asked you
6  questions about whether or not when you made the statement
7  about potentially getting back those consult codes, whether
8  that was a naive statement.  You remember those questions?
9    **A.  Yes.**
10    **Q.**  And did it turn out that, in fact, that that was a
11  naive hope?
12    **A.  Well, we didn't get them back; that's for sure.**
13    MR. SCHAFER:  No further questions.
14    THE COURT:  Any further cross?
15    MR. WILSON:  No, Your Honor.
16    MR. ETTINGER:  No, Your Honor.
17    THE COURT:  All right.  You may step down.  Thank
18  you, Dr. Page.
19    THE WITNESS:  Thank you.
20    THE COURT:  Call your next witness.
21    MR. SCHAFER:  Your Honor, we are going to be
22  showing the video deposition of Dr. Steven Brown of
23  Saint Al's.  Roughly 75 percent of it has been marked AEO by
24  plaintiffs' counsel, so, I mean, we could do the -- switch
25  things on and off and mute or not, but I don't think it's

2872

1  going to be very efficient, given the amount of AEO in the
2  testimony.  It's roughly -- I think it's roughly a 40-minute
3  clip, but the vast majority of it is -- has been marked AEO.
4    THE COURT:  Well, the way that we had approached
5  this is for me to turn off the monitor and the sound, and I
6  could just watch the scrolling transcript for the AEO.  But
7  given the -- counsel, you will, however, make available to
8  the public as part of the redacted transcript those portions
9  which are not AEO?
10    MR. SCHAFER:  Yes.  And, obviously, I understand
11  that plaintiffs' counsel will have to file an affidavit and
12  actually figure out which parts of that it's going to stand
13  on.
14    THE COURT:  All right.
15    MR. SCHAFER:  So some more will be released, but
16  yes, we will make public what has not been marked AEO.
17    THE COURT:  All right.  Ms. Duke, are you
18  agreeable to that?
19    MS. DUKE:  That's my understanding of the process,
20  Your Honor.
21    THE COURT:  All right.  Very good.  All right.
22  Then we will -- we'll have to clear the courtroom.  Who has
23  designated it?
24    MR. SCHAFER:  Saint Al's employees can stay,
25  Your Honor.

2873

1    THE COURT:  So Saint Al's employees may remain in
2  the courtroom, but everyone else will have to leave, except
3  for counsel for -- who have been -- who have signed the
4  protective order in this matter.
5    ******COURTROOM CLOSED TO THE PUBLIC******
6    THE COURT:  All right.  Let's go ahead and
7  proceed.  Let's -- we do need to catch up on publishing some
8  depositions.  Ms. Gearhart, if you want to make a list,
9  perhaps we can do that after the next break.  All right.
10    (Testimony of Steven Dunning Brown via video
11    deposition.)
12    MR. SCHAFER:  That concludes Dr. Brown,
13  Your Honor.  I don't know how -- we're at 12:16.  We have
14  two shorter clips that could get us to 12:30.
15    THE COURT:  Yeah, let's definitely go until at
16  least 12:30 since we're running a little bit late today.
17    MR. SCHAFER:  This will be the deposition of
18  Rodney Reider.
19    THE COURT:  AEO?
20    MR. SCHAFER:  Like five of the eight minutes are
21  AEO, so it probably makes sense to be --
22    THE COURT:  Follow the same process, then.
23    MR. SCHAFER:  Yes.
24    THE COURT:  Play the video, but you'll ensure
25  that --

2874

1     MR. SCHAFER: Yes, Your Honor.
2     THE COURT: -- the non-AEO is made available to
3  the public.
4     MR. SCHAFER: We will.
5     (Testimony of Rodney Reider via video deposition.)
6     MS. DUKE: Your Honor, could we pause real quick?
7  In all fairness, a lot of this is not AEO, so I mean,
8  there's a few designations, but they can certainly -- we can
9  do the same thing that we did with our case and --
10    MR. SCHAFER: It's five of the eight minutes, and
11 I don't it --
12    MS. DUKE: Is it really five minutes?
13    MR. SCHAFER: -- makes sense. Yeah.
14    MS. DUKE: I mean, it's only a couple of pages,
15 but okay. That's fine. I'm just trying to balance it,
16 so --
17    THE COURT: No. I understand, and I appreciate
18 that. But I think we will go ahead and follow the same
19 format.
20    (Continued testimony of Rodney Reider via video
21 deposition.)
22    MR. SCHAFER: That was the end of the Reider
23 deposition.
24    Your Honor, we have a -- we've got either a 5-minute
25 clip or a -- or a 5-minute deposition or a 27-minute

2875

1  deposition. We can play whichever one you --
2     THE COURT: Ms. Duke.
3     MS. DUKE: And before we go there, page 77,
4  line 3, it says, "take their supplies; other than ones take
5  deficiencies." It should have been "efficiencies."
6     THE COURT: Okay. Is there any disagreement with
7  that?
8     MR. SCHAFER: I didn't see it, but if counsel is
9  representing it, I'm sure she's --
10    THE COURT: All right. Why don't we do the
11 5-minute clip. Or was it 5 or 7?
12    MR. SCHAFER: Yeah. There was a 5-minute and a
13 27. Do you want to take the 5?
14    THE COURT: Let's take 5-minute clip. And then
15 when we return, we'll also publish a bunch of depositions.
16    MR. SCHAFER: And this is the deposition of
17 Blaine Petersen.
18    THE COURT: Also AEO?
19    MS. DUKE: Yes.
20    MR. SCHAFER: Yes.
21    THE COURT: All right.
22    (Testimony of Blaine Petersen via video deposition.)
23    MR. SCHAFER: That's the end of Blaine Petersen,
24 Your Honor.
25    THE COURT: All right. Ms. Gearhart.

2876

1     THE CLERK: Your Honor, there were some exhibits
2  that were referenced that weren't admitted during the
3  deposition of Blaine Petersen and Steve -- Steven Brown.
4     THE COURT: Did you say there were some?
5     THE CLERK: Yes.
6     THE COURT: Counsel, let me review very briefly
7  the exhibit numbers, and we'll...
8     There was an objection to Exhibits 2135 -- excuse me,
9  2131, 2135, 2141, and 2142. Those were all referenced in --
10 I think it was Dr. -- was it Brown? I think Dr. Brown's
11 deposition. Is there any objection to those exhibits?
12    MS. DUKE: Yes, Your Honor. I mean, the 402 and
13 403 you have already ruled on with respect to the motion in
14 limine; yet we still continue to have the --
15    THE COURT: I'm sorry. I couldn't hear that.
16    MS. DUKE: 402 and 403 are noted on the 2131 and
17 2135 exhibits. That, again, is the motion in limine that
18 you've previously ruled upon with respect to Saint Alphonsus
19 and whether there were any offers related to some type of
20 different relationship between Saltzer and Saint Alphonsus.
21    THE COURT: Right.
22    MS. DUKE: So, yes, we would maintain those same
23 objections.
24    THE COURT: I'll overrule the objections given my
25 prior ruling. The understanding, or at least the court's

2877

1  prior ruling was that those offers could have independent
2  relevance. And rather than sit down and, I think, try to
3  flyspeck that distinction, I'm going to overrule the
4  objection. I'll admit Exhibits 2131, 2135, 2141, and 2142.
5  Now, those were hearsay objections, 2141 and 42.
6     MS. DUKE: Those are -- the hearsay objection
7  we'll withdraw.
8     THE COURT: All right.
9     (Defendants' Exhibit Nos. 2131, 2135, 2141, and 2142
10 admitted.)
11    THE COURT: Now, with regard to the depositions
12 during Mr. -- was it Reider --
13    MR. SCHAFER: Yes, Your Honor.
14    THE COURT: Wasn't it a hearsay objection to and a
15 relevance objection to Exhibit 2170.
16    MS. DUKE: We'd maintain the relevance objection,
17 Your Honor.
18    THE COURT: All right. The objection will be
19 overruled. Those two exhibits will be admitted.
20    (Defendants' Exhibit Nos. 2164 and 2170 admitted.)
21    MR. SCHAFER: And, Your Honor, just for the
22 record, I think those documents may have been used with
23 Petersen and not Reider, just so the record is clear.
24    THE COURT: Oh, I think that's correct. I'm
25 sorry. That is correct.

