Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.      Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 1 of 68

3140

1                  UNITED STATES DISTRICT COURT

2                   IN THE DISTRICT OF IDAHO

3    - - - - - - - - - - - - - - - - - - x Case No. 1:12-cv-00560-BLW
4    SAINT ALPHONSUS MEDICAL CENTER -    :
     NAMPA, INC., TREASURE VALLEY        : Bench Trial
5    HOSPITAL LIMITED PARTNERSHIP, SAINT : **Witnesses:**
     ALPHONSUS HEALTH SYSTEM, INC., AND  : **Lisa Ahern**
6    SAINT ALPHONSUS REGIONAL MEDICAL    : **Thomas S. Patterson**
     CENTER, INC.,                       : **Harold V. Kunz**
7                        Plaintiffs,     : **Greg Sonnenberg**
              vs.                        :
8                                        :
     ST. LUKE'S HEALTH SYSTEM, LTD., and :
9    ST. LUKE'S REGIONAL MEDICAL CENTER, :
     LTD.,                               :
10                       Defendants.     :
     - - - - - - - - - - - - - - - - - - : Case No. 1:13-cv-00116-BLW
11   FEDERAL TRADE COMMISSION; STATE OF  :
     IDAHO,                              :
12                       Plaintiffs,     :
              vs.                        :
13                                       :
     ST. LUKE'S HEALTH SYSTEM, LTD.;     :
14   SALTZER MEDICAL GROUP, P.A.,        :
                                         :
15                       Defendants.     :
     - - - - - - - - - - - - - - - - - - x

16                  * * * SEALED * * *

17

18   REPORTER'S TRANSCRIPT OF PROCEEDINGS

19     before B. Lynn Winmill, Chief District Judge

20     Held on October 18, 2013

21     Volume 17, Pages 3140 to 3397

22

23              **Tamara I. Hohenleitner**
          Idaho Certified Shorthand Reporter No. 619
24              Registered Professional Reporter
                Certified Realtime Reporter
25          Federal Certified Realtime Reporter

          United States Courts, District of Idaho
     550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

3141

1                                                   A P P E A R A N C E S

2

3

      FOR PLAINTIFFS SAINT ALPHONSUS MEDICAL CENTER-NAMPA, INC.,
4     SAINT ALPHONSUS HEALTH SYSTEM, INC.,
      AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.

5

6          Keely E. Duke
           DUKE SCANLAN & HALL, PLLC
7          1087 W. River Street, Suite 300
           Boise, ID 83707
8
           David A. Ettinger
9          HONIGMAN MILLER SCHWARTZ AND COHN LLP
           2290 First National Building
10         660 Woodward Avenue
           Detroit, MI 48226
11

12

13    FOR PLAINTIFF U.S. FEDERAL TRADE COMMISSION

14

15         Peter C. Herrick
           U.S. FEDERAL TRADE COMMISSION
16         500 Pennsylvania Ave., N.W.
           Washington, DC 20580
17
           J. Thomas Greene
18         U.S. FEDERAL TRADE COMMISSION
           600 Pennsylvania Ave N.W.
19         Washington, DC 20580

20         Henry Chao-Lon Su
           U.S. FEDERAL TRADE COMMISSION
21         601 New Jersey Ave., N.W.
           Washington, DC 20001
22

23

24

25

3142

```
 1                          A P P E A R A N C E S  (Continued)

 2

 3       FOR PLAINTIFF STATE OF IDAHO

 4              Eric J. Wilson
                GODFREY & KAHN, S.C.
 5              One East Main Street
                Suite 500
 6              PO Box 2719
                Madison, WI 53701

 7
                Brett T. DeLange
 8              OFFICE OF ATTORNEY GENERAL, STATE OF IDAHO
                954 W. Jefferson, 2nd Floor
 9              Boise, ID 83720-0010

10

         FOR PLAINTIFF TREASURE VALLEY HOSPITAL
11
                Raymond D. Powers
12              POWERS TOLMAN FARLEY, PLLC
                PO Box 9756
13              Boise, ID 83707

14

         FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, LTD.
15       AND ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

16              Jack R. Bierig
                Ben J. Keith
17              Scott Stein
                Charles Schafer
18              SIDLEY AUSTIN
                One South Dearborn
19              Chicago, IL 60603

20              J. Walter Sinclair
                STOEL RIVES
21              101 S. Capitol Boulevard, Suite 1900
                Boise, ID 83702
22

         FOR DEFENDANT SALTZER MEDICAL GROUP
23
                Brian Kenneth Julian
24              ANDERSON JULIAN & HULL, LLP
                PO Box 7426
25              Boise, ID 83707
```

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 4 of 68

Bench trial, 10/18/2013

3143

1                                                    I N D E X

2

3

| | | PAGE: |
|---|---|---|
| | Courtroom open to the public...................... | 3144 |
| | Courtroom closed to the public................... | 3151 |
| | Courtroom open to the public...................... | 3308 |

7                                            PLAINTIFFS

8                                    W I T N E S S E S

9

| | | PAGE: |
|---|---|---|
| SONNENBERG, Greg | | |
| | Direct Examination by Ms. Duke................ | **3385** |
| | Cross-Examination by Mr. Stein................ | **3390** |

13                           DEFENSE ST. LUKE'S HEALTH SYSTEM

14                                    W I T N E S S E S

15

| | | PAGE: |
|---|---|---|
| AHERN, Lisa | | |
| | Direct Examination by Mr. Schafer............ | **3145** |
| | Cross-Examination by Mr. Ettinger............ | **3255** |
| | Redirect Examination by Mr. Schafer.......... | **3291** |
| | Examination by the Court..................... | **3296** |
| | Continued Redirect Examination by Mr. Schafer. | **3302** |
| | Recross-Examination by Mr. Ettinger.......... | **3304** |
| KUNZ, Harold V. | | |
| | Direct Examination by Mr. Bierig............. | **3342** |
| | Cross-Examination by Mr. Ettinger............ | **3368** |
| | Cross-Examination by Mr. Powers.............. | **3381** |
| | Redirect Examination by Mr. Bierig........... | **3382** |
| PATTERSON, Thomas, S. | | |
| | Direct Examination by Mr. Bierig............. | **3309** |
| | Cross-Examination by Ms. Duke................ | **3331** |
| | Cross-Examination by Mr. Powers.............. | **3340** |

                                    * * * * *

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 5 of 68

3144

                    P R O C E E D I N G S
1
2                    October 18, 2013
3            ******COURTROOM OPEN TO THE PUBLIC******
4        THE CLERK:  The court will now hear Civil Case
5    12-560-S-BLW, Saint Alphonsus Medical Center, Nampa, Inc.,
6    versus St. Luke's Health System for Day 17 of a bench trial.
7        THE COURT:  Good morning, Counsel.
8        I believe, Counsel, just to kind of keep the record
9    straight, I did conclude last night after reviewing the
10   portions of the deposition and also the exhibit itself that
11   I just simply didn't see the relevance of Exhibit 2104, so
12   I'm going to exclude that for the record.
13       Now, I think we're ready to proceed.  Mr. Schafer.
14       MR. SCHAFER:  Thank you, Your Honor.  Defendants
15   call Lisa Ahern.
16       THE COURT:  Ms. Ahern, would you please step
17   before the clerk and be sworn as a witness and then follow
18   her directions from there.
19                    LISA AHERN,
20   having been first duly sworn to tell the whole truth,
21   testified as follows:
22       THE CLERK:  Please take a seat in the witness
23   stand.
24       Please state your complete name and spell your name for
25   the record.

3145

1        THE WITNESS:  My name is Lisa Ahern, L-I-S-A
2    A-H-E-R-N.
3        THE COURT:  Mr. Schafer, you may examine the
4    witness.
5        MR. SCHAFER:  Thank you, Your Honor.
6                    DIRECT EXAMINATION
7    BY MR. SCHAFER:
8        Q.  Good morning, Ms. Ahern.
9        A.  Good morning.
10       Q.  What do you do for a living?
11       A.  I am a financial consultant, analyst, and advisor.
12       Q.  Who is your employer?
13       A.  I work for AlixPartners, LLP.
14       Q.  What does AlixPartners, LLP, do?
15       A.  We're a professional services firm.  We provide a
16   range of financial consulting, management consulting, and IT
17   consulting services.
18       Q.  What's your position at AlixPartners?
19       A.  I am a managing director, which is our equivalent
20   to a partner, in the Financial Advisory Services Department.
21       Q.  And how long have you been a managing director of
22   that department?
23       A.  Since January of 2005.
24       Q.  Can you please describe what, if any,
25   healthcare-related work you've done as a managing director

3146

1    in the Financial Advisory Services group.
2        A.  Sure.  My work frequently focuses on the advising
3    of healthcare clients.  In particular, I focus on analyses
4    of healthcare organizations joining together in potential
5    transactions.  So I'm frequently analyzing both historical
6    and projected financial data, both for hospitals, health
7    systems, as well as for physician practices.  Oftentimes,
8    I'm looking at the staffing of departments within
9    organizations, be it hospital departments, from a clinical
10   or nonclinical standpoint, but also physician -- recruiting
11   physician plans.
12       Q.  Have you had any recent opportunities to speak on
13   the types of issues you just discussed?
14       A.  I have.  I was recently invited by the American
15   Health Lawyers Association to serve as the financial expert
16   on a panel on the topic of antitrust issues and efficiency
17   matters.  I was on that panel with counsel, as well as
18   members of the Federal Trade Commission.
19       Q.  Ms. Ahern, have you worked on projects where you
20   focused on the acquisition or recruitment of physicians or
21   physician practices by health systems?
22       A.  I do, yes.  I'm often involved in -- the analysis
23   that I'm doing is often focused on, in part, physician
24   recruiting and physician practices.
25       Q.  Ms. Ahern, where did you work before joining

3147

1    AlixPartners?
2        A.  Prior to AlixPartners I was with Ernst & Young,
3    and before Ernst & Young with Price Waterhouse in the days
4    before it was PricewaterhouseCoopers.
5        Q.  Could you please describe your educational
6    background.
7        A.  Sure.  I have a bachelor of science degree in
8    economics from the University of Iowa.  I -- my degree is
9    with honors and distinction, and my undergraduate honors
10   thesis was in the field of health economics.  I also have a
11   master's of business administration degree, also from the
12   University of Iowa, with an emphasis in corporate finance.
13       Q.  What percentage of the work that you have
14   performed at AlixPartners involves healthcare-related
15   issues?
16       A.  Well, it varies, but I would say over the last
17   five years it's been 50 to 75 percent of my time, and very
18   frequently it's 100 percent of my time.
19       Q.  Over the course of your career, how many
20   engagements have you worked on where the focus of the matter
21   involved a healthcare entity?
22       A.  I haven't tallied that up, but I would venture a
23   guess of approximately 50 different engagements involving
24   healthcare and life sciences-type companies.
25       Q.  Have your engagements involved financial analysis

3148

1  of hospitals, as well as physicians and physician groups?
2      **A.**  Yes.
3          MR. SCHAFER:  I would like to ask Mr. Chase to put
4  your resumé up on the board.
5          And Your Honor, I also have a binder of documents for
6  Ms. Ahern if I could have -- hand it to Mr. Metcalf.
7          THE COURT:  Yes.
8          MR. SCHAFER:  Your Honor, the resumé is Trial
9  Exhibit 2374.
10  BY MR. SCHAFER:
11      **Q.**  If we could focus on the portion of your resumé,
12  Ms. Ahern, that's entitled, "Examples of Healthcare
13  Experience."  I just want to look at maybe two of these
14  examples.  If you could please describe your work related to
15  the first bullet point in that section.
16      **A.**  Sure.  On this particular matter I served as the
17  expert and directed a team of AlixPartners individuals in
18  the quantification of efficiencies that were to be achieved
19  in a merger of two healthcare organizations in the eastern
20  portion of the United States.  One of the two organizations
21  was a healthcare system.  It involved several hospitals and
22  ownership of several physician practices.  The second party
23  to the potential transaction was a standalone hospital, also
24  which employed several physicians.
25          And my work there involved the analysis, together

3149

1  with administration and the chief medical officer, of the
2  consolidation efforts that could occur and the resulting
3  cost savings associated with those consolidations or
4  integrations.
5          In addition, we looked at the financial viability
6  of the standalone hospital system -- or not system, the
7  hospital, the standalone system -- hospital.  And, of
8  course, that involved the analysis of all that hospital's
9  financial records, be that historical information or their
10  projection.
11      **Q.**  Let's look at the second bullet point on the page.
12  Can you describe your work on this matter?
13      **A.**  Yes.  In a similar situation, this was a potential
14  merger between two hospitals in the southern portion of the
15  United States.  This was very focused on clinical
16  integration, and so our work was very specifically with the
17  physicians that were employed by both hospitals, as well as
18  affiliated with both hospitals, in order to assess the
19  benefits, financial benefits, of clinical integration, as
20  well as nonclinical integration.
21      **Q.**  And are there other healthcare matters on which
22  you have worked that do not appear on this list?
23      **A.**  There are.  I'm -- this is a list of examples I'm
24  currently engaged in, and many matters similar to the ones
25  that I just described.

3150

1      **Q.**  In this matter, what were you requested to do on
2  behalf of the defendants?
3      **A.**  I was asked -- excuse me -- I was asked to conduct
4  two different analyses.  One was to look at the analysis put
5  forth by Saint Alphonsus related to the claims regarding
6  their Nampa facility and the alleged lost referrals based on
7  the Saltzer and St. Luke's transaction.  I have referred to
8  that analysis as the "Impact Analysis."
9          Secondly, I was asked to evaluate the impact on
10  Saltzer and its physicians if Saltzer were made to be
11  divested from St. Luke's, and I have referred to that as the
12  "Unwind Analysis."
13      **Q.**  Just to be clear, these two analyses are -- they
14  are separate and unrelated; is that correct?
15      **A.**  That's correct.
16      **Q.**  And did you prepare and submit any expert reports
17  on these issues?
18      **A.**  I did.  I issued an initial expert report and then
19  a reply report to plaintiffs' expert, Mr. Reed Tinsley.
20          MR. SCHAFER:  Your Honor, we have basically, as we
21  just explained, two modules for Ms. Ahern's exam.  The first
22  will be AEO for everyone but Saint Alphonsus, and the second
23  one will be AEO for everyone but St. Luke's-Saltzer, so we
24  may have to do some shifting.  But it will be -- they're,
25  roughly, you know, an hour in length.

3151

1          THE COURT:  Starting now?
2          MR. SCHAFER:  I think we might need to exclude the
3  non-Saint Al's people now.
4          THE COURT:  All right.  At this time I'll direct
5  everyone not associated with Saint Al's or otherwise advised
6  that they can remain in the courtroom because they've signed
7  the court's protective order in this matter will be directed
8  to leave the courtroom.
9          ******COURTROOM CLOSED TO THE PUBLIC******
10  BY MR. SCHAFER:
11      **Q.**  Okay.  Ms. Ahern, let's start with your opinion as
12  to Saint Alphonsus Nampa's alleged loss of Saltzer referrals
13  due to the affiliation between St. Luke's and Saltzer.  Can
14  you summarize that opinion for the court?
15      **A.**  Yes, I can.  It's my opinion that based on the
16  analysis and information that I've seen, including testimony
17  and document review, that there is no support for or
18  evidence that the transaction between St. Luke's and Saltzer
19  would render Saint Alphonsus Nampa unable to effectively
20  compete with St. Luke's.
21      **Q.**  And can you describe the primary information you
22  reviewed and analyzed in order to come to that conclusion?
23      **A.**  Yes, I can.  There was an analysis put forth by
24  Mr. Lannie Checketts, the CFO at Saint Alphonsus Nampa, that
25  we heard him testify about here at trial a couple of weeks

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 7 of 68

3152

1  ago at this point.  I analyzed his work.  I also reviewed
2  portions of Professor Haas-Wilson's analysis as it related
3  to referral patterns.  And, of course, I have listened to
4  and read the testimony Mr. Checketts, Mr. Keeler, and others
5  who had information on that topic.
6       Q.  And can you describe, generally, Mr. Checketts'
7  impact analysis?
8       A.  Sure.  Generally speaking, Mr. Checketts' analysis
9  had four principal parts.  First, he set forth a series of
10 Saint Alphonsus Nampa income statement projections that
11 spanned the fiscal years 2013 through '16.  That is referred
12 to in his analysis as the "Current State Projections."  So,
13 essentially, what he did was put forth projections that had
14 already been prepared in the October 2012 time frame that
15 were forward-looking and called that the current state or
16 what Saint Alphonsus Nampa would look like but for his
17 asserted losses associated with referrals due to Saltzer.
18      Secondly, he then quantified an estimate of the
19 impact of the referral losses due to the St. Luke's-Saltzer
20 transaction.  So he has gone through and individually, by
21 departments, so to speak, made assumptions about referral
22 losses that Saint Alphonsus Nampa anticipates.
23      Third, he analyzed and put forth revenue loss
24 assumptions related to the Treasure Valley Surgery Center
25 and, specifically, Saint Alphonsus Nampa's ownership in that

3153

1  facility, as well as included some additional expenses
2  related to Pediatrix, which is a third-party entity that he
3  asserted needed to be hired to take over some of the
4  referral losses assumed due to Saltzer.
5       Ultimately, his conclusion subtracts the estimates
6  that he has made for referral losses from what he called
7  "the current state of Saint Alphonsus Nampa."  So what he
8  has essentially done is derived an operating income, which,
9  in fact, he projects to be a loss for Saint Alphonsus Nampa,
10 based on -- excuse me -- the estimate of referral losses.
11      From that operating loss, he has quantified two
12 different areas of asserted FTE or full-time equivalent cuts
13 that would be necessary.  The first set of cuts relates
14 to -- directly, very directly -- to what he has assumed in
15 terms of losses of referrals.  So to the degree Saint
16 Alphonsus Nampa is allegedly going to lose net revenue, they
17 would also, then, cut some employees in order to be able to
18 compensate for that revenue.
19      And then, secondly, he has included another cut of
20 full-time equivalents related to achieving a desired 2
21 percent margin.
22      Q.  Before we talk through each of these specific
23 areas of the impact analysis, can you tell the court what
24 time period is covered by that analysis?
25      A.  Yes.  The projections, as I indicated -- excuse

3154

1  me -- relate to the fiscal year '13 through '16 time period.
2  His analysis in terms of losses relates to fiscal year '14
3  through '16.
4       Q.  So are any of the alleged losses purporting to
5  measure actual losses?
6       A.  No.  The entire analysis is a projection.
7       Q.  And what information did Mr. Checketts look at in
8  attempting to project referral losses?
9       A.  Principally he looked at the fiscal year 2012
10 admissions data and financial data at Saint Alphonsus Nampa.
11      Q.  And what is your understanding of the ultimate
12 conclusion of the impact analysis?
13      A.  Ultimately, he concluded that by fiscal year '16
14 there would be a need for approximately 140 full-time
15 equivalent employee cuts.
16      Q.  Based on your review and analysis of the impact
17 analysis, do you agree with Saint Alphonsus Nampa's
18 conclusion that the affiliation between Saltzer and
19 St. Luke's will be, quote, crippling, unquote, to Saint
20 Alphonsus Nampa?
21      A.  No, I don't.  Mr. Checketts was able to derive his
22 conclusions based on very aggressive assumptions.  In fact,
23 he assumed the maximum loss, 100 percent in most instances,
24 of referrals being lost from Saltzer physicians.
25      Q.  Let's discuss some of your specific critiques of

3155

1  these impact analyses.  I believe you indicated that the
2  starting point of the impact analysis was Saint Alphonsus
3  Nampa's income projections for 2013 through 2016.  Is that
4  right?
5       A.  That's correct.
6       Q.  And can you please describe that aspect of the
7  impact analysis.
8       A.  Sure.  What's shown here on the screen is a
9  snapshot of Mr. Checketts' summary of his analysis, which is
10 two pages.  And pulling forward here, the very first, or the
11 top section, which he has labeled the "Current State."  And
12 this sets out the projections, as I mentioned, from fiscal
13 year '13 through '16, again, that had been created in the
14 fall of 2012.
15      And just for sake of getting our bearings, if you
16 look at the far-right column, which is the projection for
17 fiscal year 2016, the projected net revenue for the Nampa
18 facility is approximately $116 million.  So that $115,966 on
19 the top line is nearly $116 million.
20      From that, certain operating expenses have been
21 projected to derive, then, a bottom line, again, focusing on
22 fiscal year '16, of a projected operating income of
23 approximately $6.3 million.
24      Q.  And what role do Mr. Checketts --
25      THE COURT:  Counsel, for the record, does this

Case 1:13-cv-00560-BLW Document 565 Filed 11/04/14 Page 8 of 68

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 10/18/2013

3156

1  demonstrative have an assigned exhibit number?
2          MR. SCHAFER: 5123, Your Honor.
3          THE COURT: All right. Thank you. Go ahead and
4  proceed.
5  BY MR. SCHAFER:
6      Q. Ms. Ahern, what role do Mr. Checketts' current
7  state projections play with respect to the rest of his
8  impact analysis?
9      A. It's the starting point for his analysis, so this
10 is where he starts and makes reductions for the asserted
11 Saltzer referral losses.
12     Q. And what is the Saint Alphonsus Nampa fiscal
13 year-end?
14     A. It ends June 30th of each year.
15     Q. So fiscal year 2013 already ended this past June
16 30th?
17     A. That's right.
18     Q. How did the projections utilized by Mr. Checketts
19 for fiscal year 2013 compare against the actual financial
20 results for Saint Alphonsus Nampa?
21     A. Well, information, financial information, was
22 produced by Saint Alphonsus Nampa through the first half of
23 their fiscal year '13, so that would be through December of
24 2012.
25         And, in particular, here is an excerpt from one of

3157

1  the Saint Alphonsus President's Council's documents related
2  to the six months through December 2012. And the
3  highlighted section here is indicating that the year-to-date
4  operating income -- so this is the actual -- was a net loss
5  of nearly $200,000 versus a budgeted profit of nearly $1.4
6  million. So they were significantly under projection.
7          THE COURT: Counsel, was that for FY13?
8          MR. SCHAFER: Yes, Your Honor, that was the first
9  six months of fiscal year '13, which was the information
10 that we received in discovery.
11         THE COURT: Now, wait, the first six months of
12 FY13, which would have ended December 31st, 2012?
13         MR. SCHAFER: Yes.
14         THE COURT: All right. Thank you. Go ahead.
15         THE WITNESS: In putting that text that we just
16 saw into numbers, the first half of fiscal year '13, again,
17 Your Honor, that ended December 31st, 2012, was a generation
18 of operating revenues of approximately $45 million, and,
19 again, that operating profit, which was actually a loss of
20 approximately $200,000, that was a negative operating margin
21 of nearly a half a percent.
22 BY MR. SCHAFER:
23     Q. And what did the current state projections relied
24 upon by Mr. Checketts report as the projected operating
25 margin in fiscal year '13?

3158

1      A. In fiscal year '13, the set of current state
2  projections utilized by Mr. Checketts projected a 2.8
3  percent positive margin, so there was a swing of
4  approximately 3.2, 3 and a half percent between what they
5  had projected and what they actually achieved.
6      Q. And do you know whether Mr. Checketts is aware of
7  Saint Alphonsus Nampa's fiscal year 2013 underperformance
8  relative to his projections?
9      A. Yeah. He is aware of it. He testified both in
10 his deposition and then here in trial with regard to the
11 fact that fiscal year '13 had performed at a negative
12 margin.
13     Q. And how does Saint Alphonsus Nampa's
14 underperformance affect the impact analysis?
15     A. Well, as I mentioned, one of the FTE cut
16 assumptions that Mr. Checketts has made is the number of
17 employees that would need to be eliminated based on the
18 desired achievement of a 2 percent margin. In this case, we
19 can see for the first half of fiscal year '13, they weren't
20 achieving 2 percent on their own, so why he would find it
21 appropriate to include employee cuts associated with a
22 positive margin is not supported.
23     Q. Did Mr. Checketts adjust his analysis for this
24 underperformance in 2013?
25     A. No, he didn't.

3159

1      Q. How might he have done so?
2      A. Well, one way for him to have achieved that would
3  have been to not include the FTE eliminations associated
4  with getting Saint Alphonsus back up to a 2 percent margin.
5      Q. And can you please walk the court through an
6  illustration of how Saint Alphonsus Nampa's underperformance
7  in fiscal year 2013 affects the impact analysis?
8      A. Sure. This is an illustration of if we were to
9  annualize those fiscal year '13 numbers, so, still assuming
10 an operating loss, the same percentage of .4 percent. The
11 impact analysis logic or methodology would be to take the
12 operating revenue for that time period, so in this instance
13 nearly $91 million, it multiplies that by the desired
14 2 percent margin to achieve a desired 2 percent operating
15 profit of 1.8 million.
16         What Mr. Checketts does, then, is compares that
17 1.8 million desired income against actual operating profit
18 of the $400,000 loss and says that the variance or the
19 amount you need to actually pull yourselves up from the
20 $400,000 loss is a total of 2.2 million. So that's simply
21 the difference between a negative $400,000 figure and a
22 positive $1.8 million number.
23         From that desired operating margin, then, he takes
24 the average labor and benefit of what Saint Alphonsus Nampa
25 pays employees of $75,000, and that's in fiscal year 2013,

3160

1  divides that average labor amount into the $2.2 million to
2  derive what he calls the FTEs cut to achieve a 2 percent
3  margin.  So in this illustration, Mr. Checketts' methodology
4  would eliminate 23 full-time employees just simply based on
5  pulling themselves back up to a desired margin.
6      Q.  I believe you said "23 full-time employees"?
7      A.  I'm sorry, yes.
8      Q.  I thought that's what the slide showed.
9      What is your opinion regarding the 2 percent desired
10  margin contained in the impact analysis?
11      A.  Well, the 2 percent desired margin is in excess of
12  what they've actually been able to achieve in at least three
13  of the last five years.
14      Q.  Does the fact that Saint Alphonsus Nampa missed
15  its fiscal year 2013 projections tell you anything about the
16  projections for fiscal years 2014 and later?
17      A.  Typically, projections, as you would probably
18  guess, are based on year-over-year performance, so if a
19  projection is made for fiscal year '13 in the fall of 2012,
20  as I mentioned, to the degree that it's significantly
21  overstated, more than likely that cumulative effect will
22  flow through to the future years.  So I would imagine that
23  fiscal years '14 through '16 are likely overstated, as well.
24      Q.  And you mentioned that Saint Alphonsus Nampa had
25  missed that 2 percent margin or been under that 2 percent

3161

1  margin in three of the last five years.  Did you perform an
2  analysis of Saint Alphonsus Nampa's historic performance?
3      A.  I did.  I have a demonstrative here that will
4  show.  Since fiscal year 2008 through the first half of
5  fiscal year '13, three of those time periods have had either
6  a break-even or a negative operating loss.  So the fiscal
7  year '09 break-even numbers, fiscal year '10, there was
8  actually a loss of 1.4 percent, and then, again, the first
9  six months of fiscal year '13 was a loss of .4 percent.
10      Q.  And in the most recent periods that Saint
11  Alphonsus Nampa recorded an operating loss, fiscal year 2010
12  and the first half of fiscal year 2013, are you aware of
13  whether Saint Alphonsus Nampa eliminated any FTEs on the
14  basis of not having achieved that desired 2 percent
15  operating margin?
16      A.  I'm aware that they did not.  In fiscal year 2010
17  Mr. Checketts testified to the fact that they had not
18  eliminated employees for that reason, and I've seen no
19  evidence or heard any testimony with regard to any
20  eliminations in fiscal year 13 for that reason.
21      THE COURT:  Ms. Ahern, is the average margin,
22  operating margin, during those years roughly 2 percent?  I
23  mean, I haven't done the math, but it would seem to me that
24  it would be probably in the order of more like 3 percent.
25      THE WITNESS:  I haven't done that math, either,

3162

1  but it looks like that would be the case.
2      THE COURT:  All right.
3      All right.  Mr. Schafer.
4  BY MR. SCHAFER:
5      Q.  Ms. Ahern, you were here in the courtroom and you
6  heard Mr. Checketts testify that Saint Alphonsus Nampa needs
7  that 2 percent operating margin in order to continue to make
8  investments and improvements in its plan and facilities.
9  Did you hear that testimony?
10      A.  I did, yes.
11      Q.  Did Saint Alphonsus Nampa's inability to achieve a
12  2 percent margin in three of the last five years stop it
13  from making investments and improvements?
14      A.  No.  As I understand it, there has been
15  approximately a $30 million investment made in the Nampa
16  Health Plaza within the last couple years and a request, at
17  least, for another approximately $20 million to continue the
18  next phase of that project.
19      Q.  Ms. Ahern you indicated --
20      THE COURT:  Let me just inquire.  Typically, the
21  idea of having an operating margin is probably a good -- I
22  mean, in your consulting work with other hospitals, that
23  presumably is a goal that even a nonprofit should have;
24  correct?
25      THE WITNESS:  Absolutely.

3163

1      THE COURT:  Okay.  But I'm also going to guess
2  that because of economic changes in the community in which
3  the hospital serves, external factors, including federal
4  regulations that may change, problems with recruiting, any
5  number of things that can happen from year to year, probably
6  means that that targeted operating margin of whatever
7  percent, say 2 percent in this case or 3 percent for another
8  facility, is rarely going to be spot-on.  I mean, you will
9  not year to year, so it has to be an average.
10      Isn't that fair to say that in some years when it
11  drops, then you're going to have to make some adjustments
12  perhaps to try to get it up; other years you may have a
13  surplus, so the next year you might lower rates or do other
14  things to try to maintain the operating margin?
15      So I'm curious would an institution, a hospital,
16  typically be expected -- when they have one or two years of
17  dropping into negative territory in terms of operating
18  margins -- be expected to immediately start laying off
19  people, or do they look more for long-term trends?
20      THE WITNESS:  It certainly depends on the facts
21  and circumstances of the particular situation, but generally
22  speaking, I don't see hospitals or health systems laying off
23  this number of people just because they have a year that
24  isn't up to their goal.
25      THE COURT:  All right.  Okay.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW  Document 565  Filed 11/04/14  Page 10 of 68

3164

1    Mr. Schafer, go ahead.
2        MR. SCHAFER:  Thank you, Your Honor.
3    BY MR. SCHAFER:
4        Q.   Moving on, Ms. Ahern, to the second section or
5    step in the impact analysis, which I believe you testified
6    was Mr. Checketts' estimate of the impact of potential lost
7    Saltzer referrals; is that right?
8        A.   Correct.
9        Q.   Can you describe that aspect of the impact
10   analysis for the court?
11       A.   Sure.  So, again, here is Mr. Checketts' analysis,
12   and I am pulling forward here the section that's titled the
13   "Estimated Saltzer Referral Loss."  You can see these are
14   all native numbers.  This is -- the basis here is that
15   Mr. Checketts has projected, based on a series of loss
16   assumptions, net revenue changes at Saint Alphonsus Nampa.
17   So, again, for sake of ease in looking at numbers, the
18   projected year fiscal year '16, he has asserted a net
19   revenue loss of approximately $21 million.
20       After reducing expenses, including -- you can see
21   the top expense here, which is "Labor," of nearly $7.4
22   million, and that is, in fact, the FTE cuts he asserts -- he
23   derives an operating income, just for related to the Saltzer
24   portion of the lost business, of negative $7.7 million in
25   that particular year.

