<u>TESTIMONY OF RANDALL BILLINGS</u>
**Received September 26-27, 2013**
**In the United States Federal District Court for the District of Idaho**
*Saint Alphonsus Medical Center-Nampa, Inc., et al. v. St. Luke's Health System Ltd., et al.*
**Case No. 1:12-cv-00560-BLW**

**Page Range:     8:5-8:10**

8: 5    So, in any event, could you state your full name
8: 6    for the record, please.
8: 7    A.  Randall Martel Billings.
8: 8    Q.  And Mr. Billings, what's your occupation?
8: 9    A.  I am the vice president of payor and provider
8:10    relations for St. Luke's Health System.


**Page Range:     8:16-8:17**

8:16    Q.  And how long have you held that position?
8:17    A.  Since January 24th of 2011.


**Page Range:     9:4-10:7**

9: 4    Q.  Thanks.  Could you briefly run through your
9: 5    educational and occupational history, just positions,
9: 6    years, roughly?
9: 7    A.  Master's degree -- MBA Master's degree, finance
9: 8    emphasis at University of Illinois, Chicago.  In the
9: 9    healthcare industry since 1992 in Chicago, MacNeal Health
9:10    Providers, an IPA.  Did claims processing for them.
9:11    '94, '95, University of Chicago hospital health
9:12    system, marketing and planning for a year.  And then the
9:13    remainder of my time in Chicago through 2011, when I came
9:14    here, was with Advocate Healthcare as a payor contracting
9:15    area.  I was vice president of payor contracting there.
9:16    Q.  Did you have different positions over time at
9:17    Advocate?
9:18    A.  Yeah, I was an analyst.  I started off as an
9:19    analyst.  Director of contracting, director of a physician
9:20    hospital organizations, a few of their physician hospital
9:21    organizations, Ravenswood Hospital, Good Samaritan
9:22    Hospital.
9:23    And then vice president -- director and vice
9:24    president of managed care contracting for Advocate.
9:25    Q.  Okay.  Who do you report to at St. Luke's?
10: Page 10
10: 1    A.  Jeff Taylor, CFO.

10: 2   Q.  And who reports to you?
10: 3   A.  Currently, Steve Drake, who is the director of
10: 4   contracting.  Linda House, who's the director of employee
10: 5   relations.  And Janice Fulkerson, who is the director of
10: 6   the PHO, Select physician hospital organization.  Select
10: 7   Medical Network I guess is the official name.


**Page Range:     11:3-11:22**

11: 6   Q.  I've handed you what's been marked as
11: 7   Exhibit 271, which is a document dated January 24, 2011 to
11: 8   St. Luke's Health System Leadership and Management from
11: 9   Jeff Taylor, Bates Numbered 1157694.
11:10   And why don't you take a look at that and see if
11:11   you can identify that.  And then maybe that will shed some
11:12   light on 270.  Maybe not.
11:13   A.  So, this one, 271, looks like the memo that
11:14   Jeff Taylor sent out on January 24th announcing my
11:15   arrival.  This must be my current kind of description of
11:16   my duties that we send to folks that -- if I'm going to a
11:17   conference.  It looks like that's what 270 is.
11:18   Q.  Okay.  So, did you draft 270, do you believe?
11:19   A.  I think my secretary drafted this with my input,
11:20   yes.
11:21   Q.  And did you review it before it was used?
11:22   A.  Sure.


**Page Range:     13:3-14:21**

13: 3   Q.  Okay.  Let's go to the next paragraph, the third
13: 4   paragraph, which describes your roles at Advocate Health;
13: 5   is that right?
13: 6   A.  Yes.
13: 7   Q.  The second sentence says, among other things,
13: 8   that you "served a critical role interfacing with the
13: 9   3,800 physicians," and I'm skipping a few words, with
13:10   Advocate Physician Partners."
13:11   Do you see that?
13:12   A.  Yes.
13:13   Q.  What is Advocate Physician Partners?
13:14   A.  Advocate Physician Partners is an organization
13:15   made up of physicians in the Chicago market and hospitals
13:16   of Advocate Healthcare.
13:17   Q.  So, is it a physician hospital organization?
13:18   A.  It's a -- yes, it's a super PHO is what I would
13:19   call it, super physician hospital organization.  It's made

13:20    up of, at that time, nine PHOs.  It might have 10 or 11
13:21    now.  There's a physician hospital organization with each
13:22    of its hospitals.
13:23    Q.  Okay.
13:24    A.  All those comprise Advocate Physician Partners.
13:25    Q.  Okay.  And did Advocate Physician Partners
14: Page 14
14: 1    contract with healthcare plans?
14: 2    A.  Yes.
14: 3    Q.  The reference to 3,800 physicians, can you tell
14: 4    me roughly how many of those were independent versus the
14: 5    number who were either employed or under a PSA with an
14: 6    Advocate hospital?
14: 7    A.  Roughly, a quarter of those were employed.
14: 8    Q.  Okay.  The rest were independent?
14: 9    A.  Correct.
14:10    Q.  Okay.  The next sentence refers to "Advocate's
14:11    innovative Clinical Integration contracting structure."
14:12    Do you see that?
14:13    A.  Yes.
14:14    Q.  What was -- could you describe generally what
14:15    Advocate's innovative Clinical Integration contracting
14:16    structure was?
14:17    A.  Advocate negotiated contracts for each of those
14:18    -- or including each of those 3,800 physicians on the
14:19    basis of their clinical integration program.
14:20    Q.  Okay.  And were those contracts risk based?
14:21    A.  Yes, some of them.


**Page Range:       15:4-16:1**

15: 4    Number one:  Was Advocate successful in
15: 5    negotiating risk-based contracts on behalf of those 3,800
15: 6    physicians?
15: 7    A.  Yes.
15: 8    Q.  And number two:  Was Advocate successful in
15: 9    negotiating clinically integrated contracts on behalf of
15:10    those 3,800 physicians?
15:11    A.  Yes.
15:12    Q.  And what was innovative about the structure of
15:13    what Advocate did?
15:14    That's your word here, innovative.
15:15    A.  What was innovative?
15:16    I'm not sure what you mean.
15:17    Q.  Well, you see you used the word innovative in
15:18    that document?
15:19    A.  Yeah.

15:20   Q.  I'm just asking you what you meant by that word.
15:21   A.  Advocate had a clinical structure that included
15:22   clinical integration metrics that were measured across all
15:23   physicians, independent or -- and/or employed.
15:24   It included measurements for hospitals.  It tied
15:25   all those together and coordinated the care across the
16: Page 16
16: 1   contracts that they negotiated.


