<u>TESTIMONY OF JACKIE BUTTERBAUGH</u>
**Received on September 25-26, 2013**
**In the United States Federal District Court for the District of Idaho**
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
**Case No. 1:12-cv-00560-BLW**

**Page Range:     6:17-6:19**

6:17   Q.    Could you state your full name for the
6:18   record, please.
6:19   A.   Jackie Butterbaugh.


**Page Range:     7:2-8:2**

7: 2   So let's start right in.  What's your
7: 3   occupation?
7: 4   A.    I'm the director of contract network
7: 5   development and network management for managed care
7: 6   services of Imagine Health.
7: 7   Q.    How long have you worked at Imagine
7: 8   Health?
7: 9   A.   Six years.
7:10   Q.    What is Imagine Health?
7:11   A.    Imagine Health is a managed care company.
7:12   We develop and manage preferred provider organization
7:13   network for health insurance for self-funded employers
7:14   and also narrow networks of physicians and hospitals,
7:15   again, on behalf of self-funded employer groups.
7:16   Q.    Before I get into the specifics of that,
7:17   how long have you been at Imagine?  Did you say six
7:18   years?
7:19   A.   Six years.
7:20   Q.   I may have asked that, sorry.
7:21   How long have you worked in health care?
7:22   A.    About 22 years.
7:23   Q.    What kinds of responsibilities have you
7:24   had in your other health care positions?
7:25   A.    Really pretty much along the same lines:
8: Page 8
8: 1   Provider relations, network contracting, the same
8: 2   thing basically I'm doing now.


**Page Range:     8:17-9:22**

8:17   Q.    You talked about a PPO network -- or PPO
8:18   networks and narrow networks.  So my next question is:

1

8:19    What are they and what's the difference?
8:20    A.    A PPO network is a -- as I said, it's an
8:21    acronym.  It's a business of acronyms.  But it's
8:22    preferred provider organization which generally
8:23    includes most of or a majority of physicians and
8:24    hospitals in a given area that are contracted to be
8:25    part of a network.
9: Page 9
9: 1    A narrow network is described as a type
9: 2    PPO network, only it's narrower in scope.  It
9: 3    generally doesn't include as many of the physicians
9: 4    and hospitals in a service area as a standard PPO
9: 5    would.
9: 6    Q.    What's a high performance network?
9: 7    A.    A high performance network would be a
9: 8    network that -- at least in our model and in a
9: 9    business we would phrase a high performance network as
9:10    physicians and hospitals that are prescreened or
9:11    reviewed for higher quality levels compared to their
9:12    peers within the local marketplace.  So high
9:13    performing physicians and hospitals.
9:14    Q.    So you said "in our model".  So I assume
9:15    that meets in Imagine's models; is that correct?
9:16    A.    Yes.
9:17    Q.    So what is the Imagine model that involves
9:18    high performance networks?
9:19    A.    It's physicians within the community that
9:20    perform better than their peers or the hospitals that
9:21    would perform better than their peers in providing
9:22    medical care and medical outcomes.


**Page Range:      9:23-10:14**


9:23    Q.    So who are Imagine's customers?
9:24    A.    Employer groups that self-fund their
9:25    insurance plans.  So they don't buy insurance premium
10: Page 10
10: 1    or insurance coverage from a carrier, but they
10: 2    self-fund their insurance plan.  So they're large
10: 3    employers.
10: 4    Q.    Okay.  So we've jumped into definitions
10: 5    maybe out of order.  Can you describe just briefly,
10: 6    you know, what it is Imagine does for its customers,
10: 7    for these self-funded employers?
10: 8    A.    We build these narrow networks or a PPO
10: 9    network, you know, given the employer, on behalf of
10:10    those employers and they access our network for their

10:11    health care services for their employees.
10:12    Q.    So would this be an alternative to using a
10:13    Blue Cross or Blue Shield?
10:14    A.    Yes.


**Page Range:        10:15-12:8**

10:15        **REDACTED**
10:16
10:17
10:18
10:19
10:20
10:21
10:22
10:23
10:24
10:25
11: Page 11
11: 1        **REDACTED**
11: 2
11: 3
11: 4
11: 5
11: 6
11: 7
11: 8
11: 9
11:10
11:11
11:12
11:13
11:14
11:15
11:16
11:17
11:18
11:19
11:20
11:21
11:22
11:23
11:24
11:25
12: Page 12
12: 1        **REDACTED**
12: 2

12: 3
12: 4
12: 5
12: 6
12: 7     **<u>REDACTED</u>**
12: 8


**Page Range:      13:3-13:10**

13: 3
13: 4
13: 5
13: 6     **<u>REDACTED</u>**
13: 7
13: 8
13: 9
13:10


**Page Range:      13:11-13:20**

13:11
13:12
13:13
13:14
13:15     **<u>REDACTED</u>**
13:16
13:17
13:18
13:19
13:20


**Page Range:      13:21-15:3**

13:21     **<u>REDACTED</u>**
13:22
13:23
13:24
13:25
14: Page 14
14: 1     **<u>REDACTED</u>**
14: 2
14: 3
14: 4
14: 5
14: 6

14: 7
14: 8
14: 9
14:10
14:11
14:12
14:13
14:14
14:15
14:16    **REDACTED**
14:17
14:18
14:19
14:20
14:21
14:22
14:23
14:24
14:25
15: Page 15
15: 1    **REDACTED**
15: 2
15: 3


**Page Range:**    **16:2-17:18**

16: 2    **REDACTED**
16: 3
16: 4
16: 5
16: 6
16: 7
16: 8
16: 9
16:10
16:11
16:12
16:13
16:14
16:15
16:16
16:17
16:18
16:19
16:20
16:21
16:22

16:23
16:24
16:25   **REDACTED**
17: Page 17
17: 1   **REDACTED**
17: 2
17: 3
17: 4
17: 5
17: 6
17: 7
17: 8
17: 9
17:10
17:11   **REDACTED**
17:12
17:13
17:14
17:15
17:16
17:17
17:18


**Page Range:       17:19-19:25**


17:19
17:20   **REDACTED**
17:21
17:22   A.   Well, we think we're elevating health care
17:23   quality.  It's putting health care in more of a
17:24   competitive landscape.  These employers are purchasing
17:25   health care services and putting out a competitive
18: Page 18
18: 1   field for them.
18: 2   It's like purchasing tires or Toyota is
18: 3   building tires they purchase tires, they purchase it
18: 4   in major quantities so they think they can demand a
18: 5   good price on the competition than a bid against
18: 6   Michelin for the price for Toyota.
18: 7   So it allows the employers to go out and
18: 8   hopefully put together a competitive situation where
18: 9   they'll be able to save extra dollars.
18:10   We also think that through our quality
18:11   review process up front in selecting the higher
18:12   quality physicians and hospitals that we're also able
18:13   to help the employers direct their employees to the
18:14   right physicians and right hospitals to have better

18:15    quality outcomes for their members and, you know, a
18:16    better health care experience.
18:17    Q.    Has this Imagine program generally been
18:18    successful or unsuccessful, in your view?
18:19    A.    It's been successful, yes.
18:20    Q.    In what cities has Imagine been offering
18:21    this program?
18:22    A.    San Antonio, Texas; we have a network in
18:23    Albuquerque, New Mexico, Boise, of course.  We've
18:24    recently developed networks in Chicago, Illinois and
18:25    Houston, Texas and Dallas, Texas as of now.
19: Page 19
19: 1    Q.    Planning to go into other cities as well?
19: 2    A.    Yes.
19: 3    Q.    When you go into a particular city, is
19: 4    your goal to just do this with one employer or with
19: 5    multiple employers?
19: 6    A.    It's a model that would fit multiple large
19: 7    employers.
19: 8    Q. So do you try to get multiple employers to
19: 9    utilize the network that you build?
19:10    A. Yes.
19:11    Q. Have you been successful in doing that in
19:12    some cities?
19:13    A. We have been, yes.  We've been running
19:14    this for about six years now and our first network was
19:15    in San Antonio, Texas and we've been able to develop
19:16    that.  And over time we've developed employers for
19:17    Toyota
19:18
19:19
19:20
19:21    **REDACTED**
19:22
19:23
19:24
19:25


**Page Range:    20:1-22:21**

20: 1
20: 2
20: 3
20: 4
20: 5    **REDACTED**
20: 6
20: 7

20: 8
20: 9
20:10
20:11
20:12    **<u>REDACTED</u>**
20:13
20:14
20:15
20:16
20:17
20:18
20:19
20:20
20:21
20:22
20:23
20:24
20:25
21: Page 21
21: 1
21: 2
21: 3
21: 4
21: 5
21: 6
21: 7
21: 8
21: 9
21:10
21:11    **<u>REDACTED</u>**
21:12
21:13
21:14
21:15
21:16
21:17
21:18
21:19
21:20
21:21
21:22
21:23
21:24
21:25
22: Page 22
22: 1
22: 2
22: 3

22: 4    **REDACTED**
22: 5
22: 6
22: 7
22: 8
22: 9
22:10
22:11
22:12
22:13
22:14    **REDACTED**
22:15
22:16
22:17
22:18
22:19
22:20
22:21


**Page Range:      22:22-22:25**

22:22    Q.    I think you've mentioned when you talked
22:23    to hospitals you tell them that you want more
22:24    employers because that will make the program more
22:25    valuable to them?  Did I get that right?


