# TESTIMONY OF DR. MICHAEL DJERNES
Received on September 25, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:**     7:13-7:25

```
7:13   BY MR. ETTINGER
7:14   Q.  Doctor, could you state your full name
7:15   for the record, please.
7:16   A.  Michael Roger Djernes.
7:17   Q.  And what's your occupation?
7:18   A.  Physician.
7:19   Q.  And where do you work?
7:20   A.  Saltzer Medical Group in Nampa, Idaho.
7:21   Q.  How long have you worked at Saltzer?
7:22   A.  22 -- this is my 23rd year with
7:23   Saltzer.
7:24   Q.  Okay.  And what's your specialty?
7:25   A.  Neurology.
```

**Page Range:**     8:17-9:12

```
8:17   Q.  Okay.  Are you on the Finance Committee
8:18   of Saltzer?
8:19   A.  Yes.
8:20   Q.  Does that committee still exist today?
8:21   A.  Yes.
8:22   Q.  How long have you been on the Finance
8:23   Committee?
8:24   A.  I don't recall how many years.  I've
8:25   been on Finance Committee intermittently since we
9: Page 9
9: 1   formed it originally.
9: 2   Q.  Which was roughly when?
9: 3   A.  I don't recall the exact year.
9: 4   Q.  Okay. Are there any -- was it ten
9: 5   years ago or more?
9: 6   A.  My guess would be 10 or 12 years.
9: 7   Q.  Okay. Okay.  Have you had any
9: 8   particular positions on the Finance Committee?
9: 9   A.  I was chairman of Finance Committee for
9:10   several years and have -- then took a break
9:11   thereafter from committee positions.  And now I'm
9:12   a member of Finance Committee at this time.
```

**Page Range:     10:1-10:12**

10: 1   Do you have any other administrative or
10: 2   committee roles at Saltzer?
10: 3   A.  Yes.
10: 4   Q.  And what are they?
10: 5   A.  I'm on Executive Committee.
10: 6   Q.  About how long have you been on
10: 7   Executive Committee?
10: 8   These questions seem to have a certain
10: 9   similarity, don't they?
10:10   A.  For almost as long as I've been here.
10:11   I've been on Executive Committee for many years.
10:12   Not consistently so, but for many years.

**Page Range:     11:1-11:8**

11: 1   Q.  Okay.  When you say you've been on it
11: 2   for many years, can you just give me a sense of
11: 3   what -- what "many" means in this most recent --
11: 4   A.  15, 20 years.
11: 5   Q.  Any other administrative or committee
11: 6   roles at Saltzer in recent years?
11: 7   A.  I'm currently chairman of the IT
11: 8   Committee.

**Page Range:     29:24-31:3**

29:24   Q.  BY MR. ETTINGER:  Okay.  Let me show
29:25    you what's been previously marked as Exhibit 203,
30: Page 30
30: 1   and it's an E-mail from you to several people.
30: 2   A.  Thank you.
30: 3   MR. ETTINGER:  This one I've got enough on.
30: 4   Q.  BY MR. ETTINGER:  Are you ready?
30:5    A.  Oh.
30: 6   Yes, sir.  Go ahead.
30: 7   Q.  Okay.  So is this top E-mail in
30: 8   Exhibit 203 an E-mail that you sent?
30: 9   A.  Yes.
30:10   Q.  And in the first paragraph, you say,
30:11   about three lines down, ". . . I feel that we
30:12   should simply agree to disagree and abandon
30:13   further negotiations with them."
30:14   Do you see that?
30:15   A.  Yes.

30:16  Q.  And by "them," you meant St. Luke's,
30:17  correct?
30:18  A.  Yes.
30:19  Q.  And why did you think that as of June
30:20  of 2011?
30:21  A.  I was afraid on a couple of fronts.
30:22  The first is there was beginning to be a lot of
30:23  dissension within the group over proceeding with
30:24  this deal, between the surgeons and the primary
30:25  care physicians.
31: Page 31
31: 1  And my other concern with this deal if
31: 2  it went forward is that I would somehow lose
31: 3  autonomy, independence.


**Page Range:     31:4-31:10**

31: 4  Q.  You said in the third paragraph,
31: 5  " . . . I remain uninterested, as I have from day
31: 6  one, in giving Luke's any control of our employee
31: 7  base, nor would I currently be interested in
31: 8  selling them any of our ancillary services."
31: 9  Was that your view at the time?
31:10  A.  Yes.


**Page Range:     31:11-31:15**

31:11  Q.  Were there others in the group who
31:12  shared that view at the time?
31:13  A.  I don't know of -- of their personal
31:14  views.  There were others who spoke against it, as
31:15  I recall.


