# TESTIMONY OF LINDA HOUSE
Received on September 26, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:     7:3-7:8**

   7: 3   Q.  Ms. House, could you state your name
   7: 4   for the record, please.
   7: 5   A.  Linda Kay House.
   7: 6   Q.  What's your occupation?
   7: 7   A.  I am the systems director of employer
   7: 8   relations at St. Luke's Health System.

**Page Range:     7:20-9:4**

   7:20   We'll start out by looking at the most
   7:21   recent resume of yours that I was able to find,
   7:22   anyhow.
   7:23   Why don't you mark that as 210.
   7:24   (Exhibit No. 210 marked.)
   7:25   You've been handed Plaintiff's Exhibit
   8: Page 8
   8: 1   No. 210, Ms. House.  Please take a look at it and
   8: 2   let me know what it is.
   8: 3   It appears to be a resume of yours from
   8: 4   2009?
   8: 5   A.  That is correct.
   8: 6   Q.  Okay.  So, in 2009, what was your
   8: 7   position at St. Luke's?
   8: 8   A.  In 2009, I had changed positions, and I
   8: 9   was appointed the director of employer relations.
   8:10   Q.  And, prior to that, would you say, on
   8:11   the cover note on Exhibit No. 210 says, "Director
   8:12   of physician relations/ manager select medical
   8:13   network."
   8:14   Were those positions that you had as of
   8:15   February of 2009?
   8:16   A.  Prior to February of 2009 --
   8:17   Q.  Okay.
   8:18   A.  -- I had those positions.
   8:19   Q.  Okay.  And, on the cover e-mail, it
   8:20   says, "director physician relations."  On the
   8:21   resume, it says, "director of provider services."
   8:22   Are those the same thing?
   8:23   A.  Yes.

8:24   Q.   Why don't you describe what your duties
8:25   were in that position.
9: Page 9
9: 1   A.   In that position, I was still managing
9: 2   Select Medical Network, as well as responsible for
9: 3   physician recruitment, relations, and in-house
9: 4   credentialing of providers.


**Page Range:    11:10-11:21**

11:10   Q.   And what is Select Medical Network?
11:11   A.   Select Medical Network was a local
11:12   independent practice association that was started
11:13   in probably 2002.  And it was owned by a group of,
11:14   I believe, eight primary care physician groups and
11:15   St. Luke's.
11:16   Q.   What were the relative ownership
11:17   interests?
11:18   A.   The physician partners owned
11:19   50 percent.  St. Luke's owned 50 percent.  And
11:20   50 percent was distributed equally among those
11:21   practices.


**Page Range:    11:22-12:5**

11:22   Q.   And so how did your role at St. Luke's
11:23   change in February of 2009?
11:24   A.   In February of 2009, I was asked by
11:25   Ed Dahlberg and Chuck Pomeroy to take on the role
12: Page 12
12: 1   of acting as a liaison to the employers in the
12: 2   community.
12: 3   Q.   And how long did you serve in that
12: 4   position?
12: 5   A.   I'm still serving in that position.


**Page Range:    17:24-18:6**

17:25   You've been handed Exhibit No. 211.  It
18: Page 18
18: 1   appears to be a meeting of the St. Luke's Health
18: 2   System contracting committee, June 9, 2010.  The
18: 3   cover page is an agenda.  And the pages after that
18: 4   appear to be minutes.
18: 5   Have I properly described the document?

18: 6    A.  Yes.


**Page Range:    27:17-27:21**

27:17    Q.  Okay.  So did St. Luke's ever give a
27:18    discount to Boise Schools?
27:19    A.  Not that I am aware.
27:20    Q.  Did St. Luke's ever give a discount to
27:21    Idaho Power?


**Page Range:    27:24-28:1**

27:24    A.  Not that I'm aware.
27:25    Q.  Did St. Luke's ever give a discount to
28: Page 28
28: 1    Ada County?


**Page Range:    28:3-28:13**

28: 3    THE WITNESS:  Not that I'm aware.
28: 4    Q.  BY MR. ETTINGER:  Has St. Luke's ever
28: 5    offered a discount to any employer?
28: 6    A.  Yes, to Micron.
28: 7    Q.  Besides Micron?
28: 8    A.  Not that I'm aware of.
28: 9    Q.  Have you ever proposed St. Luke's offer
28:10    a discount to one or more employers?
28:11    A.  Have I?
28:12    Q.  Right.
28:13    A.  Yes.


