**TESTIMONY OF DR. JOHN KAISER**
Received on September 25, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

Page Range:     10:5-10:12

| | |
|---|---|
| 10: 5 | Q. Please state your full name for the record. |
| 10: 6 | A. Dr. John Kaiser. |
| 10: 7 | Q. Dr. Kaiser, where are you currently employed? |
| 10: 8 | A. Saltzer Medical Group. |
| 10: 9 | Q. How long have you been employed at Saltzer |
| 10:10 | Medical Group? |
| 10:11 | A. I entered employment in 1999. I think it was |
| 10:12 | August 1999. |

Page Range:     12:14-12:24

| | |
|---|---|
| 12:14 | Q. And you joined the Saltzer Medical Group |
| 12:15 | directly after completing your residency? |
| 12:16 | A. Yes, I did. |
| 12:17 | Q. What is your current title with the Saltzer |
| 12:18 | Medical Group? |
| 12:19 | A. President. |
| 12:20 | Q. What are your roles and responsibilities as |
| 12:21 | president of Saltzer Medical Group? |
| 12:22 | A. To oversee the executive committee, to |
| 12:23 | participate in managerial decisions as outlined in the |
| 12:24 | bylaws of the corporation. |

Page Range:     74:15-74:25

| | |
|---|---|
| 74:15 | Q. Okay. In 2009 was -- was the consensus |
| 74:16 | within Saltzer that the group should remain |
| 74:17 | independent? |
| 74:18 | A. So in 2009 we had just started our |
| 74:19 | investigation of what we could or might do. And |
| 74:20 | it was a long process and there were different |
| 74:21 | points at different times. I don't know exactly, |
| 74:22 | but we were moving from a totally independent. So |
| 74:23 | certainly in the beginning before knowing all of |
| 74:24 | our options, we were more on the track of being an |
| 74:25 | independent group. |

Page Range:     95:12-95:25

```
95:12   Q.  Well, let's see if we can refresh your
95:13   recollection on this one.  Let me show you what's
95:14   been previously marked as Deposition Exhibit 102,
95:15   which is a report to St. Luke's by WIPFLi or
95:16   WIPFLi, I think someone explained to me.
95:17   Have you ever seen this report?
95:18   A.  I don't recall seeing it.
95:19   Q.  Why don't you turn to page 38,
95:20   Bates-numbered 892244.
95:21   A.  I'm sorry, what page?
95:22   Q.  It's got the little "38" in the lower
95:23   right there.
95:24   A.  Can I take a minute just to look
95:25   through this?
```

Page Range:     96:11-96:15

```
96:11   Q.  Page 38 you see it says, "We also
96:12   interviewed Dr. Kaiser of Saltzer Medical
96:13   Group ..."?
96:14   A.  Yeah.  I do recall -- I didn't
96:15   recognize the name.
```

Page Range:     97:18-97:20

```
97:18   Q.  Okay.  And -- and if patients make all
97:19   of the choices and you don't recommend, how are
97:20   you able to estimate a number, Doctor?
```

Page Range:     97:23-98:7

```
97:23   THE WITNESS:  So what this is in reference
97:24   to is my patients, OB patients, specifically, tend
97:25   to request St. Luke's facilities.  There are no
Page 98
98: 1   St. Luke's facilities in the Nampa community.
98: 2   If when opened, it is my belief, and
98: 3   I don't know for certainty, that a significant
98: 4   portion would then rather than going downtown
98: 5   Boise or to the Meridian -- Meridian facility,
98: 6   would then have their obstetrics care done in
98: 7   Nampa.
```

Page Range:     98:18-98:24

98:18   Q. Okay. And the next bullet says, again,
98:19   according to Dr. Kaiser, "An 80- to 90-bed
98:20   facility in Nampa would appear reasonable given
98:21   the size of the Saltzer Medical Group expected to
98:22   support this new facility." Does that accurately
98:23   paraphrase what they -- what you told them?
98:24   A. Yes. I believe it does.


Page Range:     100:20-101:9

100:20   Q. BY MR. ETTINGER: Why don't we go back
100:21   to Mr. Reiboldt's letter. Now under No. 4 --
100:22   A. I'm sorry, you're referring back to?
100:23   Q. Back to exhibit --
100:24   A. What page?
100:25   Q. -- 191, Mr. Reiboldt's letter, page 3
Page 101
101: 1   of the letter, Bates-numbered 33852.
101: 2   A. Okay.
101: 3   Q. Okay. Under No. 4, the first subbullet
101: 4   says, "The Practice wants to maintain independence
101: 5   while aligning."
101: 6   As of December of 2010, is that an
101: 7   accurate characterization of where the group
101: 8   was?
101: 9   A. I would say probably was.


