# TESTIMONY OF DR. RANDELL PAGE

Received on September 25, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:**     7:9-7:14

```
7:9    EXAMINATION
7:10   BY MR. PERRY:
7:11   Q.  Good morning, Dr. Page.
7:12   A.  Morning.
7:13   Q.  Have you ever been deposed before?
7:14   A.  A very long time ago.
```

**Page Range:**     8:16-9:15

```
8:16   Q.  Please briefly describe your
8:17   educational and professional background.
8:18   A.  I went to college at Princeton
8:19   University, graduated in 1971.  Medical school at
8:20   Philadelphia College of Osteopathic Medicine,
8:21   graduated in 1977.  Internal medicine residency at
8:22   Emanuel Hospital, now Legacy Health Systems in
8:23   Portland, Oregon.  Graduated from the residency
8:24   program in 1980.  Board certified in 1980 in
8:25   American Board of Internal Medicine.
9: Page 9
9: 1   Q.  And you're currently a partner of
9: 2   Saltzer Medical Group, one of the defendants in
9: 3   this case?
9: 4   A.  That's correct.
9: 5   Q.  How -- how long have you been with
9: 6   Saltzer?
9: 7   A.  I came to Saltzer in 1989.
9: 8   Q.  And you've been with Saltzer that
9: 9   entire time?
9:10   A.  The entire time.
9:11   Q.  Can you describe what your practice
9:12   encompasses?
9:13   A.  I'm an internist.  For the last
9:14   approximately ten years, my practice has been
9:15   limited to gastrointestinal problems.
```

**Page Range:** 9:16:9-19

9:16 Q. When you say "limited to
9:17 gastrointestinal problems," you only treat
9:18 gastrointestinal problems; is that right?
9:19 A. That's right.

**Page Range:** 11:8-11:17

11: 8 Q. And prior to affiliating with
11: 9 St. Luke's, Saltzer was the largest independent
11:10 multispecialty practice in Idaho; is that right?
11:11 A. I believe we were.
11:12 Q. You had a -- and Saltzer had a strong
11:13 reputation in the community in which you practice?
11:14 A. I believe we do.
11:15 Q. And Saltzer has a strong reputation for
11:16 providing high-quality medical care?
11:17 A. I believe we do.

**Page Range:** 17:18-19:8

17:18 Q. At -- at Saltzer, you served for a
17:19 number of years as chairman of the Contracts
17:20 Committee, right?
17:21 A. Correct.
17:22 Q. Can you describe what the Contracts
17:23 Committee is?
17:24 A. We review most contracts that Saltzer
17:25 has of just about any nature. Primarily, it was
18: Page 18
18: 1 designed to deal with contracts with insurance
18: 2 companies.
18: 3 Q. Health plans?
18: 4 A. Health plans.
18: 5 Q. And what was your role as chair of the
18: 6 Contracts Committee, specifically as it relates to
18: 7 negotiations with health plans?
18: 8 A. My role as chairman, I would review the
18: 9 contract in detail. And partly that had to do
18:10 with just contract language, requirements of
18:11 contracts of the physicians aside from issues
18:12 relating to fee schedules and things like that.
18:13 And then I would be part of deciding how we would
18:14 deal with the fee schedules.
18:15 Q. Were you responsible for the

2

18:16   negotiations of those managed care contracts?
18:17   A.  Most of the negotiations were done by
18:18   our -- our CFO.
18:19   Q.  Your CFO, Saltzer's CFO.  You're
18:20   referring to Nancy Powell?
18:21   A.  Nancy Powell.
18:22   Q.  So Ms. Powell would be the person most
18:23   knowledgeable about Saltzer's managed care
18:24   contract negotiations?
18:25   A.  She would be the person who did most of
19: Page 19
19: 1   the detail, in terms of looking at the numbers,
19: 2   running the spreadsheets, et cetera.  She had --
19: 3   well, especially over -- things kind of evolved
19: 4   over years that Ms. Powell was there.
19: 5   And over time, she probably took on
19: 6   more of that responsibility than I did.  You know,
19: 7   took on more of the communication responsibility,
19: 8   whereas I did more of that initially.


