**TESTIMONY OF MAX REIBOLDT**
Received on September 25, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:     10:8-10:18**

10: 8    Q.   Mr. Reiboldt, could you state your full
10: 9    name for the record, please.
10:10    A.   James M. Reiboldt.
10:11    Q.   And where do you work?
10:12    A.   Coker Group.
10:13    Q.   What's your position?
10:14    A.   I'm president and CEO.
10:15    Q.   And where is the Coker Group located?
10:16    A.   We're based in Atlanta.
10:17    Q.   And are you personally based in Atlanta?
10:18    A.   Yes.


**Page Range:     11:14-13:18**

11:14    Q.   You've been shown what I hope has been
11:15    marked Plaintiff's Exhibit 190, which is a copy of a
11:16    brief biography of you pulled off your website.
11:17    A.   Mm-hmm (affirmative).
11:18    Q.   Is that what you're looking at?
11:19    A.   Yes, sir.
11:20    Q.   And it says you're -- you've had at least
11:21    20 years of experience in health care matters; is
11:22    that correct?
11:23    A.   That's correct.
11:24    Q.   And talks about your expertise in a wide
11:25    variety of different kinds of health care
12: Page 12
12: 1    transactions.  Is that all accurate?
12: 2    A.   Yes, sir.
12: 3    Q.   And it says you've also authored or
12: 4    contributed to many of Coker Group's 60-plus books.
12: 5    Is that also accurate?
12: 6    A.   That's correct.
12: 7    Q.   Specifically in terms of -- that's really
12: 8    all I need that for.  So that's an accurate summary
12: 9    of your biography?
12:10    A.   Yes, it is.
12:11    Q.   About how many physician groups have you
12:12    represented over the years, just ball park?

12:13   A.   You mean over the entire 20 years I have
12:14   been with --
12:15   Q.   Sure.
12:16   A.   20-plus years I have been with --
12:17   Q.   Sure.
12:18   A.   -- Coker Group?  We -- let me back into
12:19   it.
12:20   Q.   Sure.
12:21   A.   We represent, through the course of a
12:22   given year, we represent from about 200 to 300
12:23   clients; and I would guess that about 60 percent of
12:24   those are physician groups.
12:25   Now, every year we represent some of the
13: Page 13
13: 1   same ones, so I don't -- I would say over the course
13: 2   of my 20 years, close to 1,000 probably.
13: 3   Q.   Okay.  And about how many times have you
13: 4   represented physician groups in connection with a
13: 5   possible purchase or sale transaction or merger?
13: 6   A.   Multiple times.  I would say several
13: 7   hundred.  Well, at least a couple of hundred, let's
13: 8   put it that way, easily.
13: 9   Q.   And you're based in Atlanta and, of
13:10   course, this case is about Idaho?
13:11   A.   Mm-hmm (affirmative).
13:12   Q.   What geographic area does your practice
13:13   encompass?
13:14   A.   We have a national practice.  We work
13:15   physically in about 40 to 45 states every year.
13:16   It's not always the same states, but that's
13:17   historically been our trend.  So we truly have a
13:18   national practice.


**Page Range:      15:2-16:19**

15: 2   Q.   And what exactly did Saltzer engage you
15: 3   to do?
15: 4   A.   Well, at the beginning -- and this is
15: 5   typical of our transactions of this nature.  We as a
15: 6   consulting firm philosophically, I have always felt
15: 7   that -- you know, I resent some consultants who try
15: 8   to push themselves onto a client, whether it's a
15: 9   hospital, which we work with a lot of hospitals,
15:10   too, or a group, and do -- try to do too much too
15:11   quickly.
15:12   And so when they explained their
15:13   situation and they said, look, we're -- we're --

15:14   there is two major systems out here.  We are not
15:15   discounting either of them, per se, and we also have
15:16   several different models of affiliation, we call it
15:17   "alignment" these days, and we just need some help.
15:18   And I said, well, here's how we typically
15:19   start a process.  We come out and we do what I call
15:20   landscape review, which is essentially one to
15:21   two days of more intensive internalization
15:22   consulting.
15:23   So we interview a representative number
15:24   of both management and the physicians, cross-section
15:25   as much as we have time, and we also provide often
16: Page 16
16: 1   with groups like this a collective presentation or
16: 2   two.
16: 3   And, really, what we're doing is a
16: 4   combination of consulting and educating, educating
16: 5   by showing them the various models of affiliation
16: 6   that are out there from employment to something less
16: 7   than employment.
16: 8   And then from there, we really try to
16: 9   provide a consultative approach to helping them as a
16:10   group crystallize a strategy going forward.
16:11   And so that's all we were engaged to do
16:12   initially.  It was a relatively limited assignment
16:13   as such to complete that review.
16:14   We delivered a report, as I recall, which
16:15   we always do, a short report, and probably -- I
16:16   can't remember if it was in narrative or SlideDeck.
16:17   These days we're putting them most in SlideDeck
16:18   forms, our reports like that.  And basically that
16:19   was what we did the first visit.


**Page Range: 16:23-16:24**

16:23   (Plaintiff's Exhibit 1143 marked)
16:24   BY MR. ETTINGER

**Page Range:   17:2-18:7**

17: 2   Q.   So I -- you've been handed what's been
17: 3   marked as Exhibit 191, which is a Coker Group letter
17: 4   dated December 17th, 2010, to John Kaiser, Bill
17: 5   Savage, Nancy Powell.
17: 6   And I wonder is this the report you're
17: 7   referring to --
17: 8   A.   Mm-hmm (affirmative).

17: 9    Q.    -- or is this --
17:10    A.    I believe so, because we're doing most of
17:11    them in SlideDecks now, but back then in 2010, yeah,
17:12    I recall us doing it in -- in not a -- we also have
17:13    a more formal narrative report that looks like a
17:14    consultant's report, but, quite frankly, a lot of
17:15    clients are getting tired of reading all that
17:16    detail.
17:17    Q.    Okay.
17:18    A.    So we've tried to abridge our reports and
17:19    cut to the chase, I guess you would say.
17:20    Q.    Sure.  So a few things -- and feel free
17:21    to look at whatever you want.
17:22    A.    Mm-hmm (affirmative).
17:23    Q.    But for the moment I'm just going to ask
17:24    you about a few things on the first page of the
17:25    document.
18: Page 18
18: 1    A.    Sure.
18: 2    Q.    So the footnote kind of describes your
18: 3    due diligence, I think, is that a fair description
18: 4    of what's in the footnote?
18: 5    A.    Mm-hmm (affirmative).
18: 6    Q.    -- that's a "yes"?
18: 7    Yes.  Yes, sir.


