### TESTIMONY OF WILLIAM SAVAGE
Received on September 25, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:    7:8-7:12**

  7: 8   Q.  BY MR. WILSON:  What's your full name,
  7: 9   sir?
  7:10   A.  William Earl Savage.
  7:11   Q.  Okay.  Do you go by Bill?
  7:12   A.  I do.


**Page Range:    11:10-11:14**

  11:10   Q.  Okay.  What is your current title with
  11:11   your current employer?
  11:12   A.  CEO.
  11:13   Q.  And who is your current employer?
  11:14   A.  St. Luke's.


**Page Range:    11:23-12:2**

  11:23   Q.  Okay.  From January 1st, 2013, to the
  11:24   present, your title has still been CEO?
  11:25   A.  Yes.
  12: Page 12
  12: 1   Q.  Of what organization?
  12: 2   A.  Saltzer Medical Group.


**Page Range:    12:9-12:14**

  12: 9   Q.  Okay.  And prior to January 1st, you
  12:10   were the CEO of Saltzer Medical Group, correct?
  12:11   A.  Yes.
  12:12   Q.  And how long -- when did you start as
  12:13   the CEO of Saltzer Medical Group?
  12:14   A.  January 1999.


**Page Range:    65:25-66:21**

  65:25   Q.  Okay.  When you said that back then at
  66: Page 66

66: 1   the time, in 2009, you anticipated that going
66: 2   forward into the future Saltzer was going to be
66: 3   paid in a different manner, what did you mean by
66: 4   that?
66: 5   A.   I think I said -- I should probably say
66: 6   that many experts in the field and things that I
66: 7   read, some meetings that I attended, there was --
66: 8   there was talk about being paid for -- being paid
66: 9   for outcomes, being paid for quality measures,
66:10   risk taking and very much like the managed -- in
66:11   some ways, like the managed care environment in
66:12   California.
66:13   Q.   Why did that pay structure, if it came
66:14   to pass, require a different organization and
66:15   system than Saltzer had in place?
66:16   A.   Well, currently, Saltzer -- at -- at
66:17   that time, Saltzer was strictly on a
66:18   fee-for-service delivery system.  And so -- so
66:19   that is vastly different than accepting managed
66:20   care risk for a population, for a panel of
66:21   patients, if you will.

**Page Range:     66:22-66:24**

66:22   Q.   Why couldn't Saltzer negotiate that
66:23   risk on its own?  Why did it need to go to
66:24   St. Luke's?

**Page Range:     67:4-67:7**

67: 1   THE WITNESS:  At this time, I'm just
67: 2   developing a strategic plan.  I hadn't --
67: 3   Q.   BY MR. WILSON:  Understood.
67: 4   A.   -- I hadn't decided that it could or
67: 5   couldn't or if it was relevant or not.  But -- so
67: 6   we were -- this was strictly -- we were very much
67: 7   on the -- on the learning curve here.

**Page Range:     67:8-68:15**

67: 8   Q.   Well, what was it about the potential
67: 9   affiliation with St. Luke's that you might -- you
67:10   thought might be beneficial to Saltzer when it
67:11   came to dealing with the anticipated changes in
67:12   the payment structure?

67:13   A.  In my experience, it takes a -- it
67:14   takes a much larger organization in order to
67:15   accept risk -- in resources, both human and
67:16   capital resources, in technology, expertise.  I
67:17   think you need a -- you can't assume risk in -- in
67:18   small numbers.  It -- it requires a -- a larger
67:19   population.  You can't -- accept risking for 2,000
67:20   people is not enough to ride the ups and downs
67:21   of -- of -- of a -- of that population.
67:22   And Saltzer is -- you know, it's been
67:23   said, I've probably said it a lot, that -- that
67:24   Saltzer is the largest independent medical group
67:25   in -- in Idaho.  I also follow that by saying that
68: Page 68
68: 1   that probably says more about Idaho than it does
68: 2   about Saltzer.
68: 3   We are not a -- we are large only -- I
68: 4   mean, we're the largest, but we're not nearly
68: 5   large enough to assume that type of risk and
68: 6   develop that type of systems and lay out that kind
68: 7   of capital in a -- in a relatively small to
68: 8   small-medium group of physicians.
68: 9   Q.  Okay.  Did you also approach St. Luke's
68:10   because of how it would change the landscape for
68:11   Saltzer with respect to its negotiations with
68:12   third-party payers?
68:13   A.  No.
68:14   Q.  That had nothing to do with it?
68:15   A.  Absolutely nothing.


