<u>TESTIMONY OF DR. JAMES SOUZA</u>
Received on October 2, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:      5:6-5:6**

  5: 6    MS. PHILLIP:  Good morning, Dr. Souza.  My

**Page Range:      10:15-11:4**

  10:15    Q.  And did you become employed after you
  10:16    completed your fellowship?
  10:17    A.  Yes.
  10:18    Q.  What employment did you have at that
  10:19    time?
  10:20    A.  So for one year I worked at the Boise
  10:21    VA Medical Center, and then I went into private
  10:22    practice in the community with Idaho Pulmonary
  10:23    Associates.
  10:24    Q.  Is that the same group you've been with
  10:25     throughout your career from that point on?
  11: Page 11
  11: 1    A.  In 2010 there was a split in the group,
  11: 2    and I've been an employee of St. Luke's since
  11: 3    2010.  And we call ourselves St. Luke's Idaho
  11: 4    Pulmonary Associates.

**Page Range:      11:13-12:5**

  11:13    Q.  Do you still use the acronym IPA to
  11:14    represent the group?
  11:15    A.  S-L-I-P-A.
  11:16    Q.  S-L-I-P-A?
  11:17    A.  SLIPA.  I guess you need another P to
  11:18    be SLIPA, but.
  11:19    Q.  So for ease of reference, can we refer
  11:20    to it as SLIPA today throughout the deposition?
  11:21    A.  Absolutely.
  11:22    Q.  For the time period after January 2010?
  11:23    A.  Sure.
  11:24    Q.  And prior to January 2010 did the group
  11:25    refer to itself as IPA at times?
  12: Page 12
  12: 1    A.  Yes.

12: 2    Q.   Okay.  So I may use the acronym IPA to
12: 3    refer to the group for the time period prior to
12: 4    January 2010.
12: 5    A.   Sounds good.


**Page Range:     12:15-13:8**

12:15    Q.   On what ad hoc committees did you serve
12:16    at Saint Alphonsus?
12:17    A.   There was an ad hoc committee to
12:18    establish a mandatory intensivist consult in the
12:19    intensive care unit.  There was an ad hoc
12:20    committee that was looking at pulmonary function
12:21    testing in the hospital and in our clinic in
12:22    trying to coordinate those efforts.  And I was
12:23    invited -- to sit on the then CEO's -- I'm forgetting
12:24    the name of the committee that she had, but she
12:25    had a council in which physician group leaders
13: Page 13
13: 1    were invited to participate.  I attended three or
13: 2    four of those meetings.
13: 3    Q.   During what time period were you
13: 4    participating with the ad hoc committee regarding
13: 5    the mandatory intensivist consult?
13: 6    A.   So my recollection of that is that it
13: 7    would have been in the timeframe of around 2004 to
13: 8    2005.


**Page Range:     14:19-14:24**

14:19    Q.   I'm sorry.  I see that.  Do you have
14:20    any administrative roles at St. Luke's?
14:21    A.   I do.
14:22    Q.   Can you explain those roles for me.
14:23    A.   I'm the vice president medical affairs
14:24    for the Treasure Valley region.


**Page Range:     35:16-35:22**

35:16    Did St. Luke's make the initial
35:17    approach to IPA about the possibility of acquiring
35:18    IPA?
35:19    A.   No.
35:20    Q.   How then did the possibility of
35:21    St. Luke's acquiring IPA first come about?

35:22    A.  Dr. Bergquist approached St. Luke's.


**Page Range:     39:1-39:5**

39: 1    Q.  Why did you want to be employed?
39: 2    A.  We wanted the closest relationship
39: 3    possible because we believed that that would drive
39: 4    mutual goals more efficiently.  We fundamentally
39: 5    did not believe in the old model any longer.


**Page Range:     40:3-40:7**

40: 3    Q.  BY MS. PHILLIP:  Did the practice seek
40: 4    competing bids from any other partners?
40: 5    A.  Yes.
40: 6    Q.  From whom?
40: 7    A.  Saint Alphonsus.


