**TESTIMONY OF JONI STRIGHT**
Received on September 27, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

**Page Range:     9:3-9:8**

9: 3    Q.   Ms. Stright, could you state your full
9: 4    name for the record, please.
9: 5    A.   Joni Summers Stright.
9: 6    Q.   And what is your occupation?
9: 7    A.   I am the administrator for the Treasure
9: 8    Valley region of the St. Luke's clinics.


**Page Range:     18:16-18:24**

18:16    Q.   Is there any difference in the
18:17    operational structure as between physicians who
18:18    have employment agreements and physicians who are
18:19    under PSAs?
18:20    A.   No.
18:21    Q.   Okay.  Is there any difference in
18:22    day-to-day operations as between those two
18:23    groups?
18:24    A.   No.


**Page Range:     77:9-80:15**

77: 9    Q.   BY MR. ETTINGER:  You've been handed
77:10    Exhibit 307, Ms. Stright, and that's a report by
77:11    ECG Management Consultants, June of 2012,
77:12    confidential discussion draft with regard to fair
77:13    market value with compensation to Jill Beck, M.D.,
77:14    and Jacob Robison, M.D.
77:15    Did I identify the document correctly?
77:16    A.   Yes.
77:17    Q.   And so who is "ECG"?
77:18    A.   ECG is a management consulting firm
77:19    with offices you can see as indicated on their
77:20    letterhead, and this particular one came out of
77:21    their Seattle office.
77:22    Q.   Okay.  And did you -- have you used
77:23    them for -- for a number of projects?
77:24    A.   Yes.  They do a -- a pretty extensive
77:25    survey every year of pediatric subspecialty

78: Page 78
78: 1    practices.  And if you -- back to our discussion
78: 2    about MGMA, if you look at MGMA benchmarks for,
78: 3    like, pediatric neurosurgeons, or in this case
78: 4    pediatric ENTs, the sample sizes are very small.
78: 5    And so ECG goes out and actually
78: 6    solicits people to participate.  You pay to
78: 7    participate in their surveys, and then they --
78: 8    they obviously provide you the data.  So we've
78: 9    used them in a lot of our pediatric arena because
78:10    of their little bit better data available.
78:11    Q.   And are Dr. Beck and Dr. Robison
78:12    pediatric subspecialists?
78:13    A.   Yes.  They are pediatric
78:14    otolaryngologists.
78:15    Q.   And were they -- I always say "ENT"
78:16    because I could never pronounce the
78:17    "laryngologist."
78:18    A.   Yes, I know.
78:19    Q.   So -- and were they hired by
78:20    St. Luke's, those physicians?
78:21    A.   Dr. Beck started working for St. Luke's
78:22    on March 1 of '13, and Dr. Robison is finishing
78:23    his fellowship and will start work in August or
78:24    September of this year.
78:25    Q.   Okay.  So why don't you go to page 766,
79: Page 79
79: 1    the Bates number, which is page 10 of the letter
79: 2    of this ECG letter.
79: 3    A.   What -- what was that again?  Excuse
79: 4    me.  Page --
79: 5    Q.   Well, page -- it's 766 at the lower
79: 6    right.  It's page 10 of the letter.
79: 7    A.   Oh.
79: 8    Q.   And this is a letter to you, is it
79: 9    not?
79:10    A.   Correct.
79:11    Q.   Okay, page 10, it says "Table 7" at the
79:12    top there?
79:13    A.   Yes.
79:14    Q.   Well, that's not what I'm -- I'm not
79:15    going to ask you about Table 7, but just to
79:16    identify the page.  I want to ask you about the
79:17    paragraph right under Table 7.
79:18    It says there, "In the course of our
79:19    discussions with St. Luke's, it was acknowledged
79:20    that the payer market in Boise, Idaho, is much
79:21    more favorable than in the United States as a

79:22    whole."
79:23    Do you see that statement?
79:24    A.  I do.
79:25    Q.  Is that accurate?
80: Page 80
80: 1    A.  That's been our determination.
80: 2    Q.  And who -- when you say "our
80: 3    determination," who's made that determination?
80: 4    A.  Based on our work that we've done
80: 5    internally with analytics and then our support by
80: 6    hiring Health Care Futures.
80: 7    Q.  Okay.  And again, when you say "our
80: 8    work," you mean you personally plus certain other
80: 9    people?  That's what I'm trying to find out.
80:10    A.  St. Luke's work, yeah.  Some of it I
80:11    was involved with, yeah.
80:12    Q.  And who else was involved with it?
80:13    A.  Our physician services team, just
80:14    looking at analytics around practices as we
80:15    brought them on board.


