**TESTIMONY OF KATHY MOORE**
Received on October 1, 2013
In the United States Federal District Court for the District of Idaho
*Saint Alphonsus Medical Center-Nampa, Inc., et. al. v. St. Luke's Health System Ltd., et. al.*
Case No. 1:12-cv-00560-BLW

Page Range:     8:11-8:25

8:11   Q.  Could you state your full name for the record,
8:12   please.
8:13   A.  Kathy Deanne Moore.
8:14   Q.  And what's your occupation, Ms. Moore?
8:15   A.  I'm the chief operating officer at St. Luke's
8:16   Regional Medical Center.
8:17   Q.  And what are your responsibilities as the
8:18   chief operating officer?
8:19   A.  My responsibilities are to run the
8:20   day-to-day operations of the organization.
8:21   Q.  And when you say "the organization," can you
8:22   explain to me what's comprised by "the organization"?
8:23   A.  Yes.  It's two hospitals, the one in Boise and
8:24   Meridian and then I do have oversight of operations from
8:25   Boise to Baker City.


Page Range:     26:20-27:10

26:20   Q.  You've been handed Plaintiff's Exhibit 1973, I
26:21   believe.
26:22   Can you tell me what that is?
26:23   A.  It looks like the front page of a notebook that I
26:24   would use to take my notes.
26:25   Q.  So, are the notes in Exhibit 1973 your notes?
Page 27
27: 1   A.  Yes, they are.
27: 2   Q.  Why don't you turn to Page 488 is the Bates
27: 3   Number in the lower right.  And there's a discussion there
27: 4   of a leadership --
27: 5   Are you there?
27: 6   There's a discussion there of a leadership team
27: 7   meeting on March 21, 2011; is that right?
27: 8   A.  Did you say March 21st, 2011?
27: 9   Q.  Yes.
27:10   A.  Yeah.

Page Range:     30:21-31:18

30:21   Q. Okay. Why don't you turn to Page 489.
30:22   A. Okay.
30:23   Q. The Line 32 -- you really make it easy with these
30:24   numbered lines.
30:25   A. Oh, okay.
Page 31
31: 1   Q. It says "we have a lot of average..."
31: 2   What does that refer to?
31: 3   A. We have a lot of average performance, according
31: 4   to the HealthGrades report, in quality.
31: 5   Q. Okay. Then it says "many of our indicators are
31: 6   going the wrong direction."
31: 7   Can you explain what you meant by that?
31: 8   A. Yes. That says "many of our indicators are going
31: 9   the wrong direction because others are improving."
31:10   But we were experiencing across the country was
31:11   all other hospitals, including the hospital I was with
31:12   prior to this, was putting a lot of emphasis on our
31:13   quality metrics. And hospitals, as other hospitals across
31:14   the country focused and improved their metrics, St. Luke's
31:15   were just going the wrong direction.
31:16   They weren't -- they weren't doing worse in their
31:17   quality. But the measurement showed that they were losing
31:18   ground because others were improving their quality.


Page Range:     38:22-39:1

38:22   Q. Ms. Moore, I think you've been handed
38:23   Plaintiffs' Exhibit 1111, which is a variety of emails
38:24   involving you and Angela Christensen and Chris Roth.
38:25   Have I properly identified the document?
Page 39
39: 1   A. Yes.


Page Range:     39:18-40:14

39:18   Q. Okay. So, let's talk about her email to you on
39:19   August 13, 2012, at 11:58 a.m.
39:20   Do you see that one?
39:21   A. Yes.
39:22   Q. And she talks about a Dr. Poole validating a
39:23   study.
39:24   Who is Dr. Poole?
39:25   A. Dr. Poole is an orthopaedic surgeon.

Page 40
40: 1   Q. Which group is he in; do you know?
40: 2   A. I don't.
40: 3   Q. Okay. She says "He validated for me a study that
40: 4   I found indicating physician productivity falls by
40: 5   20 percent when practices are purchased."
40: 6   Do you see that?
40: 7   A. I do.
40: 8   Q. Did you and she have any discussion about that
40: 9   study that she found?
40:10   A. No.
40:11   Q. Okay. Did you look at the study?
40:12   A. No.
40:13   Q. Were you interested in looking at the study?
40:14   A. No.