2878

1    All right. Anything else at this time?
2         MR. SCHAFER: No, Your Honor.
3         MS. DUKE: No, Your Honor.
4         MR. STEIN: Just as a heads-up as far as the rest
5    of the afternoon, we'll be beginning the direct examination
6    of our economic expert Dr. Argue. We'll probably have a
7    little more video before we start, and then Dr. Argue will
8    be back tomorrow morning.
9         THE COURT: All right. Very good. All right.
10   We'll be in recess for 15 minutes.
11        (Recess.)
12        ******COURTROOM OPEN TO THE PUBLIC******
13        THE COURT: We're going to call the next witness
14   again by video?
15        MR. SCHAFER: Yes, Your Honor, Thomas Reinhardt.
16   And we have discussed with Ms. Duke the first 11 minutes of
17   this are nonAEO, so we can keep the courtroom open. And
18   then most of -- it's 27 minutes total. Most of the 16 after
19   that will be closed. We'll take a break, maybe clear the
20   courtroom, and mostly just St. Luke's people here that would
21   need to leave.
22        THE COURT: All right. Very good.
23        (Testimony of Thomas Allan Reinhardt via video
24          deposition.)
25        (Video deposition paused.)

2879

1         MR. SCHAFER: Your Honor, this is where the AEO
2    portion starts. I think we need to clear the courtroom.
3         THE COURT: I'll have to ask anyone in the
4    courtroom to leave unless they're affiliated with
5    Saint Al's.
6         ******COURTROOM CLOSED TO THE PUBLIC******
7         (Video deposition of Thomas Allan Reinhardt resumed.)
8         (Video deposition of Thomas Allan Reinhardt concluded.)
9         MR. SCHAFER: That's the end.
10        ******COURTROOM OPEN TO THE PUBLIC******
11        THE COURT: Counsel, I believe there was reference
12   to Exhibits 2188, 2189 in that -- in Mr. Schafer's
13   deposition. There was a relevance objection to 2188, but it
14   had to do with referrals, I think, not necessarily the
15   acquisition.
16        MS. DUKE: Correct, Your Honor.
17        THE COURT: Do you intend to stand on that
18   objection or do you withdraw it?
19        MS. DUKE: We'll stand on it, Your Honor.
20        THE COURT: I'll overrule the objection.
21   Exhibit 2188 will be admitted.
22        (Defendants' Exhibit No. 2188 admitted.)
23        THE COURT: Hearsay was the grounds for objection
24   to 2189.
25        MS. DUKE: That's withdrawn, Your Honor.

2880

1         THE COURT: The exhibit will be admitted.
2         (Defendants' Exhibit No. 2189 admitted.)
3         THE COURT: Mr. Schafer.
4         MR. SCHAFER: Defendants call Dr. David Argue.
5         MR. STEIN: We can begin the examination with the
6    courtroom open, but we'll have to close it.
7         THE COURT: That's fine.
8         MS. DUKE: Your Honor, while they are bringing
9    Dr. Argue up, may I just take a few moments to read in a
10   couple of exhibits -- a handful of exhibits that were agreed
11   to by Mr. Stein related to Deborah Haas-Wilson's testimony?
12        THE COURT: Yes.
13        MS. DUKE: So it's been agreed that Exhibits 1668,
14   1669, 1673, 1674, 1675, 1682, 1683, 1686, 1693 --
15        THE COURT: 1693?
16        MS. DUKE: Yes -- 1694, 1695, 1696, 1697, 1702,
17   1703, 1704, 1705, 1706, and 1741 are admitted.
18        THE COURT: Mr. Stein, is that correct?
19        MR. STEIN: I don't have my list with me, but I
20   trust Ms. Duke's representation.
21        THE COURT: All right. Exhibits 1668, 1669, 1673
22   through -- -74 and -75, 1682 and -83, 1686, 1693 through
23   -97, 1702 through 1706, and I believe it was 1741 are
24   admitted.
25        (Plaintiffs' Exhibit Nos. 1668, 1669, 1673, 1674,

2881

1    1675, 1682, 1683, 1686, 1693, 1694, 1695, 1696, 1697,
2    1702, 1703, 1704, 1705, 1706, and 1741 admitted.)
3         MS. DUKE: Thank you, Your Honor. And one last
4    exhibit --
5         THE COURT: Yes.
6         MS. DUKE: -- was Joint Exhibit 54 had been agreed
7    to, as well. So that will be admitted, and I'll provide a
8    copy to counsel.
9         Thank you, Your Honor.
10        THE COURT: Thank you. Exhibit 54 also will be
11   admitted.
12        (Joint Exhibit No. 54 admitted.)
13        THE COURT: Dr. Argue, please step before the
14   clerk and be sworn.
15             DAVID ARGUE,
16   having been first duly sworn to tell the whole truth,
17   testified as follows:
18        THE CLERK: Please state your complete name and
19   spell your name for the record.
20        THE WITNESS: My name is David Argue. First name
21   is David, D-A-V-I-D. Last name is Argue, A-R-G-U-E.
22        THE COURT: Mr. Stein, you may inquire.
23             DIRECT EXAMINATION
24   BY MR. STEIN:
25        Q.  Good afternoon, Dr. Argue.

2882

1    **A.**  Good afternoon.

2    **Q.**  Did you prepare a demonstrative exhibit in order

3    to aid the court in understanding your testimony this

4    afternoon and tomorrow morning?

5    **A.**  Yes, I did.

6    **Q.**  And it's the exhibit that we have marked for the

7    record as 5119 and the demonstrative exhibit that you

8    prepared in front of you?

9    **A.**  Yes, it is.

10   **Q.**  Dr. Argue, I would like to begin this afternoon

11   and have you describe for the court, if you could, your

12   background and qualifications.

13   **A.**  Certainly, I received my Ph.D. in economics at the

14   University of Virginia in 1990.  Prior to that, I had

15   received an MA in economics also with the University of

16   Virginia and a BA in economics at American University.

17          Subsequent to receiving my Ph.D., I joined

18   Economists Incorporated, a consulting firm in Washington,

19   D.C., and I have been a principal at Economists Incorporated

20   for the past 11 years.

21          Over the past 20 years or so, I have analyzed

22   markets and competitive effects analysis in over a hundred

23   hospital or government investigations or mergers and

24   litigation in healthcare matters, including 40 mergers of

25   hospitals or physicians or health insurers.

2883

1          For a three-year period, I was an adjunct

2    professor in healthcare economics at Johns Hopkins

3    University, Washington, D.C., campus in their school -- in

4    their business school in their MBA program.

5    **Q.**  And have you also written and spoken on healthcare

6    antitrust-related matters?

7    **A.**  I have.  I have spoken a number of times and

8    written several articles.

9    **Q.**  And so this is obviously -- what we're showing

10   here on slide 5, it's not a complete list of your

11   publications and speeches; correct?

12   **A.**  That's correct.

13   **Q.**  Can you talk briefly about the ones that you have

14   identified on this slide.

15   **A.**  Certainly.  I'll go through the ones that I think

16   are probably most pertinent for the case at hand.

17          At the top of the list is a study that I did in

18   the state of Utah on behalf of the Utah state legislature

19   examining competition in healthcare markets in that state.

20   It involved insurance markets, health insurance markets,

21   hospital providers, physician providers, ancillary service

22   and ambulatory providers.

23          I testified before the state legislature on my

24   findings, and the task force continued with its

25   recommendations.

2884

1          The second matter down is particularly pertinent.

2    It's a transaction that occurred in North Carolina in the

3    Greensboro area.  In many ways, it's similar to this one.

4    Cone Health was a multi-hospital system that employed a

5    significant number of physicians.  Alamance Regional Medical

6    Center was located not far.  It was a standalone hospital.

7    It had a moderate-sized employed physician staff that I was

8    the economist who analyzed that on behalf of the parties.

9    We presented our findings or our opinions before the Federal

10   Trade Commission.  That transaction was ultimately allowed

11   to go through.

12          The third item, HealthPartners, Park Nicollet

13   Affiliation, involved two integrated systems in the

14   Minneapolis-St. Paul area.  Both had at least one or

15   multiple hospitals, but the key feature there was they both

16   had large physician practices.  Again, that was a merger

17   review.  I was the economist for the parties.  We presented

18   before the FTC.  And that transaction also was allowed to go

19   through.