3165

1        Q.   And what specific inpatient losses does
2    Mr. Checketts assume in his analysis?
3        A.   And by the way, this chart here does represent
4    both inpatient and outpatient on a combined basis.
5        The inpatient referral assumptions that
6    Mr. Checketts made are that 100 percent of the historical
7    family practice admissions made by Saltzer practitioners
8    would be lost.  He makes that same 100 percent loss
9    assumption related to Saltzer pediatricians with a small
10   carve-out for certain newborn visits.
11       He then assumes 100 percent of historical
12   admissions of Saltzer patients by Saint Alphonsus Nampa
13   hospitalists would be lost, and that results in a 57 percent
14   decrease to overall hospitalists' admissions at Saint
15   Alphonsus Nampa.
16       Then he's assumed a 60 percent reduction in the
17   historical admissions or volume of the former Saltzer
18   orthopedic surgeons who are now with Saint Alphonsus Nampa.
19       And then, finally, 100 percent assumption related
20   to lost referrals to Dr. Ballantyne, a general surgeon at
21   Saint Alphonsus Nampa, which results in approximately 13
22   percent of Dr. Ballantyne's overall business.
23       Q.   And those are the inpatient assumptions.  What
24   outpatient losses does Mr. Checketts assume?
25       A.   Similar to the inpatient referrals, he has assumed

3166

1    100 percent historical loss of Saltzer physician outpatient
2    referrals.  Again, the 60 percent loss in volume for the
3    former Saltzer orthopedics -- again, those are the surgeons
4    who are now at Saint Alphonsus Nampa -- from an outpatient
5    standpoint.  And then the same 100 percent loss associated
6    with outpatient procedures performed by Dr. Ballantyne, the
7    general surgeon.
8        Q.   With respect to both inpatient and outpatient, how
9    did Mr. Checketts derive the value of these alleged lost
10   referrals?
11       A.   So a couple slides ago we had the fiscal year 2016
12   was showing approximately a $20 million loss in revenues.
13   What he did was took the revenue that had been generated by
14   Saltzer physician activity at Saint Alphonsus Nampa in
15   fiscal year '12 and multiplied those amounts by these
16   assumed referral loss assumptions.
17       Q.   And the court has heard some testimony thus far
18   about the difference between two fields in Saint Alphonsus
19   Nampa's data, one for an admitting physician and one for a
20   PCP.  Can you describe the difference between those two
21   fields?
22       A.   Sure.  The admissions data that's been produced by
23   Saint Alphonsus contains a series of fields, one of which is
24   titled "Admitting Physician," and that represents literally
25   the physician who is going to make the admission of the

3167

1    patient at the hospital.
2        The PCP identifier or field is the referring or
3    the physician who is the primary care physician of that
4    patient.  So the PCP may not be the individual who is
5    actually admitting the patient to the hospital.
6        Q.   Do you have an opinion as to whether one or the
7    other of those fields is more appropriate to use in
8    determining potential lost referrals from Saltzer?
9        A.   I do.  There -- the admitting physician field, in
10   my opinion, is inappropriate for use, based on the fact that
11   this is a referral analysis.  Whether or not the patient was
12   admitted by a particular physician is really not the
13   underlying necessary component to analyze in terms of where
14   the patient referral came from.
15       Q.   And is there -- are there any other reasons why
16   the use of Saint Alphonsus Nampa's admitting physician data
17   is a flawed approach considering any changes that its made
18   in the recent past?
19       A.   Yes.  In the beginning of the calendar year 2008,
20   so in the neighborhood of January 2008, Saint Alphonsus
21   Nampa implemented a hospitalist program, which, in essence,
22   means that employed physicians at the Saint Alphonsus Nampa
23   facility who are working in the facility will take patients
24   and do the admissions.  So if a patient were to be referred
25   by a physician and walk through the front door of the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 11 of 68

3168

1  hospital or enter the hospital through the emergency room,
2  the hospitalist employed by Saint Alphonsus Nampa would be
3  responsible for the actual admission.
4          So in the admissions data, the admitting physician
5  would identify the hospitalist who made that admission of
6  the patient, regardless of who the primary care physician
7  was that sent the patient there.
8      Q.  And did you discuss the Nampa admissions process
9  with any physicians that served as hospitalists at Saint
10  Alphonsus Nampa?
11      A.  I did.  I spoke with Dr. Crownson, and similar to
12  what he had prepared in his declaration, he told me that
13  when he was a Saint Alphonsus hospitalist he would admit
14  patients, as I just described, but importantly, since he is
15  no longer a hospitalist there the patients that he refers to
16  Saint Alphonsus Nampa would not have him recorded as the
17  admitting physician any longer.  To the degree the patient
18  discloses who the primary care physician is, his name would
19  then show up as a primary care physician, but not the
20  admitting physician.
21      Q.  Did you see any deposition testimony in this case
22  from other physicians regarding referrals to Saint Alphonsus
23  in light of its hospitalist program?
24      A.  I did.  Dr. Mark Johnson, who was formerly with
25  the Mountain View Medical Group, testified similarly that

3169

1  any Saint Alphonsus data that would list him as the
2  admitting physician would not reflect the many times that he
3  referred patients to the facility and would have been
4  admitted under someone else's name.
5      Q.  How frequently is a primary care physician
6  identified in the Saint Alphonsus Nampa admissions data?
7      A.  In the most recent data that was produced for
8  Saint Alphonsus Nampa, there is a physician's name in the
9  primary care field approximately 56 percent of the time.
10      Q.  And what is your understanding as to how that
11  primary care physician data is recorded or collected?
12      A.  I understand when a patient is being admitted to
13  the hospital, they are asked by the individual doing the
14  admission process who their primary care physician is
15  that -- who they would indicate as their primary care
16  physician.  So to the degree that a PCP has been
17  articulated, it would be recorded at that point in time in
18  the medical record of the patient.
19      Q.  And have you seen any testimony from any Saint
20  Alphonsus Nampa witnesses regarding the use of admissions
21  data versus PCP data?
22      A.  I have.  Mr. Checketts testified in his
23  deposition, and then again here at the trial, that in order
24  for him to come up with the 57 percent overall loss in
25  referrals to hospitalists, it was necessary for him to look

3170

1  at data that was before the hospitalist program had been
2  implemented.  So in his analysis, he went back to the first
3  half of fiscal year 2008, which is the first six months
4  of -- or rather, the last six months of 2007, to analyze
5  admissions data so that he could avoid the issue of the
6  hospitalist program that then started in 2008.
7      Q.  Having reviewed the data and the deposition
8  testimony of Saint Alphonsus witnesses, what data do you
9  find to be the most reliable in terms of analyzing a
10  potential decline in referrals made by physicians to Saint
11  Alphonsus Nampa?
12      A.  I think the most reliable data would be the
13  recorded primary care physician identifier.
14      Q.  And have you seen any evidence of Saint Alphonsus
15  Nampa, itself, relying on the PCP information captured in
16  its admissions data?
17      A.  Yes, I have.
18      Q.  What is that?
19      A.  Mr. Checketts testified that not only do they
20  collect the information, that based on the primary care
21  physician that's recorded in the data, Saint Alphonsus Nampa
22  actually provides medical records back to that physician for
23  that patient.
24      Q.  So what does that type of reliance suggest to you
25  regarding the way that Saint Alphonsus Nampa views the PCP

3171

1  data?
2      A.  Well, not only is it reliable, it's relied upon,
3  obviously, in a very important way since medical records are
4  being sent back to that primary care physician.
5      Q.  Moving on to the lost referral assumptions
6  themselves that are contained in the impact analysis, focus
7  first on the inpatient assumptions that you discussed
8  earlier.  I think you previously testified that the impact
9  analysis assumes 100 percent of the admissions of Saltzer
10  family practitioners and pediatricians will be lost; is that
11  right?
12      A.  Correct.
13      Q.  What was Mr. Checketts basis for these
14  assumptions?
15      A.  He didn't conduct any analysis related to those
16  assumptions.  Rather, both he and Mr. Keeler testified, or
17  indicated via declaration, that in their experience with
18  regard to the Mercy Physicians Group, so MPG, that they had
19  seen a loss in admissions -- or "referrals" they called
20  them -- of anywhere between 80 to 100 percent.  There was no
21  analysis underlying those assertions.
22      Q.  And even that testimony didn't get to 100 percent;
23  is that correct?
24      A.  It got close, in that there was a suggestion that
25  virtually all referrals had ceased, but, no, I didn't see

3172

1  anything that specifically said 100 percent.
2      Q.  Have you seen any analysis in this case that
3  would, at least purportedly, support that 100 percent loss
4  assumption?
5      A.  I've seen an analysis that was performed by
6  Professor Haas-Wilson on admissions and/or what she might
7  call "referral patterns."
8      Q.  Can you describe Professor Haas-Wilson's analysis
9  of those referrals patterns?
10     A.  Sure.  What Professor Haas-Wilson looked at was in
11  the one year before a transaction whereby one of these
12  practices was acquired by St. Luke's, and in the one year
13  after that acquisition had happened, what percentage of
14  referrals, as she phrased it, were lost.  But really what
15  she did, importantly to know here, is looked at the
16  admitting physician patterns.  So, again, because of the
17  hospitalist issue in particular, looking at admitting
18  patterns is not relevant, in my opinion.
19          What Professor Haas-Wilson concluded was that with
20  regard to three of these transactions, there had actually
21  been a 100 percent change in admissions to the Saint
22  Alphonsus hospitals.
23          Further, she looked at two other practices and
24  found approximately a 90 percent decline in admissions
25  between the two time periods.  For Mountain View Medical, a

3173

1  primary care practice, she found a 48 percent decline in
2  admissions.  And then for three more recent transactions,
3  including the MPG Nampa primary care physician acquisition,
4  a range between 70 up to nearly 90 percent loss in
5  admissions.
6      Q.  It appears that several of the practices analyzed
7  by Professor Haas-Wilson are specialty practices.  Do you
8  believe her results related to specialty practices, even if
9  they were accurate, are instructive to the impact analysis?
10     A.  No, I don't.  The impact analysis is looking at
11  lost referrals from Saltzer, which is principally a primary
12  care practice, and, as I understand it, there are nuances
13  associated with specialists, such as having to take call and
14  things of that nature that wouldn't be relevant to the PCP
15  analysis.
16     Q.  In addition to the issues that you discussed a few
17  minutes ago regarding the admitting physician field, have
18  you seen evidence indicating that there may be other reasons
19  for decreased admissions for certain physicians that have
20  nothing to do with an acquisition of a physician practice by
21  St. Luke's?
22     A.  I have.  First, there are preaffiliation decreases
23  utilizing Professor Haas-Wilson's analysis that would have
24  nothing to do with the date and time of an acquisition.  So
25  you'll see -- I can show a table here of preaffiliation

3174

1  decreases in admissions, and, again, it would have nothing
2  to do with the transaction timing.
3          Secondly, there is evidence regarding a shift in
4  referrals from Saint Alphonsus physicians away from
5  physicians who then affiliated with St. Luke's.
6          And then, also, there is information and evidence
7  that I've seen that would just generally show a decline in
8  volumes related to Saint Alphonsus Nampa's facility, such as
9  them losing patients to St. Luke's due to the proximity of
10  some patients to Interstate 84 and their ease in getting to
11  St. Luke's Meridian's facility, just general increased
12  competition from St. Luke's.  And there's testimony
13  regarding, at least historically, the outdated and
14  non-upkept hospital, Saint Alphonsus Nampa's facility.
15     Q.  The first bullet point on here is "Pre-Affiliation
16  Decreases."  Can you elaborate on that point?
17     A.  Sure.  So as I indicated, Professor Haas-Wilson
18  had a chart in her report, which is the top line item here,
19  and this, again, focuses on those seven primary care
20  physicians that made up the MPG group that was acquired by
21  St. Luke's in the 2012 time frame.  You can see to the far
22  right here I've drawn a line essentially at when the
23  acquisition of that practice was.  And on Professor
24  Haas-Wilson's basis you see a decline in admissions for the
25  two time periods she analyzed of 87 percent.

3175

1          But if you go back and look at the declines,
2  historically -- or increases for that matter -- but the
3  declines in fiscal years '08, '9, and '10 are fairly
4  sizable, as well; and, of course, those time periods had
5  nothing to do with the acquisition by St. Luke's.
6      Q.  I think the second point on your earlier slide was
7  a shift in referral patterns by Saint Alphonsus physicians
8  away from St. Luke's-affiliated physicians.  Can you give a
9  little more detail as to what you meant by that?
10     A.  Sure.  There is testimony that I have reviewed
11  from Dr. Huerd, who was formerly with Cardiovascular
12  Associates; if I can summarize by saying the number of heart
13  procedures that he had been doing at Saint Alphonsus had
14  decreased once he left Saint Alphonsus in lieu of
15  St. Luke's.  And essentially, looking at any admissions
16  data, then, associated with Dr. Huerd would indicate a
17  decrease in volumes that he had at Saint Alphonsus.  But, in
18  fact, it didn't have anything to do with him changing his
19  referral patterns, rather with the Saint Alphonsus internal
20  physicians no longer referring to him.
21     Q.  I think you also stated that if -- a third reason
22  or a general concept was a loss in historical volume at
23  Saint Alphonsus Nampa related to a number of different
24  reasons.  Can you explain those in a bit more detail.
25     A.  Sure.  There were a few documents, at least, that

Case 1:12-cv-00560-BLW v. Document 565 Filed 11/04/14 Page 13 of 68

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 10/18/2013

3176

1  I've seen.  This first from March 2010 is a Saint Alphonsus
2  document where they were discussing the gradual withdrawal
3  of inpatient services from their facility to St. Luke's
4  Meridian.  So, you know, two, three years before the
5  transaction between Saltzer and St. Luke's, a discussion of
6  services already being directed away from Saint Alphonsus.
7        Also, in July 2010, there was a strategic plan
8  that was produced in this matter, again, indicating that
9  St. Luke's had garnered both market growth and share
10  increases, and that competition at that point in time was
11  fierce.
12        That same document, in its final form, made a
13  recommendation in the March 2011 time frame that Saint
14  Alphonsus needed to reverse the market share trend and
15  strengthen Nampa's market share from the 43 percent it was
16  at up to 48 percent.
17        And then, also, in March 2011, in a document that
18  was a proposal for the Nampa Health Plaza, similar comments
19  were made that the general decline in market presence and
20  reputation over the prior few years had decreased the market
21  share experienced by Saint Alphonsus Nampa to 42 percent and
22  that Saltzer physicians had changed practice patterns in
23  favor of St. Luke's at that point in time, so that there was
24  also a general preference of residents, including those
25  close to Interstate 84, as I mentioned, to utilize

3177

1  St. Luke's Meridian.
2        So there were these reasons in Saint Alphonsus
3  documents dating back further in time that were explaining
4  some of their volume decreases.
5        Q.  Have you seen any testimony in this case that
6  supports any of those facility concerns you mentioned?
7        A.  I have.  Mr. Keeler, the president and CEO of
8  Saint Alphonsus Nampa, testified that -- well, when asked
9  about the reason for Saint Alphonsus Nampa's declining
10  market share back at that point in time, he had indicated
11  that the facility itself had not been kept up well and that
12  there were perceptions in the community that there were
13  quality issues with the hospital.  So that -- that was at
14  least what he offered for a partial explanation for a
15  decline in volumes and market share, historically.
16        Q.  So how do these other possible explanations for a
17  decline in admissions affect the impact analysis?
18        A.  I think that it's representative of instances, at
19  least historically, when Saint Alphonsus Nampa's volumes
20  have been impacted, but that they -- that shift in volume
21  wouldn't have anything to do with any particular
22  transaction, but rather just general competition in the
23  marketplace and other reasons.
24        Q.  And putting those other potential explanations
25  aside, did you recalculate Professor Haas-Wilson's

3178

1  percentage change in referral patterns using the PCP field
2  instead of the admitting physician field?
3        A.  Yes, I did.
4        Q.  What did you find?
5        A.  I looked at the three primary care physician
6  groups that she analyzed, given that that's what we're
7  facing here with Saltzer.  And as it related to the MPG
8  physicians, which included these seven doctors, over the
9  time period that Professor Haas-Wilson performed her
10  analysis, doing the exact same analysis, but instead of
11  using the admitting physician as an indicator of a referral,
12  and, therefore, a loss, I looked at the primary care
13  physician field.
14        So instead of the 87 percent that she calculated
15  based on the inaccurate, I believe, admitting physician
16  data, that decline for MPG physicians over the same time
17  period was only 23 percent.
18        Q.  And how do you know that referrals from the MPG
19  physicians to Saint Alphonsus Nampa didn't stop following
20  the acquisition of the group by St. Luke's?  In other words,
21  how do you know that the 203 referrals on here in fiscal
22  year 2012 weren't all prior to the acquisition?
23        A.  I looked at the data on a quarterly basis for that
24  very reason.  And the transaction with MPG was actually in
25  the time frame between July and September of 2011.  So the

3179

1  blue line here is the number of patients with an MPG
2  physician listed as the primary care physician or the
3  referring physician, essentially, to Saint Alphonsus Nampa.
4  And you can see that following the transaction, there was
5  actually a modest increase in referrals on that basis.
6        Q.  Did you prepare any similar analyses of the other
7  primary care groups addressed by Professor Haas-Wilson?
8        THE COURT:  Counsel, could I -- before we move on,
9  just so I'm clear, you're referring now to -- what you're
10  referring to is the referring physician is the physician
11  noted in the Saint Al's admission documents as the primary
12  care physician for this patient; correct?
13        THE WITNESS:  That's right.
14        THE COURT:  Okay.
15        THE WITNESS:  For these physicians.  These are the
16  number of patients who would have an MPG physician listed as
17  their primary care physician.
18        THE COURT:  In the Saint Al's documents?
19        THE WITNESS:  That's right.
20        THE COURT:  In terms of the admitting physician,
21  that's -- that may be the same physician or may be, I guess,
22  if it -- if it was the same physician, then that would have
23  been the 80-some-odd percent reduction that Dr. Haas-Wilson
24  referred to, because that's what she focused on; correct?
25        THE WITNESS:  What she focused on was -- yes, in

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 14 of 68

3180

1 the instances when one of the seven MPG physicians would
2 have shown up as an admitting physician.
3       THE COURT: Is it fair to say that -- I mean, I
4 suppose another approach to this might have been to actually
5 do some sampling and try to determine exactly what did
6 happen and whether there was, in fact, a referral or not,
7 rather than kind of relying upon these surrogates to
8 determine who the referring physician is.
9       But do you agree that you've used one method of
10 surrogacy, if you will, and Dr. Haas-Wilson used a
11 different, and you feel yours is more accurate, more in
12 keeping -- would track closer with what, in reality, was
13 going on in terms of actual referrals to the hospital?
14       THE WITNESS: Yes, I believe that's the case. And
15 that's not just my belief, by my own doing. Several of the
16 Saint Alphonsus employees have testified about the PCP
17 information being more representative of a referral.
18       THE COURT: Okay. Are we going to hear about that
19 in a minute or is that something -- well --
20       MR. SCHAFER: I think we'll elaborate a little on
21 that, Your Honor, hopefully -- hopefully, shed some more
22 light on it. But, obviously, at any point if you have
23 questions, please.
24       THE COURT: All right. Let's go ahead and
25 proceed.

3181

1       Counsel, I'm going to need to take another five-minute
2 break. My apologies. We can do it now or in the next five
3 or ten minutes. Whenever it's convenient for you, Mr.
4 Schafer.
5       MR. SCHAFER: I think maybe if you can wait five
6 minutes, Your Honor, I think I'd be at a --
7       THE COURT: Sure. I can wait five minutes.
8       MR. SCHAFER: Great, thank you.
9 BY MR. SCHAFER:
10    Q. So, Ms. Ahern, did you prepare similar analyses,
11 as you just discussed with respect to the MPG group, with
12 respect to the other primary care physician groups that
13 Professor Haas-Wilson analyzed?
14    A. Yes, I did. As I indicated previously, Professor
15 Haas-Wilson looked at three different primary care practices
16 that had been acquired by St. Luke's. And as it related to
17 Mountain View Medical Group, her analysis, using this
18 admitting physician data, which, again, would have issues
19 associated with it based on the hospitalist program at Saint
20 Alphonsus, derived a 48 percent decline in admissions.
21 Using the primary care physician field in conducting the
22 exact same analysis renders a 20 percent decline in
23 referrals.
24       For Idaho Family Medicine, her 91 percent asserted
25 decline in admissions would be 9 percent, if you focused on

3182

1 the primary care physician data.
2    Q. Ms. Ahern, getting to, I guess, the question that
3 the court just asked of you, you're aware the plaintiffs'
4 experts have made the argument that just because a given
5 patient has a primary care physician indicated in the PCP
6 field doesn't mean that that PCP actually referred that
7 patient for that admission at the hospital; correct?
8    A. That's right.
9    Q. And how do you respond to that argument?
10   A. Well, this analysis, the impact analysis is
11 looking at whether the Saltzer physicians will steer
12 patients away from Saint Alphonsus Nampa. So in utilizing
13 the primary care physician field, whether that PCP actually
14 made the referral or the patient themselves were
15 self-referred, Saint Alphonsus Nampa hasn't lost the
16 admission. So if the PCP was attempting to steer patients
17 away, they weren't successful in doing so.
18   Q. So with respect to the calculations and the
19 percentages that you've calculated, does it matter to you
20 whether that physician actually made the referral or just
21 was unsuccessful and -- you know, with respect to
22 plaintiffs' argument -- was just unsuccessful in steering
23 that patient away from Saint Alphonsus Nampa?
24   A. It doesn't make a difference because the patient
25 still was admitted to the Saint Alphonsus Nampa facility.

3183

1       THE COURT: Can I ask another --
2       MR. SCHAFER: Please.
3       THE COURT: I just want to make sure I understand
4 precisely. Let's take -- well, the one that's highlighted,
5 Idaho Family Medicine. So in the year before, there were 43
6 instances in which Idaho Family Medicine doctors were listed
7 as the admitting physician on the Saint Al's admission
8 documents, and the year after only four times were they
9 listed; is that correct?
10       THE WITNESS: That's correct.
11       THE COURT: Now taking that same over -- now using
12 the PCP field, we know that in the year before there were
13 180 patients admitted at Saint Al's in which the patient
14 described their primary care physician as a doctor at Idaho
15 Family Medicine; correct?
16       THE WITNESS: That's right.
17       THE COURT: And that that number reduced to 164
18 the year after; correct?
19       THE WITNESS: That's correct.
20       THE COURT: Now, what that intuitively tells me is
21 that this is a -- and I could be wrong; that's why I want
22 you to tell me if my intuition is wrong. But, intuitively,
23 it would seem that these patients have -- again, we
24 discussed this, I think, yesterday or the day before -- have
25 a chronic problem in which perhaps they now have a

3184

1  specialist and that the specialist is probably not
2  affiliated with Idaho Family Medicine, since I'm assuming
3  that they are primarily, if not exclusively, primary care
4  physicians, is now providing them -- that they had a
5  flare-up of a chronic condition being treated by a
6  specialist, the specialist, who could come from anywhere or
7  be affiliated with anyone, went ahead and admitted them, but
8  this same patient still considers their primary care
9  physician to be the Idaho Family Medicine doctor; correct?
10         THE WITNESS:  That's correct.
11         THE COURT:  All right.  Mr. Schafer, go ahead.
12         MR. SCHAFER:  Your Honor, I think if you want to
13  take a break now, now would be a fine time to take a break.
14         THE COURT:  All right.
15         All right, we'll take -- Counsel, this will be just a
16  very short five-minute break.  My apologies, but it is what
17  it is.  We'll be in recess for five minutes.
18         (Recess.)
19         THE COURT:  Counsel, my apologies, we didn't check
20  to make sure you were back in your seats before we came in.
21         MR. SCHAFER:  We were walking too far away from
22  the courtroom.
23         THE COURT:  Mr. Schafer, actually, I want to
24  compliment you on your ability to slow down.  I have
25  commented that asking someone to slow down when they talk

3185

1  fast is kind of like asking them to remove their right arm.
2  I mean, it's just -- it's almost physically impossible to do
3  it, and yet you've been able to do it today.  Now, having
4  complimented you, I assume that that will not cause you
5  to --
6         MR. SCHAFER:  Encourage me to talk faster.  I will
7  try to keep it up.  I told Tammy yesterday to give me the
8  stop sign when I was taxing her fingers too much.
9         THE COURT:  I jokingly have said, but perhaps only
10  partly in jest, that I am thinking about putting a flashing
11  sign on the lectern for counsel.  And I could push it, and
12  it says "slow down," kind of like that biofeedback loop.
13         MR. SCHAFER:  Your words are traveling at this
14  speed.
15         THE COURT:  I'll just remind the witness, Ms.
16  Ahern, you are still under oath.
17         Mr. Schafer, you may resume your examination of the
18  witness.
19         MR. SCHAFER:  Thank you, Your Honor.
20  BY MR. SCHAFER:
21     Q.  Ms. Ahern, staying on this slide for a bit longer
22  to just make sure that we address this concept, can you
23  explain why is that you think or that your analysis looks
24  at the PCP physician name field as opposed to the admitting
25  physician name field, again, with respect to these numbers

3186

1  and why you think that's a more accurate sense of what's
2  actually happening as it relates to Mr. Checketts' impact
3  analysis.
4     **A.**  Sure.  So Mr. Checketts' impact analysis is
5  **quantifying the financial loss of patients who would no**
6  **longer, theoretically, be with Saint Alphonsus Nampa due to**
7  **the Saltzer and St. Luke's affiliation.  Again, Saltzer**
8  **physicians, principally being primary care physicians, what**
9  **he has assumed is approximately $20 million a year in lost**
10  **revenue.  That $20 million a year is based on the premise of**
11  **100 percent loss in patient referrals.  To the degree you**
12  **look at admitting physician data, you might have some**
13  **support for that excessive analysis.  But the reality is**
14  **when you look at the patients' primary care physician, it's**
15  **significantly less, 9 to 23 percent, as I show here.**
16         THE COURT:  Okay.  Counsel, let me try to explore
17  this just a bit.  If -- what this teaches me, I think -- and
18  I want you to correct me if you think I'm wrong -- is that
19  clearly the primary care physicians, when they admitted a
20  patient, were -- did make a change in their practice and, in
21  fact, went from referring to Saint Al's to not referring to
22  Saint Al's directly.  But what it also teaches us is that
23  not that many admissions come directly from a primary care
24  physician; the admissions appear to come far more likely for
25  a specialist of some kind who has started to treat

3187

1  the -- this patient and -- however, there are specialists
2  only, and the primary care physician services are being
3  provided by the original doctor.
4         So what it suggests to me is that the concern should be
5  not so much with the referral patterns from the primary care
6  physicians, but with the referrals from the primary care
7  physicians to the specialists and, in turn, the specialists
8  to the hospital.
9         First of all, are any of those assumptions wrong?  And,
10  secondly, is there anything in this data or in your analysis
11  that kind of picks up not so much the loss of direct
12  referrals, but the loss of indirect referrals because of a
13  change in connection with various specialists that may have
14  resulted from an acquisition?
15         THE WITNESS:  First of all, the one thing I would
16  add to what you suggested was that the admitting physician
17  may not necessarily be a specialist.  More often than not,
18  in the Saint Al's data, it's a hospitalist.
19         THE COURT:  Hospitalist.  All right.
20         THE WITNESS:  So whether the primary care
21  physician or a specialist made that --
22         THE COURT:  Do we know -- I mean, it seems it
23  would have been a relatively simple thing to pull out the
24  referrals that were done by primary care physicians,
25  hospitalists, or a specialist.  Has any data been done of

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 16 of 68

3188

1  that?
2         THE WITNESS:  I looked at the --
3         THE COURT:  Or any analysis?
4         THE WITNESS:  I've looked at the percentage of
5  time that the admissions are -- hospitalists make up the
6  portion of admissions, and at Saint Alphonsus Nampa it's
7  approximately, depending on the year, between 50 and 60
8  percent of the time.  So an admitting physician would be
9  listed as a hospitalist.
10        THE COURT:  Okay.  Again, just trying to figure
11 out how this actually works, that's probably an ER
12 admission.
13        THE WITNESS:  It could be an ER admission.  I
14 think that the vast majority of the admissions are through
15 the ER, but it could also be a non-ER admission.
16        THE COURT:  I'm trying to figure out how that
17 would work, but -- all right.  I'm just trying to make sure
18 I've got my head around it.  I think I do to some extent.
19        Mr. Schafer, go ahead.
20 BY MR. SCHAFER:
21     Q.  And just to clarify one other point.  Staying on
22 this slide, Ms. Ahern, if you look at the Idaho Family
23 Medicine line, you see the "One Year After" field here
24 showing "4," does that mean that there were only four direct
25 referrals that year from an Idaho Family Medicine physician

3189

1  for an inpatient admission at Saint Alphonsus Nampa?
2      **A.  No.  It means that there were four instances when**
3  **an Idaho Family Medicine primary care physician showed up as**
4  **the admitting physician.**
5         THE COURT:  Right.  And I overstated.  Again,
6  we're using surrogates.  All we know is that 43 times in the
7  year before and 4 times in the year after did a primary care
8  physician associated with Idaho Family Medicine show up as
9  the admitting physician on Saint Al's admitting documents.
10 And now, as I said, that's only a surrogate because we
11 don't -- we've not done surveys.  I think.  Now, again, you
12 can correct me if I'm wrong on that.
13        THE WITNESS:  That's right.
14        THE COURT:  Go ahead.
15 BY MR. SCHAFER:
16     Q.  And staying on this, to hopefully make it even
17 more clear, I believe at a certain point in her response or
18 her rebuttal to your report, Professor Haas-Wilson raised a
19 similar concept to what the court has raised with respect to
20 whether or not these are just all the same patients, these
21 were all prior referrals that have just continued on with
22 their specialist and there were no new referrals from the
23 primary care doctor.  Do you remember her making a statement
24 like that?
25     **A.  I do.  Yes, I do.**

3190

1
2
3
4             REDACTED
5
6
7
8
9      Q.  And setting aside the specific PCP analysis based
10 on the data contained in that PCP field, are you aware of
11 any other Saint Alphonsus Nampa information demonstrating
12 the aggressiveness of Mr. Checketts' 100 percent loss
13 assumption?
14     **A.  I am.  This document is a little bit hard to read,**
15 **but this was an internal Saint Alphonsus document where they**
16 **were estimating the impact of the MPG physicians departing**
17 **from Saint Alphonsus.  And the assumption that was made**
18 **internally -- if we can get this to blow up -- was that when**
19 **those physicians left Saint Alphonsus for -- based on the**
20 **transaction with St. Luke's, that they would lose at Nampa,**
21 **at the Nampa facility, 40 to 50 percent of the volume**
22 **associated with those physicians.  So, obviously, these**
23 **numbers are, in some instances, less than half of what**
24 **Mr. Checketts has assumed, and, again, significantly less**
25 **than what Professor Haas-Wilson's analysis would suggest.**

3191

1      Q.  And, again, this is Saint Alphonsus Nampa's own
2  internal projections; is that right?
3      **A.  That's right.**
4      Q.  Is there any other information you're aware of
5  that would explain a potential future shift in referrals
6  away from Saint Alphonsus Nampa by Saltzer physicians that
7  has nothing to do with Saltzer's affiliation with
8  St. Luke's?
9      **A.  Yes.  Mr. Checketts testified about the opening of**
10 **the Nampa Health Plaza and moving certain OB services to**
11 **that plaza.  Because of the distance from the Saltzer's**
12 **physicians' clinic, the OB clinic, they had expressed a**
13 **desire before the transaction with St. Luke's to not**
14 **actually serve patients in that facility.  So that would be**
15 **an explanation for a decrease in volume associated with**
16 **Saltzer physicians that was prior to the St. Luke's**
17 **transaction.**
18     Q.  So what is your ultimate opinion with respect to
19 Mr. Checketts' projection that the Saltzer affiliation is
20 likely to result in a 100 percent decline in referrals from
21 Saltzer PCPs and pediatricians?
22     **A.  I think the 100 percent assumption is quite**
23 **aggressive, based not only on my analysis of primary care**
24 **physician data, but also, as we can see here, based on**
25 **Saint Al's own internal records as it analyzed the departure**

3192

1  of the MPG physicians from its facility.
2      **Q.**  And what do you think a more appropriate
3  percentage would be to apply?
4      **A.**  I think the 23 percent, which is the higher of the
5  three primary care practices that I looked at, would be
6  appropriate.
7
8
9
10
11
12
13                    REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

3193

REDACTED

3194

REDACTED

3195

REDACTED

3196

REDACTED

3197

REDACTED

    **Q.**  So what is your conclusion with respect to the percentage loss in referrals by orthopedic surgeons at Saint Alphonsus Nampa?

    **A.**  The 60 percent that Mr. Checketts has assumed is obviously, in Saint Alphonsus' own words, a worst-case scenario. And in the actual modeling that they prepared, from a financial standpoint, and then based on testimony from the doctors and representations from Saint Alphonsus, I think that the assumed 30 percent that they utilized is more

3198

appropriate.

REDACTED

3199

REDACTED

3200

REDACTED

20        **A.   That's true.**

21        **Q.   What are Mr. Checketts' bases for these assumed**

22   losses on the outpatient side?

23        **A.   He didn't prepare and produce any analysis**

24   **underlying those assumptions; rather, he simply used the**

25   **same assumptions that are on the inside -- inpatient side of**

3201

1   the analysis in his outpatient analysis.

2        **Q.   Ms. Ahern, after purporting to project losses of**

3   Saltzer referrals over future years, did Mr. Checketts

4   simply assume that referrals from Saltzer physicians would

5   have kept up at the same volume through 2016 as they had

6   been in prior years?

7        **A.   No.  This, again, is an excerpt from his actual**

8   **analysis, and you can see that between the projected years**

9   **of fiscal year '14 through '16 that the top line or the lost**

10   **revenue is increasing, and, in fact, it happens to be**

11   **increasing at an assumed 5 percent rate per year.**

12        **Q.   And what was the basis for that assumed 5 percent**

13   growth assumption?

14        **A.   There was no basis for it.  Mr. Checketts simply**

15   **testified that he didn't think that the referrals from**

16   **Saltzer would remain stagnant, so he chose to grow them at**

17   **5 percent.**

18        **Q.   Did you perform any analysis to test that**

19   5 percent assumption?

20        **A.   Yes, I did.**

21        **Q.   And what did you find?**

22        **A.   I found that in looking at the Saint Alphonsus**

23   **admissions data that over the course of fiscal years '09**

24   **through fiscal year '12, that on average there had been a**

25   **loss of 4 percent of referrals to Saint Alphonsus' facility**

3202

1   **by the Saltzer physicians, so --**

2             THE COURT:  Now, what did you use to base that on?

3             THE WITNESS:  The primary care physician data.

4             THE COURT:  Okay.

5             THE WITNESS:  So as opposed to an assumed

6   5 percent increase, the data based on primary care physician

7   would show a decline.

8   BY MR. SCHAFER:

9        **Q.   So what's your opinion regarding that 5 percent**

10   growth assumption in Mr. Checketts' analysis?

11        **A.   Well, his use of the 5 percent increases or**

12   **inflates, year over year, the amount, the value, the**

13   **financial value of estimated referral losses.  So to the**

14   **degree he is growing the base of losses, it's further**

15   **increasing the number of FTEs that he would calculate**

16   **needing to be cut.**

17        **Q.   Ms. Ahern, you indicated that the third portion of**

18   Mr. Checketts' impact analysis addressed an alleged revenue

19   loss related to the Treasure Valley Surgery Center and to, I

20   believe, a third-party entity that you referred to as

21   "Pediatrix" with an X; is that right?

22        **A.   Yes.**

23        **Q.   Can you please describe that portion of the impact**

24   analysis?

25        **A.   Sure.  Mr. Checketts had included an assumption**

3203

1   for SCA or the surgery center losses related to, again,

2   referrals that he assumes will be lost to Saltzer -- or from

3   Saltzer physicians to those individuals who would be

4   performing surgeries at the Treasure Valley Surgery Center.

5   As it related to Pediatrix, he assumed that there would be

6   an additional expense that Saint Alphonsus Nampa would have

7   to incur in order to cover newborn or well-baby checks at

8   the Nampa Health Plaza.  So, previously, when I talked about

9   the Saltzer physicians, the OBs not wanting to perform

10   services there based on the distance from their clinic, this

11   was the assertion of what it would cost to replace that.

12        **Q.   And just so we're clear, since I don't think the**

13   scale is listed on this slide, these numbers are in

14   thousands, not millions; correct?

15        **A.   That's correct.  So in fiscal year '16, the**

16   **highlighted row there is a $336,000 assumed loss.  The**

17   **Pediatrix expense is $386,000 in that year.**

18        **Q.   When did the Treasure Valley Surgery Center open?**

19        **A.   Approximately August of 2012.**

20        **Q.   Did Mr. Checketts utilize any actual financial**

21   performance of the Treasure Valley Surgery Center in making

22   his loss estimates?