**Page Range:      16:2-16:13**

16: 2   Q.  Okay.  Give me an example of one of those
16: 3   clinical integration metrics.
16: 4   A.  Do you have an email address?
16: 5   Q.  Okay.  Can you give me an example of one that
16: 6   relates to medical care a little more specifically?
16: 7   A.  The email address actually did relate to medical
16: 8   care.
16: 9   Q.  Well, I'm sure they all did in some degree.
16:10   But the one that addresses clinical practices.
16:11   Put it that way.
16:12   A.  We communicated our clinical practices to the
16:13   physicians via email.


**Page Range:      17:3-17:18**

17: 3   Q.  Okay.  And were doctors -- did doctors have,
17: 4   including independent doctors, have financial incentives
17: 5   to meet or exceed certain clinical integration metrics?
17: 6   A.  Yes.
17: 7   Q.  Well, could you describe generally the nature of
17: 8   those financial incentives that the independent doctors
17: 9   had?
17:10   A.  There was a scorecard that scored each physician
17:11   based on clinical innovation metrics.  And then there were
17:12   incentives that were paid out based upon their score
17:13   compared to their peers.
17:14   Q.  Okay.
17:15   A.  And external peers as well.
17:16   Q.  And those payouts were to both independent and
17:17   employed physicians?
17:18   A.  Yes.

**Page Range:      18:1-18:9**

18: 1    Q.  In your judgment as -- in your role as vice
18: 2    president at Advocate, is it the case that those metrics
18: 3    worked to encourage physicians to improve their clinical
18: 4    performance in connection with those metrics?
18: 5    A.  They helped.  I don't know what you mean by
18: 6    worked.
18: 7    Q.  Okay.  They helped in the sense that the doctors
18: 8    got better, performed better?
18: 9    A.  I'm not sure of the actual outcomes.


**Page Range:      18:10-18:11**

18:10    But any time you incentivize a physician to do
18:11    something, it will probably help them pay attention to it.


**Page Range:      24:20-25:2**

24:21    Q.  Mr. Billings, you've been shown what's been
24:22    marked as Exhibit 274, which appears to be a piece you
24:23    wrote for Dr. Pate's blog on the St. Luke's website.
24:24    Is that what it is?
24:25    A.  Yes.
25: Page 25
25: 1    Q.  And let me ask you about a few comments in your


**Page Range:      25:8-26:3**

25: 8    A.  There's comments attached here that isn't part of
25: 9    my -- what I posted.
25:10    Q.  Right.  So, what you posted ends about a third of
25:11    the way down the second page; is that right?
25:12    A.  Yeah.  Where it ends "Triple Aim can be based."
25:13    That sentence a third of the way down.
25:14    Q.  Yeah.  Okay.  So, let me ask you about a couple
25:15    of your comments, if you're ready.
25:16    Going back to the first page, I'm going to ask
25:17    you about the last three paragraphs.  The third paragraph
25:18    from the end there says, among other things, "St. Luke's
25:19    has defined clinical integration as 'healthcare providers
25:20    in separate legal entities working together in an
25:21    interdependent and mutually accountable fashion.'"  It
25:22    goes on to provide some details.
25:23    Is that, in fact, a definition that St. Luke's

25:24   has adopted?
25:25   A.  Yeah.  I'm pretty sure that's the definition that
26: Page 26
26: 1   was approved at a physician leadership group.
26: 2   Q.  Okay.
26: 3   A.  By the physician leadership group.


**Page Range:     28:2-28:7**


28: 2   Q.  Why don't you go to the second page.  And the
28: 3   first sentence there says "Clinical integration with
28: 4   independent providers is clearly the essential building
28: 5   block of accountable care."
28: 6   Do you still believe that today?
28: 7   A.  It is essential -- it is an essential part of it.


**Page Range:     28:9-28:16**


28:9    (Whereupon, Exhibit Number 1213 was marked for
28:10   identification.)
28:11   BY MR. ETTINGER:
28:12   Q.  Showing you what's been marked as Exhibit 275,
28:13   which is a document entitled St. Luke's Health System
28:14   Network Scope & Key Priorities Select PHO Board
28:15   Presentation May 11, 2011.  And I can represent to you
28:16   this was in your file.


**Page Range:     29:11-29:21**


29:11   Q.  Okay.  Is this a document that you wrote?
29:12   A.  It looks like it was one that I put together with
29:13   Geoff Swanson, I'm guessing.  But...
29:14   Q.  And for what purpose?
29:15   A.  For a Select PHO board presentation.
29:16   Q.  Okay.  What is your role with regard --
29:17   A.  I'm not sure if this is a final version, by the
29:18   way.  I don't -- it doesn't -- the pages after 27, I'm not
29:19   sure if they're -- I'm not sure if this is the actual one
29:20   that was -- the pages look a little bare, some of them.
29:21   So, I'm not sure.


**Page Range:     30:5-33:19**


30: 5   Q.  What is your role with regard to Select PHO?

30: 6   In terms of your job, how do you interact with
30: 7   them as part of your duties?
30: 8   A.  The PHO director, Janice Fulkerson, reports to
30: 9   me.
30:10   Q.  Okay.  And do you regularly attend PHO -- Select
30:11   PHO meetings?
30:12   A.  I attend the finance committee meetings and the
30:13   PHO board meetings, the Select PHO board meetings.
30:14   Q.  Okay.
30:15   A.  I guess not finance committee.  It's called the
30:16   contracting committee to be specific.
30:17   Q.  Okay.  Why don't you turn to Slide 14.  Slide 14
30:18   talks about Joint Contracting.
30:19   Do you see that?
30:20   A.  Yes.
30:21   Q.  What is Joint Contracting in this context?
30:22   A.  Contracting for independent and employed
30:23   physicians for all the providers in the Select Medical
30:24   Network.
30:25   Q.  Okay.  The second paragraph under the heading or
31: Page 31
31: 1   under the bullet says "Joint Contracting is Fundamental to
31: 2   Aligning the Essential Requirements of Clinically
31: 3   Integrated Care.
31: 4   Do you see that?
31: 5   A.  Yes.
31: 6   Q.  Do you believe that to be true?
31: 7   A.  Yes.
31: 8   Q.  Does joint contracting provide common financial
31: 9   incentives for the independent and employed providers?
31:10   A.  Say that again.
31:11   Q.  Does joint contracting act to provide common
31:12   financial incentives for independent and employed
31:13   providers?
31:14   A.  It can.
31:15   Q.  Yeah.  Is that one of the purposes of joint
31:16   contracting?
31:17   A.  It aligns the incentives.
31:18   Q.  Okay.
31:19   A.  Financial and clinical.
31:20   Q.  Okay.  Why don't you go to Slide 16.
31:21   A.  Excuse me, 16?
31:22   Q.  Yeah.  And you see 16 refers to
31:23   Performance-Based Reimbursement; do you see that?
31:24   A.  Yes.
31:25   Q.  And then underneath that, there's what appears to
32: Page 32
32: 1   be maybe a terse definition of

7

32: 2    performance-based reimbursement.  It says

32: 3    "incentives/penalties for outcomes & processes, pooled

32: 4    resources, & even risk."