**Page Range:      23:2-23:20**

23: 2    Q.    Is that what you meant to say?
23: 3    A.    Right.  The more employers you have
23: 4    involved in this and the greater the patient mix --
23: 5    again, the model is all about direction of patient
23: 6    volume to our network participants.  So additional
23: 7    employers, of course, bring additional patients and
23: 8    additional members.
23: 9    Q.    Okay.  How did St. Al's respond to your
23:10    approach?
23:11    A.    They were very interested in the model.
23:12    We're very -- we think very innovative, actually, in
23:13    this model.  There's not really many folks out there,
23:14    particularly five years ago when this started with
23:15    Micron in Boise, that were doing this.  So they were
23:16    very interested and intrigued in what we were doing.
23:17    Q.    Did St. Al's submit a proposal?
23:18    A.    Yes, they did.
23:19    Q.    Did you regard it as a substantial

23:20    proposal or not so substantial?


**Page Range:      23:23-24:7**

23:23    A.    I would say it was very substantial
23:24    proposal.  It was about this thick.  (Demonstrating).
23:25    A lot of information.
24: Page 24
24: 1    Q.    For the record, how many inches?
24: 2    A.    I don't know.  Four or five inches thick.
24: 3    A lot of information was included about the hospital.
24: 4    Q.    Did St. Luke's submit a proposal?
24: 5    A.    Yes, they did.
24: 6    Q.    Was its proposal substantial or not so
24: 7    substantial?


**Page Range:      24:9-24:23**

24: 9    A.    The St. Luke's proposal was not as
24:10    comprehensive as the St. Al's proposal in that there
24:11    was not as much information in it.  It was about two
24:12    or three pages.
24:13    Q.    Who did you talk to from St. Al's?
24:14    A.    At St. Al's we worked with Greg Sonnenberg
24:15    and Janell Riley.
24:16    Q.    What was the attitude they expressed about
24:17    their view of the program?
24:18    A.    They were very excited about the program.
24:19    Q.    Who did you talk to on behalf of St.
24:20    Luke's?
24:21    A.    We worked with Steve Drake.
24:22    Q.    And what attitude did he express about the
24:23    program?


**Page Range:      24:25-26:17**

24:25
25: Page 25
25: 1
25: 2
25: 3
25: 4    **<u>REDACTED</u>**
25: 5
25: 6
25: 7

25: 8
25: 9
25:10
25:11
25:12
25:13
25:14
25:15
25:16
25:17
25:18     **REDACTED**
25:19
25:20
25:21
25:22
25:23
25:24
25:25
26: Page 26
26: 1
26: 2
26: 3
26: 4
26: 5
26: 6
26: 7
26: 8     **REDACTED**
26: 9
26:10
26:11
26:12
26:13
26:14
26:15
26:16
26:17


**Page Range:      26:18-28:7**

26:18
26:19
26:20
26:21     **REDACTED**
26:22
26:23
26:24
26:25

27: Page 27
27: 1
27: 2
27: 3
27: 4
27: 5
27: 6
27: 7
27: 8
27: 9
27:10
27:11
27:12
27:13
27:14
27:15   **<u>REDACTED</u>**
27:16
27:17
27:18
27:19
27:20
27:21
27:22
27:23
27:24
27:25
28: Page 28
28: 1
28: 2
28: 3
28: 4   **<u>REDACTED</u>**
28: 5
28: 6
28: 7


**Page Range:      28:8-28:12**

28: 8    Q.    By the way, the high performance network
28: 9    that Micron ended up using, was there a name for it?
28:10    A.    Yes, we allowed the employer sponsor to
28:11    brand their own network and they elected Micron Health
28:12    Partners Network.


**Page Range:      00:29:08 - 00:30:53**

28:13

28:14
28:15    **REDACTED**
28:16
28:17
28:18
28:19
28:20
28:21
28:22
28:23
28:24
28:25
29: Page 29
29: 1
29: 2
29: 3
29: 4
29: 5
29: 6
29: 7
29: 8    **REDACTED**
29: 9
29:10
29:11
29:12
29:13
29:14
29:15
29:16
29:17
29:18
29:19
29:20
29:21
29:22


**Page Range:      29:23-30:20**

29:23    Q.    Did you have any communications with the
29:24    Saltzer group at this time?
29:25    A.    Yes.
30: Page 30
30: 1    Q.    Did you seek to involve Saltzer in the
30: 2    high performance network?
30: 3    A.    Yes, we did.
30: 4    Q.    And why was that?
30: 5    A.    They were a quality performing group and

30: 6    also a key group in the Nampa area of the market for
30: 7    Micron.
30: 8    Q.    So did you meet with Saltzer?
30: 9    A.    We did.
30:10    Q.    Who was at the meeting on behalf of
30:11    Imagine?
30:12    A.    It was myself, Allison Robbins, who is the
30:13    owner of Imagine Health, and one of our marketing
30:14    representatives, Laura Peifer.
30:15    Q.    And who was there on behalf of Saltzer?
30:16    A.    There were a number of people.  I don't
30:17    remember exactly everybody that was there.  But Nancy
30:18    Powell was there, who I was working with directly, and
30:19    Bill Savage as well.  And I think there were some
30:20    physician representatives there as well.


**Page Range:      31:9-32:25**

31: 9
31:10
31:11
31:12
31:13
31:14
31:15
31:16    **<u>REDACTED</u>**
31:17
31:18
31:19
31:20
31:21
31:22
31:23
31:24
31:25
32: Page 32
32: 1
32: 2
32: 3
32: 4
32: 5
32: 6
32: 7
32: 8    **<u>REDACTED</u>**
32: 9
32:10
32:11

```
32:12
32:13
32:14
32:15
32:16
32:17
32:18
32:19
32:20
32:21    REDACTED
32:22
32:23
32:24
32:25
```

**Page Range:        33:1-33:16**

```
33: 1    Q.    Was it important or unimportant to Imagine
33: 2    that you had primary care physicians in these specific
33: 3    local communities?
33: 4    A.    It's always important to have good primary
33: 5    care coverage.
33: 6    Q.    And why is that?
33: 7    A.    Primary care is pretty close to home.
33: 8    Primary care would include pediatricians, so you have
33: 9    to have them close to home.  Family practice, internal
33:10    medicine providers.  So it's a real local care.
33:11    Then we also need them, of course, for the
33:12    kind of the point of entry for patients so that we can
33:13    appropriately manage referrals and that type of thing
33:14    to specialists.
33:15    So it's really kind of a basis of any
33:16    network for primary care services.
```

**Page Range:        33:17-34:18**

```
33:17    Q.    So we've talked about the high performance
33:18    network.  Let's talk about the PPO network.  What
33:19    networks did you look at as candidates to be the PPO
33:20    network for Micron?
33:21    A.    We looked at all of the available PPOs in
33:22    that market.  We primarily looked at First Health, ICN
33:23    at the time, ICN; and Idaho Physician Network, IPN,
33:24    which is a local PPO network in Boise.  There's not
33:25    too many up there.  And the Blue Cross and PPO network
34: Page 34
```

34: 1
34: 2
34: 3
34: 4   **REDACTED**
34: 5
34: 6
34: 7
34: 8
34: 9
34:10
34:11
34:12   **REDACTED**
34:13
34:14
34:15
34:16
34:17
34:18


**Page Range:      34:19-36:4**

34:19
34:20
34:21
34:22
34:23
34:24
34:25
35: Page 35
35: 1
35: 2
35: 3
35: 4
35: 5
35: 6
35: 7   **REDACTED**
35: 8
35: 9
35:10
35:11
35:12
35:13
35:14
35:15
35:16
35:17
35:18

35:19
35:20
35:21
35:22
35:23
35:24
35:25
36: Page 36
36: 1
36: 2    **<u>REDACTED</u>**
36: 3
36: 4


**Page Range:    36:5-37:4**

36: 5    Q.    So who did you choose to be the PPO
36: 6    network for Micron?
36: 7    A.    We selected First Health.
36: 8    Q.    When you selected First Health, did they
36: 9    have to go out and assemble in that area of providers
36:10    or were they going to offer their existing network of
36:11    hospitals --
36:12    A.    It was an existing network.
36:13    Q.    Okay.  And what Boise hospital was in the
36:14    First Health network?
36:15    A.    St. Luke's.
36:16    Q.    So did First Health become the PPO network
36:17    for Micron?
36:18    A.    Yes.  Well, they accepted -- they were
36:19    going down the path to be the PPO network.
36:20    Q.    Did they ultimately end up at the
36:21    destination?
36:22    A.    No, they did not.  No.
36:23    Q.    And what happened?
36:24    A.    They really rescinded their participation
36:25    as well.  They received, I believe, a termination from
37: Page 37
37: 1    St. Luke's that they would no longer participate in
37: 2    the First Health network if they did this.  So we
37: 3    ended up getting a notice from First Health that they
37: 4    were terminating participation with us.