**Page Range:     32:4-32:13**

32: 4  Q.  Do you recall others who disagreed with
32: 5  your views at that time?
32: 6  A.  Yes.
32: 7  Q.  And who was that?
32: 8  A.  There were physicians within the group
32: 9  who were in favor of proceeding and moving forward
32:10  with the negotiations and the deal, so to speak.
32:11  Q.  And who were those?
32:12  A.  The physicians that come to mind were
32:13  Randy Page and John Kaiser.

**Page Range:**   32:14-32:24

32:14   Q.  Okay.  In the next-to-last paragraph,
32:15   you say, "Clearly an undesirable outcome for an
32:16   otherwise very strong and economically healthy
32:17   group."
32:18   Do you see that?
32:19   A.  Yes.
32:20   Q.  Was that accurate that the group was
32:21   very strong and economically healthy?
32:22   A.  At this time?
32:23   Q.  Yeah.
32:24   A.  In my opinion, they were.


**Page Range:**   33:6-33:12

33: 6   Q.  Between -- between June -- June of 2011
33: 7   and the time the transaction with St. Luke's
33: 8   occurred, did that change?
33: 9   A.  The orthopedists left at that point.
33:10   And subsequent to them leaving, the remainder of
33:11   the surgeons left.  I think that impacted the
33:12   group's economics.


**Page Range:**   41:4-41:5

41: 4   Q.  Okay.  I want to go back to
41: 5   Exhibit 203, if you can find that in your stack.


**Page Range:**   41:13-42:7

41:13   Q.  In the first paragraph of this
41:14   E-mail -- this is the E-mail, you recall, where
41:15   you said we should agree to disagree and abandon
41:16   further negotiations.  Do you remember that that
41:17   was the context of the E-mail?
41:18   A.  Do I remember the contact of --
41:19   Q.  The context of the E-mail --
41:20   A.  Oh, context.
41:21   Q.  -- since we looked at it a few minutes
41:22   ago?
41:23   A.  Yes.
41:24   Q.  In that first paragraph, you say --
41:25   after talking about we should abandon further
42: Page 42

    42: 1    negotiations, you say, "I feel particularly
    42: 2    strongly about this given their recent responses
    42: 3    to our administration this past Friday where they
    42: 4    declined to allow us autonomy in patient referral
    42: 5    patterns, et cetera."
    42: 6    Do you see that?
    42: 7    A.  Yes.

**Page Range:     44:8:44-11**

    44: 8    Q.  Okay.  So just -- you just don't
    44: 9    remember the details behind your statement in the
    44:10    E-mail?
    44:11    A.  That is correct.

**Page Range:     44:13-45:1**

    44:13
    44:14
    44:15
    44:16
    44:17
    44:18
    44:19    **REDACTED**
    44:20
    44:21
    44:22
    44:23
    44:24
    44:25
    45: Page 45
    45: 1

**Page Range:     45:3-45:6**

    45: 3
    45: 4    **REDACTED**
    45: 5
    45: 6

**Page Range:   47:2-47:4**

    47: 2
    47: 3   **REDACTED**

47: 4

Page Range:    47:6-47:25  47: 6

47:6
47:7
47:8
47:9
47:10
47:11
47:12
47:13
47:14
47:15  **REDACTED**
47:16
47:17
47:18
47:19
47:20
47:21
47:22
47:23
47:24
47:25

Page Range:    54:6-54:13

54: 6    Q.  Did you apply for privileges at -- at
54: 7    St. Luke's?
54: 8    A.  Yes.
54: 9    Q.  And what privileges -- did you seek
54:10    active staff privileges?
54:11    A.  No.
54:12    Q.  What level of privileges?
54:13    A.  Courtesy.


Page Range:    54:16-55:2

54:16    When did you apply for privileges at
54:17    St. Luke's?
54:18    A.  I don't recall the exact date.  Our
54:19    business office has an employee that is in charge
54:20    of physician application for privileges.  Beverly
54:21    Rich is her name, and she submitted the paperwork
54:22    on behalf of all the physicians for privileges to
54:23    St. Luke's at various hospitals.
54:24    Q.  And was this the latter part of 2012?

54:25   A.   I don't know when Beverly sent them in.
55: Page 55
55: 1   It would have been sometime after we formed the
55: 2   agreement with St. Luke's.


**Page Range:      55:22-56:19**

55:22   Q.   And why did you apply for privileges at
55:23   that time?
55:24   A.   Because I thought that I might want to
55:25   refer patients to St. Luke's facilities to do
56: Page 56
56: 1   certain procedures.  It's just myelograms, or
56: 2   things along those lines, which we do in
56: 3   neurology, and privileges are required to order
56: 4   some of those procedures.
56: 5   Q.   Where had you ordered those procedures
56: 6   previously?
56: 7   A.   Depending upon preferences, primarily
56: 8   at -- well, I was going to say Mercy -- Saint
56: 9   Alphonsus.
56:10   Q.   Okay.  And is it because of -- why is
56:11   it that you came to the conclusion in 2012 that
56:12   you wanted to start, potentially, ordering those
56:13   procedures at St. Luke's?
56:14   A.   It was just a matter of trying to
56:15   expand my privilege base.  And then, secondarily,
56:16   it's my understanding that St. Luke's is going to
56:17   build a facility in Nampa, and I wanted to be able
56:18   to have privileges to order imaging and other
56:19   procedures there as well.