**Page Range:    28:20-29:4**

28:20    Q.  And what was your proposal?
28:21    A.  The proposal was that, at the time,
28:22    there were benefit designs in place for the other
28:23    -- to steer people to the other facilities so that
28:24    we take a look at that and see if it's something
28:25    that we might want to, ourselves, put a proposal
29: Page 29
29: 1    forth.
29: 2    Q.  Was your idea to do it just for Micron
29: 3    or to do it for others, as well?
29: 4    A.  To do it for others, as well.

**Page Range:     29:5-30:1**

```
29: 5   Q.  And what was your reasoning for
29: 6   thinking that that was something that St. Luke's
29: 7   ought to look more closely at?
29: 8   A.  Well, I thought it was, basically, if
29: 9   Saint Al's was doing that, that was something that
29:10   St. Luke's should take a look at.
29:11   Q.  And who did you make that proposal to?
29:12   A.  Chuck Pomeroy.
29:13   Q.  Anyone else?
29:14   A.  Probably Ed Dahlberg.
29:15   Q.  What were their positions at the time?
29:16   A.  I believe, at that time, I believe
29:17   Ed Dahlberg was still CEO of the health system,
29:18   and Chuck Pomeroy was chief financial officer of
29:19   the health system.
29:20   Q.  What was their reaction to your
29:21   proposal?
29:22   A.  They really felt that the market should
29:23   drive where people go.
29:24   Q.  So they opposed the idea of offering
29:25   discounts to employers?
30: Page 30
30: 1   A.  Yes.
```

**Page Range:     30:11-30:22**

```
30:11   But when you say they believed the
30:12   market ought to drive where people go, either way
30:13   the market is driving where people go; correct?
30:14   A.  Maybe I misstated that.  I think the
30:15   individuals should choose where they get their
30:16   health care.
30:17   Q.  Without regard to the employer making a
30:18   decision on price?
30:19   A.  Correct.
30:20   Q.  Did they explain why that was their
30:21   view?
30:22   A.  They didn't.
```

**Page Range:     30:23-31:13**

```
30:23   Q.  Okay.  Are you familiar with the
30:24   benefit design that Idaho Power had that favored
30:25   Saint Alphonsus?
```

31: Page 31
31: 1   A.  I'm familiar with it.
31: 2   Q.  Tell me what you can recall about it.
31: 3   A.  What I recall is that there was an
31: 4   arrangement with Saint Alphonsus, and the
31: 5   employees were incentivized if they use the
31: 6   inpatient services at Saint Alphonsus.  They would
31: 7   receive a $500 check to help them with the payment
31: 8   of their services.  And if they received any kind
31: 9   of outpatient surgery, that there was a $250
31:10   incentive check that was given to the employee.
31:11   Q.  And, I'm sorry, I may have asked you
31:12   this, but Idaho Power ended that program?
31:13   A.  They have.


**Page Range:     40:6-40:21**

40: 6   Have any employers approached you about
40: 7   some kind of program to control utilization?
40: 8   A.  They have approached us to visit about
40: 9   what we were working on in regards to controlling
40:10   utilization.
40:11   Q.  Which employers did that?
40:12   A.  Boise School District.
40:13   Q.  Any others?
40:14   A.  Micron.
40:15   Q.  Any others?
40:16   A.  Not that I'm aware.
40:17   Q.  And in either of those cases, did
40:18   St. Luke's make a specific proposal:  We can offer
40:19   you a program that does such and such in
40:20   controlling utilization?
40:21   A.  No.


**Page Range:     40:22-41:13**

40:22   Q.  Okay.  Did either of those employers
40:23   ask for a specific proposal?
40:24   A.  It was more of a request to explore
40:25   what we were working on.  As I expressed before,
41: Page 41
41: 1   Boise School District would have us, as well as
41: 2   Saint Al's, out probably every six months to
41: 3   discuss what programs that we were working on,
41: 4   what we felt the benefit would be, where we were
41: 5   in the development of the program, if we had any

5

| | |
|---|---|
| 41: 6 | outcome measures, that type of thing. |
| 41: 7 | Q.  Okay.  And when was -- when did |
| 41: 8 | utilization come up, the conversations with Boise |
| 41: 9 | School District, what year, approximately? |
| 41:10 | A.  We actually started talking to Boise |
| 41:11 | Schools in regards to what Select Medical |
| 41:12 | Network's goals and visions were going to be |
| 41:13 | probably back in 2005. |