Page Range:     113:7-113:24

113: 7   Did the St. Luke's consultants and
113: 8   personnel who evaluated Saltzer as part of your
113: 9   discussions indicate that they thought Saltzer was
113:10   run efficiently?
113:11   A. I recall comments from consultants
113:12   saying, yes, they thought that we were efficient.
113:13   I don't know what criteria they were using but ...
113:14   Q. Did Peter LaFleur say that?
113:15   A. I believe he did.
113:16   Q. Okay. And you believe that Saltzer
113:17   provides quality medical services?
113:18   A. I hope. We try to. 113:19
           Q. All right. And do you
113:19   recall
113:20   compliments from St. Luke's personnel on that

113:21   subject?
113:22   A.  I can't give you a specific reference,
113:23   but, yes, I recall them saying they thought we
113:24   provided good care.


Page Range:      115:25-116:3

115:25   Q.  So who -- who -- was there somebody who
Page 116
116: 1   tended to be the scribe for the negotiating
116: 2   committee?
116: 3   A.  Nancy Powell did a lot of it.


Page Range:      117:3-117:21  117: 3

117:3    Q.  Okay.  And – and was it true that the
117: 4   initial proposals by Saltzer were focused on
117: 5   allowing it to remain autonomous?
117: 6   A.  Yes.
117: 7   Q.  Okay.  And was the focus also on
117: 8   getting more compensation for the Saltzer
117: 9   physicians?
117:10   A.  Fair market value, compensation, yes.
117:11   Q.  Well, I mean I assume everybody
117:12   understood that it had to be fair market value but
117:13   they were also seeking more money, weren't they?
117:14   A.  Everyone?
117:15   Q.  Was it -- was it generally?
117:16   A.  No.  I can say no to that one.
117:17   Q.  Was it generally the case that the
117:18   physicians at Saltzer were seeking --
117:19   A.  Yes.
117:20   Q.  -- more money from this transaction?
117:21   A.  Yes.  Yes.


Page Range:      124:24-125:14

124:24    Q.  BY MR. ETTINGER:  You've been handed
124:25    Exhibit 1159, a letter to Gary Fletcher from
Page 125
125: 1   Max Reiboldt, cc'ing a number of people, including
125: 2   Dr. Kaiser, Bates-numbered SMG383895 through -897.
125: 3   Why don't you take a look at the letter in general
125: 4   and then I'll ask you about it.
125: 5   A.  (Reviewing document.)

125: 6   MR. ETTINGER: I should add for the record
125: 7   that this letter with a Coker Bates number is
125: 8   already Plaintiff's Exhibit 1159, but it made sense
125: 9   to have it as a Saltzer Bates number as well.
125:10   THE WITNESS: Okay.
125:11   Q. BY MR. ETTINGER: So is this a letter
125:12   that Mr. Reiboldt sent to Mr. Fletcher turning
125:13   down St. Luke's then-current proposal to affiliate
125:14   with Saltzer?

Page Range:    125:16-125:22

125:16   THE WITNESS: This is a letter that was sent
125:17   describing results of a -- a ballot that was
125:18   conducted by Max Reiboldt on the then-form of the
125:19   PS agreement.
125:20   Q. BY MR. ETTINGER: And that was the
125:21   then-form presented by St. Luke's?
125:22   A. Correct, yes.

Page Range:    130:25-131:5

130:25   Q. BY MR. ETTINGER: Okay. So as of
Page 131
131: 1   August of 2011, the time of this letter, there was
131: 2   still a strong feeling by the members of the group
131: 3   that they wanted as much independence as they
131: 4   could maintain, correct?
131: 5   A. Correct.

Page Range:    132-5-132:5

132:5   Q. BY MR. ETTINGER: But this was a -- the
132: 6   issue was that if Saltzer was a department of the
132: 7   hospital, it could be billed at higher rates;
132: 8   isn't that right?

Page Range:    132:11-132:18

 132:11   THE WITNESS: Again, I would say there are
132:12   experts that could answer that question much
132:13   better than I could.
132:14   Q. BY MR. ETTINGER: Was – was that
132:15   position articulated in the course of the

132:16   discussions?
132:17   A. Yes. This was one of the points
132:18   articulated.


Page Range:     134:11-135:1

134:11   Q. Okay. Let's take a look at what's been
134:12   marked previously as Plaintiff's Exhibit 1160.
134:13   And is 1160 another Max Reiboldt letter,
134:14   this one to John Kee and Peter LaFleur on behalf
134:15   of Saltzer?
134:16   A. Yes, it is.
134:17   Q. Why don't you turn to page -- not
134:18   page 9 of 10 of the letter, Bates-numbered
134:19   COKER9508.
134:20   A. I was reading that first paragraph.
134:21   Q. Oh, go ahead. Take -- take a look at
134:22   whatever you want to look at.
134:23   A. I finished that, could you tell me
134:24   where you're asking me to turn to?
134:25   Q. Page 9 of 10 of the letter, page
Page 135
135: 1   COKER9508.