**Page Range:     21:18-22:19**

21:18   Q.  You may have already answered this
21:19   question, but I just want to make sure I
21:20   understand it.  What -- your role within the
21:21   managed care contracting area was to review
21:22   contracts; is that right?
21:23   Describe your role more generally in
21:24   terms of managed care contracting.
21:25   A.  We would review the contracts, again,
22: Page 22
22: 1   for detail related to language.  And Nancy would
22: 2   run the -- Ms. Powell would run the spreadsheets.
22: 3   And we would look at the fee schedules and how
22: 4   they affected us, how they affected the various
22: 5   specialties, et cetera.
22: 6   And then as a committee, we would make
22: 7   recommendations as to whether we would proceed to
22: 8   recommend the -- the contract to the Executive
22: 9   Committee or -- or not.
22:10   Q.  The contract negotiations that you're
22:11   describing, those include both price and nonprice
22:12   terms; is that right?
22:13   A.  Correct.
22:14   Q.  And the rates or the reimbursement
22:15   that Saltzer received included both physician fees
22:16   and other services, such as ancillary services,

22:17   lab, imaging, those types of services; is that
22:18   right?
22:19   A.  Correct.


**Page Range:**     26:20-27:1

26:20   Q.  BY MR. PERRY:  If you -- when you were
26:21   able to -- when Saltzer was able to have some
26:22   success with its negotiation with health plans,
26:23   whenever that was, with whomever it may have been,
26:24   why do you think that was?
26:25   A.  It would be because they felt they
27: Page 27
27: 1   needed to have Saltzer participate.


**Page Range:**     27:12-28:1

27:12   Q.  You -- let me rephrase it.  You stated
27:13   that -- that when Saltzer had negotiating leverage
27:14   with health plans, it was because the health plans
27:15   felt that they needed to have Saltzer participate;
27:16   is that right?
27:17   A.  That was my assumption.
27:18   Q.  I'm not asking whether it's your
27:19   assumption.  I'm asking is that -- did you
27:20   accurately explain the situations in which
27:21   Saltzer had negotiating leverage?
27:22   A.  They never said to me we'll pay you
27:23   this amount because we must have Saltzer in the
27:24   network.  It was an assumption that we made that
27:25   they would do that because they needed us in their
28: Page 28
28: 1   network.


**Page Range:**     28:2-28:9

28: 2   Q.  Your understanding in terms of -- when
28: 3   you say that a health plan needed Saltzer in the
28: 4   network, what do you mean by that?
28: 5   A.  They needed a certain number of
28: 6   providers so they could offer a network to their
28: 7   enrollees.  And Saltzer, as a provider of 40 or
28: 8   50, whatever the number was at the time, was an
28: 9   attractive source of providers.

**Page Range:	51:24-52:22**

51:24	Q.  BY MR. PERRY:  Plaintiffs' Exhibit 476
51:25	is an E-mail from Randell Page to Nancy Powell,
52: Page 52
52: 1	Mark Rasmus and Michael Djernes, copying
52: 2	John Kaiser, dated April 22nd, 2011, subject
52: 3	"Blue Cross Consultations."  It bears Bates
52: 4	numbers SMG000315458 through 315459.
52: 5	Exhibit -- take your time to review
52: 6	Exhibit 476.
52: 7	THE WITNESS:  Okay.
52: 8	Q.  BY MR. PERRY:  Plaintiffs' Exhibit 476
52: 9	is an E-mail exchange discussing Blue Cross's
52:10	decision to no longer accept the consult codes, as
52:11	we had just discussed; is that right?
52:12	A.  Yes.
52:13	Q.  And in the first E-mail, in the
52:14	exchange from Stephanie Herman, Ms. Herman reports
52:15	that there's been a change in how they're billing
52:16	consult codes for Blue Cross patients.  "As of
52:17	April 1st, Blue Cross is no longer going to accept
52:18	consult codes"; is that right?
52:19	A.  That's what it says.
52:20	Q.  Does this refresh your recollection as
52:21	to when this took place?
52:22	A.  I can see the dates here.

**Page Range:	52:23-53:3**

52:23	Q.  Does it refresh your recollection about
52:24	when Blue Cross's change took place?
52:25	A.  I don't recall that.  I didn't have a
53: Page 53
53: 1	recollection of when it took place.  I said I
53: 2	don't know the exact date.  Yes, it gives me the
53: 3	date.

**Page Range:	55:11-55:14**

55:11	Q.  The details, such as the specific
55:12	financial impact of managed care contracts, is
55:13	that something that Ms. Powell would know about?
55:14	A.  Yes.