**Page Range:        18:10-19:18**


18:10    Q.    And you say -- you talk about meetings
18:11    and interviews as you did a moment ago, and then you
18:12    also say, "along with the review of data and
18:13    information"?
18:14    A.    Yes.
18:15    Q.    Do you recall generally the kind of data
18:16    and information that you reviewed?
18:17    A.    We have what we call a Request for
18:18    Information form, RFI.  And if you didn't get a copy
18:19    of that, we'll be happy to give it to you.  I am
18:20    sure one existed because we always do it that way.
18:21    And that, generally speaking, asks for a
18:22    rather comprehensive list of pertinent information,
18:23    both, you know, a fair amount of it is financial,
18:24    and then a lot of it is more of an overview of the
18:25    practice, in other words, history, background,
19: Page 19
19: 1    brochures, you know, so we get a good feel -- the
19: 2    way we break our projects down, without getting into

19: 3   too much boring detail, is we break them into
19: 4   phases.
19: 5   So phase one is a review of data and
19: 6   information before we go onsite.  And that's a
19: 7   result of this RFI that I referred to.
19: 8   And then we go onsite and do the
19: 9   interviews and what have you onsite.  And then the
19:10   third phase -- that's second phase.  Third phase is
19:11   the report.
19:12   And then fourth phase is usually
19:13   optional.  It can be a presentation.  It can be
19:14   additional followup work that they request us to do.
19:15   But, usually, that's really the commitment at that
19:16   point.  And we're not -- the client has not
19:17   committed to any more work beyond that at that
19:18   point.


**Page Range:      22:15-23:13**

22:15   Let me ask you about your note-taking
22:16   process since you brought it up.  So do you
22:17   regularly in the course of your engagement take
22:18   notes of conversations?
22:19   A.   I try to.  And I have a colleague, and
22:20   you have her notes, too.  Actually, the initial
22:21   engagement there were two colleagues with me.  And I
22:22   believe we gave you both of their notes.
22:23   So between -- normally, it's just -- and
22:24   as it turned out, only one of the two associates
22:25   really continued on with the project with me, of our
23: Page 23
23: 1   firm, because that was all that was needed, quite
23: 2   frankly.
23: 3   So to answer your question, yes, I try to
23: 4   take good notes.  Sometimes we split up into two
23: 5   tracks of interviews.  So needless to say, I'm very
23: 6   cognizant of taking better notes when Aimee, who is
23: 7   my colleague in this case is not there.  If she is
23: 8   there, a lot of times as president of the company,
23: 9   I'll kind of resort to her taking the better notes.
23:10   But it varies.
23:11   Q.   So Aimee Greeter is the associate who
23:12   stuck with the project?
23:13   A.   That's correct.  That's correct.

**Page Range:      24:3-25:2**

24: 3   Q.   So when you take notes, do you take them
24: 4   at the meetings that the notes relate to while the
24: 5   meeting is going on?
24: 6   A.   Yes, most of the time I do.  Ever -- on
24: 7   occasion, you know, particularly if it's a lot of
24: 8   input, and a lot of talking, I may go back at the
24: 9   end of a meeting and update those notes while it's
24:10   still fresh.
24:11   Q.   So you do it that same day?
24:12   A.   Oh, or in the evening, yeah.
24:13   Q.   Yeah.  And I gather what you just did was
24:14   use your notes to refresh your recollection --
24:15   A.   I did.  Sorry.
24:16   Q.   -- at one point?
24:17   No problem.  No problem.  There is --
24:18   okay.
24:19   So let's go -- so the engagement -- the
24:20   initial engagement was to do the report, and that's
24:21   Exhibit 191, right?  So you did that report -- is
24:22   that correct?
24:23   A.   That is correct.
24:24   Q.   Thanks.  And so you did that report.  And
24:25   were you then engaged by Saltzer to take the project
25: Page 25
25: 1   further?
25: 2   A.   We were.


**Page Range:      25:19-27:8**

25:19   Q.   Okay.  And let me just ask something
25:20   about the process as you went forward and negotiated
25:21   with St. Luke's and so on.
25:22   Were you, in effect, a free agent, sort
25:23   of did Saltzer say to you, Go off and cut a deal and
25:24   let us know?  Or did you step by step make
25:25   recommendations, get direction from the client and
26: Page 26
26: 1   act at the clients' behest; which of those two
26: 2   processes?
26: 3   A.   Much more so the latter.
26: 4   Q.   Okay.
26: 5   A.   We were not a free agent, by any means.
26: 6   We were working under the auspices of really the
26: 7   physicians that control or run the group and
26: 8   ultimately the partner -- all the shareholder

26: 9   physicians.
26:10   But we worked most closely with the -- I
26:11   forget the term they used.  Practices use different
26:12   terms, some use "boards", some use "executive
26:13   committees."  I don't actually recall.  I think it
26:14   was executive committee is the term they used.  But
26:15   that's the leadership, the board, if you will, of
26:16   the physicians.
26:17   And, of course, we worked closely with
26:18   both Bill and Nancy through the -- well, until Nancy
26:19   left the group.
26:20   Q.   Okay.
26:21   A.   I would say in this group the -- you
26:22   know, clients are different, as I am sure yours are,
26:23   the way they conduct their oversight of a consultant
26:24   or attorney.  For example, some groups will not
26:25   involve their administration that much.  Some will
27: Page 27
27: 1   have them at every single meeting and very much
27: 2   involved in the whole process.
27: 3   In Saltzer's case, Bill and Nancy were at
27: 4   every meeting, on every phone call, and discussed
27: 5   the entire purview of what it was we were doing with
27: 6   the physicians.  They relied on them a great deal.
27: 7   Q.   And you relied on them, is that fair?
27: 8   A.   Sure.


**Page Range:      30:13-31:13**


30:13   Q.   So you've been handed Exhibit Plaintiff's
30:14   192.  And I guess the first question is are these
30:15   your notes, or somebody else's notes?
30:16   A.   These are somebody else's notes.
30:17   Q.   Okay.  Could you tell whose notes these
30:18   are?
30:19   A.   Yes, I believe these are Aimee's.  I
30:20   think I recognize her writing.
30:21   Q.   So did you have occasion to review
30:22   Aimee's notes in the course of your normal work or
30:23   not?
30:24   A.   No, I do not.
30:25   Q.   But would you have occasion to rely on
31: Page 31
31: 1   work she did based on her notes?
31: 2   A.   Sure, absolutely.
31: 3   Q.   Well, let me ask you about a couple of
31: 4   things.  So this is a December 2010 meeting.  It

31: 5    says Bill Savage and Nancy Powell at the top.
31: 6    And if you flip through the pages you go,
31: 7    for example, to the fourth page, there is a Dr. Jon
31: 8    Hlavinka.  And if you go to the sixth page, there is
31: 9    Dr. Djernes and various people.
31:10    And I guess my question is:  Does this
31:11    appear to be notes of the initial round of
31:12    interviews that you described earlier?
31:13    A.   Yes, sir.


**Page Range:      53:24-54:11**

53:24    (Plaintiff's Exhibit #194 marked)
53:25    BY MR. ETTINGER:
54: Page 54
54: 1    Q.   You have been handed what is Plaintiff's
54: 2    Exhibit 194, which is minutes of a Saltzer
54: 3    Shareholder Meeting, December 9th and 10th, 2010.
54: 4    Again, it's a Saltzer document, but it's
54: 5    minutes of the meeting that shows that you were
54: 6    present along with Rick Langosch and Aimee Greeter.
54: 7    Was it, that meeting, a part of that
54: 8    initial effort that you've described?
54: 9    A.   Yes, I believe it was.  I honestly didn't
54:10    realize it was in the form of a formal shareholder
54:11    meeting, but that's fine, yes, I believe it is.