**Page Range:     82:8-82:11**

82: 8   Q.  In late 2010, was it important to
82: 9   Saltzer to maintain considerable autonomy in
82:10   whatever arrangement it worked out with
82:11   St. Luke's?


**Page Range:     82:13-82:14**

82:13   THE WITNESS:  Many of the shareholders felt
82:14   it was important to maintain an independence.


**Page Range:     82:24-83:4**

82:24   Q.  Okay.  Did you agree back in December

3

```
82:25    of 2010 that the objective of the global PSA that
83: Page 83
83: 1    is described here would be "improved reimbursement
83: 2    through contracts with payers"?
83: 3    A.  This -- these are the consultants.
83: 4    This is what the consultants told us.
```

Page Range:     83:5-83:13

```
83: 5    Q.  Correct.  Understand that.  So my
83: 6    question to you is did you agree with what the
83: 7    consultants were telling you that that was one of
83: 8    the objectives of the global PSA that is being
83: 9    discussed here?
83:10    A.  Increasing reimbursement wasn't our --
83:11    wasn't our reason.  It was not our -- it was not
83:12    our principal reason or reason for finding a
83:13    partner to align with.
```

Page Range:     84:23-84:25

```
84:23    Q.  And how would partnering with
84:24    St. Luke's help curb the stagnation in
84:25    reimbursement rates?
```

Page Range:     85:3-85:6

```
85: 3    THE WITNESS:  How would it?  I -- I think
85: 4    the consultant here is assuming -- it appears to
85: 5    me the consultant is assuming that the hospital
85: 6    has better contracts than Saltzer.
```

Page Range:     216:14-216:20

```
216:14    Q.  Okay.  Do you remember anyone from
216:15    St. Luke's mentioning negotiating leverage?
216:16    A.  No.
216:17    Q.  Do you remember anyone from St. Luke's
216:18    talking about commercial payer reimbursement?
216:19    A.  Commercial payers wasn't part of our
216:20    negotiations, so no.
```

**Page Range:**     219:7-219:20

```
219: 7   Q.  BY MR. ETTINGER:  That concept?
219: 8   A.  So -- so ask the question -- ask the
219: 9   question again.  So no --
219:10   Q.  Okay.  Did you or Ms. Powell say in
219:11   substance to Mr. Reiboldt and/or Ms. Greeter that
219:12   Saint -- that in order for St. Luke's to have a
219:13   hospital in Nampa, it must have a relationship
219:14   with Saltzer?
219:15   A.  I would have -- I would have said it
219:16   differently.  I think that St. Luke's would not
219:17   come to Nampa, to Canyon County and build a
219:18   hospital with -- without the -- without the --
219:19   well, "consent" isn't the word -- endorsement,
219:20   support of Saltzer.
```