**Page Range:     49:12-49:18**

49:12
49:13
49:14    **<u>REDACTED</u>**
49:15
49:16
49:17
49:18


**Page Range:     49:19-49:22**

49:19    Q.  So the noncompete terms offered by
49:20    Saint Al's was not the reason for rejecting the
49:21    offer; is that correct?
49:22    A.  That's correct.


**Page Range:     74:23-75:16**

74:23    Q.  Prior to St. Luke's acquisition of IPA,
74:24    at what hospitals did you maintain privileges?
74:25    A.  At Saint Alphonsus, at St. Luke's
75: Page 75
75: 1    Meridian, St. Luke's Boise, and Complex Care
75: 2    Hospital of Idaho, which is a long-term acute care

75: 3   hospital.
75: 4   Q.   Which Saint Alphonsus hospitals did you
75: 5   have privileges at?
75: 6   A.   In Boise.
75: 7   Q.   And what type of privileges did you
75: 8   have at each?
75: 9   A.   Active staff.
75:10   Q.   And did active staff give you full
75:11   admission privileges at each of those hospitals?
75:12   A.   Yes.
75:13   Q.   And since the acquisition by
75:14   St. Luke's, have you relinquished your privileges
75:15   at any of those hospitals?
75:16   A.   At Saint Alphonsus.


**Page Range:      76:4-76:7**

76: 4   Q.   Did your partners similarly relinquish
76: 5   their privileges at Saint Alphonsus after the
76: 6   acquisition?
76: 7   A.   Yes.


**Page Range:      79:24-80:5**

79:24   Q.   So you said the acquisition took place
79:25   in January of 2010; is that correct?
80: Page 80
80: 1   A.   That's correct.
80: 2   Q.   And you stopped seeing patients at
80: 3   Saint Alphonsus all together in May 2010; is that
80: 4   correct?
80: 5   A.   That's correct.


**Page Range:      82:19-83:12**

82:19   Q.   When you became employed by St. Luke's,
82:20   was it your intention to stop taking call at Saint
82:21   Al's and admit all your patients at St. Luke's?
82:22   A.   It was our -- it was my intention, I
82:23   did hope to simplify my life.  Covering four
82:24   hospitals on call is a challenge.  I think it was
82:25   also -- I think everybody in the group, when we
83: Page 83
83: 1   decided to become employees of the health system,
83: 2   you know, had a similar goal of simplification.

83: 3   Once it became clear that the group was
83: 4   not going to remain intact and that there was
83: 5   going to be a fracture, a split, it made it --
83: 6   everybody was worried through the entire process.
83: 7   We'd never wanted to leave anybody uncovered.  The
83: 8   idea that, you know, critically ill patients, that
83: 9   people would be harmed by our decision was
83:10   unacceptable.  So once it became clear that there
83:11   was going to be a split, frankly it made the
83:12   decision to go our separate ways much easier.

**Page Range:     89:23-90:4**

89:23   Q.  But you don't send any patients to
89:24   Saint Alphonsus for any outpatient procedures?
89:25   A.   Only if you count lab as an outpatient
90: Page 90
90: 1   procedure.
90: 2   Q.   And you haven't done so since at least
90: 3   May 2010?
90: 4   A.  Correct.

**Page Range:     90:15-91:13**

90:15   Q.  And what percentage of those
90:16   ancillaries for which you refer patients do you
90:17   refer to St. Luke's facilities?
90:18   A.  The vast majority.  And that's because
90:19   my practice has changed over time.  It's almost
90:20   exclusively now patients who are cared for by
90:21   either St. Luke's primary care physicians or
90:22   patients who have made a choice already that
90:23   St. Luke's is going to be their health system that
90:24   they want to get their care at.
90:25   Q.   When did you start sending patients for
91: Page 91
91: 1   ancillaries almost exclusively to St. Luke's
91: 2   facilities?
91: 3   A.   So it's changed, you know, over time.
91: 4   I would say it's really in the last probably 12 to
91: 5   18 months that it's so predominantly St. Luke's.
91: 6   And that's -- the reason radiology shifted is, I
91: 7   mean, it's in my statement, but our own radiology
91: 8   department had deficiencies compared to Saint
91: 9   Alphonsus.  And I continued to use the Saint Al's
91:10   group until those deficiencies were remedied.