**Page Range:     117:8-117:16**

117: 8    Q.  Typically, in these medical director
117: 9    arrangements, does the physician agree to perform
117:10    some set of duties, for some fixed period of time
117:11    at least, and gets paid an amount for that?
117:12    A.  Yes.
117:13    Q.  Are the medical directors always
117:14    St. Luke's Clinic physicians or are they sometimes
117:15    independent physicians?
117:16    A.  Sometimes independent.


**Page Range:     117:17-117:25**

117:17    Q.  Could you give me some examples of
117:18    independent physicians who have those arrangements
117:19    at St. Luke's?
117:20    A.  The ones I work with are the employed
117:21    ones through the St. Luke's Clinic.  But at our
117:22    Executive Leadership Team, there would be medical
117:23    directors over, like, the ED, and they are not
117:24    employed.  Pathology, you know, some of the
117:25    hospital-based practices.

**Page Range:      118:2-119:7**

118:20   Q.   And so, typically, do the medical
118:21   directors play a significant role in terms of the
118:22   quality initiatives that are going on at
118:23   St. Luke's?
118:24   A.   They are and they will be.  Again, this
118:25   is an evolving process that we're in the middle
119: Page 119
119: 1   of, you know, really just leaping off on and is
119: 2   development of those.
119: 3   We've had some areas of the hospital
119: 4   that have been, you know, really working for a
119: 5   long time are much ahead of others.  But specific
119: 6   to certain areas, we're just, you know, working on
119: 7   beginning those quality initiatives.


**Page Range:      121:23-125:10**

121:23   Q.   BY MR. ETTINGER:  Showing you what's
121:24   been marked as Exhibit 314, an E-mail from you to
121:25   John Kee, "Capital Budget-Practice Acquisitions."
122: Page 122
122: 1   Take a look at that and I'll ask you some
122: 2   questions.
122: 3   Are you ready?
122: 4   A.   Yes.  Sorry.
122: 5   Q.   So what is this document?
122: 6   A.   So this appears -- it was a -- prepared
122: 7   in July of last year, so we would have been
122: 8   developing and finalizing our capital budget for
122: 9   the year.  And so part of that is look at any
122:10   integration we have -- integration activities we
122:11   have going relative to capital needs for
122:12   acquisitions.
122:13   Q.   So these were deals that were at some
122:14   point in process as of July of 2012; is that
122:15   right?
122:16   A.   That would be correct.
122:17   Q.   So what happened with OB/GYN
122:18   Associates?
122:19   A.   They were put on hold because of the
122:20   legal issue here.
122:21   Q.   Of --
122:22   A.   So they are still independent.
122:23   Q.   Okay.  By "the legal issue here," you
122:24   mean the FTC investigation?

122:25   A.  Exactly.
123: Page 123
123: 1   Q.  And Pioneer Family Medicine, what
123: 2   happened with that one?
123: 3   A.  Same thing.
123: 4   Q.  And Boise Podiatry, what happened with
123: 5   that one?
123: 6   A.  We actually are employing them as of
123: 7   either May 1st or June 1st, but it wasn't an
123: 8   acquisition.  And there's been notification
123: 9   provided for that.
123:10   Q.  So the individual podiatrists are being
123:11   employed but the practice was not acquired?
123:12   A.  That's correct.
123:13   Q.  So what about Shawn Nowierski?
123:14   A.  Put on hold as well.
123:15   Q.  Because of?
123:16   A.  Due to this.  Um-hum.  Yeah, we've
123:17   pretty much --
123:18   Q.  And "by this," you mean the
123:19   investigation and litigation, the antitrust
123:20   issue?
123:21   A.  Exactly.  Yeah.
123:22   Q.  Okay.  What about Advanced Pain
123:23   Management?
123:24   A.  They were actually -- we provided
123:25   notification.  And they came on board, I think,
124: Page 124
124: 1   December 1st of last year to help us start a pain
124: 2   program.
124: 3   Q.  How many physicians is that?
124: 4   A.  Two.
124: 5   Q.  And what about Alexander Orthopaedics?
124: 6   A.  That was -- that's two orthopods in
124: 7   Wood River, and they came under a PSA effective
124: 8   12/1 of last year.
124: 9   Q.  What about Sunshine Pediatrics?
124:10   A.  That's just gone away.  We're not
124:11   working on that anymore.
124:12   Q.  Where is Advanced Pain Management?
124:13   A.  Advanced Pain Management is here in the
124:14   Treasure Valley.
124:15   Q.  Okay.  You said -- you started to stay
124:16   "pretty much," and then I think I accidentally cut
124:17   you off.  It sounded like you were going to say
124:18   pretty much everything is on hold pending the
124:19   litigation in terms of deals.  Is that what you
124:20   intended to say?