Page Range:     41:15-41:25

41:15   Q. Okay. So, then, you sent this on to Chris Roth,
41:16   your boss; right?
41:17   A. Uh-huh, yes.
41:18   Q. Yeah.
41:19   A. Sorry.
41:20   Q. And you said "Recognizing Angela can be gruff in
41:21   her communication, please do not forward the below."
41:22   So, was there something "gruff" about this email
41:23   from Angela?
41:24   A. Well, she's accusing our physicians of practicing
41:25   less because they've been acquired by St. Luke's.


Page Range:     43:8-43:11

43: 8   Q. So, as far as you know, St. Luke's has never
43: 9   examined whether productivity goes up, goes down or stays
43:10   the same after a group is acquired?
43:11   A. No.


Page Range:     43:12-43:16

43:12   Q. Okay. Again, we have a yes/no. It's probably my
43:13   fault. Let me just be clear.
43:14   So, am I correct that as far as you know
43:15   St. Luke's has never studied what I've just described?
43:16   A. Not that I'm aware of.


3

Page Range: 45:8-46:20

45: 8   Q.  Would you take a look at Exhibit 1113, which
45: 9   you've been handed, which is a series of emails involving
45:10   a number of people, including Dr. Souza and yourself.  So,
45:11   take a look at it and I'll ask you about it.
45:12   A.  Okay.
45:13   Q.  So, what was this discussion about in these
45:14   emails?
45:15   A.  It appears from the email that we had a referral
45:16   to a primary care provider that was on the Treasure Valley
45:17   call list for a followup appointment from our Nampa ED.
45:18   Q.  And it was a referral to a Meridian provider for
45:19   a Nampa patient; is that right?
45:20   A.  That's what it appears to be.
45:21   Q.  And Dr. Souza -- who is Dr. Souza?
45:22   A.  At -- let's see.  Dr. Souza became our VP,
45:23   vice president of medical affairs, on October 1st, 2012.
45:24   Q.  Okay.  So, that's the position he had as of the
45:25   time of these emails?
Page 46
46: 1   A.  Yes.
46: 2   Q.  And he's saying, you know, sending somebody from
46: 3   Nampa to Meridian may make sense for specialty care, but
46: 4   really not for primary care; is that right?
46: 5   A.  Yes.
46: 6   Q.  Do you agree with that?
46: 7   A.  Yes.
46: 8   Q.  Okay.  And why is that?
46: 9   A.  Well, we had put practices in place to where
46:10   primary care would have access to -- that patients would
46:11   have access to primary care in both Nampa and Caldwell, as
46:12   they preferred, from our Nampa ED.
46:13   Q.  Okay.
46:14   A.  It was never meant that they would be referred
46:15   into Boise or Meridian for primary care.
46:16   Q.  Okay.  And why was it never meant that they would
46:17   be referred in to Boise or Meridian for primary care?
46:18   A.  Because we had primary care physician's both in
46:19   Nampa and in Caldwell that were willing to follow these
46:20   patients after an emergency department visit.


Page Range: 78:3-78:16

78: 3   Q.  You have been shown what's been marked as
78: 4   Exhibit 1118, Ms. Moore.  Why don't you take a look at it

78: 5   and tell me when you're ready to discuss it.
78: 6   And again, when I'm ready to talk about
78: 7   particular items, I'll point you to something.
78: 8   A.  Okay.
78: 9   Q.  What is this document?
78:10   A.  This is a monthly document that I require of
78:11   those individuals that report through the Treasure Valley.
78:12   Q.  So, is this your -- is this a document you
78:13   prepare with input from others or not?
78:14   A.  John Barnes is a financial person that helps
78:15   gather this data from all of my direct reports and
78:16   Joanne's direct reports.