20   **Q.**  Dr. Argue, if I could interrupt you for just one

21   second.  The slide here refers to a Hart-Scott-Rodino

22   review, and you have referred to merger review.  What is the

23   context in which you have used these types of reviews?

24   **A.**  I'm sorry.  The Hart-Scott-Rodino review is a

25   requirement for transactions of a specific size.  They need

2885

1    to be presented and reviewed by the Federal Trade Commission

2    or the U.S. Department of Justice.  There are rules about

3    the process that goes through that.  And typically the

4    parties hire -- obviously, they hire attorneys, but they may

5    hire economists to help them in that process.

6    **Q.**  Thank you.  I'm sorry.  Can you continue.

7    **A.**  Certainly.  The fourth item down and -- let's

8    see -- the last item are some presentations that I made.

9    These both happened to have been at the FTC.  The fourth one

10   I was invited last fall to speak at an FTC conference on

11   hospital competition.  The one at the bottom was from

12   several years ago when the FTC was holding hearings on

13   competition in healthcare, and I gave a talk there or

14   participated in a panel on physician service competition.

15          Come up a little bit, back maybe five or six down,

16   there is a chapter called market -- a book called *Market*

17   *Definition in Antitrust*, and I wrote a chapter on market

18   definition for healthcare providers -- hospitals, physicians

19   in particular.

20   **Q.**  Dr. Argue, you talked a little bit about work that

21   you have done in presenting on behalf of private parties to

22   the Federal Trade Commission.  Have you in the past ever

23   been hired by the Federal Trade Commission?

24   **A.**  Yes, I have.

25   **Q.**  In connection with your work in this case, how are

2886

1   you being compensated?
2        **A.**   I'm being paid on an hourly basis for my time.
3        **Q.**   Is your compensation dependent in any way on the
4   outcome of this case?
5        **A.**   No, it is not.
6        **Q.**   Dr. Argue, have you conducted an analysis of the
7   likely competitive effects of the Saltzer transaction?
8        **A.**   Yes, I have.
9        **Q.**   Can you describe generally the sources of
10  information that you have considered in that analysis.
11       **A.**   I took into account as many relevant sources of
12  information as I could get my hands on.  That included some
13  data provided through Regence and Blue Cross of Idaho;
14  certainly, the deposition transcripts; the documents that
15  were produced.  I had talked to numerous people and
16  interviewed them and have attended some of the trial
17  hearings, as well.
18       **Q.**   Now, we're obviously going to be spending a fair
19  amount of time getting into the specifics, but can you
20  summarize for the court what conclusion you have reached
21  about what the likely competitive impact of the Saltzer
22  transaction is.
23       **A.**   Certainly.  My conclusion is that I think there is
24  very little likelihood that this transaction would result in
25  harm to competition in the provision of primary care or

2887

1   pediatric physician services.  In fact, I think the
2   transaction will also result in significant procompetitive
3   benefits.
4        **Q.**   And have you also analyzed the competitive impacts
5   in the vertical markets that the plaintiffs have identified,
6   the hospital services markets?
7        **A.**   Yes.  I have examined that, as well.
8        **Q.**   And is your conclusion any different?
9        **A.**   No.  It's the same, no harm to competition.
10       **Q.**   So, Dr. Argue, let's start -- let me ask you to
11  explain to the court generally the approach that you've
12  taken in analyzing the competitive impact of the Saltzer
13  transaction.
14       **A.**   I think the easiest way to look at this at a very
15  high level is to separate into these three components that I
16  have got here.
17            The first is identifying the market.  And the
18  purpose of identifying the market is to determine who the
19  likely competitors are, who the alternatives are for
20  customers and for patients in this case and for health plans
21  and employers.
22            The second component there is assessing the
23  competitive effects, and that actually is very closely tied
24  with the identifying the market.  Many of the same tools are
25  used; much of the same data is analyzed.  And the the

2888

1   assessing the competitive effects really is just talking
2   about: How does this market work?  What makes it tick?  How
3   do the interactions come together?
4            And then the third point is assessing the
5   procompetitive benefits.
6        **Q.**   Now, Dr. Argue, we have heard a lot in the trial
7   about harm to competition and harm to competitors.  Can you
8   define what harm to competition means to an economist and
9   how that's different from harm to competitors?
10       **A.**   Certainly.  Harm to competition occurs when an
11  action results in prices that are higher than competitive
12  levels or quality being provided that's lower than
13  competitive levels.  And market power -- which is another
14  concept we have heard and I'm sure I'll talk about more
15  today -- is closely related to the question of harm to
16  competition.
17            And market power exists when a supplier has the
18  ability to harm competition, to raise prices above
19  competitive levels or reduce quality below, and not lose so
20  many customers as to make that change unprofitable.
21            Now, that's distinctly different from harm to a
22  competitor.  Competitors get harmed all the time in the
23  competitive process.  Every time a seller loses out in a
24  transaction, they are harmed for not having made that sale.
25  That's what the competitive process is all about.  It's a

2889

1   rough-and-tumble world to see who is going to prevail, but
2   that doesn't necessarily mean it's harm to competition.
3        **Q.**   So does that mean harm to competition -- or harm
4   to competitors can never amount to harm to competition?
5        **A.**   No.  It certainly could amount to harm to
6   competition.  If you harm your competitors enough or enough
7   of them, it could enable the supplier to gain market power.
8        **Q.**   And what does that mean more specifically to say
9   "harm them enough"?  What is the standard that has to be
10  met?
11       **A.**   It's -- to put it in words -- there is no magic
12  number on this, but to put it in words, it's so that they
13  are no longer an effective competitive constraint.
14       **Q.**   Dr. Argue, again, just by way of background, we
15  have talked about market definition a little bit.  Can you
16  explain the role of market definition in the antitrust
17  analysis and how that relates to understanding the
18  competitive effects of the transaction.
19       **A.**   Market definition is a little bit of an abstract
20  concept.  It's certainly not the final point.  It's a step
21  in the way to trying to figure out what the competitive
22  consequences may be of a particular transaction.  It's not
23  an end.  The agencies in the merger guidelines specifically
24  talk about the need to start with market definition.
25  They might start with a competitive effects analysis first.

2890

1    The outgrowth or the follow-on concept from market
2    definition is market shares and market concentration.  And
3    those aren't an end, either.  There again, they may be
4    informative; they may be not so informative.  But they are
5    not intended to be a rigid guideline.  They are nothing more
6    than another piece of information to consider whether
7    additional analysis is necessary.
8        As I mentioned before, market definition and
9    competitive effects are greatly intertwined, and it's --
10   the -- there may be difficulties, so it would seem, as you
11   do a market definition analysis and a concentration
12   analysis.  But if it turns out from the competitive effects
13   analysis that this market is functioning well anyway, that's
14   ultimately what's going to be most important in a
15   competitive analysis.
16       Q.  Now, Dr. Argue, in order to reach opinions in this
17   case, did you undertake to understand how competition for
18   the healthcare services in the Treasure Valley works?
19       A.  Yes, I did.
20       Q.  Why did you do that?
21       A.  I think that it's important in considering any
22   competitive -- in doing any analysis of competition to get a
23   clear understanding of the foundational interaction between
24   the buyers and the sellers in the market.  It's not just
25   background.  This is really important to being able to

2891

1    understand how the -- the transaction might possibly harm
2    competition.  We can't get to that point unless we
3    understand the nature of the markets themselves.
4        Q.  And, Doctor, does your slide 12 identify features
5    or key features of healthcare competition in the Treasure
6    Valley --
7        A.  Yes.
8        Q.  -- that you've identified?
9        A.  Yes, it does.
10       Q.  And are the features of healthcare competition
11   that are identified here in slide 12, are these important
12   to -- just to understanding how the market should be defined
13   or the competitive effects analysis or both?
14       A.  I think it's for both, certainly.
15       Q.  So let's start with the first feature of
16   healthcare competition that you've identified here,
17   system-to-system competition.
18       First, can you explain what you mean by a system?
19       A.  A healthcare system is -- comprises a collection
20   of entities.  It's often named around a hospital, although
21   that's not always the case.  In the case of the Treasure
22   Valley, the St. Luke's Health System is focused around
23   St. Luke's hospitals; same on the Saint Al's side.
24       But it's more than just a hospital, of course.  It
25   includes the physicians; it includes the ambulatory surgery