23        **A.   No, he didn't.  His analysis is based sheerly on**

24   **projections that were performed by someone other than him.**

25        **Q.   Do you have any opinion regarding the estimate**

Case 1:13-cv-00560-BLW Document 565 Filed 11/04/14 Page 20 of 68

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 10/18/2013

3204

1  that he has made with respect to Treasure Valley Surgery
2  Center losses.
3      **A.** I do. Similar to -- the second point I have here,
4  similar to the assumptions that he made in regard to the
5  inpatient or outpatient analysis he performed, he applied
6  the same 60 percent assumed losses of orthopedic surgeries
7  that would be conducted at the Treasure Valley Surgery
8  Center and, again, assumed that same 12 and a half percent
9                    REDACTED
10  the general surgeon. So, essentially, he made the same
11  assumptions here as he made in other aspects of his
12  analysis.
13          The top point here is that certain of the
14  physicians, based on documents in this case, indicate that
15  the physicians who were going to perform surgeries at the
16  Treasure Valley Surgery Center haven't been credentialed by
17  the time it started up, so any projections associated with
18  that surgery center may very well, in fact, be inflated
19  based on the fact that certain physicians couldn't perform
20  services there yet.
21          And then, finally, and I think importantly, there
22  is a Saint Alphonsus document from August of 2012,
23  approximately the time of the surgery center opening, that I
24  think rightfully points out the fact that outpatient
25  surgical cases -- and this is at Saint Alphonsus

3205

1  Nampa -- were expected to decline once that Treasure Valley
2  Surgery Center opened at full capacity. So there is this
3  concept of there would be cannibalization of outpatient
4  surgeries, neither of which has been adjusted for in
5  Mr. Checketts' analysis.
6      **Q.** Now, moving to the aspect of this portion of the
7  impact analysis related to Pediatrix with an X,
8  Mr. Checketts included some additional expenses in his
9  impact analysis related to that third-party entity; correct?
10      **A.** He did.
11      **Q.** Is it your understanding that the Pediatrix
12  expenses are still part of Mr. Checketts' impact analysis or
13  his assumptions that he is making?
14      **A.** No. As I understand it, based on his testimony
15  here, he has agreed that those Pediatrix costs -- so this is
16  the cost of hiring a third party to cover certain newborn
17  checks -- would no longer, in his opinion, be part of the
18  Saltzer-St. Luke's affiliation quantification.
19      **Q.** And you were in court when Mr. Checketts testified
20  that moving the Pediatrix expenses from those related --
21  those losses related to Saltzer and St. Luke's from where he
22  had it originally in his impact analysis to the current
23  state section, which he said would be appropriate, didn't
24  make any difference to his bottom line because Saint
25  Alphonsus Nampa's operating margin would still be negatively

3206

1  impacted. Were you there for that testimony?
2      **A.** Yes, I was.
3      **Q.** What's your response to that assertion?
4      **A.** While it's true that the operating income wouldn't
5  change based on the way that Mr. Checketts has done his
6  analysis, that is, there would still be extra costs
7  associated with Pediatrix, to the degree that that isn't
8  associated with the affiliation between Saltzer and
9  St. Luke's, that expense or hit to income, if you will,
10  shouldn't be included in the FTE cuts that would be
11  associated with the alleged referral losses due to Saltzer
12  and St. Luke's affiliation.
13      **Q.** And, finally, you indicated that the fourth
14  portion or the final portion of the impact analysis includes
15  the net impact to operations from loss and the corresponding
16  FTE cuts. Can you describe that aspect of the impact
17  analysis?
18      **A.** I can. So this is the final portion of
19  Mr. Checketts' analysis, and it's really the math of A minus
20  B and C. This is the resulting net impact based on his
21  analysis to operations. And so I'll stick with fiscal year
22  '16 here. The net revenue that would result at Saint
23  Alphonsus Nampa based on the alleged referral losses is
24  approximately $95 million. The operating income based on
25  the losses, then, is a resulting $2.1 million loss. Again,

3207

1  that's fiscal year '16.
2      **Q.** And does this step of the calculation that you
3  just talked about end with the desired 2 percent margin?
4      **A.** It does not. Well, it does -- the desired 2
5  percent margin here is an additional calculation beyond the
6  operating income. So as I explained earlier, what this
7  desired income is is a calculation applying 2 percent to the
8  net revenue in order to derive what a favorable or a desired
9  margin would be. So, again, a fiscal year 2016, rather than
10  the $2.1 million operating loss, the desired income or
11  margin would result in $1.9 million of profit.
12      **Q.** And how are the resulting operating losses and the
13  desired operating income used in the impact analysis?
14      **A.** Well, this is the sheer bottom line of the
15  analysis. Again, as I mentioned earlier, there are two
16  areas of full-time employee cuts. So the second line in the
17  bottom pull-out on this page shows -- is titled, "FTE's
18  cut - cost." And in sticking with fiscal year 2016, you can
19  see that the analysis calculates approximately 91 employees
20  would be cut. That is from the labor that would need to be
21  reduced, so the employees and their corresponding salaries
22  and benefits that would need to be released in order to make
23  up for the asserted lost referrals.
24      **Q.** And -- sorry. Go ahead.
25      **A.** Secondly, then, the third line under the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 21 of 68

3208

1  "Projected Cut in FTE's" is titled the "Additional FTEs cut
2  to achieve a 2 percent margin."  So the 49.7 employees out
3  in fiscal year '16 is the additional employees that would
4  need to be cut based on the average labor and benefit rate
5  per FTE based on the difference between the $2.1 million
6  projected loss in fiscal year '16 versus the desired income
7  of $1.8 million or $1.9 million.
8      Q.  So for fiscal year 2016, the end result looks like
9  the total FTEs necessary to cut would be roughly 140?
10     A.  That's what this calculation shows, yes.
11     Q.  Okay.  And so I understand, that's -- that's made
12  up of 91 related to the cost cuts and roughly 50 related to
13  the desired 2 percent margin; is that right?
14     A.  That's right.
15     Q.  What percentage of Saint Alphonsus Nampa FTEs does
16  140 FTEs constitute?
17     A.  Based on their current staffing level, it's
18  approximately 27 percent of the total head count.
19     Q.  Ms. Ahern, have you seen any evidence that Saint
20  Alphonsus Nampa is currently overstaffed?
21     A.  I have.  Mr. Checketts, as part of the documents
22  that he produced with his analysis, actually provided a
23  departmental level worksheet that shows there are
24  approximately 56 --
25         MR. ETTINGER:  Your Honor, I think this is beyond

3209

1  anything in Ms. Ahern's reports.
2          THE COURT:  Mr. Schafer.
3          MR. SCHAFER:  It is definitely something that she
4  addressed in her reports, Your Honor.
5          THE COURT:  Well, pull out the report, and let's
6  see it.  Show it to counsel.
7          MR. STEIN:  Your Honor, I may be able to
8  accelerate this.  I'll just read from paragraph 160 of
9  Ms. Ahern's report:  "As shown above Saint Alphonsus Nampa
10 had budgeted FTEs of 501.7 but has actual FTEs of 557.4.
11 Saint Alphonsus Nampa's own data, therefore, shows that it
12 may be overstaffed versus budget by 55.7 FTEs."
13         THE COURT:  And that's what the witness is going
14 to now testify to?
15         MR. SCHAFER:  Yes, Your Honor.
16         THE COURT:  All right.  The objection is
17 overruled.
18 BY MR. SCHAFER:
19     Q.  It's now been read into the record, but, Ms.
20 Ahern, can you expand on what your opinion is with respect
21 to the number of FTEs by which Saint Alphonsus Nampa is
22 currently overstaffed having nothing to do with the Saltzer-
23 St. Luke's affiliation?
24     A.  Based on their documents that have been provided
25 by Mr. Checketts, it shows that they are over budget to the

3210

1  tune of approximately 56 FTEs, by their own doing.
2      Q.  And so what would that mean to Saint Alphonsus
3  Nampa's bottom line that it's overstaffed by -- for factors
4  having nothing to do with the Saltzer-St. Luke's
5  affiliation?
6      A.  They would be incurring direct labor costs
7  associated with those individuals that would result in
8  losses to their bottom line that if the FTEs shouldn't be
9  there, then those losses wouldn't be there either.
10     Q.  Ms. Ahern, can you please summarize your findings
11 related to the assumptions that underlie Mr. Checketts'
12 impact analysis?
13     A.  Sure.  It's my belief that the assumptions that
14 Mr. Checketts has employed, as it relates to referral
15 losses, are the maximum that they can be at 100 percent, and
16 that if you utilized a more practical assumption of loss
17 referrals of 23 percent, that the losses he has projected
18 would be significantly less.
19         Also, we saw information that in the first half of
20 fiscal year '13 there hasn't been the ability of Saint
21 Alphonsus Nampa to achieve that desired 2 percent operating
22 margin.  So utilizing that goal as a way to eliminate
23 additional FTEs in the analysis does not seem appropriate.
24         Also as it relates to the hospitalists assumption
25 of 100 percent losses, the 23 percent reduction in Saltzer

3211

1  referrals would then result in a 13 percent overall loss in
2  hospitalists admissions rather than Mr. Checketts' assumed
3  57 percent.
4          The documents indicate that the 60 percent loss in
5  volume assumption related to the Saltzer orthopedic surgeons
6  that are now with Saint Alphonsus is unsupported, and the 30
7  percent assumption that was utilized in the internal pro
8  forma analysis I think is more appropriate for inclusion in
9  Mr. Checketts' work.
10
11                   REDACTED
12
13
14         And as it relates to outpatient referrals, for the
15 same reasons that I've given related to the inpatient
16 referrals, the significant assumptions of 100 percent, for
17 example, should be decreased significantly.
18     Q.  And have you attempted to recalculate the results
19 of the impact analysis using more appropriate numbers?
20     A.  I did, yes.
21     Q.  And what did you find?
22     A.  This is a summary table that demonstrates -- if
23 these highlight -- that demonstrates over the course of the
24 fiscal year '14 through '16, so over three fiscal years,
25 based on the assumptions he has made, Mr. Checketts

3212

1  generates lost operating income -- so that's profit -- of
2  $22 million. If you change Mr. Checketts' assumptions on
3  those referral losses to those which I believe are more
4  appropriate, you can see the far four columns, so the four
5  right-hand columns, of recalculated losses would result in
6  approximately $7 and a half million. So nearly a 66 percent
7  decline over what Mr. Checketts has asserted.
8      Q. A decline in the decline, so an increase; correct?
9      A. That's correct.
10
11
12
13                    REDACTED
14
15
16
17
18      Q. What's the effect of adjusting Mr. Checketts'
19  aggressive referral assumptions on the bottom line of the
20  impact analysis?
21      A. Ultimately, if I adjust, again, for the
22  assumptions that I think are more appropriate, the fiscal
23  year '14, '15, and '16 margins, so the operating margins,
24  are positive in all years. In fiscal year '14 at .8
25  percent, and 3 and 3.4 percent, respectively, in fiscal

3213

1  years '15 and '16. So by simply utilizing more reasonable
2  assumptions, there would be no FTE cuts related to any
3  desired margin necessary, as these margins would be in
4  excess of the 2 percent.
5      Q. And, similarly, to respond to the court's question
6  from earlier in the day, in 2015 and 2016, your numbers show
7  that Saint Alphonsus Nampa would exceed that 2 percent
8  desired margin; is that correct?
9      A. That's right.
10      Q. How many FTE cuts does your recalculation suggest
11  generally might be required by the Saint Alphonsus -- by
12  Saint Alphonsus Nampa?
13      A. Well, using Mr. Checketts' logic, there are a
14  resulting approximately 30 FTEs that would be eliminated,
15  because I have assumed that there will be referral losses,
16  and anytime there is a referral loss, the analysis would
17  calculate a reduction in FTEs for that.
18      Q. You testified earlier, though, that Saint
19  Alphonsus Nampa may be overstaffed currently, by its own
20  doing, to the tune of approximately 55 FTEs; is that right?
21      A. That's right.
22      Q. So what does that overstaffing mean relative to
23  your 30 FTE calculation?
24      A. It may very well mean that even if there are 30
25  employees that are calculated, using Mr. Checketts' logic

3214

1  and analysis, that to the degree they are overstaffed by 55,
2  there may be no necessary FTE cuts for this purpose.
3          MR. SCHAFER: Your Honor, we're moving now into
4  the second aspect of Ms. Ahern's opinion, which I think we
5  need to --
6          THE COURT: Could I ask one question before we
7  move on?
8          MR. SCHAFER: Sure.
9          THE COURT: Did Mr. Checketts -- again, I'm trying
10  to make sure that I understand kind of the base difference
11  you have with Mr. Checketts. When Mr. Checketts assumed a
12  100 percent loss of referrals from the Saltzer Medical Group
13  physicians, did he use as the numbers that would be lost --
14  did he use the Saint Al's admitting data in the way you have
15  so that he was operating based upon referrals -- patients
16  who are indicated on the Saint Al's admission documents as
17  having been referred -- or having been admitted by a Saltzer
18  doctor?
19          THE WITNESS: Yes. His underlying starting point
20  was the admissions made by Saltzer physicians and the
21  financial -- well, the revenue and the corresponding costs
22  associated with those admissions in fiscal year of 2012. So
23  he used 2012 actual data to apply his percentage assumptions
24  for loss on a go-forward basis.
25          THE COURT: All right. Again, just hypothetically

3215

1  speaking, in other words, if there were 100 patients
2  admitted in FY13 -- or FY10 -- that's not the right year --
3  let's say FY11, where the patients were identified as having
4  been admitted by a Saltzer Medical Group physician, not
5  as -- not listed as the primary care physician but as the
6  admitting physician, if he assumed that that number would --
7  100 percent of those patients would go away.
8          THE WITNESS: For every instance other than the
9  orthopedics, but yes, yes.
10          THE COURT: Okay.
11          THE WITNESS: An entire loss associated with any
12  admissions associated with the Saltzer physicians.
13          THE COURT: He did not assume that there would be
14  a 100 percent loss of all patients who, when they were
15  admitted to Saint Al's, listed a Saltzer Medical Group
16  doctor as the primary care physician.
17          THE WITNESS: He did not analyze primary care
18  physician data at all, so yes.
19          THE COURT: All right.
20  BY MR. SCHAFER:
21      Q. Just to emphasize one other point -- Your Honor,
22  just to make sure it's clear -- the data that you looked at,
23  Ms. Ahern, related only to what happened with respect to
24  those specific groups and their PCP -- their lists in the
25  PCP in the admitting physician fields; correct?

3216

1    **A.**   That's exactly right.

2    **Q.**   It didn't look at what happened to those aspects

3   of Saint Alphonsus Nampa's services generally and how those

4   were affected by changes; correct?

5    **A.**   That's right.

6    MR. SCHAFER:  Thank you, Your Honor.

7    THE COURT:  Let's go ahead and, I guess, advise

8   those in the hallway that they -- excuse me -- it will be

9   only the -- now the --

10    MR. SCHAFER:  St. Luke's and Saltzer.

11    THE COURT:  -- St. Luke's --

12    MR. SCHAFER:  St. Luke's and Saltzer, yes.

13   BY MR. SCHAFER:

14    **Q.**   Ms. Ahern, now moving on to the second issue that

15   you were asked to analyze, you understand that one of the

16   remedies requested by plaintiffs in this case is the

17   divestiture by St. Luke's of the Saltzer group?

18    **A.**   I do.

19    **Q.**   And can you summarize your opinions as to the

20   impact on Saltzer and Saltzer physicians of Saltzer being

21   divested from St. Luke's?

22    **A.**   Yes.  It's my opinion that if the Saltzer

23   **affiliation were made to be unwound, that Saltzer -- and if**

24   **it returned to operations as an independent physician group,**

25   **that the Saltzer physicians who would remain in the event of**

3217

1   **that unwind relative to the compensation that they received**

2   **in fiscal year 2012 would be a decrease of more than 30**

3   **percent on average.  And the reason for that is that there**

4   **have been a series of physicians who departed from Saltzer**

5   **which have left behind overhead, essentially costs that need**

6   **to be absorbed by the then-remaining physicians.**

7    **Q.**   Can you describe, sort of in a general manner,

8   what the effect is on compensation when a physician leaves

9   the Saltzer practice?

10    **A.**   Yes.  When a physician leaves, the portion of the

11   **overhead costs that that physician had been absorbing is**

12   **then redistributed across the remaining physicians.  And to**

13   **the degree that costs allocated to a particular physician**

14   **increased, their compensation decreases.**

15    **Q.**   I notice on this slide you have referenced fiscal

16   year 2012 in both instances.  Why is fiscal year 2012

17   significant to your analysis?

18    **A.**   That was the last fiscal year or full year of

19   **Saltzer financial information prior to the affiliation with**

20   **St. Luke's.**

21    **Q.**   And what is Saltzer's fiscal year?

22    **A.**   It ends September 30th of each year.

23    **Q.**   Is there a name that you've given to this aspect

24   of your analysis?

25    **A.**   I have referred to my work here as the "Unwind

3218

1   **Analysis" to represent the impact of the compensation for**

2   **the remaining physicians in the event of an unwind from**

3   **St. Luke's.**

4    **Q.**   Ms. Ahern, I want to make sure that the court

5   understands the parameters of your analysis.  Are you aware

6   that St. Luke's and Saltzer made a representation to the

7   court at the time of the preliminary injunction hearing that

8   they would not complain at some later date that it would be

9   impossible to divest Saltzer if the court ordered a

10   divestiture?

11    **A.**   I am aware of that, yes.

12    **Q.**   Does your unwind analysis, in your view, run afoul

13   of that representation?

14    **A.**   No, it doesn't.  I am not suggesting that it would

15   **be impossible for this to occur, but rather that the**

16   **compensation decrease would occur, and that would occur**

17   **regardless of whether or not there was a St. Luke's**

18   **affiliation.**

19    **Q.**   Can you please generally describe your unwind

20   analysis.

21    **A.**   Sure.  There were a net 12 physicians who departed

22   **from Saltzer during or after fiscal year 2012.  What the**

23   **unwind analysis does, and what I've done in that analysis,**

24   **is to reallocate the costs and some revenues associated with**

25   **those departed physicians across the remaining physicians in**

3219

1   **the event of an unwind, and then I've compared that unwound**

2   **compensation, if you will, to what those same physicians**

3   **made in fiscal year 2012.**

4    **Q.**   Can you identify the physicians who departed from

5   Saltzer that you've taken into account in your unwind

6   analysis?

7    **A.**   Sure.  In my reports that I have issued, the

8   **surgeons and other physicians who have departed are those**

9   **shown on this demonstrative, and they include five**

10   **orthopedic surgeons; one general surgeon, Dr. Williams;**

11   **Dr. Beasley, an ENT surgeon.  All seven of those physicians**

12   **departed for employment at St. Luke's -- or Saint Alphonsus,**

13   **rather.  Two Saltzer physicians have retired since fiscal**

14   **year '12.  They are Drs. Papiez and Chenore.  And then four**

15   **other physicians have departed either during fiscal year '12**

16   **or after, including Drs. Owsley, DuBose, Vetsch, and**

17   **Dr. Harris.**

18    **Q.**   What percentage of Saltzer's practice did the

19   **departed physicians constitute?**

20    **A.**   They were approximately 25 percent of the head

21   **count in terms of physicians.**

22    **Q.**   Has Saltzer ever lost that many physicians at any

23   time in its past?

24    **A.**   No.  I understand they've never lost anywhere

25   **close to this number of physicians over this time period.**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 24 of 68

3220

1  I've looked at the historical financial records and see at
2  least over the past four or five years, they haven't lost
3  more than two physicians in any particular year, and I've
4  heard testimony here in trial that, at max, over the last
5  ten years, it's probably four physicians in any year.
6    Q.  Does your unwind analysis take into account any
7  physicians joining the Saltzer practice since the end of
8  fiscal year 2012?
9    A.  It does.  In my reports I included Dr. Dahlke, who
10 was an individual that joined Saltzer in approximately
11 January of 2012.  And then subsequent to my reports,
12 Dr. Affleck, an ENT surgeon, has joined Saltzer.  I
13 understand that he started about a month ago.
14   Q.  I believe you testified just now that Dr. Dahlke
15 joined in January 2012?
16   A.  I'm sorry.  2013.
17   Q.  Okay, thank you.  That clarifies it.
18     What does it mean to include these new physicians in
19 your unwind analysis?
20   A.  When new physicians are included and come into
21 Saltzer, it has the opposite effect of someone leaving; that
22 is, when they join the practice, they, then, will be
23 distributed some of the overhead costs, and, therefore, the
24 remaining physicians would see an increase in compensation
25 for that reason.

3221

1    Q.  And have any additional Saltzer physicians left
2  since you submitted your report?
3    A.  Yes.  I understand that Dr. Brandy Welch has left
4  the practice.  She is a pediatrician and left for work in
5  the state of Texas.
6    Q.  And have you analyzed the impact of Dr. Welch
7  departing from Saltzer?
8    A.  Yes, I have.  Again, a departure of the physician
9  means that the costs she was absorbing then are reallocated
10 across the remaining physicians, again, having a negative
11 impact on their salaries.
12   Q.  So what impact does it have on your unwind
13 analysis that Dr. Welch has left, but Dr. Affleck has now
14 joined the practice and is working at Saltzer?
15   A.  Essentially, there isn't a meaningful change based
16 on Dr. Welch leaving and Dr. Affleck joining.  So the more
17 than 30 percent is still valid in terms of a decrease in
18 compensation, on average.
19   Q.  And just to make sure I understand where Saltzer
20 stands today versus where it would have stood on sort of the
21 date of the preliminary injunction hearing.  It sounds like
22 four additional physicians have left, and two more have
23 joined since the date of the preliminary injunction hearing?
24   A.  I think that's correct, yes.
25   Q.  Okay.  So basically the difference between what

3222

1  you've analyzed and what your opinion would have been on the
2  date of the preliminary injunction hearing is a net loss of
3  two physicians?
4    A.  That's correct.
5    Q.  Okay.  You were asked some questions -- just
6  getting into some other specific physicians -- you were
7  asked some questions in your deposition about your treatment
8  of two doctors, Drs. Omer and Dr. Knowles.  Do you remember
9  those questions?
10   A.  I do.
11   Q.  What's unique about Drs. Omer and Knowles?
12   A.  Both of those physicians joined Saltzer's practice
13 during fiscal year 2012, so they had only been with the
14 practice for two and a half and two months, respectively.
15   Q.  How did you treat those doctors in your initial
16 calculation?
17   A.  In my report analysis what I did was made the
18 assumption that those physicians would be part of the
19 Saltzer unwind situation to the same portion of the year
20 that they were with Saltzer in fiscal year '12.  So I made
21 the assumption from an apples-to-apples basis, that
22 Drs. Omer and Knowles would be with Saltzer in an unwind for
23 two and a half and two months, respectively.
24   Q.  Do you know whether those two doctors will leave
25 Saltzer in the event of an unwind after two and a half and

3223

1  two months?
2    A.  I don't know with certainty, no.

REDACTED

13   Q.  And your calculation assumes, also, that no other
14 Saltzer physicians will depart in the year following an
15 unwind; is that right?
16   A.  That's right.  This assumes that every physician,
17 then, will remain for a full year following the unwind.
18   Q.  Let's move on to the specifics of your unwind
19 analysis.  What was the first step you undertook in
20 conducting that analysis?
21   A.  The first step that I undertook was to analyze the
22 fiscal year '12 financial statements of Saltzer.  I needed
23 to adjust those, if you will, for physicians who had been
24 there for a portion of the year, as well as remove
25 physicians who had departed.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 25 of 68

3224

1    Q.   And can you describe for the court generally how
2  the costs incurred by Saltzer affect the compensation of the
3  Saltzer physicians?
4    A.   I can.  Generally speaking, I have shown an
5  illustration here, that if a particular physician earns
6  income of $500,000, so that's generating positive profit, if
7  you will, for the Saltzer group, before receiving
8  compensation, there are costs that need to be deducted from
9  that income.  There are facility costs that are an
10  allocation on a practice-wide basis, indirect overhead
11  costs, and then there is actually a positive ancillary
12  revenue distribution to physicians, so on a net basis the
13  ancillary revenue would increase their compensation.
14       For these practice allocations in this
15  illustration, you'll see that the $500,000 that was
16  generated in income by this theoretical physician resulted
17  in compensation of $275,000.
18    Q.   I think it's probably clear, but just to make
19  clear, these are just imaginary numbers for purposes of your
20  illustration; is that right?
21    A.   That's correct.
22    Q.   Now, you mentioned facility costs, and I see them
23  on the slide here.  What are facility costs?
24    A.   Facility costs are, as you may expect, the costs
25  associated with rent of facilities, maintenance associated

3225

1  with buildings, utilities, and then the salaries of the
2  individual maintenance department employees.
3    Q.   How are the facility costs allocated to the
4  Saltzer physicians?
5    A.   Based on the Saltzer compensation employment
6  agreement and the compensation parameters within it, total
7  facility costs are allocated on an equal-share basis.  So to
8  the degree that a physician was with Saltzer for a full
9  year -- I have an illustration here -- that the -- these
10  five physicians, assuming they were all there for the same
11  portion of time, in any given year, would receive an equal
12  share of those facility costs.  So five physicians would
13  each receive $100,000 of $500,000 in facility costs.
14    Q.   With respect to the second aspect of overhead,
15  what are indirect overhead costs?
16    A.   Indirect costs are associated with, largely, the
17  salary and benefits of individuals who work in -- let me
18  call it nonrevenue-generating departments, so administrative
19  salaries, for example, marketing costs, salaries associated
20  with schedulers or individuals who are coding or working in
21  the billing department, the chart room, things of that
22  nature.
23    Q.   How are the indirect overhead costs allocated to
24  the Saltzer physicians?
25    A.   Indirect overhead is allocated based on a

3226

1  proportion of income generated by a physician.  So, for
2  example -- again, these are illustrative figures -- if
3  Physician A had income of $400,000 and the entire practice
4  income was $4 million, he or she would receive a 10 percent
5  allocation of indirect overhead.  Keeping with theoretical
6  numbers here, if that indirect overhead was $2 million,
7  Physician A would receive an allocation of cost to the tune
8  of $200,000.
9       Similarly, and to show a difference here, if
10  Physician B was a lesser earner, so instead of generating
11  income of $400,000, generated $100,000 in income, he or she
12  would receive a 2 and a half percent share of the indirect
13  overhead or $50,000.
14    Q.   So does this show that physician income is
15  impacted differently based on whether a high-earning
16  physician leaves versus a low-earning physician?
17    A.   It is.  The higher earner of a physician, the
18  more costs they are allocated in terms of indirect overhead.
19  So if a physician who is a higher earner departs, there is
20  going to be more cost left behind to allocate over the
21  remaining physicians.
22    Q.   With respect to the third aspect of the overhead,
23  you mentioned a positive number that you refer to as
24  "Ancillary Revenue."  What is that?
25    A.   Ancillary revenue is actually the income generated

3227

1  by ancillary departments, which includes, for example,
2  laboratory -- the laboratory department; rehabilitation
3  departments, which includes physical therapy; and then
4  imaging departments, like MRI or X-ray.
5       Because there is a generation of positive income,
6  meaning revenue minus costs results in a positive number,
7  that amount is then distributed back to the physicians as a
8  positive impact to their compensation.
9    Q.   And how is ancillary revenue allocated among the
10  Saltzer physicians?
11    A.   Generally, it's done on an equal-share basis, like
12  the facility costs are, but there are some carve-out
13  examples.  So for certain physicians, they will receive a
14  share, for example, of laboratory that's based on a
15  different type of formula.
16    Q.   So can you walk the court through an illustration
17  of a reallocation of costs in the event that a physician
18  departs from Saltzer?
19    A.   Sure.  Sticking with my facility cost
20  illustration, again, and assuming facility costs of $500,000
21  and initially five physicians being part of the Saltzer
22  practice on an equal-share basis, they each would have
23  received $100,000 cost allocation.  If one of those
24  physicians departs, that $100,000 share for his or her cost
25  allocation is redistributed across the remaining physicians.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 26 of 68

Bench Trial, 10/18/2013

3228

1  So in this illustration, the $100,000 is spread over the
2  remaining four so that each physician then remaining
3  receives $125,000 share of facility costs as opposed to the
4  original $100,000 based on five physicians.
5      Q.  And how does a reallocation like that impact
6  physician compensation at the end of the day?
7      A.  Going back to how the compensation works here, if
8  the facility costs are increased so there's a larger cost
9  allocated to a physician, it will affect his or her
10  bottom-line compensation in the same amount.  So additional
11  costs for facility means an equal decrease in your
12  compensation.
13      Q.  With that background regarding Saltzer's
14  methodology for allocating costs, can you describe what
15  specifically your unwind analysis contemplates?
16      A.  Yes.
17      THE COURT:  Counsel, we're going to need to take
18  another break in the next five or ten minutes, but, again,
19  go ahead.
20      MR. SCHAFER:  I think we're probably two minutes
21  away from a good breaking point, Your Honor.
22      THE COURT:  Very good.
23      THE WITNESS:  My specific analysis, then, looks at
24  the facility costs, indirect overhead and ancillary revenue,
25  that were related to the 13 physicians, net 12 physicians,

3229

1  who departed Saltzer.  So I've redistributed, based on these
2  formulas, that overhead costs and ancillary revenue from the
3  departed physicians back across the remaining physicians in
4  the event of an unwind, so as to calculate their new
5  compensation.  I then compared that result to what those
6  same physicians who would be remaining received in fiscal
7  year '12 to calculate the reduction in compensation.
8      MR. SCHAFER:  Your Honor, I think, actually, this
9  is probably the best place to take a break, if that works
10  for Your Honor.
11      THE COURT:  All right.  That's fine.
12      We will be in recess, then, for 15 minutes.  We'll be
13  in recess.
14      (Recess.)
15      THE COURT:  Ms. Ahern, I'll remind you you are
16  still under oath.
17      Mr. Schafer, you may resume your examination.
18      MR. SCHAFER:  Thank you, Your Honor.
19  BY MR. SCHAFER:
20      Q.  Ms. Ahern, before we move on to the next step, I
21  want to look at this slide again and just make sure I
22  understand.
23      This slide, as far as the facility allocation and the
24  way facility costs, indirect overhead, and ancillary revenue
25  is allocated amongst Saltzer physicians, that only applies

3230

1  to Saltzer as an independent group; is that right?
2      A.  That's right, yes.
3      Q.  And what it would look like again in the event of
4  an unwind?
5      A.  That's right, as an independent group.
6      Q.  Okay.  This doesn't apply to how Saltzer
7  physicians are compensated as members of the St. Luke's
8  Clinic?
9      A.  No, not at all.
10      Q.  So we've talked about this model using
11  illustrative numbers.  I want to talk about some actual
12  numbers, starting with facility costs.
13      First, what was the amount of Saltzer's facility costs
14  in fiscal year 2012?
15      A.  In fiscal year 2012, the Saltzer facility costs
16  were approximately $3.1 million.
17      Q.  And how did you perform the reallocation of those
18  facility costs?
19      A.  Well, as you can see here, the portion of that
20  $3.1 million that related to the departed physicians was
21  approximately $700,000.  So that $700,000 following the
22  compensation model was redistributed across the remaining
23  physicians.  So the same $3.1 million then is reallocated to
24  a fewer number of physicians, thereby increasing the per
25  physician charge for facility costs from $65,000 per

3231

1  physician to $81,000.
2      Q.  And with respect to indirect costs, what was the
3  amount of Saltzer indirect overhead in fiscal year 2012?
4      A.  In 2012, the indirect overhead was a total of $8.5
5  million.
6      Q.  And how did you conduct your analysis in terms of
7  reallocating that indirect overhead?
8      A.  Again, following the compensation agreement at
9  Saltzer, I reallocated the $2.7 million that had been
10  charged to the departed physicians across those physicians
11  who would remain in the event of an unwind.
12      Further, however, I made a reduction to indirect
13  overhead costs for individuals, employees that would be
14  eliminated based on physicians having departed.  So a lower
15  head count, if you will, or base of physicians would require
16  fewer support staff, so to speak.  So the end result was a
17  reallocated total amount of costs across the remaining
18  physicians of $7.8 million.
19      Q.  And what's the effect of that reallocation on a
20  per physician basis?
21      A.  Again, because indirect overhead is based -- is
22  allocated based on the earning level of a particular
23  physician, there is a range on a per physician basis for the
24  lower earners receiving approximately $25,000 more in cost
25  allocation, and thereby lower compensation, up to

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 665   Filed 11/04/14   Page 27 of 68

3232

1  approximately $125,000 for the higher earners.
2      Q.  And just so it's clear, this number, 25,000 to
3  125,000, is shown on here as a positive, but you're saying
4  that's a positive to overhead that would then be subtracted
5  from their compensation; is that right?
6      A.  That's right.  This would serve to reduce
7  compensation, yes.
8      Q.  Let's move on now to ancillary revenue.  What was
9  the amount of ancillary revenue allocated to Saltzer
10  physicians in fiscal year 2012?
11     A.  In 2012 ancillary revenue was a net $1.9 million.
12     Q.  And what did you do in order to reallocate that
13  ancillary revenue across the physicians who would remain at
14  Saltzer in the event of an unwind?
15     A.  Again, I redistributed the $500,000 that had been
16  provided to the departed physicians across those remaining
17  physicians.  But importantly, as it related to the ancillary
18  departments, I had to make a reduction for the losses
19  associated with ancillary services that were generated based
20  on the departed physicians.
21         So, for example, the rehabilitation department,
22  which includes physical therapy, a lot of those patients,
23  and therefore the revenue and income, is generated by the
24  departed orthopedic surgeons.  So I have removed from the
25  ancillary revenue any departments that were impacted by the

3233

1  physicians who departed.
2      Q.  And how would that decrease to ancillary revenue
3  and the reallocation of the ancillary revenue across the
4  Saltzer physicians affect compensation of those physicians
5  on a per physician basis?
6      A.  The reallocation of ancillary revenue totaling
7  $800,000 in the unwind situation meant a lesser distribution
8  of ancillary revenue between $14,000 and $52,000 per
9  physician.
10     Q.  And can you talk a bit more about which ancillary
11  departments were impacted and how by the departed
12  physicians?
13     A.  Yeah.  The departments that were impacted were the
14  imaging departments, and you can see the percentage here of
15  revenue in each of those departments that was related to the
16  departed physicians.  So a significant portion of the MRI
17  imaging department, vascular, ultrasound, and X-ray departed
18  along with the departed physicians.  Laboratory had an
19  impact, and rehab -- again, including physical therapy in
20  particular -- took a hit of 44 percent.
21     Q.  So after reallocating facility costs, indirect
22  overhead costs, and ancillary revenue, what is the effect
23  that you calculated on Saltzer physician compensation?
24     A.  The effect on Saltzer compensation for the
25  remaining physicians in the event of an unwind is more than

3234

1  30 percent when compared to the fiscal year '12 salaries for
2  those same individuals.
3      Q.  Did you conduct any analysis comparing the Saltzer
4  physician compensation levels in the event of an unwind to
5  any benchmarks?
6      A.  I did.  I looked at the management -- the MGMA
7  benchmarks, which is the Medical Group Management
8  Association.  And in fiscal year '12, for those physicians
9  that could be compared against benchmarks at Saltzer, 52
10  percent of the Saltzer physicians received compensation at
11  or above the median benchmark.  And this benchmark is for
12  physicians in the same areas of practice, so it's done on a
13  per physician basis, and it relates to the western region of
14  the United States, which would include Idaho.
15         Following an unwind, the compensation decrease
16  results in 15 percent of the Saltzer physicians then earning
17  median benchmark -- at or above median benchmark
18  compensation, so a significant decrease.
19     Q.  And have you compared the Saltzer compensation
20  levels to any other metric?
21     A.  I have.  I reviewed the offers that were made by
22  both St. Luke's and Saint Alphonsus for the physicians.
23     Q.  And were those higher or lower than what they
24  would earn in event of an unwind?
25     A.  Certainly higher than what they would earn in an

3235

1  unwind and also higher than what they were earning in fiscal
2  year '12.
3      Q.  Did you conduct any analysis comparing the
4  profitability of the Saltzer practice by any metric?
5      A.  I did.  Again, I looked at the MGMA benchmarks.
6  And on a per FTE physician basis -- so based on a full-time
7  physician -- in 2012, Saltzer had profitability of
8  approximately $308,000 per physician.  That put them between
9  approximately the 25th and 50th percentile benchmarks for
10  profitability in the western region.
11         In an unwind, that income or profit would be in
12  the neighborhood of $189,000, which would then put Saltzer's
13  profit per physician below the 10th percent benchmark.
14     Q.  And you've talked some about the physicians who
15  have departed.  Relative to the physicians who would remain
16  at Saltzer in the event of an unwind, how significant were
17  the physicians who departed?
18     A.  Well, of the physicians who departed, six of
19  Saltzer's top ten earners were amongst that bunch.  So they
20  were -- they were a significant portion of the income of the
21  practice.
22     Q.  So overall, in your opinion, what do the results
23  of the unwind analysis indicate in terms of the physicians
24  who would remain at Saltzer immediately following an unwind?
25     A.  It would indicate that the -- the compensation

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 28 of 68

Bench Trial, 10/18/2013

3236

1  that those physicians would be receiving relative to fiscal
2  year '12 would be far less competitive and significantly
3  decreased.
4      Q.  Did you see any evidence indicating that the
5  parties to this litigation or the departed physicians
6  believed that overhead costs would increase and, therefore,
7  compensation to the remaining physicians would decrease in
8  the event of an unwind?
9      A.  Yeah.  I think this concept isn't a surprise to
10 anyone involved.  I have seen documents from Saint Alphonsus
11 Nampa, internal planning documents, where they indicated the
12 departure of the orthopedic surgeons from Saltzer would
13 create a destabilizing force on that group, and the
14 remaining physicians would be left, then, to cover the fixed
15 overhead.  So consistent with what -- the math of what
16 actually happens.
17          And then there was also a text message exchange
18 between Drs. Curran and Williams where they indicated
19 Saltzer's overhead would be through the roof without us.  So
20 they were aware that this would be the case.
21     Q.  And do you have an opinion as to whether the
22 impact of this compensation would affect the retention by
23 Saltzer of its current physicians?
24     A.  Well, certainly to the degree that compensation is
25 going to be decreased by, on average, 30 percent, the

3237

1  physicians are likely going to start logically thinking
2  about other options available to them.  That, combined with
3  the benchmark data that is available and the offers that had
4  been received from Saint Alphonsus and St. Luke's, would
5  indicate that there are other opportunities for the
6  physicians.
7      Q.  And do you have an opinion regarding whether the
8  decreased compensation levels would impact Saltzer's ability
9  to recruit new physicians?
10     A.  In terms of recruiting, if you're competing in the
11 marketplace and offering 30 percent less than you would
12 otherwise, that will logically impact recruiting, also.
13     Q.  Now, Ms. Ahern, you testified earlier that
14 you -- in addition to your initial expert report, you
15 submitted a rebuttal report, or a surrebuttal report, to
16 Mr. Tinsley; is that correct?
17     A.  That's right.
18     Q.  And Mr. Tinsley issued only one report; is that
19 right?
20     A.  He issued one report and a one-page summary
21 schedule of a revision to his calculations, or an update to
22 his calculations, at the date of his deposition.
23     Q.  What, generally, did Mr. Tinsley claim in his
24 rebuttal to your unwind analysis?
25     A.  Generally speaking, he had indicated in his

3238

1  report, as well as through his testimony, that the
2  recruitment by Saltzer of replacement surgeons should not be
3  difficult and, furthermore, that Saltzer could cut costs
4  that would eliminate some of the additional overhead burden.
5          For example, Mr. Tinsley suggested cutting or
6  suspending retirement contributions by 50 percent,
7  indefinitely delaying upgrades to imaging equipment,
8  terminating profitable mid-level providers, and canceling
9  all employee and physician events.
10     Q.  With respect to the overhead reallocation that we
11 talked about earlier, did Mr. Tinsley alter your $3.1
12 million that you calculated and reallocated for facility
13 costs?
14     A.  No, he didn't.
15     Q.  Did he criticize or alter the FTE-related
16 adjustments that you made, reducing the indirect overhead
17 figure from 8.5 million to 7.8 million?
18     A.  No, he did not.
19     Q.  Did he criticize or alter the ancillary revenue
20 adjustments that you made, reducing ancillary revenue from
21 $1.9 million to roughly $830,000?
22     A.  He didn't, no.
23     Q.  So how would you characterize Mr. Tinsley's
24 critiques of your unwind analysis?
25     A.  Well, essentially, he hasn't directly critiqued