32: 5    Is that intended to define

32: 6    performance-based reimbursement or give examples of it or

32: 7    what is that sentence intended to do?

32: 8    I'm a little bit unclear.

32: 9    A.  Yeah.  It was to give some examples of

32:10    performance-based reimbursement.

32:11    Q.  Okay.  And this would be

32:12    performance-based reimbursement for independent as well as

32:13    employed or PSA physicians?

32:14    A.  Yes.

32:15    Q.  Okay.  And by "outcomes & processes," can you

32:16    give me an example of what you mean?

32:17    A.  Clinical integration metrics and how the

32:18    providers are performing against those.

32:19    Q.  Okay.  And since we're outside of Advocate, let

32:20    me ask you a similar question to what I asked you there.

32:21    So, with your St. Luke's hat on, can you give me

32:22    an example of a clinical integration metric that one might

32:23    apply in the context of performance-based reimbursement?

32:24    A.  Did you perform a hemoglobin A1C on a diabetic

32:25    patient?

33: Page 33

33: 1    Q.  Okay.  And so, physicians might be financially

33: 2    incentivized to meet that metric, is that right; is that

33: 3    how this might work?

33: 4    A.  They might be scored based upon their performance

33: 5    to that and other metrics.

33: 6    Q.  Yeah.  And receive some kind of financial reward

33: 7    or penalty, depending upon their score?

33: 8    A.  They could.

33: 9    Q.  Yeah.  And that would be true of independent as

33:10    well as employed or PSA physicians?

33:11    A.  Sure.

33:12    Q.  Okay.  The second paragraph there says

33:13    "Incentives Could Include Financial Carrots or Sticks,

33:14    Affect Membership Status, Require Provider Communication,

33:15    and Promote Peer Influence at Both Individual and Group

33:16    Levels."

33:17    Is that a true statement do you believe as the

33:18    kinds of things that incentives could do?

33:19    A.  Sure.  Incentives could include all those.

**Page Range:      39:1-39:19**

39: 1    Q.  Mr. Billings, you've been handed what's been
39: 2    marked as Exhibit 279, which is some emails.  The top
39: 3    email is from you to Hank Clark, attaching some other
39: 4    emails in which you're involved.
39: 5    Why don't you take a look at these and I'll ask
39: 6    you about them.
39: 7    A.  Okay.
39: 8    Q.  So, is Exhibit 279, in fact, some emails
39: 9    exchanged between you and Mr. Clark attaching another
39:10     email that he sent to others?
39:11    A.  Yes.
39:12    Q.  Who is Hank Clark?
39:13    A.  Hank Clark is an analyst in our finance
39:14    department.
39:15    Q.  And what are his responsibilities generally?
39:16    A.  I'm not sure what all of them are.  He handles
39:17    the price increases the hospital charges.
39:18    Q.  Okay.
39:19    A.  Does a lot of analytical work for finance.


**Page Range:      39:23-40:5**

39:23    Q.  Okay.  So, starting with the email at the bottom
39:24    of the page, which was not addressed to you but then
39:25     became part of the chain that made its way to you,
40: Page 40
40: 1    Mr. Clark says, among other things quote -- on the first
40: 2    page, "I have outlined the projected price increases based
40: 3    on increases this year (inpatient 35-50 %."
40: 4    Do you see that?
40: 5    A.  Yes.


**Page Range:      40:6-40:7**

40: 6    Q.  So, did inpatient charges increase 35 to
40: 7    50 percent at the St. Luke's hospitals?


**Page Range:      40:9**

40: 9    THE WITNESS:  I'm not sure.

**Page Range:      74:20-76:10**

74:20   Q.  So, Mr. Billings, why don't you take a look at
74:21   284 and 285 and I will ask you about them as soon as
74:22   you're ready.
74:23   A.  Okay.
74:24   Q.  So, these appear to be emails from Dr. Swanson to
74:25   you, the same document sent about two weeks apart.
75: Page 75
75: 1   Am I describing them correctly?
75: 2   A.  Yes.
75: 3   Q.  Do you recall receiving this document from
75: 4   Dr. Swanson?
75: 5   A.  I don't.
75: 6   Q.  Did you prepare the attached document or not?
75: 7   A.  No.
75: 8   Q.  Do you recall any discussion with Dr. Swanson
75: 9   about the attached document?
75:10   A.  No.
75:11   Q.  Do you recall any discussion with Dr. Swanson
75:12   about an end game for St. Luke's?
75:13   A.  No.
75:14   Q.  Looking at Item 3 in the attachment, do you
75:15   recall any discussion with him about a monopoly model?
75:16   A.  No.
75:17   Q.  Do you recall any discussion with anybody about a
75:18   monopoly model?
75:19   A.  No.
75:20   Q.  So, you just have no idea -- you see that he
75:21   apparently sent this to you at least twice; right?
75:22   A.  Yeah.
75:23   Q.  And he sent it to you in March and April of 2011;
75:24   correct?
75:25   A.  Yeah.
76: Page 76
76: 1   Q.  And you have absolutely no recollection of this
76: 2   document or the subject of monopoly model or his emails;
76: 3   correct?
76: 4   A.  Correct.
76: 5   Q.  Okay.  Do you see monopoly models under
76: 6   Scenario Planning?
76: 7   A.  Yes.
76: 8   Q.  Was there ever any discussion of any possible
76: 9   plans or scenarios that involved a monopoly at St. Luke's?
76:10   A.  No, not that I know of.

**Page Range:     79:7-80:01**

79: 7    Q.  Handing you what's been marked as Exhibit 287,
79: 8    it's a document the first page of which says
79: 9    St. Luke's Key Community Services.  It's
79:10    Bates Numbered 804539 through 551.
79:11    Take a look at it and tell me when you're ready.
79:12    A.  Okay.
79:13    Q.  Do you know what Exhibit 287 is?
79:14    A.  It appears to be the presentation that St. Luke's
79:15    made to Blue Cross in our -- to begin our negotiations for
79:16    the 2013 contract year back --
79:17    Q.  Did you prepare that presentation?
79:18    A.  Yes.
79:19    Q.  Okay.  I just want to ask you about one item.
79:20    If you go to the third page of the document,
79:21    which is numbered 3 --
79:22    A.  Uh-huh.
79:23    Q.  -- you see at the bottom left there is --
79:24    actually, on the right side, there's a chart that says
79:25    Respective Business Mix?
80: Page 80
80: 1    A.  Yes.