**Page Range:    37:7-37:13**

37: 7    Q.    When did you get that notice?
37: 8    A.    On the eve of July 1st, which is when the

37: 9   whole network -- both networks were to go live for
37:10   Micron.  So we received it on the last day of June.
37:11   Q.    So one day before the networks were to go
37:12   live, they informed you they could not participate
37:13   because St. Luke's had terminated them?


**Page Range:      37:16-37:22**

37:16   A.    We received notification from First Health
37:17   that they would not be the PPO network because it was
37:18   in jeopardy of their relationship with First Health.
37:19   They were gone.
37:20   Q.    In jeopardy of their relationship with
37:21   First Health?
37:22   A.    I'm sorry.  With St. Luke's.


**Page Range:      38:4-38:13**

38: 4   Q.    (By Mr. Ettinger) So when you enter into a
38: 5   relationship with a PPO network, what Imagine does, is
38: 6   it -- are the discount -- do the discounts vary from
38: 7   the PPO's normal discounts?
38: 8   A.    No.
38: 9   Q.    So assuming the Micron network went
38:10   forward, do you know of any reason that St. Luke's
38:11   could have benefitted from withdrawing from the PPO
38:12   network if it was already in the First Health PPO
38:13   network?


**Page Range:      38:16-39:6**

38:16   A.    First, St. Luke's -- well, it put
38:17   everybody in a tough situation.  It put Micron in a
38:18   tough situation, it put Imagine Health in a tough
38:19   situation.
38:20   So it gave them a lot of leverage at that
38:21   moment, I mean, to force Micron to abandon the whole
38:22   strategy.  It was done at the very final hour and
38:23   difficult to adjust and react to.
38:24   Q.    Maybe my question wasn't clear, though I
38:25   think that was going to be my next question.  So let
39: Page 39
39: 1   me ask the first question again.  Assuming that the
39: 2   Micron network was not put at risk or in jeopardy,
39: 3   assume that for the moment, would there be any other

39: 4   reason for St. Luke's to have benefitted from
39: 5   withdrawing from the First Health PPO network that it
39: 6   was already in?


**Page Range:       39:9-40:11**

39: 9   Q.   That you can think of?
39:10   A.   Nothing that I can think of, no.
39:11   Q.   So what was Micron's reaction to the loss
39:12   of First Health, including St. Luke's?
39:13   A.   They were actually pretty angry.
39:14   Q.   Did you stop or did you go forward?
39:15   A.   No, we came up with a contingency plan to
39:16   go forward.
39:17   Q.   And what was the contingency plan?
39:18   A.   Stan Sweedy felt that St. Luke's was not
39:19   going to participate in any PPO network that was
39:20   already in existence.  We decided that we would go
39:21   ahead and build our own, that my organization, Imagine
39:22   Health, would go in and contract with the physicians
39:23   to build a PPO network off of availability.
39:24   Q.   And did you do that?
39:25   A.   We did.
40: Page 40
40: 1   Q.   Did you use any existing networks as part
40: 2   of this network that you built?
40: 3   A.   It's not really a network, but we did tap
40: 4   into what is called an IPA, independent physician
40: 5   association.  So it is a group of physicians that can
40: 6   come -- that can so join a network on one single
40: 7   contract signature.  So that helped us to fulfill our
40: 8   physician needs.
40: 9   We used ACN for that option, and then we
40:10   also contracted directly with other independent
40:11   physicians in the community for the PPO.


**Page Range:       40:12-41:22**

40:12   Q.   So did the Micron program -- or the Micron
40:13   Imagine program succeed after that?
40:14   A.   It does.
40:15   Q.   Is it still in effect today?
40:16   A.   It is.
40:17   Q.   So what year did it start?
40:18   A.   It was effective July 1st of 2008.
40:19   Q.   Okay.  How would you assess the success or

40:20    not of the program?
40:21    A.    It's successful in that we're meeting our
40:22    obligations to Micron, saving them money, as they
40:23    wanted, and we're getting the patients to the -- our
40:24    network providers.
40:25    It's successful for the providers in that
41: Page 41
41: 1    they're getting the volume that we had promised them
41: 2    as well for their price point.
41: 3    Q.    Has Imagine estimated the cost savings to
41: 4    Micron for the program?
41: 5    A.    Yes.
41: 6    Q.    What is that estimate?
41: 7    A.    Annually, it's about 27 million a year.
41: 8    Q.    Based on Imagine's review, was the program
41: 9    successful in incentivizing Micron employees to use
41:10    the narrow network providers?
41:11    A.    Yes.
41:12    Q.    So that would have been on the hospital
41:13    side using Saint Alphonsus not St. Luke's; is that
41:14    right?
41:15    A.    That's correct.
41:16    Q.    So after the program had been in operation
41:17    after these things were occurring, did St. Luke's ever
41:18    come back to Imagine and say:  Well, you proved you
41:19    could do it, we'd like to be considered for a bid?
41:20    A.    No.
41:21    Q.    Up to today, have they ever done that?
41:22    A.    No.


**Page Range:      41:24-43:3**

41:24    Q.    Now, did it come to your attention at a
41:25    certain point that St. Luke's had acquired some of the
42: Page 42
42: 1    physician groups that were in the high performance
42: 2    network?
42: 3    A.    Yes.


**Page Range:      42:4-44:14**

42:4    (Plaintiffs' Exhibit 1001 marked for
42:5    identification.)
42: 6    Q.    I'll show you what's been marked as
42: 7    plaintiffs Exhibit Number 2, Imagine documents 552 to
42: 8    553.  Can you identify this document, Ms. Butterbaugh?

42:9   A.   Yes, this is an e-mail from myself to
42:10   Connie Kniefel, who is the -- or was the director at
42:11   the Boise Orthopedic clinic -- orthopedic group in our
42:12   high performance network.
42:13   Q.   And just -- there's a series of e-mails
42:14   back and forth.  Are they all between you and Connie
42:15   Kniefel?
42:16   A.   Yes.
42:17   Q.   Is e-mailing something that you do in the
42:18   ordinary course of your job or not?
42:19   A.   Yes.
42:20   Q.   So let me ask you about the e-mail at the
42:21   top of the document.  You say there:  "My concern
42:22   comes with two recent purchases made by St. Luke's,
42:23   the Pediatric Gastroenterology and Boise Heart.  Both
42:24   groups are conveying to me that St. Luke's
42:25   Professional Services are not willing to honor our
43: Page 43
43:1   agreement.  I have tried to obtain confirmation from
43:2   Steve Drake, one way or the other, but no response."
43:3   Do you see that?
43:4   A.   Yes.
43:5   Q.   Are those accurate statements by you?
43:6   A.   Yes.
43:7   Q.   Were -- was Pediatric Gastroenterology in
43:8   the high performance network?
43:9   A.   They were.
43:10   Q.   And was Boise Heart in the high
43:11   performance group?
43:12   A.   They were in the PPO network.
43:13   Q.   Did Pediatric Gastroenterology stay in the
43:14   high performance network after it was acquired by St.
43:15   Luke's?
43:16   A.   No.
43:17   Q.   Did Boise Heart stay in the PPO network
43:18   after being acquired by St. Luke's?
43:19   A.   No.
43:20   Q.   Then in this e-mail, what was the basic
43:21   purpose of the e-mails with Connie Kniefel?
43:22   A.   Connie and I after, you know, St. Luke's
43:23   purchased them, we had communicated back and forth.  I
43:24   wanted to make sure:  Are you guys going to stay in
43:25   the high performance network?  Are you going to be
44: Page 44
44:1   available to our patients?  We need to be aware of
44:2   this.
44:3   And she had always communicated that, yes
44:4   we are, that they were committed to the Micron

44: 5   members.  But with this other activity, I was trying
44: 6   to make sure that I could get a further commitment
44: 7   from them that they would remain in.
44: 8   Q.    Ultimately, did Boise Orthopedic stay in
44: 9   the high performance network or not?
44:10   A.    No.
44:11   Q.    Just to make sure we're clear, as of the
44:12   time of Exhibit 2, had Boise Orthopedic been acquired
44:13   by St. Luke's?
44:14   A.    Yes, I believe they had.


**Page Range:      44:15-45:20**

44:15   (Plaintiffs' Exhibit 1002 marked for
44:16   identification.)
44:17   Q.    You've been handed what's been marked as
44:18   Plaintiffs' Exhibit 3, Imagine Bates numbered 554 to
44:19   564.  What is this document, Ms. Butterbaugh?
44:20   A.    This is a communication between myself and
44:21   Heather at the pediatric GI office.
44:22   Q.    And what is the pediatric GI office?
44:23   A.    The Pediatric Gastroenterology providers.
44:24   Q.    Was that a group that was in the high
44:25   performance network?
45: Page 45
45: 1   A.    Yes.
45: 2   Q.    And were they acquired by St. Luke's?
45: 3   A.    Yes.
45: 4   Q.    Did they stay in the high performance
45: 5   network?
45: 6   A.    No.
45: 7   Q.    Why don't you turn to the second page of
45: 8   the document.  There's an e-mail there from Heather
45: 9   Beard at Idaho Peds GI to you.  Do you see that
45:10   e-mail?
45:11   A.    Yes.
45:12   Q.    At that point when the e-mail was sent,
45:13   was Idaho Pediatrics owned by St. Luke's?
45:14   A.    Yes.
45:15   Q.    She said:  "It appears that St. Luke's is
45:16   not going to allow any of its provider clinics to be a
45:17   contracting provider.  I guess our contract
45:18   termination date for Idaho Pediatrics GI would be
45:19   November 30, 2010."
45:20   Did that turn out to be accurate?