**Page Range:      58:1-58:11**

58: 1   Q.   BY MR. ETTINGER:  Let me show you
58: 2   Exhibit 733, Dr. Djernes, which is a series of
58: 3   E-mails in which you were involved in December of
58: 4   2012, Bates-numbered Saltzer177706 through 07.
58: 5   Take a look at it and I'll ask you some questions.
58: 6   A.   Go ahead, please.
58: 7   Q.   Is Exhibit 733 a series of E-mails in
58: 8   which you were involved in December of 2012 on the
58: 9   subject of contingency plans should the St. Luke's
58:10    deal be blocked?
58:11    A.   Yes.

**Page Range:**     59:6-59:8

    59: 6   Q.  Do you recall the -- the subjects
    59: 7   discussed in the E-mail?
    59: 8   A.  Yes, I recall the subject.

**Page Range:**     59:24-61:6


  59:24  Q.  Dr. McKinnon asked you ". . . what
  59:25  the financial impact of the surgeons leaving
 Page  60
  60: 1  would/will have on us." Do you see that?
  60: 2  A.  Yes, I see that.
  60: 3  Q.  And you said, among other things, "We
  60: 4  will rehire surgeons and eventually bridge the
  60: 5  gap." Do you see that?
  60: 6  A.  Yes, I see that.
  60: 7  Q.  And did you make that statement to him?
  60: 8  A.  In the E-mail, I did.
  60: 9  Q.  Now, though, the E-mail is reporting to
  60:10  others on what you said orally to Dr. McKinnon,
  60:11  correct?
  60:12  A.  Yes.  I don't know that my E-mail
  60:13  exactly expressed the word-for-word conversation I
  60:14  had with Dr. McKinnon.
  60:15  Q.  Do you have any basis for disputing the
  60:16  accuracy of your E-mail, sitting here today?
  60:17  A.  I think this E-mail expresses the
  60:18  sentiment of the conversation I had with
  60:19  Dr. McKinnon.
  60:20  Q.  Accurately?
  60:21  A.  Within reasonable accuracy, yes.
  60:22  Q.  Do you recall it any differently,
  60:23  sitting here today?
  60:24  A.  Well, again, Dr. McKinnon's concern was
  60:25  the financial impact on the group of the surgeons
 Page 61
   61:1   leaving and how would we cover that.
   61:2   And one of the things that I tried to
   61:3   do to help him understand how we would cover that
   61:4   is to explain to him that we would probably,
   61:5   hopefully, rehire additional orthopedic surgeons
   61:6   to fill the gap.

**Page Range:**     71:10-71:15

71:10   Q.  If -- if the deal were unwound, would
71:11   you leave -- would you leave town, go practice in
71:12   some other place other than the Treasure Valley?
71:13   A.  Maybe.
71:14   Q.  Have you thought about that?
71:15   A.  Yes.

**Page Range:     71:16-71:24**

71:16   Q.  Okay.  Where would you go?
71:17   A.  I don't know.
71:18   Q.  Okay.  So how much time have you spent
71:19   thinking about that issue?
71:20   A.  Occasionally, from time to time.
71:21   Q.  Okay. Have you inquired anywhere in
71:22   some other communities as to what might be
71:23   available?
71:24   A.  No.

**Page Range:     71:25-72:21**

71:25   Q.  Okay.  Does -- have you inquired of
72: Page 72
72: 1   anyone at St. Luke's as to how St. Luke's might
72: 2   help out if the court were to order Saltzer
72: 3   unwound?
72: 4   A.  Have I inquired?
72: 5   Q.  With anyone at St. Luke's as to how
72: 6   they might help out to -- to make that workable
72: 7   for Saltzer?
72: 8   A.  No.
72: 9   Q.  Do you know whether anyone at Saltzer
72:10   has done that?
72:11   A.  I don't know.
72:12   Q.  Have you asked whether anyone at
72:13   Saltzer has done that?
72:14   A.  Not that I recall.
72:15   Q.  Do you care whether anyone at Saltzer
72:16   has done that?
72:17   A.  We at Saltzer Executive Committee have
72:18   talked about forming a committee to come up with
72:19   a contingency plan were this deal unwound.  To
72:20   my knowledge, that committee has not been formed
72:21   yet.

9

**Page Range:**   77:22-77:23

  77:22   Q.  Okay.  In your view, has Saltzer always
  77:23   been a high-quality institution?