**Page Range:     45:7-45:15**

| | |
|---|---|
| 45: 7 | Q.  And St. Luke's has not offered any |
| 45: 8 | employer any program to control utilization as of |
| 45: 9 | today; correct? |
| 45:10 | A.  Not that I am aware of.  I know that |
| 45:11 | there is one that they're looking at. |
| 45:12 | Q.  And so how long -- for how long has |
| 45:13 | St. Luke's been talking about controlling |
| 45:14 | utilization, in your experience? |
| 45:15 | A.  Since 2003. |

**Page Range:     49:10-50:18**

| | |
|---|---|
| 49:10 | Q.  Ms. House, I'm showing you what has |
| 49:11 | been marked as Plaintiff's Exhibit 213.  It |
| 49:12 | appears to be an e-mail from you to Gary Fletcher, |
| 49:13 | Jack Kee, and Janet Miller.  And I'll ask you to |
| 49:14 | take a look at it. |
| 49:15 | A.  Okay. |
| 49:16 | Q.  Is that, in fact, an e-mail that you |
| 49:17 | wrote? |
| 49:18 | A.  It is. |
| 49:19 | Q.  You started off by saying, "I wanted to |
| 49:20 | pass on a few comments I have received from some |
| 49:21 | local brokers," and you describe the comments. |
| 49:22 | So who were the local brokers you were |
| 49:23 | referring to here? |
| 49:24 | A.  Mercer, Payne Financial, and Western |
| 49:25 | Benefit Solutions. |
| 50: Page 50 | |
| 50: 1 | Q.  Who at Mercer? |
| 50: 2 | A.  Shelli Stayner. |
| 50: 3 | Q.  And what was the second company you |
| 50: 4 | mentioned?  I'm sorry. |
| 50: 5 | A.  Payne Financial, Trish Quarlet. |
| 50: 6 | Q.  How do you spell her name? |

6

50: 7   A.  Q-u-a-r-l-e-t.
50: 8   Q.  Second?
50: 9   A.  Western Benefit Solutions, Ron Osborn.
50:10   Those are some major brokers out in the
50:11   community.
50:12   Q.  Okay.  And you say, "Some brokers are
50:13   expressing their concerns regarding St. Luke's
50:14   acquisition of numerous practices.  It seems there
50:15   is some concern over St. Luke's having a monopoly
50:16   and raising prices."
50:17   Did I read that correctly?
50:18   A.  That is correct.


**Page Range:**    69:25-70:8

69:25   Q.  BY MR. ETTINGER:  Ms. House, you've
70: Page 70
70: 1   been handed Exhibit No. 215, which is a meeting of
70: 2   the Special Select Medical Network of Idaho and
70: 3   board meeting from August of 2008.
70: 4   So, first of all, did I identify that
70: 5   correctly?
70: 6   A.  Yes.
70: 7   Q.  And is that a meeting you attended?
70: 8   A.  Yes.


**Page Range:**    70:12-70:22

70:12   Q.  Why don't you take a look at it, and
70:13   I'll ask you about a couple of items.
70:14   All set?
70:15   A.  I think so.
70:16   Q.  Before I get into specifics of the
70:17   meeting, you were manager of Select Medical
70:18   Network at this time?
70:19   A.  I was.
70:20   Q.  And what did that mean, to be manager
70:21   of Select Medical Network?
70:22   A.  I did most of the work.


**Page Range:**    72:3-72:5

72: 3   Q.  So was this a special meeting to
72: 4   discuss the Micron situation?
72: 5   A.  Yes.

**Page Range:     72:14-73:4**

72:14   Q.   Okay.  And did St. Luke's make a
72:15   proposal on its own, or did it make one with
72:16   Select?
72:17   A.   It originally made the first one on its
72:18   own.
72:19   Q.   And did it make one with Select?
72:20   A.   It did.
72:21   Q.   And the initial proposal from
72:22   St. Luke's and Select was rejected by Micron; is
72:23   that correct?
72:24   A.   It was.
72:25   Q.   And it says a counterproposal was made?
73: Page 73
73: 1   A.   Correct.
73: 2   Q.   And that was ultimately rejected, as
73: 3   well?
73: 4   A.   It was.