Page Range:     135:9-136:9

135: 9   Q. Do you see – why don't you look at the
135:10   first bullet and subbullet on page 9508. It
135:11   starts out, "There's a significant disparity
135:12   between the compensation increases for primary
135:13   care and specialists."
135:14   Do you see that?
135:15   A. I do.
135:16   Q. Is the discussion there accurate as far
135:17   as you know?
135:18   A. Not complete, but accurate.
135:19   Q. Okay. Complete, that's a metaphysical
135:20   concept, but we'll stick with accurate for now.
135:21   Now, you say here, "…the average" --
135:22   it says here, you don't say it -- is says here,
135:23   "… the average primary care increase is 35%
135:24   while the average specialty increase is 18%.
135:25   Inclusive within these two categories are
136: Page 136
136: 1   increases as high as 47% (Internal Medicine) and
136: 2   as low as 5% (ENT and orthopedics)."

136: 3    Why was that a concern to Saltzer?
136: 4    A.  Why was what a concern?
136: 5    Q.  These disparities?
136: 6    A.  The disparities?
136: 7    Q.  Yes.
136: 8    A.  A concern for the people who were
136: 9    making 5 percent as being too low.

Page Range:    202:23-204:2

202:23    (Plaintiffs' Exhibit 1386 marked.)
202:24    MR. ETTINGER:  You've been handed exhibit
202:25    1386, Dr. Kaiser, an E-mail from you to SMG
Page 203
203: 1    Everyone, Bates-numbered SMG286177, it's dated
203: 2    November 20, 2012.  Take a look at it and I will
203: 3    ask you about it.
203: 4    A.  Go ahead.
203: 5    Q.  Is this an E-mail that you sent to all
203: 6    staff at Saltzer?
203: 7    A.  Yes, it is.
203: 8    Q.  And you sent it after the lawsuit by
203: 9    Saint Alphonsus had been filed?
203:10    A.  Correct.
203:11    Q.  You sent it after the Saltzer surgeons
203:12    had left Saltzer?
203:13    A.  Correct.
203:14    Q.  And I just want to ask you about
203:15    one sentence, the last sentence in the first
203:16    paragraph.  It said, "For each of our employees I
203:17    would like to emphasize that you will continue to
203:18    have your jobs no matter what course these
203:19    investigations and legal challenges take."
203:20    A.  Um-hum.
203:21    Q.  Is that your statement?
203:22    A.  That is what is written.
203:23    Q.  And did you believe that at the time?
203:24    A.  With caveats, yes.
203:25    Q.  There are no caveats in the E-mail you
Page 204
204: 1    sent out.
204: 2    A.  I didn't give a time frame.

Page Range:    204:3-204:6

204: 3    Q.  So what did you -- well, what was

```
 204: 4    your -- what was -- what was in your brain when
 204: 5    you wrote it as to how long they would continue to
 204: 6    have their jobs?
```

Page Range:     204:8-205:3

```
 204: 8    THE WITNESS:  So if you take the context of
 204: 9    this letter, we had just undergone a significant
 204:10    disruption to our clinic.  One, a lawsuit filed.
 204:11    The weekend before that, all of our high producers
 204:12    had left and gone to Saint Al's.  We had recently
 204:13    lost another physician who was a high income
 204:14    earner to a death and there was lots of stress in
 204:15    our group and we were about to enter the holiday
 204:16    seasons, meaning Thanksgiving and Christmas.
 204:17    We had also started negotiations with
 204:18    the -- down the path of St. Luke's providing for
 204:19    our employees contracts or offers of employment.
 204:20    With all of that, I wanted to reassure
 204:21    our staff that in the short term, doesn't say
 204:22    "short term," but that's what my intent was, is
 204:23    you're not going to -- we're not going to fire
 204:24    you, you're not going to lose your job.  This was
 204:25    intended to reassure these people that we have
Page 205
 205: 1    work in front of us, we're going to do the best
 205: 2    thing we can to try to help you and keep you in --
 205: 3    employed.
```

Page Range:     205:25-206:8

```
 205:25    Q.  You didn't have any time frame in the
Page 206
 206: 1    E-mail, did you?
 206: 2    A.  But it's clear that I could not assure
 206: 3    them for ad infinitum that anybody would be
 206: 4    continue to be employed.
 206: 5    Q.  Well, this says, "... no matter what
 206: 6    course these investigations and legal challenges
 206: 7    take."  Those are your words, right?
 206: 8    A.  Correct.
```