5

**Page Range:      57:7-57:18**

```
57: 7   Q.  The last sentence in your E-mail in
57: 8   Exhibit 476 states, "If our negotiations with
57: 9   Luke's go to fruition, this will be something we
57:10   could try to get back, i.e. consult codes, as
57:11   there would be the clout of the entire network."
57:12   Do you see that?
57:13   A.  Um-hum.  Yes.
57:14   Q.  By "negotiations with Luke's go to
57:15   fruition," you mean the pending negotiations
57:16   regarding a potential PSA agreement with
57:17   St. Luke's?
57:18   A.  I would assume that's what I meant.
```

**Page Range:      58:1-58-7**

```
58: 1   Q.  When you say that "if Saltzer's
58: 2   negotiations with Luke's go to fruition" -- and by
58: 3   that you mean enter into a PSA agreement --
58: 4   "Saltzer would then have the clout of the entire
58: 5   network"; is that right?
58: 6   A.  I think this whole sentence on my part
58: 7   was purely speculation.
```

**Page Range:      58:8-58:12**

```
58: 8   Q.  Your hope was that once Saltzer was
58: 9   affiliated with St. Luke's, you would have greater
58:10   clout vis-a-vis your negotiations with Blue Cross?
58:11   A.  A hope, yeah.  Not a hope that had --
58:12   had a lot behind it, but yes.
```

**Page Range:      58:13-58:16**

```
58:13   Q.  And the hope would -- that -- your hope
58:14   was that once you affiliated with St. Luke's, you
58:15   would have the clout of both Saltzer's network and
58:16   St. Luke's network; is that right?
```

**Page Range:      58:18-59:3**

```
58:18   THE WITNESS:  That's what this says.  Again,
```

| | |
|---|---|
| 58:19 | it is entirely speculation. |
| 58:20 | And I -- I should also point out that |
| 58:21 | this -- this whole issue is not something where |
| 58:22 | Saltzer or, as I was speculating, Saltzer and |
| 58:23 | St. Luke's, or Saltzer and anybody else for that |
| 58:24 | matter, would be able to increase reimbursement |
| 58:25 | from Blue Cross. |
| 59: | Page 59 |
| 59: 1 | This was an assumption about possibly |
| 59: 2 | preventing a reduction in reimbursement from |
| 59: 3 | Blue Cross. |

**Page Range:     63:11-63:21**

| | |
|---|---|
| 63:11 | Q.  BY MR. PERRY:  Okay.  Plaintiffs' |
| 63:12 | Exhibit 477 is an E-mail from Randell Page to |
| 63:13 | John Kaiser, dated May 4, 2011.  Subject, "Andy's |
| 63:14 | SCA guy."  It bears the Bates numbers SMG000306637 |
| 63:15 | through 638.  Feel free to review as much as |
| 63:16 | Exhibit 477 as you want, Dr. Page.  I'll only be |
| 63:17 | asking you about your E-mail from 4:12 p.m.  Let |
| 63:18 | me know when you're ready. |
| 63:19 | Have you had a chance to review |
| 63:20 | Exhibit 477? |
| 63:21 | A.  Yes. |

**Page Range:     64:9-64:21**

| | |
|---|---|
| 64: 9 | Q.  Your E-mail that you just mentioned |
| 64:10 | from Exhibit 477 is discussing an idea that |
| 64:11 | Dr. Hessing raised about Saltzer partnering with |
| 64:12 | Treasure Valley Hospital and Primary Health |
| 64:13 | Medical Group; is that right? |
| 64:14 | A.  Well, yeah, partly, in the context of |
| 64:15 | this meeting that they were trying to put together |
| 64:16 | where this gentleman from SCA would come out and |
| 64:17 | address the group. |
| 64:18 | Q.  SCA is the company that manages |
| 64:19 | Treasure Valley Hospital? |
| 64:20 | A.  I don't know what the relationship is. |
| 64:21 | I thought they were part owners, actually. |

**Page Range:     68:20-68:22**

| | |
|---|---|
| 68:20 | Q.  Is Saltzer a preferred provider by the |

68:21   community?
68:22   A.  I believe we are.


**Page Range:     62:2-69:16**

69: 2   Q.  When you mention contracting in -- in
69: 3   Exhibit 477, you're referring to managed care
69: 4   contracting; is that right?
69: 5   A.  Presumably.
69: 6   Q.  And you felt that St. Luke's would be a
69: 7   stronger partner for Saltzer in terms of managed
69: 8   care contracting?
69: 9   A.  I -- I didn't say that here, but I
69:10   certainly believe that.
69:11   Q.  Why do you believe that St. Luke's
69:12   would be a stronger partner in terms of managed
69:13   care contracting?
69:14   A.  For lots of reasons.  I believe that
69:15   St. Luke's is the preeminent provider in this
69:16   community.