**Page Range:      58:20-59:15**

58:20    Q.   Okay.  Hand you what's been marked as
58:21    Exhibit 196.
58:22    These are handwritten notes from your
58:23    group.  Whose notes are these?
58:24    A.   I believe they're Aimee's.  Aimee
58:25    Greeter's.
59: Page 59
59: 1    Q.   Okay.  And does this -- this appears to
59: 2    be a couple of separate meetings with different
59: 3    groups of Saltzer doctors; is that right?
59: 4    A.   Yes, sir.
59: 5    Q.   And under the first headings, 12:00 p.m.,
59: 6    it says:  Drs. Welch, Bennett, Williams, Patterson,
59: 7    Andrews.  And then it says Max and Aimee -- you and
59: 8    Aimee; correct?
59: 9    A.   Yes, sir.
59:10    Q.   You see there it says: "Not willing to

59:11    take the deal even with 28 percent because they
59:12    don't want to give up their autonomy, control of
59:13    staff."
59:14    Did I read that correctly?
59:15    A.   Yes, sir.


**Page Range:      63:22-64:17**

63:22    (Plaintiff's Exhibit #197 marked)
63:23    BY MR. ETTINGER:
63:24    Q.   You've been handed Exhibit 197.  But
63:25    before you look at that, let me ask you something
64: Page 64
64: 1    else quickly.
64: 2    196, of course, you said was Aimee's
64: 3    notes.  So did Aimee in your experience, since you
64: 4    were often sitting there with her, take notes during
64: 5    the interviews themselves?
64: 6    A.   Yes.  We both tried to take notes, but --
64: 7    you know, I, obviously, was at this meeting, and I
64: 8    don't remember if I didn't take any notes or not.
64: 9    Obviously, she didn't take many in this case.
64:10    But, yes, she would almost always take
64:11    notes, particularly if I didn't.
64:12    Q.   And was it the case that she was kind of
64:13    the more complete note taker because you were busy
64:14    talking a little bit more?
64:15    A.   It could be the case.  It depends on the
64:16    structure of the meeting.  It could be the case.  I
64:17    wouldn't say it all every single time.


**Page Range:      72:16-73:25**

72:16    Q.   Okay.  Why don't you turn to Exhibit 191
72:17    again, your initial report.  And turn to Page 2.
72:18    And under Key Need, under Issues,
72:19    Concerns and Comments, the fourth checkpoint says,
72:20    quote:  "Opportunities for improved managed care
72:21    negotiations exist based on a higher number of
72:22    physicians."  Close quote.
72:23    First of all, that was an observation
72:24    about a deal with St. Luke's; correct?
72:25    A.   Only to the extent if this is pertaining
73: Page 73
73: 1    to the fact that we were only focused on St. Luke's
73: 2    at the time.

73: 3    But I actually don't think that's the
73: 4    case.  I think this is a statement that we made
73: 5    as -- and it was identified to us during this
73: 6    interview process that the whole concept -- we wrote
73: 7    a book one time and we called it "Strength in
73: 8    Numbers" as one of our books.  And obviously, it
73: 9    means that when you do have a higher number of
73:10    physicians and providers, partners in the health
73:11    system, that you have more leverage as such and
73:12    negotiations.
73:13    And so I think that's really what this
73:14    was referring to.  In the context, it's saying keep
73:15    the group together and don't splinter.
73:16    See, this was another issue that we
73:17    talked about and we always do, with multispecialty
73:18    groups is that, you know, regardless of what you do
73:19    -- and as a matter of fact, it says up here "do not
73:20    allow the group to fragment as a result of
73:21    integration."  So that was the key context here.
73:22    That's what's said here at the beginning of this
73:23    number, point number one, key need.
73:24    Q.    Okay.
73:25    A.    So it was all in that context, I think.

**Page Range:      74:16-75:6**

74:16    Q.  And by "their" you mean because they'd be
74:17    under one set of managed care contracts, that would
74:18    be improved reimbursement with commercial payers;
74:19    correct?
74:20    A.  The general premise is two things.
74:21    Number one, health systems.  And this would -- it
74:22    doesn't matter which health system in this case it
74:23    would have been.  St. Luke's or Saint Al's probably
74:24    would have done better; though in this case I am
74:25    sure we're referring to St. Luke's because they are
75: Page 25
75:01    the only ones that we were focused on at this point.
75:02    But what that means is that the health
75:03    systems are much larger, and have the ability to
75:04    generate, generally speaking, better rates of
75:05    reimbursement on a fee-for-service basis from the
75:06    commercial payers.

**Page Range:      76:21-77:20**

76:21    Q.   I think this was in the midst of the

76:22   process, not the beginning of the process.  Sitting
76:23   here right now, I can't be more specific, but you
76:24   can assume that.
76:25    The third item says:  "Start to lose
77: Page 77
77: 1   market share that would impact our ability to
77: 2   negotiate contracts."
77: 3   Do you recall that issue being discussed
77: 4   with either Nancy Powell or other people at Saltzer?
77: 5   A.   Yeah, the -- yes.  The market share
77: 6   that's being referred to, of course, is Saltzer's
77: 7   market share, again, in the context that if you
77: 8   don't find a major health system partner, they will
77: 9   be -- the group will fracture, it will implode
77:10    potentially, and, therefore, in the context of
77:11   what's going on in the health care industry, you
77:12   need to find -- the conclusion was we need to find a
77:13   major partner.  It has to be one of the two systems.
77:14   Those are really our only choices.
77:15   So there is concern always about losing
77:16   market share.  And, obviously, in the context of
77:17   what I just responded to in your last question, if
77:18   you have fewer numbers, and you're fractured as a
77:19   group, or worse than anything, you're imploded, then
77:20   you can't negotiate contracts.


**Page Range:      81:17-82:21**

81:17   Q.   You've been shown what's been marked as
81:18   Exhibit 200.  Whose notes are these?
81:19   A.   Aimee Greeter.
81:20   Q.   Let me ask you about an item on the
81:21   second page.  And you see where just before Item 3
81:22   it says:  "If things don't work out with Saltzer,
81:23   St. Luke's will swallow a 7-man Mercy medical group,
81:24   which is a family medicine group.  This will create
81:25   competition within Nampa."
82: Page 82
82: 1   Do you see that reference?
82: 2   A.   I do.
82: 3   Q.   Does that refresh your recollection that
82: 4   there was such concern within Saltzer about that
82: 5   specific group?
82: 6   A.   Yes.  But it says "will swallow."  I
82: 7   don't think St. Luke's had done this deal yet.  I
82: 8   think there was concern that that would happen.
82: 9   And trying to think who this conversation

82:10   was with.  It looks like it was just Bill, Nancy and
82:11   myself.
82:12   Q.   Okay.
82:13   A.   I don't -- yeah.  There was definitely
82:14   concern that St. Luke's would move into Canyon
82:15   County, and that they had already announced it, that
82:16   it was with all these intentions.
82:17   So there was definitely concern that, you
82:18   know, a very prominent player, what was looked upon
82:19   at least by the Saltzer docs in general, as the best
82:20   of the two systems would come into their territory.
82:21   There was that concern.


**Page Range:      82:24-83:10**

82:24   Q.   Handing you what's been marked as
82:25   Exhibit 201, a series of e-mails including one from
83: Page 83
83: 1   you to Bill Savage.
83: 2   Have I described that correctly?
83: 3   A.   Yes, sir.
83: 4   Q.   And you say in this top e-mail:  "We are
83: 5   going to have to stand our ground as they know they
83: 6   must have Saltzer to do their thing in Nampa, and as
83: 7   such we have a lot of leverage if we don't crater
83: 8   too quickly."  Close quote.
83: 9   Was that your statement?
83:10   A.   Yes, sir.