**Page Range:**     284:4-250:15

```
248: 4   Q.  BY MR. ETTINGER:  I'm showing you
248: 5   what's been marked as Exhibit 529, Mr. Savage, an
248: 6   E-mail from Heather Gillmore to you, Dr. Kaiser,
248: 7   and David Orchard, Bates-numbered Saltzer239891.
248: 8   Take a look at it and I'll ask you about it.
248: 9   A.  Okay.
248:10   Q.  Who is Heather Gillmore?
248:11   A.  She's the application and system
248:12   analyst in our IT department at Saltzer.
248:13   Q.  Okay.  Okay.  And is this an E-mail she
248:14   sent to you and Dr. Kaiser and Mr. Orchard?
248:15   A.  Yes.
248:16   Q.  And she's giving totals for the
248:17   "demographics survey and the referral-related
248:18   data."  Can you tell me what each of these is?
248:19   A.  The one from the -- the demographics
248:20   survey is a survey -- there's -- there's a
248:21   question that's asked at check-in, one time, of
248:22   our patients -- beginning in January, I think.
248:23   I'm not sure when we began -- asking -- asking
248:24   patients for their -- I'm not exactly sure how --
248:25   how it's worded -- what is your hospital
249: Page 249
249: 1   preference.
249: 2   Q.  Okay.  And then does the referral data
249: 3   indicate?
249: 4   A.  These are -- these are from referrals
249: 5   where doctors -- where the patient was actually
```

249: 6    faced with the -- with the opportunity to be
249: 7    referred or opportunity -- with the need to be
249: 8    referred to a provider or ancillary service or
249: 9    some type of health care service.
249:10    Q.  Okay.  Was this survey commenced since
249:11    the lawsuit was filed?
249:12    A.  Just before that.
249:13    Q.  Okay.
249:14    A.  Parts of it.  I -- I'm not sure.
249:15    We -- we started -- we started them at different
249:16    times.
249:17    Q.  BY MR. ETTINGER:  Okay.  And so --
249:18    A.  Not before the lawsuit -- no, no.  It
249:19    started -- it started at the end of last year.
249:20    Your question was?  Would you repeat your
249:21    question?  I could --
249:22    Q.  Was it started -- was it started after
249:23    the lawsuit was filed, this lawsuit, in
249:24    mid-November of 2012?
249:25    A.  Yes, it was after that.
250: Page 250
250: 1    Q.  Okay.  And this says, "Here are the
250: 2    totals as of tonight," and this is March 18.  Were
250: 3    these running totals from the beginning of the
250: 4    survey period?
250: 5    A.  These are ongoing -- yes, it is an
250: 6    ongoing process.
250: 7    Q.  So as of this date, what this shows is,
250: 8    in percentage terms, only about half the
250: 9    percentage of patients who said they preferred
250:10    Saint Al's were actually referred to Saint Al's by
250:11    Saltzer physicians, correct?
250:12    A.  So --
250:13    Q.  Is that correct?
250:14    A.  That's the difference between the two
250:15    surveys.


**Page Range:**     252:22-252:24

252:22    Q.  Okay.  Do you feel personal animosity
252:23    towards the surgeons who left Saltzer?
252:24    A.  Personal, no.


**Page Range:**     253:13-253:19

253:13    Q.  Do you have any animosity towards any

6

253:14  of those surgeons?
253:15  A.  No.  I don't -- I don't think about
253:16  those surgeons.
253:17  Q.  Are you aware -- has anyone at Saltzer
253:18  Medical Group expressed animosity towards those
253:19  surgeons?


**Page Range:     253-21**

253:21  THE WITNESS:  Not that I recall.