91:11   Q.   And when in your opinion were those
91:12   deficiencies in radiology remedied at St. Luke's?
91:13   A.   Around 18 months ago.


**Page Range:      92:11-92:25**

92:11   Q.   When did you reduce your referrals to
92:12   Saint Alphonsus for radiology services?
92:13   A.   So again it was a process.  It happened
92:14   as -- as St. Luke's radiology improved its
92:15   services and got in my opinion again the best
92:16   trained chest radiologist in the valley, that
92:17   occurred over time.
92:18   You know, also over time I have lost my
92:19   Saint Alphonsus patients in part of my own doing
92:20   because I have -- if I've got a patient who is
92:21   cared for by a Saint Alphonsus Medical Group
92:22   primary care physician, I offer to send them to
92:23   one of my former partners for their pulmonary care
92:24   because I believe so fundamentally in the power of
92:25   an integrated system.  I told my own parents that


**Page Range:      93:9-93:16**

93: 9   Q.   How many patients specifically have you
93:10   sent to a Saint Alphonsus pulmonologist because
93:11   they were seen by a -- they have a SAMG primary
93:12   care physician?
93:13   A.   I don't -- I don't know, but I mean, I
93:14   can at least -- at least three or four.  Two come
93:15   to my mind immediately.  And the physicians I sent
93:16   them to.


**Page Range:      96:5-96:11**

96: 5   Q.   Prior to the acquisition, what
96: 6   percentage of your patients were you sending to
96: 7   Saint Alphonsus for ancillary services?
96: 8   A.   Roughly 50 percent.
96: 9   Q.   Okay.  And by 2011 it had dropped to
96:10    about 10 percent?
96:11   A.   Yes.

**Page Range:      100:3-100:14**

100: 3    Q.   So if one of your patients that you see
100: 4    now has a St. Luke's primary care doctor and they
100: 5    don't state a specific preference for a
100: 6    specialist, you would refer them to a specialist
100: 7    within the St. Luke's system; is that accurate?
100: 8    A.   I always ask the patient.
100: 9    Q.   Oh, I understand that.  But where the
100:10    patient does not state a specific preference, is
100:11    your process then to refer them to a St. Luke's
100:12    specialist --
100:13    A.   It is.
100:14    Q.   -- where available?


**Page Range:      100:15-100:17**

100:15    A.   Because I fundamentally believe in the
100:16    power of that integration and that single medical
100:17    record, yes.


**Page Range:      101:6-101:18**

101: 6    Q.   Are there any Saint Alphonsus
101: 7    specialists to which you are still referring
101: 8    patients?
101: 9    A.   You mean employed by Saint Alphonsus?
101:10    Q.   Employed or in a PSA.
101:11    A.   Okay.
101:12    Q.   Nondependent.
101:13    A.   I believe neurology.  I don't pay
101:14    attention to which of the neurologists is employed
101:15    by Saint Al's.  But I have sent patients to
101:16    neurologists who are affiliated with Saint Al's I
101:17    would say and no longer have privileges at
101:18    St. Luke's.


**Page Range:      102:12-103:6**

102:12    Q.   So the patients that you have referred
102:13    to a Saint Alphonsus neurologist since the
102:14    acquisition, what were the circumstances of that
102:15    referral?
102:16    A.   Headache I believe.
102:17    Q.   Okay.  And what was the reason why you

102:18    referred them to a Saint Alphonsus neurologist as
102:19    opposed to a St. Luke's neurologist?
102:20    A.   Oh, sorry.  Let me try to remember the
102:21    specific example.  I honestly don't -- I believe
102:22    it's because this patient who's one of my lung
102:23    transplant patients forwarded the physician's
102:24    name, "Are they a good doctor?" and I said "Sure."
102:25    Q.   You're referring to this patient.  Is
103: Page 103
103: 1    it the case there's only one patient you can
103: 2    recall that you have sent to a Saint Alphonsus
103: 3    neurologist since becoming acquired by St. Luke's?
103: 4    A.   Yeah.  I don't make very many neurology
103: 5    referrals, and only one, yes, only one person
103: 6    comes to my mind.