124:21   A.  I don't recall that.
124:22   Q.  Is that true?
124:23   A.   This -- this is activity that was going
124:24   on at the time when the lawsuit was filed.  And
124:25   so then we went through and said "yeah."  Worked
125: Page 125
125: 1   with the FTC and said, okay, these are on hold and
125: 2   provide notification if others need to go through.
125: 3   So we basically have been on hold, yeah.
125: 4   Q.  Have any other deals been pursued since
125: 5   that time?
125: 6   A.  No.
125: 7   Q.  Because of the litigation?
125: 8   A.  Um-hum.
125: 9   Q.  That's a yes?
125:10   A.  Yes.  Sorry.


**Page Range:      147:6-148-6**

147: 6   Q.  Did you ever think of moving all your
147: 7   primary care clinics to Boise to the hospital
147: 8   campus?
147: 9   A.  No.
147:10   Q.  Why not?
147:11   A.  I would not think of that because part
147:12   of the concept is being out in the community where
147:13   patients have access.  And so not all patients
147:14   want to drive down to downtown Boise.
147:15   Q.  Okay.
147:16   A.  Being out in the communities is part of
147:17   our strategy.
147:18   Q.  Okay.  And is that particularly
147:19   important for primary care, where people may come
147:20   routinely for a shot or a checkup or to take their
147:21   kids in for a checkup?
147:22   A.  It's -- it's one of the components.
147:23   Yeah, they tend to like accessibility, but they
147:24   also drive to wherever their primary care -- you
147:25   know, I -- we've seen where patients will follow
148: Page 148
148: 1   their physician to -- you know, if they move or
148: 2   something.
148: 3   Q.  Yeah.  If they already have a physician
148: 4   they may be willing to follow that physician,
148: 5   correct?
148: 6   A.  Um-hum.  Yeah.

**Page Range:      165:10-165:19**

165:10    document.  Let me show you what's been previously
165:11    marked as Exhibit 159, an E-mail from Kathy Moore
165:12    to you, attaching a document that I believe you
165:13    wrote.  You can look at that and I'll ask you a
165:14    couple questions.
165:15    MR. LITVACK:  David, do you mind if we just
165:16    read the Bates number onto the record so there's
165:17    no confusion?
165:18    MR. ETTINGER:  Well, the Bates number here
165:19    is 91783.


**Page Range:      165:22-166:12**

165:22    Q.  BY MR. ETTINGER:  Do you recall this
165:23    event?
165:24    A.  I recall the document.
165:25    Q.  Do you recall sending the document to
166: Page 166
166: 1    Kathy Moore and her telling you, "See deleted
166: 2    portion.  We can talk to this, but I don't think
166: 3    we want it in the document"?
166: 4    A.  I remember it now, seeing this, yeah.
166: 5    Q.  Yeah.  Did you and she have any
166: 6    discussion about this, aside from her E-mail?
166: 7    A.  I don't recall that we did.
166: 8    Q.  Did she explain why she said it was
166: 9    fine to talk about it but it shouldn't be in
166:10    writing?
166:11    A.  I don't recall a discussion with her
166:12    about it.


**Page Range:      166:14-166:23**

166:14    Q.  BY MR. ETTINGER:  Did that seem odd to
166:15    you?
166:16    A.  No.  I was preparing a summary for
166:17    executive-level review and they provide me
166:18    feedback.
166:19    Q.  So why would her feedback be it is fine
166:20    to do it orally, but not in writing?  Why would
166:21    that make sense to you?
166:22    A.  Because that was -- that was her
166:23    preference.