Page Range:      79:9-80:1

79: 9   Q.  Okay.  So, that phrase in-network referral
79:10   patterns, does it mean different things at different
79:11   times?
79:12   A.  Yes.
79:13   Q.  And how does one tell what it means at a
79:14   particular point in time?
79:15   A.  I'd say you have to look at the context of the
79:16   document.
79:17   Q.  Okay.  Now, underneath that, it says "Integration
79:18   of new groups" and you see it says "Saltzer Medical Group
79:19   (not final), Boise Surgical Group (completed),
79:20   Surgical Oncology (completed)"?
79:21   A.  Yes.
79:22   Q.  And that's under a broad category called
79:23   Revenue Enhancements?
79:24   A.  Yes.
79:25   Q.  So, how are these acquisitions going to enhance
Page 80
80: 1   revenue?


Page Range:      80:3-80:4

80: 3   THE WITNESS:  Their revenue would now be recorded
80: 4   on our financial statements as well as their expenses.



Page Range:      81:23-81:25

81:23   Q.  Okay.  It would have to be some manner in which
81:24   the acquisition of those groups increased inpatient or

5

  81:25    outpatient hospital revenues; correct?


Page Range:     82:1-82:4

  82: 1   A.  It could increase revenue or we could also get
  82: 2   additional savings through the integration process.  But I
  82: 3   think aligning those groups were felt to be a positive
  82: 4   impact to our financial statement.


Page Range:     83:3-83:6

  83: 3   Q.  What you're saying here is the acquisition would
  83: 4   result, you believed, in greater use of the hospital;
  83: 5   isn't that right?
  83: 6   A.  Yes.


Page Range:     94:12-95:4

  94:12   Q.  Ms. Moore, you've been shown Exhibit 160.  Take a
  94:13   look at it and tell me when you're ready.
  94:14   1120.  I'm sorry.
  94:15   Is that what it is, 1120?
  94:16   A.  Yes.
  94:17   Q.  Okay.
  94:18   A.  Oh, yes.
  94:19   Q.  Is 1120 an email exchange between you and
  94:20   Angela Christensen?
  94:21   A.  Yes.
  94:22   Q.  And she asks you "If Saltzer spins off" -- well,
  94:23   actually, let me back up.
  94:24   So, this is September of 2012?
  94:25   A.  Yes.
  Page 95
  95: 1   Q.  And at that point, it was generally believed that
  95: 2   Saltzer would be agreeing to do a deal with St. Luke's;
  95: 3   correct?
  95: 4   A.  Yes.


Page Range:     95:7-95:12

  95: 7   Q.  And at that point, was it also generally believed
  95: 8   that the general and orthopaedic surgeons at St. Luke's --
  95: 9   let me start that over.
  95:10    Was it generally believed at that time that the

6

95:11 general and orthopaedic surgeons at Saltzer might well be
95:12 leaving Saltzer and not participating in the transaction?


Page Range: 95:14-96:1

95:14 THE WITNESS: We had heard that the general
95:15 surgeons and the orthopaedic surgeons had expressed
95:16 interest to spin out of Saltzer?
95:17 BY MR. ETTINGER:
95:18 Q. Okay. So, Ms. Christensen says "If Saltzer spins
95:19 off General and Ortho specialties who will they refer to?"
95:20 That's her question?
95:21 A. Yes.
95:22 Q. And by "they" she meant the remaining Saltzer
95:23 physicians; correct?
95:24 A. Yes.
95:25 Q. And you said "St. Luke's aligned docs"; correct?
Page 96
96: 1 A. Yes.


Page Range: 96:2-96:9

96: 2 Q. And what was your basis for that statement?
96: 3 A. I was assuming that because of the disruption
96: 4 between the physicians in Saltzer between the physicians
96: 5 that wanted to stay and align with St. Luke's that the
96: 6 relationship would have been damaged by their current
96: 7 orthopaedic and general surgeons. I mean, that was an
96: 8 assumption. And so that the Saltzer remaining physicians
96: 9 would then find other avenues.