2892

1    centers, the ancillary service providers.  And some of these
2    systems have close relationships with particular insurers,
3    as well.  In the Treasure Valley, we have got two
4    substantial healthcare systems.
5        MR. STEIN:  Your Honor, at this point we are going
6    to be moving into some slides that have been designated
7    attorneys' eyes only by Saint Alphonsus.  So I think we'll
8    need to ask others to leave.
9        THE COURT:  All right.  Anyone in the courtroom
10   other than an employee of Saint Al's or an attorney who has
11   subjected himself or herself to the protective order issued
12   by the court will have to vacate the courtroom.
13       ******COURTROOM CLOSED TO THE PUBLIC******
14       THE COURT:  While that's happening, I was trying
15   to go back over something you just testified to, Dr. Argue.
16   By the way, that's a great name for --
17       THE WITNESS:  Thank you.  Everyone tells me I
18   should have been a lawyer.
19       THE COURT:  I was going to say that, but I'm sure
20   you have heard that so many times that you're probably bored
21   with it.
22       But you indicated the market definition and competitive
23   effects are greatly intertwined.  So it would seem as you do
24   a market definition analysis and a concentration analysis,
25   that it turns out -- in essence, my sense was that you might

2893

1    do a competitive effects analysis first, and that's kind of
2    what -- my understanding, that's the approach you took and
3    decided that you could define the market later?
4        THE WITNESS:  It's not strictly the approach I
5    took.  And as I mentioned, the merger guidelines suggest you
6    can put it in the opposite order.  But it's imprecise or
7    it's incomplete to do them totally separately from each
8    other.  There is enough back-and-forth that one informs you
9    as to the other.
10       THE COURT:  Okay.  The problem is, I guess I have
11   a hard time seeing how you could assess the competitive
12   effects analysis without knowing what the market is.
13       THE WITNESS:  I think -- if I could respond to
14   that, I think the way that I would articulate a response is
15   it may not matter much what the market definition is to what
16   the competitive effects outcome is.  You could have a narrow
17   market and, with the same dynamics, have highly competitive
18   outcomes as if the market were broader.
19       Now, as we'll get into this, in my analysis of market
20   definition, I didn't put an outside bound on what I thought
21   that market should be.  And that was largely because of what
22   I was learning from the competitive effects analysis and
23   because it wouldn't have added any more players to the
24   story; it wouldn't have changed the way that the competition
25   was working in the Treasure Valley.

2894

1  THE COURT:  Doesn't that kind of assume that we're
2  going to talk about the Treasure Valley as the relevant
3  market?
4  THE WITNESS:  I used that term too loosely.
5  Adding additional -- expanding the market into other parts
6  of Boise.
7  THE COURT:  Okay.  Go ahead.
8  MR. STEIN:  Thank you, Your Honor.
9  BY MR. STEIN:
10  Q.  So turning to this issue of system-to-system
11  competition, Dr. Argue, there have been a number of
12  St. Luke's witnesses who have talked about this concept of
13  building an integrated delivery system.
14  In your review of the evidence, did you see any
15  evidence that others in this market are also viewing
16  competition as developing on this system-to-systemwide
17  basis?
18  A.  There is certainly evidence in Saint Al's
19  documents as to their perspective on this market also being
20  a Saint Al's to St. Luke's system-to-system competition.
21  Q.  And so what are we looking at on slide 13?
22  A.  Slide 13 is a page from a Saint Al's strategic
23  planning document.  You can see right there in the title, it
24  says, "Two integrated health systems in the region."  Now,
25  this map shows more than just the Treasure Valley, more than

2895

1  Nampa.
2  But it's clear that the Saint Al's system views
3  itself as a system in competition with St. Luke's.  You can
4  see at the bottom in that shaded box, it says the "Saint
5  Al's has a broad reach as a regional referral network and
6  competes with the St. Luke's Health System."
7  Q.  And what about on slide 14?  What are we looking
8  at here?
9  A.  Again, this is -- it's a Trinity Health document.
10  It appears to be a planning document.  It refers again just
11  to Saint Al's key competitor being St. Luke's Health System.
12  And it talks also about changing the rules of engagement to
13  take initiative to compete on its strengths -- this is
14  Saint Al's talking -- and considers a proposed strategy
15  statement which talks about engagement in aggressively
16  developing its clinically integrated network.
17  It goes on and talks a little bit about
18  gain-sharing contracts and some of these concepts that will
19  come up in a few minutes.
20  Q.  On slide 15.
21  A.  Again -- again, a Saint Al's strategic plan of
22  some sort.  And the first highlighted line here from inside
23  that text was -- it says "Intense competition from the major
24  competitor, St. Luke's Health System."
25  If you come down one, two, three -- four lines,

2896

1  there is a reference to the payor market desiring a shift to
2  more risk in quality and cost to providers.  Again, that's
3  in the system-to-system context, but it's talking about some
4  of the value-based contracting.
5  Coming back up to the second point, it makes a
6  reference to "physicians having uncertainty about their
7  future and seeking security through employment, particularly
8  as it relates to capital investments."  And I expect that
9  most of that was referring to investments in information
10  technology.
11  Q.  And what are we looking at on slide 16?
12  A.  This slide also is a page from the Saint Al's
13  strategic plan.  Its title talks about physician delivery
14  networks, but the second bullet point down is particularly
15  interesting in the context of what I'm talking about here in
16  the system-to-system competition.
17  It says, "The region will have two fully aligned
18  systems with few crossover physicians."  I interpret that
19  "few crossover physicians" to mean that there are some that
20  are going to be loyal to Saint Al's, some that are going to
21  be loyal to St. Luke's -- whether that's employed or not
22  employed -- but there are going to be few that are admitting
23  patients at both institutions.
24  This slide also talks a little further down about
25  more physicians will be highly aligned.  But it's

2897

1  interesting; there is a point at the very last bullet that
2  says "strength and alignment with independent physicians."
3  It's clear and there is other documents and testimony that
4  alignment with independent physicians is an important part
5  of Saint Al's strategy, but it's part of St. Luke's strategy
6  as well.  And neither system plans to employ every physician
7  in the Treasure Valley.
8  Q.  So the second major feature of healthcare
9  competition in this market you identified is increasing
10  physician employment.  And so, Dr. Argue, what are we
11  looking at on slide 17?
12  A.  Again, it's a Saint Al's strategic planning
13  document.  And the title says what the slide is all about,
14  "Physician employment is increasing."
15  The red bars on this chart are for Saint Al's
16  employed physicians.  You can see that's rising over time.
17  The last bar, of course, compares that with St. Luke's.  And
18  it's clear that both of them have a significant employed
19  physician base.
20  The shaded box at the bottom, the implication says
21  "Rapid alignment of physicians is accelerating the
22  development of Saint Al's and St. Luke's into two integrated
23  health systems."
24  MR. STEIN:  Your Honor, at this point, we'll be
25  able to open the courtroom back up for a while until we have

2898

1  to close it again.
2       THE COURT: All right. Thank you.
3       ******COURTROOM OPEN TO THE PUBLIC******
4  BY MR. STEIN:
5       Q.  Dr. Argue, the third feature of healthcare
6  competition that you identified is the movement from volume
7  to value. Can you explain what you're referring to here and
8  the significance of that.
9       A.  Certainly. I probably ought to start with
10 defining what I mean by "volume" in this context. And
11 volume care -- volume-oriented care derives from the
12 fee-for-service system where the more you provide, the more
13 you get paid. So there is an incentive for providers to
14 enhance, to expand the amount of volume that they're going
15 to provide.
16      Value contracting or value-based care is just the
17 opposite where the incentive is on providing an equal or
18 higher quality of care at a lower cost to payors. And there
19 are different mechanisms that can be used for this. I have
20 got gain sharing on there, and that's kind of the baby steps
21 of value-based care, followed by bundling, and then
22 ultimately out to full risk.
23      The next-to-last bullet here talks about
24 information technology. And that's clearly a key point. We
25 have heard an awful lot about that in the trial so far. And