3239

1  the work that I did do.  What he has suggested is that
2  recruiting of replacement surgeons should not be difficult
3  and that there's possibly costs that could be cut in order
4  to eliminate some of the additional overhead burden.
5      Q.  Now, you have mentioned that Mr. Tinsley focused
6  on replacement surgeons.  Did Mr. Tinsley look at the
7  replacement of the other physicians who have left Saltzer?
8      A.  He didn't.  What Mr. Tinsley's report and analysis
9  is based on is simply the seven departed surgeons.  So he
10 focused 100 percent on -- in his comments about replacing
11 the departed physicians only related to those seven.  He
12 didn't address the six physicians who, in addition to the
13 surgeons, have departed Saltzer and who would leave behind
14 overhead costs to be absorbed by the remaining practice.
15         Obviously, as I have mentioned, as it related to
16 the departed surgeons, Saltzer has now obtained a new ENT
17 surgeon, Dr. Affleck.  And in terms of the nonsurgeon
18 departures, Dr. Dahlke has joined.
19     Q.  So let's discuss the seven surgeons that
20 Mr. Tinsley believes can be recruited without much
21 difficulty.  Has Mr. Tinsley put forward any plan that
22 demonstrates how Saltzer could recruit those replacement
23 surgeons?
24     A.  No.  He has provided absolutely no plan or
25 instruction of how that would occur.  He's simply made the

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 10/18/2013

3240

1  assertion that it shouldn't be difficult.
2      **Q.**  Are you aware of any evidence that runs counter to
3  Mr. Tinsley's assertion that replacement surgeons should not
4  be difficult to recruit?
5      **A.**  **I am.  I have seen testimony from individuals at**
6  **Saint Alphonsus.  For example, Dr. Michael Roach, when**
7  **questioned about the difficulty in recruiting specialists,**
8  **testified that specialists who have very unique skills are**
9  **much more difficult to replace when compared against primary**
10 **care physicians.**
11     **Also, Ms. Jeffcoat, the CEO of Saint Alphonsus,**
12 **indicated that in discussing cardiovascular surgeons who had**
13 **departed from Saint Alphonsus, that it had taken Saint**
14 **Alphonsus multiple years, a very long time to be able to**
15 **replace those specialists.**
16     **Q.**  Are you aware of any difficulty that Saltzer has
17 had in recruiting replacement orthopedic surgeons after the
18 surgeons that left for Saint Alphonsus?
19     **A.**  **Yes.  I understand that -- that while there is a**
20 **goal to recruit three new orthopedic surgeons that, in fact,**
21 **over the course of the last year of efforts, they have not**
22 **been able to recruit any, even with the financial assistance**
23 **of St. Luke's during that time period.**
24     **Q.**  Has Mr. Tinsley put forth any calculations
25 regarding physicians that he opines have already been

3241

1  recruited by Saltzer?
2      **A.**  **Yes, he did.**
3
4
5
6
7
8
9
10
11
12                    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

3242

1
2
3
4
5
6
7
8
9
10
11
12                    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

3243

1
2
3                    REDACTED
4
5
6      **And, furthermore, he hasn't put forth any analysis**
7  **whatsoever of replacing the remaining surgeons.**
8      **Q.**  And did Mr. Tinsley suggest that Saltzer may
9  receive financial support from St. Luke's in the recruitment
10 of replacement physicians in the event of a divestiture?
11     **A.**  **He did, yes.**
12     **Q.**  And what's your response to Mr. Tinsley in that
13 regard?
14     **A.**  **With all due respect to Mr. Tinsley, I don't think**
15 **either he or I know what the court will order in terms of an**
16 **unwind situation.  So whether or not St. Luke's could offer**
17 **any kind of financial assistance or would, for that matter,**
18 **offer financial assistance is unknown to either of us at**
19 **this point.**
20     **Q.**  And even if St. Luke's were legally permitted to
21 provide recruiting assistance, do you have any reason to
22 suspect that that may not be in St. Luke's financial best
23 interests?
24     **A.**  **Well, certainly in the event of an unwind, Saltzer**
25 **physicians will be competing with those at St. Luke's.  And**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 30 of 68

3244

1  there is very likely a possibility that St. Luke's wouldn't
2  want to help a competitor of theirs in terms of recruiting
3  physicians.
4        Q.   With respect to looking at historical periods, are
5  you aware of St. Luke's ever assisting Saltzer in the
6  recruitment of replacement surgeons or recruitment of
7  surgeons in general?
8        A.   I am not aware of any instance of financial
9  assistance being provided related to a surgeon.
10       Q.   Let's move now to discussing some of the cost cuts
11 that Mr. Tinsley addressed.
12       As an initial matter, what was Mr. Tinsley's source for
13 the categories of suggested cuts?
14       A.   He had a conversation with Nancy Powell at Saint
15 Alphonsus.
16       Q.   That was it?
17       A.   Yes.
18       Q.   Do you see any problems with him relying on
19 Ms. Powell for these areas of proposed cost cutting?
20       A.   Well, I see at least two issues.  One, as it
21 related to Dr. Ballantyne, the information that he was
22 provided was -- was incorrect.  Dr. Ballantyne did not
23 depart Saint Alphonsus for Saltzer, but rather for
24 St. Luke's.
25       And then secondly, as I understand it, Ms. Powell

3245

1  has been gone from Saltzer for approximately two years.  So
2  I think, at best, her information would be a bit stale at
3  this point.
4        Q.   And before discussing those cost cuts, can you
5  explain where Mr. Tinsley obtained the amounts that he
6  proposed could be cut?
7        A.   Yes.  He utilized the Saltzer fiscal year '12
8  financial statements, just as I did.
9        Q.   And let's walk through a few of Mr. Tinsley's
10 proposed cost reductions.  He suggested that an unwound
11 Saltzer would experience a cost savings of roughly $600,000
12 annually related to the expiration of certain equipment
13 leases; is that right?
14       A.   That's right.
15       Q.   What's your response to that opinion?
16       A.   Well, what Mr. Tinsley actually suggested
17 specifically was that the MRI machine, the CT scanner, and
18 ultrasound equipment that Saltzer has that came off lease in
19 December of 2012 wouldn't need to be replaced and that that
20 equipment could just continue to be used and, therefore,
21 without releasing or upgrading the equipment, would be a
22 cost savings.
23       But my understanding is that Saltzer would, in
24 fact, have to either maintain that equipment in a way that
25 would cost them funds in order to upgrade it, and/or replace

3246

1  the equipment entirely.  My understanding of the equipment
2  replacements would be a financial cost to Saltzer of
3  approximately $900,000.
4        Q.   Did you discuss the need for new equipment with
5  Saltzer personnel?
6        A.   I did.  I spoke with Mr. Taylor, Drew Taylor, who
7  is the director of imaging for Saltzer.  I also spoke with
8  Dr. Kaiser and Mr. Savage about the practicality and reality
9  of the need for the replacement.  And the fact is that, in
10 order to remain competitive in the -- and have industry
11 standards in terms of the equipment, there is a need to
12 replace and/or upgrade those three pieces of machinery.
13       Q.   In those discussions regarding the Saltzer imaging
14 equipment, did you learn any other information about
15 expectations regarding future imaging services at Saltzer?
16       A.   Yeah.  I understand that, based on government
17 legislation, that there is an expectation of reimbursement
18 rates related to procedures utilizing this imaging equipment
19 are expected to decrease.  So the upshot of that is that
20 lower revenue would also serve to offset any potential cost
21 savings.
22       Q.   And Mr. Tinsley also suggested that the reductions
23 regarding EMR license costs and CME, or continuing medical
24 education, costs could be saved relating to the seven
25 departed surgeons; is that right?

3247

1        A.   Yes, he did.
2        Q.   Can you discuss your views on those potential cost
3  savings?
4        A.   Yeah.  I agree with Mr. Tinsley that those are
5  costs that could be eliminated based on departed physicians.
6  What I disagree with is the dollar amount that he's
7  included.  He's made an assumption of $5,000 per physician
8  in cost savings associated with the electronic medical
9  record system.
10       In fact, the documents related to the
11 eClinicalWorks system demonstrate that there is a $1,600
12 savings on an annual basis when a physician departs or a
13 user departs.  So I've made calculations associated with
14 $1,600 per departed physician related to the EMR cost and
15 have accepted the $2,000 in continuing medical education
16 costs per physician.
17       Q.   And did you apply that -- those costs over the
18 same seven surgeons that he looked at?
19       A.   I didn't.  I focused on a departure of 13
20 physicians or a net 12 physicians.  So what I did was
21 actually reduce costs by more than what Mr. Tinsley
22 suggested because his focus is simply on seven physicians.
23       Q.   And are those reduced costs included in your
24 opinion that you testified to earlier that Saltzer physician
25 compensation in the event of an unwind would be decreased by

3248

1  at least 30 percent?
2      **A.  Yes, they are.**
3      **Q.  And Mr. Tinsley also suggested cost cuts with**
4  respect to certain mid-level providers.  Can you explain
5  what his opinion was on that?
6      **A.  Yes.  He made the suggestion that perhaps one**
7  **nurse practitioner and a physician's assistant could be**
8  **eliminated from Saltzer in the event of an unwind.  His**
9  **basis for, or rationale for, making that assertion was that**
10 **he understood those mid-level providers not to be busy, and,**
11 **therefore, eliminating them would allow Saltzer to save on**
12 **their -- the salaries that they are paying those**
13 **individuals.**
14     **Q.  And did you do any analysis of those assumptions?**
15     **A.  I did.  In looking at the financial records for**
16 **Saltzer, the two mid-level providers that he had indicated**
17 **would be eliminated on the basis that they were not busy are**
18 **actually profitable, meaning they more than cover the cost**
19 **of themselves being there and contribute revenue,**
20 **profitability, to the bottom line, therefore increasing**
21 **physician compensation.**
22     **Q.  And did you learn anything about the types of**
23 patients that those mid-level providers saw?
24     **A.  Yes.  The mid-level providers are seeing overflow**
25 **patients, as it's coined; that is, patients that the**

3249

1  physicians can't see, don't have the time to see.  So
2  Mr. Tinsley's suggestion was that the physicians could just
3  take those patients back on.  But on the basis that their
4  overflow patients that they are seeing, that -- that
5  wouldn't be possible.
6      **Q.  Mr. Tinsley's largest cost reduction category**
7  relates to his suggestion that Saltzer suspend retirement
8  contributions for physicians and employees; is that right?
9      **A.  That's correct.**
10     **Q.  Can you explain what Mr. Tinsley is suggesting in**
11 that regard?
12     **A.  Yes.  He made the assertion that a possible cost**
13 savings would be to cut physician retirement contributions
14 and Saltzer employee contributions to retirement by 50
15 percent.
16     **Q.  And how much money did Mr. Tinsley deduct from the**
17 increased overhead burden based on that recommendation?
18     **A.  So the increased overhead burden is approximately**
19 $3.2 million.  He made the assumption that by cutting
20 retirement benefits, he could save $989,000 of that
21 increase.
22     **Q.  And can you show how Mr. Tinsley arrived at that**
23 figure?
24     **A.  Yes.  In utilizing the fiscal year 2012 Saltzer**
25 financial statements, there are physician retirement

3250

1  contributions that those physicians have made in the amount
2  of $1.3 million.
3      Saltzer, in addition to that, made employee
4  retirement contributions, so on behalf of the employees, in
5  the amount of approximately $673,000.  So the total
6  retirement contributions were in the neighborhood of $2
7  million.
8      **Q.  And how does the -- and that -- that relate --**
9  that then gets related how to the 989,000?
10     **A.  So applying the 50 percent reduction that's been**
11 **suggested will get to the $989,000 in savings.**
12     **Q.  And how does that break down between physicians**
13 and employees?
14     **A.  The $989,000 is made up of approximately $652,000**
15 **for physician contributions and $337,000 for Saltzer**
16 **employees.**
17     **Q.  Ms. Ahern, can you please describe for the court**
18 the process by which Saltzer physicians are involved in
19 determining how their earnings are distributed?
20     **A.  Yes, I can.  Saltzer physicians receive**
21 **compensation at the end of the year that they then decide**
22 **which portion they'll take in terms of salary or W-2**
23 **compensation versus how much of that they want to put into**
24 **their retirement funds.  So it's the option of the**
25 **physician, but in any event, it doesn't change their overall**

3251

1  compensation.
2      **Q.  And to that point, what would it mean for a**
3  Saltzer physician to fully suspend his or her retirement
4  contributions to their overall compensation?
5      **A.  It would just simply mean that they were taking**
6  **that amount of retirement contribution in the form of**
7  **salary.**
8      **Q.  And would that result in any cost savings for**
9  Saltzer?
10     **A.  No, it wouldn't.  There is no effect on Saltzer,**
11 **the business.  This is the compensation of the physicians.**
12     **Q.  And can you illustrate sort of what the effect of**
13 that would be?
14     **A.  Yes.  So in this illustration, in making the**
15 **assumption that the physicians who would remain at Saltzer**
16 **in the event of an unwind made nearly $8 million in salary**
17 **in fiscal year '12 and $1.3 million in retirement benefits,**
18 **what that results in is total compensation to those**
19 **physicians of $9.3 million.**
20     Mr. Tinsley has assumed movement of 50 percent of
21 **those retirement funds and, of course, has assumed a savings**
22 **associated with that of $652,000.  But the reality is,**
23 **despite the fact that the salary component and the benefits**
24 **component of compensation would change, total compensation**
25 **remains consistent at $9.3 million.**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 32 of 68

3252

1    Q.   So moving money from retirement to salary has no
2    effect at the end of the day for physicians on their overall
3    compensation?
4    **A.   That's right.**
5    Q.   And what's your understanding of the importance of
6    retirement plans to the physician participants?
7    **A.   In my discussions with Mr. Savage, who is**
8    **principally responsible for the recruitment of physicians, I**
9    **understand that the retirement aspect of compensation is**
10   **very important.  And, in fact, he indicated to me that it's**
11   **oftentimes the topic that the physician addresses with him**
12   **before he can get to it with them.**
13   Q.   And do you have an understanding as to how
14   retirement contributions for staff are determined?
15   **A.   I do.  Generally speaking, there is an**
16   **actuarial-based formula that, depending on how much**
17   **retirement contribution is made by what's called highly**
18   **compensated employees or, for the most part, physicians,**
19   **there is a mathematical formula that then sets up limits on**
20   **what can be contributed by -- on behalf of Saltzer**
21   **employees.**
22   Q.   Would cutting employee retirement benefits result
23   in some cost savings to Saltzer?
24   **A.   It could in the short-term.  By cutting employee**
25   **benefits to that tune, I think you would end up with**

3253

1    potential retention issues associated with your staff.
2    They'd become accustomed, of course, to retirement benefits
3    being part of their compensation.
4    Q.   You mentioned earlier your opinion that the
5    decreased compensation that Saltzer physicians would earn in
6    the event of an unwind might affect the retention of those
7    physicians.
8    Are you aware of anything that would prevent Saltzer
9    physicians from leaving Saltzer in the event of an unwind?
10
11
12              REDACTED
13
14
15   Q.   And Mr. Tinsley and plaintiffs have criticized
16   your conclusion that Saltzer would be less competitive
17   following a divestiture from St. Luke's than it was at the
18   end of fiscal year 2012, and I'm calling it unfounded.
19   How do you respond to that criticism?
20   **A.   Well, the reduction in compensation in the amount**
21   **of, on average, 30 percent or more than 30 percent would**
22   **certainly be impactful on the recruitment or, frankly, the**
23   **retention of the remaining physicians.**
24       **And as I indicated, the Saltzer physicians, at**
25   **this point in particular, are aware of the benchmark data.**

3254

1    **They're aware of the offers that have been made to them by**
2    **St. Luke's and Saint Alphonsus.  So it would be a logical**
3    **assumption that some of those physicians would depart**
4    **Saltzer.**
5    Q.   And what is your opinion regarding Mr. Tinsley's
6    suggested cost reductions in terms of Saltzer's
7    competitiveness?
8    **A.   Well, Mr. Tinsley's suggestion in his report was**
9    **that based on the way he had treated physicians and the cost**
10   **cuts that he had suggested, that the remaining Saltzer**
11   **physicians in the event of an unwind would actually be made**
12   **better off than they were in fiscal year '12.**
13       **He's revised those calculations and at his**
14   **deposition proposed three different scenarios, one of which**
15   **is that Saltzer physician compensation would decrease by**
16   **nearly 15 percent.**
17   Q.   And do you find Mr. Tinsley's calculation of that
18   nearly 15 percent net loss compensation to be accurate?
19   **A.   No, I don't.**
20   Q.   And if you -- putting the other cost cuts aside,
21   if you simply reallocated or adjusted the retirement
22   component of that opinion that we discussed earlier, what
23   would that do to the bottom line with respect to
24   Mr. Tinsley's opinion?
25   **A.   Right.  So Mr. Tinsley's opinion was that there**

3255

1    would be a net loss compensation, as I said, of nearly 15
2    percent.  If I correct his calculations for the portion of
3    the retirement suspension that's affiliated with the
4    physician component, that 14 percent loss in compensation
5    becomes nearly 22 percent.
6    Q.   So do you believe that Mr. Tinsley's adjusted 22
7    percent net loss compensation estimate is the appropriate
8    measure for Saltzer physicians' compensation in the event of
9    an unwind?
10   **A.   I don't.  There are cost reductions that he's**
11   **still assuming that I think are inappropriate.  But,**
12   **ultimately, if you appropriately account for the departed**
13   **former Saltzer physicians and the addition of new physicians**
14   **and then account for the cost reductions that Saltzer can**
15   **make, could actually make in the event of an unwind, the**
16   **resulting decrease in compensation for those physicians**
17   **compared against fiscal year '12 would be a reduction of**
18   **more than 30 percent.**
19       MR. SCHAFER:  Thank you, Ms. Ahern.  No further
20   questions.
21       THE COURT:  Cross, Mr. Ettinger.
22       MR. ETTINGER:  Thank you, Your Honor.
23             CROSS-EXAMINATION
24   BY MR. ETTINGER:
25   Q.   Good morning, Ms. Ahern.

3256

1    **A.**    Good morning.
2    **Q.**    I want to start with something that you said this
3    morning, and I think I got the exact words down. And we can
4    find it in the transcript if need be, but I took them down
5    as I was reading it scrolling across the screen.
6        And what you said was, quote: To the degree
7    Dr. Ballantyne is not at Saint Alphonsus, there are no
8    losses from the Saltzer physicians that would be recorded in
9    the financial record of Saint Alphonsus Nampa, close quote.
10    Is that -- did you mean to say that?
11    **A.**    I assume that you're reading what I said. Yes.
12    **Q.**    Okay. So what you're saying is that because
13    Dr. Ballantyne is now at St. Luke's, he won't be admitting
14    patients at Saint Alphonsus Nampa; correct?
15    **A.**    No, that's not what I'm saying.
16    **Q.**    Well, Mr. Checketts' projections are of hospital
17    revenues; correct?
18    **A.**    They are.
19    **Q.**    And you're saying Dr. Ballantyne is not going to
20    have hospital revenues at Saint Alphonsus Nampa; correct?
21    **A.**    No, that's not what I'm saying.
22    **Q.**    Well, if he still has hospital revenues at Saint
23    Alphonsus Nampa, then why is it that he is no longer
24    susceptible to losing those hospital revenues if he loses
25    Saltzer referrals?

3257

1    **A.**    The basis on which the calculation was made is no
2    longer valid.
3    **Q.**    What basis is no longer valid? What specific
4    basis is no longer valid?
5    **A.**    That the referrals that Dr. Ballantyne has been
6    receiving by the Saltzer physicians would, therefore, be
7    reduced because of the Saltzer affiliation. The fact of the
8    matter is that Dr. Ballantyne won't be at Saint Alphonsus,
9    so any of his reductions don't have to do with the Saltzer
10    and St. Luke's affiliation.
11    **Q.**    So you're saying that -- do you believe
12    Mr. Checketts' calculations only concern Saint Alphonsus
13    employed physicians?
14    **A.**    No, I don't think.
15    **Q.**    So, presumably, Mr. Checketts' calculations
16    included whatever doctors are practicing at Saint Alphonsus
17    Nampa; isn't that right?
18    **A.**    I -- there are several physicians that I'm sure
19    Mr. Checketts is including.
20    **Q.**    Yeah. Any physician who is practicing at Saint
21    Alphonsus Nampa generating revenues there are included in
22    his projections; correct?
23    **A.**    Can you say the question again, please.
24    **Q.**    Any physician practicing at Saint Alphonsus Nampa
25    contributing revenues who might be getting referrals from

3258

1    Saltzer doctors are included in his projections; correct?
2    **A.**    Well, no. He's included very specific physicians,
3    so not any doctor. I don't think I agree with that.
4    **Q.**    So you think -- let me just be sure I get straight
5    what your assumptions are here before we move on. You're
6    saying that now that Dr. Ballantyne is a St. Luke's doctor,
7    he will keep doing cases at Saint Al's Nampa, but the
8    Saltzer physicians will have no incentive to take referrals
9    away from him. Is that your assumption?
10    **A.**    No. My assumption is that Mr. Checketts'
11    inclusion of Dr. Ballantyne in the way he has is no longer
12    valid.
13    **Q.**    What is it about Dr. Ballantyne's changed status
14    that makes it irrelevant to the projections? One last try.
15    **A.**    Again, Mr. Checketts has included Dr. Ballantyne
16    in his analysis as a physician practicing at Saint Alphonsus
17    Nampa. And given that he will be employed then by
18    St. Luke's, the presumption is that Dr. Ballantyne will no
19    longer be performing all of his volume any longer at Saint
20    Alphonsus.
21    **Q.**    You said he is including Dr. Ballantyne as a
22    physician practicing at Saint Alphonsus Nampa, and so you
23    are now concluding that he won't be a physician practicing
24    at Saint Alphonsus Nampa?
25    **A.**    No. I'm simply saying his employment or his -- he

3259

1    will now be employed by St. Luke's.
2    **Q.**    And how will that affect his practice at Saint
3    Alphonsus Nampa?
4    **A.**    His practice will change to the degree that any of
5    his patterns change by no longer being at Saint Alphonsus.
6    **Q.**    Thank you.
7        Let's look at one more on this. You cited Dr. Mark
8    Johnson in your report and talked about him today; correct?
9    **A.**    That's correct.
10    **Q.**    I want to show you a little clip from
11    Dr. Johnson's deposition.
12        MR. ETTINGER: Keely, it's Ahern cross clip 100.
13        THE COURT: I'm sorry?
14        MS. DUKE: It's this one right here. Yeah, that
15    little -- the court's little remote isn't working up there,
16    so thank you.
17        THE COURT: All right.
18        MR. ETTINGER: We're going to play this, and then
19    I want to ask you about it.
20        (Video clip played as follows:)
21        **Q.**    "And how do you determine which hospital
22        to admit a patient to?
23        **A.**    Patient preference is the -- is the first
24        criteria. That's the first question I ask, do
25        you have a preference on where you go?

Saint Alphonsus Medical Center, et al.; v. St. Luke's Health System, et al.                     Bench Trial, 10/18/2013

3260

1    **Q.**  "And where there isn't a preference,
2    what's the next step?
3        **A.**  "If there's not a preference, then I'll
4    typically have them admitted at St. Luke's."
5    (Video clip concluded.)
6    BY MR. ETTINGER:
7        **Q.**  Did you remember reading that testimony in his
8    deposition?
9        **A.  I recall that testimony.**
10       **Q.**  Is his testimony as to his behavior consistent
11   with what you expect the Saltzer primary care physicians
12   will do if the St. Luke's acquisition goes forward?
13       **A.  Which is what?  Which behavior?**
14       **Q.**  If there is not a preference, I'll typically have
15   them admitted at St. Luke's.
16       **A.  I have no opinion as to whether or not the Saltzer**
17   **physicians would model Dr. Johnson.**
18       **Q.**  You have no opinion as to whether the Saltzer
19   physicians will engage in the behavior as he described it;
20   correct?
21       **A.  I have not made a comparison of Saltzer physicians**
22   **to Dr. Johnson in particular, so I don't know.**
23       **Q.**  Well, it's a very simple thing.  We don't -- just
24   take this statement:  If there is not a -- and I'll take
25   out Dr. -- let's take out Dr. Johnson's name, make it real

3261

1    simple for you.  If there is not a preference, the doctor
2    will typically have the patients admitted at St. Luke's.
3        Now, is that consistent with what you expect the
4    Saltzer doctors to do if this acquisition goes forward?  Yes
5    or no, please.
6        **A.  I have no expectation of what Saltzer doctors will**
7    **do at St. Luke's.**
8        **Q.**  Thank you.
9        And you don't know what St. Luke's expectations were as
10   to where the Saltzer referrals would go after St. Luke's
11   acquired Saltzer, do you?
12       **A.  I don't know what their expectations are, no.**
13       **Q.**  Prior to this case, you've had no experience in
14   performing quantitative analyses of physician referrals;
15   correct?
16       **A.  No.  I disagree with that.**
17       MR. ETTINGER:  Why don't we play clip 44, Keely,
18   44A and 44B.
19       (Video clip played as follows:)
20       **Q.**  "Prior to this case, do you have any
21       experience in doing quantitative analyses of
22       physician referrals?
23       **A.**  "Not like the referral patterns we're
24       looking at here, no.
25       **Q.**  "Did you ever actually perform a

3262

1        quantitative analysis of physician referrals
2        prior to this case?
3        **A.**  "Not of the nature of this sort."
4    (Video clip concluded.)
5    BY MR. ETTINGER:
6        **Q.**  Was that your testimony, Ms. Ahern?
7        **A.  Yes, it was.**
8        **Q.**  And you don't recall ever providing a specific
9    opinion to a client on physician referrals, do you?
10       **A.  That's true.**
11       **Q.**  And prior to this case, you had never performed
12   any kind of calculation where you tried to attribute
13   referrals or admissions at a hospital to either particular
14   physicians or physician groups; correct?
15       **A.  As I testified, not in the form, not in the form**
16   **of -- exactly the form of this case, no.**
17       **Q.**  Or even approximately in the form of this case;
18   correct?
19       **A.  Well, as I indicated, I have worked consistently**
20   **with health systems and their affiliation and employment**
21   **with physicians, so referrals are always an issue.**
22       **Q.**  Isn't it true that you have, prior to this case,
23   never tried to perform any kind of calculation where you
24   tried to attribute referrals or admissions at a hospital,
25   either to particular physicians or groups of physicians?

3263

1    Yes or no.
2        **A.  Yes, in the manner of this case.**
3        MR. ETTINGER:  Keely, why don't you play cross
4    clip 10.
5        (Video clip played as follows:)
6        **Q.**  "Have you ever yourself tried to do
7        a -- prior to this case, do any kind of
8        calculation where you tried to attribute
9        referrals or admissions at a hospital to
10       particular physicians?
11       **A.**  "Not that I recall."
12   (Video clip concluded.)
13   BY MR. ETTINGER:
14       **Q.**  Was that your testimony?
15       **A.  Yes, it was.**
16       **Q.**  Now, you talked today about Karl Keeler's
17   testimony about business at Saint Alphonsus Nampa.  Do you
18   remember that?
19       **A.  I do, yes.**
20       **Q.**  And you remember you were trying to suggest at
21   that time that there was an ongoing decline in business at
22   Saint Alphonsus Nampa up to this time.  Is that -- was that
23   what you were trying to suggest?
24       **A.  Up to this time, did you say?**
25       **Q.**  Right, right.

Case 1:12-cv-00560-BLW v. Document 565 Filed 11/04/14 Page 35 of 68

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench trial, 10/18/2013

3264

1      A.   I don't think I said that, no.

2      Q.   You said, Mr. Keeler said, quote, at that point in

3   time, close quote, that there had been a decline, right?

4      A.   I think I was paraphrasing what was on the screen,

5   which was his testimony regarding the perception of the

6   Nampa facility at that point in time.

7      Q.   And that point in time was when he had just

8   arrived before the improvements program that he and Saint

9   Alphonsus instituted at that hospital; correct?

10     A.   That's right.   That's what I indicated.

11     Q.   And since that time, that hospital's revenues have

12  increased by more than 10 percent, haven't they?

13     A.   They -- Nampa revenues have increased, yes.

14     Q.   Now, you offered a lot of testimony about the

15  surgeons, the Saltzer surgeons.   Now, those slides related

16  to the cases performed by the surgeons themselves as

17  doctors; correct?

18     A.   Which slides?

19     Q.   The slides about Dr. Curran, about Dr. Holley,

20  about Dr. Beasley, and so on; correct?

21     A.   The question again?

22     Q.   Those slides related to the cases performed by

23  those surgeons as physicians; correct?

24     A.   Yes.

25     Q.   And you don't have a view, do you, about the

---

3265

1   relationship between any loss of cases by those surgeons and

2   the loss of surgery cases by Saint Al's Nampa due to the

3   Saltzer transaction; correct?

4      A.   I don't -- I don't follow your question.

5           MR. ETTINGER:   Why don't we play clip 15, Keely.

6      Your Honor, I'm sorry.   I haven't been giving the

7      page and line numbers, but this one is 174, page [sic] 24 to

8      175, page 6.   And we can supply the others.

9           MS. DUKE:   Your Honor, just since we're at that

10     point, the first clip when David said -- Mr. Ettinger said

11     clip 44, it was page 182, lines 11 to 15, and page 182,

12     lines 23 to 25.   And when he indicated clip 10, it was 184,

13     lines 1 through 5.

14          THE COURT:   All right.   Thank you.

15  (Video clip played as follows:)

16     Q.   "Do you have a view as to the relationship

17          between any loss of cases by the surgeons who

18          left Saltzer due to the Saltzer transaction and

19          any loss of surgery cases by Saint Al's Nampa

20          due to the Saltzer transaction?

21     A.   "I don't necessary -- now, I would have to

22          think through that more, but I don't think -- I

23          don't think so."

24  (Video clip concluded.)

25  BY MR. ETTINGER:

---

3266

1      Q.   And was this your testimony?

2      A.   It was.

3      Q.   And when the Saltzer surgeons gained referrals

4   from SAMG doctors, those may have been cases that otherwise

5   were already going to Saint Alphonsus hospitals; correct?

6      A.   They may have been.   But there was --

7      Q.   And Dr. Curran talked about his volume being

8   maintained but his payor mix getting worse; isn't that

9   right?

10     A.   I believe he did testify to that, yes.

11     Q.   And when the payor mix gets worse, the hospital

12  gets less dollars; correct?

13     A.   That's true.

14     Q.   Let's talk about this issue that you spent a lot

15  of time on and the judge asked a lot of questions about in

16  terms of the PCP field and the admitting field.

17          Now, you repeatedly, based on what I heard, Ms. Ahern,

18  talked about PCP or referring physician.   You seem to treat

19  those words interchangeably.

20          In fact, it is the case, is it not, that the PCP field

21  at Saint Al's Nampa doesn't say anything about referrals or

22  referring physician; correct?

23     A.   I would disagree with that.

24     Q.   When you look at the field in the data, does it

25  mention referrals?

---

3267

1      A.   The field in the data set itself, no, it doesn't.

2      Q.   Okay.   And you also said -- and I'm quoting; I

3   took it down:   Several of the Saint Al's employees have

4   testified that the PCP field is more representative of a

5   referral, close quote.

6      A.   Yes.

7      Q.   Did you misspeak when you said that?

8      A.   I didn't misspeak.   There is testimony from Saint

9   Alphonsus employees equating the PCP field to referrals.

10     Q.   Did any Saint Alphonsus employee say that the PCP

11  field is more representative of referrals than any other

12  field?

13     A.   They talked about it being representative of

14  referring patterns.

15     Q.   What -- okay.   Well, we will look at the

16  transcript, and we'll judge the credibility of your

17  testimony.   So I want you to very carefully answer if you

18  have a clear recollection.

19          Which Saint Alphonsus employee said the PCP field is

20  representative of a referral?

21     A.   That was not the testimony in that --

22     Q.   Okay.   Well that's what you said a minute ago, so

23  let's try another -- let's try another version.

24          Did any Saint Alphonsus employee say that the PCP field

25  is more representative of a referral than any other

3268

1  particular field?
2      **A.  That was not the way the testimony was given, no.**
3      **Q.**  Okay.  Now, in fact, it is your belief, is it not,
4  that the PCP data doesn't tell you whether any patient
5  admission was caused in any way by the primary care
6  physician who is shown in the field; correct?
7      **A.  That's right.  The field does not indicate who**
8  **caused the referral.**
9      **Q.**  Okay.  And, in fact, if you look at the admitting
10  field, as Dr. Haas-Wilson did, that will understate the
11  cases in which Saltzer physicians had a role, understate the
12  cases; isn't that right?
13      **A.  I don't know.  The admitting data is -- is**
14  **convoluted with the hospitalist issue, so I assume that's**
15  **true, but I don't know with certainty.**
16      **Q.**  Now, Mr. Checketts did not use the primary care
17  physician field; correct?
18      **A.  He did not, no.**
19      **Q.**  But the primary care physician field shows that 40
20  percent of Saint Alphonsus Nampa patients have used a
21  Saltzer PCP; isn't this right?
22      **A.  I don't know.  I'd have to look at the data to see**
23  **that.**
24      **Q.**  Okay.  Dr. Haas-Wilson looked at it, and that's
25  what she found; isn't that right?