**Page Range:     80:18-80:23**

80:18    Q.  So, does this indicate for 2012 that the
80:19    percentage of St. Luke's revenue that comes from
80:20    Blue Cross is 23 percent and the percentage of
80:21    Blue Cross's healthcare expenses that come from St. Luke's
80:22    is 35 percent?
80:23    A.  Yes.

**Page Range:     80:24-81:2**

80:24    Q.  Okay.  And does that indicate that St. Luke's is
80:25    more important to Blue Cross than Blue Cross is to
81: Page 81
81: 1    St. Luke's?
81: 2    A.  No.

**Page Range:     81:12-81:23**

81:12    Q.  Okay.  Now, to the extent that Blue Cross
81:13    represents a large portion of St. Luke's revenues, that

81:14    makes Blue Cross important to St. Luke's; correct?
81:15    A.  Correct.
81:16    Q.  And to the extent St. Luke's represents a large
81:17    percentage of the services that Blue Cross patients
81:18    demand, that means St. Luke's is important to Blue Cross;
81:19    correct?
81:20    A.  Correct.
81:21    Q.  And the comparison here indicates that St. Luke's
81:22    is a larger -- is a significantly larger portion of
81:23    Blue Cross than Blue Cross is of St. Luke's; correct?


**Page Range:      82:1-82:11**

82: 1    Q.  Just by arithmetic?
82: 2    A.  Based on the percentage.
82: 3    Q.  Yeah.
82: 4    A.  This is percentages, not dollars.
82: 5    Q.  Right.  And that's part of what you were trying
82: 6    to convey to Blue Cross; correct?
82: 7    A.  No.  I'm just conveying that this is our -- this
82: 8    is what our current business is.
82: 9    Q.  And you weren't trying to send any message
82:10     whatsoever with this chart; is that right?
82:11    A.  Correct.


**Page Range:      88:21-88:25**

88:21    Q.  In the negotiations that led up to the most
88:22    recent Blue Cross contract, did Blue Cross end up agreeing
88:23    to increase physician rates to St. Luke's and therefore to
88:24    increase its statewide physician fee schedule?
88:25    A.  No, it didn't happen that way.


**Page Range:      89:1-89:18**

89: 1    Q.  Which way did it happen?
89: 2    A.  They were going to increase their statewide fee
89: 3    schedule.  So, they said:  You'll get that same increase.
89: 4    Q.  It's your belief that they did exactly what they
89: 5    would have done without regard to your demands?
89: 6    A.  We put in the contract exactly what they were
89: 7    going to do.  That's what Jeff Crouch and I determined to
89: 8    do.
89: 9    Jeff Crouch said:  We'll put in what we're going
89:10     to do and no more.  That's what he said.

89:11   Q.  Okay.  You'd asked him for an increase?
89:12   A.  We did.
89:13   Q.  It's your view that your request for an increase
89:14   had no influence on his decision?
89:15   A.  Correct.
89:16   Q.  Okay.
89:17   A.  In fact, he said:  We're not negotiating
89:18   physician rates in this deal.


**Page Range:      89:19-90:1**

89:19   Q.  Okay.  Now, did you take the position with
89:20   Mr. Crouch in these negotiations that there would be no
89:21   deal unless you could reach agreement on payments to
89:22   hospitals as well as payments to physicians?
89:23   A.  We were negotiating them together, yes.
89:24   Q.  Yeah.  Okay.  And that included all of St. Luke's
89:25   hospitals?
90: Page 90
90: 1    A.  Correct.


**Page Range:      91:23-92:13**

91:23   Q.  And are you limiting those increases to
91:24   ten percent?
91:25   A.  We don't have to limit the increase to
92: Page 92
92: 1    ten percent.  We had to limit the impact on Blue Cross to
92: 2    ten percent.
92: 3    Q.  When you say "limit the impact on Blue Cross to
92: 4    ten percent," can you explain the arithmetic that you've
92: 5    got in mind with that statement?
92: 6    A.  Well, it's not what I have in mind.  It's what is
92: 7    actually in the contract, which says if Blue Cross is
92: 8    impact -- if including an additional facility in the terms
92: 9    of this contract could be reasonably expected to increase
92:10   or decrease the anticipated annual reimbursement
92:11   Blue Cross would have paid to that specific facility by
92:12   more than ten percent, then the additional facility may
92:13   only be added to this contract through written amendment.


**Page Range:      93:12-94:13**

93:12   (Whereupon, Exhibit Number 290 was marked for
93:13   identification.)

93:14    THE WITNESS:  Okay.
93:15    BY MR. ETTINGER:
93:16    Q.  Do you recall receiving this letter from
93:17    Todd York that's Exhibit 290?
93:18    A.  Yes.
93:19    Q.  And in his last paragraph of his letter, he says
93:20    "Until an equitable resolution is reached to address this
93:21    change of ownership, BCI expects no change in billing
93:22    patterns for ancillary services provided by Saltzer.  I
93:23    would like to add this topic as an agenda item to be
93:24    discussed in our upcoming meeting."
93:25    Was there a discussion of this topic in an
94: Page 94
94: 1    upcoming meeting with Blue Cross?
94: 2    A.  Probably.
94: 3    Q.  Do you recall anything about such a discussion?
94: 4    A.  I recall talking to them about Saltzer, sure.
94: 5    Q.  And what do you remember about that discussion?
94: 6    A.  We acknowledged that there's this clause in the
94: 7    contract.
94: 8    Q.  Did you respond to their expectation that there
94: 9    be no change in billing patterns for ancillary services?
94:10    A.  The clause doesn't say that there will be no
94:11    change in billing patterns.  The contract says that it
94:12    wouldn't exceed ten percent.  So, we didn't have to
94:13    address that.


**Page Range:      95:4-95:6**

95: 4    Q.  Have you heard anything more from Blue Cross on
95: 5    this issue?
95: 6    A.  No.