**Page Range:     45:23-46:14**

45:23   A.   They did terminate.  I don't recall the
45:24   exact termination date, but they did leave.
45:25   Q.    And why don't you go down a few more
46: Page 46
46: 1   pages.  Do you see an e-mail from Steve Drake to you
46: 2   dated February 8, 2011?
46: 3   A.   I'm sorry, which page is that?
46: 4   Q.   I have a copy without Bates numbers I'm
46: 5   working from which is probably a bad idea.  So let me
46: 6   look at this copy.
46: 7   A.   Yes.
46: 8   Q.    Mr. Drake said:  "Please consider this
46: 9   group terminated at the end of their required notice
46:10   of termination period.  Do you see that?
46:11   A.   Yes.
46:12   Q.    Was he referring there to Idaho Pediatrics
46:13   GI?
46:14   A.   Yes.


**Page Range:     46:18-48:3**

46:18   Q.   You have Plaintiffs' Exhibit 4 there --
46:19   A.   Yes.
46:20   Q.    -- which is Bates numbered Imagine 579 to
46:21   577.  Can you identify this document, please.
46:22   A.   This is a communication from Michele
46:23   Marcum at ACN to me.
46:24   Q.    Michele Marcum, is she forwarding another
46:25   e-mail?
47: Page 47
47: 1   A.   Yes.
47: 2   Q.   And who was that from?
47: 3   A.   Janine Cleverley.
47: 4   Q.   Is Janine Cleverley at St. Luke's?
47: 5   A.   I didn't work with her directly, but this
47: 6   is from a St. Luke's e-mail, yes.
47: 7   Q.    And Janine says:  "I have received
47: 8   direction from Steve Drake in contracting.  He has
47: 9   indicated that Dr. Katherine Lee will not be
47:10   continuing her participation with the ACN network
47:11   under St. Luke's TIN."  What is a TIN?
47:12   A.   That's a tax identification number that is
47:13   used for physician billing.
47:14   Q.    So if a physician was not continuing her
47:15   participation with ACN, how would that affect the

47:16   Micron network?
47:17   A.    That would remove them from out of the
47:18   PPO.
47:19   Q.    If you go a couple of pages in, there's an
47:20   e-mail from you dated February 18 at 2:15 on page 574.
47:21   Do you see that from you to Michele Marcum?
47:22   A.    Yes.
47:23   Q.    You say:  "Another one bites the..."  What
47:24   were you referring to there?
47:25   A.    Dust.  Another one came out.
48: Page 48
48: 1   Q.    What did you mean by that?
48: 2   A.    That another termination had taken place
48: 3   of a St. Luke's provider.


**Page Range:      48:6-49:6**

48: 6   Q.    Showing Plaintiffs' Exhibit 5, which is a
48: 7   letter from Steve Drake to Allison Robbins, Bates
48: 8   number Imagine 316.  Can you identify that document?
48: 9   A.    Yes.
48:10   Q.    Are you CC' d on this letter?
48:11   A.    I was.
48:12   Q.    What is it?
48:13   A.    It's a termination notice from Steve for
48:14   three of the physician groups that they have
48:15   purchased:  The Cardiothoracic and Vascular
48:16   Associates, Boise Orthopedic Clinic and Payette Lakes
48:17   Medical Clinic.
48:18   Q.    He says:  "Notice of termination of the
48:19   participating provider agreements with Wise."  What is
48:20   Wise?
48:21   A.    Wise is our company.  At the time when we
48:22   developed the Micron health network we were under the
48:23   Wise provider network.  We've recently restructured
48:24   and rebranded to the Imagine Health Network.  Wise is
48:25   now considered a network that's an LLC of Imagine
49: Page 49
49: 1   Health.
49: 2   Q.    And what are the three groups that Mr.
49: 3   Drake is providing notice of termination for?
49: 4   A.    Cardiothoracic and Vascular Associates,
49: 5   Boise Orthopedic Clinic and Payette Lakes Medical
49: 6   Clinic.

**Page Range:      49:9-50:24**

49: 9    Q.    I'll show you what's been marked as
49:10    Plaintiffs' Exhibit 6, which is e-mails.  The top
49:11    e-mail is from Toni Newman to Jackie at
49:12    WiseProvider.net.  Can you identify this document?
49:13    A.    Yes.  This is an e-mail from Toni.  We
49:14    were trying to work through the current contracting
49:15    status with Dr. Walker and our high performance
49:16    network.
49:17    Q.    Who was Toni Newman?
49:18    A.    Toni Newman is -- or at the time was a new
49:19    associate that began working with Steve Drake in the
49:20    managed care office of St. Luke's.
49:21    Q.    She's the one that sent the e-mail?
49:22    A.    Yes.
49:23    Q.    And Steve Drake is CC' d on the e-mail?
49:24    A.    Yes.
49:25    Q.    She says in the last sentence of the first
50: Page 50
50: 1    paragraph:  "All of the providers on the attached
50: 2    spreadsheet should be terminated effective June 30,
50: 3    2012 per Steve Drake's letter dated March 29, 2012."
50: 4    Do you see that?
50: 5    A.    Yes.
50: 6    Q.    There is no spreadsheet attached.  Do you
50: 7    know what happened to that?
50: 8    A.    I don't know.  It's probably in our system
50: 9    somewhere.
50:10    Q.    In the last paragraph she says:  "In
50:11    closing, as far as we know there are no other
50:12    physicians/clinics who are now part of St. Luke's
50:13    Health System that have direct agreements with Wise.
50:14    If this is not correct and you are aware of any
50:15    additional agreements that we have not mentioned,
50:16    please let me know as soon as possible.  If there are
50:17    other agreements we have not mentioned, it is simply
50:18    because St. Luke's is not aware of them."
50:19    Do you recall whether you identified any
50:20    other such clinics that St. Luke's had not terminated?
50:21    A.    I don't think there were anymore.
50:22    Q.    By the way, where it says to
50:23    Jackie@WiseProvider.net, who is that?
50:24    A.    That's me.

**Page Range:      50:25-52:2**

50:25   Q.    Did St. Luke's acquire a group called
51: Page 51
51: 1    Boise Surgical Group?
51: 2    A.    They did, yes.
51: 3    Q.    Did Boise Surgical -- was Boise Surgical's
51: 4    current relationship with ACN terminated?
51: 5    A.    Eventually, yes, it was.
51: 6    Q.    By who?
51: 7    A.    By us.  By Imagine Health or Wise.
51: 8    Q.    Why did you terminate Boise Surgical?
51: 9    A.    We were made aware of some member issues
51:10    and concerns through DAS.  DAS is the third-party
51:11    administrator for Micron, so they handle all the
51:12    preauthorization, benefits, eligibility etc.
51:13    Paula Bosler is my representative I worked
51:14    with there.  She notified us we had some cases under
51:15    preauthorization with Boise Surgical, and the
51:16    physicians were not willing or able to provide the
51:17    surgery at St. Al's.  They had to do it at St. Luke's,
51:18    which is out of network.
51:19    So as we investigated further, we found
51:20    out that the Boise Surgical physicians no longer held
51:21    their privileges at St. Al's and, therefore, all of
51:22    their services would be going to St. Luke's, which is
51:23    again out of network, and a concern -- a service
51:24    concern for the Micron patients.
51:25    So we elected to notify ACN that we no
52: Page 52
52: 1    longer wanted to include their contract, we would need
52: 2    to terminate their participation with us.


**Page Range:      52:3-54:14**

52: 3    Q.    What's the concern if an out-of-network
52: 4    hospital is used?
52: 5    A.    Again, it goes back to the various benefit
52: 6    levels.  A patient has a lot greater out-of-pocket
52: 7    expense if they go out of network.
52: 8    Q.    So after all these terminations, what was
52: 9    Micron's reaction?
52:10    A.    They are -- they -- very concerned.
52:11    Q.    Were you involved in any meetings with
52:12    Micron on that subject?
52:13    A.    Yes, continually.
52:14    Q.    Who from Micron was involved?