**Page Range:**   77:25-78:3

  77:25   Q.  BY MR. ETTINGER:  Provide high-quality
  78: Page 78
  78: 1   care, generally?
  78: 2   A.  In my opinion, Saltzer provides high
  78: 3   quality of -- of care.


**Page Range:**   78:20-78:23

  78:20   Q.  Okay.  Has the IT Committee ever
  78:21   undertaken any kind of comparison between the
  78:22   eClinicalworks system and the Epic system?
  78:23   A.  To my knowledge, no.


**Page Range:**   79:20-79:23

  79:20   Q.  Okay.  Okay.  But with the exception of
  79:21   the complaints that one would expect from a
  79:22   certain generation, have Saltzer physicians been
  79:23   pretty satisfied with eClinicalworks?


**Page Range:**   79:25

  79:25   THE WITNESS:  As far as I know.


**Page Range:**   80:10-80:20

  80:10   Q.  Okay.  You said you're very busy.  Is
  80:11   your business down since the -- the surgeons have
  80:12   left Saltzer?
  80:13   A.  I don't think it's down.  It -- it's
  80:14   different.
  80:15   Q.  Different how?
  80:16   A.  Immediately after the orthopedic
  80:17   surgeons left, because a good share of my
  80:18   referrals are procedural from the orthopedics,
  80:19   when they left, it seemed that -- that I was no

80:20   longer receiving those referrals from them.


**Page Range:      81:15-82:4**

81:15   Q.   Okay.  Are you -- are there cases that
81:16   you turned down in the past that you're no longer
81:17   turning down --
81:18   A.   Yes.
81:19   Q.   -- because of the payment source?
81:20   A.   Yes.
81:21   Q.   What cases have you turned down in the
81:22   past?
81:23   A.   Medicare, uninsured, TRICARE.
81:24   Q.   Did you see Medicare patients at all in
81:25   the past?
82: Page 82
82: 1   A.   A few on case-by-case basis.
82: 2   Q.   But generally, you refused --
82: 3   A.   Most neurologists in private practice
82: 4   in the state do not accept Medicaid.


**Page Range:      83:10-83:12**

83:10   So you ultimately voted for the
83:11   St. Luke's deal, did you not?
83:12   A.   I did.


**Page Range:      85:5-85:15**

85: 5   Q.   Okay.  And one of your concerns in
85: 6   getting compensated more than St. Luke's initially
85: 7   offered was to have enough money to tide you over
85: 8   if worse came to worse after five years and you
85: 9   wanted to start a practice again, correct?
85:10   A.   That is one of the things that I
85:11   considered at the time.
85:12   Q.   Yeah.  Okay.  And you ultimately were
85:13   satisfied with the compensation that St. Luke's
85:14   offered?
85:15   A.   Yes.


**Page Range:      95:14-95:19**

95:14   Q.   While Saltzer was independent, was

11

```
95:15    there ever a discussion of Saltzer being in
95:16    financial jeopardy?
95:17    A.  By "jeopardy," you mean . . .
95:18    Q.  In poor financial condition?
95:19    A.  Not that I recall.
```

**Page Range:     97:23-98:6**

```
97:23    Q.  What was the nature of the dissension
97:24    between PCPs and specialists?
97:25    A.  The nature of the dissension was not
98: Page 98
98: 1    exclusively between specialists and primary care
98: 2    doctors.  It was primarily between the surgeons
98: 3    and the rest of the group.
98: 4    There was dissension, I -- I think,
98: 5    really over -- it boils down to Treasure Valley
98: 6    Hospital.  That was the primary sticking point.
```

**Page Range:     106:25-107:15**

```
106:25    Q.  Okay.  All the others, were their
107: Page 107
107: 1    reasons --
107: 2    A.  No, you said -- you asked me for one.
107: 3    Q.  No, I said -- I said --
107: 4    A.  Okay.  Okay.
107: 5    Q.  Any besides Dr. Andrew who gave a
107: 6    reason unrelated to the St. Luke's deal?
107: 7    A.  It's difficult to answer with yes or no
107: 8    because the reasons that the surgeons told me were
107: 9    intertwined.  There were call issues they were
107:10    concerned about.  There were ability to expand
107:11    their practice they were concerned about.  Some
107:12    wanted to remain independent.  Some wanted to
107:13    align with Saint Alphonsus.  There were different
107:14    answers.  It's hard to put them all into one
107:15    nutshell.
```

**Page Range:     109:4-109-10**

```
109: 4    Q.  BY MR. ETTINGER:  Let me put it this
109: 5    way.  If there had been no St. Luke's transaction,
109: 6    do you have any specific reasons to believe that
109: 7    any of those surgeons would have left?
```

109: 8   A.  I can't speak for them, but from my
109: 9   viewpoint, I can't think of a specific reason why
109:10   they would have.