**Page Range:     75:11-77:5**

75:11   Q.   And that was all about the high
75:12   performance preferred network, Select, for Micron;
75:13   correct?  The bidding we've been discussing?
75:14   A.   Yes.
75:15   Q.   But Micron was also interested in
75:16   having a second tier set of providers that would
75:17   not be the recipient of the preferred benefit
75:18   design, but would be for Micron employees;
75:19   correct?
75:20   A.   Correct.
75:21   Q.   And, in the minutes, the second box,
75:22   "Micron update," the second bullet, it says, "Dr.
75:23   Swanson also disclosed that IPN had been contacted
75:24   by Micron to submitted" -- to submit -- "a
75:25   proposal to Micron/Wise to be part of the second
76: Page 76
76: 1   tier."
76: 2   Do you see that?
76: 3   A.   Um-hmm.
76: 4   Q.   That's a yes?
76: 5   A.   I see that.  Yes.  Sorry.
76: 6   Q.   Do you recall that that had, in fact --
76: 7   that it was reported that that had, in fact,
76: 8   happened?
76: 9   A.   Yes.

```
76:10   Q.  What was and is IPN?
76:11   A.  Idaho Physician Network is an
76:12   independent network across Idaho.
76:13   Q.  And it consists of various kinds of
76:14   providers?
76:15   A.  It does, hospitals, ancillary
76:16   providers, physicians, mid levels.
76:17   Q.  And it includes St. Luke's, does it
76:18   not?
76:19   A.  It does.
76:20   Q.  Going to the second page of the
76:21   minutes, see under the first full bullet point
76:22   there, it says, quote, "If IPN contracts with
76:23   Micron as a second tier, St. Luke's would walk
76:24   away from IPN unless option to carve out Micron."
76:25   Do you see that?
77: Page 77
77: 1   A.  Um-hmm.
77: 2   Q.  Is that a yes?
77: 3   A.  Yes, I do.  Sorry.
77: 4   Q.  And that was St. Luke's position?
77: 5   A.  I believe so.
```

**Page Range:      77:10-77:25**

```
77:10   Q.  Okay.  Go back to the first page of the
77:11   document, under "Micron update," the fourth
77:12   bullet, you see it says, quote, "Keep in mind with
77:13   the growth of the Treasure Valley, Select will be
77:14   seeing other companies likewise making their
77:15   presence in Boise," close quote.
77:16   Do you see that reference?
77:17   A.  Um-hmm.
77:18   Q.  Do you remember that subject being
77:19   discussed at Select Medical?
77:20   A.  Somewhat.
77:21   Q.  And other companies, like Wise, was the
77:22   idea:  Other companies may come in and try to get
77:23   deep discounts in exchange for preferential
77:24   treatment on behalf of employers?
77:25   A.  I believe that's what was discussed.
```

**Page Range:      82:25-83:20**

```
82:25   Q.  The programs that Select Medical is
83: Page 83
```

83: 1   offering -- first of all, Select Medical involves
83: 2   both St. Luke's physician and independent
83: 3   physicians?
83: 4   A.  Correct.
83: 5   Q.  And how do they break out at Select
83: 6   Medical, independents versus employed physicians?
83: 7   A.  The board consisted of six independent
83: 8   practices and physicians that represent the
83: 9   employed physicians and three administrators from
83:10   St. Luke's.
83:11   Q.  What about in terms of physicians who
83:12   are in the Select Medical Network, how did they
83:13   break out as between independents and St. Luke's
83:14   clinic physicians?
83:15   A.  The majority were independents.
83:16   Q.  And that was true when you were at
83:17   Select Medical?
83:18   A.  Correct.
83:19   Q.  Do you feel that's still true today?
83:20   A.  No.


**Page Range:**    83:25-84:3

83:25   Q.  Okay.  And the Center for Spine
84: Page 84
84: 1   Wellness program, that involved independents, as
84: 2   well as employed physicians?
84: 3   A.  Correct, and health plans.


**Page Range:**    87:3-87:7

87: 3   Q.  Okay.  So if a company like Wise came
87: 4   in, and another company like Wise came in to Boise
87: 5   and wanted to get a deeper discount in exchange
87: 6   for volume, how would agreeing to that interfere
87: 7   with St. Luke's integration?