Page Range:     206:9-206:18

```
 206: 9    Q.  Those are strong words, aren't they?
```

```
206:10   "... no matter what course ..."
206:11   A.  They are.  And probably overstated, if
206:12   you wish to have my opinion at this point in time.
206:13   Trying to reassure people the sky is not falling,
206:14   we are not going to fire you, you're not going to
206:15   lose your benefits.  These are people who we have
206:16   had in our employment for a long period of time,
206:17   and perhaps even you could understand why they
206:18   might be a bit concerned about their future.
```

Page Range:      207:22-208:6

```
207:22   Q.  Well this says "… no matter what
207:23   course the investigations … take," which means
207:24   whether the FTC sues or not, correct? Isn't that
207:25   what those words mean?
Page 208
208: 1   A.  Not necessarily.
208: 2   Q.  What -- what did you intend to convey
208: 3   by "... no matter what course these investigations
208: 4   ... take" if not -- whether the FTC sues or not?
208: 5   What else did you intend to convey by that phrase?
208: 6   A.  That they would have their --
```

Page Range:      208:8-208:15

```
208: 8   THE WITNESS:  That they would have their
208: 9   jobs and not be fired, because we could have fired
208:10   them because there was not enough work for all of
208:11   our employees.
208:12   Q.  BY MR. ETTINGER:  Had their jobs for
208:13   how long?
208:14   A.  I don't know.  I couldn't have answered
208:15   that question if you asked me the next day.
```

Page Range:      251:4-251:15

```
251: 4   Q.  Since -- since the Saltzer surgeons
251: 5   resigned, the former Saltzer surgeons, have you
251: 6   had discussions with the primary care physicians
251: 7   about referring their patients to those former
251: 8   Saltzer surgeons?
251: 9   A.  We have had questions come up in -- for
251:10   example, executive committee where they -- some of
251:11   the primary care have asked, so should I continue
```

| | |
|---|---|
| 251:12 | to refer to this or should I use this doctor?  And |
| 251:13 | my response has been you use the doctor that you |
| 251:14 | think is best for the patient or that the patient |
| 251:15 | wants. |

Page Range:     251:16-251:23

| | |
|---|---|
| 251:16 | Q.  Okay.  And referrals to -- referrals to |
| 251:17 | Saltzer surgeons, former Saltzer surgeons, are |
| 251:18 | down substantially, aren't they? |
| 251:19 | A.  Well, they no longer work at either of |
| 251:20 | the facilities that we tend to refer to. |
| 251:21 | Q.  Just try to answer my question. |
| 251:22 | A.  So the answer is yes as far as I know, |
| 251:23 | although I don't know the exact numbers. |

Page Range:     264:3-264:13

| | |
|---|---|
| 264: 3 | Other than complaints about the charges |
| 264: 4 | associated with procedures, are you aware of |
| 264: 5 | Saltzer physicians ordering unnecessary |
| 264: 6 | procedures? |
| 264: 7 | A.  No, not that I can recall. |
| 264: 8 | Q.  Are you aware of Saltzer physicians |
| 264: 9 | performing unnecessary tests, such as labs or |
| 264:10 | MRIs? |
| 264:11 | A.  No.  I cannot say that I know of any |
| 264:12 | data that we would have that indicated that there |
| 264:13 | was excessive ordering of tests. |

Page Range:     266:11-267:10

| | |
|---|---|
| 266:11 | Q.  Does Saltzer implement evidence-based |
| 266:12 | medicine? |
| 266:13 | A.  Individual physicians choose to use |
| 266:14 | what they are aware of in their departments or |
| 266:15 | their fields of specialty, and it is their |
| 266:16 | responsibility to implement them and utilize them |
| 266:17 | as they see fit. |
| 266:18 | The other area would be where it |
| 266:19 | involves hospitals and whether there are |
| 266:20 | guidelines for what should be done, shouldn't be |
| 266:21 | done and how to do it, then it would fall under -- |
| 266:22 | those physicians would fall under those guidelines |
| 266:23 | provided by the hospitals. |

266:24    Q.  Can you provide some examples of
266:25    physicians implementing those best practices?
Page 267
267: 1    A.  Okay.  I'll use my field.  Obstetrics.
267: 2    We used to induce labor early at kind of variable
267: 3    time frames, and there was a large study that came
267: 4    out several years ago that looked at induction of
267: 5    labor before 39 weeks and was found that even a
267: 6    day early did have increased risk for the baby
267: 7    being admitted to the NICU.  And so policies went
267: 8    down unless there is medical indications for doing
267: 9    early inductions, we don't do them.  Most of us
267:10    have adopted that practice.