**Page Range:     69:17-70:12**

69:17   Q.  And their status, in your view, as the
69:18   preeminent provider in this community makes them a
69:19   strong partner in terms of managed care
69:20   contracting?
69:21   A.  In terms of -- yes, I do.  And I also
69:22   believe that they are the right partner to have in
69:23   terms of contracting because of where they are
69:24   trying to go, where they are trying to take the
69:25   provision of health care in this community.
70: Page 70
70: 1   Q.  Would -- I mean, would St. Luke's also
70: 2   be a what you've described as a "preferred
70: 3   provider" in the community?
70: 4   A.  I believe they are.
70: 5   Q.  And by "preferred provider in the
70: 6   community," you're referring to they are providers
70: 7   that patients in the community are most interested
70: 8   in -- in seeing?
70: 9   A.  I believe that St. Luke's has an
70:10   excellent reputation in this community and that a
70:11   large number of patients would see them as their
70:12   preeminent provider.

Page Range:     72:16-73:12

72:16   Q.  BY MR. PERRY:  Plaintiffs' Exhibit 478
72:17   is an E-mail from Randell Page to a number of
72:18   recipients, dated March 7, 2011.  Subject, "PSAs."
72:19   It bears the Bates number SMG000278243.  Take a
72:20   minute to review Exhibit 478.
72:21   Do you recognize Exhibit 478?
72:22   A.  I recognize it in that it says it is
72:23   from me.  I don't recall it otherwise.  Can I
72:24   finish reading it?
72:25   Q.  Sure.
73: Page 73
73: 1   A.  Okay.
73: 2   Q.  Do you recall the subject matter of
73: 3   Exhibit 478?
73: 4   A.  Yes.
73: 5   Q.  And what -- what are you discussing in
73: 6   Exhibit 478?
73: 7   A.  I think the -- the -- underlying --
73: 8   underlying it is the form of the PSA.
73: 9   Q.  You're referring to the form of the PSA
73:10   agreement that was being negotiated at this point
73:11   between St. Luke's and Saltzer?
73:12   A.  Correct.


Page Range:     73:23-74:7

73:23   Q.  What was discussed with St. Luke's in
73:24   terms of recruiting and building the provider
73:25   network in western Ada and Canyon County?
74: Page 74
74: 1   A.  It wasn't specifics.  It was
74: 2   generalities that we would work together to build
74: 3   the provider network in western Ada and Canyon
74: 4   County, so that St. Luke's would help us recruit.
74: 5   We would have input into the kind of providers
74: 6   that were recruited, the specialties, for example,
74: 7   that were recruited.


Page Range:     77:23-79:24

77:23   Q.  Turning back to Exhibit 478.
77:24   Further down in the first paragraph of your
77:25   E-mail, you state, "We need to try to bring the

78: Page 78
78: 1    Mercy Physician Group family docs into Saltzer if
78: 2    possible.  That would be huge for maintaining/
78: 3    improving the referral base in Canyon County as
78: 4    Al's begins more recruiting of pcps and other
78: 5    specialists to be in direct competition."
78: 6    Do you see that?
78: 7    A.  I do.
78: 8    Q.  The Mercy Physician Group family docs
78: 9    that you refer to in Exhibit 478, is that the
78:10   group of physicians that we discussed earlier that
78:11   is now part of St. Luke's?
78:12   A.  In general.  I couldn't say if Doctor
78:13   by Doctor if it is exactly the same, but in
78:14   general, yes.
78:15   Q.  That's the group you're referring to
78:16   when you mentioned, I think it is called --
78:17   correct me if I'm wrong -- "Saint Al's Family
78:18   Practice Nampa"?
78:19   A.  Yes.
78:20   MR. ETTINGER:  You said "Saint Al's Family
78:21   Practice."
78:22   Q.  BY MR. PERRY:  I'm sorry.  St. Luke's
78:23   Family Practice, Nampa.
78:24   A.  Yes.  Excuse me.
78:25   MR. PERRY:  Thanks for the correction.
79: Page 79
79: 1    Q.  BY MR. PERRY:  Why was it so important
79: 2    to bring this group of family practice physicians
79: 3    into Saltzer if possible?
79: 4    A.  Well, they were respected
79: 5    practitioners.  They already had existing
79: 6    practices, so they wouldn't be providers that you
79: 7    would be bringing in trying to build a practice.
79: 8    So you wouldn't have that impediment.
79: 9    Plus, a multispecialty group needs to
79:10   have healthy primary care physician practices to
79:11   support referrals to the specialists within that
79:12   practice.
79:13   Q.  Let's unpack that just a little bit to
79:14   make sure I understand it.  When you say that they
79:15   are an existing provider group, they don't have
79:16   the impediment of having to build a practice,
79:17   you're referring again to the difficulty in terms
79:18   of recruiting; is that right?
79:19   A.  I'm referring to that if these would be
79:20   physicians who would bring a practice to the
79:21   group, a lot of their patients would follow them,