**Page Range:      86:8-86:24**

86: 8   that.  And Luke's, you had that leverage, Saltzer
86: 9   had that leverage with Luke's because, in your
86:10   words, Luke's knew they must have Saltzer to do
86:11   their thing in Nampa; correct?
86:12   A.   Well, sure.  Saltzer makes up even then,
86:13   and I am sure today, still makes up a significant
86:14   percentage of the total provider base in Nampa and
86:15   Canyon County.  But particularly Nampa.
86:16   Q.   Okay.  Why don't you turn to Exhibit 191
86:17   again, your December 2010 letter, report.  And go to
86:18   Page 5 of the letter.
86:19   And I want to ask you about some language
86:20   that's underlined there.  It's not underlined by me.
86:21   It's underlined in the original.
86:22   This is a copy of your report from the

86:23   Saltzer files.  For some reason I didn't find this
86:24   report in your files.  I'm not sure why.


**Page Range:      86:25-87:19**

86:25    But it says there, "St. Luke's indicated
87: Page 87
87: 1    their intent to break ground on a new ambulatory
87: 2    facility within the next 30 days, but wants
87: 3    assurance that it has an ambulatory partner
87: 4    especially prior to committing to a complete acute
87: 5    care medical surgical facility."
87: 6    Is that something that you learned from
87: 7    St. Luke's directly, or from Saltzer?
87: 8    A.   Both.  I can remember -- my guess is that
87: 9    we were first told that by Saltzer and their
87:10   doctors, but I remember going to St. Luke's and
87:11   hearing and seeing a presentation with drawings and
87:12   everything of all their intent to do what it says
87:13   here.
87:14   Q.   Okay.  And who gave that presentation?
87:15   A.   It was several of the executives at
87:16   St. Luke's.  I don't remember all the names.  I
87:17   think the -- well, if you said the names, I could
87:18   probably say -- I think the CFO was there, the COO,
87:19   I think the CEO was there.


**Page Range:      88:19-88:20**

88:19   Q.   Showing you what's been marked as
88:20   Exhibit 202.


**Page Range:      89:1-89:6**

89: 1   Q.   So whose notes are these?
89: 2   A.   These are mine.
89: 3   Q.   Okay.  And why don't you turn to the
89: 4   third page of the notes.
89: 5   Do you remember a discussion with
89: 6   St. Luke's about imaging?


**Page Range:      90:14-91:11**

90:14   Q.   Okay.  Why don't we go back again to your

90:15    December 2010 report, Exhibit 191.  Go to Page 856.
90:16    And I want to ask you about the language underlined
90:17    at the bottom of the page again, not by me.
90:18    Take a look at that, and I'll ask you
90:19    about it.
90:20    A.   Okay.
90:21    Q.   It says there the physicians that
90:22    practice at Mercy will later relocate to a new
90:23    St. Luke's facility.
90:24    Does that refer to the plan that the
90:25    Saltzer physicians, who were then practicing at
91: Page 91
91: 1    Mercy Medical Center, later Saint Al's Nampa, would
91: 2    relocate to the new St. Luke's Hospital in Nampa
91: 3    once it was opened?
91: 4    A.   I think more specifically -- yeah, the
91: 5    hospital, or but at first it was ASC.  And relocate
91: 6    doesn't necessarily mean physically relocate their
91: 7    clinic.  It probably means that they would shift and
91: 8    do more of their surgeries at that facility.
91: 9    Q.   Okay.  Surgeries, or once a hospital
91:10    opened, inpatient care?
91:11    A.   Yeah, sure.


**Page Range:     93:11-95:6**

93:11    Q.   Why don't you turn to Exhibit 202 again,
93:12    your notes.
93:13    A.   Mm-hmm (affirmative).
93:14    Q.   And these -- were these your notes?
93:15    A.   These are my notes, yes.
93:16    Q.   Okay.  Why don't you turn to page 60 --
93:17    Page 2 of the notes, Bates-numbered 64 again.
93:18    A.   Okay.
93:19    Q.   See the reference to Treasure Valley
93:20    Hospital towards the bottom of the page --
93:21    A.   I do.
93:22    Q.   -- there is a sentence there that says,
93:23    quote:  "They'd like to see a transition period to
93:24    move the Saltzer MDs out of Treasure Valley, close
93:25    quote."
94: Page 94
94: 1    Do you see that?
94: 2    A.   I do.
94: 3    Q.   And was "they" there referring to
94: 4    St. Luke's?
94: 5    A.   I would say, yes, that's probably the

94: 6    case.  This was dated March of 2011, which was
94: 7    before we were successfully able to negotiate within
94: 8    the transaction to protect the surgeons, to keep
94: 9    their interests.
94:10    And we also even entertained the fact, as
94:11    you see here in this same note, that Luke's might be
94:12    willing, or wondered if they'd be willing to
94:13    purchase a minority interest in TVH.
94:14    Q.   Okay.
94:15    A.   And so I think, again, you've got to put
94:16    this in the context of when it was.  This was March.
94:17    And we were very much early on in the negotiations
94:18    in this process, and we were concerned, once again,
94:19    about keeping the surgeons with the group, keeping
94:20    them happy, keeping them invested in TVH because
94:21    they said they had to remain invested with their
94:22    equity interest.  And so I think it's in that
94:23    context that, sure, it was related to St. Luke's.
94:24    Q.   St. Luke's wanted to move them out of
94:25    Treasure Valley at this time; right?  Is that
95: Page 95
95: 1    correct?
95: 2    A.   St. Luke's did not want -- yes.  But let
95: 3    me explain why.  St. Luke's did not want to allow
95: 4    the surgeons to basically do, in some cases,
95: 5    50 percent or more of their surgeries in a remote
95: 6    facility in Boise.


**Page Range:     97:4-97:23**

97: 4    Q.   So you've got Exhibit 204 in front of
97: 5    you:  "Saltzer Medical Group Physician Pod
97: 6    Meetings"?
97: 7    A.   Yes, sir.
97: 8    Q.   And that's a Coker presentation?
97: 9    A.   Yes, sir.
97:10    Q.   And now we're to July of 2011; correct?
97:11    A.   Yes, sir.
97:12    Q.   And I want you to go to Page 6.
97:13    And there you see it says "Exclusivity is
97:14    an expectation of SLSH"; that means St. Luke's,
97:15    correct?
97:16    A.   Yes, sir.
97:17    Q.   "And there is an associated economic
97:18    impact.  This includes divestiture of outside
97:19    ownership including TVH."  Is that right?
97:20    A.   Yes, sir.

97:21   Q.   And by exclusivity there, you meant
97:22   exclusivity in terms of referrals and admissions;
97:23   correct?


**Page Range:      97:25-99:1**

97:25   A.   Not -- not to the extent that St. Luke's
98: Page 98
98: 1   would have said that they couldn't have -- that the
98: 2   doctors couldn't have made their -- the three
98: 3   standard choices that doctors have; in other words,
98: 4   if it's in the opinion of the doctor that it's the
98: 5   best place to go, if the managed care provider, I
98: 6   mean, managed care payer requires it, or the patient
98: 7   themselves want to go to another facility.
98: 8   But, obviously, in a presentation like
98: 9   this, we didn't go to that level of, you know,
98:10   commentary, but that's implicit.
98:11   But beyond those three criteria, which
98:12   are standard for every health system including
98:13   St. Luke's, the expectation was that, yes, once they
98:14   are aligned fully with St. Luke's, there was the
98:15   expectation that their work would largely, other
98:16   than those three things that I just noted, go to
98:17   St. Luke's.
98:18   And this was particularly true, once
98:19   again, which is why we pointed it out as a bullet,
98:20   about the divestiture of the outside ownership of
98:21   TVH.
98:22   Q.   And that expectation didn't just apply to
98:23   the surgeons who worked at TVH, it applied to the
98:24   whole group; correct?
98:25   A.   It would apply to the whole group.  But
99: Page 99
99: 1   once again, the surgeons were of particular concern.