**Page Range:     270:14-272:10**

270:14  Q.  BY MR. ETTINGER:  Let me show you
270:15  what's been marked as Exhibit 531, Mr. Savage.
270:16  Oh, here it is.  I mixed it up slightly so.
270:17  This is a -- some E-mails between
270:18  Mr. Savage and Warren Miller, Bates-numbered
270:19  Saltzer523325.  Take a look at it and tell me when
270:20  you're ready.
270:21  A.  Okay.
270:22  Q.  So Warren Miller, is that a physician
270:23  in Saltzer?
270:24  A.  Yes.
270:25  Q.  This is E-mails between you and
271: Page 271
271: 1  Dr. Miller in April of 2013?
271: 2  A.  Yes.
271: 3  Q.  And Dr. Miller asks, among other
271: 4  things, what would happen in the event that
271: 5  Saltzer is unwound pursuant to a court decision?
271: 6  A.  Yes.
271: 7  Q.  And you say, "If we're required by the
271: 8  court to unwind, you do not lose the goodwill
271: 9  money."  Do you see that?
271:10  A.  Yes.
271:11  Q.  Was that a true statement?
271:12  A.  Yes.
271:13  Q.  And you say, "Likewise with the shares
271:14  buyback."  Do you see that phrase?
271:15  A.  Yes.
271:16  Q.  And was there a payment for the shares
271:17  by St. Luke's for the Saltzer stock?
271:18  A.  No.  Saltzer bought back the shares of
271:19  its partners with the proceeds of the transaction.
271:20  Q.  Okay. And so what you're saying is the

271:21    partners would not have to return that money to
271:22    Saltzer?
271:23    A.  Right.
271:24    Q.  Okay.  And the proceeds of the
271:25    transaction that were used to buy back the shares,
272: Page 272
272: 1    where did those proceeds come from specifically?
272: 2    A.  It came from the -- it came from the
272: 3    workforce in place, the goodwill, and the asset
272: 4    acquisition.
272: 5    Q.  Okay.  So if the deal is unwound by the
272: 6    court, does Saltzer have to pay back the workforce
272: 7    in play money to Luke's or not?
272: 8    A.  I think that's part of the goodwill
272: 9    money.  I think that's the goodwill money I refer
272:10    to.


**Page Range:    344:11-344:14**

344:11    Q.  I think so.  Let's turn back to
344:12    exhibit -- Plaintiff's Exhibit 529.  This is an
344:13    E-mail from Heather Gillmore.
344:14    A.  Yes.


**Page Range:    344:21-346-11**

344:21    Q.  BY MR. KEITH:  So I wanted you to walk
344:22    me through how the demographics survey information
344:23    is collected.
344:24    A.  Heather Gillmore refers to that as
344:25    "demographics information" as to where -- that's
345: Page 345
345: 1    where this -- this question is queried.  So it's
345: 2    in the what we call the -- it would be the
345: 3    "demographic screen."
345: 4    And so when patients come in to check
345: 5    in or -- or register, we ask them a question, "Do
345: 6    you have a hospital preference?"  And this is the
345: 7    answers that we've gotten.  And many of them --
345: 8    you can see, there's a large category of "no
345: 9    preference."
345:10    Many people were taken aback by that.
345:11    It was a -- it was a very -- it was actually a
345:12    very confusing survey.  Many didn't know how to
345:13    answer it or why.  And we just -- and we told them
345:14    this is just -- this is just on an initial survey

8

345:15   basis what -- do you have a hospital preference.
345:16   Q.  So I have the same question with
345:17   respect to the referral-related data.  How is that
345:18   collected?
345:19   A.  Referral data, so -- so the first data
345:20   is generally collected in what we would call the
345:21   "front office" or by the receptionist or check-in
345:22   person, "CSR" as we refer to them.
345:23   The second -- the second set of data
345:24   is -- comes from -- comes from the back office,
345:25   generally recorded -- excuse me -- generally
346: Page 346
346: 1   recorded by the MA, the -- the medical assistant,
346: 2   when -- when the doctor and the patient, perhaps,
346: 3   come out of a room and say, you know, Mable needs
346: 4   to go see a surgeon.  Mable needs to have an MR.
346: 5   Mable -- something -- something has to be referred
346: 6   outside of Saltzer.
346: 7   And -- and then, you know, we ask them,
346: 8   "Where would you like to go?  Do you have a
346: 9   preference?"  And these are the results of that
346:10   survey.  Two very different groups of people, not
346:11   even a direct subset.


**Page Range:     350-20-350-22**

350:20   Do you think -- who asked you to track
350:21   referrals as part of the transaction?
350:22   A.  I think it was the Attorney General.