**Page Range:     103:7-103:15**

103: 7    Q.   Do you know how many referrals you have
103: 8    made to St. Luke's neurologists since the
103: 9    acquisition?
103:10    A.   I'm sorry, I don't.  But it's more than
103:11    one.  It might be -- it's not a common referral
103:12    because it's generally poor form I think for
103:13    specialists to refer to specialists.  It should go
103:14    through the primary care doctor.  So it might be
103:15    three or four.


**Page Range:     150:15-151:14**

150:15    MS. PHILLIP:  I'd like to ask the court
150:16    reporter to mark as Plaintiffs' Exhibit 462 an
150:17    e-mail chain bearing the Bates number SLHS 4617.
150:18    (Plaintiffs' Exhibit 462 marked.)
150:19    Q.   BY MS. PHILLIP:  And the e-mail at the
150:20    bottom of this page includes an e-mail from a
150:21    Dr. Murali Bathina to Gary Fletcher, subject
150:22    "Saltzer," from December 2nd, 2011.
150:23    Who's Dr. Bathina?
150:24    A.   He's a cardiologist.
150:25    Q.   Okay.  And in his e-mail Dr. Bathina
151: Page 151
151: 1    reports on a conversation that he had with you.
151: 2    Do you see that in the first line, "Just had a
151: 3    conversation with Jim Souza"?
151: 4    A.   Yep.

151: 5   Q.  Okay.  In the second paragraph, he
151: 6   writes, "He and I and likely some other physicians
151: 7   are feeling like this whole, quote, 'physician
151: 8   led,' quote, mantra is a bunch of propaganda
151: 9   without real meaning.  Why are we working on
151:10   standards and expectations for the system when the
151:11   system is making decisions based on dollars and
151:12   strategy regardless of quality?"
151:13   Did I read that accurately?
151:14   A.  You read it accurately.


**Page Range:      151:15-152:3**

151:15   Q.  Did you and Dr. Bathina discuss
151:16   concerns that Luke's decision to acquire the
151:17   Saltzer pulmonologists was based on dollars as
151:18   opposed to quality?
151:19   A.  We discussed in this conversation my
151:20   personal and emotional reaction to Dr. Mark
151:21   Rasmus.  That's what we discussed.
151:22   Q.  And was there discussion about the
151:23   decision to bring him on being based on dollars
151:24   and strategy regardless of quality?
151:25   A.  I didn't discuss that with him.  What I
152: Page 152
152: 1   discussed with Dr. Bathina was, again, my
152: 2   completely emotional and slightly irrational
152: 3   reaction to Dr. Rasmus.


**Page Range:      152:4-152:9**

152: 4   Q.  Did he express the viewpoint at all in
152: 5   the conversation that the decision to bring him on
152: 6   was based on dollars and strategy regardless of
152: 7   his quality?
152: 8   A.  Not that I recall.  He says that here,
152: 9   but I don't recall that.


**Page Range:      153:7-154:15**

153: 7   with Dr. Rasmus.  Dr. Rasmus is a doctor I
153: 8   recruited to this valley.  He was a member of my
153: 9   group.  When we asked him to buy into our group
153:10   and he disagreed with the buy-in and the
153:11   opportunity to purchase real estate at valuation

9

153:12    and he insisted that he be allowed to purchase for
153:13    what previous people had purchased in at four
153:14    years earlier, we felt that was unreasonable.  And
153:15    when he left the group, he sabotaged a recruit
153:16    that he was helping bring.  And he attempted to
153:17    have one of our partners who's still in good
153:18    standing, Dr. Sasso, go with him to Saltzer.  So
153:19    hopefully you can see that that was a completely
153:20    damaged relationship.
153:21    My reaction to this situation was not
153:22    my proudest leadership moment.  It was selfish.
153:23    Leaders aren't selfish.  They serve the people
153:24    they lead.  And this was my emotional, selfish
153:25    reaction to Dr. Rasmus.  We have turned a new
154: Page 154
154: 1    page.  Dr. Rasmus and I are building a
154: 2    relationship.  And we'll get there.
154: 3    With regard --
154: 4    Q.  Now.
154: 5    A.  Go ahead.
154: 6    Q.  I didn't mean to cut you off.  Go
154: 7    ahead.
154: 8    A.  With regard to Dr. Sadaj, he is not
154: 9    like the rest of us pulmonologists.  He is not a
154:10    fellowship-trained pulmonologist.  He performs an
154:11    old fashioned version of some procedures like a
154:12    bronchs, bronchoscopy.  We would be happy to help
154:13    him improve his skills through proctoring, through
154:14    the medical staff processes.  But what colored
154:15    this conversation was a whole lot of emotion.