**Page Range:      167:1-168:5**

167: 1    Q.  BY MR. ETTINGER:  Do you have any idea
167: 2    as to why that might be her preference, based on
167: 3    your dealings with her or your other experience at
167: 4    St. Luke's?
167: 5    A.  No.
167: 6    Q.  Are there other things that you do
167: 7    that you don't put in writing but express only
167: 8    orally?
167: 9    Let me put it this way.  Are there
167:10    things you avoid putting in writing that you want
167:11    to convey orally?
167:12    A.  Not that I can think of.
167:13    Q.  Okay.  Did you delete the language she
167:14    asked you to delete?
167:15    A.  I don't recall exactly, but I would
167:16    assume that this was one of the revisions that
167:17    went through.
167:18    Q.  Okay.  The -- the language that she's
167:19    shaded in is, "Currently, the surgical volume is
167:20    divided between St. Luke's and Saint Alphonsus
167:21    hospitals.  It is anticipated that surgical volume
167:22    will migrate to St. Luke's over time as additional
167:23    outpatient surgical capacity at St. Luke's becomes
167:24    available."
167:25    A.  Um-hum.
168: Page 168
168: 1    Q.  Have I read that correctly?
168: 2    A.  Yes, you did.
168: 3    Q.  And was that a truthful -- were those
168: 4    truthful statements?
168: 5    A.  I believe it was.

**Page Range:      168:6-168:23**

168: 6    Q.  Yeah.  And so one relevant factor in
168: 7    informing the board of the -- of the acquisition
168: 8    of Boise Surgical Group was that this -- this
168: 9    additional volume would occur, correct?
168:10    A.  The -- the -- prior to this even
168:11    happening, Boise Surgical Group had relocated
168:12    their clinic onto the Meridian campus for
168:13    St. Luke's.
168:14    Q.  And but what you're doing here was

168:15  telling the board what was relevant to their
168:16  decision is to whether to allow the purchase,
168:17  correct?
168:18  A.  Well, this is a piece and part of what
168:19  we do when we analyze the business aspects of --
168:20  and the impact of any acquisition.  And part of
168:21  bringing Boise Surgical Group on, they were
168:22  wanting to do more of their surgeries at
168:23  St. Luke's --


**Page Range:        171:17-172:10**

171:17  Q.  So was this information relevant to the
171:18  purchase decision?
171:19  A.  It was a piece and part of it, but not
171:20  the whole picture.
171:21  Q.  But it was relevant?
171:22  A.  It was a piece of it.
171:23  Q.  Were you trying to convey to the board
171:24  that the migration of business would occur whether
171:25  they approved the deal or not?
172: Page 172
172: 1  A.  That -- that had actually started
172: 2  before Boise Surgical Group became part of
172: 3  St. Luke's because they had already moved their
172: 4  clinic onto our --
172: 5  Q.  I asked you a question.  Were you
172: 6  trying to tell the board that this business
172: 7  would migrate whether or not they approved the
172: 8  deal?
172: 9  A.  I don't know the answer to that.  I
172:10  wasn't trying to tell them anything.


**Page Range:        172:16-173:15**

172:16  Q.  BY MR. ETTINGER:  Ms. Stright, have you
172:17  ever avoided putting in writing information about
172:18  referrals shifting as a result of a physician
172:19  acquisition?
172:20  A.  No.
172:21  Q.  Have you ever told somebody something
172:22  about referrals shifting -- anticipated being
172:23  shifting as a result of a physician acquisition
172:24  that you did not put in writing?
172:25  A.  Part of the role that I play is to
173: Page 173

173: 1   develop the business strategy, the business
173: 2   picture around any anticipated integration.  And
173: 3   as a result of that, we may look at are there
173: 4   going to be additional surgeries.  And we have
173: 5   to -- you know, our role is to provide service to
173: 6   the patients and service to the physicians.
173: 7   So we need to be aware of anticipated
173: 8   volume changes that could go either way.
173: 9   Sometimes we anticipate volumes may go the other
173:10   way because of payer contracts or changing
173:11   referral patterns, so we look at that.  But do
173:12   we -- do we require that?  Do we know that that's
173:13   going to happen?  It is part of the overall
173:14   analysis.  We don't know the answers to all of
173:15   that.


**Page Range:      174:9-174:24**

174: 9   Q.  You said that there are cases where you
174:10   expect that surgeries, for example, will go up as
174:11   a result of the acquisition of a physician
174:12   practice at St. Luke's, correct?
174:13   A.  There is that potential.
174:14   Q.   And what cases have you conveyed that
174:15   that was your expectation?  Boise Surgical did you
174:16   convey that?
174:17   A.  To who?
174:18   Q.  To anyone?
174:19   A.  Well, obviously, we talked about it
174:20   because it was in this document.
174:21   Q.  So your interpretation of what's in
174:22   this document is that surgeries would go up as a
174:23   result of the acquisition?
174:24   A.  There was the possibility.  Um-hum.