Page Range: 96:22-97:4

96:22 Q. Okay. And align does mean a physician who will
96:23 works with St. Luke's refers to St. Luke's; correct?
96:24 A. Yes.
96:25 Q. Practices at St. Luke's?
Page 97
97: 1 A. Yes.
97: 2 Q. Uses St. Luke's surgical facilities if he or she
97: 3 is a surgeon?
97: 4 A. Yes.


7

Page Range:     101:6-102:2

101: 6    Is there -- before I show you a document, is a
101: 7    Meridian ambulatory surgery center being planned?
101: 8    A.  Yes.
101: 9    Q.  Has the decision been made to go forward with
101:10    that?
101:11    A.  Yes.
101:12    Q.  Has construction begun?
101:13    A.  Yes.
101:14    Q.  When did it begin?
101:15    A.  January 2013.
101:16    Q.  And when it is due to be completed?
101:17    A.  December 2013.
101:18    Q.  And how many ORs are going to be in that
101:19    ambulatory surgery center?
101:20    A.  There will be two ORs that are finished in that
101:21    facility.
101:22    Q.  And what's the approximate cost of that facility,
101:23    ballpark?
101:24    A.  About eight million to build.
101:25    Q.  Okay.  I've got a number of questions about that
Page 102
102: 1    facility, naturally?
102: 2    A.  Okay.


Page Range:     102:6-103:16

102: 6    Q.  You've been handed Exhibit 165, I bet; is that
102: 7    right?
102: 8    A.  Yes.
102: 9    Q.  Okay.  Which is -- why don't you take a look at
102:10    that.  Tell me when you're ready.


Page Range:     102:11-103:16

102:11    The only thing I'm going to ask you about is on
102:12    the first page.
102:13    A.  Oh, okay.
102:14    Q.  So, is this, in fact, an email you sent out to
102:15    quite a number of people, including Jeff Taylor and
102:16    Chris Roth and Angela Christensen about, you know, your
102:17    thoughts about what should go into a write-up on the ASC?
102:18    A.  Yes.
102:19    Q.  And this would be a write-up to go to the audit
102:20    and finance committee for approval?

102:21   A.  Yes.
102:22   Q.  Okay.  So, I want to ask you about, under
102:23   "ProForma notes," the fifth bullet, the one that talks
102:24   about Saltzer, no surprise.
102:25   You say there "A significant number of" Saltzer
103: Page 103
103: 1   -- you say Seltzer, but you mean Saltzer; right?
103: 2   A.  Yes.
103: 3   Q.  "A significant number of Saltzer surgical cases
103: 4   are currently performed at Treasure Valley Hospital"?
103: 5   A.  Yes.
103: 6   Q.  "As Saltzer recruits to backfill the loss of
103: 7   orthopaedics and general surgery physicians that have
103: 8   recently left the group, we anticipate cases will be
103: 9   performed at St. Luke's Meridian."
103:10   A.  Yes.
103:11   Q.  Did I read that correctly?
103:12   A.  Yes.
103:13   Q.  And was that your view?
103:14   A.  Yes.
103:15   Q.  And is that your view today?
103:16   A.  Yes.


Page Range:     Page 103:23-104:20

103:23   Q.  Why did you reference Treasure Valley Hospital?
103:24   A.  Because the orthopaedic and general surgeons that
103:25   practice within the Saltzer facility had been performing
Page 104
104: 1   their procedures at Treasure Valley Hospital.  And this
104: 2   goes back to the earlier issue of because they had damaged
104: 3   those relationships, because we all know referrals are
104: 4   based on relationships in addition to quality and service,
104: 5   that they would have damaged their relationship with the
104: 6   remaining Saltzer physicians was my assumption.  And that
104: 7   those remaining physicians would be looking at alternative
104: 8   physicians to fill that hole, based on services that they
104: 9   desired for their patients.
104:10   Q.  And you expected they would use St. Luke's
104:11   physicians who used St. Luke's Meridian to perform those
104:12   surgeries?
104:13   A.  That would be my assumption, because there's not
104:14   a surgery center or surgical services in Nampa currently.
104:15   Q.  Saint Al's does not have a surgery center?
104:16   A.  Well, in Saint Al's.  But Saint Al's did not
104:17   have -- again, the Saint Al's orthopaedic and general
104:18   surgery physicians are the Saltzer prior physicians.  And

| | |
|---|---|
| 104:19 | again, it comes back to that damaged relationship that |
| 104:20 | they're not going to refer to them. |