2899

1  the systems, to the extent they want to compete or are
2  compelled to compete on value-based care, need to understand
3  what is the value, what is the quality, and what is the cost
4  of the care that they're providing.
5       And these sophisticated information systems
6  collect the data and aggregate it and report it and feed it
7  back to the providers and to the system managers so they
8  know what's going on.
9       The -- let me just go back, if you could for a
10 second, Scott, to the last slide.
11      One of the important implications of this move
12 from volume to value is the transition that's going to be
13 required for providers, both for the health systems and
14 certainly for the physicians as well, as they adapt to the
15 new system.
16      Q.  Dr. Argue, the fourth key feature of healthcare
17 competition you identified is how provider and health plan
18 contracts are actually negotiated. Can you explain the
19 significance of this to your opinions.
20      A.  This slide gets us out of kind of the basic
21 profile of who the major players are or the types of major
22 players and begins to think about the dynamics of the
23 network process or the contracting process.
24      And the general understanding that I have got here
25 is that the contracts are negotiated on a -- over the

2900

1  percentage change in the total payments that the provider is
2  going to receive from the health plan. This is the lower-
3  right-hand corner that Professor Dranove talked about last
4  week or two.
5       And that total payment is then often allocated
6  among the services. Maybe it's split between inpatient and
7  outpatient. You could have a high increase in inpatient and
8  a lower increase in an outpatient; looking for an average
9  that's going to be X percent, whatever that is.
10      The way they get to this point -- the way the
11 health plans get to this point, the plans and the providers,
12 is with this bargaining process with the health plan on the
13 one side of the table and the providers, the health system,
14 on the other side.
15      Now, the health plan is there representing its
16 enrollees. It's trying to put together a product that's
17 going to be attractive to its enrollees and include the
18 providers that the enrollees think are going to be valuable.
19      But as they're sitting at this conference
20 table trying to figure out what this contract is going to
21 be, they both have to think about: What happens if I don't
22 get an agreement? What happens if I can't come to terms
23 with the plan or -- if you're on the provider side, or with
24 the provider if you're on the plan side.
25      And -- now, Professor Dranove didn't think that

2901

1  second part, the provider's outside option or best
2  alternative to a negotiated agreement -- didn't think that
3  was as important, but I'll talk about that more later.
4       An important feature of this -- this dynamic as
5  they're sitting at this conference table is: What is their
6  relative bargaining strength? There is more to it than
7  that, and I'll talk about it a little bit more later on.
8  But it's important to understand that the bargaining
9  strength of a plan or provider is determined by a lot more
10 than just its size.
11      Yes, a plan's enrollment affects its bargaining
12 strength, or a hospital or health system's physicians or the
13 number of surgery centers it's got affects the bargaining
14 power, but so do other things. So does their reputation or
15 the quality of the doctors that they have or the -- how they
16 fit into a network or their location. There are any number
17 of factors that affects that relative bargaining position.
18      Q.  Dr. Argue, the fifth feature of healthcare
19 competition you identified is how health plan products are
20 marketed. Can you explain what you mean by this and why
21 it's important?
22      A.  Having just gone through the last slide, where the
23 health plans and the providers sat down and negotiated their
24 contract, now the health plans have a network in place, and
25 now they have to go and market this to their -- their

2902

1  customers.
2       And from my research, all of the major health
3  plans market all of their products throughout the Treasure
4  Valley.  Now, when I say "all of their products," there
5  could be some narrow network products that don't include as
6  many providers.  There could be some broad products that
7  have very comprehensive set of providers located in there.
8       But the significant part about this is that none
9  of the plans markets their products in a narrow geographic
10 area.  There is no plan that sells a product just in Nampa.
11 They sell a product that includes Nampa but includes the
12 rest of the area as well.  And it doesn't matter whether
13 that's a narrow product or a broad product.
14      And I have just got some examples down at the
15 bottom with BCI and Micron that show their broad network and
16 their narrow network products.
17      Q.   And the last key feature of healthcare competition
18 that you identified is the movement from broad network to
19 narrow network products.  Can you explain what you mean by
20 that.
21      A.   This is a change that's been happening certainly
22 in the Treasure Valley; that is, the growth of more narrow
23 network products.  And it's happening elsewhere around the
24 country for sure.
25      The principle behind the narrow network, how they

2903

1  work and how they are made attractive in the first place is
2  that the health plan offers to set up a product that does
3  not include every provider.  It includes some subset of
4  providers, and that's going to concentrate and channel that
5  patient volume to that smaller group of providers.
6       And this is attractive to the provider because it
7  gives them greater volume, greater chance of getting a
8  higher volume of patients.  And they're willing to give up
9  something for it, so they will offer to reduce -- or they
10 will be compelled to reduce their rates if they want to be
11 the primary provider in that narrow-network product.
12      That reduction in cost -- in rates by the
13 providers leads to a reduction in costs by the health plans.
14 So that allows the health plan then to turn around and sell
15 this product at a lower premium and a lower out-of-pocket
16 cost.
17      Different consumers have different preferences.
18 Some like broad networks.  Some are happy with the narrow
19 network at a lower price.  So you can have a market like the
20 Treasure Valley where both products coexist.
21      There also are variations on this kind of a mixed
22 blend, the tiered network product -- we have heard about
23 that before, and I'll talk about it again in a little bit --
24 where there are both narrow network and broad networks
25 offered to a set of enrollees at the same time, and

2904

1  sometimes they can just choose.  At the point they need a
2  physician, they can go to the broad network, and they can go
3  to the narrow network, and their costs would reflect that.
4       A term that's -- that's used periodically -- and
5  I'll probably use it myself -- is this "directed benefits"
6  designs.  And it's not -- it's kind of a close cousin to a
7  tiered network.  And the more important point is that it is
8  another means by which health plans can try to influence the
9  choices of providers that their patients choose.
10      MR. STEIN:  Your Honor, just for the next slide,
11 if we could turn the public screen off.
12      THE COURT:  Yes.
13 BY MR. STEIN:
14      Q.   Dr. Argue, you just referenced a couple of minutes
15 ago this tradeoff between cost and volumes and a narrow
16 network.
17      Can you -- first of all, can you identify the document
18 or where this document comes from, the page that's reflected
19 in slide 23.
20      A.   It looks to me to be a Micron document.
21      Q.   Can you describe for the court generally how
22 this -- what's shown in this document relates to the
23 testimony you just provided?
24      A.   Okay.  I was just talking about the tradeoff in
25 the narrow networks and how the increase in volume can

2905

1  offset the reduction in costs, and that's what makes it
2  attractive to the -- to the health plan.
3       And this on the left-hand side, that box shows
4  what Micron anticipated their increase in volume had to be
5  to break even, to get enough extra volume to account for
6  that reduction in their prices or their rates.
7       The box on the right-hand side shows what they
8  actually achieved in the first -- it looks like the first
9  six months of the -- of their arrangement.  And you can see
10 that was substantially larger than what they needed to
11 achieve to make that a profitable change for them.
12      Q.   Profitable change for the providers who took the
13 discounts?
14      A.   That's correct.
15      Q.   We can turn the monitor back on now, Your Honor.
16      THE COURT:  We can turn it back on?
17      MR. STEIN:  Yes.
18      THE COURT:  I'm sorry.
19 BY MR. STEIN:
20      Q.   So on the subject of Micron, Dr. Argue, obviously
21 the court has heard a fair bit about Micron over the last
22 few weeks.  What is described on this slide, slide 24?
23      A.   This is just a -- a somewhat souped-up graphic
24 version of a brochure that was handed out to the Micron
25 employees.