3269

1      **A.  She may have.**
2      **Q.**  And Mr. Checketts assumed that Saltzer admissions
3  only accounted for 20-some percent of the admissions at
4  Saint Alphonsus Nampa; isn't that right?
5      **A.  Well, the revenue that he quantified was**
6  **approximately 20 percent of total revenue.**
7      **Q.**  Right.  So Mr. Checketts' assumption using the
8  admitting field was much more conservative than the
9  conclusion that Dr. Haas-Wilson found when she looked at the
10  PCP field; correct?
11      **A.  I don't know how their assumptions would compare.**
12  **I would have to analyze that.**
13      **Q.**  Well, 20 percent is a lot less than 40 percent, is
14  it not?
15      **A.  I think it's a different bases that they're**
16  **talking about.**
17      **Q.**  Is there any reason to believe 20 percent of
18  revenues is more than 40 percent of admissions in this case,
19  Ms. Ahern?
20      **A.  Revenue is different from admissions.  It depends**
21  **on the nature of the -- the patient being admitted and what**
22  **the reason is, so --**
23      **Q.**  I'm asking a very specific question.  Do you have
24  any reason you can provide the court as to why 20 percent of
25  revenues would end up being a bigger number than 40 percent

3270

1  of admissions in the facts of this case?
2      **A.  Sure.**
3      **Q.**  Why?
4      **A.  Because, depending upon what the patient is being**
5  **treated for, revenues could be higher or lower than the**
6  **percentage of the actual admissions.**
7      **Q.**  Do you have any reason to believe that the Saltzer
8  physicians who are admitting patients at Saint Al's Nampa
9  are admitting lower revenue patients than the typical
10  patient?
11      **A.  I don't -- I don't know that to be the case.**
12      **Q.**  And, In fact, the Saltzer physicians tend to have
13  a better payor mix than the typical patient at Saint Al's
14  Nampa; isn't that right?
15      **A.  I have seen that assertion.  I don't know that**
16  **that's true.**
17      **Q.**  Do you know that, for example, a lot of patients
18  at Saint Al's Nampa are from Terry Reilly, and they are
19  patients who are lower income, often uninsured; isn't that
20  right?
21      **A.  There are some patients.  I don't know if it's a**
22  **lot.**
23      **Q.**  Okay.  And is there any reason to believe that
24  patient -- well, strike that.
25      You also had some questions about hospitalists that

3271

1  arose, and I think the court asked you some questions about
2  them.
3      Isn't it true that when a patient is admitted by a
4  hospitalist -- actually, let me ask it slightly differently.
5      Isn't it true that if a specialist is causing a patient
6  to be admitted to the hospital and treating the patient in
7  the hospital, that is not shown as a hospitalist admission?
8      **A.  I don't know that that's necessarily the case.**
9      **Q.**  You don't know one way or the other?
10      **A.  Well, you would have to look at instances of a**
11  **patient -- in your scenario of a patient being referred by a**
12  **specialist and then see who the recorded admitting physician**
13  **is.**
14      **Q.**  I'm not asking how you would look at the data.
15  Isn't it true, as a matter of fact, that hospitalists take
16  care of primary care physicians' patients in the hospital?
17  That's their role.
18      **A.  That is their role.  I don't know that that's**
19  **their only role.**
20      **Q.**  Is it -- you don't know whether hospitalists
21  routinely forgo taking care of patients of specialists when
22  they're admitted to the hospital?  Let me ask the question a
23  different way.  I'm sorry.
24      Isn't it true that if a specialist wants one of his
25  patients to go in the hospital, it's recorded as an

Case 1:12-cv-00560-BLW v. Document 565 Filed 11/04/14 Page 37 of 68

3272

1  admission of that specialist, not of the hospitalist?
2  **A.  It may be.**
3  **Q.**  Okay.  Now, you've never prepared any projections
4  of hospital revenues, have you?
5  **A.  From scratch, I have not, no.**
6  **Q.**  Okay.  You criticized Mr. Checketts' baseline
7  projections as too optimistic, did you not?
8  **A.  That's, in fact, the case, yes.**
9  **Q.**  And what he did was he subtracted the -- his
10  calculated impact of the Saltzer acquisition from his
11  baseline; isn't that right?
12  **A.  Yes, he did.**
13  **Q.**  Okay.  So as a matter of arithmetic, if his
14  baseline projections were too optimistic, that would mean
15  that -- and the actual baseline numbers were lower, as a
16  matter of arithmetic, the net number would be lower; isn't
17  that right?
18  **A.  The net number?  Which net number?**
19  **Q.**  You start out with how they are performing before
20  Saltzer; you subtract the Saltzer impact.  If they're
21  performing worse before Saltzer, the net number after
22  subtracting the Saltzer impact is, in fact, a lower number;
23  correct?
24  **A.  It's a lower number resulting in more FTE cuts**
25  **that would have nothing to do with Saltzer and St. Luke's**

3273

1  **affiliation.**
2  **Q.**  Well, if the FTE --
3  MR. ETTINGER:  Why don't we play clip -- why don't
4  we play clip -- strike that.
5  BY MR. ETTINGER:
6  **Q.**  In fact, it would result in more FTE cuts and the
7  incremental FTE cuts because the baseline was lower, would
8  not be due to Saltzer.  The FTE cuts due to the Saltzer
9  impact would be the same, wouldn't they?
10  **A.  I'm not sure I follow what you're asking.**
11  **Q.**  If a hospital makes $100 and you assume $20 in
12  lost revenues due to Saltzer, you end up at 80, and that may
13  be associated with a certain number of FTE cuts; isn't that
14  right?
15  **A.  That's the way Mr. Checketts' analysis worked,**
16  **yes.**
17  **Q.**  Yeah.
18  MR. ETTINGER:  Your Honor, I just realized that we
19  have been proceeding as if this were AEO St. Luke's.  And I
20  don't think it's AEO for anybody, but the Saint Al's people
21  have been excluded and the St. Luke's people have remained.
22  I don't think it matters, but I am now about to get into a
23  document that was AEO Saint Al's, so maybe we need to flip
24  who is in the courtroom very briefly.
25  THE COURT:  Of everyone except Saint Al's?

3274

1  MR. ETTINGER:  Right.
2  THE COURT:  All right.  Ladies and gentlemen,
3  unless you're affiliated with Saint Al's or have been
4  designated as subject to the court's protective order,
5  you'll need to leave the courtroom.
6  MR. ETTINGER:  Your Honor, this will be brief, and
7  then we're going to have to flip it back the other way, but
8  sorry.
9  THE COURT:  I just wouldn't run for election in
10  Ada County in the foreseeable future.
11  MR. ETTINGER:  Nobody suggested that to me,
12  Your Honor, so I think we're safe.
13  BY MR. ETTINGER:
14  **Q.**  You -- I want to take a look at slide 20 from your
15  deck, Ms. Ahern.  And your slide 20 was intended to show --
16  you entitle it "Saint Alphonsus-Nampa Historical Volume
17  Losses"; correct?
18  **A.  Yes.**
19  **Q.**  And the top bullet says, "Even with a gradual
20  withdrawal. . .Saltzer still represents 40 percent of the
21  hospital's inpatient volume."  Correct?
22  **A.  Yes.**
23  **Q.**  Do you know whether that was referring to
24  admissions or revenues?
25  **A.  I don't with certainty, no.**

3275

1  **Q.**  Okay.  You talked about Mr. Checketts' 5 percent
2  growth assumption.  Do you recall that?
3  **A.  I do.**
4  **Q.**  And his growth assumption was not an assumption
5  about the growth of Saltzer but an assumption about the
6  growth of hospital business derived from Saltzer physicians;
7  correct?
8  **A.  Correct.**
9  **Q.**  Okay.  And then finally, for our brief AEO portion
10  of this sort, you mentioned that you thought that there was
11  room for Saint Al's Nampa to trim the fat because they were
12  57 FTEs over budget.  Do you recall that?
13  **A.  I don't think I used the phrase "trim the fat,"**
14  **but I recall the topic.**
15  **Q.**  Well, I heard that phrase.  Is that -- does that
16  reflect your opinion or not, trim the fat?
17  **A.  What I talked about was Saint Alphonsus Nampa**
18  **being overstaffed based on their documents.**
19  **Q.**  Isn't it true that they were shown as 57 FTEs over
20  budget because their volume was substantially over budget?
21  **A.  I don't know that that's true, no.**
22  **Q.**  And if that were true -- and that's what the
23  document you cited shows -- that doesn't suggest that there
24  is any room to reduce FTEs simply in response to losses;
25  correct?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 10/18/2013

---

3276

1    **A.**  So that their volume was -- was over budget, also?
2    **Q.**  If a hospital does a budget -- you're familiar;
3    the hospital will budget revenues, admissions, and costs;
4    right?
5    **A.**  Absolutely.
6    **Q.**  And if it's underestimating its volume, it's going
7    to end up having to staff more FTEs to match the greater
8    volume; correct?
9    **A.**  That's true.
10   **Q.**  And so if its FTEs are over budget because its
11   volume is greater, that's not a sign of too many FTEs;
12   that's just a sign that it did better than it thought it was
13   going to do; correct?
14   **A.**  I don't think we've seen evidence that Saint
15   **Alphonsus Nampa did better than it thought it was going to**
16   **do in fiscal 2013.**
17   **Q.**  Did you --
18   **A.**  That's what I discussing --
19   **Q.**  Do you recall one way or -- the document you are
20   talking about is not fiscal '13.  It's fiscal '12; isn't
21   that right?
22   **A.**  Which document?
23   **Q.**  The document that talked about 57 FTEs over budget
24   was fiscal '12, was it not?
25   **A.**  It's a fiscal year 2012 document, yes.

---

3277

1    **Q.**  And in fiscal year 2012, Saint Alphonsus Nampa was
2    significantly over budget in terms of volumes, was it not?
3    **A.**  I don't know that to be true.
4    **Q.**  You don't know it to be false either, do you?
5    **A.**  I don't.  I haven't looked at the volume in that
6    **year.**
7            MR. ETTINGER:  Your Honor, I think I'm about to
8    finish off my last chances of politics in Ada County.  I
9    think we need to flip the AEO.  Sorry.
10           THE COURT:  Yes, if you would, Mr. DeLange.
11           MR. ETTINGER:  The person I'll probably be least
12   popular with is my client, who I inadvertently excluded from
13   a large part of my cross-examination.  Hopefully, I've
14   retained enough goodwill.
15           Should I proceed, Your Honor, or wait?
16           THE COURT:  Yes.  Let's go ahead and proceed.
17           For the record, I'm obviously counting on the
18   attorneys to make sure we have the right people in the
19   courtroom because I don't have too much familiarity with who
20   works where, so...
21           Go ahead and proceed, Mr. Ettinger.
22           MR. ETTINGER:  Thank you, Your Honor.
23   BY MR. ETTINGER:
24   **Q.**  So, Ms. Ahern, as you might have guessed, I'm now
25   moving on to your unwind portion of your report.

---

3278

1    **A.**  I did.
2    **Q.**  And since that's about physician practice, let me
3    start with your experience in that area.
4            You have never personally prepared projections relating
5    specifically to a physician practice before this case;
6    correct?
7    **A.**  Not from scratch, that's true.
8    **Q.**  And you've never had primary responsibility for
9    preparing projections with regard to a physician practice
10   before this case; correct?
11   **A.**  I have had primary responsibility associated with
12   **analyzing those type of projections.**
13   **Q.**  You have not had primary responsibility for
14   preparing such projections.
15   **A.**  I have not.
16   **Q.**  And you have never assessed the viability of a
17   physician practice in a professional engagement; correct?
18   **A.**  Well, I have assessed -- I have done financial
19   **analysis associated with physician practices but not the**
20   **viability of a practice.**
21   **Q.**  Okay.  And you have never analyzed the ability or
22   inability of a physician organization to downsize; isn't
23   that right?
24   **A.**  No, I wouldn't agree with that.
25   **Q.**  Aside from an efficiency study in connection with

---

3279

1    a hospital merger, you have never looked at a physician
2    practice stand-alone and assessed its ability to downsize;
3    isn't that?
4    **A.**  Outside of all the work I do related to mergers
5    **involving hospitals and physicians, no.**
6    **Q.**  That's right.
7    **A.**  That's true.
8    **Q.**  And you have never analyzed the effect on
9    physician profitability or compensation of the loss of a
10   revenue source; correct?
11   **A.**  Well, again, I have analyzed many instances of
12   **financial ramifications involving physicians, so I don't**
13   **know that I can agree that that's true.**
14           MR. ETTINGER:  Well, why don't we play clip 26,
15   please, Keely.
16           Your Honor, this is page 38, lines 7 through 11 of
17   Ms. Ahern's deposition.
18           (Video clip played as follows:)
19   **Q.**  "Have you -- and is it fair to say that,
20               prior to this matter, you've never analyzed the
21               effect on physician practice profitability or
22               compensation of the loss of a revenue source?
23   **A.**  "That's probably true."
24           (Video clip concluded.)
25   BY MR. ETTINGER:

---

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW  Document 565  Filed 11/04/14  Page 39 of 68

3280

1    **Q.**   And was that your testimony?
2    **A.**   Yes, it was.
3    **Q.**   And isn't it true that, prior to this matter, you
4    have never analyzed the impact of a divestiture of a
5    physician group on the finances of that group?
6    **A.**   That's true.
7    **Q.**   Now, we've heard, of course, your opinion on the
8    effect of the -- these physicians leaving Saltzer on
9    compensation, but you have no opinion whatsoever about the
10   impact of those physicians leaving on compensation following
11   the first year after an unwind; isn't that right?
12   **A.**   My analysis addresses the immediate impact in the
13   **first year following the unwind; that's right.**
14   **Q.**   And your calculations are under the assumption
15   that no additional physicians will be added after an unwind,
16   other than those physicians who are -- have currently been
17   added; correct?
18   **A.**   None would be added or removed, that's right.
19   **Q.**   But you have not reached a conclusion that Saltzer
20   would be unable to recruit any additional physicians even in
21   the first year following an unwind; correct?
22   **A.**   Well, I just testified that I haven't assumed
23   **anyone else will be added, but I've formulated no physician**
24   **recruiting plan, no.**
25   **Q.**   And you haven't offered any opinions on the

3281

1    success or failure of physician recruiting; correct?
2    **A.**   Other than what I've observed from Saltzer's
3    **inability to be able to recruit the three orthopedic**
4    **surgeons it's been attempting to recruit --**
5    **Q.**   But you have not --
6    **A.**   -- I don't have an independent opinion.
7    **Q.**   But you have not drawn any conclusions as an
8    expert about Saltzer's ability or inability to recruit even
9    in the first year; correct?
10   **A.**   That's correct.
11   **Q.**   Nor have you offered an opinion as to how long it
12   might take Saltzer to recruit additional physicians in the
13   event of an unwind; correct?
14   **A.**   Just from the testimony and the documents I've
15   **seen in this matter of the difficulties associated with --**
16   **Q.**   You are not offering an opinion --
17   **A.**   I am not.
18   **Q.**   -- to this court as to how long it would take
19   Saltzer to recruit additional physicians; correct?
20   **A.**   That's right.
21   **Q.**   And you would not regard yourself as an expert on
22   physician recruitment.
23   **A.**   I am not a physician recruiter.
24   **Q.**   And you mentioned the word "competitive" at one
25   point.  You did not attempt to assess the competitiveness of

3282

1    Saltzer before its acquisition by St. Luke's, did you?
2    **A.**   I compared the fiscal year '12 Saltzer to
3    **benchmarks, but beyond that, I didn't do a financial**
4    **analysis of Saltzer.**
5    **Q.**   You did not attempt to assess the competitiveness
6    of Saltzer before its acquisition by St. Luke's; correct?
7    **A.**   Again, benchmarks are comparing against peers, so
8    **to some degree, that's looking at competitiveness of**
9    **compensation.**
10   **Q.**   Well, okay.  Maybe that's our confusion.  Beyond
11   compensation, you didn't attempt in any way to assess
12   Saltzer's competitiveness in the marketplace, did you?
13   **A.**   That's right.
14   **Q.**   And Saltzer has not identified to you any
15   individual physicians that they expect would leave if this
16   deal were unwound; correct?
17   **A.**   I'm not -- no, I'm not aware of any specifically
18   **that would depart.  Again, I said I think it's probably a**
19   **logical connection to make, but I know of no one with**
20   **certainty.**
21   **Q.**   And no one from Saltzer has even provided you with
22   an estimate as to how many physicians, if any, would leave
23   in the event of an unwinding; correct?
24   **A.**   That's right.
25   **Q.**   And you don't have any opinion to whether, if

3283

1    there is an unwinding, whether any Saltzer physicians would
2    leave the area, do you?
3    **A.**   Do I have an opinion?
4    **Q.**   You don't have an expert opinion on that subject.
5    **A.**   I do not.
6    **Q.**   And you don't know whether, in the event of an
7    unwinding, all the Saltzer physicians would leave or none of
8    them would leave, do you?
9    **A.**   I don't know with certainty if they would leave or
10   **not leave.  I suspect that with 30 percent decreased**
11   **compensation, it might be a factor.**
12   **Q.**   You don't have an opinion, an expert opinion, as
13   to whether one would leave, five would leave, or a larger
14   number would leave, do you?
15   **A.**   I do not.
16   **Q.**   And you've talked about Saltzer's compensation.
17   You have not done any comparison of Saltzer's compensation
18   in the event of an unwind with the compensation that anybody
19   else in the Treasure Valley pays physicians, other than
20   what St. Luke's currently pays Saltzer; correct?
21   **A.**   What I have looked at is benchmark data --
22   **Q.**   Could you please answer my question yes or no, if
23   you can?  I'll ask it again if it helps.
24   **A.**   Yes.  I think I have looked at that information.
25   MR. ETTINGER:  Why don't we play clip 41, please,

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.        Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 40 of 68

3284

1  Keely.
2      Your Honor, it's page 149, lines 15 through 23.
3      THE COURT:  Thank you.
4      (Video clip played as follows:)
5      **Q.**  "Have you done any comparison of Saltzer
6   compensation in the event of an unwind and what
7   anybody else in the Treasure Valley is paying
8   any physicians currently?
9      **A.**  "Beyond the St. Luke's compensation that
10  we know, no.
11     **Q.**  "And the St. Luke's compensation you know
12  is just St. Luke's compensation of Saltzer;
13  correct?
14     **A.**  "That's right."
15     (Video clip concluded.)
16  BY MR. ETTINGER:
17     **Q.**  Was that your testimony?
18     **A.**  There was more to it than that, but that was my
19  testimony in the clip you showed.
20     **Q.**  And you have not attempted to determine the
21  alternatives, if any, available to Saltzer doctors if they
22  were to leave Saltzer to go to work somewhere else in the
23  Treasure Valley or were to consider that; correct?
24     **A.**  I am aware of other employers.  I haven't done an
25  analysis of where individuals might go, no.

3285

1      **Q.**  Okay.  One thing, and maybe I missed this --
2      MR. ETTINGER:  Can we put up slide 61 from
3   Ms. Ahern's PowerPoint, please, Keely.
4   BY MR. ETTINGER:
5      **Q.**  Just a quick question:  Does slide 61 represent
6   your calculation of the aggregate impact of the physicians
7   leaving on compensation as compared to 2012?
8      **A.**  This was the -- the figures that were presented in
9   my second reply report.  As I indicated, Dr. Affleck has
10  joined Saltzer since that time.  Dr. Welch has departed, and
11  I testified about making a small adjustment for Drs. Omer
12  and Knowles being with Saltzer for a full year in the event
13  of an unwind.
14     **Q.**  So in round numbers, just so the record is clear,
15              REDACTED
16
17     **A.**  That's approximately correct.
18     **Q.**  Okay.  Now you mentioned six of the ten top
19  earners were among the doctors who left.  Are those the
20  orthopedic and general surgeons who left?
21     **A.**  Yes, they are.
22     **Q.**  And are you able to say how much of that, of your
23  projected $3 million decline, results from the departure of
24  the orthopedic and general surgeons, approximately?
25     **A.**  I certainly could do the analysis.  I don't know

3286

1   off the top of my head, no.
2      **Q.**  Is it the majority?
3      **A.**  I don't know.  It would be a large portion.
4      **Q.**  Now, you referred at one point to what the -- you
5   didn't know what the court might order in the event of an
6   unwind.  Do you remember that comment you made?
7      **A.**  I do.
8      **Q.**  Have you considered what the court could order in
9   order to mitigate the kinds of issues that you've raised in
10  your analysis?
11     **A.**  I have not made any assumptions as to what -- what
12  Your Honor may order.
13     **Q.**  No, my question is:  Have you considered what
14  might be useful things for the court to order to try to
15  mitigate the impacts that you found?
16     **A.**  No.  I have not made any assessment of what a
17  divestiture should or shouldn't look like.
18     **Q.**  You have not been asked to do that?
19     **A.**  Other than my analysis related to the compensation
20  of these physicians at issue, I have not looked at that.
21     **Q.**  Okay.
22     MR. ETTINGER:  Why don't we look at Trial Exhibit
23  1386.  If you could put that up, Keely, please.
24  BY MR. ETTINGER:
25     **Q.**  Do you remember this email from Dr. Kaiser to

3287

1   Saltzer Medical Group everyone?
2      **A.**  I've briefly skimmed it, but yes, I recall this.
3      **Q.**  We talked about it in your deposition, you recall.
4      **A.**  Yes.
5      **Q.**  And Dr. Kaiser says in the last sentence of that
6   long paragraph -- and by the way, this email was sent after
7   this lawsuit was filed; is that right, just to put it in
8   context?  The first sentence, "Recent legal actions taken by
9   Saint Alphonsus Health System and Treasure Valley Hospital"?
10     **A.**  Right.
11     **Q.**  And this is late November of 2012?
12     **A.**  It is.
13     **Q.**  And this is after the surgeons had left Saltzer?
14     **A.**  They departed in November, so I -- I don't know
15  that I know the exact date.
16     **Q.**  Everybody knew by November 20, certainly, that
17  they were going if they were not already gone; correct?
18     **A.**  I don't know what everybody knew.
19     MR. SCHAFER:  Object to foundation.
20  BY MR. ETTINGER:
21     **Q.**  Had they announced their departure at that point?
22     **A.**  I don't know.
23     **Q.**  And Dr. Kaiser says in that last sentence, quote:
24  For each of our employees, I would like to emphasize that
25  you will continue to have your jobs no matter what course

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 41 of 68

3288

1 these investigations and legal challenges take, close quote.
2     Do you see that sentence?
3     **A.  I do see that.**
4     **Q.** And you don't know that that sentence is
5 consistent with what Dr. Kaiser and Mr. Savage and
6 Ms. Maggard were telling you about what would happen if
7 there were an unwind; correct?
8     **A.  I don't know whether it's consistent?**
9     **Q.** That's my question.
10     **A.  We didn't talk -- Dr. Kaiser and Mr. Savage and**
11 **Ms. Maggard and I did not talk about employees that may or**
12 **may not have their jobs in the event of an unwind.**
13     **Q.** So the subject of employees having their jobs or
14 not having their jobs has never come in up in your
15 investigation?
16     **A.  No.  Of course, it has in the context that I made**
17 **reductions.  But as a general statement that's being made**
18 **here, I haven't -- I haven't discussed this document with**
19 **them.**
20     MR. ETTINGER:  Why don't we play clip 31,
21 Your Honor.  It's page 108, lines 19 through 23 of
22 Ms. Ahern's deposition.
23     (Video clip played as follows:)
24     **Q.** "Do you believe that sentence that I read
25     is consistent with what Dr. Kaiser and

3289

1     Mr. Savage and Ms. Maggard have been telling
2     you regarding their prospects if there were an
3     wind?
4     **A.** "I don't -- I don't know that it's
5     consistent."
6     (Video clip concluded.)
7 BY MR. ETTINGER:
8     **Q.** Was that your testimony?
9     **A.  That was my testimony, yeah.**
10     **Q.** Now, you were --
11     MR. SCHAFER:  Your Honor, I'll just object on
12 grounds of completeness to the clip that was just played.
13 It cut off right in the -- yeah.  Playing the whole question
14 and the whole answer, I think, would be appropriate there.
15 This isn't something where I'm arguing we should play three
16 pages before it, but playing the whole question and answer
17 would seem appropriate here, given that --
18     MR. ETTINGER:  Your Honor, I have to confess that
19 until I just saw those couple of words, I didn't realize it
20 had been cut off, and I'm not sure what's there.
21     THE COURT:  Well, at some point, we need to have
22 it played in its entirety to make sure that we haven't --
23     MR. ETTINGER:  That's fine.
24     MR. SCHAFER:  I could read it for the record if --
25     THE COURT:  Why don't we just do that,

3290

1 Mr. Schafer, if you have that.
2     MR. SCHAFER:  The question was:
3     **Q.** "Do you believe that sentence that I read
4     is consistent with what Dr. Kaiser and
5     Mr. Savage and Ms. Maggard have been telling
6     you regarding their prospects if there were an
7     unwind?
8     **A.** "I don't think that it's consistent.  I
9     think -- I don't know that it's consistent.  I
10     think this was for a different, a different
11     audience, and it was probably too optimistic."
12     MR. ETTINGER:  Okay.
13     THE COURT:  Mr. Ettinger.
14     MR. ETTINGER:  Should have played it all; I
15 apologize.
16 BY MR. ETTINGER:
17     **Q.** Ms. Ahern, your unwind opinion is based on data,
18 you've testified, from fiscal year 2012; is that right?
19     **A.  The financial data is from fiscal year 2012, yes.**
20     **Q.** And if the surgeons who left Saltzer left, in
21 fact, but on December 1, 2012, hypothetically, Saltzer had
22 decided not to do the St. Luke's deal, would that change any
23 of the calculations you made or any of the conclusions you
24 reached?
25     **A.  No, I don't believe so.**

3291

1     MR. ETTINGER:  Nothing further at this time.
2 Thank you.
3     THE COURT:  I assume you're covering,
4 Mr. Ettinger, for --
5     MR. GREENE:  We are relying on Mr. Ettinger at
6 this point, Your Honor.
7     THE COURT:  All right.  Very good.
8 Mr. Schafer.
9     MR. SCHAFER:  And can we switch over?  I think
10 this -- thank you.
11     REDIRECT EXAMINATION
12 BY MR. SCHAFER:
13     **Q.** Ms. Ahern, Mr. Ettinger asked you some questions
14 regarding your analysis of Dr. Ballantyne and whether or not
15 your understanding was that Mr. Checketts was including a
16 number of physicians within his analysis.  Do you remember
17 those questions?
18     **A.  I do.**
19     **Q.** In Mr. Checketts' analysis, in the impact
20 analysis, does he name Dr. Ballantyne by name?
21     **A.  Yes, he does.**
22     **Q.** And do you have any reason to believe that
23 Mr. Checketts is assuming that if Dr. Ballantyne is now at
24 St. Luke's, that his referrals from Saltzer physicians will
25 change in any meaningful way?

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 42 of 68

3292

1    **A.** No, I don't.

2    **Q.** And that wasn't addressed, correct?

3    **A.** Correct.

4    **Q.** Plaintiffs' counsel also asked you some questions
5    about Dr. Johnson and whether you've specifically measured
6    your expectation of Saltzer's future referral patterns
7    against, specifically, Dr. Johnson's patterns. Do you
8    remember those questions?

9    **A.** I do.

10   **Q.** Now, Dr. Johnson is part of the Mountain View
11   Group; correct?

12   **A.** He is.

13   **Q.** And that was one of the groups that you analyzed,
14   the primary care groups that you analyzed as far as a change
15   in referral patterns?

16   **A.** He's one of the physicians within that group, yes.

17   **Q.** And you, in fact, analyzed your expectation
18   regarding a potential change in referral patterns based on
19   looking at all three of the entirety of the groups, the
20   primary care groups that were addressed by Professor
21   Haas-Wilson; correct?

22   **A.** That's correct. I didn't remove any physicians
23   from those -- those practices.

24   **Q.** Plaintiffs' counsel also asked you some questions
25   about deposition testimony or trial testimony that you

3293

1    reviewed regarding the primary care field versus the
2    admitting physician field. Do you recall that?

3    **A.** I do.

4    **Q.** I'm going to ask you, is this -- this is testimony
5    from Blaine Petersen at lines -- 147, 8 through 16. I just
6    want to know if this is something that you considered in
7    your opinion.

8        **Q.** "If you wanted to identify referrals to
9        Saint Al's from primary care physicians
10       affiliated with St. Luke's, do I understand
11       correctly that what you would do is go to Saint
12       Al's data, identify the primary care physician
13       where the doctor was a St. Luke's doctor, and
14       then look for those counters.

15       **A.** "Yes. We would look at the counters and
16       compare it for different periods of time."

17       Did you consider that testimony?

18   **A.** Yes, I did.

19   **Q.** And I think you also testified that you were here
20   when Mr. Checketts testified at trial; correct?

21   **A.** I was.

22   **Q.** I'm going to read you a question and answer from
23   his trial testimony, page 974, lines 14 through 21 and ask
24   if you considered that.

25       **Q.** "When a hospitalist admits a patient who

3294

1        has been referred by a primary care doctor,
2        it's the hospitalist that's identified as the
3        admitting physician; right?

4        **A.** "Yes.

5        **Q.** "So one could not reliably determine
6        whether a primary care doctor referred a
7        patient for admission by looking at the
8        admitting physician field, right?

9        **A.** "That is correct."

10       Did you consider Mr. Checketts' answer on that
11       basis when he testified at trial?

12   **A.** Yes, I did.

13   **Q.** Now, plaintiffs' counsel also asked you a question
14   about the 5 percent growth assumption.

15   MR. SCHAFER: And, Mr. Chase, if you could put up
16   slide 36. That's the wrong 36. I'll ask a different
17   question while we're trying to find that slide.

18   BY MR. SCHAFER:

19   **Q.** You were asked some questions by plaintiffs'
20   counsel regarding what information you had looked at or
21   considered regarding what other groups in the Treasure
22   Valley paid physicians. And I believe you were -- you gave
23   an answer that your deposition testimony gave half of the
24   answer but not the full answer. Do you recall that?

25   **A.** I do.

3295

1    **Q.** And you did mention in your deposition testimony
2    that you've seen offers from St. Luke's to Saltzer; correct?

3    **A.** That's right.

4    **Q.** And I believe you also testified this morning
5    you've also seen offers from Saint Alphonsus to the Saltzer
6    physicians; correct?

7    **A.** That's right.

8    **Q.** And as a general matter, were those offers higher
9    both than what Saltzer was making in 2012 and considerably
10   higher than they would make in the event of an unwind?

11   **A.** In both instances, whether it was fiscal year '12
12   compensation of Saltzer or the unwind, those offers were
13   higher.

14   **Q.** And have you seen any testimony in this case from
15   St. Luke's or Saint Al's representatives that those offers
16   were consistent with a scale that both St. Luke's and Saint
17   Al's pays similar physicians across the Treasure Valley?

18   **A.** Yes.

19   **Q.** And now we do have the slide on the screen, slide
20   36. Plaintiffs' counsel asked you a question as to whether
21   or not -- I believe the suggestion was that what you had
22   measured in this slide was a 4 percent decrease in the size
23   of Saltzer itself. Is that what this measures?

24   **A.** No, it doesn't.

25   **Q.** What does this measure?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 43 of 68

3296

1    **A.**   **This looks at the instances, as I indicated, where**
2    **a Saltzer physician is recorded in the Saint Alphonsus Nampa**
3    **data as a primary care physician.  So this represents the**
4    **average decline in PCP data or referrals associated with**
5    **Saltzer physicians over this time period.**
6        **Q.**   And that's before any Saltzer affiliation with
7    St. Luke's; correct?
8        **A.**   **That's right.**
9            MR. SCHAFER:  No further questions, Your Honor.
10           MR. ETTINGER:  No questions, Your Honor.
11           THE COURT:  Ms. Ahern, I want to -- and I don't
12   want to be beating a dead horse, but I want to make sure I
13   understand.
14           Is it possible to bring up the slide that showed the
15   numbers, the PCP versus the admitting doctor?  I think it
16   may have been from Mr. Checketts.
17           MR. ETTINGER:  Your Honor, I think now we're
18   getting into the AI's AEO.  But maybe we can just --
19           THE COURT:  I will turn off, and then I will try
20   to avoid asking -- it's just going to be purely a
21   hypothetical, so I'll turn off the screen.
22           MR. SCHAFER:  Is this the one you were asking for,
23   Your Honor?
24           THE COURT:  That probably will be sufficient.
25                          EXAMINATION

3297

1    BY THE COURT:
2        **Q.**   Now, and this really has more to do with trying to
3    make sure I understand, I guess, your perception of
4    Mr. Checketts' analysis.
5        **A.**   **Uh-huh.**
6        **Q.**   All right.  Let's just take, all right, the first
7    line reference there.  There is a suggestion that one year
8    before, there were 43 patients admitted who designated --
9    this would be one year before an acquisition.  There were 43
10   patients who were -- who listed as the admitting physician
11   someone from this practice group, correct?
12       **A.**   **That's right.**
13       **Q.**   All right.  The year after, that number reduced
14   to four.
15       **A.**   **Correct.**
16       **Q.**   Okay.  During the same two years, there were 180
17   patients who listed a physician from that practice group as
18   their primary care physician.  The year after, that number
19   reduced only to 164.
20       **A.**   **That's right.**
21       **Q.**   Now, is it your impression that Mr. Checketts took
22   this trend of going from 43 down to 4 and, in fact, assumed
23   that it effectively went from 43 to zero -- in other words,
24   a 100 percent loss in referrals -- and then carried that
25   number forward based upon what the Saltzer Medical Group

3298

1    actual experience was where they had been listed as the
2    admitting physician in the year before and assumed that that
3    number would drop down to zero?
4        **A.**   **That's exactly correct.**
5        **Q.**   All right.  If, indeed -- again, assuming
6    hypothetically that there were 100 patients the year before
7    who were admitted to Saint AI's with a Saltzer Medical Group
8    physician listed as the admitting physician, that number
9    dropped down to zero in the year after, why is that not a
10   fair assumption that there will be no more patients going
11   forward who were admitted to Saint AI's by a Saltzer Medical
12   Group physician?
13           I'm not referring about referrals now.  I'm talking
14   about admissions, where they were actually the admitting
15   physician.  Why is Mr. Checketts wrong in assuming that that
16   trend will continue and that there will be a resulting loss
17   of revenues.
18           Now, again, assuming that, in fact, it's 100 down to
19   zero.  Now, I understand that may be in dispute, but
20   assuming that that's correct, why do we need to look to
21   primary care physicians?  I use the word a "surrogate."  I
22   think a "proxy" might be -- I know in the environmental
23   litigation world, the Forest Service uses a proxy as a way
24   of trying to determine factors that they can't really get a
25   good handle on.  So I'm going to use this as a proxy.

3299

1    Why is that not a good proxy for determining what's
2    going to happen in the future with regard to patients who
3    the admitting physician, which had been -- had been referred
4    by Saltzer Medical Group physicians, but that will not occur
5    in the future?
6        **A.**   **First of all, the admitting physician data on its**
7    **face, I think, is not a reliable source.  There is a lot of**
8    **testimony regarding the hospitalist issue and --**
9        **Q.**   Now, what was the -- I was trying to figure out.
10   I mentioned that it seemed to me that that would be
11   primarily ER doc.  Someone comes to the emergency room, they
12   need to be admitted, and so a hospitalist -- it's referred
13   to a hospitalist because they are going to be overseeing the
14   care while in the hospital, and they become the admitting
15   physician.
16           That wouldn't seem to be relevant here, but I'm
17   assuming that there is also a group in which, perhaps, a
18   referral, if you will, is made by a primary care physician
19   to a hospitalist.
20           Is that what was happening?  Or how does a hospitalist
21   admit a patient since they, by definition, don't have a
22   private practice; they only work in the hospital?
23       **A.**   **Right.  So a patient -- this is my understanding**
24   **based on discussions with physicians.  A patient will either**
25   **arrive at the emergency room, as you have indicated, and**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 44 of 68

3300

1  be -- if needs to be admitted to the hospital, would -- that
2  would occur through the hospitalist.
3       Alternatively, if Dr. Kaiser, for example, was
4  referring a patient to the hospital, not needing to go to
5  the ER but said, I've got a patient that needs to go to the
6  hospital and be admitted, he may send that patient directly
7  to the hospitalist or call the hospitalist and say, I'm
8  sending somebody over; look for them.
9       So you can be admitted through the front door of
10 the hospital if someone has sent you there.  More often than
11 not, I think the admissions by hospitalists are through the
12 ER.
13      Q.   All right.  Now putting that aside, again, what's
14 wrong with Mr. Checketts assuming that going forward that
15 the -- that if, indeed, in the year before, there were 100
16 admissions from the Saltzer Medical Group, the year after
17 there were zero, that they can assume that that source of
18 admissions will dry up and be nonexistent going forward?
19      Totally without regard to whether you refer to it as a
20 referral or as a referring physician, just the phenomena
21 that the -- that there were a universe of admissions in
22 which the Saltzer Medical Group physicians were the
23 admitting physician and that that universe has now either
24 been reduced to zero or to a much smaller number, what is
25 wrong with that analysis?

3301

1       A.   Maybe the way that I can approach this is to say
2  that I did analyze and look at the data, both in terms of
3  combining instances when a physician appeared as the
4  admitting physician and also the PCP.
5       So there may be instances when a physician, as
6  you've indicated, shows up as the admitting physician from
7  Saltzer.  When I did that and compared the before and after
8  time period, the 23 percent number that I calculated for MPG
9  actually becomes 22 percent.
10      So it's -- when you take all of the data into
11 account in instances when a Saltzer physician, or the
12 proxies as we're calling them, show up as either a PCP or an
13 admitting physician, it's -- it doesn't change the results.
14 In fact, it makes them a little bit less in terms of the
15 assumed loss.
16      MR. ETTINGER:  Your Honor, I don't believe that's
17 in Ms. Ahern's reports, what she just described.
18      THE COURT:  Well, I obviously can't criticize her
19 for using that, but I understand the concern that counsel
20 has not had a chance, I think, to -- all right.  Well,
21 perhaps my concern is much ado about nothing, but I
22 will -- I think it's better, perhaps, I leave it as it is --
23      MR. SCHAFER:  Could I ask one --
24      THE COURT:  -- with all the testimony coming in.
25      MR. SCHAFER:  Could I ask one --

3302

1       THE COURT:  I'm going to allow counsel to --
2       MR. ETTINGER:  I think we both may want to,
3  Your Honor.
4       THE COURT:  Yeah.  I certainly am going to permit
5  that.  That's -- I don't ask questions and then say, I'm
6  done; I get the last word.  That's not my MO here at all.
7  Mr. Schafer.
8       MR. SCHAFER:  Thank you, Your Honor.  Just looking
9  -- staying with this screen --
10      THE COURT:  Now, again, I have got the screen off,
11 so I --
12      MR. SCHAFER:  It should still be off, yes.
13      THE COURT:  I tried to avoid referring to the
14 physician group.  I assume referring to numbers in the
15 abstract is not going to violate any AEO concerns.
16      But go ahead, Mr. Schafer.
17           CONTINUED REDIRECT EXAMINATION
18 BY MR. SCHAFER:
19      Q.   And, Ms. Ahern, if you'll look at this, the
20 acquisition date section with respect to these three
21 groups --
22      THE COURT:  And I should note this is slide 25 of
23 the exhibit number which we have assigned to this
24 demonstrative, and I don't recall what that exhibit number
25 is.