**Page Range:      95:7-96:2**

95: 7    Q.  Okay.  Do you know what percentage of the
95: 8    billings of a practice like Saltzer could be represented
95: 9    by ancillary services?
95:10    A.  Huh-uh, no idea.
95:11    Q.  So, something less than 100 percent, certainly;
95:12    right?
95:13    A.  Certainly.
95:14    Q.  Yeah.  And the ten percent figure as you're
95:15    interpreting it applies to overall reimbursement to
95:16    Saltzer; correct?
95:17    A.  Ten percent what?

95:18    Say that again.
95:19    Q.  The ten percent figure in the Blue Cross contract
95:20    that we've been discussing is a ten percent of total
95:21    reimbursement to Blue Cross regarding Saltzer, not just
95:22    ancillary services; correct?
95:23    A.  Correct.
95:24    Q.  So, it's possible that you could have a 20, 30,
95:25    40 percent increase in ancillary services and still not
96: Page 96
96: 1    trigger that ten percent clause; correct?
96: 2    A.  That's possible.


**Page Range:     96:4-96:9**

96: 4    THE WITNESS:  Correct.  That's possible.
96: 5    BY MR. ETTINGER:
96: 6    Q.  Okay.  To your knowledge, was there any
96: 7    calculation of the percentage increase in ancillary
96: 8    services that occurred?
96: 9    A.  Not that I know of.


**Page Range:     96:16-97:11**

96:16    Q.  So, is 291 a series of emails involving you,
96:17    Bill Savage, David Orchard, Steve Drake?
96:18    A.  Yes.
96:19    Q.  And the subject is "ACN - Saltzer participation"?
96:20    A.  Correct.
96:21    Q.  And Mr. Savage says in the first email
96:22    chronologically:  We are hearing rumors that Saltzer is no
96:23    longer in the ACN network; correct?
96:24    A.  Correct.
96:25    Q.  And you said in response quote -- among other
97: Page 97
97: 1    things, "I doubt that Saint Al's would cripple their own
97: 2    network like that"?
97: 3    A.  Correct.
97: 4    Q.  And why did you think that if Saint Al's kicked
97: 5    out Saltzer from ACN that it would "cripple their own
97: 6    network"?
97: 7    A.  Because Saint Al's employees are seeing Saltzer
97: 8    docs.  And so, if they kick Saltzer out of their network,
97: 9    they're going to have a revolt on their hands from
97:10    employees saying we -- That's our doc.  Why can't we see
97:11    them anymore?

**Page Range:      97:16-100:2**

97:16    Q.  We've handed you what's been marked as
97:17    Exhibit 292, which is an email from you to, I believe,
97:18    Dr. Pate and a response from Chris Roth.
97:19    So, take a look at that.
97:20    A.  Okay.
97:21    Q.  Did I describe 292 accurately?
97:22    A.  Yes.
97:23    (Whereupon, Mr. Withroe rejoined the
97:24    proceedings.)
97:25    BY MR. ETTINGER:
98: Page 98
98: 1    Q.  I want to ask you about your email to Dr. Pate.
98: 2    This is October 25 of 2012; is that right?
98: 3    A.  Yes.
98: 4    Q.  The paragraph -- I want to ask you about the
98: 5    bottom paragraph on the first page.
98: 6    You're talking here about an entity called
98: 7    First Choice Health; is that right?
98: 8    A.  First Choice Health, yes.
98: 9    Q.  What is First Choice Health?
98:10    A.  They are a provider network.
98:11    Q.  Okay.  And the discussion is what to do about
98:12    First Choice Health's contract with Saltzer; is that
98:13    right?
98:14    A.  In that paragraph, correct.
98:15    Q.  Yeah.  Do you know what happened to First Choice
98:16    Health's contract with Saltzer?
98:17    A.  I believe it was just assigned over, yes, to
98:18    St. Luke's.
98:19    Q.  And you say, in that third paragraph at the end,
98:20    "I wouldn't recommend that an FCH relationship should
98:21    expand."
98:22    What was the expansion that was being considered?
98:23    A.  Well, First Choice was asking, in the first
98:24    paragraph, if they could have a discussion with all of the
98:25    St. Luke's Health System --
99: Page 99
99: 1    Q.  Okay.
99: 2    A.  -- which didn't have a contract with them at the
99: 3    time.
99: 4    Q.  And what response was given to First Choice
99: 5    Health to that request?
99: 6    A.  That we weren't interested in expanding the
99: 7    relationship.
99: 8    Q.  You were not interested?

99: 9   A.  Right.
99:10   Q.  Okay.  So, let's go back to the third paragraph.
99:11   You say:  "While we do recognize FCH's current contracts
99:12   with Saltzer providers and will most likely respect those
99:13   within the larger Saltzer transaction, even those
99:14   relationships' clients/volumes should be reviewed and put
99:15   into the exit queue just like we are contemplating with
99:16   Wise, ACN and even IPN eventually."
99:17   Did I read that correctly?
99:18   A.  Yes.
99:19   Q.  And what do you mean by "the exit queue"?
99:20   Do you mean that those were in line to be ended
99:21   at some point in the future?
99:22   A.  Yes.  We had discussions to end those
99:23   relationships, yes.
99:24   Q.  Okay.  And Wise is the Wise Network that Imagine
99:25   has put together for Micron?
100: Page 100
100: 1   A.  Correct.  St. Luke's did not have a relationship
100: 2   with Wise.


**Page Range:       102:5-102:8**

102: 5   Q.  You've been handed what's been marked
102: 6   Exhibit 293, I think, some emails involving a number of
102: 7   people, including Jeff Taylor, Gary Fletcher and yourself
102: 8   from April of 2011.


**Page Range:       102:12-103:2**

102:12   Q.  Okay.  So, is this, in fact, a series of emails
102:13   including one from you to Jeff Taylor, Steve Drake, cc:
102:14   Greg Fletcher, on April 20, 2011?
102:15   A.  Yes.
102:16   Q.  And your email discusses, in part, your
102:17   understanding of what happened with Micron before you came
102:18   to St. Luke's; correct?
102:19   A.  Correct.
102:20   Q.  And you then said "So Saint Al's brought the
102:21   business with a lower reimbursement, which we should
102:22   definitely avoid if we're again thinking about talking
102:23   with Micron."
102:24   Do you see that?
102:25   A.  Yes.
103: Page 103
103: 1   Q.  And did anybody at St. Luke's disagree with that

103: 2    view of yours?

**Page Range:       103:4**

103: 4    THE WITNESS:  I don't know.

**Page Range:       103:6-103:8**

103: 6    Q.  Did anybody communicate disagreement with it to
103: 7    you?
103: 8    A.  No.