52:15   A.   Primarily we worked with Margo Nielsen,
52:16   who is in the HR department with Micron, and then
52:17   other team members on her team.
52:18   Q.   Is it Margo Nielsen or Margo Nicholson?
52:19   A.   Margo Nicholson, I'm sorry.
52:20   Q.   So did Imagine take any steps to try to
52:21   deal with the problem?
52:22   A.   We -- yes, many -- many steps have been
52:23   involved in working with them to try to alleviate
52:24   their concern and to see if we can backfill the loss
52:25   of these physicians and services into the high
53: Page 53
53: 1   performance network for Micron.
53: 2   Q.   When you say "backfill", what do you mean?
53: 3   A.   If we have alternatives available in the
53: 4   community.
53: 5   Q.   Were you able to find alternatives in the
53: 6   community?
53: 7   A.   Ultimately, yes, we were.
53: 8
53: 9
53:10
53:11
53:12
53:13
53:14
53:15
53:16   **<u>REDACTED</u>**
53:17
53:18
53:19
53:20
53:21
53:22
53:23
53:24
53:25
54: Page 54
54: 1   group in the community.
54: 2   Q.   So when these replacements were found,
54: 3   were they added to the network?
54: 4   A.   Ultimately they were, yes.
54: 5   Q.   Did Micron conclude that this was no
54: 6   longer a problem after that happened?
54: 7   A.   No, they did not.  We had a lot of
54: 8   meetings and conversations with Micron to review the
54: 9   quality information that we had on these alternatives
54:10   to eventually get them to a level of agreement that we

54:11   could go ahead and include them for their access
54:12   needs.
54:13   Q.    And once you got Micron to agree, was
54:14   Micron happy about the situation?


**Page Range:      54:16-54:18**

54:16   A.    I would not say that Micron was happy
54:17   about it, not 100 percent satisfied.
54:18   Q.    Why not?


**Page Range:      54:20-54:23**

54:20   A.    I would not say they were 100 percent
54:21   satisfied because, again, with the quality review and
54:22   comparison, we were not able to validate that they
54:23   were at the same level as BOC was.


**Page Range:      54:24-56:5**

54:24   Q.    Did Imagine do any modeling for Micron of
54:25   the effect if St. Luke's was added to the network at a
55: Page 55
55: 1   particular set of prices?
55: 2   A.    Yes.
55: 3   Q.    Who asked for that -- whose idea was that
55: 4   model?
55: 5   A.    Micron requested it.
55: 6   Q.    Were you involved in the details of the
55: 7   modeling?
55: 8   A.    Not really in the details, no.
55: 9   Q.    So you said -- did St. Luke's ever have
55:10   direct communications with Imagine about the
55:11   possibility of joining the network?
55:12   A.    No.
55:13   Q.    Did you learn whether St. Luke's had any
55:14   communications with Micron regarding that possibility?
55:15   A.    We were told by Micron that they had
55:16   direct conversation, yes.
55:17   MR. STEIN:  Can we put some timeframe on
55:18   the period you are talking about now.
55:19   Q.    So when were you told that by Micron?
55:20   A.    Most recently, it was about a year ago,
55:21   nine or ten months ago.  About a year ago, I would
55:22   say.

55:23   Q.    Did Micron ever inform you as to why
55:24   Imagine was not at the table for those discussions?
55:25   A.    We had been informed by Micron on a couple
56: Page 56
56: 1   of occasions that St. Luke's has expressed to them
56: 2   that they are not willing to work with Imagine Health.
56: 3   Q.    Were you told any reason for that by
56: 4   Micron?
56: 5   A.    No.


**Page Range:        56:8-57:7**

56: 8
56: 9
56:10
56:11
56:12
56:13
56:14
56:15
56:16   **REDACTED**
56:17
56:18
56:19
56:20
56:21
56:22
56:23
56:24
56:25
57: Page 57
57: 1
57: 2
57: 3   **REDACTED**
57: 4
57: 5
57: 6
57: 7


**Page Range:        57:8-58:23**

57: 8   Q.    Now, has Imagine made any efforts to bring
57: 9   other employers into its Boise network?
57:10   A.    Yes.
57:11   Q.    What has that involved?
57:12   A.    We've done numerous -- we've had numerous

57:13    efforts.  We've tried to work with brokers within the
57:14    community to let them know what our model is and what
57:15    the results have been for Micron so that they can
57:16    provide that information to their employer clients.
57:17    Then we also work on a national scope with
57:18    national self-funded employers who like to look at our
57:19    networks in various markets and may want to join on
57:20    networks as well.
57:21    So we've tried to do it locally and
57:22    nationally.
57:23    **REDACTED**
57:24
57:25    A.    No.
58: Page 58
58: 1    Q.    When you have made these efforts, have you
58: 2    reported that St. Luke's is not in either the high
58: 3    performance or PPO network?
58: 4    A.    Yes, we have reported they are not in the
58: 5    high performance network, and we do report that they
58: 6
58: 7
58: 8
58: 9
58:10
58:11
58:12    **REDACTED**
58:13
58:14
58:15
58:16
58:17
58:18
58:19
58:20
58:21
58:22
58:23


**Page Range:      59:1-59:12**

59: 1
59: 2
59: 3
59: 4    **REDACTED**
59: 5
59: 6
59: 7

59: 8   with the Walmart activity?
59: 9   A.   Well, we have -- we've since kind of
59:10   rebranded our narrow networks, and we are using the
59:11   Smart Care is our current brand for narrow networks
59:12   nationally.


**Page Range:      59:13-59:14**

59:13   Q.   Do you know whether IPN knows that Smart
59:14   Care is Imagine?


**Page Range:      59:16**

59:16   A.   I have not talked with IPN directly.


**Page Range:      59:17-60:17**

59:17   Q.   Is Saltzer in the PPO network today?
59:18   A.   They are now, yes.
59:19   Q.   Are they in the high performance network
59:20   today?
59:21   A.   No.
59:22   Q.   Did Saltzer ever come to Imagine and say:
59:23   We've changed our mind, we want to be in the high
59:24   performance network?
59:25   A.   No.
60: Page 60
60: 1   Q.   Did Saltzer ever come to Imagine and say:
60: 2   We've changed our mind, we want to be in the PPO
60: 3   network?
60: 4   A.   No.
60: 5   Q.   How did Saltzer come to be in the PPO
60: 6   network?
60: 7   A.   A little over a year ago they joined the
60: 8   ACN network, which we contract with.  And so now they
60: 9   are in our PPO network.
60:10   Q.   Do you know the circumstances under which
60:11   they joined the ACN network?
60:12   A.   I do not, no.
60:13   Q.   So for another employer considering your
60:14   programs currently, at least, they have Saltzer in the
60:15   PPO network; correct?
60:16   A.   Yes.  If they -- if they elect to use our
60:17   Wise PPO network, they do, yes.

**Page Range:      61:6-61:18**

61: 6    Can you tell me what you did to prepare
61: 7    for your deposition today?
61: 8    A.    I've met with Mr. Ettinger and talked
61: 9    about some of the issues and history of the case.
61:10    That's about it.
61:11    Q.    Is that just one meeting?
61:12    A.    We've had two meetings.
61:13    Q.    Can you tell me when those meetings were?
61:14    A.    There was one yesterday, and then one
61:15    about two weeks ago.
61:16    Q.    In the meeting yesterday, where did that
61:17    take place?
61:18    A.    At our office, Imagine Health.


**Page Range:      61:23-62:9**

61:23    Q.    And how long did that meeting -- how long
61:24    did that meeting last?
61:25    A.    About two and a half hours.
62: Page 62
62: 1    Q.    Did you go over some of the questions that
62: 2    you were going -- that you were asked this morning?
62: 3    A.    Uh-huh.
62: 4    Q.    And the second meeting you mentioned which
62: 5    was actually, I guess, the first meeting two weeks
62: 6    ago?
62: 7    A.    Yes.
62: 8    Q.    Where did that take place?
62: 9    A.    Also at our office.


**Page Range:      62:16-62:17**

62:16    Q.    And how long was that meeting?
62:17    A.    Probably about two hours as well.


**Page Range:      64:11-64:18**

64:11    Q.    Now, you are an employee of Imagine
64:12    Health; correct?
64:13    A.    Correct.
64:14    Q.    You are not an employee of Micron?
64:15    A.    No.

64:16   Q.    You are not authorized by Micron to talk
64:17   -- to speak on their behalf today?
64:18   A.    We are not, no, correct.


**Page Range:      65-4:65:15**

65: 4   Q.    Now, Imagine Health was contracted by
65: 5   Micron to help put together a network in Ada and
65: 6   Canyon counties; is that correct?
65: 7   A.    Initially, yes.  We later expanded that to
65: 8   include three more counties.
65: 9   Q.    Okay.  But in 2007, the original
65:10   engagement was for Ada and Canyon counties?
65:11   A.    Correct.
65:12
65:13   **REDACTED**
65:14
65:15


**Page Range:      66:2-67:8**

66: 2
66: 3
66: 4
66: 5
66: 6
66: 7
66: 8
66: 9
66:10
66:11
66:12
66:13
66:14   **REDACTED**
66:15
66:16
66:17
66:18
66:19
66:20
66:21
66:22
66:23
66:24
66:25
67: Page 67

67: 1
67: 2
67: 3
67: 4    **REDACTED**
67: 5
67: 6
67: 7
67: 8


**Page Range:      67:18-67:21**

67:18    **REDACTED**
67:19
67:20    **REDACTED**
67:21


**Page Range:      68:4-68:13**

68: 4
68: 5
68: 6
68: 7
68: 8    **REDACTED**
68: 9
68:10
68:11
68:12
68:13


**Page Range:      69:15-69:24**

69:15
69:16
69:17
69:18
69:19    **REDACTED**
69:20
69:21
69:22
69:23
69:24

**Page Range:**      **70:2-70:12**

70: 2      What is the network maintenance guarantee
70: 3      broadly?
70: 4      A.    I'd have to read it to remember what it
70: 5      was.
70: 6      Q.    Okay.
70: 7      A.    This looks like we would guarantee certain
70: 8      access in these areas of specialty to the Micron
70: 9      membership.
70:10      Q.    So if we look, for example, at the second
70:11      line of the chart for family practice, how do you
70:12      interpret what is required here for that?