**Page Range:**    87:9-87:18

87: 9   THE WITNESS:  Can you repeat that, please.
87:10   Q.  BY MR. ETTINGER:  Just to put it into
87:11   context, you said we weren't interested in these
87:12   kinds of discount-for-volume offers because we
87:13   want to focus on clinical integration.
87:14   So my question is:  In what way, if at

87:15   all, because frankly I don't see it, would
87:16   agreeing to such a program, discounts for volume,
87:17   have interfered with your clinical integration
87:18   efforts?

**Page Range:     87:20-87:24**

87:20   THE WITNESS: I'm not sure I can answer
87:21   that.
87:22   Q.  BY MR. ETTINGER: The answer is: You
87:23   don't know?
87:24   A.  I don't know.

**Page Range:     91:19-91:25**

91:19   Q.  If St. Luke's offers a small discount
91:20   along with the benefits of its clinical
91:21   integration program, it could as easily, if it
91:22   chose to, offer a bigger discount along with the
91:23   benefits of the clinical integration program;
91:24   correct?
91:25   A.  Yes.

**Page Range:     92:2-92:5**

92: 2   Q.  BY MR. ETTINGER: But, in 2008, you
92: 3   chose not to, correct, offer a bigger discount?
92: 4   A.  In 2008, we put on the table what we
92: 5   thought was a reasonable discount.

**Page Range:     94:25-95:5**

94:25   (Exhibit No. 1166 marked.)
95: Page 95
95: 1   I'm showing you Exhibit No. 216, which
95: 2   is an e-mail from Beth Toal to you, subject
95: 3   "Micron draft memo," attaching a memo.
95: 4   Did I describe the document correctly?
95: 5   A.  Yes.

**Page Range:     95:16-95:25**

95:16   Q.  Okay. And we talked a little bit

95:17 earlier about how there was a second tier to the
95:18 Micron/Wise program below the high performance
95:19 network tier?
95:20 A. Um-hmm.
95:21 Q. That's a yes?
95:22 A. Yes.
95:23 Q. And that was called the PPO network?
95:24 A. I believe so. I don't have the exact
95:25 terminology.

**Page Range: 96:9-96:20**

96: 9 Q. First Health declined after St. Luke's
96:10 -- well, let's go on to the fifth paragraph.
96:11 The fifth paragraph says, "St. Luke's
96:12 has chosen to terminate its agreement with First
96:13 Health."
96:14 Do you recall that that happened?
96:15 A. Yes.
96:16 Q. And after St. Luke's chose to terminate
96:17 its agreement with First Health, First Health was
96:18 no longer a player for the PPO network for Micron;
96:19 correct?
96:20 A. That is correct.

**Page Range: 110:14-110:25**

110:14 (Exhibit No. 219 marked.)
110:15 Q. Okay. You've been handed what has been
110:16 marked as Exhibit No. 219, Ms. House, which is --
110:17 it's participants and agenda for a meeting with
110:18 Micron, Select, and St. Luke's. And then attached
110:19 to it is a document that says, "Employer Relations
110:20 Talking Points."
110:21 Did I properly describe the document?
110:22 A. Yes.
110:23 Q. So do you recall that you attended a
110:24 meeting with Micron and St. Luke's personnel?
110:25 A. Yes.

**Page Range: 111:20-113:19**

111:20 Q. Let's go to point No. 1, little Roman
111:21 ii.
111:22 Do you see that the second sub bullet