79:22    presumably, as opposed to a new provider coming in
79:23    who wouldn't have any patients and would have to
79:24    build a practice from scratch.

**Page Range:    97:17-97:23**

97:17    Q.  BY MR. PERRY:  Plaintiffs' Exhibit 481
97:18    is a three-page document beginning with Bates No.
97:19    SMG000033688.  It appears to be a -- a letter by
97:20    Dr. Page, signed by a number of other physicians
97:21    at Saltzer.
97:22    Do you recognize Exhibit 481?
97:23    A.  I do.

**Page Range:    98:5-98:7**

98: 5    Q.  And you wrote -- you wrote the letter
98: 6    that is included in Exhibit 481?
98: 7    A.  I did.

**Page Range:    98:21-99:8**

98:21    Q.  Let's turn to the second and third
98:22    pages of Exhibit 481, 33689 and 33690.  There
98:23    appear to be signature blocks for a large number
98:24    of Saltzer physicians.  Do you see that?
98:25    A.  Yes.
99: Page 99
99: 1    Q.  And there are signatures on, by my
99: 2    count, 25 of these lines.  Do you see that?
99: 3    A.  I haven't counted it, but I see the
99: 4    signatures.
99: 5    Q.  You see all the signatures that are
99: 6    listed here that -- are these physicians who
99: 7    reviewed this letter and then signed it because
99: 8    they agreed with you?

**Page Range:    99:10-99:13**

99:10    THE WITNESS:  I see that they signed it,
99:11    and I would assume that they signed it because
99:12    they agreed.  And I would assume that they
99:13    wouldn't sign and agree if they hadn't read it.

**Page Range:**     100:2-101:4

| | |
|---|---|
| 100: 2 | Q.  Turning back to the first page.  After |
| 100: 3 | your initial E-mail -- or the initial letter that |
| 100: 4 | we discussed earlier, you then, the letter then |
| 100: 5 | states, "My thoughts are as follows," and within |
| 100: 6 | that section you state, "For me personally, and I |
| 100: 7 | believe for Saltzer, Saint Al's is the wrong |
| 100: 8 | partner.  Reasons -- " and you have a series of |
| 100: 9 | bullet points. |
| 100:10 | I want to turn your attention to the |
| 100:11 | fifth around sixth bullet points, the last two |
| 100:12 | bullet points on this page.  You state, "We have |
| 100:13 | to be concerned with aligning if appropriate with |
| 100:14 | the strongest partner.  No one would disagree that |
| 100:15 | Saint Al's is not the dominant provider in the |
| 100:16 | valley." |
| 100:17 | Next bullet, "We are already linked |
| 100:18 | in many ways to St. Luke's because we all know |
| 100:19 | they are and will likely remain the dominant |
| 100:20 | provider." |
| 100:21 | It is your position that St. Luke's is |
| 100:22 | the dominant provider in the Treasure Valley? |
| 100:23 | A.  I would -- I think that we should |
| 100:24 | consider that there are -- there are synonyms, |
| 100:25 | let's say, to the word "dominant."  And what I was |
| 101: Page 101 | |
| 101: 1 | trying to imply was not that they dominate the |
| 101: 2 | market, but that they are the preferred or the |
| 101: 3 | preeminent provider in the market and the best |
| 101: 4 | partner for us. |

**Page Range:**     101:5-101:15

| | |
|---|---|
| 101: 5 | Q.  The word you chose, though, was |
| 101: 6 | "dominant," right, not "preferred" or |
| 101: 7 | "preeminent"? |
| 101: 8 | A.  When I chose that word, I didn't choose |
| 101: 9 | the word anticipating that two years later I would |
| 101:10 | be sitting in this room being questioned about why |
| 101:11 | I chose the word "dominant" versus "preeminent" or |
| 101:12 | "preferred."  So that's the word I chose.  That's |
| 101:13 | not what I meant.  I meant "preferred" or |
| 101:14 | "preeminent," not that they dominate the |
| 101:15 | marketplace. |