**Page Range:      99:8-99:14**

99: 8   Q.   Just give me a second.  I'm trying to
99: 9   find the right set of notes here.
99:10   Would you go back to Exhibit 192.
99:11   Do you recall a discussion where Bill
99:12   Savage said that he thinks that St. Luke's is trying
99:13   to pick -- plans to pick the legs off TVH so that no
99:14   commercial payers deal with them?

**Page Range:**      **99:16-99:16**

99:16     A.   I don't recall those specific terms.


**Page Range:**      **99:18-102:7**

99:18     Q.   Okay.  Why don't you turn to Page 11 of
99:19     the notes, Exhibit 192.
99:20     See under the heading called "Debrief
99:21     with Bill, Nancy, Rick, Max, Aimee" there?
99:22     A.   Yes.
99:23     Q.   And in the first paragraph does it say:
99:24     Bill thinks that they, Saint Al, will, quote, 'pick
99:25     the legs off,' close quote, that.  Make it so only
100: Page 100
100: 1    Medicare can be seen through the ASC through their
100: 2    payer contracting?"  Close quote.
100: 3    A.   This -- I think this is referring to TVH
100: 4    again.
100: 5    Q.   Well, it's referring -- well, TVH is the
100: 6    ASC in question; correct?
100: 7    A.   Let me read it again.  Consideration --
100: 8    what's that word?  Consideration of what?  TVH.
100: 9    Pulling?  Is that pulling?  Or --
100:10    Q.   Pulling TVH?
100:11    A.   Is it pulling?  I can't read Aimee's
100:12    writing half the time.
100:13    Q.   I think it is.  But you're the witness.
100:14    A.   Well, but I didn't write it.
100:15    Q.   It looks to me like it says:  Tell me if
100:16    you agree, "consideration of pulling TV into a deal
100:17    with St. Luke's."
100:18    But then it goes on to say:  "However,
100:19    instead, Bill thinks that, they, (St. Luke's) will
100:20    'pick the legs off' that.  Make it so only Medicare
100:21    can be seen through the ASC through their payer
100:22    contracting."
100:23    So it's quite clear that, first of all,
100:24    that this is saying St. Luke's is pulling the legs
100:25    off the ASC; correct?
101: Page 101
101: 1    A.   Yeah.  I think he -- I think the context
101: 2    is Bill believed that St. Luke's would have the
101: 3    wherewithal to be able to influence the work that
101: 4    the surgeons did at TVH to where it would be a
101: 5    lower-paying patient.

101: 6    And the facts of life are that Medicare
101: 7    is the worst -- generally one of the worst payers.
101: 8    And so I think the context is that Luke's
101: 9    influence would have been such that they would have
101:10    moved the lesser-paying -- I think the word -- and
101:11    what you have to understand is we use these terms a
101:12    lot when we're talking.  We'll say Medicare, and you
101:13    really -- and I don't know if this is what Bill
101:14    meant; maybe he did mean specifically Medicare.
101:15    But it's generally the lower-paying
101:16    patients that will be shifted to the other facility,
101:17    so that's what -- I believe what he's probably
101:18    referring to here.
101:19    Q.    So, in essence, he's saying that
101:20    St. Luke's would, through its contracting, make sure
101:21    that the commercial payers would not deal with TVH,
101:22    and it would be left with the low-paying government
101:23    payers; correct?
101:24    A.    I believe that there was the concern,
101:25    yes, that St. Luke's would exert that level of
102: Page 102
102: 1    influence.  They had that much influence.
102: 2    Now, may I say that this is during our
102: 3    first review in December of 2010, and there was a
102: 4    lot of -- I mean, this was very early on in the
102: 5    discussions and the processes in terms of where we
102: 6    ended up, and, you know, obviously a lot of things
102: 7    that happened within TVH later.


**Page Range:       102:20-104:5**

102:20    Q.    Let me show you some more notes.  You've
102:21    been handed Exhibit 205, Mr. Reiboldt.
102:22    Whose notes are these?
102:23    A.    These are mine.
102:24    Q.    Okay.  So and these are more notes from
102:25    that initial investigation in December of 2010; is
103: Page 103
103: 1    that right?
103: 2    A.    Correct.
103: 3    Q.    Why don't you turn to Page 2 of these
103: 4    notes; again, the third page.  Somehow or other it
103: 5    includes second blank pages a lot.
103: 6    And see the reference to "Bill and Nancy
103: 7    meeting"?
103: 8    A.    Yes, sir.
103: 9    Q.    And the second item says, quote:

103:10    St. Luke's strategy hyphen prob," P-R-O-B, "to
103:11    muscle them out on payer contracting, make it go
103:12    away."  Close quote.
103:13    And that's talking about St. Luke's'
103:14    strategy with regard to TVH; correct?
103:15    A.   Yes.  I think that's probably what that's
103:16    referring to more so than it would have been Mercy
103:17    in this case.
103:18    Q.   And does it appear to you that looking at
103:19    both prior set of notes, Aimee's and yours, appear
103:20    to be at the same meeting, don't they?
103:21    A.   Yes.
103:22    Q.   So Aimee remembered "pick the legs off"
103:23    and you said "muscle them."  Do you think you were
103:24    both talking about the same thing, is that your
103:25    recollection?
104: Page 104
104: 1    A.   Yeah, I think it's -- I think it's
104: 2    referring to -- now that I see both notes and look
104: 3    at your questions, or consider your questions, I
104: 4    think, yes, it's talking about the entire TVH
104: 5    competitive concern that existed among St. Luke's.


**Page Range:      104:7-105:12**

104: 7    Now, I may want to ask you one more thing
104: 8    about these notes.
104: 9    Yeah.  Turn to Page 3 of the notes, which
104:10    is Bates-numbered 56.
104:11    And is this still the Bill and Nancy
104:12    meeting?
104:13    A.   Yes.
104:14    Q.   And in the middle of the page it says --
104:15    see where it says "Treasure Valley"?
104:16    A.   Mm-hmm, yes.
104:17    Q.   "Already excluded from most of the
104:18    private insurers.  Could be worse later."
104:19    Do you see that reference?
104:20    A.   I do.
104:21    Q.   Do you recall was that said at that
104:22    meeting as well?
104:23    A.   Yes.
104:24    Q.   Okay.  And looking at the top of the same
104:25    page of notes, Page 3 in Exhibit 205, tell me, see
105: Page 105
105: 1    if I'm getting your abbreviations right there.
105: 2    It looks like it says "hospital at

105: 3   St. Luke's in Nampa, MH," meaning must have, "a
105: 4   relationship with Saltzer, thinks there SB," meaning
105: 5   should be, "a hospital west of Meridian."
105: 6   Did I read that correctly?
105: 7   A.   Mm-hmm, yes, sir.
105: 8   Q.   Do you recall that you were told,
105: 9   consistent with some of the things you said later,
105:10   by Bill and Nancy that St. Luke's must have a
105:11   relationship with Saltzer to develop this hospital?
105:12   A.   Yes.