**Page Range:      155:4-155:24**


155: 4    Q.  BY MS. PHILLIP:  All right.  In the
155: 5    fourth paragraph of his e-mail, Dr. Bathina writes
155: 6    that it will -- quote, "It will be very
155: 7    disappointing to us doctors who work on the west
155: 8    side to have to refer to these guys because they
155: 9    are now part of Luke's when we are fully aware
155:10    that they offer a far inferior product than what
155:11    our colleagues at IPA can provide."
155:12    Do you see that?
155:13    A.  I do.
155:14    Q.  Did you and Dr. Bathina discuss
155:15    frustration with having to refer to Saltzer
155:16    pulmonologists after the acquisition?
155:17    A.  No.  We wouldn't have discussed that,

155:18   because Dr. Bathina would know as well as I do
155:19   that referrals are not directed in the St. Luke's
155:20   system.  I can refer to anybody that I want to
155:21   refer to.
155:22   Q.   Well, then why would he write, "It's
155:23   disappointing to us doctors to have to refer to
155:24   these guys"?


**Page Range:     156:2-156:2**

156: 2   THE WITNESS:  I don't know.


**Page Range:     164:17-165:14**

164:17   Q.   I'd like to show you a document that
164:18   was previously marked at a prior deposition as
164:19   Plaintiffs' Exhibit 155, an e-mail chain between
164:20   yourself and several individuals including a
164:21   Dr. Nathan Andrew from October 16th, 2012.
164:22   A.   Okay.
164:23   Q.   And this relates to unclaimed call in
164:24   Nampa.
164:25   A.   Right.
165: Page 165
165: 1   Q.   Do you recall this e-mail chain?
165: 2   A.   Yes.
165: 3   Q.   If you'd turn to the first e-mail in
165: 4   the chain on the second page.
165: 5   A.   Okay.
165: 6   Q.   It starts with an e-mail from a
165: 7   Dr. Scott Shappard?
165: 8   A.   Shappard.
165: 9   Q.   Shappard.  Relaying a story of a Luke's
165:10   ER doctor who attempted to refer to him a Nampa
165:11   patient.  Who is Dr. -- did you say Shappard?
165:12   A.   Shappard.
165:13   Q.   Shappard.
165:14   A.   He's a family medicine physician.


**Page Range:     165:17-166:18**

165:17   Q.   In his e-mail Dr. Shappard states that
165:18   the patient refused the referral "because he wants
165:19   a provider in Nampa," in all caps.  Do you see
165:20   that?

165:21   A.  I see that.
165:22   Q.  He then states in the next paragraph,
165:23   quote, "Nampa needs to have its own unclaimed
165:24   schedule.  Folks in Nampa want care in Nampa
165:25   generally."
166: Page 166
166: 1   Do you agree with Dr. Shappard's
166: 2   statement that folks in Nampa want care in Nampa
166: 3   generally?
166: 4   A.  It depends.  It depends on convenience
166: 5   and the type of care.  If they work in Boise, my
166: 6   experience is actually the opposite, that they're
166: 7   going to want to choose a Boise doctor who's close
166: 8   to where they work because that's when office
166: 9   hours are.
166:10   I think it also depends on quality.  I
166:11   have patients still in my panel from the west
166:12   valley who choose to come to see me because of
166:13   a -- they're basically willing to travel to see me
166:14   because of the perceived quality.
166:15   Q.  But you're a specialist; right?
166:16   A.  I am a --
166:17   Q.  Not a primary care physician.
166:18   A.  I am a specialist.