**Page Range:      175:11-177:12**

175:11   Q.  BY MR. ETTINGER:  Exhibit 323, which
175:12   is -- you're probably tired of seeing these
175:13   today -- but yet another Health Care Futures
175:14   document.
175:15   A.  I agree.
175:16   Q.  Agree -- you agree that's what it is or
175:17   that you're tired of --
175:18   A.  No, I agree that's what it is.
175:19   Q.  Okay.  Why don't we turn to -- I

175:20   just have one question on one page, page 10 --
175:21   actually, go back to the first page of the
175:22   document.  I'm sorry.  Then we'll go back to
175:23   page 10.  This is entitled "Discussion with
175:24   SLHS Project Leadership Team, June 3, 2009,"
175:25   correct?
176: Page 176
176: 1   A.  Yes.
176: 2   Q.   And that was the group that we've seen
176: 3   that you were a part of?
176: 4   A.  Yes.
176: 5   Q.   Okay.  Now let's go to page 10.
176: 6   A.  And you're on page 10?
176: 7   Q.   Page 10 starts out at the top "SLHS
176: 8   "Practice Profile-Definition of Group Value."
176: 9   Okay?  Are you there?
176:10   A.  Yes, I am.  Sorry.
176:11   Q.   So I'll -- take a look at it and tell
176:12   me when you're -- I want to ask you about it when
176:13   you're ready.
176:14   A.  I need to refresh my mind here what
176:15   they were doing.
176:16   Q.  Okay.
176:17   A.  Okay.
176:18   Q.  Are you ready?  I'm sorry.
176:19   A.  Yes, I am.
176:20   Q.   So would you agree that what page 10
176:21   is conveying is that the value of a physician
176:22   group is comprised of its professional practice
176:23   activity plus the hospital outpatient and
176:24   inpatient activity it generates plus the primary
176:25   care referrals it generates?
177: Page 177
177: 1   A.  This -- that's what this diagram
177: 2   presents, yes.
177: 3   Q.   And did anyone at St. Luke's disagree
177: 4   with that conclusion when you met with Health Care
177: 5   Futures?
177: 6   A.  No.  The recognition here is that
177: 7   it's -- it's -- there's -- the business model of
177: 8   health care is it's just not professional
177: 9   practice, as physicians are the ones that, you
177:10   know, order services that we provide to them at
177:11   the hospital, so it is recognizing the hospital
177:12   component of that as well, yeah.

**Page Range:    177:13-177:23**

177:13    Q.  And in evaluating what you get from
177:14    acquiring a physician group, all of these factors
177:15    are relevant whether or not you are allowed to
177:16    compensate them for all of these factors,
177:17    correct?
177:18    A.  Their -- the context of this document,
177:19    if I recall, was trying to look at how we were
177:20    going to report on the activities of our quickly
177:21    growing group, and this concept was discussed.
177:22    This was never implemented relative to how we
177:23    actually quantified these numbers.


**Page Range:    179:4-182:8**

179: 4    Q.  BY MR. ETTINGER:  So you've been handed
179: 5    Exhibits 324 and 325.  I suppose I can identify
179: 6    the Bates numbers.  Well, she didn't do it while
179: 7    she typed, so I better identify the Bates numbers.
179: 8    324 is 7644.  325 is 7583.  And these are both
179: 9    E-mail strings in the September 6 to 17 range, and
179:10    some of -- some of which you're cc'd on.  So why
179:11    don't you take a look at them and then I'll ask
179:12    you some questions.
179:13    A.  Okay.
179:14    Q.  Okay.  So first of all, did I describe
179:15    these correctly in terms of what these documents
179:16    are?
179:17    A.  Yes.
179:18    Q.  Do you recall this issue?
179:19    A.  Yes.
179:20    Q.  So who is Douglas Croft?
179:21    A.  He is an employee that works in our
179:22    patient access department and is involved with a
179:23    lot of the technical aspects of the IT systems and
179:24    whatnot related to patient access.
179:25    Q.  And referrals?
180: Page 180
180: 1    A.  Which includes ordering, inpatient
180: 2    access.  So that is ordering inside of St. Luke's
180: 3    and outside of St. Luke's, yeah.
180: 4    Q.  Okay.  And who is Pamela Williams?
180: 5    A.  I'm not sure.
180: 6    Q.  Okay.  So this concerns an issue where
180: 7    Dr. Rasmus thought he was getting a referral and
180: 8    it didn't come through; is that right?