Page Range:     104:21-104:23

| | |
|---|---|
| 104:21 | Q. So, the tell me what you know personally about a |
| 104:22 | so-called damaged relationship. |
| 104:23 | A. It's all assumption. |

Page Range:     118:14-118:22

| | |
|---|---|
| 118:14 | Q. Is there any reason why, after an acquisition by |
| 118:15 | St. Luke's of Saltzer, that the Saltzer primary care |
| 118:16 | doctors couldn't refer to a surgeon at Saint Al's in |
| 118:17 | Boise? |
| 118:18 | A. Not at all. |
| 118:19 | Q. But you assumed that that's not what would |
| 118:20 | happen, that the business would go to the Meridian ASC; |
| 118:21 | correct? |
| 118:22 | A. I made that assumption. |

Page Range:     131:6-131:13

| | |
|---|---|
| 131: 6 | Q. Okay. When you were at West Valley, did you deal |
| 131: 7 | with Saltzer much? |
| 131: 8 | A. No. |
| 131: 9 | Q. Did you regard them as being in a different |
| 131:10 | market? |
| 131:12 | THE WITNESS: I regard the Treasure Valley as one |
| 131:13 | market. I don't regard them as separate markets. |

Page Range:     131:15-131:23

| | |
|---|---|
| 131:15 | Q. Let me ask you this: When you were a CEO at |
| 131:16 | West Valley, did you have regular interaction with |
| 131:17 | physicians in Caldwell? |
| 131:18 | A. Yes. |
| 131:19 | Q. And why was that? |
| 131:20 | A. Because they were on my medical staff. |
| 131:21 | Q. Were there any Saltzer doctors on your medical |
| 131:22 | staff? |
| 131:23 | A. Not until shortly before I left West Valley. |

Page Range:     132:17-133:9

132:17   Q. Okay. So, until shortly before you left, did any
132:18   Saltzer physicians practice in Caldwell?
132:19   A. Yes, they did.
132:20   Q. Who did?
132:21   A. I believe we had their ophthalmologist practiced
132:22   in Caldwell. I forgot about this. And it seems to me
132:23   like they did have one other specialist that practiced in
132:24   Caldwell.
132:25   Q. And did those two, the ophthalmologist and the
Page 133
133: 1   other specialist, have a physical office in Caldwell?
133: 2   A. They did.
133: 3   Q. Okay. Were the -- and just before you left, were
133: 4   a couple of primary care physicians added by Saltzer in
133: 5   Caldwell?
133: 6   A. Yes.
133: 7   Q. And were those the first Saltzer primary care
133: 8   physicians to practice in Caldwell, to your knowledge?
133: 9   A. Yes.


Page Range:     134:11-135:1

134:11   Q. Ms. Moore, I'd like you to refer back to
134:12   Plaintiff's Exhibit 1120.
134:13   A. Okay.
134:14   Q. This is an email from Friday, September 14th,
134:15   2012 that you sent to Angela Christensen.
134:16   Do you recall this document?
134:17   A. Yes.
134:18   Q. Could you give us, in the context of this
134:19   document, what your understanding of aligned means?
134:20   A. So, aligned -- aligned docs are docs that
134:21   practice at St. Luke's. It doesn't mean they're exclusive
134:22   to St. Luke's. But they could be, you know, aligned
134:23   clinically and working on some of our programs with us.
134:24   They practice at one of our facilities. They are not
134:25   exclusive to us, by any means. But they're aligned and
Page 135
135: 1   support our clinical quality.