2906

1    I don't need to go over in great detail what's
2    here.  The two parts of it that are most interesting to me
3    and to my analysis are the -- you have got those bullets,
4    target rings there for the Micron networks.  Not the center
5    one but the next one out, the Micron Health Partners
6    Network, that's their limited, their narrow network product.
7    And you can see from the box on the bottom, that the MHPN
8    only accounts for about 25 percent of area physicians.
9    Micron and their consultants were very selective in who they
10   included in that network.
11            And the next ring out, the Wise PPO, was much
12   broader, with 1600 Treasure Valley providers.
13       Q.   What's reflected on slide 25?
14       A.   This is just showing us again, for Micron, the
15   view that the patient has or the enrollee has as they're
16   thinking about or in need of care.  What do they do?
17            This says copays for primary care office visits.
18   And it shows -- again, skip the health center, but go to the
19   MHPN.  The MHPN, the coinsurance amount, is 10 percent.  And
20   for PPO, the coinsurance is 20 percent.
21            And I -- this coinsurance is really just a part of
22   a -- it's just a percentage that's multiplied by the allowed
23   amount to get what their out-of-pocket copay is.
24       Q.   And, Dr. Argue, based on the evidence that you
25   have examined, did the implementation of the Micron Health

2907

1    Partners Network succeed in causing patients to switch
2    providers?
3        A.   There are several sources of information that
4    confirm that.
5        Q.   Okay.  So let's talk about one of the main
6    responses that the plaintiffs have to that argument, which
7    is this argument that Micron is just different, that -- that
8    there is really nothing to take away from what's happened
9    with Micron as far as what might happen in response to
10   a -- an above competitive price increase in this case.  Do
11   you agree with that argument?
12       A.   No, I don't.
13       Q.   And why not?
14       A.   You know, I looked at this.  I heard that
15   argument, and I -- I tried to collect what information I
16   could about Micron and the others.
17            And it doesn't strike me that Micron is
18   substantially different in the context of what we're talking
19   about here.  Micron faces intense competition; there is no
20   doubt about that.  But they're not the only employer in the
21   Treasure Valley that faces intense competition.
22            Part of competing in a difficult market is
23   controlling your costs.  And it's hard to think of a
24   competitor who is more adept at controlling their costs than
25   Walmart, also in a very intensely competitive retail

2908

1    industry.  They're here in the Treasure Valley.
2            Paul's Market is a series of grocery stores or a
3    chain of grocery stores.  They typically have very narrow
4    margins, and they surely are facing intense competition with
5    any other grocer in the area.
6            Now, there is also the argument and the testimony
7    by Mr. Otte that Micron was losing money, losing buckets of
8    money, in 2008, at one point, $6 billion.  And 2009 was the
9    start of the recession that undoubtedly affected Micron as
10   well as other firms.
11            But by 2010, Mr. Otte testified that Micron was
12   making $1.8 billion, and the following year it acquired a
13   large competitor.  This is not the profile of a company that
14   is continuously wallowing in financial stress.  They didn't
15   end up changing their health plan after 2009, when things
16   turned around.
17       Q.   And is Micron the only company that -- in this
18   market that you've seen that's implemented one of these
19   narrow or directed type products?
20       A.   No, it's not.  I mentioned Walmart in the last
21   slide as a competitor.  And Walmart is one that has signed
22   onto a network that's very similar to Micron's.  It's not
23   identical, but it's similar.
24            Paul's Market, I mentioned, has a directed benefit
25   type program, as does Thomas Cuisine and Woodgrain.  The

2909

1    other two, Boise Schools and Idaho Power, had those similar
2    types of agreements until just recently.
3        Q.   And this -- this move toward more -- toward the
4    growth of narrow networks from broader networks, are narrow
5    networks right now -- do they have a large share of
6    the -- of the covered lives in Idaho or in the Treasure
7    Valley?
8        A.   I think -- I haven't measured that exactly, but I
9    think generally not.  I think more people are currently in
10   the broader network products.
11       Q.   Does that mean that that is, in fact, likely the
12   way things are going to stay in the future?
13       A.   There are a lot of indications that that's not the
14   way.  I don't know what's ultimately in the future in terms
15   of the split between the two, but it's clear that the narrow
16   network products are growing.
17       Q.   And have you seen any evidence from the -- from
18   the plaintiffs that, in fact, they likewise think that the
19   narrow networks will be increasing in the future?
20       A.   Yes.  There are a number of sources of evidence.
21       Q.   And what are we looking at here, for example, on
22   slide 29?
23       A.   This slide is a document from Saint Al's
24   production from the hospital plaintiffs' counsel to the FTC
25   that makes reference to clinical advancement being

2910

1   inextricably linked to narrow networks.  That's in the first
2   sentence.
3       A couple of sentences down it says, "This requires
4   that those patients' lives be exclusive or virtually
5   exclusive to the particular network."
6       That reference to "particular network" is the
7   narrow network that we're talking about.
8       And going on to the next sentence, you can see
9   references to managing care of patients.  This -- when
10  Ms. Jeffcoat was asked about this in her deposition, she
11  confirmed that she agreed to it -- agreed with that
12  paragraph largely, and Mr. Peterson agreed with it as well
13  in his deposition transcript.
14      Q.  So, Dr. Argue, I would like to move on now to one
15  of the other major components of your analysis, which is a
16  critical loss analysis.  And I would like to start and see
17  if you could explain to the court in as layman's terms as
18  possible what a critical loss analysis is.
19      A.  The antitrust question before us, the antitrust
20  question in this type of hearing, is:  Does this transaction
21  give St. Luke's-Saltzer the ability to raise prices above
22  competitive levels by some what we call small but
23  significant amount, usually thought of as 5 to 10 percent?
24  Does it enable the parties to raise prices above competitive
25  levels without losing so many patients that that price

2911

1   increase is unprofitable?
2       And the last part of that is really important,
3   "without losing so many patients."  What the critical loss
4   does is it gives us a measure of what is enough lost
5   patients to make that price increase unprofitable.
6       Q.  And in the slide here, you refer to -- there is a
7   bullet about halfway down.  It says, "Are there enough
8   'marginal' customers who would react in response to a
9   supracompetitive price increase?"
10      Can you explain what you mean by that?
11      A.  "Marginal" is one of those terms that economists
12  throw around a lot, and it's not a terribly complicated one,
13  but it's probably worth, as you point out, defining it a
14  little bit.
15      We're talking here about a change from one state
16  of the world to another, before there is a price increase or
17  supposed price increase to after.  And what we're looking --
18  what we want to see is what's going to happen to customers,
19  to patients and health plans and employers in those two
20  states of the world.
21      Some people are not going to change their
22  behavior.  They are going to be just like they were before.
23  Some people might change their behavior, and those are the
24  marginal customers.  It's not everybody.  It may not even be
25  very many patients or purchasers.

2912

1       But that's the response that's going to be most
2   important for determining the profitability of that price
3   increase and ultimately whether the transaction is creating
4   market power.
5       Now, I mentioned here that this is used in market
6   definition in competitive effects, and we'll use it in
7   market definition with this hypothetical monopolist.  We
8   will use it in competitive effects when we're talking
9   specifically about St. Luke's and Saltzer.
10      What's really most important about this critical
11  loss is it's an objective yardstick.  It gives us something
12  to shoot at.  We don't have to guess how many patients would
13  have to be lost.  This number comes out of the revenues and
14  costs -- directly out of the revenues and costs, in this
15  case of St. Luke's Family Medicine Centers.
16      Q.  So if I -- if we understand correctly, the first
17  thing you do as part of this analysis is you calculate this
18  critical loss figure?
19      A.  That's right.
20      Q.  And what type of information do you use to
21  identify for, let's say, the combined St. Luke's and
22  Saltzer, what that critical loss would be?
23      A.  I collect information -- excuse me -- I collect
24  information on revenues for the St. Luke's primary care
25  practices and on their costs, both their fixed costs and

2913

1   their variable costs.
2       Q.  And is the relevant question once you have
3   identified that critical loss, is it whether if a combined
4   St. Luke's and Saltzer raised price by a certain amount,
5   like 5 percent, would they lose enough patients that the
6   price -- that the loss of patients would exceed that
7   critical loss amount?
8       A.  That's -- that's the question that's ultimately
9   where we want to get.
10      Q.  Now, you talked about critical loss being kind of
11  an objective benchmark.  You know, you can look at the data
12  and just calculate this number.
13      Is this critical loss test, is this something that
14  David Argue just came up with himself, or is it something
15  propriety that Economists Incorporated came up with?
16      A.  No.  The critical loss has been around for close
17  to 30 years.  It's been used -- it was first published in
18  articles.  It's been discussed in articles over the years.
19  It's been used in many, many transactions, analyses,
20  antitrust analyses, healthcare and nonhealthcare.
21      It's even incorporated or it's discussed in the
22  merger guidelines as a tool that can be used for analyzing
23  transactions of this type.
24      Q.  Now, you submitted several reports in this case;
25  is that right, Dr. Argue?

2914

1    **A.**  Yes.

2        **Q.**  And Professor Dranove in his reports criticizes

3    the use of critical loss analysis; is that right?

4    **A.**  That's right, he does.