3303

1       MR. SCHAFER:  5123, Your Honor.
2       THE COURT:  All right.  Thank you.
3  BY MR. SCHAFER:
4       Q.   So looking at the acquisition date field here,
5  Ms. Ahern, to address some of the court's questions
6  regarding why it may not be an apples to apples comparison
7  to look at the admitting physician field one year before and
8  one year after, can you remind me when the hospitalist
9  program was implemented at Saint Alphonsus Nampa?
10      A.   In January of 2008.
11      Q.   Okay.  So -- and has that hospitalist program,
12 since its implementation, had an effect on the number of
13 admissions associated with primary care physicians at
14 independent groups or other groups?
15      A.   Yes, it has.
16      Q.   And with respect to the --
17      THE COURT:  Wait just a moment.  Let me make sure
18 I understand.  So you're saying apart from any physician
19 group that was acquired after the implementation of the
20 hospitalist program in January of the 2008, from that point
21 forward, the number of direct admissions by primary care
22 physicians reduced by some measurable number?
23      THE WITNESS:  Yes.
24      THE COURT:  All right.  Thank you.  I just wanted
25 to make sure I understood the point.  Go ahead.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW v. Document 565 Filed 11/04/14   Page 45 of 68

3304

1  BY MR. SCHAFER:
2      **Q.**  And I'll identify one group here but not the
3  specific numbers associated with it.  With respect to the
4  Mercy Physician Group where the acquisition date was in
5  fiscal year 2012, can you tell the court any reasons why
6  that group may have had more admissions at Saint Alphonsus
7  Nampa during the pre-period when it was part of Saint
8  Alphonsus Nampa than the post, other than, you know, issues
9  relating to referrals?
10     **A.**  **Sure.  The Mercy Physician Group was a group that**
11  **was employed by Saint Alphonsus Nampa.  So they, presumably**
12  **in the pre-time period, were admitting more patients than**
13  **they would in the post period when they were no longer with**
14  **Saint Alphonsus.**
15     **Q.**  And were any of the Mercy Physician Group
16  physicians actually themselves hospitalists at Saint
17  Alphonsus Nampa?
18     **A.**  **Yes.  Drs. Cothern and Crownson were, in fact,**
19  **hospitalists.**
20         MR. SCHAFER:  Thank you.  No further questions.
21         THE COURT:  All right.  Mr. Ettinger.
22         MR. ETTINGER:  If we could leave that screen up.
23  If I don't have it there, let me just check something.
24                 RECROSS-EXAMINATION
25  BY MR. ETTINGER:

3305

1      **Q.**  Two of the three groups shown there practiced in
2  Boise, not Nampa; isn't that right, Ms. Ahern?
3      **A.**  **They were in Boise, that's right.**
4      **Q.**  So the time that the hospitalist program was
5  instituted in Nampa doesn't tell you anything about those
6  two groups; correct?
7      **A.**  **I believe they were instituted at the same time.**
8      **Q.**  When was the hospitalist program instituted in
9  Boise, do you know?
10     **A.**  **I believe it was in 2008, as well.**
11     **Q.**  Okay.  Now, Drs. Crownson and Cothern were
12  hospitalists one day per week; correct?
13     **A.**  **I believe the testimony is that they were**
14  **hospitalists one week at a time, so a seven-day time period.**
15     **Q.**  Per month?
16     **A.**  **I think it was every four to six weeks they spent**
17  **a week serving as hospitalists.**
18     **Q.**  Okay.  Now, you say the admitting physician data
19  is not reliable.  If the admitting field lists a doctor as
20  the admitting physician, that is absolutely reliable, is it
21  not?
22     **A.**  **I don't know that that's true.  I don't have a**
23  **reason to think it's not.**
24     **Q.**  Okay.  Now, the hospitalist program at Saint Al's
25  Nampa is very popular among the Saltzer primary care

3306

1  physicians; isn't that right?
2      **A.**  **I don't know if it's very popular.**
3      **Q.**  Did you investigate as to that?
4      **A.**  **Referrals are made by Saltzer physicians to Saint**
5  **Al's, and then the patients are admitted by hospitalists.  I**
6  **don't know the level of popularity.**
7      **Q.**  And by and large, the Saltzer primary care
8  physicians who, before the hospitalist program, practiced at
9  Saltzer Nampa, after the hospitalist program have confined
10  themselves to an office practice and sent their patients to
11  that hospital through the hospitalist; correct?
12     **A.**  **I believe that's correct, yes.**
13     **Q.**  And the number Mr. Checketts calculated that he
14  used, he used -- he looked at the percentage of cases that
15  those doctors represented of the total who later used
16  hospitalists for the year before the hospitalist program
17  started; isn't that right?
18     **A.**  **And he assumed 100 percent of those would be lost,**
19  **yes.**
20     **Q.**  And that was a 50- -- 57 percent of the
21  hospitalist cases; correct?
22     **A.**  **That's right, more than half.**
23     **Q.**  Yeah.  And you have no reason to believe, do you,
24  that the Saltzer physicians who were admitting directly
25  before the hospitalist program, reduced -- the primary care

3307

1  physicians reduced their admissions to the hospital after
2  the hospitalist program, as opposed to simply admitting at
3  the same rate but through the hospitalists; correct?
4      **A.**  **I don't know with certainty.**
5          MR. ETTINGER:  Nothing further.  Thank you.
6          THE COURT:  All right.  You may step down.
7  Thank you, Ms. Ahern.
8          Counsel, we're -- where are we at in terms of further
9  testimony?  We need to take another break, but I --
10         MR. SCHAFER:  I think this would probably be a
11  good time for it.  We have two more live witnesses, Your
12  Honor, and I think we should get through them today.
13         THE COURT:  Okay.
14         MR. SCHAFER:  I have every expectation we will get
15  through them in plenty of time today.
16         MR. BIERIG:  And, Your Honor, we have two more
17  live witnesses.  I expect that the direct testimony of each
18  of them will be in the vicinity of 25 minutes to a half
19  hour.
20         THE COURT:  All right.  Let's try to -- we'll
21  truly try to hold this to a 15-minute recess, so please be
22  in your seats.  We'll probably try to be coming into the
23  courtroom in about ten minutes to.  All right.
24         MS. DUKE:  And, Your Honor --
25         THE COURT:  Yes?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 46 of 68

3308

1   MS. DUKE: -- we also have Greg Sonnenberg, who
2   will be very brief, but he is the witness that you indicated
3   we could subpoena and bring in for a brief
4   cross-examination. And we have him here at 1:00 today.
5   THE COURT: Is there a chance -- I don't want to
6   break up a witness.
7   MS. DUKE: It's fine. We can have him wait till
8   the end of court today.
9   THE COURT: Okay. Very good.
10   MS. DUKE: I just wanted you to know that.
11   THE COURT: All right. We'll be in recess for
12   15 minutes.
13   (Recess.)
14   *****COURTROOM OPEN TO THE PUBLIC*****
15   THE COURT: Mr. Bierig.
16   MR. BIERIG: Thank you, Your Honor. As our next
17   witness, we call Dr. Thomas Patterson.
18   THE COURT: Dr. Patterson, would you please step
19   before the clerk and be sworn.
20   THOMAS SHON PATTERSON,
21   having been first duly sworn to tell the whole truth,
22   testified as follows:
23   THE CLERK: Please state your complete name and
24   spell your name for the record.
25   THE WITNESS: Thomas Shon Patterson, T-H-O-M-A-S,

3309

1   S-H-O-N, P-A-T-T-E-R-S-O-N.
2   THE COURT: Mr. Bierig, you may inquire.
3   MR. BIERIG: Thank you, Your Honor.
4   DIRECT EXAMINATION
5   BY MR. BIERIG:
6   **Q.** Good afternoon, Dr. Patterson.
7   **A. Good afternoon.**
8   **Q.** What is your profession?
9   **A. I'm a physician.**
10   **Q.** Do you have a medical specialty?
11   **A. I'm in pediatrics.**
12   **Q.** By whom are you currently employed?
13   **A. Saltzer Medical Group.**
14   **Q.** Can you briefly describe your educational
15   background.
16   **A. I completed my bachelor of science in chemistry at**
17   **University of Arizona in 1991. And then I went to**
18   **University of Arizona College of Medicine from 1991 to 1995,**
19   **where I got my medical degree. And then I completed a**
20   **pediatric residency at University of Arizona-affiliated**
21   **hospitals from 1995 to 1998.**
22   **Q.** And then what did you do in 1998?
23   **A. In 1998 I was blessed to have an opportunity to**
24   **join Saltzer Medical Group, which was then Medical Center**
25   **Physicians.**

3310

1   **Q.** So have you been with Saltzer since 1998?
2   **A. Yes, sir.**
3   **Q.** And where is your office?
4   **A. I'm located in Nampa.**
5   **Q.** Is your practice limited to pediatrics?
6   **A. I do pediatric patients only.**
7   **Q.** Roughly how many patients do you have in your
8   practice?
9   **A. I don't count patients entirely, but I know my**
10   **panel has to be somewhere in the 2,000 to 2,500 range.**
11   **Q.** Approximately how many of those patients come from
12   Boise?
13   **A. Again, I think my best estimate would be somewhere**
14   **between 50 and 100 patients.**
15   **Q.** And how many from Meridian?
16   **A. A little bit larger number. Probably in the 200**
17   **to 300 range.**
18   **Q.** And how many of your patients would you estimate
19   come from Caldwell?
20   **A. Caldwell is a large percentage of my patients. I**
21   **would guess somewhere in the 700, 800 range.**
22   **Q.** Do you serve in any administrative capacities of
23   Saltzer?
24   **A. I sit on the Saltzer Medical Group Executive**
25   **Committee as well as the St. Luke's Saltzer Joint Operating**

3311

1   **Council. And I am the chairman of the Business Marketing**
2   **Development Committee.**
3   **Q.** How long have you been on the Executive Committee?
4   **A. It's been greater than a decade. It's been most**
5   **of my career here.**
6   **Q.** Are you aware of an entity called the Patient-
7   Centered Medical Home Collaborative?
8   **A. Yes, sir.**
9   **Q.** And what is that?
10   **A. The Patient-Centered Medical Home Collaborative**
11   **was started by an executive order of Governor Otter about**
12   **three years ago looking at a patient-centered medical home**
13   **model that was focussed on commercial insurance rather than**
14   **public insurance as most of the models across the nation had**
15   **been prior to that.**
16   **Q.** And what is the goal of the collaboration?
17   **A. The ultimate goal is actually coming to fruition**
18   **now where there are pilot programs across the state where**
19   **practices have moved towards patient medical --**
20   **patient-centered medical home, and they are now able to**
21   **provide that increased availability and that better care**
22   **that a patient-centered medical home provides.**
23   **Q.** What is your position on the collaborative?
24   **A. I represent pediatric patients on the**
25   **collaborative and pediatricians.**

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW v. Document 565   Filed 11/04/14   Page 47 of 68

3312

1    **Q.**  Now, Dr. Patterson, as a Saltzer physician, why
2  were you interested in affiliating with a healthcare system
3  back in the 2010-2011 time frame?
4    **A.**  It's been a long process, but there is many
5  benefits to the affiliation.  I think going along with a
6  patient-centered medical home, it's a goal of mine.  It's
7  been since the patient-centered medical home really came to
8  my knowledge base that I wanted to move towards that.
9         Including integrated care, that required a greater
10  infrastructure being part of a health system.  I think if
11  you look at recruitment, the doctors that are coming to us
12  as applicants at this point are looking to see if we're with
13  a health system.  And I think that's enhanced our ability to
14  recruit.
15         I think a goal that we share with St. Luke's is a
16  value-based compensation model for the care of our patients.
17  And that's something that with a health system we are
18  allowed to do, but as a private practice we were really not
19  able to do.
20         And then one of my passions is child advocacy.  I
21  do a lot of community outreach, and that is as a private
22  physician.  It was all on my own time.  It was time I had to
23  take out of the practice, time I was not available to my
24  patients, and time I was not getting compensated to do all
25  of the child advocacy things I do.  At St. Luke's, it's just

3313

1  part of the culture; it's expected of me.
2         So I think where being out of the office created a
3  stress for my pediatric practice, now it's expected, and
4  it's encouraged, and I welcome that.
5         And then I think, lastly, you know, the most
6  important part is patients.  You know, again, patients have
7  greater access to us.  There is more availability to see the
8  most vulnerable of those that are on Medicaid that -- or
9  self-pay, those that their real only disability is a
10  financial disability.
11    **Q.**  If I followed you, I think there were five reasons
12  that you gave, so let me see if I can explore them.
13         You used the term "patient-centered medical home."
14  What do you mean by that?
15    **A.**  So, in essence, a patient-centered medical home
16  puts the patient at the center.  They become part of the
17  care team.  They're a partner with you.  They are in a
18  situation where they have a relationship closer with their
19  primary physician.  That physician is then available or has
20  coverage to be available to that patient 24/7, across
21  outpatient care, inpatient care, ancillary services.  It
22  really is a great benefit to the patient.
23    **Q.**  How, if at all, is the affiliation with St. Luke's
24  helping you with establishing a patient-centered medical
25  home for your patients?

3314

1    **A.**  So a patient-centered medical home takes a long
2  time.  It requires a lot of transformation in the practice.
3  It requires a lot of resources.
4         At this point in time, I have looked to a pilot
5  that is going at St. Luke's with a developmental pediatric
6  office, and they are part of the Governor's Patient-Centered
7  Medical Home Collaborative.  And they're actually
8  instituting patient-centered medical home practice in their
9  location, and I'm seeing the benefit my patients have from
10  that.
11         Being that they are part of St. Luke's, I know
12  that's a direction that I can head now and am closer to
13  having that as an option for me.  Where, as a private
14  physician, I was offered a chance to start a patient-
15  centered medical home pilot at my practice, but it required
16  buy-in from all of my providers in pediatrics.  And I --
17  because of costs and time and the risk, there was not a good
18  buy-in, and so we weren't able to get a pilot program
19  started.
20    **Q.**  So are you saying that you tried to establish a
21  patient-centered medical home project while at Saltzer, and
22  it didn't work?  Or what are you saying?
23    **A.**  Yes.
24    **Q.**  How long will the process take to go to a patient-
25  centered medical home for pediatric patients?

3315

1    **A.**  It's a long process.  It's going to be two years
2  or more at minimum.
3    **Q.**  Could you have established a patient-centered
4  medical home through a joint venture with St. Luke's?
5    **A.**  Again, a patient-centered medical home requires
6  extended resources.  It requires integrated care across
7  hospital and outpatient settings.  A patient-centered
8  medical home is difficult to establish without those
9  extended resources.
10    **Q.**  How did you see an affiliation with St. Luke's as
11  helping you provide more integrated care or more coordinated
12  care?
13    **A.**  So being part of a health system enhances my
14  ability to be realtime with what's going on with my
15  patients.  And if I'm patient-centered, I want to know
16  what's going on at the specialist's office.  I want to know
17  what's going on in the hospital.  I want to know everything
18  that's going on.  And integrated care is seamless, and it
19  provides my patient the benefit of me being involved in all
20  aspects of care rather than being fragmented as part of an
21  outside system that works in concert with the health system
22  but not integrated with the health system.
23    **Q.**  So as a pediatrician at Saltzer, you are not yet
24  fully participating in the Epic health -- electronic health
25  record, are you?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 48 of 68

3316

1    A.   No.  It's not been offered to us at this point in
2    time pending the current litigation.
3        Q.   What effect, if any, would participation in the
4    Epic EHR have on your practice?
5        A.   Again, it's an enhanced electronic medical record.
6    Our current electronic medical record was purchased based on
7    value.  It was affordable for us, but it's more of a
8    plug-and-play electronic medical record.  It doesn't have
9    the extended ability to look at outcomes.  It doesn't have
10   the patient registry options.
11           Epic is a much more robust system.  It's one that
12   you see, you know, three-fourths of the ACOs in the
13   United States using Epic as a system.  So I look forward to
14   being able to explore what power that has in my effort to
15   become a patient-centered medical home.
16       Q.   When you say "ACO," what are you referring to?
17       A.   Accountable care organization.
18       Q.   The second thing you mentioned was recruiting.
19   How, if at all, has affiliation with St. Luke's helped
20   Saltzer to recruit physicians?
21       A.   So having been on executive committee for a long
22   time and seeing recruitment efforts, we'll have open
23   recruitments for several years and very few applicants.  And
24   now we're actually getting so many applicants, we have to
25   say, "We can't process your application right now.  Please

3317

1    bear with us."
2           And so we have seen a great number of applications
3    increase, and the big change has been being part of a health
4    system.
5        Q.   And why is being part of a health system important
6    for recruiting physicians to Nampa?
7        A.   I think it's a change where, a decade ago, there
8    was a lot of emphasis on being independent.  I think where
9    healthcare is going, people are seeing the shift to being
10   part of a healthcare system is important for the longevity
11   of their careers.
12       Q.   So now moving to what I think was your third item,
13   which I believe is value-based delivery of care.  How do you
14   understand that term?
15       A.   So value-based medical care is really looking at
16   outcomes.  It's looking at population management of disease,
17   and it's a shift from taking care of acute issues to doing
18   more in prevention and education.  It is a best- practice
19   that certainly benefits the patient by aligning incentives
20   that are favorable for the patient.
21       Q.   And could Saltzer have transitioned to value-based
22   care as an independent clinic?
23       A.   So value-based care, being that it's outcome-
24   measured, Saltzer didn't have the capability to look at
25   outcomes to measure them specifically.  It would have been,

3318

1    one, too expensive, and we would have had too little
2    resources to do that.  We have too narrow of a physician
3    base.  We don't have the specialties across all areas that
4    it would require.  We don't have that integrated care with a
5    health system that I think is so pivotal in a value-based
6    care.  We really costwise couldn't, timewise couldn't.
7        Q.   What impact does a fee-for-service system have on
8    a transition to value-based care in your experience?
9        A.   So a fee-for-service schedule is really volume-
10   driven, and it's counter to what value-based medicine really
11   means for the patient.  You know, a physician is so busy
12   trying to see volume, that they don't have time to take care
13   of the patient the way they really want to oftentimes.
14       Q.   Could you have transitioned to value-based care
15   through a joint -- a joint venture or some kind of loose
16   affiliation with St. Luke's?
17       A.   You know, we looked at joint ventures, and we
18   realized very quickly that it wouldn't have the scope of the
19   needed things that we would need to go that direction.  We
20   have had some joint ventures that haven't been really
21   successful for us, and they have done nothing to push us
22   forward towards our goals.
23       Q.   How, if at all, do you see the affiliation with
24   St. Luke's as affecting your ability to transition to value-
25   based delivery of care?

3319

1        A.   It's already happening within part of St. Luke's.
2    And again, that gives me the hope that we can bring it to
3    Nampa and let our Nampa patients experience the value that
4    that has.
5        Q.   And when you say you have already seen it
6    happening, could you elaborate on that.
7        A.   If you look at the Spine Institute that's part of
8    St. Luke's, they're actually doing less surgery.  That
9    doesn't make sense under fee-for-service, to do less
10   surgery.
11           So patients that typically would have been in a
12   fee-for-service schedule, gone into, you know, surgery, they
13   are now having nonsurgical intervention which is helping
14   them.
15       Q.   So I think the fourth thing you mentioned was
16   community outreach.  How, if at all, has the affiliation
17   with St. Luke's affected your ability to do community
18   outreach?
19       A.   So, again, it's encouraged.  It's expected.  It's
20   part of the culture, which is just kind of a cool thing for
21   me.  It allows me to do it without having that stress.  And
22   if we certainly move to a value-based compensation program
23   in the future, it will allow me to have more freedom to do
24   that because all of my activities won't be focused on seeing
25   a patient in a room as an integral unit.  It will be on

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 49 of 68

3320

1  helping the community be healthy, which my community
2  outreach helps with.
3      Q.  Can you give an example of the kind of community
4  outreach you're doing as a result of the affiliation with
5  St. Luke's?
6      A.  So since the affiliation with St. Luke's, I have
7  been able to join the Kids Congress, which is a group of
8  pediatricians who are focused on improving the health and
9  outcomes for the pediatric population.  And it's just been
10  an exciting part of joining St. Luke's to be included in
11  that group of what I see as very respected pediatricians in
12  the community.
13      Q.  And what is the goal of the Kids Congress?
14      A.  So the Kids Congress is really looking -- there
15  are projects that we're focusing on.  One of the ones I can
16  think of that happened two months ago at our meeting was we
17  were looking at introducing a vision screening by
18  instrumentation program in pediatric offices.
19          And just knowing that child development and vision
20  development specifically occurs all the way through age
21  nine.  And having an ability to have an instrument in the
22  office to get visual acuity screening is important, and the
23  Kids Congress has seen that.
24          We have had education from pediatric
25  ophthalmologists that are local, and we're trying to

3321

1  establish the feasibility and the mechanism to do that at
2  this point.
3      Q.  Now, if I'm not mistaken, you're currently
4  compensated on the basis of a guarantee and then some
5  additional compensation based on RVUs; is that correct?
6      A.  Yes.
7      Q.  How does the compensation structure affect your
8  ability to do community outreach?
9      A.  Again, the guarantee is nice from the point of
10  view of I can take the time to do those things.  I recently
11  had to be out of the office for an entire day to lecture at
12  the statewide immunization summit -- that's the immunization
13  coalition that I started -- put on.  And doing it as part of
14  St. Luke's, I had way less stress than I would have a year
15  ago doing it as Saltzer, where it was completely, you know,
16  my responsibility.
17      Q.  When you say "completely my responsibility," what
18  do you mean by that?
19      A.  The cost of me being out of the office.
20      Q.  Because you were on fee-for-service?
21      A.  I bore that entirely.
22      Q.  Going to the fifth point you made, when Saltzer
23  was entirely independent of St. Luke's, what was its policy
24  on its physicians treating Medicaid patients?
25      A.  So as an employed physician, when I started 15

3322

1  years ago, it was clear that I could not limit my Medicaid
2  practice.  This was a rule that was in our bylaws, and it
3  really allowed us to grow our practice as fast as we could.
4          And that was incredibly important because there
5  were plenty of Medicaid patients not being treated by a
6  pediatrician.  So when a new one comes to town, we would
7  fill up very quickly, and we would have a large percentage
8  of Medicaid patients.  And then over time, as you became a
9  partner, then you could limit your practice to certain types
10  of insurance.
11          And that was an independent decision.  And many of
12  the docs, as soon as they got to that point, they would
13  limit their Medicaid just by sheer, you know, busy-ness,
14  one, and two, the cost.  You know, viability, you have to
15  not grow to be entirely Medicaid; otherwise, it would be
16  very difficult to survive.
17      Q.  So what impact did the Saltzer policy with respect
18  to partners have on the taking of new Medicaid patients by
19  partners at Saltzer?
20      A.  So every time we had a new physician that was an
21  employed physician, the benefit to the Medicaid population
22  was realized.  When we didn't have a new employed physician
23  in our pediatric group, then there was limited access to
24  Medicaid.
25      Q.  And so what is the policy, now that Saltzer has

3323

1  become affiliated with St. Luke's, with respect to taking
2  Medicaid patients?
3      A.  This is probably my most exciting part of being
4  affiliated with St. Luke's is I don't have to look at it
5  anymore.  I don't have to worry about Medicaid and I don't
6  have to worry about self-pay because there is no policy that
7  would restrict that.  I get paid whether it's an insured
8  patient, whether it's a self-pay patient, whether it's a
9  no-pay patient, whether it's a Medicaid patient.  I get paid
10  the same.
11      Q.  So what is your testimony with respect to the
12  effect of the St. Luke's payment structure to you on the
13  ability of Saltzer physicians to take self-pay patients?
14      A.  I truly believe it enhances their ability to come
15  and seek pediatric care.
16      Q.  And why is that?
17      A.  Having a patient that was self-pay was very
18  difficult.  Canyon County has a lot of uninsured patients
19  that, quite honestly, can't afford medical care.  And so
20  assuming them into your practice meant that some portion of
21  the time you wouldn't be paid.
22      Q.  Were you ever told by anyone at St. Luke's that if
23  you treated too many Medicaid or self-pay patients, your
24  compensation would go down?
25      A.  Absolutely not.

Case 1:12-cv-00560-BLW  Document 565  Filed 11/04/14  Page 50 of 68

3324

1    **Q.**   Now, Dr. Patterson, as a general pediatrician, do
2    your patients sometimes require hospitalization?
3    **A.**   Yes, sir.
4    **Q.**   Where do you send patients who need to be
5    hospitalized?
6    **A.**   I have admitting privileges at Saint Alphonsus
7    Nampa facility.
8    **Q.**   And how, if at all, have your admissions practices
9    changed since Saltzer's affiliation with St. Luke's?
10   **A.**   Not at all.
11   **Q.**   How do you decide where to send a patient, which
12   hospital to send a patient to?
13   **A.**   So patient choice is important.  The next issue
14   would be acuity of care.  And certainly if they need an ICU,
15   whether it be a nursery ICU or pediatric ICU, the Saint
16   Alphonsus Nampa facility doesn't include that.
17            And you know, other times the care will just
18   require a pediatric subspecialist, which they don't come to
19   Saint Alphonsus Nampa, so we need to have them go downtown.
20   **Q.**   So can you estimate roughly what percentage of
21   your pediatric patients that are hospitalized are
22   hospitalized at Saint Alphonsus Nampa?
23   **A.**   So if it's an admission that comes from a patient
24   that I see in an outpatient setting, it's almost all of
25   them.

3325

1    **Q.**   Almost all of them go to Saint Alphonsus?
2    **A.**   Go to Saint Alphonsus Nampa.  It's very
3    convenient.  It's out my back door.  I can see them morning,
4    noon, and night.  And it's a 50-foot walk for me.  It's
5    incredibly convenient.
6    **Q.**   So how, if at all, do you expect your practice of
7    sending almost all of your patients who require
8    hospitalization to Saint Alphonsus Nampa -- how do you
9    expect that to change over the next year or two?
10   **A.**   Not at all.  Saint Alphonsus Nampa is the only
11   hospital in Nampa, and our patients are going to be admitted
12   there as long as we are able to do that.
13   **Q.**   Has St. Luke's ever sought to influence your
14   admission patterns to hospitals in any way?
15   **A.**   Absolutely not.
16   **Q.**   During the discussions between Saltzer and
17   St. Luke's, how important was it to you that you be able to
18   continue to be able to refer patients to Saint Alphonsus
19   Nampa after the affiliation with St. Luke's?
20   **A.**   So, in essence, it would have been a deal-breaker
21   for me if I wouldn't have been able to continue to admit
22   patients to Saint Alphonsus Nampa and take care of the
23   newborn population there.
24   **Q.**   And why would that have been a deal-breaker?
25   **A.**   Because that's where my patients are.  I get my

3326

1    referral pattern.  I get referrals from the nursery.  I
2    admit my patients there.  It was important to me to continue
3    to be able to do that.
4    **Q.**   Did you raise that issue with St. Luke's during
5    the discussion about the possible affiliation?
6    **A.**   We did.
7    **Q.**   Did you expect that to be a sticking point with
8    St. Luke's?
9    **A.**   We were worried about it, and it quickly became a
10   nonissue when we, you know, got word back from St. Luke's
11   that that wasn't an issue at all, that they would not ask us
12   to stop that.
13   **Q.**   Let me turn now, Dr. Patterson, to your
14   compensation.  I believe we have already discussed the fact
15   that your compensation is based on a guarantee, and then you
16   can get an additional amount based on the RVUs that you
17   performed.  Was that your testimony?
18   **A.**   Yes.
19   **Q.**   When Saltzer entered into its agreement with
20   St. Luke's, what was your understanding of whether quality
21   considerations would become part of your compensation in the
22   future?
23   **A.**   For me, it was expected.  I was already part of
24   the Patient-Centered Medical Home Collaborative.  That was
25   an effort that the collaborative was working towards.  It's

3327

1    an effort that the nation is working towards.  And it's
2    something that I looked forward to and expected and
3    welcomed.
4    **Q.**   Do you have any understanding of why quality
5    considerations weren't built into the compensation package
6    at the outset of the relationship with St. Luke's?
7    **A.**   So, again, the population in Nampa, outcomes have
8    not been studied at this point.  And so it takes time to
9    develop what the outcome measures would be, and so it wasn't
10   something that could be established at the time.
11   **Q.**   Where do things stand now in terms of moving
12   towards some element of value compensation in your -- in
13   your compensation?
14   **A.**   So Saltzer Medical Group has an addendum to the
15   PSA agreement with St. Luke's that we would put up to 20
16   percent of our income at risk in a quality-based, value-
17   based compensation model.
18   **Q.**   Under your current compensation arrangement, does
19   your compensation depend on whether you refer outside of
20   St. Luke's?
21   **A.**   No.
22   **Q.**   Is your compensation -- let me put it this way:
23   How, if at all, is your compensation affected by where you
24   refer your patients for lab tests?
25   **A.**   There is no effect at all.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 10/18/2013

3328

1  Q.  How, if at all, is your compensation affected by
2  where you refer your patients for imaging?
3  A.  Again, no effect.
4  Q.  One final topic, Dr. Patterson.  Are you aware
5  that the plaintiffs are seeking divestiture of Saltzer from
6  St. Luke's?
7  A.  Yes.  It's a daily stress for me as a
8  pediatrician.
9  Q.  Is it something you think about?
10  A.  Every day.  I spend time in prayer every day
11  hoping that I can continue to do what I do.
12  Q.  How would divestiture -- if this court were to
13  order it, how would divestiture of Saltzer from St. Luke's
14  affect Saltzer?
15  A.  This is the point that creates so much stress for
16  me, is the magnitude of the effect.  One, if Saltzer can
17  survive -- and I have daily reservations about whether we
18  would be able to survive if we divest from St. Luke's --
19  we're in a different setting.  We are not the Saltzer from
20  preaffiliation anymore.  We're a completely different group.
21  If we do survive, best-case scenario, we're going
22  to be fighting so hard to survive with a fee-for-service
23  structure, that we're not going to be able to compete.
24  What's more, the cost of rejoining Saltzer, to me,
25  just creates a lot of heartburn because our overhead went up

3329

1  when we lost all of our specialists.  In addition to that
2  increased overhead, now we have increased overhead to buy
3  back all of our stuff, to rehire employees, to really
4  reestablish.
5  So my overhead is going to go up many fold, and I
6  just can't sustain that personally.  So I'm afraid that
7  we're not going to be a very good competitor in the
8  community, which is going to impact our income even further.
9  Q.  What effect would divestiture have on your efforts
10  to transition to value-based delivery of care?
11  A.  So, again, you know, I think we lose the ability
12  to seek a value-based delivery care model, a patient-
13  centered medical home.  I think recruitment is going to be
14  more difficult again, just with the changing emphasis on
15  being part of a health system by applicants.  My community
16  outreach, I'm going to be struggling to meet that increased
17  overhead, so I'm going to have to really pick and choose
18  what I sign up here to support.
19  And then I think, lastly, the biggest impact on
20  the community is just the access to care.  I -- I have a
21  huge stress that overwhelms me at times about what happens
22  if I can't continue as Saltzer.  I came to Saltzer 15 years
23  ago with the intention of retiring from there.
24  I think about my patients that are already anxious
25  about whether I'm going to continue to be able to care for

3330

1  their families because they are reading the newspaper.
2  I think access to care is going to decrease.  I'm
3  certainly not going to be able to be open to every self-pay
4  and Medicaid patient.  Again, I'm going to have to do some
5  management of that so that I can afford to survive.
6  Q.  And how would divestiture of Saltzer affect
7  Dr. Thomas Patterson?
8  A.  So I went into medicine to help children.  They
9  are the most vulnerable population, and this has sidelined
10  my ability to do that.  I'm closer than ever to being able
11  to have the resources to do a patient-centered medical home,
12  to get out of this rat race that I was warned about when I
13  left my residency program, that I would be so busy trying to
14  see volume that I wouldn't be able to continue to care for
15  kids the way I wanted to.
16  And you know, I have got three children with 20
17  student years in a Christian school.  If I have to leave the
18  community, that is a huge impact on my family.  We have got
19  four generations in Nampa.  It's my home now.  I'm an import
20  from Arizona, but it's my home now, and I don't want to go
21  somewhere else.  But I feel like my ability to practice the
22  best kind of medicine I can for my patients is threatened by
23  this.
24  MR. BIERIG:  Your Honor, I have no further
25  questions of this witness at this time.

3331

1  Thank you, Dr. Patterson.
2  THE COURT:  Cross, Ms. Duke.
3  MS. DUKE:  Yes, Your Honor.
4  May we please switch over to Table 1.
5  CROSS-EXAMINATION
6  BY MS. DUKE:
7  Q.  Dr. Patterson, good afternoon.  My name is Keely
8  Duke, and I am one of the attorneys who represents the Saint
9  Alphonsus plaintiffs in this case.  All right?  You and I
10  haven't had a chance to meet yet, so --
11  A.  Good to meet you.
12  Q.  With respect to the unwind that you were just
13  talking about related to Saltzer, you have not seen any
14  financial analysis regarding how long Saltzer could stay in
15  business independently if the transaction were unwound;
16  correct?
17  A.  There has not been a formal evaluation; however,
18  the month that we were independent without our income
19  ability from our surgical specialties, I borrowed money from
20  my retirement to take a paycheck that month.
21  Q.  Sure.  But at this point, you have not seen any
22  type of financial analysis that has been provided to you by
23  Saltzer or St. Luke's with respect to how long Saltzer could
24  stay in business independently if this transaction was
25  unwound --

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 52 of 68

3332

1   A.  No.
2   Q.  -- yes or no?
3   A.  No.
4   Q.  So that's correct, that you haven't seen such an
5   analysis?
6   A.  I have not seen an analysis.  I am not aware of
7   it.
8   Q.  Now, you received money for the share buyback and
9   your goodwill through part of the agreement that Saltzer
10  reached with St. Luke's; correct?
11  A.  Yes.
12  Q.  And that tallied to what number for you,
13  personally?
14  A.  I can't remember.  I know it was in the 128-,
15  -9,000 range.
16  Q.  And that's money that you don't need to pay back;
17  correct?
18  A.  That's money that, if I leave, I would have to pay
19  back.
20  Q.  Right.  But if you remain at Saltzer, you do not
21  owe that money back; correct?
22  A.  I do not.
23  Q.  Now, let's chat about recruitment in the Nampa
24  area.  You believe that it is easier to recruit
25  pediatricians to Meridian than it is to Nampa; correct?