**Page Range:       103:9-103:19**

103: 9    Q.  Okay.  Is that still your view today in terms of
103:10    dealings with Micron?
103:11    A.  What do you mean dealings with Micron?
103:12    Q.  Is it still -- you've been talking to Micron off
103:13    and on?
103:14    A.  Yes.
103:15    Q.  Between 2011 and 2013; have you not?
103:16    A.  Correct.
103:17    Q.  Indeed, you mentioned earlier you've had a
103:18    discussion with Mr. Otte this year?
103:19    A.  Pat and I have regular discussions, yes.

**Page Range:       104:3-104:17**

104: 3    Q.  Sure.  You see you say "So St. Al's bought the
104: 4    business with a lower reimbursement, which we should
104: 5    definitely avoid."
104: 6    Do you see that?
104: 7    A.  Yes.
104: 8    Q.  Has that consistently been your view through
104: 9    today?
104:10    A.  It's my assumption of what happened in 2010, yes.
104:11    Q.  And your view as to what you should be doing --
104:12    and in 2011, you said that was your view as to what you
104:13    should not be doing.
104:14    And is that still today your view today about
104:15    what you should not be doing?
104:16    A.  Yes.  We should not get into a bidding war the
104:17    Saint Al's, yes.

**Page Range:      104:18-105:      1**

104:18   Q.  Okay.  Has anyone at St. Luke's communicated a
104:19   different opinion to you on this subject at any time
104:20   through today?
104:21   A.  I'm not sure everyone -- I'm not sure everyone
104:22   else feels we shouldn't go as low as I think we should go.
104:23   So, I think there are other opinions as to how -- what our
104:24   discount level needs to be or what's the lowest level of
104:25   offer that we would give to Micron.  I think there are
105: Page 105
105: 1   differing levels of opinion there.


**Page Range:      105:9-106:16**

105: 9
105:10
105:11   **REDACTED**
105:12
105:13
105:14
105:15   Q.  Okay.  When did you make that offer?
105:16   A.  Probably Fall of last year.
105:17   Q.  Okay.  And what --
105:18   A.  Spring or Fall.
105:19   Q.  And what response did you get from Micron?
105:20   A.  They said "No thanks."
105:21   Q.  Okay.  Have you ever made a specific risk
105:22   proposal to Micron?
105:23   And by specific, I mean, you know, the kind of
105:24   proposal you -- well, let me start that over.
105:25   Have you ever made a specific risk proposal to
106: Page 106
106: 1   Micron that involves numbers?
106: 2   A.  What do you mean by numbers?
106: 3   Q.  I mean, a proposal based on reimbursement based
106: 4   on per member per month costs or some other quantitative
106: 5   proposal that involves risk.
106: 6   A.  We've talked about that.  But we've never talked
106: 7   about specific numbers, what those numbers would be.
106: 8   Q.  Okay.  What's the most specific thing you've said
106: 9   to Micron in terms of a risk proposal?
106:10   A.  That St. Luke's would consider offering a
106:11   guaranteed per member per month, investigating what that
106:12   might look like.
106:13   Q.  Okay.  You said that without saying anything

106:14   about what that guaranteed number would be; correct?
106:15   A.  Yeah.  We don't have any data that would say
106:16   exactly what that is.  So, we haven't said any number, no.


**Page Range:      111:15-111:21**

111:15   Q.  Okay.  Other than Micron, are you aware of any
111:16   employers in the Treasure Valley who have indicated that
111:17   they want to set up an arrangement involving bidding with
111:18   deep discounts in exchange for steering patients, even if
111:19   that meant excluding St. Luke's providers from their
111:20   network?
111:21   A.  I'm not aware of anything like that.


**Page Range:      111:23-112:19**

111:23   (Whereupon, Exhibit Number 296 was marked for
111:24   Identification.)
111:25   BY MR. ETTINGER:
Page 112
112: 1   Q.  You've been shown 296, an email from you to
112: 2   Dr. Pate, February 15, 2012, cc:  Jeff Taylor, subject:
112: 3   Micron possibilities.
112: 4   Take a look at that and I'll ask you about it.
112: 5   A.  Okay.
112: 6   Q.  Is this indeed an email you sent to Dr. Pate
112: 7   about your meeting with Pat Otte of Micron?
112: 8   A.  Yes.
112: 9   Q.  In the second paragraph, you say, among other
112:10   things, "not that we want to go back into that game of
112:11   discount wars with Saint Al's in any form or fashion."
112:12   Do you see that?
112:13   A.  Yes.
112:14   Q.  Did either Dr. Pate or Mr. Taylor express any
112:15   disagreement with that view of yours?
112:16   A.  I don't know.
112:17   Q.  Did they communicate any such disagreement to
112:18   you?
112:19   A.  Not that I remember, no.


**Page Range:      114:9-114:18**

114: 9   Q.  So, starting over on that, you've now been shown
114:10   what's been remarked as 297, I hope, Mr. Billings, which a
114:11   series of emails Bates Numbered 93447 through -- 4477
114:12   through 4479.

114:13    Is that what you've got?
114:14    A.  Yes.
114:15    Q.  And is this, in fact, a series of emails in the
114:16    -- covering a period actually from February to June of
114:17    2012 regarding Micron?
114:18    A.  Yes.


**Page Range:      117:9-118:6**

117: 9    Q.  Okay.  So, is this, again, a series of emails
117:10    from 2012 on Micron, Exhibit 298?
117:11    A.  Yes.
117:12    Q.  And the top email is from you to Dr. Pate and
117:13    Gary Fletcher, cc:  Jeff Taylor, John Kee, Dr. Swanson?
117:14    A.  Yes.
117:15    Q.  Subject:  Micron possibilities?
117:16    A.  Yes.
117:17    Q.  You say "we clearly communicated that our
117:18    discount proposal is only for Micron, not any other
117:19    potential clients of whatever network they might use
117:20    (Wise/Imagine or otherwise), and for St. Luke's parity
117:21    within their network participation."
117:22    So, is this -- are you referring to a meeting you
117:23    had with someone at Micron?
117:24    A.  Yes.
117:25    Q.  And who did you meet with in which you made these
118: Page 118
118: 1    communications?
118: 2    A.  I'm -- it was probably Margo.
118: 3    Q.  Okay.
118: 4    A.  And maybe Pat as well.
118: 5    Q.  Margo Nicholson?
118: 6    A.  Yes.


**Page Range:      118:7-118:20**

118: 7    Q.  And what's her position?
118: 8    A.  I don't know specifically.
118: 9    Q.  Okay.  So, why was your view that you didn't want
118:10    to offer -- that whatever discount you were willing to
118:11    offer to Micron would not be available to other clients of
118:12    the network that Micron participated in?
118:13    A.  Because our discussions weren't with the network.
118:14    They were with Micron.
118:15    Q.  Did you have concerns about encouraging a broader
118:16    network to form?