**Page Range:**      **70:15-70:25**

70:15
70:16
70:17
70:18
70:19      **REDACTED**
70:20
70:21
70:22
70:23
70:24
70:25


**Page Range:**      **71:23-72:4**

71:23
71:24      **REDACTED**
71:25
72: Page 72
72: 1
72: 2      **REDACTED**
72: 3
72: 4


**Page Range:**      **72:14-74:8**

72:14      Q.    So prior to Imagine Health becoming the
72:15      network lease company, how did Micron provide health
72:16      insurance to its employees?
72:17      A.    It's my understanding they've always been

72:18   self-funded.  At least prior to our involvement with
72:19   them, they were self-funded, and they leased the Blue
72:20   Cross network in Boise.
72:21   Q.    Was the Blue Cross network limited to
72:22   Boise or did it also include Canyon County?
72:23   A.    And Canyon County, yes.
72:24   Q.    How inclusive was the Blue Cross network,
72:25   do you know?
73: Page 73
73: 1   A.    It's a broad panel PPO.  So it generally
73: 2   includes most or all of the providers in the area.
73: 3   Q.    Was Saltzer in the Blue Cross PPO network?
73: 4   A.    I believe they were.
73: 5   Q.    Was St. Luke's also in the PPO network?
73: 6   A.    Yes.
73: 7   Q.    And Saint Alphonsus was in the PPO
73: 8   network?
73: 9   A.    Yes.
73:10   Q.    So before Micron launched its narrow
73:11   network product, Micron employees had access --
73:12   network access to Saltzer, St. Luke's and Saint
73:13   Alphonsus; is that right?
73:14   A.    Right.
73:15   Q.    When you were putting together a network
73:16   for Micron, was it important to understand who the
73:17   existing providers were of services to Micron
73:18   employees?  In other words, who were the providers
73:19   that were providing a lot of services to Micron
73:20   employees?
73:21   A.    Yes.
73:22   Q.    What was the level of St. Luke's -- strike
73:23   that.
73:24   To what extent were Micron employees
73:25   obtaining hospital services from St. Luke's when Blue
74: Page 74
74: 1   Cross was the primary -- or was the provider for
74: 2   insurance to Micron employees?
74: 3   A.    Large extent.  I think about 70 percent of
74: 4   their hospitalization was going to St. Luke's.
74: 5   Q.    What is it today?
74: 6   A.    Probably about ten.  I know 90 percent of
74: 7   our population is going to St. Al's.  So I don't know
74: 8   the exact percentage going to St. Luke's.


**Page Range:      74:9-74:18**


74: 9   Q.    To what extent were Micron employees

74:10    seeking primary care and pediatric services from
74:11    Saltzer physicians when Blue Cross was the provider of
74:12    insurance?
74:13    A.    I can't answer that right now.  I don't
74:14    know.
74:15    Q.    Do you know the extent to which Saltzer
74:16    today is providing care to Micron insureds?
74:17    A.    No, I do not know.  I haven't looked at
74:18    that.


**Page Range:      76:14-76:19**

76:14    Q.    Let me hand you what I've marked as
76:15    Defendants' Exhibit 2.  This document is stamped SLH
76:16    604 through 615.  I'm going to ask you some questions
76:17    about this, but can you tell me whether you recognize
76:18    this document?
76:19    A.    I don't.


**Page Range:      78:16-80:8**

78:16    Q.    If you turn the page to 608, there's a
78:17    chart -- there's a section entitled New Plan Cost
78:18    Comparisons?
78:19    A.    Right.
78:20    Q.    Does this chart reflect the different
78:21    financial benefits available to Micron employees
78:22    depending on which level -- or from whom they obtain
78:23    services?
78:24    A.    Yes.
78:25    Q.    And then at the bottom of the page,
79: Page 79
79: 1    there's a section called What Does This Mean To Me,
79: 2    that attempts to translate this, with an example of
79: 3    the employee's out-of-pocket cost depending upon what
79: 4    type of provider they use; is that correct?
79: 5    A.    Right.
79: 6    Q.    So for an employee who has a sinus
79: 7    infection and visits a doctor and the office visit is
79: 8    $100, the chart shows that with a premium plan if the
79: 9    employee visits the Micron Family Health Center,
79:10    they're going to pay $10?
79:11    A.    Right.
79:12    Q.    If they use somebody in the narrow network
79:13    -- high performance network, it will be $15?
79:14    A.    Yes.

79:15   Q.    If they use someone in the PPO, they'd
79:16   have to pay $30 out of pocket?
79:17   A.    Yes.
79:18   Q.    And non-network would be $40?
79:19   A.    That's correct.
79:20   Q.    So an employee who went to an
79:21   out-of-network provider would pay four times as much
79:22   as they would if they went to the Micron health
79:23   center, and more than double what they'd pay if they
79:24   used a high performance network provider; is that
79:25   correct?
80: Page 80
80: 1   A.    Yes.
80: 2   Q.    In your experience, do patients respond to
80: 3   financial incentives to use in-network providers?
80: 4   A.    Yes.
80: 5   Q.    Those financial incentives are sufficient
80: 6   or can be sufficient to overcome patients' preference
80: 7   for out-of-network providers?
80: 8   A.    It can be.


**Page Range:      80:10-80:15**


80:10
80:11
80:12   **REDACTED**
80:13
80:14
80:15


**Page Range:      80:16-80:25**


80:16   Q.    When Saltzer was out of network, did
80:17   Micron succeed in shifting patient care from Saltzer
80:18   physicians to in-network physicians?
80:19   A.    Ultimately, yes.
80:20   Q.    How did you do that?
80:21   A.    Benefit direction.  They were required to
80:22   leave that community and go to the surrounding areas
80:23   to get access.
80:24   Q.    Who were required to do that?
80:25   A.    The patients.

**Page Range:      81:1-82:3**

81: 1   Q.    What were the surrounding areas they had
81: 2   to go to get -- what were the surrounding areas to
81: 3   which Micron employees had to travel to get primary
81: 4   care and pediatric services when Saltzer went out of
81: 5   network for Micron?
81: 6   MR. ETTINGER:  Objection.
81: 7   A.    Primarily they would have to transition
81: 8   into Boise.  We had some primary care available in
81: 9   Caldwell, but the migration doesn't go that way --
81:10   patient migration.
81:11   Q.    Did you hear from Micron that their
81:12   employees were not happy about having to go from Nampa
81:13   to Boise and other areas for primary care and
81:14   pediatric services?
81:15   A.    Yes, there was a lot of disruption
81:16   involved at that time.  So, yes, it was all over the
81:17   place.
81:18   Q.    At that time, you mean back in 2008?
81:19   A.    Correct.
81:20   Q.    So why didn't Micron add Saltzer to the
81:21   network?
81:22   A.    Excuse me?
81:23   Q.    So given all of the disruption and given
81:24   the complaints from Micron employees, why didn't
81:25   Micron add Saltzer back to the network?
82: Page 82
82: 1   A.    Saltzer was unwilling to contract with
82: 2   Imagine Health to enter into the Micron Health
82: 3   Partners Network or the narrow network.


**Page Range:      82:24-83:4**

82:24   Q.    And the -- and Saltzer's joining ACN or
82:25   the Advantage Care Network was something that happened
83: Page 83
83: 1   independent of the Micron relationship; right?  It
83: 2   wasn't something that Micron insisted on?
83: 3   A.    They did not insist on it for that
83: 4   contract to take place, that I'm aware of anyway.