111:23    under No. 1, under "Brief history"?
111:24    A.   Um-hmm.
111:25    Q.   It says there, "I have clearly
112: Page 112
112: 1    articulated Select and St. Luke's are willing to
112: 2    engage in conversation relating to a new delivery
112: 3    model.  We are not interested in discounting for
112: 4    volume, participating in the Wise network, or
112: 5    strategies that would result in patient care
112: 6    disruption."
112: 7    Did I read that correctly?
112: 8    A.   You did.
112: 9    Q.   And was that St. Luke's and Select
112:10    Medical's position at the time?
112:11    A.   Yes.
112:12    Q.   Was that articulated at the meeting?
112:13    A.   Yes.
112:14    Q.   By whom?
112:15    A.   Myself.  And it was actually
112:16    articulated prior to the meeting because we wanted
112:17    to make sure that we weren't going in to have the
112:18    same conversation we didn't have the previous
112:19    year.
112:20    Q.   And who was it -- who articulated it
112:21    prior to the meeting?
112:22    A.   Probably myself.
112:23    Q.   You called Margo Nicholson?
112:24    A.   Um-hmm.
112:25    Q.   That's a yes?
113: Page 113
113: 1    A.   Yes.
113: 2    Q.   Let's talk about that item for a
113: 3    minute.
113: 4    By participating in the Wise network,
113: 5    did you mean we didn't want to be part of an
113: 6    arrangement that involved Wise or Imagine?
113: 7    A.   Select Medical Network did not want to
113: 8    contract with Wise or Imagine.  Again, individual
113: 9    physicians could contract with them on their own.
113:10    Q.   So the first sentence here says, as I
113:11    read to you, "Select and St. Luke's," and then it
113:12    says, "we" in the second sentence.
113:13    So were those points applicable to both
113:14    Select and St. Luke's?
113:15    A.   I believe so.  St. Luke's did not want
113:16    to get into a -- any kind of a -- just a simple
113:17    rate negotiation that was going to pull people
113:18    away from where they had already moved to receive

13

113:19    care.


**Page Range:    113:20-114:19**

113:20    Q.  And it says, among other things, you
113:21    said you're not interested in doing it.  In the
113:22    second sentence, it says, "Strategies that would
113:23    result in patient care disruption."
113:24    A.  Correct.
113:25    Q.  What does that refer to?
114: Page 114
114: 1    A.  Well, we had a lot of patients that had
114: 2    been utilizing St. Luke's at the onset of the
114: 3    Micron negotiations.  And those people could have
114: 4    been in the middle of cancer treatment, had
114: 5    children at NICU.  They were seeing St. Luke's
114: 6    physicians for their deliveries.
114: 7    And a lot of those patients, we tried
114: 8    to accommodate them by working with Micron on
114: 9    allowing them to get through their entire episode
114:10    of care and give them a better rate.  And that was
114:11    refused by Micron.  So that really impacted those
114:12    people that they either had to switch their
114:13    carrier of where they were getting cancer
114:14    treatment or they would end of up paying more.
114:15    And we did not want -- if we were going
114:16    to renegotiate with them, we did not want that
114:17    same scenario happening again, where there would
114:18    be disruption in the current care they were
114:19    receiving.


**Page Range:    118:4-118:22**

118: 4    Q.  Were you articulating there that, you
118: 5    were telling Micron:  If you want to have a
118: 6    meeting with us, we don't want Wise at the
118: 7    meeting?
118: 8    A.  Um-hmm.
118: 9    Q.  That's a yes?
118:10    A.  Yes.
118:11    Q.  Why didn't you want Wise even to be
118:12    present at the meeting?
118:13    A.  Why did we not want them to be present?
118:14    Q.  Right.
118:15    A.  Because we didn't want to contract
118:16    through them.  This was to be a separate

118:17   negotiation that was a direct deal with Micron.
118:18   So there was no reason for Wise to be present in
118:19   the meeting.
118:20   Q.   Was St. Luke's worried that Wise and
118:21   Imagine had a strategy to disrupt competition in
118:22   the market?


**Page Range:       118:24-119:2**

118:24   THE WITNESS:  Would you repeat that.
118:25   Q.   BY MR. ETTINGER:  Was St. Luke's and
119: Page 119
119: 1   Select Medical concerned that Wise and Imagine had
119: 2   a strategy to disrupt competition in the market?


**Page Range:       119:4-119:11**

119: 4   THE WITNESS:  I think that that was obvious
119: 5   that they were doing that.
119: 6   Q.   BY MR. ETTINGER:  And St. Luke's was
119: 7   against that?
119: 8   A.   I can't speak for St. Luke's.  I can
119: 9   speak for Linda House.
119:10   Q.   Linda House was against that?
119:11   A.   Linda House was against that.