Page Range:     103:1-103:14

103: 1   Q.  So you shared the letter that we've
103: 2   discussed as part of Exhibit 481 with Bill Savage
103: 3   and John Kaiser before you sent it more broadly to
103: 4   other physicians at Saltzer; is that right?
103: 5   A.  Yes.
103: 6   Q.  And you, yourself, had reviewed the
103: 7   letter before you -- you sent it on first to
103: 8   Bill Savage and John Kaiser and then to all the
103: 9   other physicians at Saltzer; is that right?
103:10   A.  Yes.
103:11   Q.  And did you -- when you reviewed
103:12   Exhibit 481, did you think anything in it was
103:13   inaccurate?
103:14   A.  No.


Page Range:     105:22-106:7

105:22   Q.  BY MR. PERRY:  Let me turn to the
105:23   second page of Exhibit 481, 33689.  About halfway
105:24   through the second full paragraph after the
105:25   bullets, you note, "Compensation for primary care
106: Page 106
106: 1   and nonprocedural specialties is based on the
106: 2   hospital system maintaining access to patients.
106: 3   Via these providers they control the input to
106: 4   outpatient services, diagnostics, and referral to
106: 5   proceduralists who then use the hospital."
106: 6   Do you see that?
106: 7   A.  I do.


Page Range:     106:15-107:1

106:15   Q.  In Exhibit 481, you're -- you're
106:16   stating that the rationale for the compensation
106:17   that's paid to primary care providers is based on
106:18   the hospital system being able to obtain
106:19   downstream revenue through the outpatient
106:20   services, diagnostics, and other referrals that
106:21   those primary care providers generate; is that
106:22   right?
106:23   A.  The compensation is based on the work
106:24   that the primary care providers do.  It is not
106:25   based on where they send people for services, lab

13

107: Page 107
107: 1    work, et cetera.


**Page Range:     109:24-110:9**

109:24    Q.   BY MR. PERRY:  In Exhibit 481, though,
109:25    you're explaining the logic, in your words, behind
110: Page 110
110: 1    the compensation that is being offered for primary
110: 2    care and nonprocedural specialties, correct?
110: 3    A.   Yes.
110: 4    Q.   And the logic of that compensation is
110: 5    based on the hospital system maintaining access to
110: 6    patients because they control the input to
110: 7    outpatient services, diagnostics, and referral
110: 8    to proceduralists who then use the hospital,
110: 9    right?


**Page Range:     110:11-110:17**

110:11    THE WITNESS:  They -- "they" refers to the
110:12    primary care physician, not to the hospital.
110:13    Q.   BY MR. PERRY:  Right.  And the primary
110:14    care physician controls the input to outpatient
110:15    services, diagnostic, and referral to
110:16    proceduralists who then use the hospital, right?
110:17    A.   Correct.


**Page Range:     110:18-111:8**

110:18    Q.   And that's the logic behind St. Luke's
110:19    proposed compensation for primary care and
110:20    nonprocedural specialties, correct?
110:21    MR. KEITH:  Objection; form, foundation.
110:22    THE WITNESS:  I don't know that I did a very
110:23    good job in this paragraph of trying to state the
110:24    issue.  The issue that I was trying to point out
110:25    was that what we're trying to do is have access to
111: Page 111
111: 1    the patients and then the patients have a
111: 2    choice -- we have a choice where we send them for
111: 3    what we want done.
111: 4    The surgeons wanted their compensation
111: 5    from St. Luke's.  In addition to that, they wanted
111: 6    to maintain the compensation that they were

14

111: 7    getting from Treasure Valley Hospital, and that
111: 8    was an issue.


**Page Range:     130:22-131:1**

130:22    Q.   BY MR. PERRY:  You also mentioned
130:23    that you thought it was important that additional
130:24    services be brought into Canyon County, and you
130:25    specifically mentioned a hospital; is that right?
131: Page 131
131: 1    A.   Yes.