**Page Range:     107:2-107:15**

107: 2   So do you recall any specific competitive
107: 3   weaknesses of Saltzer that were identified at that
107: 4   time?
107: 5   A.   There were some subspecialties that they
107: 6   didn't have included, and to the extent that they
107: 7   didn't have a competitive edge, quote, unquote, that
107: 8   was -- comes to mind.
107: 9   But for the most part, Saint, or excuse
107:10   me, Saltzer was looked upon to be the group in
107:11   Nampa.
107:12   Q.   Okay.
107:13   A.   And they were looked upon as the best
107:14   quality, the best doctors, the -- you know,
107:15   obviously more numbers than anybody else.


**Page Range:     107:16-107:20**

107:16   Having said that, they weren't looked
107:17   upon as being the only group in Nampa.  I do
107:18   remember discussions where there were other specific
107:19   physicians mentioned.  I want to say some primary
107:20   care but also some specialists, too.


**Page Range:     113:21-114:23**

113:21   Do you recall what that issue was
113:22   regarding extending the group on a larger scale than
113:23   had been able to do in the past due to capital
113:24   restrictions?  Was this a recruitment issue?
113:25   A.   Sure.  This is typical of groups, all
114: Page 114
114: 1   groups these days.  It's one of the major reasons

114: 2   why they align with the health care system is
114: 3   because they have challenges with sufficient
114: 4   capital, as it were.
114: 5   That's kind of -- it's not so much, you
114: 6   know, brick-and-mortar capital.  It's capital of
114: 7   financial capital to recruit and meet the
114: 8   compensation and other requirements of recruiting
114: 9   physicians.
114:10   So it is -- it's kind of one of the major
114:11   reasons why groups like Saltzer are looking to align
114:12   with the health system is because they see a benefit
114:13   in the ability as they partner with the health
114:14   system to recruit and retain, retention is the other
114:15   bigger part or biggest part of this because the
114:16   groups, you know, they distribute all their earnings
114:17   to the partners, so there is no retained earnings,
114:18   so there is no capital to reinvest in your business
114:19   as you typically see in the -- like my business, I
114:20   retain earnings so I can reinvest.
114:21   Well, practices don't do that.  So that's
114:22   what this is referring to, that, you know, it makes
114:23   sense to align with a health system for that reason.

**Page Range:    114:24-115:13**

114:24   Q.   So had Saltzer had problems recruiting
114:25   because of lack of capital?
115: Page 115
115: 1   A.   Yes.  And, more importantly, I think they
115: 2   saw this to be a greater issue going forward, not so
115: 3   much that they hadn't been able to do it
115: 4   historically.  But they were starting to see this as
115: 5   a trend and were fearful that this would be more so
115: 6   the case going forward.
115: 7   Q.   Do you remember anything specific about
115: 8   their difficulties, or the lack thereof, in having
115: 9   enough funds to recruit in the past?
115:10   A.   Well, again, my -- I don't remember
115:11   specifically that, but I do recall in an overall
115:12   sense that this was a concern going forward and that
115:13   thus the reason to partner with the health system.

**Page Range:    116:16-117:1**

116:16   Q.   Okay.  Do you recall comments by Bill
116:17   Savage and Nancy Powell that if Mercy, Saint Al's

21

116:18    Nampa ever tried to kick Saltzer out, the hospital
116:19    would implode?
116:20    A.   If Saint Al's-Mercy ever kicked Saltzer?
116:21    Q.    Saltzer docs out of the hospital, or had
116:22    to forego Saltzer docs?
116:23    A.    That the hospital would implode?
116:24    Q.    Right.
116:25    A.    I don't recall a specific comment, but I
117: Page 117
117: 1    wouldn't be surprised if they said that.


**Page Range:      117:22-119:23**

117:22    Is Exhibit 192, I can't remember, are
117:23    these your notes, or are these Aimee Greeter's?
117:24    A.    These are Aimee's.
117:25    Q.    Okay.  So why don't you turn to Page 13
118: Page 118
118: 1    in the notes.
118: 2    A.    Got it.
118: 3    Q.    You see about five lines from the bottom
118: 4    right above where it says the struggle with Treasure
118: 5    Valley.  You see it says, quote:  "They think that
118: 6    Saint Al's Mercy will be imploding if they kick
118: 7    Saltzer out."
118: 8    You see that reference?
118: 9    A.    Mm-hmm, I do see it.
118:10    Q.    Does that refresh your recollection at
118:11    all about what was said?  I understand your opinions
118:12    that you've offered, but...
118:13    A.    All right.  So this is a meeting with Ed
118:14    Castledine and Peter LaFleur, Bill and Nancy, myself
118:15    and Aimee and Rick when we were first there, just to
118:16    put it in context.
118:17    Q.    Oh, okay.  So there were St. Luke's
118:18    people present at this meeting?
118:19    A.    That's what it looks like.
118:20    Q.    Okay.
118:21    A.    Looks like it's Ed Castledine and Peter
118:22    LaFleur.
118:23    Q.    Okay.
118:24    A.    If I -- you know, if these are all, and
118:25    looks like they are, in the proper page order.
119: Page 119
119: 1    Q.    So do you know if "they" refers to the
119: 2    Saltzer people, or St. Luke's people?
119: 3    A.    I don't know.  I need to read it if you

119: 4   want me to try to help you with your answer.
119: 5   Q.   Sure.
119: 6   A.   So I'm sorry, what's your question again?
119: 7   Q.   Does the "they" there -- first of all,
119: 8   does this refresh your recollection about what was
119: 9   said at the meeting on this subject, or not?
119:10   A.   Yeah, I think this is -- this is a
119:11   dialogue.  And it was the very first meeting that we
119:12   had with the consultant from Luke's, which I do
119:13   recall when we were there because we always, always
119:14   try to meet with representatives of the hospital
119:15   when we do this initial review.  And these were the
119:16   two individuals that we met with.  And this is a
119:17   part of that initial discussion.
119:18   So like, for example, looks like they
119:19   point out a lot of things here relative to what
119:20   Luke's may or may not do in the context of, you
119:21   know, a transaction.
119:22   You know, I can -- like, for example, it
119:23   says St. Luke's is not closed to all exclusivity.


**Page Range:     120:12-121:5**


120:12   "The worry on the Saltzer side that it
120:13   may be less than three years before they get kicked
120:14   out of Saint Al's."
120:15   The concern -- and then, you know,
120:16   however, they think that if Saint Al's-Mercy will be
120:17   imploding if they kick Saltzer out.  So I think
120:18   there was concern on both sides, but there was
120:19   definitely concern that Al's would kick the Saltzer
120:20   doctors out.
120:21   BY MR. ETTINGER:
120:22   Q.   And that was in the event there was a new
120:23   facility built, and they switched the referrals to
120:24   that facility; correct?
120:25   A.   Or I think also in the context of
121: Page 121
121: 1   depending on -- there was a lot of uncertainty as to
121: 2   what Al's would do, not only in retribution to a
121: 3   deal that Saltzer would do with Luke's, but also
121: 4   just in general, that Saint Al's was a bit of a
121: 5   loose cannon in their minds.