**Page Range:       166:24-168:1**

166:24   Q.  Okay.  And in your e-mail from
166:25   October 16th, 2012 forwarding on Dr. Shappard's
167: Page 167
167: 1   concern, you write, quote, "I realize that as a
167: 2   St. Luke's facility we are using the Treasure
167: 3   Valley call list for unclaimed admissions.  Having
167: 4   said that, we really should not be using that for
167: 5   follow-up in the primary care realm.  The point
167: 6   that Dr. Shappard makes is a good one, I think.
167: 7   For patients, primary care should be easy to
167: 8   access."
167: 9   Do you still agree with your statement
167:10   here that primary care should be easy to access?
167:11   A.  Wherever easy is for you.  Yes.
167:12   Q.  And you go on to state that, quote, "I
167:13   think most understand that more specialized care
167:14   may require travel."
167:15   Were you making the point here that
167:16   while patients may be more willing to travel for
167:17   specialized care, they prefer to get primary care

167:18   close to home?
167:19   A.  The point I'm making here is we want to
167:20   be patient centered.  It's like it's one of our
167:21   goals for this year, and so we've got to do what
167:22   the patient wants.  If the patient wants care in
167:23   the place where their house is, let's do that.  If
167:24   they want care in the place where they work, let's
167:25   do that.  If they want care in Ketchum, let's do
168: Page 168
168: 1   that.


**Page Range:      168:2-168:25**

168: 2   Q.  The whole point in this e-mail chain
168: 3   was the concern that unclaimed admissions from the
168: 4   Nampa ED should not be sent to primary care
168: 5   physicians in Boise or Meridian; right?
168: 6   A.  And part of that has to do with my role
168: 7   as the vice president medical affairs.  And in
168: 8   general the medical staff in Boise, which includes
168: 9   the -- so there's a freestanding ED that has this
168:10   call schedule, but it doesn't have a medical
168:11   staff.  So the medical staff in Boise in general
168:12   had this perception that:  Why am I getting calls
168:13   from this new emergency department in Nampa?  And
168:14   I don't want to cover that new emergency
168:15   department in Nampa.
168:16   So part of the solution of engaging
168:17   those Nampa community physicians was if a patient
168:18   has chosen to go to the freestanding ED in Nampa
168:19   rather than the freestanding -- rather than the ED
168:20   in Meridian or in Boise, then presumably they want
168:21   to get care around there.  So let's have a call
168:22   system that distributes those patients into
168:23   clinics around there.  That was the idea.  And it
168:24   was in part to heal the wounds with the medical
168:25   staff here.


**Page Range:      180:11-181:2**

180:11   Q.  Fair enough.  Are you aware of data
180:12   which indicates that the overall quality of spine
180:13   care at St. Luke's over the past three years has
180:14   not improved, that it in fact has declined?
180:15   A.  I'm aware of Healthgrades data that
180:16   I -- and I'm just going to say I don't know the

180:17   details of that, but I believe scores for spine
180:18   surgery were low by Healthgrades, which in
180:19   subsequent investigation with my neurosurgical
180:20   colleagues in part has to do with documentation
180:21   failures.
180:22   Q.   So Healthgrade scores have been low
180:23   over the past three years for spine care in the
180:24   St. Luke's system here in the Treasure Valley?
180:25   A.   Yeah.  I would say Treasure Valley is
181: Page 181
181: 1   what I'm familiar with.  I don't know about Magic
181: 2   Valley and elsewhere.


**Page Range:      181:3-181:12**

181: 3   Q.  Sure, I understand.  So it would be
181: 4   incorrect to say that the quality of spine care in
181: 5   this community in the face of that evidence has
181: 6   improved over the last several years.  Would that
181: 7   be true?
181: 8   A.   I don't know about that.  I think, I'm
181: 9   sorry, but I'm going to say that -- I mean, I know
181:10   how Healthgrades works, and I know how critical
181:11   documentation is.  And Healthgrades is one way to
181:12   measure quality.