180: 9    A.  The best I understand this, this is a
180:10    little technical, but he -- someone placed an
180:11    order for a sleep test to Dr. Rasmus, who was a
180:12    Saltzer physician at the time, so not a St. Luke's
180:13    physician.  And when they attached it, it
180:14    defaulted to the St. Luke's sleep lab, which is
180:15    not where he does his services.  So that's what
180:16    all this was about is trying to correct that.
180:17    Q.   And Mr. Croft said "all referrals auto
180:18    default to internal referral type," did he not?
180:19    And that's Exhibit 325 is his E-mail.  I think
180:20    you're looking at --
180:21    A.  325?  Oh, Exhibit 325.
180:22    Q.  Yes.
180:23    A.  This has been, you know, a -- at that
180:24    point in time in Epic, they've been working on the
180:25    ordering process within Epic.  And so I don't
181: Page 181
181: 1    know -- at this point in time, that must have been
181: 2    how it was set up.  It was not the -- I know that
181: 3    there's been a lot of work done on it since, and I
181: 4    can't speak to that.
181: 5    Q.  Okay.
181: 6    A.   And I don't know exactly what all that
181: 7    means, to be honest.
181: 8    Q.   So, well, "auto default" as I
181: 9    understand it means it automatically goes to an
181:10    internal referral within St. Luke's unless
181:11    somebody does something affirmative to the
181:12    contrary; is that right?
181:13    A.  That's what that implies, yeah.  And
181:14    that's why it defaulted to the St. Luke's sleep
181:15    lab --
181:16    Q.  Right.
181:17    A.  -- where they should have selected
181:18    because of -- they were trying to refer to a
181:19    physician that doesn't work at the St. Luke's
181:20    sleep lab, yeah.
181:21    Q.  Right.  And so you don't have any
181:22    reason to doubt that Mr. Croft was correct in what
181:23    he said as of September of 2012?
181:24    A.  That's what the E-mail says, yeah.
181:25    Q.   And, I mean, you have no reason to
182: Page 182
182: 1    doubt his conclusion, do you?
182: 2    A.  At that point in time, no, I don't.
182: 3    Q.  If I understand you correctly, you
182: 4    don't know if anything has changed since that

182: 5   point it time, correct?
182: 6   A.  I know there's been a lot of work done
182: 7   on this, but I don't know the current status.
182: 8   You're correct.


**Page Range:      182:10-182:14**

182:10   Let me show you what's been previously
182:11   marked as Plaintiff's Exhibit 118 (sic).  It is an
182:12   E-mail from Greg Orr to John Kee, cc'ing lots of
182:13   people, including you, dated December 9, 2011, in
182:14   response to an E-mail from Mr. Kee.  Take a look


**Page Range:      183:1-183:7**

183: 1   Q.  And in 4 he says, he refers to
183: 2   "St. Luke's historical willingness to
183: 3   preferentially direct patients to St. Luke's
183: 4   affiliated practices rather than equally among all
183: 5   on medical staff."
183: 6   Is that a true statement?
183: 7   A.  I don't think so.  I can't comment on


**Page Range:      183:7-183:8**

183: 7   A.  I don't think so.  I can't comment on
183: 8   that.


**Page Range:      183:12-183:18**

183:12   Q.  Well, I mean, do you understand the
183:13   statement?
183:14   A.  When he says, "I think this has to do
183:15   with St. Luke's historical willingness," I don't
183:16   agree with that, no.  I mean, I -- we have not
183:17   been prescriptive with our physicians about where
183:18   they refer to, so I'm not sure what he means.


**Page Range:      196:20-198:13**

196:20   Q.  BY MR. ETTINGER:  Okay.  I'm going to
196:21   show you another one.  I've handed you
196:22   Exhibit 329, which is an E-mail from -- the top