5        **Q.**  I anticipate we will probably be hearing about

6    that some on Monday.  But since you won't be here then,

7    could you summarize for the court your understanding of what

8    the basic critiques that Dr. Dranove has of critical loss

9    are and what your response to those is.

10   **A.**  The way I understand it, he has got, let's call

11   it, two basic critiques.  The first one maybe encapsulates

12   more than one, but the fundamental issue that -- let me back

13   up a little bit.

14       As I mentioned, we have this price-cost margin.  I

15   guess I didn't mention it, but a key part of the critical

16   loss analysis is determining the price-cost margin.

17   Professor Dranove has -- he and I disagree on the

18   implications of that price-cost margin as it relates to the

19   elasticity of demand.  I promise I won't use that term

20   again.

21       But what we're talking about is the price

22   sensitivity of patients to changes in price.  And I'm not

23   the only one who disagrees with Professor Dranove on that

24   concept.  There are published articles that have critiques

25   that supports my view.  So that I think is the first one.

2915

1        Well, there are -- well, yeah, I'll just leave it

2    at that.  It's all about how you use this margin and whether

3    you can use it to test sensitivity of patients.

4        The second one is that he articulated a position

5    that he thought the critical loss analysis was not relevant

6    for assessing hospital transactions that were where the

7    bargaining process was used to reach an agreement and

8    determine what the terms of the contract would be.

9        And that critique was based on his examination of

10   six or seven articles.  I have read those articles.  I read

11   them before he issued his critique.  And I thought each one

12   of them to be, independently of the issue of critical loss,

13   just to be not -- not very well established for assessing

14   antitrust issues and competitive effects in the hospital

15   transactions that he was looking at there.

16       I thought that some of them had measures of price

17   that were not accurate or the market definition was largely

18   arbitrary.  There were other theoretical components of those

19   that were not appropriate.  And they may be fine for an

20   academic article; it may be completely benign to make an

21   assumption about what the price is.  But when we're talking

22   about applying the lessons -- or if there are lessons from

23   those articles -- to a real-world situation like we have got

24   here, I think that's inappropriate basis for a critique of

25   the critical loss.

2916

1        **Q.**  And I take it that this discussion of competing

2    positions between you and Professor Dranove on critical loss

3    is something that's discussed more fully in your reports?

4    **A.**  Yes, it is.

5        MR. STEIN:  Your Honor, at this point we are going

6    to be moving into a few slides that are -- contain

7    St. Luke's attorneys' eyes only information.  My thought is

8    maybe we would just ask anyone not affiliated with

9    St. Luke's to leave the courtroom, and that would probably

10   take us through the end of today.

11       THE COURT:  All right.  Again, anyone who is not

12   affiliated with St. Luke's or is otherwise not been

13   designated as someone who can stay because they have signed

14   the protective order will be instructed to leave the

15   courtroom.

16       ******COURTROOM CLOSED TO THE PUBLIC******

17   BY MR. STEIN:

18       **Q.**  So, Dr. Argue, you mentioned that you did a

19   critical loss analysis.  And is the summary of your analysis

20   of critical loss reflected on slide 32?

21   **A.**  Yes, it is.  It shows a critical loss of 8.8

22   percent for a 5 percent price increase.

23       **Q.**  Okay.  So this is, I think for a lot of people, a

24   difficult but I think important concept to understand.  So

25   can you explain what it means when you say that the critical

2917

1    loss for St. Luke's for primary care physicians services is

2    8.8 percent for a 5 percent price increase.

3        **A.**  What it means is that if, as a result of this

4    transaction, St. Luke's-Saltzer tried to raise the prices of

5    their primary care physicians services by just 5 percent and

6    they lost as little as 8.8 percent of their patient volume

7    and the associated patient revenue, that price increase

8    would be unprofitable.  They would have lost too much in

9    revenue from these lost patients that's not made up by the

10   increase in the price for the patients who stay.

11       If that is unprofitable, it means that

12   St. Luke's-Saltzer is not able to impose that price increase

13   on payors, and the price would then revert to the

14   competitive levels.

15       The conclusion would be that St. Luke's-Saltzer

16   does not have market power.

17       **Q.**  And the analysis that you did calculate that

18   figure, is that reflected in Exhibit 2570, the exhibit to

19   your report?

20   **A.**  Yes.  Yes.  The fuzzy numbers behind are all

21   there.

22       THE COURT:  Let me make sure I understand what

23   you're saying.  If I understand you correctly, what

24   you're -- that if -- if the -- if St. Luke's and the Saltzer

25   Medical Group were to increase prices by 5 percent, a loss

2918

1 of 8.8 percent in their volume would make that a losing
2 proposition for them?
3          THE WITNESS:  That's essentially right.
4          THE COURT:  You're not saying that that, in fact,
5 would result -- that a 5 percent increase would result in an
6 8.8 percent loss in volume, but that's kind of the -- I'll
7 call it a break-even point or a point at which they would
8 have to make that kind of an assessment?
9          THE WITNESS:  That's actually a critical point,
10 and we'll get into this in a little bit more.  But calling
11 it a break-even point is spot on.  That's exactly what it
12 is.
13          THE COURT:  All right.  Go ahead.
14 BY MR. STEIN:
15     Q.  And, Dr. Argue, the 8.8 figure, did
16 you -- had you previously in the course of your work in this
17 case calculate a different critical loss?
18     A.  Yes.  When I first calculated it, I had a number
19 of 6.8 percent for a 5 percent price increase.
20     Q.  So that would have been a -- obviously a lower
21 break-even point for the price increase; right?
22     A.  That's right.  It would have been exceeded with
23 even fewer patients leaving.
24     Q.  So what is it that caused you ultimately to
25 calculate a different critical loss of 8.8 percent?

2919

1     A.  Well, Professor Dranove in his reply report
2 reviewed the critical loss calculation I had done and
3 critiqued it.  I think his conclusions in his critique were
4 very excessive, but it gave me reason to go back and check
5 the sources I had used to confirm that I had done
6 things -- I had interpreted the information correctly, that
7 I had gathered all the information that I needed to do it.
8          And in the process of collecting that data and
9 laying it all out, I realized that I had needed to make some
10 adjustments to that.  So I ended up recalculating the
11 critical loss.  It made it worse as far as
12 St. Luke's-Saltzer go, but the 8.8 percent I believe is the
13 correct figure.
14     Q.  Now, the way you described the critical loss
15 figure is if St. Luke's lost 8.8 percent of primary care
16 physician service revenue, that would make a 5 percent
17 increase unprofitable.  Does that mean the only thing that
18 we -- one would focus on in considering the effect of a
19 hypothetical price increase is just lost revenues from the
20 professional services of primary care physicians?
21     A.  No.  You know, this is a health system.  So as
22 the -- the tape that was played here a little while before
23 talked about PCP services can result in additional services
24 provided to those same patients, whether it's ambulatory
25 care or ancillary services, or some of them get admitted

2920

1 into the hospital.
2          So it's fair enough in this context to say:  If
3 they raise the price of their physician services and that
4 causes some patients to leave, what are the follow-on lost
5 revenues that may occur?
6          The only price increase is in the PCP services.
7 There is only that little sliver, that 5 percent at the top
8 of the PCP services, and there is some lost volume, but that
9 lost value ripples through the health system in the form of
10 a lost inpatient and outpatient and so forth.  And there is
11 no price increase there.  There is nothing there to offset
12 it, so that's just a pure loss to the extent that that
13 carries through.
14          And I did some calculations on that.  I tried to
15 figure out, you know, on average what was the kind of
16 follow-on revenue that might come from certain number of PCP
17 visits.  And I did these calculations, and it turns out that
18 it's about fivefold.  The one dollar lost in PCP -- or for
19 every dollar lost in PCP revenue, the system can trace another
20 five dollars in additional revenue elsewhere.  That really
21 magnifies the impact of the critical loss.
22          So now, instead of losing 8.8 percent, you lose a
23 much smaller number of patients and their revenue because
24 there is the additional revenue that's lost going --
25 carrying out throughout the rest of the system.  That's

2921

1 all -- all that lost revenue is offsetting that little
2 sliver of increased price or increased revenue that's coming
3 on just those PCP services.
4          So my calculation is that, instead of an 8.8
5 percent, it could be as little as one-and-a-half percent.
6 And that's unusual, but it's because of that, the breadth of
7 the system and the follow-on care that might be -- might be
8 lost as well.
9     Q.  So is the idea that if a -- for example, if -- if
10 because the price of certain services goes up and a patient
11 decides to go to a different provider, then St. Luke's is
12 losing not only the primary care professional revenue, but
13 to the extent that patient needed other services -- lab
14 services or they had an outpatient surgery -- those revenues
15 go to another system or provider as well?
16     A.  That -- that's exactly right.  And I hope I
17 explained it clearly that there is this multiplier effect.
18 And it's not literally a multiplier effect, but there is
19 some natural follow-on care that's provided in the health
20 system that would be lost along with the PCP revenue.
21     Q.  And so when you consider those other revenues that
22 might be associated with a primary care visit, how does that
23 affect the loss of patients or the extent to which there
24 would need to be loss of patients for the critical loss
25 threshold to be exceeded?