3333

1   A.  Yes.
2   Q.  And you also hold the opinion that there is a
3   shortage of pediatricians in Nampa; is that correct?
4   A.  Yes.
5   Q.  And you feel that it is important to specifically
6   offer a pediatric option separate from family medicine in
7   Nampa; right?
8   A.  In Nampa there are a lot of family physicians who
9   are caring for children.  There are certain children who
10  family physicians and pediatricians alike would agree need a
11  pediatric medical home.
12  Q.  So you would agree that it's important to offer a
13  pediatric option to the residents in Nampa?
14  A.  Yes.
15  Q.  You also feel that it's important for pediatric
16  patients to have care close to home, don't you?
17  A.  Yes.
18  Q.  Now, if St. Luke's builds a new hospital in Nampa,
19  would you anticipate that you would also support that
20  hospital?
21  A.  So that's long term.  I have got short-term
22  concerns before another hospital option is available.  But,
23  again, as I do now, patient choice is my first question.  So
24  if my patient says, "I want to be admitted to Saint
25  Alphonsus," I'm going to do my best to admit them to Saint

3334

1   Alphonsus Nampa.  If they have a St. Luke's choice,
2   currently they would go to St. Luke's Meridian or downtown,
3   but if there is a St. Luke's pediatric ward, then that
4   option would be available.
5        If you go back to when St. Luke's Meridian opened
6   up, my call group in Nampa split so that we could cover both
7   hospitals.  And in the early points of this, our
8   pediatricians had talked about if there is a St. Luke's
9   hospital, we would again figure out a split, knowing we
10  would need to recruit more of us, but to cover both
11  hospitals.
12  Q.  Sure.  Let me put up the web page real quick, and
13  I'll represent to you that this is --
14       MS. DUKE:  It's just a demonstrative exhibit,
15  Your Honor.
16       THE COURT:  But it is marked, has an exhibit
17  number assigned?
18       MS. DUKE:  It will be 3075, Your Honor.
19  BY MS. DUKE:
20  Q.  This is pulled off of the website.  And you would
21  agree with me that Saltzer certainly has a website; correct?
22  A.  Yes.
23  Q.  And that Saltzer -- part of the purpose of having
24  that website is to advertise to its patients; correct?
25  A.  Our website I don't think is very robust in that

3335

1   effort.
2   Q.  Regardless, whether it's robust or not, one of the
3   goals of the website is to -- if patients are out Googling
4   or they want to look up a physician, that they can glean
5   information about you and your group; correct?
6   A.  Yes.
7   Q.  And the goal in doing that with respect to the
8   website -- certainly Saltzer will talk about its quality on
9   the website and the -- strike that.
10       Certainly Saltzer will indicate on the website the
11  quality that it can provide to its patients; correct?
12  A.  Yes.
13  Q.  And that's in the hopes that those patients will
14  decide, "Yes, I want to go see a Saltzer physician"; right?
15  A.  Yes.
16  Q.  "I want to see Dr. Patterson as my pediatrician";
17  right?
18  A.  Yes.
19  Q.  And things that you've done and that you've done
20  prior to the St. Luke's acquisition to improve your quality
21  is you've been a good doctor; right?
22  A.  I believe so.
23  Q.  You practice what you believe to be good medicine?
24  A.  To the best of my ability.
25  Q.  And you were doing that prior to the acquisition

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.     Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 53 of 68

3336

1   with St. Luke's; correct?
2       **A.**  Yes.
3       **Q.**  And you also -- despite the fact you weren't
4   aligned with St. Luke's at the time, you also engaged in
5   various initiatives to advance child health and welfare
6   throughout this state; correct?
7       **A.  Yes.  That's how I'm built.**
8       **Q.**  Excuse me?
9       **A.  That's how I'm built.**
10      **Q.**  That's in your genetic code, isn't it?
11      **A.  It is part of me.**
12      **Q.**  And that was as an independent physician, you were
13  involved in the immunization -- statewide immunization
14  program; right?
15      **A.  Yes.**
16      **Q.**  And that's what's referenced there if you look in
17  the -- on the website; it's talking about your advocacy for
18  immunizations throughout the state?
19      **A.  Yes.**
20      **Q.**  Now, this immunization quality improvement
21  initiative started prior to St. Luke's acquisition of
22  Saltzer; correct?
23      **A.  Yes.**
24      **Q.**  And you played a fairly integral role in it here
25  in the state of Idaho?

3337

1       **A.  I'm president of the American Academy of**
2   **Pediatrics Idaho Chapter, and it runs through the AAP Idaho**
3   **Chapter.  So, yes, I was involved in it.**
4       **Q.**  And this initiative for immunizations has a number
5   of participating clinics, doesn't it?
6       **A.  Across the state.  But I think it's important to**
7   **say that my group, two of our pediatricians participated in**
8   **this.  One, it costs money to participate in it; and, two,**
9   **it costs time.  So two of us had buy-in to wanting to**
10  **improve immunization in our state --**
11      **Q.**  And the others did not?
12      **A.  -- in our practice.  Because of time and money,**
13  **the others could not afford to and did not choose to**
14  **participate.**
15      **Q.**  It's not part of their genetic code?
16      **A.  I can't speak for their genetic code.  But, you**
17  **know, the time constraint and the money constraint were the**
18  **things that were told to me by my colleagues as the reason**
19  **they can't join it.**
20      **Q.**  But you and another colleague certainly did,
21  didn't you?
22      **A.  Yes.**
23      **Q.**  As independent physicians; right?
24      **A.  Yes, two of us.**
25      **Q.**  And that initiative looked at key immunization

3338

1   rates, such as missed opportunities and immunization status
2   recorded at each visit; right?
3       **A.  Yes.**
4       **Q.**  And those were reported to those participating
5   clinics on a monthly basis; correct?
6       **A.  Yes.**
7       **Q.**  And the purpose of the initiative was to improve
8   outcomes related to childhood immunizations; right?
9       **A.  Yes.**
10      **Q.**  And the goal of the initiative was to inform those
11  that are participating about best past practices with
12  respect to immunizations?
13      **A.  Yes.**
14      **Q.**  And then to take those best practices and apply
15  them to their own individual practices throughout the entire
16  state; right?
17      **A.  Yes.  However, in fee-for-service, we're all busy**
18  **trying to see volume.  And so, honestly, there was not a lot**
19  **of crosstalk to my other colleagues.  So the ones of us that**
20  **are doing it are the ones of us that are benefiting from it.**
21      **Q.**  Sure.  And the goal of it is for folks to take
22  that information and to take it back to wherever their
23  clinic may be -- in Sandpoint, in Boise, in Lewiston, in
24  Pocatello -- and to implement those best practices?
25      **A.  Yes.**

3339

1       **Q.**  And there were other independent clinics that were
2   not owned by hospitals that were participating in that
3   program; correct?
4       **A.  I cannot recall all of the clinics involved, but I**
5   **know we were part of it.**
6       **Q.**  Certainly you weren't the only independent groups
7   involved in it; correct?
8       **A.  Primary Health was involved in it.**
9       **Q.**  And they're independent as well?
10      **A.  Yes.**
11      **Q.**  You also participated in an asthma initiative,
12  didn't you?
13      **A.  It's one of three of these that is planned through**
14  **the American Academy of Pediatrics through a CHIPRA grant**
15  **that we share with Utah.**
16      **Q.**  You were involved in that initiative prior to
17  St. Luke's acquisition with respect to Saltzer; correct?
18      **A.  Yes.**
19      **MS. DUKE:  Dr. Patterson, thank you very much for**
20  your time today.
21      THE WITNESS:  Thank you.
22      THE COURT:  Redirect.
23      MR. POWERS:  Your Honor, I just have a couple
24  questions.
25      THE COURT:  I'm sorry.  Yes, Mr. Powers.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 54 of 68

Bench Trial, 10/18/2013

3340

1    MR. POWERS:  Thank you.
2            CROSS-EXAMINATION
3    BY MR. POWERS:
4        Q.   Dr. Patterson, along those same lines as Ms. Duke
5    was asking you questions on, you have always practiced --
6    based on your training, you have always practiced in a way
7    that you would never go ahead and order studies or order
8    ancillary services which you felt would not change the
9    patient's -- the quality of the patient's care; correct?
10       A.   Yes.
11       Q.   You have never ordered studies that you felt may
12   not be necessary for the patient; correct?
13       A.   I do not order a study unless I think it's going
14   to change the outcome of the patient.
15       Q.   Even though you weren't aligned with any system in
16   the last 15 years, that's always been your practice;
17   correct?
18       A.   Yes.  That's how I was trained.
19       Q.   And you know that morally and ethically and
20   legally, that's your obligation; correct?
21       A.   I would practice no other way.
22       Q.   And you expect that of all the other physicians
23   that you practice with and that you're associated with;
24   correct?
25       A.   I feel it's an important part.  Anyone that takes

3341

1    an oath to practice medicine ought to have the same values.
2        Q.   And that's the way you and the Saltzer physicians
3    at Saltzer have practiced over the last 15 years; correct?
4        A.   We have been 40-odd physicians with our own
5    shingle hanging on a single shingle, Saltzer.  So there is a
6    wide variety of practices than just our different providers.
7        Q.   And you would never practice with someone who was
8    acting in an illegal way, would you?
9        A.   I would not.
10       Q.   And you would never practice with someone who was
11   medically unethical, would you?
12       A.   No.
13           MR. POWERS:  Thank you.  No more questions.
14           THE COURT:  Mr. Bierig.
15           MR. BIERIG:  No further questions, Your Honor.
16           THE COURT:  Dr. Patterson, thank you.  You may
17   step down.  I appreciate your being here.
18           Call your next witness.
19           MR. BIERIG:  Your Honor, I have been looking
20   forward to this moment for the last four weeks.  I am
21   pleased to report that we are now calling our last live
22   witness, Dr. Harold Kunz.
23           THE COURT:  Sir, would you please step before the
24   clerk and be sworn.  This way is probably faster.
25           HAROLD VENE KUNZ,

3342

1    having been first duly sworn to tell the whole truth,
2    testified as follows:
3            THE CLERK:  Please state your complete name and
4    spell your name for the record.
5            THE WITNESS:  Harold Vene Kunz, K-U-N-Z.  Middle
6    name is spelled V-E-N-E.
7            THE COURT:  You may inquire, Mr. Bierig.
8            MR. BIERIG:  Thank you, Your Honor.
9            DIRECT EXAMINATION
10   BY MR. BIERIG:
11       Q.   Good afternoon, Dr. Kunz.
12       A.   Good afternoon.
13       Q.   What is your profession?
14       A.   I am a physician.
15       Q.   And do you have a medical specialty?
16       A.   I specialize in family medicine.
17       Q.   Could you briefly describe your education since
18   high school.
19       A.   I attended Ricks College in Rexburg, Idaho, from
20   1972 to '73 and from 1975 to '76.  I then attended Brigham
21   Young University in Provo, Utah, and graduated with a
22   bachelor's of biology in 1977.  I entered medical school at
23   the University of Washington at Seattle in 1978 and
24   graduated in 1982.
25       Q.   Then what did you do after graduation from medical

3343

1    school?
2        A.   I was accepted into an internship and residency
3    program at the University of Utah-affiliated hospitals in
4    Ogden, Utah, at McKay-Dee Hospital.  And subsequently I
5    joined the -- began my active duty service in the
6    United States Air Force in 1985 through 1989 at Fairchild
7    Air Force Base.
8        Q.   What did you do in 1989?
9        A.   In 1989 I moved to Nampa, Idaho, and joined
10   Medical Center Physicians, now Saltzer Medical Group.
11       Q.   So you have been a primary care physician with
12   Saltzer since 1989?
13       A.   Yes, sir.
14       Q.   Do you serve on any committees at Saltzer?
15       A.   Yes.  I am the current chairman of the finance
16   committee, and as such, I also serve on the executive
17   committee.  From about 2000 until 2008 I was also on the
18   executive committee, and I was the president of Saltzer
19   Medical Group between 2005 and 2008.
20            I serve on the St. Luke's-Saltzer Operations
21   Council, and I also serve as a site manager for the family
22   practice department at St. Luke's-Saltzer.
23       Q.   Let's go back, Dr. Kunz, to the period roughly
24   2011.  Do you know why Saltzer Medical Group was interested
25   in affiliating with a healthcare system at that time?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 55 of 68

3344

1    **A.**   Yes.  We had been, as a group, trying to practice
2    good quality healthcare for over 50 years.  And in that
3    time, we had developed some systems and programs and had
4    some tools that we thought we were doing a pretty good job.
5         But healthcare delivery has changed in the last 10
6    or 12 years, and it became clear to us that we had good
7    tools but not good enough, and we needed to change how we
8    were approaching our -- our business model.
9         We knew that we needed to have robust medical
10   records and health information technology, and the tools
11   that we had just weren't adequate.  So we knew that we would
12   have to upgrade, but we just didn't have the money or the
13   resources to buy the kinds of information technology
14   equipment that we needed.  Those are usually reserved for
15   groups of doctors of 200 or 300 in size.  So we started
16   looking for an integrated healthcare system that could help
17   us to obtain those goals.
18        In addition, we also were seeing a difference in
19   the way that healthcare reimbursement was happening.  And
20   volume-based, fee-for-service kinds of programs were not
21   going to be sustainable, so we knew that we needed to look
22   for some value-based kinds of reimbursement and healthcare
23   delivery systems.  So, again, that's an integrated system
24   that is able to offer that.
25        And then we noticed kind of a change in our

3345

1    recruitment.  In order to replenish and to add programs and
2    doctors -- we were interviewing candidates, and ten years
3    ago these candidates wanted to be part of a separate sort of
4    independent fee-for-service kind of group.  But we really
5    saw that pool of applicants dry up.  And everyone wants now
6    as they are interviewing to be part of a healthcare system.
7         And so those were the reasons that we felt that we
8    needed to join with a tightly integrated healthcare system.
9         **Q.**   So you initiated discussions with St. Luke's?
10        **A.**   Yes.
11        **Q.**   And during those discussions, what, if anything,
12   did St. Luke's suggest would be the benefits of a -- of an
13   affiliation with Saltzer?
14        **A.**   Well, actually, the things that I just mentioned
15   we knew would be benefits, so that's part of the reason that
16   we wanted to talk to St. Luke's.  We knew they had a robust
17   platform for health information technology with -- and they
18   started the Epic system, which is really the highest rated
19   health information technology system available.  We thought
20   that would be great for us.
21        Also, we knew that they were working in a value-
22   based healthcare program.  They had the only ACO in the
23   state, accountable care organization in the state.  And it
24   would be much easier for us to recruit doctors and to
25   replenish and to expand our healthcare in Nampa and

3346

1    Canyon County if we were affiliated.
2         But I think the biggest advantage that we could
3    see that they could offer to us was that we could take all
4    of these programs and systems, and we could bring them into
5    Canyon County to our patients where they hadn't ever been
6    available before, and that was exciting to us.
7         **Q.**   During Saltzer's discussions with St. Luke's in
8    the period 2011-2012, to what extent was anything discussed
9    that one of the benefits of affiliation would be the ability
10   to raise price to commercial payors?
11        **A.**   That was never discussed.  In fact, quite the
12   opposite.  St. Luke's always in their discussions reiterated
13   that we would want to stress better health, better care, and
14   lower costs.
15        **Q.**   Did Saltzer -- at any time in that 2011-2012
16   period, did Saltzer approach Saint Alphonsus about a
17   possible affiliation?
18        **A.**   Yes.
19        **Q.**   And when was that?
20        **A.**   I believe it was in the fall of 2012.
21        **Q.**   And do you know why that was?
22        **A.**   Yes.  Some of the members of our group felt that
23   it would be important, since we had been having discussions
24   about affiliation with St. Luke's, that we allow Saint Al's
25   or ask Saint Al's to give us a proposal as well.

3347

1         So St. Luke's agreed to let -- in our discussions
2    with them, they agreed that we could go ahead and do that.
3         **Q.**   So, in other words, you told St. Luke's that you
4    would also be talking to Saint Alphonsus?  Is that what you
5    said?
6         **A.**   Yes.  As a matter of fact, I believe St. Luke's
7    supplied some data and information to Saint Alphonsus before
8    they made their proposal so that we could hear proposals
9    based on the same data.
10        **Q.**   And did Saint Alphonsus make an offer to acquire
11   Saltzer?
12        **A.**   Yes.
13        MR. ETTINGER:  Your Honor, I was going to let this
14   go a couple of questions, but we're beyond the scope of
15   what's allowed under the motion in limine, I believe.
16        THE COURT:  Well, as I have noted on several
17   occasions, I'm allowing some leeway into this, but are you
18   referring to the unclean hands issue?
19        As I previously ruled, I'm going to give some leeway on
20   this issue so long as it's tied to an issue other than
21   unclean hands.
22        Go ahead and proceed.
23        MR. BIERIG:  I want to be clear, Your Honor, we
24   are not making an unclean hands defense.
25   BY MR. BIERIG:

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 56 of 68

3348

1  **Q.** Did Saint Alphonsus make an offer to acquire
2  Saltzer?
3  **A.** Yes.
4  **Q.** Do you know how the financial terms of that offer
5  compared to the terms offered by St. Luke's?
6  **A. They were virtually identical.**
7  **Q.** So why did Saltzer accept the St. Luke's offer
8  rather than the Saint Alphonsus offer?
9  **A. Well, I think there were a number of reasons.**
10 **First of all, we wanted to be -- as Saltzer, we wanted to be**
11 **involved with a -- an organization or affiliated with an**
12 **organization that had the same vision that we did about**
13 **moving from fee-for-service to value-based care, and we**
14 **didn't really see that so much in the Saint Al's offer.**
15 **We also felt like we were more of a valued partner**
16 **and more of our input was listened to and would be listened**
17 **to and taken into account in the discussions with St. Luke's**
18 **than we had previously felt with Saint Al's.**
19 **And plus, there were just some things in the**
20 **Saint Al's offer that were troublesome to us. One of them**
21 **was a 90-mile noncompetition clause that basically made it**
22 **impossible if anyone wanted to opt out of their contract to**
23 **practice medicine anywhere between Twin Falls and --**
24 MR. ETTINGER: Your Honor, this is not
25 merely -- if it's not an unclean hands defense, it's

3349

1  certainly irrelevant. And our motion explained why these
2  issues are irrelevant. He is going on and on about
3  Saint Al's.
4  THE COURT: Well, Counsel, I think my prior ruling
5  indicated that I would allow some testimony on this subject
6  matter. The one issue that immediately comes to mind was
7  kind of an implicit suggestion that a premium was paid in
8  the acquisition for exclusive referrals; and, therefore, the
9  terms offered by Saint Al's would be relevant in terms of
10 kind of establishing a fair market value.
11 I think that there was also questions about
12 efficiencies of one proposal versus the other that I think
13 would inform the court's decision on that.
14 I'm going to, Mr. Bierig, suggest that you kind of
15 direct the witness testimony in that fashion and that we not
16 go too far afield, or I think Mr. Ettinger is correct it
17 would be irrelevant. Not necessarily in violation of the
18 court's prior order in which I said that evidence of unclean
19 hands is not going to be admitted, but that testimony
20 concerning the Saint Al's offer would be considered for
21 these other purposes.
22 MR. BIERIG: And I agree with that, Your Honor.
23 But if I just can respond to counsel for Saint Alphonsus,
24 one of the issues in the case is: What is the relevant
25 geographic market? And the fact that there was a 90-mile

3350

1  covenant not to compete would at least be a basis for an
2  argument that Saint Alphonsus thought that the -- that the
3  relevant market was 90 miles from Nampa. So I think that
4  this is not in any way an unclean hands argument.
5  THE COURT: Let's go ahead and proceed.
6  BY MR. BIERIG:
7  **Q.** So I think you testified -- well, on the 90-mile
8  covenant not to compete, isn't it true that Saint Alphonsus
9  indicated it would waive that requirement for Saltzer?
10 **A. Yes, that is true. However, we sort of felt that**
11 **it shouldn't have ever been included anyway, and those sorts**
12 **of things just didn't generate a great deal of trust.**
13 **Q.** You indicated that you felt that with St. Luke's
14 you would be equal partners. What was the basis for that
15 feeling?
16 **A. We had had occasion in the past to try to work**
17 **with St. Luke's on some other projects, and in doing so, we**
18 **had always felt that they had been open and transparent.**
19 **And in our dealings with them, they had been willing to**
20 **listen to what we had to say and to value our input and**
21 **opinion.**
22 **Q.** Dr. Kunz, do you refer patients to physician
23 specialists?
24 **A. Yes, I do.**
25 **Q.** And how do you decide to which specialist you will

3351

1  refer a patient?
2  **A. I determine, first of all, what the patient's**
3  **needs are and where they will get the best care. And then I**
4  **have a discussion with the patient about if they have**
5  **any -- if they know anyone in that area that they would like**
6  **to see, and then together we determine who they will see.**
7  **Q.** How important was it to you when you were in
8  discussions with St. Luke's that you be able to refer to
9  whatever physician you chose?
10 **A. I think that's critically important. It's a -- an**
11 **element of trust that I have with my patient that I'm always**
12 **going to give them the advice that I think is best for them**
13 **and for their health.**
14 **Q.** Did you make that view known to St. Luke's during
15 the negotiation process?
16 **A. Yes, sir.**
17 **Q.** And how did St. Luke's respond?
18 **A. St. Luke's has never indicated in any way that**
19 **they want to direct how I refer my patients and to whom I**
20 **refer my patients.**
21 **Q.** How, if at all, have your referrals to medical
22 specialists changed since Saltzer's affiliation with
23 St. Luke's?
24 **A. Well, I have been able to be introduced to some**
25 **new consultants, so I think I have a little bit wider field**

3352

1    of consultants to pick from.  But, in general, I don't
2    believe that my referral patterns have changed in any
3    significant way.
4        Q.    So to what extent do you still refer to physicians
5    associated with Saint Alphonsus?
6        A.    I refer to them frequently.
7        Q.    Do you have any reason to believe that the
8    referral practices of the other primary care physicians who
9    treat adults at Saltzer have changed in a different way
10   since the affiliation?
11       A.    I don't have any reason to believe that.
12       Q.    Dr. Kunz, do your patients ever require
13   hospitalization?
14       A.    Yes, my patients require hospitalization.
15       Q.    And how do you decide which hospital to send your
16   patients to?
17       A.    Well, when I see the patient and I determine that
18   they need to be hospitalized, I will ask them if they have a
19   hospital preference.  And if that hospital can provide the
20   services and the care that the patient needs, then I will
21   generally refer them to that hospital.
22       Q.    And during the discussions with St. Luke's that
23   led up to the affiliation, did you make it known to
24   St. Luke's that you wanted to be able to continue making
25   referrals to Saint Alphonsus Nampa?

3353

1        A.    Yes.  In fact, we made it known that it was very
2    important to us that we be able to do that.
3        Q.    And how did St. Luke's respond to -- to that
4    point?
5        A.    Their response was the same as with the referrals
6    to other physicians.  They didn't want to interfere with our
7    ability to refer to any hospital.
8        Q.    How, if at all, have your referral patterns to
9    hospitals changed since the affiliation with St. Luke's?
10       A.    They haven't changed at all, I don't believe.
11       Q.    And what percentage of your patients who require
12   hospitalization are hospitalized at Saint Alphonsus Nampa?
13       A.    I would say between 60 and 70 percent.
14       Q.    Has St. Luke's ever done anything to discourage
15   you from referring patients to Saint Alphonsus Nampa?
16       A.    Never.
17       Q.    You mentioned earlier that you are a member of the
18   Joint Operating Council.
19       A.    Yes.
20       Q.    What exactly is the Joint Operating Council?
21       A.    It's a committee composed of equal member -- equal
22   representation of members from the St. Luke's administration
23   and also from the executive committee of Saltzer Medical
24   Group.
25       Q.    Does the Joint Operating Council track referrals

3354

1    of patients from Saltzer physicians to other physicians and
2    to St. Luke's Nampa?
3        A.    Yes.  And Saint Al's Nampa as well.  It was, I
4    believe --
5        Q.    Sorry for interrupting.  I may have said
6    "St. Luke's Nampa."  I meant Saint Alphonsus Nampa.  I
7    apologize.
8        A.    Yes.  Oh, that's fine.  It was, I think, the
9    request of the court that those referral patterns be
10   followed, and that is the committee where those referrals
11   are tracked.
12       Q.    When you say the request of the court, you're
13   referring to a request of the court made at the preliminary
14   injunction hearing?
15       A.    That's my understanding, yes.
16       Q.    So what has the Joint Operating Council determined
17   with respect to referrals by Saltzer physicians, both to
18   other physicians and Saint Alphonsus Nampa?
19       A.    The referrals to Saint Alphonsus Nampa have
20   remained proportionately stable through the first seven
21   months.  I don't remember seeing any data past July, but
22   January through July, the proportion of admissions to
23   Saint Al's Nampa and St. Luke's facilities remained the
24   same, didn't change in any significant way.
25       Q.    And what is that proportion roughly?

3355

1        A.    Roughly 60/40 to Saint Al's Nampa.
2        Q.    So 60 to Saint Al's Nampa, 40 to St. Luke's?
3        A.    Roughly.
4        Q.    Okay.
5        A.    As far as other referrals go, about 40 to 50
6    percent of referrals go to St. Luke's physicians; about 20
7    to 35 percent go to Saint Al's; and of the group that has no
8    preference, about half of that group goes to Saint Al's
9    physicians and about half to St. Luke's.
10       Q.    Now, you just testified, if I understood you
11   correctly, that a majority of your patients who require
12   hospitalization you send to Saint Alphonsus Nampa; is that
13   correct?
14       A.    That is correct.  The majority are admitted at
15   Saint Al's Nampa.
16       Q.    So are you aware whether Saint Alphonsus's records
17   indicate that you are sending these patients to Saint
18   Alphonsus Nampa?
19       A.    I am listed as the provider, not as the admitting
20   physician.
21       Q.    Even though it is you who makes the decision as to
22   where the patient is sent; is that correct?
23       A.    That's correct.  I make the decision of where to
24   send the patient, and then the hospitalist at that hospital
25   admits the patient.

3356

1  Q.  Can you explain for the court the relationship
2  between the primary care physician who actually decides
3  where a patient will be hospitalized on one hand as opposed
4  to the hospitalist in the hospital on the other hand?
5  A.  Certainly.  I had a couple of occasions to utilize
6  the hospitalist just this week.
7      When I see a patient who is ill in my clinic and I
8  determine that that patient would benefit from
9  hospitalization and can't be treated as an outpatient, then
10 I talk to the patient and see which hospital they want to go
11 to.  And then I call the hospitalist at that hospital and
12 tell them about the patient, and then the hospitalist takes
13 care of the patient's care while they're in the hospital.
14 Q.  What about when a patient goes through the
15 emergency room?
16 A.  The second patient that I sent to Saint Al's Nampa
17 this last week was in my clinic, and I felt that they would
18 very likely need admitted.  Talked to the hospitalist.  The
19 hospitalist said, "I need more information, so send them to
20 the emergency room."
21     I sent them to the emergency room where they could
22 have CT scans and other testing done that I couldn't do in
23 my office, and then the hospitalist and the emergency room
24 doctor determined whether or not the patient would be
25 admitted.

3357

1  Q.  So with respect to the choice of what hospital a
2  patient is sent to, who makes that decision?  The primary
3  care physician or the hospitalist?
4  A.  I make that decision.
5  Q.  When you say "I," you're referring to the primary
6  care physician?
7  A.  Primary care doctor, yes, I make that decision.
8  Q.  What about the other primary care physicians at
9  Saltzer?
10 A.  They do it the same way I do.
11 Q.  So what role does the hospitalist play in the
12 decision as to where a patient is sent for hospitalization?
13 A.  The hospitalist has no say in that because I send
14 the patient to the hospitalist.  If the hospital happens to
15 be full and can't admit the patient, then they would divert
16 that patient to another hospital, but that's the only way in
17 which the hospitalist would determine where a patient would
18 be hospitalized.
19 Q.  So the source of the decision is basically the
20 primary care physician, not the hospitalist.  Am I
21 understanding that correctly?
22 A.  That is correct.
23 Q.  And to what extent was -- would what you have just
24 said be true when the patient arrives through the emergency
25 room?

3358

1  A.  If the patient arrives after hours through the
2  emergency room, the decision to admit that patient usually
3  rests with the emergency room physician.
4  Q.  But what role does the primary care physician have
5  in directing the patient as to which emergency room to go
6  to?
7  A.  Usually speaking, there will be some contact with
8  the patient with a primary care doctor before that, and the
9  doctor, the primary care doctor, will direct them to which
10 emergency room they should be seen.
11 Q.  How, Dr. Kunz, if at all, has the affiliation with
12 St. Luke's changed the number of Medicaid patients that are
13 seen by Saltzer physicians?
14 A.  Well, in my case, I think I see more now than I
15 did before.
16 Q.  And why is that?
17 A.  Well, Medicaid or self-pay or commercial
18 insurance, after our affiliation, it doesn't matter what
19 payor mix I see.  I can see patients from any payor mix, and
20 it -- to me, it's the same.  And so I don't have to worry
21 about limiting certain payor mixes to make my practice
22 viable.
23 Q.  Would you say the same is true of your primary
24 care physician colleagues at Saltzer?
25 A.  Yes.

3359

1  Q.  How, if at all, has the affiliation with
2  St. Luke's changed your delivery of care to your patients?
3  A.  Well, I -- this is where I start to get a little
4  bit excited because with the ability to have access to
5  improved healthcare records and with a system like
6  WhiteCloud Analytics, where I can pull the patient's or
7  my -- my performance up and I can see how I'm performing
8  with my patients in relationship to their treatment of
9  diabetes and high blood pressure and coronary artery disease
10 and asthma and childhood immunizations and just many, many
11 other things I have never had that ability before to see how
12 I compare with national standards with -- with other doctors
13 in the St. Luke's system.  And what that can do is it
14 actually makes me change how I approach healthcare, makes me
15 focus on more important -- more important things, and so I
16 can tell how many of my patients I should be telling to take
17 their aspirin when they have coronary disease and diabetes.
18 And that makes a big difference for them in the long run.
19     I learned in looking at WhiteCloud Analytics that
20 I may have been telling my patients that, but I haven't been
21 telling enough of them to do that.  And it's changed the way
22 I approach the way I practice medicine, and that's exciting
23 for me because that way I can make an impact on the health
24 of all of my patients.
25 Q.  Can you give an example of that?

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW    Document 565    Filed 11/04/14    Page 59 of 68

3360

1    A.   Sure.  For example, there is one metric in that
2  diabetes profile that asks:  How many of your patients have
3  an A1c of greater than 9 percent?  Well, I have always
4  thought that I had done a pretty good job in keeping my
5  diabetic patients under control.  And I found that I was not
6  doing as well as I thought I was, and I didn't have any way
7  of knowing that before I had access to this information.
8          And that's -- that's just one metric in a whole
9  series of things of diseases and chronic conditions that I
10  can treat.  And with that knowledge now, I can contact those
11  people.  I can focus their treatment.  I can get them in to
12  see diabetes educators.  I can bring to bear the whole
13  weight, if you would, of an integrated healthcare system to
14  help that patient, and that's an exciting way to do things.
15    Q.   Now, do you have access to -- do you participate
16  fully in the Epic electronic health record at this point?
17    A.   No.  Again, we haven't been allowed to do that
18  because, again, I think the -- it was part of the court's
19  decision to not integrate that fully until after the
20  decision had been made about this case.
21    Q.   What do you know about Epic?
22    A.   I know that Epic is the number-one rated
23  electronic health technology platform available.  It's used
24  by several university systems -- the University of Utah;
25  Stanford uses it; Kaiser uses it.

3361

1          And I read in an article that Epic is the
2  preferred healthcare platform for health technology.  In
3  three out of four of the ACOs, they -- they are
4  either now using it or are moving to it.
5          And I have a partner in my group who trained on
6  Epic, and he is just wildly excited about getting it back
7  because it just gives us so much more power and so much more
8  ability to care for our patients.
9    Q.   How would you anticipate that being on the Epic
10  EHS would change your delivery of care to patients?
11    A.   Well, I think that I have just been able to sort
12  of scratch the surface with what the WhiteCloud Analytics
13  information can do for me.
14          If I had Epic -- Epic actually allows us to get
15  accurate data and then put it in a format, a platform where
16  we can use that data to measure our performance.  Without
17  the accurate data and without the ability to integrate that
18  data, it's all just a guess.
19          So I can -- I can try all I want with the current
20  systems that we have, and we can try and wire a whole bunch
21  of them together that don't have that capability, but we
22  still aren't going to get the same type of power and
23  capability that we would get if we had the Epic system.
24    Q.   I want to go back to referrals for a minute.  What
25  would you do, Dr. Kunz, if St. Luke's sought to prevent you

3362

1  or discourage you from making referrals to Saint Alphonsus?
2    A.   I wouldn't do that.  I would refer my patient to
3  where my patient needed to go.
4    Q.   What would you do if St. Luke's tried to get you
5  to admit patients to one of its facilities where you
6  concluded that admission of a patient to such a facility was
7  not warranted by the patient's condition?
8    A.   I have never done that, and I -- that's a behavior
9  I will never engage in.
10    Q.   And do you have any reason to believe that your
11  colleagues -- any of your colleagues would take a different
12  view on that?
13    A.   I believe they all feel the same way I do.
14    Q.   I would like to move on to another subject.  Was
15  there a time when you treated a substantial number of
16  patients associated with Micron?
17    A.   Yes.
18    Q.   When was that?
19    A.   Before 2008.
20    Q.   What happened in 2008?
21    A.   Micron developed a new insurance product, and
22  Saltzer Medical Group was dropped from that product.
23    Q.   And before Saltzer was not -- was not in the
24  Micron network, approximately how many patients did you see
25  from Micron?