118:17   A.  No.
118:18   Q.  Okay.
118:19   A.  Our discussions were with Micron only, that's
118:20   why.


**Page Range:      119:4-119:9**

119: 4   Q.  Okay.  And you never had a meeting with anyone
119: 5   from Imagine or the Wise Network; did you?
119: 6   A.  Never.
119: 7   Q.  And you indicated you did not want to meet with
119: 8   them or communicate with them; correct?
119: 9   A.  Correct.


**Page Range:      119:22-119:24**

119:22   Q.  Okay.  Have any of your offers been conditioned
119:23   on preference towards St. Luke's against Saint Alphonsus?
119:24   A.  No.


**Page Range:      119:25-120:12**

119:25   Q.  Okay.  So, your proposals were all in the context
120: Page 120
120: 1   of no steering; correct?
120: 2   A.  Equal steering.
120: 3   Q.  Well, equal steering is no steering; isn't it?
120: 4   A.  Equal steering.
120: 5   Q.  So, was there -- steering to somebody implies
120: 6   steering away from somebody.
120: 7   So, if it's equal steering, who were the members
120: 8   being steered away from?
120: 9   A.  We are -- we would be presented to their network
120:10   on an equal footing with Saint Al's, that's all.
120:11   Q.  Okay.
120:12   A.  No preferential treatment.


**Page Range:      120:14-121:23**

120:14   (Whereupon, Exhibit Number 299 was marked for
120:15   identification.)
120:16   BY MR. ETTINGER:
120:17   Q.  You've been shown Exhibit 299, Mr. Billings,
120:18    which is a series of emails with various people from

120:19   Micron.
120:20   And this is a Micron document.  But since every
120:21   email has you on it, I am showing it to you, I think
120:22   appropriately, under the Protective Order.  And it's
120:23   Bates Numbered MT001298 through 1301.
120:24   So, take a look at that.  I've really just got --
120:25   I'm just going to ask you about your email of May 25 at
121: Page 121
121: 1   12:47 p.m.  But feel free to look at whatever you like, of
121: 2   course.
121: 3   A.  Okay.
121: 4   Q.  Okay.  So, is 299 a series of emails between you
121: 5   and Margo Nicholson and Pat Otte with certain other
121: 6   people --
121: 7   A.  Yes.
121: 8   Q.  -- from St. Luke's involved?
121: 9   That's a Yes?
121:10   A.  Yes.
121:11   Q.  And this is in the May and June 2012 period?
121:12   A.  Yes.
121:13   Q.  So, that May 25 at 12:47 p.m. email, you say,
121:14   among other things, "I was informed that Select Medical
121:15   Network specifically denied a Wise/Imagine contract
121:16   previously."
121:17   Do you see that?
121:18   A.  Yes.
121:19   Q.  Who informed you of that?
121:20   A.  I don't -- probably Steve Drake.
121:21   Q.  Okay.  And that was --
121:22   A.  Maybe Linda House.  I don't know.  One of those
121:23   two.


**Page Range:      122:3-122:6**

122: 3   Q.  The contract in question was one that would have
122: 4   applied to Micron, the one that was denied; correct?
122: 5   A.  Among other clients of Wise/Imagine, probably,
122: 6   yes.


**Page Range:      128:16-128:22**

128:16   Q.  And there's a sentence there where you write "And
128:17   I doubt that Saint Al's would cripple their own network
128:18   like that right after the beginning of their plan year
128:19   (January 1st?), which would be a significant impact on
128:20   their employees."

128:21    I'd like you to explain what you meant in
128:22    particular by the phrase "cripple their own network."

**Page Range:      129:2-129:17**

129: 2    THE WITNESS:  Well, I was talking about the
129: 3    Saint Al's employee benefit plan and -- which I understood
129: 4    was effective January 1st of this 2013 calendar year.  And
129: 5    their employees had just selected physicians based on a
129: 6    network that Saint Al's communicated to them.
129: 7    And so, why would they turn around three weeks
129: 8    later or four weeks later, four weeks into that new
129: 9    benefit plan year and tell their members that Saint Al's
129:10    or -- yeah, Saint Al's had fewer physicians than they had
129:11    to represent it, whether it's Saltzer or anyone.  They
129:12    wouldn't say:  We've given you this panel of physicians up
129:13    until December and now they're out.
129:14    BY MR. KEITH:
129:15    Q.  What is your understanding, if any, of the effect
129:16    of Saltzer's leaving the ACN network on the attractiveness
129:17    of that network to employers and individuals in Nampa?

**Page Range:      129:19-129:25**

129:19    THE WITNESS:  I don't know.  I don't know the
129:20    impact of that.
129:21    BY MR. KEITH:
129:22    Q.  Have you ever analyzed how many Saint Al's
129:23    employees use Saltzer physicians as their physician of
129:24    choice?
129:25    A.  No.

**Page Range:      131:4-133:13**

131: 4    You know, I'd like you to describe for us the
131: 5    state of Advocate Health Partner's creation of an
131: 6    accountable care provider model at the time you joined in
131: 7    1995.
131: 8    A.  So, Advocate Health Partners -- Advocate was
131: 9    formed in '94.  So, Advocate itself was formed a year
131:10    before -- less than a year before I got there.
131:11    Prior to '95 and formation of Advocate, there
131:12    were separate PHOs for each of the hospitals that made up
131:13    -- that ultimately joined to form Advocate in the former
131:14    Lutheran General and Evangelical system.  And they each