**Page Range:      98:21-100:25**

98:21   Q.    You mentioned there were two PPOs.  There
98:22   was IPN and then you talked about First Health.  Who

98:23   specifically at First Health were you negotiating
98:24   with?
98:25   A.    It was not me that was doing the
99: Page 99
99: 1   negotiation.  That was going through Allison Robbins
99: 2   and Laura Peifer.  They managed that part.  I was over
99: 3   on the network development side.
99: 4   Q.    So who had communications with First
99: 5   Health about their decision not to participate in the
99: 6   Micron health plan?
99: 7   A.    That would have been Allison and Laura.
99: 8   Q.    It wasn't you?
99: 9   A.    No.
99:10   Q.    So you don't have firsthand knowledge of
99:11   what First Health said to Imagine Health about why it
99:12   was pulling out of its agreement to participate in the
99:13   network?
99:14   A.    Not directly with them, no.
99:15   Q.    Now, St. Luke's, it's your understanding,
99:16   was part of First Health; is that right?
99:17   A.    Yes.
99:18   Q.    Were there any other hospitals that were
99:19   part of the First Health network?
99:20   A.    In Boise?
99:21   Q.    Yes.
99:22   A.    No.
99:23   Q.    Saint Alphonsus was not in First Health?
99:24   A.    Was not.
99:25   Q.    So you mentioned earlier today that one of
100: Page 100
100: 1   the principles of the narrow network is that providers
100: 2   will give deeper discounts in exchange for exclusivity
100: 3   and the anticipated steerage that comes with that; is
100: 4   that right?
100: 5   A.    Yes.
100: 6   Q.    So would you think it's reasonable to
100: 7   conclude that in offering -- whatever rate St. Luke's
100: 8   offered to contract with First Health, if it was the
100: 9   only hospital system, that St. Luke's might have given
100:10   those rates in anticipation of receiving steerage from
100:11   contracts that First Health entered into?
100:12   A.    Yes.
100:13   Q.    But if First Health entered into a
100:14   contract with Micron, St. Luke's couldn't reasonably
100:15   expect steerage from Micron because Saint Alphonsus
100:16   was the preferred hospital provider; right?
100:17   A.    Through our network, yes.
100:18   Q.    Right.  So when Mr. Ettinger asked you

100:19   before if you could think of any reason why St. Luke's
100:20   wouldn't want to contract through First Health with
100:21   Micron, wouldn't one legitimate reason be that the
100:22   rates that St. Luke's agreed to give to First Health
100:23   were conditioned on an assumption of steerage that
100:24   wasn't going to happen?
100:25   A.    That would be legitimate, yes.


**Page Range:        102:1-102:22**

102: 1
102: 2
102: 3
102: 4
102: 5
102: 6
102: 7
102: 8
102: 9
102:10
102:11
102:12       **<u>REDACTED</u>**
102:13
102:14
102:15
102:16
102:17
102:18
102:19
102:20
102:21
102:22


**Page Range:        103:16-103:25**

103:16
103:17
103:18
103:19
103:20       **<u>REDACTED</u>**
103:21
103:22
103:23
103:24
103:25

**Page Range:**      **104:1-104:17**

104: 1
104: 2
104: 3
104: 4
104: 5
104: 6
104: 7
104: 8      **REDACTED**
104: 9
104:10
104:11
104:12
104:13
104:14
104:15
104:16
104:17

**Page Range:**      **104:18-104:23**

104:18
104:19
104:20      **REDACTED**
104:21
104:22
104:23

**Page Range:**      **105:2-106:10**

105: 2
105: 3
105: 4
105: 5
105: 6
105: 7
105: 8
105: 9
105:10
105:11
105:12      **REDACTEDA**
105:13
105:14
105:15

105:16
105:17
105:18
105:19
105:20
105:21
105:22
105:23
105:24
105:25
106: Page 106
106: 1     exactly right now.
106: 2     Q.     But even today, there are a number of St.
106: 3     Luke's providers who are in the PPO network for
106: 4     Micron; is that right?
106: 5     A.     Yes, they have retained contracts with
106: 6     ACN.
106: 7
106: 8     **REDACTED**
106: 9
106:10


**Page Range:        106:24-107:14**

106:24
106:25     **REDACTED**
107: Page 107
107: 1
107: 2
107: 3
107: 4
107: 5
107: 6     **REDACTED**
107: 7
107: 8
107: 9
107:10
107:11
107:12
107:13
107:14


**Page Range:        108:2-108:24**

108: 2     Q.     In addition to talking to Micron about the
108: 3     termination of provider contracts by St. Luke's, you

108: 4    were also talking to Saint Alphonsus; correct?
108: 5    A.    Yes.
108: 6    Q.    And they were doing their best to persuade
108: 7    you that they had an adequate network even with the
108: 8    loss of the St. Luke's providers; correct?
108: 9    A.    To persuade us and Micron, yes.  We were
108:10    trying to retain the client.
108:11    (Defendants' Exhibit 8 marked for
108:12    identification.)
108:13    Q.    Handing you now what I've marked as
108:14
108:15
108:16
108:17
108:18    **REDACTED**
108:19
108:20
108:21
108:22
108:23
108:24


**Page Range:       109:5-110:10**

109: 5
109: 6
109: 7
109: 8
109: 9
109:10
109:11
109:12
109:13
109:14    **REDACTED**
109:15
109:16
109:17
109:18
109:19
109:20
109:21
109:22
109:23
109:24
109:25
110: Page 110
110: 1    physicians employed by St. Luke's.  A few of the

110: 2
110: 3
110: 4
110: 5     **<u>REDACTED</u>**
110: 6
110: 7
110: 8
110: 9
110:10


**Page Range:       110:23-111:4**

110:23
110:24    **<u>REDACTED</u>**
110:25
111: Page 111
111: 1
111: 2     **<u>REDACTED</u>**
111: 3
111: 4


**Page Range:       111:6-112:3**

111: 6
111: 7
111: 8
111: 9
111:10
111:11
111:12
111:13
111:14    **<u>REDACTED</u>**
111:15
111:16
111:17
111:18
111:19
111:20
111:21
111:22
111:23
111:24
111:25
112: Page 112
112: 1     **<u>REDACTED</u>**
112: 2

112: 3   **<u>REDACTED</u>**

**Page Range:       112:7-112:12**

112: 7
112: 8
112: 9   **<u>REDACTED</u>**
112:10
112:11
112:12

**Page Range:       112:18-113:4**

112:18   **<u>REDACTED</u>**
112:19
112:20
112:21
112:22
112:23   **<u>REDACTED</u>**
112:24
112:25
113: Page 113
113: 1
113: 2   **<u>REDACTED</u>**
113: 3
113: 4

**Page Range:       113:22-114:14**

113:22   **<u>REDACTED</u>**
113:23
113:24
113:25
114: Page 114
114: 1
114: 2
114: 3
114: 4   **<u>REDACTED</u>**
114: 5
114: 6
114: 7
114: 8
114: 9
114:10
114:11

114:12
114:13    **<u>REDACTED</u>**
114:14


**Page Range:       114:15-114:18**

114:15
114:16    **<u>REDACTED</u>**
114:17
114:18


**Page Range:       114:19-115:8**

114:19    **<u>REDACTED</u>**
114:20
114:21
114:22
114:23    **<u>REDACTED</u>**
114:24
114:25
115: Page 115
115: 1
115: 2
115: 3
115: 4    **<u>REDACTED</u>**
115: 5
115: 6
115: 7
115: 8


**Page Range:       115:15-116:7**

115:15
115:16
115:17
115:18
115:19    **<u>REDACTED</u>**
115:20
115:21
115:22
115:23
115:24
115:25
116: Page 116
116: 1    primarily with St. Al's.

116: 2    Q.    Where would you have gotten these numbers?
116: 3    A.    Out of our database with current
116: 4    contracted providers.
116: 5    Q.    So those were the numbers of existing --
116: 6    other existing network providers and services?
116: 7    A.    Yes.


**Page Range:        116:11-118:1**


116:11
116:12
116:13        **<u>REDACTED</u>**
116:14
116:15
116:16
116:17
116:18
116:19
116:20
116:21        **<u>REDACTED</u>**
116:22
116:23
116:24
116:25
117: Page 117
117: 1
117: 2
117: 3
117: 4
117: 5
117: 6
117: 7
117: 8
117: 9
117:10        **<u>REDACTED</u>**
117:11
117:12
117:13
117:14
117:15
117:16
117:17
117:18
117:19
117:20
117:21
117:22

117:23    Surgical in the network?
117:24    A.    It might be considered in that way, yes.
117:25    Q.    Did you consider that to be the case?
118: Page 118
118: 1


**Page Range:        118:1-118:4**

118: 1
118: 2    **REDACTED**
118: 3
118: 4


**Page Range:        120:20-121:7**

120:20
120:21
120:22    **REDACTED**
120:23
120:24
120:25
121: Page 121
121: 1
121: 2
121: 3    **REDACTED**
121: 4
121: 5
121: 6
121: 7


**Page Range:        121:11-121:16**

121:11
121:12
121:13    **REDACTED**
121:14
121:15
121:16


**Page Range:        121:17-122:24**

121:17    **REDACTED**
121:18
121:19

121:20
121:21   **<u>REDACTED</u>**
121:22
121:23
121:24
121:25
122: Page 122
122: 1
122: 2   **<u>REDACTED</u>**
122: 3
122: 4
122: 5
122: 6
122: 7
122: 8
122: 9
122:10
122:11
122:12
122:13
122:14   **<u>REDACTED</u>**
122:15
122:16
122:17
122:18
122:19
122:20
122:21
122:22
122:23
122:24


**Page Range:**   **123:7-123:20**

123: 7
123: 8
123: 9
123:10
123:11
123:12
123:13   **<u>REDACTED</u>**
123:14
123:15
123:16
123:17
123:18
123:19

123:20


**Page Range:      123:21-123:24**

123:21
123:22   **<u>REDACTED</u>**
123:23
123:24


**Page Range:      132:21-133:13**

132:21   Q.     Mr. Stein also asked you about paragraph
132:22   three on the next page, the eight miles discussion; do
132:23   you remember that?
132:24   A.    Yes.
132:25   Q.    So my question is generally:  Did Imagine
133: Page 133
133: 1   -- was Imagine -- did Imagine shoot for just to meet
133: 2   the minimum targets at which it would not be penalized
133: 3   as set forth in this addendum?
133: 4   A.    Yes, Allison -- this is negotiated.  We
133: 5   obviously try to keep our guarantees as low as we can
133: 6   because there's financial risk involved.  So that's
133: 7   why it's stated "minimum".
133: 8   That is our minimum number associated with
133: 9   our financial risk, and we always exceed that -- or
133:10   generally try to exceed that, yes.
133:11   Q.     Do you try to exceed that in order to do a
133:12   good job in the clients?
133:13   A.    Yes.