**Page Range:       143:3-144:16**

143: 3
143: 4
143: 5
143: 6
143: 7
143: 8   **REDACTED**
143: 9
143:10
143:11
143:12
143:13
143:14
143:15
143:16
143:17   March 7, 2012, at 2:55 p.m.?
143:18   A.   I do.
143:19   Q.   And, in the paragraph marked

143:20   "Secondly," I want to ask you about that.  Why
143:21   don't you read it, and I'll ask you about it.
143:22   A.  The second paragraph?
143:23   Q.  The second one that says, "Secondly,"
143:24   which is actually the third paragraph.
143:25   A.  Thank you.
144: Page 144
144: 1   Yes.
144: 2   Q.  And one of the things you say there,
144: 3   that you confirm to Margo that the St. Luke's
144: 4   clinic physicians who were in the Wise/Imagine
144: 5   network were planning to terminate on June 30,
144: 6   2012; is that correct?
144: 7   A.  That is correct.
144: 8   Q.  And it happened, did it not?
144: 9   A.  I ACN only speculate.  I don't know.
144:10   Q.  And that included physician groups who
144:11   when they had -- before they had been acquired by
144:12   St. Luke's, had contracted with the Wise/Imagine
144:13   network at discounted rates; correct?
144:14   A.  Correct.  I don't know if they were
144:15   discounted rates.  I just know they were
144:16   contracted.


**Page Range:     177:10-177:15**

177:10   You've been handed Exhibit No. 229,
177:11   which is an e-mail from you to Mary Cronin and
177:12   Dave McFadden, July 20, 2012; subject:  Referral
177:13   and access center.
177:14   Did I describe the document correctly?
177:15   A.  Yes.


**Page Range:     184:25-185:22**

184:25   Q.  Why don't you turn to the seventh page
185: Page 185
185: 1   of the document.  It says, "Problem Statement -
185: 2   Shortage of Primary Care providers."
185: 3   A.  Um-hmm.
185: 4   Q.  And it says, "Recruitment of the
185: 5   primary care physicians becomes more difficult as
185: 6   newly trained physicians are electing to
185: 7   specialize rather than stay in primary care."
185: 8   A.  Yes.
185: 9   Q.  Was that yes?

185:10   A.  Yes.
185:11   Q.  Was that presented to the committee?
185:12   A.  Yes.
185:13   Q.  And was that consistent with your
185:14   understanding?
185:15   A.  I don't know what the -- I don't have
185:16   an understanding of what happened in Twin Falls.
185:17   Q.  This is a general statement?  It's not
185:18   restricted to Twin Falls, is it?
185:19   A.  It is a Twin Falls document.
185:20   Q.  But, as a general statement, the
185:21   statement I read, is that consistent with your
185:22   understanding?


**Page Range:     185:24-186:19**

185:24   THE WITNESS:  Well, I would say within
185:25    primary care physicians, that's a true statement.
186: Page 186
186: 1   A lot of internal medicine physicians that used to
186: 2   have practices are now becoming hospital-less.
186: 3   And, because of that, they can't see patients.  So
186: 4   there is no access to providers.  So, yes, in that
186: 5   area.
186: 6   Q.  BY MR. ETTINGER:  That's more than --
186: 7   as a general statement, beyond Twin Falls, that is
186: 8   true, is it not?
186: 9   A.  The statement that I just made in
186:10   reference to internal medicine physicians is
186:11   correct.  I would say that is a true statement.
186:12   Q.  But in that area?  You meant in the
186:13   area of general internal medicine?
186:14   A.  Correct.
186:15   Q.  Okay.  And, in fact, isn't it the case
186:16   that some years earlier you developed a finder's
186:17   fee to try to find internists because it was so
186:18   difficult to recruit them?
186:19   A.  Yes, um-hmm.


**Page Range:     187:1-187:15**

187: 1   You've been handed Exhibit No. 230.
187: 2   The cover note is an e-mail from Dana Ellis to
187: 3   Carrie Cowgill, Greg Orr, and you; subject:
187: 4   Forward:  Finder's fee.  And then there were
187: 5   several e-mails attached.  And then the bottom

```
187: 6    document is Internal Medicine Referral Incentive
187: 7    Program.
187: 8    So, first of all, let me know if I have
187: 9    correctly identified the document.
187:10    A.  Yes, you have.
187:11    Q.  Okay.  And, as you mentioned a minute
187:12    ago, there was a finder's fee approved to try to
187:13    help recruit general internal medicine physicians;
187:14    is that correct?
187:15    A.  That is correct.
```

**Page Range:      188:5-188:11**

```
188: 5    Q.  It says in the first paragraph, at the
188: 6    end, "St. Luke's has also classified general
188: 7    internal medicine physicians as difficult to
188: 8    recruit."
188: 9    Do you recall that classification by
188:10    St. Luke's?
188:11    A.  Absolutely.
```