**Page Range:     131:2-131:12**

131: 2    Q.   Is there any reason that additional
131: 3    services couldn't be brought into Canyon County
131: 4    through a looser affiliation with St. Luke's?
131: 5    A.   I guess I have to respond to that in
131: 6    the same way that I've been responding.  I think
131: 7    if you're going to ask a hospital to invest the
131: 8    time, the people, the money, the risk of putting
131: 9    up an outpatient surgery center, a medical office,
131:10    a hospital, they are more likely going to want to
131:11    do that and be more inclusive if you're more
131:12    tightly aligned than if you're not.


**Page Range:     159:12-160:6**

159:12    Q.   Okay.  Why don't we -- why don't you
159:13    pull out Exhibit 476.  Mr. Perry asked you some
159:14    questions about that.
159:15    So do you recall questions about that
159:16    last sentence in your top E-mail about the if
159:17    negotiations with St. Luke's go to fruition there
159:18    would be the clout of the entire network.
159:19    Do you remember Mr. Perry asked you
159:20    about that?
159:21    A.   Yes.
159:22    Q.   I believe you said that that was a
159:23    naive view; is that right?
159:24    A.   Yes.
159:25    Q.   So when you wrote this in 2011, you had
160: Page 160
160: 1    been the chair of the Contracting Committee for
160: 2    something like 18 years or so; is that right?

160: 3   A.  That would be a reasonable estimate.
160: 4   Q.  Yeah.  And were you -- after 18 years,
160: 5   were you naive about managed care relationships
160: 6   generally?


**Page Range:      160:9-160:14**

160: 9   A.  I still -- I said it was a naive
160:10   statement.
160:11   Q.  My -- my question is a different one.
160:12   I said after 18 years on the Contracting
160:13   Committee, were you naive about managed care
160:14   relationships generally?


**Page Range:      160:16-160:17**

160:16   THE WITNESS:  No, I don't think I'm naive
160:17   about managed care relationships generally.


**Page Range:      161:12-161:16**

161:12   Q.  Okay.  So what happened in the last few
161:13   years that made you less naive today that didn't
161:14   happen in the first 18?
161:15   A.  I can't tell you in detail what --
161:16   what's happened.


**Page Range:      161:17-161:23**

161:17   Q.  Okay.  In March of 2013, two months
161:18   ago, were you naive about managed care
161:19   relationships and about clout and managed care?
161:20   A.  I don't think it is fair to
161:21   characterize whether I was naive in general versus
161:22   whether I might have made a judgment that was
161:23   incorrect or naive about a specific issue.


**Page Range:      168:17-169:22**

168:17   Let me go back to Exhibit 481, which
168:18   Mr. Perry showed you.  I want to ask you about a
168:19   different sentence than he showed you.
168:20   If you go to the second page, you see

168:21    that paragraph starts out, "I'm pretty convinced
168:22    that St. Luke's is the right partner"?
168:23    A.  Yes.
168:24    Q.  It is in the same paragraph, but it's a
168:25    different sentence.  You see the fifth sentence in
169: Page 169
169: 1    that paragraph says, "They are offering a
169: 2    wonderful opportunity to control and codevelop
169: 3    services in Canyon County."
169: 4    Do you see that sentence?
169: 5    A.  Yes.
169: 6    Q.  And by "they," you meant St. Luke's,
169: 7    correct?
169: 8    A.  Yes.
169: 9    Q.  So what was the wonderful opportunity
169:10    to control services in Canyon County?
169:11    A.  Again, probably not the best choice of
169:12    words.  Because it has never been about control.
169:13    It's been about the opportunity to participate in
169:14    the development of services, to have a say, to
169:15    have Saltzer's goals and Saltzer's wishes
169:16    represented.
169:17    Q.  But when you wrote this, this letter to
169:18    your colleagues, did you try to be as accurate as
169:19    possible?
169:20    A.  Of course.
169:21    Q.  Did you try to choose the best words?
169:22    A.  Yes.


**Page Range:     169:23-170:4**

169:23    Q.  Were you worrying about whether the
169:24    words would have significance in a court case when
169:25    you wrote this?
170: Page 170
170: 1    A.  Of course not.
170: 2    Q.  Okay.  Now today, you are in a
170: 3    situation where these words have potential
170: 4    significance in a court case, correct?


**Page Range:     170:6-170-22**

170: 6    THE WITNESS:  It is unfortunate that they
170: 7    would because that's not what was meant.  But I'm
170: 8    sure somebody will try to make it look like that's
170: 9    what was meant.