**Page Range:        121:6-121:10**

121: 6    Q.   At this point was Sally Jeffcoat, had she
121: 7    arrived as CEO at Saint Al's?
121: 8    A.   I -- we had no dealings with Sally until
121: 9    sometime later.  I don't know if she was there or
121:10    not.


**Page Range:        121:11-124:6**

121:11    Q.   Okay.  Now, going up higher on that page
121:12    at the top of the page, it says: "Also" -- the
121:13    second line through the fourth -- through the fifth
121:14    line.  It says:  "Also considering a surgery center
121:15    (but they'll need the volume from Treasure Valley);
121:16    then all the way to a hospital."
121:17    Now do you recall, was that articulated
121:18    by Mr. LaFleur and Mr. Castledine?
121:19    A.   Mm-hmm (affirmative).
121:20    Q.   That's a "yes"?
121:21    A.   That's a yes.
121:22    Q.   And then going to the bottom of the page,
121:23    the last -- I'm going to ask you about the last six
121:24    lines.  It says:  "The struggle with Treasure Valley
121:25    is that St. Luke's cannot build a new facility
122: Page 122
122: 1    without volume, and that's difficult if Treasure
122: 2    Valley is still around."
122: 3    Was that also a comment by Mr. LaFleur
122: 4    and Mr. Castledine?
122: 5    A.   I don't know if that's their comment.  I
122: 6    can enlighten you a little bit more about what I
122: 7    think she means by that if you want me to.  But I'm
122: 8    not sure if it's their comment or not.
122: 9    Q.   Do you recall that exact comment being
122:10    made at the meeting?
122:11    A.   No, I think -- I think what this is
122:12    talking about is that --
122:13    Q.   My question was just whether you recall
122:14    whether the comment was made at the meeting?
122:15    A.   The comment had to do with the surgeons
122:16    that were invested in Treasure Valley and whether or
122:17    not they were around and continuing to work at
122:18    Treasure Valley.
122:19    Q.   And if they were, there would not be
122:20    enough volume for the new hospital, was that the
122:21    St. Luke's concern?

122:22   A.   The concern that St. Luke's would have
122:23   would be, yes, if the surgeons were not loyal to
122:24   their hospital in Nampa, if they continued to do all
122:25   the work at Treasure Valley, or a lot of their work,
123: Page 123
123: 1   not all, that there would be a concern there.
123: 2   Now, the final analysis, we negotiated
123: 3   that out.
123: 4   Q.   Well --
123: 5   A.   We got them to agree to stay --
123: 6   Q.   Yeah, we will talk about that.
123: 7   A.   -- at Treasure Valley.
123: 8   Q.   Now, the next sentence says:  "St. Luke's
123: 9   recognizes there could be an alignment model that
123:10   allows the group to keep their outpatient work, but
123:11   as soon as the new facility is developed/ready, then
123:12   the volume needs to be transferred."
123:13   Was that a comment made by -- do you
123:14   recall made by Mr. Castledine and Mr. LaFleur?
123:15   A.   It would appear because she does say
123:16   St. Luke's recognizes, so that would definitely
123:17   appear to be the case.
123:18   And I do recall that we had -- we made it
123:19   very clear from the beginning that the volume --
123:20   that the work that was done at Mercy would have to
123:21   continue for, you know, for a while.
123:22   Q.   But Luke's said once the new hospital is
123:23   up, we expect that volume at the new hospital;
123:24   correct?
123:25   A.   As would normally be the case if you're
124: Page 124
124: 1   aligned, yes, with whoever you're aligned with,
124: 2   that's where you're going to be expected to work.
124: 3   Q.   Okay.
124: 4   A.   I doubt seriously they would have wanted
124: 5   them to continue to be on the medical staff of Mercy
124: 6   at that point.


**Page Range:**   **136:7-138:5**

136: 7   (Plaintiff's Exhibit #208 marked)
136: 8   BY MR. ETTINGER:
136: 9   Q.   Showing you what's been marked as
136:10   Exhibit 208 --
136:11   A.   Mm-hmm (affirmative).
136:12   Q.   -- which is a letter to John Kee and
136:13   Peter LaFleur that you and Aimee wrote.

136:14   A.   Correct.
136:15   Q.   Did I describe it correctly?
136:16   A.   That's correct.
136:17   Q.   Now we're at November of 2011.  We're
136:18   further on --
136:19   A.   Mm-hmm (affirmative).
136:20   Q.   That's a "yes"?
136:21   A.   That's a yes.
136:22   Q.   Okay.  Now, on Page -- I want you to turn
136:23   to Page 9 of the letter.
136:24   A.   Okay.
136:25   Q.   You say after that language in bold:
137: Page 137
137: 1   "Several points for further discussion include."
137: 2   And one of them was there was a
137: 3   significant disparity between the compensation
137: 4   increases for primary care and specialists.
137: 5
137: 6   **REDACTED**
137: 7
137: 8
137: 9
137:10   Do you see that?
137:11   A.   I do.
137:12   Q.   And Luke's pushed back and said, no,
137:13   we're not going to change that, isn't that right?
137:14   A.   That's correct.  Would you like for me to
137:15   tell you why?
137:16   Q.   I want -- yeah.  Tell me why Luke's said
137:17   why they wouldn't change those.
137:18   A.   Very simply.  At this point in the
137:19   negotiations we had won, quote, unquote, the ability
137:20   for the surgeons to retain their TVH ownership
137:21   interest.
137:22   Luke's, while they agreed with that, were
137:23   not particularly enamored by it because they knew
137:24   that these surgeons would continue to do a
137:25   significant portion of their surgeries at TVH.  And
138: Page 138
138: 1   as a result, Luke's was not as enamored with paying
138: 2   them, even though it could well have been deemed to
138: 3   be fair market value and commercially reasonable
138: 4   rates that were higher, Luke's was not interested in
138: 5   paying them at that level -- at those high levels.

**Page Range:     138:7-138:21**

138: 7    Q.   Let me just stop you.  Why was it that
138: 8    they were not interested in paying them at those
138: 9    high levels?  Because the cases were going to go to
138:10    TVH?
138:11    A.   Partially.  But I was just telling you
138:12    the other reason why --
138:13    Q.   Okay.
138:14    A.   -- which is extremely important
138:15    because -- and ultimately we had to pretty much
138:16    agree.
138:17    Now, you got to understand, we're working
138:18    for our client here, and we're trying to get the
138:19    most money we possibly can for our client and still
138:20    stay within the white lines of legality.
138:21    Q.   Yeah.


**Page Range:     138:22-140:6**

138:22    A.   So in that context, though, what we
138:23    said -- we said that.  But what Luke's came back
138:24    with and, quite frankly, we had to acknowledge and
138:25    tell our client as much, is that when you consider
139: Page 139
139: 1    the total compensation that the surgeons were going
139: 2    to make in the community, including their TVH
139: 3    interest and profits, we started to have some
139: 4    concerns that if they were compensated more by
139: 5    Luke's that they -- their total income, their total
139: 6    income, now, would be outside the boundaries of FMV
139: 7    and commercially reasonable.
139: 8    Not just what Luke's paid them.  Because
139: 9    you have to look at the total.
139:10    We do, as a part of our firm, FMV
139:11    opinions.  We weren't, obviously, an appendant to do
139:12    one here.  But we do them.  And we always put our
139:13    deals in the context of going through the firewall
139:14    of our own opinion analysis -- analyst that do these
139:15    FMV opinions.  We always say look at this deal that
139:16    we're working on and tell me if it's -- is in the
139:17    whole picture, if it's fair market value and
139:18    commercially reasonable.
139:19    And so when we looked at this deal on
139:20    behalf of the surgeons, whether Luke's pushed this
139:21    or not, whether -- I mean, clearly part of it was
139:22    without question, to answer your question, Luke's

139:23   wanted the volume.
139:24   But when they had acquiesced to allowing
139:25   the surgeons to continue to work at TVH, we felt
140: Page 140
140: 1   that that income that they were earning had to be
140: 2   considered.
140: 3   Because, remember, the only way they earn
140: 4   that income and have equity is by being an owner.
140: 5   And the only way they can be an owner is to continue
140: 6   to do surgeries at TVH.