196:23    E-mail is from Chris Roth, but the E-mail right
196:24    below it is from Peter LaFleur and Chris Roth,
196:25    cc'ing you and John Kee, attaching the KPMG
197: Page 197
197: 1    valuation and as of April 2010 of the Saltzer
197: 2    group.  But then the top E-mail is September of
197: 3    2012.  Do you see that?
197: 4    A.   The E-mail is dated September 12.  Is
197: 5    that what you're referring to?  I missed that.
197: 6    Q.   Yeah.  And so -- but the attached
197: 7    valuation is September of 2010; isn't that right?
197: 8    A.   Oh, that's how -- this is April 30th of
197: 9    2010 is the valuation that I have dated.
197:10    Q.   Yeah.
197:11    A.   Yeah.  Okay.
197:12    Q.   And did KPMG originally do a valuation
197:13    of Saltzer in 2010 and then update it in 2012?
197:14    A.   Yes.
197:15    Q.   Okay.  Why don't you turn to page 1 of
197:16    the valuation.  You see -- why don't you read the
197:17    paragraph that says "Engagement Purpose."
197:18    A.   I have a letter that says "Dear Ed."
197:19    Q.   Oh, I'm sorry.  If you go -- it's under
197:20    the -- there's a letter to Mr. Castledine that
197:21    says "Dear Ed," and then under that there's the
197:22    valuation itself.  And page 5414 is the first page
197:23    of the valuation, correct, which is also numbered
197:24    "1"?
197:25    A.   Okay.  Yes.  I'm with you.
198: Page 198
198: 1    Q.   Okay.  That's all right.  Sorry.
198: 2    So why don't you read that paragraph that says
198: 3    "Engagement Purpose."
198: 4    A.   Okay.
198: 5    Q.   So is it correct that this valuation,
198: 6    like others, is done to -- is supporting evidence
198: 7    the transaction is based on fair market value to
198: 8    assist St. Luke's with it's compliance with Stark
198: 9    and anti-kickback statutes?
198:10    A.   I believe so.
198:11    Q.   Okay.  And that's part of why you want
198:12    it to be as accurate as possible, correct?
198:13    A.   Sure.


**Page Range:      198:14-198:25**


198:14    Q.   And then going to the right-hand

198:15   column, the last paragraph, KPMG describes what
198:16   it did as part of its work to do this valuation.
198:17   And they talk about relying on documents supplied
198:18   by the Saltzer practice, a site visit, discussions
198:19   with management and gathering other information.
198:20   Do you see that?
198:21   A.  I do see that.
198:22   Q.  And do you have any reason to doubt
198:23   that they did all of that?
198:24   A.  No.  I wasn't involved at the time, but
198:25   I don't doubt that they did that.


**Page Range:      199:1-199:22**

199: 1   Q.  Okay.  Why don't you turn to page 14 of
199: 2   the valuation.  Do you see the paragraph there
199: 3   with the heading "Impact on Saltzer"?
199: 4   A.  Um-hum.
199: 5   Q.  That's a yes?
199: 6   A.  Yes.
199: 7   Q.  Thanks.  Could you just read the first
199: 8   paragraph there and I'll ask you about it.  Of
199: 9   course, you can read whatever else you like, but
199:10   it's the first paragraph I'm going to ask you
199:11   about.


**Page Range:      199:12-199:22**

199:12   A.  Okay.
199:13   Q.  Do you see the -- I'm only going to ask
199:14   you about the last two sentences of that
199:15   paragraph.  The first of those last two says,
199:16   "Saltzer has maintained a dominant market position
199:17   in Nampa for decades and has built strong name
199:18   recognition and relationships throughout the
199:19   area."
199:20   Do you agree or disagree with that
199:21   statement?
199:22   A.  I agree.


**Page Range:      199:23-200:6**

199:23   Q.  And the next sentence says, "Due to
199:24   Saltzer's size relative to the other medical
199:25   practices in the area, it has also developed

200: Page 200
200: 1    leverage with payers and other providers."
200: 2    A.  I don't know the answer to that.  I
200: 3    don't know if that's true.
200: 4    Q.  Okay.  You don't know one way or the
200: 5    other?
200: 6    A.  I'm not involved with that piece, no.


**Page Range:     214:25-215:7**

214:25   Q.  So you said St. Luke's get a lot of
215: Page 215
215: 1    business from Canyon County, and that's why it is
215: 2    a significant -- a significant reason why you
215: 3    wanted to do this deal.  So let me ask you it this
215: 4    way.  How does this deal help St. Luke's either
215: 5    get more business from Canyon County or keep the
215: 6    business it already has in Canyon County?
215: 7    A.  Well, that --


**Page Range:     215:9-216:13**

215: 9    THE WITNESS:  Initially -- I mean, we need
215:10   to start back -- Saltzer came to us.
215:11   Q.  BY MR. ETTINGER:  That's not my
215:12   question.
215:13   A.  I understand, but --
215:14   Q.  Well, could you answer my question?
215:15   A.  But the strategy of -- around this
215:16   is, you know, as any health system, you have to
215:17   look at where your pockets of patient population
215:18   are, and then determine in your strategic planning
215:19   where your best needs are for future facilities,
215:20   where -- where you're meeting the patient needs,
215:21   where you're not, where you've got gaps.
215:22   And our strategy over the last couple
215:23   years has been the need to expand our Meridian
215:24   services.  And/or since 20 percent of the volume
215:25   there already comes from Canyon County, maybe not
216: Page 216
216: 1    look at expanding Meridian but actually expanding
216: 2    services into Nampa and Canyon County.
216: 3    So that is part of the background of
216: 4    it.  And in order to provide services in Nampa, we
216: 5    need to have physicians that will work with us.
216: 6    And so, yeah, we're very interested in working