2922

1    **A.** Well, it would greatly reduce it.

2    **Q.** So let's turn to the question that the court asked

3    a couple of minutes ago, which is -- so you've identified

4    this critical loss.  Now, obviously, the key question is:

5    If Saltzer and St. Luke's were to try to raise prices by a

6    small but significant amount, say 5 percent, are they going

7    to lose enough revenue that it would be unprofitable?  Did

8    you calculate what the specific losses would be?

9    **A.** There is no specific single number that you can

10   put your finger on.  It's nice enough to have the 8.8

11   percent to put your finger on, but it's not practical.

12   There is no -- insufficient information to say I know

13   exactly what's going to happen.

14   A lot of my analysis throughout the rest of this

15   testimony is going to be about trying to get my hands around

16   would that actual loss exceed the critical loss, the 8.8

17   percent.  And I have to evaluate a lot of different sources

18   of information and give my opinion and my value judgment or

19   my judgments as part of this analysis as to whether that

20   would actually occur.

21   **Q.** And what type of information do you consider in

22   trying to determine whether the actual loss that would

23   be -- would be experienced in this hypothetical

24   price-increase world would exceed that critical loss?

25   **A.** If you don't mind, Scott, if you could go back one

2923

1    slide.  There is a point on this that I think is important

2    not to lose.

3    THE COURT:  Could I just ask -- just so I'm

4    absolutely clear on this, when we use the word "critical

5    loss," we're talking about a loss of volume, a loss of

6    patients; correct?

7    THE WITNESS:  That's right.  It's the loss of

8    patients that really ought to be thought of as the revenue

9    associated with those patients.  Now, there is some cost

10   loss as well, but it's really this balancing that we're

11   talking about.

12   THE COURT:  The problem is when I think of losses,

13   it's -- I immediately start thinking with a dollar sign

14   associated.  And I guess at the end of the day, there is a

15   dollar sign.  But what you're referring to by "critical

16   loss" is a loss of volume --

17   THE WITNESS:  That's right.  That's right.

18   THE COURT:  -- reflected in patients and ancillary

19   services and whatnot.

20   THE WITNESS:  Yeah.

21   THE COURT:  Go ahead, Mr. Stein.

22   BY MR. STEIN:

23   **Q.** Dr. Argue, with respect to the loss of patients --

24   and maybe this is what you were about to discuss -- but one

25   way that's been discussed is:  Well, if the price of primary

2924

1    care services goes up, is that going to cause patients to

2    choose a different primary care provider?  And is that one

3    of the ways that you're talking about how patient volume can

4    be affected by a price increase?

5    **A.** Yes.  A price of -- the price that's felt by the

6    patient, the out-of-pocket costs, could cause the patient,

7    him or herself individually, to make a decision not to use

8    that provider.  And that would contribute to the critical

9    loss.

10   **Q.** But are there other ways that -- that a combined

11   St. Luke's-Saltzer could be affected by an attempted

12   increase in price apart from just the immediate effect on

13   the patient?

14   **A.** Absolutely.  One of the other ways is the

15   possibility that a health plan will decide they don't want

16   that provider in their network.  They don't want St. Luke's

17   and Saltzer in their network anymore -- maybe an employer,

18   maybe a health plan -- because of that increase in price.

19   That could also contribute to the critical loss.  Maybe it

20   would exceed it, maybe it wouldn't, but it would add into

21   the critical loss.

22   And there is a third part which we often don't

23   think about.  But as the price of the provider goes up, it's

24   adding to the cost of the health plan, and the health plan

25   is going to add that on in premiums.  It's going to go up,

2925

1    and it's going to cause premiums to increase.

2    To some extent, patients are going to just be

3    unable to afford the healthcare anymore, the health

4    insurance anymore, and will drop off the commercial

5    insurance rolls.  They may become uninsured.  They may

6    become Medicaid insured.  But, in any event, all three of

7    those parts -- the patient moving, the change in the

8    network, and the premium -- can cause losses to the provider

9    that's raising prices.

10   THE COURT:  With regard to that third component,

11   how does the Affordable Care Act play into that, or does it?

12   THE WITNESS:  It ultimately may play into that.  I

13   think it's going to depend a lot on the dynamics or the

14   specific terms of how these contracts are set up in Idaho

15   and the level of payment that gets -- now, if a commercial

16   product has a higher payment rate for a regular product than

17   it would for one that's in one of these networks, then even

18   if somebody drops out of a commercial product and joins one

19   of the exchanges -- that's what I meant to say -- one of the

20   exchange products, if it's being reimbursed at a lower rate,

21   that's a loss relative to what St. Luke's and Saltzer would

22   have had had they not had that price increase and not had

23   that loss of patient because of the increased premium.

24   BY MR. STEIN:

25   **Q.** So, Dr. Argue, what kind of information have you

2926

1  considered in trying to determine whether the actual loss
2  would exceed this critical loss threshold?
3      A.  There are a number of them listed on this slide.
4  Certainly the patient origin data that I mentioned early on
5  is an important source.  I looked at the proximity of PCPs
6  to folks' homes and their work.  I examined the experience
7  of employers with tiered networks.
8      I looked a lot at the price sensitivity of
9  enrollees and patients.  And there was some information on
10 the willingness of patients to change physicians.  All of
11 those were part of determining what the actual loss would
12 be.
13     MR. STEIN:  Your Honor, this is actually a natural
14 breaking point.
15     THE COURT:  All right.  Why don't we -- we'll
16 reconvene at 8:30 tomorrow morning.  I'm trying to
17 think -- oh, we need -- let's go ahead and publish
18 depositions very quickly, just put it on the record.
19     Ms. Gearhart, if you'll announce the depositions that I
20 have directed to be published.
21     THE CLERK:  The depositions of Steven Brown taken
22 May 2nd, 2013; Alain Enthoven taken August 9th, 2013;
23 Marc Chasin taken March 21st, 2013; William Deal taken
24 July 2nd, 2013; Patricia Richards taken June 13, 2013;
25 Roberto Barresi taken June 3, 2013; Kurt Seppi taken

2927

1  May 14th, 2013; Rodney Reider taken April 10th, 2013;
2  Blaine Petersen taken May 17, 2013; and Thomas Reinhardt
3  taken May 22, 2013, are published.
4      THE COURT:  All right.  Thank you.
5      All right.  Counsel, we'll reconvene tomorrow morning
6  at 8:30.  I have another hearing at 3:30 in here.  But it's
7  I think just an audio status conference in an MDL case.  So
8  I guess you clear out every night pretty much anyway, but I
9  thought I would just let you know you probably don't need to
10 clear out as much as you might otherwise.
11     We'll be in recess until 8:30 tomorrow morning.
12     (Court recessed at 2:32 p.m.)

1      R E P O R T E R ' S   C E R T I F I C A T E
2
3
4
5      I, Tamara I. Hohenleitner, Official
6  Court Reporter, County of Ada, State of Idaho,
7  hereby certify:
8      That I am the reporter who transcribed
9  the proceedings had in the above-entitled action
10 in machine shorthand and thereafter the same was
11 reduced into typewriting under my direct
12 supervision; and
13     That the foregoing transcript contains a
14 full, true, and accurate record of the proceedings
15 had in the above and foregoing cause, which was
16 heard at Boise, Idaho.
17     IN WITNESS WHEREOF, I have hereunto set
18 my hand October 17, 2013.
19
20 _____-s-_____
   Tamara I. Hohenleitner
21 Official Court Reporter
   CSR No. 619
22
23
24
25