3363

1    A.   Approximately 60.
2    Q.   So then what happened to those 60 when Saltzer
3  went out of network with Micron?
4    A.   They moved the providers closer to Micron.
5    Q.   And when you say "closer to Micron," where -- what
6  are you referring to?
7    A.   Meridian and Boise.
8    Q.   How many Micron patients do you currently see?
9    A.   I see one family.
10    Q.   Do you know how much extra money a Micron patient
11  would have had to pay to have seen you as compared to an
12  in-network Micron provider?
13         MR. ETTINGER:  Your Honor, I think there is no
14  foundation for this witness to --
15         THE COURT:  Well, the question is do you know, yes
16  or no; and then you'll have to explain how the witness
17  knows.
18         MR. BIERIG:  That's exactly what I intend to do,
19  Your Honor.
20         THE COURT:  Proceed.
21         THE WITNESS:  Yes.
22  BY MR. BIERIG:
23    Q.   And how do you know that?
24    A.   I didn't know that until just recently.  But in
25  preparation for these proceedings, we looked into that, and

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.
Case 1:12-cv-00560-BLW Document 565 Filed 11/04/14 Page 60 of 68
Bench Trial, 10/18/2013

3364

1  I found out that the difference in copay is $20.
2      Q.  Did Saltzer ever get back into the Micron network?
3      A.  Yes, in 2011.
4      Q.  And to what extent have the Micron patients come
5  back since 2011?
6      A.  I still see the one family.
7      Q.  Dr. Kunz, have you given any thought to the effect
8  on Saltzer if this court were to order St. Luke's to divest
9  Saltzer?
10     A.  Yeah.  I think about that every day.  I think it
11 would be disastrous for Saltzer if that were to occur.
12     Q.  And when you say "disastrous for Saltzer," what do
13 you mean?
14     A.  Well, there are a number of things that I am
15 concerned about.  First of all, is we have invested a lot of
16 time and effort in creating a vision of where we think our
17 business needs to go and the kinds of healthcare systems and
18 so forth that we need to develop.  And if we are forced to
19 divest, then I have to go back to that same model of
20 high-volume, fee-for-service kinds of healthcare, which I
21 really don't think is the best way to go, and I don't think
22 it's sustainable.  I think that model for healthcare is
23 going to go away.
24         Also, I think that in order to recapitalize, we
25 would have to borrow huge amounts of money.  We would still

3365

1  have the same bills that we have to pay now, but we would
2  have to do it with a third less income because the surgeons
3  and orthopedic surgeons left.
4         So I think that, under that burden, there would be
5  a -- probably a very serious consideration amongst myself
6  and my partners as to whether we could stay open and viable,
7  and we would still have four to six months' worth of time
8  that we weren't getting any -- any revenue, per se.  Any
9  revenue stream, our accounts receivable would have to build
10 up.  We would have to hire 2- or 300 people.  We would have
11 to do a lot of those things -- buy back all of our equipment
12 and furniture and so forth.  And that would just create an
13 enormous burden of debt.  The risk to the partners would be
14 so great that many of them would, I think, want to leave.
15 That would further reduce our revenue.  Our expenditures
16 keep going up, our revenue keeps going down, and I think
17 eventually our doors would close.
18     Q.  What impact, if any, would divestiture have on the
19 ability of Saltzer to do outreach programs in the community
20 in Nampa?
21     A.  We wouldn't have any money even to recruit
22 physicians to replenish or replace the physicians that we
23 lost, and we wouldn't have any money to pay the salaries of
24 the partners who stayed for months and months.
25         I think outreach programs would -- would be --

3366

1  would have to be let go.
2      Q.  What impact, if any, would divestiture have on the
3  ability of Saltzer physicians to treat Medicaid patients?
4      A.  Well, Medicaid and low-income patients, self-pay
5  patients already have difficulty getting access to
6  healthcare, and we see a substantial number of those
7  patients.  If we aren't available, then those patients won't
8  have any other -- really any other avenues other than to go
9  to emergency rooms or other doctors in Meridian or Boise or
10 Caldwell, elsewhere in the Treasure Valley.
11         I think it would be a tremendous strain on those
12 people, and they may not be able to have access to the same
13 quality care that they have had.
14     Q.  Now, there has been a suggestion made in this case
15 that the benefits -- the kind of benefits you've described
16 of the affiliation between Saltzer and St. Luke's -- could
17 be achieved through a much looser affiliation, kind of a
18 joint venture.
19         What are your thoughts on the extent to which those
20 benefits could be achieved if Saltzer were divested and some
21 kind of looser arrangement would be -- would go forward?
22     A.  I -- I have no doubt in my mind that a joint
23 venture or some sort of loose affiliation just would not
24 work.  In my mind, it's just doomed to failure.
25         Again, you have to take into consideration that we

3367

1  initially, when we were approaching St. Luke's, we looked at
2  doing it as a joint venture, and we studied that very
3  carefully.  And through our discussions and through our
4  research, it just became clear to us that unless we could
5  align financial incentives, unless we had vision and
6  leadership, unless we had the appropriate financing -- and
7  these -- these healthcare platforms are just tremendously
8  expensive -- we wouldn't be able to get the same kind of
9  quality care that we could -- that we could get in a closer
10 affiliation with St. Luke's.
11         And so we just decided that the joint venture idea
12 wouldn't work.  And so that's when we started to look
13 toward, you know, closer affiliations, and we could see a
14 vision of -- St. Luke's had the same vision that we did of
15 getting into a value-based kind of reimbursement product and
16 away from fee-for-service.
17         And so we just felt like that it would not be
18 feasible in any way to just kind of get a bunch of people
19 together and say we're going to form our own ACO with
20 St. Luke's.
21     Q.  One last question, Dr. Kunz.  What would the
22 impact of divestiture be on you, personally?
23     A.  Well, I have lived in Nampa now for 24 years, and
24 I love the community, and I -- I'm dedicated to my patients.
25 And I -- having said all of that, if I can't practice the

3368

1 kind of medicine that I think I need to practice, then it's
2 going to be really hard to stay, especially if I can't -- if
3 all of these things with divestiture really happen the way I
4 see that they -- they can, I don't know that I could stay.
5          MR. BIERIG: Thank you. Thank you very much.
6 Thank you, Your Honor. No further questions.
7          THE COURT: Mr. Ettinger.
8          MR. ETTINGER: Thank you, Your Honor.
9          THE COURT: Counsel, we're going to go a little
10 beyond 2:30 so we can get the cross of --
11          MS. DUKE: Sonnenberg.
12          THE COURT: Yes. Go ahead and proceed,
13 Mr. Ettinger.
14          MR. ETTINGER: Thank you, Your Honor.
15                    CROSS-EXAMINATION
16 BY MR. ETTINGER:
17     Q.   Good afternoon, Dr. Kunz.
18     A.   Good afternoon.
19     Q.   I was listening very carefully, and I think you
20 used the following words to describe the consequences of a
21 divestiture or unwind. You said "disastrous"; correct?
22     A.   Yes, sir.
23     Q.   You said "concern regarding whether you could stay
24 open and viable"; correct?
25     A.   Yes.

3369

1     Q.   And you said eventually your doors would close;
2 correct?
3     A.   Yes.
4     Q.   Now, you, in fact, believe that those kinds of
5 views are, quote, "overly dramatic," close quote, don't you?
6     A.   No.
7     Q.   And you, in fact, dismiss them as doomsday
8 scenarios, don't you, Doctor?
9     A.   I do not.
10          MR. ETTINGER: Why don't we play clip 106, Keely.
11 Your Honor, this is page 78, lines 14 to 23, from
12 Dr. Kunz's deposition.
13          (Video clip played as follows:)
14     Q.   "What do you recall about the discussion
15          of contingency plans in the Finance Committee?
16     A.   "Well, as I recall this email,
17          Dr. McKinnon was concerned about our clinic
18          becoming financially insolvent if the PSA were
19          blocked and we were left without the surgeons
20          who had then left our group and that would
21          increase our overhead to a point that our group
22          would implode basically or collapse.
23          "These are sort of doomsday scenarios.
24          Sometimes Ryan has a little penchant to do
25          that."

3370

1          (Video clip concluded.)
2 BY MR. ETTINGER:
3     Q.   Was that your testimony, Dr. Kunz?
4     A.   Yes.
5          MR. ETTINGER: And why don't we play clip 107,
6 Keely.
7          Your Honor, this is page 81, lines 5 through 16, of
8 Dr. Kunz's deposition.
9          (Video clip played as follows:)
10     Q.   "Who was Ryan McKinnon?
11     A.   "Ryan is an ophthalmologist who is a
12          partner at Saltzer Medical Group.
13     Q.   "And were you saying that he has a
14          penchant for being overly dramatic or
15          doomsday-ish?
16     A.   "That's my opinion, yes. He has a
17          penchant for not attending meetings and then
18          listening to rumors and then worrying and
19          coming up with doomsday scenarios about what
20          might happen.
21          "So, I've had a long history with
22          Dr. McKinnon. He's a good friend and a
23          wonderful doctor. And he just has that
24          penchant, in my opinion, to do those things."
25          (Video clip concluded.)

3371

1 BY MR. ETTINGER:
2     Q.   And was that your testimony?
3     A.   Yes.
4     Q.   And you have not conducted any financial analysis
5 to support your conclusion about divestiture, have you,
6 Doctor?
7     A.   No, but I am the chairman of the finance
8 committee. I do know what our finances are.
9     Q.   I understand. Thank you.
10          And you did in the finance committee talk about selling
11 off assets if divestiture were to occur and you needed to
12 cover some short-run costs; isn't that right?
13     A.   That was one thought.
14     Q.   Were specific assets identified?
15     A.   What assets we have we would sell.
16     Q.   Were specific assets identified, Doctor? That's
17 my question. Yes or no.
18     A.   I think I mentioned laboratory. I don't remember
19 which other ones.
20     Q.   Okay. And there have been no concrete plans put
21 in place as to what would be done with regard to any
22 divestiture; isn't that right?
23     A.   There haven't.
24     Q.   And your view that problems would occur on
25 divestiture is based on the assumption that there would not

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.                    Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 62 of 68

3372

1 be any successful recruitment of new orthopedic surgeons;
2 correct?
3    **A.  I do not believe we could --**
4    **Q.**  Isn't it right that your conclusion is based on
5 the assumption that you could not successfully recruit
6 orthopedic surgeons?  Yes or no, please, Doctor.
7    **A.  Yes.**
8    **Q.**  Thank you.
9    Now, Saltzer was profitable in the fiscal year ending
10 2012; correct, Doctor?
11    **A.  Yes.**
12    **Q.**  And, in fact, it's been profitable in every year
13 that you've been at Saltzer; correct?
14    **A.  Yes.**
15    **Q.**  Did you mention -- turning to another topic,
16 Doctor.  Did you mention in your direct, did I hear
17 correctly, that one reason that you decided to do a deal
18 with St. Luke's was that it had the only ACO in the state?
19    **A.  I believe that's what I said.**
20    **Q.**  Do you know when St. Luke's became an ACO?
21    **A.  Within the last year.**
22    **Q.**  Was it before Saltzer made its decision?
23    **A.  I'm not entirely sure.  It was near the same time.**
24    **Q.**  And you talked about the reasons why from your
25 perspective the St. Luke's deal was done.  Were you one of

3373

1 the physicians who signed Dr. Page's letter where he
2 explained his reasoning for doing the deal?
3    **A.  Yes.**
4    **Q.**  It's the case, is it not, Doctor, that about
5 $9 million which were paid to Saltzer physicians as part of
6 the St. Luke's deal is money that the doctors get to keep if
7 there is an unwind; isn't that right?
8    **A.  That is correct.**
9    **Q.**  And for you, is that a couple hundred thousand
10 dollars personally?
11    MR. JULIAN:  Objection, Your Honor.  Compensation
12 of a physician is AEO.  Asking that question probably was as
13 well, but we can supply the figures.  It's already in an
14 exhibit.  I don't think his compensation --
15    MR. ETTINGER:  Well, I think it's relevant,
16 Your Honor.  But it's in the document.  We don't need to
17 clear the courtroom for it.
18    THE COURT:  Very well.
19 BY MR. ETTINGER:
20    **Q.**  You talked about quality, Dr. Kunz.  St. Luke's
21 has only had positive comments about Saltzer's quality;
22 correct?
23    **A.  That I'm aware of.**
24    **Q.**  And Saltzer had a quality assessment committee
25 with quality metrics in place before it was acquired by

3374

1 St. Luke's; isn't that right?
2    **A.  It has a quality assurance committee.  I'm not
3 aware of any quality metrics.**
4    MR. ETTINGER:  Keely, could you play clip 14.
5 Your Honor, this is page 84, line 25 through page 85,
6 line 9 of Dr. Kunz's deposition.
7    (Video clip played as follows:)
8    **Q.**  "Prior to entering into the PSA with
9 St. Luke's, did Saltzer use any metrics to
10 assess its quality?
11    **A.**  "We did patient questionnaires and
12 satisfaction surveys.  We tried to do the
13 Meaningful Use of the medical records.  We were
14 involved in that.  So, we -- to the
15 extent that we could, we tried to measure
16 ourselves for quality.
17       "We have a quality -- a QA Committee that
18 handles that and other kinds of quality sorts
19 of metrics.  So, yeah, we try to do that."
20    (Video clip concluded.)
21 BY MR. ETTINGER:
22    **Q.**  Was that your testimony, Doctor?
23    **A.  Yes.**
24    **Q.**  Now, you mentioned Meaningful Use in that clip.
25 What is the Meaningful Use Program, Doctor?

3375

1    **A.  The Meaningful Use Program is a federal program
2 where electronic medical records are measured and how the
3 clinics and doctors who use them comply with certain
4 standards that are set by the government.  And if they
5 comply with those standards and those metrics, then they are
6 eligible to receive compensation from the government.**
7    **Q.**  And that includes a large number of quality
8 metrics, does it not?
9    **A.  Well, not in the same extent that I'm talking
10 about quality metrics from the other -- the metrics that are
11 in Meaningful Use have something to do, I guess, with do I
12 ask my patient if -- or do I counsel my patient to stop
13 smoking.  I suppose that's a quality metric.**
14    **Q.**  That's a quality metric that this court has heard
15 about in connection with WhiteCloud.  But, in fact, that
16 quality metric has been in the Meaningful Use program for
17 some years, has it not, Doctor?
18    **A.  For two years that I know of.**
19    **Q.**  Yeah.  And Saltzer qualified for Meaningful Use,
20 did it not?
21    **A.  It did.**
22    **Q.**  Prior to being acquired by St. Luke's; correct?
23    **A.  Yes.**
24    **Q.**  And are you aware that St. Luke's has not
25 qualified for meaningful use on the inpatient side?

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 63 of 68

3376

1  A.  I don't know anything about St. Luke's inpatient
2  quality metrics.
3      Q.  And you personally, as well as the other
4  individual physicians in Saltzer, get regular reports on
5  your compliance with the meaningful use metrics; correct?
6      A.  Are you referring to the WhiteCloud clinical
7  integration?
8      Q.  No.  I'm talking about what you received in
9  Saltzer before you were ever acquired by St. Luke's.
10     A.  We -- in an effort to try to be compliant, we
11  would receive reports from our information technology people
12  about where we stood in relationship to the qualification
13  for meaningful use.
14     Q.  And that was for each individual physician as to
15  his or her qualification; right?
16     A.  Yes.
17     Q.  And you believe and Saltzer believes that your
18  eClinicalWorks system is state-of-the-art, do you not?
19     A.  When we bought it, it was state-of-the-art.  It is
20  not state-of-the-art now.
21     Q.  You still call it state-of-the-art on your
22  website, don't you, Doctor?
23     A.  I haven't looked at the website in a while.
24     Q.  Why don't we pull it up, if we could, Keely.
25  And do you see this page?  This is the Saltzer website,

3377

1  Doctor?
2      A.  It appears to be.
3      Q.  And it refers to "Our state-of-the-art electronic
4  medical record."  Do you see that?
5      A.  That's what it says.
6      Q.  Is that a false statement today, Doctor?
7      A.  In my opinion, eClinicalWorks is kind of an older-
8  generation electronic medical record.  It's not as
9  state-of-the-art as Epic.
10     Q.  What's the latest version of eClinicalWorks that
11  Saltzer has purchased?
12     A.  I'm not aware of that.
13     Q.  Are you on the IT committee at Saltzer?
14     A.  I am not.
15     Q.  So you're really not very acknowledgeable about
16  the details of electronic medical record systems, are you,
17  Doctor?
18     A.  Not as knowledgeable as the people on the IT
19  committee, I suppose.
20     Q.  And one reason why you advertise eClinicalWorks on
21  your website and your electronic medical record is you think
22  that could attract patients; correct?
23     A.  Yes.
24     Q.  And you advertise medical research that Saltzer
25  does on its website as well; isn't that right?

3378

1      A.  Yes.
2      Q.  And you think that could attract patients;
3  correct?
4      A.  Yes.
5      Q.  And good quality in the modern sense -- achieving
6  quality metrics, using electronic medical records -- those
7  kinds of things are not only good medicine, they are good
8  business because they attract patients; correct?
9      A.  Yes.
10     Q.  Let's talk a bit about referrals, Doctor.
11     It's your view, is it not, that part of the value of a
12  primary care physician to a hospital system is the access to
13  the primary care physician's patient base for referrals?
14     A.  Could you restate that, please.
15     Q.  Part of the value of primary care physicians to a
16  hospital system is the access that those primary care
17  physicians provide to their patient base for referrals?
18     A.  Yes.
19     Q.  And since Saltzer entered into its PSA with
20  St. Luke's, your personal referrals to the St. Luke's Boise
21  Surgical Group have increased; correct?
22     A.  Yes.
23     Q.  And your referrals to the St. Luke's orthopedic
24  department generally have increased; correct?
25     A.  Yes.

3379

1      Q.  And your referrals to St. Luke's specialists
2  generally have increased; correct?
3      A.  In those two instances, I think so, yes.
4      Q.  And your referrals to the former Saltzer surgeons
5  have decreased; correct?
6      A.  I still send people to the orthopedic surgeons.
7      Q.  You don't send anybody to Dr. Williams anymore, do
8  you, Doctor?
9      A.  I haven't in a while.
10     Q.  But you don't feel any animosity towards him or
11  the other surgeons, do you?
12     A.  I personally don't, no.
13     Q.  How many referrals have you sent to the
14  orthopedic -- the former Saltzer orthopedic surgeons in
15  2013, Doctor?  Less than five?
16     A.  No.  I think it's more than that.
17     Q.  Can you give me a number?
18     A.  This past week, I looked at my -- my records that
19  I received from Saint Alphonsus -- in the past two weeks;
20  pardon me.  And I had received five surgical reports from
21  Saint Alphonsus doctors, one of them Dr. Williams, who had
22  operated on my patients.
23     Q.  Now, were these patients that you personally
24  referred to them, or were these patients who happened to use
25  you as a primary care physician and had either utilized

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.          Bench Trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 64 of 68

3380

1  these surgeons before or self-referred to them?

2  **A.  I suspect there was some of both of those.**

3  **Q.**  Okay.  So how many cases did you explicitly refer

4  to the former Saltzer surgeons in 2013 -- you, personally?

5  **A.  I don't know that.**

6  **Q.**  Any?

7  **A.  Yes.**

8  **Q.**  But you don't know at all how many?

9  **A.  No, I don't.**

10  **Q.**  Okay.  Now, you first obtained admitting

11  privileges at St. Luke's in 2013; isn't that right?

12  **A.  I believe that's true, yes.**

13  **Q.**  And you did that in connection with entering into

14  this transaction with St. Luke's; correct?

15  **A.  Yes.**

16  **Q.**  And Mr. Bierig asked you some questions you talked

17  to him about -- about reporting to the court.  Did you read

18  the court's December order on the preliminary injunction

19  motion?

20  **A.  I don't remember reading it exactly, but I have**

21  **read some of those documents.  I can't tell you -- there are**

22  **a lot of them.  I can't tell you which one.**

23  **Q.**  Do you remember the court's four assumptions in

24  that order?

25  **A.  No.**

3381

1  **Q.**  Do you remember anything about referral patterns

2  not changing substantially?  Did you hear about that issue?

3  **A.  I don't remember that.**

4  **Q.**  Okay.  Mr. Bierig mentioned a noncompete and

5  mileage, so that opened the door for me to ask you just a

6  few more questions, Doctor.

7  You have never personally undertaken any efforts to

8  market your practice in Caldwell, have you?

9  **A.  Not to my recollection.**

10  **Q.**  And you have not personally made any efforts to

11  market your practice in Boise, have you?

12  **A.  No.**

13  **Q.**  And the only time you can recall ever getting a

14  patient from a Boise-based primary care physician is if the

15  patient moved to Nampa and wanted to establish closer care;

16  isn't that right, Doctor?

17  **A.  I suppose that's what I -- yeah, I suppose that's**

18  **true.**

19  MR. ETTINGER:  I have nothing further.  Thank you.

20  MR. POWERS:  One question, Your Honor.

21  THE COURT:  Yes, Mr. Powers.

22  CROSS-EXAMINATION

23  BY MR. POWERS:

24  **Q.**  Dr. Kunz, when Dr. Williams was part of your group

25  over the last 15 years, you used to regularly refer patients

3382

1  to him; correct?

2  **A.  Until he moved his practice to Meridian.  Then it**

3  **wasn't as easy to get people in to him.**

4  **Q.**  But you referred more than 10 patients a year to

5  him before 2012; correct?

6  **A.  I believe so.**

7  **Q.**  Okay.  And the reason you did that was because you

8  trusted his abilities as a surgeon with respect to your

9  patients; correct?

10  **A.  Yes.**

11  **Q.**  You knew it was good for your patients to refer to

12  a surgeon who was highly skilled, like Dr. Williams?

13  **A.  Yes.**

14  **Q.**  And at that point in time, you were trying to do

15  what was best for your patients; correct?

16  **A.  Yes.**

17  MR. POWERS:  All right.  Thank you.

18  THE COURT:  Redirect.

19  MR. BIERIG:  Thank you, Your Honor.

20  REDIRECT EXAMINATION

21  BY MR. BIERIG:

22  **Q.**  Dr. Kunz, Counsel for Saint Alphonsus asked you

23  whether your view about the future of Saltzer was based on

24  the assumption that Saltzer could not recruit an orthopedic

25  surgeon.

3383

1  Is your assumption about the likely future of Saltzer

2  in the event of divestiture based solely on the ability or

3  inability to recruit an orthopedic surgeon?

4  **A.  No.  There are many other factors.**

5  **Q.**  And counsel for plaintiff asked you about the

6  quality metrics utilized by Saltzer as an independent group.

7  How has sort of the review of quality metrics been affected

8  by the affiliation with St. Luke's?

9  **A.  It's certainly much more robust now.  The quality**

10  **metrics from -- from Meaningful Use are only one aspect of**

11  **the quality metrics that we use.  There are a lot more**

12  **available to us.  Plus, some of the surveys that I was**

13  **referring to in my deposition were done in 2007.**

14  **I mean, there hasn't been any real recent surveys**

15  **or any -- other than Meaningful Use, any real robust effort**

16  **on our part to implement more quality metrics.**

17  **We simply didn't have the ability to mine the data**

18  **and get meaningful information from it.  It wasn't because**

19  **we didn't want to.  We just didn't have the right tools to**

20  **do it.**

21  **EClinicalWorks can do some of those things, but**

22  **it's -- it is inadequate to give us the power and the level**

23  **of quality metrics that we can get from Epic and other**

24  **systems.**

25  MR. BIERIG:  Thank you, Dr. Kunz.  I have no

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 65 of 68

3384

1  further questions.
2          THE COURT:  Anything further?
3          MR. ETTINGER:  No.
4          THE COURT:  All right.  You may step down.  Thank
5  you.
6          THE WITNESS:  Thank you.
7          THE COURT:  That I believe is the last witness for
8  St. Luke's; is that correct?
9          MR. BIERIG:  Last live witness, Your Honor.
10         THE COURT:  All right.
11         MR. BIERIG:  Of course, we don't know what the
12  rest of their case is going to be.
13         THE COURT:  Well, presumably, you will know before
14  the end of the day.
15         MR. BIERIG:  We would hope.
16         THE COURT:  I think we can more than hope.  I will
17  require it.
18         So let's go ahead and call I think the one witness that
19  we were going to call out of order.  Was it --
20         MR. STEIN:  Your Honor, while we're waiting for
21  the plaintiffs' next witness, am I correct that now is the
22  time that plaintiffs are required to disclose their rebuttal
23  witnesses and their demonstratives?
24         THE COURT:  Yes.  That's what I was referring to
25  with Mr. Bierig.  At the conclusion of the proceedings

3385

1  today, you will notify St. Luke's as to who will be called
2  to testify as rebuttal witnesses.
3          MS. DUKE:  Correct, Your Honor.
4          THE COURT:  All right.  Very good.
5          Mr. Sonnenberg, is it, is being summoned?
6          MS. DUKE:  He is.  Mr. Powers is looking for him.
7  He was out there about 20 minutes ago.
8          MR. POWERS:  I will try to find him, Your Honor.
9  Found him.
10         THE COURT:  Mr. Sonnenberg, would you please step
11  before the clerk, be sworn as a witness, and then
12  Ms. Gearhart will direct you from there.
13                 GREG SONNENBERG,
14  having been first duly sworn to tell the whole truth,
15  testified as follows:
16         THE CLERK:  Please state your complete name and
17  spell your name for the record.
18         THE WITNESS:  Greg Sonnenberg,
19  S-O-N-N-E-N-B-E-R-G.
20         THE COURT:  You may inquire.
21         MS. DUKE:  Thank you, Your Honor.
22                 DIRECT EXAMINATION
23  BY MS. DUKE:
24     Q.  Good afternoon, Mr. Sonnenberg.
25     A.  Hi.

3386

1      Q.  You were -- you are here under subpoena; correct?
2      A.  Yes.
3      Q.  And you worked at Saint Alphonsus up until the
4  summer of this past year; right?
5      A.  That is correct.
6      Q.  And you were there --
7          THE COURT:  Would you scoot a little closer to the
8  microphone.
9  BY MS. DUKE:
10     Q.  You were there for 13 years?
11     A.  Actually, close to 15.
12     Q.  Close to 15 years.  And one of the roles that you
13  had there was director of managed care; correct?
14     A.  That is correct.
15     Q.  And in that position, you were responsible for
16  Saint Alphonsus's payor contracting; right?
17     A.  That's correct.
18     Q.  And as such, you had intimate knowledge of
19  Saint Alphonsus' negotiating strategy with payors, including
20  rates that Saint Alphonsus was able to get through various
21  payors through its negotiations?
22     A.  That's correct.
23     Q.  And you were also the executive director of the
24  PHO Advantage Care Network; right?
25     A.  That's correct.

3387

1      Q.  And that PHO Advantage Care Network ultimately
2  became the Saint Alphonsus Health Alliance; right?
3      A.  That's correct.
4      Q.  Now, in July of 2012, you reached out to Jeff
5  Taylor, who is the chief financial officer at St. Luke's,
6  inquiring about leaving Saint Alphonsus and going to
7  St. Luke's Health System; right?
8      A.  I did inquire.  I don't know the exact date, but I
9  did inquire and approached Jeff Taylor; that's correct.
10     Q.  Sure.  And what you did is you sent him an email?
11  Do you remember that?
12     A.  I don't recall that, either.
13     Q.  Let me show you Exhibit 1617.
14  What this is is an email -- is that -- it shouldn't be.
15  We can turn the screen off, Your Honor.
16  Exhibit 1617, which has been admitted, if you look
17  there on that July 25, 2012, email, that's from you to Jeff.
18  Do you see that there?
19     A.  I do.
20     Q.  Does that help refresh your recollection --
21     A.  Yes.
22     Q.  -- as to the time frame that you reached out to
23  Mr. Taylor with respect to potentially working for
24  St. Luke's?
25     A.  Yes.

Saint Alphonsus Medical Center, et al., v. St. Luke's Health System, et al.    Bench trial, 10/18/2013

Case 1:12-cv-00560-BLW   Document 565   Filed 11/04/14   Page 66 of 68

3388

1    **Q.** And Mr. Taylor indicates there to you that he does
2    recall who you are and he is knowledgeable of what your
3    current role is. You see that?
4    **A.** I do.
5    **Q.** And he also -- you wanted this to be a
6    confidential communication; correct? You see there where he
7    says, "I understand that this is confidential, and we'll be
8    back in touch."
9    **A.** Yeah. Those are his words.
10   **Q.** Sure.
11   **A.** That's correct.
12   **Q.** But you weren't advertising to Saint Alphonsus
13   that you were looking for a different job; right?
14   **A.** I wasn't advertising, but I wasn't keeping it a
15   secret, either.
16   **Q.** You were then contacted by Mr. Taylor sometime
17   later, weren't you?
18   **A.** Yes.
19   **Q.** And you ended up meeting with St. Luke's on
20   several occasions between July of 2012 and ultimately June
21   of 2013, when you were offered a position by -- by
22   St. Luke's; correct?
23   **A.** That's correct.
24   **Q.** And one of the positions that you were looking
25   to -- or part of what was being discussed with respect to

3389

1    you working for St. Luke's would be to assist with payor
2    contracting negotiating; correct?
3    **A.** Probably more specifically, the title was senior
4    director of PHO management and development. So in that
5    capacity, there would probably be some involvement with
6    contracting.
7    **Q.** There would be some involvement?
8    **A.** Yes.
9    **Q.** And the negotiations really between you and
10   St. Luke's happened in the spring of 2012, leading up to
11   June of 2012; correct?
12   **A.** To June of 2013?
13   **Q.** Sorry. June of 2013; you're correct.
14   **A.** Right.
15   **Q.** Let me rephrase that. So the negotiations between
16   you and St. Luke's for a position were between sometime in
17   the spring of 2013 up to about June of 2013?
18   **A.** Correct.
19   **Q.** And your deposition in this case was taken on
20   April 18 of 2013; correct?
21   **A.** That's correct.
22   **Q.** And you certainly didn't advise Saint Alphonsus
23   counsel that you were negotiating with St. Luke's related to
24   a position; correct?
25   **A.** I believe that's correct.

3390

1    **Q.** And after that job -- excuse me. After that
2    deposition, you were offered a job by St. Luke's; correct?
3    **A.** That's correct.
4    **Q.** Now, when you were communicating to St. Luke's
5    related to looking to them to have a job, you sent your
6    resumé to them; right?
7    **A.** That is correct.
8    **Q.** And let me just show you Exhibit 2064. Can you
9    see that all right, Mr. Sonnenberg?
10   **A.** I can, yes.
11   **Q.** Does that look to be your resumé?
12   **A.** It is.
13   **Q.** And you prepared that in anticipation of reaching
14   out to St. Luke's for employment; correct?
15   **A.** In anticipation of employment with anyone.
16   **Q.** Which included St. Luke's?
17   **A.** Which included St. Luke's.
18   **Q.** All right. Just wait one second.
19        All right. Thank you very much, Mr. Sonnenberg for
20   your time.
21        THE COURT: Mr. Stein.
22              CROSS-EXAMINATION
23   BY MR. STEIN:
24   **Q.** Good afternoon, Mr. Sonnenberg.
25   **A.** Hi.

3391

1    **Q.** I don't know if you remember me. My name is Scott
2    Stein. I took your deposition in April.
3    **A.** I do.
4    **Q.** Did you and I ever meet or speak or communicate in
5    any way before I took your deposition?
6    **A.** Not to my knowledge, no.
7    **Q.** Did anyone from St. Luke's tell you what you
8    should or shouldn't say in your deposition?
9    **A.** Nope.
10   **Q.** And did you understand that you were under oath at
11   your deposition?
12   **A.** I did.
13   **Q.** And did you take that oath seriously?
14   **A.** I did.
15   **Q.** And did you comply with that oath?
16   **A.** I did.
17   **Q.** And if someone were to suggest perhaps that you
18   were shading your testimony in a way to favor St. Luke's in
19   order to potentially get a job with them, how would you
20   respond to that?
21   **A.** I -- I did not.
22   **Q.** By the way, after you gave your deposition, you
23   got a transcript of it; is that right? Do you recall
24   reviewing it?
25   **A.** No, I do not recall that.

3392

1  **Q.** Let me ask this: Did anyone from Saint Al's ever
2  say to you after your deposition, "You know, Greg, what you
3  said isn't right," or "That's not accurate"?
4  **A. Not to my knowledge.**
5  **Q.** Do you still have good relationships with people
6  at Saint Alphonsus?
7  **A. I do.**
8  **Q.** Did St. Luke's ever ask you to disclose any
9  confidential information of Saint Alphonsus?
10  **A. They did not.**
11  **Q.** And have you ever done that?
12  **A. I have not.**
13  **Q.** Would you do that if St. Luke's asked you to?
14  **A. No, I wouldn't.**
15  **Q.** In the resumé that you prepared, did I hear you
16  right, you were considering -- you weren't just looking at
17  an opportunity with St. Luke's; there were other
18  opportunities; is that right?
19  **A. I was exploring other opportunities, that's**
20  **correct.**
21  **Q.** And was one of those additional opportunities a
22  position in the -- a new position in the Saint Alphonsus
23  Health Alliance?
24  **A. Probably not at that time. They had already made**
25  **that decision to move on. So I interviewed for that**

3393

1  position before this period of time.
2  **Q.** Let me ask this: Do you recall that you provided
3  a copy of the -- your same resumé to Blaine Petersen?
4  **A. You know, I think I did, actually.**
5  **Q.** And that would have been -- you would have given
6  him the same resumé that you gave to St. Luke's?
7  **A. It would have been.**
8  **Q.** And did Mr. Petersen ever look at the resumé and
9  say, "Greg, these things you're saying about Saint Al's
10  payor contracting or the success we've had, those are just
11  wrong"?
12  **A. He never did.**
13  MR. STEIN: I don't have any further questions,
14  Your Honor.
15  THE COURT: Ms. Duke.
16  MS. DUKE: Nothing further, Your Honor. Thank
17  you.
18  Thank you, Mr. Sonnenberg.
19  THE COURT: Counsel, this exhibit that was on the
20  screen, the -- has that previously --
21  MS. DUKE: No, Your Honor. We objected and you
22  sustained yesterday.
23  THE COURT: All right.
24  MR. STEIN: They sustained it. Your Honor, I
25  would, however, like to make a representation -- and if we

3394

1  need to make a proffer -- that this was actually produced --
2  I'm sorry -- not this exhibit, but the document that was
3  shown to Mr. Sonnenberg, his email to St. Luke's, was
4  actually produced months in advance of his deposition. And
5  I'm not sure what the right -- what the proper way to have
6  that be on the record is.
7  THE COURT: We're referring to Exhibit 2064?
8  MR. STEIN: No. I think it was Exhibit 1617, the
9  exhibit that was shown, the email.
10  THE COURT: Oh, the email.
11  MR. STEIN: Yes.
12  THE COURT: Well, I'm not sure what -- I mean,
13  it's admitted. So I don't know -- what is it you want the
14  record --
15  MR. STEIN: Simply the fact that it was produced.
16  To the extent there was a suggestion that there was
17  something being hidden from Saint Al's, this very document
18  was produced months in advance of Mr. Sonnenberg's
19  deposition.
20  THE COURT: Ms. Duke, do you have any reason to
21  doubt that?
22  MS. DUKE: I don't have any reason to question
23  that one way or the other.
24  THE COURT: All right. Well, I guess the
25  statement is made for the record, and we will proceed from

3395

1  there.
2  Mr. Sonnenberg, you may step down. Thank you.
3  Counsel, we will start Monday morning at 8:30, go
4  beyond 2:30 if need be, but it would be nice if we could be
5  done fairly close to that time frame.
6  Also, I suspect Monday morning we'll have the
7  plaintiffs formally rest, and the defense can make their
8  motion for the record under Rule 52.
9  Mr. Wilson or Ms. Duke, was there something else?
10  MS. DUKE: I think both of us have something, but
11  I beat him to it.
12  I know that Mr. Su talked to Mr. Metcalf with respect
13  to exhibits that have still not been agreed to, and there
14  are still negotiations occurring on both sides related to
15  objected-to exhibits. And it's our understanding from
16  Mr. Metcalf that we are to submit those at the time of the
17  findings of fact. Is that fair?
18  THE COURT: Well, to the extent there is
19  agreement. Where there is not agreement, I'll rule based
20  upon the record that's been developed up to that point in
21  time.
22  MS. DUKE: Sure.
23  THE COURT: Obviously, I need to see what the
24  objection is and look at the record, but we will incorporate
25  into our proposed -- our final findings and conclusions any

3396

1  rulings that need to be made part of the record on any --
2  any exhibits that were moved into admission and the court
3  had not had the opportunity to rule.
4          MS. DUKE: Right. We just want to make sure when
5  we do, in fact, rest, that's obviously an open issue --
6          THE COURT: Yes.
7          MS. DUKE: -- that would need to be addressed at a
8  later time.
9          THE COURT: Correct.
10         Mr. Wilson.
11         MR. WILSON: Thank you, Your Honor. If I may just
12  take a moment just for the record to renew our objection.
13  One thing I did not do -- and at this point I will do --
14  with respect, is to move to strike any of the evidence that
15  the defendants have presented with regard to the financial
16  condition of Saltzer to the extent that that evidence
17  improperly cloaks a failing or flailing firm defense as a
18  remedy argument or somehow argues that unwinding Saltzer
19  will be unduly costly or burdensome. And we would move to
20  strike any such evidence in the testimony of Mr. Savage,
21  Ms. Ahern, Dr. Patterson, or Dr. Kunz, Your Honor.
22         THE COURT: All right. In the court's prior
23  ruling, we -- we filed a written decision setting forth the
24  areas in which that economic circumstances of Saltzer and
25  the details of the acquisition would still be relevant to

3397

1  the court's decision on other issues. But it won't be
2  considered in any way as part of either an argument
3  concerning the remedy in this matter based upon some
4  suggestion that the unwinding would be based upon events
5  that occurred since the date of the court's prior decision
6  that would in any way give the court a reason to not order a
7  full and unlimited unwinding of the acquisition agreement.
8  And, likewise, that the court would not consider any
9  evidence to the extent that it might be proffered as part of
10  some type of a failing defense -- excuse me -- failing firm
11  defense, since that's been essentially waived by St. Luke's
12  in this matter.
13         But the objection will be overruled based upon the
14  court's prior ruling. All right. But limited in the
15  fashion I have described. So it's absolutely clear that I
16  am not allowing it in for either of the two purposes that
17  Mr. Wilson has stated a concern about.
18         Counsel, is there anything else we need to take up now
19  before we recess for the weekend? All right. We will
20  start, then, at 8:30 Monday morning, hopefully finish by
21  2:30. If not, we will go just a little bit long if need be.
22  We'll be in recess.
23         (Court recessed at 2:54 p.m.)
24
25

1          R E P O R T E R ' S   C E R T I F I C A T E
2
3
4
5          I, Tamara I. Hohenleitner, Official
6  Court Reporter, County of Ada, State of Idaho,
7  hereby certify:
8          That I am the reporter who transcribed
9  the proceedings had in the above-entitled action
10  in machine shorthand and thereafter the same was
11  reduced into typewriting under my direct
12  supervision; and
13         That the foregoing transcript contains a
14  full, true, and accurate record of the proceedings
15  had in the above and foregoing cause, which was
16  heard at Boise, Idaho.
17         IN WITNESS WHEREOF, I have hereunto set
18  my hand October 31, 2013.
19
20
21
22  _____-s-_____
    Tamara I. Hohenleitner
23  Official Court Reporter
    CSR No. 619
24
25