131:15   had physician hospital organizations, they each had risk
131:16   contracts, they had partial as well as full risk contracts
131:17   that date back to, I don't know, probably in the '80s,
131:18   probably the late '80s.
131:19   Q.  What was your role while you were at Advocate in
131:20   creating the clinical protocols and procedures that
131:21   Advocate used to implement its accountable care strategy?
131:22   A.  Zero.  In clinical piece, zero.  I didn't
131:23   participate.
131:24   Q.  What was your role, if any, in creating or
131:25   implementing the financial terms of the relationship that
132: Page 132
132: 1   Advocate had with its independent providers to incentivize
132: 2   those providers to reach the goals of the accountable care
132: 3   model that Advocate was developing?
132: 4   A.  So, I wasn't involved in that either.  I was
132: 5   upstream negotiating.  That's what I consider a downstream
132: 6   process, you know, how you handle the providers
132: 7   downstream.
132: 8   I negotiated with the upstream payers to sell the
132: 9   product that was put together based on those clinical and
132:10   financial pieces.
132:11   Q.  I believe that Mr. Ettinger asked you a question
132:12   about the percentage of employed versus independent
132:13   physicians who participated in the Advocate Health
132:14   Partners contracts.
132:15   Do you remember that discussion?
132:16   A.  Yeah, about a quarter.
132:17   Q.  About a quarter.  What is your understanding of
132:18   the geographic distribution of employed and independent
132:19   physicians across the region that Advocate Health Partners
132:20   served?
132:21   A.  Well, each of those predecessor organizations had
132:22   a PHO, which had varying levels, you know, in the various
132:23   communities of Chicagoland.  So, in one community around
132:24   one hospital, you'd have a PHO.  Around another, you'd
132:25   have another.  And they had varying levels of -- I mean,
133: Page 133
133: 1   they weren't all equal in terms of they weren't all
133: 2   quartered if that's what you're asking.
133: 3   But they were -- they had varying levels of
133: 4   employed versus independent providers, depending on the --
133: 5   so, I guess you'd call them subregions of Chicagoland.
133: 6   Probably even dependent on how much Medicare managed care
133: 7   was in an area.  I mean, you have certain areas of Chicago
133: 8   where there's a lot of Medicaid.
133: 9   And Medicaid managed care is prevalent.  So,
133:10   you'd have -- it depends on what physicians have joined

133:11   and participate in Medicaid managed care and Medicare and
133:12   so forth.  So, it varied based on that and other factors,
133:13   I guess.


**Page Range:       133:25-135:8**

133:25   Q.  I wanted to ask you why that -- why it is your
134: Page 134
134: 1   strategy not to get into bidding wars with Saint Al's for
134: 2   the Micron business?
134: 3   A.  Well, our overall strategy, at least since I've
134: 4   gotten here, is to introduce new innovative
134: 5   risk-based contracting strategies.
134: 6   And so, my preference has always been, in the two
134: 7   years I've been here, to push the payers to -- you know,
134: 8   to be more open to risk sharing, surplus sharing, even
134: 9   deficit sharing, even full risk versus remaining in that
134:10   same old, you know, decade-long parodyne of negotiating
134:11   fee for service, unit cost price.
134:12   And you know, when you just negotiate price,
134:13   that's -- the ultimate cost is based on the volumes that
134:14   run through those prices versus the overall level of care.
134:15   So, it's -- the risk base is preferred, you know.
134:16   Obviously, there are many negotiations where we
134:17   negotiate fee-for-service rates still.  And you have to do
134:18   that and we to that.  But...
134:19   Q.  What is your strategy in terms of negotiating
134:20   risk-based contracts with payers in the event that
134:21   Saint Al's also offered a risk-based proposal to the
134:22   payor?
134:23   A.  Well, I guess it could be Saint Al's or anybody
134:24   that offers a risk base.  It could be any provider that
134:25   offers a risk-based contract.  It could be the same as
135: Page 135
135: 1   what St. Luke's would offer.
135: 2   And generally, in negotiations, your first offer
135: 3   is never what you're willing to settle on.  So, you
135: 4   usually arrive at some other number that -- through
135: 5   negotiations that get you a contract that's still above
135: 6   what is your threshold for what you think even this
135: 7   risk-based contract would still be reasonable and not, you
135: 8   know, upside down either financially or outcomes wise.


**Page Range:       135:14-135:25**

135:14    Q.  Mr. Billings, why don't you pull out Exhibit 270,

26

135:15    the first exhibit, your resume.
135:16    A. The very first exhibit?
135:17    Q. Yeah.
135:18    A. Okay.
135:19    Q. So, in the third paragraph, and I think we went
135:20    through this before, you said that at Advocate you "served
135:21    a critical role interfacing with the 3,800 physicians."
135:22    Do you see that?
135:23    A. Yep.
135:24    Q. Is that a true statement?
135:25    A. Yeah.


**Page Range:    137:6-137:14**

137: 6    Q. Okay. Advocate contracts, by the way, that you
137: 7    negotiated, were across this whole system; isn't that
137: 8    right?
137: 9    A. Yes.
137:10    Q. And so they included places where the employed
137:11    physicians were more than 25 percent and they included
137:12    places where the employed physicians were less than
137:13    25 percent; correct?
137:14    A. Correct, as a group.


**Page Range:    138:1-138:9**

138: 1    Q. Okay. Now, you -- on the subject of Saltzer and
138: 2    Saint Al's crippling its network, you never believed that
138: 3    the relationship between Saint Al's employees and Saltzer
138: 4    was new as of January 2013; did you?
138: 5    A. No.
138: 6    Q. And you never believed that the relationship
138: 7    between ACN and Saltzer was new as of January 2013; did
138: 8    you?
138: 9    A. No.


**Page Range:    138:10-139:8**

138:10    Q. Okay. I have one question on the issue of
138:11    bidding wars.
138:12    Is it your view that you would rather give up the
138:13    Micron business than engage in a bidding war with
138:14    Saint Al's?
138:15    A. No. There's a level at which -- there's a level
138:16    at which you would not, you know, get down to and still

138:17   take the business, because it wouldn't make it worth
138:18   while; right?
138:19   Q.  Yeah.  But to date, you have not gotten the
138:20   Micron business; correct?
138:21   A.  We don't have the Micron business, correct.
138:22   Q.  And you've not engaged in a bidding war with
138:23   Saint Al's; correct?
138:24   A.  We've -- I don't know what your definition of
138:25   bidding war is, but --
139: Page 139
139: 1   Q.  This is your phrase in email after email; isn't
139: 2   it?
139: 3   By your definition, you've not engaged in a
139: 4   bidding war with Saint Al's; correct?
139: 5   A.  We gave them a proposal, which I guess could be
139: 6   the beginning of a bidding war.
139: 7   Q.  Are you now saying that --
139: 8   A.  They gave a proposal, we gave a proposal.


**Page Range:      140:5-140:16**

140: 5   Q.  Okay.  That works.  Isn't it true that you took
140: 6   the position from the beginning and still take the
140: 7   position that you don't want to engage in a bidding war
140: 8   with Saint Al's and that nobody from St. Luke's has
140: 9   communicated a disagreement with that to you?
140:10   A.  We do not want to get into a bidding war, that's
140:11   correct.
140:12   Q.  Yeah.  And you think that's the right decision
140:13   even though you don't have the Micron business as of
140:14   today; correct?
140:15   A.  I don't want to get into a
140:16   fee-for-service bidding war, that's correct.