**Page Range:      133:15-133:16**

133:15   A.    Yeah, to make sure there's adequate
133:16   access.


**Page Range:      134:2-134:12**

134: 2   Q.    You mentioned -- and I think I'm quoting
134: 3   you -- in response to questions about what happened
134: 4   when Saltzer was not in the network, you said I think
134: 5   a lot of disruption, unhappiness all over the place.
134: 6   Is disruption like that important to Imagine?
134: 7   A.    Yes.  Very important.

134: 8   Q.   And why is that?
134: 9   A.   Well, we obviously want to -- we want
134:10   client satisfaction.  And when there's disruption,
134:11   there's concern on the client's behalf, which is of
134:12   concern to us.


**Page Range:      134:13-135:2**

134:13   Q.   Was there a disruption in connection with
134:14   when -- was there disruption when Cardiovascular
134:15   Associates left the network?
134:16   A.    It was -- it was disruption.  As you can
134:17   imagine, cardiovascular was around and there's not a
134:18   lot of cases, as pediatric cases might be.  It's not
134:19   as many.
134:20   But it was important to Micron that we got
134:21   that contract in place.  And we're one of very few
134:22   payors that I know of that had a contract with that
134:23   group.  So that was a big score for us and they were
134:24   very happy about that.
134:25   Thankfully -- or luckily for Micron, when
135: Page 135
135: 1   they did terminate, St. Al's has since recruited other
135: 2   specialists of that nature into the market.


**Page Range:      135:10-135:23**

135:10   Q.   Was there disruption when Boise Orthopedic
135:11   left the network?
135:12   A.   Yes.  That was a serious disruption.
135:13   Q.   When you say "serious disruption", what
135:14   happens?
135:15   A.   Well, Micron, by nature of their business,
135:16   orthopedic is a big medical spend for them.  So they
135:17   have a lot of orthopedic cases within their medical
135:18   plan, a lot of hips, joints, backs.
135:19   Boise Orthopedic, as I mentioned, are
135:20   independent providers are more in sports medicine
135:21   related, etc.  Boise Orthopedic provided that full
135:22   scope, head to toe, for orthopedic services that they
135:23   were able to cover.


**Page Range:      136:6-136:12**

136: 6   A.   All of the employers are concerned about

136: 7    disruption.  This is a disruptive strategy.  So
136: 8    they're all concerned about that.
136: 9    They're interested in the strategy.  It's,
136:10    obviously, a cost saver.  And they love our quality
136:11    component.  But they're all interested in that and
136:12    worried about that.


**Page Range:     137:7-137:8**

137: 7    **REDACTED**
137: 8


**Page Range:     137:10-137:19**

137:10
137:11
137:12
137:13
137:14    **REDACTED**
137:15
137:16
137:17
137:18
137:19


**Page Range:     138:1-138:11**

138: 1    Q.   In response to one of Mr. Stein's
138: 2    questions, I think you said -- or he said and you
138: 3    agreed that Saltzer and St. Luke's turned out to be
138: 4    wrong on the ability of the program to shift patients;
138: 5    is that right?
138: 6    A.    Yes.
138: 7    Q.    So after they turned out to be wrong, did
138: 8    either of them to back to the table, to Imagine, and
138: 9    say:  Okay, we'll now offer you a more competitive bid
138:10    to be in the high performance network?
138:11    A.    No.


**Page Range:     138:12-139:6**

138:12    Q.    You were asked some questions about what
138:13    happened when Saltzer was out, and you said something
138:14    about shifting to Boise.  Were -- and then you said

138:15   there were other primary care physicians in the
138:16   network in Nampa from SAMG; am I right so far?
138:17   A.   Yes.
138:18   Q.   Do you recall or do you have knowledge as
138:19   to whether or not any of the shifting from Saltzer to
138:20   Boise involved specialists versus primary care
138:21   physicians?
138:22   A.   Yeah, I haven't looked at that in detail.
138:23   That's just I know the migration.  If they left the
138:24   Nampa area -- if the care wasn't available, they just
138:25   naturally migrated to Boise, which is where we had the
139: Page 139
139: 1   access available.
139: 2   So I can't tell you specifically primary
139: 3   care versus specialty.
139: 4   Q.   And was there primary care available in
139: 5   the network in Nampa other than Saltzer?
139: 6   A.   Yes.  We've established that, yes.


**Page Range:       143:12-143:22**

143:12   Q.   Turn to Exhibit 9 -- Defendants' Exhibit
143:13   9.  So under family practice there's a reference to
143:14   Idaho Family Physicians on page 464 that Mr. Stein
143:15   asked you about at the top of the page?  Do you see
143:16   that?  It's page 464, Defendants' Exhibit 9.
143:17   A.   Yes.
143:18   Q.   Family practice; do you see that?
143:19   A.   Yes, uh-huh.
143:20   Q.   Do you know which specialties are in Idaho
143:21   Family Physicians?
143:22   A.   I believe they're just family practice.


**Page Range:       147:3-147:5**

147: 3   If Saltzer were to leave the PPO network,
147: 4   do you think that would or would not cause significant
147: 5   disruption?


**Page Range:       147:7-147:16**

147: 7   A.   I believe it would cause disruption again.
147: 8   We made it through the initial storm in 2008 when they
147: 9   weren't in and moved along from there.
147:10   But now that they've been back in the

147:11   network for a year and a half -- and, again, I haven't
147:12   checked exactly to see what the utilization is for
147:13   them, but you'd have to assume that Micron has them
147:14   available again and are seeking services from them.
147:15   So if they pulled out again, it would be another round
147:16   of disruption.

**Page Range:      149:2-150:12**

149: 2   Q.    What do you mean by "disruption"?
149: 3   A.    Well, if you are used to going to a
149: 4   certain physician for services, for care, and they're
149: 5   no longer available, you are disrupted.  You have to
149: 6   find a new doctor.
149: 7   Q.    And is that why you said before that this
149: 8   is a disruptive strategy, referring to the narrow
149: 9   network strategy?
149:10   A.    Yes.
149:11   Q.    So the Micron -- the plan that you brought
149:12   to Micron was unique for the Boise market; right?  It
149:13   was something that this market hadn't seen before; is
149:14   that correct?
149:15   A.    No.
149:16   Q.    And any time you are narrowing a network
149:17   as in the case, for example, of moving from the Blue
149:18   Cross PPO to a narrow network, there's going to be
149:19   disruption; right?
149:20   A.    Yes.
149:21   Q.    And any time a provider leaves the network
149:22   or moves from one tier to another, there's disruption?
149:23   A.    It is disruptive in that manner.  And I
149:24   probably should expand my interpretation of
149:25   "disruption".
150: Page 150
150: 1   It's really disruption to the whole health
150: 2   care community.  Hospitals aren't used to having to
150: 3   bid competitively, and they're not used to losing
150: 4   necessarily, so they're disrupted.
150: 5   Physicians are the same way.  They go
150: 6   along life a certain way.  Health care has always been
150: 7   done a certain way.  PPO networks contract with
150: 8   everybody.  They've melted into it, they like it.
150: 9   So it disrupts hospitals, it disrupts
150:10   physicians, it disrupts patients.  It's new.  Any time
150:11   you do something new and it's different like that,
150:12   it's going to cause disruption.

**Page Range:      151:6-151:13**

151: 6    Q.    Mr. Ettinger asked you about the
151: 7    disruption that would be caused to Micron if Saltzer
151: 8    were to leave the PPO network.  In order to know what
151: 9    the disruption is, you really would have to know what
151:10    the level of utilization is?
151:11    A.    That is correct.
151:12    Q.    And you don't know what this is?
151:13    A.    No, we do not know today.  No.

**Page Range:      151:20-152:8**

151:20    Q.    When a group has been excluded from the
151:21    network or resigns the network or its contract is
151:22    terminated, are all those equally disruptive?
151:23    A.    It has been in Boise.  I should say that
151:24    this has not occurred in any of our other networks.
151:25    In San Antonio, we've had that network in
152: Page 152
152: 1    place for about six years.  We did lose a pediatric
152: 2    group who elected to no longer work with us so we did
152: 3    have to replace them.
152: 4    This is the only model that we've had to
152: 5    deal with this kind of continuous change.  It's always
152: 6    disruptive in the beginning, but them it usually
152: 7    settles down.  This is the one constant that continues
152: 8    to go, as far as disruption is concerned.