170:10   Q.  BY MR. ETTINGER:  So -- well, what word
170:11   did you mean when you wrote "control services in
170:12   Canyon County," Doctor?  What -- tell me the right
170:13   word should have been instead of "control."
170:14   A.  The opportunity was, as I said, was to
170:15   participate.
170:16   Q.  So you -- you said "control" when you
170:17   meant to say "participate"; is that correct?
170:18   A.  I -- it would have been better had I
170:19   used the word "participate."
170:20   Q.  Did you say "control" when you meant to
170:21   say "participate," Doctor?
170:22   A.  Yes.

**Page Range:     187:24-188:14**

187:24   Q.  Okay.  Now, Blue Shield, Regence Blue
187:25   Shield agreed to provide -- to allow Saltzer to
188:  Page 188
188: 1   participate in its PPO at its traditional rates;
188: 2   isn't that right?
188: 3   A.  They did.
188: 4   Q.  And that amounted to about an 8 or 10
188: 5   percent price advantage to -- to Saltzer; isn't
188: 6   that right?
188: 7   A.  I'm not sure I would describe it that
188: 8   way.  It -- what it prevented, Saltzer from taking
188: 9   an 8 to 10 percent decrease, and that was years
188:10   ago.
188:11   Q.  Yeah.  And that was in effect through
188:12   part of 2012, was it not?
188:13   A.  I don't remember the date when that
188:14   ended.

**Page Range:     220:9-221:4**

220: 9   Q.  And your outpatient cases at Saint Al's
220:10   are down to less than half they were before the
220:11   St. Luke's acquisition; isn't that right?
220:12   A.  And -- and that's because -- that's not
220:13   by choice.  My practice style, my -- where I do
220:14   things has not changed.  What's changed is, and
220:15   not by my intent, when I came off the endoscopy
220:16   call schedule, I've had less in-hospital work to
220:17   do that was call related, and that's why that
220:18   volume is down.

220:19  The number of patients that I need to
220:20  do over there has not changed.  The way I practice
220:21  with those patients has not changed.
220:22  Q.  So I just want to be clear on the facts
220:23  on the record because in part you gave me the
220:24  explanation without answering the question.  So
220:25  let's just get some facts straight.
221: Page 221
221: 1  You chose to go off the endoscopy call
221: 2  schedule, and as a result, you were doing less
221: 3  cases at Saint Al's Nampa, correct?
221: 4  A.  Correct.  Not by design.


**Page Range:     221:5-221:13**

221: 5  Q.  I understand that's your position.
221: 6  A.  Well --
221: 7  Q.  I'm not trying to argue with you,
221: 8  Doctor.  I'm saying I understand --
221: 9  A.  No, what you're trying to -- with all
221:10  due respect, what you're trying to imply is that I
221:11  changed the nature of my practice because of the
221:12  St. Luke's deal, and that is not the case.  That
221:13  has not happened.


**Page Range:     232:12-233:4**

232:13  Q.  BY MR. ETTINGER:  Doctor, you've been
232:14  handed Exhibit 489, which is a series of E-mails
232:15  beginning with the same Dr. McKinnon E-mail
232:16  following an E-mail from Dr. Kunz, and then
232:17  another one from Dr. McKinnon, Bates-numbered
232:18  47702 to 3.  Why don't you take a look at this and
232:19  I'll ask you about it.
232:20  A.  Okay.
232:21  Q.  Okay.  You see that Dr. Kunz said, "We
232:22  have discussed contingency plans in Finance
232:23  Committee"?
232:24  A.  I do.
232:25  Q.  Does that refresh your recollection
233: Page 233
233: 1  that you heard about contingency plans?
233: 2  A.  It does not -- that's the extent of
233: 3  what I know is that there have been some
233: 4  discussions about it.  And that's all I know.

**Page Range:**     233:23-234:12

233:23   Q.   Yeah.  Were you curious as to what had
233:24   been discussed about contingency plans in the
233:25   Finance Committee?
234: Page 234
234: 1   A.   Apparently not very much so, because I
234: 2   didn't inquire about it.
234: 3   Q.   Okay.  All right.  Are you curious
234: 4   today as to whether Saltzer has any contingency
234: 5   plans to deal with this eventuality of the
234: 6   surgeons not being present if the judge unwound
234: 7   the group?
234: 8   A.   Yes.
234: 9   Q.   Is there a reason why you never asked
234:10   Dr. Kunz or anyone on the Finance Committee about
234:11   what contingency plans they've discussed?
234:12   A.   Not that I can give you, no.