**Page Range:      147:22-148:25**

147:22   Q.   Okay.  That's all I have got with that.
147:23   I'm trying to -- why don't you go back to
147:24   Exhibit 198, which is Dr. Page's e-mail.
147:25   A.   Okay.
148: Page 148
148: 1   Q.   Go to the second page of the e-mail.  And
148: 2   I want to ask you about language after the sentence
148: 3   in the third paragraph we had talked about before.
148: 4   I'm now going back to that sentence.
148: 5   After that control and co-developed sentence, it
148: 6   says: Quote, "they" meaning St. Luke's, I believe,
148: 7   "just haven't offered enough to satisfy the
148: 8   surgeons.  There is logic to that.  Compensation for
148: 9   primary care and non-procedural specialties is based
148:10   on the hospital system maintaining access to
148:11   patients.  Via these providers they control the
148:12   input to outpatient services, diagnostics and
148:13   referral to proceduralists, who then use the
148:14   hospital.  Compensation of proceduralists is
148:15   dependent on procedures done at these facilities.
148:16   Compensation cannot be more unless the procedures
148:17   are there."  Close quote.
148:18   Do you see that language?
148:19   A.   Yes, I do.
148:20   Q.   Did you ever discuss that idea with
148:21   Dr. Page?
148:22   A.   Not that I recall.
148:23   Q.   Do you agree or disagree with what he's
148:24   saying?
148:25   A.   I agree with what he's saying.

**Page Range:      152:1-152:13**

152: 1    Q.   You indicated that when you first become
152: 2    involved, there was already perspective at Saltzer
152: 3    that they needed to align with one of the two major
152: 4    hospitals; is that correct?
152: 5    A.   That is correct.
152: 6    Q.   And did they indicate to you why they
152: 7    felt that?
152: 8    A.   They did.  They told us that there was a
152: 9    longstanding history of distrust even to the point
152:10    that many of the physicians detested the management
152:11    of Saint Al's, and that there was no way they would
152:12    ever consider aligning with Saint Alphonsus because
152:13    they didn't trust them.


**Page Range:      152:14-154:6**

152:14    Q.   Now, in this process at some point in
152:15    time you indicated earlier they did engage with
152:16    discussions with Saint Al's?
152:17    A.   That's correct.  And that was way on down
152:18    the road, so to speak.  I think if -- and reading
152:19    this this morning has refreshed may memory a little
152:20    bit that it was toward the latter part of 2011.  And
152:21    that had to do a lot with the Plaintiffs's Exhibit
152:22    on the straw vote that we looked at earlier this
152:23    morning where we as their consultants -- first of
152:24    all, as their consultants, we never had the issues
152:25    with Saint Alphonsus.
153: Page 153
153: 1    They are a good system.  They are part of
153: 2    the system out of Michigan.  We know them.  We
153: 3    didn't have the issues or the baggage with them that
153: 4    they had.
153: 5    So we said from the beginning, well, you
153: 6    know what, it's a lot better if you create a
153: 7    two-party system here, I mean, for negotiations.
153: 8    That's what we told them.
153: 9    They wouldn't have any part of it at the
153:10    beginning.  They said we don't trust Saint Al's,
153:11    et cetera, et cetera.  I won't say that again.
153:12    As the process unfolded, and candidly, we
153:13    got more push back on the deal from St. Luke's
153:14    vis-à-vis the fact that it wasn't going to be the
153:15    global payment PSA, which that survey straw vote
153:16    obviously pointed out, and some of the other things,

153:17   the economic structure, the surgeons not getting as
153:18   much money, all those things, we, Coker, said, look,
153:19   you need to -- you need to give Saint Alphonsus a
153:20   fair shot at this and you need to allow them to
153:21   present a proposal.
153:22   And in the course of that -- I'll stop
153:23   there.  But that was really how that all transacted.
153:24   And toward the end of this process, we actually went
153:25   over and met Sally Jeffcoat and several of the
154: Page 154
154: 1   Saint Al's folks were there, and I think even one or
154: 2   two of their corporate people were there.
154: 3   And it was a great -- it was a good
154: 4   presentation.  And we felt at the time that they
154: 5   needed to open it back up or open it up to Saint
154: 6   Alphonsus.  And they did.


**Page Range:**     **156:19-157:8**


156:19   Q.   There was a discussion earlier in regards
156:20   to "pulling the legs off TVH", or some such
156:21   reference.  Those comments, were those from
156:22   St. Luke's representatives?
156:23   A.   I believe those comments were from Bill
156:24   and Nancy.
156:25   Q.   So that was comments they made of their
157: Page 157
157: 1   prospective of what St. Luke's could or could not
157: 2   do?
157: 3   A.   Yes.
157: 4   Q.   But not a representation from St. Luke's
157: 5   that that was what they could do, or intended to do?
157: 6   MR. ETTINGER:  Objection, leading.
157: 7   A.   I have never -- I never recalled that any
157: 8   St. Luke's person said that to us.


**Page Range:**     **157:19-158:5**


157:19   Q.   Could you pull out Exhibit 192 again,
157:20   Mr. Reiboldt, and turn to Page 11.
157:21   I want to ask you about that "pick the
157:22   legs off" comment that Mr. Sinclair just asked you
157:23   about.  Just one quick thing on that.
157:24   You see that reference again under
157:25   "debrief with Bill, Nancy, Rick, Max, Aimee"?
158: Page 158

158: 1   A.   I do.
158: 2   Q.   What it says there is:  "Bill thinks that
158: 3   they", St. Luke's, "will pick the legs off," it
158: 4   doesn't say could.  It says "will," does it not?
158: 5   A.   It does.


**Page Range:        158:10-159:4**

158:10   Q.   Following up on that; who is Bill?
158:11   A.   Bill is the administrator for St. Luke's.
158:12   I mean, for Saltzer.  And Nancy was the CFO for
158:13   Saltzer, who later became the employee of Alphonsus'
158:14   during about the middle of this process.
158:15   Q.   So this is what Bill was saying he
158:16   thought?
158:17   A.   That would be my interpretation of
158:18   Aimee's notes.  And it says -- and it clearly says
158:19   Bill thinks that they will pick off the legs, or
158:20   whatever.  So, yes, I believe this is strictly
158:21   Bill's opinion --
158:22   Q.   Did you ever --
158:23   A.   -- in this case.
158:24   Q.   Sorry.  Did you ever hear anyone from
158:25   St. Luke's --
159: Page 159
159: 1   A.   I did not.
159: 2   Q.   -- make that type of comment?
159: 3   A.   I did not.  I have never heard that from
159: 4   St. Luke's.