216: 7   with Saltzer.
216: 8   Q.   Well, what you're saying is you're
216: 9   interested in putting a hospital in Nampa and
216:10   having the primary care base for that hospital be
216:11   the Saltzer physicians, correct?
216:12   A.   At -- at some point in the future, yes.
216:13   Since we don't have a hospital now.


**Page Range:      216:14-216:19**

216:14   Q.   And, indeed, the plan was to have a
216:15   hospital there within three years; isn't that
216:16   right?
216:17   A.   I'm not involved with all of the
216:18   strategic planning discussions, but the timeline
216:19   hasn't been set, to my awareness.


**Page Range:      219:15-219:20**

219:15   Q.   Okay.  Now let's go back to
219:16   Exhibit 331.  So is the -- is a significant
219:17   purpose of the Saltzer acquisition to provide
219:18   primary care support for the hospital in Nampa if
219:19   and when it occurs?
219:20   A.   Yes.


**Page Range:      245:9-246:18**

245: 9   Q.   BY MR. ETTINGER:  Ms. Stright -- no,
245:10   I'll show you the document and then I'll ask the
245:11   question.
245:12   Exhibit 338.  Exhibit 338 is a series
245:13   of E-mails involving you, Kathy Moore, Chris Roth
245:14   and others in the November 8th, 2012, time period
245:15   relating to surgeons at Saltzer.  Take a look at
245:16   it and I'll ask you questions?
245:17   A.   Okay. Okay.
245:18   Q.   So first of all, did I correctly
245:19   describe the document?
245:20   A.   How did you describe it?  I really
245:21   don't remember.
245:22   Q.   E-mails between Kathy Moore, you,
245:23   Chris Roth and others regarding around the
245:24   November 8, 2012, time period, regarding referrals
245:25   to surgeons at Saltzer?

246: Page 246
246: 1   A.   Correct.  Um-hum.
246: 2   Q.   And this is after the existing Saltzer
246: 3   surgeons had left?
246: 4   A.   I believe so.  Right around that time
246: 5   frame.
246: 6   Q.   And you set up for people to -- for the
246: 7   Saltzer doctors to call to get general surgery
246: 8   referrals to Boise Surgical Group and orthopedic
246: 9   referrals to Boise Orthopedics and Intermountain
246:10   Orthopaedics, correct?
246:11   A.   That's correct.
246:12   Q.   And those are all St. Luke's Clinic
246:13   physicians?
246:14   A.   That's correct.
246:15   Q.   And your assumption was that the
246:16   Saltzer -- and at this point, Saltzer had agreed
246:17   to be acquired by St. Luke's, correct?
246:18   A.   Yes.  I believe so.


**Page Range:       246:19-246:23**

246:19   Q.   And you expected that Saltzer would be
246:20   referring to these physicians rather than the
246:21   ex-surgeons who had left Saltzer, correct?
246:22   A.   And I wouldn't say it was an
246:23   "expectation."

**Page Range:       246:24-247:12**

246:24   Q.   Well, then why did you set up these
246:25   lines if it wasn't an expectation?
Page 247
247: 1   A.  Because the remaining physicians at
247: 2   Saltzer were very upset with their partners who
247: 3   had left, and they wanted new referral patterns,
247: 4   new referral options.
247: 5   Q.  Who told you that, what you just said?
247: 6   A.  I wasn't actually in meetings to – to
247: 7   hear that.
247: 8   Q.  I see.
247: 9   A.  So I was –
247:10   Q.  I kind – I kind of thought that.
247:11   A.  Yeah.  Yeah.
247:12   Q.  But where --

**Page Range:      247:15-247:16**

247:15   Q.  BY MR. ETTINGER:  But who told you that
247:16   is my question.

**Page Range:      249:14-249:18**

249:14   Q.   My question was do you recall -- do
249:15   know of a single thing that the surgeons did,
249:16   other than not wanting to go to work for
249:17   St. Luke's, that created any -- created hostility?
249:18   A.   I don't recall.